**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
WAYCROSS DIVISION**

|  |  |
|---|---|
| DR. MAHENDRA AMIN, M.D., | Case No. 5:21-cv-00056-LGW-BWC |
| Plaintiff, | **NBCU'S MOTION FOR JUDGMENT ON THE PLEADINGS AND SUPPORTING MEMORANDUM** |
| v. | |
| NBCUNIVERSAL MEDIA, LLC, | |
| Defendant. | |

Defendant NBCUniversal Media, LLC ("NBCU") respectfully submits this motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c).

## PRELIMINARY STATEMENT

In this action, Plaintiff Dr. Mahendra Amin ("Dr. Amin"), an OB/GYN who contracted with the federal government to treat immigrants detained at a federal facility, alleges that NBCU defamed him by reporting on a protected whistleblower complaint and government investigations into his practices. The whistleblower complaint was filed with federal agencies on behalf of a nurse at the Irwin County Detention Center ("ICDC") and detainees who corroborated her claims. It stated that a doctor had been performing gynecological procedures on detainees unnecessarily and without their full informed consent. Due to the gravity of the allegations, the complaint received immediate attention from government officials, who demanded a formal investigation, and the media, which reported on the complaint's contents and identified Dr. Amin as the government doctor at ICDC. Indeed, the allegations in the whistleblower complaint were covered extensively by nearly every major media organization, from *The Associated Press* to *Fox News* to *The Atlanta Journal-Constitution*, among many others. One day after the whistleblower complaint

was filed, U.S. Immigrations and Customs Enforcement ("ICE") announced that the allegations against Dr. Amin would be investigated by an independent body.  The Office of Inspector General, the Department of Homeland Security, the Federal Bureau of Investigation ("FBI"), and the Department of Justice ("DOJ") each opened investigations into the allegations.

Despite the national and international news coverage of the whistleblower allegations, in this lawsuit Dr. Amin targets only five MSNBC news reports that aired from September 15-17, 2020 (the "News Reports"), claiming that these particular News Reports defamed him and damaged his reputation.  His Complaint should be dismissed for several reasons:

*First*, New York Civil Rights Law § 74, which applies to NBCU's New York-based reporting, bars claims arising from "fair and true report[s]" of "official proceedings," including reports of government investigations and allegations leading to those investigations.  Because the News Reports fairly and accurately report on the whistleblower complaint and allegations that formed the basis of the government's investigations, they are absolutely privileged, and the Complaint should, therefore, be dismissed in its entirety.

*Second*, and in the alternative, if Georgia's statutory privileges instead apply to this action, the News Reports are privileged pursuant to the fair report and public interest privileges codified in O.C.G.A. § 51-5-7, which protect fair and honest reports of judicial and quasi-judicial proceedings as well as reports made in good faith in furtherance of the right to free speech.  Dr. Amin has not pled—and cannot prove—actual malice sufficient to defeat these privileges.

*Finally*, in addition to being privileged, many of the challenged statements are also non-actionable opinions, speculations, or judgments that are incapable of being proven false.  Others are just the type of "loose, figurative" language suggestive of exaggeration rather than provable fact.  Accordingly, since they are not factual, these statements must be dismissed from this action.

## FACTUAL BACKGROUND

### I.    The Parties

Plaintiff Dr. Amin is an OB/GYN practicing in Irwin County, Georgia.  Compl. ¶ 36.  Until 2020, he provided gynecological services to immigrant women detained at ICDC.  *Id.* ¶ 39.  He held this position despite the fact that he had previously settled claims that he "caus[ed] false claims to be submitted under Medicare and Medicaid."  Answer ¶ 10.

Defendant NBCU owns and operates the news platform MSNBC.  Compl. ¶ 17.

### II.    The Whistleblower Complaint and Immediate Government Investigations

On September 14, 2020, Project South, a non-profit organization that advocates for immigrants' rights, filed a whistleblower complaint with the Department of Homeland Security, ICE, and ICDC on behalf of Dawn Wooten, a nurse at ICDC.  *See* Answer Ex. A[1] (the "Whistleblower Complaint").  The Whistleblower Complaint identified serious concerns that Wooten and others had with ICDC, including the high rate at which seemingly unnecessary hysterectomies and other gynecological procedures were performed on detainees by the facility's gynecologist without the women's full consent.  *Id.* at 18.  One detainee reported speaking with five women who claimed they were "confused" about why they received hysterectomies, while "several" others did not understand "what they [were] getting done."  *Id.* at 18-19.  Another observed that ICDC felt like "an experimental concentration camp."  *Id.* at 19.

The Whistleblower Complaint quoted Wooten, who stated that "everybody [Dr. Amin] sees, he's taking all their uteruses out or he's taken their tubes out," and recounted the story of one detainee who was supposed to have her left ovary removed, but the doctor removed the right one accidentally.  *Id.*  It also quoted another detainee who stated that in three different conversations,

---

[1] This brief refers to Answer Exhibits A–G as "Ex. A"–"Ex. G."

she received three contradictory explanations of the medical procedure she would be having, causing her to feel "scared and frustrated." *Id.* at 20. Wooten explained that women referred to the doctor as the "uterus collector" and opined "everybody's uterus cannot be that bad." *Id.* at 19.

State and federal officials expressed outrage and demanded government action. On September 14, 2020—the same day the Whistleblower Complaint was filed—State Representative Robert Trammell sent a letter to Georgia's Composite Medical Board requesting that the Board suspend the license of the providers referenced in the Whistleblower Complaint pending a full investigation by the Board's offices. Answer ¶ 3. On September 15, 2020, 170 members of the U.S. House of Representatives sent a letter to the Department of Homeland Security requesting an "immediate investigation" into the Whistleblower Complaint's claims because they caused "grave concerns for the violation of the bodily autonomy and reproductive rights of detained people." *Id.*

On September 15, 2020, an ICE representative confirmed to NBCU that the allegations in the Whistleblower Complaint would be investigated. *See* Ex. G. Indeed, the Office of Inspector General, the Department of Homeland Security, the FBI, and the DOJ each launched investigations into the allegations. Answer ¶ 3, n.4. Although findings from these investigations have not yet been released, the government began the process of closing ICDC in December 2020, with the Secretary of Homeland Security stating, "[w]e will not tolerate the mistreatment of individuals in civil immigration detention." Answer ¶ 6.

## III. News Outlets Across the Country, Including NBCU, Report on the Whistleblower Complaint and Investigation

Immediately after the Whistleblower Complaint was filed, media organizations across the country—and across the political spectrum—began to report its allegations. On September 14, 2020, *Vice* published an article titled, "Staggering Number of Hysterectomies Happening at ICE Facility, Whistleblower Says." *See* Answer ¶ 10, n.10 (quoting Wooten's description of Dr. Amin

4

as "uterus collector."). *Fox News* did the same on September 15, 2020, publishing an article titled, "Georgia prison with ICE detainees performs questionable hysterectomies, shreds coronavirus records: nurse." *Id.* (quoting Wooten, "Everybody [the doctor] sees has a hysterectomy").

On September 15, 2020, *Prism* reported that the doctor referenced in the Whistleblower Complaint was Dr. Amin, followed by other outlets. *Id.* For example, the *Intercept* published an article that included accounts from detainees and advocates who confirmed the allegations in the Whistleblower Complaint and explained that Dr. Amin was "notorious among detainees for 'rough treatment' of women during gynecological exams and performing a high number of procedures." *Id.* Detainees told the *Intercept* that they were "pressured by the doctor to undergo partial or full hysterectomies" and "one woman estimated that as many as 20 others were recommended for an operation." *Id.* One detainee said that Dr. Amin "got mad when [she] didn't want to have surgery" and another said that she "didn't understand why the doctor was insisting on an operation."

Because allegations of a doctor performing unconsented-to medical procedures on women detained by the government are inherently newsworthy, NBCU—like nearly every other major news outlet[2]—reported on the Whistleblower Complaint and the government's investigations into the allegations, including in the five News Reports cited in Dr. Amin's Complaint.

On September 15, 2020, during "Deadline: White House," host Nicole Wallace interviewed Julia Ainsley, an NBC reporter, concerning the Whistleblower Complaint. *See* Ex. B.

---

[2] From September 14-16, 2020 alone, articles discussing the Whistleblower Complaint and/or Dr. Amin were published by countless news organizations, including but not limited to: *The Associated Press* (https://apnews.com/article/virus-outbreak-us-news-hysterectomy-immigration-ga-state-wire-30d71f010ec2696c5ca8b69e62b97c09); *The Washington Post* (https://www.washingtonpost.com/nation/2020/09/15/ice-covid-irwin-complaint-nurse/); *The Guardian* (https://www.theguardian.com/us-news/2020/sep/14/ice-detainees-hysterectomies-medical-neglect-irwin-georgia); *NPR* (https://www.npr.org/2020/09/16/913398383/whistleblower-alleges-medical-neglect-questionable-hysterectomies-of-ice-detaine); *The New York Times* (https://www.nytimes.com/2020/09/16/us/ICE-hysterectomies-whistleblower-georgia.html); *The Wall Street Journal* (https://www.wsj.com/articles/lawmakers-seek-investigation-into-allegations-of-mass-hysterectomies-on-detained-migrants-11600291610), and *The Atlanta Journal-Constitution* (https://www.ajc.com/news/ice-detainees-complained-about-rough-treatment-from-georgia-doctor/S4V5UDBRKZCJZMSUPOJQRXKYNM/).

Ainsley explained that she spoke with four lawyers who represented detainees at ICDC and who reported claims consistent with the Whistleblower Complaint.  Similar to other reports, these lawyers said that their clients who saw Dr. Amin "came back bruised" and felt that he was "overly harsh and abusive."  Ex. B(i) at 28.  Further, one woman was told she needed a hysterectomy because she had cancer, but her medical records did not include a biopsy for cancer.  *Id.*  Ainsley explained that another lawyer said that his client had a hysterectomy because she had cervical cancer but, after the hysterectomy, the client learned from an oncologist that she did not have cancer.  *Id.*  Ainsley noted that she personally called Dr. Amin's office but, when she identified herself as a reporter, the person on the other end of the line hung up.  *Id.*  Ainsley also reported ICE's response: they "don't comment on allegations that have been brought to their inspector general" but, "in general, anonymous unproven allegations made without any fact-checkable specifics should be treated with the appropriate skepticism they deserve."  *Id.* at 29.  The show also aired part of an interview that Jacob Soboroff, another NBC reporter, conducted with Wooten during which Wooten recounted the allegations in the Whistleblower Complaint.  *Id.* at 28-29.

Later that day, NBCU's "All In With Chris Hayes" reported on the Whistleblower Complaint, showing images of the document itself and interviewing Wooten.  *See* Ex. C.  In addition, echoing the allegations in the Whistleblower Complaint, Hayes explained that "a lawyer named Benjamin Osorio . . . told NBC News that indeed two of his clients had received hysterectomies they believe may have been unnecessary" and another attorney who represents two different detainees also said that his clients "had unnecessary hysterectomies."  Ex. C(i) at 12.  That lawyer said "as many as 15 immigrant women were given full or partial hysterectomies or other procedures for which no medical indication existed."  *Id.*  Hayes noted that ICE "sent us a long statement disputing these allegations," and showed portions of that statement on screen,

including that "an independent office will investigate these claims," and that "only two individuals in that facility were referred to certified credential medical professional for hysterectomies." *Id.*

The same evening, after "All In," "The Rachel Maddow Show" reported on the allegations in the Whistleblower Complaint, showing them on-screen while Maddow read directly from the Whistleblower Complaint. *See* Ex. E. The show also aired Soboroff's interview with Wooten. *Id.* Following the interview, Maddow noted that "NBC News has spoken to four different lawyers who represent women who were detained in that federal facility in Georgia who are making similar claims." *See* Ex. E(i) at 7. While simultaneously showing it on screen, Maddow read a statement from ICE as well as Dr. Amin's just released statement that he "vigorously denies these allegations and will be cleared of any wrongdoing when the facts come out." *Id.*

On September 16, 2020, during "All in With Chris Hayes," Hayes interviewed a woman, identified with the pseudonym "B," who described her own experiences with Dr. Amin while detained at ICDC and corroborated the claims in the Whistleblower Complaint. *See* Ex. D. She stated that Dr. Amin performed a hysterectomy on her and she felt she "had no right to say anything." Ex. D(i) at 13. Hayes also spoke with the lawyer for another detainee, who claimed she went in for a dilation and curettage but later learned the doctor removed her fallopian tube. *Id.* at 14. Hayes noted that there was an "announcement today that Ken Cuccinelli [then the *de facto* acting Deputy Secretary of Homeland Security] is going to be sending a team to investigate." *Id.*

Finally, on September 17, 2020, Hayes again reported on the Whistleblower Complaint, referenced the interview with "B," and highlighted a separate, 2013 complaint against Dr. Amin, which alleged that women, including pregnant women, at a medical facility that he owned were given unnecessary medical procedures to get more money from Medicare and Medicaid. *See* Ex. F. This News Report, like the previous Reports, included statements from Dr. Amin and noted

that the allegations against him were under investigation.  Ex. F(i) at 13-15.

Notably, reports on the Whistleblower Complaint and the allegations against Dr. Amin continued long after the initial coverage.  On October 22, 2020, the *Los Angeles Times* reported that 19 detainees were alleging that Dr. Amin "performed or pressured them to undergo 'overly aggressive' or 'medically unnecessary' surgery without their consent."  Answer ¶ 8, n.7.  The article cited to a report submitted to Congress by nine board-certified OB-GYNs who reviewed more than 3,200 pages of records and found "alarming patterns in which Amin allegedly subjected women to unwarranted gynecological surgeries, in most cases performed without consent."  *Id.*

On December 21, 2020, more than 40 women filed a class action lawsuit against Dr. Amin and others, asserting claims of battery and malpractice.  *See Oldaker v. Giles*, No. 7:20-cv-00224, ECF No. 54.[3]  In that complaint, one woman described a visit to Dr. Amin as "the most medical way of being raped you could possibly experience."  *Id.*  ¶ 429.  In October 2021, the Court stayed *Oldaker* because investigations into the alleged misconduct were ongoing.  *See* ECF No. 178.

And, on June 5, 2021, the *Atlanta Journal-Constitution* reported that, according to documents obtained through Freedom of Information requests, ICE "understated the number of invasive procedures Amin had performed," as Dr. Amin had actually billed ICE "for at least eight hysterectomies from 2017 to 2020" as well as for "75 other invasive procedures."  Compl. ¶ 7, n.6.

## IV.    The Present Lawsuit

Despite the extensive coverage media organizations gave—and continue to give—to the allegations against Dr. Amin, this action singles out the five News Reports, claiming that "[a]s a direct and proximate result" of these Reports, he suffered damages totaling over $30 million.  In

---

[3] The *Oldaker* court sealed most filings in the case.  The complaint is still linked in media reports from prior to the sealing, and a true and correct copy is attached hereto as **Exhibit 2**.

particular, Dr. Amin claims that thirty-eight statements made during the News Reports are false and defamatory.  These statements fall into two categories:

*First*, Dr. Amin challenges statements that quote or paraphrase the Whistleblower Complaint, including that detained women referred to him as a "uterus collector," that "everybody" he saw had a hysterectomy, and that he took out the wrong ovary on one immigrant woman.

*Second*, he challenges statements from detainees who were treated by Dr. Amin or their lawyers, which corroborated—and went no further than—the allegations in the Whistleblower Complaint, and which formed the basis of the government's investigations.  These include that women felt "afraid" to go to Dr. Amin, they felt like he "abused" them, and that a woman who received a hysterectomy and vaginal ultrasound from Dr. Amin felt that she had "no right to say" anything and "was not prepared" for the procedures.[4]

## <u>ARGUMENT</u>

Under Federal Rule of Civil Procedure 12(c), "[j]udgment on the pleadings is appropriate when there are no material facts in dispute, and judgment may be rendered by considering the substance of the pleadings and any judicially noticed facts."  *Hawthorne v. Mac Adjustment*, Inc., 140 F.3d 1367, 1370 (11th Cir. 1998).  A Rule 12(c) motion is governed by the same standards as a Rule 12(b)(6) motion to dismiss.  *Strategic Income Fund, LLC v. Spear, Leeds & Kellog Corp.*, 305 F.3d 1293, 1295 n.8 (11th Cir. 2002).  The complaint must contain sufficient factual information to state a claim for relief that is "plausible on its face."  *Wooten v. Quicken Loans, Inc.*, 626 F.3d 1187, 1196 (11th Cir. 2010).  "Labels and conclusions" and a "formulaic recitation

---

[4] Attached hereto as **Exhibit 1** is a chart listing all thirty-eight challenged statements, including the surrounding context from the News Reports, which was omitted from the Complaint.  This Motion refers to each of the statements using the numbering in Exhibit 1 ("Statement 1," "Statement 2," etc.).  In his Motion to Strike (ECF No. 22), Dr. Amin inexplicably challenges the Answer's incorporation of the Whistleblower Complaint and the actual transcripts of the News Reports, even though they were incorporated by reference in the Complaint.  Compl. ¶¶ 45, 76-80.

of the elements of a cause of action" are insufficient to raise a right to relief above the "speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  The court may consider documents attached to the pleadings. *Horsley v. Feldt*, 304 F.3d 1125, 1134 (11th Cir. 2002).

To state a claim for defamation, a plaintiff has the burden of pleading: "(1) a false and defamatory statement concerning the plaintiff; (2) an unprivileged communication to a third party; (3) fault by the defendant amounting at least to negligence; and (4) special harm or the actionability of the statement irrespective of special harm." *Mathis v. Cannon*, 276 Ga. 16, 20-21 (2002).  While generally, "[w]hen reviewing [a motion for judgment on the pleadings] . . . we accept the facts in the complaint as true and view it in the light most favorable to the nonmoving party," *Hawthorne*, 140 F.3d at 1370, "[u]nder the substantive law of the State of Georgia . . . a claim sounding in [defamation] is a traditionally disfavored cause of action . . . [and] the courts tend to construe the complaint by a somewhat stricter standard." *Escort v. Verizon Commc'ns Inc.*, 2005 WL 8155369, at *3 (N.D. Ga. Sept. 27, 2005) (internal quotations omitted).  Because Dr. Amin fails to plead— and cannot prove—these elements, early dismissal is the only proper remedy.

## I.     The Challenged Statements Are Privileged Fair Reports of Official Proceedings

### A.   *Public Policy Dictates that New York's Absolute Fair Report Privilege Applies*

Because NBCU undertook its reporting in New York, the absolute privilege of New York Civil Rights Law § 74 ("Section 74") should apply regardless of the law applied to Dr. Amin's case-in-chief.  As the court held in *Wilkow v. Forbes, Inc.*, 2000 WL 631344, at *6 (N.D. Ill. 2000), *aff'd* 241 F.3d 552 (7th Cir. 2001), "New York has a strong interest in encouraging unfettered expression by protecting certain types of speech within its borders. . . . This policy would be wholly eviscerated if conduct occurring in New York was evaluated under another state's privilege laws." Said differently, "the fair reporting privilege is meant to protect speakers, not provide a remedy to

plaintiffs."  *Id.* at *7 (applying Illinois law to underlying defamation claim but New York's fair report privilege); *see also Gubarev v. Buzzfeed, Inc.*, 2018 U.S. Dist. LEXIS 97246, at *15 (S.D. Fla. June 5, 2018) (applying New York fair report privilege in libel action otherwise governed by Florida law because decision to publish dossier was made in New York); *Miller v. Gizmodo Media Grp.*, 994 F.3d 1328, 1331 (11th Cir. 2021) (affirming application of New York fair report privilege when defendants drafted and posted challenged article in New York).  Here too, NBCU's reporters undertook the relevant reporting in New York and the News Reports originated from New York.  Assessing their conduct under any other state law would frustrate the purpose of New York's privilege—to protect its journalists reporting on government proceedings—and ultimately harm the New York public by limiting the news on matters of particular importance (the happenings of government) that media organizations can freely disseminate.

Under Section 74, "[a] civil action cannot be maintained against any person, firm, or corporation, for the publication of a fair and true report of any judicial proceeding, legislative proceeding, or official proceeding."  The New York legislature enacted this statute to ensure that the press receives "broad protection" when reporting on official proceedings to increase public awareness of these inherently newsworthy matters.  *Idema v. Wager*, 120 F. Supp. 2d 361, 365 (S.D.N.Y. 2000).  Thus, whether an article presents a fair and true report of a proceeding is a question of law for the court to decide.  *Holy Spirit Ass'n for the Unification of World Christianity v. N.Y. Times Co.*, 49 N.Y.2d 63, 65-68 (N.Y. 1979).

Certain core principles inform the application of the privilege.  *First*, Section 74 protects reporting on allegations made in official proceedings regardless of whether the underlying allegations are true or false.  *See, e.g.*, *Mulder v. Donaldson, Lufkin & Jenrette*, 161 Misc.2d 698, 705 (Sup. Ct. N.Y. Cty. 1994); *aff'd*, 208 A.D.2d 301 (1st Dep't 1995).  *Second*, the failure to

include facts favorable to one party in a proceeding will not remove a report from Section 74's protections so long as the "omissions d[o] not alter the substantially accurate character of the article." *Rakofsky v. Washington Post*, 39 Misc. 3d 1226(a), at *9 (Sup. Ct. N.Y. Cty. Apr. 29, 2013). *Third*, the news report "must be accorded some degree of liberality" and "should not be dissected and analyzed with a lexicographer's precision." *Holy Spirit*, 49 N.Y.2d at 68. Instead, the substance of the report must only be "substantially accurate," *id.*, meaning it would not "produce a different effect on a reader than would a report containing the precise truth." *Cholowsky v. Civiletti*, 69 A.D.3d 110, 115 (N.Y. App. 2d Dep't 2009).

### B.   *Georgia Also Recognizes an Expansive Fair Report Privilege*

Even if the Court finds that New York law does not apply, Plaintiff's claims should be dismissed under Georgia's fair report privilege. Georgia law recognizes a qualified privilege for "fair and honest reports of the proceedings of legislative or judicial bodies" and "court proceedings." O.C.G.A. § 51-5-7(5)–(6). This privilege also applies to "quasi-judicial proceedings" including "[a]dministrative proceedings by governmental agencies." *Lawton v. Georgia Television Co.*, 216 Ga. App. 768, 771 (Ga. Ct. App 1995).

Like in New York, Georgia courts have recognized that "the [fair report] privilege exists because it is more important that the public be informed about the privileged proceeding than it is for the defamed person to have legal recourse for publication of the defamatory material." *Id.* at 770 (internal quotations omitted). "The public interest in being informed about public proceedings, public controversies, public officials and public figures demands freedom of the press to report such events without assuming responsibility for what was said by the speaker." *Id.* at 772. Accordingly, the applicability of Georgia's fair report privilege is a matter of law for the court to decide. *Id.* at 770.

Moreover, as with Section 74, a "fair and honest" report only requires "substantial accura[cy]," meaning the report must have the same "gist" as the proceedings reported. *Lawton*, 216 Ga. App. at 772. "A publication is not shorn of its privileged character because it is abridged or condensed." *Shiver v. Valdosta Press*, 82 Ga. App. 406, 412 (Ga. Ct. App. 1950).

### C.   The News Reports Reported on Official Proceedings

The News Reports fulfill the elements of the fair report privilege under both New York and Georgia law and therefore are not actionable. First, they attribute their reporting to the Whistleblower Complaint and to lawyers and detainees whose allegations about Dr. Amin mirrored those in the Whistleblower Complaint and, accordingly, were being investigated by the government. *See, e.g.*, Stmt. 1 ("[B]reaking news today, *it's about an alarming new whistleblower complaint* . . . ."); Stmt. 11 ("Tonight, we can report *a lawyer named Benjamin Osorio representing women at that very facility* told NBC News . . . ."); Stmt. 17 ("Yesterday, we brought you an interview with a nurse, a whistleblower . . . *And in her complaint*, she says . . . .") (emphasis added).

It is well-established that government investigations and the allegations spurring those investigations are official proceedings protected by the fair report privileges of both New York and Georgia. Recently, in *Cummings v. City of New York*, 2020 WL 882335, at *16 (S.D.N.Y. Feb. 24, 2020), a New York court confirmed this point, holding that "even the announcement of an investigation by a public agency, made before the formal investigation has begun, is protected as a report of an official proceeding" and "reports on allegations that lead to a government investigation are fully protected." Moreover, the Section 74 privilege "also extends to background material with regard to the case." *Fishof v. Abady*, 280 A.D. 2d 417, 417-18 (N.Y. App. 1st Dep't 2001). This is true regardless of how the reporter gathered the information; the fact that information is acquired from "secondary sources d[oes] not mean that [Section] 74 [i]s

inapplicable." *Cholowsky*, 69 A.D.3d at 115.  Accordingly, in *Cummings*, an article reporting on a student's allegations that a teacher taught a racist lesson, which led to a government investigation, was privileged under Section 74 even when the article did not merely repeat the student's claims but, instead, quoted other students and staff about the teacher's conduct.  2020 WL 882335 at *15.

Similarly, in *Morton v. Stewart*, 153 Ga. App. 636, 641 (Ga. Ct. App. 1980), the Georgia Court of Appeals applied the fair report privilege to an article reporting on complaint letters about the plaintiff that were submitted to the State Board of Medical Examiners.  The court explained that the Board was authorized "to investigate, license or refuse to license, inquire into grounds for disciplinary action, issue subpoenas, hold hearings, and take disciplinary action."  *Id.* at 639.  Accordingly, because the newspaper article reported the "gist of the letters submitted to the Board," it was a privileged report of a quasi-judicial proceeding.  *Id.* at 641.

Accordingly, the News Reports—each of which reported on the Whistleblower Complaint and similar allegations about Dr. Amin being investigated by the federal government—qualify for the fair report privileges of New York and Georgia.

### D.  The News Reports Fairly and Accurately Reported on the Proceedings

Second, a comparison between the challenged statements and the Whistleblower Complaint proves that the News Reports fairly and accurately report on the allegations.

Certain challenged statements directly quote from or closely paraphrase the Whistleblower Complaint.  For example, the News Reports state that Dr. Amin was referred to as a "uterus collector" at ICDC and the Whistleblower Complaint expressly states, according to Wooten, "That's his specialty, he's the uterus collector."  *Compare* Stmts. 6, 7, 14, 16, 18, 29, 30 *with* Ex. A at 19.  Similarly, Dr. Amin challenges the News Reports' statements that it seemed like "everybody" with whom Wooten spoke had undergone a hysterectomy, when the Whistleblower

Complaint says: "Everybody he sees has a hysterectomy—just about everybody" and "We've questioned among ourselves like goodness, he's taking everybody's stuff out." *Compare* Stmts. 15, 26, 28, 31, *with* Ex. A at 19.  And while Dr. Amin challenges numerous statements in the News Reports that women felt they received unnecessary hysterectomies, *see* Stmts. 1, 9, 10, 17, 22-23, 32, 35, this is the very crux of the Whistleblower Complaint, which states:

> Several immigrant women have reported to Project South their concerns about how many women have received a hysterectomy while detained at ICDC…
>
> Ms. Wooten also expressed concern regarding the high number of detained women at ICDC receiving hysterectomies.  She stated that while some women have heavy menstruation or other severe issues that would require hysterectomy, "everybody's uterus cannot be that bad."…
>
> Ms. Wooten also stated that detained women expressed to her that they didn't fully understand why they had to get a hysterectomy.  She said, 'I've had several inmates tell me that they've been to see the doctor and they've had hysterectomies and they don't know why they went or why they're going.'

Ex. A. at 19.   Indeed, during "The Rachel Maddow Show," Maddow holds a copy of the Whistleblower Complaint and reads directly from it.  *See* Ex. E(ii).  Accordingly, there can be no question that these Reports are "fair" and "accurate."

While other challenged statements are based on NBCU's independent reporting, including first-hand discussions with detainees and their lawyers, just like in *Cummings,* these statements mirror the allegations in the Whistleblower Complaint—which are the subject of the government's investigation—and thus are privileged fair reports.  For example, NBCU's reporters spoke with lawyers who explained that their clients were "afraid" to go to Dr. Amin, including because they felt that he was "overly harsh" or "abusive."  *See* Stmts. 2-4, 8.  This echoes the allegation in the Whistleblower Complaint that women in ICDC "did not trust" Dr. Amin and felt "scared and frustrated" because it seemed like he was performing unnecessary procedures on women and because he did not fully explain these procedures.  Ex. A at 18-20.  Similarly, the News Reports

quoted lawyers who said that their clients and other women at ICDC received medical procedures that they believed were unnecessary.  *See* Stmts. 11-13, 19-21, 33.  This is no different from the allegations in the Whistleblower Complaint that there were a "high number" of women receiving hysterectomies and other gynecological procedures that were not required.  Ex. A at 18-20.  And on the September 17, 2020 episode of "All In," Hayes interviewed a woman who claimed that Dr. Amin performed a hysterectomy and an "unexpected vaginal ultrasound."  *See* Stmts. 36-38.  This too goes no further than the Whistleblower Complaint, which alleges that ICDC detainees did not "all the way understand . . . what's going to happen" when they visited Dr. Amin and that, according to one woman, Dr. Amin's office "did not properly explain" to her what gynecological procedure she was going to receive.  Ex. A at 20.  Accordingly, because the News Reports are reporting on the basis of a government investigation and because these statements go no further than the "gist" of the Whistleblower Complaint, they too are protected fair reports.

Notably, Dr. Amin never alleges that the News Reports inaccurately represent the allegations against him.  He instead appears to contest the truth of the allegations themselves, claiming that he performed only two hysterectomies on ICDC detainees, both of which were necessary and consented-to, Compl. ¶¶ 55, 67, and that he "never treated any patient roughly or inappropriately," *id.* ¶ 71.  But these denials are immaterial under the fair report privilege, which is designed to immunize reporting on charges made in official proceedings regardless of whether the underlying allegations are true or false.  *Mulder*, 161 Misc. 2d at 704-05; *Savannah News-Press, Inc. v. Hartridge*, 104 Ga. App. 22, 28 (Ga. Ct. App. 1961) (report on court proceeding was privileged because "[i]n the instant case there is no affirmative allegation that the article is not a truthful report of judicial proceedings as they occurred in the recorder's court").

While Dr. Amin may wish that the News Reports portrayed him in a more flattering

manner, he cannot ignore that the News Reports in fact included his denials once he issued them, as well as ICE's response to the allegations.  *See* Facts Section III, *supra*.  Moreover, neither New York's nor Georgia's fair report privilege requires journalists to include facts favorable to a subject when reporting on a proceeding.  *See Rakofsky*, 39 Misc. 3d 1226(a), at *9 ("Even though [judicial documents] do not portray Rakofsky in a positive light, and Rakofsky may wish to disavow or interpret them in a different way, the defendants were permitted to publicly disseminate them as a report of a judicial proceeding."); *Lawton*, 216 Ga. App. at 772 ("The report on Lawton's behavior condemned, not exculpated him.  The tone of the broadcast accurately depicted the tone of that report.  The fact that exculpatory evidence was omitted from the broadcast is not dispositive since it was not required to devote equal time to Lawton's contentions.").

The News Reports provided a substantially accurate representation of the allegations against Dr. Amin, which were, and remain, the subject of federal investigations.  Accordingly, each of the challenged statements is privileged regardless of whether the New York or Georgia fair report privilege applies, and the Complaint must be dismissed in its entirety.

## II.     If Georgia Privilege Law Applies to this Case, the News Reports Are Also Protected Under Georgia's Public Interest Privilege

If this Court finds that Georgia's privileges apply to this action, in addition to being privileged fair reports of official proceedings, each of the challenged statements is also conditionally privileged under O.C.G.A. § 51-5-7(4), Georgia's public interest privilege.[5]  This privilege applies to any statement "made in connection with an issue under consideration or review by a legislative, executive, or judicial body or any other official proceeding authorized by law;" made in a "public forum;" or made "in furtherance of the exercise of the constitutional right of . . .

---

[5] This statue provides a conditional privilege for "[s]tatements made in good faith as part of an act in furtherance of the right of free speech or the right to petition government for a redress of grievances under the Constitution of the United States or the Constitution of the State of Georgia in connection with an issue of public interest or concern."

free speech in connection with a public issue or an issue of public concern." *See* O.C.G.A. § 9-11-11.1.  As a matter of law, the News Reports fall within the protection of these statutes.

*First*, the News Reports are "acts" under O.C.G.A. § 9-11-11.1.  In *Boxcar Development Corp. v. New World Communications of Atlanta, Inc.*, 2008 WL 1943313, at *3-4 (Ga. Sup. Ct. May 1, 2008), the court explained that "[a] defendant who comments upon and reports about potential illegal or wrongful conduct or activity that is made in connection with an issue under consideration or review by a government entity has engaged in an 'act'" under O.C.G.A. § 9-11-11.1(c)(2).  "Even a defendant's statement made prior to the initiation of a government investigation qualifies as an 'act.'" *Id.* (finding FOX news report that discussed government investigation into plaintiff concerning "questionable business practices" was an "act").  The same is true here.  The News Reports each discussed the Whistleblower Complaint and related allegations, which were immediately under "government consideration."  *See* Answer ¶ 3.

The News Reports also qualify as "acts" under O.C.G.A. § 9-11-11.1(c)(3) and (4).[6]  The News Reports were televised on national news programs, which courts have held constitute "public forums."  *See Metabolic Intern., Inc. v. Wornick*, 72 F. Supp. 2d 1160, 1165 (S.D. Cal. 1999) ("[A] widely disseminated television broadcast [] is undoubtedly a public forum."), *rev'd in part on other grounds*, 264 F.3d 832 (9th Cir. 2001).  They certainly involve "the exercise of the constitutional right of . . . free speech," because "reporting the news is speech subject to the protections of the First Amendment." *Lieberman v. KCOP Television, Inc.*, 110 Cal. App. 4th 156, 164 (2003).  Further, the claims discussed in the News Reports—alleged unconsented-to invasive surgeries performed on detainees by a government-contracted doctor—unquestionably relate to a matter of

---

[6] "In 2016, the General Assembly revised OCGA § 9-11-11.1 to substantially track California's [law]."  *Wilkes & McHugh, P.A. v. LTC Consulting, L.P.*, 306 Ga. 252, 257 (Ga. 2019).  Courts, therefore, "may look to California case law . . .  for guidance."  *Id.*

"public interest or concern." *See Hindu Temple & Cmty. Ctr. of High Desert, Inc. v. Raghunathan*, 311 Ga. App. 109, 114 (Ga. Ct. App. 2011) ("[I]t goes without saying that the perceived (and substantially documented) victimization of individuals throughout the country constitutes 'an issue of public interest or concern.'"); *Boxcar Dev. Corp.*, 2008 WL 1943313, at *1 (news reports that "'imputed actions' to [p]laintiffs that could be criminal in nature . . involved a matter of significant public interest"). The News Reports are therefore "acts" under the public interest privilege.

*Second*, NBCU acted in "good faith" in publishing the News Reports. Statements are made in "good faith" when they are not made with "actual malice," meaning the defendant did not "in fact entertain[] serious doubts as to the truth of his statements." *Neff v. McGee*, 346 Ga. App. 522, 527 (Ga. Ct. App. 2018). As set forth below, NBCU published the News Reports without actual malice and, indeed, the Complaint does not make a single, non-conclusory allegation to the contrary. The News Reports are, therefore, protected by Georgia's public interest privilege, and the Complaint should be dismissed in its entirety for this independent reason.

### III.    Dr. Amin Has Not Plausibly Pleaded Actual Malice

As an initial matter, "[t]he privilege set forth in [New York's Section 74] is absolute, and is not defeated by the plaintiff's allegations of malice or bad faith." *Pelayo v. Celle*, 270 A.D.2d 469, 469 (N.Y. App. 2d Dep't 2000). Because New York's privilege should apply to this case, the Court need not even reach the question of whether Dr. Amin sufficiently pled actual malice.

Should Georgia's privileges instead apply, the privileges found in O.C.G.A. § 51-5-7 can only be defeated by a finding of actual malice. *See O'Neal v. Home Town Bank of Villa Rica*, 237 Ga. App. 325, 332 (Ga. Ct. App. 1999).[7] "Actual malice," or "knowledge that [a statement] was

---

[7] Notably, Georgia courts have, at times, recognized that the fair report privilege should be treated differently than other privileges found in O.C.G.A. § 51-5-7 and should *not* be defeated by actual malice. *See Lawton v. Georgia Television Co.*, 1994 WL 538892, at *7 (Ga. Sup. May 5, 1994). As the *Lawton* court held, "to require the media to go behind an official Government Report to ascertain whether the contents of the report are true would . . . place an

false or [] reckless disregard of whether it was false or not," *N.Y. Times Co. v. Sullivan*, 376 U.S.

254, 280 (1964), "is not an objective [test]." *Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 703

(11th Cir. 2016).  Instead, a plaintiff must establish that a defendant, in fact, "entertained serious

doubts about the truth of the published account or w[as] otherwise 'highly aware' that the account

was likely false." *Id.* Here, as a matter of law, the Complaint does not and cannot plausibly plead

actual malice, and the privileges attached to the News Reports therefore cannot be defeated.[8]

In the wake of the U.S. Supreme Court's decisions in *Twombly* and *Ashcroft v. Iqbal*, 556

U.S. 662, 678 (2009), pleading actual malice has become a much more rigorous burden.

Accordingly, courts in the Eleventh Circuit frequently dismiss libel claims on upfront motions

when a plaintiff's allegations of actual malice amount to little more than "threadbare recitals of the

elements of a cause of action, supported by mere conclusory statements." *Michel*, 816 F.3d at 704;

*Turner v. Wells*, 879 F.3d 1254, 1273 (11th Cir. 2018) (affirming dismissal for failure to plead

actual malice when plaintiffs alleged defendants "knowingly and recklessly ignored or deliberately

avoided learning information" but did "not set forth facts demonstrating that [d]efendants acted in

these ways"); *Coral Ridge Ministries Media, Inc. v. Amazon.com, Inc.*, 6 F.4th 1247, 1253 (11th

Cir. 2021)  ("[B]are-bone allegations . . . are insufficient to show that SPLC doubted the truth of

its designation."); *Jacoby v. Cable News Network, Inc.*, 2021 WL 5858569, at *5 (11th Cir. Dec.

10, 2021) ("conclusory allegations" insufficient to plead actual malice).

---

unacceptable burden on the press in the exercise of First Amendment Rights.  Moreover, such a burden would have a
chilling impact on media dissemination of sensitive matters of legitimate public interest."  For the reasons stated in
*Lawton*, actual malice should not defeat Georgia's fair report privilege.

[8] The level of fault required to defeat a Georgia conditional privilege—actual malice—is the same regardless on
whether the plaintiff is a private or public figure.  *See, e.g.*, *Torrance v. Morris Pub. Grp.*, 281 Ga. App. 563, 567-68
(Ga. Ct. App. 2006) (applying actual malice standard in case involving child plaintiff identified only by initials);
*Munoz v. Am. Lawyer Media, L.P.*, 236 Ga. App. 462, 464-65 (Ga. Ct. App. 1999) (applying actual malice standard
in case involving plaintiff, a woman who had body piercing performed at defendant business); *Neff*, 346 Ga. App. at
525-26 (applying actual malice standard in case involving plaintiff, a motorist who used Snapchat's "Speed Filter").

Georgia courts routinely dismiss complaints where qualified privileges are not overcome by plausible allegations of actual malice.  *See Watkins v. Capital City Bank & Guaranty*, 2020 WL 9607008, at *4 (N.D. Ga. Jan. 31, 2020) (dismissing claim based on O.C.G.A. § 51-5-7 because "[t]o overcome a conditional privilege and establish liability, a plaintiff must allege and show actual malice.  This [p]laintiff has failed to do"); *ThermoLife Int'l LLC v. Hi-Tech Pharms., Inc.*, 2019 WL 12291350, at *6 (N.D. Ga. Nov. 1, 2019) (same); *Rema Tip Top/North America, Inc. v. Shaw-Almex Indus.*, 2015 WL 11492540, at *6 (N.D. Ga. Nov. 18, 2015) (same).

Here, Dr. Amin's "allegations" of actual malice are simply boilerplate recitations of the standard, devoid of factual support.  *See* Compl. ¶ 84 ("MSNBC knowingly and purposely avoided the truth"); ¶¶ 85-86 ("MSNBC broadcasted accusations against Dr. Amin that were so inherently improbable" and "so outrageous on their face as to raise serious doubts about their truth."); ¶ 89 ("MSNBC had actual knowledge that the accusations against Dr. Amin were false").

While Dr. Amin asserts that NBCU failed to conduct "even a cursory investigation" before publishing the allegations, *id.* ¶ 88, he provides no facts to support this conclusion.[9]  Nor could he since the News Reports on their face belie this conclusory contention. Far from simply relying on the Whistleblower Complaint, it is evident that NBCU reporters spoke with *numerous* lawyers representing detainees, and with detainees themselves, who confirmed the Whistleblower Complaint's allegations and provided consistent claims about Dr. Amin's medical treatment.  *See, e.g.*, Ex. B(i) at 28 ("Our new reporting . . . is based on conversations with four lawyers."); Ex. C(i) at 12 ("[W]e here on ALL IN spoke with another attorney who represents two different women who claim they also had unnecessary hysterectomies while detained at this facility."); Ex. D(i) at

---

[9] Regardless, it is well-established that a "failure to investigate and seek out public information is insufficient to plead actual malice."  *Donald J. Trump for President, Inc. v. CNN Broadcasting, Inc.*, 500 F. Supp. 3d 1349, 1357 n.3 (N.D. Ga. 2020); *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 688 (1989).

13 ("Tonight, we [] bring you part of an exclusive interview with one of those women detained at that very facility, who says she felt pressured into a full abdominal hysterectomy by this doctor."). The News Reports also state that reporters viewed the women's medical records, which corroborated their claims.  *See* Ex. D(i) at 13.  The reporters sought comment from all relevant parties, including the government, the operator of ICDC, and Dr. Amin.  While Dr. Amin initially refused to comment, *see id.* at 28, once he issued a statement, it was included in the News Reports, *see* Ex. E(i) at 7 ("An attorney for the doctor…says his client, quote, vigorously denies these allegations."); *see also,* Ex. F(i) at 14.

Finally, Dr. Amin asserts that the News Reports published the allegations against him even though they "contradicted known facts."  Compl. ¶ 87.  But Dr. Amin does not specify any such "known facts."  *Id.*  Reading the Complaint generously to Dr. Amin, the only purported "fact" that relates to this assertion is the allegation that "one day after the [Whistleblower Complaint] was sent, it was revealed that . . . ICDC and Irwin County Hospital confirmed that Dr. Amin had performed only two hysterectomies on ICDC patients."  Compl. ¶ 55.[10]  But the statement that Dr. Amin appears to be referencing here—a September 15, 2020 statement from ICE—did not "confirm[] that Dr. Amin had performed only two hysterectomies."  *See* Ex. G.  Rather, it stated that "since 2018 only two individuals at Irwin County Detention Center were *referred* to certified, credentialed medical professionals . . . for hysterectomies."  *Id.* (emphasis added).  The fact that only two women were "referred" for hysterectomies says nothing about the number of hysterectomies that Dr. Amin actually performed, and thus, ICE's actual statement neither contradicts the News Reports nor would it have caused NBCU to seriously doubt the News

---

[10] The Complaint also alleges that, on September 15, 2020, it became known that "allegations of mass hysterectomies were not based on first-hand accounts." Compl. ¶ 55.  But this was consistent with the Whistleblower Complaint, as the News Reports made clear. *See, e.g.*, Ex. A at 18-20; Ex. D(i) at 13 ("[Wooten] heard [about allegations] from women she spoke to.  And so, for the last couple of days, we here at ALL IN have been trying to run down the story.").

Reports' accuracy at the time they were broadcast.  And ICE's actual statement was included in the News Reports as soon as it was issued.  *See, e.g.*, Ex. C(i) at 12.[11]

And even if ICE *had* stated that Dr. Amin only performed two hysterectomies, it still would not establish actual malice.  The gravamen of the allegations against Dr. Amin made in the Whistleblower Complaint and in additional interviews with NBCU—on which NBCU accurately reported—is that Dr. Amin performed various unconsented-to or unwarranted gynecological procedures on ICDC detainees, including hysterectomies, but also ovary and fallopian tube removal and vaginal examinations.   *See* Ex. A at 19-20.  ICE's statement, even as incorrectly articulated by Dr. Amin, does not even address, let alone contradict, the claims against Dr. Amin in relation to these other invasive gynecological procedures.

Because Dr. Amin has not pled—and will never be able to show—that NBCU published the News Reports with actual malice, Georgia's conditional privileges cannot be defeated and the Complaint must be dismissed.

### IV.    Many Statements Are Non-Actionable Opinion or Hyperbole

Finally, in addition to being part of the Whistleblower Complaint and the government investigations into Dr. Amin—and therefore protected by the fair report and public interest privileges—numerous challenged statements are, in themselves, non-actionable opinions or rhetorical hyperbole that cannot form the basis of Dr. Amin's claim.  *See* Ex. 2.[12]  It is a bedrock

---

[11] Irwin County Hospital did not release a statement until September 22, 2020, after the News Reports were broadcast. At that time, it said that Dr. Amin operated on two detained women who were referred to the hospital for hysterectomies.  Even then, "the hospital's general counsel did not respond to questions about whether Amin performed hysterectomies in cases where the women had a different initial referral [and] did not say how many other procedures he had performed that could jeopardize a woman's ability to have children, including the removal of fallopian tubes or ovaries."  *See* Nomaan Merchant, "Migrant women to no longer see doctor accused of misconduct," THE ASSOCIATED PRESS (Sept. 22, 2020), available at: https://apnews.com/article/georgia-archive-immigration-f3b1007a9d2ef3cb6d2bd410673eae83/.

[12] In addition to being fully protected under the fair report and public interest privileges, Statements 2-4, 6-9, 14-16, 18, 20, 25-26, 28-31, and 36-38 should also be dismissed as non-actionable opinions, speculation, or hyperbole.

principle under the First Amendment that a defamation claim must be based on statements of fact. *See Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20 (1990). "An assertion that cannot be proved false cannot be held libelous. A writer cannot be sued for simply expressing his opinion of another person, however unreasonable the opinion or vituperous the expressing of it may be." *Atlanta Humane Soc'y v. Mills*, 274 Ga. App. 159, 166 (Ga. Ct. App. 2005); *Horsley v. Rivera*, 292 F.3d 695, 702 (11th Cir. 2002) (Constitution protects rhetorical hyperbole, reflecting "the reality that exaggeration and non-literal commentary have become an integral part of social discourse.")

Here, statements alleging that detainees were "afraid" of Dr. Amin, felt that they had no right to speak out against him, did not understand what procedure he was performing, or thought that his tactics were "abusive," *see* Stmts. 2-4, 8, 20, 36-38, are all pure statements of opinion, expressing how detainees subjectively felt about Dr. Amin's conduct. Because these statements are incapable of being proven false, they cannot form the basis of Dr. Amin's claim. *See Turner v. Wells*, 198 F. Supp. 3d 1355, 1372 (S.D. Fla. 2016) (characterization of conduct as "abusive" "is not an objectively verifiable statement of fact"), *aff'd* 879 F 1254 (11th Cir. 2018); *Sandmann v. WP Co.*, 401 F. Supp. 3d 781, 792 (E.D. Ky. 2019) (statement that student felt "threatened" does not "convey actual, verifiable facts" because "[h]ow [the student] felt was obviously subjective"); *Glaze v. Marcus*, 151 Ariz. 538, 540 (Ariz. Ct. App. 1986) (statement that plaintiff's behavior was "unprofessional, insubordinate and abusive" was pure opinion).

Statements referring to Dr. Amin as a "uterus collector," claiming that ICDC was like an "experimental concentration camp," and indicating that "everybody" had hysterectomies, *see* Stmts. 6-7, 14-16, 18, 25-26, 28-31, are the type of "loose, figurative" language suggestive of exaggeration rather than provable fact. *See Atlanta Humane Soc.*, 274 Ga. App. at 166 (reference to plaintiff as "Mr. Kill" is incapable of being proven false); *Byrnes v. Lockheed-Martin, Inc.,* 2005

WL 3555701, at *7 (N.D. Cal. Dec. 28, 2005) (characterization of plaintiff as "sex harasser," "unstable person," "menace," and "danger to other employees" are opinions); *Yeager v. Local Union 20*, 6 Ohio St. 3d 369, 369, 371 (Ohio 1983) (referring to employer as "Little Hitler" operating "Nazi concentration camp" is "expression of opinion"), *abrogated on other grounds by* 113 Ohio St. 3d 464 (Ohio 2007).  Accordingly, these statements are not actionable.

Finally, the statement in "Deadline: White House" that ICDC was "perhaps doing very unnecessary procedures and not what you would need in a short-term detention situation," *see* Stmt. 9, is a protected opinion based on facts disclosed in the News Report: that detainees at ICDC appeared to be getting more gynecological care than care for conditions like diabetes.  Because a speaker's "subjective interpretation of the facts" cannot be defamatory, *Austin v. OMG Acquisition LLC*, 278 Ga. App. 539, 542 (Ga. Ct. App. 2006), this statement must be dismissed.

## CONCLUSION

For the foregoing reasons, NBCU respectfully requests that the Court dismiss the Complaint in its entirety with prejudice and for such other and further relief as is just and proper.

Dated: January 10, 2022

Respectfully submitted,

*s/ Elizabeth A. McNamara*
Elizabeth A. McNamara
(admitted *pro hac vice*)
Amanda B. Levine
(admitted *pro hac vice*)
DAVIS WRIGHT TREMAINE LLP
1251 Avenue of the Americas, 21st Floor
New York, NY 10020-1104
Tel: (212) 489-8230
lizmcnamara@dwt.com
amandalevine@dwt.com

*s/ Cynthia L. Counts*
Cynthia L. Counts
Georgia Bar No. 190280
FISHERBROYLES, LLP
945 East Paces Ferry Rd. NE, Suite 2000
Atlanta, GA 30326
(404) 550-6233
cynthia.counts@fisherbroyles.com


*Attorneys for Defendant*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on the 10th day of January, 2022, a true and correct copy of the foregoing document was served upon the following via the Court's electronic filing system:

Stacey Godfrey Evans
sevans@staceyevanlaw.com

Tiffany N. Watkins
twatkins@staceyevanslaw.com

Scott R. Grubman
sgrubman@cglawfirm.com

and that a true and correct copy of the foregoing has been served upon the following via first class mail:

Stacey Godfrey Evans
STACEY EVANS LAW
4200 Northside Parkway NW
Bldg One; Suite 200
Atlanta, GA 30327

Tiffany N. Watkins
STACEY EVANS LAW
4200 Northside Parkway NW
Bldg One; Suite 200
Atlanta, GA 30327

Scott R. Grubman
CHILIVIS GRUBMAN DALBEY & WARNER LLP
1834 Independence Square
Atlanta, GA 30338

*Cynthia L. Counts*
Cynthia L. Counts
Georgia Bar No. 190280
FISHERBROYLES , LLP
945 East Paces Ferry Rd. NE, Suite 2000
Atlanta, GA 30326
Telephone: (404) 550-6233
cynthia.counts@fisherbroyles.com

*Attorneys for Defendant*