**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF GEORGIA**
**WAYCROSS DIVISION**

DR. MAHENDRA AMIN, M.D.,     )
                                        )
       Plaintiff,          )
                                        )   Case No. 5:21-CV-00056-LGW-BWC
v.                               )
                                        )
NBCUNIVERSAL MEDIA, LLC,     )
                                        )
       Defendant.      )
_____

**PLAINTIFF'S RESPONSE IN OPPOSITION TO**
**DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS**

Defendant discarded the truth when it broadcast to the world that Dr. Amin, an immigrant and 35-year physician who dedicated his career to providing medical care to underserved communities, was an abusive, unethical, and dishonest doctor. Now Defendant asks this Court to apply inapplicable law and summarily deny Dr. Amin access to the litigation process—blocking Dr. Amin from any discovery and robbing a jury of the opportunity to decide issues of fact. But unlike Defendant, the law is not so quick to judge and dismiss the truth.

Defendant cannot meet its high burden for judgment on the pleadings. Defendant tells the Court that facts do not matter and whether or not it told the truth to billions of people across the globe is irrelevant because its statements were protected by two privileges or were non-actionable opinion. Defendant is wrong. First, the fair report privilege does not apply to the broadcasts because there was no "report" as enumerated by statute, any report was not "fair and accurate," and Defendant's actual malice bars application of the privilege even if it could apply here (it does not). Second, Defendant also cannot use any alleged "public interest privilege" to summarily dismiss Dr. Amin's claims because it acted with actual malice. Finally, nothing about

Defendant's false and defamatory broadcasts claiming Dr. Amin performed hysterectomies without regard to need, want, or consent qualifies as non-actionable opinion or hyperbole.

Just like Defendant quickly dismissed Dr. Amin's right to the truth in its broadcast, Defendant asks this Court to quickly close the door on Dr. Amin's right to access redress in the courthouse. The law does not support summary dismissal and Dr. Amin is entitled to engage in discovery to create a complete record for this Court, and ultimately a jury, to decide his claims.

## FACTUAL BACKGROUND

Dr. Amin is a Georgia citizen who was born, raised, and educated in India who worked extremely hard to become a licensed physician in the United States, where he has practiced medicine for over 35 years. Doc. 1 (Compl.) ¶¶ 20, 25-29. Dr. Amin has dedicated his career to providing medical treatment to underserved areas and patients, including rural south Georgia. *Id.* ¶¶ 30-44. This included, until last year, patients who were detained at the Irwin County Detention Center (ICDC). *Id.* ¶ 39. In treating those patients, Dr. Amin was subject to rigid Immigration and Customs Enforcement (ICE) oversight, including an independent ICE review process to approve any medical procedures, independent physician review of all procedures, and constant supervision by at least one other person, in addition to normal medical boundaries such as informed consent. *Id.* ¶¶ 63-70.

On September 14, 2020, an organization sent a letter ("the Letter") to the Department of Homeland Security, the ICE Atlanta Field Office, ICDC, and the news media. *Id.* ¶¶ 45, 50. The Letter, which was not part of a complaint filed in any court or submitted as part of any legislative or administrative proceeding, alleged poor conditions for people detained at the ICDC. The vast majority of the 27-page Letter was about alleged inadequate protections against COVID-19, but

parts of two pages of the Letter also contained allegations of high rates of hysterectomies for detainees at ICDC.  *Id.* ¶¶ 46, 49.  ***The Letter did not name Dr. Amin***.  *Id.* ¶ 48.

The media, including Defendants, referred to the Letter as a "whistleblower complaint," improperly seeking to elevate its status.  *See id.* ¶¶ 46-47.  The day after the Letter was sent, it was discredited.  It was revealed that there were only two hysterectomies on ICDC patients, the allegations of mass hysterectomies were not based on first-hand accounts, and the allegations regarding hysterectomies were included in the Letter only for effect.  *Id.* ¶ 55.

Despite these clear warnings that the Letter was not credible regarding alleged mass hysterectomies, in an effort to fulfill a narrative attractive to its target audience and increase ratings and profits, on September 15-17, 2020, MSNBC, owned and operated by Defendant, broadcast five segments with statements that falsely accused Dr. Amin of abusing and performing medically unnecessary hysterectomies on patients ("broadcasts").  *Id.* ¶¶ 1-3, 6, 17, 19, 56-58, 61, 76-80.  The statements were also published in online videos, articles, and social media posts.  *Id.* ¶¶ 9, 81.

Despite Dr. Amin's never being named in the Letter, Defendant took license to vilify Dr. Amin and ruin his reputation as a physician and a human being.  He has suffered great financial, physical, and mental damage as a result of the defamatory broadcasts.  *Id.* ¶¶ 98-114.  He has been stalked, he received death threats, and he has suffered scorn and ridicule that no one should be forced to endure.  *Id.* ¶¶ 100-103.  He's been called "inhuman," "corrupt," "evil," "monster," and "racist."  *Id.* ¶¶ 104, 108.  Some have compared Dr. Amin to Dr. Josef Mengele, the infamous Nazi doctor who performed medical experiments at the Auschwitz death camps and some have gone so far as to announce that he "should be hung by [his] genitals."  *Id.* ¶¶ 105-106.

## ARGUMENT

### I.     Defendant cannot meet its high burden for dismissal on the pleadings

Defendant concedes that its motion is "governed by the same standards as a Rule 12(b)(6) motion to dismiss."  Doc. 24 at 9 (citing *Strategic Income Fund, LLC v. Spear, Leeds & Kellog Corp.*, 305 F.3d 1293, 1295 n.8 (11th Cir. 2002)).  A court may grant Defendant's motion only "where there are no material facts in dispute and the moving party is entitled to judgment as a matter of law."  *Perez v. Wells Fargo N.A.*, 774 F.3d 1329, 1335 (11th Cir. 2014) (quotation marks omitted).  In making this determination, the Court must "accept as true all material facts alleged in the *non-moving party's* pleading" and "view those facts in the light most favorable to the *non-moving party*."  *Id.* (citation omitted and emphasis supplied).  The motion to dismiss standard does not change in a defamation case.  *See, e.g.*, *No Witness, LLC v. Cumulus Media Partners, LLC*, 2007 WL 4139399, at *14 (N.D. Ga. 2007) (applying standard after *Twombly* and denying motion to dismiss defamation action).

"If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56.  All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion."  Fed. R. Civ. P. 12(d).  The Court may consider a document attached to a motion to dismiss without converting the motion "only if the attached document is (1) central to the plaintiff's claim; and (2) undisputed."  *Horsley v. Feldt*, 304 F.3d 1125, 1134 (11th Cir. 2002) (citation omitted).  Dr. Amin has moved to strike portions of Defendant's Answer.  Doc. 22.  For reasons discussed therein, the Court should not consider any material that Defendant attaches to its Answer that is non-responsive to or not incorporated by reference in the Complaint without converting Defendant's motion for judgment on the pleadings to a motion for summary

judgment, which requires that Dr. Amin have access to a full discovery record.  This also applies to the extraneous information in Defendant's motion, including much of the "Preliminary Statement" and "Factual Background" sections in Doc. 24, and the entirety of Docs. 24-1 and 24-2, all of which are obviously not "central to" the Complaint.[1]

## II.    The fair report privilege does not bar Dr. Amin's claims

Georgia law—not New York law—applies to this case overall, to include which and how privileges may apply, including the fair report privilege.  Defendant asks this Court to ignore applicable law and provides a twisted application of the fair report privilege.

The fair report privilege does not and cannot protect any part of the broadcasts for two reasons.  First, to qualify for the privilege, the report must concern certain statutorily enumerated official proceedings.  The broadcasts were not of any such proceeding.  Second, there was no fair report of anything.  Factual disputes preclude determinations on these two threshold elements of the fair report privilege in any event.

Further, even if the fair report privilege did apply (it does not), actual malice defeats the privilege.  Here, Defendant has adequately alleged actual malice.  Whether Defendant acted with actual malice is a fact issue for the jury, and a determination regarding actual malice is certainly not appropriate prior to discovery.

### A.  Georgia's law on the fair report privilege applies to this case

A federal court hearing state law claims in a diversity case must determine which state's substantive law applies to the claims of the case.  To answer this choice of law question, the federal court "must apply the choice of law rules of the forum state."  *U.S. Fid. & Guar. Co. v.*

---

[1] As discussed below, even if the Court considered all of the extraneous material, Defendant's motion for judgment on the pleadings should be denied.  But Defendant's efforts to make factual arguments at the pleading stage are unfair to Dr. Amin and foreclosed by Eleventh Circuit law.

Case 5:21-cv-00056-LGW-BWC   Document 32   Filed 01/24/22   Page 6 of 26

*Liberty Surplus Ins. Corp.*, 550 F.3d 1031, 1033 (11th Cir. 2008) (citations omitted). Accordingly, this Court, sitting in diversity in the forum state of Georgia, applies Georgia law to determine which state's defamation and privilege laws should apply to this case.

In 2005, the Supreme Court of Georgia held that Georgia courts must use the *lex loci delicti* doctrine to determine which state's law applies to tort cases; other "choice of law" tests, such as the "most significant relationship" test of the Restatement (Second) of Conflict of Laws that the appellants in that case urged and that Defendant assumes, do not apply. *Dowis v. Mud Slingers, Inc.*, 279 Ga. 808, 810-11, 816 (2005). The *lex loci delicti* doctrine mandates that "a tort action is governed by the substantive law of the state where the tort was committed." *Id*. at 809 (citation omitted). And "where the tort was committed" means "the place where the injury sustained was suffered rather than the place where the act was committed." *Risdon Enters., Inc. v. Colemill Enters., Inc.*, 172 Ga. App. 902, 903 (1984) (quotation marks omitted).

Since *Dowis*, two federal district courts sitting in diversity in Georgia have considered which state's laws should apply in a defamation case in which the statement was published in multiple states. Both applied the *lex loci delicti* doctrine—the law of the forum state—to rule that the law of the state where the tort was committed, which is the domicile of the plaintiff, applied. *Donald J. Trump for President, Inc. v. CNN Broad., Inc.*, 500 F. Supp. 3d 1349, 1353-54 (N.D. Ga. 2020) (citing Georgia law); *Adventure Outdoors, Inc. v. Bloomberg*, Case No. 1:06-CV-2897-JOF, 2007 WL 9735875, at *2-3 (N.D. Ga. Dec. 18, 2007) (citing Georgia law).

In this case, the Complaint alleges that Dr. Amin resides in and is a citizen of Georgia, and that he has been licensed to practice medicine in Georgia for over 35 years. Doc. 1 ¶¶ 16, 20, 29. Accordingly, because Georgia is Dr. Amin's domicile and is therefore the place where

Dr. Amin suffers injury to his reputation, the *lex loci delicti* doctrine provides that the Court

should follow Georgia law as to Dr. Amin's defamation claim.

Defendant ignores at least 80 years of binding precedent that requires the Court to apply

the doctrine of *lex loci delicti*. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496

(1941) ("The conflict of laws rules to be applied by the federal court in Delaware must conform

to those prevailing in Delaware's state courts." (citations omitted)).[2]  The cases Defendant cites

all ruled that New York law should apply *as a matter of the forum state's choice of law*

*principles*, and in each case the court's forum state used the "most significant relationship" test,

which is different from the *lex loci delicti* doctrine that this Court must apply.[3]  Defendant's

arguments and citations based on the "most significant relationship" test are simply not relevant

here.  *See CNN*, 500 F. Supp. 3d at 1353-54 (rejecting a party's contention that the court should

apply the "most significant relationship" test law in a defamation case and instead using *lex loci*

*delicti*).

Defendant also argues that New York privilege law "should apply regardless of the law

applied to Dr. Amin's case-in-chief."  Doc. 24 at 10.  There is no legal support for this position,

---

[2] Defendant knows this law—*that is directly opposed to what they argue to this Court*—because Defendant cites the very case that recounted the binding case law requiring federal courts in Georgia hearing a tort case in diversity cases to apply the *lex loci delicti* doctrine, albeit on a different issue.  Doc. 24 at 21 n.9 (*citing CNN* regarding actual malice issue).

[3] *See Gubarev v. Buzzfeed, Inc.*, Doc. 171, Case No. 1:17-cv-60426-UU, at *6-10 (S.D. Fla. June 5, 2018) (applying most significant relationship test in Florida to rule New York privilege law applies); *Wilkow v. Forbes, Inc.*, Case No. 99 C 3477, 2000 WL 631344, at *5-6 (N.D. Ill. May 15, 2000) (applying most significant relationship test in Illinois to rule New York privilege law applies).  In *Miller v. Gizmodo Media Grp., LLC*, the Eleventh Circuit did not make a "choice of law" decision at all; without other discussion, it simply noted in a single clause of a sentence that the plaintiff did "not dispute that § 74 governs if it applies."  994 F.3d 1328, 1331 (11th Cir. 2021).  The lower court in that case applied Florida's choice of law test, the "most significant relationship test," because Florida was the forum state of the federal court sitting in diversity. *Miller v. Gizmodo Media Grp., LLC*, Case No. 18-24227-CIV-ALTONAGA/Goodman, 2019 WL 1790248, at *5-6 (S.D. Fla. Apr. 24, 2019) (citations omitted).

and the court in *Bloomberg* rejected its defendants' identical argument that "the question of which state's law applies to a substantive aspect of Plaintiffs' defamation claim is distinct from a determination of which state's privilege law applies," ruling that "the law of Georgia applies to all aspects of Plaintiffs' defamation claims" because, again, the harm to the reputation of the plaintiff happened in Georgia.  2007 WL 9735875, at *2-3.

The court in *Bloomberg* further noted that, even under the "most significant relationship" test Defendant tacitly requests, "there is an extremely strong presumption that the choice of law applied to multistate defamatory communications is the place of the injury," the plaintiff's domicile.  *Id*. at *3 n.2.  The Restatement (Second) Conflict of Laws provides with respect to privileges that "the rule of liability of the state of injury should usually be applied unless the policy underlying the rule of non-liability of the state of conduct is a strong one, as would probably be true if the conduct was required as opposed to being only privileged."  *Id*. (quotation marks omitted).  The New York fair report privilege is a privilege; it does not impose a requirement.  *See id*.  Therefore, even under the "most significant relationship" test, the law of Georgia as the "state of injury" should apply.

### B. There was no "report," no "fair and accurate" report of anything, and Defendant's actual malice defeats any application of the fair report privilege

Defendant seeks to summarily dispose of certain, but not all, statements from the broadcasts claiming protection of the fair report privilege because it contends those statements were fair reports of the Letter.  The statutory privilege does not apply to the Letter.  Even if it did, the gist of the Letter is about COVID-19 conditions at the ICDC ***and does not mention Dr. Amin at all***, so any reporting about improper hysterectomies or Dr. Amin are not "fair reports" of the Letter.  Further, Defendant acted with actual malice, which defeats the fair report privilege even if it did apply (which it does not).

**1. The broadcasts were not "reports of the proceedings of legislative or judicial bodies" or of "court proceedings"**

The Letter was not filed in any court requiring attorneys to subject themselves to Rule 11 and other sanctions for false statements.  The Letter was not issued by a government agency and did not reflect any statements from government officials with their oaths and credibility on the line.  The Letter did not report information from witness testimony provided under oath.  In other words, the Letter is nothing like the types of documents or information that the law finds credible and important enough on its face to eject from the need for scrutiny from news media before blasting it on the airwaves.  Put simply, the fair report privilege does not apply to the Letter.[4]

Defendant conveniently ignores that the Letter was not part of any report of the "proceedings of legislative or judicial bodies" or "court proceedings," as required by the statute affording any fair report privilege.  O.C.G.A. §§ 51-5-7(5)-(6).  And though courts have ruled that reports *of* administrative proceedings by governmental agencies to "discipline, remove from office, or revoke a license, are quasi-judicial in nature" and thus are entitled to the fair report privilege (as a "judicial proceeding"), *Morton v. Stewart*, 153 Ga. App. 636, 639 (1980), there was no such proceeding here.  Defendant argues simply that because a statement was made *to* an administrative agency, it falls under the privilege.  That is not the law.

Georgia law specifically limits what the fair report privilege may possibly protect. Privileges on defamation, as statutes that relax the requirements of common law, are construed strictly.  *See Heard v. Neighbor Newspapers, Inc.*, 259 Ga. 458, 460 (1989) ("Statutes in

---

[4] Defendant makes passing references to "lawyers," Doc. 24 at 13, 15-16, but does not cite to any existing litigation or other court proceeding that it claims it based its reporting upon.  Defendant includes a copy of a complaint filed months after its broadcasts (Doc. 24-2), which should not be considered for any purpose at this stage, but also could not provide a "court proceeding" upon which the broadcasts were based because it did not exist at the time of the broadcasts.

derogation of the common law are construed strictly." (citations omitted)).  Therefore, the Court

must construe "proceedings of legislative or judicial bodies" and "court proceedings" strictly.

*See id*. (applying the same rule in concluding that the phrase "any arresting officer or police

authorities" in O.C.G.A. § 51-5-7(7) should have a "narrow construction").

The cases that Defendant cites do not support the application of the fair report privilege

to the Letter.  *Lawton v. Ga. Television Co.*, 216 Ga. App. 768 (1995) concerned a broadcast that

discussed a report *from* the National Guard about an official investigation it conducted.  216 Ga.

App. at 768.  Further, the plaintiff in Lawton did not contest that the fair report privilege could

apply to the report at issue if it was otherwise fair and honest.  216 Ga. App. at 771.  Here, in

contrast, the Letter is not from a government agency and Dr. Amin argues that the Letter does

fall outside the scope of the privilege.  Thus, *Lawton* is irrelevant.

Indeed, the dispute over the status of the Letter shows why the existence of a privilege is

generally a question for a jury, or for the Court to decide on summary judgment after factual

development.  Notwithstanding Defendant's misleading and disputed assertions that the Letter is

a "whistleblower complaint" that was "filed" with the government entities to whom it was

addressed, Doc. 24 at 3, the Letter is actually—unlike the National Guard report in *Lawton*—not

a document produced *by* the government pursuant to an administrative proceeding.  It is simply a

letter.  Adding four addresses to the front page of a letter that is also sent to the media does not

make that letter a "whistleblower complaint," much less "proceedings of legislative or judicial

bodies" or "court proceedings," especially when Defendant can identify no "proceeding" that it

reported on.  O.C.G.A. §§ 51-5-7(5)-(6); *see generally* Docs. 18, 24.

The Supreme Court of Georgia held in *Heard* that a defamation privilege for "[t]ruthful

reports of information received from any arresting officer of police authorities" would not apply

as to a newspaper's report of statements by an investigator that lacked authority to arrest or to initiate and conduct criminal prosecutions.  259 Ga. at 460.  Similarly, the Court should not find that "there are no material facts in dispute and the moving party is entitled to judgment as a matter of law" as to the fair report privilege, because accepting "as true all material facts alleged in the non-moving party's pleading" viewed "in the light most favorable to the non-moving party," the defamatory statements are not reports of proceedings of legislative or judicial bodies, court proceedings, or quasi-judicial proceedings.  *Perez*, 774 F.3d at 1335 (quotation marks omitted).

Defendant only cites one other *Georgia* case—which again, is the relevant law because the injury to Dr. Amin's reputation occurred in Georgia—that it purports to apply here, *Morton*.  Doc. 24 at 14.  First, as with other cases, *Morton* was determined on summary judgment, *Morton*, 153 Ga. App. at 640, at which point the parties have had the opportunity to develop the factual record enough to determine as a matter of law if a reasonable factfinder could conclude whether the privilege applies.  Second, contrary to Defendant's implication, *Morton* did not simply report on "letters" like the Letter in this case.  Doc. 24 at 14.  Rather, the report was regarding an actual investigation that had occurred and the results thereof.  The court found the investigation was of the type akin to a judicial proceeding because it was an investigation by the Composite Board of Medical Examiners, which had the power to discipline the plaintiff members.  153 Ga. App. at 637, 639.  Because the statements were "a report of a quasi-judicial proceeding of a public body," the only question remaining for the court was whether the report was "fair and accurate."  *Id*. at 641.

Here, in contrast, the statements were not "of" any "proceeding."  The discussions in the segments, as alleged in the Complaint, bear that out.  Defendant admits, as it must, that some

11

challenged statements are "based on NBCU's independent reporting," not the contents of the Letter.  Doc. 24 at 15.  Moreover, the existence of "investigations" without those "investigations" relating to the types of proceedings listed in Georgia statute to which the fair report privilege may apply, does not establish, as a matter of law, that the fair report privilege should protect Defendant's defamatory statements.  But, even consulting the documents Defendant attaches to its Answer, the only real discussions of "investigations" are of *future* investigations or *pleas for* investigations, demonstrating the very *absence of* proceedings at the time the statements were made.  *See, e.g.*, Doc. 18 at 98 ("They do say an independent office will investigate the claims."); *id*. at 123 (Department of Homeland Security "is going to be sending a team to investigate"); *id*. at 124-25 ("plea" for Inspector General and Congressional investigations); *id*. at 126 ("Importantly, according to the Washington Post, one of the whistleblower's attorneys expressing [sic] knowledge she did not speak to any of the women directly, and that she included the allegations in the report with the intention of triggering investigation to whether or not the claims are true."); *id*. at 141 (quoting ICE statement as: "These [sic] accusations will be fully investigated by an independent office."); *id*. at 143 (Q: "What do you expect to happen in terms of this being looked into in terms of these women's claims being investigated and potentially there being accountability here?"  A: "So, the Office of the Inspector General, at the Department of Homeland Security will open an investigation."); *id*. at 143-44 ("And that's why now you have the Department of Homeland Security will [sic] be forced to investigate this, and we have heard the top officials in Congress, on the Hill, also called for investigations as well and so now that has to play its course.").

Importantly, "defamatory matter does not become privileged simply for the reason that it is published as news."  *Morton*, 153 Ga. App. at 637 (citation omitted).  There is a danger in

expanding the fair report privilege to cover any allegations before investigations of those allegations.  The fair report privilege exists to allow the media to act as the public's eyes on the government's work.  *See*, *e.g.*, 2 Law of Defamation § 8:66 (2d ed.) (Nov. 2021 Update) ("The reporter is a surrogate for the public, permitting it to observe through the reporter's eyes how the business of government is being conducted." (quotation marks omitted)).  But until the government actually does the work, there is no work to report.  Reporting on government work provides guardrails for witnesses, such as oaths to tell the truth under the penalty of perjury.  Further, most government or quasi-judicial entities, such as medical boards or boards of education that can discipline their member doctors or teachers, typically do their work and then share the results so a full picture can be had, instead of a snap rush to judgment from one person not even based on first-hand accounts, which is what happened here.  Doc. 1 (Compl.) at ¶ 55.

Here, there was no investigation that the media was reporting on.  Certainly, one may find the Letter itself newsworthy and the media is free to report on it, but it does not do so with the blanket protection of the fair report privilege.  The media must do its job and consider the source, seek out the other side of the story, and do the real work of reporting to find out if the material is true before rushing to blast it across the globe and ruin an innocent doctor's hard-earned reputation.[5]  And if the media rushes to judgment as it did here, it must stand to account for its actions in court.

---

[5] Even the cases interpreting New York's fair report privilege (which does not apply here) show that you cannot claim a privilege for reporting on official proceedings unless and until there is an official proceeding.  *Cummings v. City of New York*, 2020 WL 882335, at *16 (S.D.N.Y. Feb. 24, 2020) (reporting of ongoing department of education disciplinary investigation of teacher and notice of claim and summons that initiated a legal action); *Fishof v. Abady*, 280 A.D.2d 417, 417-18 (2001) (reporting of ongoing litigation); *Cholowsky v. Civiletti*, 69 A.D.3d 110, 114-15 (2009) (reporting of criminal court case).

### 2.   The broadcasts were not "fair and honest reports"

Even if reporting on the Letter were eligible for protection under the fair report privilege, the privilege would only protect a "fair and honest report" of the Letter.  The broadcasts here were not "fair and honest reports" of anything.

To be privileged, a statement must "present fully, fairly, and accurately an impartial account of the proceedings." *Lawton*, 216 Ga. App. at 771 (quotation marks omitted).  "The 'substantial accuracy' required for a 'fair report' means that the fair report must have the same 'gist' as the proceedings reported." *Lawton*, 216 Ga. App. at 772 (citation omitted). Importantly, whether the broadcasts were "fair and honest" reports of the Letter (even if the fair report privilege could apply to the Letter, which it cannot), is an issue of fact for the jury if facts exist from which the jury could determine the broadcasts were not "fair and honest reports." *See*, *e.g.*, *AirTran Airlines, Inc. v. Plain Dealer Publ'g Co.*, 66 F. Supp. 2d 1355, 1365 (N.D. Ga. 1999) (citation omitted).  "Generally the question of whether a communication is privileged is a jury question." *Kennedy v. Johnson*, 205 Ga. App. 220, 223 (1992) (quotation marks omitted); *see also Murray v. Cmty. Health Sys. Pro. Corp.*, 345 Ga. App. 279, 287 (2018) ("In general, questions of privilege are for the jury to decide." (citation omitted)).

Here, the statements did not have the same "gist" as the Letter.  First, the Letter does not identify Dr. Amin. ***His name does not appear at all in the Letter.***  Doc. 1 (Compl.) ¶ 48; Doc. 18 (Ans.) at Ex. A.[6]  Second, the Letter mostly concerns the lack of COVID-19 protections at the ICDC, with general lack of adequate institutional health care serving as a secondary focus; Defendant's contention that allegations regarding unnecessary hysterectomies are "the very

---

[6] Defendant goes to great lengths to mislead this Court to believe that Dr. Amin was named in the Letter by adding his name in brackets to alleged quotes from the Letter where they do not appear. *See*, *e.g.*, Doc. 24 at 3-5.

crux" of the Letter, Doc. 24 at 15, is simply untrue.  *See* Doc. 18 (Ans.) at Ex. A (introduction of the Letter discussing COVID-19 multiple times, with only a single sentence about "red flags regarding the rate at which hysterectomies are performed"); *see generally id*.

Indeed, hysterectomies are only mentioned in a ***two-page section of the 27-page Letter***. *See id*.  Plucking parts of two pages of a 27-page letter for the broadcasts and focusing those broadcasts on someone never mentioned in the Letter, yet claiming the broadcasts fairly reflect the gist of the Letter, is absurd.  Certainly, it cannot be said as a matter of law that no jury could find the broadcasts did not have the same gist of the Letter when the broadcasts cast Dr. Amin as the villain in the story but the Letter never even mentioned his name.

Further, Defendant does not even attempt to explain how the gist of the entire broadcast was the same as the Letter.  Rather, Defendant discusses how certain cherry-picked statements from the Letter compare to some statements in the broadcasts.  *See* Doc. 24 at 14-16.  Defendant simply cannot show that the gist of the broadcast is the same as the Letter.

It bears repeating, the Letter ***does not even mention Dr. Amin's name***, and its "gist" is the alleged institutional failure of the ICDC protect people from COVID-19, with a secondary focus on more general concerns about those people's health care—covering 25 of the 27 pages of the letter.  But even considering the Letter's discussion of hysterectomies—in parts of only two pages—the Letter merely expresses "concerns" about "high numbers" of people at the ICDC receiving hysterectomies.  Doc. 18 (Ans.) at 44-46.  It also states that "[i]ntertwined with the issue of the reported high rates of hysterectomies is the issue of proper informed consent."  *Id*. at 45.  In contrast, the broadcasts contained more conclusive allegations, like stating that medical procedures were "unauthorized," "unnecessary," and "without consent," which was simply not alleged by the Letter.  *Compare, e.g.*, Doc. 1 ¶¶ 76-80 (Complaint alleging statements made,

such as "without consent" and "unnecessary" or "unauthorized" hysterectomies), *with* Doc. 18 at 44-46 (the section of the Letter concerning hysterectomies, using qualifiers such as "issue of proper informed consent," "everybody's uterus cannot be that bad," and "women expressed to her that they didn't fully understand why they had to get a hysterectomy").  Even under New York law, which again should not apply, the statements were not "fair and accurate" as a matter of law, for these same reasons.[7]

Though it is not entirely clear, it appears that Defendant argues that, because the Letter may lead to an investigation, it is covered by the fair report privilege.  But there is no support for this leap.  Further, in addition to its real audience—the media—the Letter was sent to the Office of the Inspector General, the Department of Homeland Security, ICE, and ICDC.  Defendant does not cite to any investigation by any of these entities at the time of the broadcasts, and only cites to a statement by one of those entities (ICE) that it will later investigate the allegations of the Letter.  If Defendant had made a "fair report" of any alleged ICE investigation, its broadcasts would have exactly the opposite "gist" as they did because the ICE statement denies all allegations in the Letter regarding any medical procedures, including hysterectomies; specifically states that only two detainees have undergone hysterectomies since 2018; and does not mention

---

[7] Indeed, even if New York law applied, which it does not, Defendant's motion for judgment on the pleadings should be denied because, as discussed below, factual disputes remain.  *See, e.g.*, *Bilinski v. Keith Haring Found., Inc.*, 96 F. Supp. 3d 35, 49 (S.D.N.Y. 2015) ("Application of the fair reporting privilege is inappropriate at the motion to dismiss stage if a reasonable jury could conclude that the report 'suggest[ed] more serious conduct than that actually suggested in the' judicial proceeding." (quoting *Karedes v. Ackerley Grp.*, 423 F.3d 107, 119 (2d Cir. 2005))).  The New York case that Defendant cites for the proposition that New York's fair report privilege is a matter of law for the court to decide was also decided on summary judgment, not on a motion for judgment on the pleadings.  Doc. 24 at 11; *Holy Spirit Ass'n for the Unification of World Christianity v. N.Y. Times Co.*, 49 N.Y.2d 63, 65 (1979).

Dr. Amin at all.  Doc. 23 at Ex. G.  Further, ICE had not obtained any witness testimony or other information that the broadcasts aired, so there was nothing yet to report.

### 3.  Defendant acted with actual malice which precludes any protection from the fair report privilege

Finally, assuming both the fair report privilege applies and a fair report was made (neither of which is true), the fair report privilege will not protect false and defamatory statements made with actual malice: "All of the privileges contained in O.C.G.A. § 51-5-7 [including the fair report privilege] are conditional, rather than absolute, and may be lost upon a showing . . . of 'actual malice.'"  *AirTran*, 66 F. Supp. 2d at 1365.  Here the Complaint alleges facts tending to show that Defendant acted with actual malice.

Actual malice is "knowledge that [a statement] was false or with reckless disregard of whether it was false or not."  *Id*. (quoting *New York Times v. Sullivan*, 376 U.S. 254, 280 (1964)).  "Georgia courts have repeatedly held that the issue of malice in conditional privilege cases is generally a jury issue, inappropriate for summary judgment" if there is competing evidence.  *Hammer v. Slater*, 20 F.3d 1137, 1143 (11th Cir. 1994) (citing Georgia cases).  In *AirTran*, on a motion for summary judgment, the court ruled that the defendant had offered no evidence to pierce the plaintiff's sufficiently pleaded allegations of actual malice.  66 F. Supp. 2d at 1365-66.  Another district court did the same in *StopLoss Specialists, LLC v. VeriClaim, Inc.*, ruling that, again on summary judgment, there was a genuine issue of material fact as to the defendant's malice.  340 F. Supp. 3d 1334, 1353-54 (N.D. Ga. 2018).

Defendant argues that Dr. Amin's allegations of malice "are simply boilerplate recitations of the standard, devoid of factual support," Doc. 24 at 21, but it only cherry-picks certain portions of the Complaint to support its false indictment of Dr. Amin's allegations.  The Complaint more than adequately alleges actual malice.

The Complaint alleges that the broadcasts were made "without any investigation into the truth or falsity and in the face of contradictory information already known at the time of the broadcasts." Doc. 1 ¶ 54.  The Complaint further alleges that prior to any of the broadcasts, it was revealed that the allegations regarding hysterectomies "were not based on first-hand accounts," were added for effect, and that ICDC confirmed that only two hysterectomies were performed on ICDC patients.  Doc. 1 ¶ 55.  Broadcasting statements that misstate facts as Defendant knows them constitutes knowledge or reckless disregard of their falsity.  Although the "failure to investigate, *without more*, cannot establish reckless disregard for the truth," *CNN*, 500 F. Supp. 3d at 1357 n.3 (quotation marks omitted and emphasis added),[8] "recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports" or "when the publisher's allegations are so inherently improbable that only a reckless man would have put them in circulation."  *St. Amant v. Thompson*, 390 U.S. 727, 732 (1968).

Moreover, the Complaint alleges that because of federal requirements for pre-approval for healthcare treatment of detainees, it "is beyond reasonable belief that detainees in an ICE facility . . . could undergo surprise hysterectomies without consultation and consent," and that Defendant's broadcasts "contained statements that were so inherently improbably on their face" and "so outrageous on their face as to raise serious doubts about their truth."  Doc. 1 ¶¶ 62, 85-86.  Further, the Complaint alleges that Defendant's motive was "feeding the ratings beast," not to report the truth.  Doc. 1 ¶¶ 56-57, 61.

These allegations give rise to the reasonable inference that the inherent improbability of the allegations, along with reported facts contradicting those allegations, Defendant failing to

---

[8] Compare this, the actual rule stated in *CNN*, with Doc. 24 at 21 n.9 (Defendant quoting *CNN* but omitting the citation preceding it that qualifies the quote).

investigate, and evidence of motive point to knowledge or reckless disregard of falsity.  *See Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 668 (1989) ("Although courts must be careful not to place too much reliance on such factors, a plaintiff is entitled to prove the defendant's state of mind through circumstantial evidence, and it cannot be said that evidence concerning motive or care never bears any relation to the actual malice inquiry." (citations omitted)); *Levine v. World Fin. Network Nat'l Bank*, 437 F.3d 1118, 1120 (11th Cir. 2006) ("When considering a motion to dismiss, the pleadings are construed broadly so that all facts pleaded therein are accepted as true, and all inferences are viewed in the light most favorable to the plaintiff." (citations omitted)).  Defendant may have spoken with "*numerous* lawyers representing detainees, and with detainees themselves," Doc. 24 at 21 (emphasis in original), but in failing to buttress the claims with independent verifications in light of known contradictory information, it acted with knowledge or reckless disregard of the falsity of its broadcasts.

In sum, the Complaint alleges "factual content that allows the [C]ourt to draw the reasonable inference" of actual malice pursuant to the "short and plain claim" mandate of Rule 8(a).  *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 686-87 (2009) (citations omitted).  This case is far different from the cases Defendant cites, Doc. 24 at 21, such as *Watkins v. Cap. City Bank & Guar.*, a Report and Recommendation from a Magistrate Judge in which the plaintiff appears to have failed to plead malice as to the conditional privilege at all.  Case No. 1:19-CV-04345-ELR-CMS, 2020 WL 9607008, at *4 (N.D. Ga. Jan. 31, 2020).

If the Court determines that Dr. Amin's compliant did not adequately allege actual malice, which as discussed above it did, Dr. Amin should be granted leave to amend.  The Eleventh Circuit has held that Federal Rule of Civil Procedure 15(a)(2)'s requirement that courts "should freely give leave" to amend pleadings means that, "[o]rdinarily, a party must be given at

19

least one opportunity to amend before the district court dismisses the compliant."[9] *Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1014 (11th Cir. 2005) (citation omitted).

### III.    Any "public interest" privilege does not bar Dr. Amin's claims

Georgia law allows a conditional privilege for "[s]tatements made in good faith as part of an act in furtherance of the person's or entity's right of petition or free speech under the Constitution of the United States or Constitution of the State of Georgia in connection with an issue of public interest or concern, as defined in subsection (c) of Code Section 9-11-11.1." O.C.G.A. 51-5-7(4).

Importantly, this privilege is conditional and only applies to statements made in "good faith," which is impossible when a publisher acts with actual malice, as here. *Murray*, 345 Ga. App. at 288 (2018) (citations omitted).  And the existence of actual malice is an issue for a jury. *AirTran*, 66 F. Supp. 2d at 1369 (concluding that defendant could not make "good faith" demonstration as a matter of law.  Further, "[g]enerally, the question of whether a communication is privileged is a jury question and general conclusory assertions by a defendant that statements it published were published in good faith is insufficient to meet defendant's burden of showing the statements were privileged as a matter of law." *Id.* at 1370 (citation omitted).

As discussed above, Dr. Amin has sufficiently pleaded actual malice to overcome any conditional privilege.  Further, every single case that Defendant cites claiming the "Georgia's public interest privilege" applies decided a motion to strike pursuant to Georgia or California's

---

[9] Courts within and outside of the Eleventh Circuit, including the Eleventh Circuit itself, have applied this rule to cases dismissed pursuant to Rule 12(c) motions in addition to Rule 12(b)(6) motions. *See Gen. Star Indemn. Co. v. Triumph Hous. Mgmt., LLC*, 855 F. App'x 599, 608-609 (11th Cir. 2021); *Williams v. Monroe Cnty. Bd. of Educ.*, Case No. 07-0561-CG-B, 2009 WL 1767658, at *5 (S.D. Ala. June 23, 2009) (collecting cases).

anti-SLAPP statutes.[10]  But in the Eleventh Circuit, such motions are absolutely unavailable,

because the Eleventh Circuit has held that they conflict with the Federal Rules of Civil

Procedure, including Rule 12(c), by requiring different pleading standards than those imposed by

Rules 8 and 12 and by requiring an evidentiary showing without converting a motion to a Rule

56 motion.  *Carbone v. Cable News Network, Inc.*, 910 F.3d 1345, 1350 (11th Cir. 2018).

### IV.     The broadcasts do not contain non-actionable opinion or hyperbole

The statements alleged in the Complaint are not "non-actionable opinion or hyperbole" as

a matter of law.[11]  As an initial matter, Defendant does not contend that this argument applies to

almost half of the statements.  *See* Doc. 24 at 23 n.12; Doc. 1 ¶¶ 76-80; Doc. 24-1.

"[T]here is no wholesale defamation exemption for anything that might be labeled

'opinion.'"  *Lucas v. Cranshaw*, 289 Ga. App. 510, 514 (2008) (citation omitted).  This is true

because an alleged expression of opinion "may often imply an assertion of objective fact."  *Id.*

"The pivotal questions are whether the challenged statements can reasonably be interpreted as

---

[10] *See* Doc. 24 at 18-19; *Boxcar Dev. Corp. v. New World Commc'ns of Atlanta, Inc.*, Case No. 08CV2248-10, 2008 WL 1943313, at *1 (Super. Ct. Ga. May 1, 2008); *Wilkes & McHugh, P.A. v. LTC Consulting, L.P.*, 306 Ga. 252, 252 (2019); *Metabolife Intern., Inc. v. Wornick*, 72 F. Supp. 2d 1160, 1162 (S.D. Cal. 1999) (rev'd in part on other grounds by 264 F.3d 832 (9th Cir. 2001)); *Lieberman v. KCOP Television, Inc.*, 110 Cal. App. 4th 156, 161 (2003); *Hindu Temple and Cmty. Ctr. of High Desert, Inc. v. Raghunathan*, 311 Ga. App. 109, 109 (2011); *Neff v. McGee*, 346 Ga. App. 522, 522 (2018).  Defendant misleadingly edits a sentence in *Boxcar*, quoting: "Even a defendant's statement made prior to the initiation of a government investigation qualifies as an 'act,'" Doc. 24 at 18, but omitting the rest of the sentence: "of free speech in connection with an issue of public interest or concern *entitled to protection as Georgia's anti-SLAPP statute*."  2008 WL 1943313, at *3 (emphasis added).

[11] Defendant attaches Doc. 24-1, a table of the statements and the grounds for which Defendant argues the statements are not actionable as a matter of law, which is styled as "Exhibit 1" to the Motion for Judgment on the Pleadings.  Defendant's filing of Doc. 24-1 contravenes Southern District of Georgia Local Rule 7.1(a) by exceeding the 26-page limit for briefs without prior permission of the Court.  Rule 7.1(a) provides that "tables of contents, tables of cases, and other pages prefatory to the main body of a brief are not necessary but, if used, count toward the 26-page limit."  The table of challenged statements in Doc. 24-1 operates similarly, and it is certainly not a part of the pleadings or a document appropriate for incorporation by reference.

stating or implying defamatory facts about plaintiff and, if so, whether the defamatory assertions are capable of being proved false." *Id.* "An opinion can constitute actionable defamation if the opinion can reasonably be interpreted, according to the context of the entire writing in which the opinion appears, to state or imply defamatory facts about the plaintiff that are capable of being proved false." *McCall v. Couture*, 293 Ga. App. 305, 308 (2008) (quotation marks omitted).

Here, the identified statements are either themselves capable of being proven false or, according to the context of the entire broadcasts, can reasonably be interpreted as stating or implying defamatory facts about Dr. Amin that are capable of being proved false. First, whether patients returned from doctor visits bruised, procedures are medically unnecessary, or someone conducted a procedure without telling a patient "nothing" are capable of being proved false. *See* Doc. 24 at 23 n.12; Doc. 1 ¶¶ 76-80; Doc. 24-1. Second, whether someone felt pressured can reasonably be interpreted to imply that someone did the pressuring, which is also capable of being proved false. *Id.*

The statements that Defendant argues are hyperbolic also state or imply defamatory facts, since they too are based on facts that Dr. Amin alleges are false. "Uterus collector" may be "hyperbole" in the sense that a reasonable viewer would not interpret it as meaning that Dr. Amin has a uterus collection at home, but it does not make sense without the implication of the *fact* of unnecessary hysterectomies. *Id.* In contrast, in a case like *Monge v. Madison Cnty. Record, Inc.*, the district court ruled that the statement that a lawyer "torpedoed" a case was built on "non-defamatory facts" set forth in the publication and was therefore itself not defamatory. 802 F. Supp. 2d 1327, 1335 (N.D. Ga. 2011); *see id.* ("It is of course debatable whether Martin 'torpedoed' [the] case in the figurative sense; but that is the point."). The statements in this case being made on national news broadcasts also would give the reasonable viewer the implication

22

that the statements were fact.  *See Pierce v. Warner Bros. Ent., Inc.*, 237 F. Supp. 3d 1375, 1379 (M.D. Ga. 2017) ("Although the fictional or humorous nature of a publication will not necessarily insulate it from a libel claim, if the allegedly defamatory statement could not be reasonably understood as describing actual facts about the plaintiff or actual events in which he participated, the publication will not be libelous." (quotation marks omitted)).

The cases Defendant cites, Doc. 24 at 24-25, do not persuade otherwise.  In *Horsley*, the Eleventh Circuit applied Georgia defamation law to consider whether the assertion, that the plaintiff who operated an anti-abortion web site was an "accomplice to murder" after a doctor the plaintiff identified on his web site was assassinated, was opinion or rhetorical hyperbole as a matter of law.  292 F.3d at 697-700.  The court held that, where a reasonable viewer would have understood the defendant's comments "merely as expressing his belief that [the plaintiff] shared in the moral culpability of [the doctor]'s death, not as a literal assertion that [the plaintiff] had, by his actions, committed a felony," the statement was not defamation because "no reasonable person would believe [it] presented facts."  *Id*. at 702.  This is a far cry from Defendant's broadcasts falsely accusing Dr. Amin of performing unnecessary hysterectomies without consent while also referring to him as the "uterus collector," which implies that he was removing uteruses for sport.

One case Defendant cites, Arizona case *Glaze v. Marcus*, was called into question in 1992, for its holding that a statement of opinion is an absolute defense to a defamation claim being inconsistent with post-*Glaze* United States Supreme Court precedent.  *See Miller v. Servicemaster by Rees*, 174 Ariz. 518, 520 (1992).  Another case, *Turner v. Wells*, concerned facts that were not in dispute—what was disputed was the "*characterization* of the various taunting incidents" as "abusive;" also, *Turner* applied Florida, rather than Georgia, defamation

law.  198 F. Supp. 3d 1355, 1364, 1372 (S.D. Fla. 2016) (emphasis supplied).  In contrast, here, Dr. Amin contests terms like "abusive" as arising from *facts* that he alleges are false and defamatory.  And in *Sandmann v. WP Co. LLC*, a district court not within the Eleventh Circuit applied Kentucky law and ruled the statements did not "connote[] actual objectively verifiable facts" but instead opinions built upon undisputed facts.  401 F. Supp. 3d 781, 787-88, 797 (E.D. Ky. 2019) (quotation marks omitted).  *Atlanta Humane Soc'y v. Mills* concerned "obviously exaggerated and unprovable assertions," such as "'evil' or 'worthy' to lick excrement from shoes" and "Mr. Kill" based on the *undisputed* fact that under the plaintiff's leadership the organization did indeed kill "a significant number of animals yearly."  274 Ga. App. 159, 166 (2005).  Also, *Mills* was determined on summary judgment, as "evidentiary issues [had] remained for resolution" at a previous stage.  *Id*. at 159, 168.  *Byrnes v. Lockheed-Martin* and *Yeager v. Loc. Union 20* both (1) applied non-Georgia state law outside of the Eleventh Circuit, (2) were also determined on summary judgment rather than the pleadings, and (3) concerned statements that were obviously opinion or hyperbole not based on allegedly defamatory facts. *Byrnes*, Case No. C-04-03941 RMW, 2005 WL 3555701, at *6-7 (N.D. Cal. 2005); *Yeager*, 6 Ohio St. 3d 369, 369-70 (1983) (abrogated by *Welling v. Winfield*, 113 Ohio St. 464 (2007)).

Finally, even if some challenged statements were opinion or hyperbole that could not reasonably be interpreted as stating or implying defamatory facts capable of being proved false, most of the statements are plainly factual.  *See Ga. Soc'y of Plastic Surgeons, Inc. v. Anderson*, 257 Ga. 710, 715 (1987) (holding that the appellants' argument that statements were opinions of the authors and not statements of fact did not provide grounds to overturn the jury's decision on this issue because "the article contains at least some expressions of fact").

**CONCLUSION**

Dr. Amin's complaint states a claim for defamation. Defendant seeks protection of inapplicable privileges, and fact issues preclude summary application of any privileges at this stage of the litigation in any event. Defendant's motion should be denied.

Respectfully submitted this <u>24th</u> day of January 2022.

<u>/s/ Stacey Godfrey Evans</u>
Stacey Godfrey Evans
Georgia Bar No. 298555
<u>sevans@staceyevanslaw.com</u>
Tiffany N. Watkins
Georgia Bar No. 228805
<u>twatkins@staceyevanslaw.com</u>

STACEY EVANS LAW
4200 Northside Parkway NW
Bldg One; Suite 200
Atlanta, GA 30327
(770) 779-9602 (phone)
(404) 393-2828 (fax)

*Counsel for Plaintiff*

<u>/s/ Scott R. Grubman</u>
Scott R. Grubman
Georgia Bar No. 317011
<u>sgrubman@cglawfirm.com</u>

CHILIVIS GRUBMAN
DALBEY & WARNER LLP
1834 Independence Square
Atlanta, GA 30338
(404) 233-4171 (phone)
(404) 261-2842 (fax)

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing **PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS** will be served upon all attorneys in this matter via email or by filing with the Court's CM/ECF system.

This <u>24th</u> day of January 2022.

<u>/s/ Stacey Godfrey Evans</u>
Stacey Godfrey Evans
Georgia Bar No. 298555

*Counsel for Plaintiff*