1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
WAYCROSS DIVISION


DR. MAHENDRA AMIN, M.D.,    )
              )
      Plaintiff,   )
              )
    vs.       )   CASE NO.
              ) 5:21-CV-00056-LGW-BWC
NBCUniversal MEDIA, LLC,    )
              )
      Defendant.   )


MOTIONS HEARING
BEFORE THE HONORABLE LISA GODBEY WOOD
April 26, 2022; 3:06 p.m.
Brunswick, Georgia

APPEARANCES:

For the Plaintiff:   STACEY GODFREY EVANS, Esq.
           Stacey Evans Law
           4200 Northside Parkway NW
           Suite One; Suite 200
           Atlanta, Georgia  30327
           (770) 779-9602
           sevans@staceyevanslaw.com

           SCOTT ROBERT GRUBMAN, Esq.
           Chilivis Grubman, LLP
           1834 Independence Square
           Atlanta, Georgia  30338
           (404) 233-4171
           sgrubman@cglawfirm.com

For the Defendant:   ELIZABETH A. McNAMARA, Esq.
           Davis Wright Tremaine, LLP
           1251 Avenue of the Americas
           21st Floor
           New York, New York  10020-1104
           (212) 603-6437
           lizmcnamara@dwt.com

2

CYNTHIA L. COUNTS, Esq.
Fisher Broyles, LLP
945 East Paces Ferry Road, NE
Suite 2000
Atlanta, Georgia 30326
(404) 550-6233
cynthia.counts@fisherbroyles.com


R. BATES LOVETT, Esq.
Fisher Broyles, LLP
2 East Bryan Street
Suite 436
Savannah, Georgia  31401
(912) 335-4467
Bates.lovett@fisherbroyles.com


Reported by:                    Debbie Gilbert, RPR, CCR
                                Official Court Reporter
                                801 Gloucester Street
                                Post Office Box 1894
                                Brunswick, GA 31521-1894
                                (912) 262-2608 or (912) 266-6006
                                debra_gilbert@gas.uscourts.gov



                          - - -

3

1                    P R O C E E D I N G S

2              (Call to order at 3:06 p.m.)

3         THE COURT:  Good afternoon.

4         SPEAKERS:  Good afternoon, Your Honor.

5         THE COURT:  Ms. Sharp, call the next case.

6         THE CLERK:  Case CV-5:21-56, Dr. Mahendra Amin versus

7    NBCUniversal Media, LLC, Scot Grubman, Stacey Evans for the

8    plaintiff, Bates Lovett, Cynthia Counts, Elizabeth McNamara for

9    the defendant.

10        THE COURT:  Ready for the plaintiff?

11        MR. GRUBMAN:  Your Honor.

12        THE COURT:  Ready for the defense?

13        MS. EVANS:  Yes, Your Honor.

14        THE COURT:  Well, we have two motions that are pending,

15   the motion to strike the answer to the complaint or at least

16   parts of it and then the motion for judgment on the pleadings,

17   one motion filed by each side, and I'm going to start with the

18   defense.

19        They filed the judgment on the pleadings, and I may ask

20   you some questions about your opponent's motion as well as we go

21   along.

22        Please understand ahead of time that I did have the

23   opportunity to read all of the briefs that were submitted on

24   behalf of both motions so I do have that understanding of the

25   case in mind.  I've got some questions that I need to ask each

4

1   side, and I'm sure there may be things that you want to add to

2   your written product, and so this is your opportunity to do

3   that.

4           Having said that, who will speak for NBCU?

5           MS. McNAMARA:  Elizabeth McNamara, Your Honor.

6           THE COURT:  Ms. McNamara, if you will come to the

7   podium.

8           MR. GRUBMAN:  And, Judge, a quick housekeeping matter.

9           THE COURT:  Yes.

10          MR. GRUBMAN:  To my right is Amble Johnson, cocounsel

11  for Dr. Amin.  Mr. Johnson is not yet admitted, although his

12  application for the Southern District is pending.  Is it okay

13  that he sits here?

14          THE COURT:  That's fine that he sits at counsel table.

15          MR. GRUBMAN:  Thank you.

16          THE COURT:  All right, good afternoon, Ms. McNamara.

17          MS. McNAMARA:  Good afternoon, Your Honor, Elizabeth

18  McNamara of Davis Wright Tremaine on behalf of the defendant,

19  NBCUniversal Media.

20          We're here, as Your Honor is well aware, on NBC's Rule

21  12(c) motion to dismiss the complaint as privileged reports

22  concededly of highly newsworthy accusations against a doctor,

23  the plaintiff, Dr. Amin, that he was performing gynecological

24  procedures on immigrant inmates at the government detention

25  facility either unnecessarily or without adequate consent.

1      Just briefly, a couple of note issues that are not under

2  dispute in this case.  There's no dispute that the allegations

3  were, in fact, filed with four government agencies, including

4  the inspector general's office of the Homeland Security.

5      There is no dispute that the submission that was filed

6  in its first sentence styled itself as a complaint on behalf of

7  a protected whistleblower, and there's no dispute, finally, Your

8  Honor, that within 24 hours of the filing of the complaint, in

9  addition to widespread coverage in the media and condemnation

10 from certain public officials, ICE confirmed that an

11 investigation was underway and a team of investigators from

12 Homeland Security was sent to ICDC, and, in fact, to this day --

13      THE COURT:  So I understand the timeline is, around

14 September 14th, the letter, as Plaintiff characterizes it --

15 whistleblower complaint, as you characterize it -- was filed,

16 and that next day, September 15th, various news organizations

17 reported it or just NBC News?

18      MS. McNAMARA:  No, Your Honor, actually, as we put a

19 footnote, there was a ton of media coverage actually that

20 commenced on September 14th, the same day as the filing.  The

21 first broadcast aired on NBC on September 15th, and there was

22 significant media coverage that predated or preceded the NBC

23 coverage.

24      THE COURT:  And at the time of the first NBC coverage on

25 the 15th, had agency action already begun?

6

1    MS. McNAMARA:  Yes, it had, or the announcement that ICE

2    was going to be investigating had occurred by the first show,

3    and then as the shows went on in the progressive days more

4    events occurred.

5    THE COURT:  All right, proceed.

6    MS. McNAMARA:  Thank you, Your Honor.

7    So on this motion NBC contends first that the entire

8    action should be dismissed as privileged under either or both of

9    Georgia's fair report privilege and/or its public interest

10   privilege.

11   THE COURT:  Let me stop you there because it could

12   pretermit some of the questions that I have for you, and I

13   notice that you say Georgia's law, and I was not terribly taken

14   with your argument for application of New York law.  Is that --

15   MS. McNAMARA:  Well, Your Honor -- I'm sorry.

16   THE COURT:  -- something that you're dropping at this

17   point?

18   MS. McNAMARA:  I wouldn't say I'm waiving it, Your

19   Honor, but we're going to focus on Georgia's privilege because

20   we feel comfortable that the privileges in Georgia are

21   sufficient to dismiss this entire action.

22   So focusing on Georgia's privileges, we've moved under

23   two separate privileges under Georgia's Code 51-5-7.  The first

24   is the fair report privilege, which is codified in Subsections 5

25   through 7, and the other is the public interest privilege, which

1   is codified in Subsection 4.

2        I want to underscore that this Court can dismiss the

3   action under either or both of those provisions, so I'll

4   consider the application of the news reports to the privileges

5   first, and then since the actual malice defense applies to both

6   privileges, I'll address the actual malice defense.

7        So first, Your Honor, briefly I'll address the public

8   interest privilege, and I say briefly because there's really no

9   dispute in this opposition that the language of Subsection 4

10  does, in fact, apply to the news reports at issue here.

11       It provides in relevant part that statements that are

12  made in good faith as part of an act in furtherance of a

13  person's free speech in connection with an issue of public

14  concern are privileged.

15       The plaintiff makes no substantive argument that these

16  reports are not covered by Section 4.  Instead the plaintiff

17  argues either that actual malice would prevent -- the

18  allegations of actual malice would prevent the enforcement of

19  the privilege or that federal courts will not apply Georgia's

20  anti-SLAP statute, and as to the latter point, Your Honor, we

21  agree.

22       We're not here on an anti-SLAP motion, and NBC is not

23  seeking any of the procedural remedies that are afforded by

24  Georgia's anti-SLAP motion.

25       Instead, NBC seeks application of the public interest

8

1   privilege under Georgia's privilege statute, and this is a

2   substantive right applicable in federal court independent of the

3   procedural rights afforded by the anti-SLAP statute, and this

4   was found and recognized in the case cited by the plaintiffs.

5   *Adventure Outdoors versus Bloomberg* made the observation that

6   the provisions are substantive and can be applied in federal

7   court.

8        So setting aside actual malice, which I'm going to get

9   to -- they make no other argument on the application of

10  Subsection 4 -- I will move to the fair report privilege under

11  Georgia.

12       THE COURT:  Let me ask you, turning to the statute,

13  9-11-11.1, which categories of acts do you address your primary

14  argument to?

15       MS. McNAMARA:  Well, Your Honor, I think there's

16  multiple categories.  Actually, "the act" is a word used in

17  Subsection 4 but then the definition of public concern is

18  addressed under 9-11-11.1.

19       THE COURT:  Which would you focus on?

20       MS. McNAMARA:  Yes, I would focus on that there was a

21  writing in a public forum in connection with an issue of public

22  interest or concern, which is Subsection (c)(3), as well as

23  Subsection 4, that any other conduct in furtherance of the

24  exercise of the constitutional right of petition or free speech

25  in connection with a public issue or an issue of public concern,

1   and the plaintiff here has admitted that this is highly

2   newsworthy, and I think we all would agree with that.

3        So turning to the fair report privilege, Your Honor,

4   there are certain fundamentals I would first underscore.   First

5   is that the fair report privilege is broadly applied in Georgia.

6   Recognized by *Lawton versus Georgia TV*, Georgia's Subsection 5

7   through 7 codifies the common-law fair report privilege, and as

8   The Court recognized, it has a broader scope and is treated

9   differently than some of the other privileges in the privilege

10  statute.

11       And this, of course, is consistent with basic First

12  Amendment principles that have long recognized the critical role

13  of the press in keeping the public informed about government

14  actions.

15       The plaintiff cites to a 1989 Georgia Supreme Court

16  decision, *Heard*, for the proposition that the privilege must be,

17  quote, construed strictly.  But *Heard* had nothing to do with the

18  fair report privilege.

19       It instead was interpreting a different subsection of

20  the privilege statute involving statements made by police, and

21  as The Court in *Heard* critically emphasized, this was an

22  immunity that did not exist at common law, unlike the fair

23  report privilege, and since it did not exist at common law, The

24  Court found it should be construed strictly.

25       Next, further on the fundamentals, Your Honor, the fair

1    report privilege can be decided and often is decided as a

2    question of law on an upfront motion to dismiss.  Courts around

3    the country have dismissed fair report actions up front, and

4    that was also recognized in *Lawton versus Georgia TV*.

5          Now, turning to Plaintiff's arguments on why the fair

6    report privilege should not apply, he first argues that the

7    whistleblower complaint is nothing more than allegations made to

8    a government agency and that the privilege must concern

9    reporting on actions by a government finding, like a report or a

10   ruling or some issuance.

11         Now, we submit that there's a number of problems with

12   this argument, but the most important is that it finds no

13   support in the law.

14         They don't cite to any cases that squarely held that

15   this must be an issuance of a report or government actions.

16         THE COURT:  Look at *Morton* with me, though.

17         MS. McNAMARA:  Absolutely.  I wanted to turn to *Morton*,

18   Your Honor.

19         THE COURT:  Yeah.  Can *Morton* be read that specific

20   adjudicatory proceedings is, in fact, what makes a government

21   entity quasi-judicial?

22         MS. McNAMARA:  Well, here the inspector general of

23   Homeland Security has an adjudicatory role.  It can issue

24   rulings and reprimand people and have all sorts of issues, you

25   know, akin to judicial, so in that way it is quasi-judicial in

1  the same way that the board of the -- the Georgia State Medical

2  Board, which was at issue in *Morton*, was deemed to be.

3       THE COURT:  And do the pleadings support that the IG of

4  Homeland Security was, in fact, one of the recipients of the

5  letter?

6       MS. McNAMARA:  Absolutely, and it was the inspector

7  general's office that continues to investigate in connection

8  with the allegations concerning Dr. Amin as is the DOJ, by the

9  way, so turning back again to *Morton*, because it is an important

10  case that the plaintiff focuses on as substantiating the

11  contention that there must actually be a report issued or a

12  finding or something from a government agency, the court there

13  observed that there could be no dispute that -- let me step back

14  for a moment.

15       *Morton* concerned letters that were sent to the Georgia

16  medical board and the court found that -- and I quote from the

17  decision, Your Honor -- that the -- the accuracy of the

18  newspaper's submission reporting the gist of the letters

19  submitted to the board concerning the activities, and, because

20  it was substantially accurate, it was found to be a complete

21  defense.

22       It was clear that the news article was reporting on the

23  letters that were submitted to the board.  The plaintiff

24  identifies the use of the word "report" in the prior sentence,

25  but the word "report" in that prior sentence is referring to the

1    newspaper article.  The sentence reads, "As the newspaper

2    article was a report of a quasi-judicial proceeding of a public

3    body, it need only be fair and accurate to qualify for the

4    conditional privilege."

5         THE COURT:  So the body was up and functioning at the

6    time that I guess it was the AJC reported about it.  Here, it's

7    a letter to what you say is a quasi-judicial organization.  It's

8    just a letter to them at that point.

9         MS. McNAMARA:  Well, Your Honor, it was more than just a

10   letter to them at that point.  I think the distinction -- and I

11   think when you look, step back, and let me focus on the Georgia

12   Supreme Court decision in *Berryhill*, because I think what the

13   courts protect against in the context of the fair report

14   privilege is they are not going to accord the privilege to, just

15   as in *Berryhill*, they were just e-mails sent to a government

16   agency.  As The Court made clear in *Berryhill*, there was no

17   action either before or after of an investigation.

18        Here there is indisputably, within 24 hours, the federal

19   government announced they were taking action, and that

20   announcement coincided and preceded the news reports at issue

21   here.

22        So to our mind, what the cases really seek to

23   distinguish is that you don't get the privilege just on the

24   random communications to a government agency, but at this point

25   that complaint that was filed with the -- it was filed with ICE,

1   it was filed with Homeland Security, Civil Rights Division --

2         THE COURT:  It was being acted on.

3         MS. McNAMARA:  -- it was clearly being acted upon.  It

4   was announced that they were sending investigators down to the

5   facility in Georgia to investigate it.

6         And so we submit that, you know, the same conclusions

7   should be reached here, and under *Morton* and other cases

8   applying Georgia's fair report privilege, there should be no

9   dispute, we submit, that they are fully covered by the

10  privilege.

11        And so let me turn to the plaintiff's arguments on why

12  this is not a fair and honest report, which is, of course,

13  required for a fair report privilege.

14        Again, there is no dispute as to the operative standard

15  here, Your Honor.  It's clear that news reports don't need to be

16  dry verbatim accounts of the filing.  The Court instead looks to

17  whether the news report conveys the gist or the sting of the

18  filing, and here there is no question that the complaint

19  conveyed a most serious portrait concerning Dr. Amin.

20        He was described as a uterus collector, experimenting

21  with detainee's bodies.

22        THE COURT:  And all this is from that letter?

23        MS. McNAMARA:  Exactly.  Those are direct quotes from

24  the letter.  The women didn't fully understand what or why they

25  were receiving these procedures, and the accusations were not

1   limited to hysterectomies, as the plaintiff tries to argue.  It

2   also related to other procedures that were received that were

3   either not fully understood by the participants or the inmates

4   or were unnecessary, like the letter specifically talks about an

5   instance where one inmate had her -- the wrong ovary was taken

6   out.

7          And, in fact, plaintiff doesn't seriously challenge here

8   that the news reports conveyed a similar gist as the

9   whistleblower complaint.  The actual segments quote verbatim

10  from the report and/or quote and/or rely on information that's

11  entirely consistent with the whistleblower complaint.

12         THE COURT:  I think the way they perceive "gist" is

13  because this was a long letter that was an awful lot about COVID

14  and 20-some pages and only two of which talked about uterus

15  collecting that that wasn't really the gist.  The gist of the

16  letter was COVID is I think what --

17         MS. McNAMARA:  Yeah, they made two arguments.

18         THE COURT:  -- the gist argument is.

19         MS. McNAMARA:  Exactly, Your Honor, that's one of the

20  arguments, and my response to that is, first of all, the rest of

21  the letter about the facility not complying with COVID protocols

22  and putting people at risk with COVID did not concern Dr. Amin.

23         The two pages that dealt with Dr. Amin were the pages

24  about the unnecessary medical procedures and/or procedures that

25  were not adequately consented to.

1    THE COURT:  They also mention numerous occasions in the

2    briefing that the letter itself doesn't ever mention his name.

3    MS. McNAMARA:  Exactly.  That is their other argument on

4    why it's not a fair and true report, and, Your Honor, first of

5    all, there is no dispute that this was of and concerning Dr.

6    Amin.

7    I mean, it was immediately reported widely and the

8    Government acknowledged that it was about Dr. Amin.  And what's

9    interesting about that argument, that his name was not used in

10   the report, is that the plaintiff relies extensively on ICE's

11   statement as a vindication of him, the statement that we

12   actually did report in the news articles, our news reports, and

13   that ICE statement did not use Dr. Amin's either.

14   Yet the plaintiff relies on it when it's in their

15   interest that it doesn't use the name but the --

16   THE COURT:  What legal significance are we to make of it

17   in the context of these pleadings?  What legal significance does

18   it have that the actual name wasn't used?

19   Is it the Pocahontas rule?  They say what Native

20   American Indian princess, the answer is always going to be

21   Pocahontas.  What Article III federal judge who sits in

22   Brunswick, the answer is always going to be me.

23   MS. McNAMARA:  Right, the plaintiff pled here in

24   Paragraph 36 of his complaint that he was the only OB-GYN doctor

25   in Irwin County, and he was the only -- they don't plead this --

1    but he was, in fact, the only doctor who was providing OB-GYN

2    services to the ICDC facility, so that's why he was so readily

3    identifiable and the legal principle is really that it's of and

4    concerning him.  You don't need to use a name.

5         THE COURT:  You would say that because it is readily

6    identifiable then that doesn't detract from either fairness or

7    accuracy.

8         MS. McNAMARA:  Correct, Your Honor, absolutely.  So the

9    two arguments are the name and then the COVID protocols versus

10   it, and I've addressed both of those, so we believe that the

11   fair report privilege does indeed apply here, should apply and

12   is enough to dismiss the entire actions, Your Honor.

13        So I will turn to -- since this is a qualified privilege

14   in Georgia, they can overcome the privilege by adequately

15   pleading facts to support a finding of actual malice.

16        And here, again, there's no dispute that to overcome the

17   privilege, they must plead facts that support a finding of

18   actual malice by clear and convincing evidence, and we submit,

19   as we've argued, that the plaintiff has failed to meet his

20   burden under the Eleventh Circuit's clear guidelines.

21        First, the plaintiff argues that the issue of actual

22   malice cannot be resolved on a motion to dismiss because it's

23   generally a jury question, yet the plaintiff largely looks to

24   pre*Iqbal* and *Twombly* law.  For example, it relies heavily on the

25   *AirTran* decision from 1999 and ignores the Eleventh Circuit more

1    recent decisions that affirm over and over dismissals on a

2    motion to dismiss because the plaintiff failed to adequately

3    allege facts to support actual malice, and here the plaintiff

4    makes three arguments primarily in support of actual malice,

5    none of which we submit cross the line into the plausible

6    factual allegations.

7         The first is that the plaintiff conclusorily alleges

8    that NBC conducted no investigation to establish the truth of

9    the allegations.

10        Yet, of course, to rely on the fair report privilege

11   does not require an independent investigation.  The privilege

12   looks to whether the media fairly and accurately addressed the

13   allegations in the complaint at issue, not whether they are

14   independently true or whether they are, in fact, true.  It's

15   whether they have adequately addressed accurately and fairly the

16   statements.

17        THE COURT:  I think, though, as we look at this issue,

18   perhaps a more fruitful way to do it is, rather than pull up

19   every attempt individually to set forth actual malice, what is

20   more fair to all concerned is to look at the whole constellation

21   of allegations they have made with regard to actual malice as I

22   have to do, and rather than try to knock each one down one at a

23   time and say we have nothing, it's really the sum of the

24   allegations that might be the most powerful.

25        MS. McNAMARA:  I agree, Your Honor, and I think in order

1  to do that, however, one needs to look at the building blocks to

2  get to that sum.

3         You can't start at the sum because really the sum is

4  made up of certain of those building blocks.

5         THE COURT:  All I'm saying is I do reject the temptation

6  to hear you knock down each one and then say there is nothing.

7         MS. McNAMARA:  Okay.

8         THE COURT:  But proceed.

9         MS. McNAMARA:  Absolutely, Your Honor, and I appreciate

10  that, and thank you for underscoring that point.

11         The other point about no investigation is that, of

12  course, on the face of the broadcast, it's evident that they

13  had, in fact, conducted --

14         THE COURT:  Talked to the lawyers.

15         MS. McNAMARA:  They talked to the lawyers.  They talked

16  to the whistleblower, but what's critical under the Eleventh

17  Circuit guidance I think more than anything here is that they

18  reached out to get comment from all the parties involved,

19  including Dr. Amin, and when they obtained comment, they

20  included the full statements in the broadcasts, and as the

21  Eleventh Circuit, I think, noted in *Michel's*, when an article

22  made clear the journalist and, I quote, spoke to, consulted or

23  reached out to the parties involved, it's hard to see why,

24  quote, none of that qualified as due diligence, end quote.  That

25  is equally true here, Your Honor.

1        They also, I think, underscore -- and this I think goes

2   to the sum of the total and the global -- is that they argue

3   strenuously that the claims -- that we -- that the NBC had

4   serious reason to doubt the accuracy of this information.

5        THE COURT:  They say it's so outlandish.

6        MS. McNAMARA:  Yes, they say it's inherently improbable.

7   They say that it was secondhand information and they had this

8   ICE statement saying that there had only been a referral of two

9   hysterectomies to -- to the -- from the facility, and here

10  what's critical -- and again relying on the Eleventh Circuit

11  decisions -- is that the reports include each of those defenses.

12       They include that this was contended to be hearsay.

13  They include Dr. Amin's statement about that he absolutely

14  didn't do this, and there was, you know, denied it vociferously.

15  They include the ICE statement over and over about the only two

16  references, but they also questioned that statement in the body

17  of the broadcast.  All it says, there were only two that were

18  referred.  Of course, that only speaks to hysterectomies, and

19  yet the broader allegations were about medical procedures that

20  went beyond hysterectomy per se, included things like taking

21  someone's ovaries out or the wrong ovary out and other

22  procedures that were not adequately understood by the inmates.

23       And as the Eleventh Circuit in *Michel's* again found that

24  when a defendant includes the alleged contrary evidence in its

25  report, this is, quote, far from intentionally avoiding the

1   truth, end quote, and, quote, undermines the plaintiff's claim

2   that they acted with actual malice, end quote.  That's at Page

3   705, and the Eleventh Circuit in *Turner* made a similar

4   observation where the plaintiff was raising a number of issues

5   that they found should have put them on notice that there was

6   something false here or inadequate.

7        THE COURT:  Let me ask you at this point:  Is it your

8   contention not only that they haven't adequately alleged actual

9   malice in order to get by a motion for judgment on the

10  pleadings, but they are not able to.

11       MS. McNAMARA:  I think so, Your Honor, and I'll tell you

12  why.  I mean, they do make a request, as you know, in a sentence

13  in their brief about an amendment to the complaint, but they

14  don't specify in any way what has happened, and the since the

15  time -- and we've got to go back in time and these reports were

16  literally two to three days after the thing, very early in the

17  process.

18       Since then, based upon reports that have come out of

19  Congress, and there's -- and into these investigations, Dr.

20  Amin's, there's been a finding issued -- we link to it in

21  Footnote 5 -- in our reply of a letter from Congress to the

22  secretary of Homeland Security revealing that a doctor had

23  looked at thousands of pages of medical records concerning these

24  inmates and found there to be serious inadequate treatment to

25  the degree that there was a referral to the board of medical

1   examiners.

2        THE COURT:  That also smacks, though, of the kind of

3   thing that discovery would reveal and not the kind of thing that

4   would be proper to adjudicate on a motion for a judgment on the

5   pleadings.

6        MS. McNAMARA:  You're absolutely correct, Your Honor,

7   and we're not advocating that that should be a part of this.

8   We're looking at the submissions, the complaint, the news report

9   and the ICE statement are the key documents that are

10  incorporated, we submit, by reference in the complaint because

11  they are relied on there and that this goes to -- I know Your

12  Honor is separately considering the motion to strike but that

13  goes to the motion to strike issue where again the Eleventh

14  Circuit has made it crystal clear that, in *Horsley,* that The

15  Court can and should consider documents that are integral to the

16  complaint on a motion to dismiss without moving it to summary

17  judgment, and we are not -- and, you know, when you have a

18  privilege like this, it's important that they be vindicated if

19  at all possible on a motion to dismiss.

20       The last point I will make on the actual malice issue,

21  Your Honor, is they talk about motive.  I'll just say one thing

22  about this.  They say that the motive was to feed the ratings,

23  but, of course, the personal motives of the parties has nothing

24  to do with actual malice, which goes to whether they knew, in

25  fact, knew the statements were false or serious, and that was

1    determined by *Harte-Hanks*, the US Supreme Court, decades ago, so

2    that does not support the actual malice.

3          And then putting that all together, what you have are

4    reports that quoted verbatim and/or were consistent with the

5    reports.

6          You have reports that revealed all the information they

7    were aware of that might be contrary to those reports, and it is

8    that mix that the Eleventh Circuit has over and over again found

9    to be insufficient at the motion-to-dismiss stage to state

10   actual malice.

11         So we would submit that amendment isn't warranted and

12   that it should be dismissed.

13         So I will just very briefly mention the opinion/

14   rhetorical/hyperbole argument.  That doesn't dispose of the

15   entire case, but it would dispose of a number of the statements

16   that we've identified, and they are itemized in our papers.  I

17   won't bore The Court with them right now.  They fall into two

18   categories, Your Honor, really.  One is statements about women

19   being described as being afraid or didn't understand or felt

20   like the situation was abusive.

21         These are clearly perceptions of an individual that are

22   not -- they are not able to be proven true and false whether a

23   woman did or did not understand something, whether a woman was

24   or was not afraid, and then the other bucket of statements we

25   argue should be dismissed on this independent grounds are really

1   the clear rhetorical/hyperbole statements, the uterus collector,

2   the experimental concentration camp, that everybody had their

3   uterus taken out, and Dr. Amin does not challenge the broader

4   charges against him, the factual underlying for this, that he

5   performed unwanted or un-consented, adequately consented-to

6   gynecological procedures.

7          If you parse his complaint, it is rigidly focused on

8   hysterectomies.  It does not speak to the other more broader

9   contention against him, and so for all these reasons, Your

10  Honor, and those in the papers, we ask The Court to grant the

11  motion.

12         THE COURT:  Let me hear from you, although it is out of

13  turn in a way, about the motion to strike your answer.

14         MS. McNAMARA:  Yes, Your Honor, and I apologize if I'm

15  not adequately prepared.  I didn't know that that was on the

16  record, but as I indicated earlier, basically, the primary focus

17  of the motion to strike is that The Court cannot and should not

18  consider these key documents, the whistleblower complaint, the

19  transcripts or videos of the news reports at issue and the ICE

20  statement.

21         THE COURT:  You're stating they are central.

22         MS. McNAMARA:  And we submit that each of them are

23  identified and spoken about in the complaint and are clearly

24  integral to the complaint.  You have to look at the transcripts.

25  There's a basic fundamental principle in any defamation claim,

1    you have to look at statements in context.

2         So, for example, as the statements are quoted in the

3    complaint, they tend to start in the middle of a sentence, and

4    the preceding information in the sentence says, you know,

5    "According to the whistleblower's complaint" and then goes to

6    quote and they just pick up the quote, so in order to appreciate

7    that this is clearly something covered, we submit, by the fair

8    report privilege, you need to look at the transcripts, the

9    entire -- what is said in its entirely.

10        THE COURT:  I didn't pick up on any, but I'll ask both

11   sides this, beginning with you.  Is there any dispute that what

12   you have included is authentic?

13        MS. McNAMARA:  There is nothing in the record.  They

14   haven't, in connection with either our motion to dismiss, Your

15   Honor, or the motion to strike, there's been no contention that

16   any of those three kind of categories of documents are not

17   authentic and are not accurate, and should there be any issue,

18   clearly that's the case with the whistleblower complaint;

19   clearly that's the case concerning the ICE statement.

20        With regard to the shows themselves, that's in part why

21   we supplied The Court with the transcripts but also the videos.

22   You can watch them to see that they are, in fact, literally true

23   as to what's there.

24        THE COURT:  Thank you, Ms. McNamara.

25        MS. McNAMARA:  Thank you very much.  I appreciate Your

1    Honor's time.

2         THE COURT:  Let me turn to the plaintiffs then.  Who

3    will argue, Ms. Evans?

4         MS. EVANS:  Yes, Your Honor.

5         THE COURT:  All right, and let's start there, where we

6    left off with Ms. McNamara and the motion to strike.

7         Looking at Rule 12(f), it's always more restrictive than

8    I think, and it has very restricted categories of information

9    that justify striking an answer.  And as I read your motion to

10   strike, it's more the spirit of the answer that you object to.

11        You've explained that really it seems as though the

12   answer was packed with things to tee up a motion for judgment on

13   the pleadings rather than just to respond to what you had put in

14   the complaint.

15        But looking at motion to strike as a vehicle, Rule 12(f)

16   just tells to look for material in an answer that is redundant,

17   immaterial, impertinent or scandalous, and although I appreciate

18   that there's strategy involved in the pleadings that have been

19   submitted, can you point to me any part of the answer that's

20   redundant or immaterial or impertinent or scandalous?

21        MS. McNAMARA:  Thank you, Your Honor.  And understanding

22   that the burden on a motion to strike is high, we did file it,

23   though, Your Honor, because of exactly what you picked up on,

24   that it was meant to tee up this motion for judgment on the

25   pleadings.

1          A motion to dismiss deadline came and went, and when we

2     had a 26(f) conference with opposing counsel, I said, "Well, I

3     guess we're going to move right into discovery because there is

4     no dispositive motion."

5          "Well, hold on a second; we're getting ready to file a

6     motion for a judgment on the pleadings; there wasn't enough in

7     the complaint for us to do it so that's why you might have

8     noticed that our answer was a speaking answer and so now get

9     ready for this."

10         That's an improper purpose that has now taken us on a

11    delay away from discovery where Dr. Amin has already been

12    waiting for years to start vindicating his reputation.

13         And the answer included news reports for the truth of

14    the matter asserted, and I know we're switching between motion

15    to strike and motion for judgment on the pleadings arguments --

16         THE COURT:  Let's stay with this motion because, even if

17    it did, even if it had information that contradicted your

18    complaint, the judgment on the pleadings standard would have me

19    honor your complaint.  That is, you win the dispute on a

20    judgment on the pleadings side.

21         So even if there's things in there that would conflict

22    with your complaint, your complaint wins.  And so again I've got

23    to go by 12(f), and it doesn't ask about strategy or, you know,

24    loading.  It asks about redundant, immaterial, impertinent or

25    scandalous.

1      MS. EVANS:  It does talk about improper burden as well,

2  though, Your Honor, on the other party, and because they put new

3  facts, new allegations, their side of the story, so to speak, in

4  an answer, which is normally what you don't have, and we don't

5  have an opportunity to respond to that answer.

6      While I appreciate Your Honor recognizing that, yes, our

7  complaint wins, they went well beyond that and started talking

8  about what other news organizations did and we haven't had a

9  chance to respond to that, and then they pack all that into

10 their motion for judgment on the pleadings and it puts us back

11 on our heels a little bit because we can't point to where we've

12 already responded to this because we haven't had that

13 opportunity to do so, so I would lean on the burden that it has

14 created and also, Your Honor, that many of the materials that

15 they cited are not central to our complaint.

16      I'm not going to argue that they shouldn't be able to

17 put in the whistleblower complaint or even the transcripts of

18 the segments we are contending are defamatory, but those

19 transcripts are of the whole show, so you've got information

20 from Dr. Fauci, you've got whatever story, whatever defense

21 story was following, and this is a lot of information in the

22 record that really has nothing to do with this case, and then,

23 again, Your Honor, putting in these news reports for the truth

24 of the matter asserted when they're not proper for judicial

25 notice and essentially asking The Court to take judicial notice

28

1   without asking and actually briefing that issue, that's what

2   we've ended up with.

3           THE COURT:  Do you, in fact, dispute the authenticity of

4   some of them?

5           MS. EVANS:  Of the news reports, Your Honor?

6           THE COURT:  Of what was included in any way in the

7   answer.

8           MS. EVANS:  I don't have any basis of doing that now.  I

9   couldn't say that throughout discovery that we might not take

10  issue with some of the news reports and the authenticity of

11  them, but I'm not in a place where I can do that at this moment,

12  which is part of the problem why sort of the cart before the

13  horse in this speaking answer that we received.

14          THE COURT:  Anything further you would like to add with

15  regard to the motion to strike before we move on to the

16  substantive motion?

17          MS. EVANS:  No, Your Honor.

18          THE COURT:  All right.

19          MS. EVANS:  I did want to start if it's okay with The

20  Court just clearing up the record a little bit on some of the

21  things that Ms. McNamara said that we don't dispute that we very

22  much do, and first and most is that, yes, we do dispute that

23  there was a government investigation at the time of these

24  broadcast.

25          There absolutely was not, and our complaint makes that

1    clear.  This whistleblower complaint was not a whistleblower

2    complaint.  It was a letter.  There is no evidence that it was

3    ever even filed or sent to the addresses that are set out on

4    that letter, and, in fact, while we shouldn't be getting into

5    fact issues of what different agencies said or didn't say,

6    Defendant has put into evidence, into the record here at

7    Document 18 a statement from ICE that directly refutes the fact

8    that there was government investigation or government action at

9    the time.

10        This is from ICE -- this is a statement from ICE --

11   where it's clear that the only government action at the time of

12   the broadcast was a statement from ICE that the alleged

13   whistleblower had not followed the process and that, if there

14   was an investigation, ICE would cooperate, if/then, announcing,

15   "If there is an investigation, absolutely we will be here," but

16   this is a quote from ICE and this is again not something we

17   would have put in at this stage but Defendant did.  Quote, this

18   is from ICE, "It is unfortunate that those involved in this

19   report have chosen to first go to the media with their

20   allegations without allowing the Government to examine or take

21   appropriate action."

22        THE COURT:  What is the date on that?

23        MS. EVANS:  That is the day of the first broadcast,

24   September 15th.  The only affirmative statement by any

25   government action, any government agency was again that ICE

1   would cooperate if there was an investigation.  Quote, ICE

2   intends to fully cooperate with any resulting investigation by

3   the OIG, again forecasting that if this happens, we will be

4   there.

5          THE COURT:  But not a confirmation.

6          MS. EVANS:  Not a confirmation, and, in fact, I think

7   the Government is saying very clearly, "This is not how we do

8   it.  There was a complaint that did not follow our process.

9   There's no evidence that it was filed.  There is no evidence

10  that it was mailed.  There is no evidence that it was submitted

11  through the formal channels," and if you -- again, it's weird to

12  argue fact issues, Your Honor, but they have put it into focus

13  so I feel like I need to make sure The Court is aware.  You can

14  look up the formal Department of Homeland Security/ICE process

15  for filing a formal complaint.  You submit it, and they take it

16  from there.

17         You can say, "I want to be private all of the time."

18  You can say, "I give you permission to release my name as

19  necessary."

20         But at that point the Government controls that

21  investigation.  The Government controls mentioning those

22  allegations.  It is now in the hands of the Government, and what

23  happened here was someone released allegations to the media and

24  then tried to pretend like that was part of a government

25  investigation and the media grabbed on that to avoid the need to

1    fact-check because they were going to rely on the fair report

2    privilege.

3        It's a terrible precedent under defamation law to set up

4    the situation where someone can take their allegations to the

5    media and say, "Oh, now that the Government is investigating it,

6    it's a government action and a fair report privilege applies,"

7    but if you look at the cases that are cited, you're not going to

8    find, Your Honor, you're not going to find a single case cited

9    that allows the use of a fair report privilege on allegations

10   made to a government agency without also having the Government

11   talk about what they are doing, what they have been doing and

12   mostly and usually what they've already found because, as is

13   explained in this ICE statement, they make it very clear, "This

14   is not how we do it; we investigate and then we will tell you

15   why we investigated and then we will tell you what we found."

16   That is where you get the fair report privilege.

17       THE COURT:  But in any event, you would point out there

18   was not even an investigation at the time the report was made on

19   the 15th?

20       MS. EVANS:  Exactly, and at the very least, Your Honor,

21   again, we're here on a motion for judgment on the pleadings.

22   All reasonable inferences to our allegations have to be

23   respected and we say there was no investigation at the -- and

24   this ICE statement actually supports us, not them.

25       At the very least, though, Your Honor, it's a fact issue

1   as to whether this was actually a government proceeding and

2   investigation, a discussion of any government action whatsoever,

3   which is what you have to have for the fair report privilege.

4           Now I was also taken aback by Defendant's argument that

5   we don't concede that the public interest privilege applies.  We

6   very much --

7           THE COURT:  She said you concede that it applies.

8           MS. EVANS:  We very much do not concede that it applies,

9   Your Honor, and it doesn't, or if it does the -- well, let me

10  back up and say this.

11          Up until today, Your Honor, Defendant has said in their

12  briefing, including on Page 9 of their reply brief, that the

13  public interest privilege also attaches to proceedings.

14          This is the first time, Your Honor, that I have heard

15  them say that they are going to ask for the privileges under

16  5157 Subsection 4 to include 9-11-11.1(c)(4).

17          It's the first time, Your Honor, and I would ask humbly

18  that if Your Honor is going to consider that argument that we

19  have the ability to brief because this would be a huge change in

20  the application of the public interest privilege, and, in fact,

21  if their interpretation of how the public interest privilege

22  should be applied here, if they really are arguing for

23  Subsection 4, (c)(4), that obliterates the fair report

24  privilege.

25          THE COURT:  And I did hear that that was their

1   contention, the (c)(4).

2       MS. EVANS:  Yes, but I had never heard that, Your Honor,

3   until today because, even through the reply brief, they were

4   talking about how the public interest privilege attaches to

5   certain proceedings, and since we don't have a proceeding, in my

6   mind, we don't have to worry about it, but if they are going to

7   argue that you don't even need a proceeding for there to be this

8   privilege that the media can use, I would argue -- and we can

9   get into it, Your Honor, if you wish -- but if you use the

10  public interest privilege that broadly so that the media can now

11  talk about anything that's a public issue and not have to worry

12  about truth, why do we need the fair report privilege?  You

13  would then be making 51 --

14      THE COURT:  That would swallow it.

15      MS. EVANS:  It would be superfluous.  5157(5) and (6)

16  would have no more meaning and no use in the law.  We're not

17  allowed to interpret statutes that way, so, again, Your Honor, I

18  don't suggest that you go down that rabbit hole, but if you do,

19  I would respectfully request for an opportunity to brief because

20  it really would be a very big change in Georgia law.

21      THE COURT:  You heard my statement.  Coming into this

22  argument, I thought Defense was going to argue for New York law,

23  and although she's not conceding that that's out of the

24  question, I do think Georgia law is appropriate under our

25  choice-of-law provisions no matter what exception you go to.

1    They all, public policy, it all leads back to Georgia applying,

2    but in any event, whether we're looking at any of those

3    privileges, tell me about malice in the pleadings thus far.

4          What is the most you can say about what has been pled

5    thus far to plausibly allege actual malice?

6          MS. EVANS:  Absolutely, Your Honor, and thank you.

7          And I agree with you completely that we've got to look

8    at this as a whole sphere, and, yes, we would certainly agree

9    that a lack of investigation on its own would not be enough --

10   excuse me, Your Honor -- that a profit motive alone is not

11   enough, but we get to consider this whole picture, and what we

12   have in this case is very rare in a defamation case where you're

13   trying to show actual malice is we not only allege reckless

14   disregard for truth or falsity, we allege knowledge.  We allege

15   that NBCUniversal had knowledge on the first day that it started

16   the broadcast, much less when it did Number 2, Number 3, Number

17   4 and Number 5, they had knowledge that there was a statement

18   out there from ICE that directly contradicted what they were

19   saying with regard to mass hysterectomies.

20         Now they want to say -- this is what Ms. McNamara was

21   talking about with regard to there was only two referrals.

22   That's different from saying there was only two hysterectomies,

23   but, again, motions for judgment on the pleadings, our

24   allegations have to be taken as true including any reasonable

25   inferences.  That is the same thing.  When you're talking about

1   treating detainees at a government facility, if there's not a

2   referral and there's not an approval, and if there's not those

3   two things, there is not a hysterectomy.  It will not happen.

4        So when ICE said there is only two referrals, that means

5   only two hysterectomies, and they knew that on the first day,

6   and not only did they not say -- not only did they keep saying

7   mass hysterectomies over and over, not only did they keep

8   talking about the uterus collector, they didn't even tell the

9   viewers about the referral statement.

10       They say that they did.  Not until September 22nd, seven

11   days after the broadcasts started.  After all of the broadcasts

12   that are the subject of this litigation, that's the first time

13   they talked about it.

14       They mention it in one of their briefs.  They only talk

15   about a statement that they got from the Irwin County Detention

16   Center on this issue on September 22nd and they say, "We

17   immediately put it up," ignoring the fact that they knew that

18   the ICE said two on September 15th.  If we want to talk about

19   other news reports, other people were reporting that.  They get

20   the same news wire service that everybody else does.  The AP was

21   reporting that as well.

22       They did not tell the viewers.  They knew and they kept

23   saying it.  They said it in five broadcasts, so I think that is

24   very -- we contend, Your Honor, that is very strong evidence of

25   actual knowledge that what they were saying was false.  At the

1   very least it is strong evidence for reckless disregard for

2   truth or falsity not to look further into that before continuing

3   to tell everyone that Dr. Amin was performing mass

4   hysterectomies on his detainees.

5        THE COURT:  Is that part of the reason that, although a

6   number of different news outlets reported this, you've only

7   identified NBCU as a defendant?

8        MS. EVANS:  There are different reasons why certain

9   organizations were chosen and others were not.  Your Honor, to

10  be honest, a big part of it is mentioning his name.  They want

11  to talk about all news reports but not a lot of people mentioned

12  his name.  For example, CNN never said his name.

13       THE COURT:  But if he is the only person that satisfies

14  the description that CNN used, how is that any different?  How

15  is Native American Indian princess any different or Native

16  American Disney princess any different than saying Pocahontas?

17       MS. EVANS:  Well, Your Honor, we're after the fact, and

18  so now we all know.  This was an OB-GYN that served Irwin County

19  in southeast Georgia, served the area for years and years.

20  Without the news reports, I doubt anybody knows his name.

21       And the reason that we know that's true and the reason,

22  going back again to where you have to have an actual government

23  investigation to get this fair report privilege, it's not just

24  anything that touches Government because they handle their

25  allegations differently.  While Defendant has said that there's

1   not been any report out of any investigation, there has.

2        The office of inspector general did eventually do an

3   investigation.  They clearly interviewed lots of people and got

4   through all the facts on that.

5        They released a report in January and it was before

6   Defendant's briefing, so even though it was out, they did not

7   mention it.  That report does not mention Dr. Amin.  The letter

8   does not mention Dr. Amin.  It alleges COVID violations and it

9   alleges mass hysterectomies, again not based on firsthand

10   knowledge, not mentioning Dr. Amin.

11        The report that came out in January says there was an

12   official action finally by the office of inspector general; here

13   is what we found.

14        First, we had allegations of improper COVID measures,

15   and we had allegations of unnecessary medical procedures, two

16   things.  They don't mention Dr. Amin.  They say those are the

17   two allegations that we were looking at and here's what we

18   found.

19        The allegations regarding COVID were found to have some

20   merit but the allegations of unnecessary medical procedures were

21   not substantiated by the investigation, though there were some

22   missing paperwork from a provider's office that we wish had been

23   submitted after treatment.  That's it.  Not substantiated, not

24   mentioning him, so if we were following the actual fair report

25   privilege scheme the way it goes, no one would have ever known

1    his name, so, yes, now we all know he's the only OB-GYN provider

2    within a certain radius of counties, but nobody knew that then.

3            THE COURT:  But it was readily ascertainable.

4            MS. EVANS:  I don't know that that's true, Your Honor.

5    It's certainly something that would be a fact issue at the very

6    least, and the standard right now that we have to apply, Your

7    Honor, is when we're talking about now we're moving to, even if

8    we assumed this letter could qualify for the fair report

9    privilege, which we say it couldn't, even if it could, it still

10   has to be a fair and honest report, and that is a fact issue on

11   the point that Your Honor is making, and even the New York law,

12   which I think we all agree does not apply, even under New York,

13   the *Cholowsky* case recognizes that if a report that is only

14   partly true or accurate would, quote, produce a different effect

15   on the reader than would a report containing the precise

16   truth -- partial truth being Dr. Amin, precise truth being we

17   don't mention him -- if that would have a different effect on

18   the reader, it cannot be said as a matter of law that the report

19   was fair and honest.

20           Now, would a report that doesn't mention Dr. Amin have a

21   different effect on readers?  Absolutely.  At the very least we

22   can't say as a matter of law it couldn't.

23           Dr. Amin got death threats.  His office was called.  He

24   was stalked.  He was called names that I -- I can't even stand

25   to think that he's had to live through this.  That wouldn't have

1   happened.

2        THE COURT:  Let me ask you this:  Is your real

3   opposition not that the reporting that the news organizations

4   did was inaccurate but that the reports that the complainers

5   made were inaccurate?

6        MS. EVANS:  Well, the complaint is certainly against

7   NBCUniversal, and under the law, a tale bearer is as guilty a

8   tale maker because that -- that --

9        THE COURT:  What if the tale bearer qualifies what they

10  tell by saying, "These are only accusations; the organization

11  disputes these."

12       MS. EVANS:  It doesn't necessarily change their burden

13  if they knew, and that would be again if they were relying on

14  the fair report privilege, but also just saying "This is an

15  allegation" alone does not prevent you as a publisher from

16  having to worry about truth or falsity.  That's why the law says

17  a tale bearer is as guilty as a tale maker because if I could

18  just couch everything I say with "It's alleged, it's alleged,

19  it's alleged," well, then I don't ever have to fact-check, and

20  that's not the incentive structure that the law seeks to provide

21  us.

22       I know I got off a little bit.  We were talking about

23  actual malice but I think the allegation that they knew on

24  September 15th -- that is our allegation -- it's supported; it's

25  not refuted -- at least creates a fact issue on actual malice in

1   addition to the full picture here, and I think the fact that

2   they waited and then finally did put this out on September 22nd

3   and pretended like it didn't exist before that, Your Honor, is

4   something that we can't ignore.

5          But this is definitely not a case like the cases that

6   the defendant has cited, this case, and I appreciate that you

7   mentioned that this isn't a situation where you want to knock

8   down each thing but those cases --

9          THE COURT:  Let me ask you, too:  Hypothetically if you

10  were afforded an opportunity to amend the complaint, would there

11  be things that would even be possible to include that would

12  affect the actual malice allegations?  I mean, is there anything

13  different you would say?

14         MS. EVANS:  Certainly we could always go in a little bit

15  more detail, Your Honor, as any good lawyer after the fact.  We

16  could talk about what ultimately became and who wasn't

17  consulted, the types of people that were and the type of biases

18  that they might have had, and it's all well and good that they

19  talked to the whistleblower and then they talked to lawyers of

20  detained women, but those are all one side of the story, and

21  when they seek to reach out to Dr. Amin, they do it 45 minutes

22  before broadcast and know that his hands are tied.

23         Your Honor, you've got to remember, while the detainees

24  may be able to waive their HIPAA right, Dr. Amin can't do that

25  for them, and if his defense is in those medical records, he

1    can't go on air and talk about medical treatment for these

2    women.

3         He's not even allowed to confirm that he treats them.

4    They knew this.  So while they want to pretend like they were

5    doing all this investigative work, it was very one-sided and it

6    was from very biased sources at this point where you had -- also

7    you had folks being told, "Tell your story and maybe you won't

8    get deported."

9         "I'll tell you whatever you want to hear if you tell me

10   I get to stay in this country."

11        THE COURT:  Let me go back to what I didn't understand

12   before the argument.  Coming in today, I was under the

13   impression that the plaintiffs agreed that the reports fell

14   under Georgia's public interest privilege.  I understand now

15   that is not your concession.

16        Walk me through your argument in that regard.  Why do

17   these reports not fall within Georgia's public interest

18   privilege?

19        MS. EVANS:  Because until today we were focused on a

20   proceeding, which I agree.  I think you have to have a

21   proceeding, even under the public interest privilege, and since

22   we don't have a proceeding for the reasons that I've stated --

23   there was no investigation; there was no government action;

24   there was no proceeding where you could come under this public

25   interest privilege where you could be taking your allegations

1   to, and that's because of the way the alleged whistleblower

2   handled it.  She went to the media first.  She didn't allow the

3   Government to take hold and let its own process work, so even

4   if, even if we were to concede -- which we don't; this is a fact

5   issue -- but even if we were to give some credence to, well,

6   they were talking about how there might be an investigation,

7   well, that's it then.

8         Unless the Government started talking about the

9   allegations that Ms. Wooten made, they don't exist as far as the

10   government proceeding for purposes of the public interest

11   privilege or for purposes of the fair report privilege to apply.

12         THE COURT:  And with regard to (c)(4), you didn't know

13   that that was being relied upon by Defense?

14         MS. EVANS:  Correct, and I'm happy to address that

15   briefly, Your Honor, but I do think --

16         THE COURT:  That's okay.

17         MS. EVANS:  -- it's in the weeds and it might be better

18   to have in briefing, but it would obliterate the fair report

19   privilege and we're just not allowed to do that.

20         THE COURT:  Anything further that you would like to add?

21         MS. EVANS:  I'll touch briefly on opinion, Your Honor,

22   the argument that this is non-actionable opinion.

23         First of all, another area where I think Defendant

24   misrepresented our statements is that, yes, we do contest the

25   allegations that he was performing any unnecessary procedures.

1    That's very clear from our brief.  It's also very clear from the

2    allegations in our complaint at least at Paragraphs 64, 65, 68,

3    76, 78, 79, 80, we allege that every procedure Dr. Amin did was

4    medically necessary and, in fact, we have the benefit of

5    hindsight of what the OIG did now, and they don't find any

6    evidence that anything was medically unnecessary.

7          Even the doctor that they quote from the Congressional

8    letter, which is not a proceeding that applies to these

9    broadcasts because it was well over a year afterwards, even that

10   doctor did not find evidence that there were unwanted medical

11   procedures.

12         He took issue with some of the care plans.  "I would

13   have done something different" but he doesn't say it was

14   unnecessary; he doesn't say it was unwanted.

15         So not only do we contest it, but I don't think that the

16   facts would support that he performed unnecessary procedures,

17   but the situation here with the opinion statements or the

18   hyperbole statements as they want to characterize, uterus

19   collector and whether women felt threatened or abused, the

20   underlying facts of those allegations are that Dr. Amin

21   performed unwanted, unnecessary procedures and that he was

22   performing mass hysterectomies.

23         Those statements can be proven true or false, and

24   because they can be proven true or false, there is no

25   non-actionable opinion or hyperbole, and I think that the

1    Georgia Supreme Court case *Georgia Society of Plastic Surgeons*

2    *versus Anderson* is the best case for Your Honor to look to for

3    guidance on this.

4         It was a jury verdict for plaintiff doctors that was

5    upheld.  There was an article that was written likening the

6    plastic surgeons' procedures to serving skim milk and calling it

7    cream and saying that their qualifications were shaky and that

8    it was really just a smokescreen for the fact -- what they were

9    saying was a smokescreen for the fact that they weren't

10   qualified to do what they were doing, and the defendant tried to

11   argue, "Well, those are just opinions; that's a hyperbolic

12   statement, skim milk as cream," but the court found and allowed

13   to go to the jury the fact that, yes, maybe those statements are

14   but they are tied to the fact that you're saying that these

15   folks are not qualified.

16        Here, saying that Dr. Amin was a uterus collector and

17   saying that these women were threatened, that they were being --

18   that they felt harmed, that they felt scared, all that goes to

19   the underlying factual allegations that they are making that he

20   performed unnecessary and mass hysterectomies when they weren't

21   wanted or necessary, and so because that can be proven true or

22   false, it is actionable and we should be allowed to move on,

23   because, again, at this stage you've got to ask if looking at

24   the whole picture, are you saying that a jury could not possibly

25   find that these statements are true or false.  We can't say that

1    yet, certainly not here, maybe not even ever on summary

2    judgment, but certainly not.

3          Your Honor, I think even though we skipped around, which

4    I love and I appreciate Your Honor's questions and how prepared

5    you were for us today, I think I've covered everything other

6    than I would emphasize again that there is not a single case

7    that allows the fair report privilege in the way that they are

8    asking it to be applied.

9          I've looked through their cases painstakingly.  The

10   closest that I've come, Your Honor, is the *Freeze Right* case.

11   It's a New York case from 1984.  It itself was a summary

12   judgment case.  It itself talked about a complete investigation,

13   no discussion of allegations in a vacuum, only allegations that

14   led to investigation, and here's the final result, again how the

15   fair report privilege is supposed to work, but in a statement of

16   dicta, which they latched onto in one of their briefs, I think

17   their reply brief says, "Yeah, maybe sometimes an announcement

18   of an investigation is enough," but you've got to dig all the

19   way into the cases that are cited there to find out where that

20   came from.  And all of those cases, Your Honor, involve trial,

21   jury verdict, summary judgment, where a full picture was had

22   about whether those allegations in a vacuum could qualify for

23   the fair report privilege, and all it was, Your Honor, was a bar

24   complaint, a quasi-judicial proceeding, which is not even close

25   to what we have here because while -- one thing that I did want

1  to mention for Ms. McNamara, she mentioned that -- you talked

2  about the *Morton* case, which, stepping back again, it's not just

3  any -- anything that touches Government is not qualifying for

4  the fair report privilege, and that case talks specifically

5  about how really you're talking about legislative proceedings

6  and judicial proceedings, but if it's a quasi-judicial, we will

7  let you in, and quasi-judicial is do you have the ability to

8  discipline someone, take away their license.  ICE, Department of

9  Homeland Security, Your Honor, they don't have the ability to

10  take away Dr. Amin's license.

11       They don't have any ability with regard to him, who was

12  the subject of these complaints, not ICDC, he, with regard to

13  those agencies.  There's no quasi-judicial function that they

14  have over him, so it's not like *Morton* and again --

15       THE COURT:  What about the fact that they may have the

16  ability to shut down that facility?

17       MS. EVANS:  Again, it has -- that has to do with the

18  facility, with maybe ICDC, with Irwin County Detention Center,

19  but not Dr. Amin, and that sort of underscores the point of how

20  we've got to have -- if we're going to be in fair report world,

21  which again we say we shouldn't be, but if we are, it's got to

22  be a fair and honest report.

23       A fair and honest report would have talked about policy

24  and procedure failures, failures of ICDC, not Dr. Amin.  Any

25  investigation was really not about Dr. Amin.  That's another

1  fact that's in dispute.  These investigations, to the extent

2  they existed, the extent they were threatened, to the extent

3  they were forecasted back at the time of these broadcasts, they

4  were about the facility.  They were about ICE.  They were not

5  about Dr. Amin, and we do have the benefit of hindsight.

6        As I mention, the January 2022 report bears that out.

7  It was ICE and ICDC and what they needed to do better.  It

8  doesn't even mention Dr. Amin, so I would just fall back that

9  there is not a case cited that will allow to be done what this

10  Court is asking you to do, and I would just remind us again that

11  we are at a motion for judgment on the pleadings.

12        Our allegations must be accepted as true.  We are

13  already in this place because, while MSNCB had the media

14  microphone, Dr. Amin never did.

15        That's why he had to come here, and now they are saying,

16  "We're not even going to let you have the court microphone.

17  Despite all these factual issues that are floating around,

18  you're done; we get to say whatever we want to say; it doesn't

19  matter if it's true; it doesn't matter if the proceeding was

20  really about you; you're done; we're taking the microphone away

21  from you."

22        Please don't take the microphone away from Dr. Amin at

23  this early stage, Your Honor.

24        THE COURT:  Thank you, Ms. Evans.  So let me give you

25  the plan of action, counsel.  I don't want us to get all bogged

1   down in the pleadings for too long.  The motions that were made

2   I think were very well briefed and well thought out, and I've

3   thought about them a lot, and the argument that I heard today

4   has been helpful.

5        So the plan going forward is this:  With regard to the

6   motion to strike the answer, I am denying that motion.  It

7   simply doesn't fit within the recognized reasons under 12(f).

8   So that motion will be marked denied.

9        However, I am going to give the plaintiff an opportunity

10  to amend the complaint.  So within seven days of today's date,

11  you can amend your complaint only regarding the actual malice

12  issue that you requested in your briefs.  So don't put a lot of

13  other things in there that don't touch the issue of actual

14  malice.

15        And so within seven days of today's date, you can amend

16  your complaint to that extent.  Seven days thereafter, the

17  defendant can file an answer to that amended complaint, and

18  again, don't pack anything else in there.  Just respond to the

19  allegations with regard to actual malice that are the amended

20  part of the complaint.

21        So in 14 days we will have the operative pleadings, the

22  amended complaint and the answer to the amended complaint.  I'm

23  not going to require that you redo all your briefing on the

24  motion on the judgment on the pleadings.  You will want to

25  freshen it to account for the amended nature of the complaint

49

1    and answer, so within 21 days after today's date, if you will

2    file any additional brief refreshing your argument about the

3    actual substance, and, as I say, you don't have to repeat what

4    you've already put.

5          This would just be any new arguments you make.  You

6    don't have to, if there's nothing else new you want to say, you

7    don't have to, but if, given the amended pleadings, that sparks

8    something you want to add or include, do so, or just based on

9    the questions and the discussions we've had today, if when you

10   return home, "Oh, I wish I had said this or pointed this out" or

11   the (c)(4) argument, for example, so 21 days from today's date

12   any refresher briefs, and once I receive those, then I will rule

13   on the motion on judgment on the pleadings.  Any question on

14   that plan of action on behalf of the plaintiffs?

15         MS. EVANS:  No, Your Honor.

16         MS. McNAMARA:  Thank you.  Thank you for your time.

17         THE COURT:  Counsel, thank you for your excellent

18   argument and I will be looking for those future pleadings.

19   Thank you.

20         (Proceeding concluded at 4:20 p.m.)

21

22

23

24

25

50

1                           CERTIFICATION

2

3          I certify that the foregoing is a true and correct

4    transcript of the stenographic record of the above-mentioned

5    matter.

6

7

9    _____         04/26/2022

10   Debra Gilbert, Court Reporter           Date

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25