**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
WAYCROSS DIVISION**

| | |
|---|---|
| DR. MAHENDRA AMIN, M.D., | Case No. 5:21-cv-00056-LGW-BWC |
| Plaintiff, | |
| v. | **NBCU'S MOTION FOR JUDGMENT ON THE PLEADINGS AND SUPPORTING MEMORANDUM** |
| NBCUNIVERSAL MEDIA, LLC, | |
| Defendant. | |

Defendant NBCUniversal Media, LLC ("NBCU") respectfully submits this motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c).

## PRELIMINARY STATEMENT

In this action, Plaintiff Dr. Mahendra Amin ("Dr. Amin"), an OB/GYN who treated immigrants from a federal detention facility, alleges that NBCU defamed him by reporting on a protected whistleblower complaint and resulting government investigation into his practices. The whistleblower complaint, which was submitted to the Department of Homeland Security ("DHS"), Immigrations and Customs Enforcement ("ICE"), and the Irwin County Detention Center ("ICDC"), alleged that a doctor (promptly identified to be Dr. Amin) performed gynecological procedures on ICDC detainees unnecessarily or without full consent. Given the gravity of the allegations, the complaint received immediate attention not only from government officials but from the media as well. Dr. Amin now targets five MSNBC broadcasts that aired from September 15-17, 2020, and claims that these particular reports—although substantively no different than the dozens of reports by other media organizations—damaged his reputation. Because NBCU's reporting is privileged under Georgia law, and because Dr. Amin has not alleged facts to support a plausible finding that NBCU acted with actual malice sufficient to overcome the privilege, this

case must be dismissed at the outset.

## FACTS[1]

### A.  The Whistleblower Complaint

On September 14, 2020, Project South, a non-profit organization that advocates for immigrants' rights, filed a whistleblower complaint with DHS, ICE, and ICDC on behalf of Dawn Wooten, a nurse at ICDC, and immigrant detainees.  *See* Ex. A (the "Whistleblower Complaint"). The Whistleblower Complaint alleged, among other things, that the gynecologist who treated the women detained at ICDC performed a high number of invasive gynecological procedures, including hysterectomies, seemingly unnecessarily or without the women's full consent.  *Id.* at 18. It stated that the women referred to the doctor as the "uterus collector" and recounted stories from women who felt "scared and frustrated" after being treated by him.  *Id.* at 19-20.  As but one example, the Complaint cited to a woman who initially went to see the doctor to have her right ovary removed, but the doctor accidentally removed the left one.  *Id.* at 19.

### B.  The Media Reports on the Whistleblower Complaint

Immediately after the Whistleblower Complaint was filed, media outlets across the country reported on its allegations.  *See* Answer ¶ 10 n.14.[2]  On September 15, 2020, in an "exclusive" first report, *Prism* identified Dr. Amin as the doctor referenced in the Whistleblower Complaint.  *Id.* NBC News, and other news outlets, followed.

---

[1] Given the parties' previous briefing and April 26, 2022 hearing (the "Hearing"), NBCU includes a high-level overview of the relevant facts here.  A more detailed factual history can be found in NBCU's prior motion for judgment on the pleadings (Dkt. 24).  All references to "Answer" and Exhibits are to the Verified Answer filed May 10, 2022 (Dkt. 51), unless otherwise specified.  All references to "Answer (Dkt. 18)" are to the video exhibits (identified with "(ii)" after the exhibit letter) to the Verified Answer filed December 6, 2021 (Dkt. 18).

[2] Defendants reference these articles not for the truth of reported information but to show that news about Dr. Amin was widespread and mirrored the statements that Dr. Amin now challenges as defamatory.  Accordingly, the Court can take judicial notice of these articles.  *See U.S. ex rel. Osheroff v. Humana Inc.*, 776 F.3d 805, 811 n.4 (11th Cir. 2015) ("[C]ourts may take judicial notice of . . . [] newspaper articles . . . for the limited purpose of determining which statements the documents contain.").

### C.  The Government Responds to the Whistleblower Complaint

State and federal government officials quickly responded to the Whistleblower Complaint. On the same day the Complaint was filed (September 14, 2020), State Representative Robert Trammell sent a letter to Georgia's Composite Medical Board requesting that the Board suspend the license of the providers referenced therein.  Answer ¶ 3 n.2.[3]  On September 15, 2020, over 170 members of Congress sent a letter to DHS requesting an "immediate investigation" into the Whistleblower Complaint's allegations.  *Id.* n.3.  That same day, an ICE representative issued a statement responding to the Whistleblower Complaint and explaining that the allegations "will be investigated by an independent office."  *Id.* n.4; Ex. G.  On September 16, 2020, then acting Deputy Secretary of Homeland Security, Ken Cuccinelli, confirmed that DHS had, in fact, opened a formal inquiry into the allegations.  *Id.* ¶ 3 n.5.  By September 22, 2020, ICE announced that Dr. Amin would no longer be treating ICDC detainees but declined to comment any further due to DHS's ongoing investigation.  *Id.* ¶ 39 n.15.

DHS's inquiry into Dr. Amin, as well as other investigations by Congress, DOJ, and the FBI, remain ongoing today.  *See id.* ¶ 3.  And while final reports from these investigations have not yet been released, on December 3, 2021, the chairs of congressional committees sent a letter to the Secretary of Homeland Security stating that, based on an independent doctor's review of detainee medical records, Dr. Amin "did not meet the acceptable standards of care."  *Id.* ¶ 7.

In addition to these government actions, on December 21, 2020, dozens of ICDC detainees filed a lawsuit against Dr. Amin and others, asserting claims of battery and malpractice.  *See* ¶ 3

---

[3] This Court can take judicial notice of statements from the government.  *See, e.g.*, *Christa McAuliffe Intermediate School PTO, Inc. v. de Blasio*, 364 F. Supp. 3d 253, 263 (S.D.N.Y. 2019) (taking judicial notice of statements by New York Mayor Bill de Blasio on his Twitter account); *JNL Mgmt., LLC v. Hackensack Univ. Med. Ctr.*, 2019 WL 1951123, at *4 (D.N.J. May 2, 2019) ("[T]he Department of Justice's Press Release is also a matter of public record because it is a record of a government agency.  Thus, the Court can take judicial notice of these documents.").

n.7.  In that complaint, one woman described a visit to Dr. Amin as "the most medical way of being raped you could possibly experience."  *Id.* Ex. I ¶ 429.  Discovery in that case is stayed due to the ongoing investigations into Dr. Amin.  *Id.* Ex. J (Dkt. 187).[4]

### D.  The Present Lawsuit

In this action, Dr. Amin singles out five MSNBC news reports: the September 15, 2020 episode of "Deadline: White House" with Nicolle Wallace, *see* Answer (Dkt. 18) Ex. B, the September 15-17, 2020 episodes of "All In with Chris Hayes," *id.* Exs. C-D, F, and the September 15, 2020 episode of "The Rachel Maddow Show," *id.* Ex. E (each a "News Report," collectively the "News Reports").  He argues that 48 statements in the News Reports damaged his reputation and claims $30 million in damages.

Dr. Amin filed the initial Complaint in this action on September 9, 2021, almost one year after the News Reports were broadcast.  *See* Dkt. 1.  On December 6, 2021, NBCU filed an answer *see* Dkt. 18, and, shortly thereafter, filed a motion for judgment on the pleadings, *see* Dkts. 24, 37. On April 26, 2022, the Court held oral argument on NBCU's motion, after which, the Court gave Dr. Amin leave to amend his Complaint "*only regarding the actual malice issue*."  Hearing Tr. at 48:11 (emphasis added).  The Court expressly cautioned Dr. Amin's counsel, "don't put a lot of other things in there that don't touch the issue of actual malice."  *Id.* at 48:13-14.  Ignoring this Court's instruction, Dr. Amin has filed the FAC, which doubles the size of the initial Complaint and includes extensive, though futile, allegations unrelated to actual malice.

## ARGUMENT

Despite Dr. Amin's many revisions to his prior complaint, his new FAC only further

---

[4] "[T]he Court may take judicial notice of public records, such as pleadings and orders from prior cases."  *Burgest v. Bd. of Regents*, 2021 WL 1187088, at *1 n.1 (S.D. Ga. Mar. 29, 2021).

underscores two fundamental reasons to dismiss this action. *First*, because the government took immediate action on the Whistleblower Complaint, NBCU's reporting is indisputably covered by the privileges codified in O.C.G.A § 51-5-7(4)–(6). *Second*, the FAC's allegations fail to conjure a question of fact that NBCU published the News Reports with actual malice. Amin's contentions are squarely rebutted by government and judicial records or the content of the News Reports themselves. And the Eleventh Circuit has over and over instructed that "when the exhibits contradict the general and conclusory allegations of the pleading, the exhibits govern." *Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 704 (11th Cir. 2016) (quoting *Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1205-06 (11th Cir. 2007). This Court has now given Dr. Amin every opportunity to state a plausible defamation claim against NBCU. Because he has still failed to do so, the FAC should be dismissed with prejudice.

## I.   NBCU's Reporting Is Privileged Under O.C.G.A. § 51-5-7[5]

O.C.G.A. § 51-5-7 includes three privileges that together protect the News Reports from defamation liability. O.C.G.A. §§ 51-5-7(5) and (6) shield "fair and honest reports of the proceedings of legislative bodies" and "fair and honest reports of court proceedings." These include administrative proceedings by government agencies, like the DHS and related investigations commenced into the allegations concerning Dr. Amin. *See, e.g.*, *Lawton v. Georgia Television Co.*, 216 Ga. App. 768, 770 (1995). Independently, O.C.G.A. § 51-5-7(4), shields "statements made in good faith as part of an act in furtherance of the person's or entity's right . . . of free speech . . . in connection with an issue of public interest or concern." Notably, the definition of an "act in furtherance of the right of free speech" broadly includes, among other things, "any

---

[5] NBCU's reporting is also privileged under New York Civil Rights Law § 74. *See, e.g.*, *Cummings v. City of N.Y.*, 2020 WL 882335, at *16 (S.D.N.Y. Feb. 24, 2020) ("even the announcement of an investigation by a public agency, made before the formal investigation has begun, is protected as a report of an official proceeding" and "reports on allegations that lead to a government investigation are fully protected.") (citations omitted). *See* Dkt. 24. at 10-14.

written or oral statement . . . made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law," any statement "made in a place open to the public or a public forum in connection with an issue of public interest or concern," and a catch-all provision for "any other conduct in furtherance of the exercise of the constitutional right . . . of free speech in connection with a public issue." O.C.G.A. § 9-11-11.1(c)(2)-(c)(4).[6]

Here, there can be no plausible dispute that, immediately after the Whistleblower Complaint was filed, the government took action, including by opening multiple investigations into Dr. Amin's conduct, which remain pending today. Indeed, during the parties' oral argument on April 26, 2022, Dr. Amin did not contest that the government is, in fact, investigating his treatment of ICDC detainees. Nor did he contest that the news reports, as televised national news programs, were "public forums," *see Metabolic Int'l, Inc. v. Wornick*, 72 F. Supp. 2d 1160, 1165 (S.D. Cal. 1999) ("[A] widely disseminated television broadcast [] is undoubtedly a public forum."), *reversed in part on other grounds*, 264 F.3d 832 (9th Cir. 2001), or that the News Reports involved a matter of "public concern," *see Hindu Temple & Cmty. Ctr. of High Desert, Inc. v. Raghunathan*, 311 Ga. App. 109, 114 (2011) ("[I]t goes without saying that the perceived (and substantially documented) victimization of individuals throughout the country constitutes 'an issue of public interest or concern.'") (citation omitted). Finally, there is no real dispute that the News Reports contained a substantially accurate picture of the allegations of the Whistleblower Complaint. The "media's responsibility lies in ensuring that the 'gist or sting' of the report . . . is accurately conveyed." *Lawton*, 216 Ga. App. at 771 (quoting *Dorsey v. Nat'l Enquirer, Inc.*, 973

---

[6] Despite NBCU's express reliance on these provisions in its prior motion, Dr. Amin's counsel inexplicably contended at the hearing that she was unaware NBCU was making an argument under O.C.G.A § 51-5-7(4). *See* Hearing Tr. at 32:14-16; Dkt. 24 at 17-18.

F.2d 1431, 1436 (9th Cir. 1992)).

Instead, Dr. Amin makes two arguments against the application of the O.C.G.A. § 51-5-7 privileges.  *First*, he asserts that these privileges cannot apply until the government has issued formalized findings or comment from its investigation.  *Second*, he asserts that the "catch all" definition of an "act" in O.C.G.A. § 9-11-11.1(c)(4) cannot be incorporated into the O.C.G.A. § 51-5-7(4) privilege.  Both of these arguments lack merit.

### A.  The O.C.G.A. § 51-5-7 Privileges Do Not Require Formal Government Findings

During the April Hearing, Dr. Amin argued that for Georgia's fair report privileges to apply, the government must first "talk about what they are doing, what they have been doing and mostly and usually what they've already found," and only then is the media privileged to report on this information.  Hearing Tr. at 31:9-15.  In the FAC, Dr. Amin doubles-down on this argument, asserting no privilege can exist because the Whistleblower Complaint was not properly filed in accordance with technical DHS protocols that would have kept it secret in September 2020. *See* FAC ¶¶ 52-64.  Thus, according to Dr. Amin, because the allegations against him were published before DHS announced any findings concerning its investigation, the media was not privileged to report on them.  This position has no basis in Georgia law.  If accepted, it would let the government unilaterally decide when the press can report on issues affecting the public's health and safety, effectively rendering the media as a government mouthpiece.

As an initial matter, Georgia law makes clear that reports on allegations leading to a government investigation are privileged.  *See, e.g.*, *Morton v. Stewart*, 153 Ga. App. 636, 639 (1980) (fair report privilege protects reporting on letters submitted to Georgia Composite State Board of Medical Examiners, which resulted in an investigation into the plaintiff).  Indeed, because "[e]ven a defendant's statement made *prior* to the initiation of a government investigation qualifies

as an 'act' of free speech in connection with an issue of public interest or concern," *Boxcar Dev. Corp. v. New World Commc'ns of Atlanta, Inc.*, 2008 WL 1943313, at *3 (Ga. Super. Ct. May 1, 2008), reporting on a subject that ultimately becomes the focus of an investigation is necessarily also privileged under O.C.G.A. § 51-5-7(4).

Comparing the present case to *Berryhill v. Georgia Community Support and Solutions, Inc.*, 281 Ga. 439 (2006), underscores this point. In *Berryhill*, which was decided prior to the legislature's expansion of O.C.G.A. § 9-11-11.1 to include sections (c)(3) and (c)(4), the court held that an email sent by the mother of a mentally handicapped child to the Department of Human Resources did not constitute a statement made "in connection with an issue under consideration or review by a [government] body" because "there was not any evidence of an actual official proceeding *either before or after* the statements in question." *Id* (emphasis added). The logic behind the court's reasoning was clear: the legislature did not intend to shield media defendants from defamation liability merely because someone sent an email or other random communication to a government agency that was never acted upon, but when the government *does* take action to address a complaint, the public is entitled to know about the allegations and government conduct.

Here, unlike in *Berryhill*, the allegations that Dr. Amin was performing unnecessary and unconsented-to gynecological procedures on ICDC detainees drew immediate government action, including through the opening of formal investigations. Notably, almost two years after the Whistleblower Complaint was filed, the government is *still* investigating the allegations, meaning that if Dr. Amin were correct and NBCU were required to wait for formal government findings, the public would still be in the dark about the allegations against Dr. Amin. Because it is clear that the Georgia legislature intended to shield reporting that is ultimately the subject of government

activity, like NBCU's, the O.C.G.A. § 51-5-7 privileges apply to the News Reports.[7]

## B.  The O.C.G.A. § 51-5-7(4) Privilege is a Substantive Privilege that Independently Protects the News Reports

Next, during the April Hearing, Dr. Amin's counsel argued that recognizing the O.C.G.A.'s § 51-5-7(4) privilege would render Georgia's "fair report" privilege under O.C.G.A. §§ 51-5-7(5)-(6) "superfluous" because the media "could talk about anything that's a public issue and not have to worry about truth."  Hearing Tr. at 33:9-20.  Dr. Amin's argument is in direct conflict with the express language of the statute and Georgia law.

As recognized by Georgia's Supreme Court, when the General Assembly enacted the state's anti-SLAPP statute, it made "only one substantive change in the law," which was the enactment of O.C.G.A. § 51-5-7(4) which privileged "statements made in good faith as part of an act" and concerning "an issue of public interest or concern, as defined in subsection (c) of Code Section 9-11-11.1." *Atlanta Humane Soc'y v. Harkins*, 278 Ga. 451, 455 (2004).  Given the language of the statute, Georgia courts have recognized that the expanded definitions in § 9-11-11.1(c)(3) and (c)(4) are also incorporated into the O.C.G.A. § 51-5-7(4) privilege.  *See Neff v. McGee*, 346 Ga. App. 522, 526 (2018).  And, citing to *Harkins*, at least one District Court has held that the question of "what communications are privilged under O.C.G.A. § 51-5-7" is "substantive" and, accordingly, "[t]hose substantive provisions are applicable in federal court." *See Adventure Outdoors, Inc. v. Bloomberg*, 519 F. Supp. 2d 1258, 1278-79 (N.D. Ga. 2007), *reversed on other grounds*, 552 F.3d 1290 (11th Cir. 2008).[8]  Accordingly, Georgia's § 51-5-7(4)

---

[7] NBCU's reporting was also entirely in keeping with the very purpose of fair report and related privileges.  *See e.g.*, *Gubarev v. BuzzFeed, Inc.*, 340 F. Supp. 3d 1304, 1314 (S.D. Fla. 2018) ("The press also provides the public with the information it needs to exercise oversight of the government and with information concerning the public welfare.  The fair report privilege exists to protect the press as it carries out these functions.").

[8] Indeed, Georgia state courts have applied the § 51-5-7(4) privilege in cases without also applying the procedural aspects of the anti-SLAPP statute, *see, e.g.*, *Bodana v. Times Journal, Inc.*, 2012 WL 2375267 (Ga. Super. Ct. Feb. 27, 2012); *Godfrey v. Cobb Cty.*, 2009 WL 2776599 (Ga. Super. Ct. July 10, 2009).

privilege is recognized in federal court and shields the News Reports even if there was no government investigation into the Dr. Amin allegations.[9]

By adopting the broader four-part definition of an "act" that tracks California law, the Georgia General Assembly purposefully and knowingly broadened the scope of the privileges enacted in O.C.G.A. § 51-5-7(4) to now include "[a]ny…oral statement or petition…made in a…public forum in connection with an issue of public interest." *Neff*, 346 Ga. App. at 524. With such an admittedly "expansive" definition, the statute now includes the speech at issue here even if there was no resulting government investigation, which there most certainly was. *See Wornick*, 72 F. Supp. 2d at 1165 ("[A] widely disseminated television broadcast [] is undoubtedly a public forum."). In effect, Dr. Amin argues that the Court should just ignore the public interest privilege because it would make the fair report privilege "superfluous." But, it is Dr. Amin's position—not NBCU's—which, if accepted, would render an express provision in O.C.G.A. § 51-5-7 entirely without any basis. That is plainly not the law.

For these reasons, NBCU's News Reports are privileged under O.C.G.A. § 51-5-7(4)-(6).

## II.     Dr. Amin Fails to Plead That NBCU's Privilege Is Overcome by Actual Malice

To overcome the privileges that attach to the News Reports, Dr. Amin is required to plead facts sufficient to find actual malice. Actual malice is a subjective standard under which a plaintiff must plead and prove that the defendant, in fact, "entertained serious doubts about the truth of the published account or w[as] otherwise 'highly aware' that the account was likely false." *Michel*, 816 F.3d at 703. Following *Twombly* and *Iqbal*, the Eleventh Circuit has frequently recognized that defamation cases should be dismissed on upfront motions when a plaintiff fails to plead actual

---

[9] Dr. Amin's contention that media organizations would no longer "have to worry about truth" if the privilege was applicable ignores that the privilege is qualified and only covers reports "made in good faith." *Harkins*, 276 Ga. at 293. Thus, actual malice can overcome the privilege.

malice.  *See, e.g.*, *Michel*, 816 F.3d at 704; *Turner v. Wells*, 879 F.3d 1254, 1273 (11th Cir. 2018); *Coral Ridge Ministries Media, Inc. v. Amazon.com, Inc.*, 6 F.4th 1247, 1253 (11th Cir. 2021); *Jacoby v. Cable News Network, Inc.*, 2021 WL 5858569 (11th Cir. Dec. 10, 2021).  This is true even where, as here, a plaintiff includes various allegations that he contends, together, support an inference of actual malice.  In such cases, courts analyze each allegation to determine whether it demonstrates that the defendant subjectively doubted its reporting, disregarding conclusory allegations and allegations contradicted by documents in the record.  *See Michel*, 816 F.3d at 703-04; *Jacoby*, 2021 WL 5858569, at *5.

Here, despite adding dozens of paragraphs to the FAC in an attempt to plead actual malice, the FAC still suffers from the same defects as the initial Complaint.  Indeed, the News Reports demonstrate that NBCU not only accurately reported on the Whistleblower Complaint but also interviewed the whistleblower herself, spoke with numerous attorneys representing detainees at ICDC who were treated by Dr. Amin, spoke with at least one detainee who alleged that Dr. Amin unnecessarily gave her a total hysterectomy, reviewed medical records corroborating the detainees' accounts, contacted the government and Dr. Amin for comment on the allegations, and included statements from ICE, Dr. Amin, La Salle Corrections, and DHS as soon as those statements were made available.  Accordingly, Dr. Amin fails to meet the high standard for actual malice recognized by the Eleventh Circuit, and he cannot overcome NBCU's privileges.

### A.  NBCU Did Not "Pretend" There Was Government Action

Dr. Amin claims that NBCU knew its News Reports were false because it "knew there was no government action, but continued to pretend there was throughout the broadcasts."  FAC ¶¶ 92, 93.  Citing a January 3, 2022 OIG report (the "January Report"), which addressed COVID-related and other allegations in the Whistleblower Complaint, and observed that the government "initiated

this review in October 2020," Dr. Amin argues there was no "government action" until this investigation was "initiated."  *See* Answer Ex. H.  But his position is nonsense for two reasons.

*First*, the January Report does not address the Whistleblower Complaint's allegations about Dr. Amin.  Indeed, the report repeatedly makes clear: "The NCCHC Resources team did not evaluate the specific allegations of inappropriate gynecological care, as those have been referred to our Office of Investigations."  *Id.* at 1, 3, 12 n.39.  Underscoring that fact, in September 2020, when ICE ended its relationship with Dr. Amin, its representative explained that it could not comment further due to DHS' *ongoing* investigation.  *See* Answer ¶ 39 n.15.

*Second*, the January Report was not released until nearly two years after the News Reports were broadcast.  Actual malice depends on a defendant's subjective state of mind "at the time of publication."  *Bose Corp. v. Consumer Union*, 466 U.S. 485, 512 (1984).  Thus, the January Report from 2022 is inapposite to the question of actual malice concerning NBCU's 2020 News Reports.

Dr. Amin relies on a single quote from the September 17, 2020 episode of "All In with Chris Hayes" in which Hayes says, "We truly need nothing less than a full . . . investigation," for his theory that NBCU knew there was no government action at the time of the broadcasts.  FAC ¶¶ 96-97.  Yet, Dr. Amin's assertion is belied both by Hayes' statements the day before on the September 16, 2020 episode, during which Hayes reported, "There's [an] announcement today that Ken Cuccinelli is going to be sending a team to investigate," *see* Ex. D(i) at 14, and by the very first sentences of the September 17, 2020 News Report, in which Hayes stated:

> We've been bringing you the story of allegations of medical procedures performed on immigrant women without – many without consent at an ICE detention facility in Georgia.  Now, there is now a formal inquiry into those allegations in the Department of Homeland Security's Office of the Inspector General.

*See* Ex. F(i) at 13.  At the same time, the screen displayed the headline of a *New York Times* article titled "Inquiry Ordered Into Claims Immigrants Had Unwanted Gynecology Procedures":



*See* Answer (Dkt. 18), Ex. F(ii) (Sept. 17, 2020 "All In with Chris Hayes") at 35:02.  When read in this context, it is clear that Hayes was not advocating for the *initiation* of an investigation but, instead, making clear that the media would hold the government accountable in the investigation that it had already opened.  Dr. Amin's contention that Hayes knew there was no government action is baseless.

### B.  The News Reports Were Consistent with the Whistleblower Complaint and ICE's Response

Dr. Amin next asserts that NBCU should have known that its reporting was false because it was inconsistent with the Whistleblower Complaint and the statement issued by ICE on September 15, 2020.  FAC ¶¶ 98-152.  But, again, the News Reports and the Whistleblower Complaint conclusively rebut this contention and control on this motion.

*First*, Dr. Amin claims that the News Reports "went beyond" the contents of the Whistleblower Complaint because the Whistleblower Complaint did not mention Dr. Amin's name and because much of the Whistleblower Complaint discussed COVID-19 protections at ICDC rather than Dr. Amin.  *See* FAC ¶¶ 99, 101-04.  Even accepting both of these allegations as true, they do not support a finding that NBCU knew its reporting was false or was reckless regarding the truth.  As to the inclusion of his name, Dr. Amin does not contest that he is the doctor referenced

in the Whistleblower Complaint (in fact, his own lawyer stated to NBCU's journalists: "We're aware of the whistleblowers allegations *as they relate to Dr. Amin* and vehemently deny them," *see* Ex. D(i) at 17).  And other news organizations as well as an NBC News online article identified Dr. Amin as the doctor referenced in the Whistleblower Complaint prior to the broadcast of any of the News Reports.  *See Rosanova v. Playboy Enter., Inc.*, 580 F.2d 859, 862 (5th Cir. 1978) (actual malice "cannot be found where . . . the publisher's allegations are supported by a multitude of previous reports upon which the publisher reasonably relied"); Answer ¶ 100 n.17.  Similarly, the fact that the Whistleblower Complaint addressed both COVID protocols and claims about Dr. Amin does not contradict any of NBCU's reporting about Dr. Amin.

Dr. Amin also argues that NBCU made the challenged statements "without conducting even a cursory investigation."  Yet, at the same time, he faults NBCU because it investigated the Whistleblower Complaint's allegations by speaking to lawyers for detained women who alleged that Dr. Amin was "abusive," "overly harsh," and that they came back "bruised" after visiting him. FAC ¶¶ 110-12, 119, 215.  Dr. Amin claims that these allegations "exceed[] the scope of the letter." *Id.* ¶ 118.  But far from establishing actual malice, this shows that NBCU did not simply take the Whistleblower Complaint at face value but sought to verify the allegations.  Further, NBCU would have no reason to doubt the veracity of women who called Dr. Amin "abusive" or "overly harsh," since their allegations corroborated one another and were entirely consistent with the Whistleblower Complaint, including allegations that women "did not trust" Dr. Amin, that women felt like he was "experimenting" with their bodies, that he took out the wrong ovary on one patient, and that another felt "scared and frustrated" after visiting him.  *See* Ex. A at 19-20.

*Second*, Dr. Amin asserts that NBCU should have known that its reporting was false because it was inconsistent with ICE's September 15, 2020 statement, which indicated that "only

two individuals" were "referred" for hysterectomies and that "detainees are afforded informed consent, and a medical procedure, like a hysterectomy, would never be performed against a detainee's will."  *See* FAC ¶¶ 122-23.

Yet, the News Reports document that as soon as NBCU received ICE's statement, it was included in the reporting:



*See* Answer (Dkt. 18), Ex. C(ii) (Sept. 15, 2020 "All In with Chris Hayes") at 33:00; *id.* Ex. D(ii) (Sept. 16, 2020 "All In with Chris Hayes") at 42:27; *id.* Ex. E(ii) (Sept. 15, 2020 "The Rachel Maddow Show") at 15:39).  As the Eleventh Circuit has recognized, "where the publisher includes information contrary to the general conclusions reached in an article, that showing tends to *undermine* the claims of malice. . . . Thus, reporting perspectives contrary to the publisher's own should be interpreted as helping to rebut, not establish, the presence of actual malice."  *Michel*,

816 F.3d at 703 (emphasis added).  By including ICE's statement, NBCU allowed viewers to conclude for themselves whether to believe or view with skepticism the ICDC detainees' claims, "making any allegation of actual malice less plausible." *Turner*, 879 F.3d at 1274 (affirming grant of motion to dismiss because plaintiff failed to plead actual malice when defendant's publication included information favorable to the plaintiff).[10]

Further, nothing in the ICE statement would have caused NBCU to doubt its reporting.  Dr. Amin theorizes that because the ICE statement said that only two women were "referred" for hysterectomies, because Dr. Amin would only be paid if medical procedures are "referred" by the government, and because Dr. Amin would not have performed medical procedures without being paid, this necessarily means that only two hysterectomies were performed, and NBCU must have known that its reporting was false.  FAC ¶¶ 144-51.  But the entire gist of the Whistleblower Complaint was that Dr. Amin was performing gynecological procedures on detainees regardless of whether those procedures were necessary.  Thus, as both Chris Hayes and Rachel Maddow explained, the fact that only two women were initially "referred" for hysterectomies says nothing about the number of hysterectomies that Dr. Amin actually performed on women who were referred for a different procedure.  *See* Ex. C(i) at 12; Ex. E(i) at 8.  Indeed, one of the women referenced in the Whistleblower Complaint claimed that she was initially referred to Dr. Amin to have an ovary removed but, after he took out the wrong one, "she wound up with a total

---

[10] Dr. Amin faults NBCU for failing to include the *entire* ICE statement in certain News Reports or "selectively quot[ing] it in others."  *See* FAC ¶ 128.  As an initial matter, this statement was not released by ICE until *after* "Deadline: White House" had aired but that News Report included an earlier statement from ICE.  *See* Ex. B(i) at 29 ("ICE had said they don't comment on allegations that have been brought to their inspector general.").  Further, there is no requirement that a news organization include in its reporting the entire statement provided by the plaintiff or a third-party; holding otherwise would infringe on the media's editorial discretion.  *See Jacoby*, 2021 WL 5858569, at *5 ("[Plaintiff] also claims that the Articles did not properly frame the statements from [his] representatives denying the relevance of his 2008 misdemeanor to his political work in the Articles.  But [Plaintiff] is not entitled to having Defendants credit his preferred sources of information or structure its articles in the manner that he desires.").  Unquestionably, NBCU conveyed the gist of these statements in each of the News Reports and rebut that NBCU published the News Reports with actual malice.

hysterectomy." *See* Ex. A at 19.  And the ICE statement does not even address whether Dr. Amin performed *other* gynecological procedures, like fallopian tube removal, unnecessarily.[11]

In addition, while ICE made the general assertions that medical procedures would never be performed against a detainee's will, *see* Ex. G, the Whistleblower Complaint, corroborated by what detainees and their lawyers told NBCU, alleges that women received gynecological procedures without fully understanding what was happening.  For example, Pauline Binam, a woman who was detained at ICDC and whose story was discussed in the September 16 episode of "All In with Chris Hayes," alleged that she went to see a doctor while at ICDC for a D&C procedure but woke up from the surgery to learn that one of her fallopian tubes had been removed. She said that she had "no idea this would happen."  *See* Ex. D(i) at 15;[12] *see also id.* at 13-14 (interview with former detainee using the pseudonym "B," who alleged that she "felt like [she] had no right to say anything" when "Dr. Amin just told [her], listen you're going to get a hysterectomy done," and she expected to receive a stomach ultrasound but Dr. Amin instead performed a vaginal ultrasound).  Because feeling pressured to undergo gynecological procedures or not fully understanding what is occurring are subjective assessments, there is simply no way that ICE could speak to how individual women felt about their treatment.  Accordingly, ICE's general disclaimer and denials would not alert NBCU that its reporting was false.  *See, e.g., Harte-*

---

[11] Other media organizations interpreted ICE's statement and a similar statement later issued by the Irwin County Hospital in precisely the same way as Hayes and Maddow.  *See* Nicole Narea, *The outcry over ICE and hysterectomies, explained*, VOX MEDIA (Sept. 18, 2020), available at: The outcry over ICE and hysterectomies at a Georgia immigrant detention center, explained - Vox ("Still, it's possible that detainees could have received hysterectomies without being specifically referred for the procedure."); Norman Merchant, *Migrant women to no longer see doctor accused of misconduct*, ASSOCIATED PRESS (Sept. 22, 2020), available at: Migrant women to no longer see doctor accused of misconduct | AP News (discussing a statement regarding women "referred" for procedures, and noting, "the hospital's general counsel did not respond to questions about whether Amin performed hysterectomies in cases where the women had a different initial referral [and] did not say how many other procedures he had performed that could jeopardize a woman's ability to have children, including the removal of fallopian tubes or ovaries").

[12] The News Report included on the screen Binam's ICDC Psychiatric Progress Notes which confirmed her account, stating that Binam was "bothered" by the fact that she went into surgery expecting a D&C and ended up having a salpingectomy.  *See* Answer (Dkt. 18), Ex. D(ii) at 30:01.

*Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 691 n.37 (1989) ("Of course, the press need not accept denials, however vehement; such denials are so commonplace in the world of polemical charge and countercharge that, in themselves, they hardly alert the conscientious reporter to the likelihood of error.") (citation and internal quotation marks omitted).

In sum, NBCU's reporting was consistent with the Whistleblower Complaint and included ICE's September 15, 2020 statement.

### C.  The News Reports Included Dr. Amin's Side of the Narrative

Dr. Amin next alleges that NBCU published the News Reports with actual malice because it purposefully avoided his side of the story and instead gave a platform for ICDC detainees to share their narratives. *See* FAC ¶¶ 153-80.  This contention is, once again, contradicted by the contents of the News Reports which provided Dr. Amin's statement and shows a lack of actual malice. *Michel*, 816 F.3d at 703.

Dr. Amin asserts that MSNBC only sought a statement from Dr. Amin "less than 90 minutes" before the Chris Hayes' September 16 News Report and "less than several hours" before Hayes' September 17 News Report. *Id.* ¶ 180.  But, as the very first challenged News Report (the September 15 episode of "Deadline: White House") made clear, an NBCU reporter's earlier attempt to contact Dr. Amin was stymied when the person who answered hung up after the reporter identified herself.  Ex. B(i) at 28.  As soon as Dr. Amin provided comment to news outlets, those comments were included in the News Reports.  *See* Ex. D(i) at 17 ("I just want to be clear that Dr. Amin's lawyer says in a statement, 'We're aware of the whistleblower's allegations . . . and vehemently deny them.'"); Ex. E(i) at 8 ("An attorney for the doctor against whom these allegations have been made says his client, quote, vigorously denies these allegations."); Ex. F(i) at 14 ("Yesterday, through his lawyer, Dr. Amin sent us this denial.").

Perhaps recognizing that his side of the story *was* included in the News Reports, Dr. Amin switches gears and alleges that NBCU nonetheless should have known that HIPPA prevented him from providing detailed answers unless his patients provided releases. *See* FAC ¶¶ 156-70. But Dr. Amin *never* told NBCU that his patients would not execute HIPAA releases and he does not allege that told NBCU anything about HIPPA. Moreover, NBCU told viewers that ICE stated it could not "comment on medical records without a waiver due to privacy concerns," *see* Ex. D(i) at 15, so this information was still presented to viewers.

Finally, Dr. Amin contends that NBCU acted recklessly as to the truth because "an attorney for the 'whistleblower'" said that she "included the allegations in the report with the intention of triggering investigation to whether or not the claims are true." FAC ¶ 172. But this very statement from Dr. Amin's lawyer *was* included in the September 16, 2020 episode of "All In with Chris Hayes":



*See* Answer (Dkt. 18), Ex. D(ii) at 42:17.[13] Accordingly, NBCU did not recklessly disregard this

---

[13] The FAC also mischaracterizes the attorney's statement. This lawyer did *not* state that Ms. Wooten—the whistleblower—had not spoken to anyone who had received a hysterectomy. As is evidenced by the Whistleblower Complaint and NBCU's own interview with Ms. Wooten, she *had* spoken to detainees who claimed they received unwanted hysterectomies. The *Washington Post* instead reports, "Priyanka Bhatt, staff attorney at Project South, acknowledged to the Washington Post that *she* did not speak to any women who had a forced sterilization." *See* Tim

information but, to the contrary, presented it to viewers to allow them to make their own assessment of Whistleblower Complaint's allegations.

### D.  NBCU Had No Reason to Doubt Its Sources

Acknowledging that NBCU did, in fact, investigate the allegations against him, Dr. Amin next alleges that NBCU's sources, Ms. Wooten and ICDC detainees, were unreliable, and NBCU, therefore, acted recklessly as to the truth of its publications.

Dr. Amin first alleges that Ms. Wooten was an unreliable source because she did not follow DHS's procedures for reporting a complaint.  *See* FAC ¶ 61.  But even if Dr. Amin's contentions were true (and they are not), it is clear that the government still took her allegations seriously, promptly acting on the Whistleblower Complaint, including by opening numerous investigations that continue to this day.[14]  Even if, as Dr. Amin avers, Ms. Wooten "sought the limelight" by creating a GoFundMe page after she was, effectively, fired from her job at ICDC after reporting her concerns about the treatment of detainees, *id.* ¶ 66, that does not, as a matter of law, cast doubt upon the veracity of her allegations.  *See Reuber v. Food Chem. News, Inc.*, 925 F.2d 703, 715 (4th Cir. 1991) ("Actual malice cannot be proven simply because a source of information might also have provided the information to further the source's self-interest.  Self-interest . . . motivates many news sources; if dealing with such persons were to constitute evidence of actual malice on the part of a reporter, much newsgathering would be severely chilled.").

Further, NBCU did not merely rely on Ms. Wooten; it spoke with *numerous* lawyers for

---

Elfrink, "Pelosi demands probe after ICE nurse raises alarm over medical care, hysterectomies at detention center," WASH. POST (Sept. 15, 2020), available at: Pelosi demands probe after ICE nurse raises alarm over hysterectomies at detention center - The Washington Post (emphasis added).

[14] Notably, the government has already corroborated many of Ms. Wooten's allegations concerning COVID-19 protocols at ICDC.  *See* Ex. H.  And Congress' own ongoing investigation into Dr. Amin has already revealed that Dr. Amin "did not meet acceptable standards of care."  *See* Answer ¶ 7 (congressional letter to DHS Secretary Mayorkas).

detainees and at least one detainee who directly corroborated Ms. Wooten's account.  Dr. Amin claims that even this was not enough because the ICDC detainees were "incentivized to allege that [he] was abusive and performed unnecessary hysterectomies and procedures as a way for [them] to stay in the United States."  FAC ¶ 171.  If Dr. Amin is drawing the conclusion that immigrant status, *ipso facto*, means that these women were not credible, NBCU made clear to viewers that the women making claims against Dr. Amin were current or former detainees at ICDC.  *See, e.g.*, Ex. B(i) at 28 ("[B]ased on conversations with four lawyers *who represented clients in this facility* . . . .") (emphasis added); *see also* Ex. C(i) at 12; Ex. D(i) at 13.  Accordingly,  NBCU's viewers had enough information to decide for themselves whether to trust the women's accounts.  *See Berisha v. Lawson*, 973 F.3d 1304, 1312-13 (11th Cir. 2020) ("Lawson's book explicitly informed the reader of these supposed problems with the men's credibility, describing them as young partiers who drank, used drugs, and committed a major international fraud. . . . [W]here a publisher in this manner 'inform[s] its audience that its primary source [is] not an unimpeachable source of information, it serve[s] to undermine claims showing that the report was issued with actual malice.'") (quoting *Michel*, 816 F.3d at 703).  And, NBCU did not simply take these accounts at face value.  As explained in the News Reports, NBCU corroborated the women's accounts with medical records, which showed they received the procedures they alleged.  *See* Ex. D(i) at 14 ("We've reviewed medical records.").

Finally, Dr. Amin claims that NBCU's sources were unreliable because they "would not share their names or faces."  FAC ¶ 155.  But, the fact that "many of the sources were not identified by name does not render them or the reliance on them invalid."  *Michel*, 816 F.3d at 704.  That is particularly true here, where the women explained that they feared deportation for speaking out against Dr. Amin.  And NBCU *did* identify certain sources, including Benjamin Osorio, who was

a lawyer for many ICDC detainees, and Pauline Binam, who was an ICDC detainee.  *See* Ex. C(i) at 12; Ex. D(i) at 14-15.  Accordingly, the News Reports rebut any suggestion that NBCU was reckless as to the truth of its reporting.

### E.  Lack of Neutrality or Political Differences Are Not Probative of Actual Malice

Last, Dr. Amin asserts that NBCU did not report on the allegations about him in a "neutral" manner and hypothesizes that MSNBC was motivated by political animus to tie Dr. Amin to the Trump Administration in the weeks before the 2020 election.  *See* FAC ¶¶ 181-200.  But even the examples of NBCU's reporting cited by Dr. Amin, *see id.* ¶¶ 182-86, show that NBCU was careful to report that the claims in the Whistleblower Complaint were merely allegations and a full investigation into the allegations had not yet been completed.  And it is well-established that a lack of neutrality—or even outright political animosity—in reporting is not probative of actual malice.  As the court explained in *Arpaio v. Zucker*, when granting a Rule 12(b)(6) dismissal motion based on the plaintiff's failure to plead actual malice:

> The Court will not pry open the gates of discovery just because [the plaintiff] believes the erroneous communications were motivated by differences in political opinions. Doing so would run afoul of the Supreme Court's landmark ruling in *New York Times Co. v. Sullivan.  See* 376 U.S. at 271-72, 84 S.Ct. 710…. Allegations of 'leftist enmity' cannot trump the guarantees of the First Amendment.

414 F. Supp. 3d 84, 92 (D.D.C. 2019); *see also Tavoulareas v. Piro*, 817 F.2d 762, 795 (D.C. Cir. 1987) (stating that a publisher's "adversarial stance" may be "fully consistent  with professional, investigative reporting" and is not necessarily "indicative of actual malice").

Notably, NBCU was *far* from alone in reporting on the Whistleblower Complaint and similar allegations against Dr. Amin.  Local, national, and international news organizations that span the political spectrum, from *Fox News*, to the *Associated Press*, to the *Atlanta Journal*

*Constitution*,[15] and countless others, all reported on the allegations against Dr. Amin in similar manner as NBCU, including by quoting the Whistleblower Complaint, interviewing lawyers who alleged that their clients had been mistreated by Dr. Amin, and citing to Dr. Amin's previous settlement for Medicare fraud.  NBCU even referenced the fact that the Whistleblower Complaint had been widely discussed by the media, and displayed some of this reporting in its own News Reports, beginning on September 15, 2020:



*See* Answer (Dkt. 18), Ex. C(ii) at 31:33.

Thus, far from publishing knowingly false information, it is clear that NBCU—no different than nearly every other news organization in the country—was simply fulfilling its duty to inform

---

[15] Danielle Wallace, *Georgia prison with ICE detainees performs questionable hysterectomies, shreds coronavirus records: nurse*, Fox News (Sept. 15, 2020), available at: Georgia prison with ICE detainees performs questionable hysterectomies, shreds coronavirus records: nurse | Fox News; Greg Norman, Danielle Wallace, *ICE detainees will no longer be seen by doctor accused of performing hysterectomies without consent*, Fox News (Sept. 23, 2020), available at: ICE detainees will no longer be seen by doctor accused of performing hysterectomies without consent | Fox News; *Nurse questions medical care at immigration jail in Georgia*, Associated Press (Sept. 14, 2020), available at: Nurse questions medical care at immigration jail in Georgia | AP News; Nomann Merchant, *AP Exclusive: More migrant women say they didn't OK surgery*, Associated Press (Sept. 18, 2020), available at: AP Exclusive: More migrant women say they didn't OK surgery | AP News; Alan Judd and Jeremy Redmon, *ICE detainees complained about 'rough' treatment from Georgia doctor*, Atlanta Journal-Constitution (Sept. 16, 2020), available at: ICE detainees complained about 'rough' treatment from Georgia doctor (ajc.com).

the public about breaking news on a matter of immense public concern.[16]

## **CONCLUSION**

For the reasons stated herein, NBCU respectfully requests that the Court dismiss the FAC

in its entirety with prejudice and for such other and further relief as is just and proper.

Dated: May 17, 2022

Respectfully submitted,

| | |
|---|---|
| *s/ Elizabeth A. McNamara* | *s/ Cynthia L. Counts* |
| Elizabeth A. McNamara | Cynthia L. Counts |
| (admitted *pro hac vice*) | Georgia Bar No. 190280 |
| Amanda B. Levine | FISHERBROYLES, LLP |
| (admitted *pro hac vice*) | 945 East Paces Ferry Rd. NE, Suite 2000 |
| DAVIS WRIGHT TREMAINE LLP | Atlanta, GA 30326 |
| 1251 Avenue of the Americas, 21st Floor | (404) 550-6233 |
| New York, NY 10020-1104 | cynthia.counts@fisherbroyles.com |
| Tel: (212) 489-8230 | |
| lizmcnamara@dwt.com | |
| amandalevine@dwt.com | |
| | *Attorneys for Defendant* |

---

[16] As explained in NBCU's prior motion, *see* Dkt. 24 at 23-25, many of the challenged statements are also either opinions—because they report the subjective feelings of detainees—or are rhetorical hyperbole that cannot be proven true or false.  NBCU incorporates those arguments by reference into this Motion.

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on the 17th day of May, 2022, a true and correct copy of the foregoing document was served upon the following via the Court's electronic filing system:

Stacey Godfrey Evans
sevans@staceyevanlaw.com

Tiffany N. Watkins
twatkins@staceyevanslaw.com

Scott R. Grubman
sgrubman@cglawfirm.com

*Cynthia L. Counts*
Cynthia L. Counts
Georgia Bar No. 190280
FISHERBROYLES , LLP
945 East Paces Ferry Rd. NE, Suite 2000
Atlanta, GA 30326
Telephone: (404) 550-6233
cynthia.counts@fisherbroyles.com

*Attorneys for Defendant*
