UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
WAYCROSS DIVISION

DR. MAHENDRA AMIN, M.D.,                )
                                        )
        Plaintiff,                      )
                                        )   Case No. 5:21-CV-00056-LGW-BWC
v.                                      )
                                        )
NBCUNIVERSAL MEDIA, LLC,                )
                                        )
        Defendant.                      )
_____

## PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS

Defendant made false and defamatory statements about Dr. Mahendra Amin and published those statements to its vast audience, irreparably harming Dr. Amin's reputation and causing him great anguish and suffering.  It did so with knowledge and reckless disregard of the falsity of its statements.  Notwithstanding Defendant's repeated efforts to argue its gloss on heavily disputed facts inappropriate at the pleading stage, Dr. Amin's First Amended Complaint, Doc. 49 ("Complaint" or "Compl."), plausibly states a claim that he is entitled to relief. Defendant's Motion for Judgment on the Pleadings (Doc. 52) should be denied.

### FACTUAL BACKGROUND[1]

#### A.  A letter not about Dr. Amin is release to the media

On September 14, 2020, an organization distributed a letter to the media, detailing Immigration Customs and Enforcement (ICE) detainees' conditions at the Irwin County Detention Center (ICDC).  Compl. ¶¶ 45, 47-48.  The letter focused primarily on a lack of

---

[1] Many facts are in dispute.  The Court must "accept as true all material facts alleged in the *non-moving party's* pleading" and "view those facts in the light most favorable to the *non-moving party.*"  *Perez v. Wells Fargo N.A.*, 774 F.3d 1329, 1335 (11th Cir. 2014) (quotation marks omitted and emphasis supplied).

COVID-19 protections.  *Id*. ¶¶ 101-02.  In a short, two-page section of the 27-page letter, it also relayed, in cautious language, "concerns" about "high numbers" of people receiving hysterectomies from "a particular gynecologist outside the facility," unnamed, and stated, "[i]ntertwined with the issue of reported high rates of hysterectomies is the issue of proper informed consent."  *Id*. ¶¶ 104-05.  The letter's language in this section was couched so because, as an attorney relayed and Defendant knew, the section was included in the letter without being substantiated "with the intention of triggering investigation" into the allegations.  *Id*. ¶¶ 154, 172.

The originators of the letter emphasized—in the letter itself, the introduction to the letter, and the press release accompanying the letter—COVID-19 conditions only.  The press release was titled, "Whistleblowing Nurse from Detention Center in Georgia Reports Unsafe Practices that Promote COVID-19," and the letter was titled, "Re: Lack of Medical Care, Unsafe Work Practices, and Absence of Adequate Protection Against COVID-19 for Detained Immigrants and Employees Alike at the Irwin County Detention Center," and its introduction had only a brief mention of hysterectomies.  *Id*. ¶ 106; Doc. 51-1 at 3.

### B. Defendant's media campaign against Dr. Amin went beyond the letter and was prior to government action

The letter did not identify Dr. Amin, which makes sense given the lack of substantiated allegations against him.  Compl. ¶ 46.  Defendant, however, not only identified Dr. Amin, but made him the focus of five broadcasts from September 15-17, 2020 ("broadcasts").  Defendant's coverage sensationalized the letter before any government entity could initiate an investigation.

A September 15, 2020 statement by Dr. Ada Rivera, Medical Director of ICE Health Service Corps ("ICE Statement"), demonstrates that there was no investigation underway at the time of the broadcasts:  "ICE *intends to fully cooperate with **any resulting** investigation by the OIG*."  *See* Doc. 51-7 at 2 (emphasis supplied).  Indeed, the ICE Statement lamented that the

"whistleblower's" handling of the allegations did not follow protocol allowing government examination:  "it is unfortunate that those involved in this report have chosen to first go to the media with their allegations, ***without allowing the government to examine or take appropriate action***."  *Id.* (emphasis supplied).  No government investigation was opened until at least October 2020, several weeks after the broadcasts at issue in this case, and no government entity ever mentioned Dr. Amin before or during the course of the broadcasts.  Compl. ¶¶ 91-94.[2]

The ICE Statement also confirmed that only two hysterectomies were performed on detainees at ICDC and stated that detainees must provide consent for all medical procedures. Doc. 51-7 at 2.  Defendant knew the ICE Statement at the time of the broadcasts.  Compl. ¶ 128.

Defendant's broadcasts vilified Dr. Amin and went well beyond the letter.  Among much else, the broadcasts relayed accusations that Dr. Amin was "abusive," he subjected patients to "unnecessary hysterectomies," "[a]s many as 15 immigrant women were given full or partial hysterectomies or other procedures for which no medical indication existed," "five different women who'd had a hysterectomy done," and he caused "bruising" in a patient.  *Id.* ¶¶ 75-88. Defendant portrayed the allegations in the letter, as well as others it sought out, as established truth, and it advocated for ICE, ICDC, and Dr. Amin to face "accountability," called Dr. Amin "a so-called medical professional," and vowed to "do[] our best" to pressure authorities to investigate Dr. Amin.  *Id.* ¶ 182.[3]

---

[2] Defendant attempts to summarize a highly politicized letter from certain members of Congress—dated over a year after the broadcasts—contending that Dr. Amin "did not meet the acceptable standards of care," without consideration of the unique circumstances of caring for patients in detainment.  Doc. 52 at 3.  But that letter does not validate Defendant's broadcasts about mass hysterectomies without consent, but rather refutes them, stating medical review "could not conclude whether patients received unwanted hysterectomies."  Doc. 51 ("Answer") ¶ 7 n.10.

[3] Defendant points to other reporting as somehow excusing its defamatory broadcasts.  First, whether Dr. Amin also has potential claims against other media outlets has no bearing on whether his Complaint states a claim against Defendant.  Second, Defendant's coverage was different from that of other outlets, many of whom did not identify Dr. Amin, much less advocate against him.  Third, Defendant's size and reach carried the story much farther than other outlets, such as an outlet called "Prism," which Defendant claims identified Dr. Amin before it did.  Doc. 52 at

As a result of Defendant's false and defamatory broadcasts, Dr. Amin, who is an immigrant himself, was flooded with vitriol and hatred. *Id.* ¶¶ 25-28. He was called "inhuman," "corrupt," "evil," and a "monster." *Id.* ¶ 232. He was stalked and followed by people who ridiculed and harassed him. *Id.* ¶¶ 229-31. He suffered immense damage to his personal and professional reputation, as well as unimaginable stress, emotional distress, embarrassment, humiliation, and other mental pain and suffering. *Id.* ¶¶ 226-27.

## ARGUMENT

## I.  The broadcasts are not protected by the fair report privilege

The fair report privilege does not apply because there was no proceeding on which to report. Even if there was a proceeding, there was no "fair and honest" report of anything. *Id.*

"In general, questions of privilege are for the jury to decide." *Murray v. Cmty. Health Sys. Pro. Corp.*, 345 Ga. App. 279, 287 (2018) (quotation marks omitted). Thus, if there are allegations from which a jury could find there was no proceeding that qualifies for the fair report privilege or if there are allegations from which a jury could find there was no "fair and honest" report of those proceedings, then it cannot be said that the fair report privilege applies as a matter of law. Here, such allegations exist on both points.

### A.  There was no "proceeding" of any kind at the time of the broadcasts

The broadcasts did not report on any proceeding at all. The broadcasts were September 15-17, 2020. Compl. ¶ 2. No government investigation was opened regarding ICDC until at least October 2020. Compl. ¶ 92. The fair report privilege applies to reports "of" certain proceedings. O.C.G.A. §§ 51-5-7(5) and (6). The language of the statute—specifically using the word "of"—cannot be ignored. There can be no report of a proceeding if there is no proceeding.

---

2. Finally, Defendant's contention that it meekly "followed" Prism's story (*id.*) is new; during the broadcasts, it bragged that it was leading the charge of identifying and pillorying Dr. Amin. *See* Compl. ¶¶ 113-114, 182.

Defendant contends that "DHS [Department of Homeland Security] had, in fact, opened a formal inquiry into the allegations" by September 16, 2020.  Doc. 52 at 3.  But Defendant merely cites to its Answer citing to two articles that (1) largely merely report on the ICE Statement and politicians *asking* for investigations, and (2) Defendant concedes may not be offered "for the truth of the matter asserted."  Doc. 51 ("Answer") ¶ 3 n.5; Doc. 52 at 2 n.2.  What the facts show is that the so-called "whistleblower" and the media, with the help of politicians seeking headlines six weeks from an election, pressured OIG to eventually conduct an investigation of allegations regarding women's medical care at ICDC, which began in October 2020 and turned out to be without merit.  *See* Compl. ¶¶ 68-72 (report found "women's health care to be appropriate").  At the very least, whether there was a government investigation ongoing at the time of the broadcasts is a highly contested factual dispute at this stage, not established as a matter of law.[4]

Even if there was an investigation of ICDC at the time of the broadcasts (there was not), there is no evidence of any investigation of Dr. Amin, the subject of the broadcasts.  A January 3, 2022 OIG Report demonstrates there was no investigation until October of 2020—well after the broadcasts at issue here.  *Id.* ¶¶ 68-71; Doc. 51-8 at 7.  Defendant seems to imply there was some other investigation about Dr. Amin specifically that started before the October 2022 investigation that led to the OIG Report when it claims that report had nothing to do with Dr. Amin—even though it specifically states a review of medical records found "women's health care to be appropriate."  *Id.* ¶¶ 69-72; Doc. 52 at 12.  Defendant cites nothing to support this timeline.

Finally, Defendant mischaracterizes Dr. Amin's argument, claiming he argues that "because the allegations against him were published before DHS announced any findings concerning its investigation, the media was not privileged to report them."  Doc. 52 at 7.  Dr.

---

[4] Defendant implies Dr. Amin's contract with ICDC ended prior to the broadcasts by stating it happened in "September 2020."  Defendant knows that occurred September 22—after the broadcasts.  Answer ¶ 39 n.15.

Amin does not argue that the phrase "report" in the fair report privilege is restricted only to reports *by* an appropriate public body.  Doc. 32 at 11 (quoting *Morton v. Stewart*, 153 Ga. App. 636, 641 (1980)).  Rather, he contends that Defendant's broadcasts could not be "reports *of*" any proceeding, as they were not *about* any "proceeding" of any kind, because there was no proceeding at the time of the broadcasts.  *Id*. at 13 ("Here, there was no investigation that the media was reporting on."); *see also id*. at 12 (pointing out that the broadcasts discussed or pleaded for proceedings that were not yet underway, and therefore could not be reports about those non-existent proceedings).  Put simply, until the government does something, there can be no report of what the government is doing.

Defendant cannot apply the fair report privilege to its coverage by pointing to an investigation that began after that coverage.  While Defendant's previous briefing pointed to a single New York case applying the New York version of the fair report privilege to what it terms "nascent" proceedings (Doc. 37 at 6), it identifies no cases applying the Georgia privilege so broadly.  And even in that case, there of course was an existing proceeding; the court did not apply the privilege to a proceeding that did not exist at all at the time of the publication.  *See Freeze Right Refrig. & A.C. Servs. v. City of N.Y.*, 101 A.D.2d 175, 181-82 (1984).

### B.  Any investigations were not "proceedings" under the fair report privilege

There was no proceeding that existed, as a matter of law, at the time of the broadcasts.  But even assuming Defendant's disputed timeline is true (which is not proper at the pleading stage), what Defendant claims were "proceedings" underway at the time of the broadcasts are not "proceedings" under the fair report privilege.  Not just any proceeding qualifies under the fair report privilege.  Georgia law is specific that the proceedings be "proceedings of legislative or judicial bodies" or "court proceedings."  O.C.G.A. §§ 51-5-7(5) and (6).  Even if investigations

that began in October 2020, had begun before some of the broadcasts occurred, none of those qualify as proceedings under the statute.

First, investigations by DHS and OIG are not proceedings of judicial or legislative bodies.  The only way investigations by these entities could be proceedings under the fair report privilege is if they qualify as proceeding of a judicial body because they are considered "quasi-judicial."  *See Morton*, 153 Ga. App. at 639.  Defendant has not established as a matter of law that any investigation was by a "quasi-judicial" entity.

In Georgia, "[t]he real test as to the legislative and judicial character of the proceeding is not to be found in the fact of a hearing being afforded, but depends upon the subject of the inquiry.  …  It is legislative to make a rule for future conduct, and judicial to punish for an infraction of, or to enforce, an existing rule."  *Southeastern Greyhound Lines v. Ga. Pub. Serv. Comm'n*, 181 Ga. 75 (1935).  "It is clear…that it is the nature of the act to be performed rather than the office, board, or body which performs it, that determines whether or not it is the discharge of a judicial or quasi-judicial function."  *Morton*, 153 Ga. App. at 639 (quoting *Southeastern Greyhound Lines*, 181 Ga. at 78).

Defendant has not demonstrated, much less shown as a matter of law, that the nature of any investigation was judicial, "to punish for an infraction of, or to enforce, an existing rule." Indeed, the OIG Report called itself a "report" and included "findings" and "recommendations;" "punishment" and "enforcement" were not terms OIG used to describe the "nature of the act to be performed."  Doc. 51-8 at 3-4.  Defendant has made no showing that any agency supposedly investigating anything at the time of the broadcasts had the power to discipline Dr. Amin.

Second, the letter was also not part of a "court proceeding," where complaints are eligible for media coverage prior to judicial action on the allegations.  This makes sense because in court,

the accused gets a chance to respond in kind on the same record as the accuser.  That process did not exist for Dr. Amin.  In sum, Defendant does not identify any way that the broadcasts constituted reports about non-existent court proceedings.[5]

### C.  The broadcasts were not "fair" reports of the letter

Defendant has the burden on its motion yet omits any explanation for how any report was a fair and honest report, as required for the fair report privilege.[6]  "The 'substantial accuracy' required for a 'fair report' means that the fair report must have the same 'gist' as the proceedings reported."  *Lawton v. Ga. Television Co.*, 216 Ga. App. 768, 772 (1995) (citation omitted).

Even assuming the letter was part of a qualifying "proceeding" at the time of the broadcasts (it was not), the broadcasts were not "fair and honest" reports of the letter because the broadcasts did not have the same "gist" as the letter.  First, the letter did not identify Dr. Amin.  Compl. ¶ 46.  Yet the broadcasts focused nearly exclusively on him, including splashing his picture across an international media platform.  *Id.* ¶¶ 83, 88, 225.

Second, the letter was about COVID-19, barely mentioned allegations relating to gynecological care, and when it did it used couched language to describe the admittedly unsubstantiated claims regarding hysterectomies.  *Id.* ¶¶ 101-108.  Defendant's broadcasts exceeded the scope of the letter by adding allegations, avoiding the couched language of the letter in favor of strong language such as "abuse," and focusing on hysterectomy and abuse allegations.  *Id.* ¶¶ 109-118.

A jury must decide whether the broadcasts were "fair and honest" reports of the letter.  It

---

[5] The *Oldaker* case, which is the only case Defendant discusses in its Answer (at ¶ 3 n.7), is not referenced in any broadcasts, because it did not exist at the time of the broadcasts; it was filed months later.
[6] While Defendant incorporates by reference its arguments that some challenged statements were non-actionable opinion or hyperbole (Doc. 52 at p. 24 n.16), it provides no argument at all to claim that its reporting was a "fair and honest" account of the letter.  Plaintiff incorporates his arguments from Doc. 32 at 21-24 and at the Hearing (Doc. 48) at 42:21-45:2 in response to Defendant's incorporated arguments regarding opinion and hyperbole.

cannot be said as a matter of law that a reasonable jury would not find it relevant that the letter did not mention Dr. Amin, but the broadcasts focused on him, or that the letter was mainly about COVID-19, but the broadcasts were about hysterectomies.  "The reporter is not privileged under [the fair report privilege] to make additions of his own that would convey a defamatory impression, nor to impute corrupt motives to any one, nor to indict expressly or by inuendo the veracity or integrity of any of the parties." *AirTran Airlines, Inc. v. Plain Dealer Publ'g Co.*, 66 F. Supp. 2d 1355, 1365 (N.D. Ga. 1999) (denying summary judgment to defendant) (quoting *Lawton*, 216 Ga. App. at 772).

## II.    The broadcasts are not protected by the public interest privilege

No court has relied on the public interest privilege as a basis to excuse false and defamatory statements and no Georgia court has substantively applied the public interest privilege separate from an anti-SLAPP motion.  Because the anti-SLAPP process is not available in the Eleventh Circuit, Defendant has no basis to claim a public interest privilege.  Indeed, Defendant advocates an application of the public interest privilege that is contrary to its statutory language and purpose and common sense.

The purpose of the public interest privilege is to curtail the "chill[ing]" of "the valid exercise" of free speech through the "abuse of the judicial process."  O.C.G.A. § 9-11-11.1(a). Georgia's anti-SLAPP statute accomplishes this protection of the "valid" exercise of free speech by setting up a fast and early mechanism to dismiss complaints unless the plaintiff can show a likelihood of success on the merits.  O.C.G.A. § 9-11-11.1(b).  And that is the context in which courts have applied the privilege.  Indeed, O.C.G.A. § 9-11-11.1(f) specifies that "nothing in this code section shall affect or preclude the right of any party to any recovery otherwise authorized by common law, statute, law, or rule."

Defendant asks for a reading of the public interest privilege that provides a privilege over false statements made by others in nearly any context. The privilege would be similar to the one the media enjoys to report on court proceedings without having to fact check allegations made in court. Given that the public interest privilege and the anti-SLAPP statute are designed to protect the "valid exercise" of free speech, there can be no protection of false statements, because telling lies about someone is not a valid exercise of free speech. *See AirTran*, 66 F. Supp. 2d at 1368 ("Freedom of the press gives the right to print the truth and to comment fairly about the truth; freedom of the press does not give a license to print untruths or half-truths…." (quoting *Davis v. Macon Telegraph Publ'g Co.*, 93 Ga. App. 633, 640-41 (1956))).

Defendant's proposed application of the public interest privilege would swallow up the fair report privilege, and, indeed, the other privileges of O.C.G.A. § 51-5-7.[7] If a news organization could make any statement on any issue of public concern and invoke the public interest privilege, then it would never need to invoke the fair report privilege because by definition anything from a qualifying proceeding would be of "public concern." This would render O.C.G.A. §§ 51-5-7(5) and (6) superfluous. Doing so would defy the "Surplusage Canon," which says that courts should construe a statute to give effect to "all its provisions, so that no part will be inoperative or superfluous, void or insignificant." *Corley v. United States*, 556 U.S. 303, 314 (2009) (quotation marks omitted).

Defendant cites no precedent applying the public interest privilege so broadly that it would swallow existing privileges. Instead, it cites cases that, almost exclusively in the context

---

[7] Defendant previously contended that the broadcasts were made in connection with an issue under consideration of "an official proceeding authorized by law," pursuant to O.C.G.A. § 9-11-11.1(c)(2). Doc. 24 at 18. It may have abandoned that argument. *See* Doc. 48 at 8:20-23 (at the Hearing, listing only subsections (c)(3) and (c)(4) as its "focus"); Doc. 52 at 9-10 (not addressing subsection (c)(2)). To the extent that Defendant argues subsection (c)(2) applies, Dr. Amin's Complaint has sufficiently alleged that there was no "proceeding" here, for the same reasons discussed above as to the fair report privilege.

of an anti-SLAPP motion, considered a more limited application of the public interest privilege. *See* Doc. 52 at 9-10.  Anti-SLAPP motions are not available at all in the Eleventh Circuit, because they conflict with the Federal Rules of Civil Procedure, including Rule 12(c), by requiring different pleading standards as well as an evidentiary showing prior to discovery. *Carbone v. Cable News Network, Inc.*, 910 F.3d 1345, 1350 (11th Cir. 2018).  Accordingly, the cases Defendant cites are not instructive in the Eleventh Circuit.  *See* Doc. 24 at 17-19 (citing only anti-SLAPP cases); Doc. 32 at 21 n.10 (pointing out that the cases are all anti-SLAPP); Doc. 52 at 9-10 (citing almost exclusively anti-SLAPP cases).

Defendant cites only two lower state court orders applying the public interest privilege outside the scope of the anti-SLAPP statute, where its application was not the only basis of the decisions and which offer no support for the unprecedented action it asks the Court to take here. Doc. 52 at 9 n.8.  In both cases, defendants acknowledged the importance of the lack of falsity to the dismissals—something Defendant implies can be ignored here without any support.  *See Godfrey v. Cobb Cnty.*, 2009 WL 2776599 (Cobb Cnty. Ga. Super. Ct. July 10, 2009) (finding no evidence of falsity); *Bodana v. Times J., Inc.*, 2012 WL 2375267 (Cobb Cnty. Ga. Super. Ct. Feb. 27, 2012) (finding statements at issue "substantially true").  Further, both of the cases were handled by counsel for the Defendant and the judges in both cases entered counsel's proposed orders, *Godfrey* was a summary judgment case, and *Bodana* was a case in which the plaintiff apparently appeared *pro se*.  *See id.*

### III.    Defendant acted with actual malice, defeating any conditional privilege

As discussed above, the fair report privilege and public interest privilege do not protect Defendant in this case and for that reason, Defendant's motion should be denied.  But even if one or both were applicable, Dr. Amin has alleged that Defendant published the statements with

actual malice, which defeats any privilege.[8]

### A. The Complaint alleges facts from which the Court may infer Defendant knew or recklessly disregarded the falsity of its statements

Defendant now comes close to conceding that Georgia, rather than New York, privilege law must apply. *See* Doc. 52 at 5 n.5 (limiting discussion of New York in its Motion to a single footnote); Doc. 48 at 6:12-22 (at the Hearing, Defendant's counsel beginning with Georgia law but stating she was not waiving argument that New York privilege law applies). But Defendant originally argued that New York law rather than Georgia law applied, a stance which defies clear federal and Georgia precedent. It did so because under Georgia law, but not under New York law, conditional privileges such as the fair report privilege do not protect false and defamatory statements made with "actual malice." *AirTran*, 66 F. Supp. 2d at 1365. Thus, originally, Defendant's motion asked for application of a law that would allow it to avoid even attempting to argue that Plaintiff had not adequately alleged actual malice.

Actual malice means that a statement was made with "knowledge that it was false or reckless disregard for whether it was true or false." *StopLoss Specialists, LLC v. VeriClaim, Inc.*, 340 F. Supp. 3d 1334, 1348-49 (N.D. Ga. 2018) (quotation marks omitted). Plaintiff has adequately alleged that Defendant acted with actual malice. That is, Plaintiff has made allegations from which the Court can plausibly infer that Defendant acted with actual malice in publishing the broadcasts. *See Ashcroft v. Iqbal*, 556 U.S. 662, 664 (2009) ("When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement of relief."); *Michel v. NYP Holdings, Inc.*, 816

---

[8] Defendant states that Dr. Amin's Complaint "[i]gnor[es] this Court's instruction" by adding "extensive, though futile, allegations unrelated to actual malice." Doc. 52 at 4. Defendant fails to support this broadside with explanation or citation, making it difficult to respond. Dr. Amin simply states that his amendments appropriately allege facts from which actual malice can be inferred because they demonstrate Defendant's knowledge and/or reckless disregard of the falsity of its defamatory statements.

F.3d 686, 702 (11th Cir. 2016).  Such facts include allegations that Defendant knew statements in the broadcasts were false or recklessly disregarded their falsity, or that the published "allegations are so inherently improbable that only a reckless man would have put them in circulation," or that "there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports."  *Id.* at 703 (quoting *St. Amant v. Thompson*, 390 U.S. 727, 732 (1968)).

As a Northern District of Georgia case noted, in 2018—well after *Iqbal* and *Twombly*— "Georgia courts have repeatedly held that the issue of malice in conditional privilege cases is generally a jury issue, inappropriate for summary judgment."  *StopLoss Specialists*, 340 F. Supp. 3d at 1349 (quotation marks omitted).  The fact that Defendant may have strategically included some statements in its broadcasts to at least fake the appearance of impartiality does not erase its blind eye to the known truth, advocacy against Dr. Amin, and use of biased and uncredible sources, which demonstrate actual malice.  Put another way, if there are allegations from which a jury may plausibly find Defendant acted with actual malice—even if it is plausible a jury could also find the opposite—the case must advance to discovery.  *See, e.g.*, *id.* at 1353-54 (finding, on summary judgment, sufficient evidence to create a genuine issue of material fact as to actual malice, "considering the entire record," even though the defendant had also proffered evidence that "may explain or refute the evidence of malice"); *see also, e.g.*, *Hammer v. Slater*, 20 F.3d 1137, 1143 (11th Cir. 1994) ("We have repeatedly held that credibility is a factual issue that is uniquely the province of the jury.").  Plaintiff does not have to show there is no other conclusion that a jury could make except that Defendant acted with actual malice; he must only show that it is plausible that the jury could find Defendant acted with actual malice.  Plaintiff has done so.

Defendant cites four cases for the proposition that, in the Eleventh Circuit, "defamation cases should be dismissed on upfront motions when a plaintiff fails to plead actual malice."  Doc.

52 at 10-11.  None of those cases are like this one.  First, those cases were all public figure cases and as the Court in *Michel* highlighted, there is a "powerful interest" in allowing "breathing space" for media outlets to report on public figures without having to enter discovery in "groundless litigation."  *Michel*, 816 F.3d at 702.  Second, two of the cases involved only conclusory allegations that the defendants did not sufficiently investigate.  *Id.* at 704-05; *Turner v. Wells*, 879 F.3d 1254, 1273-74 (11th Cir. 2018).  Here, Plaintiff alleges that Defendant ignored known facts, ignored the bias and lack of credibility of its sources, and ignored and refused to share with its audience that its sources' statements were contradicted by known facts and that the sources personally prevented Dr. Amin from responding to their allegations against him, in addition to the other substantive allegations that support actual malice, as discussed in detail below.  Compl. ¶¶ 65-73, 90-201.

Finally, the other two cases involved a conclusory allegation that a media outlet wanted to hurt the reputation of those associated with Kanye West and the Trump campaign (*Jacoby v. Cable News Network, Inc.*, 2021 WL 5858569, at *5 (11th Cir. Dec. 10, 2021)) and a conclusory allegation that a defendant did not believe its own definition of "hate group" (*Coral Ridge Ministries Media, Inc. v. Amazon.com, Inc.*, 6 F.4th 1247, 1252-53 (11th Cir. 2021)).  The plaintiffs in those cases simply did not allege detailed and multiple allegations from which a jury could plausibly find that a defendant acted with actual malice, as here.

### 1.  Defendant pretended there was a government investigation when none existed

Defendant pretended there was government action against Dr. Amin when it knew there was not.  Indeed, during the fifth broadcast, Defendant included a banner statement claiming an investigation was "ordered" without citing to any government statement or otherwise discussing where this investigation was occurring—because there was no investigation and no cite to be

had.  Compl. ¶ 96.  The letter was just a letter, which did not adhere to the protocols of formal complaints to any government entity and was not part of any government proceeding.  *Id.* ¶¶ 45, 49-67.  ICE itself said so.  *Id.* ¶ 67.  Rather than requesting an investigation through normal channels, which would have shielded the allegations if and until they were verified after investigation, the originators of the letter enlisted the media to sensationalize the allegations, and Defendant was more than happy to oblige.  *Id.* ¶ 48, 52-60, 64.  Far from reporting on an investigation, Defendant worked with the originator of the letter to cause an investigation of allegations against Dr. Amin after the broadcasts—allegations that proved to be meritless as the OIG investigation found "women's health care to be appropriate."  *Id.* ¶¶ 69-72.

Defendant cites to a *New York Times* headline for support of its argument that it was not pretending there was a government investigation at the time of the broadcasts.  Doc. 52 at 12-13.  Putting aside that there certainly is no fair report privilege for reporting another news agency's reports, the New York Times article does not help Defendant prove there was an actual investigation instead of the one Defendant pretended existed.  The *New York Times* story discussed the same ICE Statement that said there was no investigation:  "ICE intends to fully cooperate with ***any resulting*** investigation."  Compl. ¶ 127.  The same ICE Statement that admonished the letter's originator for "go[ing] to the media with their allegations, without allowing the government to examine or take appropriate action."  *Id.* ¶ 124.  In short, Defendant cites to nothing in its Motion that shows it relied on anything from the ***government*** when reporting that there was a ***government*** investigation.  As Plaintiff alleges in the Complaint, Defendant pretended there was an investigation when there was not.

Defendant argues that Dr. Amin's position that Defendant knew there was no investigation "relies on a single quote" from anchor Chris Hayes.  Doc. 52 at 12.  Not so.  In

addition to the ICE Statement's clear guidance that there was no investigation, the broadcasts are overflowing with calls and pleas for investigation, which further demonstrates Defendant's role as an advocate against Dr. Amin instead of a neutral news organization reporting on any alleged government action.  *See, e.g.*, Doc. 51-4 at 17 ("plea" for Inspector General and Congressional investigations); Doc. 51-5 at 11 ("[W]e have heard the top officials in Congress, on the Hill, also called for investigations as well and so now that has to play its course.").

## 2. Defendant's broadcasts far exceeded the letter and morphed into a campaign singularly focused against Dr. Amin that defied known facts and logic

Defendant turned a letter focused on COVID-19 issues at ICDC into a five-part series aimed at ending Dr. Amin's 35-year medical career.  Defendant knew that only two hysterectomies were performed on ICDC patients.  Compl. ¶ 120-30, 144-46.  Defendant knew that informed consent of detainees was required for all medical procedures.  *Id.* ¶ 123, 152. Defendant also knew that claims of mass and surprise hysterectomies are beyond reasonable belief because medical care for ICE detainees is provided pursuant to strict protocols requiring pre-approval for all procedures and the presence of third parties at medical procedures, including translators and detention center transport personnel.  *Id.* ¶¶ 134-48.  Yet Defendant persisted.

The originators of the letter deemphasized allegations about hysterectomies:  Dr. Amin was not named, it takes up only less than two pages of the 27-page letter, and the press release releasing the letter and the subject line of the letter do not mention hysterectomies at all.  *Id.* ¶¶ 101-08, 154.  Defendant also knew that the hysterectomy and abuse allegations in the letter were not based on firsthand accounts but were instead included in the letter "with the intent of triggering investigation to whether or not the claims are true."  *Id.* ¶¶ 120, 172.  Yet Defendant still focused its broadcast on allegations of mass hysterectomies.  Compl. ¶¶ 75, 78, 81, 84, 86.

Defendant's broadcasts far exceeded the careful language of the letter, characterizing Dr.

Amin as "abusive," "overly harsh," and "hurting" his patients, and including additional accusers. Compl. ¶¶ 98-118.  Notwithstanding its shift now, Defendant bragged about this expansion in the broadcasts themselves, citing its "new reporting" that "really broadens this story out" and even celebrating "call[ing] out this doctor by name and giv[ing] specific allegations that clients gave their lawyers."  *Id*. ¶¶ 112-15.

Defendant accuses Dr. Amin of inconsistency by charging it with not investigating abuse claims when it spoke to detainees.  Doc. 52 at 14.  But this is not inconsistent.  Lawyers who prepared the letter were not comfortable making the same allegations that Defendant relayed in the broadcasts.  For example, where the broadcasts say, "without consent," the letter acknowledges someone explaining procedures and states, "[t]hese immigrant women, I don't think they really, totally, all the way understand this is what's going to happen depending on who explains it to them."  Compl. ¶¶ 105, 116.  Defendant, despite knowing that the originators of the letter were careful in relaying unsubstantiated allegations of detainees, did not mince words and instead amplified outrageousness and extreme claims.  Defendant was not seeking to "verify" the allegations in the letter (Doc. 52 at 14), but instead to mutate and then amplify the allegations.

Further, Defendant had a reason to doubt the allegations that not even the letter's originators did:  the ICE Statement.  The ICE Statement revealed that a patient would not get a hysterectomy without consent, and that only two hysterectomies were performed on ICDC detainees since 2018.  Doc. 51-7 at 2.  Defendant argues that it shared portions of the ICE Statement, which it claims should mitigate actual malice.  But while it is true that "where the publisher includes information contrary to the general conclusions reached in the article, that showing tends to undermine the claims of malice," *Michel*, 816 F.3d at 703, here, Defendant omitted the ICE Statement completely from some broadcasts (Compl. ¶ 128), and omitted parts

17

of the ICE Statement that contradicted accusations against Dr. Amin in other broadcasts:

(a) The ICE Statement admonished the "whistleblower" for failing to follow proper procedure and instead playing to the media "without allowing the government to examine or take appropriate action." Compl. ¶¶ 124-125. Defendant never aired this part of the ICE Statement and does not argue otherwise.

(b) The first broadcast accused Dr. Amin of performing mass hysterectomies and providing other procedures without consent yet fails to include statements from ICE that there were only two hysterectomies on ICDC detainees and that all medical procedures required patient consent. *Id.* ¶¶ 75, 129.

(c) The second broadcast accused Dr. Amin of performing mass hysterectomies, but failed to include the statement from ICE that there were only two hysterectomies on ICDC detainees. *Id.* ¶¶ 78, 130.

(d) The third broadcast accused Dr. Amin of performing mass hysterectomies and providing other procedures without consent, but failed to include any part of the ICE Statement at all. *Id.* ¶¶ 81, 131.

(e) The fourth broadcast accused Dr. Amin of performing mass hysterectomies and providing other procedures without consent, but failed to include the statement from ICE that all medical procedures required patient consent. *Id.* ¶¶ 84, 132.

(f) The fifth broadcast accused Dr. Amin of performing medical procedures without consent, but failed to include the statement from ICE that all medical procedures required patient consent. *Id.* ¶¶ 86, 133.

By selectively omitting information, Defendant created the impression that ICE was silent on information that contradicted the broadcasts, when in fact it was not. Most egregiously, in the third broadcast when Defendant did not air any part of the ICE Statement, Defendant created the impression that ICE had said nothing substantive regarding the allegations of mass hysterectomies (although it had) by stating, "Now, we've asked ICE for comment. They've told us they cannot comment on medical records without a waiver due to privacy concerns." *Id.* ¶ 131. As to the partial information from the ICE Statement that *was* actually shared, Defendant's own anchors undermined the ICE Statement by expressing doubt and disdain toward it. *Id.* ¶¶ 149-52. Accordingly, Defendant must not get the benefit afforded the defendant in *Michel*, who

18

straightforwardly and fairly relayed the contrary information.  *See* 816 F.3d at 704-05.[9]

Defendant did not "[u]nquestionably…convey[] the gist" of the ICE Statement, as it claims

(Doc. 52 at 16 n.10), but instead distorted or omitted the gist of it throughout the broadcasts.

Defendant argues that "the fact that only two women were initially 'referred' for

hysterectomies says nothing about the number of hysterectomies that Dr. Amin actually

performed."  Doc. 52 at 16.  This is incorrect.  As the Complaint alleges, "two referrals" means

"two hysterectomies" because of the way Dr. Amin was supervised, authorized, and reimbursed,

and it is "beyond reasonable belief that detainees in an ICE facility, such as ICDC, could

undergo surprise hysterectomies without consultation and consent."  *See* Compl. ¶¶ 134-39, 142,

144-48.  Even if Dr. Amin somehow managed to perform mass hysterectomies without referrals

(which he denies), he could never have expected payment for such unauthorized procedures.  *Id.*

¶ 144-48.  It is inherently improbable that a provider would perform mass procedures of any type

for free.  Defendant knew what it was telling the world was wrong, but they did it anyway.

It may be true that, as Defendant quotes, "denials are so commonplace in the world of

polemical charge and countercharge that, ***in themselves***, they hardly alert the conscientious

reporter to the likelihood of error."  Doc. 52 at 17-18 (quoting *Harte-Hanks*, 491 U.S. at 691

n.37) (emphasis added).  But ICE's denial, in concert with the inherent improbability of patients

receiving hysterectomies without consent and mass hysterectomies being performed by a rogue

doctor who could escape the layers of approvals required for detainee medical care and the

supervisors present during medical procedures, presented information causing Defendant to

doubt the veracity of the broadcasts.  By ignoring that information, Defendant recklessly

---

[9] Defendant catalogs a hodge-podge of some parts of the ICE Statement that it included at various times (Doc. 52 at 15), but the broadcasts each stand alone.  *See, e.g.*, *Lucas v. Crenshaw*, 289 Ga. App. 510, 513 (2008) ("A publication deemed to be defamatory must be read and construed in the sense in which the readers to whom it is addressed would ordinarily understand it."  (quotation marks omitted)).

disregarded the falsity of the broadcasts and accordingly acted with actual malice.

### 3. Defendant ignored Dr. Amin's constraints into responding to the allegations

Dr. Amin is not allowed to discuss the treatment of patients because HIPAA prevents him from doing so without a patient's release.  Defendant spoke to detainees who wanted to stay in the United States, seeking extreme stories without examining their veracity, while failing to convey that those very detainees had refused to release Dr. Amin to speak out.  Compl. ¶¶ 154-71.  In doing so, Defendant demonstrated actual malice by both showing that it cared about its narrative rather than the truth or falsity of the allegations, and by failing to verify the accounts of people who had not permitted Dr. Amin to defend himself against their accusations.

While Defendant aired Dr. Amin's blanket denial on some of the broadcasts, it knew that was all he could say because the detainees refused the HIPAA waivers.  Defendant cannot be said to be neutral when it allows someone to make accusations against someone while that person single-handedly and simultaneously prevented the accused from speaking.  It is easy to look sympathetic when no one is allowed to rebut your accusations.  Not only did Defendant provide a one-sided account, but it allowed the detainees and their lawyers to ensure they would not be challenged on air by allowing those detainees to muzzle Dr. Amin.

Further, the broadcasts did not publish the fact that Dr. Amin was unable to respond to the allegations without HIPAA releases.  Compl. ¶¶ 156-66.  Defendant contends that Dr. Amin did not tell it that the patients would not execute HIPAA releases.  Doc. 52 at 19.  But this is a fact issue, and the broadcasts themselves demonstrate that Defendant knew that Dr. Amin could not discuss his patients.  *See* Compl. ¶ 131.

Defendant seems to argue that because it aired that ICE could not comment with HIPAA waivers, then the audience knew Dr. Amin also could not comment.  Doc. 52 at 19.  But exactly

the opposite is true: upon hearing that ICE was constrained—but not Dr. Amin—the audience

may infer that Dr. Amin was not so constrained, but simply chose not to speak out.  Dr. Amin's

allegations that Defendant knew that fact and failed to convey it to viewers while nevertheless

cultivating sensational accounts against Dr. Amin constitute facts from which the Court may

infer Defendant's actual malice in publishing the broadcasts.[10]

Finally, Defendant argues the law does not require it to allow both sides of an issue a

platform (Doc. 52 at 16 n.10), but what happened here goes further.  In a non-HIPAA context, at

least when someone speaks out against another, the accused may be able to find other outlets to

share his side of the story.  But without a HIPAA waiver, Dr. Amin could not speak the truth

about the care he provided patients anywhere.  Here too, Defendant allowed the accusers to

actively present the accused from responding—allowing a roadblock to the truth.

### 4.  Defendant had obvious reasons to doubt the veracity of the informants

Defendant had myriad reasons to doubt the sources of its accounts.  First, the alleged

"whistleblower" was admonished by ICE for failing to follow the protocol for obtaining an

actual investigation into any allegations and admitted to including allegations about mass

hysterectomies for "effect."  *Id*. ¶¶ 120, 124-25, 173-174.  In addition, the alleged

"whistleblower" solicited funds from a GoFundMe page that earned her over $100,000 as she

sought the limelight rather than anonymity that true whistleblowers can enjoy.  Compl. ¶¶ 49-67.

Defendant quotes a Fourth Circuit case holding that self-interest, *alone*, cannot prove actual

malice.  Doc. 52 at 20.  But Defendant cannot segregate Dr. Amin's alleged facts that support an

inference of actual malice and address each in solitude.  *See, e.g.*, *StopLoss*, 340 F. Supp. 3d at

---

[10] Defendant also states that it reached out to Dr. Amin for comment and published his comment once it had it.  Doc. 52 at 18.  But Defendant contacted Dr. Amin less than 90 minutes before one broadcast and less than several hours before another.  Compl. ¶ 180.

1353-54 (considering entire record on summary judgment and finding sufficient evidence to create genuine issue of material fact as to actual malice). The Court must consider whether the Complaint, as a whole, states a claim.

Second, Defendant knew that the detainees it put on air refused to give HIPAA waivers to Dr. Amin to allow him to counter their statements. *Id.* ¶¶ 156-170, 176. This was outrageous. The fact that the people leveling accusations—often anonymously—were not willing to give Dr. Amin a release to discuss their cases presents a significant reason to doubt them. Because if they were telling the truth, why not give Dr. Amin permission to share medical records that would show details of medical and administrative procedures? While Defendant argues medical records they reviewed show the women received the services they claimed, Doc. 52 at 21, there is an issue of fact regarding what those records show. Dr. Amin disputes the accusations and posits that it is likely Defendant has never seen full medical records, given the lack of HIPAA releases to Dr. Amin or ICE. *See* Compl. ¶¶ 135-143.

Third, detainees were also "incentivized to allege that Dr. Amin was abusive and performed unnecessary hysterectomies and procedures as a way for the women to stay in the United States and receive increased assistance and attention to their efforts to stay." Compl. ¶ 171. The broadcasts themselves show that a member of Congress intervened to prevent one detainee from being sent away from the United States. *See* Doc. 51-4 at 16 (a broadcast representing that Representative Sheila Jackson Lee, a guest on the broadcast, provided "last-minute intervention" in keeping someone in the country).

Defendant argues that, by sharing the detainees' immigration status, viewers "had enough information to decide for themselves whether to trust the women's accounts." Doc. 52 at 21. But it is not their "immigration status" that should have caused Defendant to investigate the

accounts before airing them, but rather the incentives being created to speak out, specifically, avoiding deportation.  That accusers were ***avoiding deportation*** by speaking out was not apparent to the viewers because Defendant told its audience the opposite in its broadcasts, stating to viewers that the women accusers were ***risking deportation*** by sharing their stories.  *See*, *e.g.*, Doc. 51-4 at 14.

Finally, Defendant contends that the government's investigations show that the allegations were trustworthy.  Doc. 52 at 20.  This is demonstrably false, as the OIG report states medical review "determined women's health care to be appropriate" (Compl. ¶ 72), and a letter from certain members of Congress stated they "could not conclude whether patients received unwanted hysterectomies" (Answer ¶ 7 n.10).  Further, it is an issue of disputed fact whether the government responded to the letter itself, which did not follow proper channels of an administrative complaint, or to the media maelstrom, in which Defendant participated and fomented.  The same is true of whether and to what extent Defendant actually "corroborated the women's accounts with medical records."  Doc. 52 at 21.[11]  Dr. Amin did not provide those medical records—HIPAA prevented him—and he very much contests the allegations that he was abusive and provided hysterectomies or other treatment without consent.

### 5.   Defendant advocated against Dr. Amin and tied him to its audience's villain: the Trump Administration, and just before the 2020 Presidential Election

Defendant was not neutral in its broadcasts, but instead was an advocate against Dr. Amin, who Defendant portrayed as a member of a nefarious Trump Administration immigration apparatus.  Compl. ¶¶ 187-201.  Defendant portrayed allegations as truth and argued that the people responsible, including Dr. Amin, should face "accountability," called Dr. Amin "a so-

---

[11] Further underscoring the extent to which this is an issue of disputed fact, the OIG Report concluded that detention standards that "detainees have access to appropriate and necessary medical, dental, and mental health care" *were* met at the ICDC.  Doc. 51-8 at 4.

called medical professional," and vowed to "do[] our best" to pressure authorities to investigate Dr. Amin. *Id.* ¶¶ 182-86. Defendant further portrayed itself as a "crusader, advocating for 'accountability' and vowing to 'make sure' Dr. Amin was investigated." *Id.* ¶ 219.

Defendant went so far as to characterize Dr. Amin as part of the "next chapter in the same story" of the "moral catastrophe" of the Trump Administration's child separation policy. *Id.* ¶¶ 181-201. Defendant not only described the allegations of mass hysterectomies as the "next chapter" in the story of the Trump Administration's refugee child separation policy, but also likened his medical care to the actions of a Trump appointee to prevent a young immigrant girl from obtaining an abortion after she was raped. *Id.* ¶ 193. The same broadcast featured the author of a book on the child separation policy and described it as "relevant context" for Defendant's coverage of Dr. Amin. *Id.* ¶ 195. Defendant's broadcasts fit a narrative in which Defendant was an advocate of holding Dr. Amin and the Trump Administration to account.

Defendant created this narrative to appeal to its viewers, "primarily comprised of…politically left-leaning voters who dislike Donald Trump." *Id.* at ¶ 187. Defendant knew they would respond with viewership and engagement, and increased enthusiasm to vote against Trump in the upcoming election. *See Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 668 (1989) ("Although courts must be careful not to place too much reliance on such factors, a plaintiff is entitled to prove the defendant's state of mind through circumstantial evidence, and it cannot be said that evidence concerning motive or care never bears any relation to the actual malice inquiry." (citations omitted)). As a result, Defendant financially benefited from viewership that resulted from the broadcasts. Compl. ¶ 217. This adherence to a narrative demonstrates a motive and explanation for Defendant's not caring about the truth or about Dr. Amin and his reputation. *Id.* ¶¶ 196-99. Along with the other allegations discussed above, Dr.

Amin has alleged facts from which the Court may infer Defendant published the broadcasts with actual malice—that is, knowledge or reckless disregard for the falsity of the allegations of abuse and unwanted hysterectomies.

Defendant mischaracterizes these allegations as being about "political animus." Doc. 52 at 22. In truth, they demonstrate that Defendant acted with knowledge or reckless disregard of falsity. In *Palin v. New York Times Co.*, the Second Circuit reversed a district court that had dismissed allegations of actual malice as merely showing "political opposition," holding that "political opposition alone does not constitute actual malice, but we conclude that these allegations could indicate more than sheer political bias." 940 F.3d 804, 814 (2d Cir. 2019). And a district court in Georgia ruled, on summary judgment, that evidence of a defendant's animus toward a plaintiff and his motivation contributed to a genuine issue of material fact. *StopLoss*, 340 F. Supp. 3d at 1353-54; *see Harte-Hanks*, 491 U.S. at 668 ("[I]t cannot be said that evidence concerning motive or care never bears any relation to the actual malice inquiry.").

Defendant again posits that it was "*far* from alone in reporting on the [letter] and similar allegations against Dr. Amin." Doc. 52 at 22. While what, for example, the Washington Post published is not probative of the sufficiency of Dr. Amin's Complaint against Defendant, Defendant also did not just "report[] on the [letter] and similar allegations." It advocated and rallied. It conveyed extreme and contested allegations as truth. It told a story it thought its viewers wanted, of a Trump Administration doctor leading the "next chapter" of Donald Trump's general hostility toward immigrants.

In sum, the Complaint states many facts from which the Court may infer that Defendant knew or acted with reckless disregard of the falsity of the statements that Dr. Amin is abusive and conducted mass hysterectomies without consent, and was a gleeful advocate of those making

false allegations against Dr. Amin.

## CONCLUSION

Dr. Amin's complaint states a claim for defamation.  Defendant's gloss on the facts is highly disputed, and its arguments for application of privileges at this pleadings stage of the litigation are wrong.  Accordingly, Defendant's Motion should be denied.

Respectfully submitted this <u>31st</u> day of May 2022.

| | |
|---|---|
| /s/ Stacey Godfrey Evans | /s/ Scott R. Grubman |
| Stacey Godfrey Evans | Scott R. Grubman |
| Georgia Bar No. 298555 | Georgia Bar No. 317011 |
| sevans@staceyevanslaw.com | sgrubman@cglawfirm.com |
| Tiffany N. Watkins | |
| Georgia Bar No. 228805 | |
| twatkins@staceyevanslaw.com | CHILIVIS GRUBMAN |
| | DALBEY & WARNER LLP |
| STACEY EVANS LAW | 1834 Independence Square |
| 4200 Northside Parkway NW | Atlanta, GA 30338 |
| Bldg One; Suite 200 | (404) 233-4171 (phone) |
| Atlanta, GA 30327 | (404) 261-2842 (fax) |
| (770) 779-9602 (phone) | |
| (404) 393-2828 (fax) | |

*Counsel for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing **PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS** will be served upon all attorneys in this matter by filing with the Court's CM/ECF system.

This <u>31st</u> day of May 2022.

/s/ Stacey Godfrey Evans
Stacey Godfrey Evans