# In the United States District Court
# for the Southern District of Georgia
# Waycross Division

DR. MAHENDRA AMIN,         )
M.D.,                      )
                           )
    Plaintiff,        )
                           )
    v.                )         5:21-CV-56
                           )
NBCUNIVERSAL MEDIA,        )
LLC,                       )
                           )
    Defendant.        )

**ORDER**

Before the Court is NBCUniversal Media's motion for judgment on the pleadings. Dkt. No. 52. For the reasons given below, the motion is **GRANTED** in part and **DENIED** in part.

**BACKGROUND**

Plaintiff Mahendra Amin ("Dr. Amin") is a doctor who provided gynecological medical services to patients detained at the Irwin County Detention Center ("ICDC"). Dkt. No. 49 ¶ 39.[1] On September 14, 2020, an organization called Project South released a whistleblower letter ("Whistleblower Letter" or the "Letter")

---

[1] At this stage, the Court must "accept as true all facts alleged in the non-moving party's pleading, and [ ] view those facts in the light most favorable to the non-moving party." Perez v. Wells Fargo, N.A., 774 F.3d 1329, 1335 (11th Cir. 2014).

addressed to the Department of Homeland Security ("DHS"), the U.S. Immigrant and Customs Enforcement ("ICE") Atlanta Field Office, and the ICDC. Id. ¶ 45. Dawn Wooten, a former nurse at the ICDC, was the alleged source of the information in the Letter. Id. ¶¶ 61, 106; Dkt. No. 51-8 at 7. The Letter alleged various deficiencies in detainees' treatment at ICDC. Dkt. No. 49 ¶ 47; Dkt. No. 51-1. The Letter focused on issues with the ICDC's COVID-19 protocols, but it also raised alarm about "high rates of hysterectomies at the ICDC." Dkt. No. 49 ¶ 47. Project South also released the Letter to the news media. Id. ¶ 48.

NBCUniversal Media ("NBCU") broadcast on its network MSNBC five reports about the Whistleblower Letter between September 15 and September 17, 2020. Dkt. No. 49 ¶¶ 74–89. In addition to reporting the allegations in the Letter, NBCU interviewed a detainee and several lawyers representing the detainees and reviewed the detainees' medical records. Dkt. No. 51 ¶¶ 7–8. In NBCU's broadcasts, it reported that Dr. Amin, dkt. no. 49 ¶¶ 77, 83, 85, 88, who was not cited by name in the Whistleblower Letter, id. ¶ 99, had performed large numbers of unnecessary hysterectomies on immigrant women detained at the ICDC. Id. ¶¶ 1–2; see also id. ¶¶ 74–88 (describing in detail the allegedly defamatory statements made on each of the five broadcasts); id. ¶ 89 (alleging that NBCU repeated these statements via Twitter on at least three occasions

between September 16 and September 22, 2020). By releasing the letter to the media, Ms. Wooten and Project South did not follow DHS protocol for submitting complaints to the agency. Dkt. No. 49 ¶¶ 61–63. Had they followed DHS protocol, the letter would not have been made public. Id. ¶ 64.

After NBCU's broadcasts, Dr. Amin "suffered public hatred, contempt, scorn, and ridicule," id. ¶ 228, including stalking, being called names, and receiving hateful comments, death threats, and bomb threats. Id. ¶¶ 229–31.

On August 26, 2021, Dr. Amin's lawyer sent a letter to NBCU indicating that the statements in the broadcasts were false and defamatory and demanding a retraction and correction. Dkt. No. 49 ¶ 222. NBCU refused to publish a retraction or correction. Id. ¶ 223. Dr. Amin then filed this defamation action against NBCU. See generally Dkt. No. 1 (original complaint); Dkt. No. 49 (first amended complaint). In its answer, NBCU attached copies of the Whistleblower Letter, transcripts and digital copies of the broadcasts at issue, and a copy of ICE's statement in response to the Letter. Dkt. Nos. 18-1 through 18-7 (first answer). NBCU also included various "affirmative[] alleg[ations]," presenting various facts contradicting Dr. Amin's contentions. See Dkt. No. 18 ¶¶ 5–8, 10, 46, 48, 55–56, 59, 68, 71, 74, 84, 97, 117. Dr. Amin filed a motion to strike those portions of the answer, dkt. no. 22, and

3

NBCU filed a motion for judgment on the pleadings, dkt. no. 24. This Court held a hearing on the motions where it denied Dr. Amin's motion to strike and granted him seven days to amend his complaint. Dkt. No. 47. Dr. Amin then filed an amended complaint, dkt. no. 49, prompting this Court to deny NBCU's original motion for judgment on the pleadings as moot. Dkt. No. 50. NBCU answered the amended complaint, dkt. no. 49, and attached copies of the Letter, a copy of ICE's statement in response to the Letter, transcripts and digital copies of the broadcasts at issue, an Office of the Inspector General ("OIG") report about its investigation into some of the allegations in the Letter, and a copy of a complaint and order from a separate lawsuit filed by various ICDC detainees. Dkt. Nos. 51-1 through 51-10. NBCU's answer to the first amended complaint also contains various "affirmative allegations" contradicting facts Dr. Amin alleges in the first amended complaint. See Dkt. No. 51 ¶¶ 3, 5-8, 10, 46, 49, 52, 65, 68-69, 71-73, 76, 79-80, 82-85, 87, 91-92, 94-97, 99-100, 129, 133, 139-40, 143, 152-53, 157, 159, 161, 163, 165, 172, 177, 211, 225, 245. NBCU then renewed its motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedures 12(c). Dkt. No. 52.

## LEGAL STANDARD

"After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c).  The court will "accept as true all material facts alleged in the non-moving party's pleading" and "view those facts in the light most favorable to the non-moving party." Perez, 774 F.3d at 1335. "Judgment on the pleadings is appropriate where there are no material facts in dispute and the moving party is entitled to judgment as a matter of law." Id. (internal quotations omitted) (quoting Cannon v. City of W. Palm Beach, 250 F.3d 1299, 1301 (11th Cir. 2001)). If, however, "a comparison of the averments in the competing pleadings reveals a material dispute of fact, judgment on the pleadings must be denied." Id. (citing Hawthorne v. Mac Adjustment, Inc., 140 F.3d 1367, 1370 (11th Cir. 1998)). "Judgment on the pleadings is appropriate only when the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Horsley v. Feldt, 304 F.3d 1125, 1131 (11th Cir. 2002) (quoting Moore v. Liberty Nat'l Life Ins. Co., 276 F.3d 1209, 1213 (11th Cir. 2001)).[2]

---

[2] An objection that a complaint "[fails] to state a claim upon which relief can be granted . . . may be raised . . . by a motion under rule 12(c)." Fed. R. Civ. P. 12(h)(2)(B). The difference between motions under Rules 12(b) and (c) lies in the effect of granting the motion: "a Rule 12(b) motion to dismiss is directed solely towards procedural defects or the statement of the

## DISCUSSION

### *A. Georgia's law on conditional privilege applies to this case.*

Georgia's law on conditional privilege applies to the facts of this case, not New York's law on absolute privilege, as NBCU argues. Dkt. No. 24 at 10-11; Dkt. No. 52 n.7. A federal court sitting in diversity must apply the conflict-of-laws rules of the forum state, which is Georgia in this case. Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941); U.S. Fid. & Guar. Co. v. Liberty Surplus Ins. Corp., 550 F.3d 1031, 1033 (11th Cir. 2008). Under Georgia's choice-of-law rules, the court must first determine whether the legal issue sounds in tort, contract, or property. Acme Circus Operating Co., Inc. v. Kuperstock, 711 F.2d 1538, 1540 (11th Cir. 1983).

Dr. Amin alleges defamation, a tort claim. Georgia's choice of law for torts is "lex loci delicti," which means "where the tort was committed." Dowis v. Mud Slingers, Inc., 621 S.E.2d 413, 415-16, 419 (Ga. 2005). "The general rule is that 'the place of

---

plaintiff's claim," so granting that motion "does not [ ] determine the substantive merits of the controversy"; "[a] motion for judgment on the pleadings, however, theoretically . . . determin[es] [ ] the substantive merits of the [case.]" 5C Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure § 1369 (3d ed. Apr. 2022 Update). As a result, courts are typically "unwilling to grant a judgment under Rule 12(c) unless it is clear that the merits . . . can be fairly and fully decided in this summary manner." Id.

wrong . . . is the place where the injury sustained was suffered rather than the place where the act was committed, or, as it is sometimes more generally put, it is the place where the last event necessary to make an actor liable for an alleged tort takes place.'" Risdon Enters., Inc. v. Colemill Enters., Inc., 324 S.E.2d 738, 740 (Ga. Ct. App. 1984) (quoting 15A C.J.S. Conflict of Laws § 12(2)(b), 459)).

In defamation cases where the parties reside in different states, Georgia's choice of law rules require courts to apply the law of the plaintiff's domicile. See, e.g., Donald J. Trump for President, Inc. v. CNN Broad., Inc., 500 F. Supp. 3d 1349, 1353-54 (N.D. Ga. 2020) (applying Georgia law); Adventure Outdoors, Inc. v. Bloomberg, No. 1:06-CV-2897-JOF, 2007 WL 9735875, at *2-3 (N.D. Ga. Dec. 18, 2007) (same); cf. Nunes v. Cable News Network, 31 F.4th 135, 143 (2d Cir. 2022) (framing the issue as "where a plaintiff incurs the *greatest* reputational injury, with a presumption that a plaintiff suffers the brunt of the injury in their home state" (emphasis added)). Because Dr. Amin alleges that the injury to his reputation happened in Georgia in the community where he lives and works, Georgia law applies. Bloomberg, 2007 WL 9735875, at *3.[3]

---

[3] NBCU's other arguments for applying New York's absolute privilege on the pleadings also fail. Dkt. No. 52 at 5 n.5 (arguing that New

**B. NBCU's reports are conditionally privileged under Georgia's Public Interest Privilege.**

The facts of this case implicate two types of Georgia's conditional privileges. Dkt. No. 52 at 5-10 (arguing that the

---

York law applies and citing NBCU's arguments in its first motion for judgment on the pleadings, dkt. no. 24 at 10-14).

First, NBC suggested that because it undertook its reporting in New York, "public policy" requires that New York's absolute privilege should apply, regardless of which state's law governs Dr. Amin's substantive claims. Dkt. No. 24 at 10-11. Neither Georgia's, nor New York's, nor the federal government's public policy requires this result. Georgia has made its own policy decisions regarding both (a) the scope of reporting privilege from defamation, O.C.G.A. § 51-5-7(5), and (b) the choice of law rules to apply in multistate defamation cases. Dowis, 621 S.E.2d at 419. New York has no right to force its own policy preferences on another sovereign state. See Bradford R. Clark, Federal Common Law: A Structural Reinterpretation, 144 U. Pa. L. Rev. 1245, 1325 (1996) ("Because states are coequal sovereigns under the Constitution, neither party to an interstate dispute has legislative power to prescribe rules of decision binding upon the other." (footnote omitted)); Gubarev v. Buzzfeed, Inc., No. 0:17-CV-60426, 2018 U.S. Dist. LEXIS 97246, at *15 (S.D. Fla. June 5, 2018)(ruling on motion for judgment on the pleadings and considering New York's policy only as part of the forum state's conflicts-of-law rules). NBCU did not point to any authority that the United States has taken a side in the defamation/privilege debate.

Second, NBC contended that *the person denied the privilege* was the "injured" party for lex-loci purposes, not the allegedly defamed plaintiff. Dkt. No. 37 at 2-3. However, "[t]he place of the wrong . . . is the place where the injury sustained was suffered," meaning "the place where the last event necessary to make an actor liable *for an alleged tort* takes place." Risdon, 324 S.E.2d at 740 (quoting 15A CJS Conflict of Laws, 12(2)(b), 459). Because NBCU is the actor liable for the alleged tort, it is not the "injured" party for lex-loci purposes. 15A CJS Conflict of Laws, 12(2)(b), 459.

conditional privileges apply); Dkt. No. 55 at 4-11 (arguing that neither of the conditional privileges apply). First, Georgia's "fair report privilege" adheres to "[f]air and honest reports of the proceedings of legislative [bodies,] judicial bodies," or "court proceedings." O.C.G.A. § 51-5-7(5), (6). Next, Georgia's "public interest privilege" protects "[s]tatements made in good faith as part of an act in furtherance of the . . . entity's right of . . . free speech under the Constitution of the United States or the Constitution of the State of Georgia in connection with an issue of public interest or concern." Id. § (4).

NBCU has not shown that the agencies that received the Whistleblower Letter had the power to institute "quasi-judicial proceedings" against Dr. Amin, and Dr. Amin has plausibly alleged that some of NBCU's statements were not "fair reports." Thus, the "fair report privilege" does not apply as a matter of law at this stage in the proceedings. The "public interest privilege," however, adheres because NBCU's reports were made in connection to allegations of severe mistreatment of detainees, which is "an issue of public interest or concern."

## 1. The Fair Report Privilege does not apply to NBCU's reports.

Georgia's fair report privilege does not apply as a matter of law at this stage in the proceedings. As already noted, Georgia's fair report privilege protects reports of quasi-judicial or

legislative proceedings, O.C.G.A. § 51-5-7(5), (6), which can include "fair, impartial, and accurate news accounts of[] administrative agencies of the government." <u>Morton v. Stewart</u>, 266 S.E.2d 230, 233 (Ga. Ct. App. 1980) (citing 45 A.L.R. 2d 1296, 1305). Thus, for the fair report privilege to adhere, a defendant must show that (1) the reports concerned a proceeding of a qualifying body or court proceeding, and (2) the reports were fair and honest.

> ### i.   NBCU did not report about the proceedings of legislative bodies, judicial bodies, or court proceedings.

NBCU's reports did not concern a court proceeding, <u>see generally</u> dkt. no. 49, so to qualify for the privilege, NBCU must have reported on the proceedings of a legislative or judicial body. To determine whether a body qualifies as "legislative" or "judicial," courts must examine the "nature of the act to be performed rather than the office, board, or body that performs it." <u>Id.</u> (quoting <u>Se. Greyhound Lines v. Ga. Pub. Serv. Comm'n</u>, 181 S.E. 834, 838 (Ga. 1935)). When agencies "make a rule for future conduct," they exercise legislative or quasi-legislative powers. <u>Se. Greyhound Lines</u>, 181 S.E. at 839 (quoting <u>Mut. Light & Water Co. v. City of Brunswick</u>, 124 S.E. 178, 179 (Ga. 1924)). In contrast, "[a]dministrative proceedings by governmental agencies to discipline, remove from office, or revoke a license,

are quasi-judicial in nature and entitled, as a minimum, to a qualified privilege." <u>Morton</u>, 266 S.E. at 233 (citing 45 A.L.R. 2d 1296, 1305).

NBCU argues that the fair report privilege adheres in this case because (1) DHS, OIG, and ICDC are administrative agencies with quasi-judicial and quasi-legislative powers and (2) they opened investigations into the Whistleblower Letter. Dkt. No. 57 at 7. First, NBCU does not allege that these agencies made rules governing future conduct in response to the Whistleblower Letter, so the agencies' actions cannot be quasi-legislative. Second, following the Georgia Court of Appeal's reasoning in <u>Morton</u>, the agencies did not exercise quasi-judicial powers. In <u>Morton</u>, the court held that the Georgia Composite State Board of Medical Examiners, which had the power to investigate and discipline physicians, exercised quasi-judicial functions when it received letters complaining of abuses and investigated members of the Board in response. <u>Id.</u> at 232-33. Like the board in <u>Morton</u>, the OIG opened an investigation in response to the Whistleblower Letter.[4] Dkt. No. 51-8. Unlike the defendant in <u>Morton</u>, however, NBCU has

---

[4] The parties dispute what dates the agencies opened investigations and argue that this impacts whether the privilege adheres. Dkt. no. 55 at 6; Dkt. No. 52 at 12. Since the Court finds insufficient evidence of the agencies' powers to determine that the privilege adheres at this point in the proceedings, it does not need to address these arguments at this time.

not established that these agencies had the power to "discipline [Dr. Amin], remove [him] from office, or revoke" Dr. Amin's medical license. Morton, 266 S.E. at 233 (citing 45 A.L.R. 2d 1296, 1305). The OIG's report based on its investigation provided only "findings" and "recommendations," dkt. no. 55 at 7, dkt. no. 51-8 at 17-27, rather than instituting any disciplinary action, and the report itself did not address the claims made against Dr. Amin. Dkt. No. 51-8 at 7, 16 n.39 ("The . . . team did not evaluate the specific allegations of inappropriate gynecological care, as those have been referred to our Office of Investigations.").

The closest NBCU comes to pleading quasi-judicial action against Dr. Amin is showing that on September 22, 2020, ICDC confirmed that Dr. Amin "would no longer see patients from the detention center."[5] See Nomaan Merchant, Migrant Women to no Longer

---

[5] While motions to dismiss and motions for judgment on the pleadings typically must be decided on the pleadings alone, see Fed. R. Civ. P. 12(d), documents that are "incorporated by reference" in the pleadings can be considered if the documents are (1) central to the plaintiff's claim and (2) their authenticity is undisputed. Speaker v. U.S. Dep't of Health & Human Serv. Ctrs. for Disease Control & Prevention, 623 F.3d 1371, 1379 (11th Cir. 2010) (motion to dismiss); Horsley, 304 F.3d at 1135-36 (judgment on the pleadings). NBCU's attachments satisfy these two requirements. First, the transcripts of the news reports, dkt. nos. 18-2 through 6, are the subject of this defamation case, so they are "central" to Dr. Amin's claims, see Hoffman-Pugh v. Ramsey, 193 F. Supp. 2d 1295, 1299 (N.D. Ga. 2002). The Whistleblower Letter, dkt. no. 18-1, is the object of the reports, and whether NBCU fairly reported its contents is a key issue on the merits. Dr. Amin relies in part on the ICDC statement, dkt. no. 18-7, to show that NBCU's accusations about Dr. Amin were false, see dkt. no. 1 ¶ 55. Thus, each of the attachments are "central" to Dr. Amin's claims. Since

See Doctor Accused of Misconduct, AP News, Sept 22, 2020, https://apnews.com/article/georgia-archive-immigration-f3b1007a9 d2ef3cb6d2bd410673eae83; Dkt. No. 52 at 12, Dkt. No. 51 ¶ 39, id. at 11 n.15 (citing Merchant, supra). The record, however, does not show that this action was taken to discipline Dr. Amin. One could infer that ICDC took disciplinary action or had disciplinary capabilities against Dr. Amin. Taking inferences in favor of Dr. Amin, this action may simply have been a procedural requirement while the agencies investigated the allegations rather than a punishment specifically against Dr. Amin due to a finding of fault. Absent allegations about the agencies' powers and how they exercised these powers over Dr. Amin, which NBCU may well be able to obtain in discovery, NBCU has not established that the fair report privilege applies at this point in the proceedings.

> ### ii. Plaintiff has plausibly alleged that NBCU's reports were not "fair."

Even if NBCU was reporting about the proceedings of a judicial body, Dr. Amin has plausibly alleged that the fair report privilege does not apply because NBCU's reports were not "fair." To be "fair," a qualifying report must "present fully, fairly, and accurately an impartial account of the proceedings." Lawton v. Ga.

---

Dr. Amin does not contest the authenticity of any of those documents, considering them is appropriate.

Television Co., 456 S.E.2d 274, 277 (Ga. Ct. App. 1995) (quoting Shiver v. Valdosta Press, 61 S.E.2d 221, 226 (Ga. Ct. App. 1950)). Even "a substantially accurate report may be privileged," as long as any omissions or inaccuracies "are immaterial." Id. At bottom, "[this] 'substantial accuracy' required for a 'fair report' means that the fair report must have the same 'gist' as the proceedings reported." Id. at 277 (citing Lavin v. New York News, Inc, 757 F.2d 1416 (3rd Cir. 1985)). The essential requirement is that "the report be . . . 'neutral reportage.'" Id. (quoting McCracken v. Gainesville Tribune, Inc., 246 S.E.2d 360, 363 (Ga. Ct. App. 1978)); see also AirTran Airlines, Inc. v. Plain Dealer Publ'g Co., 66 F. Supp. 2d 1355, 1365 (N.D. Ga. 1999) ("The question[ ] of whether [a statement] is privileged as a fair report . . . [is] generally [a] question[ ] of fact for the jury" (quoting Lamb v. Fedderwitz, 30 S.E.2d 436, 438 (Ga. Ct. App. 1944))).

The Whistleblower letter identifies two categories of concern. First, the Letter expresses "concerns about how many women have received a hysterectomy while detained at ICDC." Dkt. No. 51-1 at 19-20. Second, the letter states that "detained women expressed to [Ms. Wooten] that they didn't fully understand why they had to get a hysterectomy," which is "[i]ntertwined with the issue of the reported high rates of hysterectomies [and] . . . proper informed consent." Id. at 20-21.

14

The broadcasts, on the other hand, stated that the medical procedures were "unauthorized" and "without consent." Dkt. No. 49 ¶¶ 3, 78, 86 110, 116; Dkt. No. 51-3 at 12 ("unauthorized"); Dkt. No. 51-4 at 13 ("unauthorized"); Dkt. No. 18-5 at 5 ("without them consenting"); Dkt. No. 18-6 at 13 ("without consent"). The characterizations "unauthorized" and "without consent" arguably expand on the statements in the letter itself. Making reasonable inferences in Dr. Amin's favor, Dr. Amin has plausibly alleged that the news reports went further than the Whistleblower Letter. That kind of report would not "present fully, fairly, and accurately an impartial account of the proceedings" because it would not "have the same 'gist' as the proceedings reported." Lawton, 456 S.E.2d at 277 (quoting Shiver, 61 S.E.2d 221). Thus, even if the broadcasts were covering a judicial proceeding, Dr. Amin has plausibly alleged that at least some of the statements in the report were not "fair" reports such that the fair-report privilege is inapplicable.

**2. The Public Interest Privilege applies to NBCU's reports.**

Georgia's "public interest privilege" protects "[s]tatements made in good faith as part of an act in furtherance of the . . . entity's right of . . . free speech under the Constitution of the United States or the Constitution of the State of Georgia in connection with an issue of public interest or concern as defined in [O.C.G.A. § 9-11-11.1(c)]." O.C.G.A. § 51-5-7(4). O.C.G.A. § 9-

11-11.1(c)(2)-(4) defines an act in furtherance of free speech to include "[a]ny written or oral statement . . . made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law"; "[a]ny written or oral statement . . . made in . . . a public forum in connection with an issue of public concern"; or "[a]ny other conduct in furtherance of the exercise of the constitutional right of . . . free speech in connection with a public issue or an issue of public concern."

### i. O.C.G.A. § 9-11-11.1(c)(2) applies to NBCU's statements.

NBCU's reports are statements "made in connection with an issue under consideration or review by a[n] . . . executive . . . body." O.C.G.A. § 9-11-11.1(c)(2). In Georgia Community Support & Solutions, Inc. v. Berryhill, 620 S.E.2d 178, 181 (Ga. Ct. App. 2005), aff'd, 638 S.E.2d 278 (Ga. 2006), the court held that statements in emails and on a website were not "made in connection" to an issue under consideration because there was no evidence of any official proceeding "either before or after [the defendant's] statements" and there was "not any evidence that [the defendant] sought to initiate an official proceeding by making the statements." Unlike the defendant in Berryhill, Ms. Wooten "included allegations in the report with the intention of triggering investigation into whether or not the claims were true."

16

Dkt. No. 49 ¶ 172. Further, after receiving the Letter, the agencies publicly responded to her allegations and then began investigating their merit. Dkt. No. 49 ¶ 121–127; Dkt. No. 51-7; Dkt. No. 51-8; Dkt. No. 51-2 at 29. The day after Ms. Wooten sent the Whistleblower Letter, ICE issued a statement addressing the allegations, dkt. no. 49 ¶¶ 121–127, and the Deputy Secretary of Homeland Security announced an investigation into the allegations two days after the Letter was sent. Dkt. No. 52 at 3; Dkt. No. 51 at 2-3 n.5. Because ICE and DHS are executive bodies that specifically responded to the allegations in the Whistleblower Letter, NBCU's reporting qualifies as reporting "made in connection with an issue under consideration or review by a[n] . . . executive body." O.C.G.A. § 9-11-11.1(c)(2).

Dr. Amin argues that the privilege does not apply because no executive agency had begun investigating when Ms. Wooten and Project South issued the Whistleblower Letter. Dkt. No. 55 at 4-6. While the record is unclear whether ICE started its own investigation, see dkt. no. 49 ¶ 127 (ICE stating that it "intend[ed] to fully cooperate with any resulting investigation"),[6] the OIG did later institute official proceedings, dkt. no. 51-8 at 7 (the OIG "started [its] review in

_____

[6] Taking all inferences in favor of Dr. Amin, it is presumed ICE did not start its own investigation.

17

October 2020"). Concluding that the Whistleblower Letter, which triggered the investigation itself, is not covered by O.C.G.A. § 9-11-11.1(c)(2) would undermine the purpose of the subsection. See Hawks v. Hinely, 556 S.E.2d 547, 550 (Ga. Ct. App. 2001) (rejecting the argument that O.C.G.A. § 9-11-11.1 did not apply because the statements at issue, which triggered the subsequent proceeding, were made prior to the initiation of the proceeding as a "construction [that] would produce [] undesirable and illogical results and consequences"). Thus, O.C.G.A. § 9-11-11.1(c)(2) still applies even though the OIG investigation did not begin until after Ms. Wooten and Project South issued the Letter.[7]

### ii. O.C.G.A. § 9-11-11.1(c)(3) or (c)(4) apply to NBCU's reports.

Even if NBCU's reports are not privileged under O.C.G.A. § 9-11-11.1(c)(2), they are privileged under O.C.G.A. § 9-11-11.1(c)(3) or O.C.G.A. § 9-11-11.1(c)(4). O.C.G.A. § 9-11-

---

[7] That Ms. Wooten failed to follow the procedure for filing an official complaint also does not prevent O.C.G.A. § 9-11-11.1(c)(2) from applying. The court in Berryhill, when determining whether O.C.G.A. § 9-11-11.1(c)(2) applied, considered only whether the defendant's emails and comments on a website were written with the *intent* to initiate official proceedings, not whether they followed the "appropriate channels" for initiating official proceedings. It is undisputed that Ms. Wooten and Project South issued the Whistleblower Letter in order to trigger an official investigation. Dkt. no. 49 ¶ 172. Thus, O.C.G.A. § 9-11-11.1(c)(2) still applies.

11.1(c)(3) applies to statements "[1] made in . . . a public forum [2] in connection with an issue [3] of public concern." NBCU argues that "widely disseminated television broadcasts," such as MSNBC, are public forums. Dkt. No. 52 at 6 (citing Metabolic Int'l, Inc. v. Wornick, 72 F. Supp. 2d 1160, 1165 (S.D. Cal. 1999), rev'd in part on other grounds, 264 F.3d 832 (9th Cir. 2001) ("[A] widely disseminated television broadcast [] is undoubtedly a public forum.")). Dr. Amin does not dispute this assertion.[8] Dkt. No. 55 at 9–11 (arguing only that the public interest privilege does not apply, but not arguing that a television broadcast is not a "public forum").

To determine whether an issue is an "issue of public concern" under the statute, courts consider "whether the subject of

---

[8] While Georgia courts may look to cases interpreting California's Anti-SLAPP statute for guidance in interpreting O.C.G.A. § 9-11-11.1, Am. C.L. Union, Inc. v. Zeh, 864 S.E.2d 422, 429 n.6 (Ga. 2021); Wilkes & McHugh, P.A. v. LTC Consulting, L.P., 830 S.E.2d 119, 124 (Ga. 2019), Georgia courts have also previously applied O.C.G.A. § 9-11-11.1(c)(3) to newspapers, see Rosser v. Clyatt, 821 S.E.2d 140, 145 (Ga. Ct. App. 2018), indicating that Georgia Courts may interpret "public forum" to include entities such as newspapers and television broadcasts for the purposes of O.C.G.A. § 9-11-11.1(c)(3), even though a newspaper is likely not a "public forum" in the constitutional, First Amendment sense of the term. See Ark. Educ. Television Com'n v. Forbes, 523 U.S. 666, 681 (1998) (identifying the three types of fora and finding that a public television political debate was a nonpublic forum). This issue, however, is not dispositive of NBCU's motion because NBCU's reports are covered by either O.C.G.A. § 9-11-11.1(c)(2) or (c)(4).

the speech or activity was a person or entity in the public eye or could affect large numbers of people beyond the direct participants; and whether the activity occurred in the context of an ongoing controversy, dispute or discussion, or affected a community in a manner similar to that of a governmental entity." Lane Dermatology v. Smith, 861 S.E.2d 196, 204 (Ga. Ct. App. 2021). Lastly, to determine whether the speech was made "in connection" with an issue of public concern, courts "ask what public issue or issue of public interest the speech in question implicates—a question they answer by looking to the content of the speech. [Next,] they ask what functional relationship exists between the speech and the public conversation about some matter of public interest." Id. (alterations accepted). Compare id. at 205 (finding that a nameplate listing the plaintiff as a dermatology provider was not a statement made "in connection with an issue of public interest or concern" because there was no evidence that the plaintiff was within the public eye, the subject of an ongoing media campaign, or that the nameplate or the plaintiff's employment affected "more than the parties and a small group of the parties' customers"), with Rosser, 821 S.E.2d at146 (finding that statements about the management and operation of Grady EMC, including its upcoming board of directors election, were "made in connection" with an issue of public interest or concern because the elections were a topic of public debate due to Grady being a

20

major employer in the community and its actions affecting thousands of people).

Dr. Amin, like the dermatologist in Lane Dermatology, is not a person in the public eye. Dkt. No. 49 ¶¶ 1, 14 (referring to Dr. Amin as a "private figure" and a "private individual"). Unlike in Lane Dermatology, where the speech impacted only a small group of people, allegations of mistreatment of detainees in the Irwin County ICE facility could impact all detainees in the facility. The mistreatment of detainees more broadly is "an ongoing controversy, dispute, or discussion." See Dkt. No. 52 at 6; see also Wilkes & McHugh, P.A., 830 S.E.2d at 128 ("[T]he alleged existence of serious injuries and deaths at local nursing homes resulting from deficiencies known to a government agency certainly qualifies as a public issue or an issue of public concern."); Hindu Temple & Cmty. Ctr. of High Desert, Inc. v. Raghunathan, 714 S.E.2d 628, 632 (Ga. Ct. App. 2011) (pronouncing, before the 2016 amendment to the statute, that "it goes without saying that the perceived (and substantially documented) victimization of individuals throughout the country constitutes 'an issue of public interest or concern.'"). Furthermore, the allegations in the Whistleblower Letter prompted outcry from members of the public, dkt. no. 49 ¶ 228, dkt. no. 55 at 4, and members of Congress. Dkt. No. 51-4 at 17; Dkt. No. 55 at 16 (citing Dkt. No. 51-5 at 11); Dkt. No. 52 at 3 (citing Dkt. No. 42 ¶ 3 n.2). Accordingly, many

other news organizations similarly reported on the allegations. Dkt. No. 52 at 22-23. Because the subject of the speech could affect large numbers of people and occurred in the context of an ongoing controversy and discussion, NBCU's reports related to an issue of public concern.

Furthermore, NBCU's reports were made "in connection" with the issue of public concern because they relate to the public issue of the government's treatment of detainees. NBCU's reports were directly discussing and investigating the Whistleblower's allegations regarding Dr. Amin's treatment of the detainees. Therefore, NBCU's speech was made "in connection" with the issue of public concern and the speech is privileged under O.C.G.A. § 9-11-11.1(c)(3).

Even if O.C.G.A. § 9-11-11.1(c)(3) does not apply because NBCU's statements were not made in a public forum, O.C.G.A. § 9-11-11.1(c)(4) would apply to them. O.C.G.A. § 9-11-11.1(c)(4) applies to "[a]ny other conduct in furtherance of the exercise of the constitutional right of petition or free speech in connection with a public issue or an issue of public concern." As discussed above, NBCU's reports were made "in connection with" a public issue or an issue of public concern. Public reporting of public allegations is conduct in furtherance of free speech. Thus, NBCU's statements are conditionally privileged under O.C.G.A. § 9-11-11.1(c)(4).

Dr. Amin argues that the public interest privilege does not apply because O.C.G.A. § 9-11-11.1 is Georgia's anti-SLAPP (strategic lawsuit against public participation) statute and "[n]o court has relied on the public interest privilege as a basis to excuse false and defamatory statements," "no Georgia court has substantively applied the public interest privilege separate from an anti-SLAPP motion," and "the anti-SLAPP process is not available in the Eleventh Circuit." Dkt. No. 55 at 9. Further, Dr. Amin asserts, reading the public interest privilege to cover NBCU's reports would "provide[] a privilege over false statements made by others in nearly any context," protecting false statements and "swallow[ing] up the fair report privileges and . . . the other privileges of O.C.G.A. § 51-5-7." Id. at 10.

Under the Erie doctrine, "the substantive privileges of O.C.G.A. § 51-5-7 are applicable in federal court even if the procedural anti-SLAPP law is not." Dkt. No. 57 at 4 n.4 (citing Adventure Outdoors, Inc. v. Bloomberg, 519 F. Supp. 2d 1258, 1278-79 (N.D. Ga. 2007), rev'd on other grounds, 552 F.3d 1290 (11th Cir. 2008)); Dkt. No. 52 at 9 (citing Adventure Outdoors, Inc., 519 F. Supp. 2d at 1278-79); see Adventure Outdoors, Inc., 519 F. Supp. 2d at 1278-79 ("[C]ertain aspects of the statute could be considered 'substantive' in the sense of what communications are privileged under O.C.G.A. § 51-5-7." (citing Atlanta Humane Soc'y v. Harkins, 603 S.E.2d 289 (Ga. 2004)); Atlanta Humane Soc'y, 603

S.E.2d at 293 (referring to the "substantive protection of the anti-SLAPP statute"). The public interest privilege in O.C.G.A. § 9-11-11.1(c), as applied through O.C.G.A. § 51-5-7(4), does not directly conflict with a Federal Rule of Civil Procedure and, thus, is *substantive* and can apply in federal court even though the anti-SLAPP *procedure* does not apply in federal court. See Hanna v. Pulmer, 380 U.S. 460, 464-66, 472-73 (setting out the two-step test, where there must first be a "direct collision" between the statute and a Federal Rule of Civil Procedure for a statute to be found procedural); Garcia v. Chiquita Brands Int'l, Inc., 48 F.4th 1202, 1210 (11th Cir. 2022) ("The first step of the analysis is to determine whether state and federal law conflict with respect to the disputed issue before the district court. If no conflict exists, then the analysis need proceed no further, for the court can apply state and federal law harmoniously to the issue at hand.").

Further, as NBCU notes, Georgia courts have applied the O.C.G.A. § 51-5-7 privileges separately from an anti-SLAPP motion. Dkt. No. 52 at 9; see also Chaney v. Harrison & Lyman, LLC, 708 S.E.2d 672, 677 (Ga. Ct. App. 2016); Godfrey v. Cobb Cnty., No. 06-1-7337-49, 2009 WL 2776599 (Ga. Super. July 10, 2009); Bodana v. Times J., Inc., No. 10-1-6769-18, 2012 WL 2375267 (Ga. Super. Feb. 27, 2012). Dr. Amin attempts to distinguish Godfrey and Bodana by noting that, in those cases, privilege "was not the only basis"

for granting the motions.  Dkt. No. 55 at 11. In both Godfrey and
Bodana, however, the courts recognized that the privilege would
constitute a separate and independent ground for reaching their
holding. Godfrey, 2009 WL 2776599; Bodana, 2012 WL 2365267. That
Godfrey was a summary judgment case and Bodana was a *pro se* case
does not, as Plaintiff argues, change the fact that the courts
applied the privileges outside an anti-SLAPP motion. The Court
also rejects Plaintiff's argument that it should dismiss the
authority of the courts' rulings simply because both cases were
handled by counsel for the defendant and the judges in both cases
entered counsel's proposed orders.  Dkt. No. 55 at 11. Doing so
would undermine the authority of those courts.

Lastly, applying the public interest privilege in this case
would not make the fair report privilege mere surplusage nor would
it undermine the purpose of the anti-SLAPP statute by permitting
false statements, as Dr. Amin argues. Dkt. No. 55 at 10. As
discussed supra, Georgia has a specialized definition of "public
concern," such that not every story reported would qualify as made
"in connection with an issue of public interest or concern,"
O.C.G.A. § 51-5-7(4), and thus reporters would need to seek the
protection of the fair report privilege instead. Georgia courts
have also applied multiple O.C.G.A. § 51-5-7 privileges to the
same statement, see, e.g., Examination Management Services v.
Steed, 794 S.E.2d 678, 681 (Ga. Ct. App. 2016); thus, that both

the public interest and fair report privileges might apply to one statement does not mean the privileges were applied incorrectly.

Georgia courts have also previously recognized that "privileged communications bar recovery" for slander in the case of conditional privileges. <u>Brown v. Scott</u>, 259 S.E.2d 642, 644 (Ga. Ct. App. 1979) (application of the limited privilege under former Code Section 105-706 barred recovery for slander); <u>Corbin v. First Nat'l Bank of Atlanta</u>, 258 S.E.2d 697, 699 (Ga. Ct. App. 1979) (finding that the conditional privilege in former Code Section 105-809(1) barred recovery for slander); O.C.G.A. § 51-5-5 ("In cases of privileged communications, such proof shall bar a recovery [for slander]."). Further, as discussed <u>infra</u>, a showing of actual malice will overcome any of the privilege's protection such that people cannot report whatever facts they want without concern for the consequences. <u>Infra</u> pp. 26–28. Thus, Dr. Amin's argument—that the public interest privilege cannot apply in this case because it might protect false communications—fails. Nevertheless, as discussed below, some of Dr. Amin's claims survive.

**C. Dr. Amin has plausibly alleged that NBCU acted with actual malice during NBCU's First, Second, and Fifth Broadcasts.**

Georgia law recognizes two types of privilege: absolute and conditional. <u>Saye v. Deloitte & Touche, LLP</u>, 670 S.E.2d 818, 821 (Ga. Ct. App. 2008). Where a conditional privilege applies, the

privilege protects the speaker from liability for the communication unless the communication is made with actual malice. McCraken v. Gainesville Trib., Inc., 246 S.E.2d 360, 362 (Ga. Ct. App. 1978) (noting that "'[t]he characteristic feature of absolute, as distinguished from conditional, privilege, is that in the former the question of malice is not open. All inquiry into good faith is closed[,]'" whereas "[a] conditional privilege is lost if maliciously made." (quoting Atlanta News Publ'g Co. v. Medlock, 51 S.E.2d 756, 759(Ga. 1905))); see also Murray v. Cmty. Health Sys., 811 S.E.2d 531, 539-40 (Ga. Ct. App. 2018) (explaining that statements made in "good faith" are privileged, and good faith can be negated "by showing that [the speaker] acted with actual malice").

Georgia applies the federal *New York Times* actual malice standard to cases of conditional privilege. Hammer v. Slater, 20 F.3d 1137, 1142 (11th Cir. 1994). "Actual malice" means the speaker "[knew] that [a statement] was false or [made the statement] with reckless disregard of whether it was false or not." Michel v. NYP Holdings, Inc., 816 F.3d 686, 702 (11th Cir. 2016). (quoting New York Times v. Sullivan, 376 U.S. 254, 280 (1964)). Malice "is generally a jury issue," Hammer, 20 F.3d at 1143 (collecting cases), but courts may dismiss defamation suits for failure to state a claim "where the plaintiff has not pled facts

sufficient to give rise to a reasonable inference of actual malice," Michel, 816 F.3d at 702.

When determining whether there is actual malice "[t]he test is not an objective one"; "the beliefs or actions of a reasonable person are irrelevant." Michel, 816 F.3d at 702-03 (citing St. Amant v. Thompson, 390 U.S. 727, 731 (1968)). Instead, "we ask whether the defendant [himself], instead of acting in good faith, actually entertained serious doubts . . . or was highly aware that the account was probably false." Id. at 703. This requires more "than a departure from reasonable journalistic standards," and "a failure to investigate, standing on its own, does not indicate the presence of actual malice." Id. Circumstances supporting that inference typically involve situations where:

- "a story is fabricated by the defendant, [or] is the product of his imagination, or is based wholly on an unverified anonymous telephone call";

- "when the publisher's allegations are so inherently improbable that only a reckless man would have put them in circulation"; and

- "where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports."

Id. (quoting St. Amant, 390 U.S. at 732). Even those situations can be undercut "where the publisher includes information contrary

to the general conclusions reached in an article." Id. (quoting Lohrenz v. Donnelly, 350 F.3d 1272, 1286 (D.C. Cir. 2003)).

Dr. Amin contends that five of NBCU's actions, either on their own or when considered as a whole, demonstrate actual malice. Specifically, he alleges that: (1) NBCU's broadcasts exceeded the Whistleblower Letter and contradicted known facts, dkt. no. 55 at 16; (2) NBCU "pretended there was government action against Dr. Amin when it knew there was not," id. at 14; (3) NBCU ignored that its sources "personally prevented Dr. Amin from responding to their allegations against him," id. at 14, 20; (4) NBCU "ignored the bias and lack of credibility of its sources," id. at 14, 21; and (5) NBCU "was not neutral in its broadcasts," instead portraying Dr. Amin "as a member of the nefarious Trump Administration immigration apparatus" that NBCU advocated against, id. at 23.

## 1. Dr. Amin's allegations, taken as a whole, raise a plausible inference of actual malice.

While not all of Dr. Amin's allegations contribute to a plausible inference of actual malice, Dr. Amin has alleged sufficient facts that, when taken together, raise such an inference. See, e.g., StopLoss Specialists, LLC v. VeriClaim, Inc., 340 F. Supp. 3d 1334, 1354–55 (N.D. Ga. 2018) (considering the record in its entirety, rather than each piece of evidence separately, when analyzing actual malice). To begin, Dr. Amin alleges that NBCU exceeded the "careful language of the

[Whistleblower Letter]" to the extent that it acted with actual malice. Dkt. No. 55 at 17.  In support, Dr. Amin contends that (1) the Whistleblower Letter mentioned hysterectomies in only two out of the twenty-seven pages in the Letter and did not name Dr. Amin; (2) NBCU knew that the allegations against Dr. Amin were not based on firsthand accounts but rather included "with the intent of triggering investigation [in]to whether or not the claims are true"; (3) NBCU exaggerated the Letter by saying that the procedures were done "without consent" and reporting that Dr. Amin was "abusive," "overly harsh," and "hurting his patients," and (4) ICE issued a public statement asserting that a patient would not get a hysterectomy without consent and that only two patients "were referred" for hysterectomies since 2018.  Dkt. No. 55 at 17.

While the fact that the Whistleblower Letter mentioned hysterectomies in only two out of its twenty-seven pages, did not mention Dr. Amin, and did not contain allegations based on firsthand accounts may be indicative of NBCU's poor journalistic ethics or investigation, it does not weigh in favor of a finding of actual malice. Although the women's health allegations may not have been the focus of the Letter, they were in the Letter, so one cannot infer that NBCU acted with reckless disregard by reporting on them. Dr. Amin also does not contest that the allegations in the Letter were levied against him, so it cannot be said that NBCU acted with reckless disregard for truth when reporting his name.

Further, unlike statements "based wholly on an unverified anonymous telephone call" which can raise an inference of actual malice, <u>Michel</u>, 816 F.3d at 703, NBCU knew the Whistleblower Letter was written by Ms. Wooten and publicized by Project South. <u>See, e.g.,</u> Dkt. No. 51-2 at 28. NBCU also interviewed at least one detainee and several attorneys representing detainees, all of whom corroborated the claims in the Letter. Dkt. No. 52 at 11.

NBCU correctly points out that even if it exceeded the "careful language" of the Whistleblower Letter or focused on the allegations about women's health instead of COVID-19, that does not indicate that NBCU knowingly reported false information or recklessly disregarded the truth. Dkt. No. 52 at 13. To infer actual malice, "the factual allegations must show 'that the defendant purposefully avoided further investigation with the intent to avoid the truth.'" <u>Jacoby v. Cable News Network, Inc.</u>, No. 21-12030, 2021 WL 5858569, at *5 (11th Cir. Dec. 10, 2021). Rather than simply accepting the allegations in the Whistleblower Letter, NBCU conducted its own investigation by speaking to detainees and their lawyers, reviewing the detainees' medical records, and reaching out to Dr. Amin, the ICDC, and ICE for comment. Dkt. No. 52 at 11; Dkt. No. 51 ¶ 7. NBCU's investigation resulted in its reporting on matters outside the Letter: the detainees and their lawyers reported that Dr. Amin was "abusive," "overly harsh," and "hurting" his patients. Dkt. No. 51-2 at 28-

29. Conducting further investigation is antithetical to "purposefully avoid[ing] further investigation with the intent to avoid the truth," so NBCU's reports that Dr. Amin was "abusive," "overly harsh," and "hurting his patients" do not support an inference that NBCU acted with actual malice. Dkt. No. 49 ¶ 111.

Dr. Amin also objects to NBCU's reports that he performed procedures "without consent" because the Letter states: "'[t]hese immigrant women, I don't think they really, totally, all the way understand this is what's going to happen depending on who explains it to them.'" Dkt. No. 55 at 17; Dkt. No. 51-1 at 20. Taking inferences in favor of Dr. Amin, this sentence in the Letter alleges a lack of *informed* consent such that the detainees did not fully understand the procedures. In contrast, NBCU's statement that the procedures were done "without consent" could refer to a lack of *any type of consent*, including verbal or physical consent to the procedures. However, the Letter also states: "I've had several inmates tell me that they've been to see the doctor and they've had hysterectomies and they don't know why they went or why they're going." Dkt. No. 51-1 at 20. This statement, too, indicates a lack of *any type* of consent. NBCU also investigated this allegation and found that a detainee claimed her fallopian tube had been removed without her consent. Dkt. No. 51-4 at 2. While NBCU's use of the word "without consent" might fall below reasonable journalistic standards or fail to convey the gist of

the Whistleblower Letter, such use is supported by both the Whistleblower Letter and NBCU's investigation and, thus, does not contribute to an inference of actual malice. Cf. Bose Corp. v. Consumers Union of U.S., Inc., 466 U.S. 485, 486–87 (1984) ("The choice of the language used, though reflecting a misconception, did not place the speech beyond the outer limits of the First Amendment's broad protective umbrella."). To the extent Dr. Amin argues that NBCU should have done more to verify the detainees' statements, this would only constitute a failure to investigate. Thus, these allegations do not contribute to an inference of actual malice.

That the ICE letter contradicts NBCU's reporting also does not support an inference of actual malice. Dkt. No. 55 at 17–19. The ICE letter states that "detainees are afforded informed consent" and that only "two patients were referred for hysterectomies." Dkt. No. 55 at 17; Dkt. No. 51-7 at 2. ICE's denial, however, does not indicate that NBCU *knew* the information was false or had serious doubts about its veracity, because "the press need not accept denials, however vehement; such denials are so commonplace in the world of polemical charge and countercharge that, in themselves, they hardly alert the conscientious reporter to the likelihood of error." Harte-Hanks Commc'ns, Inc. v. Connaughton, 491 U.S. 657, 691 n.37 (1989) (citation and internal quotation marks omitted).

Dr. Amin counters that "ICE's denial, in concert with the inherent improbability of patients receiving hysterectomies without consent and mass hysterectomies being performed by a rogue doctor who could escape the layers of approvals required for detainee medical care and the supervisors present during medical procedures, presented information causing Defendant to doubt the veracity of the broadcasts." Dkt. No. 55 at 19. This response overlooks the fact that the Letter and NBCU's report did not allege that Dr. Amin "escape[d] the layers of approvals" required for medical procedures. Instead, they raise concern about the high number of hysterectomies and whether the detainees fully understood the medical procedures they underwent, which could occur even with the proper approvals. See generally Dkt. Nos. 51-1 through 51-6. ICE also stated that only two women were "referred" for hysterectomies. Dkt. No. 51-8 at 2. While the number of hysterectomies that occurred at ICDC could have been just those that were "referred," it does not exclude the possibility that other hysterectomies could have been performed on women who were not initially "referred" for hysterectomies. Dkt. No. 52 at 16 (noting that one woman referenced in the Whistleblower Letter ended up with a hysterectomy after Dr. Amin removed the wrong ovary initially). The allegations in the Letter were also "probable" enough to prompt calls for investigation from members of Congress and to trigger federal agency investigations. Dkt. No. 55 at 16

34

(citing Dkt. No. 51-5 at 11); Dkt. No. 51-4 at 17; Dkt. No. 51-8 at 7. Thus, that the ICE statement contradicts the Letter does not weigh in favor of Dr. Amin's contention that NBCU acted with actual malice.

Next, Dr. Amin argues that NBCU acted with actual malice because "MSNBC pretended to simply be reporting on government action when none existed." Dkt. No. 49 ¶ 90. To support this argument, Dr. Amin contends that (1) "MSNBC included the statement 'investigation ordered into claims of unneeded medical procedures on immigrant women' across the screen during the [F]ifth [B]roadcast [on September 17, 2020] even though no investigation announcement was cited or otherwise discussed," id. ¶¶ 91-93, 96, and (2) NBCU reported that government action had occurred in September 2020, id. ¶ 86, but "[t]here was no government action taken on any allegation made in the [Whistleblower Letter] until at least October 2020," id. ¶ 92.[9] According to Dr. Amin, not only do NBCU's actions show that NBCU publicized information it knew was false, but also, they demonstrate that NBCU advocated against Dr. Amin rather than acting as a "neutral news organization." Dkt. No. 55 at 15-16.

---

[9] NBCU disputes this fact, dkt. no. 52 at 12, but on a motion for judgment on the pleadings, the Court must accept the plaintiff's factual allegations as true. Perez v. Wells Fargo, N.A., 774 F.3d 1329, 1335 (11th Cir. 2014).

A timeline of the relevant events helps to analyze this claim:

- On September 14, 2020, Project South sent the Whistleblower Letter to various agencies and news organizations. Dkt. No. 49 ¶ 45.

- On September 15, 2020, NBCU issued its First Broadcast about the Whistleblower Letter. Id. ¶ 75. Sometime the same day, ICE publicly responded to the Letter, stating that the agency intended to "fully cooperate with any *resulting* investigation." Id. ¶ 127 (emphasis added). After ICE's statement, NBCU issued its Second Broadcast and Fourth Broadcast.[10] Dkt. No. 49 ¶ 78; Dkt. No. 52 at 15.

- On September 16, 2020, NBCU reported in its Third Broadcast that DHS Deputy Secretary Ken Cuccinelli had pledged to send a team to investigate the allegations.[11] Dkt. No. 49 ¶ 81; Dkt. No. 51-4 at 15; Dkt. No. 51 at 2 n.5 (citing a *New York Times* article reporting that "[t]he Department of Homeland Security is investigating allegations that immigrant women

---

[10] Note that the complaint states that the Fourth Broadcast occurred on September 16, 2020, while the exhibit states that it occurred on September 15, 2020. Dkt. No. 49 ¶ 84 (the Fourth Broadcast aired "on or about September 16, 2020"); Dkt. No. 51-1 (September 15, 2020).

[11] Dr. Amin does not dispute this report, instead, he argues that no governmental investigation actually *began* until October 2020. Dkt. No. 49 ¶ 92.

detained at a privately run detention center in Georgia
underwent gynecological procedures without fully
understanding or consenting to them").

- On September 17, 2020, NBCU issued its Fifth Broadcast, which
  "included the statement 'investigation ordered into claims of
  unneeded medical procedures on immigrant women' across the
  screen." Dkt. No. 49 ¶¶ 91–93, 96.

- On September 22, 2020, ICE issued a statement confirming that
  Dr. Amin would no longer see patients at ICDC, and ICE refused
  to comment further on the matter because of an "on-going
  investigation by the Department of Homeland Security's
  inspector general." See Nomaan Merchant, Migrant Women to No
  Longer See Doctor Accused of Misconduct, AP News, Sept 22,
  2020, https://apnews.com/article/georgia-archive-immigratio
  n-f3b1007a9d2ef3cb6d2bd410673eae83; Dkt. No. 52 at 12, Dkt.
  No. 51 ¶ 39, id. at 11 n.15 (citing Merchant, supra).

- In October 2020, the OIG began its investigation. Dkt. No.
  51-8 at 7.

- The OIG released its report on January 3, 2021. Dkt. No. 51-
  8 at 3.

Even inferring that NBCU's report that an "investigation
[was] ordered" meant that the government *had begun* its
investigation, an inference a jury is not required to credit, Dr.
Amin has not alleged facts that raise the inference that NBCU

subjectively knew the statement was false or that NBCU made the statement with reckless disregard of its truth or falsity. The fact that the OIG *stated in January 2021* that it did not open its investigation until October 2020 does not raise the inference that NBCU *knew in September 2020* that the OIG had not yet begun investigating. See Dkt. No. 49 ¶ 59 ("No matter which of the[] ways a complaint is handled [by the government], it is not made public by the government."); id. ¶ 126 ("ICE stated that it 'does not comment prematurely on reported allegations.'").

On September 15, 2020, two days before the broadcast at issue, ICE stated that it would "fully cooperate with any *resulting* investigation." Dkt. No. 51-7 at 2. This indicates that NBCU should have known on September 15 that no investigation had begun. Had the Fifth Broadcast occurred that day, Dr. Amin may have successfully alleged knowledge or recklessness.[12] However, on September 16, 2020, the day before the Fifth Broadcast, NBCU reported that the DHS Deputy Secretary had pledged to investigate the allegations. Dr. Amin does not dispute this fact. See Dkt. No. 55 at 4-6 (arguing only that the investigation had not *begun* until October 2020); Griffin Indus., Inc. v. Irvin*,* 496 F.3d 1189, 1205-

---

[12] Similarly, NBCU's reference to ICE's September 22, 2020 statement that it would not comment because of an "*on-going*" investigation is not probative of NBCU's subjective knowledge on September 17 during its Fifth Broadcast.

06 (11th Cir. 2007) ("[W]hen the exhibits contradict the general and conclusory allegations of the pleading, the exhibits govern."). While perhaps NBCU should have further investigated whether the Deputy Secretary's investigation had actually *begun*, no facts indicate that NBCU "fabricated" the investigation. Michel, 816 F.3d at 703. That NBCU lacked subjective knowledge of falsity is further supported by the fact that it displayed a headline from the *New York Times* on the screen above the banner stating "investigation ordered."[13] Dkt. No. 52 at 13. The *New York Times* headline similarly read "Inquiry Ordered Into Claims Immigrants Had Unwanted Gynecology Procedures." Id. As Dr. Amin indicates, the existence of these other newspaper reports does not make NBCU's statements less defamatory. Dkt. No. 55 at 3 n.3. The other reports, however, are probative of NBCU's subjective

---

[13] Dr. Amin argues that NBCU's reference to the *New York Times* headline is misplaced because it also discussed ICE's September 15 statement that it would cooperate with "any *resulting* investigation." Dkt. No. 55 at 15. The *New York Times* article references the ICE statement, but it is not entirely clear the article is referring to the statement when it says: "The Department of Homeland Security is investigating allegations that immigrant women detained at a privately run detention center in Georgia underwent gynecological procedures without fully understanding or consenting to them." Caitlin Dickerson, Inquiry Ordered Into Claims Immigrants Had Unwanted Gynecology Procedures, N.Y. Times, Sept. 16, 2020, https://www.nytimes.com/2020/09/16/us /ICE-hysterectomies-whistleblower-georgia.html. Taking the allegations in the light most favorable to Dr. Amin, this Court will credit Dr. Amin's explanation.

knowledge at the time of its report, even if they relied on what Dr. Amin alleges is the same misconception.

Dr. Amin also points to NBCU's various "calls and pleas for investigation" to show that NBCU knew that no investigation had begun during its Fifth Broadcast on September 17, 2020. Dkt. No. 55 at 15–16 (citing Dkt. No. 51-4 at 17 (September 16); Dkt. No. 51-5 (September 15)). The first call for an investigation occurred on September 15, the day before NBCU reported about the DHS Deputy Secretary ordering an investigation, so it does not indicate that NBCU knew it was falsely reporting that an investigation had begun. The second plea for investigation Dr. Amin cites occurred on September 16 after NBCU had reported about the Deputy Secretary's order. Dkt. No. 51-5 at 16 (Representative Sheila Jackson Lee referring to her "plea" for an investigation on NBCU's broadcast). While perhaps more indicative of NBCU's reporting standards, this plea could raise an inference that NBCU knew that no investigation had begun, which weighs in favor of an inference of actual malice. See Palin v. New York Times Co., 940 F.3d 804, 814 (2d Cir. 2019) (holding that defendant's job as a newspaper editor raised the inference that the defendant knew that the journalistic consensus contradicted his allegedly defamatory statements, despite the district court's conclusion that the defendant's statements were more plausibly unintended mistakes). Nevertheless, Dr. Amin does not attempt to argue that NBCU "fabricated" any other parts of its

stories, including the allegations in the Whistleblower Letter that were the focus of its reports. Michel, 816 F.3d at 703. This weighs against an inference of actual malice. Cf. id. (stating that a court could find actual malice when "a story is fabricated by the defendant, [or] is the product of his imagination, or is based wholly on an unverified anonymous telephone call" (quoting St. Amant, 390 U.S. at 732)).

Dr. Amin additionally alleges that NBCU "demonstrated actual malice by both showing that it cared about its narrative rather than the truth or falsity of the allegations, and by failing to verify the accounts of people who had not permitted Dr. Amin to defend himself against their accusations." Dkt. No. 55 at 20. Because the detainees would not grant Dr. Amin HIPAA waivers, he could not discuss their treatment. Dkt. No. 55 at 20. While NBCU disclosed that ICE was prevented from commenting on the substance of the patients' allegations due to HIPAA, NBCU did not disclose that Dr. Amin was similarly hampered by HIPAA. Dkt. No. 49 ¶¶ 160-61. Although Dr. Amin does not allege that he informed NBCU that HIPAA restricted his ability to respond, taking inferences in favor of Dr. Amin, a jury could infer that NBCU knew or should have known about Dr. Amin's inability to fully respond because ICE was similarly restrained.

Nevertheless, certain facts mitigate NBCU's culpability. First, NBCU reported Dr. Amin's general denial after Dr. Amin's

41

lawyer issued same. Dkt. No. 52 at 18–19. <u>Jacoby</u>, 2021 WL 5858569, at *5 ("[W]here the publisher includes information that 'gives readers sufficient information to weigh for themselves the likelihood of an article's veracity,' this showing tends to undermine claims of actual malice."). Second, Dr. Amin has not alleged that NBCU did anything to encourage the detainees not to grant Dr. Amin HIPAA waivers. Thus, there is not "some showing that [NBCU] purposefully avoided further investigation with the intent to avoid the truth." <u>Michel</u>, 816 F.3d at 703. NBCU failing to report on Dr. Amin's lack of HIPAA waivers is, at worst, failure to investigate or a departure from professional standards. The lack of HIPAA waivers, however, contributes to the inference that NBCU had "obvious reasons" to doubt the veracity of the informants.

Dr. Amin argues that NBCU acted with actual malice because NBCU "had myriad reasons to doubt the sources of its accounts." Dkt. No. 55 at 21. He highlights that (1) the whistleblower was not reliable because she did not follow the proper DHS protocols for submitting complaints and she solicited funds from a GoFundMe page, <u>id.</u>, (2) the detainees refused to grant Dr. Amin HIPAA waivers so he could specifically respond to their allegations, <u>id.</u> at 22, and (3) the detainees were incentivized to levy these allegations against Dr. Amin so that they could "receive increased assistance and attention to their efforts to stay," <u>id.</u> (quoting Dkt. No. 49 ¶ 171).

Dr. Amin correctly notes that "obvious reasons to doubt the veracity of the informant[s] or the accuracy of [] reports" can raise an inference of actual malice. Michel, 816 F.3d at 703. NBCU responds that it had no obvious reasons to doubt the veracity of the reports because NBCU "interviewed the whistleblower herself, spoke with numerous attorneys representing detainees at ICDC who were treated by Dr. Amin, spoke with at least one detainee who alleged that Dr. Amin unnecessarily gave her a total hysterectomy, reviewed medical records corroborating the detainees' accounts, contacted the government and Dr. Amin for comment on the allegations, and included statements from ICE, Dr. Amin, La Salle Corrections, and DHS as soon as those statements were made available." Dkt. No. 52 at 11.

First, Dr. Amin points to possible bias and credibility issues involving the whistleblower, the detainees, and the detainees' lawyers. Dr. Amin argues that the Whistleblower "sought the limelight" through her reports because she started a GoFundMe campaign which generated over $100,000 in donations. Dkt. No. 49 ¶ 66; Dkt. No. 55 at 21. Similarly, Dr. Amin argues that the detainees' refusal to grant Dr. Amin HIPAA waivers undermined their credibility and notes that the detainees and their lawyers were motivated to levy these allegations against Dr. Amin because doing so helped them avoid deportation. Dkt. No. 55 at 22. Inferring in Dr. Amin's favor that these factors do undermine the sources'

credibility,[14] the sources' self-interest in levying the claims against Dr. Amin does not, without more, present an "obvious reason" to doubt the veracity of their reports. See Berisha v. Lawson, 973 F.3d 1304, 1312-14 (11th Cir. 2020) (finding that sources' self-interest in providing a story and other factors undermining the sources' credibility did "not show that a publisher necessarily acted with malice"); Reuber v. Food Chem. News, Inc., 925 F.2d 703, 715 (4th Cir. 1991) ("Actual malice cannot be proven simply because a source of information might also have provided the information to further the source's self-interest.").

However, the sources' bias in addition to other information that contradicted the sources' stories could present such an "obvious reason." In Berisha, the court found no actual malice where the defendant relied on sources with dubious credibility but corroborated the stories with several other sources and informed readers of issues with the sources' credibility. 973 F.3d at 1312-13. Dr. Amin alleges that, unlike in Berisha, other sources contradicted, rather than corroborated, the detainees' stories and

---

[14] That the detainees refused to grant Dr. Amin HIPAA waivers so he could specifically respond to their allegations does not necessitate the inference that they were not telling the truth. The women could, for example, have not wanted their alleged abuser to access their personal health information and discuss it publicly. Because the Court must draw inferences in favor of Dr. Amin, it will infer it does undermine their credibility.

that NBCU did not inform viewers about possible issues with their sources' credibility. See Dkt. No. 49 ¶¶ 135-43.[15]   While NBCU contends that the detainees' health records corroborate their stories, dkt. no. 51 at 21, the Court must accept Dr. Amin's alleged facts as true. Perez, 774 F.3d at 1335. If the medical records do not corroborate the detainees' stories, NBCU would have "obvious reasons" to doubt the veracity of their allegations. Further, unlike the defendant in Berisha, NBCU did not disclose its sources' possible bias. NBCU argues that it did disclose bias because it reported that the detainees were immigrants, but this argument is belied by NBCU's report that "the women accusers were *risking deportation* by sharing their stories."[16] Dkt. No. 55 at 22

---

[15] Dr. Amin alleges that the records contradicted the detainees' stories and "posits that it is likely Defendant has never seen full medical records, given the lack of HIPAA releases to Dr. Amin or ICE." Dkt. No. 55 at 22 (citing Dkt. No. 49 ¶¶ 135-43).

The ICE statement also contradicts the detainees' stories. Dkt. No. 49 ¶¶ 121-23. However, "the press need not accept denials, however vehement." Harte-Hanks Commc'ns, Inc., 491 U.S. at 691 n.37. Even without considering the ICE denial, the contradiction within the medical records is sufficient to create an "obvious reason" to doubt the veracity of the sources.

[16] To be clear, Dr. Amin is *not* arguing that "immigrant status, *ipso facto*, means that these women were not credible." Dkt. No. 52 at 21. Rather, Dr. Amin argues that the detainees were incentivized to levy certain allegations because doing so might increase their chances of avoiding deportation. Dkt. No. 55 at 23. While a jury need not infer that this incentive made the detainees unreliable, Dr. Amin presents a plausible inference that the Court must credit on a motion for judgment on the pleadings.

(citing Dkt. No. 51-4 at 14); see also Michel, 816 F.3d at 703 (noting that "a news report inform[ing] its audience that its primary source was 'not an unimpeachable source of information'" and an article "cast[ing] doubt on its primary source by quoting other individuals calling the source a 'lair' and a 'con man'" undermined a finding of actual malice). Taking all these facts together and drawing all inferences in favor of Dr. Amin, Dr. Amin has plausibly alleged that NBCU had "obvious reasons" to doubt the veracity of the sources' reports. This weighs in favor of an inference of actual malice.

Dr. Amin further argues that NBCU acted with actual malice because it "was not neutral in its broadcasts, but instead was an advocate against Dr. Amin, who [NBCU] portrayed as a member of a nefarious Trump Administration immigration apparatus." Dkt. No. 55 at 23 (citing Dkt. No. 49 ¶¶ 187–201). Dr. Amin contends that this narrative would appeal to NBCU's viewers, financially benefitting NBCU and causing it to act with reckless disregard of the truth or falsity of its reports. Id. at 24. Bias or political animus on its own "cannot provide a sufficient basis for finding actual malice," but, "[a]lthough courts must be careful not to place too much reliance on such factors, a plaintiff is entitled to prove the defendant's state of mind through circumstantial evidence, and it cannot be said that evidence concerning motive or care never bears any relation to the actual malice inquiry." Harte-Hanks Commc'ns,

_Inc._, 491 U.S. at 668; _Reid v. Viacom Int'l Inc._, No. 1:14-CV-1252-MHC, 2017 WL 11634619, at *4 (N.D. Ga. Sept. 22, 2017) ("By arguing that source bias is not probative of actual malice absent related evidence of doubt, Defendants would have this Court adopt a rule requiring a subjective showing of actual doubt on the part of a defamation defendant in every case, a rule that is inconsistent with _St. Amant_."); _see also Arpaio v. Zucker_, 414 F. Supp. 3d 84, 91–92 (D.C. Cir. 2019) (finding that the plaintiff's allegation that the defendants were motivated by "malice and leftist enmity," without more, did not plausibly allege actual malice).

That NBCU was financially motivated to tie Dr. Amin to the Trump Administration plausibly constitutes another fact that weighs in favor of finding actual malice. Rather than arguing generally that NBCU was motivated by "leftist enmity," _Apario_, 414 F. Supp. 3d at 92, Dr. Amin alleges that NBCU "went so far as to characterize Dr. Amin as part of the 'next chapter in the same story' of the 'moral catastrophe' of the Trump Administration's child separation policy." Dkt. No. 55 at 24 (quoting Dkt. No. 49 ¶¶ 181–201). Thus, instead of opaquely alleging "political animus," Dr. Amin has alleged facts that plausibly raise the inference that NBCU was motivated to tie its reporting about Dr. Amin to its greater opposition of the Trump Administration. Dkt. No. 49 ¶¶ 187–201.

Although Dr. Amin's contentions that NBCU's reports exceeded the Whistleblower Letter and contradicted the ICE Letter do not contribute to a plausible inference of actual malice, Dr. Amin has sufficiently pled other facts that, when taken together, support such an inference. NBCU's September 16th report about a plea for an investigation, NBCU's inferred knowledge that Dr. Amin could not defend himself against specific allegations because he lacked HIPAA waivers, source bias and lack of disclosure of source bias, contradictory health records, and NBU's monetary incentive to report inflammatory allegations against Dr. Amin constitute sufficient factual allegations to raise a plausible inference of actual malice at this stage in the proceedings.

## 2. NBCU's reporting on the ICE statement undermines a finding of actual malice for NBCU's Third Broadcast.

NBCU argues that its inclusion of the ICE statement undermines a finding of actual malice. Dkt. No. 57 at 12–13; Dkt. No. 52 at 15–16. "Where the publisher includes information *contrary to the general conclusions reached in an article*, that showing tends to undermine the claims of malice. . . . Thus, reporting perspectives contrary to the publisher's own should be interpreted as helping to rebut, not establish, the presence of actual malice." Michel, 816 F.3d at 705 (emphasis added). Dr. Amin argues that NBCU's actions should not rebut the presence of actual malice because NBCU omitted parts of the ICE statement that contradicted

48

accusations against Dr. Amin and reacted with scorn after parts of the statement were read. Dkt. No. 55 at 17–18.[17]

While a plaintiff is "not entitled to having [d]efendants credit his preferred sources of information or structure its articles in the manner that he desires" to rebut an inference of actual malice, a defendant must still introduce information "contrary to the general conclusions reached in an article." Jacoby, 2021 WL 5858569, at *5. In Jacoby, a CNN article reported on Kanye West's presidential campaign and noted that Jacoby, who had previously pleaded guilty to voter registration fraud, was helping West collect campaign signatures. 2021 WL 5858569, at *1. Jacoby filed suit, arguing that the article implied that he was linked to allegations of fraud within the West campaign. Id. at *2. The court found that CNN had included information contrary to that conclusion in one of its articles by sharing a statement by

_____

[17] Dr. Amin argues that, in its First Broadcast, NBCU "did not include any of the ICE statement regarding there only being two hysterectomies referred and did not include the ICE statement that 'detainees are afforded informed consent, and a medical procedure like a hysterectomy would never be performed against a detainee's will.'" Dkt. No. 49 at 24. NBCU responds that the First Broadcast was released before ICE issued its statement. Dkt. No. 52 at 16. However, because the exhibits do not clearly show what time ICE issued its statement, the Court will credit Dr. Amin's version of the facts as required on a motion for judgment on the pleadings. See Dkt. No. 51-7 at 2 (publishing "ICE's latest statement on this developing story" on September 15, 2020, at 23:38:35 but not stating what time ICE issued the statement).

Jacoby's representatives rebutting that implication and directly
stating that "none of the allegations of fraud surrounding the
West campaign have been directly tied to Jacoby or his firm". Id.
at *5. Unlike the articles in Jacoby, NBCU's reports, according to
Dr. Amin, omitted information that rebutted the two general
conclusions of its reports: (1) that there were high rates of
hysterectomies (2) to which detainees did not consent. See also
Michel, 816 F.3d at 705 (defendants' statement that "Michel was
listed as a board member on the group's Web site early last week"
but "[b]y Friday, his name had disappeared, and Mike Jean told The
Post the Grammy winner wasn't a board member" was information
contrary to the article's conclusion that Michel was affiliated
with the organization).

According to Doctor Amin, in its First Broadcast, NBCU "did
not include any of the ICE statement regarding there only being
two hysterectomies referred and did not include the ICE statement
that 'detainees are afforded informed consent, and a medical
procedure like a hysterectomy would never be performed against a
detainee's will.'" Dkt. No. 49 at 24.[18] NBCU omitting the ICE

---

[18] The First Broadcast included part of an ICE statement:

> ICE had said that they don't comment on allegations that
> have been brought to their inspector general just like
> this whistleblower complaint was. But they say that *in
> general, anonymous, unproven allegations made without
> any fact-checkable specifics should be treated with the*

statement about two hysterectomy referrals and mandatory informed consent raises a plausible inference that NBCU did not include information contrary to its general conclusions: that there were allegations of high rates of unconsented hysterectomies. Thus, NBCU has not rebutted the inference of actual malice regarding its statements in its First Broadcast.

Dr. Amin similarly alleges that NBCU failed to include either the ICE statement that there were only two hysterectomy referrals or the ICE statement that all medical procedures required patient consent in all the subsequent broadcasts. Dkt. No. 55 at 18.[19] The

_____

> *appropriate skepticism they deserve*. So they are clearly questioning Dawn Wooten here. But so far, *ICE has not responded to the new reporting by NBC News that calls out this doctor by name and gives specific allegations that clients gave their lawyers*. . . . Right now, ICE has not responded to that new reporting.

Dkt. No.51-2 at 29 (emphasis added).

While NBCU does include an ICE statement that casts some doubt on NCBU's reporting, that ICE statement is not contrary to the general conclusions reached in NBCU's reporting because it does not address the allegations about hysterectomies and unconsented procedures. Therefore, taking inferences in favor of Dr. Amin, because he has plausibly alleged that NBCU knew that no investigation had begun but reported on one, the medical records contradicted the Letter, and NBCU was personally motivated to advance its narrative, this denial is not enough to fully rebut the inference of actual malice.

[19] Because each defamation claim is evaluated in "the context of the entire writing in which the opinion appears," each report is considered separately for this analysis. Grace v. Lowery, 860 S.E.2d 159, 162 (Ga. Ct. App. 2021). Doing so follows the rationale behind the rule that including information contrary to the general conclusions tends to undermine claims of actual malice: providing

same logic as above applies to the Second,[20] Fourth, and Fifth Broadcasts. Each of the broadcasts included a general denial: in the Second Broadcast, NBCU reported that the company that ran the facility "refute[d] any allegations of misconduct," dkt. no. 51-3 at 12, and in the Fourth and Fifth Broadcast, NBCU reported that Dr. Amin's lawyer "vigorously" and "vehemently" denied the allegations, dkt. no. 51-5 at 8; dkt. no. 51-6 at 14. This weighs against a finding of actual malice. But, in the cases NBCU cites, dkt. no. 57 at 12, dkt. no. 52 at 16 n.10, the defendants reported

---

contrary information "reduces the risk that readers will reach unfair (or simply incorrect) conclusions." Michel, 816 F.3d at 703. Inferring in Dr. Amin's favor, because viewers would encounter the reports separately (since they occurred on different days and at different times), providing contrary information in one report but not a subsequent one would not reduce the risk that a viewer of the subsequent broadcast would reach unfair conclusions. See Michel, 816 F.3d at 703 (evaluating whether, in the context of a single article, the publisher included information contrary to the general conclusions the article reached); Jacoby, 2021 WL 5858569, at *5 (noting that the publisher shared information in both articles rebutting the allegedly defamatory conclusion).

[20] Dr. Amin argues that the Second Broadcast "selectively quoted from the ICE statement and did not include the ICE statement that 'detainees are afforded informed consent, and a medical procedure like a hysterectomy would never be performed against a detainee's will." Dkt. No. 49 ¶ 130; Dkt. No. 18 at 26. While NBCU reported in the Second Broadcast that "ICE also says that since 2018, only two individuals in that facility were referred to certified credential medical professionals for hysterectomies," dkt. no. 57 at 12, it did not include information about informed consent. Taking all inferences in favor of Dr. Amin, such information at least arguably does not rebut the conclusions reached in the report.

more than just general denials of the allegations. Jacoby, 2021 WL
5858569, at *5 (both sharing a denial by the plaintiff's
representatives and directly stating in the article that "none of
the allegations of fraud surrounding the West campaign have been
directly tied to Jacoby or his firm"); Michel, 816 F.3d at 705
(both sharing a denial and the fact that the plaintiff's name had
been removed from a website, which rebutted the general conclusion
of the article); see also McFarlane v. Esquire Mag., 74 F.3d 1296,
1304 (D.C. Cir. 1996) (sharing facts undermining the credibility
of the article's source); Lohrenz v. Donnelly, 350 F.3d 1272, 1286
(D.C. Cir. 2003) (reporting that several Navy officials held views
that conflicted with the conclusions of the article). Further, the
courts did not rely on these facts alone in finding that the
plaintiff had not sufficiently pleaded actual malice. Jacoby, 2021
WL 5858569, at *5 (finding that "Jacoby does not allege any facts
demonstrating that Defendants held serious doubts about the truth
of these sources" and noting statements contrary to the article's
conclusions further undermined allegations of malice); Michel, 816
F.3d at 705 (finding no inference of actual malice in part because
of the defendant's inclusion of contrary information in its
article).

Taking inferences in favor of Dr. Amin, while NBCU's reports
of general denials weigh against a finding of actual malice, they

do not fully rebut the inference that NBCU acted with actual malice at this stage in the proceedings.

Dr. Amin's allegations for the Third Broadcast fail, however, because his allegations are contradicted by the exhibits that show NBCU reported portions of ICE's statement that specifically refute the conclusions of NBCU's reporting, dkt. No. 57 at 12-13, dkt. no. 51-4; NBCU reported Dr. Amin's general denial, dkt. no. 51-4 at 14-15, 17; and NBCU stated malfeasance "has not been established," dkt. no. 51-4 at 17. Dr. Amin alleges that "[i]n the [T]hird [B]roadcast, [NBCU] creates the impression that ICE has said nothing substantive regarding the allegations of mass hysterectomies (although it had) by stating . . . 'Now we've asked ICE for comment. They've told us they cannot comment on medical records without a waiver due to privacy concerns.'" Dkt. No. 49 ¶ 131.

However, NBCU quoted ICE in the Third Broadcast, stating that "medical care decisions concerning detainees are made by medical personnel," "detainees are afforded informed consent and a medical procedure like a hysterectomy would never be performed against a detainee's will." Dkt. No. 51-4; Dkt. No. 57 at 12. This effectively rebuts the general conclusions reached in the report. In addition, NBCU reported Dr. Amin's general denial three times and stated that malfeasance by Dr. Amin "has not been established." Dkt. No. 51-4 at 14-15, 17. Even taking all inferences in favor of

Dr. Amin, the pleadings show that NBCU presented information contrary to the general conclusions it reached in its reports, thus giving viewers "sufficient information to weigh for themselves the likelihood of [the report's] veracity." Michael, 816 F.3d at 703. Therefore, NBCU has successfully undermined Dr. Amin's allegations of actual malice regarding its Third Broadcast. Accordingly, NBCU's motion for judgment on the pleadings is **GRANTED** as to Dr. Amin's claims of defamation relating to statements made during the Third Broadcast, and those claims are **DISMISSED**.[21]

D. *Several of NBCU's challenged statements are non-actionable opinion.*

Even though NBCU has not undermined the inference that it acted with actual malice during its First, Second, Fourth, and Fifth Broadcasts, if NBCU's statements in those broadcasts are non-actionable opinion or hyperbole, Dr. Amin's claims must still be dismissed.

"An assertion that cannot be proved false cannot be held [defamatory]. A [speaker] cannot be sued for simply expressing his opinion of another person, however unreasonable the opinion or vituperous the expressing of it may be." Atlanta Humane Soc'y v. Mills, 618 S.E.2d 18, 24–25 (Ga. Ct. App. 2005); Horsley v. Rivera,

---

[21] This means Dr. Amin's claims that statements 17–21, dkt. no. 24-1, are defamatory are **DISMISSED**.

292 F.3d 695, 702 (11th Cir. 2002) (discussing "the reality that exaggeration and non-literal commentary have become an integral part of social discourse" (quoting Levinsky's, Inc. v. Wal-Mart Stores, Inc., 127 F.3d 122, 128 (1st Cir. 1997))). Still, "there is no wholesale defamation exemption for anything that might be labeled 'opinion,'" because any given expression of an opinion "may often imply an assertion of objective fact." Lucas v. Cranshaw, 659 S.E.2d 612, 616 (Ga. Ct. App. 2008) (citation omitted). "[A] statement of [opinion] is actionable only if it implies the allegation of *undisclosed* defamatory facts as the basis for the opinion." Levinsky's, 127 F.3d at 127 (emphasis added) (quoting Rst. 2d. of Torts § 566); see also Lucas, 659 S.E.2d at 616 ("If an opinion is based upon facts already disclosed in the communication, the expression of the opinion implies nothing other than the speaker's subjective interpretation of the facts."); Jaillett v. Ga. Television Co., 520 S.E.2d 721, 726 (Ga. Ct. App. 1999) (same). So "[t]he pivotal questions are [1] whether the challenged statements can reasonably be interpreted as stating or implying defamatory facts about [the] plaintiff and, if so, [2] whether the defamatory assertions are capable of being proved false." Jaillett, 520 S.E.2d at 725-26 (alterations accepted); cf. McCall v. Couture, 666 S.E.2d 637, 640 (Ga. Ct. App. 2008). "[A]s a general rule, the question whether a particular communication is defamatory is for the jury," but "if the statement is not ambiguous

and reasonably can have only one interpretation, the question of defamation is one of law for the court." McCall, 666 S.E.2d at 640 (quoting Speedway Grading Corp. v. Gardner, 425 S.E.2d 676, 678 (Ga. Ct. App. 1992)).

NBCU argues that "many of the challenged statements are [] either opinions—because they report the subjective feelings of detainees—or are rhetorical hyperbole that cannot be proven true or false." Dkt. No. 52 at 24 n.16 (citing Dkt. No. 24 at 23-24); Dkt. No. 24-1 (arguing that Statements number 2-4, 6-9, 14-16, 18, 20, 25-26, 28-31, 36-38 are opinion or hyperbole). As Plaintiff points out, NBCU "does not contend that this argument applies to almost half of the statements" identified in the complaint. Dkt. No. 32 at 21. As such, with regard to those statements in the First, Second, Fourth, and Fifth Broadcast that NBCU does not argue are opinion or hyperbole, dkt. no. 24-1 (Statements 1, 5, 10-13, 22-24, 27, 32-35), NBCU's motion for judgment on the pleadings is **DENIED**.[22]

As for the other statements, NBCU correctly identifies that Statements 2, 4, 8, and 36-38 are opinion.[23] Dkt. No. 24-1. The

---

[22] The Court need not analyze statements 17-21, dkt. no. 24-1, because they are dismissed due to the public interest privilege, supra.

[23] The statements read:

- (2) "Women were afraid to go to this doctor."

assertions in these statements are not capable of being proven false because they refer to the impressions of various detainees. Cf. Turner v. Wells, 198 F. Supp. 3d 1355, 1372 (S.D. Fla. 2016) (characterization of conduct as "abusive" "is not an objectively verifiable statement of fact"), aff'd, 879 F.3d 1254 (11th Cir. 2018); Sandmann v. WP Co., 401 F. Supp. 3d 781, 792 (E.D. Ky. 2019) (statement that student felt "threatened" does not "convey actual, verifiable facts" because "[h]ow [the student] felt was obviously subjective"). NBCU's motion for judgment on the pleadings is therefore **GRANTED** as to Statements 2, 4, 8, and 36–38.

---

- (4) "They called him abusive."

- (8) "Our clients are afraid to go back to him; he's hurting these women."

- (36) "Felt like I had no right to say anything about a hysterectomy she underwent that was performed by a doctor named Mahendra Amin. She also told us about how Dr. Amin performed an unexpected vaginal ultrasound that she was, she says, not prepared for."

- (37) "He didn't tell me nothing, he just—instead he proceed with vaginal ultrasound, I think. Am I saying it right? But I was not aware of that."

- (38) "No, not at all [I was not prepared for that.] No. So I felt violated. And just, you know, keep doing the procedures, the ultrasound."

Dkt. No. 24-1.

Statement number 20, "She felt pressured into a full abdominal hysterectomy," id., also likely qualifies as opinion, but because it is from the Third Broadcast, it is conditionally privileged and is dismissed on that ground.

In contrast, Statements 3 and 9 from the First Broadcast can be proven false. Statement 3 reads: "[s]ome [detainees] said that they came back bruised and that he was overly harsh." Dkt. No. 49 ¶ 75; Dkt. No. 24-1 at 2. Whether Dr. Amin was overly harsh is the detainees' perception and cannot be proven true or false. Whether the detainees came back bruised, however, implies a fact—that the detainees were bruised—which can be proven false by determining whether this occurred. Statement 9 reads: "perhaps [Dr. Amin is] doing very unnecessary procedures and not what you would need in a short-term detention situation." Dkt. No. 49 ¶ 75; Dkt. No. 24-1 at 3. What procedures are "unnecessary" could be a matter of opinion rather than a provable fact used to mean "more than needed," i.e., the procedures could have benefitted the women but were not strictly needed. See Unnecessary, Oxford English Dictionary (2022). But "unnecessary" in this context could also mean entirely "useless" or "needless," such that the women were in no way benefitted by the procedures, which theoretically can be proven true or false. See Unnecessary, Merriam-Webster Unabridged (2022); cf. Bryant v. Cox Enters., Inc., 715 S.E.2d 458, 464 (Ga. Ct. App. 2011) ("If the meaning of a publication is unambiguous so as to bear only one reasonable interpretation, the determination as to whether it is defamatory is for the court."). Unlike in Jaillett, 520 S.E.2d at 726, where the court rejected a defamatory interpretation of a statement because "nothing in the broadcast

suggest[ed] to the viewer that [the defendants were] aware of any defamatory facts other than those disclosed in the broadcast," NBCU indicated that it had access to several detainees' medical records. Dkt. No. 49 ¶ 75 ("One of those women, her medical records do[] not indicate that she ever had a biopsy . . . ."); Dkt. No. 51-4 at 14 ("We've reviewed the medical records that corroborate that she had this procedure."); Dkt. No. 52 at 21 ("NBCU corroborate the women's accounts with medical records[.]"). This could indicate to viewers that NBCU was aware of other defamatory facts than those disclosed in its broadcasts, such as facts indicating that Dr. Amin performed entirely unnecessary procedures. Thus, NBCU's motion for judgment on the pleadings is **DENIED** as to Statements 3 and 9.

NBCU also argues that Statements 6-7, 14-16, 25-26, and 28-31 are hyperbole and thus unactionable.[24]  "In determining whether

---

[24] These statements read as follows:

- (6) "This is his specialty, he's the uterus collector."

- (7) "Well what's he doing . . . collecting all of our uteruses?"

- (14) "Is he the uterus collector? Does he collect[] uteruses?"

- (15) "Everybody that I talked to has had a hysterectomy."

- (16) "They would say is he the uterus collector?"

- (25) "I thought this was like an experimental concentration camp.  It was like they're experimenting with our bodies."

[the defendant's] statement is entitled to protection as rhetorical hyperbole, we must consider the circumstances in which the statement was expressed." Evans v. Sandersville Georgian, Inc., 675 S.E.2d 574, 578 (Ga. Ct. App. 2009). If a statement is susceptible to multiple reasonable interpretations, one of which is defamatory, it is a question for the jury. McCall, 666 S.E.2d at 640. In context, Statements 6, 7, 14, 16, 29, and 30, referring to Dr. Amin as "the uterus collector" or "collecting . . . uteruses," are not "obviously exaggerated and unprovable assertions." Atlanta Humane Soc'y, 618 S.E.2d at 24–25. In Atlanta Humane Society, the court held that "referring to [the director of the humane society] as 'Mr. Kill' is . . . incapable of being proved false, because the [humane society] under his leadership indeed killed a significant number of animals yearly; in [the

---

- (26) "Everybody this doctor sees has a hysterectomy, just about everybody."

- (28) "He's taking everybody's stuff out, that's his specialty."

- (29) "He's the uterus collector."

- (30) "Is he collecting these things or something?"

- (31) "Everybody he sees he's taking all their uteruses out or he's taking their tubes out."

Dkt. No. 24-1.

Statement 18, "uterus collector," id., is conditionally privileged and thus dismissed on that ground.

defendant's] opinion and that of her amici curiae, that number is too large and could be reduced by improving adoption procedures." Id.  The "Mr. Kill" statement was innuendo suggesting that the director enjoyed killing animals, which was a subjective issue incapable of being disproven. Id.; see also Johnson v. Lindsay Pope Brayfield & Assocs., Inc., 875 S.E.2d 856, 862–63 (Ga. Ct. App. 2022) (finding an assertion that someone was "a strong candidate for a mass shooting" was an expression of opinion). NBCU's "uterus collector" statements, when considered in context, are not similarly unambiguously opinion or incapable of being proven false.

Unlike calling someone evil, which reflects a moral judgment about someone's actions, "uterus collector" describes someone's actions themselves.  A reasonable person could interpret the phrase "uterus collector," like "Mr. Kill," as innuendo, implying that Dr. Amin enjoyed removing uteruses or removed too many uteruses. Nevertheless, a reasonable person could also interpret "uterus collector" as a description of Dr. Amin's actions, that is, that he collects uteruses.

When taken out of context, calling Dr. Amin a "uterus collector" could be perceived as an absurd assertion that no reasonable person would believe referred to an undisclosed fact. In context, however, NBCU made these comments as it was raising alarm about a "rogue" doctor who nefariously removed women's

uteruses without justification. Dkt. No. 55 at 19; see, e.g., Dkt. No. 49 ¶ 84 ("They have been sending immigrant women in their care, in their custody, to a doctor who has removed their reproductive organs for no medical reason and without them consenting to it."). Taking all inferences in favor of Dr. Amin, given the extreme nature of the allegations, calling Dr. Amin a "uterus collector" could "imply the allegation of undisclosed defamatory facts as the basis for the opinion." Levinsky's, 127 F.3d at 127 (quoting Rst. 2d. of Torts § 566). Unlike the subjective nature of determining whether someone enjoyed killing animals, whether Dr. Amin actually collected uteruses is a fact that is capable of being proven false. Therefore, Statements 6, 7, 14, 16, 29, and 30 are susceptible to two reasonable interpretations, which makes their defamatory nature a jury issue. As such, NBCU's motion for judgment on the pleadings for these statements is **DENIED.**

For the same reasons, when taken in context, a reasonable person could interpret Statements 15, 26, 28, and 31, referring to Dr. Amin giving hysterectomies to "everybody he sees," as asserting a fact rather than opinion or hyperbole. As NBCU argues, a reasonable person could interpret the statements as a hyperbolic way of describing the allegations that Dr. Amin performed a high number of unnecessary hysterectomies. Dkt. No. 52 at 24 n.16 (citing Dkt. No. 24 at 24–25). Given that NBCU reported that Dr. Amin performed an alarmingly high rate of hysterectomies, however,

a reasonable person could also interpret the statements as asserting a fact: that Dr. Amin gave a hysterectomy to every patient he saw.  This fact is capable of being proved false. Therefore, NBCU's motion for judgment on the pleadings is **DENIED** as to Statements 15, 26, 28, and 31.

Similarly, the statement comparing Dr. Amin's care to "an experimental concentration camp," where "[i]t was like they're experimenting with our bodies," dkt. no. 24-1 at 9 (Statement 25), when considered in context, is not "the sort of loose, figurative language that no reasonable person would believe presented facts." Bryant, 714 S.E.2d at 469.  In Bryant, a columnist compared the plaintiff to a famous convicted child serial killer. Id. at 468–69.  The court held that the column was "nonliteral commentary that cannot reasonably be interpreted as stating actual facts about an individual." Id. at 469.  In Bryant, the columnist compared the two men to highlight similarities between the two rather than to assert additional facts about the plaintiff's actions. Id. at 468. As in Bryant, a reasonable person could interpret the "experimenting on our bodies" comment and reference to an "experimental concentration camp" as nonliteral commentary, noting the similarities between Dr. Amin's actions and an "experimental concentration camp," but not asserting that Dr. Amin was in fact running a concentration camp and experimenting on people.  A reasonable person, however, could also interpret the statements as

a way of expounding upon Dr. Amin's actions, that is, explaining that he removed uteruses to experiment upon his patients.[25] Whether Dr. Amin performed hysterectomies to experiment on his patients is a fact that is capable of being proved false.  Thus, this statement presents an issue for the jury.

Further, this case is unlike Yeager v. Local Union 20, 453 N.E.2d 666, 669 (Ohio 1983), abrogated on other grounds by Welling v. Weinfeld, 866 N.E.2d 1051 (Ohio 2007).  In that case, the Ohio Supreme Court held that a reference to an employer as "Little

---

[25] NBCU cites Byrnes v. Lockheed-Martin, Inc., No. C-04-03941 RMW, 2005 WL 3555701, at *7 (N.D. Cal. Dec. 28, 2005), aff'd sub nom Byrnes v. Lockheed-Martin Corp., 257 F. App'x 34 (9th Cir. 2007), as persuasive authority to support its argument. Dkt. No. 24 at 24–25.  In Byrnes, the District Court for the Northern District of California granted the defendants summary judgment on the plaintiff's defamation claim for statements that the plaintiff was a "sex harasser," a "dangerous harasser," an unstable person, a "menace," and a "danger to other employees." Id.  The court granted summary judgment because the statements were not published, the statements were substantially true, and the statements were "couched in defendants' own perceptions and therefore opinions rather than statements of fact." Id.  The Ninth Circuit affirmed the ruling because the statements were substantially true. Byrnes v. Lockheed-Martin Corp., 257 F. App'x 34, 36 (9th Cir. 2007). The phrase "sex harasser" is akin to "uterus collector" in that it describes behavior.  However, "uterus collector" can be interpreted as indicating further facts about Dr. Amin's motive in acting, that he performs hysterectomies to collect the uteruses, while "sex harasser" does not indicate further facts about the person's motives in acting.  Because Byrnes, 2005 WL 3555701, is persuasive authority, was affirmed on other grounds, and is distinguishable from this case, the Court does not follow Byrnes's rationale.

Hitler" and operating a "Nazi concentration camp" in the context of a labor dispute was not defamation because of Ohio's "innocent construction" rule, which requires the court to reject the defamatory meaning if the statement is susceptible to an innocent meaning. Id.  Georgia does not have an "innocent construction" rule. See, e.g., Cmty. Newspaper Holdings, Inc. v. King, 682 S.E.2d 346, 349 (Ga. Ct. App. 2009). Instead, in Georgia, "[i]f . . . [a statement] is capable of two meanings, one of which would be . . . actionable and the other not, it is for the jury to say . . . which of the two meanings would be attributed to it by . . . whom it may be read." Id. (quoting Constitution Publishing Co. v. Andrews, 177 S.E. 258 (Ga. App. 1934)).  Because Statement 25 is susceptible to two reasonable interpretations, one of which is defamatory, NBCU's motion for judgment on the pleadings as to Statement 25 is **DENIED.**

### CONCLUSION

Georgia's public interest privilege applies to NBCU's reports. Dr. Amin, however, has plausibly alleged actual malice to remove the protection of the privilege for all NBCU's broadcasts except its Third Broadcast. Because the Third Broadcast is covered by the public interest privilege, NBCU's motion for judgment on the pleadings, dkt. no. 52, is **GRANTED** as to Statements 17–21, and Plaintiff's claims with regard to those statements are **DISMISSED.** Next, Statements 2, 4, 8, and 36–38, while not privileged, are unactionable opinion, so NBCU's motion for judgment on the

pleadings, id., is **GRANTED** as to those statements, and Plaintiff's claims with regard to those statements are **DISMISSED**. Further, because a reasonable jury could find that Statements 3, 6-7, 9, 14-16, and 25-31 are statements of fact, not opinion, NBCU's motion, id., is **DENIED** as to those statements. Finally, because NBCU does not argue that the remaining Statements, i.e., 1, 5, 10-13, 22-24, 27, and 32-35, are opinion or hyperbole, NBCU's motion, id., is **DENIED** as to those statements.

 **SO ORDERED** this 16th day of November, 2022.

_____
HON. LISA GODBEY WOOD, JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA