1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
WAYCROSS DIVISION


DR. MAHENDRA AMIN, M.D.,           )
                                   )
            Plaintiff,             )
                                   )
      vs.                          )          CASE NO.
                                   )   5:21-CV-00056-LGW-BWC
NBCUniversal MEDIA, LLC,           )
                                   )
            Defendant.             )
_____


                TELEPHONIC MOTIONS HEARING
      BEFORE THE HONORABLE BENJAMIN W. CHEESBRO
             August 31, 2023; 3:00 p.m.
                  Brunswick, Georgia
APPEARANCES:

For the Plaintiff:          STACEY GODFREY EVANS, Esq.
                            JOHN AMBLE JOHNSON, Esq.
                            Stacey Evans Law
                            4200 Northside Parkway NW
                            Suite One; Suite 200
                            Atlanta, Georgia  30327
                            (770) 779-9602
                            sevans@staceyevanslaw.com
                            ajohnson@staceyevanslaw.com


For the Defendant:          ELIZABETH A. McNAMARA, Esq.
                            AMANDA B. LEVINE, Esq.
                            Davis Wright Tremaine, LLP
                            1251 Avenue of the Americas
                            21st Floor
                            New York, New York  10020-1104
                            (212) 603-6437
                            lizmcnamara@dwt.com
                            amandalevine@dwt.com


                            CYNTHIA L. COUNTS, Esq.
                            Fisher Broyles, LLP
                            945 East Paces Ferry Road, NE
                            Suite 2000
                            Atlanta, Georgia 30326
                            (404) 550-6233
                            cynthia.counts@fisherbroyles.com

```
Transcribed by:              Debbie Gilbert, RPR, CCR
                             Official Court Reporter
                             801 Gloucester Street
                             Post Office Box 1894
                             Brunswick, GA 31521-1894
                             (912) 262-2608 or (912) 266-6006
                             debra_gilbert@gas.uscourts.gov


                                   -  -  -
```

3

1                          P R O C E E D I N G S

2                     (Call to order at 3:00 p.m.)

3           THE COURT:  Hello, this is Ben Cheesbro speaking.  Ms.

4    Mixon, would you please call the case.

5           THE CLERK:  Yes, Your Honor.  Case Number 5:21-CV-56,

6    Dr. Mahendra Amin versus NBCUniversal Media, LLC.

7           For the plaintiff, we have Stacey Evans and Amble

8    Johnson.  For the defense, we have Amanda Levine, Cynthia Counts

9    and Elizabeth McNamara.

10          THE COURT:  All right, thank you, Ms. Mixon.  Good

11   afternoon everyone.

12          MS. McNAMARA:  Good afternoon, Your Honor.

13          THE COURT:  I set this call down based on an e-mail

14   request from Plaintiff's counsel related to two discovery

15   disputes.

16          I will note for everyone's benefit that we are on the

17   court's recording equipment.  There is not a court reporter

18   participating so there's not going to be a transcript prepared

19   unless one of the parties requests one.

20          So this is part of The Court's informal discovery

21   dispute resolution process.  I will remind everyone of the

22   requirements of that process that is set forth in my Rule 26

23   order is that y'all confer.

24          If you're unable to resolve your disputes by conferral,

25   then you reach out to Ms. Mixon as you've done by e-mail.  I'm

4

1  going to conduct this call, and those first two steps are

2  required before anyone files any sort of motion, that being a

3  motion to compel, a motion for protective order, motion to

4  quash.  I think there's a subpoena here as well.

5        So we're at Step 2.  We will take up those two issues

6  today, and if necessary I'll determine during this call whether

7  any motions should be filed.

8        Now, I've received the parties' submissions with e-mails

9  related to these disputes and they're thorough, and I've

10 reviewed them and I believe I understand the issues, although

11 before I get into too much depth with this, I want to clarify a

12 little bit about Issue Number 2, which is the dispute over the

13 discovery request for certain reporters' phone numbers.

14       That was related, the dispute was initially

15 characterized in the e-mail from Ms. Evans and then I received

16 an additional e-mail that came in yesterday that included some

17 additional information related to the subpoena that was directed

18 to HNP, and so what I'm going to do is take Issue Number 2 first

19 and get some clarification.

20       I'd ask you not to go into a lot of detail about Issue

21 Number 1 and providing the contacts right now.  I just need a

22 little bit of clarification at the outset about where this

23 dispute stands, and my uncertainty comes from the fact that in

24 the initial e-mail request I understand the nature of the

25 parties' respective positions but that first e-mail related to

1   this dispute indicated that this dispute really concerns

2   Plaintiff's Interrogatory Number 20, which was requesting phone

3   numbers for certain individuals.  Those individuals by last name

4   are Ainsley, Price and Soboroff.

5          Now, I've seen the subpoena that was attached to the

6   later e-mail provided by Defendant's counsel, and there I see

7   that in the attachment to the subpoena, two of those three

8   individuals are identified and their phone numbers appear to be

9   listed as well.

10          One of those, Ainsley, is not included on the attachment

11   but an additional individual, Scholl, is included there, so I

12   understand that there's likely some ongoing dispute related to

13   the HNP subpoena, but I'm unclear at this point as to whether

14   there's still a dispute about merely obtaining the phone numbers

15   that were requested in Interrogatory Number 20.

16          Put more simply, I see now that the phone numbers are

17   included in the subpoena so I'm asking if those have now been

18   provided or obtained through some other mechanism.

19          Now so I want to address that question first.  I will

20   call on counsel for Plaintiff first and ask for some

21   clarification and give an opportunity for response.

22          I will need a little bit of additional clarification,

23   too, regarding the precise relief requested related to the

24   subpoena.

25          So Ms. Evans, I'm going to call on you first.  Clarify

1    that that is the dispute as to the interrogatory, whether it

2    still is the interrogatory, whether it's also the subpoena or

3    both.

4          MS. EVANS:  Thank you, Your Honor.  Yes, we had

5    originally asked for the phone numbers that you identified in

6    the interrogatory, and then when it was clear to us that

7    NBCUniversal was not going to answer the interrogatory, we

8    sought to find the numbers elsewhere, some of which we found,

9    you know, a little embarrassingly, was in some of the documents

10   that we had, so we were able to find some of the phone numbers,

11   and so to the extent we have the phone numbers and you noted

12   they're in the subpoenas, I guess the discovery dispute over the

13   phone numbers for at least Mr. Price and Mr. Soboroff don't

14   exist anymore, but they would still exist as to Ms. Ainsley

15   because we haven't been able to find her phone number by any

16   other means.

17         THE COURT:  And then I suppose I need to direct my

18   inquiry on the second part of that question to Ms. McNamara.

19         Ms. McNamara, can you clarify a little bit?  I

20   understand what your position would be as to the request for Ms.

21   Ainsley's phone number in the interrogatories, but can you

22   clarify a little bit for me the position with regard to the

23   subpoena.

24         I understand you've laid out you don't believe

25   that these phone records are discoverable or that there should

1   be some limitation, and so I'm just a little bit unclear because

2   of this e-mail and the indication that these records should be

3   subject to a protective order.

4           By that, do you mean a protective order that precludes

5   any production by AT&T to Plaintiff's counsel, or is there a

6   narrower protective order you're proposing?

7           MS. McNAMARA:  Thank you, Your Honor.  This is Elizabeth

8   McNamara.

9           Yes, we're asking for a protective order to preclude the

10  production of the phone records for the reasons we outlined in

11  the e-mail yesterday.

12          It's really two-fold, that they necessarily will include

13  privileged communications or reflections of phone calls

14  regarding news-gathering that has absolutely nothing to do with

15  this case and would be squarely privileged under the operative

16  law for the contract with AT&T, which is New York, and secondly,

17  even as to, once you maybe were able to exclude those phone

18  numbers, which would be a highly burdensome process, then the

19  whole endeavor of going through these phone records to try to

20  parse out precisely which, if any, of the calls reflected on the

21  records concerned calls that are relevant to this litigation, we

22  believe at this juncture the litigation is unduly burdensome

23  given the fact that these witnesses have already testified.

24  They've testified to the calls being made.  The sorts of the

25  people they were talking to have or will be testifying

8

1   concerning the calls were made, and given that the phone records

2   do nothing but reflect that a call was made at a certain time

3   and no content, the burden aligned with this whole process, were

4   NBCU allowed to intervene, review any records that exist, are

5   far outweighed by any, you know, relevancy to what would be

6   produced.

7        THE COURT:  Thank you for that, Ms. McNamara.  That

8   clears it up.  So I'm going to effectively give counsel for both

9   sides two options, and these are two options that relate to each

10  of the two discovery disputes.

11       And this is an approach I've taken in these informal

12  discovery dispute resolution calls frequently.

13       Option A is that I provide you with some preliminary

14  thoughts on the dispute as it has been presented to me currently

15  and then let you-all brief up the issue more thoroughly in

16  motions.

17       I can do that based on the information I've been

18  provided.  I'm comfortable doing that here.  That is not a

19  set-in-stone determination, and I always take up the issue and

20  consider it and then if there is additional briefing -- and, in

21  fact, I believe I've sort of communicated this to you-all at

22  least once before in this case.

23       Option B is I'm also prepared to issue an oral ruling

24  here based on the way that these two disputes have been

25  presented, and it will be limited to the way that these have

9

1    been presented.

2         That would foreclose additional motions practice on it

3    but it will give you clarity on how to go forward on these two

4    disputes.

5         I will only provide you with an oral ruling on these

6    disputes if both parties agree to go forward with an oral ruling

7    at this point.  In other words, forego any additional briefing

8    on either or both of these issues.

9         So let me ask you, Ms. Evans, first, and, if you would,

10   speak specifically to Issue 1 and Issue 2 -- Issue 1 being the

11   scripts issue and Issue 2 being the telephone records issue --

12   and state whether you would go with Option A, which is the

13   preliminary thoughts and motions practice or an oral ruling at

14   this time?

15        MS. EVANS:  Your Honor, I will be comfortable with

16   Option B if it's an option, I guess, to have a chance to respond

17   to some of the arguments that the defendant raised in the e-mail

18   communications with Ms. Mixon and some of the information this

19   morning or this afternoon about the subpoena issue specifically.

20        I guess otherwise I would opt for, if there's not going

21   to be allowed any further oral advocacy, I guess I would rather

22   opt for Option A.

23        THE COURT:  And I will give you an opportunity to speak

24   to those remarks made in the e-mail, so I understand that you

25   would be fine with an oral ruling.

1          Let me ask you, Ms. McNamara, what is your preference?

2          MS. McNAMARA:  Well, Your Honor, I think particularly

3    with Option 1, we feel that this is such an extraordinary

4    intrusion at this point that I don't want to risk causing the --

5    without the option of more thoroughly approaching it and

6    briefing it, so I think I would have to go with Option B.

7          On Issue Number 2, I think I'm comfortable with hearing

8    The Court's assessment on it and addressing any issues that The

9    Court has and hopefully we can reconcile everything on this

10   call.

11         THE COURT:  All right, so for the scripts issue, you

12   would like additional briefing but like to hear the preliminary

13   thoughts, and then for Issue 2, you were comfortable with a

14   ruling here at this time.

15         MS. McNAMARA:  Yes, provided we can like have a

16   conversation about it and make sure that everybody -- everything

17   gets there.

18         THE COURT:  Sure.  That will be fine.

19         Let me call on Ms. Evans first.  Go ahead and present

20   any additional remarks that you have related to the e-mail

21   submission that came in yesterday.

22         MS. EVANS:  Thank you, Your Honor.  With regard to the

23   phone number and the subpoena issue to AT&T?

24         THE COURT:  Yes.

25         MS. EVANS:  Thank you.

1          And very briefly, Number 1, Your Honor, we just got that

2     communication yesterday, and Ms. McNamara raised it with me for

3     the first time yesterday either mid-morning or early afternoon.

4     I can't recall exactly.  We're not convinced that New York law

5     applies.  We haven't seen the contract.  It's not a contract

6     dispute.  So that's one issue.

7          Number 2, we're not sure that the issue of whether a

8     protective order can be placed over that subpoena is actually in

9     the jurisdiction of the Southern District of Georgia given that

10    the subpoena was served in Florida and compliance would be in

11    Atlanta.

12         I am still interested in your thoughts on it because

13    obviously it's tied up in this issue of phone records that I

14    just raised.

15         The issue of burden is not nearly as broad as Ms.

16    McNamara and NBCU would have you believe, Your Honor.  We're

17    asking for a total of four days' worth of records and we just

18    want, you know, incoming and outcoming phone numbers and text

19    messages, and we know exactly which phone numbers we're -- and

20    the time period that those phone numbers would have been

21    communicating with each other, so this is not a situation where,

22    as has been presented to you, that NBCU is going to have to go

23    and match up all these phone numbers to people.

24         We know the people.  We either know the phone numbers or

25    we will know them after probably another week or so of

1   depositions or we believe those phone numbers are known to NBCU

2   and we could confer and agree on what the phone numbers that

3   we're looking for within each of the individuals' records, and

4   so those would be the only numbers that we would want to see or

5   particular time periods when their call came in, for example.

6   That would be relevant to us.  Everything else could be

7   redacted.

8        So it's not -- they are not going to have to go into

9   this labor and spend hours and hours as has been portrayed.  I

10  think reasonable counsel, which despite us being here now for

11  the second time, I think Ms. McNamara and I, our teams have been

12  able to work together through a lot of the other discovery

13  disputes, and we would be able to do this I think without too

14  much burden and this is particularly, it sort of comes into

15  focus I hope for The Court with this one example.

16       Chris Scholl's, his phone number is in the subpoena that

17  Your Honor noted.  He was deputy head of standards, and there's

18  a big question -- and I won't get into Issue Number 1 -- but

19  there's a big question about whether an article was approved by

20  standards, and that article was the alleged dates that a lot of

21  this recording that went on the broadcasting.

22       e-mail traffic indicates that Mr. Scholl, deputy head of

23  standards, did not approve the article.  There is testimony from

24  a particular editor, Mr. Schone, who says, "It wasn't approved

25  in an e-mail but we had a phone call," and that phone call had

1    to occur between -- it's about a two- or three-hour time period

2    on September 15th, 2020.

3          So if we were able to see Mr. Scholl's phone records, we

4    would see either he didn't get any phone calls during that time

5    period or he didn't get a phone call either to or from Mr.

6    Schone.  That would be very relevant because of this -- again,

7    the e-mail traffic indicates that Mr. Schone never approved it,

8    I mean, that Mr. Scholl never approved it, the deputy head of

9    standards.

10         And the only evidence that we have that it was approved

11   is Mr. Schone claiming that there's a phone call and Mr. Scholl

12   saying maybe there was a phone call.  So that wouldn't take that

13   long.

14         If the records were to be obtained, we would be able to

15   isolate that particular time period, so that -- I go through

16   that, and I appreciate your indulging me -- just to show how

17   precise we're able to be here and how little of a burden this

18   can be, and the same thing is true for the reporters.

19         There's particular times from particular sources that

20   we're curious about, and we would be able to go in and be laser-

21   focused if we were able to have cooperation from NBCUniversal.

22         THE COURT:  Ms. Evans, point me to that one more time.

23   I want you to focus on that specific example that you just

24   discussed.

25         Is there any -- aside from the equivocation about

1  whether I think you described Mr. Scholl's testimony as maybe

2  there was -- is there anything suggesting there wasn't?

3       MS. EVANS:  Yes, there is specific -- first of all, the

4  writer of that article, Julia Ainsley, testified that while she

5  thought there was approval of the article from standards as

6  communicated to her by her editor, Mr. Schone, she later learned

7  that it was not, and there's discussion about the deputy head of

8  standards, Mr. Scholl, being upset with the editor, Mr. Schone,

9  for moving forward.

10       Now, when I asked Mr. Scholl in his deposition if he

11  ever approved the article at issue, there are some very dramatic

12  pauses.  It takes us a while to get to the answer, but what he

13  ultimately says is, "At the end of the day, I was comfortable

14  with all the reporting."

15       Now, this is an after-the-fact in-a-litigation-

16  deposition answer.  The e-mail traffic from that day after this

17  alleged comfort or phone call where there may have been some

18  approval indicated per Schone, Mr. Scholl is saying, "This never

19  should have happened, guys; you can't just state that an article

20  is approved by standards on the basis of me answering

21  questions."  You know, he is very upset.  It's very clear from

22  the e-mail.

23       Now what's happened now after litigation has started is

24  a different story, but in the moment, the e-mail traffic

25  suggests he never approved it and that he was very upset.

1        In fact, the day after this alleged comfort with the

2   reporting, Mr. Scholl is in a recorded telephone call produced

3   to us by NBCUniversal where he says, quote, we just don't know

4   if any of this is true; right?  Secondly, what we know is that

5   Vice's take on the story -- Vice is another, was a written

6   medium that recorded a staggering number of hysterectomies --

7   Mr. Scholl says we know that Vice's take on this story, as we

8   can tell, I think, from reading that article that came out

9   yesterday was somewhat specifically contradicted by what ICE has

10  said.  Quote, we don't know his side of the story -- meaning,

11  Dr. Amin -- and we're not capable to assess from a medical

12  standard whether or not the decisions made were legit.

13       So there's clear evidence in the e-mails that he was not

14  happy, that it was not approved and the only evidence that it

15  was approved comes from the editor, Mr. Schone, saying that he

16  had this phone call with Mr. Scholl.

17       THE COURT:  Ms. Evans, I may be missing something here.

18  As I read the initial description of the dispute, this

19  interrogatory and the way that it was characterized was about

20  communications between reporters and sources for the accounts

21  manager highlighting internal communications at NBC; am I

22  misunderstanding?

23       MS. EVANS:  No, you're not misunderstanding, Your Honor,

24  and I can understand how it's confusing.  I use that example

25  because it's such a specific one day one time period and one

1  person, and you're right, they are both internal.

2        From the reporter's standpoint, we have on September

3  15th, 2020, which is the main day in question from when the

4  broadcasting started, we had -- you have two main reporters at

5  NBCUniversal, Julia Ainsley and Jacob Soboroff.

6        They were pushing for this article that ended up being

7  the alleged basis of the reporting on air, and they are getting

8  pushback again from Mr. Scholl, the deputy head of standards,

9  saying, "We don't have enough," so, you know, mid-afternoon,

10  they say, "Okay, we will get back to you," and then about 33

11  minutes later, they say, "Okay, we talked with four lawyers; we

12  have all this new information; we're going to write it up."

13        So even though earlier that day, starting at 7:00 a.m.,

14  everyone is saying, if we're going to run with this

15  whistleblower story about ICDC, we've got to do our own

16  reporting.  That started at 7:00 a.m. or 7:30.

17        No communications with other, you know, other lawyers

18  who represented detainees, detainees, no firsthand accounts or

19  even secondhand accounts beside Dawn Wooten who wrote the

20  whistleblower letter or was the source for that, nothing, and

21  then all of a sudden when it looks like their story is going to

22  get tanked -- they are not going to get to write it -- suddenly

23  they come up with these four attorneys and they had full

24  conversations with these sources in 43 minutes.

25        By comparison, we have one recorded phone call from

1  someone else in NBCUniversal with one of those attorneys that

2  alone lasted 33 minutes.  So there's skepticism.

3       The timeline of when and who allegedly talked to each

4  other in the deposition testimony is much less clear than has

5  been represented to The Court.

6       There's a lot of "I don't remember," "Well, I know I

7  talked to this person but maybe Jacob talked to that person,"

8  "maybe I talked to them in the morning, maybe I talked to them

9  in the afternoon."

10      Again, we know there's four sources that allegedly

11  talked to these two reporters.  We know the phone numbers for at

12  least two of them right now.  We're going to be deposing the

13  other two sources within the coming weeks, so if we have to wait

14  to get their phone numbers by asking them in the deposition or

15  if NBCUniversal would simply cooperate and identify those phone

16  numbers, that's all we care about, those four attorneys' phone

17  numbers and the calls in and out to those two -- at this point

18  I'm willing to limit it to just Ms. Ainsley and Mr. Soboroff.

19      I'm willing to forego Mr. Price at this point because

20  those two are really the key here, and we're going to be

21  laser-focused on the day and the time period.

22      THE COURT:  So the previous example about the internal

23  communications between the editor and the standards individual,

24  those are not involving those four attorneys?  So those are not

25  records that are being sought here?

1      MS. EVANS:  We are seeking those records, Your Honor.

2      THE COURT:  So it's both communications with sources and

3  communications internally amongst the (unintelligible).

4      MS. EVANS:  Among those two, yes, Your Honor.

5      THE COURT:  All right.  And to go back again, let's

6  focus on the four attorneys that you referenced.  I understand

7  you said there's some ambiguity in the deposition testimony

8  about when and precisely if they occurred.

9      Is there anything that you've identified in the records

10  that suggest that a reporter testified that a phone conversation

11  did occur and you have some additional information that that

12  conversation did not actually occur?

13      MS. EVANS:  We have discrepancy on the time, Your Honor,

14  which calls into question whether the call occurred.  Like, for

15  example, Mr. Soboroff allegedly spoke with an attorney named Ms.

16  Owings.

17      Ms. Owings only has a memory of speaking with Mr.

18  Soboroff early in the day, and text messages support the timing

19  of that telephone call being earlier in the day.

20      That information, information from that phone call, if

21  any were (unintelligible) was never shared, and there's

22  extensive e-mail traffic all day on September 15th, 2020, and

23  you've got standards begging for other reporting, and Mr.

24  Soboroff is silent about this alleged call with this attorney,

25  and then you have this alleged window of time where they

1    suddenly spoke to four, but Ms. Owings has no memory of speaking

2    to Mr. Soboroff during that sort of late afternoon time period

3    on September 15th, so we don't have "No, I never talked to them"

4    but we have a lot of discrepancy on time, and again there's two

5    attorneys that I haven't yet been able to depose in those

6    sources.

7              THE COURT:  Thank you, Ms. Evans.

8              Ms. McNamara, I will give you an opportunity to respond.

9              MS. McNAMARA:  Yes.  Well, there was a lot said there

10   and I'm sorry to say a lot of misrepresentation of the record.

11   It's very clear, there's no dispute at this point -- I think for

12   purposes of this discovery dispute -- there is no dispute that

13   each of these two reporters spoke to these four lawyers.

14             There's no dispute that other journalists at NBC, but

15   mainly Vander Price, spoke to at least two of those attorneys,

16   and there's no dispute that those attorneys were speaking to

17   numerous media, were quoted in numerous publications, and two of

18   those witnesses, the two of the sources, have already testified

19   unequivocally that they spoke to either Jacob Soboroff or Julia

20   Ainsley, that that reporting, that what they have -- what is

21   used from them is accurate, that the information is all, you

22   know, substantiated, and they stand behind it, and that is what

23   matters for the publication.

24             When precisely that phone call occurred has no relevance

25   whatsoever to the fact that the information was obtained, the

1    information was accurate.  The information was reasonably relied

2    on, and at the time of publication, everyone believed it to be

3    substantially accurate.  That is what is at issue ultimately in

4    the litigation.

5         The search for the phone records to document precisely

6    when it occurred or whether it occurred, you know, after a

7    particular time period or before someone said something is of

8    really no moment.

9         What matters is the knowledge people had at the time of

10   publication, and the publication of the original article was at

11   5:24 p.m.

12        They spent much of the day reporting on that story as

13   well as doing other, you know, news stories, and that is all

14   documented.

15        So I'm kind of at a loss on why this is such a focus or

16   what benefit this is, and I also would note that the testimony

17   is that Jacob Soboroff spoke with one of the sources, Sarah

18   Owings, in the morning before Chris Hayes raised any questions

19   or was brought into the review.

20        Now turning to the Chris Scholl communications

21   internally, again, Ms. Evans seems to be kind of making her

22   final argument about trying to conjure up some contention of

23   doubt about the accuracy of the reporting when the consistent

24   testimony has been no one doubted anything; everyone did

25   thorough and complete reporting on it.

1        But specifically as to the communications between Chris

2   Scholl and Mark Schone, both Chris Scholl testified and Mr.

3   Schone testified that the article was published at 5:24.

4        The substance of the article had been approved.  Chris

5   Scholl had not signed off in the formal way in an e-mail or some

6   other formal way of saying, "This is fine; go ahead, print it,"

7   but by 5:40 or 5:50, that e-mail was sent by Chris Scholl.

8        It was put into what is the drop distribution within

9   NBCU, in which everybody had access to this article, and it

10  was recognized as something the entire news organization could

11  rely on, and both witnesses, Mark Schone and Chris Scholl,

12  unequivocally testified that they had complete faith and

13  confidence in the article and that it had been approved.

14       The only issue that Ms. Evans is putting so much weight

15  on was a procedural, you know, back and forth about whether

16  people had dotted the I and crossed the T's that Mr. Scholl had

17  wanted on that day, and that has nothing to do with the ultimate

18  merits of this case, and it has no basis for us to be intruding

19  on these phone records, having to go through all the phone

20  records to ascertain what numbers are called for and what's not.

21       This is the first I've heard that the only thing they

22  are looking for are phone calls with the four sources.  It was

23  phone calls about anything to do with this story was the way

24  that this has always been portrayed, but even if you limit it to

25  these four sources or the phone call between Chris Scholl and

1    Mark Schone or any communications, it still is an unnecessary,

2    you know, burden and weight to go into this when it has

3    absolutely no substantive merit given the testimony in this

4    action.

5          THE COURT:  Ms. McNamara, let me emphasize one point for

6    everyone, and I know that everyone is savvy with this, too, but,

7    of course, at this point we're only discussing discoverability

8    and not admissibility and not making any determinations about

9    how any of this or the substantive evidence might bear on the

10   ultimate resolution of the issues in the case.  I just wanted to

11   emphasize that point.  It also influences my thinking in

12   resolving these disputes.

13         You indicated, Ms. McNamara, that -- forgive me if I

14   characterize this incorrectly -- but I believe that your

15   statement was along the lines of whether the time or duration of

16   these calls with these attorney sources is immaterial because

17   the testimony is these conversations occurred and substantively

18   the information is what matters.

19         So paraphrasing that a bit, the "when" and "how long"

20   doesn't seem to matter in your view as the merits of the case

21   but you would agree if you change that to "if" those

22   conversations occurred at all that that would matter; is that

23   right?

24         MS. McNAMARA:  Yes, but there would have to be a

25   foundation to believe that they didn't, and I think here any

1   foundation that there's any rational reason to believe that

2   these phone conversations did not occur, given the undisputed

3   testimony of both the journalists, both confirming that the

4   phone calls were made, that they spoke to these people, the

5   quotes that appear in the article are accurate.

6         Two of the sources have already testified and have

7   already testified unequivocally that, yes, they did speak with

8   either Jacob or Julia; what is in the article is accurate, and

9   two other sources will undoubtedly confirm that because there's

10  just no dispute that they did speak to them, and as I said

11  before, it wasn't just that these people were speaking to Julia

12  and Jacob at NBC News.

13        They were speaking to just a whole raft of news

14  organizations and are quoted in a number of other news

15  publications.

16        So the proposition that no phone call occurred, that

17  they never spoke to them is complete speculation on this point,

18  but it's disputed by the unequivocal testimony of the relevant

19  parties.

20        THE COURT:  Let me just pose a hypothetical to you, Ms.

21  McNamara.

22        First, two of these attorney depositions coming up, if

23  one of them says, "No, I never spoke to Ms. Ainsley or Mr.

24  Soboroff about this; I spoke to a number of other reporters at

25  other organizations but I didn't speak with them," would your

1   position be different in this request then?

2        MS. McNAMARA:  Yes, it might be.  I mean, it would be.

3   I mean, I think that because then you would have a foundation

4   that you have some reason to think that the phone conversations

5   didn't occur, but at this point, there is absolutely no

6   foundation to believe that either Jacob or Julia did not speak

7   to these four sources.

8        Two of them spoke to, you know, Vander Price the next

9   day, and in those taped conversations that Ms. Evans has

10  transcripts of, they make reference to the fact that they spoke

11  to Jacob or Julia.  That's in the recorded conversation.  There

12  is simply no foundation to even speculate that those phone

13  conversations did not occur.

14        THE COURT:  I have two other questions for Ms. McNamara.

15  But the other question concerns burden and a significant portion

16  of your response was related to not just the privilege and

17  privacy concerns, which I don't mean to diminish those concerns

18  or sound flippant in any way, but it sounds to me like that is

19  probably not a driver for this dispute given that Plaintiff's

20  counsel suggested, even proposed widespread redactions other

21  than the focused-on information here.

22        If the focused-on information is relevant, then likely

23  it wouldn't be privileged in any way.  It would only relate to

24  this case, so I don't want to focus on that too much, but I do

25  want to focus on this question of burden.

1        Ms. Evans indicated that this is really only looking at

2   potentially two, two phone numbers and -- I believe that's

3   right -- narrowing it to two phone numbers for four days so

4   identify these records, and I want you to focus on practical

5   burden here.

6        If AT&T were to provide phone records for these dates to

7   you without providing them directly to Plaintiff's counsel, what

8   is the burden in carving off four days and going through and

9   identifying these communications?

10       MS. McNAMARA:  Well, if we were only searching for the

11  phone numbers of the four sources and we have those phone

12  numbers, I mean, so that we had Andrew Fried's phone number and

13  the other three sources and all we had to do was look at the

14  phone records if they exist and identify any calls to those four

15  numbers, I don't think it would be a burden, but as this was

16  originally conceived of and requested and the subpoena would

17  require, it would cover all phone calls made by those two

18  journalists over four days when they are doing countless other

19  things, countless maybe personal things, countless other, you

20  know, phone calls, and we would have to look at these numbers

21  not knowing who they are and whether they have any relevance to

22  this case and go through an incredibly extensive burdensome

23  process of trying to align those phone numbers with anybody that

24  maybe they were speaking with that might have something to do

25  with this case.

1          THE COURT:  I understand, and it doesn't escape me that

2    that is the inherent value of having these informal discovery

3    dispute resolution conferences, is that sometimes the disputes

4    evolve and sometimes both the scope and the burden can be

5    expressed at times.

6          In any case I don't want that to suggest any conclusion

7    on these issues, so I've heard from both of y'all.  I understand

8    what your positions are.

9          No, I'm sorry, I have one additional question for you,

10   Ms. McNamara, and I do want to take that issue up.  It concerns

11   the propriety of this dispute coming here to Southern District.

12         Y'all already have encountered my view on Rule 45

13   subpoena disputes whereas I believe that y'all have already

14   taken up Southern and Northern District of Georgia there.

15         Speak to me on this issue.  I may even (unintelligible)

16   protective order.  I looked at the language on Rule 26, and it

17   seems to suggest that it's the party from whom the discovery is

18   sought that can proceed in the place where the action is

19   pending.

20         I know that Rule 35 seems a bit more specific to dealing

21   with these issues, and it lays out clearly the location of the

22   compliance, but please speak to that issue and tell me your view

23   of why this is the correct forum.

24         MS. McNAMARA:  Well, in the cases we cited in our e-mail

25   that we sent yesterday, Your Honor, if between the parties we're

1   seeking a protective order concerning the subpoena to -- the

2   subpoena is really effectively to the business records of NBCU.

3   It's not to a third party.

4         I mean, yes, it is technically AT&T but that's their

5   carrier, but what they are seeking are the business records of

6   NBCU, and so for that reason, for the cases we cited, the

7   *Shamblin* case versus Obama, that we cited out of the Middle

8   District as well as the *Davis* case that we cite, it's our

9   understanding that seeking a protective order is proper before

10  this Court.

11        If we're moving to quash the subpoena, it would be

12  proper to do it I think in the jurisdiction as you previously

13  held with regard to LaSalle, to do it in the jurisdiction where

14  they're seeking production of the documents.

15        THE COURT:  I'm sorry, Ms. McNamara, I'm maybe a little

16  bit confused.  I thought that -- so your view is that these

17  phone numbers that are identified in the attachment to the

18  subpoena, those are records that belong to NBCU.  They are in

19  the possession, custody or control of NBCU.  These are requests

20  directly to NBCU; they just happen to be held by a third party.

21        And the reason I'm expressing some confusion is I

22  thought that you had suggested earlier that these may have been

23  private individual phones that were maintained by these

24  reporters who just happened to utilize them for some business

25  purposes.

1       MS. McNAMARA:  No.  These are, they're business phones,

2   Your Honor, and so these are phones issued by NBCU.  NBCU

3   doesn't maintain the call records.  You know, their carrier

4   does, and in this case, it's AT&T, so these are NBCU records

5   although held by AT&T.

6       THE COURT:  This may be academic, but I think it's

7   important for resolving this dispute, so in your view, could

8   Plaintiff -- I know you have your objections to this and reasons

9   for not wanting these records produced, but for procedural

10  purposes as it goes to the piece just under Rule 34 document

11  request directed to NBCU that you could then obtain from AT&T?

12      MS. McNAMARA:  Well, I don't know that -- frankly, I

13  don't know that answer, Your Honor, on whether we can force AT&T

14  to give us phone records.  I think that's the reason the

15  plaintiff went directly to AT&T.  We did pull the contract with

16  AT&T.  And that's how we ascertained that it's subject to New

17  York law.

18      I've been involved in other situations with news

19  organizations, and when people -- usually it's a third party,

20  not the party in this underlying dispute -- but where phone

21  records have been sought, and depending upon the contracts and

22  particular contractual language, the phone company can issue,

23  can respond to these subpoenas from third party, you know,

24  without the approval necessarily of the company who, you know,

25  by which they contract with.

1       As we all read in the news, that's how the Government

2   gets phone records from phone companies when they are looking

3   for things.

4       THE COURT:  That's certainly in the background of my

5   thinking, but I realize this is a bit of a different context.

6   So I just wanted some grasp into that experience under this

7   dispute so ...

8       MS. McNAMARA:  Yes.

9       THE COURT:  Well, let me circle back to the original

10  notion that I proposed to you, which is the two focused on this.

11  As I understood -- I just want to get confirmation from you,

12  let's just take up Issue 1 first, which we've not really talked

13  much about, about these draft scripts.

14      As I understand it, Ms. McNamara, you would like the

15  opportunity to brief it up but you're welcome to hear

16  preliminary thoughts; is that correct?

17      MS. McNAMARA:  Yes, Your Honor.

18      THE COURT:  Well, I will do that.  I'm not going to

19  issue any kind of ruling right now.  I will just give you my --

20  I won't say completely from the hip -- but my impressions based

21  on what I've received, which is not extensive briefing or

22  citation case law.

23      The initial impression that I have here hinges somewhat

24  on an issue that wasn't directly addressed in the submissions,

25  and that is specifically the temporal issue relative to these

1  scripts, and so as I understand this dispute and as I understand

2  the issue presented, Plaintiff's theory is that NBCU through its

3  individual members of the standards unit made some

4  (unintelligible) along with the individual figures may have

5  acted with actual malice here and published false and defamatory

6  statements.

7        That is the theory of the case, and the theory of the

8  discoverability of draft scripts or scripts for other programs

9  is that they may bear on NBCU's and those individuals'

10  respective knowledge and understanding of the facts underlying

11  the alleged defamatory reporting and also may underscore and be

12  used to demonstrate actual malice.

13        What jumps out to me first and foremost from this is

14  that I have a very difficult time envisioning how any draft

15  script that was generated or considered after the

16  (unintelligible) broadcast, which my recollection -- I don't

17  have a date in front of me, but I think it was September 15th

18  and September 17th, 2020, how any script or programming that

19  occurred after those events would bear on either truth or

20  falsity or actual malice, and to the extent that they would at

21  all, for example, maybe a draft script that would sort of cast

22  some sort of historical documentation, I find that that value

23  would be nominal, if any, to demonstrating either of those

24  facts, and at this point, I wouldn't find that those

25  after-report scripts would be discoverable because I don't see

1    any likelihood of that production leading to discoverable

2    information.

3           On the other hand, draft scripts or other scripts that

4    may have been utilized in production prior to the at-issue

5    reports could, and I realize that there is some degree of

6    (unintelligible) here, but the notion that the members of

7    standards or individual reporters may have encountered draft

8    scripts that contained different or contrary information or

9    suggested that something that ended up in the final September

10   15th and September 17th reports was untrue could potentially be

11   used to bolster, if not necessarily on its own prove, falsity or

12   actual malice, and so my initial impressions here are that those

13   are more likely to be discoverable.

14          The only way that I would conclude that they would not

15   be discoverable, if there was a demonstration through some

16   adequate degree of proof that no one who was in any way

17   connected with the disputed reporting encountered any of those

18   draft scripts, so, if, for example, if there was a show that

19   NBCU was considering reporting on this and they had a script

20   generated two weeks prior and it was not submitted to standards,

21   it was not considered a review, there is no indication

22   whatsoever that any of the individual reporters involved in

23   these reports ever had even the ability to encounter that

24   script, well, then that couldn't bear on these individuals'

25   knowledge of truth or falsity or actual malice.

1          So you-all know the discovery better than I do.  You

2    know what's transpired.  What I'm discussing here may be helpful

3    or not, but because it may be that there are no prereporting

4    draft scripts or it may be that there they are all prereporting

5    draft scripts, but that is what stands out to me at this point,

6    and so because it does suggest to me that there could be some

7    discoverable or relevant information in those draft scripts, I

8    would probably be inclined to order that those be produced, and

9    I would, of course, consider any limitations on use.

10          I understand that they are not necessarily published,

11    but for the purposes of discoverability, that's my initial

12    impression.

13          I'll give you a chance to ask questions on that.  Those

14    are preliminary impressions and subject to change based on

15    additional briefing, but that is what it is, so Ms. Evans, do

16    you have any additional comments or questions?

17          MS. McNAMARA:  Yes, I do, Your Honor.  I'm sorry.

18          MS. EVANS:  Oh, I thought you said "Ms. Evans," I'm

19    sorry.

20          THE COURT:  I did.  Go ahead, Ms. Evans.

21          MS. McNAMARA:  Oh, I'm sorry, I thought you said

22    defendants.  We both misunderstood or I misunderstood you.  I'm

23    sorry.

24          MS. EVANS:  Thank you, Your Honor.  Appreciate that

25    distinction.

1          I disagree with it a little on one point is that the

2     broadcasts may have stopped on the 17th, but it appears from

3     e-mails that people were still considering and that if they were

4     considering stories the scripts would have been going through to

5     standards for review because it's very clear that standards

6     wanted to see everything related to these stories, and so we

7     don't see more broadcasts after the 17th other than maybe one

8     that I'm forgetting right now, but the tweets continued, and I

9     take issue with something that was in the e-mail that were

10    just -- only at this point about four specific broadcasts.

11         It is about those broadcasts but we also raised claims

12    about tweets and those claims were not argued in Defendant's

13    motion for judgment on the pleadings and so were not dismissed,

14    so that's very much in the case, and NBCUniversal was claiming

15    large numbers of hysterectomies being performed on ICE detainees

16    at ICDC as late as late September.

17         I also think that those drafts could be relevant to the

18    decision that NBCU made not to retract any statements,

19    information that they could have learned or it became crystal

20    clear that they had gotten it wrong and still in the face of

21    that decided not to retract.

22         But I am much more interested in the scripts that were

23    reviewed and that were discussed simultaneously, but those are

24    the ones that are at issue so I don't have -- you know, I don't

25    take large issue with what you said, Your Honor.

1          And more importantly, the drafts are important and I

2    think will shed light on what was allowed to go through and what

3    wasn't, but it's the discussion about those scripts and the

4    discussions among standards and others at NBCU about Dr. Amin,

5    about ICDC, which we discovered through, you know, going through

6    the process of discovery and having depositions, we've

7    discovered that we didn't get those documents.

8          You know, we had to determine whether it was that they

9    didn't exist or whether we just weren't getting them, and it

10   turns out it's not that they don't exist.  It's that we are not

11   getting them, and that became crystal clear to us during the

12   depositions of the standards gentlemen that took place about six

13   weeks ago, seven weeks ago, and then, you know, we've attempted

14   to work with NBCUniversal in the interim, so it's not just -- I

15   just want to make sure that The Court is clear and if we're

16   going to do more briefing on it that we will be able to make it

17   crystal clear, I hope, that it's not just the draft scripts.

18         It's the communications about them and it's the

19   communications, maybe it's not even connected to a particular

20   script, but communications among standards employees with the

21   producers, with the on-air talent about Dr. Amin and about ICDC

22   because that's knowledge of standards that that was passed

23   through to the reporters, to the producers that ultimately ended

24   up on air -- those are the ones that were responsible and whose

25   actual malice would be an issue for those communications -- are

1   very much at issue for that.

2          THE COURT:  I'm going to make two remarks on that, Ms.

3   Evans.

4          And the only reason I'm doing this is because I

5   anticipate that there probably will be motions practice and if

6   not motions practice at a minimum you-all will have some

7   additional conferral and hopefully this will be helpful in

8   either of those endeavors.

9          With regards to the tweets and the non-retraction and

10  how these discovery requests -- and I'm focused specifically

11  right now on the transcripts -- how those would bear on those

12  issues, those aren't really presented in the discovery dispute

13  exchange.

14         The temporal aspect of this may play out the same way or

15  it may play out differently depending on how those issues are

16  presented.

17         But the big takeaway from this is that if the inquiry

18  here for the defamation claims is about knowledge at the time of

19  the alleged defamatory statements, the basic is that knowledge

20  that may have been gained after the fact is not likely to be the

21  case, not likely to be discoverable or relevant knowledge.

22         What is before clearly is more so, but I understand your

23  point and I understand there may be alternative theories.  I'm

24  only focused on what was presented here.

25         The other comment that I would make is that -- this may

1  have warranted a little more discussion, but in reviewing the

2  submission of the dispute here to The Court in e-mail, I took it

3  to be a focus primarily if not almost solely dedicated to the

4  draft scripts but with an acknowledgement of those two other

5  RFP's.

6       I think it was 1 and 2 that were a bit broader, and, you

7  know, that may bear some benefit for more detailed motions

8  practice.

9       I'm not going to wade into the additional dispute about

10  discovery of internal communications about those issues, but

11  I'll just observe that if this is a question about knowledge and

12  contemporaneous assessments about the veracity of reporting and

13  motivations in reporting or assessments of the material that's

14  being reported, those are likely to be discoverable for the

15  purposes of proving up either truth or falsity and actual

16  malice, and so that says nothing as to admissibility or exactly

17  how they will affect the ultimate outcome, but those strike me

18  as material that will likely be discoverable, so Ms. McNamara, I

19  will give you the same opportunity, any comments or questions on

20  Issue 1?

21       MS. McNAMARA:  Yes, Your Honor.  A number of

22  observations.

23       First, this kind of emphasis now that I'm first hearing

24  about tweets, not only was it not raised in the discovery

25  dispute as presented to Your Honor, and while there is passing

1   reference in the complaint to tweets, there has been no

2   questioning of witnesses on tweets.

3           There has been no discovery or identification beyond I

4   think one or two tweets that were contemporaneous on days of

5   this publication at issue.  This is first I'm hearing about

6   tweets at the end of September, tweets later.

7           These have not been presented in the case.  They have

8   not been identified.  To my mind, they are not subject of

9   dispute in this case and are not the subject of the defamation

10  in this case.

11          A defamation claim needs to be predicated on clearly

12  identified challenged statements, and we have those clearly

13  identified challenged statements in the complaint as well as in

14  the decision that was issued, and so I just think this is some

15  kind of a last-ditch attempt to expand the case in a way that I

16  haven't foreseen, was never discussed, I have no idea about, and

17  then by the same token, now trying to -- I want to parse out

18  here and perhaps explain -- and this would benefit I think by

19  briefing to get this explained -- but as we put in our e-mail,

20  NBCU has multiple news platforms, multiple news programs,

21  multiple reporting that is being done.

22          The testimony has been consistent in this litigation

23  that even amongst the three shows that are actually at issue in

24  this litigation, they act independently.  They do not, you know,

25  coordinate or talk to each other.  They are independent news

1    programs that define both their reporting and how they are

2    reporting it.

3          The other news programs, I'm now hearing from Ms. Evans,

4    she wants draft scripts.  She wants all communication.  She

5    wants everything concerning other news programs that have

6    nothing to do with the three programs at issue in this

7    litigation.

8          If that were to be introduced into this case now, if we

9    were to start looking for those documents and we were to start

10   producing those documents, the discovery will grow

11   exponentially, and we will be here for another six months at

12   least because there would be no way that one could even begin to

13   undertake that and do a thorough job.

14         It is, from the outset of this case, we've been

15   producing documents for the three broadcasts at issue, the very

16   segments that have been challenged and nothing else, and it's

17   never been raised before this dispute almost a month out when

18   we're supposed to be closing discovery, but all of a sudden,

19   they want to look at any and all other news programming from

20   this entire corporation to see whether there's some nexus or

21   some different relationship with these three programs.

22         The nexus they have tried to draw is in the -- it's in

23   standards.  The testimony to date has been crystal clear.  Two

24   people dealt with the news program at issue here, Chris Scholl

25   and Steve Thode.  Chris Scholl was deposed at length.  There was

39

1  never a single question put to him about did you provide

2  reporting or consultation on other news programs that was in

3  some way contradictory to these programs.

4       We have searched the records, the entire records of

5  Chris Scholl concerning anything about Dr. Amin.

6       We have done the same for Steve Thode.  We have produced

7  any and all records that exist, and that -- and so they have

8  everything now.

9       They have had the opportunity to depose these people,

10  and unless there's a foundation laid that Chris Scholl was

11  reviewing records for the "Today" show in the morning or NBC

12  News or something and there was, you know, some reporting on Dr.

13  Amin, unless there's a foundation that that is somehow

14  inaccurate or distinguishable or different than the reporting

15  here and that he was actually reviewing it, we are totally on a

16  fishing expedition.

17       There is no foundation for what they are asking for, and

18  maybe an analogy that would make sense for everybody would be

19  that if you were dealing with a book publisher, for example, and

20  they published probably 20 different books that touched on the

21  January 6th events and someone sued over one book, no one would

22  ever posit that you start getting all the reporters' drafts and

23  news gathering of the 19 other books not challenged in this

24  litigation, yet that is what is being proposed here, is that

25  we're dealing with three programs and now they are, at a month

1    before the close of discovery, are suggesting that we go in and

2    start looking across the entire NBCU programming, literally

3    perhaps scores or hundreds of programs, to ascertain whether

4    there's any other reporting on Dr. Amin.

5         Most of those, those programs have publicly available

6    scripts that one could look at.  If the plaintiff here believed

7    that there was some incredible or some -- any inconsistency in

8    the reporting of these other news programs, then let's see the

9    foundation.

10        Let's see the testimony of asking questions of Chris

11   Scholl or, you know, or the standards people involved in these

12   three shows to ascertain that they were somehow advising other

13   programs, that they were giving different advice or something to

14   these other programs or let's see the scripts that are publicly

15   available and lay a foundation that there is something

16   inconsistent.

17        Otherwise, we are just fishing.  That's all we're doing

18   here, and the time and money and costs that this would open the

19   door to is exponential.

20        MS. EVANS:  Your Honor, I'm sorry, I dropped for a

21   second.  It looks like the call dropped, but I heard Ms.

22   McNamara and I apologize.

23        I was simply responding to Your Honor's comments.  I

24   didn't know we were going to go into this, and I promise not to

25   go long, but I just wanted to make sure The Court is not scared

1  because of what we are asking for because it's --

2        THE COURT:  Ms. Evans, I'm going to interrupt you and

3  I'm sorry for doing that.

4        I want to go ahead and curtail this discussion for now

5  because we've got another issue to discuss, and I want to be

6  conscientious of everyone's time.

7        And this first issue is likely to lead to additional

8  briefing, so I don't know that there's a whole lot more value to

9  be gained continuing to rehash these issues out.

10       I will make a couple of very, very brief remarks related

11  to Ms. McNamara's statements, and this is really geared towards

12  trying to make the conferral and subsequent briefing as focused

13  and beneficial as possible.

14       As I understand Plaintiff's theory that -- I don't know

15  about the role of the tweets or the non-retraction.  That's

16  something that you-all should confer about and you should also

17  brief up if necessary.

18       As far as the notion that you expressed, Ms. McNamara,

19  your analogy that utilized for a book publisher, the image that

20  comes to mind is a question of whether you're talking about

21  scripts or a (unintelligible), and if the discovery is to

22  inquire as to whether any of these possible spokes in the entire

23  organization might have encountered some contrary information

24  but there is not a suggestion that that contributed to any false

25  reporting or actual malice, then that's not a compelling basis

1  for discoverability, but the hearing here acknowledges, Ms.

2  McNamara, that there is a standards unit and they act at least

3  in some way as has been described -- and you may disagree with

4  this -- but it's been represented that it's sort of a

5  clearinghouse for some of this information and therefore all

6  that information passes through, then all that information may

7  be relevant and discoverable.

8          If it doesn't, then you're certainly at liberty to brief

9  that up, or if it does and you think that that's not material,

10  then you're welcome to brief that up.

11          But I do not understand Ms. Evans' request to be sort of

12  looking in every back file, every filing cabinet in the entire

13  NBCU organization, regardless of any connection, but rather if

14  there was some basis for it contributing or lending material or

15  suggesting something about these disputed broadcasts, that would

16  be it, so we're going to leave that issue there.

17          I'm going to let y'all confer about it.  I think you

18  should.  I understand that there are some controlling viewpoints

19  about this particular topic, but I think you might be able to

20  find a little bit of common ground on this.

21          What I would suggest is trying to chip away at the

22  dispute as much as possible, and if you can't fully resolve it,

23  try to at least narrow it as much as you possibly can.

24          Think again about some practical aspects of this, what

25  is it that Plaintiffs are really looking for on this and what is

1   it that Defendants might be willing to provide, and there may be

2   a line that prevents this from being fully resolved and may need

3   Court intervention, but try to least find how much common ground

4   you can achieve.

5         So let's move to Issue Number 2.  Issue Number 2 is

6   about these phone records.  You-all provided a lot of additional

7   information about this, so I want to go back and ask again.

8         Ms. Evans, are you prepared for me to make an oral

9   ruling on this issue at this time or would you like the ability

10  to brief this up?

11        MS. EVANS:  I'm comfortable with an oral ruling, Your

12  Honor.  Thank you.

13        THE COURT:  Ms. McNamara, same question to you.

14        MS. McNAMARA:  I'm comfortable with an oral ruling.

15        THE COURT:  Well, I have to make a little bit of a

16  caveat then at the very beginning, which is that to the extent

17  that I'm able to rule on the propriety of this, I certainly have

18  no issue ruling on the discoverability of the phone number for

19  the one individual reporter that's still outstanding.  I think

20  that's Ms. Ainsley; do I have that right?

21        MS. EVANS:  Yes, sir.

22        THE COURT:  I don't really see how there's any objection

23  to providing the phone number itself.  That doesn't really seem

24  to be the heart of this dispute at all.  It's really about the

25  records, and so the other numbers were communicated in the

44

1    course of discovery anyway, so I'm going to require the

2    defendants to provide that phone number.  That doesn't really

3    seem to be the heart of this at all.

4         But the more important dispute is about the telephone

5    records that are maintained by AT&T on behalf of NBC as their

6    provider for these phone numbers.

7         At this point I'm not going to order that that

8    information be provided to Plaintiff's counsel, and I say that

9    information.  I'm speaking specifically with the narrowing that

10   the plaintiffs have articulated here, which is to narrow it to

11   the limited number of users, the limited number of days and the

12   limited number of contact information to include those four

13   attorneys that were referenced as well as the internal

14   communications.

15        And it really comes down to this issue, which is that,

16   at the risk of a slight oversimplification, the primary focus

17   for the plaintiffs at this point in getting this information is

18   to confirm whether calls occurred or did not occur and

19   secondarily when they occurred or when they did not occur and

20   how long they may have been, so sort of biographical information

21   about the calls.

22        When it comes to the timing and the duration of those

23   calls, given what's been presented here, that does not provide a

24   compelling basis for me to order NBC to obtain, redact and

25   produce those telephone records.  Likewise, I would rule that

45

1    AT&T is not required to produce those records.

2         You have deposition testimony at this point.  There's

3    some ambiguity in the timeline.  While I understand that there

4    may be some benefit to pinning all of this down to a very

5    concrete set of dates, times and durations, that doesn't offset

6    the burden that may be imposed and their (unintelligible) to

7    provide a great deal of benefit, at least not a clear

8    discernable benefit at this point.

9         Of course, the testimony is under oath, and I have

10   assumed that there are interrogatories that either could have

11   been or have been served that may address some of these calls.

12        If there's misrepresentations there, there's other ways

13   to address that, but in terms of providing these phone records,

14   that's not been shown to be necessary here.

15        The other part of the plaintiff's theory for obtaining

16   these records is to prove if a particular phone call occurred.

17   That would be a more compelling basis for requesting these phone

18   records but only if there was evidence in the record to support

19   that, so for example, if a deposition of a reporter yielded

20   testimony that that reporter talked to a particular source for

21   30 minutes on September 15th midday and then the deposition of

22   that source said "No, I had no call with that individual; I did

23   not discuss the information that was represented by that

24   particular reporter," that would be a basis for obtaining these

25   records because then there would be a clear dispute and record

46

1   on the need for confirmation through the phone records.

2           And while it may not prove falsity or truth of a

3   broadcast or may not prove in and of itself actual malice, it

4   would be germane to proving those issues.  It would be relevant

5   to those issues.

6           And I again emphasize this is a question about

7   discoverability and not admissibility, and so while it needs to

8   be limited in terms of proportionality and burden, if there were

9   a clear contradiction in the record that required proof through

10  the phone records, then I would order that it was to be

11  provided.

12          As you-all noted, two of the four sources have already

13  been deposed.  I did not hear any representation that there was

14  an outright contradiction in any of that testimony.

15          There was some ambiguity and uncertainty from some of

16  the reporters and perhaps even from some of the sources.  But so

17  far, there has not been that sort of direct contradiction.

18          Two more depositions remain.  Of course, if direct

19  contradiction arises or some other unique, unforeseen

20  circumstance that would suggest that they will yield some deeper

21  need for information contained in those records, I would

22  reconsider this request, but as it has been presented right now,

23  there seems to be a mechanism for clarifying, perhaps bolstering

24  some existing testimony, sorting out and building a little bit

25  of a timeline with more detail, but given the nature of the

1 records that are requested and the potential for burden, this is

2 not information that I would find would be discoverable at this

3 time based on this record.

4 So that's my ruling here.  Not going to be able to brief

5 that one up anymore, but I will certainly consider a renewed

6 request if the factual record develops in a different way.

7 Any questions about that, Ms. Evans?

8 MS. EVANS:  Yes, two quick questions, Your Honor.  One

9 is I understand your ruling about the reporters and the sources,

10 but then there was also the issue of the phone call of the

11 alleged approval of the article that happened between the two

12 internal employees, Mr. Schone and Mr. Scholl, and I wondered if

13 your ruling was different as to that particular person.

14 It would be one phone record looking for one particular

15 number on one particular day, and I could even pinpoint through

16 Ms. McNamara, I think it's a two- or three-hour window of time.

17 THE COURT:  Ms. Evans, it strikes me on that one that

18 obtaining these phone records from AT&T is not the most direct

19 or economical mechanism for doing this between the parties.

20 These are internal communications that were conducted

21 among NBC employees.  Would this not be more appropriate to

22 address in your interrogatory if they have access to these call

23 logs or these call records?

24 MS. EVANS:  I could ask.  I have a feeling that if I

25 were to do that I would be told, you know, we're not going to

1    take the burden of taking the step to ask for the phone records.

2          When I tried to ask these questions to these individuals

3    in the deposition testimony, I have Mr. Schone saying, "Yeah, I

4    think I called him," and I have Mr. Scholl saying, "I don't

5    know -- I don't know -- I don't know if I got a call from him or

6    not."

7          So I'm sort of left here.  I certainly can try that.  We

8    have one set of questions that will go out this week, so I can

9    add it.

10          My only other thing to say, Your Honor, for

11    consideration is that AT&T seems to be the phone provider that

12    keeps records the longest, and so I think at this point we still

13    have a fighting chance that these call logs exist.  That may not

14    be true in a month.  It may not be true in a week.

15          So given your statement that you would consider renewed

16    requests and if I'm correct about how a request for production

17    to NBCUniversal asking for these same records would be received,

18    I would simply ask that perhaps our subpoena -- I mean, again, I

19    don't know that you're quashing it or doing anything, but

20    perhaps it remains and those records just sit with NBCUniversal,

21    and then we ultimately decide whether we get access to any part

22    of them.

23          But I hate to cancel that request when we sort of put a

24    timestamp in the ground at least with AT&T, and I would hate for

25    those to be lost to, you know, record retention policies.

49

1          MS. McNAMARA:  I can speak to that, Your Honor.

2          THE COURT:  Ms. McNamara, would you like to respond to

3     that?  Go ahead.

4          MS. McNAMARA:  Yes, thank you, Your Honor.

5          I frankly have no idea if they even still exist.  As we

6     put in our e-mail, I think internally the corporate people at

7     NBC have indicated to their carrier or their contacts at AT&T

8     that they objected to the subpoena, but I don't know that

9     anybody has ascertained whether the records even exist, so we

10    may be talking about something entirely theoretical, but I'm

11    happy to suggest to my client that they can communicate with

12    AT&T and ask, try to find out, A, do these exist; if they do,

13    then they should be retained, you know, given full, you know, X

14    period of time should the need arise or an issue arise where

15    Your Honor thinks it's appropriate to review them.

16         THE COURT:  I'll address it this way so that there's no

17    ambiguity about it.

18         I'm going to grant NBC's request for a protective order

19    to the extent that it asks for this Court to order that AT&T is

20    not required to produce the requested records to Plaintiff's

21    counsel in response to the subpoena.

22         In addition to that, I'm going to order counsel for NBCU

23    to inform its client or rather direct its client to take

24    necessary steps to preserve the requested records for the

25    duration of this litigation.

1          I'm going to leave it to you, Ms. McNamara, as well as

2    your client and in coordination with AT&T to navigate the best

3    steps for doing that.

4          That may include obtaining and holding those records.

5    It may be include directing a preservation request to AT&T.  It

6    may be something else, but my order is that I'm directing NBCU

7    to take the steps necessary to preserve those records for the

8    duration of this litigation.

9          That will conclude with any final judgment or appeal,

10   once that's concluded, if there is one, but at this time, there

11   is no obligation to produce those requested records to

12   Plaintiff's counsel.

13         Any uncertainty about that, Ms. McNamara?

14         MS. McNAMARA:  No.  Thank you.  That's very helpful.

15   Thank you, Your Honor.

16         THE COURT:  And I --

17         MS. McNAMARA:  Oh, excuse me, Your Honor, I'm sorry,

18   just one minor thing.  What would happen because, you know, I

19   understand these are NBC records.  If when NBC tells AT&T "You

20   need to preserve these," if AT&T says "No, these are our own

21   records; you know, you don't have them," can we come back to

22   Your Honor or something?  I mean, we can't control the third

23   party if we don't actually have control over them.

24         THE COURT:  You --

25         MS. McNAMARA:  I don't know that that would be the case

1   but ...

2         THE COURT:  You are certainly able to come back and I

3   think that would be well advised to do so, you know, preserve

4   the record as to what steps you've taken, but I want to

5   emphasize again that my order here is directed to NBCU and the

6   steps that it is required to take to try to preserve.

7         MS. McNAMARA:  Okay.

8         THE COURT:  I understand that here is a third party who

9   is involved, but, again, I don't want to discourage you from

10  coming back to either provide additional information and

11  clarification or ask for further guidance.  You're not

12  discouraged in any way, but I just want to make the point that

13  this is an order directed to you and your client only.

14        MS. McNAMARA:  Great.  Thank you very much, Your Honor.

15        THE COURT:  You know, I floated the idea of an

16  interrogatory here.  My thinking on this is that there seems to

17  be a great deal of concern on the defendant's side about the

18  production of these phone records, and as I detailed here, I

19  also understand also Plaintiff's interest in obtaining this.

20        This dispute, I've disposed of a large portion of it.

21  There still does remain the possibility of some dispute about

22  this internal communication.

23        My reason for suggesting the possibility of an

24  interrogatory is that it would not require the involvement of a

25  third party potentially and also may provide but exclude

52

1    information that's requested without any of the additional

2    burden of redaction or the possibility of privileged or

3    protected communication.

4         This goes back to that sort of core kind of idea of what

5    is Plaintiff looking for and what can Defendant provide.  It may

6    be that you are able to resolve this through an interrogatory

7    that provides the same sort of information.

8         I'm not requiring anyone to do that.  I'm not requiring

9    any specific response.  But I think it might be a helpful

10   approach that you-all should consider when you're engaging in

11   further conferral on this issue.

12        The last thing that I'm going to do is set a schedule

13   for the briefing on Issue Number 1.

14        Ms. Evans, I (unintelligible) that you filed the

15   open-ended motion to compel on that issue.  How long do you need

16   to submit that motion?

17        MS. EVANS:  Your Honor, if we could have two weeks only

18   just because we have a number of depositions scheduled in the

19   case.

20        THE COURT:  That will be fine, and then I will provide

21   two weeks to NBCU to respond to that motion, and I will get a

22   ruling out relatively quickly after that.  Certainly not

23   required to take the full two weeks for each of you, but I

24   understand the pressing needs of litigation and so you will have

25   that time.

53

1          I will issue a written order to that effect after this

2     call.

3          Ms. Evans, any additional comments, concerns or issues

4     you want to raise?

5          MS. EVANS:  Thank you, Your Honor.  For that, we will be

6     faster than two weeks.

7          I did -- and I hate to ask you this -- but given that

8     you did say that we were entitled to the phone number for Julia

9     Ainsley and if we had had it before and we sent a subpoena to

10    AT&T, we would have included her.  Can her records be part of

11    the order to NBCUniversal to direct preservation by AT&T?

12         THE COURT:  It may well be, so Ms. McNamara, I will give

13    you seven days to provide that phone number to Plaintiff's

14    counsel.

15         That will satisfy your obligations to Plaintiff's

16    counsel but that phone number and Ms. Ainsley's records will be

17    included in that same direction for preservation.

18         MS. McNAMARA:  Thank you, Your Honor.

19         THE COURT:  Ms. McNamara, any additional comments or

20    concerns?

21         MS. McNAMARA:  No, nothing on this, Your Honor.

22         I just wanted to check in because, you know, we're

23    scheduling still multiple depositions and two scheduling issues.

24    One, we have -- there's a pending issue before Your Honor about

25    the motion to compel on the Hutchinsons, who we want to take

1    their depositions, but they have refused to engage with us, and

2    they are within your jurisdiction and I just didn't know where

3    that stood.

4         THE COURT:  Can you point me to the motion?

5         MS. McNAMARA:  Amanda, do you have the timing on that?

6    I don't have it in front of me, I apologize.

7         MS. LEVINE:  I'm just looking at -- hold on.  On June

8    28th, 2023, there was an e-mail from Liz to Ms. Mixon raising

9    the issue, and Ms. Evans responded on June 28th saying that

10   Plaintiffs take no position on Defendant's efforts to depose and

11   obtain additional documents from the Hutchinsons, and Ms. Mixon

12   responded on June 28th at 2:59 saying, "Received, thank you."

13        THE COURT:  Ms. McNamara, let me look into that and

14   follow up.  We may need to have another call, but I appreciate

15   your raising that issue.  Let me look into it and someone from

16   the court will be in touch.

17        MS. McNAMARA:  Thank you very much, and finally, Your

18   Honor, on the experts' reports and the like, I know when we last

19   spoke, we agreed we were going to fold that into the discovery

20   process and Ms. Evans has raised the issue of serving her

21   reports on September 8th, which we have no objection to because

22   I think someone is out of town or something.

23        We have no objection to that September 8th.  The

24   scheduling order, however, did not -- we would plan to probably

25   file rebuttal expert reports, and there's just no scheduling

1    kind of on that.

2         Should that be just be something for us to work out

3    amongst the parties, or is that something we should raise with

4    Your Honor?

5         THE COURT:  You-all try to work that out first and

6    discuss that, and if there's any disagreement about the date,

7    reach out to Ms. Mixon and let her know what the positions are.

8         We may not need a call on that, but I can set a date if

9    y'all can't find common ground on it, but as long as you have

10   agreement on it, I will treat it as enforceable among the

11   parties, and there's not going to be a need for further ruling

12   on that, but I would rather y'all try to identify that date

13   because you know what the issues are, but again, if you can't,

14   just reach out to Ms. Mixon.

15        MS. McNAMARA:  Thank you.  That's very helpful.  I just

16   have had orders before that had that kind of that type of

17   timeline and I just wanted to clarify.  So thank you very much.

18        MS. EVANS:  And, Your Honor, I will work with Ms.

19   McNamara and see if we can reach agreement without her having to

20   come back to you, but the scheduling order has been clear from

21   the beginning that expert reports were due when they were due.

22        This is not a traditional case where you would have like

23   a medical malpractice and this is what my expert says and you

24   need to respond to it.

25        The expert reports that I think anybody would expect in

1   this litigation just go to the truth or falsity of the

2   underlying allegations or media standards.  That's not what

3   we're doing, but it's not a rebuttal situation, so I think this

4   is a little late.

5           I've always assumed we all had the same deadline, and I

6   am certainly not inclined to voluntarily, you know, provide more

7   time if NBCUniversal has not seen fit to obtain experts knowing

8   that that same deadline existed for everybody, again, Your

9   Honor, from the very, very, very, very beginning of the case

10  and --

11          THE COURT:  Y'all just talk about it --

12          MS. McNAMARA:  And I can -- yeah, we will talk about it,

13  but, Your Honor, I do want to state for the record that we did

14  communicate this about two months ago.

15          We had a back and forth with Ms. Evans in which we made

16  it clear that we were going to present rebuttal witnesses.  We

17  don't need affirmative ones but we will talk -- let me talk to

18  her.  We can hopefully work this out and not need to bring it to

19  you.

20          MS. EVANS:  Disagree, but, yes, we will --

21          THE COURT:  I think there should be a schedule that

22  y'all can work this out and figure it out, but if not, just

23  reach back out.

24          MS. McNAMARA:  Great, thank you very much, Your Honor.

25          THE COURT:  Thank you-all.  Y'all take care and have a

57

1    good afternoon.

2            MS. EVANS:  Thank you, too.

3            MS. McNAMARA:  Bye-bye.

4            (Proceeding concluded at 4:22 p.m.)

5                        CERTIFICATION

6

7        I certify that the foregoing is a true and correct

8    transcript of the stenographic record of the above-mentioned

9    matter.

10

11

13   _____        09/06/2023

14   Debra Gilbert, Court Reporter          Date

15

16

17

18

19

20

21

22

23

24

25