# Exhibit C



1612 K Street NW, Suite 1100
Washington, DC, 20006
(202) 457-0034
whistleblower.org



Institute for the Elimination of Poverty & Genocide

9 Gammon Ave SE
Atlanta, GA 30315
projectsouth.org

September 17, 2020

The Honorable Bennie Thompson
Chairman
House Committee on Homeland Security
310 Cannon House Office Building
Washington, D.C. 20515

The Honorable Ron Johnson
Chairman
Senate Committee on Homeland Security
and Governmental Affairs
340 Dirksen Senate Office Building
Washington, D.C. 20510

The Honorable Mike Rogers
Ranking Member
House Committee on Homeland Security
310 Cannon House Office Building
Washington, D.C. 20515

The Honorable Gary Peters
Ranking Member
Senate Committee on Homeland Security
and Governmental Affairs
340 Dirksen Senate Office Building
Washington, D.C. 20510

The Honorable Lindsey Graham
Chairman
Senate Committee on the Judiciary
224 Dirksen Senate Office Building
Washington, D.C. 20510

The Honorable Dianne Feinstein
Ranking Member
Senate Committee on the Judiciary
224 Dirksen Senate Office Building
Washington, D.C. 20510

The Honorable Carolyn Maloney
Chairwoman
House Committee on Oversight and Reform
2157 Rayburn House Office Building
Washington, D.C. 20515

The Honorable James Comer
Ranking Member
House Committee on Oversight and Reform
2157 Rayburn House Office Building
Washington, D.C. 20515

The Honorable Jerrold Nadler
Chairman
House Committee on the Judiciary
2138 Rayburn House Office Building
Washington, D.C. 20515

The Honorable Jim Jordan
Ranking Member
House Committee on the Judiciary
2138 Rayburn House Office Building
Washington, D.C. 20515

**RE: Whistleblower's Disclosures on Medical Care in ICE Detention at Irwin County Detention Center: Private Contractors' Mismanagement is Endangering Immigrant, Worker and Public Health and Safety**

Dear Committee Chairpersons and Ranking Members:

Government Accountability Project and Project South[1] submit this letter seeking an investigation into the disturbing whistleblower disclosures contained herein of our client Ms. Dawn Wooten, LPN, concerning gross mismanagement of the spread of COVID-19 and other disturbing failures in the provision of medical care generally at the Irwin County Detention Center (ICDC) in Ocilla, Georgia, run by LaSalle Correctional (LaSalle), a private company contracted by the Immigrations and Customs Enforcement (ICE) to operate immigration detention facilities. This letter constitutes a protected disclosure pursuant to federal whistleblower law.

Ms. Wooten, as a provider of direct medical care to the detained immigrants at ICDC, possesses both direct and indirect evidence concerning medical neglect and other misconduct, including high numbers of hysterectomies and concerns regarding informed consent, the shredding of medical requests submitted by detained immigrants, the fabrication of medical records, and the denial of medical treatment.

Ms. Wooten has also directly witnessed misconduct and failures to provide medical care in the context of the COVID-19 pandemic. Ms. Wooten has disclosed LaSalle's disregard of public health guidelines set by both the Centers for Disease Control and Prevention (CDC) and ICE, including: the failure to isolate and quarantine in accordance with CDC guidance; LaSalle's refusal to test detained immigrants for COVID-19 who have been exposed to the virus and are symptomatic; refusal to comply with CDC requirements regarding Personal Protective Equipment (PPE), social isolation, and medical quarantining for COVID-19; continuously allowing transfers of detained immigrants, even those who have tested positive for COVID-19; and the months-long failure to abate unsanitary conditions. Ms. Wooten observed ICDC under-counting and under-reporting to State of Georgia public health officials regarding the number of staff and detained immigrants who were determined to have or be suspected of having COVID-19.

Ms. Wooten's disclosures of conditions at ICDC echo concerns outlined in Government Accountability Project's June 2020 letter to Congress on behalf of employees and former employees from the Richwood Correctional Center, another private prison operated by LaSalle

---

[1] Government Accountability Project is a global leader in whistleblower advocacy and protection. Our lawyers have represented whistleblower employees for over four decades, employees who, among other things, have exposed government and corporate illegality, waste, fraud, abuse, and serious dangers to public health and safety.

Project South was founded as the Institute to Eliminate Poverty & Genocide in 1986, and includes a legal and advocacy program that provides direct consultation, representation, and attorney training to support communities facing discrimination and legislative marginalization, particularly immigrants and migrants without documentation, refugees, Muslim communities, and young Black people.

in Monroe, Louisiana, about gross misconduct and failures to comply with CDC guidelines mandated by regulations governing ICE detention facilities, endangering immigrants, workers and the public.2

These disclosures validate warnings of other Department of Homeland Security (DHS) whistleblowers. As early as February 2020, Government Accountability Project clients Drs. Scott Allen and Josiah Rich, medical subject matter experts in detention health for the Department of Homeland Security's Office of Civil Rights and Civil Liberties, started raising the alarm that the the spread of COVID-19 in ICE detention would pose imminent harm to the health and safety of immigrants, workers and the public.3

It is well-documented that the provision of medical care in ICE detention is inconsistent and inadequate.4 Conditions at ICDC similarly have been shown to fail to meet prescribed standards of care.5

Ms. Wooten's disclosures, validated below by reports from immigrant detainees provided to Project South, reveal the willful disregard of ICDC's responsibility to meet the medical needs of immigrants in detention, a condition that has only compounded harm during the COVID-19 pandemic. ICDC's abuses not only harmed immigrant detainees, but also endangered workers and the public at large.

**Nurse Dawn Wooten is a Protected Whistleblower**

Ms. Wooten has been a Licensed Practical Nurse since 2009, and she first began work at ICDC in 2010. In the time since, Ms. Wooten has also worked elsewhere, but has been rehired by ICDC three times, most recently in October 2019, when she was hired as a full-time LPN, working regular shifts and averaging 36-40 hours per week. Her performance record at ICDC was unblemished and, indeed, praised by her superiors until she began disclosing her concerns to LaSalle in March 2020.

---

2 Letter from Government Accountability Project to Chairman Thompson (July 10, 2020). https://whistleblower.org/wp-content/uploads/2020/07/071020-letter-to-Congress-from-GovAcctProj-re-whistleblowers-ICE-Detention-COVID-FINAL-Submitted.pdf
3 Scott A. Allen, MD, FACP and Josiah Rich, MD, MPH, Letter to Congress (March 19, 2020), available at https://whistleblower.org/wp-content/uploads/2020/03/Drs.-Allen-and-Rich-3.20.2020-Letter-to-Congress.pdf.
4 Department of Homeland Security Office of Inspector General, Concerns about ICE Detainee Treatment and Care at Four Detention Facilities (June 3, 2019), https://www.oig.dhs.gov/sites/default/files/assets/2019-06/OIG-19-47-Jun19.pdf; Department of Homeland Security Office of Inspector General, Concerns about ICE Detainee Treatment and Care at Detention Facilities (December 11, 2017), https://www.oig.dhs.gov/sites/default/files/assets/2017-12/OIG-18-32-Dec17.pdf.
5 Project South and PennState Law Center for Immigrants' Rights Clinic, "Imprisoned Justice: Inside Two Georgia Immigrant Detention Centers," (May 2017), https://projectsouth.org/wp-content/uploads/2017/06/Imprisoned_Justice_Report-1.pdf; DHS Office of Detention Oversight, "Compliance Inspection: Enforcement and Removal Operations, ERO Atlanta Field Office, Irwin County Detention Center" (March 7-9, 2017), https://www.ice.gov/doclib/foia/odo-compliance-inspections/2017IrwinCountyGA.pdf

Letter to Congress from Government Accountability Project and Project South Re: Whistleblower Disclosures on Medical Care in ICE Detention/Irwin County Detention Center
September 17, 2020
Page 3 of 13

Ms. Wooten has been disclosing to LaSalle management her concerns of the mismanagement of the ongoing response to the coronavirus pandemic since March 2020. Also, earlier this month, Ms. Wooten filed a disclosure and retaliation complaint with the DHS Office of Inspector General (OIG). She also made protected disclosures via a complaint submitted by Project South to the DHS OIG, the Office of Civil Rights and Civil Liberties, the ICE Atlanta Field Office, and the Warden of the Irwin County Detention Center seeking expedited investigation.6

Federal whistleblower laws, specifically 41 U.S.C. § 4712, protect employees of federal contractors, like LaSalle, who make disclosures of misconduct, gross mismanagement, abuses of authority, and substantial and specific dangers to public health and safety to all of these entities. As counsel for Ms. Wooten, we are now similarly asking Congress to thoroughly investigate the following disclosures which warrant immediate action to prevent ongoing and future harm to immigrant detainees and workers at ICDC.

**A. Disclosures Related to Gross Medical Negligence**

*1) Detained Immigrants Received High Numbers Of Hysterectomies With Dubious Consent*

Several detained immigrants reported that many immigrant women have received hysterectomies while detained at ICDC by ICE without their fully informed consent. Upon our information and belief, one woman reported last year that ICDC routinely sends many women to see a particular gynecologist outside the facility and that some women find him untrustworthy. More recently, a detained immigrant told Project South that she talked to five different women detained at ICDC during just the last three months of 2019. When she talked to them about the surgeries they had received, the women "reacted confused when explaining why they had one done."

This detained immigrant said: "When I met all these women who had had surgeries, I thought this was like an experimental concentration camp … they're experimenting with our bodies."

Ms. Wooten similarly expressed concern regarding the high numbers and percentages of detained immigrant women at ICDC receiving hysterectomies. She stated that although some women have heavy menstruation or other severe issues that might would require a hysterectomy, "everybody's uterus cannot be that bad." Ms. Wooten explained:

> "Everybody he sees has a hysterectomy—just about everybody. He's even taken out the wrong ovary on a young lady [detained immigrant woman]. She was supposed to get her left ovary removed because it had a cyst on the left ovary; he took out the right one. She was upset. She had to go back to take out

---

6 Complaint from Project South to DHS OIG, CRCL, ICE Atlanta Field Office, and ICDC RE: Lack of Medical Care, Unsafe Work Practices, and Absence of Adequate Protection Against COVID-19 for Detained Immigrants and Employees Alike at the Irwin County Detention Center (September 14, 2020), https://projectsouth.org/wp-content/uploads/2020/09/OIG-ICDC-Complaint-1.pdf

Letter to Congress from Government Accountability Project and Project South Re: Whistleblower Disclosures on Medical Care in ICE Detention/Irwin County Detention Center
September 17, 2020
Page 4 of 13

> the left and she wound up with a total hysterectomy. She still wanted children—so she has to go back home now and tell her husband that she can't bear kids… she said she was not all the way out under anesthesia and heard him [doctor] tell the nurse that he took the wrong ovary."

The rate at which the hysterectomies have occurred have been a red flag for Ms. Wooten and other nurses at ICDC. As Ms. Wooten has explained: "Everybody he sees, he's taking all their uteruses out or he's taken their tubes out."

Intertwined with the issue of the reported high rates of hysterectomies is **widespread lack of proper, informed consent**. Regarding the hysterectomies, Ms. Wooten explained: "These immigrant women, I don't think they really, totally, all the way understand this is what's going to happen depending on who explains it to them." Ms. Wooten observed that the sick call nurse tried to communicate with the detained immigrants in Spanish by simply googling translations or by asking another detained immigrant to help interpret rather than using "the language line" as medical staff are instructed to use.

Ms. Wooten recalled that detained women expressed to her that they didn't fully understand why they had to get a hysterectomy. She said: "I've had several inmates tell me that they've been to see the doctor and they've had hysterectomies and they don't know why they went or why they're going." And if the immigrants do understand what they're getting done, "some of them a lot of times won't even go, they say they'll wait to get back to their country to go to the doctor."

One detained immigrant reported to Project South that staff at ICDC and the doctor's office did not properly explain to her what procedure she was going to have done. When she asked what was being done to her body, she was given three completely different and conflicting responses by three different individuals.

*First*, she was told by the doctor that she had an ovarian cyst and was going to have a small twenty-minute procedure done drilling three small holes in her stomach to drain the cyst. *Second*, the ICDC officer who was transporting her to the hospital told her that she was receiving a hysterectomy to have her womb removed. *Third and finally*, when the hospital refused to operate on her because her COVID-19 test came back positive for antibodies, she was transferred back to ICDC where the ICDC nurse said that the procedure she was going to have done entailed dilating her vagina and scraping tissue off. The nurse initially told the detained immigrant she was going to get this procedure done because she had heavy bleeding, but then told her it was because she had a thick womb. The woman quickly responded that she never had heavy bleeding in her life and was never told by the doctor that she had a thick womb. Instead she stated that the doctor had described an entirely different procedure that did not involve scraping her vagina. She stated: "I tried to explain to her that something isn't right; that procedure isn't for me." The nurse responded by getting angry and agitated and began yelling at her.

In addition to the disclosures made to Project South, lawyers representing detained victims alleging similar wrongdoing have publicly discussed their clients' experiences following Ms.

Wooten's disclosures' publicization.7

### *2) LaSalle Improperly Withheld Medical Care From Detained Immigrants, Shredded Detainees' Medical Request Forms*

Since October 2019, Ms. Wooten has disclosed to LaSalle management her concerns regarding the lack of medical care for detained immigrants at ICDC. She disclosed that the sick call nurses commonly shred medical request forms from detained immigrants who make requests to go to the medical unit. She also disclosed that the sick call nurse sometimes fabricated medical records such as vital signs without ever seeing the individual requesting medical help.

At ICDC, detained immigrants have two methods for making a sick call request. One is via a paper form, blue in color, which detainees fill out and then put in a box on the wall of their unit to be picked up by a nurse each night. The other is an electronic request, prepared and submitted by the detainees on the electronic "Telmate" tablets available in the units. Ms. Wooten has disclosed to OIG that LaSalle has encouraged detained immigrants to fill out handwritten request form because ICDC's medical staff supposedly will be able to more quickly review and act on such handwritten requests. However, when detained immigrants fill out the blue handwritten request forms, the nurse in charge of reviewing these documents will shred the forms without even looking at them. In fact, Ms. Wooten disclosed to the OIG that she has seen the sick call nurse shred an entire box worth of forms without looking at them.

Ms. Wooten has disclosed to OIG the case of a woman who had put in 12 sick call requests in the span of two weeks because she had an infection from an abdominal laparoscopy procedure and thus "green pus" was "oozing out of her belly button." Ms. Wooten believed that this woman's sick call requests had been shredded because the green puss oozing from the woman's navel so clearly would indicate an immediate course of treatment by antibiotics to any competent medical provider.

Ms. Wooten also disclosed to OIG LaSalle's practice of shredding paper "sick call" requests while preserving and fulfilling the simpler requests (such as requests for shampoo and toothpaste). If the immigrant filed a second sick call request indicating COVID-19 symptoms, LaSalle would decline that request, claiming that it was identical to a recently submitted, and supposedly completed request.

---

7 Jose Olivares and John Washington, "'He Just Empties You All Out'" Whistleblower Reports High Number of Hysterectomies at ICE Detention Facility," The Intercept (September 15, 2020), https://theintercept.com/2020/09/15/hysterectomies-ice-irwin-whistleblower/; Jacob Soboroff, Julia Ainsley and Daniella Silva, "Lawyers allege abuse of migrant women by gynecologist for Georgia ICE detention center," NBC News Investigations (September 15, 2020), https://www.nbcnews.com/news/latino/nurse-questions-medical-care-operations-detainees-immigration-jail-georgia-n1240110.

### *3) LaSalle Fabricated Medical Records when Detained Immigrants Submitted an Electronic Medical Request Form*

Ms. Wooten has disclosed to LaSalle management and OIG that when an immigrant submits an electronic sick call request, where shredding the requests is not an option, LaSalle would fabricate records of medical exams of immigrants. For example, upon a request for care that described symptoms of a runny nose and a fever, LaSalle would close the request by prescribing an over-the-counter cold medicine — without seeing, talking to, or examining the immigrant detainee. In addition, LaSalle would falsely annotate the immigrant's medical record as if the immigrant had been examined, to include bogus vital signs.

Ms. Wooten further disclosed that LaSalle gamed the sick call request system to further deny and delay medical care for the immigrants. LaSalle variously told the detained immigrants that a written request was more effective for obtaining needed treatment and that the electronic requests were the better method. When an immigrant inquired about delayed treatment following a written request, LaSalle would tell the immigrant that they should submit an electronic request. After an electronic request was ignored, LaSalle would tell the immigrant to file a paper request to ensure treatment. When Ms. Wooten disclosed internally that this practice was a serious threat to the immigrants' health and safety, her supervisors refused to take steps to address the problem.

### **B. Disclosures Related to COVID-19**

### *1) LaSalle Continued to Transfer Immigrants in and out of ICDC Against Both CDC Guidelines and the Advice of ICDC's Medical Director*

Ms. Wooten disclosed to OIG that LaSalle continued to allow transfers of individuals in and out of ICDC, contrary to CDC guidelines for correctional and detention facilities,[8] guidelines which are made mandatory on detention facilities by ICE's own ICE's Performance-Based National Detention Standards (PBNDS).[9] Ms. Wooten disclosed that Dr. Howard McMahan, the Medical Director of ICDC, pleaded with ICDC Warden David Paulk in March 2020, when the facility had its first COVID-19 case, to stop all transfers of individuals in and out the facility, but the Warden would not heed the Medical Director. Ms. Wooten disclosed that LaSalle continues to allow transfers of individuals into the facility who have COVID-19 and that ICDC also continues to transfer COVID-19 positive immigrants and those awaiting COVID-19 test results out of the facility. Ms. Wooten disclosed to OIG specific incidents involving a COVID-19 positive immigrant deported to Mexico and a COVID-19 positive immigrant transferred ICE-funded detention facility Lumpkin, Georgia, the Stewart Detention Center, which is operated by the

---

[8] Centers for Disease Control and Prevention, "Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities" (Updated July 22, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html
[9] ICE detention facilities are bound to follow the Performance Based National Detention Standards (PBNDS), which state that "Centers for Disease Control and Prevention (CDC) guidelines for the prevention and control of infectious and communicable diseases shall be followed." Immigration and Customs Enforcement, PBNDS 2011, Medical Care, Section 4.3, available at https://www.ice.gov/doclib/detention-standards/2011/4-3.pdf

Letter to Congress from Government Accountability Project and Project South Re: Whistleblower Disclosures on Medical Care in ICE Detention/Irwin County Detention Center
September 17, 2020
Page 7 of 13

Corrections Corporation of America. Ms. Wooten disclosed that LaSalle had ignored her admonition that the immigrants were COVID-19 positive and should not be transferred or deported.

### 2) LaSalle Did not Properly Isolate, Quarantine, and Cohort Immigrants with Confirmed COVID-19 Cases or Symptoms, or Those in Close Contact

Ms. Wooten disclosed to OIG that LaSalle failed to follow CDC guidelines concerning isolation, quarantine, and cohorting. The CDC guidelines, mandated by ICE's Performance-Based National Detention Standards (PBNDS), require medical **isolation** when an immigrant develops symptoms of COVID-19, 14-day **quarantine** of anyone who is a close contact of a confirmed or suspected case of COVID-19, and any **cohorting** of confirmed cases with suspected cases or case contacts is strictly prohibited.

Ms. Wooten disclosed that LaSalle would cohort entire dorm units for a 14-day quarantine after a single individual in the unit was confirmed as having, or merely suspected of having COVID-19. In addition, new transferees would be introduced into a unit that was in the middle of a 14-day quarantine, without restarting the 14-day clock. This defeats the entire purpose of a quarantine. If the new arrival was in fact COVID-19 positive, then all her unit-mates would come out of quarantine less than 14 days after the introduction of the immigrant with COVID-19, placing the group, the general population, facility staff, and the general public at risk.

### 3) LaSalle Downplayed the Need for COVID-19 Testing and Did Not Use the COVID-19 Testing Machines at ICDC

Ms. Wooten disclosed that detained women in ICDC's Unit C complained about fevers and sore throats during the pandemic, however, LaSalle did not test them for COVID-19, downplaying the immigrants' symptoms. The ICDC's Health Services Administrator (HSA) stated that "all [the immigrants] want is attention. . . . Everybody wants to be tested for COVID." Ms. Wooten disclosed that even if a detained immigrant had COVID-19 symptoms like a fever, LaSalle would do nothing but put them on over-the-counter cold medications for seven days without testing them for COVID-19.

Ms. Wooten further disclosed to OIG that LaSalle not only downplayed the need to test immigrants for COVID-19, it also declined to utilize two rapid-testing COVID-19 machines that had cost ICE $14,000 each. Ms. Wooten disclosed that LaSalle had not trained any medical staff on the operation of the rapid-testing machines as of August 2020, and that as of July 2020, she had only seen the machines used twice, once for an immigrant and once for a LaSalle employee. The ICDC Director of Nursing kept the machines locked up, claiming that she did not want the employees testing each other.

*4) LaSalle Concealed the Nature and Extent of COVID-19 at ICDC*

In August, ICE reported that a total of 41 detained immigrants at ICDC tested positive for COVID.[10] However, Ms. Wooten disclosed to OIG that the actual number of those infected is much higher because LaSalle was not actively testing detained immigrants and had been under-reporting the number of positive cases to ICE and to Georgia public health officials.

*5) ICDC Employees were Instructed to Work if They Had a Positive COVID-19 Test Result, Exhibit COVID-19 Symptoms, or Were Awaiting a COVID-19 Test Result*

Ms. Wooten has disclosed to OIG serious concerns regarding LaSalle's COVID-19 employee policies. She disclosed that LaSalle employees were expected to come into work even if they had COVID-19 symptoms and were awaiting test results. ICDC's HSA instructed medical staff, such as Ms. Wooten, to come into work while they were waiting to be tested, waiting for their test results, and even if they tested positive, stating that "we can work symptomatic and work positive as long as we had a mask on."

Ms. Wooten also disclosed LaSalle's practice of "clearing" symptomatic employees for work, despite the admonition of the employee screening form that must be completed upon arrival for work. The document expressly states:

> If there are any 'yes' answers to any questions above and/or if the temperature is equal to or greater than 100.4 degrees Fahrenheit, medical staff will be notified and the individual will not be allowed access to the facility and will be advised to seek medical attention.

Ms. Wooten disclosed LaSalle's practice of requiring employees to work their shifts, despite having COVID-19 symptoms. On June 22, 2020, Ms. Wooten answered "yes" to having symptoms of COVID-19 as she reported for work, including muscle or body aches, headaches, and diarrhea. LaSalle still cleared her to work that day.

Ms. Wooten also disclosed to OIG that the thermometer at the ICDC's front desk, which is intended to measure and record the temperature of employees as they report to work, and as part of the screening form, intended to screen out COVID-19 symptomatic employees, was defectively operated, maintained, and calibrated. Ms. Wooten disclosed that the thermometer regularly reported obviously incorrect readings, such as 89.6 and 90.4 degrees Fahrenheit.

*6) LaSalle Failed to Provide Employees Proper PPE or Facilitate Social-Distancing*

Ms. Wooten disclosed that she repeatedly requested, to no avail, that LaSalle provide a replacement N-95 mask after her original mask had broken. Her supervisor told her that she had been issued one N-95, and LaSalle would not issue her another. Ms. Wooten is immuno-

compromised, due to sickle cell anemia, and has made LaSalle aware of her consequently increased risk for complications from COVID-19, but the response of ICDC's HSA was nothing more than saying "life goes on," implying that if Ms. Wooten were to get sick or die, LaSalle would simply replace her.

Ms. Wooten disclosed to OIG an occasion when higher-ranked and longer-tenured nurses brought a detained immigrant who presumably had COVID-19 into their shared office and removed the immigrant's mask without warning Ms. Wooten. While the higher-rank nurses had N-95 masks on, Ms. Wooten did not. She had to walk out of the room to protect herself, especially because of her immunocompromised condition. Ms. Wooten's office—four computers, shared by eight employees—made six-foot separation impossible, but LaSalle made no accommodations.

Ms. Wooten also disclosed to OIG that LaSalle did not provide proper sanitization material in the medical unit. When medical staff requested and finally received sprays and sanitizers in May or June 2020, the HSA took all of them and locked them in the HSA's office while leaving out only one bottle of the spray and sanitizer because the HAS said she did not want the medical staff just " pass[ing] them out." Ms. Wooten disclosed that this resulted in employees not being able to properly sanitize their workspace because they lacked the necessary resources.

### 7) ICDC Refused to Inform Employees and Detained Immigrants of who had COVID-19

Ms. Wooten disclosed to OIG that LaSalle management at ICDC did not tell officers which detained immigrant or employee had COVID-19. She tried to warn her fellow officers, so they could take proper precautions when they were about to come in contact with an immigrant with COVID-19, but LaSalle targeted her and reprimanded her, saying that was "not her job." Ms. Wooten disclosed that the officers were the most at risk of contracting the virus because of their extensive contact with the immigrants, such as transporting them and providing food to them, and should have had ample warning to take proper precautions.

Ms. Wooten disclosed to OIG an incident when she had interacted with several immigrants whom the HSA had assured Ms. Wooten had tested negative for COVID-19. Ms. Wooten later discovered that those immigrants were *awaiting* their test results and were later confirmed COVID-19 positive. This callous and negligent threat to Ms. Wooten's health is emblematic of LaSalle's general disregard for the risk of COVID-19 and the employees' and immigrants' health.

### C. Past Whistleblower Complaints Warned of and Exposed Risks from the Spread of COVID-19 From Systemic Problems and Gross Mismanagement in ICE Detention

Government Accountability Project's July 10, 2020 letter to the House Committee on Homeland Security's Subcommittee on Border Security, Facilitation & Operations summarized the concerns that DHS's subject matter medical experts on detention health, Drs. Scott Allen and Josiah "Jody" Rich, expressed to Congress on March 19, 2020 and again in testimony before the

Senate Judiciary Committee's June 2, 2020 hearing on "Examining Best Practices for Incarceration and Detention During COVID-19"[11]. Warning of a "tinderbox scenario" where rapid spread of the virus through a detention facility could rapidly overwhelm local hospital capacity and result in community spread of the virus, some of the risks they noted include:

1) The congregate nature of immigrant detention makes compliance with detention standards related to medical care and CDC guidelines both critical and difficult. Social distancing, adequate Personal Protective Equipment (PPE), frequent handwashing, and sanitizing the frequently shared surfaces of dorms, door handles, and other common areas are uniquely challenging in detention settings, which is why some other non-detention facilities, like schools and nursing homes, have focused on closures and/or population reduction;

2) The steady rotation of ICE and contractor staff in and out of detention facilities for work shifts, and the frequent transfers of immigrant detainees between facilities and for deportation through airports, dramatically exacerbates the public spread of COVID-19; and

3) Failures to adequately test and report infections of both detainees and all ICE and ICE-contractor staff puts the health of workers, detained immigrants, and the public at greater risk.

The whistleblowers from LaSalle's Richwood facility provided first-hand accounts validating DHS experts' concerns. They told Congress that LaSalle is clearly not implementing anything close to "best practices" when it comes to COVID-19. Not only did they report that CDC guidelines were not being met because of the challenge of the congregate setting of detention and frequent transfers in and out of the facility by both staff and detainees, but that LaSalle management willfully ignored the ICE-mandated CDC standards for managing infectious disease in a detention facility and for maintaining minimum hygiene, cleanliness, and sanitation at Richwood. This breach has fueled the public health disaster that Drs. Allen and Rich warned Congress of this spring.

Coupled with the Richwood whistleblowers' disclosures, Ms. Wooten's disclosures reinforce their concerns of systemic wrongdoing and expand upon them to include evidence of LaSalle's willful abdication of its responsibility to provide medical care for detained immigrants and practices that negligently threaten the health of immigrants, employees, and the community.

As if the disclosures of medical neglect and misconduct, during a pandemic, were not concerning enough, Ms. Wooten's reports of a pattern of women undergoing hysterectomies without adequate informed consent, reinforced by testimony of reports by immigrants to Project South as

---

[11] U.S. Senate Judiciary Committee, "Examining Best Practices for Incarceration and Detention During COVID-19" (June 2, 2020), available at https://www.judiciary.senate.gov/imo/media/doc/Scott%20Allen%20Testimony.pdf

well as other immigration attorneys,[12] evidence potential violations of laws, rules and regulations, gross mismanagement, abuses of authority, and substantial and specific threats to public health and safety. This would constitute a form of unconscionable discrimination and human rights violations against women immigrants in U.S. detention, a profoundly vulnerable and marginalized population. [13] Even if these abuses were discrete, a system plagued by a pandemic and deficient in oversight would allow them to flourish. Every instance of wrongdoing disclosed by any detention whistleblower deserves a full and robust investigation. Ms. Wooten seeks an investigation into her disclosures so that the United States Government can find the facts, stop the misconduct, and apply corrective actions.

**Conclusion**

Our clients from LaSalle's Irwin County Detention Center and Richwood Correctional Center have disclosed that LaSalle has flouted the PBNDS-mandated CDC guidelines for managing infectious disease in detention facilities. LaSalle has not met the minimum requirements to adequately mitigate the serious public health risk of the coronavirus pandemic to the detained immigrants, LaSalle's employees, and the community, instead exacerbating the risk of harm through negligent and willful disregard of its duties of care. And evidence of multiple hysterectomies performed without consent constitutes a level of wrongdoing that, if further validated upon investigation, should warrant immediate corrective action.

In thanks to Ms. Wooten for her frequent internal challenges of LaSalle's misconduct, in July 2020, LaSalle demoted Ms. Wooten from a full-time position to an "on call" position. She no longer has a regular shift and her hours have been severely curtailed. Her OIG complaint includes details of her retaliation claim. The chilling effect of LaSalle's retaliation on other employees who may want to disclose these or similar breaches of the public trust is real. Acknowledging the courage required of whistleblowers may help to counteract that chilling effect. We ask Congress to demand that the OIG prioritize a full investigation into Ms. Wooten's complaint of retaliation to reinforce the essential role employees of conscience play in exposing wrongdoing, promoting accountability and preventing and mitigating health and safety dangers. Sending such requests to the DHS Inspector General, Hon. Joseph Cuffari, helps ensure OIG conducts a fulsome investigation into Ms. Wooten's disclosures and the retaliation she has suffered for speaking up.

---

[12] Jose Olivares and John Washington, "'He Just Empties You All Out'" Whistleblower Reports High Number of Hysterectomies at ICE Detention Facility," The Intercept (September 15, 2020), https://theintercept.com/2020/09/15/hysterectomies-ice-irwin-whistleblower/; Jacob Soboroff, Julia Ainsley and Daniella Silva, "Lawyers allege abuse of migrant women by gynecologist for Georgia ICE detention center," NBC News Investigations (September 15, 2020), https://www.nbcnews.com/news/latino/nurse-questions-medical-care-operations-detainees-immigration-jail-georgia-n1240110.

[13] Patel, P. Forced sterilization of women as discrimination. *Public Health Rev* 38, 15 (2017). https://doi.org/10.1186/s40985-017-0060-9

We appreciate the oversight the House Committee on Homeland Security's Subcommittee on Border Security, Facilitation & Operations and Senate Judiciary Committee has already conducted on this issue. But we also recognize that more oversight is necessary. We hope that Ms. Wooten's whistleblower disclosures drive additional and urgently needed efforts to address the gross abuses in ICE detention the pose ongoing and imminent dangers to immigrants in detention on an ongoing basis, as well as to workers and the public during the coronavirus pandemic.

For more information contact John Whitty at johnw@whistleblower.org and Priyanka Bhatt at priyanka@projectsouth.org, or by phone at (202) 457-0034.

Very truly yours,


Government Accountability Project
John Whitty, Staff Attorney

Project South
Priyanka Bhatt, Esq.