UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
WAYCROSS DIVISION

| | |
|---|---|
| DR. MAHENDRA AMIN, M.D.,<br><br>    Plaintiff,<br><br>v.<br><br>NBCUNIVERSAL MEDIA, LLC,<br><br>    Defendant. | Case No. 5:21-cv-00056-LGW-BWC<br><br>**DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION TO COMPEL** |

In his Motion to Compel discovery from Defendant NBCUniversal Media LLC ("Defendant"), Plaintiff Dr. Mahendra Amin ("Plaintiff") insists that he is not engaging in a "fishing expedition." *See* Mot. at 10. But the broad-reaching discovery that Plaintiff asks this Court to order—including searching the email boxes of at least eleven additional custodians on top of the twenty-three that Defendant previously searched and scouring emails from the last three years to try to find anything that Plaintiff believes might reflect on Defendant's state of mind in September 2020—belies his assertion. On the eve of the close of discovery and recognizing the weakness of his case, Plaintiff is simply grasping at straws to find *something* that can bolster his claim—even if it has no logical nexus to the challenged statements or the individuals responsible for them. Defendant has already produced the documents relevant to this action. In short, Plaintiff's eleventh-hour demand would prolong discovery and would generate documents having no relevance to this action. It is not a question of admissibility; Plaintiff seeks plainly irrelevant documents. The Court should not condone Plaintiff's tactics, and his Motion should be denied.

## BACKGROUND

Because the procedural history of this case is directly relevant to the discovery requests

discussed in Plaintiff's Motion, Defendant briefly recounts this history here.

### I.     Plaintiff Files The Initial Complaint In This Action

This case stems from a complaint initially filed by Plaintiff on September 9, 2021, *see* Dkt. 1 (the "Initial Complaint"). The very first paragraph of the Initial Complaint explained that it arose from "a series of MSNBC broadcast segments," Compl. ¶ 1, and identified these segments as appearing in: (1) the September 15, 2020 episode of "Deadline: White House" with Nicolle Wallace; (2) the September 15, 2020 episode of "All In" with Chris Hayes; (3) the September 16, 2020 episode of "All In" with Chris Hayes; (4) the September 16, 2020 episode of "The Rachel Maddow Show"[1]; and (5) the September 17, 2020 episode of "All In" with Chris Hayes, *id.* ¶ 2 (collectively, the "News Reports"). Each of the News Reports discussed a whistleblower complaint, which alleged that Plaintiff performed unnecessary or unconsented-to gynecological procedures on detainees at the Irwin County Detention Center. The Initial Complaint enumerated specific statements from each of the News Reports that Plaintiff claimed were defamatory. *See id.* ¶¶ 76-80.

Despite the fact that MSNBC published the News Reports in September 2020 and Plaintiff was clearly aware of them—indeed, his lawyer was contacted by and provided comment to MSNBC journalists—Plaintiff raised no concern with the Reports until almost a full year later, on August 26, 2021. At this time, Plaintiff's counsel sent a letter to Defendant requesting that it retract the News Reports.[2] Defendant refused to do so.

After the Initial Complaint was filed, Defendant sent a litigation hold notice to seventeen

---

[1] Plaintiff's counsel subsequently clarified that this was actually the September 15, 2020 episode of "The Rachel Maddow Show."

[2] Despite ultimately suing over the September 17, 2020 episode of "All In," this News Report is not mentioned in Plaintiff's August 26, 2021 letter.

employees that Defendant believed may have documents related to the claims in this action. In the following weeks, as Defendant conducted interviews with various employees and learned more about the five challenged News Reports, Defendant sent litigation hold notices to an additional four employees. Notably, however, because NBCU's document retention policy provides for the automatic deletion of emails after sixty days (unless the emails are archived by an individual or that individual is otherwise on a litigation hold) and because Plaintiff did not contact Defendant about the challenged News Reports until nearly a year after they were published, many of the documents relevant to this litigation had already been automatically deleted.

## II. Discovery Begins But Is Promptly Stayed Pending Defendant's Motion For Judgment On The Pleadings

On January 10, 2022, Defendant filed a Rule 12(c) motion for judgment on the pleadings in this action, arguing that this case should be dismissed in its entirety. *See* Dkt. 24. On January 21, 2022, Defendant filed a motion to stay all discovery pending the Court's ruling on the Rule 12(c) motion. *See* Dkt. 31. While Defendant's motion to stay was pending, on February 14, 2022, Plaintiff served an initial set of document requests, which Defendant responded to on March 16, 2022. On April 19, 2022, prior to the production of any documents in this action, the Court granted Defendant's motion to stay and stayed all discovery in this action pending the Court's ruling on the Rule 12(c) motion. *See* Dkt. 43.

Meanwhile, following oral argument on Defendant's Rule 12(c) motion, Plaintiff filed an amended complaint. *See* Dkt. 49 (the "FAC"). The FAC, now the operative complaint in this action, again asserted that this case arose from the same five challenged News Reports, claiming "MSNBC began publishing false and defamatory statements about Dr. Amin on September 15, 2020 and continued to do so through at least September 17, 2020," *see* FAC ¶ 74, and enumerating the challenged statements from these five News Reports, *see* FAC ¶¶ 75, 78, 81, 84, 86. After the

3

FAC was filed, Defendant again moved for judgment on the pleadings, arguing that Plaintiff's new allegations did not alter the conclusion that he had not—and could not—state a defamation claim. *See* Dkt. 52.

On November 16, 2022, the Court issued an order granting in-part and denying in-part Defendant's motion. *See* Dkt. 59. In so doing, the Court dismissed from this action all statements stemming from the September 16 episode of "All In," all statements except one stemming from the September 17 episode of "All In," and select statements from the September 15 episode of "Deadline: White House."

### III.  Defendant Undertakes A Significant Search For And Production Of Documents

Following the Court's ruling on the Rule 12(c) motion, discovery in this action began in earnest. Throughout this process, as Defendant collected and reviewed documents and spoke with its employees, it learned of additional individuals who may have documents relevant to the claims and defenses in this action. Defendant promptly sent litigation hold notices to two additional individuals and, if Defendant believed that they had non-duplicative, relevant documents, it also searched for documents from them.

Ultimately, Defendant searched for documents from **twenty-three custodians**: Julia Ainsley, Jacob Soboroff, Mark Schone, Rich Greenberg, Chris Hayes, Denis Horgan, Brendan O'Melia, Rawan Jabaji, Tina Cone, Diane Shamis, Alexander Price, Luciana Lopez, Rachel Maddow, Cory Gnazzo, Kelsey Desiderio, Nicolle Wallace, Patrick Burkey, Cort Harson, Regina Donizetti, Christoper Scholl, Steve Thode, Mary Lockhart, and Betsy Korona.[3]

---

[3] In her Declaration, Ms. Evans claims that Defendant "sent a litigation hold for some custodians without searching their documents, searched for some custodians without sending them a litigation hold, and did not send a litigation hold nor search the documents for some individuals who appear to have relevant discoverable information." Evans Decl. ¶ 19. Taking each of these accusations in turn, Defendant sent a litigation hold notice to certain individuals who Defendant believed *may* have relevant documents. But, upon communications with its employees about this action, Defendant learned that it was unlikely that certain low-level employees would have any documents that were non-duplicative of the more senior producers whose documents Defendant searched. Defendant did not communicate a

This list includes the on-air talent, the executive producer, and the senior producers for each of the challenged News Reports, as well as the segment producers from "All In" who were conducting independent reporting and whose emails, therefore, may not have been captured by the search of more senior employees. The list also includes two NBC journalists who published an article on NBCNews.com prior to the challenged News Reports (the "NBC News Article"), as well as their editors and supervisors. While the NBC News Article is not challenged in this litigation, because it served as a key source for the challenged News Reports, Defendant produced any documents showing the newsgathering and vetting of the Article. Finally, the list includes three individuals from "Standards"—a group of employees who review Defendant's reporting to ensure that it meets the company's high journalistic standards. As discussed in further detail below, the Standards employees whose emails were searched were the only Standards employees responsible for reviewing the challenged News Reports or the NBC News Article.

Since its initial document production on January 10, 2023, Defendant has produced over 3,800 pages of documents.

**IV.    Plaintiff Does Not Challenge Defendant's Production Until One Month Before The Close Of Discovery**

Throughout discovery, and as Plaintiff knew, Defendant has limited its email production to emails relating to the five challenged News Reports, which aired from September 15-17, 2020, including documents relating to the NBC News Article that served as a source for the News Reports. Documents unrelated to these News Reports would not only be irrelevant to the claims and defenses in this action but would constitute Defendant's privileged newsgathering material.

---

litigation hold to certain individuals whose documents were searched because those individuals were no longer with the company at the relevant time. The documents that were preserved at the time those individuals left the company were searched. Finally, as explained in detail in this brief, Plaintiff has not identified *anyone* who may have information relevant to this case whose documents were not preserved or searched.

Until the issues were raised in connection with this Motion, at no time during the intervening months did Plaintiff's counsel challenge this limitation (despite the fact that, as evidenced by Ms. Evans's Declaration, she clearly knew about other MSNBC news reports and countless other news reports that discussed Plaintiff).

On June 5, 2023, Plaintiff served his third requests for documents, which specifically sought scripts and draft scripts "reviewed by Standards" and "all other documents regarding such reviews." Defendant objected to this request, explaining that it understood the request to call for scripts or draft scripts for the challenged News Reports, which had already been produced. Nonetheless, Plaintiff insisted that he was entitled to *all* scripts for *any* show that were sent to *any* member of NBCU's Standards department.

After the parties could not reach agreement about the proper scope of production, Plaintiff raised this issue with the Court, which held a preliminary conference on August 31, 2023. Following that conference, in an attempt to compromise with Plaintiff, Defendant offered to produce communications from the inboxes of Christoper Scholl, Steve Thode, and Mary Lockhart—the only Standards employees with potential relevance to the challenged News Reports—discussing scripts or draft scripts from unchallenged news reports between September 15-17, 2020. Plaintiff rejected this offer. Notably, Plaintiff's Motion all but ignores this offer. This Motion follows.

## ARGUMENT

### I. The Documents Plaintiff Seeks Are Largely Irrelevant To The Question Of Actual Malice

The only justification that Plaintiff proffers for his belated and expansive discovery requests is that the sought-after documents may be relevant to the issue of "actual malice." *See* Mot. at 5. Plaintiff concedes he shoulders the burden of establishing actual malice because the

challenged statements were made "in good faith as part of an act in furtherance of . . . the entity's right of petition of free speech." *See Murray v. Cmty. Health Sys.*, 345 Ga. App. 279, 288 (Ga. App. Ct. 2018) (explaining that statements made in "good faith" are privileged but the privilege can be negated "by showing that [the speaker] acted with actual malice").

Actual malice means that "the defendant[] published a defamatory statement either with actual knowledge of its falsity or with a 'high degree of awareness' of its 'probable falsity.'" *Berisha v. Lawson*, 973 F.3d 1304, 1312 (11th Cir. 2020) (quoting *Garrison v. Louisiana*, 379 U.S. 64, 74 (1964)).  Notably, as the U.S. Supreme Court has explained, when the defendant is a news organization, actual malice must be "brought home to the persons in the . . . organization having responsibility for the publication." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 287 (1964). Of particular relevance here, in *Sullivan*, the Court held that the presence of stories in *The New York Times'* files that contradicted a challenged advertisement could not establish actual malice because these stories were not connected to the individuals responsible for the advertisement. *See id.* at 287-88.

This requirement of "homing" actual malice to the individuals responsible for the challenged publication has been repeated time and time again by courts throughout the country. *See Blankenship v. NBCUniversal, LLC*, 60 F.4th 744, 762 (4th Cir. 2023) (affirming grant of summary judgment in defamation action stemming from reference to plaintiff as a "felon" because the record failed to identify who in the news organization was responsible for the scripted language and "actual malice must be brought home to the persons responsible for the publication"); *Donald J. Trump for President, Inc. v. CNN Broadcasting, Inc.*, 500 F. Supp. 3d 1349 (N.D. Ga. 2020) (dismissing defamation action based on lack of actual malice when plaintiff failed to connect specific CNN staff members who expressed bias toward the plaintiff to the challenged article);

*Mejia v. Telemundo Mid-Atlantic LLC*, 440 F. Supp. 3d 495, 502 (D. Md. 2020) (dismissing defamation action based on text in on-screen banner when the complaint contained no factual allegations that the person specifically in charge of the banner acted with actual malice); *Dongguk University v. Yale University*, 873 F. Supp. 2d 460, 465 (D. Ct. 2012) (holding that "when the defendant is an organization, a plaintiff must prove that a particular agent or employee of the defendant acted with actual malice at the time that agent or employee participated in the publication of the statement in question; an organizational defendant is not charged with the collective knowledge of all its agents and employees for purposes of the actual malice inquiry"), *aff'd*, 734 F.3d 113 (2d Cir. 2013).[4]

### a. The Individuals From Whom Plaintiff Seeks Documents Are Not Relevant To The Actual Malice Inquiry

In his Motion, Plaintiff seeks discovery from a list of over thirty-four individuals who Plaintiff claims were "among the decisionmakers" of Defendant's decision to publish the statements at issue in this lawsuit, "appear in correspondence with such decisionmakers," or "are members of the Standards team that may have reviewed scripts or been involved in discussions thereof." Mot. at 2. This expansive description itself highlights the breadth of Plaintiff's request. And examining the individuals included on Plaintiff's list whose emails were not previously searched by Defendant only underscores this point.

Take, for example, Casey Dolan. In September 2020, Dolan was an executive producer on the MSNBC program "Live with Hallie Jackson." According to documents produced by Defendant, at 6:00 am on September 15, 2020, Dolan sent an article from *The Guardian* entitled

---

[4] Plaintiff attempts to distinguish *Sullivan* and its progeny by noting that the procedural posture in these cases is different than the present discovery motion. *See* Mot. at 8-9. But this does not change the fact that *Sullivan's* requirement to bring home allegations of actual malice is controlling in this action and limits the scope of relevant documents to those involving individuals responsible for the challenged News Reports. Plaintiff has provided no foundation that the additional individuals he now seeks discovery from were responsible for the publication of the challenged News Reports.

"ICE detainees faced medical neglect and hysterectomies, whistleblower alleges," to Betsy Korona (MSNBC's executive director of news) and Catherine Corrigan (an MSNBC coordinating producer) asking whether NBC News reporters Julia Ainsley and Jacob Soboroff (who had long reported on immigration issues for NBC News) were looking into this issue. Korona added Soboroff and Ainsley to the email, who explained that they had spoken to the lawyer for the whistleblower and would be speaking to the whistleblower later that day. Dolan responded that she "wouldn't want to touch [the story]" without further context from Soboroff and Ainsley and merely wanted to put it on their radar. Because this email reflected Soboroff's and Ainsley's newsgathering for the NBC News Article, Defendant produced it to Plaintiff. But there is no evidence that Dolan spoke with *anyone* working on the challenged News Reports or that she had any other involvement, including any substantive involvement in the NBC News Article. Dolan has no relevance to the actual malice inquiry.

Daniella Silva is similarly situated. In September 2020, Silva was a reporter for NBC News. In the early afternoon of September 15, 2020, Silva updated an Associated Press article about the whistleblower complaint (which NBC News had previously published) in order to add information from the whistleblower's press conference that morning. Neither the Associated Press article nor Silva's update is challenged in this action. As Julia Ainsley testified, in order to be "courteous" to Silva, Ainsley "weaved" into the NBC News Article some of the material from Silva's previous article, *see* Ainsley Tr. at 153:11-19,[5] and gave her the third byline on the Article. Just as is the case for Dolan, there is no evidence that Silva spoke with anyone who worked for "Deadline: White House," "All In," or "The Rachel Maddow Show." Thus, any knowledge that Silva had is likewise irrelevant to the question of whether those actually responsible for the

---

[5] Following Plaintiff's lead, Defendant has not attached copies of deposition transcripts or documents to this Brief but would be happy to provide anything to the Court upon request.

9

challenged News Reports acted with actual malice.

In addition, most of the remaining individuals from whom Plaintiff now seeks discovery are members of Defendant's Standards team. But Plaintiff's Motion entirely mischaracterizes how Standards works. Standards is not a monolith. It is a team of individual employees who review NBCU's reporting to ensure that it is accurate, fair, and transparent. Each day, the Standards team will call for review of stories on certain subjects, and reporters across NBCU's platforms can either send stories to the Standards Distribution List email address (which automatically sends the email to every member of the Standards team)[6] or directly to one of the employees. As has been explained during depositions, because individual members of Standards may be more familiar with certain topics, when stories on these topics are sent to the Distribution List, the Standards employees will often coordinate behind the scenes to determine who is going to review them. Each story or script is assessed in its own context, considering the relevant sources and facts particular to that publication. Thus, comments that a Standards employee provides on a script for one MSNBC news report may be entirely irrelevant to another news report on the same subject since each MSNBC program writes its own scripts.

From the outset of the case, Defendant understood through speaking with its reporters that Christopher Scholl—then the deputy head of Standards—was the individual primarily responsible for reviewing the NBC News Article. Because the NBC News Article served as a key source for the challenged News Reports, Scholl's email box was searched for responsive documents at the outset of discovery. And his involvement was confirmed through emails produced to Plaintiff, which show that he began working with Jacob Soboroff and Julia Ainsley early in the afternoon

---

[6] Plaintiff asks Defendant to search the Standards Distribution List email for responsive emails in this action. But because this Distribution List simply routes emails to all members of the Standards team, it is not a searchable inbox. In addition, the Distribution List is dynamic—individuals can be added and removed from it. Accordingly, it is not possible for Defendant to isolate the precise individuals who were on the Distribution List in September 2020.

10

on September 15, 2020 and continued to work with them for hours until he felt comfortable with the Article and it was published. *See* NBCU003427 (email from Scholl to Soboroff dated September 15, 2020 at 1:09 pm). While, at one point, Scholl indicated that he was going to be stepping away from his computer for the night and intended to pass off the review of the Article to Mary Lockhart (another member of the Standards team), emails revealed and Scholl testified that this never actually happened. *See* Scholl Tr. at 83:6-9 ("My guess is I simply made the call, after I tried to push it off my plate, to stay involved."). Nonetheless, Defendant searched for documents from Lockhart's email box as well.

In addition to Scholl, discovery revealed that Steve Thode, another member of the Standards team, reviewed some of the challenged News Reports. Once this became clear, Defendant searched for emails from Thode. Other than Scholl and Thode, there is no evidence that any other member of the Standards team had any responsibility for the challenged News Reports or the NBC News Article; nor did they review the News Reports.[7] Indeed, when Plaintiff's counsel specifically asked Scholl about other members of the Standards team, he repeatedly testified that, to the best of his recollection, they were not involved "in the review or discussions regarding Irwin County Detention Center stories." *See* Scholl Tr. at 22:3-24 (testifying that Marian Porges, Susan Sullivan, and Robin Gradison had no involvement in Irwin County Detention Center stories that he could recall).

In his Motion, Plaintiff references emails that directed MSNBC producers to send scripts about the whistleblower complaint to Jason Cumming. *See* Mot. at 11. What Plaintiff neglects to mention, however, is that the first of these emails was not sent until late in the evening on

---

[7] Plaintiff claims that there is a member of the Standards team included on Defendant's privilege log whose emails were not preserved or searched. *See* Mot. at 11. It is unclear who Plaintiff is referring to here. The only members of Standards who appear on the privilege log are Chris Scholl and Steve Thode.

11

September 15, 2020—*after* the September 15, 2020 episodes of "Deadline: White House," "All In," and "The Rachel Maddow Show" had already aired—and directed scripts to be sent to Cumming beginning at 2:00 am.  And Cumming clearly was not responsible for reviewing the September 16 and 17, 2020 "All In" scripts.  Documents produced in discovery and entries on Defendant's privilege log make clear that it was Chris Scholl who did so.  *See, e.g.*, NBCU000689 (email sending September 16 "All In" script to Scholl).  Thus, the fact that Cumming may have been reviewing scripts for unchallenged news reports on other MSNBC programs is inapposite.

Said differently, during the August 31 conference, this Court analogized the scope of discovery to "spokes" and "hubs."  *See* Pl. Ex. 2 at 41:18-42:7.  While the Court explained that it would be proper to seek discovery from "hubs"—*i.e.*, individuals who touched the challenged news reports—because their state of mind may be relevant to actual malice, the Court explained that discovery should not be sought from "spokes"—*i.e.*, Defendant's employees who operated distinctly from the challenged News Reports.  Under the Court's analogy, Chris Scholl and Steve Thode—the two Standards employees who actually reviewed the challenged News Reports or the NBC News Article—are the only two employees from Standards who can be considered "hubs."  And, after the August 31 conference, Defendant offered to search for and produce communications between them (or Mary Lockhart) and the employees for other, unchallenged MSNBC programs that occurred between September 15 and 17, 2020—an offer that Plaintiff rejected.

All of the other individuals in Standards who did not work on the challenged News Reports or the NBC News Article (but may have reviewed other reporting from other MSNBC shows) are "spokes."  For example, if hypothetically Jason Cumming reviewed a script from "The Beat with Ari Melber" and obtained information that called into question the veracity of the allegations made therein, this would be irrelevant to actual malice under *Sullivan* because Cumming's knowledge

12

would not have been transferred to any of the individuals responsible for the challenged News Reports. This is analogous to the contradictory news articles in the *Times* files that were irrelevant to actual malice in *Sullivan*. The fact that Cumming is a member of the Standards team does not change this conclusion. Similarly, any independent reporting that Melber's show may have conducted concerning the whistleblower complaint is unrelated to the reporting done for the challenged News Reports. And to the extent there is overlap in the reporting because multiple shows relied upon the NBC News Article, documents showing the newsgathering for that Article have already been produced.

In a last-ditch effort to lay the foundation for his broad-reaching discovery requests, Plaintiff asserts that "Standards and others expressed concerns regarding Dr. Amin and ICDC stories." Mot. at 7. But "Standards" as a whole did not express "concerns regarding Dr. Amin and ICDC stories." To the contrary, at 1:24 pm on September 15, 2020, *Chris Scholl* sent an email in which he expressed a "concern" about reporting on an interview Jacob Soboroff conducted with the whistleblower without doing further independent reporting. Rich Greenberg and Betsy Korona (both of whose email boxes were also searched) said that they shared this concern. Even before Scholl's email, and over the course of the next four hours, Soboroff and Julia Ainsley conducted the independent reporting that Scholl suggested—they spoke with four lawyers who had clients at the Irwin County Detention Center who had been treated by Plaintiff and who provided corroboration for certain allegations in the whistleblower complaint. In addition, Soboroff and Ainsley located a 2013 Department of Justice complaint that was filed against Plaintiff, which accused him of billing Medicare and Medicaid for unnecessary gynecological procedures. This complaint was ultimately settled for $500,000 by the hospital that Plaintiff's company managed. And Soboroff and Ainsley contacted Plaintiff's medical office for comment, as well as

Immigration and Customs Enforcement, and the private company that ran the Irwin County Detention Center. Given this additional reporting, Scholl testified that he was "entirely comfortable" with the story at the time it was published. *See* Scholl Tr. at 41:12-20; *see also id.* at 58:17-19 ("I was absolutely comfortable with the reporting of the story as it ran and was published."); 174:10-14 ("The reporting we did was absolutely solid . . . and, in fact, when I look at this stuff, I really look at this and say, 'This is an exact example of the way journalism should work.'"). And emails demonstrate that before the Article was published, Korona similarly believed that they had a "much fuller picture" on the story. *See* NBCU002600. Thus, to the extent that any "concern" existed, it was completely addressed by the time the NBC News Article was published—*before* all of the challenged News Reports. And even if this "concern" could lay the foundation for further discovery requests, the only relevant individuals—Scholl, Greenberg, and Korona—already had their emails searched.

At bottom, Defendant has already produced or agreed to produce the only documents that could be relevant to actual malice in this case under the standard set in *Sullivan*. Plaintiff's expansive remaining discovery requests should thus be denied.

### b. Documents After The Date Of The Challenged News Reports Are Not Relevant To The Actual Malice Inquiry

In his Motion, Plaintiff also claims that Defendant should be required to search for and produce documents from the thirty-four-plus custodians through the present date because it is theoretically possible that there is an email from someone at some point in which they state that they "never believed there were mass hysterectomies," which would be relevant to their state of mind at the time of the challenged News Reports. *See* Mot. at 12. But Plaintiff has not laid a foundation that any such information exists; this is rank speculation.

The best that Plaintiff can muster is that it is possible that after the United States Senate

released an investigative report about Irwin County Detention Center in November 2022—which found that between 2017 and 2020 Plaintiff conducted two hysterectomies (more than any other gynecologist for ICE detainees), referred two other women for hysterectomies, appeared to subject female detainees to "excessive, invasive, and often unnecessary gynecological procedures," personally performed "more than 90% of particular OB-GYN procedures when compared to the entire ICE detention network across the United States" even though Irwin County Detention Center "housed just 4% of the female population," and "accounted for almost one-third . . . of the total procedures performed by OB-GYN providers on ICE detainees"—Chris Scholl could have stated, "this is why I had concerns." Mot. at 13. But Scholl testified that he was not even aware that this Senate report was published. *See* Scholl Tr. at 169:20-24 ("Q: Were you aware that the report that came out of those hearing said that . . . Congress was unable to substantiate the claims of mass or large numbers of hysterectomies?  A: I'm not aware of it."). And other of Defendant's reporters who indicated that they *were* aware of the Senate report testified that it did not cause them to doubt the September 2020 news reports. *See* Hayes Tr. at 76:6-16 ("And the general feeling that I had gotten from our reporting the first time around was that this was a story not specifically about hysterectomies but invasive or unnecessary or unconsented to procedures being done on women, procedures, broadly, without their full informed consent.  The report did not definitively knock down that concern, given the data that's reflected . . . ."); Price Tr. at 195:5-21 (Q: My question was: The Senate report that has since come out that said it couldn't substantiate the allegations regarding the number of hysterectomies also did not lead you to believe that [the whistleblower complaint] was less credible; is that right?  A: In 2020?  Q: Right now.  A: "Oh, right now? Again, no.  Because if they – if they found that . . . these hysterectomies had not happened, then they would have said that.  They said they could not substantiate.").

Given that there is no foundation for Plaintiff's request, the burden and expense of searching through dozens of email boxes for any email from the last three years that might reflect on the custodian's state of mind in September 2020—a process that Defendant estimates would take at least one month—is entirely unwarranted. Indeed, even this Court recognized as much, noting in the August 31 conference, in the context of draft scripts that post-dated the news reports:

> I have a very difficult time envisioning how any draft script that was generated or considered after the broadcast[s] . . . would bear on either truth or falsity or actual malice, and to the extent that they would at all, for example maybe a draft script that would sort of cast some historical documentation, I find that value would be nominal, if any, to demonstrating either of those facts, and at this point, I wouldn't find those after-report scripts would be discoverable because I don't see any likelihood of that production leading to discoverable information.

Pl. Ex. 2 at 30:14-31:2. The Court's initial inclination was correct. Defendant should not be required to conduct this extensive search for documents that, if they even exist (a highly unlikely proposition), could have "nominal" value at best.

## II.     Plaintiff Cannot Rely On Twitter Posts To Justify His Document Requests

In his Motion, Plaintiff also attempts to rely on unidentified Twitter postings as a foundation for his broad document requests. *See* Mot. at 8. But this is improper for two reasons.

*First*, this case is not—and has never been—about Tweets. This was abundantly clear in the Initial Complaint and remained clear in the FAC, which states in the very first paragraph: "This Complaint arises from a series of *MSNBC broadcast segments* that contain multiple false and defamatory statements of and concerning a private figure, Dr. Mahendra Amin, M.D. . . . " *See* FAC ¶ 1 (emphasis added). The FAC goes on to define the "broadcasts" as the five challenged News Reports, *see id.* ¶ 2, and refers to these "broadcasts" countless times throughout the pleading. While there is one paragraph mentioning Twitter posts, *see* FAC ¶ 89 ("MSNBC and its reporters repeated their false and defamatory statements of and concerning Dr. Amin on Twitter on at least

16

three occasions on September 16, 2020 and September 22, 2020."), Plaintiff does not actually identify these Twitter posts, the statements supposedly repeated, or explain on whose accounts they appear. And, in fact, there are Twitter accounts for MSNBC generally and each of its programs, and its reporters also have personal Twitter accounts that are not run by Defendant.

In addition, discovery in this case has been focused on the News Reports, not Tweets. While Plaintiff's counsel insists that she asked Chris Hayes about Tweets during his deposition, Mot. at 8, Plaintiff's counsel asked him about two Twitter posts and a Facebook post from the "All In" accounts, which were dated September 17 and September 21, 2020.  It thus appears that these are not even the posts vaguely referenced in the FAC.  And while Plaintiff notes that Chris Hayes testified that "he had reviewed Twitter posts as part of his preparation for his deposition," *id.*, he did not specify what those Twitter posts were or whether they were even associated with an MSNBC account.  He merely stated that they "were tweets that were in the discovery." *See* Hayes Tr. at 240:21-241:1.  The fact that Hayes reviewed some unidentified Tweets as part of his preparation for a deposition does not in any way evidence Plaintiff's "prosecution" of claims stemming from Tweets.

*Second*, to the extent Plaintiff uses these supposed Twitter posts as a reason to obtain additional emails from Standards, Chris Scholl testified that Standards does not even review Tweets.  *See* Scholl Tr. at 258:1-3 ("People tweet on their own.  Some shows tweet.  We don't look at tweets."); 258:7-8 ("Q: Okay.  I'm referring to – there were some tweets from MSNBC and some tweets from particular shows, as I recall.  A: Yeah, we don't – we don't review those as a matter of course.").  Thus, there is no nexus between anyone from Standards and the unspecified Twitter posts that have never been a real basis for Plaintiff's claims.

### III. Plaintiff Should Not Be Awarded Attorneys' Fees

Finally, Plaintiff claims that Federal Rule of Civil Procedure 37(a)(5)(A) entitles him to fees for bringing this Motion. But, even if the Court grants Plaintiff's Motion—and it should not—awarding fees would be unjust. Defendant attempted, in good faith, to compromise with Plaintiff by offering to produce any communications about scripts or draft scripts between the only three Standards employees that in any way touched the challenged News Reports or the NBC News Article—Chris Scholl, Steve Thode, and Mary Lockhart—and other MSNBC programs that pre-dated the challenged News Reports. This aligned with the Court's "spoke" and "hub" analysis presented at the August 31 conference. Plaintiff rejected this request and instead demanded that Defendant run searches across eleven additional individuals with no demonstrated relevance to this action. Defendant should not be punished for following the Court's August 31 instruction by refusing to turn over documents that the Court appeared to indicate were not subject to discovery.

### CONCLUSION

For the foregoing reasons, Defendant respectfully requests that the Court deny Plaintiff's Motion to Compel.

Dated: September 29, 2023

*/s/ Elizabeth A. McNamara*
Elizabeth A. McNamara
(admitted *pro hac vice*)
Amanda B. Levine
(admitted *pro hac vice*)
Leena Charlton
(admitted *pro hac vice*)
DAVIS WRIGHT TREMAINE LLP
1251 Avenue of the Americas, 21st Floor
New York, NY 10020-1104
Tel: (212) 489-8230
lizmcnamara@dwt.com
amandalevine@dwt.com
leenacharlton@dwt.com

Cynthia L. Counts
Georgia Bar No. 190280
FISHERBROYLES, LLP
945 East Paces Ferry Rd. NE, Suite 2000
Atlanta, GA 30326
(404) 550-6233
cynthia.counts@fisherbroyles.com

*Attorneys for Defendant*