**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
WAYCROSS DIVISION**

| | |
|---|---|
| DR. MAHENDRA AMIN, M.D., | |
| Plaintiff, | CIVIL ACTION NO.: 5:21-CV-00056-LGW-BWC |
| v. | |
| NBCUNIVERSAL MEDIA, LLC, | |
| Defendant. | |

**PLAINTIFF'S RESPONSE TO MOTION FOR PROTECTIVE ORDER
QUASHING THE DEPOSITION OF CYNTHIA COUNTS**

Plaintiff Dr. Mahendra Amin, M.D. ("Plaintiff" or "Dr. Amin"), through undersigned counsel, herein responds to the Motion for a Protective Order Quashing the Deposition of Cynthia Counts (ECF No. 112, "Mot. to Quash"), respectfully showing the Court as follows:

**INTRODUCTION**

The July 27, 2023 deposition of Yanira Oldaker was going poorly for NBCU. Before lunch, Ms. Oldaker's testimony revealed several weaknesses in NBCU's defense of this defamation action, including that the "mass hysterectomies" and "the uterus collector" statements made about him were false, revealing how much detainees' claims about Dr. Amin are capable of influence from counsel and the media. Essentially, any basis for NBCU to claim truth to its various on-air defamatory statements was unraveling. Then, following a one-hour lunch break, Ms. Oldaker's testimony regarding several critical factual issues dramatically changed. Dr. Amin is entitled to know how and why and what it means for the credibility of witnesses, the behavior of opposing counsel moving forward, and the trial of this case.

1

During the lunch break, Ms. Oldaker and her attorneys sat down at a table in a nearby restaurant. Ms. Cynthia Counts, counsel for Defendant NBCU, joined them. During this sit-down, Ms. Counts identified certain topics about which she intended to ask Ms. Oldaker. They went over "paperwork." It was also suggested to Ms. Oldaker that perhaps she had not remembered "all of her interactions with Dr. Amin[.]" While Ms. Oldaker's attorneys may have provided some on-the-record insight into the improper conversation, Ms. Counts did not. By bringing this motion, Ms. Counts continues her obfuscation.

Ms. Counts made herself a fact witness by sitting down with Ms. Oldaker and her attorneys during a lunch break to discuss Dr. Amin, provide them a sneak-peek of her questioning, and in the process, attempting to influence certain contradicting testimony from Ms. Oldaker on several crucial factual issues. As a result, Ms. Counts should be required to give sworn answers regarding her conduct. To be clear, Dr. Amin does not seek Ms. Counts's deposition upon oral examination. Rather, Dr. Amin simply asks that Ms. Counts answer ten *written* questions under oath about her lunch-time interference. Ms. Counts's refusal to do so is telling, particularly considering that she attaches a (non-responsive to Dr. Amin's concerns) sworn declaration to her motion. The issue at hand concerns more than the violation of a local rule of the district in which the deposition was taken (a violation which cannot be credibly denied): it raises questions concerning the source of the allegations against Dr. Amin, a party's coordination with a non-party witness, and the credibility of that and similar witnesses moving forward.

Requiring Ms. Counts to provide written answers to narrowly tailored questions regarding a conversation she had with a witness she was deposing within minutes does not implicate larger questions regarding depositions of opposing counsel. The Court should deny Ms. Counts's motion

because no protective order is warranted given Dr. Amin's good faith concessions and the narrow scope of his written questions..

## FACTUAL BACKGROUND

The Court is well aware of Dr. Amin's defamation allegations. But as a brief summary, NBCU stated on air that Dr. Amin performed "mass hysterectomies" on ICE detainees; that Dr. Amin is referred to as the "uterus collector[;]" and that he was "doing very unnecessary procedures" including "unauthorized hysterectomies." (ECF No. 49, FAC ¶¶ 79, 82; ECF No. 24-1, Statement Nos. 6, 9, and 10). Several other similar on-air statements about Dr. Amin survived Rule 12(c) dismissal and are thus the subject of discovery. (ECF No. 59 at 66-67). Ms. Oldaker was one of Dr. Amin's ICDC immigrant detainee patients, and NBCU identified Ms. Oldaker in its Rule 26(a) initial disclosures. Below, Dr. Amin summarizes testimony from Ms. Oldaker's deposition ("Oldaker Tr.") relevant to this motion and the need for Ms. Counts's sworn written answers.

### A.   Ms. Oldaker's Morning Testimony (9:42 a.m. – 12:04 p.m.) and Changes in Testimony

Ms. Oldaker was represented at her deposition by two attorneys: Ms. Elora Mukherjee and Ms. Fatma Marouf. (Oldaker Tr. 2:18-24). Ms. Oldaker testified that none of the three women brought to Dr. Amin's office with her complained that Dr. Amin acted inappropriately. (*Id.* 24:7-10). Ms. Oldaker did not speak with any other women detained at ICDC about having hysterectomies performed on them, and she only overheard one story of one woman who declined to have a hysterectomy performed (as was that patient's right). (*Id.* 28:20-29:18). Ms. Oldaker never referred to Dr. Amin the "uterus collector" and never heard anyone else at ICDC describe him that way. (*Id.* 30:7-17). Ms. Oldaker never heard anyone mention that Dr. Amin removed anyone's wrong ovary. (*Id.* 31:4-9). Ms. Oldaker only heard of the Project South Letter (ECF No.

3

18-1) through "rumors," "gossip," and seeing it on the news. (*Id.* 37:19-38:8). She does not know Dawn Wooten (the "whistleblower" behind the Project South Letter) or remember having conversations with her. (*Id.* 20:3-13).

With respect to her own medical visits, Ms. Oldaker testified that she was not handcuffed and that there was a female nurse in the examination room standing behind Dr. Amin and taking notes. (*Id.* 40:16-41:23; 50:4-7). Ms. Oldaker testified she was not given time to ask questions, but that she did not really have any more questions for him or the nursing staff; and that she was not prevented from asking questions. (*Id.* 42:12-43:2). Ms. Oldaker never described Dr. Amin as treating her inhumanely. (*Id.* 47:2-4; 47:19-23). At her second visit, a female nurse was also present during her pap smear. (*Id.* 50:8-21). She testified that she did not tell Dr. Amin "no" or otherwise ask him to stop the transvaginal ultrasound during her first visit, and she did not tell Dr. Amin to stop the pap smear during her second visit. (*Id.* 63:15-22).

During a morning break, Ms. Oldaker's attorneys encouraged her to change a part of her testimony – "the part where I told him no…Just for me to think about and then just really try to remember what happened and – try to remember everything that I said." (*Id.* 94:8-16). Then, Ms. Oldaker testified that she did indeed tell Dr. Amin "no" during the transvaginal ultrasound. (*Id.* 96:17-97:8).[1]

### B.    Lunch Break and Ms. Oldaker's Afternoon Changes in Testimony

After the lunch break, which lasted for one hour and seven minutes (*id.* 110:1-110:6), Dr. Amin's counsel asked about what occurred during the lunch sit-down attended by Ms. Oldaker, her two attorneys, and Ms. Counts. Ms. Oldaker testified that Ms. Mukherjee allowed Ms. Counts

---

[1] While Ms. Counts was not present during this pre-lunch break during which Ms. Mukherjee steered her client to change her testimony, the event establishes the pattern, continued during lunch at which Ms. Counts gladly participated in, to attempt to coerce Ms. Oldaker to change her testimony to say harsher things about Dr. Amin.

to eat lunch with Ms. Oldaker and Ms. Mukherjee. (*Id*. 114:4-15). At that lunch, Ms. Oldaker testified that the participants discussed "[w]omen issues" and "this situation [Ms. Oldaker] find[s] [her]self in," and admitted that Dr. Amin's "name came up."  (*Id*. 114:16-115:2). She further testified that her counsel and Ms. Counts reviewed "paperwork" together in front of Ms. Oldaker. (*Id*. 115:12-13). Ms. Oldaker mentioned that they discussed "this one person" but did not know who that person was. (*Id.* 115:14-24). When asked whether Ms. Counts spoke about Ms. Oldaker's upcoming testimony, Ms. Oldaker testified, "She might have mentioned a thing or two."  (*Id*. 116:3-8).

When asked whether Ms. Counts had told her "she was going to ask you about your prior Pap smears," Ms. Oldaker admitted the question was previewed: "Yes, I believe so."  (*Id*. 220:4-7). When asked, "did Ms. Counts tell you that she was going to ask you about your prior transvaginal ultrasounds," Ms. Counts interjected with a speaking objection that directly addressed the witness and instructed the witness how to answer: "Objection. To the extent that you recall specifically me saying such a thing, [sic] but you shouldn't speculate or allow her to influence you." (*Id*. 220:8-14). Right after this speaking objection, Ms. Oldaker suddenly began testifying that she could not remember what Ms. Counts told her during lunch about transvaginal ultrasounds and other topics into which Dr. Amin's counsel attempted to inquire. (*Id.* 221:11-16; 223:1-15).

In addition to Ms. Oldaker's changed testimony from answering "no" to the question, "[d]id you tell [Dr. Amin] no [during the transvaginal ultrasound]," to "yes" to the same question (*compare id*. 63:8-16, *with id*. 96:6-19), Ms. Oldaker's testimony changed in other ways. For example, Ms. Oldaker's testimony changed as to having spoken to Congress, going from multiple "no" answers, to, "I'm sorry, but yeah, I did.  I spoke to the Congress." (*Compare id*. 32:4-24, *with* 227:20-22).  After lunch, Ms. Oldaker testified in greater detail about alleged harsh treatment that

she did not recall earlier. This included testimony about being treated inhumanely which directly contradicted her morning testimony. (*Compare id.* 47:2-4, 47:19-23 *with* 171:1-12). Furthermore, Ms. Oldaker's testimony changed from over-hearing about only one hysterectomy to personally hearing others complain about hysterectomies. (*Compare id.* 28:20-29:18 *with* 195:2-9). Ms. Counts's violation of common-sense deposition conduct from counsel, in conjunction with direct contradictions and shifts in testimony, merited additional investigation.[2]

### C.   Ms. Counts Refuses to Share the Contents of Her Conversation with a Deponent

Ms. Mukherjee admitted to violating District of South Carolina Local Rule 30.04(E) through her own conversations with Ms. Oldaker. She stated on the record: "And I apologize. I was not familiar with that local rule." (*Id*. 118:14-15). Ms. Mukherjee stated that she had discussed "three subjects" regarding Ms. Oldaker's testimony with Ms. Oldaker during the breaks, including:

> And then the third issue was just asking Ms. Oldaker to please remember all—all of her interactions with Dr. Amin and to testify truthfully about them and to testify fully about them.

> We did not tell her what to say, but we did remind her that, even though it's really difficult for her to remember all of her interactions with Dr. Amin, especially as a survivor of extreme trauma, it's important for her to testify truthfully and accurately today.

(*Id*. 118:10-12, 120:1-11). Essentially, Ms. Oldaker was coached to testify more negatively about Dr. Amin.

---

[2] While counsel for Dr. Amin will attempt to refrain from responding to every broadside in Ms. Counts's brief, one particular contention warrants correction. The record demonstrates that, as *part of an objection*, Dr. Amin's counsel stated, "That's also just blatantly a lie," to the answer "no" to the question from Ms. Counts, "Did we discuss at lunch anything about what you had been asked prior?" (Oldaker Tr. 228:24-229:6).  As discussed above, Ms. Oldaker had testified that the lunch participants, including Ms. Counts, discussed "[w]omen issues" and "this situation [Ms. Oldaker] find[s] [her]self in," and Dr. Amin's "name came up;" accordingly, the answer "no" was clearly contradicted by Ms. Oldaker's prior testimony.  (*Id*. 114:16-115:2).

While Ms. Mukherjee perhaps provided some explanation of what occurred during at least some of her conversations with Ms. Oldaker during breaks in the deposition, Ms. Counts took a different route: stonewalling. Ms. Counts made clear on the record that her interests were aligned with Ms. Mukherjee's admonitions to her own client, stating in response to the question of whether her client is NBCU or Ms. Oldaker: "[w]ell, we have a substantial truth defense, and so, to some extent, there are times when I would say that I am going to be careful to make sure that is record is reflecting the truth[.]" (*Id.* 120:22-121:1). Despite protesting twice that she knew the rules, had practiced for a long time in the jurisdiction, and "did not violate the rules," *id*. 121:6-9, 221:1-3, Ms. Counts finally conceded that she did not know the local rule at issue: "[w]ell, then I wish you-all would have told me I shouldn't be sitting with her because I certainly wouldn't have known that that was considered improper to talk and have a friendly—" (*Id*. 230:21-25).

### D.      Dr. Amin's Willingness to Receive a Written Declaration from Ms. Counts

Following Ms. Oldaker's deposition, counsel for Dr. Amin negotiated extensively and in good faith to first obtain Ms. Counts's deposition testimony, but then, in an effort to compromise, offered to accept a simple declaration responding to ten narrowly tailored questions concerning the lunchtime conversation.

The email negotiations between Ms. Counts and Dr. Amin's counsel started on August 16 and 24, 2023 (ECF No. 112-4) and continued for several weeks. In an October 20, 2023 email, Ms. Counts attempted to equivocate that her actions of going through paperwork, discussing Dr. Amin, and previewing questions and topics with Ms. Oldaker and her attorneys somehow did not violate District of South Carolina Local Rule 30.04(E). (ECF No. 112-11 at 2-3). Ms. Counts claimed that a lunch in a public restaurant somehow does not constitute an "off the record" conference during a break. (*Id.*). Ignoring her efforts during the deposition to coach Ms. Oldaker and lodge speaking

objections, Ms. Counts then claimed that Dr. Amin availed himself of all means of obtaining the information sought by questioning Ms. Oldaker (*Id.*). On October 24, 2023, counsel for Dr. Amin reiterated her offer to have Ms. Counts submit a written declaration in lieu of oral examination. (*Id.* at 1).

After these conferrals, Ms. Counts took a leave of absence from her law firm for unspecified personal reasons and Dr. Amin's counsel was directed to confer with the general counsel of Ms. Counts' law firm, Jill Gulden. (*See* Declaration of Stacey G. Evans ("Evans Decl."), ¶ 4, Ex. A at 6).  Dr. Amin's counsel did so, but despite offering the option of answering written questions by declaration, and even reducing the number of questions, Ms. Counts and her then-counsel did not agree to provide a declaration, and never offered any alternative discovery options. (*Id.* ¶ 5; *see also* ECF No. 112-11).

After Ms. Counts returned from her leave of absence, on November 27, 2023, counsel for Dr. Amin wrote to Ms. Guldin:

> I continue to offer the option of a declaration answering the below questions (and I also continue to offer to leave off #11 in the interest of a compromise).  So far that offer has been rejected, despite the Court telling us that he encouraged us to work together on alternative discovery and specifically suggested written interrogatories.
>
> 1. During lunch on July 27, 2023, did Ms. Counts or Ms. Mukherjee discuss any questions Ms. Counts was planning to ask Ms. Oldaker?
>
> 2. During lunch on July 27, 2023, did Ms. Counts or Ms. Mukherjee say that Ms. Counts would ask Ms. Oldaker about prior pap smears with other doctors?
>
> 3. During lunch on July 27, 2023, did Ms. Counts or Ms. Mukherjee say that Ms. Counts would ask Ms. Oldaker about prior transvaginal ultrasounds with other doctors?
>
> 4. During lunch on July 27, 2023, did Ms. Counts or Ms. Mukherjee say that Ms. Counts would ask Ms. Oldaker about literature or pamphlets available at other doctors' offices she had visited?

5. During lunch on July 27, 2023, did Ms. Counts or Ms. Mukherjee say that Ms. Counts would ask Ms. Oldaker whether other doctors had given her pamphlets during her visits?

6. During lunch on July 27, 2023, did Ms. Counts or Ms. Mukherjee show Ms. Oldaker any medical records?

7. During lunch on July 27, 2023, did Ms. Counts or Ms. Mukherjee say that Ms. Counts was going to ask Ms. Oldaker about a sonogram picture?

8. During lunch on July 27, 2023, did Ms. Counts or Ms. Mukherjee suggest that Ms. Oldaker should have, must have, or maybe did hear more information about women at ICDC having hysterectomies than Ms. Oldaker shared in response to Dr. Amin's counsel's questioning?

9. During lunch on July 27, 2023, did Ms. Counts or Ms. Mukherjee suggest to Ms. Oldaker what her answers to any questions should be, and if so, what?

10. During lunch on July 27, 2023, did Ms. Counts or Ms. Mukherjee state how they would answer any questions if they were Ms. Oldaker, and if so, what?

11. What was said during lunch on July 27, 2023 (inclusive of all present)?

(ECF No. 112-12 at 3-4). As such, Dr. Amin made an extremely reasonable good faith modification of the subpoena, which originally sought Ms. Counts's deposition upon oral examination. (ECF No. 112-5). Nevertheless, Ms. Counts again rejected the offer and offered no alternatives. (ECF No. 112-13 at 3).

## MOTION STANDARDS

Ms. Counts bears a significant burden for quashing or obtaining a protective order against Dr. Amin's written questions. First, Rule 45(d)(1) requires parties "take reasonable steps to avoid imposing an undue burden or expense on a person subject to the subpoena." Fed. R. Civ. P. 45(d)(1). To determine whether a subpoena creates an undue burden, a court "balance[s] the interests served by demanding compliance with the subpoena against the interests furthered by quashing it." *Jordan v. Comm'r, Miss. Dep't of Corr.*, 947 F.3d 1322, 1337 (11th Cir. 2020)

(quoting 9A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2463.1 (3d ed. 2019)). Several factors have been identified as pertinent to the analysis, including the "relevance of the information requested" to the underlying litigation and the "burden [that would be] imposed" by producing it. *Jordan*, 947 F. 3d at 1337 (quoting *Wiwa v. Royal Dutch Petroleum Co.*, 392 F.3d 812, 818 (5th Cir. 2004)). "The party seeking to quash a subpoena bears the burden of establishing at least one of the requirements articulated under Rule 45(d)(3)."[3] *Malibu Media, LLC v. Doe*, No. 8:14-CV-2351-T-36AEP, 2015 WL 574274, at *3 (M.D. Fla. Feb. 11, 2015). Rule 45 discovery must be analyzed in conjunction with the scope of discovery set forth in Rule 26, *Castleberry v. Camden Cnty.*, 331 F.R.D. 559, 562 (S.D. Ga. 2019), which provides:

> Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within this scope of discovery need not be admissible in evidence to be discoverable.

Fed. R. Civ. P. 26(b)(1). Relevance in discovery "has been construed broadly to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case." *Akridge v. Alfa Mut. Ins. Co.*, 1 F.4th 1271, 1276 (11th Cir. 2021) (quotation marks omitted). Information "need not be admissible in evidence to be discoverable," as a civil litigant is generally entitled to "any information sought if it appears reasonably calculated to lead to the discovery of admissible evidence." *Id.* (quoting *Degen v. United States*, 517 U.S. 820, 825–26 (1996)).

---

[3] Ms. Counts's motion only invokes the "undue burden" component of Rule 45(d)(3)(A). (Mot. to Quash at 9).

Second, and similarly, the burden of demonstrating good cause for a Rule 26(c)(1) protective order "is on the movant to show the necessity of the protective order, and the movant must meet this burden with a 'particular and specific demonstration of fact as distinguished from stereotyped and conclusory statements.'" *Ekokotu v. Fed. Express Corp.*, 408 F. App'x 331, 336 (11th Cir. 2011) (quoting *United States v. Garrett*, 571 F.2d 1323, 1326 n.3 (5th Cir. 1978)). "Protective orders prohibiting depositions ... are rarely granted." *Baratta v. Homeland Housewares, LLC*, 242 F.R.D. 641, 642 (S.D. Fla. 2007); *see also Dunford v. Rolly Marine Service Co.*, 233 F.R.D. 635, 637 (S.D. Fla. 2005) ("The burden of showing good cause to preclude a deposition altogether is a heavy one. That is why protective orders prohibiting depositions are rarely granted.") (internal citations omitted).

<strong>ARGUMENT</strong>

Ms. Counts made herself a fact witness by coordinating with a key witness and her attorneys during a deposition lunch break. By limiting his discovery request to a written declaration answering ten narrowly tailored questions, Dr. Amin[4] has already taken reasonable steps to avoid imposing any undue burden on Ms. Counts. Fed. R. Civ. P. 45(d)(1). Nor does Dr. Amin's request for a written declaration cause annoyance, embarrassment, or expense. Fed. R. Civ. P. 26(c)(1). As such, the Court should deny Ms. Counts's motion to quash.

## I.   MS. COUNTS CANNOT DEMONSTRATE AN UNDUE BURDEN OR PARTICULAR AND SPECIFIC NEED FOR A PROTECTIVE ORDER.

---

[4] Dr. Amin and his undersigned counsel take issue with Ms. Counts's frequent references only to "Ms. Evans" in the argument section of her motion. (*See* Mot. to Quash at 10 ("Ms. Evans seeks to depose…Ms. Evans cannot show that her need to depose…"; *id.* at 12 ("…Ms. Evans already has enough information…Ms. Evans Cannot Meet the High Standard[;]" *id.* at 14 ("…the information that Ms. Evans seeks…")). Although Ms. Counts's motion is brought personally, the decision to personalize this dispute as a fight against Ms. Evans minimizes the importance of the case to Dr. Amin's reputation, and it constitutes a poor attempt to disguise Ms. Counts's improper actions as a mere scuffle between lawyers. To the contrary, Ms. Counts's lunchtime interference is much more serious.

While Ms. Counts focuses her argument on the factors set forth in *Shelton v. Am. Motors Corp.*, 805 F.2d 1323 (8th Cir. 1987), she ignores her burden and makes no attempt to argue that Dr. Amin's ten proposed questions create a burden or annoyance to her. Other than a conclusory recitation of the Federal Rules (Mot. to Quash at 9), Ms. Counts offers no particular fact to show that the written questions constitute an undue burden or cause embarrassment. Indeed, Dr. Amin's offer to serve ten written questions that Ms. Counts can answer by declaration (and not via Rule 31 process) is more than reasonable and is not burdensome.

But even if Ms. Counts had presented a threshold argument that she faces undue burden or embarrassment, it would fail. By offering written questions, Dr. Amin has already reduced any burden to Ms. Counts to virtually none. *See Cruz v. Green*, No. 18-60995-CIV-MOORE/SNOW, 2019 WL 5208902, at *3 (Apr. 15, 2019 S.D. Fla.) ("The Court does not find that the Chief Judge has established that the proposed questions, to be served through counsel for written responses, present the type of intrusion for which Rule 26(c) authorizes the entry of a protective order."); *Lee v. TriCentury Corp.*, 1:08-CV-719, 2010 WL 11531248, at *3 (E.D. Tex. June 9, 2010) (denying motion to quash written question deposition). Indeed, Ms. Counts prepared an affidavit in support of her motion, but not one responsive to Dr. Amin's concerns and efforts to determine the extent of the coordination between Ms. Counts and Ms. Oldaker. (ECF No. 112-1). Because Ms. Counts fails to meet her basic burden of demonstrating undue burden or annoyance from Dr. Amin's written questions, her motion should fail.

## II.   MS. COUNTS IS A FACT WITNESS, BUT DR. AMIN NEVERTHELESS SATISFIES ANY TEST FOR OBTAINING WRITTEN ANSWERS FROM OPPOSING COUNSEL.

The case law on discovery of information from a party's attorney largely concerns oral depositions. "The Federal Rules of Civil Procedure do not prevent the deposition of another party's

12

lawyer, so long as the deposition seeks relevant, non-privileged information." *Gamache v. Hogue*, 595 F. Supp. 3d 1344, 1350 (M.D. Ga. 2022) (quoting *Gaddy v. Terex Corp.*, No. 1:14-cv-1928-WSD, 2015 WL 13545486, at \*2 (N.D. Ga. Oct. 28, 2015)). "A lawyer's profession is not a talisman of privilege, automatically granting attorneys immunity from discovery under the federal rules." *Bank of Am., N.A. v. Ga. Farm Bureau Mut. Ins. Co.*, No. 3:12-CV-155 (CAR), 2014 WL 4851853, at \*2 (M.D. Ga. Sept. 29, 2014)). None of the cases which Ms. Counts cites (Mot. to Quash at 12) involve a factual scenario similar to the one at hand: a party's attorney making herself a fact witness by improperly attempting to coach a deponent prior to questioning or to make substantive changes to her testimony. Under the present circumstances, Ms. Counts is simply a factual participant who, under the broad scope of Rule 26(b)(1), must provide a sworn written statement regarding her intentional interference with a witness.

But even if the Court does not treat Ms. Counts as a mere fact witness, Dr. Amin has established the need for her sworn answers under any applicable test for obtaining discovery from counsel. First, in *Fox v. Pitney Bowes Inc.*, the Northern District of Georgia applied a more flexible Second Circuit test which includes considering "the need to depose the lawyer, the lawyer's role in connection with the matter on which discovery is sought, the risk of encountering privilege and work-product issues, and the extent of discovery already conducted." 1:09-CV-1028-RLV, 2009 WL 10670417, at \*5 (N.D. Ga. Sept. 18, 2009) (quoting *In re Subpoena Issued to Dennis Friedman*, 350 F.3d 65, 72 (2d 2003)).

Here, Ms. Counts's role in coaching and otherwise influencing testimony is clear in the record, and none of Dr. Amin's proposed questions to Ms. Counts seek work product or privileged information. Furthermore, Ms. Counts's lunchtime conversation and the "paperwork" she shared with Ms. Oldaker and her counsel cannot possibly be protected under the attorney-client privilege.

"A communication made for a purpose other than to seek or give legal advice is not privileged, and the mere fact that a lawyer is used to make the non-legal communication does not make it privileged." *In re Blue Shield Antitrust Litig. (MDL No. 2406)*, No. 2:13-CV-20000-RDP, 2015 WL 10891632, at *4 (N.D. Ala. Nov. 4, 2015).

Additionally, the information gathered after the lunch does not stand in place of sworn testimony from Ms. Counts. This is especially true because Ms. Counts directly interfered with Dr. Amin's counsel's ability to obtain testimony about the lunch conversation from Ms. Oldaker. While Ms. Oldaker answered "yes" to one question about whether questions about pap smears were previewed for her during lunch (*id*. 220:4-7), when Dr. Amin's counsel attempted to find out whether other questions were previewed for her, Ms. Counts directly instructed Ms. Oldaker, "[t]o the extent that you recall specifically me saying such a thing, [sic] but you shouldn't speculate or allow her to influence you." (*Id*. 220:8-14). Right after this exchange Ms. Oldaker suddenly testified that she could not remember whether questions were previewed or not—despite the lunch occurring only a short time before. (*Id*. 221:11-16).

Finally, the Second Circuit in *Dennis Friedman* also added that "[t]hese factors may…be especially appropriate to consider in determining whether **interrogatories should be used at least initially and sometimes in lieu of a deposition.**" *Dennis Friedman*, 350 F.3d at 72 (emphasis added). Here, while Dr. Amin is entitled to an oral deposition, he merely requires sworn answers to written questions – a resolution that the Court specifically suggested during the October 20, 2023 status conference.

Dr. Amin's proposed written questions also pass the *Shelton* test, to which Ms. Counts clings. First, only Ms. Counts can provide a complete answer as to what she said to Ms. Oldaker and her attorneys. And to be sure, Ms. Counts cannot deflect by pointing to the information gained

14

from other lunchtime participants. For one, Ms. Oldaker's testimony about the lunch was far from "extensive" as Ms. Counts claims. (Mot. To Quash at 15). Additionally, Ms. Counts directly interfered with that testimony by instructing Ms. Oldaker only to answer questions from Dr. Amin's counsel if she "specifically" recalled Ms. Counts "saying such a thing." (Oldaker Tr. 220: 11-16). Further, there was already a limited amount of time to question the witness per an earlier agreement that allowed the parties to avoid litigating a motion to quash the subpoena to Ms. Oldaker, which her counsel had filed. Make no mistake, Dr. Amin's counsel had to fight for every minute of time with Ms. Oldaker, and Ms. Counts cut into that time with her improper speaking objections and instructions to the witness. And while Ms. Mukherjee provided some on-record statement, only a sworn statement from Ms. Counts will provide a complete account. In essence, only Ms. Counts can provide full detail of her own improper behavior. Unsworn, self-serving statements will not do.

Second, as argued above, there is no legitimate claim to any privilege or work product protection. Completely ignoring the fact that she possesses the exact questions that Dr. Amin intends to ask her, Ms. Counts baselessly asserts that Dr. Amin's counsel may ask for her mental impressions. (Mot. to Quash at 14). The Court should reject Ms. Counts's conclusory work product assertion out of hand.

Third, sworn written answers from Ms. Counts are indeed crucial to this case. Through the extensive discovery taken so far it has become clear that there never were, for example, "mass hysterectomies" or "experimenting with…bodies." Rather, the detainees' counsel concocted a false narrative and NBCU took it and aired it despite their own internal concerns regarding falsity.

The detainees' counsel's ability to influence detainees' sworn testimony was on display during Ms. Oldaker's testimony. (*See* Oldaker Tr. 63:8-16, *compare with* 96:6-19; *see also id*. 32:4-

15

24, *compare with* 227:20-22). Based on what little Dr. Amin's counsel could discover from Ms. Oldaker prior to Ms. Counts' interruptions and instructions, it appears NBCU's counsel has also influenced them. Given that the truth or falsity of what occurred during the medical treatments of detainees relies on testimony from the detainees and Dr. Amin, the credibility of those parties is relevant. Dr. Amin is entitled to be fully prepared to assess and if necessary, impeach, the credibility of any potentially adverse witness.

Further, because there were no "mass hysterectomies," when the detainees' counsel wanted to continue their pursuit to close ICDC and sue over 20 defendants, including Dr. Amin, in a class action lawsuit, they pivoted from making claims about hysterectomies to claiming that Dr. Amin was, for example, "rough" or allegedly did not explain procedures, despite the existence of extensive consent forms. A similar pivot occurred in NBCU's broadcasting—from discussing hysterectomies to changing their language to "procedures," which of course any viewer at that point would hear as "hysterectomies."  Dr. Amin is entitled to develop all evidence that may demonstrate this goal-post moving is the result of his opposing counsel's planning or coordination of testimony with detainees.

Under every legal test, Dr. Amin has demonstrated that he is entitled to obtain sworn written answers from Ms. Counts regarding her improper actions during the lunch break, her role as opposing counsel notwithstanding. *See Loendorf v. PeopleConnect, Inc.*, 21 C 51, 2022 WL 2867174, at *7 (N.D. Ill. July 21, 2022) ("In sum, whether this issue is analyzed under the *Shelton* factors or the Federal Rules of Civil Procedure more generally, Defendant has established that the limited discovery it now seeks—a written deposition of Plaintiff's law firm as to three narrow questions—is warranted.").

III.   **MS. COUNTS'S REMAINING ARGUMENTS PROVIDE NO BASIS FOR QUASHING DR. AMIN'S PROPOSED QUESTIONS OR ENTERING A PROTECTIVE ORDER.**

Ms. Counts's extraneous arguments regarding the *Oldaker* lawsuit, the Southern District of New York ("S.D.N.Y.") order, and the application of District of South Carolina local rule have no bearing on the present motion.

First, Ms. Counts's recitation of the *Oldaker* lawsuit merely reveals NBCU's ill-fated strategy: rely on the *Oldaker* plaintiffs and attempt to shoehorn their broadcasts claiming mass hysterectomies to match allegations in the *Oldaker* litigation. (Mot. to Quash at 2-3).[5] The problem NBCU has faced with every detainee deposition is that the detainees' claims do not match what they put on air for the world to see and hear. In any event, the *Oldaker* lawsuit has no relation to Ms. Counts's improper behavior during Ms. Oldaker's deposition.

Second, the S.D.N.Y. decision has no bearing on Ms. Counts's motion to quash because, with respect to Mr. Mukherjee, the S.D.N.Y. found it particularly important that Ms. Mukherjee "stated on the record what she discussed with her client during breaks and Attorney Evans asked follow-up questions, which Prof. Mukherjee and Prof. Marouf answered." (ECF No. 112-9 at 12). Ms. Counts has not been so accountable. Further, the S.D.N.Y. court did not consider the alternative discovery Dr. Amin had offered. As such, the S.D.N.Y. decision should not be instructive here.

Finally, it is clear from its plain language that Ms. Counts violated District of South Carolina Rule 30.04(E): "[c]ounsel and witnesses shall not engage in private 'off the record' conferences during depositions or during breaks of recesses regarding the substance of the testimony at the deposition[.]" There is no do doubt that Ms. Counts violated this rule, and her

---

[5] Ms. Counts's recitation of the "being raped again" allegation from the *Oldaker* lawsuit is particularly noteworthy. (*Id.*). It appears that Ms. Counts presented the background of the *Oldaker* lawsuit just so she could include that shocking statement in her brief.

equivocation about being in a public restaurant amounts to pure sophistry. While Ms. Counts contends that the rule does not apply in this action, that issue is not yet before the Court. If, upon receiving Ms. Counts's sworn answers, Dr. Amin determines that her behavior likely constitutes sanctionable conduct under the *Federal Rules*, then he will file a motion if it there is a legal basis for one. Until then, it remains that Ms. Counts engaged in improper behavior; that improper behavior is on record, and the extent to which that behavior influenced Ms. Oldaker's testimony is worthy of further discovery through the written questions Dr. Amin has identified. On that basis alone, Dr. Amin is entitled to obtain sworn answers regarding the extent of Ms. Counts's interference with Ms. Oldaker's testimony.

## CONCLUSION

Ms. Counts has failed to meet her burden of demonstrating that Dr. Amin's proposed questions constitute an undue burden or annoyance. Nor can she because Dr. Amin's proposal is eminently reasonable considering Ms. Counts's extensive interference with Ms. Oldaker's testimony. Furthermore, Dr. Amin meets any test for demonstrating the need to obtain Ms. Counts's sworn answers. For these reasons, the Court should deny Ms. Counts's motion and order her to answer the questions posed by Dr. Amin's counsel under oath.

[Signature on following page.]

Respectfully submitted this 12th day of December, 2023.

**STACEY EVANS LAW**

***/s/ Stacey G. Evans***
Stacey G. Evans
Georgia Bar No. 298555
Tiffany Watkins
Georgia Bar No. 228805
John Amble Johnson
Georgia Bar No. 229112
4200 Northside Parkway NW
Building One, Ste 200
Atlanta, Georgia 30327
Telephone: 770-779-9602
Facsimile: 404-393-2828
sevans@staceyevanslaw.com
twatkins@staceyevanslaw.com
ajohnson@staceyevanslaw.com

**CHILIVIS GRUBMAN
DALBEY & WARNER LLP**

Scott R. Grubman
Georgia Bar No. 317011
sgrubman@cglawfirm.com
1834 Independence Square
Atlanta, GA 30338
(404) 233-4171 (phone)
(404) 261-2842 (fax)

*Counsel for Plaintiff*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that a true and correct copy of the foregoing **PLAINTIFF'S RESPONSE TO MOTION FOR PROTECTIVE ORDER QUASHING THE DEPOSITION OF CYNTHIA COUNTS** will be served upon all attorneys in this matter by filing with the Court's CM/ECF system.

This <u>12th</u> day of December 2023.

<u>*/s/ Stacey G. Evans*</u>
Stacey G. Evans

*Counsel for Plaintiff*