# Exhibit L

# Exhibit A



Huseby.com
Exhibit
222

September 19, 2023

## EXPERT REPORT OF ERIN TEETER CAREY, MD, MSCR

My name is Dr. Erin Carey. I have been asked to provide an opinion regarding Dr. Amin's care and treatment of incarcerated women at the Irwin County Detention Center. As set forth below, based on my education, training, research, clinical practice of caring for gynecologic patients, it is my opinion that Dr. Amin had a clear pattern in his medical practice that led with the most aggressive approach, resulting in unnecessary surgeries. Being surgically aggressive in medicine poses significant medical dangers and risks to patients. Surgical interventions should always be carefully considered and weighed against potential benefits. From a review of the medical records, Dr. Amin consistently took the most aggressive approach. Risks of being surgically aggressive compared to medical management or monitoring include: 1) increased risk of complications, 2) longer recovery times, 3) reduced quality of life, 4) negative psychological impact, 5) overuse of resources, 6) ethical concerns and 7) patient dissatisfaction.

To mitigate the dangers of surgical risk, physicians must prioritize evidence-based medicine, engage in shared decision-making with patients, and carefully consider the potential risks and benefits of each intervention. Repeated exposure to surgical risk can result in complications. Less invasive, more conservative approaches often offer similar or better outcomes with a lower risk of complications, injury and hardship to patients; however the records generally do not indicate alternatives were offered by Dr. Amin. Additionally, Drs. Bills and Hamilton emphasize that informed consent was followed as documented in the medical records provided. Informed consent is a process in which a healthcare provider explains the nature, risks, benefits, and alternatives of a proposed medical or surgical intervention to a patient, ensuring the patient comprehends the information. The patient then voluntarily and autonomously decides to either accept or decline the treatment, based on their understanding and free will. Informed consent must be obtained in a patient's primary language to ensure their full understanding of the medical information and their ability to make an informed decision. A signed consent form does not necessarily indicate informed consent was provided. I hold the opinions presented in this report to a reasonable degree of medical and scientific certainty. I reserve the right to supplement this report, if necessary, and I intend to testify in response to the opinions of Plaintiffs' experts that fall within my field of expertise.

### I. Records Reviewed.
Please review the cover letter for the documents I reviewed.

### II. Qualifications.
I am qualified to render an opinion in this case based on my education, training, and experience as a Gynecologist with specialty and subspecialty training in treating patients with chronic pelvic pain, abnormal uterine bleeding, fibroids, sexual pain, pelvic floor dysfunction, endometriosis. I am a physician licensed to practice medicine in North Carolina. I am certified by the American Board of Obstetrics and Gynecology and am fellowship trained in Minimally Invasive Gynecologic Surgery (MIGS) and Pain Medicine. I am also a Fellow of the American Congress of Obstetricians and Gynecologists (FACOG). I have been the Director of Minimally Invasive Gynecologic Surgery (MIGS) at the University of North Carolina-Chapel Hill (UNC) since 2016. I am a tenured Associate Professor of Obstetrics and Gynecology at UNC. I was a faculty member at the University of Kansas Medical Center from 2013-2016. I have been on the Fellowship of Minimally Invasive Gynecologic Surgery (FMIGS) General Board between 2018-2020, Chair of the FMIGS Curriculum Standardization Committee since 2018-2021 and on the Executive FMIGS Board beginning 2021-currently Vice-President. I am also an active member of the FMIGS Curriculum Visionary Task Force and the FMIGS Quality Improvement Committee.

As a full-time subspecialty clinician, my practice includes a range of gynecologic surgery and pain disorders. This includes pelvic diseases such as endometriosis and uterine leiomyoma, as well and genitourinary pain

disorders. I routinely care for incarcerated women who desire medical and surgical intervention for treatment of gynecologic conditions. I have been on the Board of the International Pelvic Pain Society (IPPS) since 2015 and was elected to the Executive Board of IPPS in 2018-I currently hold the Immediate Past-President position. I am a reviewer for many peer-reviewed journals including Obstetrics and Gynecology, the Journal of Minimally Invasive Gynecology and the International Urogynecology Journal. I serve on the Editorial Board of the Journal of Gynecologic Surgery.

In addition to my clinical practice, I am actively involved in clinical translational research in the field of chronic pelvic pain, sexual pain, high tone pelvic floor dysfunction, endometriosis, and racial and ethnic disparities in gynecologic care. I am a co-author on over 60 peer-reviewed publications, many of which concern perioperative interventions and postoperative outcomes, and am Co-Primary Investigator of a multi-million-dollar NIH R01 grant examining peripheral and central nervous system contributors of vulvar pain. I also serve as a clinical consultant on several ongoing multi-million-dollar NIH grants and private grants to reduce disparities in gynecologic care.

In addition to being actively engaged in research and direct clinical care, I am also highly involved in providing medical education. My teaching activities at the University of North Carolina include didactic and clinical education of medical students, residents, and fellows, as well as extensive experience in giving lectures and organizing CME events for national and international medical societies. I have been the fellowship director of our nationally recognized Minimally Invasive Gynecologic Surgery (MIGS) Fellowship at UNC since 2016. The OBGYN department has honored my commitment to resident and fellow education by awarding me several distinguished teaching awards including the Positive Learning Environment Award in 2020 and Excellence in Clinical Care in 2020 and 2021.

I have lectured locally, nationally, and internationally on many subjects in the field of minimally invasive surgery and pelvic pain. I have also been a Principal Investigator for several independent as well as industry sponsored investigational studies in minimally invasive surgery. As such, I am familiar with the standard of care that applies to the care and treatment rendered in this case. Additional information and details regarding my background, experience, and qualifications can be found in the attached CV.

### III.   Opinions

All of the opinions expressed in this report are to a reasonable degree of medical certainty.  In my opinion:

*a. Medical chart selection:* It is unclear how or why Dr. Bills selected the medical records he reviewed. The number does not align with the records provided and reviewed. Dr. Amin saw approximately 250 women from ICDC. Of the patients reviewed, 54 underwent surgical intervention (one patient underwent two D&Cs within 3 months). As an example, Dr. Bill only accounts for 46 D&Cs.

These were two additional patients not reviewed by Dr. Bills include patient M.A. and patient S.N. Patient M.A. was a 48-year-old G2P2002 female with uterine leiomyoma, and anemia who underwent a 'D&C scope' as well as an ovarian cystectomy for an ovarian cyst. She was transfused two units of blood for her anemia and was not provided hormonal suppression to increase her hemoglobin. Patient S.N. was a 40-year-old G2P2 who also had uterine leiomyoma and anemia and underwent 'D&C scope'. She also received a blood transfusion and was not provided hormonal suppression to increase her hemoglobin.

*b. Routinely interpreting normal physiology as pathology:* In the detailed review of the medical records, the pattern of Dr. Amin interpreting normal physiologic changes with pathology is concerning and results in unnecessary surgical interventions. He appears to use his interpretation to justify surgically aggressive behavior. Below are repeated examples of misinterpretation of normal menstrual physiology.

1. <u>Endometrial thickness/thickened endometrium</u>
In pre-menopausal women, a normal endometrial thickness can vary throughout the menstrual cycle due to hormonal changes. However, in the proliferative phase (before ovulation), the endometrial thickness is typically thin, often measuring less than 5 millimeters (mm). After ovulation, during the secretory phase, the endometrium thickens in preparation for possible implantation of a fertilized egg. During this phase, a normal endometrial thickness can range from approximately 7 mm to 16 mm. Additional factors such as age, hormonal status, and underlying medical conditions can influence endometrial thickness. In post-menopausal women, the normal thickness of the endometrium on ultrasound is typically much thinner than in pre-menopausal women. This is because, after menopause, the endometrium tends to atrophy (shrink) due to the decreased levels of estrogen. A thin endometrial lining is generally considered normal in post-menopausal women and is often less than or equal to 5 millimeters (mm) in thickness. Therefore, when assessing endometrial thickness on ultrasound, physicians must consider the patient's specific clinical context and menstrual cycle phase to determine what is considered within the normal range. Almost all of Dr. Amin's patients were pre-menopausal women with normal endometrium, even when described as 'thickened.'

2. <u>Ovarian cysts/adnexal masses</u>
Adnexal masses (ie, masses of the ovary, fallopian tube, or surrounding tissues) are commonly encountered by obstetrician–gynecologists. These are identified incidentally on physical examination or at the time of pelvic imaging. Less commonly, a mass may present with symptoms of acute or intermittent pain. Given the high volume of transvaginal/pelvic ultrasounds performed by Dr. Amin, it is not surprising he identified adnexal masses during his evaluation.

To understand this, one must consider the differential diagnoses of adnexal masses in premenopausal women. Most of incidental adnexal masses are of gynecologic origin and are benign ovarian or tubal lesions. Age is the most important independent risk factor for ovarian cancer, with an average age of diagnosis of 63. Transvaginal ultrasonography is the most used imaging technique- this exam should measure the size and composition of the mass (cystic, solid, or mixed); laterality; and the presence or absence of septations, mural nodules, papillary excrescences, or free fluid in the pelvis. Doppler ultrasonography can be used to evaluate vascular characteristics of pelvic lesions. Serum tumor markers (i.e. cancer antigen-125, human epididymis protein 4, ß-hCG, L-lactate dehydrogenase, alpha-fetoprotein, or inhibin) are obtained when a suspicious mass is identified, particularly in postmenopausal women. Ultrasound findings that should raise a physician's level of concern for malignancy include cyst size greater than 10 cm, papillary or solid components, cyst irregularity, presence of ascites, and high color Doppler flow. Of all the transvaginal ultrasounds reviewed, none identified the above concerning findings of ovarian malignancy.

This leads to an extremely important point. Of all the adnexal masses Dr. Amin identified on ultrasound, almost all were simple cysts with benign characteristics: thin, smooth walls; no solid components or septations. This is an exact description of a follicular ovarian cyst that women Doppler ultrasound imaging was not performed. These simple cysts are **almost always benign in any age group**. While an absolute size cutoff for surgical intervention has not been established, cysts of 10 cm or larger often may be an indication for surgery[1]. It is important to also note that simple cysts (even those greater than 10 cm) often will spontaneously regress when examined in 6-12 weeks with repeat ultrasound. Of the women who had an indication for surgery for ovarian cyst, almost all that were removed were follicular cysts. Additionally, I did not see any woman return for serial ultrasound to evaluate for cyst resolution.

A follicular ovarian cyst, also known as a simple or functional cyst, is a type of ovarian cyst that forms when a follicle in the ovary does not rupture or release its mature egg during the menstrual cycle. Normally, a follicle develops in the ovary each month, and it eventually releases an egg in a process called ovulation. However, in the case of a follicular cyst, the follicle continues to grow, and a fluid-filled sac or cyst forms. Follicular ovarian cysts are almost always benign and are one of the most

common types of ovarian cysts. They **almost always resolve on their own within a few menstrual cycles without the need for surgical or medical treatment**. Most women with these cysts do not experience symptoms, and the cysts are often discovered incidentally during a routine pelvic examination or imaging studies. Women who report chronic pelvic pain only have a gynecologic etiology of pain 30% of the time. The remaining 70% of pain is nongynecologic in nature and must be systemically evaluated in the ambulatory care setting.

The American College of Radiology (ACR) Ovarian-Adnexal Reporting and Data System (O-RADS) description is routinely used in the evaluation of ovarian cysts.
   a.   Normal ovary (O-RADS 1) – This includes follicles (ie, simple cysts) and corpus lutea ≤3 cm. This does not require additional follow up imaging.
   b.   Almost certainly benign (O-RADS 2; risk of malignancy <1 percent) – This includes typical hemorrhagic cysts, dermoid cysts, and endometriomas (all <10 cm), and simple paraovarian cysts, normal peritoneal inclusion cysts, and normal hydrosalpinges (any size). Repeat transvaginal ultrasound is typically recommended in six weeks, allowing for visualization of the mass at a different point in the menstrual cycle. Depending on findings it may not be unreasonable to consider an ultrasound in another three months.
   c.   Low-risk (O-RADS 3; risk of malignancy 1 to <10 percent)
   d.   Intermediate-risk (O-RADS 4; risk of malignancy 10 to <50 percent)
   e.   High-risk (O-RADS 5; risk of malignancy ≥50 percent)

*c. Patterns of aggressive surgical intervention:* The combination of multiple surgeries at one time, when necessary, can reduce anesthesia exposure for patients compared to undergoing these experiences individually. However, the routine combination of unnecessary and potentially harmful surgeries, such as the 'D&C, laparoscopy', is generally not required. First-line assessment of patients with a presenting symptom of pelvic pain, abnormal uterine bleeding and ovarian cysts are monitored and evaluated in the office setting with endometrial biopsy, an appropriate trial of medication, and repeat endovaginal ultrasound in 6 to 12 weeks to follow up pathology (i.e. ovarian cyst). Inappropriate assessment results in preceding to a surgical intervention in time frame that does not allow for a medical trial. Risks of surgery and anesthesia cannot be understated. Risks of pelvic surgery includes bleeding, infection, adhesion/scar tissue, damage to adjacent structures/organs, the need for a larger incision or additional surgeries as well as the risk of anesthesia itself. Layered on the baseline risks of all surgery, we will highlight surgery-specific risks throughout the report. In my review of the records, the vast majority of the patients reviewed were low risk and would qualify for an office endometrial biopsy to evaluate abnormal uterine bleeding. Nonetheless, Dr. Amin performed a combination of nonobstetrical D&C and laparoscopy on virtually all of the surgical patients I reviewed. Of all of the patients who underwent nonobstetrical surgical intervention, only one patient did not undergo a combined D&C and laparoscopy at any time point (C.Y) and one patient (A.A.) had two D&C procedures in 3 months. The combined intervention of 'D&C scope' is rarely necessary in clinical practice.

Shared decision-making refers to a collaborative process between providers and patients in making informed and personalized treatment decisions. The management of benign gynecologic conditions can be complex and multifaceted, involving the patient in the decision-making process becomes essential to ensure that the chosen treatment aligns with the patient's values, preferences, and lifestyle. The process of shared decision-making in endometriosis typically involves information sharing; taking time to understand the patient's preferences, values, and individual circumstances; exploring treatment options, including medication, hormonal therapies, procedures, surgical interventions, or a combination of approaches with option thoroughly discussed, including risks, benefits and alternatives; review of the potential risks and benefits associated with each treatment option; and finally the patient must actively participates in the decision-making process. Shared medical decision making is not well documented in the review of the medical records between Dr. Amin and his vulnerable patients.

*1. Dilation and Curettage (D&C) vs office endometrial biopsy*

The aim in the diagnosis of abnormal uterine bleeding (AUB) is to identify the bleeding cause, which can be classified by the PALM-COEIN (Polyp, Adenomyosis, Leiomyoma, Malignancy (and hyperplasia), Coagulopathy, Ovulatory disorders, Endometrial, Iatrogenic and Not otherwise classified) classification system[2]. In a gynecologic setting, the first step is most often to identify structural abnormalities (PALM causes). Common diagnostic options for the identification of the PALM include ultrasonography, endometrial sampling, and hysteroscopy. These options alone or in combination are sufficient for the diagnosis of most women with AUB.

Dilation and Curettage (D&C) and office endometrial biopsy are both medical techniques used to sample and examine the tissue lining the inside of the uterus (the endometrium). While they have a similar objective, there are important differences in terms of their invasiveness and purpose. Dr. Amin routinely performed surgeries instead of procedures for the same indication. The American College of Obstetricians and Gynecologists Position Statement, 'Definition of "Procedures" Related to Obstetrics and Gynecology' outlines the importance of differentiating procedure from surgery, highlighting that procedures are 'associated with lower risk of complications, including infection, bleeding, scarring, and pain[3]. The classification of an intervention as a "procedure" should be based on the intervention being performed, and not based on the location at which the procedure is performed, or the level of anesthesia or sedation being utilized.' It goes on to further describe procedure as:

"*A procedure is a short interventional technique that includes the following general categories:*

- *non-incisional diagnostic or therapeutic intervention through a natural body cavity or orifice*
- *superficial incisional or excisional diagnostic or therapeutic intervention that does not involve repair or significantly alter morphology*
- *device placement into a natural cavity*
- *subcutaneous implant*
- *injections*

*All other invasive interventions (including superficial incisional or excisional procedures and placement of devices or implants that require repair) are considered 'surgery'."*

<u>Dilation and Curettage (D&C)</u>: D&C is a more invasive surgery compared to an office endometrial biopsy. It is typically performed in an operating room under anesthesia (either local or general) and involves a greater degree of pain and complications. During a D&C, the cervix is dilated (widened) to allow for the insertion of a curette, a surgical instrument with a spoon-shaped tip. The curette is then used to scrape and remove a larger portion of the endometrial tissue, typically for diagnostic purposes or to address conditions like abnormal bleeding or to investigate the cause of miscarriage. D&C may be performed for diagnostic purposes when there are concerns about abnormal uterine bleeding, suspected uterine polyps or fibroids, or other uterine conditions. It can also be used for therapeutic purposes to remove incomplete miscarriages and decrease acute bleeding. D&Cs are not indicated for the evaluation of chronic pelvic pain. Risks of nonobstetrical D&C include uterine perforation, false passage formation, hemorrhage, and vaginal/cervical laceration. Additionally, dilation and curettage can also result in intrauterine adhesion formation after the procedure as well as Asherman's syndrome, both associated with infertility.

<u>Office Endometrial Biopsy</u>: An office endometrial biopsy is considered first line evaluation of the endometrium because it is convenient, low-cost and less invasive with a high patient acceptance[4]. It can provide adequate endometrium samples for histopathologic evaluation in most patients and because of the high sensitivity and specificity rates, it is the preferred evaluation of endometrium in low-risk patients[5]. It is typically performed in an outpatient setting, such as a gynecologist's office, without the need for anesthesia or sedation. It is generally associated with less discomfort and a

quicker recovery. During an office endometrial biopsy, a thin, flexible tube is inserted through the cervix into the uterus. A small sample of endometrial tissue is gently suctioned or scraped from the uterine lining. The procedure is usually completed in a matter of minutes. It is often used to investigate the cause of abnormal uterine bleeding, evaluate the endometrium for signs of endometrial hyperplasia (abnormal thickening of the uterine lining), check for uterine polyps, or rule out endometrial cancer. In short, it is a less invasive way to obtain a tissue sample compared to a D&C. The office biopsy is considered a comparable sample to D&C[1], particularly in patients who are low risk for uterine cancer, as the patients reviewed here. In postmenopausal women with abnormal uterine bleeding, a more aggressive sample may be appropriate[1].

*2. Endometriosis surgery*
Dr. Amin also fulgurated suspicious areas of endometriosis in many patients who underwent diagnostic laparoscopy. Endometriosis is a histologic/pathologic diagnosis. While Dr. Amin fulgurated many peritoneal lesions, almost no disease was excised or sent to pathology therefore disease cannot be confirmed. The most recent ESHRE guidelines recommend empiric treatment of endometriosis with medical therapy rather than aggressive treatment with laparoscopy as first-line treatment[6].

*3. Endocervical curettage (ECC)*
As a component of the D&C, Dr. Amin appears to also collect an endocervical curettage (ECC) on each patient at D&C. ECC is indicated in women with abnormal findings on pap who then undergo additional testing, including colposcopy. It is recommended in women with +HPV infection, high grade cervical cytology or worse, aged 50 or older, or invisible transformation zone in colposcopy. This intervention risk profile is similar to D&C.

*4. Ovarian cystectomy*
In some cases, larger follicular cysts may cause mild abdominal discomfort or pelvic pain. If a cyst becomes particularly large or causes persistent symptoms, a healthcare provider may recommend monitoring it or, **rarely**, may suggest medical intervention such as hormonal therapy or surgical removal. Risk of ovarian torsion (twisting of the ovary on its blood supply) is a rare risk of an ovarian cyst and therefore risk of ovarian torsion should not be the primary indication for removal. A 2022 meta-analysis of CT features found that adnexal enlargement of 8–12 cm was most associated with adnexal torsion[1]. No patients reviewed who underwent cystectomy had an ovarian cyst over 7 cm. Of the women who underwent laparoscopy, #36/54 had an ovarian cystectomy and almost all of these returned as follicular cysts.

Dr. Bills justifies the removal of normal, physiologic cysts as appropriate due to the inability to follow to resolution. However, this aggressive surgical intervention for normal physiology highlights Dr. Amin's inconsistent practice. In the women who underwent ovarian cystectomy, the records indicate many were under his care for at least 4 months, which would have allowed for monitoring of cyst resolution rather than surgery for a normal physiologic process. Dr. Amin readily used interventions that require follow up, including surgery. While postoperative complication risks are highest withing the first 30 days of surgery, they can present up to three months (and abdominal wall hernias can present years after surgery). While there did not appear be to significant immediate postoperative complications, many patients did not have resolution of their pain or bleeding following the intervention. Each surgery Dr. Amin exposed a patient to was associated with a real risk of complication. Ovarian cystectomy risks cannot be understated. Ovarian cystectomy, a surgical procedure used to remove ovarian cysts while preserving the affected ovary, carries certain risks and potential complications. Most importantly, for women who desire future fertility, there is a risk of damaging the ovary, resulting in decreased ovarian reserve. Ovarian reserve is defined as a woman's reproductive potential in terms of the number and quality of her remaining oocytes (eggs)[5]. Fertility can be directly compromised by laparoscopic ovarian cystectomy resulting in diminished

ovarian reserve (DOR) and risk of ovarian failure (also known as premature ovarian insufficiency or premature menopause).

*5. Hysterectomy*

Trialing medical and lower-risk treatments before considering a hysterectomy is essential to minimize the potential risks surgery. By exploring less invasive alternatives, patients can often alleviate their symptoms, maintain reproductive options, and reduce the risks associated with major surgery. This approach promotes patient-centered care, allowing individuals to make informed decisions about their treatment while prioritizing their overall well-being. Of the medical records reviewed, Dr. Amin scheduled five hysterectomies, though only two were completed. Again, his pattern of limited medical trials and aggressive surgical approach is evident in the medical records reviewed. I have reviewed each of the five hysterectomy cases below.

1. R.F.S. is a 27-year-old G3P0030 female who presented to Dr. Amin with history of myomectomy and reported uterine pain. Her exam was normal apart from an 18-week size fibroid uterus. She was provided a single 30-day supply of Provera 10 mg po 1 tab daily 'to control bleeding'. Dr. Amin recommend D&C and scope at her initial consult visit at which time a normal follicular cyst was also removed. She was surgically treated for endometriosis without pathologic specimen. The primary pathology, the uterine fibroids, were not treated during this surgery. She returned 2/26/2020 for her postop visit. At her postoperative visit, Dr. Amin's clinic documentation reports that partial hysterectomy is recommended and should be scheduled, however 'Pt is unsure about surgery.' Surgery was cancelled on 3/02/2020 as patient was deported per ICDC staff. There is no evidence that the patient was counseled on fertility or fertility sparing options. No additional imaging was obtained to further evaluate the uterus for 'malignancy.' Routinely a pelvic MRI is obtained to evaluate the uterus for any concerning lesions including leiomyosarcoma. On MRI, uterine sarcomas often present as a large infiltrating myometrial mass of intermediate to high signal intensity on T2-weighted images. Although MR imaging usually allows diagnosis of common benign leiomyomas, leiomyomas may occasionally be associated with various types of necrosis, degeneration or cellular histologic subtype, which can cause increased signal on T2-weighted images. When these features are identified on routine MRI, the differentiation between benign and malignant myometrial tumors is difficult if only based on signal intensity of nonenhanced and postcontrast MR sequences. Several studies have explored the use of diffusion weighted imaging on MRI for distinguishing leiomyomas from leiomyosarcomas and other malignancies. The prevalence of leiomyosarcoma has also been debated, with the FDA estimating the rates as high as 1/458 women, though more rigorous analysis of the literature suggests that the prevalence among women having surgery for presumed leiomyomas may range as low as 1/1,960 (0.051%)[7] to 2/8,720 (0.023%)[8]. Neither patient in Bojahr et al cohort was less than 45 years old. Uterine sarcoma is associated with increasing age and peaks sharply in the menopausal range. While uterine sarcoma ranges widely between age groups, the average age of diagnosis is 60 years and the highest risk in patients are aged 70–79 years old while the lowest risk is in patients less than 30 years old. **To a high degree of medical certainty, RFS did not have a gynecologic malignancy. A noninvasive imaging study, such as MRI, would allow for evaluation of the pelvic mass rather than surgical intervention with a 'D&C scope.' R.F.S had a recurrent benign fibroid. She was a candidate for a repeat uterine-sparing intervention including uterine artery embolization or repeat myomectomy if she desired fertility preservation. There is no evidence in the medical records that fertility counseling was performed.**

2. Patient B.P. is a 36-year-old G5 P40415 (NSVD x 3, c-section a 1 for twins) was initially referred for OBGYN consult for lower abdominal pain 5/14/2019. She presented to Dr. Amin on 6/06/2019. She reported a history of abnormal pap smears, a pap was obtained. A transvaginal pelvic ultrasound 6/06/2019 for 'heavy periods' which revealed a slightly enlarged anteverted

uterus with small fibroids 1-3cm, small physiologic cysts on the right ovary, normal left ovary, no free fluid or other abnormalities. Endometrium was 11 mm, normal for reproductive aged based on menstrual cycle. She received an injection of DMPA also on 6/06/19. The pap smear returned as HSIL results on 6/12/19. Dr. Amin had a follow up on 6/20/2019 – patient scheduled for dilation/curettage, LEEP, diagnostic laparoscopy and right ovarian cystectomy. At the time of the laparoscopy 7/12/19 she underwent dilation and curettage, LEEP, and operative laparoscopy. A 4 x 4 cm right ovarian cyst was removed, and endometriosis implants were noted in the posterior cul-de-sac and ablated. The final pathology of the LEEP returned as Carcinoma in situ with positive margins. A follicular cyst was noted and removed. Normal uterus, tubes and ovaries noted in the operative photos. She was offered an urgent total abdominal hysterectomy at her postoperative visit 7/23/2019. This was scheduled on 8/09/2019, < 4 weeks after her LEEP. A review of the operative note from the hysterectomy appeared uncomplicated except for a small amount of oozing, treated, and with estimated blood loss < 200 ml. The final pathology of the hysterectomy returned on 8/12/19. Dr. Amin was notified that the uterus returned as **pT1A2 microinvasive squamous cell carcinoma of cervix- stromal invasion 4 mm deep with horizontal spread < 7mm.** Evidence of previous endocervical curetting endometrial curetting and cervical conization. When the final pathology returned, he urgently referred the patient to gyn oncology (James Burke, MD) the following day and secured an appt with oncology 11/01/2019. The PET/CT or the re-read of the pathology slides Dr. Burke requested were not available for review. Dr. Burke reviewed the case at tumor conference. From his consultation note, only when he had the additional information could he give his final recommendations. If the patient had negative margins and no lymphovascular space invasion (LVSI), observation only. If margins negative, but +LVSI laparoscopic lymph node dissection required.

There are several concerning features of this case:
a. LEEP specimen with positive margins requires repeat excisional biopsy. This would allow negative margins to be obtained and to ensure she underwent appropriate treatment (surgery or radiation).
b. A repeat excision was not performed and the patient underwent a simple hysterectomy by Dr. Amin. B.P. had **Stage IA2 cervical cancer, and the preferred treatment is a modified radical hysterectomy (class II hysterectomy).** A modified radical hysterectomy is different than the surgery Dr. Amin performed. It includes removal of the uterus, cervix, upper one-fourth of the vagina, and parametria. These are typically performed by a gyn oncologist. A modified radical hysterectomy is an effective treatment for patients with low-risk, early-stage cervical cancer with a rate of recurrence of 1% for patients with stage IA disease at 12-year follow-up. Patients with stage IA1 cervical cancer without lymphovascular space invasion LVSI on the excision (LEEP or cone) specimen, management depends on margin status. If the margins negative- no further treatment is necessary, though a simple hysterectomy may be an acceptable alternative. **B.P. had positive margins on her LEEP specimen and therefore it was unacceptable to perform a simple hysterectomy.**
c. Dr. Amin performed the hysterectomy < 4 weeks from the LEEP with positive margins. It is well known that a significant inflammatory tissue reaction follows cone/LEEP that should impact the timing of subsequent surgery. There are two appropriate time windows, either immediately after an excisional procedure until the inflammation begins (usually one to two days postoperatively), usually based on frozen section or expedited final pathologic evaluation. If a hysterectomy is indicated, but cannot be done within 48 hours, it is recommended to wait at least six-eight weeks to allow for resolution of parametrial inflammation. The evidence of previous endocervical curetting endometrial curetting and cervical conization on final pathology suggests that this may be some of the post procedure inflammatory response.

3. K. C. was a 47-year-old G3P3003 female who underwent a total abdominal hysterectomy on 6/14/2017. She first presented to Dr. McMahan and reported prolonged menstruation. A

transvaginal ultrasound was performed 11/29/16 prior to her initial appointment with Dr. Amin. She was then referred to OB/GYN for irregular menses 2/14/2017 and her first appointment was scheduled for 2/21/2017. At her initial visit she reported vaginal bleeding x 4 months, vaginal pain, abdominal pain and Dr. Amin repeated the ultrasound for dysfunctional uterine bleeding and chronic pelvic pain. She reported she had never had a pap smear and his records do not indicate a pap smear was performed. Exam performed- breast exam, pelvic-speculum exam. A 10-week uterus was palpated on bimanual exam. He prescribed Provera (medroxyprogesterone acetate)10 mg po daily x 10 days. A formal ultrasound was ordered which revealed a normal uterus with a small intramural fibroid. She returned on 3/14/17 for 'heavy menstrual bleeding, eye burning, sinuses, head cold, vaginal pain, abdominal pain, stomach pain, can't eat, rash on body and itching.' Exam performed, including a repeat pelvic-speculum exam. Impression included anemia. Offered a 'D&C scope'. Hb 11.2. Started on oral iron therapy. She underwent a D&C and scope on 4/05/17 for abnormal uterine bleeding. She was 'treated with hormones without a response.' On 4/27/2019 KC returned for routine postoperative care. She reported persistent spotting. She continued to have pain, abnormal bleeding and anemia and a hysterectomy was recommended over other options on 5/18/17. A bilateral salpingo-oophorectomy was also recommended; there is no evidence of counseling for removal of the pelvic organs in the medical record, nor evidence a pap smear despite no history of having a pap documented on multiple records. K.C. was a candidate for a minimally invasive route of hysterectomy however there is no documentation on counseling for route of hysterectomy and no indication for an abdominal hysterectomy. C-section is not an indication for abdominal hysterectomy. Vaginal hysterectomy is the preferred approach, but laparoscopic, robotic-assisted laparoscopic, or abdominal approaches may be performed[9]. Recent data reports that compared to White women, Black and Hispanic women are less likely to undergo hysterectomy via a minimally invasive approach[10]. Her uterus was under 250 g, coming in at 220g, and amenable to delivery via the vagina rather than abdominally or requiring morcellation. Postoperatively, being in surgical menopause, Dr. Amin prescribed oral estrogen therapy to prevent menopausal symptoms. The action to remove ovaries and then recommend daily hormonal supplementation to avoid surgical menopause directly opposes Dr. Bills concerns about Dr. Amin not prescribing oral medical therapy within the confines of the prison system due to structural challenges with ensuring patients receive daily medication while incarcerated. Without these medications, she will experience immediate menopausal symptoms if/when she misses a dose.

4. W.D. is a 48-year-old G6P6 (NSVD x5, c-section x 1) female who initially presented to Dr. Amin on 12/21/2018 for CPP, vaginal pain, anemia. She was unsure of her last pap smear and a pap smear was collected. She had a tubal ligation. Breast exam normal. Pelvic-speculum exam performed and 10–12-week uterus. CBC, CMP, PAP GC/C ordered. Pap/HPV negative. A pelvic ultrasound was performed- one picture, and no report was noted in the medical records. She was treated for empirically with flagyl 500 mg po bid x 7 days and cleocin cream nightly for one week. On 1/11/19 W.D. returned for follow up and pain 8/10, she reported her pain and bleeding were worse. Abdominal, pelvic-speculum exam were performed and a 10–12-week size fibroid uterus was noted. A repeat TVUS was performed. Dr. Amin recommended the patient have a 'D&C scope' for metrorrhagia, menorrhagia and dysmenorrhea. On 1/29/19 W.D. presented for her surgery. She signed consent for D&C and laparoscopy 'to correct abnormalities'. CBC, CMP and pregnancy test obtained. The operative findings included a larger uterus than noted on exam and ultrasound- ultrasound measured the uterus as small with a total length of 6.3 cm. Intraoperatively she sounded to 13 cm. The intraoperative photos are consistent with a normal sized uterus as measured by her TVUS. On 3/19/19 W.D. returned for her follow up from surgery. At her postop visit, she reported 'vaginal and stomach pain.' Pain 10/10. Abdominal exam normal, pelvic-speculum exam performed. Diagnosed with menorrhagia, dysmenorrhea. Dr. Amin recommended TAH-BSO at this visit. Consent signed for DMPA. W.D. received her first DMPA injection 3/19/2019 and returned for her second injection 05/28/2019. A request for

surgery placed by Dr. Amin on 3/20/2019. Date requested by Dr. Amin was 4/11/2019-4/13/2019. Despite the request for surgery, this was not scheduled. W.D. returned for follow up 5/28/2019. She reported no change in her pain or bleeding. On his pelvic exam this time he noted a uterus that was significantly larger at 16-week size than her initial exam of 10–12-week size. It is unclear of the options he counseled her on, but she was then scheduled for a total abdominal hysterectomy and bilateral salpingo-oophorectomy. She received her second DMPA injection at this appointment. While W.D. was ultimately scheduled for surgery 6/07/2019, a representative from ICDC called to cancel surgery as patient refused the intervention.

5. C.M. is a 40-year-old G3P3 (NSVD x 3) female who presented to Dr. Amin 10/04/18 for lower abdominal pain, heavy periods, known fibroids. Reports age 16 at menarche, menses regular lasting 10 days with large clots. Contraception with ParaGard. Pain 8/10. She had a full exam, TVUS and labs- TSH, CBC, CMP, UA, CA-125. Last pap 2017. An exam was performed- including a pelvic-speculum. Due to 'concern for malignancy', he offered her a 'D&C scope' and DMPA injection for her heavy menstrual bleeding. On 10/18/2018 she underwent a D&C and laparoscopy for pelvic mass, menorrhagia, dysmenorrhea, DUB, rule out gyn malignancy. A review of the intraoperative photos do not show evidence of adhesive disease or pathologic ovarian cysts- both ovaries appear normal. No cyst on the left ovary. At her two-week postop visit on 11/02/2018 C.M. was then scheduled for a total abdominal hysterectomy/BSO for chronic pelvic pain, uterine leiomyoma, dysmenorrhea, menorrhagia on 11/27/18. C.M. was deported the day she was scheduled for hysterectomy.

In conclusion, only 2/5 planned hysterectomies were completed, both including removal of ovaries in premenopausal women. Of the 3/5 that were not completed, 1 patient cancelled surgery and 2 patients were deported. 5/5 planned hysterectomies were preceded by a 'D&C scope' before an adequate trial of medical therapy. Nearly all recommendations for proceeding with definitive surgery (hysterectomy) was done at the postoperative visit from the 'D&C scope.,' which does not allow for full healing from the first surgery or an appropriate time to evaluate for symptom improvement from the intervention before recommending a second surgical intervention. Dr. Amin's highly procedural/surgical approach is evident in reviewing the hysterectomy and potential hysterectomy cases. Appropriate trials of medical therapy were not offered before two separate surgical interventions (D&/scope and hysterectomy) were recommended to each patient. It is not routine practice to perform 'D&C scope' as an immediate precursor to a hysterectomy.

*d. Medical management practices*

Dr. Bills describes the importance of Dr. Amin's aggressive treatment as indicated due to the limited ability to follow up with incarcerated patients. **This is directly inconsistent with his practice.** Dr. Amin routinely and excessively used Depo-Provera for contraception and management of abnormal bleeding. In the review of the patient records, 39 received at least one DMPA injection. Of these, at least 12 patients received more than one injection. The majority did not undergo more than 3-month trial of medical therapy with this medication before urgently moving onto surgical intervention. Most important to highlight, this method of treatment, compared to all other available methods, requires quarterly monitoring/follow up. This medication is the definition of short-term follow up, as it only lasts three months.

*1. Medroxyprogesterone acetate (DMPA)*

Depo-Provera, also known as medroxyprogesterone acetate (DMPA) inhibits the production of gonadotropin, preventing follicular maturation and ovulation, which is responsible for its ability to prevent pregnancy. This action also thins the endometrium. DMPA reduces nuclear estrogen receptors and DNA synthesis in epithelial cells of the endometrium. The major side effect of DMPA is complete disruption of the menstrual cycle. In the 3 months after the first injection, about 30% of women are amenorrheic (no period). Endometrial biopsies taken at intervals of 1.5, 3, 6, 9, and 12 months after the first DMPA injection in a group of women receiving DMPA every 3 months showed about half the

endometrial samples were still active at 6 weeks post first injection. This means that it takes several months, specifically at least two DMPA injections, for the biopsies to quiet the endometrium. After the second injection, <10% of the biopsies were proliferative and after 1 year of DMPA, about 40% are described as atrophic. By the end of 2 years, about 70% of women treated with DMPA are amenorrheic. After discontinuation of DMPA, about half resume regular cycles within 6 months and three-fourths have regular menses within 1 year. Because of the time it takes to metabolize DMPA resumption of ovulation may be delayed for as long as 18 months after the last injection. The delay in return to fertility is not related to the number of injections but increases with increasing weight, most likely because the drug is absorbed into adipose tissue and is not rapidly cleared. This can directly affect fertility after receiving a single DMPA injection.

2. *Long-acting reversible contraception (LARC)*
One argument Dr. Bills identifies as a reason to use this medication was the challenges of patients receiving daily oral medical therapy during incarceration. If Dr. Amin's goal was to offer women long-term treatments for contraception and abnormal uterine bleeding with minimal side effects and limited follow up, he would routinely offer long-acting reversible contraception (LARC) as a component of his practice. LARC is long-lasting and easily reversible birth control that includes contraceptive implants and intrauterine devices (IUDs), which are more than 99% effective in preventing unintended pregnancy[11].

**In a review of all medical records, he did not offer a LARC to a single patient who would have qualified. These have significantly fewer side effects and require less follow up than DMPA injections. Additionally, once removed, patients immediately resume baseline fertility.**

ACOG's Patient-Centered Contraceptive Counseling, Committee Statement highlights the conclusions: *"Obstetrician–gynecologists (ob-gyns) should intentionally incorporate the reproductive justice framework into contraceptive counseling by:*
- *acknowledging historical and ongoing reproductive mistreatment of people of color and other marginalized individuals whose reproductive desires have been devalued;*
- *recognizing that counselor bias, unconscious or otherwise, can affect care and working to minimize the effect of bias on counseling and care provision; and*
- *prioritizing patients' values, preferences, and lived experiences in the selection or discontinuation of a contraceptive method.*

*Ob-gyns should adhere to the recommended ethical approach of shared decision making through patient-centered contraceptive counseling."*[1]

3. *Oral progestin therapy*
Dr. Amin routinely describes 'trial of hormone therapy' as the short-term use of Provera (medroxyprogesterone acetate) 10 mg orally for 10 days. A 10-day course of Provera can help regulate the menstrual cycle and reduce abnormal bleeding patterns short-term. In cases of secondary amenorrhea (the absence of menstruation in women who previously had regular periods), a 10-day course of Provera may be prescribed to induce withdrawal bleeding. This can help determine if the amenorrhea is due to a hormonal imbalance. **A single 10-day course of Provera does not constitute a 'trial of hormone therapy' for the chronic management and regulation of abnormal uterine bleeding prior to hysterectomy.** Only a handful of patients received 3-6 months of progestin therapy would constitute a 'trial of hormone therapy' as an accepted definition in clinical practice.

4. *High frequency of transvaginal ultrasound*
Dr. Amin readily used transvaginal ultrasound as a component of his initial assessment in many patients. While an initial ultrasound may be indicated in patients with abnormal uterine bleeding (AUB), chronic

pelvic pain or a pelvic mass. One would then routinely follow up an abnormal finding at a set interval with repeat ultrasound.

*5. High frequency of pelvic exams*
A common theme that arose from the medical record review is the high number of repeated pelvic examinations performed, specifically in a short-time frame while receiving gyn care. Patient P.B. had a total of 6 of pelvic exams over the course of 10 months: 4/03/19, 4/17/19, 5/02/19, 6/19/19, 8/02/19 and 2/26/20. In the absence of specific symptoms or risk factors, pelvic exams (which may include bimanual and speculum examinations) are generally not required on a routine basis for reproductive-aged women, particularly once the primary complaint has been initially evaluated (i.e. abnormal uterine bleeding). However, discussions about pelvic health, birth control, and sexual health should occur regularly with a healthcare provider. These discussions can occur in the office without the need for a pelvic exam.

*6. Inconsistency with cervical cancer screening/ management of cervical dysplasia guidelines*
Dr. Amin is notably inconsistent with his management of cervical cancer screening and treatment of abnormal pap smears. Dr Bills describes the lifesaving care Dr. Amin provides regarded cervical cancer treatment, but this is not demonstrated in the medical record review. 13,960 new cervical cancer cases are diagnosed annually and the lifetime risk of developing cervical cancer is approximately 0.7 % based on 2017–2019 data. Cervical cancer is most often diagnosed between ages 35 and 44 and therefore the cadence of pap smear screening and subsequent management is vital. In patients without history of abnormal pap smears who are over the age of 30, co-testing with a normal pap smear and HPV test can be performed q 5 years. Specifically in his hysterectomy patients, the records reviewed do not indicate Dr. Amin followed the American Cancer Society, American Society for Colposcopy and Cervical Pathology, and American Society for Clinical Pathology Screening Guidelines for the Prevention and Early Detection of Cervical Cancer guidelines[10]. Patient W.D. had a repeat pap smear/HPV testing 14 months after a normal pap smear/HPV testing; K.C. never had a pap smear during her care or in the preoperative preparation for hysterectomy despite reporting numerous times she had never had one in her gynecologic history; B.P. had inappropriate management of an abnormal high risk pap smear. Rather than providing a repeat excisional procedure following the LEEP with positive margins, she was quickly moved to definitive surgery with a simple hysterectomy. Dr. Amin did not have the information he needed to decide Given the extent of the cervical cancer, Dr. Amin should have referred the patient for a modified radical hysterectomy following the second excisional biopsy with negative margins. The LVSI presence or absence and the stage of disease would then inform the gyn oncologist on the best next step, including risks and benefits.

*7. Trauma-informed care (TIC)*
Adverse childhood and adult experiences can result in recurrent stress exposures, impacting mental and physical health. Trauma-informed care (TIC) is an approach to healthcare that recognizes and responds to the impact of trauma on an individual's physical, mental, and emotional well-being. There are clear associations with childhood and adult trauma and incarceration[12–14]. Trauma survivors may have heightened sensitivity to touch, sounds, or sensations. Ensuring the patient feels supported and cared for after the exam is an essential aspect of trauma-informed practice. Incarcerated patients represent a vulnerable patient group due to their restricted access to healthcare resources and the unique healthcare challenges within correctional facilities. Given the sensitivity of his practice, it did not appear that Dr. Amin incorporated TIC as a core component of his patient experiences.

*Patients medically managed by Dr. Amin*
Dr. Bills specifically highlights 14 women who did not have surgery and were rather managed in the ambulatory care setting without surgical intervention. All 14 received transvaginal ultrasound, some without a clear indication for the procedure. Several of them underwent repeat TVUS without a clear indication.
- 2 patients were postmenopausal women who desired hormone replacement therapy

- 3 patients were recommended/scheduled by Dr. Amin to have a 'D&C scope' but did not proceed due to a) early release, b) COVID positive test and c) declined
- 7 premenopausal patients were offered/provided DMPA
- 2 were offered a trial of medical therapy a) combined oral contraceptives and b) continuous oral progestin

Therefore, I respectfully disagree with Dr. Bills' opinions that Dr. Amin provided medical management to the 14 patients reviewed for their conditions in the ambulatory setting without surgical intervention. Of the premenopausal women, (3/9) were told they 'needed D&C scope', but these procedures were not performed. My review of the nonsurgical management again depicts a pattern of repeated exams, procedures/ultrasounds and surgical recommendations before exploring medical management options.

## IV. Conclusions.

In conclusion, based on a comprehensive review of the available medical records and pertinent information, it is my professional opinion, to a reasonable degree of medical certainty, that Dr. Amin consistently acted in a surgically aggressive manner, performing unnecessary surgeries and failing to provide patients alternative medical therapies. From the medical record review, fertility risks were not addressed and some of the unnecessary surgeries could have impacted future fertility.

As discussed above, it appears that Dr. Amin frequently offered a procedure known as 'D&C scope,' which, in several instances, may not have been medically necessary and exposed patients to avoidable harm. Dr. Amin would also consistently remove follicular cysts that did not need to be removed. Ovarian cystectomies have the unique risk of potential damage to future fertility. Even in the medical records of the women who were deemed 'medically managed', several were offered the surgery only to decline or be deported/released before the surgery date.

The full process of informed consent is fundamental to ethical medical practice. In my review of the medical records, it did not appear that Dr. Amin consistently followed the full process of informed consent, particularly in considering surgical interventions with patients. Additionally, from my review of the medical records, Dr. Amin did appear to not consistently engaged patients in shared medical decision-making.

In conclusion, based on the available information and my professional judgment, it is my opinion that Dr. Amin's clinical approach demonstrated a pattern of aggressive and unnecessary surgeries that increased risks to his patients.