# Exhibit S

EXHIBIT # 3

# VERIFIED DECLARATION OF DAWN WOOTEN

Pursuant to 28 U.S. Code § 1746, I, Dawn Wooten, hereby declare, under penalty of perjury of the laws of the United States of America, that the following is true and correct.

## INTRODUCTION

1. I submit this Declaration in furtherance of my Disclosure and Retaliation Complaint to the U.S. Department of Homeland Security Office of Inspector General.

2. I am over 21 years of age and a legal resident of the State of Georgia. I live at 1224 Hall Avenue, Tifton, Georgia. I am personally familiar with facts as stated herein and am competent to testify about them. I certify that the facts stated herein are true and correct.

3. I have been a Licensed Practical Nurse ("LPN") since 2009.

4. I was first employed as a LPN at the Irwin County Detention Center ("ICDC") in Ocilla, Georgia in 2010.

5. Since my first period of employment at ICDC beginning in 2010, I have had periods of employment elsewhere, but I have been rehired by ICDC three times, most recently in October 2019.

6. ICDC is operated by LaSalle Corrections under contract to U.S. Immigration and Customs Enforcement ("ICE").

7. Since my most recent rehire at ICDC, I have been employed fulltime, working approximately 36-40 hours per week, including regular shifts from 6 am to 6 pm, six times in every two-week pay period.

8. Prior to July 2, 2020, I had never received a written reprimand at ICDC.

9. My most recent supervisor at ICDC was the Health Services Administrator ("HSA"), Ms. Lakisha Brown.

10. I am African-American woman.

EXHIBIT 165
WIT: _____
DATE: _____
Goldy Gold, RPR

Declaration of Dawn Wooten, supporting her DHS OIG complaint
September 2020
Page 2 of 10

## LASALLE VIOLATED FEDERAL LAWS, RULES, OR REGULATIONS; LASALLE'S ACTIONS POSED A SUBSTANTIAL AND SPECIFIC DANGER TO PUBLIC HEALTH OR SAFETY; AND LASALLE TOOK OR FAILED TO TAKE ACTIONS THAT CAUSED GROSS WASTE, FRAUD, OR MISMANAGEMENT.

11. In March 2020, detainees in Unit C at ICDC began to report they and their dormmates were experiencing well-recognized symptoms of COVID-19, such as fevers and sore throats. These detainees thus repeatedly requested to be tested for the disease. Ms. Brown and ICDC Director of Nursing, Ms. Shanise Bell routinely rejected these requests. When I questioned Ms. Brown about these denials of COVID-19 testing for detainees exhibiting symptoms, Ms. Brown told me that she would not authorize testing for the detainees because "all they want is attention. ... Everybody want [sic] to be tested for COVID."

12. In June 2020, ICDC received two rapid response COVID-19 testing machines. These machines would produce COVID-19 testing results in eight minutes. I understood the machines were to be used for testing the detainees, but I saw the machines in use only twice, once to test an ICDC employee and once for a detainee.

13. From March through July 2020, rather than order a COVID-19 test for detainees seeking medical attention for a fever, I observed ICDC medical staff prescribing a seven-day course of over-the-counter cold medication to those detainees.

14. From October 2019 through July 2020, I observed ICDC medical staff shredding detainees' written requests for exams or treatment and otherwise denying medical care by falsely documenting or reporting exams as performed that actually had not performed. During May and July 2020, I reported this to Ms. Brown, who took no action but told me, "One day they will be caught [shredding the exam requests]."

15. ICE has developed and disseminated its own standards for hygiene, cleanliness, and sanitation for detention facilities like ICDC, which are described ICE's Performance-Based National Detention Standards ("PBNDS"), as revised in 2016. ICE also requires detention facilities like ICDC to comply with relevant hygiene, cleanliness, and sanitation standards established by U.S. Centers for Disease Control and Prevention.

16. Among other things, even before the COVID-19 pandemic hit he U.S., ICE required

Declaration of Dawn Wooten, supporting her DHS OIG complaint
September 2020
Page 3 of 10

(and still requires) that:

"a. All horizontal surfaces shall be damp-dusted daily with an approved germicidal solution used according to the manufacturer's directions" —— ICDC never met this standard, especially not on a "daily" basis

"b. Windows, window frames and windowsills shall be cleaned on a weekly schedule." —— ICDC never met this standard, especially not on a "weekly" basis

"c. Furniture and fixtures shall be cleaned daily." —— ICDC never met this standard, especially not on a "daily" basis

"d. Floors shall be mopped daily and when soiled, using the double-bucket mopping technique and with a hospital disinfectant-detergent solution mixed according to the manufacturer's directions." —— ICDC never met this standards, especially not on a "daily" basis

"e. A clean mop head shall be used each time the floors are mopped." —— ICDC never met this standard

"h. Cubicle curtains shall be laundered monthly or during terminal cleaning following treatment of an infectious patient." —— ICDC never met this standards, especially not on a "monthly" basis.

17. According to the CDC:

"Even if COVID-19 cases have not yet been identified inside the facility or in the surrounding community, begin implementing intensified cleaning and disinfecting procedures according to the recommendations below. These measures may prevent spread of COVID-19 if introduced." This requires detention facilities like ICDC to:

A   "Several times per day, clean and disinfect surfaces and objects that are frequently touched, especially in common areas. Such surfaces may include objects/surfaces not ordinarily cleaned daily (e.g., doorknobs, light switches, sink handles, countertops, toilets, toilet handles, recreation equipment, kiosks, and telephones)." —— ICDC never met this standard

B   "Staff should clean shared equipment several times per day and on

a conclusion of use basis (e.g., radios, service weapons, keys, handcuffs)." —— ICDC never met this standard

C. "Use household cleaners and EPA-registered disinfectants effective against the virus that causes COVID-19 as appropriate for the surface, following label instructions. This may require lifting restrictions on undiluted disinfectants." —— ICDC never met this standard

D. "Ensure adequate supplies to support intensified cleaning and disinfection practices, and have a plan in place to restock rapidly if needed." —— ICDC never met this standard

18. From October 2019 through July 2020, ICDC failed to maintain hygiene, cleanliness, and sanitation standards for medical exam rooms and equipment.

19. I observed exam room tables and floors that were rarely cleaned, wiped down, or mopped, and certainly not to ICE or CDC standards. There was often blood on the floor that had not been cleaned up

20. To give just one example, a detainee's blood lay on the same spot, in the same pattern, an exam room for at least two full months. In other words, it was never mopped up.

21. ICE and the CDC also require minimum standards of personal hygiene for all detainees, such as providing them with personal bars of soap, and providing female detainees with special hygiene products, such as tampons —— ICDC never met these standards.

22. The CDC has very specific standards regarding Personal Protective Equipment ("PPE"), including "Ensur[ing] that sufficient stocks of hygiene supplies, cleaning supplies, PPE, and medical supplies (consistent with the healthcare capabilities of the facility) are on hand and available, and have a plan in place to restock as needed if COVID-19 transmission occurs." —— PPE, of all kinds, always was in very short supply at ICDC. Some things, such as gowns and face shield were rarely if ever provided.

23. From March through July 2020, ICDC constantly failed to provide or unreasonably delayed the provision of adequate quantities of PPE to detainees and lower-level staff

Declaration of Dawn Wooten, supporting her DHS OIG complaint
September 2020
Page 5 of 10

like me.

24. I observed highly effective PPE, such as N-95 face masks, being reserved for high-ranking staff (who rarely had contact with the detainees and staff most likely to be exposed to COVID-19), while the most at-risk individuals were given only inferior paper or cloth masks and were never given new masks to replace old or broken ones. From March through early June 2020, there were no face shields or gowns provided.

25. As just one example, staff like myself were given an N-95 face mask in mid-March. They are supposed to be used one time or to last one day. Ours were never cleaned, repaired, or replaced. When staff complained, ICDC supervisors told us to go to stores and buy our own.

26. Detainees were rarely, if ever, given even paper facemasks (like surgical masks) even when they begged for them. For this reason, detainees were forced to buy socks from the commissary to tie around their noses and mouths as substitute facemasks.

27. The CDC also requires that staff and detainees "trained to correctly don, doff, and dispose of PPE" —— ICDC never trained anyone about how to put on, take off, and dispose of PPE.

28. The CDC requires regular temperature checks for COVID-19, with the frequency of temperature checks depending on the circumstances: immediately after detainees arrive and before they are brought into the general detainee population, once a day for staff as they arrive for work, twice a day for quarantined detainees, and daily "in housing units where COVID-19 cases have been identified." —— ICDC performed temperature check on new detainees and staff entering the facility, but it rarely performed other checks with the frequency the CDC requires.

29. More important, ICDC misused and never properly calibrated the hand-held temperature gun that was used for temperature check.

30. The guns was routinely pressed to the foreheads of staff and detainees, rather than being held 6-12" away, and were rarely, if ever, cleaned and sanitized.

31. The guns also were never calibrated, which necessary to produced accurate readings. For example, the gun frequently reported low temperatures for me, including below 90 degrees. These are the temperatures one gets when testing recently deceased

Declaration of Dawn Wooten, supporting her DHS OIG complaint
September 2020
Page 6 of 10

people, not living and breathing ones!

32. The CDC has established very detailed standards social-distancing, medical isolation, and COVID-19 quarantining of detainees and staff. For example, the CDC requires detention facilities to:

33. "Implement social distancing strategies to increase the physical space between incarcerated/ detained persons (ideally 6 feet between all individuals, regardless of the presence of symptoms)."

34. "Have staff "maintain a distance of feet or more from an individual with respiratory symptoms while interviewing, escorting, or interacting in other ways."

    c. As soon as an individual [detainee] develops symptoms of COVID-19, they should wear a face mask (if it does not restrict breathing) and should be immediately placed under medical isolation in a separate environment from other individuals."

    d. "Keep the individual's movement outside the medical isolation space to an absolute minimum.

    e. "Provide medical care to cases inside the medical isolation space."

    f. "Serve meals to cases inside the medical isolation space."

    f. "Exclude the individual from all group activities."

    g. "Assign the isolated individual a dedicated bathroom when possible."

    h. "Ensure that the individual is wearing a face mask at all times when outside of the medical isolation space, and whenever another individual enters. Provide clean masks as needed. Masks should be changed at least daily, and when visibly soiled or wet."

    i. "Facilities should make every possible effort to place suspected and confirmed COVID-19 cases under medical isolation individually. Each isolated individual should be assigned their own housing space and bathroom where possible. Cohorting should only be practiced if there are no other available options."

Case 5:21-cv-00056-LGW-BWC   Document 122-20   Filed 12/19/23   Page 8 of 11
Case 7:23-mc-00001-HL   Document 1-6   Filed 05/22/23   Page 7 of 10

Declaration of Dawn Wooten, supporting her DHS OIG complaint
September 2020
Page 7 of 10

    j.    "If cohorting is necessary: Only individuals who are laboratory confirmed COVID-19 cases should be placed under medical isolation as a cohort. Do not cohort confirmed cases with suspected cases or case contacts."

    k.    "Incarcerated/detained persons who are close contacts of a confirmed or suspected COVID-19 case (whether the case is another incarcerated/detained person, staff member, or visitor) should be placed under quarantine for 14 days."

35. ICDC routinely ignored every one of these requirements.

36. From March through July 2020, ICDC adopted inadequate social-distancing policies. ICDC leadership failed to encourage and enforce the CDC's social distancing recommendations. What's worse, ICDC reprimanded staff for practicing social distancing. On various dates from March through May 2020, the former HSA, Ms. Marion Cole, and later in May and June 2020, Ms. Brown verbally reprimanded me for warning other staff to adhere to CDC-recommended distancing guidelines and to use extra precautions when working with someone who has tested positive for COVID-19.

37. For example, from March through July 2020, I observed ICDC unreasonably refuse to isolate, from the general population, both detainees who had tested positive for COVID-19 and those who were COVID-19-symptomatic.

38. From March through June 2020, ICDC routinely failed to inform detainees and staff which persons among the detainee population had tested positive for COVID-19. In June 2020, I had substantial contact with three detainees that, unbeknownst to me, were suspected of having COVID-19 and had submitted COVID-19 test samples. I expressed some concern about this to Ms. Brown and, without telling me the detainees were suspected of having COVID-19 and that they had submitted samples, she assured me the three detainees were negative for COVID-19. Later I learned that the three detainees had in fact tested positive.

39. The CDC also has very strict standards regarding detainee transfers. The CDC says that detention facilities must "restrict transfers of incarcerated/detained persons to and from other jurisdictions and facilities unless necessary for medical evaluation, medical isolation/quarantine, clinical care, extenuating security concerns, or to prevent overcrowding" and "suspend all transfers of incarcerated/detained persons to

Declaration of Dawn Wooten, supporting her DHS OIG complaint
September 2020
Page 8 of 10

and from other jurisdictions and facilities (including work release where relevant), unless necessary for medical evaluation, medical isolation/quarantine, care, extenuating security concerns, or to prevent overcrowding."

40. From March through June 2020, ICDC routinely violated CDC rules regarding detainee transfers.

41. For example, on or about the end of May or early June 2020 ICDC transferred a detainee to the Stewart Detention Center despite ICDC leadership knowing he had tested positive for COVID-19. Other detainees, suspected of having contracted COVID-19 and awaiting their test results, were transferred to other facilities without knowing their test results. ICDC regularly transferred COVID-19-positive detainees to other ICE facilities without informing those facilities that the transferees had tested positive. At the same time, ICDC accepted the transfer of COVID-19-positive detainees from other ICE-related institutions without informing ICDC-housed detainees or ICDC-based staff that the new arrivals were infected with COVID-19. New arrivals were neither tested for COVID-19 nor isolated from other detainees.

42. The CDC states: "It will be especially important for [detention] facilities to coordinate closely with their state, local, tribal, and/or territorial health department when they encounter confirmed or suspected cases among incarcerated/detained persons or staff, in order to ensure effective medical isolation and quarantine, necessary medical evaluation and care, and medical transfer if needed." To the best of my knowledge, ICDC routinely ignored its reporting obligations.

43. For example, from March through May 2020, ICDC violated CDC and Georgia state reporting requirements regarding detainees determined to have or be suspected of having COVID-19 by undercounting and underreporting such cases to both LaSalle corporate and to the State of Georgia.

44. From October 2019 through June 2020, ICDC discriminated against employees and detainees on the basis of race and ethnicity. White nurses who were out sick were not required to report in sick every day, and they were not reprimanded and demoted when they did not report sick every day. In addition, White employees who were out sick with COVID-19 or suspected COVID-19 received "COVID pay," while ICDC did not pay me while I was out sick.

Declaration of Dawn Wooten, supporting her DHS OIG complaint
September 2020
Page 9 of 10

**RETALIATORY REPRIMAND AND DEMOTION.**

45. On Monday, June 22, 2020, I was off work to obtain a COVID-19 test prior to receiving a medically prescribed blood transfusion for my sickle-cell condition. At that time, I was exhibiting symptoms that indicating a potential COVID-19 infection, such as muscle ache, fatigue, and shortness of breath.

46. I expected to quarantine while awaiting the COVID-19 test results, and my physician, Dr. Margaret Richardson Nixon told me I would be in violation of CDC guidelines if I returned to work at ICDC while I was symptomatic. Nevertheless, ICDC required me to return to work and I worked Tuesday, June 23 and Thursday, June 25, 2020. I was scheduled to be off on Friday, Saturday, and Sunday, June 26-28, 2020.

47. I spoke with my supervisor, Ms. Brown. on Thursday evening, June 25, 2020, and told her I expected to receive my test results on Monday, June 29, 2020. An ICDC Human Resources staff-person, Ms. Joan Whitley, then called me and instructed me that I must report in "sick" each day even though ICDC understood I was in quarantine while awaiting the test results. I then spoke with Ms. Brown, who assured me that because ICDC was fully informed of my situation and my doctor's orders and thus it made no sense for me to burden myself and ICDC staff by reporting in sick every day while I was quarantined on doctor's orders.

48. On Monday, June 29, 2020, I received my negative COVID-19 test results and reported them via phone to Ms. Whitley that same day.

49. I returned to work on my next scheduled work-day, Wednesday, July 1, 2020.

50. On the following day, Thursday, July 2, 2020, I was summoned to see Deputy Warden Albright. I was presented with a written reprimand for not reporting to work or reporting in sick on Saturday, June 27, 2020. Ms. Bell was the charging official, Ms. Brown was the investigator, and ICDC Deputy Warden Albright was the reprimanding authority. Ms. Brown falsely indicated on the reprimand form and during the reprimand proceedings that she had informed me that I would have to "call in each day," when, in fact, she had never said that that and actually had said there was no need for me to do that.

51. On or about July 2, 2020, I discussed this matter with ICDC Warden Paulk. I told him of my ten-year history of employment at ICDC and my record of solid performance

Declaration of Dawn Wooten, supporting her DHS OIG complaint
September 2020
Page 10 of 10

and attendance. Warden Paulk expressed anger and frustration and told me that effective immediately he was demoting me. I was no longer to be a fulltime LPN, but instead I would be "PRN" or as needed. This meant that my hours were severely curtailed and I no longer had a regular shift.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 8, 2020, at Tifton, Georgia.

Dawn Wooten

Dawn Wooten