# Exhibit 4

**THE FIRM OF**
**Stacey Evans Law**

Phone: 770-779-9602 | Fax: 404-393-2828
4200 NORTHSIDE PKWY, NW
BLDG ONE; SUITE 200
ATLANTA, GA 30327

*Stacey Godfrey Evans*
*sevans@staceyevanslaw.com*

October 3, 2023

**VIA ELECTRONIC MAIL ONLY**
lizmcnamara@dwt.com

Elizabeth A. McNamara, Esq.
Davis Wright Tremaine LLP
1251 Avenue of the Americas, 21st Floor
New York, NY 10020-1104

RE:   *Dr. Mahendra Amin, M.D. v. NBCUniversal Media, LLC*
United States District Court for the Southern District of Georgia Waycross Division |
Case No. 5:21-cv-00056-LGW-BWC
*Plaintiff's Service of Expert Witness Reply Reports*

Dear Liz:

Enclosed with this letter are the expert reports of Dr. Elbridge F. Bills, M.D., FACOG and Dr. Lauren F. Hamilton, M.D., FACOG that are submitted in reply to the expert rebuttal of Dr. Erin Teeter Carey, M.D. MSCR.

In preparation of his expert reply report, Dr. Bills further reviewed the following medical records, which are identified by patients' first and last initials and Bates numbers.

- M.S.A. – AMIN_0009489
- F.G. – AMIN_0003324
- N.G.H. – AMIN_0001575
- R.L.L. – AMIN_0006761
- S.N. – AMIN_0007011

Yours truly,

*[signature]*

Stacey Godfrey Evans

Elizabetha A. McNamara, Esq.
October 3, 2023
Page 2

cc:  Amanda B. Levine, Esq. (by e-mail only, amandalevine@dwt.com)
Leena Charlton, Esq. (by e-mail only, leenacharlton@dwt.com)
Cynthia L. Counts, Esq. (by e-mail only, cynthia.counts@fisherbroyles.com)
Erik Bierbauer, Esq. (by e-mail only, erik.bierbauer@nbcuni.com)
Taylor Carter, Esq. (by e-mail only, taylor.carter@nbcuni.com)
J. Amble Johnson, Esq. (by e-mail only, ajohnson@staceyevanslaw.com)
Tiffany N. Watkins, Esq. (by e-mail only, twatkins@staceyevanslaw.com)
Scott R. Grubman, Esq. (by e-mail only, sgrubman@cglawfirm.com)

Enclosure



Lauren F. Hamilton, M.D.
Denise H. Devine, M.D.
W. Stanley Ottinger, M.D.
Heidi M. Sapp, M.D.

Monica J. Mitchum, M.D.
Elizabeth A. Richardson, M.D.
Jessica F. Wade, M.D.
Mai N. Dyer, M.D.
Jennifer A. Winkler, CNM

October 1, 2023

Reply to Dr. Carey's opinions

My name is Dr. Lauren Hamilton. I have been asked to provide a reply to Dr. Erin Carey's opinions regarding Dr. Amin's care of two patients, CK DOB ▓▓▓▓ and BP DOB ▓▓▓▓. I hold the opinions presented in this reply report as well as in my affidavit to a reasonable degree of medical and scientific certainty.

My opinion is based on my education, training and treatment of gynecologic patients since starting my practice in 1997. I have reviewed the expert report of Dr. Carey and agree that surgical interventions should always be carefully considered and weighed against potential benefits. I disagree with her statement that Dr. Amin had a clear pattern that led to the most aggressive approach and resulted in unnecessary surgeries. Medical management is always the preferred route of treatment but when that fails, minor surgical procedures are often performed, and then lead to major surgical procedures.

I am fully aware of the requirements of informed consent, as well as shared decision making with patients and providers. I am also fully aware of consenting patients in their primary language via an interpreter, which is an acceptable standard if the consents are not available in the patient's primary language. Only Dr. Amin or the OR staff can truly speak to whether the patient was consented in their primary language via an interpreter. The fact that the consents are in English does not speak to this.

Opinions
I have reviewed the medical records of two patients who Dr. Amin performed hysterectomies on for very different reasons, and these patients and their treatment cannot be compared.

Patient BP ▓▓▓▓▓▓▓▓ was a 36-year-old G5P4A1 who was initially referred to Dr. Amin for lower abdominal pain. A Pap smear was performed on 6/6/2019 which revealed HGSIL. A ultrasound was performed on 6/16/2019 which revealed multiple fibroids as well as a right ovarian cyst. The patient was appropriately scheduled for a hysteroscopy D&C operative laparoscopy, and LEEP excision procedure. Pathology from this surgery revealed carcinoma, in situ or CIN3 with involvement of margins. Although ideally a repeat excision would be performed according to ASCCP guidelines, the guidelines also provide that a simple or modified radical hysterectomy is also acceptable. A simple hysterectomy was performed by Dr. Amin with the diagnosis of stage 1A2 cervical cancer. The patient was appropriately referred to a GYN oncologist. This oncologist requested that the pathology be reread by their team, and the patient either be observed or undergo a second procedure for a lymph node dissection, depending on final pathology.

Dr. Carey reviewed what she thought were several concerning features of this case. Although the LEEP specimen did have positive margins, a simple hysterectomy is acceptable per ASCCP guidelines which was performed. There is no doubt that this patient needed a hysterectomy and earlier in her statement, Dr. Carey reported that being surgically aggressive poses significant medical dangers and risks to patients. This surgical intervention was actually a life-saving procedure for the patient.

• 1027 Physicians Drive, Suite 110, Charleston 29414 •
• 446 Folly Road, James Island 29412 • 929 Bowman Road, Suite 400, Mt Pleasant 29464 •
843.740.6700 *p* • www.charlestonobgyn.com • 843.745.9428 *f*



Lauren F. Hamilton, M.D.
Denise H. Devine, M.D.
W. Stanley Ottinger, M.D.
Heidi M. Sapp, M.D.

Monica J. Mitchum, M.D.
Elizabeth A. Richardson, M.D.
Jessica F. Wade, M.D.
Mai N. Dyer, M.D.
Jennifer A. Winkler, CNM

Patient CK DOB ▮▮▮▮▮▮▮ was a 47 year old G3 P3 who was referred to Dr. Amin in February 14 of 2017 for irregular and heavy, bleeding as well as chronic pelvic pain and vaginal pain. Appropriate labs were performed as well as an ultrasound which revealed a 3.4 cm fibroid. On 4/5/2017, she underwent a laparoscopy with lysis of adhesions, as well as a hysteroscopy D&C. Final diagnosis revealed pelvic inflammatory disease with adhesions with a negative endocervical curettage and endometrial curettage. Patient was given Depo-Provera in March and returned in April and May complaining of pain, dizziness, and heavy bleeding. According to Dr. Amin's note on 5/18, she was offered another D&C with an ablation versus a total abdominal hysterectomy and bilateral salpingo-oophorectomy. The patient chose to have an abdominal hysterectomy and bilateral salpingo-oophorectomy which was performed without complication. Final pathology revealed serosal adhesions, adenomyosis and leiomyoma. She was placed on daily estradiol 2 mg dose.

Dr. Carey opines that CK was a candidate for a minimally invasive route of hysterectomy but there was no documentation on counseling for this. She also disagreed with Dr. Amin and the patient's decision to remove her tubes and ovaries. While the patient may have been a candidate for a minimally invasive hysterectomy, Dr. Amin had already performed a minimally invasive surgery on this patient and noted adhesions and PID, which may be the reason that he did not choose this route. Regardless, what we are debating is not the route of hysterectomy chosen, but whether it was appropriate or not. Dr. Amin performed medical management on this patient which failed, then performed minimally invasive surgical management on this patient which failed, and offered the patient another minimally invasive surgical procedure which she declined. The patient chose the more aggressive procedure which was the hysterectomy. Many patients who have chronic pelvic pain choose to have their ovaries removed and are then supplemented with oral estrogen. It is well documented in Dr.Amin's records that the patient had severe pelvic pain and documented in Dr. Amin's laparoscopy as well as the pathology that the ovaries had adhesions on them, and so to remove these ovaries was a reasonable medical procedure.
Again, the debate is not whether this patient should have had a different type of hysterectomy, but whether a hysterectomy was indicated and reasonable, and it is clear that this hysterectomy was also indicated and reasonable.

I do not know the number of patients that Dr. Amin sees from this facility on a regular basis, but certainly the performance of two hysterectomies in three years seems completely reasonable. There are issues that we could debate regarding Dr. Amin's medical care but it is clear that there were no contraindications to these procedures. Dr. Carey's claim that Dr. Amin's demonstrated a pattern of aggressive and unnecessary surgery is simply not correct.

*Lauren F Hamilton MD*

Lauren Hamilton MD, MS, FACOG
Senior Partner, Charleston OBGYN
Physician Director,
Women's Infants and Children
Roper St. Francis Healthcare system

• 1027 Physicians Drive, Suite 110, Charleston 29414 •
• 446 Folly Road, James Island 29412 • 929 Bowman Road, Suite 400, Mt Pleasant 29464 •
843.740.6700 *p* • www.charlestonobgyn.com • 843.745.9428 *f*

**Alpharetta Office**
3180 North Point Parkway
Building 200, Suite 205
Alpharetta, GA 30005
Phone: 770-777-4933
Fax: 770-777-4934

**Alliance Ob/Gyn Group, LLC**

**Northside Tower Office**
5670 Peachtree Dunwoody Rd., NE
Suite 1240
Sandy Springs, GA 30342
Phone: 404-303-1167
Fax: 404-303-1126

October 3, 2023

Reply to Rebuttal Report of Erin Teeter Carey MD, MSCR

I, Elbridge F. Bills II, MD, have been asked to respond to the report of Dr. Carey on the care and practice patterns of Dr. Amin. I hold the opinions presented in this replied report, as well as my initial report, to a reasonable degree of medical and scientific certainty.

I have reviewed her qualifications as she has stated in Exhibit B. As she stated, she is a sub specialist and works exclusively with minimally, invasive gynecological procedures. She completed her training in 2013. She is a tenured associate professor at one of the top institutions in the country. From this review, I do not believe she has ever worked outside of academia.

When I was approached to review the cases, it was to try to determine if, based on the medical records and not outside information, whether Dr. Amin was providing appropriate care and whether he performed any unnecessary procedures; and as stated in my September 5, 2023 report, I concluded that from my review, it appeared that Dr. Amin has been providing appropriate care to this high-risk, indigent population and has not performed any unnecessary medical procedures. I believe I was selected to do this based on my experience as an expert witness for malpractice cases. I do advertise on several websites to market the services while maintaining a full-time in clinical practice. My opinions are based on review of the medical record only—not subsequent testimony or news reports. None of my time is devoted to research or resident training.

It is my understanding that Dr. Carey has been retained to defend the accusations that unnecessary medical procedures were performed at the Irwin Medical Center. Again, I'm not privy to how or why she was retained, but it seems reasonable to presume Dr. Carey is utilizing information outside of the medical record for some of her conclusions. I will attempt to respond to Dr. Carey's concerns in the order they were written.

In the first paragraph of page one, it is stated that, "Dr. Amin consistently took the most aggressive approach." Although the term "aggressive surgical approach" is well-known, it is not necessarily a derogatory statement. Many surgeons outside academia will routinely recommend surgery as a definitive diagnostic and therapeutic approach. I agree patients should be given treatment options; however, the patient may elect to have surgery based on their own desire or how the options are presented by the surgeon. Exhaustion of medical therapies is not required prior to surgical interventions.



**Alpharetta Office**
3180 North Point Parkway
Building 200, Suite 205
Alpharetta, GA 30005
Phone: 770-777-4933
Fax: 770-777-4934

**Alliance Ob/Gyn Group, LLC**

**Northside Tower Office**
5670 Peachtree Dunwoody Rd., NE
Suite 1240
Sandy Springs, GA 30342
Phone: 404-303-1167
Fax: 404-303-1126

Page 3. IIIa medical chart selection. I am unclear on Dr. Carey's claim regarding medical chart selection. For example, Dr. Carey asserts I have not reviewed medical records for "M.A."—this is false. This patient is erroneously indicated as "M.A." in Dr. Carey's report when Exhibit C identifies this same patient "M.F." In either respect, I have reviewed this patient's medical records. With the except to Exhibit D, my initial review included the same medical records reviewed by Dr. Carey, as set for in Exhibit C. I have also reviewed more than 46 D&C's. Dr. Carey fails to identify what additional patients she has reviewed to support her claim regarding medical chart selection, and I cannot appropriately reply to general assertions without support.

The charts I reviewed were the charts forwarded to me by Dr. Amin's attorney. Dr. Carey describes two patients that underwent a blood transfusion. I presume both these patients had anemia that required preoperative blood transfusion. Dr. Carey states they were not provided hormonal suppression to increase her hemoglobin. Hormonal suppression does not increase hemoglobin. It will simply decrease blood loss and with time (provided the hormonal suppression works; it frequently does not) then iron supplementation can slowly build blood counts back to normal levels.

IIIb. Routinely, interpreting normal physiology as pathology. Dr. Carey gives a description of the variations in endometrial thickness based on sonography. This gives an example of the differences in Dr. Amin's practice patterns and Dr. Carey's practice pattern. We are currently taught that a blind D&C should be essentially replaced by valid imaging modalities or hysteroscopy. Historically, a D&C was done not only as a diagnostic procedure, but also therapeutic, i.e., meaning that a woman's dysmenorrhea (painful periods) could be treated by the D&C procedure itself. It is certainly not uncommon to be treated with a D&C procedure. This was much more likely to be beneficial if the patient did have a thicker endometrial stripe. This is something that is learned based on individual doctor's practice and experience.

IIIc. Ovarian cyst/adnexal masses. Dr. Carey again gives a dissertation on ovarian cyst, care, and treatment. Again, the practice pattern difference appears to be patient follow up in compliance. I am very impressed that Dr. Carey cares for incarcerated patients. That has been extremely rare for me in 30 years of private practice. That did change this year when I became a hospitalist and began caring for indigent women without the means for follow up. I presume in Dr. Carey's care of incarcerated individuals is in a state facility which I presume is relatively stable and not subject to deportation without notice. If pain is related to persistent ovarian cysts, then surgery is indicated. The confounding factor is what time frame would be used for an individual who may not have access to medical care in the future.

Page 5. C. Patterns of aggressive surgical intervention. She states "first-line assessment" should be medical in nature and that the combined intervention of "D & C scope" is rarely necessary in clinical practice. "Rarely necessary" does not mean the option of performing is



**Alpharetta Office**
3180 North Point Parkway
Building 200, Suite 205
Alpharetta, GA 30005
Phone: 770-777-4933
Fax: 770-777-4934

**Alliance Ob/Gyn Group, LLC**

**Northside Tower Office**
5670 Peachtree Dunwoody Rd., NE
Suite 1240
Sandy Springs, GA 30342
Phone: 404-303-1167
Fax: 404-303-1126

wrong. There are plenty of doctors who will offer both conservative as well as surgical options at the onset. Again, there may be a disconnect with her patient population and those in this detention center.

Page 6 begins the discussion of the various surgical procedures. Number one is again discussing dilatation and curettage versus office endometrial biopsy. As I alluded to above, she does not consider that a D&C can be used as a therapeutic, and not a diagnostic procedure, as she describes.

Number two endometriosis surgery. Her statement that "almost no disease was excised or sent to pathology therefore disease cannot be confirmed" is simply not true. Fulguration was historically performed and is still commonly done. It wasn't until the last 20 years that excision was advocated. This is technically more difficult and thus frequently not performed. I understand in her environment that excision in pathological diagnosis is standard of care in the university center. Its absence does not mean substandard care was performed.

Number four ovarian cystectomy. To be clear, I do not justify removal of normal physiological cysts. I am presuming that Dr. Amin is doing that to treat the patient's pain. Dr. Carey points out that patients did have the opportunity for long-term follow up. She does fail to state that they were also taken away without notice. I have no idea of the specifics of their term or length of incarceration and neither does Dr. Carey.

Number 5 Hysterectomy. There is a discussion of five different patients. I will address her comments individually.
1. RFS. I presume in Dr. Carey's clinic the patient's initial surgery would be a robotic myomectomy. Less than one in twenty gynecologists can perform that procedure. Depending on the size and location of the individual fibroids, an open myomectomy may not be technically performed. Specifically, after removing all the fibroids, there may be no uterus left to put back together. Most gynecologists, including I presume Dr. Carey, would disclose during the informed consent for a myomectomy that a hysterectomy may be necessary. In the history and physical dated March 13, 2020, "The patient was examined and given multiple choices. The patient decided to have a hysterectomy because ...". I presume according to this, that she was given options, including fertility sparing options. From Dr. Carey's viewpoint, she did not. Critically, this patient ultimately did not have a hysterectomy due to deportation.
2. BP. I believe she's received life-saving care. Several things are noted that Dr. Carey felt the need to put in bold print. She states that a LEEP with positive margins requires repeat excisional biopsy. This is not true. There is significant cautery artifact associated with the LEEP procedure as opposed to a cold knife cone and in the low-risk population, i.e., with adequate follow up, this can be evaluated with repeat cytology and colposcopy. The patient had a Stage Ia2 cancer. Simply putting in "stage ia2 cervical cancer simple hysterectomy" in Pubmed



**Alpharetta Office**
3180 North Point Parkway
Building 200, Suite 205
Alpharetta, GA 30005
Phone: 770-777-4933
Fax: 770-777-4934

**Alliance Ob/Gyn Group, LLC**

**Northside Tower Office**
5670 Peachtree Dunwoody Rd., NE
Suite 1240
Sandy Springs, GA 30342
Phone: 404-303-1167
Fax: 404-303-1126

(basically google for doctors), the first two articles state how a simple hysterectomy is a reasonable option for treatment instead of a radical hysterectomy.

3. KC. This is the most extreme example of Dr. Carey's implicit bias and review of the records. She gives numerous reasons (less than 250 g uterus, previous cesarean section) that are not contraindications to a minimally invasive hysterectomy. I agree, a minimally invasive procedure is preferable. I perform greater than 95% of my hysterectomies via single incision laparoscopy. However, if a physician performs a hysterectomy abdominally that does not mean he or she is doing anything wrong. In fact, the majority of hysterectomies performed in the United States are done abdominally. She goes on to discuss part of her research showing that minorities are less likely to receive a minimally invasive approach. There are some reasons for this true statement that academia refuses to acknowledge. One is that minimally invasive surgery requires more skill and time. I understand Dr. Carey accepts Medicaid and its several forms in North Carolina (according to UNC website). The majority of community-based, minimally invasive surgeons, at least in the Metro Atlanta and Tampa Bay area, do not for the simple reason that they do not pay enough. I happen to accept Medicaid myself. The other problem with the studies is they usually use 250 g as a cutoff between small and large uteruses. From experience, I can tell you removing a 900 g uterus is significantly more difficult than a 255 g uterus. And although several of my peers may be able to remove a 255 g uterus only a few of us are capable of removing a 900 g uterus via single incision laparoscopy. Certain minorities are genetically predisposed to larger uteruses. She concludes that since the patient had her ovaries removed, she will require hormone replacement therapy, and that any argument of lack of follow up is abandoned because this patient may not receive her hormone replacement therapy. Less than half of women are currently taking any form of hormone replacement therapy. This is more evident in the minority population. This patient's final pathology did reveal a serous cyst adenofibroma of her ovary. Dr. Carey's review of this case seems to be to prove a point as opposed to reviewing the case for merit of what a standard community physician would perform.

4. WD. This is a patient who ultimately did not have a hysterectomy. There are discrepancies within the chart that I cannot evaluate. Neither can Dr. Carey. A 16-week size uterus is something that can be felt abdominally. There are times when a 12-week size uterus will feel 16 weeks when it is elevated out of the pelvis secondary to fibroids. Dr. Carey is able to tell the uterus is normal sized based on a two-dimensional image. I am not. The uterus sounded 13 cm. If one presumes Dr. Amin is lying, then the uterus is normal size. One presumes Dr. Amin is not lying, then one must assume the ultrasound is incorrect. This brings up the subject of ultrasound. Most radiologists realize the shortcoming of sonography is based on the technician performing the procedure. You are taking two dimensional images of three-dimensional objects. The concern here is that a vaginal ultrasound was performed without an abdominal component. I have seen numerous times when a fundal fibroid is out of the field of view of a vaginal ultrasound, however, readily seen abdominally. I have no idea if that is the situation here.

5. CM. Discussion of a patient with pain who had a "D & C scope." She was scheduled for a total abdominal hysterectomy. According to the chart, the patient had a 20-week side uterus.



**Alpharetta Office**
3180 North Point Parkway
Building 200, Suite 205
Alpharetta, GA 30005
Phone: 770-777-4933
Fax: 770-777-4934

**Alliance Ob/Gyn Group, LLC**

**Northside Tower Office**
5670 Peachtree Dunwoody Rd., NE
Suite 1240
Sandy Springs, GA 30342
Phone: 404-303-1167
Fax: 404-303-1126

This is ample reason for a hysterectomy. I'm not sure what her concerns are about this. It does state that the patient was deported on the day she was scheduled for surgery. This reaffirms the inability to know of the follow up of this transient population.

Page 11. d. Medical management practices.
1. Dr. Carey goes on a discussion of Depo-Provera. She provides another dissertation of mechanism of action and physiology. She discusses the use Depo Provera for contraception. I presume since these women are incarcerated it is not being used for contraception but for pain and bleeding control. It is used commonly for this indication. Dr. Amin may have been using Depo-Provera in this population because it is easy and lasts three months.
2. There is subsequently a discussion of LARCs and intrauterine devices. Again, she feels that she must place in bold that a LARC has fewer side effects and less follow-up than Depo-Provera injections. The fallacy in this argument is that IUDs should not be used in people with risk for pelvic, inflammatory disease. There is some argument among academicians regarding this fact. Dr. Amin may have felt this is not suitable for this population and its use is not wrong.
3. There was a discussion of the use of oral progestins, suggesting 3 to 6 months of therapy, which I agree with in context, however, certainly not applicable in this transient population.
4. There was discussion of the high frequency of transvaginal ultrasound. There are no specifics on anything being done incorrectly.
5. There's a subsequent discussion with high frequency of pelvic examinations. This is a relatively new phenomenon to criticize the use of pelvic examinations during a gynecological examination. Pelvic examinations are frequently done to evaluate for hidden pathology. This is not outside standard practice.
6. Dr. Carey next gives a discussion with statistics of cervical cancer screening. She points out that I described life-saving care provided by Dr. Amin, and that's not demonstrated in the medical record review. That's a false statement. The incidence of cervical cancer here is far greater than the general population she describes and without care they both would likely die of their disease.
7. Trauma-informed Care (TIC). Admittedly, I had to look that one up. I would argue that is not a term the vast majority of OB/GYNs are aware of. When I went to PubMed, looking for trauma informed care in obstetrics and gynecology, the earliest reference I could find was 2022. Thus, I do not believe this is relevant to the case that is being reviewed. It reflects Dr. Carey's research and academic status and her bias in trying to review this case.

Page 13. Patient's Medically Managed by Dr. Amin



**Alpharetta Office**
3180 North Point Parkway
Building 200, Suite 205
Alpharetta, GA 30005
Phone: 770-777-4933
Fax: 770-777-4934

**Northside Tower Office**
5670 Peachtree Dunwoody Rd., NE
Suite 1240
Sandy Springs, GA 30342
Phone: 404-303-1167
Fax: 404-303-1126

I agree that three patients were recommended D&Cs. I have no fund of knowledge of how many patients he saw total through this facility.

I believe her conclusions are based not on whether the treatment was adequate, but rather what she would have done in each particular circumstance, but without the benefit of seeing the patients or considering the unique circumstances of this transient population.

I also received five additional charts to review. Three were office notes only without surgical intervention. The two other charts involved a possible ectopic and anemia with a pelvic mass. It appears that Dr. Amin provided appropriate care and that the procedures were medically indicated.

Further, I cannot speak to the testimony of Dr. Anderson or summary findings of Dr. Anderson and others because I do not have a clear understanding of what medical records were reviewed or whether the medical records were of patients of Dr. Amin. Dr. Anderson's remarks are generalizations that I cannot comment or reasonably opine on without an understanding what was reviewed.

Elbridge F. Bills II, MD FACOG