## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF GEORGIA
## WAYCROSS DIVISION

|  |  |
|---|---|
| DR. MAHENDRA AMIN, M.D., | |
| Plaintiff, | Case No. 5:21-cv-00056-LGW-BWC |
| v. | **NBCU'S MOTION FOR SUMMARY JUDGMENT AND SUPPORTING MEMORANDUM** |
| NBCUNIVERSAL MEDIA, LLC, | |
| Defendant. | |

Defendant NBCUniversal Media, LLC ("NBCU") respectfully submits this motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 and Southern District of Georgia Local Rule 56.1.

### PRELIMINARY STATEMENT

On September 14, 2020, a whistleblower complaint alleged that detained immigrant women were being subjected to unnecessary or unconsented-to invasive gynecological surgeries, including hysterectomies (the "Whistleblower Complaint"). The Complaint was newsworthy (as this Court held) and credible (as evidenced by many reliable news organizations promptly reporting the allegations and government officials calling for immediate investigations). Out of this sea of coverage, Dr. Amin's defamation action targets four news reports that aired on MSNBC between September 15 and 17, 2020. MSNBC did not just re-state the allegations of the Whistleblower Complaint, as many news organizations did. Instead, it conducted and relied on additional reporting—interviewing the whistleblower, speaking with detainees' lawyers who expressed serious concerns with Dr. Amin's medical care, consulting a medical expert, and reviewing court records with similar allegations against Dr. Amin. At every turn, the Whistleblower Complaint's allegations were corroborated. In short, MSNBC published each news

report with full confidence in the accuracy of the reporting and no serious doubts.

Now, after a year of discovery, almost forty depositions, and thousands of pages of documents produced, the undisputed material facts dictate dismissal of this action. Dr. Amin's defamation action against NBCU fails for several independent reasons.

*First*, Dr. Amin cannot meet his burden of proving by clear and convincing evidence that the defamatory sting of the challenged statements is false. As he admits, the "gist" of the statements is that he was accused of having "conducted unnecessary and unconsented-to medical procedures on detainees at Irwin County Detention Center ("ICDC"), including large numbers of hysterectomies." The "sting" of that libel is the accusation of "unnecessary" procedures. The record is replete with evidence, including conclusions from a bipartisan Senate investigation, that Dr. Amin performed "excessive, invasive, and unnecessary gynecological procedures" on ICDC detainees. Dr. Amin's response is that whether a procedure is "unnecessary" is a subjective conclusion (or, as he succinctly put it, "a different opinion").   Either way, Dr. Amin cannot meet his burden of conclusively showing falsity, and his claims fail on this basis alone.

*Second*, this Court's Rule 12(c) Order reserved decision on whether statements quoting or paraphrasing the Whistleblower Complaint are protected by Georgia's fair report privilege, observing that, while numerous investigations into Dr. Amin's care were opened, the scope of the agencies' powers and how they were exercised should be developed in discovery. Discovery now establishes that Immigration and Customs Enforcement ("ICE") began investigating the Whistleblower Complaint's allegations immediately and, ███████████████████████████ ███████████████████████████ Other investigations into Dr. Amin's care that could carry significant consequences, including a Department of Justice ("DOJ") criminal investigation, remain ongoing. The evidence establishes that the privilege attaches, and all the

challenged statements that fairly reported on the Whistleblower Complaint should be dismissed.

*Third*, as this Court held, Georgia's public interest privilege applies to the news reports, which requires Dr. Amin to establish by clear and convincing evidence that each challenged statement was published with actual malice—*i.e.* with subjective knowledge that the statements were false or with serious doubts as to their truth. The evidence is undisputed that everyone responsible for the news reports believed the Whistleblower Complaint was credible. And the significant additional reporting they conducted only corroborated the Complaint's allegations. But that was not all. MSNBC published responsive statements from ICE, the company that operated the ICDC, and Dr. Amin's lawyer, as well as information allowing viewers to independently assess the credibility of the whistleblower. In the end, those responsible for each of the three MSNBC shows—which must be analyzed separately—firmly believed in the accuracy of their news reports, including each of the challenged statements. This is responsible reporting that does not come close to the high bar necessary for Dr. Amin to establish actual malice.

For these reasons, summary judgment should be granted, dismissing all claims.

## FACTUAL BACKGROUND

### A.   A Whistleblower Complaint Alleges Medical Mistreatment of ICE Detainees

On September 14, 2020, a group of non-profit organizations sent a Whistleblower Complaint to the Department of Homeland Security ("DHS"), ICE, and ICDC on behalf of detainees and nurse, Dawn Wooten (who qualified as a "protected whistleblower"). *See* NBCU's Statement of Material Facts ("SOMF") ¶¶ 5-7.  The Whistleblower Complaint alleged that there was a pattern of medical mistreatment of ICDC detainees. *Id.* ¶¶ 11-17

Specifically, the Whistleblower Complaint contained a section titled, "Detained immigrants and ICDC nurses report high rates of hysterectomies done to immigrant women." *Id.* ¶ 11. It noted that "several immigrant women" reported their concern about the number of

hysterectomies ICDC detainees received. *Id.* One detainee reported that she had spoken to five women between October and December 2019 who had hysterectomies and "reacted confused when explaining why they had one done." *Id.* She stated, "when I met all these women who had had surgeries, I thought this was like an experimental concentration camp." *Id.* ¶ 13.

Based on her own conversations with detainees, Wooten echoed this detainee's concerns. She stated that "[e]verybody [the doctor] sees has a hysterectomy—just about everybody" and that he has "even taken out the wrong ovary on a young lady" (*i.e.* "[s]he was supposed to get her left ovary removed because it had a cyst . . . [but] he took out the right one"). *Id.* ¶ 14. She reported that detainees called the doctor the "uterus collector," alleging that he is taking "their uteruses out or he's taken their tubes out." *Id.* ¶ 15. Like the detainees, Wooten also stated that women do not "totally, all the way understand this is what's going to happen to them." *Id.* ¶ 16.

The Whistleblower Complaint was not the only claim received by ICDC concerning Dr. Amin's medical care. In November 2018, an attorney representing a detainee complained that her client went to see Dr. Amin, the experience was "painful and traumatic," and the client wanted to see a different doctor. *Id.* ¶ 75. In that 2018 email, ICDC's inmate services director was quoted as saying "this was not the first time someone complained about Dr. Amin." *Id.*

**B. ICE Immediately Begins Investigating and Terminates Dr. Amin**

ICE began investigating as soon as it received the Whistleblower Complaint. By the afternoon of September 15, 2020, ICE employees were compiling information about the number of gynecological procedures performed on ICDC detainees. And by 7:19 pm, the investigation focused specifically on Dr. Amin. *See* SOMF ¶ 107 ("Just got an email from the AD, now they want to investigate the provider so we need to go back five years. Can you pull everything going back five years (2015)?").

By September 16, 2020, ICE employees further researched Dr. Amin's background, discovering that he had been involved in "several instances of settlement related to improper care" and concluding that, if this had been known, ICE "would not have accepted utilizing this specialist." *Id.* ¶ 108. Further, ICE employees pulled data about the number of procedures performed by Dr. Amin and concluded that he had performed six hysterectomies and over seventy other invasive gynecological procedures on ICDC detainees. *Id.* ¶ 109.[1] On September 21, 2020, just one week after the Whistleblower Complaint was sent, ICE ███████████████████████ ███████████████████████████████████████████████████ ████████████████████████████████████████████ *Id.* ¶ 111. Later that day, ███████████████ *Id.* ¶ 112. Likewise, after receiving the Whistleblower Complaint, DHS's Office of Civil Rights and Civil Liberties "immediately opened approximately nine complaint investigations regarding alleged unnecessary gynecological procedures performed on detainees at ICDC without informed consent." *Id.* ¶ 113. By September 18, 2020, █████████ ███████████████████████████████████████████████ followed by the DOJ opening a criminal investigation, which remains ongoing. *Id.* ¶ 125.

## C. News Organizations Across the Political Spectrum Report on the Whistleblower Complaint and Identify Dr. Amin as the Doctor

As ICE was investigating the Whistleblower Complaint, the media was extensively reporting on its allegations. On September 14, 2020, the same day the Whistleblower Complaint was filed, the *Associated Press* published an article titled, "Nurse questions medical care at immigration jail in Georgia." SOMF ¶ 25 (the "AP Article"). The AP Article summarized the contents of the Whistleblower Complaint, including the allegations that the gynecologist was

---

[1] ICE later learned that one hysterectomy was performed by another doctor and other hysterectomies Dr. Amin scheduled for surgery did not take place because the women refused or because they were deported. *See* SOMF ¶ 109.

referred to as the "uterus collector," "[e]verybody he sees has a hysterectomy," and he has "taken out the wrong ovary" on a detainee. *Id.* ¶ 25(b)-(c).

Also on September 14, the Whistleblower Complaint's allegations concerning improper gynecological care were reported in Georgia publications like *The Atlanta Journal Constitution*, national publications like *The Daily Beast* and *Business Insider*, international publications like *The Guardian*, and legal-based news sites like *Law360* and *Law & Crime. Id.* ¶ 28.[2]

By the afternoon of September 15, news coverage included independent corroboration of the Whistleblower Complaint allegations. The news outlet, *Prism*, published the first article naming Dr. Amin, titled, "Exclusive: Georgia doctor who forcibly sterilized detained women has been identified."  *Id.* ¶ 36. Then, an *Intercept* article titled, "'He Just Empties You All Out': Whistleblower Reports High Number of Hysterectomies at ICE Detention Facility" also identified Dr. Amin and reported that detainees claimed that they were pressured to undergo full or partial hysterectomies and "as many of 20 others were recommended for an operation." *Id.* ¶ 37. Dr. Amin is quoted in the article, acknowledging the damage already done by the Whistleblower Complaint, stating that "allegations of performing procedures without patients' consent were ruining his reputation and affecting his practice." *Id.* ¶ 37(g).

### D.  NBC News Reports on the Whistleblower Complaint

 On September 15, 2020 around 8:00 am, NBC News, like many other news organizations, re-published the AP Article on its website, www.nbcnews.com. SOMF ¶ 45. Later that day, after Wooten gave a press conference about the Whistleblower Complaint, NBC News reporter Daniella Silva updated the story to include quotes from the press conference. *Id.* ¶ 50

---

[2] This reporting continued on September 15, 2020 and beyond. News outlets ranging from *CBS News* to  *Fox News* and *Fox 5 Atlanta*, and even *Elle* magazine republished the AP Story, repeating the claims made by Wooten and the ICDC detainees, along with new reporting. Dr. Amin does not challenge *any* of this reporting. SOMF ¶¶ 34, 43, 287.

Two NBC News veteran journalists, Julia Ainsley and Jacob Soboroff, began investigating the allegations in the Whistleblower Complaint on September 14. *Id.* ¶ 66. Ainsley and Soboroff are among the nation's foremost reporters on immigration. They report extensively on ICE issues for NBC News and won an award for their in-depth reporting on the Trump administration's policy of family separation. *Id.* ¶¶ 58-61.

On the evening of September 14, Soboroff scheduled an interview with Wooten for to the next morning. *Id.* ¶ 66. During that interview, Wooten confirmed her allegations in the Whistleblower Complaint (including that women called the doctor the "uterus collector") and reiterated that she spoke directly with women who did not fully understand why their surgeries occurred. *Id.* ¶ 69. And she confirmed speaking first-hand with a woman who said that the doctor took out her wrong ovary and then removed the other ovary, effectively destroying her fertility. *Id*. At the same time, Wooten made clear that she did not know the precise number of women who had surgeries or the name of the outside gynecologist performing them. *Id.*

Soon after the interview concluded, a full video of it was circulated to other members of the NBC News team, including Christopher Scholl, the Deputy Head of Standards NBCU News Group ("Standards"). *Id.* ¶ 88. Standards is a group of veteran journalists who review NBCU reporting to ensure that it accords with the company's journalistic standards of fairness, accuracy, and transparency. *Id.* ¶ 87. Scholl's initial reaction, expressed in a 1:24 p.m. email, was a "concern" with reporting on the interview with Wooten without any additional reporting. *Id.* ¶ 88. But even before receiving Scholl's comments, Ainsley and Soboroff were working on further reporting and had contacted lawyers for ICDC detainees who were treated by Dr. Amin. *Id.* ¶¶ 70-71.

Of the four lawyers Ainsley and Soboroff spoke with, three—Benjamin Osorio, Elizabeth Matherne, and Sarah Owings—agreed to be named in the reporting. *Id.* ¶ 71. The other lawyer,

Andrew Free, was a reliable source Ainsley and Soboroff had relied on in the past. *Id.* ¶¶ 71-72. The attorneys corroborated Wooten and the allegations in the Whistleblower Complaint. *Id*. ¶¶ 71, 89. Osorio said that two of his clients received hysterectomies from Dr. Amin that they believed may not have been necessary. *Id.* ¶¶ 62(h), 77.[3] Owings said that she had heard of many women who were told by Dr. Amin that they had ovarian cysts that needed to be removed or drained (often, an unnecessary surgery). *Id.* ¶¶ 62(i), 76. Matherne stated that she had previously complained about Dr. Amin to ICDC, but her complaints were overlooked (a fact documented in discovery in this case). She also said that multiple detainees told her that Dr. Amin was "rough" and that one of her clients was bruised after he examined her. *Id.* ¶¶ 62(e), 74-75. Further supporting the credibility of the whistleblower's allegations, Soboroff and Ainsley learned that Dr. Amin had settled a complaint brought by the DOJ and state of Georgia, which alleged that he ordered unnecessary procedures on patients to bill Medicare and Medicaid. *Id.* ¶¶ 78-82.

Soboroff and Ainsley contacted ICE and LaSalle for comment about all of the new information they had found. *Id.* ¶ 84. Ainsley also called Dr. Amin's office to request comment, but the office hung up on her when she identified herself as a reporter. *Id.* ¶¶ 37(g), 84.

At this point, Ainsley and Soboroff had significant new evidence that corroborated the allegations in the Whistleblower Complaint, and Ainsley began drafting an article. *Id.* ¶ 89. At 2:45 pm, Ainsley shared the draft article with Scholl and their editors, one of whom noted, "[t]his does feel like a much fuller picture." *Id.* Scholl raised a few questions about details in the article, including whether Dr. Amin had ever had a malpractice claim against him (Ainsley later confirmed he did). The reporters addressed these questions and understood any issues were resolved. *Id.*

---

[3] This accorded with what Osorio told others around the same time. *See* SOMF ¶ 77 (email dated 9/15/20 from Osorio, "I have two clients that had hysterectomies while detained at Irwin." And 9/17/20 *USA Today* article quoting Osorio regarding his two clients who claimed they had hysterectomies from Dr. Amin after being told they had cancer).

Ainsley and Soboroff's article, "Lawyers allege abuse of migrant women by gynecologist for Georgia ICE detainees," was published on www.nbcnews.com at 5:24 pm on September 15, 2020 (the "NBC News Article"). *Id.* ¶ 56. Ainsley, her editor, Scholl, and Soboroff all testified that they believed the published story was accurate, was approved by Standards, and was reportable across NBCU platforms. *Id.* ¶¶ 91-93, 96-97.[4] Very soon thereafter, Scholl asked Ainsley to share the Article on NewsConnect—an internal NBCU News Group[5] platform that allows journalists within the organization to see the Article and rely on it in their own reporting. *Id.* ¶ 95. Significantly, Dr. Amin does not challenge the NBC News Article (or prior reports by NBC News) in this action. *Id.* ¶ 65.

### E.   Relying on the NBC News Article and Prior Reporting, MSNBC Reports on the Whistleblower Complaint

This action arises out of four MSNBC news reports that aired *after* the NBC News Article was published and expressly relied on the Article, together with other sourcing (collectively "the News Reports"). SOMF ¶ 139. Notably, NBC News and MSNBC both operate under the journalistic standards of the NBCU News Group. *Id.* ¶ 87. When MSNBC shows rely on NBC News reporting, as here, they know that it has gone through NBCU's editorial processes and Standards review. *Id.* ¶¶ 165, 201, 284.

### A.   The September 15 *Deadline: White House* News Report

The first News Report that Dr. Amin challenges appeared in the September 15, 2020 episode of *Deadline: White House*, a news and politics television program hosted by Nicolle

---

[4] There was a brief procedural dispute between Ainsley's editor, Mark Schone, and Scholl about his sign off on the Article. As Scholl testified, this dispute did not change the fact that he was comfortable with the Article when it was published, which is documented by the fact he did not request any changes to the Article (other than including later-released statements from ICE, LaSalle, and Dr. Amin) and ensured it was available across NBCU News Group platforms. *See* SOMF ¶¶ 94-95, 98.

[5] NBCU News Group is a business unit within NBCU that includes NBC News, CNBC, MSNBC, NBCU local stations, and Telemundo.

Wallace that airs weekdays from 4:00 pm to 6:00 pm (the "*Deadline* Report"). The *Deadline* Report began at 5:33 pm and ran for about seven minutes. SOMF ¶ 143.

The *Deadline* Report consisted of an interview with Julia Ainsley. *Id.* Shortly before the interview, Ainsley sent a *Deadline* producer a finalized draft of the NBC News Article that she would discuss on the show, stating it was approved by Standards. *Id.* ¶ 171. The segment opened with Wallace describing the "breaking news" about the allegations in the Whistleblower Complaint, which was displayed on screen. *Id.* ¶¶ 144, 148. Wallace then introduced Ainsley, who summarized her NBC News Article, including that four lawyers confirmed they represented ICDC patients who had concerns with Dr. Amin's medical care (including two women who had hysterectomies) and that Dr. Amin had previously been accused of Medicare fraud based on ordering unnecessary medical procedures. *Id.* ¶¶ 149-151. The NBC News Article was displayed on screen. *Id.* ¶ 153. Ainsley explained that when she called Dr. Amin's office for comment, the office hung up on her. Ainsley also read ICE's initial response to the Whistleblower Complaint, displaying it on-screen. *Id.* ¶ 155-56. (ICE issued a second, more detailed response later that evening. *Id.* ¶ 104). *Deadline* played a brief clip of Soboroff's interview with Wooten, *id.* ¶ 154, and ended with Ainsley opining that, based on the Whistleblower Complaint's allegations and information from lawyers, "perhaps" detainees were receiving unnecessary procedures from Dr. Amin and "not enough of what you would need in a short-term detention situation," *id.* ¶ 160.

Dr. Amin challenges eight statements from the *Deadline* Report. *Id.* ¶¶ 142-60. Each is either a quote or paraphrased statement from the Whistleblower Complaint or is information previously published in the NBC News Article. *Id.* Wallace, Ainsley, and Soboroff firmly believed and were confident in the accuracy of the challenged *Deadline* Report. *Id.* ¶¶ 173-75.

**B.  The September 15 *All In* News Report**

The second news report that Dr. Amin challenges appeared in the September 15, 2020 episode of *All In With Chris Hayes*, a news commentary show hosted by Chris Hayes, which airs Tuesdays through Fridays at 8:00 pm (the "9/15 *All In* Report"). SOMF ¶ 176

The 9/15 *All In* Report opened by displaying on screen some of the extensive news coverage surrounding the Whistleblower Complaint that *All In* was relying on, underscoring that the Complaint contained "allegations" about the treatment of ICE detainees. *Id.* ¶ 181. Turning to NBC News's coverage, it then displayed on screen Osorio's quote from the NBC News Article that two of his clients "received hysterectomies they believe may have been unnecessary." *Id.* ¶ 185. Hayes then reported (based on *All In*'s interview with Andrew Free, a credible source previously relied on by Hayes, who was not quoted in the NBC News Article) that a different attorney stated that he had two clients who also had "unnecessary hysterectomies" and "as many as 15 women were given full or partial hysterectomies or other procedures." *Id.* ¶ 186. (Free also gave *All In* a page from his client's medical records documenting a hysterectomy. *Id.* ¶ 213.)

Next, the 9/15 *All In* Report displayed responses received from ICE and LaSalle, including ICE's newly released statement that "only two individuals" were "referred" for hysterectomies. *Id.* ¶¶ 190-91. (Discovery has revealed that ICE's statement was false, and there were at least five referrals for hysterectomies. *Id.* ¶¶ 291, 322.) The 9/15 *All In* Report ended with Hayes's interview of Wooten, during which Hayes made clear that Wooten was basing her information on what detainees told her and that she had been demoted, so that viewers could better evaluate Wooten's credibility. *Id.* ¶¶ 192-96. The 9/15 *All In* Report did not identify Dr. Amin. *Id.* ¶ 197.

Dr. Amin challenges ten statements from the 9/15 *All In* Report. *Id.* ¶¶ 176-77. Except for the two quotes from *All In's* source (Free), every challenged statement was a quote or paraphrase from the Whistleblower Complaint (and had already been reported by multiple news outlets) or

was information reported in the NBC News Article. *Id.* ¶¶ 179-96. Hayes and his producers firmly believed and were confident in the accuracy of the challenged 9/15 *All In* Report. *Id.* ¶ 218.

### C.  The September 15 *The Rachel Maddow Show* News Report

The third news report that Dr. Amin challenges appeared in the September 15, 2020 episode of *The Rachel Maddow Show*, a news commentary show hosted by Rachel Maddow that, in 2020, aired weekdays at 9:00 pm (the "*TRMS* Report"). SOMF ¶¶ 219-20.

The *TRMS* Report began with Maddow providing context for the allegations in the Whistleblower Complaint by referring to past government treatment of immigrant detainees that was widely criticized, including family separation and the tracking of migrants' menstrual cycles to prevent them from obtaining abortions. *Id.* ¶ 222.. Maddow then turned to the Whistleblower Complaint, reading its allegations directly and showing the relevant portions on screen. *Id.* ¶¶ 223-28. Maddow next interviewed Soboroff about his reporting for the NBC News Article and included a clip of his interview with Wooten. *Id.* ¶¶ 220, 235-38, 241-44. Finally, Maddow and Soboroff read (and displayed on screen) relevant portions of the ICE and LaSalle statements, and Maddow included a new statement from Dr. Amin's lawyer that his client "vigorously denies these allegations and will be cleared of any wrongdoing." *Id.* ¶¶ 233-34, 239.

Dr. Amin challenges sixteen statements from the *TRMS* Report. *Id.* ¶ 219. Every challenged statement is either directly from the Whistleblower Complaint (and was already widely reported) or from the NBC News Article. *Id.* ¶¶ 219-244. Maddow, her producers, and Soboroff firmly believed and were confident in the accuracy of the challenged *TRMS* Report. *Id.* ¶¶ 253-55.

### D.  The September 17 *All In* News Report

Finally, Dr. Amin challenges two statements in the September 17, 2020 episode of *All In* (the "9/17 *All In* Report"). SOMF ¶ 273. The 9/17 *All In* Report was informed by newsgathering

by the *All In* producers since the 9/15 *All In* Report, ongoing news coverage of the Whistleblower Complaint, and multiple government officials releasing statements about the allegations in the Complaint. *Id.* ¶¶ 275-76. *All In* received medical records from detainees, spoke with an independent gynecologist, interviewed a detainee (who claimed she "felt she had no right to say anything" about her hysterectomy), and interviewed a Congresswoman. *Id.* ¶¶ 257-72.

The two statements challenged from the 9/17 *All In* Report simply recap that *All In* had been reporting on a "story of allegations of medical procedures performed on immigrant women, many without consent at an ICE detention facility" and that the government had ordered an "investigation" into the claims, which was an established fact evidenced by a *New York Times* article displayed on screen. *Id.* ¶¶ 275-76. Hayes and his producers firmly believed and were confident in the accuracy of the challenged 9/17 *All In* Report. *Id.* ¶ 282.

### E.  Government Officials Speak Out, News Organizations Continue to Corroborate the Allegations in the Whistleblower Complaint, and Detainees Sue Dr. Amin

Soon after news of the Whistleblower Complaint broke, local and national politicians, clearly believing the allegations were credible, expressed serious concerns and demanded investigations. SOMF ¶¶ 116-24. On the afternoon of September 15, before the challenged News Reports, Speaker Nancy Pelosi released a statement calling for an investigation, claiming that "the appalling conditions described in the whistleblower complaint – including allegations of mass hysterectomies," if true, "are a staggering abuse of human rights." *Id.* ¶ 119. On September 15, 173 members of Congress wrote a letter to DHS requesting that it open an "immediate investigation" into "whistleblower allegations of mass hysterectomies." *Id.* ¶ 121. Georgia public officials also spoke out concerning "forced hysterectomies for detained women," and "unconscionable" "mass hysterectomies." *Id.* ¶¶ 117, 124. On September 16, Ken Cuccinelli, Deputy Director of ICE, confirmed that an investigation was underway. *Id.* ¶ 287(f).

In the months that followed, reporting on this subject continued to develop. On October 7, 2020, *Roll Call* published an article reporting that, according to DHS submissions to Congress, a total of *five* individuals from ICDC had been referred for hysterectomies—not two as ICE initially reported. *Id.* ¶ 291. On October 22, 2020, the *Los Angeles Times* published an article reporting that "at least 19 women" claimed that Dr. Amin performed or pressured them to undergo "overly aggressive" or "medically unnecessary" surgeries without their consent, including procedures that could affect their fertility. *Id.* ¶ 292. The article referenced a report written by nine board-certified OB-GYNs who reviewed more than 3,200 pages of medical records for these women. *Id.*[6]

In December 2020, former ICDC detainees filed a putative class action lawsuit against Dr. Amin, LaSalle, and others. *See Oldaker v. Giles*, 20-cv-00224. *Id.* ¶ 298. The detainees alleged that Dr. Amin subjected them to "non-consensual, medically unindicated, and/or invasive gynecological procedures." *Id.* ¶ 302(a). One plaintiff—a survivor of sexual violence—alleged her ultrasound by Dr. Amin as "feeling like she was being raped again" *Id.* ¶ 302(b). Discovery in the *Oldaker* action stayed due to the ongoing DOJ criminal investigation into Dr. Amin. *Id.* ¶ 303.

Finally, in May 2021, DHS announced that ICDC would no longer house ICE detainees. *Id.* ¶ 133. The Warden of ICDC explained that this decision was "at least in part" due to the Whistleblower Complaint allegations. *Id.* ¶ 134.

### F.  Dr. Amin Singles Out MSNBC in the Present Action

On August 26, 2021—nearly one year after the News Reports aired—Dr. Amin's lawyer contacted NBCU, claiming for the first time that the September 15 and 16 News Reports were

---

[6] Similarly, on September 29, 2020, the *New York Times* interviewed sixteen Dr. Amin patients. The article explained that gynecologists reviewed these women's cases and found that Dr. Amin "seemed to consistently recommend surgical intervention, even when it did not seem medically necessary." SOMF ¶ 289. On October 5, 2020, the *Atlanta Journal Constitution* ("*AJC*") published an article reporting that "[d]ozens" of detainees told Congress Dr. Amin "examined them so roughly they returned to jail bruised or bleeding." *Id.* ¶ 290. On June 5, 2021, *AJC* published an article reporting that Dr. Amin billed ICE for "at least eight hysterectomies between 2017 and 2020." *Id.* ¶ 293.

false and defamatory and demanded a retraction.[7] SOMF ¶ 305. The letter gave NBCU no reason to doubt its reporting, and it therefore declined Dr. Amin's belated demand. Dr. Amin filed this action in September 2021. *Id.* ¶ 311.

Dr. Amin has not sued *any* of the other news organization that reported, or continue to report, the same allegations against him. *Id.* ¶¶ 32, 43. He even told the *Intercept* that his reputation and practice were "ruin[ed]" *before* MSNBC published the News Reports. *Id.* ¶ 37(g). Dr. Amin testified that he had never heard of *Deadline*, did not know the host of the show, and did not know when it aired. *Id.* ¶ 313. When asked if he knew the names of *any* of the MSNBC television programs that he was suing over, the best he could muster was, "I think one is Rachel Maddow or something" and "I think Chris, I don't know his last name." *Id.* ¶ 312. In fact, no one deposed by NBCU, including three long-serving employees of Dr. Amin's practice, recalled watching the News Reports. *Id.* ¶ 140. Nor has Dr. Amin produced a single document showing that any patient or potential patient watched, complained about, or even referenced the News Reports. *Id.* ¶ 141.

### G.  The Senate Investigative Report

On November 15, 2022, the Senate Permanent Subcommittee on Investigations, a bipartisan select committee, published a 108-page report titled, "Medical Mistreatment of Women in ICE Detention" (the "Senate Report"). SOMF ¶ 371. The Senate Report, the result of an eighteen-month investigation into the Whistleblower Complaint's allegations, concluded concerning Dr. Amin's care: "Female detainees appear to have been subjected to excessive, invasive, and unnecessary gynecological procedures" and "repeated failures to secure informed consent." *Id.* ¶¶ 372-73. It found that, based on ICE's statistics, Dr. Amin performed *more than 90%* of several invasive gynecological procedures (like laparoscopies) on ICE detainees across the

---

[7] The letter does not mention the 9/17 *All In* News Report. SOMF ¶ 309. Accordingly, pursuant to O.C.G.A. § 51-5-11(c), Dr. Amin cannot seek punitive damages for claims arising from this News Report.

country, even though ICDC housed only 4% of the female ICE detainee population. *Id.* ¶ 376. And while the Senate Report stated that, according to ICE, the two hysterectomies performed by Dr. Amin were appropriate, no other provider across all ICE facilities in the country performed more than one. Further, the Report found that Dr. Amin submitted referrals to ICE for *four* hysterectomies during this time; two were cancelled because they women refused or were deported.  *Id.* 371. Dr. Amin admits he has no basis to challenge the Senate Report's statistics documenting he was a clear outlier in performing aggressive surgeries on detainees and testified that, in fact, he recommended hysterectomies for at least *five* ICDC detainees. *Id.* ¶ 378.

At a hearing, Senator Ossoff referred to Dr. Amin's treatment of ICE detainees as "one of the most nightmarish and disgraceful" things the Subcommittee had ever investigated. *Id.* ¶ 381. Subpoenaed by the Senate Committee to testify, Dr. Amin refused, citing his Fifth Amendment rights and the pending criminal investigation into his care of detainees. *Id.* ¶ 138.

### H.  This Action

On May 3, 2022, Dr. Amin filed an amended complaint—the operative complaint in this action—and NBCU moved for judgment on the pleadings. SOMF ¶ 315. On November 16, 2022, the Court granted-in-part and denied-in-part the motion. *Id.* ¶ 317. It ruled that Georgia's public interest privilege applies to this action, the News Reports concerned issues of public concern, and Dr. Amin would have to show the statements were published with actual malice. *Id.* The Court dismissed all claims arising out of the September 16 *All In* News Report and also dismissed some statements from two other News Reports as non-actionable opinions. *Id.* The remaining challenged statements are listed in Exhibit 1 to the Declaration of Elizabeth A. McNamara.

## <u>ARGUMENT</u>

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and movant is entitled to judgment as a matter of law." Fed. R. Civ.

P. 56(a). "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Brooks v. Cty. Comm'n of Jefferson Cty.*, 446 F.3d 1160, 1162 (11th Cir. 2006). "Unsupported speculation . . . does not meet a party's burden of producing some defense to a summary judgment motion. Speculation does not create a *genuine* issue of fact; instead it creates a false issue, the demolition of which is a primary goal of summary judgment." *Cordoba v. Dillard's Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005).

Under Georgia law, a defamation plaintiff has the burden of proving that the defendant (1) published, (2) a false and defamatory statement of fact, (3) of and concerning the plaintiff, (4) with fault. *Mathis v. Cannon*, 276 Ga. 16, 20-21 (2002). Where a conditional privilege applies to the challenged statements, as here, the plaintiff must demonstrate by clear and convincing evidence that the defendant made the false statement with "actual malice," *i.e.*, that it knew the statement was false, entertained serious doubts as to its truth, or was highly aware that the statement was false. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 334-35, 342 (1974); *see also Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 702-03 (11th Cir. 2016). Because defamation is a "traditionally disfavored cause of action" in Georgia, *Willis v. United Family Life Ins.*, 226 Ga. App. 661, 662 (1997), "summary judgment is the rule and not the exception in defamation cases," *Rosanova v. Playboy Enters.*, 411 F. Supp. 440, 449 (S.D. Ga. 1976), *aff'd*, 580 F.2d 859, 862 (5th Cir. 1978).

Plaintiff's action fails for three reasons. ***First***, Dr. Amin cannot meet his burden of proving the challenged statements false. ***Second***, the challenged statements directly quoting or closely paraphrasing the Whistleblower Complaint are privileged under Georgia's fair report privilege. ***Third***, Dr. Amin cannot establish that NBCU published any of the challenged statements with actual malice. Summary judgment should be granted and the action dismissed with prejudice.

I.    **Dr. Amin Cannot Meet His Burden of Proving Falsity**

    A.  **Dr. Amin Must Establish the "Gist" of the Challenged Statements Is False**

As plaintiff, Dr. Amin shoulders the burden of proof on falsity. *Philadelphia Newspapers v. Hepps*, 475 U.S. 767, 775-76 (1986) (a "constitutional requirement" that private and public figures must establish falsity when speech is of public concern). This burden is meaningful. At summary judgment, Dr. Amin cannot rest on conclusory denials but must show by "clear and convincing evidence" that each of the challenged statements is false. *See Stange v. Cox Enterprises*, *Inc.*, 211 Ga. App. 731, 732-73 (1994). Failure to meet his burden is "dispositive," as Georgia's Supreme Court makes clear. *Cox Enterprises, Inc. v. Thrasher*, 264 Ga. 235, 236 (1994) (affirming summary judgment dismissal where plaintiff was "unable to resolve conclusively whether the speech at issue was true or false.").

"Falsity" in a defamation action turns on objectively false statements that would "have a different effect on the mind of the reader from which the pleaded truth would have produced." *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 517 (1991). This means that the Court first determines "what, exactly, is the defamatory falsehood," if any, about the plaintiff. *See Lovingood v. Discovery Commcn's, Inc.*, 800 F. App'x 840, 848 (11th Cir. 2020). The Court must consider the defamatory "gist" or "sting" of the challenged statements, not technical errors. "[A] statement does not have to be perfectly accurate if the 'gist ' or the 'sting' of the statement is true." *Parekh v. CBS Corp.*, 820 F. App'x 827, 834 (11th Cir. 2020); *Masson,* 501 U.S. at 517.

*Project Veritas v. Cable News Network, Inc.*, 591 F. Supp. 3d 1322, 1332 (N.D. Ga. 2022) *appeal docketed*, 22-11270 (11th Cir. 2022) is instructive. There, CNN reported that the plaintiff violated Facebook's policy on spreading misinformation. The court held this was not "false" even though plaintiff had violated a wholly separate Facebook policy about providing private information. As the court explained, "both violations are similarly damaging to the [plaintiff's]

reputation." *Id.*; *Turner v. KTRK Television, Inc.*, 38 S.W.3d 103, 123 (Tex. 2000) ("An average viewer…would not view a 1.7 million dollar insurance swindle—or even an $875,000 insurance swindle—with any less opprobrium than a 6.5 million dollar swindle."); *Weiser v. Gannett Suburban Newspapers*, 25 Media L. Rep. 2174, 2176 (N.Y. App. Div. Dec. 17, 1996) (article was substantially accurate despite erroneously stating plaintiff was arraigned on 22 felony charges when he was only arraigned on one felony charge).

In sum, Dr. Amin must "conclusively" establish that the defamatory "gist" or "sting" of the challenged statements is false. He cannot meet his burden.

### B. Dr. Amin Cannot Prove That the Gist of the Challenged Statements Is False

Dr. Amin acknowledges that the "gist" of the challenged statements is that he was accused of having "conducted unnecessary and unconsented-to medical procedures on detainees at [ICDC], including large numbers of hysterectomies." SOMF ¶ 351.[8]  Dr. Amin fails to meet his heavy burden of proving falsity.

***First***, the record is replete with evidence showing that he performed unnecessary medical procedures.  At least four OB-GYNs who reviewed medical records for ICDC detainees concluded that Dr. Amin engaged in a pattern and practice of performing unnecessary procedures. *Id.* ¶ 358. NBCU's expert, Dr. Carey, opined that "Dr. Amin consistently acted in a surgically aggressive manner, performing unnecessary surgeries," including over forty unnecessary D&Cs and the unnecessary removal of over thirty functional ovarian cysts. *Id.* ¶¶ 359-62, 364-66. These surgeries carry significant risks to fertility, ███████████████████████ *Id.* ¶ 363. The Senate Report

---

[8] The "gist" of all but three challenged statements concerns "unnecessary" or "unconsented-to" procedures. Two additional challenged statements refer to Dr. Amin "bruising" patients. *See* Statement Nos. 4, 8. Dr. Amin has not come forward with any evidence this is false, and ████████████████████ SOMF ¶ 348. The only other challenged statement claims that an investigation was ordered into the Whistleblower Complaint. (Statement No. 52). This is indisputably true. *See* Order at 17-18; SOMF ¶¶ 106-15, 125-29, 136-38, 371-72.

concluded that Dr. Amin subjected detainees to "excessive, invasive, and unnecessary gynecological procedures." *Id.* ¶ 373. Dr. Peter Cherouny, an OB-GYN retained by the bipartisan Senate Committee to independently review ICDC medical records, testified that Dr. Amin routinely performed unnecessary surgeries, finding that, among other things, Dr. Amin removed ovarian cysts that "generally resolve without surgical intervention" and removed benign fibroids that "could have been evaluated with simple imaging." *Id.* ¶ 383. Other doctors who testified before Congress reached similar conclusions. *Id.* ¶ 384 (Dr. Margaret Mueller: "Our findings identified a disturbing pattern of overly aggressive care . . . and, in some cases, unnecessary surgical procedures"); ¶ 368 ███████████████████████████████████████████

█████████████████████ Concerns also extended to Dr. Amin's hysterectomies, with two doctors concluding that Dr. Amin put a detainee at serious future risk because he performed the wrong kind of hysterectomy before the proper pathology record was obtained.[9] *Id.* ¶¶ 367, 369.

Rather than directly confront these damning findings, Dr. Amin and his expert claim ████

████████████████████████████████████████████████████████████████

████████. For example, Dr. Amin testified that ███████████████████████

████████████████████████████████████████████ *Id.* ¶¶ 353-54, and with respect to the medical necessity of a procedure he performed on an ICDC detainee, ████

████████████████████████████████████████████ *Id.* Dr. Amin's expert similarly testified that ████████████████████████████████████████████

█████████████████ *Id.* ¶ 357. Based on their testimony, Dr. Amin cannot satisfy his burden of establishing falsity because a "subjective assessment, as to which reasonable minds could

---

[9] ███████████████████████████████████████████████████████████████████

████████████████████████████████████ SOMF ¶ 370.

differ," cannot be proven false. *Cottrell v. Smith*, 299 Ga. 517, 523 (2016); *Gast v. Brittain*, 277 Ga. 340, 341 (2003) ("An assertion that cannot be proved false cannot be held libelous . . . however unreasonable the opinion or vituperous the expressing of it may be.").

**Second**, the record likewise establishes that, in many instances, Dr. Amin failed to take the steps necessary to ensure that his patients understood the surgeries he was performing and, for this reason, he did not have their full informed consent. An executed consent form in medicine does not establish informed consent. SOMF ¶ 332 ███████████████████████████████

███████████████████████████████████████████[10] Consent turns on the patient subjectively understanding what the surgery is, why it is necessary, and what the risks and alternatives are. *Id.* Here, there is substantial evidence that Dr. Amin's patients did not adequately understand or consent to the procedures he performed on them. In this action, ICE detainees testified that they did not fully understand what Dr. Amin did to them or why. *See, e.g.*, *id.* ¶ 348 ████████████████████████████; ¶¶ 346-47. And the patients' medical records provide contemporaneous proof that they were often confused about the procedures Dr. Amin performed or planned to perform. *See, e.g. id.* ¶ 350 ███████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████ The detainees in the *Oldaker* action allege that Dr. Amin "performed gynecological procedures . . . without obtaining consent for those procedures." *Id.* ¶ 302(g). Because Dr. Amin cannot "conclusively" establish that all of his surgeries were performed with adequate consent, he cannot meet his burden of proving falsity.

---

[10] The evidence raises serious doubts concerning Dr. Amin's consent forms. His forms were in English, even though many detainees did not speak English. SOMF ¶ 331. █████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████ *Id.* ¶¶ 324-30.

Dr. Amin will seek to avoid dismissal by arguing the falsity lies in the *number* of surgeries (particularly, hysterectomies) he is alleged to have performed. But the "sting" of the libel does not turn on the *number* of procedures performed, whether it was two, four, or "mass" procedures; it is whether Dr. Amin performed *unnecessary* invasive gynecological procedures, including hysterectomies and other procedures that could affect fertility. Dr. Amin understands this critical distinction, as he agrees that "performing even one unnecessary invasive medical procedure would be excessive." SOMF ¶ 352. The law confirms this conclusion. Courts consistently reject defamation claims that rest on an error in the quantity of an alleged act. *See, e.g.*, *Stange*, 211 Ga. App. at 734 ("[V]ariance in the number of owners who alleged or stated that they were deceived" by plaintiff is a "minor factual error[] which do[es] not go to 'the substance, the gist, the sting' of the story"); *Jeter v. McKeithen*, 2014 WL 4996247, at *3 (N.D. Fla. Oct. 7, 2014) ("[R]egardless of whether [plaintiff] was alleged by the police to have bullied 'dozens' of victims or 'at least one' victim the statement communicates the same 'gist' to the audience."); *Koniak v. Heritage Newspapers, Inc.*, 198 Mich. App. 577, 581 (1993) ("[A]rticle stating that plaintiff had allegedly sexually assaulted his stepdaughter thirty to fifty times" was "close enough to the truth" when she testified it was only eight times because "whether plaintiff assaulted his stepdaughter once, eight times, or thirty times, would have little effect on the reader."). [11]

In sum, whether Dr. Amin was performing one or multiple unnecessary hysterectomies or other unnecessary surgeries on ICE detainees (including surgeries that detainees understood to be hysterectomies), the effect on the mind of the viewer is no different. The defamatory "sting" turns

---

[11] Eight challenged statements repeat the Whistleblower Complaint's hyperbolic reference to Dr. Amin as the "uterus collector." *See* Statements 7, 8, 12, 21, 23, 33, 41, 43. This nickname reflected the allegation that Dr. Amin was performing many gynecological surgeries on detainees, not that he was literally collecting uteruses. Discovery has documented that Dr. Amin was a clear "outlier," for example, performing more than *fifty* D&Cs on ICE detainees (a surgery which involves removal of uterine tissue). Testimony also reveals that patients *believed* they were receiving hysterectomies. *See* SOMF ¶ 350.

on allegations that Dr. Amin was putting patients' health or future fertility at risk via his aggressive gynecological procedures. As a matter of law, Dr. Amin cannot prove that "sting" to be false.

## II. Twenty-Two Statements Are Shielded By Georgia's Fair Report Privilege

Next, twenty-two of the remaining thirty-six challenged statements—which directly quote or closely paraphrase the Whistleblower Complaint—are shielded by Georgia's fair report privilege. This privilege applies to "[f]air and honest reports of the proceedings of legislative [bodies], judicial bodies" or "court proceedings," O.C.G.A. §§ 51-5-7(5)-(6), and, as interpreted by Georgia courts, also applies to news accounts of "administrative agencies of the government," when they are acting in a "quasi-judicial" manner. *Morton v. Stewart*, 153 Ga. App. 636, 639 (1980). "Quasi-judicial proceedings" are administrative proceedings "to discipline, remove from office, or revoke a license." *Id.* The privilege reflects Georgia's belief that "it is more important that the public be informed about the privileged proceeding than it is for the defamed person to have legal recourse for publication of the defamatory matter." *McCracken v. Gainesville Tribune, Inc.*, 146 Ga. App. 274, 275 (1978). Said differently, "[t]he public interest in being informed about . . . public controversies . . . demands freedom of the press to report such events without assuming responsibility for what was said by the speaker." *Lawton v. Georgia Television Co.*, 216 Ga. App. 768, 770-71 (1995).

In *Morton*, for example, the court granted summary judgment in a defamation action arising from an article that reported on letters submitted to the Georgia Composite Board of Medical Examiners. The court held the fair report privilege applied because the Board was a quasi-judicial body capable of disciplining the plaintiff, the newspaper article "report[ed] the gist of the letters" to the Board, and the article included information about the plaintiff's side of the story.  153 Ga. App. at 641-42; *see also Ltc. Lawton v. Georgia Television Co.*, 1994 WL 538892, at *6 (Ga. Super. Ct. May 5, 1994) (finding that fair report privilege applied after comparing statements in

National Guard report with statements in television broadcast), *aff'd*, 216 Ga. App. 768 (1995).

In its Order on NBCU's Rule 12(c) Motion, this Court recognized that numerous government investigations into Dr. Amin were opened, yet the Court held that it could not determine whether the fair report privilege applied because it was unclear, at that stage of the litigation, the scope of the "agencies' powers and how they exercised these powers over Dr. Amin. Order at 11-12. It noted "NBCU may well be able to obtain [such information] in discovery." *Id.*

NBCU has done just that. Documents produced in this action show that a Project South attorney sent ICE and LaSalle the Whistleblower Complaint on the morning of September 14, 2020. *See* SOMF ¶ 7. David Paulk, the Warden at ICDC in September 2020, █████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████ As in *Morton*, ICE had the ability to—and did, in fact—discipline Dr. Amin by ending his ability to treat ICE detainees.[12]

Further, the News Reports "fairly and honestly" reported on these statements. They either directly quote from or closely paraphrase the Whistleblower Complaint. *Compare e.g.*, Statement 2 ("Detained women . . . didn't fully understand why they were undergoing hysterectomies."), *with* SOMF ¶ 16 ("Ms. Wooten also stated that detained women expressed to her that they didn't fully

---

[12] The DOJ also opened a criminal investigation into Dr. Amin. The Georgia Composite Medical Board, the same government body at issue in *Morton*, received the Whistleblower Complaint on September 14, 2020, ██████ █████████████████████████████████ SOMF ¶¶ 118, 125. Ultimately, it elected not to discipline Dr. Amin, *id.* ¶ 126, but that has no bearing on the application of the privilege at the time of News Reports. The Senate also investigated Dr. Amin and issued recommendations to ICE concerning its oversight of offsite medical providers.

understand why they had to get a hysterectomy."); Statement 8 ("Well what is he doing…collecting all of our uteruses?"), *with* SOMF ¶ 15 ("I know that's ugly…is he collecting these things or something…Everybody he sees, he's taking all their uteruses out or he's taken their tubes out."). Each News Report underscores that it is referring to *allegations* in the Whistleblower Complaint rather than statements of fact, *see, e.g.*, SOMF ¶¶ 144, 180, 224, 275, and includes available responses or denials from all involved parties, including Dr. Amin, *see e.g., id.* ¶¶ 155-56, 190-91, 232, 234, 239, 279. And it was precisely these allegations of "mass hysterectomies" that were generating a national controversy being addressed by the highest levels of government. Protecting MSNBC's reporting on allegations at the heart of governmental action is the precise purpose of the fair report privilege as articulated by Georgia courts.[13]

### III.    Dr. Amin Cannot Prove that NBCU Acted With Actual Malice

As this Court previously held, Georgia's public interest privilege applies to this action and, under that privilege, Dr. Amin must prove that each MSNBC show published the challenged statements with actual malice. Order at 25-26. Dr. Amin's claims all independently fail because the undisputed record establishes that, based on the reporting of NBC News and the reporting of each MSNBC show, each challenged statement in the News Reports was published firmly believing in its accuracy and with no doubt it was true.

"Actual malice" does not mean malice in the sense of ill will; it means knowledge of falsity or reckless disregard for the truth. *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964).

---

[13] Whether Georgia's fair report privilege is defeated by actual malice appears unresolved.  *See Lawton*, 1994 WL 538892, at *8 ("[T]o require the media to go behind an official Government Report to ascertain whether the contents of the original report are true would . . . place an unacceptable burden on the press in the exercise of First Amendments Rights.).  If it applies, application of the privilege is only defeated if the statements are so inherently incredible to not be plausible. *See AirTran Airlines, Inc. v. Plain Dealer Pub. Co.*, 66 F. Supp. 2d 1355, 1365 n.10 (N.D. Ga. 1999) ("For example, if defendant knew the questionable validity of the preliminary findings, it should have been clearly conveyed to the readers as to not mislead them.").  MSNBC journalists and public officials calling for investigations found the allegations credible and the News Reports made clear that the Whistleblower Complaint contained "allegations" and included contrary statements and evidence to show possible bias. *See also* Section III, *infra*.

"[K]nowledge of falsity is self-explanatory," *Silvester v. Am. Broad. Co.*, 839 F.2d 1491, 1498 (11th Cir. 1988), and requires proof that the defendant was actually aware that the statement in suit was false at the time it was published, *Bose Corp v. Consumer Union of U.S., Inc.*, 466 U.S. 485, 512 (1984). "Reckless disregard," on the other hand, does not mean recklessness in the objective sense of gross negligence. It is, instead, a purely "subjective test" that focuses on "whether the defendant 'actually entertained serious doubts as to the veracity of the published account, or was highly aware that the account was probably false.'" *Turner v. Wells*, 879 F.3d 1254, 1273 (11th Cir. 2018) (citation omitted). Essentially, reckless disregard means that the defendant believed a statement was likely false but published it anyway.

The burden of demonstrating actual malice is "exceedingly difficult to satisfy," *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 768 (1985) (White, J., concurring), and, for this reason, "[c]ourts frequently dispose of the question of malice on the defendant's motion for summary judgment," *Rosanova*, 411 F. Supp. at 448. A plaintiff must prove actual malice "by clear and convincing evidence." *Levan v. Capital Cities/ABC, Inc.*, 190 F.3d 1230, 1239 (11th Cir. 1999); *see also Neff v. McGee*, 346 Ga. App. 522, 529 (2018) ("evidence must show in a *clear and convincing manner* that a defendant in fact entertained serious doubts as to the truth of his statements") (emphasis added). This is a "higher standard of proof than proof by a preponderance of the evidence" and requires that a claim be "highly probable or reasonably certain." *Younger v. Experian Info. Solutions, Inc.*, 817 F. App'x 862, 870 (11th Cir. 2020).

In a case like this one involving a large news organization, this state of mind must "be brought home to the persons in the . . . organization having responsibility for the publication." *Sullivan*, 376 U.S. at 287. Thus, knowledge of falsity must reside in the minds of those responsible for the News Reports at issue. *Id.* (stories in the *New York Times*'s files contradicting a challenged

advertisement was insufficient to "establish that the *Times* 'knew' the advertisement was false"); *Speer v. Ottaway Newspapers, Inc.*, 828 F.2d 475, 477-78 (8th Cir. 1987) (that journalist for news organization provided false account to his colleagues did not establish actual malice when there was no evidence the colleagues, in fact, doubted the story). Here, there is no evidence in this record, let alone "clear and convincing" evidence, that those responsible for each of the News Reports knew the statements were false or had serious doubts about the accuracy of the statements.

### A.  Key Principles That Inform an Actual Malice Analysis

In analyzing actual malice in defamation actions, the Eleventh Circuit and other courts have established core principles that guide the actual malice analysis.

***First***, when a news organization investigates and finds corroborating information for challenged statements—as is the case here—it is "antithetical" to a finding of actual malice. *See Berisha v. Lawson*, 378 F. Supp. 3d 1145, 1162 (S.D. Fla. 2018) (granting summary judgment for lack of actual malice when defendant "*did* conduct his own investigation, which included interviews with sources who corroborated [the] claim"), *aff'd*, 973 F.3d 1304, 1313 (11th Cir. 2020); *Stange*, 211 Ga. App. at 733 ("[T]he investigation which [the writer] undertook tends to corroborate his assertion of good faith and belief in the truth of the published statements."); Order at 32. The reasoning behind this principle is simple: such an investigation shows that the defendant was not "intend[ing] to avoid the truth." *Michel*, 816 F.3d at 703. At the same time, even a "total failure to investigate" a story—which was far from the case here—does not itself establish actual malice, nor does failure to investigate a story to the level desired by the plaintiff. *Torrance v. Morris Pub. Grp.*, 289 Ga. App. 136, 140 (2007); *Levan*, 190 F.3d at 1243 (Defendant "was not required to continue its investigation until it found someone who would stand up for [the plaintiff]."). This is particularly true in cases involving breaking news, where "[i]t is not realistic

to require thorough research or verification." *Rosenbloom v. Metromedia, Inc.*, 415 F.2d 892, 895-96 (3d Cir. 1969).

**Second**, a news organization does not act with actual malice when it relies on reporting done by other reliable news organizations. To the contrary, "[t]he law is clear that individuals are entitled to rely on 'previously published reports' from 'reputable sources.'" *Berisha*, 973 F.3d at 1313 (quoting *Liberty Lobby, Inc. v. Dow Jones & Co.*, 838 F.2d 1287, 1297 (D.C. Cir. 1988)); *see also Rosanova*, 580 F.2d at 862 ("[S]ubjective awareness of probable falsity . . . cannot be found where, as here, the publisher's allegations are supported by a multitude of previous reports upon which the publisher reasonably relied."); *Tobinick v. Novella*, 848 F.3d 935, 947 (11th Cir. 1989( ("[L]ook[ing] to trustworthy sources" including a "*Los Angeles Times* article" negated finding of actual malice). This conclusion is equally true when the reliance is on news reporting within the same news organization. In *Stange*, for example, the plaintiff challenged as defamatory an editorial in a newspaper. That editorial relied on an article written by a reporter in the news organization who had undertaken his own investigation into the facts. In granting summary judgment, the court explained there was no actual malice based on "the editorial's reliance on [the journalist's] investigation." 211 Ga. App. at 733.

**Third**, to avoid a finding of actual malice, a defendant need not "find only pure, unimpeachable sources of information" which is "perhaps impossible." *Berisha*, 973 F.3d at 1313; *see also Spacecon v. Specialty Contractors, LLC v. Bensinger*, 713 F.3d 1028, 1045 (10th Cir. 2013) ("That Bensinger knew Wilson . . . may have been biased . . . is not evidence Bensinger had obvious reasons to doubt the veracity or the accuracy of his report."); *Cobb v. Time, Inc.*, 278 F.3d 629, 638 (6th Cir. 2002) (reliance on paid source with "criminal background" did not constitute actual malice); *Reuber v. Food Chem. News, Inc.*, 925 F.2d 703, 715 (4th Cir. 1991) ("Actual

malice cannot be proven simply because a source of information might also have provided the information to further the source's self-interest.").

Moreover, providing "information contrary to the general conclusions reached in the [news report] . . . tends to undermine the claims of malice." *Michel*, 816 F.3d at 703. Here, each News Report included available statements from ICE, LaSalle, and Dr. Amin, and provided information that allowed viewers to assess Wooten's credibility. Thus, as the Eleventh Circuit recognizes, "[w]here a publisher gives readers sufficient information to weigh for themselves the likelihood of a source's veracity, it reduces the risk that readers will reach unfair (or simply incorrect) conclusions." *Id.*; *see also Klayman v. City Pages*, 650 F. App'x 744, 751 (11th Cir. 2016) ("Evidence that an article contains information that readers can use to verify its content tends to undermine claims of actual malice.").

### B. The Challenged News Reports Were Not Published With Actual Malice

Dr. Amin cannot establish by clear and convincing evidence that those responsible for the News Reports believed the challenged statements were false or had any serious doubt.

### A. The *Deadline* Report Was Published with Confidence in Its Accuracy

First, there is no evidence that those responsible for the *Deadline* Report acted with actual malice. Wallace had full confidence in the accuracy of the Report. She accurately reported on the claims in the Whistleblower Complaint, which news organizations across the spectrum had already reported, making clear they were still "allegations" and not established facts. *See, e.g.*, SOMF ¶¶ 144-48. She then interviewed Ainsley, an experienced journalist whom she trusted, about NBC News's published investigation. *Id.* ¶¶ 149-61, 165.

Ainsley likewise believed her statements on air were entirely accurate and consistent with her previously published NBC News Article, which was the product of an investigation that only

increased the credibility of the Whistleblower Complaint. *Id.* ¶ 174. Aisley and Soboroff spoke to four lawyers representing detainees claiming to have received unnecessary or unconsented-to procedures from Dr. Amin, including two hysterectomies. *Id.* ¶¶ 62(a), (h), 71. One lawyer said that she complained to ICDC years before the Whistleblower Complaint about Dr. Amin's care (a fact confirmed in discovery). *Id.* ¶¶ 62(e), 75. And they discovered that Dr. Amin had previously settled a lawsuit, which alleged he ordered unnecessary procedures for purposes of over-billing the government, a claim strikingly similar to the allegations here. *Id.* ¶¶ 62(h), 78-82.

The *Deadline* Report included information allowing viewers to assess for themselves the credibility of the Whistleblower Complaint's claims. *Deadline* played a portion of Wooten's interview in which she explained that she did not accompany detainees on their visits to Dr. Amin. *Id.* ¶ 154. The Report also included the only statement that ICE had released at that time, denying the claims. *Id.* ¶ 156. Ainsley underscored ICE's point, stating "they're clearly questioning Dawn Wooten here." *Id.* ¶ 157. Finally, she reported that she attempted to contact Dr. Amin's office for comment, but the office hung up on her. *Id.* ¶ 155.

Accordingly, Dr. Amin cannot meet his burden of proving by clear and convincing evidence that those responsible for the *Deadline* Report acted with actual malice.

### B. The *TRMS* Report Was Published with Confidence in Its Accuracy

There is no evidence that those responsible for the *TRMS* News Report had doubts (let alone serious doubts) about its accuracy. SOMF ¶¶ 253-55. Prior to the Report, Maddow read news stories about the Whistleblower Complaint from reputable sources and had no reason to believe they were inaccurate. *Id.* ¶¶ 247, 249. Given her reporting on the long history of immigration-related controversies, she found the Whistleblower Complaint's allegations credible. *Id.* ¶ 251. She made clear to viewers that she was reporting on "allegations" in a Complaint,

including by reading directly from the Whistleblower Complaint. *Id.* ¶¶ 223-28. And she reported on NBC News's independent investigation, which she knew was previously published and which she viewed as a significant corroboration of the Whistleblower Complaint. *Id.* ¶¶ 230-31, 247-48. The show included information contrary to the Whistleblower Complaint. It made clear that Wooten was demoted by ICDC (and therefore may have a bias) and featured on-screen statements from ICE, LaSalle, and Dr. Amin's lawyer. *Id.* ¶¶ 229, 232-34, 239.

### C.  The *All In* Reports Were Published with Confidence in Their Accuracy

Finally, the record establishes that those responsible for the 9/15 and 9/17 *All In* News Reports had complete confidence in the Reports' accuracy. SOMF ¶¶ 218, 281. On September 15, *All In* relied on the Whistleblower Complaint, the NBC News Articles, and a long-standing source, lawyer Andrew Free. *Id.* ¶¶ 200-01, 207. Free informed *All In* that he had two clients from ICDC who had received potentially unnecessary hysterectomies and sent *All In* a page from one of his client's medical records in support. *Id.* ¶¶ 208-09, 213. In addition, Hayes questioned the whistleblower about her allegations on live television, revealing potential bias since she was demoted by ICDC and disclosing that she heard about allegations of improper care from detainees (rather than witnessing procedures first-hand). *Id.* ¶¶ 192-93, 195. *All In* also included statements from ICE and LaSalle, denying the allegations. *Id.* ¶¶ 190-91.  Hayes and his producers firmly believed in the accuracy of their reporting that night and had no doubts. *Id.* ¶ 218.

On September 17, *All In* reported further on Dr. Amin's settled fraud lawsuit, relying on court filings. *Id.* ¶ 278.  Hayes recounted that *All In* had been reporting on "allegations of medical procedures performed on women . . . many without consent." *Id.* ¶ 275. Hayes believed this statement was accurate.  *Id.* ¶ 281. By this point, Hayes had personally spoken with a detainee who had a hysterectomy from Dr. Amin that she claimed she did not fully understand and a vaginal

ultrasound that she was not expecting. *Id.* ¶ 272. His producer obtained that detainee's medical records and discussed them with an OB-GYN, who raised concerns about the hysterectomy's necessity. *Id.* ¶ 263. Hayes also received a psychiatric record for yet another ICDC detainee who indicated that she did not know that her fallopian tube would be removed during a D&C. *Id.* ¶ 257. The 9/17 *All In* Report further stated that the Whistleblower Complaint was under investigation—a fact that had been reported by other news organizations, such as *The New York Times* (displaying the headline on screen)—and Hayes had no reason to doubt it. *Id.* ¶¶ 276-77. Further, despite receipt of Dr. Amin's prior denial of the allegations, *All In* contacted Dr. Amin's attorney again for comment on the fraud suit and showed his comment on screen. *Id.* ¶ 279.

In short, the significant investigation that *All In* conducted proves that, far from looking to avoid the truth, Hayes and his producers investigated the Whistleblower Complaint's allegations and found only corroborating information. They firmly believed in the accuracy of their News Reports and had no doubts, let alone serious doubts. Dr. Amin cannot sustain his burden to prove actual malice.

*     *     *

Dr. Amin has suggested several ever-shifting theories of actual malice throughout this case. None has merit.

***First***, Dr. Amin has alleged that the NBC News Article was not approved by Standards. But testimony is consistent from everyone involved that Standards had no concerns about the reporting at the time it was published. SOMF ¶¶ 92-97, 99, 102. Testimony is similarly clear that Standards worked closely with *Deadline*, *All In*, and *TRMS*, and in an iterative process designed to raise the bar, which was more than met, it was comfortable with the News Reports. *Id.* ¶¶ 171-72, 217, 252, 266-67, 281.

Legally, Dr. Amin's argument has no basis since "actual malice cannot be established merely by showing a departure from accepted journalistic or professional practices." *Blankenship v. NBCUniversal, LLC*, 60 F.4th 744, 763 (4th Cir. 2023) (MSNBC's purported failure to follow its own News Group Policies and Guidelines deemed insufficient to establish actual malice); *Prince v. Intercept*, 634, F. Supp. 3d 114, 140 (S.D.N.Y. 2022) (that reporters "failed to include information regarding their anonymous sources in violation of The Intercept's policies and procedures" was "unavailing"); *Jankovic v. Int'l Crisis Grp.*, 822 F.3d 576, 595 (D.C. Cir. 2016) ("ICG's purported deviations from its normal operating procedures" was not "suggestive of actual malice."). In short, even if one or more News Reports or the NBC News Article *was* published without approval from Standards—and there is no evidence that this occurred—such a deviation would *not* support a finding of actual malice.

***Second***, Dr. Amin places great weight on ICE's second statement (released after the *Deadline* Report) that two detainees were "referred" for hysterectomies. But this ambiguous statement hardly put anyone on notice that the substance of the Whistleblower Complaint was false. As Maddow and Hayes both explained, saying that only two women were "referred" for hysterectomies does not mean that only two women *received* hysterectomies, especially since the Whistleblower Complaint alleged that at least one woman was referred for one procedure, removal of an ovary, and then ultimately had both ovaries removed. SOMF ¶¶ 216; 253; *see also*, Order at 34. Further, Maddow and *All In*'s producer explained that they viewed ICE's statement with skepticism given that ICE had previously released statements that were false, including stating that it had stopped separating migrant children from their parents. *Id.* Their skepticism was justified: days after the challenged News Reports were published, DHS informed Congress that that there were actually *five* referrals for hysterectomies, *id.* ¶ 291, and Dr. Amin's own records and

33

testimony ███████████████████████████████████████████████ *id.* ¶ 322.

Despite questions about the reliability of this ICE statement, *All In* and *TRMS* nevertheless included what they believed to be the most relevant portions of this statement in the September 15 News Reports. *Id.* ¶¶ 190, 234. The law protects their editorial judgment on what to include. *See Jacoby v. Cable News Network, Inc*., 2021 WL 5858569, at *5 (11th Cir. Dec. 10, 2021) (while plaintiff argued that defendants failed to properly frame statements from his representative, a plaintiff "is not entitled to having Defendants credit his preferred sources of information or structure its articles in the manner that he desires."); *Reed v. Chamblee*, 2023 WL 6292578, at *24 (M.D. Fla. 2023) ("A publisher's failure to include allegedly exculpatory information has no bearing on actual malice because a publisher is 'not required to balance its reporting with potentially mitigating factors so long as the reporting [does] not purposely make false statements.'").

**Third**, Dr. Amin faults MSNBC for speaking with lawyers, not detainees, on September 15. But this is nothing more than a dressed-up claim that MSNBC failed to adequately investigate, which cannot support a finding of actual malice. *See* Section III.A, *supra*.  No one had any reason to believe the lawyers were providing false information about their clients' experiences (to the contrary, Free sent a page of his client's medical records to *All In* on September 15 and told *All In* that his client would be willing to speak with Hayes but was at work that evening). And lawyers often speak for their clients; Dr. Amin himself had his counsel communicate his denials to the media. *See* SOMF ¶ 232. Georgia courts have recognized as much. In *Stange*, the plaintiff argued that the defendant failed to speak to each of the purported victims of a scheme at issue. The court disagreed, explaining that even though the journalist did not speak with each victim, "he did interview in each case a person with knowledge, such as an attorney." 211 Ga. App. at 733.

**Fourth**, Dr. Amin alleges that MSNBC was motivated to publish the challenged News Reports both for political purposes—*i.e.* because the 2020 presidential election was fast approaching—and to boost its ratings and drive profits. But "unsupported inferences or conjecture regarding a defendant's motivation" fall far short of proving actual malice. *Smith v. Henry*, 276 Ga. App. 831, 833 (2005). And "if a profit motive could somehow strip communications of the otherwise available constitutional protection, our cases . . . would be little more than empty vessels." *Harte-Hanks Commcn's, Inc. v. Connaughton*, 491 U.S. 657, 667 (1989). Here, no evidence supports Dr. Amin's theory. Wallace, Maddow, and Hayes all stated that did not base editorial decisions on ratings or what they thought would impact the election; they published the News Reports because allegations that ICE detainees were subjected to unnecessary or unconsented-to gynecological procedures were inherently newsworthy. *See* SOMF ¶¶ 173.

**Finally**, Dr. Amin previously argued that even if these allegations individually do not establish actual malice, together they somehow create a triable issue of fact. But allegations that, in and of themselves, are not probative of actual malice, cannot together create actual malice. For example, in *Terrell v. Georgia. Television Co.,* 215 Ga. App. 150 (1994), a former police chief claimed he was defamed by a news report, which reported that cash was found in his office after he resigned from his position and that, according to the mayor, this money was "unaccounted for." The plaintiff argued numerous theories of actual malice, all of which the court rejected individually and then noted, "[t]hese contentions, singly or all together, do not amount of a clear and convincing showing of actual malice." *Id.* at 152; *Jankovic*, 822 F.3d at 597 ("Even taking these flawed evidentiary assertions together, no reasonable jury could find by clear and convincing evidence that ICG acted with actual malice."); *see also Basulto v. Netflix, Inc.*, 2023 WL 7129970, at *50 (S.D. Fla. Sept. 20, 2023) ("Plaintiffs have cobbled together a series of circumstances they deem

to be suspicious and argue that these factors somehow establish actual malice. They do not.").

In sum, the record establishes that Dr. Amin cannot prove that the challenged News Reports were published with actual malice, and summary judgment should be granted for NBCU.

## **CONCLUSION**

For the foregoing reasons, NBCU respectfully requests that this Court grant summary judgment in its favor, dismiss Dr. Amin's claim against it, and award NBCU such other and further relief as the Court deems necessary and proper.

Respectfully submitted,

<table>
<tr>
<td>

_s/ Cynthia L. Counts_
Cynthia L. Counts
Georgia Bar No. 190280
FISHERBROYLES, LLP
945 East Paces Ferry Rd. NE, Suite 2000
Atlanta, GA 30326
(404) 550-6233
cynthia.counts@fisherbroyles.com

</td>
<td>

_s/ Elizabeth A. McNamara_
Elizabeth A. McNamara (_pro hac vice_)
Amanda B. Levine (_pro hac vice_)
Leena Charlton (_pro hac vice_)
DAVIS WRIGHT TREMAINE LLP
1251 Avenue of the Americas, 21st Floor
New York, NY 10020-1104
Tel: (212) 489-8230
lizmcnamara@dwt.com
amandalevine@dwt.com
leenacharlton@dwt.com
_Attorneys for Defendant_

</td>
</tr>
</table>

## **CERTIFICATE OF SERVICE**

The undersigned certifies that on the 19th day of December, 2023, a true and correct copy of the foregoing document was served upon all counsel of record via the Court's electronic filing system.

_Elizabeth A. McNamara_
Elizabeth A. McNamara (_pro hac vice_)
DAVIS WRIGHT TREMAINE LLP
1251 Avenue of the Americas, 21st Floor
New York, NY 10020-1104
Tel: (212) 489-8230
lizmcnamara@dwt.com
_Attorneys for Defendant_