UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
WAYCROSS DIVISION

| | |
|---|---|
| DR. MAHENDRA AMIN, M.D.,<br><br>            Plaintiff,<br><br>v.<br><br>NBCUNIVERSAL MEDIA, LLC,<br><br>            Defendant. | Case No. 5:21-cv-00056-LGW-BWC |

### DECLARATION OF JULIA AINSLEY

I, Julia Ainsley, being of lawful age and otherwise competent to testify in a court of law, hereby declare pursuant to 28 U.S.C. § 1746 and under penalty of perjury that the following is true and correct:

1. I am over the age of eighteen, a resident of Washington, D.C., and am competent to make this declaration. I have personal knowledge of the statements set forth below. I submit this declaration, together with the exhibits annexed hereto, in support of the motion for summary judgment of defendant NBCUniversal Media, LLC ("NBCU").

2. I am an investigative reporter at NBC News. My reporting focuses on homeland security, and I frequently report on matters related to Immigration & Customs Enforcement ("ICE").[1] In the time period relevant to this litigation, I often worked with another NBC News reporter, Jacob Soboroff. Jacob and I have been nationally recognized for our immigration

---

[1] *See, e.g.*, "Trump claims ICE will begin deporting millions," (June 18, 2019), available at: https://www.nbcnews.com/politics/donald-trump/trump-claims-eve-reelection-launch-ice-will-begin-deporting-millions-n1018651; "ICE to launch mass raids targeting undocumented families on Sunday," (June 21, 2019), available at: https://www.nbcnews.com/politics/immigration/ice-launch-mass-raids-targeting-undocumented-families-sunday-n1020446; "Nearly half the employees at an Arizona ICE detention center have tested positive for COVID-10." (July 8, 2020), available at: Nearly half the employees at an Arizona ICE detention center have tested positive for COVID-19 (nbcnews.com).

reporting, including winning the 2019 Hillman Prize for Broadcast Journalism for our coverage of the Trump Administration's family separation policy.

### NBC News Investigates and Reports on the Whistleblower Complaint

3.      I understand that Dr. Amin challenges as defamatory certain statements made on various MSNBC programs, which reported on a whistleblower complaint that alleged that detainees at the Irwin County Detention Center ("ICDC") were receiving unnecessary or unconsented-to gynecological procedures, including hysterectomies, from an outside gynecologist (the "Whistleblower Complaint").  I reported on this story for NBC News in September 2020 and appeared on *Deadline: White House* ("*Deadline*"), which I understand is one of the challenged news reports.  I have reviewed the *Deadline* segment, the article that I drafted about the Whistleblower Complaint, and the relevant documents produced in discovery in this action, and based on that review, I state the following:

4.      To the best of my recollection, I first learned of the Whistleblower Complaint on the evening of September 14, 2020.  I had seen reporting on the Complaint from other reputable media organizations, including a wire story in the *Associated Press* ("*AP*").  The AP wire quoted allegations from the Whistleblower Complaint and included a general statement from ICE about the claims.

5.      Jacob and I discussed the Whistleblower Complaint and believed that it was highly newsworthy and would be of-interest to our readers.  It concerned the potential mistreatment of ICE detainees (a vulnerable population under the control of the United States government) and followed other major news stories about detainee treatment, including family separation, on which we had reported.  We decided to investigate.

6. Jacob reached out to one of the Georgia lawyers who had worked on the Whistleblower Complaint. (A true and correct copy of the text messages I exchanged with Jacob on September 14, 2020 and throughout our reporting process are attached hereto as **Exhibit 1**.)

7. On September 15, I reviewed the Whistleblower Complaint, and found it credible. It was submitted to the United States government with the backing of immigration attorneys. It was based on the account of Ms. Wooten, a nurse at the facility, who explained what she had heard directly from detainees during the course of her employment at ICDC, as well as accounts from detainees interviewed by Project South.

8. That morning, Jacob interviewed Ms. Wooten. I watched the interview and believed that Ms. Wooten was credible. The answers that she provided to Jacob's questions were consistent with her account in the Whistleblower Complaint. Although Ms. Wooten was not able to recount the gynecologist's name or the precise number of women who received procedures from him, I took it as a sign of her credibility that she would not provide information she did not have or engage in conjecture.

9. I then contacted ICE. ICE's spokesperson conveyed that ICE was working to get us data about the number of hysterectomies performed and believed it would negate the whistleblower's claims. ICE did not agree we could publish that statement (telling me that it was "off the record") nor would ICE provide a time by which it would give us this data. Given my experience reporting on ICE, I knew that it could take days and may never be provided.

10. I also contacted a Georgia immigration lawyer, Andrew Free. Mr. Free had been a source to me on immigration issues for years, and I have always found him to be credible, knowledgeable, and well-informed. To the best of my knowledge Mr. Free always provided me with accurate information that has never been challenged, and I trusted him.

11. Mr. Free informed me that he had clients at ICDC who received unnecessary or unconsented-to gynecological procedures, including hysterectomies, which they believed may have been unnecessary, from the doctor, whom he identified as Dr. Amin. Mr. Free provided me contact information for other lawyers with knowledge of what he described, namely, Benjamin Osorio, Elizabeth Matherne, and Sarah Owings.

12. I spoke to Mr. Osorio and, I believe, Ms. Matherne, while Jacob spoke with Ms. Owings.

13. Each of the lawyers with whom I spoke confirmed that they had clients at ICDC who had been mistreated by Dr. Amin. I understood that the lawyers were communicating information they had obtained from their client's medical records.

14. When I speak with sources, I generally type contemporaneous notes in an email and then send that email to myself. This ensures that I am correctly taking down what a source tells me, which I then rely on when I draft an article. Jacob also takes contemporaneous notes on his calls with sources and then sends them to me. I am therefore confident that the quotes and information attributed to these sources in my article accurately reflect the information Jacob and I learned in our interviews. It is my practice to delete emails pertaining to completed stories when my inbox gets full, so I deleted my and Jacob's email notes long before the present action was filed (nearly a year after publication, which was the first time I learned of Dr. Amin's objections to the MSNBC news reports). As a result, I cannot now recall the exact details of these interviews.

15. I again contacted ICE to comment on what we learned from the lawyers. ICE did not respond to the new claims. I called Dr. Amin's office, but his receptionist hung up on me as soon as I identified myself as a journalist. Jacob reached out to LaSalle Corrections, the private prison company that ran ICDC. It also did not respond at that time.

16. At this point, given the significant information we gathered that further corroborated the Whistleblower Complaint, and in light of statements by various elected officials about the Whistleblower Complaint, including from the Chairman of the House Committee on Homeland Security, Bennie Thompson, I believed it was important to inform the public about this highly newsworthy topic.

17. I drafted an article, and I sent it to my editors and Chris Scholl, the Deputy Head of NBCU News Group's Standards Department. Standards reviews our reporting to make sure that it accords with the company's journalistic standards and longstanding commitment to trusted, credible journalism. We had been speaking with Chris about our reporting throughout the day. After Jacob interviewed Ms. Wooten in the morning, Chris had expressed some concern about reporting on Ms. Wooten's interview at that time without further corroboration. I believed that our communications with attorneys for ICDC detainees, together with other facts we uncovered, was the further back-up Chris was looking for.

18. In response to my draft article, Chris asked a few questions, including whether Dr. Amin had any previous complaints against him. We answered the questions and informed Chris that Dr. Amin had been part of an over $500,000 settlement for Medicare/Medicaid fraud. The allegations in that case seemed similar to the allegations in the Whistleblower Complaint—that Dr. Amin had ordered procedures for Medicare/Medicaid patients that were not necessary in order to bill the government. For this reason, we added information about the lawsuit into the draft article.

19. Meanwhile, I continued speaking with our lawyer sources. Mr. Osorio provided me with additional details about one of the two women who he previously told me received a

potentially unnecessary hysterectomy. I updated the draft story to reflect that additional information. *See* **Exhibit 1** at NBCU003153.

20. As Jacob and I were working on reporting the story, I became aware that NBC News had previously published the *AP* wire about the Whistleblower Complaint, and Daniella Silva, a digital reporter from NBC News, updated the wire story with information from a press conference Ms. Wooten held. Daniella added her byline to this updated story. My editor, Mark Schone, and I decided to incorporate some of Daniella's reporting into my and Jacob's reporting and give her the third byline on the article.

21. Through communications with Chris and Mark, by the afternoon on September 15, I understood that Standards was comfortable with the reporting in our updated article, which I told Daniella. The article was published at 5:24 pm (the "NBC News Article") (A true and correct copy of the NBC News Article is attached hereto as **Exhibit 2**.) I believed that everything in the Article was truthful and accurate based on the extensive reporting that Jacob and I had done that day.

### My Appearance on *Deadline*

22. Shortly thereafter, I appeared on *Deadline*. I had no editorial control over the content of the *Deadline* segment, and there was no script for my live interview.

23. I believe that I accurately and fairly explained the state of our reporting on the Whistleblower Complaint when I appeared on *Deadline*. The time constraints of television interviews often limit the amount of detail that can be included about a particular topic, but I made sure to explain what Jacob and I learned from our communications with attorneys for several ICDC detainees, my attempt to contact Dr. Amin for comment, and the statement we received from ICE.

24. I understand that Dr. Amin now challenges three statements that I made on *Deadline*:

    a. "Some [women] said that they came back bruised and that he was overly harsh."

    b. "There were women who were told they needed to have a hysterectomy because they had cancer. One of those women, her medical record does not indicate that she ever had a biopsy to indicate that she had cancer and another case, a lawyer told me that his client had a hysterectomy because she was told she had stage four cervical cancer and after the hysterectomy when she went to the oncologist, the oncologist said you do not have cancer, so these are alarming allegations about this doctor."

    c. Dr. Amin was "perhaps doing very unnecessary procedures and not enough of what you would need in a short term detention facility."

25. The first two statements came directly from my published NBC News Article and reflect information from the lawyers for ICDC detainees. I believed at the time—and still believe—that I accurately recounted what these lawyers told me. I had no doubt about the accuracy of the information they provided since it aligned with the Whistleblower Complaint and other evidence we had uncovered in our independent reporting. I have never heard from any of these lawyers that anything we published in the Article or anything I said on *Deadline* was inaccurate.

26. The third statement conveyed that Dr. Amin was potentially doing unnecessary procedures at ICDC. I believed that conclusion to be true based on the full scope of my prior reporting. In particular, just before making that statement I shared particular facts I learned from the attorneys I interviewed that supported this conclusion.

**Subsequent Updates to the NBC News Article**

27.     After my appearance on *Deadline*, I circulated our published NBC News Article to the Politics DL, an email distribution list that goes to other journalists within the NBCU News Group. Chris asked me to add the Article to NewsConnect, an internal online platform that we use to share reporting across the News Group. I understood Chris's email as further confirmation that he approved the Article and was comfortable with our reporting. At his request, I posted the Article in NewsConnect.

28.     I understand that, upon further review of the published Article, Chris noted that we did not include information concerning other claims against Dr. Amin. While the Article explained Dr. Amin's fraud case and linked to the DOJ's announcement of the settlement, Chris believed it would also be relevant to state, if true, that Dr. Amin had never had a malpractice claim against him. I performed a Google search and found two malpractice actions against Dr. Amin. In the first case, the court overturned a jury verdict in favor of Dr. Amin and ordered a new trial. In the second, the court had dismissed the claims against Dr. Amin. Chris agreed that because Dr. Amin been sued at least twice for malpractice, there was no need to update the Article with this information.

29.     After we published the Article and after my appearance on *Deadline*, we received a new statement from ICE, which stated that only two women at ICDC had been "referred" for hysterectomies. I did not believe this contradicted anything in our Article or anything I had said on *Deadline*. Nor did this cause me to doubt the credibility of the Whistleblower Complaint. The Whistleblower Complaint did not relate to the number of referrals, but whether gynecological procedures, including hysterectomies, were actually performed on the detainees. For example, the Whistleblower Complaint alleged that at least one woman had been referred to Dr. Amin for the

removal of one ovary, but ended up having both ovaries removed, which necessarily would affect her future fertility. The statement recounted ICE's policies for outside medical referrals, which did not respond to the allegations. Based on my experience reporting on ICE, the agency often restates its policies when it is not ready to directly respond to a request for comment. Nonetheless, we updated the Article to include the portions of this ICE statement relevant to the Article.

30. We also received a boilerplate statement from LaSalle Corrections that it refutes allegations of misconduct at its facility. This general statement did not cause me to doubt the credibility of the Whistleblower Complaint. Nonetheless, we updated the Article to include the relevant portions of this statement.

31. That night, we noticed that a BuzzFeed reporter Tweeted out a statement from Dr. Amin's lawyer. Jacob called the lawyer, but reached his answering machine. We later updated the Article to include the statement that he had provided. (A true and correct copy of the Article with these further updates is attached hereto as **Exhibit 3**.)

32. After our September 15 reporting was published and after Jacob and I appeared on *Deadline* and *The Rachel Maddow Show*, Jacob and I recounted via text message some of the facts that we had learned that day, as we commonly do on stories we are covering. *See* Ex. 1 at NBCU003157-59. As evidenced by our exchange, we clearly had confidence in what we had been reporting, including the fact that we had spoken with multiple lawyers and uncovered two hysterectomies and other alleged mistreatment from Dr. Amin. As with any evolving story, we expected that more facts would come out over the next few days, and we were interested in pursuing it. The next day, however, we ultimately decided to move on to other stories.

33. I understood from my deposition that plaintiff believes that our reporting was somehow politically motivated. That could not be further from the truth. As described above, the

9

Whistleblower Complaint was highly newsworthy and was being reported on by news organizations across the political spectrum.

34. I am proud of the reporting that Jacob and I did concerning the Whistleblower Complaint. We shed light on this important issue by speaking directly to the whistleblower, who we believed to be credible, interviewing numerous lawyers for detainees who corroborated the whistleblower's claims, and learning of other probative facts, like the earlier fraud complaint about unnecessary medical procedures that Dr. Amin settled. At every turn, we gave Dr. Amin and the entities involved an opportunity to comment. I believed everything that I published was truthful and accurate.

I declare pursuant to 28 U.S.C. § 1746 and under penalty of perjury that the foregoing is true and correct.

Executed on December 18, 2023.

*Julia E Ainsley*
JULIA AINSLEY