UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
WAYCROSS DIVISION

DR. MAHENDRA AMIN, M.D.,

    Plaintiff,

v.

NBCUNIVERSAL MEDIA, LLC,

    Defendant.

Case No. 5:21-cv-00056-LGW-BWC

## **DECLARATION OF NICOLLE WALLACE**

I, Nicolle Wallace, being of lawful age and otherwise competent to testify in a court of law, hereby declare pursuant to 28 U.S.C. § 1746 and under penalty of perjury that the following is true and correct:

1.    I am over the age of eighteen, a resident of New York, New York, and am competent to make this declaration. I have personal knowledge of the statements set forth below. I submit this declaration, together with the exhibits annexed hereto, in support of the motion for summary judgment of defendant NBCUniversal Media, LLC ("NBCU").

2.    I am the host of the news and politics television program, *Deadline: White House* ("*Deadline*"), which airs on MSNBC between 4:00 pm and 6:00 pm on weekdays. As the host of *Deadline*, I am responsible for the content of the program.

**My Background**

3.    I have spent my professional career working in journalism and politics. I graduated from the University of California, Berkeley with a Bachelor of Arts in mass communications and then received a Master's in journalism from the Northwestern University Medill School of Journalism. After I graduated from journalism school, I was a reporter in California.

4.	In 1999, I became the press secretary for Florida Governor Jeb Bush. I later began working in the White House as special assistant to President George W. Bush and the director of media affairs. In 2003, when President Bush was running for re-election, I became the communications director for the presidential campaign. After President Bush was re-elected, I was promoted to the role of White House Communications Director. I held this role until 2006. I later served as senior advisor for the 2008 John McCain presidential campaign.

5.	In 2014, I began working at MSNBC as a political analyst. My show, *Deadline*, premiered in May 2017 as a one-hour program. In August 2020, it was expanded to two hours.

6.	While we at *Deadline* may be generally aware of what other MSNBC shows are reporting (since my staff members attend MSNBC-wide meetings each day), we make our own decisions about what stories we are going to cover and how to cover them.

### *Deadline* Decides to Report on the Whistleblower Complaint

7.	I am familiar with the September 15, 2020 segment of *Deadline* that is challenged in this action as well as documents produced in discovery related to that segment. Based on that review, I note the following:

8.	To the best of my recollection, I first learned of a whistleblower complaint alleging that detainees at the Irwin County Detention Center ("ICDC") were receiving unnecessary and/or unconsented-to gynecological procedures, including hysterectomies, on the morning of September 15. Querry Robinson, a producer for *Deadline*, circulated to our team an article from *Law & Crime* (Dan Abrams's website) dated September 14, 2020 titled, "'Like an Experimental Concentration Camp': Whistleblower Complaint Alleges Mass Hysterectomies at ICE Detention Center." (A true and correct copy of this email is attached hereto as **Exhibit 1**.) I was familiar with Dan Abrams

(he is a former Chief Legal Correspondent for both NBC News and ABC News) and had no reason to believe that his website would be anything other than a trustworthy source of news.

9. The *Law & Crime* article reported that on September 14, 2020, advocacy organizations filed a whistleblower complaint on behalf of Dawn Wooten, a nurse at an Immigration & Customs Enforcement ("ICE") detention facility in Georgia. The article described the allegations contained in the Whistleblower Complaint, including that multiple women spoke to the advocacy organizations about what they perceived to be an inordinate rate at which women in the Detention Center received hysterectomies. It explained that the women who underwent this procedure were "confused" when asked to explain why they had it. The article also quoted Nurse Wooten as stating in the Whistleblower Complaint, in reference to the doctor who allegedly performed the procedures, "Everybody he sees has a hysterectomy—just about everybody" and referring to the doctor as the "uterus collector." The *Law & Crime* article included a link to the Whistleblower Complaint, which my staff downloaded and reviewed.

10. Upon learning of this story, my team thought we should cover it on *Deadline*, and I agreed. The claims in the Whistleblower Complaint were clearly newsworthy—the Complaint alleged a doctor was performing medical procedures on a vulnerable population that were either improper or without their full informed consent. And this was in the wake of other stories about immigrants being mistreated by the government. While the Whistleblower Complaint discussed hysterectomies, the critical component was that these gynecological procedures were alleged to be unnecessary or performed without adequate consent. Removing an ovary (also referenced in the Complaint) or another invasive procedure would be no less newsworthy.

11. Soon after receiving the *Law & Crime* article, I learned that Jacob Soboroff, an NBC News reporter, was in touch with the whistleblower's lawyer and was going to interview the

3

whistleblower that day.  (A true and correct copy of the email informing me of Jacob's reporting is attached hereto as **Exhibit 2**.)  This provided a means of independently assessing the whistleblower's credibility.

12. I understand that my executive producer, Patrick ("Pat") Burkey, contacted Jacob and asked him to keep us posted about his interview with the whistleblower as we might want Jacob to appear on the show to discuss the story and his interview.  (A true and correct copy of the text message exchange between Pat and Jacob has been shared with me and is attached hereto as **Exhibit 3**.)

13. Following Jacob's interview with the whistleblower, we learned that he and Julia Ainsley were doing additional reporting on the story, including speaking with attorneys for some of the detained women who saw the doctor in question.  Julia and Jacob are nationally recognized for their immigration reporting.  In 2019, they won the Hillman Prize for Broadcast Journalism for their coverage of the Trump administration's policy of child separation.  I had full confidence that we could rely on Jacob and Julia's reporting on this story.

14. Jacob also shared the footage of his interview with the whistleblower with my team. Upon watching it, my staff agreed that the whistleblower appeared to be credible.  Her allegations were consistent with those made in the Whistleblower Complaint.  Further, when she did not know information—like the exact number of women who had hysterectomies or the name of the off-site doctor—she said she did not know.  I often find sources to be more credible when it is clear that they are honest about what they do and do not know.  And, Ms. Wooten was forthright about the fact that the facility had demoted her, which she said was done after she spoke out about its treatment of detainees.  Publicly acknowledging her demotion was another indicator of credibility.

15. By that afternoon, we decided to move forward with a segment on the show reporting on the Whistleblower Complaint. By that point, the story was not only generating widespread news coverage, but politicians were speaking out and raising concerns about the allegations. For example, Nancy Pelosi, who was then the Speaker of the House of Representatives, issued a statement in which she called for an immediate investigation into the Whistleblower Complaint. (A true and correct copy of this statement is attached hereto as **Exhibit 4**. A true and correct copy of an email between my producer, Regina Donizetti, and Jacob discussing this statement, which has been shared with me, is attached hereto as **Exhibit 5**.) From my work in government and in journalism, I understood this statement from a high-level lawmaker as a sign that the government was taking the Whistleblower Complaint seriously.

16. We initially intended to interview Jacob live on the show, since he was the NBC News journalist who had personally spoken to the whistleblower. My team drafted a brief introduction to the segment, which incorporated a clip from Jacob's interview with the whistleblower. As is customary for live interviews, we did not script the proposed interview with Jacob. It turned out, however, that Jacob was appearing on another, non-NBCU show at the time of our segment. We decided to interview Julia since she and Jacob had been reporting on the story together all day.

17. Julia told us that she would be able to share on *Deadline* the name of the doctor referenced in the Whistleblower Complaint and accounts from four lawyers representing detainees at the ICE detention center. In preparation for appearing on the show, Julia sent my producer a draft of the article that she and Jacob were publishing, which she noted had been approved by Standards— a team within the NBCU News Group that reviews and talks through our reporting to ensure that it accords with the News Group's journalistic standards. (A true and correct copy of

the email thread between Regina and Julia, the contents of which were shared with me, is attached hereto as **Exhibit 6**.)  We understood that NBC News published Julia and Jacob's article (the "NBC News Article") shortly before Julia appeared on *Deadline.*

18.  *Deadline* was independently in touch with Standards concerning our coverage of the Whistleblower Complaint and the NBC News Article.  Standards never expressed any concern about *Deadline* reporting on the Whistleblower Complaint or NBC News's story.  Standards specifically approved having Jacob (when we believed he would be our guest) read a statement that ICE had issued concerning the Complaint.  *See* **Exhibit 5**.

**The September 15, 2020 *Deadline* News Report Is Broadcast**

19.  The *Deadline* news segment aired on September 15, 2020, beginning around 5:30 pm.  (A true and correct copy of the video of the September 15, 2020 episode of *Deadline* is attached hereto as **Exhibit 7**.  The relevant segment begins at 01:34:15.  In addition, attached hereto as **Exhibit 8** is a true and correct copy of a transcript of the September 15, 2020 episode of *Deadline*.  The relevant segment begins on Page 10 of the transcript.)  In the segment, I gave a short introduction to the Whistleblower Complaint, interviewed Julia about NBC News's reporting, and played a clip from Jacob's interview with the whistleblower. I understand that Dr. Amin is challenging eight statements from the segment. I believed each challenged statement to be entirely accurate.

20.  ***First***, I understand that Dr. Amin challenges the statement, "High numbers of female detainees, detained immigrations, at an ICE detention center in Georgia received questionable hysterectomies while in ICE custody," which I made in the introduction to the segment.

21. I did not doubt the accuracy of this statement. It was a summary of the allegations in the Whistleblower Complaint, which I made clear by noting, immediately before the challenged statement, "An alarming new Whistleblower Complaint, alleges quote…" I used the word "quote" before stating "high numbers" to make clear that this phrase was directly from the Whistleblower Complaint. I believed the allegations in the Whistleblower Complaint were inherently credible given the recent history of ICE-related controversies. And they only became more credible after NBC News's reporting, including speaking with lawyers who said their clients at ICDC had been mistreated by this gynecologist, and finding that Dr. Amin had settled a claim with the government for inflating Medicaid procedures (which seemed similar to the allegations in the Whistleblower Complaint that Dr. Amin was performing unnecessary procedures and getting reimbursed by the government). These same allegations had been reported by numerous other reliable news organizations, including in the *Law & Crime* article that was published well before our news report.

22. **<u>Second</u>**, Dr. Amin challenges the statement I made, "Detained women . . . didn't fully understand why they were undergoing hysterectomies." But Dr. Amin's recitation of this statement omits relevant context. I began this statement by explaining that the Whistleblower Complaint was filed by a nurse who worked at the detention center, and "[t]he nurse says that detained women told her they didn't fully understand why they were undergoing hysterectomies." I made clear that this was coming directly from the Whistleblower Complaint by showing it on the screen with a pull-quote.



23.     For the same reasons as stated above, I did not doubt this statement.  In fact, the Whistleblower Complaint itself included a first-hand interview with a detained woman who said that she was confused about the medical procedure she was supposed to receive and that someone told her she was going to be having a hysterectomy.

24.     ***Third***, I understand that Dr. Amin challenges two statements made by Julia Ainsley during our interview: (1) "Some [women] said that they came back bruised and that he was overly harsh;" and (2) There were women who were told they needed to have a hysterectomy because they had cancer.  One of those women, her medical record does not indicate that she ever had a biopsy to indicate that she had cancer and another case, a lawyer told me that his client had a hysterectomy because she was told she had stage four cervical cancer and after the hysterectomy when she went to the oncologist, the oncologist said you do not have cancer, so these are alarming allegations about this doctor."

25.     I did not doubt these statements by Julia during our interview.  Julia is a highly regarded reporter on immigration issues, had been reporting on this story all day, and I believed she was accurately summarizing her reporting.  She was recounting the same information already published by NBC News.

26. Here, our belief in the accuracy of Julia's reporting was only heightened because, per my team's communications with her, we understood that her Article had been reviewed by Standards.

27. **Fourth**, Dr. Amin challenges two statements made by the whistleblower during her interview with Jacob: (1) "That's his specialty, he's the uterus collector;" and (2) "Well what is he doing . . . collecting all of our uteruses?"

28. When Ms. Wooten referred to Dr. Amin as the "uterus collector," I did not understand her to mean that Dr. Amin was literally collecting uteruses. Instead, I understood her to be saying that Dr. Amin had this figurative nickname based on the fact that he was performing many gynecological surgeries on detainees, including hysterectomies.

29. I did not doubt Ms. Wooten's account of Dr. Amin being called "the uterus collector," nor did I doubt the facts alleged in the Whistleblower Complaint that supported this figurative nickname. These statements aligned with what Ms. Wooten had previously stated in the Whistleblower Complaint, so her story was consistent. And, by this point, NBC News had found a lawyer who stated that two of his clients received unnecessary hysterectomies. Further, the phrase "uterus collector" had been included in many news reports before ours.

30. In the clips we included of Ms. Wooten's interview, she made clear that she did not accompany the detainees when they received procedures from the doctor. This allowed our viewers to understand that the whistleblower did not witness the doctor's treatment first-hand, but had instead heard about it from the detainees, allowing them to assess the credibility of their allegations for themselves.

31.     **_Fifth_**, I understand that Dr. Amin challenges a statement that Julia made at the end of the segment that it seemed like Dr. Amin was "perhaps doing very unnecessary procedures and not enough of what you would need in a short term detention facility."

32.     This statement was Julia's opinion based on her reporting that day, including conversations with lawyers that she recounted during our interview. Indeed, immediately before this challenged statement, Julia noted that lawyers said that their clients could not get diabetes medication but were able to go to the gynecologist for a pap smear and keep going back to the doctor when that pap smear was irregular. I found this to be suspicious, particularly because, as Julia explained, these ICE detainees were not supposed to be able to stay in detention for longer than six months. I did not doubt any of these facts that formed a basis for Julia's opinion, nor did I doubt her conclusion that Dr. Amin may have been performing unnecessary procedures even while detainees did not receive enough care in other ways.

33.     **_Sixth_**, Dr. Amin challenges the banner that appeared on our screen during the reporting, which read: "Whistleblower: High Number of Hysterectomies At ICE Detention Ctr." I understand that Dr. Amin omits the word "Whistleblower," but that word is important context. The banner made clear that this was an allegation in the Whistleblower Complaint. As explained above, at the time of this reporting, I did not doubt the allegations in the Whistleblower Complaint.

34.     In addition, in keeping with the guidance Standards provided, we made sure to include the comment that ICE had issued about the Whistleblower Complaint, which we showed on screen. Julia was also clear that she had reached out to ICE about NBC News's specific reporting, but ICE had not yet provided any further comment.



35. I understand that, after our show aired, ICE did provide another statement to Julia concerning the Whistleblower Complaint. Because that statement was not received until after the challenged *Deadline* segment, we could not include it in our reporting.

36. Julia also noted that she attempted to call Dr. Amin's office, but the office hung up on her as soon as she identified herself as a journalist.

37. Overall, at the time of the September 15 *Deadline* episode, I understood everything contained in our reporting to be entirely accurate, and I understood my team felt the same way. I did not have any doubts about the truth of what we reported, and no one on my team expressed any doubts. Our reporting was based on the Whistleblower Complaint and NBC News's reporting, which corroborated allegations in the Whistleblower Complaint, and which I trusted. Dr. Amin refused to provide a comment and ICE merely gave a boilerplate denial. High-level government officials such as Nancy Pelosi had made public statements showing that they took the allegations in the Whistleblower Complaint seriously. And, as we reported, Dr. Amin had previously been involved in a civil settlement of over $500,000 for fraudulent Medicaid billing, which gave further credibility to the Whistleblower Complaint's allegations. We had been working with Standards and Julia represented that she had done the same. And our reporting accorded with the reporting

11

that other news organizations were doing on the Whistleblower Complaint, including using many of the same quotes from the Complaint that appeared in the *Law & Crime* article that I viewed as reliable.

### The Present Litigation

38. I understand that Dr. Amin alleges that we published the segment to feed our ratings. That is categorically false. *Deadline* was simply reporting on a newsworthy story about the alleged treatment of ICE detainees. These allegations were already garnering government attention (as evidenced by Speaker Pelosi's statement) and were being reported on by various media outlets. I did not—and still do not—know what ratings the segment received. At *Deadline*, we do not decide which stories to cover on a given day based on how we think they might affect the ratings. In fact, I think viewers tend to turn off the news when they see reporting on abuses in the immigration system, which can be emotionally difficult to watch.

39. Following our reporting, we did not hear about any concern or other issue with this news report. This was not surprising as it was entirely consistent with the widespread news coverage of the Whistleblower Complaint that began prior to the September 15, 2020 *Deadline* segment and continued long after.

40. The first I heard of any challenge to the news report was in August 2021—nearly one year after it was televised. At this time, a lawyer for Dr. Amin sent a letter to NBCU requesting that it retract the news report. Because we believed the news report was accurate and fair, we saw no reason to retract it.

I declare pursuant to 28 U.S.C. § 1746 and under penalty of perjury that the foregoing is true and correct.

Executed on December 18, 2023

NICOLLE WALLACE