UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
WAYCROSS DIVISION

DR. MAHENDRA AMIN, M.D.,

    Plaintiff,

v.

NBCUNIVERSAL MEDIA, LLC,

    Defendant.

Case No. 5:21-cv-00056-LGW-BWC

## DECLARATION OF CHRISTOPHER HAYES

I, Christopher Hayes, being of lawful age and otherwise competent to testify in a court of law, hereby declare pursuant to 28 U.S.C. § 1746 and under penalty of perjury that the following is true and correct:

1. I am over the age of eighteen, a resident of Brooklyn, New York, and competent to make this declaration. I have personal knowledge of the statements set forth below. I submit this declaration, together with the exhibits annexed hereto, in support of the motion for summary judgment of defendant NBCUniversal Media, LLC ("NBCU").

2. I am the host of the news and commentary television program, *All In with Chris Hayes* ("*All In*"), which airs on MSNBC Tuesdays through Fridays between 8:00 and 9:00 pm. As the host of *All In*, I am responsible for the content of the program.

### My Background

3. In 2001, I graduated from Brown University with a Bachelor of Arts in philosophy. Following graduation, I began my career in journalism, working for local publications in Chicago. In 2007, I became the Washington D.C. editor for the publication *The Nation*.

4.      In 2010, I began working for MSNBC, and in September 2011, I began hosting a weekend morning show called *Up with Chris Hayes*. I began hosting *All In* in 2013. Since its inception, *All In* has won two Emmy awards and has been nominated many other times, including in 2015 for our reporting on women's healthcare.

5.      My *All In* team and I decide what news to cover on each evening's show and how to present this news to our viewers. When there is breaking news—like the whistleblower complaint at issue in this action—several MSNBC shows may cover the same news story, along with the media more generally. While my producers may know generally what topics other MSNBC shows are covering, we make our own decisions about whether and how to cover stories.

### *All In* Decides to Report on the Whistleblower Complaint

6.      I understand that Dr. Amin currently challenges as defamatory twelve statements made in the September 15 and September 17 episodes of *All In*. As discussed below, when we made these statements, I believed them to be accurate based on the reporting conducted by reputable media organizations, including NBC News, and the significant independent investigation undertaken by my team at *All In*. I have reviewed the challenged news reports and relevant documents produced in discovery and, based on that review, I state the following:

7.      As I explained in my deposition in this action, I first learned of a whistleblower complaint alleging that female detainees in immigration detention were receiving unnecessary or unconsented to gynecological care (the "Whistleblower Complaint") on social media on September 14 or 15. The Complaint also was being discussed and reported on by news organizations across the political spectrum. Some of the rhetoric around the story by commentators on social media evoked images of government-sanctioned sterilizations.

8. As with any story going viral on social media, I viewed the online rhetoric about the Complaint with a reporter's baseline skepticism. But, as I testified at my deposition, I viewed the actual allegations of the Whistleblower Complaint to be credible, and I thought *All In* was well-positioned to investigate and report on those allegations. *All In* had previously reported extensively on the treatment of Immigration and Customs Enforcement ("ICE") detainees, including the separation of migrant children from their parents. I viewed this new story as an extension of that reporting.

9. I found the Whistleblower Complaint to be credible for several reasons. *First*, it was made by a nurse who worked at the ICE facility. The claims that she made in the Complaint were based on her own conversations with detainees. *Second*, it appeared that the Whistleblower Complaint had been sent to various government agencies, including ICE, the Department of Homeland Security's Office for Civil Rights and Civil Liberties, and the Department of Homeland Security's Office of Inspector General. *Third*, the Whistleblower Complaint was prepared by legal counsel at Project South, and contained accounts from both the whistleblower and from ICE detainees, which corroborated each other.

10. Although the Complaint focused on hysterectomies in particular, to me, what was newsworthy about the story was not the specific procedure being discussed but, more broadly, that a highly vulnerable group of people in ICE custody could have been subjected to invasive medical care without their informed consent.

11. My staff contacted the whistleblower, Dawn Wooten, on September 15, and she agreed to appear live on *All In* to discuss the Complaint. Her willingness to go on national television to answer questions only gave me greater confidence in her story. At the same time, because Ms. Wooten was basing her claims on what she was told by detainees, I wanted to do

further reporting to see if we could corroborate the allegations, ideally finding someone who actually experienced this alleged improper care.

12. To that end, on September 15 I also made contact with Andrew Free, an immigration lawyer who had been a long-time source of mine. In my experience, Mr. Free is knowledgeable and operates in good faith. As I testified at my deposition, he has a deep understanding of immigration law and explains it in a way that I, as a non-lawyer, understand. I referred Mr. Free to Alexander ("Xander") Price, one of the segment producers on our show, because Xander was responsible for the script on September 15. I have worked with Xander for years, believe he is an excellent reporter and producer, and had complete confidence in his ability to produce an accurate and thoughtful script for this segment.

13. On September 15, I also learned that Julia Ainsley and Jacob Soboroff, two award-winning reporters for NBC News, were looking into the allegations in the Whistleblower Complaint. I trusted their journalism and integrity, knew that they were well-sourced in the immigration world, and knew that *All In* would be comfortable in relying on their reporting when we did our segment about the allegations in the Complaint. I also knew that their reporting would go through the editorial processes at NBC News, which gave us a further basis to rely on it.

14. Through our reporting and the reporting that was ultimately published by NBC News, I learned that Dr. Amin was the doctor referenced in the Whistleblower Complaint. I also learned that Dr. Amin had previously been a defendant in a False Claims Act lawsuit brought by the Department of Justice and the State of Georgia. The lawsuit claimed that Dr. Amin gave standing orders to perform allegedly unnecessary medical procedures if the government could be billed for the procedures, and the action was ultimately settled for over $500,000.

15. The allegations in the False Claims Act action were similar to the allegations here—*i.e.* performing unnecessary procedures (whether those procedures were ultrasounds, hysterectomies, or something else) and billing the government for them. Thus, reviewing the False Claims Act case, which the defendants had settled for over $500,000, revealed a possible pattern for Dr. Amin's alleged current conduct and gave me further confidence in the allegations in the Complaint.

16. In sum, by the time we went on air on September 15, we had read the Whistleblower Complaint and found it to be credible on its face, identified the doctor referenced in the Whistleblower Complaint, spoke with a lawyer who corroborated the claims in the Whistleblower Complaint based on his own clients and documentation (and this attorney was a source we previously used and found credible), reviewed Dr. Amin's previous False Claims Act case that gave further credibility to the allegations, and had read the published NBC News Article and reporting from other third-party news organizations that we were confident we could rely on.

### *All In* Broadcasts The September 15, 2020 News Report

17. On September 15, 2020, *All In* aired its first news report about the allegations in the Whistleblower Complaint. During this news report, I briefly summarized the allegations and explained what *All In* and others had been able to learn about them. I then interviewed the whistleblower, Dawn Wooten, and her attorney, John Whitty. (A true and correct copy of the video of the September 15, 2020 episode of *All In* is attached hereto as **Exhibit 1**. The relevant segment runs from 31:24 to 40:50. In addition, attached hereto as **Exhibit 2** is a true and correct copy of a transcript of the September 15, 2020 episode of *All In*.)

18. As part of our September 15, 2020 segment, I read from portions of the statements released by ICE and LaSalle Corrections (the private prison company that ran ICDC), noting that

we had received a "long" statement from ICE. Thus, I was alerting viewers to the fact that we were reporting what we deemed to be the portions of the statements most responsive to the claims being discussed in our segment. Excerpting from statements is a common and necessary journalistic practice, because constraints of time and space often do not allow for an entire statement to be used. We wanted to explain that ICE was taking the Complaint seriously and stated that the allegations would be investigated by an independent office. We displayed that statement on screen.



19. Further, because we were reporting allegations that there had been four women identified as receiving hysterectomies, we wanted to include the portion of ICE's statement noting that only two women were "referred" for hysterectomies. I explained to our audience that I had a question about what ICE meant in using the word "referred."

6



20. For the LaSalle statement, we also included the relevant portion of the statement that directly addressed allegations of misconduct.



21. At the time of the September 15, 2020 segment, we did not yet have a statement from Dr. Amin (indeed, the NBC News Article noted that his office hung up once the journalists identified themselves as reporters), so we could not include one in our reporting. We did not name Dr. Amin in this news report, referring to him instead using the general term "doctor"

7

22. I understand that Dr. Amin challenges ten statements from the September 15, 2020 episode of *All In*, although two of these statements are duplicative:

23. **First**, Dr. Amin challenges the statement "migrant women say that a doctor was performing unauthorized hysterectomies on immigrant women detained at that facility." This was a summary of the allegations in the Whistleblower Complaint, which had been widely reported on by numerous news organizations—a point that I made clear by showing headlines from other, third-party news reports on-screen. I made this statement in the opening of the segment, stating explicitly that this was an "allegation" in a formal Whistleblower Complaint, which also alleged that the detention facility lacked protection against COVID-19 for detained immigrants and that detainees suffered from a lack of medical care.

24. I believed that Dr. Amin performed unauthorized hysterectomies on immigrant women. The reporting that *All In* conducted throughout the day had corroborated the allegations in the Whistleblower Complaint that there were ICDC detainees who received gynecological procedures, including hysterectomies, without fully understanding what was happening.



25. **Second**, I understand that Dr. Amin challenges the statement "two of his clients received hysterectomies they believe may have been unnecessary." I was specifically quoting

8

from the published NBC News Article, which attributed this information to a named lawyer for detainees. We displayed part of the NBC News article on-screen to make clear to viewers where we had obtained this information. I had no doubt about the accuracy of this statement and no reason to doubt it. At *All In*, we frequently rely on the reporting of reputable news organizations, like NBC News. NBC News has particular credibility to me because I'm familiar with the rigorous internal policies and processes that NBC News follows.



26. ***Third***, I understand that Dr. Amin challenges the statements, "two different women who claim they also had unnecessary hysterectomies while detained at this facility" and "[a]s many as 15 immigrant women were given full or partial hysterectomies or other procedures for which no medical indication existed." These statements are based on *All In*'s own reporting, specifically Xander's conversations with Mr. Free. During these conversations, Mr. Free informed Xander that he personally represented two women who believed they received unnecessary hysterectomies, and that he spoke with other lawyers who similarly represented women who received other unnecessary gynecological procedures. He said that these allegations were corroborated by documentation that he or other lawyers reviewed.

9

27. I did not doubt the accuracy of these statements. I believed Mr. Free to be a trustworthy source and had relied on him in the past without issue.

28. ***Fourth*,** I understand that Dr. Amin challenges three statements made by Ms. Wooten during my interview of her: (1) "Is he the uterus collector?[1] Does he collect uteruses?"; (2) "Everyone that I talked to has had a hysterectomy"; and (3) "They would say, is he the uterus collector?"

29. These statements are direct quotes (or paraphrasing) of the Whistleblower Complaint and were previously reported by many other news organizations (including NBC News) prior to *All In*. When Ms. Wooten used the phrase "uterus collector" and said that "everyone" she talked to had a hysterectomy, I did not understand her to be saying that Dr. Amin was literally collecting everyone's uteruses. Instead, I understand these terms as hyperbole to reflect the fact that Dr. Amin was performing many suspect gynecological surgeries on women, including surgeries that removed portions of their reproductive organs. The idea that Dr. Amin was performing many such gynecological procedures was entirely credible based on what I had learned from *All In*'s reporting, the published NBC News Article, and the fact that federal and state authorities previously had accused Dr. Amin of ordering unnecessary procedures in a lawsuit that was settled for over $500,000.

30. I found Ms. Wooten to be very credible during her interview on *All In*. She was able to provide details about the claims she was making, including the specific dates that she heard women referring to Dr. Amin as the "uterus collector."

31. I also provided our viewers with information that would allow them to independently assess Ms. Wooten's credibility. I asked Ms. Wooten how long she had worked at

---

[1] Dr. Amin's complaint lists this statement twice.

ICDC and what her role was. This information would allow viewers to assess whether she was in a position to know about improper care. She responded that she worked at the facility as a medication nurse three different times, the latest time beginning in 2019.

32.  Through my questioning of Ms. Wooten, I also made it clear to viewers that she learned information from speaking directly with detainees about their concerns with the doctor's care, not from working directly with the doctor and or witnessing the procedures first-hand. I also underscored for viewers that Ms. Wooten had been "essentially demoted" from a full-time employee to a swing employee and that she claimed this was "punishment" for her allegations about care at ICDC. This information was important because it allowed viewers to understand and evaluate Ms. Wooten's credibility.

33.  **_Fifth_**, I understand that Dr. Amin challenges a statement made by Ms. Wooten's attorney, John Whitty, at the end of our interview that "there's a large population of these—of these women, immigrants . . . who have been mistreated in this way, assaulted." This statement was made in response to a question I asked, whether Mr. Whitty believed there would be more women coming forward with allegations. Mr. Whitty opined that, based on the claims in the Whistleblower Complaint from Ms. Wooten and detainees, there appeared to be a large population of women who could come forward.

34.  Mr. Whitty's opinion was supported by the facts as I knew them. The idea that there were numerous women who had been "mistreated" or "assaulted" at ICDC aligned with the allegations in the Whistleblower Complaint. In addition, NBC News reported that, according to lawyers, Dr. Amin treated detainees "roughly" and caused "bruising." And *All In* had similarly spoken with a lawyer who claimed that women had been mistreated by Dr. Amin. Indeed, I

11

understand that many women have since filed a lawsuit against Dr. Amin accusing him of medical battery.

35. **_Finally_**, I understand that Dr. Amin challenges the banner that appeared during this news report, "Complaint: Mass Hysterectomies Performed On Women At ICE Facility." I did not doubt the banner's accuracy. We used the word "Complaint" to make clear that this was an allegation coming from the Whistleblower Complaint itself. The Whistleblower Complaint refers to a "high number" of hysterectomies, and "mass" is a shorter synonym that can fit on a banner. As we displayed at the outset of the segment, other news outlets such as *The Daily Beast* used the same synonym. The substance of the segment gave context to the banner: that the reporting of NBC News and *All In* had found four alleged hysterectomies, and there were allegations of other invasive procedures. We were confident that the gist of the Complaint's allegations were accurate and we had no concern with referencing the language of the Whistleblower Complaint, as multiple news organizations did before us.

36. In sum, I was confident in the accuracy of our reporting in the September 15, 2020 *All In* news report. I did not believe—nor did I have any reason to believe—that we had published any false information. I was proud of our reporting. Our show had moved the story forward by conducting our own investigation of the allegations in the Whistleblower Complaint. And the reporting that *All In* did, along with the reporting of others including NBC News, corroborated the Whistleblower Complaint's allegations.

### *All In* Continues Reporting on the Whistleblower Complaint and Broadcasts Another News Report About It on September 16, 2020

37. Following the September 15, 2020 news report, *All In* continued investigating the Whistleblower Complaint. In so doing, we had a phone call with NBCU News Group's Standards Department to keep them apprised of our continued reporting. Christopher Scholl, one of the

members of Standards, reminded us to "stick with" the tenor of Julia and Jacob's NBC News Article and to continue to frame the claims in the Whistleblower Complaint as allegations. We followed Chris's advice as we continued our reporting.

38. What we found on September 16 further supported the credibility of the Whistleblower Complaint's allegations:

   a. We learned of another detainee, Pauline Binam, whose psychiatric records showed that she had gone in for surgery expecting a dilation & curettage but woke up and learned that the doctor had performed a salpingectomy, which is the removal of a fallopian tube. This corroborated the allegations in the Whistleblower Complaint that women did not fully understand what was happening to them.

   b. I interviewed a detainee who received a hysterectomy from Dr. Amin, who we referred to as "B" because she was in active immigration proceedings. "B" claimed that she "felt like [she] had no right to say anything" when Dr. Amin said he was going to perform a hysterectomy on her. I found "B" credible. I understood that she was hesitant about speaking with us because she was in active immigration proceedings but did so in order to make sure other women were not harmed by this doctor. And her story supported the Whistleblower Complaint's allegations.

   c. Before "B's" appearance on the show, we received her medical records and Xander reviewed those records with an OB/GYN, who said the hysterectomy done by Dr. Amin was not the appropriate or best procedure. "B" should have been referred to cancer specialist before proceeding with a hysterectomy. This too aligned with the Whistleblower Complaint's allegations of improper medical procedures, including hysterectomies.

39. Accordingly, on the evening of September 16, *All In* aired a report discussing these updates from our investigation. (Attached hereto as **Exhibit 3** is a true and correct copy of a transcript of the September 16, 2020 episode of *All In*.) I opened the segment by telling viewers that *All In* had continued running down the story, and our show had found three women who had procedures they either did not consent to or felt coerced into consenting to ahead of time.

40. I understand that Dr. Amin argues that this statement, referring to three "procedures" shows that we doubted our reporting from the night before about the number of hysterectomies performed by Dr. Amin. As I explained in my deposition, that is not true. The previous night, we referred to four women that had received hysterectomies—two that we had found and two from NBC News's independent reporting. On September 16, we were discussing what we at *All In* specifically had learned about through our own reporting, which included the two hysterectomies that Mr. Free told Xander about on September 15, plus Ms. Binam's story about undergoing a salpingectomy.

## *All In* Broadcasts The September 17, 2020 News Report

41. On September 17, 2020, *All In* aired another report about the Whistleblower Complaint. It focused on relevant context to the Whistleblower Complaint, namely Dr. Amin's 2015 False Claims Act settlement. We again discussed our reporting with Standards to ensure they were comfortable with it.

42. Dr Amin does not challenge any statement concerning his 2015 settlement. Nonetheless, I understand that Dr. Amin challenges as defamatory two statements from the September 17, 2020 episode of *All In*. (A true and correct copy of the video of the September 17, 2020 episode of *All In* is attached hereto as **Exhibit 4**. The relevant segment runs from 34:50 to

14

38:22. In addition, attached hereto as **Exhibit 5** is a true and correct copy of a transcript of the September 17, 2020 episode of *All In*.)

43. ***First***, I understand that Dr. Amin challenges as defamatory the introduction to the segment, "We've been bringing you the story of allegations of medical procedures performed on immigrant women without – many without consent at an ICE detention facility in Georgia."

44. I believed this statement to be accurate. It was a brief summary of the reporting we had done over the last three days. In addition to the Whistleblower Complaint and all the independent news reports (including the NBC News Article) we were relying on, *All In* had found at least two instances of women who claimed that they received medical procedures without consent, including "B" (who believed she did not consent to a vaginal ultrasound and "had no say" in her hysterectomy) and Ms. Binam (who claimed that she did not know she was going to receive a salpingectomy). And we were careful to still frame these statements as "allegations" to make clear that there had been no official finding of fault against Dr. Amin, in accordance with guidance from Standards. Further, I understand that since our reporting, the United States Senate issued a report finding that Dr. Amin performed many unnecessary medical procedures and failed to properly secure informed consent.

45. ***Second***, I understand that Dr. Amin challenges a banner that appeared on the screen during this news report, which read "Investigation ordered into claims of unnecessary medical procedures on immigrant women."

46. I had no doubt this banner was accurate. This information came from a *New York Times* article, the headline of which we displayed on-screen, so viewers would understand our sourcing for this statement.

15



47.  The *New York Times* is a highly credible source of information and, accordingly, we had no reason to doubt that an inquiry had been ordered into Dr. Amin. In fact, I now understand that there were several subsequent investigations into Dr. Amin, including by the United States Senate.

48.  For these reasons, at the time we published the September 17 news report, I believed the challenged statements (and everything else that we reported) to be entirely accurate.

### The Present Litigation

49.  I understand that Dr. Amin believes that we reported on the Whistleblower Complaint to increase our ratings. This is not true. I do not review ratings for *All In*, and I do not know how these segments rated.

50.  I also understand that Dr. Amin believes that we reported on the Whistleblower Complaint because we were two months away from the 2020 presidential election. This too is false. We were not making editorial decisions about this story based on the upcoming election. And I saw reporting on the Whistleblower Complaint by various news organizations across the political spectrum.

51. Following our reporting, we did not hear about any issues with the substance of these news reports. Nor would I have expected to hear such concerns. We had investigated the allegations in the Whistleblower Complaint and found evidence to corroborate the allegations. If Dr. Amin had any issues with our news reports, I would have expected to hear about it given that we had been in touch with his lawyer and he had given us statements.

52. The first I heard of any challenge to the substance of the news reports was in August 2021—nearly one year after they were televised. At this time, a lawyer for Dr. Amin sent a letter to NBCU requesting that it retract some of the news reports. While Dr. Amin's letter referenced the September 15 and 16 *All In* news reports, it did not take issue with the September 17 episode. Because we had confidence in our reporting, we declined to retract it. The first I heard that Dr. Amin took issue with our segment on September 17 was when he filed the present litigation.

I declare pursuant to 28 U.S.C. § 1746 and under penalty of perjury that the foregoing is true and correct.

Executed on this 14 day of December 2023.

_____
CHRISTOPHER HAYES