UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
WAYCROSS DIVISION

| | |
|---|---|
| DR. MAHENDRA AMIN, M.D., <br><br> Plaintiff, <br><br> v. <br><br> NBCUNIVERSAL MEDIA, LLC, <br><br> Defendant. | Case No. 5:21-cv-00056-LGW-BWC |

**DECLARATION OF ALEXANDER PRICE**

I, Alexander ("Xander") Price, being of lawful age and otherwise competent to testify in a court of law, hereby declare pursuant to 28 U.S.C. § 1746 and under penalty of perjury that the following is true and correct:

1. I am over the age of eighteen, a resident of Berkeley Heights, New Jersey, and competent to make this declaration. I have personal knowledge of the statements set forth below. I submit this declaration, together with the exhibits annexed hereto, in support of the motion for summary judgment of defendant NBCUniversal Media, LLC ("NBCU").

2. I have worked for MSNBC for eleven years. I am a segment producer of *All In*.

**The Challenged *All In* News Reports**

3. I understand that, in this action, Dr. Amin challenges as defamatory certain statements from *All In* news reports that aired on September 15 and 17, 2020. These news reports concerned a whistleblower complaint that alleged that female immigrant detainees at the Irwin County Detention Center ("ICDC") in Georgia were receiving unnecessary or unconsented-to gynecological procedures, including hysterectomies (the "Whistleblower Complaint"). I also understand that Dr. Amin had initially challenged as defamatory certain statements from *All In's*

September 16, 2020 news report on the Whistleblower Complaint, but that the claims arising out of that segment were dismissed from the case.  I worked on the challenged segments.

4. I have reviewed the declaration submitted by Chris Hayes in this action, in which he explains how and why he believed the challenged statements were accurate.  I agree with Chris that we firmly believed that each of the challenged statements was accurate and true at the time we reported it.  With this declaration, I provide additional background information about the investigative reporting that I conducted for these news reports and why I believed our reporting was accurate.

### September 15, 2020

5. On September 15, 2020, as Chris described in his declaration, *All In* decided to report on the Whistleblower Complaint. By the time I was assigned to work on the segment, I understood that we had booked Ms. Wooten for a live interview on the show, and my role was to do further reporting on the Whistleblower Complaint and draft an introduction to Chris's interview.

6. As I explained in my deposition, upon reading the Whistleblower Complaint, I believed it to be credible.  It was a formal complaint filed with multiple high-ranking Department of Homeland Security ("DHS") officials and the Warden of ICDC.  It seemed highly unlikely that a detention center employee would file such a serious complaint—and put her name to it—unless she believed it to be true.  Further, Dawn Wooten was not just any employee, but a nurse, meaning she would understand medical terminology and procedures.  And the claims she made in the Whistleblower Complaint were based on her direct conversations with detainees about their experiences, not rumors.

7. In addition to Ms. Wooten's claims, the Whistleblower Complaint also included accounts from ICDC detainees, which corroborated Ms. Wooten's allegations about gynecological procedures. For example, one of these detainees alleged that at least five women had undergone hysterectomies in a short timeframe and did not understand what had happened to them. Another detainee said that she was scheduled for a gynecological surgery with this doctor but was confused about what procedure she was having after she received numerous different explanations. While these detainees were not named in the Whistleblower Complaint, this did not cause me to doubt their accounts. To the contrary, it would have been surprising to me if these women—who were at risk of deportation by the United States government—decided to be identified in a whistleblower complaint.

8. After reading the Whistleblower Complaint, I also read a significant amount of third-party reporting about the Complaint, including in the *Associated Press*, *Law & Crime*, the *Intercept*, the *Atlanta Journal Constitution*, the *Daily Beast*, and other news outlets. I was not surprised that so many other reputable media organizations were reporting on the story. It seemed highly newsworthy to me due to the substance of the allegations—*i.e.* gynecological procedures performed on detainees that were unnecessary or done without their full consent—particularly given the recent history of controversies surrounding ICE, such as family separation.

9. By the afternoon of September 15, I knew that Jacob Soboroff, who was one of NBC News's top immigration reporters, was investigating this story. I am familiar with Jacob's work and think that he is an outstanding journalist. I believed that if he published an article about the Whistleblower Complaint, it would be something that we could rely on for our show. This was both because I knew Jacob is an excellent journalist who is experienced and well-sourced in his reporting about immigration matters, and also because Jacob's article would go through the

3

editorial processes and Standards review at NBC News. When covering national breaking news stories, we often rely on reporting from NBC News, and sometimes also rely on previously published news reports from other reputable news organizations.

10. Because *All In* has frequently reported on immigration issues, Chris Hayes has cultivated sources knowledgeable about this subject. That afternoon, he sent me the phone number of a Georgia immigration attorney named Andrew Free and told me to contact Mr. Free on Signal. (A true and correct copy of the email forwarding Mr. Free's contact information to me is attached hereto as **Exhibit 1**.) I did so, and we scheduled a call for 5:30 pm that day. (A true and correct copy of my initial communications with Mr. Free scheduling a call are attached hereto as **Exhibit 2**.)

11. My call with Mr. Free lasted around 30 minutes. The goal of this call, as Mr. Free aptly described in his Signal messages, was to tell me what he knew and could prove about the Whistleblower Complaint. *See* Ex. 2. I recorded my call with Mr. Free and understand that a transcript of this call was made for purposes of this litigation. (A true and correct copy of this transcript is attached hereto as **Exhibit 3**.)

12. During this call, Mr. Free explained that he was an immigration and civil rights lawyer who works with whistleblowers. *See* Ex. 3 at NBCU001810. He then explained that when the Whistleblower Complaint was initially released, he had questions about the allegations relating to gynecological care, particularly because they were not discussed in the article that broke the news of the Complaint (the first *Intercept* article). *Id.* at NBCU001811. As a result, Mr. Free contacted Project South, a well-known organization that advocates for immigrants' rights, and which had worked on the Whistleblower Complaint, and began to dig into the allegations further. *Id.* at NBCU001812.

13. Mr. Free then explained that, in the last 24 hours, he had heard from five different immigration attorneys with multiple clients who either had hysterectomies without their full informed consent from the doctor—who he identified as Dr. Mahendra Amin—or who were accusing Dr. Amin of medical battery. *Id.* at NBCU001812. Mr. Free said that one of the attorneys with whom he spoke, Elizabeth Matherne, complained about the doctor to ICDC employees years ago, so the facility was aware that women were afraid of this doctor's harsh treatment. *Id.* at NBCU001812-13.

14. Mr. Free next explained that he, along with another attorney, Benjamin Osorio, was representing two women from ICDC who received hysterectomies—one of whom was deported to El Salvador and another residing in the United States. *Id.* at NBCU001813. Mr. Free said that he already personally spoken with the latter woman. This patient was told by Dr. Amin that she had cancer or a risk of cancer. Without explaining to her what her options were, she was allegedly given a hysterectomy to treat this cancer. When she got out of detention, she was told that she needed to get additional treatment for her cancer. But, when she went to a doctor, it turned out that she did not have cancer. *Id.* at NBCU001814-15. Mr. Free said that this patient would be willing to speak with Chris Hayes for the show but would be unable to do so that night due to her job schedule. He said that we would need to anonymize this patient because she was in active immigration proceedings. *Id.* at NBCU001816, NBCU001837.

15. Mr. Free then recounted what he had heard from the other immigration lawyers who had clients at ICDC and had been treated by Dr. Amin. Their accounts further corroborated the allegations in the Whistleblower Complaint. *Id.* at NBCU001817-18.

16. Mr. Free also informed me that Dr. Amin had previously been sued by the Department of Justice and the State of Georgia for Medicare fraud, and there was a $520,000

5

settlement for these claims. *Id.* at NBCU001811. Mr. Free opined that after Dr. Amin was caught engaging in Medicare fraud in the private sector, he could have moved on to performing similar conduct in the immigration space. *Id.* at NBCU001833.

17. Mr. Free said he thought that many women would come forward with claims against Dr. Amin. He explained that immigration attorneys had already identified 14 or 15 individuals who were affected by Dr. Amin's conduct, and he was personally in the process of getting these patients' medical records and vetting their claims. *Id.* at NBCU001822-23. He explained that everything he was recounting to me was either based on his personal review of documents, his personal communications with individuals, or other immigration lawyers recounting their clients' experiences based on documents. *Id.* at NBCU001826.

18. During the call, Mr. Free told me that ICE was going to release a statement (which he obtained from an *Associated Press* reporter who was similarly working on this story) indicating that there were only two hysterectomies at the facility. Mr. Free said that the statement had a number of caveats and that ICE was "playing games" with the number of *referred* versus *performed* procedures. *Id.* at NBCU001837.

19. I found Mr. Free credible for numerous reasons. *First*, I knew that Chris had previously relied on him as a source. *Second*, Mr. Free did not blindly believe the allegations in the Whistleblower Complaint but, instead, had undertaken an investigation to learn whether they could be corroborated—and, in fact, they could. *Third*, Mr. Free was not basing his conclusions merely on rumor or hearsay. He had directly spoken with detainees or reviewed their records or had spoken with other attorneys who had done the same.

20. Following our call, I asked Mr. Free some clarifying questions. He told me he did not want to be named as a source. This was not surprising to me: we frequently report on

information provided by sources who do not want to be named in a story, and there are countless reasons why a source may not want to be named. It did not affect Mr. Free's credibility, given my experience. (A true and correct copy of my communication with Mr. Free is attached hereto as **Exhibit 4**.)

21. Next, I asked Mr. Free whether it would be accurate to characterize what he told me as, "tonight we spoke with a lawyer who represents two women who had this procedure done, and tells us that as many as 15 women were given hysterectomies, and that number is growing." Mr. Free clarified that the "15 women" referred to detainees who had "full or partial hysterectomies or other procedures for which no medical indication existed." This further buttressed his credibility for me, as he clearly wanted to be precise and accurate. I used the clarified language in the script. (A true and correct copy of my communications with Mr. Free is attached hereto as **Exhibit 5**.)

22. Mr. Free then provided me a page from his client's medical records. It showed that Dr. Amin was planning to schedule the patient for a "partial hysterectomy" but then later noted that the procedure would be a "total abdominal hysterectomy." (A true and correct copy of this message from Mr. Free is attached hereto as **Exhibit 6**.) Mr. Free said that this was the hysterectomy that he was "on the hook for" because he could prove it. I understood this to mean that of the two clients he represented who he stated had hysterectomies, this was the one for which he had seen medical records.

23. While I was on the phone with Mr. Free, NBC News published an article about the Whistleblower Complaint written by Julia Ainsley and Jacob Soboroff ("NBC News Article"). After I got off the call, I read the NBC News Article.

24. The NBC News Article summarized the Whistleblower Complaint and included statements from an interview that NBC News had conducted with the whistleblower. It also reported that three lawyers had identified Dr. Amin as the doctor referenced therein. It quoted Benjamin Osorio, Elizabeth Matherne, and Sarah Owings, but not Andrew Free. In the Article, Mr. Osorio explained that he had two clients who received hysterectomies that they believed may have been unnecessary. In addition, it referenced the Department of Justice's Medicare/Medicaid fraud investigation into Dr. Amin and provided a link to a press release announcing the settlement of these claims for over $500,000. Because Julia and Jacob, who are excellent reporters, had spoken with Mr. Osorio and Ms. Matherne, and because their Article had been published after going through NBC News' editorial processes, I did not believe that I needed to separately call either Mr. Osorio or Ms. Matherne to duplicate Julia and Jacob's reporting.

25. At this point, I believed from my conversations with Mr. Free and the NBC News Article that there had been four women identified who had hysterectomies from Dr. Amin that they believed may have been unnecessary. Mr. Free identified two such clients. And the NBC News Article stated that Benjamin Osorio also had two clients who had hysterectomies that may have been unnecessary. If this many hysterectomies were found in only one day, I believed that there were likely other women who had also received hysterectomies from Dr. Amin.

26. While Mr. Free said that he represented clients alongside Mr. Osorio, based on the details about the patients that Mr. Free provided to me during our call and the details in the NBC News Article that Mr. Osorio provided, I believed they were discussing two different sets of patients. I had no reason to believe that Mr. Osorio shared all his clients with Mr. Free.

27. Specifically, Mr. Free told me that he represented a woman from El Salvador who was potentially in diabetic shock at the time she had a hysterectomy and a woman in removal

proceedings who was told that she had "cancer, or at least the risk of cancer" and then received a hysterectomy. The NBC News Article quoted Mr. Osorio as describing a woman of child-bearing age who was told she needed a hysterectomy because she had ovarian cancer but no biopsy was performed on her to confirm the cancer and another woman who had a hysterectomy after she was told she had Stage 4 cervical cancer. These appeared to be two different sets of patients.

28. The Article noted that Dr. Amin's office had been contacted for comment, but hung up once the reporters identified themselves. It also included a statement from ICE that it takes all allegations "seriously," but "in general, anonymous, unproven allegations, made without any fact-checkable specific, should be treated with appropriate skepticism." This ICE statement differed from what Mr. Free said the *Associated Press* had more recently received. I emailed ICE's media contact, explaining my conversation with Mr. Free and asking for comment on his allegations. (A true and correct copy of my email to ICE is attached hereto as **Exhibit 7**.)

29. ICE later responded with what appeared to be the same statement that Mr. Free was referencing on our call. In this statement, ICE "vehemently dispute[d]" that the detainees had been "used for experimental medical procedures." It asserted that female ICE detainees were provided "routine, age-appropriate gynecological and obstetrical health care" and said that "only two individuals at Irwin County Detention Center were referred to certified, credentialed medical professionals . . . for hysterectomies." Ex. 7.

30. This statement from ICE did not respond to the specific allegations I raised. And I agreed with Mr. Free that the discussion of "referred" procedures did not resolve any issue since it was possible that a detainee could be referred for one procedure and nonetheless receive a hysterectomy or some other invasive medical surgery that could impact fertility. In fact, the statement seemed entirely rushed and sloppily drafted. ICE misstated its own name, referring to

9

itself as "Immigration and Enforcement" rather than "Immigrations and Customs Enforcement." In short, we would of course include ICE's statement in our reporting, but I did not conclude that it repudiated the allegations in the Whistleblower Complaint or the additional information I was receiving and reading.

31. The ICE statement also included information about ICE's procedures for outside medical treatment. I reviewed these procedures but they did not seem relevant to our reporting and did not undermine the allegations in the Whistleblower Complaint. While ICE may have had a process in place for outside medical care, that did not mean that the process was being followed.

32. As we worked on the script for that evening's show, we were also working with Standards, a department that reviews NBC News and MSNBC reporting to ensure that it accords with the company's journalistic standards.

33. At 6:48 PM, Standards sent an email providing guidance for reporting on "the ICE story from Jacob Soboroff and Julia Ainsley." (A true and correct copy of this email from Standards, which was later forwarded to me, is attached hereto as **Exhibit 8**.) This reflects that Standards deemed the NBC News Article to be reportable. Steve Thode from Standards was working with us that evening. He sent us a comment from LaSalle Corrections—the private facility that ran ICDC—which we added to the script. (A true and correct copy of this email from Thode is attached hereto as **Exhibit 9**.) When we went on air with this segment, I understood that Standards was comfortable with our reporting on the Whistleblower Complaint. I also knew that Standards was comfortable with the NBC News Article.

34. At the time *All In* aired the September 15 news report, I felt confident in each of the challenged statements included in the segment, and had no doubts about the accuracy of what we were reporting. We had numerous sources—the excellent reporting that Jacob and Julia had

10

done for the NBC News Article, reporting from other news organizations about the Whistleblower Complaint, my own interview with Mr. Free, and the page from his client's medical records that corroborated at least one of his clients did indeed have a hysterectomy. The doctor at issue in the Whistleblower Complaint had previously been accused of—and settled a case for—fraudulent over-billing of the government for unnecessary procedures, and the allegations in the Whistleblower Complaint seemed similar to these earlier allegations. Chris Hayes was also going to be doing a live interview with the whistleblower. The fact that she was willing to appear live on national television bolstered my belief in her credibility.

35. I watched Chris's interview with Ms. Wooten and her attorney, John Whitty. What they said aligned both with the Whistleblower Complaint and with Mr. Free's claim that there were multiple ICDC detainees who had "medical battery" claims against Dr. Amin.

**September 16, 2020**

36. Following our broadcast, I continued to exchange messages with Mr. Free about the Whistleblower Complaint. Around 9:30 pm on September 15, he sent me a page of a patient's psychiatric records from ICDC. These records noted that the patient had surgery and was "bothered" by the fact that she went in expecting to have a D&C but ended up having a salpingectomy. Mr. Free told me that this woman was set to be deported the following day and her story was embargoed (meaning that we could not yet report on it), but that he was working with others to stop the deportation. Although we could not yet report on this story, to me it further corroborated the allegations in the Whistleblower Complaint. (A true and correct copy of this exchange with Mr. Free is attached hereto as **Exhibit 10**.)

37. By the late morning of September 16, I was aware that *All In* planned to do another segment reporting on advances in the Whistleblower Complaint story. So I reached out to Mr.

Free to ask if the story about the patient who received a salpingectomy was still embargoed. He said that it was not, and he had been in touch with Chris Hayes about it. *See* Ex. 9.

38. Diane Shamis, who books guests for the show, also told me that she had spoken with Mr. Osorio about conducting an interview of one of the clients he shared with Mr. Free who had received a hysterectomy from Dr. Amin.

39. I spoke with Mr. Osorio that afternoon, ahead of his client's interview. Mr. Osorio was very concerned about his client appearing on national news because she was in active immigration proceedings. He her face and voice to be obscured. (I recorded my call with Mr. Osorio. A true and correct copy of a transcript of my call, which was prepared for purposes of this litigation, is attached hereto as **Exhibit 11**.)

40. In preparation for the interview, Mr. Free sent me a recording of his own interview with this detainee, who we referred to as "B." (A true and correct copy of a transcript of Mr. Free's recorded interview, which was prepared for purposes of this litigation, is attached hereto as **Exhibit 12**.) I listened to this recording, in which "B" gave a detailed and logical recitation of what happened when Dr. Amin treated her, including a vaginal ultrasound that he did not explain to her, and initial surgery because Dr. Amin said she had cysts. Ex. 11 at NBCU0011766-67. When she went back to the doctor's office, he told her that she was on "level five," she had cervical cancer, and would need a hysterectomy. *Id.* at NBCU001769. She said that the doctor "somewhat" explained the surgery to her, showing her a picture of what she would need to have removed. She said that she felt like she did not have enough information to make an informed decision, there was not anyone else in the room with her when Dr. Amin was explaining the surgery, and she felt like she did not have a say in anything. *Id.* at NBCU001774-75. After this second surgery (the hysterectomy), she had bruises on her legs and back. *Id.* at NBCU001768.

41. I found "B's" story to be highly corroborative of the Whistleblower Complaint. She received a hysterectomy from Dr. Amin that she apparently did not fully understand, and he performed a vaginal ultrasound on her without explaining it to her first.

42. During our call, Mr. Osorio also provided me with two sets of "B's" medical records. Mr. Osorio explained that he was having an independent doctor assess the records, but this review was not yet completed. (A true and correct copy of the medical records that we received from Mr. Osorio is attached hereto as **Exhibit 13**.)

43. I initially reviewed these medical records on my own. From a non-professional perspective, they appeared to be full and legitimate—they had a cover, sequential page numbering, and a fax header from ICDC. Because I am not a doctor, I wanted to have a medical professional review the records to ensure they corroborated what I was being told by Mr. Free and Mr. Osorio.

44. I reached out to Dr. Joia Crear-Perry, an OB/GYN whose contact information was provided to me by our booker, Diane. Because Mr. Osorio was so concerned about revealing his client's identity, I did not send the patient's medical records to Dr. Crear-Perry. Instead, I walked through the document over the phone and recorded the phone call. (I recorded my call with Dr. Crear-Perry. A true and correct copy of the transcript of my call, which was made for purposes of this litigation, is attached hereto as **Exhibit 14**.)

45. I first read from the records showing that "B" had gone in for a D&C scope in July. Her biopsy came back "abnormal, carcinoma in situ." "B" then went back for a follow-up, when she was scheduled for a hysterectomy. Dr. Crear-Perry explained that a patient does not need a hysterectomy for carcinoma in situ. Ex. 13 at NBCU001865. She said that the patient's medical records should have explained how the patient and Dr. Amin arrived at the decision to have a hysterectomy, walking through the risks, benefits, and other options offered, including monitoring,

cervical cauterization, and referral to a cancer specialist. *Id.* at NBCU001887. While there were records saying that "results and treatment were discussed" and the patient "understands and agrees to the procedure," *Id.* at NBCU001885, there was nothing approaching the level of detail that Dr. Crear-Perry described.

46.     Dr. Crear-Perry then asked me to read to her the pathology report for the hysterectomy. It stated that "B" had multiple follicular cysts. Dr. Crear-Perry explained to me that it is normal for a menstruating woman to have follicular cysts, which are cysts that are made during ovulation, and this is not a reason to perform a hysterectomy. *Id.* at NBCU001890-92.

47.     I then read to Dr. Crear-Perry from another pathology report received *after* the hysterectomy, which said that "B" had "microinvasive squamous cell carcinoma of cervix." Dr. Crear-Perry explained to me that this *is* cancer, and the fact that Dr. Amin performed a hysterectomy may mean that this patient actually needs to undergo *more* procedures if the cancer spread further than Dr. Amin was aware of. She explained that the patient should have been referred to a cancer specialist before a hysterectomy was performed because this may not have been the right treatment. *Id.* at NBCU001893-97.

48.     During the call, Dr. Crear-Perry also offered her own take on how *All In* could present the records on our show. While I appreciated Dr. Crear-Perry's input, her opinion outside of her medical expertise was not relevant to me, and I did not reflect those comments in my draft script for the show. I did, however, find Dr. Crear-Perry's medical perspective to be very helpful in understanding "B's" treatment. I believed that Dr. Crear-Perry's analysis corroborated that "B" may have received an unnecessary hysterectomy that could be damaging to her.

49.     During our newsgathering for the September 16 episode of *All In*, our team arranged a call with Christopher Scholl of Standards, who had been closely following the

Whistleblower Complaint story, to discuss "B's" request to obscure her face and voice. I attended this call along with one of the *All In* senior producers, the executive producer, and Chris Hayes. I recorded this call. (A true and correct copy of a transcript of the call, which I understand was made for purposes of this litigation, is attached hereto as **Exhibit 15**.)

50. During the call, Chris Scholl explained that the story was "obviously reportable," but it was important to remember that these were still allegations. Ex. 14 at NBCU002340. He advised us to "stick with" Julia and Jacob's reporting in our own reporting. *Id.* at NBCU002341. At the end of the call, Chris Scholl reaffirmed that he believed we could move forward with our reporting, including obscuring "B's" name and face, we should explain why we were reporting on the story now, and we should make sure to include any statement that Dr. Amin provided. *Id.* at NBCU002351.

51. Later that afternoon, we planned to tape Chris Hayes's interview with "B." Because she ended up only having a few minutes available during her work day, we did a only a short phone interview. "B" explained that she had a hysterectomy and "felt like [she] had no right to say anything," and she told Chris that Dr. Amin performed a transvaginal ultrasound on her when she was expecting an abdominal ultrasound.

52. I found "B" to be credible. Her story to Chris was consistent with what she told Mr. Free and her medical records. Because the interview was short and there were technical difficulties in the call, we planned to do another interview the next day.

**September 17, 2020**

53. On September 17, 2020, Diane, our booker, told me that "B's" attorney wanted to know what would be covered in the follow-up interview in order to prepare "B" beforehand. (A true and correct copy of Diane's email to me is attached hereto as **Exhibit 16**.) At *All In*, we do

not share interview questions with an interviewee prior to an interview. And while we may agree not to ask questions about certain, limited topics—such as avoiding questions that relate to "B's" current immigration proceedings—we do not allow interviewees to exert editorial control over interviews. Ultimately, we did not move forward with a second interview of "B."

### The Present Litigation

54. In sum, at the time that we published each of the challenged news reports, I believed everything in our reporting to be entirely accurate. We relied on numerous different sources—the Whistleblower Complaint, the reporting of other news organizations, the whistleblower herself, the NBC News reporting, our own communications with attorneys, our review of medical records, our interview with a detainee, and review of the DOJ's complaint against Dr. Amin. At each step, the Whistleblower Complaint's allegations appeared increasingly credible.

I declare pursuant to 28 U.S.C. § 1746 and under penalty of perjury that the foregoing is true and correct.

Executed on December 18, 2023.

_____
ALEXANDER PRICE