UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
WAYCROSS DIVISION

DR. MAHENDRA AMIN, M.D.,

    Plaintiff,

v.

NBCUNIVERSAL MEDIA, LLC,

    Defendant.

Case No. 5:21-cv-00056-LGW-BWC

### DECLARATION OF RACHEL MADDOW

I, Rachel Maddow, being of lawful age and otherwise competent to testify in a court of law, hereby declare pursuant to 28 U.S.C. § 1746 and under penalty of perjury that the following is true and correct:

1. I am over the age of eighteen, a resident of New York, New York, and am competent to make this declaration. I have personal knowledge of the statements set forth below. I submit this declaration, together with the exhibits annexed hereto, in support of the motion for summary judgment of defendant NBCUniversal Media, LLC ("NBCU").

2. I am the host of the news and commentary television program, *The Rachel Maddow Show* ("*TRMS*"), which, at the time relevant to this litigation, aired on MSNBC weekdays between 9:00 and 10:00 pm. As the host of *TRMS*, I am responsible for the content of the program.

**My Background**

3. In 1994, I graduated from Stanford University with a Bachelor's degree in public policy. I also attended the University of Oxford as a Rhodes Scholar, where I earned my Doctor of Philosophy. I wrote my dissertation on the standards of health for prisoners in the United States

compared to prisoners in the United Kingdom, and the efficacy of social movements in advocating for improvements in that treatment.

4. After I graduated, I worked as a radio host. I started appearing on MSNBC television programs in 2005 and began hosting *TRMS* in 2008. Since that time, *TRMS* has won numerous Emmy awards.

5. I, supported by the *TRMS* team, decide what to discuss in each episode of *TRMS*. While there is often overlap between the topics that are covered on *TRMS* and what is reported on other MSNBC programs, *TRMS* has its own perspective, including frequently discussing the relevant historical framework of contemporary issues.

### *TRMS* Decides To Report On The Whistleblower Complaint

6. I understand that Dr. Amin challenges as defamatory sixteen statements made in the September 15 episode of *TRMS*. As discussed below, when we aired these statements, I believed them all to be truthful and accurate based in large part on the reporting conducted by NBC News, which we relied upon, as well as the reporting by other reputable news outlets. I have reviewed the challenged segment and relevant documents produced in discovery and, based on that review, I state the following:

7. To the best of my recollection, I first became aware of a whistleblower complaint that alleged that detainees at the Irwin County Detention Center ("ICDC") were receiving unnecessary and/or unconsented-to gynecological procedures, including hysterectomies (the "Whistleblower Complaint"), on September 14 or 15, 2020, when I read reporting about it from other reputable media outlets. I later read the Whistleblower Complaint, which I found credible. It was made by a nurse, was drafted by various lawyers subject to ethical responsibilities, was

submitted to government agencies, and was made in the wake of a series of shocking—and true—stories about the treatment of ICE detainees.

8. On September 15, at a staff meeting for that evening's show, I became aware that NBC News's Jacob Soboroff and Julia Ainsley—two of the most prominent and well-respected reporters in the country on immigration issues—had been further investigating the Whistleblower Complaint. I am familiar with Jacob's and Julia's journalism generally, know that they are well-sourced in the immigration world, and was confident that they would not move forward with reporting on the Whistleblower Complaint if they believed the allegations to be false. (A true and correct copy of notes from my staff meeting are attached hereto as **Exhibit 1**.)

9. Cory Gnazzo, my executive producer, texted Jacob to get an update concerning whether he would be publishing an article. Jacob confirmed that he had advanced the reporting on the allegations in the Whistleblower Complaint, had identified the doctor referenced in the Complaint, would be publishing an article shortly, and would send us a video of his interview with the whistleblower, Dawn Wooten. (A true and correct copy of the text messages between Cory and Jacob, which have been provided to me, is attached hereto as **Exhibit 2**.)

10. Given the newsworthiness of the allegations, the expansive reporting on the Whistleblower Complaint by other news organizations, and Jacob's representations, *TRMS* decided to cover the Whistleblower Complaint that evening and booked Jacob to appear for a live interview during that segment.

11. Because I was writing other scripts for that evening's show, I assigned one of my producers to draft a script introducing my interview with Jacob, but I provided my thoughts on how *TRMS* should frame the story. Consistent with the show's general approach of informing our audience about the broader context underlying a story, I believed that the Whistleblower

3

Complaint should be contextualized by referencing our previous reporting about ICE's treatment of detainees.

12. After the meeting, Jacob sent the transcript and video of his interview with Ms. Wooten to my staff. (A true and correct copy of the emails transmitting the transcript and tape, which have been provided to me, are attached hereto as **Exhibit 3**.) I read the interview and independently concluded that Ms. Wooten appeared credible. Her answers to Jacob's questions aligned with what was alleged in the Whistleblower Complaint, and she was willing to put her face and name to these allegations on national television, which I believed bolstered her credibility. She was basing her allegations on her first-hand conversations with detainees, rather than rumors that she overheard. And her allegations were specific, including providing an anecdote about a woman having the wrong ovary removed. While she was not able to identify the precise number of hysterectomies that women received, that seemed rational and unsurprising to me, since it is a highly specific detail, especially when there are hundreds of detainees in the facility at any given time and a constantly changing population, and since she was relying on conversations with individual detainees rather than conducting some kind of overarching survey.

13. Once Julia and Jacob's article was published (the "NBC News Article"), I reviewed it and believed that it significantly advanced the reporting about the Whistleblower Complaint. It identified Dr. Amin, contained accounts from attorneys who had clients at ICDC who believed they were mistreated by Dr. Amin, and explained that Dr. Amin had been the subject of a Department of Justice investigation into Medicare/Medicaid over-billing (which indicated a possible motive and pattern for Dr. Amin's alleged conduct here).

### Standards Reviews Our Script on The Whistleblower Complaint

14. Once my team had a draft of the script, Cory sent it to the NBCU News Group Standards Department. (A true and correct copy of this email chain, which has been provided to me, is attached hereto as **Exhibit 4**.) Standards is a team that reviews reporting to ensure that it accords with NBCU's journalistic standards and proactively issues guidance concerning certain stories that are being covered across NBCU's news platforms and other outlets.

15. I knew that Standards had been involved with NBCU's reporting on the Whistleblower Complaint beginning earlier that day. In the morning, Standards raised a concern about reporting on the story without further, independent corroboration. But I understood that once the NBC News Article was published, Standards was comfortable with MSNBC and other NBCU News Group platforms reporting on it. In fact, Standards issued guidance across the NBCU News Group about how to approach such reporting. (A true and correct copy of this email, which appears at NBCU000531-535, is attached hereto as **Exhibit 5**.)

16. Steve Thode, one of the members of the Standards team, suggested only minor changes to the script, which we implemented. *See* **Exhibit 4**.

### *TRMS* Broadcasts The September 15, 2020 News Report

17. On September 15, 2020, *TRMS* aired a news report about the allegations in the Whistleblower Complaint. (A true and correct copy of the video of the September 15, 2020 episode of *TRMS* is attached hereto as **Exhibit 6**. The relevant segment runs from the beginning of the video to 22:36. In addition, attached hereto as **Exhibit 7** is a true and correct copy of a transcript of the September 15, 2020 episode of *TRMS*.)

18. In accordance with my note at our afternoon team meeting, I began the segment by providing viewers with the context of other recent immigration controversies, including the family

5

separation policy and the attempt to obstruct abortions by monitoring the menstrual cycles of female detainees. In both cases, the practices were supposedly terminated but nonetheless continued even after the government said they were no longer in effect. As I explained at my deposition, I believed these stories were related to the Whistleblower Complaint not only because they concerned the treatment of detained migrants, but also because they showed a lack of successful oversight by ICE. These stories made the allegations in the Whistleblower Complaint—*i.e.* an outside gynecologist performing improper procedures on detainees—seem inherently believable to me.

19. I next turned to a discussion of the Whistleblower Complaint. After I summarized the Whistleblower Complaint's allegations, I read from it directly, and then spoke to Jacob about NBC News's new reporting. I understand that Dr. Amin challenges sixteen statements from this portion of our news report:

20. ***First***, Dr. Amin challenges two statements that I made during the introduction to this portion of the segment, that "immigrant women at that facility told her that they routinely have been sent to a gynecologist who has performed unnecessary procedures on them, including hysterectomies" and "[t]hey have been sending immigrant women in their care, in their custody, to a doctor who has removed their reproductive organs for no medical reason." The first statement is a direct quote from the previously published NBC News Article, which I displayed on the screen. The second was simply my restatement of that same information in different words—something that I often do for emphasis.

21. I believed these statements to be accurate. They were taken from and based on the NBC News Article, which I had no reason to doubt, and I believed they accurately summarized the Whistleblower Complaint, which only seemed more credible after the NBC News reporting.

Julia and Jacob are outstanding journalists, and I had no reason to doubt their reporting. Further, NBC was hardly alone. By the time of our show, these allegations had been reported on by numerous other reliable news organizations, including a September 14 wire story in the *Associated Press*. I view the *Associated Press* as one of the most reputable sources and, when the *Associated Press* reports on a topic, I generally feel confident that we can similarly report on it.

22. I also was careful to make clear that these were still "allegations" from a complaint, rather than statements of fact. Directly before the first challenged statement, I stated: "A nurse who works at an ICE detention facility in Georgia has just contributed to a whistleblower complaint. She says that in her time working at this ICE detention facility…" Before the second challenged statement, I stated: "[J]ust to underscore that, the allegation here is that…"

23. **<u>Second</u>**, Dr. Amin challenges eight statements that I read almost verbatim from the Whistleblower Complaint: (1) "Five different women between October, November, and December 2019, over that three-month period, five different women who'd had a hysterectomy done;" (2) "I thought this was like an experimental concentration camp. It was like they're experimenting with our bodies;" (3) "Everybody this doctor sees has a hysterectomy, just about everybody;" (4) "He's even taken out the wrong ovary on one detained immigrant woman. She was supposed to get her left ovary removed because it had a cyst on the left ovary. He took out the right one. She had to go back to take out the left and wound up with a total hysterectomy;" (5) "He's taking everybody's stuff out, that's his specialty;" (6) "He's the uterus collector;" (7) "Is he collecting these things or something?;" (8) "Everybody he sees he's taking all their uteruses out or he's taking their tubes out."

24. Before making these statements, I informed my viewers that I was reading allegations from the Whistleblower Complaint, stating: "Let me read you some of the passages

from the complaint here, which was written on behalf of that nurse as well as some of the women detainees." As I read these statements, I displayed them on the screen, so my viewers could see that they came from the Whistleblower Complaint (an example of which is included below).



25.     I did not doubt the accuracy of these statements. These allegations were contained in a formal whistleblower complaint that was sent by lawyers to numerous government agencies. Ms. Wooten was willing to put her name to the allegations. As stated above, they had already been similarly quoted by numerous other news organizations, including in the *Associated Press* wire story, and NBC News's independent reporting added further credibility to the Whistleblower Complaint.

26.     When I read Ms. Wooten's reference to the nickname "uterus collector" and "he's taking everybody's stuff out" in context, I did not understand her to be saying that Dr. Amin was actually collecting women's uteruses. Instead, I understood—and believed my audience would understand—this to be a rhetorical device used to emphasize the number of gynecological surgeries that Dr. Amin was performing on detainees, which I had no reason to believe was untrue.[1]

---

[1] Dr. Amin also challenges Jacob's statement at the end of our interview, "they considered him the uterus collector." For the same reasons, I did not doubt the accuracy of his statement.

8

27.     ***Third***, Dr. Amin challenges the statement "[h]e removed the uteruses of these refuge women for no medical reason, without their proper informed consent."  This was a paraphrase of the allegations in the Whistleblower Complaint regarding informed consent, which I again made clear by displaying the relevant text on the screen.



28.     I had no reason to doubt the accuracy of this statement.  The Whistleblower Complaint stated that women who received hysterectomies did not understand what was happening to them.  The Complaint also told the first-hand account of a detainee who stated that she was scheduled to undergo a surgical procedure and did not understand what it was.  In addition, because the Complaint concerned ICE detainees, and many ICE detainees do not speak English as their first language, it seemed credible to me that women could be undergoing surgeries without fully understanding them.

29.     ***Fourth***, Dr. Amin challenges two statements in which I summarized reporting from the NBC News Article: (1) "Two women who were detained at the facility say they received hysterectomies that they believe may have been unnecessary;" and (2) "She went to this doctor's office for an exam.  The exam left her with bruising."

9

30. I believed these statements to be accurate. They came directly from the NBC News Article, which I again showed on-screen.

31. **_Fifth_**, Dr. Amin challenges a statement I made during my interview with Jacob Soboroff, "the complaints here from these women and their lawyers who are speaking on their behalf is essentially that they—not that they never should have been sent out to see a gynecologist, but, rather, whatever was going on with them, they did not understand that the treatment was going to be a hysterectomy and then in some cases the allegation here is that the hysterectomies, whether or not the women consented to them in the first place, they were not medically necessary."

32. I believed this statement to be an accurate summary of the Whistleblower Complaint's allegations as well as the allegations reported in the NBC News Article. For the reasons stated above, I did not doubt either of these sources. In addition, I was again careful to frame these statements as "complaints" and "allegations."

33. **_Finally_**, Dr. Amin challenges Jacob's response to my question, in which he stated, "And there are other allegations of other procedures including pap smears where women are told you've got ovarian cysts or cancer, and that turned out not to be the case and those procedures happened anyway." I had no reason to doubt the accuracy of that statement. Jacob had been reporting on this story all day, and I understood this statement to be something that he learned during his reporting.

34. Notably, the statements that Dr. Amin challenges were made in the context of a news report where we were very careful to include information that would allow viewers to assess the credibility of the allegations on their own.

35. When we played a portion of Jacob's interview of Ms. Wooten, for example, we included the part when she explained that she had been demoted at ICDC. I believed that this allowed viewers to evaluate Ms. Wooten's credibility themselves.

36. I read and showed on-screen the statement issued by Dr. Amin's attorney. This graphic was the only time that Dr. Amin's name was included in the news report.



37. Dr. Amin's statement did not cause me to doubt our reporting. Denials to allegations—including true allegations—are commonplace, and this statement seemed cursory and general. I understand that Dr. Amin later began to claim that he was prevented from providing a more fulsome statement due to the Health Insurance Portability and Accountability Act ("HIPAA"). I am generally familiar with HIPAA and its restrictions. I did not see any HIPAA impediment to Dr. Amin providing more details (like the number of hysterectomies he performed), if he so elected, since our reporting on September 15—and much of the reporting from other news organizations—did not discuss patients by name.

38. While I noted that ICE had not yet responded to requests for comment about the NBC News Article specifically, I explained that ICE did release a general statement concerning the Whistleblower Complaint. Due to its length, we could not show the ICE statement in its

entirety in our show. We therefore made editorial judgments—as we often do when given long comments—about what portions were most relevant to our reporting.

39. Here, because we were including allegations from the Whistleblower Complaint that a detainee felt like ICDC was an "experimental concentration camp" and that there were a "high number" of hysterectomies, we included the portions of ICE's statement responding to those allegations.





40. I did not find the ICE statement compelling. The number of women "referred" for hysterectomies did not necessarily correlate with the number of women who actually received hysterectomies, particularly when one of the claims in the Whistleblower Complaint was that a

woman had been referred for a different procedure (removal of an ovary) but wound up with the removal of both ovaries, which of course has profoundly adverse consequences for their fertility.

41.  I understand that Dr. Amin believes that we should have included in our news report portions of the ICE statement that were "on background" and discussed the approval process for outside medical care.  As I explained in my deposition, this background information seemed extraneous to our news reporting.  The allegations at the heart of this story were not that there was a bad procedure or bad policy from ICE; it was that there was bad behavior by a doctor treating detainees that had not been prevented notwithstanding ICE's policies.  Having a policy that says detainees should be providing consent, for example, does not mean that the policy was followed, nor does it contradict the allegations in the Whistleblower Complaint—that women felt that they did not understand what was happening to them.

42.  Jacob read a statement from LaSalle (the private company that ran ICDC), which we also displayed on the screen.  This statement seemed like a boilerplate denial to me and therefore did not cause me to doubt anything we had reported.



43.  In sum, I understood each of the statements now challenged by Dr. Amin to be truthful and accurate.  I did not doubt the credibility of the Whistleblower Complaint and had the utmost confidence in the accuracy of the NBC News Article, which further corroborated the

13

whistleblower's claims. We included the statements from ICE, LaSalle, and Dr. Amin and were careful to frame the claims as allegations. It is my understanding that my team on *TRMS* also had no doubts about what we reported.

44. Later, I learned that during my introduction to this segment, when we were discussing the family separation policy under the Trump administration, we inadvertently used pictures of detention facilities taken during the Obama administration. These were not pictures that I was specifically discussing; they were an on-screen graphics that were merely used to illustrate immigrant detention facilities.

45. While this mistake did not go to the substance of the Whistleblower Complaint allegations or in any way cause us to doubt the substance of what we reported, we nevertheless thought that it would make sense to issue a brief correction. One of my producers wrote a draft of this correction, which I thought was far too long. I instructed my producers to significantly shorten the correction.

46. On the day that we planned to run the correction, September 18, 2020, Justice Ruth Bader Ginsburg died, and we ended up scrapping our initial plans for that evening's show so that we could devote the entire show to Justice Ginsburg. Accordingly, we did not run the proposed correction. Because this was a Friday and our next show did not air until Monday—six days after the September 15 report—we ultimately decided against running the correction the following week. Too much time had passed to address a minor photo issue that had no impact on the substance of the reporting.

### This Litigation

47. I understand that Dr. Amin argues in this litigation that the Whistleblower Complaint primarily discussed COVID-19 at the detention facility, with only a small section on

14

gynecological care at the facility, and consequently there was no reason to focus on that section. But Dr. Amin fundamentally misunderstands the nature of newsgathering and newsworthiness. As journalists, we often sift through hundreds or even thousands of pages of information and will report on even one line from these documents if it has national news value. Distilling information in this way is the essence of what journalists do. The media had previously and extensively reported on the lack of treatment surrounding COVID in prison facilities. For this reason, the most newsworthy aspects of the Whistleblower Complaint were the allegations concerning gynecological care. The newsworthiness did not turn on whether the doctor specifically was performing hysterectomies versus other gynecological procedures (which are necessarily sensitive and invasive) or the number of procedures performed.

48. I understand that Dr. Amin believes that *TRMS* ran its segment on the Whistleblower Complaint in order to boost ratings. This is not true. The story was newsworthy and important and had already been attracting attention from politicians. It is my duty as a journalist to inform my viewers about public and political controversies like this. I did not know at the time and still do not know what ratings the segment received. The decision to report this story had absolutely nothing to do with ratings or a view that the reporting would increase ratings.

49. In addition, I do not know the demographics of my audience and do not change my show to please that audience. Nor did I report on the Whistleblower Complaint for political reasons. Rather, I write and broadcast the show that I think provides the facts and context to an audience that may not be as immersed in the topic as I am, but nevertheless is interested in the issues that I am presenting.

50. Following our reporting, we did not hear about any concern or other issue with the substance of the challenged news report. Nor would I have expected to receive such feedback

since it was entirely consistent with the extensive other reporting on the Whistleblower Complaint. The first I heard of any challenge to the substance of the news report was in August 2021—nearly one year after it was televised. At this time, a lawyer for Dr. Amin sent a letter to NBCU requesting that it retract the news report. Because we had confidence in our reporting, we declined to issue a retraction.

I declare pursuant to 28 U.S.C. § 1746 and under penalty of perjury that the foregoing is true and correct.

Executed on December 17, 2023.

_____
RACHEL MADDOW