# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF GEORGIA
# WAYCROSS DIVISION

DR. MAHENDRA AMIN, M.D.,

           Plaintiff,

     v.

NBCUNIVERSAL MEDIA, LLC,

           Defendant.

Case No. 5:21-cv-00056-LGW-BWC

## DECLARATION OF CHRISTOPHER SCHOLL

I, Christopher Scholl, being of lawful age and otherwise competent to testify in a court of law, hereby declare pursuant to 28 U.S.C. § 1746 and under penalty of perjury that the following is true and correct:

1. I am over the age of eighteen, a resident of New York, New York, and competent to make this declaration. I have personal knowledge of the statements set forth below. I submit this declaration, together with the exhibits annexed hereto, in support of the motion for summary judgment of defendant NBCUniversal Media, LLC ("NBCU").

2. I am the senior deputy head of Standards for NBCU News Group. I have worked with the Standards group since 2014. Before that, I held various jobs in journalism, including spending thirteen years as a producer for NBC News.

### The NBCU News Group Standards Department

3. Standards is an internal team within the NBCU News Group made up of veteran journalists. Standards focuses on ensuring that NBCU journalism meets high journalistic standards. Standards does not make editorial decisions about what news should be covered. Instead, we give guidance about *how* to cover the news. For some stories, we issue proactive

DocuSign Envelope ID: B46874CA-662C-42C0-952E-E24EE5B1A496

guidance to NBCU News Group journalists.  For example, we will make note of relevant statements that we believe should be included in stories or provide thoughts about how reporting should be framed.  We also review articles and scripts to help ensure that reporting is accurate, fair, and transparent.  Each day, Standards reviews dozens of articles and scripts across NBCU News Group platforms.

4.     NBCU News Group's Standards team reflects the organization's commitment to meeting its own high standards for integrity in reporting. Not all news organizations have Standards departments.

**NBC News Reports On the Whistleblower Complaint**

5.     I am aware that Dr. Amin has sued NBCU based on certain statements in three MSNBC shows (*Deadline: White House, All In* and *The Rachel Maddow Show*), which aired on September 15, 2020 and September 17, 2020 (each a "News Report," together, "News Reports"). The News Reports discussed a whistleblower complaint filed with the government alleging that female detainees at an Immigration & Customs Enforcement ("ICE") detention facility had received unnecessary or unconsented-to procedures by an outside gynecologist working with the facility (the "Whistleblower Complaint").  Each News Report relied, at least in part, on an article by Julia Ainsley and Jacob Soboroff that was published on NBC News's website on September 15, 2020 (the "NBC News Article).  I reviewed and approved the NBC News Article.  I understand that Dr. Amin has not asserted any claims arising out of the NBC News Article itself.  As for the News Reports at issue in this action, I recall that my colleague, Steve Thode, and I were the two Standards employees most intimately involved with the reporting.

6.     I have reviewed the NBC News Article, the challenged News Reports, and relevant documents produced in discovery in this action, and state the following:

7.      I believe that I first learned of the Whistleblower Complaint on September 15, 2020, when I received a call from Betsy Korona, Executive Director of News for MSNBC and NBC News Now.  Betsy told me that NBC News reporters Julia Ainsley and Jacob Soboroff were planning to report on the Whistleblower Complaint.  Julia and Jacob are two of NBC News's top immigration reporters.  By September 2020, I had already worked with Julia countless times and thought she was an excellent investigative reporter.  As Julia began working with Jacob on immigration stories, I began working with him too and held him in similarly high regard.

8.      Following our call, Betsy forwarded me an email that Jacob had sent to others at NBC News and MSNBC explaining that he had interviewed the whistleblower over Zoom and was transcribing the interview.  The email also included an article from the news outlet, *VICE*, reporting on the Whistleblower Complaint.  (A true and correct copy of this email is attached hereto as **Exhibit 1**.)

9.      From Betsy's email, I understood that other news organizations had already been reporting on this breaking news story.  Indeed, I later learned that NBC News had published an *Associated Press* (*"AP"*) wire story about the Whistleblower Complaint early in the morning of September 15.  *AP* wires are news stories published by the *AP* that can be downloaded and re-published by other subscribing news organizations.  Standards generally does not review *AP* wires because NBC News is not undertaking independent reporting on the subject.  For this reason, I did not see this *AP* wire at the time it was published.

10.      Half an hour later, Betsy sent me a copy of Jacob's full video interview with the whistleblower.  (A true and correct copy of this email thread is attached hereto as **Exhibit 2**.)  I reviewed Jacob's interview and, at 1:24 pm, sent an email to the team noting my initial concern regarding the reporting.  While I had no doubt we could report the story, we would need to make

DocuSign Envelope ID: B46874CA-662C-42C0-852E-E24EE5B1A486

clear what we still did not know.  At this point, as I noted in my email, we were relying on the Whistleblower Complaint and the whistleblower.   The whistleblower did not have direct knowledge of the procedures and she had been demoted from her position at Irwin County Detention Center ("ICDC"), meaning she could have an agenda.  If we were going to run an interview with the whistleblower, I thought we needed to conduct further reporting to see if we could corroborate the allegations.   Rich Greenberg, who led NBC News's investigative team and Betsy both responded that, at that point, they agreed with my assessment.

11.     Julia replied to my email that she had just had an "off-the-record conversation" with ICE.  ICE had already released a general statement about the Whistleblower Complaint and told Julia that it was working to get data on the number of hysterectomies performed at ICDC, which it believed would negate the whistleblower's claims.  Julia noted that ICE did not provide an ETA for this comment.  (A true and correct copy of a version of this email chain containing Julia's response is attached hereto as **Exhibit 3**.  Julia's response is located at NBCU002608.) The fact that this was "off-the-record" meant that Julia could not report on it.

12.     Although I believed it would be important to consider any data from ICE if and when the agency provided it, I did not believe that this off-the-record statement necessitated delaying publication of our reporting.   In my experience, it is not unusual for a government agency to downplay or seek to refute a story "off the record" and then fail to follow up with promised details in a timely way.  And the statement that ICE "believe[d]" its statistics would contradict the whistleblower did not provide us with any real evidence.

13.     Jacob also responded that he had leads on women who saw the doctor and lawyers who knew the doctor's name.  Later that afternoon, Julia explained that she and Jacob had obtained

"a lot of information" including specific allegations of abuse. She was going to write up an article that I would review. *See* Ex. 3 at NBCU002608.

14.     Within the hour, Julia sent a draft article. Reading it, I could see that they had, indeed, obtained a lot more information that independently supported the allegations in the Whistleblower Complaint. She and Jacob had spoken to four lawyers who represented ICDC detainees. Three of these lawyers identified the doctor referenced in the Whistleblower Complaint as Dr. Amin and provided specific information concerning complaints about Dr. Amin's care. One lawyer confirmed that she had complained to ICDC years ago about Dr. Amin's treatment of detainees. The article reported that Julia and Jacob called Dr. Amin's office for comment, but the receptionist hung up the phone. Julia also noted that she had contacted ICE for a statement about the new information the lawyers had given her. *See* Ex. 3 at NBCU002606-07.

15.     Betsy responded that she believed this reporting felt like a "much fuller picture." *See* Ex. 3 at NBCU002606. I agreed with Betsy—the draft article contained numerous hallmarks of good reporting. It relied on multiple sources that corroborated the allegations in the Whistleblower Complaint. While Julia and Jacob had not spoken to detainees directly, I know both from my experience as a reporter and as a member of Standards that lawyers are credible sources who often speak for their clients—especially clients who are in detention facilities or prison. The article noted that Julia had tried to contact the doctor for comment and also included the statement that ICE had previously provided.

16.     In response to Julia's draft article, I raised some questions, including asking whether there were complaints filed against Dr. Amin in the past. Jacob quickly responded to my email, providing answers to my questions, including noting that Dr. Amin was part of a settlement

for Medicare and Medicaid fraud and providing a link to a DOJ press release on the settlement. (A true and correct copy of this email thread is attached hereto as **Exhibit 4**.)[1]

17.     Around 3:30 pm on September 15, I told Julia, Jacob, and their teams that I was going to be logging off for the day and bringing in another member of Standards, Mary Lockhart, to take over for me.  In my email, I included some parting thoughts about the article, including my belief that we should note whether or not there were any complaints about Dr. Amin.  *See* Ex. 4 at NBCU002645.

18.     About 15 minutes later, however, Julia sent an email providing further answers to my questions.  *See* Ex. 4 at NBCU002644-45.  Because I had been working on the story all day and therefore knew more about it than Mary, I decided to continue working on it.  To my knowledge, Mary did not end up having any involvement in reviewing this article.

19.     In Julia's response, she indicated that she would add Dr. Amin's False Claim Act settlement to the story and otherwise addressed my questions.  At this point,  I informed Julia and her editor, Mark Schone, via phone that I was comfortable with the information contained in the article.  Accordingly, Julia sent a draft of the article to the NBC News digital team, Daniella and her editor, to let them know that she and Jacob had done further reporting on the Whistleblower Complaint and the material in the revised article had been approved by Standards.  Julia's message was accurate.  (A true and correct copy of this email from Julia is attached hereto as **Exhibit 6**.)

---

[1] While I was going through this process with Julia and Jacob, I understand that a different NBC News digital team— including reporter Daniella Silva and her editor—updated the *AP* wire article to add additional reporting about a press conference that Ms. Wooten gave about the Whistleblower Complaint.  This update was not sent to me for review beforehand since reporting on press conferences often is not sent to Standards.  I understand that the updates to the article did not concern Dr. Amin but, instead, other allegations in the Whistleblower Complaint about COVID-19 at ICDC.  (A true and correct copy of the updated article is attached hereto as **Exhibit 5**.)

**NBC News Publishes Its Article About the Whistleblower Complaint**

20.     At 5:25 pm, I asked for an update on the status of the NBC News article and, specifically, whether it was in NewsConnect.  *See* Ex. 6.  NewsConnect is an online program available to NBCU News Group journalists. It allows them to share reportable information about a story and for Standards to communicate guidance.  I had been fielding questions from various NBCU News Group programs who were interested in reporting on the story, and I wanted Julia and Jacob's article to serve as a model for the contents of the reporting.

21.     In response, Mark informed me that the article had been published, and sent me the link to the live URL (the "NBC News Article" or the "Article").  (A true and correct copy of this email is attached hereto as **Exhibit 7**.)

22.     I then reminded Julia to add the Article to NewsConnect because I wanted other NBCU News Group programs to rely on it for their own reporting. This confirmed my approval of the Article. A true and correct copy of this email is attached hereto as **Exhibit 8**.)

23.     Julia followed my advice and placed the Article in NewsConnect.  Shortly thereafter, Standards attached guidance to the Article, explaining that when other platforms reported on it, they should be sure to include ICE's comment and note that LaSalle and Dr. Amin had not yet provided responses to the allegations.

24.     I understand that Dr. Amin has argued that Standards never actually approved the NBC News Article because, when Julia placed it in NewsConnect, she did not attach a "Reportable" tag to it.  That is wrong.  "Reportable" tags are generally used to alert the News Group that a snippet of information (separate from a full article) can be reported on.  When a full, published article from the NBC News website is placed in NewsConnect, it is reportable.  There

is no need to add a "Reportable" tag.  Similarly, if Standards attaches reporting guidance to an article—as it did in this case—this is another sign that it is reportable.

25.    Soon after the NBC News Article was posted in NewsConnect, I again reviewed the published Article and, while I remained comfortable with its content, I realized that it did not address whether Dr. Amin had any malpractice claims against him.  I sent an email to Mark, explaining that I had previously asked whether Dr. Amin had any prior complaints about his medical practice and, if he had not, it was important to include.  I noted that it was "imperative" that Standards see a final story before it is published, and an article should not be considered "approved" based only on answers to questions.  (A true and correct copy of this email, which appears at NBCU002957 is attached hereto as **Exhibit 9**.)

26.    My email reflected my consternation with Mark not following our procedures, and did not reflect any substantive concerns with the content of the Article.  By this point, I had already alerted Julia and Mark that I was comfortable with the material in the Article, told Julia to add it to NewsConnect so other NBCU News Group programs could rely on it, and Standards attached reporting guidance to the NewsConnect post.

27.    Further showing my comfort with the Article, at 6:48 pm, I sent a note to all MSNBC Primetime Executive Producers sharing the Standards guidance for reporting on the Article.  I would not have done so if I was concerned about MSNBC shows reporting on the Article.  (A true and correct copy of my email is attached hereto as **Exhibit 10**.)

28.    In response to my question about malpractice claims, Mark noted that the Article *did* reference Dr. Amin's False Claims Act lawsuit and settlement.  *See* Ex. 9 at NBCU002957.  Jacob had previously flagged this settlement but, at the time, I did not understand that it was indeed directly relevant.  I saw it as a financial complaint against Dr. Amin, not something about his

medical care of patients.  As discussed below, when Chris Hayes later also pointed to the relevancy

of the 2015 False Claims Act, I finally read the complaint and realized that it was relevant and

corroborative of the allegations in the Whistleblower Complaint. (A true and correct copy of my

communications with Chris Hayes are attached hereto as **Exhibit 11**.)  In the False Claims Act

complaint, Dr. Amin had been accused of performing unnecessary procedures to bill the

government for them—the same thing he was accused of doing in the Whistleblower Complaint.

In short, I was wrong not to realize that Julia and Jacob had addressed my question about

complaints against Dr. Amin.

29.    In any event, Julia then directly addressed my question about malpractice claims.

She found two instances where Dr. Amin had been sued for medical malpractice.  *See* Ex. 9 at

NBCU002956.  Since my advice was to include, if true, the absence of malpractice claims against

Dr. Amin, there was no need to revise the Article to say that Dr. Amin *did* have malpractice claims

brought against him.  Thus, the approved Article as published and placed in NewsConnect

remained the same.

**NBC News Updates the Article Based On Further Developments In The Story**

30.    As I was communicating with Mark, Julia, and Jacob about Dr. Amin's malpractice

claims, we were also discussing updates to the Article based on information that Julia and Jacob

learned after publication.

31.    First, Jacob explained that the *Intercept* wanted credit for being the first news

organization to report on the Whistleblower Complaint.  I was fine with this change, and the Article

was updated. (A true and correct copy of Jacob's email requesting this change is attached hereto

as **Exhibit 12**.)

32.     Next, Jacob also asked if we could credit another news organization, *Prism*, for being the first outlet to name Dr. Amin as the doctor referenced in the Whistleblower Complaint. I did not agree with this suggestion.  I did not doubt that Dr. Amin was, in fact, the relevant doctor. But I wanted to be sure that we were framing the claims in the Whistleblower Complaint as allegations rather than proven facts.  Thus, I did not think that it made sense to directly tie our reporting to the *Prism* article by crediting it for "outing" Dr. Amin.  (A true and correct copy of Jacob's email requesting this change, which appears at NBCU002294, is attached hereto as **Exhibit 13**.)

33.     Separately, after the Article's publication, ICE released a new statement about the Whistleblower Complaint.  *See* Ex. 13 at NBCU002996.  I concluded that the statement did not contradict anything we reported.  It noted that "since 2018, only two individuals" at ICDC were "referred" for hysterectomies.  "Referring" patients was not the same as performing procedures. Nonetheless, I thought that this was important context and the Article should be updated to include the new ICE statement.  We could not include the ICE statement in full as it was nearly as long as our Article.  As is common when we receive statements from third-parties, the editor selected the most relevant portions and added them to the Article.

34.     We also received a boilerplate statement from LaSalle Corrections—the private prison company that ran ICDC—after we published the Article.  We similarly updated the Article to reference the relevant portions of that statement.  *See* Ex. 13 at NBCU002995.

35.     Finally, once Dr. Amin's lawyer released a statement about the allegations, we updated the Article to include his statement as well.  *See* Ex. 13 at NBCU002994-95.

**MSNBC Programs Report on the Whistleblower Complaint**

36.     I am aware that various MSNBC primetime shows reported on the Whistleblower Complaint based on the NBC News Article.  Standards was involved with MSNBC's reporting on the Whistleblower Complaint, including reviewing scripts for segments on this topic.  There are a variety of ways Standards can review a script or article.  It can be sent to us via email or, for television shows, we can review scripts in a software called iNews—a computer program used by shows to time their segments, which contains the show's draft scripts.  Sometimes we email our feedback to the show.  Other times, we have phone calls or meetings with the reporters, producers, or editors to provide oral feedback.

37.     While I remember working with primetime shows about their reporting generally, I do not recall specifically which shows' scripts I reviewed at the time.  Nonetheless, I have now reviewed all of the MSNBC News Reports challenged in this action.

38.     Julia appeared on *Deadline: White House* on September 15 to discuss the NBC News Article.  Because television programs have strict time constraints, we recognize that it is not possible to capture every detail from an article on television and trust that the journalists will accurately reflect the reporting that Standards previously reviewed.  I did not review Julia's interview before it aired because it was live and unscripted.  But I believe that Julia accurately summarized the thrust of NBC News's new reporting.  She was careful to frame the claims in the Whistleblower Complaint as allegations, she read ICE's statement, and she noted that Dr. Amin's office declined to comment.

39.     Jacob appeared live on *The Rachel Maddow Show* on the evening of September 15. I believe he also appropriately summarized the NBC News Article, he made clear that the allegations in the Whistleblower Complaint were still claims that were going to be investigated,

and he made sure to include the new statement that LaSalle had issued since the Article's publication.

40.     *All In* aired three segments about the Whistleblower Complaint between September 15 and 17, 2020, which I have reviewed.  From the initial segment, *All In* followed the guidance that Standards shared—the show was careful to frame the Whistleblower Complaint's claims as allegations, Chris Hayes read the relevant statements from ICE and LaSalle, and he made clear that Ms. Wooten had been demoted from her job at ICDC.

41.     On September 16, I had a call with the *All In* editorial team to discuss their reporting, including a request to obscure the name and face of a detainee who allegedly received a hysterectomy from Dr. Amin.  During this call, I re-affirmed my belief that this story was reportable. I noted that *All In* should stick with the framing of the story as reported in Julia and Jacob's NBC News Article, presenting the claims in the Whistleblower Complaint as allegations rather than proven facts.  I also informed *All In* that they should continue to reach out to Dr. Amin to try to obtain comment from him.  *All In* followed my advice.  In particular, they made clear the Complaint reflected "allegations" and obtained comment from Dr. Amin.

42.     As noted above, during the September 16 call, Chris Hayes and I also briefly discussed Dr. Amin's False Claims Act lawsuit and Chris then sent me a copy of the complaint. *See* **Exhibit 11**.  After reading it, I came to understand why Jacob, Mark, Julia, and Chris all believed it was pertinent.  Like the Whistleblower Complaint, the False Claims Act case included allegations of Dr. Amin ordering unnecessary procedures on patients to get more money from the government.

43.     In short, I believe the NBC News Article and the subsequent MSNBC segments were exemplary reporting.  Julia and Jacob took a story that had already been garnering significant

media attention and advanced the reporting by corroborating the allegations. We reached out to the relevant parties for comment and included their positions in our reporting. We gave our viewers information to help them assess the credibility of the whistleblower. At the time our reporting it was published, I believed it to be accurate, and I was entirely comfortable with it.

I declare pursuant to 28 U.S.C. § 1746 and under penalty of perjury that the foregoing is true and correct.

Executed on December  16 , 2023

CHRISTOPHER SCHOLL