Declaration of

Elizabeth McNamara

Exhibit 3

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
WAYCROSS DIVISION

DR. MAHENDRA AMIN, M.D.,      )
                             )
            Plaintiff,       )
                             )
vs.                          )        CIVIL ACTION NO.
                             )    5:21-cv-00056-LGW-BWC
NBCUNIVERSAL MEDIA, LLC,      )
                             )
            Defendant.       )
_____)

         Videotaped Deposition of DR. MAHENDRA

AMIN, M.D., taken by counsel for the Defendant,

pursuant to notice and by agreement of counsel, under

the Federal Rules of Civil Procedure, reported by

Tamela G. Sheeler, RPR, CLR, CCR-6537-8261-3701-4272,

at Hunter, Maclean, Exley & Dunn, PC, 200 East Saint

Julian Street, Savannah, Georgia, on Tuesday, August

1, 2023, commencing at 9:30 a.m.

_____
Transcript Prepared By:

            McKEE COURT REPORTING, INC.
                 P.O. Box 9092
            Savannah, Georgia 31412-9092
                 (912) 238-8808

1          Q.      Was Mr. Grubman present in the meeting in

2     Douglas?

3          A.      No.

4          Q.      Did you review or speak with anybody else

5     in connection with your preparation for this deposition

6     other than Miss Evans and your daughter?

7          A.      No.

8          Q.      Okay.  Let's have this marked as

9     Exhibit 12, which is the first amended complaint in this

10    action that is the action that we are here for today.

11                 (Defendant's Exhibit No. 12, marked for

12                 identification.)

13    BY MS. McNAMARA:

14         Q.      Are you familiar with this document,

15    Dr. Amin?

16         A.      Yes.

17         Q.      Do you understand this to be the complaint

18    that you filed -- that you had your counsel file in this

19    action?

20         A.      Yes, ma'am.

21         Q.      And prior to the filing of this complaint,

22    did you review it?

23         A.      No.

24         Q.      So you didn't review it or approve that the

25    facts in the complaint were accurate?

```
 1              MS. EVANS:  Object to form, that's
 2         misrepresenting his testimony.
 3              Go ahead.
 4         A.    I'm sorry, what's the question?
 5         Q.    Well, let me ask the question again.
 6              Prior to the filing of this action, and
 7    this is the first amended complaint, did you review the
 8    complaint, did you read it?
 9         A.    Myself, no.
10         Q.    So prior to the filing of this action you
11    did not read the complaint to make sure it was accurate?
12              MS. EVANS:  Object to form.
13              When I object to the form I'm just -- it is
14         just for the record, because I think her question
15         is improper.  But if you understand her question,
16         you can answer it.
17         A.    Well, my daughter reviewed, and she advised
18    me, and I do it.  Because I don't -- I mean, I'm busy in
19    my practice, so I can't have time to read all the paper.
20    But she review and she suggests me, daddy, yes, you do
21    this or that.
22         Q.    So if I understand you correctly your
23    daughter read the amended complaint before it was filed
24    and told you it was okay?
25              MS. EVANS:  Object to the form.
```

1        A.    Well, I don't know about before it was

2   filed or not, I don't know when it was filed.  But I'm

3   sure she reviewed and gave me what is in the -- what

4   contained in those papers.

5        Q.    So would you say that you approved the

6   filing of this action?

7        A.    Yes.

8        Q.    Do you know whether this complaint

9   identifies the programming that you're challenging in

10   this litigation?

11              MS. EVANS:  Object to form.

12              If you understand --

13       A.    I don't understand the question; what is

14   program?

15       Q.    Do you understand that you have filed a

16   lawsuit for defamation?

17       A.    Yes.

18       Q.    What does defamation mean to you?

19              MS. EVANS:  Object to form.  You're asking

20         him to define a legal term?

21              MS. McNAMARA:  I'm asking him how he

22         understands it.

23       A.    I don't know, I can't tell you.

24       Q.    Okay.  Do you know what statements you have

25   filed this action concerning?

1        A.      Statement?

2        Q.      Yes, what statements.

3                Do you understand that you allege that

4    certain statements were published and that those

5    statements were false?

6        A.      Oh, yes, that's true.

7        Q.      Do you understand what shows or do you know

8    what shows those statements appeared on?

9        A.      Are you talking about news channel?

10       Q.      Yes.

11       A.      MSNBC.

12       Q.      Okay.  Do you know what programs they

13   appeared on on MSNBC?

14       A.      What program is?

15       Q.      Yes, what was the name of the program of

16   any of the shows that you're suing over?

17       A.      I think one is Rachel Maddow or something.

18       Q.      Do you know any other?

19       A.      I think Chris, I don't know his last name.

20       Q.      Chris Hayes?

21       A.      Yes.

22       Q.      Do you know the name of his program?

23       A.      No.

24       Q.      Do you know when it airs?

25       A.      After hours.

Page 23

```
 1          Q.    Pardon me?

 2          A.    After hours, evening time, I think.

 3          Q.    Okay.  Do you know when in the evening?

 4          A.    No.

 5          Q.    Do you know the third program that you're

 6    suing over?

 7                MS. EVANS:  Object to form.

 8                Go ahead.

 9          A.    I don't know.

10          Q.    Have you ever heard of Deadline White

11    House?

12          A.    No.

13          Q.    Have you ever heard -- do you know who is

14    the host of Deadline White House?

15          A.    No.

16          Q.    Do you know when Deadline White House airs

17    on TV?

18          A.    No.

19          Q.    Do you know what statements from Deadline

20    White House you are suing over?

21                MS. EVANS:  Object to form.  Liz, this

22          complaint has all of that detail in.  If you want

23          to point to something and ask him if he agrees

24          with the statement, that's fine.  What is this, a

25          quiz show that you're doing here about who knows
```

```
 1          the reporters of MSNBC?
 2               MS. McNAMARA:  I think if a man has
 3          commenced a defamation action, has asked us to
 4          invest a huge amount of resources in defending
 5          this action, I'm entitled to know if he even
 6          knows what he sued over and he --
 7               MS. EVANS:  He knows what he sued over.  He
 8          knows what he sued over.  Do not imply that my
 9          client is acting improperly.  But you have seven
10          hours and you are not using it wisely and I will
11          not be letting this go over seven hours based on
12          how this has started.  You wasted almost 30
13          minutes quizzing him about reporters.  It makes
14          no sense.
15               MS. McNAMARA:  And again --
16               MS. EVANS:  I'm done, go ahead.
17               MS. McNAMARA:  And you do not need to raise
18          your voice, this is a deposition --
19               MS. EVANS:  Apparently I do.
20               MS. McNAMARA:  Miss Evans --
21               MS. EVANS:  But listen --
22               MS. McNAMARA:  -- you do not need to yell.
23               MS. EVANS:  -- I am very protective of my
24          client, and you are acting completely
25          inappropriately right now.  But go ahead, use
```

Page 25

1          your time how you want to use it.

2    BY MS. McNAMARA:

3          Q.   Dr. Amin, am I correct to assume that the

4    statements and the shows that you're suing over are

5    identified in the complaint that you filed in court?

6               MS. EVANS:  Object to form.

7          A.   I don't understand the question, what

8    exactly are you asking?

9          Q.   Well, this --

10         A.   In a simple language.

11         Q.   Yes, in a simple language, let me -- why

12   don't you turn to the document in front of you.

13         A.   Okay.

14         Q.   And if you would turn to Paragraph 75 of

15   the document?

16              MS. EVANS:  Page 11.

17   BY MS. McNAMARA:

18         Q.   Yes, it's on Page 11.

19         A.   Okay.

20         Q.   Do you see Paragraph 57 on what is marked

21   Exhibit 12 that there are a number of statements

22   identified, they are identified as A through J?

23         A.   Yes.

24         Q.   Do you understand that those are the

25   statements that you're challenging in this action that

Page 26

1    were aired on Nicolle, Deadline White House on September

2    15th?

3            A.    Challenging what?

4            Q.    That you are challenging in this action,

5    that you say they are false and defamatory?

6            A.    Oh, yeah, that's true.

7            Q.    That these statements -- these are the

8    statements you're challenging from the Deadline White

9    House; is that right?

10           A.    Yes.

11           Q.    Then turn to Paragraph 78.  And you see

12   that there are statements with All In with Chris Hayes

13   that aired on September 15th, 2020, Statements A through

14   M; are those the statements from Mr. Hayes' program that

15   you're challenging in this defamation action?

16                 MS. EVANS:  Object to form.

17           A.    (Examines document.)

18                 Okay, what was the question?

19           Q.    Yes, are those the statements, statements

20   in Paragraph 78, A through M, the statements that you

21   are challenging from All in With Chris Hayes that aired

22   on September 15th, 2020?

23           A.    Yes, because this is all a lie.

24           Q.    Okay, thank you.

25                 So now on Paragraph 81, do you see that

1   there are statements identified A through E that were

2   aired on Chris Hayes on September 16th, 2020?

3          A.    (Examines document.)

4                That's not true at all.

5          Q.    So those are the statements you're

6   challenging from that show; right?

7          A.    Yes.

8          Q.    Do you understand that the court has

9   dismissed all of those statements from this action?

10                MS. EVANS:  Object to form.

11          A.    The court dismissed?

12          Q.    That the judge who is overseeing your libel

13   lawsuit, that she dismissed those statements from this

14   action; do you understand that?

15          A.    No, I don't understand.

16          Q.    Okay.

17          A.    What's that?

18          Q.    So then Paragraph 84 there are statements

19   from the Rachel Maddow Show, A through P, that aired

20   on -- the complaint says September 16th, but I think

21   your counsel would agree with me that that was September

22   15th.

23                MS. EVANS:  What paragraph are you on?

24                MS. McNAMARA:  84.

25                MS. EVANS:  Yes, it was September 15th.

1  BY MS. McNAMARA:

2      Q.    And are those the statements from the

3  Rachel Maddow show that you're challenging in this

4  action as being false?

5      A.    (Examines document.)

6            Yes.

7      Q.    Then finally, Dr. Amin, if you look at

8  Paragraph 86 of the complaint, there was an episode of

9  All in With Chris Hayes that aired on September 17th,

10 and according to the complaint you're challenging

11 statements A through D from that broadcast; is that

12 correct?

13     A.    (Examines document.)

14           Yes.

15     Q.    And do you understand that the court has

16 thrown out or dismissed all of the statements from

17 September 17th except for the first statement, A?

18           MS. EVANS:  Object to form.

19           Go ahead.

20     A.    Let me ask you, you try to tell me that B,

21 C and D?

22     Q.    B, C and D the court has thrown out, they

23 are no longer in the case.

24           MS. EVANS:  Object to form.  She is

25           mischaracterizing what that means, but...

Page 29

1        A.    I don't know about that part, but I know

2    all of this was not correct because...

3        Q.    Okay.  Have you ever watched the videos of

4    these programs that you're challenging in this action?

5              MS. EVANS:  Object to form.

6              Go ahead.

7        A.    Some, not much.

8        Q.    When did you watch them?

9        A.    That happened -- first thing, my daughter,

10   she knew, and my wife.  They decided not to -- that --

11   they say, I don't need to watch it because so bad

12   against me that all lies by MSNBC.

13             Second thing, I have a lot of employees

14   coming to hospital including specialists saying, Doctor,

15   you saw this video or TV?  And they said, Dr. Amin, what

16   is going on, this is all lies, why don't you do

17   something?

18             But then I was livid and just stop it

19   because it is so wrong and it was lie completely about

20   me.

21        Q.    Did you -- and so when approximately was

22   this that you watched these videos that you're

23   describing?

24        A.    I don't remember.

25        Q.    Was it -- did you watch them when they

Page 30

1   aired on September 15th?

2        A.    No.

3        Q.    Do you know whether it was weeks or months

4   later that you watched them?

5        A.    I don't remember.

6        Q.    Did you read any other news concerning the

7   allegations that first arose in the whistleblower

8   complaint?

9             MS. EVANS:  Object to form, lack of

10            foundation, compound.

11       A.    I tried not to read because my family, my

12   wife and children, you know, they knew what I was going

13   through at that time because about these lies on the

14   national TV.  So -- but unless one of the patients or

15   one of the nurse in the hospital saw me, Dr. Amin, look

16   at this on the Facebook or things like that.  And I just

17   try not to read.  But they give me the -- let me know

18   what's going on against me.

19       Q.    Why don't we mark Exhibit 13.

20            (Defendant's Exhibit No. 13, marked for

21            identification.)

22   BY MS. McNAMARA:

23       Q.    I may come back to that, but you...

24            We've marked for the record an August 26th,

25   '21 letter as Exhibit 13 and Bates stamped Amin 5463

Page 31

1   through 5467.

2              Are you familiar with this letter,

3   Dr. Amin?

4        A.    I didn't see this.

5        Q.    Pardon me?

6        A.    No, I'm not familiar.

7        Q.    So you didn't review this letter before it

8   was sent?

9              MS. EVANS:  Object to form.

10             Go ahead.

11       A.    Not personally, but I'm sure if it has come

12  to me, my daughter must give me what the content is and

13  then I just approve or disapprove.

14       Q.    So your daughter -- you understand your

15  daughter reviewed it and then she told you that it was

16  okay?

17             MS. EVANS:  Object to form.

18       A.    No, I make the decision, she give me the

19  information.

20       Q.    Do you understand this to be the notice

21  that was provided to NBCUniversal that you challenged or

22  had issues with certain statements that aired on their

23  programs?

24             MS. EVANS:  Object to form.

25       A.    Yeah, because it was all a lie.

Page 32

1      Q.     Okay, so you understood this.  And do you
2  understand that this was the first notice that was
3  provided by you, August 26th, 2021?
4      A.     I don't know about first -- I don't know if
5  that was first.
6      Q.     This was almost a year after the programs?
7             MS. EVANS:  Is that a question?
8             MS. McNAMARA:  Yes.
9      A.     I don't know.
10     Q.     Well, the programs aired on September 15th,
11  2020.
12     A.     Okay.
13     Q.     So would you agree that August 26th was
14  almost a year later?
15     A.     Yes, okay.
16     Q.     Do you know whether you or any counsel on
17  your behalf provided any notice to NBCUniversal prior to
18  this letter on August 26th, 2021?
19     A.     I don't remember.
20     Q.     Do you have any reason to believe that
21  notice was provided earlier?
22     A.     I don't know that.
23     Q.     Whenever it was that people started
24  communicating with you about what was on the TV, did you
25  ever ask that they contact NBC and alert them to the

Page 36

1  that she went to see the female cancer specialist and

2  they told her that she don't need a hysterectomy because

3  she has no cancer and I did a hysterectomy and I told

4  her that she had cancer.  And it's proven on medical

5  record.

6           And the second hysterectomy I did was a big

7  tumor.  And I did a surgery because she was only 43 or

8  45, I don't remember exactly.  But to make sure because

9  of the tumor I did a hysterectomy.  So those are the

10 only two hysterectomies I did on patients in the ICE.

11      Q.   Okay.  Turn to --

12      A.   Plus --

13      Q.   Oh, I'm sorry.

14      A.   -- MSNBC went to the national TV, put my

15 name and my picture and accused me for doing mass

16 hysterectomy, I'm a uterus collector.  And do you know

17 how that feels somebody -- if somebody lies on national

18 TV that knows it is not true, it's a lie?

19      Q.   And Doctor -- are you done?

20      A.   Yeah.

21      Q.   Okay.  And were you -- do you believe that

22 MSNBC was the only news channel that aired statements

23 about the whistleblower complaint and the allegations?

24           MS. EVANS:  Object to form.

25      A.   It might be another news channel, yes.  But

1    they are not put my picture, and name, and everything.

2               Because that threatened me, my family, I

3    have death call, I'm going to cut you MF, I'm going -- I

4    know where you live in Douglas, I'm going to come and

5    kill you and your family.

6               I have to call my son, all of this, and I

7    told him that if somebody calls you, because they are

8    harassing my children calling, that if somebody calls,

9    just tell them you don't know me, don't tell them you

10   are my son.  Because I don't want to put his life in

11   danger.  Same thing as my employee was threatened.  The

12   people are following me.  It's like a -- and that's all

13   because of a lie put on national TV.

14        Q.    Dr. Amin, do you have any reason to believe

15   that MSNBC was the first news organization to use your

16   name?

17               MS. EVANS:  Object to form.

18        A.    I don't know that.

19        Q.    Are you aware that other news organizations

20   used your name prior to MSNBC?

21        A.    Possibly, yes.

22        Q.    Are you aware that other news organizations

23   aired the allegations including the statement from the

24   whistleblower complaint about uterus collector or that

25   there were a number of hysterectomies, that others news

1    organizations aired those statements before MSNBC?

2              MS. EVANS:  Object to form.

3         A.    Possible.

4         Q.    Are you aware -- and have you sued any of

5    those news organizations?

6              MS. EVANS:  Object to form.

7         A.    Sued means like -- sue part, I don't

8    think -- no, well, let me see.

9              MS. EVANS:  I'm just going to caution the

10             witness not to discuss anything that he --

11             communications with counsel.  Because

12             unfortunately, based on what MSNBC did, others

13             continue to spread lies about Dr. Amin.  And I

14             don't want -- there are some communications --

15             this question calls for attorney/client privilege

16             communications.  It doesn't, but I want to

17             caution him not to go into those areas.

18   BY MS. McNAMARA:

19        Q.    Dr. Amin, do you remember my question?

20        A.    No.

21        Q.    I don't remember either, so we're aligned

22   in that.

23             MS. McNAMARA:  Can you tell me what the

24             question was, please?

25             (The record was read back as follows:  Have

```
                                                 Page  39
 1          you sued any of those news organizations?)

 2               MS. EVANS:  And I object to the form of

 3          that question.

 4  BY MS. McNAMARA:

 5          Q.   And what I was referencing in that question

 6  were all of the news organizations that were

 7  published -- news articles that were published -- before

 8  MSNBC aired its broadcast?

 9               MS. EVANS:  Objection to form, vague.  If

10          you have a specific person you want to ask him

11          about, do, but that is hopelessly vague.

12  BY MS. McNAMARA:

13          Q.   Dr. Amin, you are aware of what

14  litigations, if any, you have commenced; are you not?

15          A.   What litigation -- what?

16          Q.   Yes.  That you're aware that you sued

17  MSNBC; is that right?

18          A.   Yeah.

19          Q.   Okay.  Have you sued any other news

20  organization?

21               MS. EVANS:  Do you want to define news

22          organization?

23  BY MS. McNAMARA:

24          Q.   Any organization that publishes a news

25  article, or airs a broadcast, or airs a news programming
```

1   on television; have you sued any news organization that

2   has aired allegations concerning you?

3           MS. EVANS:  Object to form.

4       A.   Yes.

5       Q.   And who else did you sue?

6       A.   That I think my daughter and --

7       Q.   Are you referring to Don Winslow?

8       A.   Yes.

9       Q.   Do you know, is Mr. Winslow, does he -- are

10  you suing over tweets that he posted?

11      A.   That I don't know that I know.

12      Q.   Other than Don Winslow and MSNBC, have you

13  sued over any other statements concerning you that arose

14  out, originated with the whistleblower complaint?

15      A.   I don't think so.

16      Q.   Why not?

17          MS. EVANS:  Object to form, calls for

18          attorney/client privileged communications and I

19          instruct you not to answer.

20  BY MS. McNAMARA:

21      Q.   Can you answer -- independent of any

22  information you have from counsel, is there a reason you

23  didn't sue any other news organization that published

24  your name, published your picture, published uterus

25  collector, published, you know, other allegations

Page 41

1    concerning you both before and after MSNBC?

2              MS. EVANS:  Object to the form of the

3         question.  I further object that the question

4         directly calls for attorney/client privileged

5         communications and I instruct the witness not to

6         answer.

7    BY MS. McNAMARA:

8         Q.    And you're following your attorney's

9    instructions?

10        A.    Yes, ma'am.

11        Q.    Okay.  Turn to the amended complaint, if

12   you would, please.  And Paragraph 140.

13        A.    Yes.

14        Q.    Do you see the statement there, it says,

15   Dr. Amin always obtains informed consent from his

16   patients; is that a true statement?

17        A.    Yes.

18        Q.    And you stand by that allegation today?

19        A.    Yeah, 100 percent.

20        Q.    And you're aware, are you not, that you've

21   been sued in a punitive class action by a number of

22   women in a litigation called Oldaker?

23             MS. EVANS:  Object to the form.

24             Do you want to define some of those terms

25        or ask a more general question?

Page 42

1   BY MS. McNAMARA:

2          Q.     Are you aware that you've been sued by a

3   number of women concerning the treatment they received

4   from you?

5          A.     Yes.

6          Q.     And the named -- the lead plaintiff in that

7   litigation is a woman by the name of Miss Oldaker; are

8   you familiar with that?

9                 MS. EVANS:  Object to the form.

10         A.     ████████████████████████████████████████

11   ████.

12         Q.     Are you aware that the plaintiffs in that

13   action have made a number of allegations amongst them

14   that they have not -- that -- strike that.

15                Are you aware that some of those women

16   allege that procedures were performed on them that they

17   did not adequately understand or consent to?

18                MS. EVANS:  Object to form.

19         A.     That's a lie.  I never, ever, ever, ever

20   done any surgery on any patient without consent.  And I

21   can explain it to you, I'm sure you're not a doctor --

22   have experience.

23                When patient I see in the office and she

24   needs surgery, I explain to them, give them all the

25   different options.  Once they decide to go ahead with

Page 43

1   the surgery, then patient goes from IH to the hospital,

2   the person who admits the patient, they would make sure

3   all the criteria is meant.  It's like a checklist, you

4   have to check it.

5           Then that patient goes to the ASU, called

6   ambulatory surgery unit.  The nurse over there, she has

7   to go to the list, history and physical is there,

8   consent is there signed, lab work is there, nurse

9   anesthetist is there and see everything is fine.  Then

10  patient goes from ASU to the operating room.

11          In operating room the circulating nurse who

12  helps before the surgery is her responsibility to make

13  sure each and every patient has all the checklists were

14  done.  If someone is -- one part is not done, like

15  consent is not witnessed or one blood work is not there,

16  they won't even put the patient to sleep.  And also port

17  time, the anesthesia reconfirms that all, everything is

18  there.

19          So I think it is humanly impossible in this

20  country any patient goes through surgery without the

21  consent signed.  They explain to them and they

22  understand that.  If they say otherwise, the patient is

23  lying.

24      Q.   So you're saying each patient in the

25  Oldaker litigation is lying?

Page 44

1        A.      Yes.

2        Q.      And you're saying that their testimony

3   under oath before the senate, to the degree if they did,

4   that those were lies as well?

5              MS. EVANS:  Object to form, lack of

6         foundation.

7        A.      I didn't read that report.  But if somebody

8   accused me that I did procedure or surgery without

9   consent, it doesn't matter who that person is,

10  politician, or you, or anybody, that's a lie.

11       Q.      So you're saying each and every woman is

12  lying?

13             MS. EVANS:  Object to form.  That's vague.

14        Who are you talking about, every woman in the

15        world?

16  BY MS. McNAMARA:

17       Q.      Every woman who is participating in the

18  Oldaker litigation as well as any woman who testified

19  before the senate, for example, if they allege that they

20  did not fully understand what surgery was going to be

21  done on them, is it your testimony that each of those

22  women was lying?

23             MS. EVANS:  Object to form.

24             Answer that as best you can.

25       A.      My testimony is I never, ever, ever, ever

Page 45

1   did surgery on any patient without consent and make sure

2   the patient understands completely what they are going

3   through, what kind of surgery.

4            And that also done not by me, also there

5   were three people in the hospital involved, they check

6   also.  If you have one paper that you check it, you

7   check it, she checks it, there is no way that I can --

8   anybody can do surgery without consent, it is not even

9   possible.

10       Q.    Okay.  Let me show you, maybe so we can --

11  so that I can try to understand this better, and I

12  appreciate you explaining it to me --

13            MS. McNAMARA:  If we can have Tab 107 and

14       we will mark that as Exhibit 14.

15            (Defendant's Exhibit No. 14, marked for

16       identification.)

17            MS. EVANS:  Do you want him to keep

18       Exhibit 12 out?

19            MS. McNAMARA:  I don't think so, not now.

20  BY MS. McNAMARA:

21       Q.    ███████████████████████████████████

22  ████████████████████████████████████████████████

23  ████████████████████████████████████████████████

24  ████████████████████████████████████████████████

25  ███████████████████████████

Page 46

1            MS. EVANS:  Object to the characterization

2        of the exhibit.  Thank you.

3   BY MS. McNAMARA:

4        Q.    And if you would turn your attention,

5   Dr. Amin, to Page -- the -- do you see the numbers at

6   the bottom, what we call them Bates numbers, it says

7   Amin 4473, the second page?

8        A.    Yes.

9        Q.    Okay.

10           MS. EVANS:  And, Dr. Amin, if you need to

11        flip through this further other than just the

12        individual section she is asking you to look at,

13        feel free to do so.

14   BY MS. McNAMARA:

15        Q.    And I agree with your counsel, if you want

16   to look at these records, you're welcome to do so.  But

17   my questions right now are going to be directed at the

18   consent to surgical or diagnostic procedures form that

19   appears on these two pages; do you see that?

20        A.    Yes.

21        Q.    Now, this is -- is this what you were

22   talking about, the consent form?

23           MS. EVANS:  Object to form.

24        A.    Yeah, from the hospital.

25        Q.    When you say from the hospital, what do you

Page  47

1    mean?

2        A.    The hospital provided me, see, Irwin County

3    Hospital.

4        Q.    Yes.

5        A.    So like any patient I do surgery, it

6    doesn't matter which hospital, they have the hospital

7    consent.

8        Q.    ████████████████████████████████████

9    ███████████████████████████████████████████

10   ██████████████████████████████████████  --

11       A.    ████████████████

12       Q.    Okay, thank you.  To remove all female

13   organs, so it says; okay?

14       A.    Yeah.

15       Q.    So walk me through.  You said that the

16   patient is told -- explained all the information that's

17   in this form?

18            MS. EVANS:  Object to form.

19       A.    Patient has option -- means we give them

20   consent, if they want to read it, that's fine; if they

21   have any question, I answer it.  And I always explain to

22   them in detail what I'm going to do exactly, what kind

23   of surgery they need.

24            Not only that, once they go to the

25   hospital, as I told you before, three more levels

Page 48

1  they'll be checked.  Okay, you understand?  Do you have

2  any question?  They asked in ASU, they ask in the

3  operative room, anesthesia will go examine the patient,

4  the nurse examines the patient also.

5        So it's not like I'm the only one that

6  explains to the patient, it's more than one party

7  involved to make sure patient understands what kind of

8  procedures they are going through before they put you to

9  sleep.

10       Q.    Okay.  So this form you'll see where the

11  patient says before the signature by signing below I

12  acknowledge I have read -- or had it read or explained

13  to me and I understand this form and I voluntarily

14  consent to allow Dr. Amin, and it goes on; do you see

15  that?

16            MS. EVANS:  Where are you reading from?

17            MS. McNAMARA:  The paragraph right above

18        the signatures.

19            MS. EVANS:  On 4474.  Would you please --

20        when you start reading a document, please direct

21        the witness where you're reading from before you

22        start reading, please.

23  BY MS. McNAMARA:

24       Q.    Dr. Amin, you see -- is your signature --

25       A.    Yes.

1       Q.      -- on this?

2       A.      Yeah.

3       Q.      ███████████████████████████████████

4       █████████████████████████████████████████

5       A.      Yes.

6       Q.      Does that reflect when you signed the form?

7       A.      No, sometime in -- I signed in the

8   hospital, sometime I sign when the patient -- because

9   they are a surgery patient, I sign it.

10      Q.      So the 1600 wouldn't necessarily reflect

11  the time that you actually signed it.

12              What does the 1600 reflect?

13              MS. EVANS:  Object to form.

14      A.      It's timing, I think, 4:00.

15      Q.      But does it -- if it's not reflecting when

16  this was executed, do you have any understanding as to

17  what it's meant to reflect?

18              MS. EVANS:  Object to form.

19      A.      My responsibility is to make sure the

20  patient -- list everything, sign it.  I don't worry

21  about this part, I just want to make sure, patient

22  signed, witness and I sign.

23      Q.      Do you sign it all at the same time?

24      A.      I don't remember that one.

25      Q.      There is a witness here; do you see that

Page 50

 1   line with witness?

 2        A.    Yes.

 3        Q.    And the witness is Maria Nito?

 4        A.    Yes.

 5        Q.    Who is Miss Nito?

 6        A.    That's my employee.

 7        Q.    And does she work in your medical office?

 8        A.    Yes.

 9        Q.    And does she go to the hospital with the

10   patient?

11        A.    No.

12        Q.    So she doesn't sign this at the hospital

13   with the patient?

14        A.    No, I don't think so there is any rule

15   anywhere that patient has to sign the consent only in

16   the hospital.  They can sign like so many times.  I

17   admit the patient for C-section and I sign -- patient

18   sign consent, witness, I sign it in my office.  Then

19   patient take all of the paper to the hospital.

20             So it doesn't matter where you sign as long

21   as consent is signed, as long as patient understands

22   what is going on and what kind of surgery she is going

23   to have.

24        Q.    Is the witness the person who is meant to

25   █████████████████████████████████████████████████

Page 51

1   ███████████████████████████████████████████████o

2   ██████████

3        A.    ██████████████████████████████████████

4   █████████████████████████████████████

5        Q.    ███████████████████████████████████████

6   ████████████████████████████████████ --

7             MS. EVANS:  Object to the form, he just

8        told you.

9   BY MS. McNAMARA:

10       Q.    -- is that right?

11       A.    I --

12            MS. EVANS:  That completely misrepresents

13       his testimony.

14            MS. McNAMARA:  He just -- I asked about his

15       signature, Stacey, I'm asking ██████████████

16       signature.

17            MS. EVANS:  No, you're misrepresenting the

18       record here.

19   BY MS. McNAMARA:

20       Q.    Well, correct me if I'm wrong, do you know

21   when ████████████ signed this form, when would the normal

22   practice be where she would sign this consent form?

23            MS. EVANS:  Object to form.

24       A.    In my office or in the hospital, it's

25   dependent upon where everything is going on.

Page 52

```
 1              I explain to patient -- I witnessed -- I
 2    sign my name once the patient understands me, so she
 3    don't have any questions, you know.  And then in this
 4    case Maria, I'm sure she must have talked with the
 5    patient, do you have any question?  Do you understand
 6    everything?  And she witnessed.
 7         Q.    And Miss Nito doesn't go to the hospital
 8    with the patient; is that right?
 9         A.    Correct, she is my employee, she is not
10    hospital employee.
11         Q.    Okay.  And does the -- when -- and these
12    are detained women who were detained at ICDC; do you
13    understand that?
14              MS. EVANS:  Object to form, lack of
15              foundation.  Are you --
16         A.    Yeah, they are my patient still.
17         Q.    I understand that.  But ▇▇▇▇▇▇ was --
18    at the time of the surgery -- was an inmate at the ICDC;
19    do you understand that?
20         A.    Yes.
21         Q.    So on the day of her surgery when she had
22    the hysterectomy, was she brought to your office before
23    the surgery?
24         A.    No.
25         Q.    She would be brought directly to the
```

Page 53

1    hospital; is that correct?

2         A.    Correct.

3         Q.    So would ████████ sign this informed

4    consent at the hospital?

5               MS. EVANS:  Object to form, asked and

6         answered.

7         A.    It's at the hospital or when they arrived

8    inside to do surgery ask does she understand.  We

9    schedule the patient, get all of the paperwork ready.

10   And then take her to the hospital.  Either she can sign

11   in the office, if not, they would sign in the hospital.

12   It depends upon situation.

13              Because routinely, when I have patients

14   scheduled to surgery, my patients always comes back one

15   day before the surgery to pick up the paper for surgery

16   and I explain to them.

17              In ICDC, my patient from there, they don't

18   bring it back to sign the consent.  So consent was

19   signed in my office or hospital, but either way, consent

20   must be signed, all three, before she goes to the

21   surgery.

22              MS. McNAMARA:  I got a note from the

23         videotaper that you need to change.  Do you want

24         to -- let's take a break and then we'll come back

25         and finish this, thank you.

Page 54

```
 1              THE VIDEOGRAPHER:  The time is 10:27 a.m.;
 2         we're going off the record.
 3           (Recess at 10:27 a.m. until 10:45 a.m.)
 4              THE VIDEOGRAPHER:  The time is 10:45 a.m.;
 5         we are back on the record.
 6   BY MS. McNAMARA:
 7         Q.    Dr. Amin, right before the break we were
 8   looking at the consent form for ██████████ and you
 9   have that before you; is that right?
10         A.    Yes.
11         Q.    This is called a consent form, but it's
12   intended to reflect informed consent; is that right?
13              MS. EVANS:  Object to form.
14         A.    To me consent is consent means like -- to
15   me that patient is giving me permission to do surgery
16   and she understands everything.
17         Q.    So you use consent as synonymous with
18   informed consent; is that what I understand?
19              MS. EVANS:  Object to form, he can't speak
20         to what you understand.
21         A.    What?
22         Q.    Do you use consent to mean basically the
23   same thing as informed consent?
24              MS. EVANS:  Object to form, calls for a
25         legal conclusion.
```

Page 55

```
 1        A.     You can call that.  As what I'm concerned,
 2   a physician, my job is to consent and sign everything is
 3   ready, confirmed by more than one person that patient is
 4   ready to go to sleep for surgery.  And she understood
 5   everything because signed, witnessed, my consent -- my
 6   sign.
 7        Q.     If I understood your testimony correctly,
 8   but please correct me if I'm wrong, so the dates
 9   reflected on this consent form 6/14/17 doesn't
10   necessarily mean the date you signed the consent form;
11   is that right?
12        A.     That part I don't know, because the only
13   thing -- when I sign the consent, I'm not looking at the
14   time, or date, or anything.  For me it's not important.
15   My important thing is based on understand everything I'm
16   planning on doing it, she has any question, she sign,
17   and I sign, and that's all.
18        Q.     If this doesn't reflect the date you signed
19   and it doesn't -- does it reflect the date that
20   ███████████████████████████
21             MS. EVANS:  Object to form.
22        A.     What's the question?
23        Q.     Does this reflect that ██████████ signed
24   this consent form on June 14th, 2017?
25             MS. EVANS:  Object to form.
```

1        A.     As per I'm concerned, I never pay any

2   attention on this area, because that is not my job.  My

3   job is patient sign the consent, witness, explain

4   everything, she understands, you know.  When it's

5   signed, or where it's signed, or what the date, I don't

6   even try to look at it, because it's not -- I'm not

7   worried about that part, I'm worried about consent,

8   patient understand everything; that is more important

9   than timing.

10        Q.     But if someone is going to go back and look

11   at these forms to try to reconstruct what happened and

12   when it happened, how would they now when this consent

13   form was signed by you?

14             MS. EVANS:  Object to form.

15        A.     Signed by me?

16        Q.     Yes.

17        A.     That's my signature.  You can't lie that

18   signature.

19        Q.     No, but what date you signed it, how would

20   they know that?

21             MS. EVANS:  Object to form.

22        A.     I don't know who -- I never pay attention,

23   that's what I'm telling you.  That for me date is not

24   important.  It's important for you.  But for me, most

25   important thing that patient understands what I'm going

1    to do, she signs the consent, I answer all of her

2    questions, witness, explain by nurse from ASU, operating

3    room, anesthesia, that's more important for me than

4    date.

5         Q.    Okay.  And prior to scheduling the surgery,

6    when you're working with a detained woman at the ICDC,

7    do you get approval from ICE before scheduling the

8    surgery?

9         A.    Yes, any time after examining the patient,

10   whatever blood work needs to be done, I explain the

11   patient, give multiple-choice.  And if they ask me my

12   opinion, what is best for me?  I say, okay, I think you

13   need to go through this biopsy, because I want to make

14   sure everything is all right.

15              And once the patient agrees, we send all

16   the information to ICE.  And they send it, the medical

17   personnel, I don't know where it is, but they will

18   approve or disapprove the surgery.  It's not that just

19   because I recommend a surgery, that doesn't mean she

20   will have the surgery.  It is approved each and every

21   surgery done by me for my patient in ICE is approved by

22   the medical personnel from the inservice company.

23              So first thing, it would never happen that

24   I did surgery without approval.  Not only that, once the

25   patient goes to the hospital, the hospital personnel

Page 58

1  will verify to make sure the surgery is approved of

2  necessary paperwork is done, because otherwise they

3  won't get paid.

4       Q.    And so if I -- do you get the approval from

5  ICE before you schedule the date of the surgery?

6       A.    Correct, yeah.

7       Q.    When this form is signed by the patient,

8  ██████████ in this case, if she doesn't speak English,

9  does someone read her the form in Spanish --

10           MS. EVANS:  Object to form.

11  BY MS. McNAMARA:

12       Q.    -- if that's her language?

13           MS. EVANS:  Object to form.

14       A.    We have -- when I examine the patient, me,

15  patient, my nurse, one officer from ICE, and they have a

16  special translation toll-free number.  If the patient

17  don't understand English, we go to the translator and it

18  explains everything.  And if there is any questions, I

19  ask them to the translator.

20       Q.    Does anybody read -- if you're using the

21  translation line, does anybody read the form through the

22  translation line so that the patient knows what they are

23  signing?

24           MS. EVANS:  Object to form, compound, lack

25           of foundation.

Page 59

1        A.     Anybody read?  Patient has a choice to ask

2   any question.  And if she has any question, I answer

3   through the translator.

4        Q.     But if the patient, like ███████ here,

5   she -- you expect that she reads this form before she

6   signs it; do you not?

7        A.     If she needs to read it.

8        MS. EVANS:  Object to the form.

9        A.     I explain to them, and they'll consent.

10  And they have a choice to read, it's up to them, or if

11  they have any question, or hesitant, and I'll answer the

12  patient, or the nurse will answer the question.

13       Q.     What if she wants to read the form but she

14  doesn't read English, what do you do then?

15       MS. EVANS:  Object to form, lack of

16       foundation.

17       A.     I think we have -- not about this one, but

18  some consent, my office put in a Spanish language

19  because I have five or six Spanish employees.

20       Q.     So the Spanish-speaking employee would read

21  the patient the form in Spanish?

22       MS. EVANS:  Object to form.

23       A.     No.  What I can tell you, once I decide to

24  do surgery, if the patient has any question, ask.  And

25  I'm a -- I'm sure that somebody from here will have

Page 60

1   surgery, I don't think so anybody -- some people might

2   read it, but that doesn't mean they are going to read

3   each and every thing.  They are going to believe the

4   doctor, or to suggest to you, or explain to you.  And I

5   never had that, at least I seen patient that has surgery

6   from one end to the other end, and I'm sure whoever has

7   surgery, you must have signed the consent report in any

8   hospital that you have something done.  And I don't know

9   what person -- patient will read completely, they are

10  going to rely on the doctor's opinion or questions.

11  Once I answered all the questions to them, they have a

12  choice to read it.

13         Q.    But if I'm understanding your testimony

14  correct, most do not; is that correct?

15               MS. EVANS:  Object to form.

16         A.    No, I'm not saying that.

17               MS. EVANS:  And Dr. Amin, don't guess.  She

18         keeps asking you about unspecified situations and

19         she hasn't even -- there is so much wrong with

20         your questions, Liz, but...

21               MS. McNAMARA:  Well --

22               MS. EVANS:  But do the best you can,

23         Doctor.

24               I mean, but he is trying to be helpful, and

25         talk to you, and answer your questions.  But

1        truthfully you're asking him about hypothetical,

2        speculative situations.  So I felt it was my duty

3        as his counsel to remind him he shouldn't be

4        speculating.

5   BY MS. McNAMARA:

6        Q.    Dr. Amin, I don't want you to speculate,

7   I'm asking you to the best of your recollection.  Do

8   your patients generally read the consent form before

9   they sign it?

10              MS. EVANS:  Object to form.

11       A.    Some yes, most of them no.

12       Q.    Okay, thank you.

13             So turn to -- and while we are still on

14  ████████████████████████████████████████████████████

15  ████████████████████████████████████████████████

16  ████████; do you see that?

17              MS. EVANS:  Give him a moment to get

18       through; please.

19       A.    4491, yeah.

20       Q.    Now, describe for me what this block of

21  information is and when do you provide that information?

22              MS. EVANS:  Object to form.

23       A.    Which one?

24       Q.         ████████████████████████████████████████

25  ██████████████████████████-



Page 62

```
 1        A. ████████████████████████ --
 2  ███████████ .
 3        Q. ████████████████████████
 4  █████████████████████████████████
 5  ████████████████
 6        A█ ████████████
 7        Q. █████████ --
 8           ███████████████████ --
 9  BY MS. McNAMARA:
10        Q. ███████████
11        A. █████
12        Q. ██████████████
13        A. ████████
14        Q. O██████████████
15  ███ -- █████████████████
16        A. █████████ .
17        Q. ████████████████
18  ██████████████████
19        A. █████
20        Q. █████████████████
21  ████████████████████████
22  ██████
23        A. ████████
24        Q. I█████████████████
25  ███████████████████████████████ ?
```

Page 63

1          A.     Yes.

2          Q.     And you --

3          A.     Always.

4          Q.     Always?

5          A.     Yeah.

6          Q.     So like if the patient withdrew or didn't

7     want to go forward, would you update this to reflect

8     that the patient didn't want to proceed with the

9     surgery?

10               MS. EVANS:  Object to form.

11               Go ahead.

12          A.     If the patient don't want to go through

13     surgery, you know, that's all.  It's like, I don't have

14     any -- I don't have to dictate or add anything else.  If

15     the patient decided not to have surgery, that's her

16     choice.

17          Q.     But do you update this form or this

18     information about the surgery?

19               Because it says, like if you look in

20     here -- like on the fifth line from the bottom it says,

21     patient stated that she wants --

22               MS. EVANS:  Wait, hold on, hold on.  Give

23          him a second, give all of us a second, to get

24          where you are before you start reading and be a

25          little more clear about where you're at.

```
                                              Page 64
 1   BY MS. McNAMARA:
 2        Q.    One, two, three, four, five lines from the
 3   bottom in that block; do you see in the middle --
 4              MS. EVANS:  What block -- for the record,
 5         what block are you in?
 6              MS. McNAMARA:  The block that begins HPI.
 7              MS. EVANS:  Five from the bottom?
 8              MS. McNAMARA:  Correct.
 9              MS. EVANS:  It starts bilateral?
10              MS. McNAMARA:  Yes.
11              MS. EVANS:  I want to make sure Dr. Amin is
12         there before you start reading.
13   BY MS. McNAMARA:
14        Q.    ███████████████████████████████████
15   █████████████████████████████████████████████████
16   █████████████████
17        A.    Yes.
18        Q.    So if the patient later decides she does
19   not want that, would you update or change this?
20              MS. EVANS:  Object to form.
21        A.    I might, I might not -- well, the consent
22   will be changed if the patient decided that she is
23   scheduled for ██████████████████████████████████
24   █████████████████████████████████████████████████
25   █████████████████████████████████████████████████
```

1 ████████████████████████████████████████████

2 ████████████████████████████████████████

3 ██████    If that's the case, the nurses inform me and we

4 change the consent, we pull, she goes to the surgery,

5 operating room.

6           Q.    How do you change the consent?

7           A.    New consent, everything is new consent.

8           Q.    But if she decided she didn't want to do

9 it, I'm not understanding, how would you change the

10 consent?

11           A.    She didn't want to do surgery?

12           Q.    Yes, if she didn't want the surgery at all;

13 how would you change the consent?

14                 MS. EVANS:  Object to the form, calls for

15                 hypothetical --

16           A.    I don't change any --

17                 MS. EVANS:  -- lack of foundation --

18           A.    I don't --

19                 MS. EVANS:  Sorry, Dr. Amin, just a second.

20                 Lack of foundation, calls for speculation.

21                 If you can answer, go ahead.

22           A.    I don't think I would change anything

23 because patient not having surgery, how can you change

24 something that you're not going to do it?

25           Q.    Because the patient wouldn't have signed it

Page 66

1    yet; is that right?

2                    MS. EVANS:  Object to form, argumentative.

3         A.    No.

4         Q.    Okay.  Let's get a concrete example so that

5    we can try to understand this better; okay?

6         A.    Okay.

7         Q.    Let's mark as Exhibit 15 the medical

8    records of ████████████.

9    ████████████████████████████

10   ██████████████████████████

11   ████████████████████████████████

12   ███████████████

13   █████████████

14        Q.    ████████████████████████████

15   ████████████████████████████████████████████

16   ████████████████████████████████████████████

17   ████████████████████████████████

18              ████████████████████████████████

19                    MS. EVANS:  Is that a question?

20                    MS. McNAMARA:  I haven't finished.

21                    MS. EVANS:  Okay.

22                    MS. McNAMARA:  If you might let me finish

23              the question --

24                    MS. EVANS:  I apologize, I thought you were

25              done.



Page 67

1    BY MS. McNAMARA:

2         Q.   ████████████████████████████████

3    ███████████████████████████████████████.

4              ███████████████████████████

5    ████████████:

6         Q.   █████████████████████

7              █████████████████████

8         A.   ████████████████████████████

9    ███████████████████

10        Q.   ████████████████████████████

11   ██████████████████████████████████

12   ████████████████████████████████████████

13   ██████████████████████

14        A.   Yes.

15        Q.   And is that your signature dated 11/27/18?

16        A.   Yes.

17        Q.   And Miss Nito's signature dated 11/27/18?

18        A.   Yes.

19        Q.   And there is no signature from the patient?

20        A.   Yes.

21        Q.   ████████████████████████████████

22   ████████████████████

23        A.   No.

24        Q.   ████████████████████████████████

25   █████████████████████████████

Page 68

1  documents; is that right?

2       A.    Correct.

3       Q.    Do you -- and you would have obtained the

4  MedPAR approval from ICE before scheduling that surgery;

5  isn't that right?

6             MS. EVANS:  Object to form.

7             Go ahead.

8       A.    Correct.

9       Q.    So this would be an example of you signing

10  the consent form before the patient signed it; is that

11  right?

12             MS. EVANS:  Object to form.

13       A.    Yeah, because patient was already explained

14  ████████████████████████████████████████████████

15  ████████████████████████████████████████████████████

16  ████████████████████████████████████████████████████

17  ████████████████████████████████████████████████

18  ████████████████████████████████████████████████████

19  ████████████████████████████████████████████████████

20  ████████████████████████████████████████████████

21  ████████████████████████████████████████████████████

22       Q.    So is it your testimony that ICDC patients,

23  you would see them eight weeks before a surgery and also

24  four weeks before the surgery?

25             MS. EVANS:  Object to form.

```
 1          A.     If they have major surgery, yes.

 2                 Minor surgery, just one time, two weeks

 3     after the surgery so I can explain to patient the biopsy

 4     report or pathology report.  And also make sure she is

 5     healing well, she has any complications or not or how

 6     she is doing.

 7                 MS. EVANS:  For the record, you're using

 8          before and after, I think you all are

 9          interchanging.  He is talking about after, you're

10          saying before.

11     BY MS. McNAMARA:

12          Q.    I think I misspoke, and I apologize if I

13     created any confusion.

14                 The question is you would see the

15     patient -- if I understand, would you see the patient

16     eight weeks before the surgery and then four weeks

17     before the surgery?

18          A.    No.

19          Q.    When would you do the explanation to the

20     patient about the need for the surgery, and the side

21     effects, and everything else?

22                 MS. EVANS:  Object to form, compound and

23          hypothetical.

24                 Are you talking about this patient or all

25          patients?
```

Page 70

1    BY MS. McNAMARA:

2         Q.    I'm talking about -- in this case I'm

3    talking about ███████████████████████████████

4    ████████████████ when would you have provided the

5    information?

6         A.    For the patient?

7         Q.    Yes.

8               MS. EVANS:  Hold on, Dr. Amin.  Sorry.

9         Object to form.

10              And if you need to flip through the medical

11        records to refamiliarize yourself with

12   ██████████████████████████████████████████████████f

13   ████████████████████████████████████████████████

14   ██████████████████████████████████████████

15   ███████████████

16        A.    ██████████████████████████████████████

17   ██████████████████████████████████████████████

18   █████████████████████████████████████████████

19   record notes somewhere.

20              I'm sorry, what was the question?

21        Q.    Yes.  When would you have explained the --

22   ███████████████████████████████████████████████████

23   ████████████████████████████████████████████

24   ███████████████████████████████

25              MS. EVANS:  Object to form.

Page 71



1     A.     You know about this patient?

2     Q.     Yes.

3     A.     ████████████████████████

4     ████████████████████████

5     ████████████████████████████

6     ████

7     Q.     ██████████████

8     A.     ████████████████

9     ████████████████████████████

10    ████████████████████

11    ██████████████████████████████

12    ████████████████████████████████

13    ████████████████████████████████

14    ████████████████████████████

15    ████████

16    ████████████████████████████

17    ██████████████████████████

18    ████████

19    ████████████████████████

20    ████████████████████████████████

21    ██████████████████████████

22    ████

23    ████████████████████████████

24    ██████████████

25    Q.     And you referred that recommendation to ICE

Page 72

1   ████████████████████████████████████████████

2        A.     I assume.

3        Q.     ████████████████████████████

4   ████████████████████████████████████████████

5               MS. EVANS:  Object to form.

6        A.     That I don't know.  I just -- once I

7   decide -- once I explain to the patient, if she agrees,

8   then I want -- the rest of the team is taking care of my

9   office stuff.

10       Q.     █████████████████████████████████

11  ██████████████████████████████████████████

12  ██████

13              MS. EVANS:  Can you give a page number?

14  BY MS. McNAMARA:

15       Q.     It's 7972.

16       A.     Yeah.

17       Q.     ██████████████████████████████████

18  ████████████████████████████████████████████

19  █████████████████████████████████

20  ████████████

21       A.     █████████████████████

22       Q.     ██████████████████████

23  ████████████████████████████████████████

24  █████████████████████████████████

25       A.     Correct.

Page 73

```
 1        Q.      So how can this be written in the past
 2   tense?
 3        A.      You mean?
 4        Q.      That she was admitted.  She was never
 5   admitted.
 6              MS. EVANS:  Object to form,
 7          mischaracterizes the document.
 8        A.      ████████████████████████████████
 9   ███████████████████████████████████████████████
10   ███████████████████████████████████████████████
11   that what you are looking for.
12        Q.      Pardon me?
13        A.      The surgery was scheduled.
14        Q.      And it wouldn't be scheduled without ICE
15   approval; correct?
16              MS. EVANS:  Object to form, asked and
17          answered.
18        A.      That -- you know, again, once I decided or
19   suggest to the patient multiple options, sometimes
20   ████████████████████████████████████████
21   █████████████████████████████████████████
22   ████████████████████████████████████████
23   ██████████████████████
24              ███████████████████████████████████r
25   ███████████████████████████████████████████████
```

Page 74

1

2

3          Q.     And you would provide that recommendation

4   to ICE to get approval; is that right?

5                 MS. EVANS:  Object to form.

6          A.     Not me, my office employee.

7          Q.     And who in your office would do that?

8          A.     Anybody, most of the time it is Maria, but

9   sometimes other nurses will if she is not working, she

10  sends all the information to the ICE.

11         Q.     And by Maria, you mean Maria Nito?

12         A.     Yeah.

13         Q.

14

15

16

17         A.                                            .

18         Q.

19

20

21         A.

22         Q.     O

23

24

25

Page 75



1            MS. EVANS:  Object to form.

2            Go ahead.

3       A.    Yeah.

4       Q.

5

6       A.

7       Q.

8

9            MS. EVANS:                    --

10      A.

11

12      Q.

13

14

15           (Defendant's Exhibit No. 16, marked for

16      identification.)

17      A.

18      Q.

19

20

21           MS. EVANS:  What page?

22           MS. McNAMARA:  I don't have it in front of

23      me.

24           MS. EVANS:  Dr. Amin, do what you need to

25      do to refamiliarize yourself with --

Page 76

1    BY MS. McNAMARA:

2         Q.    If you turn --

3               MS. EVANS:  -- this patient that you -- I'm

4         talking.  That you would have seen, it looks

5         like, maybe five years ago.  Don't let her rush

6         you.

7               And then, Liz, before you start asking him,

8         if you would direct us all to the page, please.

9               MS. McNAMARA:  Absolutely.

10   BY MS. McNAMARA:

11        Q.    So we've marked as Exhibit 16 the records

12   of ███████████ and --

13              MS. EVANS:  Object to the characterization.

14   BY MS. McNAMARA:

15        Q.    And if you would turn your attention to the

16   page that is Bates stamped 1850, admission hysterectomy

17   and physical.  Do you see that page, Dr. Amin?

18        A.    Yes.

19        Q.    ████████████████████████████████████████

20   ████████████████████████████

21        A.    ████████████████████████████████████████

22   ████████████████████████

23        Q.    ███████████████████████████████████

24   ██████████████████████████████████████

25        A.    ██████████

Page 77



1    Q.

2

3

4

5

6

7    Q.

8

9

10

11

12   A.

13   Q.

14

15

16          MS. EVANS:  Object to form.

17   BY MS. McNAMARA:

18   Q.    Do you see that?

19          MS. EVANS:  Object to form.

20   A.    Yes.

21          (Defendant's Exhibit No. 17, marked for

22          identification.)

23   BY MS. McNAMARA:

24   Q.

25

Page 78



1

2

3

4

5      Q.

6

7

8

9

10

11      A.

12

13   BY MS. McNAMARA:

14      Q.

15

16      A.

17      Q.

18

19

20      A.

21      Q.

22

23           MS. EVANS:  Is that a question?

24           MS. McNAMARA:  No, I'm getting ready to

25      introduce the exhibit so that the doctor has it

Page 79

1          in front of him.

2                    (Defendant's Exhibit No. 18, marked for

3          identification.)

4          A.    (Examines document.)

5          Q.    ██████████████████████████████████

6    ████████████████████████████████████████████████

7    ████████████████████████████████████████████

8    ████████████████████████████████████████████████

9    █████████

10                    MS. EVANS:  Can you let him get to the page

11         before you start reading?

12                    MS. McNAMARA:  I'm just reading and then he

13         can -- please don't interrupt me.

14                    MS. EVANS:  I want him to be able to see

15         what you're reading.

16                    MS. McNAMARA:  I will wait for him to get

17         there.

18   BY MS. McNAMARA:

19         Q.    Are you on Page 2205?

20         A.    Yes.

21         Q.    ████████████████████████████████████

22   ████████████████████████████████████████████

23                    MS. EVANS:  Object to form.

24         A.    Correct.

25         Q.    ████████████████████████████

Page 80



Page 81

Page 82

1 ███████████████████████████████

2                  But patient has choice.  If they are -- if

3 I schedule for the surgery for the right medical reason

4 and somehow surgery is not done, because patient decided

5 not to have it, that is her choice.  Or based on going

6 to someone else without my knowledge.  So I don't have

7 any control over that one, because they don't tell me

8 that that patient is gone.

9      Q.     ████████████████████████████████

10 ██████████████████████████████████

11      A.     Yes, ma'am.

12      Q.     So --

13      A.     And proof is in the record.

14      Q.     And are you familiar with a statement that

15 was issued by ICE after the whistleblower complaint was

16 filed?

17      A.     No.

18      Q.     Are you familiar with a statement in which

19 they indicated only two individuals at the Irwin County

20 Detention Center were referred for hysterectomies?

21           MS. EVANS:  Object to form.  He's already

22           told you he is not familiar with it.  If you want

23           him to comment --

24      A.     No.

25           MS. EVANS:  -- on a statement, you need to

Page 83

 1          show it to him.  He's not going to answer about a

 2          statement he just told you he is not familiar

 3          with.

 4                  MS. McNAMARA:  And I'm asking --

 5                  MS. EVANS:  It is completely improper to

 6          continue to ask these questions.

 7                  MS. McNAMARA:  I am asking him a follow-up

 8          question to try to prod his recollection, which

 9          I'm entitled to do.

10                  MS. EVANS:  Why don't you show him the

11          statement?

12                  MS. McNAMARA:  You can object --

13                  MS. EVANS:  And I will.

14                  MS. McNAMARA:  -- and I can proceed as I

15          wish --

16                  MS. EVANS:  It is very frustrating to have

17          to object so much, but your questions are

18          completely inappropriate and improper.

19     BY MS. McNAMARA:

20          Q.    Dr. Amin, do you recall that ICE issued a

21     statement in 2020 that you had referred only two

22     individuals to the ICDC?

23                  MS. EVANS:  Object to form.

24     BY MS. McNAMARA:

25          Q.    From the ICDC for hysterectomies?

Page 84

1             MS. EVANS:  Object to form.

2       A.    ████████████████████████████████

3    ██████████

4       Q.    ████████████████████████████

5       A.    ██████

6       Q.    ██████████████████████████████

7    ██████████████████████████████████████████

8    ████████████████████████████████████████

9    ██████████  is that fair to say?

10             MS. EVANS:  Object to form.

11             Go ahead.

12       A.    Yeah.

13       Q.    Let's go...  Now, Dr. Amin, are you board

14    certified?

15       A.    No.

16       Q.    Do you remember -- strike that.

17             At some point in time did you become aware

18    that a whistleblower complaint had been filed that

19    concerned you?

20             MS. EVANS:  Object to form.

21       A.    Do I remember when; what?

22       Q.    Do you remember that a whistleblower

23    complaint was filed that concerned you?

24             MS. EVANS:  Object to form.

25             Do you want to tell him --

 1          A.     Yes.

 2          Q.     And do you remember how you became aware of

 3     that?

 4                 MS. EVANS:  Object to form.

 5          A.     One of my stepdaughters, she lives in

 6     Jacksonville, she told me that, what's going on in Irwin

 7     County Hospital?  Because she knows I'm the OB/GYN over

 8     there, that they are accusing you of doing a mass

 9     hysterectomy, and uterus collector, and all of this lie.

10          Q.     Do you know when you had that conversation

11     with your stepdaughter?

12          A.     No.

13          Q.     Let me show you what has been previously

14     marked as Exhibit 3, which is the whistleblower

15     complaint?

16                 MS. EVANS:  Object to the characterization

17                 of the exhibit.

18     BY MS. McNAMARA:

19          Q.     Are you familiar with this document?

20          A.     No, ma'am.

21          Q.     Did you ever read this document?

22          A.     This is the first time I'm seeing it.

23          Q.     This is the first time you're seeing this?

24          A.     (No audible response.)

25          Q.     So no one ever provided you a copy of this

Page 86

1   whistleblower complaint?

2           MS. EVANS:  Object to form,

3       mischaracterizes his testimony.

4           Go ahead.

5       A.    It was provided to my daughter, yes.  And

6   then as I told you before, because of my practice by

7   myself, I'm busy, so my daughter usually -- everything

8   goes through her and she will tell me somebody -- what's

9   going on.  So she might have told me all of content but

10  I might not have seen this paper before.

11      Q.    So if I understand your testimony correct,

12  you never read it; is that right?

13          MS. EVANS:  Object to form, asked and

14      answered.

15      A.    Yes, I never read this paper, yeah.

16      Q.    But you came to understand that sections of

17  this complaint concerned a gynecologist who was treating

18  ICDC patients; is that right?

19      A.    Yeah, that's what I told you.

20          MS. EVANS:  Object to form.

21  BY MS. McNAMARA:

22      Q.    Okay.  And you understood that referred to

23  you because you were treating -- you were the

24  gynecologist treating ICDC patients?

25      A.    Correct.

Page 87

1          Q.      Were you aware of any complaint from

2     detainees at the ICDC about your medical treatment prior

3     to the filing of this whistleblower complaint on

4     September 14th, 2020?

5          A.      Did somebody complain to me?

6          Q.      Was it ever brought to your attention that

7     a patient, one or more patients, was complaining about

8     your medical treatment at the ICDC?

9          A.      No.

10         Q.      That was never brought to your attention?

11         A.      Yes, correct.

12              MS. McNAMARA:  Let's mark as Exhibit 19.

13              (Defendant's Exhibit No. 19, marked for

14         identification.)

15    BY MS. McNAMARA:

16         Q.      This is a document that was produced by a

17    witness in this case, Free, and so it's Bates stamped

18    Free 1606 through 1608.  And it's dated the

19    ████████████████████████████████████████████████

20    ███████████████████████████████████

21              Do you know who David Paulk is, Dr. Amin?

22              MS. EVANS:  Object to form,

23         mischaracterizes the exhibit.

24              You can answer the question about --

25         A.      I heard his name, he works in ICDC, but

Page 88

1    that's all.

2         Q.    So have you ever met Mr. Paulk?

3         A.    I might, but I don't recall.

4         Q.    Do you recall ever speaking to Mr. Paulk?

5         A.    I think a couple of times I called from my

6    office to complain about what a problem I'm having with

7    nursing personnel or medical personnel over there.

8         Q.    What were your complaints about nursing

9    personnel or medical personnel over there?

10        A.    First thing, whenever -- initially,

11   whenever I start seeing patient from ICE, if they have

12   female problem, they have problem with a period or

13   cramps, heavy bleeding and I order some -- before I

14   decided what kind of treatment she needs, I order some

15   blood test or necessary ultrasound in case, that I --

16   there is a form in my office I can fill it out with my

17   name, my address, my phone number, fax number, and my

18   nurse marks what kind of blood test need to be done.

19   Then sonogram, there are sonogram requests, and we send

20   that one to ICE.

21             A lot of times initially I send all the

22   requests, I see the patient after three or four weeks,

23   no blood work was done, no sonogram was done.

24             Then I ask the patient, did they give you

25   any hormone, birth control pills or something I

Page 89

1    prescribed?  And they say, no, they are not getting any

2    medication.  It was more than one or two patients.  So I

3    talked with a nurse before that and I never got any

4    response.

5              So I think that's why I talked with him,

6    listen, if you want me to see the patient, you know,

7    this -- I'm not getting report, I have a hard time

8    getting a report and I can't treat the patient without

9    all of the tests, it's three weeks, it's not done.

10             And what they did from the ICE that --

11   whatever I ordered, copy on different forms, say blood

12   test, sonogram, all of it.  And the change -- everything

13   is the same except it changed the name of the doctor --

14   not me, it was somebody else, that medical officer over

15   there.

16             And I never get the report.  And I said,

17   why are they doing like this, you know, I am the one

18   ordering the blood test and sonogram, why when I get the

19   results is some other doctor's name that he ordered it,

20   not me.  And that's what I complained, you know, that

21   what's going on?  You know.

22             Second thing, once I do the blood tests and

23   sonogram, they know that I do all of my surgery,

24   everything, in Irwin County Hospital.  So a couple of

25   nurses, whatever reason they have, they send it to other

Page 103

```
 1              MS. EVANS:  Miss McNamara, you told him to
 2       read it, he is reading it.  Don't start asking
 3       him questions while he is still reading it.
 4  BY MS. McNAMARA:
 5       Q.   I didn't realize you were still reading it,
 6  I'm sorry.
 7              MS. EVANS:  Well, you should ask him.
 8       A.   Yes, ma'am.
 9       Q.   I'm sorry.
10       A.   I'm looking now.
11       Q.   Okay.
12       A.   (Examines document.)
13            I read this part.
14       Q.   Okay.  And in that part do you see that the
15  Associated Press reported that an immigration detention
16  center in Georgia performed questionable hysterectomies,
17  refused to test detainees for COVID-19 and shredded
18  medical records according to a nurse quoted in a
19  complaint filed Monday; do you see that?
20              MS. EVANS:  Object to form.
21       A.   Yes.
22       Q.   And do you believe that statement that a
23  medical provider was performing questionable
24  hysterectomies is accurate?
25       A.   No.
```

Page 104

1          Q.     And in the third paragraph do you see that
2    it says Wooten calls a gynecologist who works outside
3    the facility the uterus collector?
4          A.     That's a lie.
5          Q.     It's a lie that no one ever said that?
6          A.     No.
7          Q.     Would you know that whether immigrants who
8    were housed at ICDC, would you know whether they called
9    you a uterus collector?
10               MS. EVANS:  Object to form.
11         A.     Not until she opened her mouth.
12         Q.     Okay.  But as you sit here today, do you
13   have any way to know whether patients or detainees at
14   the ICDC, whether they called you the uterus collector?
15         A.     Based upon ICE, no, never.
16         Q.     No, never, they did not or you don't know?
17         A.     They never told me.
18         Q.     You're certain they never, ever called you
19   the uterus collector?
20               MS. EVANS:  Object to form.
21         A.     Based on ICE never came to my office or
22   told me personally or on the phone that I'm a uterus
23   collector.  That come first time I noticed when
24   Miss Wooten say something like that.
25         Q.     And it was reported by at least the

Page 105

1    Associated Press on September 14th; is that right?

2              MS. EVANS:  Object to form.

3         A.    On this one, yes.

4         Q.    And do you know -- you didn't commence a

5    litigation against the Associated Press; did you?

6              MS. EVANS:  Objection, asked and answered.

7         A.    No.

8         Q.    Okay.  If you would turn your attention,

9    I'm only going to direct your attention to a couple of

10   these.

11             MS. EVANS:  Since you're not using this,

12        can I have it?

13             MS. McNAMARA:  Yes.

14   BY MS. McNAMARA:

15        Q.    If you turn your attention to Tab 16

16   please.

17             This is an article that appeared in the

18   Intercept with the headline he just empties you all out,

19   whistleblower reports high number of hysterectomies at

20   ICE detention facility; do you see that?

21             MS. EVANS:  Object to form.

22        A.    Yes.

23        Q.    While it is very light, it indicates that

24   it was published on September 15, 2020 at 5:22 p.m.?

25        A.    Yes.

1          Q.     Do you recall speaking to the reporter from

2     the Intercept?

3               MS. EVANS:  Object to form.

4          A.     Me?

5          Q.     Yes.

6          A.     I never talked to any reporter as far as I

7     remember.

8          Q.     Okay.  If you turn your attention to the

9     third page of this article?

10               MS. EVANS:  For the record, I don't -- I

11               don't think you -- there is no foundation.  I

12               don't know if he's ever seen this before, so if

13               you want him to answer further questions, I think

14               he probably needs to take a look at least at the

15               area you're going to ask him about.

16               MS. McNAMARA:  I'm directing his attention

17               to look.

18     BY MS. McNAMARA:

19          Q.     If you look on the third page of the

20     article, Dr. Amin, the paragraph that begins -- well,

21     the carry over, the first full sentence on this page

22     reads, the doctor's identity which was first reported by

23     Prism?

24               MS. EVANS:  Liz, where are you before

25               you --

Page 107

```
 1              MS. McNAMARA:  I just said on the record,
 2         the first sentence on the third page.
 3              MS. EVANS:  Well, give everybody a second
 4         to get there before you start reading.
 5         A.   1621?
 6         Q.   Correct.
 7         A.   Okay.
 8         Q.   The first sentence at the top.
 9              It says, the doctor's identity which was
10    first reported by Prism did not appear in the
11    whistleblower's complaint to the Homeland Security
12    Office of Inspector General.  Do you see that?
13         A.   Yes.
14         Q.   Were you aware that Prism had first
15    reported your name as the doctor who was treating
16    patients at the ICDC?
17              MS. EVANS:  Object to form.
18         A.   I don't recall.
19         Q.   Pardon me?
20         A.   I don't recall.
21         Q.   Okay.  Then the next paragraph right under
22    that, Dr. Amin.  When reached by phone for comment, Amin
23    confirmed that he conducted procedures on immigrant
24    women brought from the facility.  He said that he
25    conducts exams, he requires the approval of the
```

1    detention center before conducting any necessary

2    procedures.

3                    MS. EVANS:  Object to form.

4    BY MS. McNAMARA:

5        Q.    Amin said that he had only performed,

6    quote, one or two hysterectomies in the past two or

7    three years, end quote.  Do you see that?

8                    MS. EVANS:  Object to form.

9        A.    Yes.

10       Q.    Does that refresh your recollection,

11   Dr. Amin, that you spoke to a reporter from the

12   Intercept?

13                   MS. EVANS:  Object to form.

14       A.    I don't recall anybody -- I talked with

15   anybody about this things, I don't know.  I don't

16   remember, I don't think so I talk with any person

17   outside my office or anyone from news or media, I never

18   talked with them, anything.  At that time, in case

19   somebody called, the only thing I can suggest is you

20   have to talk with my attorney, Mr. Grubman.

21                   But I never, myself, volunteered any

22   permission, because Mr. Grubman told me that don't say

23   anything --

24                   MS. EVANS:  Don't share what your counsel

25        might have provided with you.  But it's also --

Page 109

1           we are here today because reporters aren't always

2           telling the truth.  So the document says what it

3           says, your testimony is what it is, and

4           Miss McNamara should probably move on.

5    BY MS. McNAMARA:

6           Q.    Dr. Amin, are you suggesting that the

7    Intercept reporter just made up this interview?

8                 MS. EVANS:  Object to form.

9           A.    I don't know that one, but I don't recall

10   talking with anybody except hospital, my family, but I

11   don't recall ever I talked with anybody from newspaper,

12   or TV media, or -- they are circling my office all the

13   time and harassing me, but I never talk or -- I don't

14   give any permission, I don't know how they got it.

15          Q.    Dr. Amin, you see under where it says join

16   our newsletter in bigger print, and then under that

17   there is a sentence that begins Amin said; do you see

18   that?

19          A.    Yes.

20          Q.    It says, Amin said that allegations of

21   performing procedures without patient's consent were

22   ruining his reputation and affecting his practice; do

23   you see that?

24          A.    Yes.

25          Q.    Is that an accurate statement?

Page 110

```
 1        A.    Yes, but it -- yeah.

 2        Q.    Then it goes on to say, everything is

 3   wrong, and if you want to talk, talk to the hospital

 4   administrator, Amin said, referring to Irwin County

 5   Hospital, and then hung up the phone.  Does that help

 6   you recall this --

 7        A.    I don't recall.

 8        Q.    -- probably brief conversation with this

 9   reporter?

10             MS. EVANS:  Object to form.

11        A.    I don't recall, no.

12        Q.    Now, after the whistleblower complaint

13   allegations were published, did you retain Mr. Grubman

14   to help you with this?

15             MS. EVANS:  Object to form.

16        A.    Yes.

17        Q.    And you had conversations with Mr. Grubman

18   about how to respond to the press concerning this?

19             MS. EVANS:  Object to form.  And I caution

20             you while there could be some conversations with

21             Mr. Grubman about the press that arguably are not

22             privileged, this is very close to the line, and

23             Miss McNamara knows it.  So I just want to

24             caution you to be very careful when you are

25             responding to her questions about what
```

Page 111

1          Mr. Grubman may have told you.  I'm not saying
2          you can't yet, but I just want everybody to just
3          -- extra pauses.  And Miss McNamara knows to
4          tread carefully, I'm sure she will.
5          A.    Could you please say it again, the
6     question?
7          Q.    Yes, I'm just asking you about your
8     conversations with Mr. Grubman about how to communicate
9     to the press with regard to these allegations.
10         A.    Yes.
11         Q.    Did you speak with Mr. Grubman about that?
12         A.    Yes.
13         Q.    Did he create a statement which he would
14    provide to the press when reached to give comment?
15              MS. EVANS:  Object to form.
16              If you know.
17         A.    No.  I don't know exactly, no.
18         Q.    Did you ever review a proposed press
19    statement?
20         A.    No.
21         Q.    So you didn't review or approve a press
22    statement issued by Mr. Grubman?
23              MS. EVANS:  Object to form,
24              mischaracterizes his testimony.  We've been
25              through this a million times, review and approve

1          are two different things.

2    BY MS. McNAMARA:

3          Q.    You just testified you did not review a

4    press statement; is that right?

5          A.    Yes.

6          Q.    Did you ever approve a press statement that

7    was issued by Mr. Grubman?

8          A.    I think I let -- talked with him and let

9    him know that, you know, I want you to respond whatever

10   going on.  Because he know more than me how to respond

11   to the press; he is a lawyer, I'm a physician.  So I

12   trusted him and I think he did whatever is best for me.

13         Q.    And did he tell you what he was going to

14   say to the press?

15              MS. EVANS:  Object to form, asked and

16              answered.  He just told you that.

17         A.    He might, but I'm sure he must have talked

18   with my daughter.  And my daughter must have told me

19   that -- how they are going to respond.  And I might say

20   okay.

21         Q.    Mr. Grubman would issue a statement that in

22   part said we look forward to all of the facts coming out

23   and are confident that once they do, Dr. Amin will be

24   cleared of any wrongdoing.

25              MS. EVANS:  Object to form.

Page 113

1    BY MS. McNAMARA:

2            Q.    Does --

3                  MS. EVANS:  If you're reading from

4            something, you need to show it to him.

5    BY MS. McNAMARA:

6            Q.    Does that sound familiar as a statement

7    that Mr. Grubman provided to the media?

8                  MS. EVANS:  Object to form.

9                  You can answer to the best you can

10           without -- with her reading something that she is

11           looking at that she is not providing to you,

12           Dr. Amin.

13           A.    Are you asking me whether I gave

14    permission?

15           Q.    No, I'm not asking whether you gave

16    permission.  Do you recall that part of the statement

17    that Mr. Grubman provided to the media on your behalf

18    said that we look forward to all the facts coming out

19    and we are confident that once they do, Dr. Amin will be

20    cleared of any wrongdoing.  Do you believe that's

21    correct?

22           A.    Yes.

23           Q.    What, if anything, did you do to help the

24    facts come out concerning the allegations?

25                  MS. EVANS:  Object to form.

Page 132



1   BY MS. McNAMARA:

2         Q.      -- 982 to 983.

3                 (Defendant's Exhibit No. 25, marked for

4         identification.)

5   BY MS. McNAMARA:

6         Q.

7         A.

8         Q.

9

10

11        A.

12        Q.

13

14

15

16        A.

17        Q.

18

19

20

21

22

23

24

25



Page 133

1

2

3       A.

4

5       Q.

7

8

9       A.

10      Q.

11

12

14

15

16

17

18

19

20

21      --

22

23

24

25      BY MS. McNAMARA:

Page 134



22          MS. EVANS:  Object to form.

23    A.    I don't know anything about...

24    Q.    Pardon me?

25    A.    I don't know.

Page 135

```
 1          Q.     You didn't bring a lawsuit against Project
 2     South or Dawn Wooten; did you?
 3                 MS. EVANS:  Object to form.  To the extent
 4             the question calls for attorney/client privileged
 5             communications, I instruct you not to answer.
 6     BY MS. McNAMARA:
 7          Q.     Did you bring a lawsuit against Project
 8     South or Dawn Wooten?
 9                 You can answer that question.
10                 MS. EVANS:  You can answer at the present
11             time.
12          A.     No.
13          Q.     No, you did not?
14          A.     (No audible response.)
15          Q.     Dr. Amin, at some point you began treating
16     patients at the ICDC; is that right?
17          A.     At?
18          Q.     At some point you began treating patients
19     at the ICDC?
20          A.     Correct.
21          Q.     Do you know when you began, approximately?
22          A.     No.
23          Q.     Do you know how it came about that you
24     started treating patients at the ICDC facility?
25          A.     No.
```

Page 136

1          Q.     You don't have any information as to how

2     that happened?

3          A.     Correct, I don't have information.

4          Q.     What happened, a patient just all of a

5     sudden arrived at your office one day?

6               MS. EVANS:  Object to form.

7          A.     My office girl, employee, they know more

8     than me.

9               THE REPORTER:  I'm sorry?

10              THE WITNESS:  My office employee, they

11         know.

12         A.     Because I don't keep the record who's

13    calling for appointment and who's not.  So somebody has

14    to call from ICDC to make the appointment.

15         Q.     Do you have any information as to whether

16    ICDC conducted any investigation concerning you before

17    they started sending patients to you?

18         A.     No, I don't have any information.

19         Q.     Did you provide any information to ICDC

20    ████████████████████████████████████████████████████

21    treating patients from the facility?

22              MS. EVANS:  Object to form.

23         A.     They asked me, I'm sure, the record.

24         Q.     Did you provide any information to ICDC

25    ████████████████████████████████████████████████████



Page 137

1

25                    MS. EVANS:  Object to form.

Page 138

```
 1        A.    No, because they didn't ask for any
 2   information.
 3        Q.    Let's mark --
 4        A.    And I'm sure they knew, it was on the news
 5   everywhere, it's not something that happened back door.
 6        ██      ███████████████████████████████
     ██  ███████████████
 8        A.    That was in the newspaper, yeah, news
 9   media.
10        Q.    And did you bring any actions against the
11   news media reporting on that complaint?
12              MS. EVANS:  Object to form.
13        A.    No.
14              (Defendant's Exhibit No. 26, marked for
15              identification.)
16   BY MS. McNAMARA:
17        Q.    This is a document we marked as Exhibit 26,
18   Dr. Amin.  It was produced to us by ICE.  It's Bates
19   stamped ICE 1910 through 1916.
20        A.    (Examines document.)
21        Q.    ████████████████████████
22   ████████████████████████████████████████
23   ██████████████████████████████████████
24   ███████████████████████████████-
25        ████████████████████████-
```

Page 147





Page 149



16      Q.    Before you -- you get approval for an

17 office visit or -- do you -- do ICDC patients get

18 approval from ICE before they come for an office visit

19 to you?

20           MS. McNAMARA:   Object to form.

21      A.    I believe so, but my office employee deals

22 more than I did.  Because I never try to involve

23 anything other than medical practice for my patients.

24      Q.    You leave that to your office employees?

25      A.    Yeah.

Page 150

1          MS. EVANS:  Object to form.

2   BY MS. McNAMARA:

3          Q.     Would you get separate pre-approval to do a

4   Pap smear?

5          MS. EVANS:  Object to form.

6          A.     I don't think so.

7          Q.     Would you get separate pre-approval to do a

8   vaginal ultrasound?

9          MS. EVANS:  Object to form.

10         A.     I don't think so.

11         Q.     How about pelvic exams, would you get a

12  separate pre-approval for that?

13         MS. EVANS:  Object to form.

14         A.     Pre-approval from whom, ICDC?

15         Q.     From ICDC.

16         A.     Well, it's like a common sense, if patient

17  has female problem and she goes to OB/GYN doctor, when

18  she comes to the office she signs all the necessary

19  paper for me to perform a pelvic examination,

20  ultrasound, for the blood test, do the Pap smear.

21  Otherwise why they have to send it to me if they don't

22  have -- a non-OB or non-GYN problem.

23         Q.     Do you know how you got paid from ICE in

24  connection with the treatment that you did for ICDC

25  patients?

Page 151

1          MS. EVANS:  Object to form.

2      A.     Never, I never tried to look, I'm not

3  involved.  The only thing I do in my office is see the

4  patient, treat the patient.  That's why the employee can

5  handle that.  They do their job, I do my job.

6      Q.     So you don't know anything about the

7  billing procedures; is that correct?

8      A.     Correct.

9      Q.     Would that be Alma who would know that?

10     A.     She would know, yeah.

11     Q.     And she would know whether you are paid per

12 procedure or how you're paid; is that right?

13         MS. EVANS:  Object to form.

14     A.     I think the billing company that does

15 billing for me, they should know.

16     Q.     Who is the billing company?

17     A.     I don't know the name of the company, but

18 person who does my billing, her name is Rachael, R-A-C

19 --

20     Q.     Rachael?

21     A.     R-A-C-H-A-E-L.

22     Q.     So she would know how much money was

23 received from ICDC and how bills were bundled or done;

24 is that right?

25         MS. EVANS:  Object to form.



Page 153





Page 161







Page 163



Page 165



Page 166











Page 174







Page 177





Page 178





Page 181





Page 183







Page 186



Page 187



1        A.    No, ma'am, I'm a gynecologist, I respect my

2  patients and they respect me.  To me, like, this is

3  insulting.

4        Q.    I'm just quoting your lawyer, I'm not

5  quoting you.

6        A.    But sometimes, you know, this --

7        Q.    How is a Pap smear?

8        MS. EVANS:  He is still talking.

9  BY MS. McNAMARA:

10       Q.    I'm sorry, I'm sorry, I'm sorry.

11        Dr. Amin, how does a Pap --

12        MS. EVANS:  No, you interrupted him.

13        MS. McNAMARA:  I thought he was done, I'm

14      sorry.

15  BY MS. McNAMARA:

16       Q.    Do you want to add something?

17        MS. EVANS:  Then why did you say you were

18      sorry if you --

19        MS. McNAMARA:  Because I thought he was

20      done, I'm sorry.

21       A.    I know I wanted to say something, but I

22  don't remember what it was.  Private parts, yeah.

23        You know -- you know that from deep down

24  inside in your heart, no gynecologist would tell patient

25  that I'm going to be examining your private part, I

Page 194

```
 1   promise you.

 2         Q.    I agree with you, that's why I was

 3   surprised to read it.  I remember totally agree with

 4   you.

 5         A.    I'm glad.

 6         Q.    So Dr. Amin, do you consider a Pap smear an

 7   invasive procedure?

 8         A.    No.

 9               MS. EVANS:  Object to form.

10   BY MS. McNAMARA:

11         Q.    No?

12         A.    No.

13               MS. EVANS:  Can you define what you mean by

14         invasive procedures?

15               Well, I object to the form, it's just this

16         whole -- your questions are just ridiculous.

17               Go ahead.

18         A.    I think it's common knowledge being a woman

19   you know that, that Pap smear is not an invasive

20   procedure.

21         Q.    Okay.

22         A.    You don't have to go to school or anywhere

23   to notice that.

24         Q.    Would you agree with me, Dr. Amin, that

25   performing any medically unnecessary procedure is wrong?
```

Page 195

```
 1        A.    Any?

 2        Q.    Unnecessary medical procedure is wrong?

 3        A.    Correct.

 4        Q.    And it would be particularly wrong if it

 5   was invasive, if it was a surgery; would you agree?

 6        A.    Yes.

 7        Q.    And that an unnecessary medical procedure

 8   could harm a patient?

 9        A.    Correct.

10        Q.    And it could even cause lasting damage if

11   it was unnecessary; isn't that right?

12              MS. EVANS:  Object to form.

13        A.    Possible.

14        Q.    And it would most certainly violate the

15   hippocratic oath; wouldn't it?

16        A.    That's true.

17        Q.    And it could cause mental stress from a

18   patient?

19              MS. EVANS:  Object to form.

20              Do you have a specific example if you want

21        to ask him that?

22        A.    Possible.  I wish you could provide me a

23   record that I can --

24        Q.    I'm just asking you generally that any

25   invasive procedure that was performed that was
```

Page 196

1    unnecessary would be harmful.  And you --

2         A.    That's a common knowledge question.  Any

3    well-educated human being knows that.

4         Q.    And it would be improper to take out a

5    fallopian tube if that wasn't necessary; isn't that

6    right?

7              MS. EVANS:  Object to form.

8         A.    Yeah, if it -- without any medical reason.

9         Q.    The same with performing a DNC; isn't that

10   right?

11             MS. EVANS:  Object to form.

12        A.    DNC never caused any problem and damage to

13   anybody.

14        Q.    Okay.

15        A.    It's like -- a lot of doctors do biopsies

16   in the office or many DNC I do in the hospital because I

17   know it's painful for a woman.  For me it's easier to do

18   in the hospital under anesthesia for the patient's

19   benefit.

20        Q.    And would you agree that performing even

21   one unnecessary invasive medical procedure would be

22   excessive?

23             MS. EVANS:  Object to form.

24        A.    Any unnecessary procedure.

25        Q.    ████████████████████████████████████

Page 197



Page 198

1 ████████████████████████████████████

2         MS. EVANS:   ███████████████

3      A.   ████████████████████████████████

4 ████████████████████████████████████████

5 ████████████████████████████████████████████

6 ████████████████████████████████████████

7 ████████████████.

8      Q.   Now, you previously confirmed that you're

9 not board certified; that's right?

10      A.   Correct.

11      Q.   Do you have an obligation, like lawyers do,

12 to have, like, continuing medical education on an annual

13 basis?

14      A.   Yes.

15      Q.   And what does that involve?

16      A.   I go to -- attend the conference, I go

17 online.  In state of Georgia you have to have, like -- I

18 don't remember exactly, 40 or 60 CMEs every two years.

19 In order for me to renew my license, I have to have CME

20 satisfied to the state board.  So any time I renew the

21 contract -- sorry, license, every two years, I send them

22 my CME, what I did, what I attended.  And --

23      Q.   And -- I'm sorry.

24      A.   Then if they are satisfied, they renew the

25 license.

Page 199

```
 1        Q.     Have you attended gynecological conventions

 2   or conferences in the last ten years?

 3        A.     Online or mostly on internet CME I go to

 4   and study.  Plus I have two or three OB/GYN magazine, I

 5   keep myself updated because -- and I'm satisfied with

 6   what I'm doing.  And I'm in solo practice by myself so I

 7   don't want to leave my patients without any care for one

 8   week.  It's not -- for the patients and for me I get the

 9   CME what I needed, I keep up to date with new procedures

10   or read the OB/GYN magazines different times.  Whenever

11   I'm in the hospital between the delivery, that's all I

12   do.

13        Q.     So you feel like you keep up to date on the

14   latest knowledge concerning gynecological procedures?

15        A.     Yes.

16             MS. McNAMARA:  Let's have marked Tab 84 and

17        85.

18             (Defendant's Exhibit No. 35, marked for

19        identification.)

20   BY MS. McNAMARA:

21        Q.     ████████████████████████████████████████

22   ██████████████████████████████████████████████████████

23   █████████████████████████████████████████████

24   ██████████████████████████████████████████████████████

25   ████████████████████████
```





Page 202

1





Page 204

19     Q.    Can you tell me what a follicular cyst is?

20     A.    It's a simple cyst on the ovary and cause

21  pain, abnormal bleeding, back pain, cramps depending

22  upon size.

23     Q.    And are follicular cysts sometimes a normal

24  part of the menstruation process?

25     A.    That's correct, yeah.

Page 205

1          Q.    And often they just disappear after the
2    woman's cycle; is that correct?

3                MS. EVANS:  Object to form.

4          A.    Not necessarily.

5          Q.    But they do sometimes just disappear, they
6    resolve themselves; don't they?

7                MS. EVANS:  Object to the form.

8          A.    Sometimes they get bigger.

9          Q.    Okay.  But sometimes they resolve
10   themselves?

11         A.    Yeah.

12         Q.    And if they resolve themselves, you
13   wouldn't need to do anything; is that right?

14               MS. EVANS:  Object to form.

15         A.    If you treat the hormone based on still
16   complaint of pain and not getting any better, you do
17   laparoscopy to find out the pain, that doesn't mean I'm
18   doing laparoscopy to remove the follicular cyst.
19   Because if you give me the chart I can show you, they
20   might have had (indiscernible), or adhesion, or
21   something like that.  The reason I drain or remove the
22   cyst is because sometimes that can cause problems.  I'm
23   not removing the ovary, just drain or remove the cyst.

24         Q.    Do you see your answer to the point about
25   removal of normal function of ovarian cyst?

Page 206

```
 1          A.     That's his opinion.

 2          Q.     No, the response.

 3          A.     What?

 4          Q.     If you would direct your attention to the

 5   response.

 6                 In the second sentence it says many if not

 7   all --

 8                 MS. EVANS:  He is trying to read it.

 9                 MS. McNAMARA:  I was just trying to direct

10          his focus.

11          A.     (Examines document.)

12                 Okay.

13          Q.     Looking at the medical records of the ICE

14   patients that were produced to us in this litigation

15   many saw you over eight months or longer.

16                 MS. EVANS:  Object to form, lack of

17          foundation.

18   BY MS. McNAMARA:

19          Q.     Do you have --

20                 MS. EVANS:  That's your characterization of

21          the record, but --

22                 MS. McNAMARA:  I'm asking -- if you would

23          let me finish, Miss Evans, you will see that

24          there is a question.

25                 MS. EVANS:  I thought you already asked it;
```

Page 207

1       go ahead.

2   BY MS. McNAMARA:

3       Q.    Dr. Amin, do you have any reason to believe

4   that all patients -- let me back up.

5             If a follicular cyst is going to resolve on

6   its own, approximately how much time does it take to

7   resolve?

8             MS. EVANS:  Object to form.

9       A.    You can't tell.

10      Q.    Six weeks often?

11      A.    Yeah.

12      Q.    You would see patients often more than over

13  a six-week period; isn't that right?

14      A.    Yes.

15            MS. EVANS:  Object to form.

16  BY MS. McNAMARA:

17      Q.    So is it correct to say that you always

18  didn't have sufficient time to have the -- as you say

19  here -- the luxury of waiting to see if a more

20  conservative treatment was possible?

21            MS. EVANS:  Object to form.

22      A.    I didn't get the question, what do...

23      Q.    You say many, if not all, detainees did not

24  have the luxury of waiting to see if more conservative

25  treatment would cause a spontaneous resolution of their

1  symptoms.  And as I understand it a follicular cyst

2  could be resolved in approximately six weeks?

3       A.    Correct, what I'm focusing on follicular

4  cyst, that's not the reason for laparoscopy.  Woman

5  cannot have any cyst and you do laparoscopy to find out

6  what is causing the pelvic pain.  There is more than one

7  reason, and one of the reason is include follicular cyst

8  depending upon size.

9            So what you're stuck on follicular cyst, if

10 you look at the record, it could be the reason for

11 pelvic pain getting worse, you do diagnostic laparoscopy

12 to see what exactly the problem is.

13            The only time you can tell 100 percent what

14 the problem is when you look inside because that is how

15 you see what is there.  It's not like ultrasound that

16 you guess what it is.

17       Q.    Did you ever give the women the option of

18 waiting six to eight weeks to see whether the cyst you

19 saw resolved on its own?

20            MS. EVANS:  Object to form.

21       A.    I'll give the option more than six or eight

22 weeks.  But based on come back again and not helping --

23 pain is getting worse and they're not getting any

24 treatment, you know, I can't just say, okay, go and

25 suffer the pain, go back home.  I can't do that, I have

McKee Court Reporting, Inc.
912-238-8808

Page 209

 1   obligation, patient came for help, I would try my best

 2   to help her.

 3             So the reason for laparoscopy in your mind

 4   is follicular cyst, that is not true.  My mind because

 5   patient has a problem, the reason for laparoscopy is

 6   diagnosis, it's not follicular cyst, it's pelvic pain or

 7   cramps during the period, menorrhagia, abnormal

 8   bleeding, DUB, that is more than one reason to do

 9   laparoscopy.

10        Q.    If when you did a laparoscopy --

11        A.    Laparoscopy.

12        Q.    I'm sorry if I mispronounced it.  If you

13   saw a follicular cyst, would you always remove it?

14        A.    Depend on size, if it is small, I drain it

15   and leave it alone.

16        Q.    But if it was larger, you would remove it?

17        A.    If it is more than five, six centimeters,

18   if I think that might be the cause of pain, I drain or

19   remove it, yes.

20        Q.    The follicular cyst would be on the woman's

21   ovary?

22        A.    Yes, ma'am.

23        Q.    So you would scrape the ovary; isn't that

24   right?

25             MS. EVANS:  Object to form.

Page 210

```
 1        A.    No.

 2        Q.    In order to remove it you don't have to

 3   scrape it a little bit?

 4        A.    You don't -- I don't know how to explain

 5   it.  You just remove the cyst or drain the cyst.  It is

 6   not that you scrape like this and it's going to come

 7   out.  I wish I could explain, laparoscopy I can tell

 8   you.

 9        Q.    Well, I wouldn't know, so I -- that is for

10   sure.

11             So let's turn now, if I may, to the

12   complaint.  We referred to it before, but I wanted to

13   show it to you, that the Oldaker plaintiffs filed

14   against you and a number of other defendants.

15             MS. EVANS:  I'll take that one.  Do you

16        want a break or keep going?

17             THE WITNESS:  I'm good.

18   BY MS. McNAMARA:

19        Q.    Did you want to take a break?

20        A.    I'll be all right.

21             MS. EVANS:  Okay.  Just keep going or you

22        want to take a break?  Totally up to you.

23             THE WITNESS:  Yeah, keep going.

24             MS. EVANS:  Just keep going.

25             THE VIDEOGRAPHER:  We have ten minutes in
```

Page 219

1                    MS. EVANS:  Object to form.

2          A.    I understand and I know what my hospital

3    employee and nursing staff and what my patients were

4    telling me.

5          Q.    What were they telling you?

6          A.    That they don't believe this, it is all

7    political.

8          Q.    The senate report was all political?

9          A.    Yes.

10         Q.    What did they mean by that it was all

11   political?

12                   MS. EVANS:  Object to form.

13         A.    It's political, they've known me for 34, 35

14   years and they said there is no way that this can be

15   true or it's impossible, because they know me for 30

16   years, they know how I treated them.

17         Q.    After this senate report came out, they

18   still believed that you were an excellent doctor; is

19   that correct?

20                   MS. EVANS:  Object to form, vague.

21         A.    I'm a good doctor and they believe me, they

22   trust me what health care I provide them.

23         Q.    And did you understand that this was a

24   bipartisan report from both the democrats and the

25   republicans?

Page 220

```
 1              MS. EVANS:  Object to form.

 2         A.    I don't know about that part.

 3         Q.    Are you familiar with the senator from

 4    Georgia, John Ossoff?

 5         A.    I heard his name.

 6         Q.    And he is a democratic senator?

 7         A.    I believe so.

 8         Q.    And are you familiar with the senator from

 9    Wisconsin who is a republican senator, senator Johnson?

10         A.    It might be, I don't know.

11         Q.    Turn your attention, if you would, on

12    Page 4 and 5 of the report, they are page numbered at

13    the bottom.  On Page 3 it starts the executive summary.

14              I'm directing your attention to Page 4,

15    Dr. Amin under the subhead female detainees appear to

16    have been subjected to excessive invasive and often

17    unnecessary gynecological procedures; do you see that?

18         A.    Yes.

19         Q.    In the second sentence it says over the

20    course of its review the subcommittee determined that

21    ██████████████████████████████████████████████████

██   ██████████████████████████████████████████████

██   ████████████████████████████████████████████████████

██   ██████████████████████████████████████████████████████

██   ████████████████████████
```



Page  222



17        Q.     Okay.  Turning your attention to Page 6 of

18   the report.  Do you see the chart that's on that page

19   that has blue lines.  And it indicates that you've

20   performed 163 limited pelvic exams and the second

21   highest ranking physician performed four pelvic exams;

22   do you see that?

23        A.     Yes.

24        Q.     Do you have any information or statistics

25   to challenge the statistics supplied by ICE in

Page 223

1  connection with this report?

2       A.    Yeah.

3             MS. EVANS:  Object to form.

4  BY MS. McNAMARA:

5       Q.    Pardon me?

6             MS. EVANS:  Go ahead.

7       A.    Yes.

8       Q.    You have statistics to challenge these?

9       A.    No, what they see, this number is -- for me

10  a surgery is a surgery, if you have five surgery, you

11  have five laparoscopy, that's five surgeries.  What they

12  are counting is a laparoscopy, one surgery; DNC, another

13  surgery; removal of the cyst, third surgery.  That's not

14  the way the medicine practice works.  It's just like one

15  surgery is one surgery, do different things.  Like DNC,

16  laparoscopy, cauterize endometriosis, that is one

17  surgery, that is not five surgeries.

18      Q.    I don't think this is referencing the

19  number of surgeries, Dr. Amin, I think that is breaking

20  it down.  So like look at the second one --

21            MS. EVANS:  Object to form,

22            mischaracterizes and argumentative.

23  BY MS. McNAMARA:

24      Q.    -- Depo-Provera injections; okay?

25            MS. EVANS:  I think you're

Page 224

1          misunderstanding.  He's right, let him answer,

2          don't term him that he is wrong.

3              MS. McNAMARA:  I'm asking him the question,

4          Stacey, this isn't for you to opine on your view.

5              MS. EVANS:  You're interrupting him and

6          you're telling him --

7              MS. McNAMARA:  I did not.

8              MS. EVANS:  -- that he is wrong --

9              MS. McNAMARA:  I did not.

10             MS. EVANS:  -- instead of listening to him.

11             MS. McNAMARA:  I am listening to him.  And

12         I'm directing his attention to the second line of

13         this chart.

14  BY MS. McNAMARA:

15         Q.    And it says Depo-Provera injections; okay?

16         A.    Yes.

17         Q.    Those are separately indicated in your

18  medical records; are they not?

19             MS. EVANS:  Object to form.

20         A.    If I give the Depo injection to the

21  patient, it should be in the chart.

22         Q.    And it should be indicated that you gave

23  that patient a Depo-Provera injection; is that right?

24         A.    Correct.

25         Q.    So someone could go through your medical

Page 225

1    records that you supplied to ICE and count the number of

2    Depo shots you provided; could they not?

3              MS. EVANS:  Object to form.

4         A.    Yes.

5         Q.    Here it indicates that for the ICDC

6    patients you gave 102 Depo shots; do you see that?

7         A.    Yes.

8         Q.    Do you have any facts to challenge that

9    conclusion?

10             MS. EVANS:  Object to form.

11        A.    I assume they wrote it, but they haven't

12   said how many patients I saw for four years.  For three

13   or four years, how many patients I saw from ICDC.

14             And before I explained to you that when I

15   started seeing them first I was trying to give them

16   birth control pills and they are not getting.  So I have

17   to choose whatever is help the patient or the next

18   alternative is Depo.

19        Q.    So that explains why you gave the Depo

20   shots, but you're not challenging the number of Depo

21   shots provided; are you?

22             MS. EVANS:  Object to form.

23        A.    If it's there, it's there, you know.

24        Q.    The same with a DNC, it says you performed

25   53 DNCs; do you see that?

Page 226

1        A.      Yes.

2        Q.      Do you have any facts to challenge that

3    statistic?

4                MS. EVANS:  Object to form.

5        A.      I have to check the record, I assume it's

6    right, but I have to check my record.

7        Q.      But you haven't checked those to verify

8    that this is wrong or to determine whether this is

9    wrong; is that right?

10               MS. EVANS:  Object to form.

11       A.      Correct, yeah.

12       Q.      And laparoscopy; do you see that?

13       A.      Yes.

14       Q.      It says that you performed 44 laparoscopies

15   on ICDC patients in the medical records supplied by ICE;

16   do you have any basis to challenge that number?

17       A.      There should be.

18               MS. EVANS:  Object to form.

19       A.      But I wish they say how many patients I saw

20   there and what period of time, it's not just in six

21   months or one year, it is about two and a half to three

22   years.

23       Q.      Yes, I -- it says that these are the

24   procedures you provided -- see at the top of the chart,

25   Figure 1?

Page 227

1          A.     Yeah.

2          Q.     It says number of be OB/GYN medical

3     procedures performed on ICE detainees and percentage

4     nationwide of Dr. Amin's procedures for fiscal year 2017

5     to 2020; do you see that?

6          A.     Yeah.

7          Q.     So this is for that time period?

8                 MS. EVANS:  Object to form.

9          A.     Okay.

10         Q.     Okay.  So you performed 44 laparoscopies on

11    ICDC patients during that time period, and the total

12    number of laparoscopies performed on ICE detainees

13    nationwide was 47; do you see that?

14                MS. EVANS:  Object to form.

15         A.     Okay.

16         Q.     So they found that you performed 94 percent

17    of laparoscopies nationwide on ICE detainees?

18                MS. EVANS:  Object to form.

19         A.     I don't know that part.

20         Q.     Okay.  But you don't have any reason to

21    challenge these statistics; do you?

22                MS. EVANS:  Object to form.

23         A.     You said 94 percent of the patients;

24    suppose I saw 100 patients, on 94 I did the laparoscopy?

25         Q.     No, no, no, that's not what it is saying.

Page 228

```
 1              MS. EVANS:  Don't interrupt him.
 2    BY MS. McNAMARA:
 3         Q.    No, I don't mean to interrupt you.
 4         A.    Okay, no.
 5         Q.    But so that we understand.  The total
 6    across the patients across the entire ICE facilities --
 7    you understand there are ICE facilities across the
 8    country; is that right?
 9         A.    I assume.
10         Q.    And that across the country, between the
11    years 2017 and 2020, 47 women received laparoscopies;
12    okay?
13              MS. EVANS:  Object to -- are you done?  I
14         want to object and I can't tell when you're done.
15              MS. McNAMARA:  I'm done.
16              MS. EVANS:  Object to form, lack of
17         foundation, he has no idea where this number for
18         nationwide comes from.  And he's already told you
19         that he would have to check his medical records
20         whether the numbers for him is correct.
21              That is my objection for the record.
22    BY MS. McNAMARA:
23         Q.    Dr. Amin, did you -- after the senate
24    report was issued, did you or any representative of
25    yours seek to correct the record set forth in the senate
```

Page 229

1    report?

2            MS. EVANS:  Object to form.

3        A.      Correct the record?

4        Q.      Yeah.  Did you write to the senate and say,

5    no, no, no, this is false, I didn't perform 94 percent

6    of laparoscopies?

7            MS. EVANS:  Object to form.

8        A.      But this is the first time I'm seeing this.

9        Q.      You're aware, are you not, that your

10   counsel has seen this?

11           MS. EVANS:  Object to form.

12       A.      I'm sure, yes.

13       Q.      So I'm asking again, do you know whether

14   you or your counsel has ever put the senate on notice

15   that they have inaccurate statistics in here if that's

16   the case?  I don't believe it is.

17           MS. EVANS:  Object to form -- hold on,

18       Dr. Amin.  Object to form with the commentary.

19       Object to form, misrepresents.  Object to form --

20       do you mean other than the letter where we wrote

21       to the senate and said you're wrong?  But other

22       than that, go ahead, Dr. Amin.

23       A.      What was the question?

24       Q.      Are you aware -- did you or your counsel

25   ever put the senate on notice that there -- the

Page 230

1  information and the conclusions they reached in their

2  senate report are in any way an error?

3            MS. EVANS:  Object to form.

4       A.    No, because I don't need to because this is

5  all, you know, more political than anything else.  And I

6  don't believe that total procedure 362.  To me that's

7  totally wrong.  As I told you before, one surgery for me

8  is five surgeries for them.  That is the wrong way to do

9  the statistics, that's not right, they are not medical

10 people.

11      Q.    And you didn't cooperate with this

12 investigation; did you?

13            MS. EVANS:  Object to form,

14      mischaracterizes.

15      A.    The reason for that was I was a -- it was

16 more political, I believe, and it's not going to be -- I

17 would rather talk with the DOJ and tell them the truth

18 than go to the senate, and it doesn't matter what I say,

19 they are going to use it for their own advantage because

20 it's politics.

21      Q.    The senate concluded that you were -- and

22 if you look at the top paragraph on Page 5, Dr. Amin, it

23 indicates that the subcommittee's review of Dr. Amin's

24 treatment practice of ICE detainees after the settlement

25 from 2017 to 2020 identified a similar pattern of

Page 231

1   potentially excessive medical procedures.  Dr. Amin was

2   a clear outlier in both the number and types of

3   procedures who performed compared to other OB/GYNs that

4   treated ICE detainees; do you see that?

5          A.    Yes.

6          Q.    Do you have any information to contradict

7   those conclusions?

8                MS. EVANS:  Object to form.

9          A.    I don't have information because this is

10   the first time I'm seeing this.

11         Q.    On Page 76 of the senate report.  When you

12   were looking at that chart, Dr. Amin, you seemed to

13   indicate that they were counting surgeries wrong; do you

14   recall saying that, Dr. Amin?

15         A.    Count the surgeries?

16         Q.    Yeah, a little while ago when you were

17   looking at the prior chart you indicated that you

18   believed the senate was counting surgeries wrong; do you

19   recall that?

20         A.    Yeah.

21                MS. EVANS:  Object to form.

22   BY MS. McNAMARA:

23         Q.    If you've never seen this before, how do

24   you know they were counting them wrong?

25                MS. EVANS:  Object to form, he --

Page 232

1       A.      Because I saw that when they count, like,

2   one surgery for me, they are counting as two surgeries

3   or three surgeries for them.

4       Q.      They were counting the procedures, not

5   surgeries.

6               MS. EVANS:  Object to form,

7           mischaracterizes.

8   BY MS. McNAMARA:

9       Q.      They were counting, like, laparoscopy, or

10  DNC, or Depo shot.

11      A.      For me that's one procedure.

12      Q.      Well, every single time you do a DNC, do

13  you do a laparoscopy?

14      A.      Not all the time it's indicated, but that's

15  -- if I do laparoscopy, that is one surgery, if I do

16  laparoscopy with DNC, for me, that is one surgery.

17      Q.      Okay.  Turn your attention to Page 76,

18  Dr. Amin, after the chart at the top.  The first

19  sentence says, according to information from ICE,

20  Dr. Amin submitted referrals for four hysterectomies but

21  he performed only two hysterectomies, one on June 14th,

22  2017 and the other on August 9, 2019; do you see that?

23      A.      Yes.

24      Q.      Do you have any reason to challenge that

25  information?

1        A.     No.

2        Q.     In fact, when we were looking at the

3    records before you had recommended five hysterectomies

4    during that period.

5             MS. EVANS:   Object to form.

6    BY MS. McNAMARA:

7        Q.     Isn't that right?

8        A.     I see.

9        Q.     Do you see the last sentence in that

10   paragraph?  It says, no other provider treating ICE

11   detainees performed more than one hysterectomy during

12   this period; do you see that?

13       A.     No other provider treating ICE detainees

14   performed more than one -- yeah.

15       Q.     ██████████████████████

██   ████████████████████████████████████

██   ████████████████████████████████████

██   ██████████

██          ████████████████████

██      ██  ████████████████████

██      ██  ████████

██      ██  ██████████████████████████

██   ██████████████████████████████████████

██   ████████████████████████████████

██   ██████████████████████████████









Page 238







Page 241

1

6

Page 242

1          MS. EVANS: ██████████████

2     A.  ████████████████████████████

■  ██████████████████████████████████████

■  ██████████████████████████████████████

■  ████████████████████████████████

■  ██████████████████████████████████

■  ██████████████████████████████████

■  ████████████████████████████████████████

■  ████████████████████████

■     ■  ████████████████████████████

■  ██████████████████████████████

■        ████████████████████

■     ■  ████

■     ■  ████████████████████████

■  ████████

■        ██████████████████

■     ■  ██████████████████

■     ■  ████████████████████████

■  ██████████████████████████████

■        ██████████████

■     ■  ████████████████████████████  I

■  ████████████████████████████████

■  ██████████████████████████████████

■  ████████████████████████████████████████

■  ████████████████████

Page 243











Page 256

1

2   --

3   A.

8

14   Q.

23   Q.   You said about the FBI, you pull over --

24   A.   Yeah.

25   Q.   -- because the FBI might be arresting you.

Page 257

1          A.      Because, you know --

2                  MS. EVANS:  Object to form.

3                  Go ahead, Doctor.

4          A.      Yeah, reporter, and car, and following me

5    everywhere I go, spying on my -- in my front of the

6    house, you can see the car, you ask the neighbors.  To

7    call my son and my daughters, harass them.

8          Q.      Who is they?

9          A.      Huh?

10         Q.      Who is they?

11         A.      Either the newspaper or I don't know who

12   those people are.

13         Q.      Do you have any reason to believe that

14   anybody from MSNBC called?

15                 MS. EVANS:  Object -- no, no, no, you've

16                 interrupted, he was talking.  If you have a

17                 question, you wait until he is done and you can

18                 ask your next question.

19         A.      I don't know who they are, so I can't tell.

20                 MS. EVANS:  But she interrupted you,

21                 Dr. Amin, you were talking about the stress.

22         A.      Yeah, and -- take phone call for this --

23   tried to kill me, and going to come to the Douglas and

24   kill you, and MF, and the children, and, you know,

25   that... And, you know, it is like I have to so many

Page 258

1    times I have to wake up nighttime, I want to see myself

2    if my family is all right and the doors are locked.

3              Harass, I have to -- a lot of times I have

4    to leave my office in somebody else's car on the back

5    seat to lie down.  And they take me to the hospital

6    parking lot and my daughter or wife in the other car I

7    go there and see the patient in the hospital.  Because

8    there is so much harassment and all of that.

9              And it's a lot of things that are going on

10   in my life.  And I -- it's just I deal with the wrong

11   way back then.

12             And it was so much like -- they tried to

13   break into my car, picture it, they threaten my

14   employee, a couple of employee that leave because of all

15   of this, that they can't take it.  But they -- you know,

16   they don't know what is going to happen over here.

17             It's like people, reporter, or I don't

18   know, they come out -- sometimes -- what happened my

19   office is full, there are only 20 chairs of patients,

20   sometimes they have to wait outside because there is no

21   place to sit down.  And they'll go out and harass them

22   and ask them about me, all of these questions and

23   everything.

24             And it was just like it's so many things

25   going on and I don't know how to deal it.  And I did it.

Page 259

1          And then, you know, my wife and my children

2  s

3

4

5                                              ,

6

7

8

9

10

11

12

13

14      Q.    Are you done?

15      A.    Yeah.

16      Q.    Thank you.  The -- what you just described

17  about the reporters outside or messages that were

18  communicated to you or phone messages, did any of them

19  make reference to MSNBC?

20          MS. EVANS:  Object to form.

21      A.    They -- I mean, who called, they never said

22  who they are, we asked, I mean, my office manager, when

23  they called her, they ask, who are you, they don't say

24  anything, they don't identify.  So I don't know who was

25  calling.

Page 260

1          Q.    I'm not asking who was calling necessarily,

2    I'm asking did anybody make any reference to All In, or

3    Deadline White House, or Rachel Maddow, was that ever

4    referred to in any of these communications you're

5    talking about?

6          A.    I don't know, but I don't think so they,

7    you know, mention anything.  Because my office wants to

8    realize who they are, they just say, okay, thank you,

9    bye.  Because they don't want to be harassed also

10   because they are harassing my employee that has nothing

11   to do with anything.

12         Q.    And the they, do you have any idea who they

13   are?

14         A.    Who?  They means?

15         Q.    You said they are harassing my employees.

16         A.    No, I wish I knew that, they don't say.

17         Q.    Did you ever call the police about it?

18         A.    Yes, I called my friend AJ and he came a

19   couple of times and tell them that please park outside

20   or go outside because they are parking in the front of

21   the -- my office where the patient parks, they come

22   outside, walking back of the car, back of the office

23   where the employees and me park.  And they look in the

24   car and picture.  I don't know what the purpose is.

25         Q.    Did AJ ever tell you whether he learned

Page 266

1  Exhibit 40.

2          (Defendant's Exhibit No. 40, marked for

3       identification.)

4  BY MS. McNAMARA:

5       Q. ████████████████████████████

6  ████████████████████████████████████

7  ██████████████████████

8       A. ████████████

9       Q. ██████████████████████████████████

10 ████████████████████████████████

11 ████████████

12      A. ████

13      Q. ██████████████

14      A. ████

15      Q. ██████████████████

16      A. ████

17      Q. ████████████████████████████

18 ████████████████████████████████

19 ██████████████████████████████████████

20 ████████████████████████

21      A. ████

22      Q. ██████████████████

23 ████████████████

24          MS. EVANS: ██████████████████

25      ████



Page 267

```
 1    BY MS. McNAMARA:
 2         Q.   ████████████████████████████
 3    ████████████████████████████████████
 4    ████████
 5         A.   ██████████████████████████
 6    ██████████
 7         Q.   ████████████████████████
 8         A.   ████████████████
 9         Q.   ██████████████████████████
10    ██████?
11         A.   ██████████████████████████,
12    ██████████████ --
13         Q.   ██████████████████████
14    ████████████████
15         A.   ██████████████████████████
16    ██████████████████████████████████
17    ████████████████████████████████████
18    ██████████████
19         Q.   ██████████████████████████
20    ██████████████████████████████████████
21    ██████████████████████████████████████
22    ████████
23         A.   ████████████████
24         Q.   S███████████████
25         A.   ██████
```

Page 268

```
 1        Q.    ████████████████████████████
 2  ███████████████████████████████████████
 3  ████████████████████████████████████████
 4  █████████████████████████████████████
 5  ████████████
 6        A.    ███████████████████
 7        Q.    ██████████████████████████████
 8  ████████████████████  --
 9              MS. EVANS:  █████████████████
10  BY MS. McNAMARA:
11        Q.    ███████████████.
12              MS. EVANS:  ███████████████████
13              MS. McNAMARA:  ███████████████
14  BY MS. McNAMARA:
15        Q.    ██████████████████████████████
16  ████████████████████████████████████
17  ███████████?
18        A.    ██████
19        Q.    ██████████████████████████████
20  ███████████████████████████████████
21        A.    ██████
22        Q.    ██████████████████████████
23  ████████████
24              MS. EVANS:  ██████████████.
25        A.    ██████████████████████████,  █
```

Page 269



1    ███████ .

2        Q.  ██████████████████████

3    ████████████████

4            MS. EVANS:  ███████████

5            MS. McNAMARA:  ████████

6    BY MS. McNAMARA:

7        Q.  ████████████████████████

8    ██████████████████████████████████

9    ██████████████████████████████████

10   ████████████████████████████████

11   █████████████████████████████████

12   ██████████████████████████████████

13   ██████████

14       A.  ████████

15       Q.  ███████████████████████

16   p████████████████████

17       A.  █████████████████████████

18   --  ████████████████████████████

19       Q.  ███████████████████████

20   ████████████████████████████████████

21   ████████

22           MS. EVANS:  O███████████████████

23          █████████████

24       A.  ███████████████████████████

25   ████████████████████

Page 270



1    Q.    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

2    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

3    ▮▮▮▮▮▮▮▮▮▮▮?

4          MS. EVANS:   ▮▮▮▮▮▮▮

5    A.    W▮▮▮▮▮▮▮▮▮

6    Q.    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

7    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

8          MS. EVANS:   ▮▮▮▮▮▮▮▮▮

9    ▮▮▮▮

10   A.    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

11   ▮▮▮▮

12   Q.    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

13         MS. EVANS:   ▮▮▮▮▮▮▮

14   A.    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

15   ▮▮▮▮

16   Q.    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

17   A.    ▮▮▮▮

18   Q.    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

19   I▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

20   A.    ▮.

21   Q.    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

22   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

23   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

24         MS. EVANS:   ▮▮▮▮▮▮▮

25   A.    ▮▮▮▮▮▮▮▮▮▮▮▮

Page 271

1    ▮▮▮▮▮

2        Q.    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

3    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

4              MS. EVANS:   ▮▮▮▮▮▮▮▮

5        A.    ▮▮▮▮▮

6        Q.    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

7    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

8    ▮▮▮▮

9              MS. EVANS:   ▮▮▮▮▮▮▮

10       A.    ▮▮▮▮▮▮▮▮

11       Q.    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

12   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

13             MS. EVANS:   ▮▮▮▮▮▮▮

14   BY MS. McNAMARA:

15       Q.    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

16   ▮▮▮

17       A.    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

18   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

19   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

20   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

21   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

22       Q.    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

23   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

24             MS. EVANS:   ▮▮▮▮▮▮▮

25       A.    ▮▮▮



Page 272

```
 1          Q.    Do you agree, Dr. Amin, that certain

 2     treatments other than a hysterectomy can affect a

 3     woman's fertility?

 4                MS. EVANS:  Object to form.

 5          A.    Possible.

 6          Q.    If you removed one of her fallopian tubes,

 7     it might reduce her ability to conceive; is that

 8     correct?

 9                MS. EVANS:  Object to form.

10          A.    No.

11          Q.    It would not?

12          A.    It would depend upon what was the reason

13     for the tumor on the tube.  And I can give you an

14     example.  If the person has, in medical term they call

15     hydrosalpinx, that means that tube is not working at

16     all, it's zero percent chance she will get pregnant from

17     that tube.  ███████████████████████████████████

18     ███████████████████████████████████████████████

19     ███████████████████████████████████████████████

20     ███████████████████ -- █████████████████████████

21     ██████████████████████████████████

22     ███████████████████████████████████████████████

23     █████████████████████████████████████

24     ████████████████████████████████████████████

25     ███████████████████████████████████████████████
```



Page 273

1   ███████

2   Q.  ██████████████████████████████████

3   ██

4   A.  ███████████████

5   Q.  ██████████████████████

6   A.  ██████████████████████████████████

7   ████████████████████████████████████████████

8   ██████  ████████████████████████████████████

9   ████████████████████████████████████████████████

10  ███████████████████

11      Q.   What other treatments other than the

12  hysterectomy might have an impact on a woman's

13  fertility?

14          MS. EVANS:  Object to form.

15      A.   They won't get pregnant.

16      Q.   Pardon me?

17      A.   They won't get pregnant if you do the

18  hysterectomy.

19      Q.   No.  Other than hysterectomy, you indicated

20  there are other medical procedures that could affect

21  fertility.  I'm asking you what other medical procedures

22  can you do that actually would affect a woman's

23  fertility but may be necessary to do?

24          MS. EVANS:  Object to form, misrepresents.

25      A.   Tubes, remove the tubes, that's one.

Page 274

1          Q.    I didn't understand you, I'm sorry.

2          A.    If the tube is bad, if you remove it, that

3    is going to affect the fertility.  But she is not -- the

4    tube is not working, so in a way nothing changed.

5          Q.    If you removed a woman's ovary, would that

6    have an impact on their fertility?

7                MS. EVANS:  Object to form.

8          A.    Some.  Some, yeah, but not -- you need one

9    healthy ovary and one healthy tube for a woman to

10   conceive.

11         Q.    Is there anything else that -- any other

12   procedure you could do that might have an impact on a

13   woman's fertility?

14               MS. EVANS:  Object to form.

15   BY MS. McNAMARA:

16         Q.    In a negative way.

17         A.    I can give an example, I don't know if that

18   was satisfy or not.

19               If you do the new procedure called

20   endometrial ablation, you cauterize the lining of the

21   uterus, and that -- she won't get pregnant.  I usually

22   don't do the ablation unless patient has tubes tied,

23   because then I know she not want to have any baby.  And

24   if she has a bleeding problem, to stop the bleeding is

25   like now is alternative for hysterectomy.

Page 275



1       Q.    Are you aware that in connection with this

2  litigation your counsel had provided two affidavits from

3

4       A.

5       Q.   A

6

7       A.

8       Q.

9

10

11      A.

12      Q.

13

14      A.

15      Q.

16      A.

17      Q.

18

19

20      A.

21      Q.

22          MS. EVANS:  O

23

24          THE WITNESS:

25          MS. EVANS:

Page 295

```
 1                     CERTIFICATE

 2    GEORGIA:

 3    CHATHAM COUNTY:

 4              I, Tamela G. Sheeler, Certified Court

 5    Reporter for the State of Georgia, do hereby certify:

 6              That the foregoing deposition was taken

 7    before me on the date and at the time and location

 8    stated on Page 1 of this transcript; that the witness

 9    was duly sworn to testify to the truth, the whole

10    truth and nothing but the truth; that the testimony

11    of the witness and all objections made at the time of

12    the examination were recorded stenographically by me

13    and were thereafter transcribed by computer-aided

14    transcription; that the foregoing deposition, as

15    typed, is a true, accurate and complete record of the

16    testimony of the witness and of all objections made

17    at the time of the examination.

18              I further certify that I am neither

19    related to nor counsel for any party to the cause

20    pending or interested in the events thereof.

21              Witness my hand, I have hereunto affixed

22    my official seal this 8th day of August, 2023, at

23    Savannah, Chatham County, Georgia.

24    _____
      TAMELA G. SHEELER, RPR, CLR,
25    CCR-6537-8261-3701-4272
```

**McKee Court Reporting, Inc.**
**912-238-8808**