Declaration of

Elizabeth McNamara

Exhibit 7

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
WAYCROSS DIVISION
----------------------------------------X
DR. MAHENDRA AMIN, M.D.,

                              PLAINTIFF,

          -against-          Case No.:
                             5:21-cv-00056
                                LGW-BWC

NBCUNIVERSAL MEDIA, LLC,

                              DEFENDANT.
----------------------------------------X
                    DATE: November 13, 2023
                    TIME: 10:00 a.m. EDT
```

            REMOTE DEPOSITION of DAVID

PAULK, taken by the Defendant, pursuant to

a notice and to the Federal Rules of Civil

Procedure, held remotely via Zoom

Videoconference, before Suzanne Pastor, a

Notary Public of the State of New York.

David Paulk
November 13, 2023

1    there were six dormitories with 60 to 70

2    detainees each in them plus whoever was in

3    closed housing, is that right?

4          A.    Correct.

5          Q.    Were there separate medical

6    staff for ICE detainees?

7          A.    No.

8          Q.    Did the number of ICE detainees

9    between 2017 and 2020 fluctuate in any way?

10         A.    Can you clarify what you're

11   looking for there?

12         Q.    Yeah, I'm trying to understand

13   if it was generally a constant number of

14   ICE detainees or if it grew between 2017

15   and 2020 or decreased between 2017 and

16   2020.

17         A.    It was basically, it was an

18   even number.  You would see fluctuations

19   depending on the number of removal flights

20   or the Immigration bonds that were

21   provided, you would see fluctuation there.

22   But so far as the overall housing numbers,

23   they were consistent.

24         Q.    And that was the between 600

25   and 800 figure that you gave me earlier.

David Paulk
November 13, 2023

1        A.    Up to about 800 max, yeah.

2        Q.    And when you said earlier

3    that -- you said detainees generally would

4    stay anywhere from two weeks to six months.

5    And you said that was the same for ICE

6    detainees, right?

7        A.    Correct.

8        Q.    And was that the same for

9    female ICE detainees, just to be clear?

10       A.    Yes.

11       Q.    Is it fair to say that ICE

12   detainees were often at ICDC for more than

13   three months?

14       A.    I would not be able to give you

15   the number, but yes, it would be fair to

16   say that some were here for in excess of 90

17   days.

18       Q.    Do you know the longest period

19   of time that an ICE detainee was at ICDC?

20       A.    No, ma'am.

21       Q.    I'm sorry, I couldn't catch

22   that.

23       A.    No, I do not.

24       Q.    Do you know if there were any

25   that were at ICDC for more than a year?

David Paulk
November 13, 2023

```
1        A.    Possibly two or three that I
2   can recall.  Generally recall.  I don't
3   recall the names.
4        Q.    Do you know if they were all
5   undocumented immigrants?
6        A.    Ma'am, that would be in the ICE
7   files.  That would be -- the only thing we
8   would have would be if they were held for
9   illegal entry.  That would be the only
10  document that we would be aware of for
11  booking process.  Everything else --
12       Q.    I'm sorry, I couldn't hear what
13  you said.  You said if they were something
14  of legal entry.  What was the first word?
15       A.    Illegal entry, for whatever
16  charge that ICE may have on them for that,
17  for the hold.  We wouldn't have any other
18  information.
19       Q.    So I just want to make sure I
20  understand that.  So the only information
21  you would have about the ICE detainees were
22  whether they came into the country legally
23  or illegally?
24       A.    We would have the information
25  that was provided by Immigration for us to
```

David Paulk
November 13, 2023

1    house their detainees.  And in general,

2    that would be illegal entry or some other

3    mechanism for having committed some crime

4    and having been arrested and picked up on

5    the 287-G program and put back in for

6    deportation purposes or for court purposes.

7    That's all that we would have.

8         Q.    ICDC no longer houses ICE

9    detainees, is that right?

10        A.    No, ma'am.

11        Q.    "No" as in I'm wrong or no,

12   they no longer house ICE detainees?

13        A.    No, no longer have ICE

14   detainees at this location.

15        Q.    When did that stop?

16        A.    I do not remember the date the

17   last one left, ma'am.

18        Q.    Do you know the reason that

19   ICDC stopped housing ICE detainees?

20        A.    It would have something to do

21   with the fact that they were -- at that

22   point the numbers were reducing gradually

23   and generally across the board anyway.  But

24   they moved the population of female

25   detainees that we had left over to Stewart

David Paulk
November 13, 2023

1    Detention Center, which was a very minor

2    number of females.  That would have been a

3    decision made by Immigration.

4         Q.    In your employment as the

5    warden of ICDC, do you know the reason that

6    the female detainees were moved from ICDC

7    to Stewart?

8         A.    Specific reason was never given

9    to me.  It was a determination made by

10   Immigration.

11        Q.    What about the general reason?

12        A.    Media, press.

13        Q.    What do you mean by that?

14        A.    General media content that had

15   been put out.

16        Q.    About what?

17        A.    About the issues with

18   detainees.

19        Q.    Do you mean the medical

20   treatment of detainees by Dr. Amin?

21        A.    That would have been part of it

22   probably.

23        Q.    What would have been the other

24   part of it?

25        A.    General acrimony towards any

David Paulk
November 13, 2023

1    detention center that was housing

2    Immigration detainees from the NGO groups,

3    Southern Poverty Law Center, et cetera.

4              THE REPORTER:  I'm sorry, what

5    was the "group"?

6         A.    Nongovernmental organizations

7    that were very active in trying to gain the

8    release of all Immigration detainees across

9    the board.

10         Q.    If this were something about

11    the general acrimony from nonprofit

12    organizations, why would the detainees have

13    moved from ICDC to Stewart rather than been

14    released?

15         A.    Ma'am, that's Immigration, ICE

16    determination.  If their cases did not

17    merit them being released, they would be

18    continued to be held.

19         Q.    So what are you basing the idea

20    that ICE detainees were no longer being

21    housed at ICDC as a result of general

22    acrimony from nonprofit organizations?

23    What is the basis for that statement?

24         A.    Ongoing news broadcasts,

25    ongoing media, ongoing phone calls into the

David Paulk
November 13, 2023

1    facility, pressure from certain political

2    figures.  In my case death threats, shots

3    fired over the house, just in general,

4    people not happy.

5        Q.    When you say ongoing media, is

6    there any media organization in particular

7    that you're thinking of?

8        A.    Ma'am, everything I looked at.

9    That we saw, just generally speaking.  Not

10   any in particular.  Most of it was the

11   pressure placed on staff and management by

12   the general public and targeted at us by a

13   lot of these groups that do the call and

14   the general harassment.

15       Q.    Is it fair to say that there

16   was extensive media coverage following the

17   ICE detainees' complaints about the

18   treatment from Dr. Amin?

19       A.    No, ma'am.  They were -- no, I

20   wouldn't say "extensive."  It was just very

21   targeted.

22       Q.    What do you mean by that?

23       A.    Very targeted.  We've -- you

24   know, you would get information coming from

25   certain reporters who would be turning in

David Paulk
November 13, 2023

1    to Vice News and places like that,

2    whichever agencies picked that up and went

3    forward with it.

4            I'm sorry, somebody had tried

5    to step in my office.

6    Q.    No worries.  You said vice.

7    Are there any other specific media

8    organizations, do you remember?

9    A.    Ma'am, just whichever media

10   organizations that picked up these stories

11   and went with them.

12   Q.    So you know it was more than

13   Vice, is that correct?

14   A.    I know that a lot of it started

15   with Vice and was picked up and put on the

16   Associated Press by other agencies.

17   Specific agencies, I didn't pay that much

18   attention to who they were.

19   Q.    Did you have any communications

20   with anyone concerning the reasons that

21   ICDC was no longer going to house ICE

22   detainees?

23   A.    No, I do not.

24   Q.    How were you informed of that

25   decision?

David Paulk
November 13, 2023

1        A.    Yes.

2        Q.    How did you learn about that?

3        A.    Same way everybody else did.

4    In the news.

5        Q.    What news?

6        A.    There was a whistleblower

7    report went out, there was war on who did

8    this, who did that.  It got very confusing,

9    but I was not aware of any complaints that

10   she had relative to the conditions of the

11   treatment or the care at this facility

12   until that time.

13       Q.    When you say "news," are you

14   talking about any specific news

15   organization?

16       A.    Ma'am, I don't remember the

17   specific news organization.

18       Q.    Multiple news organizations

19   reported on the whistleblower complaint.

20       A.    They know better than me.  I

21   just know that that's where most of this

22   information came out.

23       Q.    Do you know if multiple news

24   organizations reported on the whistleblower

25   complaint?

David Paulk
November 13, 2023

1    A.    I did not look at the specific

2    organizations that did it.  I remember

3    seeing one or two online and I guess it got

4    picked up from there.  I'm not sure.  I

5    don't have a clear precise memory of that.

6    Q.    I'm going to introduce as

7    Exhibit 13 a document that was produced by

8    Dawn Wooten and Bates stamped Wooten 93.

9    I'm going to put it in the chat and I'll

10   share my screen.

11            (Whereupon, 09/08/20 Letter

12        from Mr. Whitty, Wooten 93 to 94 was

13        marked as Paulk Exhibit 13 for

14        identification as of this date by the

15        Reporter.)

16   Q.    Mr. Paulk, do you recognize --

17   well, I'll scroll down so you can see this.

18   Do you recognize this letter?

19   A.    I do.

20   Q.    What is this -- well, for the

21   record, this is a letter dated September 8,

22   2020 from John Whitty at the Government

23   Accountability Project and Priyanka Bhatt,

24   Project South, to Ryan Horvath and David

25   Paulk.

David Paulk
November 13, 2023

```
 1                    Mr. Paulk, what is this letter?
 2         A.    It was notification of
 3    whistleblower status on Down Wooten.
 4         Q.    It's dated September 8, right?
 5    It's dated September 8, 2020, right?
 6         A.    That's correct.
 7         Q.    And you said it indicated that
 8    Ms. Wooten was a protected whistleblower,
 9    is that right?
10         A.    That's what I read it.  That's
11    what it starts out with it's regarding.
12         Q.    Do you know what a
13    whistleblower is?
14         A.    Generally speaking, it's
15    someone that -- yeah, yeah.
16         Q.    What is it?
17         A.    Someone that provides
18    information, supposedly accurate, honest in
19    reporting a wrongdoing or issues within an
20    organization.
21         Q.    Do you know the legal standards
22    to determine if somebody's a whistleblower?
23         A.    Specifics I do not.
24         Q.    Do you have any basis to
25    challenge the classification of Ms. Wooten
```

David Paulk
November 13, 2023

1    as a whistleblower here?

2         A.    At this point I've never seen

3    anything that she provided.  And as far as

4    I'm aware, this is still an active case.

5    I'm not sure I've got anything to add to

6    this moving forward.

7         Q.    Well, so my question is a

8    little bit different.  I was asking do you

9    have any basis to challenge Ms. Wooten's

10   classification as a whistleblower?

11        A.    Do I have a basis for it?

12        Q.    Yes.

13        A.    On paper I have no basis for

14   it.  I mean, taking this letter as it is

15   presented.  I mean, they've classified her

16   as that.  And until someone indicates that

17   that's not the case from a legal nature, I

18   mean, you have to go with what you've got.

19        Q.    Are you familiar with the

20   whistleblower complaint filed by Project

21   South on September 14, 2020?

22        A.    Ma'am, probably.  It didn't

23   come immediately to mind.  But I'm sure

24   I've seen it.

25        Q.    I'm going to introduce as

David Paulk
November 13, 2023

```
1    Exhibit 14 a document Bates stamped Project

2    South 000211.

3              (Whereupon, 09/14/2020 E-mail

4         from Ms. Bhatt, Project South 211 was

5         marked as Paulk Exhibit 14 for

6         identification as of this date by the

7         Reporter.)

8         Q.   I put it in chat and then I'll

9    open it on my screen.

10             This is a September 14 e-mail

11   from Priyanka Bhatt to DPaulk@IrwinCDC.com.

12   Do you see that?

13        A.   I see it.

14        Q.   Is that your e-mail address?

15        A.   It is.

16        Q.   It still is?

17        A.   Yes.

18        Q.   And it was on September 14,

19   2020?

20        A.   Yes.

21        Q.   And this e-mail was sent to you

22   at 6:00 a.m.?

23        A.   It appears to be so, yes.

24        Q.   It says, "Dear Warden Paulk,

25   Project South, Georgia Detention Watch,
```

David Paulk
November 13, 2023

1    Georgia Latino Alliance for Human Rights

2    and South Georgia Immigrant Support Network

3    filed this complaint regarding deliberate

4    lack of medical care, unsafe work practices

5    and absence of adequate protection against

6    COVID-19 for detained immigrants and

7    employees alike at the Irwin County

8    Detention Center."  Do you see that?

9        A.    Yes.

10       Q.    Do you remember receiving this

11   e-mail?

12       A.    Throughout this, hazily, yes.

13       Q.    And attached to this e-mail

14   there was an OIG ICDC complaint.  Do you

15   see that?

16       A.    I don't recall the contents of

17   it, but I see the attachment.

18       Q.    Let me introduce as Exhibit 15

19   a document marked NBCU 001536.

20             (Whereupon, 09/14/20 Letter

21         from Project South (Ex-14

22         Attachment), NBCU 1536 to 1562 was

23         marked as Paulk Exhibit 15 for

24         identification as of this date by the

25         Reporter.)

David Paulk
November 13, 2023

1        Q.    I'll put that in the chat and
2    share my screen again.
3              I can scroll through this, but
4    do you -- tell me if you'd like me to
5    scroll.
6        A.    Yes, scroll up, please.
7        Q.    That's the top of the document.
8        A.    All right, down.  This is the
9    attachment?
10       Q.    Do you recall if this was the
11   attachment?
12       A.    I do not recall.  I said I
13   haven't seen the document.  Ma'am, it's
14   been a few years and I don't have a file of
15   this stuff.  I did not go back and look
16   prior to this.  But I'm sure that if this
17   is the attachment, I did see it at one
18   point.
19       Q.    Would you have read the
20   attachment when you received the e-mail on
21   September 14, 2020?
22       A.    Yes.  Scroll down, please, a
23   little bit.  Right there.
24             Yes, I'm quite sure I read
25   through it.  I'm quite sure that I

David Paulk
November 13, 2023

1    forwarded this on to our legal and

2    appropriate parties.

3         Q.    So does this change your

4    testimony earlier that the first time you

5    heard about the whistleblower complaint was

6    on the news?

7              MR. JOHNSON:  Object to form.

8          You can answer.

9         A.    I recall it coming out online.

10   Probably about the same time as all of

11   this.  So no, I recall -- I recall seeing

12   it online at or about the same time as this

13   was put out.

14        Q.    If you look at the first

15   paragraph, back up here, it says, "Project

16   South, Georgia Detention Watch, Georgia

17   Latino Alliance for Human Rights, and South

18   Georgia Immigrant Support Network filed

19   this complaint on behalf of detained

20   immigrants at the Irwin County Detention

21   Center operated by the private prison

22   company, LaSalle Corrections, and Ms. Dawn

23   Wooten, a licensed practical nurse employed

24   by ICDC, who is a protected whistleblower."

25   Do you see that?

David Paulk
November 13, 2023

```
 1        A.    I see that.

 2        Q.    So this document classifies

 3   itself as a complaint.  Do you see that?

 4        A.    I see it.

 5              MR. JOHNSON:  Object to form

 6         there.

 7        Q.    And do you agree that this is a

 8   complaint?

 9              MR. JOHNSON:  Object again.

10              MR. ROUSE:  Object to form as

11         well.

12        Q.    You can answer.

13        A.    I suppose it does qualify as a

14   notification of filing a complaint.

15        Q.    Were you familiar with Dawn

16   Wooten before this September 14, 2020

17   complaint?

18        A.    Passingly so.

19        Q.    I'm sorry, what was the first

20   word you said?

21        A.    No more than any other medical

22   employee that was in the department.

23        Q.    Do you know how long she worked

24   at ICDC?

25        A.    She had several stints of
```

David Paulk
November 13, 2023

1    employment.  Now, again, I believe that

2    this is still being litigated to some

3    degree.  And I'm not comfortable going any

4    further discussing Wooten or her

5    allegations.

6        Q.    If your counsel tells you not

7    to answer a question, you cannot answer it.

8    But unless that occurs, you have to answer

9    questions.

10            Do you know -- you said earlier

11   Ms. Wooten was in a medical -- or she was a

12   medical employee.  Do you know what her

13   precise role was?

14       A.    She was a licensed practical

15   nurse.

16       Q.    And had she ever made any

17   complaints about ICDC before?

18       A.    Not to me.

19       Q.    Do you know if she made it to

20   anybody else?

21       A.    Not that I'm aware of.

22       Q.    And you again see this

23   characterizes Ms. Wooten as a protected

24   whistleblower, right?

25            MR. JOHNSON:  Object to form.

David Paulk
November 13, 2023

1          A.    I see it characterizes as

2     whistleblower, yes.

3          Q.    I'm going to scroll down to

4     page 18 of this document.  The section

5     that's titled "Detained immigrants and ICDC

6     nurses report high rates of hysterectomies

7     done to immigrant women."  Do you see that?

8          A.    I see it.

9          Q.    Does that refresh your

10    recollection that you've seen this document

11    before?

12         A.    I'm going to be honest with

13    you, I don't know if I ever read the entire

14    document.  I just forwarded it to our

15    legal.  I do remember hysterectomies;

16    whether this was the exact time or it was

17    through the media or 24 hours later I'm not

18    sure.

19         Q.    The first line says, "Several

20    immigrant women have reported to Project

21    South their concerns about how many women

22    received a hysterectomy while detained at

23    ICDC."  And it says one woman told Project

24    South in 2019 that Irwin sends many women

25    to see a particular gynecologist outside

David Paulk
November 13, 2023

1    the facility but that some women did not

2    trust him.  Do you see that?

3         A.    I see that.

4         Q.    Do you see there's a footnote

5    referenced after that that says 93?  I can

6    zoom in.  Do you see that now?

7         A.    I see it.

8         Q.    Do you see a footnote 93 at the

9    bottom says "Project South interview at the

10   Irwin County Detention Center, October

11   2019"?

12        A.    I see it.

13        Q.    Do you recall Project South

14   coming to the Irwin County Detention

15   Center?

16        A.    I believe there was an occasion

17   or two when they came by.  So specific

18   dates I don't know.

19        Q.    Do you know if they ever spoke

20   to detainees over the phone?

21        A.    I'm sure they did.

22        Q.    Does LaSalle keep any kind of

23   record of those phone calls?

24        A.    If there was an inmate phone,

25   it would be records maintained on it.

David Paulk
November 13, 2023

1        Q.    So this statement, "One woman

2    told Project South in 2019 that Irwin sends

3    many women to see a particular gynecologist

4    outside the facility but that some women

5    did not trust him," you see that sentence

6    with the footnote 93 after it, and it says

7    "Project South interview at the Irwin

8    County Detention Center, October 2019"?

9        A.    Yes.

10       Q.    You understand that that means

11   that this letter says that this statement

12   was supported by a Project South interview

13   in October 2019 of a detainee?

14       A.    I understand that's what this

15   indicates, yes.

16       Q.    And later in the paragraph it

17   says, "More recently, a detained immigrant

18   told Project South that she talked to five

19   different women detained at ICDC between

20   October and December 2019 who had a

21   hysterectomy done."  Do you see that?

22       A.    I see that.

23       Q.    And there's a footnote 95

24   indicator after that.

25       A.    I see that.

David Paulk
November 13, 2023

1      Q.    And footnote 95 says "Project

2   South interview with detained immigrant,

3   summer 2020."

4      A.    I see that, yes.

5      Q.    So this complaint was based on

6   interviews with detained immigrants.  Do

7   you see that?

8      A.    I understand that this -- the

9   information in here is purported to have

10   come from detained immigrants.  And

11   purported to be accurate, yes.

12      Q.    On page 19 it says in this

13   first full paragraph, "Ms. Wooten also

14   expressed concern regarding the high

15   numbers of detained immigrant women at ICDC

16   receiving hysterectomies."  Do you see

17   that?

18      A.    Yes, ma'am.

19      Q.    So this complaint was based in

20   part on what detained immigrants said and

21   in part on what Ms. Wooten said.  Is that

22   your understanding?

23           MR. JOHNSON:  Object to form.

24      A.    Yes.  I mean, I understand what

25   it says.

David Paulk
November 13, 2023

```
1          Q.    You said that you don't recall
2    when you received the e-mail with this
3    complaint if you --
4          A.    I do not recall the specific
5    date and time, no.  I do not.
6          Q.    And you don't recall if you
7    read the complaint.
8          A.    I don't know if I read the
9    thing in total at the time it came out.  I
10   know that I processed it over to the
11   appropriate legal team for ourselves.  And
12   then leaned on direction from legal.
13         Q.    Did you speak to anybody other
14   than legal at the Irwin County Detention
15   Center about this complaint?
16         A.    Not that I'm aware of.  There
17   may have been a short, brief conversation
18   with Marian Cole.  But no.
19         Q.    So you don't remember
20   specifically having that conversation.
21         A.    I don't remember specifically
22   having that conversation.
23         Q.    Did you speak to Ms. Wooten?
24         A.    No.
25         Q.    Any of the other medical staff
```

David Paulk
November 13, 2023

1    other than Ms. Cole?

2         A.    No.  It would have been limited

3    to Ms. Cole immediately with the

4    whistleblower's classification, I think I

5    just made sure that everybody knew that

6    mind your business, don't do anything that

7    will be considered harassment or aggression

8    and just let legal handle it.  Other than

9    that, that was the end of it as far as I'm

10   aware -- as far as I recall.

11        Q.    Did you speak to any detainees?

12        A.    No.

13        Q.    Did you speak to anybody at the

14   Irwin County Hospital?

15        A.    No.

16        Q.    Did you speak to ICE?

17        A.    I'm sure I spoke to ICE when

18   this came out.  But date and time I'm not

19   sure.

20        Q.    Did you implement any kind of

21   hold on documents so that documents

22   wouldn't be destroyed?

23        A.    I believe that came from legal.

24   And I believe that that was done.

25        Q.    Do you remember when that was?

David Paulk
November 13, 2023

```
 1        A.    No, I don't remember specific
 2    date.  It would have been within the
 3    24-hour period of receiving it and
 4    comfortable.
 5        Q.    Do you know whether LaSalle
 6    commenced any kind of investigation into
 7    the allegations in the whistleblower
 8    complaint?
 9        A.    Yes, LaSalle did an internal
10    investigation.
11        Q.    When did that investigation
12    start?
13        A.    Almost immediately.  That's
14    when we made sure the records were held, et
15    cetera, et cetera.
16        Q.    Do you know whether ICE also
17    commenced an investigation?
18        A.    ICE commenced -- ICE did an
19    investigation.
20        Q.    Do you know when you became
21    aware of an ICE investigation?
22        A.    There was records requests, et
23    cetera, but I don't remember the specific
24    date.  All of it started off within the
25    same small window.
```

David Paulk
November 13, 2023

```
 1        Q.    Are you aware that the

 2   whistleblower complaint also contains

 3   claims about COVID-19 practices at Irwin

 4   County Detention Center?

 5        A.    Heard that.  I didn't see the

 6   specifics on it other than what was

 7   written.  I didn't see anything that she

 8   had provided or otherwise.  Still haven't.

 9        Q.    Did you in September 2020 have

10   any belief of whether the allegations in

11   the whistleblower complaint were true or

12   not?

13        A.    I did not believe that these

14   allegations as she laid out were true.

15   However, it was passed up and processed for

16   handling by legal and by the medical peer

17   group.

18        Q.    What was the basis for your

19   belief that this wasn't true?

20        A.    We had been operating for

21   years, years, with hundreds and hundreds

22   and hundreds of female detainees and this

23   is the first time it had ever come up.

24        Q.    And so that led you to believe

25   it couldn't be true.
```

David Paulk
November 13, 2023

```
1          A.    That led me to not immediately

2     believe that was what was going on.  It was

3     processed for investigation so that we

4     could make sure that there was no problems.

5          Q.    Do you remember if the

6     whistleblower complaint referred to Dr.

7     Amin by name?

8          A.    I did not see anything from

9     her, a list of items.  I know that Amin's

10    name is in these documents that you've been

11    presenting.

12         Q.    But do you know if it's in this

13    document that's currently on the screen?

14         A.    Flipping through I can't read

15    it.  I mean, process up, please.

16         Q.    Sorry, I can go back to the --

17    down to the hysterectomy part.

18         A.    Okay, I'm not seeing Amin's

19    name per se there.  It says a particular

20    gynecologist.

21         Q.    And Dr. Amin was the

22    gynecologist that was seeing ICDC

23    detainees.

24         A.    The primary at the time.  Yes,

25    primarily at the time.
```

David Paulk
November 13, 2023

1        Q.    Do you remember if you spoke to

2    Dr. Amin about this complaint?

3        A.    Not one word.

4        Q.    I'm going to introduce as

5    Exhibit 16 a document Bates stamped ICE

6    0014669.

7              THE VIDEOGRAPHER:  Counsel, did

8         you drop 15 into the chat?  Because I

9         didn't see it.

10             MS. LEVINE:  I thought I did

11        but maybe it didn't go.  Oh, it

12        didn't go.  There's 15.

13             And here is 16.

14             (Whereupon, 09/15/2020 E-mail

15        from Mr. Paulk, ICE 14669 was marked

16        as Paulk Exhibit 16 for

17        identification as of this date by the

18        Reporter.)

19        Q.    So this looks like it's an

20    e-mail from you to somebody at ICE, the ICE

21    name is blurred out.  But the e-mail is

22    just from you.  There's no response from

23    ICE here.

24             MS. LEVINE:  John, I'll wait

25        until you've had a chance if you want

David Paulk
November 13, 2023

1      to look at the content of the e-mail

2      before I ask a question about it.

3           MR. ROUSE:  It appears that

4      this is an ICE document, and at the

5      bottom of this document I think I saw

6      before you rolled through it, it

7      specifically says "not for public

8      disclosure."

9           So pursuant to the instructions

10     from ICE to Warden Paulk, Mr. Paulk,

11     in the October 13, '23 letter,

12     Mr. Paulk is not supposed to give

13     testimony about ICE documents that

14     are not within the public domain.

15          MS. LEVINE:  This is an e-mail

16     from Mr. Paulk with no response from

17     ICE.  It's just Mr. Paulk's words

18     with no mental impression or anything

19     from ICE.  Are you going to instruct

20     Mr. Paulk not to answer questions

21     about this?

22          MR. ROUSE:  With your

23     clarification that there is no

24     weighing of ICE, then no, I do not

25     feel comfortable instructing him not

David Paulk
November 13, 2023

1          to answer.  If something does come up

2          that this is an ICE document that

3          should be protected in the future,

4          then we may have to revisit it.  But

5          for now, no.

6          Q.    Mr. Paulk, do you see this

7     e-mail says that it was sent from you to --

8          A.    I see that.  I see it.

9          Q.    It's dated September 15, 2020

10     at 9:19 a.m.  Do you see that?

11          A.    Yep.

12          Q.    Do you see it says in the

13     second paragraph, "I received a call from

14     the physician in question last night and he

15     was confused as to where the information

16     regarding his giving everyone he saw a

17     hysterectomy came from as he indicated that

18     out of the multitudes of detainees treated,

19     he cannot recall having done more than two

20     of these procedures."  Do you see that?

21          A.    I do.

22          Q.    Does that refresh your

23     recollection that you had a call with Dr.

24     Amin?

25          A.    I did have that -- I did

David Paulk
November 13, 2023

1    receive that call and he gave me his

2    concerns.  I do not recall discussing

3    anything with him.  And I referred it

4    forward; I got with the medical director on

5    it.

6        Q.    So when you said earlier that

7    you didn't have a word with Dr. Amin, that

8    wasn't accurate.

9        A.    I never -- let me rephrase that

10   if you'll allow it.  I never had an in

11   depth conversation with him regarding any

12   of the allegations.

13       Q.    Do you remember the

14   substance -- well, let me strike that.

15            It seems like the call that you

16   had with Dr. Amin would have occurred on

17   September 14th, 2020 if you're saying "I

18   received a call from the physician in

19   question last night," and this e-mail was

20   sent on September 15th.  Is that your

21   understanding?

22       A.    Obviously, based on the dates.

23       Q.    And do you remember anything

24   about the substance of that call on

25   September 14th?

David Paulk
November 13, 2023

1        A.    The only interaction I remember

2    with Dr. Amin was him stating that he

3    didn't understand where all this was coming

4    from.  And I recall telling him that we

5    would forward it up and go from there.  I

6    mean, basically.  But no, there was no in

7    depth discussion on that.

8        Q.    The next paragraph says, "I

9    spoke with the medical director and he

10   indicated that he overviews all of the

11   prescriptions and bulk of notes and he did

12   not recall this type of procedure as being

13   recurrent either."  Do you see that?

14       A.    Yeah, that would have been Dr.

15   McMahan.

16       Q.    So you spoke to Dr. McMahan

17   about this as well on September 14th?

18       A.    Whether Dr. McMahan called me

19   or I called him I'm not sure.

20       Q.    Do you remember the substance

21   of the call with Dr. McMahan?

22       A.    No.  No, other than basically

23   what it says there.

24       Q.    It says he reviews the bulk of

25   notes.  Do you see that?

David Paulk
November 13, 2023

1       A.      Yes.

2       Q.      Does that mean he doesn't

3    review all of the notes?

4       A.      That's basically what he told

5    me.  That's what I put down.  I mean,

6    whatever interpretation you get out of

7    that.

8       Q.      The last paragraph of this

9    e-mail says, "The facility is receiving

10    hate calls repetitively this morning and I

11    am fielding calls from the hospital, et

12    cetera."

13              Does that refresh your

14    recollection that you had a call with the

15    hospital?

16       A.      I don't recall the hospital

17    calling regarding anything to do with the

18    case.  I remember them calling because they

19    were getting hate calls and hang-up calls

20    and threats.  Based on the allegation.

21       Q.      And LaSalle was getting those

22    as well?

23       A.      Yes.

24       Q.      And it seems like that started

25    on September 14, 2020, is that right?

David Paulk
November 13, 2023

1        A.     It started all at the same time

2    when it came out.

3        Q.     And how long did that go for?

4        A.     Into '21.  I mean, I had

5    multiple death threats, multiple issues.

6    They had -- immediately upon this coming

7    out they had their e-mail group start

8    sending out e-mails, fliers, calls, hang-up

9    calls, threats, drive-by's.  They started

10   with their protests on site.  You name it.

11   All of that started up and continued for an

12   extensive period of time.

13       Q.     So the news of this the

14   whistleblower complaint started spreading

15   September 14th.

16       A.     This was -- in my opinion, this

17   was a planned approach, and everything was

18   in place at the same time that the initial

19   notification was sent because it all

20   started popping off.  It had to be a

21   well-planned, and it was.  It was.  We were

22   covered up and stayed covered up for an

23   extended period of time.  Activists, NGO

24   groups, you name it.

25       Q.     You say it's planned because

David Paulk
November 13, 2023

1    basically as soon as you got word of the

2    whistleblower complaint, the public also

3    started inquiring about it?

4         A.    Correct.

5         Q.    Did LaSalle take any action --

6    you said that LaSalle opened -- strike

7    that.  This is going to be a very poor

8    question.

9              I'm going to introduce as

10   Exhibit 17 a document Bates stamped Project

11   South 261.  It was produced to us by

12   Project South.

13             (Whereupon, 10/05/2020 E-mail

14        to Warden, Project South 261 to 262

15        was marked as Paulk Exhibit 17 for

16        identification as of this date by the

17        Reporter.)

18        Q.    I'll put it in the chat and

19   open it.

20             MS. LEVINE:  John, this is an

21        e-mail that was produced to us by

22        Project South that I understand they

23        received in response to a FOIA

24        request from ICE.

25             MR. ROUSE:  Could you scroll to

David Paulk
November 13, 2023

1          Brown says, "Will do."  And the

2          second version just has Kimberly

3          Howard saying "okay. "

4               MR. ROUSE:  Could you scroll to

5          the bottom?

6               MS. LEVINE:  Yes.  That's the

7          bottom.

8               MR. ROUSE:  This is a ICE

9          document.  It is as far as I know not

10         a publicly available document.  As we

11         discussed, ICE has restricted

12         Mr. Paulk from testifying about ICE

13         documents that are not within the

14         public domain.  And I don't believe

15         this is a publicly available

16         document.

17              With that analysis in mind,

18         I'll have to object to questions

19         about this document.  ICE's October

20         13, 2023 letter specifically states

21         that he's prohibited from providing

22         testimony regarding such documents.

23              MS. LEVINE:  Okay.  I'm going

24         to ask questions and if you feel the

25         need to object specifically to the

David Paulk
November 13, 2023

1              questions, then you can do that and

2              we can create a record.

3         Q.    Mr. Paulk, you see that this is

4    an e-mail from Latrelle Copeland at ICE to

5    Lakeysia Brown, Shanise Bell and Kimberly

6    Howard?

7         A.    Yes.

8         Q.    Who was Shanise Bell?

9         A.    Shanise Bell, at that time she

10   was operating as director of nursing

11   assistant for Lakeysia Brown.  Lakeysia

12   Brown was the old director of nursing that

13   replaced Marian Cole on her death.

14        Q.    And who was Kimberly Howard?

15        A.    Kimberly Howard was just a

16   nurse in the department, and Kimberly was

17   probably at that point dealing with

18   appointment setting.

19        Q.    And so it says, "Per ICE,

20   please cancel any pending appointments with

21   Dr. Amin.  Also, do not schedule any future

22   appointments."

23              Was this message communicated

24   to you?

25              MR. ROUSE:  Object to the

David Paulk
November 13, 2023

1          question.  Warden Paulk has been

2          restricted from providing testimony

3          regarding ICE documents that are not

4          within the public domain.  So I'm

5          going to instruct Warden Paulk --

6          Mr. Paulk now not to answer that

7          question regarding what ICE has told

8          LaSalle within the course of this

9          letter as Exhibit 18.

10     Q.    Are you going to take your

11   counsel's instruction?

12     A.    Yes, ma'am, I respectfully

13   decline to answer the question.

14     Q.    Separate and apart from this

15   e-mail, was it communicated to you that ICE

16   did not want to schedule any future

17   appointments with Dr. Amin and to cancel

18   all pending appointments?

19     A.    That would have been word of

20   mouth coming from Brown to me.  I was aware

21   of it.  And it all, like I said, occurred

22   about the same time.

23     Q.    But because the medical team

24   was the one who actually would schedule the

25   appointments if ICE wanted to cancel

David Paulk
November 13, 2023

1    certain appointments or not schedule future

2    appointments, they would need to go through

3    the medical team.  Is that fair?

4         A.    ICE controlled the vetting and

5    approval of the surrenders.  ICE controlled

6    the process.  So at this point they were

7    coming in and saying okay, we're now

8    basically not using this vendor anymore.

9         Q.    After this point was there ever

10   a point where Dr. Amin started seeing ICE

11   detainees again?

12        A.    No.

13        Q.    Did ICDC find a new OB/GYN to

14   see detainees?

15        A.    I'm sure that they did.

16        Q.    Do you know who that was?

17        A.    There was one or two

18   availabilities.  I don't know which one

19   they went up going with or if they used

20   both of them.

21        Q.    Did you notice any difference

22   in medical care once these other OB/GYNs

23   started treating detainees?  And by that I

24   mean do you know if there were the same

25   number or more or fewer gynecological

David Paulk
November 13, 2023

1    visits when these other OB/GYNs started?

2              MR. JOHNSON:   Object to form.

3         A.    I would not have known that.

4    The population of females in the facility

5    was going down, so it would automatically

6    be reduced by the number of any

7    appointments by the attrition of inmates.

8         Q.    Did ICE provide you personally

9    with any orders concerning the

10   whistleblower complaint?

11        A.    Everything was --

12             MR. ROUSE:   I need to make an

13        objection there.   I think that ICE is

14        prohibiting from its October 13, '23

15        letter any testimony about the

16        statements that ICE may have made to

17        Warden Paulk.   So I'm going to, per

18        that letter, object and instruct

19        Warden Paulk, now Mr. Paulk, not to

20        respond to that question.

21        Q.    Are you going to take your

22   counsel's instructions?

23        A.    Absolutely.

24        Q.    I'm going to introduce as

25   Exhibit 19 a document Bates stamped LaSalle

David Paulk
November 13, 2023

```
 1    416950.

 2                (Whereupon, 09/22/2020 E-mail

 3          and Attachment, LaSalle 416950 to

 4          416951 was marked as Paulk Exhibit 19

 5          for identification as of this date by

 6          the Reporter.)

 7    Q.    This appears to be an e-mail

 8   from -- initially from Scott Grubman to

 9   what I believe is Dr. McMahan, and then

10   from Dr. McMahan to Paige Wynn and

11   Mr. Paulk.  So this does not have ICE on

12   it.

13                MR. ROUSE:  Thank you so much

14          for that, Amanda, no objection.

15    Q.    Mr. Paulk, do you remember

16   receiving this e-mail?

17    A.    I remember getting a copy of

18   it.

19    Q.    Have had you spoken with Scott

20   Grubman before this e-mail?

21    A.    Not that I'm aware of, no.

22    Q.    Do you know who Scott Grubman

23   is?

24    A.    Specifically, no.

25    Q.    Generally do you have an idea?
```

David Paulk
November 13, 2023

```
1        A.    Ma'am, I'm assuming he's an
2   attorney either for the hospital or for the
3   doctor.
4        Q.    And attached to this e-mail to
5   Dr. McMahan is a letter from Dr. Amin.  Do
6   you see that?
7        A.    Yes.
8        Q.    Do you recall seeing this
9   letter?
10       A.    I recall seeing it.
11       Q.    Do you remember having any
12  thoughts when you received the letter?
13       A.    I passed the letter on to the
14  appropriate personnel in legal.
15       Q.    And you would have done that
16  after you received the letter on
17  September 22nd at 8:25 a.m.?
18       A.    I would have pressed the
19  process whenever I received it to legal.
20       Q.    Going back to the e-mail that
21  we were looking at before, the one with ICE
22  instructing to cancel any appointments with
23  Dr. Amin, that looks like it was sent at
24  12:55 p.m. on September 21st.  Do you see
25  that?
```

David Paulk
November 13, 2023

```
1        A.    I see that.

2        Q.    Does it refresh your

3   recollection that you were interviewed by

4   the Senate?

5        A.    Either queried in questions,

6   whether it was directly interviewed or via

7   phone, I don't remember.  But I am pretty

8   sure there would have been that

9   communication.

10       Q.    Okay, so you just don't

11  remember if it was in person or if it was

12  on the phone?

13       A.    Correct.

14       Q.    Do you disagree with this

15  statement that I just read?

16             MR. JOHNSON:  Object to form.

17        Asked and answered.

18             You can answer.

19       A.    Go back to your statement.

20       Q.    It's right here.  For example,

21  ICDC Warden Paulk, then it goes on to the

22  next page.

23       A.    Okay, what's your question?

24       Q.    Do you agree with the

25  statement?
```

David Paulk
November 13, 2023

1        A.    That that's what they're

2   indicating that was said?  You're grouping

3   two or three people together, not

4   attributing statements to individuals.  I

5   mean, I got limited -- well, I've already

6   stated that.  I'm not going back against

7   whatever Dr. Amin had that's on record, if

8   he actually stated that.

9        Q.    Let me rephrase my question.

10  As to you, don't worry about what's in Dr.

11  McMahan's head or in Deputy Warden

12  Albright's head.  As to you, is this

13  statement accurate?

14       A.    Yes, on the malpractice

15  lawsuits and as regards any efforts to vet

16  efforts by ICDC, to vet ICE -- if he began

17  treating ICDC appreciates prior to the

18  onset of ICE, then the vetting would not

19  have been in place for Immigration.

20       Q.    I don't understand that.  Can

21  you just explain that to me?

22       A.    He said ICDC detainees, and it

23  does not say Immigration detainees.  So was

24  this prior to Immigration detainees

25  residual buildup, or when he started

David Paulk
November 13, 2023

1    treating, what was his initial start

2    treating date?  Were there even any ICE in

3    the facility?  I don't know.  I don't have

4    that information.

5              In that case, if -- and I was

6    not in a leadership position then so I

7    wouldn't know what the process was.

8         Q.    Okay, so if Dr. Amin started

9    treating ICDC detainees before ICDC started

10   housing ICE detainees, then LaSalle would

11   have vetted Dr. Amin?

12        A.    He would either have been

13   processed through the hospital with the

14   county or whatever the procedure was at

15   that time.

16        Q.    But you don't know one way or

17   the other --

18        A.    I don't know one way or the

19   other.  But it's not specific enough to --

20   you're gonna have to tie it down.  The

21   statement's not.  And McMahan's been

22   involved here forever.  So I mean, how far

23   back does his memory go or what's the

24   intent of his statement?  I don't know.

25        Q.    I'll stop sharing the screen.

David Paulk
November 13, 2023

1          You testified earlier that you

2    were aware detainees stopped being housed

3    at the Irwin County Detention Center.

4    That's accurate?

5          A.    Yes.

6          Q.    And you couldn't recall when

7    that was.

8          A.    I don't remember the specific

9    date.  I mean, we had a few of -- we had a

10   few -- they held the males here until they

11   were deported or were released and went

12   down by attrition.

13          The females, the population had

14   dropped quickly.  And what few we had left,

15   they made a determination to go ahead and

16   move them over to Stewart Detention Center.

17   I don't have the specific date.  But they

18   were transported over to Stewart Detention

19   Center where I believe they're currently

20   housed now.

21          Q.    Earlier I think you testified

22   that it's your understanding that that was

23   in part due to the allegations in the

24   whistleblower complaint, is that correct?

25          A.    Obviously that was concern on

David Paulk
November 13, 2023

1    all sides regarding the female population

2    being in here.

3         Q.    I don't want to interrupt you.

4         A.    No, I'm done.

5         Q.    At the time that ICDC stopped

6    housing detainees or ICE detainees, do you

7    remember if there was any media surrounding

8    that?

9         A.    I believe there was -- may have

10   been a blurb here or there.  I don't recall

11   where I saw it.

12             I do recall that as soon as the

13   Southern Poverty Law Center, our neighbors

14   down here, found out that they had moved

15   all the females, they bailed out and went

16   to Stewart Detention Center.  We never saw

17   another one in here, so for whatever that's

18   worth.

19        Q.    Do you know if LaSalle gave a

20   statement concerning the decision not to

21   house detainees at ICDC anymore?  ICE

22   detainees?

23        A.    Something was put out, but that

24   would have come through Scott Sutterfeld.

25   And I don't recall specifically when or

David Paulk
November 13, 2023

1   what.

2       Q.    Do you recall when you read

3   media about that decision, whether it

4   mentioned the whistleblower complaint?

5       A.    No, I do not recall.

6       Q.    And who's housed in ICDC now?

7       A.    What agencies are housed in

8   ICDC?

9       Q.    Yeah, what detainees are housed

10  in ICDC?

11      A.    United States Marshal Service

12  detainees and county.

13      Q.    How many detainees are there?

14  Generally.

15      A.    Ma'am, is this pertinent to

16  this particular deposition for what its

17  current housing numbers are?

18      Q.    I'm curious to know if it was

19  more or less than when the ICE detainees

20  were being housed there.

21      A.    It's around 650 to 700 at the

22  moment.  So it's comparable.

23      Q.    And are you still -- are any of

24  those detainees female detainees?

25      A.    Inmates, we have some county

David Paulk
November 13, 2023

 1    female detainees and some Marshal female

 2    detainees.

 3         Q.    Are you using an outside

 4    gynecologist for those detainees still?

 5         A.    I'm sure they are when needed.

 6         Q.    And do you know who that

 7    gynecologist is?

 8         A.    Not right off I do not.

 9         Q.    Do you know how the number of

10    referrals to that outside gynecologist

11    compared to when Dr. Amin was the outside

12    gynecologist?

13              MR. JOHNSON:  Object to form.

14         A.    I do not.  I'm sorry, I

15    interrupted.

16         Q.    I just have a question about

17    one more document.  I just want to get it

18    to pull it up.  So we can take, like, a

19    two-minute break just so I can grab the

20    document and then I'll be done.

21              THE VIDEOGRAPHER:  The time is

22         4:24 p.m. and we're going off the

23         record.

24              (Whereupon, a short recess was

25         taken.)

David Paulk
November 13, 2023

1                THE VIDEOGRAPHER:  4:27 p.m.,

2         back on the record.

3    BY MS. LEVINE:

4         Q.    Mr.  Paulk, I'm going to enter

5    into the chat document 23.  It's Bates

6    stamped LaSalle 410638.

7                (Whereupon, Letter, LaSalle

8           410638 to 410639 was marked as Paulk

9           Exhibit 23 for identification as of

10          this date by the Reporter.)

11        Q.    I will share my screen with

12   you.  Can you see that?

13        A.    I see it.

14              MS. LEVINE:  John, just so you

15          can see, this is a document that was

16          produced to us by LaSalle.  It looks

17          like it's from Mahendra Amin's office

18          to I think that's supposed to be

19          Ms. Cole but the document was

20          produced with some weird spacing

21          issues.  That's my understanding.

22              MR. ROUSE:  Thanks for the

23          description, Amanda.  Can you scroll

24          down to the bottom?

25              MS. LEVINE:  Attached to the

David Paulk
November 13, 2023

```
1          C E R T I F I C A T E

2
     STATE OF NEW YORK       )
3                   :    SS.:
     COUNTY OF DELAWARE      )
4

5          I, SUZANNE PASTOR, a Notary Public for and

6     within the State of New York, do hereby certify:

7          That the witness whose examination is

8     hereinbefore set forth was duly sworn and that

9     such examination is a true record of the testimony

10    given by that witness.

11         I further certify that I am not related to

12    any of the parties to this action by blood or by

13    marriage and that I am in no way interested in the

14    outcome of this matter.

15         IN WITNESS WHEREOF, I have hereunto set my

16    hand this day, November 28, 2023.

17

18              _Suzanne Pastor_
             _____
19              SUZANNE PASTOR

20

21

22

23

24

25
```