Declaration of

Elizabeth McNamara

Exhibit 30

**DR. MAHENDRA AMIN, M.D. vs NBCUNIVERSAL MEDIA, LLC**
**Julia Ainsley on 04/25/2023**

```
1                 UNITED STATES DISTRICT COURT

2            FOR THE SOUTHERN DISTRICT OF GEORGIA

3                     WAYCROSS DIVISION

4

5  DR. MAHENDRA AMIN, M.D.,     )

6       Plaintiff,             )   Case No.

7  V                           )   5:21-CV-00056-LGW-BWC

8  NBCUNIVERSAL MEDIA, LLC,    )

9  _____/

10

11                  ZOOM VIDEOTAPED DEPOSITION OF

12                       JULIA AINSLEY

13           DATE:  Tuesday, April 25, 2023

14           TIME:   9:00 a.m. - 5:57 p.m.

15

16

17

18

19

20

21

22  REPORTED BY:  TAMIKA M. BURNETTE, RPR, CSR-2870

23

24

25
```

1  standards, is that when there are third-party sources

2  involved that aren't directly on camera?

3      A.  Define a third party; someone who's not

4  directly on camera?

5      Q.  Yes.  Any source that's not out in a public

6  view, giving a speech, for example?

7      A.  Oftentimes if someone is just named, they don't

8  necessarily have to be on camera, but if we have all on

9  the record sources, we will skip legal and standards.

10      Q.  So if you have sources that are not giving

11  public speeches and are not on the record, then it goes

12  to standards?

13          MS. MCNAMARA:  Objection.  Form.

14          THE WITNESS:  It's not -- it's not as clear

15  as that.  It's not -- I don't make that determination.

16  So I would ask you to -- someone else would be better to

17  answer that question than me.

18      Q.  BY MS. EVANS:  But you're aware that most of

19  your reporting goes to standards?

20      A.  Yes.

21      Q.  What is your understanding about why most of

22  your reporting goes to standards?

23      A.  Because most of my reporting is original.  And

24  by original, I mean not commodity news.

25      Q.  Who made the decision to send the print article

1  that we were looking at, as reflected in Plaintiff's

2  Exhibit 3, to standards?

3       A.  I would imagine Mark Schone and Rich Greenberg.

4       Q.  **Collectively or one or the other?**

5       A.  Yes.  Collectively or one or the other.

6       Q.  **Do you know if Daniella's story -- strike that.**

7            **Are we in agreement that Daniella's story**

8  **is what's reflected in Plaintiff's Exhibit 4?**

9       A.  Yes.  It looks like it's got her byline on it,

10 and not mine.

11      Q.  **But not Plaintiff's Exhibit 5?**

12      A.  (Witness examining document.)

13           So your question is whether or not this is

14 Daniella's story.

15      Q.  **Correct.  Plaintiff's Exhibit 5 that refers to**

16 **the Associated Press.**

17      A.  No.  It looks like this is not Daniella's

18 story.  I don't know personally if Daniella had anything

19 to do with getting this published on our website.  That

20 would have been happening in a conversation I wasn't a

21 part of.

22      Q.  **But Daniella's story is what's reflected in**

23 **Plaintiff's Exhibit 4, the 2:26 p.m. --**

24      A.  Yes.  That is definitely her story.  It's got

25 her name on it.  But I can't say for sure if she had

1  anything to do with Exhibit 5.

2      **Q.  Do you know if Plaintiff's Exhibit 4 was**

3  **retroactively approved by standards?**

4      A.  I don't know.

5      **Q.  Do you know if it was ever approved by**

6  **standards at all?**

7      A.  I don't know.

8      **Q.  Do you know if standards reviewed it?**

9      A.  I don't know, because that -- this -- this

10  entire story is running without my involvement at all.

11      **Q.  When you get approval from standards, what --**

12  **strike that.**

13              **How is approval from standards**

14  **communicated?**

15      A.  E-mail, usually.

16      **Q.  And what does it say?**

17      A.  Oh, it's never like some sort of official

18  stamp.  It's just conversations back and forth.  They

19  usually answer questions -- or they ask questions, and

20  you answer questions, and then -- yes, then it can be

21  published.

22      **Q.  Well, how do they let you know that you can**

23  **publish it?**

24      A.  It varies.  It's not like we have some system

25  where the light turns green.  It wouldn't -- so I don't

1  even publish it myself.  Mark is the one who goes in and

2  publishes it.  And so Mark has made the determination --

3  if it's being published, Mark or Rich would have made

4  the determination that -- that we have resolved any of

5  the standards' concerns.

6       **Q.  How would it be possible for Daniella's story**

7  **to have been published without standards?**

8       A.  They must have made the determination that this

9  was commodity news.  It was being reported so widely, by

10 so many respected news organizations.  Nothing in here

11 is what I would consider original, so that's how they

12 made that determination.  Then I'm complaining that it's

13 unfair that I'm reporting on the exact same thing, yet I

14 have to go through a more rigorous process.

15      **Q.  There's not a situation where you, Julia**

16 **Ainsley, would push something up to the internet**

17 **yourself?**

18      A.  No.  I have no ability to do that.

19      **Q.  And Daniella wouldn't have the ability to do**

20 **that?**

21      A.  I don't know.  I've never even met Daniella.

22      **Q.  What is NCX?**

23      A.  News Connect.

24      **Q.  Tell me what is News Connect.**

25      A.  It is our system where you can share material

1  with our whole news organization.  So MSNBC Show can use

2  it.  We will mark it, you know, with reporting notes.

3  You can tell people where to find footage of a video.

4  It's just a way -- we're such a big news organization.

5  It's a way that -- to communicate the news or lines of

6  reporting that we're continuing to pursue.

7      **Q.  Do things have to be approved before they can**

8  **-- strike that.**

9           **Do things have to be approved in some way**

10  **--  I'm not referring to standards necessarily with this**

11  **question.**

12           **Do things have to be approved in some way**

13  **to go on News Connect?**

14      A.  Not necessarily.  You can make a note to say

15  another news organization has reported something, and

16  you want to send out a note that says hey, we haven't

17  independently confirmed this yet ourselves, but we're

18  working on it.  You can tell people that over News

19  Connect.

20      **Q.  And anyone --**

21      A.  But you would indicate reporting that is

22  approved by standards, when you go on to News Connect,

23  so that they can know that that's been approved.

24      **Q.  And what would that indication look like?**

25      A.  You would just say it.

1      Q.   This is approved by standards?

2      A.   Sure.  Some people -- everybody uses a

3  different form.  Some people would say reportable,

4  approved by so and so.  They might use a name.

5  Sometimes they might just say standards.  But you would

6  just indicate that it's reportable.  But very often,

7  people will forget and leave that off.

8      Q.   What do you mean sometimes they would --

9      A.   Some people will just put out -- they're

10  reporting, they're like copying and pasting their

11  article, they're copying and pasting and they'll forget

12  to say that it's approved.

13      Q.   Then how does one who's looking at News Connect

14  know what information in there is approved or reportable

15  versus what's just information sharing?

16      A.   It -- it should say approved.  If someone left

17  that off, they'd get a call, and they'd say is this

18  approved or not?

19      Q.   Get a call from?

20      A.   Probably the show that wanted to use it,

21  whoever wants to use it.  They'd say wow, that's good

22  information, can we use that?  Well, they didn't say if

23  we could, so let's call them up and ask.  This is so

24  hypothetical.  I'm just saying people sometimes forget,

25  but that's --

1    Q.   That's the way you do it?

2    A.   -- generally the way you would indicate it's

3    usable, as you would say it's been approved or it's

4    reportable.  If you say it's reportable.

5    Q.   So reportable means approved by standards as

6    well, because I've seen that?

7    A.   Yes.  Unless -- I mean, so there could be a

8    situation where it could be reportable, but it didn't

9    have to go through standards.  If my editor says that's

10   reportable and you don't need to go through standards,

11   then it's -- then it's reportable.  Rich Greenberg has

12   the authority to do that.

13   Q.   Okay.  And the entirety of the NBC News

14   organization has access to News Connect; true?

15   A.   I don't know for sure.  It would make sense

16   that they did, but I don't know for sure.

17   Q.   How do you put information into News Connect?

18   Logistically, how do you do it?

19   A.   You would go there -- it's funny.  It's

20   actually like so cumbersome.  We call it news concealed,

21   because it's so hard to find news on there.  So you go

22   into this website and you do like a plus button and you

23   can add on to a topic.  So like one of the topics I

24   follow is immigration.  So if there's ever any news on

25   immigration and someone adds to it, I get an e-mail that

```
 1  says that.  I almost never even go on there, I just do
 2  it if I need to post information.  The other thing I do
 3  is I e-mail out.  We have this list serve of politics
 4  deal that we call it, and that goes out to most people,
 5  because News Connect is a pain.
 6       Q.  What do you think -- strike that.
 7               What is the intent, as far as you
 8  understand, of the News Connect platform?
 9       A.  To share information across our news
10  organization that can be used.
11       Q.  And is it up to an individual that happens to
12  have gathered whatever news it is, whether to put it on
13  there or not?  And by "on there," I mean News Connect?
14       A.  Okay.  Is it up to an individual to decide?
15  Well, they would have -- I think that question could
16  imply that someone could go and just publish.  The rules
17  are, you know, you're supposed to say whether or not
18  it's reportable or not reportable.
19               If you have something that's not
20  reportable, say, it's a single source, but you just want
21  to put that out there, you're putting it out there to
22  see if maybe somebody else can come get another source.
23       Q.  Could add to the story?
24       A.  Yes.  That's often when other news
25  organizations have already published something and we're
```

1  trying to confirm it.  I personally don't put single

2  source reporting in News Connect.  I would call up

3  another reporter who would be able to help.  But that's

4  my personal practices.  I don't know about the rest of

5  my nesorganizations.

6      Q.  When you refer to the legal of legal and

7  standards --

8      A.  Yes.

9      Q.  -- the separate systems we talked about just a

10 moment ago --

11     A.  Yes.

12     Q.  -- is that the same thing as prepublication

13 review?

14     A.  So when I talk about legal, I'm talking about a

15 group of people, not a review.  That is one of their

16 functions.

17     Q.  One of the functions of legal is to do

18 prepublication reviews?

19     A.  Of some things, not all everything.

20     Q.  What is -- what are the other functions of

21 legal --

22     A.  Well --

23     Q.  -- as you understand it?

24     A.  This.

25     Q.  As far as the publication process of news, what

```
 1  that we were looking at, as reflected in Plaintiff's
 2  Exhibit 3, to standards?
 3      A.  I would imagine Mark Schone and Rich Greenberg.
 4      Q.  Collectively or one or the other?
 5      A.  Yes.  Collectively or one or the other.
 6      Q.  Do you know if Daniella's story -- strike that.
 7              Are we in agreement that Daniella's story
 8  is what's reflected in Plaintiff's Exhibit 4?
 9      A.  Yes.  It looks like it's got her byline on it,
10  and not mine.
11      Q.  But not Plaintiff's Exhibit 5?
12      A.  (Witness examining document.)
13              So your question is whether or not this is
14  Daniella's story.
15      Q.  Correct.  Plaintiff's Exhibit 5 that refers to
16  the Associated Press.
17      A.  No.  It looks like this is not Daniella's
18  story.  I don't know personally if Daniella had anything
19  to do with getting this published on our website.  That
20  would have been happening in a conversation I wasn't a
21  part of.
22      Q.  But Daniella's story is what's reflected in
23  Plaintiff's Exhibit 4, the 2:26 p.m. --
24      A.  Yes.  That is definitely her story.  It's got
25  her name on it.  But I can't say for sure if she had
```

1   anything to do with Exhibit 5.

2      **Q.  Do you know if Plaintiff's Exhibit 4 was**

3   **retroactively approved by standards?**

4      A.  I don't know.

5      **Q.  Do you know if it was ever approved by**

6   **standards at all?**

7      A.  I don't know.

8      **Q.  Do you know if standards reviewed it?**

9      A.  I don't know, because that -- this -- this

10  entire story is running without my involvement at all.

11     **Q.  When you get approval from standards, what --**

12  **strike that.**

13              **How is approval from standards**

14  **communicated?**

15     A.  E-mail, usually.

16     **Q.  And what does it say?**

17     A.  Oh, it's never like some sort of official

18  stamp.  It's just conversations back and forth.  They

19  usually answer questions -- or they ask questions, and

20  you answer questions, and then -- yes, then it can be

21  published.

22     **Q.  Well, how do they let you know that you can**

23  **publish it?**

24     A.  It varies.  It's not like we have some system

25  where the light turns green.  It wouldn't -- so I don't

 1   even publish it myself.  Mark is the one who goes in and

 2   publishes it.  And so Mark has made the determination --

 3   if it's being published, Mark or Rich would have made

 4   the determination that -- that we have resolved any of

 5   the standards' concerns.

 6       **Q.  How would it be possible for Daniella's story**

 7   **to have been published without standards?**

 8       A.  They must have made the determination that this

 9   was commodity news.  It was being reported so widely, by

10   so many respected news organizations.  Nothing in here

11   is what I would consider original, so that's how they

12   made that determination.  Then I'm complaining that it's

13   unfair that I'm reporting on the exact same thing, yet I

14   have to go through a more rigorous process.

15       **Q.  There's not a situation where you, Julia**

16   **Ainsley, would push something up to the internet**

17   **yourself?**

18       A.  No.  I have no ability to do that.

19       **Q.  And Daniella wouldn't have the ability to do**

20   **that?**

21       A.  I don't know.  I've never even met Daniella.

22       **Q.  What is NCX?**

23       A.  News Connect.

24       **Q.  Tell me what is News Connect.**

25       A.  It is our system where you can share material

1  with our whole news organization.  So MSNBC Show can use

2  it.  We will mark it, you know, with reporting notes.

3  You can tell people where to find footage of a video.

4  It's just a way -- we're such a big news organization.

5  It's a way that -- to communicate the news or lines of

6  reporting that we're continuing to pursue.

7       Q.  Do things have to be approved before they can

8  -- strike that.

9            Do things have to be approved in some way

10 --  I'm not referring to standards necessarily with this

11 question.

12           Do things have to be approved in some way

13 to go on News Connect?

14      A.  Not necessarily.  You can make a note to say

15 another news organization has reported something, and

16 you want to send out a note that says hey, we haven't

17 independently confirmed this yet ourselves, but we're

18 working on it.  You can tell people that over News

19 Connect.

20      Q.  And anyone --

21      A.  But you would indicate reporting that is

22 approved by standards, when you go on to News Connect,

23 so that they can know that that's been approved.

24      Q.  And what would that indication look like?

25      A.  You would just say it.

1      Q.   This is approved by standards?

2      A.   Sure.  Some people -- everybody uses a

3  different form.  Some people would say reportable,

4  approved by so and so.  They might use a name.

5  Sometimes they might just say standards.  But you would

6  just indicate that it's reportable.  But very often,

7  people will forget and leave that off.

8      Q.   What do you mean sometimes they would --

9      A.   Some people will just put out -- they're

10 reporting, they're like copying and pasting their

11 article, they're copying and pasting and they'll forget

12 to say that it's approved.

13     Q.   Then how does one who's looking at News Connect

14 know what information in there is approved or reportable

15 versus what's just information sharing?

16     A.   It -- it should say approved.  If someone left

17 that off, they'd get a call, and they'd say is this

18 approved or not?

19     Q.   Get a call from?

20     A.   Probably the show that wanted to use it,

21 whoever wants to use it.  They'd say wow, that's good

22 information, can we use that?  Well, they didn't say if

23 we could, so let's call them up and ask.  This is so

24 hypothetical.  I'm just saying people sometimes forget,

25 but that's --

1    Q.   That's the way you do it?

2    A.   -- generally the way you would indicate it's

3  usable, as you would say it's been approved or it's

4  reportable.  If you say it's reportable.

5    Q.   So reportable means approved by standards as

6  well, because I've seen that?

7    A.   Yes.  Unless -- I mean, so there could be a

8  situation where it could be reportable, but it didn't

9  have to go through standards.  If my editor says that's

10  reportable and you don't need to go through standards,

11  then it's -- then it's reportable.  Rich Greenberg has

12  the authority to do that.

13    Q.   Okay.  And the entirety of the NBC News

14  organization has access to News Connect; true?

15    A.   I don't know for sure.  It would make sense

16  that they did, but I don't know for sure.

17    Q.   How do you put information into News Connect?

18  Logistically, how do you do it?

19    A.   You would go there -- it's funny.  It's

20  actually like so cumbersome.  We call it news concealed,

21  because it's so hard to find news on there.  So you go

22  into this website and you do like a plus button and you

23  can add on to a topic.  So like one of the topics I

24  follow is immigration.  So if there's ever any news on

25  immigration and someone adds to it, I get an e-mail that

1  says that.  I almost never even go on there, I just do

2  it if I need to post information.  The other thing I do

3  is I e-mail out.  We have this list serve of politics

4  deal that we call it, and that goes out to most people,

5  because News Connect is a pain.

6      **Q.  What do you think -- strike that.**

7          **What is the intent, as far as you**

8  **understand, of the News Connect platform?**

9      A.  To share information across our news

10  organization that can be used.

11      **Q.  And is it up to an individual that happens to**

12  **have gathered whatever news it is, whether to put it on**

13  **there or not?  And by "on there," I mean News Connect?**

14      A.  Okay.  Is it up to an individual to decide?

15  Well, they would have -- I think that question could

16  imply that someone could go and just publish.  The rules

17  are, you know, you're supposed to say whether or not

18  it's reportable or not reportable.

19          If you have something that's not

20  reportable, say, it's a single source, but you just want

21  to put that out there, you're putting it out there to

22  see if maybe somebody else can come get another source.

23      **Q.  Could add to the story?**

24      A.  Yes.  That's often when other news

25  organizations have already published something and we're

1  trying to confirm it.  I personally don't put single

2  source reporting in News Connect.  I would call up

3  another reporter who would be able to help.  But that's

4  my personal practices.  I don't know about the rest of

5  my nesorganizations.

6      Q.  When you refer to the legal of legal and

7  standards --

8      A.  Yes.

9      Q.  -- the separate systems we talked about just a

10 moment ago --

11     A.  Yes.

12     Q.  -- is that the same thing as prepublication

13 review?

14     A.  So when I talk about legal, I'm talking about a

15 group of people, not a review.  That is one of their

16 functions.

17     Q.  One of the functions of legal is to do

18 prepublication reviews?

19     A.  Of some things, not all everything.

20     Q.  What is -- what are the other functions of

21 legal --

22     A.  Well --

23     Q.  -- as you understand it?

24     A.  This.

25     Q.  As far as the publication process of news, what

1  is the -- what is the role of legal other than

2  prepublication review?

3      A.  That's -- in my experience, that's the only

4  time I work with them.

5      Q.  On September the 15th, we talked about the

6  individual lawyers that you had talked to and/or that

7  Mr. Soboroff had talked to.

8          Did you -- do you recall that?

9      A.  Yes.

10     Q.  Did you talk to anyone else outside of NBC News

11 about the story related to Irwin County Detention Center

12 on September 15th, 2020?

13     A.  No.  I do remember that I had to not -- I

14 remember like telling my husband I had to work on the

15 story and so I had to like -- I needed his help with

16 baby stuff, but that's like the extent of it.

17     Q.  Your husband's in the healthcare industry,

18 true?

19     A.  Yes.

20     Q.  Did you talk to him substantially at all about

21 any part of this situation at Irwin County Detention

22 Center?

23     A.  No.

24     Q.  Ever?

25     A.  He knows I'm here doing this deposition.

 1  That's the extent to which we've spoken about it.

 2       Q.  Did you speak to him about what sort of

 3  documents may exist or any special rules related to

 4  healthcare?

 5       A.  No.  We have not talked about that.

 6       Q.  Who did you -- strike that.

 7             Did you speak to any other news

 8  organizations on September 15, 2020 about Irwin County

 9  Detention Center?

10       A.  No, I did not.

11       Q.  Is that unusual for you to not talk to other

12  news organizations?

13       A.  That would be totally unusual to talk to

14  another news organization about that.  I mean, you see

15  what they publish.  We're certainly reading what

16  everybody has done, but that would be highly unusual to

17  call up a reporter and ask them about their process.

18       Q.  You wouldn't be speaking to your counterpart at

19  CNN, for example?

20       A.  No, no.  They would be like, what, why are you

21  calling me.

22       Q.  The same would be true for crime sources like

23  the New York Times?

24       A.  Yes, yes.  You see what they put out, but no

25  one is like opening up the hood and showing what they're

1  reporting.  What they're reporting, they put it out,

2  they're reputable news organization, you know.

3  Certainly, what they're putting out is, you know, part

4  of my day and why I'm continuing to report this.  It's a

5  major thing but no, we wouldn't -- I can't think of any

6  story where I have ever, in the middle of it, called a

7  reporter at another news organization.

8      **Q.  On September 15th, 2020 do you recall whether**

9  **it was your own concerns or whether others were**

10 **discussing it?**

11           **Were there concerns discussed at NBC News**

12 **about being scooped by another news organization with**

13 **regard to this story?**

14     A.  No, because we -- I mean, scooped would mean

15 somebody else had it first and that would -- that had

16 already happened.  The internet had this first.

17     **Q.  Was there concern that other news outlets might**

18 **gain access and have detainee interviews, for example,**

19 **before MSNBC or NBC News?**

20     A.  Not that I recall.

21     **Q.  Any concern about other news outlets having**

22 **better access to detainee attorneys, for example?**

23     A.  Not that I recall.

24     **Q.  Is that something that is of concern, on**

25 **occasion, at NBC News?**

```
 1        A.  Sure.  On occasion, in other stories, I would
 2   be competitive to want to get an interview, you know, or
 3   get a story before another news organization.  But in
 4   this case, you know -- we'll sometimes use the term,
 5   like, we're hearing footsteps, if somebody else -- like,
 6   if you call someone and they're like, I'm about to do an
 7   interview with so and so, then you realize that's
 8   competitive, and that was not part of the conversations
 9   around this story.  We didn't see it that way.
10        Q.  You didn't hear any footsteps from other news
11   organizations that they were moving in on this?
12        A.  No.  I mean, but we just saw what they were
13   publishing it in the Associated Pressed, CBS, CNN was
14   all over the place.
15             This wasn't a story where we were going to
16   win a scoop.  I can point to a lot of stories where we
17   haven't been competitive on that, but this wasn't going
18   to be that.
19        Q.  Why were you in such a hurry then, on
20   September 15, 2020?
21        A.  I don't think we were in a hurry.  What makes
22   you think that?
23        Q.  Unfortunately, you don't get to ask those
24   questions.
25        A.  Okay.  Sorry.  I don't believe that we were in
```

1  a hurry.  No.  Jacob did the interview in the morning.

2  We published at 5:24 p.m., after we talked to four

3  lawyers.  I don't think that any piece of that looks

4  like a hurry to me.

5      **Q.  Did you speak to all of the lawyers whether it**

6  **was you speaking to them or Mr. Soboroff speaking to**

7  **them, was that all after Mr. Soboroff's interview was**

8  **Ms. Wooten?**

9      A.  I believe so.  I believe so.

10     **Q.  Were you present during the interview with Ms.**

11 **Wooten?**

12     A.  No.

13     **Q.  Do you know if anyone else was, besides Mr.**

14 **Soboroff -- and I assume there was a camera -- well, it**

15 **was Zoom?**

16     A.  It was Zoom, yes.  It was during COVID so I

17 don't know who was present for that.

18     **Q.  Did you ever speak directly with John Witty?**

19     A.  No. I don't think I know who that is.

20     **Q.  It was Ms. Wooten's lawyer or was at the time.**

21     A.  Okay.

22     **Q.  Have you had any direct conversations with Dawn**

23 **Wooten at any other times?**

24     A.  No.  I've never spoken with her.

25     **Q.  Have you attempted to speak with her since**

1  September 15, 2020?

2      A.  No.  That was Jacob's job.  I don't -- I don't

3  go double-check his work.

4      Q.  **Who all, within NBC News, did you speak with**

5  **about this story on September 15th besides Jacob**

6  **Soboroff?**

7      A.  Some other editors.  It would have been Rich

8  Greenberg or Mark Schone.  Obviously there's the e-mail

9  communications with standards, but no other reporters.

10     Q.  **What about Zander Price?**

11     A.  No.  Not that I recall.

12     Q.  **What about Patrick Burkey?**

13     A.  Not that I recall.

14     Q.  **Do you recall Patrick Burkey having a role in**

15  **the production of any part of the Irwin County Detention**

16  **story?**

17     A.  Not that I --

18              MS. MCNAMARA:  Objection to form.

19              THE WITNESS:  When you say "any part of the

20  Irwin County Detention story," are you referring to

21  Exhibit 3?

22     Q.  **BY MS. EVANS:  Strike that.  I'll ask another**

23  **question.**

24     A.  Because he had no role in this.

25     Q.  **So Mr. Burkey had no role in the article --**

1  print article in this exhibit -- well, what ultimately

2  became Plaintiff's Exhibit 3?

3       A.  Yes.

4       Q.  Mr. Burkey, I understand, is a producer on

5  Deadline:  White House; is that right?

6       A.  I don't recall.  I know Patrick, I've worked

7  with him before.  He has changed jobs.  I don't know

8  what his job was at that time, but he works at MSNBC or

9  he did.

10            Does he still work there?  I don't know.

11      Q.  Did you have any conversations with Nicole

12 Wallace about the Irwin County Detention Center story on

13 September 15th?

14      A.  Only on air.

15      Q.  Just on air?

16      A.  Yes.

17      Q.  Is that normal that you wouldn't talk to the

18 anchor --

19      A.  That's totally normal.  Yes. 99 --

20      Q.  Special on the air?

21      A.  No.  Not that they're special.  I mean, look,

22 I'm good friends -- you know, I see Nicole in the

23 hallway and she gives me a hug.  We're certainly

24 friendly with these anchors, but we -- they have so many

25 things that they're getting through, in the course of

1  their show, it would -- it would be highly unusual that

2  we would have, like, time for a sidebar conversation

3  when they have got to go from one thing to another.

4      Q.  Did you have any conversations with -- strike

5  that.

6              On September 15th, there were lots of

7  e-mails going around about the Irwin County Detention

8  Center --

9      A.  Yes, in a typical way that we would do.  Yes.

10  That's part of our process.

11      Q.  And Christopher Scholl was part of some of

12  those communications?

13      A.  Yes.

14      Q.  Did you have any phone conversations with

15  Christopher Scholl on September 15, 2020?

16      A.  Not that I recall.

17      Q.  Do you think that you may have?

18      A.  It would be unusual for me to do that.

19      Q.  Did you have --

20      A.  Most of our communications with standards is

21  over e-mail.

22      Q.  Did you have any telephone conversations with

23  Christopher Scholl about Irwin County Detention Center

24  and the related reporting after September 15, 2020?

25      A.  No.

1      Q.  Did you have any in person meetings with him

2   about Irwin County Detention Center reporting?

3      A.  No.  I don't even think I've met Chris in

4   person, ever.  Apologies if he sees this and we have,

5   but I don't think we've ever met.

6      Q.  Do you know where he is physically located?

7      A.  New York, and I'm in DC.

8      Q.  What about -- did you have any telephone

9   conversations with Rich Greenberg on September 15th?

10     A.  Yes.

11     Q.  And what was the purpose of those phone calls

12  or phone call?

13     A.  So he -- I mean, he is my direct person.  I

14  call Rich when I'm about to start writing a story.  So

15  we would have just talked it through.  I -- I can't

16  remember the exact content.  I'm sure we would have just

17  talked about what we had, and -- I mean, Rich is the

18  former head of standards, so he really -- would just

19  want to make sure that we had as much information as

20  possible.

21     Q.  Do you recall having multiple conversations

22  with him on September --

23     A.  I can't remember if it was one or more.  I

24  mean, I talk to Rich so much, it would be hard for me to

25  know on a certain day whether it was one or more.

1     Q.  What about since September 15, 2020, have you

2  had conversations with Mr. Greenberg about Irwin County

3  Detention Center reporting?

4     A.  Yes.  So I talked to him on the 16th.  This was

5  a great Rich-moment.  Rich has retired, so I'm just

6  going to use this moment to remember Rich.  Okay.

7          So I was going to get the medical records

8  and -- no, no.  Sorry.  I was going to do this

9  interview, we were going to get the medical records and

10  Rich said, "Let's have our medical team look at them

11  because, you know, you're not a doctor, you're not in a

12  position to do this.  So let's get our medical team to

13  look at that."

14          Rich is so good about knowing the kind of

15  resources that we had, and so that was his suggestion.

16     Q.  And did you end up doing that?

17     A.  Yes, but it ended up not -- I did that, and

18  then I passed the information along, that I got from the

19  medical team, to Chris Haze's Show.  But then I didn't

20  do the interview, and Chris Haze's Show did.  So I just

21  tried to pass along what I learned, and then that was

22  the end of that.

23     Q.  Did you have any -- strike that.

24          Did you have any other telephone

25  conversations with Rich Greenberg about Irwin County

 1  Detention Center reporting since that phone call that

 2  you just referenced?

 3      A.  Not that I recall.

 4      Q.  Did you have any conversations with Mark Schone

 5  on September 15th, 2020 about Irwin County Detention

 6  Center reporting?

 7      A.  Mark Schone, yes.  I would have.  Yes.

 8      Q.  Multiple?

 9      A.  I'm sure.  Yes.

10      Q.  And what would the purpose of those calls have

11  been?

12      A.  To see where we were in our reporting, when it

13  could get published.  I mean, you know, he's the one

14  who's going to take all of this and put it all together

15  and just -- as you would on any story you're working on.

16  It's not like we write the whole thing and then e-mail

17  it, you know.  I'm talking to Mark along the way.

18      Q.  What about since September 15, 2020, have you

19  had conversations with Mr. Schone about Irwin County

20  Detention Center reporting?

21      A.  No.

22      Q.  Did you do any other reporting related to this

23  story after September 15th?

24      A.  Only on the 16th with the medical records, but

25  I didn't publish anything.  Remember, I just handed it

 1  over to Chris Haze's Show and that was it.

 2      **Q.  That was it?**

 3      A.  Yes.

 4      **Q.  Why did you stop?**

 5      A.  Because I remember we were thinking that the

 6  New York Times, we heard, was sending somebody down

 7  there, that they were going to own this story.  And so

 8  this was not a story we were going to be super

 9  competitive on.  Everybody else, you know, was already

10  reporting it, and -- what was it?  And the Chris Haze's

11  Show was going to continue with the interview, so why

12  would I interview somebody that they were going to

13  interview too?

14              So basically we just decided, just as a

15  matter of resources, if other news organizations are

16  already plugging so much into this, we don't need to

17  compete with them on that.  Let's go -- we'll refocus

18  and look at some other stories.

19      **Q.  Have you done any reporting on any of -- strike**

20  **that.**

21              **Have you done any reporting on any**

22  **congressional investigation related to Irwin County**

23  **Detention Center since September 15th?**

24      A.  No, I have not.  Not that I recall.

25      **Q.  Have you done any reporting related to Dr. Amin**

 1  in any way since September 15, 2020?

 2      A.  No.

 3      Q.  When you spoke with Mr. Osorio on September 15,

 4  2020 -- I think the answer was no, but did you ask him

 5  for the names of any of his clients?

 6      A.  I don't recall.

 7      Q.  Wouldn't that just be a standard question that

 8  you would ask, who are these women?

 9      A.  Not necessarily.  Again, I don't recall the

10  conversation.  So he may have started off saying, "I can

11  tell you about my client, but I can't reveal their

12  names."  Also, I mean, he's -- without recalling the --

13              MS. MCNAMARA:  Don't guess.

14              THE WITNESS:  I can't guess.

15      Q.  BY MS. EVANS:  Did you ask Mr. Osorio or any

16  other attorney that you may have spoken with on

17  September 15, 2020 to provide any of their client's

18  medical records?

19      A.  Did I ask him on the 15th?

20      Q.  Correct.

21      A.  I don't recall.  I mean, I know that I got

22  those records on the 16th, so did we talk about them on

23  the 15th?  Maybe, but I don't know.  I can't guess about

24  when that conversation started.

25      Q.  Other than the medical records that you

1  referred to that you saw on September the 16th, have you

2  seen any other medical records of any detainee from

3  Irwin County Detention Center?

4      A.  I don't believe so.

5      Q.  Do you know if anyone at NBC News has?

6      A.  I don't know.  I can't speak for them.

7      Q.  What about Mr. Soboroff, do you know if he has?

8      A.  I'm not going to speak for Jacob.  If he has,

9  he hasn't told me that.

10     Q.  Let's go back to Plaintiff's Exhibit 2, and if

11  you could go with me to page 18.

12     A.  Give me one second.  So we're back to the

13  complaint, and page 18.  Okay.

14     Q.  Underneath Subsection D, where it starts out

15  saying, "Several immigrant women have reported to

16  Project South."

17     A.  Right.  Yes, we've talked about this.

18     Q.  Do you have any idea how many several is?

19     A.  No.

20     Q.  Did you make any attempt to find out the answer

21  to that question?

22     A.  No.

23     Q.  Do you know if anyone at NBC News did?

24     A.  I don't know.

25     Q.  On page 19, up at the top, there's a quote, I

 1  assume from the detainee that's referenced in footnote

 2  95.  "When I met all these women who had had surgeries,

 3  I thought this was like an experimental concentration

 4  camp.  It was like they're experimenting with our

 5  bodies."

 6              Do you see that?

 7      A.  I see that.

 8      Q.  Did you make any attempt -- strike that.

 9              You've already testified you didn't ask or

10  make any attempt to find out who this detainee was?

11      A.  Correct.

12              MS. MCNAMARA:  Objection to form.

13      Q.  BY MS. EVANS:  Did you tell me that earlier,

14  that you didn't try to find out who the detainee was

15  that was interviewed as referenced in footnote 95?

16      A.  Yes.  That's correct.  I did not make an

17  attempt to find out who that person was, and I also gave

18  you the reasons why.

19      Q.  And did you make any attempt to understand what

20  this person meant by this quote.  For example --

21      A.  I'm going to need to take a second.  Okay.

22      Q.  It's up, right at the top.

23      A.  Yes, I know, but it starts on the other page.

24              (Witness examining document.)

25              (Witness reading out loud.)

```
 1                    Okay.  So what's your question about this?

 2        Q.  Did you make any attempt to understand what

 3   this person meant by that quote, that's at the top of

 4   page 19 of Plaintiff's Exhibit 2?

 5        A.  No.

 6        Q.  And then, in the block quote, at the top, the

 7   top of the block quote -- do you see the block quote?

 8        A.  Yes. "Everybody he sees..."

 9        Q.  Yes. "Everybody he sees has a hysterectomy,

10   just about everybody."

11                    Do you see that?

12        A.  Yes.

13        Q.  Did you make any attempt to find out where that

14   quote came from -- or strike that.

15                    That quote came from Ms. Wooten?

16        A.  Yes.

17        Q.  Did you make any attempt to find out who was,

18   "everybody, just about everybody"?

19        A.  No.

20        Q.  You didn't speak to Ms. Wooten about that?

21        A.  Remember, I didn't speak to Ms. Wooten, Jacob

22   did.

23        Q.  I got you on cross.  I'm just asking you for

24   the record.

25                    You did not speak to Ms. Wooten about this
```

```
 1  quote or anything else directly, correct?

 2      A.  I did not speak to Ms. Wooten.

 3      Q.  That -- that quote right there, "Everybody he

 4  sees has a hysterectomy, just about everybody."

 5              If you flip to -- back to Plaintiff's

 6  Exhibit 5, which was the Associated Press story?

 7      A.  Yes.

 8      Q.  If you flip to page 2 of that Exhibit, toward

 9  the top, you'll see that same quote, "Everybody --

10      A.  Right.

11      Q.  Do you see that?

12      A.  Yes.

13      Q.  That quote -- and you can check this -- was

14  removed from the 2:26 update, Plaintiff's Exhibit 4.

15  And you can take a look to make sure I'm right about

16  that.

17              My question is, do you know why?

18              MS. MCNAMARA:  Objection to form.

19              MS. EVANS:  What's objectionable about

20  that, Liz?

21              MS. MCNAMARA:  Because it's assuming

22  something that's not in evidence.  There's no evidence

23  this was removed.

24              MS. EVANS:  I just asked her to look and

25  see.  She can tell me if it's not --
```

1          MS. MCNAMARA:  Well, I think the word,

2  "removed" is inappropriate, but anyway, she can answer

3  the question.  You asked for the reason for the

4  objection so I --

5          MS. EVANS:  No.  Understood.

6          THE WITNESS:  And you want me to say why it

7  was removed.  So again, I wasn't part of Daniella's

8  article.  This is all a conversation with her and her

9  editors.

10     Q.  BY MS. EVANS:  So you don't know why --

11         MS. MCNAMARA:  Objection.  Same objection.

12         MS. EVANS:  I didn't even finish my

13  question.  Let me ask my question again.

14     Q.  BY MS. EVANS:  You don't know why, the quote,

15  "Everybody he sees has a hysterectomy, just about

16  everybody," appears in Plaintiff's Exhibit 5, but not in

17  Plaintiff's Exhibit 4?

18     A.  Right.  Because I'm not in a position to know

19  that information.

20     Q.  And who would know that besides -- well, strike

21  that.

22             Who would know that?

23     A.  Whoever edited this story, and I don't know who

24  that was.

25     Q.  Do you think that it would have potentially

 1  been a different editor than who edited the --

 2      A.  Yes.

 3      Q.  -- the two versions?

 4      A.  Very likely.

 5      Q.  Do you have any idea who that might have been?

 6      A.  I don't.  I don't know who Daniella's editor

 7  was at the time, but mine was Mark Schone; he was not

 8  hers.

 9      Q.  Does Mr. Soboroff have an editor?

10      A.  No.  Jacob and I worked together with Mark.

11  Because Jacob is really more TV.  When he wants to go

12  online, like with a digital article, we usually work

13  together and then go to Mark.

14      Q.  Have you ever been subject to discipline at NBC

15  News?

16      A.  No.

17      Q.  Have you ever been called in to answer for any

18  of your reporting in any way whatsoever?

19      A.  Define "answer for"?

20      Q.  Have you ever been called in by one of your --

21  strike that.

22          Who do you report to?

23      A.  Right now I just got a new boss.  So Rich

24  Greenberg just retired two weeks ago, then literally,

25  like as I walked in here, announced that I'm going to

 1  have a new boss.  I think currently, like my expenses go

 2  to this woman named Kathryn Kent.

 3      Q.  Has Mr. Greenberg ever called you in -- strike

 4  that.

 5              Has Mr. Greenberg ever expressed

 6  displeasure to you about any of your reporting?

 7      A.  No.

 8      Q.  Has anyone else at NBC News ever expressed

 9  displeasure to you about your reporting?

10      A.  No.  And I solicit feedback very strongly.

11      Q.  What is NBC Net Desk?

12      A.  I'm going to embarrass myself with the answer

13  to this because our company is so big, I don't know what

14  everybody does.  Yes, I don't -- I don't know for sure.

15  I see them on e-mails.  I think that they help with

16  coordinating the coverage of things, but I don't -- I

17  don't know what I would reach out to them for.

18      Q.  Would you gather documents to provide to

19  lawyers in October of 2021?

20      A.  Yes.

21      Q.  How did you go about gathering those?

22      A.  I looked in my e-mail.  I just looked up the

23  name "Amin," and I did keywords from this.  And then I

24  went and looked at -- I looked at the date of the story,

25  and I went and got the text messages that Jacob and I

1  said that day.

2      Q.  **Text messages between you and Jacob?**

3      A.  Yes.

4      Q.  **And you turned those over?**

5      A.  I did.

6      Q.  **When you said "keywords from this," what are**

7  **you referring to?**

8      A.  Well, I mean, first of all, I went in -- I just

9  searched "Amin," and everything that came up were things

10  that would have come way later.  So, you know, like the

11  congressional investigations.  But I also just went back

12  and looked at all the e-mails from that date and I

13  didn't have those anymore.

14     Q.  **Did you make any other attempts to search for**

15  **documents within your own e-mail besides searching the**

16  **word "Amin"?**

17     A.  Yes, I looked at the date.

18     Q.  **You went back and looked to September 15, 2020**

19  **--**

20     A.  To see if I had anything from that point, but I

21  didn't have anything that old.

22     Q.  **No.  Your testimony is that you had no e-mails**

23  **from September 15, 2020 whatsoever, whether about Irwin**

24  **County or anything else?**

25     A.  Yes.  If I didn't have them about this, I

1  didn't have them about anything else either.

2      **Q.  And did any lawyer, either in-house or**

3  **out-of-house, work with you to search for documents or**

4  **did you do that completely on your own?**

5      A.  I did that on my own.

6          MS. MCNAMARA:  Object.  And I object to

7  format.  I think that you're assuming certain facts.

8          MS. EVANS:  I asked a question.  She can

9  answer.  If she doesn't agree with the premise, she can

10  tell me.

11     **Q.  BY MS. EVANS:  Do you recall receiving a -- or**

12  **strike that.**

13          **Have you ever received a document telling**

14  **you not to delete documents?**

15     A.  Yes.  That was -- that we got over a year after

16  this story aired and that's when I immediately -- or

17  where I was standing in my kitchen, I immediately

18  started looking for them.  That was the first time that

19  I ever had that.

20     **Q.  You never had a document telling you to hold**

21  **documents before?**

22     A.  Not before that.

23     **Q.  Have you since?**

24     A.  Is that related?

25     **Q.  If your lawyer thinks I'm not allowed to ask**

1  you, she will --

2              MS. MCNAMARA:  Well, I think you can answer

3  whether you received it.  I'm not going to allow you to

4  answer the substance of things that are not relevant

5  here.

6              THE WITNESS:  Okay.  Since, yes, but not

7  before that.

8      Q.  BY MS. EVANS:  And what was the subject matter

9  of that?

10             MS. MCNAMARA:  I object and I instruct you

11 not to answer.  It's attorney-client --

12             MS. EVANS:  It's attorney-client privilege

13 how?

14             MS. MCNAMARA:  It's attorney-client

15 privilege as to what she's being communicated and the

16 substance of it.  The fact that she received a

17 communication is not covered, the substance of that

18 communication is.

19     Q.  BY MS. EVANS:  Are you currently -- strike

20 that.

21             Are there currently documents that you are

22 intentionally not destroying pursuant to your normal

23 e-mail cleanup practices?

24     A.  I don't understand that.  So my normal e-mail

25 cleanup practices are to delete things I don't have to

DR. MAHENDRA AMIN, M.D. vs NBCUNIVERSAL MEDIA, LLC
Julia Ainsley on 04/25/2023                                Page 87

1  hold on to when my inbox gets full.

2      **Q.  And are there some things that you currently**

3  **have to hold on to regardless of how full your e-mail**

4  **gets?**

5      A.  Yes.  I hold on to some things regardless how

6  full my e-mail gets --

7      **Q.  And what are the subject matters of those?**

8      A.  I mean, a lot of times it's for my own

9  reporting.  You know, if I have, like, if there's a

10  story that I've been working on for a long time where I

11  still want to hold on to those documents.

12     **Q.  What's that criteria?**

13     A.  If it's -- if I'm going to need it again.  You

14  know, I make the decision to try to windle down my

15  inbox, and so I look -- I delete everything.  So first,

16  I do largest, because you try to delete the largest, and

17  then with those attachments, if there's anything that

18  I'm still reporting, like, if there's more reporting to

19  be done on that, I hold it.  And then I go back to a

20  certain date, where I know I don't need anything, like,

21  for example, if it's six months to a year old, then I

22  delete it all.

23          There's only one story that I'm still

24  reporting on, that I have been reporting on since last

25  summer, and that's the only thing that I hold on to.

1      Q.   How often do you go through this process of --

2      A.   Only when my e-mail says you can't send anymore

3  e-mails because it's full.

4      Q.   How often does that happen?

5      A.   I'm not -- I couldn't put a frequency on it.

6           Multiple times a year.  I mean -- and I get

7  so many press statements with attachments, my inbox

8  fills up so quickly.

9      Q.   Did you -- strike that.

10          Did you reach out to LaSalle on September

11  15, 2020?

12     A.   I know we reached -- we reached out to them for

13  comments.  I'm assuming it was me, but there's a

14  possibility it was Jacob.

15     Q.   Do you recall when that happened?

16     A.   It would have been sometime during the course

17  of reporting on the 15th.  I don't remember when it was.

18     Q.   Did you do that on your own or did you get that

19  instruction or suggestion from someone else, similar to

20  the medical records issue?

21     A.   I don't recall, but it would've been my -- you

22  know, when I report something like that, and I see a

23  whistleblower complaint, I'm going to reach out to the

24  company, to ICE, to the doctor.  I want to reach out to

25  all the parties.  That's my normal practice.

1    Q.  And you reached out to Mr. -- strike that.

2              You reached out to Dr. Amin?

3    A.  I called his office, yes, but they did not talk

4  to me as soon as I identified myself as a reporter.

5    Q.  Did you attempt to reach out to Dr. Amin's

6  office in any other way?

7    A.  Besides the phone call, talking to the

8  receptionist, no.  There was no e-mail address.  I

9  really wanted to explain the story but, you know, when

10  you get hung up on, I don't know how else you're

11  supposed to do that.

12    Q.  Do you know why -- or strike that.

13              Plaintiff's Exhibit 3, the 9:02 update to

14  the written article?

15    A.  Okay.

16    Q.  That went through standard review; true?

17    A.  Yes.  I believe so.

18    Q.  And how were you told that it was approved by

19  standards?

20    A.  I would not have been told, but Mark would have

21  made the decision and published it.  I can't remember

22  exactly how that went.  I -- are you -- yes.

23    Q.  How did you find out it was approved by

24  standards?

25    A.  I don't recall.  I just knew that it was -- I

 1  don't recall.

 2      Q.  Was Plaintiff's Exhibit 3 subject to

 3  prepublication review as well?

 4      A.  Yes.

 5      Q.  And how did you -- strike that.

 6          When did you find out that it had been

 7  approved?

 8      A.  I would have had to know that in order for this

 9  to be published, it was approved.  I don't know when I

10  found out.

11      Q.  The script -- strike that.

12          Was there a script written before you went

13  on Deadline:  White House?

14      A.  No.  We don't write -- the only scripts that

15  would be written would be for Nicole's intro, and I'm --

16  I'm just speaking based on my knowledge.  I didn't write

17  those words before I spoke them.

18      Q.  Did you have to discuss what you were going to

19  say with either Mr. Greenberg or Mr. Schone or anyone

20  else prior to going on air?

21      A.  Schone.  No, no.  As long as I'm sticking to my

22  reporting, I mean Rich just over and over again tell us

23  to stick to the reporting, and that's what I did.

24      Q.  Did you write out any notes to yourself ahead

25  of that appearance?

 1      A.  No.  I don't normally do that.
 2      **Q.  Originally Mr. Soboroff was going to deliver**
 3   **that?**
 4      A.  Right.  He was on Steven Cobair, yes, so I
 5   stepped in and did it for him.
 6      **Q.  Was that the only reason --**
 7      A.  Yes.
 8      **Q.  -- you did it instead of him?**
 9      A.  Yes.  I think that -- yes, that is the only
10   reason.
11      **Q.  Was he on Cobair related to this?**
12      A.  No.  He had just come out with a book on family
13   and child separations, and he was going on Cobair to
14   talk about his book.  It was a previously arranged thing
15   he had to do.
16              MS. MCNAMARA:  Are we getting close to a
17   break for either -- I think the food is here.  We can --
18              MS. EVANS:  Yes.  Whenever is fine with me.
19   We can go off the record.  He probably needs to change
20   the tape too.
21              THE VIDEOGRAPHER:  The time is 12:26 p.m.
22   We're going off the record.
23              (Off the record.)
24              THE VIDEOGRAPHER:  Please stand by.  The
25   time is 1:09 p.m. We're back on the record.

```
 1                    MS. EVANS:  I only have one copy of this
 2  besides mine.
 3                    MS. MCNAMARA:  Okay.
 4                    (Plaintiff's Exhibit 7 marked for
 5  identification.)
 6       Q.  BY MS. EVANS:  I'm going to hand you
 7  Plaintiff's Exhibit 7.
 8       A.  Okay.
 9       Q.  Do you recognize this document?
10       A.  I do.  Yes.
11       Q.  What is it?
12       A.  This is the policies and guidelines manual, and
13  I see this is from 2019 to 2020.
14       Q.  Do you know what date in 2020 this document
15  goes through?
16       A.  I don't.
17       Q.  Is there a new set of policies and guidelines
18  that are in effect currently?
19       A.  My guess would be yes, if -- if -- just based
20  on what I'm looking at in this document that it only
21  goes through 2020, and they would have sent out an
22  e-mail when they updated the guidelines.
23       Q.  And you would be a recipient of updated
24  guidelines?
25       A.  Yes, I would.
```

1     Q.  Are you expected to -- strike that.

2             Have you read the contents of Plaintiff's

3  Exhibit 7?

4     A.  I have.  I have to say I don't know that I have

5  -- like, when I first started NBC I read it.  I don't

6  know that I read every update.  But yes, I'm familiar

7  with it.

8     Q.  When did you start at NBC News?

9     A.  In 2017.

10    Q.  Do you know how many versions of policies and

11  guidelines you've worked under prior to this version

12  that's reflected in Exhibit 7?

13    A.  I don't.

14    Q.  Is it more than one?

15    A.  I don't know.

16    Q.  And how many additional -- strike that.

17             How many changes to the policies and

18  guidelines have you received since this version in

19  Exhibit 7?

20    A.  I don't know.

21    Q.  Is it more than one?

22    A.  I don't know.

23    Q.  Do you remember when you received the version

24  of policies and guidelines after this version,

25  Exhibit 7?

```
 1      Q.  Do you know if the policies and guidelines from
 2  this version, Exhibit 7, to the version that exists
 3  today are different?
 4      A.  If they updated it, then I would imagine it
 5  would be different.  But to my knowledge, it was not
 6  updated in a significant way that demonstratively
 7  changed our work or our standards.
 8      Q.  Do you have any recollection of changes sitting
 9  here today?
10      A.  No.
11      Q.  When it -- when the policies and guidelines
12  come out, are they predated?
13      A.  I don't know.
14          MS. MCNAMARA:  Objection to form.
15          THE WITNESS:  Yes, I don't know what that
16  means.
17      Q.  BY MS. EVANS:  So Plaintiff's Exhibit 7 shows
18  2019 to 2020.  Do you think when this came out in 2019
19  it had already said through 2020?
20      A.  I don't know.
21      Q.  Or was it reflected to indicate that it had
22  been superseded at some point or something else?
23          MS. MCNAMARA:  Objection to form.
24          THE WITNESS:  I don't -- I don't -- I don't
25  know the answer to that.
```

1      Q.  BY MS. EVANS:  Is Chris Scholl involved in

2  writing --

3      A.  I don't know who writes these.

4      Q.  No idea whatsoever?

5      A.  No idea whatsoever.

6      Q.  You don't know if they come from legal or

7  standards?  You have no idea?

8      A.  What I'm telling you is, I know that legal and

9  standards use these.  I don't know the author of this

10  document.

11      Q.  But they have to be approved by either legal or

12  standards or both?

13            MS. MCNAMARA:  Objection.

14            THE WITNESS:  I don't know.

15      Q.  BY MS. EVANS:  Who would know that?

16      A.  I don't know.  I think that I'm -- you should

17  ask someone in a management position at my company and

18  not me.

19      Q.  Would that be -- strike that.

20            Is Chris Scholl considered to be in a

21  management position?

22      A.  He certainly is in a standards position where

23  he uses this.  So, perhaps, he would know who writes

24  this.  I don't know what Chris Scholl knows.

25      Q.  And would Rich Greenberg have been considered

 1  to be in a management position prior to his retirement?

 2      A.  Yes.  He was my manager.

 3      Q.  And when did he retire?

 4      A.  Late March.

 5      Q.  Of this year?

 6      A.  Yes.  That's why the issue of who my boss is

 7  right now is a little confusing.

 8      Q.  I'm so excited to find out.  Eventually, it

 9  will be announced, right?

10      A.  Yes.

11          MS. MCNAMARA:  When we're off the record, I

12  can tell you because it's public, but I won't do that

13  now.

14      Q.  BY MS. EVANS:  I'm going to refer back to

15  Exhibit 6.  It's an e-mail chain that we marked earlier.

16      A.  Yes.

17      Q.  Actually, before we do that, just one more

18  matter.

19          (Plaintiff's Exhibit 8 marked for

20  identification.)

21      Q.  BY MS. EVANS:  I'm going to hand you and your

22  counsel what I've marked as Plaintiff's Exhibit 8, which

23  is another e-mail chain produced to us by NBCUNIVERSAL,

24  2695 to 2697?

25      A.  Yes.

1       Q.  Do you recognize this e-mail chain?

2       A.  I do.

3       Q.  What is it?

4       A.  This is -- give me one second because I've seen

5  a lot of e-mails.  I want to make sure I'm accurately --

6  so this is a copy of our article that has been published

7  online, just maybe about 30 minutes before, and Chris

8  Scholl, from standards, is saying put this into News

9  Connect.  That way, everybody in the news organization

10 can see it.

11      Q.  And that was my question.  Why was Chris

12 Scholl, if you know, saying to place this directly into

13 News Connect?

14      A.  So everyone can see it.  That's also showing

15 that he has approved of what's in it.  If he had any

16 problems with it -- yes.  He's approved of it and he

17 wants everybody to see it.

18      Q.  And did you put this into News Connect?

19      A.  I don't know.  Probably, if he asked me to.

20      Q.  Yes.  It looks like it's addressed to you?

21      A.  Yes.  So I don't know.  Also, Political Desk,

22 you see it's CC'd to NBC News Political Desk?

23      Q.  Yes.

24      A.  That means it's going out to 536 people.  So

25 oftentimes I would use the Politic's Desk as a way of --

1  it accomplishes the exact same thing as News Connect.

2  It gets out to a lot of people.

3              I would need to see this 552 e-mail.  It's

4  just I personally would like to know who I sent this to.

5  I may have sent this to the Politic's DL and then he

6  replied all, which he probably didn't mean to include

7  them, to say put it into News Connect as well.  I'm not

8  sure.  It's accomplishing the same thing, just make sure

9  everybody sees it.

10      **Q.  You said this also means that it's been**

11  **approved.  Do you mean by standards?**

12      A.  Yes.

13      **Q.  And how do you know that?**

14      A.  Because he's telling me to send it out to

15  everyone in our organization.

16      **Q.  But didn't you testify earlier that sometimes**

17  **things go into News Connect just so that everyone has**

18  **the information?**

19      A.  He would like flag that it's not reportable at

20  that point.  If somebody from standards is telling you

21  to put it into News Connect, that means that he approves

22  it.  If he had any problems with it, he would tell me at

23  that point.  And we've already been through this long

24  process with me answering his questions.  If he had any

25  problems with it, he would not tell me to go put it in

1  the News Connect.  It's also already published online.

2  If he had problems with it, he would say something

3  there, not blast it to more people.

4       **Q.  But if someone else besides -- well, strike**

5  **that.**

6            **Not just anyone saying place something in**

7  **News Connect would mean that it's approved, true?**

8       A.  Yes.  I mean, it carries more weight because

9  it's from Chris.

10      **Q.  Right.  But I mean --**

11      A.  I'd like --

12      **Q.  -- if you told someone to put something in News**

13  **Connect, that wouldn't mean that standards had approved**

14  **it?**

15      A.  No.  They would need to indicate when they

16  placed it in there that standards had approved it.

17      **Q.  And not everything that goes on News Connect,**

18  **though, is approved by standards, before it goes there,**

19  **right?**

20      A.  Right.  But you would indicate, when you place

21  it, whether it's approved by standards or not.  The

22  scenario I brought up before was if it's not approved by

23  standards, then you would have to indicate that it's

24  not.

25      **Q.  What would be the purpose of you sending**

 1  something to the Political Desk?

 2      A.  To make sure that everybody -- I do it after

 3  all of my articles, because we don't -- it's funny.  The

 4  website is really for the public.  In order to make sure

 5  my colleagues see it, I send it out so everybody can see

 6  it, so that it can be used across our platforms,

 7  including on air.

 8      **Q.  Okay.  Let's look at Exhibit 6.**

 9      A.  Okay.

10      **Q.  The e-mail chain, of course, starts at the**

11  **back.  And it all begins with an e-mail from Alana**

12  **Heller to Jacob Soboroff.**

13      A.  Yes.  She's helping him out there.

14      **Q.  What is -- what's going on in this e-mail, from**

15  **your understanding?**

16      A.  So Alana is -- from my understanding, again,

17  I'm not part of this e-mail, but it looks like Jacob has

18  conducted the interview with Dawn Wooten, and Jacob is

19  trying to figure out what pieces from the interview we

20  could -- should cut.  In other words, basically the

21  breakout, and put them on our platform so they can be

22  easily be pulled to broadcast on air.  And Alana is

23  helping him by giving him, what we would call the

24  verbate, so the verbatim of the interview.  That way --

25  I work with producers in the same way.  That way they

 1  -- other sterilizing procedures that have been conducted

 2  in the past several years.

 3            So there was a lot of -- based on this, we

 4  couldn't say that only two had been performed, because

 5  they seem to be picking over it very carefully here.  I

 6  will also say that -- you know what, not every

 7  government statement is exact.  I mean, they're

 8  continuing to investigate this.  This isn't the end all,

 9  be all.

10      Q.  BY MS. EVANS:  Did anybody at NBC -- well,

11  strike that.

12            You can't speak for everybody at NBC News,

13  but did you finish reading that paragraph, the one you

14  just started?

15      A.  Do you want me to finish reading it now?

16      Q.  I'll read it to you.  "Based on they're

17  evaluations" -- well, strike that.

18            You just read me the part about Irwin

19  County Detention Center referred two women for

20  hysterectomies to certified, credentialed medical

21  professionals at gynecological and obstetrical

22  healthcare facilities, right?

23      A.  Uh-huh.

24      Q.  Referred.  The next sentence says, "Based on

25  their evaluation, these specialists recommended

 1  hysterectomies.  These recommendations were reviewed by

 2  the facility clinical authority and approved."

 3                 Did you read that on September 15th?

 4                 MS. MCNAMARA:  Objection.  This is

 5  September 16th -- no, I'm sorry.  Correct me.  I'm

 6  sorry, it's September 15th.

 7      Q.  BY MS. EVANS:  Did you read this on

 8  September 15th when you came in?

 9      A.  Can I go back to --

10      Q.  Those last two sentences?

11      A.  I believe so because I said, "This does not

12  contradict our story, but I will reach out to ICE and

13  get the same statement."

14                 At that point I'm looking at Caitlin's

15  status.  I'm not sure if her Twitter included this

16  entire statement, but then ICE would eventually sent me

17  the statement, and I would read that.

18      Q.  Right.  And you and others at NBC News, it

19  seems, clued in on the word "referred," but seemed to

20  skip the part where everything still comes back through

21  the facility clinical authority for approval.  Do you

22  see that last sentence?

23                 MS. MCNAMARA:  Objection to form.

24                 THE WITNESS:  Yes, I see the sentence.

25      Q.  BY MS. EVANS:  So the idea that there would be

1  a medical professional out there, just performing

2  hysterectomies, one, that were for women that were not

3  referred to them, or two, that were not ultimately

4  approved by the facility, so that the facility would

5  know about it, makes no sense.

6       A.  We have been hearing from the whistleblower,

7  some pretty egregious allegations.  What ICE is telling

8  us is they're only able to pull data on what they're own

9  healthcare providers recommended or referred.  ICE has

10 not gone to Dr. Amin and looked at his records.

11      Q.  Don't you have enough information at this point

12 -- I would argue before -- but at least now, to say

13 maybe we're wrong?

14      A.  No.

15      Q.  Did you have any concerns at any point about

16 the credibility of Dawn Wooten?

17      A.  No.

18      Q.  Never?

19      A.  It was not a matter of her credibility.  We've

20 always needed more than just Dawn.  We weren't hanging

21 the whole story on her, while other news organizations

22 were.  We went above and beyond.  We also found out that

23 it wasn't just hysterectomies.  It was bruising, being

24 overly harsh, unnecessary procedures.  None of this

25 contradicts that reporting.

1        Q.  Did you tell Jacob Soboroff that you'd heard
2   mixed things about Wooten from Andrew Free?
3        A.  I did, in a text message.
4        Q.  What were the mixed things that you heard about
5   Dawn Wooten?
6        A.  I don't recall specifically, but I believe
7   Andrew was -- I don't recall specifically.
8        Q.  No idea?
9        A.  I believe Andrew was trying to say, you know,
10  continue to do this reporting, that in many cases -- no.
11  I'm just going to be speculating here.  I'm sorry.  I
12  don't know.  I don't know what the mixed things were.
13  It wasn't, like, anything too crazy.  I wasn't to the
14  point where we're going to go -- yes, I don't know.  But
15  the point is we had more than just Dawn Wooten.
16       Q.  What did you have besides Dawn Wooten?
17       A.  We had four lawyers who had clients inside the
18  facility, the doctor had a history of Medicaid and
19  Medicare fraud, and two claims of malpractice.  All of
20  this corroborated her characterization of this person.
21       Q.  Did you know -- did you know -- I know people
22  at NBC knew.  Did you know that Dr. Amin won both of
23  those medical malpractice cases?
24       A.  I can't recall if I know that -- if I knew that
25  at the time.

1    Q.  And do you know --

2    A.  If I knew that at the time, it would have -- go

3  ahead.

4    Q.  And do you know that Dr. Amin did not admit any

5  wrongdoing with regard to the settlement, which was

6  primarily against the hospital?

7    A.  He was a name in the settlement, and oftentimes

8  in settlements you don't admit wrongdoing.  It was still

9  a matter that needed to be included in this news

10  article.

11    Q.  When people get accused of wrongdoing, does

12  that makes them bad?

13    A.  No.

14    Q.  Does that --

15    A.  It makes it newsworthy.  I'm not doing articles

16  on people being bad.

17    Q.  It appears that way.  You mentioned that you

18  mentioned to Soboroff in a text message produced to us,

19  well into the evening last night -- thanks for that.

20            MS. MCNAMARA:  We produced it.

21            MS. EVANS:  Sure.  I'm sure that's true.

22    Q.  BY MS. EVANS:  Strike that.

23            Did you provide --

24            MS. MCNAMARA:  We're not going to strike

25  that.

```
 1                   MS. EVANS:  No.  I thought I had started a

 2    question.  No, you don't have to -- I don't want you to

 3    strike what I said.  I don't believe that.

 4         Q.  BY MS. EVANS:  Did you provide any text

 5    messages to counsel in the last week?

 6         A.  Yesterday.

 7         Q.  What time?

 8         A.  We were -- yesterday afternoon.

 9         Q.  What time?

10         A.  I don't remember the exact time.  We finished

11    up around five, so it was probably -- it was really

12    soon.  It was like within 30 minutes of getting it to

13    y'all.  It was probably around 3:00 or 3:30.

14         Q.  You came in to meet with lawyers and shared

15    e-mails with them at the end of the meeting?

16         A.  So we were going through --

17                   MS. MCNAMARA:  Objection.  I instruct her

18    not to answer.  I can make a represent for the record,

19    that we received the text messages.  We didn't receive

20    e-mails.  We received text messages that -- that she

21    had.  We obtained them from her yesterday, and at the

22    meeting we produced them to you within hours of

23    receiving them.

24                   The timeline between when she provided them

25    to us and when we produced them was to have them
```

 1  reviewed and redacted for information that was not

 2  relevant.

 3              MS. EVANS:  Hours.  When you knew I was

 4  getting on a plane to come here and they were produced

 5  me to when I already left the office, not even --

 6              MS. MCNAMARA:  I produced them to you when

 7  I became aware of them.

 8              MS. EVANS:  Within hours?

 9              MS. MCNAMARA:  Within hours.

10              MS. EVANS:  I'm just making sure the record

11  is clear.  Within hours of a deposition that started

12  less than 12 hours later.

13      **Q.  BY MS. EVANS:  All right.  You mentioned in**

14  **this exchange with Jacob --**

15      A.  I'm sorry, can I get more water?

16              THE VIDEOGRAPHER:  Sure.

17              THE WITNESS:  Thank you.

18      **Q.  BY MS. EVANS:  You mentioned to Jacob that The**

19  **Intercept had spoke with detainees, right?**

20              MS. MCNAMARA:  Objection.

21  Mischaracterization.

22              THE WITNESS:  Could I see the --

23      **Q.  BY MS. EVANS:  I can't because I can't print**

24  **things when I'm on a plane.**

25      A.  Can I pull them up on my phone?

```
 1                    MS. MCNAMARA:  We produced The Intercept to
 2  you.
 3                    MS. EVANS:  I'm asking her who she thought
 4  The Intercept spoke to.
 5                    THE WITNESS:  I don't know who they spoke
 6  to.  I must have just looked at the article that they
 7  wrote.
 8       Q.  BY MS. EVANS:  And you also note that Chris
 9  Hayes spoke to an additional lawyer, right?
10       A.  I must have.  If that's what you're saying,
11  I'll take your word for it.
12       Q.  Who is the additional lawyer that Chris Hayes
13  talked to?
14       A.  I don't know.
15       Q.  Didn't, in fact, Chris Hayes just talked to one
16  of the lawyers that you'd talked to?
17       A.  I don't know.
18       Q.  Y'all don't talk to each other?
19       A.  No.  I was talking to -- I was communicating
20  with Luciana, who is on his team.
21                    MS. EVANS:  Could we take a break and I'll
22  print it?
23                    MS. MCNAMARA:  Sure.
24                    MS. EVANS:  Because I want to make sure I
25  understand who is saying which side in this
```

1  think I know who that is.

2      Q.  **After Jacob refers to the lawyers, he says,**

3  **"Okay.  Spoke with her."**

4      A.  Yes.  That must mean Dawn.

5      Q.  **So he talked to her that night prior to the**

6  **interview?**

7      A.  Maybe.  Okay.  So that's right, because he

8  would have interviewed her in the morning.  So that --

9  just taking this in context, it must be that he is going

10  to talk to the lawyer at 9:00 p.m.  He did talk to her

11  at 9:00 p.m. my time.  And then it said spoke with her.

12  And then they're going to talk about this whistleblower

13  complaint.  So he's talking about the lawyer, not Dawn.

14      Q.  **Okay.  A Georgia female lawyer?**

15      A.  It must be.  Yes.

16      Q.  **And then you asked, "Anything to it."  And he**

17  **writes back, "Doesn't sound like they have much beyond**

18  **the complaint, which is the whistleblower's account."**

19      A.  Yes.

20      Q.  **Down at the bottom, you say, "What do you think**

21  **about sending a note to standards?"  What would that**

22  **mean?**

23      A.  So that's the next day, and at this point,

24  we're the seeing other news organizations report this.

25  So I -- well, let me finish reading what I'm saying.

1  "And they can make a decision about whether to wave

2  people off, until we have more reporting."  So in other

3  words, he says -- this is -- I think this is before he

4  interviews Dawn.  Let me see.  Let me see at what time

5  he interviews Dawn, because I'm trying to figure out

6  what I'm responding to because --

7         Q.  **He finishes up with Dawn around 11:15, I think.**

8         A.  Okay.  So it looks like, you know, he's saying,

9  "I've got the whistleblower's complaint.  They don't go

10 a lot beyond that," means it's harder to prove.  And I'm

11 saying why don't we let standards decide this, because

12 we -- a lot of people are going to be asking us about

13 this, as other news organizations are reporting it.  So

14 why don't we send it in to standard saying, here's what

15 we've learned so far, and standards can decide whether

16 -- because if we decide -- if standards decides

17 something shouldn't be reported, then they can send out

18 a note to the news organization saying, "Yes, we know

19 all of these news organizations are reporting this, but

20 here's why were not."  So we're basically trying to say,

21 let's let standards decide where we fall on reporting

22 other media news organization's reporting.

23        Q.  **And ultimately, you didn't let standards**

24 **decide, did you?**

25              MS. MCNAMARA:  Objection to form.

```
 1              THE WITNESS:  (Witness reading out loud.)
 2      Q.  BY MS. EVANS:  I'm not referring to Exhibit 17
 3  at this point.  I'm saying overall --
 4      A.  I don't.
 5      Q.  -- scholl is telling you guys, "I don't think
 6  we have it."
 7      A.  So this is a separate conversation.
 8      Q.  I'm not asking you about that.  You said at
 9  least on September 15th in the morning, you're saying
10  standards should decide?
11      A.  That's before we done any of our own reporting.
12  He hadn't talk to Dawn.  I hadn't talked to the lawyers.
13      Q.  How does that change?  Why isn't -- why isn't
14  there some deference on your part to the skepticism
15  coming from standards?
16      A.  There was -- standards didn't even know about
17  this at this time.
18      Q.  I'm not talking about that anymore.
19      A.  So I think you would have to explain to me what
20  you mean by skepticism coming from standards.
21      Q.  It seems to me that Charles Scholl -- not
22  Charles Scholl.  I've dated somebody named Charles
23  Scholl.  Here's -- Christopher Scholl, in standards, is
24  expressing concern, throughout the day --
25      A.  It's --
```

1      Q.  Let me finish.  Why not take some of that to

2  heart, where maybe we shouldn't be rushing so fast just

3  because everybody else is?  That's what you're sort of

4  saying in the morning, why did that change?

5      A.  There's --

6              MS. MCNAMARA:  Objection.

7  Mischaracterization.

8              THE WITNESS:  That's a mischaracterization.

9  In the morning, other people are doing this.  Maybe

10  let's let standard decide later, what -- the

11  conversations we were having with Scholl, about what

12  we're going to, what we're going to put our name on.

13  And that is his job.  Standards is devil's advocate.

14  We're supposed to have this back and forth.  They're

15  supposed to ask questions.  He said, "Look, I -- we're

16  going to base this on one whistleblower."  So then we go

17  above that.  He raised the bar.  We met the bar.  And

18  you can see at the end, he's approving of it.  He's

19  saying put this directly into News Connect, and I agree.

20  It says responds back to Mark after he adds in what he

21  wants him to add.

22              So Chris ultimately agrees.  There's no --

23  I am not going around Chris.  He's raising the bar, and

24  I'm meeting it.  He's doing his job, and I'm doing mine.

25      Q.  BY MS. EVANS:  Earlier today, you testified --

 1   strike that.

 2               Earlier today, you testified that it wasn't

 3   just Dawn Wooten?

 4       A.  Yes.

 5       Q.  It was conversations y'all were having with

 6   lawyers, acknowledging that they came after the Project

 7   South letter.  But then you said there's all these other

 8   news organizations, credible news organizations are

 9   reporting it?

10       A.  Right.

11       Q.  And that was support for you to keep going,

12   right?  That's what you were telling me earlier.  That

13   was part of the support for you to keep going?

14       A.  Yes.

15       Q.  But in the morning, on September 15th, other

16   news organizations were going too, and you were like it

17   needs to be up to standards?

18               MS. MCNAMARA:  Objection.

19   Mischaracterization.

20       Q.  BY MS. EVANS:  What's wrong about that?  What

21   did I get wrong?

22       A.  So other news organizations were going to

23   continue to report this, and I'm saying do we want to

24   let standards decide how we characterize other people's

25   reporting.  That's not going to affect the reporting

```
 1  that we do, and I believe that's the reporting we're

 2  talking about here.  We're not talking about the

 3  reporting of other news organizations or how we

 4  characterized their reporting before we did our own.

 5      Q.  And did you ultimately do that?

 6      A.  Send the note to standards about other news

 7  organizations --

 8      Q.  Yes.

 9      A.  -- reporting?

10          It doesn't appear -- I don't have any

11  e-mails that show I did.  But, you know, at that point,

12  Daniella had pulled from the Associated Press.  It looks

13  like they were in a place where they felt comfortable

14  with it.

15      Q.  There was a question about whether her story

16  was --

17      A.  Right.  That's true.  That's true.

18          (Witness reading out loud.)

19          Okay.  Then Micah Grimes is saying, "Hey,

20  everybody's got this.  Hit got canceled."

21      Q.  Who is Micah Grimes?

22      A.  He is someone who's no longer with the company,

23  but he used to flag things to reporters on their beats,

24  that other people were doing.  He's the kind of person

25  you can e-mail him, sometimes and you be like, what did
```

1  I miss, you know, because there's always going to be
2  someone else on your beat that another news organization
3  is doing, and he will want to flag it.  That was his
4  job.
5      Q.  A simple note, is that a term of art?
6      A.  No.  I don't know what I meant by simple note.
7          MS. MCNAMARA:  That's not your words;
8  that's Jacob's.
9          THE WITNESS:  Just sort of simple note that
10  you must mean short.  It's not like a term we use.
11     Q.  BY MS. EVANS:  On the page that ends in 3150,
12  it's hard to tell what time this is, but do you see
13  messages from Jacob Soboroff saying, "Was able to reach
14  one of two" --
15     A.  Yes.
16     Q.  -- "to have something usable"?  Who is --
17     A.  So that's when we -- I sent him two lawyers.
18  That was probably Mathren and Owings, Sarah Owings.
19     Q.  Owings?
20     A.  Owings.  So he's reaching one of two.  That
21  would be my guess, based on the timing.
22     Q.  The next page, 3157 at the top.
23     A.  Five, seven?
24     Q.  I'm sorry?
25     A.  I'm sorry.  That's not the next page, but you

```
 1                   -       -        -

 2                 CERTIFICATE OF REPORTER

 3

 4            STATE OF GEORGIA)

 5                           )

 6            COUNTY OF DEKALB)

 7

 8            I, TAMIKA M. BURNETTE, hereby certify

 9   that the foregoing proceedings were taken before me at

10   the time and place therein designated; that a review of

11   the transcript was requested, and that the foregoing

12   pages numbered 1 through 268 are a true and correct

13   record of the aforesaid proceedings.

14            I further certify that I am not a relative,

15   employee, attorney or counsel of any of the parties, nor

16   am I a relative or employee of any of the parties'

17   attorneys or counsel connected with the action, nor am I

18   financially interested in the action.

19

20            DATED this 5th day of May, 2023

21            _____

22                 TAMIKA M. BURNETTE

23            CERTIFIED COURT REPORTER, RPR, CSR-2870

24

25
```

**Julia Ainsley Deposition Errata**
*Amin v. NBCU* **(21-cv-00056)**

| Page/Line No. | Change | Reason for Change |
|---|---|---|
| 14:13 | "Today's show" should be "the Today Show" | Typographical error |
| 25:8 | "kids" should be "can't" | Incorrect transcription |
| 27:4 | "always" should be "also" | Incorrect transcription |
| 27:9 | "and" should be "in" | Incorrect transcription |
| 33:3 | "certainly" should be "certainty" | Typographical error |
| 47:22 | "Heikkila" should be "remotely" | Incorrect transcription |
| 41:19 | "light" should be "line" | Incorrect transcription |
| 51:16, 51:18 | "Porches" should be "Porges" | Typographical error |
| 52:9 | An ellipsis should be placed after "It depends on…" Strike "its uniform" | Incorrect transcription |
| 52:15 | "where lawyers answers to standards" should be "it goes to our lawyers and standards" | Incorrect transcription |
| 53:9 | "would" should be "wouldn't" | Incorrect transcription |
| 62:4 | "deal" should be "DL" | Incorrect transcription |
| 63:5 | "nesorganizations" should be "news organization" | Typographical error |
| 66:2 | "organization" should be "organizations" | Typographical error |
| 67:17 | "haven't" should be "have" | Incorrect transcription |
| 69:10 | "Zander" should be "Xander" | Typographical error |
| 73:19 (and throughout) | "Haze" should be "Hayes" | Typographical error |
| 85:20 | "windle" should be "winnow" | Incorrect transcription |

| Page/Line No. | Change | Reason for Change |
|---|---|---|
| 89:13 | "standard" should be "standards" | Typographical error |
| 90:22 | "tell" should be "tells" | Typographical error |
| 91:4 (and throughout) | "Cobair" should be "Colbert" | Typographical error |
| 98:25; 99:5 | "Politic's" should be "Politics" | Typographical error |
| 102:17 | "Burrow" should be "Bureau" | Incorrect transcription |
| 114:25 | "for" should be "of" | Incorrect transcription |
| 118:16-17 | "National News" should be "national news" | Typographical error |
| 139:1 | "image" should be "imagine" | Incorrect transcription |
| 142:19 | "say" should be "see" | Incorrect transcription |
| 146:13 | "bright crown" should be "bread crumb" | Incorrect transcription |
| 153:10 | Strike "a" before "unusual" | Typographical error |
| 154:10 | "standard's" should be "standards" | Typographical error |
| 158:10 | "5:42 pm" should be "5:24 pm" | Incorrect transcription |
| 164:12 | Strike "can" after "don't" | Typographical error |
| 176:9 | "we'r" should be "we're" | Typographical error |
| 186:18 | "represent" should be "representation" | Incorrect transcription |
| 197:14 | "standard" should be "standards" | Typographical error |
| 197:22 | "organization's" should be "organizations'" | Typographical error |
| 199:10 | "standard" should be "standards" | Typographical error |
| 208:1 | Add closed quotation mark after "referrals" | Typographical error |

| Page/Line No. | Change | Reason for Change |
|---|---|---|
| 208:2 | Add open quotation mark before "did" | Typographical error |
| 220:8 | "it" should be "at" | Incorrect transcription |
| 223:10 (and throughout) | "Zander" should be "Xander" | Typographical error |
| 226:14 | "Luciano" should be "Luciana" | Typographical error |
| 230:18 | "with" should be "what" | Incorrect transcription |
| 233:23 | "people that he was rough" should be "people **said** that he was rough" | Incorrect transcription |
| 240:12 | "give" should be "gave" | Typographical error |
| 243:18 | "give" should be "gave" | Typographical error |
| 251:2 | "ICE's" should be "VICE's" | Incorrect transcription |
| 251:17 | "contradicts ICE's reporting" should be "contradicts VICE's reporting" | Incorrect transcription |
| 251:19 | "ICE's" should be "VICE's" | Incorrect transcription |
| 251:23 | "I don't know if saw ICE" should be "I don't know if I saw VICE" | Incorrect transcription |
| 252:22 | "contradicts ICE's" should be "contradicts VICE's" | Incorrect transcription |
| 254:5 | "statements" should be "statement" | Typographical error |
| 256:18 | "Standard" should be "Standards" | Typographical error |
| 260:17 | Strike "a" before "approved" | Typographical error |