Declaration of

Elizabeth McNamara

Exhibit 31

**DR. MAHENDRA AMIN, M.D. vs NBCUNIVERSAL MEDIA, LLC.**
**Christopher Scholl on 07/12/2023**

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF GEORGIA
 2   -------------------------------------------------x

 3   Dr. Mahendra Amin, M.D.

 4            Plaintiffs,              Case No.
                                       5:21-CV-00056-LGW-BWC
 5        vs.

 6   NBCUNIVERSAL MEDIA, LLC

 7            Defendants.

 8   -------------------------------------------------x

 9

10

11

12        VIDEOTAPED DEPOSITION OF CHRISTOPHER SCHOLL

13

14                   1251 Sixth Avenue

                     New York, New York
15

16              Wednesday, July 12, 2023

17                      9:37 a.m.

18

19

20

21

22

23

     Reported By:
24   Cheryll Kerr, CSR
     Job No. 131324
25
```

```
 1        A.    But I'm -- I'm -- I'm sorry.  I'm not
 2   positive on how many times we've met, so I can't
 3   remember exactly, but I know we had a meeting last week.
 4   It lasted -- I don't know how long that lasted either.
 5   I didn't really keep a clock.
 6        Q.    More than an hour?
 7        A.    I think about an hour or more, yeah.
 8        Q.    And when was the next meeting?
 9        A.    If it's the next in sequence, it would have
10   been yesterday.
11        Q.    And how long was that meeting?
12        A.    It was ...
13              (Pause.)
14              THE WITNESS:  I don't remember the exact
15          time we met.  I think it was about 10:30 to
16          4:30 or something like that.
17              (Pause.)
18   BY MS. EVANS:
19        Q.    Did you look at documents at both meetings?
20        A.    At the last two, yes.
21        Q.    So when was the third one?
22        A.    I believe that was the third.  If there -- if
23   there was -- if there were three.  I don't remember.
24        Q.    The last one was yesterday.
25        A.    Yeah.
```

1      Q.      There was one last week?

2      A.      Right.

3      Q.      Was there another one that you recall?

4      A.      I can't remember if there was another one

5   before that.  I'm not sure.

6      Q.      Did you look at documents at both meetings

7   that you recall?

8      A.      I recall -- I looked at documents last week

9   and this week.  That's sort of what I remember.

10      Q.      Were the documents chosen for you or did you

11   ask to see certain documents?

12      A.      They were chosen for me, but I would

13   occasionally ask for guidance in terms of where

14   something could be found.

15      Q.      Did you look at documents outside of these

16   meetings with counsel?

17      A.      No.

18      Q.      And what counsel were present at the

19   meetings?  And if they were different, you can tell me

20   that.

21      A.      The people that are here right now.

22      Q.      Your current job title is deputy head of

23   standards?

24      A.      It's senior deputy head of standards.

25      Q.      What was your job title at the time of

 1   September 2020?

 2        A.    I believe deputy head of standards.

 3        Q.    **What's the difference between senior deputy**

 4   **head and deputy head?**

 5        A.    Well, it -- it's -- it's -- it's a step up --

 6   you know.

 7        Q.    **Are your job duties different now --**

 8   **different now than they were then?**

 9        A.    No.  When you say "job duties," my duty in

10   standards has always remained the same.  Subject matter

11   varies year to year.  Sometimes I end up doing this or

12   that and different things like that.

13        Q.    **But the change in title didn't change the**

14   **basic duties that you do in your job in standards?**

15        A.    I may -- no.  Possibly I have more to say on

16   the management side of the team.

17             (Pause.)

18   BY MS. EVANS:

19        Q.    **What is the purpose of standards?**

20        A.    Standards is made up of veteran journalists,

21   experienced people who we spend our time and our focus

22   on making sure, to the extent we can, that our

23   journalism is of the highest possible standard.

24        We want to make it accurate, fair, and transparent,

25   and those are the sort of three core principles.  We're

 1   not fact checkers, but we are the people who ask a lot

 2   of questions and hard questions, and that's our job ...

 3   during the process of reporting.

 4        **Q.    Does every story that appears on air have to**

 5   **go through standards?**

 6        A.    No.

 7        **Q.    How is it decided which ones do and which**

 8   **ones don't?**

 9        A.    When a story is in the news and we can

10   anticipate that there will be issues surrounding that

11   story -- you know, it would be a story that is worth a

12   set of -- an extra set of standards eyes, we will

13   usually call for a script or digital stories, say, send

14   them out for review.

15        We'll put out a morning note or other notes during

16   the day, and we will call for those scripts to be sent

17   to us for review.  Sometimes we don't see those stories

18   coming.  We see them at the last minute.

19        Somebody says, "Here's our plan for the show

20   tonight.  What do you think?"  And we say, "Sure, we'll

21   take a look at that" and there are -- then there are

22   stories where people simply come to us because they

23   recognize that it's important to have a set of standards

24   eyes on a script.

25        **Q.    For the story surrounding the Irwin County**

 1   Detention Center, the journalists or reporters that were

 2   involved, at least one or more of them came proactively

 3   to standards from the beginning; is that right?

 4       A.   That's my recollection, yeah.

 5       Q.   So for the Irwin County Detention Center

 6   stories, standards was involved essentially from the

 7   beginning?

 8       A.   That's my recollection, except that as -- as

 9   I recall, it broke as a sort of a breaking news story.

10   We don't --

11       We don't tend to -- we don't generally get

12   involved.  If somebody holds a press conference or

13   something like that, it's just breaking news.  It's not

14   something that we are -- we don't routinely get involved

15   in that kind of coverage.

16       We step in later in generally -- in terms of

17   stories that are -- that might be more complicated or

18   might provide -- might -- might require guidance on how

19   to do better reporting, more thorough reporting.

20       Q.   Do you consider the Irwin County Detention

21   Center matter -- do you consider that to be breaking

22   news?

23       A.   It was breaking news initially, and in that

24   way, it was not something that we would typically

25   review, but it became -- as we looked into it, as our

1  reporters looked into it, they were furthering the

2  story.  They were digging into it more.

3       And at that point, as soon as we start to dig into

4  a story more and we discover various things along the

5  way, it emerged as a story of -- of interest to

6  standards.

7            (Pause.)

8  BY MS. EVANS:

9       Q.   **The breaking part of the story was --**

10      **Would you consider that to be the Associated Press**

11 **story that came out early that morning?**

12      A.   Well, it wasn't their -- I mean, yes.

13      It was -- it was the -- it was the public nature of

14 the story of interest to various news organizations.

15           (Pause.)

16 BY MS. EVANS:

17      Q.   **Who -- at the time of September 2020, who**

18 **made up standards, people-wise?**

19      A.   Who or how many?

20      Q.   **How many?**

21      A.   I don't actually know the answer to either of

22 those, when people were hired precisely.

23      I think it was about eight or nine people at that

24 time.

25      Q.   **Has that changed since September 2020?**

1      A.    We're a larger team now.  I believe we have

2   about 14 people.

3      **Q.    What was the reason for the -- the increase?**

4      A.    I hired some people.  As -- as our -- as our

5   news platforms have expanded now to the NBCUniversal

6   News Group, we have adjusted to make sure we are

7   covering that much larger portfolio, is the bottom line.

8           (Pause.)

9   BY MS. EVANS:

10     **Q.    More stories go through standards now than**

11  **did in September 2020?**

12     A.    It's not that -- yes.  I mean, the volume is

13  greater, but it's not that different stories are going

14  through.  It's just that different platforms are

15  contributing different material.

16     **Q.    Who, to the best of your recollection, was**

17  **part of standards in September 2020?**

18     A.    It would have been Marian Porges, me.  Let's

19  see.  Steve Thode, Mary Lockhart, Susan Sullivan, Robin

20  Gradison, Jason Cumming.  Mirta Ojito -- she works at

21  Telemundo.

22     I'm not sure who, beyond that, at that time.  There

23  may have been others.

24     **Q.    Was Marian --**

25             MS. EVANS:  Strike that.

```
 1                   (Indistinguishable crosstalk.)
 2    BY MS. EVANS:
 3         Q.    Marian Porges was head of standards in
 4    September 2020?
 5         A.    She was.
 6         Q.    Was she involved in the review or discussions
 7    regarding Irwin County Detention Center stories?
 8         A.    Not that I recall.
 9         Q.    Steve Thode was, true?
10         A.    Yes.
11         Q.    Mary Lockhart was, true?
12         A.    I don't know.  I know that at one point, I --
13    I ... was going to loop her in and have her take over
14    for me at a certain time of day, but I don't know
15    whether she ever had any involvement.
16         Q.    She was copied on emails?
17         A.    She -- yes.
18               (Pause.)
19               THE WITNESS:  Some emails.
20    BY MS. EVANS:
21         Q.    What about Susan Sullivan?
22         A.    Susan had no involvement in this story that I
23    can recall.
24         Q.    What about Robin Gradison?
25         A.    The same.
```

```
 1                    THE WITNESS:  Standards guidance.
 2   BY MS. EVANS:
 3        Q.    Do you recognize it as such?
 4        A.    Yes.
 5        Q.    On this one, it went out on September 17th at
 6   7:42 a.m.  Do you see that?
 7        A.    Yes.
 8        Q.    And it says "Until 10 a.m., looks like talk
 9   to Jason.  After 10, please use the DL."
10        Do you see that?
11        A.    Yes.
12        Q.    Why the difference from Exhibit 91 -- or from
13   Exhibit 20 to Exhibit 91?
14        A.    I don't know.  I would imagine that we had a
15   particular issue due to somebody's schedule in terms of
16   having them cover MSNBC day side full-time that day.
17        So it appears we didn't have anybody designated to
18   MSNBC day side that day and that we would sort of cover
19   it with the DL.
20        Q.    Were there other emails like this that would
21   go out later in the day?
22        A.    At that time, it was on an occasional basis.
23   If a particular standards person wanted to communicate
24   to the platform or shows that they work with, they
25   always have the opportunity to write an email and convey
```

 1  additional guidance.

 2      So, for example, the MSNBC prime shows sometimes

 3  get a particular note -- you know, as the day goes on,

 4  but that's not as kind of formalized a process.

 5            (Pause.)

 6  BY MS. EVANS:

 7      Q.    In your preparation for your deposition, did

 8  you see any --

 9               MS. EVANS:  Strike that.

10  BY MS. EVANS:

11      Q.    Did you see Exhibit 91 in preparation for

12  your deposition today?

13      A.    If I did, I didn't notice the DL.

14      Q.    What about Exhibit 20?

15      A.    Exhibit 90?

16               MS. McNAMARA:  20.

17  BY MS. EVANS:

18      Q.    20.  It's previously marked.

19      A.    Oh.  I'm sorry.  Okay.

20      Again -- I mean, it looks like every other note we

21  send out.

22      Q.    Do you recall seeing any notes sent out later

23  in the day on September 16th or September 17th similar

24  to these two?

25      A.    It -- it -- no.  I don't recall any, no.

1     Q.    How does someone who's working on a story --

2     whether that's a reporter or an investigator, whoever

3     needs to know -- how -- how do they know when --

4                 MS. EVANS:  Or strike that.

5     BY MS. EVANS:

6     Q.    How do you characterize when standards has

7     approved or cleared?  How do you speak to that?

8     A.    You mean after we've reviewed a story and

9     we've said, "This is okay for air or publishing"?

10    Q.    Sure, we can start with that.

11    A.    We tell them that.

12    Q.    So it's a verbal conversation?

13    A.    It's verbal or in an email chain.  Most

14    stories are a mix of the two.

15    Q.    What is News Connect?

16    A.    News Connect is a system that was set up some

17    years ago, fairly recently, within the last five,

18    six-something years.  I don't know.  It -- it's a --

19    it's essentially an in-house platform in which various

20    stories are tracked.

21        Reporters and producers can contribute information

22    to those stories in a particular bin.  It's -- and then

23    various people in the news group can then follow those

24    stories to stay up to speed on the latest developments

25    on that story.

1      Q.    Does standards indicate that a story is

2   cleared or approved in News Connect?

3      A.    No.

4      Q.    Do individuals within the NBCUniversal

5   umbrella have to get permission to post things in News

6   Connect?

7      A.    They should.

8      It is not unheard of that we have to, in standards,

9   ask somebody to put it in.

10     Q.    But can individuals put it in on their own

11   before standards has had a chance to review it, if it's

12   a story that standards is interested in?

13     A.    That should not happen.

14     Q.    Because once it goes --

15           MS. EVANS:  Or strike that.

16   BY MS. EVANS:

17     Q.    When information goes into News Connect, is

18   that an indication to the news organization that you can

19   use this information?

20     A.    No.  No.

21     Q.    So how do people know the difference between

22   what's in News Connect that can't be used and what's in

23   News Connect that can be used?

24     A.    So I think you -- you -- there's a

25   distinction here.  One is that what you're talking about

```
 1   is having a story go into News Connect.  A story that

 2   goes into News Connect that has been reviewed by

 3   standards should only go into News Connect if standards

 4   is comfortable with that, right?

 5        That is, in a sense, an internal publishing

 6   platform, and I treat it with the same weight that I

 7   would treat publication anywhere.

 8        So information, however, goes into News Connect all

 9   the time.  That's the principal bucket where people

10   provide information that may be reportable or

11   unreportable.  It should be clearly marked.  Sometimes

12   it's tips and leads.

13               (Pause.)

14               THE WITNESS:  But that's a system set up

15          for information sharing.

16   BY MS. EVANS:

17        Q.   I'm going to hand you and your counsel what

18   I'm marking as Exhibit 92.

19               (Thereupon, a document was marked by the

20          shorthand reporter as Exhibit 92 for

21          identification.)

22   BY MS. EVANS:

23        Q.   Is this an example of something in News

24   Connect?

25               (Pause.)
```

```
 1              THE WITNESS:  I mean, I -- I don't know

 2         whether this was in News Connect.  I don't

 3         know where this went.  It sort of appears that

 4         way.  I don't recognize the formatting

 5         (indicating).

 6  BY MS. EVANS:

 7      Q.    This format is not something that you

 8  recognize as News Connect?

 9      A.    It -- it -- it's unclear to me.

10      Q.    What does News Connect -- what does a News

11  Connect entry look like?  Describe it for me.

12      A.    Well, I guess I've only seen it on a

13  computer.  It looks like you're looking at it in News

14  Connect.  This appears to be text which could have gone

15  into News Connect that way.  The "created by" sort of

16  indicates to me it was in News Connect.  I just can't

17  tell you with absolute certainty.

18      Q.    If I give you a piece of paper, could you

19  draw what News Connect looks like?

20      A.    Sorry.  I laughed out of sequence.

21  I don't -- I can -- I can try.  I would need a pen.

22              MS. EVANS:  Mark this as Exhibit 93.

23              (Thereupon, a document was marked by the

24         shorthand reporter as Exhibit 93 for

25         identification.)
```

1            THE WITNESS:  Might be incredibly lousy.

2            (Pause.)

3            MS. EVANS:  For the record, I asked the

4        witness to draw, as best as he can, what News

5        Connect looks like when he uses it, and that's

6        what is reflected on Exhibit 93.

7   BY MS. EVANS:

8        Q.    This says "Story Labels"?

9        A.    It would be story title, which if this were

10  from News Connect, this particular document, 92, it

11  would be that standards "read inside" thing.  That's

12  sort of strange language, but -- but in any case, that

13  would be essentially the -- the story line or post line.

14  It's -- let me -- let me explain.

15       We track stories, right?  So every story will have

16  some subject line that gave it -- you know, a slug,

17  essentially, for that story.

18       Within that story, there will be posts, not too

19  dissimilar from social media in some ways, except

20  internal, obviously.

21       And so if you were looking at the page of a story,

22  you would see the story slug at the top.  You will see,

23  below that, various posts that are people's updates to

24  that story, and they would be labeled if there are

25  reasons to label them.  Plaques, essentially.

1        Q.     And what would be reasons to label?

2        A.     So, for example, we have -- we have the term

3    "cleared," which is a copyright term, typically.  It

4    means -- it typically refers to video and the rights

5    have been obtained for a piece of video or still images.

6        It may have the flag that says "standards," which

7    means that -- that we have issued guidance and attached

8    it to that post or to the story itself.

9        Q.     And so --

10       A.     There are others.

11       Q.     What are some others?

12       A.     I don't -- we've changed them through the

13   years, so I can't tell you exactly, but I believe we

14   would have had a "not reportable."  We would have

15   definitely had a "do not use."

16       The terminology has changed somewhat through the

17   years.

18       Q.     In Exhibit 92, at the top, assuming that this

19   is News Connect -- that's what's been represented to me

20   that these are News Connect entries.

21       You see "standards" at the top?  Is that what

22   you're talking about when you say sometimes there will

23   be a flag to standards?

24       A.     No.  We -- it's very difficult to tell.  This

25   is strangely -- what -- what I would say is it's not

```
 1                     (Thereupon, a document was marked by the

 2              shorthand reporter as Exhibit 94 for

 3              identification.)

 4    BY MS. EVANS:

 5         Q.    I'm going to hand you and your counsel what

 6    I'm marking as Exhibit 94.  Take a moment to take a look

 7    at that.

 8         I'm just putting this back so it doesn't get

 9    separated from the pack.

10         A.    Okay.

11                     (Thereupon, an informal discussion was

12              held off the record.)

13                     (Pause.)

14    BY MS. EVANS:

15         Q.    You testified earlier that --

16                     MS. EVANS:  Strike that.

17    BY MS. EVANS:

18         Q.    You testified earlier that in News Connect,

19    you could have a story or you could have -- I think you

20    said tips and -- what was it?  Tips and --

21         A.    Information.

22         Q.    Tips and leads?

23         A.    Right.

24         Q.    Exhibit 94 -- is that an example -- at least,

25    the second part of that where it says "Lawyers allege
```

1    abuse of women by gynecologist for ICE Detention

2    Center" -- is that an example of a story being posted in

3    News Connect?

4        A.    Yes.

5        Q.    And this Exhibit 94 indicates created by

6    Julia Ainsley, 9/15/2020, and it looks like military

7    time 2152.

8        Do you see that?

9        A.    Yes.

10       Q.    And that would be 9:00, 9:52 p.m.?

11       A.    Yes.

12       Q.    Are you aware of any story being posted in

13   News Connect prior to 9:52 p.m. on September 15, 2020?

14       A.    No.

15       Q.    Is that surprising?

16       A.    Not to me.

17       Q.    Why not?

18       A.    When a story goes into News Connect, it means

19   we've --

20       If standards was involved in a story, it means the

21   story will have gone through us and it's typically going

22   in so that we can attach guidance, which is what's

23   happening here.

24       In other words -- it's a little bit complicated to

25   explain.  We can attach guidance to a story itself.

 1   Let's say the story is, in broad terms (indicating), Dr.

 2   Amin or these allegations, right?  So let's say that's

 3   the story.

 4        People can post in there hey, I've got -- I've

 5   got -- you know, a picture of Amin from a particular

 6   location.  Can we use it?  We've got these different

 7   elements, right?  So visual elements sometimes, social

 8   media posts from lawyers involved, whatever they may be.

 9   They may go in as different posts.

10        If it's a story, then this is a story that is --

11   that has gone through standards review, has been

12   published, and -- and in order to provide guidance on

13   that -- on that -- excuse me.  I'm using the wrong term.

14        If we've got a big, broad story, and there are many

15   different elements to it -- you know, as I said, social

16   media posts and the like -- this would maybe go in as a

17   separate element, right?  It's a separate post within

18   the story overall, but it is a detailed -- you know,

19   write-up that has been published.

20        It is a good platform for us then to attach

21   standards guidance, so that as soon as we then flag

22   that -- we put the standards label on -- the entire

23   thing that you're seeing here would go out to the news

24   group on their emails.

25        Unless you've opted out, it's distributed to a

 1   large platform.  It's the best way for us to communicate

 2   our standards across the news group.

 3                  (Pause.)

 4                  THE WITNESS:  So to answer your question,

 5            I'm not surprised that a story goes -- there's

 6            no particular schedule.  It happens that if we

 7            feel guidance is important, we can ask at any

 8            time, put your story in News Connect itself so

 9            we can attach guidance.  My guess is that's

10            happened here.

11   BY MS. EVANS:

12       **Q.    Did standards approve the story that's**

13   **reflected in Exhibit 94?**

14                  (Pause.)

15                  THE WITNESS:  I was working throughout

16            the process on this story.  I'd had

17            conversations -- multiple conversations --

18            about this story throughout the day.

19                  So at the end of the day, I was entirely

20            comfortable with the story.

21   BY MS. EVANS:

22       **Q.    When you say "at the end of the day," what**

23   **is --**

24       A.    Well, I don't mean -- I'm sorry.  I don't

25   mean at the end of the day chronologically.  I mean I

 1   was comfortable with everything reported in this story.

 2       Q.    Was --

 3                  MS. EVANS:  Strike that.

 4   BY MS. EVANS:

 5       Q.    Was the story reflected in Exhibit 94

 6   approved by standards?

 7       A.    The -- the content and the write-up is

 8   language that I had seen and was comfortable with.

 9       Q.    Was it approved?

10                  MS. McNAMARA:  Objection, asked and

11            answered.

12                  You can answer the question again.

13                  THE WITNESS:  Yeah.  I mean, I considered

14            it --

15                  I considered the information in here and

16            the write-up approved.

17   BY MS. EVANS:

18       Q.    Well, you told me earlier that "reportable"

19   and "approved" -- those are terms that standards uses to

20   indicate that a story's approved, right?

21       A.    We don't use the term "approved" that often.

22   We say something's "reportable."

23       When we're working through a story or a script,

24   whatever it may be -- language is sometimes informal.

25   You're good to go.  This is fine.  I have nothing else

```
 1   -- you know.
 2        Q.    Is "I'm comfortable with it" -- is that --
 3        A.    Yeah.
 4        Q.    -- also meant to signal it's okay?
 5        A.    Yes.
 6              (Pause.)
 7   BY MS. EVANS:
 8        Q.    When did you --
 9              MS. EVANS:  Strike that.
10   BY MS. EVANS:
11        Q.    To the extent standards made approvals of
12   Irwin County Detention Center stories on September 15,
13   2020, that would have been through you; is that right?
14        A.    I didn't handle all of those stories.  The
15   digital story, I worked on.
16        Q.    Who else would have potentially approved a
17   story in standards regarding Irwin County Detention
18   Center on September 15, 2020?
19        A.    To my knowledge, Steve Thode.
20        Q.    Did you approve the story reflected in
21   Exhibit --
22              MS. McNAMARA:  94.
23   BY MS. EVANS:
24        Q.    -- 94?
25              (Pause.)
```

```
 1                    THE WITNESS:  By this time of day, I had
 2            seen the story.  I don't know exactly when the
 3            story was originally published, but I --
 4                 This -- this contains everything in it
 5            that I was comfortable with, and I conveyed
 6            that to the various people.
 7   BY MS. EVANS:
 8        Q.    Did you, at any point on September 15, 2020,
 9   approve this story reflected in Exhibit 94?
10                    MS. McNAMARA:  Objection, asked and
11            answered.
12                 (Pause.)
13   BY MS. EVANS:
14        Q.    Did you?
15                 (Pause.)
16                    THE WITNESS:  I'm sorry.  So I'm a little
17            bit confused by this, because it appears to me
18            that the guidance that Steve Thode added on
19            here reflected reporting subsequent to this
20            story (indicating).
21                 I don't see, for example, LaSalle's --
22            maybe LaSalle's statement is in there.  I
23            don't see the reference to my saying there
24            were two hysterectomies in the story, so I
25            know that was updated in a -- in a later
```

```
 1                version of the story.

 2                     So it -- it appears to me that somewhere

 3                along the line, someone put an earlier version

 4                of the story in and that Steve then attached

 5                guidance based on what we knew as of 2152.

 6    BY MS. EVANS:

 7         Q.    Do you see the second bullet on Exhibit 94?

 8         A.    I do.

 9         Q.    What does that say?  Read it for the record,

10    please.

11         A.    "Reflect ICE's latest statement and note that

12    ICE says" --

13                     (Thereupon, an informal discussion was

14                held off the record with the shorthand

15                reporter.)

16                     THE WITNESS:  "Reflect ICE's latest

17                statement and note that ICE says there have

18                been only two hysterectomies performed at the

19                facility since 2018."

20    BY MS. EVANS:

21         Q.    So that's there, right?

22         A.    That is there as a bullet point in standards'

23    guidance.  I don't see it in the story, which suggests

24    to me, unless I'm missing it --

25                Hold on.  Let me just...
```

```
 1                C E R T I F I C A T E

 2        I, CHERYLL KERR, CSR, a Certified Shorthand

 3   Reporter and Notary Public, do hereby certify

 4   that the witness whose deposition is hereinbefore

 5   set forth was duly sworn by me, and that such

 6   deposition is a true record of the testimony given

 7   by such witness.

 8        I further certify that I am not related to

 9   any of the parties to this action by blood or

10   marriage; and that I am in no way interested in

11   the outcome of this matter.

12        IN WITNESS WHEREOF, I have hereunto set my

13   hand this 17th day of July, 2023.

14

15                          Cheryll Kerr

16                   --------------------------------
                            CHERYLL KERR, CSR
17

18

19

20

21

22

23

24

25
```