Declaration of

Elizabeth McNamara

Exhibit 32

**DR. MAHENDRA AMIN, M.D. vs NBCUNIVERSAL MEDIA, LLC.**

Confidential                    Jacob Soboroff on 05/18/2023

1                UNITED STATES DISTRICT COURT
           FOR THE SOUTHERN DISTRICT OF GEORGIA
2                    WAYCROSS DIVISION

3    DR. MAHENDRA AMIN, M.D.,

4                    Plaintiff,    CASE NO.
         v.                       5:21-CV-00056-LGW-
5                                  BWC
     NBCUNIVERSAL MEDIA, LLC,
6
                     Defendant.
7


8
              *** CONFIDENTIAL TRANSCRIPT ***
9
              VIDEO-RECORDED DEPOSITION OF
10                    JACOB SOBOROFF

11            Davis Wright Tremaine, LLP
              1251 Avenue of the Americas
12                    21st Floor
              New York, New York 10020
13
                    05/18/2023
14                10:35 a.m. (EDT)

15

16

17

18

19

20

21

22

23

24
         REPORTED BY:  MONIQUE CABRERA
25       JOB NO. 14603

**DR. MAHENDRA AMIN, M.D. vs NBCUNIVERSAL MEDIA, LLC.**

1        in-house at NBCUniversal on behalf of

2        the defendant and the witness.

3              MS. CARTER:  Taylor Carter

4        in-house law clerk at NBCUniversal on

5        behalf of the defendant and the

6        witness.

7    JASON SOBOROFF, called as a witness,

8    having been first duly sworn by a Notary

9    Public of the State of New York, was

10   examined and testified as follows:

11             THE WITNESS:  Yes.

12             COURT REPORTER:  Can you state

13       your name and address for the record.

14             THE WITNESS:  Jacob Soboroff,

15       30 Rockefeller Plaza, New York, New

16       York.

17             COURT REPORTER:  Great.  Thank

18       you.

19             THE WITNESS:  Thank you.

20   EXAMINATION

21   BY MS. EVANS:

**22       Q.    Good morning, Mr. Soboroff.**

23       A.    Good morning.

**24       Q.    I am Stacey Evans.  We met**

**25   earlier.  I'll be asking you questions**

```
 1    today on behalf of the plaintiff.

 2              MS. EVANS:  The first thing I am

 3         going to do is mark the deposition

 4         notice that brings us here today as

 5         Plaintiff's Exhibit 55.  Nothing for

 6         you to do with it.  It's really more

 7         of a housekeeping matter.

 8              (Whereupon, Exhibit 55, Notice

 9         of Deposition, was marked for

10         identification.)

11    BY MS. EVANS:

12         Q.   Mr. Soboroff, when did you first

13    learn that you would be deposed in this

14    case?

15         A.   I don't recall the exact date,

16    but I believe it was several years ago at

17    this point.

18         Q.   At some point, were you asked to

19    gather documents related to this case?

20         A.   Yes, I was.

21         Q.   When was that?

22         A.   I don't recall.

23         Q.   Did you take efforts to search

24    through your e-mails?

25         A.   Yes, I did.
```

1      Q.     Did you take efforts to search

2    through your text messages?

3      A.     Yes, I did.

4      Q.     Did you find text messages?

5      A.     No, I did not.

6      Q.     Did you find e-mails?

7      A.     Did not.

8      Q.     Did someone undertake to find

9    documents on your behalf that you're aware

10   of?

11     A.     Did someone undertake an effort

12   to find documents on my behalf on my

13   devices?

14     Q.     Or -- or related to your phone

15   numbers or e-mail addresses, if you know.

16     A.     I don't know.

17     Q.     Do you have -- strike that.

18            Who is considered your employer?

19     A.     NBCUniversal.

20     Q.     Do you have a phone that

21   NBCUniversal pays for?

22     A.     I do.

23     Q.     Do you know the provider for

24   that phone?  Verizon?  AT&T?

25     A.     I believe it's AT&T.

```
 1                MS. EVANS:  Sorry.  I am letting
 2         my assistant know the videographer
 3         situation.
 4    BY MS. EVANS:
 5         Q.    When did you first -- strike
 6    that.
 7                Have you -- strike that.
 8                Prior to any information about
 9    Irwin County Detention Center, had you
10    worked with anyone at Project South
11    before?
12         A.    Define "worked with."
13         Q.    Communicated with related to
14    news stories.
15         A.    I don't recall.  I covered a
16    wide variety of immigration issues.  It's
17    possible, but I don't recall.
18         Q.    No specific recollection of
19    working with them prior?
20         A.    No.
21         Q.    What about the lawyer named John
22    Whitty?
23         A.    Not to my recollection, no.
24         Q.    What about Andrew Free?
25         A.    Yes, I knew Andrew Free.
```

1      Q.    How did you know him?

2      A.    I covered the Trump

3   administration's policy of separating

4   migrant children from their parents.  And

5   Mr. Free, if I recall correctly,

6   represented some of those parents who were

7   deliberately taken from their parents by

8   the Trump administration.

9      **Q.    Had you worked with Andrew Free**

10  **on any other stories prior to Irwin County**

11  **Detention Center besides the parent-child**

12  **separation story?**

13     A.    No, not to my recollection.

14     **Q.    And when was it that you worked**

15  **with Andrew Free with regard to the**

16  **parent-child separation?**

17     A.    Again, if you could define

18  "worked with," please.

19     **Q.    Communicated with.**

20     A.    I don't recall because we didn't

21  communicate extensively about family

22  separation, although we did cross paths

23  about the topic.

24     **Q.    How did you come to know him?**

25     A.    As a source.

1      Q.    Did someone tell you about him

2   and you reached out or he reached out to

3   you?

4      A.    I don't recall who initiated

5   our -- our conversation.

6      Q.    When did you first learn that

7   Project South was -- strike that.

8             When did you first learn that

9   Project South was going to send out a

10   letter regarding Irwin County Detention

11   Center?

12      A.    I believe --

13             MS. MCNAMARA:  Objection to

14      form.

15             You can answer.

16      A.    I believe when I read about the

17   whistleblower complaint.  Is that what

18   you're referring to, the whistleblower

19   complaint?

20   BY MS. EVANS:

21      Q.    Yeah.  That's what you-all call

22   it.

23             MS. MCNAMARA:  Objection to

24      characterization.

25      A.    I believe when I saw it reported

1   in the media is when I first saw it.

2   BY MS. EVANS:

3       Q.    You didn't have any advance

4   notice from anyone at Project South?

5       A.    I don't recall having any

6   advance notice, no.

7       Q.    Do you remember when you first

8   saw the -- strike that.

9            I am going to hand you what was

10  previously marked as Exhibit 2.

11           (Whereupon, Exhibit 2,

12       Whistleblower Complaint, was

13       identified.)

14       A.    Thank you.

15  BY MS. EVANS:

16       Q.    A version of this document was

17  attached to a filing in this case, which

18  is why it has Exhibit A on the front.

19           But if you could flip to the

20  second page, can you identify this

21  document, Exhibit 2?

22       A.    Yes.

23       Q.    What is it?

24       A.    The whistleblower complaint.

25       Q.    When did you first -- strike

```
 1    that.
 2             Did you see this letter for the
 3    first time through a media report?
 4        A.    I don't recall.
 5        Q.    When did you first read -- or
 6    strike that.
 7             Did you read Exhibit 2 at some
 8    point?
 9        A.    Yes.
10        Q.    When?
11        A.    I don't remember the date.
12        Q.    Was it on September 14th or
13    after September 14th, to the best of your
14    recollection?
15        A.    I do not recall.
16             MS. MCNAMARA:  And just for
17        clarity, we are talking
18        September 14th, 2020, correct?
19             MS. EVANS:  Yes.
20             I am going to hand you and your
21        counsel what I am marking as
22        Exhibit 56.
23             THE WITNESS:  Thank you.
24             (Whereupon, Exhibit 56, E-mail
25        Chain Bates Project South Bates No.
```

1   text on September 14, 2020 at 8:06 p.m.

2   that you were going to talk to the Georgia

3   lawyer and that you had just talked to TPS

4   lawyer, you write at 9:15 p.m., "Okay,

5   spoke with her."

6          Do you see that?

7   A.   I do.

8   Q.   Who was that?

9   A.   I don't remember.

10  Q.   Do you think it was the Georgia

11  lawyer?

12  A.   Yes.

13  Q.   You said "Spoke with her," so

14  I'm assuming that means that the Georgia

15  lawyer was a female?

16  A.   It must have been.

17  Q.   Does that refresh your

18  recollection at all as to what her name

19  was?

20  A.   When you look at the e-mail

21  chain you provided me, it looks like it

22  might have been Azadeh.

23  Q.   Do you think it could have been

24  Ms. Matherne?

25  A.   I don't -- I don't believe so,

 1   but I can't say for sure.

 2        Q.    And Julia asks, "Anything to

 3   it?"

 4              Do you see that?

 5        A.    Yes.

 6        Q.    And what did you say?

 7        A.    I said, "Doesn't sound like they

 8   have much beyond the complaint, which is

 9   the whistleblower's account.  Doesn't mean

10   it didn't happen, but harder to prove."

11        Q.    And then Julia texts back, it

12   looks like, "Yo, gone to sleep."

13              Then she texts the next morning

14   at 8:02 a.m., "What do you think about

15   sending a note to standards?"

16              Do you see that?

17        A.    I do.

18        Q.    Did you-all -- strike that.

19              Did you have any concern in your

20   mind already on either September 14th or

21   September 15th that standards was going to

22   be need to be involved in this story that

23   you-all were going to work on?

24              MS. MCNAMARA:  Objection to

25        form.

```
 1      A.    Standards -- concern is not how
 2   I would -- "concern" is not the word I
 3   would use.  Standards is a part of our
 4   news organization and I would expect them
 5   to be involved in most of the stories, if
 6   not, you know -- yeah, the majority of the
 7   stories that I work on.
 8   BY MS. EVANS:
 9      Q.    At this point, on September 14th
10   or September -- strike that.
11            At the point of September 14th
12   in the evening and September 15th --
13   strike that.
14            On September 14th, 2020, were
15   you at that point hoping to work on a
16   story related to the letter reflected in
17   Exhibit 2?
18            MS. MCNAMARA:  Objection to
19       form.
20      A.    I thought it was a newsworthy
21   and potentially consequential story, so I
22   wanted to learn more about it.  But "hope"
23   is not the word I would use.
24   BY MS. EVANS:
25      Q.    At what point in your mind did
```

1   you decide you wanted to work on a story

2   related to this, if you did?

3        A.    I wouldn't put it in those

4   terms.  Oftentimes when we work on stories

5   as journalists, these are dynamic,

6   evolving situations and, as you learn

7   more, you see where that takes you.

8        Q.    Who is Betsy you refer to?

9        A.    Betsy is Betsy Korona who was my

10  direct report at the time.

11       Q.    What was her job title at the

12  time?

13       A.    I don't recall exactly.  But

14  Betsy supervised television correspondents

15  who reported in the field.

16       Q.    Is she part of standards or was

17  she?

18       A.    No.

19       Q.    Over on the second page, it's

20  the same last three texts from Julia at

21  the bottom of page 1 of Exhibit 17, which

22  is a little easier to read.

23            She says, "What do you think

24  about sending a note to standards.  Just

25  say what you did to Betsy and they can

1   make the decision about whether to wave

2   people off of it until we have more

3   reporting."

4          Do you see that?

5      A.   I do.

6      Q.   Did you indeed reach out to

7   Betsy?

8      A.   If Julia says here that I had

9   spoken to Betsy and relayed that to Julia,

10  then yes, I mostly likely spoke with

11  Betsy.

12     Q.   Do you have any recollection of

13  that?

14     A.   Not directly, no.

15     Q.   Did you speak with anyone,

16  either by phone, video conference, or

17  e-mail from standards on morning of

18  September 15th, 2020?

19     A.   I don't recall.

20     Q.   The last text message from you

21  under September 15th, 2020 at 9:15 a.m.

22  says, "Everyone is all over this story."

23         Do you see that?

24     A.   I do.

25     Q.   What were you referring to

```
 1    there?

 2         A.    The whistleblower complaint.

 3         Q.    And who is "everyone"?

 4         A.    Other outlets.  I probably would

 5    have performed a Google search in Google

 6    News, if you know what that is, and seen

 7    that there were other news outlets who

 8    were reporting on the complaint.

 9         Q.    Who is Micah Grimes?

10         A.    Micah Grimes no longer works at

11    NBC, but he was effectively the head of

12    our social media operation.

13         Q.    "Just wrote a simple note back

14    to Micah Grimes."

15              Do you see that?

16         A.    I do.

17         Q.    What is "simple note"?

18         A.    The note that you provided me in

19    Exhibits 57 and 58.  It's in both of them.

20         Q.    So "simple note" just refers to

21    a quick note.  It's not a specific thing?

22         A.    No.  Just exactly what you see

23    in the -- in the exhibits.

24         Q.    The third page of Exhibit 17,

25    there's a reference in the middle of that
```

1    text string that says, "I e-mailed Scott."

2             Do you see that?

3    A.    Yes.

4    Q.    Who is Scott?

5    A.    I don't recall.

6    Q.    Do you think it was someone

7    inside NBC?

8    A.    No.

9    Q.    Do you think it was a source?

10   A.    I do think it was a source.

11   Q.    Any idea of Scott's last name,

12   or is this a last name?

13   A.    It's possible it was Scott

14   Shuchart.

15   Q.    How do you spell that?

16   A.    I don't know off the top of my

17   head.  S-C-H-U-C-A-R-T [sic].

18   Q.    Who is Scott Shuchart?

19   A.    He worked at Civil Rights and

20   Civil Liberties.  Not at this time but

21   previously and was a public figure at that

22   time.

23   Q.    A public figure?

24   A.    Meaning he wasn't a government

25   official.

DR. MAHENDRA AMIN, M.D. vs NBCUNIVERSAL MEDIA, LLC.

```
 1       Q.    What do you mean by "public

 2   figure"?

 3       A.    I just mean he wasn't a

 4   government official.  He had spoken out in

 5   the media before about immigration-related

 6   issues.

 7       Q.    What is NewsConnect --

 8             (Reporter clarification.)

 9   BY MS. EVANS:

10       Q.    NewsConnect?

11       A.    It's an internal content

12   management system, I think is how you

13   would describe it at NBC News.

14       Q.    Do you use NewsConnect?

15       A.    I try not to.

16             MS. MCNAMARA:  There's a theme

17       here, spend a lot of money on

18       NewsConnect and everyone hates it.

19             THE WITNESS:  Correct for the

20       record.

21   BY MS. EVANS:

22       Q.    When you use it, how -- how do

23   you use it?  And I can ask it a better

24   way.

25             I have heard that you get
```

1    e-mails from NewsConnect or you can go log

2    on to NewsConnect.

3              Do you do one or the other or

4    both when you use NewsConnect?

5      A.    Honestly, without sarcasm, I try

6    to avoid using NewsConnect because I find

7    it onerous.  But I have logged into it on

8    the back-end of a desktop computer.  I

9    have looked at it on a phone.  And I have

10   received e-mails from lists I've

11   subscribed to on NewsConnect.

12     Q.    On the third page of Exhibit 17

13   with Bates number 3149, it looks like

14   you're telling Julia that you put the ICE

15   statement that was reported by Telemundo

16   into NewsConnect on September 15th, 2020.

17     A.    That's correct.  That's what I'm

18   saying there.

19     Q.    And you would have logged on and

20   sort of posted it?

21     A.    Like copied and pasted it.

22     Q.    Yeah.  The only time stamp on

23   the text string on the third page of

24   Exhibit 17, Bates number 3149 in the

25   middle of the page, September 15th, 2020

1        Q.     Did -- strike that.

2               Did Mr. -- strike that.

3               You recall that you did speak

4     with Mr. Free at some point on

5     September 15th, 2020, right?

6        A.     I believe I did.

7        Q.     Did he say that he did not want

8     to be quoted?

9        A.     I don't remember one way or

10    another.

11       Q.     Did you ask him if he would

12    provide a quote?

13       A.     I don't remember one way or

14    another.

15       Q.     Would that be normal that you

16    would prefer to have sources on the record

17    as opposed to background?

18       A.     It depends on the circumstances.

19       Q.     Do you recall conversations with

20    other lawyers on September 15th, 2020 and

21    any of lawyers telling you they did not

22    want to be quoted?

23       A.     I don't remember.

24       Q.     Do you recall asking any other

25    lawyers on September 15th, 2020 whether

```
 1   they would provide a quote?

 2        A.    I don't remember.

 3        Q.    But as reflected in Exhibit 17

 4   on the page Bates number 3150, you think

 5   that something usable may have been a

 6   quote from at least one of the lawyers?

 7        A.    That's correct, yes.

 8        Q.    Top of next page, Bates numbered

 9   3151, you say, "The name of the doctor

10   will be reported shortly by Intercept, I'm

11   told."

12        A.    Yes.

13        Q.    How did you come to find that

14   out?

15        A.    I don't remember who told me

16   that but through source-based

17   conversations.

18        Q.    Do you think it was Andrew Free?

19        A.    It's possible.

20        Q.    At the bottom of the page Bates

21   number 3151, do you see the text message

22   where you're asking, "First name?"

23        A.    Yes.

24        Q.    And then right under that says,

25   "Andrew Free is urging us to make the
```

1   framing about a crooked doctor, yes, but

2   also a system with little oversight."

3       A.    Yes.

4       Q.    "What the whistleblower is

5   saying."

6       A.    Yes.

7       Q.    Does that refresh your

8   recollection about your conversation with

9   Andrew Free?

10      A.    I don't recall one specific

11  conversation.  But, yes it -- this is a

12  text about having spoken with Andrew Free

13  and his -- what he would have said.

14      Q.    Did he share the name

15  Dr. Mahendra Amin to you?

16      A.    I don't believe so.

17      Q.    He urged you to make a story

18  about a crooked doctor in addition to

19  other things, right?

20            MS. MCNAMARA:  Objection.

21      Mischaracterization.

22      A.    If I could zoom out a little

23  bit.

24            When you speak to other

25  journalists, when you speak to sources

1    about a story, or when you speak to anyone

2    who's a human being, everybody has a

3    particular vantage point through which

4    they look at a set of facts or events.

5    And what I was telling Julia here was this

6    was my interpretation of what Mr. Free's

7    vantage point was about this, the facts

8    that we had known at the time when I sent

9    this text, yes.

10   BY MS. EVANS:

11       Q.    **Your interpretation from your**

12   **conversation with Andrew Free on**

13   **September 15th, 2020 was that he wanted**

14   **you to frame a story about a crooked**

15   **doctor at least in part, true?**

16       A.    That's what it says, yes.

17       Q.    **And that's what you recall?**

18       A.    Yes.

19       Q.    **But you don't recall if he gave**

20   **you a name of the doctor?**

21       A.    I don't believe he did, but I

22   don't recall.  Again, this was awhile ago

23   and we spoke collectively, Julia and

24   myself, to quite a few people about -- as

25   we reported this story.

```
 1       Q.    Sure.

 2             You have been a journalist for

 3    how many years?

 4       A.    I've worked at NBC since the

 5    summer of 2015.

 6       Q.    So 8 years?

 7       A.    Just about.

 8       Q.    Did you work in journalism prior

 9    to working in NBC?

10       A.    Not in a big national news

11    organization like this, no.

12       Q.    Did you work in journalism some

13    other way?

14       A.    I would say non-traditional jobs

15    in media.

16       Q.    Which were what?

17       A.    I worked on a broadcast for

18    YouTube for a company called Participant

19    Media, which had a cable network.  I

20    worked for the Huffington Post on a

21    streaming news network.  I worked for the

22    AMC Movie Channel doing red carpet

23    interviews.  I did a reality show for NBC

24    called School Pride, which was like

25    extreme makeovers for school.
```

1          I had a lot of interesting jobs
2     in media before coming to NBC News and
3     dedicating myself to journalism.
4          Q.     Where did you go to college?
5          A.     New York University.
6          Q.     Did you pursue -- strike that.
7                 Is that where you got your
8     undergraduate degree?
9          A.     It is, yes.
10         Q.     Do you have a degree beyond your
11    undergraduate degree?
12         A.     I do.
13         Q.     What is that?
14         A.     It's a master's degree in
15    political theory and philosophy.
16         Q.     Where did you get that?
17         A.     Also NYU.
18         Q.     Any other degrees?
19         A.     No.
20         Q.     When did you obtain your
21    master's degree?
22         A.     I think the year after I
23    graduated undergrad, so I think it was
24    2005 undergrad, 2006 master's.
25         Q.     Did you go to work in journalism

1   in some form immediately after your

2   master's?

3        A.    I wouldn't call it journalism.

4            If you really want to know the

5   story, I loved MTV News and I always

6   wanted to pursue a career in

7   non-traditional media and journalism, but

8   it was a circuitous route to becoming a

9   journalist here.

10       Q.    At least 8 years, you would

11   consider yourself having been a

12   journalist?

13       A.    Yes.

14       Q.    Talked to countless sources at

15   this point, right?

16       A.    That's correct.

17       Q.    If someone -- strike that.

18            If you interpreted someone as

19   urging you to make a story, at least in

20   part, about a crooked doctor, would you

21   assume that they knew who the doctor was?

22       A.    I wouldn't make an assumption.

23   That's one thing I have learned in

24   journalism is to assume nothing.

25       Q.    If someone was urging you to

1    September 15th, 2020?

2        A.    No, he was not present.  I don't

3    even recall if he was in the Zoom himself.

4            There -- if I can back up, there

5    may have been other NBC people present but

6    not visible in the Zoom in order to record

7    the Zoom, but I don't recall who that was.

8    It would not have been Aarne.  It was

9    probably someone from a technical

10   operations.

11           Aarne -- Aarne has been my

12   producer for many years.  And so we work

13   together on things, all kinds of things,

14   including getting interviews transcribed.

15   Aarne would be the one, you know, whatever

16   the process is to get a transcript of the

17   interview.

18       Q.    Did you review Exhibit 9

19   yesterday during your meeting?

20       A.    On Monday, yes.

21       Q.    On Monday.  Sorry.

22           (Discussion held off the

23       record.)

24   BY MS. EVANS:

25       Q.    On Monday you reviewed

```
 1   Exhibit 9?

 2        A.    Correct.

 3        Q.    After this transcript was --

 4   strike that.

 5              Your interview was via Zoom and

 6   then someone made this transcript?

 7        A.    Correct.  The process is, I

 8   think, it's probably sent out to a

 9   transcription service and -- and then it's

10   returned.

11        Q.    And then you shared this with

12   various individuals?

13        A.    Either myself or Aarne.

14        Q.    Do you recall who you shared it

15   with?

16        A.    I might have shared it with the

17   Cory Gnazzo, Rachel Maddow's executive

18   producer.  I probably sent it around quite

19   widely.

20        Q.    Certainly Julia?

21        A.    Probably so, although I don't

22   recall specifically sending it to her but

23   very likely.

24        Q.    On page 7 up at the top if it's

25   easier for you to find, but the Bates
```

```
 1    number 410 at the bottom if it's easier

 2    for you to find it that way.

 3            And actually, one page before

 4    that, so page 6 at top or 411 at the

 5    bottom.

 6            Do you see that?

 7    A.    Yes.

 8    Q.    At the bottom, the last

 9    paragraph statement from you.

10            Do you see that?

11    A.    Yes.

12    Q.    Could you read what you said

13    there?

14    A.    "I'll come back to the issues on

15    PPE and Covid, which to me having done

16    reporting on other ICE facilities sounds

17    similar to what we've heard from other ICE

18    facilities as well about the conditions

19    with Covid."

20    Q.    And then you go on to say what?

21            And our court reporter is lovely

22    and an amazing human, but she can only

23    type so fast.  And when we're reading --

24    I'm saying this to myself as much as

25    you -- but when I ask you to read or when
```

1   I read, let's try to slow down a little

2   bit.

3        A.    Got it.

4        Q.    What do you say next?

5        A.    "What I want to ask you about

6   what I think is perhaps the most startling

7   revelation or allegation in your complaint

8   and that's about hysterectomies that took

9   place with an outside doctor for detainees

10   that were residing in Irwin."

11        Q.    Did Ms. Wooten provide you with

12   Dr. Amin's name during this interview?

13        A.    No.

14        Q.    She didn't know the doctor's

15   name, did she?

16        A.    I believe I asked her in the

17   interview.  If I recall correctly, she did

18   not know his name.

19        Q.    Did you find that concerning,

20   that she would not have that basic piece

21   of information about who was doing these

22   things that she was alleging were done to

23   women at ICDC?

24             MS. MCNAMARA:  Objection to

25        form.

1       A.     Not at all.

2   BY MS. EVANS:

**3       Q.     Why not?**

4       A.     Because Ms. Wooten worked in an

5   ICE detention center.  And having reported

6   from inside ICE detention centers myself

7   and spoken with other people who have

8   worked within ICE detention centers, I

9   understand or understood that oftentimes

10  these folks are working under stressful

11  conditions.  Resources are strained.

12  There are lots of -- there are lots of

13  things going on, including, in her case,

14  what sounded like a very stressful

15  situation with regard to the pandemic.

16          There was a lot going on, and

17  remembering the name of a doctor or not

18  remembering the name of a doctor is --

19  wouldn't surprise me at all.

**20      Q.     You asked Ms. Wooten during the**

**21  interview about the number of women that**

**22  alleged to have had unnecessary**

**23  hysterectomies, right?**

24      A.     I believe so.

**25      Q.     And you asked her about the**

1    number of women that she talked to that

2    told her that either they had had

3    unnecessary hysterectomies or knew of

4    others who claimed that, right?

5        A.    I believe so.

6        Q.    And she couldn't give you an

7    answer to either of those questions,

8    right?

9        A.    I believe that's correct.

10       Q.    Was that concerning to you?

11       A.    Same answer.

12       Q.    And same reason why, because

13   there's a lot going on?

14       A.    There's a lot -- workers

15   generally, I'm not speaking specifically

16   of Ms. Wooten.  Again, I have spoken --

17   I've been inside ICE detention in

18   California.  I have spoken to workers who

19   work for ICE in other parts of the

20   country.

21            And oftentimes these are

22   intense, traumatic jobs that are

23   overwhelming to people.  And so particular

24   details of particular stories are told by

25   a detainee or multiple detainees when they

1    meet literally, you know, potentially

2    hundreds, if not thousands, of detainees,

3    it's not surprising that she didn't

4    remember specific details.

5        **Q.    Well, with all that's going on**

6    **and her not being able to recall numbers**

7    **of women that she talked to or numbers of**

8    **women that were making these allegations,**

9    **not being able to identify the doctor,**

10   **isn't it also logical that she may have**

11   **had the details of what was even told to**

12   **her wrong?**

13           MS. MCNAMARA:  Objection to

14       form.

15       A.    Sure, that's possible.  But

16   that's why we're reporters and we continue

17   to speak with other sources to corroborate

18   information.  And, in this case, whether

19   that was information in the complaint or

20   what Ms. Wooten told me directly, which is

21   exactly what we did.

22   BY MS. EVANS:

23       **Q.    Well, the complaint was based on**

24   **information from Ms. Wooten in large part,**

25   **right?**

```
 1              MS. MCNAMARA:   Objection;
 2       mischaracterization.
 3       A.     The complaint also included
 4    interviews with detainees.
 5    BY MS. EVANS:
 6       Q.     Which you didn't see, right?
 7       A.     But they were characterized in
 8    the complaint.
 9              I did not see, correct, as far
10    as I recall.
11       Q.     And you don't know who the
12    detain -- strike that.
13              Do you know who the detainees
14    were that were even interviewed as
15    reflected in Exhibit 2?
16       A.     No, I don't believe I did.
17       Q.     Ms. Wooten didn't have any
18    firsthand knowledge of what happened to
19    any detainee during any medical
20    examination or procedure, right?
21       A.     Can you repeat that?  Sorry.
22       Q.     Ms. Wooten didn't have any
23    first -- strike that.
24              Ms. Wooten did not have any
25    firsthand knowledge of what happened to
```

1   any detainee during any medical

2   examination or procedure, right?

3       A.    She was not present, no.

4   According to my interview with her,

5   correct.

6       Q.    Which means she doesn't have

7   firsthand knowledge of what happened to

8   detainees during those medical visits,

9   right?

10      A.    Correct.

11      Q.    And the other sources that you

12  spoke with on September 15th, 2020 with

13  regard to detainees at ICDC were lawyers,

14  true?

15      A.    Correct.

16      Q.    You didn't speak directly to any

17  detainees?

18      A.    I don't recall having spoken to

19  detainees on that date, no.

20      Q.    And none of the attorneys that

21  you spoke with on September 15, 2020 had

22  any firsthand knowledge of what happened

23  to any detainees during a medical visit,

24  true?

25              MS. MCNAMARA:  Objection to

1      form.

2          A.     They weren't present but

3    detainees, they said, told them what

4    happened.

5    BY MS. EVANS:

6          **Q.     Which means that the lawyers**

7    **didn't have firsthand knowledge of what**

8    **happened with the detainees during their**

9    **medical visits while being detained at**

10   **ICDC, true?**

11         A.     Correct.   The lawyers were not

12   detained themselves.

13         **Q.     And were not in the medical**

14   **examination or procedure room with any of**

15   **the detainees from ICDC, right?**

16         A.     That's correct.

17         **Q.     What -- strike that.**

18                **From your review of Exhibit 2**

19   **and from your interview with Ms. Wooten as**

20   **reflected in Exhibit 9, did you think**

21   **Ms. Wooten was more concerned with Covid**

22   **or more concerned with the gynecological**

23   **allegations?**

24         A.     I couldn't make that judgment

25   call about her level of concern about

```
 1    here, and she was also concerned about the

 2    treatment of these women who she had

 3    spoken with who said that they were

 4    mistreated by a doctor, even though she

 5    couldn't name the doctor.

 6            But I don't want to say one more

 7    than another, and she didn't say one way

 8    over another.

 9    BY MS. EVANS:

10        Q.    You didn't ask her to

11    characterize it that way, right?

12        A.    Yeah, I wouldn't have.  I don't

13    know why I would have done that.

14        Q.    And your testimony under oath is

15    that considering why she thought her hours

16    were reduced and considering the number of

17    pages devoted to gynecological allegations

18    versus the number of pages devoted to

19    Covid allegations in Exhibit 2, you took

20    no indication about whether Ms. Wooten was

21    more concerned about Covid or about

22    allegations regarding gynecological care

23    at ICDC?

24            MS. MCNAMARA:  Objection to

25        form.  Asked and answered.
```

```
 1   BY MS. EVANS:
 2        Q.    It sounds like the answer is
 3   "no."
 4             MS. MCNAMARA:  Objection.
 5        Mischaracterization --
 6        A.    You are putting words in my
 7   mouth.
 8   BY MS. EVANS:
 9        Q.    Tell me.
10             MS. MCNAMARA:  -- of his
11        testimony.
12        A.    I told you.  I am not a
13   psychiatrist or psychologist.  I'm not
14   here to analyze her.  I'm a reporter and I
15   deal with facts on the ground and I dealt
16   with the facts that she gave me and that's
17   it.  I don't make judgment calls about how
18   people feel.
19   BY MS. EVANS:
20        Q.    But you took nothing from the
21   information with regard to whether she was
22   more concerned about one thing over the
23   other?
24        A.    Again --
25             MS. MCNAMARA:  Objection.
```

```
 1      Mischaracterization.  And this has
 2      been asked and answered three or four
 3      times at this point.
 4      A.    -- I don't consider my job to
 5   make assumptions about the way people feel
 6   about things.  Sort of a cardinal rule of
 7   journalism.  We deal with the facts.
 8   BY MS. EVANS:
 9      Q.    At some point, was there an
10   article written with regard to allegations
11   at ICDC?
12           MS. MCNAMARA:  Article written
13      by whom?  What are you talking about?
14           MS. EVANS:  I'll rephrase the
15      question.  You know exactly what I'm
16      talking about.  Everything is going to
17      be hard and that's fine.  The jury's
18      not going to love this, but it is what
19      it is.
20           MS. MCNAMARA:  I feel that might
21      be a different conclusion.
22   BY MS. EVANS:
23      Q.    Mr. Soboroff, did you
24   participate in writing an article for NBC
25   News with regard to allegations of
```

1    gynecological care at ICDC on or about

2    September, 15 of 2020?

3        A.    Yes, I did.

4        Q.    How -- strike that.

5            Did you see any versions of that

6    article yesterday during your deposition

7    preparation?

8        A.    On Monday, yes, I did.

9        Q.    I keep doing that.

10           On Monday, how many versions did

11   you see?

12       A.    I don't recall the exact name,

13   but generally speaking, when we work on

14   stories, we work in drafts.  And there

15   were multiple versions of this story

16   because, as always, as a reporter, stories

17   are often dynamic and we add to them when

18   it's appropriate.

19       Q.    I understand drafts of an

20   article to be, you know -- this is going

21   to be an inartful question, but bear with

22   me -- Julia makes a draft and you may have

23   a comment, someone else may have comments

24   and you pass it back and forth internally,

25   right?  Is that what you were referring to

```
 1   as drafts?
 2        A.    Well, yes, that's a relatively
 3   accurate characterization.
 4        Q.    And I may be using the word
 5   "versions" different than you.
 6              Do you know how many iterations
 7   of the article were published?
 8        A.    I guess I wouldn't use that
 9   terminology.  Once an article is
10   published, if there's additional relevant
11   information, we would say an article is
12   updated to reflect new information that we
13   learned.
14        Q.    Do you know how many updates
15   were made to the article after it was
16   first posted by NBC News?
17        A.    I don't.
18        Q.    Was it 17?
19        A.    I have no idea.
20        Q.    Have you seen 17 updates to the
21   article at any point in time?
22        A.    I don't believe so.
23        Q.    How many -- strike that.
24              Did you say that you have no
25   recollection of how many updates or
```

 1   versions of the article you may have seen

 2   on Monday?

 3        A.    My recollection is less than --

 4   less than a handful.

 5        Q.    Handful being?

 6        A.    Five.

 7        Q.    What was your role in drafting

 8   the article itself?

 9        A.    I conducted the interview with

10   Ms. Wooten.  I conducted -- I had

11   conversations, I believe, with at least

12   one attorney.  And then Julia and I sort

13   of confer and she is the actual -- she

14   would be the literal writer, fingertips on

15   a keyboard of the story.

16        Q.    Did you provide any edits to

17   Julia's writing, that you recall?

18        A.    I am not the editor, so I

19   wouldn't have explicitly edited the story.

20   There's a specific editor of the story.  I

21   maybe verbally gave comments on an early

22   version.  But I -- it's possible I didn't

23   also.  I don't recall.  We have done many

24   stories together.

25        Q.    What is standards?

```
 1        A.    In the context of NBC News?

 2        Q.    Yes.

 3        A.    It's a part of our reporting

 4   process, a group of people with whom we

 5   collaborate to make sure our reporting is

 6   accurate and fair and precise.

 7        Q.    Did standards review the article

 8   in the different iterations that were

 9   published by NBC News?

10        A.    I believe so.

11        Q.    Did they review each iteration?

12        A.    Can you be more specific,

13   please?

14        Q.    Well, there was more than one

15   iteration of the article that published to

16   NBC News, true?

17        A.    There were updates made to the

18   story, as I would characterize it.

19        Q.    There were multiple updates made

20   to the article that were published by NBC

21   News, true?

22        A.    I believe that's correct, yes.

23        Q.    Would -- strike that.

24              Did standards review each of

25   those updates?
```

```
 1        there's multiple findings.
 2             MS. EVANS:  Are you aware -- is
 3        he aware of any of them?
 4             MS. MCNAMARA:  Well, that's not
 5        what you're asking.  You're saying are
 6        you aware of the findings?
 7    BY MS. EVANS:
 8        Q.   Are you aware any of the
 9    findings -- are you aware of any of the
10    findings -- any of them -- can you tell me
11    anything that was part of the findings
12    from the Senate investigation with regard
13    to gynecological care at ICDC?
14        A.   You're making me feel like this
15    is a quiz that I needed to study the
16    answer to.  And I don't want to do that
17    because this is a forum in which guessing
18    is not appropriate.
19        Q.   I am not trying to quiz you.  I
20    am not even -- I'm not even going to
21    comment on whether I think you're right or
22    wrong about the findings.
23             I am just trying to figure out
24    if you can say any of the findings that
25    came out of the Senate investigation with
```

```
 1    regard to gynecological care at ICDC.

 2        A.    I don't have a different

 3    answer --

 4            MS. MCNAMARA:  This has been

 5        asked and answered.

 6        A.    -- to your question.

 7    BY MS. EVANS:

 8        Q.    Even though you work for the

 9    Today Show now, you look at MSNBC ratings

10    every day or almost every day in your

11    testimony.

12        A.    They arrive in my inbox, so

13    sometimes I click on them.  Sometimes I

14    don't.

15        Q.    Can you tell me any information

16    about those ratings that you receive?

17            MS. MCNAMARA:  Over what period

18        of time?

19    BY MS. EVANS:

20        Q.    Did you look at any of the

21    ratings last week?

22        A.    They came daily, and maybe one

23    day I looked at them.

24        Q.    What do they show with regard to

25    MSNBC compared to Fox?
```

1    A.   Oh, that, I don't know.  Like I

2  said, I don't study them closely.  Maybe I

3  looked at Katie Tur's ratings because

4  she's one of my dearest friends and I am

5  just looking to give moral support.  But

6  I'm not obsessed over anything like that.

7    **Q.   Have you been disciplined by**

8  **anyone at NBC News?**

9    A.   Never.

10    **Q.   Have you ever been the recipient**

11  **of any warnings or reviews that were**

12  **negative?**

13    A.   Never.  On the contrary in my

14  time at NBC News, I have received multiple

15  journalism awards, like the Walter

16  Cronkite Award for Excellence in

17  Television Journalism for my reporting on

18  the family separation crisis at border.  I

19  won the Hillman prize along with my

20  colleagues at NBC News.  The opposite of

21  receiving discipline.

22    **Q.   Have you received any awards**

23  **with regard to your reporting on ICDC?**

24    A.   Not that I know of.  I am not

25  sure we submitted the reporting for

```
 1   awards.
 2       Q.    I think I heard you say off
 3   camera that you had never been deposed
 4   before; is that right?
 5       A.    That's correct.
 6       Q.    Have you ever given any
 7   testimony in court?
 8       A.    No.
 9       Q.    Do you know if any of the
10   stories you have been involved in
11   reporting on have been the subject of a
12   defamation lawsuit other than what brings
13   us here today?
14       A.    Not that I know of, no.
15       Q.    In September of 2020, you
16   reported to Betsy Currens?
17       A.    Korona.
18       Q.    Korona.
19       A.    Correct.
20       Q.    Did anyone report to you during
21   that time period?
22       A.    No.  I worked with Aarne
23   Heikkila, the producer who we have
24   discussed.  But I was not a manager.  I
25   have never been a manager at NBC News.
```

1      Q.    Do you have a personal e-mail

2    address that you use?

3      A.    I do.

4      Q.    Did you have a personal e-mail

5    address that you used in September 2020?

6      A.    I did.

7      Q.    Did you have ever used that

8    personal e-mail for work-related purposes?

9      A.    Not -- not on this story.

10     Q.    Did you check --

11     A.    I did.

12     Q.    -- your personal e-mail --

13     A.    Sorry to interrupt you.  Go

14   ahead.

15     Q.    Did you check your personal

16   e-mail account for records when you were

17   asked to search?

18     A.    I did.

19     Q.    Did you find any?

20     A.    No.

21     Q.    When was the last time you

22   talked to Julia Ainsley?

23     A.    I sent her a note saying that I

24   thought she did a great job down at the

25   border over the course of the last week.

1    Actually, I think we talked earlier this

2    week about a story about Biden

3    administration immigration policy about a

4    particular source, if I was willing to --

5              MS. MCNAMARA:  Let me caution

6         you.  I don't want you to give

7         news-gathering information --

8              THE WITNESS:  Thank you.

9              MS. MCNAMARA:  -- on an

10        unpublished information --

11             THE WITNESS:  Got it.

12             MS. MCNAMARA:  -- that you have

13        not reported, so --

14             THE WITNESS:  Got it.

15             MS. MCNAMARA:  -- I think the

16        question was when did you speak with

17        her.  You don't have to say.

18             THE WITNESS:  Thank you.  Thank

19        you.

20        A.   Julia and I talked last week and

21   this week.

22   BY MS. EVANS:

23        **Q.   Did you talk to her about ICDC**

24   **in any way?**

25        A.   No.

```
 1            CERTIFICATE OF SHORTHAND REPORTER

 2                      NOTARY PUBLIC

 3                 I, Monique Cabrera, the officer

 4          before whom the foregoing deposition

 5          was taken, do hereby certify that the

 6          foregoing transcript is a true and

 7          correct record of the testimony given;

 8          that said testimony was taken by me

 9          stenographically and thereafter

10          reduced to typewriting under my

11          direction; and that I am neither

12          counsel for, related to, nor employed

13          by any of the parties to this case and

14          have no interest, financial or

15          otherwise, in its outcome.

16                 IN WITNESS WHEREOF, I have

17          hereunto set my hand this 18th day of

18          May, 2023.

19

20

21          _____

22          MONIQUE CABRERA
            Notary Public in and for the State of New
23          York
            County of Suffolk
24          My Commission No.  01CA6043156
            Expires:  06/12/2026

25
```