Declaration of

Elizabeth McNamara

Exhibit 33

MAHENDRA AMIN, M.D. vs NBCUNIVERSAL MEDIA, LLC
Andrew Free on 08/15/2023

```
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE SOUTHERN DISTRICT OF GEORGIA
 2

 3
     MAHENDRA AMIN, M.D.,         § CIVIL ACTION FILE NO.
 4                                § 5:21-CV-00056-LGW-BWC
                                  §
 5                                §
              Plaintiff,          §
 6                                §
         vs.                      §
 7                                §
                                  §
 8                                §
     NBCUNIVERSAL MEDIA, LLC,     §
 9                                §
                                  §
10                                §
              Defendant.          §
11   ~~~~~~~~~~~~~~~~~~~~~~~~~

12               VIDEOTAPED DEPOSITION OF
                       ANDREW FREE
13

14

15              9:44 a.m. EST
       Tuesday, the 15th day of August, 2023
16

17
                      Suite 1600
18            999 Peachtree Street, NE
                   Atlanta, Georgia
19

20

21
        Blanche J. Dugas, RMR, CRR, CCR No. B-2290
22

23

24

25
```

1  Zoom and I was, too.  Or maybe it was Teams, you know,
2  a video communication.  That's what I recall.  But
3  those -- those would have been multiple e-mails.  I
4  don't know the number, but multiple phone calls.
5           After Irwin was being announced by Secretary
6  Mayorkas as being closed, Ms. Gilbert reached out to
7  me and asked if we wanted -- the DOJ wanted to restart
8  investigative interviews, which had stopped
9  essentially, if there were witnesses.  So who would be
10 available.  So that would have been, like, May of
11 2021, something like that.
12      Q.  **And did interviews take place after**
13 **May 2021?**
14      A.  I don't know.  I informed Ms. Gilbert that I
15 had taken a step back much earlier actually and that
16 she could speak with those folks' counsel.  So that's,
17 you know, the folks that they ultimately retained to
18 help, you know, file habeas cases and then file other
19 litigation and that's who they would need to speak
20 with.
21      Q.  **When you say you had taken a step back, do**
22 **you mean from Irwin County Detention Center matters or**
23 **the law or --**
24      A.  Specifically, Irwin County Detention Center.
25 I was in the throes of resolving a death matter in

1   early 2021, doing depositions in February and
2   resolution in March, April.  And it was sort of
3   those -- those months that the burnout of Irwin really
4   started to become apparent to me.  And so, you know,
5   just in terms of, like, having so much going on.  It
6   was a big undertaking in September and October.
7        **Q.   To your knowledge, how many women actually**
8   **had a hysterectomy performed by Dr. Amin who were at**
9   **Irwin County Detention Center?**
10       A.   Two.
11       **Q.   And who were those?**
12       A.   Barbara and B.J.'s other client, I think.
13  I'm not sure who that person was, as I sit here today.
14       **Q.   You mentioned earlier that there were women**
15  **who had said that they had hysterectomies and then it**
16  **turned out that they hadn't.  Do you recall that?**
17       A.   Yes.  I think I said that they thought they
18  had hysterectomies, that that's what they understood
19  their procedure was.
20       **Q.   How many women would you say fall into that**
21  **category?**
22       A.   You know, in the early days, it was a lot.
23  I mean, it was more than half a dozen folks.  We can
24  talk about why I think that happened.  I think it's
25  been documented that sometimes Irwin staff were

1   telling people they were going for a hysterectomy.  I
2   don't think I documented that with the Senate.
3   Cystectomy sounds a lot like hysterectomy, and I think
4   if you're not given an interpreter in your
5   consultation with a gynecologist, if you're in chains,
6   if you've got a guard sitting next to you while
7   they're shoving a wand inside of you and you're not
8   given any paperwork in the language of, you know, your
9   fluency, it's tough to know what happened, especially
10  when there's basically no postop protocol where folks
11  are being given care after they're put under the
12  knife.
13          I should say he was the only gynecologist
14  who was regularly treating women at Irwin, and I do
15  know that either Warden Paulk or Dr. McMahan said
16  there were actually three who had hysterectomies, and
17  moreover, that there were six who were scheduled for
18  hysterectomies from 2017 to 2020 according to ICE and
19  that Amin was the doctor who, according to the ICE
20  records, was seeking those hysterectomies.
21          For context, there have only been 14 in the
22  total ICE system and he only saw 4 percent of the
23  female detained population and 6 percent of the
24  gynecological patients.  So on 6 percent of the
25  gynecological patients between 2017 and 2020, Irwin

1  ICE records show that six hysterectomies had been
2  scheduled.
3          Some of those hysterectomies didn't happen
4  because folks got deported.  At least one didn't.  And
5  some of them hadn't because people refused.  I think
6  unsuccessfully attempting a surgery that a woman
7  didn't consent to, you know, I think it's misleading
8  to say, I only did two if the reason you only did two
9  is because people actually refused.
10     Q.   **There's no jury here, Mr. Free.  I've been**
11  **very -- I've been trying to be respectful and let you**
12  **tell me anything you want to tell me, but a lot of**
13  **this is not responsive to my questions and I am**
14  **limited in time.  So at some point, I am going to**
15  **start objecting as nonresponsive and -- and talk to**
16  **your counsel about cutting you off because I can't let**
17  **you just give a closing argument to a jury.**
18          MR. TOBIN:  And I object to your
19      instructions to my client.  He's trying to
20      answer your question.
21          MS. EVANS:  And I'm trying to be nice
22      about him not doing it.
23          MR. TOBIN:  He's completely doing his
24      best to answer.
25          MS. EVANS:  Well, he's -- I asked him

1      a specific question and I got --
2           THE WITNESS:  I'm sorry.  I want to
3      make sure I do not do that again.  What was
4      the question you asked me so I can
5      understand?
6           MR. TOBIN:  Answer and let's move on
7      to the next question.
8           THE WITNESS:  I mean --
9      Q.   (By Ms. Evans)  I think you answered my
10  question, and then you did a lot more than that.
11           Did you have any direct communication -- and
12  by direct communication, I mean either in person, on a
13  video discussion or on the phone -- with any woman who
14  told you that she thought she had a hysterectomy
15  performed on her?
16      A.   Yes.
17      Q.   For any of those women, did you ask them
18  whether they were still having their menstrual cycles?
19      A.   I think that asking about menstruation was
20  within -- again, you're asking about my conversations
21  with my clients.  But I think that the -- I think that
22  that was within the set of questions that we asked.
23  We asked about bleeding.  Actually, let me just answer
24  your question.
25           I think so is my answer to your question.

```
 1      Q.   And did any of those women tell you yes?
 2      A.   I don't recall.
 3      Q.   When Law Lab went onsite at Irwin County
 4  Detention Center, do you know if they collected
 5  information from the clients -- or strike that.
 6           When Law Lab went onsite at Irwin County
 7  Detention Center, do you know if they collected
 8  information from women who were detained there in
 9  writing?
10      A.   I do.
11      Q.   And -- and how did they do that?
12      A.   How did they do what?
13      Q.   Get information from the women in writing.
14  Did they have a form of some kind?
15      A.   Yes.
16      Q.   Did you help prepare that form?
17      A.   I did.
18           (Plaintiff's Exhibit 125 was marked
19       for identification.)
20      Q.   (By Ms. Evans)  I'm going to hand you and a
21  copy for your counsel and Ms. McNamara what I'm
22  marking as Exhibit 125.
23           Is Exhibit 125 an example of one of those
24  forms?
25      A.   This is one example of forms that went to
```

1   women, but this happened a little bit later.  This was
2   a little bit farther out from September 14th to 25th
3   or something like that.
4       Q.   When did it happen?
5       A.   I would say early October, maybe late
6   Sep- -- late September, maybe early October.
7       Q.   But during the time period that Law Lab was
8   onsite at Irwin County Detention Center?
9       A.   Yes.
10      Q.   You can see about middle ways through the
11  page where it says, "You can also call" -- and then it
12  gives a phone number -- "to fill out this survey on
13  the phone if you are more comfortable."
14           Do you see that?
15      A.   I do.
16      Q.   Do you know where that phone number went to?
17      A.   I think the line above it says, "Call
18  Caitlin from the legal team at the same number."
19      Q.   And is Caitlin at Law Lab?
20      A.   No.
21      Q.   Where is she?
22      A.   Caitlin was a third-year law student at
23  Columbia.
24      Q.   When the women -- strike that.
25           If a woman who was at Irwin County Detention

 1   I'm answering the question that you didn't ask, so
 2   I'll shut up.
 3       Q.   No, it's fine.  Well, I -- no.  And I think
 4   we're fine.  I just want to make sure I understand.
 5            You're -- you're speculating.  You don't
 6   have a specific recall of those conversations refers
 7   to your conversations with the other attorneys, not
 8   that you talked to representatives at MSNBC,
 9   NBCUniversal or NBC News to put them in touch with the
10   attorneys.
11       A.   You're right.
12       Q.   Okay.  Thank you.
13            Do you recall -- or strike that.
14            I know earlier you said you couldn't
15   recall -- never mind.  Strike that.
16            Do you recall if you connected those other
17   attorneys to Julia or to Jacob?
18       A.   I don't recall one way or the other.
19       Q.   You think it was one of those two?
20       A.   I think it was probably Julia.
21       Q.   Did you ever have any conversations with
22   Julia Ainsley or Jacob Soboroff at the same time that
23   one of the other lawyers was on the line?
24       A.   Maybe.
25       Q.   Do you have any specific recollection of

 1    anything like that?
 2        A.   No.
 3        Q.   Which attorneys did you put into contact
 4    with either Julia Ainsley or Jacob Soboroff?
 5        A.   I can't give you an exhaustive list.  I can
 6    tell you the ones I can remember sitting here today.
 7    Sarah, Mr. Osorio, maybe Elizabeth Matherne, maybe
 8    Kimberlee Payton Jones.  I think there are more, but I
 9    cannot remember all of them.
10        Q.   Do you recall putting lawyers into contact
11    with Xander Price at some point?
12        A.   No.  I'm not saying it didn't happen.  I
13    just don't remember it.
14        Q.   Do you recall if he asked you to connect him
15    to other attorneys?
16        A.   No.
17        Q.   Did Ms. Ainsley ever ask you if she could
18    speak to any of your clients?
19        A.   I don't remember.
20        Q.   What about Mr. Soboroff?
21        A.   Don't remember.
22        Q.   What about Mr. Price?
23        A.   I don't remember.
24        Q.   Do you recall your conversation -- or strike
25    that.

1        When you spoke to either Ms. Ainsley or
2   Mr. Soboroff on September 15th, 2020, did you insist
3   that your conversation with them be on background?
4        A.   Insist is a strong word.  The standard
5   conversation that I have with reporters is on
6   background.
7        Q.   Why is that?
8        A.   Because I'm in the practice of trying to
9   share information that people can report out as
10  opposed to trying to get quoted and, you know, soak up
11  the sort of attention that that happened -- you know,
12  happens to bring.
13       Q.   And what -- what kind of attention is that?
14       A.   I think that as a matter of, like, media
15  narrative and framing, there's a certain way you can
16  tell a story where the person who's at the center of
17  the harm is the person whose voice is coming out or
18  the person who is closest to the harm is the person
19  whose voice is coming out, and that has a certain
20  impact on the audience, has certain implications for
21  the reason you're telling the story.  And there's
22  another way to do it where attorney says, you know,
23  lawyers are the sole people providing the information,
24  and I prefer the first one.
25       Q.   Did you share any names of clients with

1   Ms. Ainsley or Mr. Soboroff that you recall?

2       A.   I think so.

3       Q.   Who?

4       A.   During which period of time?

5       Q.   September 15th, 2020.

6       A.   Barbara, Marcia, Sarah's client.  Can't
7   recall when the engagement with Pauline began, whether
8   it was the 15th or later.  I definitely shared
9   Pauline's name, Pauline Binam.  Those are the ones
10  that I can remember right now.

11      Q.   You had a relationship with -- or strike
12  that.

13           You had worked with Julia -- both Julia
14  Ainsley and Jacob Soboroff prior to September 2020;
15  right?

16      A.   Yes.

17      Q.   And you knew they were affiliated with NBC;
18  is that right?

19      A.   I did.

20      Q.   And you know now and knew then that
21  Mr. Hayes was also affiliated with NBC?

22      A.   I did.

23      Q.   Do you recall at some point speaking with
24  Xander Price?

25      A.   Yes.

```
 1      Q.   And you were put in touch with Mr. Price by
 2   Mr. Hayes; is that right?
 3      A.   I think so.
 4      Q.   Did you ever tell Mr. Free that you --
 5   you're Mr. Free -- strike that.
 6           Did you ever tell Mr. Price that you had
 7   been in contact with Julia Ainsley or Jacob Soboroff?
 8      A.   I don't remember.
 9      Q.   Any particular reason?
10      A.   That I don't remember?
11      Q.   Any particular reason -- well, if you don't
12   recall, I'll ask another question.
13           MR. TOBIN:  Thank you.
14      Q.   (By Ms. Evans)  Do you -- you recall having
15   a conversation at some point with Mr. Price; true?
16      A.   True.
17      Q.   And that was on September 16th, 2020?
18      A.   I don't know the date.
19      Q.   Have you ever seen a transcript of your call
20   with Mr. Price?
21      A.   I have not.
22      Q.   I'm sorry?
23      A.   I have not.
24      Q.   Have you ever had a transcript of your call
25   with Mr. Price -- or strike that.
```

1        Are you aware that there is a transcript of
2   your call with Mr. Price?
3        A.   Based on the last question, I'd say yes.
4        Q.   Have you had -- ever had any portions of
5   that transcript read to you?
6             MR. TOBIN:  I'm going to instruct you
7        not to touch on anything you may have
8        discussed with your attorneys.  If you can
9        answer the question outside of that
10       attorney-client privilege setting, please
11       go ahead.
12            THE WITNESS:  Outside of the
13       attorney-client privilege setting, no.
14       Q.   (By Ms. Evans)  I just want to clarify for
15  the record.  You are raising the attorney-client
16  privilege as a reason not to answer the question about
17  whether you have ever had any portions of a transcript
18  of a call from you and Xander Price read to you; is
19  that right?
20            MR. TOBIN:  That's not entirely
21       accurate.
22            MS. EVANS:  Tell me where I'm wrong.
23            MR. TOBIN:  He is not going to answer
24       any question that would -- he is not going
25       to disclose any information that he may

 1      have learned during a conversation with his
 2      counsel.  He's free to answer the question
 3      outside of that context.  That was the
 4      purpose for the instruction and that's the
 5      basis for the objection.
 6      Q.   (By Ms. Evans)  Can you answer the question
 7   about whether you've ever had any portions of a
 8   transcript of a call between you and Xander Price read
 9   to you, without violating your attorney's instruction?
10      A.   I can answer it.  The answer is no, outside
11   of the context -- context of the attorney-client
12   privilege.
13      Q.   I'm going to hand you -- and a copy for your
14   counsel and Ms. McNamara -- what's been previously
15   marked as Exhibit 67.
16         MR. TOBIN:  Looks like it's a 35-page
17      document.  So if Ms. Evans is going to ask
18      you questions about it, I would suggest
19      that you read it.
20         THE WITNESS:  Is this separate from
21      the September 16th transcript that you're
22      referring to?
23      Q.   (By Ms. Evans)  I'm sorry?
24      A.   You said earlier there was a September 16th
25   transcript.

```
 1    STATE OF GEORGIA:
 2    COUNTY OF FULTON:
 3
 4            I hereby certify that the foregoing
 5        transcript was reported, as stated in the
 6        caption, and the questions and answers
 7        thereto were reduced to typewriting under
 8        my direction; that the foregoing pages
 9        represent a true, complete, and correct
10        transcript of the evidence given upon said
11        hearing, and I further certify that I am
12        not of kin or counsel to the parties in the
13        case; am not in the employ of counsel for
14        any of said parties; nor am I in any way
15        interested in the result of said case.
16
17
18
19            [signature: Blanche J. Dugas]
20            BLANCHE J. DUGAS, CCR-B-2290
21
22
23
24
25
```