Declaration of

Elizabeth McNamara

Exhibit 42

**DR. MAHENDRA AMIN, M.D. vs NBCUNIVERSAL MEDIA, LLC**
**Mark Schone on 07/13/2023**

```
 1              UNITED STATES DISTRICT COURT
        FOR THE SOUTHERN DISTRICT OF GEORGIA
 2                 WAYCROSS DIVISION

 3   DR. MAHENDRA AMIN, M.D.

 4               Plaintiff,   CASE NO.
        v.                    5:21-CV-00056-LGW-BWC
 5
     NBCUNIVERSAL MEDIA, LLC,
 6
                 Defendant.
 7


 8

          VIDEO-RECORDED DEPOSITION OF
 9                 MARK SCHONE
          Davis Wright Tremaine, LLP
10        1251 Avenue of the Americas
                  21st Floor
11         New York, New York 10020

12                07/13/2023
                10:36 a.m. (EDT)
13

14

15

16

17

18

19

20

21

22

23

24
     REPORTED BY:  MONIQUE CABRERA
25   JOB NO. 455948
```

 1       A.    I don't know, but I see an ICE

 2   statement added.  Certainly, if I got an

 3   ICE statement -- I mean, maybe that's -- I

 4   see a LaSalle Corrections did not

 5   immediately respond.  I would have added

 6   that, but I can't speculate as to whether

 7   or not I wanted to do it.  If I did, I

 8   don't know.

 9            Any one of our editors at NBC

10   News knows that they need to add comment

11   as they get it from any party mentioned in

12   a story.

13       **Q.    Documents like the one reflected**

14   **in Exhibit 105-B where at top it says:**

15   **Revisions new CMS.**

16            **Where do documents like this**

17   **live within NBC?**

18       A.    They live inside the CMS.

19   They're not -- they're not publicly

20   visible.  You go into a file and you --

21   and it lists all the revisions, no matter

22   how miniscule.

23       **Q.    And CMS stands for what?**

24       A.    Content Management System.

25       **Q.    So the versions that are within**

1    the news Content Management System are not

2    necessarily the versions that are

3    published online, true?

4        A.    If it says -- these probably

5    were published.  When it says revisions,

6    it's -- it's showing you everything that

7    was done and all of those things,

8    typically, are made live.

9        Q.    If you flip to tab C, it's a

10   version time stamped 2:28 p.m., just two

11   minutes later, the same word count.

12           Do you recognize that on the

13   document?

14       A.    I see it.

15       Q.    The best I can tell, there's no

16   changes between the version at tab B and

17   tab C.

18           And I assume it's the same

19   answer, but I wanted to ask:  Do you know

20   who would have written the version at tab

21   C?

22       A.    There's a possibility that any

23   change was done by somebody in the video

24   department or in the photo department when

25   a word count doesn't change like that.

```
 1   It's just that the visual elements were
 2   changed.  Those people also have access.
 3   What -- their changes are listed as
 4   revisions as well.  Sometimes they are
 5   simply moving something up or down, a
 6   paragraph, or they're changing the sizing
 7   on a photo or something insignificant, but
 8   everything is recorded.  It could also
 9   have been a typo.  I don't know.
10      Q.    Understood.  Flip, if you would,
11   please, to tab D.  The time stamp on this
12   version is 9/15/2020 at 5:24 p.m.
13            Do you see that?
14      A.    Yes.
15      Q.    Is this the version of the story
16   that Julia Ainsley participated in
17   writing?
18      A.    I believe so, yes.
19      Q.    And this was the first -- strike
20   that.
21            Was this the first version of
22   the story for which you were the editor?
23      A.    Yes.  That -- that I know of.
24   You know, somebody else could have added
25   those other comments as they came in, but
```

```
 1   I don't know that.  Again, it's -- it's a
 2   long time ago.
 3      Q.    Was the version of the article
 4   reflected at Exhibit 105, tab D, approved
 5   by standards?
 6      A.    The reporting in the story is
 7   all approved by legal and standards.
 8      Q.    What is the distinction between
 9   the article being approved versus the
10   reporting being approved?
11      A.    I don't know that there's a
12   meaningful distinction.  The -- we were
13   confident that all the reporting in this
14   was approved by legal and standards, based
15   on our conversations with legal and
16   standards.
17      Q.    The reason I asked you what the
18   distinction was between an article being
19   approved and reporting being approved is
20   because when I asked you whether the
21   article was approved, your answer was the
22   reporting in the story was approved.
23            I'm going to -- I'm giving your
24   counsel background because she's going to
25   say I'm asking the same question again,
```

 1   but that's why.  And here's my question:

 2   Was the version of the article reflected

 3   in Exhibit 105, tab D, approved by

 4   standards?

 5       A.    The reporting in this story was

 6   approved by standards and legal.

 7       Q.    But the article was not, true?

 8             MS. MCNAMARA:  Objection to

 9       form.

10       A.    The reporting in the story was

11   approved by standards and legal.

12   BY MS. EVANS:

13       Q.    I'm going to break up and make

14   sure I get a clear understanding because

15   you've also combined legal and standards,

16   and we know this from your earlier

17   testimony on different things.

18             Was the version of the article

19   reflected in Exhibit 105, tab D, approved

20   by legal?

21       A.    I'm certain that it was.  I am

22   certain -- I'm certain -- I'm certain that

23   the article was -- was -- the contents of

24   the article, the reporting in it were

25   approved by Scholl and Sternlicht.

```
 1                  (Reporter clarification.)

 2       A.    By Scholl and Sternlicht.

 3  BY MS. EVANS:

 4       Q.    I don't want to combine legal

 5  and standards.  As an attorney, I want to

 6  get clear answers to each part, so listen

 7  carefully to my questions.

 8             Was the version of the article

 9  at Exhibit 105-B approved by legal?

10             MS. MCNAMARA:  Objection to

11       form.  Asked and answered.  He

12       answered that question.

13             You can answer it again.

14       A.    The reporting in the story is --

15  was approved by legal.  The reporting in

16  the story was approved by standards.

17  BY MS. EVANS:

18       Q.    Was the article itself reflected

19  in Exhibit 105-D approved by legal?

20       A.    The reporting in the article was

21  approved by legal.

22       Q.    Was the article approved by

23  legal?

24             MS. MCNAMARA:  Objection.  Asked

25       and answered.  He just said the
```

```
 1        reporting and the article was approved
 2        by legal.
 3              MS. EVANS:  He said the
 4        reporting in the article.
 5              MS. MCNAMARA:  No.  Maybe I
 6        misheard him.  I thought he said the
 7        reporting and the article was.
 8        A.   I said "in, in."  The reporting
 9   in the article was approved.
10   BY MS. EVANS:
11        Q.   Was the article reflected at
12   Exhibit 105-D approved by legal?
13        A.   I don't know that there's a -- a
14   meaningful distinction.
15        Q.   Did you send a copy of the
16   article reflected at Exhibit 105-D to
17   legal?
18        A.   I'm certain that I did.
19        Q.   And that would have been via
20   e-mail?
21        A.   Yes.
22        Q.   You wouldn't have read it to
23   someone over the phone, right?
24        A.   Sometimes I do.
25        Q.   Did you here?
```

 1      A.     I don't have any idea.
 2      **Q.     Did you send a copy of the**
 3   **article reflected in Exhibit 105-D to**
 4   **standards?**
 5      A.     Yes, I think so.
 6      **Q.     Via e-mail?**
 7      A.     I think so.
 8      **Q.     To Chris Scholl?**
 9      A.     Generally, I would or, you know,
10   or I would have said here are the
11   questions and then here -- here are the
12   issues and here are the responses, or
13   somebody else might have sent it to him.
14   It is not -- it is not the case that
15   the -- the procedure works exactly the
16   same every time.
17      **Q.     I'm not asking for the purposes**
18   **of this question, if you sent questions or**
19   **parts of a story to standards.**
20           **Did you send a copy of the**
21   **article reflected in Exhibit 105-D to**
22   **standards?**
23      A.     I certainly sent everything that
24   we were going to publish to legal and
25   standards.

```
 1       Q.    Mr. Schone, you told me -- and
 2   we spent some time talking about legal and
 3   standards are different things, all right?
 4             Listen to my question.  Based on
 5   the documents that you did review, did you
 6   see an e-mail reflecting that you sent a
 7   copy of the article reflected in Exhibit
 8   105-D to standards?
 9             MS. MCNAMARA:  Objection.  Asked
10        and answered several times.
11             You can answer the question
12        again.
13       A.    You said "standards," that time.
14   Did you mean legal?
15   BY MS. EVANS:
16       Q.    I have been saying "standards"
17   for several times --
18             MS. MCNAMARA:  You have been
19        saying "legal" for several times.
20             THE WITNESS:  You've been saying
21        -- you've been saying "legal."
22   BY MS. EVANS:
23       Q.    I have asked very clear
24   questions.  I'm going to do it again.
25   Listen to my question.  Don't worry about
```

```
 1    what you think I'm asking.  Just listen to

 2    the question.

 3              MS. MCNAMARA:  Well, he has to

 4       worry about what he thinks you're

 5       asking.  That's what he answered.

 6              MS. EVANS:  Well, but he should

 7       listen to the words and not what he

 8       wants -- I know he wants to tell me

 9       that legal approved it because that's

10       probably what happened; but we don't

11       have it from standards, so I am going

12       to ask my question.

13              MS. MCNAMARA:  His testimony is

14       clear that you have it -- he had it

15       from standards as well; but you can

16       belabor this if you want, Ms. Evans.

17              MS. EVANS:  Well, I'm going to

18       get answers to my question.

19              MS. MCNAMARA:  Well, you've

20       gotten an answers to your question.

21              MS. EVANS:  No, I haven't.

22       A.    I guarantee you that you said

23    "legal" repeatedly.

24    BY MS. EVANS:

25       Q.    I've got -- I am looking at the
```

```
 1    transcript.  Our court reporter is amazing

 2    and I can -- I know what I said, and it's

 3    right here in front of me.

 4            Based on the documents that you

 5    did review, did you see any e-mail

 6    reflecting that you sent a copy of the

 7    article reflected in Exhibit 105-D to

 8    standards?

 9       A.    I believe that I did.

10       Q.    That you did see such an e-mail?

11       A.    I believe that I sent -- that I

12    sent copy, but I can't be certain that I

13    did.

14            I know that I -- that I sent all

15    the reporting or -- or -- you know, Jacob

16    or Julia or I sent all the reporting.

17            (Reporter clarification.)

18       A.    Jacob or Julia or I sent all the

19    reporting to be -- for -- for Chris to

20    review, and that that reporting was

21    approved.  As far as the -- you know,

22    exactly the process by which that

23    happened, I do not recall.

24    BY MS. EVANS:

25       Q.    How did you come to understand
```

1   in your mind that you had approval -- or

2   strike that.

3            In your mind, you had approval

4   for Exhibit 10 -- strike that.

5            Your testimony is that you

6   believed you had approval of the reporting

7   reflected in Exhibit 105-D from standards;

8   is that right?

9       A.   I'm certain that I had approval

10  for the reporting.

11      Q.   And how are you certain that you

12  had that approval from standards?

13      A.   Again, it's been three years;

14  but it is my practice to be certain that I

15  have that approval before I move forward.

16      Q.   So the reason that you believe

17  you had approval before you moved forward

18  is based on your standard practices?

19      A.   That I get approval for the

20  reporting in a story before we publish.

21      Q.   Anything else that gave you that

22  certainty?

23      A.   Might have had a conversation

24  with Chris on the phone; I might not have.

25  I might have seen communication from Julia

```
 1   or Jacob, indicating that it was approved
 2   -- or this type of reporting was approved
 3   --
 4             (Reporter clarification.)
 5             THE WITNESS:  I'm sorry?
 6        A.   I might have seen an e-mail from
 7   Julia, indicating that the reporting was
 8   approved.  I think she sent something to
 9   that effect to Daniella prior to our
10   publication, that said the reporting in
11   this -- you know, This has been approved
12   by standards.
13   BY MS. EVANS:
14        Q.   Do you believe that the alleged
15   approval from standards was communicated
16   to you through Julia or Jacob, as opposed
17   to directly from Chris Scholl?
18        A.   I believe it was communicated to
19   all of us separately or together.  But,
20   you know, Julia is quite careful, and I'm
21   quite careful, and Jacob's careful.  We
22   are not going to publish something on a --
23   on a matter involving serious allegations
24   without consultation and approval from the
25   legal and standards folks.
```

```
 1       Q.    Do you have any recollection of

 2   a specific conversation with Chris Scholl

 3   wherein he communicated approval of any

 4   reporting on September 15th, 2020?

 5       A.    Again, I am not familiar with --

 6   with the contents of all the e-mails from

 7   -- or -- or text or phone calls from

 8   three years ago.  I simply know that on --

 9   all of us are very conscientious about

10   getting approval for our reporting -- for

11   their reporting before we move forward.

12       Q.    So the answer to my question is,

13   no, you don't have any specific

14   recollection of a conversation with Chris

15   Scholl wherein he communicated approval of

16   reporting on September 15th, 2020?

17       A.    I know -- I know that he did.  I

18   know that he did.

19       Q.    Why?

20       A.    I mean, we simply wouldn't have

21   -- we simply wouldn't have done a --

22   published a story without -- with -- all

23   of us were -- been confident that we had

24   approval.  I think that's reflected in

25   what -- what Julia sent.
```

```
 1              The -- I know there were
 2    exchanges in which we asked specific
 3    questions and provided answers, and when
 4    he -- there were answers to the questions
 5    that he raised.  And there were things
 6    added to the story based on the questions
 7    that he raised, but I can't recall the
 8    details.
 9       Q.    When Chris Scholl or someone
10    from standards asked questions and then
11    answers were provided, is that approval by
12    standards?
13       A.    If it -- it -- it can depend on
14    the circumstances.  But there was probably
15    a conversation on the phone that it
16    satisfied the requirements for those
17    specific -- for the specific questions.
18              I mean, this, again, was during
19    COVID, and we talk on the phone all the
20    time.  And we simply talked on the phone
21    even more at that time.  So there is going
22    to be a whole lot of -- there's going to
23    be a whole lot of conversations that are
24    not memorialized.
25       Q.    Simply -- strike that.
```

1    links or writing the headlines or

2    whatever.  She wants to be able to

3    communicate with the -- with the

4    producers, which is, again, separate from

5    what I do and that is, in their

6    preparation for when they're going to be

7    on-air, whenever that is.

8        Q.    If something -- if something was

9    in NewsConnect, it wouldn't necessarily

10   mean that a digital piece on the same

11   subject would be approved by standards,

12   true?

13       A.    It means the reporting -- it

14   means the reporting in the note is

15   approved for all platforms.

16       Q.    If -- if information is in

17   NewsConnect without the word "reportable"

18   or "approved" or "cleared," is it still

19   reportable, in your mind, just because

20   it's in NewsConnect?

21       A.    I look for those words.  People

22   are supposed to put those words there.

23   They're -- that is the protocol.  People

24   don't always do it, but generally they do.

25   It'll say reportable or it'll say

 1   guidance.  We try to encourage people to

 2   do that so that people know the difference

 3   and don't -- guidance is not meant to be

 4   said on-air or published.  It's meant

 5   often -- it's meant often to inform people

 6   why they can or can't use particular

 7   information or how they should frame it.

 8        **Q.    Can you please pull up**

 9   **Exhibit 8?**

10        A.    Sure.

11             (Whereupon, Exhibit 8, E-mail,

12        was identified.)

13        A.    I apologize, I'm not finding it.

14             MS. MCNAMARA:  Neither am I, but

15        I'm sure we'll get there if we go

16        through the stack.  Is it an e-mail?

17             MS. EVANS:  Yes.  I'm sure we

18        looked at it yesterday.  Oh, you know

19        what?  I got it.

20             MS. MCNAMARA:  Well, that's the

21        reason why we're not finding it.

22        Thank you.

23             MS. EVANS:  We must have looked

24        at a different version.

25             THE WITNESS:  Thank you.

```
 1                  MS. EVANS:  Yep, sure.

 2     BY MS. EVANS:

 3         Q.    So I've handed you what's been

 4     previously marked as Exhibit 8, which is

 5     an e-mail chain produced to us in this

 6     case, on September 15, 2020.  It's an

 7     exchange between you -- or strike that.

 8               This is an exchange between

 9     Chris Scholl and Julia Ainsley.  You're

10     not on this one.

11               Do you see that?

12         A.    I do.

13         Q.    And it's CC'd to you at NBCUni

14     News Political desk.

15               Do you see that on the CC?

16         A.    Yes.

17         Q.    Are you part of that deal?

18         A.    I am now.  I don't know if I was

19     then.

20         Q.    In this e-mail, Chris Scholl

21     says to Julia:  Please place this directly

22     in NewsConnect.

23               Do you see that?

24         A.    Yes.

25         Q.    And "this" seems to refer to the
```

1    story copied below from Julia at 5:52 p.m.

2            Do you see that?

3    A.    Yes.

4    Q.    And that is some version of the

5    story regarding Irwin County Detention

6    Center, written in part by Julia Ainsley

7    on September 15, 2020, true?

8    A.    True.

9    Q.    Why would Mr. Scholl ask for

10   that to be placed directly into

11   NewsConnect if it was already approved

12   earlier in the day?

13           MS. MCNAMARA:  Objection to

14       form.

15   A.    I'm not sure I understand the

16   question.  Is this -- I can tell you that

17   if he says, please place this directly

18   into NewsConnect, then he is blessing what

19   I have published as reportable and

20   accurate and approved.  That's -- he wants

21   you to -- the NewsConnect is where the

22   approved reporting goes and this is him

23   approving of it, yet again.

24   BY MS. EVANS:

25   Q.    So approval is communicated by

```
 1   saying put it in NewsConnect?

 2           MS. MCNAMARA:  Objection;

 3       mischaracterization.

 4       A.   No.

 5           MS. EVANS:  I'm asking.  I'm so

 6       confused.

 7           MS. MCNAMARA:  Well, he --

 8       you've -- you've asked this question

 9       ten different ways, the same question.

10           MS. EVANS:  Well, because when

11       he --

12       A.   Earlier, he was asking about

13   whether it is in NewsConnect.  I don't see

14   an answer to that.  I don't know what the

15   answer was to that.

16           But now when he sees this, he

17   says, yeah, put this in NewsConnect.  And

18   that means this story which we published

19   with the approved reporting, which we

20   know -- we did -- we later determined we

21   didn't need to add anything, even

22   though -- you know, I followed up with

23   Chris and said, "I didn't mean to irritate

24   you.  Let's check and make sure that

25   everything is okay" and everything was.
```

```
 1              We didn't have to change
 2    anything.  He's saying, yeah, put this
 3    story into NewsConnect because he's good
 4    with it.
 5    BY MS. EVANS:
 6        Q.    You purport to know the state of
 7    mind of Mr. Scholl on September 15, 2020
 8    at 5:52 p.m.?
 9        A.    He would never do this if he
10    were not good with it because that is his
11    job.
12        Q.    Well, you're the first person
13    that's told me that information going into
14    NewsConnect means it's reportable.
15              Does that surprise you?
16        A.    No.
17              MS. MCNAMARA:  Objection;
18        mischaracterization.
19        A.    That's a mischaracterization of
20    what I said.  As I've said, NewsConnect
21    information is supposed to be marked
22    reportable or guidance.
23    BY MS. EVANS:
24        Q.    Does Mr. Scholl indicate in his
25    e-mail to Julia, asking her to put this in
```

```
 1    NewsConnect, whether to include the term
 2    "reportable"?
 3        A.    It's published on our site, so
 4    it's implicit.
 5        Q.    It's reportable because it was
 6    reported; is that your testimony?
 7        A.    It was published.  It was
 8    reported.
 9            MS. EVANS:  Let the record
10        reflect that general counsel for NBC
11        is smirking and laughing.
12            MS. MCNAMARA:  Objection to the
13        characterization of the -- it is not
14        your job to make a record of someone
15        finding something funny if the --
16            MS. EVANS:  Sure it is.
17            MS. MCNAMARA:  -- if the cause
18        -- if there's good cause for mirth.
19            MS. EVANS:  Well, that phrase
20        has been used multiple times.  So
21        you-all might want to go look at that
22        standards call transcript and listen
23        to it, actually because the -- the
24        inflections don't come across well on
25        the written transcript.
```

```
 1   BY MS. EVANS:
 2        Q.    Well, but it was -- but that's
 3   my -- but my question, Mr. Schone, is:  Is
 4   something reportable simply because it was
 5   reported?
 6        A.    No, because Chris Scholl looked
 7   at it and said -- because it's his job to
 8   do that.  He would not do that.  He would
 9   not say, put this into NewsConnect if he
10   were not good with it.  It is part of his
11   job description, and it's something he
12   does all day long.  When is something
13   reportable?  Chris determines.  Chris --
14   he says, put this in the NewsConnect,
15   because he wants this to be what the --
16   what he refers to -- what all platforms
17   refer to as the state of the reporting on
18   this story.  And I say that with complete
19   confidence.
20        Q.    Can you pull up, please,
21   Exhibit 13.  It should be in that stack.
22            (Whereupon, Exhibit 13, E-mail
23        Chain, was identified.)
24        A.    Yep.
25   BY MS. EVANS:
```

```
 1      Q.     Do you have it?

 2      A.     I do.

 3      Q.     Exhibit 13 is part of the Bite

 4   Verbates e-mail chain on September 15th,

 5   2020.

 6             Do you see that?

 7      A.     I'm sorry?  I --

 8      Q.     I said Exhibit 13 is part of the

 9   e-mail chain --

10      A.     Bite Verbates.

11      Q.     -- Bite Verbates.

12             Do you see that?

13      A.     Yes, I see that.

14      Q.     If you can flip over, please, to

15   -- actually, it's on the front page, the

16   e-mail from Chris Scholl, toward the

17   bottom, at 6:23 p.m.

18             Do you see that?

19      A.     I'm sorry.  Yeah, I see -- yeah,

20   6:23, from Chris Scholl.

21      Q.     So that is later in time than

22   the e-mail we just looked at where he was

23   saying, please place this directly to

24   NewsConnect --

25      A.     Right.
```

1      Q.      -- at 5:53, right, in Exhibit 8?

2      A.      Right.

3      Q.      Could you please read what Mr.

4    Scholl says there?

5      A.      All of this?

6      Q.      Yes.  And remember that the

7    court reporter is writing it, so don't

8    read it super fast.

9      A.      Okay.

10             What I'd asked about was whether

11   Amin had prior complaints about his

12   medicine, malpractice, et cetera, or

13   lawsuits.  If he has not, that is

14   important to include.  It is imperative

15   that standards see the final version of a

16   story like this before it is posted.  It

17   should not be considered approved on basis

18   of answers to questions.

19     Q.      Why do you think Mr. Scholl

20   would have said it's imperative that

21   standards see a final version of a story

22   like this before it's posted if, according

23   to you, he had said things were approved

24   by saying, put it in NewsConnect, earlier,

25   at 5:53?

1      A.    Well, you can see above that, I
2   say:  Apologies for the misunderstanding,
3   my bad.
4            I'm saying, oh, I'm sorry that I
5   didn't do that.
6            I mean, my understanding was
7   that we were all, you know, through
8   because the reporting was approved and he
9   wanted to do another step and I'm trying
10  to accommodate him.  And I'm not
11  considered about the contents, but I
12  recognize his irritation, and I'm trying
13  -- trying to be conciliatory.
14     **Q.    You understand that Mr. Scholl**
15  **did not believe he had signed off on**
16  **behalf of standards to the story reflected**
17  **in Exhibit 105-D that you published at**
18  **5:24 p.m., true?**
19     A.    I understand that he approved
20  the contents of the reporting.
21     **Q.    But you understand that he did**
22  **not believe he had signed off on the**
23  **article itself, true?  Whether you agree**
24  **with it or not, you understand that's what**
25  **he is saying to you here?**

```
 1              MS. MCNAMARA:  Objection to
 2      form.
 3      A.    I see what he has written.
 4  BY MS. EVANS:
 5      Q.    And you acknowledge the
 6  misunderstanding, that you thought
 7  different than him, true?
 8      A.    I -- I -- I'm -- I'm -- I'm
 9  apologizing for the fact that he and I
10  were not understanding each other.  Again,
11  I don't remember what our interactions had
12  been that day, other than, you know, I
13  knew that we had answered all the
14  questions and the reporting was improve --
15  approved.
16      Q.    And you don't remember any other
17  time in your interactions with Mr. Scholl
18  where you had had a misunderstanding
19  similar to the ones that is reflected in
20  Exhibit 13, true?
21      A.    We've worked together for many
22  years.  That could have happened, but I
23  don't have any specific memory of any
24  specific story.  People in newsrooms
25  sometimes get snippy with each other,
```

```
 1   especially working on a deadline.
 2           I don't know.  I don't know.  I
 3   have no -- I have no memory of any
 4   specific case.
 5       Q.    Your role at -- at the NBC News
 6   or NBCUniversal organization is -- is it
 7   limited to print and digital articles?
 8       A.    Almost entirely, yes.
 9       Q.    Do you have any role on what
10   goes on-air on television?
11       A.    I do not have any role on what
12   goes on MSNBC when people are talking
13   about their stories.  I will sometimes for
14   things we're doing on Nightly News be
15   involved in making sure that things are
16   accurate in a script, but that's rare.  I
17   would say 99 percent of my time is spent
18   on digital matters.
19       Q.    Do you -- strike that.
20           Did you review any script for
21   any on-air broadcast of Irwin County
22   Detention Center stories on
23   September 15th, 2020?
24       A.    I don't think I did.  I don't
25   think I read them or certainly didn't
```

 1    review them or approve them or edit them

 2    or anything like that.

 **3**        Q.     **And would that be true, also,**

 **4**    **for September 16th and 17th, 2020?**

 5        A.     I'd be very surprised if I had

 6    had any involvement in anything like that.

 7               When people go on-air to talk

 8    about their stories, they're talking about

 9    what we published online.  And my

10    involvement ends with the -- the

11    publication of their story, and then maybe

12    getting a clip of when they have been on

13    and embedding it in the story.

14               That's my extent of my

15    involvement, if anything, at MSNBC.

**16**        Q.     **Are you involved in crafting or**

**17**    **approving or editing tweets?**

18        A.     I am not.  I used to be involved

19    in that actually, but we always stick

20    close to whatever headlines we have used.

21    I am not involved in the MSNBC News

22    account.  I wasn't involved at the time.

**23**        Q.     **The September 2020?**

24        A.     Yes, I was not involved.  Micah

25    Grimes probably would have been, but I

**DR. MAHENDRA AMIN, M.D. vs NBCUNIVERSAL MEDIA, LLC**
**Mark Schone on 07/13/2023          Index: Scholl's..showing**

22:2,11
34:19
40:25 41:2
43:8 53:17
54:2,15
55:9 57:20
58:5 70:19
71:7,21
78:4 79:8,
12 80:1,
10,20
81:4,17
82:24
83:5,18
86:3,23
87:4 88:12
89:1 97:9,
20 98:9
100:7,24
102:6
103:16,20
104:4,19
105:14
106:17
118:7
127:15
129:16
130:3
131:16
132:11
134:2,11,
15 138:8
140:8
141:20
142:14
145:14
148:6

**Scholl's**
86:10,16
128:16
137:10
140:22

**Schone**  6:3
7:6,12,16
18:4 49:1
57:2 102:3
126:7
131:13
149:11

**script**
107:16,20

**security**
9:18 11:19

**seek**  30:18
31:14,22
33:7

**seeking**
34:17

**sees**  99:16

**Senate**
146:7,18

**send**  42:15
43:2,20
47:1,2,3
64:21
142:1

**sending**  44:4
73:23
143:1

**sends**  59:11
74:12

**sentence**
116:17
117:10
142:9,17,
19

**separate**
14:25
15:21,22
84:25
93:14,15
95:4

**separately**
53:19
64:24
94:23

**September**
23:6,14
24:2,7,11,
23 26:10
27:23
28:16
29:16 30:7
33:4
34:11,14
54:4,16
60:15 61:7
64:15 69:8
71:20 72:6
73:4,17
78:3 79:9,
13 80:11,
12,20
82:25
91:20 97:6
98:7 100:7
103:4
107:23

108:4,23
111:24
113:13
114:12
116:8
119:1,23
121:9
122:11,23
128:16
129:5,11
148:12,20

**sequence**
83:25
84:13

**serve**  92:8
112:25

**service**
16:13,22

**services**
16:19

**set**  64:21,
25 139:16

**Shapiro**
59:20

**shifts**  22:19

**short**  18:16

**shortly**
129:4

**show**  19:6
119:18

**showing**  37:6
47:21
121:25