Declaration of

Elizabeth McNamara

Exhibit 47

AMIN_0011294

AMIN_0011294

Homeland Security

# OFFICE OF INSPECTOR GENERAL

# Medical Processes and Communication Protocols Need Improvement at Irwin County Detention Center

January 3, 2022
OIG-22-14



# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security

Washington, DC 20528 / www.oig.dhs.gov

January 3, 2022

MEMORANDUM FOR:   Tae D. Johnson
Acting Director
U.S. Immigrations and Customs Enforcement

FROM:   Joseph V. Cuffari, Ph.D.
Inspector General

JOSEPH V CUFFARI

Digitally signed by JOSEPH V CUFFARI
Date: 2022.01.03 15:09:13 -05'00'

SUBJECT:   *Medical Processes and Communication Protocols Need Improvement at Irwin County Detention Center*

Attached for your information is our final report, *Medical Processes and Communication Protocols Need Improvement at Irwin County Detention Center.* We incorporated the formal comments provided by U.S. Immigrations and Customs Enforcement in the final report.

The report contains five recommendations aimed at improving ICE's oversight of medical care and facility operations at Irwin County Detention Center ICDC).  Your office concurred with one recommendation but did not concur with four recommendations as it no longer houses detainees at ICDC and its contract with ICDC ended on October 7, 2021.  Based on information provided in the response to the draft report, we consider one recommendation open and resolved.  We have administratively closed four recommendations that cannot be implemented due to the termination of the ICDC contract.  Once your office has fully implemented the recommendation, please submit a formal closeout letter to us within 30 days so that we may close the recommendation.  The memorandum should be accompanied by evidence of completion of agreed-upon corrective actions and of the disposition of any monetary amounts. Please send your response or closure request to oigispfollowup@oig.dhs.gov.

Consistent with our responsibility under the *Inspector General Act,* we will provide copies of our report to congressional committees with oversight and appropriation responsibility over the Department of Homeland Security.  We will post the report on our website for public dissemination.

Please call me with any questions, or your staff may contact Thomas Kait, Deputy Inspector General for Inspections and Evaluations, at (202) 981-6000.

Attachment

# DHS OIG Highlights

## *Medical Processes and Communication Protocols Need Improvement at Irwin County Detention Center*

### January 3, 2022

## Why We Did This Inspection

In September 2020, DHS OIG received complaints concerning medical care, response to COVID-19 protocols, retaliation against employees and detainees, and specific allegations about detainees referred for gynecological procedures at ICDC. We sought to determine whether ICDC provided detainees adequate medical care and adhered to COVID-19 protections. This inspection did not review the gynecological procedure approval process for detainees at ICDC, which has been referred to our Office of Investigations.

## What We Recommend

We made five recommendations to improve ICE's oversight of medical care and facility operations at ICDC.

**For Further Information:**
Contact our Office of Public Affairs at (202) 981-6000, or email us at DHS-OIG.OfficePublicAffairs@oig.dhs.gov

## What We Found

We determined Irwin County Detention Center (ICDC) in Ocilla, Georgia, generally met U.S. Immigration and Customs Enforcement (ICE) detention standards, which specify that detainees have access to appropriate and necessary medical, dental, and mental health care.

However, our contract medical team's evaluation of ICDC's medical processes found the facility's chronic care, continuity of care, and medical policies and procedures to be inadequate. The medical team identified additional concerns in seven other areas: health assessments, medication administration, sick call, health records, program administration, emergency care, and women's health. We initiated a separate audit which will focus on how surgical procedures are authorized and approved for detainees across ICE detention facilities.

Similar to our findings on the ICE detention standards, the facility generally complied with Centers for Disease Control and Prevention and ICE COVID-19 guidance, but ICDC and ICE management did not adequately or consistently keep facility employees, ICE staff, and detainees informed of COVID-19 protocols and guidance. We also found that detainees' communication with, and access to, their ICE deportation officers were limited. Further, some ICE officers stated they were not comfortable expressing concerns with detention conditions.

## ICE Response

ICE did not concur with four recommendations as it no longer houses detainees at ICDC and its contract with ICDC ended on October 7, 2021, but concurred with one recommendation directed at enhancing communication among Atlanta Field Office. We have administratively closed four recommendations and consider one recommendation resolved and open.

AMIN_0011294

AMIN_0011296



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

## Table of Contents

Introduction ................................................................................................ 3

Background ................................................................................................. 3

Results of Inspection ................................................................................. 6

    Medical Care Provided to Detainees Generally Met Standards, but
    Improvements Were Warranted ............................................................. 7

    ICDC Generally Complied with CDC and ICE COVID-19 Guidance, but
    Faced Challenges Implementing Protocols ......................................... 12

    Communication about COVID-19 to ICE Officers, Facility Staff, and
    Detainees Was Inconsistent ................................................................. 17

    Detainees' Access to ICE Deportation Officers Was Limited during the
    COVID-19 Pandemic ............................................................................ 19

    Detainees and ICDC Staff Were Generally Comfortable Lodging
    Concerns, but Some ICE Officers Were Hesitant to Voice Their
    Concerns ............................................................................................... 21

Recommendations ..................................................................................... 22

Management Comments and OIG Analysis ............................................... 23

## Appendixes

    Appendix A: Objective, Scope, and Methodology ............................... 26
    Appendix B: ICE Comments to the Draft Report ................................. 27
    Appendix C: NCCHC Resources, Inc., Irwin County Detention Center
    Inspection Report ................................................................................. 32
    Appendix D: Office of Inspections and Evaluations Major Contributors
        to This Report ............................................................................ 64
    Appendix E: Report Distribution ......................................................... 65

## Abbreviations

| | |
|---|---|
| ADP | average daily population |
| CDC | Centers for Disease Control and Prevention |
| COVID-19 | coronavirus disease 2019 |

AMIN_0011294

AMIN_0011297



# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security

| | |
|---|---|
| DOJ | Department of Justice |
| DRF | Detainee Request Form |
| ERO | Enforcement and Removal Operations |
| EUA | Emergency Use Authorization |
| FDA | Food and Drug Administration |
| HIPAA | Health Insurance Portability and Accountability Act |
| ICDC | Irwin County Detention Center |
| ICE | U.S. Immigration and Customs Enforcement |
| IGSA | intergovernmental services agreement |
| IHSC | ICE Health Service Corps |
| LPN | licensed practical nurse |
| NCCHC | National Commission on Correctional Health Care |
| NSAID | non-steroidal anti-inflammatory drug |
| PBNDS | Performance-Based National Detention Standards |
| PPE | personal protective equipment |
| PRR | Pandemic Response Requirements |
| TDY | temporary duty |
| U.S.C. | United States Code |

AMIN_0011294

AMIN_0011298



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

# Introduction

In September 2020, Project South, an advocacy group, filed a complaint with Department of Homeland Security Office of Inspector General concerning the Irwin County Detention Center (ICDC) in Ocilla, Georgia, which houses U.S. Immigration and Customs Enforcement (ICE) detainees.  We started our review in October 2020.  The complaint included allegations from ICE detainees and a licensed practical nurse previously employed by ICDC about inappropriate medical care, inadequate response to coronavirus disease 2019 (COVID-19), and retaliation against employees and detainees.[1]  It also included specific allegations about the rate at which intrusive gynecological procedures were performed on ICE detainees in ICDC custody.  In response to this complaint, numerous hotline complaints DHS OIG recieved,[2] and congressional requests, we sought to determine whether ICDC provided adequate medical care to detainees and whether COVID-19 protections were in place and adequate.  This inspection did not review the gynecological procedure approval process for detainees at ICDC, which has been referred to our Office of Investigations. We also initiated a separate audit which will focus on how surgical procedures are authorized and approved for detainees across ICE detention facilities.

# Background

ICE apprehends, detains, and removes noncitizens who are in the United States unlawfully.  ICE Enforcement and Removal Operations (ERO) oversees the detention of noncitizens in approximately 150 detention facilities in conjunction with private contractors or state or local governments.  ICDC is owned by LaSalle Corrections and operates under an intergovernmental service agreement (IGSA) as an ICE detention facility.[3]  As of February 2021, ICDC held 236 male and 9 female immigration detainees.  In addition to ICE detainees, the facility houses Federal prisoners for the U.S. Marshals Service and Irwin County inmates.  In May 2021, Secretary Mayorkas announced DHS

---

[1] Allegations regarding reprisal or retaliation against employees were referred to another DHS OIG office.

[2] Between FY 2017 and FY 2020, the DHS OIG Hotline received 795 complaints referencing ICDC.  Many Hotline complaints originated from detainees in the facility, family members of detainees within the facility, and those who had previously been detained at ICDC.

[3] ICE uses DHS authority under the *Immigration and Nationality Act* to enter into IGSAs with state or local entities (e.g., a county sheriff or a city government).  These entities, in turn, may contract with a private company to provide detention services, or provide the services using local law enforcement entities (such as a local jail that holds criminal populations and ICE detainees).  The *Immigration and Nationality Act*, as amended, grants ICE the authority to enter into an agreement with a state or locality to provide necessary clothing, medical care, requisite guard hire; and the housing, care, and security for detained individuals.  See 8 United States Code (U.S.C.) § 1103(a)(11)(A).

AMIN_0011294

AMIN_0011299



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

plans to discontinue the use of ICDC as soon as possible and transfer all detainees whose continued detention is necessary.  ICE terminated the contract with LaSalle Corrections effective October 7, 2021, and as of September 3, 2021, ICE no longer housed detainees at ICDC.

ICDC is required to follow the *2011 ICE Performance-Based National Detention Standards* (PBNDS).[4]  According to ICE, the PBNDS reflect ICE's ongoing effort to tailor the conditions of immigration detention to its unique purpose while maintaining a safe and secure detention environment for staff and detainees.  ICE detention standards require that all facilities provide detainees with access to appropriate and necessary medical, dental, and mental health care, including emergency services.  These standards also require facilities to have written plans that address the management of infectious and communicable diseases, including, but not limited to, education, prevention, testing, and isolation.

ICE Health Service Corps (IHSC) provides direct on-site medical services in at least 20 facilities that house ICE detainees for more than 72 hours.  At all other detention facilities, including ICDC, local government staff or private contractors deliver on-site care while IHSC provides general oversight of those facilities' medical services.[5]  ICE ERO also provides on-site management of detention operations in an effort to ensure a safe and secure detention environment for staff and detainees.  At the time of our review, the ICE staff at ICDC included a detention standards compliance officer from ICE ERO Custody Management, as well as an ERO supervisory detention and deportation officer, and three deportation officers, some on permanent and some on temporary bases.[6]

On March 11, 2020, the World Health Organization declared the outbreak of the infectious and communicable COVID-19 a pandemic.  In March 2020, ERO decided to reduce the population of all detention facilities to 75 percent capacity or less, to allow for greater social distancing.[7]  When we initiated this

---

[4] ICDC followed the 2008 PBNDS until June 15, 2020.

[5] IHSC does not directly provide or direct the medical care in approximately 148 non-IHSC-staffed detention facilities.  IHSC oversees those facilities' compliance with national detention standards and coordinates medical referrals through the Field Medical Coordinator Program. In addition, IHSC oversees the financial authorization and payment for off-site specialty and emergency care services for detainees in ICE custody.

[6] In lieu of assigning all deportation officers at ICDC on a permanent basis, some ICE officers have temporary duty (TDY) assignments to ICDC, which can be voluntary or mandatory, with an average detail length of 60 days.

[7] Since March 1, 2020, ICE ERO has decreased its detainee population by more than 7,000 individuals.  In March 2020, ERO evaluated its detainee population and released more than

AMIN_0011294

AMIN_0011300



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

review in October 2020, ICDC had an average daily population (ADP) of 406, compared with 878 detainees in October 2019, a 54 percent reduction. Although ICE reduced the ICDC ADP and the facility enhanced COVID-19 sanitation protocols, we were not able to determine if these actions had a direct effect in mitigating the spread of COVID-19 in the facility. Table 1 shows the reduced ADP at ICDC from October 2019 to March 2021.

**Table 1. ICDC Average Detainee Population (ADP), October 2019 to May 2021**

| Month | Female ADP | Male ADP | Total ADP |
|---|---|---|---|
| October 2019 | 344 | 533 | 878 |
| November 2019 | 324 | 495 | 819 |
| December 2019 | 296 | 462 | 758 |
| January 2020 | 292 | 453 | 745 |
| February 2020 | 297 | 420 | 717 |
| March 2020 | 277 | 354 | 631 |
| April 2020 | 189 | 395 | 583 |
| May 2020 | 140 | 393 | 534 |
| June 2020 | 127 | 352 | 479 |
| July 2020 | 119 | 391 | 510 |
| August 2020 | 113 | 369 | 482 |
| September 2020 | 100 | 336 | 436 |
| October 2020 | 85 | 321 | 406 |
| November 2020 | 71 | 298 | 369 |
| December 2020 | 50 | 319 | 369 |
| January 2021 | 24 | 296 | 320 |
| February 2021 | 9 | 236 | 245 |
| March 2021 | 5 | 180 | 185 |
| April 2021 | 1 | 111 | 113 |
| May 2021 | 0 | 271 | 271 |

*Source*: ICE Integrated Decision Support.
Note: Due to rounding, the total ADP may not equal the sum of the male and female ADP for each month.

In response to the pandemic, the Centers for Disease Control and Prevention (CDC) issued its *Interim Guidance on Management of Coronavirus Disease 2019*

---

900 individuals who might be at higher risk for severe illness as a result of COVID-19, after evaluating their immigration history, criminal record, potential threat to public safety, flight risk, and national security concerns. ERO continues to assess other potentially vulnerable populations currently in ICE custody and all new arrestees. Additionally, ERO has fewer new detainees coming from U.S. Customs and Border Protection, resulting from Title 42 restrictions. See https://www.ice.gov/coronavirus and 42 U.S.C. § 265, 268 (b).

AMIN_0011294

AMIN_0011301



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

*(COVID-19) in Correctional and Detention Facilities*, to "ensure continuation of essential public services and protection of the health and safety of incarcerated and detained persons, staff, and visitors."[8]  The CDC frequently updated this guidance on its website between March 2020 and June 2021 as more information about COVID-19 became available.  Based on CDC guidance, ICE provided *Pandemic Response Requirements* (PRR) to help facility operators "sustain detention operations while mitigating risk to the safety and well-being of detainees, staff, contractors, visitors, and stakeholders due to COVID-19."[9]  ICE first issued the PRRs in April 2020 and subsequently released five updated versions as COVID-19 protocols evolved.

The objective of our review was to determine whether ICDC provided adequate medical care to detainees and whether COVID-19 protections were in place and adequate.[10]  We conducted our work remotely, given the inherent risks associated with on-site inspections during the COVID-19 pandemic.[11]  We interviewed ICE personnel, ICDC officials, and detainees by telephone.  We also viewed surveillance video from common and housing areas.  To assess medical care, we utilized medical experts from the National Commission on Correctional Health Care (NCCHC) Resources, Inc.[12] to conduct a virtual tour of the ICDC medical unit and medical records review.

## Results of Inspection

We determined ICDC generally met ICE detention standards, which specify that detainees have access to appropriate and necessary medical, dental, and mental health care.  However, the NCCHC Resources medical team's evaluation of ICDC's medical processes found the facility's chronic care, continuity of care, and medical policies and procedures to be inadequate.  The medical team identified additional concerns in seven other areas: health assessments, medication administration, sick call, health records, program administration, emergency care, and women's health.  Similar to our findings on the ICE detention standards, the facility generally complied with CDC and ICE COVID-19 guidance, but ICDC and ICE management did not adequately or

---

[8] https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html.
[9] ERO, *COVID-19 Pandemic Response Requirements* (Version 1.0, April 10, 2020).
[10] DHS OIG is also conducting a separate, in-depth evaluation of ICE's handling of COVID-19 in its detention facilities.
[11] At the time of this review, COVID-19 vaccines were not widely available.
[12] NCCHC Resources, Inc. works to strengthen the mission of its parent company (NCCHC), to improve the quality of health care in prisons, jails, and juvenile detention and confinement facilities.  NCCHC Resources was created to manage the increasing demand for correctional health care technical assistance and other consulting work through the provision of high-quality consulting services. https://www.ncchc.org/work

AMIN_0011294

AMIN_0011302



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

consistently keep facility employees, ICE staff, and detainees informed of COVID-19 protocols and guidance.  We also found that detainees' communication with, and access to, their ICE deportation officers were limited.  Further, some ICE officers stated they were not comfortable expressing concerns about detention conditions during the pandemic.

## Medical Care Provided to Detainees Generally Met Standards, but Improvements Are Necessary

We determined ICDC adhered to ICE 2011 PBNDS, which specify that detainees have access to appropriate and necessary medical, dental, and mental health care.[13]  Our contracted medical team assessed the adequacy of medical processes and policies and the appropriateness of any actions taken to address medical concerns.[14]  NCCHC Resources' full report evaluating the 36 defined medical care processes is included as Appendix C.  Of those 36 processes, NCCHC Resources determined 3 — chronic care, continuity of care, and policies and procedures — were inadequate.[15]  The medical team identified additional concerns in seven other areas: health assessments, medication administration, sick call, health records, program administration, emergency care, and women's health.[16]  These results should be considered in the context that medical care in fiscal year 2020 was provided to a detainee population in ICDC that was significantly less than normal, due to the COVID-19 pandemic.

### ICDC Medical Unit Needs to Improve Chronic Care Program Organization, Continuity of Care, and Policies and Procedures

The contract medical team reviewed 37 medical files with chronic care diagnoses.  The team determined that care for chronic conditions, such as hypertension, hyperlipidemia, diabetes, asthma, and menstrual disorders, appeared adequate, but that the chronic care program itself was inadequate.[17]  Of the 37 medical files reviewed, the NCCHC Resources physician identified

---

[13] ICE, *Performance-Based National Detention Standards, 2011,* § 4.3, *Medical Care* (Revised Dec. 2016) ("PBNDS 2011").
[14] NCCHC Resources' review included 195 medical records of detainees with stays at ICDC of 180 days or longer between FY 2017 and FY 2020, as well as the provision of care for 37 detainees who had chronic care conditions.  NCCHC Resources also reviewed 5 medical records resulting from our interviews with ICDC detainees.
[15] See Appendix C, *Policies and Procedures,* pp. 38–39; *Chronic Care,* pp. 44–45; and *Continuity of Care,* pp. 45–46.
[16] See Appendix C, *Health Assessments,* pp. 40–41; *Pharmacy Management/Medication Management,* pp. 49–50; *Sick Call/Nursing Protocols,* pp. 43–44; *Health Records,* p. 38; *Program Administration,* p. 37; *Emergency Care,* p. 48; and *Women's Health,* pp. 46–47.
[17] See PBNDS 2011, § 4.3, *Medical Care,* W. *Special Needs and Close Medical Supervision.*

AMIN_0011294

AMIN_0011303



## OFFICE OF INSPECTOR GENERAL
Department of Homeland Security

issues in 15 files related to chronic care management.[18]  Our contract medical team found the medical unit did not have consistent guidance or provider-developed guidelines for chronic care; rather, ICDC medical staff reported using several different guidance documents for care.  The contract medical team also found provider staff were not monitoring and documenting the current status or condition of detainees with chronic conditions.  In addition, the contract medical team identified records where providers acknowledged laboratory results, but did not include interpretation of those results, actions taken regarding those results, and proof of sharing the results with the detainee.

The NCCHC Resources physician identified issues regarding the continuity of care process[19] in 12 of the 37 detainee medical files reviewed.[20]  In nine of the cases, the physician highlighted issues with both continuity of care and chronic care.  These issues included multiple medical files missing care plans,[21] records without planned chronic care visits,[22] missing laboratory results,[23] and improper medications.[24]  We also found issues in medical records, including unexplained orders, grievance responses, improper referrals, and timeliness concerns.[25]

The contract medical team deemed ICDC's policies and procedures process inadequate because ICDC had not established facility-specific policies and procedures.  Instead, it relied on overarching policies and procedures established by the facility contractor, LaSalle Corrections.  For example, we found the terminal illness policy references Louisiana state laws, even though ICDC is located in the state of Georgia.[26]  Additionally, a detainee medical restraint and seclusion policy exists despite ICDC reporting that the facility does not use either method in the ICDC medical facility.  Without clear written policies and procedures specific to the facility, ICDC staff do not have adequate guidance.  As a result of the lack of facility specific policies, the facility was also found to be delinquent on annual reviews of facility-specific policies and

---

[18] For chronic care issues, see cases 1, 4, 8–9, and 13–20 in Appendix C.

[19] PBNDS 2011, § 4.3, *Medical Care*, Z. *Continuity of Care.*  Continuity of care requires the facility Health Service Administrator to ensure a plan is developed that provides for continuity of medical care in the event of a change in detention placement or status.

[20] For continuity of care issues, see cases 2–4, 6, 8, 10–17, and 19–20 in Appendix C.

[21] Appendix C, cases 6, 10–12, and 14–15.

[22] Appendix C, cases 2, 4, 11, and 13.

[23] Appendix C, cases 1, 9–10, 12, and 19–20.

[24] Appendix C, cases 3, 5, 7–8, 11, 16, 18, and 20.

[25] Appendix C, see case 20 for unexplained order, case 4 for issues with grievances, case 3 for improper referrals, and case 17 for timeliness concerns.

[26] It appears ICDC's terminal illness policy referenced Louisiana state laws because ICDC was using a policy from another LaSalle detention facility located in Louisiana.

AMIN_0011294

AMIN_0011304



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

procedures, which are necessary to ensure appropriate updates are made when said policies and procedures are in place.

**ICDC Needs to Improve Health Assessments, Medication Administration, Sick Call, Health Records, Program Administration, Emergency Care, and Women's Health**

*Health Assessments*

The contract medical team reviewed 195 detainee intake records and found that care was timely and complete, with only 3 records indicating minor issues that were not reflections of an inefficient intake program.[27]  Overall, ICDC's compliance with standards in this area was adequate, but there is room for improvement.  For example, we found ICDC does not have defined health assessment criteria to provide consistent and adequate periodic health assessments.[28]  We also identified 7 records indicating the health assessment occurred after the required 14-day timeframe, and 15 records missing health assessment documentation.  Additionally, the NCCHC Resources physician found one case where a detainee reported at intake a history of asthma with previous inhaler use, but the initial health assessment of the detainee, days later, did not acknowledge that health history.[29]

*Medication Administration Process*

The 2011 PBNDS require prescriptions and medications to be ordered, dispensed, and administered in a timely manner and as prescribed by a licensed health care professional.[30]  Although the pharmacy and the medication management processes were found to be adequate, some issues in medication administration exist.  For example, our medical contractors found it "almost impossible to provide an accurate assessment of medication administration practices based on the documentation provided in the health record."[31]  To complete the medication assessment review, the medical team

---

[27] PBNDS 2011, § 2.1, *Admission and Release*.  Intake occurs within 12 hours of a detainee's arrival at the facility and prior to placement in the general population.  A more in-depth initial health care assessment occurs after intake, approximately 14 days after a detainee's arrival at the facility.  PBNDS 2011, § 4.3, *Medical Care*.  Each detainee shall receive a comprehensive health assessment, including a physical examination and mental health screening, by a qualified, licensed health care professional no later than 14 days after entering into ICE custody or arrival at facility.
[28] See Appendix C.
[29] Asthma is a chronic care condition that requires continuous and ongoing care.  See Appendix C, case 4.
[30] PBNDS 2011, § 4.3, *Medical Care*.
[31] Appendix C, report p. 16.

AMIN_0011294

AMIN_0011305



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

needed the original order, documentation of first dose, and the medication administration record, which were missing from the health records provided from ICDC.  To determine the quality of medication services, the contracted medical team reviewed 37 chronic care health records.  Of the 37 records, 22 indicated detainees were seen by a provider, received their medication promptly, and were found to have properly taken the medication.  The remaining 15 records showed detainees' general lack of compliance taking medication.  Nursing staff documented detainees who did not show up for pill call, but the records did not have detainee signatures demonstrating refusal of the medication.[32]  Additionally, only some detainees received provider's education on the importance of medication administration.

During our interviews, a detainee reported difficulty receiving medication, and we referred the case to the NCCHC Resources physician for review.[33]  This record revealed the detainee did not show up for medication pass[34] to receive the prescribed medication for most of July and part of August 2020.  The medical staff did not adhere to the facility policy requiring provider medication counseling after 3 days of missed medication.  The detainee was not seen by a provider until August 9, 2020.

*Sick Call and General Nursing Protocols*

The NCCHC Resources team found co-related issues in the areas of sick call and nursing protocols.[35]  They reviewed 195 health records with 236 sick call visits.  The team determined that care provided during 8 of the 236 visits could have had been more appropriate.  The team also found issues with nursing protocols that allow the nursing staff to provide over-the-counter medications without checking the current medications the detainee is prescribed.  For example, the nursing protocols allow nurses and licensed practical nurses (LPN) to administer appropriate amounts of ibuprofen to detainees, resulting in some detainees receiving ibuprofen while already on other non-steroidal anti-inflammatory drugs (NSAID), which the NCCHC Resources team determined

---

[32] PBNDS 2011, § 4.3, *Medical Care*.  ICE requires facilities to maintain written records of all prescribed medication given to or refused by detainees.
[33] Appendix C, case B.
[34] Medication pass is the administering of prescribed drugs by nurses or aides to a group of patients or residents, in accordance with state and federal standards.
[35] 2011 PBNDS, § 4.3, *Medical Care*, S. *Sick Call*.  Facilities are required to have sick-call procedures that allow detainees unrestricted opportunity to freely request health care services and that ensure sick-call requests are received and triaged by appropriate medical personnel within 24 hours of the detainees' requests.  At ICDC, detainees are able to make sick-call requests using electronic tablets or by submitting paper requests into a confidential lockbox.

AMIN_0011294

AMIN_0011306



## OFFICE OF INSPECTOR GENERAL
### Department of Homeland Security

was inappropriate.[36]  An ICDC provider specifically stated in one medical record that the detainee was not to be prescribed NSAIDs.  However, the detainee was prescribed an NSAID 3 days later during a sick-call visit by a different provider.  The current facility-established nursing protocols would not identify this medication administration as inappropriate.[37]

During our interviews on February 24, 2021, one detainee reported being referred to a provider during a sick-call visit but was restricted from seeing a provider due to being under a quarantine.  We referred this case to the NCCHC Resources physician who reviewed the medical record and found the detainee had been referred to a provider on February 12, 2021, but there was no documentation indicating a provider had ever seen the detainee.[38]  On-site medical staff assured the team that quarantine does not limit a detainee's ability to be seen by a provider.  However, staff could not supply documentation showing a provider saw the detainee.

*Health Records*

During the health records review, the contracted medical team was unable to determine if a Health Insurance Portability and Accountability Act (HIPAA) program was in place and properly applied.  No evidence of HIPAA training was provided to the medical team for evaluation, despite the team's request.

*Overall Program Administration*

The program administration review found ICDC's medical unit had not developed a continuous quality improvement program.  The purpose of a continuous quality improvement program is to improve health care by identifying problems, implementing and monitoring corrective action, and studying the improvement program's effectiveness.  ICDC did not provide documentation showing any organized approach to evaluate the delivery of health care services.

---

[36] Appendix C cases 3, 5, and 18.  NCCHC Resources defines nursing protocols as written instructions or guidelines that specify the steps to be taken to evaluate a patient's health status and provide intervention.  These protocols include acceptable first-aid procedures and care of ailments that would ordinarily be treated with over-the-counter medication or through self-care.
[37] Appendix C, case 18.
[38] Appendix C, case A.

AMIN_0011294

AMIN_0011307



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

*Emergency Care*

During the emergency care review, despite NCCHC Resources' request, the medical unit was unable to provide emergency response drill documentation, making it unclear whether the drills were being conducted. Lack of emergency preparation, such as conducting drills, could hinder proper response to emergency situations at ICDC.

*Women's Health*

Based on its medical records review, the NCCHC Resources team determined women's health care to be appropriate.[39] However, off-site specialty provider care information was not consistently returned to the ICDC medical unit.

Proper health assessments, medication administration, sick-call procedures, and general nursing protocols are necessary to ensure that sufficient care is provided to detainees. Appropriate documentation, procedures for health records, and off-site documentation related to women's health care ensure adequate care is provided to each individual detainee. Continuous quality improvement protocols ensure responsiveness to detainee needs. Additionally, having emergency response plans ensures personnel and detainee safety while in the medical unit.

## ICDC Generally Complied with CDC and ICE COVID-19 Guidance, but Has Faced Challenges Implementing Protocols

The Project South complaint letter described allegations regarding the lack of COVID-19 protections at ICDC. Specifically, the complaint alleged the facility:

- did not implement social distancing;
- did not provide sufficient face masks for detainees and allowed employees to enter the facility without wearing personal protective equipment (PPE);
- allowed detainees with COVID-19 to transfer into the facility, and transferred detainees with COVID-19 out of the facility;
- failed to test detainees for COVID-19 who exhibited symptoms such as coughing or fever; and
- allowed employees with COVID-19 symptoms to report to work.

---

[39] The NCCHC Resources team did not evaluate the specific allegations of inappropriate gynecological care, as those have been referred to our Office of Investigations.

AMIN_0011294

AMIN_0011308



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

We discussed these issues with detainees and staff, and reviewed records and video footage from the facility to determine whether we could substantiate these allegations. ICDC generally complied with guidance, but we identified issues with social distancing, wearing of PPE, and routine testing for COVID-19. Our findings for each of the allegations follow.

**Allegation: ICDC Did Not Implement Social Distancing**

The team found that ICDC did not adequately implement and enforce social distancing protocols. CDC guidance recommends prevention practices for detainees and staff in detention facilities to include implementing social distancing strategies and wearing face masks to help reduce the risk of transmission and severe disease from COVID-19.[40] ICE's PRR provide additional social distancing measures for detention facilities to implement, if practicable, such as housing detainees in individual rooms, rearranging beds in housing areas to maintain 6 feet of separation, and having detainees sleep "head-to-foot" in shared sleeping quarters. We found ICDC staff and detainees did not always observe or enforce these protocols.

In our interviews, female detainees expressed concerns about being moved to a dorm where they had difficulty social distancing. ICDC's ADP of female detainees decreased from 100 in September 2020 (when the complaint was sent) to 9 in February 2021, with all females consolidated into two dorms. Detainees described these dorms as double-wide trailers with the beds very close together (2 feet apart), minimizing their ability to be 6 feet apart from each other. The security camera footage from one of these dorms corroborated the bunk beds had very little space between them. We also noted that female detainees in the dorm did not wear masks or practice social distancing with each other while in the common areas of the dorm.

During our review of ICDC security footage from cameras throughout the facility, we observed instances of detainees and staff members near each other while not wearing masks. Staff told us detainees are required to wear masks outside dormitory areas and are encouraged to wear masks and practice social distancing within the dorms, but detainees often choose not to do so within the dorms. The September 2020 ICE guidance makes no distinction between the need for mask-wearing inside or outside dormitory areas. The facility risks additional COVID-19 spread by not ensuring detainees practice social distancing and wear masks within the dormitory area and housing units.

---

[40] CDC, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities Guidance for Correctional & Detention Facilities* (July 2020).

AMIN_0011294

AMIN_0011309



## OFFICE OF INSPECTOR GENERAL
Department of Homeland Security

**Allegation: ICDC Did Not Provide Sufficient Face Masks for Detainees and Allowed Employees to Enter the Facility without Wearing PPE**

The team confirmed that ICDC encountered problems obtaining and distributing masks to detainees and staff at the beginning of the COVID-19 pandemic. As of April 2020, ICE PRR guidance recommended detainees and staff wear cloth masks to help slow the spread of COVID-19. ICE updated the PRR guidance in July 2020 to require facilities to provide cloth masks to detainees at no charge, which the facility did beginning in May 2020. However, we heard in numerous interviews that confusion at the beginning of the pandemic made for a late and inconsistent implementation of mask distribution and wearing. For example, an ICDC officer said that, at the beginning of the pandemic, employees were instructed by management not to wear masks. ICE officers also confirmed that, at the beginning of the pandemic, the facility had limited numbers of masks and gloves available for ICDC officers and detainees, but ICE provided masks and gloves for ICE personnel. ICDC management acknowledged that its mask roll-out was slow, which it attributed to confusion over guidance.

Most detainees and staff we interviewed told us the staff wore their masks consistently. Staff also said they were required to wear masks and PPE or would face disciplinary action. Our review found that ICDC did not consistently ensure staff appropriately wore masks. We reviewed surveillance video footage from February 22, 2021, and March 10, 2021, and observed facility staff not wearing masks or practicing social distancing (see Figures 1 and 2).




**Figures 1 and 2. ICDC staff not wearing masks and not practicing social distancing on February 21, 2021.**
*Source*: Video surveillance footage provided by ICDC.

AMIN_0011294

AMIN_0011310



## OFFICE OF INSPECTOR GENERAL
Department of Homeland Security

In addition, most ICDC staff we interviewed said they were comfortable reporting to work with the COVID-19 protocols that were in place. Those who expressed a degree of discomfort listed the following as potential concerns:

- possibility of contact with asymptomatic detainees;
- uncertainty of PPE protection when in direct contact with COVID-19 positive detainees;
- lack of consistency enforcing facility entrance protocols; and
- lack of COVID-19 testing for facility staff.

**Allegation: ICDC Allowed Detainees with COVID-19 to Transfer into the Facility, and Transferred Detainees with COVID-19 out of the Facility**

The team found that ICE transferred a small number of COVID-19 positive detainees in and out of ICDC during the COVID-19 pandemic. This was in line with ICE guidance as an operational requirement. ICE PRR guidance allows for the limited transfer, where possible, of ICE detainees to and from other jurisdictions and facilities. The transfers may occur, if necessary, for medical evaluation, medical isolation/quarantine, clinical care, extenuating security concerns, to facilitate release or removal, or to prevent overcrowding. According to ICE, between March 2020 and March 2021, one detainee transferred out of ICDC to another facility, and two detainees transferred into ICDC from another facility, while positive for COVID-19. Other detainees were repatriated or released, including two detainees who were released after testing positive for COVID-19. As of October 2020, CDC guidance did not require detainees to be COVID-19 negative before transfer or release. We interviewed ICDC intake officers and reviewed ICE PRR and ICDC intake policies and procedures and determined that ICDC adhered to proper procedures when transferring detainees with a positive COVID-19 test.

**Allegation: ICDC Failed to Test Detainees for COVID-19 Who Exhibited Symptoms Such as Coughing or Fever**

We found that, although ICDC has implemented testing and other procedures to slow the spread of COVID-19, it did not routinely test asymptomatic detainees. CDC guidance states that detainees exhibiting COVID-19 symptoms should be separated from other detainees and get tested. The guidance does not dictate testing of asymptomatic detainees. However, it suggests facilities consider strategies for testing asymptomatic detainees without known exposure to COVID-19 for early identification of COVID-19 in the facility. As of July 2021, ICDC reported 146 detainees with confirmed COVID-19 infections, and no detainee deaths in the facility were attributed to COVID-19.

AMIN_0011294

AMIN_0011311



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

According to testing records we reviewed, ICDC tested a detainee for COVID-19 for the first time on March 31, 2020. During April and May 2020, ICDC tested a total of 57 detainees. We were not able to determine the reason for testing these detainees because ICDC did not track the reason for testing. However, ICDC staff members told us that all detainees are tested upon intake and whenever they present COVID-19 symptoms. In August 2020, ICDC tested 499 detainees; 461 of the detainees were tested on August 18 during a facility-wide test. All 12 detainees we interviewed in February 2021 indicated they had been tested for COVID-19 at least once while detained at ICDC.

Instead of testing asymptomatic detainees, the facility used a cohorting approach.[41] ICDC staff used the "cohort" term to refer to dorms that house detainees during quarantine.[42] Interviewees consistently stated that when a detainee tested positive for COVID-19, the detainee was put in medical isolation,[43] and the rest of the dorm residents were quarantined together and monitored for symptoms. The neighboring dorms were also monitored for COVID-19 symptoms.

**Allegation: ICDC Allowed Symptomatic Employees to Work**

We were not able to confirm this allegation as the ICDC policy requires employees and visitors to self-report COVID-19 symptoms. As of October 2020, CDC guidance required symptomatic staff to self-quarantine. To ensure continuity of operations, staff could continue to work following potential exposure if they remained asymptomatic and additional precautions were implemented to protect them and others. In order to enter the facility, employees and visitors must have completed a COVID-19 questionnaire and had their temperature taken by an automated temperature scanner.[44] One staff member described witnessing officers at the main entrance not taking seriously their responsibility to perform temperature self-screenings and not paying attention when the reader identified an abnormal temperature. All of the other staff members we spoke with said employees with symptoms were not allowed to work. Several staff we spoke with had either contracted COVID-19

---

[41] ICE ERO's PRR defines cohort as a group of persons with a similar condition grouped or housed together for observation over a period of time.

[42] Quarantine is the separation of a person or group of people reasonably believed to have been exposed to a communicable disease but not yet symptomatic, from others who have not been exposed, to prevent the possible spread of the communicable disease.

[43] Isolation is the separation of a person or group of people known or reasonably believed to be infected with a communicable disease and potentially infectious from others to prevent the spread of the communicable disease.

[44] ICDC COVID-19 Employee/Visitor/Attorney/Contractor Screening Form.

AMIN_0011294

AMIN_0011312



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

or had close contact with a family member with COVID-19 and were familiar with the protocols for self-identifying and not reporting to work.

## Communication about COVID-19 to ICE Officers, Facility Staff, and Detainees Was Inconsistent

Our review of ICDC's response to COVID-19 identified issues with communication to ICE officers, facility staff, and detainees. First, staff and detainees reported not receiving consistent information regarding positive COVID-19 cases within the facility. Additionally, confusion existed among staff and detainees regarding access to PPE. Lastly, detainees reported not being informed of their cohort or quarantine status, their COVID-19 test results, or facility COVID-19 protocols.

### Positive Cases of COVID-19 Were Not Appropriately Communicated to ICE Officers, Facility Staff, and Detainees

At the time of our review, CDC guidelines stated facilities should provide clear information to detainees and staff about the presence of COVID-19 in the facility and the protections in place. However, opinions varied among ICE, ICDC staff, and the detainees regarding the quality and extent of COVID-19 communication. Specifically, on-site ICE officers, ICDC staff, and detainees complained about poor communication and a lack of transparency about suspected and confirmed cases in the facility. One ICE officer described not hearing about confirmed cases at the facility from ICE management or facility staff prior to arriving for a TDY assignment. Another ICE officer said the ICE field office would send ICE staff electronic notifications regarding potential exposures to detainees with COVID-19, stating there were no exposures to staff, but the officer did not believe ICE was asking the on-site ICE staff if they had contact with those detainees, to confirm no exposure had occurred. Facility staff also expressed concerns about the lack of communication regarding positive COVID-19 cases in the facility. One ICDC officer described an instance when officers and a supervisor on-duty unknowingly entered a dorm that was housing detainees with confirmed COVID-19 cases.

During our interviews with 12 detainees, we heard similar concerns over insufficient COVID-19 communication. Detainees reported learning about COVID-19 protections, such as needing to wear PPE and social distance, from a variety of external sources such as other facilities, news stations, or family and friends. Only five detainees said they received some instruction from the facility through staff or posters on the walls; two detainees claimed they never received any instruction. One detainee described facility staff communication with detainees as "poor," explaining that, while their previous facility provided

AMIN_0011294

AMIN_0011313



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

direct communication from the warden regarding the COVID-19 pandemic, ICDC did not.

### ICDC Staff Were Aware of COVID-19 Protocols, but Access to Respirator Masks Varied

We found that ICDC had adequate policies related to COVID-19 protocols and maintained an adequate supply of PPE, including face masks, gowns, and gloves.  These COVID-19 policies included intake procedures for detainees entering the facility, employee screening procedures, facility sanitation procedures, and general infectious disease protocols.  ICDC staff we spoke to understood that masks and gloves were required in the facility and that KN95 or N95 masks and gowns were required in dorms with confirmed COVID-19 cases.

Staff we spoke to reported receiving hands-on training for the use of masks and gloves from facility medical staff, supervisors, or prior employers.  However, ICDC officers from various units in the facility gave inconsistent answers about the availability of, and the protocols for, obtaining and using KN95 and N95 masks.[45]  For example, one ICDC officer said it was possible to get a new respirator mask whenever one was needed.  Another said ICDC officers were issued a KN95 mask every 30 days and described replacing one as a "hassle."  Yet another officer said respiratory masks were issued every 3 days.  Despite hands-on training and an adequate supply of all types of protective masks and gloves, confusion remained among staff about their use and availability.

### ICDC Did Not Consistently Ensure Detainees Were Notified of COVID-19 Quarantine, Cohorting, or Testing Status and Facility COVID-19 Protocols

We found detainees were not receiving results of their COVID-19 testing, and some feared reporting COVID-19 symptoms.  ICDC conducted facility-wide COVID-19 testing in August 2020, but nine detainees we spoke with said they were never provided the results of their test.  We also found detainees were not being informed of their quarantine or cohorting status.  Of the 12 detainees we interviewed, 11 described being cohorted for COVID-19 quarantine either upon arrival or sometime during their stay at ICDC.  However, only six of these

---

[45] In April 2020 the Food and Drug Administration (FDA) approved an Emergency Use Authorization (EUA) for use of KN95 respirator masks by health care personnel.  KN95 masks do not meet the National Institute for Occupational Safety and Health (NIOSH) standards for approval as a level of respiratory protection.  In June 2021, the FDA revoked the EUA.

AMIN_0011294

AMIN_0011314



~
## OFFICE OF INSPECTOR GENERAL
Department of Homeland Security

detainees were informed of their quarantine status, while five of the detainees reported not having the situation explained to them.[46]

The lack of communication caused additional issues among detainees, including fear of reporting symptoms. A detainee described an incident where dorm residents witnessed another detainee report COVID-19 symptoms and get removed from the dorm without explanation. After the incident, the detainee explained that some detainees experienced possible COVID-19 symptoms but refused to report the symptoms out of fear of segregation.[47]

## Detainees' Access to ICE Deportation Officers Was Limited during the COVID-19 Pandemic

According to PBNDS, security, safety, and orderly operation of a detention facility relies on a system that encourages and requires informal, direct, and written contact among staff and detainees, as well as informal supervisory observation of living and working conditions. Although the PBNDS are very specific as to how ICE should interact with detainees, compliance with those provisions was limited at ICDC due to COVID-19 travel restrictions and the apparent reluctance of ICE officers to visit detainee dorms.

The 2011 PBNDS require ICE officers to respond to detainee questions and requests in 3 to 5 business days, depending on the location of the ICE ERO officer.[48] Detainees' requests normally include questions regarding immigration case information, medical care, facility conditions, and assistance locating family. In March 2020, ICE ERO notified detention centers and field offices that detainees may experience increased feelings of fear and confusion during the pandemic and should have frequent opportunities for interaction with ERO field office staff.[49] ICDC is located approximately 185 miles from the

---

[46] Most detainees who were not aware of their cohort or quarantine status described living conditions such as being placed in single cells, having meals brought to them, having their temperatures checked daily, or being put into medical isolation. All descriptions matched the ICDC incoming detainee procedures that required detainees to cohort prior to entering general population.

[47] Segregation is the process of separating certain detainees from the general population for administrative or disciplinary reasons. Disciplinary segregation is a punitive form of separation from the general population imposed after a finding by a disciplinary hearing panel that the detainee is guilty of a serious prohibited act or rule violation. Administrative Segregation is a nonpunitive status in which detainees are separated from the general population to ensure the safety of detainees and others, the protection of property, or the security or good order of the facility. PBNDS 2011, § 2.12 *Special Management Units*.

[48] PBNDS 2011, § 2.13, *Staff-Detainee Communication*.

[49] ICE Memorandum on Coronavirus Disease 2019 (COVID-19) Action Plan, Revision 1 (March 27, 2020).

AMIN_0011294

AMIN_0011315



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

Atlanta ERO Field Office where the detainees' deportation officers normally work. Deportation officers we interviewed stated they had primarily performed their duties by telework and had not visited ICDC during the COVID-19 pandemic due to travel restrictions.

At the time of our review, three ICE officers were assigned to the facility, and up to three additional officers were detailed on a rotational basis. Detailed officers we interviewed told us they perform a variety of duties to oversee detainee detention, with one officer designated to collect and provide responses to Detainee Request Forms (DRF). The detailed officer responsible for DRFs normally collects them from the locked collection boxes located in each dorm. The officer records all requests in a logbook and determines whether the request can be answered locally. Many requests are for immigration case information, which then are referred to the assigned deportation officer in the Atlanta Field Office. Two of the detainees we interviewed stated that ICE officers do not check the collection boxes on a regular basis and that DRFs were not readily available in the dorm. Additionally, an ICE officer that was TDY to ICDC stated that one of the assigned ICE officers refused to go to the detainee dorms during the COVID-19 pandemic.

The 2011 PBNDS require the ICE ERO officer receiving the request to normally respond in person or in writing as soon as possible and practicable, but no later than within 3 business days of receipt, for facilities with ICE ERO staff on-site, which is the case with ICDC.[50] We reviewed 3,593 requests in the ICDC Detainee Communication Log submitted between January and October 2020, and found that 284 did not receive a response within the 3-day period. An ICE officer detailed to ICDC believed the 3-day response time was not being met because of a mandate for field office staff to telework, which seemed to create delays.

The 2011 PBNDS also require each detention center's local supplement to the detainee handbook to include contact information for the ICE ERO field office and the scheduled hours and days that ICE ERO staff is available to be contacted by detainees at the facility.[51] The local detainee handbook supplement must also include procedures to submit written questions, requests, or concerns to ICE ERO staff, and to ensure the availability of assistance to prepare such requests. Of 12 detainees we interviewed, 7 complained about not being able to get in touch with their assigned deportation officers. One detainee who has been at ICDC since September 2020 reported not knowing the name of the assigned ICE deportation officer and claimed to

---

[50] PBNDS 2011, § 2.13, *Staff-Detainee Communication*.
[51] PBNDS 2011, § 6.1. *Detainee Handbook*.

AMIN_0011294

AMIN_0011316



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

have never spoken to him or her.  Another detainee at ICDC since May 2020 also reported "never once" being able to communicate with an ICE deportation officer about his/her immigration case, resulting in almost 10 months without questions or requests being addressed.  We reviewed the Lasalle Corrections Southeast Inmate/Detainee Handbooks dated February and December 2020, respectively, and found that neither version had contact information or the scheduled hours and days that ICE ERO staff is available to be contacted by detainees at the facility.

## Detainees and ICDC Staff Were Generally Comfortable Lodging Concerns, but Some ICE Officers Were Hesitant to Voice Their Concerns

The Project South complaint letter described retaliation against staff for reporting concerns about detention conditions at ICDC.  We asked ICE and ICDC staff about fear of retaliation for raising concerns about facility operations.  We also asked detainees to share any concerns about how they are treated at the facility.  We found that most of the ICDC staff we interviewed did not report fear of retaliation; most said they were comfortable bringing their concerns to either their supervisors or directly to the warden.  Several of the staff members reported their voices were not always acknowledged or concerns were not always addressed, and that communication from management could be better.

Several ICE officers were hesitant to speak up about conditions at ICDC, specifically regarding COVID-19 protocols.  Some did not feel comfortable voicing concerns about the facility conditions.  One ICE officer alleged that a systemic issue existed within ICE leadership in the Atlanta Field Office that is not willing to hear complaints or concerns about detention facilities.  The officer further noted that fellow officers were disinclined to complain about ICDC because of the opportunity to receive additional money while TDY to ICDC.  The officer also believes there is reluctance to use other means to voice concerns, such as filing an OIG Hotline complaint, due to the impression that one's identity would be compromised as the calls are recorded.

When asked whether detainees had complaints about how they were treated by ICDC officers, detainees we interviewed had a range of opinions, describing some officers as "good," but others as "rude," "bossy," and "kind of crazy." None of the detainees we interviewed described experiencing physical abuse. However, some detainees expressed discomfort with the way some facility officers communicated with them, using rude language such as "shut your mouth."  Detainees we spoke with did not provide any specific allegations toward officers or staff and had not filed complaints alleging verbal abuse.  One

AMIN_0011294

AMIN_0011317



## OFFICE OF INSPECTOR GENERAL
### Department of Homeland Security

ICE officer we interviewed recalled, in visits over the course of several years, staff being "very nasty" and "very unprofessional" in the way they addressed detainees and hearing comments from facility and medical staff about detainees that were "degrading and harsh."

Between FY 2017 and FY 2020, detainees at ICDC filed 970 non-medical grievances.  In addition, the DHS OIG Hotline received 795 complaints referencing ICDC.  Many Hotline complaints originated from detainees in the facility, family members of detainees within the facility, and those who had previously been detained at ICDC.  We found that detainees knew how to file grievances and complaints and did so regularly.  When asked about any concerns they had, none referenced being afraid of complaining about facility conditions.  However, one detainee explained to us that detainees were afraid to disclose possible COVID-19 symptoms for fear of being sent to isolation or the "hole" as the detainee put it.  The detainee said other detainees had symptoms like lack of taste and smell or body aches or a high temperature but did not want to disclose them and tried to hide their symptoms.

## Recommendations

We recommend the Executive Associate Director of Enforcement and Removal Operations direct the Atlanta Enforcement and Removal Field Office responsible for Irwin County Detention Center to:

**Recommendation 1:**  Ensure IHSC coordinates with ICDC medical unit to update processes and documentation for chronic care cases and develop a continuous quality improvement program.

**Recommendation 2:**  Ensure IHSC conducts training with ICDC medical unit about medication administration and health records documentation.

**Recommendation 3:**  Coordinate with ICDC management staff to develop a communication plan to keep detainees informed during a pandemic or other emergency situations, and to include related policy and protocols, potential exposures, quarantine/isolation status, and testing procedures.

**Recommendation 4:**  Develop a plan to enhance communication among Atlanta Field Office staff, permanent on-site ICE staff, and ICE detailed staff to ensure awareness of pandemic-related policy, protocols, and conditions.

**Recommendation 5:**  Coordinate with ICDC management staff to review and update the ICDC Detainee Handbook to ensure it contains current contact

AMIN_0011294

AMIN_0011318



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

information for the ICE ERO Atlanta Field Office and the scheduled hours and days that ICE ERO staff are available to detainees.

## Management Comments and OIG Analysis

ICE concurred with one recommendation but did not concur with four recommendations, as it no longer houses detainees at ICDC and its contract with ICDC ended on October 7, 2021. Appendix B contains ICE's management comments in their entirety. We also received technical comments to the draft report and revised the report as appropriate. We have administratively closed four recommendations; recommendation 4 is resolved and open. A summary of ICE's response and our analysis follows.

**ICE Comments to Recommendation 1:** Non-Concur. Because ICE no longer uses ICDC, ICE is required to not concur with this recommendation for procedural reasons, while acknowledging the importance of maintaining appropriate conditions at its detention facilities. As of September 3, 2021, ICE no longer houses detainees at ICDC, and ICE's contract with ICDC ended on October 7, 2021. Therefore, ICE cannot implement this recommendation. Should detainees again be housed at ICDC at some point in the future, ICE will ensure that all applicable detention standards are followed, as appropriate.

**OIG Analysis:** We acknowledge that ICE's contract with ICDC terminated on October 7, 2021, and that ICE cannot reasonably implement this recommendation, which we have administratively closed. However, we reserve the option to reopen the recommendation should ICE reinstate a contract to house ICE detainees at ICDC.

**ICE Comments to Recommendation 2:** Non-Concur. Because ICE no longer uses ICDC, ICE is required to not concur with this recommendation for procedural reasons, while acknowledging the importance of maintaining appropriate conditions at its detention facilities. As of September 3, 2021, ICE no longer houses detainees at ICDC, and ICE's contract with ICDC ended on October 7, 2021. Therefore, ICE cannot implement this recommendation. Should detainees again be housed at ICDC at some point in the future, ICE will ensure that all applicable detention standards are followed, as appropriate.

**OIG Analysis:** We acknowledge that ICE's contract with ICDC terminated on October 7, 2021, and that ICE cannot reasonably implement this recommendation, which we have administratively closed. However, we reserve the option to reopen the recommendation should ICE reinstate a contract to house ICE detainees at ICDC.

AMIN_0011294

AMIN_0011319



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

**ICE Comments to Recommendation 3:** Non-Concur.  Because ICE no longer uses ICDC, ICE is required to not concur with this recommendation for procedural reasons, while acknowledging the importance of maintaining appropriate conditions at its detention facilities.  As of September 3, 2021, ICE no longer houses detainees at ICDC, and ICE's contract with ICDC ended on October 7, 2021.  Therefore, ICE cannot implement this recommendation.  Should detainees again be housed at ICDC at some point in the future, ICE will ensure that all applicable detention standards are followed, as appropriate.

**OIG Analysis:** We acknowledge that ICE's contract with ICDC terminated on October 7, 2021, and that ICE cannot reasonably implement this recommendation, which we have administratively closed.  However, we reserve the option to reopen the recommendation should ICE reinstate a contract to house ICE detainees at ICDC.

**ICE Comments to Recommendation 4:** Concur.  ICE acknowledges the importance of strong communication practices to fully implement ICE's policies and protocols that protect employees and people detained by ICE from COVID-19.  To address this recommendation, the Atlanta Field Office will supplement, reinforce, and enhance a communications plan and leadership will directly engage in enhancements to that plan.  To address the need for fulsome communication, the Field Office Director conducts: (1) quarterly "town-halls" for all employees; (2) daily meetings with his staff and Deputy Field Office Directors; and (3) weekly meetings with the Assistant Field Office Directors throughout the area of responsibility.  In turn,  Assistant Field Office Directors regularly meet with their supervisory staff, as do supervisory staff with their employees.  In addition, the Atlanta Field Office has a full-time staff devoted to messaging and sending communications throughout the Field Office, through which all broadcast messages and policies from ICE Headquarters or Field Office leadership are sent to ensure all communication is disseminated to the appropriate parties.

All employees have access to all the broadcast messages and intranet and internet information, and supervisors ensure that all messaging is understood by the employees.  Accordingly, on-site facility staff's responsibility was to ensure that the facility remained compliant with ICE policies and procedures, including compliance with all COVID-19-related protocols.

Further, ICE broadcast messages are distributed to all supervisors with COVID-19 decision trees, in accordance with the current communication plan, to assist management with making educated decisions regarding potential or confirmed exposures.

AMIN_0011294

AMIN_0011320



## OFFICE OF INSPECTOR GENERAL
Department of Homeland Security

ICE also distributes each new release of the PRR to all ICE employees and shares these updates with all contractors operating ICE facilities.  On March 24, 2020, prior to the first PRR, ICE ERO followed established communications guidance to issue a broadcast message to all employees titled "CDC Interim Guidance on Management of COVID-19 for Correctional and Detention Facilities," and similar broadcast messages and guidance are available to all employees on the ICE intranet under the link "COVID-19 Coronavirus - Updates & Guidance."

In addition to reinforcing the communications practices that the Atlanta Field Office already has in place, the Field Office Director will conduct mandatory bi-weekly meetings with individual detention facilities' responsible ERO management, senior contract management, IHSC, OPLA, and the COR and/or Detention Standards Manager.  At these meetings, the Field Office Director will personally message select PRR requirements and confirm that relevant stakeholders understand and are implementing those requirements.  Moreover, these meetings will allow for an open discussion of all concerns at the facility with full stakeholder participation.

**OIG Analysis:** We consider these actions responsive to the intent of the recommendation, which is resolved and open.  We will close this recommendation when we receive documentation showing the Atlanta Field Office implemented the stated enhancements to the communications plan to include evidence of the mandatory bi-weekly meetings with individual detention facilities' ICE personnel.

**ICE Comments to Recommendation 5:** Non-Concur.  Because ICE no longer uses ICDC, ICE is required to not concur with this recommendation for procedural reasons, while acknowledging the importance of maintaining appropriate conditions at its detention facilities.  As of September 3, 2021, ICE no longer houses detainees at ICDC, and ICE's contract with ICDC ended on October 7, 2021.  Therefore, ICE cannot implement this recommendation.  Should detainees again be housed at ICDC at some point in the future, ICE will ensure that all applicable detention standards are followed, as appropriate.

**OIG Analysis:** We acknowledge that ICE's contract with ICDC terminated on October 7, 2021, and that ICE cannot reasonably implement this recommendation, which we have administratively closed. However, we reserve the option to reopen the recommendation should ICE reinstate a contract to house ICE detainees at ICDC.

AMIN_0011294

AMIN_0011321



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

## Appendix A
## Objective, Scope, and Methodology

The Department of Homeland Security Office of Inspector General was established by the *Homeland Security Act of 2002* (Pub. L. No. 107–296) by amendment to the *Inspector General Act of 1978*.

We initiated this review in response to complaints requesting OIG investigate the health and welfare of detainees at ICDC. We conducted the review remotely, given the travel restrictions and inherent risks associated with on-site inspections during the COVID-19 pandemic. We focused on elements of applicable standards that could be observed and evaluated remotely.

We conducted our fieldwork between October 2020 and May 2021. During this period, we reviewed ICE 2011 PBNDS guidance, ICDC surveillance camera footage, CDC and ICE COVID-19 guidance, and ICDC's medical, grievance, and complaint logs. We reviewed DHS OIG Hotline complaints from FY 2017 through FY 2020, totaling 795 allegations specific to ICDC. We excluded hotline allegations related to the ongoing OIG investigation (25 allegations) from our review. Additionally, we interviewed 12 detainees in ICDC custody; 26 ICDC staff members, including the warden, deputy warden, and corrections officers; 12 ICE officers assigned or detailed to ICDC; and 6 ICE staff assigned to the Atlanta Field Office.

We utilized a contracted medical team from NCCHC Resources, Inc., to conduct medical record review and a virtual site tour of the ICDC medical unit. The contracted medical team consisted of one physician and two registered nurses. The medical team reviewed a total of 200 detainee records, including 195 randomly selected records for detainees at ICDC for 180 days or longer between FY 2017 and FY 2020, with 5 more added as a result of OIG concerns during detainee interviews. The nursing staff reviewed 158 records, focusing on completeness, timeliness, and proper actions, while the physician focused on 37 chronic care detainees that were identified. We incorporated information provided by the medical team into our findings and include the full report in Appendix C.

We conducted this inspection under the authority of the *Inspector General Act of 1978*, as amended, and according to the *Quality Standards for Inspection and Evaluation* issued by the Council of the Inspectors General on Integrity and Efficiency.

AMIN_0011294

AMIN_0011322



# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security

*Office of the Chief Financial Officer*

U.S. Department of Homeland Security
500 12th Street, SW
Washington, DC 20536



**U.S. Immigration
and Customs
Enforcement**

November 16, 2021

MEMORANDUM FOR:   Joseph V. Cuffari, Ph.D.
                  Inspector General

FROM:             Stephen A. Roncone     STEPHEN A RONCONE   Digitally signed by STEPHEN A
                  Chief Financial Officer and                RONCONE
                  Senior Component Accountable Official      Date: 2021.11.16 10:24:28 -05'00'

SUBJECT:          Management Response to Draft Report: "Medical Processes
                  and Communication Protocols Need Improvement at Irwin
                  County Detention Center" (Project No. 21-001-SRE-ICE)

Thank you for the opportunity to comment on this draft report. U.S. Immigration and
Customs Enforcement (ICE) appreciates the work of the Office of Inspector General
(OIG) in planning and conducting its review and issuing this report.

ICE leadership is pleased to note the OIG's acknowledgement of ICE detention
standards, overarching efforts to mitigate the risk to the safety and well-being of
detainees and staff due to the COVID-19 pandemic, and positive findings at Irwin County
Detention Center (ICDC), in Ocilla, Georgia. For example, OIG's draft report noted that
ICE detention standards require that all facilities provide detainees with access to
appropriate and necessary medical, dental, and mental health care, and that facilities must
have written plans that address the management of infectious and communicable
diseases. The OIG also acknowledged that ICE Enforcement and Removal Operations
(ERO) (1) provides on-site management of detention operations to ensure a safe and
secure environment for detention staff and detainees, and (2) issued Pandemic Response
Requirements (PRR) in April 2020, and subsequently updated the PRRs, to establish
clear expectations and assist ICE detention facility operators in sustaining detention
operations while mitigating risks due to COVID-19.

Regarding ICDC specifically, on May 20, 2021, ICE gave notice of its intent to terminate
its contract with ICDC. This termination became effective on October 7, 2021. While
ICE no longer uses ICDC, ICE appreciates the OIG's acknowledgement that (1) the

www.ice.gov

AMIN_0011294

AMIN_0011323



# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security

Management Response to Draft Report: "Medical Processes and Communication Protocols Need Improvement at Irwin County Detention Center" (Project No. 21-001-SRE-ICE)
Page 2

facility generally met ICE detention standards for medical, dental, and mental health care, and (2) ICE dramatically reduced the population of ICDC by releasing individuals who might be at higher risk for severe illness due to COVID-19, after ICE ERO evaluated detainees immigration history, criminal record, potential threat to public safety, flight risk, and national security concerns. The OIG also reported that ICDC complied with Centers for Disease Control and Prevention and ICE COVID-19 guidance.

The draft report contained five recommendations. Approximately five months prior to receiving the OIG's draft report, ICE had given notice to terminate its contract with ICDC. By September 3, 2021, ICE was no longer using ICDC for detention purposes, and on October 7 ICE's contract with ICDC ended. Because ICE no longer uses ICDC, ICE non-concurs with the recommendations directly related to facility operations, while acknowledging the importance of maintaining appropriate conditions at its detention facilities. ICE concurs with the fourth recommendation related to communication of ICE policy and procedure.

Attached find our detailed response to each recommendation. ICE previously submitted technical comments addressing several accuracy, contextual, and other issues under a separate cover for OIG's consideration.

Again, thank you for the opportunity to review and comment on this draft report. Please feel free to contact me if you have any questions.

Attachment

AMIN_0011294

AMIN_0011324



## OFFICE OF INSPECTOR GENERAL
### Department of Homeland Security

Management Response to Draft Report: "Medical Processes and Communication Protocols Need Improvement at Irwin County Detention Center" (Project No. 21-001-SRE-ICE)
Page 3

### Attachment:  Management Response for Recommendations Contained in 21-001-SRE-ICE

<u>OIG recommended that the Executive Associate Director of ERO direct the Atlanta Enforcement and Removal Field Office responsible for Irwin County Detention Center</u>:

**Recommendation 1:**  Ensure IHSC [ICE Health Service Corps] coordinates with ICDC medical unit to update processes and documentation for chronic care cases and develop a continuous quality improvement program.

**Response:**  Non-Concur.  Because ICE no longer uses ICDC, ICE is required to non-concur with this recommendation for procedural reasons, while acknowledging the importance of maintaining appropriate conditions at its detention facilities.  As of September 3, 2021, ICE no longer houses detainees at ICDC, and ICE's contract with ICDC ended on October 7, 2021.  Therefore, ICE cannot implement this recommendation.  Should detainees again be housed at ICDC at some point in the future, ICE will ensure that all applicable detention standards are followed, as appropriate.  We request that the OIG consider this recommendation resolved and closed.

**Recommendation 2:**  Ensure IHSC conducts training with ICDC medical unit about medication administration and health records documentation.

**Response:**  Non-Concur.  Because ICE no longer uses ICDC, ICE is required to non-concur with this recommendation for procedural reasons, while acknowledging the importance of maintaining appropriate conditions at its detention facilities.  As of September 3, 2021, ICE no longer houses detainees at ICDC, and ICE's contract with ICDC ended on October 7, 2021.  Therefore, ICE cannot implement this recommendation.  Should detainees again be housed at ICDC at some point in the future, ICE will ensure that all applicable detention standards are followed, as appropriate.  We request that the OIG consider this recommendation resolved and closed.

**Recommendation 3:**  Coordinate with ICDC management staff to develop a communication plan to keep detainees informed during a pandemic or other emergency situations, and to include related policy and protocols, potential exposures, quarantine/isolation status, and testing procedures.

**Response:**  Non-Concur.  Because ICE no longer uses ICDC, ICE is required to non-concur with this recommendation for procedural reasons, while acknowledging the importance of maintaining appropriate conditions at its detention facilities.  As of September 3, 2021, ICE no longer houses detainees at ICDC, and ICE's contract with

www.ice.gov

AMIN_0011294

AMIN_0011325



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

Management Response to Draft Report: "Medical Processes and Communication Protocols Need
Improvement at Irwin County Detention Center" (Project No. 21-001-SRE-ICE)
Page 4

ICDC ended on October 7, 2021. Therefore, ICE cannot implement this
recommendation. Should detainees again be housed at ICDC at some point in the future,
ICE will ensure that all applicable detention standards are followed, as appropriate. We
request that the OIG consider this recommendation resolved and closed.

**Recommendation 4:** Develop a plan to enhance communication among Atlanta Field
Office staff, permanent on-site ICE staff, and ICE detailed staff to ensure awareness of
pandemic-related policy, protocols, and conditions.

**Response:** Concur. ICE acknowledges the importance of strong communication
practices to fully implement ICE's policies and protocols that protect employees and
people detained by ICE from COVID-19. To meet this recommendation, the Atlanta
Field Office will supplement, reinforce, and enhance a communications plan and
leadership will directly engage in enhancements to that plan. To address the need for
fulsome communication, the Field Office Director conducts: (1) quarterly "town-halls"
for all employees; (2) daily meetings with his staff and Deputy Field Office Directors;
and (3) weekly meetings with the Assistant Field Office Directors throughout the area of
responsibility. In turn, each Assistant Field Office Director regularly meets with their
supervisory staff, as do supervisory staff with their employees. In addition, the Atlanta
Field Office has a full-time staff devoted to messaging and sending communications
throughout the Field Office, through which all broadcast messages and policies from ICE
Headquarters or Field Office leadership are sent to ensure all communication is
disseminated to the appropriate parties.

All employees have access to all the broadcast messages and intranet and internet
information, and supervisors ensure that all messaging is understood by the
employees. Accordingly, on-site facility staff's responsibility was to ensure that the
facility remained compliant with ICE policies and procedures, including compliance with
all COVID-19-related protocols.

Further, ICE broadcast messages are distributed to all supervisors with COVID-19
decision trees, in accordance with the current communication plan, to assist management
with making educated decisions regarding potential or confirmed exposures.

ICE also distributes each new release of the PRR to all ICE employees and shares these
updates with all contractors operating ICE facilities. On March 24, 2020, prior to the first
PRR, ICE ERO followed established communications guidance to issue a broadcast
message to all employees titled "CDC Interim Guidance on Management of COVID-19
for Correctional and Detention Facilities," and similar broadcast messages and guidance
are available to all employees on the ICE intranet under the link "COVID-19 Coronavirus
- Updates & Guidance."

www.ice.gov

AMIN_0011294

AMIN_0011326



# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security

Management Response to Draft Report: "Medical Processes and Communication Protocols Need Improvement at Irwin County Detention Center" (Project No. 21-001-SRE-ICE)
Page 5

In addition to reinforcing the communications practices that the Atlanta Field Office already has in place, the Field Office Director will conduct mandatory bi-weekly meetings with individual detention facilities' responsible ERO management, senior contract management, IHSC, OPLA, and the COR and/or Detention Standards Manager. At these meetings, the Field Office Director will personally message select PRR requirements and confirm that relevant stakeholders understand and are implementing those requirements. Moreover, these meetings will allow for an open discussion of all concerns at the facility with full stakeholder participation.

We request that the OIG consider this recommendation resolved and closed, as implemented.

**Recommendation 5:** Coordinate with ICDC management staff to review and update the ICDC Detainee Handbook to ensure it contains current contact information for the ICE ERO Atlanta Field Office and the scheduled hours and that ICE ERO staff are available to detainees.

**Response:** Non-Concur. Because ICE no longer uses ICDC, ICE is required to non-concur with this recommendation for procedural reasons, while acknowledging the importance of maintaining appropriate conditions at its detention facilities. As of September 3, 2021, ICE no longer houses detainees at ICDC, and ICE's contract with ICDC ended on October 7, 2021. Therefore, ICE cannot implement this recommendation. Should detainees again be housed at ICDC at some point in the future, ICE will ensure that all applicable detention standards are followed, as appropriate. We request that the OIG consider this recommendation resolved and closed.

www.ice.gov

AMIN_0011294
AMIN_0011327



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

**Appendix C**
**NCCHC Resources, Inc., Irwin County Detention Center**
**Inspection Report**



*Final Report*

*April 2021*

Irwin County Detention Center

OFFICE OF INSPECTOR GENERAL
INSPECTION REPORT

*This report details findings from a virtual site tour*
*conducted February 8, 2021, of Irwin County Detention*
*Center, Ocilla, Georgia.*

*SOLUTIONS* FROM THE MOST TRUSTED NAME IN
**CORRECTIONAL HEALTH CARE**

AMIN_0011294

AMIN_0011328



# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security

## Irwin County Detention Center
## Office of Inspector General Inspection Report

### INSPECTION REPORT

**FACILITY OVERVIEW**

- The Irwin County Detention Center is in Ocilla, Georgia, and is a private prison operated by LaSalle Corrections. The facility is contracted to house and provide care to Immigration and Customs Enforcement (ICE) detainees.
- On the day of inspection the facility reported a total census of 256 ICE detainees: 242 males and 14 females. The census is lower than normal because of the impact of the COVID-19 pandemic.
- The facility does not hold accreditation from the National Commission on Correctional Health Care or the American Correctional Association.

**INSPECTION PROCESS**

- Dr. Randall Stoltz, MD, CCHP, Becky Pinney, MSN, RN, CCHP-RN, CCHP-A, and Barbara Mariano, RN, CCHP conducted the medical inspection.
- The NCCHC Resources team completed the inspection using a virtual format.
- The team also interviewed a number of health staff, including:



- o     , RN, health services administrator (HSA)
- o     , RN, director of nursing (DON)
- o     , MD, correctional medical authority (CMA)
- o     , MD, psychiatrist
- o     , NP
- o     , NP
- o     , NP
- o     , NP
- o     , LPN
- o     , LPN
- o     , LPN

- We completed an extensive document review, including administrative documents and 200 health records. This includes 195 assigned health records and an additional 5 health records reviewed based on legal inquiries.
- We have incorporated the findings of the record review into the appropriate sections of the report.
- Standards used for this inspection were the 2011 Operations Manual ICE Performance-Based National Detention Standards and the National Commission on Correctional Health Care's 2018 *Standards for Health Services in Jails*.

**INSPECTION FINDINGS**

**Report Organization**

This report is organized based on the Lead Inspector Workbook that was created for use when NCCHC Resources personnel conduct OIG ICE inspections. The workbook is organized to allow for the collection of critical data about the clinical processes used to provide care to ICE detainees. The workbook provides for the guided interview of key health care personnel, the review of program documents, the review of a small sample of health care records, and in some cases a virtual tour of the facility. This approach allows the inspector to develop a clear understanding of how well the health care program is organized and operating. For the Irwin County facility, in addition to the typical inspection activities, the OIG team asked the NCCHC Resources team to review a significant number of health records, totaling 195. The nurses on the inspection team reviewed 158 of the records and focused on the completeness,

---

AMIN_0011294

AMIN_0011329



# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security



*Inspection Report*

timeliness, and proper actions taken in the daily health care delivery processes. The team physician focused on the records of identified chronic care detainees (37 records) and their documented continuity of care.

To provide a clear picture of our findings, the report is divided into clearly defined care process sections. Each section has subsections for "Reported Processes and Document Review" and "Health Record Review." The Reported Processes subsections document how care is delivered as voiced by the individuals interviewed and based on the administrative documents we reviewed. The Health Record Review subsections provide insights regarding the care delivered as documented in the health records.

For each section there may be "Findings" or "Suggestions." Findings are provided when there is a lack of compliance with the 2011 Operations Manual ICE Performance-Based National Detention Standards and/or NCCHC's 2018 *Standards for Health Services in Jails*. Suggestions are provided when there is an issue that should be addressed, but findings do not represent a significant lack of compliance.

## ASSIGNED PERSONNEL
### *Reported Processes and Document Review*
- Staffing is adequate for the facility's health care mission and average daily population. The ▮▮▮ reports that any changes to the health care staffing plan are addressed and resolved with the warden.
- There is an assigned health services administrator and a director of nursing who are on site Monday through Friday and on weekends as needed. Both individuals have served in their positions for less than 1 year but have worked in the facility for some time.
- Dr. ▮▮▮ ▮▮▮ serves as the correctional medical authority and is on site 1 day a week. A nurse practitioner is on site Monday through Friday. Additional nurse practitioners provide weekend coverage. The physician supervises all nurse practitioners.
- A psychiatrist and a licensed counselor provide mental health services.
- Dr. ▮▮▮, the psychiatrist, is on site 2 days a week. Mental health staff are on site 6 days a week and reachable for call on a 24/7 basis. There is currently one mental health vacancy.
- No dental services are provided on site. All dental care is provided in the community through a memorandum of understanding with a local dental provider.
- There is adequate nursing staff to provide required services. One nursing supervisor position on the night shift is vacant.
- All staff members are employees of LaSalle.
- Staff safety is provided by the presence of custody team members located in the medical areas. Radios are not provided to medical staff. Staff are aware of security requirements and are expected to adhere to those requirements.

### *Health Record Review*
- The health record review yielded no findings that reflect any concerns related to the staffing plan.

*Findings:* None
*Quality of Process:* Adequate

## STAFF ORIENTATION AND TRAINING
### *Reported Processes and Document Review*
- The ▮▮▮ reports that all new employees are required to complete 40 hours of custody training at hire and annually. The content of custody training is approved by the ▮▮▮ annually.
- The content of the program is based on company policy with the addition of topics and processes specific to the facility.

---

AMIN_0011294

AMIN_0011330



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security



*Inspection Report*

- The ▮▮ reports that onboard training to the medical department is provided over a 30-day period. The ▮▮ and ▮▮ both provide oversight for each new employee and ensure they are prepared to work independently in their position before being assigned.
- The ▮▮ and ▮▮ review the onboarding program on an annual basis.
- Annual training hours for all health staff are based on state licensure requirements.
- The ▮▮ provided a list of training topics and attendance rosters for inspector review.
- Current custody and health staff trainings were verified through a sample document review.

<u>*Health Record Review*</u>
- The health record review yielded no findings that reflect any concerns related to the training and orientation process.

<u>*Findings:*</u> None
<u>*Quality of Process:*</u> Adequate

PEER REVIEW
<u>*Reported Processes and Document Review*</u>
- Only provider staff receive peer reviews. LaSalle arranges peer reviews with an off-site MD for the MD and the nurse practitioners.
- The ▮▮ shares the findings of the reviews for the nurse practitioners. Regional medical leadership provides the ▮▮ and psychiatrists with the results of their peer review findings.

<u>*Health Record Review*</u>
- The health record review yielded no findings that reflect any concerns related to the peer review process.

<u>*Suggestions:*</u>
- Nursing staff are not a part of the peer review process. We suggest that a peer review program for nurses be implemented.
- Some of the nurse practitioner staff reported that the results of their peer reviews were not clearly shared with them. This should be addressed to ensure proper feedback to all involved staff members.

<u>*Quality of Process:*</u> Adequate

MEDICAL FACILITY PHYSICAL PLANT
<u>*Reported Processes and Document Review*</u>
- There is a central medical department with adequate space for the delivery of medical services and administrative duties.
- There are six medical observation cells. Two of these rooms are negative pressure rooms and three are designed for suicide prevention. The facility compliance officer checks the functioning of the negative pressure rooms daily.
- The ▮▮ reports appropriate equipment is present for the delivery of health care. This includes the presence of scales, exam tables, electrocardiogram (EKG) machines, blood pressure cuffs, Ambu bags, oxygen, and pulse oximetry devices.
- The ▮▮ is responsible for obtaining all needed equipment and supplies. Items are obtained through the submission of an order to a procurement clerk within the facility. The ▮▮ creates these orders based on a perpetual inventory created and maintained by the ▮▮.
- The facility has five automated external defibrillators (AEDs). Locations include the medical area, the intake area, the main hall of the facility, and two housing locations.
- There is no dental equipment as all dental services are provided off-site.
- Basic diagnostic laboratory studies are provided on site.

Irwin County Detention Center – Inspection Report                                                          3

AMIN_0011294

AMIN_0011331



# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security



*Inspection Report*

*Health Record Review*
- The health record review yielded no findings that reflect any concerns related to the medical areas of the physical plant.

*Findings:* None

*Quality of Physical Plant:* Adequate

## PROGRAM ADMINISTRATION

*Reported Processes and Document Review*
- The medical leadership team appropriately manages the health care program.
- Job descriptions for the health services administrator and correctional medical authority were provided and were appropriate for these positions.
- The ▇▇ reports no issues with medical autonomy. Custody supports medical decisions and supports delivery-of-care efforts.
- Medical administration meetings occur quarterly with documented minutes and attendance rosters.
- Staff meetings are appropriately held and documented.
- Monthly medical statistics are compiled and provided to facility administration. The types of statistics collected are appropriate.
- There are no concerns with access to detainees for the delivery of medical care. Detainees are escorted to the medical department for treatment when requested. It was also reported that there are no issues with off-site escort for medical care.
- All custody and medical staff receive training on confidentiality and there were no reported concerns on this issue.
- Confidentiality of medical information during detainee transport is maintained using a sealed envelope process.
- The continuous quality improvement (CQI) program is not well defined and implemented. The ▇▇ was unclear about how the program is conducted and documented.

*Health Record Review*
- The health record review yielded no findings that reflect any concerns related to the program administration.

*Findings:* A continuous quality improvement program has not been appropriately developed and implemented.
- *Criteria:* 4.3.V.EE Administration of the Medical Department; NCCHC A-06 Continuous Quality Improvement Program
- *Cause of Problem:* The ▇▇ and ▇▇ have not properly developed and implemented a CQI program. Documentation of a CQI program could not be provided.
- *Effect of Problem:* There is no organized approach in place to evaluate the delivery of health care services.
- *Suggested Actions:* The ▇▇ and ▇▇ should work together to properly educate themselves about the required elements of an effective CQI program. The ICE and NCCHC standards listed under Criteria can provide the needed guidance. Once there is an understanding of program needs, a CQI program should be developed and implemented.

*Quality of Process:* Adequate

AMIN_0011294
AMIN_0011332



## OFFICE OF INSPECTOR GENERAL
### Department of Homeland Security



*Inspection Report*

### HEALTH RECORDS

*Reported Processes and Document Review*

- The facility uses the CorrecTek electronic health record (EHR) system. A health record is maintained for each detainee.
- Medical and mental health use the same EHR. Dental documentation is scanned into the record as those services are provided off site.
- The EHR system enables health records to be available for all providers during detainee encounters.
- A designated and secure location is used for health record maintenance.
- All health care documentation created outside of the EHR is scanned into the electronic record and then properly disposed of, based on facility and jurisdiction guidance. There is no reported backlog for the scanning of paper documents.
- Evidence of Health Insurance Portability and Accountability Act (HIPAA) training was not provided for inspector review and thus could not be confirmed.
- The ▮▮ described a clear process for the detainee to receive a copy of their health record. The records are provided after a written authorization is obtained from the detainee.
- There is a defined and implemented process for the release of health information as needed.

*Health Record Review*

- The health record review yielded no findings that reflect any concerns related to the health record system.
- The records reviewed were provided in a PDF format, with some being difficult to read because of the copying process.
- The documents provided covered several years with forms differing within the records.
- The inspection team made every effort to obtain needed information when it could not be located in the health record. The ▮▮ did an outstanding job assisting with these requests.

*Findings:* The presence of HIPAA training and its application was not presented for review. The inspection team could not determine if the program is in place and appropriately applied.

- *Criteria:* 4.3.V.BB Medical Records; NCCHC A-08 Health Records
- *Cause of Problem:* No evidence of a HIPAA program was provided to the inspection team.
- *Effect of Problem:* If such a program is not in place, it creates a greater opportunity for breach of confidentially.
- *Suggested Actions:* The ▮▮ must ensure that the HIPAA program is in place and properly applied to daily health care activity,

*Quality of Health Records:* Adequate, but the lack of a HIPAA program should be addressed.

### POLICIES AND PROCEDURES

*Reported Processes and Document Review*

- The ▮▮ provided policies that were described as the site-specific policies to be followed at the Irwin County Detention Center.
- A review of the policies and procedures found them to be generally well written. However, they appear to be the generic LaSalle company policies that have not been made site-specific for the Irwin facility. For example, they have a policy for restraint and seclusion when it was reported that this is not used at the facility. The terminal illness policy cites state guidelines for the state of Louisiana. There is a policy for infirmary services, but these services are not provided at the facility.
- We noted that the policies and procedures have been signed by the ▮▮ but do not include a review date.

---

Irwin County Detention Center – Inspection Report                                                    5

AMIN_0011294

AMIN_0011333



# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security



*Inspection Report*

<u>*Health Record Review*</u>
- The health record review yielded no findings that reflect any concerns related to policies and procedures.

<u>*Findings:*</u>  The policies and procedures in place are not specific to the delivery of care at the facility, nor has the annual review been properly documented.

- *Criteria:* 4.3.V.EE Administration of the Medical Department; NCCHC A-05 Policies and Procedures
- *Cause of Problem:*  Facility leadership has not created a site-specific set of policies and procedures.
- *Effect of Problem:*  Policies and procedures provide a roadmap for the day-to-day operations of the medical department. The procedures provide guidance to staff about how to implement a policy. They also ensure compliance with organizational policies and ICE regulations. Failure to have clearly written policies and procedures that are specific to the Irwin facility results in lack of proper guidance for staff.
- *Suggested Actions:* The policies and procedures should be reviewed to ensure that applicable policies and procedures that meet ICE standards are put in place. This also includes a process for the annual review of the policies and procedures with updates made as needed.

<u>*Quality of Policies and Procedures:*</u>  Not adequate

## RECEIVING SCREENING

<u>*Reported Processes and Document Review*</u>
- The ██ reports that the receiving process is the same for ICE detainees and non-ICE detainees.
- A designated intake area in the facility has two rooms where intake assessments can be conducted in private.
- Two members of the nursing staff are assigned to the intake area to complete the receiving screenings. Custody team members do not complete screenings.
- Translation services are available for the completion of receiving screenings if required.
- Detainees are prioritized for screening based on presented clinical need.
- The receiving screening assesses medical status, mental health, medication, and dental needs.
- A review of the receiving screening form shows that it is appropriate in content and scope.
- The nurse completing the intake performs a dental screening and another dental screening occurs during the health assessment. Detainees presenting with significant dental needs are referred to the off-site dental provider. The ██ reports that they are seen in a timely manner. It is reported that oral hygiene education is provided during intake.
- The ██ reports that staff have been trained to complete the medication and dental screening portions of the receiving screening.
- The facility has a 12-hour time frame for completion of the receiving screening, but the ██ reports that the screenings occur much sooner than 12 hours.
- Any urgent/emergent issues identified during the screening are addressed immediately. If a medical or mental health provider is required but not on site, a phone or telemedicine visit can be done to ensure proper assessment and ordered action. If needed, the detainee is transferred to a local hospital for treatment.
- Routine referrals to mental health are seen the next day or by telehealth if mental health staff are not on site.
- Medication needs are reviewed at screening and addressed as needed.

AMIN_0011294
AMIN_0011334



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security



*Inspection Report*

- Tuberculosis screening and testing occur as a part of the receiving process. All detainees entering the facility receive a chest X-ray the same day. The X-rays are completed by a contracted provider who is on site daily or as needed. Staff may house potentially infectious detainees in the two negative pressure rooms in the medical unit until proper disposition and treatment are defined.
- All females have a urine pregnancy test completed at intake. Those with positive tests are referred to a provider for further testing and treatment. This would include treatment for reported opioid use.

*Health Record Review*
- In the 195 intake records reviewed, the care was found to be timely and complete. We noted that three health records had minor issues at intake but these findings are not reflective of an inefficient intake system.
- 12 health records did not include copies of the intake screening.
- Overall the intake process is well organized and functions well.

*Suggestions:* We recommend that the timeliness and completeness of the intake system be monitored through the CQI program once the program is established.

*Quality of Care:* Adequate

HEALTH ASSESSMENTS (INITIAL AND PERIODIC)

*Reported Processes and Document Review*
- Initial health assessments are to be completed within 14 days. The ▉ reports that the health assessments are typically completed within 24 hours.
- Trained nurse practitioners or registered nurses complete initial health assessments.
- Staff complete the initial health assessment using a form in the EHR. If the electronic record system is not functioning, the health assessment is documented on paper and scanned into the electronic health record.
- The use of an electronic record enables the nurse completing the health assessment to access the receiving screening for reference purposes. The ▉ reports that the nurses do use the receiving screening for medication review but is unsure if the screening is used for review and comparison of information shared during the health assessment.
- Initial health assessments are prioritized at the point of the intake screening. If the detainee requires immediate care or priority for the health assessment, a provider is contacted for immediate guidance. Otherwise, detainees are scheduled through the established process.
- Pelvic exams are not routinely done as a part of the initial health assessment. These would be ordered based on detainee presentation and performed by an off-site specialty provider.
- There are no reported backlogs for the completion of initial health assessments.
- Periodic health assessments are reportedly completed on an annual basis. The ▉ reports that detainees are tracked by medical administration for the timing of the annual health assessments.
- The ▉ should define the timing and content of these exams, but that process is not currently in place.
- We noted that the annual exams were completed by RN staff rather than a provider. This is not best practice, especially for those detainees who are enrolled in chronic care services.

*Health Record Review*
- Initial health assessments were found to be timely and complete except for a few detainees.
- We found seven records that exceeded the 14-day time frame and 15 records did not provide a copy of the health assessment. The ▉ was able to provide most of the missing documents.
- In general, the initial health assessment process functions well. The missing documents were due for the most part to copying issues.

Irwin County Detention Center – Inspection Report                                                    7

AMIN_0011294

AMIN_0011335



# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security



*Inspection Report*

- The ▮ should determine the timing and content of annual health assessments, but that is not currently in place.
- We noted that the annual exams were completed by RN staff rather than a provider. This is not best practice, especially for those detainees who are enrolled in chronic care services.

*Findings:* There are no defined health assessment criteria in place to provide consistent and adequate periodic health care assessments.

- *Criteria:* 4.3.V.M Comprehensive Health Assessment; 4.3.V.Q Annual Health Examinations; NCCHC E-04 Initial Health Assessment; NCCHC B-03 Clinical Preventive Services
- *Cause of Problem:* The ▮ has not created a set of expected annual health assessment examination elements.
- *Effect of Problem:* There is a lack of guidance for provider staff regarding expected examination elements. Lack of definition leads to inconsistent evaluation of detainees.
- *Suggested Actions:* Create and implement clearly defined annual assessment guidelines, to include the timing and content of the examinations. While the initial health assessment process appears to function well, we suggest that the process be monitored as a part of the newly established CQI program.

*Physician Case Reviews That Show Noncompliance:* Case 4

*Quality of Care:* Adequate

## NOTIFYING DETAINEES ABOUT HEALTH CARE SERVICES/TRANSLATION AND LANGUAGE ACCESS

*Reported Processes and Document Review*

- All detainees are provided information on health services orally and in written formats.
- Signage providing this information is posted in the intake area as well as housing areas.
- The facility has two translation lines that are used when these services are needed.
- The ▮ reports that non-medical and non-mental health staff are not used to provide translation services.

*Health Record Review*

- The health record review yielded no findings that reflect any concerns related to these services.

*Findings:* None

*Quality of Process:* Adequate

## TRANSFER PROCESS

*Reported Processes and Document Review*

- The facility does perform transfers to and from other ICE facilities.
- All detainees received at the facility through transfer are treated as new intakes.
- An assigned nurse processes all transfers out of the facility. This individual prepares all necessary paperwork, health record documents, and medications for continuity of care during the transfer process.
- The ▮ reports that notification of transfer or discharge is provided to medical staff in a time frame that allows for proper preparation for transfer.

*Health Record Review*

- The health care record review shows facility staff do an adequate job preparing transfer documentation.
- The intent of transfer reviews is to ensure that detainees being transferred into the facility have their transfer information reviewed and acted upon in a timely manner.

---

Irwin County Detention Center – Inspection Report                                       8

AMIN_0011294

AMIN_0011336



## OFFICE OF INSPECTOR GENERAL
### Department of Homeland Security



*Inspection Report*

- All detainees transferred into the Irwin facility are treated as new intakes and go through the intake process.
- Given that transfers in would not be in the health record, the team looked at the transfer forms completed for detainees leaving the facility. It should be noted that not all detainees would require a completed transfer-out form.
- For those health records that did have a transfer form, the forms found were appropriately completed.

*Findings:* None
*Quality of Care:* Adequate

MEDICAL OBSERVATION BEDS

*Reported Processes and Document Review*
- The facility has no infirmary beds; detainees requiring this level of care would be housed elsewhere.
- There are 6 medical observation beds in the medical unit. Two of these cells are negative pressure rooms and three are reportedly suicide resistant and used for suicide watch if needed.
- Per the ▮▮, detainees are admitted to and discharged from medical observation bed status based on the order of a provider.
- It was reported that nursing staff conduct wellness checks on the detainees housed in medical observation every 2 hours with rounds documented in the electronic health record.

*Health Record Review*
- We noted that there is little to no documentation of care provided in the medical observation rooms. There was no evidence of admission and discharge orders nor of routine nursing rounds.
- Not all detainees would have required medical observation care and therefore not all would have any documentation for this level of care.
- Of the total number of records reviewed, only a few charts contained any documentation related to medical observation care.
- The very few mentions of care only contained an occasional documented nursing round. There was no admission and/or discharge documentation found in any of the records reviewed.

*Findings:*
- *Criteria:* NCCHC F-02 Infirmary-Level Care
- *Cause of Problem:* The facility did not provide any documentation for these services so it is assumed that the approach for documenting this care has not been defined by facility leadership.
- *Effect of Problem:* The facility states that medical observation services are provided but there is no documentation of this type of care being documented in the health care records reviewed. Failure to define and document this care impacts continuity of care.
- *Suggested Actions:* All provided medical observation care, including associated orders, rounds, and care provided, should be documented in the health record. The types of care provided in these rooms should be defined in policy and procedure. Facility leadership should create defined policy for the delivery of medical observation care and ensure all aspects of this care are documented in the health record.

*Quality of Care:*
- There was no documentation to support assessment of these services. This documentation should have been present in the health records made available for review.
- We were unable to determine quality of care because of lack of documentation in the health records provided for review.

---

Irwin County Detention Center – Inspection Report                                    9

AMIN_0011294

AMIN_0011337



# OFFICE OF INSPECTOR GENERAL
### Department of Homeland Security



*Inspection Report*

## SICK CALL/NURSING PROTOCOLS

### *Reported Processes and Document Review*

- In addition to the ▮▮▮▮, we interviewed sick call nurse ▮▮▮▮▮▮, LPN, as a part of the sick call review.
- Sick call services are provided 7 days a week.
- Detainees can request sick call services either through a tablet system or on a written form that is placed in a confidential locked box in their housing area. The same is true for segregated detainees.
- A nurse collects the written requests on the evening/night shift. This nurse reviews the requests and will immediately see any detainee who has an urgent need.
- Non-urgent requests are scanned and sent to the nurse who is responsible for the sick call process.
- The day shift sick call nurse then reviews the requests and proceeds to conduct sick call visits. All visits are conducted in the medical unit, including those for detainees housed in segregation.
- The nurse interviewed reports that the number of visits varies from a low of 16 to a high of approximately 30 or 40. We noted that the census is down due to the COVID-19 pandemic, which has reduced the number of sick calls.
- Sick call is conducted using nursing protocols that are in CorrecTek. There are approximately 25 nursing protocols that allow the sick call nurse to address the typical complaints that occur in the correctional health care setting. Documentation was provided to verify that nurses are trained in nursing protocol use at the point of new hire orientation.
- The nursing protocols include over-the-counter medications that have been approved by the ▮▮▮.
- The sick call nurse refers any detainee that they deem to require provider care. It was reported that these referrals are typically seen within 7 days unless urgent need requires them to be seen sooner.
- Emergency protocols are in place that include prescription medications. Nursing staff are to contact a provider before use of these medications.
- There were no reported backlogs for sick call services.

### *Health Record Review*

- The nursing team members focused on the sick call process in the health record review. The 2011 ICE standards require that all sick call requests be triaged within 24 hours, while the NCCHC standards require a face-to-face encounter within 24 hours of sick call request submission. The records were reviewed based on the ICE standards.
- We attempted to find at least two sick call encounters in each records reviewed, although two did not exist in every record.
- It was difficult to track time frames because the actual dated request was not always in the health record.
- For those cases where that documentation was available, care was generally completed within 48 hours, but there were some outliers where care was delayed.
- In the 195 health records reviewed, the team evaluated 236 sick call visits. Of those 236 sick call visits, there were 8 visits with care that could have been more appropriate, with the remaining visits deemed to be appropriate.
- Sick call nursing team members use nursing protocols appropriately.
- The physician inspector noted that the sick call LPN had to place several provider referrals before a detainee was seen, causing a delay of a few weeks.
- One concern we noted was that many of the nursing protocols allow the nurse to order appropriate amounts of ibuprofen. However, some detainees were already on other NSAIDs (non-steroidal anti-inflammatory medications) and the addition of the ibuprofen was not appropriate. The nurses should check the detainee's current medications before ordering ibuprofen.

---

Irwin County Detention Center – Inspection Report

10

AMIN_0011294

AMIN_0011338



# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security



*Inspection Report*

*Suggestions:*
- Referrals to providers by nursing at sick call should be tracked for timeliness.
- Over-the-counter medication use in nursing protocols should be reviewed and nurses educated about the proper instances to provide these medications.
- All sick call requests should be scanned into the detainee health record. This may be current policy but the records reviewed spanned several years back and may not reflect current practice.
- All sick call requests should be tracked to proper completion within established time frames
- Sick call care should be monitored through the newly established CQI program.
- The widespread use of ibuprofen in the nursing protocols should be reviewed.

*Physician Case Reviews That Show Noncompliance:* Cases 3, 5, and 18

*Quality of Care:* Sick call is adequate but time frames need to be monitored through the CQI program.

## CHRONIC CARE

*Reported Processes and Document Review*
- There are no site-specific chronic care or preventive care guidelines. It was reported that laboratory and other test results are shared with detainees at chronic care visits. Sick call requests that are referred to the NPs are reportedly seen within 72 hours.
- In addition to the ██, we also interviewed chronic care nurse ████, LPN, as part of the chronic care review.
- The nurse assigned to chronic care tracks all detainees enrolled in chronic care clinics, including completion of required laboratory tests, medication renewals, and assistance with scheduling chronic care visits.
- The chronic care nurse works directly with the nurse who supports the ████ to schedule the chronic care visits.
- Referrals to chronic care typically begin at intake but can occur when an issue is noted during any clinical encounter.
- Provider staff report that there are standing laboratory testing orders for chronic care detainees that are initiated at intake. Identified chronic care detainees are to be seen by a provider within 72 hours of intake.
- The timing of chronic care visits is based on provider order, as is associated diagnostic testing, but is usually every 3 months, per provider staff.
- Provider staff are to establish and maintain the problem list during sick call and chronic care encounters.
- There are no reported backlogs for chronic care services.

*Health Record Review*
- Overall the management of chronic conditions, including hypertension, hyperlipidemia, diabetes, asthma, and menstrual disorders, appears adequate.
- While care appears adequate, the organization, consistency, and delivery of the program is not adequate and requires a great deal of process work.
- There is no consistent guidance for the treatment of chronic illness due to a lack of chronic care guidelines. These guidelines have not been developed for use by provider staff. Staff providing chronic care services report using a number of different guidance documents.
- We noted that master problem lists were not present in all of the health records. For those records with master problem lists, they did not always reflect current detainee status.
- Provider staff who treat chronic care detainees are not monitoring and documenting the current status (stable, improving, deteriorating) or condition (poor, fair, good).
- It was difficult to track the completion of laboratory studies ordered for chronic care detainees. For the laboratory results that were found in the records, many were signed or acknowledged by the

---

Irwin County Detention Center – Inspection Report                                      11

AMIN_0011294

AMIN_0011339



# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security



*Inspection Report*

ordering provider, but there was no documentation stating actions to be taken. Documentation that laboratory results were shared with detainees was also lacking.
- Chronic care visits were not scheduled with consistency.
- Many provider documentation entries are not properly dated. This is expected documentation practice.

*Findings:*
- *Criteria:* 4.3.V.W Special Needs and Close Medical Supervision; NCCHC F-01 Patients With Chronic Disease and Other Special Needs
- *Cause of Problem:* Lack of defined chronic care program guidelines.
- *Effect of Problem*
  - Lack of chronic care guidelines results in inconsistent chronic care treatment.
  - Incomplete and outdated master problem lists negatively impact detainee care across interactions with all health staff.
  - Lack of documented detainee health status in addition to the lack of guidelines results in inconsistent and poorly defined approaches to care.
  - Lack of response to laboratory results does not provide a clear picture of treatment approaches.
  - Lack of proper documentation for dates of chronic care provided also impedes understanding of treatment.
- *Suggested Actions:*
  - Establish chronic care guidelines for use by provider staff.
  - Provider staff should be provided clearly defined direction regarding the proper completion and maintenance of the master problem list in the health records.
  - Provider staff should be properly educated on how to determine and document the chronic care patient's health status and condition.
  - Provider staff should be instructed to not only acknowledge that laboratory studies have been reviewed, but also document their intended action based on the findings. The findings should be shared with the detainee and that encounter should be documented in the health record.
  - Provider staff should be reminded of the need to date and time all documented clinical encounters.
  - The chronic care program requires a great deal of definition to ensure that adequate chronic care is being provided. Involved staff should be provided documented education and held accountable for all required actions in the delivery of chronic care.

*Physician Case Reviews That Show Noncompliance:* Cases 2, 3, 4, 6, 8, 10, 11, 12, 13, 14, 15, 16, 17, 19, and 20
*Quality of Chronic Care:* Care – adequate; program organization – not adequate

## CONTINUITY OF CARE
*Reported Processes and Document Review*
- A defined process is in place for diagnostic testing. The ordering provider enters the order into the EHR. These are printed and placed in a designated location for use by the evening nurse who will obtain the specimens.
- All laboratory specimens are transported to a local hospital for processing. This includes both routine and stat laboratory studies.
- Critical and stat laboratory results are called in to the facility. A provider is notified for orders in this circumstance and orders are obtained as needed.
- The ███ reports that laboratory results are shared with detainees and that communication is documented in the health record.

---

AMIN_0011294
AMIN_0011340



## OFFICE OF INSPECTOR GENERAL
### Department of Homeland Security



*Inspection Report*

- Requests for off-site specialty care go through the ICE approval process. It was reported that the approval process can vary from 2 days to 2 weeks if additional information is required from the ordering provider. The ordering provider is responsible for tracking the approvals and providing information as required.
- Detainees are reportedly seen every 30 days or as needed until the requested appointment is completed.
- Detainees returning from inpatient stays or emergency room visits are housed in a medical observation room until they can be seen by a provider. These detainees receive a nurse wellness check every 2 hours.
- It was reported that off-site specialty providers return necessary information and paperwork for completed appointments. The ██ and ██ have a positive working relationship with specialty providers and emergency staff and can easily monitor detainees and obtain required paperwork when needed.
- One member of the nurse practitioner staff noted that she schedules a follow-up appointment at the time of a laboratory order to ensure review of laboratory findings with the detainee. It was not clear that all provider staff use this approach.

*Health Record Review*
- The health record review revealed a number of instances where continuity of care was not appropriate.
- In several instances orders were not carried out or test results were not appropriately addressed.

*Findings:* None for reported processes.

*Physician Case Reviews that Show Non-Compliance:* Cases: 1, 4, 8, 9, 13, 14, 15, 16, 17, 18, 19, and 20

*Quality of Care:* Not adequate

## SPECIAL NEEDS DETAINEES

*Reported Processes and Document Review*
- Detainees are provided aids to impairment when ordered by provider staff based on need.
- If a detainee enters the facility with an aid, they are referred to a provider at the point of the intake screening for a decision on continuation of use.
- Basic aids to impairment are kept on site for immediate use, but items such as hearing aids or dentures would need to go through the required process for obtaining these devices.
- All aids to impairment are approved for use in the facility by custody staff.
- It was reported that hormone therapy is continued for transgender detainees who enter on therapy.
- The ██ reports that she works with custody to arrange for special accommodations and housing for special needs detainees.

*Health Record Review*
- There was no documentation in the health record to support assessment of these services.

*Findings:* None

*Quality of Care:* Adequate based on documentation review and interviews.

## WOMEN'S HEALTH

*Reported Processes and Document Review*
- Our insights and determinations about women's health are based solely on the health records provided for review and staff interviews.
- The facility houses females, with a census of 14 on the day of the inspection.
- There have been no deliveries in the last 12 months and currently there are no pregnant females housed at the facility.

---

Irwin County Detention Center – Inspection Report                                           13

AMIN_0011294

AMIN_0011341



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security



*Inspection Report*

- All female detainees receive a urine pregnancy test during the intake screening. If they test positive, they are referred to a provider who will order confirmatory blood testing, prenatal vitamins, diet, and a lower bunk assignment. The provider would deliver pregnancy counseling at this time.
- It was reported that restraints would not be used during labor and delivery.
- Mammograms and Pap smears would be provided as ordered but performed by an off-site provider.
- The ▇ reports that females who deliver or miscarry would be automatically referred for mental health services.
- The pregnant females are referred to an outside obstetrics and gynecology specialty group for continued care and delivery.
- No pregnant females with opioid addiction have entered the facility recently. Those who did would be referred to the provider for further orders for care and treatment.
- Emergency contraception would be provided by the local hospital.
- Females discharged from the facility are provided continued contraception methods and are instructed to contact their local health department.

*Health Record Review*
- Women's health care was deemed to be appropriate in the health records reviewed.
- The only issue noted was that the off-site specialty provider did not consistently return clinical care information to the facility.

*Suggestions:* Work with off-site obstetrics and gynecology providers to ensure proper sharing of information following specialty care appointments.

*Quality of Care:* Adequate

COMMUNICABLE DISEASE AND INFECTION CONTROL/ENVIRONMENTAL HEALTH: MEDICAL OPERATIONS

*Reported Processes and Document Review*
- The facility has a written exposure plan. The ▇ last reviewed it in July 2020.
- All instruments used on site are disposable. Approved cleaning solutions are used to wipe down surfaces and medical equipment.
- Sharps and biohazardous waste are disposed of through an outside vendor. Medical staff transport these items to the pickup location within the facility. Detainees do not handle these items.
- Health staff are trained in the use of standard precautions annually and are expected to observe these standards as a part of their daily routine.
- Detainees suspected of or confirmed as having a contagious disease would be placed in one of the two negative pressure rooms in the medical unit.
- The facility compliance officer checks the functioning of these rooms daily.
- The facility works closely with the medical providers at the local health department and report all diseases they track as required.
- The medical unit is reportedly cleaned daily. The ▇ was able to produce a monthly inspection checklist but the form does not contain confirmatory signatures. We suggest that the individual(s) assigned to this duty review and sign this form.
- Detainees who are discharged with a contagious disease are instructed to contact their local health department and are provided current treatment medications. This is also reported to ICE.

*Health Record Review*
- The health record review yielded no findings that reflect any concerns related to the communicable disease, infection control, or environmental health for the facility.

---

Irwin County Detention Center – Inspection Report                                    14

AMIN_0011294

AMIN_0011342



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security



*Inspection Report*

*Suggestions:* Consider editing the current form used to document medical unit cleaning to clearly show dates, times, and signature(s) of responsible individual(s).
*Physician Case Reviews That Show Noncompliance:* Case 15
*Quality of Care/Process:* Adequate

## EMERGENCY CARE

*Reported Processes and Document Review*
- The ▮ reports that medical leadership approve the medical portion of the emergency response plan. The plan was last approved in August 2020.
- The facility has arrangements for the provision of 24-hour emergency care for medical, dental, and mental health needs.
- The facility requires a 4-minute response time for emergency calls within the facility.
- Custody staff are trained in cardiopulmonary resuscitation and receive emergency training annually. They are expected to deliver care in emergency situations until medical staff arrive.
- Documentation of man-down and mass disaster drills was not provided for review.
- Appropriate emergency response equipment is on site, including oxygen, AEDs, Ambu bags, and backboards. Nursing staff check all emergency equipment daily.

*Health Record Review*
- No emergency response documentation was found in the records provided for review.
*Findings:* The ▮ could not provide copies for all required man-down and mass disaster drills.
- *Criteria:* 4.3.V.T: Emergency Medical Services and First Aid; NCCHC Standard D-07 Emergency Services and Response Plan
- *Cause of Problem:* The ▮ did not provide all required emergency response drill documentation.
- *Effect of Problem:* Lack of preparation can hinder proper response in emergency situations.
*Quality of Process:* Adequate
*Quality of Emergency Care:* Could not be determined because no documentation of emergency care was provided.

## SUBSTANCE DEPENDENCE AND DETOXIFICATION

*Reported Processes and Document Review*
- Detoxification and withdrawal treatment rarely, if ever, occurs at Irwin because the detainees were previously housed at another location.
- If required, detoxification would be provided under the direction of provider order. LaSalle provides protocol direction to the ▮.
- Detainees being detoxed are housed in one of the medical observation rooms in the medical department.
- Detainees entering the facility on medication-assisted treatment are referred to the provider for immediate orders and plan of care.
- If the staff determine they cannot provide the level of care needed for a detainee receiving detoxification treatment, the detainee would be transferred to the local emergency room.
- The ▮ reports that staff receive annual training for the identification of potential withdrawal and the detoxification process.

*Health Record Review*
- The physician and nursing health record review did not identify any incidents of detoxification treatment.

AMIN_0011294
AMIN_0011343



# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security



Inspection Report

*Findings:* None, as no documented incidence of detoxification treatment was noted during the health record review.

*Quality of Care:* There was no documentation to support assessment of these types of services. Note that this type of care would be very rarely required at the Irwin facility.

### PHARMACY MANAGEMENT/MEDICATION MANAGEMENT
*Reported Processes and Document Review*
- In addition to the ▮▮, we also interviewed medication nurse ▮▮▮▮▮▮▮, LPN, as a part of the pharmacy review.
- The facility has two pharmacy providers: IHS in Alabama and a local pharmacy.
- The provider enters medication orders into the EHR. Orders for IHS are electronically transmitted to the pharmacy. Orders for the local pharmacy are printed from the EHR and faxed or emailed. The local pharmacy provides all psychotropic medications and is the backup for IHS as needed.
- IHS provides medications in individual, prefilled, multidose packs and the local pharmacy uses a blister pack system. While the multidose packs save time, the use of two systems requires a great deal of tracking effort by the nurses.
- Medication is stored in a designated area in the medical unit. It is secured by a double lock for controlled substances.
- Par levels are established for stock medications that are kept on site. Staff use a checkout system for these medications and work with the assigned clerk to replace depleted supplies.
- Nursing staff administer medications twice a day in the housing areas.
- A pharmacy tech assigned to the facility handles the return and/or disposal of medications. There is a disposal system on site for medications not returned to the pharmacy.
- Controlled substances are kept under a double lock system and are accounted for at every shift change.
- Some emergency medications are kept on site, but it was reported that no antidotes are available. The number for poison control is posted. We suggest that the ▮▮ and ▮▮ establish which antidotes should be kept on site and arrange to obtain them for use. Staff should be trained for their proper use.
- Keep-on-person medications are allowed and are provided to detainees in the multidose packs described above. Detainees can carry emergency medications if approved by the provider.
- The EHR notifies providers of impending expirations.
- The formulary process is based on ICE policy and procedure.
- It was reported that the chronic care nurse tracks detainees on chronic care medications for compliance.

*Health Record Review*
- The nursing team found it almost impossible to provide an accurate assessment of medication administration practices based on the documentation provided in the health record.
- To make a clear assessment the team needed to see the original order, the documentation of the first dose administered, and a completed medication administration record. Many of these documents were not present in the health records provided for review.
- Given this lack of documentation, the nursing team decided to take 37 chronic care health records and review those with the ▮▮ to determine the quality of medication services as reflected in the records of detainees requiring more intensive care.
- The ▮▮ reported that she felt that current medication services were improved as compared to the medication services documented in previous years. With that in mind, the nurse reviewing these records focused on medication orders in 2020 or 2021 when possible.
- Three of the records were reported to be old paper charts and not available for review.

---

Irwin County Detention Center – Inspection Report                                   16

AMIN_0011294

AMIN_0011344



# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security



*Inspection Report*

- Of the 37 records, 22 of the detainees were seen by a provider, received their medication promptly, and were found to be compliant in taking their medications.
- The remaining records showed detainees' general lack of compliance to take their medication as ordered. The medication administration records showed the nursing staff repeatedly documenting the detainee as a no show but there were no documented refusals with detainee signatures. The many refusals with only nursing staff signatures and no detainee signature is a concern.
- A provider educated some detainees, and others do not have documentation of this occurring.
- In one instance the nurses reported that an order was not available for administration "due to storms." These medications could have been obtained from the local pharmacy for more timely administration.
- Generally, medications are made available and administered in a timely manner.

*Findings:* Detainee noncompliance with taking medication is not consistently and properly addressed in the health records.

- *Criteria:* 4.3.V.G: Pharmaceutical Management; 4.3.V.U: Delivery of Medications; NCCHC C-05 Medication Administration Training; D-01 Pharmaceutical Operations; D-02 Medication Services
- *Cause of Problem:* Lack of compliance by nursing and provider staff in addressing noncompliance with taking medications.
- *Effect of Problem:* Lack of compliance and inconsistent documentation of medication administration makes it difficult to determine the effectiveness of care ordered.
- *Suggested Actions:*
  o Nursing staff should be instructed to meet with each noncompliant detainee to ensure proper education is provided and signed refusals are obtained.
  o Referrals to providers should be made in a timely manner. These should be properly documented in the health record, including a plan of action for the medication(s) being refused.
  o We noted that a consulting pharmacist is contracted to oversee the pharmacy area and to perform pharmacy inspections. Based on provided documentation, these inspections do not occur on a regularly scheduled basis. We suggest that the inspections occur on a more regular basis.

*Physician Case Reviews That Show Noncompliance:* Cases 5 and 7
*Quality of Process for Obtaining Pharmaceuticals and Managing the Pharmacy:* Adequate
*Quality of the Medication Administration Process:* Adequate, but requires improvement.

## MENTAL HEALTH SERVICES
### Reported Processes and Document Review

- The ▮▮ reports that the mental health program consists of evaluations, individual counseling, transfer to a mental health facility if needed, and a suicide prevention program.
- It was reported that designated staff have been trained in and provide crisis intervention if needed.
- Mental health evaluations occur as a part of the receiving screening and the health assessments.
- Any detainee identified as being on mental health medications at the time of the screening is reportedly seen by mental health staff within 24 to 48 hours.
- The facility psychiatrist manages psychotropic medications. Detainee-signed consent is obtained for psychotropic medications. The psychiatrist reports that he sees every detainee on psychotropic medications monthly.
- It was reported that mental health treatment plans are established for each detainee on the mental health rosters.
- Clinically ordered and custody-ordered restraints and seclusion are not used at the facility.
- If there is a need for involuntary treatment, it would be addressed through ICE and the detainee would be transferred to an appropriate location for treatment.

Irwin County Detention Center – Inspection Report                                        17

AMIN_0011294

AMIN_0011345



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security



*Inspection Report*

*Health Record Review*
Mental health care was documented in the health records provided for review.
*Findings:* None
*Physician Case Reviews That Show Noncompliance:* Case 13
*Quality of Care:* Adequate based on the lack of mental health encounters reviewed in the health records.

SELF-HARM/SUICIDE PREVENTION AND INTERVENTION

*Reported Processes and Document Review*
- The ▇ reports that there have been no suicide attempts or completed suicides in the past 2 years.
- The ▇ is responsible for notifying ICE in the event of an attempted or completed suicide.
- Medical staff receive suicide-prevention training at hire and annually.
- Custody staff, medical staff, and other detainees may all identify and report suicidal detainees.
- Suicidal detainees are transferred to the medical unit. In the event of an attempt and injury, the detainee would be transported to the emergency department.
- If a member of the mental health staff is on site, they immediately assess the detainee. If no mental health staff member is on site, a member of the medical staff assesses the potentially suicidal detainee and a mental health provider is then contacted. A member of the mental health staff is on site 6 days a week.
- Identified detainees are placed in a suicide-prevention cell in the medical observation area. The psychiatrist will provide all orders including the use of suicide-prevention smocks.
- Detainees requiring an elevated level of mental health care are transferred to a local emergency room for further treatment.
- Custody staff monitor the detainee and nurses conduct wellness checks on the detainee every 2 hours.
- The ▇ and ▇ are assigned to provide daily updates for detainees on watch.
- Care is taken to ensure that excessive deprivations and restrictions are not placed on suicidal detainees.
- It was reported that only the psychiatrist can release a detainee from suicide watch.
- Once released from close watch, mental health staff see the detainee daily. Care plans and scheduled encounters are adjusted based on detainee acuity.
- The ▇ clearly articulated the steps to be taken in the event of a completed suicide.

*Health Record Review*
- The care represented in the limited number of cases reviewed in the health records was appropriate.
*Findings:* None
*Quality of Care:* Adequate based on interviews with an understanding of limited documentation.

TERMINAL ILLNESS OR DEATH OF A DETAINEE/ADVANCE DIRECTIVES AND DEATH

*Reported Processes and Document Review*
- The ▇ reports that there have been no deaths at the facility in the last 3 years.
- If the facility receives a seriously or terminally ill detainee, ICE is notified and the detainee is transferred to a more appropriate facility. The ▇ reports that she and the ▇ work together to accomplish that transfer and that it happens in a timely fashion.
- No end-of-life planning would occur at Irwin.
- Note our previous mention that this policy only reflects state guidelines and thus needs to be updated to also reflect local jurisdiction guidelines.

Irwin County Detention Center – Inspection Report                                    18

AMIN_0011294

AMIN_0011346



## OFFICE OF INSPECTOR GENERAL
### Department of Homeland Security



*Inspection Report*

*Health Record Review*
- No terminal illness care was documented in the health records provided for review.

*Findings:* None

*Quality of Care:* Processes as reported meet the established standards.

### NOTIFICATION OF DETAINEES WITH SERIOUS ILLNESS

*Reported Processes and Document Review*
- The ▇ described the process for notification of designated ICE personnel when a detainee presents with a serious medical or mental health illness. The ▇ reports that this contact would be documented in the health record.
- The ▇ reports one such incident in the past 6 months.

*Health Record Review*
- There was no documentation of notifications in the health records reviewed.

*Findings:* None

*Quality of Care:* Processes as reported meet the established standards.

### HEALTH EDUCATION AND WELLNESS PROGRAM

*Reported Processes and Document Review*
- The ▇ reports that health education is provided in written form, including pamphlets and posters.
- Specific health education is documented in the health care record at the time of the encounter.

*Health Record Review*
- There was no documentation of health education in the health records reviewed.

*Findings:* None

*Quality of Care:* Processes as reported meet the established standards.

### DISCHARGE PLANNING

*Reported Processes and Document Review*
- An RN is assigned to complete discharge planning.
- Parameters are assigned for the types and amounts of medications that are provided to the detainee at the point of release as well as the health information to be provided.
- Detainees who will require ongoing care in the community are given information that directs them to their primary care provider or their local health department.
- The ▇ reports that medical staff receive notification of transfer or discharge in a time frame that allows for proper preparation for discharge to the community.

*Health Record Review*
- Discharge information was not provided in the health records reviewed.

*Findings:* None

*Quality of Process:* Adequate based on reported process

### SEGREGATED DETAINEES

*Reported Processes and Document Review*
- The ▇ reports that there are 24 segregated housing cells in the facility.
- An assessment is completed for each detainee placed in segregation. The detainee may be brought to the medical unit or the nursing team member goes to segregation to complete the assessment.
- Nursing staff completes rounds in the area twice daily. Rounds are documented on individual detainee observation sheets. These become part of the custody record.
- It is reported that the psychiatrist makes rounds on the days he is on site.
- Segregated detainees are afforded the same access to care as nonsegregated detainees.

---

Irwin County Detention Center – Inspection Report                                19

AMIN_0011294

AMIN_0011347



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security



*Inspection Report*

*Health Record Review*
- The nursing record review did not reveal any health clearances for detainees being placed in segregated housing.

*Findings:* None
*Quality of Care:* Could not be determined based on health record review. Process as described meets standards language.

## MEDICAL DIETS

*Reported Processes and Document Review*
- Medical diets are enacted only upon a provider order.
- Medical staff report medical diet orders to food service daily.
- A registered dietitian nutritionist reviews the facility's diets annually and addresses the nutritional adequacy of the diets provided.
- The facility provides a heart-healthy diet in addition to other routine medical and religious diets.
- Members of the nursing and provider teams address detainee refusal of medically ordered diets. Medical diet noncompliance is addressed at the point of reported noncompliance and then at each following chronic care visit. Education and refusals are documented in the health care record. Refusals include detainee and staff signatures.

*Health Record Review*
- The health records showed medical diets but did not show detainee compliance with the ordered diet.

*Findings:* None
*Quality of Care:* Processes as reported meet the established standards.

## DENTAL SERVICES

*Reported Processes and Document Review*
- Dental services are not provided on site. A community provider is contracted to provide all dental care. Oral surgery services are available as needed.
- The █████ reports that the off-site dentist provides 8 hours a week of dental coverage with approximately 30 detainees seen monthly.
- The contracted dentist sets the dental priorities based on presented detainee need.
- The initial dental screening occurs at intake.
- Detainees are scheduled with the dental provider as needed and for their annual evaluation.
- Detainees have access to the preventive benefits of fluoride.

*Health Record Review*
- The nursing health record review showed appropriate action for dental sick calls based on the appropriate nursing protocols.
- Dental treatment plans were available in the health record and appeared appropriate.

*Findings:* None
*Quality of Dental Care:* Adequate

## GRIEVANCES

*Reported Processes and Document Review*
- Health care grievances are to be addressed per ICE policy and procedure.
- At intake detainees are educated about the grievance system through oral and written communication.

---

AMIN_0011294

AMIN_0011348



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security



*Inspection Report*

- Grievances can be submitted orally or via a tablet. Appeals are to be submitted in writing.
- It was reported that grievances are addressed within established time frames.

*Health Record Review*
- The NCCHC Resources inspection team physician reviewed five cases from legal sources. The care in each case was found to be appropriate.

*Findings*: None
*Quality of Process*: Adequate

PRIVACY AND CHAPERONES

*Reported Processes and Document Review*
- Care is provided in a manner that ensures privacy and allows for a same-gender provider or chaperone.
- The ▉ reports that care is provided in designated exam rooms in the medical area that provide for care to be delivered in a private manner.

*Health Record Review*
- Documentation of this would not be present in the health record.

*Suggestions*: A nurse practitioner reported that custody staff are not always available to cover medical appointments on the weekends. We suggest that this be reviewed and addressed as needed.
*Quality of Care*: Adequate based on reported compliance with the standard.

REFERRALS FOR SEXUAL ABUSE VICTIMS AND ABUSERS

*Reported Processes and Document Review*
- The ▉ reports that all custody and health staff receive Prison Rape Elimination Act (PREA) training on an annual basis. The training involves both a classroom and an e-training component.
- The ▉ defined the procedure that occurs in the event of a reported sexual assault.
- Detainees are transported to the emergency department for forensic sample collection.
- Mental health services are provided for the involved detainee.
- The ▉ reports that the emergency department would provide prophylactic treatment for sexually transmitted infections as well as emergency contraception.

*Health Record Review*
- The record reviews did not contain instances of sexual assault care.

*Findings*: None
*Quality of Process*: Adequate based on reported compliance with the standard.

INFORMED CONSENT, REFUSALS, AND INVOLUNTARY TREATMENT

*Reported Processes and Document Review*
- Each detainee signs a general consent for the provision of health services.
- Specific consent is obtained for invasive procedures following the delivery and documentation of detainee education and documentation of general consent.
- Interpretation services are provided for the process of gaining informed consents.
- Detainees who refuse treatment are provided education and counseling that includes the impact of not accepting the care.
- A refusal form that includes the signatures of the detainee and the involved health staff member is completed and scanned into the EHR.
- Involuntary treatment would occur only after ICE notification and court order.

AMIN_0011294

AMIN_0011349



# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security



*Inspection Report*

*Health Record Review*
- Documented consents for surgical procedures were found in the health records reviewed.

*Findings:* None
*Quality of the Process:* Adequate

## MEDICAL EXPERIMENTATION

*Reported Processes and Document Review*
- Policies and procedures state that medical experimentation is allowed for detainees housed in the facility based on an approval process.

*Findings:* None

## CREDENTIALING

*Reported Processes and Document Review*
- The credentialing of all employees is completed by the LaSalle company office.
- Current credentialing for all staff was verified through document review.
- The credentialing process for provider staff includes the use of the National Practitioner Data Bank. Staff with licensure restrictions are not allowed to work.
- The facility monitors licenses and required certifications for provider and nursing staff.
- The ▇ reports the use of job descriptions to ensure that staff work within their scope of practice.

*Health Record Review*
- The health record review yielded no findings that reflect any concerns related to the credentialing process.

*Findings:* None
*Quality of Process:* Adequate

Irwin County Detention Center – Inspection Report                                                    22

AMIN_0011294

AMIN_0011350



# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security

## HEALTH RECORD REVIEWS

### SET 1 – LEGAL-ASSIGNED CASES

We were asked by the OIG team to look at five specific cases. Dr. Stoltz performed these reviews.

██████ / A #: ██████   **Case A**

*Described Issues*

- ████ submitted a couple of health service requests on sick call paper forms.
- He states that he received a response within three days of submission, but he feels like it depends on the mood of the health staff about when he would be seen.
- Last year he submitted a health service request for pain in his chest. He was taken to see a doctor but he did not feel that his issue was resolved and submitted another request a few weeks ago.
- He was told that he could not go to the doctor because his dorm was under quarantine. He has not heard anything since then.

*Case Review Findings*

- Intake was in November 2019 with no medical issues noted.
- There is no history of asthma.
- No health service request for chest pain was found in the health record but rather for breathing problems off and on.
- A nurse saw the detainee in a timely fashion when the requests were submitted.
- The health service request submitted on February 12, 2021, noted a complaint of breathing problems off and on for 7 months.
- The nurse referred him to see a provider, but there is no documentation that shows he has been seen by any provider.
- ████ ████, does not understand why the detainee would not have been seen as there are no restrictions on seeing the provider because of a quarantine. ██ ██ noted that she will get him set up to see the provider.

██████ / A #: ██████   **Case B**

*Described Issues*

- Medication Concerns
  - The detainee has an issue with how her medication has been managed at the facility.
  - June 2020 – She arrived at the facility with 2 months of medication.
  - When that supply ended she had to file a grievance because her medications were not being administered.
  - October 2020 – She began receiving the medication again.
- Physical concern:  Vaginal Bleeding
  - She feels that she is having excessive vaginal bleeding and requires additional care.
  - July 2020 – She made a request to see health staff.
  - October 2020 – The doctor made a recommendation for a blood test.
  - December 2020 – The nurse practitioner saw her. An obstetrician also saw her and recommended a sonogram.
  - January 28, 2021 – She started an additional medication.
  - To date the sonogram has not been completed.
- Physical Concern:  Headaches
  - November 2020 – The detainee made a complaint about experiencing constant headaches, describing pain radiating from her head to her back. Health staff prescribed Tylenol for 5 days during one encounter and aspirin for 7 days during another encounter.
  - She believes LPN ████ is diagnosing her and does not let her see the nurse practitioner.
  - She does not know what is wrong with her. She feels she needs a MRI to determine the cause of her pain.

---

Irwin County Detention Center – Inspection Report                                      23

AMIN_0011294

AMIN_0011351



# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security



*Health Record Reviews*

- o  She has described her issues while being seen by mental health. The mental health nurse told her to file a grievance on her concerns. She said she is going to put in a grievance tonight.
- o  So far, she has submitted two grievances on the tablet and one using paper.

*Case Review Findings*
- June 14, 2020 – Intake screening showed only a history of anemia and GERD reported by the detainee.
- She was started on her meds right away; however, she did not show up for med pass for most of July and August.
- Per policy, a detainee who misses 3 days of medications is to be seen by a provider for compliance counseling. Even though the missed doses occurred in July, she was not seen by a provider until August 9, 2020.
- The site was not following policy related to medication noncompliance.
- The gynecological problem seems to have been managed appropriately. She had an endometrial biopsy on January 28, 2021, and a pelvic ultrasound on March 1, 2021.
- The detainee has not continued to complain about headaches nor has she complained about headaches during her gynecological provider encounters.
- If the detainee continues to experience headaches, she should submit another health service request for this issue.
- December 12, 2020 – During a mental health visit it was recommended that she see the psychiatrist. The detainee refused this recommendation.

 / A #: ▮▮▮▮▮▮  Case C

*Described Issues*
- Detainee complains of chronic back pain.
- She was previously housed in Charlie dorm when they had more females in the facility. She has submitted health service requests on the tablet and on paper. The paper request was placed in the grievance box because Charlie dorm did not have a medical box.
- She is prescribed ibuprofen daily but has gone without pain medication for up to 8 days.
- She has not been able to see the nurse practitioner and the nurse sees puts in the request for medication for either 5 or 7 days at a time based on the associated nursing protocol.
- She has seen the nurse practitioner only 3 days in almost a year. She saw a new nurse practitioner a month ago and said this NP did more for her in 5 minutes than anyone has done for her in the entire time at the detention center because she was able to get X-rays.
- However, her medical issues are not resolved. She now needs an MRI of her back.
- She is experiencing sciatica pain in her back and wears a back brace but cannot deal with it without medication.
- The detainee also has hypertension but does not want to be on medication for it.
- Per the detainee, she manages her hypertension on her own with breathing exercises, but she cannot manage the back pain on her own.
- She said the response time for her health service requests varies. It could be a day or two or it could be a week, and she has not gotten resolution of her problems.
- She described the medical care she receives as very poor. She has been waiting a month to see the nurse practitioner and is not on the schedule.

*Case Review Findings*
- June 3, 2020 – At intake the detainee complained of chronic back pain.
- Detainee was initially given ibuprofen or Tylenol per nursing protocols.
- June 3, 2020 –Detainee was seen by the provider and given ibuprofen as needed three times a day for 14 days and a muscle rub.

---

Irwin County Detention Center – Inspection Report                                    24

AMIN_0011294

AMIN_0011352



## OFFICE OF INSPECTOR GENERAL
Department of Homeland Security



*Health Record Reviews*

- The provider also saw her on October 19, 2020, November 23, 2020, December 7, 2020, January 26, 2021, and February 27, 2021.
- January 26, 2021 – She had a lumbar X-ray.
- The detainee is being seen and managed appropriately.

 **/ A #:** ▮▮▮▮▮▮  **Case D**

*Described Issues*
- She has diabetes and receives daily medications as well as a daily glucose check.
- Currently the facility is giving her medications for her diabetes and cholesterol.
- She has filed a grievance through the tablet system about her medication.
- Previously she took a liquid medication and believes she is not receiving the same medication. She feels anxious and weak after taking her medications now and she is not sure if this is a side effect of these medications.
- She has recently had blood work done at the hospital but is unsure of the results.
- She said an officer told her there was something abnormal in her blood work but health staff did not explain or tell her this.
- After she came back from the hospital, she asked about the different medications through the tablets available in the housing pods to submit the question to health staff.

*Case Review Findings*
- June 7, 2019 – No medical issues reported at the intake screening.
- She was diagnosed with diabetes based on laboratory tests completed on December 11, 2020.
- The detainee was started on a pill form of metformin with NPH (neutral protamine Hagedorn) insulin added December 15, 2020.
- The detainee was prescribed Lipitor for elevated lipids during a January 8, 2021, visit.
- Her blood glucose levels have been very good with a few being in the low range. This probably accounts for her feelings of weakness at times.
- She has never gone to the hospital.
- She appears to be receiving proper management.
- Better communication with her would ease her concerns.

▮▮▮▮▮▮ **/ A #:** ▮▮▮▮▮  **Case E**

*Described Issues*
- The detainee is seeing the psychiatrist for post-traumatic stress disorder and is receiving medication for this.
- The medicine is "slowing things down."
- He was taking a medication in Folkston because he was going through "a lot."
- They were giving him 2 to 3 doses of this medication and it was too strong. He said he almost died – he woke up to use the restroom at midnight and fainted backwards. The officer heard him and came to his aid with another detainee. He was weak and couldn't do anything.
- The next morning he went to see the doctor. He told the doctor the medication is too strong and he needs something else and will not take it again.
- When he went to Stewart and they asked him if he was going to take the medication, he told them about that incident and why he is not going to take it.
- He was there for a month and did not take the medication.
- At Irwin, things were going poorly for him with his mental illness.
- He requested to see the doctor and was able to see the psychiatrist within 3 to 4 days. They gave him a lower dose of the same medication, and in conjunction with another medication. He is still sick, but the medication is slowing the progression of his illness.

AMIN_0011294

AMIN_0011353



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security



*Health Record Reviews*

*Case Review Findings*
- The detainee does not seem to have a complaint regarding his care at Irwin.
- A review of the health record shows that the detainee has been seen by the psychiatrist a number of times with attempts to adjust his medications to find the appropriate doses that are most effective.
- His most recent visit was on March 9, 2021.

**SET 2 – ASSIGNED HEALTH RECORD REVIEWS**
The OIG team asked the physician inspector to review records of the 37 detainees with known chronic illness. The 20 cases below are those where he noted concerns during the review.

**Case 1:** ⬛⬛⬛⬛ )
*Findings of Concern*
- The following orders have no documentation of completion:
  - May 16, 2019 – X-ray of the foot
  - June 27, 2019 – X-ray of the finger
  - November 24, 2019 – laboratory studies
  - December 13, 2019 – laboratory studies
*Process Noncompliance*
- Continuity of care

**Case 2:** ⬛⬛⬛⬛⬛ )
*Findings of Concern*
- April 25, 2017 – The detainee was placed on metformin and a statin for diabetes and hyperlipidemia.
- October 10, 2017 – The detainee was seen for chronic care with no note in the orders to monitor their HgbA1c or lipids to follow control based on previous medication orders.
- No regular chronic care visits were noted in the health record.
*Process Noncompliance*
- Chronic care

**Case 3:** ⬛⬛⬛⬛ )
*Findings of Concern*
- December 17, 2018 – The detainee was seen at sick call with an elevated blood pressure of 141/105, which is a concern. He was seen by an LPN who did not properly refer the detainee to a provider.
- December 18, 2018 – The detainee was seen and ibuprofen 600mg twice a day for 14 days was ordered; this is not a sound clinical decision based on the history of hypertension and order for the blood pressure medication lisinopril.
- No regular chronic care visits were noted in record.
*Process Noncompliance*
- Chronic care
- Nursing sick call

**Case 4:** ⬛⬛⬛⬛ )
*Findings of Concern*
- The detainee reported a history of asthma and using an inhaler at the intake screening.
- This was not noted on the initial health assessment that was completed 4 days later.
- The asthma history was not noted on the master problem list.

Irwin County Detention Center – Inspection Report                                    26

AMIN_0011294

AMIN_0011354



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security



*Health Record Reviews*

- April 1, 2017 – The detainee was seen for a chronic care visit for their asthma but no peak flow testing was completed. This should be done at all asthma chronic care visits.
- May 22, 2017 – The detainee submitted a request for glasses and then five additional requests before being seen.
- August 17, 2017 – The last request for glasses was submitted; the response to this request should have occurred in a more timely manner.

*Process Noncompliance*
- Initial health assessment
- Chronic care
- Continuity of care

**Case 5** 
*Findings of Concern*
- May 24, 2017 – The detainee was seen for hypertension, presenting with blood pressure of 190/98, and was placed on two medications: 50 mg of losartan and 25 mg of hydrochlorothiazide (HCTZ).
- We noted that the detainee was administered an incorrect dose of 12.5 milligrams of HCTZ instead 25 milligrams as ordered.
- October 10, 2017 – An LPN ordered ibuprofen at sick call when the detainee was already on a similar medication. The LPNs need to check current orders before providing over-the-counter medications.

*Process Noncompliance*
- Medication administration
- Sick call/nursing protocols

**Case 6** 
*Findings of Concern*
- Detainee has a diagnosis of hypertension and diabetes.
- June 20, 2017 – The detainee was seen for a chronic care visit with an elevated blood pressure of 156/86; there was no documentation of disease control or an adjustment of blood pressure medications.

*Process Noncompliance*
- Chronic care

**Case 7** 
*Findings of Concern*
- Detainee has a history of hypertension and was placed on medication: 12.5 milligrams of HCTZ.
- November 21, 2018 – The detainee had a court appearance and upon return did not have his medication restarted.

*Process Noncompliance*
- Medication management

---

Irwin County Detention Center – Inspection Report                                    27

AMIN_0011294

AMIN_0011355



# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security



*Health Record Reviews*

**Case 8** ▮▮▮▮ )

*Findings of Concern*
- Detainee has a stated allergy to NSAIDs, which would include ibuprofen.
- July 24, 2019 – The detainee was seen at a chronic care visit and was prescribed ibuprofen despite the documented allergy.
- The detainee sent in a sick call note stating "ibuprofen killed me."
*Process Noncompliance*
- Chronic care
- Continuity of care

**Case 9** ▮▮▮▮ )
*Findings of Concern*
- May 18, 2019 – Sexually transmitted disease testing was ordered, to include an RPR (rapid plasma regain) test for syphilis.
- No RPR result was found in the health record.
*Process Noncompliance*
- Continuity of care

**Case 10** ▮▮▮ )
*Findings of Concern*
- Detainee has a documented history of hypertension and hyperlipidemia.
- There is no documented evidence that lipid levels were checked for proper control.
*Process Noncompliance*
- Chronic care

**Case 11** ▮▮▮ )
*Findings of Concern*
- Detainee has a history of diabetes with no documented chronic care visits.
- The detainee was not placed on proper medication for an elevated low-density lipoprotein cholesterol level and there was no explanation of the clinical thought process for that decision.
*Process Noncompliance*
- Chronic care

**Case 12** ▮▮▮▮ )
*Findings of Concern*
- July 21, 2018 – The detainee was noted to have a history of hyperlipidemia.
- There is no documentation that lipids were checked and no chronic care visits are noted.
*Process Noncompliance*
- Chronic care

**Case 13** ▮▮▮ )
*Findings of Concern*
- Detainee is on two medications that require careful monitoring, yet no medication level checks were documented in the health record.
*Process Noncompliance*
- Chronic care
- Mental health services
- Continuity of care

Irwin County Detention Center – Inspection Report                                28

AMIN_0011294

AMIN_0011356



# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security



*Health Record Reviews*

**Case 14**  ]
*Findings of Concern*
- August 22, 2017 – Results of a cholesterol check were high, 316.
- There was no interpretation of the results, nor was a plan of care created.
*Process Noncompliance*
- Chronic care
- Continuity of care

**Case 15** 
*Findings of Concern*
- The detainee received a chest X-ray at the point of intake.
- The chest X-ray showed abnormal findings and the radiologist recommended follow-up care.
- There was no documented follow-up for the abnormal chest X-ray.
- The detainee had a diagnosis of diabetes with failure to follow lipid levels.
*Process Noncompliance*
- Chronic care
- Communicable disease
- Continuity of care

**Case 16** ]
*Findings of Concern*
- Detainee was diagnosed with hypertension and diagnosed with a rash following medication administration.
- Medication was changed but the medication list in the health record did not reflect the change of medication and why.
*Process Noncompliance*
- Chronic care
- Continuity of care

**Case 17** ]
*Findings of Concern*
- July 19, 2020 – This date marks the first of multiple requests for asthma medications.
- There was a significant delay seeing a provider and the detainee did not receive his inhaler until September 20, 2020.
- The detainee did not receive peak flow checks during the period of delay.
- Care was delayed.
*Process Noncompliance*
- Chronic care
- Continuity of care

**Case 18** ]
*Findings of Concern*
- Detainee has a history of hypertension.
- November 14, 2017 – The provider noted "No NSAIDs" due to an increased creatinine level.
- November 17, 2017 – An LPN at sick call prescribed an NSAID despite the physician's note.
*Process Noncompliance*
- Sick call
- Continuity of care

Irwin County Detention Center – Inspection Report                                    29

AMIN_0011294

AMIN_0011357



# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security



*Health Record Reviews*

**Case 19** 
*Findings of Concern*
- Detainee has cardiac history.
- No laboratory studies or EKG results were in the health record even though they were ordered.

*Process Noncompliance*
- Chronic care
- Continuity of care

**Case 20** 
*Findings of Concern*
- The health record for this detainee was very difficult to follow.
- September 6, 2018 – The detainee has a history of anemia. Laboratory studies were ordered but the results could not be found in the health record.
- December 27, 2018 – The detainee was ordered ibuprofen despite the history of anemia and stomach issues.
- January 24, 2019 – The detainee was ordered iron pills for the treatment of anemia.
- March 4, 2019 – The detainee experienced uterine bleeding so a gynecology referral for a pelvic ultrasound was ordered; the test results could not be located in the health record.
- March 27, 2019 – A nurse practitioner again ordered ibuprofen for abdominal pain.
- March 28, 2019 – The detainee was prescribed a diabetic medication with no explanation of why in the health record.

*Process Noncompliance*
- Chronic care
- Continuity of care

---

AMIN_0011294

AMIN_0011358



# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security

## REPORT SUMMARY FOR MEDICAL INSPECTION

- The medical inspection consisted of two approaches: (1) interviews with members of the health care team, including leadership and direct care personnel and (2) thorough review of administrative documents and 195 health records. No virtual tours were conducted.
- The health record review was completed by the physician and nurses assigned to this project. The nurse team members focused on the timeliness and appropriateness of care for the core processes of care in the correctional setting. This included intake, initial health assessments, sick call, medication administration, and medical observation care. The physician focused on the care provided to detainees with chronic illness to determine its appropriateness.
- We listed the health care records with concerns in this document.
- We noted the findings for all reviewed clinical processes in each specific section of this report.
- Findings that require attention are noted them in the specific section being addressed.
- All members of the Irwin medical team made themselves fully accessible to the inspection team and participated in the interviews in a cooperative manner.
- The facility leadership team provided documentation as requested except in the few circumstances as noted in the report.
- Adequacy of care is noted in each section of the report

AMIN_0011294

AMIN_0011359



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

**Appendix D**
**Office of Inspections and Evaluations Major Contributors to**
**This Report**

Tatyana Martell, Chief Inspector
Kimberley Lake de Pulla, Supervisory Lead Inspector
Stephen Farrell, Senior Inspector
Erika Algeo, Senior Inspector
Rebecca Blaskey, Attorney Advisor
Jean Choi, Attorney Advisor
Stephanie Christian, Independent Referencer

AMIN_0011294

AMIN_0011360



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

**Appendix E**
**Report Distribution**

**<u>Department of Homeland Security</u>**

Secretary
Deputy Secretary
Chief of Staff
Deputy Chiefs of Staff
General Counsel
Executive Secretary
Director, GAO/OIG Liaison Office
Under Secretary for Office of Strategy, Policy and Plans
Assistant Secretary for Office of Public Affairs
Assistant Secretary for Office of Legislative Affairs
ICE Liaison

**<u>Office of Management and Budget</u>**

Chief, Homeland Security Branch
DHS OIG Budget Examiner

**<u>Congress</u>**

Congressional Oversight and Appropriations Committees

AMIN_0011361

AMIN_0011294

## Additional Information and Copies

To view this and any of our other reports, please visit our website at:
www.oig.dhs.gov.

For further information or questions, please contact Office of Inspector General
Public Affairs at: DHS-OIG.OfficePublicAffairs@oig.dhs.gov.
Follow us on Twitter at: @dhsoig.



## OIG Hotline

To report fraud, waste, or abuse, visit our website at www.oig.dhs.gov and click
on the red "Hotline" tab. If you cannot access our website, call our hotline at
(800) 323-8603, fax our hotline at (202) 254-4297, or write to us at:

> Department of Homeland Security
> Office of Inspector General, Mail Stop 0305
> Attention: Hotline
> 245 Murray Drive, SW
> Washington, DC 20528-0305