Declaration of

Elizabeth McNamara

Exhibit 68

PART 1

*United States Senate*
*PERMANENT SUBCOMMITTEE ON INVESTIGATIONS*
*Committee on Homeland Security and Governmental Affairs*

*Jon Ossoff, Chairman*
*Ron Johnson, Ranking Member*

# MEDICAL MISTREATMENT OF WOMEN IN ICE DETENTION

## STAFF REPORT

**PERM**Annexed hereto as **Exhibit __** is a true and correct copy o
**INVESTIGATIONS**

## UNITED STATES SENATE



**RELEASED IN CONJUNCTION WITH THE**
**PERMANENT SUBCOMMITTEE ON INVESTIGATIONS**
**NOVEMBER 15, 2022 HEARING**

NBCU002045

**SENATOR JON OSSOFF**
Chairman

**SENATOR RON JOHNSON**
Ranking Minority Member

**PERMANENT SUBCOMMITTEE ON INVESTIGATIONS**

**DOUGLAS S. PASTERNAK**
Staff Director

**CAITLIN WARNER**
Chief Counsel

**MEERAN AHN & DANIEL M. EISENBERG**
Senior Counsels

**TAYLOR BURNETT**
Counsel

**DENNIS HEINRICH**
Detailee

**SAMANTHA ARREGUI, SHIZA ARSHAD, KARAZ AXAM, DANIELLE DAVIS,
CORENZA JEAN, KRISTY HAMER, ISMAEL FAROOQUI, SAM KREVLIN, MALLORY
LEOPOLD NEEDLE, ZOE LI, MARYANNE MAGNIER, MORGEN OLSON, KEVIN
PARKER, MADELYN PHINNEY, NICHOLAS RAWLINSON, ANNIA ROCHESTER,
AVERY SALINGER, NAILA SCOTT, ANDREW VAILLIENCOURT, &
THOMAS WEAVER**
Law Clerks

**BRIAN DOWNEY**
Staff Director to the Minority

**SCOTT WITTMANN**
Deputy Staff Director to the Minority

**KYLE BROSNAN**
Chief Counsel to the Minority

**PATRICK HARTOBEY**
Senior Counsel to the Minority

**MAURA BRENNAN, CHRISTOPHER ECKHARDT JR., VICTORIA GARRASTACHO,
SLOAN MCDONAGH, JAMES PRIEST, & DAVID SAMBERG**
Law Clerks to the Minority

**KATE KIELCESKI**
Subcommittee Clerk

NBCU002046

## MEDICAL MISTREATMENT OF WOMEN IN ICE DETENTION

### TABLE OF CONTENTS

I.  EXECUTIVE SUMMARY ................................................................. 3

II.  BACKGROUND ............................................................................ 21

    A.  Key Players ......................................................................... 22

    i.  ICE and Relevant Subcomponents ...................................... 22

    ii.  ICDC and LaSalle ............................................................ 24

    iii. Dr. Amin and ICH ............................................................ 26

    B.  Key Processes for Medical Treatment of ICDC Detainees ............... 30

    i.  ICDC Sick Call Process ..................................................... 30

    ii.  ICE Surgical Approval Process .......................................... 31

    iii. ICDC Grievance Process .................................................... 33

    C.  Key Medical Procedures and Treatments ............................... 34

III.  FORMER DETAINEES AND EMPLOYEES AS WELL AS FEDERAL ENTITIES
HAVE ALLEGED SUBSTANDARD CARE AT ICDC ................................ 35

    A.  Former Detainees Have Alleged Deficiencies Related to ICDC Healthcare .... 36

    B.  Former ICDC Employees Reported Disturbing Conditions to the
Subcommittee ..................................................................... 38

    C.  Internal DHS Entities Have Identified Numerous and Repeat Deficiencies at
ICDC ................................................................................. 41

    D.  The DHS OIG Found That ICDC Generally Met ICE Detention Standards for
Healthcare but Identified Areas for Improvement ........................... 44

    i.  The DHS OIG Found That ICDC Medical Care Generally Met Standards but
Improvements Are Necessary ............................................. 44

    ii.  The OIG Identified Seven Other Areas of Concern About ICDC Medical Care 45

IV.  ALLEGED SERIOUS MEDICAL MISCONDUCT BY DR. MAHENDRA AMIN . 47

    A.  Former ICDC Detainees Have Raised Concerns About Conditions at ICDC
and Alleged That Dr. Amin Performed Nonconsensual, Unnecessary, or
Excessive OB-GYN Procedures ............................................... 48

    i.  Karina Cisneros Preciado .................................................. 49

    ii.  Jaromy Floriano Navarro ................................................... 50

    iii. Wendy Dowe .................................................................... 53

    iv. Maribel Castaneda-Reyes ................................................... 57

    v.  Jane Doe #1 ..................................................................... 58

    vi. Jane Doe #2 ..................................................................... 60

    B.  Former ICDC Employees Recounted Concerns Regarding Dr. Amin to the
Subcommittee ..................................................................... 62

i

NBCU002047

**C.** **Several Medical Experts Identified "Disturbing Patterns" in Treatment by Dr. Amin** ........................................................................................ 63

**i.** **OB-GYN Medical Experts Engaged by Immigration Advocacy Groups Found Alarming Surgical Patterns by Dr. Amin** .......................................... 64

**ii.** **The Subcommittee's Medical Expert Identified Concerning Treatment Patterns by Dr. Amin** ........................................................................ 65

**D.** **Response from Dr. Amin Concerning ICDC Allegations** ................................... 69

**V.** **DR. AMIN WAS A CLEAR OUTLIER IN THE VOLUME OF CERTAIN OB-GYN PROCEDURES HE PERFORMED ON ICDC DETAINEES** .................................. 70

**A.** **Despite Housing a Low Number of ICE Detainees, ICDC and Dr. Amin Accounted for a Large Percentage of OB-GYN Referrals, Visits, and Procedures Within the ICE System** .......................................................... 71

**B.** **Dr. Amin Accounted for At Least One in Three OB-GYN Procedures and Received Nearly Half of All ICE Payments for OB-GYN Procedures Between 2017 and 2020** .............................................................................. 73

**VI.** **ICE FAILED TO EFFECTIVELY OVERSEE OR INVESTIGATE DR. AMIN** ..... 77

**A.** **Current ICE Oversight Mechanisms to Review Detention Centers and Medical Care** ...................................................................................... 77

**B.** **ICE Had Limited Capabilities to Vet Off-Site Medical Providers or Monitor Their Medical Practices** ..................................................................... 80

**i.** **ICE Did Not Have a Thorough Process in Place to Vet Dr. Amin Before He Began Treating ICDC Detainees** ........................................................ 80

**ii.** **ICE Never Identified Any Treatment by Dr. Amin as Potentially Excessive or Unnecessary and Lacked a Utilization Review Process to Identify Trends in Off-Site Medical Treatment** ............................................................. 83

**iii.** **ICE Performed a Limited Investigation Following the Public Allegations Against Dr. Amin** ........................................................................... 86

**iv.** **ICE Personnel Failed to Conduct Site Visits to ICDC Between January 2018 and October 2020** ............................................................................. 89

**v.** **ICE Is Not Required to Monitor the Use of Language Translation Services by Off-Site Medical Providers** ................................................................ 91

**vi.** **ICE Is Not Required to Ensure Off-Site Medical Providers Obtain Informed Consent** ...................................................................................... 91

**vii.** **ICE Conducts Limited Oversight of Hospitals Providing Off-Site Services for Non-IHSC Detention Facilities** ......................................................... 93

**VII.** **ICDC HAD LIMITED OBLIGATIONS TO CONDUCT OVERSIGHT OF OFF-SITE CARE FOR DETAINEES** ....................................................................... 94

**A.** **LaSalle Had Minimal Contractual Obligations Concerning Off-Site Medical Care at ICDC** ................................................................................. 94

**B.** **LaSalle Conducted a Limited Investigation of Abuse Allegations** ................... 99

NBCU002048

**VIII.** **ICH DECLINED TO IDENTIFY EFFORTS TO INVESTIGATE DR. AMIN AND DID NOT IDENTIFY ANY CHANGES TO POLICIES AND PROCEDURES FOLLOWING THE 2020 ALLEGATIONS**................................................................ 101

**IX.** **CONCLUSION**........................................................................................ 103

iii

NBCU002049

## GLOSSARY OF ACRONYMS

| Acronym | Definition |
| --- | --- |
| CIA | Corporate Integrity Agreement |
| CMD | Custody Management Division |
| CMS | Centers for Medicare & Medicaid Services |
| CPI | Center for Program Integrity |
| CRCL | Office for Civil Rights and Civil Liberties |
| D&C | Dilation and Curettage |
| DHS | Department of Homeland Security |
| DOJ | Department of Justice |
| DON | Director of Nursing |
| DSCO | Detention Standards and Compliance Officer |
| DSM | Detention Service Manager |
| eCAMS | Electronic Claims Adjudication Management System |
| ERO | Enforcement and Removal Operations |
| FMC | Field Medical Coordinator |
| FOIA | Freedom of Information Act |
| GAO | Government Accountability Office |
| HHS | Department of Health and Human Services |
| HPMU | Health Plan Management Unit |
| HSA | Health Services Administrator |
| ICDC | Irwin County Detention Center |
| ICE | Immigration and Customs Enforcement |
| ICH | Irwin County Hospital |
| IGSA | Intergovernmental Service Agreement |

1

NBCU002050

| | |
|---|---|
| IHSC | ICE Health Service Corps |
| IHSC Facilities | Facilities in which IHSC directly provides healthcare services |
| LaSalle or LaSalle Corrections | LaSalle Southeast, LLC |
| LEEP | Loop Electrosurgical Excision Procedure |
| LOU | Letter of Understanding |
| LPN | Licensed Practical Nurse |
| MedPAR | Medical Payment Authorization Request |
| NCCHC | National Commission on Correctional Health Care |
| Non-IHSC Facilities | Facilities in which local governments or their contractors provide services without embedded federal staff |
| NPDB | National Practitioner Data Bank |
| OB-GYN | Obstetrician and Gynecologist/Obstetrics and Gynecology |
| ODO | Office of Detention Oversight |
| OIG | Office of Inspector General |
| OPR | Office of Professional Responsibility |
| PBNDS | Performance-Based National Detention Standards |
| PSI or Subcommittee | Permanent Subcommittee on Investigations |
| RCD | Regional Clinical Director |
| VAFSC | Veterans Affairs Financial Services Center |

NBCU002051

## I.    EXECUTIVE SUMMARY

In May 2021, the Permanent Subcommittee on Investigations ("Subcommittee" or "PSI") initiated a bipartisan investigation into the alleged mistreatment of Immigration and Customs Enforcement ("ICE") detainees housed in the Irwin County Detention Center ("ICDC") in Ocilla, Georgia.  Over the course of its 18-month-long investigation, the Subcommittee examined multiple allegations of medical abuse against detainees at ICDC, a private detention center owned and operated by LaSalle Southeast, LLC ("LaSalle" or "LaSalle Corrections"). The allegations stemmed from a September 2020 whistleblower complaint ("September 2020 complaint") filed by immigration advocacy groups and attorneys alleging that an off-site obstetrician and gynecologist ("OB-GYN"), Dr. Mahendra Amin, performed "high rates" of unauthorized hysterectomies on ICDC detainees.[1]  The groups also alleged that ICDC had poor medical conditions and lax COVID-19 mitigation procedures.[2]

The Subcommittee's investigation identified serious issues relating to ICDC and specifically connected to Dr. Amin's care:

- Female detainees appear to have been subjected to excessive, invasive, and often unnecessary gynecological procedures.

- There appears to have been repeated failures to secure informed consent for off-site medical procedures performed on ICDC detainees.

- Medical care provided to detainees at ICDC was known by DHS to be deficient, but neither ICE nor LaSalle took effective corrective action.

- ICE did not conduct thorough oversight of off-site medical providers and procedures.

The Subcommittee did not substantiate the allegations of mass hysterectomies on ICDC detainees.  Records indicate that Dr. Amin performed two hysterectomies on ICDC detainees between 2017 and 2019.  Both procedures were deemed medically necessary by ICE.

Dr. Amin stopped treating ICE detainees after the September 2020 complaint became public.  In December 2020, former ICDC detainees filed a class action lawsuit ("December 2020 lawsuit") against ICDC, ICE, Dr. Amin, Irwin County Hospital ("ICH"), and other federal and nonfederal parties alleging that the detainees had undergone nonconsensual and unnecessary gynecological procedures.[3]  In addition, the lawsuit alleged a broader pattern of medical abuse

---

[1] Complaint by Project South, Georgia Detention Watch, Georgia Latino Alliance for Human Rights & South Georgia Immigrant Support Network to Joseph V. Cuffari, Cameron Quinn, Thomas P. Giles, & David Paulk, *Re: Lack of Medical Care, Unsafe Work Practices, and Absence of Adequate Protection Against COVID-19 for Detained Immigrants and Employees Alike at the ICDC County Detention Center* (Sept. 14, 2020) (projectsouth.org/wp-content/uploads/2020/09/OIG-ICDC-Complaint-1.pdf) [hereinafter *Project South Complaint*].
[2] *Id.*
[3] Consolidated Amended Petition for Writ of Habeas Corpus and Class Action Complaint for Declaratory and Injunctive Relief and for Damages (Dec. 21, 2020), *Oldaker v. Giles*, M.D. GA (No. 7:20-cv-00224-WLS-MSH).

NBCU002052

and mistreatment of detainees at ICDC.  The plaintiffs demanded $5 million in money damages and other relief.  The litigation is ongoing.

As of early 2022, Dr. Amin was under criminal investigation by multiple federal agencies.[4]  PSI staff attempted on multiple occasions to obtain voluntary testimony from Dr. Amin regarding his treatment of female ICE detainees at ICDC.  Dr. Amin declined these requests.  On February 7, 2022, the Subcommittee served Dr. Amin with a subpoena for deposition.  Through his attorney, Dr. Amin submitted an affidavit stating that he declined to provide testimony pursuant to his Fifth Amendment privilege against self-incrimination.  The Subcommittee accepted Dr. Amin's invocation of his rights and did not question him throughout the investigation.

In May 2021, the Department of Homeland Security ("DHS") directed ICE to discontinue its contract with ICDC.  As of September 3, 2021, all immigrant detainees were removed from the ICDC facility and moved to other detention facilities.  Effective October 7, 2021, ICE terminated the contract with LaSalle regarding its management of ICDC.[5]  As of today, ICDC is still utilized to detain individuals under the custody of the U.S. Marshals Service.  The federal government continues to contract with LaSalle to operate other detention facilities throughout the country.

The Subcommittee investigated the veracity of the allegations surrounding medical treatment at ICDC and sought to determine whether these treatments occurred against a backdrop of general medical neglect or abuse at the facility.  The Subcommittee also sought to determine whether gaps in ICE policies permitted an off-site provider of medical care to perform unnecessary, nonconsensual, or excessive procedures on ICE detainees.

## A. Female Detainees Appear to Have Been Subjected to Excessive, Invasive, and Often Unnecessary Gynecological Procedures

According to expert medical analysis conducted for the Subcommittee, under Dr. Amin's care, female detainees appear to have undergone excessive, invasive, and often unnecessary gynecological procedures.  Over the course of its review, the Subcommittee determined that Dr. Amin holds no board certifications, and in 2013 the Department of Justice ("DOJ") and the State of Georgia sued Dr. Amin, claiming he had committed Medicaid fraud by ordering unnecessary and excessive medical procedures.[6]  That lawsuit was settled in 2015, when Dr. Amin and his codefendants paid a $520,000 settlement to the federal government while admitting no wrongdoing.[7]

---

[4] Letter from Counsel for Dr. Amin to the Senate Permanent Subcommittee on Investigations (Feb. 21, 2022).  PSI is unaware of the current status of these investigations.
[5] U.S. Department of Homeland Security, Office of Inspector General, *Medical Processes and Communication Protocols Need Improvement at Irwin County Detention Center* (OIG-22-14) (Jan. 3, 2022) (https://www.oig.dhs.gov/sites/default/files/assets/2022-01/OIG-22-14-Jan22.pdf).
[6] Complaint (July 8, 2013), *United States v. Hospital Authority of Irwin County*, M.D. Ga. (No. 7:13-cv-00097-HL).
[7] The United States of America's Filing of Settlement Agreement (July 8, 2013), *United States v. Hospital Authority of Irwin County*, M.D. Ga. (No. 7:13-cv-00097-HL); U.S. Department of Justice, U.S. Attorney's Office Middle District of Georgia, *Hospital Authority of Irwin County Resolves False Claims Act Investigation for $520,000* (Apr.

NBCU002053

The Subcommittee's review of Dr. Amin's treatment practices of ICE detainees after the settlement, from 2017 to 2020, identified a similar pattern of potentially excessive medical procedures.  Dr. Amin was a clear outlier in both the number and types of procedures he performed compared to other OB-GYNs that treated ICE detainees.  ICDC housed roughly 4% of female ICE detainees nationwide from 2017 to 2020.  Dr. Amin accounted for roughly 6.5% of total OB-GYN *visits* among all ICE detainees in the same time period.  However, he performed nearly one-third of <u>certain</u> OB-GYN *procedures* on ICE detainees across the country between 2017 and 2020 and more than 90% of some key procedures.

For example, from 2017 to 2020:[8]

- Dr. Amin performed 44 laparoscopies to excise lesions, or 94% of all such procedures conducted on all ICE detainees.[9]

- Dr. Amin administered 102 Depo-Provera injections, or 93% of all such injections provided by all OB-GYN specialists to ICE detainees.[10]

- Dr. Amin performed 163 limited pelvic exams, or 92% of limited pelvic exams conducted on all ICE detainees.

- Dr. Amin performed 53 dilation and curettage ("D&C") procedures, or 82% of all D&C procedures conducted by all OB-GYN specialists treating ICE detainees.[11]

---

29, 2015) (www.justice.gov/usao-mdga/pr/hospital-authority-irwin-county-resolves-false-claims-act-investigation-520000).

[8] The Subcommittee recognizes that this data in and of itself does not indicate that the treatments were unnecessary. ICE does not track the demographic information of its female population, and the agency could not provide the Subcommittee with information regarding key variables of the female detainee population, including age and medical history.

[9] A laparoscopy may be used to obtain a small tissue sample for testing or even remove organs like the appendix or gallbladder, and it is generally performed under anesthesia.  Johns Hopkins Medicine, *Laparoscopy* (www.hopkinsmedicine.org/health/treatment-tests-and-therapies/laparoscopy) (accessed Nov. 13, 2022).

[10] Depo-Provera is an injection that contains the hormone progestin and is typically administered every three months to prevent pregnancy and manage issues related to the menstrual cycle.  Mayo Clinic, *Depo-Provera (contraceptive injection)* (www.mayoclinic.org/tests-procedures/depo-provera/about/pac-20392204) (accessed Nov. 13, 2022).

[11] A D&C procedure removes tissue from inside the uterus.  During this procedure, a provider will dilate the cervix and then use a surgical instrument called a curette (a sharp instrument or suction device) to remove uterine tissue. Mayo Clinic, *Dilation and Curettage (D&C)* (www.mayoclinic.org/tests-procedures/dilation-and-curettage/about/pac-20384910) (accessed Nov. 13, 2022).

NBCU002054

**Figure 1: Number of OB-GYN Medical Procedures Performed on ICE Detainees and Percentage Nationwide of Dr. Amin's Procedures for FY 2017-2020**[12]

| Medical Procedure | Dr. Mahendra Amin | Second Highest-Ranking Physician[13] | Total Number of Procedures on ICE Detainees Nationwide |
|---|---|---|---|
| Limited Pelvic Exam | 163 (92%) | 4 | 179 |
| Depo-Provera Injection | 102 (93%) | 2 | 110 |
| D&C | 53 (82%) | 3 | 65 |
| Laparoscopy | 44 (94%) | 1 | 47 |
| Total Procedures | 362 (90%) | 10 | 401 (100%) |

Following the September 2020 complaint, the ICE Health Services Corps ("IHSC") stated it "conducted a comparative analysis of medical referrals and claims completed after receiving allegations about Dr. Amin."[14] IHSC also stated that it "conduct[ed] an analysis of referral and claims data at ICDC compared to other ICE detention facilities housing females and determined that the number of referrals and claims was not abnormal."[15] IHSC stated that it never identified any red flags regarding Dr. Amin's treatment of detainees before or after officials reviewed his procedures following the publication of the September 2020 complaint.[16]

---

[12] U.S. Immigration and Customs Enforcement, *Q&A Paper: IHSC Response to PSI Requests: Irwin County Detention Center* (Sept. 1, 2021) (response on file with the Subcommittee) [hereinafter *Sept. 1, 2021 ICE Q&A Paper*].

[13] The second highest-ranking physician for these procedures varied. This column represents the second highest-ranking physician providing these treatments to ICE detainees for each procedure.

[14] U.S. Immigration and Customs Enforcement, *Q&A Paper: Responses to Allegations of Inappropriate Care Provided by Dr. Amin for the Female Population of the Irwin County Detention Center (ICDC)* (June 23, 2021) (response on file with the Subcommittee) [hereinafter *June 23, 2021 ICE Q&A Paper*].

[15] *Id.* Information ICE used in this analysis is discussed in more detail in Section IV.

[16] U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (Sept. 29, 2021). ICE later stated to the Subcommittee that based on the comparative analysis, ICE noted a possible overutilization of the D&C and laparoscopic procedures, but that it would need an expert OB-GYN review of the medical records because its analysis was based solely on medical claims data. Email from U.S. Immigration and Customs Enforcement Staff to the Senate Permanent Subcommittee on Investigations (Nov. 11, 2022).

NBCU002055

An IHSC Regional Clinical Director ("RCD") approved each procedure before it was authorized. In interviews with the Subcommittee, IHSC officials explained that the disparity in the number of Dr. Amin's procedures compared to other doctors treating ICE detainees alone did not raise alarm either when the RCD approved the surgeries, or when IHSC retrospectively reviewed Dr. Amin's medical care. However, IHSC could not explain or provide context explaining why Dr. Amin was such an outlier compared to other doctors treating ICE detainees.

To better understand the appropriateness of Dr. Amin's treatment and care of ICDC detainees, the Subcommittee engaged Dr. Peter Cherouny, an OB-GYN physician who previously conducted medical reviews for the Department of Health and Human Services ("HHS") Office of Inspector General ("OIG") in other contexts. To support this investigation, Dr. Cherouny conducted an independent review of more than 16,600 pages of medical records obtained by the Subcommittee, pertaining to approximately 94 ICDC women Dr. Amin treated.

Dr. Cherouny identified significant issues with the care Dr. Amin provided to ICDC detainees and found Dr. Amin's use of certain surgical procedures to be "too aggressive" and inappropriate.[17] Dr. Cherouny's key findings include:

- Dr. Cherouny found that Dr. Amin performed 40 D&C procedures with a laparoscopy on ICDC detainees. He found that Dr. Amin's use of these procedures were "too aggressive" and that the "vast majority [of cases where Dr. Amin performed a D&C] appear to be manageable with imaging and appropriate hormonal therapy."[18]

- Dr. Cherouny concluded that Dr. Amin's practices were "woefully behind the times" and his treatment of ICDC detainees "is not meeting current standards of care."[19] He added, "[d]ue to a lack of knowledge or capability, Dr. Amin persistently uses inpatient, surgical options as diagnostic tools for benign clinical conditions."[20] Such conditions are "more appropriately managed with imaging studies and outpatient clinical tools."[21] Dr. Cherouny told the Subcommittee that Dr. Amin "appears unaware of these current options or does not have them available in his office or hospital."[22] In one interview with the Subcommittee, Dr. Cherouny summarized Dr. Amin's care as "pretty good medicine for the 1980s, but we're not there anymore."[23]

- Dr. Cherouny found that "Dr. Amin seemed to use a boiler plate approach to care. He uses a D&C and laparoscopy for primary diagnostic reasons and seems to 'pile

---

[17] Dr. Peter Cherouny, Interview with Senate Permanent Subcommittee on Investigations (Jan. 26, 2022); Memorandum from Dr. Peter Cherouny to Senate Permanent Subcommittee on Investigations (Oct. 27, 2022).
[18] Memorandum from Dr. Peter Cherouny to Senate Permanent Subcommittee on Investigations (Oct. 27, 2022).
[19] Id.
[20] Letter from Dr. Peter Cherouny to Senate Permanent Subcommittee on Investigations (Oct. 27, 2022).
[21] Id.
[22] Id.
[23] Dr. Peter Cherouny, Interview with Senate Permanent Subcommittee on Investigations (Sept. 8, 2022).

NBCU002056

on' the pathologic diagnoses postoperatively."[24]

- Dr. Cherouny flagged that because Dr. Amin is not board certified, Dr. Amin "likely does no or limited continuing education to stay current" on up-to-date medical practices in these areas.  He explained further that there appeared to be board certified OB-GYN providers in the area of ICDC and that he was "concerned" with how and why Dr. Amin was selected to treat this population.[25]

- Dr. Cherouny found that Dr. Amin performed 36 transvaginal ultrasounds on patients in the records he reviewed.  Those records indicate Dr. Amin generally had "[p]oor performance and documentation of transvaginal ultrasound evaluation."[26]  Dr. Cherouny commented further that Dr. Amin is "clearly not skilled in ultrasound of the female pelvis" and that he "appears to frequently confuse normal findings for pathology and uses these as indications for surgery."[27]  Dr. Cherouny explained to the Subcommittee that these practices did not appear to comply with the American Institute of Ultrasound in Medicine Guidelines.[28]

- Dr. Cherouny explained that Dr. Amin "does not appear to follow the current recommendations regarding Pap smear management through colposcopy and further treatment."[29]

- Dr. Cherouny also found that Dr. Amin did not give "adequate time to affect a clinical response" in most of the 40 cases he examined where Depo-Provera injections were administered for abnormal uterine bleeding.[30]  He explained that the "adequate time" for a response to this medication was six months and that was not given to these patients.[31]  Dr. Cherouny noted that Dr. Amin generally used 2-6 weeks of clinical response time before declaring that the Depo-Provera medication failed and proceeded to surgery.[32]

- Dr. Cherouny explained that 40 patient records—of the 94 examined—indicated the patients had benign ovarian cysts removed by Dr. Amin, despite the fact that benign ovarian cysts "generally resolve without surgical intervention."[33]  He noted that in the records he reviewed, Dr. Amin "persistently finds and removes

---

[24] Memorandum from Dr. Peter Cherouny to Senate Permanent Subcommittee on Investigations (Oct. 27, 2022).
[25] *Id.*
[26] Letter from Dr. Peter Cherouny to Senate Permanent Subcommittee on Investigations (Oct. 27, 2022).
[27] Memorandum from Dr. Peter Cherouny to Senate Permanent Subcommittee on Investigations (Oct. 27, 2022).
[28] The American Institute of Ultrasound in Medicine is a multidisciplinary medical association of more than 10,000 physicians, sonographers, scientists, students, and other healthcare providers.  *See* American Institute of Ultrasound in Medicine, Training Guidelines (https://www.aium.org/resources/ptGuidelines.aspx) (accessed Nov. 13, 2022).
[29] Letter from Dr. Peter Cherouny to Senate Permanent Subcommittee on Investigations (Oct. 27, 2022).
[30] Letter from Dr. Peter Cherouny to Senate Permanent Subcommittee on Investigations (Feb. 1, 2022).
[31] Letter from Dr. Peter Cherouny to Senate Permanent Subcommittee on Investigations (Oct. 27, 2022).
[32] *Id.*
[33] Letter from Dr. Peter Cherouny to Senate Permanent Subcommittee on Investigations (Feb. 1, 2022).

8

NBCU002057

functional ovarian cysts" and that the "vast majority" of the cysts "did not require removal."[34]  He also noted that there are risks with this surgery like any other, including infection and bleeding, and other issues that "can result in pain and infertility, among other risks."[35]

- Dr. Cherouny explained that seven patients underwent a Loop Electrosurgical Excision Procedure ("LEEP"),[36] used to identify abnormalities on Pap smears,[37] and he found that the records he reviewed suggest Dr. Amin has "limited knowledge and/or skill in Pap smear management."[38]  He noted that the "point of the [LEEP] procedure is to get tissue for diagnostic purposes and in each case [Dr. Amin] failed this outcome."[39]  Dr. Cherouny attributed these failures to Dr. Amin's "technique" in performing the procedure.[40]

- Dr. Cherouny also found that "Dr. Amin frequently prescribes multiple treatments for a vaginal discharge complaint without an appropriate clinical evaluation."[41]  The failure to conduct appropriate clinical evaluation in these circumstances "results in patients receiving multiple treatments for the same complaints without improvement."[42]

- Dr. Cherouny stated that "[i]t appears there was, likely, no oversight of the care provided to these patients.  The repetitive nature of some of the issues, like inadequate cervical tissue after a LEEP procedure, would seem to prompt a review in many hospitals."[43]

Additionally, the Subcommittee interviewed three physicians—Dr. Ted Anderson, Dr. Margaret Mueller, and Dr. Sarah Collins.[44]  These physicians were part of a medical team asked

---

[34] Letter from Dr. Peter Cherouny to Senate Permanent Subcommittee on Investigations (Oct. 27, 2022); Memorandum from Dr. Peter Cherouny to Senate Permanent Subcommittee on Investigations (Oct. 27, 2022).

[35] Letter from Dr. Peter Cherouny to Senate Permanent Subcommittee on Investigations (Feb. 1, 2022).

[36] A LEEP is a procedure in which a provider uses a heated, electric wire to remove cell s and tissues in the cervix and vagina.  John Hopkins Medicine, *Loop Electrosurgical Excision Procedure (LEEP)* (www.hopkinsmedicine.org/health/treatment-tests-and-therapies/loop-electrosurgical-excision-procedure-leep) (accessed Nov. 13, 2022).

[37] A Pap smear or Pap test is a procedure used to test for cervical cancer in women.  A Pap test requires a provider to insert an instrument called a speculum into the vagina to take a tissue sample from the cervix using a soft brush and scraping device known as a spatula.  Mayo Clinic, *Pap Smear* (www.mayoclinic.org/tests-procedures/pap-smear/about/pac-20394841) (accessed Nov. 13, 2022).

[38] Memorandum from Dr. Peter Cherouny to Senate Permanent Subcommittee on Investigations (Oct. 27, 2022).

[39] *Id.*

[40] *Id.*

[41] Letter from Dr. Peter Cherouny to Senate Permanent Subcommittee on Investigations (Oct. 27, 2022).

[42] *Id.*

[43] Memorandum from Dr. Peter Cherouny to Senate Permanent Subcommittee on Investigations (Oct. 27, 2022).

[44] Dr. Anderson is the Vice Chair for Clinical Operations and Director of the Division of Gynecology at Vanderbilt University Medical Center.  Vanderbilt University Medical Center, *Ted L. Anderson, MD, PhD* (https://www.vumc.org/obgyn/person/ted-l-anderson-md-phd) (accessed Nov. 13, 2022).  Dr. Collins is an Assistant Professor at the Northwestern University, Feinberg School of Medicine.  Northwestern Medicine, *Sarah A. Collins, MD* (https://www.nm.org/doctors/1942401948/sarah-a-collins-md) (accessed Nov. 13, 2022).  Dr. Mueller is also an

NBCU002058

by attorneys and advocacy groups later involved with the December 2020 lawsuit to review the medical charts for 19 ICDC detainees Dr. Amin treated.[45]  The plaintiffs in the December 2020 lawsuit filed the summary findings of the medical review team and declarations from these doctors summarizing the chart reviews of select individual plaintiffs in support of the litigation.[46]

These experts concluded that Dr. Amin subjected women to aggressive and unethical gynecological care.[47]  They found that Dr. Amin quickly scheduled surgeries when non-surgical options were available, misinterpreted test results, performed unnecessary injections and treatments, and proceeded without informed consent.[48]  Dr. Collins later reviewed a new set of over 500 pages of medical records associated with 36 ICDC detainees in coordination with attorneys involved in the lawsuit by former detainees.[49]  Dr. Collins stated that in many cases, Dr. Amin appeared to have proceeded with unnecessary or excessive treatment regardless of patient conditions.[50]

Subcommittee staff interviewed six former ICDC detainee patients treated by Dr. Amin—Karina Cisneros Preciado, Jaromy Floriano Navarro, Wendy Dowe, Maribel Castaneda-Reyes, Jane Doe #1, and Jane Doe #2—who described negative experiences with Dr. Amin.[51]  All of these women, except Jane Doe #2, are plaintiffs in the December 2020 lawsuit.  These women described feeling confused, afraid, and violated after their treatment by Dr. Amin.  Several reported that they still live with physical pain and uncertainty regarding the effect of his treatments on their fertility.  These women also described instances in which Dr. Amin was rough and insensitive while performing procedures, continued despite their complaints regarding pain, and failed to disclose the potential side effects of certain procedures or even answer

---

Assistant Professor at the Northwestern University, Feinberg School of Medicine.  Northwestern Medicine, *Margaret G. Mueller, MD* (https://www.nm.org/doctors/1346570405/margaret-g-mueller-md) (accessed Nov. 13, 2022).

[45] The review team consisted of nine board-certified OB-GYN physicians and two nursing experts.  The team examined 3,200 pages of medical records for 19 women who alleged medical maltreatment while detained at ICDC.  The records for these 19 detainees were included in the files of the 94 detainees that Dr. Cherouny reviewed.  *Executive Summary of Findings by the Independent Medical Review Team Regarding Medical Abuse Allegations at the Irwin County Detention Center* (Oct. 21, 2020) (on file with the Subcommittee).

[46] Docket, *Oldaker v. Giles*, M.D. GA (No. 7:20-cv-00224-WLS-MSH).

[47] *Executive Summary of Findings by the Independent Medical Review Team Regarding Medical Abuse Allegations at the Irwin County Detention Center* (Oct. 21, 2020) (on file with the Subcommittee).

[48] *Id.*  Informed consent requires that patients are well informed of the planned benefits, potential risks, and possible alternative options of medical treatments, procedures or surgeries that a healthcare provider intends to perform.  Importantly, it also requires that the patient clearly understands the benefits and potential risks of the proposed treatment option and is afforded ample opportunity to ask questions and obtain medically sound responses.  Based on witness testimony to the Subcommittee and a review of medical records by a number of physicians, it appears that informed consent was not provided to multiple ICDC detainees treated off-site by OB-GYN specialist Dr. Amin.  Dr. Amin did not voluntarily sit for an interview with the Subcommittee.  However, in civil litigation against Dr. Amin he has claimed he always obtains informed consent from his patients.

[49] Email from Counsel for the National Immigration Project of the National Lawyers Guild to the Senate Permanent Subcommittee on Investigations (Oct. 22, 2021).

[50] Dr. Sarah Collins, Interview with Senate Permanent Subcommittee on Investigations (Oct. 19, 2021).

[51] All of these women entered ICDC detention following arrests by local law enforcement in the interior of the United States.  These women's records were included in the documents reviewed by the medical experts engaged by the Subcommittee.  Two former ICDC detainees the Subcommittee interviewed asked to remain anonymous.

NBCU002059

questions regarding his diagnosis or treatment plan.  Several women stated that they did not provide their consent to the examinations or procedures Dr. Amin performed.

### B.  There Appears to Have Been Repeated Failures to Secure Informed Consent for Off-Site Medical Procedures Performed on ICDC Detainees

Obtaining informed consent from any patient is a sacrosanct responsibility of practicing physicians.  This is particularly true when treating a vulnerable population in a confined institution.  The American Medical Association's Code of Medical Ethics describes the importance of informed consent:

> To enable patients to participate meaningfully in decisions about health care, physicians have a responsibility to provide information and help patients understand their medical condition and options for treatment.  [...]  Informed consent to medical treatment is fundamental in both ethics and law.  It helps patients make well-considered decisions about their care and treatment.[52]

Furthermore, the Code of Medical Ethics advises: "Document the informed consent conversation and the patient's (or surrogate's) decision in the medical record in some manner.  When the patient/surrogate has provided specific written consent, the consent form should be included in the record."[53]

ICE Performance-Based National Detention Standards ("PBNDS") define informed consent as: "An agreement by a patient to a treatment, examination, or procedure after the patient receives the material facts about the nature, consequences, and risks of the proposed treatment, examination or procedure; the alternatives to it; and the prognosis if the proposed action is not undertaken."[54]

The Subcommittee found that ICE does not monitor informed consent procedures for off-site medical providers and does not have a responsibility to do so.[55]  IHSC officials stated to the Subcommittee that it is the sole professional obligation of the off-site provider to obtain informed consent from patients.  Furthermore, there is no requirement in ICE's process for the approval or review of off-site medical procedures that an ICE official verifies that a consent form

---

[52] American Medical Association, Code *of Medical Ethics: Consent, Communication & Decision Making*, (https://www.ama-assn.org/delivering-care/ethics/code-medical-ethics-consent-communication-decision-making) (accessed Nov. 13, 2022).

[53] American Medical Association, *Informed Consent: Code of Medical Ethics Opinion 2.1.1* (https://www.ama-assn.org/delivering-care/ethics/informed-consent) (accessed Nov. 13, 2022).

[54] U.S. Department of Homeland Security, U.S. Immigration and Customs Enforcement, *Performance-Based National Detention Standards 2011*, at 469-470 (Revised December 2016) (https://www.ice.gov/doclib/detention-standards/2011/pbnds2011r2016.pdf).

[55] U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (Sept. 29, 2021).  According to ICE, the agency does not have a responsibility to monitor informed consent because providers are professionally and legally obligated to ensure informed consent.  Email from U.S. Immigration and Customs Enforcement Staff to the Senate Permanent Subcommittee on Investigations (Nov. 11, 2022).

NBCU002060

from a visit with an off-site provider is included in a detainee's medical file. The Subcommittee also found that LaSalle, the ICDC contractor, did not have any contractual obligation with ICE to oversee the off-site care of detainees housed at its facility.

According to medical experts who reviewed the records of Dr. Amin's ICDC patients, there was a lack of informed consent in many instances. For example, based on the records Dr. Cherouny reviewed, he stated that Dr. Amin did not provide sufficient information regarding surgical procedures with detainee patients.[56] The medical records reviewed do not consistently document thorough patient-doctor discussions and do not establish that patients were fully informed of all of their treatment options, including the benefits and risks of surgical procedures and other treatments, or whether they were clearly given a choice to opt out of any treatment at all.

Former ICDC detainees interviewed by Subcommittee staff stated that Dr. Amin did not explain or answer questions regarding examinations, medication administration, or surgical procedures he performed on them. For example, one former detainee treated by Dr. Amin, Ms. Castaneda-Reyes, stated that she was told she was having surgery to remove an ovarian cyst and that when she arrived for the surgery, an electronic tablet and a stylus were simply handed to her to sign with no explanation from the nurses, the anesthesiologist, or Dr. Amin about the surgery or its risks, and they did not ask if she had any questions.[57] This would appear to violate best practices of the doctor-patient informed consent process.

The Subcommittee received incomplete records from ICH, the hospital where Dr. Amin performed the procedures on ICDC detainees, and no records from Dr. Amin. Thus, the Subcommittee could not verify whether any consent forms for the anonymized patients the medical experts reviewed may have existed in files separately maintained by Dr. Amin or ICH. The records from ICH included signed consent forms from some anonymized ICDC patients. In some cases, the records indicate that a nurse discussed the surgical process with Dr. Amin's patients. However, these files do not indicate that Dr. Amin himself engaged in a thorough discussion with all of his patients regarding the informed consent process as would be expected medical practice for a physician. Furthermore, the records provided to the Subcommittee do not establish that the detainees Dr. Amin treated were fully informed of all of their treatment options.

### C.  Medical Care Provided to Detainees at ICDC Was Known by DHS to Be Deficient, but neither ICE nor LaSalle Took Effective Corrective Action

Following its review of records and interviews with former detainees, former employees, and DHS auditors, the Subcommittee found that ICDC detainees made frequent complaints about the quality and timeliness of medical care they received at the facility.[58] Former ICDC nurses described deficiencies and delays in the treatment of detainees. Moreover, DHS offices

---

[56] Memorandum from Dr. Peter Cherouny to Senate Permanent Subcommittee on Investigations (Oct. 27, 2022).
[57] Maribel Castaneda-Reyes, Interview with Senate Permanent Subcommittee on Investigations (Oct. 5, 2021).
[58] The Subcommittee did not seek to verify every complaint heard from witnesses or every allegation reviewed in written grievances. However, the Subcommittee reviewed an estimated 760 grievances and nearly 650 of them were related to medical care. In addition, the complaints by detainees mirrored observations that former ICDC nurses relayed to Subcommittee staff in interviews and that have previously been documented by DHS.

NBCU002061

responsible for oversight of detention facilities identified numerous, repeated, and serious deficiencies with the ICDC medical unit as far back as 2012, but ICDC and ICE failed to take effective corrective action to address these issues.

ICDC medical staff dealt with a large number of medical complaints from detainees on a regular basis. These complaints ranged from cosmetic issues like dandruff and dry skin to more serious medical and mental health conditions.[59] When detainees were not satisfied with the services they received from the medical unit, they submitted grievances to be addressed by ICDC leadership. The Subcommittee reviewed more than 760 grievances filed by ICDC ICE detainees between 2018 and 2020. Of those grievances reviewed, the Subcommittee identified 659 medical grievances that contained allegations of delayed or deficient medical care. For example, one detainee stated that the facility failed to provide their diabetes medicine and as a result they started experiencing blurry vision due to elevated sugar levels.[60] In other instances, an individual with chronic seizures and those with other chronic ailments, such as asthma, high blood pressure, and anemia, stated they were forced to wait days and weeks for the ICDC medical staff to address their critical prescription needs. Records reviewed by the Subcommittee showed that medical unit staff generally responded to these grievances with 24 to 48 hours.[61]

One detainee interviewed by Subcommittee staff said he submitted multiple requests related to a toothache but never received a response.[62] He claimed his pain eventually stopped because the tooth fell out.[63] Another detainee, who fell and broke her foot while at ICDC, told Subcommittee staff she was not taken to see anyone to treat the injury for a full month.[64] Former detainees also described making multiple requests for access to their own medical laboratory or imaging results that went unaddressed.[65] The Subcommittee was not able to review the medical records for these detainees and could not verify their claims. Some detainees alleged that their medical complaints were either not addressed or they received delayed care.[66] The Subcommittee did not obtain records to corroborate the allegations made by these detainees. However, medical records reviewed by the Subcommittee showed that the ICDC medical unit frequently responded to medical requests within a few days and provided lab or imaging results when requested.[67]

---

[59] *See, e.g.,* LaSalle_167885-88, LaSalle_216450, LaSalle_216456 (sick calls for dandruff); LaSalle_232939-40, LaSalle_232942 (sick calls for dry skin and dry scalp); LaSalle_177638-41 (mental health sick call for depression); LaSalle_281516-19 (sick call for pain related to a hernia).

[60] Records indicate that ICDC staff responded three days later stating that staff would contact the detainee's previous detention center again to request records and obtain medication names and dosages. LaSalle_002652.

[61] Records indicate that ICDC medical staff generally responded to these grievances within one to two days after the grievance was filed. LaSalle_000187; LaSalle_002668; LaSalle_002598; LaSalle_002600.

[62] Senate Permanent Subcommittee on Investigations Staff Visit to Irwin County Detention Center (Aug. 17, 2021) (memorandum on file with the Subcommittee).

[63] *Id.*

[64] A.K., Interview with Senate Permanent Subcommittee on Investigations (June 23, 2021).

[65] Senate Permanent Subcommittee on Investigations Staff Visit to Irwin County Detention Center (Aug. 17, 2021) (memorandum on file with the Subcommittee).

[66] *Id.*

[67] For example, one detainee filed a sick call request on September 9, 2020 requesting test results and complaining of skin irritation and pain in her ovaries (LaSalle_177857-61). She was seen for all three requests at the medical unit on September 10, 2020 where she also requested her medical records at the same visit (LaSalle_177863-65). The detainee received her medical records on September 21, 2020 (LaSalle_177869). The detainee requested all of

13

Interviews with former ICDC staff provided additional insight on the issues with the ICDC medical unit. A former nurse described the facility's medical unit as "filthy."[68] Another former nurse described ICDC as "the least clean place of any place I have worked in."[69]

As far back as 2012, internal DHS audit and oversight entities identified deficiencies with the ICDC medical unit.[70] For example, the DHS Office for Civil Rights and Civil Liberties ("CRCL") cited issues at ICDC with record maintenance and medication distribution, including an incident involving a cancer patient who was never allegedly provided medication.[71]

In addition, a 2017 ICE Office of Detention Oversight ("ODO") review of ICDC found that ICDC staff inconsistently reviewed detainees' medical intake forms and often left sections of those forms blank.[72] The review also found a lack of documentation showing that medical staff had completed required staff training.[73] Finally, ODO found syringes and needles in examination rooms that were "neither secured nor inventoried."[74] Overall, the inspection examined 15 ICE detention standards and found 26 deficiencies in 10 standards, which included nine "medical care" deficiencies, a number of which were repeat deficiencies.[75]

In March 2020, five months prior to the public allegations against ICDC surfaced, another ODO inspection found that medical files at ICDC were stored improperly, on the floor and across desks, and examination tables in facility medical units were "torn beyond repair, making cleaning and decontamination impossible."[76] The ODO review found that ICDC was only in compliance with five of 18 ICE detention standards they examined overall and documented 36 deficiencies, including three regarding "medical care."[77]

---

her ICDC medical records on December 7, 2020 (LaSalle_178320). She signed an acknowledgment that she received her ICDC medical records on December 10, 2020 (LaSalle_178329).
[68] LPN #1, formerly of Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (June 30, 2021).
[69] LPN #2, formerly of Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (July 12, 2021).
[70] U.S. Department of Homeland Security, Office for Civil Rights and Civil Liberties, *Redacted Irwin Rec & Close Memorandum from FY13 Expert Report Memorandum* (Nov. 5, 2012) (notes from document review on file with the Subcommittee).
[71] U.S. Department of Homeland Security, Office for Civil Rights and Civil Liberties, *Redacted Irwin Rec & Close Memorandum Expert Report Memorandum* (Nov. 4, 2016) (notes from document review on file with the Subcommittee).
[72] U.S. Department of Homeland Security, U.S. Immigration and Customs Enforcement, Office of Professional Responsibility, Inspections and Detention Oversight Division, *Compliance Inspection for the Irwin County Detention Center Ocilla, Georgia* (Mar. 2017) (https://www.ice.gov/doclib/foia/odo-compliance-inspections/2017IrwinCountyGA.pdf).
[73] *Id.*
[74] *Id.*
[75] *Id.*
[76] U.S. Department of Homeland Security, U.S. Immigration and Customs Enforcement, Office of Professional Responsibility, Inspections and Detention Oversight Division, *Compliance Inspection for the Irwin County Detention Center Ocilla, Georgia* (Mar. 2020) (https://www.ice.gov/doclib/foia/odo-compliance-inspections/irwinCoDetCntr_OcillaGA_Mar3-5_2020.pdf).
[77] *Id.*

NBCU002063

**D.  <u>ICE Did Not Conduct Thorough Oversight of Off-Site Medical Providers and Procedures</u>**

Past DHS reviews have documented consistent, ongoing, and unresolved deficiencies in ICE's medical record keeping procedures, prescription medication distribution practices, and overall quality of medical care at various ICE detention facilities, including ICDC.  In addition, through multiple interviews with senior IHSC officials and a review of ICE documents, the Subcommittee identified key gaps in ICE oversight of physicians providing medical care to ICE detainees at facilities outside of its detention centers.

Highlights of the Subcommittee's investigation on ICE oversight of off-site medical providers include:

- ICE was not aware of, and did not review key information regarding Dr. Amin's professional history prior to the agency's agreement to allow Dr. Amin to treat ICDC detainees in 2014.  ICE authorized Dr. Amin to treat ICE detainees based solely on the fact that he had an active medical license, admitting privileges at ICH, and was not otherwise prohibited from treating ICE detainees.

- ICE did not have access to the National Practitioner Data Bank ("NPDB")—a confidential federal clearinghouse of healthcare provider information—and was unable to conduct a search for Dr. Amin in the database before he began treating ICDC detainees.  Had ICE been able to conduct this search, it would have found multiple past medical malpractice claims against Dr. Amin, and the fact that a major U.S. insurance company dropped him as a covered physician in 2005 due to "excessive malpractice cases" and an "extensive malpractice history."[78]  ICE was not aware of the medical malpractice suits filed against Dr. Amin until <u>after</u> the September 2020 public allegations against him.

- ICE was unaware that DOJ and the State of Georgia had filed a 2013 lawsuit against Dr. Amin and other physicians at ICH until <u>after</u> the September 2020 allegations.  The lawsuit included five counts, including allegations that Dr. Amin and his codefendants had engaged in Medicaid fraud, violated the Federal Anti-Kickback Statute and Georgia Medicaid policies, and maintained "standing orders" to conduct unnecessary gynecological procedures.

- Dr. Amin began treating ICDC detainee patients in 2014, the year after DOJ filed its lawsuit against him.  In 2015, Dr. Amin, other physicians, and the hospital entered into a settlement agreement with DOJ and the State of Georgia and agreed to pay $520,000 to resolve the allegations regarding Medicaid fraud.

- ICE did not have a process to automatically flag the disproportionately high number of medical procedures Dr. Amin or any given doctor performs compared to his or her peers.  While ICE informed the Subcommittee that the disparity in

---

[78] Staff conducted an *in camera* review at the U.S. Department of Health and Human Services of National Practitioner Data Bank information on Dr. Amin. (Dec. 9, 2021) (notes on file with the Subcommittee).

NBCU002064

the number of Dr. Amin's procedures alone would not be disqualifying, additional scrutiny of Dr. Amin's practices may have prevented unnecessary procedures from occurring.[79]

Since the initial September 2020 public allegations against Dr. Amin and ICE, IHSC has initiated limited vetting procedures of off-site medical providers.  IHSC officials also noted, however, that even these new procedures likely would not have disqualified Dr. Amin from treating ICE detainees.  An IHSC official told Subcommittee staff that the agency would not have deemed the information on Dr. Amin in the NPDB as disqualifying based on the fact that he maintains a current, active medical license with the state of Georgia, and the state had never restricted his license or otherwise intervened at any point in his medical service.  As a result, the IHSC official said IHSC "would not have had any issues" with allowing Dr. Amin to treat ICE patients.[80]

Following the public allegations against Dr. Amin in September 2020, ICE conducted a limited review of medical records, claims, and referrals for his patients.  ICE did not, however, obtain complete files from ICDC or ICH and ultimately suspended its investigation pending completion of a DHS OIG investigation into the allegations of inappropriate off-site gynecological care at ICDC.[81]  In multiple conversations with Subcommittee staff, IHSC officials were only able to speculate about the reasons why Dr. Amin performed so many more procedures than other physicians providing OB-GYN care to ICE detainees.  Dr. Amin stopped treating ICE detainees in September 2020.

**The Subcommittee's Investigation**

During the Subcommittee's 18-month long investigation, the Subcommittee interviewed more than 70 witnesses and reviewed more than 541,000 pages of records, including records from DHS, ICE, ICDC, LaSalle, and ICH.

The Subcommittee evaluated litigation materials, reports, declarations, expert medical assessments, and documents provided by the Department of Veterans Affairs Financial Services Center ("VAFSC"), and conducted an *in camera* review of documents from HHS and the Departments of Treasury.

---

[79] U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (Sept. 29, 2021).  ICE later stated to the Subcommittee that based on the comparative analysis, ICE noted a possible overutilization of the D&C and laparoscopic procedures, but that it would need an expert OB-GYN review of the medical records because its analysis was based solely on medical claims data.  Email from U.S. Immigration and Customs Enforcement Staff to the Senate Permanent Subcommittee on Investigations (Nov. 11, 2022).
[80] U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (Sept. 29, 2021).
[81] The DHS OIG started its review in October 2020.  However, this review did not evaluate off-site medical care of ICDC detainees.  This review "sought to determine whether ICDC provided detainees adequate [on-site] medical care and adhered to COVID-19 protections.  This inspection did not review the gynecological procedure approval process for detainees at ICDC, which has been referred to our Office of Investigations."  The review of gynecological treatment is currently underway.  U.S. Department of Homeland Security, Office of Inspector General, *Medical Processes and Communication Protocols Need Improvement at Irwin County Detention Center* (OIG-22-14) (Jan. 3, 2022) (https://www.oig.dhs.gov/sites/default/files/assets/2022-01/OIG-22-14-Jan22.pdf).

NBCU002065

The Subcommittee secured briefings from attorneys, advocates, physicians, and other entities including: the U.S. Marshals Service, the Centers for Medicare & Medicaid Services ("CMS"), HHS OIG, DHS OIG, the Nakamoto Group, and the Georgia Composite Medical Board.

Additionally, the Subcommittee interviewed nearly 50 former ICDC detainees, 40 of which were interviewed during the Subcommittee's August 2021 staff visit to ICDC. Subcommittee staff also interviewed seven former ICDC employees, four current ICDC or LaSalle employees, two ICH executives, three ICH nurses, six current ICE officials, and one former ICE official.

## FINDINGS OF FACT AND RECOMMENDATIONS

### Findings of Fact

(1)    **Female detainees at ICDC appear to have been subjected to excessive, invasive, and often unnecessary gynecological procedures.**

(2)    **The Subcommittee did not substantiate the allegation that ICDC detainees underwent "high rates" of unauthorized hysterectomies.**  Dr. Amin performed two hysterectomies on ICDC detainees between 2017 and 2019.  According to ICE, patient records indicated that both procedures were medically necessary.

(3)    **Between 2017 and 2020 Dr. Amin performed a significantly higher volume of invasive procedures on ICE detainees compared to other OB-GYN physicians serving ICE detainees.**  Dr. Amin ranked first among all physicians treating ICE detainees across the country during this period in terms of the number of D&C procedures, laparoscopies to excise lesions, and limited pelvic exams he performed, as well as the number of Depo-Provera injections he administered.  In fact, of the 401 combined total number of these procedures performed on all ICE detainees by OB-GYN specialists across the nation, Dr. Amin performed 362 of these procedures—or 90% of them.  In ten categories of OB-GYN procedures the Subcommittee reviewed, Dr. Amin was among the top five providers for eight of the ten procedures.  For the specific OB-GYN procedures the Subcommittee examined, Dr. Amin performed nearly one-third of the total procedures performed on ICE detainees at **all** ICE detention facilities between 2017 and 2020.  This was despite the fact that ICDC housed about 4% of the female detainee population.

(4)    **For the specific OB-GYN procedures the Subcommittee examined, Dr. Amin received around half of all payments from ICE for these procedures.**  From 2017 to 2020, physicians performed 1,201 of these ten types of OB-GYN procedures on ICE detainees, costing ICE over $120,400.  Dr. Amin performed 392 of the 1,201 procedures and received approximately $60,000 for these procedures.

17

NBCU002066

(5)     **Dr. Amin had a history of medical malpractice suits filed against him**.  Due to this history, a major U.S. insurance company dropped its contract with him nearly one decade before ICE began using his services at ICDC.

(6)     **ICE was not aware of publicly available information regarding medical malpractice suits and a DOJ and State of Georgia Medicaid fraud complaint against Dr. Amin before he began treating ICE detainees.**

(7)     **Prior to October 2019, ICE did not employ a thorough vetting process for physicians treating detainees at facilities outside detention centers.**  ICE has since established a process to review board certifications, records of adverse actions, and a list of individuals and entities excluded from federal healthcare programs, but ICE never completed this process for Dr. Amin.

(8)     **ICE officials stated that its new vetting procedures would not necessarily have disqualified Dr. Amin from treating detainees.**  Due to the fact that the state of Georgia had never restricted Dr. Amin's license or otherwise intervened at any point in his medical service, and the information in the NPDB were unsubstantiated allegations that had been settled, ICE would not necessarily have disqualified Dr. Amin from treating ICE detainees.

(9)     **ICE lacked a medical utilization review process to identify potential trends in off-site medical treatment.**  Until recently, ICE did not maintain a system to detect trends in medical procedures by off-site physicians that might indicate medical waste, fraud, or abuse.  ICE states it intends to change its procedures to standardize the medical request approval process and has begun to employ a web-based application for medical utilization review and management, beginning with a retrospective review of ICE medical claims.

(10)    **ICE performed an investigation of medical treatments provided to ICDC detainees following the public allegations against Dr. Amin, but did not obtain complete medical records for ICDC detainees.**  During its investigation, ICE did not obtain complete medical records for ICDC detainees and ultimately did not conduct a more thorough review due to the pending DHS OIG investigation involving off-site gynecological procedures.

(11)    **ICE personnel failed to conduct site visits at ICDC between January 2018 and October 2020.**  The Field Medical Coordinator assigned to ICDC did not visit ICDC between January 2018 and October 2020—the period of greatest activity for Dr. Amin in terms of office visit claims and procedures.

(12)    **ICE is not required to monitor the use of language translation services by off-site medical providers or ensure these providers obtain informed consent for off-site medical procedures.**  Instead, ICE has relied on off-site providers to fulfill their professional obligations to ensure detainees understand and consent to the medical care they receive.

18

NBCU002067

**(13)   ICE conducts limited oversight of hospitals providing off-site care to detainees.**   To date, ICE has also performed no reviews of hospitals treating detainees to review the appropriateness of the medical care they provide, although ICE told the Subcommittee that it intends to conduct these reviews in the future.

**(14)   ICE approved Dr. Amin's performance of OB-GYN procedures on a case-by-case basis and never identified any of Dr. Amin's treatments as potentially excessive or unnecessary.**

**(15)   ICE's contract with LaSalle did not require the company or ICDC to conduct oversight of off-site medical care for detainees.**   ICDC and LaSalle played no role in vetting off-site medical providers treating detainees, or ensuring that these providers obtained informed consent or used appropriate language translation services.   No ICDC or LaSalle employee the Subcommittee interviewed recalled a review of treatment by Dr. Amin—prior to the public allegations in September 2020 or since—that found signs of waste, fraud, or abuse.

## Recommendations

**(1)   ICE should expedite efforts to improve the vetting of off-site medical providers for detainees and should consider expanding criteria for excluding providers.**   ICE officials noted to the Subcommittee that even new vetting procedures ICE instituted in 2019 might not have excluded Dr. Amin—despite his previous malpractice settlements, the fact that a major insurance company severed its contract with him based on his history of malpractice cases, and his False Claims Act settlement with DOJ in 2015.

**(2)   ICE should expedite efforts to identify trends in off-site medical procedures for detainees for potential waste, fraud, or abuse and should conduct regular audits of physicians, hospitals, or other facilities providing off-site care.**   To provide context for its review efforts, ICE should also expand the range of information it collects from detention centers to include historic demographic population information and descriptions of on-site medical capabilities.

**(3)   ICE should institute policies and procedures to ensure off-site providers obtain informed consent in connection with their treatment of detainees.**   ICE currently expects that off-site medical providers will honor their professional obligations to ensure detainees understand and consent to medical procedures, but ICE has taken no responsibility for them doing so.

**(4)   ICE should ensure it reviews all detainee complaints regarding medical treatment independently of site visits from Field Medical Coordinators.**   ICE officials should have the ability to receive and review all detainee medical

19

NBCU002068

complaints electronically and contemporaneously, regardless of whether staffing challenges prevent annual visits to detention facilities.

**(5)**     **Federal immigration policy should support and allow for the swifter adjudication of immigration cases without undermining the procedural due process rights of immigrants.**

20

NBCU002069

## II.    BACKGROUND

On September 14, 2020, several immigration advocacy organizations filed a whistleblower complaint to DHS OIG, DHS CRCL, the ICE Atlanta Field Office, and the ICDC Warden alleging, among other claims, that an off-site medical provider for the ICDC facility had performed mass hysterectomies on detainees at ICDC.[82]  This provider was later identified as Dr. Mahendra Amin, an OB-GYN specialist authorized to provide off-site medical services for ICDC detainees since 2014.[83]  Three months after the initial complaint was filed, former ICDC detainees filed a class action lawsuit against ICDC, ICE, Dr. Amin, and other federal and nonfederal parties alleging that the detainees had received nonconsensual and unnecessary gynecological procedures.[84]  The lawsuit also alleged a broader pattern of medical abuse and mistreatment of detainees at ICDC.[85]  The lawsuit is ongoing.[86]

The initial September 2020 whistleblower complaint alleged that Dr. Amin performed mass hysterectomies on ICDC detainees.[87]  However, the Subcommittee found this allegation to be false, and ICE determined that the two hysterectomies Dr. Amin performed on ICDC detainees appeared to be medically necessary.[88]  Additional allegations in the September 2020 whistleblower complaint focused on ICDC's mismanagement of its response to COVID-19 and other issues related to medical care at ICDC.[89]

Dr. Amin stopped treating ICDC detainees in September 2020, when the public allegations against him first emerged.[90]  In May 2021, DHS directed ICE to discontinue its contract with ICDC.[91]  ICE terminated the contract effective October 7, 2021.[92]  As of September 3, 2021, all ICE detainees were removed from ICDC.[93]

---

[82] The Subcommittee's investigation did not find that Dr. Amin performed a large number of hysterectomies. According to records obtained by the Subcommittee, he performed two hysterectomies on ICE detainees, one in 2017 and one in 2019.  However, the data the Subcommittee obtained reveals that Dr. Amin did perform a dramatically larger number of other medical procedures on female detainees when compared to other OB-GYN specialists treating ICE detainees.  Information on the hysterectomies Dr. Amin performed are discussed in more detail in Section IV below.  *See Project South Complaint, supra* note 1.

[83] Consolidated Amended Petition for Writ of Habeas Corpus and Class Action Complaint for Declaratory and Injunctive Relief and for Damages (Dec. 21, 2020), *Oldaker v. Giles*, M.D. GA (No. 7:20-cv-00224-WLS-MSH).

[84] *Id.; June 23, 2021 ICE Q&A Paper, supra* note 14.

[85] Consolidated Amended Petition for Writ of Habeas Corpus and Class Action Complaint for Declaratory and Injunctive Relief and for Damages (Dec. 21, 2020), *Oldaker v. Giles*, M.D. GA (No. 7:20-cv-00224-WLS-MSH).

[86] *Id.*

[87] Project South Complaint, *supra* note 1.

[88] *June 23, 2021 ICE Q&A Paper, supra* note 14.

[89] Project South Complaint, *supra* note 1.

[90] *June 23, 2021 ICE Q&A Paper, supra* note 14; Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations (Oct. 22, 2021) (Tranche 18, 11144).

[91] U.S. Department of Homeland Security, *ICE to Close Two Detention Centers* (May 20, 2021) (https://www.dhs.gov/news/2021/05/20/ice-close-two-detention-centers).

[92] U.S. Department of Homeland Security, Office of Inspector General, *Medical Processes and Communication Protocols Need Improvement at Irwin County Detention Center* (OIG-22-14) (Jan. 3, 2022) (https://www.oig.dhs.gov/sites/default/files/assets/2022-01/OIG-22-14-Jan22.pdf).

[93] *Id.*

NBCU002070

The Subcommittee's investigation examined the provision of healthcare on and off-site for ICDC detainees and reviewed Dr. Amin's treatment of female ICDC detainees.  This section provides background on the key entities, policies, and procedures that served as the subject matter of the Subcommittee's investigation.

## A.  Key Players

### i.   ICE and Relevant Subcomponents

Fiscal year 2022 saw a record 2,378,944 apprehensions of migrants at the Southwest border.[94]  Federal law requires that migrants in certain immigration proceedings be detained throughout the adjudication of their cases.  ICE is the federal agency responsible for immigration enforcement, including detention of noncitizens who have violated U.S. immigration laws.[95]  For decades, the federal government has struggled to balance the requirements of federal immigration law with rates of border apprehensions, rising timelines of completion for immigration cases, limited resources, and the rights and interests of detainees.

For Fiscal Year 2022, ICE housed immigration detainees in 130 detention centers, processing centers, and other facilities, with an average length of stay of about 25.8 days and an average daily population of about 22,578 detainees.[96]  ICE executes its detention mission through two main entities:  IHSC, which oversees healthcare at ICE detention facilities and ICE Enforcement and Removal Operations ("ERO"), which manages all aspects of enforcement and detention process.

### a.  IHSC

As part of its healthcare focused mission, IHSC directs patient care at ICE-run facilities and oversight of compliance with detention standards at facilities operated by non-federal entities.[97]  IHSC maintains a workforce of 915 employees, including 600 commissioned officers of the U.S. Public Health Service, 15 federal civil servants, and 300 contract health professionals.[98]  IHSC directly provides healthcare services in 21 facilities nationwide ("IHSC facilities").[99]  IHSC monitors compliance with healthcare-related detention standards at approximately 150 other facilities in which local governments or their contractors provide services without embedded federal staff ("non-IHSC facilities") through the Field Medical Coordinators ("FMC") program.[100]  When it housed ICE detainees, ICDC was a non-IHSC

---

[94] U.S. Customs and Border Protection, *Southwest Land Border Encounters* (Oct. 21, 2022) (https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters) (accessed Nov. 13, 2022).
[95] U.S. Immigration and Customs Enforcement, *Mission* (Aug. 17, 2022) (https://www.ice.gov/mission).
[96] U.S. Immigration and Customs Enforcement, *ICE Facilities Data FY22 YTD* (https://www.ice.gov/doclib/detention/FY22_detentionStats09292022.xlsx) (accessed Nov. 13, 2022).
[97] *June 23, 2021 ICE Q&A Paper*, *supra* note 14; Email from U.S. Immigration and Customs Enforcement Staff to the Senate Permanent Subcommittee on Investigations (Nov. 11, 2022).
[98] *June 23, 2021 ICE Q&A Paper*, *supra* note 14.
[99] U.S. Immigration and Customs Enforcement, *ICE Health Service Corps* (https://www.ice.gov/detain/ice-health-service-corps) (accessed Nov. 13, 2022).
[100] *Id.*; *June 23, 2021 ICE Q&A Paper*, *supra* note 14.

NBCU002071

facility. If ICDC was unable to provide certain medical services with its on-site medical staff, it would transfer detainees off-site to receive medical services from providers in the community.

IHSC FMCs typically conduct at least one site visit per year at non-IHSC facilities to evaluate their adherence to detention standards and quality of care indicators.[101] IHSC employees known as RCDs are physicians with oversight responsibilities for all ICE-operated and non-ICE-operated facilities.[102]

### b. ICE ERO

ICE ERO "manages all aspects of the immigration enforcement process, including identification and arrest, domestic transportation, detention, bond management, and supervised release, including alternatives to detention."[103] The Custody Management Division ("CMD") within ERO provides oversight of ICE detention facilities through two sub-divisions: the Custody Programs Division develops policies related to programing within detention facilities and oversees segregation procedures and policies to protect detainees with special vulnerabilities, and the Detention Management Division provides oversight of detention facilities through Detention Service Managers ("DSMs") and Detention Standards and Compliance Officers ("DSCOs") who inspect and audit certain detention facilities.[104] In addition to inspections by the Detention Management Division, CMD also performs announced annual inspections of detention facilities.[105]

### c. Other Federal Entities and Contractors

In addition to IHSC and ICE ERO, federal immigration detention is overseen by:

- DHS OIG who conducts unannounced inspections of detention facilities for violations of ICE standards;

- ICE ODO who conducts biannual inspections of certain facilities;

---

[101] U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (June 23, 2021); *see also* Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations (Feb. 7, 2022) (Tranche 3, 01014-27). IHSC provides direct medical care at 21 facilities in the United States and, in FY 2021, "oversaw health care for over 169,000 detainees housed in 150 non-IHSC staffed facilities." U.S. Immigration and Customs Enforcement, *ICE Health Service Corps* (https://www.ice.gov/detain/ice-health-service-corps) (accessed Nov. 13, 2022).
[102] U.S. Immigration and Customs Enforcement Health Service Corps Official Regional Clinical Director, Interview with Senate Permanent Subcommittee on Investigations (Feb. 14, 2022).
[103] U.S. Immigration and Customs Enforcement, *Enforcement and Removal Operations* (http://www.ice.gov/about-ice/ero) (accessed Nov. 13, 2022).
[104] U.S. Immigration and Customs Enforcement, Enforcement and Removal Operations, Custody Management Division, Briefing with Senate Permanent Subcommittee on Investigations (June 17, 2021).
[105] *Id.*

NBCU002072

- DHS CRCL who investigates allegations of civil rights and civil liberties violations at detention facilities and issues policy recommendations to ICE headquarters, field offices, and facilities; and

- The Nakamoto Group, which is contracted by ICE to conduct annual inspections of detention facilities.[106]

### ii.    ICDC and LaSalle

ICDC is located in Ocilla, Georgia.  In 2007, the U.S. Marshals Service entered into an Intergovernmental Service Agreement ("IGSA") with Irwin County, Georgia, which allowed the Marshals Service, Federal Bureau of Prisons, and ICE to house federal detainees at ICDC.[107] The most recent IGSA between the federal government and Irwin County became effective on June 15, 2020.[108]  In this IGSA, ICE agreed to maintain a minimum population of at least 600 detainees at ICDC with a bed day rate of $83 per detainee for the first 600 detainees and $65 per detainee above the 600-person threshold.[109]

On December 12, 2013, Irwin County entered into an agreement with LaSalle, a private company that operates correctional facilities in Louisiana, Texas, Arizona, and Georgia.[110] Under the agreement, LaSalle provided certain operation, maintenance, and management services to ICDC, either directly through LaSalle employees or individuals who contract with LaSalle.[111]

The current Warden of ICDC is David Paulk.[112]  Mr. Paulk oversees officials including the Deputy Warden, Chief Security Officer, Captain of Administrative Services, Captain of Security, Health Services Administrator ("HSA"), Director of Nursing ("DON"), Medical Director, and food service manager.[113]  According to Mr. Paulk, the ICDC staff comprised between 210 and 220 individuals when the facility operated at full capacity, during which it had 944 beds available.[114]  Between FY 2017 and FY 2020, the average length of stay at ICDC rose

---

[106] In addition to these oversight bodies, detention facilities are required to maintain National Commission on Correctional Health Care and American Correctional Association accreditation.  *Id.*; U.S. Department of Homeland Security, Office of Inspector General, *ICE's Inspections and Monitoring of Detention Facilities Do Not Lead to Sustained Compliance or Systemic Improvements* (OIG-18-67) (June 26, 2018) (https://www.oig.dhs.gov/sites/default/files/assets/2018-06/OIG-18-67-Jun18.pdf); Email from U.S. Immigration and Customs Enforcement Staff to the Senate Permanent Subcommittee on Investigations (Nov. 17, 2021); Email from U.S. Immigration and Customs Enforcement Staff to the Senate Permanent Subcommittee on Investigations (Nov. 11, 2022).
[107] LaSalle_048633-89.
[108] LaSalle_048623.
[109] LaSalle_048636.  Bed day is defined as "one person per day."  *Id.*
[110] LaSalle Corrections, Our Locations (https://lasallecorrections.com/locations/) (accessed Nov. 13, 2022); LaSalle_009481-505.
[111] Counsel for LaSalle, Briefing with Senate Permanent Subcommittee on Investigations (May 19, 2021); LaSalle 009481-505.
[112] David Paulk, Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Sept. 16, 2021).
[113] *Id.*
[114] *Id.*

NBCU002073

slightly from 36 days to 42 days, and the average daily population varied between a high of 850 detainees and a low of 642 detainees.[115]

Under its agreement with Irwin County, LaSalle provided limited, basic medical services to detainees at ICDC, including intake screening, physicals, laboratory testing, routine healthcare, and emergency services or referrals.[116]  According to LaSalle policy, the HSA at ICDC was responsible for ensuring detainees have access to care and supporting the delivery of healthcare services to detainees.[117]  The HSA was to be aided by the DON, registered nurses, licensed practical nurses ("LPNs"), a medical records clerk, a dentist, and a psychiatrist.[118]

According to LaSalle policy, all detainees were supposed to receive an initial medical, dental, and mental health screening within 12 hours of arrival at ICDC that consisted of intake review questions and observatory assessments.[119]  LaSalle policy also required that all female detainees had "access to appropriate and necessary medical and mental healthcare, gynecological and obstetrical treatment during their detainment," as well as access to pregnancy services and preventative screenings, such as breast examinations, mammograms, and sexually transmitted disease testing.[120]  If ICDC medical personnel determine that they lack the capabilities or capacity to treat a particular ailment on-site, they would refer the patient to an outside provider. ICE would review and make the determination on whether the detainee would see an outside provider.

LaSalle was responsible for providing "communication assistance" to detainees who were limited in their English proficiency during on-site medical appointments.[121]  ICDC medical unit staff were responsible for referring detainees in need of healthcare beyond facility resources or hospital services to an IHSC-approved facility, and "all surgeries and major treatments must be approved by the Warden of [sic] designee."[122]  However, according to LaSalle's agreement with ICE, "[t]he primary point of contact for obtaining pre-approval for non-emergent care as well as the post approval for emergent care will be the IHSC FMC assigned to [ICDC]."[123]  Medical providers with which LaSalle contracted also had to maintain "adequate records in accordance with HIPPA [sic] guidelines" for on-site care, and LaSalle had to provide transportation to off-site medical services for detainees.[124]

LaSalle also contracted with Dr. Howard McMahan for the provision of medical services as ICDC Medical Director, which involved overseeing the work of on-site medical employees and—while ICDC housed individuals for ICE—providing medical services as necessary to all

---

[115] U.S. Immigration and Customs Enforcement, *HSGAC/PSI Interviews with ICE Health Service Corps (IHSC) Personnel Get-backs* (Nov. 5, 2021) (response on file with the Subcommittee).
[116] LaSalle_027934-37.
[117] LaSalle_009506-09.
[118] *Id.*
[119] LaSalle_027993-97.
[120] LaSalle_028057-59.
[121] LaSalle_027938-43.
[122] LaSalle_009506-09.
[123] LaSalle_048633-89.
[124] LaSalle_009506-09.

NBCU002074

detainees, including those with chronic illnesses.[125]  Dr. McMahan is physically on-site at ICDC between two and a half and six hours per week and reports to Dr. Pamela Hearn, the Medical Director for LaSalle.[126]

### iii.    Dr. Amin and ICH

When an ICDC detainee required off-site OB-GYN care, ICDC medical personnel previously would refer the detainee patients to Dr. Mahendra Amin.  Dr. Amin attended medical school at Government Medical College of South Gujarat University in Surat, India.  He completed his internship at the New Civil Hospital in Surat, India and his OB-GYN residency at the University of Medicine and Dentistry in Newark, New Jersey.[127]  Dr. Amin maintains an active medical license with the Georgia Composite Medical Board, which was issued on June 11, 1985.[128]  However, he holds no board certifications.[129]  Dr. Amin has practices in Douglas, Georgia, and Ocilla, Georgia, and he has admitting privileges at ICH and Coffee Regional Medical Center.[130]

According to public reports and documents reviewed by the Subcommittee, a company incorporated by Dr. Amin called "MGA Health Management, Inc." ("MGA") entered into a contractual relationship with ICH in 1996 to run daily operations for the hospital.[131]  A November 2010 Amended and Restated Management Services Agreement between MGA and ICH states that MGA had "the authority and responsibility to supervise and manage the day-to-

---

[125] Howard McMahan, Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Sept. 15, 2021).

[126] *Id.*

[127] Emily Shugerman & William Bredderman, *ICE Hysterectomy Doctor Wasn't Even a Board-Certified OB-GYN*, Daily Beast (Sept. 19, 2020) (www.thedailybeast.com/ice-hysterectomy-doctor-wasnt-even-a-board-certified-ob-gyn); Georgia Composite Medical Board, License Details for Mahendrakumar Govindbhai Amin (https://gcmb.mylicense.com/verification/) (search first name "Mahendra" and search last name "Amin") (accessed Nov. 13, 2022).

[128] Georgia Composite Medical Board, License Details for Mahendrakumar Govindbhai Amin (https://gcmb.mylicense.com/verification/) (search first name "Mahendra" and search last name "Amin") (accessed Nov. 13, 2022).  Georgia state law requires one year of postgraduate training after medical school to obtain a medical license, and board certification is a voluntary process.  *See* Rules and Regulations of the State of Georgia, Rule 360-2-.01 Requirements for Licensure (https://rules.sos.ga.gov/gac/360-2); Shugerman & Bredderman, *supra* note 127.

[129] The American Board of Obstetrics and Gynecology has stated that "its records show Amin is not certified by the organization," and the American Board of Medical Specialties—the primary organization for physician board certifications in the United States—stated that Dr. Amin was not certified by any of its 24 member boards. Shugerman & Bredderman, *supra* note 127.

[130] *Id.*; Georgia Composite Medical Board, License Details for Mahendrakumar Govindbhai Amin (https://gcmb.mylicense.com/verification/) (search first name "Mahendra" and search last name "Amin") (accessed Nov. 13, 2022); Alan Judd, *At ICE Detention Center, Red Flag Raised about Gynecologist*, Atlanta Journal-Constitution (Oct. 2, 2020) (www.ajc.com/news/at-ice-detention-center-red-flag-raised-about-gynecologist/SH7TJ35UJRAOXONQH7KALL7IVM/).

[131] *See* Production from Irwin County Hospital to the Senate Permanent Subcommittee on Investigations, *November 10th Amended and Restated Management Services Agreement between MGA Health Management and Irwin County Hospital Authority* (Aug. 5, 2021); Shugerman & Bredderman, *supra* note 127; Alan Judd, *At ICE Detention Center, Red Flag Raised about Gynecologist*, Atlanta Journal-Constitution (Oct. 2, 2020) (www.ajc.com/news/at-ice-detention-center-red-flag-raised-about-gynecologist/SH7TJ35UJRAOXONQH7KALL7IVM/).

NBCU002075

day operation of the Facilities."[132]   Under the agreement, MGA was required to assist the hospital "in the recruitment of physicians to join the medical staffs of the Facilities," including by "screening candidates presented by any physician recruitment firms or possible candidate to locate or relocate their medical practice to the area served by the Hospital."[133]   MGA received an annual fee of $960,000 in exchange for its services.[134]   In addition to the amended agreement, in November 2010, MGA and ICH entered into a promissory note for $2,303,847.71.[135]   According to current ICH CEO Paige Wynn, the promissory note was a loan from Dr. Amin for renovations to the hospital.[136]

In December 2014, the November 2010 amended agreement was terminated, and Dr. Amin and ICH entered into a "Physician Services Agreement."[137]   The new agreement established Dr. Amin as the Chief Medical Officer of ICH and an independent contractor receiving an hourly fee.[138]   Under the agreement, the ICH Board of Trustees "retain[ed] control over all functions of the Hospital."[139]   As Chief Medical Officer, Dr. Amin was required to assist with the development of policies and procedures regarding regulatory compliance, conduct oversight over hospital credentialing, assist the CEO and other hospital staff with accreditation and licensure, assist the DON with evaluating staffing needs, prepare operating and capital budgets for the hospital, and assist the Chief Compliance Officer with implementation of a compliance plan.[140]

Dr. Amin's agreement with the hospital continued to be renewed from 2015 through 2020.[141]   He continues to serve as the Chief Medical Officer and was re-credentialed in 2021.[142]   According to Ms. Wynn, Dr. Amin is "by far the busiest" physician at the hospital, the main doctor at ICH, and the busiest physician in the community at large.[143]

---

[132] Production from Irwin County Hospital to the Senate Permanent Subcommittee on Investigations, *November 10th Amended and Restated Management Services Agreement between MGA Health Management and Irwin County Hospital Authority* (Aug. 5, 2021).

[133] *Id.*

[134] *Id.*

[135] ICH005144-49.

[136] Ms. Wynn told the Subcommittee that the hospital renovations were completed and the Promissory Note was fully paid by ICH in May 2021.  Paige Wynn, Irwin County Hospital, Interview with Senate Permanent Subcommittee on Investigations (Aug. 25, 2021).

[137] ICH005120-35.

[138] According to counsel for ICH, in 2014, all agreements between ICH and Dr. Amin were provided to the HHS OIG and subsequently reviewed by an Independent Review Organization HHS OIG approved.  ICH005120-35; Email from Counsel for Irwin County Hospital to the Senate Permanent Subcommittee on Investigations (Nov. 17, 2021).

[139] ICH005120-35.

[140] ICH005128-29.

[141] ICH005101; ICH005113; ICH005114-19; ICH005136-41; ICH005143.

[142] Paige Wynn, Irwin County Hospital, Interview with Senate Permanent Subcommittee on Investigations (Aug. 25, 2021).

[143] *Id.*  Counsel for ICH noted to the Subcommittee that the community is "small" and contains approximately 9,500 residents.  Email from Counsel for Irwin County Hospital to the Senate Permanent Subcommittee on Investigations (Nov. 17, 2021).

NBCU002076

According to a 2016 survey from the American Medical Association, around 63% of OB-GYN specialists have been sued at least once, and around 44% of these specialists have been sued at least twice.[144]  The NPDB shows that Dr. Amin settled at least seven medical malpractice lawsuits between 1998 and 2007.[145]  The settlements involve allegations concerning a mother's death, a miscarriage, fetal brain damage, stillbirths, and a pelvic abscess/infection.[146]  (See Figure 2.)  The Subcommittee's review of the NPDB showed that a major private insurance company terminated its contract with Dr. Amin in 2005 due to "excessive malpractice cases" and an "extensive malpractice history."[147]

**Figure 2: Dr. Amin Malpractice Settlements in the NPDB**[148]

| Date | Settlement |
|---|---|
| March 16, 2007 | Settlement for improper performance: 29-year-old underwent a hysterectomy for pelvic pain and bleeding; allegedly resulted in right **ureterovaginal fistula.**[149] |
| April 30, 2004 | Settlement for delay in treatment of identified fetal distress: alleged delay in C-section led to post-surgical pulmonary embolism which resulted in **mother's death.** |
| February 21, 2002 | Settlement for delay in delivery (inductive or surgery): allegedly resulted in **stillbirth.** |
| November 30, 2001 | Settlement for obstetric not otherwise specified: alleged failure to evaluate 21-week gestation resulted in **miscarriage.** |
| November 15, 1999 | Settlement for improperly managed labor not otherwise specified: alleged failure to diagnose and treat group B streptococcus infection, which resulted in **fetal brain damage.** |
| September 7, 1999 | Settlement for failure to diagnose: alleged **pelvic abscess/infection.** |
| February 26, 1998 | Settlement for delay in delivery: alleged failure to monitor fetus resulted in **stillbirth.** |

Many of the contractual arrangements for services by Dr. Amin described above occurred after DOJ and the State of Georgia joined a complaint filed by two employees of ICH in July 2013 against ICH, Dr. Amin, and eight other ICH physicians, alleging violations of the False

---

[144] The survey did not provide numbers on the percentage of OB-GYN specialists sued seven times in less than one decade.  José R. Guardado, PhD, *Medical Liability Claims Frequency Among U.S. Physicians*, American Medical Association: Policy Research Perspectives (2017) (https://www.ama-assn.org/media/21976/download).

[145] *June 23, 2021 ICE Q&A Paper*, *supra* note 14; Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations (Sept. 27, 2021) (Tranche 10, 3037-42).

[146] *Id.*

[147] Staff conducted an *in camera* review at HHS of National Practitioner Data Bank information on Dr. Amin. (Dec. 9, 2021) (notes on file with the Subcommittee).

[148] *June 23, 2021 ICE Q&A Paper*, *supra* note 14; Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations (Sept. 27, 2021) (Tranche 10, 3037-42).

[149] A ureterovaginal fistula describes an unusual opening that develops between the vagina and the tubes that carry urine from the kidneys to the bladder, also known as ureters.  Mayo Clinic, *Vaginal Fistula* (https://www.mayoclinic.org/diseases-conditions/vaginal-fistulas/symptoms-causes/syc-20355762) (accessed Nov. 13, 2022).

NBCU002077

Claims Act and the Georgia False Medical Claims Act.[150]  The complaint asserted that physicians at ICH billed Medicare and Medicaid for treatments and procedures performed by nurses and technicians instead of physicians.[151]  Nurses allegedly followed "standing orders"—scripted procedures—regardless of an individual patient's condition.[152]

These standing orders allegedly required that "certain tests always be run on pregnant patients, without any medical evaluation and regardless of her condition."[153]  For example, the 2013 DOJ complaint stated:

> [N]o matter what symptoms the patient may be exhibiting, ICH performs an OB ultrasound on every pregnant patient, without consulting [Dr. Amin] or obtaining his or any other doctor's medical opinion for that particular patient. . . . Dr. Amin's standing order for ultrasounds on his patients constitutes a pattern of medical services that he, ICH, and the on-call doctors know or should know are not medically necessary.[154]

The complaint further alleged that Dr. Amin and other physicians allegedly engaged in a kickback scheme and directed patients to ICH despite the availability of a closer hospital.[155]

In April 2015, the defendants reached a civil settlement and agreed to pay $520,000 to resolve the allegations without a determination of liability.[156]  In announcing the settlement, DOJ noted that it "marks the end of an investigation into alleged violations of the Federal Anti-Kickback Statute, the Federal Stark Law, and related Georgia Medicaid policies."[157]

In October 2015, ICH replaced MGA with a different management company—ER Hospital LLC; however, Dr. Amin remained on the medical staff at the hospital, as the Medical Director.[158]  Along with the civil settlement, ICH entered into a five-year Corporate Integrity

---

[150] The other named physician defendants included: Ashfaq Saiyed, M.D.; Romana Bairan, M.D.; Arturo Ruanto, M.D.; Concordio Ursal, M.D.; Drew Howard, M.D.; Steve Anderson, M.D.; Robert Reese M.D.; and Marshall Tanner, M.D.  Complaint (July 8, 2013), *United States v. Hospital Authority of Irwin County*, M.D. Ga. (No. 7:13-cv-00097-HL).

[151] *Id.*

[152] *Id.*

[153] *Id.*

[154] *Id.*

[155] *Id.*

[156] The United States of America's Filing of Settlement Agreement (July 8, 2013), *United States v. Hospital Authority of Irwin County*, M.D. Ga. (No. 7:13-cv-00097-HL); U.S. Department of Justice, U.S. Attorney's Office Middle District of Georgia, *Hospital Authority of Irwin County Resolves False Claims Act Investigation for $520,000* (Apr. 29, 2015) (www.justice.gov/usao-mdga/pr/hospital-authority-irwin-county-resolves-false-claims-act-investigation-520000).

[157] U.S. Department of Justice, U.S. Attorney's Office Middle District of Georgia, *Hospital Authority of Irwin County Resolves False Claims Act Investigation for $520,000* (Apr. 29, 2015) (www.justice.gov/usao-mdga/pr/hospital-authority-irwin-county-resolves-false-claims-act-investigation-520000).

[158] Irwin County Hospital, *2018 Annual Hospital Questionnaire* (Feb. 28, 2019) (www.irwincntyhospital.com/fileadmin/Files/Irwin/Transparency_Documents/HTR-Annual-Hospital-Questionnaire.pdf).

NBCU002078

Agreement ("CIA") with the HHS OIG that became effective in January 2015.[159]  The CIA required ICH to establish and maintain a compliance program that included a compliance officer and committee, develop and implement a code of conduct setting forth its "commitment to full compliance with all Federal healthcare program requirements," develop and implement written policies and procedures related to the operations of the hospital's compliance program, and provide training to staff regarding the compliance program and code of conduct.[160]  Counsel for ICH told the Subcommittee that ICH followed all recommendations in the CIA, and both HHS OIG and an Independent Review Organization that HHS OIG approved and reviewed this implementation, as well as monitoring and reporting by ICH.[161]

As of early 2022, Dr. Amin was under active criminal investigation by multiple federal agencies.[162]  In addition, the DHS OIG is currently examining two other matters that relate to the issues PSI investigated.  First, the DHS OIG Office of Investigations is reviewing the gynecological procedure approval process for ICDC detainees who underwent treatment by Dr. Amin.[163]  Second, the DHS OIG is conducting an audit of all surgical procedure authorizations and approvals across all ICE detention centers.[164]

## B.  Key Processes for Medical Treatment of ICDC Detainees

### i.  ICDC Sick Call Process

According to LaSalle's medical care policy, "[i]t is the policy of LaSalle Corrections to ensure a sick call procedure that allows detainees the unrestricted opportunity to freely request medical, mental health and dental services that are provided by a physician or other qualified medical staff in a clinical setting."[165]  To request routine medical assistance, detainees filled out a Health Services Request Form located in each residential housing unit or in the ICDC medical unit and submitted these forms at designated "Sick Call" boxes.[166]  Alternatively, detainees could complete an electronic request form on tablet computers available in each dormitory.[167]  The timeframe for the medical unit to respond to a request was 24 to 48 hours, and appointments for

---

[159] Production from Irwin County Hospital to the Senate Permanent Subcommittee on Investigations, *Corporate Integrity Agreement between the Office of Inspector General of the U.S. Department of Health and Human Services and Hospital Authority of Irwin County* (Aug. 5, 2021).

[160] *Id.*

[161] Email from Counsel for Irwin County Hospital to the Senate Permanent Subcommittee on Investigations (Nov. 17, 2021).

[162] Letter from Counsel for Dr. Amin to the Senate Permanent Subcommittee on Investigations (Feb. 21, 2022).  PSI is unaware of the current status of these investigations.

[163] U.S. Department of Homeland Security, Office of Inspector General, *Medical Processes and Communication Protocols Need Improvement at Irwin County Detention Center* (OIG-22-14) (Jan. 3, 2022) (https://www.oig.dhs.gov/sites/default/files/assets/2022-01/OIG-22-14-Jan22.pdf).

[164] *Id.*

[165] LaSalle_011126.

[166] LaSalle_011127; LaSalle_014225-26; LaSalle_014246-47.

[167] Amber Hughes Strout, formerly of Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Sept. 22, 2021).  Nurse Hughes Strout worked as a sick call nurse at ICDC from 2016 to April 2021.

NBCU002079