Declaration of

Elizabeth McNamara

Exhibit 68

PART 2

detainees were typically scheduled within one week of their request.[168]  The detainee would either see a nurse practitioner or physician assistant for basic needs or the facility's medical director Dr. McMahan for more involved medical questions.[169]  If the facility lacked the capabilities to treat ICE detainees in house, ICDC would refer them to IHSC-approved off-site providers.[170]

### ii.    ICE Surgical Approval Process

The IHSC RCD reviews requests for routine, nonemergency surgery for detainees by off-site providers.[171]  According to ICE, detainee patients are first evaluated in the facility medical unit by the facility clinician.[172]  (See Figure 3.)  If the facility clinician believes a detainee patient's medical condition warrants a referral to an off-site specialist, the facility submits a Medical Payment Authorization Request ("MedPAR").  The FMC reviews and approves the MedPAR for the initial consult.  If the off-site provider recommends surgery, the facility will submit a MedPAR for the surgery.  The FMC will review the surgery request and forward the request to the RCD for review.  The RCD will review the documentation accompanying the surgery request and use their clinical judgment to approve or deny the surgery via email.  The facility is required to submit the approved MedPAR with the referral authorization number to the off-site provider for reimbursement.[173]

---

[168] Howard McMahan, Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Sept. 15, 2021); Amber Hughes Strout, formerly of Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Sept. 22, 2021); Lakeysa Brown, formerly of Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Jan. 5, 2022).

[169] Howard McMahan, Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Sept. 15, 2021).

[170] Lakeysa Brown, formerly of Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Jan. 5, 2022).

[171] U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (June 23, 2021); U.S. Immigration and Customs Enforcement Health Service Corps Official Regional Clinical Director, Interview with Senate Permanent Subcommittee on Investigations (Feb. 14, 2022).

[172] Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations (Feb. 22, 2022) (Tranche 7, 01255); Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations, *Summary Report: Irwin County Detention Center-Employee Allegations & Media Response* (Sept. 27, 2021) (Tranche 10, 3037-42).

[173] *Id.*; Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations (Feb. 7, 2022) (Tranche 3, 00947, 00983).

NBCU002080

**Figure 3: IHSC Surgery Approval Process**[174]



---

[174] Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations (Feb. 22, 2022) (Tranche 7, 01255); Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations, *Summary Report: Irwin County Detention Center-Employee Allegations & Media Response* (Sept. 27, 2021) (Tranche 10, 3037-42).

NBCU002081

Along with the referral, RCDs may review laboratory and imaging reports and the off-site provider's examination notes.[175]  When additional information or documentation is needed to aid in the RCD's determination of the referral, RCDs will contact the FMCs who will then ask the off-site provider for that information.[176]  RCDs will make decisions regarding surgical requests based on the needs of the patient and clinical practice guidelines.[177]  IHSC officials noted to the Subcommittee that IHSC currently does not provide guidance to RCDs regarding requirements for approving referral requests.[178]  In rare cases, an off-site provider can appeal if an RCD rejects a request due to lack of medical necessity, and a surgical request can be escalated to IHSC leadership.[179]  RCDs are also responsible for identifying unusually frequent referrals to a certain provider or insufficient justifications for referrals.[180]

### iii.    ICDC Grievance Process

When ICDC detainees had issues related to their detention, including medical treatment, detainees were supposed to utilize LaSalle's grievance process.  According to LaSalle policy, ICDC is responsible for providing "a grievance system that protects the detainee's rights and ensures they are treated fairly by providing procedures for them to file both informal and formal grievances, which will receive timely responses relating to any aspect of their detention, including medical care."[181]  The policy defines a "grievance" as a "formal written complaint filed by a detainee related to any aspect of facility life or condition of detention that personally affects the detainee grievant."[182]  To file a grievance, ICDC detainees filled out a paper grievance form or the electronic form on tablet computers.[183]  ICDC's "grievance officer" then

---

[175] An IHSC official told the Subcommittee that IHSC does not require specific documents to be submitted to RCDs with each referral.  U.S. Immigration and Customs Enforcement Health Service Corps Official Regional Clinical Director, Interview with Senate Permanent Subcommittee on Investigations (Feb. 14, 2022).  The Subcommittee reviewed emails between the ICDC FMC and the ICDC RCD regarding surgical requests and found that provider visit notes, documentation of prescribed medication, imaging reports, and lab results were generally forwarded to the RCD along with the surgical request. *See, e.g.,* Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations (Apr. 25, 2022) (Tranche 10, 01445-61); Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations (Apr. 25, 2022) (Tranche 11, 01792-1806); Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations (Apr. 25, 2022) (Tranche 13, 02645-56).

[176] U.S. Immigration and Customs Enforcement Health Service Corps Official Regional Clinical Director, Interview with Senate Permanent Subcommittee on Investigations (Feb. 14, 2022).

[177] U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (June 23, 2021).

[178] U.S. Immigration and Customs Enforcement Health Service Corps Official Regional Clinical Director, Interview with Senate Permanent Subcommittee on Investigations (Feb. 14, 2022).

[179] *Id.*; U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (June 23, 2021).

[180] U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (May 17, 2021).

[181] According to the policy, an informal grievance is an "oral or written complaint attempting to resolve an issue through an informal process.  The issue may be resolved by staff at any level without complete processing of a formal grievance."  LaSalle_011690.

[182] *Id.*

[183] David Paulk, Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Sept. 16, 2021); Frank Albright, Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Sept. 21, 2021); Shanise Bell, formerly of Irwin County Detention Center, Interview with Senate

NBCU002082

processed and forwarded the grievances to the relevant department heads who would respond to the grievances.[184]  For example, all medical grievances were referred to the HSA.[185]  According to former HSA Lakeysa Brown, the medical unit responded to medical grievances within 72 hours.[186]  ICDC addressed non-medical grievances typically within 5 to 15 days.[187]  After a grievance was investigated and addressed, it was logged and stored by the facility.[188]

Specifically for medical grievances, the HSA investigated each grievance.[189]  According to former HSA Brown, the investigative process generally involved calling the detainee to the medical unit.[190]  For example, regarding a grievance related to medication, the detainee's chart would be reviewed to see if the medication was ordered and the detainee would be called to the medical unit for a "face-to-face encounter" to resolve the issue.[191]  If the issue was resolved, the resolution and date of the resolution was noted in a grievance log, and no further response was required.  If a detainee was not satisfied with the resolution, the detainee could pursue the formal grievance process or appeal to the grievance board, which was composed of the Warden, Deputy Warden, and one other facility official.[192]  Detainees were also able to submit grievances related to off-site providers through this grievance process, and the HSA would "explore" the complaint.[193]

## C. Key Medical Procedures and Treatments

The report will discuss the following medical procedures and treatments:

- Colposcopy:  A colposcopy used to examine the cervix, vagina, and vulva for signs of disease.  The procedure is recommended after an abnormal Pap test result.  During the

---

Permanent Subcommittee on Investigations (Oct. 13, 2021); Lakeysa Brown, formerly of Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Jan. 5, 2022).

[184] David Paulk, Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Sept. 16, 2021); Frank Albright, Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Sept. 21, 2021).

[185] David Paulk, Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Sept. 16, 2021).

[186] Lakeysa Brown, formerly of Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Jan. 5, 2022).

[187] David Paulk, Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Sept. 16, 2021).

[188] Id.; Frank Albright, Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Sept. 21, 2021); Shanise Bell, formerly of Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Oct. 13, 2021); Lakeysa Brown, formerly of Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Jan. 5, 2022).

[189] Lakeysa Brown, formerly of Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Jan. 5, 2022).

[190] Id.

[191] Id.

[192] Id.; David Paulk, Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Sept. 16, 2021).

[193] Pamela Hearn, LaSalle Corrections, Interview with Senate Permanent Subcommittee on Investigations (Nov. 9, 2021); Lakeysa Brown, formerly of Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Jan. 5, 2022).

NBCU002083

procedure, a colposcopy—a magnifying instrument—is used to identify any suspicious cells.  A small sample of tissue may be collected if suspicious cells are identified.[194]

- Depo-Provera:  Depo-Provera is an injection that contains the hormone progestin and is typically administered every three months to prevent pregnancy and manage issues related to the menstrual cycle.[195]

- Dilation & Curettage ("D&C"):  A D&C procedure removes tissue from inside the uterus. During this procedure, a provider will dilate the cervix and then use a surgical instrument called a curette (a sharp instrument or suction device) to remove uterine tissue.[196]

- Laparoscopy:  A laparoscopy may be used to obtain a small tissue sample for testing or even remove organs like the appendix or gallbladder, and it is generally performed under anesthesia.[197]

- Loop Electrosurgical Excision Procedure ("LEEP"):  A LEEP is a procedure in which a heated, electric wire is used to remove cells and tissues in the cervix and vagina.[198]

- Pap smear: A Pap smear or Pap test is a procedure used to test for cervical cancer.  A Pap test requires a provider to insert an instrument called a speculum into the vagina to take a tissue sample from the cervix using a soft brush and scraping device known as a spatula.[199]

## III.     FORMER DETAINEES AND EMPLOYEES AS WELL AS FEDERAL ENTITIES HAVE ALLEGED SUBSTANDARD CARE AT ICDC

ICDC detainees, former ICDC medical unit employees, and federal entities have alleged substandard medical care at ICDC.  The Subcommittee reviewed more than 700 grievances submitted by ICDC detainees.  The grievances reviewed by Subcommittee staff included complaints regarding delays in medical care and lack of quality medical care.  During a visit by Subcommittee staff to ICDC in August 2021, multiple detainees raised concerns regarding long wait times for medical care and issues obtaining translation services and medical test results. The Subcommittee also conducted interviews with eight former ICDC detainees who expressed

---

[194] Mayo Clinic, *Colposcopy* (https://www.mayoclinic.org/tests-procedures/colposcopy/about/pac-20385036) (accessed Nov. 13, 2022).
[195] Mayo Clinic, *Depo-Provera (Contraceptive Injection)* (www.mayoclinic.org/tests-procedures/depo-provera/about/pac-20392204) (accessed Nov. 13, 2022).
[196] Mayo Clinic, *Dilation and Curettage (D&C)* (www.mayoclinic.org/tests-procedures/dilation-and-curettage/about/pac-20384910) (accessed Nov. 13, 2022).
[197] Johns Hopkins Medicine, *Laparoscopy* (www.hopkinsmedicine.org/health/treatment-tests-and-therapies/laparoscopy) (accessed Nov. 13, 2022).
[198] John Hopkins Medicine, *Loop Electrosurgical Excision Procedure (LEEP)* (www.hopkinsmedicine.org/health/treatment-tests-and-therapies/loop-electrosurgical-excision-procedure-leep) (accessed Nov. 13, 2022).
[199] Mayo Clinic, *Pap Smear* (www.mayoclinic.org/tests-procedures/pap-smear/about/pac-20394841) (accessed Nov. 13, 2022).

NBCU002084

concerns regarding medical treatment at the facility and referrals to off-site providers.  PSI could not verify all of these allegations.

The Subcommittee also heard concerns from three former ICDC nurses who collectively worked at the facility from 2016 to 2020.  The three nurses shared concerns regarding unsanitary medical unit conditions, delays in medical care, record keeping issues, and inconsistent use of language translation services.

Internal DHS entities—ICE ODO and DHS CRCL—have identified numerous and repeat deficiencies at ICDC over the past few years.  Since 2017, at least three ODO inspections of ICDC documented violations of safety and health standards, including medical standards, at ICDC.  CRCL inspections of ICDC conducted within the past ten years found ICDC detainees failed to receive appropriate or timely medical care, identified poor medical unit conditions at ICDC, and found medical records were mishandled.  In addition, a recent DHS OIG report on medical care provided by ICDC found that ICDC generally met ICE detention standards but identified areas for improvement.  The OIG report did not review the gynecological procedure approval process or the surgical approval process for detainees at ICDC.  It is currently engaged in a separate investigation reviewing those matters.

## A.  Former Detainees Have Alleged Deficiencies Related to ICDC Healthcare

ICDC medical staff dealt with a large number of medical complaints from detainees on a regular basis.  These complaints ranged from cosmetic issues like dandruff and dry skin to more serious medical and mental health conditions.[200]

When detainees were not satisfied with the services they received from the medical unit, they submitted grievances to be addressed by ICDC leadership.  The Subcommittee reviewed more than 650 medical grievances.  The grievances reviewed included complaints regarding delays in medical care and lack of quality medical care.  Detainees detailed not receiving requested medical care for severe stomach pain, severe intestinal pain, blood in urine, and mouth pain and bleeding.[201]  One detainee grievance described being in pain for two months and not receiving a requested tooth extraction.[202]  In addition, there were allegations of not receiving prescribed medications and waiting weeks for required medical care.  One detainee stated that

---

[200] *See, e.g.*, LaSalle_167885-88, LaSalle_216450, LaSalle_216456 (sick calls for dandruff); LaSalle_232939-40, LaSalle_232942 (sick calls for dry skin and dry scalp); LaSalle_177638-41 (mental health sick call for depression); LaSalle_281516-19 (sick call for pain related to a hernia).

[201] Records indicate that for the detainee asking for "urgent help" due to stomach pain, the detainee had submitted a medical request one week before and received no response.  The detainee filed this grievance, and ICDC staff responded to the detainee's grievance within six days stating that the detainee had been placed "on the list to be evaluated by the sick call nurse."  LaSalle_002597.  Records indicate that the detainee who detailed intestinal pain was seen for the issue three days after submitting the grievance.  LaSalle_002831.  Records indicate that the detainee who complained of urinary pain was seen for the issue within four days of submitting the grievance. LaSalle_003150.  Records indicate that the detainee who complained of experiencing "severe mouth pain including bleeding" felt that "medical isn't providing care."  The Warden spoke with the medical unit for the detainee and an off-site appointment was scheduled.  LaSalle_000349.

[202] Records indicate that within an hour of the grievance submission, ICDC staff responded, "[y]ou have an upcoming appointment with the dentist."  LaSalle_002659.

NBCU002085

the facility failed to provide their diabetes medicine and as a result they started experiencing blurry vision due to elevated sugar levels.[203]  Records obtained by the Subcommittee indicate that medical unit staff responded three days after the detainee's initial complaint.[204]  Other detainees with chronic conditions, such as seizures, asthma, high blood pressure, and anemia, alleged in grievances that they were forced to wait days and weeks for their prescriptions.[205]  Records reviewed by the Subcommittee, however, showed that medical unit staff generally responded to these grievances with 24 to 48 hours.[206]  Another detainee said that he had submitted requests for a toothache, but ICDC staff never responded, and the pain ultimately stopped because the tooth fell out.[207]  The Subcommittee could not verify the accuracy of this detainee's claims.

In an interview with Subcommittee staff, ICDC detainees also complained about slow or non-existent translation services at ICDC.  For example, one detainee stated that he had repeatedly asked to go to the medical unit, and once he did arrive, it took one and a half hours to reach a translator on the language line.[208]  The Subcommittee's document review revealed widespread and common use of translation services at ICDC.  Documents show ICDC medical unit staff completed a "communication assessment" at intake to determine whether the detainee spoke English and made such notes in their medical files.[209]  If a detainee did not speak English, the medical file included a note indicating which language the detainee spoke and a code for the interpretation services provided.[210]  Other records identify the use of translation services when assessing sick call requests.[211]  In addition, during a Subcommittee staff visit to ICDC in August

---

[203] LaSalle_002652.

[204] Records indicate that ICDC staff responded three days later stating that staff would contact the detainee's previous detention center again to request records and obtain medication names and dosages.  *Id.*

[205] Records indicate that a detainee who suffered from chronic seizures had not received their third dose of seizure medications for a few days.  The ICDC HSA responded two days later stating that the pill cart nurses had been instructed to administer the detainee's medication three times daily and stated, "I can assure you that this matter will not occur again."  LaSalle_000187.  Records indicate that a detainee with asthma complained of waiting more than one month for an inhaler.  An inhaler was ordered for the detainee one day after the grievance was filed. LaSalle_002668.  Records indicate that a detainee with high blood pressure complained of not receiving medication for two days and that "every other day a nurse will not find my blood pressure [medications]."  The ICDC medical unit staff responded to the complaint and changed the status of the grievance from "open" to "closed" two days after the grievance was filed.  LaSalle_002598.  Records indicate a detainee with anemia had not received iron supplements for two weeks despite multiple requests.  ICDC medical unit responded to the detainee by stating they did not see the detainee's "multiple medical requests," and placed the detainee "on the [nurse practitioner] list" the day after the grievance was submitted.  LaSalle_002600.

[206] Records indicate that ICDC medical staff generally responded to these grievances within one to two days after the grievance was filed.  LaSalle_000187; LaSalle_002668; LaSalle_002598; LaSalle_002600.

[207] Senate Permanent Subcommittee on Investigations Staff Visit to Irwin County Detention Center (Aug. 17, 2021) (memorandum on file with the Subcommittee).

[208] *Id.*

[209] *See, e.g.*, LaSalle_199415; LaSalle_386054; LaSalle_396725 (indicating these detainees were English speakers).

[210] *See, e.g.*, LaSalle_248643; LaSalle_350105 (indicating that these detainees spoke Spanish and were provided a Spanish interpreter).  The codes appear to be different for each use of the interpreter.

[211] *See, e.g.*, LaSalle_315366 (identifying that an interpreter was used in a July 14, 2017 medical request to address complaints of abdominal pain and a need to refill pain medication); LaSalle_315368 (identifying that an interpreter was used in a July 5, 2017 medical request for medical records); LaSalle_315370 (indicating an interpreter was used in a January 7, 2017 medical request complaining of irregular bleeding).

NBCU002086

2021, ICDC medical unit staff showed Subcommittee staff how they use translation services.[212] ICDC staff were able to quickly and easily obtain a translator for a language of their choosing over the phone.[213]

Several detainees also stated to Subcommittee staff that they never received test results after medical tests.  For example, one detainee told staff that the medical unit took a blood and urine sample for his kidney issues; he had yet to receive results from these tests one month later.[214]  Another detainee said he had experienced knee pain and received an off-site X-ray, but he never received the results.[215]  He stated that he continued to experience pain in his knees, and submitted multiple medical requests, but he had not received a response.[216]  Subcommittee staff did not review the medical records for these detainees.  However, Subcommittee staff reviewed medical files for other detainees and found that they received their test results when requested.[217]

The Subcommittee conducted more extensive interviews with eight former ICDC detainees who expressed concerns regarding medical treatment at ICDC and referrals to off-site providers.  Several detainees described instances where another detainee's medical records ended up in their own medical file.[218]  One detainee said that at one point during her detainment at ICDC, she fell and fractured her left foot.[219]  It then took approximately one month before ICDC staff transported her to an off-site provider.[220]  During this appointment, she said that the provider stated to her that he was surprised ICDC did not bring her for treatment sooner.[221]  The Subcommittee was unable to verify the specifics of each of these claims.

### B.  Former ICDC Employees Reported Disturbing Conditions to the Subcommittee

In interviews with the Subcommittee, three former LPNs who worked at ICDC collectively from 2016 to 2020 shared their concerns regarding unsanitary medical unit conditions, delays in medical care, record keeping issues, and inconsistent use of language translation services at the facility.  These three individuals asked to remain anonymous.  In interviews with the Subcommittee, the LPNs did not provide specific details or any corroborating evidence to support any of the alleged misconduct.  The Subcommittee's review of hundreds of

---

[212] Senate Permanent Subcommittee on Investigations Staff Visit to Irwin County Detention Center (Aug. 17, 2021) (memorandum on file with the Subcommittee).

[213] *Id.*

[214] *Id.*

[215] *Id.*

[216] *Id.*

[217] For example, one detainee filed a sick call request on September 9, 2020 requesting test results and complaining of skin irritation and pain in her ovaries (LaSalle_177857-61).  She was seen for all three requests at the medical unit on September 10, 2020 where she also requested her medical records at the same visit (LaSalle_177863-65). The detainee received her medical records on September 21, 2020 (LaSalle_177869).  The detainee requested all of her ICDC medical records on December 7, 2020 (LaSalle_178320).  She signed an acknowledgment that she received her ICDC medical records on December 10, 2020 (LaSalle_178329).

[218] N.A., Interview with Senate Permanent Subcommittee on Investigations (June 23, 2021); A.K., Interview with Senate Permanent Subcommittee on Investigations (June 23, 2021).

[219] A.K., Interview with Senate Permanent Subcommittee on Investigations (June 23, 2021).

[220] *Id.*

[221] *Id.*

NBCU002087

thousands of pages of records from LaSalle did not identify instances corroborating these allegations. The Subcommittee makes no determination on the veracity of any of the LPNs' allegations.

LPN #1 described the ICDC medical unit conditions as "filthy."[222] They stated that the floors and examination tables were always dirty and they had to wipe down surfaces when they arrived to work.[223] They noted that staff members were responsible for bringing their own cleaning supplies, even during the COVID-19 pandemic.[224] When asked how the sanitary conditions at ICDC compared to previous places of employment, LPN #2 described ICDC as "the least clean of any place I have worked in."[225] LPN #3 stated that the conditions at ICDC were "terrible" and the building needed a lot of work.[226] In addition, LPN #1 stated that prior to ICE audits of the medical unit, the ICDC medical staff "scrambled" to get the unit in order, and according to LPN #3, medical unit staff would "shuffle things around" before ICE officials visited the unit.[227]

LPN #1 also alleged to the Subcommittee that detainee requests for medical attention were not addressed in a timely manner, and detainees often had to submit multiple requests before being seen.[228] LPN #1 recalled one detainee who submitted 14 medical requests, but did not provide the name of the detainee to allow the Subcommittee to verify the accuracy of this claim.[229] LPN #1 also stated that in some cases, detainees were not even seen by ICDC medical staff, however she did not raise this issue with her supervisors and did not provide specific cases to support this claim.[230] According to records reviewed by the Subcommittee, detainees generally received care within a few days after submitting requests, and ICDC medical staff responded to most requests within days.[231]

---

[222] LPN #1, formerly of Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (June 30, 2021).

[223] *Id.*

[224] *Id.*

[225] LPN #2, formerly of Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (July 12, 2021).

[226] LPN #3, formerly of Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (July 19, 2021).

[227] LPN #1, formerly of Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (June 30, 2021); LPN #3, formerly of Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (July 19, 2021).

[228] LPN #1, formerly of Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (June 30, 2021).

[229] *Id.* The Subcommittee was unable to identify the individual referenced in this statement and thus could not verify this claim.

[230] *Id.*

[231] For example, one detainee filed a sick call request on September 9, 2020 requesting test results and complaining of skin irritation and pain in her ovaries (LaSalle_177857-61). She was seen for all three requests at the medical unit on September 10, 2020. (LaSalle_177863-65). This detainee was added to the sick call list within 24 hours of submitting a complaint for irregular bleeding on November 24, 2020 (LaSalle_178294) and for general pain on December 23, 2020 (LaSalle_178607) and was seen within two days for a December 28, 2020 sick call complaining of blood in her stool (LaSalle_178635; LaSalle_178642).

NBCU002088

LPN #2 stated that ICDC medical staff, "when possible," tried to see detainees within 24 hours after submission of a medical request, but sometimes it was not possible when the medical unit was short-staffed.[232]  In addition, if the ICDC nurse responsible for triaging sick call requests was absent over the weekend, detainees had to wait until Monday to be seen.[233]

Regarding record keeping inside the medical unit, LPN #1 stated, without providing specifics, that they saw some medical requests "tucked away" and "underneath a box."[234]  LPN #1 told the Subcommittee that when they showed these requests to a fellow nurse, the nurse responded that it "happens all the time."[235]  LPN #3 told the Subcommittee, without providing specific examples, that if a detainee submitted multiple requests, some medical unit staff would say, "we have already seen them for that" and "get rid" of the sick call request.[236]

LPN #1 alleged that medical unit staff had fabricated vital signs.[237]  Specifically, LPN #1 alleged the shift nurses would fabricate vital signs for patients in medical isolation and make little changes to previous vitals taken.[238]  Instead of taking vital signs, LPN #1 alleged ICDC medical staff were "busy surfing the internet."[239]  LPN #1 provided no names of detainees or cases to support this allegation.  In interviews with the Subcommittee, ICDC Medical Director Dr. McMahan, former ICDC HSA Brown, and former ICDC DON Shanise Bell denied these events occurred.[240]  The Subcommittee identified no evidence of fabrication of vital signs or document destruction.

The former LPNs also told the Subcommittee about instances in which the medical unit did not use language translation services.  For example, LPN #1 told the Subcommittee that one time  when a detainee needed blood drawn, another  nurse did not bother to call a translation provider and instead made another detainee waiting to be seen by medical staff translate for the patient.[241]  The LPN did not tell the Subcommittee the name of the nurse or detainee to allow for verification.   LPN #3 told the Subcommittee that if medical unit staff had "piles of intake,"

---

[232] LPN #2, formerly of Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (July 12, 2021).

[233] Id.  LPN #3 also stated that detainees who would place a sick call request on Saturdays and Sundays would not be seen until Monday because sick call nurses would not work on the weekends.  LPN #3, formerly of Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (July 19, 2021).

[234] LPN #1, formerly of Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (June 30, 2021).

[235] Id.  LPN #1 also alleged that a "stack" of grievances against a certain nurse were destroyed and "nothing was done." Id.

[236] LPN #3, formerly of Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (July 19, 2021).

[237] LPN #1, formerly of Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (June 30, 2021).

[238] Id.

[239] Id.

[240] Howard McMahan, Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Sept. 15, 2021); Shanise Bell, formerly of Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Oct. 13, 2021); Lakeysa Brown, formerly of Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Jan. 5, 2022).

[241] LPN #1, formerly of Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (June 30, 2021).

NBCU002089

translation services might not have been used.[242]  LPN #3 also noted that staff could not use translation services when internet or phone services were down at the facility.[243]  The Subcommittee's document review, however, indicated widespread use of translation services both at intake and during sick call requests.[244]

### C.  Internal DHS Entities Have Identified Numerous and Repeat Deficiencies at ICDC

ICE ODO has completed at least three compliance inspections of ICDC dating back to 2017.  In these inspections, ODO documented violations of safety and health standards, including medical standards, at ICDC.  ODO identified several medical deficiencies as repeat deficiencies and "priority components" for mitigation.

In 2017, ODO found that intake screening forms were inconsistently reviewed and the mental health, medical history, and medication sections of intake forms were incomplete or left blank.[245]  ODO further noted that of the 35 medical records it reviewed, three detainees had not received health appraisals or dental screenings at all and two more detainees received their appraisals and screenings outside of the required 14-day timeframe.[246]  ODO identified both of the intake-related deficiencies as a "priority component and repeat deficiency."[247]  ODO also found a lack of documentation showing that ICDC medical staff had completed required training.[248]  In reviewing medical records, ODO discovered that the materials "were not organized in a uniform or orderly manner, and many documents were awaiting filing at the time of inspection."[249]  Finally, ODO found syringes and needles in examination rooms that were "neither secured nor inventoried."[250]  Overall, the inspection examined 15 ICE detention standards and found 26 deficiencies in 10 standards, which included nine "medical care" deficiencies, a number of which were repeat deficiencies.[251]

---

[242] LPN #3, formerly of Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (July 19, 2021).

[243] *Id.*

[244] *See, e.g.*, LaSalle_248643, LaSalle_350105 (indicating that these detainees spoke Spanish and were provided a Spanish interpreter at intake); *see also, e.g.*, LaSalle_315366 (identifying that an interpreter was used on a July 14, 2017 medical request to address complaints of abdominal pain and a need to refill pain medication);
LaSalle_315368 (identifying that an interpreter was used on July 5, 2017 to receive a request for medical records); LaSalle_315370 (indicating an interpreter was used in a January 7, 2017 sick call request complaining of irregular bleeding).

[245] U.S. Department of Homeland Security, U.S. Immigration and Customs Enforcement, Office of Professional Responsibility, Inspections and Detention Oversight Division, *Compliance Inspection for the Irwin County Detention Center Ocilla, Georgia* (Mar. 2017) (www.ice.gov/doclib/foia/odo-compliance-inspections/2017IrwinCountyGA.pdf).

[246] *Id.*

[247] According to ODO, "priority components" are "considered critical to facility security and the legal and civil rights of detainees." *Id.*

[248] *Id.*

[249] *Id.*

[250] *Id.*

[251] *Id.*

NBCU002090

In March 2020, ODO found that patient examination tables in the ICDC medical units were "torn beyond repair, making cleaning and decontamination impossible."[252]  In the medical department, "medical records were stored on the floor and across the desks throughout the area."[253]  ODO noted that the medical storage issues were a "repeat deficiency."[254]  In addition, ODO found that staff were not conducting regular medication room inventories and could not validate if requested peer reviews were conducted by an outside physician.[255]  The ODO review found that ICDC was only in compliance with five of 18 ICE detention standards examined overall and documented 36 deficiencies, including three regarding "medical care."[256]

In December 2020, ODO reviewed medical records of 12 detainees relating to their initial physical examination and found that one out of the 12 medical files had not been "reviewed nor signed by the physician within 14-days of the detainee's arrival to assess the detainee's priority for treatment."[257]  According to counsel for LaSalle, ODO identified these issues from numerous medical encounters ICDC facilitated in December 2020 and conducted 20 voluntary interviews with ICE detainees and a remote examination as part of its investigation.[258]

Over the past ten years, DHS CRCL has also conducted two on-site investigations of ICDC and noted deficiencies with the facility's provision of medical care.  Two CRCL Expert Recommendation Memoranda from November 2012 and November 2016 indicate that CRCL

---

[252] U.S. Department of Homeland Security, U.S. Immigration and Customs Enforcement, Office of Professional Responsibility, Inspections and Detention Oversight Division, *Compliance Inspection for the Irwin County Detention Center Ocilla, Georgia* (Mar. 2020) (www.ice.gov/doclib/foia/odo-compliance-inspections/irwinCoDetCntr_OcillaGA_Mar3-5_2020.pdf).

[253] *Id.*

[254] *Id.*

[255] *Id.*  According to the 2008 Performance-Based National Detention Standards, health authorities at detention centers must coordinate an external review of licensed medical professionals at their facilities every two years. *Id.* In interviews with the Subcommittee, LaSalle medical personnel stated that physicians outside of the ICDC medical unit conducted peer reviews on an annual basis and included chart reviews of patients of ICDC providers.  Pamela Hearn, LaSalle Corrections, Interview with Senate Permanent Subcommittee on Investigations (Nov. 9, 2021); Lakeysa Brown, formerly of Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Jan. 5, 2022).

[256] U.S. Department of Homeland Security, U.S. Immigration and Customs Enforcement, Office of Professional Responsibility, Inspections and Detention Oversight Division, *Compliance Inspection for the Irwin County Detention Center Ocilla, Georgia* (Mar. 2020) (https://www.ice.gov/doclib/foia/odo-compliance-inspections/irwinCoDetCntr_OcillaGA_Mar3-5_2020.pdf).

[257] U.S. Department of Homeland Security, U.S. Immigration and Customs Enforcement, Office of Professional Responsibility, Inspections and Detention Oversight Division, *Compliance Inspection of the Irwin County Detention Center Ocilla, Georgia* (Dec. 2020) (www.ice.gov/doclib/foia/odo-compliance-inspections/irwinCoDetCntrOcillaGA_Dec14-17_2020.pdf).  According to counsel for LaSalle, ICDC challenged or explained the two deficiencies in the December 2020 ODO report.  Specifically, regarding the physician sign-off deficiency, counsel for LaSalle explained that a local policy allowed for a licensed nurse practitioner to sign off on initial health assessments; the one medical file missing a physician sign-off had a signature from a nurse practitioner.  Regarding the lack of consent forms for psychotropic medications, ICDC staff maintained these forms in its files and submitted them to ODO on March 24, 2021.  Counsel for LaSalle, Briefing with Senate Permanent Subcommittee on Investigations (May 19, 2021).

[258] Email from Counsel for LaSalle to the Senate Permanent Subcommittee on Investigations (Nov. 17, 2021).  ODO did not issue any corrective action as a result of this review.  Email from Counsel for LaSalle to the Senate Permanent Subcommittee on Investigations (Nov. 11, 2022).

NBCU002091

conducted site visits to ICDC due to complaints it received regarding the facility.[259]  The November 2012 memorandum detailed findings from a medical expert concerning circumstances in which ICDC detainees failed to receive appropriate or timely medical care.[260]  The medical expert noted instances in which staff inappropriately handled medication, failed to process laboratory orders correctly, and elected to prescribe medication for serious conditions instead of alerting the medical director immediately—actions that could have resulted in serious injury to detainees.[261]  In one case, staff allegedly never ordered medication for a detainee who suffered from chronic seizures; in several other cases, detainees waited multiple days for medical attention for acute conditions.[262]  After reviewing 11 randomly-selected medical records, the expert concluded that five files showed unacceptable response times to sick call requests.[263]  Another review of eight complaints from detainees concluded that four detainees had received inappropriate medical care.[264]

A second CRCL memorandum from November 2016—while generally describing medical care at ICDC as "good"—identified issues with medication distribution, medical records maintenance, and nurse staffing.[265]  The medical expert for this review concluded that medication was not consistently available to detainees at ICDC and specifically identified an incident in which medication was allegedly prescribed—but never administered—to a detainee with a serious cancer condition.[266]  The expert also identified two intake healthcare appraisals out of a set of 13 randomly-selected files that failed to meet appropriate standards and noted that ICDC medical records were not easily navigable.[267]

---

[259] According to the November 2012 memorandum, CRCL received three complaints from December 2011 to April 2012 and a report by the American Civil Liberties Union of Georgia "regarding concerns related to conditions of detention at ICDC.  Following a review of these complaints, CRCL decided to conduct a site review of ICDC to review medical care and overall correctional policies."  Similarly, the November 2016 memorandum indicated that CRCL conducted a site visit to ICDC following "numerous allegations alleging civil rights and civil liberties violations of persons being detained at ICDC" since 2015.  The allegations related to medical and mental healthcare, use of force, food service, segregation, recreation, and the detainee grievance system.  U.S. Department of Homeland Security, Office for Civil Rights and Civil Liberties, *Redacted Irwin Rec & Close Memorandum from FY13 Expert Report Memorandum* (Nov. 5, 2012) (notes from document review on file with the Subcommittee); U.S. Department of Homeland Security, Office for Civil Rights and Civil Liberties, *Redacted Irwin Rec & Close Memorandum Expert Report Memorandum* (Nov. 4, 2016) (notes from document review on file with the Subcommittee).

[260] U.S. Department of Homeland Security, Office for Civil Rights and Civil Liberties, *Redacted Irwin Rec & Close Memorandum from FY13 Expert Report Memorandum* (Nov. 5, 2012) (notes from document review on file with the Subcommittee).

[261] *Id.*

[262] *Id.*

[263] *Id.*

[264] *Id.*

[265] U.S. Department of Homeland Security, Office for Civil Rights and Civil Liberties, *Redacted Irwin Rec & Close Memorandum Expert Report Memorandum* (Nov. 4, 2016) (notes from document review on file with the Subcommittee).

[266] *Id.*

[267] *Id.*

NBCU002092

**D.  The DHS OIG Found That ICDC Generally Met ICE Detention Standards for Healthcare but Identified Areas for Improvement**

Following receipt of the September 2020 whistleblower complaint, the DHS OIG opened an audit in October 2020 to evaluate whether "ICDC provided detainees adequate medical care and adhered to COVID-19 protections."[268]  According to the audit report that was released in January 2022, the OIG determined that ICDC "generally met [ICE] detention standards, which specify that detainees have access to appropriate and necessary medical, dental, and mental health care."[269]  However, the OIG noted that the evaluation of ICDC's medical processes revealed that the facility's chronic care, continuity of care, and medical policies and procedures were inadequate.  Further, the OIG identified seven other areas of concern within the ICDC medical unit.[270]

The OIG noted that its inspection did not review the gynecological procedure approval process for detainees at ICDC.  That investigation has been referred to the OIG's Office of Investigations due to the potential criminal nature of the investigation and remains ongoing.[271]  In addition, the OIG has initiated a separate audit that will focus on how surgical procedures are authorized and approved for detainees across the ICE system.[272]

> **i.  The DHS OIG Found That ICDC Medical Care Generally Met Standards but Improvements Are Necessary**

For the audit, the OIG utilized a contract medical team from the National Commission on Correctional Health Care ("NCCHC") to review medical records of ICDC detainees.[273]  The NCCHC medical team was comprised of one physician and two registered nurses.  The team reviewed 200 detainee records, including records for detainees held at ICDC for 180 days or longer between the fiscal years 2017 and 2020.[274]  These chart reviews occurred in conjunction with a virtual site visit that occurred in February 2021.[275]

---

[268] U.S. Department of Homeland Security, Office of Inspector General, *Medical Processes and Communication Protocols Need Improvement at Irwin County Detention Center* (OIG-22-14) (Jan. 3, 2022) (https://www.oig.dhs.gov/sites/default/files/assets/2022-01/OIG-22-14-Jan22.pdf).
[269] *Id.*
[270] Those seven areas of concern include: health assessments, medication administration, sick call, health records, program administration, emergency care, and women's health.  *Id.*
[271] *Id.*
[272] *Id.*
[273] *Id.*
[274] The medical chart reviews included 195 randomly selected records for detainees at ICDC for 180 days or longer between FY 2017 and FY 2020, including 118 male detainee records and 77 female detainee records.  The team reviewed an additional five records based on concerns detainees raised with OIG staff during interviews.  The nursing staff reviewed 158 records, "focusing on completeness, timeliness, and proper actions," while the physician reviewed the charts of 37 detainees with chronic illnesses.  *Id.*; U.S. Department of Homeland Security, Office of Inspector General, Briefing with Senate Permanent Subcommittee on Investigations (Feb. 1, 2022).
[275] *Id.*

NBCU002093

The OIG "determined that ICDC adhered to the ICE 2011 PBNDS, which specify that detainees have access to appropriate and necessary medical, dental, and mental health care."[276] The OIG's contract medical team "assessed the adequacy of medical processes and policies and the appropriateness of any actions taken to address medical concerns."[277]  Of the 36 medical processes the NCCHC medical team evaluated, the team determined three—chronic care, continuity of care, and policies and procedures—were inadequate.[278]

The NCCHC medical team determined that the care ICDC provided for specific chronic conditions "such as hypertension, hyperlipidemia, diabetes, asthma, and menstrual disorders, appeared adequate, but that the chronic care program itself was inadequate."[279]  For this review, the NCCHC physician reviewed medical files for 37 ICDC detainees with chronic conditions.[280] The physician identified issues in chronic care management in 15 of the medical files.[281]  These issues included inconsistent guidelines for chronic care; lack of monitoring and documenting the current status of detainees with chronic conditions; and issues with the interpretation, documentation, and sharing of lab information with detainees.[282]

The NCCHC physician identified issues with ICDC's continuity of care process in 12 of the 37 detainee medical files reviewed.[283]  These issues included "multiple medical files missing care plans, records without planned chronic care visits, missing laboratory results, and improper medications."[284]  The team also identified inconsistent medical record keeping including unexplained orders, grievance responses, improper referrals, and timeliness concerns.[285]

### ii. The OIG Identified Seven Other Areas of Concern About ICDC Medical Care

The OIG identified seven additional areas of concern in the ICDC medical unit: (1) health assessments, (2) medication administration, (3) sick call, (4) health records, (5) program administration, (6) emergency care, and (7) women's health.[286]  A number of the OIG's findings mirror similar allegations the Subcommittee reviewed during its investigation.

With respect to health assessments, the NCCHC medical team concluded that in general, "ICDC's compliance with standards [for medical intake screening] was adequate, but there is room for improvement."[287]  Of the 195 detainee intake records reviewed, the NCCHC team found that medical care at intake was "timely and complete," and that three records showed

---

[276] *Id.*
[277] *Id.*
[278] *Id.*
[279] *Id.*
[280] *Id.*
[281] *Id.*
[282] *Id.*
[283] *Id.*
[284] *Id.*
[285] *Id.*
[286] *Id.*
[287] *Id.*

NBCU002094

"minor issues that were not reflections of an inefficient intake program."[288]  The OIG noted, however, that seven records indicated an initial health screening occurred after the required 14-day timeframe, and 15 records lacked health assessment documentation altogether.[289]

The medical contractors concluded that the ICDC medication management process was ultimately "adequate," but that there were "some issues in medication administration."[290]  The NCCHC medical team found that it was "almost impossible to provide an accurate assessment of medication administration practices based on the documentation provided in the health record."[291]  In order to determine the adequacy of the medication administration procedures at ICDC, the contract medical team needed documents, such as the original order and documentation of the first dose, that were not in the health records of the detainees they reviewed.[292]  The NCCHC medical team also found additional concerns with records management of chronic care patients that refused to take prescribed medications.[293]

The NCCHC medical team reviewed 195 health records with 236 sick call visits and determined that the care provided during 8 of the 236 visits could have been "more appropriate."[294]  The contract team identified additional issues with nursing protocols that allow the ICDC "nursing staff to provide over-the-counter medications without checking the current medications the detainee is prescribed."[295]  For example, the NCCHC medical team determined it was inappropriate that ICDC LPNs were allowed to prescribe ibuprofen to detainees while the detainee was already on another non-steroidal anti-inflammatory drug or were on orders to not be administered such medication.[296]

The NCCHC medical team also identified issues with health records management.  The OIG noted that during the review, the medical team was "unable to determine if a Health Insurance Portability and Accountability Act (HIPAA) program was in place and properly applied" at ICDC.[297]  The team requested evidence that ICDC staff had undergone HIPAA training, but ICDC did not provide any.[298]

With respect to program administration, the NCCHC medical team found that "ICDC's medical unit had not developed a continuous quality improvement program."[299]  Such a program would improve detainee healthcare by "identifying problems, implementing and monitoring corrective action, and studying the improvement program's effectiveness."[300]  The OIG

---

[288] *Id.*
[289] *Id.*
[290] *Id.*
[291] *Id.*
[292] *Id.*
[293] *Id.*
[294] *Id.*
[295] *Id.*
[296] *Id.*
[297] *Id.*
[298] *Id.*
[299] *Id.*
[300] *Id.*

46

NBCU002095

explained that "ICDC did not provide documentation showing any organized approach to evaluate the delivery of health care services."[301]

The ICDC medical unit was "unable to provide emergency response drill documentation" to the NCCHC medical team.[302]  With the missing documentation, it was "unclear whether drills were being conducted."[303]  The OIG explained that the lack of emergency preparation could "hinder proper response to emergency situations at ICDC."[304]

Regarding women's health, the OIG's contract medical team concluded that, based on its medical records review, women's healthcare at ICDC was "appropriate."[305]  The OIG noted, however, "off-site specialty provider care information was not consistently returned to the ICDC medical unit."[306]

## IV.    ALLEGED SERIOUS MEDICAL MISCONDUCT BY DR. MAHENDRA AMIN

In the September 2020 complaint to DHS OIG, DHS CRCL, the ICE Atlanta Field Office, and the ICDC Warden, a whistleblower alleged that Dr. Amin had performed a high volume of hysterectomies on female detainees at ICDC.[307]  This allegation was not substantiated by the Subcommittee.  In December 2020, several detainees filed a lawsuit against Dr. Amin, ICDC, ICE, and other parties alleging that Dr. Amin had subjected them to nonconsensual and unnecessary gynecological procedures as part of a broader pattern of medical abuse at ICDC.[308]  This litigation is ongoing.  Other complaints making similar allegations followed, including complaints to the Georgia Composite Medical Board.[309]

Ultimately, the Subcommittee's investigation found that Dr. Amin performed just two hysterectomies, one in 2017 and one in 2019, which ICE deemed to be medically necessary. However, the Subcommittee did find that Dr. Amin performed an unusually high number of other gynecological procedures on ICDC detainees.

As described in Section I, the Subcommittee discovered that Dr. Amin had also been the subject of similar allegations just seven years earlier.  A 2013 DOJ complaint against Dr. Amin and other parties alleged that he and other physicians at ICH had maintained "standing orders" that required nurses to perform certain medical treatments on pregnant women regardless of their

---

[301] *Id.*
[302] *Id.*
[303] *Id.*
[304] *Id.*
[305] *Id.*
[306] *Id.*
[307] Project South Complaint, *supra* note 1.
[308] Consolidated Amended Petition for Writ of Habeas Corpus and Class Action Complaint for Declaratory and Injunctive Relief and for Damages (Dec. 21, 2020), *Oldaker v. Giles*, M.D. GA (No. 7:20-cv-00224-WLS-MSH).
[309] Complaints for six ICDC detainee patients treated by Dr. Amin are on file with the Subcommittee.

NBCU002096

condition and without an evaluation from a physician.[310]  Dr. Amin and the other defendants reached a civil settlement with DOJ in 2015 without a determination of liability.[311]

In 2014—the year before his settlement with DOJ—Dr. Amin began providing OB-GYN services to detainees at ICDC.[312]  The Subcommittee interviewed six of these detainees who described feeling confused, afraid, and violated after their encounters with Dr. Amin—and many of the women reported that they still live with pain and uncertainty regarding their fertility. Former nurses at ICDC also told the Subcommittee that they had observed confusion among detainee patients regarding the procedures they were scheduled to receive by Dr. Amin and why they were receiving them.  The nurses also informed the Subcommittee that they observed excessive numbers of OB-GYN treatments by Dr. Amin.[313]  Dr. Amin stopped treating female ICDC detainees after the whistleblower complaint was filed in September 2020.[314]

The Subcommittee also spoke with multiple experts in the OB-GYN field of medicine. These doctors reviewed medical records of former ICDC patients who were treated by Dr. Amin. Each expert raised significant concerns about the treatment Dr. Amin provided to ICDC detainees.

### A.   Former ICDC Detainees Have Raised Concerns About Conditions at ICDC and Alleged That Dr. Amin Performed Nonconsensual, Unnecessary, or Excessive OB-GYN Procedures

To assess the allegations in the complaints, the Subcommittee spoke directly with six of the women Dr. Amin treated:  Karina Cisneros Preciado, Jaromy Floriano Navarro, Wendy Dowe, Maribel Castaneda-Reyes, Jane Doe #1, and Jane Doe #2.  All of these women, except Jane Doe #2, appear as plaintiffs in the December 2020 lawsuit against the federal government and other parties.[315]  Based on interviews with the women and reviews of their medical records, it appears that Dr. Amin deployed a specific pattern in examining and treating these women. Records and testimony indicate that Dr. Amin performed a vaginal ultrasound on all six women, diagnosed five of the women with ovarian cysts, and subsequently prescribed Depo-Provera

---

[310] Complaint (July 8, 2013), *United States v. Hospital Authority of Irwin County*, M.D. Ga. (No. 7:13-cv-00097-HL).

[311] The United States of America's Filing of Settlement Agreement (July 8, 2013), *United States v. Hospital Authority of Irwin County*, M.D. Ga. (No. 7:13-cv-00097-HL); U.S. Department of Justice, U.S. Attorney's Office Middle District of Georgia, *Hospital Authority of Irwin County Resolves False Claims Act Investigation for $520,000* (Apr. 29, 2015) (www.justice.gov/usao-mdga/pr/hospital-authority-irwin-county-resolves-false-claims-act-investigation-520000).

[312] *June 23, 2021 ICE Q&A Paper*, *supra* note 14.

[313] LPN #2, formerly of Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (July 12, 2021); LPN #3, formerly of Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (July 19, 2021).

[314] *June 23, 2021 ICE Q&A Paper*, *supra* note 14; Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations (Aug. 10, 2021) (Tranche 16, 10869).  The same day, Dr. Amin sent a letter to a LaSalle employee stating that he had "decided to sever my ties with ICDC and will no longer be treating ICDC patients."  Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations (Oct. 22, 2021) (Tranche 18, 11144).

[315] *See* Consolidated Amended Petition for Writ of Habeas Corpus and Class Action Complaint for Declaratory and Injunctive Relief and for Damages (Dec. 21, 2020), *Oldaker v. Giles*, M.D. GA (No. 7:20-cv-00224-WLS-MSH).

NBCU002097

injections for each woman with the cyst diagnosis.  Dr. Amin also appears to have recommended surgical procedures to four of the women, including a cyst removal, D&C, and a LEEP.  One patient avoided undergoing a procedure from Dr. Amin because she tested positive for COVID-19 antibodies on the day of her scheduled surgery.[316]

### i.   Karina Cisneros Preciado

Ms. Cisneros Preciado—a 23-year-old mother and survivor of domestic abuse—was brought to the United States by her mother from Mexico in 2007 at the age of eight.[317]  She was detained at ICDC from July 2020 to January 2021 following an arrest in Georgia for domestic violence against an abusive partner.[318]  Shortly before her detainment at ICDC, she gave birth to her daughter, and she sought postpartum treatment while at ICDC.[319]  Ms. Cisneros Preciado also experienced pain in her lower abdomen.[320]  She was ultimately referred to Dr. Amin.

Ms. Cisneros Preciado recalled that at her first appointment on September 2, 2020, Dr. Amin did not acknowledge her when he came into the room.[321]  She stated that instead of explaining the procedures he intended to perform, Dr. Amin simply told Ms. Cisneros Preciado to "open your legs."[322]  She stated that the ICDC female guard who escorted her to the visit sat directly in front of her during this encounter, so she did not feel comfortable complying.[323]  Once the guard moved and stood next to her, she complied, and Dr. Amin inserted a long white tube into her vagina.[324]

Ms. Cisneros Preciado explained that the ICDC nurse had told her that she would be getting a Pap smear at this visit; however, based on her previous treatments, Ms. Cisneros Preciado said that she knew this was a vaginal ultrasound and not a Pap smear.[325]  Ms. Cisneros Preciado told Subcommittee staff that she became confused and extremely uncomfortable, but she did not feel that she had any choice about what occurred.[326]

---

[316] Jaromy Jazmin Floriano Navarro, Interview with Senate Permanent Subcommittee on Investigations (June 25, 2021).
[317] Karina Cisneros Preciado, Interview with Senate Permanent Subcommittee on Investigations (Oct. 6, 2021).
[318] Ms. Cisneros Preciado told Subcommittee staff that she was actually the victim in the altercation that led to her arrest.  Her charges have subsequently been dismissed.  *Id.*; Email from Counsel for Ms. Cisneros Preciado to the Senate Permanent Subcommittee on Investigations (Nov. 10, 2022).
[319] Karina Cisneros Preciado, Interview with Senate Permanent Subcommittee on Investigations (Oct. 6, 2021); LaSalle_177704 (August 11, 2020 medical request from Ms. Cisneros Preciado stating, "I would like to get [p]renatal[] [vitamins].  I had a baby a few months ago and I still need them.").
[320] LaSalle_177736 (August 17, 2020 sick call request from Ms. Cisneros Preciado stating, "I have pain in the lower part of my stomach.  Like my ovaries."); *see also* LaSalle_177737-39.
[321] Karina Cisneros Preciado, Interview with Senate Permanent Subcommittee on Investigations (Oct. 6, 2021); LaSalle_178472-82.
[322] Karina Cisneros Preciado, Interview with Senate Permanent Subcommittee on Investigations (Oct. 6, 2021).
[323] *Id.*
[324] *Id.*
[325] *Id.*
[326] *Id.*

NBCU002098

She said that Dr. Amin told her that she had an ovarian cyst and he planned to administer a Depo-Provera injection, but he never provided any other information about the injection.[327] According to Dr. Amin's notes from the visit, his treatment plan included prescribing a Depo-Provera injection and having Ms. Cisneros Preciado return for a follow-up visit in four weeks.[328]

Ms. Cisneros Preciado recalled shaking while dressing after this encounter ended.[329] After she dressed, the ICDC guard put handcuffs back on Ms. Cisneros Preciado, and Dr. Amin's nurse asked her to sign a form.[330] While Ms. Cisneros Preciado was handcuffed, a nurse administered the Depo-Provera injection.[331] Ms. Cisneros Preciado learned after the appointment that Depo-Provera was a form of contraception.[332] According to an ICDC medical unit provider's notes from September 26, 2020, Ms. Cisneros Preciado "got a Depo – states wasn't explained."[333]

Ms. Cisneros Preciado did not return to Dr. Amin for additional treatment because the allegations about him became public a few weeks later.[334] On October 5, 2020, Ms. Cisneros Preciado received a transvaginal ultrasound at ICH for "report [of an] ovarian cyst."[335] The imaging report states that the ultrasound showed "[t]he uterus is normal in its appearance" and found an "[u]nremarkable evaluation of the pelvis."[336]

Ms. Cisneros Preciado currently resides in Fort Lauderdale, Florida.

### ii.  Jaromy Floriano Navarro

Ms. Floriano Navarro—a 29-year-old mother of three daughters—was brought to the United States from Mexico when she was about eight years old by a family member, and was detained at ICDC from October 2019 to September 2020 following an arrest for traffic

---

[327] *Id.*
[328] LaSalle_178463; LaSalle_178465-67.
[329] Karina Cisneros Preciado, Interview with Senate Permanent Subcommittee on Investigations (Oct. 6, 2021).
[330] *Id.*
[331] *Id.*
[332] *Id.*
[333] LaSalle_178401.
[334] Karina Cisneros Preciado, Interview with Senate Permanent Subcommittee on Investigations (Oct. 6, 2021). According to medical records reviewed by the Subcommittee, Ms. Cisneros Preciado experienced irregular bleeding after the Depo-Provera injection and was referred to another OB-GYN provider in December 2020. The new OB-GYN provider prescribed oral Provera and Sprintec. LaSalle_178294; LaSalle_178295-97; LaSalle_178323; LaSalle_178354-64.
[335] LaSalle_178414-23.
[336] LaSalle_178223.

NBCU002099

violations.[337]  Ms. Floriano Navarro described ICDC to the Subcommittee as "living in Hell."[338] She said that the facility was dark and dirty, and detainees were treated like they were "less than human."[339]  Ms. Floriano Navarro also stated that the drinking water in the facility was "nasty" and "always dirty."[340]  She explained that detainees would often drink water from a rusty faucet, and rust would fall into the water.[341]  Additionally, she stated that the conditions at ICDC terrified her because she believed she "could die in there and nobody is going to know how it happened."[342]

While at ICDC, Ms. Floriano Navarro complained of painful menstrual cramps for about five to six months before she was ultimately referred to Dr. Amin.[343]  Prior to her appointment with Dr. Amin she had heard him referred to as "Mr. Two-Fingers" because "he would always just stick his two fingers inside of you."[344]  When Ms. Floriano Navarro ultimately met with Dr. Amin for the first time on February 24, 2020, she thought he was "cold" and stated that he did not look her in the eyes or say hello but instead walked in and said "lay back, open your legs."[345] During this appointment, Dr. Amin performed a vaginal ultrasound, determined Ms. Floriano Navarro had an ovarian cyst, and administered a Depo-Provera injection.[346]  Ms. Floriano Navarro stated that she was grateful that she understood English because otherwise she would not have known what was occurring.[347]  Ms. Floriano Navarro recalled that no one asked her if she would be comfortable removing her clothes for an examination and stated that "no one ever got my consent."[348]

Ms. Floriano Navarro recalled that Dr. Amin did not explain anything in later appointments and did not look her in the eyes.[349]  In a subsequent visit with Dr. Amin on May 26, 2020, Ms. Floriano Navarro was under the impression she was to receive her second Depo-

---

[337] Ms. Floriano Navarro was arrested for possession of marijuana in 2013.  Jaromy Jazmin Floriano Navarro, Interview with Senate Permanent Subcommittee on Investigations (June 25, 2021); Declaration of Jaromy Jazmin Floriano Navarro (Nov. 18, 2020) (on file with the Subcommittee); Email from Counsel for Ms. Floriano Navarro to the Senate Permanent Subcommittee on Investigations (Nov.10, 2021); Email from Counsel for Ms. Floriano Navarro to the Senate Permanent Subcommittee on Investigations (Apr. 26, 2022); Email from Counsel for Ms. Floriano Navarro to the Senate Permanent Subcommittee on Investigations (Nov. 12, 2022).

[338] Jaromy Jazmin Floriano Navarro, Interview with Senate Permanent Subcommittee on Investigations (June 25, 2021).

[339] *Id.*

[340] *Id.*

[341] *Id.*

[342] *Id.*

[343] *Id.*; *see, e.g.,* LaSalle_334271 (January 15, 2020 sick call request from Ms. Floriano Navarro stating, "I'm experiencing severe back pain and cramps due to my period."); LaSalle_334412 (February 6, 2020 sick call request from Ms. Floriano Navarro complaining of "cramps").

[344] Jaromy Jazmin Floriano Navarro, Interview with Senate Permanent Subcommittee on Investigations (June 25, 2021).

[345] *Id.*; LaSalle_335998-336018.

[346] Jaromy Jazmin Floriano Navarro, Interview with Senate Permanent Subcommittee on Investigations (June 25, 2021); LaSalle_333620-21 (The impressions from the transvaginal ultrasound report included "[e]nlarged uterus. Thickened Endometrium.  Follicular cysts on both ovaries."); LaSalle_333625.

[347] Jaromy Jazmin Floriano Navarro, Interview with Senate Permanent Subcommittee on Investigations (June 25, 2021).

[348] *Id.*

[349] *Id.*

NBCU002100

Provera injection; however, this did not occur, and Dr. Amin prescribed antibiotics after she presented with right side pain, white discharge, and pain with urination.[350]  According to ICDC nurse notes from a June 5, 2020 encounter, Ms. Floriano Navarro continued "having cramps in lower [abdomen] and [] was told by Dr. Amin that she needed to have cyst removed."[351]  On June 29, 2020, Dr. Amin administered the second Depo-Provera injection.[352]

At a July 22, 2020 appointment, Dr. Amin informed Ms. Floriano Navarro that she would be receiving surgery for her cyst.[353]  Ms. Floriano Navarro said that she did not understand why Dr. Amin decided on surgery rather than giving the Depo-Provera injections a chance to work.[354]  On July 31, 2020, the day of her scheduled surgery for what she believed to be a cyst removal, Ms. Floriano Navarro stated that an ICDC guard informed Ms. Floriano Navarro that she was scheduled to receive a hysterectomy.[355]  Ultimately, this surgery did not take place because Ms. Floriano Navarro tested positive for COVID-19 antibodies.[356]  When Ms. Floriano Navarro returned to ICDC, she inquired about the potential hysterectomy.[357]  Ms. Floriano Navarro stated that an ICDC nurse told her that the ICDC guard must have misheard the name of the treatment and that she was actually scheduled for a D&C procedure.[358]

Ms. Floriano Navarro's surgery was later rescheduled for August 14, 2020.[359]  Before her surgery date, Ms. Floriano Navarro asked the ICDC medical unit whether her upcoming surgery was for a cyst drain procedure, to "remove [her] womb," or to remove an ovary.[360]  According to ICDC nurse notes, Ms. Floriano Navarro presented to the ICDC medical unit the day before what she believed was her scheduled surgery date to remove a cyst and was "informed she is having a D&C scope which is a dilation of the uterus to look around and take samples as needed for testing."[361]  However, Ms. Floriano Navarro still refused the surgery due to her confusion regarding which surgical procedure she would be undergoing.[362]

Ms. Floriano Navarro recalled feeling pressured by the ICDC medical unit to receive the surgery.[363]  Additionally, she recalled one ICDC officer stating that she "might as well" have the

---

[350] LaSalle_333435-44; LaSalle_333446; LaSalle_333450.

[351] LaSalle_334989-91.

[352] LaSalle_333616; LaSalle_333625.

[353] LaSalle_333602-15.  According to Dr. Amin's request for a D&C and laparoscopy, Ms. Floriano Navarro "was seen back on Feb. 24, 2020 and was given Depo Provera injection.  She follow[ed]-up a couple of times and more hormones were tried without a response.  The plan is to schedule her for a D&C scope."  Dr. Amin requested the outpatient surgery for July 31, 2020.  LaSalle_333614.

[354] Jaromy Jazmin Floriano Navarro, Interview with Senate Permanent Subcommittee on Investigations (June 25, 2021).

[355] *Id.*

[356] *Id.*; ICH004869-4900; LaSalle_333646-55.

[357] Jaromy Jazmin Floriano Navarro, Interview with Senate Permanent Subcommittee on Investigations (June 25, 2021).

[358] *Id.*

[359] LaSalle_333700-10.

[360] LaSalle_333712.

[361] LaSalle_335569-71.

[362] Jaromy Jazmin Floriano Navarro, Interview with Senate Permanent Subcommittee on Investigations (June 25, 2021).

[363] *Id.*

NBCU002101

surgery because it was "already paid for," and that she could go back to her home country and "start fresh."[364]  In medical requests submitted on August 20, 2020, Ms. Floriano Navarro wrote, "I did speak with the ICE agents, I was a bit scared, I do remember the period I had for about 3 weeks" and asked if the D&C procedure could be rescheduled because she was "cramping more now."[365]  On September 14, 2020, Ms. Floriano Navarro was taken to see Dr. Amin once more, and he again diagnosed her with an ovarian cyst and questioned Ms. Floriano Navarro's decision to reject the surgery.[366]  Ms. Floriano Navarro was rescheduled for a D&C procedure on September 18, 2020.[367]  On September 16, 2020, Ms. Floriano Navarro was deported to Mexico, where she currently resides.[368]

### iii. Wendy Dowe

Ms. Dowe—a 51-year-old mother of four children—arrived in the United States in 1997 on a visitor visa and ultimately overstayed that visa.[369]  She was detained for one and a half years following an arrest for possession of marijuana and providing a false information to a law enforcement officer.[370]  Ms. Dowe described ICDC as a "nightmare" and stated that she "would not even put dogs in ICDC."[371]  She further stated that "I can't give you the words for it," and she "does not like to relive or remember" her time at ICDC.[372]

While at ICDC, Ms. Dowe requested an appointment with an OB-GYN specialist because she had experienced heavy and painful menstrual cycles.[373]  On December 21, 2018, Ms. Dowe had an initial appointment with Dr. Amin.[374]  As with the other women, Ms. Dowe said that Dr. Amin performed a vaginal ultrasound and told her that she had ovarian cysts.[375]  Ms. Dowe stated that she asked Dr. Amin to explain what he meant by "cyst," but he refused to answer her question.[376]  Instead, Ms. Dowe said that Dr. Amin told her that the explanation would be provided in writing and forwarded to ICDC nurses because he "was not authorized" to give Ms. Dowe that information.[377]  Ms. Dowe said that she did not "know what was going on."[378]

---

[364] *Id.*
[365] LaSalle_333723; LaSalle_333725; *see also* LaSalle_335656-58.
[366] LaSalle_333658-67; LaSalle_333747.
[367] LaSalle_333753-62.
[368] Jaromy Jazmin Floriano Navarro, Interview with Senate Permanent Subcommittee on Investigations (June 25, 2021).
[369] Email from Counsel for Ms. Dowe to the Senate Permanent Subcommittee on Investigations (Apr. 25, 2022).
[370] Wendy Dowe, Interview with Senate Permanent Subcommittee on Investigations (June 25, 2021); Email from Counsel for Ms. Dowe to the Senate Permanent Subcommittee on Investigations (Nov. 18, 2021).
[371] Wendy Dowe, Interview with Senate Permanent Subcommittee on Investigations (June 25, 2021).
[372] *Id.*
[373] *Id.*; *see* LaSalle_323784 (December 12, 2018 sick call request from Ms. Dowe stating, "I'm on my cycle now for two weeks and bleeding heavily and I'm week [sic] and dizzy."); LaSalle_323943 (December 20, 2018 sick call request from Ms. Dowe stating, "I have pain in my abdomen.").
[374] LaSalle_323830-42; LaSalle_323897-901.
[375] Wendy Dowe, Interview with Senate Permanent Subcommittee on Investigations (June 25, 2021); ICH000972-1058.
[376] Wendy Dowe, Interview with Senate Permanent Subcommittee on Investigations (June 25, 2021).
[377] *Id.*  A review of Ms. Dowe's medical records indicate a diagnosis of "multiple uterine fibroids and ovarian cyst," but did not describe what a cyst was.
[378] *Id.*

NBCU002102

According to ICDC nurse notes after Ms. Dowe returned from her visit, Dr. Amin had provided "new written orders, [] order for labs, [] order for [a] transvaginal pelvic sonogram, and a follow-[up] appointment" for an "[abdominal] mass" diagnosis.[379]

On January 10, 2019, medical records indicate that Ms. Dowe received a transvaginal ultrasound at ICH as requested by Dr. Amin.[380]  The ultrasound report's impressions included "multiple uterine leiomyomata" and "[n]ormal ovaries with cysts present bilaterally."[381]  The next day, Ms. Dowe had a follow-up visit with Dr. Amin.[382]  At this visit, Dr. Amin determined that Ms. Dowe needed a D&C scope based on his impressions that Ms. Dowe was suffering from chronic pelvic pain, metrorrhagia, menorrhagia, and dysmenorrhea.[383]  Ms. Dowe told the Subcommittee that on the day of her surgery, the ICDC medical unit staff called her to the medical unit to be transported to an "outside appointment."[384]  Ms. Dowe recalled that the medical unit staff did not tell her what doctor she was going to see, nor was it explained that she was to have surgery that day.[385]  Ms. Dowe received surgery on January 29, 2019.[386]  It was only when she arrived at the hospital that she learned she was scheduled for surgery.[387]

Ms. Dowe said she was shackled at her feet and waist and "physically was not able to argue" with the ICH nursing staff about the surgery.[388]  She recalled "it was too much for me at the time."[389]  Ms. Dowe also told the Subcommittee that she did not recall signing any consent forms prior to this surgery.[390]  After the surgery, Ms. Dowe said she awoke in the ICDC medical unit with pain in her lower abdomen.[391]  She said she felt the bandages on her abdomen, and she had to ask the nursing staff about what had occurred.[392]  The ICDC nurses stated that they could not answer her questions because they had not received paperwork from Dr. Amin.[393]

---

[379] LaSalle_323885-86; *see also* LaSalle_323899-323900.
[380] LaSalle_324222-29; LaSalle_324286.
[381] LaSalle_324286.
[382] LaSalle_324213-14.
[383] *Id.*; LaSalle_324285.  Menometrorrhagia is the medical term for excessive, prolonged and/or irregular bleeding unrelated to menstruation.  Cleveland Clinic, *Abnormal Uterine Bleeding* (my.clevelandclinic.org/health/diseases/15428-uterine-bleeding-abnormal-uterine-bleeding) (accessed Nov. 13, 2022).  Menorrhagia is the medical term for menstrual periods with abnormally heavy or prolonged bleeding.  Mayo Clinic, *Menorrhagia (Heavy Menstrual Bleeding)* (https://www.mayoclinic.org/diseases-conditions/menorrhagia/symptoms-causes/syc-20352829) (accessed Nov. 13, 2022).  Dysmenorrhea is the medical term for menstrual cramps.  Mayo Clinic, *Menstrual Cramps* (www.mayoclinic.org/diseases-conditions/menstrual-cramps/symptoms-causes/syc-20374938) (accessed Nov. 13, 2022).
[384] Wendy Dowe, Interview with Senate Permanent Subcommittee on Investigations (June 25, 2021).
[385] *Id.*
[386] ICH000972-1058; LaSalle_324488-507; LaSalle_324913-14; LaSalle_325088-92.
[387] Wendy Dowe, Interview with Senate Permanent Subcommittee on Investigations (June 25, 2021).
[388] *Id.*
[389] *Id.*
[390] *Id.*  The Subcommittee found a signed consent form for a D&C with laparoscopy in Ms. Dowe's medical records from ICH.  ICH000991-92.
[391] Wendy Dowe, Interview with Senate Permanent Subcommittee on Investigations (June 25, 2021).
[392] *Id.*
[393] *Id.*

NBCU002103

Ms. Dowe told Subcommittee staff that she learned a week later that she had undergone a cyst removal procedure.[394]  Following the procedure, Ms. Dowe continued to have pain in her stomach and was referred to Dr. Amin for a follow-up visit.[395]  On March, 19, 2019, Ms. Dowe went back to Dr. Amin.  At this visit, like Ms. Floriano Navarro, Ms. Dowe received a Depo-Provera injection.[396]  Ms. Dowe also recalled that Dr. Amin told her she needed another surgery—a hysterectomy.[397]  Ms. Dowe stated that when she asked why, Dr. Amin said it was for a cancerous tumor in her ovary and stated it was the "size of a cantaloupe."[398]  She explained that Dr. Amin asked her how many children she had, and after she answered, he stated, "Okay, you're good, you don't need no more [children]."[399]  Dr. Amin requested the hysterectomy be scheduled April 11-13, 2019, and in his request for a hysterectomy summarized his care for Ms. Dowe as the following:

> The patient is a 47 year old female … [Patient] recently had surgery D&C scope on 01-29-19.  Operative findings were leiomyoma of the uterus 16 week size, pelvic endometriosis.  Pathology was benign.  [Patient] came in for another [appointment] 03-19-19 chief complaints were vaginal pain and abdominal pain.  [Patient] was still bleeding since February 2019.  Depo Provera injection was given.  The plan is to admit for a hysterectomy.[400]

On April 10, 2019, the day before her scheduled hysterectomy surgery, Ms. Dowe refused to undergo the procedure.[401]  According to ICDC nurse notes, Ms. Dowe stated, "I'm not going to no appointment for a hysterectomy" and added "I will get it done when I get out of here" and signed a refusal of treatment form.[402]  After Ms. Dowe declined the hysterectomy, she said she was subjected to pressure from ICDC staff.[403]  Ms. Dowe stated that ICDC staff told her she was "crazy" for refusing medical treatment and attempted to force her to see a psychiatrist several times.[404]

According to a May 7, 2019 sick call request, Ms. Dowe continued to experience gynecological issues writing, "bleeding for the past three weeks now and it can't stop I [am] feeling very week [sic]."[405]  On May 28, 2019, Ms. Dowe was referred back to Dr. Amin.[406]  Dr.

---

[394] Id.
[395] See LaSalle_324737 (February 17, 2019 sick call request from Ms. Dowe stating, "I still have the swelling and the pain in my stomack [sic] and left side of my back is swollen and hurts alot [sic].").
[396] Wendy Dowe, Interview with Senate Permanent Subcommittee on Investigations (June 25, 2021); LaSalle_325086.
[397] Wendy Dowe, Interview with Senate Permanent Subcommittee on Investigations (June 25, 2021); LaSalle_325087.
[398] Wendy Dowe, Interview with Senate Permanent Subcommittee on Investigations (June 25, 2021).
[399] Id.
[400] LaSalle_325085.
[401] LaSalle_325361; LaSalle_325364.
[402] Id.
[403] Wendy Dowe, Interview with Senate Permanent Subcommittee on Investigations (June 25, 2021).
[404] Id.
[405] LaSalle_325749.
[406] LaSalle_325846-54; LaSalle_326062-63.

NBCU002104

Amin's notes from this appointment stated that Ms. Dowe needed to have surgery—a hysterectomy—as "soon as possible" and noted that she had been approved for the procedure.[407] On June 7, 2019, Ms. Dowe again refused the hysterectomy.[408]

On August 8, 2019, Ms. Dowe submitted a sick call request asking for a "second opinion" because her ovary was "hurting" and she had been "bleeding over a month."[409] According to ICDC medical records, an order for a provider visit was put into the system stating that Ms. Dowe wanted "to discuss getting a second opinion with another OB/GYN on problems she is having."[410] By October 2019, Ms. Dowe still had not received a second opinion. ICDC medical unit notes for an encounter with Ms. Dowe on October 30, 2019 states, "Mrs. Dowe has been referred to mental health for stress. She does not want to have surgery [a hysterectomy] because she is afraid. She wants a second opinion for the surgery. Will try to find another OB/GYN for consulting."[411]

Based on documents reviewed by the Subcommittee, there is no record that Ms. Dowe received a second opinion. In fact, Ms. Dowe was referred back to Dr. Amin in February 2020 for "stomach and vaginal pain."[412] Dr. Amin's notes indicate that his impression for Ms. Dowe's pain was due to "fibroids" and noted to follow up yearly or as needed.[413] A few weeks after that appointment, Ms. Dowe submitted a sick call request stating that she was "still in terrible pain in my ovary."[414] She was seen in the medical unit the next day, and the nurse notes for the visit included instructions for a provider visit noting that Ms. Dowe "still wants second opinion."[415]

In March 2020, due to continuing pain in her lower abdomen which was "getting worse," Ms. Dowe was scheduled to see Dr. Amin again despite requesting a second opinion.[416] A March 4, 2020 outside provider referral order for Ms. Dowe stated, "Referral to Dr. Amin to discuss option of fibroid biopsy/Total Hysterectomy."[417] However, the order was canceled due to Ms. Dowe's scheduled release from the facility a few weeks later.[418] Ms. Dowe was ultimately deported to Jamaica in April 2020. Since leaving ICDC, Ms. Dowe says she has seen a doctor who confirmed that she does not have a cancerous tumor.[419]

---

[407] LaSalle_326062-63.
[408] LaSalle_326174-75; LaSalle_326178.
[409] LaSalle_319164.
[410] LaSalle_319161-62.
[411] LaSalle_320169.
[412] LaSalle_322136-37; LaSalle_322785.
[413] LaSalle_322785.
[414] LaSalle_322419.
[415] LaSalle_322421-23.
[416] LaSalle_322511.
[417] LaSalle_322528-29.
[418] Id.
[419] Wendy Dowe, Interview with Senate Permanent Subcommittee on Investigations (June 25, 2021).

NBCU002105

### iv. Maribel Castaneda-Reyes

Ms. Castaneda-Reyes—a 30-year-old mother to three children—was brought to the United States from Mexico when she was ten years old by her parents.[420] Ms. Castaneda-Reyes is a rape and domestic abuse survivor.[421] Ms. Castaneda-Reyes was detained at ICDC from June to December 2020 following a May 2020 arrest for possession of a controlled substance.[422] She recalled that she was "shocked" by the living conditions when she first arrived at ICDC.[423] She said there were spider webs covering the surfaces at ICDC, and when she arrived, staff provided her with dirty, used underwear.[424] Like others, she described the water as discolored and "not drinkable."[425]

While at ICDC, Ms. Castaneda-Reyes originally sought medical treatment for a hernia; however, she began "spotting" and the ICDC medical unit referred her to Dr. Amin.[426]  On August 12, 2020, Ms. Castaneda-Reyes had her first appointment with Dr. Amin.[427]  According to Dr. Amin's notes, Ms. Castaneda-Reyes presented with "irregular menstrual cycle" and had been bleeding for three weeks intermittently.[428]  Ms. Castaneda-Reyes told Subcommittee staff that at her first appointment with Dr. Amin, he told her to lift her legs and "rammed" a camera inside of her.[429]  According to medical records reviewed by the Subcommittee, Dr. Amin performed a pelvic ultrasound and his ultrasound report indicated a "right ovarian mass."[430]  Ms. Castaneda-Reyes recalled that Dr. Amin told her that she had a cyst and that the best course of action would be surgery or a Depo-Provera injection.[431]  Ms. Castaneda-Reyes informed Dr. Amin that she was already on birth control.  However, Dr. Amin administered a Depo-Provera injection anyway.[432]  Ms. Castaneda-Reyes inquired about her hernia, but Dr. Amin responded that he did not treat hernias.[433]  In the same appointment, Ms. Castaneda-Reyes received a Pap smear from Dr. Amin.[434]  She stated that this was the most painful Pap smear she had ever received and "the way he checks you is not how a regular doctor checks you."[435]

---

[420] Maribel Castaneda-Reyes, Interview with Senate Permanent Subcommittee on Investigations (Oct. 5, 2021); Declaration of Jane Doe #5 – Maribel Castaneda-Reyes (Dec. 16, 2020) (on file with the Subcommittee).
[421] Id.
[422] Id.; Email from Counsel for Ms. Castaneda-Reyes to the Senate Permanent Subcommittee on Investigations (Oct. 15, 2021)
[423] Maribel Castaneda-Reyes, Interview with Senate Permanent Subcommittee on Investigations (Oct. 5, 2021).
[424] Id.
[425] Id.
[426] Id.; LaSalle_281089; LaSalle_281102-04; LaSalle_281156; LaSalle_281182; LaSalle_281187-89; LaSalle_281244-45; Declaration of Jane Doe #5 – Maribel Castaneda-Reyes (Dec. 16, 2020) (on file with the Subcommittee).
[427] LaSalle_282410-20.
[428] LaSalle_282348-49.
[429] Maribel Castaneda-Reyes, Interview with Senate Permanent Subcommittee on Investigations (Oct. 5, 2021).
[430] LaSalle_282342.
[431] Maribel Castaneda-Reyes, Interview with Senate Permanent Subcommittee on Investigations (Oct. 5, 2021).
[432] Id.; LaSalle_282396-97; LaSalle_282401.
[433] Maribel Castaneda-Reyes, Interview with Senate Permanent Subcommittee on Investigations (Oct. 5, 2021).
[434] Declaration of Jane Doe #5 – Maribel Castaneda-Reyes (Dec. 16, 2020) (on file with the Subcommittee); LaSalle_282348-49.
[435] Maribel Castaneda-Reyes, Interview with Senate Permanent Subcommittee on Investigations (Oct. 5, 2021).

NBCU002106

In a follow-up appointment on August 26, 2020, Dr. Amin told her that her ovarian cyst was abnormal and that surgery was the best course of action.[436]  According to Dr. Amin's notes and request for surgery, Ms. Castaneda-Reyes was seen "on 08-12-20 for irregular periods for 3 weeks on [and] off.  She was treated with depo provera [sic] injection, Pap smear [and] HPV was detected.  The plan is to schedule for D&C, LEEP, scope."[437]

On September 4, 2020, Ms. Castaneda-Reyes arrived at ICH for surgery.[438]  She recalled that the anesthesiologist made fun of her teeth, and that the nurses and the anesthesiologist did not explain the procedures, but simply handed her an electronic tablet with a document on it and a stylus to sign it—"everything was quick."[439]  According to Ms. Castaneda-Reyes, she was not shown the document or given time to read it.[440]  Following the surgery, Ms. Castaneda-Reyes only learned that Dr. Amin performed a D&C and a LEEP by reviewing her own medical records.[441]

Ms. Castaneda-Reyes currently resides in Gainesville, Georgia.[442]  Since her release from ICDC, a physician told her that she would not be able to have any more children because her uterine lining is so thin.[443]  She has also sought mental health counseling and is taking medications for her mental health to help cope with the trauma from her time at ICDC.[444]  Additionally, Ms. Castaneda-Reyes says she experiences constant pain shooting down her leg that has left her unable to run, which she used to do for enjoyment, and unable to bend which forced her to leave her previous job.[445]

### v.  Jane Doe #1

Jane Doe #1—38-year-old mother of a 13-year-old daughter—was brought to the United States from Mexico by her grandparents at the age of three and was detained at ICDC from January to December 2020 following an arrest in South Carolina for possession of a controlled

---

[436] LaSalle_282376-85; LaSalle_282341; *see also* Maribel Castaneda-Reyes, Interview with Senate Permanent Subcommittee on Investigations 5 (Oct. 5, 2021); Declaration of Jane Doe #5 – Maribel Castaneda-Reyes (Dec. 16, 2020) (on file with the Subcommittee).
[437] LaSalle_282340.
[438] ICH005031-99; LaSalle_282319-28; LaSalle_281403-04; LaSalle_281406-10.
[439] Maribel Castaneda-Reyes, Interview with Senate Permanent Subcommittee on Investigations (Oct. 5, 2021); Email from Counsel for Ms. Castaneda-Reyes to the Senate Permanent Subcommittee on Investigations (Nov. 10, 2022).
[440] Email from Counsel for Ms. Castaneda-Reyes to the Senate Permanent Subcommittee on Investigations (Nov. 10, 2022).
[441] Maribel Castaneda-Reyes, Interview with Senate Permanent Subcommittee on Investigations (Oct. 5, 2021).
[442] *Id.*
[443] Email from Counsel for Ms. Castaneda-Reyes to the Senate Permanent Subcommittee on Investigations (Nov. 10, 2022).
[444] Maribel Castaneda-Reyes, Interview with Senate Permanent Subcommittee on Investigations (Oct. 5, 2021); Email from Counsel for Ms. Castaneda-Reyes to the Senate Permanent Subcommittee on Investigations (Nov. 10, 2022).
[445] Maribel Castaneda-Reyes, Interview with Senate Permanent Subcommittee on Investigations (Oct. 5, 2021).

NBCU002107

substance.[446]  Jane Doe #1 described the water at ICDC as not drinkable and having a yellowish tint.[447]  She also stated that ICDC staff were rude and would laugh at the detainees who did not speak English.[448]  While detained at ICDC, Jane Doe #1 stated that she generally felt like a "caged animal."[449]

On January 4, 2020, Jane Doe #1 requested an appointment with an OB-GYN provider to obtain a prescription for estrogen pills.[450]  She said that she had previously undergone a hysterectomy and wanted medication to regulate her hormone levels.[451]  On February 7, 2020, Jane Doe #1 had her first appointment with Dr. Amin.[452]  Even though Jane Doe #1 explained her medical history to the nurse at Dr. Amin's office, she was still told to undress, which she thought was odd.[453]

Jane Doe #1 stated that when Dr. Amin arrived, he told her that he would be performing a vaginal ultrasound, which he described as a standard procedure.[454]  Instead of gently inserting the instrument, Jane Doe #1 stated that Dr. Amin "just shoved it in there."[455]  When Jane Doe #1 told Dr. Amin she was in pain, Jane Doe #1 said he responded: "it's okay; almost done."[456]  He then performed a finger examination, which according to Jane Doe #1, felt like "he shoved his whole hand" inside of her.[457]  She further stated that it burned and she tried to hold still, but Dr. Amin just told her to stop moving.[458]  Dr. Amin ultimately prescribed the estrogen pills for her.[459]

In August 2020, Jane Doe #1 ran out of her estrogen pills and had another appointment with Dr. Amin on September 8, 2020.[460]  During this visit, Jane Doe #1 stated to the Subcommittee that a nurse working with Dr. Amin encouraged her to receive a Pap smear.[461]  As with the vaginal ultrasound, Jane Doe #1 stated that the Pap smear was rough, and she again told Dr. Amin that she was in pain, but he did not stop the examination.[462]  Jane Doe #1 recalled that she attempted to ask questions, but Dr. Amin told her she would be notified of any abnormal

---

[446] This former ICDC detainee asked to remain anonymous.  Jane Doe #1, Interview with Senate Permanent Subcommittee on Investigations (Oct. 12, 2021); Declaration of Jane Doe #1 (Dec. 18, 2020) (on file with the Subcommittee).
[447] Jane Doe #1, Interview with Senate Permanent Subcommittee on Investigations (Oct. 12, 2021).
[448] Id.
[449] Id.
[450] Id.; LaSalle_443112.
[451] Jane Doe #1, Interview with Senate Permanent Subcommittee on Investigations (Oct. 12, 2021); LaSalle_443114.
[452] Declaration of Jane Doe #1 (Dec. 18, 2020) (on file with the Subcommittee); LaSalle_443017-18; LaSalle_443067-74.
[453] Jane Doe #1, Interview with Senate Permanent Subcommittee on Investigations (Oct. 12, 2021).
[454] Id.; LaSalle_443019.
[455] Jane Doe #1, Interview with Senate Permanent Subcommittee on Investigations (Oct. 12, 2021).
[456] Id.
[457] Id.
[458] Id.
[459] Id.; LaSalle_442999.
[460] LaSalle_442629-30; LaSalle_442633; LaSalle_442636; LaSalle_443179-81.
[461] Jane Doe #1, Interview with Senate Permanent Subcommittee on Investigations (Oct. 12, 2021); LaSalle_443172.
[462] Jane Doe #1, Interview with Senate Permanent Subcommittee on Investigations (Oct. 12, 2021).

NBCU002108

results and walked out of the room.[463] Jane Doe #1 stated that she never received the results of this test.[464] Dr. Amin wrote her a prescription for estrogen pills at this appointment.[465] Jane Doe #1 did not see Dr. Amin again.[466] During her interview with the Subcommittee, Jane Doe #1 stated that she is still afraid to see a doctor following her experience with Dr. Amin.[467]

Following her release from ICDC, Jane Doe #1 now resides in Jackson, South Carolina.[468] Jane Doe #1 was recently arrested again for possession of a controlled substance.[469]

### vi. Jane Doe #2

Jane Doe #2—a 32-year-old mother to a 14-year-old U.S. citizen daughter—was brought to the United States from Cameroon by her parents when she was two years old.[470] Jane Doe #2 was detained at ICDC from October 2017 to February 2020, following a 2017 encounter with the police, the charge from which was later dropped.[471] Jane Doe #2 informed the Subcommittee that she actively sought medical services available to detainees, as the services were free to her.[472]

During her time at ICDC, she experienced "severe" pain in between her menstrual cycles.[473] In March 2019, Jane Doe #2 complained of pelvic pain and abnormal menstrual cycle and was referred to Dr. Amin.[474] Similar to Ms. Navarro, Jane Doe #2 said that she was told by

---

[463] *Id.*

[464] *Id.*

[465] LaSalle_443170.

[466] Jane Doe #1, Interview with Senate Permanent Subcommittee on Investigations (Oct. 12, 2021).

[467] *Id.*

[468] *Id.*

[469] Email from Counsel for Jane Doe #1 to the Senate Permanent Subcommittee on Investigations (Nov. 10, 2022).

[470] This former ICDC detainee asked to remain anonymous. Email from Counsel for Jane Doe #2 to the Senate Permanent Subcommittee on Investigations (Nov. 15, 2021).

[471] Jane Doe #2, Interview with Senate Permanent Subcommittee on Investigations (Oct. 4, 2021); Email from Counsel for Jane Doe to the Senate Permanent Subcommittee on Investigations (Nov. 11, 2022). The dropped charge (shoplifting) arose from an incident in which she was sitting in the car outside of a gas station when her friends attempted to steal beer without her knowledge. Prior to this dropped charge, she was convicted of three non-violent misdemeanors from two incidents: shoplifting and possession of stolen goods when she was underage (2007) and misdemeanor larceny (2014). The 2014 conviction arose from her being present during a former boyfriend's criminal act. She did not participate in the criminal act herself. Although she was initially charged with conspiracy to commit robbery with a firearm or dangerous weapon, felony possession of cocaine, and felony possession of a controlled substance she was only convicted of misdemeanor larceny. Email from Counsel for Jane Doe #2 to the Senate Permanent Subcommittee on Investigations (Nov. 11, 2022).

[472] Jane Doe #2 mentioned that detainees were able to receive free glasses within 90 days and get their teeth whitened within six months so she "wanted to do stuff like that." Jane Doe #2, Interview with Senate Permanent Subcommittee on Investigations (Oct. 4, 2021).

[473] *Id.*; Email from Counsel for Jane Doe #2 to the Senate Permanent Subcommittee on Investigations (Nov. 10, 2022). *See also* LaSalle_244060 (December 21, 2017 medical request from Jane Doe #2 stating, "My menstruation cramps are causing me severe pain please help me."); LaSalle_245228 (October 29, 2018 medical request from Jane Doe #2 stating, "I am having very bad cramps, and I need something for the pain please.").

[474] LaSalle_245699; LaSalle_245701; LaSalle_245724; LaSalle_245744; LaSalle_245747-48.

NBCU002109

other detainees that Dr. Amin was "rough," and she should not see him or allow him to treat her because he "messes people up."[475]

On April 3, 2019, Jane Doe #2 had her initial appointment with Dr. Amin.[476]  She stated that Dr. Amin told her that she had an ovarian cyst and prescribed Depo-Provera injections.[477]  Jane Doe #2 noted that Dr. Amin did not provide an explanation regarding the Depo-Provera injection, other than saying it would hopefully shrink the cyst, and did not explain the potential side effects.[478]  Jane Doe #2 received a Depo-Provera injection at this visit.[479]

According to medical records reviewed by the Subcommittee, Jane Doe #2 had follow-up visits with Dr. Amin on April 17, 2019 and May 2, 2019.[480]  At the May 2019 visit, Jane Doe #2 complained that she had not started her period.[481]  According to Dr. Amin's notes for the visit, Dr. Amin prescribed another Depo-Provera injection and a follow-up appointment in one month.[482]  On June 19, 2019, Jane Doe #2 returned to Dr. Amin and received a Depo-Provera injection.[483]  Dr. Amin also performed a pelvic ultrasound at the appointment and found an "enlarged uterus" and "follicular cysts on both ovaries."[484]

After the June 2019 appointment, Jane Doe #2 experienced vaginal bleeding and was referred back to Dr. Amin on August 2, 2019.[485]  According to Dr. Amin's visit notes, Jane Doe #2 had been bleeding "since [her] last visit [on] 6/19/19" and her menstrual cycle had been "spotting to heavy."[486]  Dr. Amin's plan included prescribing Provera and Tramadol and performing a D&C scope.[487]  Jane Doe #2 recalled that Dr. Amin told her that the Depo-Provera injections she received did not work and she would need a D&C.[488]  Jane Doe #2 stated that Dr. Amin did not explain this procedure, but because she believed that Dr. Amin worked for a "government organization," she did not feel the need to second-guess his opinion.[489]

According to Dr. Amin's request to perform a D&C and laparoscopy, Jane Doe #2 had been seen by his office since April 3, 2019 for lower pelvic pain, bleeding with cramps, and irregular periods and was "diagnosed with cysts on both ovaries and enlarged uterus."[490]  Jane Doe #2 received two Depo-Provera injections, Provera hormone tablets, and pain medication,

---

[475] Jane Doe #2, Interview with Senate Permanent Subcommittee on Investigations (Oct. 4, 2021).
[476] LaSalle_245759-68; LaSalle_245874-75.
[477] Jane Doe #2, Interview with Senate Permanent Subcommittee on Investigations (Oct. 4, 2021).
[478] Id.; Email from Counsel for Jane Doe #2 to the Senate Permanent Subcommittee on Investigations (Nov. 10, 2022).
[479] LaSalle_242761.
[480] LaSalle_245858-66; LaSalle_245976-78; LaSalle_246023-32; LaSalle_246109.
[481] LaSalle_246109.
[482] Id.
[483] LaSalle_246813-23; LaSalle_440128; LaSalle_440131.
[484] LaSalle_440132.
[485] LaSalle_247113-14; LaSalle_247297-98; Email from Counsel for Jane Doe #2 to the Senate Permanent Subcommittee on Investigations (Nov. 10, 2022).
[486] LaSalle_440130.
[487] Id.; LaSalle_440129.
[488] Jane Doe #2, Interview with Senate Permanent Subcommittee on Investigations (Oct. 4, 2021).
[489] Id.
[490] LaSalle_440125.

NBCU002110

which all "failed."[491]  As a result, Dr. Amin scheduled Jane Doe #2 for a D&C and laparoscopy and indicated that "[s]he agrees and understands the procedure."[492]

On August 23, 2019, Dr. Amin performed a D&C and laparoscopy on Jane Doe #2.[493] Following her procedure, Jane Doe #2 stated that Dr. Amin informed her that he had performed a D&C and removed a portion of her fallopian tube.[494]  She said that Dr. Amin also told her that she would never be able to have children naturally again.[495]  Jane Doe #2 stated to Subcommittee staff that Dr. Amin never explained that the removal of a fallopian tube was a possible risk associated with a D&C.[496]

According to medical records reviewed by the Subcommittee, Jane Doe #2 received another Depo-Provera injection on September 9, 2019.[497]  A few months later in November 2019, Jane Doe #2 experienced "spotting" and was "not sure why" because she had a D&C and received a Depo-Provera injection.[498]  In January 2020, Jane Doe #2 submitted a medical request for a follow up with Dr. Amin regarding her D&C and an overdue Depo-Provera injection.[499] On February 6, 2020, Jane Doe #2 returned to Dr. Amin's office for a follow-up visit.  His staff administered another Depo-Provera injection at this visit and recommended a follow-up appointment in three months.[500]

Jane Doe #2 currently resides in Baltimore, Maryland.

## B. Former ICDC Employees Recounted Concerns Regarding Dr. Amin to the Subcommittee

As mentioned above, Subcommittee staff spoke with three former LPNs who collectively worked at ICDC between 2016 and 2020.  LPN #1 told the Subcommittee that they recalled an instance in September 2020 in which a detainee returned from an outpatient procedure performed by Dr. Amin not fully understanding the type of procedure she received and questioning whether she would be able to have children.[501]  The LPN did not name this patient and the Subcommittee's document review was unable to verify this claim.

---

[491] *Id.*
[492] *Id.*
[493] LaSalle_240221; LaSalle_240259-60; LaSalle_440113-23; ICH002539-2617.
[494] Jane Doe #2, Interview with Senate Permanent Subcommittee on Investigations (Oct. 4, 2021).  According to an ICDC psychiatric progress note five days after the surgery, Jane Doe #2 was "'bothered' by the fact that she went into surgery expecting a D&C and ended up having a salpingectomy x 1."  LaSalle_240320.
[495] Jane Doe #2, Interview with Senate Permanent Subcommittee on Investigations (Oct. 4, 2021).
[496] *Id.*
[497] LaSalle_242760.
[498] LaSalle_241418.
[499] LaSalle_242247.
[500] LaSalle_242759-60; Email from Counsel for Jane Doe #2 to the Senate Permanent Subcommittee on Investigations (Nov. 10, 2022).
[501] LPN #1, formerly of Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (June 30, 2021).

NBCU002111

LPN #1 also told the Subcommittee that in a previous role, they observed patients of Dr. Amin at ICH signing consent forms for surgical procedures while the patients were on the operating table.[502]  That nurse stated that some of these patients "were about to drift off to sleep" from anesthesia and "were just coherent enough" to sign the forms; "that lets you know that the patients have no recollection of what they agreed to," they said.[503]  The Subcommittee was unable to verify this claim.  In addition, the Subcommittee interviewed two nurses that work at ICH and assist Dr. Amin in surgeries who told the Subcommittee that they were not aware of any instances where Dr. Amin or ICH staff received signatures on informed consent forms after the patient was administered anesthesia.[504]

LPN #2 stated to the Subcommittee that Dr. Amin performed "a lot" of D&C procedures.[505]  That nurse stated that any detainee sent to Dr. Amin for the third time would receive a D&C, and that it was almost a "standard thing" that detainees would receive D&Cs when being treated by Dr. Amin.[506]  LPN #3 was not aware of Dr. Amin performing unnecessary procedures prior to their departure from ICDC in 2018.[507]  However, they said they were aware of complaints from patients outside ICDC regarding the quality of care Dr. Amin provided.[508]

## C.  Several Medical Experts Identified "Disturbing Patterns" in Treatment by Dr. Amin

Subcommittee staff consulted with four medical experts regarding Dr. Amin's treatment of former ICDC detainees and reviewed documents prepared by these experts regarding their evaluation of the medical records of some of these detainees.  Subcommittee staff first interviewed Dr. Ted Anderson, Dr. Sarah Collins, and Dr. Margaret Mueller, members of a team ("Team") asked by attorneys and advocacy groups later representing plaintiffs in the December 2020 lawsuit to review the medical files of some ICDC detainees who were treated by Dr. Amin.[509]  This Team reviewed over 3,200 pages of partial medical records for 19 ICDC

---

[502] *Id.*

[503] *Id.*

[504] Ryan Lupo, Irwin County Hospital, Interview with Senate Permanent Subcommittee on Investigations (Oct. 20, 2021); Julie Harper, Irwin County Hospital, Interview with Senate Permanent Subcommittee on Investigations (Oct. 21, 2021).

[505] LPN #2, formerly of Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (July 12, 2021).

[506] *Id.*

[507] LPN #3, formerly of Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (July 19, 2021).

[508] *Id.*

[509] Dr. Anderson is the Vice Chair for Clinical Operations and Director of the Division of Gynecology at Vanderbilt University Medical Center.  Vanderbilt University Medical Center, *Ted L. Anderson, MD, PhD* (https://www.vumc.org/obgyn/person/ted-l-anderson-md-phd) (accessed Nov. 13, 2022).  Dr. Collins is an Assistant Professor at the Northwestern University, Feinberg School of Medicine.  Northwestern Medicine, *Sarah A. Collins, MD* (https://www.nm.org/doctors/1942401948/sarah-a-collins-md) (accessed Nov. 13, 2022).  Dr. Mueller is also an Assistant Professor at the Northwestern University, Feinberg School of Medicine.  Northwestern Medicine, *Margaret G. Mueller, MD* (https://www.nm.org/doctors/1346570405/margaret-g-mueller-md) (accessed Nov. 13, 2022).  The Team was comprised of nine board-certified OB-GYN physicians and two nursing experts.  The members of the team are: Ted Anderson, MD; Haywood L. Brown, MD; Sarah Collins, MD; Caron Jo Gray, MD; Julia Geynisman-Tan, MD; Geri D. Hewitt, MD; Margaret Mueller, MD; Andrea Shields, MD; Geoffrey Schnider,

NBCU002112

detainees.  The Subcommittee received complete medical records from ICDC and partial medical records from ICH (which included the 3,200 pages of partial medical records the Team reviewed).  The Subcommittee consulted its own medical expert, Dr. Peter Cherouny, an OB-GYN physician from Vermont.[510]  Dr. Cherouny reviewed over 16,600 pages of medical records pertaining to approximately 94 former detainees treated by Dr. Amin to provide the most comprehensive analysis of Dr. Amin's treatment.[511]  Based on all of the various medical records reviewed, all consulted experts determined that Dr. Amin did not follow current medical guidelines for patient care, and all experts determined that Dr. Amin followed a pattern of treatment for almost all patients he treated regardless of their specific diagnosis or condition.

### i.   OB-GYN Medical Experts Engaged by Immigration Advocacy Groups Found Alarming Surgical Patterns by Dr. Amin

In October 2020, the Team produced an executive summary of findings regarding allegations of medical abuse allegations at ICDC.[512]  Two members of the Team—Dr. Ted Anderson and Dr. Haywood Brown—testified in a closed meeting of the Senate Democratic Caucus on October 26, 2020.[513]

The plaintiffs filed Drs. Anderson and Brown's testimony in support of the litigation in November 2020 and referenced the Team's executive summary in an amended complaint filed in December 2020.[514]  The plaintiffs also submitted three declarations drafted by Dr. Mueller in support of their case: (1) a declaration summarizing her review of the records as a whole; (2) a

---

MD; Michelle Collins, PhD, CNM; and Suzanne McMurtry Baird, DNP, RN.  According to the executive summary, the records of 19 women were the "first records available and were limited by production from the facility, which appear[ed] to be incomplete."  *Executive Summary of Findings by the Independent Medical Review Team Regarding Medical Abuse Allegations at the Irwin County Detention Center* (Oct. 21, 2020) (on file with the Subcommittee). As previously discussed, immigration advocacy groups and attorneys made allegations regarding Dr. Amin's treatment of ICDC detainees in a September 2020 whistleblower complaint.  The complaint asked for DHS OIG, DHS CRCL, IHSC, and ICDC to conduct an investigation into these allegations.  Following the filing of this complaint, an immigration attorney named Andrew Free was contacted by immigration attorneys for some of the women detained at ICDC.  Mr. Free offered his assistance and ultimately obtained the medical records of some of the former ICDC detainees who were treated by Dr. Amin.  Mr. Free determined that a review by medical experts, rather than a review conducted by immigration advocates, would be the most beneficial to the federal government's investigation into the allegations.  Mr. Free contacted a women's health attorney, Adam Snyder, to form this medical review team.  Members of the review team were not affiliated with immigration advocacy organizations nor were they compensated for their services.  Andrew Free, Briefing with Senate Permanent Subcommittee on Investigations (June 11, 2021); Adam Snyder, Briefing with Senate Permanent Subcommittee on Investigations (June 24, 2021).
[510] Dr. Cherouny is a Professor Emeritus at the University of Vermont, Larner College of Medicine.  Dr. Peter Cherouny Curriculum Vitae (on file with the Subcommittee).
[511] The 16,600 pages of medical records for 94 patients that Dr. Cherouny reviewed included the 3,200 pages for 19 patients reviewed by the Team.
[512] *Executive Summary of Findings by the Independent Medical Review Team Regarding Medical Abuse Allegations at the Irwin County Detention Center* (Oct. 21, 2020) (on file with the Subcommittee).
[513] *Testimony of Dr. Ted Anderson* (Oct. 26, 2020) (on file with the Subcommittee); *Testimony of Dr. Haywood Brown* (Oct. 26, 2020) (on file with the Subcommittee).
[514] Yesnia Aff. In Support re 2 Motion for Temp. Restraining Order (Nov. 19, 2020), *Oldaker v. Giles*, M.D. GA (No. 7:20-cv-00244-WLS-MSH); Consolidated Amended Petition for Writ of Habeas Corpus and Class Action Complaint for Declaratory and Injunctive Relief and for Damages (Dec. 21, 2020), *Oldaker v. Giles*, M.D. GA (No. 7:20-cv-00224-WLS-MSH).

NBCU002113

declaration summarizing her review of the medical records of lead plaintiff, Yanira Oldaker; and (3) a declaration summarizing her review of the records of another plaintiff, Mbeti Ndonga.[515] Dr. Collins, another member of the Team, reviewed an additional set of over 500 pages of medical records of ICDC detainees.  Immigration advocacy organizations obtained these additional records in Freedom of Information Act ("FOIA") litigation, and the records are connected to the December 2020 lawsuit.[516]  Subcommittee staff interviewed Dr. Anderson, Dr. Mueller, and Dr. Collins about their findings and to gain a better understanding of the medical procedures performed by Dr. Amin.

Based on the records it reviewed, the Team found that a number of women were subjected to "patterns of aggressive and unethical care," including what they believed to be inappropriate invasive procedures and diagnostic tests, such as ultrasounds, LEEPs, and Pap tests.[517]  Dr. Mueller and Dr. Collins also commented on the context in which Dr. Amin subjected these women to treatment.  Specifically, Dr. Mueller highlighted to the Subcommittee that Dr. Amin's patients were members of a vulnerable group undergoing painful procedures from a doctor they did not choose.[518]  Dr. Collins emphasized that physicians occupy a position of power relevant to their patients, and she felt that "power was abused" in the case of Dr. Amin.[519]

### ii.  The Subcommittee's Medical Expert Identified Concerning Treatment Patterns by Dr. Amin

The Subcommittee provided over 16,600 of pages of medical records pertaining to approximately 94 ICDC female detainees to Dr. Peter Cherouny, a medical expert the HHS OIG relied upon to perform a medical record review for one of its previous studies.[520]  Like Drs.

---

[515] *See* Declaration of Margaret Mueller, MD, FACS, FACOG for Yanira Oldaker (Nov. 18, 2020), *Oldaker v. Giles*, M.D. GA (No. 7:20-cv-00224-WLS-MSH); Declaration of Margaret Mueller, MD, FACS, FACOG for Jane Doe # 1 (Mbeti Ndonga) (Dec. 14, 2020), *Oldaker v. Giles*, M.D. GA (No. 7:20-cv-00224-WLS-MSH); Medical Care Provided to Women in Detention at Irwin County Detention Center: Declaration of Margaret Mueller, MD, FACS, FACOG (Dec. 20, 2020), *Oldaker v. Giles*, M.D. GA (No. 7:20-cv-00224-WLS-MSH).

[516] Dr. Sarah Collins, Interview with Senate Permanent Subcommittee on Investigations (Oct. 19, 2021).  According to counsel representing former ICDC detainees in the *Oldaker* litigation and in a FOIA lawsuit against ICE, Dr. Collins reviewed 518 pages not included in the original 3,200 pages of records the Independent Medical Review Team received.  Email from Counsel for the National Immigration Project of the National Lawyers Guild to the Senate Permanent Subcommittee on Investigations (Oct. 22, 2021).

[517] *Executive Summary of Findings by the Independent Medical Review Team Regarding Medical Abuse Allegations at the Irwin County Detention Center* (Oct. 21, 2020) (on file with the Subcommittee). Dr. Mueller explained that a LEEP is an excisional procedure in which the surgeon "excises or removes" a portion of a woman's cervix.  In general, a LEEP is only used if pre-cancerous cells are detected.  The short-term implications for a LEEP include extensive bleeding that could become extensive enough to require a hysterectomy.  A LEEP can also result in long-term implications, including reproductive consequences.  In addition, the removal of a significant portion of the cervix can often create cervical insufficiency, which can lead to the pre-term loss of pregnancies.  Dr. Mueller explained that if there is no indication for a particular procedure and no identifiable benefit, performing this procedure is "only exposing a woman to a risk."  Dr. Margaret Mueller, Interview with Senate Permanent Subcommittee on Investigations (July 27, 2021).

[518] Dr. Margaret Mueller, Interview with Senate Permanent Subcommittee on Investigations (July 27, 2021).

[519] Dr. Sarah Collins, Interview with Senate Permanent Subcommittee on Investigations (Oct. 19, 2021).

[520] *See* U.S. Department of Health and Human Services, Office of Inspector General, *Instances of IHS Labor and Delivery Care Not Following National Clinical Guidelines or Best Practices* (OEI-06-19-00190) (Dec. 2020)

NBCU002114

Anderson, Mueller, and Collins, Dr. Cherouny determined that Dr. Amin followed a "boiler plate approach to care" for almost all patients he treated.[521]  This "algorithm" Dr. Amin employed was generally used for a patient presenting with abnormal bleeding and/or pelvic pain.[522]  Dr. Amin would first perform a transvaginal ultrasound, where he would often diagnose patients with ovarian cysts that required treatment.  Dr. Amin would then prescribe Depo-Provera injections to treat the cysts.  He would not allow the Depo-Provera to take effect, and would instead declare the treatment a failure and proceed to surgery.  In one interview with the Subcommittee, Dr. Cherouny summarized Dr. Amin's care as "pretty good medicine for the 1980s, but we're not there anymore."[523]  The sections below discuss what Dr. Cherouny saw in the medical records and Dr. Amin's treatment patterns.

### a.  Dr. Amin's Flawed Use of Transvaginal Ultrasounds

Dr. Amin generally performed transvaginal ultrasounds in response to patients presenting with menstrual abnormalities, such as heavy bleeding and/or pelvic pain.  The Subcommittee learned that a transvaginal ultrasound is not usually the first step in an evaluation for menstrual abnormalities.[524]  Instead, the first step for a patient with abnormal bleeding would be to conduct a pregnancy test and compile a thorough patient history to determine how long the bleeding has occurred.[525]

Of the approximately 94 patient records he reviewed, Dr. Cherouny determined that Dr. Amin performed transvaginal ultrasounds on 36 of the women he treated.[526]  Dr. Cherouny commented that generally, "the documentation of these ultrasounds was limited and appeared incomplete."[527]  He added that the records he reviewed show that Dr. Amin generally had "[p]oor performance and documentation of transvaginal ultrasound evaluation."[528]  Dr. Cherouny further explained that Dr. Amin is "clearly not skilled in ultrasound of the female pelvis" and that he "appears to frequently confuse normal findings for pathology and uses these indications for surgery."[529]  Dr. Cherouny also stated that it was likely that Dr. Amin's ultrasound practices were not in compliance with the American Institute of Ultrasound in Medicine guidelines.[530]

---

(https://oig.hhs.gov/oei/reports/OEI-06-19-00190.pdf).  Dr. Cherouny reviewed LaSalle medical records, ICH medical records, the files reviewed by the Team, and the additional set of over 500 pages of records Dr. Collins reviewed.

[521] Memorandum from Dr. Peter Cherouny to Senate Permanent Subcommittee on Investigations (Oct. 27, 2022).

[522] Dr. Sarah Collins, Interview with Senate Permanent Subcommittee on Investigations (Oct. 19, 2021).

[523] Dr. Peter Cherouny, Interview with Senate Permanent Subcommittee on Investigations (Sept. 8, 2022).

[524] Dr. Sarah Collins, Interview with Senate Permanent Subcommittee on Investigations (Oct. 19, 2021).

[525] *Id.*

[526] Letter from Dr. Peter Cherouny to the Senate Permanent Subcommittee on Investigations (Feb. 1, 2022).

[527] *Id.*

[528] Letter from Dr. Peter Cherouny to Senate Permanent Subcommittee on Investigations (Oct. 27, 2022).

[529] Memorandum from Dr. Peter Cherouny to Senate Permanent Subcommittee on Investigations (Oct. 27, 2022).

[530] Dr. Peter Cherouny, Interview with Senate Permanent Subcommittee on Investigations (Jan. 26, 2022).

NBCU002115

### b.  Dr. Amin's Misuse of Depo-Provera Injections

Dr. Cherouny found that Dr. Amin administered Depo-Provera injections, at least once, to 40 women in what appeared to be an attempt to manage abnormal uterine bleeding.[531]   The Subcommittee learned that physicians generally "shy away" from using" these injections because side effects may complicate a diagnosis.[532]

Dr. Cherouny determined that in most of the cases he reviewed, Dr. Amin deviated from the standard of care and the Depo-Provera "was not given adequate time to affect a clinical response" in these women.[533]   He explained that the "adequate time" for a response to Depo-Provera was six months.  Dr. Cherouny noted that Dr. Amin generally used 2-6 weeks of clinical response time before declaring that the Depo-Provera medication failed and proceeded to surgery.[534]   Dr. Cherouny added that Depo-Provera is not the preferred treatment for management of abnormal uterine bleeding because it causes unwanted side effects, including menstrual cycle irregularity.[535]

### c.  Dr. Amin's Aggressive Surgical Approach

Dr. Cherouny identified that Dr. Amin performed a D&C with laparoscopy on 40 patients out of the approximately 94 patient files he reviewed.[536]   The Subcommittee learned that a D&C is not a first step of action, and it is not indicated as necessary in the treatment for chronic pelvic pain.[537]   Furthermore, a D&C is generally only indicated after an endometrial biopsy if the doctor did not obtain enough tissue after an endometrial biopsy, if a post-pregnancy patient is bleeding, or for acute management purposes if a woman comes into an emergency room bleeding.[538]

Dr. Cherouny found that Dr. Amin's use of these procedures were "too aggressive."[539]   Dr. Cherouny stated to the Subcommittee that Dr. Amin often did not follow standard practice, which would have been to escalate from a transvaginal ultrasound to advanced imaging, like an MRI or a CT scan.[540]   Instead, for the vast majority of patients, Dr. Amin proceeded directly from an ultrasound to a D&C and operative laparoscopy, using these procedures as diagnostic

---

[531] Letter from Dr. Peter Cherouny to the Senate Permanent Subcommittee on Investigations (Feb. 1, 2022).
[532] Dr. Margaret Mueller, Interview with Senate Permanent Subcommittee on Investigations (July 27, 2021).
[533] Letter from Dr. Peter Cherouny to the Senate Permanent Subcommittee on Investigations (Feb. 1, 2022).
[534] Letter from Dr. Peter Cherouny to Senate Permanent Subcommittee on Investigations (Oct. 27, 2022).
[535] Dr. Peter Cherouny, Interview with Senate Permanent Subcommittee on Investigations (Jan. 26, 2022).  Dr. Cherouny stated that most patient records he reviewed were premenopausal or perimenopausal women.  The initial treatment recommendation for women at this age includes oral progestin, like Provera, a levonorgestrel-containing IUD or combination birth control rather than Dr. Amin's use of Depo-Provera injections.  *Id.*
[536] Memorandum from Dr. Peter Cherouny to Senate Permanent Subcommittee on Investigations (Oct. 27, 2022).
[537] Dr. Margaret Mueller, Interview with Senate Permanent Subcommittee on Investigations (July 27, 2021).
[538] *Id.*
[539] Dr. Peter Cherouny, Interview with Senate Permanent Subcommittee on Investigations (Jan. 26, 2022).
[540] *Id.*

NBCU002116

tools.[541]  Dr. Cherouny added that the "vast majority [of cases where Dr. Amin performed a D&C] appear to be manageable with imaging and appropriate hormone therapy."[542]

Dr. Cherouny also found that during the previously mentioned surgeries, Dr. Amin removed or aspirated ovarian cysts in 40 women.[543]  The Subcommittee learned that the general standard of care for simple, or functional, ovarian cysts would have been to do nothing and repeat an ultrasound in six weeks.[544]  Dr. Cherouny stated that these cysts were "benign in every case," and the "majority were functional ovarian cysts in normally cycling ovaries" that would "generally resolve without surgical intervention."[545]  Out of the 40 patients who underwent cyst removals or aspirations, Dr. Cherouny only identified one patient whose pathology reports indicated the removal was reasonable.[546]

In addition, Dr. Cherouny identified seven patients who underwent a LEEP—a procedure used to further assess abnormalities identified by a Pap smear and colposcopy—and found that the records he reviewed suggest Dr. Amin has "limited knowledge and/or skill in Pap smear management."[547]  He explained that the "point of the [LEEP] procedure is to get tissue for diagnostic purposes and in each case [Dr. Amin] failed this outcome."[548]  Dr. Cherouny attributed these failures to Dr. Amin's "technique" in performing the procedure.[549]  For example, one patient who underwent a LEEP had a negative Pap smear and positive HPV test.  In this case, the appropriate management would have been a follow-up Pap smear and HPV test one year later, but Dr. Amin performed a LEEP.[550]  Dr. Cherouny stated this was "well outside of the guidelines."[551]  For two other patients who received a LEEP, Dr. Cherouny found that no abnormal tissue was detected and there was no indication of a colposcopy before the LEEP.[552]  Dr. Cherouny stated that Dr. Amin skipped "certainly a few" steps in the diagnostic process before performing a LEEP.[553]

### d. Dr. Amin's Questionable Informed Consent Practices and Lack of Board Certification

Dr. Cherouny explained to the Subcommittee that informed consent requires the patient to have "adequate, accurate, and useful information."[554]  Based on the records he reviewed, Dr. Cherouny stated that Dr. Amin did not provide specific information regarding surgical

---

[541] Id.

[542] Memorandum from Dr. Peter Cherouny to Senate Permanent Subcommittee on Investigations (Oct. 27, 2022).

[543] Letter from Dr. Peter Cherouny to the Senate Permanent Subcommittee on Investigations (Feb. 1, 2022).

[544] Dr. Ted Anderson, Interview with Senate Permanent Subcommittee on Investigations (July 20, 2021).

[545] Letter from Dr. Peter Cherouny to the Senate Permanent Subcommittee on Investigations (Feb. 1, 2022).

[546] Dr. Peter Cherouny, Interview with Senate Permanent Subcommittee on Investigations (Jan. 26, 2022).

[547] Letter from Dr. Peter Cherouny to the Senate Permanent Subcommittee on Investigations (Feb. 1, 2022).

[548] Memorandum from Dr. Peter Cherouny to Senate Permanent Subcommittee on Investigations (Oct. 27, 2022).

[549] Id.

[550] Dr. Peter Cherouny, Interview with Senate Permanent Subcommittee on Investigations (Jan. 26, 2022); Letter from Dr. Peter Cherouny to the Senate Permanent Subcommittee on Investigations (Feb. 1, 2022).

[551] Dr. Peter Cherouny, Interview with Senate Permanent Subcommittee on Investigations (Jan. 26, 2022).

[552] Id.; Letter from Dr. Peter Cherouny to the Senate Permanent Subcommittee on Investigations (Feb. 1, 2022).

[553] Dr. Peter Cherouny, Interview with Senate Permanent Subcommittee on Investigations (Jan. 26, 2022).

[554] Dr. Peter Cherouny, Interview with Senate Permanent Subcommittee on Investigations (Apr. 13, 2022).

NBCU002117

procedures with detainee patients and there was "no documentation of discussions regarding options for care."[555]

Dr. Cherouny flagged that Dr. Amin "does not appear to be board certified" and "likely does no or limited continuing education to stay current" on up-to-date medical practices in these areas.[556]  He explained further that it appears there are board certified OB-GYN providers in the area of ICDC and that he was "concerned" with how and why Dr. Amin was selected to treat this population.[557]  He noted that the American College of Obstetricians and Gynecologists requires annual continuing medical education, which helps OB-GYN physicians stay current in their training.[558]  Dr. Cherouny stated that it was likely that Dr. Amin would have pursued different treatment methods had he been board certified.[559]

Dr. Cherouny also noted that "[i]t appears there was, likely, no oversight of the care provided to these patients.  The repetitive nature of some of the issues, like inadequate cervical tissue after a LEEP procedure, would seem to prompt a review in many hospitals."[560]

### D.  Response from Dr. Amin Concerning ICDC Allegations

Following the public allegations in the September 2020 whistleblower complaint and December 2020 lawsuit, Dr. Amin filed two defamation lawsuits against NBCUniversal Media, LLC and the author Don Winslow.[561]  In these complaints, Dr. Amin stated that he performed only two hysterectomies on ICDC detainees.[562]  According to the complaints, for both hysterectomies "the patients were informed and consented to the procedures."[563]  In addition, Dr. Amin claimed that ICE "conducted an independent review of the treatment plans and approved the [hysterectomies]," which "confirms that the procedures were medically necessary."[564]

The complaints also stated that Dr. Amin "never performed" a procedure on an ICDC detainee without obtaining ICE approval and was supervised by at least one other person when he treated ICDC detainees, which "was a matter of protocol."[565]  Dr. Amin further claimed that he "always obtains" informed consent, uses interpreters for non-English speaking patients, and "has never treated any patient roughly or inappropriately."[566]  Both lawsuits are ongoing.

---

[555] *Id.*; Memorandum from Dr. Peter Cherouny to Senate Permanent Subcommittee on Investigations (Oct. 27, 2022).
[556] Memorandum from Dr. Peter Cherouny to Senate Permanent Subcommittee on Investigations (Oct. 27, 2022).
[557] *Id.*
[558] Dr. Peter Cherouny, Interview with Senate Permanent Subcommittee on Investigations (Jan. 26, 2022).
[559] *Id.*
[560] Memorandum from Dr. Peter Cherouny to Senate Permanent Subcommittee on Investigations (Oct. 27, 2022).
[561] *Amin v. NBCUniversal Media*, No. 5:21-cv-00056 (S.D. Ga. Sept. 9, 2021); *Amin v. Winslow*, No. 3:21-cv-01635 (S.D. Cal. Sept. 17, 2021).
[562] *Id.*
[563] *Id.*
[564] *Id.*
[565] *Id.*
[566] *Id.*

NBCU002118

When allegations against Dr. Amin first emerged in September 2020 regarding his treatment of ICDC detainees, he sent a letter to a LaSalle employee, obtained by the Subcommittee that stated, in part:

> Recently, allegations have been made regarding my treatment of ICDC detainees. To be clear, I vigorously deny these allegations, and am confident that a full review will demonstrate that the care that I provided to all of my patients, including those housed at ICDC, was medically necessary and appropriate, and always done with the full informed consent of the patient.[567]

The Subcommittee tried on multiple occasions to obtain voluntary testimony from Dr. Amin regarding his treatment of female ICE detainees at ICDC. Dr. Amin declined the Subcommittee's requests for a voluntary interview. On February 7, 2022, the Subcommittee served Dr. Amin with a subpoena for deposition. Dr. Amin submitted an affidavit to the Subcommittee stating that he was innocent of the allegations and that he declined to provide testimony pursuant to his Fifth Amendment privilege against self-incrimination.[568] His attorney also mentioned the ongoing criminal investigation into Dr. Amin at the time in a cover letter accompanying the affidavit.[569] The Subcommittee is unaware of whether the criminal investigation is still ongoing.

## V.   DR. AMIN WAS A CLEAR OUTLIER IN THE VOLUME OF CERTAIN OB-GYN PROCEDURES HE PERFORMED ON ICDC DETAINEES

Despite housing a low percentage of the total population of female ICE detainees (4%), ICDC and Dr. Amin accounted for a substantial number of OB-GYN procedures overall (over one-third), a large total of invasive procedures performed on ICE detainees, and a sizeable proportion of all taxpayer money spent on OB-GYN procedures for ICE detainees. The Subcommittee's data analysis revealed that Dr. Amin was an outlier in the number of invasive procedures performed and how much money he billed the government for these procedures. While the Subcommittee could not account for every variable of the ICE female population (e.g. ICE does not track and does not know the health histories of the female populations across ICE detention centers) the data the Subcommittee received from ICE shows potentially alarming differences in the treatment patterns of ICDC detainees compared to female detainees housed at other ICE detention centers across the country.

---

[567] Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations (Oct. 22, 2021) (Tranche 18, 11144).
[568] Letter from Counsel for Dr. Amin to the Senate Permanent Subcommittee on Investigations (Feb. 21, 2022).
[569] Id. PSI contacted Dr. Amin's counsel during the Subcommittee's errata review process and did not receive a response. Email from the Senate Permanent Subcommittee on Investigations to Counsel for Dr. Amin (Nov. 10, 2022).

NBCU002119