Declaration of

Elizabeth McNamara

Exhibit 68

PART 3

A. **Despite Housing a Low Number of ICE Detainees, ICDC and Dr. Amin Accounted for a Large Percentage of OB-GYN Referrals, Visits, and Procedures Within the ICE System**

ICE data provided to the Subcommittee shows that ICDC housed roughly 4% of female ICE detainees between 2017 and 2020.[570] (See Figure 4.) The Subcommittee also received data from ICE concerning the total number of OB-GYN referrals, visits, and procedures for all ICE facilities from 2017 to 2020.[571] These statistics show that OB-GYN referrals from ICDC, as a percentage of total annual OB-GYN referrals across the ICE system, increased from 9% in 2018 to nearly 17% in 2020.[572] Between 2017 and 2020, OB-GYN referrals for ICDC female detainees accounted for 14% of OB-GYN referrals for all ICE female detainees.[573] (See Figure 5).

**Figure 4: FY 2017-2020 Female ADP Percentage at ICDC vs All ICE Facilities[574]**

| Fiscal Year | ICE Female Average Daily Population (ADP) | ICDC Female ADP | ICDC Female ADP as a Percentage of Total ICE Female ADP |
|---|---|---|---|
| 2017 | 5,716 | 196 | 3.43% |
| 2018 | 6,224 | 210 | 3.37% |
| 2019 | 7,552 | 269 | 3.56% |
| 2020 | 4,997 | 218 | 4.36% |

---

[570] U.S. Immigration and Customs Enforcement, *HSGAC/PSI Interviews with ICE Health Service Corps (IHSC) Personnel Get-backs* (Nov. 5, 2021) (response on file with the Subcommittee); Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations (Feb. 8, 2022) (Tranche 4, 1073-95).

[571] *June 23, 2021 ICE Q&A Paper*, *supra* note 14; *Sept. 1, 2021 ICE Q&A Paper*, *supra* note 12; Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations (Feb. 2, 2022). As explained above, referrals for off-site care from a detention facility will include referrals for initial treatment after facility staff has evaluated a detainee, as well as later referrals for surgical procedures that the off-site provider has recommended. Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations (Sept. 27, 2021) (Tranche 10, 3037-42); Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations (Feb. 22, 2022) (Tranche 7, 01255).

[572] *June 23, 2021 ICE Q&A Paper*, *supra* note 14; Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations (Feb. 2, 2022).

[573] *Id.*

[574] U.S. Immigration and Customs Enforcement, *HSGAC/PSI Interviews with ICE Health Service Corps (IHSC) Personnel Get-backs* (Nov. 5, 2021) (response on file with the Subcommittee); Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations (Feb. 8, 2022) (Tranche 4, 1073-95). In an internal memorandum from October 2020, ICE noted that the female population of ICDC increased in 2019 "due to the closure of other detention facilities" in the Atlanta area of responsibility. Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations (Sept. 27, 2021) (Tranche 10, 3037-42).

NBCU002120

**Figure 5: 2017-2020 Total Number of ICE OB-GYN-Related Referrals and ICDC OB-GYN-Related Referrals**[575]

| Fiscal Year | Total ICE OB-GYN Referrals | ICDC OB-GYN Referrals | ICDC OB-GYN Referrals as a Percentage of Total ICE OB-GYN Referrals |
|---|---|---|---|
| **2017** | 783 | 126 | 16.09% |
| **2018** | 1,127 | 103 | 9.14% |
| **2019** | 1,652 | 240 | 14.53% |
| **2020** | 1,703 | 288 | 16.91% |
| **Totals** | **5,265** | **757** | **14.38%** |

From 2017 to 2020, ICE detainees had 2,567 OB-GYN specialist visits system wide.[576] ICE paid approximately $191,812 for these visits.[577]  (See Figure 6.)  Between 2017 and 2020, Dr. Amin performed the fourth-most visits (167) of OB-GYN providers treating ICE detainees, which accounted for roughly 6.5% of total OB-GYN visits for that time period and 7.3% of the total ICE paid for these visits.[578]  (See Figure 7.)

**Figure 6: Total Number of OB-GYN Specialist Visits by ICE Detainees for 2017-2020**[579]

| Fiscal Year | 2017 | 2018 | 2019 | 2020 | Total |
|---|---|---|---|---|---|
| **Total Count** | 281 | 643 | 829 | 814 | **2,567** |
| **ICE Payment Amount** | $17,177.38 | $47,792.88 | $66,421.87 | $60,419.95 | **$191,812.08** |

---

[575] *June 23, 2021 ICE Q&A Paper*, *supra* note 14; Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations (Feb. 2, 2022).  ICE noted that "[w]hile several other practitioners served ICDC over [the 2017 to 2020] time period, most OB-GYN patients were being seen by Dr. Amin." *June 23, 2021 ICE Q&A Paper*, *supra* note 14.  In September 2021, ICE provided initial data regarding the number of OB-GYN referrals for ICE detainees.  Specifically, ICE provided the following totals for ICDC OB-GYN referrals: 209 (FY17), 178 (FY18), 526 (FY19), 648 (FY20), 1,561 (total FY17-20).  ICE explained that these totals were part of ICE's "initial data reporting" and its "referral analyst was still determining the best methods for data analysis."  In addition, the earlier data was a "combination of claims and referral data" and "[a]s a result multiple counts […] were included which significantly inflated the totals."  *June 23, 2021 ICE Q&A Paper*, *supra* note 14; Email from U.S. Immigration and Customs Enforcement Staff to the Senate Permanent Subcommittee on Investigations (Feb. 10, 2022).

[576] *Sept. 1, 2021 ICE Q&A Paper*, *supra* note 12.

[577] *Id.*

[578] *Id.*  According to ICE, this total refers only to billing by Dr. Amin for office visits.  As mentioned below, Dr. Amin submitted claims for treatment for 313 detainees in total between 2014 and 2020, which would have included billing for "care and services he would have provided in the Emergency Room and inpatient at the local hospitals." U.S. Immigration and Customs Enforcement, *November 4, 2021 HSGAC/PSI Additional Follow-Up Questions* (Nov. 16, 2021) (response on file with the Subcommittee).

[579] *Sept. 1, 2021 ICE Q&A Paper*, *supra* note 12.

NBCU002121

**Figure 7: Top Five Providers of OB-GYN Visits for ICE Detainees for 2017-2020**[580]

| Top Five Specialists/Providers | Total Visit Count | Billed Charges | ICE Payment Amount |
|---|---|---|---|
| Top Provider 1 | 231 | $55,360.00 | $25,405.00 |
| Top Provider 2 | 205 | $35,545.00 | $16,466.59 |
| Top Provider 3 | 173 | $39,755.00 | $9,216.88 |
| **Dr. Mahendra Amin** | **167** | **$22,050.00** | **$14,002.77** |
| Top Provider 5 | 155 | $32,050.00 | $10,576.38 |
| **Total** | **931** | **$184,760.00** | **$75,667.62** |

### B. Dr. Amin Accounted for At Least One in Three OB-GYN Procedures and Received Nearly Half of All ICE Payments for OB-GYN Procedures Between 2017 and 2020

In September 2021, ICE produced statistical information to the Subcommittee regarding certain OB-GYN procedures Dr. Amin performed for ICE detainees between 2017 and 2020, as well as data on the frequency and cost of these OB-GYN procedures across the ICE detention system.[581] The Subcommittee determined that Dr. Amin accounted for at least one out of three OB-GYN procedures and received nearly half of all payments from ICE for 10 OB-GYN services between 2017 and 2020 despite the fact the average daily female population at ICDC accounted for roughly 4% of the average daily female population in all ICE detention facilities.[582] Specifically, from 2017 to 2020, physicians performed 1,201 of these OB-GYN procedures on ICE detainees.[583] The procedures cost ICE over $120,416.[584] (See Figure 8.)

---

[580] *Id.*

[581] *Id.* These procedures include: hysterectomies, tubal ligations, BX/curett of cervix with scope; conization of cervix; cryocautery of cervix; D&C; injection, medroxyprogesterone acetate, 100 mg; laparoscopy, excise lesions; laparoscopy, lysis; transvaginal US, obstetric; US exam, pelvic complete; and US exam, pelvic, limited. According to ICE, no tubal ligations were performed by any OB-GYN provider on ICE detainees from 2017 to 2020. *Id.*

[582] *See id.*; Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations (Feb. 8, 2022) (Tranche 4, 1073-95). The 10 procedures are: BX/curett of cervix with scope; conization of cervix; cryocautery of cervix; dilation and curettage; injection, medroxyprogesterone acetate, 100 mg; laparoscopy, excise lesions; laparoscopy, lysis; transvaginal US, obstetric; US exam, pelvic complete; and US exam, pelvic, limited. *Sept. 1, 2021 ICE Q&A Paper, supra* note 12.

[583] *Sept. 1, 2021 ICE Q&A Paper, supra* note 12.

[584] *Id.*

NBCU002122

**Figure 8: Total Number of Ten OB-GYN Procedures Performed on ICE Detainees and Related Costs for 2017-2020**[585]

| Fiscal Year | 2017 | 2018 | 2019 | 2020 | Total |
|---|---|---|---|---|---|
| Total Count | 99 | 238 | 388 | 476 | **1,201** |
| Payment Amount | $5,673.96 | $15,738.35 | $46,024.38 | $52,979.45 | **$120,416.14** |

The Subcommittee found that Dr. Amin was a clear outlier among physicians providing specialist OB-GYN care to ICE detainees and performed significantly more invasive procedures than other OB-GYN providers treating ICE detainees between 2017 and 2020 despite having the fourth-most visits from ICE detainees over the same time period. According to the data, Dr. Amin ranked first among physicians performing D&C procedures on female detainees between 2017 and 2020—with 53 procedures during this time compared to three procedures for the second-ranked physician.[586] Similarly, Dr. Amin also ranked first for Depo-Provera injections, having administered 102 injections during the same time period (and the "Hospital Authority of Irwin County" administered another two), compared to two shots for the next-highest provider.[587] Dr. Amin also ranked first for laparoscopies and limited pelvic exams. Dr. Amin performed 44 laparoscopies to excise lesions, compared to only one procedure for the second-ranked provider, and 163 limited pelvic exams, compared to four exams for the second-ranked provider.[588]

Overall, in ten categories of OB-GYN procedures, Dr. Amin was among the top five providers for eight of those ten procedures—and for seven out of these eight procedures, Dr. Amin was among the top two providers.[589] Dr. Amin accounted for almost one-third—392—of 1,201 total procedures performed by OB-GYN providers on ICE detainees between 2017 and 2020.[590] He was paid approximately $60,000 for these services—nearly half of all payments ($120,400) from ICE for these services.[591] (See Figure 9.) In addition, the payout rate for Dr. Amin for these ten procedures was 31% compared to the payout rate of 27% for the 1,201 total number of procedures performed by all OB-GYN providers treating ICE detainees.[592]

---

[585] *Id.* As indicated above, the 10 procedures are: BX/curett of cervix with scope; conization of cervix; cryocautery of cervix; dilation and curettage; injection, medroxyprogesterone acetate, 100 mg; laparoscopy, excise lesions; laparoscopy, lysis; transvaginal US, obstetric; US exam, pelvic complete; and US exam, pelvic, limited. *Id.*

[586] *Id.*

[587] *Id.*

[588] *Id.*

[589] The figure does not include the two procedures in which Dr. Amin was not among the top five providers—"BX of cervix w/scope, LEEP" and "US exam, pelvic, complete." *Id.*

[590] Subcommittee staff calculated the 392 gynecological or obstetrical procedures based on the following information regarding certain procedures performed by Dr. Amin from 2017 to 2020: conization of cervix (4); D&C (53); cryocautery of cervix (7); injection, medroxyprogesterone acetate, 100 MG (102); laparoscopy, excise lesions (44); laparoscopy, lysis (6); transvaginal US, obstetric (13); and US exam, pelvic, limited (163). *Id.*

[591] *Id.* In addition to the $59,967.05 ICE paid for the eight procedures, ICE paid $1,160 for the two hysterectomies Dr. Amin performed from 2017 to 2020. *Id.*

[592] *Id.* According to ICE data, Dr. Amin billed $193,100 for these procedures and was paid $59,967. For the 1,201 total number of these procedures, OB-GYN providers billed $441,708 and were paid $120,416. *Id.*

74

NBCU002123

**Figure 9: Top Five Providers for Eight OB-GYN Procedures for ICE Detainees for 2017-2020**[593]

| Top 5 Providers: Laparoscopy, Excise Lesions | | |
|---|---|---|
| # | Provider Name | Total Count (47) | Payment Amount ($28,862.04) |


| # | Provider Name | Total Count (47) | Payment Amount ($28,862.04) |
|---|---|---|---|
| **Top 5 Providers: Laparoscopy, Excise Lesions** | | | |
| 1 | **Mahendra G Amin MD PC** | **44 (93.6%)** | **$27,960.34 (96.9%)** |
| 2 | Top Provider 2 | 1 | $113.27 |
| 3 | Top Provider 3 | 1 | $788.43 |
| 4 | Top Provider 4 | 1 | $0.00 |
| **Top 5 Providers: Injection, Medroxyprogesterone Acetate** | | | |
| # | Provider Name | Total Count (110) | Payment Amount ($8,647.98) |
| 1 | **Mahendra G Amin MD PC** | **102 (92.7%)** | **$8,608.98 (99.5%)** |
| 2 | Top Provider 2 | 2 | $0.00 |
| 3 | Top Provider 3 | 2 | $0.00 |
| 4 | Top Provider 4 | 1 | $0.00 |
| 5 | Top Provider 5 | 1 | $0.00 |
| **Top 5 Providers: US Exam, Pelvic, Limited** | | | |
| # | Provider Name | Total Count (179) | Payment Amount ($7,348.51) |
| 1 | **Mahendra G Amin MD PC** | **163 (91%)** | **$6,941.12 (94.5%)** |
| 2 | Top Provider 2 | 4 | $162.99 |
| 3 | Top Provider 3 | 2 | $0.00 |
| 4 | Top Provider 4 | 2 | $23.36 |
| 5 | Top Provider 5 | 2 | $50.09 |
| **Top 5 Providers: Dilation and Curettage** | | | |
| # | Provider Name | Total Count (65) | Payment Amount ($12,511.14) |
| 1 | **Mahendra G Amin MD PC** | **53 (81.5%)** | **$10,736.45 (85.8%)** |
| 2 | Top Provider 2 | 3 | $440.83 |
| 3 | Top Provider 3 | 2 | $445.37 |
| 4 | Top Provider 4 | 2 | $239.02 |
| 5 | Top Provider 5 | 2 | $218.58 |
| **Top 5 Providers: Laparoscopy, Lysis** | | | |
| # | Provider Name | Total Count (8) | Payment Amount ($3,356.75) |
| 1 | **Mahendra G Amin MD PC** | **6 (75%)** | **$2,677.10 (79.8%)** |
| 2 | Top Provider 2 | 2 | $679.65 |

[593] ICE stated that certain procedures did not have "Top 5" providers and only had a "Top 2" or "Top 3." *Id.* Additionally, as discussed above, of the approximately 94 patient records he reviewed, Dr. Cherouny determined that Dr. Amin performed transvaginal ultrasounds on 36 of the women he treated. However, the information provided by ICE indicated that Dr. Amin performed only 13 transvaginal ultrasounds. When asked to explain this discrepancy, ICE stated that it provided the Subcommittee with "medical claims data." According to ICE, if the ultrasounds were performed in Dr. Amin's office, he may not have billed for the ultrasounds separately by Current Procedural Terminology (CPT) code. In addition, if the ultrasounds were performed at a hospital, the hospital would have billed for the ultrasound and possibly bundled into other coding/billing and not billed as separate CPT codes. Email from U.S. Immigration and Customs Enforcement Staff to the Senate Permanent Subcommittee on Investigations (Apr. 27, 2022).

NBCU002124

| Top 5 Providers: Cryocautery of Cervix | | |
|---|---|---|
| # | Provider Name | Total Count (13) | Payment Amount ($1,854.65) |
| 1 | **Mahendra G Amin MD PC** | **7 (53.8%)** | **$958.68 (51.7%)** |
| 2 | Top Provider 2 | 3 | $429.11 |
| 3 | Top Provider 3 | 2 | $316.99 |
| 4 | Top Provider 4 | 1 | $149.87 |
| Top 5 Providers: Conization of Cervix | | |
| # | Provider Name | Total Count (15) | Payment Amount ($3,230.43) |
| 1 | Top Provider 1 | 6 | $1,237.32 |
| 2 | **Mahendra G Amin MD PC** | **4 (26.7%)** | **$1,000.29 (31%)** |
| 3 | Top Provider 3 | 1 | $277.63 |
| 4 | Top Provider 4 | 1 | $243.19 |
| 5 | Top Provider 5 | 1 | $238.39 |
| Top 5 Providers: Transvaginal US, Obstetric | | |
| # | Provider Name | Total Count (209) | Payment Amount ($10,580.18) |
| 1 | Top Provider 1 | 33 | $2,968.76 |
| 2 | Top Provider 2 | 18 | $454.63 |
| 3 | Top Provider 3 | 16 | $457.65 |
| 4 | **Mahendra G Amin MD PC** | **13 (6.2%)** | **$1,084.09 (10.2%)** |
| 5 | Top Provider 5 | 11 | $820.33 |
| | | **Total Count of Procedures for Dr. Amin: 392** | **Total Payment Amount to Dr. Amin: $59,967.05** |

According to information from ICE, Dr. Amin submitted referrals for four hysterectomies, but he performed only two hysterectomies—one on June 14, 2017 and the other on August 9, 2019.[594]  ICE stated to the Subcommittee that "medical records show that both procedures were medically necessary."[595]  Regarding the other two hysterectomies, one detainee refused the procedure and the other detainee was released from ICE custody before the surgery.[596]  In total, ICE approved 14 hysterectomies between 2017 and 2020, and ICE was billed $31,843 in professional fees for these services and paid $8,731.[597]  For the two hysterectomies Dr. Amin performed, ICE paid Dr. Amin $1,160.[598]  No other provider treating ICE detainees performed more than one hysterectomy during this period.[599]

---

[594] *June 23, 2021 ICE Q&A Paper, supra* note 14.
[595] *Id.*
[596] *Id.*
[597] According to ICE, "[m]edical services are reimbursed at the lesser of billed charges or the Medicare allowable, therefore the initial charges to ICE will generally not be the same as the amount paid out to the provider."  *Sept. 1, 2021 ICE Q&A Paper, supra* note 12.
[598] *Id.*
[599] From 2017 to 2020, the number of hysterectomies approved by ICE annually included: 2017 (6), 2018 (2), 2019 (5), and 2020 (1).  *Id.*

NBCU002125

## VI.    ICE FAILED TO EFFECTIVELY OVERSEE OR INVESTIGATE DR. AMIN

During the period in which Dr. Amin performed the services described in Section IV above, ICE, ICDC, and ICH all had responsibilities related to ensuring ICDC detainees received appropriate medical treatment.  As the sections below describe, ICE, in particular—and other DHS components and federal contractors—maintains a complex oversight system designed to monitor detainee healthcare and general conditions inside detention facilities.  ICE, however, engaged in limited efforts to vet Dr. Amin, monitor or review the treatment he provided, ensure he obtained informed consent or used language translation services, or investigate the public allegations against him.

### A.    Current ICE Oversight Mechanisms to Review Detention Centers and Medical Care

IHSC Field Medical Coordinators ("FMCs") typically conduct at least one site visit per year at non-IHSC facilities to evaluate their adherence to detention standards and quality of care indicators.[600]  FMCs will also conduct a general overview of the layout of facilities, identify any safety concerns related to medical care, assess the quality of health services, and follow up on previous findings from other DHS auditors or private contractors.[601]  In preparation for site visits, FMCs will review trends regarding complaints from detainees concerning medical care.[602]  FMCs will also review a sample of medical records at each facility and conduct further investigations if they detect any deviations.[603]  In addition, FMC site visits will include a review of a sample of sick call requests at each facility.[604]  FMCs will document the results of their site visits and include any recommendations and facility actions and share the site visit reports with the facility and appropriate ICE Field Office Director.[605]

To the extent that systemic issues arise with medical care at detention centers, IHSC will work with these entities to draft a corrective action plan, which will often link recommendations to specific detention standards.[606]  Local and regional FMCs will review facility responses to

---

[600] U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (June 23, 2021); *see also* Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations (Feb. 7, 2022) (Tranche 3, 01014-27).  IHSC provides direct medical care at 21 facilities in the United States and, in FY 2021, "oversaw health care for over 169,000 detainees housed in 150 non-IHSC staffed facilities."  U.S. Immigration and Customs Enforcement, ICE Health Service Corp Focused on Best Patient Outcomes (https://www.ice.gov/features/health-service-corps) (accessed Nov. 13, 2022).

[601] U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (June 23, 2021); Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations (Feb. 22, 2022) (Tranche 7, 01256).

[602] U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (June 23, 2021).

[603] *Id.*

[604] *Id.*

[605] Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations (Feb. 22, 2022) (Tranche 7, 01256).

[606] U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (June 23, 2021).

NBCU002126

corrective action plans and close any addressed recommendations.[607]  As with ICE oversight generally, FMC efforts will often overlap with inspections and investigations from ODO, CRCL, the American Correctional Association, NCCHC, and the Nakamoto Group.[608]

IHSC employees known as Regional Clinical Directors ("RCDs") are physicians with oversight responsibilities for all IHSC-staffed and non-IHSC-staffed facilities.  RCDs report to IHSC's Deputy Medical Director.[609]  These employees supervise facility clinical directors and ensure facilities comply with IHSC medical policies.[610]  RCDs will also perform the duties of a clinical director for facilities without a clinical director and supervise clinical staff, lead quality control meetings, establish weekly facility plans, and meet with department heads and providers.[611]  As previously noted, RCDs are also responsible for identifying unusually frequent referrals to a certain provider or insufficient justifications for referrals.[612]

The Veterans Affairs Financial Services Center ("VAFSC") processes medical claims for reimbursement by ICE in response to claims from off-site healthcare providers, including the receipt of requests through the MedPAR system and the provision of lists of billed treatments or procedures to IHSC.[613]  IHSC staff will then review and verify these treatments and procedures before VAFSC issues reimbursements to providers.[614]  Starting in 2020, the Health Plan Management Unit ("HPMU") inside IHSC has overseen all medical claims, and IHSC has also acquired national care guidelines—effective June 2021—to support reviews of medical care for potential waste or fraud.[615]

The IHSC officials the Subcommittee interviewed explained that IHSC plays a role in monitoring and investigating complaints from individuals that receive medical care while in detention.  Detainees can raise concerns verbally with facility employees, through a written complaint, or by calling a hotline.[616]  At IHSC-staffed facilities, staff will investigate any complaints that are received; for non-IHSC facilities, the FMC will conduct an investigation.[617]

---

[607] *Id.*

[608] U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (May 17, 2021).

[609] U.S. Immigration and Customs Enforcement Health Service Corps Official Regional Clinical Director, Interview with Senate Permanent Subcommittee on Investigations (Feb. 14, 2022).

[610] *Id.*

[611] *Id.*

[612] *Id.*; U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (May 17, 2021).

[613] *Id.*  ICE noted to the Subcommittee that medical records are not uploaded to MedPAR because this functionality does not exist.  FMCs or RCDs may, however, request these requests and upload them to a detainee's referral in the IHSC electronic health record.  Email from U.S. Immigration and Customs Enforcement Staff to the Senate Permanent Subcommittee on Investigations (Nov. 17, 2021).

[614] U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (May 17, 2021).

[615] *Id.*; *June 23, 2021 ICE Q&A Paper, supra* note 14; Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations (Feb. 22, 2022) (Tranche 7, 01254).

[616] U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (May 17, 2021).

[617] *Id.*; Email from U.S. Immigration and Customs Enforcement Staff to the Senate Permanent Subcommittee on Investigations (Nov. 17, 2021).

NBCU002127

The IHSC investigative unit will also investigate complaints submitted to the ICE Office of Professional Responsibility ("OPR").[618]  For these OPR cases, IHSC staff will conduct interviews, review relevant medical records, and present findings to the IHSC Medical Director.[619]  Upon finding that the investigation has substantiated a complaint, the Medical Director will forward the findings to the IHSC Health Care Compliance Division, which will establish a corrective action plan for the relevant facility and monitor compliance.[620]

Detainees receiving medical treatment from an off-site healthcare provider can raise concerns regarding their care in a follow-up visit with detention facility staff.[621]  Detainees can also raise concerns through the same procedures applicable to complaints regarding on-site medical care, and IHSC will respond in the same way—with the addition of outreach to the off-site provider for discussions or interviews.[622]  If IHSC receives a particularly egregious complaint—or frequent complaints—against an off-site provider, IHSC will attempt to identify a replacement provider in the community with similar expertise.[623]  An IHSC official noted to the Subcommittee, however, that because detention facilities often operate "in the middle of nowhere," no comparable specialists may be available.[624]  In addition, an October 2021 DHS OIG report similarly noted that "[r]emote locations and reluctance among some medical specialists to treat detainees reduce access to specialty care."[625]  In this case, IHSC will recommend that ICE transfer the complaining detainee to another facility near another specialist who can provide the same treatment, if medically indicated.[626]

Finally, as explained in more detail in Section B below, IHSC has begun to engage in limited vetting efforts for physicians providing off-site care, including a review of board certifications, records of adverse actions, and the HHS OIG List of Excluded Individuals/Entities.[627]

---

[618] Email from U.S. Immigration and Customs Enforcement Staff to the Senate Permanent Subcommittee on Investigations (Nov. 17, 2021).
[619] U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (May 17, 2021).
[620] *Id.*
[621] *Id.*
[622] *Id.*
[623] *Id.*
[624] *Id.*
[625] U.S. Department of Homeland Security, Office of Inspector General, *Many Factors Hinder ICE's Ability to Maintain Adequate Staffing at Detention Facilities* (OIG-22-03) (Oct. 29, 2021) (https://www.oig.dhs.gov/reports/2022/many-factors-hinder-ices-ability-maintain-adequate-medical-staffing-detention-facilities/oig-22-03-oct21).
[626] U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (May 17, 2021).
[627] *Id.*  HHS OIG possesses the authority to exclude individuals and entities from federally funded health care programs for various reasons, including for Medicare or Medicaid fraud.  HHS OIG maintains a list of these individuals and entities and routinely updates this list on its website.  U.S. Department of Health and Human Services, Office of Inspector General, *Exclusions Program* (oig.hhs.gov/exclusions/).

NBCU002128

**B.  ICE Had Limited Capabilities to Vet Off-Site Medical Providers or Monitor Their Medical Practices**

As part of its investigation into the role ICE could or should have played in preventing alleged medical abuses against ICDC detainees, the Subcommittee conducted three interviews with a group of senior IHSC officials, interviewed senior officials from the ICE Atlanta Field Office, interviewed the IHSC employee responsible for approving surgical procedures at ICDC, received narrative responses and statistics from the agency, and reviewed nearly 17,000 pages of medical records, complaints, and other internal ICE materials.  The Subcommittee's review suggests that ICE lacked—and continues to lack—key tools to detect or deter any off-site provider performing unnecessary or excessive medical treatments for ICE detainees.

The only vetting ICE performed on Dr. Amin before he began treating ICDC detainees was to confirm that he was a licensed doctor and affiliated with an accredited hospital.  ICE also failed to identify any treatment by Dr. Amin as potentially excessive or unnecessary and did not maintain a utilization review process to detect high numbers of medical procedures by off-site physicians that might indicate medical waste, fraud, or abuse.[628]  ICE was also unaware of any detainee complaints against Dr. Amin before the public allegations emerged in September 2020.[629]  IHSC officials explained to the Subcommittee that ICE policies do not require detention facilities to forward all medical grievances to ICE.  Instead, FMCs will review grievances during their site visits to facilities.

The FMC assigned to ICDC, however, did not conduct a site visit between January 2018 and October 2020—a period in which Dr. Amin billed ICE for hundreds of procedures.  Finally, ICE does not maintain policies and procedures to monitor the use of language translation services by off-site providers, ensure off-site providers obtain informed consent from detainees, or review the appropriateness of medical care at hospitals providing off-site services.

**i.  ICE Did Not Have a Thorough Process in Place to Vet Dr. Amin Before He Began Treating ICDC Detainees**

In a statement to the Subcommittee, ICE explained that "[a]t the time Dr. Amin became a provider for detainees at ICDC in 2014, ICE did not have an independent vetting process for licensed medical providers in the community, though it has since begun implementing such a process."[630]  IHSC officials told the Subcommittee that ICE authorized physicians to treat

---

[628] U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (Sept. 29, 2021).

[629] *June 23, 2021 ICE Q&A Paper, supra* note 14.

[630] *Id.*  By comparison, the Centers for Medicare & Medicaid Services ("CMS") Center for Program Integrity ("CPI") screens providers for enrollment into the Medicare program, and states are required to screen providers for enrollment into their Medicaid programs.  (States may utilize CMS's screening of providers in lieu of conducting state screenings for providers enrolling in both Medicare and Medicaid.)  CMS utilizes contractors to conduct the screening of providers.  Contractor screening procedures include checking the provider's licensure status, site visits, fingerprint checks, reviewing the HHS OIG Exclusion List, and reviewing other databases for felony convictions and other adverse actions.  Providers may be disqualified from Medicare enrollment for not having a valid license, failing the site visit, having a felony conviction, being on the HHS OIG Exclusion List, or other grounds specified in regulation pertaining to program integrity or non-compliance.  CMS also has established a Preclusion List, which is

NBCU002129

detainees if the provider had a valid license and hospital credentials.[631] As a result, IHSC did not maintain an independent vetting process for off-site medical providers or otherwise require a review of these providers before they treated detainees.[632]

IHSC officials stated to the Subcommittee, however, that in October 2019, it began a credentialing process that involves a review of a provider's board certification, records of adverse actions like license suspensions or revocations in the federal National Practitioner Data Bank ("NPDB"), and a check against the List of Excluded Individuals/Entities the HHS OIG maintains.[633] In addition, IHSC started conducting NPDB queries "intermittently" on providers "when there were concerns raised regarding the provision of care."[634] IHSC officials also explained that IHSC might also perform additional research to supplement information in the NPDB.[635]

IHSC officials further explained that in the event IHSC finds a past complaint or investigation, officials will investigate; if the concern was previously adjudicated and resolved in favor of the provider, and the provider is the only provider in a particular community, IHSC will proceed with the provider for a trial period.[636] Officials also stated that IHSC will not use providers who have had their licenses suspended by a medical licensing board or have an extensive history of misconduct, fraud, or malpractice leading to an adverse outcome, such as death or loss of limb.[637] They explained, however, that the reviews IHSC conducts do not

---

a list of providers who are precluded from receiving payment for Medicare Advantage items and services and prescribers where pharmacy claims for Medicare Part D drugs prescribed by them to Medicare beneficiaries are to be rejected or denied. Medicare Advantage plans are required to deny payment for a healthcare item or service furnished by an individual or entity on the Preclusion List and Part D sponsors are required to reject a pharmacy claim (or deny a beneficiary request for reimbursement) for a Part D drug that is prescribed by an individual on the Preclusion List. Providers on the HHS OIG Exclusion List will also appear on CMS's Preclusion List, but some providers on the CMS Preclusion List may not appear on the HHS OIG Exclusion List due to different criteria. Centers for Medicare & Medicaid Services, Briefing with Senate Permanent Subcommittee on Investigations (May 25, 2021); *see also* Centers for Medicare & Medicaid Services, *Preclusion List Frequently Asked Questions (FAQs)* (Dec. 16, 2020) (www.cms.gov/Medicare/Provider-Enrollment-and-Certification/MedicareProviderSupEnroll/Downloads/Preclusion_List_FAQs.pdf); Joe Stefansky, *CMS Preclusion v. OIG Exclusion*, Streamline Verify (Feb. 8, 2021) (www.streamlineverify.com/cms-preclusion-vs-oig-exclusion/).
[631] U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (Sept. 29, 2021).
[632] *June 23, 2021 ICE Q&A Paper*, *supra* note 14. In addition, although IHSC enters into Letters of Understanding with hospitals providing medical care to detainees, it does not engage in vetting efforts for these facilities beyond verifying their accreditation. *Id.*
[633] *June 23, 2021 ICE Q&A Paper*, *supra* note 14; U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (June 23, 2021); U.S. Immigration and Customs Enforcement, *HSGAC/PSI Interviews with ICE Health Service Corps (IHSC) Personnel Get-backs* (Nov. 5, 2021) (response on file with the Subcommittee); Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations (Feb. 22, 2022) (Tranche 7, 01258-60).
[634] Email from U.S. Immigration and Customs Enforcement Staff to the Senate Permanent Subcommittee on Investigations (Apr. 27, 2022).
[635] U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (June 23, 2021).
[636] U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (May 17, 2021).
[637] *Id.*; U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (June 23, 2021).

NBCU002130

involve obtaining data on claims a provider may have submitted to Medicare and a review of this data for potentially unusual patterns.[638]

The new recruitment process IHSC has instituted is retrospective, meaning that IHSC has focused on off-site providers with no previous Letter of Understanding ("LOU") with IHSC or a prior credentialing review.[639]  IHSC has also established LOUs with certain new providers.[640]  As part of this process, IHSC has phased in a requirement that providers submit a "provider packet" to ICE that includes a LOU, recruitment letter, and forms needed for reimbursement.[641]

As of June 28, 2021, 5,044 off-site specialty providers treated detainees in ICE custody, and IHSC completed retrospective reviews for only 96 providers, reviews were in progress for 55 providers, and reviews were pending for 70 providers.[642]  According to IHSC, no providers had been disqualified under the new independent vetting system as of September 2021.[643]  IHSC has noted that it will increase the amount of LOUs processed each year as it expands its staffing.[644]

ICE had not completed the process described above for Dr. Amin at the time of the public allegations against him in September 2020.[645]  A December 30, 2020, email to a senior IHSC official noted that the LOU process was not started for Dr. Amin "due to the back log of 100+ recruitment requests pending for LOU's [sic] and 100+ in progress. [...]  The credentialing process was not completed either."[646]

After learning of the September 2020 allegations, however, ICE searched for information concerning Dr. Amin in the HHS OIG List of Excluded Individuals/Entities and did not find any information indicating he had been excluded or debarred.[647]  ICE found that Dr. Amin held an active license from the Medical Board of Georgia and did not discover any public board actions

---

[638] U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (June 23, 2021).  ICE noted to the Subcommittee that the credentialing process includes a check of the HHS OIG List of Excluded Individuals/Entities, which is a "list of 'bad actors.'"  Email from U.S. Immigration and Customs Enforcement Staff to the Senate Permanent Subcommittee on Investigations (Nov. 11, 2022).

[639] U.S. Immigration and Customs Enforcement, *PSI Briefing Get Backs* (July 26, 2021).

[640] *Id.*  An LOU will explain that the provider will accept Medicare rates, provide IHSC with access to medical records, and perform an agreed set of services.  U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (June 23, 2021).

[641] *June 23, 2021 ICE Q&A Paper*, *supra* note 14; Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations (Feb. 7, 2022) (Tranche 3, 01072).

[642] U.S. Immigration and Customs Enforcement, *PSI Briefing Get Backs* (July 26, 2021) (response on file with the Subcommittee).

[643] U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (Sept. 29, 2021).

[644] U.S. Immigration and Customs Enforcement, *PSI Briefing Get Backs* (July 26, 2021) (response on file with the Subcommittee).

[645] *June 23, 2021 ICE Q&A Paper*, *supra* note 14.

[646] Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations (Sept. 17, 2021) (Tranche 7, 2010).

[647] *June 23, 2021 ICE Q&A Paper*, *supra* note 14; Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations (Sept. 27, 2021) (Tranche 10, 3041).

NBCU002131

against him.[648]  ICE also found that Dr. Amin held privileges at Coffee Regional Hospital and ICH and was a board eligible OB-GYN.[649]  Finally, ICE noted that it reviewed documents related to prior medical malpractice settlements paid by Dr. Amin and his 2015 settlement with DOJ—but again, this occurred *after* the September 2020 allegations.[650]

According to IHSC, under the new independent vetting process, these adverse actions would be reviewed but would only be "red flags" if any allegations were substantiated.[651]  Therefore, if the new vetting system had been applied to Dr. Amin, based on IHSC's assessment that the information in the NPDB were only allegations and not substantiated as the claims were "settled" without a determination of liability, and the fact that the state of Georgia had never restricted Dr. Amin's license or otherwise intervened at any point, ICE would not necessarily have disqualified him from treating ICE detainees.[652]

An IHSC official also explained to the Subcommittee that in no scenario would an off-site provider undergo a peer review.[653]  ICE later noted that community-based providers are not ICE employees or contractors and therefore not subject to ICE's peer-review requirements.[654]  An IHSC official told the Subcommittee that because peer reviews are standard practice in the medical community, IHSC made a "reasonable assumption" that ICH and its treatment oversight board reviewed Dr. Amin's treatment and charts.[655]

> ### ii.    ICE Never Identified Any Treatment by Dr. Amin as Potentially Excessive or Unnecessary and Lacked a Utilization Review Process to Identify Trends in Off-Site Medical Treatment

IHSC never identified any treatment by Dr. Amin as potentially excessive or unnecessary.  When asked about the fact that the volume of procedures Dr. Amin performed on ICDC detainees was substantially out of proportion to the number of OB-GYN procedures performed by any other OB-GYN treating ICE detainees, IHSC officials explained that the disparity alone was not reason for alarm and that the surgeries were approved on a case-by-case basis by IHSC.[656]

In addition, before September 2020, IHSC never sought to determine whether any of the OB-GYN procedures Dr. Amin performed were medically necessary beyond the initial approval

---

[648] *Id.*

[649] *Id.*  "Board eligible" refers to a physician who has completed the requirements necessary before undergoing a board examination, but who has not taken or passed the examination.  MedicineNet, *Medical Definition of Board Eligible* (www.medicinenet.com/board_eligible/definition.htm) (accessed Nov. 13, 2022).

[650] *June 23, 2021 ICE Q&A Paper, supra* note 14.

[651] U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (Sept. 29, 2021).

[652] *Id.*

[653] IHSC officials told the Subcommittee that it conducts peer reviews of its staff at IHSC facilities.  *Id.*

[654] Email from U.S. Immigration and Customs Enforcement Staff to the Senate Permanent Subcommittee on Investigations (Nov. 17, 2021).

[655] U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (Sept. 29, 2021).

[656] *Id.*

NBCU002132

process.[657] ICE further noted to the Subcommittee that because "Dr. Amin is a community provider who owns and operates his own private practice and he is not an ICE employee or contractor," no corrective actions in response to allegations concerning his treatment were available during the period in which he treated ICDC detainees.[658]

In interviews with the Subcommittee, IHSC officials explained that until recently, IHSC did not maintain a real-time or automated system to detect high numbers of medical procedures by off-site physicians that might be indicative of waste, fraud, or abuse.[659] As ICE stated to the Subcommittee in November 2021, "IHSC does not have a utilization review process in place to identify overutilization of medical procedures."[660] Although the VAFSC—the entity responsible for processing claims from off-site providers—has certain limited capabilities to detect suspicious activity, IHSC officials noted to the Subcommittee that these functions are "not impressive," and VAFSC does not automatically screen or report claims to ICE for waste, fraud, or abuse.[661] Essentially, VAFSC currently focuses only on the existence of an authorization for a particular medical procedure.[662]

Because IHSC has not obtained satisfactory "deep dive" metrics on waste, fraud, and abuse from its current arrangement with VAFSC, it has recently worked to transition to an electronic claims management system—the Electronic Claims Adjudication Management System ("eCAMS")—from VAFSC to more efficiently adjudicate claims.[663] IHSC officials estimated that IHSC could begin using eCAMS in fiscal year 2022.[664]

---

[657] *Id.*

[658] *June 23, 2021 ICE Q&A Paper*, *supra* note 14.

[659] U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (May 17, 2021); U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (June 23, 2021); U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (Sept. 29, 2021). In contrast, the CMS Center for Program Integrity utilizes contractors to conduct various reviews at different points during the Medicare payment process. According to CMS officials, CMS receives over 1.2 billion Medicare claims a year, and CMS reviews less than 1 million. Medical Review Contractors conduct primarily prepayment reviews and prior authorizations and Recovery Audit Contractors conduct post-payment reviews. All payment reviews are informed by data analytics. CMS review contractors must adhere to statute, regulations, and the Medicare Program Integrity Manual, and CMS conducts oversight of its contractors to ensure they make accurate decisions. Centers for Medicare & Medicaid Services, Briefing with Senate Permanent Subcommittee on Investigations (May 25, 2021).

[660] U.S. Immigration and Customs Enforcement, *HSGAC/PSI Interviews with ICE Health Service Corps (IHSC) Personnel Get-backs* (Nov. 5, 2021) (response on file with the Subcommittee).

[661] U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (May 17, 2021).

[662] U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (June 23, 2021).

[663] *Id.;* U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (May 17, 2021).

[664] U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Permanent Subcommittee on Investigations (June 23, 2021).

NBCU002133

The current IHSC system is around 20 years old.[665] This new claims processing system "will support fraud, waste, and abuse [] reviews related to medical claims."[666] In June 2021, IHSC procured national care guidelines from Milliman Care Guidelines and has begun using a web-based application from this entity for utilization review of ICE medical claims, beginning with a retrospective review of these claims.[667]

According to IHSC, the Milliman Care Guidelines "will be used for [utilization review] in retrospective, concurrent, and prospective formats when used in its fullest potential."[668] Although IHSC has not established the criteria and process for investigations regarding instances of suspected waste, fraud, or abuse flagged by the new system, the investigations will be conducted by "trained [Certified Professional Medical Auditors] based on established criteria, national care guidelines [Milliman Care Guidelines], as well as related CMS and Title 18 regulations."[669]

Although IHSC is unable to identify trends using VAFSC, IHSC officials explained to the Subcommittee that RCDs may report unusually frequent numbers of referrals to a certain provider.[670] In an interview with the Subcommittee, an IHSC official with first-hand knowledge of RCD practices confirmed that reporting a high number of referrals was part of the RCD's responsibilities.[671]

However, in an interview with the RCD specifically responsible for approving surgical referrals for ICDC detainees, the RCD stated to the Subcommittee that they did not track the total number of referrals to off-site providers or referrals by types of surgical procedures and, in fact, did not "track referrals at all."[672] Instead, to determine whether the number of referrals was unusual, the ICDC RCD would review factors such as the population at a facility. The ICDC

---

[665] *Id.*

[666] *June 23, 2021 ICE Q&A Paper*, *supra* note 14.

[667] U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (June 23, 2021); Email from U.S. Immigration and Customs Enforcement Staff to the Senate Permanent Subcommittee on Investigations (Nov. 17, 2021); Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations (Feb. 22, 2022) (Tranche 7, 01254).

[668] Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations (Feb. 22, 2022) (Tranche 7, 01254).

[669] Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations (Feb. 22, 2022) (Tranche 7, 01256).

[670] U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (May 17, 2021).  ICE noted to the Subcommittee that even if an outlier was identified, it would require a review of medical records and consultation with an expert physician to make a determination of over-utilization and/or inappropriate medical services.  Email from U.S. Immigration and Customs Enforcement Staff to the Senate Permanent Subcommittee on Investigations (Nov. 17, 2021); U.S. Immigration and Customs Enforcement Health Service Corps Official Regional Clinical Director, Interview with Senate Permanent Subcommittee on Investigations (Feb. 14, 2022).

[671] U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (May 17, 2021).

[672] U.S. Immigration and Customs Enforcement Health Service Corps Official Regional Clinical Director, Interview with Senate Permanent Subcommittee on Investigations (Feb. 14, 2022).

NBCU002134

RCD stated that they did not compare off-site providers in question to other off-site providers or facilities to determine a high number of referrals.[673]

The ICDC RCD stated that they did not flag any referrals for Dr. Amin.[674]  The ICDC RCD stated to the Subcommittee that they were not concerned with the disparities in procedures between Dr. Amin and the other off-site providers as discussed above because some facilities housed a larger female population than other facilities, and questioned "why should I be concerned."[675]  Furthermore, the RCD stated that RCDs in general are not required to provide regular reports relating to referrals to IHSC.[676]

IHSC stated that it intends to provide nationally-recognized steps for RCDs to follow before approving referrals for medical procedures.[677]  As mentioned above, IHSC does not currently provide guidance to RCDs regarding the referral approval process.[678]  For example, IHSC does not provide guidance to RCDs for determining the medical necessity of a D&C procedure, and the review process for a hysterectomy is the same for a hernia.[679]  The ICDC RCD stated to the Subcommittee that they considered the detainee's needs and factored in the psychological impact of undergoing surgery while detained.[680]  This RCD stated that they relied mainly on their medical training and expertise when evaluating referrals.

In an interview with the Subcommittee, however, the ICDC RCD stated they had no additional training specific to the OB-GYN specialty since residency rotations in the 1980s and 1990s.[681]  IHSC explained to the Subcommittee that while this review process "previously relied on clinical judgment of individual medical experts, the new system will combine clinical judgment with an approach that includes nationally recognized community standards of care based on evidence-based practice (EBP) and will also allow IHSC to collect more information and facilitate more efficient and effective reviews."[682]

iii.    **ICE Performed a Limited Investigation Following the Public Allegations Against Dr. Amin**

Dr. Amin stopped seeing ICE detainees in September 2020, after the publication of the whistleblower allegations.[683]  IHSC conducted a limited review of medical records for his

---

[673] *Id.*

[674] *Id.*; *see also* Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations (Feb. 22, 2022) (Tranche 7, 01255).

[675] U.S. Immigration and Customs Enforcement Health Service Corps Official Regional Clinical Director, Interview with Senate Permanent Subcommittee on Investigations (Feb. 14, 2022).

[676] *Id.*

[677] U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (June 23, 2021).

[678] *Id.*

[679] U.S. Immigration and Customs Enforcement Health Service Corps Official Regional Clinical Director, Interview with Senate Permanent Subcommittee on Investigations (Feb. 14, 2022).

[680] *Id.*

[681] *Id.*

[682] *June 23, 2021 ICE Q&A Paper*, *supra* note 14.

[683] *Id.*

86

NBCU002135

patients, but IHSC officials explained to the Subcommittee that they did not undertake a deeper dive because they were told by ICE ERO leadership to "stand down" and await the completion of the DHS OIG investigation.[684]   IHSC officials stated a more extensive evaluation would have required an "in-depth review of the record," which IHSC did not have due to incomplete records from ICDC.[685]   IHSC officials informed the Subcommittee that ICH refused to provide additional records to IHSC due to the ongoing DHS OIG investigation.[686]

ICE explained that IHSC conducted a "comparative analysis of medical referrals and claims completed after receiving allegations about Dr. Amin."[687]   IHSC did not compare services performed by Dr. Amin to services by other providers for ICDC detainees, "as Dr. Amin saw the majority of OB/GYN patients from 2014 to 2020 and such a comparison would not have been helpful."[688]   IHSC did "conduct an analysis of referral and claims data at ICDC compared to other ICE detention facilities housing females and determined that the number of referrals and claims was not abnormal."[689]

More than one year after the public allegations regarding Dr. Amin emerged, IHSC staff expressed uncertainty to the Subcommittee as to why significant disparities existed between the volume of OB-GYN procedures he performed and procedures by other off-site physicians treating detainees.[690]   IHSC staff, for example, speculated that ICDC might have had a higher percentage of female detainees than other facilities.[691]   Those explanations do not explain the fact that Dr. Amin performed more than 90% of particular OB-GYN procedures when compared to the entire ICE detention network across the United States, and yet the ICDC facility housed just 4% of the female population.

---

[684] U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (Sept. 29, 2021); Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations (Feb. 22, 2022) (Tranche 7, 01257).  ICE noted that it is standard practice across DHS components to cease investigations while DHS OIG moves forward with its investigation to mitigate the risk of interfering with the OIG investigation.  Email from U.S. Immigration and Customs Enforcement Staff to the Senate Permanent Subcommittee on Investigations (Nov. 17, 2021).  Similarly, the decision to "stand down" here was "done to preclude potential interference and/or duplication of effort with DHS OIG."  ICE stated that the DHS OIG's investigation "takes precedence over ICE investigations."  Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations (Feb. 22, 2022) (Tranche 7, 01257).

[685] U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (Sept. 29, 2021).  ICE also reported to the Subcommittee that DHS CRCL has opened numerous investigations into inappropriate medical care provided to female detainees at ICDC, including translation issues, general conditions, and alleged retaliation in response to grievances.  Email from U.S. Immigration and Customs Enforcement Staff to the Senate Permanent Subcommittee on Investigations (Nov. 17, 2021).

[686] U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (Sept. 29, 2021).

[687] *June 23, 2021 ICE Q&A Paper, supra* note 14.

[688] *Id.*

[689] *Id.*  Information ICE used in this analysis is discussed in more detail in Section IV above.

[690] U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (Sept. 29, 2021).

[691] *Id.*

NBCU002136

IHSC officials also suggested that other factors affecting the number of OB-GYN claims for ICDC detainees could include whether ICDC referred all OB-GYN specialty care off-site, in contrast to policies and capabilities at other detention facilities that might perform routine gynecological exams and treatments on-site.[692]  ICE later noted to the Subcommittee, however, that *no* detention facilities would have the capacity to perform D&C procedures or laparoscopies on-site, "as those are [operating room] procedures that need to be performed in an ambulatory surgical center or hospital by [an] OB-GYN."[693]

Relatedly, IHSC officials mentioned anecdotal evidence that in-house ICDC medical staff might have been uncomfortable performing certain procedures like administering Depo-Provera injections, leading to a higher volume of shots administered by Dr. Amin.[694]  ICE later explained, however, that IHSC did not review whether facilities administered Depo-Provera shots or pelvic exams on-site and may not have been able to make this determination, given that non-IHSC-run detention centers would not have reported this care to IHSC.[695]  IHSC also identified other factors relevant to an analysis of OB-GYN claims, including age, pregnancy and birth history, previous pelvic and birth history, previous pelvic infections, and surgical history for female detainee populations.[696]

However, IHSC officials did not take the factors described above into account when analyzing the data it compiled for Dr. Amin's treatments because it would have involved "a huge undertaking," and IHSC had discontinued its efforts due to the DHS OIG investigation.[697]

As mentioned above, IHSC found that Dr. Amin only performed two hysterectomies,[698] and ICE stated to the Subcommittee that "medical records show that both procedures were medically necessary."[699]  According to IHSC officials, substantial intramural fibroids and cervical cancer were the medical indications for the two procedures.[700]  IHSC further determined that "Dr. Amin performed total hysterectomies on less than 1% of those detainees to whom he provided OB/GYN services," which it described as "not excessive" given hysterectomy rates among the U.S. female population.[701]

---

[692] *Id.*

[693] U.S. Immigration and Customs Enforcement, *HSGAC/PSI Interviews with ICE Health Service Corps (IHSC) Personnel Get-backs* (Nov. 5, 2021) (response on file with the Subcommittee).

[694] U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (Sept. 29, 2021).

[695] U.S. Immigration and Customs Enforcement, *HSGAC/PSI Interviews with ICE Health Service Corps (IHSC) Personnel Get-backs* (Nov. 5, 2021) (response on file with the Subcommittee).

[696] Email from U.S. Immigration and Customs Enforcement Staff to the Senate Permanent Subcommittee on Investigations (Nov. 17, 2021).

[697] U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (Sept. 29, 2021).

[698] Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations (Sept. 27, 2021) (Tranche 10, 3039).

[699] *June 23, 2021 ICE Q&A Paper*, *supra* note 14.

[700] U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (Sept. 29, 2021).

[701] *June 23, 2021 ICE Q&A Paper*, *supra* note 14.

NBCU002137

After the conclusion of its limited review, IHSC produced an internal summary memorandum for DHS headquarters dated October 5, 2020, which included recommendations regarding prior authorization and concurrence utilization review—a review of medical services while the patient receives these services—as well as continuing the LOU process with off-site providers and related credentialing process.[702]  IHSC further recommended working with ICDC and LaSalle staff to secure community OB-GYN services for ICDC detainees and suggested that the FMC assigned to ICDC conduct a site visit as soon as possible.[703]  These recommendations have been implemented throughout all contract facilities with IHSC, including ICDC prior to September 2021 when the contract ended.

### iv. ICE Personnel Failed to Conduct Site Visits to ICDC Between January 2018 and October 2020

As noted above, ICE policies state that FMCs should conduct at least one site visit per year at non-IHSC facilities to ensure these facilities have complied with contractual detention standards.[704]  However, an investigation that former DHS Acting Deputy Secretary Ken Cuccinelli began into ICDC allegations in the fall of 2020 found that the FMC responsible for ICDC had not visited the facility in several years.[705]  Mr. Cuccinelli stated that he was alarmed by the prospect of involuntary hysterectomies and formed a three-person team to inspect the ICDC facility, review detainee medical records, and interview female detainees over the course of approximately one week in the fall of 2020.[706]

Mr. Cuccinelli told the Subcommittee finding that the FMC had not visited the facility in several years "was not a favorable discovery" and stated: "You would think the people responsible for medical care would get to the … facility."[707]  After his team's initial review, in which they tentatively determined that involuntary hysterectomies were not occurring, Mr. Cuccinelli stated he was primarily concerned with the FMC's lack of visits to ICDC.[708]

The October 5, 2020, IHSC memorandum mentioned above confirmed this finding from the Cuccinelli investigative team.  The memorandum explained that the last FMC site visit to

---

[702] According to ICE, the agency is in the process of implementing these recommendations.  Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations (Sept. 27, 2021) (Tranche 10, 3037-42) (notes on file with the Subcommittee); U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (Sept. 29, 2021); Email from U.S. Immigration and Customs Enforcement Staff to the Senate Permanent Subcommittee on Investigations (Feb. 11, 2022).

[703] Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations (Sept. 27, 2021) (Tranche 10, 3037-42) (notes on file with the Subcommittee).

[704] U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (June 23, 2021); U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (Sept. 29, 2021).

[705] Ken Cuccinelli, Interview with Senate Permanent Subcommittee on Investigations (Sept. 20, 2021).

[706] *Id.*; *see also* Natalie Andrews and Michelle Hackman, *U.S. Opens Investigation into Claims of Forced Hysterectomies on Detained Migrants*, The Wall Street Journal (Sept. 16, 2020) (www.wsj.com/articles/lawmakers-seek-investigation-into-allegations-of-mass-hysterectomies-on-detained-migrants-11600291610).

[707] Ken Cuccinelli, Interview with Senate Permanent Subcommittee on Investigations (Sept. 20, 2021).

[708] *Id.*

NBCU002138

ICDC was conducted on January 8, 2018, and no site visit occurred in 2019 "due to the government shut down at the beginning of the year and [temporary staffing] requirements for FMCs which made scheduling and completing the ICDC site visit difficult."[709]  The memorandum further explained that the FMC "prioritized" site visits to facilities that had major findings and non-compliance with standards during the 2018 site visits.[710]  An IHSC official told the Subcommittee that IHSC prioritizes facilities that have had serious medical concerns in the past, and "ICDC was not one of those facilities."[711]  In addition, the FMC completed a site visit to Stewart Detention Facility in Lumpkin, Georgia, instead of ICDC in 2019 because "Stewart had recently transitioned to an IGSA."[712]  A site visit was scheduled for ICDC in March 2020, but that visit did not occur due to the COVID-19 pandemic, and the FMC "prioritized ICDC for an onsite visit in October 2020."[713]

According to an IHSC official, the October 2020 ICDC site visit did, in fact, occur and no significant medical deficiencies were identified.[714]  ICE also noted to the Subcommittee that ICDC received site visits from the Nakamoto Group in June 2018, June 2019, and September 2020, as well as an ODO visit in March 2020, and that ICE CMD had a DSCO assigned to ICDC.[715]

---

[709] Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations (Sept. 27, 2021) (Tranche 10, 3038).  An IHSC official explained that IHSC clinical staff is required to support ITOS (IHSC Temporary Duty On-call Schedule) efforts for 30 days each year to address staffing shortages.  Another IHSC official stated that IHSC staff is constantly pulled into activities such as COVID-19 testing for U.S. Customs and Border Protection, making site reviews difficult.  This official told Subcommittee staff that ICE leadership is aware that other activities will "fall off" as a result.  U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (Sept. 29, 2021).  A recent DHS OIG report noted that "FMC resources are…limited; approximately 40 FMCs are responsible for oversight of 148 non-IHSC staffed ICE detention facilities."  In response, ICE noted that it had analyzed FMC staffing levels and "concluded that it was necessary to add FMC positions.  ICE officials stated that formal presentation of the evaluation and staffing recommendations is pending, but that some new positions were created."  U.S. Department of Homeland Security, Office of Inspector General, *Many Factors Hinder ICE's Ability to Maintain Adequate Staffing at Detention Facilities* (OIG-22-03) (Oct. 29, 2021) (https://www.oig.dhs.gov/reports/2022/many-factors-hinder-ices-ability-maintain-adequate-medical-staffing-detention-facilities/oig-22-03-oct21).
[710] Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations (Sept. 27, 2021) (Tranche 10, 3038).
[711] U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (Sept. 29, 2021).  This official also stated that complications due to ITOS responsibilities—a temporary duty on-call schedule for the IHSC clinical workforce—was a reasonable explanation for the absence of a site visit to ICDC in 2019.  *Id.*
[712] Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations (Sept. 27, 2021) (Tranche 10, 3038).
[713] *Id.*
[714] U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (Sept. 29, 2021).  The 2020 ICDC site visit report found the facility compliant with the standards and noted that "[t]here were no areas of concern noted during reviews of medical records, facility processes, procedures, and policy."  Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations (Feb. 14, 2022) (Tranche 5, 01095).
[715] Email from U.S. Immigration and Customs Enforcement Staff to the Senate Permanent Subcommittee on Investigations (Nov. 17, 2021).  ICDC received a "Meets Standard" rating from the Nakamoto Group for each inspection from 2018 to 2020 and met the ICE PBNDS.  The Nakamoto Group did not identify significant medical deficiencies.  Information on the March 2020 ODO site visit is discussed in more detail in Section II above.

NBCU002139

### v.   ICE Is Not Required to Monitor the Use of Language Translation Services by Off-Site Medical Providers

IHSC does not monitor the use of language translation services by non-IHSC facilities, such as ICDC, although it tracks the use of these services in IHSC-staffed facilities on a yearly basis and audits invoices to the translation vendor.[716]  Similarly, IHSC does not monitor use of language translation services by off-site providers even though it provides a phone number and code for a "language line translator" with a referral to an off-site specialist.[717]  IHSC officials stated to the Subcommittee that they believe each provider has a professional responsibility to provide language services to ensure their patients understand each proposed treatment—and neither IHSC nor the relevant detention facility plays a role in ensuring a provider meets this responsibility.[718]

Internal ICE emails appear to confirm that ICE does not monitor the use of language translation services by off-site medical providers.  In a September 17, 2020, email to ICE officials, a *New York Times* reporter asked whether ICE had records of Dr. Amin's use of translation or interpretation services for ICDC detainees.[719]  An ICE Atlanta Field Office official later sent an internal email stating that Dr. Amin "uses a language line service," but "we do not track his usage."[720]

### vi.   ICE Is Not Required to Ensure Off-Site Medical Providers Obtain Informed Consent

ICE detention standards define informed consent as: "An agreement by a patient to a treatment, examination, or procedure after the patient receives the material facts about the nature,

---

Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations (June 8, 2021) (668-703); Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations (Jan. 31, 2022) (Tranche 2, 00295-893).

[716] U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (June 23, 2021); U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (Sept. 29, 2021).  According to IHSC officials, ICE ODO and DHS CRCL monitor the use of language services in non-IHSC facilities and will indicate any deficiencies related to these services in their reports.  U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (Sept. 29, 2021).

[717] U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (Sept. 29, 2021).  Documents reviewed by the Subcommittee showed that off-site referrals included a phone number and code for a translator.  *See, e.g.,* LaSalle_333444; LaSalle_333490; LaSalle_333516.

[718] U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (Sept. 29, 2021).

[719] Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations (Oct. 27, 2021) (Tranche 17, 11058).

[720] Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations (Oct. 27, 2021) (Tranche 17, 11057).

NBCU002140

consequences, and risks of the proposed treatment, examination or procedure; the alternatives to it; and the prognosis if the proposed action is not undertaken."[721]

As with language translation services, ICE does not monitor off-site providers to ensure they obtain informed consent from detainees before providing medical services.[722]  Instead, IHSC officials explained to the Subcommittee that providers have a professional responsibility to obtain informed consent and include consent forms with medical records, and hospitals have an incentive to obtain consent to avoid risking their accreditation.[723]  As a result, neither IHSC officials—including RCDs—nor detention facilities like ICDC have a role in ensuring providers fulfill these responsibilities.[724]  In fact, the ICDC RCD had "no idea" what the process was for obtaining consent for a surgical procedure from a detainee.[725]

During its limited investigation into allegations concerning Dr. Amin, IHSC searched for consent forms related to certain detainee patients and found that forms were missing in some cases.[726]  According to IHSC, this was "not best practices,"[727] and IHSC officials reinforced to ICDC the importance of maintaining full records for all off-site medical procedures.[728]  Mr. Cuccinelli identified a major concern related to female ICDC detainees who indicated they did not understand or consent to treatments Dr. Amin performed.[729]  Mr. Cuccinelli also stated that "there was definitely a disconnect" in the patient-doctor relationship, and detainees were not in a position to understand the procedures that occurred, "which is in itself inadequate."[730]

Internal communications also appear to confirm that ICE relied on off-site providers to meet their professional obligation to obtain consent instead of verifying that detainees provided consent or auditing consent documents after treatments.  For example, in an email exchange from

---

[721] U.S. Department of Homeland Security, U.S. Immigration and Customs Enforcement, *Performance-Based National Detention Standards 2011*, at 469-470 (Revised December 2016) (https://www.ice.gov/doclib/detention-standards/2011/pbnds2011r2016.pdf).

[722] U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (Sept. 29, 2021).

[723] *Id.;* U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (June 23, 2021).  IHSC officials and medical staff at randomly selected facilities stated to the Government Accountability Office that "ICE expects community providers, as licensed medical professionals, to execute all aspects of informed consent when providing care to detained noncitizens," and that "it is the responsibility of the off-site community provider to obtain and document informed consent."  Government Accountability Office, *Immigration Detention: ICE Needs to Strengthen Oversight of Informed Consent for Medical Care*, 15 (GAO-23-105196) (Oct. 2022) (https://www.gao.gov/products/gao-23-105196).

[724] U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (June 23, 2021); U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (Sept. 29, 2021); U.S. Immigration and Customs Enforcement Health Service Corps Official Regional Clinical Director, Interview with Senate Permanent Subcommittee on Investigations (Feb. 14, 2022).

[725] U.S. Immigration and Customs Enforcement Health Service Corps Official Regional Clinical Director, Interview with Senate Permanent Subcommittee on Investigations (Feb. 14, 2022).

[726] U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (Sept. 29, 2021).

[727] *Id.*

[728] *Id.*

[729] Ken Cuccinelli, Interview with Senate Permanent Subcommittee on Investigations (Sept. 20, 2021).

[730] *Id.*

NBCU002141

September 2020, an official from the Consulate General of Mexico stated that the medical file for Y.J.—a Mexican national who was subject to gynecological procedures by Dr. Amin while detained at ICDC—was missing consent forms and asked an ICE Atlanta Field Office official "how consent is obtained from detainees and if there are any forms they have to sign to submit themselves to invasive procedures."[731]  This ICE official replied by stating that "[c]onsent forms are obtained by the surgeon" and that "files are maintained at his office and at the hospital."[732]

Recently, the Government Accountability Office ("GAO") conducted a review of 48 medical files from six ICE detention facilities across the country.[733]  GAO determined that these facilities generally documented informed consent for care provided within the facility's medical unit.[734]  Like ICDC, however, GAO determined that most facilities reviewed did not include consent documentation in medical records for off-site medical care.[735]  GAO highlighted that ICE policies do not require detention facilities to obtain documentation of informed consent for off-site medical care.[736]  GAO recommended: (1) ICE should establish and communicate a policy requiring IHSC-staffed facilities to collect informed consent documentation for medical care from community providers; (2) ICE should require non-IHSC-staffed detention facilities to collect informed consent documentation for medical care from community providers; and (3) ICE should include a review of these policies in its oversight mechanisms once they are established.[737]

### vii.   ICE Conducts Limited Oversight of Hospitals Providing Off-Site Services for Non-IHSC Detention Facilities

ICE conducts limited oversight of hospitals providing off-site care to ICE detainees. IHSC, for example, did not maintain a written agreement or contract with ICH while ICDC housed detainees, and IHSC officials indicated that any agreement with the hospital would be at the "local level."[738]  Although ICE has begun entering into LOUs with hospitals, as mentioned above, it never concluded an LOU with ICH.[739]  However, according to ICE, an LOU is not a contract or agreement that directs hospitals on how to provide medical care and other services to

---

[731] Citizens for Responsibility and Ethics in Washington, National Immigration Project of the National Lawyers Guild, and Project South, *Deliberate Indifference: Records Show ICE's Systemic Failures at Georgia Detention Facility at the Center of Gynecological Abuse Investigations* (June 2021) (nipnlg.org/PDFs/2021_03June_ICE-ICDC-Report.pdf).

[732] *Id.*

[733] Government Accountability Office, *Immigration Detention: ICE Needs to Strengthen Oversight of Informed Consent for Medical Care* (GAO-23-105196) (Oct. 2022) (https://www.gao.gov/products/gao-23-105196).

[734] *Id.*

[735] *Id.*

[736] *Id.*

[737] *Id.*

[738] U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (Sept. 29, 2021).  As noted above, ICDC detainees received OB-GYN services at ICH due to Dr. Amin's affiliation with the hospital.

[739] U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (Sept. 29, 2021).

NBCU002142

detainees.[740]  Before ICH began treating ICDC detainees, IHSC also did not conduct any reviews to determine whether the hospital had been the subject of previous allegations concerning medical waste, fraud, or abuse.[741]

IHSC officials said they intend to review inpatient hospital admissions using the Milliman Care Guidelines as part of IHSC's new utilization review process, but no reviews have been performed to date.[742]  IHSC also has not required hospitals to submit regular reports or other information concerning the treatment of detainees, with the exception of clinical updates regarding in-patient care, and it does not provide guidance or policies to hospitals regarding appropriate treatment.[743]

## VII.   ICDC HAD LIMITED OBLIGATIONS TO CONDUCT OVERSIGHT OF OFF-SITE CARE FOR DETAINEES

LaSalle, the contractor who operated the ICDC facility, says it played a very limited role in vetting off-site physicians treating detainees from ICDC, reviewing the medical care they administered, or ensuring that detainees provided informed consent in connection with these procedures.  LaSalle and ICDC employees were also unaware of any review by ICDC staff prior to the September 2020 complaint that revealed abuse, waste, or fraud in connection with care Dr. Amin provided or any complaints or grievances from ICDC detainees concerning Dr. Amin.

Finally, LaSalle and ICDC conducted a limited review of medical records for ICDC detainees who had received gynecological surgical procedures from Dr. Amin following the public allegations against him.  LaSalle Medical Director Dr. Hearn could not make a conclusive determination regarding the appropriateness of the gynecological care Dr. Amin provided.  LaSalle representatives stated to the Subcommittee that no ICDC employee had authority or responsibility related to the quality or nature of care off-site physicians provided—only the duty to negotiate and maintain arrangements with these physicians.

### A.   LaSalle Had Minimal Contractual Obligations Concerning Off-Site Medical Care at ICDC

In interviews with the Subcommittee, ICDC officials described limited efforts to vet Dr. Amin before he provided care to ICDC detainees or review the care he eventually provided.  For example, ICDC Warden Paulk, Deputy Warden Frank Albright, and Medical Director Dr.

---

[740] ICE noted to the Subcommittee that LOUs are only intended to describe the services the provider can offer and to ensure the provider agrees to accept Medicare reimbursement rates.  Email from U.S. Immigration and Customs Enforcement Staff to the Senate Permanent Subcommittee on Investigations (Nov. 17, 2021).
[741] U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (Sept. 29, 2021).
[742] *Id.*; Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations (Feb. 22, 2022) (Tranche 7, 01254); Email from U.S. Immigration and Customs Enforcement Staff to the Senate Permanent Subcommittee on Investigations (Nov. 11, 2022).  *See also* Milliman Care Guidelines, *Industry-Leading Evidence-Based Care Guidelines* (https://www.mcg.com/care-guidelines/care-guidelines/) (accessed Nov. 13, 2022).
[743] U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (Sept. 29, 2021).

NBCU002143

McMahan were unaware of the 2015 settlement between Dr. Amin and other parties and DOJ or the previous malpractice lawsuits against Dr. Amin.[744]  Dr. McMahan also stated that he was not aware of any efforts by ICDC to vet Dr. Amin before he began treating ICDC detainees.[745]

LaSalle representatives explained to the Subcommittee that the company plays no role in vetting off-site medical providers for detainees.[746]  Dr. Hearn, Medical Director for LaSalle, also confirmed that LaSalle employees play no role in vetting off-site providers.[747]  All current ICDC and LaSalle employees the Subcommittee interviewed indicated they became aware of recent allegations against Dr. Amin only through the public disclosures in September 2020.[748]

LaSalle explained to the Subcommittee that the IGSA between ICDC and ICE required only that ICDC "ensure…access to an offsite emergency medical provider at all times."[749] Moreover, according to LaSalle's contract with ICE, the only obligation of the HSA related to this issue was, in collaboration with ICE, to "negotiate[] and maintain[] agreements with nearby medical facilities or health care providers to provide required health care not available within the facility."[750]

Regarding oversight of medical care by Dr. Amin, Dr. McMahan explained that the HSA, in accordance with her general oversight concerning access to care, and the DON might have become aware of certain aspects of care by off-site providers and would consult with him, as the facility's Medical Director, on occasion.[751]  Dr. McMahan, however, could not recall any particular circumstances in which these officials referred a patient who had seen Dr. Amin to him for further oversight.[752]

---

[744] Howard McMahan, Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Sept. 15, 2021); David Paulk, Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Sept. 16, 2021); Frank Albright, Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Sept. 21, 2021).

[745] Howard McMahan, Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Sept. 15, 2021).

[746] Counsel for LaSalle, Briefing with Senate Permanent Subcommittee on Investigations (May 19, 2021).

[747] Pamela Hearn, LaSalle Corrections, Interview with Senate Permanent Subcommittee on Investigations (Nov. 9, 2021).

[748] Howard McMahan, Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Sept. 15, 2021); David Paulk, Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Sept. 16, 2021); Frank Albright, Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Sept. 21, 2021); Pamela Hearn, LaSalle Corrections, Interview with Senate Permanent Subcommittee on Investigations (Nov. 9, 2021).

[749] LaSalle_048633-89; Email from Counsel for LaSalle to the Senate Permanent Subcommittee on Investigations (Nov. 17, 2021).

[750] LaSalle_027934-37; Email from Counsel for LaSalle to the Senate Permanent Subcommittee on Investigations (Nov. 17, 2021).

[751] Howard McMahan, Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Sept. 15, 2021); LaSalle_027935.

[752] Howard McMahan, Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Sept. 15, 2021).

NBCU002144

Former HSA Brown confirmed that she did not recall any instance in which she asked Dr. McMahan to review care Dr. Amin provided.[753] She also stated that she was not aware which ICDC employees were able to monitor or review the treatment Dr. Amin provided to ICDC detainees.[754] Additionally, Dr. Hearn stated to the Subcommittee that she was not aware of any efforts at the detention center level, in general, to oversee the care detainees receive from off-site providers.[755] She did recall, however, instances in which she had reviewed the volume of referrals to off-site providers from detention centers for signs of waste, fraud, or abuse, pursuant to her authority to make decisions regarding "the deployment of health resources" to "support the delivery of health care services."[756]

In addition, former HSA Brown did not recall undertaking any analysis of medical treatment by Dr. Amin prior to the public allegations against Dr. Amin.[757] Warden Paulk and Deputy Warden Albright were not aware of any review of Dr. Amin by ICDC staff, prior to September 2020, that revealed irregularities or indications of waste, fraud, and abuse in the treatment Dr. Amin provided to detainees.[758] Dr. Hearn was similarly unaware of any review of this kind taking place before the public allegations against Dr. Amin.[759] In addition, none of the ICDC employees the Subcommittee interviewed were aware of efforts to review trends related to detainees refusing to receive treatment from Dr. Amin.[760] In an interview with the Subcommittee, former HSA Brown recalled one complaint from a detainee in November 2018 refusing to see Dr. Amin because she "felt uncomfortable" and requested a different provider.[761]

---

[753] Lakeysa Brown, formerly of Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Jan. 5, 2022). According to LaSalle, former HSA Brown did not have "access to sufficient records to enable such a review." Email from Counsel for LaSalle to the Senate Permanent Subcommittee on Investigations (Nov. 11, 2022).

[754] Lakeysa Brown, formerly of Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Jan. 5, 2022).

[755] Pamela Hearn, LaSalle Corrections, Interview with Senate Permanent Subcommittee on Investigations (Nov. 9, 2021).

[756] Id.; LaSalle_027935; Email from Counsel for LaSalle to the Senate Permanent Subcommittee on Investigations (Nov. 17, 2021).

[757] Lakeysa Brown, formerly of Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Jan. 5, 2022). According to LaSalle, former HSA Brown did not have "access to records sufficient to undertake" any analysis of medical treatment by Dr. Amin. Email from Counsel for LaSalle to the Senate Permanent Subcommittee on Investigations (Nov. 11, 2022).

[758] David Paulk, Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Sept. 16, 2021); Frank Albright, Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Sept. 21, 2021).

[759] Pamela Hearn, LaSalle Corrections, Interview with Senate Permanent Subcommittee on Investigations (Nov. 9, 2021).

[760] Id.; Howard McMahan, Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Sept. 15, 2021); David Paulk, Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Sept. 16, 2021); Frank Albright, Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Sept. 21, 2021); Amber Hughes Strout, formerly of Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Sept. 22, 2021); Lakeysa Brown, formerly of Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Jan. 5, 2022).

[761] Lakeysa Brown, formerly of Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Jan. 5, 2022).

NBCU002145

Dr. McMahan also explained to the Subcommittee that he was unaware of any issues with Dr. Amin failing to obtain informed consent from detainee patients, and Warden Paulk was similarly unaware of any concerns that detainees may not have provided informed consent.[762] Former HSA Brown told the Subcommittee that off-site providers were responsible for obtaining informed consent from the detainee in the language understood by the detainee.[763] She did not recall ICDC medical unit staff having access to detainees' records from an off-site visit to review for a record of consent or having the ability to monitor off-site providers to ensure consent procedures were followed.[764]

Dr. Hearn explained to the Subcommittee that detention center staff play no role in ensuring off-site providers obtain informed consent from detainees.[765] Similarly, LaSalle representatives stated that responsibility for obtaining informed consent for off-site treatment lies with the relevant healthcare provider.[766] Relatedly, Dr. Hearn also stated that staff would play no role in verifying that detainees receive language translation services during off-site care.[767] Former HSA Brown confirmed that ICDC medical unit staff could not verify off-site providers' use of translation services and stated that it is the responsibility of the off-site provider to obtain consent and ensure that an interpreter is utilized.[768]

ICDC officials were also unaware of the existence of any complaints or grievances by ICDC detainees concerning Dr. Amin and no records of complaints or grievances concerning his care were discovered by ICDC, with the exception of the complaint former HSA Brown recalled discussed above and an email that Warden Paulk stated he received in November 2018 from the

---

[762] Howard McMahan, Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Sept. 15, 2021); David Paulk, Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Sept. 16, 2021).

[763] Lakeysa Brown, formerly of Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Jan. 5, 2022). This was in accordance with ICE 2011 PBNDS, Section 4.3 V.D ("Informed consent shall be obtained prior to providing treatment (absent medical emergencies)."). Email from Counsel for LaSalle to the Senate Permanent Subcommittee on Investigations (Nov. 11, 2022).

[764] Lakeysa Brown, formerly of Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Jan. 5, 2022).

[765] Pamela Hearn, LaSalle Corrections, Interview with Senate Permanent Subcommittee on Investigations (Nov. 9, 2021).

[766] Email from Counsel for LaSalle to the Senate Permanent Subcommittee on Investigations (Nov. 17, 2021); Email from Counsel for LaSalle to the Senate Permanent Subcommittee on Investigations (Nov. 11, 2022); see also 2011 PBNDS, Section 4.3 V.D ("Health care practitioners should explain any rules about mandatory reporting and other limits to confidentiality in their interactions with detainees. Informed consent shall be obtained prior to providing treatment (absent medical emergencies)." LaSalle's own Medical Request and Consent for Treatment Form, for procedures inside its detention facilities, grants LaSalle "authority to administer and perform routine examinations, treatments of minor illnesses and injuries, medications and diagnostic procedures which may be necessary to address my above medical complaint." LaSalle_014225-26.

[767] Pamela Hearn, LaSalle Corrections, Interview with Senate Permanent Subcommittee on Investigations (Nov. 9, 2021).

[768] Lakeysa Brown, formerly of Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Jan. 5, 2022). In documents reviewed by the Subcommittee, off-site referral packets from ICDC to the off-site provider included the IHSC MedPAR authorization and had information for a "language line translator." See, e.g., LaSalle _323835; LaSalle_324227; LaSalle_324493.

NBCU002146

Southern Poverty Law Center.[769]  The email discussed an ICDC detainee who had suffered a miscarriage while in custody and was still suffering from "debilitating pain."[770]  According to the email, the detainee was seen by Dr. Amin at least twice, but her pain returned and worsened.[771]  The email further stated that the detainee's "experience with Dr. Amin was so painful and traumatic that she did not want to be sent back to him."[772]  According to subsequent emails, ICDC responded to this complaint by sending the detainee to a different off-site provider "unassociated with Dr. Amin."[773]

With the exception of the one complaint discussed above, former HSA Brown was unaware of any complaints from detainees or staff regarding Dr. Amin.[774]  Dr. McMahan also was unaware of any complaints from detainees or staff regarding Dr. Amin, and apart from an email containing a memorandum regarding Dr. Amin that Deputy Warden Albright viewed shortly after joining ICDC, Deputy Warden Albright learned of no complaints regarding Dr. Amin.[775]  Dr. Hearn was similarly unaware of any complaints against Dr. Amin.[776]

As explained in Section III above, however, all of the women the Subcommittee interviewed concerning their treatment by Dr. Amin recalled submitting grievances to ICDC, ICE, or both, expressing their concerns to ICDC staff, or requesting second opinions.  Ms. Dowe, for example, stated that she requested a second opinion after Dr. Amin recommended a hysterectomy following her cyst removal.[777]  However, Ms. Dowe recalled that an ICDC nurse informed her that ICE would not pay for a second opinion.[778]

Ms. Castaneda-Reyes recalled that she shared concerns about her interaction with Dr. Amin with a mental healthcare provider at ICDC, but this individual then downplayed these concerns.[779]  She also recalled that she shared her concerns with ICDC guards about infertility

[769] David Paulk, Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Sept. 16, 2021); LaSalle_2573-77; Email from Paralegal to Counsel for LaSalle to the Senate Permanent Subcommittee on Investigations Staff (Sept. 24, 2021); Email from Counsel for LaSalle to the Senate Permanent Subcommittee on Investigations (Nov. 11, 2022).
[770] LaSalle_2574.
[771] Id.
[772] Id.
[773] LaSalle_2573.
[774] Lakeysa Brown, formerly of Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Jan. 5, 2022).  No complaints from detainees or staff regarding Dr. Amin were later located by LaSalle.  Email from Counsel for LaSalle to the Senate Permanent Subcommittee on Investigations (Nov. 11, 2022).
[775] Howard McMahan, Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Sept. 15, 2021); Frank Albright, Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Sept. 21, 2021).  Deputy Warden Albright could not further recall the specific content of this email or memorandum in his interview with the Subcommittee.
[776] Pamela Hearn, LaSalle Corrections, Interview with Senate Permanent Subcommittee on Investigations (Nov. 9, 2021).
[777] Wendy Dowe, Interview with Senate Permanent Subcommittee on Investigations (June 25, 2021); see also LaSalle_319164; LaSalle_320169.
[778] Wendy Dowe, Interview with Senate Permanent Subcommittee on Investigations (June 25, 2021).
[779] Maribel Castaneda-Reyes, Interview with Senate Permanent Subcommittee on Investigations (Oct. 5, 2021).  This encounter was not reflected in Ms. Castaneda-Reyes' medical records.

NBCU002147

following treatment by Dr. Amin, but one guard dismissed her concerns because Ms. Castaneda-Reyes already had three children.[780]

Jane Doe #2 also stated that she told multiple nurses at ICDC regarding her experiences with Dr. Amin. She recalled that "none of them were shocked," and they told her that she was not the first one Dr. Amin had "messed up."[781] Ms. Floriano Navarro remembered submitting grievances to obtain more information about the procedures Dr. Amin performed.[782] The Subcommittee was only able to substantiate Ms. Floriano Navarro's recollections.

## B. LaSalle Conducted a Limited Investigation of Abuse Allegations

Following the public allegations against Dr. Amin, Dr. Hearn conducted a review of medical records for ICDC detainees who had received gynecological surgical procedures since 2016.[783] Former HSA Brown told the Subcommittee that she, along with other medical unit staff, pulled the charts for all female detainees who were referred to Dr. Amin over the past few years.[784] Over three days, Dr. Hearn reviewed referrals from ICDC to Dr. Amin and verified that the referrals were appropriate and had been approved by IHSC.[785] Due to the limited and incomplete patient records ICDC had access to, she could not, however, make a conclusive determination regarding the appropriateness of the gynecological care detainees received.[786]

According to LaSalle representatives, the company "does not have access to hospital records other than those provided to detainees or sporadically provided to ICDC staff."[787] Dr. Hearn also reviewed ICDC grievance logs, and she informed the Subcommittee that she did not find any material raising concerns regarding off-site gynecological services.[788] She did not interview detainees—most of whom were no longer at ICDC—or speak to Dr. Amin—who was represented by legal counsel—during her review.[789] Former HSA Brown stated that she was interviewed by LaSalle headquarters.[790] She also stated that she was not presented with the findings of Dr. Hearn's review.[791]

---

[780] Id.

[781] Jane Doe #2, Interview with Senate Permanent Subcommittee on Investigations (Oct. 4, 2021). These encounters were not reflected in Jane Doe #2's medical records.

[782] Jaromy Jazmin Floriano Navarro, Interview with Senate Permanent Subcommittee on Investigations (June 25, 2021); LaSalle_333712; LaSalle_335569-71.

[783] Pamela Hearn, LaSalle Corrections, Interview with Senate Permanent Subcommittee on Investigations (Nov. 9, 2021).

[784] Lakeysa Brown, formerly of Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Jan. 5, 2022).

[785] Pamela Hearn, LaSalle Corrections, Interview with Senate Permanent Subcommittee on Investigations (Nov. 9, 2021).

[786] Id.; Email from Counsel for LaSalle to the Senate Permanent Subcommittee on Investigations (Nov. 17, 2021).

[787] Letter from Counsel for LaSalle to the Senate Permanent Subcommittee on Investigations (Nov. 17, 2021).

[788] Pamela Hearn, LaSalle Corrections, Interview with Senate Permanent Subcommittee on Investigations (Nov. 9, 2021).

[789] Id.; Email from Counsel for LaSalle to the Senate Permanent Subcommittee on Investigations (Nov. 11, 2022).

[790] Lakeysa Brown, formerly of Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Jan. 5, 2022).

[791] Id.

NBCU002148

Dr. McMahan also reviewed the past five years of gynecological procedures performed on ICDC detainees, including procedures Dr. Amin performed.[792]  Specifically, he reviewed medical charts and the "number of procedures done and justifications for doing them."[793]  He stated that his analysis was a "broad review," and he found "very few surgical interventions in the realm of the allegations."[794]  For example, Dr. McMahan found only three hysterectomies had been performed over the last five years for ICDC detainees.[795]  Dr. McMahan stated that he focused on hysterectomies and laparoscopies, in contrast to the wider evaluation he understood LaSalle conducted.[796]  His review also did not include interviews of detainees—most of whom were no longer at ICDC—nor ICDC or ICH staff.[797]

Dr. McMahan recalled that the review process only took "one afternoon."[798]  He reviewed medical charts and the "number of procedures done and justifications for doing them."[799]  He told the Subcommittee that he was "concerned about the allegations," but found "nothing alarming at all" in the medical files and that his review of those files confirmed that there "was nothing out of line, nothing egregious."[800]  Although he had not received a formal briefing on the LaSalle investigation, he spoke with Dr. Hearn in the course of her review, and he understood from that conversation that his findings were similar to the results from her inquiry.[801]

In his interview with the Subcommittee, Warden Paulk was unaware of the specific scope of the LaSalle investigation or the medical review Dr. McMahan conducted, but stated that he was aware that Dr. Hearn and Dr. McMahan had reviewed certain medical files.[802]  He also explained that he had not received a briefing concerning any findings from the two investigations and had not seen any written product summarizing these findings.[803]  Warden Paulk was also unaware of any ICDC investigative efforts involving ICH or interviews with ICDC employees.[804]  Similarly, Deputy Warden Albright was unaware of any investigative efforts regarding Dr. Amin.[805]

Finally, prior to the removal of ICE detainees from the facility, all ICDC employees the Subcommittee interviewed were unaware of ICDC implementing any new policies or procedures

---

[792] Howard McMahan, Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Sept. 15, 2021).
[793] *Id.*
[794] *Id.*
[795] *Id.*
[796] *Id.*
[797] *Id.*
[798] *Id.*
[799] *Id*; Email from Counsel for LaSalle to the Senate Permanent Subcommittee on Investigations (Nov. 11, 2022).
[800] *Id.*
[801] Howard McMahan, Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Sept. 15, 2021).
[802] David Paulk, Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Sept. 16, 2021).
[803] *Id.*
[804] *Id.*
[805] Frank Albright, Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Sept. 21, 2021).

NBCU002149

specifically in response to the allegations concerning Dr. Amin.[806]  In addition, Warden Paulk, Dr. McMahan, and former HSA Brown were unaware of any investigative efforts that identified particular ICDC employees as failing to exercise an appropriate standard of care in overseeing detainee treatment.[807]  Dr. Hearn was also unaware of LaSalle identifying any employees who had failed to exercise this standard of care.[808]

LaSalle representatives stated to the Subcommittee that no ICDC employee has authority or responsibility related to the quality or nature of care off-site physicians provide—only the duty to negotiate and maintain arrangements with these physicians.[809]  Specifically, LaSalle representatives stated that "LaSalle staff are not contracted or otherwise allowed to be present for medical procedures [like] hysterectomies."[810]

## VIII.  ICH DECLINED TO IDENTIFY EFFORTS TO INVESTIGATE DR. AMIN AND DID NOT IDENTIFY ANY CHANGES TO POLICIES AND PROCEDURES FOLLOWING THE 2020 ALLEGATIONS

Dr. Amin continues to serve as the Chief Medical Officer and exercises a broad leadership role at ICH.[811]  The current ICH executives the Subcommittee interviewed were not aware of the initial vetting process for Dr. Amin when he first joined the hospital staff but mentioned he was re-credentialed in 2021.[812]  The executives further explained that the current ICH re-credentialing process involves checking a physician's license, running a background check, checking for exclusion from Medicare and Medicaid programs, and reviewing any medical malpractice cases, which are relevant but not determinative for this process.[813]  While an

---

[806] Id.; Howard McMahan, Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Sept. 15, 2021); David Paulk, Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Sept. 16, 2021); Amber Hughes Strout, formerly of Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Sept. 22, 2021); Pamela Hearn, LaSalle Corrections, Interview with Senate Permanent Subcommittee on Investigations (Nov. 9, 2021); Lakeysa Brown, formerly of Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Jan. 5, 2022).

[807] Howard McMahan, Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Sept. 15, 2021); David Paulk, Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Sept. 16, 2021); Lakeysa Brown, formerly of Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Jan. 5, 2022); see also Amber Hughes Strout, formerly of Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Sept. 22, 2021).  According to LaSalle, no ICDC employees have authority or responsibility for medical care provided by off-site providers.  Email from Counsel for LaSalle to the Senate Permanent Subcommittee on Investigations (Nov. 11, 2022).

[808] Pamela Hearn, LaSalle Corrections, Interview with Senate Permanent Subcommittee on Investigations (Nov. 9, 2021).  According to LaSalle, "[n]o LaSalle employees are authorized or are allowed to review the quality of nature of care provided by off-site medical providers."  Email from Counsel for LaSalle to the Senate Permanent Subcommittee on Investigations (Nov. 11, 2022).

[809] Email from Counsel for LaSalle to the Senate Permanent Subcommittee on Investigations (Nov. 17, 2021); see also LaSalle_027934-37.

[810] Letter from Counsel for LaSalle to the Senate Permanent Subcommittee on Investigations (Nov. 17, 2021).

[811] Paige Wynn, Irwin County Hospital, Interview with Senate Permanent Subcommittee on Investigations (Aug. 25, 2021).

[812] Id.

[813] Id.

NBCU002150

ICH representative noted that Dr. Amin had been accused of medical malpractice, the representative also noted he was "cleared by multiple jury trials."[814]  ICH executives also explained to the Subcommittee that under the CIA with HHS OIG, an outside auditor reviewed all ICH agreements, including the agreement with Dr. Amin, as discussed above.[815]

ICH CEO Paige Wynn stated she had not received any complaints against Dr. Amin from patients or staff since she joined the hospital in 2015.[816]  Ms. Wynn also stated that she was not aware of any instances in which ICH identified waste, fraud, and abuse related to Dr. Amin—and apart from the 2015 DOJ settlement, she was not aware of any such issues related to Dr. Amin.[817]

The Subcommittee reviewed at least one medical file from ICH in which a nurse noted that she had questioned a detainee patient of Dr. Amin about the type of surgery she was having. According to the notes, the patient "didnt [sic] know she was having surgery" and spoke "very little English."[818]  Using a language translation service, the nurse confirmed that the patient "wasnt [sic] aware of having surgery" that day.[819]  The notes also indicate that the patient "is refusing surgery at this time" and will "wait and have it done in her country."[820]  The notes further state that the surgery was not performed and the patient left the hospital.[821]  According to ICH representatives, there is no indication that Ms. Wynn had seen this note.[822]

Ms. Wynn, explained that she first learned about the allegations against Dr. Amin from public reporting in September 2020.[823]  ICH officials declined to provide any information to the Subcommittee concerning any investigative actions the hospital took in response to the public allegations against Dr. Amin.[824]  Ms. Wynn stated that ICH had not changed any policies or procedures in response to the allegations and does not have "any plans" to implement new policies.[825]  ICH has also not implemented any new policies or procedures designed to monitor Dr. Amin, specifically, and ICH officials explained he was subject to the same rules as other medical staff.[826]

---

[814] *Id.*  Counsel for ICH also stated to the Subcommittee that Dr. Amin has not had any disciplinary actions brought against him during his tenure at ICH.  Email from Counsel for Irwin County Hospital to the Senate Permanent Subcommittee on Investigations (Nov. 17, 2021).
[815] Paige Wynn, Irwin County Hospital, Interview with Senate Permanent Subcommittee on Investigations (Aug. 25, 2021).
[816] *Id.*
[817] *Id.*
[818] ICH004737.
[819] *Id.*  The medical file indicates the scheduled surgeries were a D&C, laparoscopy, and LEEP.  ICH004734.
[820] ICH004737.
[821] *Id.*
[822] Email from Counsel for Irwin County Hospital to the Senate Permanent Subcommittee on Investigations (Nov. 17, 2021).
[823] Paige Wynn, Irwin County Hospital, Interview with Senate Permanent Subcommittee on Investigations (Aug. 25, 2021).
[824] *Id.*
[825] *Id.*
[826] *Id.*

NBCU002151

## IX.    CONCLUSION

Anyone held in the custody of the U.S. government should receive proper medical care. The Subcommittee's investigation into ICDC found that was not always the case for the female ICE detainees at that facility.  Additionally, for years, deficiencies in detainee medical care that were identified by multiple DHS oversight components went unaddressed.

Gaps in policies and procedures concerning off-site medical services and a weak vetting process of off-site medical experts limited ICE's ability to obtain insight into the professional conduct of Dr. Amin.  ICDC accounted for a small percentage of the total female ICE detainee population, yet Dr. Amin performed more medical procedures on female detainees than all other ICE off-site medical providers providing OB-GYN care.  ICE failed to recognize or adequately explain the vast discrepancy of medical procedures that Dr. Amin performed on ICDC female detainees compared to other providers treating ICE detainees.  The agency has still not provided any clear explanation for this disparity.  Even now, senior ICE officials can only speculate about why Dr. Amin performed a significantly higher volume of certain OB-GYN procedures compared to his peer physicians.

Although ICE has promised reforms in response to many of these deficiencies, Congress should continue to exercise aggressive oversight over medical care at ICE facilities.  ICE and DHS should consider implementing the following recommendations:

1. ICE should expedite efforts to improve the vetting of off-site medical providers for detainees and should consider expanding criteria for excluding providers.

2. ICE should expedite efforts to identify trends in off-site medical procedures for detainees for potential waste, fraud, or abuse and should conduct regular audits of physicians, hospitals, or other facilities providing off-site care.

3. ICE should institute policies and procedures to ensure off-site providers obtain informed consent in connection with their treatment of detainees.

4. ICE should ensure it reviews all detainee complaints regarding medical treatment independently of site visits from Field Medical Coordinators.

5. Federal immigration policy should support and allow for the swifter adjudication of immigration cases without undermining the procedural due process rights of immigrants.

NBCU002152