Declaration of

Elizabeth McNamara

Exhibit 79

**DR. MAHENDRA AMIN, M.D. vs NBCUNIVERSAL MEDIA, LLC**

```
 1              UNITED STATES DISTRICT COURT
           FOR THE SOUTHERN DISTRICT OF GEORGIA
 2                    WAYCROSS DIVISION

 3     DR. MAHENDRA AMIN, M.D.

 4                  Plaintiff,    CASE NO.
       v.                        5:21-CV-00056-LGW-BWC
 5
       NBCUNIVERSAL MEDIA, LLC,
 6
                   Defendant.
 7


 8
            *** CONFIDENTIAL TRANSCRIPT ***
 9
           VIDEO-RECORDED DEPOSITION OF
10                  CHRIS HAYES

11          Davis Wright Tremaine, LLP
            1251 Avenue of the Americas
12                  21st Floor
            New York, New York 10020
13
                    08/09/2023
14              9:38 a.m. (EDT)

15

16

17

18

19

20

21

22

23

24
       REPORTED BY:  MONIQUE CABRERA
25     JOB NO. 3133
```

```
 1        THE VIDEOGRAPHER:  Good morning.

 2   This is the beginning of video number

 3   one in the video deposition of Chris

 4   Hayes in the matter of Dr. Amin

 5   Mahendra, MD versus NBCUniversal

 6   Media, et al.  The case number

 7   5:21-CV-00056.  Today's date is

 8   August 9th, 2023.

 9        The time on the monitor is 9:38.

10   My name is Elizabeth Gonzalez and I'm

11   the videographer.  The court reporter

12   is Monique Cabrera.  We are with

13   Huseby Global Litigation.

14        Counsel, please introduce

15   yourself after which the court

16   reporter will swear in the witness.

17        MS. EVANS:  Stacey Evans on

18   behalf of the plaintiff.

19        MS. MCNAMARA:  Elizabeth

20   McNamara on behalf of -- of the

21   defendant and the witness.

22        MS. LEVINE:  Amanda Levine on

23   behalf of the defendant and the

24   witness.

25        MS. GOVE:  Gail Gove on behalf
```

```
 1        of the defendant and the witness.

 2             MR. BIERBAUER:  Erik Bierbauer

 3        in-house counsel, NBC on behalf of the

 4        defendant and the witness.

 5   CHRIS HAYES, called as a witness, having

 6   been first duly sworn by a Notary Public

 7   of the State of New York, was examined and

 8   testified as follows:

 9             COURT REPORTER:  Can you state

10        your name and address for the record.

11             MS. MCNAMARA:  You can use the

12        NBCUniversal.

13             THE WITNESS:  Christopher Hayes,

14        50 West 50th, New York, New York.

15             MS. MCNAMARA:  I just got a note

16        that he cannot hear us on Zoom.

17             COURT REPORTER:  Do you want to

18        go off the record?

19             MS. EVANS:  Yeah, let's go off

20        the record.

21             (Whereupon, a discussion off the

22        record.)

23   EXAMINATION BY

24   MS. EVANS:

25        Q.   Good morning, Mr. Hayes.
```

1      A.    Good morning.

2      Q.    **We met a little bit earlier.**

3    **I'm Stacey Evans, and I'll be asking you**

4    **questions on behalf of the plaintiff**

5    **today.**

6      A.    Okay.

7      Q.    **The first thing I'm going to do**

8    **is hand you what I've marked as**

9    **Plaintiff's Exhibit 115 and a copy to your**

10   **counsel.**

11          (Whereupon, Exhibit 115, Notice

12      of Deposition, was marked for

13      identification.)

14   BY MS. EVANS:

15     Q.    **There's nothing in particular**

16   **for to you do with this, this is just the**

17   **notice of deposition that brings us here**

18   **today.**

19          **Have you ever seen this document**

20   **before?**

21     A.    I don't think I have.

22     Q.    **When did you first learn that**

23   **you would be deposed in this case?**

24     A.    Boy, I have no recollection of

25   the date whenever it was communicated to

```
 1   me.
 2       Q.    At some point in the last --
 3   this year, you think?
 4       A.    I think so.  I guess.
 5       Q.    Do you know someone named Andrew
 6   Free?
 7       A.    No -- yes, yes, I do.
 8       Q.    How do you know him?
 9       A.    I don't know how I know him, to
10   be totally honest.  He's been a source on
11   reporting immigration stories for a number
12   of years.
13       Q.    How many years?
14       A.    I really couldn't say.  I think
15   probably post-2017.
16       Q.    Is there a particular story that
17   you remember first working with Mr. Free
18   on?
19       A.    I don't really recall.  I know
20   that as a general matter, the salience --
21   the new salience of immigration went up a
22   lot post-2017 for obvious reasons.  And
23   there was lots of stories about
24   immigration, and it tends to be a very
25   confusing and difficult area of law.
```

```
 1              And so he was someone that I had
 2    used as a journalistic source in
 3    navigating that.
 4         Q.    Were you introduced to him
 5    through someone else?
 6         A.    I guess I probably was, but I
 7    have no idea who.
 8         Q.    Have you ever met Mr. Free in
 9    person?
10         A.    I don't believe I have, but it's
11    possible at, like, some event once.  But I
12    couldn't, like, pick him out of a lineup.
13         Q.    Is there a particular event that
14    you're thinking of when you say, "might
15    have met him at an event"?
16         A.    I think he might have come to a
17    podcast -- a live podcast I did.
18         Q.    For your podcast?
19         A.    Yes, exactly.
20         Q.    What was going on?
21         A.    Why -- Why is This Happening?
22         Q.    Why is This Happening.
23         A.    Mm-hmm.
24         Q.    Was it sort of a launch?
25         A.    No, no, no.  We just did a bunch
```

1    of live podcasts, and I think he might

2    have come to one.

3         Q.    Was he a guest?

4         A.    I don't think so.

5         Q.    Did you do one in -- strike

6    that.

7              Do you go to different locations

8    to do your podcasts when you do live?

9         A.    We had a live tour pre-pandemic.

10   I want to say 2019 probably and went to a

11   bunch of cities.

12        Q.    Did you go to Nashville?

13        A.    We did not.

14        Q.    Atlanta?

15        A.    No.

16        Q.    Anywhere in the southeast?

17        A.    Let me think.  I don't think so.

18        Q.    Do you recall the cities you

19   went to?

20        A.    Yeah.  I think we went to

21   Chicago, New York, Los Angeles, definitely

22   Los Angeles.  I think that might have been

23   it.

24        Q.    Do you recall having a

25   conversation with Mr. Free at the event

1    that you recall?

2        A.    I don't.

3        Q.    Have you talked to him on the

4    phone?

5        A.    I -- I can't say definitively.

6    We probably have talked on the phone a few

7    times.

8        Q.    Did you talk to Mr. Free on the

9    phone with regard to the Irwin County

10   Detention story?

11       A.    I don't recall, but I don't

12   think so.

13       Q.    Did you exchange text messages

14   with him?

15       A.    I think we did.

16       Q.    Signal?

17       A.    I believe so, yes.

18       Q.    Any other way you recall

19   communicating with Mr. Free about the

20   Irwin County Detention Center story?

21       A.    I think we may have DM'd a

22   little bit about it on Twitter.  And,

23   again, this is, you know, several years

24   ago on one segment for three segments so I

25   can't be completely definitive.

```
1        Q.      E-mail?

2        A.      We may have.

3        Q.      What stories, if any, besides

4   the Irwin County Detention Center story

5   can you recall Mr. Free serving as a

6   source for your reporting?

7                MS. MCNAMARA:  And I just object

8        to intercede that if it's a published

9        story and he's -- and he's an

10       identified source, I have no problem

11       with you identifying it.  But if it

12       gets into news gathering that's

13       unpublished information, I instruct

14       you not to answer for unrelated

15       articles.

16       A.      Yeah.  As -- I would say as a

17   public matter, if he is quoted in things,

18   then we -- we could find that although I

19   can't recall.  But yeah, I'm not going to

20   speak to news gathering for that reason.

21               I mean, I should also say that

22   generally, like, sources can just be

23   informational.  Like, you know, explain

24   this to me.  Like, I don't understand how

25   this law works.  It happened all the time
```

1  during Covid, for instance.  I talk to a

2  doctor.

3          So that -- the idea that it

4  necessarily maps to a specific story isn't

5  necessarily, you know, always how it

6  works.

7  BY MS. EVANS:

8     **Q.    He's been a source for you**

9  **before, previously, true?**

10    A.    True, yes.

11    **Q.    On how many occasions?**

12    A.    Again, I really could not say.

13    **Q.    More than ten?**

14    A.    Probably not actually.

15  Somewhere in that ballpark, I would say.

16    **Q.    More than five?**

17    A.    I would be guessing.

18    **Q.    Maybe five to ten, sounds like?**

19    A.    That's --

20          MS. MCNAMARA:  Objection to

21    form.

22    A.    -- plausible, but I could not

23  definitively say.  I really couldn't.

24  BY MS. EVANS:

25    **Q.    Somewhere around ten --**

```
 1              MS. MCNAMARA:  Objection.
 2      Mischaracterization.
 3      A.    I'm not really saying that --
 4  I'm really not saying that.  I don't
 5  actually -- I do not actually know the
 6  answer to that.
 7  BY MS. EVANS:
 8      Q.    Has he ever been -- strike that.
 9            Has Mr. Free ever been an
10  on-the-record source for any story that
11  you've reported?
12      A.    He may have been.  I just really
13  can't recall.  But yes, it's totally
14  possible.
15      Q.    Did you try to get him to be an
16  on-the-record source for the Irwin County
17  Detention Center stories?
18      A.    I don't recall one way or the
19  other, but I don't really know the answer.
20  I know that other people also interacted
21  with him in the course of the reporting.
22      Q.    Other people who?
23      A.    My understanding is my segment
24  producer.
25      Q.    Mr. Price?
```

```
 1        A.    That's right, yeah.
 2        Q.    Anyone else?
 3        A.    I don't know.
 4        Q.    Do you -- strike that.
 5              Are you aware that Mr. Free --
 6    strike that.
 7              Are you aware if Mr. Free spoke
 8    with Julia Ainsley regarding the Irwin
 9    County Detention Center stories?
10        A.    I don't -- I'm not.
11        Q.    Are you aware if Mr. Free spoke
12    with Mr. Jacob Soboroff regarding the
13    Irwin County Detention Center stories?
14        A.    I don't know.
15        Q.    Did you -- strike that.
16              At some point you connected
17    Mr. Free with Mr. Price, true?
18        A.    I think that's right, yeah.
19        Q.    Did you connect Mr. Free with
20    anyone else at MSNBC or NBC News?
21        A.    I don't think so.  Again, let me
22    just say as a -- as a sort of blanket
23    matter, this was -- what year was it,
24    2020 -- so my memory of this is, like, I
25    have done 10,000 segments in the last
```

1   ten years, so I -- I cannot definitively

2   say one way or the other.  But it is not

3   my recollection that I did.

4        **Q.    Is it -- strike that.**

5             **Is your typical practice as a --**

6   **strike that.**

7             **You consider yourself a**

8   **journalist?**

9        A.    I do, yes.

10       **Q.    Is it your typical practice as a**

11  **journalist to try to get sources to go on**

12  **the record as opposed to being background?**

13       A.    It really depends on the

14  context.

15       **Q.    Isn't it preferable?**

16       A.    Again, it totally depends on the

17  context.  There's some places where it

18  would not be preferable, so it would -- it

19  would really depend.

20       **Q.    Like what, where it would be not**

21  **preferable?**

22       A.    Well, I can't really speculate.

23  There's a million different circumstances

24  that presents one --

25       **Q.    Well, you said there are**

1   contexts where it might not be preferable.

2   And so I am trying to figure what do you

3   mean.  What are you thinking?

4        A.    The world is infinitely complex.

5   There is a million different circumstances

6   one might find one's self in.  You have to

7   sort of evaluate based on what happens in

8   that circumstance.

9        Q.    Can you think of any reason why

10   it wouldn't have been preferable to have

11   Mr. Free as an on-the-record source with

12   regard to the Irwin County Detention

13   Center stories?

14        A.    I don't really remember enough

15   of the details to know whether that would

16   be necessary or preferable or not.

17        Q.    Did you meet with counsel in

18   anticipation of your deposition today?

19        A.    Yes.

20        Q.    How many times?

21        A.    Twice.

22        Q.    When was the first time?

23        A.    I think it was the day before

24   the deposition was cancelled, so whenever

25   that date is.

1   say on the air comes out of my -- my mouth

2   and is recorded for all posterity.  So,

3   you know, that is what it is.

4   BY MS. EVANS:

5       Q.     **And you don't always read the**

6   **script as it appears in the teleprompter,**

7   **true?**

8       A.     That is true, yeah.

9       Q.     **Mr. Price has testified that he**

10  **was the segment producer for the Irwin**

11  **County Detention Center story on**

12  **September 15th, September 16th, and**

13  **September 17, 2020; is that your**

14  **recollection?**

15      A.     I really don't remember, but if

16  he says that, I trust him.

17      Q.     **You don't have any reason to**

18  **doubt Mr. Price?**

19      A.     I have no reason to doubt him if

20  he testified to that.

21      Q.     **Who was the senior producer on**

22  **September 15, 2020 Irwin County Detention**

23  **Center story?**

24      A.     I have literally no idea.

25      Q.     **What about September 16, 2020?**

```
 1        A.    No idea.

 2        Q.    September 17, 2020?

 3        A.    I don't know.

 4        Q.    I would have to ask --

 5        A.    Again, I just -- I just want to

 6   be clear, I'm not trying to evasive here.

 7   Like -- like I've said, we've done 10,000

 8   segments in the last decade.  Like, I

 9   just -- I just would not -- I do not know

10   that.

11        Q.    If I wanted to know who was the

12   senior producer on the Irwin County

13   Detention Center story for September 15th,

14   16th, or 17th, 2020, I would have to ask

15   each of your senior producers to find out

16   the answer to that, true?

17        A.    I don't know.  It seems like a

18   find-out-able fact, but I'm not sure how

19   you would find it out.

20        Q.    Yeah, it does seem like a

21   find-out-able fact.

22              You mentioned that you've done

23   tens of thousands of stories?

24        A.    Ten -- 10,000 segments, probably

25   between 10 and 13,000.
```

1       Q.    Okay.  And this particular

2    segment is not of any importance to you?

3              MS. MCNAMARA:  Objection to

4         form.

5       A.    No.  No, I would never say that.

6    They're all important.  You're just -- I

7    just mean the context of recollection, it

8    can be very difficult to recollect over

9    the course of a decade of 13,000 segments,

10   like the specific back and forth of a

11   given segment, that's all.

12   BY MS. EVANS:

13      Q.    Despite eight hours of

14   preparation for today's deposition?

15      A.    Even with eight house of

16   preparation, sure.  Yeah.

17      Q.    You feel that your memory is

18   recollective in at least some regard after

19   eight hours of preparation, would you say?

20      A.    I can reconstruct things based

21   on documentary evidence, but the honest

22   truth is that I don't have a tremendous

23   amount of, like, actual memories.  And I

24   would like -- not like to lead people

25   astray about what I do and don't remember.

```
 1        Q.     Has Mr. Free ever appeared as a

 2   guest on the All In with Chris Hayes show?

 3        A.     That's a great question.  I

 4   don't know the answer to it.  I don't -- I

 5   don't believe so, but I don't -- I

 6   couldn't say for sure.  Again, that -- we

 7   could Google that, but I don't know.  I

 8   don't think so.

 9        Q.     Have you ever -- strike that.

10               Do you interact -- strike that.

11               Have you ever interacted with

12   Mr. Free on any occasion other than as a

13   source?

14        A.     No.

15        Q.     Do you trust Mr. Free?

16        A.     He has -- yeah.  He's proven to

17   be knowledgeable and operating in good

18   faith.  I wouldn't blanket trust -- say I

19   blanket trust him because there -- I'm

20   sure there's aspects of his life, I know

21   nothing about the vast majority of it.

22               In the singular form of

23   interactions I've had around immigration

24   law, he's proven to be knowledgeable and

25   operating in good faith.
```

1      Q.     How so?

2      A.     He knows the law.   Most

3  importantly, it is a very complex area of

4  law and he's been quite good at explaining

5  it and also, has a tendency to document

6  claims, which makes for a good source.

7      **Q.     When you say "document claims,"**

8  **what do you mean?**

9      A.     Like, he'll be like, here's --

10  you know, I recall at one point talking

11  about some story, I forget.   Him being

12  like, Here's the language in the statute

13  and this is what this means.   Here's a,

14  you know, citation, as it were.   That's a

15  good thing to have in a source.

16      **Q.     Anything else that you can think**

17  **of that makes you say that he documents**

18  **claims?**

19      A.     Well, clearly in -- I didn't

20  remember this at the time.   But in

21  reviewing the discovery materials, he --

22  he sent a bunch of documents over in the

23  course of our reporting on the story.

24      **Q.     What?**

25      A.     I don't recall.   I think there

 1   was a medical record, was one thing.  And

 2   there might have been a few other

 3   documents that he sent along, if I'm not

 4   mistaken.

 5       Q.    Are you aware of Mr. Free having

 6   any -- having any medical training or

 7   expertise?

 8       A.    No.  I don't know one or the

 9   other.

10       Q.    Do you have any reason to think

11   that he does?

12       A.    I don't -- my recollection, if

13   I'm not mistaken, is that we -- I believe

14   our segment producer did additional

15   reporting subsequent to the reception of

16   that medical record in which he actually

17   called an OB/GYN to walk through the

18   medical record.

19       Q.    Are you aware that your segment

20   producer never actually showed any medical

21   records to that OB/GYN?

22            MS. MCNAMARA:  Objection.

23       A.    I don't -- I don't know what he

24   did, but my understanding of what happened

25   was that he walked through and obviously

1   it's a sensitive document.

2   BY MS. EVANS:

3       Q.    Do you know how Mr. Price came

4   to speak with that OB/GYN?

5       A.    I don't know if Mr. Price spoke

6   to that OB/GYN.

7       Q.    Then how would -- then how would

8   he have walked her through the medical

9   records?

10      A.    Oh, Alexander Price.  I don't

11  remember and I didn't know about any of

12  this.  I think there's stuff in discovery

13  about some e-mail traffic in which he was

14  introduced to her, but that's the best I

15  know.

16          Again, this was taking place, at

17  the time, without any of my knowledge.

18  I'm just telling you things that I've read

19  a few days ago that's in the record.

20      Q.    Did you look at medical records

21  at any point on September 15th or 16th,

22  2020?

23      A.    I have zero recollection.  I

24  would be surprised if I did.  I couldn't

25  say definitely that I did not, but I do

```
 1   not believe I did.

 2       Q.    Did you question at all whether

 3   the medical records that anyone looked at

 4   on September 15th or 16th, 2020 were

 5   complete?

 6       A.    Again, I don't even think I

 7   was -- this segment was being reported out

 8   and delegated to the very diligent

 9   Alexander Price.  I think I might have

10   passed things along, but I -- I was not

11   the person, like, chasing this down.

12       Q.    Did you do any independent

13   review of the source material that

14   Mr. Price worked on on either

15   September 15th or 2020 -- on either

16   September 15th or 16th, 2020?

17            MS. MCNAMARA:  Objection to

18       form.

19       A.    Did I do any independent report?

20   I guess I don't understand what you mean.

21   BY MS. EVANS:

22       Q.    Did -- strike that.

23            Did you review the -- strike

24   that.

25            Are you aware that Mr. Free and
```

1   Mr. Price spoke at some point on
2   September 15, 2020?
3       A.   Yes, I am aware of that.
4       Q.   I think you told me you don't
5   recall if Mr. Price talked to you about
6   that call after he had it, right?
7       A.   Correct, yeah.
8       Q.   Do you recall -- as we've had a
9   couple more questions here today, do you
10  recall ever getting any summary or other
11  information about that call from
12  Mr. Price?
13      A.   I don't really.  I mean, again,
14  if there's a document that shows
15  something, I'm happy to look at it to
16  figure it out.  But in terms of trying to
17  remember the blow-by-blow without anything
18  in front of me, I don't really remember.
19      Q.   And you didn't look at any
20  medical records on September 15th or 16th,
21  2020, to your recollection, right?
22      A.   To my recollection, I don't
23  think I did.
24      Q.   Tell me about the general
25  process of getting the show to air on any

1    given day.  Where do you come -- how does

2    the process start?  How do you enter into

3    it?

4         A.    We have a few -- well, there's a

5    note that goes out in the morning that has

6    a bunch of different stories that are

7    possibilities, but are not exclusively the

8    stories.

9              I think there's a few meetings

10   that happen before I even enter the

11   process.  That may have changed over time.

12             One thing, let me just mark

13   this.  The process has changed during

14   different periods of time.  So, like,

15   during a particular window, I cannot

16   definitively say this was, like, the way

17   it went then because, again, over ten

18   years, it's waxed and waned in certain

19   ways.

20             We have an editorial -- the

21   standard practice, we have an editorial

22   meeting in which we discuss the rundown

23   for the show.  That's where we set what

24   the different segments will be.

25             We take a little break in which

1    the senior team will then assign out those

2    segments to segment producers.  We'll then

3    reconvene for a subsequent meeting in

4    which I collaborate with the segment

5    producer and tend to sort of walk through

6    what I want from those segments.

7              They then go off and produce

8    those segments and then I -- they get --

9    they get seniored and then I start reading

10   them when they're in the, you know, script

11   program, usually around 6:00.

12        Q.    In 2020, all of these meetings

13   that you're referring to would have

14   occurred either on Zoom or by phone; is

15   that right?

16        A.    Yes, definitely.  Yeah, none --

17   none of this would have been happening

18   in-person for sure.

19        Q.    Were you at that point in time

20   coming into the studio at all or were you

21   at a remote studio?

22        A.    Well, that's a great question.

23   I think -- we're talking about

24   September 15th?

25        Q.    Yes.

1     A.     I was coming into 30 Rock at

2   that point.

3     **Q.     Who else would have been in 30**

4   **Rock with you with regard to the All In**

5   **with Chris Hayes show?**

6     A.     Oh, literally no one.  It was a

7   lost ghost town.  I did my own makeup.

8     **Q.     That would be a conversation for**

9   **another day.**

10          **Was there a camera person in --**

11   **in the studio or any other sort of**

12   **equipment folks?**

13     A.     I'm really trying to

14   reconstruct.  I basically think we had --

15   I think at that time, it was just me.  And

16   there would be one -- one or two crew

17   people.  There'd be a usually, I think a

18   stage -- one stage manager, and may be an

19   audio person.  I can't really remember,

20   but it was -- it was definitely, like,

21   bare bones ghost town situation.

22     **Q.     Not even a producer?**

23     A.     No producers were in the

24   building at that point.

25     **Q.     Do you recall at what point on**

```
 1    September 15th, 2020, you became aware

 2    that there was a potential story with

 3    regard to Irwin County Detention Center?

 4         A.    At what point in -- in --

 5         Q.    Do you recall at what point on

 6    September 15th, 2020, you became aware

 7    that there may be a story with regard to

 8    Irwin County Detention Center?

 9         A.    Well, here's what I recall, and

10    I can't tell the dates.  I recall that

11    there was an explosive, one of those sort

12    of viral social media phenomenons around

13    allegations of un-consented to or improper

14    medical care for women in immigrant

15    detention.

16              I believe the impetus for that

17    social media virality was the original

18    whistleblower complaint, but it was one of

19    those things where suddenly everywhere I

20    went on social media, I was seeing this --

21    this story.

22              I can't remember if it was on

23    the 15th or 14th.  Maybe it started on the

24    13th.  So I really don't remember that,

25    but there was a -- there was a -- it was
```

Confidential

```
 1    really very present in social media.
 2        Q.    To the best of your
 3    recollection, you first heard about the
 4    potential story on social media as opposed
 5    to Andrew Free; is that right?
 6        A.    Oh, yeah, definitely.
 7        Q.    And then after you saw the story
 8    on social media, did you reach out to Mr.
 9    Free or did he reach out to you?
10        A.    I truly can't remember.
11        Q.    One way or the other, you have
12    no idea?
13        A.    Yes, I really don't know.
14        Q.    When you first came to see the
15    story on social media, you originally were
16    skeptical of the story, right?
17        A.    I -- I wasn't skeptical of the
18    story.  I was -- I will say that the
19    rhetoric around the story was incredibly
20    lurid and horrific.
21              And, generally, I think as a
22    reporter, you want to see, like, okay.
23    What -- what's the story here?  What's
24    the -- what's going on?
25        Q.    When it starts out, would you
```

1    say you discounted it when you first heard

2    it?

3              MS. MCNAMARA:  Objection to

4         form.

5         A.    Yeah, I didn't discount it.

6    Yeah, I didn't discount it.  In fact, the

7    opposite, I was -- I was curious to find

8    out what the -- was going on, but I also

9    didn't just take a viral story as the

10   gospel truth.

11   BY MS. EVANS:

12        Q.    You didn't discount it and

13   weren't skeptical of it all; is that your

14   testimony?

15             MS. MCNAMARA:  Objection.

16        Mischaracterization.

17        A.    Yes, I wouldn't say I was -- I

18   definitely didn't discount it.  I -- I

19   think I thought sometimes viral stories

20   bear out and sometimes they don't, and I

21   was curious which of those two it was.

22   BY MS. EVANS:

23        Q.    Did you undertake to figure out

24   if it would bear out or not?

25        A.    Yes, we did.

1    Q.    And what did you do?

2    A.    I don't remember the specifics

3  of the reporting.  What I do remember

4  thinking -- and this I actually do have,

5  like, an actual memory of as opposed to a

6  reconstructed memory, being like, what is

7  going on here?  This story is everywhere.

8  We should figure out what the actual facts

9  are, what can be established and what

10  can't be.

11    Q.    And what did you ultimately

12  conclude?

13    A.    Well, I think we concluded --

14  what we concluded shows up in a script

15  that was, you know, run through a long

16  process and went through standards and was

17  signed off on by standards.

18         So that's -- I mean, that's the

19  sort of -- the ultimate work product is

20  the thing that you have in the record and

21  is -- you know, went out to over a million

22  people.

23         We -- we proceeded -- I think,

24  one of the most important things in this

25  sort of thing is, like, what has been --

```
 1   what has been alleged?  Who is the source
 2   of the allegation?  Is that person named?
 3   Will that person, for instance, talk to
 4   us?  Will they talk to us on television?
 5           All of these are sort of
 6   ascending levels of credibility,
 7   particularly when you with start a viral
 8   story that the sourcing of which can be
 9   incredibly opaque sometimes.
10           In this case, it turned out
11   there was a specific person who actually
12   did work at the facility, who actually did
13   sign their name, who actually did file a
14   whistleblower complaint.
15           The whistleblower complaint was
16   filed with the government.  She was
17   willing to talk.  She did come on our air.
18   All of those are indications of ascending
19   levels of seriousness with which to take a
20   story.
21      Q.    The actual person you're
22   referring to is Dawn Wooten?
23      A.    Yes.
24      Q.    Are you aware that Dawn Wooten
25   had no firsthand knowledge of anything
```

```
 1    with regard to medical care, true?

 2              MS. MCNAMARA:  Objection.

 3       A.    I believe she said that on the

 4    interview, in which I interviewed on

 5    television.  In fact, I asked her about

 6    how she came to know and she said that.

 7    BY MS. EVANS:

 8       Q.    And it was all word of mouth,

 9    right?

10              MS. MCNAMARA:  Objection.

11       Mischaracterization.

12       A.    No, I don't think it was word of

13    mouth.  I think she says that she was told

14    this by women in the cells who'd

15    experienced it.

16    BY MS. EVANS:

17       Q.    Did you have any concern that

18    she was relaying something that allegedly

19    told to her by somebody else, and you

20    weren't talking to that person?

21       A.    I think we endeavored precisely

22    to talk to that person.  I think that

23    what's we did the next day.  I think, yes,

24    I did have a concern with that.  And so my

25    understanding of the track of this, and,
```

1    again, this is partially reconstructed

2    through immersing myself with the details

3    is that the next thing we did was attempt

4    to get the actual -- an example of the

5    actual person.  So we have someone who

6    says, I was told this.  So then you want

7    to say, okay, well, we should hear from

8    someone it's happened to, and I think

9    that's what we did the next day.

10        **Q.    But you did not talk to an**

11   **actual person who said this is what**

12   **happened to them before you sent -- before**

13   **you went on-air with your first story**

14   **about Irwin County Detention Center, true?**

15            MS. MCNAMARA:  Objection.

16       Mischaracterization.

17       A.   I -- I can't really -- I

18   actually can't recall, to be totally

19   honest, the timing, but there was a series

20   of reporting that we did.  This was the

21   first -- you're talking about the first

22   day?

23   BY MS. EVANS:

24       **Q.    Correct.**

25       A.   I cannot definitely say one way

1  or the other who we talked to that first

2  day, partially because the process was

3  happening not entirely by me.  But I know

4  that it was important to me to try to in

5  the course of the reporting get to an

6  actual first-person source who -- who said

7  that this thing happened to them.

8      **Q.    Are you aware of anyone involved**

9  **with the All In with Chris Hayes show**

10  **speaking with an actual detainee from**

11  **Irwin County Detention Center on September**

12  **15th, 2020 before the first broadcast?**

13      A.    I'm not.  We did it on the 16th,

14  though, I'm pretty sure.

15      **Q.    Do you recall how you came to**

16  **be -- strike that.**

17          **That's B?**

18      A.    I believe that.  I believe that,

19  yeah.

20      **Q.    How did you come to have B on**

21  **your show, to the best of your**

22  **recollection?**

23      A.    I can't remember.  I think

24  it's -- it's possible that Andrew put us

25  in touch with her or someone else did.

1    sorry.

2    BY MS. EVANS:

3         Q.    But it's rare that you would --

4    you would end up on a call with standards

5    with regard to any segment?

6         A.    Correct.  Yes.

7         Q.    Were you aware that Chris Scholl

8    had concerns about the Irwin County

9    Detention Center stories?

10             MS. MCNAMARA:  Objection.

11    Mischaracterization.

12        A.    I -- I was not aware.  I -- I do

13    recall -- the one thing I recall -- and

14    again, I think this is borne out in -- in

15    e-mail discoveries and back and forth

16    between me and the standards about this

17    story, again, that's un -- quite rare and

18    uncommon.  So I do have a recollection,

19    both a genuine and unreconstructed

20    recollection of a back and forth with

21    standards about this.  And then I believe

22    in discovery there is some e-mails that

23    attest to that.

24             So, like, yes, there was a --

25    there was a sense that we were back and

1    forth with standards.  But standards' job

2    is to have concerns about things.  That's

3    why they are there.

4    BY MS. EVANS:

5        **Q.    And what was the back and forth**

6    **that you had with standards with regard to**

7    **the Irwin County Detention Center stories,**

8    **to the best of your recollection?**

9        A.    So the one that I remember, and

10   I actually remember this quite well, was

11   the -- the doctor at issue, your client,

12   had been accused of excess billing of

13   Medicare by the Department of Justice.

14            There was a public filing of

15   that.  There is a record of that.  There's

16   documents that attest to that about what

17   people that worked in an office said what

18   was happening with regard to this excess

19   billing.

20            And there was a question about

21   whether that was germane or not to our

22   coverage of the case and a back and forth

23   about that.  And I remember -- I remember

24   that actually because I remember going

25   back and forth and then subsequent in

 1   dep -- deposition preparation, I believe I

 2   read an e-mail laying out why I thought it

 3   was germane.

 4        Q.    **Anything else that you can**

 5   **recall, you going back and forth with**

 6   **standards on with regard to the Irwin**

 7   **County Detention Center story besides what**

 8   **you just told me?**

 9        A.    I can't recall the specifics.

10   But, again, I recall there were a lot of

11   interactions with standards.  That this

12   was a story that we were in contact with

13   standards on and going back and forth

14   about.

15        Q.    **But nothing else specifically**

16   **you can recollect, sitting here today?**

17        A.    Not a specific -- like a

18   specific thing.  But, again, the way that

19   standards operates is it's usually a

20   category of stories is in a standards zone

21   as opposed to a specific thing in the

22   story.  This category of stories and this

23   story was in the standards zone, and so

24   standards was part of the process, I

25   think, almost from the beginning and

1    throughout our reporting.

2        Q.    We were talking a little bit

3    earlier about Dawn Wooten.

4        A.    Correct.  Yeah.

5        Q.    And you testified that she had

6    made a complaint and filed it.

7              Do you recall telling me that?

8        A.    Correct.  Yeah.

9        Q.    How do you know she filed it?

10       A.    I believe she sent a letter to

11   some government oversight entity.  Perhaps

12   the IG with the Department of Homeland

13   Security, although I can't recall.

14       Q.    Did you recall that letter -- I

15   mean, strike that.

16             Did you review that letter at

17   the time of the Irwin County Detention

18   Center story reporting in September of

19   2020?

20       A.    Yeah.  I read it at some point,

21   yeah.

22       Q.    Other than seeing the addressees

23   on that letter, do you have any other

24   reason to support your statement that it

25   was filed with any government agency?

1        A.    I mean, if you send a letter to

2   the IG or you have a written complaint

3   with your name to it that you send out to

4   the government, I think that counts as

5   filed.  I don't know what the technical

6   meaning of "filed" is, but that's how I

7   understand it.

8        **Q.    Other than seeing the addressees**

9   **on the letter that you're referring to, do**

10  **you have any reason to support your**

11  **statement that it was sent?**

12       A.    Oh, I have --

13            MS. MCNAMARA:  Objection to

14       form.

15       A.    -- I have no idea.  I mean --

16  yes.

17  BY MS. EVANS:

18       **Q.    You don't know?**

19       A.    I don't know, no.

20       **Q.    The -- what you were -- we were**

21  **just talking about, you going back and**

22  **forth with the standards about an alleged**

23  **complaint of overbilling with Dr. Amin.**

24            **Do you recall telling me that?**

25       A.    Yeah, correct.  Yeah.

1       Q.     How did you come to learn of

2   that FCA, False Claims Act, situation?

3       A.     I don't remember.  I -- I can't

4   remember if it was -- it's possible that

5   it was that someone on social media linked

6   it.  I don't remember if the document was

7   available on the -- on the internet -- the

8   extant internet at the time because it was

9   a --

10              (Reporter clarification.)

11      A.     -- the extant internet at the

12  time because it was a public document.  So

13  I think someone may have flagged it.  It's

14  possible someone else in our staff flagged

15  it, but I don't remember.

16  BY MS. EVANS:

17      Q.     Do you recall if it was

18  Andrew Free who brought it to your

19  attention?

20      A.     I don't, but it's -- it's

21  totally possible it was.  I don't know.

22      Q.     You don't know specifically how

23  you came to know about it?

24      A.     I definitely don't, no.

25      Q.     Exhibit 24, the transcript of

1   the standards call, if you could,

2   Mr. Hayes, flip to page -- page 12 of that

3   document, at the bottom --

4        A.    Yeah.

5        Q.    -- right around Bates

6   Number 2347.

7        A.    Yeah.

8        Q.    Are you there?

9        A.    Uh-huh.

10        Q.    If you could go down to line 22?

11        A.    Yes.

12        Q.    And if you could just read for

13   me what you say there through line 10 of

14   the next page.

15        A.    I say, "But because of the way

16   this came out, is not.  So I agree with

17   you completely and I" --

18        Q.    I'm sorry.  Can you stop for a

19   second?  Because I love our court

20   reporter, you're reading and just try to

21   read a little bit slower so she can write

22   it down.

23        A.    Sure.

24        Q.    And just -- if you could just

25   start over reading from page 12, line 22,

1      Q.     And Ms. Cone is on that one?

2      A.     Exactly, yes.

3      Q.     And so you don't know if that

4    means -- or strike that.

5             That -- that doesn't refresh

6    your recollection about whether it was

7    Ms. Cone that was the senior producer on

8    the Irwin County Detention Center story?

9      A.     Well, no.  I mean, these are --

10   those are two different people.  So I

11   don't -- I don't know -- again, I don't

12   even know if there's, like, definitively

13   one person per segment.  Do you know what

14   I mean?  Like, so -- I don't know.

15     Q.     Is it Mr. or Ms. O'Melia?

16     A.     Mr., Brendan.

17     Q.     Mr.?

18     A.     Uh-huh.

19     Q.     He shows up in some of the

20   documents as well, right?

21     A.     He does, yes.

22     Q.     And those were the three

23   seniors, right, Rawan, O'Melia, and Cone?

24     A.     I believe at the time, the three

25   different senior producers that we had on

 1   staff were Rawan, Brendan, and Tina.

 2       **Q.    But you don't know which -- or**

 3   **which one or which ones were the senior or**

 4   **seniors on these stories?**

 5       A.    I don't even know if there is a

 6   one to be established.  Like, I -- do you

 7   know what I mean?  Like, I don't -- I

 8   don't know if there was a one.  It seems

 9   that, again, this was obviously -- there

10   was a lot of resources and capacity being

11   devoted to this, as evidenced in these

12   documents.  So lots of people were working

13   on it.

14       **Q.    Is it typical that more than one**

15   **senior could be on a particular segment?**

16       A.    Yes.

17       **Q.    How -- how is -- how is it**

18   **decided who's going to be the senior?**

19            MS. MCNAMARA:  Objection to

20       form.

21       A.    I truly don't know.  This is --

22   I -- we -- we have to produce an hour of

23   TV every day.  We actually have a pretty

24   small staff to do it, so we're working in

25   parallel and this is one of these things

1    that I just don't have a lot of, like,

2    window to.

3    BY MS. EVANS:

4        Q.    This is going to be a terrible

5    question and your counsel's going to

6    object, and that's fine.  But you'll see

7    my point.

8            I always think in my life, if

9    everyone's in charge, no one's in charge.

10       A.    Uh-huh.

11       Q.    You know what that means?

12           MS. MCNAMARA:  Objection.

13       A.    I've -- I've heard that

14   statement before.

15   BY MS. EVANS:

16       Q.    Yeah.  Like, if -- if there's

17   not definitive roles, like, this person's

18   going to do this and that person's going

19   to do that.

20           It's just if everybody's doing

21   it, it's really easy for things to fall

22   through the cracks, right?

23           MS. MCNAMARA:  Objection to

24       form.  Mischaracterization.

25       A.    Yeah, I don't think that's true

1    in this case.  I mean, who's in charge,

2    ultimately, is that I'm the host of the

3    show and Denis Horgan's the EP.  That's --

4    so there's no question about -- there's

5    certainly no question about who hosts the

6    show.

7    BY MS. EVANS:

8         Q.     **Right.**

9         A.     And there's no question about

10   who the executive producer is.  And at the

11   end of the day, we're the two that the

12   buck stops with.  So things that are

13   delegated below that level can be fluid

14   sometimes.  But, again, like, I really do

15   not have a satisfying answer to you about

16   this because I don't actually know the

17   answer to it.

18        **Q.     Because you are the one -- or**

19   **strike that.**

20             **The buck ultimately stops with**

21   **you with regard to what goes on the air,**

22   **right?**

23        A.     I mean, I would say that it's a

24   partnership between me and Denis.

25   Obviously, in the end, I say all the words

1    that I say on the air and that is just a

2    fact in the world that is evidence for all

3    to see.

4         **Q.    You rely on Mr. Horgan a lot to**

5    **get you to that point where you say the**

6    **words out loud, right?**

7              MS. MCNAMARA:  Objection to

8         form.

9         A.   I -- I would say that we all --

10   I rely on everyone.  I mean, I -- I rely

11   on the staff and the process that we

12   produce to make -- to make the show, yeah.

13   BY MS. EVANS:

14        **Q.    Because you don't go back -- I**

15   **mean, I think your testimony earlier was**

16   **you didn't go back and check behind the**

17   **segment producer, for example.  He shared**

18   **what he shared and you went with it.**

19             MS. MCNAMARA:  Objection to

20        form.

21        A.    I would say that, again, I trust

22   the process that we have, the people that

23   we have, all of whom are, I think,

24   diligent and hard working, smart,

25   passionate journalists.

1              The necessity of deligation for

2      a show like ours -- again, we're talking

3      about one segment that aired -- aired on

4      our show that on that day, had five

5      others, right?  Like, I can't -- we just

6      have to delegate.  That's just the nature

7      of the job.

8      BY MS. EVANS:

9          Q.    **No, understood.**

10             **But each segment is important,**

11     **right?**

12         A.    Of course.

13         Q.    **You want to get it right?**

14         A.    We always want to do the best

15     journalism possible.

16         Q.    **You want to get it right?**

17         A.    We want to be truthful, yes.

18         Q.    **Because while it's one segment**

19     **out of five for the day, out of 25 for the**

20     **week -- my math's not good enough to**

21     **specifically tell you how many that is a**

22     **month or a year.**

23         A.    Right.

24         Q.    **But it's one segment to you at**

25     **that particular time, but it's everything**

1    to Dr. Amin or to whoever the subject is,

2    right?

3            MS. MCNAMARA:  Objection to

4        form.

5        A.    I mean, I can't speak to how

6    he -- how he sees any of this.

7            I think that we have -- again,

8    this was clearly a story that we took

9    specific care with and put specific

10   resources and labor to -- again, and I

11   repeat my testimony from earlier -- in the

12   top 1 percent of the amount of work that

13   goes into a segment on our show, as

14   evidenced by all of this back-and-forth

15   communication, documents, standards calls,

16   et cetera.

17   BY MS. EVANS:

18       Q.    Despite it in the being in the

19   one percent of the amount of work that

20   goes into a segment for your show, sitting

21   here today, you can't, Mr. Horgan

22   couldn't, and Mr. Price couldn't tell me

23   who was the senior producer on any of the

24   segments?

25           MS. MCNAMARA:  Objection to

1        form.

2        A.    I -- I just don't know.  I do

3    not know who the senior producer was on

4    the show.

5              Again, I'm reconstructing this,

6    right from -- from the documents.  There's

7    no universe in which I can truthfully tell

8    you of any segment that I've done over the

9    last 10 years, who was the senior producer

10   on that.  I would just not be able to tell

11   you.

12             If you present me documents that

13   show three different senior producers in

14   three different roles, I don't know.

15   BY MS. EVANS:

16       **Q.    We don't know if anyone was**

17   **overseeing Mr. Price's work, do we?**

18             MS. MCNAMARA:  Objection.

19        Mischaracterization.

20       A.    Oh, no.  I don't think that's

21   correct.  I think it's --

22   BY MS. EVANS:

23       **Q.    Who was?**

24       A.    Well, there's a senior producer

25   copied on this e-mail.  There's a senior

```
 1    producer in the -- a senior producer, an

 2    executive producer, and the host on the

 3    standards call.  So it seems in all of

 4    these different things -- again, I'm

 5    reconstructing this from the documents

 6    that I have in front me -- there was --

 7    that he was not --  that there were other

 8    people involved.

 9        Q.    Have you ever reviewed the

10    transcript of Mr. Price's call with

11    Mr. Free?

12        A.    I don't know if I have, to be

13    honest.  I think -- I think I'm aware it

14    exists.  But I don't think I've reviewed

15    it.

16        Q.    Do you know if anyone involved

17    with the All In with Chris Hayes show was

18    aware of the content of the conversation

19    that Mr. Price had with Mr. Free on

20    September 15th, 2020?

21            MS. MCNAMARA:  Objection to

22        form.

23        A.    I -- I don't know.

24    BY MS. EVANS:

25        Q.    Who is Diane Shamis?
```

1      Q.      --  starting on line 6,

2   you're -- you're speaking.  You can read

3   that if you want to, to answer the

4   question.  It appears, from what you say

5   here, that you're relaying what is -- what

6   you believe are the detainee lawyers'

7   theory of the case, which is that

8   indicates being whatever's happening --

9   happening at Irwin County Detention

10  Center, that this was, you know, medical

11  provider who had a sort of captive patient

12  base and was doing all these procedures to

13  make money.  That was their theory, that

14  he was not supervised and he was just

15  billing.  Is that accurate?

16              MS. MCNAMARA:  Objection.

17       Mischaracterization.

18  BY MS. EVANS:

19      Q.    If not, tell me how.

20      A.    Yeah.  I would say it slightly

21  different.  So I think that the -- that --

22  I think their theory of the case is that

23  the incentive structure that goes along

24  with the contract that he has with the

25  provider was such that the more procedures

1    he did, the more money he would make.  And

2    that that was a possible reason that

3    unnecessary procedures were happening.

4        Q.    But didn't those same lawyers

5    share with you that -- or share with

6    MSNBC, to your knowledge, that there were

7    a lot of medical care that they felt their

8    clients needed that they weren't getting?

9            MS. MCNAMARA:  Objection to

10       form.

11       A.    I don't actually recall that,

12   but I also don't think that those two are

13   really in that much tension.

14   BY MS. EVANS:

15       Q.    Well, if -- well, how?  How were

16   they not getting attention?

17       A.    Oh, because the way that the --

18   the medical system works is that certain

19   sorts of procedures are very extensive and

20   can be billed out a lot and certain

21   procedures or certain routine care, like,

22   even just general hygenic things, giving

23   people antibiotics, checking on basic

24   symptoms are not particularly lucrative in

25   the system that we have.

1            What -- the way that medical

2    billing works is that procedures,

3    particularly procedures that require

4    anesthesia, surgery, things like that, are

5    billable at a high level.  You can have --

6    it's one of the great tragedies in

7    American healthcare is that we have both

8    too much care and too little care at the

9    same time.

10        Q.    In September 2020 -- or strike

11    that.  I'll ask more broadly.

12        A.    Yeah.

13        Q.    Do you have any idea the amount

14    of money that would flow to Dr. Amin for

15    any procedure that he may have performed?

16        A.    Like the dollar reimbursable

17    value?

18        Q.    Correct.

19        A.    I don't.

20        Q.    Did you in September 2020?

21        A.    Yeah.  I have a general sense

22    that having covered, again, healthcare and

23    in particular health utilization fairly

24    closely, that the incentives like the ones

25    that I just stated and that are outlined

 1   here are incentives that are persistent in

 2   lots of parts of the system, such that,

 3   you know, certain procedures are

 4   reimbursed at much higher rates than other

 5   things.

 6      **Q.    Did you make any effort in**

 7   **September 2020 to find out what possible**

 8   **financial incentives may have existed with**

 9   **regard to OB/GYN procedures?**

10      A.    I don't recall one way or the

11   other.

12      **Q.    Do you know -- are you aware of**

13   **anyone related to the All In with Chris**

14   **Hayes show doing so?**

15      A.    What I recall is what stood --

16   stood out to me, and I think was

17   particularly front of mind in the

18   conversation that you're directing me to

19   in the standards call, was reading the

20   False Claim Act complaint in which what's

21   spelled out is that certain procedures,

22   and if I'm remembering this correctly, I

23   believe vaginal ultrasound.

24           There's a line in that False

25   Claims Act that there was actually a

1    distinction in the standard operating

2    procedure -- and, again, this in the

3    complaint -- that women who were covered

4    by Medicare/Medicaid always got

5    ultrasounds; those who weren't, didn't.

6    And that was because the ultrasound was a

7    reimbursable procedure.

8             And if you're going to bill

9    Medicare for it, you just do it as a

10   standard operating procedure because that

11   will produce higher billable numbers.

12   Whereas, if they weren't and you didn't is

13   because maybe it wasn't medically

14   necessary.

15            So that fact stuck with me and I

16   remember thinking about it particularly

17   from the facts in that False Claims Act

18   complaint that had to do with precisely

19   the back-of-the-house calculations around

20   these exact questions.

21       **Q.    Sitting here today, have --**

22   **strike that.**

23            **Have -- I think the answer to**

24   **this is no, but I just want to confirm.**

25            **You've never make -- you've**

1   never taken any steps to find out how much

2   money Dr. Amin made off of any medical

3   care given at Irwin County Detention

4   Center, have you?

5       A.    I don't know the dollar figure,

6   no.

7       Q.    Would it surprise you to know

8   that it's not much?

9            MS. MCNAMARA:  Objection.

10      Mischaracterization.

11      A.    I don't know.  I don't have

12  preconditions either way.

13  BY MS. EVANS:

14      Q.    I mean, you thought it must have

15  been lucrative and that's why you thought

16  he was doing it, right?

17           MS. MCNAMARA:  Objection.

18      Mischaracterization.

19      A.    I don't -- no, I don't think it

20  has to be lucrative for the incentive

21  structure to be pretty messed up.

22  BY MS. EVANS:

23      Q.    Well, wouldn't the incentive

24  structure have to be there to make it

25  something that a doctor was incentivized

1    to do?

2                    MS. MCNAMARA:  Objection to

3        form.

4        A.    Again, I'm just saying that

5    lucrative is a -- is a judgment call.

6    Things are lucrative at all different

7    levels.  Some people might think a million

8    dollars is lucrative and there are people

9    who think $100 is lucrative.  I can't say

10   what's lucrative.

11                   What I can say is, the structure

12   of American medical billing tends to

13   reward more complex procedures for higher

14   levels of reimbursement.  I had read a

15   False Claims Act complaint in which people

16   that worked in the office said

17   specifically that this was a defining

18   incentive in the standards of care that

19   were laid out.

20                   And I had in front of me

21   allegations of unnecessary medical care.

22   So those three things together, taken not

23   as definitive, but certainly a plausible

24   story of a motive.

25       Q.    But you did not then and you do

1   not now know how much any procedure for

2   OB/GYN care, what that would lead to

3   claim-wise?

4            MS. MCNAMARA:   Objection to

5       form.

6       A.   I don't know -- I do not know

7   dollar figures.

8   BY MS. EVANS:

9       Q.   Do you recall interviewing B on

10  September 16, 2020?

11      A.   My recollection is vague.

12      Q.   What do you recall about it?

13      A.   To be honest, mostly what I

14  recall about it -- and partly this is from

15  refreshing my memory through

16  preparation -- that it was just difficult

17  because we were -- I think we were trying

18  to interview her in between -- like, she

19  was at a job.  We were trying to catch --

20  catch her during a work break and the

21  entire thing was, like, very logistically

22  difficult.

23      Q.   Did it feel -- strike that.

24           Did you feel rushed?

25      A.   I don't know if I felt rushed.

```
 1      CERTIFICATE OF SHORTHAND REPORTER-NOTARY

 2                      PUBLIC

 3              I, Monique Cabrera, the officer

 4      before whom the foregoing deposition

 5      was taken, do hereby certify that the

 6      foregoing transcript is a true and

 7      correct record of the testimony given;

 8      that said testimony was taken by me

 9      stenographically and thereafter

10      reduced to typewriting under my

11      direction; and that I am neither

12      counsel for, related to, nor employed

13      by any of the parties to this case and

14      have no interest, financial or

15      otherwise, in its outcome.

16              IN WITNESS WHEREOF, I have

17      hereunto set my hand this 9th day of

18      August, 2023.

19

20

21      _____

22      MONIQUE CABRERA
        Notary Public in and for the State of New
23      York
        County of Suffolk
24      My Commission No.  01CA6043156
        Expires:  06/12/2026
25
```