Declaration of

Elizabeth McNamara

Exhibit 80

1    UNITED STATES DISTRICT COURT

2    FOR THE SOUTHERN DISTRICT OF GEORGIA

3    WAYCROSS DIVISION

4    ----------------------------------------X

5    DR. MAHENDRA AMIN, M.D.,

6                        Plaintiff,

7          -against-                        Index No.:
                                            5:21-CV-00056
8    NBCUNIVERSAL MEDIA, LLC,

9                        Defendant.

10   ----------------------------------------X

11

12
                              1221 Avenue of the Americas
13                            New York, New York

14                            May  9, 2023
                              9:36 A.M.
15

16

17        EXAMINATION BEFORE TRIAL of DENIS HORGAN, the

18   Witness herein, taken by the attorney for the

19   Plaintiff, pursuant to Notice, held at the

20   above-stated time and place, before Melissa

21   Leonetti, RPR, a Notary Public of the State of New

22   York.

23

24                        - - - -

25

 1       A.    Yes.

 2       Q.    **Prior to coming back for the second time,**

 3  **you were with Topcoder?**

 4       A.    Yes.

 5       Q.    **What was that?**

 6       A.    Topcoder is a software development

 7  company.  I went to work for them as a head of

 8  community development.  It was a non-media company.

 9       Q.    **And prior to that, you had been a senior**

10  **producer at MSNBC?**

11       A.    That's correct.

12       Q.    **What were you doing in that role?**

13       A.    I was a senior producer on Countdown with

14  Keith Olbermann, which was the 8 o'clock show.

15       Q.    **Any other shows that you were a senior**

16  **producer with during that stint with NBC?**

17       A.    No.

18       Q.    **And then prior to that, you were with**

19  **ESPN?**

20       A.    That's correct.

21       Q.    **Do you miss sports?**

22       A.    Sometimes.

23       Q.    **Well, we in Atlanta are having a blast**

24  **right now between the Bulldogs and the Braves.**

25       A.    Yes, I know.

```
 1        Q.    Have you held any other roles in
 2   television besides the ones we've talked about?
 3        A.    No.  No.
 4        Q.    Do you engage in any --
 5              MS. EVANS:  Strike that.
 6        Q.    Are you employed by NBC News?
 7        A.    I am employed by -- well, I'm employed by
 8   NBCUniversal, I believe, but I work for MSNBC which
 9   is a division of NBC News which is a division of
10   NBCUniversal -- is that my understanding?
11        Q.    Sounds good.
12        A.    -- which is a division of Comcast.
13        Q.    Do you do work outside of your work with
14   MSNBC?
15              MS. McNAMARA:  Objection to the form.
16        A.    No, I don't.
17        Q.    You don't have a podcast separate from
18   NBC?
19        A.    No.
20        Q.    You went to the University of Hartford?
21        A.    I did.
22        Q.    What degree did you earn there?
23        A.    Bachelor of arts.
24        Q.    Any other education?
25        A.    No.
```

1        Q.     Any certifications?

2        A.     No.

3        Q.     Can you tell me about the structure of

4    the employee team for All In with Chris Hayes.  And

5    that's sort of -- that's where I'm going.

6               You're at the top or is Chris at the

7    top?

8        A.     Of the -- well, it's -- my understanding

9    is that Chris is a contract employee of the company.

10   The rest of the team are employees, you know, but

11   technically that doesn't make too much of a

12   difference, but Chris doesn't necessarily report to

13   me.

14              So while the rest of the team does

15   report in to me -- the rest of the editorial team,

16   I should say -- Chris Hayes and I are practically,

17   or how it works in practices, are partners.  But I

18   answer to the president of the company and so does

19   he.

20       Q.     Which is who?

21       A.     Well, I should clarify.  I now answer to

22   the senior vice president of prime time, which is

23   Greg Kordick.

24       Q.     And that's changed recently?

25       A.     Yes.  That -- he -- we have a -- the

1  president of MSNBC is Rashida Jones.  She started in

2  2021 or 2022.  When she came in, she reorganized a

3  little bit.

4      **Q.    And Greg is senior vice president of**

5  **prime time for MSNBC?**

6      A.    Yes.

7      **Q.    Who has final say for what --**

8            MS. EVANS:  Strike that.

9      **Q.    There's a lot of work, it appears, that**

10 **goes into producing the script before Chris Hayes**

11 **goes on air.**

12     A.    Uh-huh.

13     **Q.    Who has final say on what gets loaded**

14 **into that teleprompter?**

15     A.    It doesn't work out that there's sort of

16 a final say on it, necessarily.  Chris Hayes is

17 the -- is ultimately going to decide whether or not

18 he's going to say something on television, which is

19 why our process goes through so many sort of

20 iterations and conversations, because it's Chris

21 Hayes' words that will be spoken on television.

22            So Chris Hayes ultimately will give a

23 final signoff on a script, but it goes through,

24 you know, various other people before that.

25     **Q.    When you say he gives the final signoff**

1   on the script, do you mean before it gets loaded or

2   in him choosing whether to say the words or to say

3   something else?

4            MS. McNAMARA:  Objection to form.

5       A.   He -- he -- I mean, he has the final say

6   because he can, while live on the air, decide

7   whether or not he's actually going to say a thing

8   that's in prompter.

9            So he's under no obligation to read

10  what is in prompter.  He often will ad lib and go

11  off script and, you know, say what he wants to say

12  or what he thinks is appropriate to say or edit

13  what he sees.

14           So I would say on the air, Chris has

15  that -- makes that final decision.  The script

16  itself is -- there's an indication given in the

17  iNews by Chris that it is ready for air.  And that

18  is the sort of last -- the last sort of approval

19  of the script before it goes to air.

20      Q.   Is there --

21           MS. EVANS:  Strike that.

22      Q.   Is that always true that he has to give

23  that signoff in iNews before going live?

24      A.   It's not always true.  That's just our --

25  that's our practice.

1        Q.     Prior to Chris Hayes making that signoff
2    when he does, are you the eyes that are right before
3    Chris?
4        A.     Not generally.  There's -- we have senior
5    producers who are in there making sure that it's
6    ready.  We have fact-checkers who are going through
7    in some cases.  We have various other producers that
8    have, you know, business in the script cue that will
9    be in there.  But I do not approve every script, no.
10       Q.     What are the occasions when you do versus
11   when you don't?
12       A.     As a matter of practice, I don't -- I
13   don't approve -- I'm not a step in the approval
14   process of the scripts.
15       Q.     What's your role?
16       A.     What is my role?  Can you clarify what
17   you mean by that.
18       Q.     In the script, if any.
19       A.     I -- I will look -- well, it all depends
20   on the time of day you're talking about.  My role in
21   the script is harder to answer.  Do you mean in our
22   process?  What -- please just --
23       Q.     Yes.
24              MS. McNAMARA:  Do you understand the
25              question?  You seem confused.

 1      A.    Yeah.  I don't understand.  You'll have

 2   to be more specific, please.

 3      **Q.    Well, I asked what is your role in the**

 4   **script and you said "do you mean in our process,"**

 5   **and I said yes.  So what did you mean?**

 6      A.    My role in the script begins in the early

 7   part of the day where we decide what we're going to

 8   do on television.  We have conversations about what

 9   we're going to do on TV, and then there are various

10   times during the day where the -- what the script

11   will be is kind of discussed.  I am there for those.

12   I am present for those.

13           In some occasions, I will make edits.

14   In others, I don't.  And as we get toward the end

15   of the day, I am usually reviewing scripts, but

16   not always.  And, as I said, not a -- I am not an

17   approver in the -- in that process.

18      **Q.    You said "we" have conversations about**

19   **what we're going to do on TV.**

20           **Who is "we"?**

21      A.    The editorial team.

22      **Q.    Who is the editorial team?**

23      A.    Chris Hayes, the seniors, the segment

24   producers.  I am.  Graphics producers, associate

25   producers.

 1        Q.    How many -- you said seniors.  Do you

 2   mean senior producers?

 3        A.    Yes.

 4        Q.    How many senior producers on All In with

 5   Chris Hayes?

 6        A.    We have three.

 7        Q.    And who are those?

 8        A.    Brendan O'Melia, Tina Cone, and Rawan

 9   Jabaji.

10        Q.    Any others?

11        A.    No.

12        Q.    And are all three of those seniors

13   involved in each show or does each one take a show?

14   How does it work?

15        A.    It depends on what our staffing is on any

16   particular day.  But there's -- there's generally

17   a -- a particular senior usually will take the lead

18   as a senior on a particular block.

19        Q.    So is it common that all seniors would

20   work on one show but not necessarily on the same

21   block?

22        A.    Yes.  All seniors work on the show every

23   night.  And oftentimes there's -- everyone is

24   working on -- more than one will work on a block.

25   But in the approval process, one senior will approve

```
 1        A.    Are there copies of the script as it was
 2   fed into prompter?  I -- we generally archive the
 3   final version of a script from each day's show.
 4        Q.    When you say "we generally archive the
 5   final version of a script from each day's show," do
 6   you mean the script as it was written going into the
 7   show or as it came out?
 8        A.    No.  As -- what -- as to your question,
 9   what was in prompter, the iNews script as written.
10        Q.    So if I requested it, I should be able to
11   find a copy of the script as it went into the
12   teleprompter as well as the transcript of what was
13   said on the air?  Both of those should exist?
14        A.    I'm not sure what your process for
15   getting stuff is, so I don't --
16        Q.    If you wanted to go and get a copy of the
17   script as it went into the teleprompter to compare
18   it to the transcript that came out after the show,
19   you should be able to get those two documents?
20   True?
21        A.    Yes.
22        Q.    Have you seen copies of the script for
23   any show of All In with Chris Hayes regarding Irwin
24   County Detention Center as it went into the
25   teleprompter in the last year and a half?
```

1       A.    I believe as part of this process, I
2    have, yes.
3       Q.    Have you spoken with Chris Hayes
4    regarding the Irwin County Detention Center story
5    since --
6             MS. EVANS:  Strike that.
7       Q.    Have you spoken with Chris Hayes
8    regarding any of the Irwin County Detention Center
9    stories in the last year?
10      A.    No, other than to note to one another
11   that this process was going on.
12      Q.    And "this process" meaning?
13      A.    Meaning that there was a suit and we were
14   scheduling depositions and that sort of thing.
15      Q.    And did you have any discussions with
16   regard to what you might say or not say?
17      A.    No.
18      Q.    He's aware you're being deposed?  You're
19   aware he's being deposed?
20      A.    Yes.
21      Q.    Anything else?
22      A.    No.
23      Q.    Have you had any conversations with
24   Xander Price regarding the Irwin County Detention
25   Center stories in the last year?

```
 1        A.    I have not.
 2        Q.    Are you surprised --
 3              MS. EVANS:  Strike that.
 4        Q.    Were you surprised that your deposition
 5   was being called for but not Xander Price's?
 6        A.    I was not aware of anyone's deposition
 7   other than my own and Chris'.
 8        Q.    Whenever --
 9              MS. EVANS:  Strike that.
10        Q.    You're aware that the scripts --
11        A.    I mean, let me just -- just to be
12   precise.  Of my team.  Those are the two I was aware
13   of.
14        Q.    Are you aware of anyone else being
15   deposed in this litigation?
16        A.    I am aware now that others have been
17   deposed.
18        Q.    Who?
19        A.    I believe Julia Ainsley I'm aware of.
20        Q.    Did you have a conversation with
21   Ms. Ainsley about her deposition?
22        A.    I don't think I've ever had a
23   conversation with Ms. Ainsley.
24        Q.    Have you had --
25              MS. EVANS:  Strike that.
```

1      Q.     Were you aware that Jacob Soboroff is
2  going to be deposed in this case?
3      A.     I'm not aware of that.
4      Q.     You recall that the script for All In
5  with Chris Hayes with regard to the Irwin County
6  Detention Center matter for September 15, 2020, was
7  reviewed by standards?  True?
8      A.     Yes.
9      Q.     Was that script approved prior to
10 broadcast?
11     A.     Yes.
12     Q.     Who approved it?
13     A.     It would have been approved by standards
14 in that case, standards and legal.
15     Q.     Are those separate approvals?
16     A.     It generally happens at the same time.
17     Q.     Did it in this instance?
18     A.     I can't recall how that went in this
19 instance, but I believe that our counsel, David --
20          MS. McNAMARA:  I caution you, Denis,
21      that I don't want you to testify to any
22      communications that you may have had with
23      NBCU counsel.
24          You can testify simply to the fact that
25      it was reviewed.  But the substance of any

1        such review is privileged and I instruct you

2        not to answer.

3        Q.    Your knowledge is that with regard --

4              MS. EVANS:  Strike that.

5        Q.    The September 15, 2020, script for All In

6    with Chris Hayes with regard to the Irwin County

7    Detention Center matter was approved by standards?

8    That's your testimony?

9        A.    Yes, my understanding is that script was

10   approved by standards.

11       Q.    And is it your testimony that the

12   September 15, 2020, script for All In with Chris

13   Hayes with regard to the Irwin County Detention

14   Center matter was approved by legal?

15             MS. McNAMARA:  Objection.  I instruct

16        him not to answer, because I think approval

17        gets into substance.  He can answer whether

18        it was reviewed or not.  But what the

19        substance of that review, whether it was

20        approved or any other different thing is --

21        goes to the substance of the legal analysis

22        and I instruct him not to answer.

23             MS. EVANS:  Well, I disagree, but I'll

24        ask a different way.

25       Q.    Was it your understanding that the script

1    for All In with Chris Hayes for September 15, 2020.

2              (Reporter clarification)

3        Q.    On September 15, 2020, with regard to the

4    segment on Irwin County Detention Center for All In

5    with Chris Hayes, was it your understanding that

6    that could not be broadcast until legal approved?

7        A.    That is not my understanding.

8        Q.    You did not --

9              MS. EVANS:  Strike that.

10       Q.    You do not believe --

11             MS. EVANS:  Strike that.

12       Q.    On September 15, 2020, before you're

13   going on air for All In with Chris Hayes, you did

14   not believe that the script with regard to the Irwin

15   County Detention Center matter had to be approved by

16   legal?

17             MS. McNAMARA:  Objection to the form.

18       A.    I am saying I recall that there was

19   someone from legal included in the reviewing of the

20   script that day.  But it was the standards approval

21   that was the reason for the conversations.

22       Q.    From your understanding, no approval by

23   legal was required of the script for All In with

24   Chris Hayes for September 15, 2020, with regard to

25   the Irwin County Detention Center matter?  True?

```
 1        A.    I don't think that that was a part of our
 2   process.  As I said, I only recall that that may
 3   have been included in it.
 4        Q.    You don't recall that you need to --
 5              MS. EVANS:  Strike that.
 6        Q.    You don't recall that on September 15,
 7   2020, you needed to wait for any go-ahead from legal
 8   before you could air the Irwin County Detention
 9   Center matter on All In with Chris Hayes?  You just
10   needed to wait for standards?  Is that your
11   understanding?
12        A.    My understanding is that our script was
13   being reviewed by standards and that we would work
14   together with standards to arrive at the final
15   script and that that is what went to air.
16        Q.    Your understanding is that the script was
17   not being reviewed by legal, however?
18              MS. McNAMARA:  Objection.
19   Mischaracterization.
20        A.    Yeah.  As I said, I -- I recall that
21   legal may have also been included on emails that
22   were sent at that time.  I do not -- I don't know
23   how to characterize it further than that.
24        Q.    You don't recall that any approval from
25   legal was required before you went on air with the
```

```
 1    Chris Hayes show on September 15, 2020?  True?
 2              MS. McNAMARA:  Objection.  Asked and
 3         answered at least three times.
 4              MS. EVANS:  No, it's not.
 5              MS. McNAMARA:  He has answered it.
 6              MS. EVANS:  No, he hasn't.  Quit the
 7         coaching, Liz.  You can object and say asked
 8         and answered if you want to, but then you've
 9         got to stop.
10         Q.    I will ask it again.
11              You, Denis Horgan, do not recall that
12    any approval from legal was required before you
13    went on air with the Chris Hayes show on
14    September 15, 2020?  True?
15              MS. McNAMARA:  Same objection.
16         A.    I have the same answer.  I recall that
17    legal was included in an email or may have been
18    included in emails during the process that we were
19    going through with standards.  I do not recall any
20    objections.
21         Q.    You recall that legal was involved in
22    discussions.  You recall that legal --
23              MS. EVANS:  Strike that.
24         Q.    You don't --
25              MS. EVANS:  Let me start over.
```

1      Q.     You recall that legal was involved in
2   discussions regarding the script on September 15,
3   2020.  You don't recall that legal had any
4   objections.  But you also don't recall that any
5   approval from legal was required.  True?
6      A.     I don't recall what the process was with
7   -- I have the same answer.  I recall that legal had
8   been included in emails, and it could have been the
9   next day or the 15th, and that they were looped in
10  on an email or something during that process with
11  standards.  That's what I recall.
12     Q.     You knew that you had to wait for
13  standards to say yes before All In with Chris Hayes
14  could move forward with the Irwin County Detention
15  Center segment on September 15th?  True?
16     A.     No.
17     Q.     You did not know that?
18     A.     No, that is not true.
19     Q.     Tell me where I'm wrong.
20     A.     The process is not that we wait for
21  standards to say yes or no before we move forward.
22     Q.     You knew that you could not air the Irwin
23  County Detention Center segment on All In with Chris
24  Hayes on September 15th until standards approved the
25  script?  True?

```
 1                  MS. McNAMARA:  Objection.  He just
 2          answered that.
 3                  MS. EVANS:  No, he didn't.
 4          Q.    I'm dumb, Mr. Horgan.  Answer me again.
 5   I'm just a simple Georgia girl.  Come on.  Help me
 6   out.
 7          A.    Our process is not that we wait for
 8   standards to give a yes or no on whether we're going
 9   to air something.
10          Q.    That was not my question.  Let me ask it
11   again.
12                  MS. McNAMARA:  How is that not the
13          answer?
14                  MS. EVANS:  It's not, Liz.  My God.
15                  MS. McNAMARA:  I mean, maybe we're dumb
16          New Yorkers.
17                  MS. EVANS:  Yeah, maybe.  We'll muddle
18          through it together.
19          Q.    What was your understanding of what
20   standards wanted with regard to your script for All
21   In with Chris Hayes with regard to the Irwin County
22   Detention Center matter on September 15, 2020?
23          A.    My understanding of what standards wanted
24   from our script -- is that the question?
25          Q.    Yes.
```

1   know that we were sending our scripts to Chris

2   Scholl for review.

3        **Q.    Do you recall a conversation with Chris**

4   **Scholl on September 16, 2020?**

5        A.    I recall that we spoke on September 16th,

6   yes.

7        **Q.    And do you recall him expressing concerns**

8   **about the Irwin County Detention Center story during**

9   **that phone call?**

10       A.    Again, that's your characterization that

11  he has concerns.  He may have said in the call "I

12  have concerns."  I don't recall knowing what his

13  concerns are.

14            There are -- every conversation we have

15  with standards, there are the items of the story

16  that we are focusing on for review, and this story

17  had items to review.

18       **Q.    Did you have concerns about the Irwin**

19  **County Detention Center story on September 15, 2020?**

20       A.    As a story, did I have concerns?

21       **Q.    Yes.**

22       A.    I don't recall any concerns about it.

23       **Q.    Not on September 16, 2020, either?**

24       A.    No.

25       **Q.    You didn't think initial --**

1          MS. EVANS:  Strike that.
2      Q.    You didn't think additional information
3  was needed?
4      A.    I may have felt additional information
5  was needed in our delivery of a segment, but that
6  does not mean that I had concerns about the story.
7          I just don't agree with the
8  characterization you're making there.
9      Q.    You said that the --
10         MS. EVANS:  Strike that.
11     Q.    You said that the scripts were sent to
12  standards to review on September 15, 2020, by email.
13         Is that the same process for getting
14  those scripts to standards for review that took
15  place on September 16th and September 17, 2020?
16     A.    That would be the way that we transmit
17  the scripts to standards.
18     Q.    Have you reviewed communications
19  reflecting that you transferred scripts to standards
20  in that manner for September 16th and September 17,
21  2020?
22     A.    In the process we went through with
23  standards, I think I did see that at some point a
24  final version of the script was sent to them.
25     Q.    And that they expressed to you, however

1    they expressed to you, that it was good to go on

2    air, right?

3         A.    Yes.

4         Q.    **That's true for September 15th,**

5    **September 16th, and September 17, 2020?**

6         A.    As far as I can recall, that is what our

7    process is and was for those days.

8         Q.    **Have you seen communications reflecting**

9    **standards expressing that the stories were ready for**

10   **air in an email communication?**

11        A.    I don't know that I have seen -- I don't

12   recall that I've seen that.

13        Q.    **How did standards communicate to All In**

14   **with Chris Hayes the stories regarding Irwin County**

15   **Detention Center on September 15th, 16th, and 17,**

16   **2020, were ready for air?**

17        A.    I mean, my -- I don't recall exactly in

18   each instance what the sort of last conversation

19   with them was.  Usually you will get an email back

20   that says, okay, great, thank you.

21              Sometimes if there are kind of

22   outstanding points to discuss, we might talk on

23   the phone and work it out, you know, verbally.

24   But I don't recall exactly how it went in those

25   days.

1      Q.    On any of the days, you don't recall how
2  it went?
3      A.    I know that there were conversations on
4  the 16th and there was email communication on the
5  15th.  I just don't remember -- to your specific
6  question of the final communication, I just couldn't
7  say for sure.
8      Q.    On September 15, 2020, do you recall it
9  being a situation where you sent the script and then
10  you got the communication back from standards that
11  it was ready for air?  Or do you recall that there
12  were conversations in between?
13          MS. McNAMARA:  Objection to the form.
14      Q.    Or something else?
15      A.    On which day?
16      Q.    September 15, 2020.
17      A.    My recollection is that we -- it was all
18  email on that day and so whatever communication
19  there was that I'm aware of was on email.
20      Q.    Do you recall having a conversation with
21  standards on September 16, 2020?
22      A.    Yes.
23      Q.    Did you see a transcript of that call in
24  anticipation of your deposition today?
25      A.    I saw that there is a transcript and I

```
 1   saw some parts of it.
 2        Q.    Had you ever seen that transcript before
 3   yesterday?
 4        A.    No.
 5        Q.    Had you listened to a recording of that
 6   call sometime prior to yesterday?
 7        A.    No.
 8        Q.    Did you listen to a recording of that
 9   conversation --
10              MS. EVANS:  Strike that.
11        Q.    Did you listen to a recording of that
12   call yesterday?
13        A.    No.
14        Q.    Do you have a recording of that call?
15        A.    I do not.
16        Q.    How was it recorded?
17        A.    I don't know.  I have my -- my assumption
18   is that Xander Price recorded it.
19        Q.    Why is that your assumption?
20        A.    Because he is the segment producer.  And
21   if I'm recalling correctly from the documents, I
22   thought maybe it said that.  But I -- that's my
23   assumption.
24        Q.    What time of day was that call on
25   September 16, 2020?
```

1      A.    I don't recall exactly what time of day.

2   I believe it was in the late afternoon before

3   showtime.

4      **Q.    Do you recall subsequent conversations**

5   **with standards on September 16, 2020, after that**

6   **call?**

7      A.    No.

8      **Q.    Do you recall email communications**

9   **regarding script review on September 16, 2020, after**

10  **that call?**

11     A.    I don't recall them.  I believe I've been

12  made aware that there -- that we have them, but I

13  don't recall exactly what they were.

14     **Q.    Did you review those yesterday in**

15  **anticipation of your deposition today?**

16     A.    I think I saw them yesterday.

17           (Whereupon, a transcript was marked as

18           Plaintiff's Exhibit 24 for identification, as

19           of this date.)

20     **Q.    I'm going to hand you and your counsel**

21  **what I have marked as Plaintiff's Exhibit 24, which**

22  **is what I understand to be a transcript prepared of**

23  **that September 16, 2020, call, which was produced to**

24  **us by NBCUniversal ending in Bates number -- well,**

25  **it starts in Bates number ending 2336 and goes**

```
 1    through, including the word index, 2364.

 2              Do you recognize Plaintiff's Exhibit 24

 3    as a transcript of the September 16, 2020, call

 4    that you had with standards?

 5    A.    Yes.

 6    Q.    Is this the transcript that you saw

 7    yesterday?

 8    A.    Yes, this is what I saw yesterday.

 9    Q.    You were on this call?  True?

10    A.    Yes.

11    Q.    Xander Price was on this call?

12    A.    Yes.

13    Q.    Chris Hayes was on this call?  True?

14    A.    Yes.

15    Q.    Chris Scholl was on this call?  True?

16    A.    Yes.

17    Q.    And Tina Cone?

18    A.    Yes.  According to this, yes.

19    Q.    Remind me who Tina is.

20    A.    Tina is a senior producer.

21    Q.    Because she was on this call, does that

22    refresh your recollection about whether she was

23    involved in at least the broadcast regarding Irwin

24    County Detention Center on September 16, 2020, for

25    All In with Chris Hayes?
```

```
 1        A.     Yes, it does.
 2        Q.     Do you know if she was also the senior
 3   producer on the other two broadcasts?
 4        A.     I don't know that.  My understanding is
 5   that Rawan was the senior on the first day.
 6        Q.     And Tina for the second two?
 7        A.     Just to clarify.  The seniors are not
 8   necessarily assigned or do they act exclusively on a
 9   particular block.  Depending on the situation and
10   depending on the staffing level and various other
11   factors, more than one senior may be involved with a
12   segment.
13             This recording was about a -- the
14   logistics of setting up an interview.  That
15   appears to be why Tina was involved in this part
16   of that.  It does not mean that she was the only
17   producer or senior producer working on the
18   segment.
19        Q.     How did this call come to be?
20        A.     I believe that we were in the process of
21   setting up an interview, and that that interview --
22   we were discussing whether or not the interview
23   subject's identity would be obscured.
24             And we wanted to have a conversation
25   with Scholl about that, along with other --
```

```
 1   whatever other conversations were going.
 2        Q.    "We" meaning who wanted to have a
 3   conversation?
 4        A.    The seniors and I.  I just checked myself
 5   if I'm mistaken on the subject matter here.
 6        Q.    So it was someone on the All In at Chris
 7   Hayes show that --
 8             MS. EVANS:  Strike that.
 9        Q.    It was someone on the All In with Chris
10   Hayes show that wanted this call, not something that
11   standards initiated?  Is that your testimony?
12        A.    I don't know exactly who set it up.  But
13   my reading of it refreshes my memory that I probably
14   said let's all get on a conference call so we can
15   talk it through in person.  Everyone was still
16   remote at this point in 2020.
17        Q.    On the fourth page toward the bottom
18   right corner of Exhibit 24 --
19        A.    Okay.
20        Q.    -- up at the top, Mr. Horgan -- that's
21   you, right?
22        A.    That's me.
23        Q.    Toward the bottom of that paragraph, you
24   say:  There was a woman who was at the facility.
25   We've been connected with her through her attorney.
```

1              Do you see that?

2       A.     Yes.

3       Q.     **Who was the woman?**

4       A.     This was the woman we were referring to

5    as B.

6       Q.     **And she was connected with you through**

7    **her attorney.  Who?**

8       A.     I think that her attorney was Mr. Osorio.

9       Q.     **You go on to say:  And they are**

10   **requesting a full --**

11             MS. EVANS:  Strike that.

12      Q.     **You go on to say:  And they are**

13   **requesting a full obscuring of the face and voice,**

14   **and so she is someone who has undergone the**

15   **procedure.**

16             **Do you see that?**

17      A.     Uh-huh.

18      Q.     **By procedure, you mean what?**

19      A.     So she is someone who was saying that she

20   had undergone a medical procedure is what I meant by

21   that.

22      Q.     **Just a medical procedure?**

23      A.     I'm saying the procedure.  I'm not -- I

24   didn't -- I wasn't specific at that point.

25      Q.     **Had you seen any medical records for B at**

```
 1                C E R T I F I C A T E

 2

 3              I, Melissa Leonetti, RPR, a Notary

 4     Public of the State of New York, do hereby certify:

 5        That the testimony in the within proceeding was

 6     held before me at the aforesaid time and place.

 7     That said witness was duly sworn before the

 8     commencement of the testimony, and that the

 9     testimony was taken stenographically by me, then

10     transcribed under my supervision, and that the

11     within transcript is a true record of the testimony

12     of said witness.

13              I further certify that I am not related

14     to any of the parties to this action by blood or

15     marriage, that I am not interested directly or

16     indirectly in the matter in controversy, nor am I in

17     the employ of any of the counsel.

18              IN WITNESS WHEREOF, I have hereunto

19     signed this 16th day of May, 2023.

20

21

22

23     Melissa Leonetti

24

25
```