Declaration of

Elizabeth McNamara

Exhibit 81

**DR. MAHENDRA AMIN, M.D. vs NBCUNIVERSAL MEDIA, LLC**
**Alexander Price on 06/15/2023**

1                UNITED STATES DISTRICT COURT
        FOR THE SOUTHERN DISTRICT OF GEORGIA
2                   WAYCROSS DIVISION

3    DR. MAHENDRA AMIN, M.D.

4                Plaintiff,    CASE NO.
        v.                     5:21-CV-00056-LGW-BWC
5
     NBCUNIVERSAL MEDIA, LLC,
6
                Defendant.
7


8

             VIDEO-RECORDED DEPOSITION OF
9                 ALEXANDER PRICE
            Davis Wright Tremaine, LLP
10          1251 Avenue of the Americas
                  21st Floor
11           New York, New York 10020

12                  06/15/2023
                 9:30 a.m. (EDT)
13

14

15

16

17

18

19

20

21

22

23

24   REPORTED BY:  MONIQUE CABRERA
     JOB NO. 454780
25

 1         counsel NBCUniversal.

 2              MR. BIERBAUER:  Erik Bierbauer,

 3         in-house counsel for NBCUniversal.

 4    Whereupon,

 5              ALEXANDER PRICE,

 6    after having been first duly sworn, was

 7    examined and testified as follows:

 8              THE WITNESS:  I do.

 9              COURT REPORTER:  Can you state

10         your name and address for the record?

11              THE WITNESS:  Alexander Price,

12         30 Rockefeller Center, New York, New

13         York.

14              COURT REPORTER:  Okay.

15    EXAMINATION

16    BY MS. EVANS:

17         Q.    **Good morning, Mr. Price.**

18         A.    Good morning.

19         Q.    **We met a moment ago.  I'm going**

20    **to be asking you questions today on behalf**

21    **of the plaintiff.**

22         A.    Okay.

23              (Whereupon, Exhibit 61, Notice

24         of Deposition, was marked for

25         identification.)

1    BY MS. EVANS:

2        **Q.     The first thing I'm going to do**

3    **is hand you what I'm making as Plaintiffs**

4    **Exhibit 61 with a copy to your counsel.**

5    **There's nothing really for you do with**

6    **this.  This is simply the notice of**

7    **deposition that brings us here today.**

8        A.    Okay.

9        **Q.     Have you ever seen that document**

10   **before?**

11       A.    I have not, no.

12       **Q.     When did you first find out that**

13   **you would be deposed in this case?**

14       A.    I don't recall specifically

15   when.  I'm -- I'm not a 100 percent sure.

16   I don't want to guess about when.

17       **Q.     In the last month?**

18       A.    No.  Longer than that I believe.

19   Yeah.  I'm not -- it's been while, so I've

20   have had a lot of things going on so I'm

21   sorry.  I don't remember specifically

22   when.

23       **Q.     In the last two months?**

24       A.    I'm not sure.

25       **Q.     Do you recall being asked to**

```
 1    search for documents related to this
 2    litigation at some point?
 3        A.    I do, yes.
 4        Q.    When was that?
 5        A.    Again, I'm not 100 percent sure
 6    without seeing the record of -- of when I
 7    was asked.  I'm sorry.
 8        Q.    I wish I could show you that but
 9    some things don't get produced to me.
10              Do you think it was some time in
11    2022?
12        A.    It could have been, but, again,
13    I'm not sure.  I -- sorry.  I've got a
14    two-year-old, so I've a lot going on
15    between 2022 and 2023, so I don't want to
16    say the wrong thing so I'm not sure.
17        Q.    Did you become aware at some
18    point that Denis Horgan was going to be
19    deposed in this case?
20        A.    Yes.  I know that he was
21    deposed, yes.
22        Q.    Do you recall when you learned
23    that he was going to be deposed?
24        A.    Again, no.  I'm sorry.
25        Q.    Did you think --
```

```
 1                MS. EVANS:  Strike that.

 2   BY MS. EVANS:

 3       Q.    Do you consider yourself to be

 4   more knowledgeable on matters related to

 5   the broadcast on September 15th, 16th and

 6   17th for the All In With Chris Hayes show

 7   with regard to the Irwin County Detention

 8   Center and Denis Horgan?

 9                MS. MCNAMARA:  Objection to

10       form.

11       A.    I feel knowledgeable about it.

12   I don't know what exactly his level of

13   knowledge is, so I can't say more or less.

14       Q.    What was your role for the

15   September 15th, 2020, segment on the Irwin

16   County Detention Center for the All In

17   With Chris Hayes show?

18       A.    I was the segment producer.

19                (Reporter clarification.)

20                THE WITNESS:  Segment.

21   BY MS. EVANS:

22       Q.    Was that also true for the

23   September 16th, 2020 All In With Chris

24   Hayes show segment for segments about the

25   Irwin County Detention Center matter?
```

```
 1      A.    I believe so.
 2      Q.    And what about for
 3 September 17th, 2020?
 4      A.    I believe so.  But to be
 5 certain, I'd have to double check the
 6 iNEWS record.
 7            (Reporter clarification.)
 8            THE WITNESS:  iNews.
 9
10 BY MS. EVANS:
11      Q.    Did you look at the iNEWS record
12 prior to coming here today?
13      A.    I did not.  I looked a
14 transcript of the show.
15      Q.    What else did you look at?
16      A.    Various e-mails and transcripts
17 of calls that I had.
18      Q.    Anything else?
19      A.    I believe so.  There was a bunch
20 of documents but the e-mails and the
21 transcripts are the things that stick out.
22      Q.    Did you look at --
23            MS. EVANS:  Strike that.
24 BY MS. EVANS:
25      Q.    When you say you looked at
```

1   transcript of the show, was that just one

2   transcript or more than one?

3        A.    It was one transcript for each

4   day so three transcripts.

5        Q.    Did you look at any draft

6   transcripts?

7        A.    No.

8        Q.    Did you work to refresh your

9   recollection about the events of

10   September 15th, 16th and 17th, 2020, prior

11   to today?

12        A.    Yes.  I reviewed the segments

13   and, again, with the e-mails and

14   transcripts of calls that we had.

15        Q.    And in reviewing --

16             MS. EVANS:  Strike that.

17   BY MS. EVANS:

18        Q.    Did you pick out the documents

19   that you reviewed or were those chosen for

20   you?

21        A.    They were shown to me.  I didn't

22   pick out the ones that I saw, no.

23        Q.    In looking at the transcript of

24   the shows, the e-mails and transcripts of

25   the calls, did that refresh your

```
 1    recollection about whether you were the

 2    segment producer for the September 16th,

 3    2020, segment or segments regarding Irwin

 4    County Detention Center on All In With

 5    Chris Hayes show?

 6        A.    No.   I'm fairly certain I was

 7    but, again, I don't want to tell you the

 8    wrong thing if I -- if I wasn't for one of

 9    those.

10        Q.    All right.   Do you think that

11    you were --

12             MS. EVANS:  Or strike that.

13    BY MS. EVANS:

14        Q.    Were you the segment producer

15    for at least one of the segments on the

16    All In With Chris Hayes show on

17    September 16th of 2020 with regard to the

18    Irwin County Detention Center matter?

19        A.    Yes.

20        Q.    Which block was that?

21        A.    I'm not sure which block it was

22    that night.   But yeah.   I'm not -- I'm not

23    100 percent sure which block it was.

24        Q.    On September 16th of 2020 on the

25    All In With Chris Hayes show, there were
```

```
 1       Q.     So some time shortly after 12:30
 2   you had a meeting about this story, right?
 3       A.     We had a meeting, yes.
 4       Q.     Who was there?
 5       A.     I am not 100 percent sure.
 6       Q.     It would -- it would have been
 7   on the phone; COVID, right?
 8       A.     Yes.
 9       Q.     Or was it Zoom?
10       A.     I believe the message said it
11   was a -- a bridge call, which is a
12   conference line that we use.
13       Q.     Was Chris Hayes part of that
14   bridge call?
15       A.     I don't recall.
16       Q.     Do you recall how many people
17   were on this bridge call?
18       A.     I don't know.
19       Q.     Was it -- well, it was certainly
20   more than one.  You weren't on the call by
21   yourself.
22       A.     Yeah.  That's true.
23       Q.     Was it more than two?
24       A.     I -- I don't recall.
25       Q.     Do you live in New York?
```

```
 1        A.    No.

 2        Q.    Where do you live?

 3        A.    New Jersey.

 4        Q.    After the -- after the call on

 5   bridge, where you can't recall who was

 6   there, what was the next thing that you

 7   did to work on the segment for the Irwin

 8   County Detention Center for the All In

 9   With Chris Hayes show on September 15,

10   2020?

11        A.    I don't recall specifically what

12   the next thing I did was.

13        Q.    What -- what all did you do on

14   September 15th, 2020, to prepare the

15   segment on the Irwin County Detention

16   Center?

17        A.    I -- I can say generally what

18   I -- what I would have done.  I -- I can't

19   recall specifically what I did three -- on

20   a day three years ago.

21        Q.    But you prepared somewhere in

22   the neighborhood of 10 to 11 hours to come

23   here and give testimony on it.  You can't

24   recall any specifics about what you did on

25   September 15th, 2020 --
```

```
 1              MS. MCNAMARA:  Objection --
 2    BY MS. EVANS:
 3       Q.    -- in regards to the Irwin
 4    County Detention Center story?
 5              MS. EVANS:  I'm not done.
 6              MS. MCNAMARA:  Objection; asked
 7       and answered.
 8       A.    Again, I -- I don't recall the
 9    specific actions I took, but I can tell
10    what I generally do to prepare for
11    stories.
12    BY MS. EVANS:
13       Q.    Did you have a conversation with
14    anyone on September 15th, 2020, with
15    regard to the Irwin County Detention
16    Center segment?
17       A.    Yes.
18       Q.    Who did you call, or who called
19    you?
20       A.    I know that we had the Standards
21    call, and I know that I -- I spoke with
22    a -- an immigration lawyer.
23       Q.    One or more than one?
24       A.    I'm sorry?
25       Q.    One immigration lawyer or more
```

```
 1   than one?
 2       A.    On the 15th?
 3       Q.    Yes.
 4       A.    One.
 5       Q.    Okay.  Anyone else on the 15th?
 6       A.    I -- I'm not 100 percent
 7   certain, no.
 8       Q.    The immigration lawyer that you
 9   talked to on September 15th, 2020, was
10   Andrew Free, true?
11       A.    Yeah.
12       Q.    How did you how come to talk to
13   Andrew Free on September 15th, 2020?
14       A.    His information was passed along
15   to me.
16       Q.    From?
17       A.    Chris Hayes.
18       Q.    Did you have a telephone
19   conversation with Mr. Hayes, or how did he
20   let you know that you were going to be
21   connected with Andrew Free?
22       A.    He e-mailed me.
23       Q.    Did you see that e-mail in
24   preparation for your testimony today?
25       A.    Yes.
```

```
 1      Q.    Was it an e-mail, or was it a
 2   different message?
 3      A.    It was an e-mail.
 4            (Whereupon, Exhibit 62, Chris
 5      Hayes E-mail, was marked for
 6      identification.)
 7   BY MS. EVANS:
 8      Q.    I am going hand you and your
 9   counsel what I am marking Plaintiff's
10   Exhibit 62.
11            Is that the e-mail that you're
12   referring to?
13      A.    Yeah.
14      Q.    Who is --
15            MS. EVANS:  Well, strike that.
16   BY MS. EVANS:
17      Q.    This is an e-mail from Chris
18   Hayes, right?
19      A.    Yes.
20      Q.    To you?
21      A.    Yes.
22      Q.    And then the other person on
23   this e-mail is -- I don't want to
24   mispronounce his name.
25      A.    Rawan Jabaji.
```

1      Q.    And that's the senior producer

2    for the All In With Chris Hayes?

3      A.    Yes.

4      Q.    No one on this e-mail is a

5    lawyer, right?

6      A.    No.

7      Q.    Any idea what's blacked out

8    underneath "reach out on Signal"?

9      A.    I believe that's the lawyer's

10   phone number.

11     Q.    Did you have a conversation with

12   Chris Hayes prior to receiving this e-mail

13   marked at Plaintiff's Exhibit 62?

14     A.    I can't recall.

15     Q.    It's a pretty skeletal e-mail --

16   immigration lawyer, misspelled,

17   R. Andrew Free reach out on Signal, and

18   then a phone number.

19     A.    Yes.

20     Q.    But you knew what to do with

21   this?

22     A.    Yes.  It says reach out on

23   Signal.

24     Q.    Do you think you had a

25   conversation with him before this?

```
 1        A.    I -- I don't recall.

 2        Q.    Do you know --

 3              MS. EVANS:  Strike that.

 4        Q.    How does --

 5              MS. EVANS:  Strike that.

 6   BY MS. EVANS:

 7        Q.    How did Chris Hayes know about

 8   Andrew Free?

 9        A.    I don't know.

10        Q.    No idea?

11        A.    No.

12        Q.    Did you ever ask him?

13        A.    No.

14        Q.    Did you ask Andrew?

15        A.    I don't believe so, no.

16        Q.    Were you curious at all?

17        A.    No, not particularly.

18        Q.    You graduated from Rutgers?

19        A.    Yes.

20        Q.    What year?

21        A.    2012.

22        Q.    And I think you had a job at

23   Rutgers while you were going to school

24   there in your last year; is that right?

25        A.    Which job are you referring to?
```

```
 1              Do you see that?

 2       A.    Yes.

 3       Q.    If you could go down, do you see

 4   where it says, "Accuracy and Fairness"?

 5       A.    Yes.

 6       Q.    Can you read the first line

 7   underneath that -- the first sentence?

 8       A.    "Accuracy and fairness are

 9   fundamental principles of journalism."

10       Q.    And then could you read the

11   first sentence of the second paragraph?

12       A.    "Accuracy requires ensuring that

13   all the facts are correct and presenting

14   them in the proper context."

15       Q.    Could you read the first two

16   sentences of the third paragraph?

17       A.    "Fairness is keeping an open

18   mind about the nature of a story, making

19   good faith and timely efforts to seek out

20   and present all relevant facts and points

21   of view and avoiding a rush to judgment."

22              I'm sorry.  Did you say the

23   first line or the first two?

24       Q.    The first two.  You can just

25   read the next sentence.
```

```
 1      A.    "We should not enter a story
 2  with a preconceived notion."
 3      Q.    Do you agree with those
 4  sentences?
 5      A.    Yes.
 6      Q.    When you're reporting on a
 7  story, do you keep an open mind?
 8      A.    Yes, I do.
 9      Q.    And when you report on a story,
10  do you avoid a rush to judgment?
11      A.    Yes.
12      Q.    When you report on a story, do
13  you avoid having a preconceived notion
14  going in?
15      A.    Yes.
16      Q.    Was that true on September 15th, 2020?
17      A.    Yes, it was.
18      Q.    On all three points?
19      A.    Yes.
20      Q.    Open mind, avoid a rush to
21  judgment, avoid preconceived notions?
22      A.    Yes.
23      Q.    You did all of things on
24  September 15th, 2020?
25      A.    I do all those things on all the
```

 1   stories that we work on.

 2            MS. EVANS:  What did I mark the

 3       telephone call transcript between you

 4       and Andrew Free?

 5            MS. MCNAMARA:  67.

 6            MS. EVANS:  Can you -- could you

 7       pull up Exhibit 67 for me, please?

 8   BY MS. EVANS:

 9       Q.   Do you see on -- if you could

10   turn to the second page?

11       A.   Okay.

12       Q.   On line 19 of page 2.

13       A.   Yes.

14       Q.   Andrew Free says, "Chris and I

15   go back a little bit."

16            Do you see that?

17       A.   Yes, I do.

18       Q.   Do you know what he's referring

19   to there?

20       A.   I don't know.

21       Q.   Did you ask?

22       A.   I did not, no.

23       Q.   Did you ask Chris?

24       A.   I did not.

25       Q.   If you flip to page 14 of the

```
 1    transcript.  Are you there?

 2         A.    Yes, I am.

 3         Q.    On line 9?

 4         A.    Yes.

 5         Q.    It says, this is you talking,

 6    "But -- but I mean, this is a story that

 7    we -- that we absolutely want to -- want

 8    to stay on because this is, I mean, you

 9    know, reading through the Whistleblower

10    complaint is like a horror show."

11              Do you see that?

12         A.    I do.

13         Q.    Do you think that was in keeping

14    with avoiding a preconceived notion going

15    into a story?

16         A.    I do.  Because I was

17    characterizing the accounts that I read in

18    the Whistleblower complaint, which were

19    pretty horrifying.

20         Q.    Did you assume that the

21    Whistleblower complaint, as you call it

22    here, in Exhibit 67 was true?

23         A.    It had credibility to me

24    because, I mean, it was -- it was a formal

25    complaint filed with multiple high-ranking
```

 1   DHS officials and the warden of the
 2   detention facility.
 3              MS. EVANS:  Move to strike as
 4       unresponsive.
 5   BY MS. EVANS:
 6       Q.    **Did you assume that the**
 7   **Whistleblower complaint, as you called it**
 8   **in Exhibit 67, was true?**
 9              MS. MCNAMARA:  Objection; asked
10       and answered.
11              THE WITNESS:  I, again, lent it
12       credibility because it was a formal,
13       on-the-record statement -- a
14       complaint, rather, that was filed with
15       multiple high-ranking DHS officials
16       and the warden at the detention
17       facility.
18   BY [!EZ SPEAKER 01]:
19       **Q.    I didn't ask you if it had**
20   **credibility.  Listen carefully.**
21              **Did you assume that the**
22   **Whistleblower complaint, as you call it in**
23   **Exhibit 67, was true?**
24              MS. MCNAMARA:  Objection to
25       form.  Asked and answered.

1        Credibility goes to truth.

2        A.    The best I can give you is that

3    it -- I lent it credibility because it was

4    an official, on-the-record complaint

5    lodged with high-ranking DHS officials and

6    the warden of the facility.

7    BY MS. EVANS:

8        **Q.    Did you assume that the**

9    **Whistleblower complaint, as you call it in**

10   **Exhibit 67, might not be true?**

11       A.    I didn't assume about it.

12       **Q.    Did you consider that the**

13   **Whistleblower complaint, as you call it in**

14   **Exhibit 67, might not be true?**

15       A.    I felt that we needed to get

16   reporting.  But, again, it was very

17   credible because it was an on-the-record

18   official complaint.

19       **Q.    You did not even consider that**

20   **the Whistleblower complaint, as you call**

21   **it in Exhibit 67, might not be true; is**

22   **that correct?**

23             MS. MCNAMARA:  Objection;

24       mischaracterization.

25       A.    That's not what I said.  I just

1  said that I -- it was credible because it

2  was an official, on-the-record complaint

3  and it was lodged with the appropriate

4  authorities.

5      **Q.    I don't know why this question's**

6  **so hard.**

7          **If you are always reporting,**

8  **keeping an open mind, avoiding a rush to**

9  **judgment and avoiding preconceived**

10 **notions, wouldn't you have to at least**

11 **consider that the Whistleblower complaint**

12 **might not be true?**

13         MS. MCNAMARA:  Objection to

14     form.

15     A.   I didn't make a certainty one

16 way or the other.  I went -- I found it

17 credible for the reasons I listed, but I

18 didn't assume anything about it.

19 BY MS. EVANS:

20     **Q.    I didn't ask that.**

21         MS. EVANS:  Move to strike as

22     non-responsive.

23 BY MS. EVANS:

24     **Q.    Did you at all ever consider**

25 **that the Whistleblower complaint, as you**

 1   call it in Exhibit 67, might not be true?

 2          MS. MCNAMARA:  Objection to

 3      form.

 4      A.    Again, I found it credible for

 5   the reasons that I listed before.

 6   BY MS. EVANS:

 7      Q.    Did you ever even consider that

 8   it was wrong?

 9      A.    I found it credible for the

10   reasons I listed.

11      Q.    Is the answer to my question no?

12      A.    It's -- finding something

13   credible is not a black and white; it is

14   keeping an open mind.  However, as I said,

15   for the reasons I listed, I found it

16   credible.

17      Q.    Did you ever consider for even a

18   second that the Whistleblower complaint,

19   as you call it in Exhibit 67, might not be

20   true?

21          MS. MCNAMARA:  Objection; asked

22      and answered four times.

23      A.    I found it credible.

24          MS. EVANS:  I'm giving him a

25      chance to tell me that he's open

```
 1   minded, avoiding a rush to

 2   judgement --

 3         MS. MCNAMARA:  And he has

 4   already --

 5         MS. EVANS:  Don't interrupt me.

 6   I'm not finished.

 7         MS. MCNAMARA:  I'm not --

 8         MS. EVANS:  I'm not finished.

 9         MS. MCNAMARA:  I am not

10   interrupting you.

11         MS. EVANS:  You are interrupting

12   me.  I was in the middle of a

13   sentence.

14         MS. MCNAMARA:  Okay.  Finish

15   your sentence so we can all speak.

16         MS. EVANS:  I'm giving the

17   witness a chance to show me that he's

18   ever had an open mind, that he ever

19   avoided a rush to judgment and that he

20   ever avoided a preconceived notion,

21   and he can't even do it.

22         MS. MCNAMARA:  And the witness

23   has clearly and repeatedly testified

24   that he found the Whistleblower

25   complaint credible, he found that --
```

1   understood.  Okay."
2        Q.    Did you ask him if there was any
3   paperwork to back up or lack thereof to
4   back up the claim of a lack of consent?
5        A.    Not in this call, no.
6        Q.    Did you later find out that
7   there were documents that indicated
8   consent from at least the woman you all
9   referred to as "B"?
10       A.    There was a document that
11  said -- that had the box checked that
12  patient gave verbal consent.  But in her
13  interview with us, she said that she felt
14  she couldn't say no.
15       Q.    And anything else that would
16  lead you to believe that there was not --
17            MS. EVANS:  Well, strike that.
18  BY MS. EVANS:
19       Q.    Did you ask if there were any
20  written consent forms from B?
21            MS. MCNAMARA:  Objection.
22       Mis -- objection to form.
23       A.    I did not.
24            MS. MCNAMARA:  Asked and
25  answered.  He just testified that they

```
 1    were --
 2              MS. EVANS:  I just want to --
 3              (Reporter clarification.)
 4              THE WITNESS:  I did not.
 5    BY MS. EVANS:
 6        Q.    You did not.  Now, on page 19 --
 7        A.    Okay.
 8        Q.    -- Andrew Free is starting to
 9    talk there on line 30 [sic].
10              I apologize in advance.  I'm
11    just going to read the words.
12              MS. MCNAMARA:  Line 30?
13              MS. EVANS:  3.
14              MS. MCNAMARA:  Oh, 3.  I'm
15        sorry.
16    BY MS. EVANS:
17        Q.    Yeah.  I'm just indicating
18    that's where Andrew Free's name is.  I am
19    just going to start reading from line 7.
20              This is Andrew Free:  "When I
21    hear forced sterilization, I want to see
22    some fucking documents."
23              Do you see that?
24        A.    I do.
25        Q.    And you said what?
```

1      A.    "Yes."

2      Q.    And Andrew Free says, "Okay.

3  I'm not going to take somebody's word for

4  it."

5            And you said what?

6      A.    "Yes.  It's a big charge."

7      Q.    Why were you willing to take

8  somebody's word for it when even your

9  source was saying, "When I hear forced

10 sterilization, I want to see some fucking

11 documents"?

12            MS. MCNAMARA:  Objection to

13      form.

14      A.    Well, I wasn't taking anyone's

15 word as absolutely fact.  I was talking to

16 a lawyer who was working with these

17 detained women.  I was also relying on

18 on-the-record interviews conducted and --

19 and the Whistleblower complaint.  And

20 also, what he's talking about here, he's

21 also talking about having it at other

22 facilities in the context of that "when I

23 hear forced sterilization."

24      Q.    Did you have any information

25 about alleged hysterectomies at ICDC at

```
 1    the time of this call reflected in

 2    Exhibit 67 that Andrew Free didn't have,

 3    to your knowledge?

 4        A.    Not that I know of.

 5        Q.    Because he was the main source

 6    for you guys, right, besides Dawn Wooten?

 7              MS. MCNAMARA:  Objection.

 8    BY MS. EVANS:

 9        Q.    Isn't that right?

10        A.    We used a lot of sources.  We

11    used the Whistleblower complaint.  We used

12    Andrew Free.  We also used the excellent

13    reporting that Jacob and Julia had done,

14    and reporting from other outlets as well

15    that corroborated the information.  So we

16    used several sources.

17        Q.    But the sources for Julia and

18    Jacob's article were lawyers given to

19    either you or Julia and Jacob from Andrew

20    Free; isn't that right?

21              MS. MCNAMARA:  Objection; lack

22        of foundation.

23        A.    I don't know where Julia and

24    Jacob got their sources.  They -- Julia

25    has been reporting on -- on federal law
```

```
 1   enforcement and the federal justice system

 2   for -- DOJ for -- for a while now.  She

 3   has really solid sourcing.  And Jacob has

 4   been working in immigration reporting

 5   for -- I don't know how long, but, you

 6   know, a very good, long time.  He has a

 7   lot of sources and knowledge there.  So I

 8   don't know how they developed their

 9   sources, but they are -- they're excellent

10   at what they do.

11       Q.    Well, we can look at the article

12   if you want to or you can assume I'm right

13   when I tell you that the sources discussed

14   in the Julia and Jacob article from

15   Benjamin Osorio, Elizabeth Matherne -- and

16   I forget her first name -- Owings?

17            MS. MCNAMARA:  Objection to

18       form.

19       A.    I'd like to look at the article

20   if that's possible.

21   BY MS. EVANS:

22       Q.    Well, there's so many versions,

23   but, yeah, we can.  I'm right.  That's

24   fine.  I will even circle to try to help

25   us along here.
```

 1            MS. EVANS:  You can have a copy
 2      of this.  Share -- mark this as
 3      Exhibit 70.
 4            (Whereupon, Exhibit 70, Document
 5      dated 9/15/2020, was marked for
 6      identification.)
 7  BY MS. EVANS:
 8      **Q.    Go through there and let me know**
 9  **if there are any other sources mentioned**
10  **besides Matherne, Osorio, or Owings and**
11  **Dawn Wooten.**
12      A.    (Reviewing.)
13            I'm ready.
14      **Q.    Do you see any other sources in**
15  **Exhibit 70 besides Matherne, Owings,**
16  **Osorio, and Dawn Wooten?**
17      A.    Yes.
18      **Q.    Who?**
19      A.    Yes.  At the -- in the first
20  sentence, it says a nurse who worked in --
21  at the Immigration and Custom Enforcement
22  Detention Center in Irwin County, Georgia,
23  and four lawyers representing clients.
24  There were only three lawyers quoted in
25  the article, so there's a -- there's a

 1   fourth lawyer who's a source.

 2        Q.    **That's Andrew Free, right?**

 3        A.    I don't know.

 4        Q.    **Do you have any reason to think**

 5   **that it's anyone other than Andrew Free?**

 6        A.    I have no idea who it is.

 7        Q.    **That's fine.**

 8              MS. MCNAMARA:  Are you

 9        testifying?

10              MS. EVANS:  Yes.  I mean, I am

11        trying to help him.

12   BY MS. EVANS:

13        Q.    **All right.  Mr. Price, can you**

14   **flip to page 25 of the transcript,**

15   **Exhibit 67?**

16        A.    Okay.

17        Q.    **Actually, before we do that,**

18   **going back to Exhibit 70.**

19              **You said the first sentence**

20   **says, "A nurse who worked at an**

21   **Immigration and Customs Enforcement**

22   **Detention Center," you realize that is**

23   **Dawn Wooten, right?**

24        A.    Yes.  She's named later in the

25   article.

1      Q.    All right.  Back on 67, on

2   page 25, starting on page 13, you say --

3   "And you had also -- you had mentioned

4   that -- that one of the women that had a

5   hysterotomy was deported in 2016.  So this

6   has been going on for longer then just

7   this administration then."

8           Do you see that?

9      A.    I do.

10     Q.    And then there's a connection

11  issue if we're listening to the audio,

12  it's clear, you're, like, "Did I lose you

13  again?"

14          And then there's a pause.  And

15  Andrew Free comes back and says, "This is

16  insane.  This is insane.  I'm sorry."

17          He's talking about the

18  connection?

19     A.    The connection, yes.

20     Q.    And then he says, "But, yeah,

21  no, I need triple check the date."

22          Do you see that?

23     A.    Yes.

24     Q.    Did you follow up with him to

25  find out about whether this hysterotomy --

1        Q.      Who is the line producer?

2        A.      At this time, the line producer

3    was a woman named Tiffany Champion.

4        Q.      Tiffany with a "Y"?

5        A.      Yes.

6        Q.      My sister-in-law spells it with

7    an "I."   I normally don't ask that.   It's

8    only because of her.

9               The part of the script that

10   starts after the commercial break, is that

11   the part of the script that you had a hand

12   in writing?

13       A.      Yes.

14       Q.      Do the words "unnecessary" and

15   "unauthorized" mean different things to

16   you?

17       A.      Yes.

18       Q.      Okay.   Tell me what they each

19   mean to you.

20       A.      Unnecessary is something that is

21   not needed, is extraneous, something

22   that -- it does not need to be done.   And

23   unauthorized is something that someone

24   does not have permission to do.

25       Q.      The third paragraph after the

```
 1    commercial break starts, "We've been

 2    chasing this story."

 3              Do you see that?

 4    A.    Yes.

 5    Q.    "Tonight, we can report a lawyer

 6    named Benjamin Osorio representing women

 7    at that very facility told NBC News that,

 8    indeed, two of his clients received

 9    hysterectomies they believe may have been

10    unnecessary."

11              Do you see that?

12    A.    Yes.

13    Q.    What do you mean by the word

14    "unnecessary" in that sentence?

15    A.    Not needed.

16    Q.    Do you mean "not" in some

17    medical sense, like, not medically

18    necessary or not medically needed?

19    A.    Yes.

20    Q.    Who did you speak to, if anyone,

21    regarding what indicates medical necessity

22    for a hysterectomy?

23    A.    For this, we spoke with

24    Andrew Free.  We also had the

25    Whistleblower complaint and Jacob and
```

1    Julia's reporting, as well as the

2    reporting of other outlets.

3        Q.    Did you speak with

4    Benjamin Osorio on September 15th, 2020?

5        A.    I don't recall if I spoke to him

6    that day.

7        Q.    The next paragraph says, "And

8    tonight, we here on All In spoke with

9    another attorney who represents two

10   different women who claim they also had

11   unnecessary hysterectomies while detained

12   at this facility."

13            Do you see that?

14       A.    Yes.

15       Q.    And by the word "unnecessary"

16   there, do you also mean medically

17   unnecessary?

18       A.    Yes.

19       Q.    And who, if anyone, did you

20   speak to regarding what indicates medical

21   necessity for a hysterectomy?

22       A.    We spoke to Andrew Free about

23   this specific example.

24       Q.    Back on the third paragraph,

25   you're referring to --

```
 1              MS. EVANS:  Strike that.
 2    BY MS. EVANS:
 3        Q.     On the third paragraph after
 4    "commercial break," you're referring to
 5    Ben Osorio's clients, true?
 6        A.     Yes.
 7        Q.     And then in the next paragraph,
 8    you're referring to Andrew Free's clients;
 9    is that right?
10        A.     Yes.
11        Q.     Why does the script talk about
12    the Andrew Free clients being two
13    different women when Andrew Free told you
14    just a couple of hours earlier that his
15    clients were also Ben Osorio's clients?
16        A.     Because the -- the Ben Osorio's
17    clients' reference is in reference to the
18    women Ben Osorio's quoted as talking about
19    in the NBC News article, and the details
20    of -- that he gave of the two women were
21    different from the details Andrew gave
22    about the two women they were
23    co-representing.
24              And we -- we concluded that they
25    were two different sets of women that
```

1   Ben Osorio was representing, the two women

2   he's quoted about in the article by --

3   without Andrew Free and then the two women

4   that Andrew Free told me about they were

5   representing together.

6       **Q.    Have you come to learn that**

7   **there is some overlap between those two**

8   **groups of women?**

9       A.    I have not.

10      **Q.    Could you -- and refer to**

11  **Exhibit 67 and Exhibit 70 if you need to.**

12          **But could you please point out**

13  **the differences in the descriptions that**

14  **led you to believe that Ben Osorio's**

15  **clients, as referenced in Exhibit 28, were**

16  **different than the two Andrew Free clients**

17  **also referenced Exhibit 28?  And just let**

18  **me know where you're reading from if you**

19  **do.**

20      A.    Sure thing.

21          MS. MCNAMARA:  Mr. Price, could

22      you tell us what the Bates number is

23      on the document that was marked

24      Exhibit 70?

25          THE WITNESS:  NBCU002301.

```
 1              MS. MCNAMARA:  Okay.  Thank you.

 2        Just because we don't have it here.

 3        A.    So I'm reading from page 6 --

 4   pages 6 and 7 of the Andrew Free

 5   transcript.

 6   BY MS. EVANS:

 7        Q.    Okay.

 8        A.    And the third paragraph from the

 9   bottom of the NBC News article.

10        Q.    Tell me again on the transcript.

11        A.    On the transcript, pages 6 and

12   7, starting roughly on line 17.

13        Q.    Let's start there for a second.

14              One client is from El Salvador.

15        A.    Yes.

16        Q.    And then he says she had a

17   hysterectomy?

18        A.    Yes.

19        Q.    Okay.  And the second client?

20        A.    And then the second client is --

21   starts on page -- on line 25 of page 6 and

22   goes over to page 7.  And then it goes all

23   down page 7 into page 8.

24        Q.    So she's in removal proceedings?

25        A.    Uh-huh.  Yes.
```

```
 1      Q.     This is "B," right?

 2      A.     This is "B" that Andrew Free is

 3   talking about, yes.

 4      Q.     The first client is from

 5   El Salvador.  The second client is "B"?

 6      A.     Yes.

 7      Q.     Okay.  Now, take me to

 8   Exhibit 70.

 9      A.     So in Exhibit 70, it is the

10   third paragraph from the bottom.

11      Q.     If you could just read it

12   because I --

13      A.     "One of the women who is of

14   child bearing age was told she needed to

15   have a hysterectomy after Amin found

16   ovarian cysts, Osorio said.  She was

17   advised that they were cancerous, but her

18   records indicate she was not given a

19   biopsy to confirm the cancer, he said.

20             "In another case, he said, his

21   client was told she had Stage 4 cervical

22   cancer and would need a hysterectomy and

23   chemotherapy.  But after her hysterectomy,

24   an oncologist in Charlotte said she did

25   not have cancer, according to Osorio."
```

1      Q.    Did not have cancer ever or did

2  not have cancer anymore after the

3  hysterectomy?

4      A.    It does not say.

5      Q.    Do you know?

6      A.    It appears that she did not have

7  cancer.

8      Q.    Ever?

9      A.    That -- it appears that, yes,

10 it's ever.

11     Q.    Well, that's what the article

12 says at least, right?

13     A.    Yes.

14     Q.    And your testimony is that

15 neither of the clients discussed in

16 Exhibit 17 are either of the clients that

17 you just mentioned from Exhibit 70?

18          MS. MCNAMARA:  It could --

19     A.    Exhibit 17?

20 BY MS. EVANS:

21     Q.    70.

22          MS. MCNAMARA:  For

23     clarification, because I don't have

24     the exhibits in front of me, can we

25     say -- can you clarify that you're

```
 1        talking about the -- which one is the

 2        transcript of Andrew Free versus the

 3        published article of Julia and Jacob?

 4        It's just not clear, and I don't have

 5        it in front of me.

 6               MS. EVANS:  Sure.  I'll -- I'll

 7        state my question again.

 8    BY MS. EVANS:

 9        Q.    Your testimony is that neither

10    of the clients discussed in Exhibit 67,

11    which is the transcript of the call with

12    you and Andrew Free, are the same as

13    either of the clients that you just

14    mentioned from the article reflected in

15    Exhibit 70?

16        A.    Yeah.  We did not believe that

17    they were the same two women.

18        Q.    Do you believe there is any

19    overlap of those two groups of people

20    today?

21        A.    I don't know.

22        Q.    You don't know one way or the

23    other?

24        A.    No.

25        Q.    Has anyone endeavored to figure
```

 1   that out?

 2        A.    I don't know.  I -- I don't.

 3        Q.    Did anyone notice that between

 4   September --

 5             MS. EVANS:  Strike that.

 6   BY MS. EVANS:

 7        Q.    Between September 15th's

 8   broadcast and September 16th's broadcast,

 9   did anyone realize that there was overlap

10   between those groups of people?

11        A.    We believed they were two

12   different sets of women.

13        Q.    You believed that on

14   September 16th as well?

15        A.    Yes.

16        Q.    I think you told me earlier you

17   did not -- I can't -- well, I'll just ask

18   you.  And I'm not asking you to try to ask

19   you again.  I can't remember what you

20   said.

21             Did you speak with Julia Ainsley

22   on September 15, 2020, prior to the

23   broadcast reflected in Exhibit 28?

24        A.    I don't believe so, no.

25        Q.    Did you speak with her after?

1       A.    About this story?

2       Q.    Yes.

3       A.    I -- I am not sure.

4       Q.    Did you speak with

5  Jacob Soboroff before the broadcast on

6  September 15th, 2020?

7       A.    I'm not sure.

8       Q.    Did you speak with

9  Jacob Soboroff after the broadcast on

10 September 15th, 2020?

11      A.    About the story?  I'm not sure.

12      Q.    From your telephone conversation

13 with Andrew Free, do you recall, or you

14 can refer to it if you want to, he talks

15 about how a lot of clients, he felt, over

16 the years received less care, medical care

17 than they needed?

18      A.    You're referring to page 8,

19 line 21 to 25?

20      Q.    Right.  That's one of the

21 places, I believe.

22            Right.  What -- what is it that

23 he is telling you there that you're

24 referring to?

25      A.    He says, "But you never want to

1    actually, like, second guess what you're

2    doing when they're treating clients

3    because many, many people's sick call

4    requests, including some that I've heard

5    from today, have been waiting for weeks."

6        Q.    And then you got information

7    that you had pointed us to earlier from

8    Exhibit 2, what you called a Whistleblower

9    complaint, where there were allegations

10   that medical request forms were being

11   shredded, right?

12       A.    Yes.   That was one of the

13   complaints.

14       Q.    So as of September 15th, 2020,

15   you have information that detainees are

16   requesting care and either it's being

17   delayed or the requests are being shredded

18   and ignored completely.   And then you have

19   these allegations that clients are being

20   overtreated with unnecessary procedures,

21   is what you put in the script, right?

22           MS. MCNAMARA:   Objection to

23       form.

24   BY MS. EVANS:

25       Q.    You referred to them as

```
 1              CERTIFICATE OF SHORTHAND REPORTER

 2                    NOTARY PUBLIC

 3              I, Monique Cabrera, the officer

 4         before whom the foregoing deposition

 5         was taken, do hereby certify that the

 6         foregoing transcript is a true and

 7         correct record of the testimony given;

 8         that said testimony was taken by me

 9         stenographically and thereafter

10         reduced to typewriting under my

11         direction; and that I am neither

12         counsel for, related to, nor employed

13         by any of the parties to this case and

14         have no interest, financial or

15         otherwise, in its outcome.

16              IN WITNESS WHEREOF, I have

17         hereunto set my hand this 15th day of

18         June, 2023.

19

20

21         _____

22         MONIQUE CABRERA
           Notary Public in and for the State of New
23         York
           County of Suffolk
24         My Commission No.  01CA6043156
           Expires:  06/12/2026
25
```