Declaration of

Elizabeth McNamara

Exhibit 82

DR. MAHENDRA AMIN,M.D. vs NBCUNIVERSAL MEDIA, LLC.
Confidential                    Rachel Maddow on 05/17/2023

```
 1            UNITED STATES DISTRICT COURT
         FOR THE SOUTHERN DISTRICT OF GEORGIA
 2                   WAYCROSS DIVISION

 3   DR. MAHENDRA AMIN, M.D.

 4              Plaintiff,   CASE NO.
     v.                      5:21-CV-00056-LGW-BWC
 5
     NBCUNIVERSAL MEDIA, LLC,
 6
                Defendant.
 7


 8          *** CONFIDENTIAL TRANSCRIPT ***

 9         VIDEO-RECORDED DEPOSITION OF
                    RACHEL MADDOW
10
            Davis Wright Tremaine, LLP
11          1251 Avenue of the Americas
                     21st Floor
12          New York, New York 10020

13                 05/17/2023
                 9:38 a.m. (EDT)
14

15

16

17

18

19

20

21

22

23

24
     REPORTED BY:  MONIQUE CABRERA
25   JOB NO. 14601
```

 1   whistleblower complaint."
 2           Do you see that?
 3           (Reporter clarification.)
 4   BY MS. EVANS:
 5      Q.    Whistleblower complaint.
 6      A.    Yes, I see that.
 7      Q.    What was your basis for calling
 8   hysterectomies at ICE facility needless at
 9   this point on September 15th, 2020?
10      A.    At this point, this was a note
11   to self.  This was an aide de mémoire.
12   There was nothing specific.  Like, this
13   note in general would have lots of typos,
14   would have lots of -- in the same way
15   that, you know, make yourself a shopping
16   list on the back of an envelope and you
17   might misspell Charmin.
18           Like, this is -- this is not
19   meant to be a public facing document, and
20   it's notes to self to essentially to keep
21   a placeholder in mind as to what type of
22   story this is that we might be considering
23   but not in any -- it's not binding in any
24   of its specifics in terms of the way that
25   I'd use this as a working document.

 1    Q.   Well, what did you see that
 2  caused you to believe there was a story
 3  with regard to allegedly needless
 4  hysterectomies at ICE facility,
 5  whistleblower complaint?
 6    A.   I don't remember about why I
 7  wrote that down that day.  It was a long
 8  time ago.
 9    Q.   No idea?
10    A.   No.
11    Q.   What did you do to prepare for
12  your deposition today, Ms. Maddow?
13    A.   I watched the segment that we
14  did on this topic on September 15th and
15  September 16th.  I looked at the
16  transcripts of those segments.
17         I reread the Julia Ainsley,
18  Jacob Soboroff NBC news story which was
19  substantially the basis of our reporting.
20  I reviewed but did not read the
21  whistleblower complaint that was in part
22  the basis for Jacob and Julia's story.
23         I reviewed but did not read the
24  rough transcript of Jacob's interview with
25  the Georgia whistleblower.

```
 1                 Let me just think for a second
 2     to see if there was anything else that
 3     I...
 4                 I think that's it.
 5        Q.      Did you meet with counsel?
 6        A.      Yes.
 7        Q.      When?
 8        A.      Yesterday.
 9        Q.      For how long?
10        A.      I think it was -- let's see,
11     maybe it was like 6 -- no, I'd say about 5
12     and a half hours maybe-ish.  Don't hold me
13     to it.  I think it was roughly that long.
14        Q.      Who all was there?
15        A.      These three lawyers who are at
16     the table were here, Liz and Gail and
17     Justine.  There was another man here named
18     Eric, embarrassed if I got that wrong.
19     And then there were two other lawyers who
20     were here but not for the entire day, and
21     they are not people who I could name to
22     you.  I'm sorry.
23        Q.      Is it your understanding that
24     they work with Liz at this law firm?
25        A.      Yes.  Eric works at NBC, one of
```

1  the lawyers, and I think his name was
2  Eric.  This is really embarrassing.
3      Q.    We don't tell.
4      A.    I only met everybody yesterday.
5  I've seen -- I know Gail from -- from our
6  work at NBC, but everybody else, I'd only
7  ever met by e-mail or not before -- not at
8  all in person before yesterday.
9      Q.    The documents that you
10 mentioned, looking at the transcripts,
11 watching the segment, was that stuff you
12 did yesterday during that meeting or
13 things you did outside of that meeting?
14     A.    I watched the segments from
15 September 15th and September 16th at end
16 of last week.
17     Q.    But the rest of what you
18 testified to earlier you did yesterday?
19     A.    Yes.
20     Q.    Did you also look at e-mails
21 yesterday?
22     A.    Yes.
23     Q.    In the process of preparing for
24 this deposition yesterday, did you not see
25 anything to refresh your recollection as

```
 1    to why, as reflected in Exhibit 33, you
 2    wrote a note to yourself for a potential
 3    story on needless hysterectomies at ICE
 4    facility whistleblower complaint?
 5         A.    Well, in the e-mails that we
 6    reviewed yesterday, I know that there was
 7    -- I saw that there were news stories on
 8    this general topic that were circulated in
 9    the story note and then -- well, that's
10    not relevant because that's later in the
11    day.  This was something that was sent at
12    4:00.
13              But I don't know exactly what it
14    is that I had -- the references to this
15    story in the story note, I don't know if
16    reading the story in the story note is the
17    reason that I wrote this down.
18              As you probably know, there were
19    lots of news stories on this topic both on
20    the 15th and I think even before then.
21    And so, like I said, my news gathering day
22    starts at soon as I am sent -- basically
23    as soon as I wake up.  And so I read
24    widely.
25              It might have been any of the
```

 1  news stories that were already circulating
 2  around this story or it might have been
 3  the one that was in the stories note.  I
 4  don't know.
 5     Q.   **When you were looking at**
 6  **documents yesterday in the 5 and a half**
 7  **hour meeting-ish, did you see the story**
 8  **note?**
 9     A.   I think so.  And the reason that
10  I am hesitating is because I don't
11  actually remember if I saw this stories
12  note itself or discussions of the story
13  note.
14          MS. MCNAMARA:  I caution you to
15      -- she can ask what you looked at in
16      the preparation, but any discussion
17      with counsel is privileged and you
18      can't --
19          THE WITNESS:  Okay.
20          MS. MCNAMARA:  -- testify as to
21      that.
22     A.   I think I saw the stories note,
23  but I can't say for sure.  As I said, the
24  stories note is a very -- it's a long
25  document.  There is usual two versions of

```
 1   it that circulate before the news meeting.
 2              (Reporter clarification.)
 3        A.    News meeting.
 4   BY MS. EVANS:
 5        Q.    And the news meeting is usually
 6   around 4:00?
 7        A.    Yes.
 8        Q.    In September 15, 2020, that
 9   meeting would have been virtual because of
10   Covid; is that right?
11        A.    I assume so.  I don't even
12   remember that day, but that seems
13   plausible.
14        Q.    I am going to hand you and your
15   counsel what has been previously marked as
16   Plaintiff's Exhibit 37.
17              (Whereupon, Exhibit 37, Julia
18         DeAngelo e-mail, was identified.)
19   BY MS. EVANS:
20        Q.    This is a document from --
21   strike that.
22              This is an e-mail from Julia
23   DeAngelo to several folks on your show,
24   September 15, 2020.  Subject line:
25   Meeting log.
```

 1         Do you recognize Exhibit 37 as
 2   such?
 3         A.   I recognize that that is -- what
 4   you are describing appears to be what I am
 5   looking at.  This is not a document that
 6   was circulated to me.
 7         Q.   Right.  You are not on this
 8   e-mail, I have noticed.  This is a meeting
 9   log of 9/15.  Again, a lot of this is
10   blacked out, but as you flip through it,
11   you start to see what has been represented
12   to me by Mr. Gnazzo as notes from that
13   news meeting.
14              If you can flip through and see
15   if that looks to be what this is to your
16   understanding of how news meetings go.
17         A.   Yes.
18         Q.   And Ms. DeAngelo, maybe her next
19   career will be a court reporter.  She
20   seems to be very good at keeping notes and
21   she even has time stamped on the various
22   parts of the discussion, as you can see as
23   you flip through the document.
24         A.   Yes.
25         Q.   Do you know why she does that?

```
 1   No particular reason?
 2        A.    First of all, not to put poor
 3   Julia on the spot, I think the staff
 4   product and sometimes it's -- I assume
 5   sometimes it's Julia, and sometimes it's
 6   other people.  I don't think she is doing
 7   this of her own initiative.
 8              But my understanding, the reason
 9   why something like this exists is because
10   the news meeting is prescriptive for all
11   the producers on the show in terms of what
12   the rest of their workday is going to be
13   like and what's going to be on the show.
14              And so if there is confusion
15   about that later in the day or if
16   one person thinks I put it -- I put it in
17   X terms and another person remembers as me
18   having put it in Y terms, this is the
19   document that can help them sort that out.
20              This is also helpful for us as a
21   staff because sometimes with individual
22   segments, particularly the ones that I am
23   not going to write, I will say things at
24   the news meeting that is effectively
25   dictating script or something close to
```

1       A.    Yes.
2       Q.    Sitting here today, can you
3    think of any additional information that
4    you got either during the news meeting or
5    after the news meeting on September 15th,
6    2020 that caused you to be more inclined
7    to add this story to the show on
8    September 15th, 2020?  And by "this
9    story," I mean the Irwin County Detention
10   Center story.
11      A.    I am sorry.  Let me make sure.
12   You want to know if I remember today that
13   there was something that happened post
14   news meeting that changed my feeling about
15   whether it should be on the show?
16      Q.    Right.
17      A.    I don't remember the day at all,
18   and I don't remember the sequence of
19   events.  But I know from reviewing
20   material yesterday, and I can sort of
21   surmise from looking at the transcript of
22   -- and looking at the segment of what
23   we've put on the air, that a really big
24   important thing happened after the news
25   meeting which is that NBC news published

 1   an important story on the topic.  And that
 2   we had the reporter who had done the work
 3   on that story available to us as a
 4   potential guest.  That was an important --
 5   that seemed to me to be on important
 6   thing.
 7            And I knew from the time stamp
 8   on that NBC story that I reviewed
 9   yesterday that that story was published
10   subsequent to this meeting.
11      Q.   Any other information that you
12   can recall or that you were refreshed on
13   yesterday during your 5 and a half-ish
14   hour meeting with counsel that you may
15   have learned either during the news
16   meeting or after that made you more
17   inclined to include the Irwin County
18   Detention Center in the transcript on
19   September 15th, 2020?
20            MS. MCNAMARA:  Again, I caution
21       you can -- if you recall documents or
22       something, but any communications with
23       counsel, you can't testify to.
24      A.   Okay.  This is sort of a subset
25   of what I previously answered, but the

1    other thing that I know happened
2    subsequent, and I am asking about it in
3    the meeting, and then I know that it
4    happened after the meeting, is that we got
5    -- that we got the transcript and
6    ultimately the tape of Jacob Soboroff's
7    interview with the Georgia whistleblower.
8    And that was an important part of what we
9    brought to the story.
10   BY MS. EVANS:
11       Q.   Anything else that you can think
12   of sitting here today?
13       A.   Not that I can think of, but I
14   don't -- I don't know.
15       Q.   And the reporter that you're
16   referring to that had been working on the
17   story is Jacob Soboroff?
18       A.   Yes.
19       Q.   And he ended up being a guest on
20   the show?
21       A.   Yes.
22       Q.   And Jacob Soboroff is the one
23   that spoke with Ms. Wooten, true?
24       A.   Yes.
25       Q.   Are you aware of any

```
 1   conversations that Jacob Soboroff had with
 2   an attorney named Andrew Free?
 3        A.   No.
 4        Q.   Do you know who Andrew Free is?
 5        A.   No.
 6        Q.   Were you relying on Jacob
 7   Soboroff -- strike that.
 8             You were relying on Jacob
 9   Soboroff's reporting for the story
10   regarding Irwin County Detention Center
11   that ultimately became the A Block for
12   your show on September 15th, 2020, true?
13        A.   In part, true.  But that was not
14   -- that was part of it, but that was not
15   all of it.
16        Q.   What else?
17        A.   Well, we had access to the
18   whistleblower complaint itself.  There
19   were lots of other news organization that
20   had done various degrees of reporting on
21   this story.
22             In addition to that, we had NBC
23   News's published reporting, which, of
24   course, it had gone through NBC legal and
25   standards and our reporting standards.
```

 1              We had Jacob having interviewed
 2    the whistleblower herself, which is, you
 3    know, not just tape.  That's really
 4    important for us because it meant that
 5    this is not an anonymous person.  This is
 6    person who's willing to put her name on
 7    something and to be put on tape attesting
 8    to her allegations, which is an important
 9    part of assessing credibility.
10              And then we also had reporting
11    that involved attorneys for individual
12    detainees, separate and apart from what we
13    had on paper in the whistleblower
14    complaint.
15        Q.    **And the information from the**
16    **attorneys for individual detainees, that**
17    **all came from either Jacob Soboroff or**
18    **Julia Ainsley, true?**
19        A.    Yes.
20        Q.    **No one from The Rachel Maddow**
21    **Show spoke to any of those attorneys; is**
22    **that right, that you are aware of?**
23        A.    I don't know actually.  I mean,
24    there is -- we -- we call people and seek
25    documents and ask for stuff all the time.

1   It's a normal part of our developing a
2   story like this.
3           And so I don't know whether
4   producers on my staff contacted attorneys
5   related to this whistleblower complaint or
6   to detainees at this facility.  So I would
7   not be surprised either way.  That would
8   be a normal -- that would be a normal part
9   of what we would do.
10          Jacob and Julia are doing that
11  on behalf of NBC News is a lot, is a big
12  deal.  I wouldn't be surprised if we did
13  some of that ourselves, but I don't know
14  if we did.
15          MS. EVANS:  I just have a couple
16      more questions and then we can take a
17      break.
18          MS. MCNAMARA:  It's been a
19      little over an hour.
20  BY MS. EVANS:
21      **Q.    Are you aware of anyone from The**
22  **Rachel Maddow Show calling people and**
23  **seeking documents with regard to the Irwin**
24  **County Detention Center story on**
25  **September 15th, 2020?**

```
 1      A.    I feel like I am remembering
 2   something from -- not from the moment, but
 3   from the review that I did of documents of
 4   e-mails yesterday.  No, it's here.  It's
 5   in this document.  Exhibit 37, page 1937.
 6           This is a staff member, as
 7   logged in the meeting log.  I asked her
 8   lawyers if they would send me her
 9   declaration and they told me no.  I asked
10   again.  More forward in the answer.
11           So clearly we are making calls
12   to lawyers.
13      Q.    That was Lisa Rubin?
14      A.    Yes.
15      Q.    Are you aware of other -- strike
16   that.
17           Other than what Lisa Rubin did
18   on September 15th, 2020, are you aware of
19   anybody from The Rachel Maddow Show
20   calling people or seeking documents with
21   regard to the Irwin County Detention
22   Center story?
23      A.    I am not specifically aware, but
24   I would not necessarily know if that had
25   happened.
```

```
 1            The -- you know, there's a
 2   producer of the segment.  In this case,
 3   there's two that are very experienced
 4   producers of the segment.  They are
 5   supervised by a senior producer.  They're
 6   all supervised by -- there's an executive
 7   producer who oversees everybody.
 8            And that whole process,
 9   including dealing in many cases, you know,
10   dealing with people like Julia and Jacob
11   about the nature of their reporting and us
12   trying to fill in any gaps or trying to
13   seek additional documents, that would kind
14   of all happen under the supervision of
15   producers and not under my direct
16   supervision.
17            So it might have happened, but I
18   wouldn't know.
19       Q.   And other than what you saw as
20   reflected in Exhibit 37 with regard to
21   Lisa Rubin, in preparing for today's
22   deposition, did you see any reference to
23   anyone from The Rachel Maddow Show calling
24   anyone or asking for documents relating to
25   the Irwin County Detention Center story?
```

```
 1           CERTIFICATE OF SHORTHAND REPORTER
 2                     NOTARY PUBLIC
 3           I, Monique Cabrera, the officer
 4      before whom the foregoing deposition
 5      was taken, do hereby certify that the
 6      foregoing transcript is a true and
 7      correct record of the testimony given;
 8      that said testimony was taken by me
 9      stenographically and thereafter
10      reduced to typewriting under my
11      direction; and that I am neither
12      counsel for, related to, nor employed
13      by any of the parties to this case and
14      have no interest, financial or
15      otherwise, in its outcome.
16            IN WITNESS WHEREOF, I have
17      hereunto set my hand this 17th day of
18      May, 2023.
19
20      [signature: Monique Cabrera]
21      _____
22      MONIQUE CABRERA
        Notary Public in and for the State of New
23      York
        County of Suffolk
24      My Commission No.  01CA6043156
        Expires:  06/12/2026
25
```