Declaration of

Elizabeth McNamara

Exhibit 95

## *Inquiry Ordered Into Claims Immigrants Had Unwanted Gynecology Procedures*

The New York Times

September 16, 2020 Wednesday 06:48 EST

Copyright 2020 The New York Times Company All Rights Reserved

**Section:** US

**Length:** 1302 words

**Byline:** Caitlin Dickerson
**Highlight:** Members of Congress and the D.H.S. are investigating **_claims_** by a nurse and lawyers that **_immigrant_** detainees in Georgia were complaining of **_unwanted procedures_** and rough treatment.

# Body

Members of Congress and the D.H.S. are investigating **_claims_** by a nurse and lawyers that **_immigrant_** detainees in Georgia were complaining of **_unwanted procedures_** and rough treatment.

The Department of Homeland Security is investigating allegations that **_immigrant_** women detained at a privately run detention center in Georgia underwent gynecological **_procedures_** without fully understanding or consenting to them.

The allegations, some of which were submitted this week *as part of a whistle-blower complaint* by a nurse at the facility, already have prompted *more than 170 members of Congress*, including Speaker Nancy Pelosi, to call for an immediate **_inquiry_**.

The complaint details medical **_procedures ordered_** or undertaken by a physician who has treated patients detained at the Irwin County Detention Center, which is run by a private company, LaSalle Corrections, in Ocilla, Ga.

The nurse, Dawn Wooten, **_claims_** in the complaint that several women detained at the facility told her their uteruses had been removed without their consent, a **_claim_** The New York Times was unable to verify. One detainee whose testimony was included in the complaint said her medical treatment left her shaken and confused.

The woman, who like the others was not identified because she feared retaliation from immigration authorities, said she was transported this year to Irwin County Hospital for a **_procedure_** but was given three different explanations of what it would be, ranging from having her womb removed entirely to instead having a small amount of tissue scraped away.

Ultimately, the complaint says, the hospital declined to operate on the woman because she tested positive for antibodies to the novel coronavirus. But the woman said the experience left her "feeling scared and frustrated, saying it 'felt like they were trying to mess with my body,'" the complaint said.

The hospital did not immediately respond to a request for comment. It was a *defendant in a federal lawsuit* alleging the creation of false Medicare and Medicaid **_claims_** that the government said resulted in overpayments. The case was settled and the defendants, including several doctors, agreed to pay $525,000 to the federal government.

Dr. Ada Rivera, the medical director of the ICE Health Services Corps, which oversees health care in the agency's detention system, said that the reports would be fully and independently investigated, but that the agency "vehemently disputes the implication that detainees are used for experimental medical **_procedures_**."

Inquiry Ordered Into Claims Immigrants Had Unwanted Gynecology Procedures

In a statement, he said that two women detained at the facility had been referred for hysterectomies since 2018. The agency did not respond to requests for information about how many of the referrals were acted on, nor how many tubal ligations or other potentially sterilizing **procedures** had been conducted in the past several years.

The complaint does not name any specific staff members, but the lawyers for several detainees who have come forward have said that they center on a particular doctor, Mahendra Amin, an obstetrics and gynecology specialist who practices in the nearby city of Douglas.

Scott R. Grubman, a lawyer for Dr. Amin, said he and his client "vehemently deny" the allegations. "Dr. Amin is a highly respected physician who has dedicated his adult life to treating a high-risk, underserved population in rural Georgia," Mr. Grubman said in a statement.

He pointed to an admission *made to The Washington Post* by the lawyer who handled the filing of the complaint that she had not personally spoken with anyone who was sterilized without their consent, but that she included the secondhand reports in the document "with the intention of triggering an investigation into whether or not the **claims** were true."

The complaint was filed by the organizations Project South, Georgia Detention Watch, Georgia Latino Alliance for Human Rights and the South Georgia **Immigrant** Support Network.

Two immigration lawyers representing women currently or previously detained at the facility in Irwin County, Elizabeth Matherne and Van Huynh, who were not included in the whistle-blower complaint, said their clients were also left shaken after being treated by Dr. Amin while in immigration custody.

Ms. Matherne said that at least half a dozen clients had complained to her about what they described as rough treatment by the doctor. Ms. Matherne *lodged a request with ICE* in the fall of 2018 on behalf of one of them, Nancy Gonzalez Hidalgo, who had an underlying medical condition that was worsening.

Ms. Matherne said her client was refusing to see Dr. Amin, who had treated her earlier, because she said the doctor had "hurt" her during previous exams. The doctor did not speak Spanish or use a translator to explain what he was doing, Ms. Matherne said her client told her.

Eventually, Ms. Gonzalez Hidalgo worsened to the point that she was running a fever and could not stop from crying or sit up straight during their in-person meetings because she was doubled over in pain, Ms. Matherne said.

The lawyer said she was so concerned after one of the meetings that she walked over to the facility's inmate services coordinator and pleaded with the person to find another doctor for her client. Months later and after repeated follow-ups by Ms. Matherne, Ms. Hidalgo Gonzalez was eventually sent to another doctor who confirmed she had an infection in her uterus and prescribed her medication, after which she started to feel better. Ms. Hidalgo Gonzalez was eventually deported to her home country of Mexico.

"If they act like they had no idea there were issues with this doctor, they're lying," Ms. Matherne said.

The other lawyer, Ms. Huynh, said her client Pauline Binam underwent a **procedure** for an ovarian cyst in 2019 that involved general anesthesia. When Ms. Binam woke up, Ms. Huynh said, Dr. Amin told her that he had removed part of her fallopian tube and that she would be unable to conceive without in vitro fertilization.

Ms. Binam, who was 29 at the time of the **procedure**, told Ms. Huynh that she would never have consented had she known there was a risk of infertility.

Ms. Huynh said her client, who has since been transferred to an ICE detention facility in Texas, had not had a period at all since the **procedure**. Ms. Binam was nearly deported on Wednesday morning, but two Democratic members of Congress, Sheila Jackson Lee of Texas and Pramila Jayapal of Washington, rushed to contact ICE, and Ms. Binam was removed from the plane before it took off.

"We need her to testify," Ms. Jayapal said. "This story sends a chill through any woman."

Inquiry Ordered Into Claims Immigrants Had Unwanted Gynecology Procedures

Also part of the whistle-blower complaint are allegations that the facility has not complied with guidelines from the Centers for Disease Control and Prevention for containing the coronavirus. A total of 43 detainees there have tested positive for the virus, *according to government data,* and Ms. Wooten alleged in her complaint that officials at the facility knowingly placed healthy detainees near those who were sick and contagious.

There is a long history of substandard health and safety conditions in immigration detention facilities. Soon after President Trump took office, the administration *moved to roll back detention standards* that were meant to rectify the problem.

In 2019, staff members of the House Oversight Committee visited several detention facilities, including the Irwin County Detention Center, and *wrote in a letter to ICE's inspector general* that they had left with "significant concerns" after detainees said they were being verbally abused and subject to sleep deprivation.

The committee has also called for an emergency investigation into the facility following the whistle-blower complaint.

PHOTO: Dawn Wooten, left, a nurse at a Georgia detention facility, filed a whistle-blower complaint. (PHOTOGRAPH BY JEFF AMY/ASSOCIATED PRESS)

**Load-Date:** October 7, 2020

End of Document



# Immigrants Say They Were Pressured Into Unneeded Surgeries

Immigrants detained at an ICE-contracted center in Georgia said they had invasive gynecology procedures that they later learned might have been unnecessary.



After Wendy Dowe underwent surgery in ICE custody, a radiologist's report described her uterus as being a healthy size, not swollen with enlarged masses and cysts, as the doctor had written in his notes. Marina Burnel for The New York Times

By Caitlin Dickerson, Seth Freed Wessler and Miriam Jordan

Sept. 29, 2020, 5:00 a.m. ET

Leer en español

Wendy Dowe was startled awake early one morning in January 2019, when guards called her out of her cellblock in the Irwin County immigration detention center in rural Georgia, where she had been held for four months. She would be having surgery that day, they said.

Still groggy, the 48-year-old immigrant from Jamaica, who had been living without legal status in the United States for two decades before she was picked up by immigration authorities, felt a swell of dread come over her. An outside gynecologist who saw

patients in immigration custody told her that the menstrual cramping she had was caused by large cysts and masses that needed to be removed, but she was skeptical. The doctor insisted, she said, and as a detainee — brought to the hospital in handcuffs and shackles — she felt pressured to consent.

It was only after she was deported to Jamaica and had her medical files reviewed by several other doctors that she knew she had been right to raise questions.

A radiologist's report, based on images of her internal organs from her time at Irwin, described her uterus as being a healthy size, not swollen with enlarged masses and cysts, as the doctor had written in his notes. The cysts she had were small, and the kind that occur naturally and do not usually require surgical intervention.

"I didn't have to do any of it," Ms. Dowe said.

The Irwin County Detention Center in Ocilla, Ga., drew national attention this month after a nurse, Dawn Wooten, filed a whistle-blower complaint claiming that detainees had told her they had had their uteruses removed without their full understanding or consent.

Since then, both ICE and the hospital in Irwin County have released data that show that two full hysterectomies have been performed on women detained at Irwin in the past three years. But firsthand accounts are now emerging from detainees, including Ms. Dowe, who underwent other invasive gynecological procedures that they did not fully understand and, in some cases, may not have been medically necessary.

At least one lawyer brought the complaints about gynecological care to the attention of the center's top officials in 2018, according to emails obtained by The New York Times, but the outside referrals continued.



Ms. Dowe and 15 other women told The New York Times they were concerned about the gynecological care they got while at the immigration detention center in Irwin County, Ga.  Aileen Perilla for The New York Times

The Times interviewed 16 women who were concerned about the gynecological care they received while at the center, and conducted a detailed review of the medical files of seven women who were able to obtain their records. All 16 were treated by Dr. Mahendra

NBCU002224

Amin, who practices gynecology in the nearby town of Douglas and has been described by ICE officials as the detention center's "primary gynecologist."

The cases were reviewed by five gynecologists — four of them board-certified and all with medical school affiliations — who found that Dr. Amin consistently overstated the size or risks associated with cysts or masses attached to his patients' reproductive organs. Small or benign cysts do not typically call for surgical intervention, where large or otherwise troubling ones sometimes do, the experts said.

The doctors stressed that in some cases the medical files might not have been complete and that additional information could potentially shift their analyses. But they noted that Dr. Amin seemed to consistently recommend surgical intervention, even when it did not seem medically necessary at the time and nonsurgical treatment options were available.

In almost every woman's chart, Dr. Amin listed symptoms such as heavy bleeding with clots and chronic pelvic pain, which could justify surgery. But some of the women said they never experienced or reported those symptoms to him.

Both the reviewing doctors and all of the women interviewed by The Times raised concerns about whether Dr. Amin had adequately explained the procedures he performed or provided his patients with less invasive alternatives. Spanish-speaking women said a nurse who spoke Spanish was only sporadically present during their exams.

The diagnoses and procedures are "poorly supported" and "not well documented," said Dr. Sara Imershein, a clinical professor at George Washington University and the Washington, D.C., chair of the American College of Obstetricians and Gynecologists.

Even if the patients had reported the symptoms recorded by Dr. Amin, "there would have been many avenues to pursue before rushing to surgery," she said. "Advil for one."

"He is overly aggressive in his treatment and does not explore appropriate medical management before turning to procedures or surgical intervention," said Dr. Deborah Ottenheimer, a forensic evaluator and instructor at the Weill Cornell Medical School Human Rights Clinic.

But the doctors who reviewed the cases noted that aggressive overtreatment is all too common among doctors — especially with patients who do not have the resources to seek a second opinion.

Dr. Ada Rivera, medical director of the ICE Health Service Corps, said in a statement that the whistle-blower's allegations "raise some very serious concerns that deserve to be investigated quickly and thoroughly." She added, "If there is any truth to these allegations, it is my commitment to make the corrections necessary to ensure we continue to prioritize the health, welfare and safety of ICE detainees."

Dr. Amin's lawyer, Scott Grubman, said in a statement that the physician "strongly disputes any allegations that he treated any patient with anything other than the utmost care and respect."

"Dr. Amin also strongly disputes that any patient was treated without full informed consent," the statement continued. Mr. Grubman said that patient privacy laws prevented him from discussing any specific patient's treatment, but in each case it "was medically necessary, performed within the standard of care, and done only after obtaining full informed consent."

The statement added that Dr. Amin always uses an interpreter when treating patients who do not speak English and "always attempts to treat his patients with more conservative treatment, including medicine and less invasive procedures, before even recommending surgery," which he views as a last resort.

NBCU002225

Independent doctors that provide treatment for ICE detainees are paid for the procedures they perform with Department of Homeland Security funds. Procedures like the ones that Dr. Amin performed are normally billed at thousands of dollars each.

Dr. Amin's billings had previously come to the attention of federal authorities. In 2013, the Justice Department named him in a civil case alleging that he and several other doctors had overbilled Medicare and Medicaid by, among other things, performing unnecessary procedures on terminal patients and leaving the emergency room staffed by nurses while billing for diagnoses and treatments as if they had been performed by doctors. The case was settled, and the defendants were collectively required to pay $520,000 while admitting no fault.

Independent doctors that provide treatment for ICE detainees are paid for the procedures they perform with Department of Homeland Security funds. Aileen Perilla for The New York Times

### 'I could not ask any questions'

In many cases, Dr. Amin's patients said they were confused about why they ended up being sent to his office in the first place — some after raising medical issues that had nothing to do with gynecology.

Yuridia, a 36-year-old immigrant from Mexico, sought out a nurse at the center soon after she arrived because she was having pain in her rib after a fight with her abusive ex-partner just before she was picked up by ICE. She asked to be identified by her first name because she feared for her safety.

She was sent for a medical exam at Dr. Amin's office, where she said he began to prepare an ultrasound machine. "I was assuming they were going to check my rib," she said. "The next thing I know, he's doing a vaginal exam."

Dr. Amin recorded in his notes that Yuridia had cysts in her ovaries and scheduled a surgery to remove them. He also wrote that she had complained of heavy menstruation and pelvic pain. She said that she never experienced or reported those conditions and that she had not asked to see a gynecologist.

Weeks later, she underwent surgery. Pathology reports show that she did not have dangerous cysts, but small ones of the kind that occur naturally in most women and do not call for surgical intervention.

Yuridia said she had expected only a minor procedure that would be performed vaginally, but she was surprised when she woke up to find three incisions on her abdomen and a piece of skin missing from her genital area.

"I woke up and I was alone, and I was in pain and everyone spoke English so I could not ask any questions," Yuridia said. Three days later, still sore and recovering, she was deported.

Yuridia's case bears striking similarities to others that the panel of doctors reviewed. Many of them led to two surgical procedures performed simultaneously: "dilation and curettage," often referred to as a "D & C," which involves inserting tools into a woman's vagina and scraping tissue from the uterus, and laparoscopy, in which three incisions are made to insert a camera into the

abdominal cavity to examine or perform procedures on the reproductive organs.

The cases suggest a pattern of "excessively aggressive surgical intervention without adequate trial of medical remedies," Dr. Ottenheimer said.

### A report reveals longstanding complaints

It was the Irwin County center's handling of the coronavirus pandemic that inspired Ms. Wooten, the nurse whose whistle-blower complaint was first reported by The Intercept, to come forward about another issue that troubled her: Dr. Amin's surgeries. She said in an interview that she had for years noticed that an inordinate number of women were being referred to Dr. Amin. She said she would hear reports that they had undergone surgeries but that they had no idea why the surgeries were performed.

"After they get up from general anesthesia," Ms. Wooten said, the women would ask, "Why'd I have this surgery?"

"And I don't have an answer for why," she said. "I am just as shocked as they are. Nobody explained it to them."

Data from ICE inspection reports show that the center, which is operated by a private prison company, Lasalle Corrections, refers more than 1,000 detainees a year for outside medical care, far more than most other immigration detention centers of the same size. It is not clear how many of these referrals are for gynecological care. Lasalle Corrections did not respond to requests for comment.

Several women said they never had the symptoms, such as heavy bleeding with clots and chronic pelvic pain, that Dr. Mahendra Amin listed in their charts. Aileen Perilla for The New York Times

Concerns from women detained at Irwin emerged long before Ms. Wooten came forward.

Ms. Dowe, after being told by Dr. Amin that she had a mass the size of a "cantaloupe" on her uterus, had reached out in early 2019 to Donald Anthonyson, an immigrant advocate she had met through a fellow detainee. She was asking for help, Mr. Anthonyson said.

"She expressed real concerns about going to that doctor," he said. "She was concerned about what was happening to her and what she was hearing from other women."

Unlike some of the women who had no gynecological complaints, Ms. Dowe was experiencing intense menstrual cramping, which the doctors who reviewed her case said could sometimes justify the procedure she underwent — but only if the patient understands the options and elects to move forward. Even then, the doctors raised questions about several seemingly healthy and naturally occurring cysts that Dr. Amin might have removed unnecessarily while he was operating on her.

After the procedure, Dr. Amin wrote in his notes that Ms. Dowe requested a second surgery — a full abdominal hysterectomy and removal of her ovaries.

But Ms. Dowe insists she never made any such request. A note in her medical records from the detention center appears to corroborate her denial. "Detainee is requesting a second opinion to

NBCU002227

have a hysterectomy," it reads, "OB/GYN scheduled hysterectomy and patient refused."

Complaints about Dr. Amin had also been raised with senior officials long before Ms. Dowe's case.

In November 2018, a woman named Nancy Gonzalez Hidalgo was left shaken after several visits with the physician, during which she said he performed rough vaginal ultrasounds and ignored her when she cried out in pain. Ms. Gonzalez Hidalgo's lawyers sent an email to the warden of the center, David Paulk.

In the email, Erin Argueta, a lawyer at the Southern Poverty Law Center, explained that Ms. Gonzalez Hidalgo's health was worsening because of complications she was experiencing from an earlier miscarriage.

"Nancy hesitated to seek medical attention because her last experience with Dr. Amin was so painful and traumatic that she did not want to be sent back to him," Ms. Argueta wrote.

She referred in her email to several previous verbal complaints about Dr. Amin that lawyers had taken to the center's inmates services director, Marteka George. "Ms. George stated that this was not the first time someone complained about Dr. Amin, and she said that she would look into whether Nancy could see a different provider," the lawyer wrote.

The warden responded twice, stating on Nov. 30 that Ms. Gonzalez Hidalgo had been scheduled for an appointment with an outside provider "that is unassociated with Dr. Amin." The other doctor, Warden Paulk said, was "reportedly well thought of by his patients."

Warden Paulk did not respond to requests for comment.

Other women who questioned Dr. Amin's care in the past said they had also faced challenges when they tried to seek answers.

On the morning of Aug. 14, Mileidy Cardentey Fernandez said, there was no interpreter present at the Irwin County Hospital when she was presented with consent forms in English to sign for a procedure she was undergoing that day.

Mileidy Cardentey Fernandez said her requests for more information about the surgical procedure Dr. Amin was advising her to undergo were ignored. Melissa Lyttle for The New York Times

She asked the technician, "Spanish, please? Little English." The woman urged her to sign the forms — and so she did.

Afterward, she said, she filled out a form on numerous occasions at the detention center requesting her medical records but got no response.

"I wanted to know everything they had done," she said. "I made requests for the biopsy, analyses, and they don't want to give them to me. They said they don't have the results. How can they not have the results?"

When she was released from detention on Sept. 21, she called her daughter in Virginia and then headed straight to Dr. Amin's clinic with her lawyer to demand her records, which she received.

Some women said they had managed to avoid surgeries by Dr. Amin but not without facing resistance.

NBCU002228

Enna Perez Santos said she objected when Dr. Amin suggested that she undergo a procedure similar to the ones that other women had complained about. Dr. Amin, she said, counseled her that it was a mistake to forgo the treatment and he wrote in his notes that she had asked to speak to a mental health care provider.

Back at the detention center on the same day, Ms. Perez Santos was given a psychiatric evaluation. "I am nervous about my upcoming procedure," Ms. Perez Santos told the examiner, according to the practitioner's notes. "I am worried because I saw someone else after they had surgery, and what I saw scared me."

Ms. Perez Santos was brought three more times to Dr. Amin's office over the next several months, she recalled. Each time, she said, Dr. Amin raised the prospect of a surgery. She felt "pressured" to agree, she said, but each time she told him she did not consent.

Three board certified gynecologists who reviewed Ms. Perez Santos's medical files say that her instincts appear to have been correct. "Based on what I see here, Amin was inappropriately suggesting a D & C scope," Dr. Ottenheimer said. "There is nothing at all there to support the procedure."

Kitty Bennett contributed research.

ADVERTISEMENT

© 2020 The New York Times Company   NYTCo   Contact Us   Work with us   Advertise   T Brand Studio   Your Ad Choices   Privacy   Terms of Service   Terms of Sale   Site Map   Help   Subscriptions

NBCU002229