Declaration of

Elizabeth McNamara

Exhibit 104

OFFICE OF INSPECTOR GENERAL

**Testimony of Inspector General,
Dr. Joseph V. Cuffari**

**Before the Permanent Subcommittee on Investigations,**

**Committee on Senate Homeland Security and Governmental Affairs**

**United States Senate**

**"Medical Mistreatment of Women in ICE Detention"**


Homeland Security

**November 15, 2022
2:30 PM**

NBCU003859



# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security

Chairman Ossoff, Ranking Member Johnson, and Members of the Subcommittee:

Thank you for the opportunity to appear before you today to discuss the oversight work of the Department of Homeland Security (DHS) Office of Inspector General (OIG).  We provide objective oversight and actionable recommendations to the Department and its components to advance the Nation's homeland security objectives.

We are grateful for the continued, bipartisan support that we have received from Congress.  To that end, recent congressional appropriations have allowed us to hire medical professionals to augment our oversight functions, including reviews of U.S. Immigration and Customs Enforcement's (ICE) detention facilities and detention practices.

Between FY 2020 and FY 2022, our office conducted 12 inspections of ICE detention facilities as part of our unannounced inspections program.  In 9 of those inspections, teams of medical professionals—typically consisting of 1 nurse and 1 medical doctor—reviewed detainee medical files, medical staffing levels, training curriculum, and medical protocols to determine whether the medical care provided in ICE detention facilities complied with agency detention standards, as well as the 2018 National Commission on Correctional Health Care Standards.[1]  Given the significant risk posed by the COVID-19 pandemic, the analysis of our medical partners also considered the COVID-19 protocols utilized in ICE detention facilities.

## OIG's Review of the Medical Processes and Communication Protocols at the Irwin County Detention Center (OIG-22-14)

In September 2020, we received a complaint concerning ICE detainees at the Irwin County Detention Center (ICDC) in Ocilla, Georgia.  The complaint included allegations from ICE detainees and a licensed practical nurse previously employed by ICDC about inappropriate medical care, inadequate response to coronavirus disease 2019 (COVID-19), and retaliation against employees and detainees.  It also included specific allegations about the rate at which intrusive gynecological procedures were performed on ICE detainees in ICDC custody.  We referred the allegations of intrusive gynecological procedures to our Office of Investigations and the allegations of whistleblower retaliation to our Office of Counsel.

In October 2020, we initiated an inspection of ICDC.  In our review, we sought to determine whether ICDC provided adequate medical care to detainees and whether COVID-19 protections were in place and adequate.[2]  We interviewed ICE personnel, ICDC officials, and detainees.  We also reviewed surveillance video from common and housing areas.  We utilized a team of medical experts from the National Commission on Correctional Health Care (NCCHC) Resources, Inc., to conduct a virtual tour of the ICDC medical unit and review medical records.

---

[1] 2008 and 2011 Performance-Based National Detention Standards and ICE National Detention Standards 2019.  Our medical experts also rely on National Commission on Correctional Health Care Standards 2018.
[2] *Medical Processes and Communication Protocols Need Improvement at Irwin County Detention Center, OIG-22-14*.

NBCU003860



# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security

Our inspection did not review the gynecological procedure approval process for detainees at ICDC. Rather, we launched a separate system-wide audit, across all DHS detention facilities, to ascertain the rigor of the approval process for invasive surgical procedures, as well as the propriety of previously approved invasive medical procedures, in light of medical community standards.[3]

**ICDC Operations and Authorities**

ICDC is owned by LaSalle Corrections and was operated as an ICE detention facility under an intergovernmental service agreement. When we initiated our inspection in October 2020, ICDC housed 321 male and 85 female immigration detainees. In May 2021, Secretary Mayorkas announced DHS' plans to discontinue the use of ICDC. ICE terminated the contract with LaSalle Corrections effective October 7, 2021. After September 3, 2021, ICE no longer housed detainees at ICDC, but the facility continued to house Irwin County inmates and Federal prisoners for the U.S. Marshals Service.

ICE began operating its detention system under the *National Detention Standards* (NDS), issued in 2000, to establish consistent conditions of confinement, program operations, and management expectations in immigration detention. Over the years, ICE developed two additional sets of standards, *Performance-Based National Detention Standards 2008* (PBNDS 2008) and PBNDS 2011, to improve safety, security, and conditions of confinement for detainees. ICE also revised NDS in 2019. ICE uses all three sets of standards across ICE detention facilities, depending on the type of facility.

ICDC's contract with ICE required ICDC to follow the PBNDS 2011. According to ICE, the PBNDS 2011 reflect ICE's ongoing effort to tailor detention standards to its unique purpose while maintaining a safe and secure detention environment for staff and detainees. ICE detention standards require that all facilities provide detainees with access to appropriate and necessary medical, dental, and mental health care, including emergency services. These standards also require facilities to have written plans that address the management of infectious and communicable diseases, including, but not limited to, education, prevention, testing, and isolation.[4]

On April 10, 2020, ICE Enforcement and Removal Operations (ERO) released the *COVID-19 Pandemic Response Requirements* (PRR),[5] a guidance document developed in consultation with the Centers for Disease Control and Prevention (CDC), that builds upon previously issued guidance. Specifically, the PRR sets forth specific mandatory requirements for all detention

---

[3] The U.S. Government Accountability Office (GAO) has also reviewed deficiencies in ICE detainee medical care. See, e.g., GAO-23-105196, *ICE Needs to strengthen Oversight of Informed Consent for Medical Care*. This report contained three recommendations and stated that ICE must obtain documentation of informed consent from individuals receiving onsite care. See also, GAO-23-105366, *Immigration Detention: Actions Needed to Collect Consistent Information for Segregated Housing Oversight*. This report made two recommendations to improve the use of segregation in detention.
[4] https://www.ice.gov/doclib/detention-standards/2011/4-3.pdf.
[5] https://www.ice.gov/doclib/coronavirus/eroCOVID19responseReqsCleanFacilities-v1.pdf.



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

facilities housing ICE detainees, as well as model practices for such facilities, to ensure that detainees are appropriately housed and to mitigate safety and health risks during this pandemic.

ICE issued nine subsequent updates to the PRR guidance, on June 22, 2020;[6] July 28, 2020;[7] September 4, 2020;[8] October 27, 2020;[9] March 16, 2021;[10] October 19, 2021;[11] April 4, 2022;[12] June 13, 2022;[13] and November 1, 2022.[14]

**Medical Care Provided to ICDC Detainees Generally Met Standards, but Improvements Were Necessary**

ICDC generally adhered to the PBNDS 2011, which require that detainees have access to appropriate and necessary medical, dental, and mental health care. However, we evaluated 36 defined medical care processes in ICDC and determined that chronic care, continuity of care, and policies and procedures were inadequate. We also identified additional concerns in seven other areas, namely health assessments, medication administration, sick call, health records, program administration, emergency care, and women's health.

Based on their medical records review, our team of medical experts determined women's health care was appropriate. However, off-site specialty provider care information was not consistently shared with ICDC.

**ICDC Generally Complied with CDC and ICE COVID-19 Guidance, but Faced Challenges Implementing Protocols**

At ICDC, we identified issues with social distancing, wearing of personal protective equipment (PPE), and routine testing for COVID-19. For example, during our review of ICDC security camera footage, we found that ICDC did not adequately implement and enforce social distancing protocols throughout the facility. We confirmed that ICDC encountered problems obtaining and distributing masks to detainees and staff at the start of the COVID-19 pandemic. ICDC management acknowledged that its mask rollout was slow, which it attributed to confusion over guidance.

We found that, although ICDC implemented testing and other procedures to slow the spread of COVID-19, it did so without tracking reasons for testing. ICDC also did not consistently ensure detainees were notified of COVID-19 quarantine, cohort, or testing status, creating confusion and fear of reporting symptoms among detainees.

---

[6] https://www.ice.gov/doclib/coronavirus/eroCOVID19responseReqsCleanFacilities-v2.pdf.
[7] https://www.ice.gov/doclib/coronavirus/eroCOVID19responseReqsCleanFacilities-v3.pdf.
[8] https://www.ice.gov/doclib/coronavirus/eroCOVID19responseReqsCleanFacilities-v4.pdf.
[9] https://www.ice.gov/doclib/coronavirus/eroCOVID19responseReqsCleanFacilities-v5.pdf.
[10] https://www.ice.gov/doclib/coronavirus/eroCOVID19responseReqsCleanFacilities-v6.pdf.
[11] https://www.ice.gov/doclib/coronavirus/eroCOVID19responseReqsCleanFacilities-v7.pdf
[12] https://www.ice.gov/doclib/coronavirus/eroCOVID19responseReqsCleanFacilities-v8.pdf
[13] https://www.ice.gov/doclib/coronavirus/eroCOVID19responseReqsCleanFacilities_v9.pdf
[14] https://www.ice.gov/doclib/coronavirus/eroCOVID19responseReqsCleanFacilities.pdf

NBCU003862



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

**ICDC Detainees' Access to ICE Deportation Officers Was Limited during the COVID-19 Pandemic**

According to the PBNDS, ensuring security, safety, and the orderly operation of a detention facility relies on a system that encourages and requires informal, direct, and written contact among staff and detainees, as well as informal supervisory observation of living and working conditions.  Although the PBNDS are specific as to how ICE should interact with detainees, compliance with those provisions was limited at ICDC due to COVID-19 travel restrictions and reluctance of ICE officers to visit detainee dorms.

**Although ICDC Detainees and ICDC Staff Were Generally Comfortable Lodging Concerns, Some ICE Officers Stated They Were Hesitant to Voice Their Concerns**

We asked ICE and ICDC staff about fear of retaliation for raising concerns about facility operations.  We also asked detainees to share any concerns about how they were treated at the facility.  We found that most ICDC staff reported they were comfortable bringing their concerns to either their supervisors or directly to the warden.  Several staff members reported their concerns were not always addressed and communication from management could be better.

**Recommendations to Improve Medical Processes and Facility Operations at ICDC**

We made five recommendations to improve ICE's oversight of medical care and facility operations at ICDC.  ICE concurred with one recommendation to enhance communication in the Atlanta Field Office.  ICE did not concur with the other four recommendations.  ICE stated they could not reasonably implement the four recommendations, since they terminated the ICDC contract and no longer housed detainees at ICDC.  We administratively closed the four ICDC-specific recommendations, but only after the Secretary announced that he was closing the facility to ICE detainees.  One recommendation for the Atlanta Field Office was resolved and closed on May 18, 2022, after ICE provided documentation of implementation of the recommendation.

## Findings from OIG's FY 2020–FY 2022 Unannounced Inspections of ICE Detention Facilities

In addition to our work at ICDC, from FY 2020 to FY 2022, we have issued 11 reports related to OIG's annual unannounced ICE detention facility inspections and are in the process of drafting 3 more reports.[15]  In all but 4 of the 11 reports, we found deficiencies in medical care being provided to detainees.

---

[15] *Violations of ICE Detention Standards at Torrance County Detention Center, OIG-22-75*; *Violations of ICE Detention Folkston Processing Center and Annex, OIG-22-47*; *Violations of ICE Detention Standards at South Texas ICE Processing Center, OIG-22-40*; *Management Alert – Immediate Removal of All Detainees from the Torrance County Detention Facility OIG-22-31*; *Violations of ICE Detention Standards at Otay Mesa Detention Center, OIG-21-61*; *Violations of ICE Detention Standards at Adams County Correctional Center, OIG-21-46*; *Violations of ICE Detention Standards at Pulaski County Jail, OIG-21-32*; *Violations of Detention Standards amid COVID-19 Outbreak at La Palma Correctional Center in Eloy, AZ, OIG-21-30*; *ICE Needs to Address Prolonged Administrative Segregation and Other Violations at the Imperial Regional Detention Facility, OIG-21-12*; *ICE*

NBCU003863



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

In FY 2020, at the outset of the COVID-19 pandemic, our office developed and implemented an innovative remote inspection protocol. Using the latest available technology, our team directed a video tour of various spaces within the facility. We also reviewed a combination of randomized and select security camera footage of the facility, including footage where nonlethal force was noted in the detention center logs.

We generally limited the scope of our inspections to the relevant standards for health, safety, access to medical and mental health care, grievances, classification and searches, use of segregation, use of force, and language access. In addition to a physical inspection of areas used by detainees, during our visits to facilities, we also reviewed written documentation and interviewed ICE and detention facility staff members and detainees. At the onset of the pandemic, we added a review of COVID-19 protocols to ensure facilities were meeting ICE's requirements for COVID-19 response.

We also rely on our contracted medical experts to review medical care provided to detainees. These medical experts review facility medical staffing, training, and protocols to ensure that the medical care provided complies with detention standards. Also, during the medical review, our medical contractors pull a minimum of 10 detainee files to review medical care provided to detainees. Records are selected based on detainee medical grievances, hotline complaints, detainee interviews, and detainees with significant medical conditions. Medical experts review the medical records and medical care of any interviewed detainees who identified medical concerns. Finally, the medical contractor also reviews all recent detainee deaths at each facility (if any) to ensure adequate care was provided.

Medical care at ICE facilities varies greatly and is affected by a number of factors, including staffing, training, and access to medical providers. We have identified numerous deficiencies in medical care at detention centers, such as inadequate medical care in segregation, lack of documentation related to medical visits, untimely response to medical grievances, critical medical understaffing, inadequate medical protocols, and delayed medical treatment and medication refills for detainees.

In March 2022, we issued a management alert, recommending immediate removal of detainees from the Torrance County Detention Facility (Torrance) in Estancia, New Mexico, unless and until the facility ensured adequate staffing and appropriate living conditions. ICE did not concur with our recommendation. During our unannounced inspection in February 2022, we found Torrance was critically understaffed. This staffing shortage prevented the facility from meeting contractual requirements, including requirements that detainees reside in a safe, secure, and humane environment. We issued our final report on the Torrance inspection in September 2022, in which we found that Torrance did not meet standards for facility conditions, facility security, medical care, use of force, detainee classification, communication between staff and detainees, and access to legal services. In addition to the management alert recommendation, in the final report we made 14 recommendations to improve ICE's oversight of detention facility

---

*Needs to Address Concerns about Detainee Care and Treatment at the Howard County Detention Center, OIG-21-03; Capping Report: Observations of Unannounced Inspections of ICE Facilities in 2019, OIG-20-45.*



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

management and operations at Torrance. ICE concurred with all 14 recommendations in the final report and provided information and documentation on corrective actions that were sufficient to close 4 of the recommendations. For the remaining 10 recommendations, ICE provided information on how it is addressing each recommendation, along with estimated completion dates.

At multiple facilities, including Imperial Regional Detention Facility in Calexico, California, we found that medical staff did not provide adequate daily medical visits to all detainees held in segregation. We also found that multiple facilities, including Howard County Detention Center, in Jessup, Maryland, did not properly document and respond in a timely manner to detainee medical grievances. At Torrance County Detention Center, in Estancia, New Mexico, we found medical staff shortages were a problem, and Torrance did not meet standards in the areas of dental care and dental complaints, chronic care, administration of medication, lab test results, and controlled substances. At La Palma Correctional Center, in Eloy, Arizona, we found the medical unit was critically understaffed, with vacancies that lingered for several months, which may have contributed to deficiencies in responsiveness to detainee sick call requests and delayed refills for essential medications. Lastly, we found that Pulaski County Jail, in Ullin, Illinois, did not have chronic care protocols or guidelines in place for the medical provider to follow. Health record reviews showed that the provider did not initiate statin therapy (drugs used to lower cholesterol levels in the blood) for diabetic patients requiring such treatment.

**ICE Has Taken Action to Address OIG Recommendations**

As part of the FY 2020 through FY 2022 unannounced inspections, we issued 69 recommendations for improvement of ICE detention operations. ICE has implemented 56 recommendations and 13 remain open.

In 7 of the 11 unannounced inspection reports, we made 20 recommendations related to medical care issues discovered during our reviews. Below are several examples of the recommendations we made and their status.

- Ensure La Palma Correctional Center's Medical Unit is appropriately refilling and administering detainees' medication. This recommendation is closed. La Palma was able to demonstrate that it had improved the effectiveness and timeliness of refilling and administering detainee medication.

- Ensure Adams County Correctional Center's Medical Unit develops emergency care guidelines, documents patient treatment during sick call encounters, and documents interpretation and medical care provided based on laboratory testing results. This recommendation is closed. Adams and ICE provided documentation showing that Adams implemented a process to document sick call requests, provide medical care to detainees based on results from medical testing, and provide training to medical staff to ensure proper documentation of medical care provided to detainees.

- Ensure the Pulaski County Detention Center's Medical Unit develops chronic care guidelines and provides routine and emergency dental care. This recommendation is



closed. Pulaski developed chronic care guidelines to care for detainees with chronic medical conditions and has completed enrollment and onboarding of an additional dental provider to provide emergency dental services for detainees.

- We made 6 medical-related recommendations in the Torrance inspection report, primarily concerning dental care, chronic care guidelines, documentation in medical files, and controlled substance storage. One of the 6 recommendations is resolved and closed, while the remaining five are resolved and open. ICE and Torrance have taken actions to address the remaining 5 recommendations and expect to have them implemented by November 30, 2022.

## Challenges with Medical Vacancies at ICE Facilities

In FY 2022, we conducted an evaluation to assess the causes and impact of medical vacancies at ICE detention facilities to determine whether existing medical staffing plans and vacancies at detention facilities hinder ICE detainees' access to adequate medical care. This evaluation included information that ICE relies on a patchwork of nearly 200 detention facilities to house detainees.[16] Regardless of how medical care is provided, facilities face challenges recruiting, hiring, and retaining medical staff. Remote locations, cumbersome hiring processes, and competing opportunities hinder ICE's ability to maintain adequate staffing levels at detention facilities. Many of the challenges in hiring medical staff also affect ICE's access to offsite specialty care. Remote locations and reluctance among some medical specialists to treat detainees reduce access to specialty care. In addition, ICE's hiring process for Federal medical staff is lengthy and not adequately resourced.

ICE has limited options to impose consequences if contractors operating detention facilities do not meet contract terms for staffing plans or for timeliness of detainee medical care. ICE has sanctioned some contractors, but sanctions have limited value in resolving vacancy rates. In addition, if contracts are not written with sufficient specificity, it may be difficult to impose penalties. ICE medical staff and contract staff can cooperate to improve the language in contracts, but such cooperation is not required, and staffing resources are limited.

Medical vacancies may increase the risk of inadequate care, but the full effects of medical vacancies are difficult to evaluate. The unusual circumstances presented by COVID-19 limited our ability to assess the costs and effects of medical vacancies during the period of our review.

We made five recommendations for ICE to evaluate options for improving the hiring and requirements for medical staffing at detention facilities. For example, we recommended ICE evaluate the feasibility of hiring and retention incentives for high-demand healthcare professionals, as well as the feasibility of including medical requirements in future contract negotiations. We also recommended that ICE evaluate staffing units that support ICE Health Service Corps (IHSC) personnel to ensure there are adequate staff to expedite processing applications for medical positions. ICE concurred with all our recommendations, which are open and resolved.

---

[16] *Many Factors Hinder ICE's Ability to Maintain Adequate Medical Staffing at Detention Facilities, OIG-22-03*.



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

## Challenges with ICE's Efforts to Mitigate COVID-19

In FY 2021, we conducted a review to determine whether ICE effectively controlled COVID-19 in its facilities.[17] The health and safety of detainees and staff in ICE detention facilities, especially during the COVID-19 pandemic, are critical. ICE took various actions to prevent the virus' spread among detainees and staff at its detention facilities. However, we found areas in which detention facilities struggled to properly manage detainee health and safety.

First, we could not independently confirm whether ICE appropriately grouped ("cohorted") detainees. ERO defines a cohort as a group of detainees "with a similar condition grouped or housed together for observation over a period of time." We analyzed weekly cohort reports to ensure COVID-positive detainees and those suspected to have COVID were separated from each other and other detainees, as required, but the cohort reports did not capture this information. IHSC officials said some facilities might use the comments field in the report to track this information, but it was not consistently tracked.

Second, we found that facility staff did not always document responses to sick call requests in tracking systems. We requested sick call documentation but received disparate information from each facility. Because of this, we were unable to determine for all the facilities we inspected remotely whether detainees were treated sufficiently and in a timely manner. When we could analyze sick call requests, we found that facility staff did not always include necessary information to confirm they responded to the requests. Some of the complaints directly referenced COVID-19, including one detainee who said, "Please, I need urgent medical attention…. I have all the symptoms of coronavirus and I'm going to infect everyone here."

Third, we determined that the facilities did not consistently communicate with detainees regarding the outcomes of their COVID-19 tests. Specifically, some detainees we interviewed alleged they had tested positive for COVID-19 but were not notified of the results. In one instance, a detainee expressed surprise when we told him he had tested positive for COVID-19 three months earlier. Facility officials acknowledged instances in which detainees were not informed of their test results because they were moved to medical isolation or another location before they could be notified. As a result of this lack of communication, one detainee stated he and other detainees were "scared and confused."

Finally, detention facilities did not test all new detainees for COVID-19, as required. According to guidance issued on October 27, 2020, "[a]ll new arrivals to ICE detention facilities require COVID-19 testing within 12 hours of arrival." Regardless of this requirement, we found that facilities were still not testing all new detainees when they arrived at a facility. As of December 2020, while all 17 IHSC facilities conducted testing as required, only 44 of the 166 non-IHSC facilities conducted testing.

We made six recommendations to help ICE improve its COVID-19 response. For example, we recommended that ICE revise its cohort tracking report to differentiate between confirmed and

---

[17] *ICE's Management of COVID-19 in its Detention Facilities Provides Lessons Learned for Future Pandemic Responses,* OIG-21-58.



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

suspected cases of contagious diseases; develop specific guidance regarding communication with detainees regarding their medical conditions; and ensure detention facilities follow ICE's Pandemic Response Requirements regarding testing of all new arrivals to ICE detention facilities for COVID-19. ICE concurred with all six recommendations. To date, four of the six recommendations are closed based on actions ICE has taken - the other two remain resolved and open.

## Systemic Reviews of Long-Standing Detention Issues

Since 2020, at my direction, in addition to our typical inspections of individual detention facilities, DHS OIG has initiated systemic reviews of long-standing detention issues. Two of those reports were mentioned above and provide an overview of ICE's COVID-19 protocols and ICE's medical vacancies.[18]

Additionally, in October 2021, we issued our first-ever systemic review of the use of administrative and disciplinary segregation in ICE detention facilities.[19] Our audit objective was to determine whether ICE's use of administrative and disciplinary segregation across all detention facilities complied with ICE detention standards. We performed data-driven and statistical analysis of detention files to accomplish our objective.

We determined that ICE did not always comply with segregation reporting requirements and did not ensure detention facilities complied with records retention requirements. In analyzing a statistical sample of detention files from FY 2015 through FY 2019, we determined ICE did not maintain evidence showing it considered alternatives to segregation for 72 percent of segregation placements. ICE also did not record 13 percent of segregation placements as required by its own policy. Finally, ICE did not ensure detention facilities complied with the National Archives and Records Administration's (NARA) records retention schedule. According to ICE officials, 24 of 265 detention files were destroyed before NARA's minimum retention date.

These problems occurred because ICE did not have effective oversight and clear policies to ensure accurate and comprehensive tracking and reporting on the use of segregation, or proper record retention. In addition, ICE's own reporting policy does not require facilities to report all segregation placements, so ICE cannot provide complete oversight or reporting to Congress and the public about the prevalent use of segregation.

We made three recommendations to improve ICE's oversight and reporting of segregation at detention facilities. ICE concurred with all three recommendations.

---

[18] *ICE's Management of COVID-19 in its Detention Facilities Provides Lessons Learned for Future Pandemic Responses,* OIG-21-58; *Many Factors Hinder ICE's Ability to Maintain Adequate Medical Staffing at Detention Facilities,* OIG-22-03.
[19] *ICE Needs to Improve Its Oversight of Segregation Use in Detention Facilities,* OIG-22-01.



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

## OIG's Ongoing Detention Oversight

In FY 2023, we are continuing our oversight of detention facilities through several ongoing projects, including our unannounced inspection of ICE detention facilities and our mandated reviews of deaths in both ICE and U.S. Customs and Border Protection (CBP) custody.

We appreciate the ongoing support of Congress and acknowledgement of our objective, independent work. Thank you for the opportunity to discuss the critical oversight efforts of DHS OIG.