Declaration of

Elizabeth McNamara

Exhibit 136

Statement of

MARGARET MUELLER, MD, FACS, FACOG

ASSOCIATE PROFESSOR IN OBSTETRICS & GYNECOLOGY
DIVISION OF FEMALE PELVIC MEDICINE & RECONSTRUCTIVE SURGERY
NORTHWESTERN UNIVERSITY FEINBERG SCHOOL OF MEDICINE

Before the

UNITED STATES SENATE

PERMANENT SUBCOMMITTEE ON INVESTIGATIONS
OF THE SENATE COMMITTEE ON HOMELAND SECURITY
AND GOVERNMENTAL AFFAIRS

At a Hearing Entitled

"MEDICAL MISTREATMENT OF WOMEN IN ICE DETENTION"

November 15, 2022

---

Mr. Chairman and Members of the Subcommittee:

My name is Margaret Mueller.  I hold specialty board-certification in Obstetrics
and Gynecology as well as subspecialty board certification in Female Pelvic
Medicine and Reconstructive Surgery, Urogynecology.  I maintain a faculty
appointment as an Associate Professor of Obstetrics/Gynecology at Northwestern
University Feinberg School of Medicine and I am the Program Director of the
Female Pelvic Medicine and Reconstructive Surgery Fellowship.  I am also a
member of the Society of Gynecologic Surgeons (2015 – present), American
College of Obstetricians and Gynecologists (ACOG), American College of Surgeons
(2018 – present) and the American Urogynecologic Society (AUGS).  Currently, I am
the principal investigator for a novel multi-center research network, with federal
funding supported by AUGS.  I was also recently elected to the AUGS Board of
Directors as a member-at-large.  I treat a variety of pelvic floor disorders both
surgically and non-surgically.  I am not being compensated for any activities that
are the subject of my testimony.

1

NBCU003870

I was part of a medical review team comprising nine board-certified gynecologists (including myself) and two advanced practice nurses who, in September and October of 2020, reviewed the medical records of nineteen women alleging medical abuse and maltreatment while in detention at Irwin County Detention Center (ICDC). An Executive Summary of our team's findings was published on October 21, 2020.[1]  Since that summary was prepared, I have reviewed additional medical records that make it clear that this pattern of mistreatment and abuse was not limited to those nineteen women.

Our findings identified a disturbing pattern of overly aggressive care, sometimes involving unnecessary diagnostic procedures and, in some cases, unnecessary surgical procedures.  Often, significant steps in the appropriate evaluation and management of common gynecologic conditions were completely omitted, leading to unindicated surgical procedures with serious risks, including potential effects on future fertility.  We also found evidence that formal "outside" radiologic procedures were reported as normal, when Dr. Mahendra Amin reported the findings of the same imaging procedures as abnormal.  These unnecessary medical procedures were performed without adequate informed consent, which would require not just a signed standard consent form, but also documentation of any discussion of less invasive options that might be appropriate for the patient.  This lack of adequate informed consent was apparent from our review of medical records, which indicated that less invasive treatments were frequently not pursued, and it was further supported by the statements of the women themselves, which demonstrated a total absence of shared decision-making between doctor and patient.  The lack of informed consent and meaningful discussion with patients is especially disturbing in the context of patients in detention with limited options for medical care, who represent a vulnerable population.

Based on my training, experience, and review of the medical records and declarations for multiple women who have received gynecologic care while in detention at ICDC, I have concluded the following:

First, many of the women who were treated by Dr. Amin while at ICDC do not know what happened to their bodies or why.  Many are not aware, for example, of what medications they were given or why, what surgical procedures were performed on them, or whether they are still able to have children.

---

[1] Executive Summary of Findings by the Independent Medical Review Team Regarding Medical Abuse Allegations at the Irwin County Detention (October 21, 2020). The medical review team was organized and supported by women's health lawyers and by the ALLGOOD Foundation in Chicago.

NBCU003871

For example, women were routinely given Depo Provera, a hormonal birth control medication which is given by injection every three months.  A known side effect of Depo Provera is irregular bleeding and/or lack of a period (amenorrhea), and Depo Provera is sometimes prescribed with the intent of inducing that side effect.  Here, women were given Depo Provera without an appropriate workup for abnormal uterine bleeding (which is a contraindication to giving Depo Provera), without a pregnancy test, and, in many cases, without being informed that they were being prescribed hormonal birth control.

Second and relatedly, many of the women who saw Dr. Amin while at ICDC did not receive appropriate treatment for the conditions for which they sought treatment, and many of them have the same symptoms with which they originally presented.  For example, several women reported non-gynecologic conditions, such as an umbilical hernia or rib pain, and were never treated for those complaints but instead referred to Dr. Amin, who then performed unnecessary and unindicated procedures that did not address those women's reported symptoms.  Others presented with gynecologic symptoms, but were not appropriately evaluated, diagnosed or managed, despite undergoing invasive surgical procedures.

No surgical procedure is without risk.  Dr. Amin routinely performed dilation and curettage, a surgical procedure to either evaluate or manage abnormal bleeding, though it is not the first step in evaluation of bleeding as that can be accomplished with a less invasive in-office method (endometrial biopsy).  This surgical procedure is typically performed in the operating room with anesthesia.  Instruments are utilized to dilate or sequentially open the cervix, which is the uterine opening, to allow access to the inside of the uterus (endometrial cavity).  Once dilation is adequate, another instrument is used to scrape the inside of the uterus.  Risks of this procedure include infection, as well as perforation or puncture of the uterus, bladder, bowel, or blood vessels, potentially requiring additional procedures including open surgery to repair the perforation.  Long-term risks include inability to achieve pregnancy due to scar tissue formation in the uterus.  Dr. Amin also routinely performed diagnostic laparoscopy, a procedure where one or more small incisions are made in the abdomen and a camera is introduced into the body.  This itself is an invasive abdominal surgery with risks of bleeding, infection, bowel or bladder perforation, nerve injury, and intra-abdominal scarring potentially requiring additional or future surgery.  In the course of these diagnostic laparoscopies, Dr. Amin often performed additional procedures, such as removal of part of an ovary or fallopian tube, which were themselves not medically indicated.

NBCU003872

Those additional procedures often use electrocautery, which is a method of burning tissue to remove it from the body and is associated with heightened risks, including delayed bowel or bladder injury, which can have catastrophic consequences.

In addition, the women whose records I reviewed underwent invasive transvaginal procedures, including transvaginal ultrasound and physical examinations, often without explanation of what was being done or why. Some of the women whose records I have reviewed also had previously experienced sexual assault and/or sexual abuse, further compounding these issues. Many may identify as trauma survivors based on the unconsented and invasive gynecology procedures they underwent while in custody, and all should be offered the opportunity for mental health support or services.

Equally concerning is the lack of documentation of a meaningful discussion of risks and benefits, and a lack of shared decision-making between doctor and patient with regards to management. An informed consent discussion should explore (1) the patient's symptoms and degree of bother from those symptoms; (2) the full range of treatment options available, from least invasive (such as observation) to most invasive (such as surgery); and (3) the risks, benefits, and alternatives to the proposed management strategies. If a patient has no symptoms, is not bothered by her symptoms, or if a particular surgery or intervention is not indicated, then that intervention exposes the patient to unwarranted risk without any benefit. Patients were also discouraged from refusing surgery or seeking a second opinion, including unnecessary referrals for mental health evaluation.

Thank you for investigating this concerning pattern of care at Irwin County Detention Center, and for the opportunity to present our team's findings.

I look forward to addressing any questions you might have.

———

NBCU003873