## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF GEORGIA
## WAYCROSS DIVISION

DR. MAHENDRA AMIN, M.D.,

        Plaintiff,

  v.

NBCUNIVERSAL MEDIA, LLC,

        Defendant.

Case No. 5:21-cv-00056-LGW-BWC

**NBCU'S STATEMENT OF MATERIAL FACTS IN SUPPORT OF MOTION FOR <u>SUMMARY JUDGMENT</u>**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Southern District of Georgia Local Rule 56.1, Defendant NBCUniversal Media, LLC ("NBCU") files this statement of material facts to which there does not exist a genuine issue to be tried in support of their Motion for Summary Judgment.[1]

    1.    This defamation action challenges statements from three MSNBC news reports that aired on September 15, 2020: (a) *Deadline: White House,* hosted by Nicolle Wallace ("*Deadline*"); (b) *All In with Chris Hayes*, hosted by Chris Hayes ("*All In*"); and (c) *The Rachel Maddow Show*, hosted by Rachel Maddow ("*TRMS*"), as well as two statements from the September 17, 2020 broadcast of *All In* (together, the "MSNBC News Reports").[2]

    2.    The thirty-six challenged statements from the MSNBC News Reports that remain in this action are identified in Paragraphs 75-76, 78-79, 84, and 86-87 of the FAC and are listed on

---

[1] References are to (1) the Amended Complaint in this action [Dkt. 49] (the "FAC"); (2) the accompanying Declarations of Elizabeth A. McNamara, Nicolle Wallace, Rachel Maddow, Chris Hayes, Xander Price, Christopher Scholl, Julia Ainsley, and Jacob Soboroff and the exhibits attached thereto.

[2] The FAC also challenged statements from the September 16, 2020 episode of *All In*.  In May 2022, the Court granted-in-part NBCU's motion for judgment on the pleadings, finding that the FAC failed to plausibly plead actual malice as to that news report and dismissing claims based on that news report from the case.  *See* Dkt. 59 ("Rule 12(c) Order") at 66.

the chart attached hereto as Exhibit 1 to the Declaration of Elizabeth A. McNamara ("McNamara Decl.") (the "Challenged Statements"); *see also* McNamara Decl. Ex. 3 at 25:3-28:14.

      3.     Plaintiff Dr. Mahendra Amin, M.D. ("Dr. Amin") is an OB-GYN physician, practicing in and around Douglas, Georgia in Coffee County.  FAC ¶ 36

      4.     Defendant NBCU owns and operates MSNBC, and each of the challenged MSNBC News Reports aired on MSNBC.  FAC ¶ 19

**The Whistleblower Complaint**

      5.     On September 14, 2020, Project South released a letter of the same date addressed to Jospeh V. Cuffari, Inspector General of the Department of Homeland Security ("DHS"), Cameron Quinn, Officer for Civil Rights and Civil Liberties ("CRCL") of the Department of Homeland Security, Thomas P. Giles, Acting Director of Atlanta Immigration and Customs Enforcement ("ICE") Field Office, and David Paulk, Warden of the Irwin County Detention Center ("ICDC") regarding the "lack of medical care" and "absence of adequate protection against COVID-19 for detained immigrants and employees," which contained reports from "detained immigrants and ICDC nurses" concerning "high rates of hysterectomies done to immigrant women," among other concerns.   McNamara Decl. Ex. 2 at NBCU001553.

      6.     In its first sentence, the signatories to the letter state that they "file this complaint on behalf of detained immigrants at the Irwin County Detention Center (ICDC) operated by the private prison company, LaSalle Corrections; and Ms. Dawn Wooten, a licensed practical nurse employed by ICDC, who is a protected whistleblower and is represented by the Government Accountability Project and Project South" (hereafter, the "Whistleblower Complaint").  *Id.*

      7.     The Whistleblower Complaint was emailed to the Office of the Inspector General ("OIG"), DHS-CRCL, the Atlanta ICE Field Office, and the ICDC at 6:00 AM on September 14, 2020.  McNamara Decl. Ex. 4.

8.     ICE acknowledged that the Whistleblower Complaint was a "complaint." McNamara Decl. Ex. 5; Ex. 6 at DHS000036.

9.     Warden David Paulk ("Paulk") acknowledged that ███████████████████ ███████████ McNamara Decl. Ex. 7 at 169:8-18; 175:22-176:2

10.    Dr. Amin testified that ███████████████████ *Id.* Ex. 3 at 222:7-10.

11.    In a section subtitled "Detained immigrants and ICDC nurses report high rates of hysterectomies done to immigrant women," the Whistleblower Complaint alleges that "several immigrant women" report "their concerns about how many women have received a hysterectomy while detained at ICDC." McNamara Decl. Ex. 2 at NBCU001553.

12.    The Whistleblower Complaint states that one woman told Project South that "Irwin sends many women to see a particular gynecologist outside the facility but that some women did not trust him." The Whistleblower Complaint stated that this information came from a "Project South Interview at the Irwin County Detention Center, October 2019." *Id.*

13.    The Whistleblower Complaint states that "a detained immigrant told Project South that she talked to five different women detained at ICDC between October and December 2019 who had a hysterectomy done." *Id.* The Whistleblower Complaint stated that this information came from a "Project South Interview with Detained Immigrant, Summer 2020." *Id.* This detainee further alleged that, these women "reacted confused when explaining why they had one done." The detainee observed, "When I met all these women who had had surgeries, I thought this was like an experimental concentration camp. It was like they're experimenting with our bodies." *Id.* at NBCU001554.

14.     The Whistleblower Complaint states that "Ms. Wooten also expressed concern regarding the high numbers of detained immigrant women at ICDC receiving hysterectomies." *Id*. She is quoted:

> Everybody he sees has a hysterectomy—just about everybody.  He's even taken out the wrong ovary on a young lady [detained immigrant woman].  She was supposed to get her left ovary removed because it had a cyst on the left ovary; he took out the right one.  She was upset.  She had to go back to take out the left and she wound up with a total hysterectomy.  She still wanted children—so she has to go back home now and tell her husband that she can't bear kids…she said she was not all the way out under anesthesia and heard him [doctor] tell the nurse that he took the wrong ovary.

*Id.*

15.     The Whistleblower Complaint further quotes Wooten as stating: "We've questioned among ourselves like goodness he's taking everybody's stuff out…That's his specialty, he's the uterus collector," and "everybody he sees, he's taking all their uteruses out or he's taken their tubes out.  What in the world."  *Id.*

16.      The Whistleblower Complaint states that "Ms. Wooten also stated that detained women expressed to her that they didn't fully understand why they had to get a hysterectomy" and observed that "[t]hese immigrant women, I don't think the really, totally, all the way understand this is what's going to happen depending on who explains it to them." *Id.*

17.     The Whistleblower Complaint further states:

> One detained immigrant reported to Project South that staff at ICDC and the doctor's office did not properly explain to her what procedure she was going to have done…When she asked what was being done to her body, she was given three different responses by three different individuals.  She was originally told by the doctor that she had an ovarian cyst and was going to have a small twenty-minute procedure done drilling three small holes in her stomach to drain the cyst.  The officer who was transporting her to the hospital told her that she was receiving a hysterectomy to have her womb removed…[T]he ICDC nurse said that the procedure she was going to have done entailed dilating her vagina and scraping tissue off.  The nurse first told the detained immigrant she was going to get this procedure done because she had heavy bleeding, but then told her it was because she had a thick womb.  The woman quickly responded that she never had heavy

bleeding in her life and was never told by the doctor that she had a thick womb. Instead she stated that the doctor had described an entirely different procedure that did not involve scraping her vagina.

*Id.* at NBCU001555.

18.     Dr. Amin never read or saw the Whistleblower Complaint until his deposition in this action. McNamara Decl. Ex. 3 at 85:13-86:15.

19.     Dr. Amin admits ███████████████████████████████████████

███████. *Id.* at 86:16-25; *see also* McNamara Decl. Ex. 7 at 187:12-188:22, Ex. 8

20.     Dr. Amin's counsel sent an October 6, 2020 letter to Dawn Wooten's counsel and Project South in which he claimed that Wooten, Project South, and one of Project South's attorneys published the following "defamatory statements" about him, which were "baseless and have since been refuted by multiple sources": (1) "Dr. Amin performed forced hysterectomies on multiple patients at the Irwin County Detention Center;" (2) "Dr. Amin performs a hysterectomy on 'just about everybody;'" and (3) "Dr. Amin is known as the 'uterus collector.'" McNamara Decl. Ex. 9 (the "October 6 Letter").

21.     In the October 6 Letter, Dr. Amin's counsel did not specifically challenge the allegations in the Whistleblower Complaint that one detainee felt like she was at an "experimental concentration camp," that women did not "fully understand why they had to get a hysterectomy," or that Dr. Amin "took out the wrong ovary" on a detainee. *Compare* McNamara Decl. Ex. 9 (Oct. 6 Letter) to Ex. 2 (Whistleblower Complaint).

22.     Dr. Amin's counsel stated that a failure to correct and retract these statements within seven days "may lead to may lead to legal action being filed against Project South, its responsible employees . . . and Ms. Wooten." McNamara Decl. Ex. 9 at AMIN_0011983.

23.     Project South and Ms. Wooten did not correct or retract their statements in the time-period specified in the October 6 Letter. McNamara Decl. Ex. 10.

24.     Dr. Amin did not sue Dawn Wooten or Project South concerning any of the statements in the Whistleblower Complaint.  McNamara Decl. Ex. 3 at 135:7:12.

**The Press Immediately Reported on the Whistleblower Complaint**

**September 14, 2020 Reporting**

25.     On September 14, 2020, the *Associated Press* published a news report on the allegations in the Whistleblower Complaint ("AP Article").  McNamara Decl. Ex. 11. The AP Article:

   a.   Opens by stating that "[a]n immigration detention center in Georgia performed questionable hysterectomies, refused to test detainees for COVID 19 and shredded medical records, according to a nurse quoted in a complaint filed on Monday."

   b.   Quotes Wooten from the Whistleblower Complaint as calling a "gynecologist who works outside the facility 'the uterus collector.'"  *Id.* at 2.

   c.   Quotes Wooten from the Whistleblower Complaint, "Everybody he sees has a hysterectomy – just about everybody…. He's even taken out the wrong ovary on a lady."  *Id.*

   d.   Quoting Wooten, reports that it "was unclear to Wooten if women knowingly consented to the operations… 'These immigrant women, I don't think they really, totally, all the way understand this is what's going to happen depending on who explains it to them.'"  *Id.*

   e.   Includes a response from ICE noting that it "does not comment on matters before the inspector general," but "[t]hat said, in general, unproven allegations, made without any fact checkable specifics, should be treated with the appropriate skepticism they deserve" (the "Original ICE Statement"). *Id.*

26.     On September 14, 2020, *Law & Crime* published a news report on the allegations in the Whistleblower Complaint ("Law & Crime Article").  McNamara Decl. Ex. 12.  The Law & Crime Article:

   a.   Opens by stating, "Several legal advocacy groups on Monday filed a whistleblower complaint on behalf of a nurse at an Immigration and Customs Enforcement (ICE) detention center documenting 'jarring medical neglect' within the facility, including a refusal to test detainees for the novel coronavirus

and an exorbitant rate of hysterectomies being performed on immigrant women." *Id.* at NBCU001571

b. Reported on the alleged "inordinate rate at which women in ICDC were subjected to hysterectomies…" *Id.* at NBCU001571

c. Reported that "many" immigrant women who had the procedure were "'confused' when asked to explain why they had the surgery, with one detainee likening their treatment to prisoners in concentration camps." *Id.*

d. Reported that "[a]ccording to Wooten, ICDC consistently used a particular gynecologist – outside the facility – who almost always opted to remove all or part of the uterus of his female detainee patients." *Id.* at NBCU001572

e. Reported the Whistleblower Complaint's allegations that "Everybody he sees has a hysterectomy—just about everybody"… "We've questioned among ourselves like goodness he's taking everybody's stuff out…that's his specialty, he's the uterus collector." *Id.*

27. On September 14, 2020, *Law360* published a news report on the allegations in the Whistleblower Compliant ("Law360 Article").  McNamara Decl. Ex. 13.  The Law360 Article:

a. Opens by stating, "A Georgia immigration detention center is denying proper medical care and COVID-19 testing to immigrants in custody, including by subjecting detained women to hysterectomies at high ratees, advocacy organizations alleged in a complaint Monday." *Id.*

b. Reports that Wooten "represented by the Government Accountability Project and Project South, has also filed a whistleblower complaint with DHS' inspector general's office." *Id.*

c. Reports that Wooten alleged that "women at the facility are referred by the same doctor for hysterectomies…at high rates, and many do not seem to understand why the procedure was done. 'Everybody [the doctor] sees has a hysterectomy – just about everybody'"…and that "one woman detained at the facility compared the facility to an 'an experimental concentration camp' in an interview with Project South, according to the complaint." *Id.*

d. Includes the Original ICE Statement.  *Id.*

28. Other news organizations reported on the Whistleblower Complaint on September 14, 2020, including *Daily Beast* ("ICE Whistleblower Complaint Alleges 'Uterus Collector' Doctor Performed Mass Hysterectomies")*, see* McNamara Decl. Ex. 14, *VICE* ("Staggering

Number of Hysterectomies Happening At ICE Facility, Whistleblower Says"), *see* Ex. 15, *Business Insider* ("A Whistleblower Is Accusing Doctors at an ICE Detention Center of Surgically Removing The Wombs of Immigrant Women"), *see* Ex. 16, *The Guardian* ("ICE Detainees Faced Medical Neglect and Hysterectomies, Whistleblower Alleges"), *see* Ex. 17, and the *Atlanta Journal Constitution* ("Whistleblower Blasts Georgia Immigration Detention Center's Covid-19 Response"), *see* Ex. 18.

29.    All of the news reports identified in Paragraphs 25-28 were initially published before MSNBC published the Challenged Statements in this action.  *See supra* ¶¶ 25-28.

30.    The news reports identified in Paragraphs 25-28 have not published any corrections concerning statements about Dr. Amin, and the news reports remain online as of the date of this filing.  *See supra* ¶¶ 25-28.

31.    Dr. Amin has not produced in this action any letter he or his counsel sent to the news organizations identified in Paragraphs 25-28 challenging or asserting claims arising out of the news reports.

32.    Dr. Amin did not sue any of the news organizations concerning the articles identified in Paragraphs 25-28.  McNamara Decl. Ex. 3 at 39:13-40:15.

33.    Dr. Amin's surgical coordinator testified that the Whistleblower Complaint was "all over the media" and recalled seeing broadcast footage about the Whistleblower Complaint's allegations on Univision.  McNamara Decl. Ex. 19 at 50:23-51:14.

**September 15, 2020 Reporting**

34.    On September 15, 2020, at 5:24 AM ET, CBS News published a news report on the Whistleblower Complaint allegations with the headline "Questionable Hysterectomies and Shoddy

Covid Care Alleged at Georgia Immigrant Detention Center," ("CBS Article"). McNamara Decl

Ex. 20.  The CBS Article:

      a. Opens by stating, "An immigration detention center in Georgia performed questionable hysterectomies, refused to test detainees for COVID-19 and shredded medical records, according to a nurse quoted in a complaint filed Monday."

      b. Reported that "Wooten calls a gynecologist who works outside the facility 'the uterus collector.'"  *Id.* at NBCU001614

      c. Reported Wooten as alleging "Everybody he sees has a hysterectomy – just about everybody…He's even taken out the wrong ovary on a young lady."

      d. Reported that it was "unclear to Wooten if women knowingly consented to the operations.  Nurses raised concerns about the doctor, who is unnamed." *Id.*

      e. Reported that Dr. Ada Rivera, "the top doctor at the agency [ICE] issued a statement saying the whistleblower allegations will be investigated by an independent office, adding, 'However, ICE vehemently disputes the implication that detainees are used for experimental medical procedures." *Id.*

      f. Reported that Wooten "was demoted after missing work with coronavirus symptoms, which she believe was retaliation for raising questions about addressing COVID-19." *Id.* at NBCU001615.

35.    On September 15, at 2:02 PM ET, *Forbes* published a news report on the

Whistleblower Complaint allegations with the headline "Pelosi Calls for Investigation Into Claims

of Mass Hysterectomies, Poor Covid-19 Care at ICE Detention Center," ("Forbes Article").

McNamara Decl. Ex. 21. The Forbes Article:

      a. Opens by stating, "House Speaker Nancy Pelosi (D-Calif.) on Tuesday called for an investigation into a Georgia ICE detention center where a whistleblower complaint from one of the facility's nurses detailed health care abuses, including questionable hysterectomies and a refusal to test for and report coronavirus cases." *Id.*

      b. Reports that Wooten "said the facility would send many detainees to see a particular gynecologist outside the facility who she described as the 'uterus collector.'"  *Id.* at NBCU001646.

    c.   Reports that Wooten "said that 'everybody he sees has a hysterectomy' in the complaint, detailing situations in which some of the immigrant women may not have understood what procedures they were undergoing due to language barriers or poor explanations." *Id.*

    d.   Reports that "Joining Pelosi in the call for an investigation is a group of 173 members of Congress, who in a Tuesday letter expressed 'deep concerns for the health and welfare of immigrants in custody of Immigration and Customs Enforcement.'" *Id.*

36.    On September 15, 2020, *Prism* published a news report on the Whistleblower Complaint with the headline "Exclusive:  Georgia doctor who forcibly sterilized detained women has been identified" ("Prism Article").  McNamara Decl. Ex. 22.  The Prism Article:

    a.   Opens by stating, "Under the Trump administration, reproductive injustice has run rampant inside the federal immigration system—stretching far beyond the family separation policy at the border.  A complaint filed yesterday sheds light on a new atrocity:  Women detained at the Irwin County Detention Center (ICDC) in Georgia have allegedly been sterilized without their consent." *Id.*

    b.   Reports that "The attorneys behind the lawsuit would not confirm the identity of the doctor referenced in the complaint, but Prism has learned, according to a source familiar with the situation, it is gynecologist Mahendra Amin, based in Douglas, Georgia.  The doctor, also an immigrant, is affiliated with Coffee Regional Medical Center and Irwin County Hospital in Georgia."  *Id.* at NBCU001501-02.

    c.   Reports that "It is unclear if Amin is financially benefiting from the procedures.  The gynecologist was once a co-defendant in a lawsuit in which he and other doctors were ordered to pay more than half a million dollars to resolve allegations that they caused false claims to be submitted to Medicare and Medicaid."  *Id.* at NBCU001503

    d.   The sentence quoted in Paragraph 36(c) included a link to an April 29, 2015, United States Attorney's Office, Middle District of Georgia, press release titled, "Hospital Authority of Irwin County Resolves False Claims Act Investigation for $520,000." *Available at* https://www.justice.gov/usao-mdga/pr/hospital-authority-irwin-county-resolves-false-claims-act-investigation-520000

    e.   Reports that "ICE did not respond to Prism's request for comment regarding the doctor, and the gynecologist's receptionist told Prism he is not commenting to the media at this time."  McNamara Decl. Ex. 22 at NBCU001503

37.   On September 15, 2020, at 5:22 PM ET, *The Intercept* published a news report on the Whistleblower Complaint allegations with the headline "'He Just Empties You All Out': Whistleblower Reports High Number of Hysterectomies at ICE Detention Facility" (the "Intercept Article").  McNamara Decl. Ex. 23.  The Intercept Article:

a.  Opens by stating "A whistleblower complaint filed this week with the Department of Homeland Security's Office of the Inspector General alleges that high rates of hysterectomies – sometimes without what the complaint called 'proper informed consent' – have been performed on women detained in a privately owned immigration jail in Georgia." *Id.*

b.  Reports the statement from a detainee in the Whistleblower Complaint that "five women who had the procedure between October and December 2019 had told her that they 'reacted confused when explaining why they had one done.'" *Id.*

c.  Reports that the accounts in Project South's complaint "were consistent with accounts given in separate interviews conducted by The Intercept with three other current detainees at the facility, eight advocates for detainees at the prison, and a former Irwin employee, all of whom requested anonymity for fear of reprisals against themselves and their clients." *Id.*

d.  Reports that "On Tuesday, Speaker of the House Nancy Pelosi called for an investigation into Wooten's allegations.  Georgia State Rep. Bob Trammell sent a letter on Monday to the Georgia Composite Medical Board and the Georgia Board of Nursing after the complaint was published, requesting that they 'immediately suspend the licenses of the providers named in the whistleblower complaint pending a full investigation by your offices.'"  *Id.* at NBCU001620

e.  Reports that "[t]hough Wooten, in an interview with The Intercept on Monday, declined to identify the doctor, according to interviews with a detainee, two detained advocates, and a former Irwin employee, the doctor is Mahendra Amin, an obstetrics and gynecology specialist based in Douglas, Georgia…. The doctor's identity, which was first reported by Prism, did not appear in the whistleblower's complaint to the Homeland Security Office of Inspector General." *Id.* at NBCU001620-21

f.  Reports that "When reached by comment, Amin confirmed that he conducted procedures on immigrant women brought from the facility.  He said that after he conducts exams, he requires the approval of the detention center before conducting any necessary procedures.  Amin said that he has only performed 'one or two hysterectomies in the past two[or] three years.'  When pressed, he

did not specify whether those hysterectomies were performed on people detained in Irwin." *Id.* at NBCU001621

g. Reports that "Amin said that allegations of performing procedures without patients' consent were ruining his reputation and affecting his practice. 'Everything is wrong, and if you want to talk, talk to the hospital administrator.' Amin said, referring to the Irwin County Hospital, and then hung up the phone."

h. Amin does not recall speaking with The Intercept but admits that the statements in the Intercept Article were true concerning the allegations of performing procedures without patient's consent were ruining his reputation and affecting his practice. McNamara Decl. Ex. 3 at 106:1-7; 109:20-110:1.

38.     Other news organizations reported on the Whistleblower Complaint allegations on September 15, 2020, before 5:30 PM ET, including UPI.com ("Complaints Allege Neglect, Sterilization at Georgia Migrant Facility"), *see* McNamara Decl. Ex. 24, *The Augusta Chronicle* ("Nurse:  Questionable Hysterectomies Performed at Georgia Immigration Jail"), *see* Ex. 25, *The Hill* ("Whistleblower Complaint Alleges Widespread Abuse on Migrant Detainees"), *see* Ex. 27, *Huff Post* ("Whistleblower Says Doctor Performed Excessive Hysterectomies on ICE Detainee"), *see* Ex. 28, Refinery.com ("An ICE Nurse Revealed that A U.S. Detention Centre is Performing Mass Hysterectomies"), *see* Ex. 29.

39.     Some of the news organizations described in Paragraphs 34-38 republished the original AP Article, as indicated in their bylines.  *See, e.g.,* McNamara Decl. Exs. 20, 24.

40.     All of the news reports identified in Paragraphs 34-38 were published before MSNBC published the Challenged Statements in this action.  *See supra*  ¶¶ 34-38.

41.     The news reports identified in Paragraphs 34-38 have not published any corrections concerning statements about Dr. Amin, and the news reports remain online as of the date of this filing.  *See supra*  ¶¶ 34-38.

42.     Dr. Amin has not produced in this action any letter he or his counsel sent to the news organizations identified in Paragraphs 34-38 challenging or asserting claims arising out of the news reports.

43.     Dr. Amin did not sue any of the news organizations identified in Paragraphs 34-38 McNamara Decl. Ex. 3 at 39:19-40:15.

### NBC News Investigated and Reported on the Whistleblower Complaint before the MSNBC News Reports

#### NBC News Publishes the AP Article

44.     On September 15, 2020, at 8:20 AM ET, NBC News re-published the AP Article, including each of the statements identified in Paragraph 25 (the "NBC/AP Article"). McNamara Decl. Ex. 26.

45.     The NBC/AP Article, as published by NBC News, carried a "By The Associated Press" byline. *See id.*

46.     Reprints of wire stories, like the NBC/AP Article, are not independently reviewed or approved by Standards. McNamara Decl. Ex. 30 at 45:5-16, 52:6-10, 53:5-14, 58:6-12; Ex. 31 at 18:4-6, 19:5-15; Scholl Decl. ¶ 9.

47.     Dr. Amin did not seek or obtain any corrections concerning any of the statements published in the NBC/AP Article.

48.     Dr. Amin (or his counsel) never sent a claim letter to NBCU concerning the publication of the NBC/AP Article.

49.     Dr. Amin did not sue NBCU concerning the publication of the NBC/AP Article.

#### NBC News Publishes the Silva Article

50.     The NBC/AP Article was updated on September 15, 2020 at 2:26 P.M in an article by Daniella Silva (the "Silva Article"). Scholl Decl. Ex. 5.

51.     The Silva Article republished several paragraphs from the AP Article and updated it to include information from a press conference held by Dawn Wooten on September 15, 2020.

52.     The Silva Article:

a.  Revises the opening of the AP Article, stating:  "A nurse who raised alarms about conditions at a U.S. Immigration and Customs Enforcement detention center in Georgia, including that it refused to test detainees for the coronavirus and that some detainees received questionable hysterectomies, said Tuesday that she decided to become a whistleblower so that detainees are treated better at the facility."  *Id.*

b.  Reports that "Wooten worked full time as a licensed practical nurse at the Irwin County detention Center in Ocilla, Georgia, until being demoted in July."  *Id.*

c.  Reports that "In a federal complaint filed Monday, a coalition of rights groups accused the detention center of committing 'jarring medical neglect,' including failing to protect its detainees from coronavirus, red flags concerning a high rate of hysterectomies performed on detainees and fabricating medical records."  *Id.*

d.  Includes the Original ICE Statement. *Id.*

e.  Re-reports several statements from the AP Article (also included in the NBC/AP Article), including that "Wooten said in the complaint that she and other nurses were alarmed at the rate at which immigrant women at the facility were receiving hysterectomies, and called an unnamed gynecologist who worked outside the facility 'the uterus collector.'" *Id.*

53.     Dr. Amin did not seek or obtain any corrections concerning the Silva Article.

54.     Dr. Amin (or his counsel) never sent a claim letter to NBCU concerning the publication of the Silva Article.

55.     Dr. Amin did not sue NBCU concerning the publication of the Silva Article.

**NBC News Publishes the NBC News Article**

56.     Following NBC News's publication of the NBC/AP Article and the Silva Article, at 5:24 PM, NBC News published a third article concerning the Whistleblower Complaint, with the byline "By Jacob Soboroff, Julia Ainsley and Daniella Silva," and the headline, "Lawyers

allege abuse of migrant women by gynecologist for Georgia ICE detention center"(the "NBC News Article"). Ainsley Decl. Ex. 2.

57.   The NBC News Article reflects the additional reporting done by two NBC News journalists, Jacob Soboroff and Julia Ainsley, investigating the allegations of the Whistleblower Complaint.

58.   Soboroff has been an NBC News journalist since 2015 and is employed by NBC News. McNamara Decl. Ex. 32 at 62:4-5.

59.   Soboroff has won awards for his reporting on immigration, including the Walter Cronkite Award for Excellence in Television Journalism for reporting on family separation at the border. Soboroff wrote a *New York Times* best-selling book on the policy of child separation. *Id.* at 215:14-20; Soboroff Decl. ¶ 2.

60.   Ainsley has been an NBC News journalist since 2017 and is employed by NBC News. McNamara Decl. Ex. 30 at 6:23-7:3.

61.   Ainsley and Soboroff have covered immigration issues together and won the 2019 Hillman Prize for Broadcast Journalism for the coverage of the Trump administration's policy of child separation. McNamara Decl. Ex. 30 at 10:4-8; Ex. 32 at 215:14-20.

62.   The NBC News Article:

    a.   Opens by stating, "A nurse who worked at an Immigration and Customs Enforcement detention center in Irwin County, Georgia and four lawyers representing clients there are claiming that immigrant women are routinely being sent to a gynecologist who has left them bruised and performed unnecessary procedures, including hysterectomies." Ainsley Decl. Ex. 2

    b.   Reports that "three lawyers identified [] Dr. Mahendra Amin, practicing in Douglas, Georgia" as the doctor. *Id.*

    c.   Reports that "Amin was the subject of a Justice Department Investigation in 2015 for making false claims to Medicaid and Medicare. As a result, he and other doctors involved paid $525,000 in a civil settlement, according to the

Justice Department," linking to a Department of Justice ("DOJ") press release. *Id.*; *see also supra* ¶36(d).

d. Includes the statement from the Silva Article that "Wooten was demoted in July from a full-time nurse to 'as-needed'" and that "she believes the demotion was in retaliation for raising coronavirus protocol concerns, according to the complaint." Ainsley Decl. Ex. 2

e. Includes information from an interview with Elizabeth Matherne (referenced in the Article as "Elizabeth Mathren"), "a lawyer who represented several women who saw Amin," who said she "brought their complaints [concerning Dr. Amin] to managers of the detention facility," stating that "I begged [someone in management] to get my client treatment with a different doctor.  I told her I had heard from multiple people that he was rough, that they were scared to go to him, that they didn't understand what he was doing." *Id.*

f. Reports that Matherne also said that "she had at least one client report bruising after being examined by Amin." *Id.*

g. Reports that they tried to obtain comment from Dr. Amin, but "a woman who answered the phone at Amin's practice hung up the phone when asked for comment." *Id.*

h. Includes information from an interview with Benjamin Osorio, "another lawyer representing women in the Irwin County facility," who said "two of his clients received hysterectomies that they believe may have been unnecessary" and describes the circumstances surrounding these two hysterectomies. *Id.*

i. Includes information from an interview with Sarah Owings, another lawyer, who "said she has heard of many women who are told they have ovarian cysts that need to be removed or drained." *Id.*

j. Includes a statement from an NBC News interview with Wooten in which she said "I had a detainee that asked me… 'What is he doing Ms. Wooten, collecting all of our uteruses?' And I just looked at her puzzled because I didn't have an answer." *Id.*

k. Includes the Original ICE Statement and reflects that "ICE did not immediately respond to a request for comment based on the lawyers' allegations." *Id.*

l. Re-reports several statements from the NBC/AP Article and the Silva Article, including that "in her complaint, Wooten said some of her patients told her they were afraid to go to a doctor they called the 'uterus collector.'" *Id.*

63. Dr. Amin did not seek any corrections concerning the NBC News Article.

64.     Dr. Amin (or his counsel) never sent a claim letter to NBCU concerning the publication of the NBC News Article.

65.     Dr. Amin did not sue NBCU concerning the publication of the NBC News Article.

**Reporting for the NBC News Article**

66.     Soboroff, having learned of the Whistleblower Complaint on the evening of September 14, 2020, spoke with the lawyer who sent the Complaint to the government to see about interviewing Wooten. Soboroff Decl. Ex. 1 at 3-4.; Soboroff Decl. ¶ 5.

67.     By the morning of September 15, 2020, Soboroff observed that "everyone is all over this story," referring to the number of media reports already published concerning the Whistleblower Complaint. Ainsley Decl. Ex. 1 at 3148; McNamara Decl. Ex. 32 at 52:20-53:8.

68.     By about 11:15 AM ET, Soboroff had interviewed Wooten. Wallace Decl. Exs. 2-3; Ainsley Decl. Ex. 1 at NBCU003147-3148; Scholl Ex. 1; Soboroff Decl. ¶ 6.

69.     Soboroff found her to be credible. Her interview was consistent with the allegations attributed to her in the Whistleblower Complaint. She made it clear that she did not accompany the women to their appointments with the gynecologist. And she stated when she did not know certain information (*e.g.,* the doctor's name, or how many women went through the procedure). Maddow Decl. Ex. 3 at NBCU000404,NBCU000413-414, NBCU000417. Wooten stated that she was not intending to attack LaSalle: "I don't know if this has to do with not having enough staff, and it's definitely not an attack on LaSalle Corporation as a whole, and not really an attack on anybody." *Id.* at NBCU000424. McNamara Decl. Ex. 32 at 86:19-87:19, 88:14-89:4; Soboroff Decl. ¶ 6.

70.     By 1:00 PM ET on September 15, Soboroff and Ainsley had contacted lawyers who represented women at ICDC who had been treated by Amin.  See, e.g. Soboroff Decl. Ex. 2; Soboroff Decl. ¶ 8; Scholl Decl. Ex. 4 at NBCU002648; McNamara Decl. Ex. 30 at 27:24-28:5.

71.     Ultimately, in addition to the attorney for Project South, Soboroff and/or Ainsley spoke with four lawyers (three who were named in the article, Matherne, Owings and Osorio, and one who was not, Andrew Free).  McNamara Decl. Ex. 30 at 27:24-28:5, 28:19-29:2, 31:4-9, 32:21-33:4; Ex. 32 at 38:5-7; Ainsley Decl. ¶ 12; Soboroff Decl. ¶ 8

72.     Soboroff and Ainsley had previously relied on Andrew Free as a source in reporting on immigration issues and found him to be a "reliable, credible, and knowledgeable" and "well-informed" source.  McNamara Decl. Ex. 30 at  27:13-16; Ex. 32 at 10:24-11:8, 11:24-25; Ex. 33 at 113:11-16; Ainsley Decl. ¶10; Soboroff Decl. ¶ 10.

73.     Soboroff and Ainsley found each of the lawyers they spoke with to be credible, Soboroff Decl. ¶ 7; Ainsley Decl ¶¶ 10, 13, as they provided detailed information and clarified what they knew and did not know.  For example, Sarah Owings observed that "I don't think this is necessarily a systemic sterilization by ICE I think this is the kind of thing that is allowed to flourish in the course of poor oversight and terrible, inhumane conditions of confinement," a quote that was included in the NBC News Article. *See* Ainsley Decl. Ex. 2.

74.     The same lawyers were speaking to other media organizations and were quoted in other news reports making similar statements.  For example, Matherne was referenced in a September 15, 2020 *Reuters* article, reporting that she "recalled complaining to detention center officials about treatment her clients said they were receiving from an outside gynecologist." McNamara Decl. Ex. 34; *see also* Ex. 35.

75.     Discovery produced in this action shows that Matherne was copied on a November 2018 email sent to ICDC, in which a lawyer stated that her client went to see Dr. Amin, the experience was "painful and traumatic," and she wanted a different doctor.  That email reports that ICDC's inmate services director had told the attorney that "this was not the first time someone complained about Dr. Amin."  McNamara Decl. Ex. 37.

76.     On September 17, 2020, Owings was referenced in a *USA Today* article, noting that her team "had identified more than 15 cases of women who underwent questionable surgeries at the hand of the doctor, including removal of the Fallopian tubes and removal of the ovaries." The article quoted Owings:  "I wouldn't say there is a systemic pattern, but based on people who have gotten in touch, it points to a lack of informed consent and full understanding by people of these medical treatments."  McNamara Decl. Ex. 35.

77.     Osorio was also interviewed for the *USA Today* article, which reports that he had two clients from ICDC who had hysterectomies after being told they had cancer.  *Id.*; *see also* Ex. 36 (email dated September 15, 2020 from Osorio, "I have two clients that had hysterectomies while detained at Irwin.").

78.     Soboroff and Ainsley also learned that in 2015, Dr. Amin and other doctors at Irwin County Hospital ("ICH") settled an action brought by the DOJ and State of Georgia alleging that they were performing unnecessary medical procedures and made false claims to Medicare and Medicaid (the "DOJ Complaint").  McNamara Decl. Ex. 38.

79.     The DOJ Complaint alleged that "Dr. Amin has a standing order at ICH which requires that certain tests always be run on pregnant patients, without any medical evaluation and regardless of her condition.  For example, no matter what symptoms the patient might be exhibiting, ICH performs an OB ultrasound on every pregnant patient, without consulting [Dr.

Amin] or obtaining his or any other doctor's medical opinion for that particular patient." McNamara Decl. Ex. 39.

80.     The DOJ Complaint alleged that, according to an ICH Utilization Review memo, "a sonogram is to be performed even if there is no indication of something wrong with the baby as long as Medicaid will pay for it, but to find out whether it is medically necessary if Medicaid might not pay for it." *Id.* at ¶ 67.

81.     The DOJ Complaint alleged, "Dr. Amin's standing order for ultrasounds on his patients constitutes a pattern of medical services that he, ICH, and the on-call doctors know or should know are not medically necessary." *Id.* at ¶ 70.

82.     The DOJ complaint was settled by a $520,000 payment.  McNamara Decl. Ex. 143; Ex. 3 at 268:15-270:17.

83.     Soboroff and Ainsley believed that the allegations in the DOJ complaint were consistent with allegations in the Whistleblower Complaint and lent further credibility to the allegations concerning Dr. Amin's medical treatment of ICDC detainees.  McNamara Decl. Ex. 30 at 184:16-185:10; Soboroff Decl. ¶ 10

84.     Soboroff and Ainsley sought comment concerning the Whistleblower Complaint and the new allegations from their reporting from Dr. Amin, ICE, and LaSalle (the private entity that ran ICDC).   McNamara Decl. Ex. 40 at NBCU002648; Ex. 41; Ainsley Decl. Ex. 1 at NBCU003152.

85.     Comments from Dr. Amin, ICE and LaSalle were included in the NBC News Article after they were obtained.  *See infra*, ¶¶ 103-05.

86.     Chris Scholl, senior deputy head of NBCU News Group Standards, reviewed the NBC News Article prior to publication.  Scholl Decl. ¶ 5; McNamara Decl. Ex. 31 at 43:11-15.

87.     Standards is a group of veteran journalists within the NBCU News Group that reviews certain articles and scripts for the News Group to help ensure that they meet the News Group's journalistic standards.  Scholl Decl. ¶¶ 3-4; McNamara Decl. Ex. 30 at 45:5-16, 52:6-10, 53:5-14, 58:6-12; Ex. 31 at 18:4-6; 19:5-15.

88.     In an email at 1:24 PM ET, Scholl expressed a "concern" with only relying on the Whistleblower Complaint and, among other points, states that "we need more of our own independent reporting."   Scholl Decl. Exs. 2, 6.

89.     Before Scholl's 1:24 email, Soboroff and Ainsley had already begun conducting independent reporting.  Before publishing the NBC News Article at 5:24 PM ET, Soboroff and Ainsley had spoken to the attorney from Project South who sent the Whistleblower Complaint, interviewed Dawn Wooten, spoken with four lawyers who represented that their clients had concerns with their medical care by Dr. Amin, researched the DOJ Complaint and the 2015 settlement with the DOJ, and sought comment from Dr. Amin, ICE, and LaSalle. *Id.* Exs. 3-4; Ainsley Decl. ¶¶ 9-19; Soboroff Decl. ¶ 18.

90.     As Ainsley testified regarding Scholl's "concern" and their response to it: "he's raising the bar, and I'm meeting it.  He's doing his job, and I'm doing mine."  McNamara Decl. Ex. 30 at 199:22-24.

91.     At the time the NBC News Article was published, at 5:24 PM, Ainsley, Soboroff, and their editor, Mark Schone, did not doubt the accuracy of the information in the Article and believed the Article to be accurate.  McNamara Decl. Ex. 42 at 39:3-7, 40:18-25, 52:9-10, 98:9-23, 105:14-20; Ex. 30 at 89:23-35, 90:6-10, 98:11-17; Soboroff Decl. ¶¶ 11, 18; Ainsley Decl. ¶¶ 21, 27, 34.

92.     At the time the NBC News Article was published at 5:24 PM, Schone, Ainsley, and Soboroff understood that Standards approved the Article. McNamara Decl. Ex. 42 at 39:3-7, 39:12-16; Soboroff Decl. ¶ 11; Ainsley Decl. ¶ 2.

93.     Scholl approved the content of the NBC News Article as published at 5:24 PM. Scholl Decl. Exs. 6, 8; McNamara Decl. Ex. 31 at 42:15-16.

94.     At 5:25 PM, Scholl emailed Ainsley asking whether the NBC News Article was in NewsConnect, stating: "We are fielding various inquiries [from others in the NBCU News Group] and someone needs to get it in there asap." Scholl Decl. Ex. 6.

95.     At 5:54 PM, Scholl again told Ainsley, regarding the NBC News Article: "Please place this directly into NCX [NewsConnect]." Scholl Decl. Ex. 8.

96.     Putting something in NewsConnect makes the content available to all NBCU News Group editorial staff.  McNamara Decl. Ex. 31 at 30:21-31:8, 41:19-20; Scholl Decl. ¶ 24.

97.     A previously published article by NBC News that is added to NewsConnect is deemed "reportable" regardless of whether it has a "reportable" tag in NewsConnect.  McNamara Decl. Ex. 30 at 60:1-7; Ex. 42 at 100:24-101:4; Ex.43; Scholl Decl. ¶ 24.

98.     The NBC News Article as posted to NewsConnect at 5:52 P.M, *see* McNamara Decl. Ex. 44 at NBCU002309, is identical to the NBC News Article as published at 5:24 P.M, *see* Ainsley Decl. Ex. 2.

99.     At 6:17 PM, Standards attached reporting guidance to the NBC News Article in NewsConnect.  Maddow Decl. Ex. 5.

100.    When Standards attaches reporting guidance to an article, that is also communicating that the story is reportable (using the Standards guidance).  Scholl Decl. ¶ 24.

101.    The guidance from Standards stated: "Note when reporting this story that we have reached out to the company (LaSalle Corrections) and have not received a response, and reflect ICE's statement.  Also, note that we reached out to Dr. Amin.  Remember: these are allegations—not established facts—relayed to us by attorneys, not the women directly.  Our reporting needs to reflect that."  Maddow Decl. Ex. 5 at NBCU000532.

102.    At 6:48 PM, Scholl sent the Standards guidance on the NBC News Article to the MSNBC Primetime Executive Producer distribution list.  Price Decl. Ex. 8.

**Updates to the NBC News Article**

103.    The NBC News Article was updated as new information was received or to correct spelling or grammatical errors.  As Soboroff testified, reporting on a story like the Whistleblower Complaint is a "dynamic, evolving situation."  McNamara Decl. Ex. 32 at 51:4:7; 102:10-18.

104.    Ultimately, the Article was updated to add that the Whistleblower Complaint was first reported by *The Intercept* and to include new comments from ICE (the "Second ICE Statement"), LaSalle, and Dr. Amin.  Ainsley Decl. Ex. 3.

105.    No information included in the original NBC News Article as published at 5:24 P.M was deleted or revised in any update, other than adding Dr. Amin's statement in place of noting that Dr. Amin's office hung up the phone when called for comment. *Compare* Ainsley Decl. Ex. 3 *with* Ex. 2.

**Government Agencies or Officials Immediately Started Investigations into the Whistleblower Complaint**

106.    David Paulk, the Warden at ICDC in September 2020, confirmed ████████████ ████████████████████████████████████████████████████ ████████████████████████████████████ McNamara Decl. Ex. 7 at 182:11-25.

107.    ICE's internal documents indicate that it was investigating the Whistleblower Complaint as of September 15, 2020.  In an email at 7:19 PM, an ICE employee noted: "Just got an email from the AD, now they want to investigate the provider so we need to go back five years. Can you pull everything going back five years (2015)?"  McNamara Decl. Ex. 48 at ICE001632.

108.    On September 16, 2020, ICE employees reported that they found "several instances of settlement related to improper care" for the specialist treating ICDC detainees, and, if this had been known, ICE "would not have accepted utilizing this specialist."  McNamara Decl. Ex. 49; *see also* Ex. 50.

109.    On September 16, 2020, ICE employees believed that Dr. Amin had performed six hysterectomies and over seventy other invasive gynecological surgeries on ICDC detainees.  They later learned that one hysterectomy was performed by another doctor and others did not move forward.  *See* McNamara Decl. Ex. 48.

110.    Paulk confirmed that ███████████████████████████████
████████████████████████ McNamara Decl. Ex. 7 at 202:4-8.

111.    On September 21, 2020 at 12:55 PM ICE ███████████████████
████████████████████████████ McNamara Decl. Ex. 51.

112.    On September 21, 2020 at 6:01 PM, Dr. Amin ███████████████
██████████████████████████████████████████████████████

McNamara Decl. Ex. 52.

113.    Upon receipt of the Whistleblower Complaint, *see* McNamara Decl. Ex. 4, DHS CRCL "immediately opened approximately nine complaint investigations," including one for the Whistleblower Complaint (Complaint No. 20-12-ICE-0987) and "forwarded these allegations to the OIG," *see id.* Ex. 6 at DHS000036.  "OIG" stands for Office of Inspector General.

114.    The DHS OIG investigation into medical care more generally at ICDC resulted in

a report on January 3, 2022, *Medical Processes and Communication Protocols Need Improvement*

*at Irwin County Detention Center*, but this report and "inspection did not review the gynecological

procedure approval process for detainees at ICDC, which has been referred to our Office of

Investigations."  McNamara Decl. Ex. 47.

115.    To date, OIG has not released a report related to the gynecological allegations from

the Whistleblower Complaint.  McNamara Decl. Ex. 68 at NBCU002064, n. 81.

116.    Various government officials called for investigations into the allegations in the

Whistleblower Complaint.

117.    On September 14, 2020 at 7:18 PM Georgia State Representative Bob Trammell

tweeted about the Whistleblower Complaint, calling the "mass hysterectomies"

"[u]nconscionable" and stating, "[j]ust sent this letter to the Composite Medical Board and Board

of Nursing calling for immediate suspension of the licensees of the providers that are named in the

complaint, pending full investigation by these Boards."  McNamara Decl. Ex. 53.

118.    Rep. Trammel's tweet linked to a letter from him to the Georgia Composite Medical

Board and the Georgia Board of Nursing, requesting that the Boards "immediately suspend the

licenses of the providers named in the whistleblower complaint pending a full investigation by

your offices."  McNamara Decl. Ex. 54.

119.    On September 15, 2020 around 11:30 AM, Nancy Pelosi, then-Speaker of the

House, issued a statement:

> "If true, the appalling conditions described in the whistleblower complaint—including
> allegations of mass hysterectomies being performed on vulnerable immigrant women—are
> a staggering abuse of human rights.  This profoundly disturbing situation recalls some of
> the darkest moments of our nation's history, from the exploitation of Henrietta Lacks to the
> horror of the Tuskegee Syphilis Study, to the forced sterilizations of Black women that
> Fannie Lou Hamer and so many others underwent and fought.

The DHS Inspector General must immediately investigate the allegations detailed in this complaint.  Congress and the American people need to know why and under what conditions so many women, reportedly without their informed consent, were pushed to undergo this extremely invasive and life-altering procedure."

Wallace Decl. Ex. 4; *see also* McNamara Decl. Ex. 55.

120.    On September 15, 2020, Bennie G. Thompson, a House Representative from Georgia, and Chairman of the Committee on Homeland Security issued a press release.  The press release stated, in part: "The complaint alleging hysterectomies have been performed on women held in detention without consent is incredibly disturbing. . . . The Committee has been conducting an ongoing investigation regarding conditions at ICE contractor facilities and will be examining these new and incredibly serious allegations."  McNamara Decl. Ex. 56.

121.    On September 15, 2020, 173 members of Congress, co-led by Representative Pramila Jayapal, sent a letter to Joseph Cuffari, DHS Inspector General, expressing their "deep concern" after "reports of mass hysterectomies performed on detained women in [ICDC], without their full, informed consent," and calling for the OIG to "immediately open an investigation" regarding the allegations raised in the Whistleblower Complaint.  McNamara Decl. Exs. 57-58.

122.    On September 15, 2020, Jamie Raskin and Carolyn B. Maloney, Chairpersons for the Subcommittee on Civil Rights and Civil Liberties, sent a letter to Joseph Cuffari, "request[ing] an emergency investigation into the shocking allegations of medical atrocities and detainee mistreatment" at ICDC.  McNamara Decl. Ex. 59.

123.    On September 16, 2020 at 7:49 PM, Cory Booker called for an investigation by DHS OIG, stating, "I am horrified by these incredibly disturbing reports out of an ICE detention center in Georgia.  I've called on @DHSOIG to being an immediate investigation into these heinous allegations."  McNamara Decl. Ex. 60.

124.     Other public officials publicly commented on the allegations in the Whistleblower Complaint, including then-candidate for Georgia state representative, Stacey Evans.  McNamara Decl. Ex. 61.

125.     On or before September 18, 2020, ████████████████████████████████ ████████████████████████████ McNamara Decl. Ex. 62; *see also* Ex. 63.

126.     On April 6, 2023, Dr Amin ██████████████████████████████████ █████████████████████████████████████████████████████████████████ ████████████████████████████ McNamara Decl. Ex. 64.

127.     In October 2020, The Department of Justice began a criminal investigation into the allegations concerning Dr. Amin and others in the Whistleblower Complaint. McNamara Decl. Ex. 65; *see also* Ex. 68 at NBCU002053.

128.     The Department of Justice's criminal investigation into Dr. Amin remains ongoing. McNamara Decl. Ex. 3 at 163:10-21; Ex. 144.

129.     In October 2020, the House and Senate Democrats began receiving testimony from detainees and doctors concerning the Whistleblower Complaint's allegations concerning Dr. Amin. McNamara Decl. Exs. 66, 67.

130.     On October 26, 2020, Dr. Ted Anderson, the Vice Chair for Clinical Operations and Director of the Division of Gynecology at Vanderbilt University, ██████████████████ █████████████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████  McNamara  Decl.  Ex.  67  at

OSORIO_0012277.

131.  Dr. Anderson ████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████  *Id.*  at

OSORIO_0012277-78.

132.  According to the Mayo Clinic, a D&C is a procedure that removes tissue from inside the uterus.  *See* McNamara Decl. Ex. 68 at NBCU002054.

133.  In May 2021, the Department of Homeland Security directed ICE to discontinue its contract with ICDC.  McNamara Decl. Ex. 37 at AMIN_0011295, Ex. 70 at NBCU003882, Ex. 72.

134.  David Paulk, warden of ICDC, testified ██████████████████████████████

██████████████████████████████████████████████████

McNamara Decl. Ex. 7 at 33:18-34:22; 237:1-238:2.

135.  Effective October 7, 2021, ICE terminated the contract with LaSalle regarding its management of ICDC.  McNamara Decl. Ex. 47 at AMIN_0011295, Ex. 69, Ex. 70 at NBCU003882, Ex. 104 at NBCU003861, Ex. 73.

136.     In May 2021, the United States Senate Permanent Subcommittee on Investigations, of the Committee on Homeland Security and Government Affairs (the "Subcommittee"), initiated a bipartisan investigation into the alleged mistreatment of ICE detainees housed in the ICDC, including the allegations concerning Dr. Amin's medical care of detainees (the "Senate Investigation"). McNamara Decl. Ex. 68 at NBCU002052, Ex. 73.

137.     The staff for the Subcommittee "tried on multiple occasions to obtain voluntary testimony from Dr. Amin regarding his treatment of female ICE detainees at ICDC.  Dr. Amin declined the Subcommittee's requests for a voluntary interview."  McNamara Decl. Exs. 74, 75, 78.

138.     On February 7, 2022, the Subcommittee served Dr. Amin with a subpoena for deposition.  Through his attorney, Dr. Amin submitted an affidavit stating that he declined to provide testimony pursuant to his Fifth Amendment privilege against self-incrimination. *Id.* Ex. 68 at NBCU002053, Exs. 76-78, Exs. 145-47.

**MSNBC News Reports at Issue in This Action**

139.     This FAC challenges statements made on *Deadline*, *All In*, and *TRMS*.  *See supra* ¶ 1.

140.     None of Dr. Amin's employees deposed in this action testified that they saw the MSNBC News Reports.

141.     No social media posts that Dr. Amin produced in this action as evidence of his damages reference the MSNBC News Reports.

### *Deadline* – September 15, 2020

142.     The FAC originally challenged eleven statements from a segment of the September 15, 2020 episode of *Deadline* that began at around 5:30 PM ET (the "*Deadline* News Report"),

*see* FAC ¶¶ 75-76, but three were dismissed pursuant to the Rule 12(c) Decision, *see* Rule 12(c) Order at 57-58; McNamara Decl. Ex. 1 (Statement Nos. 3, 5, 9).  The remaining eight Challenged Statements from the *Deadline* News Report are italicized below in Paragraphs 144-161.

143.    The *Deadline* News Report lasted about seven minutes and largely consisted of an interview by Nicolle Wallace (the host of *Deadline*) with Ainsley discussing the published NBC News Article.  Wallace Decl. Ex. 7 at 1:30:23.

144.    The *Deadline* News Report opens with Wallace reporting that "we are following breaking news today.  It's about an alarming new whistleblower complaint" that alleges *high numbers of female detainees*, *detained immigrants, at an ICE detention center in Georgia received questionable hysterectomies while in ICE custody*."  Wallace Decl. Ex. 8 at NBCU004168; *Id.* Ex. 7 at 1:34:15.

145.    During the *Deadline* News Report, there is a banner that appears on screen: "Whistleblower: *High number of hysterectomies at ICE Detention Ctr."* Wallace Decl. Ex. 7 at 1:40:10.

146.    The phrase "high numbers" was a quote from the Whistleblower Complaint.  *See* McNamara Decl. Ex. 2 at NBCU001554.

147.    The phrase "questionable hysterectomies" was initially published in the AP Article and was then re-published in the NBC/AP Article and the Silva Article (which is displayed on screen).  *See* McNamara Decl. Ex. 26; Scholl Decl. Ex. 5.

148.    During the introduction by Wallace, the Whistleblower Complaint is shown on screen and a pull-out quote from the Complaint is visible:  "Ms. Wooten also stated that *detained women expressed to her that they didn't fully understand why they had to get a hysterectomy."* Wallace Decl. Ex. 7  at 1:34:45.



149.   Wallace then introduces Ainsley, stating that "NBC's Julia Ainsley has been reporting on the story and she joins us now." Wallace Decl. Ex. 8 at NBCU004168; *Id.* Ex. 7 at 1:34:57.

150.   Ainsley explains that the "new reporting" is based on "conversations with four lawyers who represented clients in the facility over the past three years." Wallace Decl. Ex. 8 at NBCU004168; Ex. 7 at 1:35:20.

151.   Ainsley then reports information published in the NBC News Article, based on conversations with lawyers for ICDC detainees, including that "women were afraid to go to this doctor," some *"said they came back bruised, they described as overly harsh" and* "called him abusive" and described the *"two cases" where women had hysterectomies.* Wallace Decl. Ex. 8 at NBCU004168; Ex. 7 at 1:35:35.

152.   Ainsley makes clear that these were "allegations" about the doctor that the lawyers told to her and Jacob. Wallace Decl. Ex. 8 at NBCU004168; Ex. 7 at 1:36:25.

153.   While Ainsley recounts this information, the NBC News logo and headline of the NBC News Article is displayed on screen. Wallace Decl. Ex. 7 at 1:36:37.



154.    The *Deadline* News Report includes an excerpt from Soboroff's interview of Wooten.  In the excerpt, Soboroff asked Wooten: "You're quoted in the complaint as saying *that's his specialty, he's the uterus collector*.  Is that how the people refer to this doctor?"  Wooten responded, "That's how the detainees referred to this person. . . . *I had a detainee that asked me, she said, what is he doing?  Collecting all of our uteruses*?"  Wallace Decl. Ex. 8 at NBCU004169; Ex. 7 at 1:36:38.

155.    Ainsley reports that she attempted to obtain comment from Dr. Amin, calling the doctor's office, but the "phone was hung up" after she identified herself as a reporter.  Wallace Decl. Ex. 8 at NBCU004168; Ex. 7 at 1:36:29.

156.    The *Deadline* News Report includes an excerpt from the Original ICE Statement, which is read and shown on screen. Wallace Decl. Ex. 7 at 1:38:11.



157.    Immediately after reporting the Original ICE Statement, Ainsley states "so they are clearly questioning Dawn Wooten here." Wallace Decl. Ex. 8 at NBCU004169; Ex. 7 at 1:38:29.

158.    Ainsley reports that ICE and "the company that runs the facility" have not responded to the allegation [contained in the NBC News Article] that lawyers "say they went to leadership, to management at this facility and said, look, you have a problem with this doctor, our clients are afraid to go back to him, he's hurting these women." Wallace Decl. Ex. 8 at NBCU004169; Ex. 7 at 1:38:40.

159.    At the end of interview, Wallace asks Ainsley to "widen the lens" and comment on the "medical care that is standard for female detainees." Wallace Decl. Ex. 8 at NBCU004168; Ex. 7 at 1:39:10.

160.    Ainsley responds that she had "been talking to lawyers who say, look, I have clients in detention who had diabetes and couldn't get their medication, yet they were told to go back for a pap smear and then go again when that seemed irregular. It seemed like they were getting way too much care from a gynecologist *and perhaps doing very unnecessary procedures and not enough of what you would need in a short term detention situation.*" Wallace Decl. Ex. 8 at NBCU004169-4170; Ex. 7 at 1:39:30.

161.    The *Deadline* News Report closes with Ainsley noting that Dr. Amin "was part of a civil settlement with the Justice Department in 2015, where he and other doctors had to pay over $500,000 and a fine for fraudulent claims to Medicaid…we're already looking at a doctor who has been, you know, alleged to have tried to inflate his claims in order to get more money."  Wallace Decl. Ex. 8 at NBCU004170; Ex. 7 at 1:40:05.

162.    The FAC does not challenge statements included in the *Deadline* News Report that are not italicized, including the reporting on his 2015 settlement with the DOJ.

**Reporting for the *Deadline* News Report**

163.    Wallace is responsible for the content of *Deadline.* Wallace Decl. ¶ 2.

164.    The *Deadline* News Report relied on the reporting done by Ainsley and Soboroff in connection with the NBC News Article, as well as the published Article.  Wallace Decl. ¶ 2.

165.    Wallace and the producers of *Deadline* had complete confidence in  Ainsley and Soboroff's reporting based on their extensive and award-winning track record of reporting on immigration issues and the editorial process and standards of the NBCU News Group.  Wallace Decl. ¶ 13, 25.

166.    Wallace and the producers of *Deadline* received other news reporting that gave credibility to the allegations in the Whistleblower Complaint, including the Law & Crime Article.  Wallace Decl. ¶ 8-9; *Id.* Ex. 1.

167.    Wallace's producers reviewed the Whistleblower Complaint and watched Soboroff's interview of Wooten.  Wallace Decl. ¶ 9, 11, 14.

168.    Wallace and her producers found Wooten to be credible.  Wallace Decl. ¶ 14.

169.   Wallace and her producers were aware that Nancy Pelosi had issued a statement on September 15, 2020, calling for an immediate investigation into the claims of "mass hysterectomies."  Wallace Decl. ¶ 15.

170.   From her years working in government, Wallace understood Pelosi's statement as an indication that the government was taking the Whistleblower Complaint seriously. Wallace Decl. ¶ 15.

171.   Prior to appearing on the *Deadline* News Report, Ainsley sent a draft of the NBC News Article to a *Deadline* producer and stated that it had been approved by Standards.  Wallace Decl. ¶ 17

172.   *Deadline* was independently communicating with Standards concerning the show's reporting, and Standards approved the show including the Initial ICE Statement.  Wallace Decl. ¶ 18.

173.   Wallace had no doubt about the accuracy of the Challenged Statements included in the *Deadline* News Report. Wallace Decl. ¶ 21-37.  Wallace made the decision to report on the allegations in the Whistleblower Complaint because they were newsworthy and not because of perceived ratings.  *Id.* ¶ 38.

174.   Ainsley had no doubt about the accuracy of the Challenged Statements she made in the *Deadline* News Report.  Ainsley Decl. ¶ 23.

175.   Soboroff had no doubt about the accuracy of the Challenged Statements from the interview he conducted with Wooten, which was shown during the *Deadline* News Report. Soboroff Decl. ¶¶ 6, 18.

**_All In_:  September 15, 2020**

176.    The FAC initially challenged fourteen statements that it stated came from a segment of the September 15, 2020 broadcast of *All In* that aired at approximately 8:30 P.M ET (the "9/15 *All In* News Report").  *See* FAC ¶¶ 78-79.

177.    Four of these statements (FAC ¶ 78(b)-(e)), however, appear only in the September 16 episode of *All In*.  *Compare* Hayes Decl. Ex. 2, *with id.* Ex. 3 at NBCU003566-3567; *compare* Ex. 1 (Statement Nos. 13-16), *with id.* (Statement Nos. 42-45).

178.    Because the Court previously dismissed the September 16 episode of *All In* from this action, including these four statements, they no longer remain in the case.  Rule 12(c) Order at 54-55.

179.    The remaining ten Challenged Statements in the 9/15 *All In* News Report are italicized below.

180.    The 9/15 *All In* News Report is about ten minutes long and opens by stating: "Yesterday, we learned about a whistleblower, a nurse working at a Georgia Immigrations and Customs Enforcement, ICE facility, leveling honestly ghastly allegations.  Chief among them that women in that facility, *migrant women, say that a doctor was performing unauthorized hysterectomies on immigrant women detained at that facility*."   Hayes Decl. Ex. 2 at NBCU000164; Ex. 1 at 31:24-31:42.

181.    During the introduction, headlines from four previously published articles relied on by *All In* appear on screen:  *The Atlanta Journal Constitution*, *The Daily Beast*, *The Cut*, and *Law360*.  Hayes Decl. Ex. 1 at 31:34; Price Decl. ¶ 8.



182.    Hayes then reports that Wooten filed a "formal complaint" with the "watchdog at the Department of Homeland Security" and that Wooten was named in the Complaint.  Hayes Decl. Ex. 2 at NBCU000164; Ex. 1 at 31:48-58.

183.    Hayes reports that the Complaint also alleges the facility "lacked protection against coronavirus for detained immigrations, and that detainees suffer from a general lack of medical care."  Hayes Decl. Ex. 2 at NBCU000164; Ex. 1 at 32:00-12.

184.    Hayes reports that "a lawyer named Benjamin Osorio representing women at that very facility, told NBC News that indeed *two of his clients received hysterectomies they believe may have been unnecessary.*"  Hayes Decl. Ex. 2 at NBCU000164; Ex. 1 at 32:12-28.

185.    When reporting the allegation from Mr. Osorio previously reported by NBC News, the portion of the NBC News Article discussing Osorio is displayed on screen.  Hayes Decl. Ex. 1 at 32:21.



186.   Hayes then reports that "we here on ALL IN spoke with another attorney who represents *two different women who claim they also had unnecessary hysterectomies while detained at this facility.  That lawyer tells us that as many as 15 immigrant women were given full or partial hysterectomies or other procedures for which no medical indication existed."*  Hayes Decl. Ex. 2 at NBCU000164; Ex. 1 at 32:29-32:50.

187.   During the 9/15 *All In* News Report, a banner appears on screen that reads:  "*Mass Hysterectomies performed on women at ICE facility.*"  Hayes Decl. Ex. 1 at 31:26.

188.   "Mass hysterectomies" was the same language used in the headline of the *Daily Beast* article displayed in the introduction to the 9/15 *All In* News Report.  Hayes Decl. Ex. 2 at 31:24-31:42.

189.   Hayes reports that *All In* reached out to ICE for comment and ICE provided a "long statement disputing these allegations and the implication that detainees are used for experimental medical procedures.  They do say an independent office will investigate these claims.  ICE also says that since 2018, only two individuals in that facility were referred to certified credential

medical professionals for hysterectomies."  Hayes Decl. Ex. 2 at NBCU000164; Ex. 1 at 32:51-33:12.

190.    While reporting ICE's response to the allegations, the 9/15 *All In* News Report shows excerpts from the second ICE statement on screen.  Hayes Decl. Ex. 1 at 32:58, 33:06.





191.    Hayes also reports that they reached out to the "private company that runs the facility" and it said that have "strict zero-tolerance policy for any kind of . . . inappropriate behavior

at their facilities, and they refute any allegations of misconduct." Hayes Decl. Ex. 2 at NBCU000164; Ex. 1 at 33:17-31. This statement in shown on screen. Hayes Decl. Ex. 1 at 33:22.



192.    Hayes then interviews Wooten and her lawyer, John Whitty concerning the Whistleblower Complaint. After Wooten describes her previous job duties at ICDC, *see* Hayes Decl. Ex. 2 at NBCU000165; Ex. 1 at 33:42-34:22, Hayes observes that "you talk about in the complaint, [] hearing from women who are detained there, talking about a specific doctor performing hysterectomies, referring [to] him as a uterus collector. Tell us about how you heard about this doctor and what women said about their experiences with them," *see* Hayes Decl. Ex. 2 at 165; Ex. 1 at 34:25-41.

193.    Wooten responds: "I had several detained women on numerous occasions that would come to me and say, Miss Wooten, I had hysterectomy, why? I had no answers as to why they had those procedures. And one lady walked up to me here in this last time around between October 19th until July 2nd and she said, what is he? *Is he the uterus collector? Does he collect uteruses?*" And I asked her, what does she mean. And she says *everybody that I've talked to has had a hysterectomy.* And you just don't know what to say. I mean, I don't have an answer for why

40

they would come to me and *they would say, is he a uterus collector*." Hayes Decl. Ex. 2 at NBCU000165; Ex. 1 at 34:43-35:40.

194.    Hayes then asks Wooten to describe the general standard of medical care at the facility.  Wooten responds that the care "wasn't timely all the time" and during COVID the sanitation at the facility was "horrible" and that COVID "protocol was not being followed."  Hayes Decl. Ex. 2 at NBCU00065-166; Ex. 1 at 35:41-37:49.

195.    Hayes asks Wooten "you were essentially demoted"… from a "full-time employee to sort of a more kind of at will swing employee" and whether it was her contention that the change was "essentially punishment for statements about the unsafe environment you felt there." Wooten confirms that "that's correct." Hayes Decl. Ex. 2 at NBCU000166; Ex. 1 at 37:50-38:18.

196.    In response to a question from Hayes, Whitty alleges that Wooten was demoted in retaliation for the build up to the internal whistleblowing over the course of months.  Whitty then states, based on the number of cases alluded to by Wooten and others, "*there's a large population of these – of these women, immigrants who've had—who have been mistreated in this way, assaulted.*"  Hayes Decl. Ex. 2 at NBCU000166-67; Ex. 1 at 38:19-40:02.

197.    The 9/15 *All In* News Report does not identify Dr. Amin by name or picture.  *See* Hayes Decl. Ex. 1.

198.    The FAC does not challenge statements included in the 9/15 *All In* News Report that are not italicized in the above Paragraphs 180-197.

**Reporting for the 9/15 *All In* Segment**

199.    Hayes is responsible for the content of *All In*.  *See* Hayes Decl. ¶ 5; McNamara Decl. Ex. 79 at 97:18-98:3, Ex. 80 at 14:13-15:9.

200.     The 9/15 *All In* News Report relied on the previously reported NBC News Article and other previously reported news articles displayed on screen during the News Report.  Hayes Decl. Ex. 1 at 31:34, 32:21; Hayes Decl. ¶ 25; Price Decl. ¶ 8.

201.     Hayes and the staff of *All In* had complete confidence in the reporting of Ainsley and Soboroff.  Hayes Decl. ¶¶ 13, 16, 29; Price Decl. ¶¶ 9, 54; McNamara Decl. Ex. 81 at 146:9-147:10.

202.     Xander Price was the segment producer for the 9/15 *All In* News Report.  Price Decl. ¶¶ 2, 5; McNamara Decl. Ex. 81 at 11:14-18.

203.     Hayes had complete confidence in and relied on the newsgathering by Price for the 9/15 *All In* News Report.  Hayes Decl. ¶ 36; McNamara Decl. Ex. 79 at 30:2-11.

204.     Price's work was overseen by at least one senior producer, the executive producer, and host of *All In*.  McNamara Decl. Ex. 79 at 101:16-102:8.

205.     Hayes and Price both read the Whistleblower Complaint in their reporting for the 9/15 *All In* News Report and found it to be a credible because it was filed with the federal government by immigration lawyers, and Wooten was willing to put her name to the allegations contained in the Complaint.  Hayes Decl. ¶¶ 8-9 ; Price Decl. ¶ 6; McNamara Decl. Ex. 79 at 38:11-39:20; 54:16-21, Ex. 81 at 77:20-79:6.

206.     Hayes referred Andrew Free to Price as a source concerning the allegations in the Whistleblower Complaint.  Price Decl. Ex. 1; *Id.* Ex. 2 at; Hayes Decl. ¶ 12 ; Price Decl. ¶ 10; McNamara Decl. Ex. 81 at 35:8-17.

207.     Hayes had used Free as a source on prior occasions and found him to be a reliable and credible source, who documented his claims.  Hayes Decl. ¶ 12; McNamara Decl. Ex. 79 at 8:5-9:3, 12:3-14:7, 26:15-28:4 (describing Free as "knowledgeable and operating in good faith").

208.    Price interviewed Free about the allegations in the Whistleblower Complaint.  *See* Price Decl. Ex. 3; Price Decl. ¶ 11; McNamara Decl. Ex. 81 at 35:8-11, Ex. 33 at 113:23-25.

209.    Free told Price, as documented in a taped recording of the interview, that "in the last 24 hours, I have heard from five different immigration lawyers with multiple clients who have either had hysterectomies for which they did not get informed consent or who have medical battery accused by this physician," that he personally represented two clients—"one of them was deported, we think in about 2016.  She had a hysterectomy" and the other one "was told that she had cancer, or at least the risk of cancer" and "was given a hysterectomy supposedly to treat her cancer."  He also said, "we've put an outreach out and we've said, hey, do you know someone or are you affected by this?  And so far since that happened early this morning, we're looking at something like 14 or 15 individuals that we've identified."  Price Decl. Ex. 3 at NBCU001812-814, NBCU001823.

210.    After the interview, Price confirmed these quotes with Free in a text message, sating: "Can we characterize what you told me by saying 'tonight we spoke with a lawyer who represents two women who had this procedure done, and tells us that as many as 15 women were given hysterectomies, and that number is growing"?  Free corrected the second statement, clarifying that at many as 15 women were given hysterectomies or other procedures.  The correct quote from Free was used in the 9/15 *All In* News Report.  Price Decl. Ex. 5.

211.    Free told Price during the interview that he "represent[s] those women with their immigration attorney, Benjamin Osorio." Price Decl. Ex. 3 at NBCU001813.

212.    Price understood that the Osorio clients referred to in the NBC News Article were different clients than the clients that Free discussed in his interview with Price.  *See* Price Decl. ¶ 26; McNamara Decl. Ex. 81 at 159:11-160:9; 161:13-164:24.

213. Prior to airing the 9/15 *All In* News Report, Free sent Price a page of a medical record for a detainee that confirmed that she was scheduled for a hysterectomy by Dr. Amin. Price Decl. Ex. 6; *Id.* ¶ 36.

214. Hayes was aware of Dr. Amin's prior DOJ Complaint and settlement concerning allegations that Dr. Amin ordered unnecessary procedures for financial gain. Hayes Decl. ¶ 41.

215. Hayes believed that Dr. Amin's 2015 settlement supported the credibility of the allegations that Dr. Amin was performing unnecessary medical procedures on the detained immigrants. Hayes Decl. ¶¶ 41, 44; McNamara Decl. Ex. 79 at 191:6-192:20.

216. Prior to airing the 9/15 *All In* News Report, Price received the Second ICE Statement and a statement from LaSalle. Hayes Decl ¶ 19; Price Decl. Exs. 7, 9.

217. Hayes's producers worked with Standards in reporting the 9/15 *All In* News Report and understood that Standards had approved of the News Report. *See* McNamara Decl. Ex. 80 at 83:4-14; 86:6-15; Price Decl. ¶¶ 32-33; Price Decl. Exs. 8-9.

218. Hayes and his producers had no doubt about the accuracy of the Challenged Statements from the 9/15 *All In* News Report. *See* Price Decl. ¶¶ 4, 34; Hayes Decl. ¶¶ 6, 16. Hayes made the decision to report on the allegations in the Whistleblower Complaint because they were newsworthy and not because of perceived ratings. Hayes Decl. ¶ 49.

### *TRMS* – September 15, 2020

219. The FAC challenges sixteen statements from a segment of the September 15, 2020 broadcast of *TRMS* that aired at 9:00 PM (the "*TRMS* News Report").

220. The FAC erroneously identified the *TRMS* News Report as airing on September 16, 2020. *See* FAC ¶ 84. Dr. Amin's counsel admitted this was an error. *See* McNamara Decl. Ex. 3 at 27:18-25.

221.    The Challenged Statements in the *TRMS* News Report are italicized below.

222.    The *TRMS* News Report opens by providing context for the allegations from the Whistleblower Complaint, discussing immigration-related controversies, including the Trump administration's "forcible systematic removal of children from their parents at the border." Maddow Decl. Ex. 6 at 00:00:43; Ex. 7 at NBCU000195.

223.    Maddow then explains that she is going to discuss  a "new development" in the immigration story: A "nurse who works at an ICE detention facility in Georgia has just contributed to a whistleblower complaint . . . She says that *immigrant women at that facility have told her they have routinely been sent to a gynecologist who has performed unnecessary procedures on them, including hysterectomies.*" Maddow Decl. Ex. 7 at NBCU000198; Ex. 6 at 00:07:000:07:40.

224.    Maddow "underscores" that the "allegation here" is that a federal facility has "*been sending immigrant women in their care, in their custody to a doctor who has removed their reproductive organs for no medical reason and without them consenting to it.*" Maddow Decl. Ex. 7 at NBCU000198; Ex. 6 at 00:07:44.

225.    Maddow then reads "some of the passages from the complaint, which was written on behalf of that nurse as well as some of the women detainees" and submitted by an "advocacy group called Project South." Maddow Decl. Ex. 7 at NBCU000198; Ex. 6 at 00:08:00.

226.    Maddow then quotes the statement of a detainee contained in the Whistleblower Complaint that she talked to  "*five different women who had a hysterectomy done.*"  "When she talked to them about the surgery, the women quote, reacted confused when explaining why they had one done."  The detainee said "*I thought this was, like, an experimental concentration camp it was like they're experimenting with our bodies.*"  "The nurse who contributed to the Whistleblower Complaint explains it like this, quote: '*Everybody this doctor sees has a hysterectomy, just about*

*everybody. He's even taken out the wrong ovary on one detained immigrant woman.'"* The *TRMS* News Report reports the details of the allegation in the Whistleblower Complaint that the wrong ovary was taken out. Maddow Decl. at NBCU000198-199; Ex. 6 at 00:08:15.

227.   Maddow continues to quote from the Whistleblower Complaint, reporting that the nurse said "goodness, *he's taking everybody's stuff out, that his specialty, he's the uterus collector.*" "Is *he collecting these things or something? Everybody he sees he's taking all their uteruses out or he's taking their tubes out, what in the world?"* Maddow Decl. Ex. 7 at NBCU000198-199;  Ex. 6 at 00:09:22.

228.   Maddow then reports that "according to this nurse, this whistle-blower, she alleges in this complaint" that "women told her this doctor performed hysterectomies, '*removed the uterus of these refugee women for no medical reason without their proper informed consent.'"*  Maddow Decl.. Ex. 7 at NBCU000199; Ex. 6 at 00:09:41.

229.   Maddow then plays an excerpt of Soboroff's interview of Wooten, including when Wooten acknowledges that she "was demoted" and alleges that this was because she "spoke out," and when she confirms that the gynecologist was called the "uterus collector."  Maddow Decl. Ex. 7 at NBCU000199-200; Ex. 6 at 00:12:50.

230.   After the excerpt from the Soboroff/Wooten interview, Maddow observes, "I should tell you that these allegations from this whistle-blower are not isolated complaints.  NBC News has spoken to four different lawyers who represent women who were detained in that federal facility in Georgia who are making similar claims."  Maddow Decl. Ex. 7 at NBCU000200; Ex. 6 at 00:14:12.

231.   She continues, "according to NBC's reporting, one of the lawyers represents *two women who were detained at the facility who say they received hysterectomies that they believe*

*may have been unnecessary.*" "Another lawyer represents a woman who says *she went to this doctor's office for an exam. The exam left her with bruising.*" Maddow Decl. Ex. 7 at NBCU000200; Ex. 6 at 00:14:26.

232.    The *TRMS* News Report reads and displays on-screen the statement received from Dr. Amin's counsel that Dr. Amin "vigorously denies these allegations and will be cleared of any wrongdoing when the facts come out." Maddow Decl. Ex. 7 at NBCU000201; Ex. 6 at 00:14:45.



233.    Maddow reports that ICE "refused to comment on the allegations from those lawyers who spoke to NBC News. But they have released a statement tonight in response to the allegations the Whistleblower Complaint." Maddow Decl. Ex. 7 at NBCU000201; Ex. 6 at 00:14:54.

234.    Maddow then states that she is quoting "in part" from the Second ICE Statement, including that "according to ICE data, since 2018, only two individuals at Irwin County Detention Center were referred to certified credentialed medical professionals . . . for hysterectomies." These portions of the Second ICE Statement are displayed on screen. Maddow Decl. Ex. 7 at NBCU000201; Ex. 6 at 00:15:26.





235.    Maddow then interviews Soboroff who explains that "for us, it was important to corroborate the claims in this whistleblower complaint, I wanted to speak to Ms. Wooten myself, which obviously I did, but also to corroborate the allegations of the migrants who were detailed in the whistleblower complaint." Maddow Decl. Ex. 7 at NBCU000202; Ex. 6 at 00:16:42.

236.    Soboroff reports, "Julia and I spoke with four lawyers today, and every one of them has said that they had a client who had contact with this doctor where they were told one thing and ultimately they . . . came out of this either having a procedure or being recommended to have a procedure that was deeply invasive and, of course, at least in two of those cases, the hysterectomies took place.  And one of those lawyers even told us they went to the detention facility, complained

about the treatment from this doctor, but no change was ever made." Maddow Decl. Ex. 7 at NBCU000202; Ex. 6 at 00:16:57.

237.    Maddow asks Soboroff, "to be clear, *the complaints here from these women and their lawyers who are speaking on their behalf is essentially that they – not that they never should have been sent out to see a gynecologist, but rather, whatever was going on with them, they did not understand that the treatment was going to be a hysterectomy and then in some cases the allegation here is that the hysterectomies, whether or not the women consented to them in the first place, they were not medically necessary.*"   Maddow Decl. Ex. 7 at NBCU000202; Ex. 6 at 00:17:30.

238.    Soboroff responds, "No, that's right.  *And there are other allegations of other procedures including pap smears where women are told you've got ovarian cysts or cancer, and that turned out not to be the case and those procedures happened anyway."* Maddow Decl. Ex. 7 at NBCU000202; Ex. 6 at 00:17:58.

239.    Soboroff then reads a comment from LaSalle "strongly refut[ing] these allegations," which is also displayed on screen.  Maddow Decl. Ex. 7 at NBCU000202; Ex. 6 at 00:18:16.



240.    Soboroff states that LaSalle's statement "goes against what we heard from at least one of the attorneys today, which was when these allegations came up from their clients, she went to the correctional facility, she told them she didn't want her patient seeing that doctor and patients continued to see that doctor as Ms. Wooten details very graphically.  And I think, you know, this statement that *they considered him the uterus collector* is graphic, it's hard to listen to, but that's what they're talking about, according to Ms. Wooten, inside this facility, and she's not the only one saying so."  Maddow Decl. Ex. 7 at NBCU000203; Ex. 6 at 00:18:50.

241.    Maddow then states that "ICE is saying that this will be investigated" and she asks Soboroff what he expects to be the next steps in the investigation.  Maddow Decl. Ex. 7 at NBCU000203; Ex. 6 at 00:19:36.

242.    Soboroff reports that "the Office of the Inspector General, at the Department of Homeland Security will open an investigation.  The Office of Civil Rights and Civil Liberties within the Department of Homeland Security will look at this as well."  Maddow Decl. Ex. 7 at NBCU000203; Ex. 6 at 00:19:57.

243.    Soboroff next reports that "one of the lawyers said to me, which I really want to underscore here, is that while she didn't think that this is a conspiracy, a large conspiracy by the government necessarily to have these procedures on these women, it is emblematic of systematic lack of oversight for medical care and also just well-being and welfare of immigrants in immigration detention…"  Maddow Decl. Ex. 7 at NBCU000203;  Ex. 6 at 00:20:18

244.    Soboroff closes by noting that the "Department of Homeland Security will be forced to investigate this, and we have heard the top officials in Congress, on the Hill, also called for investigations as well and so now that has to play its course." Maddow Decl. Ex. 7 at NBCU000204; Ex. 6  at 00:22:08.

245.    The FAC does not challenge statements in the *TRMS* News Report that are not italicized in the above Paragraphs 233-244.

**Reporting for the *TRMS* News Report**

246.    Maddow is responsible for the content of *TRMS*. Maddow Decl. ¶ 2.

247.    The *TRMS* News Report relied on the previously published NBC News Article and the reporting done by Ainsley and Soboroff in connection with the NBC News Article.  Maddow Decl. ¶ 6; McNamara Decl. Ex. 82 75:8-76:14, Ex. 83 at 22:1-11, 25:21-26:16.

248.    Maddow and the *TRMS* staff had complete confidence in Ainsley and Soboroff's . reporting based on their extensive and award-winning track record of reporting on immigration issues and the editorial process and standards of the NBCU News Group. Maddow Decl. ¶¶ 8, 15, 21-43; McNamara Decl. Ex. 83 at 51:20-52:9, 60:9-61:6.

249.    *TRMS* relied on other reporting in further support of the *TRMS* News Report. Maddow Decl. ¶¶ 21, 25; McNamara Decl. Ex. 82 at 54:23-56:4, 75:8-76:14, Ex. 83 at 22:1-11.

250.    On September 14, 2020, a legal analyst from *TRMS* contacted Project South and received a copy of the Whistleblower Complaint.  McNamara Decl. Ex. 84.

251.    Maddow and the *TRMS* staff reviewed the Whistleblower Complaint and Soboroff's interview of Wooten and  independently found the Whistleblower Complaint and Wooten to be credible.  Maddow Decl. ¶¶ 7, 12; Maddow Decl. Ex. 3; McNamara Decl. Ex. 83 at 170:2-171:2.

252.    *TRMS* was independently communicating with Standards concerning the show's coverage of the Whistleblower Complaint and the NBC News Article, and Standards approved the reporting.  Maddow Decl. ¶¶ 14, 15, 16; Maddow Decl. Ex. 4.

253.     Maddow had no doubt about the accuracy of the Challenged Statements included in the *TRMS* News Report. Maddow Decl. ¶¶ 6, 20-43.  Maddow made the decision to report on the allegations in the Whistleblower Complaint because they were newsworthy and not because of perceived ratings.  *Id.* ¶ 48.

254.     Maddow believed the NBC News Article and the *TRMS* News Report to be accurate reporting.  Maddow Decl. ¶¶ 6, 20.

255.     Soboroff had no doubt about the accuracy of the Challenged Statement from his live interview with Maddow.  Soboroff Decl. ¶ 13.

### *All In* – September 16, 2020

256.     The FAC initially challenged six statements from the September 16, 2020 episode of *All In*, *see* FAC ¶¶ 81-82, but all claims from that news report were dismissed, *see* Rule 12(c) Order at 54-55.

257.     The *All In* producers continued to investigate the Whistleblower Complaint allegations on September 16.  Following the September 15 *All In* News Report, Free sent Price a Signal message with a page from an ICDC detainee's psychiatric records.  The record read: "Pt had surgery and is post-op day number 5.  She is 'bothered' by the fact that she went into surgery expecting a D&C and ended up having a salpingectomy x 1."  On the evening of September 15, Free told Price that the story was embargoed until further notice, the next day, he told Price that the story was no longer embargoed and he was "In touch w Chris on it."  *See* Price Decl. Ex. 10.

258.     Price had a phone call with attorney, Benjamin Osorio, to discuss an interview that his client, "B" was planning to do with Hayes that evening.  *See* Price Decl. Ex. 11.

259.     "B" was a patient of Dr. Amin's, and he performed a total abdominal hysterectomy on her.  *See* McNamara Decl. Ex. 85.

260.     Free sent Price a tape of his own discussion with "B."  During that call, Free asked, regarding "B's" hysterectomy: "Did you feel like you had enough information to make an informed decision about whether you want that to happen[?]"   "B" responded "No."   "B" also said that she had bruises around her legs following a gynecological surgery she received prior to the hysterectomy.  Price Decl. Ex. 12 at NBCU001774.

261.     Osorio sent Price two documents containing portions of "B's" medical records.  *See* Price Decl. Ex. 13.

262.     The medical records showed that "B" received a "total abdominal hysterectomy" from Dr. Amin.  *See Id.* at NBCU000615.

263.     Price called an OB-GYN, Dr. Joia Crear-Perry, to discuss the medical records. Price read from the medical records to Dr. Crear-Perry.  Dr. Crear-Perry stated on that call that, based on what Price told her, "if [B] was not aware that she had other options beside a hysterectomy for the treatment of – if she was told she was being treated for her – for her carcinoma in situ and ovarian cysts with a hysterectomy, that's not the standard – you have other options beside a hysterectomy to evaluate that."  She said that "B" should have been referred to a cancer center, which might "have done something else.  They could have done what's called a cone biopsy, which just removes the part that's bad to see how far it's gone.  Now that she's had the whole thing removed, sometimes you have to go back in and like remove other organs" and "B" "might have to have multiple surgeries."  *See* Price Decl. Ex. 14 at NBCU001896-897.

264.     *All In* did not preview any questions or topics with "B" before the interview. McNamara Decl. Ex. 122 at 22:2-23:16.

265.     Luciana Lopez, a segment producer for *All In*, emailed Dr. Amin's attorney, Scott Grubman, requesting a statement from him about the Whistleblower Complaint.  After Grubman

responded with a statement, Lopez requested to speak with Dr. Amin directly.  Grubman never responded to this request.  McNamara Decl. Ex. 86.

266.    On September 16, 2020, Hayes, Price, and other producers of *All In* spoke with Chris Scholl of Standards (the "Sept. 16 Standards Call").  *See* Price Decl. Ex. 15; Price Decl. ¶¶ 49-50; Hayes Decl. ¶ 37; McNamara Decl. Ex. 80 at 113:20-116:18.

267.    During the Sept. 16 Standards Call, Scholl said that the NBC News Article was "reportable" and *All In* should "stick with" the reporting as published by Ainsley and Soboroff in the NBC News Article.  Scholl explained that it was fine for *All In* to interview a detainee and not to name her, but the show should "explain why" it was doing so and explain to viewers why the show was covering the story now.  Price Decl. Ex. 15 at NBCU002340-2341, NBCU002351.

268.    Scholl initially questioned the relevance of Dr. Amin's 2015 settlement with the DOJ in the Sept. 16 Standards Call, but later recognized that it was relevant and supported the credibility of the Whistleblower allegations.  Price Decl. at -NBCU002341; Scholl Ex. 11; Scholl Decl. ¶ 28.

269.    Consistent with Scholl's recommendation in the Sept. 16 Standards Call, the 9/15 *All In* News Report had relied on reporting from the NBC News Article.  *See supra* ¶ 185.

270.    Consistent with Scholl's recommendation in the Sept. 16 Standards Call, the 9/15 *All In* News Report had informed viewers that Wooten was "demoted" from her full time position at ICDC and claimed that this was "essentially punishment" for her statements.  *See* ¶ 195, *supra*.

271.    Consistent with Scholl's recommendation in the Sept. 16 Standards Call, the *All In* news report on September 16 made clear why it was reporting on the story now and why it was obscuring the identity of "B."  Hayes Decl. Ex. 3 at NBCU003566-3567.

272.     On September 16, 2020, *All In* aired portions of Hayes's interview with "B," and interviewed Congresswoman Sheila Jackson Lee, who claimed that she helped halt the deportation of an ICDC detainee.  *Id.*

### *All In* – September 17, 2020

273.     The FAC initially challenged five statements from the September 17, 2020 broadcast of *All In* (the "9/17 *All In* News Report"), *see* McNamara Decl. Ex. 1 (Statement Nos. 48-52), but three were dismissed in the Court's Rule 12(c) Order, *see* Order at 58.

274.     The remaining Challenged Statements from the 9/17 *All In* News Report are italicized below.

275.     The 9/17 *All In* News Report, lasting just under 4 minutes, opens with Hayes stating: "*We've been bringing you the story of allegations of medical procedures performed on immigrant women without consent at an ICE detention facility in Georgia.*" Hayes Decl. Ex. 5 at NBCU000185; Ex. 4 at 00:34:50.

276.     A banner displayed during the 9/17 *All In* News Report reads: "*Investigation ordered into claims of unneeded medical procedures on immigrant women.*"  Hayes Decl. Ex. 4.



277.    When this banner is displayed, the 9/17 *All In* News Report displays on screen a headline from a *New York Times* article.  *Id.*

278.    The 9/17 *All In* News Report then includes additional portions of Hayes's interview with "B" and discusses Dr. Amin's DOJ Complaint, including that it was "filed by two whistleblowers" and "alleged" that "many" pregnant women "were given unnecessary medical procedures to get more money out of Medicare and Medicaid through reimbursement."   Hayes Decl. Ex. 5 at NBCU000186; Ex. 34 at 00:35:23.

279.    *All In* producers again contacted Dr. Amin's attorney and obtained comment from him concerning the DOJ complaint, and the comment was included in the 9/17 *All In* News Report. *See Id.*; McNamara Decl. Ex. 87.

280.    The FAC does not challenge the statements in the 9/17 *All In* News Report concerning the DOJ Complaint.

281.    Hayes's producers worked with Standards in reporting the 9/17 *All In* News Report and understood that Standards had approved of the News Report.  Hayes Decl. ¶ 41; Scholl Decl. Ex. 11.

282.    Hayes and his producers had no doubt about the accuracy of the Challenged Statements from the 9/17 *All In* News Report. Hayes Decl. ¶¶ 44, 46, 48.

## Media Continued to Report on the Whistleblower Allegations and Concerns with Dr. Amin's Care of ICDC Detainees

283.    Between September 15 and September 17, 2020 (the same dates as the MSNBC News Reports), other news organizations also reported on the Whistleblower Complaint's allegations.

284.    On September 15, 2020 at 11:18 PM ET, the *Washington Post* published an article, "Pelosi Demands Probe After ICE Nurse Raises Alarm Over Medical Care, Hysterectomies at Detention Center."  McNamara Decl. Ex. 88 (the "Washington Post Article").

285.    The Washington Post Article referenced an interview with Priyanka Bhatt, a staff attorney at Project South.  It noted that Bhatt "acknowledged to The Washington Post that she did not speak to any women who had a forced sterilization, and said she included the allegations in the report with the intention of triggering an investigation into whether or not the claims were true." It goes on to quote Bhatt: "'I didn't speak to anyone who had one,' Bhatt said.  'But the things we have heard are concerning, and we need to find out more information.'"  *Id.*  at NBCU001508.

286.    In the Washington Post Article, Bhatt did not say that Wooten had never spoken to detainees who had hysterectomies.  *Id.*

287.    Other reporting on these days included:

   a.   A September 15, 2020 article in *Douglas Now*, "Complaint Against Irwin County Detention Center Alleges Poor COVID-19 Protocols, Non-Consensual Hysterectomies."  McNamara Decl. Ex. 89.

   b.   A September 15, 2020 article in *Fox News*, "Georgia Prison with ICE Detainees Performs Questionable Hysterectomies, Shreds Coronavirus Records: Nurse." McNamara Decl. Ex. 90.

   c.   A September 15, 2020 article in *Fox News Atlanta*, "Federal Complaint: Questionable Hysterectomies, Lack of Covid Test at Ga. Immigrant Detention Center."  McNamara Decl. Ex. 91.

   d.   A September 15, 2020 article in *Elle Magazine*, "ICE Whistleblower Says a 'Uterus Collector' Is Reportedly Performing Hysterectomies on Immigrant Women."  McNamara Decl. Ex. 92.

   e.   A September 16, 2020 article in *CNN*, "Whistleblower Alleges High Rate of Hysterectomies and Medical Neglect at ICE Facility." McNamara Decl. Ex. 93.

f.  A September 16, 2020 article in *The Wall Street Journal*, "U.S. Opens Investigation Into Claims of Forced Hysterectomies on Detained Migrants." McNamara Decl. Ex. 94.

g.  A September 16, 2020 article in *The New York Times*, "Inquiry Ordered into Claims Immigrants Had Unwanted Gynecology Procedures," on September 16, 2020 at 6:48 AM.  McNamara Decl. Ex. 95.

h.  A September 17, 2020 article in *The Hindustan Times*, "Outrage, Calls for Probe as US Nurse Raises Alarm Over Mass Hysterectomies."  McNamara Decl. Ex. 96.

288.    The reporting listed in Paragraph 287 is not an exhaustive account of all reporting on the allegations in the Whistleblower Complaint between September 15 and 17, 2020.

289.    On September 29, 2020, *The New York Times* published an article, "Immigrants Say They Were Pressured into Unneeded Surgeries."  This *New York Times* article reported that it interviewed sixteen women who were treated by Dr. Amin, gynecologists reviewed records from ICDC detainees, and found that Dr. Amin "seemed to consistently recommend surgical interventions, even when it did not seem medically necessary."  McNamara Decl. Ex. 95.

290.    On October 5, 2020, the *Atlanta Journal Constitution* published an article, "At ICE detention center, red flag raised about gynecologist."  This article reported, "[d]ozens" of detainees told Congress and lawyers that Dr. Amin "examined them so roughly they returned to jail bruised or bleeding."  McNamara Decl. Ex. 97.

291.    On October 7, 2020, *Roll Call* published an article, "5 Hysterectomies Referred from ICE Center, DHS Tells Congress."  It reported that, according to DHS submissions to Congress, a total of five individuals from ICDC had been referred for hysterectomies.  McNamara Decl. Ex. 98.

292.    On October 23, 2020, the *Los Angeles Times* published an article, 19 Women Allege Medical Abuse in Georgia Immigration Detention."  It alleged that "at least 19 women"

claimed that Dr. Amin performed or pressured them to undergo "overly aggressive" or "medically unnecessary" surgeries without their consent.  The article relied on a report written by nine board-certified OB-GYNs, who reviewed more than 3,200 pages of medical records for these women.  McNamara Decl. Ex. 99.

293.    On June 5, 2021, the *Atlanta Journal Constitution* published an article "At Georgia Immigration Jail, Warnings About Women's Medical Care Went Unheeded," which reported that Dr. Amin billed ICE for "at least eight hysterectomies between 2017 and 2020" but two of those procedures were cancelled.  McNamara Decl. Ex. 100.

294.    There were also multiple subsequent articles in Georgia local news outlets concerning the allegations in the Whistleblower Complaint, including:

    a.   A September 23, 2020 article in *The Ocilla Star*, "Demonstrators Hold Rally outside of Irwin Detention Center Whistleblower Complaint Leads to Protest in Ocilla." McNamara Decl. Ex. 101.

    b.   A September 30, 2020 article in *The Ocilla Star*, "Irwin County Hospital Issues Statement on Irwin County Detention Center Allegations."  McNamara Decl. Ex. 102.

    c.   A November 16, 2022 article in *Douglas Now*, "Migrant Women Endured Medical Mistreatment at Georgia ICE Facility, U.S. Senate Report Finds," on November 16, 2022.  McNamara Decl. Ex. 103.

    d.   A November 23, 2022 article in *The Ocilla Star*, "Revelations Against Dr. Amin, ICDC Come to Light In Senate Report."  McNamara Decl. Ex. 104.

295.    The reporting identified in Paragraphs 285-294 is not an exhaustive account of all reporting on the Whistleblower Complaint between September 17, 2020 and the present.

296.    Dr. Amin has not sued any of the news organizations identified in Paragraphs 285-294 concerning these news reports.

**<u>Putative Class Action Lawsuit Filed Against Dr. Amin</u>**

297.    On November 9, 2020, Yanira Yesenia Oldaker, a former ICDC detainee, filed a Petition for Writ of Habeas Corpus and Temporary Restraining Order against Kenneth Cuccinelli, and others.  *See* Oldaker Decl. 7:20-cv-00224-WLS (Dkts. 1-2).

298.    On December 21, 2020, an amended Petition for Writ of Habeas Corpus and Emergency Motion for Temporary Restraining Order was filed by Oldaker, Tatyana Alekseyevna Solodkova, Luz Adriana Walker, Lourdes Terrazas Silas, Jaromy Jazmin Floriano Navarro, Mbeti Victoria Ndonga, Keynin, Jacquelin Reyes Ramirez, Ana Gabriela Adan Cajigal, and Jane Does #5, 8, 15, and 22, on behalf of themselves and other similarly situated.  7:20-cv-00224-WLS  (Dkt. 54, 56 (the "Consolidated Complaint" or "Putative Class Complaint")).

299.    The Consolidated Complaint named several defendants, including Dr. Amin.  *Id.*

300.    The Consolidated Complaint included counts for medical battery and medical malpractice against Dr. Amin.  *Id.*

301.    On December 1, 2022, *Oldaker* petitioners filed a second amended Consolidated Petition for Writ of Habeas Corpus—which is now the operative complaint in the *Oldaker* action (the "*Oldaker* Complaint").  7:20-cv-00224-WLS (Dkt. 210); McNamara Decl. Ex. 105.

302.    The *Oldaker* Complaint alleges, among other things:

    a.  "Plaintiffs were victims of non-consensual, medically unindicated and/or invasive gynecological procedures, including but not limited to unnecessary surgical procedures under general anesthesia, performed by and/or at the direction of Defendant Amin." *Id.* ¶ 62

    b.  Dr. Amin performed a transvaginal ultrasound on Ms. Oldaker.  "A survivor of extreme sexual violence, Ms. Oldaker described it as feeling like she was 'being raped again.'"  *Id.* ¶ 145.

    c.  Dr. Amin "performed gynecological procedures . . . without obtaining consent for those procedures." *Id.* ¶ 843.

303.    Discovery in *Oldaker* remains stayed until at least January 29, 2024, as government defendants have informed the Court that a "criminal investigation remains ongoing" concerning the allegations in the lawsuit and the Court has found the "Federal Defendants' reasons for requesting an extension of the stay are compelling:  the claims in this case and the ongoing criminal investigation concern the same alleged violations" [ECF No. 179 at 2].   *See* McNamara Decl. Ex. 144.

304.    In his deposition, Dr. Amin testified ████████████████████████████████ ██████   McNamara Decl. Ex. 3 at 42:2-45:9; 171:19-175:1.

**<u>Dr. Amin Demands Retraction of Some of the MSNBC News Reports</u>**

305.    In a letter dated August 26, 2021 (eleven months after the MSNBC News Reports were aired) counsel for Dr. Amin demanded that MSNBC "retract the broadcasts," including specific statements from "Deadline" that aired on or about September 15, 2021 [sic], "All In with Chris Hayes that aired on or about September 15, 2021" [sic], "All In with Chris Hayes that aired on or about September 16, 2021" [sic], and "The Rachel Maddow Show [that] aired on or about September 16, 2021" [sic] ("Plaintiff's Claim Letter").  McNamara Decl. Ex. 108.

306.    The references to "2021" in Plaintiff's Claim Letter were intended to be "2020."

307.    Plaintiff's Claim Letter was sent pursuant to O.C.G.A. § 51-5-11 and states that it constitutes "written notice" that the statements identified in the Letter are "false, defamatory, and libelous and/or slanderous per se and furthermore, constitute defamation by implication."  *Id.*

308.    Plaintiff's Claim Letter closed by stating that "if MSNBC fails to meet the demands of this letter on or before September 7, 2021, Dr. Amin is prepared to pursue all available legal remedies." *Id.*

309.    Plaintiff's Claim Letter did not include any demand or claims arising out of  the 9/17 *All In* News Report.  *Id.*

310.   Plaintiff's Claim Letter was the first notice that NBCU received that Dr. Amin challenged the specific statements identified, demanded the MSNBC News Reports be retracted, or contemplated litigation.  Wallace Decl. ¶ 40; Maddow Decl. ¶ 50; Hayes Decl. ¶ 52.

311.   NBCU did not retract the news reports enumerated in Plaintiff's Claim Letter.

312.   During his deposition, when asked if he knew the names of the programs over which he was suing, Dr. Amin testified:  "I think one is Rachel Maddow or something" and "I Think Chris, I don't know his last name."  McNamara Decl. Ex. 3 at 22:2-25.

313.   During his deposition, Dr. Amin testified that he had never heard of *Deadline*, did not know the host of *Deadline*, and did not know when *Deadline* airs.  *Id.* at 23:10-18.

314.   During his deposition, when asked if he "ever watched the videos of the[] programs that [he is] challenging in this action," Dr. Amin testified: "Some, not much."  *Id.*  at 29:3-7.

**The Present Action**

315.   Dr. Amin filed his initial complaint in this action on September 9, 2021.  *See* Dkt. 1.  After NBCU moved for judgment on the pleadings, Dr. Amin filed the FAC, which is the operative complaint in this action.  *See* Dkt. 49.

316.   The FAC challenged fifty-two statements from the September 15-17 episodes of *All In*, the September 15 episode of *TRMS*, and the September 15 episode of *Deadline*.  McNamara Decl. Ex. 1.

317.   Following another Rule 12(c) motion from NBCU, the Court dismissed sixteen of the Challenged Statements.  This includes all of the Challenged Statements from the September 16 episode of *All In*, and select statements from the *Deadline* News Report and the 9/17 *All In* News Report.  McNamara Decl. Ex. 1.

318.    The FAC also alleges that "MSNBC and its reporters repeated their false and defamatory statements of and concerning Dr. Amin on Twitter on at least three occasions on September 16, 2020 and September 22, 2020." FAC ¶ 89.

319.    On March 18, 2022, NBCU served its first set of Interrogatories to Dr. Amin. Interrogatory No. 1 requested, "With regard to the News Report (or any other publication at issue in the Complaint), identify each statement of fact that You claim is false and defamatory of You." *See* McNamara Decl. Ex. 109.

320.    On April 18, 2022, Dr. Amin responded that "Plaintiff states that he will produce the tweets set forth in Paragraph 81 of the Complaint [now Paragraph 89 of the FAC].  Those tweets are false and defamatory, and Plaintiff seeks damages for same." McNamara Decl. Ex. 110.

321.    Dr. Amin did not produce any Tweets to substantiate this claim during discovery.

**Discovery Concerning Informed Consent**

322.    Dr. Amin produced medical records from his treatment of ICDC detainees in this action.  The medical records that Dr. Amin produced show t█████████████████████████████████████████████████████████████████████████████████████████████████████████ *See* McNamara Decl. Exs 111-15.

323.    Dr.  Amin  admits ████████████████████████████████████████████████████████████████████████████████████████████████ McNamara Decl. Ex. 3 at 66:7-84:12.

324.    Medical records that Dr. Amin produced in this action ██████████████████████████████████████████████████████████████████████████████████████████████████████████████ *See* McNamara Decl. Ex. 113 at AMIN_007969-70, Ex. 114 at AMIN_002204-06.

325.    Maria Nito, Dr. Amin's surgical coordinator, was ███████████████

███████████████████████████████████████████ *See* McNamara

Decl. Ex. 111 at AMIN_007071-72, Ex. 112 at AMIN_004473-74, Ex. 113 at AMIN_007969-70,

Ex. 114 at  AMIN_002204-06.

326.    Nito did not go to the hospital as part of her job.  McNamara Decl. Ex. 19 at 29:21-

23; Ex. 3 at  50:9-23; 52:7-10.

327.    Nito  also  ████████████████████  During  her  deposition,  she

testified ███████████████████████████████

██████████████████████████████████████

███████████████████. McNamara Decl. Ex. 19 at 103:6-104:14; Ex. 3 at

59:12-23.

328.    Nito  testified ██████████████████████████

██████. McNamara Decl. Ex. 19 at 104:15-19.

329.    Nito ███████████████████████████████

██████  McNamara Decl. Ex. 19 at 104:15-24; Ex. 3 at 59:12-23.

330.    ██████████████████████████████████

█████████████████████████████ *See* McNamara Decl. Ex.

111 at AMIN_007071-72, Ex. 19 at 104:25-105:3.

331.    Dr. Amin's informed consent forms were only kept in English.  McNamara Decl.

Ex. 19 at 106:20-25; Ex. 3 at 58:20-61:11.

332.    Dr. Ted Anderson ██████████████████████████

██████████████████████ testified in this action ██████████████

███████████████████████████████████████████████████████

McNamara Decl. at 31:13-23

### ICDC Detainees Testified That They Did Not Understand the Procedures Dr. Amin Performed On Them, And That the Procedures Were Painful, Unconsented-to, and Unnecessary

333.   One former ICDC detainee, LW, testified ████████████████████

███████████████████████████████████████████████████████

McNamara Decl. Ex. 117 at 58:3-12; *see also id* at 64:1-9 ██████████████████

████████████████████████████████

334.   LW testified ████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████████████ *Id.*

at 66:5-19; 66:20-67:4

335.   LW testified that █████████████████████████████████

████████████   *Id.* at 54:14-16; 55:7-25.  She further testified that ████████████

██████████████████████   *Id.*

336.   LW testified that ████████████████████████████████

███████████████████████████████████. *Id.* at 137:9-15.

337.   When asked, LW testified that ███████████████████████████

████████████████████████████   *Id.* at 175:6-13

338.   Another former ICDC detainee, MCR, testified █████████████████

███████████████████████████████████████████████████████

██████████   McNamara Decl. Ex. 118 at 72:5-10.  She testified that ████████████████

██████████████████   *Id.* at 75:20-25; 81:7-10.  She testified that ██████████████

██████████████████████████████████ *Id.* at 97:3-5.  She was told

s█████████████████████ *Id.* at 98:10-12.  She now believes ████████████

████████████████████████████████ *Id.* at 100:17-23

   339.   MCR  testified  that  ████████████████████████

█████████████████████████████████████ *Id.* at 69:7-13.

She also testified that ██████████████████ *id.* at 76:14-20; 188:2-9, and █████

████████████████████ *id.* at 188:23-189:9.

   340.   Another  former  ICDC  detainee,  KJRR,  testified  that  ████████████

████████████████████████ McNamara Decl. Ex. 119 at 18:24-19:5.

She testified that ██████████████████████████████

███████████████████████████████████ *Id..* at

29:8-21.  She testified that ██████████████ *Id.*  She testified ██████████████

██████████████████████████████████ *Id.* at

32:6-12.  She testified that ██████████████████████████

████████████████████ *Id.* at 32:13-21.

   341.   KJRR described ██████████████████ *Id.* at 31:21-25; 42:19-

43:7

   342.   KJRR also described ███████████████ *Id.* at 41:1-5.  She testified

that, ██████████████████████████████

██████████████████. *Id.* at 41:9-24.  She testified that, ██████████████████

████████████████████████ *Id.*

   343.   KJRR testified that ███████████████████

██████████████████████████████████

66

██████████████████████████ *Id.* at 56:1-7.  She testified that ████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████ *Id.* at 155:14-21

344.    Another former ICDC detainee, KP, testified that ██████████████████

████████████████████████████████ McNamara Decl. Ex. 120 at 32:6-18, ████

████████████████████████████████████ *Id.* at 102:13-103:6. ██████████

██████████████████████████████████████████████ *Id.* ██████████

██████████████████████████████████████ *Id.* at 104:2-6

345.    KP testified that ████████████████████████ *Id.* at 43:20-22.  She also testified that ██████████████████████████████████████

████████████████████████████████████████████████████████████

██████    *Id.* at 94:11-23; *see also id.* at 41:17-42:11.

346.    Another former ICDC detainee, YRJ, testified that ████████████████

████████████████████████████████████████████ McNamara Decl. Ex. 121 at 104:3-8.  She testified that, ████████████████████████████

████████████████████████████████████████ *Id.* at 189:12-190:3; *see also id.* at 210:4-14.]  She also testified that ██████████████████████████ *Id.* at 194:10-14.  YRJ, who is not fluent in English, testified that ██████████████████

████████████████████████ *Id.* 213:8-16.

347.    Another former ICDC detainee, BPR, ██████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████ McNamara Decl. Ex. 123 at 113:1-16, 114:7-24, 144:22-145:19, 172:12-22.



348.    Another former ICDC detainee, PB, testified that ████████████████ ████████████████████████████████ McNamara Decl. Ex. 123 at 125:4-20; 164:3-165:7. She testified that, ██████████████████████████████████████ ████████████████████████████████████████████ *Id.* at 58:5-17. She testified that ███████████████████████████ *Id.* at 69:8-15.  She testified that ████████████████████████████████████████████████ ████████████████████████████ *Id.* at  208:12-209:13; 210:15-211:3.

349.    Two detainees testified that ███████████████████ ████████████████████████████████████████████████ ██████████████████████████████████ *See* McNamara Decl. Ex. 119 at 73:20-74:17, 76:18-77:3, 77:13-17, 78:13-79:4, 98:15-25; Ex. 123 at 59:13-60:20; 61:16-62:2, 62:9-63:8.

350.    Dr. Amin's patients' medical records ████████████████████ ██████████████████████████ McNamara Decl. Exs. 124-126; Ex. 33 at 97:7-99:9.

## Multiple Doctors Conclude That Dr. Amin Performed "Unnecessary" Procedures on ICDC Detainees

351.    Dr. Amin's counsel has stated in a public filing that the "gist" of the MSNBC News Reports is that Dr. Amin "conducted unnecessary and unconsented-to medical procedures on detainees at the Irwin County Detention Center (ICDC), including large numbers of hysterectomies."  McNamara Decl Ex. 127.

352.    In his deposition, Dr. Amin stated that "performing even one unnecessary invasive medical procedure would be excessive."  McNamara Decl. Ex. 3 at 196:20-24.

353.    During his deposition, when asked whether two doctors might have a different view about whether a D&C is necessary for a particular patient, Dr. Amin responded: ███████████████

████████████████████████████████████████████████████████████████

█████████████████████████████████████████ *Id.* at 184:11-21.

354.    During his deposition, Dr. Amin stated that ████████████████████████████

████████████████████████████ *Id.* at 201:10-14.

355.    Dr. Amin's retained two experts in this case, Dr. Elbridge Bills and Dr. Laura Hamilton.  *See* McNamara Decl. Exs. 130-131.

356.    During his deposition, Dr. Bills testified ████████████████████████

███████████████████████████████████████████████████████████

McNamara Decl. 132 at 82:9-22.

357.    During his deposition, Dr. Bills testified that ███████████████████████

████████████████████████████████████████████████████████████

*Id.* at 82:20-22.

358.    At least four doctors have concluded, based on reviewing medical records of ICDC detainees, including for purposes other than the present litigation, that Dr. Amin performed "unnecessary" gynecological surgeries.  *See* McNamara Decl. Exs. 67, 128, 133, 135, 136.

359.    Dr. Erin Carey, the expert retained by NBCU, concluded based on a review of medical records produced by Dr. Amin in this case, that "Dr. Amin consistently acted in a surgically aggressive manner, performing unnecessary surgeries and failing to provide patients alternative medical therapies."  McNamara Decl Ex. 128 at 13.

360.    Dr. Carey opined that Dr. Amin "routinely interpret[ed] normal physiology as pathology" and then "use[d] his interpretation to justify surgically aggressive behavior." *Id.* at 2.

361.    Dr. Carey opined that Dr. Amin "consistently removed follicular cysts that did not need to be removed" because they "almost always resolve on their own within a few menstrual cycles without the need for surgical or medical treatment." *Id.* at 4, 13.  Dr. Carey opined that of the thirty-eight ovarian cystectomies that Dr. Amin performed, only two were potentially medically necessary. McNamara Decl. Exs. 129, 133.

362.    Dr. Carey opined that "[o]varian cystectomies have the unique risk of potential damage to future fertility." McNamara Decl. Ex. 128 at 13.

363.    Dr. Bills ████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████    McNamara Decl. Ex. 130 at 65:14-66:5; *see also* Ex. 3 at 272:1-5 (agreeing that it is possible that treatments other than hysterectomies can affect a women's fertility).

364.    Dr. Carey opined that Dr. Amin "frequently offered a procedure known as a D&C scope, which, in several instances, may not have been medically necessary and exposed patients to avoidable harm.  McNamara Decl. Ex. 128 at 13.  Dr. Carey opined that of the over fifty D&Cs that Dr. Amin performed, only five were potentially medically necessary. McNamara Decl. Exs. 129, 133.

365.    Dr. Carey opined that Dr. Amin "routinely and excessively used Depo-Provera for contraception and management of abnormal bleeding" and the majority of these patients "did not undergo more than [the] 3-month trial of medical therapy, with this medication before urgently moving onto surgical intervention."   Dr. Carey opined that of the patients on whom Dr. Amin performed surgery after giving them Depo-Provera, only four received an adequate course of medical therapy before Dr. Amin performed surgery.  McNamara Decl. Ex. 128 at 13, Ex. 133.

366.   Dr. Carey opined that Dr. Amin performed three "improper, unindicated, and not medically necessary LEEPs (loop electrosurgical excision procedures).  McNamara Decl. Ex. 133.

367.   Dr. Carey testified that ████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████   McNamara Decl. Ex. 148 at 117:8-122:11.

368.   Dr. Ted Anderson, testified in a deposition in this action that ██████████ ████████████████████   McNamara Decl. Ex. 116 at 108:4-9; 115:7-116:3; 173:8-15; 204:14-25.

369.   Concerning the hysterectomy Dr. Amin performed on ████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████   *Id.* at 167:20-181:2.

370.   During his deposition, when reviewing the hysterectomy that he performed on patient ████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████   McNamara Decl. Ex. 3 at 234:14-20.

371.    On November 15, 2022, the Senate Permanent Subcommittee on Investigations released a staff report, titled "Medical Mistreatment of Women in ICE Detention" (the "Senate Report"), and held a hearing. McNamara Decl. Ex. 68.

372.    The Senate Report states that it was the result of an eighteen-month "bipartisan investigation into the alleged mistreatment of Immigration and Customs Enforcement ("ICE") detainees housed in the Irwin County Detention Center ("ICDC") in Ocilla, Georgia." *Id.* at NBCU002052.

373.    The Senate Report concludes that "[f]emale detainees [at ICDC] appear to have been subjected to excessive, invasive, and often unnecessary gynecological procedures." *Id.* at NBCU002052-53.

374.    The Senate Report states that Dr. Peter Cherouny, a doctor engaged by the Subcommittee, "conducted an independent review of more than 16,600 pages of medical records obtained by the Subcommittee, pertaining to approximately 94 ICDC women Dr. Amin treated." *Id.* at NBCU002056.

375.    The Senate Report states that, according to Dr. Cherouny, Dr. Amin's use of D&Cs was "too aggressive," and Dr. Amin "persistently" removed "benign ovarian cysts" that "generally resolve without surgical intervention" and "did not require removal." *Id.*

376.    The Senate Report states that "Dr. Amin was a clear outlier in both the number and types of procedures he performed compared to other OB-GYNs that treated ICE detainees.  ICDC housed roughly 4% of female ICE detainees nationwide from 2017 to 2020.  Dr. Amin accounts for roughly 6.5% of total OB-GYN *visits* among all ICE detainees in the same time period. However, he performed nearly one-third of <u>certain</u> OB-GYN *procedures* on ICE detainees across

the country between 2017 and 2020 and more than 90% of some key procedures." *Id.* at NBCU002054-55 (emphasis in original).

377.    The Senate Report states that Dr. Amin performed 94% of all laparoscopies to excise lesions that were conducted on all ICE detainees; administered "93% of all [Depo-Provera] injections provided by all OB-GYN specialists to ICE detainees;" performed "92% of limited pelvic exams conducted on all ICE detainees," and performed "82% of all [dilation and curettage] D&C procedures conducted by all OB-GYN specialists treating ICE detainees." *Id.* at NBCU002054-55.

378.    Dr. Amin testified in his deposition that he did not have any facts to challenge the statistics presented in the Senate Report.  McNamara Decl. Ex. 3 at 225:5-233:1.

379.    The Senate Report concludes that "there appears to have been repeated failures to secure informed consent for off-site medical procedures performed on ICDC detainees." McNamara Decl. Ex. 68 at NBCU002053.

380.    The Senate Report states, "Dr. Amin did not provide sufficient information regarding surgical procedures with detainee patients.  The medical records reviewed do not consistently document thorough patient-doctor discussions and do not establish that patients were fully information of all their treatment options, including the benefits and risks of surgical procedures and other treatments." *Id.* at NBCU002061.

381.    Senator Jon Ossoff, the Subcommittee Chair, testified that the finding that "female detainees in Georgia were subjected by a DHS-contracted doctor to excessive, invasive, and often unnecessary gynecological surgeries and procedures, with repeated failures to obtain informed medical consent," as "deeply disturbing," "nightmarish" and "disgraceful."  McNamara Decl. Ex. 71.

382.    Senator Ron Johnson, Ranking Member of the Subcommittee, submitted to the record an opening statement, in which he stated that the Subcommittee's investigation "identified concerning practices of an off-site provider" and that the Subcommittee's expert found "that many of the procedures were unnecessary, and that Dr. Amin frequently rushed to surgeries when non-surgical options were more appropriate."  McNamara Decl. Ex. 134.

383.    Dr. Cherouny submitted a written statement to the Subcommittee, in which he testified that, based on the records he reviewed, "[t]he vast majority of ovarian cysts identified on transvaginal ultrasounds and removed or aspirated during laparoscopy in these patients were benign, functional cysts," which "generally resolve without surgical intervention;" "[t]his provider appears to use laparoscopy for confirmation of the diagnosis of leiomyomas and often removes them at surgery" when "[t]he uterine muscle tumors can be evaluated by imaging techniques such as skilled ultrasonography or more advanced imaging like MRI and followed over time for clinically concerning changes;" "[t]he provider does not appear to follow the current recommendations regarding Pap smear management through colposcopy and further treatment," and "Dr. Amin appears to have performed unindicated colposcopy and/or cryosurgery on six of these patients," among other things.  McNamara Decl. Ex. 135 at NBCU003891-92.

384.    Dr. Margaret Mueller, another board certified OB-GYN, submitted testimony to the Subcommittee in which she stated that a review team on which she participated, "identified a disturbing pattern of overly aggressive care, sometimes involving unnecessary diagnostic procedures and, in some cases, unnecessary surgical procedures."  They also found that the "unnecessary medical procedures were performed without adequate informed consent, which would require not just a signed standard consent form, but also documentation of any discussion

of less invasive options that might be appropriate for the patient."  McNamara Decl. Ex. 136 at

NBCU003871.

385.    The Senate Report also included interviews with several former ICDC detainees

and concluded, based on these interviews and a review of their medical records, that Dr. Amin

deployed a specific pattern in examining and treating these women . . .  Dr. Amin performed a

vaginal ultrasound on all six women, diagnosed five of the women with ovarian cysts, and

subsequently prescribed Depo-Provera injections for each woman with the cyst diagnosis .

McNamara Decl. Ex. 68 at NBCU002097-2111.

386.    Following publication of the Senate Report, neither Dr. Amin nor his counsel ever

put the Senate on notice that the information contained in the report or the conclusions it reached

were false.  McNamara Decl. Ex. 3 at 229:24-230:10.

Respectfully submitted,

*s/ Cynthia L. Counts*
Cynthia L. Counts
Georgia Bar No. 190280
FISHERBROYLES, LLP
945 East Paces Ferry Rd. NE, Suite 2000
Atlanta, GA 30326
(404) 550-6233
cynthia.counts@fisherbroyles.com

*s/ Elizabeth A. McNamara*
Elizabeth A. McNamara (*pro hac vice*)
Amanda B. Levine (*pro hac vice*)
Leena Charlton (*pro hac vice*)
DAVIS WRIGHT TREMAINE LLP
1251 Avenue of the Americas, 21st Floor
New York, NY 10020-1104
Tel: (212) 489-8230
lizmcnamara@dwt.com
amandalevine@dwt.com
leenacharlton@dwt.com
*Attorneys for Defendant*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on the 19th day of December, 2023, a true and correct copy of the foregoing document was served upon all counsel of record via the Court's electronic filing system.

<u>*Elizabeth A. McNamara*</u>
Elizabeth A. McNamara (*pro hac vice*)
DAVIS WRIGHT TREMAINE LLP
1251 Avenue of the Americas, 21st Floor
New York, NY 10020-1104
Tel: (212) 489-8230
lizmcnamara@dwt.com
*Attorneys for Defendant*