UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
WAYCROSS DIVISION

| | |
|---|---|
| DR. MAHENDRA AMIN, M.D., <br><br> Plaintiff, <br><br> v. <br><br> NBCUNIVERSAL MEDIA, LLC, <br><br> Defendant. | Case No. 5:21-cv-00056-LGW-BWC <br><br> **DEFENDANT'S MOTION TO EXCLUDE THE OPINIONS OF PLAINTIFF'S EXPERT** <br> **DR. ELBRIDGE BILLS** |

Pursuant to Federal Rule of Civil Procedure 37 and Rule of Evidence 702, as well as *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), Defendant NBCUniversal Media, LLC ("NBCU") respectfully submits this motion to exclude the proffered expert report, deposition testimony, and any trial testimony of Dr. Elbridge Bills, the expert for Plaintiff Dr. Mahendra Amin ("Dr. Amin").

**PRELIMINARY STATEMENT**

As explained in detail in NBCU's concurrently filed motion for summary judgment, this defamation action arises from four MSNBC news reports, each of which reported on a whistleblower complaint that alleged that Dr. Amin performed unnecessary and/or unconsented-to gynecological procedures, including hysterectomies, on Immigration and Customs Enforcement ("ICE") detainees. Dr. Amin claims that these news reports were false and defamatory and irreparably damaged his reputation. In order to meet his burden of proving falsity, Dr. Amin must establish that the gist of the challenged news reports—that he performed unnecessary gynecological procedures on ICE detainees—was materially false.

To try and meet his burden, Dr. Amin submits a two-page report from Dr. Bills, in which Dr. Bills concludes that, based on his review of a subset of Dr. Amin's patients' medical records,

Dr. Amin has been providing "appropriate" care to ICE detainees and has "not performed any unnecessary medical procedures."  Dr. Bills's bare conclusion is unreliable and based only on his say-so.  He offers no objective basis on which another expert—let alone a trier of fact—could test his opinions.  Instead, his "expert analysis" appears to be that he reviewed the medical records that Dr. Amin's counsel selected for him, he identified surgeries, he believes these surgeries were proper, and the Court should trust him since he is a doctor.  But "something does not become 'scientific knowledge' just because it is uttered by a scientist." *McDowell v. Brown*, 392 F.3d 1283, 1299 (11th Cir. 2004).  "The trial court's gatekeeping function requires more than simply taking the expert's word for it."  *U.S. v. Frazier,* 387 F.3d 1244, 1261 (11th Cir. 2004) (quoting Fed. R. Evid. 702 Advisory Comms. Note (2000 amends)).

Because Dr. Bills' opinions lack any discernible methodology other than his own word, the Court should strike Dr. Bills's expert and supplemental reports and deposition testimony, and preclude his testimony from being considered at summary judgment and any trial.

## RELEVANT FACTUAL BACKGROUND

### A.  Dr. Amin Brings a Defamation Action Against NBCU

On September 14, 2020, a whistleblower complaint was filed with various government agencies on behalf of a nurse working at the Irwin County Detention Center ("ICDC") and ICDC detainees (the "Whistleblower Complaint").  As is relevant here, the Whistleblower Complaint alleged that a doctor was performing gynecological procedures, including hysterectomies, on detainees that were either unnecessary or done without the detainees' informed consent.  Media organizations from across the political spectrum reported on the Whistleblower Complaint, identifying Dr. Amin as the doctor discussed therein.  State and federal politicians called for an immediate investigation into the Whistleblower Complaint's allegations.

On November 15, 2022, after an eighteen-month investigation, the United States Senate's bipartisan Permanent Subcommittee on Investigations released a 100-page report, which concluded, based on testimony from multiple OB-GYN experts who reviewed Dr. Amin's medical records, that "[f]emale detainees appear to have been subjected to excessive, invasive, and often unnecessary gynecological procedures," and "[t]here appears to have been repeated failures to secure informed consent for off-site medical procedures performed on ICDC detainees."[1] The Senate Report found that Dr. Amin performed two hysterectomies on ICE detainees in a four-year period, twice as many as the next highest doctor who performed only one. It also found that he performed more than 90% of certain other invasive gynecological procedures on ICE detainees nationwide, even though ICDC housed only 4% of the female ICE detainees in the country.

On September 9, 2021, prior to the release of the Senate Report, Dr. Amin singled out NBCU, from among the dozens of media organizations that reported on the Whistleblower Complaint, claiming that five MSNBC news reports defamed him. The Court dismissed from this action one of the challenged news reports on NBCU's Rule 12(c) motion, and the case proceeded into discovery. Dr. Amin now must satisfy his burden of proving that the defamatory "gist" or "sting" of the remaining news reports—*i.e.* that he was performing unnecessary and/or unconsented-to medical procedures—was materially false.

B.  Dr. Bills's Expert Report

On September 5, 2023, in support of his falsity argument, Dr. Amin submitted a two-page expert report from Dr. Bills, a board-certified OB-GYN. *See* Declaration of Elizabeth A. McNamara ("McNamara Decl.") Ex. 1 ("Bills Initial Report"). The first page of the report lists

---

[1] *See* https://www.hsgac.senate.gov/wp-content/uploads/imo/media/doc/2022-11-15%20PSI%20Staff%20Report%20-%20Medical%20Mistreatment%20of%20Women%20in%20ICE%20Detention.pdf (last visited Dec. 19, 2023).

Dr. Bills's qualifications, his assignment for this action ("I have been asked to review the cases of Dr. Mahendra Amin for medical appropriateness and specifically if there was any evidence of unnecessary medical procedures performed on Dr. Amin's patients"), an explanation that he reviewed 69 patient records in total, and a summary of the two hysterectomies that Dr. Amin performed on ICE detainees. *See* Bills Initial Report at 1. The second (and last) page, lists all of the outpatient surgical procedures that Dr. Bills could identify in these 69 patient records—which was not an exhaustive list of the procedures these patients received[2]—and the conclusion "[e]ach of the above procedures were medically indicated as documented by various modalities including the history and physical, the preoperative ultrasound evaluation, intraoperative surgical images documentation, and final pathology." *Id.* at 2. Dr. Bills does not provide any detail about or analysis of the modalities he relies on. Dr. Bills then states that Dr. Amin was able to diagnose two cervical cancers, which is "higher than we would see in the normal population" (without stating what the rate of cervical cancer is for the normal population or how he can make that determination without knowing whether the records he reviewed reflected *all* of Dr. Amin's detainee patients)[3] and that "it appears that Dr. Amin has been providing appropriate care to this high-risk indigent population and has not performed any unnecessary medical procedures." *Id.*

---

[2] For example, Dr. Bills found that Dr. Amin performed 44 D&Cs on these patients. In fact, Dr. Amin performed over 50 D&Cs on these patients. *See* McNamara Decl. Ex. 3. When confronted with this difference during his deposition, Dr. Bills stated ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.* Ex. 7, Bills Deposition Transcript ("Bills Tr.") at 134:7-135:1, but ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *d.* at 130:2-6. Dr. Bills also invited NBCU to subpoena a chart that he made during his review of the records, which NBCU subsequently did. This chart is unclear and lists the same patients multiple times, but it seems to show more D&Cs than enumerated in Dr. Bills's initial report. *See* McNamara Decl. Ex 8..

[3] During his deposition, Dr. Bills admitted ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *See* Bills Tr. at 97:2-17.

4

### C. Dr. Carey's Rebuttal Expert Report

On September 19, 2023, NBCU submitted a rebuttal report from its expert, Dr. Erin Carey, a board-certified OB-GYN. *See* McNamara Decl. Ex. 2 ("Carey Report"). Dr. Carey reviewed the same patient records as Dr. Bills (plus one additional set of medical records). *See id.* In contrast to Dr. Bills's report, Dr. Carey submitted a detailed 13-page report, in which she set forth the methodology underlying her medical opinion that Dr. Bills's conclusion that Dr. Amin's care was "appropriate" was incorrect. *See id.* Among other things, Dr. Carey opined that Dr. Amin regularly interpreted normal physiology as pathology, and he used these improper conclusions to justify medically unindicated surgeries. *See* Carey Report at 2. For example, Dr. Carey explained that Dr. Amin routinely removed functional ovarian cysts (normal cysts that women make during menstruation) that would have resolved on their own without surgical or medical treatment; he performed surgical "D&C scope[s]," which in many instances "may not have been medically necessary and exposed patients to avoidable harm;" and he often undertook surgical interventions without providing an adequate trial of medical therapy (particularly evident in his pattern of providing one Depo-Provera shot, that takes at least three months to work, but then finding that the hormonal therapy "failed" in a matter of weeks). *See, e.g. id.* at 3, 5, 10, 13.

Dr. Carey's report documents that she grounded her opinions in numerous medical sources, including the American College of Radiology's Ovarian-Adnexal Reporting and Data Systems guidelines for evaluating ovarian cysts, the American College of Obstetrics and Gynecologists ("ACOG") Position Statement on "Procedures Relates to Obstetrics and Gynecology," the ACOG Committee Statement on Patient-Centered Contraceptive Counseling, and the American Society

for Clinical Pathology Screening Guidelines for the Prevention and Early Detection of Cervical Cancer.  *See id.* at 4, 11, 12.

After her deposition, at the request of Dr. Amin's counsel, Dr. Carey supplemented her report with a list of the patients whose records she reviewed for whom she believed Dr. Amin performed unnecessary medical procedures, *see* McNamara Decl. Ex. 4, as well as the wealth of medical articles and guidelines from which her conclusions were drawn, *see* McNamara Decl. Ex. 5.  Based on her experience, review of patient records, and medical literature/guidelines, Dr. Carey concluded that of the 35+ ovarian cysts that Dr. Amin removed, only two removals were medically necessary.  *See Id.* Ex. 4.  Similarly, of the over 50 D&Cs that Dr. Amin performed, only five were potentially medically necessary (and even those had significant issues, including obtaining insufficient sampling of the endometrium and using the D&C to remove an IUD—something that Dr. Carey opined was "not standard of care").  *Id.*

**D. Dr. Bills's Supplemental Expert Report**

In response to Dr. Carey's report, Dr. Bills submitted a six-page supplemental expert report.  *See* McNamara Decl. Ex. 6 ("Bills Reply Report").  This supplemental report too lacked any methodology, instead offering only Dr. Bills's say-so.  Dr. Bills's supplemental conclusions relied on suppositions that he had no evidence for (and were invariably wrong).  Rather than dispute Dr. Carey's methodology or conclusions with expert analysis or knowledge, he erroneously argued that Dr. Carey must have considered "information outside of the medical record" about Dr. Amin (she testified that she did not) or suggested that Dr. Carey resided in an ivory tower of high-end care that did not comport with everyday OB-GYN practices, dismissively citing to her "research and academic status" (or, as Dr. Bills later testified

6

██████████████████████████████████████████  *See* Bills Reply Report at 1, 5; Bills Tr. at 124:25-125:22.

Following his deposition, Dr. Bills produced a chart that he created, which appears to list the names of the patients whose records he reviewed, "pre-operative diagnoses," for these patients, and the surgeries that Dr. Amin ultimately performed. The chart does not explain why the surgeries Dr. Amin provided were medically appropriate or otherwise provide any medical guidelines for his conclusions. *See* McNamara Decl. Ex. 8.

## ARGUMENT

**A. Federal Rule of Evidence 702 Imposes A Burden On Dr. Amin to Establish The Qualification, Reliability, and Evidence Of His Expert**

Under Federal Rule of Evidence 702, "[i]f scientific, technical, or other specialized knowledge will assist a trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise." In *Daubert v. Merrell Dow Pharmaceuticals*, the United States Supreme Court imposed on courts a "gate-keeping role" to ensure that "all scientific testimony or evidence admitted is not only relevant but reliable." *Daubert*, 509 U.S. at 589. Said differently, it is the court's role to distinguish between expert opinions that are truly "scientific" and those that are merely "speculation or subjective belief." *Dukes v. Georgia*, 428 F. Supp. 2d 1298, 1309 (N.D. Ga. 2006), *aff'd sub nom*, 212 F. App'x 916 (11th Cir. 2006).

In performing its gatekeeper task, a court must consider whether the party offering the evidence has shown: (1) the expert is qualified to testify competently regarding the matters which he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the

testimony assists the trier of fact through the application of scientific, technical or specialized expertise, to understand the evidence or to determine a fact in issue. *Frazier*, 387 F. 3d at 1260.

On December 1, 2023, Rule 702 was amended to make clear that the proponent of the expert opinion bears the burden of establishing each of these factors—qualification, reliability, and relevance—by a preponderance of the evidence. *See* F.R.E. 702 (explaining that the proponent of the evidence must demonstrate that it is "more likely than not" that the proffered testimony meets the admissibility requirements set forth in the Rule); *Bourjaily v. United States*, 483 U.S. 171, 175 (1987) ("The preponderance standard ensures that before admitting evidence, the court will have found it more likely than not that the technical issues and policy concerns addressed by the Federal Rule of Evidence have been afforded due consideration."). Critically, courts should not sidestep the issue by looking to "weight" versus "admissibility." As explained by the Rules Advisory Committee, the goal of this amendment was to clarify that it is "incorrect" for a court to hold that "the sufficiency of an expert's basis and the application of the expert's methodology are questions of weight and not admissibility."[4]

### B. Dr. Bills's Report Lacks Sufficient Indicia of Reliability

The "reliability" factor is "a discrete, independent, and important requirement for admissibility." *Fiels v. Ethicon*, 2023 WL 348340, *2 (S.D. Ga. Jan. 20, 2023). Determining whether an expert is reliable is a "case-specific" analysis. *See Addison v. Arnett*, 2016 WL 1441803, at *4 (S.D. Ga. Apr. 12, 2016). When engaging in this analysis, the court must "focus... on [the expert's] principles and methodology" rather than the scientific conclusions generated. *Daubert*, 509 U.S. at 595.

---

[4] *See* https://www.uscourts.gov/sites/default/files/2023_congressional_package_april_24_2023_0.pdf#=page210 at page 210 (last visited Dec. 19, 2023).

Dr. Bills's two-page report, containing only bald-faced conclusions, establishes his lack of reliability. "Presenting a summary of a proffered expert's testimony in the form of conclusory statements devoid of factual or analytical support is simply not enough" to carry the proponent's burden. *See Cook ex rel. Estate of Tessier v. Sheriff of Monroe County*, 402 F.3d 1092, 1113 (11th Cir. 2005); *U.S. ex rel. Duncan Pipeline, Inc. v. Waldbridge Aldinger Co*, 2013 WL 1338392, at *7 (S.D. Ga. Mar. 29, 2013). And "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the ipse dixit of the expert." *Estate of Tessier,* 402 F.3d at 1111. Put differently, an expert report must include both the "how" and "why" the expert reached a certain result. *Soper v. Chipotle Mexican Grill of Colorado, LLC*, 2022 WL 2704149, at *3 (S.D. Ga. July 12, 2022) (quoting *Jones v. Novartis Pharms. Corp.*, 235 F. Supp. 3d 1244, 1276 (N.D. Ala. 2017)). An expert opinion that fails to do so will not "clear *Daubert's* 'reliability hurdle.'" *Id.* At *3.

*In re Mirena IUD Products Liability Litigation*, 169 F. Supp. 3d 396 (S.D.N.Y. 2016) is directly on point. There, the court excluded the expert opinion of a proposed gynecological expert because it lacked "sufficient indicia of reliability," *id.* at 458. The proposed expert's report "consist[ed] of one page listing [the doctor's] opinions, one page listing his qualifications, and one page describing [the plaintiff's] medical records followed by a restatement of the same opinions listed on the first page." *Id.* The court explained, "[a]lthough the [proposed expert] is a qualified OB/GYN, his expert opinion in this instance consists of nothing more than conclusory statements, which fails under Rule 702 or *Daubert*." *Id.* The doctor's report "d[id] not cite any publications or medical literature in support of his opinions, and he acknowledged at his deposition that he did not review any medical literature in reaching them." *Id.* And the report "provide[d] literally no analysis, explanation, or basis for his opinions," which the court held was a "classic case" of

9

"opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Id.* Accordingly, because there was "no data, methodology, or study underlying the opinion at all," the court found that the expert's opinion *must* be excluded. *Id.* at 459.

Dr. Bills' report fails for the exact same reasons. Although a qualified OB-GYN, Dr. Bills submitted a two-page report that is entirely conclusory. He provides no substantive analysis, cites to no medical literature or any other basis for his conclusions, and acknowledged during his deposition that he did not review medical literature in reaching his conclusions. *See* Bills Tr. at 82:17-22. Neither his supplemental report, the chart he later produced, nor his deposition cures these deficiencies. For the reasons explained below, the Court should exclude his opinion from this case.

### 1. Dr. Bills Fails To Offer Objective Support For His Opinions

Despite concluding that Dr. Amin engaged in "appropriate care" and did not perform any "unnecessary medical procedures," Dr. Bills does not define either of these terms in his reports. During his deposition, when asked about these definitions, Dr. Bills explained ▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮ Bills Tr. at 48:15-18.[5] But Dr. Bills does not reference any specific medical literature or guidelines or any other basis to explain when a procedure is "indicated," in essence, asking the Court to take his word on the issue. As courts in the Eleventh Circuit have held time and again, "[i]t is insufficient for the

---

[5] When asked what this definition was based on, Dr. Bills explained, ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮ *Id.* at 49:1-13. This conclusion is belied by Dr. Amin's own counsel. When she deposed NBCU's rebuttal expert, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ McNamara Decl Ex. 12.

expert to merely vouch for the reliability of his own methodology. . . . The Court cannot just take Plaintiff's counsel's or [the expert's] word that his method was reliable and that he gave reliable opinions." *J&V Development, Inc v. Athens-Clarke Cty.*, 387 F. Supp. 2d 1214, 1227 (M.D. Ga. 2005); *Frazier,* 387 F.3d at 1261 ("The trial court's gatekeeping function requires more than simply taking the expert's word for it.").

Dr. Bills's deposition established that he was unable to identify, let alone explain the reliability of, his methodology.  Like the expert in *Mirena*, Dr. Bills acknowledged that ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆.  His ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ the analysis of which he did not detail in his reports.  *See* Bills Tr. at 82:2-16.  In fact, Dr. Bills testified that he does not even ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆.  *Id.* at 82:17-22.  Dr. Bills's admission is fatal to his report.  Because Dr. Bills concedes ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ they cannot meet *Daubert*'s reliability requirement.



### 2. Dr. Bills's List of "Modalities" Considered Is Over-Inclusive

Dr. Bills's initial report notes that every procedure Dr. Amin performed was "medically indicated" based on "various modalities including the history and physical, the preoperative ultrasound evaluation, intraoperative surgical images documentation, and final pathology."  But Dr. Bills fails to explain which of these "modalities" he considered for each of the 69 patients patients—*i.e.*, whether, in all cases, he reviewed histories and physicals, preoperative ultrasound evaluations, intraoperative surgical images, and final pathology, or whether different documents

contributed to his opinions for each patients.  Nor does he detail the bases for his conclusion that any or all of those modalities indicate the necessity of a particular procedure performed by Dr. Amin.

During his deposition, Dr. Bills seemed to acknowledge t███████████████ ████████████████████████████████████████████ ██████████████████████████████████ Bills Tr. at 83:15-17.  He similarly stated that, ███████████████████████████████████████████" *Id.* at 85:17-20.  He testified that ████████████████████ ███████████████████████████████████████ *Id.* at 86:5-10.  Dr. Bills further admitted that ███████████████████████ ███████████████████████████████████████ *Id.* at 68:10-20.  He explained, ███████████████████████████████████ ████████ *Id.* at 68:21-24.

The chart that Dr. Bills produced following his deposition only further documented that Dr. Bills's list of "modalities" did not apply to all patients.  For example, c██████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████ *See* McNamara Decl. Ex. 8.  Nonetheless, Dr. Bills still concluded, without explanation, that this surgery was indicated and appropriate.

Because it is unclear which modalities, if any, Dr. Bills relied on to reach his conclusions about each patient, the only basis he identifies to support his conclusions, it is impossible for a trier of fact to assess his conclusions, and his opinions should be excluded.

### 3. *Dr. Bills Fails to Explain Why, Based On The Patient Records, Each Surgical Procedure Was "Indicated"*

Although Dr. Bills claims that every surgery that Dr. Amin performed was "medically indicated," he provides no analysis for most of them. For example, he does not explain what details of each patient's records led him to that conclusion. Instead, his report makes generalized statements about why a doctor could perform these surgeries, divorced from the specifics of the records themselves. *See* Bills Initial Report at 2. Dr. Bills's deposition testimony reveals the apparent reason for this lack of detail— ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

Dr. Bills's analysis of the cystectomies Dr. Amin performed is instructive. In his initial report, Dr. Bills notes that Dr. Amin performed 35 ovarian cystectomies—*i.e.*, a surgical removal of an ovarian cyst.[6] *See* Bills Initial Report at 2. He states, "although ovarian cysts can commonly be monitored to see if they resolve spontaneously, in this setting . . . these patients may not have any follow up care [and] thus removing them as a source of pain is a reasonable procedure to perform." *Id*. In his rebuttal report, Dr. Bills expands on this assertion, claiming that if a patient experiences pain, and the "pain is related to persistent ovarian cysts, then surgery is indicated." *See* Bills Reply Report at 3. While Dr. Bills does not define "persistent ovarian cysts" in either his initial or rebuttal report, during his deposition, he testified ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Bills Tr. at 160:10-13.

---

[6] This number is actually under-inclusive. The medical records reviewed by Dr. Bills indicate that Dr. Amin performed 38 cystectomies on ICDC patients. *See* McNamara Decl. Ex. 3.

13

But nothing in Dr. Amin's records indicates that the cysts Dr. Amin removed qualify as "persistent" under Dr. Bills's definition; Dr. Bills was just presuming, erroneously, that to be the case. In fact, the medical records show that Dr. Amin removed cysts that clearly were not only *impersistent* but, in some cases, were never even documented until Dr. Amin removed them:



- For patient DC, ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████.

- For patient KDM, █████████████████████████████████████████████████████████████████████████████████████████████████████████████████.

- For patient YPF, █████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████.

These records both undermine Dr. Bills's purported explanation for the cystectomies and belie Dr. Bills's conclusion that Dr. Amin's treatment of cysts on ICE detainees was medically indicated. *See, e.g.*, Bills Tr. at 70:11-19 ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████.

While the chart that Dr. Bills produced after his deposition presents a patient-by-patient list of information from the records he reviewed, it does little to rectify the issues described above. For almost every patient on whom Dr. Amin performed a cystectomy, Dr. Bills merely notes that

the patient's records showed that the patient was suffering from ▮▮▮▮▮▮▮▮. *See* McNamara Decl. Ex. 8. He fails to document that Dr. Amin allowed sufficient time for the cysts to resolve on their own—which the records establish Dr. Amin routinely did not do—nor does he provide any explanation for why it was medically appropriate for Dr. Amin to attribute that ▮▮▮▮▮▮▮▮ to the ovarian cyst (rather than non-gynecological causes). In short, this chart reveals that Dr. Bills's "expert analysis" consisted of little more than reviewing Dr. Amin's list of pre-operative diagnoses and determining that these pre-operative diagnoses—▮▮▮▮▮▮▮▮—support every single surgery that Dr. Amin performed. He does not explain how that conclusion is consistent with relevant medical literature or other reputable authority. As Dr. Carey details, it is not.

### 4. Dr. Bills's Report Relies On Numerous Other Presumptions

Finally, Dr. Bills's expert opinion fails *Daubert*'s reliability hurdle because it is based on numerous other unstated, insufficiently explained, and simply wrong presumptions. As just a few examples:

-  Bills Tr. at 99:7-18.

-  Bills Tr. at 93:11-95:2.

- In his supplemental report, Dr. Bills indicated that Dr. Amin's patients could be "taken away without notice." Bills Reply Report. at 3. ▮▮▮

15



Bills Tr. at 154:13-155:11.

During his deposition, when asked whether his report was based on any other presumptions, he responded, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Bills Tr. at 162:20-163:9.

\* \* \*

In sum, Dr. Bills's expert report has no verifiable methodology, no support for its conclusions, and is rife with unstated—and unfounded—presumptions, some of which are contradicted by the very records he reviewed.  Because the Court cannot meaningfully test Dr. Bills's methodology in his report to ensure that it is reliable, and because none of Dr. Bills's supplemental filings or depositions testimony change this conclusion, his opinion should be excluded from this action.

## CONCLUSION

For the foregoing reasons, NBCU requests that the Court enter an order excluding the proffered expert report, supplemental expert report, deposition testimony, and any trial testimony of Dr. Bills from being considered at summary judgment and at trial.

Respectfully submitted,

| | |
|---|---|
| *s/ Cynthia L. Counts* | *s/ Elizabeth A. McNamara* |
| Cynthia L. Counts | Elizabeth A. McNamara |
| Georgia Bar No. 190280 | (admitted *pro hac vice*) |
| FISHERBROYLES, LLP | Amanda B. Levine |
| 945 East Paces Ferry Rd. NE, Suite 2000 | (admitted *pro hac vice*) |
| Atlanta, GA 30326 | Leena Charlton |
| (404) 550-6233 | (admitted *pro hac vice*) |
| cynthia.counts@fisherbroyles.com | DAVIS WRIGHT TREMAINE LLP |

>
> 1251 Avenue of the Americas, 21st Floor
> New York, NY 10020-1104
> Tel: (212) 489-8230
> lizmcnamara@dwt.com
> amandalevine@dwt.com
> leenacharlton@dwt.com
>
> *Attorneys for Defendant*

*   *   *

## CERTIFICATE OF SERVICE

The undersigned certifies that on the 19th day of December, 2023, a true and correct copy of the foregoing document was served upon the following via the Court's electronic filing system:

Stacey Godfrey Evans
sevans@staceyevanslaw.com
Amble Johnson
ajohnson@staceyevanslaw.com
Scott R. Grubman
sgrubman@cglawfirm.com

> *Elizabeth A. McNamara*
> Elizabeth A. McNamara
> (admitted *pro hac vice*)
> DAVIS WRIGHT TREMAINE LLP
> 1251 Avenue of the Americas, 21st Floor
> New York, NY 10020-1104
> Tel: (212) 489-8230
> lizmcnamara@dwt.com
>
> *Attorneys for Defendant*