Declaration of

Elizabeth McNamara

Exhibit 5



# ACOG COMMITTEE OPINION

Number 830                 *(Replaces Committee Opinion 511, November 2011, and Committee Opinion 535, August 2012)*

**Committee on Health Care for Underserved Women**
*This Committee Opinion was developed by the American College of Obstetricians and Gynecologists' Committee on Health Care for Underserved Women in collaboration with committee member Carolyn Sufrin, MD, PhD.*

## Reproductive Health Care for Incarcerated Pregnant, Postpartum, and Nonpregnant Individuals

**ABSTRACT:** Obstetrician–gynecologists and other women's health care practitioners can support efforts to improve health care for incarcerated pregnant, postpartum, and nonpregnant individuals. The majority of incarcerated women are parents and are of reproductive age, which has important implications for their reproductive health care needs. The legacies of racism and resulting racialized medical outcomes shape inequities in reproductive health for all people, including those who are incarcerated. Reproductive health care for incarcerated individuals should be provided in accordance with the same guidelines and recommendations as for those who are not incarcerated, with attention to the increased risk of infectious diseases and mental health conditions common to incarcerated populations. Ensuring that incarcerated individuals receive respectful, consistent, high-quality reproductive health, pregnancy, and postpartum care is essential for ameliorating inequities and affirming these individuals' dignity. This revision provides comprehensive recommendations for pregnant, postpartum, and nonpregnant individuals and expands upon guidance to advocate for access to safe, quality, and dignified care.

## Recommendations

To facilitate quality, dignified care of incarcerated patients, obstetrician–gynecologists and other women's health care practitioners should support efforts to improve the health care of incarcerated pregnant, postpartum, and nonpregnant individuals at the local, state, and national levels. These efforts may include the following:

- work inside prisons, jails, and detention centers to provide medical care to incarcerated individuals, and consultation and training to other clinicians in these settings and correctional officers to ensure that reproductive health and pregnancy needs are being appropriately addressed
- create and participate in systems that improve continuity of care after release
- advise prisons, jails, and detention facilities on guidelines and protocols that ensure comprehensive reproductive health, pregnancy, and postpartum care is provided, including the ability to initiate or continue contraception while in custody; cervical and breast cancer screening; respectful maternity care by a qualified clinician consistent with accepted clinical guidelines; access to abortion services; treatment of mental illness and substance use disorders, including access to medications for opioid use disorder; and promotion and support of breastfeeding
- advocate at organizational; hospital; and local, state, and federal levels to ensure policies and laws follow accepted clinical guidelines and evidence-based protocols; to eliminate copays to access health care while in custody; to restrict shackling during pregnancy, labor, and the postpartum period and work with local hospital and custody staff to ensure compliance; to ensure that menstrual products are available at no cost and in adequate supply; and to support policies and laws that decrease the number of incarcerated people and promote community-based alternatives, especially for those who are pregnant and parenting
- provide compassionate, appropriate care when incarcerated patients are treated at clinics and hospitals in the community. They should foster safe and dignified birthing environments for incarcerated

CAREY000262

- people who give birth in custody and allow these individuals to have the same opportunities to bond with their newborns as nonincarcerated postpartum hospitalized people
- advocate for data collection on pregnancy and other reproductive health outcomes of incarcerated people by public agencies and through research

## Background

Prisons are systems that are under state or federal jurisdiction, whereas jails are administered through local authorities. Prisons incarcerate people convicted of felonies or parole violations, which generally carry sentences of longer than 1 year, whereas jails confine people awaiting trial or serving sentences generally shorter than 1 year. People being detained by U.S. Immigration and Customs Enforcement (ICE), a federal agency, are held in a variety of detention settings; adolescents who are detained may be housed in juvenile detention centers, residential custody facilities or, in some cases, in adult prisons or jails.

Since the early 1980s, women have represented the fastest growing segment of the incarcerated population (1). In 2019, there were more than 218,000 females in prisons and jails in the United States, comprising 10% of people behind bars (2, 3). That same year, over 1.8 million females were arrested, including 142,321 females younger than 18 years, representing 30% of all youth arrests (4). Most females in prisons and jails are in custody for drug and property charges (2, 4). Although demographic data on many aspects of immigrant detention are lacking, the best available data indicate that women and girls comprised 14.5% of people held by ICE, a 60% increase since 2009 (5). Unaccompanied minors, including adolescents of reproductive age, also may be held in immigration detention.

The majority of incarcerated women are parents and are of reproductive age, which has important implications for their reproductive health care needs (2, 6). Adolescents in these settings also have reproductive health care needs that often are neglected. Additionally, the rapid turnover of incarcerated individuals and unpredictable timing of jail and detention releases can present challenges for health care delivery and continuity of care (5).

Reflecting the institutionalized racism of mass incarceration and policing in the United States, racial and ethnic disproportionality is endemic to the U.S. incarceration system, with Black women being imprisoned at 1.7 times the rate of white women (2).

The racial disproportionality in the United States' incarceration of people of color must be understood as both a result and perpetrator of white supremacy (policies and structures grounded in the belief of a hierarchy of human value as determined by race) (7). The legacies of racism and resulting racialized medical outcomes shape inequities in reproductive health for all people, including those who are incarcerated. Therefore, in addition to advocating for access to quality reproductive health care for people currently incarcerated, the American College of Obstetricians and Gynecologists (ACOG) also supports decreasing the number of incarcerated people, investing in community-based alternatives to incarceration, and shifting our society's over-reliance on incarceration.

Along with the adverse and disparate effect of institutionalized racism and white supremacy on incarceration rates and U.S. health care systems, incarcerated adults and adolescents often come from environments characterized by poverty, constrained educational and employment opportunities, limited access to health care, and other adverse structural determinants of health (8). These factors contribute to a disproportionate number of people having, at entry to prisons, jails, and detention centers, acute and chronic illnesses, untreated substance use disorder and mental illness, and undetected or unaddressed health issues, including reproductive health needs. The convergence of these unmet reproductive health needs, along with the racist underpinnings of mass incarceration and its community and public health implications, mean that health care considerations for incarcerated individuals are part of broader reproductive justice efforts to promote equitable, dignified care (9). Reproductive justice is a framework that emerged from and centers the reproductive experiences of women of color and other groups that are marginalized by societal structures; its tenets promote the right to have children, the right not to have children, and the right to raise one's children with dignity and in safety (9). Reproductive justice-informed approaches within health care recognize that social structures and institutions differentially enable and prevent people from achieving those reproductive goals. Mass incarceration has been recognized to disrupt these tenets of reproductive justice (10).

## Scope of Reproductive Health, Pregnancy, and Mental Health Access and Needs

The 1976 U.S. Supreme Court Case *Estelle v. Gamble* serves as a foundational case that establishes incarcerated individuals have a constitutional right to receive medical care (11). However, no mandatory standards or oversight exist, which leads to substantial variability in access to and quality of care provided at prisons, jails, and detention centers, especially for reproductive health care. Although two organizations—the National Commission on Correctional Health Care and the American Correctional Association—have published health care standards and accredit correctional health care systems, accreditation is voluntary (12–14). Thus, systems of care vary from prison to prison and jail to jail: health care services may be provided on site by clinicians or off site through arrangements with local hospitals or clinics; some prisons and jails provide health care through local health

CAREY000263

departments, others through academic health system partnerships, and many others through contracts with private health care vendors.

Incarcerated individuals generally cannot use their private health insurance while in custody, and Medicaid and Medicare benefits typically are suspended or terminated while incarcerated (15, 16). Payment for health care services is the responsibility of the prison, jail, or detention institution, and its financing depends on local funds or legislative appropriations, which often compete with other priorities. Some prisons and jails require a copay in order to access health care services; this presents a barrier for individuals who already have limited financial means and who may have had limited access to care pre-incarceration. The American College of Obstetricians and Gynecologists opposes such copay policies in institutions of incarceration. States may be able to request waivers from the Centers for Medicare and Medicaid Services for pretrial detainees to be able to access Medicaid benefits. When a person is transferred to another prison or jail, or released into the community, it is critical to arrange for follow-up care and transfer of records, especially for pregnant individuals who have immediate prenatal care needs. Obstetrician–gynecologists and other women's health practitioners should create and participate in systems that improve continuity of care after release, including helping to facilitate redetermination of eligibility or reactivation of benefits.

There has been limited attention to addressing incarcerated women's gender-specific health care needs, which may be in part due to the smaller proportion of the incarcerated population that they represent, facilitating their neglect (17). However, it also relates to the inherently male focus of the system that has allowed women's needs to be eclipsed or conflated with those of males who are incarcerated.

Research has found that incarcerated individuals have high rates of prior unintended pregnancy, low prevalence of contraception use, are often sexually active immediately before incarceration and after release, and that many would like to initiate a contraceptive method while in custody in preparation for release (18). While on-site provision of contraception has been shown to be feasible and is an important preventive health service, few prisons and jails have contraception available, even for those individuals already using a method at the time of incarceration (19). Not being able to continue a pre-incarceration contraceptive method is especially concerning in jail settings—which are often short-term and with unpredictable release dates—as a disruption could put an individual at risk for an unwanted pregnancy upon release. Moreover, many people, including incarcerated individuals, use contraceptive methods for medical conditions, such as abnormal menstrual bleeding, which is common in this group (20). Emergency contraception also is rarely available, despite the fact that many newly arrested individuals are candidates for it, that rape occurs in institutions of incarceration, and that the Prison Rape Elimination Act standards require its availability in carceral institutions (21, 22).

The age profile and low prevalence of contraceptive use among people who have been sexually active before incarceration mean that some will enter jail, prison, or detention facilities pregnant. A study of all Federal Bureau of Prisons and 22 state prison systems found that in a single year there were 1,396 pregnant individuals admitted to prisons. In the study year, there were 753 live births, with 6% preterm and 30% cesarean births, although these proportions varied significantly by state; 6% of pregnancies ended in miscarriage and 1% in abortion. There were no maternal deaths, but there were three newborn deaths (23). A similar study of select jails suggested that there are nearly 55,000 annual admissions of pregnant people to U.S. jails (24). Although these data represent over half of imprisoned women and a small proportion of women in jail in the United States, there are no systematic data from all states, jails, and detention facilities. The First Step Act requires that the Bureau of Justice Statistics collect annual data on pregnancy outcomes; however, this applies only to individuals in federal custody (25). Obstetrician–gynecologists and other women's health practitioners should advocate for data collection on pregnancy and other reproductive health outcomes of incarcerated individuals by public agencies and through research, including access to abortion services. Although the legal right to an abortion is retained during incarceration, the ability to obtain an abortion while in custody varies widely by geography and the individual prison or jail policy (26, 27).

Rates of sexually transmitted infections are disproportionately higher among incarcerated women, as compared with incarcerated men and nonincarcerated women. In one study, up to 11% of incarcerated women were diagnosed with chlamydia and 3% with gonorrhea (28). In 2015, 1.3% of women in state and federal prisons were known to be infected with HIV (human immunodeficiency virus) (29). Sexually transmitted infections and pregnancies among incarcerated women mostly occur pre-incarceration but also may result from sexual assault while in custody (30).

Mental health issues and substance use disorder are common among incarcerated women. From 2007–2009, 69% of women in state prisons and 72% in jails met the criteria for substance dependence or abuse (not including tobacco use), and dependence was diagnosed more commonly among women than among men (31). Between 2011 and 2012, 66% of women in state prisons and 68% of women in jails had a history of a mental health condition, a rate that is higher than incarcerated males (32). There often are overlaps between women's mental health and substance use issues and their involvement in the

CAREY000264

criminal justice system, including lack of adequate care in the community before incarceration.

Seventy-five to 95% of incarcerated women have experienced physical or sexual abuse (33). Some of these individuals were coerced or forced with the threat of physical violence to participate in illegal activities that led to their incarceration. Screening all incarcerated individuals for past and current intimate partner violence and other forms of trauma is crucial, with appropriate referrals and mental health treatment as indicated. In addition, some incarcerated individuals may be perpetrators of intimate partner violence, and it is important that they receive appropriate counseling and support (34).

### Reproductive and Sexual Health Care

Reproductive health care for incarcerated individuals should be provided in accordance with the same guidelines and recommendations as for those who are not incarcerated, with attention to the increased risk of infectious diseases and mental health conditions common to incarcerated populations (35–37). Recommended reproductive and sexual health care in carceral settings are outlined in Box 1. To facilitate quality, dignified care of incarcerated patients, obstetrician–gynecologists and other women's health practitioners should support efforts to improve the health care of incarcerated pregnant, postpartum, and nonpregnant individuals at the local, state, and national levels. These efforts may include work inside prisons, jails, and detention centers to provide medical care to incarcerated individuals, and consultation and training to other clinicians in these settings and correctional officers to ensure that reproductive health and pregnancy needs are being appropriately addressed. They also can advise prisons, jails, and detention facilities on guidelines and protocols that ensure comprehensive reproductive health, pregnancy, and postpartum care is provided, including the ability to initiate or continue contraception while in custody; cervical and breast cancer screening; respectful maternity care by a qualified clinician consistent with accepted clinical guidelines; access to abortion services; treatment of mental illness and substance use disorder, including access to medications for opioid use disorder; and promotion and support of breastfeeding. Such clinical service and consultation arrangements can be facilitated by working with one's clinic or hospital administration to contact local and state jail and prison authorities.

Given the high rates of previous sexual and physical abuse among incarcerated individuals, clinicians should recognize that pelvic examinations may be re-traumatizing and difficult for some patients, and that incarceration itself can be a traumatizing and re-traumatizing experience. Thus, special care should be taken to avoid unnecessary pelvic exams. Clinicians working with incarcerated patients should aim to be trained in trauma-informed care to sensitively care for these patients. Furthermore, a health care chaperone should be present during pelvic examinations, and custody officers should not be present.

Clinicians should be cognizant that incarceration is inherently coercive in nature and restricts people's sense of autonomy, and work to ensure that they respect and actively promote patients' autonomy in health care decision making. It is especially important when providing contraception in carceral settings to recognize the potential for patients to experience pressure to choose contraception or a specific method. Furthermore, the history of coercive or forced contraception in people of color, who are disproportionately incarcerated, is also important context for how incarcerated individuals' reproduction may be systematically devalued (38). Such conditions can compromise informed consent for reversible, and especially permanent, contraception. Clinicians should take these factors into account when providing contraception, especially clinician-controlled long-acting reversible contraceptives (LARC), to incarcerated patients. A range of reversible methods, not just one, should therefore be available.

Sterilization for individuals who are incarcerated requires special consideration. The United States has a history of coercive sterilization practices on people who are incarcerated or institutionalized, with documented violations as recently as 2010 (39). Prisons and jails are environments that, by their nature, diminish an individual's autonomy and the ability to make decisions. Some have concluded that "the coercive nature of the prison environment undermines a person's ability to give meaningful consent to the irreversible destruction of fertility" (39). Incarcerated individuals have described coercive practices by prison health care practitioners and personnel, including rewards to those who agree to be sterilized or punishments for those who do not (39).

Respect for an individual's reproductive autonomy should be the primary concern that guides sterilization provision and policy (40). Given the inherent conflict between incarceration and autonomy, irreversible procedures like sterilization should not be routinely performed during incarceration. Sterilization should only rarely be provided to incarcerated patients who request it, and only after they have been given access to all reversible methods of contraception, including LARC, and after documentation of the patient's preincarceration request for sterilization is available. Special procedural safeguards and oversight are needed when incarcerated individuals are sterilized because of the likelihood that the coercive environment of prison impedes true informed consent (40). If hysterectomy or bilateral salpingo-oophorectomy is being considered as treatment for a medical condition for a person in custody, appropriate conservative management options should be undertaken first. If a procedure that results in sterilization must be performed, ethical counseling should be provided that emphasizes the permanence of the procedure (40).

CAREY000265

---

**Box 1. Recommended Reproductive and Sexual Health Care in Carceral Settings**

- Include reproductive and sexual history as part of intake medical screening, including current contraceptive use, eligibility for and interest in emergency contraception, risk for sexually transmitted infections (STIs), history of trauma and intimate partner violence.
- Screen for sexually transmitted infections, including HIV (human immunodeficiency virus), hepatitis, syphilis, gonorrhea, and chlamydia based on American College of Obstetricians and Gynecologists (ACOG) and Centers for Disease Control and Prevention (CDC) guidelines for people in correctional facilities (https://www.cdc.gov/std/tg2015/specialpops.htm and https://www.cdc.gov/mmwr/preview/mmwrhtml/rr6403a1.htm).
- Age appropriate screening for breast (https://www.acog.org/clinical/clinical-guidance/practice-bulletin/articles/2017/07/breast-cancer-risk-assessment-and-screening-in-average-risk-women) and cervical cancer (https://www.acog.org/clinical/clinical-guidance/practice-bulletin/articles/2016/10/cervical-cancer-screening-and-prevention?utm_source=redirect&utm_medium=web&utm_campaign=otn) and osteoporosis (https://www.acog.org/clinical/clinical-guidance/practice-bulletin/articles/2012/09/osteoporosis?utm_source=redirect&utm_medium=web&utm_campaign=otn) based on ACOG guidelines with follow up of abnormal results.
- Administer vaccines according to CDC and ACOG guidelines, including human papillomavirus infection vaccination (https://www.cdc.gov/vaccines/schedules/downloads/adult/adult-combined-schedule.pdf) (https://www.cdc.gov/vaccines/schedules/downloads/child/0-18yrs-child-combined-schedule.pdf).
- Provide comprehensive reproductive health and preventive health education that includes STI prevention, reproductive goals and contraceptive counseling, pregnancy planning, and contraception as appropriate.
- Continue pre-incarceration contraceptive methods while individuals are in custody; enable initiation of reversible contraceptive methods; and provide emergency contraception when indicated.
- Provide access to long-acting reversible contraceptives (LARC), but, given the potential for coercion in this environment, use caution in counseling and providing LARC methods; ensure access to removal of LARC.
- Defer sterilization until after release, except in rare cases and when safeguards and documentation are in place to ensure it is not coercive.
- Provide access to adequate, no-cost supply of menstrual products.
- Treat menopausal symptoms with hormone replacement therapy, as indicated, and provide other measures to ameliorate vasomotor symptoms as requested.
- Provide comprehensive gynecologic care, either on site or by referral, for abnormal uterine bleeding, fibroids, pelvic pain, and other gynecologic conditions.
- Use a trauma-informed care approach to pelvic examinations and other aspects of obstetrician and gynecologic care.
- For transgender individuals, continue hormone therapy, enable access to gender affirming surgery, and ensure safe housing.
- Screen and make appropriate referrals for mental health conditions, trauma history, and substance use disorder.

---

Clinicians also should be attuned to the reproductive health needs of transgender individuals who are incarcerated, including continuation of hormone therapy, access to gender-affirming surgery, and safe housing (36).

As most incarcerated women are younger than age 45 (2), many of them will menstruate while incarcerated. Menstrual products should be stocked in adequate supply and available to incarcerated individuals at no cost. Older persons may experience perimenopausal symptoms in custody and should have access to appropriate modalities for symptom relief, especially given the lack of control they have over their living environment.

## Pregnancy and Postpartum Care

Upon entry into a prison, jail, or detention center, every individual of childbearing age should be assessed for pregnancy and offered pregnancy testing to enable the provision of adequate perinatal care or abortion services. Incarcerated patients who wish to continue their pregnancies should have access to readily available and regularly scheduled obstetric care, beginning in early pregnancy and continuing through the postpartum period. Incarcerated pregnant patients also should have access to unscheduled or emergency obstetric visits on a 24-hour basis, and on-site health care staff should be trained to recognize concerning signs and symptoms in pregnancy. Obstetric care provided should follow recommended guidelines (Box 2) (41, 42). Maternal nutrition can contribute positively to the delivery of a healthy, full-term newborn of an appropriate weight. Pregnant individuals often experience nausea, cravings, and have smaller gastric capacity, thus pregnant people in custody

CAREY000266

should receive healthy snacks outside of scheduled mealtimes.

Pregnant individuals with opioid use disorder should not undergo opioid withdrawal and should instead receive medications for opioid use disorder with methadone or buprenorphine and behavioral treatment.

---

**Box 2. Recommended Pregnancy and Postpartum Care in Carceral Settings**

- Assess for pregnancy at intake by inquiring about menstrual history, heterosexual activity, and contraceptive use and test for pregnancy, as appropriate.
- Screen for postpartum and breastfeeding status of nonpregnant individuals at intake.
- Provide noncoercive pregnancy options counseling and abortion services.
- Deliver comprehensive perinatal care following guidelines of the American Academy of Pediatrics and the American College of Obstetricians and Gynecologists.*
- Assess for alcohol and other substance use disorders and initiate treatment; provide medications for opioid use disorder, methadone or buprenorphine, for pregnant and postpartum people with opioid use disorder who are in custody and facilitate linkages to community care when they return to their communities.
- Test for and treat HIV (human immunodeficiency syndrome) to maximize maternal health and prevent perinatal HIV transmission.
- Administer vaccines including influenza and Tdap in pregnancy according to ACOG guidelines (https://www.acog.org/clinical/clinical-guidance/committee-opinion/articles/2018/06/maternal-immunization?utm_source=redirect&utm_medium=web&utm_campaign=otn).
- Screen for mental health conditions during pregnancy and for postpartum depression after delivery and treat, as needed.
- Educate about breastfeeding and provide lactation support and accommodations for postpartum individuals to provide breastmilk for their infants.
- Ensure adequate nutrition with appropriate folic acid, calcium, and other nutrient intake to incarcerated pregnant and breastfeeding individuals.
- Delivery services must occur in a licensed hospital, with arrangements for high-risk pregnancies, when indicated.
- Provide counseling and access to initiate postpartum reversible contraceptive methods during incarceration.

*American Academy of Pediatrics, American College of Obstetricians and Gynecologists. Guidelines for perinatal care. 8th ed. Elk Grove Village (IL): AAP; Washington, DC: ACOG; 2017.

---

Despite medications for opioid use disorder being the recommended treatment in pregnancy, evidence suggests that some jails and prisons force pregnant individuals to undergo withdrawal (43). Counseling and provision of medications for opioid use disorder in carceral settings also should be attentive to the dynamics of incarceration and should be provided in a patient-centered, noncoercive manner, with appropriate care for people who, after counseling, decline medications for opioid use disorder.

Pregnant individuals who are required to stand or participate in repetitive, strenuous, physical lifting are at risk of preterm birth and small-for-gestational-age infants. However, it also is important that they have ample opportunity for moderate exercise (44). In addition, a recovery period of 4–6 weeks generally is required after delivery for resumption of normal activity (41). This should be taken into consideration when assigning work to incarcerated pregnant individuals and during the postpartum period. Pregnant individuals are at higher risk of falls, thus activities with a high risk of falling, and top bunk assignments, should be avoided (41).

When pregnant incarcerated people have symptoms that require medical evaluation, they typically have to first go through custody staff in order to see an obstetrician–gynecologist or other perinatal health care practitioner. Custody staff and clinicians must not dismiss symptoms that can signal miscarriage, preterm labor, labor, preeclampsia, or other pregnancy conditions, and pregnant people should be evaluated in a timely fashion by a qualified clinician.

Although maintaining adequate safety is critical, correctional officers do not need to routinely be present in the room while a pregnant patient is being examined or in the hospital room during labor and delivery, unless requested by medical staff or if the situation poses a legitimate danger to the safety of the medical staff or others. Delivery services for incarcerated pregnant patients should be provided in a licensed hospital with facilities for high-risk pregnancies, when available. Some prisons and jails have programs in which doulas provide support for pregnant, birthing, and postpartum incarcerated individuals. Such services have many potential benefits for incarcerated pregnant people who often feel isolated, especially during birth (45).

## Postpartum Care

People who give birth while in custody should be allowed maximum time for parent–infant bonding while in the hospital after delivery. Policies or practices that separate the newborn from the birthing person for nonmedical indications while in the hospital or that expedite postpartum hospital discharge for carceral facility convenience are punitive, medically unnecessary, and can have detrimental effects on parent–infant bonding, breastfeeding, and psychological well-being. Upon return to the prison, jail, or detention facility, institutions can promote continued bonding by allowing contact visits and

CAREY000267

working with infant caregivers to help facilitate transport. Several prison nursery programs exist, allowing those who give birth in custody to have their infants with them at the prison for varying periods of time. Although such programs facilitate bonding and breastfeeding, and some research suggests that participants have lower rates of recidivism (46), it is also important to support community-based alternatives to incarceration for all women, especially pregnant individuals; such approaches allow individuals to be with their children in community supervision settings, rather than further investing in maternal incarceration.

Forced separation from one's newborn, as happens by default for most people who give birth in custody, can potentially have devastating maternal effects. Although no data exist to document the prevalence of postpartum depression among incarcerated people, the baseline increased prevalence of mental health issues, coupled with the isolation of incarceration, suggests it may be higher than in the general population. Those who give birth in custody should have early and frequent postpartum visits starting upon return from the hospital to ensure appropriate medical care after vaginal delivery or cesarean delivery and early detection of postpartum depression and other psychiatric conditions. People receiving medications for opioid use disorder during pregnancy should be continued on this treatment after the pregnancy ends to promote long-term recovery.

The American College of Obstetricians and Gynecologists strongly supports breastfeeding as the preferred method of feeding for newborns and infants (47). Given the benefits of breastfeeding to the woman and the infant, incarcerated individuals wishing to breastfeed should be allowed to breastfeed their infants directly, when possible, and express milk for delivery to the infant. If the individual is to express her milk, accommodations should be made for equipment and a private space to pump, safe storage, and transport of the milk to the infant's caregiver (42). Information on postpartum contraception and safe birth spacing should be discussed and reversible methods of contraception provided during incarceration, especially in preparation for release.

### Opposition to Use of Restraints and Solitary Confinement in Pregnancy and the Postpartum Period

The American College of Obstetricians and Gynecologists strongly opposes the use of restraints in pregnancy, labor and delivery, and the postpartum period. Use of restraints, often called *shackling*, is defined as using any physical restraint or mechanical device to control the movement of a prisoner's body or limbs, including handcuffs, leg irons, and belly chains. The American Medical Association; National Commission on Correctional Health Care; Association of Women's Health, Obstetric and Neonatal Nurses; United Nations Committee Against Torture; and other professional societies all oppose the routine use of restraints on pregnant incarcerated people (48–51). The First Step Act restricts the use of restraints on pregnant individuals in federal custody (52), and ICE has policies and procedures that limit the use of restraints in pregnancy (53). As of December 2020, 36 states have passed laws that restrict the use of restraints in labor and delivery, with some also restricting use at other times in pregnancy and the postpartum period (54). Importantly, passing a law does not always ensure compliance, as several reports have documented (55). Sometimes hospital policies and health care practitioners may be barriers to appropriate care for incarcerated pregnant people, requiring restraints even when not consistent with state law (56). Thus, it is essential that obstetrician–gynecologists and other women's health care practitioners advocate at organizational; hospital; and local, state, and federal levels to ensure policies and laws follow accepted clinical guidelines and evidence-based protocols, to restrict shackling, and to work with local hospital and custody staff to ensure compliance.

Physical restraints interfere with the ability of clinicians to safely practice medicine by reducing their ability to assess and evaluate the pregnant patient and the fetus, especially when obstetric emergencies arise. Shackling may put the health of the pregnant person and fetus at risk (Box 3). Restraining people who are pregnant or within 6 weeks postpartum should occur only in exceptional circumstances, such as when there is imminent risk of escape or harm. If restraint is needed, it should be the least restrictive method possible to ensure safety and should never include restraints that interfere with leg movement or the ability to break a fall; this includes not using four-point restraints, abdominal restraints, ankle chains, restraint to another person, or restraining hands behind the back. The individual should be allowed to lie on their side, not flat on the back or stomach. Pressure should not be applied either directly or indirectly to the abdomen. Custody officers should be available and required to remove restraints immediately upon request of medical personnel. Individuals should never be shackled during evaluation for labor or labor and delivery. If restraint is used, a report should be filed by the custody agency and by the hospital and reviewed by an independent body. There should be consequences from local and state governing agencies for individuals and institutions when use of restraints is unjustified.

The use of restraints on pregnant incarcerated individuals is demeaning, may compromise health care, and is rarely necessary. The apparent purpose of shackling is to prevent escape or harm to oneself or others. The lack of data to support this rationale, including a lack of evidence documenting actual escape attempts, demonstrates the feasibility of preserving the dignity of incarcerated individuals and providing them with compassionate care. The safety of health care personnel is important, and for this reason, adequate custody staff must be available to monitor incarcerated people, both during transport to and from the institution of incarceration and during receipt of medical care.

CAREY000268

> **Box 3. Potential Health Consequences of Restraints**
>
> - It is important for individuals to have the ability to break their falls. Shackling increases the risk of falls and decreases the individual's ability to protect oneself and the fetus if a fall occurs.
> - If a person has abdominal pain during pregnancy, a number of tests and examinations to evaluate for serious conditions will be impaired while an individual is shackled.
> - Prompt and uninhibited assessment for vaginal bleeding during pregnancy is important. Shackling can delay diagnosis, which may pose a threat to the health of the pregnant person or the fetus.
> - Hypertensive disease occurs in approximately 2–8% of pregnancies and is directly responsible for 16% of maternal deaths in high-income countries.* Preeclampsia can result in seizures, which may not be safely treated in a shackled patient.
> - People are at increased risk of venous thrombosis during pregnancy and the postpartum period.† Limited mobility caused by shackling may increase this risk and may compromise the health of the pregnant person and fetus.
> - Adding the discomfort of restraints to an individual already suffering from common symptoms in pregnancy such as nausea and vomiting is cruel and inhumane.
> - Pregnant people may develop swelling in their extremities. Restraints may be applied too tightly, causing pain and skin damage.
> - Shackling interferes with normal labor and delivery:
>   - The ability to ambulate during labor increases the likelihood for adequate pain management, successful cervical dilation, and a successful vaginal delivery.
>   - Pregnant people need to be able to move or be moved in preparation for emergencies of labor and delivery, including shoulder dystocia, hemorrhage, or abnormalities of the fetal heart rate requiring intervention, including urgent cesarean delivery.
> - After delivery, a healthy baby should remain with the parent to facilitate infant bonding. Restraints may prevent or inhibit this bonding and interfere with the person's safe handling of the infant, including the ability to breastfeed.
>
> *Gestational hypertension and preeclampsia. ACOG Practice Bulletin No. 222. American College of Obstetricians and Gynecologists. Obstet Gynecol 2020;135:e237-60.
>
> †Thromboembolism in pregnancy. ACOG Practice Bulletin No. 196. American College of Obstetricians and Gynecologists [published erratum appears in Obstet Gynecol 2018;132:1068]. Obstet Gynecol 2018;132:e1–17.

Pregnant people should not be placed in solitary confinement. The mental health effects on people placed in restrictive housing can be compounded in pregnancy (37, 57). Being in solitary confinement can limit access to timely health care, especially when urgent pregnancy concerns arise. Such housing also limits mobility and often by default results in bedrest, which has documented harms in pregnancy (44). Furthermore, the practice of routinely placing pregnant people in medical isolation for the sole purpose of proximity to health care staff is not recommended when such arrangements limit access to programming, exercise, and social interaction.

## Conclusion

Obstetrician–gynecologists and other women's health care practitioners can support efforts to improve health care for incarcerated pregnant, postpartum, and nonpregnant individuals. Even if they do not work inside institutions of incarceration, they should provide compassionate, appropriate care when incarcerated patients are treated at clinics and hospitals in the community. They should foster safe and dignified birthing environments for incarcerated people who give birth in custody and allow these individuals to have the same opportunities to bond with their newborns as nonincarcerated postpartum hospitalized people. Obstetrician–gynecologists and other women's health care practitioners should advocate at organizational; hospital; and local, state, and federal levels to ensure policies and laws follow accepted clinical guidelines and evidence-based protocols; to eliminate copays to access health care while in custody; to restrict shackling during pregnancy, labor, and the postpartum period and work with local hospital and custody staff to ensure compliance; to ensure that menstrual products are available at no cost and in adequate supply; and to support policies and laws that decrease the number of incarcerated people and promote community-based alternatives, especially for those who are pregnant and parenting. Practitioners also can facilitate collaborations between medical and other health care professional schools and prisons and jails, as well as obtain and support funding for research on the health needs of incarcerated people, the services they receive, and health outcomes. Ensuring that incarcerated individuals receive respectful, consistent, high-quality reproductive health, pregnancy, and postpartum care is essential for ameliorating inequities and affirming these individuals' dignity.

## References

1. Sawyer W. The gender divide: tracking women's state prison growth. Northampton, MA: Prison Policy Initiative; 2018. Available at: https://www.prisonpolicy.org/reports/women_overtime.html. Retrieved March 24, 2021.

CAREY000269

2. Carson EA. Prisoners in 2019. Washington, DC: U.S. Department of Justice; 2020. Available at: https://www.bjs.gov/content/pub/pdf/p19.pdf. Retrieved March 24, 2021.

3. Zeng Z, Minton TD. Jail inmates in 2019. Washington, DC: U.S. Department of Justice; 2021. Available at: https://www.bjs.gov/content/pub/pdf/ji19.pdf. Retrieved March 24, 2021.

4. Federal Bureau of Investigation. Crime in the United States 2018. Washington, DC: FBI; 2018. Available at: https://ucr.fbi.gov/crime-in-the-u.s/2018/crime-in-the-u.s.-2018/topic-pages/tables/table-33. Retrieved March 24, 2021.

5. Women's Refugee Commission. Prison for survivors. The detention of women seeking asylum in the United States. New York, NY: Women's Refugee Commission; 2017. Available at: https://s33660.pcdn.co/wp-content/uploads/2020/04/Prison-for-Survivors-REPORT-FINAL.pdf. Retrieved March 24, 2021.

6. Maruschak LM, Bronson J, Alper M. Parents in prison and their minor children. Survey of Prison Inmates, 2016. Washington, DC: U.S. Department of Justice, Bureau of Justice Statistics; 2021. Available at: https://www.bjs.gov/content/pub/pdf/pptmcspi16st.pdf. Retrieved April 2, 2021.

7. Hardeman RR, Medina EM, Kozhimannil KB. Structural racism and supporting black lives—the role of health professionals. N Engl J Med 2016;375:2113–15.

8. Importance of social determinants of health and cultural awareness in the delivery of reproductive health care. ACOG Committee Opinion No. 729. American College of Obstetricians and Gynecologists. Obstet Gynecol 2018;131:e43–8.

9. Ross L, Solinger R. Reproductive justice: an introduction. Oakland: University of California Press; 2017.

10. Hayes CM, Sufrin C, Perritt JB. Reproductive justice disrupted: mass incarceration as a driver of reproductive oppression. Am J Public Health 2020;110:S21-4.

11. Estelle v. Gamble, 429 U.S. 97 (1976).

12. National Commission on Correctional Health Care. Standards for health services in jails. Chicago, IL: NCCHC; 2018.

13. National Commission on Correctional Health Care. Standards for health services in prisons. Chicago, IL: NCCHC; 2018.

14. National Commission on Correctional Health Care. Standards for health services in juvenile detention and confinement facilities. Chicago, IL: NCCHC; 2015.

15. Medicaid and CHIP Payment and Access Commission. Medicaid and the criminal justice system. Issue Brief. Washington, DC: MACPAC; 2018. Available at: https://www.macpac.gov/wp-content/uploads/2018/07/Medicaid-and-the-Criminal-Justice-System.pdf. Retrieved March 24, 2021.

16. Medicare Rights Center. Medicare coverage during incarceration. Available at: https://www.medicareinteractive.org/get-answers/medicare-health-coverage-options/medicare-and-incarceration/medicare-coverage-during-incarceration. Retrieved March 24, 2021.

17. Covington SS. Women and the criminal justice system. Womens Health Issues 2007;17:180–2.

18. Clarke JG, Hebert MR, Rosengard C, Rose JS, DaSilva KM, Stein MD. Reproductive health care and family planning needs among incarcerated women. Am J Public Health 2006;96:834–9.

19. Sufrin C, Baird S, Clarke J, Feldman E. Family planning services for incarcerated women: models for filling an unmet need. Int J Prison Health 2017;13:10–8.

20. Allsworth JE, Clarke J, Peipert JF, Hebert MR, Cooper A, Boardman LA. The influence of stress on the menstrual cycle among newly incarcerated women. Womens Health Issues 2007;17:202–9.

21. Sufrin CB, Tulsky JP, Goldenson J, Winter KS, Cohan DL. Emergency contraception for newly arrested women: evidence for an unrecognized public health opportunity. J Urban Health 2010;87:244–53.

22. Prison Rape Elimination Act national standards, 28 C.F.R. pt. 115 (2018).

23. Sufrin C, Beal L, Clarke J, Jones R, Mosher WD. Pregnancy outcomes in US prisons, 2016-2017. Am J Public Health 2019;109:799–805.

24. Sufrin C, Jones RK, Mosher WD, Beal L. Pregnancy prevalence and outcomes in U.S. jails. Obstet Gynecol 2020;135:1177–83.

25. U.S. Department of Justice. Federal prisoner statistics collected under the First Step Act, 2020. Bureau of Justice Statistics. Washington, DC: DOJ; 2021. Available at: https://www.bjs.gov/content/pub/pdf/fpscfsa20.pdf. Retrieved March 24, 2021.

26. Kasdan D. Abortion access for incarcerated women: are correctional health practices in conflict with constitutional standards. Perspect Sex Reprod Health 2009;41:59–62.

27. Sufrin CB, Creinin MD, Chang JC. Incarcerated women and abortion provision: a survey of correctional health providers. Perspect Sex Reprod Health 2009;41:6–11.

28. Javanbakht M, Boudov M, Anderson LJ, Malek M, Smith LV, Chien M, et al. Sexually transmitted infections among incarcerated women: findings from a decade of screening in a Los Angeles county jail, 2002-2012. Am J Public Health 2014;104:e103–9.

29. Maruschak LM, Bronson J. HIV in prisons, 2015—statistical tables. Bureau of Justice Statistics. Washington, DC: U.S. Department of Justice; 2017. Available at: https://www.bjs.gov/content/pub/pdf/hivp15st.pdf. Retrieved March 24, 2021.

30. Beck AJ, Harrison PM. Sexual victimization in local jails reported by inmates, 2007. Bureau of justice statistics special report. Available at: https://www.bjs.gov/content/pub/pdf/svljri07.pdf. Retrieved March 24, 2021.

31. Bronson J, Stroop J, Zimmer S, Berzofsky M. Drug use, dependence, and abuse among state prisoners and jail inmates, 2007-2009. Bureau of Justice Statistics Special Report. Washington, DC: U.S. Department of Justice; 2017. Available at: https://www.bjs.gov/content/pub/pdf/dudaspji0709.pdf. Retrieved March 24, 2021.

CAREY000270

32. Bronson J, Berzofsky M. Indicators of mental health problems reported by prisoners and jail inmates, 2011-12. Bureau of Justice Statistics Special Report. Washington, DC: U.S. Department of Justice; 2017. Available at: https://www.bjs.gov/content/pub/pdf/imhprpji1112.pdf. Retrieved March 24, 2021.

33. Zust BL. Partner violence, depression, and recidivism: the case of incarcerated women and why we need programs designed for them. Issues Ment Health Nurs 2009;30:246–51.

34. Van Dieten M, Jones NJ, Rondon M. Working with women who perpetrate violence: a practice guide. Washington, DC: National Resource Center on Justice-Involved Women; 2014. Available at: https://cjinvolvedwomen.org/wp-content/uploads/2015/09/Working-With-Women-Who-Perpetrate-Violence-A-Practice-Guide6-23.pdf. Retrieved March 24, 2021.

35. Women's Preventive Services Initiative. Recommendations. Available at: https://www.womenspreventivehealth.org/recommendations/. Retrieved March 24, 2021.

36. Health care for transgender and gender diverse individuals. ACOG Committee Opinion No. 823. American College of Obstetricians and Gynecologists. Obstet Gynecol 2021;137:e75–88.

37. Sufrin C. Pregnancy and postpartum care in correctional settings. Chicago, IL: National Commission on Correctional Health Care; 2018. Available at: https://www.ncchc.org/filebin/Resources/Pregnancy-and-Postpartum-Care-2018.pdf. Retrieved March 24, 2021.

38. Roberts D. Killing the black body: race, reproduction and the meaning of liberty. New York, NY: Vintage Books; 1997.

39. Roth R, Ainsworth SL. "If they hand you a paper, you sign it": a call to end the sterilization of women in prison. Hastings Womens Law J 2015;26:7–50.

40. Sterilization of women: ethical issues and considerations. Committee Opinion No. 695. American College of Obstetricians and Gynecologists. Obstet Gynecol 2017;129:e109–16.

41. American Academy of Pediatrics, American College of Obstetricians and Gynecologists. Guidelines for perinatal care. 8th ed. Elk Grove Village, IL: AAP; Washington, DC: American College of Obstetricians and Gynecologists; 2017.

42. National Commission on Correctional Health Care. Breastfeeding in correctional settings. Position Statement. Chicago, IL: NCCHC; 2018. Available at: https://www.ncchc.org/breastfeeding-in-correctional-settings. Retrieved March 24, 2021.

43. Kelsey CM, Medel N, Mullins C, Dallaire D, Forestell C. An examination of care practices of pregnant women incarcerated in jail facilities in the United States. Matern Child Health J 2017;21:1260–6.

44. Physical activity and exercise during pregnancy and the postpartum period. Committee Opinion No. 650. American College of Obstetricians and Gynecologists. Obstet Gynecol 2015;126:e135–42.

45. Schroeder C, Bell J. Doula birth support for incarcerated pregnant women. Public Health Nurs 2005;22:53–8.

46. Goshin LS, Byrne MW, Henninger AM. Recidivism after release from a prison nursery program. Public Health Nurs 2014;31:109–17.

47. Barriers to breastfeeding: supporting initiation and continuation of breastfeeding. ACOG Committee Opinion No. 821. American College of Obstetricians and Gynecologists. Obstet Gynecol 2021;137:e54–62.

48. American Medical Association. An "act to prohibit the shackling of pregnant prisoners" model state legislation. Advocacy Resource Center. Chicago, IL: AMA; 2015. Available at: https://www.ama-assn.org/sites/ama-assn.org/files/corp/media-browser/specialty%20group/arc/shackling-pregnant-prisoners-issue-brief.pdf. Retrieved March 24, 2021.

49. National Commission on Correctional Health Care. Nonuse of Restraints for Pregnant and Postpartum Incarcerated Individuals. Position Statement. Chicago, IL: NCCHC; 2020. Available at: https://www.ncchc.org/nonuse-of-restraints-for-pregnant-and-postpartum. Retrieved March 24, 2021.

50. Nursing care of incarcerated women during pregnancy and the postpartum period. Association of Women's Health, Obstetric and Neonatal Nurses. J Obstet Gynecol Neonatal Nurs 2018;47:236–8.

51. United Nations, Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment. Consideration of reports submitted by states parties under article 19 of the convention: conclusions and recommendations of the Committee against Torture. New York, NY: UN; 2006. Available at: https://www.refworld.org/docid/453776c60.html. Retrieved March 24, 2021.

52. First Step Act of 2018, Pub. L. No. 115-391, 132 Stat. 5194.

53. U.S. Immigration and Customs Enforcement. 2011 operations manual ICE performance-based national detention standards. Washington, DC: ICE; 2011. Available at: https://www.ice.gov/detention-standards/2011. Retrieved March 24, 2021.

54. American College of Obstetricians and Gynecologists. Incarcerated women and shackling state laws. Washington, DC: ACOG; 2021. Available at: https://www.acog.org/-/media/project/acog/acogorg/files/advocacy/policy-priorities/incarcerated-women-shackling_state-policies.pdf. Retrieved March 24, 2021.

55. Kraft-Stolar T. Reproductive injustice: the state of reproductive health care for women in New York state prisons. New York, NY: Correctional Association of New York; 2015. Available at: https://static1.squarespace.com/static/5b2c07e2a9e02851fb387477/t/5c4f5d01758d466ad39-b0a97/1548705033102/2015+Reproductve+Injustice+in+-New+Yorks+Prisons.pdf. Retrieved March 24, 2021.

56. Goshin LS, Sissoko DR, Neumann G, Sufrin C, Byrnes L. Perinatal nurses' experiences with and knowledge of the care of incarcerated women during pregnancy and the postpartum period. J Obstet Gynecol Neonatal Nurs 2019;48:27–36.

57. National Commission on Correctional Health Care. Solitary confinement (isolation). Position Statement. Chicago, IL: NCCHC; 2016. Available at: https://www.ncchc.org/solitary-confinement. Retrieved March 24, 2021.

CAREY000271

Published online April 27, 2021.

Copyright 2021 by the American College of Obstetricians and Gynecologists. All rights reserved. No part of this publication may be reproduced, stored in a retrieval system, posted on the internet, or transmitted, in any form or by any means, electronic, mechanical, photocopying, recording, or otherwise, without prior written permission from the publisher.

**American College of Obstetricians and Gynecologists**
**409 12th Street SW, Washington, DC 20024-2188**

Reproductive health care for incarcerated pregnant, postpartum, and nonpregnant individuals. ACOG Committee Opinion No. 830. American College of Obstetricians and Gynecologists. Obstet Gynecol 2021;138:e24–34.

*This information is designed as an educational resource to aid clinicians in providing obstetric and gynecologic care, and use of this information is voluntary. This information should not be considered as inclusive of all proper treatments or methods of care or as a statement of the standard of care. It is not intended to substitute for the independent professional judgment of the treating clinician. Variations in practice may be warranted when, in the reasonable judgment of the treating clinician, such course of action is indicated by the condition of the patient, limitations of available resources, or advances in knowledge or technology. The American College of Obstetricians and Gynecologists reviews its publications regularly; however, its publications may not reflect the most recent evidence. Any updates to this document can be found on acog.org or by calling the ACOG Resource Center.*

*While ACOG makes every effort to present accurate and reliable information, this publication is provided "as is" without any warranty of accuracy, reliability, or otherwise, either express or implied. ACOG does not guarantee, warrant, or endorse the products or services of any firm, organization, or person. Neither ACOG nor its officers, directors, members, employees, or agents will be liable for any loss, damage, or claim with respect to any liabilities, including direct, special, indirect, or consequential damages, incurred in connection with this publication or reliance on the information presented.*

*All ACOG committee members and authors have submitted a conflict of interest disclosure statement related to this published product. Any potential conflicts have been considered and managed in accordance with ACOG's Conflict of Interest Disclosure Policy. The ACOG policies can be found on acog.org. For products jointly developed with other organizations, conflict of interest disclosures by representatives of the other organizations are addressed by those organizations. The American College of Obstetricians and Gynecologists has neither solicited nor accepted any commercial involvement in the development of the content of this published product.*

CAREY000272


The American College of Obstetricians and Gynecologists
WOMEN'S HEALTH CARE PHYSICIANS

# COMMITTEE OPINION

Number 557 • April 2013
(Reaffirmed 2019)

**Committee on Gynecologic Practice**
*This document reflects emerging clinical and scientific advances as of the date issued and is subject to change. The information should not be construed as dictating an exclusive course of treatment or procedure to be followed.*

## Management of Acute Abnormal Uterine Bleeding in Nonpregnant Reproductive-Aged Women

**ABSTRACT:** Initial evaluation of the patient with acute abnormal uterine bleeding should include a prompt assessment for signs of hypovolemia and potential hemodynamic instability. After initial assessment and stabilization, the etiologies of acute abnormal uterine bleeding should be classified using the PALM–COEIN system. Medical management should be the initial treatment for most patients, if clinically appropriate. Options include intravenous conjugated equine estrogen, multi-dose regimens of combined oral contraceptives or oral progestins, and tranexamic acid. Decisions should be based on the patient's medical history and contraindications to therapies. Surgical management should be considered for patients who are not clinically stable, are not suitable for medical management, or have failed to respond appropriately to medical management. The choice of surgical management should be based on the patient's underlying medical conditions, underlying pathology, and desire for future fertility. Once the acute bleeding episode has been controlled, transitioning the patient to long-term maintenance therapy is recommended.

Abnormal uterine bleeding (AUB) may be acute or chronic and is defined as bleeding from the uterine corpus that is abnormal in regularity, volume, frequency, or duration and occurs in the absence of pregnancy (1, 2). Acute AUB refers to an episode of heavy bleeding that, in the opinion of the clinician, is of sufficient quantity to require immediate intervention to prevent further blood loss (1). Acute AUB may occur spontaneously or within the context of chronic AUB (abnormal uterine bleeding present for most of the previous 6 months). The general process for evaluating patients who present with acute AUB can be approached in three stages: 1) assessing rapidly the clinical picture to determine patient acuity, 2) determining most likely etiology of the bleeding, and 3) choosing the most appropriate treatment for the patient.

### Assessment of the Patient With Acute Abnormal Uterine Bleeding

Initial evaluation of the patient with acute AUB should include a prompt assessment for signs of hypovolemia and potential hemodynamic instability. If the patient is hemodynamically unstable or has signs of hypovolemia, intravenous access with a single or two large bore intravenous lines should be initiated rapidly as should the preparation for blood transfusion and clotting factor replacements. After the initial assessment and stabilization, the next step is to evaluate for the most likely etiology of acute AUB so that the most appropriate and effective treatment strategy to control the bleeding can be chosen.

### Etiologies of Acute Abnormal Uterine Bleeding

The etiologies of acute AUB, which can be multifactorial, are the same as the etiologies of chronic AUB. The Menstrual Disorders Working Group of the International Federation of Gynecology and Obstetrics proposed a classification system and standardized terminology for the etiologies of the symptoms of AUB, which has been approved by the International Federation of Gynecology and Obstetrics' executive board and supported by the American College of Obstetricians and Gynecologists (1, 2). With this system, the etiologies of AUB are classified as "related to uterine structural abnormalities" and "unrelated to uterine structural abnormalities" and categorized following the acronym PALM–COEIN: **P**olyp,

**A**denomyosis, **L**eiomyoma, **M**alignancy and hyperplasia, **C**oagulopathy, **O**vulatory dysfunction, **E**ndometrial, **I**atrogenic, and **N**ot otherwise classified (Fig. 1). Determining the most likely etiology of acute AUB is essential for choosing the most appropriate and effective management for the individual patient and is accomplished by obtaining a history, performing a physical examination, and requesting laboratory and imaging tests, when indicated.

### History

Obtaining a thorough medical history should be guided by the PALM–COEIN system and focused on details of the current bleeding episode; related symptoms; and past menstrual, gynecologic, and medical history; which can, in turn, guide appropriate laboratory and radiologic testing. Up to 13% of women with heavy menstrual bleeding have some variant of von Willebrand disease and up to 20% of women may have an underlying coagulation disorder (2–4). Other coagulation factor deficiencies, hemophilia, and platelet function disorders may be associated with AUB in any age group. Using a screening tool in Box 1 can assist the clinician in determining which patients may benefit from laboratory testing for disorders of hemostasis. Additionally, systemic diseases, such as leukemia and liver failure, and medications, such as anticoagulants or chemotherapeutic agents, can impair coagulation and be associated with AUB.

### Physical Examination

A physical examination of a patient who presents with acute AUB should focus on signs of acute blood loss

---

**Box 1. Clinical Screening for an Underlying Disorder of Hemostasis in the Patient With Excessive Menstrual Bleeding** ⇐

Initial screening for an underlying disorder of hemostasis in patients with excessive menstrual bleeding should be structured by the medical history. A positive screening result* comprises the following circumstances:

- Heavy menstrual bleeding since menarche
- One of the following conditions:
  —Postpartum hemorrhage
  —Surgery-related bleeding
  —Bleeding associated with dental work
- Two or more of the following conditions:
  —Bruising, one to two times per month
  —Epistaxis, one to two times per month
  —Frequent gum bleeding
  —Family history of bleeding symptoms

*Patients with a positive screening result should be considered for further evaluation, including consultation with a hematologist and testing for von Willebrand factor and ristocetin cofactor.

Modified from Kouides PA, Conard J, Peyvandi F, Lukes A, Kadir R. Hemostasis and menstruation: appropriate investigation for underlying disorders of hemostasis in women with excessive menstrual bleeding. Fertil Steril 2005;84:1345–51. [PubMed] [Full Text]

---



**Fig. 1.** Basic PALM–COEIN classification system for the causes of abnormal uterine bleeding in nonpregnant reproductive-aged women. This system, approved by the International Federation of Gynecology and Obstetrics, uses the term "abnormal uterine bleeding" paired with terms that describe associated bleeding patterns ("heavy menstrual bleeding" or "intermenstrual bleeding"), a qualifying letter (or letters) to indicate its etiology (or etiologies), or both. Abbreviation: AUB indicates abnormal uterine bleeding. (Data from Munro MG, Critchley HO, Broder MS, Fraser IS. FIGO classification system [PALM-COEIN] for causes of abnormal uterine bleeding in nongravid women of reproductive age. FIGO Working Group on Menstrual Disorders. Int J Gynaecol Obstet 2011;113:3–13. [PubMed] [Full Text]) ⇐

CAREY000226

(hypovolemia and anemia) and findings that suggest the etiology of the bleeding. The patient should be evaluated to determine that she has acute AUB and not bleeding from other areas of the genital tract. Thus, a pelvic examination (including a speculum examination and a bimanual examination) should be performed to identify any trauma to the genital tract and vaginal or cervical findings that could cause vaginal bleeding. The pelvic examination also will determine the amount and intensity of bleeding and will identify any uterine enlargement or irregularity, which can be associated with a structural cause of the acute AUB (leiomyoma).

### Laboratory Testing and Imaging

Laboratory evaluation of patients who present with acute AUB is recommended (Table 1). All adolescents and women with either abnormalities in initial laboratory testing or positive screening results for disorders of hemostasis should be considered for specific tests for von Willebrand disease and other coagulopathies, including von Willebrand–ristocetin cofactor activity, von Willebrand factor antigen, and factor VIII (2, 5). Based on the clinical presentation, a workup for thyroid disorders, liver disorder, sepsis, or leukemia may be indicated. Endometrial tissue sampling should be performed in patients with AUB who are older than 45 years as a first-line test. Endometrial sampling also should be performed in patients younger than 45 years with a history of unopposed estrogen exposure (such as seen in patients with obesity or polycystic ovary syndrome), failed medical management, and persistent AUB (2). In a stable patient, a decision whether to perform a pelvic ultrasound examination should be based on the clinical judgment of the examining clinician.

### Treatment

Limited evidence and expert opinion support recommendations for treatment. Choice of treatment for acute AUB depends on clinical stability, overall acuity, suspected etiology of the bleeding, desire for future fertility, and underlying medical problems. The two main objectives of managing acute AUB are: 1) to control the current episode of heavy bleeding and 2) to reduce menstrual blood loss in subsequent cycles. Medical therapy is considered the preferred initial treatment (Table 2). However, certain situations may call for prompt surgical management (6). Studies of treatments of acute AUB are limited, and only one treatment (intravenous [IV] conjugated equine estrogen) is specifically approved by the U.S. Food and Drug Administration for the treatment of acute AUB.

### Medical Management

Hormonal management is considered the first line of medical therapy for patients with acute AUB without known or suspected bleeding disorders. Treatment options include IV conjugated equine estrogen, combined oral contraceptives (OCs), and oral progestins. In one randomized controlled trial of 34 women, IV conjugated equine estrogen was shown to stop bleeding in 72% of participants within 8 hours of administration compared with 38% of participants treated with a placebo (7). Little data exist regarding the use of IV estrogen in patients with cardiovascular or thromboembolic risk factors.

Combined OCs and oral progestins, taken in multidose regimens, also are commonly used for acute AUB. One study compared participants who underwent therapy with OCs administered three times daily for 1 week with those who underwent therapy with medroxyprogesterone acetate administered three times daily for 1 week for the treatment of acute AUB (8). The study found that bleeding stopped in 88% of women who took OCs and 76% of women who took medroxyprogesterone acetate

**Table 1.** Laboratory Testing for the Evaluation of Patients With Acute Abnormal Uterine Bleeding ⇐

| Laboratory Evaluation | Specific Laboratory Tests |
|---|---|
| Initial laboratory testing | • Complete blood count<br>• Blood type and cross match<br>• Pregnancy test |
| Initial laboratory evaluation for disorders of hemostasis | • Partial thromboplastin time<br>• Prothrombin time<br>• Activated partial thromboplastin time<br>• Fibrinogen |
| Initial testing for von Willebrand disease* | • von Willebrand factor antigen†<br>• Ristocetin cofactor assay†<br>• Factor VIII† |
| Other laboratory tests to consider | • Thyroid-stimulating hormone<br>• Serum iron, total iron binding capacity, and ferritin<br>• Liver function tests<br>• *Chlamydia trachomatis* |

*Adult women who receive positive results for risk of bleeding disorders or who have abnormal initial laboratory test results for disorders of hemostasis should undergo testing for von Willebrand disease. Adolescents with heavy menses since menarche who present with acute abnormal uterine bleeding also should undergo testing for von Willebrand disease.

†Consultation with a hematologist can aid in interpreting these test results. If any of these markers are abnormally low, a hematologist should be consulted.

Data from James AH, Kouides PA, Abdul-Kadir R, Dietrich JE, Edlund M, Federici AB, et al. Evaluation and management of acute menorrhagia in women with and without underlying bleeding disorders: consensus from an international expert panel. Eur J Obstet Gynecol Reprod Biol 2011;158:124–34; National Heart, Lung, and Blood Institute. The diagnosis, evaluation, and management of von Willebrand disease. NIH Publication No. 08-5832. Bethesda (MD): NHLBI; 2007. Available at: http://www.nhlbi.nih.gov/guidelines/vwd/vwd.pdf. Retrieved December 5, 2012; *and* Diagnosis of abnormal uterine bleeding in reproductive-aged women. Practice Bulletin No. 128. American College of Obstetricians and Gynecologists. Obstet Gynecol 2012;120:197–206.

CAREY000227

**Table 2.** Medical Treatment Regimens ⇐

| Drug | Source | Suggested Dose | Dose Schedule | Potential Contraindications and Precautions According to FDA Labeling* |
|---|---|---|---|---|
| Conjugated equine estrogren | DeVore GR, Owens O, Kase N. Use of intravenous Premarin in the treatment of dysfunctional uterine bleeding—a double-blind randomized control study. Obstet Gynecol 1982;59:285–91. | 25 mg IV | Every 4–6 hours for 24 hours | Contraindications include, but are not limited, to breast cancer, active or past venous thrombosis or arterial thromboembolic disease, and liver dysfunction or disease. The agent should be used with caution in patients with cardiovascular or thromboembolic risk factors. |
| Combined oral contraceptives† | Munro MG, Mainor N, Basu R, Brisinger M, Barreda L. Oral medroxyprogesterone acetate and combination oral contraceptives for acute uterine bleeding: a randomized controlled trial. Obstet Gynecol 2006;108:924–9. | Monophasic combined oral contraceptive that contains 35 micrograms of ethinyl estradiol | Three times per day for 7 days | Contraindications include, but are not limited to, cigarette smoking (in women aged 35 years or older), hypertension, history of deep vein thrombosis or pulmonary embolism, known thromboembolic disorders, cerebrovascular disease, ischemic heart disease, migraine with aura, current or past breast cancer, severe liver disease, diabetes with vascular involvement, valvular heart disease with complications, and major surgery with prolonged immobilization. |
| Medroxyprogesterone acetate‡ | Munro MG, Mainor N, Basu R, Brisinger M, Barreda L. Oral medroxyprogesterone acetate and combination oral contraceptives for acute uterine bleeding: a randomized controlled trial. Obstet Gynecol 2006;108:924–9. | 20 mg orally | Three times per day for 7 days | Contraindications include, but are not limited to, active or past deep vein thrombosis or pulmonary embolism, active or recent arterial thromboembolic disease, current or past breast cancer, and impaired liver function or liver disease. |
| Tranexamic acid | James AH, Kouides PA, Abdul-Kadir R, Dietrich JE, Edlund M, Federici AB, et al. Evaluation and management of acute menorrhagia in women with and without underlying bleeding disorders: consensus from an international expert panel. Eur J Obstet Gynecol Reprod Biol 2011;158:124–34. | 1.3 g orally§ or 10 mg/kg IV (maximum 600 mg/dose) | Three times per day for 5 days (every 8 hours) | Contraindications include, but are not limited to, acquired impaired color vision and current thrombotic or thromboembolic disease. The agent should be used with caution in patients with a history of thrombosis (because of uncertain thrombotic risks), and concomitant administration of combined oral contraceptives needs to be carefully considered. |

Abbreviations: FDA indicates U.S. Food and Drug Administration; IV, intravenously.

*The U.S. Food and Drug Administration's labeling contains exhaustive lists of contraindications for each of these therapies. In treating women with acute abnormal uterine bleeding, physicians often must weigh the relative risks of treatment against the risk of continued bleeding in the context of the patient's medical history and risk factors. These decisions must be made on a case-by-case basis by the treating clinician.

†Other combined oral contraceptive formulations, dosages, and schedules also may be effective.

‡Other progestins (such as norethindrone acetate), dosages, and schedules also may be effective.

§Other dosages and schedules also may be effective.

CAREY000228

within a median time of 3 days. For all patients, the contraindications to these therapies need to be considered before administration. Consultation with the Centers for Disease Control and Prevention's *Medical Eligibility Criteria for Contraceptive Use* (9, 10) and U.S. Food and Drug Administration labeling information (11) can be helpful in determining which patients may or may not be treated with OCs or progestin alone. Other OC and progestin formulations and dose schedules may be equally effective.

Antifibrinolytic drugs, such as tranexamic acid, work by preventing fibrin degradation and are effective treatments for patients with chronic AUB. They have been shown to reduce bleeding in these patients by 30–55% (12, 13). Tranexamic acid effectively reduces intraoper-ative bleeding and the need for transfusion in surgical patients and is likely effective for patients with acute AUB, although it has not been studied for this indication (14, 15). Experts recommend using either oral or IV tranexamic acid for the treatment of acute AUB (15). Intrauterine tamponade with a 26F Foley catheter infused with 30 mL of saline solution has been reported to control bleeding successfully and also may be considered (15, 16).

Once the acute episode of bleeding has been controlled, multiple treatment options are available for long-term treatment of chronic AUB. Effective medical therapies include the levonorgestrel intrauterine system, OCs (monthly or extended cycles), progestin therapy (oral or intramuscular), tranexamic acid, and nonsteroidal antiinflammatory drugs (6). If a patient is receiving IV conjugated equine estrogen, the health care provider should add progestin or transition to OCs. Unopposed estrogen should not be used as long-term treatment for chronic AUB.

Patients with known or suspected bleeding disorders may respond to the hormonal and nonhormonal management options listed earlier in this section. Consultation with a hematologist is recommended for these patients, especially if bleeding is difficult to control or the gynecologist is unfamiliar with the other options for medical management. Desmopressin may help treat acute AUB in patients with von Willebrand disease if the patient is known to respond to that agent. It may be administered by intranasal inhalation, intravenously, or subcutaneously (17). This agent must be used with caution because of the risks of fluid retention and hyponatremia and should not be administered to patients with massive hemorrhage who are receiving IV fluid resuscitation because of issues with fluid overload (15). Recombinant factor VIII and von Willebrand factor also are available and may be required to control severe hemorrhage (5). Other factor deficiencies may need factor-specific replacement.

Patients with bleeding disorders or platelet function abnormalities should avoid nonsteroidal antiinflammatory drugs because of their effect on platelet aggregation and their interaction with drugs that might affect liver function and the production of clotting factors (17).

**Surgical Management**

The need for surgical treatment is based on the clinical stability of the patient, the severity of bleeding, contraindications to medical management, the patient's lack of response to medical management, and the underlying medical condition of the patient. Surgical options include dilation and curettage (D&C), endometrial ablation, uterine artery embolization, and hysterectomy. The choice of surgical modality (eg, D&C versus hysterectomy) is based on the aforementioned factors plus the patient's desire for future fertility. Specific treatments, such as hysteroscopy with D&C, polypectomy, or myomectomy, may be required if structural abnormalities are suspected as the cause of acute AUB. Dilation and curettage alone (without hysteroscopy) is an inadequate tool for evaluation of uterine disorders and may provide only a temporary reduction in bleeding (cycles after the D&C will not be improved) (18). Dilation and curettage with concomitant hysteroscopy may be of value for those patients in whom intrauterine pathology is suspected or a tissue sample is desired (18). Case reports of uterine artery embolization and endometrial ablation show that these procedures successfully control acute AUB (19, 20). Endometrial ablation, although readily available in most centers, should be considered only if other treatments have been ineffective or are contraindicated, and it should be performed only when a woman does not have plans for future childbearing and when the possibility of endometrial or uterine cancer has been reliably ruled out as the cause of the acute AUB. Hysterectomy, the definitive treatment for controlling heavy bleeding, may be necessary for patients who do not respond to medical therapy.

**Conclusions and Recommendations**

Based on the available evidence and expert opinion, the American College of Obstetricians and Gynecologists' Committee on Gynecologic Practice makes the following conclusions and recommendations:

- The etiologies of acute AUB should be classified based on the PALM–COEIN system: **P**olyp, **A**denomyosis, **L**eiomyoma, **M**alignancy and hyperplasia, **C**oagulopathy, **O**vulatory dysfunction, **E**ndometrial, **I**atrogenic, and **N**ot otherwise classified.

- Medical management should be the initial treatment for most patients, if clinically appropriate. Options include IV conjugated equine estrogen, multi-dose regimens of OCs or oral progestins, and tranexamic acid. Decisions should be based on the patient's medical history and contraindications to therapies.

- The need for surgical treatment is based on the clinical stability of the patient, the severity of bleeding, contraindications to medical management, the patient's lack of response to medical management, and the underlying medical condition of the patient. The choice of surgical modality should be based on

- the aforementioned factors plus the patient's desire for future fertility.
- Once the acute bleeding episode has been controlled, transitioning the patient to long-term maintenance therapy is recommended.

## References

1. Munro MG, Critchley HO, Broder MS, Fraser IS. FIGO classification system (PALM-COEIN) for causes of abnormal uterine bleeding in nongravid women of reproductive age. FIGO Working Group on Menstrual Disorders. Int J Gynaecol Obstet 2011;113:3–13. [PubMed] [Full Text] ⇐
2. Diagnosis of abnormal uterine bleeding in reproductive-aged women. Practice Bulletin No. 128. American College of Obstetricians and Gynecologists. Obstet Gynecol 2012;120:197–206. [PubMed] [Obstetrics & Gynecology] ⇐
3. Shankar M, Lee CA, Sabin CA, Economides DL, Kadir RA. von Willebrand disease in women with menorrhagia: a systematic review. BJOG 2004;111:734–40. [PubMed] [Full Text] ⇐
4. Kadir RA, Economides DL, Sabin CA, Owens D, Lee CA. Frequency of inherited bleeding disorders in women with menorrhagia. Lancet 1998;351:485–9. [PubMed] [Full Text] ⇐
5. Von Willebrand disease in women. ACOG Committee Opinion No. 451. American College of Obstetricians and Gynecologists. Obstet Gynecol 2009;114:1439–43. [PubMed] [Obstetrics & Gynecology] ⇐
6. National Collaborating Centre for Women's and Children's Health, National Institute of Clinical Excellence. Heavy menstrual bleeding. Clinical guideline. London: RCOG Press; 2007. Available at: http://www.nice.org.uk/nicemedia/live/11002/30401/30401.pdf. Retrieved December 5, 2012. ⇐
7. DeVore GR, Owens O, Kase N. Use of intravenous Premarin in the treatment of dysfunctional uterine bleeding—a double-blind randomized control study. Obstet Gynecol 1982;59:285–91. [PubMed] [Obstetrics & Gynecology] ⇐
8. Munro MG, Mainor N, Basu R, Brisinger M, Barreda L. Oral medroxyprogesterone acetate and combination oral contraceptives for acute uterine bleeding: a randomized controlled trial. Obstet Gynecol 2006;108:924–9. [PubMed] [Obstetrics & Gynecology] ⇐
9. U. S. Medical Eligibility Criteria for Contraceptive Use, 2010. Centers for Disease Control and Prevention (CDC). MMWR Recomm Rep 2010;59(RR-4):1–86. [PubMed] [Full Text] ⇐
10. Update to CDC's U.S. Medical Eligibility Criteria for Contraceptive Use, 2010: revised recommendations for the use of contraceptive methods during the postpartum period. Centers for Disease Control and Prevention (CDC). MMWR Morb Mortal Wkly Rep 2011;60:878–83. [PubMed] [Full Text] ⇐
11. Food and Drug Administration. FDA online label repository. Available at: http://labels.fda.gov. Retrieved December 5, 2012. ⇐
12. Lethaby A, Farquhar C, Cooke I. Antifibrinolytics for heavy menstrual bleeding. Cochrane Database of Systematic Reviews 2000, Issue 4. Art. No.: CD000249. DOI: 10.1002/14651858.CD000249. [PubMed] [Full Text] ⇐
13. Lukes AS, Moore KA, Muse KN, Gersten JK, Hecht BR, Edlund M, et al. Tranexamic acid treatment for heavy menstrual bleeding: a randomized controlled trial. Obstet Gynecol 2010;116:865–75. [PubMed] [Obstetrics & Gynecology] ⇐
14. Alshryda S, Sarda P, Sukeik M, Nargol A, Blenkinsopp J, Mason JM. Tranexamic acid in total knee replacement: a systematic review and meta-analysis. J Bone Joint Surg Br 2011;93:1577–85. [PubMed] ⇐
15. James AH, Kouides PA, Abdul-Kadir R, Dietrich JE, Edlund M, Federici AB, et al. Evaluation and management of acute menorrhagia in women with and without underlying bleeding disorders: consensus from an international expert panel. Eur J Obstet Gynecol Reprod Biol 2011;158:124–34. [PubMed] [Full Text] ⇐
16. Hamani Y, Ben-Shachar I, Kalish Y, Porat S. Intrauterine balloon tamponade as a treatment for immune thrombocytopenic purpura-induced severe uterine bleeding. Fertil Steril 2010;94:2769.e13–2769.e15. [PubMed] [Full Text] ⇐
17. Kadir RA, Lukes AS, Kouides PA, Fernandez H, Goudemand J. Management of excessive menstrual bleeding in women with hemostatic disorders. Fertil Steril 2005;84:1352–9. [PubMed] [Full Text] ⇐
18. Bettocchi S, Ceci O, Vicino M, Marello F, Impedovo L, Selvaggi L. Diagnostic inadequacy of dilatation and curettage. Fertil Steril 2001;75:803–5. [PubMed] [Full Text] ⇐
19. Nichols CM, Gill EJ. Thermal balloon endometrial ablation for management of acute uterine hemorrhage. Obstet Gynecol 2002;100:1092–4. [PubMed] [Obstetrics & Gynecology] ⇐
20. Bowkley CW, Dubel GJ, Haas RA, Soares GM, Ahn SH. Uterine artery embolization for control of life-threatening hemorrhage at menarche: brief report. J Vasc Interv Radiol 2007;18:127–31. [PubMed] ⇐

Copyright April 2013 by the American College of Obstetricians and Gynecologists, 409 12th Street, SW, PO Box 96920, Washington, DC 20090-6920. All rights reserved.

ISSN 1074-861X

Management of acute abnormal uterine bleeding in nonpregnant reproductive-aged women. Committee Opinion No. 557. American College of Obstetricians and Gynecologists. Obstet Gynecol 2013; 121:891–6.

CAREY000230