UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
WAYCROSS DIVISION

DR. MAHENDRA AMIN, M.D.,       )
                                   )
       Plaintiff,            )
                                   )   Case No. 5:21-CV-00056-LGW-BWC
v.                               )
                                   )
NBCUNIVERSAL MEDIA, LLC,     )
                                   )
       Defendant.         )

## PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

NBCUniversal Media, LLC ("NBCU") made false and defamatory statements that Dr. Mahendra Amin performed mass hysterectomies that were forced, unnecessary, and unauthorized on women detained by the United States Immigration and Customs Enforcement (ICE) at the Irwin County Detention Center (ICDC).  Dr. Amin did no such thing, only performing two hysterectomies on these patients; both were medically necessary, authorized, and done with each patient's consent.  In fact, Dr. Amin never provided any treatment without necessity, authorization, and consent.  NBCU published otherwise despite voicing internally at the time their own serious doubts about the accuracy of the Statements and having information that contradicted the Statements, unwilling to forgo bias and a political agenda to fuel ratings.  Defendant cannot meet its heavy burden to prove there are no genuine issues of material fact.  NBCU's motion for summary judgment should be denied.

## BACKGROUND

NBCU published the Statements at issue with knowledge or reckless disregard of their falsity.  Its sources told NBCU that only *two* women detained at ICDC were stating that they had received hysterectomies and that, even as to those two—one of whom did not turn out to have

had a hysterectomy or to have been treated by Dr. Amin at all—the sources were not ready to make allegations due to the inherently improbable and serious nature of the allegations without first seeing "some fucking documents."  Plaintiff's Statement Controverting Defendant's Statement of Material Facts ("SCSOMF") ¶¶ 62, 73, 209.  One source, who NBCU was told was on the American Immigration Lawyers Association Board of Governors, a "15,000-member immigration lawyer organization," told NBCU that in fact they were *not* seeing evidence of mass hysterectomies.  *Id*.  ICE itself issued a statement that all medical treatment, including the two hysterectomies, was necessary, authorized, and with consent.  *Id*. ¶ 104.

The two NBCU reporters who appeared on NBCU's programs texted each other doubts about their reporting—such as, "***Do we think they*** [our sources] ***conspired at all?***" "***I'm dying to know the truth***," and hearing "***mixed things***" about a source—which NBCU did not publish.  *Id*. ¶ 73 (emphases supplied).  One show host stated contemporaneously, in a transcribed phone call, that the story had gone viral because the allegations were like something from the Third Reich, "***which is not the case here***," and described the Statements as "a very, very, you know, ***wildly provocative quote by a woman with no factual, firsthand knowledge***."  *Id*. ¶ 267 (emphases supplied).  The Deputy Head of NBCU's Standards Department who reviewed the Statements before publication, expressed numerous "concerns" about the Statements, such as bias of sources, Dr. Amin's record as a physician, and the absence of corroboration, concluding "***Well, we don't have it***."  *Id*. ¶¶ 92-93, 267.  A host of another program noted, in a statement logged in pre-show meeting notes, that the story was "***jumping to conclusions***" about the accuracy of the Statements, but mere minutes later—and with no new information—she decided to publish the Statements anyway, in the premiere time slot of her program, and tie the allegations to what she described as "the moral catastrophe of them taking kids away from their parents."  *Id*. ¶ 248.

The producer said of the host of a third program, "Nicolle into [as in, interested] but doesn't know what to make of it."  *Id*. ¶ 165.  And, while other outlets declined to report Dr. Amin's name and reported, accurately, reasons to doubt the Statements, *Id*. ¶¶ 26, 30, 37, one of the NBCU reporters immediately moved on to a "fresh angle" against Dr. Amin, despite testifying that she stopped investigating.  *Id*. ¶ 73.  The false story of mass hysterectomies fit NBCU's inflammatory narrative to viewers of the "next chapter in the same story" of what one host described as the Trump Administration's immigration abuses, and she instructed, as to a proposed correction (never made) on a photograph that she attributed to the Trump Administration but was actually from the Obama Administration: "We should not be engaging with the Obama administration's ICE policies."  *Id*. ¶ 248.  NBCU's bias and devotion toward this narrative was further demonstrated in solicitousness toward the sources, calling them "courageous" while referring to Dr. Amin as a "so-called medical professional" and casting aspersions on ICE's denial of the allegations; ███████████████████████████
████████████████████████     *Id*. ¶¶ 209, 255, 264.

## LEGAL STANDARD

Summary judgment is available only "where 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *U.S. v. Aegis Therapies, Inc.*, Case No. 2:10-cv-72, 2015 WL 1541491, at *11 (S.D. Ga. Mar. 31, 2015). "The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact." *Id*. (citation omitted).  "In making this determination, the court is to view all of the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor." *Millwood-Jones v. Holder*, Case No. CV 214-035, 2016 WL 1189494, at *7 (S.D. Ga. Mar. 22, 2016) (citation omitted).

A defamation plaintiff must show: "that the defendant made a false and defamatory statement concerning the plaintiff; that the defendant made an unprivileged communication of that statement to a third party; fault by the defendant constituting at least negligence; and either that the plaintiff suffered special harm or that the statement is actionable even in the absence of special harm." *Houston v. Elan Fin. Servs.*, 135 F. Supp. 3d 1375, 1381 (S.D. Ga. 2015) (citations omitted). Where a statement is conditionally privileged, a plaintiff prevails if he shows "actual malice," or "knowledge of its falsity or reckless disregard for its truth," as, for example, when a defendant "entertained serious doubts as to the truth of his publication." *Hammer v. Slater*, 20 F.3d 1137, 1142-43 (11th Cir. 1994). The "issue of malice in conditional privilege cases is generally a jury issue, inappropriate for summary judgment." *Id*. at 1143 (citations omitted).[1] Further, "an inference of actual malice can be drawn when a defendant publishes a defamatory statement that contradicts information known to him, even when the defendant testifies that he believed that the statement was not defamatory and was consistent with the facts within his knowledge." *Hunt v. Liberty Lobby*, 720 F.2d 631, 645 (11th Cir. 1983).

**ARGUMENT**

NBCU makes three arguments: it claims the Statements are true as a matter of law, the fair report privilege protects certain of the Statements and cannot be defeated by actual malice, and there is no issue of material fact that NBCU did not publish the statements with actual

---

[1] NBCU cites a 1976 case for the proposition that "summary judgment is the rule and not the exception in defamation cases." Doc. 127 at 17 (quoting *Rosanova v. Playboy Enters,. Inc.*, 411 F. Supp. 440, 449 (S.D. Ga. 1976). That is not the law. It is flatly contradicted by *Hammer*. The United States Supreme Court criticized a court's nearly identical statement that "in determining whether a plaintiff had made a showing of 'actual malice,' summary judgment might well be the rule rather than the exception," responding: "The proof of 'actual malice' calls a defendant's state of mind into question, and does *not* readily lend itself to summary disposition." *Hutchinson v. Proxmire*, 443 U.S. 111, 120, 120 n.9 (1979) (emphasis supplied). Because "the potential chill on protected First Amendment activity stemming from libel and defamation actions is already taken into account in the constitutional limitations on the substantive law governing such suits," granting "special procedural protections to defendants in libel and defamation actions," such as providing that summary judgment be the rule and not the exception, constitutes a "form of double counting" that is contrary to the law. *Calder v. Jones*, 465 U.S. 783, 790-91 (1984).

4

malice.  All these arguments fail.  First, NBCU's Statements that Dr. Amin performed mass unnecessary hysterectomies without authorization or consent are *false* as a matter of law, not true.  To the extent an ordinary viewer construes some Statements to encompass Dr. Amin's gynecological treatment of women detained at ICDC more generally than just hysterectomies, NBCU cannot establish as a matter of law that they are true because they are also false.  Second, the Georgia fair report privilege, as a conditional privilege, is defeated by actual malice, which Dr. Amin must demonstrate anyway,[2] and anyway the Georgia fair report privilege does not protect the Statements because there was no "proceeding" upon which any Statement was a report and the Statements were not "fair and honest" reports of anything.  Finally, there exists ample evidence from the sum of which a factfinder could find that NBCU published the Statements with actual malice, including (1) NBCU decisionmakers expressing doubt about the accuracy of the allegations; (2) known information contradicting the Statements, including sources for the reporting telling NBCU that they did not see evidence of "mass" or "large numbers" of hysterectomies done without consent, necessity, and/or authorization; (3) NBCU decisionmakers conveying the story as "the next chapter" of a Trump Administration scandal for a slanted narrative to appease and motivate its viewers ahead of the Presidential election that was only six weeks away; and (4) the story's inherent improbability.  NBCU's arguments otherwise misstate the parties' burdens, the law, and the evidence.  Such distortions demonstrate the weakness of NBCU's arguments.  The motion should be denied.

## I.     NBCU's Statements are false, not true, as a matter of law.

The Statements, which accuse Dr. Amin of performing mass hysterectomies without necessity, authorization, or consent, are false as a matter of law.  *See generally* Doc. 122 at 8-20

---

[2] Because the Court ruled that Georgia's public interest privilege covers the Statements, Dr. Amin must prove actual malice.  Doc. 59 at 66-67.

(arguing Dr. Amin is due summary judgment on falsity).  They are not true, and certainly not true as a matter of law to merit summary judgment for NBCU.  NBCU's motion does not even contend that Dr. Amin performed more than two hysterectomies; it also does not contend that there is uncontroverted evidence that the two hysterectomies were not necessary, unauthorized, or done without consent.  *See generally* Doc. 127.  To the extent that the Statements also separately include allegations of additional gynecological treatment without necessity, authorization, or consent, those statements are also false, and are certainly not true as a matter of law, as it is NBCU's burden to demonstrate in its motion for summary judgment.  Indeed, NBCU does not even attempt to do so, claiming that *Dr. Amin* has not met *his* purported burden of proving the statements false before trial.

## A. NBCU's statements accusing Dr. Amin of conducting mass unnecessary hysterectomies without authorization or patient consent are false as a matter of law.

The Statements at issue in this case accuse Dr. Amin of performing forced, unnecessary, and unauthorized hysterectomies on women detained at ICDC.  These include: "High numbers of hysterectomies at ICE Detention Ctr.," "Migrant women say that a doctor was performing unauthorized hysterectomies on immigrant women detained at that facility," "Mass hysterectomies performed on women at ICE facility," "He removed the uteruses of these refugee women for no medical reason, without their proper informed consent," and "They have been sending immigrant women in their care, in their custody, to a doctor who has removed their reproductive organs for no medical reason and without them consenting to it."  Doc. 122 at 5-6.

Because falsity pursuant to defamation is defined as what "would have a different effect on the mind of the viewer from that which the pleaded truth would have produced," under Georgia law "[m]inor factual errors which do not go to the substance, the gist, the sting of a story do not render a communication false."  *Swindall v. Cox Enters., Inc.*, 253 Ga. App. 235, 236

(2002) (quotation marks omitted).  The Statements accusing Dr. Amin of performing hysterectomies are false as a matter of law, and not true as a matter of law.  The errors are not the kind of "[m]inor factual errors which do not go to the substance, the gist, the sting of a story" that would render them not false as a matter of law.  *Id*.  Dr. Amin performed *two* hysterectomies, both necessary, authorized, and with consent.  *See* Doc. 122 at 8-20 (arguing Dr. Amin is due summary judgment on falsity).  As the moving party, NBCU "bears the burden of demonstrating the absence of a genuine issue of material fact," at which point the burden shifts to Dr. Amin to "go beyond the pleadings and present affirmative evidence to show that a genuine issue of fact does exist."  *Aegis*, 2015 WL 1541491, at *11 (citations omitted).

Here, NBCU has not met its burden of demonstrating the absence of a genuine issue of material fact as to the falsity of the Statements accusing Dr. Amin of performing mass hysterectomies.  NBCU does not contend that Dr. Amin performed more than two hysterectomies, the hysterectomies were unauthorized, the patients who received hysterectomies did not need them, or the hysterectomies were not done with consent.  *See generally* Doc. 127 at 19-23.  But Dr. Amin has affirmative evidence, anyway.  As to the number of hysterectomies performed, Dr. Amin performed two hysterectomies.  SCSOMF ¶ 377.  In both instances, the hysterectomies were approved by ICE's independent medical review process.  *Id*. ¶ 302.  In both instances, the hysterectomies were medically necessary, as attested by multiple doctors, including an expert witness that NBCU has not challenged.  *Id*. ¶¶ ███ 358. ████████

████████████████████  *Id*. ¶ 322. ████████████████████████████

████████████████████████████████████████████████

███████████████████████████████

NBCU references, fleetingly: "Concerns also extended to Dr. Amin's hysterectomies,

with two doctors concluding that Dr. Amin put a detainee at serious future risk." Doc. 127 at 20.

"Concerns" regarding "future risk," of course, do not illustrate whether procedures were

necessary, authorized, or without consent. To the extent this is an effort to argue the truth of the

Statements' allegations that hysterectomies were unnecessary, an expert retained by Dr. Amin,

whose testimony is *not* subject to any motion to exclude by NBCU, opines that the

hysterectomies were medically necessary and that one, indeed, was "lifesaving." SCSOMF ¶

367. ████████████████████████████████████████████

████████ *Id.* ¶ 367. ██████████████████████████ *Id.* ███████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████ *Id.*

  NBCU also argues that "in many instances" there are "serious doubts concerning Dr.

Amin's medical forms" and whether Dr. Amin took "the steps necessary to ensure that his

patients understood the surgeries he was performing." Doc. 127 at 21, 21 n.10. Again, referring

to "doubts" falls well short of NBCU's "burden of establishing the absence of a genuine issue of

material fact" that hysterectomies were done "without consent." *Aegis*, 2015 WL 1541491, at

\*11 (citations omitted). So the burden never shifts to Dr. Amin, but anyway, the evidence shows

there was always consent. ████████████████████████████████████

████████████████████████████████ SCSOMF ¶ 322. ████

██████████████████████████████████████████

████████████████████████████████ *Id.* ¶ 322.

  NBCU cites several cases that stand for the unremarkable proposition that, on the specific

factual circumstances of those cases, an exaggeration or misstatement of number could not create a different effect on the mind of the average viewer or reader than the truth would have done. Doc. 127 at 22.  First, NBCU's descriptions of "high numbers" and "mass" undoubtedly *do* have a different effect on the reader or viewer than the truth of "one or two."  But, second, it is not a simple quantitative exaggeration to say that something that *did not happen at all* happened a "high number" or "mass" number of times.  Dr. Amin only performed two hysterectomies, not "high numbers" or "mass" as the Statements alleged.  And the Statements were false as to even the two hysterectomies because the uncontroverted evidence shows that he did not perform *any* hysterectomies without necessity, authorization, or consent.

Dr. Amin brought suit against NBCU for publishing that he performed hysterectomies that were (1) mass, (2) unnecessary, (3) without authorization, and (4) without patient consent. Doc. 49 ¶¶ 1-8.  NBCU cannot maintain that *any* part of those allegations is true.

**B. To the extent some of the Statements encompass other alleged unnecessary gynecological procedures without authorization or patient consent, they are not true as a matter of law.**

Nothing in the rest of the publications would alter the average viewer's understanding that the Statements were allegations that Dr. Amin performed mass hysterectomies that were unnecessary, unauthorized, and without patient consent.  Further, Dr. Amin did *not* perform unnecessary procedures of *any kind*, or procedures without authorization or patient consent.  The Statements "must be read and construed in the sense in which the readers to whom it is addressed would ordinarily understand it." *Lucas v. Crenshaw*, 289 Ga. App. 510, 513 (2008) (quotation marks omitted).  Rather than considering statements in isolation, "it is necessary to consider the entire article in order to arrive at its true meaning." *Id.* (quotation marks omitted). The average viewer would construe many Statements as undoubtedly concerning

hysterectomies—not other gynecological procedures—such as "the uterus collector" and "like an experimental concentration camp," as either concerning hysterectomies or more serious allegations, and not other gynecological procedures. *See* Doc. 122 at 4-5, 15-16. And *other* of the Statements, such as bruising and other gynecological procedures done without consent, do not affect the falsity or defamatory nature of the Statements regarding hysterectomies.

NBCU's argument that nevertheless the "gist" of the Statements is true as a matter of law because there was *also* discussion of non-hysterectomy medical procedures is unavailing because any mention of "other procedures" would not alter the gist or the sting of the falsity of the Statements that Dr. Amin performed mass unnecessary, unauthorized hysterectomies without consent. NBCU cites an order in which a court considered falsity where the challenged statement alleged that the plaintiff had been banned from a social media website pursuant to a rule prohibiting "the spreading or promoting of misinformation," when in fact the plaintiff had been banned pursuant to a rule prohibiting "the sharing or threat of sharing private information." *Project Veritas v. Cable News Network, Inc.*, 591 F. Supp. 3d 1322, 1332 (N.D. Ga. 2022); Doc. 127 at 18. The court ruled that "the pleaded truth . . . similarly maligns a journalist's professional reputation" as the alleged defamatory statement, so the plaintiff's allegations "do not plausibly suggest that the truth (as pled in the Complaint) would have a different effect on the mind of the average reader in terms of the reputational harm." *Id.* In contrast, true statements that Dr. Amin performed two necessary, authorized, consented-to hysterectomies *would* have a dramatically "different effect on the mind of the average [viewer] in terms of the reputational harm" from the Statements, and would *not* malign his professional reputation.

This is not an instance of an "average viewer" being asked to view "a 1.7 million dollar

insurance swindle . . . with any less opprobrium than a 6.5 million dollar swindle."  Doc. 127 at 19 (quoting *Turner v. KTRK Television, Inc.*, 38 S.W.3d 103, 123 (Tex. 2000)).  Rather, the truth is that Dr. Amin's treatment of women detained at ICDC was commendable and included two necessary (even according to NBCU's own purported experts), authorized, and consented-to hysterectomies, whereas the Statements alleged illegality, abuse, and being a bad doctor in conducting hysterectomies, in addition to other allegations.  *See, e.g.*, *HI Tech. Corp. v. Quality & Inv. Props. Suwanee, LLC*, 894 S.E.2d 666, 678 (Ga. App. 2023) (rejecting argument of substantial truth regarding a power outage at a data center when the outage affected only a portion of a suite and not the entire data center, as stated).  NBCU cannot prevail on its motion for summary judgment as to Statements that Dr. Amin performed mass hysterectomies without necessity, authorization, or consent merely because it *also* included other false allegations of Dr. Amin's treatment of women detained at ICDC.[3]

Further, to the extent that some of the Statements would be understood by the ordinary viewer as concerning gynecological treatments other than hysterectomies (they would not), they are still false, because all procedures that Dr. Amin performed were necessary, authorized, and with consent.  As to whether any gynecological treatment was "unauthorized," NBCU does not even contend it is due summary judgment on falsity.  *See* Doc. 127 at 19-23.  Dr. Amin also has affirmative evidence of the authorization: ████████████████████████████

---

[3] NBCU points to a sentence in a filing in another court as establishing an absence of material fact as to what Dr. Amin alleges.  Doc. 137 ¶ 351.  It is controverted.  SCSOMF ¶ 351.  "Statements by counsel in briefs are not evidence."  *Travaglio v. Am. Exp. Co.*, 735 F.3d 1266, 1270 (11th Cir. 2013) (quotation marks omitted).  NBCU's attempt to use a sentence in a brief regarding a third-party discovery dispute where Dr. Amin was attempting to take the deposition of a witness NBCU identified as relevant because of an alleged unnecessary procedure she claimed she had done—not a hysterectomy—and create a characterization of Dr. Amin's claims overall undermines its credibility.  And the Statements themselves and the first sentence of the complaint make clear: "This Complaint arises from a series of MSNBC broadcast segments that contain multiple false and defamatory statements of and concerning a private figure, [Dr. Amin], that accuse him of performing mass hysterectomies that were not medically necessary on immigrant women detained at the [ICDC]."  Doc. 49 ¶ 1.

███████████████████████████████████████████████████████████

██████████████████████████ SCSOMF ¶ 302.

As to consent, again there is evidence that is not controverted that his patients consented to Dr. Amin's treatment before receiving it.  Citing after-the-fact contentions of feeling pressure or disrespect, NBCU states: "Because Dr. Amin cannot 'conclusively' establish that all of his surgeries were performed with adequate consent, he cannot meet his burden of proving falsity." Doc. 127 at 21.  First, Dr. Amin *can* demonstrate as a matter of law that he always obtained informed consent, ██████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████. SCSOMF ¶¶ 302, 322, 344, 346, 347.  NBCU cites, without elaboration, to testimony that some women detained "testified that they did not fully understand" their treatment or "were often confused," which may indicate that "in many [unspecified] instances," Dr. Amin did not obtain "full informed consent." Doc. 127 at 21.  First, not "fully understanding" a procedure or being "confused" after the fact are not the same thing as *not giving consent*.  Even if it were, in the face of █████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████, summary judgment would not be appropriate. *E.g.*, SCSOMF ¶¶ 302, 322, 344, 346, 347.[4]  NBCU, even under its mischaracterization of the evidence, does not argue that there is no issue of material fact but rather that "evidence raises

---

[4] NBCU also cites allegations from another complaint as *evidence* of failure to obtain consent.  Doc. 127 at 21.  But "pleadings are only allegations, and allegations are not evidence of the truth of what is alleged," so on summary judgment, NBCU "cannot rely on the pleadings filed by other plaintiffs in other cases." *Wright v. Farouk Sys., Inc.*, 701 F.3d 907, 911 n.8 (11th Cir. 2013).  Those plaintiffs' credibility would need to be judged by a factfinder in any event.  SCSOMF ¶ 302.

serious doubts concerning Dr. Amin's consent forms." Doc. 127 at 21 n.10. Any such "serious doubts" about evidence should be probed by the factfinder at trial and not the Court on summary judgment—as should conflicting evidence.

As to its argument that it is due summary judgment on the truth of Dr. Amin having performed unnecessary gynecological treatments that were not hysterectomies, NBCU states, without citation, that Dr. Amin's "response is that whether a procedure is 'unnecessary' is a subjective conclusion." Doc. 127 at 2. That is not so.[5] Medical necessity is not subjective, and it is undisputed that the only two hysterectomies Dr. Amin performed were necessary. NBCU has not demonstrated that Dr. Amin performed *any* unnecessary procedures. Indeed, it did not offer any affirmative expert witnesses who could even offer such an affirmative conclusion, noticing only rebuttal experts who should be excluded in any event. Docs. 123, 124.

Even though NBCU has not met its initial burden of "demonstrating the absence of a genuine issue of material fact" regarding whether unnecessary procedures were performed, and accordingly the burden does not switch to Dr. Amin, affirmative evidence shows that he never performed any unnecessary procedures. First, Dr. Amin testified that he never performed unnecessary procedures. SCSOMF ¶ 358; *see, Flowers v. Wal-Mart Stores, Inc.*, Case No. 3:03-cv-35(CAR), 2005 WL 2787101, at *7 (M.D. Ga. Oct. 27, 2005) (ruling a treating physician's testimony as to medical causation and damages of patient was reliable pursuant to *Daubert*, considering standard of care required in Georgia and "high level of accountability on a practicing

---

[5] NBCU's cite for this proposition is an out-of-context quote of Dr. Amin's flat refutation of allegations made against him in a different lawsuit. ████████████ SCSOMF ¶¶ 353-54. NBCU later ascribes to Dr. Amin the testimony "that whether a medical procedure is 'unnecessary' is a matter of 'opinion' and a 'different doctor might have a different view.'" Doc. 127 at 20. ████████████████████

Unable to use evidence for what it actually shows, NBCU again mischaracterizes evidence to support its needs.

physician" that is "arguably more rigorous than the accountability peer review imposes on the work of scholars").  Second, he has attested that his medical records produced in this case note patient conditions and his observations that support his conclusions that the procedures were medically necessary.  SCSOMF ¶ 358.  Third, each procedure underwent pre-approval by ICE, which further supports that they were medically unnecessary as ICE only approves procedures that are medically necessary.  *Id*.  Fourth, an expert retained by Dr. Amin reviewed dozens of medical records of the women detained at ICDC who were treated by Dr. Amin and either had procedures or made complaints about Dr. Amin's treatment and concluded *none* of the procedures were unnecessary and all treatment was medically appropriate.  *Id*.  Finally, ███

████████████████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████.  *Id*. ¶ 75.

NBCU cites "four OB-GYNs who reviewed medical records" who it says concluded "a pattern and practice of performing unnecessary procedures," Doc. 127 at 19, but it only provided to Dr. Amin notice of *two* experts, neither of whom identified *any* unnecessary procedures and *both* of whom should be excluded.  Docs. 123; 123-3 at 2-3; 124.  Both experts were proffered only as rebuttal experts to Dr. Amin's experts.  Doc. 123-3 at 2-3.  One did not identify a "pattern and practice" of *anything*; in addition to not identifying *any* medically unnecessary procedures.  He explicitly testified the conclusions in the report that were written by attorneys (he claims with his guidance and approval) were only about the few patient records he reviewed—admittedly incomplete and including only sparse medical records.  *See* Doc. 123 at 9-10.  As to the other purported experts NBCU discusses in its brief, Doc. 127 at 19, NBCU identified neither as an expert.  *See* Doc. 123-3 at 2-3.  Their opinions must therefore be

excluded pursuant to Federal Rule of Civil Procedure 26(a)(2)(A) and 37(c)(1). *See Cedant v. U.S.*, 75 F.4th 1314, 1321 (11th Cir. 2023) ("So if a witness does *not* need to file a Rule 26(a)(2)(B) report, then a party *does* need to file a Rule 26(a)(2)(C) disclosure on her behalf.").

Statements from the Senate Subcommittee report that NBCU cites cannot be reduced to an admissible form. *See Rowell v. BellSouth Corp.*, 433 F.3d 794, 800 (11th Cir. 2005) ("Evidence must be able to be "reduced to an admissible form" to be considered on summary judgment."). The executive summary states that its conclusions were based on "expert medical analysis conducted *for* the Subcommittee." SCSOMF ¶ 358 (emphasis suppled). Accordingly, the findings NBCU highlights are not the findings *of* the Subcommittee but rather are "a *collection* of statements" from witnesses *to* the Subcommittee. *See United Tech. Corp. v. Mazer*, 556 F.3d 1260, 1278 (11th Cir. 2009) (emphasis suppled). Since the contents are therefore based on a mere collection of statements by witnesses, not the report preparer's "own observations and knowledge," the report must be excluded as hearsay to which the public report exception at Federal Rule of Evidence 803(8) does not apply. *See id*. at 1278 ("Placing otherwise inadmissible hearsay statements by third parties into a government report does not make the statements admissible." (some punctuation marks altered)); *id*. ("Hearsay within hearsay subject to an exception is not admissible."). Also, testimony of Dr. Amin and others who provided medical care to women detained at ICDC demonstrates that the contents lack trustworthiness. Fed. R. Evid 803(8); SCSOMF ¶ 358. And even if the Senate testimony were admissible, which it is not, it is not uncontroverted, so there is not an absence of an issue of material fact.[6] NBCU should have noticed these witnesses as experts so Dr. Amin could depose

---

[6] In a footnote NBCU states that Statements that Dr. Amin's treatment resulted in patients' bruising are due summary judgment as true. Doc. 127 at 19 n.8. Evidence in the record demonstrates that Dr. Amin was not rough with patients and did not leave them bruised. SCSOMF ¶¶ 62.███ . ████████████████████████

them and, if appropriate, move to exclude their testimony. The Federal Rules of Evidence and Civil Procedure do not authorize NBCU's attempts to smuggle expert opinion testimony through a back door without protections against hearsay and unreliable opinion testimony.

Dr. Amin provided NBCU medical records for hundreds of women he treated who detained at ICDC, and NBCU identified as witnesses in its initial disclosures many of his patients who have been deposed as part of this action. SCSOMF ¶ 374-75. But on its motion for summary judgment that Statements Dr. Amin performed unnecessary procedures are true, NBCU can point to *zero* procedures that were unnecessary, instead arguing incorrectly that Dr. Amin bears the burden and identifying inadmissible and unpersuasive conclusions. *See, e.g.*, *Black Warrior River-Keeper, Inc. v. Drummond Co., Inc.*, 579 F. Supp. 3d 1310, 1319-20 (N.D. Ala. 2022) ("Indeed, on summary judgment review, a court cannot simply accept counsel's *ipse dixit* for an unsupported factual statement in a brief." (quotation marks omitted)).

## II.     The Georgia fair report privilege does not authorize summary judgment.

NBCU's argument that some of the Statements "are shielded by Georgia's fair report privilege" is wrong. Doc. 127 at 23. As an initial matter, because the Court has ruled that the Georgia public interest privilege applies, Dr. Amin already must prove at trial—and identify an issue of material fact here at the summary judgment stage—that NBCU published the Statements with actual malice. The practical import of NBCU's argument is therefore unclear, and anyway the Statements were not "reports" or "fair and honest" reports of anything.

### A.  Georgia's fair report privilege is defeated by actual malice.

Generally, "talebearers are as bad as talemakers." *Baskin v. Rogers*, 229 Ga. App. 250, 252 (1997) (quotation marks and punctuation marks omitted). "Every repetition of a slander

███████████████████████████████████████████████████ Summary judgment is not appropriate.

originated by a third person is a wil[l]ful publication of it, rendering the person so repeating it liable to an action, and it is no defense that the speaker did not originate the slander, but heard it from another." *Id.* (quotation marks omitted).  However, O.C.G.A. §§ 51-5-7(5)-(6) provides that a "fair and honest report of proceedings of legislative and judicial bodies is conditionally privileged." *Morton v. Stewart*, 153 Ga. App. 636, 638 (1980) (citations omitted).  Because this "fair report privilege" is "conditional," rather than absolute, it "disappears in the face of 'actual malice.'" *Id.*; O.C.G.A. § 51-5-9; *see also Cooper-Bridges v. Ingle*, 268 Ga. App. 73, 77 (2004) ("Proof that the defendant acted with actual malice in making the statement, however, defeats the defense of [fair report] privilege." (citation omitted)).  Dr. Amin already must prove actual malice because the Court has already ruled that the Statements enjoy qualified privilege under the Georgia fair report privilege, O.C.G.A. § 51-5-7(4).  Doc. 59 at 66.

NBCU argues, incredibly, that "[w]hether Georgia's fair report privilege is defeated by actual malice appears unresolved."  Doc. 127 at 25 n.13.  Georgia law is clear: the fair report privilege is a conditional privilege and is defeated by actual malice.  NBCU cites two cases that do not support its argument.[7]  In one of the cases, the court ruled not that the issue was "unresolved" but instead that actual malice *does* defeat the fair report privilege: "All of the privileges contained in O.C.G.A. § 51-5-7 are conditional, rather than absolute, and may be lost upon a showing by the plaintiff of 'actual malice.'"  *AirTran Airlines, Inc. v. Plain Dealer Publ'g Co.*, 66 F. Supp. 2d 1355, 1365 (N.D. Ga. 1999) (citation omitted).  *Ltc. Lawton v. Ga. Television Co.*, the other case that NBCU cites, Doc. 127 at 25 n.11, is an order of the Superior Court of Fulton County.  1994 WL 538892 (Ga. Superior Ct., Fulton Cnty. May 5, 1994).  On appeal of that very case, there is no suggestion of the issue being "unresolved;" the Court of

---

[7] NBCU also misstates the actual malice standard in the footnote as requiring that the statements be "so inherently incredible to not be plausible."  Doc. 127 at 25 n.13.  As discussed below, that is not the standard.

Appeals of Georgia expressly documented that actual malice was not at issue only because the plaintiff had not alleged it. *Lawton v. Ga. Television Co.*, 216 Ga. App. 768, 771 (1995). In the next sentence, *Lawton* cited *Morton v. Stewart*, *id*., and *Morton*, as discussed above, held, quite explicitly and unequivocally: "A fair and honest report of proceedings of legislative and judicial bodies is conditionally privileged," and "such privilege disappears in the face of 'actual malice.'" 153 Ga. App. at 638 (citations omitted).[8] NBCU misrepresents the law when it contends dismissal of conditionally privileged communications made with actual malice is possible.

## B. The fair report privilege does not apply.

Further, the Georgia fair report privilege does not apply to any of the Statements. There was no proceeding on which NBCU could be fairly said to be reporting. And the Statements were not "fair and honest" reports of anything. Further, NBCU does not contend that all the Statements are protected by the fair report privilege, instead only arguing as to Statements which "directly quote or closely paraphrase the" letter. Doc. 127 at 23.

First, there was no proceeding on which NBCU even claims to have been reporting in its broadcasts. To fall "within the parameters" of the fair report privilege, a proceeding must be judicial, legislative, or "quasi-judicial," wherein a governing body is empowered "to discipline, remove from office, or revoke a license." *Morton*, 153 Ga. App. at 639. NBCU does not argue that any *investigation* was even underway at the time of its September 15-17 Statements; the only dates it identifies are September 18 and September 21—after the broadcasts at issue here. Doc. 127 at 23, 23 n.12. Nothing in any of the publications containing the Statements mentions anything that NBCU now classifies as a proceeding underway. First, the letter was not the whistleblower complaint that Dawn Wooten actually filed, was signed by different parties (not

---

[8] NBCU is aware of *Morton*'s holding that the fair report privilege "disappears in the face of 'actual malice;'" it cites the case five times in its section on the fair report privilege. *See* Doc. 127 at 23-24, 24 n.12.

Wooten or her Government Accountability lawyer), under different circumstances (not under penalty of perjury or threat of Rule 11 sanctions which provide indicia of reliability), and contained content well beyond the actual whistleblower complaint.  SCSOMF ¶ 6.  Ms. Wooten's actual whistleblower complaint and accompanying declaration mentioned *nothing* about Dr. Amin, hysterectomies, or even gynecological care.  *Id*.  An OIG report based on its investigation, as the Court ruled in its order on NBCU's motion for judgment on the pleadings, "provided only 'findings' and 'recommendations'" and accordingly is not the kind of proceeding that qualifies for the privilege.  Doc. 59 at 11-12.  Second, in a footnote of its briefing, and not in September 2020 in the broadcasts, NBCU notes that the Georgia Composite Medical Board investigated Dr. Amin, ultimately clearing him of any wrongdoing.  Doc. 127 at 24 n.12.  But that did not appear in the broadcasts.  Third, NBCU identifies deposition testimony of the ICDC warden that ICDC's parent company and ICE "began investigating" the claims at some point, with ICE ultimately instructing ICDC to arrange for other medical providers to see women detained at ICDC for gynecological care.  Doc. 127 at 24.  Again, that "investigation" was not discussed in the broadcasts, and, as the Court concluded in its order rejecting NBCU's argument as to the fair report privilege in its motion for judgment on the pleadings, NBCU has not demonstrated that it was a legislative, judicial, or quasi-judicial proceeding to punish or enforce rules or laws pursuant to *Morton*.  *See* Doc. 59 at 13.  This remains true today.

Third, NBCU's reporting was not a "fair and honest" report of the letter or any purported proceeding.  NBCU states that it "did not just re-state the allegations of the Whistleblower Complaint, as many organizations did," but instead "conducted and relied on additional reporting."  Doc. 127 at 1.  And the reporting is quite different.  Ms. Wooten's actual whistleblower complaint never mentioned Dr. Amin, hysterectomies, or even gynecological care.

SCSOMF ¶ 6.  Thus, the Statements could not have been a fair report of the actual whistleblower complaint.  Even the letter, which NBCU continues to call the "Whistleblower Complaint" even though it is not, did not even mention Dr. Amin's name, focused on COVID-19 conditions at the facility and only very briefly mentioned gynecological treatments.  SCSOMF ¶ 6.  The Court correctly ruled that the Statements, making reasonable inferences in Dr. Amin's favor, conveyed a defamatory impression on the ordinary viewer beyond what an ordinary reader of the letter would reach, so there was also no "fair report" of the letter, even if the letter was a filing in an official proceeding, which it was not.  Doc. 59 at 14-15.

### III.    NBCU published the Statements with actual malice: with knowledge or in reckless disregard of falsity.

"[O]n summary judgment, the defendant in a defamation case must negate the plaintiff's claim of actual malice by establishing that it lacked knowledge that the defamatory matter was false or did not publish it with reckless disregard as to whether it was false or not." *Ladner v. New World Commc'ns of Atlanta, Inc.*, 343 Ga. App. 449, 457-58 (2017) (quotation marks omitted).  If it does so, the plaintiff nevertheless must prevail if he shows "that there is a triable issue of fact as to" actual malice, at which point "[w]hether such conduct is merely negligent or rises to the level of recklessness is an issue for the jury." *Hammer*, 20 F.3d at 1143.  "Proof of actual malice calls a defendant's state of mind into question, but this sort of determination 'does not readily lend itself to summary disposition.'" *Reid v. Viacom Int'l Inc.*, 2016 WL 11746046, at *17 (N.D. Ga. Sept. 14, 2016) (citations omitted).  For NBCU, "the state of mind required for actual malice would have to be brought home to the persons in [its] organization having responsibility for the publication." *N.Y. Times v. Sullivan*, 376 U.S. 254, 287 (1964).

Particularly because "it would be rare for a defendant to admit actual malice," courts consider circumstantial evidence in determining a defamation defendant's state of mind. *Reid v.*

*Viacom Int'l, Inc.*, Case No. 1:14-CV-1252, 2017 WL 11634619, at *3 (N.D. Ga. Sept. 22, 2017) (citations omitted).  "Although courts must be careful not to place too much reliance on such factors, a plaintiff is entitled to prove the defendant's state of mind through circumstantial evidence, and it cannot be said that evidence concerning motive or care never bears any relation to the actual malice inquiry."  *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 668 (1989) (citations omitted).  Courts also "must consider the factual record in full."  *Id*. at 688.  The review must include the "sum total of the inferences of actual malice properly drawn from" a plaintiff's evidence.  *Hunt*, 720 F.2d at 646.

NBCU argues: "Dr. Amin has suggested several ever-shifting theories of actual malice throughout this case."  Doc. 127 at 32.  This is inaccurate: prior to discovery, Dr. Amin alleged, that the Statements contradicted information known at the time of publication, ignored reasons to question the credibility of the purported sources of the Statements, were beyond reasonable belief, purposefully avoided airing information contradicting its narrative, and reflected advocacy against Dr. Amin and a narrative NBCU elected to serve its audience.  *See* Doc. 49 ¶¶ 90-201; Doc. 59 at 29.  Indeed, it was worse than alleged, as, in addition to the above evidence of actual malice, NBCU decisionmakers contemporaneously communicated serious doubts about the Statements' truth and heard from sources who cast doubt on the Statements.

## A.  NBCU expressed serious doubts about the truth of the Statements.

Discovery revealed that NBCU decisionmakers expressed serious doubts about the Statements' truth in contemporaneous communications.  "Reckless disregard" is shown when a defendant "entertained serious doubts as to the truth of his publication."  *Hammer*, 20 F.3d at 1142 (citation omitted).  NBCU states: "The evidence is undisputed that everyone responsible for the news reports believed the Whistleblower Complaint was credible."  Doc. 127 at 3.  That itself

is not credible; many responsible for the Statements—including the main two reporters, the host of each broadcast at issue, and the Deputy Head of Standards—***explicitly expressed doubts***.

Mr. Soboroff and Ms. Ainsley texted each other doubts about the story after appearing on broadcasts and delivering some of the Statements.  SCSOMF ¶¶ 62, 73.  Ainsley questioned: "***I'm dying to know the truth***."  *Id*.  Mr. Soboroff responded: "Andrew [Free, a lawyer source] told me he's heard mixed things about Wooten."  *Id*.  No such "mixed things" were shared with NBCU's viewers, and Mr. Soboroff did not ask Ms. Wooten about them during his interview with her.  *Id*.  Ms. Ainsley raised the possibility as to their other sources, attorneys of detained women: "Do we think they conspired at all?"  *Id*.  Although Mr. Soboroff countered, "No," Ms. Ainsley followed up, referencing ICE's denial: "***But only two hysterectomies?***"  *Id*.  Later, Ainsley texted: "Gosh I really don't want to just let this one lie and move on.  ***I have to know!***"  *Id*.[9]  Taking reasonable inferences for Dr. Amin, this series of text messages indicates that Mr. Soboroff and Ms. Ainsley doubted the veracity of the reporting; further, they did not share those doubts with the audience.[10]

Christopher Scholl, Deputy Head of Standards at the time of the Statements, expressed numerous "concerns" with the Statements, including the lack of corroboration of Ms. Wooten's claims; that she had an "agenda"; that she had "no direct knowledge of what she's claiming;" the story that served as a basis for the Statements failing to mention that lawyers coordinated in

---

[9] In addition to constituting direct evidence of Ms. Ainsley's doubting the Statements' veracity at the time of their publication, these contemporaneous messages undermine Ms. Ainsley and Mr. Soboroff's *post hoc* declarations. Docs. 128, 129.  Further undermining their credibility is contradicting deposition testimony of the reporters' sources. Dr. Amin is entitled to have a jury consider the conflicting evidence, including issues of credibility.  "Therefore, where the record contains a genuine dispute of fact, and particularly where the dispute entails a credibility determination, the Court may not decide the issue."  *Krass v. Obstacle Racing Media, LLC*, 2023 WL 2587791, at *15 (N.D. Ga. Mar. 21, 2023) (citation omitted).

[10] NBCU did not produce this text message thread to Dr. Amin until mere hours before the deposition of Ms. Ainsley, with counsel for NBCU contending that Ms. Ainsley had provided them the text message well over a year earlier, "but we didn't realize we had them" until the day before the deposition.  SCSOMF ¶ 73.

responding to Mr. Soboroff and Ms. Ainsley; and the story failing to address whether or not other complaints or lawsuits existed against Dr. Amin.  *Id*. ¶¶ 86, 92-93, 267.[11]  Mr. Scholl stated bluntly regarding the reporting, "***well, we don't have it***."  *Id*. ¶ 267.

Chris Hayes, host of "All In with Chris Hayes," participated in a September 16 phone call with Standards about the allegations of mass hysterectomies done without necessity, authorization, or consent.  Hayes said, "the reason it went viral, right, is that it was, like, conjured the worst kind of like Third Reich, you know, story of, you know, Jim Crow, Mississippi Hospital history," then continued, "***which is not the case here***."  *Id*. ¶ 267 (emphasis supplied).  Mr. Scholl noted that Ms. Wooten had "a beef," and that Dr. Amin had a "pretty clean record," especially "in a field where that is not an entirely unusual thing to have somebody file a malpractice claim against you."  *Id*.  Mr. Hayes stated again that he had serious doubts about Ms. Wooten's allegations: "you've got a **secondhand, a very, very, you know, *wildly provocative* quote** in a recorded whistleblower complaint by a woman **with no factual, firsthand knowledge**."  *Id*. (emphases supplied).  Mr. Scholl acknowledged that NBCU could take the time to learn the truth, but concluded, presciently: "By the time anybody knows [the truth of the allegations], nobody's going to be doing the story."  *Id*.

Notes from a pre-show meeting summarized in a transcript format with time stamps show that Rachel Maddow, host of "The Rachel Maddow Show," indicated her subjective doubts:

---

[11] In an unorganized section toward the end of its brief, NBCU raises and then purports to knock down several straw man arguments that it says are the arguments of Dr. Amin, including, without any citation, "Dr. Amin has alleged that the NBC News Article was not approved by Standards."  Doc. 127 at 32.  As an initial matter, the evidence demonstrates that Ms. Ainsley and Mr. Soboroff's article, which was a basis for the broadcasts at issue, was *not* approved by Standards when it was first published—certainly not construing all inferences of disputed facts in the favor of Dr. Amin.  SCSOMF ¶¶ 86, 92-93 (including an email from Mr. Scholl admonishing Mr. Schone that it "is imperative that Standards see a final version of a story like this before it is posted" and that answering questions is not the same thing as approval, right after Mr. Schone posted the story based upon answering questions without explicit approval).  But regardless, people who decided to publish that article as well as the Statements in broadcasts had serious doubts about its accuracy.

"there's a lot of jumping to conclusions around the" letter.  SCSOMF ¶ 248.  Her producers

noted that Ms. Wooten and her lawyers had refused to share Ms. Wooten's declaration, the only

sworn testimony that NBCU could have thought would affirm her allegations, and that the

"hysterectomy part is largely based on her [Ms. Wooten] and anon[ymous] accounts." *Id*.[12]  Ms.

Maddow testified that she wanted additional information to "help us not jump to conclusions

about it, but rather arrive at reasonable informed conclusions about the merits of the complaint."

*Id*.  But when asked whether she could identify any additional information that would avoid the

Statements' being merely "jumping to conclusions" that happened from that point at the meeting

until Ms. Maddow decided to make the allegations the premier opening "A" block of her show—

*only nine minutes later*—she could point only to Mr. Soboroff's interview with Ms. Wooten and

Mr. Soboroff and Ms. Ainsley's article, which at the beginning of the meeting she had thought

were not enough.  *Id*.

The host of "Deadline Whitehouse," Nicolle Wallace, also indicated her doubts about the

story, with her producer indicating she "doesn't know what to make of it."  SCSOMF ¶ 173.

Despite her self-serving declaration, documents and other testimony show she was not involved

in reporting the story other than her on-air conversation with Ms. Ainsley.  *Id*. ¶ 163.

Publishing the Statements notwithstanding such doubts is evidence from which a jury

could properly infer actual malice.  *See Braig v. Field Commc'ns*, 456 A.2d 1366, 1375-76 (Pa.

Super. Ct. 1983) (Pennsylvania state trial court ruling that repeated viewing of a tape before

broadcast presented evidence from which a jury could infer actual malice because it indicated

that the decisionmaker "had 'serious doubts' concerning the truth of the statements"); *St. Amant*

---

[12] Like the letter, the declaration does not identify Dr. Amin; it also does not discuss hysterectomies or gynecological treatment *at all*, indicating that Ms. Maddow and her producers were right to see Ms. Wooten's lawyer's refusal to provide it as a reason to doubt the accuracy of the Statements.  Doc. 122-20.

*v. Thompson*, 390 U.S. 727, 731 (1968) ("Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice."). Accordingly, NBCU has not proven it is due summary judgment as to the absence of actual malice.

NBCU proffers self-serving and conclusory declarations not supported by the written evidence in the case attesting to NBCU's alleged belief in the truth of the Statements. Doc. 127 at 29-32. But a "[d]efendant's own denial of actual malice is not conclusive in the presence of evidence to the contrary." *Barber v. Perdue*, 194 Ga. App. 287, 290 (1989) (citation omitted). These cannot erase the contradictions in the evidentiary record and should be gauged by the jury.



SCSOMF ¶ 73.[13] "At the heart of this dispute are issues of credibility: whether one believes [Plaintiff's] evidence of that of [Defendant]. We have repeatedly held that credibility is a factual issue that is uniquely the province of the jury." *Hammer*, 20 F.3d at 1143 (citations omitted).

## B. Information contradicting the Statements is ignored.

NBCU's purported sources for its Statements that Dr. Amin performed mass hysterectomies that were unnecessary, unauthorized, and done without consent told NBCU that there was *not* evidence of mass hysterectomies, that the stories they heard needed additional

---

[13] NBCU failed to produce these communications until *December 22, 2023*, which is *after* it had filed its motion for summary judgment and the deadline for all civil motions other than motions in limine. Declaration of Stacey G. Evans (Feb. 1, 2024) ¶ 4. ▮▮▮

Doc. 128 ¶ 32.

support including medical records before they would make the allegations, and that "there was some skepticism among folks in the immigrant rights community as well." This further undermines NBCU decisionmakers' declarations. "[A]n inference of actual malice can be drawn when a defendant publishes a defamatory statement that contradicts information known to him, even when the defendant testifies that he believed that the statement was not defamatory and was consistent with the facts within his knowledge." *Hunt*, 720 F.2d at 645. Because NBCU knew information that contradicted the Statements, a jury may draw an inference that it published with actual malice, and summary judgment is not appropriate. *See Miranda v. B&B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1534 (11th Cir. 1992) ("If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment.").

NBCU claims, "[a]t every turn, the Whistleblower Complaint's allegations were corroborated." Doc. 127 at 1. Not so. Instead, for example, Ben Osorio, one attorney who served as a source for NBCU, told it that only one of his clients had records indicating that she had a hysterectomy, not that, as Ms. Ainsley relayed from their conversation, two did. SCSOMF ¶ 62. Mr. Osorio and Andrew Free, another attorney source, cautioned NBCU that in fact there was not sufficient confirmation yet to make allegations as to such explosive accusations of forced hysterectomies: as Mr. Free put it colorfully, he first wanted to see "some fucking documents." *Id*. ¶¶ 205, 209. And Sarah Owings, another source, who NBCU was told was a leader in a 1,500-member immigration lawyer organization, flat out told NBCU that they were *not* seeing evidence supporting the allegations of mass hysterectomies. *Id*. ¶ 62. NBCU omitted reporting those facts and published the Statements alleging mass hysterectomies without consent or authorization. NBCU states, again without citation: "Dr. Amin faults MSNBC for speaking with lawyers, not detainees, on September 15." Doc. 127 at 34. Dr. Amin indeed faults NBCU

for *contradicting* those lawyers.  Chris Hayes also noted in a phone call with Standards, "there was some skepticism among folks in the immigrant rights community" when the allegations came out.  SCSOMF ¶ 267.  Although, according to Hayes, "there is less skepticism the more people they talked to," *id.*, the Statements expressed *no* such skepticism by the attorneys.  ICE stated, correctly, that only two women detained at ICDC received hysterectomies and that no procedures are done without authorization and consent.  Doc. 51-7.  But rather than considering it, Mr. Hayes and Ms. Maddow belittled it on air.  SCSOMF ¶¶ 189, 234.

NBCU next argues that ICE's statement "hardly put anyone on notice that the substance of the Whistleblower Complaint was false."  Doc. 127 at 33.  However, Ms. Ainsley was warned by ICE sometime before 1:26PM that "they are working on getting us data on the number of hysterectomies performed at this facility.  They believe that data will negate her claims."  SCSOMF ¶ 86.  ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████  But that is not how they reported it.  Instead, NBCU continued to broadcast allegations that Dr. Amin performed mass hysterectomies.  It is difficult to imagine that NBCU could have learned anything that would have knocked it off its decided path to smear Dr. Amin, tie him to ICE and President Trump, and make Dawn Wooten a national hero.  Years later after even the Senate Report stated there were only ever two hysterectomies, the segment producer for the "All In with Chris Hayes" broadcasts, Xander Price, still refuses to admit that Ms. Wooten was wrong.  *Id.* ¶189.  Mr. Price believes everything the detainee attorneys and Ms. Wooten say, but credits nothing uttered by Dr. Amin, his attorney, or ICE.  *Id.*

In a case applying the Constitutional test for actual malice identical to Georgia's, the Supreme Court of Washington reversed a grant of summary judgment against the defamation plaintiff who alleged he was defamed by a statement that 50 percent of his campaign contributions came from bail bondsmen, when the actual amount was 2 percent, holding that a jury could find actual malice based on "two pieces of evidence" proffered by the plaintiff. *Herron v. KING Broad. Co.*, 776 P.2d 98, 105-06 (Wash. 1989).  One piece of evidence was the purported sources for the published information testified "not only that they did not remember giving him that figure, but that they themselves never had such a belief, and therefore would not have said such a thing," and the other was that the reporter had knowledge of records that showed that the 50 percent number was not true.  Failure to investigate, alone, is not recklessness, but "when a reporter does in fact conduct an investigation and his investigation does not support his false statement or brings to his attention facts which rebut the false statement, that is evidence from which a jury can infer reckless disregard." *Herron*, 776 at 106. Here, NBCU heard one thing from its sources—maybe one hysterectomy at most; need confirmation—and reported another to its audience—"everybody" has a hysterectomy; multiple lawyers tell us; no equivocation.

In her interview with Mr. Soboroff, Ms. Wooten made statements that cast doubt on the Statements, including answering "not exactly sure" to whether the hysterectomies were "forced or involuntary," that patients signed consent forms to be treated by Ms. Wooten at ICDC and she was "unaware of what takes place" at Dr. Amin's office, and asking "does he even know that they feel this way?  Have they even expressed this, you know, to him?"  SCSOMF ¶ 69.  These portions of her interview with Mr. Soboroff were not included on the broadcasts publishing the Statements, which is indicative of actual malice. *See Merco Joint Venture v. Kaufman*, 923 F.

Supp. 924, 930-31 (W.D. Tex. 1996) (finding a fact issue as to actual malice based, in part, on the misleading editing of a video).

NBCU also failed to disclose to its audience the incentivization that Ms. Wooten, the detained women, and their attorneys advocating on their behalf all had to levy allegations in order to denigrate their former employer (in the case of Ms. Wooten) and to increase chances of avoiding deportation; instead NBCU alleged incorrectly that the women's status in immigration detention centers was reason to take the allegations *more* credibly because the women "were risking deportation" by making the accusations.  Doc. 59 at 45, 45 n.16.  The attorneys of women who were detained did not provide HIPAA waivers to Dr. Amin, so he was unable to discuss the allegations, a fact that NBCU did not report and that constituted an obvious reason to doubt the veracity of the complaints.  Doc. 59 at 41-42.  But rather than scrutinizing its sources or noting reasons to doubt them, NBCU demonstrated solicitousness and underscored trustworthiness.  For example, in the second broadcast, "All In with Chris Hayes" on September 15, Mr. Hayes credits Ms. Wooten for having "tremendous bravery coming forward."  Doc. 51-3 at 15.  After a conversation Mr. Price, a producer for "All In with Chris Hayes," asked a source whether the information he had already provided was on background, ████████████████████████
██████████████████████████████████████████████████████████.

SCSOMF ¶ 209.  ████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████      *Id*. ¶ 264.

Although it does not directly argue other outlets' reporting demonstrates NBCU's own lack of actual malice, NBCU repeatedly references what it mischaracterizes as widespread

reporting matching the Statements.  *See, e.g.*, Doc. 127 at 14 (accusing Dr. Amin of "sing[ling]

out" NBCU).  In fact, other outlets' coverage demonstrates NBCU's actual malice.  NBCU

stands out as identifying Dr. Amin, failing to share with viewers that allegations were included in

the letter in order to spur investigation into their truth, and failing to share with viewers a lack of

corroboration for the Statements that mass hysterectomies had been done.  SCSOMF ¶¶ 26, 30,

37, 73.  NBCU identifies two outlets as having done "independent corroboration of the" letter,

websites called Prism and the Intercept, Doc. 127 at 6, but an NBCU decisionmaker testified that

those outlets' reporting should not have been published by NBCU and, as to the Prism reporting:

"Something about the Prism write-up was nagging at me, and I didn't want to tie ourselves to

that."  SCSOMF ¶ 37.[14]

### C.  NBCU pushed a political agenda preferred by its audience.

The Statements and the publications in which they appeared are not neutral reporting but

rather advocacy against Dr. Amin as a piece of the nefarious Trump Administration.  As the

Court ruled on NBCU's motion for judgment on the pleadings, "Dr. Amin has alleged facts that

plausibly raise the inference that NBCU was motivated to tie its reporting about Dr. Amin to its

greater opposition of the Trump Administration."  Doc. 59 at 47; *see also Palin v. N.Y. Times

Co.*, 940 F.3d 804, 814 (2d Cir. 2019) ("[P]olitical opposition alone does not constitute actual

malice, but we conclude that these allegations could indicate more than sheer political bias.").

NBCU's narrative motivation is evident from the Statements and the broadcasts

themselves.  For example, Ms. Maddow opened the fourth broadcast, "The Rachel Maddow

---

[14] Also, unlike NBCU, Prism and the Intercept shared at least some of the "mixed things" they heard about Ms.
Wooten and other reasons to doubt the truth of its original article.  Prism published an article that reported Dr. Amin
was a "pillar in the community," women detained described Ms. Wooten as "complicit" in abuses at ICDC, and an
"associate in the medical field" in the area told the reporter the allegations were unlikely because of rules around
documentation of anesthesia, hospital admissions, and medical treatment.  SCSOMF ¶ 37.  The Intercept, in the
article NBCU cites, quoted Dr. Amin as stating, "he has only performed 'one or two hysterectomies in the past two
[or] three years,'" and that pre-approval is required before any procedure on a woman detained at ICDC.  *Id*.

Show" on September 15, with a long diatribe against the Trump Administration's immigration policies, which she described as a "moral catastrophe." Doc. 51-5 at 3. She then introduced the account of the Statements by stating, "now we have arrived at the next chapter in the same story." *Id*. at 5. She introduced Mr. Soboroff as having written "the seminal book on the [Trump Administration] child separation policy that I think is relevant context here." *Id*. at 8. Mr. Soboroff then described Dr. Amin as a "so-called medical professional." Doc. 51-5 at 11. And Mr. Hayes, host of "All In with Chris Hayes," directly filled the role of advocate against Dr. Amin on air: "We truly need nothing less than a full thorough, complete, and timely investigation. And we here on the show are going to be doing our best to make sure that happens." Doc. 51-6 at 15.

The political agenda is supported by discovery. ██████████████████

███████████████████████████████████████████

████████████████████████████ SCSOMF ¶ 248. It is well known that Rachel Maddow's ratings benefited from the extensive reporting about President Trump (ratings which are shared daily at NBCU). *Id*. ¶ 253. From these facts, a jury could decide that NBCU ignored information that did not support its narrative, ignored its own doubts and its own sources skepticism of the allegations, and went forward anyway to air a narrative preferred by its viewers and intended to stir up its audience six weeks before the Presidential Election.

**D. The allegations were inherently improbably and beyond belief.**

A jury may also "infer[] actual malice from the inherent improbability of the story." *Hunt*, 720 F.2d at 645. Ms. Maddow and Mr. Hayes both questioned whether the fact that ICE claimed only two patients were "referred" for hysterectomies meant the same thing as only two women receiving approved hysterectomies. *See* Doc. 51-2 ("Of course, referred is the question

here."); Doc. 51-5 at ("Whether or not the women were referred for hysterectomies or not, more than two women are saying they got them and more than two women are telling lawyers as part of this complaint that they don't know why they got them and they don't think they needed them."). But that makes no sense in the context of NBCU's implications that Dr. Amin was performing hysterectomies for money, *e.g.*, Doc. 51-6 at 14-15—one could not receive money for a procedure that was not referred and approved—underscoring that NBCU's story bore "inherent improbability" that is evidence from which actual malice may be inferred.

### E.  From the "sum total of" the evidence, a jury may infer that NBCU published each Statement with actual malice.

In addition to direct evidence of a defendant's doubts, actual malice may be inferred where, non-exhaustively, "a story is fabricated by the defendant," "there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports," or "the publisher's allegations are so inherently improbable that only a reckless man would have put them in circulation." Doc. 59 at 28 (quotation marks omitted). As to each broadcast containing the published Statements, Dr. Amin has above set forth evidence from which a jury could infer that NBCU decisionmakers published the Statements with actual malice.

As to NBCU's Standards, which approves articles and scripts on indicated topics before publication but did not approve the article with Mr. Soboroff and Ms. Ainsley's reporting that underlined all broadcasts, SCSOMF ¶¶ 86-87, Mr. Scholl, its deputy head, expressed numerous "concerns" with the Statements, contemporaneously and soon after. *Id*. ¶¶ 86, 92-93, 267. As to Ms. Ainsley and Mr. Soboroff themselves, both had ample reason to doubt the Statements based on their own sources, and they expressed that doubt in contemporaneous texts. *Id*. ¶¶ 62, 73. This included hearing from a member of the board of governors of a 15,000-member immigration lawyer organization that they were not finding evidence of mass hysterectomies. *Id*.

The "Deadline: White House" featured Ms. Ainsley appearing in person and Mr. Soboroff's interview with Ms. Wooten, Doc. 51-2 at 27-30, and as discussed above Ms. Ainsley and Mr. Soboroff expressed doubts about the Statements and heard from sources contradicting the Statements.  Ms. Ainsley also stated that "in at least two cases, there were women who were told that they needed a hysterectomy because they had cancer."  *Id*. at 28.  Ms. Ainsley heard no such thing from the attorney sources, and ICE had told her it had data that would "negate" the claims of the letter.  SCSOMF ¶¶ 62, 73, 86.  NBCU argues that mitigating actual malice are the contents of the interview with Ms. Wooten and a mention of an ICE denial, Doc. 127 at 29-30, but Ms. Ainsley *denigrated* the ICE denial, stating that it did not address "the new reporting by NBC News that calls out this doctor by name and gives specific allegations that clients gave their lawyers."  Doc. 51-2 at 29.  And NBCU edited the interview of Ms. Wooten to *omit* information tending to contradict its narrative.  SCSOMF ¶ 69.  Further, Ms. Wallace's producer stated that she was "into" the story "but doesn't know what to make of it," suggesting Ms. Wallace and her producers had doubts as to the Statements' inherent improbability.  *Id*. ¶ 173.

As to the second and fifth broadcasts, "All In with Chris Hayes" on September 15 and 17, Mr. Hayes attested to not believing the Statements in the call with Standards and stated that his show would ensure an investigation into Dr. Amin would happen.  NBCU points to relying on Mr. Free as a source, Doc. 127 at 31, but Mr. Free was obviously biased, and Mr. Free—and Mr. Osorio, a Hayes source not mentioned by NBCU in its actual malice section—did *not* support the Statements that Dr. Amin performed mass hysterectomies without medical necessity, warning Mr. Hayes's producer Mr. Price that confirmation was necessary.  SCSOMF ¶ 62.  NBCU states that Mr. Price "discussed" medical records "with an OB-GYN, who raised concerns about the hysterectomy's necessity," *id*., but the OB-GYN did not review the medical records, and she did

*not* say that the hysterectomy was unnecessary, merely stating that more information was required; she also demonstrated bias, describing Ms. Wooten as her "new hero." *Id*. ¶ 263. Mr. Price said "sounds great" to Mr. Free's suggestion that he dictate the content of the show's coverage, and Mr. Free stated that he needed to see "some fucking documents" before he would be comfortable repeating allegations of the letter, which Mr. Hayes and his producers had already run forward and done without any. *Id*. ¶ 209.

Finally, as to the fourth broadcast, "The Rachel Maddow Show" on September 15, Ms. Maddow had described how people had been "jumping to conclusions" as to the Statements but within minutes nevertheless decided to make the allegations about Dr. Amin the story in her premiere "A" block and to tie Dr. Amin to the Trump Administration's immigration "moral catastrophe," of which she said the Statements were "the next chapter in the same story," and Mr. Soboroff appeared on the show (while mistakenly using Obama Administration photos from detention center conditions and refusing to correct that mistake), describing Dr. Amin as a "so-called medical professional." SCSOMF ¶ 248, 255. NBCU does not even address that bias, instead pointing to Ms. Maddow's inclusion of statements by ICE, LaSalle, and Dr. Amin, and having "made clear that Wooten was demoted by ICDC (and therefore may have a bias)." Doc. 127 at 30-31. But the statements from controverting sources were denigrated by Ms. Maddow, and the only time Ms. Wooten's demotion was mentioned on the show was when *Ms. Wooten herself* stated it in the interview, which she explained as "I was made an example of I whistle blew." Doc. 51-5 at 7. So rather than giving viewers information making clear that Ms. Wooten may have a bias, her demotion was instead included in a way that bolstered the Statements.

NBCU must show the absence of an issue of material fact as to actual malice. A federal district court considering actual malice under Georgia law on summary judgment ruled: "While

the record includes facts and testimony that may explain or refute the evidence of malice submitted by Plaintiffs, the Court's function in reviewing motions for summary judgment is not to resolve issues of fact presented by conflicted evidence since that role is solely within the province of the jury." *StopLoss Specialists, LLC v. VeriClaim, Inc.*, 340 F. Supp. 3d 1334, 1354 (N.D. Ga. 2018) (citations omitted).  And the Court of Appeals of Georgia reversed a court's summary judgment in a defamation case on actual malice:

> The subtlety inherent in ascertaining a person's state of mind, and the nuances discernible from objective and not only subjective evidence, in this case where plaintiff has come forth with disputing evidence on material facts about what defendant knew and upon what basis he acted, where plaintiff does not rely on the pleadings or only on the proposition that the jury might disbelieve the defendant's denial of legal malice, required the trial court to deny the motion for summary judgment.

*Barber*, 194 Ga. App. at 291 (citation omitted).

NBCU argues: "But allegations that, in and of themselves, are not probative of actual malice, cannot together create actual malice."  Doc. 127 at 35.  Communications among NBCU decisionmakers explicitly expressing their subjective doubt—as direct as asking repeatedly "do we think [our sources] conspired at all?," "I'm dying to know the truth," "We don't have it," "jumping to conclusions," and "which did not happen here"—as to the truth of the Statements, for example, cannot be said to be "not probative of actual malice."  Similarly, information that called into doubt or even contradicted the Statements is highly probative of actual malice. Indeed, it is *NBCU* who has failed to demonstrate convincing evidence of the absence of actual malice, pointing only to decisionmakers' *post hoc* protests prepared for this litigation, which Dr. Amin is entitled to have a jury judge as to credibility in the face of self-contradictory and conflicting evidence.  To prevail at trial, Dr. Amin is required only to offer proof from the "sum total of" which a jury may properly infer actual malice.  *Hunt*, 720 F.2d at 646.  He has more

than done so, and NBCU has not met its summary judgment standard of proving he cannot do so.

## CONCLUSION

This is simply not a summary judgment case, and the motion should be denied.

Respectfully submitted this <u>2nd</u> day of February 2024.


<u>*/s/ Stacey G. Evans*</u>
Stacey G. Evans
Georgia Bar No. 298555
sevans@staceyevanslaw.com
Tiffany N. Watkins
Georgia Bar No. 228805
twatkins@staceyevanslaw.com
J. Amble Johnson
Georgia Bar No. 229112
ajohnson@staceyevanslaw.com

STACEY EVANS LAW
4200 Northside Parkway NW
Bldg One; Suite 200
Atlanta, GA 30327
(770) 779-9602 (phone)
(404) 393-2828 (fax)

Scott R. Grubman
Georgia Bar No. 317011
sgrubman@cglawfirm.com

CHILIVIS GRUBMAN
DALBEY & WARNER LLP
1834 Independence Square
Atlanta, GA 30338
(404) 233-4171 (phone)
(404) 261-2842 (fax)

*Counsel for Plaintiff*


## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing will be served upon all

attorneys in this matter by filing with the Court's CM/ECF system.

This <u>2nd</u> day of February 2024.

<u>*/s/ Stacey G. Evans*</u>
Stacey G. Evans