**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
WAYCROSS DIVISION**

DR. MAHENDRA AMIN, M.D.,

          Plaintiff,

    v.

NBCUNIVERSAL MEDIA, LLC,

          Defendant.

Case No. 5:21-cv-00056-LGW-BWC

## STATEMENT CONTROVERTING DEFENDANT'S STATEMENT OF MATERIAL FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Dr. Mahendra Amin controverts the following statements of material fact proffered by NBCUniversal in its Statement of Material Facts in Support of its Motion for Summary Judgment (Doc. 137), pursuant to S.D. Ga. L.R. 56.1. As an initial statement, Dr. Amin notes that, although he has endeavored in this Statement to minimize the burden on the Court, NBCUniversal's Statement of Material Facts (Doc. 137) is not "short, and concise." S.D. Ga. L.R. 56.1. NBCUniversal's 386-paragraph filing overflows with glosses as to contentions for which it simply cannot be reasonably said that "there exists no genuine dispute to be tried." *Compare, e.g.*, Paragraph 73 (beginning, "Soboroff and Ainsley found each of the lawyers they spoke with to be credible"), *with* Ex. A, Ainsley-Soboroff Text Thread, at 12 (text later that same day, "***DO WE THINK THEY*** [the lawyers] ***CONSPIRED AT ALL?***" (emphasis and capitals supplied) and "***I'm dying to know the truth***" (emphasis supplied)). Further, in its motion for summary judgment, Doc. 127, NBCUniversal cites paragraphs of its Statement of Material Facts that do not support the contention to which it ascribes the fact in the brief.

*Compare, e.g.*, Paragraph 73 ("Soboroff and Ainsley found each of the lawyers they spoke with to be credible, Soboroff Decl. ¶ 7; Ainsley Decl ¶¶ 10, 13"), *with* Soboroff Decl. ¶ 7; Ainsley Decl ¶¶ 10, 13 (none of which attested to the credibility of any lawyer except Andrew Free); *see also* Doc. 127 at 20 and Paragraph 353-54 (ascribing to Dr. Amin words that he did not say but instead were part of the question asked to him, and ascribing to him a meaning that the testimony did not make).  NBCUniversal also attaches extraneous materials; of the 386 paragraphs in its Statement of Material Facts, many are not even mentioned, or mentioned only in part of a long sequential citation they do not support, in NBCUniversal's motion for summary judgment.  *See* Doc. 127.

NBCUniversal's misstatements and errors complicate the task of Dr. Amin in arguing and the Court in adjudicating NBCUniversal's unavailing arguments for summary judgment, and they require the lengthy response below.

Dr. Amin sets forth below, in **bold**, the reasons why NBCUniversal's contentions are controverted because the cited materials do not support NBCUniversal's contention, other facts contradict the contention, and/or the cited materials are not capable of being reduced to an admissible form.

1.     This defamation action challenges statements from three MSNBC news reports that aired on September 15, 2020: (a) *Deadline: White House,* hosted by Nicolle Wallace ("*Deadline*"); (b) *All In with Chris Hayes*, hosted by Chris Hayes ("*All In*"); and (c) *The Rachel Maddow Show*, hosted by Rachel Maddow ("*TRMS*"), as well as two statements from the September 17, 2020 broadcast of *All In* (together, the "MSNBC News Reports").  **UNCONTROVERTED, although the statements ("Statements") were also published via**

banner headlines that appeared on the broadcasts, as well as social media posts.  **Doc. 49 ¶¶ 75-89.**

2.         The thirty-six challenged statements from the MSNBC News Reports that remain in this action are identified in Paragraphs 75-76, 78-79, 84, and 86-87 of the FAC and are listed on the chart attached hereto as Exhibit 1 to the Declaration of Elizabeth A. McNamara ("McNamara Decl.") (the "Challenged Statements"); *see also* McNamara Decl. Ex. 3 at 25:3-28:14.

**UNCONTROVERTED, although the social media posts are not included herein.  Doc. 49 ¶ 89.**

3.         Plaintiff Dr. Mahendra Amin, M.D. ("Dr. Amin") is an OB-GYN physician, practicing in and around Douglas, Georgia in Coffee County.  FAC ¶ 36

**UNCONTROVERTED**

4.         Defendant NBCU owns and operates MSNBC, and each of the challenged MSNBC News Reports aired on MSNBC.  FAC ¶ 19

**UNCONTROVERTED, although the social media posts were not aired on MSNBC. Doc. 49 ¶ 89.**

**The Whistleblower Complaint[1]**

5.         On September 14, 2020, Project South released a letter of the same date addressed to Jospeh V. Cuffari, Inspector General of the Department of Homeland Security ("DHS"), Cameron Quinn, Officer for Civil Rights and Civil Liberties ("CRCL") of the Department of Homeland Security, Thomas P. Giles, Acting Director of Atlanta Immigration and Customs Enforcement ("ICE") Field Office, and David Paulk, Warden of the Irwin County

---

[1] Dr. Amin includes the section titles for the Court's ease of reference, but any contentions contained in the section titles are not admitted.

Detention Center ("ICDC") regarding the "lack of medical care" and "absence of adequate protection against COVID-19 for detained immigrants and employees," which contained reports from "detained immigrants and ICDC nurses" concerning "high rates of hysterectomies done to immigrant women," among other concerns.  McNamara Decl. Ex. 2 at NBCU001553.

**UNCONTROVERTED that this letter ("letter") was released and purported to be addressed to the individuals listed, but CONTROVERTED that it contains "reports" of anything.**

6.     In its first sentence, the signatories to the letter state that they "file this complaint on behalf of detained immigrants at the Irwin County Detention Center (ICDC) operated by the private prison company, LaSalle Corrections; and Ms. Dawn Wooten, a licensed practical nurse employed by ICDC, who is a protected whistleblower and is represented by the Government Accountability Project and Project South" (hereafter, the "Whistleblower Complaint").  *Id.*

**UNCONTROVERTED as to the quotation appearing in the document.  However, the letter, which NBCUniversal entitles "Whistleblower Complaint," is *not* a whistleblower complaint; it is a letter that was sent to the media and was not "filed" anywhere.  The letter was only signed by Project South and other advocacy groups and shared with the media, whereas Ms. Wooten's actual whistleblower complaint was submitted officially through the appropriate channels, including the Department of Homeland Security Office of Inspector General web portal for submitting official complaints.  McNamara Decl. Ex. 2, at 28; Doc. 122-1 ¶¶ 38-41.  Ms. Wooten's actual whistleblower complaint to the Department of Homeland Security Office of Inspector General was *not* what was sent**

to the media and reported on by NBCUniversal as a "whistleblower complaint," and it further did not address hysterectomies or gynecological care and did not mention Dr. Amin, nor did Ms. Wooten's declaration in support thereof.  Doc. 122-20; Doc. 122-1 ¶¶ 38-41.  Further, the letter primarily concerned COVID-19 conditions, not hysterectomies.  McNamara Decl. Ex. 2.

7.      The Whistleblower Complaint was emailed to the Office of the Inspector General ("OIG"), DHS-CRCL, the Atlanta ICE Field Office, and the ICDC at 6:00 AM on September 14, 2020.  McNamara Decl. Ex. 4.

**CONTROVERTED: The cited materials do not support NBCUniversal's contention. McNamara Decl. Ex. 4 is a set of emails with an attachment, but the attachment is not included and therefore it is not clear whether the attachment matches the letter NBCUniversal characterizes as the "Whistleblower Complaint" (hereinafter "letter").**

8.      ICE acknowledged that the Whistleblower Complaint was a "complaint." McNamara Decl. Ex. 5; Ex. 6 at DHS000036.

**CONTROVERTED: The cited materials do not support NBCUniversal's contention. McNamara Decl. Ex. 5 is internal ICE communications that do not constitute ICE's "acknowledge[ment]" of anything.  McNamara Ex. 6 at DHS000036, although discussing "complaints" and "complaint investigations," does *not* characterize the letter as such a "complaint."  The cited materials are also incapable of being reduced to admissible evidence because they are unidentified and constitute hearsay without an exception. Further, as discussed in Paragraph 6, what NBCUniversal characterizes as a "Whistleblower Complaint" was not Dawn Wooten's actual whistleblower complaint but was a letter shared with media.**

9. 

10.

11.     In a section subtitled "Detained immigrants and ICDC nurses report high rates of hysterectomies done to immigrant women," the Whistleblower Complaint alleges that "several immigrant women" report "their concerns about how many women have received a hysterectomy while detained at ICDC."  McNamara Decl. Ex. 2 at NBCU001553.

**UNCONTROVERTED.  However, as discussed in Paragraph 6, what NBCUniversal characterizes as a "Whistleblower Complaint" was not Dawn Wooten's actual whistleblower complaint but was a letter shared with media.**

12.     The Whistleblower Complaint states that one woman told Project South that "Irwin sends many women to see a particular gynecologist outside the facility but that some

women did not trust him." The Whistleblower Complaint stated that this information came from a "Project South Interview at the Irwin County Detention Center, October 2019." *Id.*

**UNCONTROVERTED that these statements appear in the letter. However, as discussed in Paragraph 6, what NBCUniversal characterizes as a "Whistleblower Complaint" was not Dawn Wooten's actual whistleblower complaint but was a letter shared with media. To the extent that the content is being offered for the truth of the matters asserted, it is CONTROVERTED as discussed throughout and is inadmissible hearsay.**

13.     The Whistleblower Complaint states that "a detained immigrant told Project South that she talked to five different women detained at ICDC between October and December 2019 who had a hysterectomy done." *Id.* The Whistleblower Complaint stated that this information came from a "Project South Interview with Detained Immigrant, Summer 2020." *Id.* This detainee further alleged that, these women "reacted confused when explaining why they had one done." The detainee observed, "When I met all these women who had had surgeries, I thought this was like an experimental concentration camp. It was like they're experimenting with our bodies." *Id.* at NBCU001554.

**UNCONTROVERTED that these statements appear in the letter. However, as discussed in Paragraph 6, what NBCUniversal characterizes as a "Whistleblower Complaint" was not Dawn Wooten's actual whistleblower complaint but was a letter shared with media. To the extent that the content is being offered for the truth of the matters asserted, it is CONTROVERTED as discussed throughout and is inadmissible hearsay.**

14.     The Whistleblower Complaint states that "Ms. Wooten also expressed concern regarding the high numbers of detained immigrant women at ICDC receiving hysterectomies." *Id*. She is quoted:

> Everybody he sees has a hysterectomy—just about everybody.  He's
> even taken out the wrong ovary on a young lady [detained
> immigrant woman].  She was supposed to get her left ovary
> removed because it had a cyst on the left ovary; he took out the right
> one.  She was upset.  She had to go back to take out the left and she
> wound up with a total hysterectomy.  She still wanted children—so
> she has to go back home now and tell her husband that she can't
> bear kids…she said she was not all the way out under anesthesia
> and heard him [doctor] tell the nurse that he took the wrong ovary.

*Id*.

**UNCONTROVERTED that these statements appear in the letter.  However, as discussed in Paragraph 6, what NBCUniversal characterizes as a "Whistleblower Complaint" was not Dawn Wooten's actual whistleblower complaint but was a letter shared with media.  To the extent that the content is being offered for the truth of the matters asserted, it is CONTROVERTED as discussed throughout and is inadmissible hearsay.**

15.     The Whistleblower Complaint further quotes Wooten as stating: "We've questioned among ourselves like goodness he's taking everybody's stuff out…That's his specialty, he's the uterus collector," and "everybody he sees, he's taking all their uteruses out or he's taken their tubes out.  What in the world."  *Id.*

**UNCONTROVERTED that these statements appear in the letter.  However, as discussed in Paragraph 6, what NBCUniversal characterizes as a "Whistleblower Complaint" was not Dawn Wooten's actual whistleblower complaint but was a letter shared with media.  To the extent that the content is being offered for the truth of the matters asserted, it is CONTROVERTED as discussed throughout and is inadmissible hearsay.**

16.     The Whistleblower Complaint states that "Ms. Wooten also stated that detained women expressed to her that they didn't fully understand why they had to get a hysterectomy" and observed that "[t]hese immigrant women, I don't think the really, totally,

all the way understand this is what's going to happen depending on who explains it to them."

*Id.*

**UNCONTROVERTED that these statements appear in the letter. However, as discussed in Paragraph 6, what NBCUniversal characterizes as a "Whistleblower Complaint" was not Dawn Wooten's actual whistleblower complaint but was a letter shared with media. To the extent that the content is being offered for the truth of the matters asserted, it is CONTROVERTED as discussed throughout and is inadmissible hearsay.**

17.     The Whistleblower Complaint further states:

One detained immigrant reported to Project South that staff at ICDC and the doctor's office did not properly explain to her what procedure she was going to have done…When she asked what was being done to her body, she was given three different responses by three different individuals. She was originally told by the doctor that she had an ovarian cyst and was going to have a small twenty-minute procedure done drilling three small holes in her stomach to drain the cyst. The officer who was transporting her to the hospital told her that she was receiving a hysterectomy to have her womb removed…[T]he ICDC nurse said that the procedure she was going to have done entailed dilating her vagina and scraping tissue off. The nurse first told the detained immigrant she was going to get this procedure done because she had heavy bleeding, but then told her it was because she had a thick womb. The woman quickly responded that she never had heavy

bleeding in her life and was never told by the doctor that she had a thick womb. Instead she stated that the doctor had described an entirely different procedure that did not involve scraping her vagina.

*Id.* at NBCU001555.

**UNCONTROVERTED that these statements appear in the letter. However, as discussed in Paragraph 6, what NBCUniversal characterizes as a "Whistleblower Complaint" was not Dawn Wooten's actual whistleblower complaint but was a letter shared with media. To the extent that the content is being offered for the truth of the matters asserted, it is CONTROVERTED as discussed throughout and is inadmissible hearsay.**

18.     Dr. Amin never read or saw the Whistleblower Complaint until his deposition in this action. McNamara Decl. Ex. 3 at 85:13-86:15.

**UNCONTROVERTED.  However, as discussed in Paragraph 6, what NBCUniversal characterizes as a "Whistleblower Complaint" was not Dawn Wooten's actual whistleblower complaint but was a letter shared with media.**

19.     

20.     Dr. Amin's counsel sent an October 6, 2020 letter to Dawn Wooten's counsel and Project South in which he claimed that Wooten, Project South, and one of Project South's attorneys published the following "defamatory statements" about him, which were "baseless and have since been refuted by multiple sources": (1) "Dr. Amin performed forced hysterectomies on multiple patients at the Irwin County Detention Center;" (2) "Dr. Amin performs a hysterectomy on 'just about everybody;'" and (3) "Dr. Amin is known as the 'uterus collector.'" McNamara Decl. Ex. 9 (the "October 6 Letter").

**UNCONTROVERTED**

21.     In the October 6 Letter, Dr. Amin's counsel did not specifically challenge the allegations in the Whistleblower Complaint that one detainee felt like she was at an "experimental concentration camp," that women did not "fully understand why they had to get a hysterectomy," or that Dr. Amin "took out the wrong ovary" on a detainee.  *Compare*

McNamara Decl. Ex. 9 (Oct. 6 Letter) to Ex. 2 (Whistleblower Complaint).

**UNCONTROVERTED.  However, the Statements are challenged in this litigation.  Doc. 49 ¶ 84(d), (f).  Further, as discussed in Paragraph 6, what NBCUniversal characterizes as a "Whistleblower Complaint" was not Dawn Wooten's actual whistleblower complaint but was a letter shared with media.  To the extent the content is being offered for the truth of the matters asserted, it is CONTROVERTED as discussed throughout and is inadmissible hearsay.**

22.     Dr. Amin's counsel stated that a failure to correct and retract these statements within seven days "may lead to may lead to legal action being filed against Project South, its responsible employees . . . and Ms. Wooten."  McNamara Decl. Ex. 9 at AMIN_0011983.

**UNCONTROVERTED**

23.     Project South and Ms. Wooten did not correct or retract their statements in the time- period specified in the October 6 Letter.  McNamara Decl. Ex. 10.

**UNCONTROVERTED**

24.     Dr. Amin did not sue Dawn Wooten or Project South concerning any of the statements in the Whistleblower Complaint.  McNamara Decl. Ex. 3 at 135:7:12.

**UNCONTROVERTED**

**<u>The Press Immediately Reported on the Whistleblower Complaint</u>**

**<u>September 14, 2020 Reporting</u>**

25.     On September 14, 2020, the *Associated Press* published a news report on the allegations in the Whistleblower Complaint ("AP Article").  McNamara Decl. Ex. 11. The AP Article:

> a.  Opens by stating that "[a]n immigration detention center in Georgia performed questionable hysterectomies, refused to test detainees for COVID

19 and shredded medical records, according to a nurse quoted in a complaint filed on Monday."

b.  Quotes Wooten from the Whistleblower Complaint as calling a "gynecologist who works outside the facility 'the uterus collector.'" *Id.* at 2.

c.  Quotes Wooten from the Whistleblower Complaint, "Everybody he sees has a hysterectomy – just about everybody…. He's even taken out the wrong ovary on a lady." *Id.*

d.  Quoting Wooten, reports that it "was unclear to Wooten if women knowingly consented to the operations… 'These immigrant women, I don't think they really, totally, all the way understand this is what's going to happen depending on who explains it to them.'" *Id.*

e.  Includes a response from ICE noting that it "does not comment on matters before the inspector general," but "[t]hat said, in general, unproven allegations, made without any fact checkable specifics, should be treated with the appropriate skepticism they deserve" (the "Original ICE Statement"). *Id.*

**UNCONTROVERTED as to these being contents within the article.  However, as discussed in Paragraph 6, what NBCUniversal characterizes as a "Whistleblower Complaint" was not Dawn Wooten's actual whistleblower complaint but was a letter shared with media.  To the extent the content is being offered for the truth of the matters asserted, it is CONTROVERTED as discussed throughout and is inadmissible hearsay. The article does not mention Dr. Amin.**

26.  On September 14, 2020, *Law & Crime* published a news report on the allegations in the Whistleblower Complaint ("Law & Crime Article").  McNamara Decl. Ex. 12.  The Law & Crime Article:

a.  Opens by stating, "Several legal advocacy groups on Monday filed a whistleblower complaint on behalf of a nurse at an Immigration and Customs Enforcement (ICE) detention center documenting 'jarring medical neglect' within the facility, including a refusal to test detainees for the novel coronavirus
and an exorbitant rate of hysterectomies being performed on immigrant women." *Id.* at NBCU001571

b. Reported on the alleged "inordinate rate at which women in ICDC were subjected to hysterectomies…" *Id.* NBCU001571

c. Reported that "many" immigrant women who had the procedure were "'confused' when asked to explain why they had the surgery, with one detainee likening their treatment to prisoners in concentration camps." *Id.*

d. Reported that "[a]ccording to Wooten, ICDC consistently used a particular gynecologist – outside the facility – who almost always opted to remove all or part of the uterus of his female detainee patients." *Id.* at NBCU001572

e. Reported the Whistleblower Complaint's allegations that "Everybody he sees has a hysterectomy—just about everybody"… "We've questioned among ourselves like goodness he's taking everybody's stuff out…that's his specialty, he's the uterus collector." *Id.*

**CONTROVERTED. The cited materials do not support NBCUniversal's contention. McNamara Decl. Ex. 12 does not open with the statement at 26.a. but instead with an UPDATE that cites the Associated Press as reporting "more migrant women had come forward and alleged that they did not agree to surgical procedures, but AP also said that its review of the matter 'did not find evidence of mass hysterectomies as alleged in a widely shared complaint filed by a nurse at the detention center.'" McNamara Decl. Ex. 12 at 2. UNCONTROVERTED as to the other contents being contents within the article. However, as discussed in Paragraph 6, what NBCUniversal characterizes as a "Whistleblower Complaint" was not Dawn Wooten's actual whistleblower complaint but was a letter shared with media. To the extent the content is being offered for the truth of the matters asserted, it is CONTROVERTED as discussed throughout and is inadmissible hearsay. The article does not mention Dr. Amin.**

27.     On September 14, 2020, *Law360* published a news report on the allegations in the Whistleblower Compliant ("Law360 Article"). McNamara Decl. Ex. 13. The Law360 Article:

a. Opens by stating, "A Georgia immigration detention center is denying proper medical care and COVID-19 testing to immigrants in custody, including by subjecting detained women to hysterectomies at high ratees, advocacy organizations alleged in a complaint Monday." *Id.*

b. Reports that Wooten "represented by the Government Accountability Project and Project South, has also filed a whistleblower complaint with DHS' inspector general's office." *Id.*

c. Reports that Wooten alleged that "women at the facility are referred by the same doctor for hysterectomies…at high rates, and many do not seem to understand why the procedure was done. 'Everybody [the doctor] sees has a hysterectomy – just about everybody'"…and that "one woman detained at the facility compared the facility to an 'an experimental concentration camp' in an interview with Project South, according to the complaint." *Id.*

d. Includes the Original ICE Statement.  *Id.*

**UNCONTROVERTED as to these being contents within the article.  However, as discussed in Paragraph 6, what NBCUniversal characterizes as a "Whistleblower Complaint" was not Dawn Wooten's actual whistleblower complaint but was a letter shared with media.  To the extent the content is being offered for the truth of the matters asserted, it is CONTROVERTED as discussed throughout and is inadmissible hearsay. The article does not mention Dr. Amin.**

28.     Other news organizations reported on the Whistleblower Complaint on September 14, 2020, including *Daily Beast* ("ICE Whistleblower Complaint Alleges 'Uterus Collector' Doctor Performed Mass Hysterectomies")*, see* McNamara Decl. Ex. 14, *VICE* ("Staggering Number of Hysterectomies Happening At ICE Facility, Whistleblower Says")*, see* Ex. 15, *Business Insider* ("A Whistleblower Is Accusing Doctors at an ICE Detention Center of Surgically Removing The Wombs of Immigrant Women")*, see* Ex. 16, *The Guardian* ("ICE Detainees Faced Medical Neglect and Hysterectomies, Whistleblower Alleges")*, see* Ex. 17, and the *Atlanta Journal Constitution* ("Whistleblower Blasts Georgia Immigration Detention

Center's Covid-19 Response"), *see* Ex. 18.

**UNCONTROVERTED as to these being contents within the article.  However, as discussed in Paragraph 6, what NBCUniversal characterizes as a "Whistleblower Complaint" was not Dawn Wooten's actual whistleblower complaint but was a letter shared with media.  To the extent the content is being offered for the truth of the matters asserted, it is CONTROVERTED as discussed throughout and is inadmissible hearsay. The articles do not mention Dr. Amin.**

29.      All of the news reports identified in Paragraphs 25-28 were initially published before MSNBC published the Challenged Statements in this action.  *See supra* ¶¶ 25-28.

**UNCONTROVERTED.  None of the articles mention Dr. Amin.**

30.      The news reports identified in Paragraphs 25-28 have not published any corrections concerning statements about Dr. Amin, and the news reports remain online as of the date of this filing.  *See supra* ¶¶ 25-28.

**CONTROVERTED.  The cited materials do not support NBCUniversal's contention. McNamara Decl. Ex. 12 opens with an UPDATE that cites the Associated Press as reporting "more migrant women had come forward and alleged that they did not agree to surgical procedures, but AP also said that its review of the matter 'did not find evidence of mass hysterectomies as alleged in a widely shared complaint filed by a nurse at the detention center.'"  McNamara Decl. Ex. 12, NBCU001568.  The cited materials also do not establish that the news reports remain online in the absence of any testimony or declaration regarding when the websites were accessed and how, nor does the declaration attesting to the accuracy of the contention.  *See* Doc. 136 ¶¶ 12-19.  Further, in the case of McNamara Decl. Ex. 14, the website at the top of the exhibit reads that it is from**

"web.archive.org" *and was changed* in June 2022.  Doc. 136-14 at 2.  Finally, the news

reports could not publish "corrections concerning statements about Dr. Amin," because,

unlike NBCUniversal, the news reports did not mention Dr. Amin's name at all.

31.     Dr. Amin has not produced in this action any letter he or his counsel sent to the

news organizations identified in Paragraphs 25-28 challenging or asserting claims arising out

of the news reports.

**CONTROVERTED.  There are no cited materials to support this contention.**

32.     Dr. Amin did not sue any of the news organizations concerning the articles

identified in Paragraphs 25-28.  McNamara Decl. Ex. 3 at 39:13-40:15.

**UNCONTROVERTED**

33.     Dr. Amin's surgical coordinator testified that the Whistleblower Complaint was

"all over the media" and recalled seeing broadcast footage about the Whistleblower

Complaint's allegations on Univision.  McNamara Decl. Ex. 19 at 50:23-51:14.

**CONTROVERTED.  The cited materials do not support NBCUniversal's contention,**

**and other facts controvert the contention.  NBCUniversal's excerpt omits that Ms. Nito**

**testified as to "seeing videos of [Dawn Wooten] being interviewed," which was done on**

**NBCUniversal and not "all over the media."  McNamara Decl. Ex. 19 at 51:5-6; *see* Doc.**

**130-8 at 28-29 (showing said video); Doc. 133-7 at 6-7 (showing said video).  Ms. Wooten**

**testified that her interviews with Mr. Soboroff and Mr. Hayes were the only two**

**television interviews she could recall doing related to the story in September 2020,**

**although later in the deposition upon after he recollection refreshed Ms. Wooten also**

**recalled doing one with a program called Democracy Now and another, later, with Al**

**Jazeera.  Ex. B, Wooten Depo. 202:4-6, 205:12-18, 211:3-7, 247:16-20, 248:4-8.  Further,**

as discussed in Paragraph 6, what NBCUniversal characterizes as a "Whistleblower Complaint" was not Dawn Wooten's actual whistleblower complaint but was a letter shared with media.

### September 15, 2020 Reporting

34.        On September 15, 2020, at 5:24 AM ET, CBS News published a news report on the Whistleblower Complaint allegations with the headline "Questionable Hysterectomies and Shoddy Covid Care Alleged at Georgia Immigrant Detention Center," ("CBS Article"). McNamara Decl Ex. 20.  The CBS Article:

a.  Opens by stating, "An immigration detention center in Georgia performed questionable hysterectomies, refused to test detainees for COVID-19 and shredded medical records, according to a nurse quoted in a complaint filed Monday."

b.  Reported that "Wooten calls a gynecologist who works outside the facility 'the uterus collector.'"  *Id.* at NBCU001614

c.  Reported Wooten as alleging "Everybody he sees has a hysterectomy – just about everybody…He's even taken out the wrong ovary on a young lady."

d.  Reported that it was "unclear to Wooten if women knowingly consented to the operations.  Nurses raised concerns about the doctor, who is unnamed." *Id.*

e.  Reported that Dr. Ada Rivera, "the top doctor at the agency [ICE] issued a statement saying the whistleblower allegations will be investigated by an independent office, adding, 'However, ICE vehemently disputes the implication that detainees are used for experimental medical procedures." *Id.*

f.  Reported that Wooten "was demoted after missing work with coronavirus symptoms, which she believe was retaliation for raising questions about addressing COVID-19." *Id.* at NBCU001615.

**UNCONTROVERTED as to these being contents within the article.  However, as discussed in Paragraph 6, what NBCUniversal characterizes as a "Whistleblower Complaint" was not Dawn Wooten's actual whistleblower complaint but was a letter**

shared with media.  To the extent the content is being offered for the truth of the matters

asserted, it is CONTROVERTED as discussed throughout and is inadmissible hearsay.

The article does not mention Dr. Amin.

      35.     On September 15, at 2:02 PM ET, *Forbes* published a news report on the

Whistleblower Complaint allegations with the headline "Pelosi Calls for Investigation Into

Claims of Mass Hysterectomies, Poor Covid-19 Care at ICE Detention Center," ("Forbes

Article"). McNamara Decl. Ex. 21. The Forbes Article:

    a.   Opens by stating, "House Speaker Nancy Pelosi (D-Calif.) on Tuesday called for an investigation into a Georgia ICE detention center where a whistleblower complaint from one of the facility's nurses detailed health care abuses, including questionable hysterectomies and a refusal to test for and report coronavirus cases." *Id.*

    b.   Reports that Wooten "said the facility would send many detainees to see a particular gynecologist outside the facility who she described as the 'uterus collector.'" *Id.* at NBCU001646.

    c.   Reports that Wooten "said that 'everybody he sees has a hysterectomy' in the complaint, detailing situations in which some of the immigrant women may not have understood what procedures they were undergoing due to language barriers or poor explanations." *Id.*

    d.   Reports that "Joining Pelosi in the call for an investigation is a group of 173 members of Congress, who in a Tuesday letter expressed 'deep concerns for the health and welfare of immigrants in custody of Immigration and Customs Enforcement.'" *Id.*

CONTROVERTED.  The cited materials do not support NBCUniversal's contention.

The article indicates that it was updated September 16, 2020, and it is unclear what text

was altered in the update or intervening updates prior.  McNamara Decl. Ex. 21 at 2.

UNCONTROVERTED as to these being contents within the article.  However, as

discussed in Paragraph 6, what NBCUniversal characterizes as a "Whistleblower

Complaint" was not Dawn Wooten's actual whistleblower complaint but was a letter

shared with media.  To the extent the content is being offered for the truth of the matters

asserted, it is **CONTROVERTED as discussed throughout and is inadmissible hearsay.**

**The article does not mention Dr. Amin.**

36.     On September 15, 2020, *Prism* published a news report on the Whistleblower

Complaint with the headline "Exclusive:  Georgia doctor who forcibly sterilized detained

women has been identified" ("Prism Article").  McNamara Decl. Ex. 22.  The Prism Article:

a.  Opens by stating, "Under the Trump administration, reproductive injustice has run rampant inside the federal immigration system—stretching far beyond the family separation policy at the border.  A complaint filed yesterday sheds light on a new atrocity:  Women detained at the Irwin County Detention Center (ICDC) in Georgia have allegedly been sterilized without their consent." *Id.*

b.  Reports that "The attorneys behind the lawsuit would not confirm the identity of the doctor referenced in the complaint, but Prism has learned, according to a source familiar with the situation, it is gynecologist Mahendra Amin, based in Douglas, Georgia.  The doctor, also an immigrant, is affiliated with Coffee Regional Medical Center and Irwin County Hospital in Georgia." *Id.* at NBCU001501-02.

c.  Reports that "It is unclear if Amin is financially benefiting from the procedures.  The gynecologist was once a co-defendant in a lawsuit in which he and other doctors were ordered to pay more than half a million dollars to resolve allegations that they caused false claims to be submitted to Medicare and Medicaid."  *Id.* at NBCU001503

d.  The sentence quoted in Paragraph 36(c) included a link to an April 29, 2015, United States Attorney's Office, Middle District of Georgia, press release titled, "Hospital Authority of Irwin County Resolves False Claims Act Investigation for $520,000." *Available at* https://www.justice.gov/usao-mdga/pr/hospital-authority-irwin-county-resolves-false-claims-act-investigation-520000

e.  Reports that "ICE did not respond to Prism's request for comment regarding the doctor, and the gynecologist's receptionist told Prism he is not commenting to the media at this time."  McNamara Decl. Ex. 22 at NBCU001503

**CONTROVERTED.  The cited materials do not support NBCUniversal's contentions.**

**The evidence does not establish that the website discussed in Paragraph 36(d) is actually**

the link discussed in Paragraph 36(c), as the hyperlink contains no title and the evidence does not otherwise demonstrate NBCUniversal's contention.  Further, as discussed in Paragraph 6, what NBCUniversal characterizes as a "Whistleblower Complaint" was not Dawn Wooten's actual whistleblower complaint but was a letter shared with media. To the extent the content is being offered for the truth of the matters asserted, it is CONTROVERTED as discussed throughout and is inadmissible hearsay.  And as discussed in Paragraph 37, Prism subsequently published a piece reporting that Dr. Amin was a "pillar in the community" while Ms. Wooten had been described as "complicit" in alleged ICDC abuse and giving readers other reasons to doubt the veracity of their reporting.

37.    On September 15, 2020, at 5:22 PM ET, *The Intercept* published a news report on the Whistleblower Complaint allegations with the headline "'He Just Empties You All Out': Whistleblower Reports High Number of Hysterectomies at ICE Detention Facility" (the "Intercept Article").  McNamara Decl. Ex. 23.  The Intercept Article:

    a. Opens by stating "A whistleblower complaint filed this week with the Department of Homeland Security's Office of the Inspector General alleges that high rates of hysterectomies – sometimes without what the complaint called 'proper informed consent' – have been performed on women detained in a privately owned immigration jail in Georgia." *Id.*

    b. Reports the statement from a detainee in the Whistleblower Complaint that "five women who had the procedure between October and December 2019 had told her that they 'reacted confused when explaining why they had one done.'" *Id.*

    c. Reports that the accounts in Project South's complaint "were consistent with accounts given in separate interviews conducted by The Intercept with three other current detainees at the facility, eight advocates for detainees at the prison, and a former Irwin employee, all of whom requested anonymity for fear of reprisals against themselves and their clients." *Id.*

    d. Reports that "On Tuesday, Speaker of the House Nancy Pelosi called for an

investigation into Wooten's allegations.  Georgia State Rep. Bob Trammell sent a letter on Monday to the Georgia Composite Medical Board and the Georgia Board of Nursing after the complaint was published, requesting that they 'immediately suspend the licenses of the providers named in the whistleblower complaint pending a full investigation by your offices.'"  *Id.* at NBCU001620

e.  Reports that "[t]hough Wooten, in an interview with The Intercept on Monday, declined to identify the doctor, according to interviews with a detainee, two detained advocates, and a former Irwin employee, the doctor is Mahendra Amin, an obstetrics and gynecology specialist based in Douglas, Georgia…. The doctor's identity, which was first reported by Prism, did not appear in the whistleblower's complaint to the Homeland Security Office of Inspector General."  *Id.* at NBCU001620-21

f.  Reports that "When reached by comment, Amin confirmed that he conducted procedures on immigrant women brought from the facility.  He said that after he conducts exams, he requires the approval of the detention center before conducting any necessary procedures.  Amin said that he has only performed 'one or two hysterectomies in the past two[or] three years.'  When pressed, he

did not specify whether those hysterectomies were performed on people detained in Irwin."  *Id.* at NBCU001621

g.  Reports that "Amin said that allegations of performing procedures without patients' consent were ruining his reputation and affecting his practice. 'Everything is wrong, and if you want to talk, talk to the hospital administrator.'  Amin said, referring to the Irwin County Hospital, and then hung up the phone."  *Id.*

h.  Amin does not recall speaking with The Intercept but admits that the statements in the Intercept Article were true concerning the allegations of performing procedures without patient's consent were ruining his reputation and affecting his practice. McNamara Decl. Ex. 3 at 106:1-7; 109:20-110:1.

**CONTROVERTED.  The cited materials do not support NBCUniversal's contention.**

**Dr. Amin agreed that the statement "allegations of performing procedures without patient's consent were ruining his reputation and affecting his practice" was an accurate statement, but neither the questioning nor Dr. Amin's answer specified any time period about which that statement was accurate.  McNamara Decl. Ex. 3 at 109:20-110:1.**

**Indeed, Dr. Amin agreed that the statement was accurate because NBCUniversal, with**

its vast reach, published his name and photograph, while almost all other outlets refused to do so.  *See, e.g.*, McNamara Decl. Ex. 11, Ex. 12, Ex. 13, Ex. 14, Ex. 15, Ex. 16, Ex. 17, Ex. 18, Ex. 20, Ex. 21, Ex. 24, Ex. 25, Ex. 26, Ex. 27, Ex. 28, Ex. 29.  Only minor internet outlets called Prism and the Intercept—and, of course, NBCUniversal—used Dr. Amin's name and/or image.  McNamara Decl. Ex. 22, Ex. 23.  And even as to those publications, Prism published another article on September 17 giving its readers information from which to weigh the credibility of the letter, opening by stating: "A complicated picture is emerging of both the doctor accused of sterilizing detained women without their consent and the nurse who brought the information to light."  Ex. C, Prism Article, at 2.  The Prism article continues by noting that Dr. Amin is viewed as a "pillar in the community" and that Ms. Wooten was described as complicit in abuse of ICDC employees, joking at the women's expense and not taking action despite knowing about abuse.  Ex. C, Prism Article, at 3.  The Prism article goes on to quote an "associate in the medical field" who observed that, because of rules on anesthesia, hospital admissions, and other medical treatment logistics, "[t]here is no way this was being done under the radar and without a paper trail.  That would be like murdering someone in the middle of a big party with no witnesses."  Ex. C, Prism Article, at 4.  Further, as discussed in Paragraph 6, what NBCUniversal characterizes as a "Whistleblower Complaint" was not Dawn Wooten's actual whistleblower complaint but was a letter shared with media.  To the extent the content is being offered for the truth of the matters asserted, it is CONTROVERTED as discussed throughout and is inadmissible hearsay.  Also, Christopher Scholl, head of NBCUniversal Standards at the time, testified: "I want our journalism to stand you up on its own . . . .  And the Intercept may be reporting something that we—that we have

reason to believe is accurate or not accurate.  It's sort of irrelevant.  I want to be comfortable with the information before something is reporting on one of our platforms. That's what happened here."  Ex. D, Scholl Depo. 100:11-17.  Mr. Scholl further testified: "First of all, I don't know what Prism is.  I still don't," that his contemporaneous hesitation to credit Prism in his reporting was probably due to its having reporting "that I would have been uncomfortable with," and that "[s]omething about the Prism write-up was nagging me, and I didn't want to tie ourselves to that." Ex. D, Scholl Depo. 212:6-213:4.  Finally, the Intercept also published that Dr. Amin, when reached by phone, stated "he has only performed 'one or two hysterectomies in the past two [or] three years.'"  McNamara Decl. Ex. 23 at 4.  It also stated that Dr. Amin "said that after he conducts exams, he requires the approval of the detention center before conducting any necessary procedures."  McNamara Decl. Ex. 23 at 4.

38.    Other news organizations reported on the Whistleblower Complaint allegations on September 15, 2020, before 5:30 PM ET, including UPI.com ("Complaints Allege Neglect, Sterilization at Georgia Migrant Facility"), *see* McNamara Decl. Ex. 24, *The Augusta Chronicle* ("Nurse:  Questionable Hysterectomies Performed at Georgia Immigration Jail"), *see* Ex. 25, *The Hill* ("Whistleblower Complaint Alleges Widespread Abuse on Migrant Detainees"), *see* Ex. 27, *Huff Post* ("Whistleblower Says Doctor Performed Excessive Hysterectomies on ICE Detainee"), *see* Ex. 28, Refinery.com ("An ICE Nurse Revealed that A U.S. Detention Centre is Performing Mass Hysterectomies"), *see* Ex. 29.

**UNCONTROVERTED.  However, as discussed in Paragraph 6, what NBCUniversal characterizes as a "Whistleblower Complaint" was not Dawn Wooten's actual whistleblower complaint but was a letter shared with media.  To the extent the content is**

23

**being offered for the truth of the matters asserted, it is CONTROVERTED as discussed**

**throughout and is inadmissible hearsay.  To the extent the content is being offered for**

**the truth of the matters asserted, it is CONTROVERTED as discussed throughout and is**

**inadmissible hearsay.  The articles do not mention Dr. Amin.**

       39.     Some of the news organizations described in Paragraphs 34-38 republished the

original AP Article, as indicated in their bylines.  *See, e.g.,* McNamara Decl. Exs. 20, 24.

**CONTROVERTED.  The cited materials do not support NBCUniversal's contention.**

**The article at McNamara Decl. Ex. 20 states, "The Associated Press contributed to this**

**report," McNamara Decl. Ex. 20 at 5, but there appears to be nothing at either**

**McNamara Decl. Ex. 20 nor Ex. 24 "indicat[ing]" republishing of the AP Article.**

**NBCUniversal implies that other exhibits do support the contention by using a "*see, e.g.*"**

**signal, and indeed Ex. 25 has "Associated Press" in the by-line.  NBCUniversal's citation**

**to a discrete fact in its plethoric, substantially irrelevant filings with only a "*see, e.g.*"**

**signal unfairly requires Dr. Amin and the Court to wade through the mountainous**

**extraneous documents it has put to obstruct a just and efficient resolution to its motion,**

**and the citations it specifically identifies do not support its contention, which anyway is**

**irrelevant to any issue raised in its motion for summary judgment.**

       40.     All of the news reports identified in Paragraphs 34-38 were published before

MSNBC published the Challenged Statements in this action.  *See supra* ¶¶ 34-38.

**CONTROVERTED.  The cited materials do not support NBCUniversal's contention.  The**

**article at McNamara Decl. Ex. 21 indicates that it was updated September 16, 2020, after**

**NBCUniversal's publications of several Statements, Doc. 130-8, Doc. 131-2, Doc. 133-7,**

**and it is not evident what text was altered in the update or whether there were any other**

intervening updates.  **McNamara Decl. Ex. 21 at 2.  The article at McNamara Decl. Ex. 22 does not list a time and its date matches that of several broadcasts that published Statements at issue.  McNamara Decl. Ex. 22 at 2; Doc. 130-8 at 2; Doc. 131-2 at 2; Doc. 133-7 at 2.  The article at McNamara Decl. Ex. 23 appears to have been published after the first broadcast that published Statements at issue began.  *Compare* McNamara Decl. Ex. 23 at 2 (timed at 5:22PM), *with* Doc. Doc. 130-8 at 2 (timed 16:00, or 4PM).  The declaration attesting to the accuracy of the materials does not fill these gaps.  *See* Doc. 136 ¶¶ 22-23.**

41.     The news reports identified in Paragraphs 34-38 have not published any corrections concerning statements about Dr. Amin, and the news reports remain online as of the date of this filing. *See supra* ¶¶ 34-38.

**CONTROVERTED.  The cited materials do not support NBCUniversal's contention.  The article at McNamara Decl. Ex. 21 indicates that it was updated September 16, 2020, after it was originally published.  McNamara Decl. Ex. 21 at 2.  The cited materials also do not establish that the news reports remain online in the absence of any testimony or declaration regarding when the websites were accessed and how, nor does the declaration attesting to the accuracy of the evidence.  *See* Doc. 136 ¶¶ 21-30.  Further, most of the news reports could not publish "corrections concerning statements about Dr. Amin," because most of the articles declined to mention Dr. Amin's name at all.  One of the two which did, Prism, later published reporting that did correct information, as discussed above in Paragraph 37.**

42.     Dr. Amin has not produced in this action any letter he or his counsel sent to the news organizations identified in Paragraphs 34-38 challenging or asserting claims arising out

of the news reports.

**CONTROVERTED.  There are no cited materials to support the contention.**

43.    Dr. Amin did not sue any of the news organizations identified in Paragraphs 34-38 McNamara Decl. Ex. 3 at 39:19-40:15.

**UNCONTROVERTED**

**<u>NBC News Investigated and Reported on the Whistleblower Complaint before the MSNBC News Reports</u>**

**<u>NBC News Publishes the AP Article</u>**

44.    On September 15, 2020, at 8:20 AM ET, NBC News re-published the AP Article, including each of the statements identified in Paragraph 25 (the "NBC/AP Article"). McNamara Decl. Ex. 26.

**UNCONTROVERTED**

45.    The NBC/AP Article, as published by NBC News, carried a "By The Associated Press" byline.  *See id.*

**UNCONTROVERTED**

46.    Reprints of wire stories, like the NBC/AP Article, are not independently reviewed or approved by Standards.  McNamara Decl. Ex. 30 at 45:5-16, 52:6-10, 53:5-14, 58:6-12; Ex. 31

at 18:4-6, 19:5-15; Scholl Decl. ¶ 9.

**CONTROVERTED.  The cited materials do not support NBCUniversal's contention. McNamara Decl. Ex. 30 does not contain the transcript pages 45, 52, or 53.  McNamara Decl. Ex. 30 at 58:6-12 does not say anything about "reprints of wire stories," and the excerpts of the deposition transcripts cited in NBCUniversal's Statement of Material Facts but not contained in McNamara Decl. Ex. 30 also do not support the stated**

contention.  *See* Ex. F, Ainsley Depo. at 45:5-16, 52:6-10, 53:5-14.  McNamara Decl. Ex. 31 similarly says nothing about "reprints of wire stories," although at least it includes the pages cited in NBCUniversal's Statement of Material Facts.  And even Scholl Decl. ¶ 9, a self-serving declaration, does not corroborate the categorical statement for which it is cited; Mr. Scholl declared that "Standards *generally* does not review *AP* wires," Doc. 134 ¶ 9 (emphasis supplied), *not* that they are categorically "not independently reviewed or approved."  Further, there is evidence that, here, NBCU decisionmakers thought that the story should have gone through Standards.  Specifically, Ms. Ainsley emailed a group of people involved with the story after the "NBC/AP Article" was published and before her and Mr. Soboroff's story was published, asking on behalf of herself and Mark Schone: "What do we do with Daniella's story [the 'NBC/AP Article'] and *WHETHER OR NOT THEY RAN THIS STORY WITHOUT PERMISSION OF STANDARDS*?"  Scholl Decl. Ex. 134-4 at 3 (emphasis supplied).

47.    Dr. Amin did not seek or obtain any corrections concerning any of the statements published in the NBC/AP Article.

**CONTROVERTED.  There are no cited materials, and to the extent that the statements published in the "NBC/AP Article" were also published in the broadcasts at issue in this case, Dr. Amin did seek corrections.**

48.    Dr. Amin (or his counsel) never sent a claim letter to NBCU concerning the publication of the NBC/AP Article.

**CONTROVERTED.  There are no cited materials, and to the extent that the statements published in the "NBC/AP Article" were also published in the broadcasts at issue in this case, Dr. Amin did send a claim letter.**

49.     Dr. Amin did not sue NBCU concerning the publication of the NBC/AP Article.

**CONTROVERTED.  There are no cited materials, and to the extent that the statements published in the "NBC/AP Article" were also published in the broadcasts at issue in this case, Dr. Amin did sue.**

### NBC News Publishes the Silva Article

50.     The NBC/AP Article was updated on September 15, 2020 at 2:26 P.M in an article by Daniella Silva (the "Silva Article").  Scholl Decl. Ex. 5.

**UNCONTROVERTED that this was one of many updates.**

51.     The Silva Article republished several paragraphs from the AP Article and updated it to include information from a press conference held by Dawn Wooten on September 15, 2020.

**CONTROVERTED.  There are no cited materials to support the contention.**

52.     The Silva Article:

    a.  Revises the opening of the AP Article, stating:  "A nurse who raised alarms about conditions at a U.S. Immigration and Customs Enforcement detention center in Georgia, including that it refused to test detainees for the coronavirus and that some detainees received questionable hysterectomies, said Tuesday that she decided to become a whistleblower so that detainees are treated better at the facility."  *Id.*

    b.  Reports that "Wooten worked full time as a licensed practical nurse at the Irwin County detention Center in Ocilla, Georgia, until being demoted in July."  *Id.*

    c.  Reports that "In a federal complaint filed Monday, a coalition of rights groups accused the detention center of committing 'jarring medical neglect,' including failing to protect its detainees from coronavirus, red flags concerning a high rate of hysterectomies performed on detainees and fabricating medical records."  *Id.*

    d.  Includes the Original ICE Statement. *Id.*

e. Re-reports several statements from the AP Article (also included in the NBC/AP Article), including that "Wooten said in the complaint that she and other nurses were alarmed at the rate at which immigrant women at the facility were receiving hysterectomies, and called an unnamed gynecologist who worked outside the facility 'the uterus collector.'" *Id.*

**CONTROVERTED.  The cited materials do not support NBCUniversal's contention.  Specifically, the sentence quoted in Paragraph 52(e) does not appear in the earlier NBC/AP article, although similar content is reported.  To the extent that the content is being offered for the truth of the matters asserted, it is CONTROVERTED as discussed throughout and is inadmissible hearsay.**

53. Dr. Amin did not seek or obtain any corrections concerning the Silva Article.

**CONTROVERTED.  There are no cited materials, and to the extent that the statements published in the "Silva Article" were also published in the broadcasts at issue in this case, Dr. Amin did seek corrections.**

54. Dr. Amin (or his counsel) never sent a claim letter to NBCU concerning the publication of the Silva Article.

**CONTROVERTED.  There are no cited materials, and to the extent that the statements published in the "Silva Article" were also published in the broadcasts at issue in this case, Dr. Amin did send a claim letter.**

55. Dr. Amin did not sue NBCU concerning the publication of the Silva Article.

**CONTROVERTED.  There are no cited materials, and to the extent that the statements published in the "Silva Article" were also published in the broadcasts at issue in this case, Dr. Amin did sue.**

<u>**NBC News Publishes the NBC News Article**</u>

56. Following NBC News's publication of the NBC/AP Article and the Silva

Article, at 5:24 PM, NBC News published a third article concerning the Whistleblower Complaint, with the byline "By Jacob Soboroff, Julia Ainsley and Daniella Silva," and the headline, "Lawyers allege abuse of migrant women by gynecologist for Georgia ICE detention center"(the "NBC News Article").  Ainsley Decl. Ex. 2.

**UNCONTROVERTED that this was one of many changes made to the article.  However, the cited materials do not support NBCUniversal's contention.  Ainsley Decl. Ex. 2 does not contain any byline or headline.  Doc. 128-2.  Further, as discussed in Paragraph 6, what NBCUniversal characterizes as a "Whistleblower Complaint" was not Dawn Wooten's actual whistleblower complaint but was a letter shared with media.**

57.    The NBC News Article reflects the additional reporting done by two NBC News journalists, Jacob Soboroff and Julia Ainsley, investigating the allegations of the Whistleblower Complaint.

**CONTROVERTED.  There are no cited materials to support the contention.  Moreover, although the primary focus of the letter was on COVID, Mr. Soboroff testified in his deposition that he and Ms. Ainsley focused on hysterectomies and gynecological care because "the reporting particularly focused on what, to me, was new news."  Ex. G, Soboroff Depo. 72:11-20.   Further, as discussed in Paragraph 6, what NBCUniversal characterizes as a "Whistleblower Complaint" was not Dawn Wooten's actual whistleblower complaint but was a letter shared with media.**

58.    Soboroff has been an NBC News journalist since 2015 and is employed by NBC News.  McNamara Decl. Ex. 32 at 62:4-5.

**UNCONTROVERTED.  However, the cited materials do not support NBCUniversal's contention.  McNamara Decl. Ex. 32 at 63:4-5 does state: "I've worked at NBC since the**

**summer of 2015." However, 62:4-5 says nothing relevant, and the cited materials do not**

**support his being employed by NBC News specifically.**

59.    Soboroff has won awards for his reporting on immigration, including the

Walter Cronkite Award for Excellence in Television Journalism for reporting on family

separation at the border.  Soboroff wrote a *New York Times* best-selling book on the policy of

child separation.  *Id.* at 215:14-20; Soboroff Decl. ¶ 2.

**UNCONTROVERTED**

60.    Ainsley has been an NBC News journalist since 2017 and is employed by NBC

News.  McNamara Decl. Ex. 30 at 6:23-7:3.

**UNCONTROVERTED.  However, the cited materials do not support NBCUniversal's**

**contention.  McNamara Decl. Ex. 30 does not contain the transcript pages 6 or 7.  The**

**transcript pages *not* contained in McNamara Decl. Ex. 30, however, do confirm the**

**statement.**

61.    Ainsley and Soboroff have covered immigration issues together and won the

2019 Hillman Prize for Broadcast Journalism for the coverage of the Trump administration's

policy of child separation. McNamara Decl. Ex. 30 at 10:4-8; Ex. 32 at 215:14-20.

**UNCONTROVERTED.  However, the cited materials do not support NBCUniversal's**

**contention.  McNamara Decl. Ex. 30 does not contain the transcript page 10.  Neither the**

**actual transcript page, which is not part of McNamara Decl. Ex. 30, nor McNamara**

**Decl. Ex. 32, support the contention that the award was made in 2019 or that the award**

**was for coverage of Trump administration child separation.  Ex. F, Ainsley Depo. 6:23-**

**7:3; McNamara Decl. Ex. 32 at 215:14-20.**

62.    The NBC News Article:

a. Opens by stating, "A nurse who worked at an Immigration and Customs Enforcement detention center in Irwin County, Georgia and four lawyers representing clients there are claiming that immigrant women are routinely being sent to a gynecologist who has left them bruised and performed unnecessary procedures, including hysterectomies."  Ainsley Decl. Ex. 2

b. Reports that "three lawyers identified [] Dr. Mahendra Amin, practicing in Douglas, Georgia" as the doctor.  *Id.*

c. Reports that "Amin was the subject of a Justice Department Investigation in 2015 for making false claims to Medicaid and Medicare.  As a result, he and other doctors involved paid $525,000 in a civil settlement, according to the Justice Department," linking to a Department of Justice ("DOJ") press release. *Id.*; *see also supra* ¶36(d).

d. Includes the statement from the Silva Article that "Wooten was demoted in July from a full-time nurse to 'as-needed'" and that "she believes the demotion was in retaliation for raising coronavirus protocol concerns, according to the complaint." Ainsley Decl. Ex. 2

e. Includes information from an interview with Elizabeth Matherne (referenced in the Article as "Elizabeth Mathren"), "a lawyer who represented several women who saw Amin," who said she "brought their complaints [concerning Dr. Amin] to managers of the detention facility," stating that "I begged [someone in management] to get my client treatment with a different doctor. I told her I had heard from multiple people that he was rough, that they were scared to go to him, that they didn't understand what he was doing." *Id.*

f. Reports that Matherne also said that "she had at least one client report bruising after being examined by Amin." *Id.*

g. Reports that they tried to obtain comment from Dr. Amin, but "a woman who answered the phone at Amin's practice hung up the phone when asked for comment." *Id.*

h. Includes information from an interview with Benjamin Osorio, "another lawyer representing women in the Irwin County facility," who said "two of his clients received hysterectomies that they believe may have been unnecessary" and describes the circumstances surrounding these two hysterectomies. *Id.*

i. Includes information from an interview with Sarah Owings, another lawyer, who "said she has heard of many women who are told they have ovarian cysts that need to be removed or drained." *Id.*

j. Includes a statement from an NBC News interview with Wooten in which

she said "I had a detainee that asked me… 'What is he doing Ms. Wooten, collecting all of our uteruses?' And I just looked at her puzzled because I didn't have an answer." *Id.*

k. Includes the Original ICE Statement and reflects that "ICE did not immediately respond to a request for comment based on the lawyers' allegations." *Id.*

l. Re-reports several statements from the NBC/AP Article and the Silva Article, including that "in her complaint, Wooten said some of her patients told her they were afraid to go to a doctor they called the 'uterus collector.'" *Id.*

**UNCONTROVERTED as to the contents of the article. CONTROVERTED as to the truth of the matters asserted. The cited materials do not support NBCUniversal's contention. NBCUniversal appears to attempt to cite this reporting in its motion for summary judgment for the truth of the matters reported, Doc. 127 at 8, 30, but other evidence contradicts Paragraph 62 for the truth of the matters reported. Specifically, testimony from Mr. Osorio contradicts the reporting that he had said "two of his clients received hysterectomies that they believe may have been unnecessary" and the characterization of NBCUniversal's "circumstances surrounding the two hysterectomies." He testified instead that he told Julia Ainsley that, although he and other attorneys "were questioning everything at that point," her medical records "indicated that the need for the hysterectomy was necessitated by cancer," and that he had the records for one client who had a hysterectomy while he was unsure as to the other client. Ex. H, Osorio Depo. 65:3-67:6. Mr. Osorio told an interviewer that a second client of his had claimed to have had a hysterectomy, but that he did not have medical records to confirm it. Ex. H, Osorio Depo. 130:8-131:10. To date, Mr. Osorio does not know whether the second client had a hysterectomy or even was a patient of Dr. Amin's; when he requested records from Dr. Amin's office, the office responded that it had no records for the second client, and Ben**

Osorio testified that he had no reason to believe the office was withholding her records.  Ex. H, Osorio Depo. 30:14-30:19, 31:15-18, 83:7-84:7.  Although Ms. Ainsley testified that she records sources who will give on the record quotes, but she did not record her conversation with Mr. Osorio, or other sources for the article.  Ex. F, Ainsley Depo. 29:24-30:14, 31:4-17, 32:13-16.  Mr. Osorio's testimony—and not the account in the article—are supported by a transcript of his conversation with Alexander Price, a producer of the program "All In with Chris Hayes," in which he told Mr. Price: "But I don't think we have a full, complete picture yet."  Price Decl. Ex. 11 at 10.  Mr. Osorio also provided Mr. Price with reason to doubt the account of BPR, stating that in contrast his other client with whom he recommended they speak "is more squeaky clean.  You know, she's got no criminal history."  Price Decl. Ex. 11 at 12.  Similarly, Ms. Owings testified that she told Jacob Soboroff that she and her colleagues were _not_ finding large numbers of hysterectomies.  Doc. 122-26 at 48:2-14, 118:1-9.  This, of course, contradicts the numerous references to "hysterectomies" and a "uterus collector."  An unnamed lawyer source, Andrew Free, told NBCU Ms. Owings was "on the American Immigration Lawyers Association Board of Governors—it's an elected position through the national 15,000-member immigration lawyer association."  Free Decl. Ex. 3 at 3:23-4:5.  As to having "had at least one client report bruising," Dr. Amin has provided a sworn statement that his examinations and other in-office treatment did not cause bruising in any ICDC patients, others involved in the medical care of patients with Dr. Amin provided sworn testimony that he was never rough, and ███████████████████████████████████████████████████████

██████████████████████████████████.  Ex. I, Amin Decl. ¶¶ 5-9; Ex. J, Ray Affidavit ¶ 3; Ex. K, Nito Affidavit ¶ 8; Ex. L, Hutchison Affidavit ¶¶ 15-16 ; Ex. M, Paulk

Depo. 148:6-154:5.  **Although Ms. Ainsley testified that she records sources who will give on the record quotes, but she did not record her conversation with Mr. Osorio.  Ex. F, Ainsley Depo. 29:24-30:14.  Finally, the sentence quoted in Paragraph 62(l) does not appear in the earlier NBC/AP article, although similar content is reported.**

63.    Dr. Amin did not seek any corrections concerning the NBC News Article.

**CONTROVERTED.  There are no cited materials, and to the extent that the statements published in the "NBC News Article" were also published in the broadcasts at issue in this case, Dr. Amin did seek corrections.**

64.    Dr. Amin (or his counsel) never sent a claim letter to NBCU concerning the publication of the NBC News Article.

**CONTROVERTED.  There are no cited materials, and to the extent that the statements published in the "NBC News Article" were also published in the broadcasts at issue in this case, Dr. Amin did send a claim letter.**

65.    Dr. Amin did not sue NBCU concerning the publication of the NBC News Article.

**CONTROVERTED.  There are no cited materials, and to the extent that the statements published in the "NBC News Article" were also published in the broadcasts at issue in this case, Dr. Amin did sue.**

**Reporting for the NBC News Article**

66.    Soboroff, having learned of the Whistleblower Complaint on the evening of September 14, 2020, spoke with the lawyer who sent the Complaint to the government to see about interviewing Wooten. Soboroff Decl. Ex. 1 at 3-4.; Soboroff Decl. ¶ 5.

**UNCONTROVERTED.  However, as discussed in Paragraph 6, what NBCUniversal**

**characterizes as a "Whistleblower Complaint" was not Dawn Wooten's actual**

**whistleblower complaint but was a letter shared with media.**

67.    By the morning of September 15, 2020, Soboroff observed that "everyone is all

over this story," referring to the number of media reports already published concerning the

Whistleblower Complaint.  Ainsley Decl. Ex. 1 at 3148; McNamara Decl. Ex. 32 at 52:20-

53:8.

**UNCONTROVERTED that Mr. Soboroff texted this, and much else, to Ms. Ainsley.**

**However, as discussed in Paragraph 6, what NBCUniversal characterizes as a**

**"Whistleblower Complaint" was not Dawn Wooten's actual whistleblower complaint but**

**was a letter shared with media.  Further, *none* of the articles published by then identified**

**Dr. Amin by name or photograph.  *See infra* Paragraphs 36-38.**

68.    By about 11:15 AM ET, Soboroff had interviewed Wooten.  Wallace Decl. Exs.

2- 3; Ainsley Decl. Ex. 1 at NBCU003147-3148; Scholl Ex. 1; Soboroff Decl. ¶ 6.

**CONTROVERTED.  The cited materials do not support NBCUniversal's contention.**

**Although a thorough comparison of the materials surrounding the documents cited,**

**which Dr. Amin should not have to undertake in reviewing NBCUniversal's Statement of**

**Material Fact, suggests that the video interview happened between 10:30AM and**

**12:30PM, nothing in the documents suggests a time as precise as NBCUniversal proffers.**

69.    Soboroff found her to be credible. Her interview was consistent with the

allegations attributed to her in the Whistleblower Complaint.  She made it clear that she did

not accompany the women to their appointments with the gynecologist.  And she stated when

she did not know certain information (*e.g.,* the doctor's name, or how many women went

through the procedure). Maddow Decl. Ex. 3 at NBCU000404,NBCU000413-414,

NBCU000417.  Wooten stated that she was not intending to attack LaSalle: "I don't know if this has to do with not having enough staff, and it's definitely not an attack on LaSalle Corporation as a whole, and not really an attack on anybody." *Id.* at NBCU000424.

McNamara Decl. Ex. 32 at 86:19-87:19, 88:14-89:4; Soboroff Decl. ¶ 6.

**CONTROVERTED.  Ms. Wooten's interview with Mr. Soboroff was, in material ways, inconsistent with the letter.  For example, Ms. Wooten told Mr. Soboroff, as to consent: "Once they go to the facility of the physician, I'm unaware of what takes place there.  I don't know if they're explained to.  I don't know if they sign consents when they get there to have these procedures."  Maddow Decl. Ex. 3 at 13.  Ms. Wooten also declined to give Mr. Soboroff a number, even generally, stating only that she had heard from "several women" who had bad experiences with the unnamed doctor, not "mass hysterectomies."  Maddow Decl. Ex. 3 at 16.  Mr. Soboroff responded: "And when you say several and over the time frame, that's—that's a long period of time."  Maddow Decl. Ex. 3 at 16.  Ms. Wooten further testified that she was not making "really an attack on anybody."  Maddow Decl. Ex. 3 at 22.  She continued: "I don't know if it's a breakdown in communications."  Maddow Decl. Ex. 3 at 23.  She continued: "I'm unsure if he's doing it to them against their wishes.  They're saying that they're not getting the full understanding."  Maddow Decl. Ex. 3 at 26-27.  She continued: "So does he even know that they feel this way?  Have they even expressed this, you know, to him?"  Maddow Decl. Ex. 3 at 27.  Other facts contradict NBCUniversal's contention that Mr. Soboroff found Ms. Wooten credible.  The *same day as the interview*, Mr. Soboroff texted Ms. Ainsley that Mr. Free had "heard mixed things" about Ms. Wooten. Ex. A, Soboroff-Ainsley Text Thread, at 12.  Mr. Soboroff did not ask Ms. Wooten any**

**questions to learn more about reasons to doubt Ms. Wooten, *see generally* Maddow Decl.**

**Ex. 3, and by not asking he did not provide viewers a chance to decide for themselves.**

**Similarly, as discussed above in Paragraph 62, and below in Paragraph 72, the attorneys**

**testified that they told Mr. Soboroff information that contradicted the Statements.**

**Finally, as discussed in Paragraph 6, what NBCUniversal characterizes as a**

**"Whistleblower Complaint" was not Dawn Wooten's actual whistleblower complaint but**

**was a letter shared with media.**

70.     By 1:00 PM ET on September 15, Soboroff and Ainsley had contacted lawyers

who represented women at ICDC who had been treated by Amin.  See, e.g. Soboroff Decl. Ex.

2; Soboroff Decl. ¶ 8; Scholl Decl. Ex. 4 at NBCU002648; McNamara Decl. Ex. 30 at 27:24-

28:5.

**CONTROVERTED as to when Mr. Soboroff and Ms. Ainsley began reporting on**

**conversations with the lawyers.  There is no discussion of lawyers in contemporaneous**

**email correspondence until 1:29PM after Mr. Scholl had pointed out as to Mr. Soboroff's**

**interview with Ms. Wooten: "all we have is a public whistleblower complaint in which she**

**provides no evidence to back up her claims."  Scholl Decl. Ex. 4 at 6.  *IN RESPONSE* to**

**that email, Ms. Ainsley writes at 2:11PM: "Jacob and I just got a lot of information,**

**including specific allegations of abuse and the name of the doctor.  I'm going to start**

**writing it up."  Scholl Decl. Ex. 4 at 6.  Further, the cited portion of the deposition**

**excerpted in McNamara Decl. Ex. 30 is not included in that exhibit, which begins with**

**page 55.**

71.     Ultimately, in addition to the attorney for Project South, Soboroff and/or

Ainsley spoke with four lawyers (three who were named in the article, Matherne, Owings and

Osorio, and one who was not, Andrew Free).  McNamara Decl. Ex. 30 at 27:24-28:5, 28:19-29:2, 31:4-9, 32:21-33:4; Ex. 32 at 38:5-7; Ainsley Decl. ¶ 12; Soboroff Decl. ¶ 8

**CONTROVERTED.  The cited materials do not support NBCUniversal's contention.  The cited portion of the deposition excerpted in McNamara Decl. Ex. 30 is not included in that exhibit, which begins with page 55.**

72.     Soboroff and Ainsley had previously relied on Andrew Free as a source in reporting on immigration issues and found him to be a "reliable, credible, and knowledgeable" and "well- informed" source.  McNamara Decl. Ex. 30 at  27:13-16; Ex. 32 at 10:24-11:8, 11:24-25; Ex. 33 at 113:11-16; Ainsley Decl. ¶10; Soboroff Decl. ¶ 10.

**CONTROVERTED.  The cited materials do not support NBCUniversal's contention.  There is nothing in the cited materials stating that Mr. Soboroff had found Mr. Free "reliable, credible, and knowledgeable" or "well-informed," though that sentiment does appear elsewhere in Mr. Soboroff's self-serving declaration.  The portions of the deposition transcript at McNamara Decl. Ex. 30 do not contain the cited page; the exhibit begins on page 55.**

73.     Soboroff and Ainsley found each of the lawyers they spoke with to be credible, Soboroff Decl. ¶ 7; Ainsley Decl ¶¶ 10, 13, as they provided detailed information and clarified what they knew and did not know.  For example, Sarah Owings observed that "I don't think this is necessarily a systemic sterilization by ICE I think this is the kind of thing that is allowed to flourish in the course of poor oversight and terrible, inhumane conditions of confinement," a quote that was included in the NBC News Article. *See* Ainsley Decl. Ex. 2.

**CONTROVERTED.  There is *nothing* in the cited paragraphs attesting to Ms. Ainsley or Mr. Soboroff finding any of the named sources credible; the cited materials only speak to**

their impressions of Mr. Free and Ms. Wooten.  Further, Ms. Owings's statement very clearly *controverts*, rather than gives credibility to, the Statements, and Mr. Soboroff testified in his deposition that by the time he appeared on the Rachel Maddow show he and Ms. Ainsley had only learned of *two* detainees who had received hysterectomies.  Ex. G, Soboroff Depo. 180:2-20.  Other facts contradict the stated contention; mere hours later, Ms. Ainsley asked Mr. Soboroff: "*DO WE THINK THEY* [the lawyers] *CONSPIRED AT ALL?*"  Ex. A, Ainsley-Soboroff Text Thread, at 12 (emphasis and capitals supplied).  In the same thread, Mr. Soboroff revealed that Mr. Free indicated doubt as to Ms. Wooten's credibility, having "heard mixed things" about her.  Ex. A, Ainsley-Soboroff Text Thread, at 12.  Their doubts were specifically about the hysterectomies, with Ms. Ainsley asking: "But only two hysterectomies?" and stating, "I'm dying to know the truth," and "Gosh I really don't want to just let this one lie and move on.  I have to know!"  Ex. A, Ainsley-Soboroff Text Thread, at 12-13.  This text exchange was not produced by NBCU until mere hours before Ms. Ainsley's deposition, although counsel for NBCU represented that Ms. Ainsley had provided her with the message "in October of 2021, but we didn't realize we had them."  Ex. F, Ainsley Depo. 186:14-187:12, 190:14-22.  Further, Ms. Ainsley and Mr. Soboroff's credibility is at issue due to these and other sworn statements that are controverted by other evidence.  For example, Ms. Ainsley's declaration attests to a thorough and specific deep memory of events around the publication of her and Mr. Soboroff's article and her appearance on a broadcast.  *See generally* Ainsley Decl.  At her deposition, she testified that "basically closed up shop" on her reporting on the story, which was why she testified she did not follow up with her sources as to whether or not there were consent forms signed, as the NBCU medical team had told her she should.  Ex.

F, Ainsley Depo. 224:4-17, 225:22-226:1. ████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████ **Further, as discussed above as**

**to Paragraph 62, the Statements contradict what the lawyers testified that they told Mr.**

**Soboroff and Ms. Ainsley, and, as discussed in Paragraph 69, what Ms. Wooten told Mr.**

**Soboroff in the interview also contradict the Statements about "mass," "forced"**

**hysterectomies "without consent."  These contradictions implicate issues of credibility as to**

**other testimony of Mr. Soboroff and Ms. Ainsley, and Dr. Amin is entitled to have a jury**

**decide.**

74.    The same lawyers were speaking to other media organizations and were quoted

in other news reports making similar statements.  For example, Matherne was referenced in a

September 15, 2020 *Reuters* article, reporting that she "recalled complaining to detention

center officials about treatment her clients said they were receiving from an outside

gynecologist." McNamara Decl. Ex. 34; *see also* Ex. 35.

**CONTROVERTED.  The cited materials do not support NBCUniversal's contention.  The**

**two examples NBCUniversal provides do not provide support as to any articles other than**

**those two, as to NBCUniversal's characterization of "similar statements," and NBCU cites**

**no comparison.  Further, the *Reuters* article states: "Reuters interviewed Wooten but**

**could not independently confirm the claims of improper hysterectomies, or surgery to**

**remove the uterus," and it did not name Dr. Amin or show his picture.  McNamara Decl.**

**Ex. 34 at 2.  In the article at McNamara Decl. Ex. 35, the Intercept is attributed for the quote from Dr. Amin that "he had performed 'one or two' hysterectomies on patients in recent years," as well as that "all procedures on immigration detainees are approved by officials at the detention center."  McNamara Decl. Ex. 35 at 3.**

75.     Discovery produced in this action shows that Matherne was copied on a November 2018 email sent to ICDC, in which a lawyer stated that her client went to see Dr. Amin, the experience was "painful and traumatic," and she wanted a different doctor.  That email reports that ICDC's inmate services director had told the attorney that "this was not the first time someone complained about Dr. Amin."  McNamara Decl. Ex. 37.

**UNCONTROVERTED as to the contents of an email.  To the extent it is offered for the truth of the content, Doc. 127 at 4, other facts controvert the contention that "this was not the first time someone complained about Dr. Amin," and it is CONTROVERTED. The email in which that text appears is written by an advocate for a person detained by ICE at ICDC, not anyone from ICDC, McNamara Decl. Ex. 37 at 3, and** ▮

▮

▮

▮ **. Ex. M, Paulk Depo. 148:6-151:9.**

▮

▮

▮

**Ex. M, Paulk Depo. 151:10-152:12.** ▮

▮

██████████████████████████████████████████████ **Ex.**

**M, Paulk Depo. 152:21-153:17.** ██████████████████████████

████████████████████████████████████████████████████

█████████████████████████ **Ex. M, Paulk Depo. 154:2-5.**

76.    On September 17, 2020, Owings was referenced in a *USA Today* article, noting that her team "had identified more than 15 cases of women who underwent questionable surgeries at the hand of the doctor, including removal of the Fallopian tubes and removal of the ovaries." The article quoted Owings:  "I wouldn't say there is a systemic pattern, but based on people who have gotten in touch, it points to a lack of informed consent and full understanding by people of these medical treatments."  McNamara Decl. Ex. 35.

**UNCONTROVERTED that these are excerpts from the story.  To the extent that the content is being offered for the truth of the matters asserted, it is CONTROVERTED as discussed throughout and is inadmissible hearsay.**

77.    Osorio was also interviewed for the *USA Today* article, which reports that he had two clients from ICDC who had hysterectomies after being told they had cancer.  *Id.*; *see also* Ex. 36 (email dated September 15, 2020 from Osorio, "I have two clients that had hysterectomies while detained at Irwin.").

**CONTROVERTED.  The materials cited do not support NBCUniversal's contentions. The summary contained in Paragraph 78 leaves out from the article in *USA Today* contained in McNamara Decl. Ex. 35 the following sentence about one of his clients who thought they had had hysterectomies: "Osorio said he doesn't know if the 2019 procedure cleared out the cancer or if his client ever had cancer in the first place."  McNamara Decl. Ex. 35 at 6.  It goes on to quote Mr. Osorio in a way that makes clear he is not**

comfortable stating allegations that Dr. Amin performed mass hysterectomies without necessity, authority, or consent: "All these questions are out there.  Hopefully, these investigations could figure out what was going on."  McNamara Decl. Ex. 35 at 6. McNamara Decl. Ex. 36, which was *not* an email to *USA Today* but to another attorney, demonstrates Mr. Osorio's reason for uncertainty: one of his clients pleaded "to misdemeanor child abuse charges stemming from the husband taking one of the children to a drug sale;" further, Mr. Osorio does *not* describe the hysterectomies his clients think they had as "unnecessary," "forced," or "unauthorized," or anything similar.  McNamara Decl. Ex. 36.  Finally, as discussed elsewhere herein, Mr. Osorio testified that he did not tell NBCUniversal that he had two clients who had hysterectomies and were told they had cancer.  To the extent that the content is being offered for the truth of the matters asserted, it is CONTROVERTED as discussed throughout and is inadmissible hearsay.

78.    Soboroff and Ainsley also learned that in 2015, Dr. Amin and other doctors at Irwin County Hospital ("ICH") settled an action brought by the DOJ and State of Georgia alleging that they were performing unnecessary medical procedures and made false claims to Medicare and Medicaid (the "DOJ Complaint").  McNamara Decl. Ex. 38.

UNCONTROVERTED that there was a settlement, but CONTROVERTED to the extent that Dr. Amin and the nine other doctors did not pay any settlement but rather "Defendant ICH," Irwin County Hospital, paid the settlement without admission of liability. McNamara Decl. Ex. 87 at 3.

79.    The DOJ Complaint alleged that "Dr. Amin has a standing order at ICH which requires that certain tests always be run on pregnant patients, without any medical evaluation and regardless of her condition.  For example, no matter what symptoms the patient might be

exhibiting, ICH performs an OB ultrasound on every pregnant patient, without consulting

[Dr. Amin] or obtaining his or any other doctor's medical opinion for that particular patient."

McNamara Decl. Ex. 39.

**UNCONTROVERTED that this allegation was in the Complaint, which ICH and not Dr. Amin nor the other nine doctors paid a settlement without any admission of liability.**

80.    The DOJ Complaint alleged that, according to an ICH Utilization Review

memo, "a sonogram is to be performed even if there is no indication of something wrong with

the baby as long as Medicaid will pay for it, but to find out whether it is medically necessary

if Medicaid might not pay for it." *Id.* at ¶ 67.

**UNCONTROVERTED that this allegation was in the Complaint, which ICH and not Dr. Amin nor the nine other doctors paid a settlement without any admission of liability.**

81.    The DOJ Complaint alleged, "Dr. Amin's standing order for ultrasounds on his

patients constitutes a pattern of medical services that he, ICH, and the on-call doctors know or

should know are not medically necessary." *Id.* at ¶ 70.

**UNCONTROVERTED that this allegation was in the Complaint, which ICH and not Dr. Amin nor the nine other doctors paid a settlement without any admission of liability.**

82.    The DOJ complaint was settled by a $520,000 payment.  McNamara Decl. Ex.

143; Ex. 3 at 268:15-270:17.

**UNCONTROVERTED that as discussed above ICH and not Dr. Amin nor the nine other doctors made this settlement payment without admission of liability.**

83.    Soboroff and Ainsley believed that the allegations in the DOJ complaint were

consistent with allegations in the Whistleblower Complaint and lent further credibility to the

allegations concerning Dr. Amin's medical treatment of ICDC detainees.  McNamara Decl. Ex.

30 at 184:16-185:10; Soboroff Decl. ¶ 10

**CONTROVERTED.  The cited materials, which are self-serving declarations and testimony anyway, do not support NBCUniversal's contention.  Other facts contradict NBCUniversal's contention that Mr. Soboroff and Ms. Ainsley found the DOJ complaint consistent with allegations in the letter.  As discussed above as to Paragraph 62, the Statements contradict what the lawyers testified that they told Mr. Soboroff and Ms. Ainsley.  As discussed in Paragraph 69, unaired portions of the interview with Ms. Wooten contradict Statements that Dr. Amin performed "mass" hysterectomies that were "forced" and "without consent."  And as discussed in Paragraph 73, Ms. Ainsley and Mr. Soboroff exchanged contemporaneous texts in which they identified reasons to doubt the Statements that they did not share with their audience or further investigate, and had additional reasons to doubt the letter.  Further, as discussed in Paragraph 6, what NBCUniversal characterizes as a "Whistleblower Complaint" was not Dawn Wooten's actual whistleblower complaint but was a letter shared with media.**

84.     Soboroff and Ainsley sought comment concerning the Whistleblower Complaint and the new allegations from their reporting from Dr. Amin, ICE, and LaSalle (the private entity that ran ICDC).  McNamara Decl. Ex. 40 at NBCU002648; Ex. 41; Ainsley Decl. Ex. 1 at NBCU003152.

**UNCONTROVERTED.  However, as discussed in Paragraph 6, what NBCUniversal characterizes as a "Whistleblower Complaint" was not Dawn Wooten's actual whistleblower complaint but was a letter shared with media.**

85.     Comments from Dr. Amin, ICE and LaSalle were included in the NBC News Article after they were obtained.  *See infra*, ¶¶ 103-05.

46

**CONTROVERTED.  The cited materials do not support NBCUniversal's contention. There is nothing in the cited paragraphs about any LaSalle comment, and Paragraph 105 is not related to Paragraph 85.  Comments included were partial.**

86.     Chris Scholl, senior deputy head of NBCU News Group Standards, reviewed the NBC News Article prior to publication.  Scholl Decl. ¶ 5; McNamara Decl. Ex. 31 at 43:11-15.

**CONTROVERTED.  The cited materials do not support NBCUniversal's contention. The testimony contained in McNamara Decl. Ex. 31 states only that Mr. Scholl "worked on" the article.  McNamara Decl. Ex. 31 at 43:11-15.  Other facts contradict NBCUniversal's contention that Mr. Scholl reviewed the article before it was published. As to an early version of the article drafted, at 1:24 PM on September 15, the afternoon NBCUniversal first published Statements, Mr. Scholl wrote as follows: "my concern is all we have is a public whistleblower complaint in which she provides no evidence to back up her claims.  ICE makes essentially the same point, and it appears a valid one. She has no direct knowledge of what she's claiming, is unable to name the doctor involved (if I understood correctly), and we are unable to verify any of it or determine whether there is really a story here.  Essentially, it boils down to a single source—with an agenda—telling us things we have no basis to believe are true.  At the least, we would have to note all of that in our reporting, but then it's worth asking why we are reporting it in the first place."  Ex. P, Email Thread 1, at 2.  At 1:26, Ms. Ainsley responded to Mr. Scholl's email to state that ICE had told her off the record that they were working on data "on the number of hysterectomies performed," which data they believe "will negate her claims."  Ex. Q, Email Thread 2, at 2.** ███████████████████

██████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████   **Mr. Soboroff and Ms. Ainsley attempted to
address Mr. Scholl's issues, but he continued to have issues as to the veracity of the
contents which would become the Statements.  Ex. S, Email Thread 4, at 2.  Scholl wrote,
at 3:31: "I have a hard commitment and am bringing Mary Lockhart in—she will take it
from here.  Offhand, though, I do think we need to mention the lawyers coordinated
after the complaint, note the false claims settlement (and whether he acknowledged
guilt), note that he has no other complaints or lawsuits (if that's the case), include that
we asked to speak with the women directly and what the result of that was, and be clear
that we've asked ICE to respond specifically to these other allegations."  Ex. T, Email
Thread 5, at 2.  Sometime before 5:11PM, Ms. Ainsley texted to Mr. Soboroff: "On with
Mark [Schone].  He is mad at Scholl."  Ex. A, Ainsley-Soboroff Text Exchange, at 8.  In
the context of the above conversation, a jury could infer that Mr. Schone was "mad at"
Mr. Scholl because of Mr. Scholl's delay with allowing the article to be published so that
Mr. Soboroff and Ms. Ainsley could appear on television.  Then, *without any approval
from Ms. Lockhart, who Mr. Scholl had said "will take it from here*," at 5:29PM, Mark
Schone wrote, to Mr. Scholl, with Mr. Soboroff and Ms. Ainsley cc-ed: "I published this,
which is based on the reporting you approved, after [REDACTED pursuant to attorney-
client privilege].  I don't know about NCX.  Julia is now doing a hit on it."  Ex. U, Email
Thread 6, at 2.  Mr. Schone's statement that what he published was "based on the
reporting you approved" and the fact that he did**

not state that Ms. Lockhart approved it establishes that the article was not approved at all, and the fact that Julia was doing "a hit on it" immediately—the broadcast of *Deadline*—shows that the reason it was published without approval was to get Ms. Ainsley on television.  At 6:23PM, Mr. Scholl sent an email that further establishes the article was not approved by Standards, noting issues that remained with the article and stating: "It is imperative that Standards see a final version of a story like this before it is posted.  It should not be considered 'approved' on the basis of answers to questions." Ex. V, Email Thread 7, at 2.  Of course, if the article *had* been approved, then Mr. Scholl's subsequent email stating that it is "imperative that Standards see a final version of a story like this before it is posted" and that an article "should not be considered 'approved' on the basis of answers to questions" would make no sense.  Instead, as a jury is permitted to infer based on the evidence discussed above, Mr. Scholl did *not* review a final version of the article.

87.     Standards is a group of veteran journalists within the NBCU News Group that reviews certain articles and scripts for the News Group to help ensure that they meet the News Group's journalistic standards.  Scholl Decl. ¶¶ 3-4; McNamara Decl. Ex. 30 at 45:5-16, 52:6-10, 53:5-14, 58:6-12; Ex. 31 at 18:4-6; 19:5-15.

**CONTROVERTED.  Other facts contradict NBCUniversal's contention that Standards merely "reviews" articles; Standards *approves* articles and scripts before they are published, and stories selected for Standards review require the "permission" of Standards before they are published.  *See, e.g.*, Ex. V, Email Thread 7, at 2 ("It is imperative that Standards see a final version of a story like this before it is posted.  It should not be considered 'approved' on the basis of answers to questions.").  Ms. Ainsley**

testified that, in the absence of something in NewsConnect indicating that it is approved by Standards, the show that wanted to use it would call and ask whether something was reportable because "Well, they didn't say if we could, so let's call them up and ask." McNamara Decl. Ex. 30 at 60:13-25.  Further, three of the four cited excerpts of the deposition contained in McNamara Decl. Ex. 30 are not included in that exhibit, which begins at page 55.

88.    In an email at 1:24 PM ET, Scholl expressed a "concern" with only relying on the Whistleblower Complaint and, among other points, states that "we need more of our own independent reporting."  Scholl Decl. Exs. 2, 6.

CONTROVERTED.  The cited materials do not support NBCUniversal's contention that this is a complete list of the concerns.  These concerns were "among other points;" as discussed in Paragraph 86 and elsewhere, Mr. Scholl had extreme concerns about the Statements that were never addressed, even if he dropped the concerns.  Further, as discussed in Paragraph 6, what NBCUniversal characterizes as a "Whistleblower Complaint" was not Dawn Wooten's actual whistleblower complaint but was a letter shared with media.

89.    Before Scholl's 1:24 email, Soboroff and Ainsley had already begun conducting independent reporting.  Before publishing the NBC News Article at 5:24 PM ET, Soboroff and Ainsley had spoken to the attorney from Project South who sent the Whistleblower Complaint, interviewed Dawn Wooten, spoken with four lawyers who represented that their clients had concerns with their medical care by Dr. Amin, researched the DOJ Complaint and the 2015 settlement with the DOJ, and sought comment from Dr. Amin, ICE, and LaSalle. *Id.* Exs. 3-4; Ainsley Decl. ¶¶ 9-19; Soboroff Decl. ¶ 18.

CONTROVERTED.  The cited materials do not support NBCUniversal's contention that they "had already begun conducting independent reporting."  As discussed above as to Paragraph 70, Mr. Soboroff and Ms. Ainsley appear to begin their independent reporting *after* Mr. Scholl had expressed that they did not have enough.  Scholl Decl. Ex. 4 at 6.  Also, omitted from this contention is that, at 1:26PM, Ms. Ainsley wrote that she "just had an off the record convo with ICE," who told her that ICE had data they were working to share "on the number of hysterectomies performed," which "will negate [the Statements'] claims."  Ex. Q, Email Thread 2, at 2.  Further, as discussed in Paragraph 6, what NBCUniversal characterizes as a "Whistleblower Complaint" was not Dawn Wooten's actual whistleblower complaint but was a letter shared with media.

90.     As Ainsley testified regarding Scholl's "concern" and their response to it: "he's raising the bar, and I'm meeting it.  He's doing his job, and I'm doing mine."  McNamara Decl. Ex. 30 at 199:22-24.

UNCONTROVERTED that Ms. Ainsley stated this testimony; however, as discussed throughout, whether Ms. Ainsley was "meeting" the bar is CONTROVERTED.

91.     At the time the NBC News Article was published, at 5:24 PM, Ainsley, Soboroff, and their editor, Mark Schone, did not doubt the accuracy of the information in the Article and believed the Article to be accurate.  McNamara Decl. Ex. 42 at 39:3-7, 40:18-25, 52:9-10, 98:9-23, 105:14-20; Ex. 30 at 89:23-35, 90:6-10, 98:11-17; Soboroff Decl. ¶¶ 11, 18; Ainsley Decl. ¶¶ 21, 27, 34.

CONTROVERTED.  The cited materials do not support NBCUniversal's contention.  Nothing in the cited materials speaks to Mr. Schone's subjective belief in the accuracy of the information of the article; all of the portions of McNamara Decl. Ex. 42 concern Mr.

**Schone's representations as to whether he thought he had *permission* to publish the contents. *See* McNamara Decl. Ex. 42 at 39:3-7, 40:18-25, 52:9-10, 98:9-23, 105:14-20. Other facts contradict NBCUniversal's contention that these NBCUniversal decisionmakers did not doubt the accuracy. As discussed throughout, Ms. Ainsley and Mr. Soboroff had numerous reasons to doubt the veracity of the Statements and indeed expressed doubts contemporaneously to each other: As discussed in Paragraph 73, Ms. Ainsley and Mr. Soboroff exchanged contemporaneous texts in which they identified reasons to doubt the Statements that they did not share with their audience or further investigate, and** ███████

███████████████████████████████████████████████

███████████████████████████████████**; as discussed above as to Paragraph 62, the Statements contradict what the lawyers testified that they told Mr. Soboroff and Ms. Ainsley; as discussed above as to Paragraph 69, unaired portions of Ms. Wooten's interview contradict Statements that Dr. Amin performed "mass" hysterectomies without consent or that were forced or without authorization.**

92.     At the time the NBC News Article was published at 5:24 PM, Schone, Ainsley, and Soboroff understood that Standards approved the Article. McNamara Decl. Ex. 42 at 39:3-7, 39:12-16; Soboroff Decl. ¶ 11; Ainsley Decl. ¶ 2.

**CONTROVERTED. The cited materials do not support NBCUniversal's contention, *none of which* attests to the article being approved, and Ainsley Decl. Paragraph 2 has nothing to do with the article. Other facts contradict NBCUniversal's contention that they understood Standards to have approved the Article. As discussed above as to Paragraph 86, Mr. Scholl appears to have *not* approved the article as published. Again, after the article was published, Mr. Scholl sent an email noting issues that remained to**

his mind and stated: "It is imperative that Standards see a final version of a story like this before it is posted.  It should not be considered 'approved' on the basis of answers to questions."  Ex. V, Email Thread 7, at 2.  Of course, if the article *had* been approved, then Mr. Scholl's subsequent email stating that it is "imperative that Standards see a final version of a story like this before it is posted" and that an article "should not be considered 'approved' on the basis of answers to questions" would make no sense.  Further, Mr. Schone pointedly refused to testify that the article had been approved by standards, instead distinguishing over three pages of deposition testimony that "the reporting in the story is all approved by legal and standards" whenever asked whether the article was approved by Standards.  McNamara Decl. Ex. 42 at 39:3-42:9.

93.   Scholl approved the content of the NBC News Article as published at 5:24 PM. Scholl Decl. Exs. 6, 8; McNamara Decl. Ex. 31 at 42:15-16.

**CONTROVERTED.  The cited materials do not support NBCUniversal's contention, and other facts contradict NBCUniversal's contention that Mr. Scholl reviewed the article before it was published.  As discussed above as to Paragraph 86, Mr. Scholl appears to have *not* approved the article as published.  Again, after the article was published, Mr. Scholl sent an email noting issues that remained to his mind and stated: "It is imperative that Standards see a final version of a story like this before it is posted. It should not be considered 'approved' on the basis of answers to questions."  Ex. V, Email Thread 7, at 2.  Of course, if the article *had* been approved, then Mr. Scholl's subsequent email stating that it is "imperative that Standards see a final version of a story like this before it is posted" and that an article "should not be considered 'approved' on the basis of answers to questions" would make no sense.**

94.     At 5:25 PM, Scholl emailed Ainsley asking whether the NBC News Article was in NewsConnect, stating: "We are fielding various inquiries [from others in the NBCU News Group] and someone needs to get it in there asap."  Scholl Decl. Ex. 6.

**UNCONTROVERTED**

95.     At 5:54 PM, Scholl again told Ainsley, regarding the NBC News Article: "Please place this directly into NCX [NewsConnect]."  Scholl Decl. Ex. 8.

**UNCONTROVERTED**

96.     Putting something in NewsConnect makes the content available to all NBCU News Group editorial staff.  McNamara Decl. Ex. 31 at 30:21-31:8, 41:19-20; Scholl Decl. ¶ 24.

**CONTROVERTED.  The cited materials do not support NBCUniversal's contention. The portion of McNamara Decl. Ex. 31 on page 41 does not even discuss NewsConnect, and neither of the other cited materials support the stated contention.  Further, whether something is "available to all NBCU News Group editorial staff" does not indicate that the material is approved by Standards, as discussed herein.  Mr. Scholl emailed contemporaneously: "It is imperative that Standards see a final version of a story like this before it is posted.  It should not be considered 'approved' on the basis of answers to questions."  Ex. V, Email Thread 7, at 2.**

97.     A previously published article by NBC News that is added to NewsConnect is deemed "reportable" regardless of whether it has a "reportable" tag in NewsConnect. McNamara Decl. Ex. 30 at 60:1-7; Ex. 42 at 100:24-101:4; Ex.43; Scholl Decl. ¶ 24.

**CONTROVERTED.  The cited materials do not support NBCUniversal's contention.  Of the cited materials, only Scholl Decl. ¶ 24 supports the contention.  Other facts**

contradict NBCUniversal's contention that an article added to NewsConnect is deemed "reportable" regardless of whether it is otherwise indicated as "reportable" in NewsConnect.  The deposition portion contained in McNamara Decl. Ex. 30 at 60:13-25, Ms. Ainsley testified that, in the absence of something in NewsConnect indicating that it is approved, the show that wanted to use it would call and ask whether something was reportable because "Well, they didn't say if we could, so let's call them up and ask." And Mr. Scholl emailed contemporaneously: "It is imperative that Standards see a final version of a story like this before it is posted.  It should not be considered 'approved' on the basis of answers to questions."  Ex. V, Email Thread 7, at 2.  Further, at the time that the article was published, NewsConnect had a flag with which an article could be marked "reportable" or "non-reportable," and the article was not marked "reportable" even when Ms. Ainsley put it in NewsConnect.  Ex. W, 30(b)(6) Depo. 95:22-97:25; ██████

████████████████████████.

98.     The NBC News Article as posted to NewsConnect at 5:52 P.M, *see* McNamara Decl. Ex. 44 at NBCU002309, is identical to the NBC News Article as published at 5:24 P.M, *see* Ainsley Decl. Ex. 2.

**CONTROVERTED.  The cited materials do not support NBCUniversal's contention.  The word count on McNamara Dec. Ex. 44 is 1202, while the word count on Ainsley Decl. Ex. 2 is 1203.**

99.     At 6:17 PM, Standards attached reporting guidance to the NBC News Article in NewsConnect.  Maddow Decl. Ex. 5.

**CONTROVERTED.  The cited materials do not support NBCUniversal's state that the time of an email containing such guidance happened at 6:13PM.  Maddow Decl. Ex. 5 at**

**3-4.  Decl. Ex. 5 is an email, and the declaration attesting to its accuracy does not contend that it was from NewsConnect but rather states that Standards issued guidance via email. Maddow Decl. ¶ 15.**

100.    When Standards attaches reporting guidance to an article, that is also communicating that the story is reportable (using the Standards guidance).  Scholl Decl. ¶ 24.

**CONTROVERTED.  Other facts controvert NBCUniversal's contention that an article with reporting guidance in NewsConnect is deemed "reportable" regardless of whether it is otherwise indicated as "reportable" in NewsConnect.  The deposition portion contained in McNamara Decl. Ex. 30 at 60:13-25, Ms. Ainsley testified that, in the absence of something in NewsConnect indicating that it is approved, the show that wanted to use it would call and ask whether something was reportable because "Well, they didn't say if we could, so let's call them up and ask."  Mr. Scholl emailed contemporaneously: "It is imperative that Standards see a final version of a story like this before it is posted.  It should not be considered 'approved' on the basis of answers to questions."  Ex. V, Email Thread 7, at 2.**

101.    The guidance from Standards stated: "Note when reporting this story that we have reached out to the company (LaSalle Corrections) and have not received a response, and reflect ICE's statement.  Also, note that we reached out to Dr. Amin.  Remember: these are allegations— not established facts—relayed to us by attorneys, not the women directly.  Our reporting needs to reflect that."  Maddow Decl. Ex. 5 at NBCU000532.

**UNCONTROVERTED**

102.    At 6:48 PM, Scholl sent the Standards guidance on the NBC News Article to the MSNBC Primetime Executive Producer distribution list.  Price Decl. Ex. 8.

**CONTROVERTED.  The cited materials do not support NBCUniversal's contention that Mr. Scholl only sent the Standards guidance as it existed in Paragraph 100.  In addition to the above, Mr. Scholl's email also instructed recipients: "If you plan on reporting the ICE story from Jacob Soboroff and Julia Ainsley, please send scripts to me (or Steve Thode after 7).  Here is existing guidance:"  Price Decl. Ex. 8.  Further, Mr. Scholl emailed contemporaneously: "It is imperative that Standards see a final version of a story like this before it is posted.  It should not be considered 'approved' on the basis of answers to questions."  Ex. V, Email Thread 7, at 2.  Accordingly, there are facts from which a jury can infer that Mr. Scholl's sending Standards guidance was a form of damage control after Mr. Schone had, without approval from Standards, published the article.**

### Updates to the NBC News Article

103.   The NBC News Article was updated as new information was received or to correct spelling or grammatical errors.  As Soboroff testified, reporting on a story like the Whistleblower Complaint is a "dynamic, evolving situation."  McNamara Decl. Ex. 32 at 51:4:7; 102:10-18.

**CONTROVERTED.  The cited materials do not support NBCUniversal's contention that Soboroff's testimony was about "reporting on a story like the Whistleblower Complaint;" such testimony was instead generally about, "Oftentimes when we work on stories as journalists,"  McNamara Decl. Ex. 32 at 51:4-7, or "as always, as a reporter, stories are often dynamic."  McNamara Decl. Ex. 102:16-18.  Further, the facts underlying the Statements have *not* changed, and if Mr. Soboroff and Ms. Ainsley had been in less of a hurry to get on television, as discussed as to Paragraph 86, they would have gotten more facts correct.  As Mr. Scholl sagely warned during a phone call with Mr. Hayes, among**

others: **"But we just don't—we don't know the facts here.  And I'd say we—we probably never will.  Not because we can't, but because—that was really more of a comment about the news cycle."  Price Decl. Ex. 15 at 16:23-17:2.  He continued: "_By the time anybody knows, nobody's going to be doing the story._"  Price Decl. Ex. 15 at 17:4-5 (emphasis added).  Further, as discussed in Paragraph 6, what NBCUniversal characterizes as a "Whistleblower Complaint" was not Dawn Wooten's actual whistleblower complaint but was a letter shared with media.**

104.     Ultimately, the Article was updated to add that the Whistleblower Complaint was first reported by *The Intercept* and to include new comments from ICE (the "Second ICE Statement"), LaSalle, and Dr. Amin.  Ainsley Decl. Ex. 3.

**UNCONTROVERTED.  However, as discussed in Paragraph 6, what NBCUniversal characterizes as a "Whistleblower Complaint" was not Dawn Wooten's actual whistleblower complaint but was a letter shared with media.  Further, Mr. Scholl had overruled adding credit to Prism for first reporting the name of Dr. Amin because of the partiality that showed and because it would imply agreement with Prism, which Mr. Scholl did not, testifying: "First of all, I don't know what Prism is.  I still don't," that his contemporaneous hesitation to credit Prism in his reporting was probably due to its having reporting "that I would have been uncomfortable with," and that "[s]omething about the Prism write-up was nagging me, and I didn't want to tie ourselves to that."  Ex. D, Scholl Depo. 212:6-213:4.** ███████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████  **Ex. X, Article in News Connect 21_52_56 2020_09_15.**

105.    No information included in the original NBC News Article as published at 5:24

P.M was deleted or revised in any update, other than adding Dr. Amin's statement in place of

noting that Dr. Amin's office hung up the phone when called for comment. *Compare* Ainsley

Decl. Ex. 3 *with* Ex. 2.

**UNCONTROVERTED**

**Government Agencies or Officials Immediately Started Investigations into
the Whistleblower Complaint**

106.    David Paulk, the Warden at ICDC in September 2020, confirmed ███████

████████████████████████████████████████████████████████████

████████████████████████████████████████  McNamara Decl. Ex. 7 at

182:11- 25.

**UNCONTROVERTED.  However, as discussed in Paragraph 6, what NBCUniversal
characterizes as a "Whistleblower Complaint" was not Dawn Wooten's actual
whistleblower complaint but was a letter shared with media.**

107.    ICE's internal documents indicate that it was investigating the Whistleblower

Complaint as of September 15, 2020.  In an email at 7:19 PM, an ICE employee noted: "Just

got an email from the AD, now they want to investigate the provider so we need to go back five

years. Can you pull everything going back five years (2015)?"  McNamara Decl. Ex. 48 at

ICE001632.

**UNCONTROVERTED.  However, as discussed in Paragraph 6, what NBCUniversal
characterizes as a "Whistleblower Complaint" was not Dawn Wooten's actual
whistleblower complaint but was a letter shared with media.**

108.    On September 16, 2020, ICE employees reported that they found "several

instances of settlement related to improper care" for the specialist treating ICDC detainees,

and, if this had been known, ICE "would not have accepted utilizing this specialist." McNamara Decl. Ex. 49; *see also* Ex. 50.

**CONTROVERTED.  The cited materials do not support NBCUniversal's contention that "ICE employees reported" the statement.  McNamara Decl. Ex. 49 is an internal email exchange, with the quoted statement being sent from one ICE employee to another; nothing was "reported" anywhere and "employees" multiple did not make any such statement.  McNamara Decl. Ex. 49 at 2.  McNamara Decl. Ex. 50 does not concern ICE at all or discuss anything that happened after 2007.**

109.    On September 16, 2020, ICE employees believed that Dr. Amin had performed six hysterectomies and over seventy other invasive gynecological surgeries on ICDC detainees. They later learned that one hysterectomy was performed by another doctor and others did not move forward.  *See* McNamara Decl. Ex. 48.

**CONTROVERTED.  The cited materials do not support NBCUniversal's contention that "ICE employees believed" anything.  McNamara Decl. Ex. 48 is an internal email exchange, in which one ICE employee writes "Total 6 hysterectomies since 2015" but is corrected within hours by another ICE employee noting that records demonstrated that, as to the only *one* hysterectomy records demonstrated at that point, "pathology showed squamous cell carcinoma (attached)."  McNamara Decl. Ex. 48 at 2.**



110.    Paulk confirmed that ███████████████████████████████████████ ████████████████████████████████. McNamara Decl. Ex. 7 at 202:4-8.

**UNCONTROVERTED**

111.    On September 21, 2020 at 12:55 PM ICE ████████████████████████ ████████████████████████████████████████ McNamara Decl. Ex.

51.

**UNCONTROVERTED, but CONTROVERTED to the extent NBCUniversal contends**

████████████████████████████████████████████████████████

████████████████████████████████████████**.**

      112.    On September 21, 2020 at 6:01 PM, Dr. Amin ████████████████

████████████████████████████████████████████████████

█████████ McNamara Decl. Ex. 52.

**UNCONTROVERTED.** ███████████████████████████████████

████████████████████████████████████████████ **McNamara**

**Decl. Ex. 52 at 3.**

      113.    Upon receipt of the Whistleblower Complaint, *see* McNamara Decl. Ex. 4,

DHS CRCL "immediately opened approximately nine complaint investigations," including

one for the Whistleblower Complaint (Complaint No. 20-12-ICE-0987) and "forwarded these

allegations to the OIG," *see id.* Ex. 6 at DHS000036. "OIG" stands for Office of Inspector

General.

**CONTROVERTED.  The cited materials do not support NBCUniversal's contentions.  In**

**addition to the materials not establishing that Complaint No. 20-12-ICE-0987 is the letter,**

**NBCUniversal omits the following text: "The OIG has the right of first refusal within**

**DHS to conduct investigations of allegations related to DHS personnel, programs, and**

**operations.  The OIG exercised its right to retain these complaints," and therefore**

**"CRCL continues to hold these complaints in abeyance."  McNamara Decl. Ex. 6 at 4.**

**Accordingly, there remain no DHS investigations under CRCL.  And OIG stated in its**

**report on the investigations: "We started our review in October 2020."  McNamara Decl.**

**Ex. 47 at 7.  Accordingly, the only DHS investigation pointed to in McNamara Decl. Ex. 6**

**did not begin until October 2020.  Further, as discussed in Paragraph 6, what**

**NBCUniversal characterizes as a "Whistleblower Complaint" was not Dawn Wooten's**

**actual whistleblower complaint but was a letter shared with media.**

114.    The DHS OIG investigation into medical care more generally at ICDC resulted

in a report on January 3, 2022, *Medical Processes and Communication Protocols Need*

*Improvement at Irwin County Detention Center*, but this report and "inspection did not review

the gynecological procedure approval process for detainees at ICDC, which has been referred

to our Office of Investigations."  McNamara Decl. Ex. 47.

**UNCONTROVERTED, and the gynecological procedure approval process for detainees**

**at ICDC was not an investigation into Dr. Amin.**

115.    To date, OIG has not released a report related to the gynecological allegations

from the Whistleblower Complaint.  McNamara Decl. Ex. 68 at NBCU002064, n. 81.

**UNCONTROVERTED.  No OIG report has been made regarding any of the allegations**

**in Dawn Wooten's actual whistleblower complaint, which, again, was not the letter that**

**NBCU continues to call the "Whistleblower Complaint."  The actual complaint was filed**

**electronically by the Government Accountability Project whereas the letter to the media**

**was signed only by Project South—not Dawn Wooten and not the Government**

**Accountability Project.  While no OIG report has been made, there is reason to believe**

**that OIG has completed its investigation without taking any action and/or that Ms.**

**Wooten is no longer pursuing any allegations through the OIG process.  Ms. Wooten has**

**filed two complaints:  her actual whistleblower complaint through the OIG process, Doc.**

**122-23, (again, not the letter) and a retaliation claim against LaSalle, Doc. 122-24.** ■

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████ **after the mediation, Ms. Wooten amended her retaliation**

**complaint against LaSalle to include the claims she had originally made in her actual**

**whistleblower complaint.** *Compare* **Ex. Y, Wooten Retaliation Complaint,** *with* **Doc. 122-**

**24 (Amended Complaint adding additional statements regarding COVID-19 care but**

**nothing regarding gynecological care).  Again, Ms. Wooten's actual whistleblower**

**complaint did not mention gynecological care at all, much less hysterectomies.** *See* **Doc.**

**122-23.  Ms. Wooten's retaliation complaint against LaSalle, not filed until December of**

**2022, included two paragraphs about gynecological care, but did not mention**

**hysterectomies, did not allege any lack of medical necessity for any procedure, and stated**

**only generally that Ms. Wooten "raised the concerns about the high rates of gynecological**

**procedures" and claimed that the women did not understand or consent, but the medical**

**records show consent forms were obtained for all procedures.  Ex. Y, Wooten Retaliation**

**Complaint ¶¶ 67-68.  And her amended complaint stated: "Effective August 14, 2023, the**

**OHS OIG Whistleblower Protection Division (WPD), gave written notice that 'the**

**conditions for exhaustion of administrative remedies have been met in this case, and that**

**the Plaintiff may remove the allegations to the appropriate U.S. district court."  Doc. 122-**

**24¶ 22.  Neither Ms. Wooten nor her attorneys were apparently ever willing to file a**

**document under oath or subject to Rule 11 sanctions that mentioned Dr. Amin's name,**

**alleged any number of hysterectomies, or claimed a lack of medical necessity regarding**

**any gynecological procedures.  As discussed in Paragraph 113, the cited materials do not**

**establish that the letter was the cause of the investigation referenced in Paragraph 115.**

**On January 23, 2024, OIG issued a report examining ICE's internal procedures for**

**authorizing surgeries, but it excluded from consideration the surgeries associated with**

**ICDC.  Ex. Y, OIG Report.**

116.    Various government officials called for investigations into the allegations in

the Whistleblower Complaint.

**CONTROVERTED.  There is no cited material to support the contention.  Further, as**

**discussed in Paragraph 6, what NBCUniversal characterizes as a "Whistleblower**

**Complaint" was not Dawn Wooten's actual whistleblower complaint but was a letter**

**shared with media.  Further, the cited materials do not establish that many of the calls for**

**investigations were a result of the letter, when it is a more plausible inference that they**

**were a result of the news coverage led in large part by NBCUniversal.**

117.    On September 14, 2020 at 7:18 PM Georgia State Representative Bob

Trammell tweeted about the Whistleblower Complaint, calling the "mass hysterectomies"

"[u]nconscionable" and stating, "[j]ust sent this letter to the Composite Medical Board and

Board of Nursing calling for immediate suspension of the licensees of the providers that are

named in the complaint, pending full investigation by these Boards."  McNamara Decl. Ex. 53.

**UNCONTROVERTED.  However, as discussed in Paragraph 6, what NBCUniversal**

**characterizes as a "Whistleblower Complaint" was not Dawn Wooten's actual**

whistleblower complaint but was a letter shared with media.  To the extent the content is being offered for the truth of the matters asserted, it is CONTROVERTED as discussed throughout.  The post does not mention Dr. Amin.

118.    Rep. Trammel's tweet linked to a letter from him to the Georgia Composite Medical Board and the Georgia Board of Nursing, requesting that the Boards "immediately suspend the licenses of the providers named in the whistleblower complaint pending a full investigation by your offices."  McNamara Decl. Ex. 54.

**UNCONTROVERTED.  However, the cited material does not support the contention. McNamara Decl. Ex. 53 and McNamara Decl. Ex. 54 do not establish that Ex. 54 is the letter linked from Ex. 53, and nothing in the declaration attesting to the accuracy of the exhibits does so, either.  McNamara Decl. ¶¶ 54-55.  Further, although the materials call for suspending "the licenses of the providers named," the letter does not name anyone, much less Dr. Amin.  To the extent the content is being offered for the truth of the matters asserted, it is CONTROVERTED as discussed throughout.**

119.    On September 15, 2020 around 11:30 AM, Nancy Pelosi, then-Speaker of the House, issued a statement:

> "If true, the appalling conditions described in the whistleblower complaint—including allegations of mass hysterectomies being performed on vulnerable immigrant women— are a staggering abuse of human rights.  This profoundly disturbing situation recalls some of the darkest moments of our nation's history, from the exploitation of Henrietta Lacks to the horror of the Tuskegee Syphilis Study, to the forced sterilizations of Black women that Fannie Lou Hamer and so many others underwent and fought.
>
> The DHS Inspector General must immediately investigate the allegations detailed in this complaint.  Congress and the American people need to know why and under what conditions so many women, reportedly without their informed consent, were pushed to undergo this extremely invasive and life-altering procedure."
>
> Wallace Decl. Ex. 4; *see also* McNamara Decl. Ex. 55.

**UNCONTROVERTED.  The post does not mention Dr. Amin.**

120.           On September 15, 2020, Bennie G. Thompson, a House Representative from

Georgia, and Chairman of the Committee on Homeland Security issued a press release.  The

press release stated, in part: "The complaint alleging hysterectomies have been performed on

women held in detention without consent is incredibly disturbing.     The Committee has been

conducting an ongoing investigation regarding conditions at ICE contractor facilities and will

be examining these new and incredibly serious allegations."  McNamara Decl. Ex. 56.

**UNCONTROVERTED.  However, the materials cited do not support the contention.**

**The quote above omits, without indicating that it has done so, the following sentence:**

**"We cannot allow the Trump Administration's horrific anti-immigrant policies to**

**continue to threaten the general health and wellness of migrants in government care or**

**of the personnel working at these facilities."  McNamara Decl. Ex. 56 at 2.  The post does**

**not mention Dr. Amin.  As discussed in Paragraph 6, the actual "whistleblower**

**complaint" of Ms. Wooten did not mention hysterectomies.**

121.     On September 15, 2020, 173 members of Congress, co-led by Representative

Pramila Jayapal, sent a letter to Joseph Cuffari, DHS Inspector General, expressing their "deep

concern" after "reports of mass hysterectomies performed on detained women in [ICDC],

without their full, informed consent," and calling for the OIG to "immediately open an

investigation" regarding the allegations raised in the Whistleblower Complaint.  McNamara

Decl. Exs. 57-58.

**UNCONTROVERTED.  However, as discussed in Paragraph 6, what NBCUniversal**

**characterizes as a "Whistleblower Complaint" was not Dawn Wooten's actual**

**whistleblower complaint but was a letter shared with media, and there were no "reports"**

of hysterectomies.  **The letter does not mention Dr. Amin.**

122.    On September 15, 2020, Jamie Raskin and Carolyn B. Maloney, Chairpersons

for the Subcommittee on Civil Rights and Civil Liberties, sent a letter to Joseph Cuffari,

"request[ing] an emergency investigation into the shocking allegations of medical atrocities

and detainee mistreatment" at ICDC.  McNamara Decl. Ex. 59.

**UNCONTROVERTED.  The letter does not mention Dr. Amin.**

123.    On September 16, 2020 at 7:49 PM, Cory Booker called for an investigation by

DHS OIG, stating, "I am horrified by these incredibly disturbing reports out of an ICE

detention center in Georgia.  I've called on @DHSOIG to being an immediate investigation

into these heinous allegations."  McNamara Decl. Ex. 60.

**UNCONTROVERTED.  However, the cited materials do not establish that many of the**

**calls for investigations were a result of the letter, when it is a more plausible inference**

**that they were a result of the news coverage led in large part by NBCUniversal.  The post**

**does not mention Dr. Amin.**

124.    Other public officials publicly commented on the allegations in the

Whistleblower Complaint, including then-candidate for Georgia state representative, Stacey

Evans.  McNamara Decl. Ex. 61.

**CONTROVERTED.  The two posts contained at McNamara Decl. Ex. 61 do not**

**demonstrate anything about other public officials.  However, as discussed in Paragraph 6,**

**what NBCUniversal characterizes as a "Whistleblower Complaint" was not Dawn**

**Wooten's actual whistleblower complaint but was a letter shared with media.  Further,**

**the cited materials do not establish that many of the calls for investigations were a result**

**of the letter, when it is a more plausible inference that they were a result of the news**

coverage led in large part by NBCUniversal.  The posts do not mention Dr. Amin.

125.    On or before September 18, 2020, █████████████████████████
█████████████████████████████. McNamara Decl. Ex. 62; *see also* Ex. 63.

**CONTROVERTED.** ████████████████████████████
████████████████████████████████████
███████████████████████

126.    On April 6, 2023, Dr Amin █████████████████████
█████████████████████████████████████
████████████████████████. McNamara Decl. Ex. 64.

**UNCONTROVERTED that** ████████████████████████.

**NBCUniversal omits several statements in the letter.  For example,** ██████████
█████████████████████████████████████
█████████████████████████████████████
████████████████████████

127.    In October 2020, The Department of Justice began a criminal investigation into
the allegations concerning Dr. Amin and others in the Whistleblower Complaint. McNamara
Decl. Ex. 65; *see also* Ex. 68 at NBCU002053.

**CONTROVERTED.  The materials cited at McNamara Decl. Ex. 68 do not support the
contention because they do not set any date as to an investigation and that document is not
capable of being reduced to admissible evidence.  UNCONTROVERTED that the
Department of Justice is performing an investigation, but the letter did not mention Dr.
Amin.  Further, as discussed in Paragraph 6, what NBCUniversal characterizes as a
"Whistleblower Complaint" was not Dawn Wooten's actual whistleblower complaint but**

was a letter shared with media.

128.    The Department of Justice's criminal investigation into Dr. Amin remains ongoing. McNamara

Decl. Ex. 3 at 163:10-21; Ex. 144.

**UNCONTROVERTED.  However, the materials cited at McNamara Decl. Ex. 3 and Ex.
144 do not support the contention, because they only date to Autumn 2023.  It is unclear
whether the Department of Justice will say when the investigation has concluded.**

129.    In October 2020, the House and Senate Democrats began receiving testimony

from detainees and doctors concerning the Whistleblower Complaint's allegations concerning

Dr. Amin. McNamara Decl. Exs. 66, 67.

**CONTROVERTED.  The cited materials do not support NBCUniversal's contention.  That
Democrats in Congress sent a "Visitation Request" letter and invited advocates to attend a
Zoom caucus meeting where they gave statements without being sworn in, which is what
the cited materials show, is not "receiving testimony." Further, as discussed in Paragraph
6, what NBCUniversal characterizes as a "Whistleblower Complaint" was not Dawn
Wooten's actual whistleblower complaint but was a letter shared with media.**

130.    On October 26, 2020, Dr. Ted Anderson, the Vice Chair for Clinical Operations

and Director of the Division of Gynecology at Vanderbilt University, ████████████

███████████████████████████████

██████████████████████████

██████████████████████████

████████████████████████

███████████████████████

███████████████████████

███████████████████████████████████████████

McNamara Decl. Ex. 67 at OSORIO_0012277.

**CONTROVERTED.  The cited materials cannot be reduced to an admissible form.  For the reasons discussed in Dr. Amin's motion to exclude the expert testimony of Dr. Anderson (Doc. 123), Dr. Anderson's expert opinion is inadmissible pursuant to the Court's gatekeeping role under Fed. R. Evid. 702 and *Daubert* and progeny.** ████

████████████████████████████████████████████

████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████

131.    Dr. Anderson ████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████████

█████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████

**CONTROVERTED.  The cited materials cannot be reduced to an admissible form.** ██



132.    According to the Mayo Clinic, a D&C is a procedure that removes tissue from

inside the uterus.  *See* McNamara Decl. Ex. 68 at NBCU002054.

**CONTROVERTED.  For reasons discussed below, the cited material cannot be reduced to admissible evidence.**

133.    In May 2021, the Department of Homeland Security directed ICE to discontinue its contract with ICDC.  McNamara Decl. Ex. 37 at AMIN_0011295, Ex. 70 at NBCU003882, Ex. 72.

**UNCONTROVERTED**

134.    David Paulk, warden of ICDC, testified █████████████████████████

██████████████████████████████████████████████

McNamara Decl. Ex. 7 at 33:18-34:22; 237:1-238:2.

**CONTROVERTED.** ████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████

█████████████████████████████████

135.    Effective October 7, 2021, ICE terminated the contract with LaSalle regarding its management of ICDC.  McNamara Decl. Ex. 47 at AMIN_0011295, Ex. 69, Ex. 70 at NBCU003882, Ex. 104 at NBCU003861, Ex. 73.

**UNCONTROVERTED**

136.    In May 2021, the United States Senate Permanent Subcommittee on Investigations, of the Committee on Homeland Security and Government Affairs (the "Subcommittee"), initiated a bipartisan investigation into the alleged mistreatment of ICE detainees housed in the ICDC, including the allegations concerning Dr. Amin's medical care

of detainees (the "Senate Investigation"). McNamara Decl. Ex. 68 at NBCU002052, Ex. 73.

**CONTROVERTED.  The material cited at McNamara Decl. Ex. 68, is not capable of being reduced to admissible form, as discussed above.**

137.    The staff for the Subcommittee "tried on multiple occasions to obtain voluntary testimony from Dr. Amin regarding his treatment of female ICE detainees at ICDC.  Dr. Amin declined the Subcommittee's requests for a voluntary interview."  McNamara Decl. Exs. 74, 75, 78.

**UNCONTROVERTED that Dr. Amin exercised his Constitutional right against self-incrimination.  Dr. Amin's attorney explained his decision not to testify before the Senate as follows: "Respectfully, and unfortunately, the conduct displayed by various members of Congress over the past year has led me to believe that Congress and its Members are not interested in uncovering the truth, but instead seem to be focused mainly on scoring political points, to the extreme and public detriment of an innocent man."  McNamara Decl. Ex. 74 at 2.  He continued: "Although Dr. Amin will not participate in an interview at this time, we are willing to send you a detailed written submission on behalf of Dr. Amin or consider answering any written questions that you would like to submit for my review.  Please let me know if you would like to take us up on that offer."  McNamara Decl. Ex. 74 at 2.**

138.    On February 7, 2022, the Subcommittee served Dr. Amin with a subpoena for deposition.  Through his attorney, Dr. Amin submitted an affidavit stating that he declined to provide testimony pursuant to his Fifth Amendment privilege against self-incrimination. *Id.* Ex. 68 at NBCU002053, Exs. 76-78, Exs. 145-47.

**UNCONTROVERTED that Dr. Amin exercised his Constitutional right against self-**

**incrimination, for reasons in a letter his attorney provided to the Subcommittee which**

**are excerpted at Paragraph 137. However, the cited materials cannot be reduced to an**

**admissible form for reasons discussed below.**

**MSNBC News Reports at Issue in This Action**

139.         This FAC challenges statements made on *Deadline*, *All In*, and *TRMS*. *See*

*supra* ¶ 1.

**UNCONTROVERTED, and also social media posts. Doc. 49 ¶ 89.**

140.    None of Dr. Amin's employees deposed in this action testified that they saw

the  MSNBC News Reports.

**CONTROVERTED.  There are no cited materials to support this contention.  Other**

**facts controvert the contention.  NBCUniversal only interviewed two of Dr. Amin's**

**employees.  Although the witnesses did not identify the News Reports by name, they each**

**attested to the harassment and other harms of news they saw on social media that**

**identified Dr. Amin by name and accused him of performing mass hysterectomies that**

**were unauthorized, unnecessary, and without consent.  Ex. BB, Nito Depo. 138:9-141:11,**

**142:7-15; Ex. CC, Arceo Depo. 56:16-57:18, 59:18-63:14.  As discussed above, of the**

**publications NBCUniversal identified, only NBCUniversal and small non-video internet**

**publications, the Intercept and Prism, identified Dr. Amin by name and accused him of**

**performing mass hysterectomies that were unauthorized, unnecessary, and without**

**consent.  Further, Ms. Nito testified as to "seeing videos of [Dawn Wooten] being**

**interviewed," McNamara Decl. Ex. 19 at 51:5-6, which as discussed above was done on**

**NBCUniversal alone among broadcast media and not "all over the media."  It is**

**undisputed that NBCUniversal's Statements were viewed widely.**

141.   No social media posts that Dr. Amin produced in this action as evidence of his damages reference the MSNBC News Reports.

**CONTROVERTED.  There are no cited materials to support this contention, and NBCU has not moved for summary judgment as to any issue of damages.  Other facts controvert the contention.  As discussed above, only NBCUniversal and small internet publications, the Intercept and Prism, both of which also published information tending to show reasons to doubt allegations of mass hysterectomies, published allegations similar to the Statements with Dr. Amin's name.**

### *Deadline* – September 15, 2020[2]

142.   The FAC originally challenged eleven statements from a segment of the September 15, 2020 episode of *Deadline* that began at around 5:30 PM ET (the "*Deadline* News Report"), *see* FAC ¶¶ 75-76, but three were dismissed pursuant to the Rule 12(c) Decision, *see* Rule 12(c) Order at 57-58; McNamara Decl. Ex. 1 (Statement Nos. 3, 5, 9).  The remaining eight Challenged Statements from the *Deadline* News Report are italicized below in Paragraphs 144-161.

**UNCONTROVERTED.  However, Dr. Amin maintains that dismissed statements are false and defamatory.**

143.   The *Deadline* News Report lasted about seven minutes and largely consisted of an interview by Nicolle Wallace (the host of *Deadline*) with Ainsley discussing the published NBC News Article.  Wallace Decl. Ex. 7 at 1:30:23.

**UNCONTROVERTED that the interview discussed information also published in the**

---

[2] To the extent any of the contents of the broadcast are offered for the truth of the matters asserted, they are CONTROVERTED as discussed throughout.

**article.**

144.    The *Deadline* News Report opens with Wallace reporting that "we are following breaking news today.  It's about an alarming new whistleblower complaint" that alleges *high numbers of female detainees*, *detained immigrants, at an ICE detention center in Georgia received questionable hysterectomies while in ICE custody*."  Wallace Decl. Ex. 8 at NBCU004168; *Id.* Ex. 7 at 1:34:15.

**UNCONTROVERTED.  However, as discussed in Paragraph 6, what NBCUniversal characterizes as a "Whistleblower Complaint" was not Dawn Wooten's actual whistleblower complaint but was a letter shared with media.**

145.    During the *Deadline* News Report, there is a banner that appears on screen: "Whistleblower: *High number of hysterectomies at ICE Detention Ctr."* Wallace Decl. Ex. 7 at 1:40:10.

**UNCONTROVERTED.  However, because the letter was not Dawn Wooten's actual whistleblower complaint, and was signed by Project South, there was no "whistleblower" statement about hysterectomies at all.**

146.    The phrase "high numbers" was a quote from the Whistleblower Complaint. *See* McNamara Decl. Ex. 2 at NBCU001554.

**CONTROVERTED.  The cited material does not support NBCUniversal's contention that the phrase "high numbers" in the video contained at Wallace Decl. Ex. 7 was a quotation of the letter.  An ordinary viewer would not know.  Further, as discussed in Paragraph 6, what NBCUniversal characterizes as a "Whistleblower Complaint" was not Dawn Wooten's actual whistleblower complaint but was a letter shared with media.**

147.    The phrase "questionable hysterectomies" was initially published in the AP

Article and was then re-published in the NBC/AP Article and the Silva Article (which is displayed on screen). *See* McNamara Decl. Ex. 26; Scholl Decl. Ex. 5.

**CONTROVERTED.  The cited material does not support NBCUniversal's contention that the phrase "questionable hysterectomies" in the video contained at Wallace Decl. Ex. 7 was a reference to the publications cited in the exhibits.  An ordinary viewer would not know.**

148.    During the introduction by Wallace, the Whistleblower Complaint is shown on screen and a pull-out quote from the Complaint is visible:  "Ms. Wooten also stated that *detained women expressed to her that they didn't fully understand why they had to get a hysterectomy."* Wallace Decl. Ex. 7  at 1:34:45.

**UNCONTROVERTED that the below image is shown on a screen.  However, as discussed in Paragraph 6, what NBCUniversal characterizes as a "Whistleblower Complaint" was not Dawn Wooten's actual whistleblower complaint but was a letter shared with media.**



149.    Wallace then introduces Ainsley, stating that "NBC's Julia Ainsley has been reporting on the story and she joins us now."  Wallace Decl. Ex. 8 at NBCU004168; *Id.*  Ex. 7 at 1:34:57.

**UNCONTROVERTED**

150.    Ainsley explains that the "new reporting" is based on "conversations with four lawyers who represented clients in the facility over the past three years."  Wallace Decl. Ex. 8 at NBCU004168; Ex. 7  at 1:35:20.

**UNCONTROVERTED that Ms. Ainsley stated this, but CONTROVERTED for the truth of the matters asserted.**

151.    Ainsley then reports information published in the NBC News Article, based on conversations with lawyers for ICDC detainees, including that "women were afraid to go to this doctor," some "*said they came back bruised, they described as overly harsh" and* "called him abusive" and described the *"two cases" where women had hysterectomies.*  Wallace Decl. Ex. 8 at NBCU004168; Ex. 7 at 1:35:35.

**CONTROVERTED.  The cited materials do not support the contention.  The quotations in Paragraph 151 have minor errors as quotations of Wallace Decl. Ex. 8 at 11.  More problematically, and more symptomatically of NBCUniversal's misrepresentations as a whole, Ms. Ainsley did not describe "the two cases where women had hysterectomies."  In addition to the references to "high rates" of hysterectomies, that section of the transcript reads: "And in at least two cases, there were women who were told they needed a hysterectomy because they had cancer.  One of these women, her medical records does not indicate that she ever had a biopsy to indicate that she had cancer."  Wallace Decl. Ex. 8 at 11.  The broadcast does not describe "the two cases where women had hysterectomies;" one paragraph after the sentences quoted above, Ms. Ainsley discussed "another case" in which a woman "had a hysterectomy because she was told she had stage four cancer.  And after the hysterectomy, when she went to an oncologist, the oncologist said, you do not**

have cancer." Wallace Decl. Ex. 8 at 11.  On the next page, the broadcast shows the

interview between Mr. Soboroff and Ms. Wooten, in which Mr. Soboroff reads that Dr.

Amin is the "uterus collector."  Wallace Decl. Ex. 8 at 12.  On the following page, Ms.

Ainsley describes another hysterectomy.  Wallace Decl. Ex. 8 at 13.

> 152.    Ainsley makes clear that these were "allegations" about the doctor that the
> lawyers told to her and Jacob.  Wallace Decl. Ex. 8 at NBCU004168; Ex. 7 at 1:36:25.

**CONTROVERTED.  The cited materials do not support NBCUniversal's contention that**

**Ms. Ainsley makes anything "clear."  Ms. Ainsley only uses the term "allegation" twice**

**when she relays the contents of those allegations into many more than two phrases.**

**Wallace Decl. Ex. 8 at 11-13.  Further, Ms. Ainsley did *not* convey the allegations the**

**lawyers told her and Mr. Soboroff; as discussed above, she omitted information that Mr.**

**Osorio and Ms. Owings testified they provided.**

> 153.    While Ainsley recounts this information, the NBC News logo and headline of
> the NBC News Article is displayed on screen.  Wallace Decl. Ex. 7 at 1:36:37.

**UNCONTROVERTED**



154.    The *Deadline* News Report includes an excerpt from Soboroff's interview of Wooten.  In the excerpt, Soboroff asked Wooten: "You're quoted in the complaint as saying *that's his specialty, he's the uterus collector*.  Is that how the people refer to this doctor?" Wooten responded, "That's how the detainees referred to this person.     *I had a detainee that asked me, she said, what is he doing?  Collecting all of our uteruses*?"  Wallace Decl. Ex. 8 at NBCU004169; Ex. 7 at 1:36:38.

**UNCONTROVERTED**

155.    Ainsley reports that she attempted to obtain comment from Dr. Amin, calling the doctor's office, but the "phone was hung up" after she identified herself as a reporter. Wallace Decl. Ex. 8 at NBCU004168; Ex. 7 at 1:36:29.

**UNCONTROVERTED that Ms. Ainsley reported this; CONTROVERTED to the extent that it is unclear how Ms. Ainsley could know that the phone was hung up or the connection was lost for some other reason, and her inclusion of it demonstrates bias against Dr. Amin and a lack of impartiality contrary to, as discussed throughout, Mr. Scholl's admonitions.**

156.    The *Deadline* News Report includes an excerpt from the Original ICE Statement, which is read and shown on screen. Wallace Decl. Ex. 7 at 1:38:11.

**UNCONTROVERTED that Ms. Ainsley stated this.  But Ms. Ainsley did *not* state what she had emailed before her appearance: that someone had ICE had told her they had data they were working to share "on the number of hysterectomies performed," which "will negate [the Statements'] claims."  Ex. Q, Email Thread 2, at 2.**



157.    Immediately after reporting the Original ICE Statement, Ainsley states "so they are clearly questioning Dawn Wooten here."  Wallace Decl. Ex. 8 at NBCU004169; Ex. 7 at 1:38:29.

**UNCONTROVERTED**

158.    Ainsley reports that ICE and "the company that runs the facility" have not responded to the allegation [contained in the NBC News Article] that lawyers "say they went to leadership, to management at this facility and said, look, you have a problem with this doctor, our clients are afraid to go back to him, he's hurting these women."  Wallace Decl. Ex. 8 at NBCU004169; Ex. 7 at 1:38:40.

**UNCONTROVERTED**

159.    At the end of interview, Wallace asks Ainsley to "widen the lens" and comment on the "medical care that is standard for female detainees." Wallace Decl. Ex. 8 at NBCU004168; Ex. 7 at 1:39:10.

**UNCONTROVERTED**

160.    Ainsley responds that she had "been talking to lawyers who say, look, I have clients in detention who had diabetes and couldn't get their medication, yet they were told to

go back for a pap smear and then go again when that seemed irregular. It seemed like they were getting way too much care from a gynecologist *and perhaps doing very unnecessary procedures and not enough of what you would need in a short term detention situation.*" Wallace Decl. Ex. 8 at NBCU004169-4170; Ex. 7 at 1:39:30.

**UNCONTROVERTED**

161.    The *Deadline* News Report closes with Ainsley noting that Dr. Amin "was part of a civil settlement with the Justice Department in 2015, where he and other doctors had to pay over $500,000 and a fine for fraudulent claims to Medicaid…we're already looking at a doctor who has been, you know, alleged to have tried to inflate his claims in order to get more money." Wallace Decl. Ex. 8 at NBCU004170; Ex. 7 at 1:40:05.

**UNCONTROVERTED**

162.    The FAC does not challenge statements included in the *Deadline* News Report that are not italicized, including the reporting on his 2015 settlement with the DOJ.

**CONTROVERTED because there are no cited materials to support the contention, and to the extent Statements are repeated in other broadcasts and challenged there.**

### Reporting for the *Deadline* News Report

163.    Wallace is responsible for the content of *Deadline.* Wallace Decl. ¶ 2.

**UNCONTROVERTED.  However, to the extent Paragraph 163 ascribes responsibility *solely* to Ms. Wallace, this contention is CONTROVERTED because it is not supported by the cited material and is contradicted by other facts.  There is nothing to support the assertion other than Ms. Wallace's self-serving declaration, which itself, elsewhere, states that an undefined "we at *Deadline*" is the decisionmaker for what airs on the program.  Wallace Decl. ¶ 6.  Ms. Wallace's declaration also states that Standards**

"approved" a planned part of the broadcast during which Statements were published. Wallace Decl. ¶ 18.  Finally, NBCUniversal only produced five emails showing that Ms. Wallace was provided any information about ICDC and Dr. Amin.  Evans Decl. ¶ 5.

164.    The *Deadline* News Report relied on the reporting done by Ainsley and Soboroff in connection with the NBC News Article, as well as the published Article.  Wallace Decl. ¶ 2.

**UNCONTROVERTED**

165.    Wallace and the producers of *Deadline* had complete confidence in  Ainsley and Soboroff's reporting based on their extensive and award-winning track record of reporting on immigration issues and the editorial process and standards of the NBCU News Group.  Wallace Decl. ¶ 13, 25.

**CONTROVERTED.  There is no support for this contention other than Ms. Wallace's self-serving affidavit, which is controverted by other facts.  In a text exchange between Ms. Wallace's executive producer, Patrick Burkey, and Mr. Soboroff, Mr. Burkey expressed that Ms. Wallace *did* have doubts about the Statements, writing: "Nicolle into [apparently, meaning she is interested] but doesn't know what to make of it."  Wallace Decl. Ex. 3 at 2.  Further, Ms. Ainsley testified that the only conversations she had with Ms. Wallace were "on air," Ex. F, Ainsley Depo. 70:11-16, suggesting that Ms. Wallace was minimally involved in the content of Ms. Ainsley's interview.**

166.    Wallace and the producers of *Deadline* received other news reporting that gave credibility to the allegations in the Whistleblower Complaint, including the Law & Crime Article. Wallace Decl. ¶ 8-9; *Id.* Ex. 1.

**CONTROVERTED.  The cited materials do not support the contention that Ms. Wallace**

and other producers "received other news reporting that gave credibility to the allegations in the Whistleblower Complaint." Other news reporting discussed in the cited materials does not "include the Law & Crime Article;" the "Law & Crime Article" is the *only* news reporting discussed in the cited materials. Further, that article in no way "gave credibility to the allegations in the Whistleblower Complaint;" all it does is relay contents of the letter and link to the letter, without identifying Dr. Amin. *See* Wallace Decl. Ex. 1 at 2-5. Further, as discussed in Paragraph 6, what NBCUniversal characterizes as a "Whistleblower Complaint" was not Dawn Wooten's actual whistleblower complaint but was a letter shared with media.

167.    Wallace's producers reviewed the Whistleblower Complaint and watched Soboroff's interview of Wooten. Wallace Decl. ¶ 9, 11, 14.

CONTROVERTED. There is no support for this contention other than Ms. Wallace's self-serving affidavit. Further, as discussed in Paragraph 6, what NBCUniversal characterizes as a "Whistleblower Complaint" was not Dawn Wooten's actual whistleblower complaint but was a letter shared with media.

168.    Wallace and her producers found Wooten to be credible. Wallace Decl. ¶ 14.

CONTROVERTED. There is no support for this contention other than Ms. Wallace's self-serving affidavit, which is controverted by other facts. In a text exchange between Ms. Wallace's executive producer, Patrick Burkey, and Mr. Soboroff, Mr. Burkey expressed that Ms. Wallace *did* have doubts about the Statements, writing: "Nicolle into but doesn't know what to make of it." Wallace Decl. Ex. 3 at 2.

169.    Wallace and her producers were aware that Nancy Pelosi had issued a statement on September 15, 2020, calling for an immediate investigation into the claims of "mass

hysterectomies." Wallace Decl. ¶ 15.

**UNCONTROVERTED**

170.    From her years working in government, Wallace understood Pelosi's statement as an indication that the government was taking the Whistleblower Complaint seriously. Wallace Decl. ¶ 15.

**CONTROVERTED.  There is no support for this contention other than Ms. Wallace's self-serving affidavit.  To the extent Ms. Wallace purports to not just interpret in her own mind but to "understand" what Ms. Pelosi was doing, the contention is absurd on its face. Further, as discussed in Paragraph 6, what NBCUniversal characterizes as a "Whistleblower Complaint" was not Dawn Wooten's actual whistleblower complaint but was a letter shared with media.**

171.    Prior to appearing on the *Deadline* News Report, Ainsley sent a draft of the NBC News Article to a *Deadline* producer and stated that it had been approved by Standards. Wallace Decl. ¶ 17

**CONTROVERTED.  Ms. Wallace, who is not included in the email cited in Wallace Decl. ¶ 17, cannot attest to its accuracy or the contents thereof.  Further, as discussed throughout, whether or not Ms. Ainsley represented that it had been approved by Standards, the article had not been.**

172.    *Deadline* was independently communicating with Standards concerning the show's reporting, and Standards approved the show including the Initial ICE Statement. Wallace Decl. ¶ 18.

**CONTROVERTED.  The cited materials do not support the contention that "Standards approved the show" *other than* someone stating that Mr. Soboroff could include the Initial ICE**

Statement, Wallace Decl. Ex. 5 at 2, which did not happen as planned because Mr. Soboroff

did not appear on the program.  Wallace Decl. Ex. 8.  So, the cited materials demonstrate only

that someone stated Mr. Soboroff's reading of the ICE Statement was approved by Standards,

*not* the rest of the show.

173.    Wallace had no doubt about the accuracy of the Challenged Statements included

in the *Deadline* News Report. Wallace Decl. ¶ 21-37.  Wallace made the decision to report on

the allegations in the Whistleblower Complaint because they were newsworthy and not

because of perceived ratings.  *Id.* ¶ 38.

**CONTROVERTED.  There is no support for this contention other than Ms. Wallace's**

**self-serving affidavit, which is controverted by other facts.  In a text exchange between**

**Ms. Wallace's executive producer, Patrick Burkey, and Mr. Soboroff, Mr. Burkey**

**expressed that Ms. Wallace *did* have doubts about the Statements, writing: "Nicolle into**

**but doesn't know what to make of it."  Wallace Decl. Ex. 3 at 2.  Ms. Maddow testified**

**that ███████████████████████████████████████████."  Ex. EE, Maddow**

**Depo 12:19-13:4.  This is a fact from which a jury may infer, in the absence of credible**

**evidence otherwise, that ███████████████████████████████.  Further,**

**as discussed in Paragraph 6, what NBCUniversal characterizes as a "Whistleblower**

**Complaint" was not Dawn Wooten's actual whistleblower complaint but was a letter**

**shared with media.**

174.    Ainsley had no doubt about the accuracy of the Challenged Statements she made

in the *Deadline* News Report.  Ainsley Decl. ¶ 23.

**CONTROVERTED.  Other facts controvert the contention.  As discussed in Paragraph 73,**

**Ms. Ainsley and Mr. Soboroff exchanged contemporaneous texts in which they identified**

reasons to doubt the Statements that they did not share with their audience or further investigate.  Further, the sources testified that they had not told Ms. Ainsley that they had evidence of "high numbers" of hysterectomies.  As discussed above as to Paragraph 62, the Statements contradict what the lawyers testified that they told Mr. Soboroff and Ms. Ainsley.

175.    Soboroff had no doubt about the accuracy of the Challenged Statements from the interview he conducted with Wooten, which was shown during the *Deadline* News Report. Soboroff Decl. ¶¶ 6, 18.

CONTROVERTED.  Other facts controvert the contention.  As discussed in Paragraph 73, Mr. Soboroff texted Ms. Ainsley, the same day that he conducted the interview, that he had heard "mixed things" about Ms. Wooten, and they exchanged other contemporaneous texts in which they identified reasons to doubt the Statements that they did not share with their audience or further investigate.   Further, as discussed above as to Paragraph 62, the Statements contradict what the lawyers testified that they told Mr. Soboroff and Ms. Ainsley.

### *All In*:  September 15, 2020[3]

176.    The FAC initially challenged fourteen statements that it stated came from a segment of the September 15, 2020 broadcast of *All In* that aired at approximately 8:30 P.M ET (the "9/15 *All In* News Report").  *See* FAC ¶¶ 78-79.

UNCONTROVERTED.

177.    Four of these statements (FAC ¶ 78(b)-(e)), however, appear only in the September 16 episode of *All In*.  *Compare* Hayes Decl. Ex. 2, *with id.* Ex. 3 at NBCU003566-

---

[3] To the extent any of the contents of the broadcast are offered for the truth of the matters asserted, they are CONTROVERTED as discussed throughout.

3567; *compare* Ex. 1 (Statement Nos. 13-16), *with id.* (Statement Nos. 42-45)

**UNCONTROVERTED**

178.    Because the Court previously dismissed the September 16 episode of *All In* from this action, including these four statements, they no longer remain in the case.  Rule 12(c) Order at 54-55.

**UNCONTROVERTED.   However, Dr. Amin maintains that dismissed statements are false and defamatory.**

179.    The remaining ten Challenged Statements in the 9/15 *All In* News Report are italicized below.

**UNCONTROVERTED that the italicized statements are challenged.**

180.    The 9/15 *All In* News Report is about ten minutes long and opens by stating: "Yesterday, we learned about a whistleblower, a nurse working at a Georgia Immigrations and Customs Enforcement, ICE facility, leveling honestly ghastly allegations.  Chief among them that women in that facility, *migrant women, say that a doctor was performing unauthorized hysterectomies on immigrant women detained at that facility*."  Hayes Decl. Ex. 2 at NBCU000164; Ex. 1 at 31:24-31:42.

**UNCONTROVERTED**

181.    During the introduction, headlines from four previously published articles relied on by *All In* appear on screen: *The Atlanta Journal Constitution*, *The Daily Beast*, *The Cut*, and *Law360*.  Hayes Decl. Ex. 1 at 31:34; Price Decl. ¶ 8.

**UNCONTROVERTED**



182.    Hayes then reports that Wooten filed a "formal complaint" with the "watchdog

at the Department of Homeland Security" and that Wooten was named in the Complaint. Hayes

Decl. Ex. 2 at NBCU000164; Ex. 1 at 31:48-58.

**UNCONTROVERTED**

183.    Hayes reports that the Complaint also alleges the facility "lacked protection

against coronavirus for detained immigrations, and that detainees suffer from a general lack of

medical care." Hayes Decl. Ex. 2 at NBCU000164; Ex. 1 at 32:00-12.

**UNCONTROVERTED**

184.    Hayes reports that "a lawyer named Benjamin Osorio representing women at

that very facility, told NBC News that indeed *two of his clients received hysterectomies they*

*believe may have been unnecessary.*" Hayes Decl. Ex. 2 at NBCU000164; Ex. 1 at 32:12-28.

**UNCONTROVERTED**

185.    When reporting the allegation from Mr. Osorio previously reported by NBC

News, the portion of the NBC News Article discussing Osorio is displayed on screen. Hayes

Decl. Ex. 1 at 32:21.

**UNCONTROVERTED**



186.    Hayes then reports that "we here on ALL IN spoke with another attorney who represents *two different women who claim they also had unnecessary hysterectomies while detained at this facility.  That lawyer tells us that as many as 15 immigrant women were given full or partial hysterectomies or other procedures for which no medical indication existed."*  Hayes Decl. Ex. 2 at NBCU000164; Ex. 1 at 32:29-32:50.

**UNCONTROVERTED**

187.    During the 9/15 *All In* News Report, a banner appears on screen that reads: "*Mass Hysterectomies performed on women at ICE facility.*"  Hayes Decl. Ex. 1 at 31:26.

**UNCONTROVERTED**

188.    "Mass hysterectomies" was the same language used in the headline of the *Daily Beast* article displayed in the introduction to the 9/15 *All In* News Report.  Hayes Decl. Ex. 2 at 31:24-31:42.

**CONTROVERTED.  The cited material does not support NBCUniversal's contention that the phrase "mass hysterectomies" in the video contained at Hayes Decl. Ex. 2 was a**

91

**reference to another publication.**

189.        Hayes reports that *All In* reached out to ICE for comment and ICE provided a

"long statement disputing these allegations and the implication that detainees are used for

experimental medical procedures.  They do say an independent office will investigate these

claims.  ICE also says that since 2018, only two individuals in that facility were referred to

certified  credential medical professionals for hysterectomies."  Hayes Decl. Ex. 2 at

NBCU000164; Ex. 1 at 32:51- 33:12.

**CONTROVERTED.  Omitted from the cited text is Mr. Hayes's aspersion at the denial:**

**"Of course, the referred is the question here."  Doc. 131-2 at 12.  At his deposition, Mr.**

**Price, a producer for Mr. Hayes, maintained that he *still* did not believe that only two**

**hysterectomies were performed on women because "there's a difference between referred**

**versus performed."  Ex. FF, Price Depo. 97:16-98:6.  Indeed, throughout a long portion of**

**his deposition, Mr. Price appeared to believe everything detainee attorneys and Dawn**

**Wooten said while crediting nothing said by Dr. Amin, his attorney, or ICE.  *See generally***

**Ex. FF, Price Depo. 78:21-124:19.**

190.      While reporting ICE's response to the allegations, the 9/15 *All In* News

Report shows excerpts from the second ICE statement on screen.  Hayes Decl. Ex. 1 at 32:58,

33:06.

**UNCONTROVERTED**





191.    Hayes also reports that they reached out to the "private company that runs the facility" and it said that have "strict zero-tolerance policy for any kind of . . . inappropriate behavior

at their facilities, and they refute any allegations of misconduct."        Hayes Decl. Ex. 2

at NBCU000164; Ex. 1 at 33:17-31.  This statement in shown on screen.  Hayes Decl. Ex. 1 at

33:22.

**UNCONTROVERTED**



192.    Hayes then interviews Wooten and her lawyer, John Whitty concerning the

Whistleblower Complaint.  After Wooten describes her previous job duties at ICDC, *see*

Hayes Decl. Ex. 2 at NBCU000165; Ex. 1 at 33:42-34:22, Hayes observes that "you talk about

in the complaint, [] hearing from women who are detained there, talking about a specific

doctor performing hysterectomies, referring [to] him as a uterus collector.  Tell us about how

you heard about this doctor and what women said about their experiences with them," *see*

Hayes Decl. Ex. 2 at 165; Ex. 1 at 34:25-41.

**UNCONTROVERTED.  However, as discussed in Paragraph 6, what NBCUniversal**

**characterizes as a "Whistleblower Complaint" was not Dawn Wooten's actual**

**whistleblower complaint but was a letter shared with media.**

193.    Wooten responds: "I had several detained women on numerous occasions that

would come to me and say, Miss Wooten, I had hysterectomy, why? I had no answers as to

why they had those procedures.  And one lady walked up to me here in this last time around

between October 19th until July 2nd and she said, what is he? *Is he the uterus collector? Does*

*he collect uteruses?*"  And I asked her, what does she mean.  And she says *everybody that I've*

*talked to has had a hysterectomy*.  And you just don't know what to say.  I mean, I don't have an

answer for why

they would come to me and *they would say, is he a uterus collector*."  Hayes Decl. Ex. 2 at

NBCU000165; Ex. 1 at 34:43-35:40.

**UNCONTROVERTED**

194.    Hayes then asks Wooten to describe the general standard of medical care at the

facility.  Wooten responds that the care "wasn't timely all the time" and during COVID the

sanitation at the facility was "horrible" and that COVID "protocol was not being followed."

Hayes Decl. Ex. 2 at NBCU00065-166; Ex. 1 at 35:41-37:49.

**UNCONTROVERTED**

195.    Hayes asks Wooten "you were essentially demoted"… from a "full-time

employee to sort of a more kind of at will swing employee" and whether it was her contention

that the change was "essentially punishment for statements about the unsafe environment you

felt there." Wooten confirms that "that's correct." Hayes Decl. Ex. 2 at NBCU000166; Ex. 1

at 37:50-38:18.

**UNCONTROVERTED**

196.    In response to a question from Hayes, Whitty alleges that Wooten was demoted

in retaliation for the build up to the internal whistleblowing over the course of months.  Whitty

then states, based on the number of cases alluded to by Wooten and others, "*there's a large*

*population of these – of these women, immigrants who've had—who have been mistreated in*

*this way, assaulted."* Hayes Decl. Ex. 2 at NBCU000166-67; Ex. 1 at 38:19-40:02.

**CONTROVERTED.  The cited materials do not support NBCUniversal's contention that the "whistleblowing" to which Mr. Whitty referred at the start of Paragraph 196 was related to the challenged statement in the second sentence of Paragraph 196.  Rather, Mr. Whitty stated that the retaliation toward Ms. Wooten happened "especially since the beginning of COVID," indicating that the retaliation was for Ms. Wooten's COVID-19 complaints which make up the bulk of the letter, and, as discussed above in Paragraph 6, all of Ms. Wooten's actual whistleblower complaint.  Doc. 131-2 at 14.**

197.    The 9/15 *All In* News Report does not identify Dr. Amin by name or picture.  *See* Hayes Decl. Ex. 1.

**UNCONTROVERTED that Dr. Amin was not explicitly named, but the broadcast was nevertheless of and concerning him.**

198.    The FAC does not challenge statements included in the 9/15 *All In* News Report that are not italicized in the above Paragraphs 180-197.

**CONTROVERTED because there are no cited materials to support the contention, and to the extent Statements are repeated in other broadcasts and challenged there.**

**Reporting for the 9/15 *All In* Segment**

199.    Hayes is responsible for the content of *All In*.  *See* Hayes Decl. ¶ 5; McNamara Decl. Ex. 79 at 97:18-98:3, Ex. 80 at 14:13-15:9.

**UNCONTROVERTED.  However, to the extent Paragraph 246 ascribes responsibility *solely* to Mr. Hayes, this contention is CONTROVERTED because it is not supported by the cited material and is contradicted by other facts.  Paragraph 5 of Mr. Hayes's declaration does not support the contention and indeed flatly contradicts the contention**

that Mr. Hayes is solely responsible, stating: "My *All In* team and I decide what news to cover on each evening's show and how to present this news to our viewers."

200.    The 9/15 *All In* News Report relied on the previously reported NBC News Article and other previously reported news articles displayed on screen during the News Report.  Hayes Decl. Ex. 1 at 31:34, 32:21; Hayes Decl. ¶ 25; Price Decl. ¶ 8.

**UNCONTROVERTED**

201.        Hayes and the staff of *All In* had complete confidence in the reporting of Ainsley and Soboroff.  Hayes Decl. ¶¶ 13, 16, 29; Price Decl. ¶¶ 9, 54; McNamara Decl. Ex. 81 at 146:9-147:10.

**CONTROVERTED.  In contradiction to Mr. Price and Mr. Hayes's self-serving declarations produced years after the fact for litigation, as discussed below, Mr. Hayes contemporaneously noted that the "reason it went viral," referring to the account of mass hysterectomies alleged in the Statements, was that it "conjured the worst kind of like Third Reich, you know, sort of, you know, Jim Crow, Mississippi Hospital history," and continued, "which is not the case here."  Price Decl. Ex. 15 at 10:1-7.  Mr. Scholl agreed: "Well, we don't have it.  Yeah.  I mean, we don't know.  Well, we don't know."  Price Decl. Ex. 15 at 10:8-9.  Mr. Hayes described the letter, which again was repeated in the Statements, as follows: "So because you've got a secondhand, a very, very, you know, wildly provocative quote in a recorded whistleblower complaint by a woman with no factual, firsthand knowledge."  Price Decl. Ex. 15 at 12:7-9.  Mr. Hayes further stated that he "discounted the whole thing when I saw it go viral."  Price Decl. Ex. 15 at 12:23-25.  He testified at his deposition: "But my basic instinct is that extraordinary claims require extraordinary evidence."  Ex. GG, Hayes Depo. 61:2-4.**

202.    Xander Price was the segment producer for the 9/15 *All In* News Report.  Price Decl. ¶¶ 2, 5; McNamara Decl. Ex. 81 at 11:14-18.

**UNCONTROVERTED**

203.    Hayes had complete confidence in and relied on the newsgathering by Price for the 9/15 *All In* News Report.  Hayes Decl. ¶ 36; McNamara Decl. Ex. 79 at 30:2-11.

**CONTROVERTED.  As discussed throughout, including as to Paragraph 201, Mr. Hayes did have doubts as to the veracity of the Statements, including information gathered by Mr. Price.**

204.    Price's work was overseen by at least one senior producer, the executive producer, and host of *All In*.  McNamara Decl. Ex. 79 at 101:16-102:8.

**CONTROVERTED.  The cited materials do not support NBCUniversal's contention that Mr. Price's work was "overseen" by anyone.  The deposition testimony surrounding the specified portions of McNamara Decl. Ex. 79 is Chris Hayes, host of *All In with Chris Hayes*, testifying that he was unable to even tell, looking at myriad emails from the time, who the senior producer theoretically overseeing Mr. Price's work even was.  McNamara Decl. Ex. 79 at 101:2-4.  Mr. Hayes further testified: "I don't think I've reviewed it," referring to the transcript of an interview Mr. Price conducted with Mr. Free.  McNamara Decl. Ex. 79 at 102:9-15.  And while Mr. Hayes stated that, "reconstructing" from documents, "there were other people involved," he could identify no one and did not testify that there was *anyone*, including himself, "overseeing" Mr. Price's work.  McNamara Decl. Ex. 79 at 101:16-102:8.**

205.    Hayes and Price both read the Whistleblower Complaint in their reporting for the 9/15 *All In* News Report and found it to be a credible because it was filed with the federal government by immigration lawyers, and Wooten was willing to put her name to the

allegations contained in the Complaint.  Hayes Decl. ¶¶ 8-9 ; Price Decl. ¶ 6; McNamara Decl. Ex. 79 at 38:11- 39:20; 54:16-21, Ex. 81 at 77:20-79:6.

**CONTROVERTED.  Other facts controvert NBCUniversal's contention that Mr. Hayes and Mr. Price found the letter to be credible.  As discussed herein, Mr. Hayes attested contemporaneously to not believing the Statements, and Price's conversations with Mr. Osorio and Mr. Free should have given him more reason to pause rather than march forward.  Further, to the extent the decisionmakers found Ms. Wooten more credible for being "willing to put her name to the allegations," they should have found her less credible for her attorneys refusing to provide NBCUniversal Ms. Wooten's declaration— the one piece of sworn evidence upon which the Statements rested.  *See* McNamara Decl. Ex. 84 at 2 (Project South refusing to provide Wooten declaration to NBCUniversal legal analyst).  Further, as discussed above, the letter was *not* signed by Dawn Wooten, just the advocate groups.  And to the extent they credited Ms. Wooten for putting her name on the record, they could discredit Mr. Free for failing to do the same.  In a transcript of a phone call between Mr. Osorio, a lawyer for "B," and Mr. Price, Mr. Osoroio told Mr. Price: "But I don't think we have a full, complete picture yet."  Price Decl. Ex. 11 at 10.  Mr. Osorio also provided Mr. Price with reason to doubt the account of BPR, stating that in contrast his other client with whom he recommended they speak "is more squeaky clean. You know, she's got no criminal history."  Price Decl. Ex. 11 at 12.  Further, as discussed in Paragraph 6, what NBCUniversal characterizes as a "Whistleblower Complaint" was not Dawn Wooten's actual whistleblower complaint but was a letter shared with media.**

206.    Hayes referred Andrew Free to Price as a source concerning the allegations in the Whistleblower Complaint.  Price Decl. Ex. 1; *Id.* Ex. 2 at; Hayes Decl. ¶ 12 ; Price Decl. ¶

10; McNamara Decl. Ex. 81 at 35:8-17.

**UNCONTROVERTED.  However, as discussed in Paragraph 6, what NBCUniversal characterizes as a "Whistleblower Complaint" was not Dawn Wooten's actual whistleblower complaint but was a letter shared with media.**

207.    Hayes had used Free as a source on prior occasions and found him to be a reliable and credible source, who documented his claims.  Hayes Decl. ¶ 12; McNamara Decl. Ex. 79 at 8:5-9:3, 12:3-14:7, 26:15-28:4 (describing Free as "knowledgeable and operating in good faith").

**CONTROVERTED.  The material cited does not support NBCUniversal's claim that Mr. Hayes found Mr. Free "to be a reliable and credible source, who documented his claims." In surrounding testimony of Mr. Hayes contained in McNamara Decl. Ex. 79, Mr. Hayes explicitly limited the description of Mr. Free as being "knowledgeable and operating in good faith" to only "the singular form of interactions I've had around immigration law," testifying: "I wouldn't blanket trust—say I blanket trust [Mr. Free] because there—I'm sure there's aspects of his life, I know nothing about the vast majority of it."  McNamara Decl. Ex. 79 at 26:15-25.  Further, when asked to support his claim that Mr. Free "has a tendency to document his claims," Mr. Hayes's only testimony about anything prior to September 15, 2020 was, "you know, I recall at one point talking about some story, I forget.  Him being like, Here's the language in the statute and this is what it means." McNamara Decl. Ex. 79 at 27:7-15.**

208.    Price interviewed Free about the allegations in the Whistleblower Complaint.  *See* Price Decl. Ex. 3; Price Decl. ¶ 11; McNamara Decl. Ex. 81 at 35:8-11, Ex. 33 at 113:23-25.

**UNCONTROVERTED.  However, as discussed in Paragraph 6, what NBCUniversal**

**characterizes as a "Whistleblower Complaint" was not Dawn Wooten's actual**

**whistleblower complaint but was a letter shared with media.**

209.    Free told Price, as documented in a taped recording of the interview, that "in the last 24 hours, I have heard from five different immigration lawyers with multiple clients who have either had hysterectomies for which they did not get informed consent or who have medical battery accused by this physician," that he personally represented two clients—"one of them was deported, we think in about 2016.  She had a hysterectomy" and the other one "was told that she had cancer, or at least the risk of cancer" and "was given a hysterectomy supposedly to treat her cancer."  He also said, "we've put an outreach out and we've said, hey, do you know someone or are you affected by this?  And so far since that happened early this morning, we're looking at something like 14 or 15 individuals that we've identified."  Price Decl. Ex. 3 at NBCU001812-814, NBCU001823.

**CONTROVERTED as to NBCUniversal's contention that this summary demonstrates the absence of actual malice, for which the contention is cited in NBCUniversal's motion for summary judgment.  Doc. 127 at 31.  NBCUniversal omits the following from the document: Mr. Price responds "that sounds great" to Mr. Free's suggestion that he "we can think about next steps in terms of story and sourcing and—and subjects if that's ok," indicating that Mr. Price was allowing Mr. Free, an attorney and advocate, to dictate the terms of the story.  Price Decl. Ex. 3 at 2:24-3:6.  Mr. Price later allowed Mr. Free to retroactively classify a conversation as "off the record."  Price Decl. Ex. 4.** ▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮ **This was the very**

**opposite of Mr. Scholl's admonition to demonstrate healthy skepticism into what Mr.**

**Hayes and Mr. Scholl agreed were extreme, unproven allegations.  Mr. Free also continued that he was *not* ready to "make the allegation" about mass hysterectomies until he gathered additional information.  "But, you know, and if we're comfortable with the data, then we'll make the allegation.  Price Decl. Ex. 3 at 9:12-13.  He stated later: "when I hear forced sterilization, I want to see some fucking documents."  Price Decl. Ex. 3 at 19:7-8.  "I'm not going to take somebody's word for it."  Price Dec. Ex. 3 at 10-11. Finally: "I've been awaiting that confirmation."  Price Decl. Ex. 3 at 19:13-14.  Mr. Free also spoke with Mr. Price in terms of a battle with ICE that further demonstrated his bias: "Because we're not going to win on anecdotes.  We've been trying for ten years.  It didn't work."  Price Decl. Ex. 3 at 20:3-5.** ████████████

████████████████

████████████

████████████

210.    After the interview, Price confirmed these quotes with Free in a text message, sating: "Can we characterize what you told me by saying 'tonight we spoke with a lawyer who represents two women who had this procedure done, and tells us that as many as 15 women were given hysterectomies, and that number is growing"?  Free corrected the second statement, clarifying that at many as 15 women were given hysterectomies or other procedures.  The correct quote from Free was used in the 9/15 *All In* News Report.  Price Decl. Ex. 5.

**CONTROVERTED.  Even after the correction, NBCU ran a banner that read "Mass Hysterectomies performed on women at ICE facility," Mr. Hayes cast aspersions on ICE's denial and statement that only two hysterectomies had been performed, Ms.**

Wooten described Dr. Amin as "the uterus collector," and other allegations of mass hysterectomies. *See, e.g.*, *infra* Paragraphs 185, 189, 193.

211. Free told Price during the interview that he "represent[s] those women with their immigration attorney, Benjamin Osorio." Price Decl. Ex. 3 at NBCU001813.

**UNCONTROVERTED that the quoted material appears at Price Decl. Ex 3.**

212. Price understood that the Osorio clients referred to in the NBC News Article were different clients than the clients that Free discussed in his interview with Price. *See* Price Decl. ¶ 26; McNamara Decl. Ex. 81 at 159:11-160:9; 161:13-164:24.

**CONTROVERTED. The materials cited do not support NBCUniversal's contention. Other facts controvert Mr. Price's ability to recall this self-serving contention. Although Mr. Price testified to believing they were the same clients, Mr. Price *also* testified at his deposition repeatedly that he did not specifically recall his specific actions with respect to the ICDC story and so limited his testimony to what he generally *would* have done. "I—I can say generally what I—what I would have done. I—I can't recall specifically what I did three-on a day three years ago." McNamara Decl. Ex. 81 at 33:17-20. "I don't recall the specific actions I took [with respect to the ICDC story], but I can tell what I generally do to prepare for stories." McNamara Decl. Ex. 81 at 34:8-11. And when asked specifically the question why the number *All In* reported of women making accusations changed, after testifying that he had thought they were different women, he answered, "I'm sure there's a—there's a good editorial reason for it. I just don't recall right now." Ex. FF, Price Depo 298:17-23. When asked a follow-up of whether it was "because someone realized that you-all were double-counting clients between Andrew Free and Ben Osorio," he answered, "I don't know." Ex. FF, Price Depo 298:17-299:5. The selective nature of Mr. Price's memory**

calls into question his credibility.  Further, in his conversation with Mr. Free, Mr. Free states that he represents "those women with their immigration attorney, Benjamin Osorio," and that one is in El Salvador and the other is in the United States in removal proceedings. Price Decl. Ex. 3 at 6:17-7:1.  He also stated: "Yeah, so I represent two women right now," and that "[t]hose are Ben Osorio's clients."  Price Decl. Ex. 3 at 15:17-21.  Mr. Osorio, in turn, told Mr. Price that one of the clients' identifying features needed to be anonymized because "she's still in removal proceedings, right," and the other "is in El Salvador."  Price Decl. Ex. 11 at 2:18-23, 4:9.  Mr. Price appears to have known that they were the same people, stating: "So—so I was talking to Andrew Free yesterday, and he kind of filled me in about a bunch of stuff," but that this conversation would be to "make sure that I'm getting—I'm getting stuff right here" about "B."  Price Decl. Ex. 11 at 4:21-5:6. Accordingly, Mr. Price's sworn declaration that he thought they were different people is simply not credible, and it is certainly not uncontroverted.

213.    Prior to airing the 9/15 *All In* News Report, Free sent Price a page of a medical record for a detainee that confirmed that she was scheduled for a hysterectomy by Dr. Amin. Price Decl. Ex. 6; *Id.* ¶ 36.

**CONTROVERTED.  The materials cited do not support NBCUniversal's contention that the medical record "confirmed that she was scheduled for a hysterectomy by Dr. Amin." It appears to state instead: "The plan is to schedule her for a partial hysterectomy."  Price Decl. Ex. 6.  It continues: "She understands and agrees to the procedure."  Price Decl. Ex. 6.  Mr. Price appears to share Dr. Amin's, and not NBCUniversal's, understanding: in his declaration, he summarizes the message as not establishing that the hysterectomy was scheduled but instead only that "Dr. Amin was planning to schedule" a procedure.  Price**

**Decl. ¶ 22.  Paragraph 36 of Price Decl., cited by NBCUniversal in support of its contention, appears to have nothing to do with this page of a medical record.  Also, in its motion for summary judgment, NBCUniversal cites these materials for the following contention: "Free informed *All In* that he had two clients from ICDC who had received potentially unnecessary hysterectomies and sent *All In* a page from one of his client's medical records in support."  Doc. 127 at 31.  For the reasons discussed herein, the cited materials certainly do not support that he had two clients "who had received potentially unnecessary hysterectomies."**

214.    Hayes was aware of Dr. Amin's prior DOJ Complaint and settlement concerning allegations that Dr. Amin ordered unnecessary procedures for financial gain.  Hayes Decl. ¶ 41.

**UNCONTROVERTED**

215.    Hayes believed that Dr. Amin's 2015 settlement supported the credibility of the allegations that Dr. Amin was performing unnecessary medical procedures on the detained immigrants.  Hayes Decl. ¶¶ 41, 44; McNamara Decl. Ex. 79 at 191:6-192:20.

**CONTROVERTED.  It does not make sense that Dr. Amin would perform mass unauthorized hysterectomies but only have two hysterectomies referred if the motivation were to perform unnecessary medical procedures for money, because he would not be reimbursed for a procedure that was not referred.**

216.    Prior to airing the 9/15 *All In* News Report, Price received the Second ICE Statement and a statement from LaSalle.  Hayes Decl ¶ 19; Price Decl. Exs. 7, 9.

**UNCONTROVERTED**

217.    Hayes's producers worked with Standards in reporting the 9/15 *All In* News

Report and understood that Standards had approved of the News Report.  *See* McNamara Decl. Ex. 80 at 83:4-14; 86:6-15; Price Decl. ¶¶ 32-33; Price Decl. Exs. 8-9.

**CONTROVERTED.  The cited materials do not support NBCUniversal's contentions that "Hayes's producers" at any time "understood that Standards had approved of the News Report."  There is nothing in any of the cited materials attesting to Standards having approved the News Report.  Mr. Price's Declaration states that he alone, and not "Hayes's producers," "knew that Standards was comfortable with the NBC News Article."  Price Decl. ¶ 33.**

218.    Hayes and his producers had no doubt about the accuracy of the Challenged Statements from the 9/15 *All In* News Report. *See* Price Decl. ¶¶ 4, 34; Hayes Decl. ¶¶ 6, 16. Hayes made the decision to report on the allegations in the Whistleblower Complaint because they were newsworthy and not because of perceived ratings.  Hayes Decl. ¶ 49.

**CONTROVERTED.  As discussed above, the self-serving declarations of Mr. Hayes and Mr. Price do not controvert the contemporaneous expressions of doubt of Mr. Hayes or Mr. Price's hearing information that contradicted the Statements.  Further, as discussed in Paragraph 6, what NBCUniversal characterizes as a "Whistleblower Complaint" was not Dawn Wooten's actual whistleblower complaint but was a letter shared with media.  Mr. Hayes testified at his deposition that, compared to hysterectomies, "[g]eneric procedures, I think, wouldn't capture the source of the newsworthiness here."  Ex. GG, Hayes Depo. 87:25-88:11.** ████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████

**_TRMS_ – September 15, 2020**[4]

219.     The FAC challenges sixteen statements from a segment of the September 15, 2020 broadcast of _TRMS_ that aired at 9:00 PM (the "_TRMS_ News Report").

**CONTROVERTED.  There are no cited materials to support this contention.**

220.     The FAC erroneously identified the _TRMS_ News Report as airing on September 16, 2020.  _See_ FAC ¶ 84.  Dr. Amin's counsel admitted this was an error.  _See_ McNamara Decl. Ex. 3 at 27:18-25.

**UNCONTROVERTED**

221.     The Challenged Statements in the _TRMS_ News Report are italicized below.

**UNCONTROVERTED that the italicized excerpts are challenged.**

222.     The _TRMS_ News Report opens by providing context for the allegations from the Whistleblower Complaint, discussing immigration-related controversies, including the Trump administration's "forcible systematic removal of children from their parents at the border." Maddow Decl. Ex. 6 at 00:00:43; Ex. 7 at NBCU000195.

**CONTROVERTED.  The cited materials do not support NBCUniversal's contentions that Ms. Maddow provided "context for the Whistleblower Complaint."  The program instead discusses Trump Administration immigration "scandals," stating: "But in terms of permanent damage done to humans, in terms of the severity of the damage deliberately done to humans, the Trump administration, no matter what else they do, they will never, ever get out from the shadow of the fact that they really did as a policy and a deliberate practice, they really did take little kids away from their moms and dads."  Doc. 133-7 at 2.**

---

[4] To the extent any of the contents of the broadcast are offered for the truth of the matters asserted, they are CONTROVERTED as discussed throughout.

After continued discussion of child separations, Ms. Maddow states: "But even still, with that standing alone, there have been weird, almost perverse offshoots of that story in terms of the behavior of the Trump administration and its appointees.  Now, one of them we covered pretty extensively on this show when it first came to light."  Doc. 133-7 at 3. Ms. Maddow then goes on to relay statements about Scott Lloyd, an appointee to the Office of Refugee Resettlement who blocked a teenager housed there from having an abortion, directed staff to collect a spreadsheet of girls' pregnancy status, and "was tracking girls' periods after the court told him he needed to stop interfering in these girls' medical care decisions."  Doc. 133-7 at 3-4.  Ms. Maddow then states: "now we have arrived at the next chapter in the same story."  Doc. 133-7 at 5.  This is not "context" for the letter but instead constitutes Ms. Maddow and NBCUniversal's preconception of the Statements as being part of their narrative of scandals perpetrated by Trump Administration officials.  Further, as discussed in Paragraph 6, what NBCUniversal characterizes as a "Whistleblower Complaint" was not Dawn Wooten's actual whistleblower complaint but was a letter shared with media.  Although Ms. Maddow testified at her deposition that she was not aware of an article that described her audience having "almost tripled from 849,000 nightly viewers in 2014 to more than 2.3 million" in 2017, she also testified ███████████████████████████████ that most days she looks at them, including periods when she looks "all the time."  Ex. EE, Maddow Depo. 12:16-13:4, 16:18-17:1.  A jury may infer from the information that Ms. Maddow was not "giving context" but rather framing a story for ratings.

223.    Maddow then explains that she is going to discuss a "new development" in the immigration story: A "nurse who works at an ICE detention facility in Georgia has just

contributed to a whistleblower complaint . . . She says that *immigrant women at that facility have told her they have routinely been sent to a gynecologist who has performed unnecessary procedures on them, including hysterectomies.*" Maddow Decl. Ex. 7 at NBCU000198; Ex. 6 at 00:07:000:07:40.

**UNCONTROVERTED.  However, as discussed in Paragraph 6, what NBCUniversal characterizes as a "Whistleblower Complaint" was not Dawn Wooten's actual whistleblower complaint but was a letter shared with media.**

224.     Maddow "underscores" that the "allegation here" is that a federal facility has "*been sending immigrant women in their care, in their custody to a doctor who has removed their reproductive organs for no medical reason and without them consenting to it.*" Maddow Decl. Ex. 7 at NBCU000198; Ex. 6 at 00:07:44.

**CONTROVERTED.  The cited materials do not support NBCUniversal's contention.  The cited material omits that the term "underscore" appears in the clause "including hysterectomies just to underscore that," demonstrating that Ms. Maddow emphasized mass, unnecessary, unauthorized hysterectomies.  Doc. 133-7 at 5.**

225.     Maddow then reads "some of the passages from the complaint, which was written on behalf of that nurse as well as some of the women detainees" and submitted by an "advocacy group called Project South." Maddow Decl. Ex. 7 at NBCU000198; Ex. 6 at 00:08:00.

**UNCONTROVERTED**

226.     Maddow then quotes the statement of a detainee contained in the Whistleblower Complaint that she talked to "*five different women who had a hysterectomy done.*" "When she talked to them about the surgery, the women quote, reacted confused when

explaining why they had one done."  The detainee said "*I thought this was, like, an experimental concentration camp it was like they're experimenting with our bodies.*"  "The nurse who contributed to the Whistleblower Complaint explains it like this, quote: '*Everybody this doctor sees has a hysterectomy, just about*

*everybody. He's even taken out the wrong ovary on one detained immigrant woman.'"* The

*TRMS* News Report reports the details of the allegation in the Whistleblower Complaint that

the wrong ovary was taken out.  Maddow Decl. at NBCU000198-199; Ex. 6 at 00:08:15.

**UNCONTROVERTED.  However, as discussed in Paragraph 6, what NBCUniversal**

**characterizes as a "Whistleblower Complaint" was not Dawn Wooten's actual**

**whistleblower complaint but was a letter shared with media.**

227.   Maddow continues to quote from the Whistleblower Complaint, reporting that

the nurse said "goodness, *he's taking everybody's stuff out, that his specialty, he's the uterus*

*collector.*" "Is *he collecting these things or something? Everybody he sees he's taking all their*

*uteruses out or he's taking their tubes out, what in the world?"* Maddow Decl. Ex. 7 at

NBCU000198-199;  Ex. 6 at 00:09:22.

**UNCONTROVERTED.  However, as discussed in Paragraph 6, what NBCUniversal**

**characterizes as a "Whistleblower Complaint" was not Dawn Wooten's actual**

**whistleblower complaint but was a letter shared with media.**

228.   Maddow then reports that "according to this nurse, this whistle-blower, she

alleges in this complaint" that "women told her this doctor performed hysterectomies, '*removed*

*the uterus of these refugee women for no medical reason without their proper informed*

*consent.'"* Maddow Decl.. Ex. 7 at NBCU000199; Ex. 6 at 00:09:41.

**UNCONTROVERTED**

229.   Maddow then plays an excerpt of Soboroff's interview of Wooten, including

when Wooten acknowledges that she "was demoted" and alleges that this was because she

"spoke out," and when she confirms that the gynecologist was called the "uterus collector."

Maddow Decl. Ex. 7 at NBCU000199-200; Ex. 6 at 00:12:50.

**UNCONTROVERTED**

230.    After the excerpt from the Soboroff/Wooten interview, Maddow observes, "I should tell you that these allegations from this whistle-blower are not isolated complaints. NBC News has spoken to four different lawyers who represent women who were detained in that federal facility in Georgia who are making similar claims."  Maddow Decl. Ex. 7 at NBCU000200; Ex. 6 at 00:14:12.

**UNCONTROVERTED**

231.    She continues, "according to NBC's reporting, one of the lawyers represents *two women who were detained at the facility who say they received hysterectomies that they believe may have been unnecessary."* "Another lawyer represents a woman who says *she went to this doctor's office for an exam.  The exam left her with bruising."*  Maddow Decl. Ex. 7 at NBCU000200; Ex. 6 at 00:14:26.

**UNCONTROVERTED**

232.    The *TRMS* News Report reads and displays on-screen the statement received from Dr. Amin's counsel that Dr. Amin "vigorously denies these allegations and will be cleared of any wrongdoing when the facts come out."  Maddow Decl. Ex. 7 at NBCU000201; Ex. 6 at 00:14:45.

**UNCONTROVERTED**



233.    Maddow reports that ICE "refused to comment on the allegations from those lawyers who spoke to NBC News.  But they have released a statement tonight in response to the allegations the Whistleblower Complaint."  Maddow Decl. Ex. 7 at NBCU000201; Ex. 6 at 00:14:54.

**UNCONTROVERTED.  However, as discussed in Paragraph 6, what NBCUniversal characterizes as a "Whistleblower Complaint" was not Dawn Wooten's actual whistleblower complaint but was a letter shared with media.**

234.    Maddow then states that she is quoting "in part" from the Second ICE Statement, including that "according to ICE data, since 2018, only two individuals at Irwin County Detention Center were referred to certified credentialed medical professionals . . . for hysterectomies."  These portions of the Second ICE Statement are displayed on screen. Maddow Decl. Ex. 7 at NBCU000201; Ex. 6 at 00:15:26.

**UNCONTROVERTED.  Omitted is Ms. Maddow's portrayal of doubt to the audience, skepticism which she does not express as to Ms. Wooten or the Statements: "Whether or not the women were referred for hysterectomies or not, more than two women are saying they got them and more than two women are telling lawyers as part of this complaint that they don't know why they got them and they don't think they needed them."  Maddow**

**Decl. Ex. 7 at 8.**





235.   Maddow then interviews Soboroff who explains that "for us, it was important to corroborate the claims in this whistleblower complaint, I wanted to speak to Ms. Wooten myself, which obviously I did, but also to corroborate the allegations of the migrants who were detailed in the whistleblower complaint." Maddow Decl. Ex. 7 at NBCU000202; Ex. 6 at 00:16:42.

**UNCONTROVERTED.  However, as discussed in Paragraph 6, what NBCUniversal**

characterizes as a "**Whistleblower Complaint**" was not Dawn Wooten's actual
whistleblower complaint but was a letter shared with media.

236.     Soboroff reports, "Julia and I spoke with four lawyers today, and every one of
them has said that they had a client who had contact with this doctor where they were told one
thing and ultimately they . . . came out of this either having a procedure or being
recommended to have a procedure that was deeply invasive and, of course, at least in two of
those cases, the hysterectomies took place.  And one of those lawyers even told us they went to
the detention facility, complained

about the treatment from this doctor, but no change was ever made." Maddow Decl. Ex. 7 at
NBCU000202; Ex. 6 at 00:16:57.

**UNCONTROVERTED**

237.     Maddow asks Soboroff, "to be clear, *the complaints here from these women
and their lawyers who are speaking on their behalf is essentially that they – not that they never
should have been sent out to see a gynecologist, but rather, whatever was going on with them,
they did not understand that the treatment was going to be a hysterectomy and then in some
cases the allegation here is that the hysterectomies, whether or not the women consented to
them in the first place, they were not medically necessary.*"  Maddow Decl. Ex. 7 at
NBCU000202; Ex. 6 at 00:17:30.

**UNCONTROVERTED**

238.     Soboroff responds, "No, that's right.  *And there are other allegations of other
procedures including pap smears where women are told you've got ovarian cysts or cancer,
and that turned out not to be the case and those procedures happened anyway."* Maddow
Decl. Ex. 7 at NBCU000202; Ex. 6 at 00:17:58.

**UNCONTROVERTED**

239.    Soboroff then reads a comment from LaSalle "strongly refut[ing] these

allegations," which is also displayed on screen.  Maddow Decl. Ex. 7 at NBCU000202; Ex. 6

at 00:18:16.

**UNCONTROVERTED**



240.    Soboroff states that LaSalle's statement "goes against what we heard from at

least one of the attorneys today, which was when these allegations came up from their clients,

she went to the correctional facility, she told them she didn't want her patient seeing that doctor

and patients continued to see that doctor as Ms. Wooten details very graphically.  And I think,

you know, this statement that *they considered him the uterus collector* is graphic, it's hard to

listen to, but that's what they're talking about, according to Ms. Wooten, inside this facility,

and she's not the only one saying so."  Maddow Decl. Ex. 7 at NBCU000203; Ex. 6 at

00:18:50.

**UNCONTROVERTED**

241.    Maddow then states that "ICE is saying that this will be investigated" and she

asks Soboroff what he expects to be the next steps in the investigation.  Maddow Decl. Ex. 7

at NBCU000203; Ex. 6 at 00:19:36.

**UNCONTROVERTED**

242.    Soboroff reports that "the Office of the Inspector General, at the Department of

Homeland Security will open an investigation.  The Office of Civil Rights and Civil Liberties

within the Department of Homeland Security will look at this as well."  Maddow Decl. Ex. 7

at NBCU000203; Ex. 6 at 00:19:57.

**UNCONTROVERTED**

243.    Soboroff next reports that "one of the lawyers said to me, which I really want

to underscore here, is that while she didn't think that this is a conspiracy, a large conspiracy

by the government necessarily to have these procedures on these women, it is emblematic of

systematic lack of oversight for medical care and also just well-being and welfare of

immigrants in immigration detention…"  Maddow Decl. Ex. 7 at NBCU000203;  Ex. 6 at

00:20:18

**UNCONTROVERTED**

244.    Soboroff closes by noting that the "Department of Homeland Security will be

forced to investigate this, and we have heard the top officials in Congress, on the Hill, also

called for investigations as well and so now that has to play its course." Maddow Decl. Ex. 7

at NBCU000204; Ex. 6  at 00:22:08

**UNCONTROVERTED**

245.    The FAC does not challenge statements in the *TRMS* News Report that are

not italicized in the above Paragraphs 233-244.

**CONTROVERTED because there are no cited materials to support the contention, and to the**

**extent Statements are repeated in other broadcasts and challenged there.**

**Reporting for the _TRMS_ News Report**

246.     Maddow is responsible for the content of _TRMS_. Maddow Decl. ¶ 2.

**UNCONTROVERTED.  However, to the extent Paragraph 246 ascribes responsibility _solely_ to Ms. Maddow, this contention is CONTROVERTED because it is not supported by the cited material and is contradicted by other facts.  There is nothing to support the assertion other than Ms. Maddow's self-serving declaration, which itself states that "the _TRMS_ team," with such term undefined, is also a decisionmaker as to the contents of the program.  The declaration also states that Standards required changes to Maddow's decision-making as to the broadcast that included Statements.  Maddow Decl. ¶¶ 15-16.**

247.     The _TRMS_ News Report relied on the previously published NBC News Article and the reporting done by Ainsley and Soboroff in connection with the NBC News Article. Maddow Decl. ¶ 6; McNamara Decl. Ex. 82 75:8-76:14, Ex. 83 at 22:1-11, 25:21-26:16.

**UNCONTROVERTED**

248.     Maddow and the _TRMS_ staff had complete confidence in Ainsley and Soboroff's . reporting based on their extensive and award-winning track record of reporting on immigration issues and the editorial process and standards of the NBCU News Group. Maddow Decl. ¶¶ 8, 15, 21-43; McNamara Decl. Ex. 83 at 51:20-52:9, 60:9-61:6.

**CONTROVERTED.  Ms. Maddow stated, at her preproduction meeting, that "there's a lot of jumping to conclusions around" with regards to the letter and that she was unsure whether to "leave room in the show or not."  Maddow Decl. Ex. 1 at 3-4.  Her producers noted that Ms. Wooten's lawyers refused to provide her declaration, and notes that "hysterectomy part is largely based on her and anon[ymous] accounts."  Maddow Decl.**

Ex. 1 at 3.  Eight minutes later, however, without any intervening reporting or corroboration, Ms. Maddow stated: "My inclination is to put the Soboroff story here," in the A block monologue that starts the show and Ms. Maddow agreed has become what her show is best known for.  Maddow Decl. Ex. 1 at 5; Ex. EE, Maddow Depo. 42:12-23. She stated: "Straight ahead on this story, context should be the moral catastrophe of them taking kids away from their parents."  Maddow Decl. Ex. 1 at 5.  Accordingly, Ms. Maddow jumped from being unsure whether to include the Statements in the show to spending the first multiple minutes of the show emphasizing the Statements as the "next chapter in the same story" of Trump Administration atrocities which demonstrates that Ms. Maddow was serving a narrative to her viewers.  Maddow Decl. Ex. 7 at 2-5.  This fits with Ms. Maddow's testimony agreeing that "within reason" it is "important to you that you have something to say that people don't already know."  Ex. EE, Maddow Depo. 32:20-23.  Ms. Maddow testified that she wanted additional information to "help us not jump to conclusions about it, but rather arrive at reasonable informed conclusions about the merits of the complaint."  Ex. EE, Maddow Depo. 64:18-65:24.  But when asked whether she could identify any additional information that would avoid the Statements' being merely "jumping to conclusions" that happened from that point at the meeting until Ms. Maddow decided to make the allegations the "A" block of her show, which happened nine minutes later in the meeting, she could point only to Mr. Soboroff's interview with Ms. Wooten and Mr. Soboroff and Ms. Ainsley's article, which existed and was not considered to be enough by her at the time of the meeting.  Ex. EE, Maddow Depo. 72:2-74:9, 109:9-111:8; Maddow Decl. Ex. 1 at 3-5.  Further, as to a correction that was being contemplated concerning an image that was incorrectly attributed to an ICE facility

during the Trump Administration when it was actually taken during the Obama Administration, Ms. Maddow's producer sent a draft correction, and Ms. Maddow stated: "We should not be engaging with the Obama administration's ICE policies."  Ex. EE, Maddow Depo. 215:1-217:6.  A jury may infer that this demonstrates Ms. Maddow's solicitousness toward her audience in the narrative of the Statements being the "next chapter" in the Trump Administration's immigration atrocities.

249.    *TRMS* relied on other reporting in further support of the *TRMS* News Report.

Maddow Decl. ¶¶ 21, 25; McNamara Decl. Ex. 82 at 54:23-56:4, 75:8-76:14, Ex. 83 at 22:1-11.

**CONTROVERTED.  The cited materials do not support NBCUniversal's contention that other reporting providing "further support."  Maddow Decl. ¶¶ 21, 25 cite articles that only discuss the letter, without describing how the reporting, which did not include Dr. Amin's name or photograph and otherwise acted less credulously toward the allegations, could "further support" their own reporting.**

250.    On September 14, 2020, a legal analyst from *TRMS* contacted Project South and received a copy of the Whistleblower Complaint.  McNamara Decl. Ex. 84.

**CONTROVERTED.  NBCUniversal's contention omits a portion of McNamara Decl. Ex. 84 that provides additional cause to doubt the letter: the legal analyst asked Project South for Ms. Wooten's declaration, and Project South refused to provide it, even though Ms. Wooten had appeared in an interview with NBCUniversal.  McNamara Decl. Ex. 84 at 2. Further, as discussed in Paragraph 6, what NBCUniversal characterizes as a "Whistleblower Complaint" was not Dawn Wooten's actual whistleblower complaint but was a letter shared with media.**

251.    Maddow and the *TRMS* staff reviewed the Whistleblower Complaint and Soboroff's interview of Wooten and independently found the Whistleblower Complaint and Wooten to be credible.  Maddow Decl. ¶¶ 7, 12; Maddow Decl. Ex. 3; McNamara Decl. Ex. 83 at 170:2-171:2.

**CONTROVERTED.  As discussed in Paragraph 248, Ms. Maddow had and expressed contemporaneous doubts.  The only cited materials not attested to by Ms. Maddow does not say *anything* about her staff's view of the credibility of the letters and the Statements. McNamara Decl. Ex. 83 at 170:2-171:2.  Further, as discussed in Paragraph 6, what NBCUniversal characterizes as a "Whistleblower Complaint" was not Dawn Wooten's actual whistleblower complaint but was a letter shared with media.**

252.    *TRMS* was independently communicating with Standards concerning the show's coverage of the Whistleblower Complaint and the NBC News Article, and Standards approved the reporting.  Maddow Decl. ¶¶ 14, 15, 16; Maddow Decl. Ex. 4.

**UNCONTROVERTED.  However, as discussed in Paragraph 6, what NBCUniversal characterizes as a "Whistleblower Complaint" was not Dawn Wooten's actual whistleblower complaint but was a letter shared with media.**

253.    Maddow had no doubt about the accuracy of the Challenged Statements included in the *TRMS* News Report. Maddow Decl. ¶¶ 6, 20-43.  Maddow made the decision to report on the allegations in the Whistleblower Complaint because they were newsworthy and not because of perceived ratings.  *Id.* ¶ 48.

**CONTROVERTED.  As discussed above, Ms. Maddow expressed contemporaneous doubt about the Statements before, without any documented reason, deciding to publish the Statements and draw a connection between the letter and the Trump**

Administration's alleged immigration atrocities.  As discussed above, although Ms. Maddow testified that she was not aware of her ratings having tripled from 2014 to 2017, she testified that ████████████████████ she reviewed them most days but not every day, and in some stretches she reviewed them with great frequency.  These are facts from which a jury may infer, in the absence of credible evidence otherwise, that perceived ratings were a part of Ms. Maddow's calculus.  Further, as discussed in Paragraph 6, what NBCUniversal characterizes as a "Whistleblower Complaint" was not Dawn Wooten's actual whistleblower complaint but was a letter shared with media.

254.     Maddow believed the NBC News Article and the *TRMS* News Report to be accurate reporting.  Maddow Decl. ¶¶ 6, 20.

CONTROVERTED.  As discussed above, Ms. Maddow expressed contemporaneous doubt about the Statements before, without any documented reason, publishing the Statements and drawing a connection between the letter and the Trump Administration's alleged immigration atrocities.

255.     Soboroff had no doubt about the accuracy of the Challenged Statement from his live interview with Maddow.  Soboroff Decl. ¶ 13.

CONTROVERTED.  The only support for this contention is Mr. Soboroff's self-serving affidavit.  Further, as discussed above as to Paragraph 62, the Statements contradict what the lawyers testified that they told Mr. Soboroff and Ms. Ainsley.  In addition to calling the contention in Paragraph 255 into doubt, the fact that Mr. Soboroff published Statements contradicting what the sources told him indicates issues of his credibility.  And as discussed in Paragraph 73 and throughout, Mr. Soboroff and Ms. Ainsley exchanged contemporaneous texts as to doubts about the Statements, which Mr. Soboroff did not

share in his live interview with Ms. Maddow, and otherwise had reasons to doubt the Statements.  Mr. Soboroff testified in his deposition that by the time he appeared on the Rachel Maddow show he and Ms. Ainsley had only learned of *two* detainees who had received hysterectomies.  Ex. G, Soboroff Depo. 180:2-20.  Further, Ms. Maddow introduced Mr. Soboroff as "MSNBC correspondent and author, of course, of 'Separated: Inside an American Tragedy,' which is the seminal book on the child separation policy that I think is relevant context here."  Maddow Decl. Ex. 7 at 8.  Mr. Soboroff had spoken specifically about that book on multiple NBC or MSNBC programs, including *All In*, *The Rachel Maddow Show*, and *Deadline*, which Mr. Soboroff said "was of great interest to our audience."  Ex. G, Soboroff Depo. 45:20-46:24.  A jury may reasonably infer from these facts the professional benefit Mr. Soboroff would receive from appearing on television pursuant to his and Ms. Ainsley's reporting.  Further, Mr. Soboroff derided Dr. Amin in the show as a "so-called medical professional," further demonstrating actual malice. Maddow Decl. Ex. 7 at 11.

### *All In* – September 16, 2020

256.    The FAC initially challenged six statements from the September 16, 2020 episode of *All In*, *see* FAC ¶¶ 81-82, but all claims from that news report were dismissed, *see* Rule 12(c) Order at 54-55.

**UNCONTROVERTED**

257.    The *All In* producers continued to investigate the Whistleblower Complaint allegations on September 16.  Following the September 15 *All In* News Report, Free sent Price a Signal message with a page from an ICDC detainee's psychiatric records.  The record read: "Pt had surgery and is post-op day number 5.  She is 'bothered' by the fact that she went into

surgery expecting a D&C and ended up having a salpingectomy x 1." On the evening of

September 15, Free told Price that the story was embargoed until further notice, the next day,

he told Price that the story was no longer embargoed and he was "In touch w Chris on it." *See*

Price Decl. Ex. 10.

**UNCONTROVERTED. However, to the extent that NBCUniversal relies on Paragraph**

**257 to demonstrate that Chris Hayes "received a psychiatric record," Doc. 127 at 32, the**

**cited materials do not support the contention. The cited material is a message thread**

**between Mr. Free and Mr. Price, not Mr. Hayes, and while Mr. Free does tell Mr. Price**

**"In touch w Chris on it," the absence of any corroboration from Mr. Hayes indicates that**

**he either was not actually in touch with Mr. Free or that he did not consider the**

**information. Further, as discussed in Paragraph 6, what NBCUniversal characterizes as**

**a "Whistleblower Complaint" was not Dawn Wooten's actual whistleblower complaint**

**but was a letter shared with media.**

258.    Price had a phone call with attorney, Benjamin Osorio, to discuss an interview

that his client, "B" was planning to do with Hayes that evening. *See* Price Decl. Ex. 11.

**UNCONTROVERTED**

259.    "B" was a patient of Dr. Amin's, and he performed a total abdominal

hysterectomy on her. *See* McNamara Decl. Ex. 85.

**UNCONTROVERTED that "B" is the person whose medical records are McNamara**

**Decl. Ex. 85. However, the cited materials do not support that contention.**

260.    Free sent Price a tape of his own discussion with "B." During that call, Free

asked, regarding "B's" hysterectomy: "Did you feel like you had enough information to make an

informed decision about whether you want that to happen[?]" "B" responded "No." "B" also

said that she had bruises around her legs following a gynecological surgery she received prior to the hysterectomy.  Price Decl. Ex. 12 at NBCU001774.

**CONTROVERTED that NBCUniversal's two-sentence gloss on the contents of the transcript contained at Price Decl. Ex. 12 is a fair characterization of what "B" told Mr. Free.  NBCUniversal omits much material causing doubt as to the veracity of the Statements.  For example, "B" told Mr. Free that Dr. Amin discussed the need for her hysterectomy with her, Price Decl. Ex. 12 at 4:24-5:5, which controverted the Statements that hysterectomies were forced and without consent.  "B" also told Mr. Free that, once Dr. Amin treated her cancer with the hysterectomy, a "place" in Charlotte examined her and concluded that she no longer had cancer, contradicting the Statements that her hysterectomy was unnecessary.  Price Decl. Ex. 12 at 9:1-10:3.  "B" further stated that she did not know what a hysterectomy was prior to Dr. Amin's treatment of her, and that he explained it.  Price Decl. Ex. 12 at 10:4-9.**

261.    Osorio sent Price two documents containing portions of "B's" medical records. *See* Price Decl. Ex. 13.

**UNCONTROVERTED**

262.    The medical records showed that "B" received a "total abdominal hysterectomy" from Dr. Amin.  *See Id.* at NBCU000615.

**UNCONTROVERTED**

263.    Price called an OB-GYN, Dr. Joia Crear-Perry, to discuss the medical records. Price read from the medical records to Dr. Crear-Perry.  Dr. Crear-Perry stated on that call that, based on what Price told her, "if [B] was not aware that she had other options beside a hysterectomy for the treatment of – if she was told she was being treated for her – for her

carcinoma in situ and ovarian cysts with a hysterectomy, that's not the standard – you have

other options beside a hysterectomy to evaluate that." She said that "B" should have been

referred to a cancer center, which might "have done something else. They could have done

what's called a cone biopsy, which just removes the part that's bad to see how far it's gone.

Now that she's had the whole thing removed, sometimes you have to go back in and like

remove other organs" and "B" "might have to have multiple surgeries." *See* Price Decl. Ex.

14 at NBCU001896-897.

**CONTROVERTED that NBCUniversal's gloss on the contents of the transcript contained
at Price Decl. Ex. 14 is a fair characterization of the conversation. NBCUniversal omits
Dr. Crear-Perry's instant statement of bias, calling Dawn Wooten "my new hero." Price
Decl. Ex. 14 at 3:12-13. Dr. Crear-Perry never read the forms, only listening to Mr.
Price's extremely brief, over-the-phone description of several pages of "B"'s medical
records. Dr. Crear-Perry's statements were not based on the minimal information Mr.
Price provided, but rather "what I glean from just the little bit I'm seeing from social
media and from—you know, even this story, what you're saying right here, is that most of
it is that he was making decisions without explaining why and doing things without
offering other options to people." Price Decl. Ex. 14 at 7:22-8:3. Dr. Crear-Perry also
advised Mr. Price as to what story would sell better to audiences—not "the pain stuff
because people are going to blow that off. Like that's not—it's like pain—you know,
black folks, people of color, we don't get to have pain. So that's not going to work." Price
Decl. Ex. 14 at 15:11-16. Dr. Crear-Perry recommended instead: "I would lean on the
whole like, she doesn't have access" to health insurance. Price Decl. Ex. 14 at 16:15-20.**

264.    *All In* did not preview any questions or topics with "B" before the interview.

McNamara Decl. Ex. 122 at 22:2-23:16.

**CONTROVERTED.** ████████████████████████

████████████████████████████████████████

██████████████████████████████████

███████████████████████████████████

████████████████████████████████████████

██████████████████████████████████

██████████████████████████████████

█████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████

██████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████

265.    Luciana Lopez, a segment producer for *All In*, emailed Dr. Amin's attorney,

Scott Grubman, requesting a statement from him about the Whistleblower Complaint.  After

Grubman responded with a statement, Lopez requested to speak with Dr. Amin directly.

Grubman never responded to this request.  McNamara Decl. Ex. 86.

**UNCONTROVERTED.  However, as discussed in Paragraph 6, what NBCUniversal**

characterizes as a "**Whistleblower Complaint**" was not Dawn Wooten's actual whistleblower complaint but was a letter shared with media.

266.   On September 16, 2020, Hayes, Price, and other producers of *All In* spoke with Chris Scholl of Standards (the "Sept. 16 Standards Call").  *See* Price Decl. Ex. 15; Price Decl. ¶¶ 49-50; Hayes Decl. ¶ 37; McNamara Decl. Ex. 80 at 113:20-116:18.

**UNCONTROVERTED**

267.   During the Sept. 16 Standards Call, Scholl said that the NBC News Article was "reportable" and *All In* should "stick with" the reporting as published by Ainsley and Soboroff in the NBC News Article.  Scholl explained that it was fine for *All In* to interview a detainee and not to name her, but the show should "explain why" it was doing so and explain to viewers why the show was covering the story now.  Price Decl. Ex. 15 at NBCU002340-2341, NBCU002351.

**CONTROVERTED as to NBCUniversal's contention that Price Decl. Ex. 15 constitutes Mr. Scholl saying to "stick with" the reporting.  Mr. Scholl instead emphasized: "We don't know if the doctor did anything wrong here," noting that Dr. Amin "has a pretty clean record," even "in a field where that is not an entirely unusual thing to have somebody file a malpractice claim against you."  Price Decl. Ex. 15 at 5:14-24.  Mr. Scholl's statement that the article was "reportable," in context, was "I mean, it's obviously reportable, right?  We—we have reported it."  Price Decl. Ex. 15 at 5:9-11.  A reasonable inference for a jury to make, particularly in light of Mr. Scholl's admonition that it is "imperative" that Standards see final versions of articles before publication and in light of the vocal inflection Mr. Scholl puts on the words, Ex. KK, Audio Recording, is that Mr. Scholl is not concluding in a vacuum that the article is "reportable" but rather**

that it is reportable by virtue of it having been reported.  In other words, a jury could infer that Mr. Scholl meant "we have reported it" in the sense of "the cat is out of the bag" or "we can't take it back now."  Mr. Scholl noted that a "financial allegation of some kind," the 2015 DOJ settlement, is "really a different animal, right?"  Price Decl. Ex. 15 at 6:2-8.  "And the other is, like, is he a good doctor or is he a shitty doctor, you know?"  Price Decl. Ex. 15 at 6:7-8.  He continued later: "And we're not capable to assess from a medical standpoint whether or not the decisions made were legit"  Price Decl. Ex. 15 at 7:17-19.  Mr. Scholl also noted that Ms. Wooten "has a beef, right?  She's got a whole separate agenda here."  Price Decl. Ex. 15 at 8:16-17.  Mr. Hayes noted that the "reason it went viral" was that it "conjured the worst kind of like Third Reich, you know, sort of, you know, Jim Crow, Mississippi Hospital history," and continued, "which is not the case here."  Price Decl. Ex. 15 at 10:1-7.  Mr. Scholl agreed: "Well, we don't have it.  Yeah.  I mean, we don't know.  Well, we don't know."  Price Decl. Ex. 15 at 10:8-9.  Mr. Hayes described the letter, which again was repeated in the Statements, as follows: "So because you've got a secondhand, a very, very, you know, wildly provocative quote in a recorded whistleblower complaint by a woman with no factual, firsthand knowledge."  Price Decl. Ex. 15 at 12:7-9.  Mr. Hayes further stated that he "discounted the whole thing when I saw it go viral."  Price Decl. Ex. 15 at 12:23-25.  He also stated that, although there was becoming less skepticism, "there was some skepticism among folks in the immigrant rights community as well."  Price Decl. Ex. 15 at 13:7-9.  Mr. Scholl summarized: "we have to—we have to come off with a really appropriate sense of skepticism."  Price Decl. Ex. 15 at 13:13-15.  He later stated, presciently: "By the time anybody knows [the truth of the allegations], nobody's going to be doing the story."  Price Decl. Ex. 15 at 17:4-5.

268.     Scholl initially questioned the relevance of Dr. Amin's 2015 settlement with the DOJ in the Sept. 16 Standards Call, but later recognized that it was relevant and supported the credibility of the Whistleblower allegations.  Price Decl. at -NBCU002341; Scholl Ex. 11; Scholl Decl. ¶ 28.

**CONTROVERTED.  The cited materials do not support NBCUniversal's contention that Mr. Scholl "later recognized that it was relevant and supported the credibility of the Whistleblower allegations."  "Scholl [sic] Ex. 11" is an email in which Mr. Scholl thanks Mr. Hayes for sharing information as to the 2015 settlement, not commenting whether he agreed or disagreed with Mr. Hayes's contention for its relevance.  Scholl Decl. Ex. 11 at 2.  There is nothing else that supports the contention other than Mr. Scholl's self-serving affidavit.  Other facts controvert the contention.  In other communications, which were done contemporaneously and not in a declaration produced in a lawsuit, Mr. Scholl described the 2015 settlement as "really a different animal" from allegations of mass hysterectomies done without consent, necessity, or authorization.  Price Decl. Ex. 15 at 6:2-8.  Unlike the Mr. Scholl in his affidavit produced for use in this litigation, Mr. Scholl at the time of the Statements stated: "we have to—we have to come off with a really appropriate sense of skepticism."  Price Decl. Ex. 15 at 13:13-15.**

269.     Consistent with Scholl's recommendation in the Sept. 16 Standards Call, the 9/15 *All In* News Report had relied on reporting from the NBC News Article. *See supra* ¶ 185.

**UNCONTROVERTED that *All In* used reporting from the article, but CONTROVERTED that this constitutes "consistent with [Mr.] Scholl's recommendation in the Sept. 16 Standards Call," which is not supported.**

270.   Consistent with Scholl's recommendation in the Sept. 16 Standards Call, the 9/15 *All In* News Report had informed viewers that Wooten was "demoted" from her full time position at ICDC and claimed that this was "essentially punishment" for her statements. *See* ¶ 195, *supra*.

**CONTROVERTED.  The cited material does not support the contention that stating including *Ms. Wooten*'s contention that her demotion was "essentially punishment" for her statements was consistent with Mr. Scholl's recommendation, because the reporting tended to *add* weight to Ms. Wooten's credibility, whereas Mr. Scholl called for Mr. Hayes to note *problems* with Ms. Wooten's testimony—that she, the sole source for the allegations of mass, forced, unconsented-to, unauthorized hysterectomies, allegations that were controverted by other NBCUniversal sources, had an ax to grind in a personnel dispute.  Further, as discussed above in Paragraph 6, Ms. Wooten's *actual* whistleblower complaint, rather than the letter NBCUniversal repeatedly mischaracterizes as a "Whistleblower Complaint," alleges that she was demoted due to her whistleblowing on COVID conditions, not mass hysterectomies.**

271.   Consistent with Scholl's recommendation in the Sept. 16 Standards Call, the *All In* news report on September 16 made clear why it was reporting on the story now and why it was obscuring the identity of "B." Hayes Decl. Ex. 3 at NBCU003566-3567.

**CONTROVERTED.  The cited script of the September 16 program does not make clear why it is reporting on the story now, and explaining why it was obscuring the identity of B is not consistent with anything from Mr. Scholl's recommendation.**

272.   On September 16, 2020, *All In* aired portions of Hayes's interview with "B," and interviewed Congresswoman Sheila Jackson Lee, who claimed that she helped halt the

deportation of an ICDC detainee. *Id.*

**UNCONTROVERTED**

> ### *All In* – September 17, 2020[5]

273.    The FAC initially challenged five statements from the September 17, 2020 broadcast of *All In* (the "9/17 *All In* News Report"), *see* McNamara Decl. Ex. 1 (Statement Nos. 48-52), but three were dismissed in the Court's Rule 12(c) Order, *see* Order at 58.

**UNCONTROVERTED.  However, Dr. Amin maintains that dismissed statements are false and defamatory.**

274.    The remaining Challenged Statements from the 9/17 *All In* News Report are italicized below.

**UNCONTROVERTED**

275.    The 9/17 *All In* News Report, lasting just under 4 minutes, opens with Hayes stating: "*We've been bringing you the story of allegations of medical procedures performed on immigrant women without consent at an ICE detention facility in Georgia.*" Hayes Decl. Ex. 5 at NBCU000185; Ex. 4 at 00:34:50.

**UNCONTROVERTED**

276.    A banner displayed during the 9/17 *All In* News Report reads: "*Investigation ordered into claims of unneeded medical procedures on immigrant women.*"  Hayes Decl. Ex. 4.

**UNCONTROVERTED**

---

[5] **To the extent any of the contents of the broadcast are offered for the truth of the matters asserted, they are CONTROVERTED as discussed throughout.**



277.    When this banner is displayed, the 9/17 *All In* News Report displays on screen a headline from a *New York Times* article.  *Id.*

**UNCONTROVERTED**

278.    The 9/17 *All In* News Report then includes additional portions of Hayes's interview with "B" and discusses Dr. Amin's DOJ Complaint, including that it was "filed by two whistleblowers" and "alleged" that "many" pregnant women "were given unnecessary medical procedures to get more money out of Medicare and Medicaid through reimbursement."  Hayes Decl. Ex. 5 at NBCU000186; Ex. 34 at 00:35:23.

**UNCONTROVERTED**

279.    *All In* producers again contacted Dr. Amin's attorney and obtained comment from him concerning the DOJ complaint, and the comment was included in the 9/17 *All In* News Report. *See Id.*; McNamara Decl. Ex. 87.

**CONTROVERTED.  Mr. Hayes did not read the comment, omitting both the fact that Dr. Amin was one of "numerous physicians" at a local hospital who were sued and the fact that, "[i]mportantly, Dr. Amin was *not* required to pay any find in connection with**

that settlement." **McNamara Decl. Ex. 87.  Mr. Hayes summarized Dr. Amin's attorneys four-sentence statement into a single sentence, and he cast aspersions on the statement by following it with: "It does serve as a useful piece of context to allegations that are so horrific."  Hayes Decl. Ex. 5 at 15.**

280.    The FAC does not challenge the statements in the 9/17 *All In* News Report concerning the DOJ Complaint.

**UNCONTROVERTED**

281.    Hayes's producers worked with Standards in reporting the 9/17 *All In* News Report and understood that Standards had approved of the News Report.  Hayes Decl. ¶ 41; Scholl Decl. Ex. 11.

**CONTROVERTED.  The cited materials do not support NBCUniversal's contention that Mr. Hayes or his producers "understood that Standards had approved of the News Report;" Paragraph 41 of Mr. Hayes's declaration, a self-serving declaration, and Ex. 11 to Mr. Scholl's declaration do not discuss Mr. Soboroff and Ms. Ainsley's article *at all*, much less the thoughts of their producers, whose understanding could not be attested to by Mr. Hayes or Mr. Scholl.**

282.    Hayes and his producers had no doubt about the accuracy of the Challenged Statements from the 9/17 *All In* News Report. Hayes Decl. ¶¶ 44, 46, 48.

**CONTROVERTED.  The cited materials—self-serving declaration paragraphs from Mr. Hayes and not any other sources—do not support NBCUniversal's contention. Further, other facts controvert the contention, as discussed above, including at Paragraphs 62, 209, 263, and 267, Mr. Hayes expressed contemporaneous disbelief in the Statements, and Mr. Price spoke with multiple sources who cast doubt on the**

**Statements.**

**Media Continued to Report on the Whistleblower Allegations and Concerns with Dr. Amin's Care of ICDC Detainees**

283.    Between September 15 and September 17, 2020 (the same dates as the MSNBC News Reports), other news organizations also reported on the Whistleblower Complaint's allegations.

**UNCONTROVERTED.  However, as discussed in Paragraph 6, what NBCUniversal characterizes as a "Whistleblower Complaint" was not Dawn Wooten's actual whistleblower complaint but was a letter shared with media.**

284.    On September 15, 2020 at 11:18 PM ET, the *Washington Post* published an article, "Pelosi Demands Probe After ICE Nurse Raises Alarm Over Medical Care, Hysterectomies at Detention Center."  McNamara Decl. Ex. 88 (the "Washington Post Article").

**UNCONTROVERTED**

285.    The Washington Post Article referenced an interview with Priyanka Bhatt, a staff attorney at Project South.  It noted that Bhatt "acknowledged to The Washington Post that she did not speak to any women who had a forced sterilization, and said she included the allegations in the report with the intention of triggering an investigation into whether or not the claims were true." It goes on to quote Bhatt: "'I didn't speak to anyone who had one,' Bhatt said.  'But the things we have heard are concerning, and we need to find out more information.'"  *Id.* at NBCU001508.

**UNCONTROVERTED.  However, NBCUniversal's contention omits important portions of the Article, including that the article stated that ICE officials "denied that widespread**

hysterectomies were performed at Irwin," and that the letter "did not detail any detainees

who said they had received a hysterectomy against their will."  Doc. 136-90 at 2-3.  The

article does not mention Dr. Amin.

286.    In the Washington Post Article, Bhatt did not say that Wooten had never spoken

to detainees who had hysterectomies.  *Id.*

**UNCONTROVERTED**

287.    Other reporting on these days included:

a.  A September 15, 2020 article in *Douglas Now*, "Complaint Against Irwin County Detention Center Alleges Poor COVID-19 Protocols, Non-Consensual Hysterectomies." McNamara Decl. Ex. 89.

b.  A September 15, 2020 article in *Fox News*, "Georgia Prison with ICE Detainees Performs Questionable Hysterectomies, Shreds Coronavirus Records: Nurse." McNamara Decl. Ex. 90.

c.  A September 15, 2020 article in *Fox News Atlanta*, "Federal Complaint: Questionable Hysterectomies, Lack of Covid Test at Ga. Immigrant Detention Center." McNamara Decl. Ex. 91.

d.  A September 15, 2020 article in *Elle Magazine*, "ICE Whistleblower Says a 'Uterus Collector' Is Reportedly Performing Hysterectomies on Immigrant Women." McNamara Decl. Ex. 92.

e.  A September 16, 2020 article in *CNN*, "Whistleblower Alleges High Rate of Hysterectomies and Medical Neglect at ICE Facility." McNamara Decl. Ex. 93.

f.  A September 16, 2020 article in *The Wall Street Journal*, "U.S. Opens Investigation Into Claims of Forced Hysterectomies on Detained Migrants." McNamara Decl. Ex. 94.

g.  A September 16, 2020 article in *The New York Times*, "Inquiry Ordered into Claims Immigrants Had Unwanted Gynecology Procedures," on September 16, 2020 at 6:48 AM.  McNamara Decl. Ex. 95.

h.  A September 17, 2020 article in *The Hindustan Times*, "Outrage, Calls for Probe as US Nurse Raises Alarm Over Mass Hysterectomies." McNamara Decl. Ex. 96.

**UNCONTROVERTED that the articles appeared.  To the extent that any contents are offered for the truth of the matters asserted, they are CONTROVERTED as discussed throughout, and many of the articles do not mention Dr. Amin's name.**

288.    The reporting listed in Paragraph 287 is not an exhaustive account of all reporting on the allegations in the Whistleblower Complaint between September 15 and 17, 2020.

**CONTROVERTED.  There are no cited materials to support this contention.  Further, as discussed in Paragraph 6, what NBCUniversal characterizes as a "Whistleblower Complaint" was not Dawn Wooten's actual whistleblower complaint but was a letter shared with media.**

289.    On September 29, 2020, *The New York Times* published an article, "Immigrants Say They Were Pressured into Unneeded Surgeries."  This *New York Times* article reported that it interviewed sixteen women who were treated by Dr. Amin, gynecologists reviewed records from ICDC detainees, and found that Dr. Amin "seemed to consistently recommend surgical interventions, even when it did not seem medically necessary."  McNamara Decl. Ex. 95.

**UNCONTROVERTED.  However, NBCUniversal's contention omits important portions of the Article, including that "both ICE and the hospital in Irwin County have released data that show that two full hysterectomies have been performed on women detained at Irwin in the past three years."  Doc. 136-97 at 6.  To the extent that any contents are offered for the truth of the matters asserted, they are CONTROVERTED as discussed throughout.**

290.    On October 5, 2020, the *Atlanta Journal Constitution* published an article, "At

ICE detention center, red flag raised about gynecologist." This article reported, "[d]ozens" of detainees told Congress and lawyers that Dr. Amin "examined them so roughly they returned to jail bruised or bleeding." McNamara Decl. Ex. 97.

**UNCONTROVERTED. To the extent that any contents are offered for the truth of the matters asserted, they are CONTROVERTED as discussed throughout.**

291.    On October 7, 2020, *Roll Call* published an article, "5 Hysterectomies Referred from ICE Center, DHS Tells Congress." It reported that, according to DHS submissions to Congress, a total of five individuals from ICDC had been referred for hysterectomies. McNamara Decl. Ex. 98.

**UNCONTROVERTED. Dr. Amin's name is not used in this article. To the extent that any contents are offered for the truth of the matters asserted, they are CONTROVERTED as discussed throughout.**

292.    On October 23, 2020, the *Los Angeles Times* published an article, 19 Women Allege Medical Abuse in Georgia Immigration Detention." It alleged that "at least 19 women" claimed that Dr. Amin performed or pressured them to undergo "overly aggressive" or "medically unnecessary" surgeries without their consent. The article relied on a report written by nine board- certified OB-GYNs, who reviewed more than 3,200 pages of medical records for these women. McNamara Decl. Ex. 99.

**CONTROVERTED. To the extent that any contents are offered for the truth of the matters asserted, they are CONTROVERTED as discussed throughout, and particularly as inadmissible hearsay. For the reasons discussed in Dr. Amin's motion to exclude the expert testimony of Dr. Anderson (Doc. 123), Dr. Anderson's purported expert opinion, which is stated in the article, is inadmissible pursuant to the Court's gatekeeping role**

under Fed. R. Evid. 702 and *Daubert* and progeny.  Other facts controvert the contention.  Further, the "report" was an executive summary that did *not* involve the review of 3,200 pages of medical records.  *See* Doc. 123 at 5-10.  Finally, Dr. Anderson was noticed by NBCU only as a rebuttal witness and his testimony not in rebuttal to Dr. Amin's expert's should be excluded as argued in Dr. Amin's motion to exclude his testimony.  *See* Doc. 123 at 14-15.

293.    On June 5, 2021, the *Atlanta Journal Constitution* published an article "At Georgia Immigration Jail, Warnings About Women's Medical Care Went Unheeded," which reported that Dr. Amin billed ICE for "at least eight hysterectomies between 2017 and 2020" but two of those procedures were cancelled.  McNamara Decl. Ex. 100.

**UNCONTROVERTED.  To the extent that any contents are offered for the truth of the matters asserted, they are CONTROVERTED as discussed throughout.**

294.    There were also multiple subsequent articles in Georgia local news outlets concerning the allegations in the Whistleblower Complaint, including:

> a. A September 23, 2020 article in *The Ocilla Star*, "Demonstrators Hold Rally outside of Irwin Detention Center Whistleblower Complaint Leads to Protest in Ocilla." McNamara Decl. Ex. 101.
>
> b. A September 30, 2020 article in *The Ocilla Star*, "Irwin County Hospital Issues Statement on Irwin County Detention Center Allegations." McNamara Decl. Ex. 102.
>
> c. A November 16, 2022 article in *Douglas Now*, "Migrant Women Endured Medical Mistreatment at Georgia ICE Facility, U.S. Senate Report Finds," on November 16, 2022.  McNamara Decl. Ex. 103.
>
> d. A November 23, 2022 article in *The Ocilla Star*, "Revelations Against Dr. Amin, ICDC Come to Light In Senate Report."  McNamara Decl. Ex. 104.

**CONTROVERTED.  The material cited in Paragraph 294(d) does not match that of**

**McNamara Decl. Ex. 104. To the extent that any contents are offered for the truth of the matters asserted, they are CONTROVERTED as discussed throughout.**

295.    The reporting identified in Paragraphs 285-294 is not an exhaustive account of all reporting on the Whistleblower Complaint between September 17, 2020 and the present.

**CONTROVERTED. There are no cited materials to support this contention. Further, as discussed in Paragraph 6, what NBCUniversal characterizes as a "Whistleblower Complaint" was not Dawn Wooten's actual whistleblower complaint but was a letter shared with media.**

296.    Dr. Amin has not sued any of the news organizations identified in Paragraphs 285- 294 concerning these news reports.

**CONTROVERTED. There are no cited materials to support this contention.**

### Putative Class Action Lawsuit Filed Against Dr. Amin

297.    On November 9, 2020, Yanira Yesenia Oldaker, a former ICDC detainee, filed a Petition for Writ of Habeas Corpus and Temporary Restraining Order against Kenneth Cuccinelli, and others. *See* Oldaker Decl. 7:20-cv-00224-WLS (Dkts. 1-2).

**UNCONTROVERTED that an action was filed. The allegations therein are controverted to the extent they are offered for the truth of the matters asserted, as stated throughout and with more particularity below in Paragraph 302.**

298.    On December 21, 2020, an amended Petition for Writ of Habeas Corpus and Emergency Motion for Temporary Restraining Order was filed by Oldaker, Tatyana Alekseyevna Solodkova, Luz Adriana Walker, Lourdes Terrazas Silas, Jaromy Jazmin Floriano Navarro, Mbeti Victoria Ndonga, Keynin, Jacquelin Reyes Ramirez, Ana Gabriela Adan Cajigal, and Jane Does #5, 8, 15, and 22, on behalf of themselves and other similarly situated.

7:20-cv-00224-WLS  (Dkt. 54, 56 (the "Consolidated Complaint" or "Putative Class Complaint")).

**UNCONTROVERTED that an amended petition was filed.  The allegations therein are controverted to the extent they are offered for the truth of the matters asserted, as stated throughout and with more particularity below in Paragraph 302.**

299.   The Consolidated Complaint named several defendants, including Dr. Amin.  *Id.*

**UNCONTROVERTED that the complaint named many defendants, including Dr. Amin. The allegations therein are controverted to the extent they are offered for the truth of the matters asserted, as stated throughout and with more particularity below in Paragraph 302.**

300.   The Consolidated Complaint included counts for medical battery and medical malpractice against Dr. Amin.  *Id.*

**UNCONTROVERTED that the complaint contained numerous counts, including counts for medical battery and malpractice.  The allegations therein are controverted to the extent they are offered for the truth of the matters asserted, as stated throughout and with more particularity below in Paragraph 302.**

301.   On December 1, 2022, *Oldaker* petitioners filed a second amended Consolidated Petition for Writ of Habeas Corpus—which is now the operative complaint in the *Oldaker* action (the "*Oldaker* Complaint").  7:20-cv-00224-WLS (Dkt. 210); McNamara Decl. Ex. 105.

**UNCONTROVERTED that an action was filed.  The allegations therein are controverted to the extent they are offered for the truth of the matters asserted, as stated throughout and with more particularity below in Paragraph 302.**

302.    The *Oldaker* Complaint alleges, among other things:

    a.    "Plaintiffs were victims of non-consensual, medically unindicated and/or invasive gynecological procedures, including but not limited to unnecessary surgical procedures under general anesthesia, performed by and/or at the direction of Defendant Amin." *Id.* ¶ 62

    b.    Dr. Amin performed a transvaginal ultrasound on Ms. Oldaker.  "A survivor of extreme sexual violence, Ms. Oldaker described it as feeling like she was 'being raped again.'" *Id.* ¶ 145.

    c.    Dr. Amin "performed gynecological procedures . . . without obtaining consent for those procedures." *Id.* ¶ 843.

**UNCONTROVERTED that these paragraphs appear in the complaint.  However, to the extent that NBCUniversal relies on Paragraph 302 for the truth of the matters asserted in these pleadings, Doc. 127 at 21, the contentions are CONTROVERTED.  Other facts controvert NBCUniversal's contentions, including, as discussed herein, the expert testimony of Dr. Bills, testimony of Dr. Amin and those who provided medical care with Dr. Amin, and informed consent forms signed by Dr. Amin's patients who were detained by ICE at ICDC.  *See, e.g.*, Ex. LL, Patient Consent forms for PB; Ex. MM, Patient Consent Forms for MCR; Ex. NN, Patient Consent forms for YRJ.  Dr. Amin has never performed surgery without patient consent, he always obtains informed consent from his patients, and multiple personnel in the hospital confirm that the patient understands the procedures they are going through.  Ex. AA, Amin Depo. 41:14-19, 42:19-20, 47:19-48:9, 288:24-289:2.  Consent forms had "to go through several hands before Dr. Amin proceeding with surgery," including hospital staff, the anesthesiologist, and Dr. Amin.  Ex. BB, Nito Depo. 98:7-16.  Dwayne Peal, a nurse at the Irwin County Hospital, testified that, when a patient "needed a procedure, then the doctors and the nurses would go over it, anesthesia will go over it making sure that the patient understood everything that was**

going on." Doc. 122-6, Peal Depo. 51:5-11, 68:7-20.  Mr. Peal testified that, whenever he

was present at a procedure being conducted by Dr. Amin, "he always explained what was

what to his patients." Doc. 122-6, Peal Depo. 72:5-10.  Alma Arceo, office manager for Dr.

Amin's practice, confirmed that Dr. Amin obtained informed consent from all patients

before performing surgeries on them.  Ex. CC, Arceo Depo. 12:9-11, 46:19-24.  Further, the

materials cited are not capable of being reduced to admissible evidence.  NBCUniversal's

only supporting materials are pleadings in another case.  But "pleadings are only

allegations, and allegations are not evidence of the truth of what is alleged." *Wright v.

Farouk Sys., Inc.*, 701 F.3d 907, 911 n.8 (11th Cir. 2012).  Accordingly, on its motion for

summary judgment, NBCUniversal "cannot rely on the pleadings filed by other plaintiffs

in other cases." *Id*.  To the extent that the complaint allegations could be attributed to the

evidence of women detained by ICE at ICDC, which it cannot, Mr. Soboroff testified that

some women who made allegations against Dr. Amin were no longer subject to deportation,

and that being able to stay in the country was a goal for many of the women detained by

ICE at ICDC. Ex. G, Soboroff Depo. 79:1-24.  Further, none of the plaintiffs allege that

they had a hysterectomy at all.  Finally, once a patient who was detained by ICE at ICDC

decided to do a surgery and before the surgery was done, ICE had to approve or

disapprove the surgery.  Ex. AA, Amin Depo. 57:9-22.  At the hospital prior to surgery,

multiple hospital personnel independently verified that surgery was approved.  Ex. AA,

Amin Depo. 42:23-43:18, 57:23-58:3.  Dr. Amin has never performed surgery without

patient consent, he always obtains informed consent from his patients, and multiple

personnel in the hospital confirm that the patient understands the procedures they are

going through.  Ex. AA, Amin Depo. 41:14-19, 42:19-20, 47:19-48:9, 288:24-289:2.  Maria

Nito, Dr. Amin's surgical coordinator, testified that ICE authorization was required for all procedures on patients detained by ICE at ICDC. Ex. BB, Nito Depo. 17:8-12, 72:1-18. Further, Dr. Amin has provided a sworn statement that his examinations and other in-office treatment did not cause bruising in any ICDC patients and that he produced to NBCUniversal documents documenting the necessity of the procedures he provided, others involved in the medical care of patients with Dr. Amin provided sworn testimony that he was never rough, and ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Ex. I, Amin Decl. ¶¶ 5-9; Ex. J, Ray Affidavit ¶ 3; Ex. K, Nito Affidavit ¶ 8; Ex. L, Hutchison Affidavit ¶¶ 15-16; Ex. M, Paulk Depo. 148:6-154:5. Particularly in the face of such controverting evidence, there are credibility issues that a jury should weigh as to women who are incentivized to make allegations against Dr. Amin.

303.    Discovery in *Oldaker* remains stayed until at least January 29, 2024, as government defendants have informed the Court that a "criminal investigation remains ongoing" concerning the allegations in the lawsuit and the Court has found the "Federal Defendants' reasons for requesting an extension of the stay are compelling: the claims in this case and the ongoing criminal investigation concern the same alleged violations" [ECF No. 179 at 2]. *See* McNamara Decl. Ex. 144.

CONTROVERTED. The materials cited, two status reports filed by parties to the litigation including one requesting a stay until January 29, 2024, but no orders of the *Oldaker* court, do not support NBCUniversal's contentions.

304.    In his deposition, Dr. Amin testified ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮  McNamara Decl. Ex. 3 at 42:2-45:9; 171:19-175:1.

**UNCONTROVERTED** ████████████████████████████

████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████

**Dr. Amin Demands Retraction of Some of the MSNBC News Reports**

305.    In a letter dated August 26, 2021 (eleven months after the MSNBC News Reports were aired) counsel for Dr. Amin demanded that MSNBC "retract the broadcasts," including specific statements from "Deadline" that aired on or about September 15, 2021 [sic], "All In with Chris Hayes that aired on or about September 15, 2021" [sic], "All In with Chris Hayes that aired on or about September 16, 2021" [sic], and "The Rachel Maddow Show [that] aired on or about September 16, 2021" [sic] ("Plaintiff's Claim Letter").  McNamara Decl. Ex. 108.

**UNCONTROVERTED**

306.    The references to "2021" in Plaintiff's Claim Letter were intended to be "2020."

**UNCONTROVERTED**

307.    Plaintiff's Claim Letter was sent pursuant to O.C.G.A. § 51-5-11 and states that it constitutes "written notice" that the statements identified in the Letter are "false, defamatory, and libelous and/or slanderous per se and furthermore, constitute defamation by implication." *Id.*

**UNCONTROVERTED**

308. Plaintiff's Claim Letter closed by stating that "if MSNBC fails to meet the demands of this letter on or before September 7, 2021, Dr. Amin is prepared to pursue all available legal remedies." *Id.*

**UNCONTROVERTED**

309. Plaintiff's Claim Letter did not include any demand or claims arising out of the 9/17 *All In* News Report. *Id.*

**CONTROVERTED.  The materials cited do not support NBCUniversal's contention. Although the claim letter contained in McNamara Decl. Ex. 108 does not identify specific statements from the 9/17 episode of All In with Chris Hayes, it specifies that it concerns "news broadcasts regarding Dr. Mahendra Amin aired on MSNBC on Deadline with Nicolle Wallace, All In with Chris Hayes, and The Rachel Maddow Show beginning on September 15."  McNamara Decl. Ex. 108 at 2.**

310. Plaintiff's Claim Letter was the first notice that NBCU received that Dr. Amin challenged the specific statements identified, demanded the MSNBC News Reports be retracted, or contemplated litigation.  Wallace Decl. ¶ 40; Maddow Decl. ¶ 50; Hayes Decl. ¶ 52.

**CONTROVERTED.  The multiple statements provided by Mr. Grubman discussed in Paragraphs 265 and 279 gave NBCUniversal such notice.**

311. NBCU did not retract the news reports enumerated in Plaintiff's Claim Letter.

**UNCONTROVERTED**

312. During his deposition, when asked if he knew the names of the programs over which he was suing, Dr. Amin testified:  "I think one is Rachel Maddow or something" and "I Think Chris, I don't know his last name."  McNamara Decl. Ex. 3 at 22:2-25.

**UNCONTROVERTED**

313.    During his deposition, Dr. Amin testified that he had never heard of *Deadline*,

did not know the host of *Deadline*, and did not know when *Deadline* airs. *Id.* at 23:10-18.

**UNCONTROVERTED**

314.    During his deposition, when asked if he "ever watched the videos of the[]

programs that [he is] challenging in this action," Dr. Amin testified: "Some, not much." *Id.* at

29:3-7.

**UNCONTROVERTED**

### The Present Action

315.    Dr. Amin filed his initial complaint in this action on September 9, 2021. *See*
Dkt. 1. After NBCU moved for judgment on the pleadings, Dr. Amin filed the
FAC, which is the operative complaint in this action. *See* Dkt. 49.

**UNCONTROVERTED**

316.    The FAC challenged fifty-two statements from the September 15-17 episodes of

*All In*, the September 15 episode of *TRMS*, and the September 15 episode of *Deadline*.

McNamara Decl. Ex. 1.

**CONTROVERTED to the extent social media posts are not included.**

317.    Following another Rule 12(c) motion from NBCU, the Court dismissed sixteen

of the Challenged Statements. This includes all of the Challenged Statements from the

September 16 episode of *All In*, and select statements from the *Deadline* News Report and the

9/17 *All In* News Report. McNamara Decl. Ex. 1.

**UNCONTROVERTED**

318.    The FAC also alleges that "MSNBC and its reporters repeated their false and

defamatory statements of and concerning Dr. Amin on Twitter on at least three occasions on September 16, 2020 and September 22, 2020." FAC ¶ 89.

**UNCONTROVERTED**

319.    On March 18, 2022, NBCU served its first set of Interrogatories to Dr. Amin. Interrogatory No. 1 requested, "With regard to the News Report (or any other publication at issue in the Complaint), identify each statement of fact that You claim is false and defamatory of You." *See* McNamara Decl. Ex. 109.

**UNCONTROVERTED**

320.    On April 18, 2022, Dr. Amin responded that "Plaintiff states that he will produce the tweets set forth in Paragraph 81 of the Complaint [now Paragraph 89 of the FAC]. Those tweets are false and defamatory, and Plaintiff seeks damages for same." McNamara Decl. Ex. 110.

**UNCONTROVERTED**

321.    Dr. Amin did not produce any Tweets to substantiate this claim during discovery.

**CONTROVERTED that Dr. Amin did not produce such Twitter posts.  The Twitter posts and Facebook posts were already produced, using NBCU's own documents that it had produced to Dr. Amin, and discussed during the deposition of Mr. Hayes.  Doc. 122-29; Doc. 122-30; Doc. 122-31.**

**Discovery Concerning Informed Consent**

322.    Dr. Amin produced medical records from his treatment of ICDC detainees in this action. The medical records that Dr. Amin produced show ████████████████████ ████████████████████████████████████████████████ ████████████████████. *See* McNamara Decl. Exs 111-15.

**CONTROVERTED.** ███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

323.    Dr. Amin admits ███████████████████████████████

███████████████████████████████████████████████████

████ McNamara Decl. Ex. 3 at 66:7-84:12.

**UNCONTROVERTED.**

324.    Medical records that Dr. Amin produced in this action ██████████

████████████████████████████████████████████████████

███████████████████████████████████████████████

████. *See* McNamara Decl. Ex. 113 at AMIN_007969-70, Ex. 114 at AMIN_002204-06._

**CONTROVERTED that** ████████████████████████████████████████

███████████████████████████████████.

325.    Maria Nito, Dr. Amin's surgical coordinator, was ████████████████

██████████████████████████████████████████. *See*

McNamara Decl. Ex. 111 at AMIN_007071-72, Ex. 112 at AMIN_004473-74, Ex. 113 at

AMIN_007969-70, Ex. 114 at  AMIN_002204-06.

**UNCONTROVERTED**

326.    Nito did not go to the hospital as part of her job.  McNamara Decl. Ex. 19 at

29:21- 23; Ex. 3 at  50:9-23; 52:7-10.

**UNCONTROVERTED**

327.    Nito also ████████████████████████████. During her deposition, she

testified ████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████. McNamara Decl. Ex. 19 at 103:6-

104:14; Ex. 3 at 59:12-23.

**UNCONTROVERTED**

328.   Nito testified ███████████████████████████████████

██████ . McNamara Decl. Ex. 19 at 104:15-19.

**UNCONTROVERTED**

329.   Nito ██████████████████████████████████████████

█████████ . McNamara Decl. Ex. 19 at 104:15-24; Ex. 3 at 59:12-23.

**UNCONTROVERTED that** ████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████

█████████████████████████████████████████████



330. ████████████████████████████████████
████████████████████████████████████████████. *See* McNamara

Decl. Ex. 111 at AMIN_007071-72, Ex. 19 at 104:25-105:3.

**UNCONTROVERTED**

331.    Dr. Amin's informed consent forms were only kept in English.  McNamara

Decl. Ex. 19 at 106:20-25; Ex. 3 at 58:20-61:11.

**UNCONTROVERTED.  However, Dr. Amin had staff who spoke Spanish, and a language
line was available for consulting with women detained by ICE at ICDC for explaining the
procedures.  Ex. K, Nito Affidavit ¶¶ 4-5; Ex. L, Hutchison Affidavit ¶¶ 11-13; Ex. CC,
Arceo Depo. 36:3-39:15.**

332.    Dr. Ted Anderson ████████████████████████████████

██████████████████████████████████████████████ testified in this action ████

████████████████████████████████████████████

██████████████████ McNamara Decl. at 31:13-23

**CONTROVERTED.** ████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████

**ICDC Detainees Testified That They Did Not Understand the Procedures Dr. Amin Performed On Them, And That the Procedures Were Painful, Unconsented-to, and Unnecessary**

333.    One former ICDC detainee, LW, testified ████████████████████

███████████████████████████████████████████

████. McNamara Decl. Ex. 117 at 58:3-12; *see also id* at 64:1-9 ██████

████████████████████████████████████████████

**UNCONTROVERTED that** ████████████████████████████████

██████████████████████████ **but CONTROVERTED to** ████████

████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████

███████████

334.    LW testified ███████████████████████████████

████████████████████████████████████████████████

████████ *Id.* at 66:5-19; 66:20-67:4

**UNCONTROVERTED that** ████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████████

████████████████████████████████████████████

154

██████████████

335. LW testified that ████████████████████████████
████████████████████████████████████████████████
██████████████████████████ *Id.*

**CONTROVERTED.** ███████████████████████████████
████████████████████████████████████████████████
███████████████████████████████████████████
██████████████ **McNamara Decl. Ex. 117 at 54:13-16.**

336. LW testified that ████████████████████████████
█████████████████████████████████. *Id.* at 137:9-15.

**CONTROVERTED.** ███████████████████████████████
███████████████████████████████████████
████████████████████████████████████████████
█████████████████████████████████
███████████████████████████████████████
███████████████████████████████████
████████████████████████████████████████████
██████████████████████████████

337. When asked, LW testified that ████████████████████
████████████████████████████████ *Id.* at 175:6-13

**UNCONTROVERTED**

338. Another former ICDC detainee, MCR, testified ███████████████
████████████████████████████████████████████████

████████████████. McNamara Decl. Ex. 118 at 72:5-10.  She testified that ██████████████

████████████████████████████████ *Id.* at 75:20-25; 81:7-10.  She testified that ████

██████████████████████████████████████████████████████████████████████████████

*Id.* at 97:3-5.  She was told ███████████████████████ *Id.* at 98:10-12.  She now

believes ██████████████████████████████████████████████████████████████

████████ *Id.* at 100:17-23.

**CONTROVERTED.** ████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████

339.    MCR testified that ██████████████████████████████████████

██████████████████████████████████████████████████████████ *Id.* at 69:7-

13. She also testified that █████████████████████████ *id.* at 76:14-20; 188:2-9, and

████████████████████████████████████ *id.* at 188:23-189:9.

**UNCONTROVERTED, but CONTROVERTED as to** ████████████████████.

340.    Another former ICDC detainee, KJRR, testified that ██████████████████████

██████████████████████████████████████. McNamara Decl. Ex. 119 at 18:24-

19:5. She testified that ███████████████████████████████████

███████████████████████████████████████████████████

███████ *Id.*. at 29:8-21.  She testified that ███████████████████ *Id.*  She testified ████

███████████████████████████████████████████████████

███████████████" *Id*. at 32:6-12.  She testified that ███████████████████████

███████████████████████████████████████ *Id.* at 32:13-21.

**CONTROVERTED.** █████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████

341.   KJRR described █████████████████████████████ *Id.* at 31:21-25;

42:19-43:7

**CONTROVERTED.** █████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████

342.   KJRR also described ██████████████████████████ *Id.* at 41:1-5.  She

testified ███████████████████████████████████████

157

███████████████████████████████ *Id.* at 41:9-24.  She testified that, █████████

███████████████████████████████████████████████████

*Id.*

**CONTROVERTED.** ████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████

████████████████████████████████

████████████████████████████████

███████████████████████████████

    343.    KJRR testified that ████████████████████████████

████████████████████████████████████████

████████████████████████████ *Id.*  at 56:1-7.  She testified ███████████

████████████████████████████████████████

████████████████████████████████ *Id.*  at 155:14-21

**CONTROVERTED.** ████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████████

██████████████████████████████████████

████████████████████████████████

███████████████████████████████

████████████████████

344.    Another former ICDC detainee, KP, testified that ███████████████

███████████████████████ McNamara Decl. Ex. 120 at 32:6-18, ██

███████████████████████ *Id.* at 102:13-103:6.

██████████████████████████████ *Id.*

██████████████████████████ *Id.* at

104:2-6

**CONTROVERTED.** ████████████████

████████████████████████████

███████████████████████████

█████████████████████████████

███████████████████████████

████████████████████████████

█████████████████████████████

███████████████████████████

██████████████████████████████

███████████████████████████

██████████

345.    KP testified that ██████████████████ *Id.* at 43:20-22.

She also testified that █████████████████████

███████████████████████████

█████████████ *Id.* at 94:11-23; *see also id.* at 41:17-42:11.

**CONTROVERTED.** ████████████████

████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████

████████████████████

346.    Another former ICDC detainee, YRJ, testified that ████████████████████ ██████████████████████████████████ McNamara Decl. Ex. 121 at 104:3-8.  She testified that, ████████████████████████ ████████████████████████████████ *Id.* at 189:12-190:3; *see also id.* at 210:4-14.]  She also testified that ████████████ ████████████ *Id.* at 194:10-14.  YRJ, who is not fluent in English, testified that ████████████████████████ *Id.* 213:8-16.

**CONTROVERTED.** ████████████████████████████████

██████████████████████████████████

████████████████████████████████

████████████████████████████████████

████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████

██████████████████████████████████

██████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████████████

█████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████

347.    Another former ICDC detainee, BPR, ███████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████ McNamara Decl.

Ex. 123 at 113:1-16, 114:7-24, 144:22-145:19, 172:12-22.

**CONTROVERTED** ████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████████



348. Another former ICDC detainee, PB, testified that ███████ ███████████████████████████████ McNamara Decl. Ex. 123 at 125:4-20; 164:3-165:7. She testified that, ████████████████████████ ████████████████████████████████ *Id.* at 58:5-17. She testified that ██████████████████ *Id.* at 69:8-15.  She testified that ████████████████████████ ███████████████████████████████ *Id.* at 208:12-209:13; 210:15-211:3.

**CONTROVERTED.** ████████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████

349.   Two detainees testified that ████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████ *See*

McNamara Decl. Ex. 119 at 73:20-74:17, 76:18-77:3, 77:13-17, 78:13-79:4, 98:15-25; Ex. 123

at 59:13-60:20; 61:16-62:2, 62:9-63:8.

**CONTROVERTED.** ██████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████

350.    Dr. Amin's patients' medical records ██████████████████████

██████████████████████████████████ McNamara Decl. Exs. 124-

126; Ex. 33 at 97:7-99:9.

**CONTROVERTED.** ██████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████



**Multiple Doctors Conclude That Dr. Amin Performed "Unnecessary" Procedures on ICDC Detainees**

351.     Dr. Amin's counsel has stated in a public filing that the "gist" of the MSNBC

News Reports is that Dr. Amin "conducted unnecessary and unconsented-to medical

procedures on detainees at the Irwin County Detention Center (ICDC), including large

numbers of hysterectomies." McNamara Decl Ex. 127.

**UNCONTROVERTED that the above quotations appear in the cited material.  However, to the extent NBCUniversal relies on segments of a sentence in a filing in a different matter for the contention that "Dr. Amin acknowledges" that his lawsuit is about "unnecessary medical procedures,"** *only***, Doc. 127 at 19, the cited materials do not support the contention.  "Statements by counsel in briefs are not evidence."** *Travaglio v. Am. Exp. Co.***, 735 F.3d 1266, 1270 (11th Cir. 2013) (quotation marks omitted).  Other facts controvert NBCUniversal's contention.  The very first paragraph of Dr. Amin's original and Amended Complaints state: "This Complaint arises from a series of MSNBC broadcast segments that contain multiple false and defamatory statements of and concerning a private figure, Dr. Mahendra Amin, M.D., that accuse him of performing mass hysterectomies that were not medically necessary on immigrant women detained at the Irwin County Detention Center ('ICDC')."  Doc. 1 ¶ 1; Doc. 49 ¶ 1.  Statements challenged include, over and over, allegations of mass hysterectomies without medical necessity, authorization, or consent: "High number of hysterectomies at ICE Detention Ctr.," "unnecessary hysterectomies," "uterus collector," "everybody this doctor sees has a hysterectomy," Doc. 49 ¶¶ 75-89.  The specific filing NBCUniversal cites was in a discovery dispute in another court, addressing the need to depose women NBCUniversal had identified in its initial disclosures that they planned to rely upon for their claims that unnecessary procedures occurred.** *See* **McNamara Decl. Ex. 127 at 2, 5.**

352.    In his deposition, Dr. Amin stated that "performing even one unnecessary invasive medical procedure would be excessive." McNamara Decl. Ex. 3 at 196:20-24.

**UNCONTROVERTED**

353.    During his deposition, when asked whether two doctors might have a different view about whether a D&C is necessary for a particular patient, Dr. Amin responded:

███████████████████████████████████████████████████████████████

████████████████████████████████████████████████████ *Id.* at 184:11-21.

**UNCONTROVERTED as to** ████████████████████████████████████████

**However, CONTROVERTED to** ████████████████████████████████████

███████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████

354.    During his deposition, Dr. Amin stated that ████████████████████

████████████████████████████████████████████ *Id.* at 201:10-14.

**CONTROVERTED.** ███████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████

███████████████████████████████████████

███████████████████████████████████

████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████

███████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████

355.    Dr. Amin's retained two experts in this case, Dr. Elbridge Bills and Dr. Laura Hamilton. *See* McNamara Decl. Exs. 130-131.

**UNCONTROVERTED**

356.    During his deposition, Dr. Bills testified that ████████████████████████

██████████████████████████████████████████

████████ McNamara Decl. 132 at 82:9-22.

**CONTROVERTED.** ████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████

357.    During his deposition, Dr. Bills testified that ██████████████████████

███████████████████████████████████████████████

███████████████████████

**UNCONTROVERTED.  However, CONTROVERTED to** █████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████



358.    At least four doctors have concluded, based on reviewing medical records of ICDC detainees, including for purposes other than the present litigation, that Dr. Amin performed "unnecessary" gynecological surgeries. *See* McNamara Decl. Exs. 67, 128, 133, 135, 136.

**CONTROVERTED.  The cited materials cannot be reduced to an admissible form.  For the reasons discussed in Dr. Amin's motions to exclude the expert testimony of Dr. Anderson (Doc. 123) and Dr. Carey (Doc. 124), those witnesses' expert opinion is inadmissible pursuant to the Court's gatekeeping role under Fed. R. Evid. 702 and *Daubert* and progeny.  NBCUniversal never provided notice of the other two doctors to which the cited materials refer, and accordingly they must be excluded pursuant to Fed. R. Civ. P. 26(a)(2)(A): "In addition to the disclosures required by Rule 26(a)(1), a party must disclose to the other parties the identity of any witness it may use at trial to present evidence under Federal Rules of Evidence 702, 703, or 705."  "If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the**

failure was substantially justified or is harmless."  Fed. R. Civ. P. 37(c)(1); *see also Cedant v. U.S.*, 75 F.4th 1314, 1321 (11th Cir. 2023) ("So if a witness does *not* need to file a Rule 26(a)(2)(B) report, then a party *does* need to file a Rule 26(a)(2)(C) disclosure on her behalf.").  Further, to the extent NBCUniversal offers the materials for the truth of the matter stated therein, Doc. 127 at 19, other facts controvert the contention.  ████████

████████████████████████████████████████████████████████████

██████████████████████  Doc. 139-7, Bills Depo. 49:21-24.  Dr. Elbridge Bills concluded that, based on his review of patient charts: "In summary, it appears that Dr. Amin has been providing appropriate care to this high-risk indigent population and has not performed any unnecessary medical procedures."  Doc. 123-2, Plaintiff's Service of Expert Witness Reports (Sept. 5, 2023), at 16; Doc. 123-4, Plaintiff's Service of Expert Witness Reports in Reply of Carey Rebuttal.  ████████████████████████████████████████

██████████████████████████████████████████████████████  Ex. TT, Hamilton Depo. 16:20-23, 17:10-24, 19:6-12.  ██████████████████████████

███████████████████████████████████████████████

██████████████████████  Ex. TT, Hamilton Depo. 108:6.  ██████████████████

███████████████████████████████████████████████

████████  Ex. TT, Hamilton Depo. 94:15-17.  Dr. Amin testified to the accuracy of the statement, "Dr. Amin has never performed a medically unnecessary procedure."  Ex. AA, Amin Depo. 190:6-13.  Further, Dr. Amin provided a sworn statement that he was never rough or caused bruising to his ICDC patients, that he produced all medical records as to his ICDC patients to NBCUniversal, and that such documents note his observations and the patients' conditions which informed his decisions that the procedures he

performed were medically necessary.  Ex. I, Amin Decl. ¶¶ 5-9.  Further, the cited materials coming from the "Senate report" cannot be reduced to an admissible form.  The conclusions stated in Paragraph 380 are based on a mere collection of statements by witnesses, not the report preparer's "own observations and knowledge," and accordingly must be excluded as hearsay to which the public report exception doe not apply.  *See United Tech. Corp. v. Mazer*, 556 F.3d 1260, 1278 (11th Cir. 2009) ("Placing otherwise inadmissible hearsay statements by third-parties into a government report does not make the statements admissible."  (some punctuation marks altered)); *id.* ("Hearsay within hearsay subject to an exception is not admissible.").  The executive summary of the Senate Report is prefaced by: "According to expert medical analysis conducted *for* the Subcommittee."  McNamara Decl. Ex. 68 at 10 (emphasis supplied).  Accordingly, the findings NBCUniversal highlights are not the findings *of* the Senate Subcommittee but rather are "a *collection* of statements" from witnesses *to* the Senate Subcommittee.  *Mazer*, 556 F.3d at 1278.  Finally, these contents of the Senate Report are inadmissible hearsay not subject to the public records exception, because testimony of Dr. Amin and others who provided medical care to women detained by ICE at ICDC demonstrates that the contents lack trustworthiness.  Fed. R. Evid 803(8).

359.    Dr. Erin Carey, the expert retained by NBCU, concluded based on a review of medical records produced by Dr. Amin in this case, that "Dr. Amin consistently acted in a surgically aggressive manner, performing unnecessary surgeries and failing to provide patients alternative medical therapies."  McNamara Decl Ex. 128 at 13.

CONTROVERTED.  The cited materials cannot be reduced to an admissible form.  For the reasons discussed in Dr. Amin's motion to exclude the expert testimony of Dr. Carey

(Doc. 124), Dr. Carey's expert opinion is inadmissible pursuant to the Court's gatekeeping role under Fed. R. Evid. 702 and *Daubert* and progeny.  Further, to the extent NBCUniversal offers the materials for the truth of the matter stated therein, Doc. 127 at 19, other facts controvert the contention.  ████████████████████████████

████████████████████████████████████████████████████████

Doc. 139-7, Bills Depo. 49:21-24.  Dr. Elbridge Bills concluded that, based on his review of patient charts: "In summary, it appears that Dr. Amin has been providing appropriate care to this high-risk indigent population and has not performed any unnecessary medical procedures."  Doc. 123-2, Plaintiff's Service of Expert Witness Reports (Sept. 5, 2023), at 16; Doc. 123-4, Plaintiff's Service of Expert Witness Reports in Reply of Carey Rebuttal.  ██████████████████████████████████████████

████████████████████████████████████████████  Ex. TT, Hamilton Depo. 16:20-23, 17:10-24, 19:6-12. ████████████████████████

████████████████████████████████████  Ex. TT, Hamilton Depo. 108:6. ██████████████████████████████████████

████████████████████████  Ex. TT, Hamilton Depo. 94:15-17.  Dr. Amin testified to the accuracy of the statement, "Dr. Amin has never performed a medically unnecessary procedure."  Ex. AA, Amin Depo. 190:6-13.  Further, Dr. Amin provided a sworn statement that he was never rough or caused bruising to his ICDC patients, that he produced all medical records as to his ICDC patients to NBCUniversal, and that such documents note his observations and the patients' conditions which informed his decisions that the procedures he performed were medically necessary.  Ex. I, Amin Decl. ¶¶ 5-9.

360.    Dr. Carey opined that Dr. Amin "routinely interpret[ed] normal physiology as pathology" and then "use[d] his interpretation to justify surgically aggressive behavior." *Id.* at 2.

**CONTROVERTED.  The cited materials cannot be reduced to an admissible form.  For the reasons discussed in Dr. Amin's motion to exclude the expert testimony of Dr. Carey (Doc. 124), Dr. Carey's expert opinion is inadmissible pursuant to the Court's gatekeeping role under Fed. R. Evid. 702 and *Daubert* and progeny.  Further, to the extent NBCUniversal offers the materials for the truth of the matter stated therein, Doc. 127 at 19, other facts controvert the contention.** ████████████████████

████████████████████████████████

████████████   **Doc. 139-7, Bills Depo.  49:21-24.  Dr. Elbridge Bills concluded that, based on his review of patient charts: "In summary, it appears that Dr. Amin has been providing appropriate care to this high-risk indigent population and has not performed any unnecessary medical procedures."  Doc. 123-2, Plaintiff's Service of Expert Witness Reports (Sept. 5, 2023), at 16; Doc. 123-4, Plaintiff's Service of Expert Witness Reports in Reply of Carey Rebuttal.** ███████████████████

████████████████████████████████

████   **Ex. TT, Hamilton Depo. 16:20-23, 17:10-24, 19:6-12.** ████████████████

████████████████████████████   **Ex. TT, Hamilton Depo. 108:6.** █████████████████████

███████████████████████   **Ex. TT, Hamilton Depo. 94:15-17.  Dr. Amin testified to the accuracy of the statement, "Dr. Amin has never performed a medically unnecessary procedure."  Ex. AA, Amin Depo. 190:6-13.**

**Further, Dr. Amin provided a sworn statement that he was never rough or caused bruising to his ICDC patients, that he produced all medical records as to his ICDC patients to NBCUniversal, and that such documents note his observations and the patients' conditions which informed his decisions that the procedures he performed were medically necessary.  Ex. I, Amin Decl. ¶¶ 5-9.**

361.    Dr. Carey opined that Dr. Amin "consistently removed follicular cysts that did not need to be removed" because they "almost always resolve on their own within a few menstrual cycles without the need for surgical or medical treatment." *Id.* at 4, 13.  Dr. Carey opined that of the thirty-eight ovarian cystectomies that Dr. Amin performed, only two were potentially medically necessary. McNamara Decl. Exs. 129, 133.

**CONTROVERTED.  The cited materials cannot be reduced to an admissible form.  For the reasons discussed in Dr. Amin's motion to exclude the expert testimony of Dr. Carey (Doc. 124), Dr. Carey's expert opinion is inadmissible pursuant to the Court's gatekeeping role under Fed. R. Evid. 702 and *Daubert* and progeny.  Opinions stated in McNamara Decl. Ex. 133 are further inadmissible because they were not disclosed in Dr. Carey's expert report, and accordingly they must be excluded: "If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."  Fed. R. Civ. P. 37(c)(1).  Further, to the extent NBCUniversal offers the materials for the truth of the matter stated therein, Doc. 127 at 19, other facts controvert the contention.**

██████████████████████████████████████████

███████████████████████████████████  **Doc. 139-7, Bills Depo. 49:21-24.  Dr. Elbridge**

Bills concluded that, based on his review of patient charts: "In summary, it appears that Dr. Amin has been providing appropriate care to this high-risk indigent population and has not performed any unnecessary medical procedures."  Doc. 123-2, Plaintiff's Service of Expert Witness Reports (Sept. 5, 2023), at 16; Doc. 123-4, Plaintiff's Service of Expert Witness Reports in Reply of Carey Rebuttal.  Dr. Amin testified to the accuracy of the statement, "Dr. Amin has never performed a medically unnecessary procedure."  Ex. AA, Amin Depo. 190:6-13.  Further, Dr. Amin provided a sworn statement that he was never rough or caused bruising to his ICDC patients, that he produced all medical records as to his ICDC patients to NBCUniversal, and that such documents note his observations and the patients' conditions which informed his decisions that the procedures he performed were medically necessary.  Ex. I, Amin Decl. ¶¶ 5-9.

362.    Dr. Carey opined that "[o]varian cystectomies have the unique risk of potential damage to future fertility." McNamara Decl. Ex. 128 at 13.

CONTROVERTED.  The cited materials cannot be reduced to an admissible form.  For the reasons discussed in Dr. Amin's motion to exclude the expert testimony of Dr. Carey (Doc. 124), Dr. Carey's expert opinion is inadmissible pursuant to the Court's gatekeeping role under Fed. R. Evid. 702 and *Daubert* and progeny.

363.    Dr. Bills



McNamara Decl. Ex. 130 at 65:14-66:5; *see also* Ex. 3 at 272:1-5

**UNCONTROVERTED**

364.     Dr. Carey opined that Dr. Amin "frequently offered a procedure known as a D&C scope, which, in several instances, may not have been medically necessary and exposed patients to avoidable harm.  McNamara Decl. Ex. 128 at 13.  Dr. Carey opined that of the over fifty D&Cs that Dr. Amin performed, only five were potentially medically necessary.  McNamara Decl. Exs. 129, 133.

**CONTROVERTED.  The cited materials cannot be reduced to an admissible form.  For the reasons discussed in Dr. Amin's motion to exclude the expert testimony of Dr. Carey (Doc. 124), Dr. Carey's expert opinion is inadmissible pursuant to the Court's gatekeeping role under Fed. R. Evid. 702 and *Daubert* and progeny.  Opinions stated in McNamara Decl. Ex. 133 are further inadmissible because they were not disclosed in Dr. Carey's expert report, and accordingly they must be excluded: "If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."  Fed. R. Civ. P. 37(c)(1).  Further, to the extent NBCUniversal offers the materials for the truth of the matter stated therein, Doc. 127 at 19, other facts controvert the contention.**

**███████████████████████████████████████████████████**

**███████████████████████████████████  Doc. 139-7, Bills Depo.  49:21-24.  Dr. Elbridge Bills concluded that, based on his review of patient charts: "In summary, it appears that Dr. Amin has been providing appropriate care to this high-risk indigent population and has not performed any unnecessary medical procedures."  Doc. 123-2, Plaintiff's Service of Expert Witness Reports (Sept. 5, 2023), at 16; Doc. 123-4, Plaintiff's Service of Expert**

**Witness Reports in Reply of Carey Rebuttal.  Dr. Amin testified to the accuracy of the statement, "Dr. Amin has never performed a medically unnecessary procedure."  Ex. AA, Amin Depo. 190:6-13.  Further, Dr. Amin provided a sworn statement that he was never rough or caused bruising to his ICDC patients, that he produced all medical records as to his ICDC patients to NBCUniversal, and that such documents note his observations and the patients' conditions which informed his decisions that the procedures he performed were medically necessary.  Ex. I, Amin Decl. ¶¶ 5-9.**

365.    Dr. Carey opined that Dr. Amin "routinely and excessively used Depo-Provera for contraception and management of abnormal bleeding" and the majority of these patients "did not undergo more than [the] 3-month trial of medical therapy, with this medication before urgently moving onto surgical intervention."  Dr. Carey opined that of the patients on whom Dr. Amin performed surgery after giving them Depo-Provera, only four received an adequate course of medical therapy before Dr. Amin performed surgery.  McNamara Decl. Ex. 128 at 13, Ex. 133.

**CONTROVERTED.  The cited materials cannot be reduced to an admissible form.  For the reasons discussed in Dr. Amin's motion to exclude the expert testimony of Dr. Carey (Doc. 124), Dr. Carey's expert opinion is inadmissible pursuant to the Court's gatekeeping role under Fed. R. Evid. 702 and *Daubert* and progeny.  Opinions stated in McNamara Decl. Ex. 133 are further inadmissible because they were not disclosed in Dr. Carey's expert report, and accordingly they must be excluded: "If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."  Fed.**

R. Civ. P. 37(c)(1).  Further, to the extent NBCUniversal offers the materials for the truth of the matter stated therein, Doc. 127 at 19, other facts controvert the contention.

█████████████████████████████████████████████████████

██████████████████████████████████  **Doc. 139-7, Bills Depo.  49:21-24.  Dr. Elbridge Bills concluded that, based on his review of patient charts: "In summary, it appears that Dr. Amin has been providing appropriate care to this high-risk indigent population and has not performed any unnecessary medical procedures."  Doc. 123-2, Plaintiff's Service of Expert Witness Reports (Sept. 5, 2023), at 16; Doc. 123-4, Plaintiff's Service of Expert Witness Reports in Reply of Carey Rebuttal.  Dr. Amin testified to the accuracy of the statement, "Dr. Amin has never performed a medically unnecessary procedure."  Ex. AA, Amin Depo. 190:6-13.  Further, Dr. Amin provided a sworn statement that he was never rough or caused bruising to his ICDC patients, that he produced all medical records as to his ICDC patients to NBCUniversal, and that such documents note his observations and the patients' conditions which informed his decisions that the procedures he performed were medically necessary.  Ex. I, Amin Decl. ¶¶ 5-9.**

366.    Dr. Carey opined that Dr. Amin performed three "improper, unindicated, and not medically necessary LEEPs (loop electrosurgical excision procedures).  McNamara Decl. Ex. 133.

**CONTROVERTED.  The cited materials cannot be reduced to an admissible form.  For the reasons discussed in Dr. Amin's motion to exclude the expert testimony of Dr. Carey (Doc. 124), Dr. Carey's expert opinion is inadmissible pursuant to the Court's gatekeeping role under Fed. R. Evid. 702 and *Daubert* and progeny.  Opinions stated in McNamara Decl. Ex. 133 are further inadmissible because they were not disclosed in Dr.**

Carey's expert report, and accordingly they must be excluded: "If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."  Fed. R. Civ. P. 37(c)(1).  Further, to the extent NBCUniversal offers the materials for the truth of the matter stated therein, Doc. 127 at 19, other facts controvert the contention.

████████████████████████████████████████████████████████████

████████████████████████████████  Doc. 139-7, Bills Depo.  49:21-24.  Dr. Elbridge Bills concluded that, based on his review of patient charts: "In summary, it appears that Dr. Amin has been providing appropriate care to this high-risk indigent population and has not performed any unnecessary medical procedures."  Doc. 123-2, Plaintiff's Service of Expert Witness Reports (Sept. 5, 2023), at 16; Doc. 123-4, Plaintiff's Service of Expert Witness Reports in Reply of Carey Rebuttal.  Dr. Amin testified to the accuracy of the statement, "Dr. Amin has never performed a medically unnecessary procedure."  Ex. AA, Amin Depo. 190:6-13.  Further, Dr. Amin provided a sworn statement that he was never rough or caused bruising to his ICDC patients, that he produced all medical records as to his ICDC patients to NBCUniversal, and that such documents note his observations and the patients' conditions which informed his decisions that the procedures he performed were medically necessary.  Ex. I, Amin Decl. ¶¶ 5-9.

367.    Dr. Carey testified that ████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████ McNamara Decl. Ex. 148 at 117:8-122:11.

**CONTROVERTED.** ████████████████████████████████

████████████████████████████████

████████████████████████████████

██████████████████████████████

████████████████████████████████████

███████████████████████████

████████████████████████████

████████████████████████████████

███████████████████████████████

████████████████████████████████

███████████████████████████████

██████████████████████████████

█████████████████████████████

████████████████████████████████████

███████████████████████████████

████████████████████████

██████████████████████████████

█████████████████████████████

███████████████████████

███████████████████████████

████████████████████████████

████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████

    368.    Dr. Ted Anderson, testified in a deposition in this action that ███████

████████████████████████████ McNamara Decl. Ex. 116 at 108:4-9; 115:7-116:3;

173:8-15; 204:14-25.

**CONTROVERTED.** ████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████████

████████████████████████

369.    Concerning the hysterectomy Dr. Amin performed on ████████████████

████████████████████████████████████████████

█████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████  *Id.* at 167:20-181:2.

**CONTROVERTED.** ███████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████

███████████████████████████████████

█████████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

█████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████

█████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████

██████████

370.    During his deposition, when reviewing the hysterectomy that he performed on

patient ████████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████ McNamara Decl.

Ex. 3 at 234:14-20.

**UNCONTROVERTED.  However, the assertion upon which in its motion for summary**

**judgment NBCUniversal purports to rely on Paragraph 370—**████████████████

████████████████████████**—is CONTROVERTED.** ████████████████

████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████



371.    On November 15, 2022, the Senate Permanent Subcommittee on Investigations released a staff report, titled "Medical Mistreatment of Women in ICE Detention" (the "Senate Report"), and held a hearing. McNamara Decl. Ex. 68.

**UNCONTROVERTED that the report exists.  However, many of the contents of the Senate Report are inadmissible hearsay because they are statements of declarants not made while testifying which are proffered for the truth of the matters asserted in the statements.  Fed. R. Evid. 801; Fed. R. Evid 802.  Although there is a general "public records" exception to hearsay, the exception is not available where, as here, inadmissible hearsay statements by third-parties are placed into a government report and where the source of information and other circumstances indicate a lack of trustworthiness.  Fed. R. Evid. 803(8).**

372.    The Senate Report states that it was the result of an eighteen-month "bipartisan investigation into the alleged mistreatment of Immigration and Customs Enforcement ("ICE") detainees housed in the Irwin County Detention Center ("ICDC") in Ocilla, Georgia." *Id.* at NBCU002052.

**UNCONTROVERTED that these words appear.  However, many of the contents of the**

Senate Report are inadmissible hearsay because they are statements of declarants not made while testifying which are proffered for the truth of the matters asserted in the statements.  Fed. R. Evid. 801; Fed. R. Evid 802.  Although there is a general "public records" exception to hearsay, the exception is not available where, as here, inadmissible hearsay statements by third-parties are placed into a government report and where the source of information and other circumstances indicate a lack of trustworthiness.  Fed. R. Evid. 803(8).  Further, the cited materials do not establish who actually participated in the hearing or their political affiliations.

373.    The Senate Report concludes that "[f]emale detainees [at ICDC] appear to have been subjected to excessive, invasive, and often unnecessary gynecological procedures." *Id.* at NBCU002052-53.

CONTROVERTED.  The cited materials cannot be reduced to an admissible form. NBCUniversal never provided notice of any experts who could offer the medical opinions expressed in Paragraph 373, and accordingly they must be excluded pursuant to Fed. R. Civ. P. 26(a)(2)(A): "In addition to the disclosures required by Rule 26(a)(1), a party must disclose to the other parties the identity of any witness it may use at trial to present evidence under Federal Rules of Evidence 702, 703, or 705."  "If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."  Fed. R. Civ. P. 37(c)(1); *see also Cedant v. U.S.*, 75 F.4th 1314, 1321 (11th Cir. 2023) ("So if a witness does *not* need to file a Rule 26(a)(2)(B) report, then a party *does* need to file a Rule 26(a)(2)(C) disclosure on her behalf.").  Further, to the extent NBCUniversal offers

the materials for the truth of the matter stated therein, Doc. 127 at 19-20, other facts

controvert NBCUniversal's contention. ███████████████████████████

███████████████████████████████████████████████████ **Doc.**

**139-7, Bills Depo.  49:21-24.  Dr. Elbridge Bills concluded that, based on his review of**

patient charts: "In summary, it appears that Dr. Amin has been providing appropriate

care to this high-risk indigent population and has not performed any unnecessary

medical procedures."  Doc. 123-2, Plaintiff's Service of Expert Witness Reports (Sept. 5,

2023), at 16; Doc. 123-4, Plaintiff's Service of Expert Witness Reports in Reply of Carey

Rebuttal.  Dr. Amin testified to the accuracy of the statement, "Dr. Amin has never

performed a medically unnecessary procedure."  Ex. AA, Amin Depo. 190:6-13.

Further, Dr. Amin provided a sworn statement that he was never rough or caused

bruising to his ICDC patients, that he produced all medical records as to his ICDC

patients to NBCUniversal, and that such documents note his observations and the

patients' conditions which informed his decisions that the procedures he performed were

medically necessary.  Ex. I, Amin Decl. ¶¶ 5-9.  Further, conclusions are based on a mere

collection of statements by witnesses, not the report preparer's "own observations and

knowledge," and accordingly must be excluded as hearsay to which the public report

exception doe not apply.  *See United Tech. Corp. v. Mazer*, 556 F.3d 1260, 1278 (11th Cir.

2009) ("Placing otherwise inadmissible hearsay statements by third-parties into a

government report does not make the statements admissible."  (some punctuation

marks altered)); *id.*

("Hearsay within hearsay subject to an exception is not admissible.").  The portion to

which NBCUniversal cites is prefaced by the statement: "According to expert medical

analysis conducted *for* the Subcommittee."  McNamara Decl. Ex. 68 at 10 (emphasis

supplied).  **Accordingly, the findings NBCUniversal highlights are not the findings *of* the Senate Subcommittee but rather are "a *collection* of statements" from witnesses *to* the Senate Subcommittee.  *Mazer*, 556 F.3d at 1278.  Further, the number of documents reviewed is meaningless and, as with Dr. Anderson, does not clarify what the documents were.  Finally, these contents of the Senate Report are inadmissible hearsay not subject to the public records exception, because testimony of Dr. Bills and Dr. Amin demonstrates that the contents lack trustworthiness.  Fed. R. Evid 803(8).**

374.     The Senate Report states that Dr. Peter Cherouny, a doctor engaged by the Subcommittee, "conducted an independent review of more than 16,600 pages of medical records obtained by the Subcommittee, pertaining to approximately 94 ICDC women Dr. Amin treated." *Id.* at NBCU002056.

**CONTROVERTED.  The cited materials cannot be reduced to an admissible form.  NBCUniversal never provided notice of any experts who could offer the medical opinions expressed in Paragraph 374, and accordingly they must be excluded pursuant to Fed. R. Civ. P. 26(a)(2)(A): "In addition to the disclosures required by Rule 26(a)(1), a party must disclose to the other parties the identity of any witness it may use at trial to present evidence under Federal Rules of Evidence 702, 703, or 705."  "If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."  Fed. R. Civ. P. 37(c)(1); *see also Cedant v. U.S.*, 75 F.4th 1314, 1321 (11th Cir. 2023) ("So if a witness does *not* need to file a Rule 26(a)(2)(B) report, then a party *does* need to file a Rule 26(a)(2)(C) disclosure on her behalf.").  Further, to the extent NBCUniversal offers**

the materials for the truth of the matter stated therein, Doc. 127 at 19-20, other facts

controvert NBCUniversal's contention. ████████████████████████████

████████████████████████████████████████████████████ **Doc.**

**139-7, Bills Depo.  49:21-24.  Dr. Elbridge Bills concluded that, based on his review of**

**patient charts: "In summary, it appears that Dr. Amin has been providing appropriate**

**care to this high-risk indigent population and has not performed any unnecessary**

**medical procedures."  Doc. 123-2, Plaintiff's Service of Expert Witness Reports (Sept. 5,**

**2023), at 16; Doc. 123-4, Plaintiff's Service of Expert Witness Reports in Reply of Carey**

**Rebuttal.  Dr. Amin testified to the accuracy of the statement, "Dr. Amin has never**

**performed a medically unnecessary procedure."  Ex. AA, Amin Depo. 190:6-13.**

**Further, Dr. Amin provided a sworn statement that he was never rough or caused**

**bruising to his ICDC patients, that he produced all medical records as to his ICDC**

**patients to NBCUniversal, and that such documents note his observations and the**

**patients' conditions which informed his decisions that the procedures he performed were**

**medically necessary.  Ex. I, Amin Decl. ¶¶ 5-9.  Further, conclusions are based on a mere**

**collection of statements by witnesses, not the report preparer's "own observations and**

**knowledge," and accordingly must be excluded as hearsay to which the public report**

**exception doe not apply.  *See United Tech. Corp. v. Mazer*, 556 F.3d 1260, 1278 (11th Cir.**

**2009) ("Placing otherwise inadmissible hearsay statements by third-parties into a**

**government report does not make the statements admissible."  (some punctuation**

**marks altered)); *id*.**

**("Hearsay within hearsay subject to an exception is not admissible.").  The portion to**

**which NBCUniversal cites is prefaced by the statement: "According to expert medical**

**analysis conducted *for* the Subcommittee."  McNamara Decl. Ex. 68 at 10 (emphasis**

supplied).  Accordingly, the findings NBCUniversal highlights are not the findings *of* the Senate Subcommittee but rather are "a *collection* of statements" from witnesses *to* the Senate Subcommittee.  *Mazer*, 556 F.3d at 1278.  Finally, these contents of the Senate Report are inadmissible hearsay not subject to the public records exception, because testimony of Dr. Bills and Dr. Amin demonstrates that the contents lack trustworthiness.  Fed. R. Evid 803(8).  Further, the number of documents reviewed is irrelevant.  Dr. Amin has delivered thousands of documents to NBCUniversal pertaining to hundreds of ICDC women he treated and NBCUniversal identified many detainees in its initial disclosures, Evans Decl. ¶ 3, and still NBCUniversal has failed to identify specific procedures it contends were definitively unnecessary.  *See generally* Doc. 127.

375.    The Senate Report states that, according to Dr. Cherouny, Dr. Amin's use of D&Cs was "too aggressive," and Dr. Amin "persistently" removed "benign ovarian cysts" that "generally resolve without surgical intervention" and "did not require removal."  *Id.*
CONTROVERTED.  The cited materials cannot be reduced to an admissible form.  NBCUniversal never provided notice of the doctor to whom the cited materials refer, and accordingly they must be excluded pursuant to Fed. R. Civ. P. 26(a)(2)(A): "In addition to the disclosures required by Rule 26(a)(1), a party must disclose to the other parties the identity of any witness it may use at trial to present evidence under Federal Rules of Evidence 702, 703, or 705."  "If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."  Fed. R. Civ. P. 37(c)(1); *see also Cedant v. U.S.*, 75 F.4th 1314, 1321 (11th Cir. 2023) ("So if a witness does *not* need to file a Rule

26(a)(2)(B) report, then a party *does* need to file a Rule 26(a)(2)(C) disclosure on her behalf.").  Further, to the extent NBCUniversal offers the materials for the truth of the matter stated therein, Doc. 127 at 19, other facts controvert the contention. ███████

████████████████████████████████████████████████████████████

█████████████████ Doc. 139-7, Bills Depo.  49:21-24.  Dr. Elbridge Bills concluded that, based on his review of patient charts: "In summary, it appears that Dr. Amin has been providing appropriate care to this high-risk indigent population and has not performed any unnecessary medical procedures."  Doc. 123-2, Plaintiff's Service of Expert Witness Reports (Sept. 5, 2023), at 16; Doc. 123-4, Plaintiff's Service of Expert Witness Reports in Reply of Carey Rebuttal.  Dr. Amin testified to the accuracy of the statement, "Dr. Amin has never performed a medically unnecessary procedure."  Ex. AA, Amin Depo. 190:6-13.  Further, Dr. Amin provided a sworn statement that he was never rough or caused bruising to his ICDC patients, that he produced all medical records as to his ICDC patients to NBCUniversal, and that such documents note his observations and the patients' conditions which informed his decisions that the procedures he performed were medically necessary.  Ex. I, Amin Decl. ¶¶ 5-9.  Further, conclusions are based on a mere collection of statements by witnesses, not the report preparer's "own observations and knowledge," and accordingly must be excluded as hearsay to which the public report exception doe not apply.  *See United Tech. Corp. v. Mazer*, 556 F.3d 1260, 1278 (11th Cir. 2009) ("Placing otherwise inadmissible hearsay statements by third-parties into a government report does not make the statements admissible."  (some punctuation marks altered)); *id*. ("Hearsay within hearsay subject to an exception is not admissible.").  The portion to which NBCUniversal cites is prefaced

by the statement: "According to expert medical analysis conducted *for* the Subcommittee."  McNamara Decl. Ex. 68 at 10 (emphasis supplied).  Accordingly, the findings NBCUniversal highlights are not the findings *of* the Senate Subcommittee but rather are "a *collection* of statements" from witnesses *to* the Senate Subcommittee. *Mazer*, 556 F.3d at 1278.  Finally, these contents of the Senate Report are inadmissible hearsay not subject to the public records exception, because testimony of Dr. Bills and Dr. Amin demonstrates that the contents lack trustworthiness.  Fed. R. Evid 803(8).

376.    The Senate Report states that "Dr. Amin was a clear outlier in both the number and types of procedures he performed compared to other OB-GYNs that treated ICE detainees. ICDC housed roughly 4% of female ICE detainees nationwide from 2017 to 2020.  Dr. Amin accounts for roughly 6.5% of total OB-GYN *visits* among all ICE detainees in the same time period. However, he performed nearly one-third of <u>certain</u> OB-GYN *procedures* on ICE detainees across the country between 2017 and 2020 and more than 90% of some key procedures." *Id.* at NBCU002054-55 (emphasis in original)

CONTROVERTED.  The cited materials cannot be reduced to an admissible form.  The conclusions stated in Paragraph 376 are based on a mere collection of statements by witnesses, not the report preparer's "own observations and knowledge," and accordingly must be excluded as hearsay to which the public report exception doe not apply.  *See United Tech. Corp. v. Mazer*, 556 F.3d 1260, 1278 (11th Cir. 2009) ("Placing otherwise inadmissible hearsay statements by third-parties into a government report does not make the statements admissible."  (some punctuation marks altered)); *id*. ("Hearsay within hearsay subject to an exception is not admissible.").  The executive summary of the Senate Report is prefaced by: "According to expert medical analysis conducted *for*

the Subcommittee." **McNamara Decl. Ex. 68 at 10 (emphasis supplied). Accordingly, the findings NBCUniversal highlights are not the findings *of* the Senate Subcommittee but rather are "a *collection* of statements" from witnesses *to* the Senate Subcommittee. *Mazer*, 556 F.3d at 1278. Further, these contents of the Senate Report are inadmissible hearsay not subject to the public records exception, because testimony of Dr. Bills and Dr. Amin demonstrates that the contents lack trustworthiness. Fed. R. Evid 803(8). Finally, the numbers do not say anything about the necessity of procedures, as the Senate itself notes: "The Subcommittee recognizes that this data in and of itself does not indicate that the treatments were unnecessary. ICE does not track the demographic information of its female population, and the agency could not provide the Subcommittee with information regarding key variables of the female detainee population, including age and medical history." McNamara Decl. Ex. 68 at 11 n.8.**

377.    The Senate Report states that Dr. Amin performed 94% of all laparoscopies to excise lesions that were conducted on all ICE detainees; administered "93% of all [Depo-Provera] injections provided by all OB-GYN specialists to ICE detainees;" performed "92% of limited pelvic exams conducted on all ICE detainees," and performed "82% of all [dilation and curettage] D&C procedures conducted by all OB-GYN specialists treating ICE detainees." *Id.* at NBCU002054-55

**CONTROVERTED. The cited materials cannot be reduced to an admissible form. The conclusions stated in Paragraph 377 are based on a mere collection of statements by witnesses, not the report preparer's "own observations and knowledge," and accordingly must be excluded as hearsay to which the public report exception doe not apply. *See United Tech. Corp. v. Mazer*, 556 F.3d 1260, 1278 (11th Cir. 2009) ("Placing otherwise**

inadmissible hearsay statements by third-parties into a government report does not make the statements admissible."  (some punctuation marks altered)); *id.* ("Hearsay within hearsay subject to an exception is not admissible.").  The executive summary of the Senate Report is prefaced by: "According to expert medical analysis conducted *for* the Subcommittee."  McNamara Decl. Ex. 68 at 10 (emphasis supplied).  Accordingly, the findings NBCUniversal highlights are not the findings *of* the Senate Subcommittee but rather are "a *collection* of statements" from witnesses *to* the Senate Subcommittee. *Mazer*, 556 F.3d at 1278.  Finally, these contents of the Senate Report are inadmissible hearsay not subject to the public records exception, because testimony of Dr. Bills and Dr. Amin demonstrates that the contents lack trustworthiness.  Fed. R. Evid 803(8). Finally, the numbers do not say anything about the necessity of procedures, as the Senate itself notes: "The Subcommittee recognizes that this data in and of itself does not indicate that the treatments were unnecessary.  ICE does not track the demographic information of its female population, and the agency could not provide the Subcommittee with information regarding key variables of the female detainee population, including age and medical history."  McNamara Decl. Ex. 68 at 11 n.8.

378.    Dr. Amin testified in his deposition that he did not have any facts to challenge the statistics presented in the Senate Report.  McNamara Decl. Ex. 3 at 225:5-233:1.

**CONTROVERTED.  The cited materials do not support NBCUniversal's contention.  In the quoted portions of McNamara Decl. Ex. 3, Dr. Amin presented the following "facts to challenge the statistics presented in the Senate Report": that the investigation was "political," the way the statistics were achieved was through a "wrong way to the statistics" which demonstrated that "they are not medical people," and that he would**

"have to check the record" in order to be prepared to understand the statistics and their accuracy.  McNamara Decl. Ex. 3 at 226:2-6, 230:4-10.  Dr. Amin also explained the reasons for some of the numbers that the Senate had insinuated were abnormally high, despite again not having access to the records: he gave depo shots to women detained by ICE at ICDC because "when I started seeing them first I was trying to give them birth control pills and they are not getting" them from the facility.  McNamara Decl. Ex. 3 at 225:5-18.  Finally, the only portion where Dr. Amin appears to answer of "no" to whether he has "any reason to challenge that information" cited in the material above is not as to "statistics" or the materials discussed therein broadly (as discussed above, he identified several reasons he challenged those) but rather to the specific portion that says, "Dr. Amin submitted referrals for four hysterectomies but he performed only two hysterectomies."  McNamara Decl. Ex. 3 at 232:17-233:1.  Further, the contents of the Subcommittee report are inadmissible as discussed above.  Finally, the statistics presented in the Senate Report do not say anything about the necessity of procedures, as the Senate itself notes: "The Subcommittee recognizes that this data in and of itself does not indicate that the treatments were unnecessary.  ICE does not track the demographic information of its female population, and the agency could not provide the Subcommittee with information regarding key variables of the female detainee population, including age and medical history."  McNamara Decl. Ex. 68 at 11 n.8.  Further, Dr. Amin provided a sworn statement that he was never rough or caused bruising to his ICDC patients, that he produced all medical records as to his ICDC patients to NBCUniversal, and that such documents note his observations and the patients' conditions which informed his decisions that the procedures he performed were medically necessary.  Ex. I, Amin Decl. ¶¶ 5-9.

379.    The Senate Report concludes that "there appears to have been repeated failures to secure informed consent for off-site medical procedures performed on ICDC detainees." McNamara Decl. Ex. 68 at NBCU002053.

**CONTROVERTED.  The cited materials cannot be reduced to an admissible form.  The conclusions stated in Paragraph 379 are based on a mere collection of statements by witnesses, not the report preparer's "own observations and knowledge," and accordingly must be excluded as hearsay to which the public report exception doe not apply.  *See United Tech. Corp. v. Mazer*, 556 F.3d 1260, 1278 (11th Cir. 2009) ("Placing otherwise inadmissible hearsay statements by third-parties into a government report does not make the statements admissible."  (some punctuation marks altered)); *id*. ("Hearsay within hearsay subject to an exception is not admissible.").  The executive summary of the Senate Report is prefaced by: "According to expert medical analysis conducted *for* the Subcommittee."  McNamara Decl. Ex. 68 at 10 (emphasis supplied).  Accordingly, the findings NBCUniversal highlights are not the findings *of* the Senate Subcommittee but rather are "a *collection* of statements" from witnesses *to* the Senate Subcommittee.  *Mazer*, 556 F.3d at 1278.  Finally, these contents of the Senate Report are inadmissible hearsay not subject to the public records exception, because testimony of Dr. Amin and others who provided medical care to women detained by ICE at ICDC demonstrates that the contents lack trustworthiness.  Fed. R. Evid 803(8).  Dr. Amin has never performed surgery without patient consent, he always obtains informed consent from his patients, and multiple personnel in the hospital confirm that the patient understands the procedures they are going through.  Ex. AA, Amin Depo. 41:14-19, 42:19-20, 47:19-48:9, 288:24-289:2.  Consent forms had "to go through several hands before Dr. Amin proceeding with surgery,"**

**including hospital staff, the anesthesiologist, and Dr. Amin.  Ex. BB, Nito Depo. 98:7-16.**

**Dwayne Peal, a nurse at the Irwin County Hospital, testified that, when a patient "needed a**

**procedure, then the doctors and the nurses would go over it, anesthesia will go over it**

**making sure that the patient understood everything that was going on."  Doc. 122-6, Peal**

**Depo. 51:5-11, 68:7-20.  Mr. Peal testified that, whenever he was present at a procedure**

**being conducted by Dr. Amin, "he always explained what was what to his patients."  Doc.**

**122-6, Peal Depo. 72:5-10.  Alma Arceo, office manager for Dr. Amin's practice, confirmed**

**that Dr. Amin obtained informed consent from all patients before performing surgeries on**

**them.  Ex. CC, Arceo Depo. 12:9-11, 46:19-24.  As discussed above, further, Dr. Amin**

**obtained informed consent signatures from women detained by ICE at ICDC before they**

**had any surgery, and the women had the opportunity to review the form, discuss the**

**treatment, and sign indicating that they understood and had the opportunity to speak.**

380.    The Senate Report states, "Dr. Amin did not provide sufficient information regarding surgical procedures with detainee patients.  The medical records reviewed do not consistently document thorough patient-doctor discussions and do not establish that patients were fully information of all their treatment options, including the benefits and risks of surgical procedures and other treatments." *Id.* at NBCU002061.

**CONTROVERTED.  The cited materials cannot be reduced to an admissible form.  The**

**conclusions stated in Paragraph 380 are based on a mere collection of statements by**

**witnesses, not the report preparer's "own observations and knowledge," and accordingly**

**must be excluded as hearsay to which the public report exception doe not apply.  *See***

***United Tech. Corp. v. Mazer*, 556 F.3d 1260, 1278 (11th Cir. 2009) ("Placing otherwise**

**inadmissible hearsay statements by third-parties into a government report does not make**

the statements admissible." (some punctuation marks altered)); *id.* ("Hearsay within hearsay subject to an exception is not admissible.").  The executive summary of the Senate Report is prefaced by: "According to expert medical analysis conducted *for* the Subcommittee."  McNamara Decl. Ex. 68 at 10 (emphasis supplied).  Accordingly, the findings NBCUniversal highlights are not the findings *of* the Senate Subcommittee but rather are "a *collection* of statements" from witnesses *to* the Senate Subcommittee.  *Mazer*, 556 F.3d at 1278.  Finally, these contents of the Senate Report are inadmissible hearsay not subject to the public records exception, because testimony of Dr. Amin and others who provided medical care to women detained by ICE at ICDC demonstrates that the contents lack trustworthiness.  Fed. R. Evid 803(8).  Dr. Amin has never performed surgery without patient consent, he always obtains informed consent from his patients, and multiple personnel in the hospital confirm that the patient understands the procedures they are going through.  Ex. AA, Amin Depo. 41:14-19, 42:19-20, 47:19-48:9, 288:24-289:2.  Consent forms had "to go through several hands before Dr. Amin proceeding with surgery," including hospital staff, the anesthesiologist, and Dr. Amin.  Ex. BB, Nito Depo. 98:7-16.  Dwayne Peal, a nurse at the Irwin County Hospital, testified that, when a patient "needed a procedure, then the doctors and the nurses would go over it, anesthesia will go over it making sure that the patient understood everything that was going on."  Doc. 122-6, Peal Depo. 51:5-11, 68:7-20.  Mr. Peal testified that, whenever he was present at a procedure being conducted by Dr. Amin, "he always explained what was what to his patients."  Doc. 122-6, Peal Depo. 72:5-10.  Alma Arceo, office manager for Dr. Amin's practice, confirmed that Dr. Amin obtained informed consent from all patients before performing surgeries on them.  Ex. CC, Arceo Depo. 12:9-11, 46:19-24.  As discussed above, further, Dr. Amin

**obtained informed consent signatures from women detained by ICE at ICDC before they**

**had any surgery, and the women had the opportunity to review the form, discuss the**

**treatment, and sign indicating that they understood and had the opportunity to speak.**

381.     Senator Jon Ossoff, the Subcommittee Chair, testified that the finding that

"female detainees in Georgia were subjected by a DHS-contracted doctor to excessive,

invasive, and often unnecessary gynecological surgeries and procedures, with repeated failures

to obtain informed medical consent," as "deeply disturbing," "nightmarish" and "disgraceful."

McNamara Decl.  Ex. 71.

**CONTROVERTED.  The cited materials cannot be reduced to an admissible form.  The**

**conclusions stated in Paragraph 381 are based on a mere collection of statements by**

**witnesses, not the report preparer's "own observations and knowledge," and accordingly**

**must be excluded as hearsay to which the public report exception doe not apply.  *See***

***United Tech. Corp. v. Mazer*, 556 F.3d 1260, 1278 (11th Cir. 2009) ("Placing otherwise**

**inadmissible hearsay statements by third-parties into a government report does not make**

**the statements admissible."  (some punctuation marks altered)); *id*. ("Hearsay within**

**hearsay subject to an exception is not admissible.").  The executive summary of the Senate**

**Report is prefaced by: "According to expert medical analysis conducted *for* the**

**Subcommittee."  McNamara Decl. Ex. 68 at 10 (emphasis supplied).  Accordingly, the**

**findings NBCUniversal highlights are not the findings *of* the Senate Subcommittee but**

**rather are "a *collection* of statements" from witnesses *to* the Senate Subcommittee.  *Mazer*,**

**556 F.3d at 1278.  Finally, these contents of the Senate Report are inadmissible hearsay not**

**subject to the public records exception, because testimony of Dr. Bills, Dr. Amin, and**

**others who provided medical care to women detained by ICE at ICDC demonstrates that**

the contents lack trustworthiness. Fed. R. Evid 803(8). As the statement in Paragraph 381 indicates, politicians of any political party are incentivized to grandstand to garner attention, and accordingly their assessments as to medical necessity or informed consent should be left to doctors with access to all of a patient's records.

382. Senator Ron Johnson, Ranking Member of the Subcommittee, submitted to the record an opening statement, in which he stated that the Subcommittee's investigation "identified concerning practices of an off-site provider" and that the Subcommittee's expert found "that many of the procedures were unnecessary, and that Dr. Amin frequently rushed to surgeries when non- surgical options were more appropriate." McNamara Decl. Ex. 134.

**CONTROVERTED. First, the quotation above omits a significant statement of Senator Johnson and the conclusion of the Senate regarding allegations that Dr. Amin "conducted <u>mass, unauthorized, hysterectomies</u> on immigration detainees housed at ICDC. <u>Thankfully, PSI's investigation found that allegation <em>was not true</em></u>. The doctor in question, <u>Dr. Mahendra Amin, performed <em>two</em> hysterectomies on ICDC detainees between 2017 and 2020 and <em>both were medically necessary</em></u>." McNamara Decl. Ex. 134 at 2 (emphases supplied). Further, the cited materials cannot be reduced to an admissible form. The conclusions stated in Paragraph 382 are based on a mere collection of statements by witnesses, not the report preparer's "own observations and knowledge," and accordingly must be excluded as hearsay to which the public report exception doe not apply. *See United Tech. Corp. v. Mazer*, 556 F.3d 1260, 1278 (11th Cir. 2009) ("Placing otherwise inadmissible hearsay statements by third-parties into a government report does not make the statements admissible." (some punctuation marks altered)); *id*. ("Hearsay within hearsay subject to an exception is not admissible."). The executive summary of the Senate**

Report is prefaced by: "According to expert medical analysis conducted *for* the Subcommittee."  McNamara Decl. Ex. 68 at 10 (emphasis supplied).  Accordingly, the findings NBCUniversal highlights are not the findings *of* the Senate Subcommittee but rather are "a *collection* of statements" from witnesses *to* the Senate Subcommittee. *Mazer*, 556 F.3d at 1278.  Finally, these contents of the Senate Report are inadmissible hearsay not subject to the public records exception, because testimony of Dr. Bills, Dr. Amin, and others who provided medical care to women detained by ICE at ICDC demonstrates that the contents lack trustworthiness.  Fed. R. Evid 803(8).

383.   Dr. Cherouny submitted a written statement to the Subcommittee, in which he testified that, based on the records he reviewed, "[t]he vast majority of ovarian cysts identified on transvaginal ultrasounds and removed or aspirated during laparoscopy in these patients were benign, functional cysts," which "generally resolve without surgical intervention;" "[t]his provider appears to use laparoscopy for confirmation of the diagnosis of leiomyomas and often removes them at surgery" when "[t]he uterine muscle tumors can be evaluated by imaging techniques such as skilled ultrasonography or more advanced imaging like MRI and followed over time for clinically concerning changes;" "[t]he provider does not appear to follow the current recommendations regarding Pap smear management through colposcopy and further treatment," and "Dr. Amin appears to have performed unindicated colposcopy and/or cryosurgery on six of these patients," among other things.  McNamara Decl. Ex. 135 at NBCU003891-92.

CONTROVERTED.  The cited materials cannot be reduced to an admissible form.  NBCUniversal never provided notice of the doctor to whom the cited materials refer, and accordingly they must be excluded pursuant to Fed. R. Civ. P. 26(a)(2)(A): "In

addition to the disclosures required by Rule 26(a)(1), a party must disclose to the other parties the identity of any witness it may use at trial to present evidence under Federal Rules of Evidence 702, 703, or 705."  "If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."  Fed. R. Civ. P. 37(c)(1); *see also Cedant v. U.S.*, 75 F.4th 1314, 1321 (11th Cir. 2023) ("So if a witness does *not* need to file a Rule 26(a)(2)(B) report, then a party *does* need to file a Rule 26(a)(2)(C) disclosure on her behalf.").  CONTROVERTED.  The cited materials cannot be reduced to an admissible form.  The conclusions stated in Paragraph 383 are based on a mere collection of statements by witnesses, not the report preparer's "own observations and knowledge," and accordingly must be excluded as hearsay to which the public report exception doe not apply.  *See United Tech. Corp. v. Mazer*, 556 F.3d 1260, 1278 (11th Cir. 2009) ("Placing otherwise inadmissible hearsay statements by third-parties into a government report does not make the statements admissible."  (some punctuation marks altered)); *id.* ("Hearsay within hearsay subject to an exception is not admissible.").  The executive summary of the Senate Report is prefaced by: "According to expert medical analysis conducted *for* the Subcommittee."  McNamara Decl. Ex. 68 at 10 (emphasis supplied). Accordingly, the findings NBCUniversal highlights are not the findings *of* the Senate Subcommittee but rather are "a *collection* of statements" from witnesses *to* the Senate Subcommittee.  *Mazer*, 556 F.3d at 1278.  Finally, these contents of the Senate Report are inadmissible hearsay not subject to the public records exception, because testimony of Dr. Bills and Dr. Amin demonstrates that the contents lack trustworthiness.  Fed. R.

Evid 803(8).  **Further, to the extent NBCUniversal offers the materials for the truth of the matter stated therein, Doc. 127 at 20, other facts controvert NBCUniversal's contention.** ████████████████████████████████
████████████████████████████████ **Doc. 139-7, Bills Depo.  49:21-24.  Dr. Elbridge Bills concluded that, based on his review of patient charts: "In summary, it appears that Dr. Amin has been providing appropriate care to this high-risk indigent population and has not performed any unnecessary medical procedures."  Doc. 123-2, Plaintiff's Service of Expert Witness Reports (Sept. 5, 2023), at 16; Doc. 123-4, Plaintiff's Service of Expert Witness Reports in Reply of Carey Rebuttal.  Dr. Amin testified to the accuracy of the statement, "Dr. Amin has never performed a medically unnecessary procedure."  Ex. AA, Amin Depo. 190:6-13.  Further, Dr. Amin provided a sworn statement that he was never rough or caused bruising to his ICDC patients, that he produced all medical records as to his ICDC patients to NBCUniversal, and that such documents note his observations and the patients' conditions which informed his decisions that the procedures he performed were medically necessary.  Ex. I, Amin Decl. ¶¶ 5-9.**

384.        Dr. Margaret Mueller, another board certified OB-GYN, submitted testimony to the Subcommittee in which she stated that a review team on which she participated, "identified a disturbing pattern of overly aggressive care, sometimes involving unnecessary diagnostic procedures and, in some cases, unnecessary surgical procedures."  They also found that the "unnecessary medical procedures were performed without adequate informed consent, which would require not just a signed standard consent form, but also documentation of any discussion of less invasive options that might be appropriate for the patient."  McNamara

Decl. Ex. 136 at NBCU003871.

**CONTROVERTED.  The cited materials cannot be reduced to an admissible form. NBCUniversal never provided notice of the doctor to whom the cited materials refer, and accordingly they must be excluded pursuant to Fed. R. Civ. P. 26(a)(2)(A): "In addition to the disclosures required by Rule 26(a)(1), a party must disclose to the other parties the identity of any witness it may use at trial to present evidence under Federal Rules of Evidence 702, 703, or 705."  "If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."  Fed. R. Civ. P. 37(c)(1); *see also Cedant v. U.S.*, 75 F.4th 1314, 1321 (11th Cir. 2023) ("So if a witness does *not* need to file a Rule 26(a)(2)(B) report, then a party *does* need to file a Rule 26(a)(2)(C) disclosure on her behalf.").  The conclusions stated in Paragraph 383 are based on a mere collection of statements by witnesses, not the report preparer's "own observations and knowledge," and accordingly must be excluded as hearsay to which the public report exception doe not apply.  *See United Tech. Corp. v. Mazer*, 556 F.3d 1260, 1278 (11th Cir. 2009) ("Placing otherwise inadmissible hearsay statements by third-parties into a government report does not make the statements admissible."  (some punctuation marks altered)); *id*. ("Hearsay within hearsay subject to an exception is not admissible.").  The executive summary of the Senate Report is prefaced by: "According to expert medical analysis conducted *for* the Subcommittee."  McNamara Decl. Ex. 68 at 10 (emphasis supplied).  Accordingly, the findings NBCUniversal highlights are not the findings *of* the Senate Subcommittee but rather are "a *collection* of statements" from witnesses *to* the Senate**

Subcommittee. *Mazer*, 556 F.3d at 1278. Further, to the extent NBCUniversal offers the materials for the truth of the matter stated therein, Doc. 127 at 20, other facts controvert NBCUniversal's contention. ███████████████████████████████

███████████████████████████████████ Doc. 139-7, Bills Depo. 49:21-24. Dr. Elbridge Bills concluded that, based on his review of patient charts: "In summary, it appears that Dr. Amin has been providing appropriate care to this high-risk indigent population and has not performed any unnecessary medical procedures." Doc. 123-2, Plaintiff's Service of Expert Witness Reports (Sept. 5, 2023), at 16; Doc. 123-4, Plaintiff's Service of Expert Witness Reports in Reply of Carey Rebuttal. Dr. Amin testified to the accuracy of the statement, "Dr. Amin has never performed a medically unnecessary procedure." Ex. AA, Amin Depo. 190:6-13. Further, Dr. Amin provided a sworn statement that he was never rough or caused bruising to his ICDC patients, that he produced all medical records as to his ICDC patients to NBCUniversal, and that such documents note his observations and the patients' conditions which informed his decisions that the procedures he performed were medically necessary. Ex. I, Amin Decl. ¶¶ 5-9. As to informed consent, Dr. Amin has never performed surgery without patient consent, he always obtains informed consent from his patients, and multiple personnel in the hospital confirm that the patient understands the procedures they are going through. Ex. AA, Amin Depo. 41:14-19, 42:19-20, 47:19-48:9, 288:24-289:2. Consent forms had "to go through several hands before Dr. Amin proceeding with surgery," including hospital staff, the anesthesiologist, and Dr. Amin. Ex. BB, Nito Depo. 98:7-16. Dwayne Peal, a nurse at the Irwin County Hospital, testified that, when a patient "needed a procedure, then the doctors and the nurses would go over it,

anesthesia will go over it making sure that the patient understood everything that was going on." Doc. 122-6, Peal Depo. 51:5-11, 68:7-20. Mr. Peal testified that, whenever he was present at a procedure being conducted by Dr. Amin, "he always explained what was what to his patients." Doc. 122-6, Peal Depo. 72:5-10. Alma Arceo, office manager for Dr. Amin's practice, confirmed that Dr. Amin obtained informed consent from all patients before performing surgeries on them. Ex. CC, Arceo Depo. 12:9-11, 46:19-24. As discussed above, further, Dr. Amin obtained informed consent signatures from women detained by ICE at ICDC before they had any surgery, and the women had the opportunity to review the form, discuss the treatment, and sign indicating that they understood and had the opportunity to speak. Further, the conclusions stated in Paragraph 384 are based on a mere collection of statements by witnesses, not the report preparer's "own observations and knowledge," and accordingly must be excluded as hearsay to which the public report exception doe not apply. *See United Tech. Corp. v. Mazer*, 556 F.3d 1260, 1278 (11th Cir. 2009) ("Placing otherwise inadmissible hearsay statements by third-parties into a government report does not make the statements admissible." (some punctuation marks altered)); *id*. ("Hearsay within hearsay subject to an exception is not admissible."). The executive summary of the Senate Report is prefaced by: "According to expert medical analysis conducted *for* the Subcommittee." McNamara Decl. Ex. 68 at 10 (emphasis supplied). Accordingly, the findings NBCUniversal highlights are not the findings *of* the Senate Subcommittee but rather are "a *collection* of statements" from witnesses *to* the Senate Subcommittee. *Mazer*, 556 F.3d at 1278. Finally, these contents of the Senate Report are inadmissible hearsay not subject to the public records exception, because testimony of Dr. Amin and others who

provided medical care to women detained by ICE at ICDC demonstrates that the contents lack trustworthiness.  Fed. R. Evid 803(8).  CONTROVERTED.  The cited materials cannot be reduced to an admissible form.  The conclusions stated in Paragraph 379 are based on a mere collection of statements by witnesses, not the report preparer's "own observations and knowledge," and accordingly must be excluded as hearsay to which the public report exception doe not apply.  *See United Tech. Corp. v. Mazer*, 556 F.3d 1260, 1278 (11th Cir. 2009) ("Placing otherwise inadmissible hearsay statements by third-parties into a government report does not make the statements admissible."  (some punctuation marks altered)); *id.* ("Hearsay within hearsay subject to an exception is not admissible.").  The executive summary of the Senate Report is prefaced by: "According to expert medical analysis conducted *for* the Subcommittee."  McNamara Decl. Ex. 68 at 10 (emphasis supplied).  Accordingly, the findings NBCUniversal highlights are not the findings *of* the Senate Subcommittee but rather are "a *collection* of statements" from witnesses *to* the Senate Subcommittee.  *Mazer*, 556 F.3d at 1278.  Finally, these contents of the Senate Report are inadmissible hearsay not subject to the public records exception, because testimony of Dr. Amin and others who provided medical care to women detained by ICE at ICDC demonstrates that the contents lack trustworthiness. Fed. R. Evid 803(8).

385.   The Senate Report also included interviews with several former ICDC detainees and concluded, based on these interviews and a review of their medical records, that Dr. Amin deployed a specific pattern in examining and treating these women . . .  Dr. Amin performed a vaginal ultrasound on all six women, diagnosed five of the women with ovarian cysts, and subsequently prescribed Depo-Provera injections for each woman with the cyst

diagnosis . McNamara Decl. Ex. 68 at NBCU002097-2111.

**CONTROVERTED.  The cited materials cannot be reduced to an admissible form. NBCUniversal never provided notice of any experts who could offer the medical opinions expressed in Paragraph 385, and accordingly they must be excluded pursuant to Fed. R. Civ. P. 26(a)(2)(A): "In addition to the disclosures required by Rule 26(a)(1), a party must disclose to the other parties the identity of any witness it may use at trial to present evidence under Federal Rules of Evidence 702, 703, or 705."  "If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."  Fed. R. Civ. P. 37(c)(1); *see also Cedant v. U.S.*, 75 F.4th 1314, 1321 (11th Cir. 2023) ("So if a witness does *not* need to file a Rule 26(a)(2)(B) report, then a party *does* need to file a Rule 26(a)(2)(C) disclosure on her behalf.").  Finally, other facts controvert NBCUniversal's contention.** ████████████████████████████

████████████████████████████████████████ **Doc. 139-7, Bills Depo.  49:21-24.  Dr. Elbridge Bills concluded that, based on his review of patient charts: "In summary, it appears that Dr. Amin has been providing appropriate care to this high-risk indigent population and has not performed any unnecessary medical procedures."  Doc. 123-2, Plaintiff's Service of Expert Witness Reports (Sept. 5, 2023), at 16; Doc. 123-4, Plaintiff's Service of Expert Witness Reports in Reply of Carey Rebuttal.  Dr. Amin testified to the accuracy of the statement, "Dr. Amin has never performed a medically unnecessary procedure."  Ex. AA, Amin Depo. 190:6-13.  Further, Dr. Amin provided a sworn statement that he was never rough or caused bruising to his ICDC**

patients, that he produced all medical records as to his ICDC patients to NBCUniversal, and that such documents note his observations and the patients' conditions which informed his decisions that the procedures he performed were medically necessary.  Ex. I, Amin Decl. ¶¶ 5-9.  Further, the conclusions stated in Paragraph 379 are based on a mere collection of statements by witnesses, not the report preparer's "own observations and knowledge," and accordingly must be excluded as hearsay to which the public report exception doe not apply.  *See United Tech. Corp. v. Mazer*, 556 F.3d 1260, 1278 (11th Cir. 2009) ("Placing otherwise inadmissible hearsay statements by third-parties into a government report does not make the statements admissible."  (some punctuation marks altered)); *id*. ("Hearsay within hearsay subject to an exception is not admissible.").  The executive summary of the Senate Report is prefaced by: "According to expert medical analysis conducted *for* the Subcommittee."  McNamara Decl. Ex. 68 at 10 (emphasis supplied).  And interviews with detainees also constitute hearsay-within-hearsay.  Accordingly, the findings NBCUniversal highlights are not the findings *of* the Senate Subcommittee but rather are "a *collection* of statements" from witnesses *to* the Senate Subcommittee.  *Mazer*, 556 F.3d at 1278.  Finally, these contents of the Senate Report are inadmissible hearsay not subject to the public records exception, because testimony of Dr. Amin and others who provided medical care to women detained by ICE at ICDC demonstrates that the contents lack trustworthiness.  Fed. R. Evid 803(8).

386.    Following publication of the Senate Report, neither Dr. Amin nor his counsel ever put the Senate on notice that the information contained in the report or the conclusions it reached were false.  McNamara Decl. Ex. 3 at 229:24-230:10.

**UNCONTROVERTED as to after the Senate Report.  However, before the Senate Report,**

an attorney for Dr. Amin did put the Senate on notice as to the Statements, noting Dr.

Amin's having volunteered to speak with the FBI and DOJ in order to "move the

investigation towards a resolution, which Dr. Amin is confident will clear him of any

wrongdoing."  McNamara Decl. Ex. 74 at 2.  Dr. Amin's attorney explained his decision

not to testify before the Senate as follows: "Respectfully, and unfortunately, the conduct

displayed by various members of Congress over the past year has led me to believe that

Congress and its Members are not interested in uncovering the truth, but instead seem to

be focused mainly on scoring political points, to the extreme and public detriment of an

innocent man."  McNamara Decl. Ex. 74 at 2.  It continues: "Although Dr. Amin will not

participate in an interview at this time, we are willing to send you a detailed written

submission on behalf of Dr. Amin or consider answering any written questions that you

would like to submit for my review.  Please let me know if you would like to take us up on

that offer."  McNamara Decl. Ex. 74 at 2.

Respectfully submitted this <u>2nd</u> day of February 2024.

*/s/ Stacey G. Evans*
Stacey G. Evans
Georgia Bar No. 298555
sevans@staceyevanslaw.com
Tiffany N. Watkins
Georgia Bar No. 228805
twatkins@staceyevanslaw.com
J. Amble Johnson
Georgia Bar No. 229112
ajohnson@staceyevanslaw.com
STACEY EVANS LAW
4200 Northside Parkway NW
Bldg One; Suite 200
Atlanta, GA 30327
(770) 779-9602 (phone)
(404) 393-2828 (fax)

Scott R. Grubman
Georgia Bar No. 317011
sgrubman@cglawfirm.com

CHILIVIS GRUBMAN
DALBEY & WARNER LLP
1834 Independence Square
Atlanta, GA 30338
(404) 233-4171 (phone)
(404) 261-2842 (fax)

*Counsel for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing **PLAINTIFF'S STATEMENTS CONTROVERTING DEFENDANT'S STATEMENT OF MATERIAL FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT** will be served upon all attorneys in this matter by filing with the Court's CM/ECF system.

This <u>2nd</u> day of February 2024.

*/s/ Stacey G. Evans*
Stacey G. Evans


*Counsel for Plaintiff*