# Exhibit F

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
WAYCROSS DIVISION

DR. MAHENDRA AMIN, M.D., )
Plaintiff, ) Case No.
V ) 5:21-CV-00056-LGW-BWC
NBCUNIVERSAL MEDIA, LLC, )
_____________________________/

ZOOM VIDEOTAPED DEPOSITION OF
JULIA AINSLEY

DATE: Tuesday, April 25, 2023
TIME: 9:00 a.m. - 5:57 p.m.

REPORTED BY: TAMIKA M. BURNETTE, RPR, CSR-2870

EXAMINATION

**Q. BY MS. EVANS: Good morning, again.**

A. Hi. Good morning.

**Q. I'm Stacey Evans, we've met.**

A. Yeah.

**Q. Got to chat?**

A. Yeah.

**Q. Could you please state your full name for the record?**

A. Sure. Julia Edwards Ainsley.

**Q. And I'm going to -- I don't have exhibit stickers, so I'm just going to write them in the bottom, since we don't have a live court reporter.**

(Plaintiff's Exhibit 1 marked for identification.)

**Q. BY MS. EVANS: This first exhibit is simply the notice that brings us here today.**

A. Okay.

**Q. There's nothing really for you to do with it, I'd just like to mark those. And other than the time, this is, again, the notice that just brings us here today.**

**Are you currently employed by NBCUniversal, MSNBC or some other entity?**

A. By NBC News, which is owned by NBCUniversal.

 **Q. And how long has that been true?**

A. Since August of 2017, so coming up on six years.

**Q. And you were working for NBC News in September of 2020?**

A. Yes.

**Q. I'm going to hand you what I'm going to mark as Plaintiff's Exhibit 2, with a copy to your counsel.**

A. Okay.

(Plaintiff's Exhibit 2 marked for identification.)

**Q. BY MS. EVANS: And it shows Exhibit A because this is a version of this document that was attached to a pleading filed in this case.**

**If you flip to the second page, do you recognize this document?**

A. Yes, I do.

**Q. What is it?**

A. This is a complaint that's sent by the Project South, and it's being sent to the Inspector General for the Department of Homeland Security, CR -- what we would call CRCL at DHS. It's civil rights and civil liberties, the Atlanta ICE field office, as well as the warden of the Irwin County Detention Center, and it details what we --

**September 15th, 2020?**
A. I believe so.
**Q. Why do you say believe so?**
A. Because September 15th, 2020 was a really long time ago.
**Q. Well, this was a -- this was a big deal to you; right?**
A. For that day. I've done over a hundred other stories since then.
**Q. Did you -- when did you find out you were going to be deposed in this case?**
A. It was either late 2022 or early 2023, I think.
**Q. And did you attempt to refresh your recollection in preparation for your testimony today?**
A. Sure. Yeah.
**Q. Did you look back over any notes?**
A. Yes. I know I talked to Mr. Osorio at some point. I'm just trying to remember -- yes, I did talk to him on -- I believe I talked to him on the 15th, that would make sense. But again, when you don't have a record of a phone call, and I'm really accurate, I want to tell you exactly what I remember, 100 percent, so if I have any doubt, I'm going to tell you that.
**Q. Did you record your phone call with Mr. Osorio?**
A. No. I never record my phone calls with people

that I'm interviewing unless I ask for their permission.

**Q. Did you -- and you didn't ask Mr. Osorio for his permission to record?**

A. No. That would not be at all in the keeping of my reporting practices.

**Q. Your reporting practices not to record seem to be different than others at NBC News; would you agree with that?**

A. I don't think so.

**Q. How do you ensure that you're accurately reflecting what your sources tell you if you don't record?**

A. I take notes, but only if they're going to be an on-the-record quote, would I need to record --

**Q. And it's your testimony that Mr. Osorio did not provide you on-the-record quotes for the story that you wrote on September the 15th, 2020 about Irwin County Detention Center?**

A. I don't remember.

THE VIDEOGRAPHER: Sorry for the interruption. The court reporter is actually having problems hearing.

MS. EVANS: Okay.

THE VIDEOGRAPHER: The time is 11:04 a.m. We're going off the record.

 (Off the record.)

THE VIDEOGRAPHER: Please stand by. The time is 11:15 a.m. We're back on the record.

**Q. BY MS. EVANS: Ms. Ainsley, did you speak with Elizabeth Mathren?**

A. Mathren, yes. I'd have to look at -- yes, I did.

**Q. On September 15th, 2020?**

A. Yes.

**Q. And did you record that interview?**

A. No.

**Q. Did you take any notes of that interview?**

A. Yes, I believe I did.

**Q. Do you still have those notes?**

A. No. What -- how I take notes is over e-mail, and I e-mail myself the notes, and then when my e-mail gets full, as it does, I have to delete.

**Q. Did you take notes -- strike that.**

**You testified earlier that you did not record your interview with Ben Osorio on September 15th; true?**

A. Right.

**Q. Did you take notes from that interview?**

A. Yes.

**Q. In the same fashion that you just described?**

A. Yes, which is easier to --
**Q. You took notes to yourself?**
A. Yes.
**Q. I do that too.**
A. Yes.
**Q. I do that too.**
A. Yes.
**Q. I do that too. And did you -- strike that.**
**Did you speak with Sarah Owings on September 15th?**
A. No. Jacob Soboroff did. We split up the calls.
**Q. And you did also speak with Andrew Free?**
A. Yes.
**Q. You did not record that interview?**
A. Correct.
**Q. Did you take notes?**
A. Yes, I did.
**Q. Also on e-mail?**
A. Yes.
**Q. Did you speak with any other attorneys of immigrant women or detainees on September 15th, 2020?**
A. No. And let me -- I have got to say something. Okay. So Andrew -- I talked to Andrew, he gave me those three the names. Jacob and I split it up. I know I

(Plaintiff's Exhibit 5 marked for identification.)

**Q. BY MR. EVANS: Do you see that?**

A. Yes. She's describing the AP wire.

**Q. So tell me what that means, "she's describing the AP wire"?**

A. Well, I was a wire reporter for years. That means the Associated Press would write up the story, and this means that there's no one from our newsroom who has changed -- actually, I don't know that for a fact. I don't -- I'm not on that side of this.

But what it would mean to me, as a reporter looking at this, is that you would take what the Associated Press puts out, and put it on your website that we haven't done any additional reporting at this point. So that's why the bylines says Associated Press.

**Q. This document reflected in Plaintiff's Exhibit 5, is this what's referred to as Daniella's story?**

A. No. Because it looks like she then did her own update at 2:26. So she must have added some more information beyond this. So what I'm updating, then, that published around like 5:24, I think, was updating Daniella's story, so not just the Associated Press. But Daniella used some of the Associated Press reporting in

**Q. Has he been head of standards at some point?**
A. I don't recall.
**Q. How big is standards?**
A. I don't know.
**Q. When you need to have -- strike that.**
**Does everything that goes on television or in print have to be approved by standards?**
MS. MCNAMARA: Objection to form.
THE WITNESS: It depends on its uniform. Not everything.
**Q. BY MR. EVANS: What does and what doesn't?**
A. This is probably one of the reasons why I'm griping here. What -- things that -- so first of all, we would call it legal and standards because that's where lawyers answers to standards. We all say, does this have to go to L&S.
Most of my reporting does go to legal and standards, but I'm not -- I know my process, I don't know the rest of the company.
Most of my reporting goes to legal and standards because I do reporting that isn't just based on the Associated Press. Right. So I've got my sources. I've got my documents. I've got a lot of really in depth reporting and that -- yeah. Honestly, it's a badge of honor that my reporting goes to legal

**print article in this exhibit -- well, what ultimately became Plaintiff's Exhibit 3?**

A. Yes.

**Q. Mr. Burkey, I understand, is a producer on Deadline: White House; is that right?**

A. I don't recall. I know Patrick, I've worked with him before. He has changed jobs. I don't know what his job was at that time, but he works at MSNBC or he did.

Does he still work there? I don't know.

**Q. Did you have any conversations with Nicole Wallace about the Irwin County Detention Center story on September 15th?**

A. Only on air.

**Q. Just on air?**

A. Yes.

[redacted]

MS. EVANS: No. I thought I had started a question. No, you don't have to -- I don't want you to strike what I said. I don't believe that.

**Q. BY MS. EVANS: Did you provide any text messages to counsel in the last week?**

A. Yesterday.

**Q. What time?**

A. We were -- yesterday afternoon.

**Q. What time?**

A. I don't remember the exact time. We finished up around five, so it was probably -- it was really soon. It was like within 30 minutes of getting it to y'all. It was probably around 3:00 or 3:30.

**Q. You came in to meet with lawyers and shared e-mails with them at the end of the meeting?**

A. So we were going through --

MS. MCNAMARA: Objection. I instruct her not to answer. I can make a represent for the record, that we received the text messages. We didn't receive e-mails. We received text messages that -- that she had. We obtained them from her yesterday, and at the meeting we produced them to you within hours of receiving them.

The timeline between when she provided them to us and when we produced them was to have them

reviewed and redacted for information that was not relevant.

MS. EVANS: Hours. When you knew I was getting on a plane to come here and they were produced me to when I already left the office, not even --

MS. MCNAMARA: I produced them to you when I became aware of them.

MS. EVANS: Within hours?

MS. MCNAMARA: Within hours.

MS. EVANS: I'm just making sure the record is clear. Within hours of a deposition that started less than 12 hours later.

**Q. BY MS. EVANS: All right. You mentioned in this exchange with Jacob --**

A. I'm sorry, can I get more water?

THE VIDEOGRAPHER: Sure.

THE WITNESS: Thank you.

**Q. BY MS. EVANS: You mentioned to Jacob that The Intercept had spoke with detainees, right?**

MS. MCNAMARA: Objection. Mischaracterization.

THE WITNESS: Could I see the --

**Q. BY MS. EVANS: I can't because I can't print things when I'm on a plane.**

A. Can I pull them up on my phone?

and did collect at that time any e-mails from Julia's e-mails. And as to my knowledge, she didn't have any.

MS. EVANS: Thank you. I appreciate that.

**Q. BY MS. EVANS: Ms. Ainsley, didn't you tell me, though, that you searched your own e-mail for documents?**

A. Yes. Both checks occurred.

**Q. And didn't you also tell me that in October of 2021, you searched your text messages?**

A. Yes.

**Q. Did you turn any text messages over to your counsel?**

A. Yes.

**Q. And the e-mails that -- strike that?**

**The text messages that you shared yesterday were not shared back in October of 2021. Why?**

A. They were the same text messages shared in October of 2021.

**Q. We just didn't get them?**

A. Yes.

MS. MCNAMARA: We didn't -- we -- we -- it turns out we had them. They had been sent to us in October of 2021, but we didn't realize we had them. They were sent in a somewhat random e-mail. And then when we spoke to her yesterday, we realized that she did indeed have text messages, which we weren't aware of.

**have signed?**

A. So I remember that after -- here's the chronology of -- so no, I don't remember that. The chronology is that he gave me records. I went to our medical team and they said, "Well, you got to figure out if there was a consent form signed." But before I went back, I found out Chris Hayes' show was already working on that. I just passed along what I learned from Chris Hayes's show and basically closed up shop, because they were going to take it from there. There's no use to have two separate reporting tracks on the exact same thing.

**Q. Do you know if anybody ultimately closed that loop and found out about whether there was consent forms?**

A. I don't think -- it becomes their work at that point. They don't need to include me.

**Q. You didn't follow up and ask them at any point?**

A. That wouldn't be within my -- that would be overstepping.

**Q. Back on Exhibit 17, the last page of the document, right in the middle, text message from you.**

A. (Witness complying.)

**Q. "Gosh, I really don't want to just let this one lie and move on. I have to know." When did that**

 **change?**

A. That was when Chris Hayes' show was going to take over the reporting.

**Q. So once Chris Hayes took over, your need-to-know --**

A. It's not a need-to-know, no. That's a mischaracterization.

**Q. What did you mean when you said --**

A. I needed to know. So guess what? The next day, I got the medical records, and I'm about to interview this woman, and I'm lining up the interpreter, and then I find out Chris Hayes's show is doing it. It kind of pisses me off a little bit because somebody else is going to take over the reporting. But, you know what, why are we both going to spend time on this? If you want it, let me give you what I know, and we don't need more cooks in the kitchen.

But, boy, I think that shows I did want to know. I was going to go talk to a detainee and look at her medical records and talk to her doctor. So I think that's a mischaracterization to say I stopped caring.

**Q. Well, you didn't ever follow up and ask Chris or any of his producers what they learned?**

A. That's an overstep. That would be an overstep.

**Q. Just curiosity as a person?**

A. I would never -- that would be an overstep.

**Q. Why was it that -- strike that.**

**Did you -- strike that.**

[redacted]

**Q. Did somebody tell you that you shouldn't be involved anymore?**

A. Jacob and I spoke at -- and determined that we weren't going to do the same interview as Chris Hayes' show, and so then I talked to Rich, and I made clear that that was the way -- what we were going to do, that I wasn't going to be involved anymore, and he agreed with that decision.