# Exhibit EE

**DR. MAHENDRA AMIN,M.D. vs NBCUNIVERSAL MEDIA, LLC.**
Confidential                 Rachel Maddow on 05/17/2023

```
 1            UNITED STATES DISTRICT COURT
        FOR THE SOUTHERN DISTRICT OF GEORGIA
 2                 WAYCROSS DIVISION

 3   DR. MAHENDRA AMIN, M.D.

 4              Plaintiff,    CASE NO.
        v.                    5:21-CV-00056-LGW-BWC
 5
     NBCUNIVERSAL MEDIA, LLC,
 6
                Defendant.
 7

 8        *** CONFIDENTIAL TRANSCRIPT ***

 9        VIDEO-RECORDED DEPOSITION OF
                 RACHEL MADDOW
10
          Davis Wright Tremaine, LLP
11         1251 Avenue of the Americas
                  21st Floor
12          New York, New York 10020

13               05/17/2023
              9:38 a.m. (EDT)
14

15

16

17

18

19

20

21

22

23

24
        REPORTED BY:  MONIQUE CABRERA
25      JOB NO. 14601
```

```
 1    you came back from --

 2         A.    Yes, I took some time.

 3         Q.    How long did you take?

 4         A.    A few weeks.

 5         Q.    And you were going to take more,

 6    but you were, like, I don't need it?

 7         A.    I was going to take a second

 8    hiatus.  I was going to take time off and

 9    then come back and then time off and then

10    come back.  And once I took the first bit

11    of time off, I was like, I don't need

12    another chunk of off time.  I just need a

13    different schedule overall, and so then we

14    decided to go to 1-day-a-week on a --

15    effectively on a semi-permanent basis.
```

██████████████████████████████

████████████████████████████████████████

████████████████████

█████████████████████████████████████████

███████████████████████████████

```
21    look at ratings, but not all.  And, you

22    know, asking on average, mathematically,

23    it's a little awkward to figure out

24    because I think the way it works in

25    practice is that in some -- like several
```

1   months will go by when I don't look at

2   ratings at all, and then several months

3   will go by when I look at ratings all the

4   time.  It's not a systematic thing.

5        Q.     When you look at ratings, what

6   are you looking for?

7        A.     I mean, just you have curiosity,

8   how'd we do.

9        Q.     Compared to prior shows?

10  Compared to other shows?

11       A.     I mean, there's some value to

12  the absolute number.  That kind of -- you

13  know, in most cases, feel like the

14  interest factor there is kind of -- that's

15  kind of like a house cable news doing.

16            Like, mostly our numbers, I

17  think, are a reflection of whether or not

18  the public is watching cable news in

19  general.  Like, it's very -- I don't take

20  it necessarily as a direct reflection on

21  me or how exactly how good our show is.

22            I think over time, I have come

23  to realize with those numbers that while

24  it is -- there's a human curiosity factor

25  that's unavoidable and comparing

```
1       Q.    Are you aware that between 2014

2    and 2017 your ratings tripled?

3       A.    On average?

4       Q.    Just overall.

5       A.    I am not aware of that.  And I

6    am not even really sure what that metric

7    would mean, I have to say.  I mean, it

8    sounds great.  But I don't know.  I mean

9    rela- -- like, relative to everybody else

10   in cable news or in terms of the absolute

11   value with number of people watching on an

12   average basis in terms of our peak

13   numbers, I don't know.

14          I don't -- there may be a --

15   there may be a knowable metric about that,

16   but I don't know it and I don't track it

17   that way.

18      Q.    Are you aware that Rolling Stone

19   described it as "No program has been

20   benefited as much as Maddow whose audience

21   has almost tripled from 849,000 nightly

22   viewers in 2014 to more than 2.3 million

23   today"?  And today at the time of this

24   article was 2017.

25      A.    No, I don't remember that
```

1    assessment.

2        Q.      Have you ever seen numbers at

3    MSNBC that showed the demographics of the

4    viewership?

5        A.      For the network?

6        Q.      Yes.

7        A.      I don't believe so.

```
 1   work.  And I'm -- whatever else I do, I'll

 2   always be proud of that.

 3       Q.    Is originality important to you

 4   in The Rachel Maddow Show?

 5           MS. MCNAMARA:  Objection to

 6       form.

 7       A.    Originality, can you say more

 8   specifically what you mean?

 9   BY MS. EVANS:

10       Q.    Like something original to say

11   on the news.

12       A.    As a stylistic matter, I think

13   that's important in effective

14   communication and in effective

15   broadcasting.  Repetition where it sounds

16   like you are saying the same sort of thing

17   that everybody else has said is, to some

18   extent, unavoidable, but stylistically, I

19   think it is not engaging.

20       Q.    Is it important to you that you

21   have something to say that people don't

22   already know?

23       A.    Yes, within reason.  Yes.

24       Q.    Within what reason?

25       A.    I could do a show every day
```

1   is?

2       A.    Articles on the Internet never

3   surprise me.

4           MS. MCNAMARA:  Objection.  Lack

5       of foundation.

6       A.    There are some amazing articles

7   on the Internet.

8   BY MS. EVANS:

9       Q.    **This is true.**

10      A.    That would actually make a nice

11  cross stitch now that I think about it.

12      Q.    **The monologues at the beginning**

13  **of your show, sort of become what your**

14  **show's best known for.  Would you agree**

15  **with that characterization?**

16      A.    To the extent that I am best

17  known for a specific thing about the show,

18  I would say that's true.  But I think

19  that's a -- it's a pretty loose

20  characterization.

21      Q.    **You refer to the monologue part**

22  **of the show as the A Block?**

23      A.    Yes.

24      Q.    **And you usually write that part**

25  **of the show, true?**

1          That -- that was not new news on

2    September 15th, 2020, was it?

3       A.    Not speaking specifically to

4    this discussion, but as a general news

5    matter that was all -- I think the idea of

6    congregate facilities in general not

7    taking Covid seriously was a concern.

8       Q.    Jails, detention centers?

9       A.    Meatpacking plants.

10      Q.    Right.  There were problems that

11   had been covered by you and others at that

12   point?

13      A.    Yes.

14      Q.    The complaint here, you are

15   referring to the letter from Project South

16   and Dawn Wooten?

17      A.    Yes.

18      Q.    What did you mean "there's been

19   a lot of jumping to conclusions around the

20   complaint"?

21      A.    I don't know what I was thinking

22   at the moment that I said that.  And,

23   again, I don't -- you know, this is kind

24   of a rough log of the discussions, so I

25   don't even know if that accurately

 1    reflects what I actually said, let alone

 2    what I meant when I said it.

 3        **Q.    Sitting here today, you don't**

 4    **have any idea what that meant?**

 5        A.    Well, in context, I think I can

 6    surmise, based on what I said next in the

 7    log, according to the log.  I don't want

 8    to assume it's true.  If it is, we should

 9    definitely do it.

10            I think what I am saying there

11    is a complaint on its own terms, sort of

12    one level of assertion, but to the extent

13    that we can add anything to -- to the

14    extent that there is anything else we can

15    do in terms of assessing the validity of

16    the complaint, to the extent that there's

17    additional reporting that could be done

18    and that Jacob, having this tape, that's

19    about speaking to somebody in conjunction

20    with this complaint, that's going to help

21    us not jump to conclusions about it, but

22    rather arrive at reasonable informed

23    conclusions about the merits of the

24    complaint.

25            That's how I read it, looking at

1        A.    Yes.

2        Q.    **Sitting here today, can you**

3  **think of any additional information that**

4  **you got either during the news meeting or**

5  **after the news meeting on September 15th,**

6  **2020 that caused you to be more inclined**

7  **to add this story to the show on**

8  **September 15th, 2020?  And by "this**

9  **story," I mean the Irwin County Detention**

10 **Center story.**

11       A.    I am sorry.  Let me make sure.

12 You want to know if I remember today that

13 there was something that happened post

14 news meeting that changed my feeling about

15 whether it should be on the show?

16       Q.    **Right.**

17       A.    I don't remember the day at all,

18 and I don't remember the sequence of

19 events.  But I know from reviewing

20 material yesterday, and I can sort of

21 surmise from looking at the transcript of

22 -- and looking at the segment of what

23 we've put on the air, that a really big

24 important thing happened after the news

25 meeting which is that NBC news published

1    an important story on the topic.  And that

2    we had the reporter who had done the work

3    on that story available to us as a

4    potential guest.  That was an important --

5    that seemed to me to be on important

6    thing.

7              And I knew from the time stamp

8    on that NBC story that I reviewed

9    yesterday that that story was published

10   subsequent to this meeting.

11   **Q.    Any other information that you**

12   **can recall or that you were refreshed on**

13   **yesterday during your 5 and a half-ish**

14   **hour meeting with counsel that you may**

15   **have learned either during the news**

16   **meeting or after that made you more**

17   **inclined to include the Irwin County**

18   **Detention Center in the transcript on**

19   **September 15th, 2020?**

20             MS. MCNAMARA:  Again, I caution

21        you can -- if you recall documents or

22        something, but any communications with

23        counsel, you can't testify to.

24        A.    Okay.  This is sort of a subset

25   of what I previously answered, but the

1   other thing that I know happened

2   subsequent, and I am asking about it in

3   the meeting, and then I know that it

4   happened after the meeting, is that we got

5   -- that we got the transcript and

6   ultimately the tape of Jacob Soboroff's

7   interview with the Georgia whistleblower.

8   And that was an important part of what we

9   brought to the story.

10  BY MS. EVANS:

11      Q.    Anything else that you can think

12  of sitting here today?

13      A.    Not that I can think of, but I

14  don't -- I don't know.

15      Q.    And the reporter that you're

16  referring to that had been working on the

17  story is Jacob Soboroff?

18      A.    Yes.

19      Q.    And he ended up being a guest on

20  the show?

21      A.    Yes.

22      Q.    And Jacob Soboroff is the one

23  that spoke with Ms. Wooten, true?

24      A.    Yes.

25      Q.    Are you aware of any

1   think that a lot of Americans thought that

2   when the story broke.

3            Would you agree with that

4   characterization?

5      A.   I think that was a broadly held

6   view.

7      Q.   And in the course of a -- strike

8   that.

9            Do you recall how long the news

10  meeting on September 15, 2020 lasted?

11     A.   I don't recall.  I mean, I can

12  -- I can make a guess based on these time

13  stamps, but given that the end is blacked

14  out, I can't tell what time it ended.

15     Q.   At least the time stamp on when

16  you birthed the gist of what the A Block

17  would be, it says 1640, and it looks like

18  the meeting started at 1615.

19            Do you see that?

20     A.   Yes.

21     Q.   So in a matter of 25 minutes,

22  you had decided that, in your mind, it

23  would be appropriate to tie alleged

24  hysterectomies at Irwin County Detention

25  Center to the only story that you can

1   think of in your memory of 15 years on

2   air, Rachel Maddow, where you broke down

3   in tears so much so that someone had to

4   finish your sentence?

5            MS. MCNAMARA:   Objection to

6       form.

7       A.    No.   The meeting took

8   25 minutes.   My decision-making process

9   took longer than that.

10  BY MS. EVANS:

11      Q.    Well, as reflected in Exhibit 37

12  on the third page at time stamp 1631, you

13  were unsure if you could even leave room

14  in the show, right?

15      A.    Yes, that's the nature of the

16  news meeting was that we debate whether

17  something should be on the show and where.

18      Q.    And sometime between 1631 and

19  1640, 9 minutes, your thought process went

20  from "I don't know if we should leave room

21  for it in the show, I don't want to assume

22  it's true, but if it is, we should

23  definitely do it," to tying alleged

24  hysterectomies at the Irwin County

25  Detention Center to the only story in your

1   memory over 15 years on air with The

2   Rachel Maddow Show that made you break

3   down in tears so much so that someone had

4   to finish your sentence?

5            MS. MCNAMARA:  Objection to

6        form.

7        A.    No, that's not the length of

8   time over which this decision was made.

9   BY MS. EVANS:

10       Q.    How long do you think that

11  decision took?

12       A.    I don't know when I first read

13  the first news story or the first report

14  of any kind about Irwin County.  I don't

15  know if I saw that before I went to bed on

16  the 14th.  I don't know if I saw it first

17  thing when I woke up on the 15th.  I don't

18  know if I saw the first story when I read

19  the news note.  I don't know when that

20  was.

21            But the nature of my thought

22  processes around these things is once I

23  learn about something and I think it might

24  be on the show, I start thinking about why

25  it might be on the show, and if so, how I

```
 1    counsel what I have previously marked as

 2    Exhibit 44 which is an e-mail exchange

 3    from September 18th, 2020 and you are part

 4    of at least some of the e-mails on this

 5    chain?

 6             (Whereupon, Exhibit 44, E-mail

 7        exchange from September 18th, 2020,

 8        was identified.)

 9        A.    Yes.  Okay.  Remind me what the

10    question is.

11        Q.    Sure.

12             Mr. Gnazzo told us that on

13    September 18, 2020, he thought the

14    correction was planned, couldn't say for

15    sure, but he thought it was.  And that was

16    the day that Justice Ginsburg passed away

17    and he believes that may have been the

18    reason why the correction did not air.

19             And you said something to the

20    effect that that makes sense.

21        A.    Makes sense.

22        Q.    And my question is:  Why not

23    just run it on another day?

24        A.    I don't remember our reasoning

25    at the time.  I don't, off the top of my
```

1    head, for example, remember what was going

2    on the next day that we did a show, which

3    was probably the Monday following.  I

4    don't know what else was happening in

5    terms of competition for a real estate in

6    the show.  However --

7         **Q.    September 18th is a Friday, if**

8    **it helps.**

9         A.    Yeah, so it would have been --

10   the next day would have been a Monday.

11   And this was a correction that would have

12   been about something that happened on the

13   show on Tuesday?

14        **Q.    The 15th, Tuesday.**

15        A.    So if Friday was not a

16   possibility because of the Justice

17   Ginsburg news, then it would have been

18   Monday.  So we would have been 6 days down

19   the road.

20             And just to speak bluntly, that

21   this was a correction that I think was

22   very much on the line -- on the borderline

23   in terms of whether or not we should run

24   it at all.  Certainly any important

25   misstatements of fact in that segment, we

DR. MAHENDRA AMIN,M.D. vs NBCUNIVERSAL MEDIA, LLC.
**Confidential**          Rachel Maddow on 05/17/2023          **Page 214**

```
 1    would have felt an urgency to correct.

 2              In this case, from my reading of

 3    the proposed correction and from the

 4    e-mail traffic around it, it seems like I

 5    didn't say anything wrong.  The error was

 6    that photos were shown that I was not even

 7    talking directly about.  I was not

 8    describing them.  They were just shown and

 9    they were of ICE detention facilities, but

10    they were not from the time period that we

11    were describing.

12              And so that's -- I believe in

13    the concept of corrections, for important

14    -- for errors, but that I also believed

15    that the -- sort of the effort to correct

16    should be proportional to the scale of the

17    error.  And in this case, this is not a

18    major error.

19              And so it's the sort of thing

20    that going back to 6 days after the fact

21    to correct it, just doesn't seem that

22    important.

23       Q.    Can you think of any other

24    reason why the correction never ran?

25       A.    No.
```

```
 1        Q.    And the error, whether
 2   considered big or small, was that while
 3   discussing child separation and describing
 4   that as a scandal of the Trump
 5   administration, the photos that were being
 6   shown were of ICE detention facilities
 7   during the Obama administration; is that
 8   right?
 9        A.    Based on the draft correction
10   that again did not run, it seems that's
11   the case.
12             My experience doing the show is
13   that I don't necessarily -- I am not
14   necessarily looking -- if I am reading
15   from the teleprompter and an image is
16   showing on the screen to the viewers, I
17   don't necessarily see what that image is.
18   And so this is something that I may not
19   have noticed was incorrect, even if I had
20   recognized it as an incorrect image in the
21   moment, if that makes any sense.
22        Q.    On Exhibit 44, Mr. Gnazzo sends
23   you a draft correction, proposed
24   correction, right?  That's the first
25   e-mail.
```

```
 1              (Reporter clarification.)

 2              MS. EVANS:  Proposed script.

 3       A.    Yes.

 4    BY MS. EVANS:

 5       Q.    And what was your response to

 6    him?

 7       A.    I wrote, "This is way too much."

 8       Q.    What does that mean?

 9       A.    I think I meant this is way too

10    much.

11       Q.    Meaning what?

12       A.    I don't remember what was in my

13    head at the moment that I said it, but

14    looking at it now, based on this

15    description of what we did wrong, this is

16    way overkill as a correction.  This is --

17    there's a lot of -- this is a lot of words

18    and a lot of explanation and a lot of

19    narrative effort, a lot of time on what

20    was in the grand scheme of things a small

21    error.  This is sort of hitting a

22    thumbtack with a sledge hammer.

23       Q.    And Mr. Gnazzo writes back to

24    you, "Okay.  We will cut it way back.  But

25    I do think the gist of it is okay."
```

1          Do you see that?

2      A.    Yes.

3      Q.    And what was your response to

4   him?

5      A.    We should not be engaging with

6   the Obama administration's ICE policies.

7      Q.    Why not?

8      A.    I think in this context what I

9   meant was this is way too much.  Like, you

10  guys -- we put up a photo with the wrong

11  time stamp on it to engage with the

12  policies of an administration in order to

13  explain why a wrong time stamp photo is

14  projected is -- is overkill to somewhat an

15  extreme degree.  It was just too much.

16     Q.    Well, you -- well, you had

17  already said it's way too much.

18     A.    Yeah.

19     Q.    Don't you think you meant

20  something different when you said we

21  should not be engaging with the Obama

22  administration's ICE policies?

23     A.    No.  This is what's known in the

24  news business as a fight between me and

25  Cory because I am saying this is way too