# Exhibit FF

**DR. MAHENDRA AMIN, M.D. vs NBCUNIVERSAL MEDIA, LLC**
**Alexander Price on 06/15/2023**

1              UNITED STATES DISTRICT COURT
        FOR THE SOUTHERN DISTRICT OF GEORGIA
2                   WAYCROSS DIVISION

3    DR. MAHENDRA AMIN, M.D.

4                   Plaintiff,    CASE NO.
        v.                        5:21-CV-00056-LGW-BWC
5
     NBCUNIVERSAL MEDIA, LLC,
6
                    Defendant.
7

8

          VIDEO-RECORDED DEPOSITION OF
9                 ALEXANDER PRICE
          Davis Wright Tremaine, LLP
10        1251 Avenue of the Americas
                   21st Floor
11        New York, New York 10020

12                 06/15/2023
                9:30 a.m. (EDT)
13

14

15

16

17

18

19

20

21

22

23

24   REPORTED BY:  MONIQUE CABRERA
     JOB NO. 454780
25

```
 1   DHS officials and the warden of the

 2   detention facility.

 3           MS. EVANS:  Move to strike as

 4      unresponsive.

 5   BY MS. EVANS:

 6      Q.    Did you assume that the

 7   Whistleblower complaint, as you called it

 8   in Exhibit 67, was true?

 9           MS. MCNAMARA:  Objection; asked

10      and answered.

11           THE WITNESS:  I, again, lent it

12      credibility because it was a formal,

13      on-the-record statement -- a

14      complaint, rather, that was filed with

15      multiple high-ranking DHS officials

16      and the warden at the detention

17      facility.

18   BY [!EZ SPEAKER 01]:

19      Q.    I didn't ask you if it had

20   credibility.  Listen carefully.

21           Did you assume that the

22   Whistleblower complaint, as you call it in

23   Exhibit 67, was true?

24           MS. MCNAMARA:  Objection to

25      form.  Asked and answered.
```

```
 1        Credibility goes to truth.

 2        A.     The best I can give you is that

 3   it -- I lent it credibility because it was

 4   an official, on-the-record complaint

 5   lodged with high-ranking DHS officials and

 6   the warden of the facility.

 7   BY MS. EVANS:

 8        Q.     Did you assume that the

 9   Whistleblower complaint, as you call it in

10   Exhibit 67, might not be true?

11        A.     I didn't assume about it.

12        Q.     Did you consider that the

13   Whistleblower complaint, as you call it in

14   Exhibit 67, might not be true?

15        A.     I felt that we needed to get

16   reporting.  But, again, it was very

17   credible because it was an on-the-record

18   official complaint.

19        Q.     You did not even consider that

20   the Whistleblower complaint, as you call

21   it in Exhibit 67, might not be true; is

22   that correct?

23             MS. MCNAMARA:  Objection;

24        mischaracterization.

25        A.     That's not what I said.  I just
```

 1  said that I -- it was credible because it

 2  was an official, on-the-record complaint

 3  and it was lodged with the appropriate

 4  authorities.

 5      Q.   I don't know why this question's

 6  so hard.

 7           If you are always reporting,

 8  keeping an open mind, avoiding a rush to

 9  judgment and avoiding preconceived

10  notions, wouldn't you have to at least

11  consider that the Whistleblower complaint

12  might not be true?

13           MS. MCNAMARA:  Objection to

14      form.

15      A.   I didn't make a certainty one

16  way or the other.  I went -- I found it

17  credible for the reasons I listed, but I

18  didn't assume anything about it.

19  BY MS. EVANS:

20      Q.   I didn't ask that.

21           MS. EVANS:  Move to strike as

22      non-responsive.

23  BY MS. EVANS:

24      Q.   Did you at all ever consider

25  that the Whistleblower complaint, as you

```
 1    call it in Exhibit 67, might not be true?
 2              MS. MCNAMARA:  Objection to
 3       form.
 4       A.    Again, I found it credible for
 5    the reasons that I listed before.
 6    BY MS. EVANS:
 7       Q.    Did you ever even consider that
 8    it was wrong?
 9       A.    I found it credible for the
10    reasons I listed.
11       Q.    Is the answer to my question no?
12       A.    It's -- finding something
13    credible is not a black and white; it is
14    keeping an open mind.  However, as I said,
15    for the reasons I listed, I found it
16    credible.
17       Q.    Did you ever consider for even a
18    second that the Whistleblower complaint,
19    as you call it in Exhibit 67, might not be
20    true?
21              MS. MCNAMARA:  Objection; asked
22       and answered four times.
23       A.    I found it credible.
24              MS. EVANS:  I'm giving him a
25       chance to tell me that he's open
```

1   minded, avoiding a rush to

2   judgement --

3          MS. MCNAMARA:  And he has

4   already --

5          MS. EVANS:  Don't interrupt me.

6   I'm not finished.

7          MS. MCNAMARA:  I'm not --

8          MS. EVANS:  I'm not finished.

9          MS. MCNAMARA:  I am not

10  interrupting you.

11         MS. EVANS:  You are interrupting

12  me.  I was in the middle of a

13  sentence.

14         MS. MCNAMARA:  Okay.  Finish

15  your sentence so we can all speak.

16         MS. EVANS:  I'm giving the

17  witness a chance to show me that he's

18  ever had an open mind, that he ever

19  avoided a rush to judgment and that he

20  ever avoided a preconceived notion,

21  and he can't even do it.

22         MS. MCNAMARA:  And the witness

23  has clearly and repeatedly testified

24  that he found the Whistleblower

25  complaint credible, he found that --

```
1       that was -- that is not a -- not black

2       and white as to truth or falsity and

3       that's why he was investigating it,

4       Ms. Evans.

5              MS. EVANS:  We'll see.

6    BY MS. EVANS:

7       Q.    Mr. Price, the transcript

8    reflected in Exhibit 67 is 35 pages,

9    right?

10      A.    Yes.

11      Q.    You reviewed this at some point

12   in the 10 to 11 hours that you worked in

13   anticipation of today, true?

14      A.    A bit, yes.

15      Q.    Did you review all of it?

16      A.    I didn't go through the entire

17   thing, no.

18      Q.    Did you assume --

19             MS. EVANS:  Strike that.

20   BY MS. EVANS:

21      Q.    During this telephone call with

22   Andrew Free on September 15th, 2020, ICE

23   released a statement regarding the

24   allegations of mass hysterectomies; is

25   that right?
```

1      A.    I believe there are statements

2   about multiple procedures, not just

3   hysterectomies, and I'm not 100 percent

4   sure what time ICE released the statement.

5      **Q.    One thing you'll learn about me,**

6   **if you hadn't already, Mr. Price, is that**

7   **I'll take as long as we need.  So if you**

8   **want to continue to remember nothing,**

9   **we'll go through this painfully and it'll**

10  **take a lot longer than it needs to or you**

11  **can, you know, use the benefit of your 10**

12  **to 11 hours that you spent preparing for**

13  **today and actually tell me some**

14  **information, but you do it however you**

15  **want to do it.**

16          MS. MCNAMARA:  And I object to

17      the insinuation that the witness is

18      not testifying accurately.  He -- his

19      job here is to testify honestly and

20      accurately.  And if he does not have a

21      specific recollection of something, it

22      would be false and inaccurate to

23      testify otherwise.

24          MS. EVANS:  He did a good job of

25      repeating your coaching from the 10 to

1          11 hours that he is never supposed to

2          refer to the hysterectomies.  It's

3          always to procedures.

4     BY MS. EVANS:

5          Q.    So you remember something,

6     right?

7               MS. MCNAMARA:  And I -- and I

8          object to the insinuation that there

9          was coaching.

10              MS. EVANS:  Sure.

11    BY MS. EVANS:

12         Q.    Mr. Price, you could you flip to

13    page 29 of Exhibit 67?

14         A.    Yes.

15         Q.    Starting on line 18, Andrew Free

16    is talking.

17               Do you see that?

18         A.    Yes.

19         Q.    On line 21, he says, "ICE is

20    saying he's only done two hysterectomies

21    at Irwin since 2018, with enough caveats

22    to refuse the point about referrals."

23               Do you see that?

24         A.    I do.

25         Q.    Does that refresh your

1    recollection about whether ICE put out a

2    statement during the time that you were

3    talking to Andrew Free regarding alleged

4    mass hysterectomies?

5        A.    I would believe this would

6    indicate that that did come out at some

7    point during the conversation.

8        Q.    And "he" on line 22 refers to

9    Dr. Amin; is that right?

10       A.    I believe so, yes.

11       Q.    Did you find that statement from

12   ICE credible?

13       A.    I give it the same weight as --

14   as any other government statement.

15       Q.    Which is what?

16       A.    That it is their official

17   position and -- and yeah, that is their

18   official position.

19       Q.    What does that mean?

20       A.    I -- I'm not quite sure how to

21   define "official position."  I mean, it's

22   the position of the federal agency that is

23   reflected in the statement they put out.

24            (Reporter clarification.)

25            THE WITNESS:  They put out.

 1   BY MS. EVANS:

 2        Q.    Did you find the statement from

 3   ICE at least as credible as you found the

 4   Whistleblower compliant as you referred to

 5   it in Exhibit 67?

 6        A.    Again, I gave it the same weight

 7   that I give all other government

 8   statements.

 9             MS. EVANS:  Move to strike as

10        non-responsive.

11   BY MS. EVANS:

12        Q.    You testified that you found the

13   Whistleblower complaint, as you call it in

14   Exhibit 67, credible.

15             Do you remember that?

16        A.    Yes.

17        Q.    Did you find the ICE statement

18   at least equally as credible as you found

19   the Whistleblower complaint or no?  Just

20   tell me.

21        A.    They -- they are two different

22   documents, so they're -- I -- it's tough

23   to, you know, compare because the ICE

24   statement didn't -- it only addressed a

25   small portion of the Whistleblower

 1    complaint.  So it -- again, I gave it

 2    the -- the weight that I gave other

 3    government statements.

 4        Q.    Which is what?  What weight do

 5    you give those other government

 6    statements?

 7        A.    That is the official position of

 8    that federal agency, that what they lay

 9    out in the statements is -- is their

10    position.

11        Q.    Do you find official positions

12    of government agencies credible?

13        A.    Sometimes.

14        Q.    Did you in this instance?

15        A.    The -- the statement was -- was

16    very narrow, and so I -- let me see how to

17    put this.

18            I -- without -- without more

19    information, I didn't have reason to doubt

20    the voracity of their specific statement.

21    But it, again, was much narrower than the

22    issues addressed in the Whistleblower

23    complaint.

24        Q.    How so?

25        A.    Well, I don't have the entire

1  statement in front of me, but it -- it

2  mentioned hysterectomies.  There was a lot

3  more in the Whistleblower complaint and

4  the other reporting that -- than just

5  hysterectomies.

6       Q.    Is that it?

7       A.    What do you mean?

8       Q.    Well, you said that the

9  statement was very narrow and without more

10 information, I didn't have reason to doubt

11 the voracity of the Whistleblower

12 complaint.

13           And I asked you how so?

14      A.    All right.  I'm -- sorry.  I

15 thought --

16      Q.    Is there anything else that you

17 want to add?

18      A.    -- I -- I meant to say the

19 voracity of the -- of the statement.  It

20 was -- it was narrow, but without more

21 information, I didn't have reason to doubt

22 its voracity.  I'm sorry if I misspoke.

23      Q.    So then you found the ICE

24 statement regarding hysterectomies

25 credible, true?

```
 1      A.    I give it the same weight I give
 2  other government statements.
 3      Q.    But you told me that sometimes
 4  you find government official positions
 5  credible and sometimes you don't.  And I
 6  asked you what did you think in this
 7  instance.
 8            And that's when you went into
 9  the -- it being narrow.
10            MS. MCNAMARA:  Objection to
11       form.
12  BY MS. EVANS:
13      Q.    So just saying that I give it
14  the same weight isn't really answering my
15  question.  I'll -- I'll ask it again.
16            Did you find the ICE statement
17  regarding hysterectomies on September 15,
18  2020 credible?
19      A.    I -- I gave it the same weight
20  that I give other government statements.
21  And, again without more information, I
22  didn't have reason to doubt the voracity
23  of the specific claims they were making.
24      Q.    When you say that "without more
25  information, I didn't have reason to doubt
```

1   the voracity of the specific claims that

2   they were making," doesn't that mean that

3   you found it credible?

4        A.    It -- it's not a black and

5   white.  It's a -- it's a very -- it's a

6   bit of a gradient scale and -- yeah.

7        Q.    Recognizing, in your words, it's

8   a gradient scale, where on the scale is

9   the ICE statement on September 15th, 2020

10  compared to the allegations about

11  hysterectomies in the Whistleblower

12  complaint, as you call it?

13       A.    Again, the -- a statement from a

14  government agency and a Whistleblower

15  complaint are two very different

16  documents, and so it's tough to

17  specifically weigh them, you know, apples

18  to apples.  The -- again, the complaint

19  was lodged with -- with authorities on --

20  who had investigatory responsibilities and

21  oversight responsibilities over the

22  agency, and the other one is a statement

23  from an agency in response to a specific

24  part of the Whistleblower complaint.  So

25  it's -- I absolutely took it into account,

```
 1   but it's -- it's not an apples-to-apples

 2   comparison.

 3        Q.    I want to make sure I'm clear.

 4             I asked you earlier if you found

 5   the Whistleblower complaint, as you call

 6   it in Exhibit 67, to be credible.  And you

 7   were asked if you found it to be truthful,

 8   and you said you found it credible.

 9             Do you remember that?

10   A.    Yes.

11        Q.    Did you consider that the

12   statements within the Whistleblower

13   complaint regarding hysterectomies were

14   not true?

15             MS. MCNAMARA:  Objection; asked

16        and answered.

17   A.    I -- again, I -- I found those

18   statements and the statements valid, the

19   other items in the Whistleblower complaint

20   to be credible, because they were lodged

21   with the proper authorities.

22   BY MS. EVANS:

23        Q.    Speaking just for the statements

24   within the Whistleblower complaint, as you

25   call it, regarding hysterectomies, you
```

```
 1   found those statements to be credible,
 2   true?
 3       A.    Yes.
 4       Q.    And speaking just for the
 5   statement from ICE regarding mass
 6   hysterectomies, did you find that
 7   statement to be credible?
 8             MS. MCNAMARA:  Objection;
 9       mischaracterization.
10       A.    I -- again, I gave it the weight
11   that I give other government positions,
12   but it's -- it's again, not a full
13   apples-to-apples comparison.
14   BY MS. EVANS:
15       Q.    But you told me sometimes you
16   find government positions to be credible
17   and sometimes you don't.  So it's not that
18   you give all government positions the same
19   -- you don't have the same feelings about
20   every government statement, right?
21       A.    It -- it depends on -- on the
22   conditions around the statement, on the --
23   the state of reporting around whatever the
24   statement regards.  It depends on a lot of
25   factors.
```

```
 1        Q.    And because it depends on a lot
 2   of factors, when I asked you:  "Did you
 3   find the ICE statement regarding
 4   hysterectomies to be credible," and you
 5   tell me that you give it the same weight
 6   as you give all other government
 7   positions, that's not an answer to my
 8   question, is it?
 9             MS. MCNAMARA:  Objection.
10   BY MS. EVANS:
11        Q.    Because there's not one answer
12   to that.  You said it depends on all of
13   these things, right?
14        A.    At I said, the ICE statement is
15   a different type of document than the
16   Whistleblower complaint, so they're not
17   apples-to-apples comparable.
18        Q.    And I am not asking you about
19   the statements in the Whistleblower
20   complaint right now.
21             I'm asking you:  Did you find
22   the ICE statement regarding hysterectomies
23   credible?
24        A.    I -- again, it was very narrow.
25   I didn't have -- I wanted -- I -- without
```

 1   more information, I didn't have reason to

 2   doubt the veracity of the specific claims

 3   they were making in the statement.

 4        Q.    If you didn't have any reason to

 5   doubt the veracity of the specific claims

 6   that they were making in the statement,

 7   doesn't that mean you found it credible?

 8        A.    It's -- it's a -- it's a very

 9   ambiguous matter of degree.  And I am

10   sorry I can't put a definitive number on

11   it, you know, from 1-to-100.

12        Q.    Well, I didn't ask you that.

13              You're very quick to tell me

14   that you found the Whistleblower

15   complaint, including statements about

16   hysterectomies, to be credible.

17              You told me that pretty quick

18   earlier, right?

19        A.    Yes.

20        Q.    And you stand by that today?

21        A.    Yes.

22        Q.    Even after reading the Senate

23   report?

24        A.    Yes.

25        Q.    When you read the Senate report,

1   you found that they found evidence of two

2   hysterectomies, right?

3       A.    I forget what the specific

4   language was, but I remember there being

5   two hysterectomies, yes.

6       Q.    So let me ask you again:  Do you

7   stand by the statement that you find

8   statements in the Whistleblower complaint,

9   as you call it, regarding hysterectomies

10  credible?

11          MS. MCNAMARA:  Objection;

12      mischaracterization.

13      A.    I found the Whistleblower

14  complaint credible, again, because it was

15  lodged with the proper authorities.  It

16  was on the record.

17  BY MS. EVANS:

18      Q.    Do you find the statement from

19  the Whistleblower complaint, as you call

20  it, regarding hysterectomies credible

21  today?

22      A.    I -- I did not get a chance to

23  read the entire Senate report.  I do find

24  it credible, yes.

25      Q.    Find what credible?

1      A.     The Whistleblower complaint.

2      **Q.     The allegations of**

3  **hysterectomies in the Whistleblower**

4  **complaint, you find them credible today?**

5      A.     I have not been able to follow

6  the story closely.  I don't know what the

7  current reporting is, but with the

8  information I have, yes.

9      **Q.     Do you find the ICE statement**

10 **from September 15th, 2020 regarding the**

11 **number of hysterectomies credible today?**

12     A.     Specifically that, the line

13 about the number of hysterectomies

14 referred, yes.  That was confirmed, I

15 believe, by the Senate report.

16     **Q.     Right.  But yet you still,**

17 **sitting here today, find credibility in**

18 **the statements regarding hysterectomies in**

19 **the Whistleblower complaint in light of**

20 **what you just told me?**

21     A.     Yes.  Because there's a

22 difference between referred versus

23 performed.  The ICE statement and the

24 Senate report were confined to "referred."

25 They -- I did not see where the Senate

1    report said anything about a conclusion

2    regarding hysterectomies actually

3    performed, and the ICE statement didn't

4    have anything about hysterectomies

5    actually performed -- or it didn't have

6    performed that were not referred.

7              MS. EVANS:  Let's take a break

8         for 10 minutes.

9              THE VIDEOGRAPHER:  We are going

10        off the record.  The time is 11:34

11        a.m.

12             (Whereupon, a brief recess was

13        taken.)

14             THE VIDEOGRAPHER:  We are back

15        on the record.  The time is 11:48 a.m.

16             MS. EVANS:  Mr. Price, I am

17        going to hand you and your counsel

18        what's previously been marked as

19        Exhibit 2.

20             (Whereupon, Exhibit 2, 9/14/2020

21        Project South Letter, was identified.)

22   BY MS. EVANS:

23        **Q.   This is a copy of the Project**

24   **South letter that was dated**

25   **September 14th, 2020.  It says "Exhibit A"**

```
 1   on the front because this is a copy of the

 2   letter that was attached to a pleading in

 3   this document.

 4           Do you recognize Exhibit 2?

 5   A.    I do, yes.

 6   Q.    Is this what you have been

 7   referring to as the Whistleblower letter

 8   or the --

 9           MS. MCNAMARA:  Objection.

10   BY MS. EVANS:

11   Q.    -- Whistleblower complaint?

12   A.    Yes.

13   Q.    Did you review this in the work

14   you did in anticipation of your deposition

15   today?

16   A.    I went over it, but yes.

17   Q.    Did you read the whole thing?

18   A.    Not cover to cover, no.

19   Q.    Did you read this letter on

20   September 14th, 2020?

21   A.    I don't know if I read it on

22   September 14th.

23   Q.    Did you read it on

24   September 15th, 2020?

25   A.    Yes, I did.
```

1    Q.    Did you read the entirety of it?

2    A.    I -- I believe I did.

3    Q.    Do you think that it's likely

4  that you did?

5    A.    Yes.

6    Q.    You would have wanted to read it

7  all if you were going to be the segment

8  producer on a segment about the story,

9  right?

10   A.    Yes.

11   Q.    The allegations in this

12 Exhibit 2 are mostly regarding COVID; is

13 that right?

14   A.    Yes.

15   Q.    Did you do any --

16         MS. EVANS:  Strike that.

17 BY MS. EVANS:

18   Q.    On page 18 of the document, in

19 the bottom right-hand corner, just let me

20 know when you are there.

21   A.    Yes.

22   Q.    Do you see in the middle of the

23 page Subsection D?

24   A.    Yes.

25   Q.    Could you read that for me,

```
 1   please?

 2       A.   "Detained" --

 3            MS. MCNAMARA:  The whole

 4       subsection?

 5   BY MS. EVANS:

 6       Q.   Just the title of the --

 7       A.   "Detained immigrants and ICDC

 8   nurses report high rates of hysterectomies

 9   done to immigrant women."

10       Q.   Did you find that statement at

11   the time that you read it on

12   September 15th, 2020 --

13            MS. EVANS:  Strike that.

14   BY MS. EVANS:

15       Q.   Did you assume that statement

16   that you just read to be the truth when

17   you read it on September 15th, 2020?

18       A.   I didn't assume anything about

19   it.

20       Q.   Did you assume it to be -- you

21   didn't assume it to be true or false?

22       A.   No.

23       Q.   Did you find that statement

24   credible?

25       A.   Yes.
```

1      Q.      Why?

2      A.      Because this document is a -- a

3   complaint filed with the DHS Inspector

4   General, The Office for Civil Rights and

5   Civil Liberties, the acting director of

6   the Atlanta ICE field office and the

7   warden of the ICDC.

8      Q.      Any other reason?

9      A.      It is on the record.

10     Q.      What record?

11     A.      On the record being Dawn Wooten

12  gave her name, and this was filed

13  publicly.

14     Q.      Did you know that on

15  September 15th whether this had been filed

16  publicly?

17     A.      Yes, because we had it.

18     Q.      Did -- did you know that on

19  September --

20             MS. EVANS:  Strike that.

21  BY MS. EVANS:

22     Q.      Did you know on September 15th,

23  2020 whether this had been filed with any

24  of the agencies that you read from page 2

25  of Exhibit 2?

1      A.    I don't know the intricacies of

2   the filing process, but it appears to have

3   been filed with -- with all of

4   these offices.

5      Q.    You assumed that?

6      A.    It appears to be, yes.

7      Q.    Do you find the statement on

8   page 18 as part of Subsection D that the

9   detained immigrants and ICDC nurses report

10  high rates of hysterectomies done to

11  immigrant women to be credible today?

12     A.    I mean, I find the -- the number

13  of -- the volume of -- I find the -- the

14  allegations of -- of unnecessary and

15  invasive medical procedures to be

16  credible, yes.

17            MS. EVANS:  Move to strike as

18     non-responsive.

19  BY MS. EVANS:

20     Q.    Looking at the statement that is

21  entitled -- I'm calling it --

22            MS. EVANS:  Well, strike that.

23  BY MS. EVANS:

24     Q.    "Detained immigrants and ICDC

25  nurses report high rates of hysterectomies

1    done to immigrant women."

2              Do you see that?

3    A.    Yes.

4    Q.    Do you find that statement

5    credible today?

6              MS. MCNAMARA:  Object to form.

7              MS. EVANS:  What is

8    objectionable about that question?

9              MS. MCNAMARA:  Because if you're

10   finding a statement credible today

11   when the statement was made three

12   years ago is -- is just a non

13   sequitur.  It doesn't make sense.

14             MS EVANS:  That's not a form

15   objection.

16             (Simultaneous crosstalk.)

17             MS. EVANS:  Liz, I was just

18   asking because if it was a real

19   objection, I wanted to -- that I

20   thought was real, I wanted to fix my

21   question.  So I don't need to fix my

22   question.

23             I'm going to ask it again and

24   you can make whatever that was again

25   if you want to.

```
 1    BY MR. EVAN:
 2        Q.    Mr. Price, do you see in the
 3    middle of page 18, where it says,
 4    "Detained immigrants and ICDC nurses
 5    report high rates with hysterectomies done
 6    on immigrant women?"
 7        A.    I do.
 8             MS. MCNAMARA:   Same objection.
 9    BY MS. EVANS:
10        Q.    And your is testimony you found
11    that statement credible on September 15th,
12    2020, true?
13        A.    Yes.
14        Q.    Do you find at that statement
15    credible today?
16        A.    I don't know what the -- the
17    latest reporting is, but I do know that I
18    do find the high rates of various medical
19    procedures to be credible.
20        Q.    Does that line right there say,
21    "High number of various medical
22    procedures?"
23        A.    It does not.
24        Q.    You would agree with me that you
25    didn't answer my question?
```

```
 1              MS. MCNAMARA:  Objection to
 2        form.
 3        A.    No.  I did answer your question.
 4   This -- this complaint is not just about
 5   hysterectomies.  It is about a variety
 6   of -- of unnecessary and invasive
 7   procedures.
 8   BY MS. EVANS:
 9        Q.    I'm going to ask another
10   question.  Hopeful we can get an answer.
11              Do you find the statement in
12   middle of page 18, "Detained immigrants
13   and ICDC nurses report a high rate of
14   hysterectomies done to immigrant women,"
15   credible today?
16              MS. MCNAMARA:  Objection; asked
17        and answered.
18        A.    I find this complaint credible
19   today.  It is about more than just
20   hysterectomies, so I do find the complaint
21   credible.
22              MS. EVANS:  Move to strike as
23        nonresponsive.
24   BY MS. EVANS:
25        Q.    Mr. Price, do you find the
```

```
 1    statement "Detained immigrants" --
 2              MS. EVANS:  Strike that.
 3    BY MS. EVANS:
 4        Q.    You testified a moment ago that
 5    you found the statement, "Detained
 6    immigrants and ICDC nurses report a high
 7    rate of hysterectomies done to immigrant
 8    women," credible on September 15th, 2020.
 9              Didn't you just tell me that?
10        A.    Yes.
11        Q.    Today, do you find the
12    statement, "Detained immigrants and ICDC
13    nurses report a high rates of
14    hysterectomies done to immigrant women,"
15    credible?
16        A.    I don't know the totality of the
17    reporting around hysterectomies
18    specifically, so I would -- I would want
19    to read more information about that to
20    answer that specifically.
21        Q.    Why are you able to answer me
22    specifically about whether you found that
23    particular statement credible on
24    September 15th, 2020 but you can't tell me
25    that today?
```

1      A.    Because it's been three years

2   and there -- there could have been more

3   reporting, more information about it.  And

4   I don't --  and -- and, yeah, I don't want

5   to -- I don't want to assume information I

6   don't have.

7      **Q.    There could have been more**

8   **reporting or more information about it on**

9   **September 15th, 20, true?**

10            **But you rushed and found it**

11  **credible then, right?**

12            MS. MCNAMARA:  Objection;

13      mischaracterization.  No foundation.

14      A.    Well, I didn't -- I didn't rush.

15  Again, it's filed with the proper

16  authorities.  There was reporting both

17  internally by Jacob Soboroff and Julia

18  Ainsley and from other outlets.  And --

19  and they have interviews with women

20  describing their experiences.  So it's --

21  so, yes, I did find it credible.

22  BY MS. EVANS:

23      **Q.    Who had interviews with women**

24  **describing their experiences?**

25      A.    The Whistleblower complaint.

1     Q.    Did you see any of the

2    interviews?

3     A.    They are right here on the

4    paper.

5     Q.    Where?  Point to me.

6     A.    Footnote 89, Project South

7    interview with detained immigrant, summer

8    2020.

9          So this goes through several

10   immigrant women have reported to Project

11   South their concerns of how many women

12   received hysterectomies while detained at

13   ICDC.

14          I mean, there are on -- there's

15   on page 20, there's an interview with a

16   woman, "I tried to explain to her that

17   something isn't right, that procedure

18   isn't for me."

19          This has a lot of interviews.

20    Q.    Where are you reading from?

21    A.    I'm sorry.  From -- just above

22   E, two lines above E.

23          "I tried to explain to her that

24   something wasn't right, that that

25   procedure isn't for me."

1        There are -- there are several

2   interviews with detained immigrants

3   contained in this.

4        Q.    Did you read any of the actual

5   interviews that are referenced in the

6   footnotes in Exhibit 2?

7        A.    I read what was in the

8   Whistleblower complaint.

9        Q.    Did you read actual interviews,

10  transcripts or summaries as referenced in

11  footnotes in Exhibit 2?

12       A.    No.

13       Q.    Did you ask for them?

14       A.    I did not.

15       Q.    Do you know if anyone within the

16  NBCUniversal organization did so?

17       A.    I don't know.

18            MS. MCNAMARA:  Objection; form.

19       He can't speak to the entire

20       NBCUniversal --

21            MS. EVANS:  Then he can tell me.

22       The question is "do you know."  Either

23       I do or I don't.  That's it.

24            MS. MCNAMARA:  He can speak to

25       what he did or what he knows about.

1     He can't speak --

2              MS. EVANS:  I can understand why

3         you want to help this witness, but you

4         need to stop.

5              MS. MCNAMARA:  I'm not help --

6         I'm not help --

7              MS. EVANS:  Yeah, you're not.

8         It's not helping.

9     BY MS. EVANS:

10        Q.    All right.  Let me ask another

11    question.

12              Did you know that Ms. Wooten

13    signed a declaration that was apparently

14    part of Exhibit 2 at some point?

15        A.    Yes.  It says at the top of

16    page 2, the first full sentence, "This

17    complaint and Ms. Wooten's accompanying

18    declaration," which is incorporated by

19    reference.

20        Q.    Did you ever see the

21    declaration?

22        A.    That, I'm not certain of.

23        Q.    Do you have any recollection of

24    seeing the declaration?

25        A.    I do not recall that.

1      Q.    You looked at the Senate report

2   yesterday?

3      A.    Yes.

4      Q.    Do you recall this statement

5   from the Senate report:  "The subcommittee

6   did not substantiate the allegations of

7   mass hysterectomies on ICDC detainees."

8      A.    Yes.

9      Q.    And do you recognize this

10  statement:  "Records indicate that

11  Dr. Amin performed two hysterectomies on

12  ICDC detainees between 2017 and 2019."

13     A.    Yes.

14     Q.    Both procedure were deemed

15  medically necessary by ICE?

16     A.    Yes.

17     Q.    Today, do you find the

18  statement, "detained immigrants and ICDC

19  nurses report high rates of hysterectomies

20  done to immigrant women," do you find that

21  statement credible today?

22     A.    Again, I would need to see if

23  there's more reporting the Senate report

24  could not substantiate, but also didn't

25  say that the claim was false.  And they --

```
1   they also said that records indicated

2   there were two hysterectomies performed,

3   but -- but they did not say for certainty

4   that absolutely only two.  So I can't say

5   for sure it -- it -- if it was absolutely

6   only two or if there was a higher rate.

7       Q.    Do you think that there would be

8   information --

9             MS. EVANS:  Strike that.

10  BY MS. EVANS:

11      Q.    If information were available

12  that could substantiate the claim of high

13  rates of hysterectomies at ICDC, don't you

14  think that the Senate would have been able

15  to find it?

16            MS. MCNAMARA:  Objection to

17      form.

18      A.    I don't know about their

19  investigative practices, so I'm not sure.

20  BY MS. EVANS:

21      Q.    Are you aware of any other

22  reporting or information gathering done

23  regarding the number of hysterectomies on

24  ICDC detainees since the date of the

25  Senate report?
```

1     A.    No.

2     Q.    **Have you made any efforts to**

3  **find any?**

4     A.    I have -- I have not looked into

5  it, no.

6     Q.    **What's the difference -- what**

7  **does it mean when you can't substantiate**

8  **something?**

9     A.    It means that I -- or I take the

10  sentence to mean that -- that they can't

11  find --

12          (Reporter clarification.)

13          THE WITNESS:  Sentence.

14     A.    -- means that they can't find

15  hard evidence proving for a fact that the

16  claim is accurate.

17  BY MS. EVANS:

18     Q.    **What makes you say they can't**

19  **find hard evidence?**

20     A.    Well, hard evidence would

21  substantiate something.  So

22  unsubstantiated would lead me to believe

23  that they can't find hard evidence to

24  fully bear it out.

25     Q.    **Do you think they found soft**

1    evidence that did bear it out?

2         A.    I couldn't say.

3         Q.    Well, why do you use the word

4    "hard"?

5         A.    It's a -- a colloquial term.

6    I'm sorry.  I haven't had to define that

7    before.

8         Q.    Let me ask a different question.

9               Does soft evidence substantiate

10   something?

11              MS. MCNAMARA:  Objection to

12        form.

13        A.    I -- I don't know.  I've never

14   heard the term "soft evidence" before,

15   only hard evidence.

16   BY MS. EVANS:

17        Q.    Hard evidence as compared to

18   what kind of evidence?

19        A.    Again, it's a colloquial term.

20   I'm --

21        Q.    Do you just mean evidence?

22        A.    Yes.

23        Q.    So the Senate couldn't find any

24   evidence to substantiate high numbers of

25   hysterectomies on ICDC detainees; is that

 1  right?

 2      A.    Yes.

 3      Q.    Do you think that makes the

 4  statement, "detained immigrants and ICDC

 5  nurses report high rates of hysterectomies

 6  done to immigrant women," more or less

 7  credible or the same?

 8      A.    I -- I think that -- I think

 9  that -- that not finding evidence in

10  however long it was after the fact that

11  the Senate looked into it doesn't -- it

12  doesn't necessarily discredit the -- the

13  allegation made by women who allegedly

14  went through it and the medical

15  professionals at the facility who also

16  reported it.

17      Q.    Doesn't -- doesn't it at

18  least -- doesn't the Senate not finding

19  evidence to substantiate high numbers of

20  hysterectomies on ICDC detainees at least

21  make the statement, "detained immigrants

22  and ICDC nurses report high rates of

23  hysterectomies done to immigrant women,"

24  doesn't it at least make that statement

25  less credible?

1           MS. MCNAMARA:  Today, you're

2      saying?

3           MS. EVANS:  Yeah.

4           MS. MCNAMARA:  Okay.

5           MS. EVANS:  It shouldn't be a

6      hard question.

7           MS. MCNAMARA:  Well, the

8      relevance is, but...

9      A.    The Senate report found -- found

10     a lot of, as their outside medical expert

11     put it, invasive and -- and abusive

12     procedures performed.  I -- just because

13     they weren't able to find evidence of high

14     rates of hysterectomies, I -- I don't

15     necessarily think it fully discounts what,

16     again, the medical professionals and the

17     women who allegedly went through this

18     reported.  But it did find a lot of other

19     unnecessary and -- and invasive procedures

20     were performed, which is what the broader

21     context of this section was about.

22          MS. EVANS:  Move to strike as

23     non-responsive.

24     BY MS. EVANS:

25     Q.    Mr. Price, is it your testimony

1    today that even despite the Senate report,

2    which could not substantiate the

3    allegations of mass hysterectomies on ICDC

4    detainees, the statement in Exhibit 2,

5    "Detained immigrants and ICDC nurses

6    report high rates of hysterectomies done

7    to immigrant women," you still find it

8    credible?

9              MS. MCNAMARA:  Objection to

10        form.  This has been asked and

11        answered at least -- we've probably

12        spent 45 minutes on this --

13             MS. EVANS:  Counsel, I will not

14        tolerate speaking objections, Liz.

15        You can object to form and that's it.

16             MS. MCNAMARA:  I --

17             MS. EVANS:  I'm going to get an

18        answer to this question.  I haven't.

19             MS. MCNAMARA:  You have --

20             MS. EVANS:  Stop.

21             MS. MCNAMARA:  You have the

22        man's answer.

23             MS. EVANS:  No, I don't.

24             MS. MCNAMARA:  You have it

25        repeatedly.

```
1              MS. EVANS:  No, I don't.
2              MS. MCNAMARA:  You just don't
3        like the answer he's giving --
4              MS. EVANS:  Oh, I love these
5        answers, Liz.  Trust me.
6              MS. MCNAMARA:  I know you love
7        them.
8              MS. EVANS:  Trust me, I do.  I
9        do.
10             MS. MCNAMARA:  I know you love
11       them.
12             Why don't we --
13             MS. EVANS:  Nope.  We're not
14       going to take a break.  I'm going to
15       get an answer to my question.
16             MS. MCNAMARA:  I'm not -- I
17       didn't ask for a break.  I said why
18       don't we move on.
19             MS. EVANS:  Nope.  We're not
20       going to move on until I get an answer
21       to my question.
22   BY MS. EVANS:
23       Q.    Mr. Price, is your -- is it your
24   testimony today that even in spite of the
25   Senate's report inability to substantiate
```

1    the allegations of mass hysterectomies on

2    IC detainees, you still find credible the

3    statement in Exhibit 2, specifically,

4    "Detained immigrants and ICDC nurses

5    report high rates of hysterectomies done

6    to immigrant women"?

7              MS. MCNAMARA:  Same objection.

8        A.    The inability to substantiate by

9    the Senate is not a finding that it is not

10   true; therefore, I don't have reason to

11   doubt the women who said they went through

12   this and the medical professionals at the

13   facility who reported this.

14   BY MS. EVANS:

15       Q.    And the medical professionals at

16   the facility who reported this is

17   Dawn Wooten?

18       A.    It says ICDC nurses, plural,

19   report high rates of hysterectomies, but

20   Dawn Wooten was the -- the primary witness

21   on the record, I believe.

22       Q.    Are you aware of any other

23   nurses that went on the record for this

24   Exhibit 2?

25       A.    I don't know.

```
 1        Q.    You're not aware of any?

 2        A.    No.

 3        Q.    Exhibit -- the transcript -- 67,

 4   I want you to take whatever time you need.

 5   I understand it might take a minute, but I

 6   want you to find me in here one question

 7   from you that reflects skepticism of

 8   Andrew Free and the information he's

 9   sharing with you.

10        A.    I mean --

11        Q.    No.  Take the time you need.  I

12   want to know.

13        A.    Okay.  (Reviewing.)

14              So as you can see, this was a

15   lot of Andrew Free giving me information.

16   And so I didn't have -- have to ask a lot

17   of questions to get the information from

18   him.  I mean, I asked him a few questions

19   about how widely known the idea of

20   shredding medical request forms is in the

21   immigration world.  I asked --

22        Q.    Where is that?

23        A.    That is page 20, line 6

24   through 15 -- or 6 through 14.

25        Q.    And shredding medical request
```

1   forms is an allegation that someone was

2   shredding medical request forms at ICDC,

3   that was not with regard to gynecological

4   care, was it?

5       A.   Well, I don't know if the

6   medical forms had to do with gynecological

7   care.  But it was part of the overall

8   Whistleblower complaint.

9       Q.   Well, the allegations in the

10  Whistleblower complaint, as you call it,

11  were that women were receiving lots of

12  gynecological care, right, mass

13  hysterectomies?

14      A.   They were receiving lots of

15  gynecological procedures.

16      Q.   Right.  But she wasn't --

17  Ms. Wooten wasn't alleging that request

18  forms for gynecological care were being

19  shredded, was she?

20      A.   Gynecological care specifically,

21  I don't know.  There was -- on page 15 of

22  the Whistleblower complaint, Section 4,

23  subsection A, "ICDC nurse shreds

24  medical" --

25      Q.   Slow down just for a second.

```
 1      A.    Sorry.

 2      Q.    Page 15?

 3      A.    Uh-huh.

 4      Q.    Where is that?

 5      A.    Section 4, subsection A.

 6      Q.    Okay.

 7      A.    "ICDC nurse shreds medical

 8  request forms from detained immigrants."

 9            It was part of the overall

10  Whistleblower complaints, so it was

11  something I asked about.

12      Q.    Anything else in Exhibit 67

13  where you asked questions showing any

14  skepticism of Andrew Free and the

15  information he was sharing with you?

16      A.    On page 23, lines 16 through

17  18 -- or I guess 11 through 18, I was

18  asking about ICE's policy for consent for

19  treatment.

20      Q.    Staying on page 23 for a

21  minute --

22      A.    Sure.

23      Q.    -- before you go to the next

24  place, the lines that you pointed out,

25  you're asking if -- well, you tell me.  I
```

 1   think you're asking whether consent for

 2   treatment is different for detainees as

 3   opposed to otherwise; is that right?

 4       A.    Yes.  He was giving me a lot of

 5   information so there -- there weren't a

 6   ton of room -- like, a ton of need for --

 7   for questions because he was giving me a

 8   lot of information.  And I mean, he was --

 9   he was a lawyer citing other lawyers by

10   name who were on the record, giving me

11   information that -- that corroborated

12   information that we had on the record.  So

13   there wasn't -- there wasn't a need for a

14   ton of questions from me.

15       Q.    Anything else you want to point

16   me to that would indicate questions

17   expressing skepticism from you in

18   Exhibit 67?

19       A.    I don't think so, no.

20       Q.    Did you have any other calls

21   with Andrew Free with regard to the ICDC

22   stories that you were segment producer on?

23       A.    I don't believe so, no.

24       Q.    Who were the other attorneys

25   that you said were on the record?

1      A.    Okay.

2      Q.    The second paragraph from the

3  top.

4      A.    Okay.

5      Q.    The second sentence says, "And

6  so for the last couple of days, we here at

7  All In have been trying to run down the

8  story to do some reporting to find out

9  what exactly are the facts and what we

10  know.  And so tonight we can report there

11  are three women who say they had

12  procedures.  They either did not consent

13  to it ahead of time or felt coerced into

14  consenting to."

15          Do you see that?

16      A.    I do.

17      Q.    Why three women when the night

18  before it was four?

19      A.    I'm not sure why the --

20  specifically why the number changed.  I'm

21  sure there's a -- there's a good editorial

22  reason for it.  I just don't recall right

23  now.

24      Q.    Is it because someone realized

25  that you-all were double-counting clients

```
 1   between Andrew Free and Ben Osorio?

 2        A.    I don't know.

 3        Q.    Have you ever heard that from

 4   anyone?

 5        A.    No, not to my recollection.

 6        Q.    The next paragraph, next to last

 7   sentence says, "She was in the Irwin

 8   County Detention Center during the Trump

 9   Administration."

10              Do you see that?

11        A.    Yes.

12        Q.    Prior to this broadcast, had you

13   followed up with Andrew Free regarding the

14   timing of allegations of misconduct with

15   regard to his clients?

16        A.    I don't believe so, no.

17        Q.    Do you have any knowledge of

18   anyone else affiliated with All In With

19   Chris Hayes show following up with Andrew

20   Free on that point?

21        A.    I don't recall other people's

22   communications with him.

23        Q.    Do you know why --

24              MS. EVANS:  Strike that.

25   BY MS. EVANS:
```