**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF GEORGIA**
**WAYCROSS DIVISION**

| | |
|---|---|
| DR. MAHENDRA AMIN, M.D., | |
| Plaintiff, | Case No. 5:21-cv-00056-LGW-BWC |
| v. | **OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| NBCUNIVERSAL MEDIA, LLC, | |
| Defendant. | |

## INTRODUCTION

In his Motion for Partial Summary Judgment (the "Motion" or "Mot."), Plaintiff Dr. Mahendra Amin argues that he is entitled to summary judgment on the issue of "falsity" in this action on all but two[1] of the challenged statements. He claims that he performed only two hysterectomies on detainees, both of which, according to him and his two experts, were necessary and consented-to. Dr. Amin's Motion ignores his significant burden of proof on falsity, the legally critical "gist" of the challenged statements that he himself has recognized, the fact that NBCU accurately reported the allegations made in the whistleblower complaint, and the facts developed during discovery showing that he performed many unnecessary and invasive gynecological procedures on detained women, at risk to their health and fertility, without obtaining their informed consent.

As NBCU explained in its motion for summary judgment, the defamatory gist or sting of the challenged news reports is the allegation that Dr. Amin was performing gynecological

---

[1] The remaining two statements report that women claimed they were "bruised" by Dr. Amin. As explained in the motion for summary judgment filed by Defendant NBCUniversal Media, LLC ("NBCU"), *see* Dkt. 127 (the "NBCU Motion"), because Dr. Amin cannot come forward with evidence to prove these statements false, claims stemming from them should be dismissed. *See* NBCU Mot. at 19, n.8.

procedures that were unnecessary or unconsented-to.  The news reports, including the challenged statements themselves, focus on more than just hysterectomies.  And whether Dr. Amin was accused of performing hysterectomies or other invasive procedures that can harm fertility makes no difference to a reasonable viewer; either way, the effect on Dr. Amin's reputation is to portray him as a doctor who risked his patients' health and reproductive ability with inappropriate medical procedures.

The record evidence substantiates this.  Government investigations into the claims against Dr. Amin confirm that he did, in fact, perform *dozens* of unnecessary or unconsented-to invasive surgeries on detainees that carry risks to fertility, including laparoscopies, dilation & curettages ("D&Cs"), and cystectomies.  Senator Jon Ossoff called Dr. Amin's medical care "nightmarish," and doctors testifying in this action further substantiated the record developed by the Senate.  ICE statistics document that Dr. Amin was an extreme outlier among OB-GYNs treating detainees, performing, for example, over 90% of certain invasive procedures even though ICDC housed only 4% of female detainees.  And testimony has revealed that detainees believed these procedures were hysterectomies because they did not understand what Dr. Amin was doing to them in the first place.

Accordingly, Dr. Amin can *never* meet his burden of establishing material falsity, which is fatal to his case.  The Court should therefore grant summary judgment in NBCU's favor, and Dr. Amin's partial summary judgment motion on falsity should necessarily be denied.

## **FACTUAL BACKGROUND**

Dr. Amin's brief recitation of the material facts in support of his Motion ignores the wealth of record evidence establishing that he cannot meet his heavy burden of showing the gist of the

challenged statements[2] is false.  NBCU briefly recounts some of the evidence here and refers the Court to the NBCU Motion for a more fulsome recitation of the facts.

## I.      The News Reports Covered Breaking News Concerning Allegations Contained in the Whistleblower Complaint

On September 14, 2020, a whistleblower complaint was filed with various government entities on behalf of detained immigrants and a nurse at ICDC, alleging that a "particular gynecologist" performed "high rates of hysterectomies" and other improper surgeries on female detainees.  McNamara Decl. Ex. 2 (the "Whistleblower Complaint").[3]  The Whistleblower Complaint prompted immediate, widespread media attention, including the four challenged MSNBC news reports (the "News Reports"), which made clear that they were reporting on "breaking news" concerning "allegations" contained in a "formal complaint" that was filed with the "watchdog at the Department of Homeland Security" by an "advocacy group."  *See, e.g.*, Wallace Decl. Ex. 8 at NBCU004168; Hayes Decl. Ex. 2 at NBCU000164; Maddow Decl. Ex. 7 at NBCU000198.[4]  The media's reporting on Dr. Amin's treatment of detainees continued long after these News Reports and only further exposed significant problems with Dr. Amin's medical care, including additional first-hand accounts from detainees who claimed that Dr. Amin performed gynecological procedures on them without their full informed consent.  *See* NBCU Mot. at 14; McNamara Decl. Exs. 95-104.

---

[2] The challenged statements, as identified in the First Amended Complaint ("FAC"), are listed in Exhibit 1 to the Declaration of Elizabeth A. McNamara in support of the NBCU Motion (the "McNamara Decl.").  *See* Dkt. 136-1.  As indicated in his Motion and associated Statement of Material Facts, Dr. Amin appears to no longer challenge six statements (Nos. 2, 24, 39-41, and 52).  Accordingly, all claims stemming from these statements should be dismissed.

[3] Dr. Amin persists in the fiction that the Whistleblower Complaint was not, in fact, a "complaint" but merely a "letter to the media."  Mot. at 3.  The record establishes this is false.  The Whistleblower Complaint was sent via email to multiple government agencies, *see* McNamara Decl. Ex. 4, which referred to the document as a "complaint" and opened investigations into it, *see* McNamara Decl. Exs. 6-7; Declaration of Elizabeth A. McNamara in Opposition to Plaintiff's Motion for Summary Judgment ("McNamara Opp. Decl.") Ex. 1 at NBCU005297 (referring "whistleblower complaint" to "Office of Investigations").  This is an archetypal "complaint."

[4] Citations to NBCU employee declarations use the same abbreviations as in the NBCU Motion.

## II.  The Government Corroborates Dr. Amin's Medical Mistreatment of Detainees

The Whistleblower Complaint spurred numerous government investigations into Dr. Amin's treatment of detainees, a fact that Dr. Amin's Motion ignores.  The Department of Homeland Security ("DHS") immediately opened an investigation into the Whistleblower Complaint (Complaint No. 20-12-ICE-0987), *see* McNamara Decl. Ex. 6 at DHS000036; Ex. 7 at 182:11-25, and the Department of Justice ("DOJ") opened a criminal investigation into Dr. Amin, *see* McNamara Decl. Ex. 65.  These investigations are ongoing.  *See* McNamara Opp. Decl. Ex. 1 at NBCU0005297; Ex. 2.  ICE immediately began investigating the invasive gynecological procedures that Dr. Amin performed on ICDC detainees and ████████████████████
████████████████████████████  *See, e.g.*, McNamara Decl. Exs. 48, 51.

Congress also opened several investigations into Dr. Amin's medical care and issued damning findings.  *First*, based on detainee medical records produced by LaSalle Corrections (the private company that operated ICDC), the House Committees on Homeland Security and Oversight and Reform expressed concern that Dr. Amin was "performing unnecessary surgical procedures to defraud DHS and the Federal government without consequence."  *See* McNamara Opp. Decl. Ex. 3 at AMIN_0000019.  They cited findings from Dr. Tony Ogburn, an independent, board-certified OB-GYN, who reviewed the medical records and concluded that Dr. Amin engaged in a "pattern of performing the same surgery – D&C, laparoscopy – on many patients no matter what their condition was" and his treatment of detainees "did not meet acceptable standards."  *Id.*; *see also id.* at AMIN_0000021.  As Dr. Ogburn informed the Georgia Composite Medical Board, he was concerned that Dr. Amin "was not competent and simply did the same evaluation and treatment on most patients because that is what he knew how to do, and/or he did tests and treatments that generated a significant amount of reimbursement without benefitting most

patients." *Id.* at AMIN_0000022.

    *Second*, the bipartisan Senate Permanent Subcommittee on Investigations (the "Senate Subcommittee") conducted an extensive investigation into Dr. Amin's treatment of ICDC detainees, interviewing more than seventy witnesses (though not Dr. Amin, who invoked his right against self-incrimination) and reviewing more than 541,000 pages of records from DHS, ICE, ICDC, LaSalle, and the Irwin County Hospital. *See* McNamara Decl. Ex. 68 at NBCU002065. The investigation concluded that "female detainees appear to have been subjected to excessive, invasive, and often unnecessary gynecological procedures" from Dr. Amin and "[t]here appears to have been repeated failures to secure informed consent for off-site medical procedures performed on ICDC detainees."[5] *Id.* at NBCU002053, NBCU0002060.

    Relying on statistics provided by ICE, the Senate Subcommittee found that between 2017 and 2020, doctors performed forty-seven total laparoscopies (a surgery involving the removal of tissue or organs) on ICE detainees:  Dr. Amin performed *forty-four* of these and the next highest provider performed *one*. *See id.* at NBCU002124.  Doctors performed sixty-five D&Cs (a surgery that removes uterine tissue) on ICE detainees:  Dr. Amin performed *fifty-three* of these and the next highest provider performed *three*. *Id.*  When confronted with these statistics during his deposition, Dr. Amin admitted that he had never disputed them and "had no facts to challenge" them.  McNamara Decl. Ex. 3 at 225:5-233:1.

    Based on a review of the records from Irwin County Hospital, the Senate Subcommittee further found that Dr. Amin "removed or aspirated ovarian cysts in 40 women," yet these cysts

---

[5] The bipartisan Senate Report is admissible pursuant to Federal Rule of Evidence 803(8) as a government report that contains indicia of trustworthiness. *See Union Pacific Railroad Co. v. Kirby Inland Marine Inc.*, 296 F.3d 671, 679 (8th Cir. 2002) (admitting into evidence Coast Guard report even when investigators relied on hearsay evidence to reach conclusions because the conclusions were based on a "thorough review process"); *Barry v. Trustees of Int'l Assoc.*, 467 F. Supp. 2d 91, 100-01 (D.D.C. 2006) (admitting into evidence Senate report under Rule 803(8) when its findings were the product of serious investigation and members of the minority party joined the report).

were "benign in every case" and most would have "resolve[d] without surgical intervention." McNamara Decl. Ex. 68 at NBCU002117.  The Senate Subcommittee investigation also found that Dr. Amin referred four ICE detainees for hysterectomies between 2017 and 2020 and performed two (notably, one more than any other OB-GYN for ICE detainees).  *See id.* at NBCU002125.[6]

As the Senate Report explained, Dr. Amin's practice of performing unnecessary procedures on detainees had real risks to women, including to their fertility.  The Report recognized that Dr. Amin's removal of normal ovarian cysts could cause "infertility, among other risks."  McNamara Decl. 68 at NBCU002058.  Indeed, Dr. Amin's own expert in this action, Dr. Elbridge Bills, agreed that cystectomies carry significant risks including "needing to remove the entire ovary, reducing ovarian reserve and possible future fertility."  McNamara Decl. Ex. 132 at 65:14-22.  The Senate Subcommittee also found that Dr. Amin performed many LEEPs (removal of a portion of the cervix), including one on a patient who merely tested positive for HPV, which was "well outside of the guidelines."  McNamara Decl. Ex. 68 at NBCU002117.  The Senate Report explained that LEEPs carry "short-term implications" including "extensive bleeding that could become extensive enough to require a hysterectomy" and "long-term implications, including reproductive consequences."  *Id.* at NBCU002114.  Indeed, "the removal of a significant portion of the cervix can create cervical insufficiency, which can lead to pre-term loss of pregnancies."  *Id.*

Senator Jon Ossoff concluded that the Subcommittee's findings that Dr. Amin "subject[ed] female detainees to nonconsensual and unnecessary gynecological surgeries" were "disgraceful" and "nightmarish," and Senator Ron Johnson concluded that these were "concerning practices of an off-site provider."  *See* McNamara Decl. Exs. 71, 134.

---

[6] ICE told the Subcommittee that "medical records show that both procedures were medically necessary."  *See* McNamara Decl. Ex. 68 at NBCU002125.  Notably, however, DHS recently released a report calling into question ICE's determination of the medical necessity of surgical procedures performed on detainees, including hysterectomies specifically.  *See* McNamara Opp. Decl. Ex. 1.

III.     **Other Evidence Corroborates Dr. Amin's Medical Mistreatment of Detainees**

Testimony, expert reports, and evidence produced in discovery, as set forth below, further

document that Dr. Amin had a pattern of performing unnecessary medical procedures that carry

risks to fertility and that detainees often did not understand what surgeries were being performed,

leaving them concerned about their ability to have children.  *See* pp. 16-24, *infra*.

## ARGUMENT

"The Court should grant summary judgment only if "there is no genuine issue as to any

material fact and the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P.

56(c).   For issues on which the movant bears the burden of proof at trial, the movant must show

"*affirmatively* the absence of a genuine issue of material fact"—*i.e.* that "no reasonable jury could

find for the non-moving party."  *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).

If the movant "fails to discharge the initial burden, then the motion must be denied."  *Id.*  If the

movant carries his initial burden, the non-moving party defeats summary judgment if it "come[s]

forward with evidence sufficient to call into question the inference created by the movant's

evidence on the particular material fact."  *Id.*; *see also Houston v. Elan Fin. Servs.*, 135 F. Supp.

3d 1375, 1381 (S.D. Ga. 2015) (Wood, J.) (non-movant must show that "a genuine issue of fact

does exist," including by showing that movant "overlooked or ignored" evidence).

I.     **Dr. Amin Must Prove by Clear and Convincing Evidence that the Defamatory
       Gist of the Challenged Statements Is False**

"A false statement of fact is the *sine qua non* for recovery in a defamation action."

*Hallmark Builders, Inc. v. Gaylord Broad. Co.*, 733 F.2d 1461, 1464 (11th Cir. 1984).  Dr. Amin

shoulders the burden of proof on falsity.  *Philadelphia Newspapers v. Hepps,* 475 U.S. 767, 775-

76 (1986).  Failure to meet his burden is "dispositive."  *Cox Enterprises, Inc. v. Thrasher,* 264 Ga.

235, 236 (1994) (affirming summary judgment dismissal where plaintiff was "unable to resolve

conclusively whether the speech at issue was true or false").

### A.  Dr. Amin Is Required to Prove Falsity by Clear and Convincing Evidence

Under Georgia law, a defamation plaintiff is required to establish falsity by "clear and convincing evidence."  *See, e.g.*, *Wolf v. Ramsay*, 253 F. Supp. 2d 1323, 1353 (N.D. Ga. 2003) ("Plaintiff must prove falsity by clear and convincing evidence.");  *Airtran Airlines, Inc. v. Plain Dealer Pub. Co.*, 314 F. Supp. 2d 1266, 1271 n.3 (N.D. Ga. 2002) (explaining, "[p]laintiff's proof of falsity and malice" must be "clear and convincing"); *Smith v. Turner*, 764 F. Supp. 632, 641 (N.D. Ga. 1991) ("A plaintiff must offer clear and convincing proof that the charge was false and was made with knowledge of its falsity or with a reckless disregard for the truth."); *Stange v. Cox Enterprises*, 211 Ga. App. 731, 732 (1994) (plaintiff must "come forward with clear and convincing evidence that the statements were false").

"Clear and convincing evidence" is a "demanding" standard that is more exacting than a "preponderance of the evidence." *Nejad v. Attorney General*, 830 F.3d 1280, 1289 (11th Cir. 2016).  It requires the plaintiff to come forward with evidence that "produce[s] in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established, evidence so clear, direct and weighty and convincing as to enable [the factfinder] to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue."  *Wolf*, 235 F. Supp. 2d at 1353.  Or, as this Court recently put it, "[c]lear and convincing evidence is a conclusive determination, i.e., that the thing to be proved is highly probable or reasonably certain." *Boatright v. CSX Transport., Inc.*, 2023 WL 4548280, at *7 (S.D. Ga. July 14, 2023) (Wood, J.).

**B.  Dr. Amin Must Prove Both that the Challenged Statements Are Literally False and that Their Defamatory Gist or Sting is False**

A statement that is literally false is not necessarily legally "false" for purposes of a defamation action.  Instead, the falsity inquiry concentrates on the "gist" or defamatory "sting" of the challenged statements.  *See Parekh v. CBS Corp.*, 820 F. App'x 827, 834 (11th Cir. 2020); *Stange*, 211 Ga. App. at 734.  Put another way, to be actionable, a statement must be "materially false," meaning it would "have a different effect on the mind of the reader [or viewer] from that which the [] truth would have produced." *Masson v. New Yorker Mag.*, 501 U.S. 496, 517 (1991).  As then-Judge Gorsuch explained in *Bustos v. A&E Television Networks*, 646 F.3d 762, 765 (10th Cir. 2011)—a case cited favorably by Georgia federal courts, *see Project Veritas v. Cable News Network, Inc.*, 591 F. Supp. 3d 1322, 1332-33 (N.D. Ga. 2022)—focusing on material falsity rather than technical falsity "works as a screen" against unfounded claims.  Because the defamation tort is intended to protect the plaintiff's reputation, an action cannot proceed if the challenged statement does not cause "reasonable people to think significantly less favorably about the plaintiff than they would if they knew the truth." *Bustos*, 646 F.3d at 765.

Thus, courts in Georgia and across the country reject defamation claims based on literally false statements, including statements that contain quantitative errors, when the discrepancies do not alter the gist or sting of the challenged statements.  *See, e.g.*, *Project Veritas*, 591 F. Supp. 3d at 1333 (statement that plaintiff's Twitter account was suspended for violating policy for sharing private information deemed substantially true when plaintiff actually violated policy for spreading misinformation); *Nichols v. Moore*, 477 F.3d 396, 401 (6th Cir. 2007) (statement that plaintiff was "arrested in connection to the [Oklahoma City] bombing" was substantially true even though the plaintiff was "neither charged nor arrested regarding the [] bombing" but was arrested days later for an unrelated explosive offense and was held as a "material witness" in the bombing); *Stange*,

211 Ga. App. at 734 ("[T]he omission of an explicit explanation of the parties to the civil action and the variance in the number of owners who alleged or stated that they were deceived" by plaintiff are "minor factual errors which do not go to 'the substance, the gist, the sting' of the story"); *Vito v. Inman*, 286 Ga. App. 646, 648 (2007) (granting summary judgment when attorney's statement that he represented "several" of doctor's patients rather than "one" patient would not have produced a different effect on the listener).

### C.  The Context of the Challenged Statements Informs Their Gist

Georgia courts also recognize that context is key when assessing the gist and ultimate falsity of challenged news reports.  In *Bryant v. Cox Enterprises, Inc.*, 311 Ga. App. 230 (2011), the *Atlanta Journal-Constitution* reported in the days after the bombing at the Centennial Olympic Park that "investigators believe [Richard Jewell] may have planted the pipe bomb" and believe Jewell "phone[ed] in a warning to 911," *id.* at 237.  Even though it was later determined that Jewell was *not* responsible for the bombing or the 911 call, the court affirmed dismissal of the action for failure to prove falsity because "a reasonable reader would have understood the information to be preliminary in nature and published during the very early stages of an ongoing investigation."  *Id.* at 238-39.  Further, "at the time of the publications," the articles included "evidence tending to belie th[e] suspicion" that the plaintiff planted the bomb.  *Id.*; *see also Global Relief Foundation, Inc. v. N.Y. Times Co.*, 390 F.3d 973, 987 (7th Cir. 2004) (statements that organization was accused of funding terrorists deemed substantially true even though organization denied doing so, when the government was investigating the organization, articles included the organization's denials, and none of the articles concluded that the organization was guilty of the conduct for which it was being investigated); *Reed v. Chamblee*, 2023 WL 6292578, at *20 (M.D. Fla. Sept. 27, 2023) (professional golfer failed to plead falsity of statement that he was "accused of cheating in the

past" when he did not allege "that his teammates never accused him of cheating" but merely that he never cheated).

Thus, when assessing the gist or sting of challenged statements here, the Court should not consider the statements in "isolation," *see Bryant*, 311 Ga. at 238, but instead must consider them in the context of the broader News Reports.

## II.   Dr. Amin Misstates the Defamatory Gist of the Challenged News Reports

Dr. Amin's Motion claims that the gist of the challenged News Reports is that he performed "high numbers" of "hysterectomies" without "consent, authorization, and/or necessity" on ICDC detainees.  *See* Mot. at 1, 4, 8.  This gist, he argues, is false because he performed only two hysterectomies, both of which he claims were necessary and consented-to.  *See id.* at 9-16.  Dr. Amin's exclusive focus on the hysterectomies he performed conflicts with the actual News Reports, Dr. Amin's repeated representations to this and other courts concerning the statements' gist, and defamation law generally.

*First*, Dr. Amin's analysis of the gist is at odds with the News Reports themselves, which were focused not just on allegations of hysterectomies but more broadly on Dr. Amin's alleged improper treatment of detainees and its impact on their health and fertility.  The *Deadline* News Report discussed claims from detainees that Dr. Amin was "overly harsh" and "abusive," that he was "hurting" women, and that detainees were afraid to see him.  *See* Wallace Decl Ex. 8 at NBCU004168-69.  It included anecdotes about detainees who could not get access to diabetes medication but nonetheless repeatedly saw Dr. Amin for non-urgent issues.  *Id.* at NBCU004169. The 9/15 *All In* News Report explained that a gynecologist treating detainees at ICDC had been accused of performing "full or partial hysterectomies *or other procedures* for which no medical indication existed."  Hayes Decl. Ex. 2 at NBCU000164 (emphasis added).  The 9/15 *TRMS* News Report similarly reported that, according to the Whistleblower Complaint, detainees "have

routinely been sent to a gynecologist who has performed unnecessary procedures on them, including hysterectomies." Maddow Decl. Ex. 7 at NBCU000198. It described a claim from the Whistleblower Complaint that a detainee had the wrong ovary removed.[7]  *Id.*  In addition, Rachel Maddow interviewed Jacob Soboroff, who described speaking with lawyers for ICE detainees who made "allegations of other procedures including pap smears where women are told you've got ovarian cysts or cancer, and that turned out not to be the case." *Id.* at NBCU000202. Finally, the 9/17 *All In* News Report reported on "allegations of medical procedures performed on immigrant women . . . many without consent." Hayes Decl. Ex. 5 at NBCU000185. It included an interview with a former detainee, identified as "B," who claimed that in addition to feeling "like she had no right to say anything about a hysterectomy she underwent" from Dr. Amin, Dr. Amin also "performed an unexpected vaginal ultrasound that she was . . . not prepared for," which made her feel "violated." *Id.* at NBCU000186.

Dr. Amin himself previously conceded that the gist of the challenged statements is not—and has never been—solely about hysterectomies. In the FAC, Dr. Amin identified the gist of the challenged statements without referencing hysterectomies. *See* FAC ¶ 3 ("The gist of the broadcasts falsely portrays Dr. Amin of being an abusive, unethical, and dishonest physician who treated and operated on immigrant women in an abusive fashion, without consent, and motivated by profit instead of quality healthcare."). Then, during discovery, former ICDC detainees moved to quash Dr. Amin's subpoenas, claiming their testimony was irrelevant to this case because they did not receive hysterectomies. Dr. Amin opposed the motions, repeatedly arguing that the

---

[7] While Dr. Amin acknowledges that "several of the Statements also concern allegations of other unnecessary and abusive medical treatment of women detained by ICE at ICDC," Mot. at 15, he only attempts to address the statement quoting the Whistleblower Complaint's allegation that he removed the wrong ovary on a detainee. *Id.*  Dr. Amin argues that in neither of the two hysterectomies did he remove the wrong ovary. *Id.*  That of course does not show the falsity of this statement (which does not refer to Dr. Amin's hysterectomies, but rather to the removal of an ovary).

depositions were relevant because he "must prove that NBCUniversal's allegedly defamatory statements—the gist of which he conducted unnecessary and unconsented-to medical procedures on detainees at the Irwin County Detention Center, including hysterectomies—were false." *See, e.g.*, McNamara Opp. Decl. Ex. 4 at 1-2; Ex. 5 at 3; McNamara Decl. Ex. 127 at 1.[8]   Dr. Amin is bound by his representations on the record.

    *Second*, in discussing the challenged statements, Dr. Amin omits their context, which made clear that the allegations against Dr. Amin were new and had not yet been proven true or false. *See* Wallace Decl. Ex. 8 at NBCU004168 ("We're following breaking news today.  It's about an alarming new whistleblower complaint *that alleges*…"); Hayes Decl. Ex. 2 at NBCU000164 ("Yesterday, we learned about a whistleblower, a nurse working at a[n] . . . ICE facility, leveling honestly ghastly *allegations*."); Maddow Decl. Ex. 7 at NBCU000198 ("*[T]he allegation here* is that this is a federal facility and they have been sending immigrant women in their care, in their custody, to a doctor who has removed their reproductive organs for no medical reason and without them consenting to it."); Hayes Decl. Ex. 5 at NBCU000185 ("We've been bringing you the story of *allegations* of medical procedures performed on immigrant women . . .").[9]   Indeed, variations of the words "allegations" and "alleges" appeared at least forty-nine times in the News Reports. *See id.*  And each News Report included available statements from government agencies or Dr. Amin "disputing the allegations," along with facts that might belie the credibility of the whistleblower, including that ICE was "clearly questioning [her]" and that she was "demoted" from her position at ICDC.  *See* Wallace Decl. Ex. 8 at NBCU004169; Hayes Decl. Ex. 2 at

---

[8] *See also Oldaker v. Giles,* 20-cv-00224 (M.D. Ga.) (Dkt. 306) (5/2/23 Hearing Tr.) at 39 (Dr. Amin's counsel recognized Dr. Amin's "very high burden of the element of falsity" explaining that he needed to prove, among other things, that "he didn't perform unnecessary procedures, that he wasn't overly harsh" and that "he didn't act inappropriately in providing medical treatment.").

[9] The challenged statements that merely quote the Whistleblower Complaint are shielded by Georgia's fair report privilege which provides an independent ground for dismissal.  *See* NBCU Mot. at 23-25.

NBCU000164, NBC000166; Maddow Decl. Ex. 7 at NBCU000200-202; Hayes Decl. Ex. 5 at NBCU000186.  Thus, like in *Bryant*, reasonable viewers would understand from this context that the News Reports were reporting on allegations in the early stage of a breaking news story and included information that belied the allegations.

*Third*, Dr. Amin ignores the fundamental principle of determining the defamatory sting: what is the alleged harm to the plaintiff's reputation.  The reporting of allegations that Dr. Amin performed high numbers of unnecessary and unconsented-to hysterectomies does no additional material harm to his reputation than the conclusions of the Senate investigation that found Dr. Amin performed scores of invasive surgeries on detained women, at rates exponentially higher than any other doctor treating detainees nationwide, thereby risking their health and fertility and without necessity or their full informed consent.  *See* pp. 5-6, *supra*.  *Bustos* is instructive.  There, the court affirmed a grant of summary judgment for the defendant after it falsely suggested that the plaintiff was a "member" of the Aryan Brotherhood prison gang instead of the reality, that plaintiff passed drugs to prison gangs, including the Aryan Brotherhood.  646 F.3d at 767.  Judge Gorsuch acknowledged that while the "delta between the defamatory statement and the truth *might* cause some modicum of additional injury to [the plaintiff's] reputation . . . it is not one a juror could find likely to be significant to a reasonable person."  *Id.*  "To the extent reasonable persons would find the views and practices of the Brotherhood abhorrent—and surely they would—they would *also* be appalled that Mr. Bustos has given the group his aid and comfort."  *Id.* at 768.  Because the gist of the challenged statement—that the plaintiff was associated with the Aryan Brotherhood—was true, the statement was not actionable.

Similarly, in *Haynes v. Alfred A. Knopf, Inc.*, 8 F.3d 1222 (7th Cir. 1993), the plaintiff brought a defamation action based on a book that he claimed, among other things, accused him of

criminal neglect by leaving his children unattended at night in a dangerous neighborhood.  *Id.* at 1225.  While the facts did not support the book's depiction, they did show the plaintiff was an unreliable father, meaning the gist of the challenged statement was true.  *Id.* at 1228*; see also Rinsley v. Brandt*, 700 F.2d 1304, 1308 (10th Cir. 1983) (statement that patient's family "instituted a suit against [plaintiff]" was not actionable when family just spoke to lawyer about filing lawsuit); *Lemons v. Chronicle Pub. Co.*, 253 Ill. App. 3d 888, 890-91 (1993) (statement that plaintiff "stabbed" security guards deemed substantially true when plaintiff scratched store employees with a knife causing a minor cut).

Here, as in these cases, a viewer troubled by the allegations of improper hysterectomies on ICE detainees would not be materially less troubled if the evidence shows, as it does, that Dr. Amin was performing unnecessary or unconsented-to D&Cs, laparoscopies, cystectomies, or other invasive gynecological surgeries, all of which could significantly affect the health and fertility of detainees.  *See* pp. 5-6, *supra*.[10]  Further, the number of unnecessary or unconsented-to surgeries does not bear on the issue of falsity; the legal concept of gist or sting does not turn on quantity. *See* pp. 9-10, *supra*.  Indeed, as Dr. Amin recognized, "performing even one unnecessary invasive medical procedure would be excessive."  McNamara Decl. Ex. 3 at 196:20-24.  Here, government investigations and testimony in this action found that Dr. Amin performed *scores* of unnecessary invasive surgeries on detainees that affect fertility.  *See, e.g.*, *id.* Ex. 68 at NBCU002052; Ex. 116 at 108:4-9, 115:24-116:3, 173:8-15 201:9-203:5; Ex. 133 at CAREY000332-34.

For all of these reasons, the gist of the challenged statements, which Dr. Amin must conclusively establish is false, is that Dr. Amin was alleged to have performed unnecessary or

---

[10] This conclusion is evidenced by the fact that Senator Jon Ossoff referred to Dr. Amin's pattern of unnecessary and unconsented-to surgeries (excluding hysterectomies) as "disgraceful" and the media continued to widely report on Dr. Amin's performance of gynecological surgeries other than hysterectomies.

unconsented-to invasive procedures on detained immigrant women.

### III.   Dr. Amin Cannot Prove that the Gist of the Challenged Statements Is False

Dr. Amin asks this Court to focus only on hysterectomies for the obvious reason that he cannot possibly meet his burden of falsity on the actual gist of the challenged statements.  The evidence shows that, in addition to the two hysterectomies he performed, Dr. Amin also performed scores of D&Cs, laparoscopies, ovarian cystectomies, LEEPs (removal of portions of the cervix), and salpingectomies (removal of portions of fallopian tubes) on detained women.  *See* McNamara Decl. Ex. 130 at 7; *see also* pp. 5-6, *supra*.  Beyond a one sentence footnote citing to a statement from his expert,  Mot. at 12, n.3, Dr. Amin provides *no evidence* to show these scores of invasive surgeries he performed were necessary, appropriate, and fully consented-to.  *See* Mot. at 11-15. As a result, he fails to meet his burden of establishing falsity, and his Motion should be denied.

### A.   Dr. Amin Does Not—And Cannot—Establish the Gynecological Surgeries He Performed On ICDC Detainees Were "Necessary"

Dr. Amin has not established by clear and convincing evidence—or even a preponderance of the evidence—that all the gynecological surgeries he performed on ICDC detainees were medically necessary.  Nor can he.  As explained in the NBCU Motion, numerous doctors testified that Dr. Amin frequently performed "unnecessary surgeries" on ICE detainees.  *See* Mot. at 19-20.  Dr. Carey concluded that Dr. Amin performed over forty unnecessary D&Cs, the unnecessary removal of over thirty functional ovarian cysts, and several unnecessary LEEPs—all surgeries that carry significant risks to fertility.  *See* McNamara Decl. Exs. 128, 133.  Dr. Anderson likewise testified that ██████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████          *See* McNamara Opp. Decl. Ex. 6 at 189:7-194:18. Based on a review of extensive evidence, including ICE statistics and expert testimony, the bipartisan Senate

Subcommittee found that female detainees at ICDC "appear to have been subjected to excessive, invasive, and often unnecessary gynecological procedures" from Dr. Amin.  *See* McNamara Decl. Ex. 68 at NBCU002052-59.  And Dr. Ogburn informed the Georgia Medical Board that Dr. Amin's "pattern of performing" D&C's or laparoscopies "did not meet acceptable standards."  *See* McNamara Opp. Decl. Ex. 3 at AMIN_0000021. Dr. Amin ignores this overwhelming record evidence showing that he routinely performed unnecessary invasive procedures on the ICDC detainees, all of which carried significant health and fertility risks.[11]  Dr. Amin's failure to meet or rebut this evidence alone defeats this Motion.

Instead, Dr. Amin's motion is improperly and narrowly focused solely on an attempt to establish that the two hysterectomies he performed were necessary.  In an effort to support this conclusion, Dr. Amin relies on his own word, ICE's "approval," and the testimony of his two experts, none of which is sufficient to establish by clear and convincing evidence that the challenged statements are false.  In other words, Dr. Amin does not (and cannot) meet his burden of proof even as to hysterectomies, much less the actual gist of the challenged statements.

*First*, courts have routinely held that a plaintiff's denials are insufficient to prove falsity, since this would "effectively shift plaintiff['s] burden of establishing falsity onto the media defendants to establish truth."  *Celle v. Filipino Reporter Enterprises*, 209 F.3d 163, 188 (2d Cir. 2000); *see also, e.g.*, *Nichols*, 477 F.3d at 399-400 (plaintiff's statement under oath that he "never experimented with explosive devices" deemed insufficient to establish falsity of statement that plaintiff made "practice bombs" with one of the Oklahoma City bombers); *Nicholson v. Promotors*

---

[11] In a footnote, Dr. Amin only makes a passing reference to █████████████████████████████████████████████████████████████████████████████████████████████████████

*on Listings*, 159 F.R.D. 343, 356 (D. Mass. 1994) ("The plaintiff's own statement, however, is a thin reed on which to support his burden of adduction.").[12]  Far from proving falsity, Dr. Amin's testimony ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████  *See* McNamara Decl. Ex. 3 at 234:14-20 ██████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████.

        *Second*, Dr. Amin relies on ICE's September 15, 2020 statement, which indicated that there were only two women "referred" for hysterectomies from ICDC and both referrals were "reviewed" and "approved."  Mot. at 12.  But discovery in this action has proven this statement false for multiple reasons.  Dr. Amin admits that ████████████████████████████████████████████. *See* McNamara Decl. Ex. 3 at 66:7-84:12; McNamara Decl. Exs. 111-15.  And, just last week, DHS released a report calling into serious question ICE's approval process for outside surgeries. *See* McNamara Opp. Decl. Ex. 1.  It concluded that between 2019 and 2021, a significant percentage of "major surgical procedures were not approved" by the appropriate medical personnel at ICE, DHS "does not have assurance that all major surgeries . . . were medically necessary," *id.* at NBCU005266, and of six hysterectomies performed on ICE detainees, for at least two, the record did not support "that a hysterectomy was the most appropriate course of treatment and was medically necessary," *id.* at NBCU005299.[13]  Thus, the September 15, 2020 ICE statement does

---

[12] The one case that Dr. Amin relies on, *Flowers v. Wal-Mart Stores, Inc.*, 2005 WL 2787101, at *7 (M.D. Ga. Oct. 27, 2005), is not to the contrary.  *Flowers* is not a defamation action, and it does not involve a physician-plaintiff relying on his own testimony to carry his burden of proving falsity.

[13] Dr. Amin's surgeries were not considered in this analysis since they were separately referred "to [the DHS] Office of Investigations resulting from a whistleblower complaint."  McNamara Decl. Ex. 1  at NBCU005297.

not provide support—let alone clear and convincing evidence—that any challenged statements were false.

*Third*, Dr. Amin relies on the testimony of his experts who concluded that the two hysterectomies he performed on ICE detainees were medically necessary. *See* Mot. at 12.  The testimony of Dr. Amin's two experts, however, is directly contradicted by the testimony of Dr. Carey (NBCU's expert) and Dr. Anderson (who confirmed in this action the expert testimony he provided to Congress).  When Dr. Carey was asked, for example, ███████████████████ ████████████████████████████ she responded, ████████████████████ McNamara Decl. Ex. 14 at 117:8-12; *see also* McNamara Decl. Ex. 116 at 175:24-176:10; 180:8-181:2 (Dr. Anderson opining that ████████████████████████████████); McNamara Opp. Decl Ex. 3 at Amin_0000021 (Dr. Ogburn referring to "egregious example" of Dr. Amin "doing a simple hysterectomy on a patient at high risk for cervical cancer without appropriate evaluation (repeat cone)").  And whether Dr. Amin performed one unnecessary hysterectomy or more than one makes no difference for purposes of material falsity.  *See* pp. 9-10, *supra*.  Thus, even as to hysterectomies, Dr. Amin has not established falsity by clear and convincing evidence.[14]  *See Wolf*, 253 F. Supp. 2d at 1362.

At best, Dr. Amin has established that whether medical procedures (including hysterectomies) are "necessary" or "unnecessary" is not a statement of fact that can be proven true

---

[14] Dr. Amin attempts to argue that Drs. Carey and Anderson were ████████████████████████ ████████████████████████████████████████████████████ Mot. at 12. ████████████████████████████████ *See* McNamara Decl. Ex. 148 at 118:8-9, 122:5-10; Ex. 116 at 179:18-181:2. ████████████████████████████████████████

or false.   Dr. Amin's expert, Dr. Bills, testified that ███████████████████████

████████████████████████████████████████████ McNamara Decl. Ex. 132

at 82:20-22.  And Dr. Amin agreed, testifying that ████████████████████████████

███████████████████████████████████ McNamara Decl. Ex. 3 at 183:22-

24; 184:16-21.   In other words, whether the procedures (including hysterectomies) Dr. Amin

performed on the detainees were "necessary" is a "subjective assessment, as to which reasonable

minds could differ." *Bryant,* 311 Ga. App. at 234 n.13; *see also Milkovich v. Lorain Journal Co.,*

497 U.S. 1, 17 (1990); *Turner v. Wells*, 879 F.3d 1254, 1262 (11th Cir. 2018)  ("[S]tatements that

are not readily capable of being proven false, and statements of pure opinion are protected from

defamation actions by the First Amendment.").[15]

Consider, for example, *Woodward v. Weiss*, 932 F. Supp. 723 (D.S.C. 1996).   There, a

doctor sued for libel after he was accused by another doctor of performing "excessive and not

recommended" treatments that were "far in excess" of what was called for by the injuries his

patients suffered.  *Id.* at 726.  During his deposition, like here, the plaintiff admitted that "there are

always differences of opinions between doctors" concerning the necessity of treatments.   *Id.*

Accordingly, the court concluded that "[w]hether treatments . . . are recommended or excessive"

are "opinions, not verifiable facts."   *Id.*   It explained, "[m]edicine, with all its great

accomplishments, remains an inexact science," and there "is no standard which could be used to

render an objective, verifiable answer" to whether the procedures were excessive or necessary.

*Id.*; *cf. Mills v. Iowa*, 924 F. Supp. 2d 1016, 1032 (S.D. Iowa 2013) (statement that lawyer had a

"conflict of interest" was non-actionable opinion, even when expert alleged there was no such

---

[15] In its Order on NBCU's Motion for Judgment on the Pleadings, Dkt. 59, the Court held at that early stage of the litigation, the term "unnecessary" could imply undisclosed facts.  *See* Order at 59.  But now, with all of the facts in the record, whether the procedures Dr. Amin performed here were "unnecessary" still cannot be proven true or false given that doctors have different opinions.

conflict under professional rules, because "[t]he mere fact that Plaintiff, his expert, or anyone else disagrees with the conclusions of the [] Report does not generate a genuine issue of material fact"). For this reason, Dr. Amin cannot meet his burden of proving falsity.

Dr. Amin's claims arising from NBCU's reporting that the Whistleblower Complaint included allegations that detainees referred to Dr. Amin as a "uterus collector" fail for a similar reason. These statements are opinion or rhetorical hyperbole—*i.e.* "loose figurative language"— and are not actionable. *See Turner*, 879 F.3d at 1262-63 (recognizing that whether a statement is a fact or opinion is a question of law for the Court). In context, viewers of the News Reports would reasonably understand that by calling Dr. Amin a "uterus collector," detainees were hyperbolically expressing their fear and confusion concerning why so many women were having gynecological surgeries. It is not reasonable to conclude that these statements were conveying that detainees believed Dr. Amin was literally collecting uteruses like stamps. *Horsley v. Feldt*, 204 F.3d 1125 (11th Cir. 2002) ("Although rhetorically hyperbolic statements may at first blush appear to be factual, they cannot reasonably be interpreted as stating actual facts about their target."); *Murray v. Pronto Installations, Inc.*, 2020 WL 6728812, at *4 (M.D. Fla. Nov. 16, 2020) (charge that plaintiff "mentally and physically abuse[d]" people was "emotionally charged rhetoric," not fact).

In sum, Dr. Amin cannot meet his weighty burden of showing that the challenged statements were materially false.

### B. Dr. Amin Does Not—And Cannot—Establish the Gynecological Surgeries He Performed on ICDC Detainees Were "Consented-To"

Relying largely on his own word and his signed consent forms, Dr. Amin also argues that the challenged statements are false because the two hysterectomies he performed were "consented-to." Mot. at 14-15. But Dr. Amin again ignores the record evidence. ████████████

████████████████████████████████████████

21

██████████████████████████████████████████ *See* McNamara Decl. Ex. 122

at  114:7-13.  ████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████ *See id.* at 113:1-16; *see also* McNamara Opp. Decl. Ex. 7 at 102:1-5, 118:19-

119:8.  ████████████████████████████████████ *See* Hayes Decl. Ex. 3 at

NBCU003567.  ████████████████████████ the American College of Obstetrics and

Gynecologists recognizes that "the coercive environment of prison impedes true informed

consent." *See* McNamara Opp. Decl. Ex. 8 at CAREY000265.[16]

This testimony alone is enough to defeat Dr. Amin's Motion.  But in addition ████████

████████████████████████████████████████████████████

████████████████████████████. For example:



- ██████████████████████████████████████████████████
  ██████████████████████████████████████████████████
  ██████████████████████████████████████████ *See* McNamara Opp.
  Decl. Ex. 9 at 58:12-17, 63:3-8, 69:8-21, 70:9-14.

- ██████████████████████████████████████████████████
  ██████████████████████████████████████████████████
  ████████████████████████████ *See* McNamara Decl. Ex. 118 at 97:3-98:17;
  McNamara Opp. Decl. Ex 10 at 111:4-8.

- ██████████████████████████████████████████████████
  ██████████████████████████████████████████████████
  ████████████████████████████ *See* McNamara Decl. Ex.

---

[16] In his Motion, Dr. Amin appears to draw a distinction between the terms "unauthorized" and "without consent," arguing that "unauthorized" means without the approval of ICE.  *See* Mot. at 13-14.  Only one challenged statement made in the 9/15 *All In* News Report uses the term "unauthorized," and the context of the News Report makes clear that by "unauthorized," it meant authorized by the detainees on whom Dr. Amin performed surgery, not by ICE.

121 at 190:12-191:3, 211:12-23; McNamara Opp. Decl. Ex. 11 218:8-219:10.

Indeed, as Andrew Free (a lawyer for several ICDC detainees) summarized, many of his clients believed that Dr. Amin performed "hysterectomies" on them, but they later learned that he actually performed "cystectomies." *See* McNamara Decl. Ex. 33 at 97:14-99:9.  He explained:

> Cystectomy sounds a lot like hysterectomy, and I think if you're not given an interpreter in your consultation with a gynecologist, if you're in chains, if you've got a guard sitting next to you while they're shoving a wand inside of you and you're not given paperwork in the language of . . . your fluency, it's tough to know what happened.

*Id.*

Discovery has revealed numerous problems with Dr. Amin's informed consent process. While Dr. Amin's surgical coordinator, Maria Nito, was the "witness" for most of Dr. Amin's informed consent forms, Ms. Nito testified that she was not present at the hospital when Dr. Amin supposedly obtained informed consent. *See* McNamara Opp. Decl. Ex. 12 at 96:16-97:2.  Instead, the evidence established that Dr. Amin and Ms. Nito would █████████████████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ █████████████████████████████ *See* McNamara Decl. Ex. 19 at 103:6-105:3; *id.* Ex. 3 at 49:25-50:23; *compare id.* Ex. 111 at Amin_00007072 ███████████████ ████, *with id*. Ex. 113 at Amin_0007070 ████████████████████.  Further, while Ms. Nito would sometimes translate for Spanish speaking patients in Dr. Amin's office, she testified that she never read these patients the entire informed consent form (which were kept only in English), *see* McNamara Decl. Ex. 19 at 106:23-107:16, and ████████████████████ ███████████████████████████████████████████████████████████████████

McNamara Opp. Decl. Ex. 12 at 113:1-114:2.[17]

To support his claim that he obtained consent, Dr. Amin again points to the September 15, 2020 ICE statement, which obliquely stated that "[d]etainees are afforded informed consent," Mot. at 15. But ICE later admitted that it did not maintain consent forms, which "are obtained by the surgeon," *see* McNamara Opp. Decl. Ex. 13 (ICE00821), and that it did not track Dr. Amin's use of a language line for translations, *see id.* Ex. 14 at ICE-0013484. When asked whether LaSalle ever checked the informed consent forms of outside medical providers, the Warden of ICDC likewise testified that "[t]hose are not forms that are readily available." *See id.* Ex. 15 at 97:20-98:2.

For all these reasons, Dr. Amin has failed to establish that each of the gynecological surgeries he performed, including the two hysterectomies, were "consented-to."

## IV. Dr. Amin Is Not Entitled to Summary Judgment on the Three "Social Media" Statements Because He Never Identified Them

Finally, Dr. Amin's Motion should be denied as to the three "social media" statements, *see* Mot. at 6, for the independent reason that Dr. Amin never previously identified them. A complaint that makes "general allegations, without identifying specific statements, [is] insufficient to state a claim for slander, libel or defamation." *Sarver v. Jackson*, 2008 WL 4911836, at *4 (N.D. Ga. 2008). Here, paragraph 89 of the FAC merely pled, "MSNBC and its reporters repeated their false and defamatory statements of and concerning Dr. Amin on Twitter on at least three occasions on September 16, 2020 and September 22, 2020." None of the three posts that Dr. Amin now

---

[17] The mere fact that these forms had to "go through several hands," as Dr. Amin's Motion claims, *see* Mot. at 14, says nothing about whether Dr. Amin adequately provided ICDC detainees with informed consent. And while Dr. Amin claims that an ICDC nurse testified that "[i]f I was there, whatever procedure [Dr. Amin] needed to do, he always explained what was what to his patients," *id.*, that same nurse testified that he was never in the examination room with Dr. Amin, McNamara Opp. Decl. Ex. 17 at 54:18-55:24, and only recalled caring for *one* ICE detainee, *id.* at 173:19-174:11, 175:6-11, 176:24-177:5, meaning he could not speak to Dr. Amin's general informed consent process for detainees.

identifies matches this vague description:  the first two Tweets were published on September 17, 2020, and the third post comes from Facebook, not Twitter, and is dated September 21, 2020. When asked to identify each of the challenged statements in discovery, Dr. Amin responded that he would produce the precise Twitter posts over which he was suing, but he never did.  *See* McNamara Decl. Ex. 110.  The Court should reject Dr. Amin's belated attempt to bring these social media posts into this action.   *See Grayson v. No Label*s, Inc., 2022 WL 12144181, at *3 (11th Cir. Oct. 21, 2022) (refusing to consider defamatory statements "alleged in [plaintiff's] opposition to summary judgment that he had omitted from—and never sought to add by amendment to—his second amended complaint"); *Akai Custom Guns, LLC v. KKM Precision, Inc.*, 2023 WL 8449374, at *12 n.7 (S.D. Fla. Dec. 6, 2023) ("Plaintiffs have also identified in their Motion papers, for the first time, four allegedly defamatory statements . . . Plaintiffs attempt in their Motion papers to make these four statements bases for their defamation claims . . . Plaintiffs cannot attempt to raise new claims or plead new allegations on summary judgment. . . . The Court will therefore disregard the four statements.").

        In any event, none of the social media posts changes the challenged gist of the statements as a whole or the conclusion that Dr. Amin has not, and cannot, carry his burden of falsity.

## **CONCLUSION**

        For the foregoing reasons, Dr. Amin's motion for partial summary judgment should be denied.[18]

---

[18] NBCU does not contest that the challenged statements were "of and concerning" Dr. Amin, were broadcast to third parties, and that damages are inferred under O.C.G.A. 51-5-4(3), except that NBCU disputes that Dr. Amin can prove any actual damages attributable to the challenged News Reports or that Dr. Amin can establish sufficient evidence to support punitive damages.  *See* Mot. at 20-26.  Given the Court's decision on NBCU's Rule 12(c) Motion, NBCU also does not contest the dismissal of its third and fourth affirmative defenses brought under New York law.

Respectfully submitted,

*s/ Cynthia L. Counts*
Cynthia L. Counts
Georgia Bar No. 190280
FISHERBROYLES, LLP
945 East Paces Ferry Rd. NE, Suite 2000
Atlanta, GA 30326
(404) 550-6233
cynthia.counts@fisherbroyles.com

*s/ Elizabeth A. McNamara*
Elizabeth A. McNamara
(admitted *pro hac vice*)
Amanda B. Levine
(admitted *pro hac vice*)
Leena Charlton
(admitted *pro hac vice*)
DAVIS WRIGHT TREMAINE LLP
1251 Avenue of the Americas, 21st Floor
New York, NY 10020-1104
Tel: (212) 489-8230
lizmcnamara@dwt.com
amandalevine@dwt.com
leenacharlton@dwt.com

*Attorneys for Defendant*

\*      \*      \*

## CERTIFICATE OF SERVICE

The undersigned certifies that on the 2nd day of February, 2024, a true and correct copy of

the foregoing document was served upon the following via the Court's electronic filing system:

Stacey Godfrey Evans
sevans@staceyevanslaw.com
Amble Johnson
ajohnson@staceyevanslaw.com
Scott R. Grubman
sgrubman@cglawfirm.com

*Elizabeth A. McNamara*
Elizabeth A. McNamara
(admitted *pro hac vice*)
DAVIS WRIGHT TREMAINE LLP
1251 Avenue of the Americas, 21st Floor
New York, NY 10020-1104
Tel: (212) 489-8230
lizmcnamara@dwt.com

*Attorneys for Defendant*