## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF GEORGIA
## WAYCROSS DIVISION

DR. MAHENDRA AMIN, M.D.,

       Plaintiff,

    v.

NBCUNIVERSAL MEDIA, LLC,

       Defendant.

Case No. 5:21-cv-00056-LGW-BWC

**RESPONSE TO PLAINTIFF'S STATEMENT OF MATERIAL FACTS**

Pursuant to Southern District of Georgia Local Rule 56.1, Defendant NBCUniversal Media LLC ("NBCU") submits this Response to the Statement of Material Facts filed by Plaintiff Dr. Mahendra Amin ("Dr. Amin").  NBCU submits this Response solely for purposes of the pending motions for summary judgment and reserves the right to challenge the purported truth of any statement made in Dr. Amin's Statement of Material Facts at any trial in this action.[1]

## I.   FACTS AS TO WHICH THERE EXISTS NO GENUINE DISPUTE TO BE TRIED[2]

### A.   Dr. Mahendra Amin's Medical Care of Women Detained by ICE at ICDC

1.      Dr. Mahendra Amin is a physician who provided medical care to women detained by United States Immigration and Customs Enforcement (ICE) at the Irwin County Detention Center (ICDC) in Ocilla, Georgia for around 3.5 years. Ex. C, Amin Depo. Ex. 24 (Letter to Dr. McMahan, Sept. 21, 2020).

**NBCU's Response:**  Undisputed.

2.      Dr. Amin only performed two hysterectomies on women who were detained by ICE at ICDC. Ex. B, Amin Depo. 84:2-5.

---

[1] Unless otherwise noted, this Response uses the same abbreviations and capitalized terms as those set forth in NBCU's Rule 56.1 Statement of Material Facts (Dkt. 137).

[2] For the Court's ease of reference, NBCU has imported the headings and sub-headings from Dr. Amin's Statement of Material Facts.  This is not meant to constitute a concession concerning the unsupported assertions in those headings, which NBCU disputes.

**NBCU's Response:**  Undisputed.

3.      The two hysterectomies Dr. Amin performed on women who were detained by ICE at ICDC were justified for medical reasons. Ex. B, Amin Depo. 34:17-18.

**NBCU's Response:** Disputed.  Admissible evidence contradicts this contention.  *See, e.g.*, McNamara Declaration in Support of Defendant's Motion for Summary Judgment ("McNamara Decl.") (Dkt. 136) Ex. 128 (Carey Report) at 8 ("[I]t was unacceptable to perform a simple hysterectomy."); McNamara Decl. Ex. 148 (Carey Tr.) at 122:5-11 ███████████████

███████████████████████████████████████████; *id.* at 120:2-8 ███████████████████████████████████████████████

███████████████████████████████████████; McNamara Decl. Ex. 116 (Anderson Tr.) at 175:22-176:10 ███████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████; *id.* at 179:18-179:25 █████████

██████████████████████████████████████████████████

████████████████████.

In addition, cited evidence is taken out of context.  *See* McNamara Decl. Ex. 3 (Amin Tr.) at 234:13-24 ████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████.

4.      One hysterectomy was to remove cancer. Ex. B, Amin Depo. 34:18-20.

**NBCU's Response:**  Undisputed that this was the justification Dr. Amin provided for the hysterectomy, but this is taken out of context.  *See, e.g.*, McNamara Decl. Ex. 148 (Carey Tr.) at 118:10-119:15 ███████████████████████████████████████████████

███████████████████

5.      The other hysterectomy was to remove a tumor. Ex. B, Amin Depo. 36:6-10.

**NBCU's Response:**  Undisputed that this was the justification Dr. Amin provided for the hysterectomy, but this is taken out of context.  *See, e.g.*, McNamara Declaration in Opposition to Plaintiff's Motion for Partial Summary Judgment ("McNamara Opp. Decl.") Ex. 22 (Carey Tr.) at 128:7-24 ██████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████.

6.      As to the patient with cancer, Dr. Amin offered her different choices for treatment, and "she decided, and I agreed with her, for hysterectomy." Ex. B, Amin Depo. 35:5-7.

**NBCU's Response:**  Disputed.  Admissible evidence contradicts this contention.  *See, e.g.*,

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████

7.      Once a patient who was detained by ICE at ICDC decided to do a surgery and before the surgery was done, ICE had to approve or disapprove the surgery. Ex. B, Amin Depo. 57:9-22.

**NBCU's Response:** Undisputed that ICE was *supposed to* approve or disapprove each surgery performed on ICE detainees but, as evidence in the record establishes, "U.S. Immigration and Customs Enforcement's (ICE) Health Service Corps (IHSC) did not always properly process and authorize major surgical procedures for non-citizens in ICE custody" and, therefore "IHSC does not have assurance that all major surgeries conducted FY 2019 through FY 2021 were medically necessary." *See* McNamara Opp. Decl. Ex. 1 at NBCU005296.

8.      At the hospital prior to surgery, multiple hospital personnel independently verified that surgery was approved. Ex. B, Amin Depo. 42:23-43:18, 57:23-58:3.

**NBCU's Response:** Disputed as inadmissible hearsay because Dr. Amin is testifying about the actions of other hospital personnel. *See, e.g.*, McNamara Decl. Ex. 3 (Amin Tr.) at 56:23-57:9 (testifying, as to informed consent forms, that he "never pay[s] any attention to this area" because "this is not [his] job"); *id.* at 71:25-72:9 ████████████████████████

████████████████████████████████████████

█████████████████████████████████.

9.      Dr. Amin has never performed surgery without patient consent, he always obtains informed consent from his patients, and multiple personnel in the hospital confirm that the patient understands the procedures they are going through. Ex. B, Amin Depo. 41:14-19, 42:19-20, 47:19-48:9, 288:24-289:2.

**NBCU's Response:** Disputed.  Admissible evidence contradicts this contention. *See, e.g.*,

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████

10.     Maria Nito, Dr. Amin's surgical coordinator, testified that ICE authorization was required for all procedures on patients detained by ICE at ICDC. Ex. D, Nito Depo. 17:8-12, 72:1-18.

**NBCU's Response**:  Undisputed.

11.     Maria Nito sought approval for procedures by providing information, including a description of the patient's treatment to that point, to ICDC, who would then send it to ICE for authorization through a medical director. Ex. D, Nito Depo. 72:1-74:23.

**NBCU's Response**:  Disputed in part.  Undisputed that Ms. Nito sought approval for procedures by providing information to ICDC.  Disputed that ICE would send authorization through a medical director.  *See* McNamara Opp. Decl. Ex. 1 at NBCU005296.

12.     Consent forms had "to go through several hands before Dr. Amin proceeding with surgery," including hospital staff, the anesthesiologist, and Dr. Amin. Ex. D, Nito Depo. 98:7-16.

**NBCU's Response**:  Disputed.  Inadmissible hearsay.  Ms. Nito did not have first-hand knowledge of what happened to consent forms at the hospital since she testified that she never went to the hospital as part of her job.  *See* McNamara Decl. Ex. 19 (Nito Tr.) at 29:21-23; McNamara Opp. Decl. Ex. 12 (Nito Tr.) at 97:3-6.

13.     Dwayne Peal, a nurse at the Irwin County Hospital, testified that, when a patient "needed a procedure, then the doctors and the nurses would go over it, anesthesia will go over it making sure that the patient understood everything that was going on." Ex. E, Peal Depo. 51:5-11, 68:7-20.

**NBCU's Response**:  Disputed.  Inadmissible hearsay.  Mr. Peal testified that he never worked with Dr. Amin in-person while employed at the Irwin County Hospital, was never in the

room with Dr. Amin and his patients, and treated only one ICDC detainee.  *See* McNamara Opp.

Decl. Ex. 17 (Peal Tr.) at 54:18-55:15.

14.    Dwayne Peal testified that, whenever he was present at a procedure being conducted by Dr. Amin, "he always explained what was what to his patients." Ex. E, Peal Depo. 72:5-10.

**NBCU's Response:**  Disputed.  Inadmissible hearsay.  *See* Response to ¶ 13.

15.    Alma Arceo, office manager for Dr. Amin's practice, confirmed that Dr. Amin obtained informed consent from all patients before performing surgeries on them. Ex. F, Arceo Depo. 12:9-11, 46:19-24.

**NBCU's Response:**  Disputed.  Inadmissible hearsay.  Ms. Arceo testified that she had not

"ever witnessed an ICE detainee signing a consent form for a surgery with Dr. Amin."  McNamara

Opp. Decl. Ex. 18 (Arceo Tr.) at 47:8-11.

**B.    Experts Confirm the Necessity of the Hysterectomies Dr. Amin Performed**

16.    ███████████████████████████████████████████████.

**NBCU's Response:** Undisputed.

17.    ███████████████████████████████████████████████
███████████████████████████████████████████████

**NBCU's Response:**    Undisputed that ████████████████████.  These

conclusions are contradicted by other doctors, including Dr. Carey and Dr. Anderson.  *See*

McNamara Decl. Ex. 128 (Carey Report) at 3-4, 5-7; *id.* Ex. 67 (Medical Review Team Executive

Summary) at OSORIO_0001280-81; *id.* Ex. 68 (Senate Report) at NBCU002052 ("Female

detainees appear to have been subjected to excessive, invasive, and often unnecessary

gynecological procedures."); *id.* at NBCU002056 ("Dr. Cherouny concluded that Dr. Amin's

practices were 'woefully behind the times' and his treatment of ICDC detainees 'is not meeting

current standards of care.'"); *id.* at NBCU002117 ("Out of the 40 patients who underwent cyst

removals or aspirations, Dr. Cherouny only identified one patient whose pathology reports indicated the removal was reasonable").

18.      Dr. Eldridge Bills concluded that, based on his review of patient charts: "In summary, it appears that Dr. Amin has been providing appropriate care to this high-risk indigent population and has not performed any unnecessary medical procedures." Ex. H, Plaintiffs Service of Expert Witness Reports (Sept. 5, 2023), at 16.

**NBCU's Response:**   Undisputed that Dr. Bills reached these conclusions.   These conclusions are contradicted by other doctors, including Dr. Carey and Dr. Anderson.  *See* Response to ¶ 17.

19.



**NBCU's Response:**  Undisputed.

20.

**NBCU's Response:**  Undisputed                               These conclusions are contradicted by other doctors, including Dr. Carey and Dr. Anderson.  *See, e.g.,* McNamara Decl. Ex. 148 (Carey Tr.) at 117:8-12; *id.* Ex. 116 (Anderson Tr.) at 174:19-177:3.

21.

**NBCU's Response:**   Undisputed that                              This conclusion is contradicted by other doctors, including Dr. Carey and Dr. Anderson.  *See* Response to ¶ 20.

22.      In its rebuttal expert disclosure, NBCUniversal disclosed Dr. Erin Carey, for rebuttal purposes only. Ex. J, Defendant's Rebuttal Expert Witness Disclosures, Sept. 19, 2023, at 2.
**NBCU's Response:**  Undisputed.

23.

**NBCU's Response**:   Disputed as the quoted testimony is taken out of context.   *See*



24.    In her expert report, Dr. Erin Carey did not opine that performing a hysterectomy on B.P. was medically unnecessary, but opined that B.P. should have received a "modified radical hysterectomy (class II hysterectomy)" rather than the "simple hysterectomy" she received. ██████ ██████████████    Ex. L, Pl. Ex. 222 (Carey Expert Rebuttal Report) at 8-9.

**NBCU's Response**:   Disputed.   Admissible evidence contradicts this contention.   *See*

McNamara Decl. Ex. 128 (Carey Report) at 8 ("B.P. had positive margins on her LEEP specimen

and therefore it was unacceptable to perform a simple hysterectomy."); *id.* ████████████

██████████████.

25.    In its rebuttal expert disclosure, NBCUniversal also disclosed Dr. Ted Anderson's Zoom statement before staff members of the Democratic Caucus of the United States Senate and an Executive Summary produced by a team of advocates and medical reviewers. Ex. J, Defendant's Rebuttal Expert Witness Disclosures, at 2-3, 123-136.

**NBCU's Response**:   Undisputed.   As explained in NBCU's Opposition to Dr. Amin's

Motion to Exclude the Testimony of Dr. Anderson, NBCU did so in an abundance of caution given

that Dr. Anderson testified as an expert witness to the Senate, even though he was not retained as

an expert witness in this action.

26.     Dr. Anderson reviewed medical records of B.P. but not K.C. *See* Ex. J, Defendant's Rebuttal Expert Witness Disclosures, Sept. 19, 2023 at 135-36 (spreadsheet of initials of patients reviewed).

**NBCU's Response:**  Undisputed.

27.  ███████████████████████████████████████████
████████.

**NBCU's Response:**  Disputed.   Mischaracterizes cited evidence.  ████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████

28.  ████████████████████████████████████████
████████████████████████████████

**NBCU's Response:**  Disputed.   Mischaracterizes cited evidence.  ████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████

**C.     Documentation Confirms that the Hysterectomies Were Authorized and Consented To**

29.  ████████████████████████████████████████
██████████████████████

**NBCU's Response:**  Disputed in part.   Undisputed that ████████████████████

████████████████████████████████████████████ Disputed  that  ████

████████████████████████████████████████████████ *See*

Response to ¶ 7, *supra*.

30.  ████████████████████████████████████████████



**NBCU's Response:** Undisputed that ███████. Disputed that ███████

31. ███████████████████████████

**NBCU's Response:** Undisputed that ███████ Disputed that ███████
███████████ *See* Response to ¶¶ 6, 9, 30.

32. ███████████████████████████

**NBCU's Response:** Disputed in part. Undisputed that ███████
███████████ Disputed that ███
███████████ *See*
Response to ¶ 7, *supra*.

33. ███████████████████████████

**NBCU's Response:** Undisputed that ███████. Disputed that ███████
███████████. *See* Response to ¶¶ 6, 9, 30.

34.     The patient K.C. signed a consent form for anesthesia that was also signed by the anesthesia provider. Ex. O, Amin Depo. Def. Ex. 14 (Medical Records of K.C.) at 4.

**NBCU's Response:**  Undisputed that ▮▮▮▮▮▮▮▮▮▮.  Disputed that ▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  *See* Response to ¶¶ 6, 9, 30.

### D.      Project South Letter is Not OIG Complaint

35.    On September 14, 2020, an organization shared with media organizations a letter, titled, "Re: Lack of Medical Care, Unsafe Work Practices, and Absence of Adequate Protection Against COVID-19 for Detained Immigrants and Employees Alike at the Irwin County Detention Center." Doc. 51-1 (letter) at 2.

**NBCU's Response:**  Disputed in part.  Undisputed that an organization shared this

document (the "Whistleblower Complaint") with media organizations.  Disputed to the extent this

document is characterized as a "letter."  This is a whistleblower complaint that was sent via email

to the government.  *See* McNamara Decl. Ex. 4.  The government identified this document as a

whistleblower complaint and opened an investigation into it, which remains ongoing.  *See id.* Ex.

5 at ICE001096 ("Not sure if you're tracking this but apparently this group (to include a nurse who

works at Irwin) has submitted this complaint to the OIG"); *id.* Ex. 6 at DHS000035 ("CRCL

opened Complaint No. 20-12-ICE-0987 regarding the whistleblower allegations made by a former

nurse at the facility regarding a gynecologist who treated female detainees.  This complaint was

retained by the Office of Inspector General…"); McNamara Opp. Decl. Ex. 16 at ICE002263

(email in which ICE Deputy Chief Counsel asks for a "copy of the OIG complaint" and Chief of

Staff to the Assistant Field Office Director provides the Whistleblower Complaint); *id.* Ex. 1 at

NBCU005297 ("We have excluded 56 of the 609 major surgeries associated with Irwin County

Detention Center due to referrals to our Office of Investigations resulting from a whistleblower

complaint."); *see also* McNamara Decl. Ex. 7 (Paulk Tr.) at 169:8-18; 175:22-176:2 (referring to

document as a "complaint"); *id.* Ex. 68 (Senate Report) at NBCU002052 ("[T]he allegations

stemmed from a September 2020 whistleblower complaint filed by immigration advocacy groups

11

and attorneys alleging that an off-site obstetrician and gynecologist, Dr. Mahendra Amin, performed 'high rates' of unauthorized hysterectomies on ICE detainees.").

36.     The letter primarily concerned COVID-19 conditions at ICDC. Doc. 51-1 (letter) at 2-28.

**NBCU's Response:** NBCU objects to the purported fact in Paragraph 36 on the ground that it refers to the Whistleblower Complaint as a "letter."  *See* Response to ¶ 35.  NBCU further objects to the purported fact in Paragraph 36 on the ground that the term "primarily" is ambiguous.  Subject to these objections, undisputed to the extent "primarily" refers to the number of pages discussing COVID-19.  But disputed that the number of pages discussing COVID-19 is a material fact.

37.     The letter stated, in a two-page subsection, "concerns" about "high numbers" of people receiving hysterectomies from "a particular gynecologist outside the facility," unnamed, and stated, "[i]ntertwined with the issue of reported high rates of hysterectomies is the issue of proper informed consent." Doc. 51-1 (letter) at 19-20.

**NBCU's Response:**  NBCU objects to the purported fact in Paragraph 37 on the ground that it refers to the Whistleblower Complaint as a "letter."  *See* Response to ¶ 35.  Subject to this objection, undisputed.

38.     

**NBCU's Response:**  Disputed.  The Whistleblower Complaint was filed with the Office of Inspector General.  *See* Response to ¶ 35; McNamara Opp. Decl. Ex. 19 (Whitty Tr. Day 2) at 31:7-32:2.  To the extent Paragraph 38 refers to ██████████████████████████ ██████████████████████████████████████████ this is not material.

39.     The OIG complaint concerned Ms. Wooten's allegation that she was fired for "blowing the whistle" about poor COVID-19 conditions at ICDC—not hysterectomies or gynecological care. ██████████████████ Ex. R, Pl. Ex. 227 (OIG Complaint).

**NBCU's Response:** Undisputed as to the ███████████ but this is not material. *See* Response to ¶ 38.

40.    The OIG complaint did not mention hysterectomies or gynecological care at all, much less mention Dr. Amin. ████████████████████ Ex. R, Pl. Ex. 227 (OIG Complaint).

**NBCU's Response:** Undisputed as to the ███████████, but this is not material. *See* Response to ¶ 38.

41.   

**NBCU's Response:** Disputed. The Whistleblower Complaint was filed with the OIG, OIG retained the complaint, and an investigation was opened into it which is ongoing. *See* Response to ¶ 35.

42.    None of the documents filed with the OIG mention hysterectomies or gynecological care. Ex. R, Pl. Ex. 227 (OIG Complaint); Ex. S, Pl. Ex. 165 (OIG Complaint Declaration); Ex. T, Pl. Ex. 228 (OIG Complaint Notice of Protected Whistleblower Activity).

**NBCU's Response:** Disputed. *See* Response to ¶ 35.

43.    The OIG complaint, declaration, and notice of protected whistleblower status were submitted through an online form that makes clear it is Ms. Wooten's official complaint, having her certify that "the statements in this complaint are true, complete, and correct" and showing a confirmation page that "[y]ou have successfully submitted your complaint to the DHS OIG" and providing a reference number. Ex. U, Whitty 1st Depo. 48:2-14; Ex. V, Pl Ex. 166 (screenshot of on-line submission form) at 7-8.

**NBCU's Response:** Undisputed as to the ███████████ but this is not material. *See* Response to ¶ 38.

44.

**NBCU's Response:**  Undisputed, but this is not material.  *See* Response to ¶ 38.

45.    The OIG investigation is over, as Ms. Wooten represented in a court filing that effective August 14, 2023, OIG provided her written notice that "the conditions for exhaustion of administrative remedies have been met in this case." ███████████████████ Ex. W, Pl. Ex. 211 (Wooten's First Amended Complaint for First Amendment and Statutory Retaliation) at 1, 5-6.

**NBCU's Response:**  Disputed to the extent this refers to the investigation OIG opened into

the Whistleblower Complaint's allegations.  *See* McNamara Opp. Decl. Ex. 1 at NBCU005297;

*id.* Ex. 2 at 1-2 ("As of January 23, 2024, the United States Attorneys and other federal civil rights

investigators continue to investigate the allegations in this lawsuit, to determine whether any

criminal conduct, including criminal civil rights violations, occurred.").

### E.    ICE Attests to Only Two Hysterectomies, Necessary and with Consent

46.    On September 15, 2020, Dr. Ada Rivera, Medical Director of the ICE Health Service Corps, issued a statement that "since 2018, only two individuals at Irwin County Detention Center were referred to certified, credentialed medical professionals at gynecological and obstetrical health care facilities for hysterectomies in compliance with National Commission on Correctional Health Care (NCCHC) standards." Doc. 51-7 (ICE Statement) at 2.

**NBCU's Response:**  Disputed in part.  Undisputed that this statement was issued on

September 15, 2020.  Disputed that there were actually only two individuals referred for

hysterectomies during this time given that Dr. Amin referred at least three planned hysterectomies

to ICE during this time (and an additional one in 2017).  *See* ████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████    McNamara Opp. Decl. Ex. 23 at ICE002496 ███████████████████

███████████████████████; *see also* McNamara Decl. Ex. 68 at NBCU002135

("According to information from ICE, Dr. Amin submitted referrals for four hysterectomies, but

he performed only two hysterectomies."); *id.* Ex. 98 at NBCU002366 (quoting answers from

acting Homeland Security Secretary Chad Wolf to the Senate, "It is my current understanding based on ICE data that, since 2017, a total of five individuals at Irwin County Detention Center were referred to certified, credentialed medical professionals at gynecological and obstetrical health care facilities for hysterectomies in compliance with National Commission on Correctional Health Care (NCCHC) standards, and three hysterectomies were in fact performed.").

47.     In her statement on September 15, 2020, Dr. Ada Rivera, Medical Director of the ICE Health Service Corps, also stated that both recommendations for hysterectomies on women detained by ICE at ICDC "were reviewed by the facility clinical authority and approved." Doc. 51-7 (ICE Statement) at 2.

**NBCU's Response**:  Disputed in part.  Undisputed that this statement was issued on September 15, 2020.  Disputed that the recommendations for hysterectomies were properly approved given DHS's January 2024 investigative report.  *See* McNamara Opp. Decl. Ex. 1 at NBCU005296.

48.     In her statement on September 15, 2020, Dr. Ada Rivera, Medical Director of the ICE Health Service Corps, also stated: "To be clear, medical care decisions concerning detainees are made by medical personnel, not by law enforcement personnel." Doc. 51-7 (ICE Statement) at 2.

**NBCU's Response**:  Undisputed.

49.     In her statement on September 15, 2020, Dr. Ada Rivera, Medical Director of the ICE Health Service Corps, also stated: "Detainees are afforded informed consent, and a medical procedure like a hysterectomy would never be performed against a detainee's will." Doc. 51-7 (ICE Statement) at 2.

**NBCU's Response**:  Disputed in part.  Undisputed that this statement was issued on September 15, 2020.  Disputed that detainees were actually afforded informed consent and that a procedure would never be performed against a detainee's will.  This is inadmissible hearsay, since ICE admitted it did not maintain consent forms, *see* McNamara Opp. Decl Ex. 13 at ICE00821-823 and is contradicted by admissible evidence, *see* Response to ¶¶ 6, 9.

**F.     NBCUniversal's False and Defamatory Broadcasts and Social Media Posts Of and Concerning Dr. Amin**

50.     In the program "Deadline: White House" on September 15, 2020 ("First Broadcast"), NBCUniversal published statements included in Dr. Amin's complaint (Doc. 49) regarding Dr. Amin. Doc. 51-2 (First Broadcast Transcript) at 27-30.

**NBCU's Response:**  Undisputed.

51.     The First Broadcast also identified Dr. Amin: "His name is Mahendra Amin. He's a gynecologist in Douglas, Georgia." Doc. 51-2 (First Broadcast Transcript) at 28.

**NBCU's Response:**  Undisputed.

52.     Julia Ainsley, who appeared on the relevant segment of the First Broadcast, and her colleague Jacob Soboroff spoke to Andrew Free, Elizabeth Matherne, Ben Osorio, and Sarah Owings as sources for their statements on the broadcasts. Ex. X, Ainsley Depo. 28:11, 31:4-9, 32:21-33:4.

**NBCU's Response:**  Undisputed that Julia Ainsley and Jacob Soboroff's reporting for the

NBC News Article informed their statements on the two News Reports they appeared on.

53.     Sarah Owings told Jacob Soboroff that she and her colleagues were not finding large numbers of hysterectomies. Ex. Y, Owings Depo. 48:2-14, 118:1-9.

**NBCU's Response:**  Disputed.  Mischaracterizes cited evidence.  Owings testified that she

told Soboroff that as of the afternoon of September 15, 2020, they "weren't finding a lot of

hysterectomies," but this was "very early in the process," they were finding things "inconsistent

with the numbers that ICE was saying," and there appeared to be a "pattern of Dr. Amin claiming

that people had ovarian cysts or diagnosing that and then providing treatment on that basis."  *See*

McNamara Opp. Decl. Ex. 21 (Owings Tr.) at 48:2-8, 118:1-9 (explaining that on September 15,

2020, "I don't see that there was a large number of hysterectomies.  But also that was 24 hours

into this.  So we were already seeing some things that were really weird and bore the need for

further investigation and questioning); *id.* at 140:12-24 (explaining that on September 15, 2020

she "absolutely" did not know the total number of hysterectomies that Dr. Amin had performed

and "other lawyers had identified women who had had hysterectomies or had scheduled hysterectomies").

54.    Ben Osorio, counsel for B.P., told Julia Ainsley that, although he and other attorneys "were questioning everything at that point," her medical records "indicated that the need for the hysterectomy was necessitated by cancer." Ex. Z, Osorio Depo. 66:7-67:6.

**NBCU's Response:**  Disputed.  Mischaracterizes cited evidence.  Osorio testified that while he "believe[s]" he told Ainsley "the documents indicated that the need for the hysterectomy was necessitated by cancer," he also told her that "given the sort of allegations in the whistleblower report, I think we were questioning everything at that point" and he "might have said that this is what the claim is, we're trying to get everything we can on this."  Pl. Ex. Z, Osorio Depo. 66:7-67:3.

55.    Ben Osorio told an interviewer that a second client of his had claimed to have had a hysterectomy, but that he did not have medical records to confirm it. Ex. Z, Osorio Depo. 130:8-131:10.

**NBCU's Response:**  Undisputed.  Mr. Osorio did not testify which "interviewer" he was referring to in this response.

56.    To date, Ben Osorio does not know whether the second client had a hysterectomy or even was a patient of Dr. Amin's; when he requested records from Dr. Amin's office, the office responded that it had no records for the second client, and Ben Osorio testified that he had no reason to believe the office was withholding her records. Ex. Z, Osorio Depo. 30:14-30:19, 31:15-18, 83:7-84:7.

**NBCU's Response:**  Undisputed.

57.    In the program "All In with Chris Hayes" on September 15, 2020 ("Second Broadcast"), NBCUniversal published additional statements included in Dr. Amin's complaint (Doc. 49) regarding Dr. Amin. Doc. 51-3 (Second Broadcast Transcript) at 12-15.

**NBCU's Response:**  Disputed.  The statements listed in Paragraphs 78(b)-(e) do not appear in the Second Broadcast.

58.    The Second Broadcast referred to its earlier reporting regarding Dr. Amin, including the First Broadcast and the article published about which Julia Ainsley's reporting was

allegedly based, both of which named Dr. Amin. Doc. 51-3 (Second Broadcast Transcript); Pl. Ex. 105 (all versions of published article).

**NBCU's Response:** Disputed.   The Second Broadcast does not reference the First Broadcast.  While the Second Broadcast references a published NBC News Article written by Julia Ainsley and Jacob Soboroff that is not challenged in this action, the Second Broadcast does not name Dr. Amin.  *See* Hayes Decl. Exs. 1-2.

59.     In the program "All In with Chris Hayes," on September 16, 2020 ("Third Broadcast"), NBCUniversal published additional statements included in Dr. Amin's complaint (Doc. 49) regarding Dr. Amin. Doc. 51-4 (Third Broadcast Transcript) at 13-18.

**NBCU's Response:** Undisputed.

60.     The Third Broadcast included a picture of Dr. Amin and the text of Dr. Amin's name on the screen during the broadcast. Doc. 19 at Ex. D(ii) (video of Third Broadcast).

**NBCU's Response:** Undisputed.

61.     In the program "The Rachel Maddow Show," on September 15, 2020 ("Fourth Broadcast"), NBCUniversal published additional statements included in Dr. Amin's complaint (Doc. 49) regarding Dr. Amin. Doc. 51-5 (Fourth Broadcast Transcript) at 2-11.

**NBCU's Response:** Undisputed.

62.     The Fourth Broadcast included Dr. Amin's name on the screen during the broadcast. Doc. 19 at Ex. E(ii) (video of Fourth Broadcast).

**NBCU's Response:** Undisputed.

63.     In the program "All In with Chris Hayes," on September 17, 2020 ("Fifth Broadcast"), NBCUniversal published additional statements included in Dr. Amin's complaint (Doc. 49) regarding Dr. Amin. Doc. 51-6 (Fifth Broadcast Transcript) at 13-15.

**NBCU's Response:** Undisputed.

64.     The Fifth Broadcast included multiple pictures of Dr. Amin and the text of his name on screen during the broadcast. Doc. 19 at Ex. F(ii) (video of Fifth Broadcast).

**NBCU's Response:** Undisputed.

65.     On the "All In with Chris Hayes" Twitter profile, on September 17, 2020 at 12:48 AM, NBCUniversal published the following Twitter post: "Learn more about the three women

claiming they have received unnecessary hysterectomies here: on.msnbc.com/2FJlvra" ("First Twitter Post"). Ex. AA, Hayes Depo. 243:18-24, Ex. BB, Pl. Ex. 119 (text of First Twitter Post).

**NBCU's Response:**  Undisputed that this Tweet was published but this is not material because the Tweet was not identified in the First Amended Complaint and is, therefore, not a challenged statement in this action.  *See* FAC ¶ 89 ("MSNBC and its reporters repeated their false and defamatory statements of and concerning Dr. Amin on Twitter on at least three occasions on September 16, 2020 and September 22, 2020.").

66.    On the "All In with Chris Hayes" Twitter profile, on September 17, 2020 at 2:00 AM, NBCUniversal published the following Twitter post: "Three women claim they received unnecessary hysterectomies at ICE facility. 'I felt like I had no right to say anything. Dr. Amin just told me, you're gonna get a hysterectomy done, and schedule an appointment for that. I had no say in this.' on.msnbc.com/2FJlvra" ("Second Twitter Post"). Ex. AA, Hayes Depo. 246:21-247:4; Ex. CC, Pl. Ex. 120 (text of Second Twitter Post). This Twitter post mentions Dr. Amin by name. Ex. CC, Pl. Ex. 120 (text of Second Twitter Post).

**NBCU's Response:**  Undisputed that this Tweet was published but this is not material because the Tweet was not identified in the First Amended Complaint and is, therefore, not a challenged statement in this action.  *See* FAC ¶ 89 ("MSNBC and its reporters repeated their false and defamatory statements of and concerning Dr. Amin on Twitter on at least three occasions on September 16, 2020 and September 22, 2020.").

67.    On the "All In with Chris Hayes" Facebook profile, on September 21, 2020, NBCUniversal published the following Facebook post: "Nurse Dawn Wooten alleges mass hysterectomies performed at Georgia facility: 'I had several detained women on numerous occasions that would come to me and say, 'Ms. Wooten, I had a hysterectomy. Why?' I had no answers as to why they had those procedures.'" Ex. DD, Pl. Ex. 121 (text of Facebook Post).

**NBCU's Response:**  Undisputed that this Facebook post was published but this is not material because the Facebook post was not identified in the First Amended Complaint and is, therefore, not a challenged statement in this action.  *See* FAC ¶ 89 ("MSNBC and its reporters repeated their false and defamatory statements of and concerning Dr. Amin on Twitter on at least three occasions on September 16, 2020 and September 22, 2020.").

68.    The Facebook Post links to the Second Broadcast, which referred to its earlier reporting regarding Dr. Amin, including the First Broadcast and the article published about which Julia Ainsley's reporting was allegedly based, both of which named Dr. Amin. Ex. CC, Pl. Ex. 121 (text of Facebook Post); Doc. 51-3 (Second Broadcast Transcript); Ex. DD, Pl. Ex. 105 (all versions of published article).

**NBCU's Response:** Disputed. *See* Response to ¶ 58.

### G.    Dr. Amin's Complaint and Motion for Summary Judgment

69.    Plaintiff's Amended Complaint, Doc. 49, alleges the following statements, ordered by appearance in the Complaint along with a status for the statements for which summary judgment is not sought:

| Complaint | Statement | Status, if Summary Judgment Not Sought |
|---|---|---|
| First Broadcast: "Deadline: White House," September 15, 2020 | | |
| 75(a) | High numbers of female detainees, detained immigrants, at an ICE detention center in Georgia received questionable hysterectomies while in ICE custody. | |
| 75(c) | Women were afraid to go to this doctor. | Dismissed, Doc. 59 |
| 75(d) | Some said that they came back bruised and that he was overly harsh. | Not subject to summary judgment motion |
| 75(e) | They called him abusive. | Dismissed, Doc. 59 |
| 75(f) | There were women who were told that they needed a hysterectomy because they had cancer. One of those women, her medical records does not indicate that she ever had a biopsy to indicate that she had cancer and another case, a lawyer told me that his client had a hysterectomy because she was told she had stage four cervical cancer and after the hysterectomy when she went to the oncologist, the oncologist said you do not have cancer, so these are alarming allegations about this doctor. | |
| 75(g) | This is his specialty, he's the uterus collector. | |
| 75(h) | Well, what is he doing . . . collecting all of our uteruses? | |
| 75(i) | Our clients are afraid to go back to him; he's hurting these women. | Dismissed, Doc. 59 |
| 75(j) | And perhaps doing very unnecessary procedures and not what you would need in a short-term detention situation. | |
| 76 | [Headline on screen] High number of hysterectomies at ICE Detention Ctr. | |

| Complaint | Statement | Status, if Summary Judgment Not Sought |
|---|---|---|
| **Second Broadcast: "All In with Chris Hayes," September 15, 2020** | | |
| 78(f) | Migrant women say that a doctor was performing unauthorized hysterectomies on immigrant women detained at that facility. | |
| 78(g) | Two of his clients received hysterectomies they believe may have been unnecessary. | |
| 78(h) | Two different women who claim they also had unnecessary hysterectomies while detained at this facility. | |
| 78(i) | As many as 15 immigrant women were given full or partial hysterectomies or other procedures for which no medical indication existed. | |
| 78(j) | Is he the uterus collector? Does he collect uteruses? | |
| 78(k) | Everyone that I talked to has had a hysterectomy. | |
| 78(l) | They would say is he the uterus collector? | |
| 79 | [Headline on screen] Mass hysterectomies performed on women at ICE facility | |
| **Third Broadcast: "All In with Chris Hayes," September 16, 2020** | | |
| 81(a) | They were subjected to unnecessary hysterectomies at the hands of a local OB/GYN. | Dismissed, Doc. 59 |
| 81(b) | Uterus collector. | Dismissed, Doc. 59 |
| 81(c) | Three women who say that they had procedures that they either did not consent to ahead of time or felt coerced into consenting to. | Dismissed, Doc. 59 |
| 81(d) | She felt pressured into a full abdominal hysterectomy by this doctor. | Dismissed, Doc. 59 |
| 81(e) | Dr. Amin just told me listen, you're gonna get hysterectomy done and schedule an appointment for that; I had no say in this. | Dismissed, Doc. 59 |
| **Fourth Broadcast: "The Rachel Maddow Show," September 15, 2020** | | |
| 84(a) | Immigrant women at that facility have told her that they routinely have been sent to a gynecologist who has performed unnecessary procedures on them, including hysterectomies. | |
| 84(b) | They have been sending immigrant women in their care, in their custody, to a doctor who has removed their reproductive organs for no medical reason and without them consenting to it. | |
| 84(c) | Five different women between October, November, and December 2019, over that three-month period, five different women who'd had a hysterectomy done. | |

| Complaint | Statement | Status, if Summary Judgment Not Sought |
|---|---|---|
| 84(d) | I thought this was like an experimental concentration camp. It was like they're experimenting with our bodies. | |
| 84(e) | Everybody this doctor sees has a hysterectomy, just about everybody. | |
| 84(f) | He's even taken out the wrong ovary on one detained immigrant woman. She was supposed to get her left ovary removed because it had a cyst on the left ovary. He took out the right one. She had to go back to take out the left and wound up with a total hysterectomy. | |
| 84(g) | He's taking everybody stuff out, that's his specialty. | |
| 84(h) | He's the uterus collector. | |
| 84(i) | Is he collecting these things or something? | |
| 84(j) | Everybody he sees he's taking all their uteruses out or he's taking their tubes out. | |
| 84(k) | He removed the uteruses of these refugee women for no medical reason, without their proper informed consent. | |
| 84(l) | Two women who were detained at the facility say they received hysterectomies that they believe may have been unnecessary. | |
| 84(m) | She went to this doctor's office for an exam. The exam left her with bruising. | Not subject to summary judgment motion |
| **Fifth Broadcast: "All In with Chris Hayes," September 17, 2020** | | |
| 86(a) | We've been bringing you the story of allegations of medical procedures performed on immigrant women without—many without consent at an ICE detention facility in Georgia. | |
| 86(b) | Felt like I had no right to say anything about a hysterectomy she underwent that was performed by a doctor named Mahendra Amin. She also told us about how Dr. Amin performed an unexpected vaginal ultrasound that she was, she says, not prepared for. | Dismissed, Doc. 59 |
| 86(c) | He didn't tell me nothing, he just—instead he proceeded with vaginal ultrasound, I think. Am I saying it right? But I was not aware of that. | Dismissed, Doc. 59 |
| 86(d) | No, not at all [I was not prepared for that]. No. So I felt violated. And just, you know, keep doing the procedures, the ultrasound. | Dismissed, Doc. 59 |
| **Social Media Posts: First Twitter Post, Second Twitter Post, Facebook Post** | | |

| Complaint | Statement | Status, if Summary Judgment Not Sought |
|---|---|---|
| 89 | Learn more about the three women claiming they have received unnecessary hysterectomies here: on.msnbc.com/2FJlvra. | |
| 89 | Three women claim they received unnecessary hysterectomies at ICE facility. "I felt like I had no right to say anything. Dr. Amin just told me, you're gonna get a hysterectomy done, and schedule an appointment for that. I had no say on this. on.msnbc.com/2FJlvra | |
| 89 | Nurse Dawn Wooten alleges mass hysterectomies performed at Georgia facilities: "I had several detained women on numerous occasions that would come to me and say, 'Ms. Wooten, I had a hysterectomy. Why?' I had no answers as to why they had those procedures." | |

Doc. 49; Doc. 59 ("Statements").

**NBCU's Response:** Undisputed that Statements in the First, Second, Third, Fourth, and Fifth Broadcast were alleged in the FAC. Undisputed as to the identification of statements dismissed from this action. Disputed because Statements in the First, Second, Third, Fourth, and Fifth Broadcast were taken out of their contexts. *See* McNamara Decl. Ex. 1 (chart of challenged statements). Disputed as to the "Social Media Posts," which were not alleged in the FAC and, thus, are not part of this action. *See* Response to ¶¶ 65-68, *supra*.

### H.    Fallout from NBCUniversal's Defamatory Statements

70.    After NBCUniversal's publications, Dr. Amin began to receive harassment, including phone calls threatening to come to Douglas and kill him and his family, for which he would check that the doors were locked and that his family members were safe. Ex. B, Amin Depo. 257:22-258:23.

**NBCU's Response:** Disputed. Admissible evidence contradicts this contention. The public response to the Whistleblower Complaint began prior to the challenged MSNBC News Reports. *See* McNamara Decl. Ex. 23 (article published by *The Intercept* at 5:22 PM, prior to the MSNBC News Reports, reporting that "Amin said that allegations of performing procedures

23

rtt

without patients' consent were ruining his reputation and affecting his practice"); McNamara Decl. Ex. 3 (Amin Tr.) at 109:20-110:1 (confirming that *The Intercept's* statement is accurate); *see also id.* Ex. 8 (email from Warden Paulk to ICE noting that Irwin County Detention Center was receiving "hate calls" repetitively on the morning of September 15, 2020, prior to any of the MSNBC News Reports)

71.    Because of the harassment and abuse he suffered from NBCUniversal's publications, Dr. Amin was unable to sleep and was "miserable, mentally, emotionally." Ex. B, Amin Depo. 259:5-7.

**NBCU's Response**:  Disputed.  Mischaracterizes the cited evidence, as Dr. Amin never testified that the "harassment and abuse" he purportedly suffered was "from NBCUniversal's publications."

72.    After NBCUniversal's publications, Dr. Amin lost patients. Ex. B, Amin Depo. 290:8.

**NBCU's Response**:  Disputed.  Admissible evidence contradicts this contention.  ███

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████

73.    After NBCUniversal's publications, Dr. Amin's practice lost "at least over a hundred" patients (aside from the women who were detained by ICE at ICDC). Ex. F, Arceo Depo. 110:2-14.

**NBCU's Response**:    Disputed to the extent this attributes any lost patients to the challenged MSNBC News Reports and because Dr. Amin has provided no documentation supporting this purported fact.

74.    After NBCUniversal's publications, Dr. Amin's office received "hundreds and hundreds of calls daily" after NBCUniversal's publications, which upset Dr. Amin and his employees. Ex. F, Arceo Depo. 60:7-17.

**NBCU's Response:**  Disputed to the extent any phone calls were attributed to or caused by the challenged News Reports.  *See* McNamara Opp. Decl. Ex. 18 (Arceo Tr.) at 63:8-14 ("Q: Do you know if anyone mentioned MSNBC?  A: Not that I can recall.  Q: Did anybody else at the office who answered a call ever convey to you that the person on the line mentioned MSNBC?  A: Not that I can recall.").

75.    After NBCUniversal's publications, Dr. Amin was depressed and "bottomed . . . down." Ex. D, Nito Depo. 142:17-23.

**NBCU's Response:**  Disputed.  Admissible evidence contradicts this contention. ■

███████████████████████████████████████████

████████████████████████████████

## I.    CONCLUSIONS OF LAW THEREOF

1.    Dr. Amin is due summary judgment on the "falsity" element of Georgia defamation law because there is no genuine issue of material fact in dispute: the Statements are false.

**NBCU's Response:**  NBCU disputes this conclusion of law and refers the Court to its Motion for Summary Judgment and Opposition to Plaintiff's Partial Motion for Summary Judgment.

2.    Dr. Amin is due summary judgment on the "defamatory" element of Georgia defamation law because there is no genuine issue of material fact in dispute: the Statements are defamatory.

**NBCU's Response:**  NBCU disputes this conclusion of law and refers the Court to its Motion for Summary Judgment and Opposition to Plaintiff's Partial Motion for Summary Judgment.

3.    Dr. Amin is due summary judgment on the "of and concerning" element of Georgia defamation law because there is no genuine issue of material fact in dispute: the Statements are "of and concerning" Dr. Amin.

**NBCU's Response:**  Undisputed.

4.      Dr. Amin is due summary judgment on the "publication" element of Georgia defamation law because there is no genuine issue of material fact in dispute: NBCUniversal communicated the Statements to third parties by publishing them on broadcasts and social media.

**NBCU's Response:** Undisputed.

5.      Dr. Amin is due summary judgment on the "actionable even in the absence of special harm" element of Georgia defamation law because there is no genuine issue of material fact in dispute: the Statements make charges against Dr. Amin in his trade, office, or profession and imputed to him a crime punishable by law.

**NBCU's Response:**  Undisputed to the extent the Statements relate to Dr. Amin's trade, office, or profession.

6.      Dr. Amin is due summary judgment on NBCUniversal's First Affirmative Defense because there is no genuine issue of material fact in dispute: Dr. Amin's Complaint (Doc. 49) states a claim for which relief may be granted.

**NBCU's Response:**  NBCU disputes this conclusion of law and refers the Court to its Motion for Summary Judgment and Opposition to Plaintiff's Partial Motion for Summary Judgment.

7.      Dr. Amin is due summary judgment on NBCUniversal's Third Affirmative Defense because there is no genuine issue of material fact in dispute: New York law does not apply in this case, and accordingly New York Civil Rights Law Section 76-a(2) does not apply.

**NBCU's Response:**  Undisputed for purposes of this Motion only.

8.      Dr. Amin is due summary judgment on NBCUniversal's Fourth Affirmative Defense because there is no genuine issue of material fact in dispute: New York law does not apply in this case, and accordingly New York Civil Rights Law Section 74 does not apply.

**NBCU's Response:**  Undisputed for purposes of this Motion only.

9.      Dr. Amin is due summary judgment on NBCUniversal's Seventh Affirmative Defense because there is no genuine issue of material fact in dispute: the Statements are false and accordingly are not "true or substantially true."

**NBCU's Response:**  NBCU disputes this conclusion of law and refers the Court to its Motion for Summary Judgment and Opposition to Plaintiff's Partial Motion for Summary Judgment.

10.   Dr. Amin is due summary judgment on NBCUniversal's Eleventh Affirmative Defense because there is no genuine issue of material fact in dispute: the Statements are not non-actionable opinion.

**NBCU's Response**:   NBCU disputes this conclusion of law and refers the Court to its

Motion for Summary Judgment and Opposition to Plaintiff's Partial Motion for Summary

Judgment.

11.   Dr. Amin is due summary judgment on NBCUniversal's Twelfth Affirmative Defense because there is no genuine issue of material fact in dispute: the Statements make charges against Dr. Amin in his trade, office, or profession and imputed to him a crime punishable by law, and accordingly even if NBCUniversal could establish that Dr. Amin suffered no "actual harm or damages proximately caused by any of the challenged statements," which it cannot, Dr. Amin's defamation claim would not be barred.

**NBCU's Response**:   Undisputed except to the extent that Dr. Amin has not suffered any

actual damages attributable to the challenged News Reports and could not establish sufficient

evidence to support punitive damages.

Respectfully submitted,

_s/ Cynthia L. Counts_
Cynthia L. Counts
Georgia Bar No. 190280
FISHERBROYLES, LLP
945 East Paces Ferry Rd. NE, Suite 2000
Atlanta, GA 30326
(404) 550-6233
cynthia.counts@fisherbroyles.com

_s/ Elizabeth A. McNamara_
Elizabeth A. McNamara
(admitted _pro hac vice_)
Amanda B. Levine
(admitted _pro hac vice_)
Leena Charlton
(admitted _pro hac vice_)
DAVIS WRIGHT TREMAINE LLP
1251 Avenue of the Americas, 21st Floor
New York, NY 10020-1104
Tel: (212) 489-8230
lizmcnamara@dwt.com
amandalevine@dwt.com
leenacharlton@dwt.com

_Attorneys for Defendant_

## CERTIFICATE OF SERVICE

The undersigned certifies that on the 2nd day of February, 2024, a true and correct copy of

the foregoing document was served upon the following via the Court's electronic filing system:

Stacey Godfrey Evans
sevans@staceyevanslaw.com
Amble Johnson
ajohnson@staceyevanslaw.com
Scott R. Grubman
sgrubman@cglawfirm.com

<div style="margin-left:40%">

*Elizabeth A. McNamara*
Elizabeth A. McNamara
(admitted *pro hac vice*)
DAVIS WRIGHT TREMAINE LLP
1251 Avenue of the Americas, 21st Floor
New York, NY 10020-1104
Tel: (212) 489-8230
lizmcnamara@dwt.com

*Attorneys for Defendant*

</div>

28