Declaration of Elizabeth A. McNamara

In Opposition to Plaintiff's Motion for

Partial Summary Judgment

# Exhibit 15

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
WAYCROSS DIVISION
-------------------------------------X
DR. MAHENDRA AMIN, M.D.,

                              PLAINTIFF,

     -against-        Case No.:
                      5:21-cv-00056
                         LGW-BWC

NBCUNIVERSAL MEDIA, LLC,

                              DEFENDANT.
-------------------------------------X
           DATE: November 13, 2023
           TIME: 10:00 a.m. EDT
```

REMOTE DEPOSITION of DAVID PAULK, taken by the Defendant, pursuant to a notice and to the Federal Rules of Civil Procedure, held remotely via Zoom Videoconference, before Suzanne Pastor, a Notary Public of the State of New York.

1  they're approved for an outside treatment

2  or outside assistance, any processes or

3  procedures that take place outside of the

4  facility requires the providers do their

5  own informed consent treatment.

6          Now, internally, if we have a

7  situation where we're recommending that

8  they go to the hospital, they got chest

9  pain, they want to go to the hospital, they

10 say they don't want to go, they're gonna

11 refuse treatment, nine times out of ten if

12 it's an emergent situation, we'll transport

13 them to the local ER and they'll have to

14 turn down care there as well.

15         So as far as outside for prior

16 to surgeries, prior to procedures the

17 providing outside physician handles his own

18 informed consents, et cetera, just like he

19 does for any other patient walking in the

20 door.

21    Q.   Do you know whether the outside

22 physician's informed consent needs to

23 accord with LaSalle's policy?

24    A.   It conforms with whatever the

25 standards are for medical care treatment.

1   And they're pretty specific I believe.  But
2   I would not have those consents.  That
3   consent would be in the files of the
4   treating physician or of the hospital where
5   the treatment/examination/procedure took
6   place.
7        Q.   So you said it would conform
8   with the standards of medical care for
9   medical treatment.  Do you believe that
10  LaSalle's policy conformed with the
11  standards of medical care?
12       A.   Yes, ma'am.
13       Q.   And so LaSalle's policy
14  requires patients to be informed of the
15  material facts about the nature,
16  consequences and risks, alternatives and
17  prognosis if the treatment is not
18  undertaken, right?
19       A.   That's correct.
20       Q.   And so you would expect outside
21  physicians, if that's the standard of care,
22  to do the same thing.  Is that right?
23            MR. JOHNSON:  Object to form.
24       A.   Basically the NPs would discuss
25  with an inmate detainee what their concern

1   is for sending them out.  They're being
2   sent out for a higher level of care or
3   assessment, which automatically means that
4   they do not have all the facts and details
5   from the tests or et cetera to make a
6   determination as to what the specifics of
7   the results or consequences are gonna be.
8              The providing -- the outside
9   provider handles the specificity as regards
10  this is what you got, this is what's going
11  on, this is what's gonna occur, if it's not
12  treated or if it's treated, this is what
13  could happen.  That is that level of care
14  which is outside the level of the scope of
15  our care.
16             So we certainly would not be
17  capable or wise to second-guess a provider
18  that specializes in that treatment when we
19  send them out for that reason to be
20  checked.
21       Q.    So my question was a little bit
22  different from that.  My question is,
23  you're saying that this policy about
24  informed consent accords with the general
25  standard of care, and this policy requires

1   patients to be informed about the nature,

2   consequences and risks of the proposed

3   treatment, alternatives to it and the

4   prognosis if the treatment is not

5   undertaken.

6           Would you expect outside

7   medical providers, giving their own

8   informed consent, to also accord with that

9   standard?

10       A.   Yes.

11           MR. JOHNSON:  Object to form.

12       A.   Yes.

13       Q.   Did LaSalle do anything to

14   ensure that outside providers were

15   according with that?

16       A.   That's outside the scope of our

17   care.  An outside provider that is doing

18   billing-wise and otherwise passing through

19   ICE with medical.

20       Q.   Did LaSalle ever check the

21   informed consent forms of outside

22   providers?

23       A.   Those are not forms that are

24   readily available as they're part of the

25   treatment files for the provider.  As to

1  whether the HSA has checked those, I would

2  not be able to tell you.  I don't know.

3       Q.   Do you know if LaSalle ever

4  checked whether outside providers were

5  using language lines to communicate with

6  patients?

7       A.   Well, anybody that was treated,

8  or if they did not have a Spanish-speaking

9  personnel, then if they did not have the

10 language line, the language line for here

11 was made available to them so they could

12 call it up.  But for the most part, Spanish

13 is so common in this general area that most

14 of them have Spanish-speaking employees.

15      Q.   I just want to go through a

16 couple more points in this policy.  Do you

17 see the second bullet point.  It says, "All

18 examinations, treatments and procedures are

19 governed by informed consent practices

20 applicable in the jurisdiction."

21      A.   Okay.

22      Q.   And you see the third bullet

23 says, "A separate documented informed

24 consent form is required for invasive

25 procedures, including surgeries, invasive

 1   diagnostic tests and dental extractions."

 2   Do you see that?

 3        A.    Mm-hmm.

 4        Q.    And page 3 defines invasive

 5   procedures as surgeries and basic

 6   diagnostic tests and dental extractions.

 7        A.    Sorry, I have to catch up.  I

 8   had some noise go by in the hall.

 9        Q.    Sorry, I was talking about

10   this.

11        A.    Okay, I see that.

12        Q.    Do you know for female

13   detainees if this would include a Pap

14   smear?

15        A.    I do not know, ma'am.  This is

16   internal policies for internal use, for

17   internal care.  And we do and have never

18   done -- we do not do, nor have we ever done

19   invasive procedures.  We do not even, nor

20   did we ever even do IVs.  So anything

21   invasive occurred at an outside provider.

22        Q.    And you would expect the

23   outside provider to accord with the

24   standards of care as reflected in this

25   policy.

1       A.    I would expect the outside
2   provider to offer it within the standards
3   of care as applies to his practice under
4   state law under which he's licensed.
5       Q.    And again, this policy was your
6   understanding of the standards of care.
7       A.    For internal use, yes.  For
8   internal processes and procedures.  You may
9   have another LaSalle facility somewhere, or
10  may not, that may do sutures or they may do
11  x-rays.  In our case we do not do invasive
12  procedures.  Not even an IV.
13      Q.    So if --
14      A.    Never.
15      Q.    If an outside provider was not
16  according with these procedures for
17  informed consent, would that be something
18  of concern to ICDC?
19            MR. JOHNSON:  Object to form.
20            MR. ROUSE:  Object to the form
21       as well.
22      A.    That would be -- that would be
23  the provider or providers, that would be
24  Immigration, ICE, medical, that would be
25  whatever rules control whatever overview

1  the state has on said providers.  It's
2  outside of this facility and it's in the
3  hands of independent qualified providers.
4      Q.   But it seems that if LaSalle
5  has a policy, it would want outside
6  providers to follow at least that policy,
7  is that correct?
8          MR. JOHNSON:  Object to form.
9          MR. ROUSE:  Join in that.
10        Object to the form of the question.
11     A.   I would assume that the outside
12  providers, since they've been vetted and
13  approved by ICE medical, is operating under
14  the standards of care that's applicable.
15  But once again, once they exit this
16  facility and go under the care of the
17  specialist, we -- who are we to give them
18  instructions on the medical care.  The
19  documentation portion of it, that's a
20  separate area for them to deal with
21  Immigration.  We would anticipate that it
22  would be done.
23     Q.   Just to go through a couple
24  more of these, here under "Invasive
25  procedures" it says, "Education must be

```
1              C E R T I F I C A T E

2

   STATE OF NEW YORK     )
3                  :   SS.:
   COUNTY OF DELAWARE    )
4

5         I, SUZANNE PASTOR, a Notary Public for and

6    within the State of New York, do hereby certify:

7         That the witness whose examination is

8    hereinbefore set forth was duly sworn and that

9    such examination is a true record of the testimony

10   given by that witness.

11        I further certify that I am not related to

12   any of the parties to this action by blood or by

13   marriage and that I am in no way interested in the

14   outcome of this matter.

15        IN WITNESS WHEREOF, I have hereunto set my

16   hand this day, November 28, 2023.

17

18        [Signature: Suzanne Pastor]
          _____
19          SUZANNE PASTOR

20

21

22

23

24

25
```