Declaration of Elizabeth A. McNamara

In Opposition to Plaintiff's Motion for

Partial Summary Judgment

# Exhibit 21

**DR. MAHENDRIA AMIN vs NBC UNIVERSAL MEDIA**
**Sarah Owings on 08/25/2023**

```
 1           IN THE UNITED STATES DISTRICT COURT
          FOR THE SOUTHERN DISTRICT OF GEORGIA
 2


 3


 4    DR. MAHENDRIA AMIN, M.D.,      )
                                     )
 5           Plaintiff,              )
                                     ) Civil Action No.:
 6    vs.                            ) 5:21-CV-00056-LGW-BWC
                                     )
 7    NBC UNIVERSAL MEDIA, LLC,      )
                                     )
 8           Defendant.              )

 9


10


11              VIDEOTAPED DEPOSITION OF
                     SARAH OWINGS
12     CONDUCTED AT THE OFFICE OF DAVID DREYER LAW
                 270 PEACHTREE STREET
13                   SUITE 1040
               ATLANTA, GEORGIA 30303

14


15
                   10:10 a.m. EST
16       Friday, the 25th day of August, 2023

17


18
            Eric Cavanaugh, CCR, GRL 2560
19


20


21


22


23


24


25
```

1    A.  Yes, I do.

2    Q.  **Does that refresh your recollection at all**

3   **about what you may have talked to Caitlin about?**

4    A.  I do not recall what her question was, no.

5    Q.  **Do you recall at some point providing a quote**

6   **to anyone affiliated with NBC News, NBC Universal, or**

7   **MSNBC?**

8    A.  I don't recall providing a quote in the

9   context of here's my quote.  Nothing like that.  But

10  I assume, you know, when you speak with reporters,

11  things are typically recorded and unless something is

12  marked as off the record or on background, that it

13  won't be shared.

14      And so I -- I don't recall the specific quote

15  being provided, but I know one was used.  I believe

16  that I was quoted in one of those articles.

17    Q.  **Do you recall how long that first conversation**

18  **with Jacob Soboroff lasted?**

19    A.  No, I don't.  Not long.  Nothing -- there was

20  no time to have long conversations during those days.

21    Q.  **Do you think it was less than five minutes?**

22    A.  It could have been -- yeah, five, 10 minutes.

23  Something like that maybe.  I don't know.

24    Q.  **Do you believe it was during that conversation**

25  **or -- strike that.**

 1        Do you believe during that conversation --

 2   strike that.

 3        Let me just show you a document.

 4   A.  Okay.

 5        (Plaintiff's Exhibit 105 previously marked for

 6   identification)

 7   Q.  I'm going to hand you and your counsel what's

 8   been previously marked as Exhibit 105 in this case.

 9   A.  Okay.

10   Q.  I'll represent to you this is a compilation of

11   versions of an article that was published by NBC

12   News?

13   A.  Uh-huh.  (indicating in the affirmative).

14   Q.  Across the top -- you can flip through this as

15   much as you want to.

16   A.  Okay.

17   Q.  Across the top of certain pages, you'll see A,

18   B, C, and it goes through Q.

19   A.  Uh-huh.  (indicating in the affirmative).

20   Q.  And those are different versions of the story

21   that --

22   A.  Okay.

23   Q.  -- were shared throughout the day?

24   A.  Uh-huh.  (indicating in the affirmative).

25   Q.  The one I'm going to ask you about is D?

```
 1    A.  Okay.

 2    Q.  9-15-2020 at 5:24 p.m.  So for account 1203.

 3  Do you see that?

 4    A.  Yeah, I do.  Uh-huh.  (indicating in the

 5  affirmative).

 6    Q.  You can see toward the bottom of the page,

 7  second paragraph up from the bottom, it says:

 8  Another lawyer, Sarah Owings.  Do you see that?

 9    A.  Yeah, that's me.  Uh-huh.  (indicating in the

10  affirmative).

11    Q.  "Another lawyer, Sarah Owings, said she has

12  heard of many women who were told they have ovarian

13  cysts that need to be removed or drained".  Do you

14  see that?

15    A.  That's correct, yes.

16    Q.  Is that information that you shared with Jacob

17  Soboroff?

18    A.  That could have been the information that I

19  had because everybody was asking about

20  hysterectomies.  We weren't finding a lot of

21  hysterectomies.

22       We were finding things that were inconsistent

23  with the numbers ICE was saying, but there did appear

24  to be this pattern of claiming that people had

25  ovarian cysts or diagnosing that and then providing
```

 1  treatment on that basis.

 2    **Q.  Did you tell Jacob Soboroff that y'all were**

 3    **not finding large numbers of hysterectomies?**

 4    A.  I -- yes, but this was also on the 15th of

 5  September.  So this was very early in the process.

 6  We were already finding evidence that something was

 7  deeply wrong in how these women were being treated.

 8        And we were encouraging, you know, attorneys

 9  to reach out to their clients and to have an

10  investigation kind of reiterating the request by

11  Project South to have an investigation.

12        But as far as full hysterectomies or partial

13  hysterectomies, I don't -- I don't even recall -- I

14  don't even recall the total number.

15        Even now, I don't know if it was ever

16  disclosed.  I think I've heard five or six or just

17  different numbers.

18    **Q.  Two.**

19    A.  Two?

20        MS. LEVINE:  Objection.

21    A.  Well, I think -- I think DHS found -- DHS

22  found five, I think -- or they said five or -- in the

23  Senate report, there was mentions of more.  So I

24  think the numbers are unclear.

25        MR. DREYER:  Hey, Stacey, can we take a break

 1     just whenever you get to a stopping point?

 2     There's no rush on it though.

 3          MS. EVANS:  Okay.  I'll just finish with this

 4      document.

 5          MR. DREYER:  Yeah, yeah.  Whenever.

 6     Q.  I would encourage you to read the Senate

 7     report.  And it will tell you exactly how many

 8     hysterectomies there were and their conclusions that

 9     the whistle blower complaint ended up being false in

10     that regard.

11          MS. LEVINE:  Are you testifying?

12          MS. EVANS:  Well, I'm just -- I'm just --

13      she's interested in this world.  I mean, I'm just

14      telling her I think she would find it interesting.

15     Q.  Ms. Owings, if you can look at the last

16     paragraph on the page that we were just looking at

17     with D at the top, Bates number 2301.

18     A.  Yeah.

19     Q.  This is a quote from you, I believe?

20     A.  It is, yes.

21     Q.  "I don't think this is necessarily a systemic

22     sterilization by ICE.  I think this is the kind of

23     thing that is allowed to flourish in the course of

24     poor oversight and terrible inhumane conditions of

25     confinement", said Owings.  Do you see that?

```
 1     A.   Yes.

 2     Q.   Is that quote -- strike that.

 3          Are those words ones that you think you told

 4   Jacob Soboroff on September 15th, 2020?

 5     A.   That is -- that's correct.  It would have

 6   either been Jacob or Caitlin.  It would have been

 7   somebody I spoke to in relation directly for this

 8   story.

 9     Q.   And, again, you don't recall speaking with

10   Julia Ainsley on September 15th, 2020.  True?

11     A.   I don't recall if I did or I didn't.  So it's

12   possible she called me, but...

13     Q.   If you look up at the top of the page --

14     A.   Uh-huh.  (indicating in the affirmative).

15     Q.   -- this -- the first paragraph, you can --

16     A.   Uh-huh.  (indicating in the affirmative).

17     Q.   -- read where they refer to four lawyers

18   representing clients.

19     A.   Uh-huh.  (indicating in the affirmative).

20     Q.   Do you see that?

21     A.   Yeah.

22     Q.   And then the second paragraph says:  The

23   doctor who three lawyers identified as Dr. Mahendria

24   Amin practicing in Douglas, Georgia.  Do you see

25   that?
```

 1    A.   Uh-huh.   (indicating in the affirmative).

 2   Yeah.

 3    Q.   **Were you one of -- strike that.**

 4        **You may not know who all Jacob spoke with --**

 5    A.   Correct.

 6    Q.   **-- or Julia.   True?**

 7    A.   Correct.

 8    Q.   **But do you believe you were someone who**

 9   **identified Dr. Amin's name to NBC News or NBC**

10   **Universal or MSNBC?**

11    A.   I believe I -- yeah, I was one of those

12   people.   Ben and Elizabeth -- Ben Osorio and

13   Elizabeth Matherne also had his name because they

14   also had clients who had been affected.

15        And so I'm probably counted as the third.   But

16   it's possible that there were others.   I don't know

17   who all they talked to.

18    Q.   **And M█ B███, your client, had identified**

19   **Dr. Amin to you; is that right?**

20    A.   She had identified him prior to all of this as

21   her doctor.   She provided those medical records to

22   me.

23    Q.   **And you had seen those medical records?**

24    A.   Correct.

25    Q.   **Did you provide any of those medical records**

 1    A.  Yeah.  It wasn't really germane to Irwin.  It

 2  was more about general medical conditions across the

 3  country.

 **4    Q.  Okay.  And I see -- if you look on the second**

 **5  page of Exhibit 143, it looks like this came up as**

 **6  y'all were preparing for a meeting with the**

 **7  Congressional Hispanic Caucus --**

 8    A.  Yes.

 **9    Q.  -- about Irwin?**

10    A.  Yes.

**11    Q.  So, yes, if you wouldn't mind after this**

**12  deposition, and I'll follow up with Mr. Dreyer about**

**13  seeing if that exists somewhere.**

14    A.  Sure.

**15    Q.  But it sounds like the Universal Survey,**

**16  whatever it was, was not the form reflected in**

**17  Exhibit 125?**

18    A.  No, no.  That would have just been for the

19  actual facility as opposed to something that

20  attorneys could -- could complete.

**21    Q.  Okay.  We talked a little bit earlier about**

**22  the 60 or so women that had been identified and then**

**23  there were follow-up conversations with at least 30.**

**24        That was in that summary report that we looked**

**25  at.  Do you recall?**

1     A.  Yeah, I remember the numbers.

2     **Q.  Did you personally have conversations with any**

3     **of those women that were followed up with in that**

4     **group of 60?**

5     A.  Not that I recall without knowing the

6     identities of those women.  But, safe to say, I

7     probably did have conversations with some of them.

8     As I disclosed, I worked with several of them.

9     **Q.  For any of the women who were, as you**

10    **described it, still not sure what had happened to**

11    **their bodies, did you or are you aware of anyone else**

12    **asking them:  Do you still have your menstrual cycle?**

13    A.  That particular question?

14    **Q.  Yeah.**

15    A.  I don't recall that being a particular

16    question that was asked, no.

17    **Q.  That would be one way of finding out if**

18    **someone had had a hysterectomy?**

19    A.  We weren't looking at just hysterectomies.

20    That was very quickly not the thing, because what we

21    were seeing was a different pattern.

22        And so people definitely reported disruptions

23    to their menstrual cycle due to the drugs that he was

24    giving them, and a lot of different gynecological

25    symptoms and side effects.

1        So that -- that wasn't really the point of

2   this and we weren't seeing universal hysterectomies

3   here.

**4    Q.  Y'all were really never saying that, right?**

5   A.  I don't recall ever saying that.  I think even

6   from that conversation and the quote that I gave, it

7   was clear we were not saying this is mass

8   hysterectomies on that scale.

9        This is something where we're seeing a pattern

10  of medical treatment that does not align with

11  standards and that these women don't understand.

12       It does not appear that informed consent has

13  been obtained.  And they also seem to be getting

14  over-treated subsequent to having these -- these

15  initial indications for a procedure.

**16    Q.  Y'all were not seeing large numbers of**

**17  hysterectomies.  And that was true even on September**

**18  15th, and you shared that with Jacob Soboroff?**

19        MS. LEVINE:  Objection.

20  A.  Yeah.  I don't believe we saw large numbers of

21  hysterectomies, no.  We saw people getting scheduled

22  for things.

23       We saw people having procedures and not having

24  answers on what it was that had occurred to them.

25  And some really, really scary awful stories.

```
 1    Q.  And you shared with Mr. Soboroff that y'all

 2   were not seeing large numbers of hysterectomies?

 3    A.  That's correct.

 4      MS. LEVINE:  Objection.

 5    A.  I don't see that there was a large number of

 6   hysterectomies.  But also that was 24 hours into

 7   this.  So we were already seeing some things that

 8   were really weird and bore the need for further

 9   investigation and questioning.

10    Q.  Are you aware at some point a congressional

11   investigation was -- was started?

12    A.  Yes.

13    Q.  What was your role, if any, in providing

14   information to the subcommittee that was handling the

15   investigation?

16    A.  To the subcommittee that was handling the

17   investigation, I don't remember having contact with

18   them once they began the investigation.

19       We had already provided documents in advance

20   of the CODEL and, you know, other -- other individual

21   advocacy asked by people who needed congressional

22   assistance and had, you know, filled out the privacy

23   waivers and done that process.

24       And so it wasn't a situation where I was

25   handling over lots of records or being that involved
```

```
 1   in that.

 2     Q.   When you say CODEL, what do you mean?

 3     A.   The CODEL, the special delegation, the

 4   Hispanic -- Congressional Hispanic Caucus that went

 5   into the delegation.

 6     Q.   Is that an acronym, just for the --

 7     A.   Oh, yeah.  CODEL was an acronym for

 8   congressional delegation.

 9     Q.   Can you say what that is again?

10     A.   A congressional delegation?

11     Q.   No, the specific one you're talking about

12   here.

13     A.   The Hispanic Caucus?  The House Hispanic

14   Caucus did a congressional delegation and went down

15   and visited Irwin Detention Center and met people

16   there at the facility on Saturday, the -- I don't

17   know.  It was on some Saturday in September.  I don't

18   remember the exact date.

19     Q.   I had just never heard that before.  Is that

20   -- can you say the letters that you mean when you say

21   CODEL?

22     A.   CODEL.  C-O-D-E-L.  CODEL.  Congressional

23   Delegation.

24     Q.   C-O --

25     A.   -- D-E-L.
```

1    Q.   -- D-E-L.

2    A.   CODEL.

3    Q.   Congressional delegation.

4    A.   Yes.  Correct.

5    Q.   Little slow, but I'll get there.

6         Are you aware that at some point, Andrew Free

7   worked with some individual that had some affiliation

8   with Georgia Tech to put together some numbers or

9   some statistics on procedures that had been performed

10   on individuals who were in detention?

11    A.   I knew that he was doing something --

12         MS. LEVINE:  Objection.

13    A.   -- with the data piece.  I don't remember the

14   outcome of it or ever interacting with those people.

15    Q.   You were not involved in that?

16    A.   I don't recall being involved in it, no.

17    Q.   Okay.  Do you recall speaking to a meeting of

18   the Congressional Hispanic Caucus at some point in

19   time?

20    A.   I do.  And I think I provided a copy of what I

21   stated to them to you with my first production of

22   documents.

23    Q.   Right.  And we've seen through that and other

24   documents that you provided written testimony?

25    A.   Uh-huh.  (indicating in the affirmative).

```
 1      Q.  Did you read that or was that just something
 2   that you submitted?
 3      A.  I read that, I believe, at one point.  At
 4   least once, I think.  But it was the same -- that was
 5   the statement that I had prepared.  It wasn't a
 6   question and answer situation.  It was mainly that.
 7      Q.  Did you -- strike that.
 8          Were you involved in the planning for that
 9   presentation?
10      A.  For the planning of the presentation?
11      Q.  Yes.
12      A.  I mean, I know I was told when and where to
13   show up and that it was happening, and agreeing on a
14   time and those sorts of things.  So in that sense,
15   yeah.
16      Q.  Were you involved in picking or discussing
17   what women who had been detained would also be
18   present for that?
19      A.  I don't recall being, you know, the one to
20   select.  I think it was more that people volunteered.
21          There were some women that were very
22   traumatized that were not comfortable talking in
23   public about stuff.  So I think it was just a
24   question of who was available.
25          But, no, I don't remember a lot of strategic
```

1    **Ms. Matherne, it's your understanding, made a**

2    **complaint to the Irwin County Detention Center about**

3    **Dr. Amin?**

4    A.   Yes.  Southern Poverty Law Center, her

5    employer, a coworker and I believe is the person who

6    was the attorney that sent the email to the warden

7    regarding their concerns.

8    **Q.   And do you know if there was any**

9    **investigations done by the Irwin County Detention**

10   **Center into those concerns?**

11   A.   I do not.

12   **Q.   On September 15th, 2020, did you know for a**

13   **fact the total number of hysterectomies that Dr. Amin**

14   **performed on detainees at Irwin County Detention**

15   **Center?**

16       MS. EVANS:  Object to form.

17   A.   No, absolutely not.

18   **Q.   Are you aware that as of September 15th, 2020,**

19   **if there were women who had had hysterectomies by**

20   **Dr. Amin who had already been identified by lawyers?**

21        MS. EVANS:  Object to form.

22   A.   Yes, I understood that other lawyers had

23   identified women who had had hysterectomies or had

24   had scheduled hysterectomies.

25   **Q.   As of September 15th, 2020, did you have**

1    information about the total number of women who had

2    scheduled hysterectomies with Dr. Amin?

3         MS. EVANS:  Object to form.

4    A.  No, I did not.

5    Q.  Did you see any consent forms concerning

6    procedures performed by Dr. Amin?

7    A.  There were sometimes consent forms, but not

8    always.  Not in the records that we obtained.

9    Q.  Is it your understanding that someone can sign

10   a consent form, but there still would not be informed

11   consent?

12        MS. EVANS:  Object to form, lack of

13     foundation.

14   A.  It's my understanding that that can be the

15   case.  And, moreover, my concern with my clients

16   because they were largely not native English

17   speakers, the things that they were telling me is

18   that they were not receiving interpretation of the

19   information and of the explanations for what was

20   happening to them.

21        So it leaves me to question any consent form

22   that was signed.

23        MS. LEVINE:  I need to just take one minute

24     off the record.  I don't think I have further

25     questions, but I just want to make sure.

```
 1      COURT REPORTER'S DISCLOSURE STATEMENT

 2

 3      I, ERIC CAVANAUGH, Georgia Certified Court

 4   Reporter, Certificate Number 2560, in compliance

 5   with Code Section 9-11-28 and Code Section

 6   15-14-37, make the following disclosure about all

 7   arrangements, financial and otherwise, involving

 8   the foregoing deposition:

 9

10   1.)   I was contacted directly by telephone

11   regarding scheduling of the deposition as to date,

12   time and place by the office of the scheduling

13   attorney, or received a message from the office of

14   the scheduling attorney by answering machine and

15   returned the call, with scheduling of the deposition

16   as to date, time and place confirmed, and no prior

17   financial arrangements were negotiated between

18   counsel and myself.

19

20      This 25th day of August, 2023.

21

22

23           Eric Cavanaugh, CCR, GRL #2560

24

25
```