UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
WAYCROSS DIVISION

| | |
|---|---|
| DR. MAHENDRA AMIN, M.D.,<br><br>        Plaintiff,<br><br>    v.<br><br>NBCUNIVERSAL MEDIA, LLC,<br><br>        Defendant. | Case No. 5:21-cv-00056-LGW-BWC<br><br>**OPPOSITION TO PLAINTIFF'S MOTION TO EXCLUDE THE EXPERT OPINION OF <u>DR. ERIN CAREY</u>** |

## INTRODUCTION

In his two-page report, Dr. Elbridge Bills, one of the experts identified by Plaintiff Dr. Mahendra Amin ("Dr. Amin") in this action, opined that each of the surgical procedures that Dr. Amin performed on ICE detainees was "medically indicated as documented by various modalities." Without explaining which modalities he analyzed for which patients or how any of these modalities proved that any surgery was "indicated," Dr. Bills concluded that Dr. Amin was providing "appropriate care" to ICE detainees and "has not performed any unnecessary medical procedures."

In response, Defendant NBCUniversal Media, LLC ("NBCU") retained Dr. Erin Carey, a board-certified OB-GYN who serves as the division director of minimally invasive gynecological surgery at the University of North Carolina at Chapel Hill ("UNC"). *See* Pl. Ex. 3 at 20. In addition to her medical degree, Dr. Carey has a master's in clinical research from UNC and has received an award from the Office of Health Equity Research for "research excellence," among numerous other awards for her clinical practice. *See id*. As Dr. Bills described during his

deposition, ███████████████████████████████████████████████████  *See*

McNamara Decl. ISO Mot. to Exclude Bills, Ex. 7 (Dkt. 138-7) ("Bills Tr.") at 125:4-9.

Dr. Carey submitted a thirteen-page report, explaining why Dr. Bills' conclusory assertions, along with the conclusions of Dr. Amin's other expert, Dr. Laura Hamilton, are incorrect. *See* Pl. Ex. 3 at 5-17. She explained that Dr. Amin inappropriately interpreted normal physiology as pathology to justify unnecessary surgeries, like dilation & curettages ("D&C"), routinely removed benign ovarian cysts that did not need to be removed, performed surgeries after providing detainees with hormonal therapy but before this therapy actually had an opportunity to work, and performed an inappropriate simple hysterectomy on a patient who needed further testing. Looking to evade these damning conclusions, Dr. Amin argues that Dr. Carey's detailed expert report should be excluded from this action because it fails to respond to Dr. Bills' and Dr. Hamilton's opinions, lacks a discernable methodology, and would not assist the trier of fact.

Dr. Amin's arguments are specious. Dr. Carey's rebuttal expert report goes to a central issue in this defamation action—*i.e.* Dr. Amin's burden to prove the challenged statements materially false. Dr. Carey directly engaged with and rebutted the conclusions reached by Dr. Amin's experts and explained in detail how she formed her opinions. Accordingly, Dr. Carey's opinions should not be excluded from this action, and Dr. Amin's motion to exclude (the "Motion") (Dkt. 124) should be denied.

## ARGUMENT

### I.  Dr. Amin's Motion Misrepresents Dr. Carey's Opinions

Dr. Amin's Motion repeatedly misstates Dr. Carey's opinions. *First*, the Motion claims that Dr. Carey "does not opine that the two patients who received hysterectomies (K.C. and B.P.) received unnecessary hysterectomies." Mot. at 6. As to B.P., Dr. Amin's contention is patently false. When asked during her deposition, ███████████████████████████████████████

2

██████████████████████████████████████████████ Pl. Ex. 6 ("Carey Tr.") at 117:8-12. Dr. Carey explained in her report and in her deposition that, after B.P. had an abnormal pap smear and after Dr. Amin performed a loop electrosurgical excision procedure ("LEEP") that returned with carcinoma in situ with positive margins, Dr. Amin should have done a repeat biopsy of B.P.'s cervix. *See* Pl. Ex. 3 at 11-12; Carey Tr. at 117:13-118:9. This is because "positive margins" means that the patient's abnormal cells extended beyond the specimen taken. Without knowing how far these cells had spread, Dr. Amin would not know the appropriate course of treatment for B.P. *Id.* Because Dr. Amin did not have sufficient information about B.P.'s diagnosis before he performed this surgery and because he performed it too soon after the LEEP, Dr. Carey opined that ████████████████████████████████████████████ ████████████████████████ Pl. Ex. 3 at 11-12; Carey Tr. at 120:12-17.

Dr. Amin nonetheless argues that because Dr. Carey testified that B.P. likely would have ultimately needed ████████████████████████████████████████████████ ██████████████████████ Dr. Carey was merely "quibbling" about the type of hysterectomy he performed. Mot. at 6-7. This belittles the potential serious consequences of Dr. Amin's error. Far from this wrong hysterectomy being a "life-saving" treatment as Dr. Hamilton described, according to Dr. Carey, this error could result in ████████████████ ████████████████████████████ *See* Carey Tr. at 122:5-11 ████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████; *id.* at 122:5-123:20 ████████████████████████████████████████. In short, Dr. Carey made clear her opinion

3

that the ███████████████████████████████████████████████████

███████████████████████████████████  *Id.* at 121:14-21.[1]

As to K.C., Dr. Amin's characterization is an over-simplification of Dr. Carey's opinion. Dr. Carey testified that ███████████████████████████████████████

████████████████████████████████[2] *See* Carey Tr. at 130:11-16.  But, once again, Dr. Amin ████████████████████████████████████████████████████

████████████████████████., *see id.* at 135:2-10—a critical distinction entirely ignored by Dr. Amin.  Specifically, while Dr. Amin claimed that ████████████████████

█████████████████████████████████████████████████████████████

██████████████████████████████. *See id.* at 128:7-24.  Dr. Carey testified that █

█████████████████████████████████████████████████████████████

████████████████████████████████ *Id.*  In addition, while K.C. reported that █

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████ *See id.* at 129:20-130:9.  And Dr. Carey explained that Dr. Amin █████████████████████

████████████████████████████████ *See id.* at 133:9-16.

*Second*, Dr. Amin claims that Dr. Carey referred to procedures as "unnecessary" simply because she believed that Dr. Amin provided less than optimal care.  Mot. at 6.  Again, Dr. Carey's report and testimony directly contradict this contention.  Dr. Carey opined that Dr. Amin

---

[1] Indeed, as NBCU explained in its Opposition to Dr. Amin's Partial Motion for Summary Judgment, Dr. Amin ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

[2] The fact that Dr. Carey honestly testified about the medical appropriateness of K.C.'s hysterectomy only bolsters the fact that Dr. Carey is a reliable expert witness.

4

performed "unnecessary" surgical procedures when he routinely removed benign ovarian cysts that would have spontaneously resolved on their own, when he performed D&Cs rather than endometrial biopsies (*i.e.*, in-office procedures that do not require anesthesia), and when he performed surgeries without waiting to see if medical interventions cured the issue.  *See* Pl. Ex. 3 at 7-11.  This is not merely sub-optimal care.  As Dr. Carey explained, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

*See, e.g.*, Carey Tr. at 46:2-49:2; 88:6-17.

At bottom, Dr. Amin's attempt to harmonize Dr. Carey's opinion with the opinions of Drs. Bills and Hamilton fails.  Dr. Carey unquestionably opined that Dr. Amin performed numerous "medically unnecessary" gynecological surgeries on ICE detainees (including a hysterectomy), needlessly exposing them to serious risks to their health and their fertility.

## II. Dr. Carey's Expert Opinions Would Assist a Trier of Fact Because They Respond Directly to the Opinions of Drs. Bills and Hamilton

Dr. Amin next argues that Dr. Carey's medical opinions would not assist the trier of fact because the "question at issue" in this case is only whether ICDC detainees "received mass hysterectomies that were forced, unauthorized, and/or without consent."  Mot. at 11.  This argument is blind to the record before the Court.  As explained in NBCU's motion for summary judgment and opposition to Dr. Amin's partial motion for summary judgment, Dr. Amin's contention misstates the "gist" of the challenged statements—that Dr. Amin performed unnecessary or unconsented-to procedures on ICDC detainees.  SJ Mot. (Dkt. 127) at 19-23; Opp. to SJ at 11-16.  Considered in context, as they must be, the News Reports reported on allegations about Dr. Amin performing a variety of unnecessary medical procedures on immigrant women that put the detained women's health and future fertility at risk.  And even if the only "question at

issue" concerned hysterectomies—which is wrong—Dr. Carey *did* testify that Dr. Amin inappropriately subjected women to hysterectomies. *See* Section I, *supra*. Thus, under any analysis, Dr. Carey's opinions are directly relevant to the issues before this Court.

Dr. Amin also claims that Dr. Carey's opinions should be excluded because they are not responsive to the expert opinions of Dr. Bills and Dr. Hamilton. *See* Mot. at 13-16. Yet, the record establishes that Dr. Carey responded directly to their opinions. Dr. Hamilton opined that the two hysterectomies Dr. Amin performed were "medically necessary." *See* Pl. Ex. 2 at 8, 10. As explained above, Dr. Carey responded that the hysterectomy Dr. Amin performed on B.P. was medically unnecessary and that Dr. Amin's recommendation for a hysterectomy to K.C. was ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *See* Section I, *supra*. Dr. Bills opined that Dr. Amin "has not performed any unnecessary medical procedures." *See* Pl. Ex. 2 at 17. Dr. Carey responded in detail that Dr. Amin had a pattern and practice of performing unnecessary medical procedures. *See* Pl. Ex. 3 at 6-17. Indeed, Dr. Amin's position regarding Dr. Bills is particularly non-sensical since Dr. Bills' expert report primarily focused on surgeries *other* than hysterectomies and was by no means exclusively assessing the two hysterectomies Dr. Amin performed. *See* Pl. Ex. 2 at 17. Clearly, Dr. Carey's opinions are responsive to those offered by Dr. Amin's experts.

Dr. Amin takes issue with portions of Dr. Carey's report where she discusses Dr. Amin's "interpreting normal physiology as pathology," "medical management practices," "trauma-informed care," and "informed consent," claiming that these sections go "beyond the scope" of a rebuttal witness. Mot. at 14.[3] But each section clearly responds to opinions contained in Dr. Bills' or Dr. Hamilton's reports.

---

[3] Dr. Amin also takes issue with the section of Dr. Carey's Report titled "medical chart selection." Mot. at 14. In this section, however, Dr. Carey merely opines that she is unsure how Dr. Bills selected the medical records he reviewed.

6

In the section titled, "interpreting normal physiology as pathology," for example, Dr. Carey opined that Dr. Amin justified surgeries through improper interpretation of diagnostic testing. *See* Pl. Ex. 3 at 6-7. This rebutted Dr. Bills' claim that all of the surgeries that Dr. Amin performed were "indicated," *see* Pl. Ex. 2 at 17, since performing surgeries based on normal findings would not be "medically indicated." In the section titled "medical management practices," Dr. Carey responded to Dr. Bills' contention that Dr. Amin "has been providing appropriate care" to ICE detainees, explaining that there were numerous issues with Dr. Amin's "care," most significantly, his consistent failure to wait to see if medical care was working before rushing to surgery. *See* Pl. Ex. 3 at 14-16.[4] Dr. Carey also rebutted Dr. Bills' claim that he reviewed "fourteen other patients" whose "conditions were managed medically and did not require surgical intervention." Pl. Ex. 2 at 17. She explained that Dr. Amin's medical care of these patients nonetheless showed a pattern of "repeated exams, procedures/ultrasounds, and surgical recommendations before explaining medical management options" and that Dr. Amin did, in fact, schedule three of these fourteen patients for surgeries. *See* Pl. Ex. 3 at 16-17.

Finally, the portions of Dr. Carey's report on "trauma-informed care" and "informed consent," *see* Pl. Ex. 3 at 16-17, respond to Dr. Hamilton's contention that both K.C. and B.P. executed "informed consent forms," which appeared to support her opinion that Dr. Amin "performed medical treatment within the applicable standard of care." Pl. Ex. 2 at 7, 10. Dr. Carey

---

She notes that these records were under-inclusive, since there were other ICE detainees on whom Dr. Amin reported performing surgeries. *See* Pl. Ex. 3 at 6. She also notes that Dr. Bills' count of surgical procedures, *see* Pl. Ex. 2 at 17, was inaccurate based on the records he reviewed.

[4] Dr. Carey also responded to Dr. Bills' non-sensical conclusion that Dr. Amin's procedures were "indicated" because "these patients may not have any follow up." Pl. Ex. 2 at 17. She explained that the medical records belied Dr. Bills' conclusion, since the records documented that Dr. Amin often treated patients over several visits and he frequently chose to perform procedures that require follow-up visits, rather than giving treatments that would not require repeat office visits. *See* Pl. Ex. 3 at 14.

7

explained how true "informed consent" requires more than just a signed consent form, particularly when dealing with patients with trauma backgrounds (like many ICE detainees). *See* Pl. Ex. 3 at 16-17.

Finally, Dr. Amin claims that Dr. Carey's report does not respond to Dr. Bills because her report does not identify specific patients who had unnecessary surgical procedures other than hysterectomies. Mot. at 15. But Dr. Bills' report did not discuss the treatment of any specific non-hysterectomy patients; he simply opined that *all* of the surgeries he could locate in the medical records (which, notably, were not even all of the surgeries that Dr. Amin performed) were medically indicated. *See* Pl. Ex. 2 at 17. Accordingly, there was no need for Dr. Carey to discuss individual patients to rebut Dr. Bills' contentions.

Further, as Dr. Carey explained in her deposition, Dr. Amin's "toolkit" was limited—he performed the exact same procedures (transvaginal ultrasound, D&C, laparoscopy, and cystectomy) on *dozens* of his patients regardless of their unique symptoms. *See* Carey Tr. at 149:15-150:9. Thus, Dr. Carey's conclusions—that Dr. Amin performed D&Cs rather than in-office procedures or that he removed functional, benign cysts—were largely the same each time Dr. Amin performed the procedures she discussed in her report. Nonetheless, when Dr. Amin's counsel requested that Dr. Carey identify specific patients who received unnecessary surgeries, Dr. Carey did so. In a letter supplementing her report, produced to Dr. Amin's counsel, Dr. Carey explained that of the thirty-eight cystectomies Dr. Amin performed, only two were medically necessary, of the over fifty D&Cs Dr. Amin performed, only five were potentially medically necessary, and that Dr. Amin performed three medically unindicated LEEPs, among other improper care. *See* McNamara Decl. ISO Mot. to Exclude Bills, Ex. 4 (Dkt. 139-4).

8

### III. Dr. Carey Employed a Reasonable Methodology to Reach Her Opinions

Dr. Amin argues that Dr. Carey's opinions should be excluded because her report failed to employ an "appropriate methodology." *See* Mot. at 6-10. This argument is audacious given that, as explained in NBCU's motion to exclude, Dr. Amin's own expert (Dr. Bills) admitted ███████ ███████████████████████████████████████████████ Mot. to Exclude Bills (Dkt. 138) at 8-10. Unlike Dr. Carey's report, Dr. Bills' expert report made no reference to any guidelines or medical literature, and he acknowledged that ████████████████ ███████████████████████████████████████████ Bills Tr. at 82:2-22.

Dr. Carey was clear about the methodology she employed—she reviewed the very same medical records that Dr. Bills and Dr. Hamilton reviewed (which were selected by Dr. Amin's counsel), analyzed the procedures Dr. Amin performed as she would look at a patient in her clinic, and determined whether Dr. Amin's treatment accorded with guidelines from ACOG, medical literature, and clinical recommendations. *See* Carey Tr. at 199:18-200:24. Further, when challenged by Dr. Amin's counsel on her ability to assess patterns in Dr. Amin's care of patients, Dr. Carey testified she was "trained" to identify patterns—she has a master's in clinical research from UNC, which taught her to "critically review data," and she is a federally funded researcher for the National Institutes of Health. *Id.* at 78:4-21, 200:11-17.

Dr. Amin makes two specific arguments about Dr. Carey's methodology, neither of which has merit. *First*, Dr. Amin claims that Dr. Carey could not have identified "patterns of aggressive surgical intervention" because she only reviewed medical records in which Dr. Amin performed surgeries. Mot. at 8-9. This is false. As Dr. Bills' report makes clear, he (and therefore Dr. Carey) reviewed fourteen medical records for women on whom Dr. Amin did not perform surgery. *See* Pl. Ex. 2 at 17.

9

Even limited to her review of the surgeries performed by Dr. Amin, Dr. Carey's opinions addressed Dr. Amin's consistent pattern of employing the very same surgeries in his "toolbox" when patients presented with certain concerns (like vaginal pain) regardless of whether the surgeries were medically indicated. This has nothing to do with an analysis that might require knowledge of Dr. Amin's care for *all* ICDC patients.  Rather, as Dr. Carey testified, based on the records she reviewed, Dr. Amin consistently performed "early surgical intervention[s] that are not necessary, without medical therapy," performed "unnecessary surgeries . . . for benign, like, normal physiologic indications," such as "[n]ormal-sized endometrium that are being described as thickened and ovarian cysts that almost exclusively return as physiologic," and he "routinely d[id not] allow for an appropriate amount of time" for medical interventions to work before rushing to surgery.  Carey Tr. at 145:10-146:3, 201:3-204:12.  That Dr. Amin may not have performed surgeries on other patients would not change these conclusions.  *See, e.g.*, *id.* at 153:24-155:2 (explaining that, regardless of the ultimate "denominator" of ICE patients that Dr. Amin saw, the records that she reviewed established that Dr. Amin had a practice of performing medically unnecessary D&Cs to evaluate the uterine cavity).  Or, as Dr. Carey explained:

> I was asked to review the surgical cases, and I did that.  And I feel, just within my review of the surgical cases, I can make these opinions without seeing other cases because of the – just the repetition of…offering a surgery for something that doesn't need surgery for again and again and again.  So even in this subset of patients, even if it is a component of whoever else is there . . . there are patterns here that are below the standard of care, that are not acceptable.

*Id.* at 210:6-214:7.  Thus, Dr. Amin's argument that Dr. Carey needed to know the total number of ICE detainees he treated in order to identify a "pattern" is simply wrong.

*Second*, Dr. Amin argues that Dr. Carey applied no methodology to reach her conclusion that Dr. Amin appeared to "not consistently engage[] patients in shared medical decision-making." Mot. at 9.  But Dr. Carey clearly explained why she reached that conclusion.  She testified that the

10

medical records she reviewed showed ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Carey Tr. at 228:13-20; *see also id.* at 62:16-19 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

As Dr. Carey testified, "the informed consent process is not just a piece of paper that we sign when we are taking the patient to surgery. It's a living document," and a doctor must "go[] through in detail the risks, benefits, and alternatives of the procedures that you're offering patients." *Id.* at 227:20-228:11. Dr. Amin's failure to adequately explain alternatives and risks concerning the surgeries he inevitably rushed into is evident by the simple fact that "most patients would not give consent for removing a normal physiologic findings[]" *Id.* at 228:21-229:9 (explaining that it "[d]idn't appear that [Dr. Amin] counseled patients on removing a physiologic cyst and cutting into an ovary to remove a normal finding with the known risks that cystectomy at baseline carries"). Further, she testified that Dr. Amin's consent forms were all in English even though many ICDC patients' records indicated that they spoke Spanish, and Dr. Amin did not document whether an interpreter was present. *Id.* at 229:15-230:3.

Dr. Amin argues that the medical records do not support Dr. Carey's conclusion, Mot. at 9, apparently because his history & physical forms contain boilerplate language stating ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *See, e.g.*, McNamara Decl. ISO SJ Ex. 111 (Dkt. 136-113) at Amin_0007091. But this generic language says nothing about the benefits and alternatives to surgery or the specific risks to fertility from the surgery. *See* Carey Tr. at 243:2-9 ("Q: Is it your opinion that if a doctor documents in his medical record that a patient understands the risks and agrees to surgery that is not sufficient for informed consent? Yes or no. A: No. I'd say if he

11

documents the risks, alternatives, benefits of every single component of the surgery he's going to offer her, yes."). And, after Dr. Amin's counsel asked Dr. Carey to provide support for her statement that these are integral elements of informed consent, Dr. Carey produced medical literature stating just that. *See, e.g.*, McNamara Decl. ISO Opp. to Exclude Carey Ex. 1 (explaining "[p]rior to obtaining consent for the proposed surgery, the surgeon must provide the patient with information about the nature of the surgery, the expected benefits, material risks and adverse effects, alternate treatments and the consequences of not having the surgery" and "[p]roper documentation is the only objective measurement of what information was communicated to the patient"); *id.* Ex. 2 (explaining, "[p]rison is an environment that is intended to restrict liberty, and thus ensuring true informed consent is challenging," "[s]pecial procedural safeguards and oversight are needed when incarcerated women are sterilized because of the likelihood that the coercive environment of prison impeded true informed consent," and that OB-GYNs have an "ethical duty to ensure that all patients understand the risks and benefits of sterilization" and "information about reversible alternatives").

In sum, Dr. Carey detailed the methodology that she relied upon to reach her conclusions, which was far more reliable than the methodology used by Dr. Amin's own expert. Dr. Amin has not come forth with any sound basis for the Court to preclude Dr. Carey's report and testimony.

## CONCLUSION

For the foregoing reasons, NBC respectfully requests that this Court deny Dr. Amin's motion to exclude the expert opinions of Dr. Erin Carey.

Respectfully submitted,

| | |
|---|---|
| *s/ Cynthia L. Counts* | *s/ Elizabeth A. McNamara* |
| Cynthia L. Counts | Elizabeth A. McNamara |
| Georgia Bar No. 190280 | (admitted *pro hac vice*) |
| FISHERBROYLES, LLP | Amanda B. Levine |

| | |
|---|---|
| 945 East Paces Ferry Rd. NE, Suite 2000<br>Atlanta, GA 30326<br>(404) 550-6233<br>cynthia.counts@fisherbroyles.com | (admitted *pro hac vice*)<br>Leena Charlton<br>(admitted *pro hac vice*)<br>DAVIS WRIGHT TREMAINE LLP<br>1251 Avenue of the Americas, 21st Floor<br>New York, NY 10020-1104<br>Tel: (212) 489-8230<br>lizmcnamara@dwt.com<br>amandalevine@dwt.com<br>leenacharlton@dwt.com<br><br>*Attorneys for Defendant* |

\*   \*   \*

## CERTIFICATE OF SERVICE

The undersigned certifies that on the 2nd day of February, 2024, a true and correct copy of the foregoing document was served upon the following via the Court's electronic filing system:

Stacey Godfrey Evans
sevans@staceyevanslaw.com
Amble Johnson
ajohnson@staceyevanslaw.com
Scott R. Grubman
sgrubman@cglawfirm.com

*Elizabeth A. McNamara*
Elizabeth A. McNamara
(admitted *pro hac vice*)
DAVIS WRIGHT TREMAINE LLP
1251 Avenue of the Americas, 21st Floor
New York, NY 10020-1104
Tel: (212) 489-8230
lizmcnamara@dwt.com

*Attorneys for Defendant*

13