Declaration of Elizabeth A. McNamara

In Opposition to Exclude Testimony of Dr. Erin Carey

# Exhibit 2

**The American College of Obstetricians and Gynecologists**
WOMEN'S HEALTH CARE PHYSICIANS

# COMMITTEE OPINION

Number 695 • April 2017  (Replaces Committee Opinion Number 371, July 2007)
Reaffirmed 2020

**Committee on Ethics**

*This Committee Opinion was developed by the American College of Obstetricians and Gynecologists' Committee on Ethics in collaboration with committee member Lisa H. Harris, MD, PhD.*

*While this document reflects the current viewpoint of the College, it is not intended to dictate an exclusive course of action in all cases. This Committee Opinion was approved by the Committee on Ethics and the Executive Board of the American College of Obstetricians and Gynecologists.*

## Sterilization of Women: Ethical Issues and Considerations

**ABSTRACT:** Sterilization is the most common method of contraception among married couples, with nearly twice as many couples choosing female partner sterilization over male sterilization. Although sterilization is among the most straightforward surgical procedures an obstetrician–gynecologist performs, it is enormously complex when considered from a historical, sociological, or ethical perspective. Sterilization practices have embodied a problematic tension, in which some women who desired fertility were sterilized without their knowledge or consent, and other women who wanted sterilization to limit their family size lacked access to it. An ethical approach to the provision of sterilization must, therefore, promote access for women who wish to use sterilization as a method of contraception, but at the same time safeguard against coercive or otherwise unjust uses. This Committee Opinion reviews ethical issues related to the sterilization of women and outlines an approach to providing permanent sterilization within a reproductive justice framework that recognizes that all women have a right to pursue and to prevent pregnancy.

### Recommendations

The American College of Obstetricians and Gynecologists (the College) makes the following recommendations regarding the permanent sterilization of women:

- Respect for an individual woman's reproductive autonomy should be the primary concern guiding sterilization provision and policy.
- Coercive or forcible sterilization practices are unethical and should never be performed.
- Obstetrician–gynecologists should provide presterilization counseling that includes a discussion of a woman's reproductive desires and places her wishes at the center of care. Patient counseling should emphasize the permanence of sterilization and include information about reversible alternatives, especially long-acting reversible contraception (LARC) methods, which are as effective as permanent sterilization.
- In appropriate cases, sterilization of a male partner should be discussed during presterilization patient counseling as an option with fewer risks and greater efficacy than female sterilization.
- It is ethically permissible to perform a requested sterilization in nulliparous women and young women who do not wish to have children. A request for sterilization in a young woman without children should not automatically trigger a mental health consultation. Although physicians understandably wish to avoid precipitating sterilization regret in women, they should avoid paternalism as well.
- Obstetrician–gynecologists should consider the role of bias in counseling and care recommendations and avoid actions based on biases about race, ethnicity, socioeconomic status, sexual orientation, and motherhood, which can, despite best intentions, affect interpretation of patients' requests and influence provision of care.

CAREY000273

- Only rarely should incarcerated women undergo sterilization, and only after access to LARC methods has been made available and excellent documentation of prior (preincarceration) request for sterilization is available. Special procedural safeguards and oversight are needed when incarcerated women are sterilized because of the likelihood that the coercive environment of prison impedes true informed consent.
- If individual physicians or institutions will not provide sterilization because of personal religious beliefs or institutional policy, patients must be informed as early as possible and provided with an alternative form of contraception that is acceptable to the patient or be referred elsewhere for care. When difficulties in meeting a postpartum sterilization request are anticipated and sterilization is desired by the patient, transfer of care for the remainder of pregnancy should be offered.

## Introduction

Although sterilization is among the most straightforward surgical procedures an obstetrician–gynecologist performs, it is enormously complex when considered from a historical, sociological, or ethical perspective. Permanent sterilization permits heterosexually active women to enjoy their sexual lives without fear of pregnancy. Thus, sterilization is a route to reproductive autonomy for women. At the same time, sterilization also can result in reproductive injustice, as it did historically in the United States when many low-income women and women of color were involuntarily sterilized as part of state and federally funded programs (1). An ethical approach to the provision of sterilization must, therefore, promote access for women who wish to use sterilization as a method of contraception, but at the same time safeguard against coercive or otherwise unjust uses.

This Committee Opinion reviews ethical issues related to the sterilization of women, and it has been updated from its previous iteration to reflect the following new research findings and developments:

- Women do not always understand the permanence of sterilization (2, 3).
- Patient race, ethnicity, and socioeconomic status influence physicians' contraceptive recommendations (4–7).
- There is now a range of equally effective, reversible alternatives to sterilization (8–9).
- Many clinicians and policy researchers have suggested that Medicaid consent requirements for sterilization merit revision because they present a barrier to desired sterilization for some women (10–12).

This Committee Opinion also reflects the importance of using a reproductive justice framework when considering ethical provision of sterilization. In this framework "reproductive rights" are something broader than access to contraception and abortion alone; that is, a reproductive justice framework, as defined by advocates who first originated the term, recognizes that women's reproductive rights include the right to have children, not to have children, and to parent in safe and humane conditions (13). A reproductive justice framework also necessarily acknowledges the ways in which gender, race, and socioeconomic status shape reproductive health care experiences, care provision, and reproductive health policy. Sterilization of women with cognitive disabilities raises a host of additional ethical issues and is beyond the scope of this document.

## Background

Sterilization by any technique must be considered a permanent method of contraception. Options for achieving pregnancy after a sterilization procedure, including reversal surgery and in vitro fertilization, are costly, carry risks, and are not always successful (14, 15). Contemporary LARC methods (intrauterine devices and implants) have efficacy comparable with, and even slightly higher than, female sterilization (14). Compared with male sterilization, most methods of female sterilization are less effective, more costly, and carry more risk (16).

Sterilization is the most common method of contraception among married couples, with nearly twice as many couples choosing female partner sterilization over male sterilization (30% versus 17%) (14). African American, Native American, and Latina women are 1.2–2 times more likely to have undergone sterilization than white women after controlling for age, parity, insurance status, marital status, vasectomy use, and a range of other variables (3, 5, 6). Women with public insurance or no insurance are approximately 1.4 times more likely to have undergone sterilization than privately insured women (5). Reasons for these differences are not clear. Although they may reflect patient preferences, these differences raise concerns that women do not have equal access to the full range of reversible methods and that low-income women and women of color may be counseled differently about contraception than white or privately insured women.

Indeed, studies suggest that patient race, ethnicity, and socioeconomic status affect physician attitudes and practices around reversible contraception and permanent contraception, which raises concerns regarding differential counseling. For example, among women with identical medical histories, patient race or ethnicity and socioeconomic status were found to influence recommendations for use of intrauterine contraception in ways that may reflect racial and social class stereotypes (4, 17). Race and socioeconomic status also have been found to affect a physician's willingness to perform sterilization, with physicians more willing to sterilize black women

compared with white women and poor women compared with more affluent women (7).

### History of Sterilization in the United States

Sterilization practices have embodied a problematic tension, in which some women who desired fertility were sterilized without their knowledge or consent, and other women who wanted sterilization to limit their family size lacked access to it. For example, through the 1970s, obstetrician–gynecologists used the guideline that a woman's age multiplied by her parity should equal 120 before sterilization was appropriate (18). This presented a barrier to sterilization for some women, especially white middle-class women who sought care with private physicians (18). In contrast, many low-income women and women of color in public hospitals were subjected to state and federal programs aimed at limiting their fertility. Between 1909 and 1979, physicians performed more than 60,000 forcible sterilizations in government-organized programs (1, 19, 20). These differential experiences—in which some women could not have a desired sterilization and others underwent undesired sterilization—reflect that a woman's race, ethnicity, and social class affected the ways in which her fertility and childbearing were valued by those with authority to perform or deny sterilization. Reproductive experiences are, therefore, "stratified," such that "some categories of people are empowered to nurture and reproduce, while others are disempowered" to do so (21).

In 1976, the U.S. Department of Health, Education, and Welfare developed protective regulations for Medicaid-funded sterilizations to prevent further coercive or nonconsensual procedures. The regulations prohibit sterilization of women younger than 21 years and of women with mental disabilities, require waiting periods between the time of consent and the sterilization procedure (currently, a 30-day waiting period), and require the use of a standardized consent form (22). However, many have argued that the policy, although well-intentioned, has not ensured adequate informed consent (3, 6) and has, in fact, become a barrier for many low-income women who genuinely desire sterilization (23–25). In response, there have been multiple recent calls by clinicians and researchers to address this problem, with some calling for shortening required waiting periods or for abandoning special protections altogether (10, 12, 26, 27). The suggestion that fewer protections are needed has been met with deep concern from many reproductive justice advocates, who remain worried about the potential for sterilization abuse of low-income women, women of color, or other disadvantaged women (28). Indeed, coercive sterilizations were documented in California prisons in the same period in which there were calls to loosen restrictions on publicly funded sterilizations. Between 2006 and 2010, more than 140 incarcerated women were sterilized, with many reporting significant pressure from prison and hospital medical personnel to undergo the procedure (29).

### Sterilization and Regret

Approximately 14% of sterilized women request information about sterilization reversal, though only approximately 1% of women obtain the procedure (2). Young age at sterilization and being a woman of color are associated with seeking reversal information and obtaining the reversal procedure. Those aged 18–24 years at the time of sterilization are nearly four times more likely to seek reversal information and nearly eight times more likely to undergo a reversal procedure than women who are sterilized at 30 years or older. Women of color also are more likely than white women to seek reversal information or to report that a sterilization procedure prevented them from having desired children (3, 6). In one report, one half of the women of color who were young and unmarried at the time of sterilization ultimately requested information about reversal (2). Women who request sterilization in conjunction with a recent pregnancy (including at the time of cesarean delivery, postpartum, or at the time of abortion) also may be more likely to be dissatisfied with their decision, though data are inconsistent (30, 31).

Requests for reversal information or procedures often are interpreted by researchers as evidence of "regret" for a prior sterilization decision, but may in fact represent other phenomena—including that at the time of sterilization a woman misunderstood (or was misinformed about) the permanence of the procedure; was coerced by a health care provider, partner, or family member; or chose sterilization under the constraints of structural issues such as poverty or lack of access to reversible methods. Indeed, dissatisfaction with a sterilization decision is most likely in women whose reasons for sterilization are issues other than a desire for no further children (eg, for reasons of marital or relationship difficulties, or other stressful life circumstances) (32). All of this points to the need for obstetrician–gynecologists to ensure that sterilization requests, particularly those by young women without children, reflect each woman's own wishes, come from a desire to permanently end childbearing, and come from a preference for sterilization over all reversible methods and male partner sterilization.

### Central Ethical Issues and Considerations

An ethical approach to sterilization requires that obstetrician–gynecologists recognize women's legitimate claims to avoid pregnancy and pursue pregnancy when desired. With this background, a set of issues emerges regarding ethical use of sterilization in contemporary obstetric and gynecologic practice.

**Ethical Provision of Sterilization Requires Careful Counseling**

Ethical counseling involves three broad considerations: 1) the content of information presented, 2) the process of conveying information, and 3) self-reflection on the part of the obstetrician–gynecologist. Content must include the most up-to-date information about the sterilization procedures and alternatives (see also Practice Bulletin No. 121, *Long-Acting Reversible Contraception: Implants and Intrauterine Devices*, and Practice Bulletin No. 133, *Benefits and Risks of Sterilization*). The process of counseling should be nonjudgmental, and physicians should recognize patients as individuals with varying desires and priorities. Finally, obstetrician–gynecologists must strive to avoid bringing into the clinical encounter conscious or unconscious gender, race, and class-based biases about who should become a mother.

*Counseling Content*

Obstetrician–gynecologists have an ethical duty to ensure that all patients understand the risks and benefits of sterilization (including emerging noncontraceptive benefits, such as possible cancer risk reduction) and that sterilization must be considered permanent, albeit with occasional failures and concomitant ectopic pregnancy risk (33). Long-acting reversible contraceptive methods should be raised as additional options for women who have completed their childbearing or do not ever wish to become pregnant (34, 35). Obstetrician–gynecologists also should inform female patients that male partner sterilization has superior efficacy and lower risks than female sterilization. Risk factors for later requesting reversal surgery should be discussed, particularly young age and marital or relationship difficulties or other significant life stressors at the time of the request. The decision among the various methods is ultimately a matter of patient preference, and a woman's own priorities and life contexts ought to determine contraceptive choice. A woman's clearly articulated desire for permanent prevention of future pregnancies should be respected. When women choose sterilization because their male partners are unwilling to consider vasectomy, the sterilization decision, although autonomous, may be the result of ideas about masculinity or other gender norms about who is responsible for family planning. Although obstetrician–gynecologists might feel uncomfortable that they are perpetuating inequitable gender norms by performing female sterilization in these situations, doing so is ethically permissible and may ultimately represent the decision that is optimal for a woman given her specific circumstances.

Obstetrician–gynecologists also should be aware of and able to discuss relevant laws or regulations that may constrain sterilization provision, such as Medicaid minimum-age and waiting-period requirements. In addition, obstetrician–gynecologists should be aware that some patients may have insurance coverage restricted to pregnancy and the immediate postpartum period and may have limited access to sterilization or other contraceptive options outside of this window (14).

In summary, patient counseling should emphasize the permanence of sterilization and include information about reversible alternatives, especially LARC methods, which are as effective as permanent sterilization. In appropriate cases, sterilization of a male partner should be discussed during presterilization patient counseling as an option with fewer risks and greater efficacy than female sterilization. Legal or regulatory constraints on sterilization should be discussed when relevant.

*Counseling Process*

The process of counseling also has ethical implications. The goal of sterilization counseling––and counseling more generally––is to adopt a patient-centered approach in which decision making is shared between a patient and her caregiver. Paternalism, in which a physician overrides a patient's autonomy to "protect" her from the consequences of her own decision making, should be avoided.

Over the past several decades there has been a transformation in health care from a "doctor knows best" model to one in which the patient is put at the center of care and is seen as a collaborator and partner in health care decisions (36). This shift to a collaborative approach is vital to ensuring patient autonomy in medical decision making. However, when patients consider an irreversible decision like sterilization, it is not uncommon for a physician to feel a protective impulse to help a patient avoid what has been termed "sterilization regret." For example, physicians may hesitate to provide requested sterilization to young women in the face of knowledge that, for most people, full cognitive maturation—including the ability to incorporate long-term goals into complex decision making—is not reached until the mid 20s (37). When young women, women of color, unmarried women, and women experiencing significant life stressors request sterilization, a protective impulse may be engendered because of the knowledge that women in these demographic groups disproportionately seek reversal information later in life. In addition, because motherhood remains a well-entrenched part of the sociocultural definition of a woman in contemporary American life, honoring sterilization requests in nulliparous women can feel difficult. In these situations, as in all sterilization counseling, it is important to raise LARC methods as equally effective and reversible options.

However, physicians must recognize that patients have great expertise in their own lives and in what is important and meaningful to them. Although eliminating all risk of regret is not possible, denying sterilization to those who request it comes at the cost of limiting the ability of women to fully express their autonomy regarding when and if to become pregnant and parent. Eliminating the risk of regret by limiting patient autonomy generally

CAREY000276

is considered by bioethicists to be worse than allowing a patient to make a possibly erroneous choice. It is impossible to eliminate regret, as the very fact of being a fully autonomous human being with decisional capacity carries with it the risk of decisional regret. This phenomenon is coined the "dignity of risk" (38). When decisional capacity is restricted by a physician or by an institution, the risk of regret may be reduced; however, eliminating decisional authority is considered to be a worse harm than decisional regret (38). When in doubt about the advisability of proceeding with a requested sterilization, it is recommended that the physician err on the side of respecting a patient's decisional and reproductive autonomy.

Some obstetrician–gynecologists decline to perform sterilization procedures because of their personal religious beliefs or moral values. In such cases, the physician must provide an alternative form of contraception that is equally acceptable to the patient or refer the patient to another gynecologic care provider, as should be the case whenever a conscience claim prevents care provision (39). The autonomy of a woman who seeks sterilization must always be respected, even in the face of conscience-based objections to her request.

Conversely, coercing or forcing a woman in any way to undergo sterilization she does not desire, or about which she is unsure or unaware, is always unacceptable. Coercion and forcible sterilization have taken a range of forms in the past, including withholding other health care to incentivize sterilization, threatening to involve the child welfare system if a woman fails to consent to sterilization, or performing a sterilization without a patient's knowledge in the course of other surgical treatment. These and any other coercive or forcible sterilization practices are unethical and should never be performed.

Sometimes external factors may affect a woman's request for sterilization. For example, a woman may request sterilization because of partner pressure, or because she lacks insurance coverage or resources for the reversible options that she would prefer. Once again, careful dialogue is paramount and the full range of a woman's family building wishes over the long term should be made clear. If the only reason for proceeding with sterilization is because of factors such as partner pressure, physicians ought to work diligently to address issues of reproductive coercion, including potential safety issues. If financial constraints lead to a sterilization request, physicians ought to work with patients to find low-cost reversible options if indeed these methods are acceptable to the patient.

Provided that counseling has followed the principles outlined here, it is ethically acceptable to perform sterilization at the time of abortion, birth, or other reproductive care. However, such requests should be discussed before the primary procedure or event, at a time when the patient is able to make a considered decision, review the risks and benefits of sterilization, think about alternative contraceptive methods, and make contingency plans in the event of obstetric or neonatal complications or other unanticipated events. Sterilization should be avoided when the sterilization decision is made during labor or other acute care or when acute events (eg, uterine rupture) raise concern that future childbearing is unadvisable or unsafe. Although there may be rare instances when sterilization is warranted, in such situations physicians generally should offer LARC methods and revisit the question of sterilization later. Conversely, when a planned sterilization is scheduled to be performed at the time of cesarean delivery or immediately postpartum, and there are unexpected neonatal complications for which a contingency plan had not been discussed in advance, the decision should be revisited and a LARC method offered as a possible alternative.

In summary, obstetrician–gynecologists should provide presterilization counseling that includes a discussion of a woman's reproductive desires and places her wishes at the center of care. Even given the risk of regret, it is ethically permissible to perform a requested sterilization in nulliparous women and young women who do not wish to have children. A request for sterilization in a young woman without children should not automatically trigger a mental health consultation. Although physicians understandably wish to avoid precipitating sterilization regret in women, they should avoid paternalism as well.

### Counseling and Self-reflection—Gender, Race, Class, and Motherhood

Social science research shows that race and social class affect ideas about who should be a mother and what qualities make a "good mother." For this reason, obstetrician–gynecologists should consider the role of bias in counseling and care recommendations and avoid actions based on biases about race, ethnicity, socioeconomic status, sexual orientation, and motherhood, which can, despite best intentions, affect interpretation of patients' requests and influence provision of care. In the case of sterilization, the risks of acting on stereotypes or of viewing women solely in terms of their "demographics" are dual: desired sterilization might be denied because a woman belongs to a demographic group that disproportionately seeks reversal information, was historically victimized, or that a physician believes should have children. Undesired sterilization might be inappropriately performed on the basis of membership in a category for which stereotypes of "unchecked fertility" predominate (40). A patient-centered approach that focuses on the reproductive desires of an individual woman can mitigate some of the potentially negative effects of the larger social climate of race and class inequality in which health care is carried out.

### Sterilization of Incarcerated Women

As aforementioned, between 2006 and 2010, more than 140 women underwent publicly funded tubal ligations in California prisons. Although all of these women signed

consent forms, researchers analyzing these cases afterward showed that many procedures were undesired, and the women felt significant pressure from prison and hospital physicians to undergo sterilization (29).

Prison is an environment that is intended to restrict liberty, and thus ensuring true informed consent is challenging. The concept of autonomy is diminished in a setting in which all choices and behaviors are monitored and potentially punished, sometimes in idiosyncratic or unpredictable ways (29). All "choices" in prison are made with implicit and explicit threats of disciplinary action for "wrong" choices and, thus, are made in situations of significant constraint, if not actual coercion. In the specific case of sterilization, many women report feeling pressured by prison physicians to undergo the procedure. Researchers who investigated these cases concluded, "The coercive nature of the prison environment undermines a person's ability to give meaningful consent to the irreversible destruction of fertility" (29). Although women are not wholly without decisional agency to make medical care choices while incarcerated, in the setting of historical and contemporary abuses, irreversible procedures like sterilization should not be routinely performed.

At the same time, the College also recognizes that some incarcerated women may genuinely desire sterilization, may have previously requested it, and may not have access to health care outside of the prison system. A policy of denying all requests for sterilization in prison may impinge upon some women's authentic desire to control their fertility permanently. Therefore, only rarely should incarcerated women undergo sterilization, and only after access to LARC methods has been made available and excellent documentation of prior (preincarceration) request for sterilization is available. Special procedural safeguards and oversight are needed when incarcerated women are sterilized because of the likelihood that the coercive environment of prison impedes true informed consent.

**Sterilization Access in Religiously Affiliated Health Systems**

Religiously affiliated hospitals (and some employer-based insurers) may prohibit sterilization based upon interpretations of religious doctrine. This may affect the access of many women, because one in six patients in the United States currently receives care in a religiously affiliated institution (41, 42). Moreover, most women are not aware of the restrictions on reproductive health care that they might experience (43). Some physicians develop "work-arounds" (eg, designating one particular operating room as a nonreligious entity), but these do not always guarantee that an individual woman will be able to receive the care she requests on any given day.

Historically, some work-arounds included offering hysterectomy for an indication that would not conflict with religious doctrine—although the true underlying motivation for surgery was sterilization (44). There are anecdotal reports that elective cesarean delivery was offered for similar reasons: because sterilization could be surreptitiously done during the surgery, or because some religiously affiliated hospitals had formal or informal policies of allowing sterilization after multiple prior cesarean deliveries. The risks to women of hysterectomy and cesarean delivery are greater than those of sterilization procedures alone or vaginal birth with postpartum sterilization; thus, hysterectomy and cesarean delivery are medically and ethically unadvisable when the end goal is the provision of sterilization and not to safeguard the pregnancy or to treat disease.

If individual physicians or institutions will not provide sterilization because of personal religious beliefs or institutional policy, patients must be informed as early as possible and provided with an alternative form of contraception that is acceptable to the patient or be referred elsewhere for care (39). When difficulties in meeting a postpartum sterilization request are anticipated and sterilization is desired by the patient, transfer of care for the remainder of pregnancy should be offered. For example, if postpartum sterilization or sterilization at the time of cesarean delivery cannot be provided, or cannot be guaranteed because of unstable or unpredictable work-around options, patients should be informed. Those who prioritize postpartum sterilization should be offered a transfer of care.

**An Ethical Approach to Sterilization Care and Policy**

The College recognizes the right of all women to unimpeded access to sterilization. In particular, low-income women using public insurance ought to be free of the burdens of waiting periods and complicated consent forms from which privately insured women are spared. At the same time, the College recognizes that U.S. women have stratified experiences of reproduction, meaning that not all women have equal opportunities to fulfill their reproductive wishes and are likely differentially vulnerable to coercive sterilization practices. The College suggests that until reproduction is equitable, or "unstratified" (a long-term vision that requires the undoing of many social inequalities), some protections of women with publicly funded health insurance may be warranted. How to craft protections that do not also create barriers is unclear; the tension between liberal access and protective safeguards is difficult to ethically navigate and operationalize.

Determining the ethical balance between access and safeguards may require a new kind of collaborative, interdisciplinary approach that involves many people who have not yet sat at the table together to consider this issue. This group might include obstetrician–gynecologists and other women's health care providers, bioethicists, health policy experts, historians and social scientists of reproduction and gender, state and federal Medicaid officials, reproductive justice

CAREY000278

advocates, representatives from women of color advocacy groups, women who have had sterilization denied, women who have undergone nonconsensual sterilization, and those who have undergone consensual sterilization but feel regret regarding their decision.

## Conclusion

This Committee Opinion outlines an approach to providing permanent sterilization within a reproductive justice framework that recognizes that all women have a right to pursue and to prevent pregnancy. In this framework, respect for an individual woman's reproductive autonomy should be the primary concern guiding sterilization provision and policy. Coercive or forcible sterilization practices are unethical and should never be performed. Ethical sterilization care requires access to sterilization for women who request it, without undue barriers. It simultaneously requires protections from unjust or coercive practices, particularly for low-income women, incarcerated women, or any women whose fertility and parenting has historically been devalued or stereotyped as problematic or in need of control or surveillance. The College recognizes that there is tension in these dual needs. Negotiating the ethical nuances of this tension will require the care and attention of multiple stakeholders working collaboratively to define care practices and policies that make every effort to meet the needs of all women as fully as possible.

## References

1. Harris LH, Wolfe T. Stratified reproduction, family planning care and the double edge of history. Curr Opin Obstet Gynecol 2014;26:539–44. [PubMed] ⇐
2. Schmidt JE, Hillis SD, Marchbanks PA, Jeng G, Peterson HB. Requesting information about and obtaining reversal after tubal sterilization: findings from the U.S. Collaborative Review of Sterilization. Fertil Steril 2000;74:892–8. [PubMed] [Full Text] ⇐
3. Shreffler KM, McQuillan J, Greil AL, Johnson DR. Surgical sterilization, regret, and race: contemporary patterns. Soc Sci Res 2015;50:31–45. [PubMed] [Full Text] ⇐
4. Dehlendorf C, Ruskin R, Grumbach K, Vittinghoff E, Bibbins-Domingo K, Schillinger D, et al. Recommendations for intrauterine contraception: a randomized trial of the effects of patients' race/ethnicity and socioeconomic status. Am J Obstet Gynecol 2010;203:319.e1–8. [PubMed] [Full Text] ⇐
5. Borrero S, Schwarz EB, Reeves MF, Bost JE, Creinin MD, Ibrahim SA. Race, insurance status, and tubal sterilization. Obstet Gynecol 2007;109:94–100. [PubMed] [Obstetrics & Gynecology] ⇐
6. Borrero S, Abebe K, Dehlendorf C, Schwarz EB, Creinin MD, Nikolajski C, et al. Racial variation in tubal sterilization rates: role of patient-level factors. Fertil Steril 2011; 95:17–22. [PubMed] [Full Text] ⇐
7. Harrison DD, Cooke CW. An elucidation of factors influencing physicians' willingness to perform elective female sterilization. Obstet Gynecol 1988;72:565–70. [PubMed] [Obstetrics & Gynecology] ⇐
8. Kavanaugh ML, Frohwirth L, Jerman J, Popkin R, Ethier K. Long-acting reversible contraception for adolescents and young adults: patient and provider perspectives. J Pediatr Adolesc Gynecol 2013;26:86–95. [PubMed] [Full Text] ⇐
9. Long-acting reversible contraception: implants and intrauterine devices. Practice Bulletin No. 121. American College of Obstetricians and Gynecologists. Obstet Gynecol 2011;118:184–96. [PubMed] [Obstetrics & Gynecology] ⇐
10. Brown BP, Chor J. Adding injury to injury: ethical implications of the Medicaid sterilization consent regulations. Obstet Gynecol 2014;123:1348–51. [PubMed] [Obstetrics & Gynecology] ⇐
11. Zite NB, Philipson SJ, Wallace LS. Consent to sterilization section of the Medicaid-Title XIX form: is it understandable? Contraception 2007;75:256–60. [PubMed] ⇐
12. Zite NB, Wallace LS. Use of a low-literacy informed consent form to improve women's understanding of tubal sterilization: a randomized controlled trial. Obstet Gynecol 2011;117:1160–6. [PubMed] [Obstetrics & Gynecology] ⇐
13. Luna Z, Luker K. Reproductive justice. Ann Rev Law Soc Sci 2013;9:327–52. ⇐
14. Benefits and risks of sterilization. Practice Bulletin No. 133. American College of Obstetricians and Gynecologists. Obstet Gynecol 2013;121:392–404. [PubMed] [Obstetrics & Gynecology] ⇐
15. Westhoff C, Davis A. Tubal sterilization: focus on the U.S. experience. Fertil Steril 2000;73:913–22. [PubMed] [Full Text] ⇐
16. Bartz D, Greenberg JA. Sterilization in the United States. Rev Obstet Gynecol 2008;1:23–32. [PubMed] [Full Text] ⇐
17. Harris LH. Interdisciplinary perspectives on race, ethnicity, and class in recommendations for intrauterine contraception. Am J Obstet Gynecol. 2010;203:293–5. [PubMed] [Full Text] ⇐
18. May ET. Barren in the promised land: childless Americans and the pursuit of happiness. Cambridge (MA): Harvard University Press; 1995. ⇐
19. Stern AM. Sterilized in the name of public health: race, immigration, and reproductive control in modern California. Am J Public Health 2005;95:1128–38. [PubMed] [Full Text] ⇐
20. Lombardo PA. Three generations, no imbeciles: eugenics, the Supreme Court, and Buck v. Bell. Johns Hopkins University Press: Baltimore (MD); 2008. ⇐
21. Ginsburg FD, Rapp R, editors. Conceiving the new world order: the global politics of reproduction. Berkeley (CA): University of California Press; 1995. ⇐
22. Department of Health and Human Services. Consent for sterilization. Washington, DC: DHHS; 2012. Available at: http://www.hhs.gov/opa/sites/default/files/consent-for-sterilization-english-updated.pdf. Retrieved November 22, 2016. ⇐
23. Access to postpartum sterilization. Committee Opinion No. 530. American College of Obstetricians and Gynecologists. Obstet Gynecol 2012;120:212–5. [PubMed] [Obstetrics & Gynecology] ⇐

CAREY000279

24. Gilliam M, Davis SD, Berlin A, Zite NB. A qualitative study of barriers to postpartum sterilization and women's attitudes toward unfulfilled sterilization requests. Contraception 2008;77:44–9. [PubMed] [Full Text] ⇐

25. Zite N, Wuellner S, Gilliam M. Barriers to obtaining a desired postpartum tubal sterilization. Contraception 2006; 73:404–7. [PubMed] ⇐

26. Borrero S, Zite N, Potter JE, Trussell J. Medicaid policy on sterilization—anachronistic or still relevant? N Engl J Med 2014;370:102–4. [PubMed] [Full Text] ⇐

27. Borrero S, Zite N, Creinin MD. Federally funded sterilization: time to rethink policy? Am J Public Health 2012; 102:1822–5. [PubMed] [Full Text] ⇐

28. Reid D. Reproductive justice advocates: don't roll back sterilization consent rules. Bethesda (MD): Rewire; 2014. Available at: http://rewire.news/article/2014/04/02/reproductive-justice-advocates-dont-roll-back-sterilization-consent-rules. Retrieved November 22, 2016. ⇐

29. Roth R, Ainsworth SL. "If they hand you a paper, you sign it": a call to end the sterilization of women in prison. Hastings Womens Law J 2015;26:7–50. [Full Text] ⇐

30. Grubb GS, Peterson HB, Layde PM, Rubin GL. Regret after decision to have a tubal sterilization. Fertil Steril 1985;44:248–53. [PubMed] ⇐

31. Hillis SD, Marchbanks PA, Tylor LR, Peterson HB. Poststerilization regret: findings from the United States Collaborative Review of Sterilization. Obstet Gynecol 1999;93:889–95. [PubMed] [Obstetrics & Gynecology] ⇐

32. Ballou J, Bryson J. The doing and undoing of surgical sterilization: a psychosocial profile of the tubal reimplantation patient. Psychiatry 1983;46:161–71. [PubMed] ⇐

33. Peterson HB, Xia Z, Hughes JM, Wilcox LS, Tylor LR, Trussell J. The risk of pregnancy after tubal sterilization: findings from the U.S. Collaborative Review of Sterilization. Am J Obstet Gynecol 1996;174:116–8; discussion 1168–70. [PubMed] ⇐

34. Winner B, Peipert JF, Zhao Q, Buckel C, Madden T, Allsworth JE, et al. Effectiveness of long-acting reversible contraception. N Engl J Med 2012;366:1998–2007. [PubMed] [Full Text] ⇐

35. Trussell J. Contraceptive failure in the United States. Contraception 2011;83:397–404. [PubMed] [Full Text] ⇐

36. Davis K, Schoenbaum SC, Audet AM. A 2020 vision of patient-centered primary care. J Gen Intern Med 2005; 20:953–7. [PubMed] [Full Text] ⇐

37. Arnett JJ. Emerging adulthood. A theory of development from the late teens through the twenties. Am Psychol 2000;55:469–80. [PubMed] ⇐

38. Watson K. A piece of my mind. Reframing regret. JAMA 2014;311:27–9. [PubMed] ⇐

39. The limits of conscientious refusal in reproductive medicine. ACOG Committee Opinion No. 385. American College of Obstetricians and Gynecologists. Obstet Gynecol 2007;110:1203–8. [PubMed] [Obstetrics & Gynecology] ⇐

40. Roberts D. Race and the new reproduction. Hastings Law J 1996;47:935–49. [Full Text] ⇐

41. Catholic Health Association of the United States. Catholic health care in the United States: facts–statistics. Washington, DC: CHA; 2016. Available at: https://www.chausa.org/about/about/facts-statistics. Retrieved November 22, 2016. ⇐

42. Stulberg DB, Dude AM, Dahlquist I, Curlin FA. Obstetrician–gynecologists, religious institutions, and conflicts regarding patient-care policies. Am J Obstet Gynecol 2012;207:73.e1–5. [PubMed] [Full Text] ⇐

43. Guiahi M, Sheeder J, Teal S. Are women aware of religious restrictions on reproductive health at Catholic hospitals? A survey of women's expectations and preferences for family planning care. Contraception 2014;90:429–34. [PubMed] ⇐

44. Stulberg DB, Hoffman Y, Dahlquist IH, Freedman LR. Tubal ligation in Catholic hospitals: a qualitative study of ob-gyns' experiences. Contraception 2014;90:422–8. [PubMed] [Full Text] ⇐

Copyright April 2017 by the American College of Obstetricians and Gynecologists. All rights reserved. No part of this publication may be reproduced, stored in a retrieval system, posted on the Internet, or transmitted, in any form or by any means, electronic, mechanical, photocopying, recording, or otherwise, without prior written permission from the publisher.

Requests for authorization to make photocopies should be directed to Copyright Clearance Center, 222 Rosewood Drive, Danvers, MA 01923, (978) 750-8400.

ISSN 1074-861X

**The American College of Obstetricians and Gynecologists**
**409 12th Street, SW, PO Box 96920, Washington, DC 20090-6920**

Sterilization of women: ethical issues and considerations. Committee Opinion No. 695. American College of Obstetricians and Gynecologists. Obstet Gynecol 2017;129:e109–16.

CAREY000280