**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
WAYCROSS DIVISION**

| | |
|---|---|
| DR. MAHENDRA AMIN, M.D., | |
| Plaintiff, | CIVIL ACTION NO.: 5:21-CV-00056-LGW-BWC |
| v. | |
| NBCUNIVERSAL MEDIA, LLC, | |
| Defendant. | |

## PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO EXCLUDE THE OPINIONS OF PLAINTIFF'S EXPERT DR. ELBRIDGE BILLS

NBCUniversal Media, LLC ("NBCU") made false and defamatory statements that Dr. Mahendra Amin performed mass hysterectomies that were forced, unnecessary, and unauthorized on women detained by the United States Immigration and Customs Enforcement ("ICE") at the Irwin County Detention Center.  Dr. Amin did no such thing, only performing two hysterectomies on these patients; both were medically necessary, authorized, and done with the patient's consent. In fact, Dr. Amin never provided any treatment without necessity, authorization, and consent.  In support of these truths, Dr. Amin engaged two physicians to provide their expert medical opinions regarding the medical necessity of the hysterectomies and other procedures.

NBCU has moved to exclude the expert testimony of one of these experts, Elbridge F. Bills, M.D., FACOG ("Dr. Bills"), on limited grounds. Declining to challenge his impeccable qualifications and presenting no serious challenge of his ability to assist the trier of fact, NBCU solely argues that Dr. Bills fails to meet the "reliability" prong of *Daubert*.[1] NBCU makes several arguments which fail to consider Dr. Bills's thorough review of the medical records and otherwise

---

[1] *Daubert v. Merrell Dow. Pharm., Inc.*, 509 U.S. 579 (1993).

merely disguise differences in opinion as an attack on reliability. NBCU's arguments fail for several reasons.

**First,** Dr. Bills offers ample support for his opinions, grounded in his qualifications, experience, references to studies, and his thorough review of the medical records – the very same medical records reviewed by NBCU's proffered expert. The Court should exercise its considerable leeway in performing its gatekeeping task and consider the reliability factors and "methodology" requirements of *Daubert* and Rule 702 as they should be applied to an experienced medical professional's review of medical records. In doing so, the Court will find that Dr. Bills renders reliable opinions on Dr. Amin's surgical and other medical decisions. **Second,** NBCU claims that Dr. Bills's testimony lacks an "indicia of reliability" or fails to explain certain "modalities," but its case law is unavailing. **Third,** NBCU's arguments concerning specific medical records merely amount to a difference in medical opinion, and the reasonable presumptions he makes are challengeable at trial.

Because Dr. Bills satisfies every *Daubert* factor by a preponderance of the evidence, the Court should deny NBCU's motion to exclude Dr. Bills's testimony.

### DR. BILLS'S EXPERT OPINIONS

Dr. Bills submitted an initial expert report in this case on September 1, 2023. [Doc. 139-1 ("First Report")] On September 19, 2023, NBCU submitted the rebuttal expert report of Dr. Erin Carey. [Doc. 139-2.] Dr. Bills disclosed a reply report responding to Dr. Carey's assertions on October 3, 2023. [Doc. 139-6. ("Second Report").] NBCU took Dr. Bills's deposition on October 13, 2023. [Doc. 139-7 ("Dr. Bills Tr.").] Below, Plaintiff summarizes Dr. Bills's two written expert reports as well as his deposition testimony, including the basis for his opinions.

A.      **Qualifications, Experience, Review Standard, and Records Reviewed**

Dr. Bills graduated from Emory University School of Medicine in 1989 and has been board certified by the American Board of Obstetrics and Gynecology for over 27 years. [First Report at 7, 10.][2] Since 1994, Dr. Bills has practiced the full breadth of obstetrics and gynecology in the Metro Atlanta area, including ambulatory and inpatient gynecological care "as well as surgical procedures including D&C's, laparoscopy, both operative and diagnostic; ovarian cystectomy, adhesiolysis; and hysterectomies." [*Id.* at 7.] Dr. Bills has also practiced as an OB hospitalist, which entails caring for indigent patients in emergency scenarios who do not have access to follow-up medical services. [*Id.*] Dr. Bills completed a four-year residency in obstetrics and gynecology at Tampa General and then a one-year pelvic surgery fellowship in Atlanta, Georgia. [Dr. Bills Tr. at 13:7-13.]

Dr. Bills describes his practice as "bread and butter OB-GYN." [*Id.* at 15:16-20.] In his over 30 years of experience, Dr. Bills has performed dilation and curettage ("D&C") procedures as well as laparoscopies, cystectomies, hysteroscopies, and hysterectomies. [*Id.* at 19:14-23.] From 1994 until 2022, Dr. Bills rarely treated incarcerated or arrested patients, but since beginning his work as OB hospitalist, he sees approximately 2-3 incarcerated patients a year. [*Id.* at 18:4-14; 20:18-23.] Dr. Bills frequently cares for indigent people who do not have access to follow-up medical services, including persons in jail. [*Id.* at 21:16-25; 23:24-25.]

Dr. Bills's understanding of the facts of the case was "[t]hat there was a defamation case, and I was asked to review medical records to see if unnecessary procedures were performed." [*Id.* at 43:9-13.] Dr. Bills defines an unnecessary medical procedure as "[a] medical procedure with no indication." [*Id.* at 49:1-3.] "My review was not to evaluate if every possible medical treatment

---

[2] In this brief, Dr. Amin cites page numbers to filed documents by the ECF page number.

can be performed. It was [']is this surgery a reasonable thing to do in this clinical situation.[']" [*Id.* at 93:7-10.] Dr. Bills reviewed the medical records of 69 individual patients – approximately 2,256 pages of records. [First Report at 2-3, 7; Dr. Bills Tr. at 45:19-22.] Dr. Carey reviewed the same 69 patient medical records which Dr. Bills reviewed, plus one apparently additional patient. [*Compare* First Report at 7 *with* Doc. 139-2 at 2.] Within these 69 patient records, Dr. Bills reviewed 14 patient records who were treated in the ambulatory care setting. [First Report at 8.] This means that ███████████████████████████████████████████████████ [Dr. Bills Tr. at 51:15-24.] Within these 69 patient records are 52 patient charts consisting of outpatient surgical procedures. [First Report at 8.] Dr. Bills put together a ████████████████ ██████████████████████████ [Dr. Bills Tr. at 55:19-56:2; Doc. 139-8.] In preparation for drafting his Second Report, Dr. Bills reviewed five additional patient records. [Second Report at 1.]

**B.    Hysterectomies**

Dr. Bills confirmed that there are only two cases where hysterectomies were actually performed. [Dr. Bills Tr. at 50:7-10.] [3]

      *i.      B.P.*

First, Dr. Bills noted that patient B.P. first had a ██████████████████████ revealing ██████████████████████████████████, and that she subsequently had a ██████████████ ████████████ [First Report at 7.] The final pathology revealed ██████████████████████ and accordingly Dr. Bills opined that the surgery performed by Dr. Amin was "curative and life saving

---

[3] NBCU mentions a U.S. Senate report which, in direct contradiction to its defamatory statements made against Dr. Amin, confirms that Dr. Amin performed only two hysterectomies. Neither Dr. Bills nor Dr. Carey reviewed the report. [*See* First Report at 2-4 (listing every document which Dr. Bills reviewed) and Doc. 139-2 at 2-3 (identifying every document which Dr. Carey was given to review).] The Senate report accordingly has no bearing on this *Daubert* motion other than the fact that both Dr. Carey and Dr. Amin also found only two, not "mass," hysterectomies.

for her ████████████ [*Id.*] Dr. Bills later wrote, "[Dr. Carey] states that ████████████

████████████████████████ This is not true. There is significant ████████████

associated with ████████████ as opposed ████████████ and in the low-risk population,

i.e., with adequate follow up, this can be evaluated with ████████████████████ Simply

putting in ████████████████████████ in Pubmed…, the first two articles state

how a ████████████ is a reasonable option for treatment instead of a ████████████."

[Second Report at 5-6.][4,5] Dr. Bills reliably explained why Dr. Amin would perform a

████████████████████████████████████████████████████████████████████

████████████ [Dr. Bills Tr. at 183:18-185:25.] Ultimately, based on his experience, his pelvic

surgery fellowship, and his understanding of the relevant medical literature, he opined ████████

████████████████████ [*Id.* at 187:8; 188:8-15.]

       *ii.*    *K.C.*

    The only other ████████████████ was for K.C. In his First Report, Dr. Bills wrote

that K.C. had failed previous ████████████████████████████████████████

████████████████████████████████████████████ [First Report at 7.] The

final pathology ████████████████████████ [*Id.*] Dr. Bills later wrote that

"if a physician performs ████████████████ that does not mean he or she is doing

anything wrong." [Second Report at 6.] Dr. Bills then provides experienced-based reasons for why

[4] Schmeler KM, Pareja R, Lopez Blanco A, Humberto Fregnani J, Lopes A, Perrotta M, Tsunoda AT, Cantú-de-León DF, Ramondetta LM, Manchana T, Crotzer DR, McNally OM, Riege M, Scambia G, Carvajal JM, Di Guilmi J, Rendon GJ, Ramalingam P, Fellman BM, Coleman RL, Frumovitz M, Ramirez PT. *ConCerv: a prospective trial of conservative surgery for low-risk early-stage cervical cancer*. Int J Gynecol Cancer. 2021 Oct;31(10):1317-1325. doi: 10.1136/ijgc-2021-002921. Epub 2021 Sep 7. PMID: 34493587.
[5] Liu Q, Xu Y, He Y, Du Y, Zhang Q, Jia Y, Zheng A. *Simple Hysterectomy for Patients with Stage IA2 Cervical Cancer: A Retrospective Cohort Study.* Cancer Manag Res. 2021 Oct 13;13:7823-7832. doi: 10.2147/CMAR.S327056. PMID: 34675677; PMCID: PMC8520820.

██████████████████████████ may not be indicated, such as ██████ [*Id.*] Dr. Bills

clarified that K.C.'s final pathology █████████████████████████████████████

████████████████████████████████████████████████████████████████████████

███████████████████████████████████ [Dr. Bills Tr. at 220:2-18.]

        *iii.*     *Not performed: R.F.S., W.D., and C.M.*

      With respect to patient R.F.S., Dr. Bills notes that the medical records indicate that the

patient was examined and given multiple choices and (quoting the medical record) "decided to

have ██████████ [Second Report at 5.] Ultimately, R.F.S. did not have a ██████████ due

to deportation. [*Id.*] Dr. Bills further noted that R.F.S. had ████████████ which ██████

███████████████████████ [Dr. Bills Tr. at 175:15-19; *see also id.* at 182:15-20.]

Dr. Bills also discussed why an ████████████████████████████████████████████

██████████████████████ [*Id.* at 176:7-178:23.]

      With respect to W.D., who ultimately did not have a ██████████ Dr. Bills notes that

██████████ is determined ████████████████ something he and Dr. Carey cannot determine.

[Second Report at 6] Dr. Bills also noted that even a ████████████ cannot note what can be

readily seen abdominally. [*Id.*] Dr. Bills then explained in detail the intricacies of determining

██████████ [Dr. Bills Tr. at 197:7-200:20.] With respect to C.M, Dr. Bills noted that her chart

indicated a ████████████████, which is "ample reason for ████████████" [Second Report at

7.]

     **C.**     **Dilation & Curettage ("D&C")**

      Dr. Bills's review noted 44 D&C procedures performed by Dr. Amin. [First Report at 8.]

Dr. Bills testified that the D&C's were performed in ████████████████████████████████

████████████████████████████████████████████ [Dr. Bills Tr. at 74:2-6.] ██████

██████████████████████ are indications for performing █████ [*Id.* at 74:7-11; 151:2-9; 151:23-152:9.] Dr. Bills cited a study by Dr. Camran Nezhat[6] that concluded that ██████████████

████████ are part of the evaluation ████████████ [*Id.* at 152:15-153:1; 154:1-8.] Dr. Bills testified

that there are plenty of physicians who perform ████████████████████ to treat ██████████████

████████████████████ [*Id.* at 76:18-22; 71:16.] Dr. Amin performed D&C's for diagnostic and

therapeutic purposes. [*Id.* at 147:17-148:5.] Responding to Dr. Carey's statements regarding

████████████████████ Dr. Bills explained in detail the appropriateness of ████████████.

[Second Report at 4-5.] Essentially, Dr. Carey fails to consider that ████████ can be used as a

████████████████████████ [*Id.* at 4.]

### D.    Ovarian Cystectomies

Dr. Bills opined that "[a]lthough ████████████ can be commonly monitored to see if they

resolve spontaneously, in this setting, as like my work as an Ob hospitalist, these patients may not

have any follow up in thus removing them as a source of pain is a reasonable procedure to

perform." [First Report at 8.] Dr. Bills testified that the ████████████████ he reviewed were

indicated for ████████ [Dr. Bills Tr. at 63:16-18.] ████████████████████████████

████████████████████████████████████████████

[*Id.* at 72:23-73:1.] In his experience as a practicing physician and frequent reviewer of medical

records, Dr. Bills equates a medical record ████████████████████████ [*Id.* at

92:13-21.]

Dr. Bills reliably explained why Dr. Amin would opt to perform a ████████ instead of

seeing if he had time to let them resolve on their own:



---

[6] Nezhat F. F. et al "Use of hysteroscopy in addition to laparoscopy for evaluating chronic pelvic pain" Journal of Reproductive Medicine 40,431-434 (1995).



[*Id.* at 172:20-173:14.]

###    E.    Other Medical Management Practices

In his Second Report, Dr. Bills challenges Dr. Carey's conclusion that Dr. Amin deployed an "aggressive surgical approach." "Many surgeons outside academia will routinely recommend surgery as a definitive diagnostic and therapeutic approach. I agree patients should be given therapeutic options; however, the patient may elect to have surgery based on their own desire or how the options are presented by the surgeon. Exhaustion of medical therapies is not required prior to surgical interventions." [Second Report at 3.] Dr. Bills concluded that "[e]ach of the above procedures were medically indicated as documented by various modalities including the history and physical, preoperative ultrasound evaluation, intraoperative surgical images documentation, and pathology." [*Id.*] "In summary, it appears that Dr. Amin has been providing appropriate care to this high-risk indigent population and has not performed any unnecessary medical procedures." [*Id.*]. Based on his decades of experience at a large obstetrical hospital, Dr. Bills knows that ▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮ [Dr. Bills Tr. at 126:25-127:10.] Dr. Bills added, "[a]cademicians have a very different practice environment than community physicians, and they are sometimes not aware

of what is considered normal and reasonable behavior in a nonacademic environment." [*Id.* at 127:23-128:2.]

In his Second Report, Dr. Bills challenged a statement made by Dr. Carey regarding the use of hormonal suppression to increase a patient's hemoglobin: "[h]ormonal suppression does not increase hemoglobin. It will simply decrease blood loss and with time (provided the hormonal suppression works; it frequently does not) then iron supplementation can slowly build blood counts back to normal levels." [Second Report at 4.] Responding to other criticisms, Dr. Bills testified that ███████████████████████████████████████ were indicated: ████████████████████████████████████████████████ ████████████████████████████████████████ [Dr. Bills Tr. at 109:3-15.] Dr. Bills noted that ████████████ is commonly used for ████████████████ [Second Report at 7.] Challenging Dr. Carey's recommendation of ██████, Dr. Bills writes, "[t]he fallacy in the argument is that ██████ should not be used in people with risk for ████████████████ ████████ [*Id.*] Dr. Bills also noted that ████████████████ are frequently performed during a gynecological examination to evaluate for hidden pathology. [*Id.*] "This is not outside standard practice." [*Id.*] Dr. Bills knows that ████████████ are still commonly performed because he has seen them performed at his place of work, one of the largest gynecological hospitals in Georgia (if not the country). [Dr. Bills Tr. at 166:7-167:7.] Furthermore, Dr. Bills reads the Green Journal and Gray Journal[7] every month. [*Id.* at 167:10-12.] Overall, Dr. Bills opined that Dr. Carey's conclusions "are based not on whether the treatment was adequate, but rather what she would have

---

[7] The *American Journal of Obstetrics and Gynecology* is known as the "Gray Journal." *See* https://www.ajog.org/ (last visited Feb. 2, 2024). The "Green Journal" is *Obstetrics & Gynecology*, the official publication of the American College of Obstetricians and Gynecologists. *See* https://journals.lww.com/greenjournal/pages/default.aspx (last visited Feb. 2, 2024).

done in each particular circumstance, but without the benefit of seeing the patients or considering the unique circumstances of this transient population." [Second Report at 8.]

### F.      Indigent Population and Lack of Follow-Up

Dr. Bills frequently cares for the indigent population that does not have access to follow-up medical services, which means "when we try to establish follow-up care with them they can't find anyone." [Dr. Bills Tr. at 24:6-13.] Dr. Bills believes that the practice setting in which Dr. Amin provided medical care informed ███████████████████████████████

███ [*Id.* at 101:24-102:9.] For example, and not indicative of expert knowledge of ICE deportation procedures, Dr. Bills assessed from the medical records the risk of deportation and therefore inability to follow-up. [*Id.* at 103:3-9.] ████████████████████████

████████████████████████████████████████████████

███ [*Id.* at 158:2-5.]

## F.R.E. 702 AND *DAUBERT* STANDARD

The United States Supreme Court's holding in *Daubert* and the text of Rule 702 require trial judges to serve as gatekeepers in determining the admissibility of expert testimony; however, any decision regarding admissibility is not a position on the strength or weight of the testimony. Fed. R. Evid. 702; *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999). In this Circuit, courts routinely look to three elements to determine if an expert is qualified under *Daubert* and Rule 702. As the Eleventh Circuit Court of Appeals has stated, the elements for consideration are whether:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (citations omitted). "[A]lthough there is some overlap among the inquiries into an expert's qualifications, the reliability of his proffered opinion and the helpfulness of that opinion, these are distinct concepts that courts and litigants must take care not to conflate." *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003).

The court's gatekeeping role under *Daubert* "is not intended to supplant the adversary system or the role of the jury." *Quiet Tech.*, 326 F.3d at 1341 (citations omitted) (internal quotation marks omitted). "Once an expert opinion has satisfied *Daubert*, a court may not exclude the opinion simply because it believes that the opinion is not — in its view — particularly strong or persuasive. The weight to be given to admissible expert testimony is a matter for the jury." *Seamon v. Remington Arms Co., LLC*, 813 F.3d 983 (11th Cir. 2016). Where the basis of expert testimony satisfies Rule 702, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596. Here, importantly, NBCU does not challenge Dr. Bills's qualifications or in any meaningful way address Dr. Bills's ability to assist the trier of fact.

Regarding the reliability requirement, in *Daubert* the Supreme Court directed district courts faced with the proffer of expert testimony to conduct "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." 509 U.S. at 592-93. There are four factors that courts may consider, if applicable: (1) whether the theory or technique can be tested, (2) whether it has been subject to peer review, (3) whether the technique has a known or potential rate of error, and (4) whether the theory has attained general acceptance in the relevant community. *Id.* at 593-94. "These factors are illustrative, not exhaustive; not all of them will apply

in every case, and in some cases other factors will be equally important in evaluating the reliability of proffered expert opinion." *Frazier*, 387 F.3d at 1262. Indeed, reliability is meant to be a flexible inquiry for district courts, allowing them to determine which factors may be relevant and to apply only those factors which the court sees fit. *Frazier*, 387 F.3d at 1262. "[T]he test of reliability is 'flexible'" in that "the law grants a district court the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination." *Kumho*, 526 U.S. at 141–42 (quoting *Daubert*, 509 U.S. at 594) (emphasis in original).

## ARGUMENT

NBCU vaguely refers to a failure to identify "modalities" and "methodology," contending that Dr. Bills's opinions do not contain an "indicia of reliability." Dr. Amin will first explain why the *Daubert* reliability prong, as it should be applied to an expert's review of medical records, weighs in Dr. Bills's favor. Then, Dr. Amin will address NBCU's arguments. Finally, Dr. Amin will argue that differences in medical opinions do not render Dr. Bills's opinions unreliable.

### A.   Dr. Bills's Opinions are Properly Based Upon his Qualifications, Experience, and Review of the Medical Records, and are Therefore Reliable.

Factors such as the testing of a theory or technique, peer review, and rate of error—perhaps more appropriate for determining the reliability of a specific test or scientific method—do not fit neatly into assessing the reliability an expert witness's medical records review. Rather, the Court should look to the Eleventh Circuit's decision in *Adams v. Lab. Corp. of Am.*, 760 F.3d 1322, 1330 (11th Cir. 2014), for determining how to weigh the reliability of an expert's medical records review. In *Adams*, the Eleventh Circuit reversed the *Daubert* exclusion of a pathologist and cytotechnologist, finding that the doctor "formed her opinion by using reliable tools, applying an established body of medical knowledge, and drawing on her extensive experience in the field." *Id.*

at 1330. In doing so, the court noted that the review of medical records and application of medical knowledge and experience, in and of itself, constitutes a methodology:

> In using the terminology of methodology we are referring to the manner in which Dr. Rosenthal reviewed the slides, applied her medical knowledge and experience, including her familiarity with the Bethesda Atlas, and formed her opinion. Whether her approach is called a "methodology" or simply "application of professional judgment" does not matter.

*Id.* at 1330 n.13. Similarly, here, Dr. Bills's testimony is admissible because he relied upon his thirty years of experience as an OB/GYN surgeon and applied his extensive training, knowledge, experience to his review of the medical records. *See, e.g., Geyer v. NCL (Bahamas) Ltd.*, 203 F. Supp. 3d 1212, 1217 (S.D. Fla. 2016) ("Stashak's testimony is admissible because it is based on his twenty-six years of experience as an orthopedic surgeon and his review of Plaintiff's medical records"); *In re Mentor Corp. ObTape Transobturator Sling Products Liab. Litig.*, 711 F. Supp. 2d 1348, 1372 (M.D. Ga. 2010) (OB/GYN and urogynecologist experts used a reliable scientific methodology "based on their review of each individual Plaintiff's medical records and the relevant depositions, as well as their experience and expertise"); *Giladi v. Strauch*, No. 94–CIV–3976–RMB–HBP, 2007 WL 415365, at *9 (S.D.N.Y. Feb. 6, 2007) (medical expert's opinions "are not mere *ipse dixit* pronouncements" because they are based upon his review of medical records and "his extensive experience as an orthopedic and hand surgeon"). Here, Dr. Bills not only applies his experience and training, but he also applies his experience from having reviewed medical records as an expert many times. [Dr. Bills Tr. at 94:4-10.] Under Eleventh Circuit precedent and the case law cited above, this "methodology" is sound.[8]

---

[8] NBCU's reliance on *J & V Dev., Inc. v. Athens-Clarke Cnty.*, 387 F. Supp. 2d 1214, 1225 (M.D. Ga. 2005) to criticize Dr. Bills's methodology is unpersuasive. [Mot. to Excl. at 11.] In *J & V*, the court found that rendering an opinion that the denial of a permit disproportionately impacted minorities requires a separate conclusion "based on scientific, technical, or specialized knowledge

Here, Dr. Bills's written reports and testimony make clear that he has applied his extensive knowledge of OB/GYN surgical procedures to find that Dr. Amin's decisions were indicated and not unnecessary. For example, with respect to B.P., Dr. Bills applied his knowledge of ███████ ███████████, and surgical procedures to explain why an ████████████████ was indicated. [*Id.* at 182:5-185-25.] Dr. Bills also offered experience-based understanding to render an opinion on ██████████████████. [*Id.* at 74:7-11; 151:2-154:12.] Dr. Bills explained the difference between the ███████████████████ versus the laparoscopic ██████████ ████████ [*Id.* at 79:24-81:2.] Several more examples are identified in the section entitled "Dr. Bills's Expert Opinion," *supra*.

Dr. Bills clearly connects his experience with the opinions he offers. Because Dr. Bills applied his extensive medical knowledge and experience to his medical records review, his opinions satisfy the reliability test.

**B.      NBCU's "Indicia of Reliability" and "Modality" Arguments Fail.**

NBCU's initial "indicia of reliability" section solely focuses on Dr. Bills's First Report[9], ignoring that "a party is considered to have met its obligations for expert disclosure so long as all required information is divulged in either the written report or a subsequent deposition of the expert." *Iacangelo v. Georgetown Univ.*, 272 F.R.D. 233, 234 (D.D.C. 2011). In any event, the cases which NBCU relies on to attack Dr. Bills's are distinguishable.

First, in *Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cnty., Fla.*, 402 F.3d 1092, 1111 (11th Cir. 2005), the excluded suicide expert offered testimony that included opinions regarding

---

that must rest on a valid methodology." The failed methodology in *J & V* does not in any way relate to Dr. Bills's exercising of professional judgment in reviewing the medical records.

[9] *See* Mot. to Excl. at 9-10, attacking Dr. Bills's "two-page report" and only mentioning, in a substance-free manner, that his Second Report and deposition do not cure prior deficiencies.

matters falling within the understanding of the average lay person. Here, NBCU cannot (and does not) argue that the complicated OB/GYN surgical decisions and medical indications which Dr. Bills discusses can be understood by lay persons. Next, *U.S. ex rel. Duncan Pipeline, Inc. v. Waldbridge Aldinger Co.*, No. CV411-092, 2013 WL 1338392 (S.D. Ga. Mar. 29, 2013), concerned an expert's failure to provide underlying facts for various opinions regarding excavation and pipeline work. Here, Dr. Bills provides ample fact-based explanations for his opinions as to why Dr. Amin proceeded with the surgeries he performed, including explaining the differences between the different surgical procedures as well as other options posed by Dr. Carey, why the two hysterectomies performed were indicated, ████████████████, and far more. *See* "Dr. Bills's Expert Opinion," *supra*. Furthermore, unlike the GI expert in *Soper v. Chipotle Mexican Grill of Colorado, LLC*, No. CV420-324, 2022 WL 2704149 (S.D. Ga. July 12, 2022), who failed to explain why alternative causes of GI symptoms should be ruled out, here Dr. Bills directly confronts alternative surgical measures and other assertions, and in doing so he explains why Dr. Amin's decisions were indicated and not unnecessary. *See, e.g.*, Dr. Bills Tr. at 183:22-188:15 & Second Report at 5-6 (addressing appropriateness of ███████ over other possible procedures); *id.* at 147:8-148:24 & Second Report at 4-5 (addressing underlying reasons for performing ████ and presenting alternative views regarding ███████████). Indeed, Dr. Bills's entire Second Report directly confronts offered alternatives.

NBCU's reliance on *In re Mirena IUD Products Liability Litigation*, 169 F. Supp. 3d 396 (S.D.N.Y. 2016), is also unavailing. Dr. Bills cannot be credibly accused of providing "literally no analysis, explanation or basis for his opinions," *Mirena*, 169 F. Supp. 3d at 458, considering that he has sufficiently explained on the basis of his training, personal experience and understanding of relevant literature, what types of procedures community physicians perform, as compared to

academicians; the intricate differences between various surgical options; and why certain non-surgical decisions taken by Dr. Amin (█████████████████████████████████████ for example) were indicated. In any event, in *Mirena* the district court appeared to play a far more intrusive role—more like that of a fact finder—than what the Eleventh Circuit allows district courts in its purview to assert. *See id.* at 459-60 (splitting hairs between the challenged expert's view and the court's opinion regarding the visibility of perforation threads).

Finally, ignoring his reference to the Dr. Nezhat study and the fact that he regularly reviews the Green and Gray Journals, NBCU focuses on the topic of medical literature. However, even if Dr. Bills did not cite a particular article when forming an opinion, "*Daubert* does not require an expert to be familiar with the all the details of the medical literature of a specific subject area. This alleged deficiency is…better suited to cross examination." *Dotson v. American Medical Systems, Inc.*, No. 1:20-cv-00788-LMM, 2020 WL 2844738 (N.D. Ga. Mar. 11, 2020) (denying *Daubert* exclusion of a urogynecologist surgeon).

       *i.*     *NBCU's "Modality" Critiques*

Vaguely referring to "modalities," NBCU argues that Dr. Bills's testimony regarding low-resolution images or illegible handwriting renders him unreliable. [Mot. to Excl. at 11-12.] First, NBCU fails to note that a "modality" is simply "a method of treatment."[10] Dr. Bills correctly noted

---

[10] The National Cancer Institute's (NCI) Dictionary of Cancer Terms defines "modality" as "[a] method of treatment. For example, surgery and chemotherapy are treatment modalities." *See* https://www.cancer.gov/publications/dictionaries/cancer-terms/def/modality (last visited Feb. 2, 2024). The American College of Obstetricians and Gynecologists' Women's Health Dictionary (https://www.acog.org/womens-health/dictionary) does not appear to define "modality," but the NCI's Dictionary of Cancer Terms has been used by courts. *See, e.g.*, *Peters v. DCL Med. Labs. LLC*, 305 F. Supp. 3d 799, 807 n.1 (S.D. Ohio 2018); *Finn v. Shinseki*, No. 11-1835, 2012 WL 2476799, at *1 n.1 (Vet. App. June 29, 2012).

that "modalities" include "the history and the physical, preoperative ultrasound evaluation, intraoperative surgical images documentation, and final pathology." [First Report at 8.] He simply describes what is included in the medical records which he *and* Dr. Carey reviewed. If a record contained a low-resolution image or illegible handwriting, then it was a low-resolution image or illegible item for Dr. Carey as well.

"*Daubert's* role of 'ensuring that the courtroom door remains closed to junk science is not served by excluding testimony such as [this expert's] that is supported by extensive relevant experience[, and s]uch exclusion is rarely justified in cases involving medical experts…" *Cartledge v. Montano*, 325 Ga. App. 322, 328 (2013) (reversing *Daubert* exclusion of a gynecological surgery expert) (quoting *Cotton v. Phillips*, 280 Ga. App. 280, 286 (2006)). Here, the evidence in the record is not sufficient to challenge the reliability of Dr. Bills's opinions and statements contained in his written reports and testimony. Dr. Bills reviewed the same patient medical records that Dr. Carey did. *See Nview Health, Inc. v. Sheehan*, No. 8:21-cv-385-VMC-TGW, 2022 WL 16923585, at *9 (M.D. Fla. Nov. 14, 2022) (denying *Daubert* motion challenging reliability where challenged doctor's testimony was "based on the same 'essential framework'" as the other party's expert, and where challenged doctor used her fifteen years of experience)) (quoting internal case document). Dr. Bills applied his training and experience and up-to-date understanding of surgical procedures to his medical records review to explain various decisions made by Dr. Amin and rule out other alternative medical decisions.

### C.    NBCU's Remaining Criticisms Amount to Difference in Opinion.

NBCU's remaining arguments either lack citations to the record (and are thus conclusory), or otherwise amount to mere difference in concluding opinions. First, NBCU criticizes Dr. Bills for not reducing to writing his analysis of every one of the over 70 patient medical records he

reviewed, but offers no legal support for the notion that a medical records review requires such writings. Rather, Dr. Bills carefully reviewed each patients' records, counted and listed the type of surgeries performed, divided the records between surgery and ambulatory patients, and offered findings on every type of procedure in question. [First Report at 8; *see also* chart at Doc. 139-8.] Critically, because he found no unnecessary procedures, a summary statement to that effect was appropriate.  Then, at trial, NBCU can ask Dr. Bills and can probe and critique any details it wants about every one of the 70 or so patient records he reviewed (NBCU could have done so during his deposition but chose not to). The record is clear that Dr. Bills reviewed every patient medical record, and that his opinions are based on these reviews and formed by his training, and experience, and current understanding of community physician work.

Next, citing the medical records of patients YDM and KPF, NBCU takes issue with Dr. Bills's conclusions about ███████████████████ and whether the ███████████ ██████ [Mot. to Excl. at 13-15.] If NBCU believes that ████████████████ ███████ that can be a subject for cross-examination at trial.[11] Essentially, NBCU seeks to exclude Dr. Bills simply because he offers opinions which differ from its own view of a few records in particular. "Balancing the evidence in such a way, however, far exceeds this Court's gatekeeping role in a *Daubert* inquiry and invades the province of the fact finder." *Underwood v. Scarborough*, No. 7:21-CV-00040 (WLS), 2023 WL 5997275 (M.D. Ga. Sept. 15, 2023) (denying *Daubert* motion to exclude medical examiner on reliability grounds, where doctor was familiar with subject matter as a pathologist and where the doctor even conceded that opposing party's theory was possible).

---

[11] NBCU chose not to ask Dr. Bills about the medical records cited in their motion, *see* Mot. to Excl. at 14, yet claim that he did not render any reliable opinion about these specific documents. [Dr. Bills Tr. at 3 (listing deposition exhibits).] The Court should reject this gamesmanship and find that any questions about specific records can be asked at trial.

i.    Other "Presumptions"

NBCU attacks three presumptions made by Dr. Bills: the indigent status of ICE detainees; the presumption of informed consent; and that Dr. Amin's ICE detainee patients could have been removed without notice or otherwise taken away from access to medical care. [Mot. to Excl. at 15-16.] None of these presumptions merit the blanket disqualification which NBCU seeks here.

First, Dr. Bills made the unremarkable assumption that ICE detainees may be indigent: he fully acknowledged that presumption could be incorrect. What is more important is that indigent patients, like detained patients without control of their movements, may be less likely to have the opportunity to follow up on their medical care, a problem he has personal experience with. [Dr. Bills Tr. at 24:6-13.] The record is also clear that at least one of Dr. Amin's patients was deported. Dr. Bills presumed that Dr. Amin may be concerned that a patient may lose access to future medical care. Where evidence in the case allows a reasonable inference to be drawn by the expert, "the expert may render an opinion for the jury to weigh." *Cox v. Allen,* 256 Ga. App. 53, 57 (2002). If Dr. Bills is wrong, and ICE detainees have consistent access to medical care in the United States and enjoy zero risk of deportation, then NBCU is free to test Dr. Bills about these assumptions and whether that would change his assessment of Dr. Amin's surgical decisions. *See Kennedy v. Elec. Ins. Co.*, No. CV 4:18-148, 2019 WL 2090776, at *3 (S.D. Ga. May 13, 2019) (denying *Daubert* attack on reliability prong where expert "thoroughly explains" the basis for his opinions and his opinions are "based on relevant facts and are reasonably drawn from his premises."). Second, Dr. Bills's presumption that informed consent was given is also reasonably drawn from Dr. Amin's records. Dr. Bills saw signed informed consent forms. [Dr. Bills Tr. at 105:11.][12] NBCU offers no

---

[12] If any party makes erroneous presumptions about informed consent, it is NBCU. The informed consent forms were written in English. [Dr. Bills Tr. at 105:13-15.] NBCU presumes that many of Dr. Amin's patients "were Spanish" and could not read forms written in English, or that no translator was utilized. [*Id.* at 105:17-23.] Apparently, NBCU can make cultural assumptions but

case law to support the notion that a medical expert must assume that the doctor did *not* provide informed consent, especially where the expert sees signed informed consent forms. In any event, because Dr. Bills was not asked to opine on informed consent, *see* Dr. Bills Tr. at 96:18-97:1, NBCU's argument is a strawman.

## CONCLUSION

In this case involving a review of medical records, Dr. Bills has applied his qualifications, considerable experience as a community OB/GYN surgeon, and understanding of the medical literature to render reliable opinions concerning Dr. Amin's medical decisions. Unlike Dr. Carey's amorphous "pattern" review[13], Dr. Bills conducted a case-by-case review and asserted reliable opinions derived from the medical records. The record shows by a preponderance of the evidence that Dr. Bills will "employ[] in the courtroom the practice of an expert in the relevant field." *Kumho*, 526 U.S. at 152. For these reasons, NBCU's blanket motion to exclude Dr. Bills's testimony should be denied.

Respectfully submitted this <u>2nd</u> day of February, 2024.

| | |
|---|---|
| **STACEY EVANS LAW** | **CHILIVIS GRUBMAN**<br>**DALBEY & WARNER LLP** |
| ***/s/ Stacey G. Evans*** | |
| Stacey G. Evans | Scott R. Grubman |
| Georgia Bar No. 298555 | Georgia Bar No. 317011 |
| Tiffany Watkins | sgrubman@cglawfirm.com |
| Georgia Bar No. 228805 | 1834 Independence Square |
| John Amble Johnson | Atlanta, GA 30338 |
| Georgia Bar No. 229112 | (404) 233-4171 (phone) |
| 4200 Northside Parkway NW | (404) 261-2842 (fax) |
| Building One, Ste 200 | |
| Atlanta, Georgia 30327 | |
| Telephone: 770-779-9602 | *Counsel for Plaintiff* |
| Facsimile: 404-393-2828 | |

argues that Dr. Bills cannot make valid presumptions grounded in actual experience or records he reviewed. The hypocrisy is telling.

[13] Dr. Amin has filed a *Daubert* motion to exclude Dr. Carey as an expert witness. [Doc. 124.]

sevans@staceyevanslaw.com
twatkins@staceyevanslaw.com
ajohnson@staceyevanslaw.com

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing **PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO EXCLUDE THE OPINIONS OF PLAINTIFF'S EXPERT DR. ELDRIDGE BILLS** will be served upon all attorneys in this matter by filing with the Court's CM/ECF system.

This <u>2nd</u> day of February, 2024.

***/s/ Stacey G. Evans***
Stacey G. Evans
