**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF GEORGIA**
**WAYCROSS DIVISION**

| | |
|---|---|
| DR. MAHENDRA AMIN, M.D., | |
| Plaintiff, | Case No. 5:21-cv-00056-LGW-BWC |
| v. | **REPLY IN FURTHER SUPPORT OF NBCU'S MOTION FOR SUMMARY JUDGMENT** |
| NBCUNIVERSAL MEDIA, LLC, | |
| Defendant. | |

NBCU respectfully submits this Memorandum of Law in Reply to Dr. Amin's Response in Opposition to NBCU's Summary Judgment Motion ("Opposition" or "Opp.") (Dkt. 153) and in further support of its Summary Judgment Motion ("Motion" or "Mot.") (Dkt. 127)).[1]

## INTRODUCTION

In its Motion, NBCU established that summary judgment should be granted for several independent reasons. NBCU published news about a Whistleblower Complaint that alleged Dr. Amin had performed unnecessary and unconsented-to medical procedures, including hysterectomies, on ICE detainees. NBCU did not blindly repeat the allegations; its reporters investigated the claims. They spoke with multiple lawyers for detainees, all of whom provided examples of Dr. Amin's alleged improper care. And, they learned that previous accusations that Dr. Amin billed the government for unnecessary procedures had led to a $520,000 settlement. This reporting corroborated that there was something seriously wrong with Dr. Amin's medical care—a point later confirmed after a government investigation, spurred by the Whistleblower Complaint, found that Dr. Amin performed scores of unnecessary gynecological procedures on detainees, some of whom still do not understand what happened to them.

---

[1] Capitalized and abbreviated terms have the same meaning as in the Motion.

Faced with these indisputable facts, Dr. Amin's Opposition misrepresents the gist and relevant context of the News Reports, the evidence and knowledge that NBCU's reporters had at the time of their publications, and the documents and testimony from this action, in an unsuccessful attempt to manufacture a factual issue.  *First*, based on the wealth of evidence showing that he performed unnecessary and unconsented-to invasive procedures on detainees—including a hysterectomy—Dr. Amin can never meet his burden of proving material falsity, and his case should be dismissed on this basis alone.  *Second*, because there is no dispute that ICE was investigating the Whistleblower Complaint when each of the News Reports was published and had the ability to ███ terminate Dr. Amin from his job treating detainees, NBCU's reporting of the allegations is shielded by the fair report privilege.  *Third*, Dr. Amin attempts to proffer "evidence" of actual malice by wrenching NBCU's internal communications out of their context. But Dr. Amin cannot misrepresent the record to create a factual issue.  And Dr. Amin's purported "proof" of actual malice—*i.e.*, journalists initially expressing hesitancy, asking questions, investigating the allegations, speaking with involved parties, and then reporting on the allegations once they are deemed credible—is precisely how good journalism works.

For these reasons, NBCU is entitled to judgment as a matter of law, and the Court should dismiss Dr. Amin's meritless defamation claim.

## ARGUMENT

### I.   Dr. Amin Cannot Meet His Burden of Proving Falsity

Dr. Amin's inability to prove that the gist of the challenged statements is false by clear and convincing evidence is fatal to his entire action.  *See* Mot. at 18-23.  Dr. Amin does not dispute that he carries the burden of proving falsity or that he must do so by clear and convincing evidence. Opp. at 4.  Instead, he argues that NBCU fails to meet *its* burden of showing the "statements are true as a matter of law."  *Id.*  But to prevail on summary judgment, NBCU must establish only that

Dr. Amin cannot meet *his* burden of proof.  *See Cox Enterprises, Inc. v. Nix*, 274 Ga. 801, 803 (2002) ("[D]efendant who will not bear the burden of proof at trial need not affirmatively disprove the nonmoving party's case, but may point out by reference to the evidence in the record that there is an absence of evidence to support any essential element of the nonmoving party's case").

Here, as NBCU's Motion and Opposition to Plaintiff's Summary Judgment Motion (Dkt. 155) (the "NBCU Opposition" or "NBCU Opp.") demonstrate, Dr. Amin cannot meet this burden because a wealth of evidence shows that he was performing unnecessary invasive procedures on detainees that could harm their health and fertility, including at least one unnecessary hysterectomy, and that detainees did not understand or fully consent to these procedures.  Mot. at 19-21; NBCU Opp. at 16-24.  In response, Dr. Amin states "NBCU has not demonstrated that [he] performed *any* unnecessary procedures" and "neither of [NBCU's experts] identified *any* unnecessary procedures."  Opp. at 13-14.  This is patently false.  Drs. Carey and Anderson testified extensively about the unnecessary surgeries Dr. Amin performed.  *See* SOMF ¶¶ 358-68.  Dr. Ogburn informed the Georgia Medical Board that Dr. Amin's "pattern of performing" D&Cs "did not meet acceptable standards."  McNamara Opp. Decl. Ex. 3 at AMIN_0000021.  And numerous detainees testified (and their medical records indicate) they did not understand what surgeries were performed on them or why.  Mot. at 19-22; NBCU Opp. at 21-24.

Perhaps most telling, Dr. Amin asks the Court to ignore the findings of the bipartisan Senate Subcommittee that ICDC detainees "appear to have been subjected to excessive, invasive, and often unnecessary gynecological procedures."  SOMF ¶¶ 373, 379-80.  Dr. Amin argues that the Report is not admissible, Opp. at 15, but the Report's conclusions are "factual findings resulting from an investigation made pursuant to authority granted by law" and are admissible under Rule of Evidence 803(8).  *Barry v. Trustees of Intern. Ass'n*, 467 F. Supp. 2d 91, 96 (D.D.C. 2006)

(admitting Senate Report, even when it relied upon reports from third-party law firms, because it was the "byproduct of a serious investigation" and was supported by both political parties).

Dr. Amin acknowledges that "findings of fact" from government reports are admissible but claims that the Senate Report is "a collection of statements" from "witnesses *to* the Subcommittee." Opp. at 15. Not so. The Report documents an eighteen-month investigation into Dr. Amin's practices,[2] and NBCU is relying on the Report's "Findings of Fact," including the undisputed data showing Dr. Amin was a clear outlier in performing invasive procedures and the conclusion that he performed "unnecessary gynecological procedures." SOMF ¶ 373, 379-80 (McNamara Decl. Ex. 68 at NBC002066-68). That the Report was informed by doctors' testimony does not remove it from the protections of Rule 803(8). *See Moss v. Ole South Real Estate*, 933 F.2d 1300, 1309-10 (5th Cir. 1991) ("[M]any government reports . . . have to rely in part on hearsay evidence, and the reports are not generally excluded for this reason.").[3] Accordingly, the Subcommittee's findings show that Dr. Amin cannot meet his burden of proof on falsity.

Looking to avoid this conclusion, Dr. Amin falls back on his refrain that this case is *only* about hysterectomies. But his contention is belied both by the News Reports themselves, which reference Dr. Amin's medical care of detainees more generally, *see* NBCU Opp. at 10-14, and the law, which holds that when assessing the gist of challenged statements, courts must look not just to the statements' words but to what causes harm to the plaintiff's reputation, *see Bustos v. A&E Television Networks*, 646 F.3d 762, 765 (10th Cir. 2011) (referring to plaintiff as "member" of Aryan Nation not materially false when plaintiff provided assistance to gang); *Haynes v. Alfred A.*

---

[2] The Senate Subcommittee engaged, reviewed and interviewed a doctor who analyzed extensive medical records for detainees, interviewed other doctors who also reviewed the medical records, interviewed ICE and LaSalle employees, reviewed nationwide ICE statistics, and attempted to interview Dr. Amin, who invoked his right against self-incrimination and refused to participate. *See* SOMF ¶¶ 137, 371.

[3] The statements from the doctors interviewed by the Senate are also admissible because they "show[] the basis" for the Subcommittee's findings. *Fowler v. Blue Bell, Inc.*, 737 F.2d 1007, 1013-14 (11th Cir. 1984).

*Knopf, Inc.*, 8 F.3d 1222, 1228 (7th Cir. 1993) (statement that plaintiff mistreated his children not materially false when plaintiff took other actions that made him an unreliable father).  Whether Dr. Amin was performing unnecessary or unconsented-to hysterectomies or other invasive procedures that impact health and fertility makes no material difference to his reputation.

Indeed, in his FAC and throughout this action, Dr. Amin has consistently admitted that the gist of the challenged statements is that he performed unnecessary "procedures," not just hysterectomies.  *See* Mot. at 19; NBCU Opp. at 12-13.  He now tries to sidestep these prior admissions, arguing that "[s]tatements by counsel in briefs are not evidence." Opp. at 11 n.3.  But this misses the point:  Dr. Amin is bound by his own representations.  *See Watson v. Lockette*, 379 F. App'x 822, 825 (11th Cir. 2010) ("We may consider the statements in the brief as admissions of facts.") (quoting *Young & Vann Supply v. Gulf, F.&A. Ry.*, 5 F.2d 421 (5th Cir. 1925)); *Coface N. Am. Ins. v. Davis*, 2019 WL 7831142, at *9-10 (N.D. Ga. June 21, 2019) (facts submitted in preliminary report are "binding judicial admission").  The one case Dr. Amin cites, *Travaglio v. American Express*, 735 F.3d 1266 (11th Cir. 2013), is not to the contrary.  There, the court merely recognized jurisdiction cannot be predicated on allegations of residency in a brief.  *Id.* at 1269-70.

Even if the gist of the statements *were* focused only on hysterectomies, Dr. Amin still cannot meet his burden of proof on falsity since he ignores the News Reports' context.  As in *Bryant v. Cox Enterprises*, 311 Ga. App. 230, 240-41 (2011), where reporting on preliminary allegations that the plaintiff was the Olympic bomber was not deemed false (even though this was later disproven), the News Reports made clear they were reporting on "breaking" news about "allegations" of high rates of hysterectomies and "other" procedures.  *See* NBCU Opp. at 13 (variations on "allegations" appeared forty-nine times in the News Reports).  Like in *Bryant*, NBCU did not state as a fact that Dr. Amin performed "mass hysterectomies," but rather reported

the whistleblower's allegations of hysterectomies, which the government was investigating.

At best, Dr. Amin can establish that his and his experts' views about the necessity of the procedures he performed, including hysterectomies, diverge from the views of NBCU's experts, the Senate, and other doctors who examined the medical records.   But this only means that assessments of medical necessity can vary amongst doctors and, for that reason, Dr. Amin cannot meet his burden of proof on falsity.   As the Georgia Supreme Court explained in *Cox Enterprises v. Thrasher*, 264 Ga. 235 (1994), when a statement cannot be proven "conclusively" false, summary judgment is proper.   There, the alleged falsity turned on whether the plaintiff had chlamydia.   The evidence established that the plaintiff was treated with a drug used to cure chlamydia, but the bacterium was not identified before being treated.   *Id.* at 236.   In dismissing the action, the Court, citing to *Philadelphia Newspapers v. Hepps*, 475 U.S. 767, 776 (1986), explained, "[t]here will always be instances when the factfinding process will be unable to resolve conclusively whether the speech is true or false; it is in those cases where the burden of proof is dispositive."   *Id.*   It recognized this will "insulate from liability some speech that is false," but the "policy behind the First Amendment's protection of true speech . . . compel[s] [this] decision."   *Id.*

Dr. Amin notably does not even attempt to distinguish *Thrasher*.   Instead, he claims, without citation to any authority, that "[m]edical necessity is not subjective."   Opp. at 13.   ███

████████████████████████████████████████████████████████████████████████

██████████████████████████████████[4]   And courts have likewise observed that, in the defamation context, statements about whether medical care is "recommended or excessive" are not verifiable facts" because there "is no standard which could be used to render an objective, verifiable answer."

---

[4] *See* SOMF ¶ 357. ████████████████████████████████████████████████

*Woodward v. Weiss*, 932 F. Supp. 723, 726 (D.S.C. 1996); *see also Gaunt v. Pittaway*, 135 N.C. App. 442, 443, 448 (1999) (allegation that plaintiff "made a practice of ordering tests that were unnecessary or excessive" deemed "statement[] of opinion").

In short, whether the challenged statements are deemed facts or subjective assessments, Dr. Amin cannot, as a matter of law, meet his burden of proving falsity by clear and convincing evidence.  Summary judgment should be granted in NBCU's favor.

## II.    Twenty-Two Statements Taken from the Whistleblower Complaint Are Shielded By Georgia's Fair Report Privilege

As NBCU's Motion established, because twenty-two challenged statements quote from or closely paraphrase the Whistleblower Complaint, which spurred immediate government investigations, they are shielded by Georgia's fair report privilege.  Dr. Amin makes two arguments in opposition, neither of which has merit.[5]

*First*, Dr. Amin claims that the News Reports were not reporting on a "proceeding" under O.C.G.A. 51-5-7(5)-(6) and, even if they were, it was not a "legislative, judicial, or quasi-judicial proceeding to punish or enforce rules or law."  *See* Opp. at 18-19.  But the Whistleblower Complaint was the catalyst to government investigations that were underway at the time of the News Reports, including an ICE investigation ongoing as of September 15, 2020.  *See* SOMF ¶ 107.  Courts in Georgia and across the country have recognized that reports on allegations leading

---

[5] Dr. Amin also argues that the fair report privilege is vitiated by actual malice.  Opp. at 16-18.  In its Motion, NBCU noted that this appears unresolved in Georgia.  In *Ltc. Lawton v. Ga. Television Co.*, 1994 WL 538892, at *7 (Ga. Super. Ct. May 5, 1994)—a case decided after *Morton v. Stewart*, 153 Ga. App. 636 (1980)—the Superior Court concluded, it appears "that the fair report privilege is accorded different treatment by the case law than the other conditional privileges."  It explained that conditioning this privilege on actual malice would have a "chilling impact on media dissemination of sensitive matters of legitimate public interest." 1994 WL 538892, at *7-8.  On appeal, the Court of Appeals did not address this, merely noting, "[t]here is no allegation of actual malice in this matter."  216 Ga. App. 768, 771 (1995).  In *Bakhtiarnejad v. Cox Enterprises*, 247 Ga. App. 205, 207 (2000), the Court of Appeals explained that the trial court "rejected [plaintiff's] assertion that applicability of the fair report privilege was conditioned upon the absence of actual malice," and did not contradict this conclusion.  Regardless, there is no evidence that NBCU acted with actual malice when discussing the Whistleblower Complaint.  *See* Section III, *infra*.

to a government investigation are privileged.  *See Morton*, 153 Ga. App. at 639 (reporting on letters submitted to Georgia Board of Medical Examiners, which resulted in investigation into plaintiff, was privileged); *White v. Fraternal Order of Police*, 909 F.2d 512, 527 (D.C. Cir. 1990) (reporting on letters submitted to police, which sparked investigation, was privileged).  ████████████

████████████████████████████████████████████████████████

████████████████████████████████████████ SOMF ¶ 110, ███████████

████████████████████████████████████████████████████████

█████████████████ *Id.* ¶ 111.  █████████████████████████████

████████████████████████████████████████ *Id.*

    *Second*, Dr. Amin asserts that the News Reports were not "fair" reports on the Whistleblower Complaint because the Complaint did not name him[6] and focused more on COVID-19 than gynecological care.  *See* Opp. at 20.[7]  But Dr. Amin admits that he was the OB-GYN referenced in the Complaint, and the Court already rejected this argument.  *See* SCSOMF ¶¶ 19, 232; Order at 30.  Nor does Dr. Amin cite any support for his assertion that the fair report privilege requires reporting on all aspects of a complaint.  This is not the law, *see Lawton*, 216 Ga. App. at 769-72 (news report was "fair and honest" even though it omitted some material present in investigatory findings), nor would this make sense.  As Rachel Maddow testified:

> It's a very common thing in the news business where some larger document . . . whether it's tens or hundreds or thousands of pages, has one nugget in it that is a thing that has national news value . . . And so, you know, that's part of what we do is we comb through stuff to find the thing that is an exclamation point.

---

[6] In his response to NBCU's SOMF, Dr. Amin also contends that "[o]nly minor internet outlets called Prism and the Intercept—and of course NBCUniversal—used Dr. Amin's name or image."  SCSOMF ¶ 37.  This is blatantly contradicted by the record.  *See* SOMF ¶¶ 287, 289-93.

[7] Dr. Amin again argues that the Whistleblower Complaint was just a letter to the media rather than a complaint.  Opp. at 19-20.  This is false.  *See* Mot. at 3-5, 13-14; NBCU Opp. at 3, n.3; Response to Pl. SOMF ¶ 35.  He also falsely characterizes Dawn Wooten's entirely distinct whistleblower retaliation complaint, submitted through the Government Accountability Project, as the only "complaint," when the Whistleblower Complaint was docketed separately by DHS and is *still* under review.  *See* SOMF ¶ 113; McNamara Opp. Decl. Ex. 1.

*See* Reply Declaration of Elizabeth McNamara in Support of Defendants' Motion for Summary Judgment ("McNamara Reply Decl.") Ex. 1 at 90:5-21; Maddow Decl. ¶ 47.

The fair report privilege exists because "the public interest in being informed about . . . public controversies . . . demands freedom of the press to report such events without assuming responsibility for what was said by the speaker." *McCracken v. Gainesville Tribune*, 146 Ga. App. 274, 275 (1978). Dr. Amin's view would bar the media from reporting on unproven allegations that the government is investigating and politicians are publicly discussing. The Court should not accept this absurd result, and the twenty-two challenged statements quoting or closely paraphrasing the Whistleblower Complaint should be dismissed.

### III.   Dr. Amin Cannot Meet His Burden to Prove that Each News Report Was Published with Actual Malice

Summary judgment should independently be granted since Dr. Amin has not raised a triable issue that the News Reports were published with actual malice. Eleventh Circuit courts routinely dismiss defamation actions on summary judgment for failure to establish actual malice. *See, e.g.*, *Grayson v. No Labels, Inc.*, 2022 WL 1701853, at *6 (M.D. Fla. May 20, 2022), *aff'd*, 2022 WL 12144181, at *2 (11th Cir. Oct. 21, 2022); *Berisha v. Lawson*, 378 F. Supp. 3d 1145, 1160-64 (S.D. Fla. 2018), *aff'd*, 973 F.3d 1304, 1312-13 (11th Cir. 2020).[8] These frequent dismissals reflect that actual malice is a "daunting" standard. *Klayman v. City Pages*, 2015 WL 1546173, at *13 (M.D. Fla. 2015), *aff'd*, 650 F. App'x. 744 (11th Cir. 2016). As the Georgia

---

[8] *Lovingood v. Discovery Commc'ns, Inc.*, 800 F. App'x 840, 849-51 (11th Cir. 2020); *Tobinick v. Novella*, 848 F.3d 935, 945-47 (11th Cir. 2017); *Depalma v. Kerns*, 2023 WL 6164312, at *15-16 (M.D. Ga. Sept. 21, 2023); *Krass v. Obstacle Racing Media, LLC*, 667 F. Supp. 3d 1177, 1210-11 (N.D. Ga. 2023). Dr. Amin cites to *Hammer v. Slater*, 20 F.3d 1137 (11th Cir. 1994), arguing that actual malice is a jury question. *See* Opp. at 4. But *Hammer* involved a draft complaint filled with purportedly false assertions, not a media defendant publishing an article about a topic that had already garnered international attention. Indeed, *Hammer* expressly limited its holding on actual malice to the unique facts of that case. *Id.* at 1143, n.10 ("We are, of course, aware of the many cases where courts have decided issues of privilege and malice as a matter of law.") Given this holding, it is unsurprising that over the next thirty years, the Eleventh Circuit has affirmed summary judgment on actual malice grounds time and again.

Supreme Court has explained, but Dr. Amin ignores, plaintiffs must "prove actual malice not merely by a preponderance of the evidence but by clear and convincing evidence, which is an extremely high standard of proof." *Am. Civil Liberties Union. v. Zeh*, 312 Ga. 647, 669 (2021); *see also Boatright v. CSX Transport, Inc.*, 2023 WL 4548280, at *7 (S.D. Ga. July 14, 2023) (Wood, J.) ("Clear and convincing evidence is a conclusive determination, i.e. that the thing to be proved is highly probable or reasonably certain."). And, as this Court recognized, "[t]he test is not an objective one;" "the beliefs or actions of a reasonable person are irrelevant." Order at 28.

The first step in assessing actual malice is identifying the gist of the challenged statements since the pertinent question is whether the defendant "broadcast *that meaning* with actual malice." *Levan v. Capital Cities/ABC, Inc.*, 190 F.3d 1230, 1240 n.28 (11th Cir. 1999); *Lovingood*, 800 F. App'x at 848. Once the gist is established, as Dr. Amin acknowledges, "the state of mind required for actual malice" must "be brought home to the person in the organization having responsibility for the publication." Opp. at 20 (quoting *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 287 (1964)).

Dr. Amin does not come close to meeting his burden. His first error is treating "NBCU" as a monolith, discussing what sources "told NBCU," Opp. at 1, 25, 26, arguing about what "NBCU knew," Opp. at 26, and referring to "NBCU decisionmakers," Opp. at 5, 21, 26-27, 32, 35, without proffering evidence that these "decisionmakers" had responsibility for the editorial content of the News Reports or even claiming that they did. Compounding this error, Dr. Amin wrenches individual communications from their context, ignores the reporting chronology, and misrepresents the contents of documents he cites. His aim is clear: to conflate or confuse the issues so that the Court will find a factual issue. But, as Dr. Amin recognizes, the Court "must consider the factual record in full," Opp. at 21 (quoting *Harte-Hanks Commc'ns v. Connaughton*, 491 U.S. 657, 668 (1989)), rather than relying on Dr. Amin's tortured construction of it, *see Wilson v. HH*

*Savannah, LLC*, 2022 WL 4473619, at *2 (S.D. Ga. Sept. 26, 2022) (The Court must "make an independent review of the record before deciding a motion for summary judgment."); *First-Citizens Bank & Tr. Co. v. Whitaker*, 2018 WL 6362630, at *2 (N.D. Ga. Sept. 4, 2018) (reviewing actual language of documents rather than relying on "party's characterization of the documents"); *cf. Griffin Indus. v. Irvin*, 496 F.3d 1189, 1206 (11th Cir. 2007) (on motion to dismiss, "when the exhibits contradict the general and conclusory allegations of the pleading, the exhibits govern").

Here, reviewing the evidentiary record and considering each News Report "separately," as this Court recognized it must, *see* Order at 51 n.19, Dr. Amin cannot meet his "extremely high" burden of proving actual malice with clear and convincing evidence.

### A. Dr. Amin Cannot Establish That Any of the News Reports Was Published with Actual Malice

Dr. Amin does not challenge the core facts that informed the relevant NBCU journalists' belief in the accuracy of their reporting.[9]  In particular, Dr. Amin does not seriously dispute that: (1) Media outlets across the ideological spectrum reported on, and politicians issued public statements concerning, the Whistleblower Complaint prior to or at the same time as the News Reports—facts which NBCU's reporters were aware of and which informed their decision to similarly report on the Whistleblower Complaint, *see* SCSOMF ¶¶ 25-29, 34-38, 117-23, 200, 283-87; (2) Soboroff interviewed Wooten on the morning of September 15 and she confirmed allegations from the Whistleblower Complaint, including that women referred to Dr. Amin as the "uterus collector," *see id.* ¶¶ 68, 154; (3) The NBC News Article, based on the reporting of Ainsley

---

[9] While Dr. Amin purports to "controvert" many of the facts in NBCU's SOMF, most of his denials are invalid.  *See Wilson*, 2022 WL 4473619, at *2 (objections are not valid when they do not "directly refute" the material fact, including by failing to cite to the record).  As just a few examples, Dr. Amin: (1) does not cite to record evidence that contradicts the material facts, *see, e.g.*, ¶¶ 71, 72, 74, 83, 124, 155, 207, 210, 215, 217, 249; (2) does not actually deny the material facts and, instead, attempts to controvert them with irrelevant information or pure speculation, *see, e.g.*, ¶¶ 77, 86, 88, 89, 102, 113, 201, 203, 210, 218, 248, 253, 267; (3) points to technicalities that do not change the material facts, *see, e.g.*, ¶¶ 98-99; and (4) makes legal arguments in response to facts, *see, e.g.*, ¶ 209.

and Soboroff and a prior report by the Associated Press, was published before the News Reports. The Article referenced Ainsley's and Soboroff's communications with four lawyers who represented ICDC detainees and were concerned about Dr. Amin's medical care.  Each News Report relied on the Article, *see id.* ¶¶ 56, 102, 164, 200; (4) After the NBC News Article was published, NBCU News Group's Standards Department signaled to NBCU journalists that the Article was reportable by providing guidance about how to report on the Article, *see id.* ¶ 102; (5) NBCU reporters contacted Dr. Amin, ICE, and LaSalle for comment and included their comments once they were available, *see id.* ¶ 84-85, 156, 190-91, 232-34, 239; and (6) NBCU journalists were aware that Dr. Amin was sued by the DOJ for fraud based on allegations that he ordered unnecessary procedures, and this lawsuit resulted in a $520,000 settlement, *see id.* ¶¶ 78-82, providing further credibility to the Whistleblower Complaint's allegations.

As set forth below, Dr. Amin's circumstantial evidence of purported actual malice falls far short of proving, by clear and convincing evidence, that any of the relevant NBCU journalists harbored serious doubts about the News Reports.  When considered together with these foundational facts, which provided ample reason for NBCU's journalists to have full confidence in the News Reports' accuracy, dismissal is required.  *See*, *e.g.*, *Berisha*, 973 F.3d at 1313 (defendant's reliance on "prior published reports" and interviews with "several additional sources who corroborated the claims" mandated dismissal on actual malice grounds even when plaintiff attempted to "nitpick" defendant's reporting because "this wealth of evidence considered altogether does not permit a reasonable juror to find clear and convincing proof that [defendant] had serious doubts about his depiction of [plaintiff]").[10]

---

[10] Dr. Amin's reliance on *Hunt v. Liberty Lobby*, 720 F.2d 633 (11th Cir. 1983) is not to the contrary.  *See* Opp. at 4, 21, 26, 31, 35. There, actual malice was found when a magazine's chairman testified he "absolutely" questioned the article's accuracy, little investigation was done despite the story not being "hot news," and the claims (*i.e.* the CIA was setting plaintiff up to be responsible for JFK's assassination) were inherently improbable.  *Hunt*, 720 F.3d at 645.

### 1. The *Deadline* News Report Was Not Published with Actual Malice

The *Deadline* News Report was published with no serious doubts about its truth.  *See* Mot. at 29-30.  In the News Report, Nicolle Wallace directly quoted from the Whistleblower Complaint, repeatedly making clear that these were "allegations."  *Id.*  She played a clip of Soboroff's interview with Wooten where Wooten repeated her claim that detainees referred to Dr. Amin as a "uterus collector."  *Id.*  And she interviewed Ainsley about the NBC News Article, which corroborated the allegations in the Complaint.  *Id.*  Ainsley read the one statement ICE had released and noted that Dr. Amin's office hung up on her when she called for comment.  *Id.*

Dr. Amin argues that Wallace subjectively doubted the challenged statements because, at 10:30 am—*seven hours* before the News Report—her producer sent a message to Soboroff explaining that the show was considering reporting on the Whistleblower Complaint and Wallace was "into it but doesn't know what to make of it."  Opp. at 24 (referencing Wallace Decl. Ex. 3). Yet facts and events "d[o] not occur in a vacuum but as part of a series of ongoing events." *Dunn v. Airline Pilots Ass'n*, 193 F.3d 1185, 1200 (11th Cir. 1999).  After that message, the *Deadline* producers learned that Soboroff had interviewed Wooten and watched the interview, reviewed a statement from Nancy Pelosi concerning the Whistleblower Complaint, read the NBC News Article, which provided corroboration for the claims in the Whistleblower Complaint (including evidence of two potentially unnecessary hysterectomies and Dr. Amin's DOJ settlement), and discussed the proposed segment with the Standards Group.  *See* SOMF ¶¶ 164-73; Wallace Decl. ¶¶ 8-15.[11]  By the time the News Report was published, as Wallace attested, she did "not have any

---

[11] Dr. Amin argues that the Court should not credit the Wallace Declaration.  But Dr. Amin did not depose Wallace or anyone else responsible for producing *Deadline*.  He thus has no evidence to rebut the Declaration (or its attached evidence) other than his rank speculation.  *See Exam. Mgm't Servs. v. Steed*, 340 Ga. App. 51, 54 (2016) (reversing denial of summary judgment and holding, "when an inference is founded on speculation, it is without evidentiary value"); *Rockland Vending Corp. v. Creen*, 2009 WL 2407658, at *16 (S.D.N.Y. Aug. 4, 2009) (when plaintiff did not depose witness, there was no admissible evidence to dispute witness's sworn statement).

doubts about the truth of what [*Deadline*] reported."  SOMF ¶ 173; Wallace Decl. ¶ 37.[12]

Dr. Amin next faults *Deadline* for playing only part of Wooten's interview.  Opp. at 28, 33 (citing *Merco Joint Venture v. Kauman*, 923 F. Supp. 924 (W.D. Tex. 1996)).  In *Merco*, a source's quote was edited to make it appear as though she said the opposite of her actual statement.  By contrast, Dr. Amin argues that *Deadline* should have played different parts of Wooten's interview that he believes undermine her credibility.  Opp. at 28, 33.  But "a plaintiff is not entitled to having Defendants credit his preferred sources of information or structure its articles in the manner that he desires." *Jacoby v. Cable News Network, Inc.*, 2021 WL 5858569, at *5 (11th Cir. Dec. 10, 2021); *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 258 (1974) (The First Amendment will not allow civil liability arising from the "exercise of editorial control and judgment.").

This argument also mischaracterizes the *Deadline* News Report.  It *did* include information showing the limits of Wooten's knowledge.   Dr. Amin suggests that *Deadline* should have included Wooten's statement that she was "unaware of what takes place" at Dr. Amin's office, Opp. at 28, but ignores that *Deadline* included Wooten's statement that she "didn't accompany [detainees] on the procedures," providing viewers with the same information,[13] *see* Wallace Decl. Ex. 8 at NBCU004169.  Similarly, Ainsley underscored the pushback against Wooten when she read ICE's statement and said, "they are clearly questioning Dawn Wooten."  SOMF ¶ 156-57; *see*

---

[12] Dr. Amin cites *Braig v. Field Communications*, 310 Pa. Super. 569 (1983), but its facts are inapposite. There, a news program re-aired a report accusing a judge of "blowing" a case after the station manager re-watched the report numerous times following the judge's objection to the reporting. *Id.* at 573-74.  Here, by contrast, Dr. Amin did not alert NBCU to his concerns with its reporting until nearly a year later, and there is no evidence anyone involved with the News Reports engaged in conduct indicative of serious doubts at any time.

[13] Dr. Amin claims that NBCU failed to include Wooten's statement that she was "not exactly sure" whether the hysterectomies Dr. Amin performed were "forced or involuntary," Opp. at 28, but ignores that in the very next sentence, Wooten said detainees "didn't know why" they had hysterectomies, Maddow Decl. Ex. 3 at NBCU000414, which is precisely what she alleged in the Whistleblower Complaint, *see* SOMF ¶ 16. In fact, none of the challenged statements used the words "forced" or "involuntary"  but, instead, explained that, according to Wooten, women did not understand what was happening to them. *See* SOMF ¶¶ 142-62, 176-98, 219-45, 273-82.

*also Levan*, 190 F.3d at 1243 (defendant adequately informed viewers about source's credibility issues and "was not required . . . to make this point as strongly as [plaintiff] would have").[14]

Dr. Amin's argument that Ainsley had "doubts" about her reporting on *Deadline* is also unavailing.  Opp. at 32-33.  *First*, under *Sullivan*, Ainsley was not "responsible" for the entire *Deadline* News Report.  As Ainsley testified, she works as a reporter for NBC News, and while she may appear as a guest on MSNBC shows, she has no editorial control over them.  *See* McNamara Reply Decl. Ex. 6 at 14:10-14; Ainsley Decl. ¶ 22; SOMF ¶ 163; *see also Speer v. Ottoway Newspapers, Inc.*, 828 F.2d 475, 477-78 (8th Cir. 1987) (state of mind of journalist who worked at news organization and was source for article could not be imputed on colleagues who were responsible for article).  Thus, at most, Ainsley's state of mind is relevant to the three challenged statements *she* made on *Deadline*, *see* Statements 4, 6, 10, all of which were based on her conversations with lawyers for detainees and were also included, in sum and substance, in the NBC News Article.

*Second*, Dr. Amin argues that Ainsley doubted the Whistleblower Complaint because ICE told her that it "had data that would 'negate' the claims of the letter."  Opp. at 33.  The evidence does not support this contention.  Rather, in an off-the-record (*i.e.*, not publishable) conversation, an ICE spokesperson merely told Ainsley they were "working on getting [] data," "[t]hey *believe* that data will negate [the whistleblower's] claims," and they did not have an "ETA" for this purported data.  Ainsley Decl. Ex. 3 (emphasis added).  Ainsley, who has long reported on ICE, testified that she viewed this comment with skepticism and it could "take days" for ICE to provide this data, if it ever did.  Ainsley Decl. ¶ 9; McNamara Reply Decl. Ex. 6 at 130:22-132:1; *see also*

---

[14] Dr. Amin also claims that Ainsley "denigrated" the ICE statement by noting it did not address NBC News's new reporting.  This is not a "denigration;" it is a fact that ICE did not respond to Ainsley's requests for additional comment.

Scholl Decl. ¶ 12; McNamara Reply Decl. Ex. 2 at 67:19-68:20 (opining it was not important to wait for further information from ICE before publishing NBC News Article because, "people tell us they're going to give information all the time," and "all we really had here was somebody telling Julia, [w]ell we might have more for you"). Thus, ICE's off-the-record comment provides no support for a conclusion that Ainsley subjectively doubted the veracity of her reporting.

Dr. Amin next claims that Ainsley doubted her reporting on *Deadline* because one of the attorneys (Ben Osorio) told her that "only one of his clients had records indicating that she had a hysterectomy." Opp. at 26, 33. But in her statement on *Deadline*, Ainsley only referenced *one* client's medical records. *See* Statement No. 6. And contemporaneous emails from September 15, 2020 show that Osorio was unequivocally sharing that he had "two clients that had hysterectomies while detained at Irwin," SOMF ¶ 77 (McNamara Decl. Ex. 36); *id.* (McNamara Decl. Ex. 35) (reporting that, according to Osorio, two of his clients had hysterectomies after being told they had cancer). Even if Osorio's testimony did contradict Ainsley's reporting on *Deadline*— and it did not—this is insufficient to establish actual malice. *See Savannah News-Press v. Whetsell*, 149 Ga. App. 233, 236-37 (1979) ("Direct conflict between the testimonies" of reporter who said she relied on source, and source, who said he did not provide the challenged information to reporter "falls short of establishing clear and convincing proof of actual malice.").[15]

*Third*, Dr. Amin points to messages between Ainsley and Soboroff from the night of September 15, after Ainsley appeared on *Deadline*, as evidence that she had "serious doubts" about her statements. Opp. at 22. All these messages show is that Ainsley—no different than every journalist reporting on this breaking news—wanted to know how the story would continue to

---

[15] Dr. Amin relies on an out-of-jurisdiction case, *Herron v. KING Broad. Co.*, 776 P.2d 98 (Wash. 1989). There, a purported source for the challenged statement testified that he was "certain" he did provide the challenged information to the journalist (vastly different from Osorio's testimony here). Further, unlike here, documents the journalist reviewed directly contradicted the challenged statement, meaning the journalist had reason to know of its falsity.

develop and what new facts would be uncovered.  That is a far cry from knowledge of falsity.
Indeed, "[t]here is a critical difference between not knowing whether something is true and being
highly aware that it is probably false."  *Chandok v. Klessig*, 632 F.3d 803, 815 (2d Cir. 2011).
Consider, for example, *Hatfill v. New York Times Co.*, 488 F. Supp. 2d 522, 531 (E.D. Va. 2007),
*aff'd*, 532 F.3d 312 (4th Cir. 2008).  There, the plaintiff claimed that the defendant's article implied
that he was involved with the anthrax mailings.  The court granted summary judgment based on a
lack of actual malice, explaining, "[a]t best, the evidence reveals that, when [the defendant]
published his columns, he did not know whether or not Plaintiff was the anthrax mailer. . . . Even
if [the defendant] was not certain as to the truth of the alleged implication of guilt, this would not
be sufficient to support the finding that he was highly aware of its probable falsity."  *Id.*[16]

Here too, Ainsley's desire to "know the truth" after ICE's second statement does not show
she had a "high awareness" of probable falsity at the time of the *Deadline* News Report.  To the
contrary, Ainsley testified she was confident in her reporting, noting her sources identified "[t]wo
hysterectomies in a span of four hours, and nothing that conflicted with what Dawn Wooten was
saying."  McNamara Reply Decl. Ex. 6 at 133:2-5.  Indeed, in a message that the Opposition omits,
Ainsley writes that her conversations with lawyers "changed things" for her, *see* Ainsley Decl. Ex.
1, because they corroborated that Dr. Amin was mistreating detainees.  And, before appearing on
*Deadline*, Ainsley learned that Dr. Amin had settled with the DOJ over allegations that he was

---

[16] Dr. Amin ignores that Ainsley's message was plainly triggered by ICE's second statement, referencing, incorrectly,
two "referrals" for hysterectomies. SOMF ¶ 291 (in fact, there were five referrals for hysterectomies).  But this
statement was not provided to NBCU until *after* the *Deadline* News Report.  SOMF ¶¶ 104, 216; Ainsley Decl. ¶ 29;
Ainsley Decl. Ex. 1 at NBCU003154; Scholl Decl. Ex. 13 at NBCU002996.  Actual malice focuses on the state of
mind "at the time of publication." *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 512 (1984); *Silvester
v. Am. Broad. Cos.*, 650 F. Supp. 766, 779 (S.D. Fla. 1986) ("The statement of an ABC employee that the legal
department thought after the broadcast that it might contain libelous material does not, without more, prove that
defendants had such thoughts at the time the segment was aired, which is the critical time for purposes of establishing
actual malice."), *aff'd*, 839 F.2d 1491 (11th Cir. 1986).  As he did with NBCU's Rule 12(c) Motion, Dr. Amin tries to
inject ICE's second statement into an analysis of *Deadline* when it has no conceivable relevance.

billing the government for unnecessary procedures, bolstering the notion he was doing the same thing again. *See* Ainsley Decl. ¶ 18. In short, Dr. Amin proffers no evidence that Ainsley doubted any of her statements on *Deadline*, let alone "knew" or was "highly aware" they were false.[17]

For these reasons, Dr. Amin cannot establish by clear and convincing evidence that the *Deadline* News Report was published with actual malice.

### 2. The *TRMS* News Report Was Not Published with Actual Malice

Dr. Amin similarly fails to raise a triable issue of fact that the *TRMS* News Report was published with actual malice. This News Report began with Maddow contextualizing the Whistleblower Complaint by explaining other recent ICE scandals involving the treatment of female detainees. *See* Mot. at 12. Maddow then read the Complaint's allegations and interviewed Soboroff about his corroborative reporting. *Id.* at 12, 30. Maddow and Soboroff read on air the statements from ICE, LaSalle, and Dr. Amin, providing each of their perspectives. *Id.*

Despite Maddow testifying that she found the Whistleblower Complaint's allegations credible and believed in the veracity of her reporting, *see* Maddow Decl. ¶ 43, McNamara Reply Decl. Ex. 1 at 185:3-11, Dr. Amin claims she had serious doubts about the *TRMS* News Report because, during a meeting much earlier that day, she noted that there was a "lot of jumping to conclusions around the complaint," Opp. at 34. Just as he does with *Deadline*, Dr. Amin wrenches this statement from its context and ignores subsequent developments. After Maddow made this remark, she said "I don't want to assume it's true but if it is we should definitely do it." Maddow Decl. Ex. 1 at NBCU001937-38. Her producer then said that he had contacted Soboroff about the

---

[17] Dr. Amin also argues that a jury should assess Ainsley's credibility because she testified that she "basically closed up shop" after *All In* began reporting on the Whistleblower Complaint, but days later she proposed a "new angle" on the story, which she did not pursue. Opp. at 25. This is not an inconsistency. Even if it was, it does not support actual malice. *See Tobinick*, 848 F.3d at 946-47 ("[I]nconsistencies in [the defendant's] deposition testimony are insufficient to demonstrate actual malice" because they concern communications "after the [] article had been published.").

Complaint, Soboroff "said yes its legit," and he would be publishing an article on it.  *Id.*  Because Soboroff is a top immigration reporter, his confirmation that the Whistleblower Complaint was "legit" gave Maddow confidence that she should report on it, a sentiment that was bolstered after she read the NBC News Article, which contained corroboration of the allegations.  *See* Maddow Decl. ¶ 10; McNamara Reply Decl. Ex. 1 at 70:2-74:9; Ex. 5 at 70:3-17.

Dr. Amin next argues that the *TRMS* News Report was not "neutral" and tied the claims about him to the Trump administration based on a political agenda and for financial gain.  *See* Opp. at 30, 34.  First, as Maddow testified, the goal of her show is to contextualize the day's news for her audience, and discussing Trump administration scandals involving improper ICE oversight before reporting on the Whistleblower Complaint did just that.  *See* McNamara Reply Decl. Ex. 1 at 101:12-102:22.  And, far from showing actual malice, the record reflects that Maddow believed that if the government could separate families and track detainees' periods to prevent them from obtaining abortions, she did not doubt that an ICE-contracted doctor could perform unnecessary or unconsented-to procedures on detainees under ICE's watch.[18]  *See* Maddow Decl. ¶ 18.

Even if this contextualization was indicative of bias—which it was not—as this Court held, "bias or political animus on its own cannot provide a sufficient basis for finding actual malice."  Order at 46; *see also Tavoulareas v. Piro*, 817 F.2d 762, 795 (D.C. Cir. 1987) (a publisher's "adversarial stance" may be "fully consistent with professional investigative reporting" and is not necessarily "indicative of actual malice").  Recognizing as much, Dr. Amin also attempts to attribute a financial motive to *TRMS*, claiming that the show was looking to bolster its ratings.

---

[18] Dr. Amin also cites to a September 18, 2020 email from Maddow, "We should not be engaging with the Obama administration's ICE policies."  Opp. at 31.  But this statement related to a potential photograph correction that had nothing to do with the allegations against Dr. Amin. As Maddow testified, she believed that it was "overkill" to "engage with the policies of an administration in order to explain why a wrong time stamp photo [was] projected." McNamara Reply Decl. Ex. 1 at 217:3-15.

Opp. at 31.  But profit motives are insufficient to "strip communications of the otherwise available constitutional protection."  *Harte-Hanks*, 491 U.S. at 667.  Further, Maddow (and every other witness) explained that they do not choose stories based on ratings, Maddow Decl. ¶ 48; Wallace Decl. ¶ 38; Hayes Decl. ¶ 49, and Dr. Amin has come forth with no evidence to the contrary.  Dr. Amin's unsupported generalization that "[i]t is well known that Rachel Maddow's ratings benefited from the extensive reporting about President Trump," Opp. at 31, does nothing to prove that the News Report at issue was published with actual malice.

Last, Dr. Amin alleges that Soboroff had doubts because one source, Sarah Owings, told him that she was not yet seeing "large numbers" of hysterectomies.  Opp. at 26.  But as with Ainsley on *Deadline*, Soboroff is not part of the *TRMS* editorial team and, at most, can be "responsible" for statements he made as a guest on the show, which Dr. Amin appears to have dismissed from this case.  *See* Pl. SOMF ¶ 69.  Even if not dismissed, Dr. Amin's argument is not supported by the evidence.  Owings testified that she was speaking with Soboroff early in her investigation, she knew that other attorneys had clients who had received or been scheduled for hysterectomies, she told Soboroff she had already seen "evidence that something was deeply wrong in how these women were being treated," *see* McNamara Opp. Decl. Ex. 21 at 48:2-17; 140:12-141:4, and women "didn't seem to know what [Dr. Amin] was performing on them," McNamara Reply Decl. Ex. 4 at 70:9-15.  Far from showing knowledge of falsity, this testimony corroborates the *TRMS* News Report and Soboroff's reporting.  Further, the record reflects that Owings's statement did not cause Soboroff to doubt the allegation that Dr. Amin performed many hysterectomies; after ICE stated that two women were "referred" for hysterectomies, Soboroff said it was "likely" that more women were referred for other procedures yet received hysterectomies, and "lots of lawyers" were saying this.  *See* Ainsley Decl. Ex. 1 at NBCU003159.

In sum, Dr. Amin has failed to come forward with any evidence that the individuals responsible for the *TRMS* News Report had serious doubts concerning its accuracy.

### 3. The *All In* News Reports Were Not Published with Actual Malice

Last, Dr. Amin cannot raise a triable issue of fact that the *All In* News Reports were published with actual malice. *All In* relied on the published NBC News Article and other published articles, the *All In* producers' communications with attorneys for ICDC detainees, detainee medical records, Hayes's interview with a detainee who received a hysterectomy from Dr. Amin, and Dr. Amin's DOJ settlement, all of which bolstered the allegations in the Whistleblower Complaint. Mot. at 10-11, 31-32.[19] As the Court previously held, "conducting further investigation," as *All In* did here, "is antithetical to purposefully avoiding further investigation with the intent to avoid the truth." Order at 32. Dr. Amin strains to avoid this conclusion by misrepresenting the record.

*First*, Dr. Amin argues that Hayes expressed "serious doubts" about the Whistleblower Complaint during a September 16 call with Standards. Opp. at 23, 33. Here too, Dr. Amin omits crucial context. The comment on which Dr. Amin focuses was made in the context of Hayes explaining why, when he first saw claims about the Whistleblower Complaint on social media, he "discounted the whole thing." Price Decl. Ex. 15 at NBCU002347. He goes on to explain that he spoke with "sources that [he's] known for a while . . . and trust[s]," and that while there was initially "some skepticism among folks in the immigrant rights community as well," there is "less skepticism the more people they talk to." *Id.* at NBCU002348. Far from showing that Hayes doubted his reporting, it instead reflects that *All In* was investigating a claim, finding it credible, and then reporting on it—this is good journalism, not knowledge of falsity.

---

[19] Different from *Deadline* and *TRMS*, Soboroff and Ainsley were not guests on the *All In* News Reports and their knowledge is therefore irrelevant to analyzing actual malice for *All In*. *All In* relied on the published NBC News Article, which negates a finding of actual malice. *See Stange v. Cox Enterprises, Inc.*, 211 Ga. App. 731, 733 (1994) (no actual malice based on editorial's reliance on journalist's investigation); *see also* p.12, *supra* (citing *Berisha*).

*Second*, Dr. Amin makes numerous misrepresentations about Andrew Free, one of *All In*'s sources. Most notably, he claims that Free doubted the allegations and did not believe *All In* should report on them until he saw "some fucking documents." Opp. at 26, 34. This is not what Free said. When asked whether he was aware of "this kind of thing" happening at ICE facilities *other than* ICDC, Free responded, "I'm aware of it happening at some other facilities, but I don't have solid enough – like I want to look at – when I hear forced sterilization, I want to see some fucking documents." Price Decl. Ex. 3 at NBCU001826. In contrast, when discussing *ICDC*, Free explained, "everything I'm saying is based on either an immigration lawyer telling me that their client had this happening and they've seen the documents, or I've seen the documents myself . . . or I've talked to the person. That's how I'm sourcing this . . . I'm not talking about, just like here are the anecdotes . . . of what's happening." *Id.* at NBCU001826-87. Free shared some of these documents with Hayes's producer, including medical records showing Dr. Amin performed a hysterectomy on Free's client, Price Decl. Ex. 6, and a psychiatric record from a detainee who was "bothered by the fact that she went into surgery expecting a D&C and ended up having a salpingectomy," *id.* Ex. 10. Thus, the evidence directly contradicts Dr. Amin's contentions.

Dr. Amin next falsely contends that Hayes's producer said "sounds great to Mr. Free's suggestion that he dictate the content of the show's coverage." Opp. at 34. In actuality, the producer said "sounds great" when Free proposed the structure of their call—*i.e.*, he would first "do a full brain dump" about the Whistleblower Complaint and they could then discuss "sourcing" for *All In*. Price Decl. Ex. 3 at NBCU001809-10.[20] A statement about how information would be

---

[20] Dr. Amin also argues that Hayes's producer "asked a source whether the information he had already provided was on background, which Mr. Scholl testified was against policy." Opp. at 29. In fact, the producer was merely "confirm[ing]" his understanding that the interview was on background. *See* McNamara Reply Decl. Ex. 3 at 221:21-223:12. Regardless, "deviations from [] normal operating procedures" are "not suggestive of actual malice." *Jankovic v. Int'l Crisis Grp.*, 822 F.3d 576, 595 (D.C. Cir. 2016).

shared does not demonstrate "serious doubts" about a report's veracity.  Dr. Amin's argument that Free (a longtime reliable source for Hayes) is "obviously biased," Opp. at 33, is also unavailing. Even if true, relying on a biased source is insufficient to establish actual malice.  *See Berisha*, 973 F.3d at 1313 (rejecting attempt to prove actual malice based on biased sources because "it was not defendant's (perhaps impossible) duty to find only pure, unimpeachable sources of information").

*Third*, Dr. Amin claims that another source, Ben Osorio, "warn[ed] Mr. Hayes's producer . . . that confirmation was necessary."  Opp. at 33. But Osorio actually stated that he was still waiting on records for his client, "B," from *after* her release from ICDC, and, accordingly, was "a little nervous" about making representations about her *subsequent* treatment.  But, he had no doubt "B" received a hysterectomy from Dr. Amin and provided records proving so (which *All In* discussed with an OB-GYN).  SOMF ¶ 261.  Dr. Amin also fails to mention that this call occurred on September 16, *id.* ¶ 258, and is thus irrelevant to the 9/15 *All In* News Report.  The only remaining challenged statement from the 9/17 *All In* News Report (Statement No. 48), has nothing to with "B's" treatment after her release and is entirely consistent with her interview with Hayes.[21]

Because there is no evidence that Hayes or his producers seriously doubted the veracity of the News Reports, Dr. Amin's claims stemming from the *All In* News Reports should be dismissed.

### B.  Dr. Amin's Remaining Arguments Fail to Establish Actual Malice

In a last-ditch effort to salvage his claim, Dr. Amin proffers four additional arguments, untethered to the News Reports or the evidentiary record in this case.  These strained assertions do not support his claim that the News Reports were published with actual malice.

*First*, Dr. Amin argues that Scholl "expressed numerous 'concerns' with the Statements."

---

[21] Dr. Amin claims that a "booking agent" for *All In* referred to Wooten as "courageous" and offered to allow an attorney to edit responses that were unacceptable to him or provide advanced notice of questions.  Opp. at 29.  But, aside from the fact this does not show that anyone had subjective doubts, this agent has no editorial control over *All In*.  *See* McNamara Reply Decl. Ex. 3 at 289:1-16.  And this interview never happened, so it is irrelevant to this case.

Opp. at 22.  This is not true.  Scholl never expressed a concern with the challenged statements in the News Reports.  In an email hours before the News Reports, Scholl expressed a "concern" with NBC News reporting on Soboroff's interview with Wooten without further corroboration.  *See* Scholl Decl. Ex. 2.  As Scholl testified, this concern was resolved when Soboroff and Ainsley did additional reporting corroborating Wooten's claims.  *See* Scholl Decl. ¶¶ 19, 25.

*Second*, Dr. Amin claims that all of NBCU's sources had "incentives . . . to levy allegations" against ICDC and Dr. Amin.  Opp. at 29.[22]  But this Court already held "the sources' self-interest in levying claims against Dr. Amin does not, without more, present an 'obvious reason' to doubt the veracity of the[] reports."  Order at 44; *see also Berisha*, 973 F.3d at 1313.  And NBCU did extensive reporting corroborating the allegations in the Whistleblower Complaint, which is antithetical to a finding of actual malice.  *See St. Amant v. Thompson*, 390 U.S. 727, 733 (1968) (reliance on single source with clear bias did not permit inference of actual malice where defendant "had verified other aspects" of source's information).

*Third*, despite focusing significantly on HIPAA in his Rule 12(c) briefing, Dr. Amin all but abandons this argument, claiming in passing, "[t]he attorneys of women who were detained did not provide HIPAA waivers to Dr. Amin."  Opp. at 29.  Dr. Amin provides no proof that he requested HIPAA waivers before the News Reports; nor did he inform NBCU that he could not respond due to HIPAA.  *See* SOMF ¶ 265, 279; McNamara Reply Decl. Ex. 8 (Dr. Amin's attorney first mentions HIPAA *after* News Reports).  Further, NBCU journalists did not believe that HIPAA prevented Dr. Amin from responding to reporting on general allegations.  *See* Maddow Decl. ¶ 37.

*Fourth*, Dr. Amin argues that the allegations against him were "inherently improbable."

---

[22] The Court previously held that if the records NBCU reviewed contradicted the detainees' stories, there would be reasons to doubt their allegations.  Order at 45.  Discovery revealed this was not the case.  *See* SOMF ¶ 262.

Opp. at 31-32.  The opposite is true.  News organization across the ideological spectrum were reporting on the allegations, showing they were reportable and newsworthy.  SOMF ¶¶ 25-28, 34-38, 284-95; *Berisha*, 378 F. Supp. 3d at 1161-62 (relying on information in *New York Times* article undermined actual malice because *New York Times* was a "reputable source").  In addition, as this Court previously noted, "[t]he allegations in the [Complaint] were also 'probable' enough to prompt calls for investigation from members of Congress and to trigger federal agency investigations."  Order at 34.  Indeed, Dr. Amin's settlement with the DOJ for ordering unnecessary procedures made the allegations entirely credible.  SOMF ¶¶ 80-82.  And investigations have revealed that Dr. Amin did, in fact, perform "unnecessary" gynecological procedures and over 90% of certain invasive procedures on *all* ICE detainees across the country.  SOMF ¶ 136 (McNamara Decl. Ex. 68 at NBCU002064).  In short, the allegations were not only entirely "probable" at the time of the challenged reporting; they were subsequently validated.

*     *     *

At bottom, even taking Dr. Amin's litany of allegations together, he has not established clear and convincing evidence that the News Reports were published with actual malice.  The record shows that NBCU's reporters believed in the News Reports' veracity, and Dr. Amin has proffered no evidence of serious doubts.  Even in situations where the evidence of actual malice far exceeded what Dr. Amin claims exists here, district courts have not hesitated to grant, and the Eleventh Circuit to affirm, summary judgment.  *See, e.g.*, *Grayson*, 2022 WL 1701853, at *6 (granting summary judgment even when plaintiff alleged, among other things, defendants had animus against him, boasted they could destroy his career, ignored advice from researchers questioning accuracy of source materials, and took materials out of context), *aff'd*, 2022 WL 12144181 (11th Cir. Oct. 21, 2022); *Berisha*, 378 F. Supp. 3d at 1162-64 (granting summary

25

judgment even when plaintiff alleged defendants conspired to fabricate story, failed to properly investigate, relied on biased sources, and distorted evidence), *aff'd*, 973 F.3d 1304 (11th Cir. 2020); *Silvester*, 650 F. Supp. at 778-79 (granting summary judgment even when plaintiff alleged defendants knew their source was unreliable, spun theories out of whole cloth, were biased, removed refutations of challenged claims from interview, made it falsely appear as if plaintiff reused to speak with media, and when legal department refused to distribute segment because "it may contain libelous matter"), *aff'd*, 839 F.2d 1491 (1988). The same result is mandated here.

## CONCLUSION

For the foregoing reasons, and those stated in NBCU's Motion, NBCU respectfully requests that this Court grant summary judgment in its favor and dismiss Dr. Amin's action.

Respectfully submitted,

*s/ Cynthia L. Counts*
Cynthia L. Counts
Georgia Bar No. 190280
FISHERBROYLES, LLP
945 East Paces Ferry Rd. NE, Suite 2000
Atlanta, GA 30326
(404) 550-6233
cynthia.counts@fisherbroyles.com

*s/ Elizabeth A. McNamara*
Elizabeth A. McNamara (*pro hac vice*)
Amanda B. Levine (*pro hac vice*)
Leena Charlton (*pro hac vice*)
DAVIS WRIGHT TREMAINE LLP
1251 Avenue of the Americas, 21st Floor
New York, NY 10020-1104
Tel: (212) 489-8230
lizmcnamara@dwt.com
amandalevine@dwt.com
leenacharlton@dwt.com

*Attorneys for Defendant*

\*       \*       \*

## CERTIFICATE OF SERVICE

The undersigned certifies that on the 21st day of February, 2024, a true and correct copy of the foregoing was served upon all counsel of record via the Court's electronic filing system.

*s/ Elizabeth A. McNamara*
Elizabeth A. McNamara (*pro hac vice*)