McNamara Reply Declaration

In Support of Summary Judgment

Exhibit 1

**DR. MAHENDRA AMIN,M.D. vs NBCUNIVERSAL MEDIA, LLC.**

Confidential                    Rachel Maddow on 05/17/2023

```
 1              UNITED STATES DISTRICT COURT
          FOR THE SOUTHERN DISTRICT OF GEORGIA
 2                   WAYCROSS DIVISION

 3   DR. MAHENDRA AMIN, M.D.

 4                 Plaintiff,    CASE NO.
        v.                       5:21-CV-00056-LGW-BWC
 5
     NBCUNIVERSAL MEDIA, LLC,
 6
                   Defendant.
 7

 8         *** CONFIDENTIAL TRANSCRIPT ***

 9          VIDEO-RECORDED DEPOSITION OF
                   RACHEL MADDOW
10
             Davis Wright Tremaine, LLP
11           1251 Avenue of the Americas
                   21st Floor
12            New York, New York 10020

13                  05/17/2023
                  9:38 a.m. (EDT)
14

15

16

17

18

19

20

21

22

23

24
        REPORTED BY:  MONIQUE CABRERA
25      JOB NO. 14601
```

 1   created, me creating my own note, us

 2   discussing the differences between those

 3   notes, us discussing those -- the merits

 4   of those various stories in this news

 5   context.

 6            We are trying to get down to a

 7   reasonable, I don't know, in that meeting

 8   maybe a dozen, maybe two dozen stories

 9   that we can actively discuss in terms of

10   what might be on the air.

11            And then we need to get it

12   winnowed down further to maybe

13   five stories that are going to make it on

14   the air.  And then we have to decide where

15   in the show they go and whether or not

16   they have guests.

17            And so this is a -- it's an

18   intense process.  It's very intellectually

19   rewarding.  I'd say it's one of the most

20   satisfying parts of my job, but it's

21   really hard and things shift all the time.

22            And even as much work as we put

23   into this meeting -- and the reason it

24   gets delayed is because we are working

25   harder, like harder than you can possibly

```
 1    believe to get ready for this meeting, and
 2    this meeting sometimes gets shifts
 3    later -- still yet, sometimes after we
 4    start putting things together, we realize
 5    that things are in the wrong order, and
 6    that the story that we thought was a C
 7    Block and was going to take 90 seconds to
 8    set up, actually needs 14 minutes to set
 9    up and it should flop to the A and we need
10    to switch producers and change horses.
11            It's just a -- that's part of
12    the process.  It's a normal part of the
13    process.  Stressful, normal part of the
14    process.
15        Q.   The whistleblower complaint, as
16    it's referred to by defendant alone, at
17    least according to the note reflected on
18    page 3 of Exhibit 37, was not enough, in
19    your mind, to put this story in the A
20    Block; is that right?
21        A.    I would not say that's
22    necessarily true.
23        Q.   Well, you say there's a lot of
24    jumping to conclusions around the
25    complaint, assuming this is an accurate
```

1   log, which, according to Mr. Gnazzo, Julia

2   is good at these notes, right?  So we can

3   assume that it is, that what she wrote is

4   accurate?

5            MS. MCNAMARA:  Objection to

6      form.

7      A.    I mean, like I said, this is a

8   rough log.  So if you're asking me under

9   oath, did I say -- did I say exactly this,

10  I cannot tell you that I said exactly

11  this.

12            I believe that Julia was making

13  a good faith, constructive effort to

14  capture the merits of the discussion.  But

15  as to exact phraseology, you know, I

16  wouldn't say that this is a perfect

17  record.

18      Q.    Is it fair to say that at the

19  time of the news meeting on

20  September 15th, 2020, you wanted more

21  before you were going make room in the

22  show for a story about a ICE detention

23  center in Irwin County, George?

24            MS. MCNAMARA:  Objection.

25      Mischaracterization.

1    BY MS. EVANS:

2        **Q.     I am asking is it fair so say**

3    **that.  If it's not, tell me why not.**

4        A.    I would say that was part of the

5    discussion.  The discussion here as makes

6    sense, given the type of meeting this is,

7    was, effectively, what do we have, what

8    else do we think we might get.

9              And if this is what we think it

10   is, here's me saying we should definitely

11   do it, but unsure if we should leave room

12   in the show.  I mean, that's the nature of

13   this type of discussion, how important is

14   it.  How compelling is it, how important

15   is it that we get on the air.

16             I mean, one of the other things

17   that can affect those decisions, either

18   during the news meeting or oftentimes

19   after, is how much additional information

20   we get about the story and almost also how

21   the story changes in the world, how many

22   -- you know, how much it develops, you

23   know.

24             And in this case, this was a

25   developing story.

1      Q.     Is part of the additional

2    information that could go into your

3    decision of whether to include a story on

4    air or not whether other news sources are

5    covering it?

6      A.     In itself, that is not that

7    important.  The way it is important is if

8    other news stories -- other news sources

9    are covering it in a way that is advancing

10   the story.

11     Q.     What do you mean by "advancing

12   the story"?

13     A.     Providing -- providing what

14   seems to be credible new development, so

15   new information about the story.

16     Q.     Sitting here today, do you

17   recall any information -- strike that.

18            You just testified that there

19   are other things that can affect the

20   decisions of what to put on air, either

21   during the news meeting or oftentimes

22   after?

23     A.     Yes.

24     Q.     Including getting additional

25   information about a story?

1        A.     Yes.

2        **Q.     Sitting here today, can you**

3    **think of any additional information that**

4    **you got either during the news meeting or**

5    **after the news meeting on September 15th,**

6    **2020 that caused you to be more inclined**

7    **to add this story to the show on**

8    **September 15th, 2020?  And by "this**

9    **story," I mean the Irwin County Detention**

10   **Center story.**

11       A.     I am sorry.  Let me make sure.

12   You want to know if I remember today that

13   there was something that happened post

14   news meeting that changed my feeling about

15   whether it should be on the show?

16       **Q.     Right.**

17       A.     I don't remember the day at all,

18   and I don't remember the sequence of

19   events.  But I know from reviewing

20   material yesterday, and I can sort of

21   surmise from looking at the transcript of

22   -- and looking at the segment of what

23   we've put on the air, that a really big

24   important thing happened after the news

25   meeting which is that NBC news published

 1    an important story on the topic.  And that

 2    we had the reporter who had done the work

 3    on that story available to us as a

 4    potential guest.  That was an important --

 5    that seemed to me to be on important

 6    thing.

 7            And I knew from the time stamp

 8    on that NBC story that I reviewed

 9    yesterday that that story was published

10    subsequent to this meeting.

11    **Q.    Any other information that you**

12    **can recall or that you were refreshed on**

13    **yesterday during your 5 and a half-ish**

14    **hour meeting with counsel that you may**

15    **have learned either during the news**

16    **meeting or after that made you more**

17    **inclined to include the Irwin County**

18    **Detention Center in the transcript on**

19    **September 15th, 2020?**

20            MS. MCNAMARA:  Again, I caution

21        you can -- if you recall documents or

22        something, but any communications with

23        counsel, you can't testify to.

24    A.    Okay.  This is sort of a subset

25    of what I previously answered, but the

1    other thing that I know happened

2    subsequent, and I am asking about it in

3    the meeting, and then I know that it

4    happened after the meeting, is that we got

5    -- that we got the transcript and

6    ultimately the tape of Jacob Soboroff's

7    interview with the Georgia whistleblower.

8    And that was an important part of what we

9    brought to the story.

10   BY MS. EVANS:

11       Q.    Anything else that you can think

12   of sitting here today?

13       A.    Not that I can think of, but I

14   don't -- I don't know.

15       Q.    And the reporter that you're

16   referring to that had been working on the

17   story is Jacob Soboroff?

18       A.    Yes.

19       Q.    And he ended up being a guest on

20   the show?

21       A.    Yes.

22       Q.    And Jacob Soboroff is the one

23   that spoke with Ms. Wooten, true?

24       A.    Yes.

25       Q.    Are you aware of any

Confidential                    Rachel Maddow on 05/17/2023                    Page 75

```
 1   conversations that Jacob Soboroff had with

 2   an attorney named Andrew Free?

 3       A.    No.

 4       Q.    Do you know who Andrew Free is?

 5       A.    No.

 6       Q.    Were you relying on Jacob

 7   Soboroff -- strike that.

 8            You were relying on Jacob

 9   Soboroff's reporting for the story

10   regarding Irwin County Detention Center

11   that ultimately became the A Block for

12   your show on September 15th, 2020, true?

13       A.    In part, true.  But that was not

14   -- that was part of it, but that was not

15   all of it.

16       Q.    What else?

17       A.    Well, we had access to the

18   whistleblower complaint itself.  There

19   were lots of other news organization that

20   had done various degrees of reporting on

21   this story.

22            In addition to that, we had NBC

23   News's published reporting, which, of

24   course, it had gone through NBC legal and

25   standards and our reporting standards.
```

```
 1              We had Jacob having interviewed
 2    the whistleblower herself, which is, you
 3    know, not just tape.  That's really
 4    important for us because it meant that
 5    this is not an anonymous person.  This is
 6    person who's willing to put her name on
 7    something and to be put on tape attesting
 8    to her allegations, which is an important
 9    part of assessing credibility.
10              And then we also had reporting
11    that involved attorneys for individual
12    detainees, separate and apart from what we
13    had on paper in the whistleblower
14    complaint.
15      Q.    And the information from the
16    attorneys for individual detainees, that
17    all came from either Jacob Soboroff or
18    Julia Ainsley, true?
19      A.    Yes.
20      Q.    No one from The Rachel Maddow
21    Show spoke to any of those attorneys; is
22    that right, that you are aware of?
23      A.    I don't know actually.  I mean,
24    there is -- we -- we call people and seek
25    documents and ask for stuff all the time.
```

1   It's a normal part of our developing a

2   story like this.

3           And so I don't know whether

4   producers on my staff contacted attorneys

5   related to this whistleblower complaint or

6   to detainees at this facility.  So I would

7   not be surprised either way.  That would

8   be a normal -- that would be a normal part

9   of what we would do.

10          Jacob and Julia are doing that

11  on behalf of NBC News is a lot, is a big

12  deal.  I wouldn't be surprised if we did

13  some of that ourselves, but I don't know

14  if we did.

15          MS. EVANS:  I just have a couple

16      more questions and then we can take a

17      break.

18          MS. MCNAMARA:  It's been a

19      little over an hour.

20  BY MS. EVANS:

21      **Q.    Are you aware of anyone from The**

22  **Rachel Maddow Show calling people and**

23  **seeking documents with regard to the Irwin**

24  **County Detention Center story on**

25  **September 15th, 2020?**

1   you agree with me that this is a 27-page

2   letter?

3           MS. MCNAMARA:  Objection.

4      Mischaracterization.

5           MS. EVANS:  I am asking her if

6      she agrees with me.  If she doesn't,

7      she can tell me.

8      A.    This is what we understood to be

9   the whistleblower complaint.

10  BY MS. EVANS:

11      Q.    Is it 27 pages?

12      A.    It is 27 pages.

13      Q.    And if you flip over to page 18,

14  in the middle of the page, it has a letter

15  D.  And it says, "Detainee immigrants and

16  ICDC nurses report high rates of

17  hysterectomies done to immigrant women."

18           Do you see that?

19      A.    Yes.

20      Q.    That's where the discussion

21  regarding hysterectomies starts.

22      A.    Okay.

23      Q.    And that goes for about a page

24  and a half; is that right, that section D?

25      A.    I am just looking how it

1    continues on to page 20 to see if that's

2    still the same topic.

3              Yes, I'd describe it as closer

4    to two pages, but yes, roughly.

5         **Q.    No more than two pages.**

6         A.    It appears that's the case,

7    yeah.  So again, it's 27 pages.  Unless

8    you want me to read the whole thing here,

9    that's seem correct.

10        **Q.    And you wouldn't have any reason**

11   **to think that Lisa Rubin would be wildly**

12   **off in her estimate of how much within the**

13   **complaint, as you-all called it, referred**

14   **to hysterectomies; right?**

15        A.    As a general matter, no.  Lisa

16   is great.  She knows what she is talking

17   about.

18        **Q.    Do you know why that was**

19   **something that Lisa felt important to**

20   **bring up during the news meeting on**

21   **September 15th of 2020?**

22        A.    I don't know.

23        **Q.    Sitting here today, what does**

24   **that speak to you?**

25        A.    Well, I mean, you could read it

```
 1    a couple of different ways, I think.  I

 2    mean, one of the things that we discuss at

 3    a news meeting is what is the source

 4    material that we have to work from in

 5    terms of putting up pictures of documents

 6    or pictures of portions of documents on

 7    the screen.  What is the source material,

 8    you know, how voluminous is the source

 9    material that producers are going to be

10    engaged with in terms of using it as the

11    basis for our reporting and writing.

12              So she could literally just be

13    describing of this -- you know, sometimes

14    a complaint can be very, very long.  And

15    if you are only talking about one portion

16    of the complaint being something that has

17    national news worthy -- national news

18    value, then it's just helpful to know

19    that.

20       Q.    Anything else significant,

21    sitting here today?

22       A.    No.

23       Q.    Does it imply to you that it

24    wasn't that big of a deal to Project

25    South, in the context of the 27-page
```

1    letter you only got at most two pages that

2    talk about hysterectomies?  Was that

3    significant to you?

4              MS. MCNAMARA:  Object to form.

5         A.    No.  I mean, that's not the way

6    that -- in my experience, that's -- that's

7    not the way that a news gathering process

8    tends to unfold.  Like, it will -- it's a

9    very common thing in the news business

10   where some larger document, some larger

11   report, some larger complaint, whether

12   it's tens or hundreds or even thousands of

13   pages, has one nugget in it that is a

14   thing that has national news value.  That

15   is a very common thing.

16             And so, you know, that's part of

17   what we do is we comb through stuff to

18   find the thing that is an exclamation

19   point in a document or a story or a

20   discussion that is otherwise not

21   necessarily going to make the news.

22   BY MS. EVANS:

23        Q.    But you didn't comb through the

24   Project South letter reflected in Exhibit

25   2, did you, to find the story?  That was

1    something that was known before you got

2    into the news meeting on September 15th,

3    2020; right?

4         A.    By the time we got into the news

5    meeting on September 15th, this story was

6    being pretty widely reported.

7         Q.    And were you aware -- were you

8    aware then or are you aware now that

9    Project South lawyers told Washington Post

10   they put in the information about the

11   hysterectomies to trigger an investigation

12   to find out if it was true?  They didn't

13   know that going in.

14              MS. MCNAMARA:  Objection to

15        form.

16        A.    Was I aware of a conversation

17   between Project South and The Washington

18   Post?

19        Q.    Yes.

20        A.    No.

21        Q.    Were you aware --

22        A.    I mean, not that I remember, I

23   should say.

24        Q.    Were you aware of that being

25   reported by The Washington Post?

DR. MAHENDRA AMIN,M.D. vs NBCUNIVERSAL MEDIA, LLC.

```
 1              MS. MCNAMARA:  Objection.  Lack
 2        of foundation.
 3              MS. EVANS:  I am asking her,
 4        Liz.
 5        A.    In the -- in the form that you
 6   are describing it, I don't remember
 7   something like that, but I honestly, like
 8   I said earlier, this is a long time ago.
 9   And so the ins and outs and the
10   nitty-gritty of what news organization
11   recorded what at the time either before or
12   after this news meeting, before or after
13   our broadcast, I don't know.
14   BY MS. EVANS:
15        Q.    Do you consider Jacob Soboroff a
16   friend?
17        A.    I have a lot of affection for
18   Jacob because I think he is a nice person,
19   but that would be the extent of my sort of
20   personal relationship with him.  I would
21   much more easily describe him as a
22   colleague -- as a colleague who I have a
23   ton of professional respect for and
24   personal affection.
25        Q.    You would be happy to see Jacob
```

1    Soboroff succeed as a reporter, true?

2        A.    Yes.

3        Q.    You would be happy who see Jacob

4    Soboroff succeed as an author, true?

5        A.    I am not sure that I would

6    characterize myself as sort of rooting for

7    him in that way.  I certainly -- I sort of

8    in general hope all the best for him.  I

9    think he's a credit to his profession and

10   a nice guy.

11       Q.    If he succeeds as an author, you

12   would be happy for him?

13              MS. MCNAMARA:  Objection.  Asked

14        and answered.

15              MS. EVANS:  No, she didn't.

16              MS. MCNAMARA:  You did.  You

17        asked you would be happy to be --

18              MS. EVANS:  Well, I am -- I

19        am -- you know, I am a little

20        clueless.  So let me ask again so that

21        I can, you know, for the cheap seats.

22   BY MS. EVANS:

23       Q.    If Jacob Soboroff is a

24   successful author, you would be happy for

25   him, true?

```
 1              MS. MCNAMARA:   Same objection.
 2        A.     As a general matter, I hope -- I
 3    wish all the best for Jacob, yes.
 4    BY MS. EVANS:
 5        Q.     On September 15th, 2020, were
 6    you aware that Jacob Soboroff had recently
 7    released a book about migrant parent/child
 8    separations at the border?
 9        A.     Yes.   I believe I mentioned that
10    in my introduction to him as a guest on
11    the show.   So when I reviewed the
12    transcript of that segment and when I
13    watched the segment again, I noted that
14    the book had just come out or was coming
15    out.
16        Q.     The A Block for The Rachel
17    Maddow Show on September 15th, 2020
18    started with you discussing the Trump
19    administration child/parent separations at
20    the border, Scott Lloyd's action, and then
21    the Irwin County Detention Center story,
22    right?
23        A.     I believe so.
24        Q.     And that progression, that
25    tie-in for the A Block, that was your
```

1   idea; right?

2       A.    That was my idea, yes.

3       Q.    **Did you do that so that there**

4   **would be a reason to discuss Jacob**

5   **Soboroff's book on the show that he was**

6   **going to be a guest on September 15th,**

7   **2020?**

8       A.    Did I structure the segment and

9   tell the sort of contextual stories in

10  order to talk about Jacob's book?

11      Q.    **Yes.**

12      A.    Not that I recall.  That

13  doesn't -- that doesn't rationally connect

14  to me.  That doesn't rationally -- I

15  don't -- I don't remember my thought

16  process that day, but that does not

17  resonate with me.

18      Q.    **Can you rule it out that that**

19  **was part of your thinking when you decided**

20  **on this A Block substance?**

21      A.    From everything that I have

22  reviewed about the decision-making around

23  putting this story on the air that night,

24  there is no -- nothing here that indicates

25  to me that I wanted to put Jacob on the

1   air to talk about his book and we needed

2   to find a reason to do it.  I do not think

3   that was a motivating factor.

4       Q.    The substance of the A Block

5   made for an easy tie-in to mention Jacob's

6   book; true?

7       A.    It was -- yes, it made -- it

8   made it sort of a segue, yes, like kind of

9   a tie-in, yeah.  But I don't think that's

10  why I did it.

11      Q.    Back on Exhibit 37, on the last

12  page of the exhibit, 1939 in the corner,

13  1639 A Block right under the big black

14  blob.

15      A.    Got it.

16      Q.    There's a indication of a note

17  from -- strike that.

18            There is an indication of a note

19  from -- strike that.

20            There is an indication of a

21  statement from you, RM, "My inclination is

22  to put the Soboroff story here, may take

23  some work especially with All In's

24  coverage."

25            Do you see that?

**DR. MAHENDRA AMIN, M.D. vs NBCUNIVERSAL MEDIA, LLC.**

```
 1      A.    Yes.

 2      Q.    Is it generally something that

 3   you try to do to have a different story or

 4   a different take on a story than what

 5   might be aired on All in?

 6      A.    As a general matter, I think

 7   sort of stylistically or philosophically,

 8   like, we try to make sure that to the

 9   extent it's possible -- it's not always

10   avoidable, but to the extent it's

11   possible, we want to make sure that

12   anybody who is watching MSNBC in prime

13   time on a given night isn't hearing

14   substantially the same story told

15   substantially the same way from multiple

16   hosts in a row.

17           And so if there is some

18   different track that we can take on a

19   story to make sure that we brought

20   something that's new and will therefore be

21   of more interest to the viewers after

22   Chris Hayes has already covered something,

23   we try for that.  And it's not always

24   possible, but that's a general

25   inclination.
```

1      Q.    And then you say according, to

2   the notes, "I don't think I should write

3   this."

4           Do you see that?

5      A.    Yes.

6      Q.    Why?

7      A.    Oh, that's -- that's a core part

8   of the news meeting.  So then at this --

9   based on the time stamp at 1639, given

10  that the first time stamp was 1615, we are

11  probably getting close to the end of the

12  meeting now or at least heading into the

13  home stretch.  And at that point in the

14  meeting, what I am saying is my preference

15  for what stories make the show in what

16  places in the show and what I should write

17  versus what other producers should write.

18          And so that's me saying there's

19  something else that I should writing

20  instead of me writing this.

21     Q.    Was it an issue of time?

22     A.    I don't remember the reasoning

23  in the moment.

24     Q.    The note continues here,

25  according to the meeting log, Exhibit 37,

1    indicates it is a note from you, "Straight

2    ahead on this story context should be the

3    moral catastrophe event taking kids way

4    from their parents.  No matter what else

5    happens in Trump administration, that will

6    be foundational in history.  But there's

7    been weird perverse offshoots of that

8    story, for example, the anti-abortion

9    activists put in charge and monitored the

10   menstrual cycles of girls under 18.  Now

11   this is sort of the next step in that."

12          Do you see that?

13   A.    Yes.

14   Q.    So while you said "I should not

15   write this," you gave them the gist of

16   what the A Block was going to be right

17   there, right?

18   A.    That's a -- yes, and that is a

19   common practice in this part of the news

20   meeting.  So in this case, I am saying

21   it's important that these things are

22   linked, that I am saying that I don't

23   think I should write this and here is your

24   start for you writing it.

25          When you asked me earlier today

1    whether or not I had written this A Block,

2    I said I did write it in part.  This is

3    what I meant by me having written it in

4    part.  And this is partly why we log the

5    meetings as well because I am effectively

6    giving something that's not script but

7    that's close to script.  And you are going

8    to be writing this, but here let me tell

9    you how I want it.

10            And this is obviously the

11   contextual part of the segment which was

12   the first part the segment once we

13   actually aired it.  And I think, as I

14   recall, the script -- the contextual part

15   of the script before we got to the ICDC

16   story pretty closely hewed to this which

17   is -- which makes me happy because that

18   means that's the way the process is

19   supposed to go and it is, in fact, how it

20   was effectuated that day.

21       **Q.    The gist of the A Block was**

22   **essentially hatched by you during this**

23   **meeting -- news meeting on September 15th**

24   **of 2020, right?**

25       A.    Well, at least the structure of

```
 1   the segment.  The structure of the segment

 2   and the opening contextual remarks.

 3       Q.     What made what was going on

 4   allegedly at Irwin County Detention Center

 5   the next step following childhood

 6   separation and an anti-abortion activist

 7   monitoring menstrual cycles of detainee

 8   women -- girls?

 9       A.     Are you asking why I thought

10   this was relevant context for the Irwin

11   County Detention Center?

12       Q.     Well, we will start with that,

13   sure.  Why?

14       A.     Well, I think it was

15   self-evident if you watch the segment.

16            What I'm trying to do is explain

17   to a national audience stories that I

18   think are of national import.  And the

19   common thread, if you think about it in

20   terms of those three stories, is that

21   those are all things that affect people

22   who are in immigration detention.  And

23   people who are immigration detention or

24   otherwise engaged in the some part of the

25   immigration process are largely invisible
```

1   to a national audience and they aren't

2   people who we think about very much in the

3   news context.

4        And so for me to make the case

5   to a national audience that this was

6   something that was of national news value,

7   I was reminding people that we are in an

8   era in which people who are not specific

9   -- powerless position relative to the

10   Government had been treated in ways that

11   had pricked our moral conscious.

12        And even if we weren't people

13   who generally thought of ourselves as

14   concerned with the plight of immigrants

15   and the functioning of immigration

16   detention facilities, we as Americans have

17   an interest in the way these people are

18   treated.

19        And in this case, we are talking

20   about another instance of -- related to

21   the treatment of people in one of these

22   immigration facilities.

23    **Q.     The childhood -- strike that.**

24        **The parent/child separations,**

25   **those were done pursuant to a policy**

1    decision, right?

2        A.    Well, yes and no.  As I think I

3    noted in the segment, there was a policy

4    and then the Trump administration said

5    they are abandoning that policy, said they

6    would stop doing it.  So, you know, their

7    announced procedure was supposedly no

8    longer in effect, but then they kept doing

9    it.

10           That was part of what I believe

11   I explained in the segment.  I could look

12   at the transcript again to refresh my

13   view.  So it was a policy, but it was also

14   sort of behavior by the Government outside

15   the bounds of what their announced policy

16   was.

17       Q.    At least it started as a policy?

18       A.    Correct.

19       Q.    I am trying to find it.  Do you

20   recall Scott Lloyd's title?  I will find

21   it eventually.

22           Scott Lloyd was in charge of the

23   Office of Refugee Resettlement?

24       A.    Yes, which I think is often

25   abbreviated as OR or ORR.  I just remember

```
 1   that from a preview of documents.
 2        Q.    And he had instructed his staff
 3   to give him this weekly spreadsheet of
 4   menstrual cycles for detainee girls,
 5   right?
 6        A.    I believe that was our -- that
 7   was the gist of our reporting.
 8        Q.    That was a specific instruction
 9   from the man in charge of the Office of
10   Refugee Resettlement?
11        A.    If you are --
12        Q.    To your understanding.
13        A.    To my understanding.  If I want
14   me to look at the transcript and give you
15   more specific answers, I could.
16        Q.    And the transcript doesn't --
17   I'm just saying that's what you understood
18   to have occurred.  He gave these
19   instructions to his staff?
20        A.    Yes, although, again, there's --
21   there's nuance to the story in terms of
22   there's -- like the other story that you
23   asked me about, the child separation.
24   There is nuance to the story in terms of
25   how much of it was at official directive
```

```
 1    -- strike that.

 2              Did you seek out any ways to

 3    assess the credibility of the policies and

 4    procedures shared by ICE, whether those

 5    were followed?

 6              MS. MCNAMARA:  Objection.

 7        Mischaracterization.

 8              MS. EVANS:  I'm asking.

 9        A.    What do you mean did I seek out

10    effort to assess the credibility of the

11    policies?

12    BY MS. EVANS:

13        Q.    Well, let's back up and take it

14    this way.  New question.

15              You testified that you couldn't

16    assess whether the policies and procedures

17    as shared by ICE reflected in Exhibit 49

18    were followed, right?

19        A.    I had no way of knowing, yes.

20        Q.    You had no way of knowing?

21        A.    Yes.

22        Q.    Your testimony is you had no way

23    of knowing whether the policies and

24    procedures shared by ICE as reflected in

25    Exhibit 49 were followed, right?
```

```
 1        A.    Correct.
 2        Q.    You also had no way of knowing
 3   whether detainees, definitively or not,
 4   had unnecessary hysterectomies, right?
 5             MS. MCNAMARA:  Objection.
 6        Mischaracterization.
 7             MS. EVANS:  I'm asking.
 8        A.    We undertook numerous
 9   journalistic steps to assess the
10   credibility of the claims.
11   BY MS. EVANS:
12        Q.    Well, that's my point.  So
13   standing alone, you don't have an ability
14   to know whether detainees had unnecessary
15   hysterectomies from Irwin County Detention
16   Center.  So you went out and sought to
17   find sources to support the idea that that
18   happened, right?
19        A.    Correct.
20        Q.    You say you have no way to
21   assess whether the policies and procedures
22   as shared by ICE reflected in Exhibit 49
23   are true or not, but you didn't go out and
24   try to see whether they were telling the
25   truth or not, right?
```

```
 1        A.    The question of whether or not
 2   this facility follows its own procedures
 3   is external to the news story here.
 4        Q.    How?
 5        A.    Because the -- the existence of
 6   these policies is a matter of their
 7   assertion, that's fine.  Whether or not
 8   women were treated in according with these
 9   policies is being asserted, right?  Is it?
10             Accusations.  We dispute the
11   implication.  There's experimental.  Our
12   mission is to protect the Homeland.  We
13   have the high priority, their welfare and
14   safety.  All our detainees are well
15   treated.
16             Recommendations were reviewed by
17   our clinical authority.  To be clear,
18   these detainees are all forwarded an
19   informed consent.
20             I mean, what you have got here
21   is boilerplate government agency statement
22   language, asserting that everything they
23   do is by the book and everybody is treated
24   well.
25             There's no direct refutation at
```

1   the individual accusations here.  This is

2   just them saying we do great work here.

3           And what we have got opposite

4   that are claims by individual detainees

5   who say they were treated in ways that

6   shock the conscience.  And so those

7   allegations we are evaluating the best we

8   can in terms of their credibility.  We had

9   a lot of evidence to bolster their

10  credibility and no reason to doubt that

11  credibility.

12          And against that, we had a

13  boilerplate statement from the government

14  agency saying we never do anything wrong.

15          And to me, that is both kind of

16  par for the course in terms of how

17  whistleblower complaints and allegations

18  of mistreatment work.  But it's also why

19  we took what I felt was relevant, I and my

20  staff felt was relevant from the statement

21  in terms of being specifically responsive

22  to the allegations rather than just a

23  blanket assertion that we're good and we

24  put that -- we put that on the air.

25      Q.    How were the allegations from

1    **the detainees not considered boilerplate**

2    **to you, but the statement from ICE was**

3    **considered boilerplate?**

4        A.    A woman talking about having a

5    cyst on her ovary and being sent in to

6    have that ovary operated on and then

7    finding out that it was a different ovary

8    and having to go back in and then

9    ultimately having her reproductive

10   capability removed from her without her

11   understanding that was happening because

12   of a medical error.

13            That is a really specific

14   statement.  That's not boilerplate.

15       **Q.    You didn't have any medical**

16   **records to support that, did you?**

17       A.    I didn't have medical records?

18       **Q.    Yes.**

19       A.    I did not have medical records.

20       **Q.    You did not talk to any medical**

21   **professional on September 15th, 2020, did**

22   **you?**

23            MS. MCNAMARA:  Are you asking

24       Rachel Maddow personally?

25   BY MS. EVANS:

1      Q.     You didn't talk to medical

2   professionals on September 15th, 2020?

3           MS. EVANS:  It's not vague.

4      A.     We aired an interview on our air

5   in which a nurse from the facility was

6   interviewed by an NBC News reporter.

7   BY MS. EVANS:

8      Q.     You are referring to Dawn

9   Wooten?

10     A.     Yes.

11     Q.     Who wasn't present during any of

12  the medical procedures that are at issue,

13  right?

14     A.     Ms. Wooten does not claim to

15  have been present during the medical

16  procedures at issue.  She claims to have

17  been told by the women who said they

18  underwent these things about their

19  experiences.

20     Q.     Other than Dawn Wooten, you

21  didn't talk to any medical professional on

22  September 15th, 2020?

23     A.     I personally did not.  I

24  personally did not.

25     Q.     To your knowledge, did anyone

1   else from NBC speak to any medical

2   professional on September 15th, 2020 other

3   than Dawn Wooten?

4           MS. MCNAMARA:  Objection to

5       form.  She can't answer to the entire

6       NBC network.

7           MS. EVANS:  I said to her

8       knowledge.

9           MS. MCNAMARA:  I don't care if

10      it's to her knowledge.  She can't talk

11      to -- answer about what everybody, of

12      thousands of people who work at NBC

13      network, what they did or did not do.

14          If you can answer that question,

15      Ms. Maddow, you are welcome to.

16      A.   I can't speak to the behavior of

17  everybody who worked at NBC on

18  September 15th and who they spoke to or

19  who they didn't.

20  BY MS. EVANS:

21      Q.   Do you have any knowledge that

22  anyone from NBC spoke to any medical

23  professional other than Dawn Wooten on

24  September 15th, 2020?

25      A.   I don't have knowledge of that,

 1   and how much of it was happening when it

 2   supposedly wasn't supposed to be.

 3        Q.    How is alleged mass

 4   hysterectomies, unnecessary

 5   hysterectomies, unnecessary procedures at

 6   Irwin County Detention Center on

 7   September 15th, 2020 as known to you

 8   anything like the known multiply

 9   documented information about parents and

10   children being separated at the border and

11   spreadsheets of menstrual cycles?  How are

12   those anything alike?

13             MS. MCNAMARA:  Objection to

14        form.  It has been asked and answered.

15             MS. EVANS:  It hasn't but...

16             MS. MCNAMARA:  You asked her

17        what was --

18             MS. EVANS:  I have this witness

19        on cross, Liz.  You are very aware

20        that I can ask her in different

21        iterations.

22   BY MS. EVANS:

23        Q.    And if you need me to repeat the

24   question, Ms. Maddow, I will.

25             MS. MCNAMARA:  The same

```
 1    would have felt an urgency to correct.

 2            In this case, from my reading of

 3    the proposed correction and from the

 4    e-mail traffic around it, it seems like I

 5    didn't say anything wrong.  The error was

 6    that photos were shown that I was not even

 7    talking directly about.  I was not

 8    describing them.  They were just shown and

 9    they were of ICE detention facilities, but

10    they were not from the time period that we

11    were describing.

12            And so that's -- I believe in

13    the concept of corrections, for important

14    -- for errors, but that I also believed

15    that the -- sort of the effort to correct

16    should be proportional to the scale of the

17    error.  And in this case, this is not a

18    major error.

19            And so it's the sort of thing

20    that going back to 6 days after the fact

21    to correct it, just doesn't seem that

22    important.

23       Q.    Can you think of any other

24    reason why the correction never ran?

25       A.    No.
```

Confidential                                                    Page 215

```
 1        Q.    And the error, whether

 2   considered big or small, was that while

 3   discussing child separation and describing

 4   that as a scandal of the Trump

 5   administration, the photos that were being

 6   shown were of ICE detention facilities

 7   during the Obama administration; is that

 8   right?

 9        A.    Based on the draft correction

10   that again did not run, it seems that's

11   the case.

12             My experience doing the show is

13   that I don't necessarily -- I am not

14   necessarily looking -- if I am reading

15   from the teleprompter and an image is

16   showing on the screen to the viewers, I

17   don't necessarily see what that image is.

18   And so this is something that I may not

19   have noticed was incorrect, even if I had

20   recognized it as an incorrect image in the

21   moment, if that makes any sense.

22        Q.    On Exhibit 44, Mr. Gnazzo sends

23   you a draft correction, proposed

24   correction, right?  That's the first

25   e-mail.
```

```
 1              (Reporter clarification.)

 2              MS. EVANS:  Proposed script.

 3      A.    Yes.

 4   BY MS. EVANS:

 5      Q.    And what was your response to

 6   him?

 7      A.    I wrote, "This is way too much."

 8      Q.    What does that mean?

 9      A.    I think I meant this is way too

10   much.

11      Q.    Meaning what?

12      A.    I don't remember what was in my

13   head at the moment that I said it, but

14   looking at it now, based on this

15   description of what we did wrong, this is

16   way overkill as a correction.  This is --

17   there's a lot of -- this is a lot of words

18   and a lot of explanation and a lot of

19   narrative effort, a lot of time on what

20   was in the grand scheme of things a small

21   error.  This is sort of hitting a

22   thumbtack with a sledge hammer.

23      Q.    And Mr. Gnazzo writes back to

24   you, "Okay.  We will cut it way back.  But

25   I do think the gist of it is okay."
```

```
 1              Do you see that?

 2       A.    Yes.

 3       Q.    And what was your response to

 4    him?

 5       A.    We should not be engaging with

 6    the Obama administration's ICE policies.

 7       Q.    Why not?

 8       A.    I think in this context what I

 9    meant was this is way too much.  Like, you

10    guys -- we put up a photo with the wrong

11    time stamp on it to engage with the

12    policies of an administration in order to

13    explain why a wrong time stamp photo is

14    projected is -- is overkill to somewhat an

15    extreme degree.  It was just too much.

16       Q.    Well, you -- well, you had

17    already said it's way too much.

18       A.    Yeah.

19       Q.    Don't you think you meant

20    something different when you said we

21    should not be engaging with the Obama

22    administration's ICE policies?

23       A.    No.  This is what's known in the

24    news business as a fight between me and

25    Cory because I am saying this is way too
```

1    much and he is saying okay, we can cut it

2    down, but you have got to admit this is --

3    I am saying no, this is way too much.

4    Like, are you kidding me?

5            This is Cory and I arguing

6    editorially about what -- what the overall

7    thrust of this correction should be.  And

8    they have tried to essentially -- my staff

9    here has essentially tried to turn this

10   into a big narrative about ICE.  Whereas

11   what we actually did wrong was something

12   minor and relatively inconsequential, that

13   was a wrong photo being selected from a

14   photo bucket.

15       **Q.    Well, wasn't the A Block of the**

16   **September 15th, 2020 Rachel Maddow Show a**

17   **narrative about ICE?**

18       A.    Yes.  Well, about immigration

19   enforcement broadly, but yes.

20       **Q.    That's according to you.**

21       A.    Yes.

22       **Q.    That was -- those were the**

23   **chapters of the story.**

24       A.    Yes.

25       **Q.    Treatment of people at ICE**

1    facilities.

2        A.    Yes.  Well, yes.  Treatment of

3    immigrants in detention or immigrants in

4    otherwise in contact with the legal --

5    legal system.  I am splitting that hair

6    because of the issue about when people had

7    their children taken way from them at what

8    point of the process that was, whether

9    they were encountered with a -- encounters

10   with the Border Patrol or ICE or otherwise

11   involved in some part of the process of

12   immigration system.

13       Q.    And you had on air described

14   that as a Trump administration scandal;

15   true?

16       A.    Yes.

17       Q.    On September 18th, 2020, we are

18   about 6 weeks way from the election,

19   right?

20       A.    Yes, yes, 5 or 6 -- yes, 6.

21       Q.    Trump/Biden?

22       A.    Yes.

23       Q.    Why even bring up Obama

24   administration right here?  The script

25   that they sent you didn't even include the

 1    word "Obama."

 2         A.    It says under the previous

 3    administration and then it says under the

 4    previous administration right above that.

 5         Q.    Well, the previous

 6    administration is Obama, I will give you

 7    that.

 8         A.    Yeah.

 9         Q.    Were you afraid of taking

10    attention away from a Trump scandal 6

11    weeks before an election?  Is that why you

12    didn't want to engage with Obama

13    administration ICE policies?

14         A.    No.

15         Q.    It looks like the next e-mail in

16    the chain they took you off.

17         A.    Yes.

18         Q.    Or forwarded it.  Taking you off

19    is probably not the right characterization

20    of that.

21              It looks like Cory forwards it

22    to Isaac, Kelsey, and Laura Conaway?

23         A.    Yes.

24         Q.    Who is Laura Conaway?

25         A.    Laura Conaway is a senior

```
 1          CERTIFICATE OF SHORTHAND REPORTER

 2                  NOTARY PUBLIC

 3              I, Monique Cabrera, the officer

 4       before whom the foregoing deposition

 5       was taken, do hereby certify that the

 6       foregoing transcript is a true and

 7       correct record of the testimony given;

 8       that said testimony was taken by me

 9       stenographically and thereafter

10       reduced to typewriting under my

11       direction; and that I am neither

12       counsel for, related to, nor employed

13       by any of the parties to this case and

14       have no interest, financial or

15       otherwise, in its outcome.

16              IN WITNESS WHEREOF, I have

17       hereunto set my hand this 17th day of

18       May, 2023.

19

20

21       _____

22       MONIQUE CABRERA
         Notary Public in and for the State of New
23       York
         County of Suffolk
24       My Commission No.  01CA6043156
         Expires:  06/12/2026
25
```