McNamara Reply Declaration

In Support of Summary Judgment

Exhibit 2

```
 1  UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF GEORGIA
 2  ----------------------------------------------------x

 3  Dr. Mahendra Amin, M.D.

 4            Plaintiffs,              Case No.
                                       5:21-CV-00056-LGW-BWC
 5       vs.

 6  NBCUNIVERSAL MEDIA, LLC

 7            Defendants.

 8  ----------------------------------------------------x

 9

10

11

12       VIDEOTAPED DEPOSITION OF CHRISTOPHER SCHOLL

13
              1251 Sixth Avenue
14
              New York, New York
15

16            Wednesday, July 12, 2023

17                 9:37 a.m.

18

19

20

21

22

23
    Reported By:
24  Cheryll Kerr, CSR
    Job No. 131324
25
```

1     A.    Rich Greenberg handled investigations for
2  NBC News.
3     Q.    What does he do now?
4     A.    He's retired.
5     Q.    And then Betsy Korona says, "This is also my
6  concern."
7           Do you see that?
8     A.    Correct.
9     Q.    And Ms. Korona was a supervisor of on-air
10 correspondence; is that right?
11    A.    I don't know what her role was at that time.
12 I don't remember.
13    Q.    Do you know why she was involved in this
14 conversation?
15    A.    I believe Betsy is the one who called me
16 originally, if I recall.  I think we had a conversation
17 in there at some point.  She was working with Julia and
18 Jacob in some sense on this story.  I don't -- I don't
19 exactly know.
20    Q.    She called you originally?  What do you mean?
21    A.    I believe that's the first time I got --
22 again -- I mean, this is three years ago, so it's
23 possible I'm off, but I recall --
24          I recall having a phone call with Betsy.  Whether
25 she was the first person to come to me or very early

1  stages, I don't know, but I remember having a phone
2  conversation with her, and she had sent me this stuff
3  here about the -- you know, the Bite Verbates --
4  B-I-T-E, Verbates -- which is the email that's referred
5  to in here.
6       As I recall, we had a phone conversation about it,
7  and so my email here is subsequent to that conversation
8  with Betsy.  I had been thinking things over.
9            (Pause.)
10 BY MS. EVANS:
11      Q.   During that conversation with Betsy, had you
12 expressed concerns to her about the Irwin County
13 Detention Center story?
14      A.   I don't recall the -- exactly what we
15 discussed.  I'm sure that I would have expressed, as I
16 almost always do in every story I ever look at, the idea
17 of doing more reporting, doing our own reporting,
18 getting it out there as far as we can in terms of
19 looking at it from every angle.
20      I would imagine I mentioned it during that
21 conversation, but that's what I was certainly getting at
22 later in this email.
23      Q.   Did Betsy express concerns to you during that
24 telephone conversation?
25      A.   I don't remember.

1          (Pause.)
2    BY MS. EVANS:
3          Q.    I'm going to hand you and your counsel what's
4    been previously marked as Exhibit 6.
5          Exhibit 6 is also part of the email chain that we
6    were just looking at in Exhibit 96 --
7          A.    May I ask if it was later in the email chain?
8          Q.    Well, the email chain grows branches --
9          A.    Yeah.
10         Q.    -- in different directions.
11         A.    Yeah.
12         Q.    -- but it seems to be all part of the same
13   conversation, which you can probably recognize by the
14   subject line "Bite Verbates."
15         A.    Got it.
16         Q.    If you could, go to the page Bates-labeled
17   2648 in the bottom right corner.
18         A.    Uh-huh, yes.
19         Q.    You can see on the bottom of that page the
20   email where you say:
21         "I've been mulling.  My concern is" --
22         Do you see that?
23         A.    Yes.
24         Q.    And Julia responds -- Julia Ainsley responds
25   to that and says:

1      "Thank you, Chris.  For what it's worth, I just had

2   an off-the-record convo with ICE, and they said they are

3   working on getting us data on the number of

4   hysterectomies performed at this facility.  They believe

5   that data will negate her claims, but they haven't given

6   me an ETA, just that they are working as fast as they

7   can."

8         Do you see that?

9      A.   Yes.

10     Q.   And the time stamp on Exhibit 6 for the part

11  I just read says 10:26 a.m., but it's really 1:26 p.m.,

12  because there's emails going back and forth on West and

13  East Coast.

14     A.   Yeah.

15     Q.   Which makes sense, because she's responding

16  to your email at 1:24 p.m.

17        Do you see that?

18     A.   Yes.

19     Q.   Did you think it was important to wait for

20  that information from ICE before further going -- going

21  further with the story?

22     A.   No.

23     Q.   Why not?

24     A.   Well, people tell us they're going to give

25  information all the time, right?  I mean, it -- it -- it

1  sort of depends on the information.
2      But I suppose in general terms, our job is to
3  report, right?  If we give -- we reach out to ICE, they
4  say some in sort of nebulous terms they may have
5  information to provide, but they're not providing it --
6      I mean, when and if they send it to us -- if it's
7  relevant to the story, we will include it, but it's not
8  reason to hold up our reporting.  And at that point, we
9  had a -- an ICE statement.
10     Q.   **You had a general ICE statement, right?**
11     A.   We had a general ICE statement.  All we --
12  all we really had here was somebody telling Julia, Well,
13  we might have more for you.
14     But we weren't in a position to evaluate whether
15  that had any relevance, even.  You know, so --
16     So no, it's not reason to hold up a story.  We --
17  this was a -- this was a news story.  It was -- it was
18  live and evolving, and ... and we were telling them we
19  want the statement, but it's not reason to hold back the
20  reporting.
21     Q.   **Well, at this point, you're saying you don't**
22  **think you should be reporting, right?  You say "It's**
23  **worth asking why are we reporting this in the first**
24  **place," right?**
25     A.   I think it's word -- I think -- I was raising

1   -- I was raising questions.  I was pointing out -- what
2   I was doing here was pointing out the need for -- the
3   need for further reporting.  As it stood at that moment,
4   we had a story that had -- had been essentially a
5   breaking news piece, right?  Everybody was covering it.
6   It was -- we were just doing the same thing everybody
7   else was doing.  We were doing -- you know, kind of
8   breaking news coverage.
9        What was being proposed here (indicating) was a
10  step in a new direction, right, which is furthering
11  this -- the reporting.  We had already taken this step
12  with this interview.
13       So that's us going deeper into the story.  The
14  moment we start to do that, then -- then we start to
15  look at -- that's when --
16       Basically, that's when standards gets involved,
17  right?  My job, at that point, is to start looking at
18  this as new and independent reporting of ours and not
19  just a breaking news story but -- you know, based on a
20  press conference or something like that.
21       So what I was doing there was pointing out the
22  areas that we're going to want to focus on, because
23  lacking those, we don't have -- it's not really much of
24  a story right?  It -- it's -- the question becomes what
25  do we know?  I was advocating -- pushing -- that we get

 1  more of our own reporting done.
 2       So Julia came back and said, "Well, I'm calling
 3  ICE.  They're going to get some information."
 4       That's great.  We didn't have the information at
 5  that point.
 6       Q.    You --
 7            MS. EVANS:  Strike that.
 8  BY MS. EVANS:
 9       Q.    At the time of your email, 1:24 p.m.,
10  reflected in Exhibit 6, you thought y'all needed more
11  before moving forward with reporting, right?
12            (Pause.)
13            THE WITNESS:  Well, no.  I think my line
14       here sums it up pretty well.  "At the least,
15       we would have to note all of that in our
16       reporting."
17            In other words, I was comfortable with
18       reporting what we've got, but we'd have -- it
19       would have a lot of caveats, right, based on
20       what we don't know.  And you've got a story
21       that is filled with -- you know, here's this,
22       but then we don't know this, this, this, and
23       this.  We end up with a story that seems like
24       what are we doing, right?  There's no --
25       you're not really advancing the story much.

```
 1              You're not able to disclose more or provide
 2              anything of content.
 3                   So what I was doing here was pointing out
 4              what we don't know and the prism through which
 5              we should look at this story and -- and --
 6              and -- and -- and telling the teams, "We need
 7              to get more."  We want to get more in order to
 8              get a strong story -- a solid story, I mean, I
 9              should say.
10                   So -- so need and want are really two
11              different things.  I felt we -- we wanted it,
12              because otherwise, what's the point of a story
13              that's filled with all -- all kinds of
14              statements about what we don't yet know?  You
15              try to get farther -- you know.
16                   If we're going to advance the story by
17              doing an interview like this, we want to also
18              uncover as much information as we can on a
19              timely basis.
20   BY MS. EVANS:
21        Q.    And part of getting more --
22              MS. EVANS:  Strike that.
23   BY MS. EVANS:
24        Q.    Did you think that as part of getting more,
25   you should wait for the information from ICE?
```

1                    C E R T I F I C A T E

2         I, CHERYLL KERR, CSR, a Certified Shorthand

3    Reporter and Notary Public, do hereby certify

4    that the witness whose deposition is hereinbefore

5    set forth was duly sworn by me, and that such

6    deposition is a true record of the testimony given

7    by such witness.

8         I further certify that I am not related to

9    any of the parties to this action by blood or

10   marriage; and that I am in no way interested in

11   the outcome of this matter.

12        IN WITNESS WHEREOF, I have hereunto set my

13   hand this 17th day of July, 2023.

14

15                       *Cheryll Kerr*

16                       ---------------------------------
                         CHERYLL KERR, CSR
17

18

19

20

21

22

23

24

25