McNamara Reply Declaration

In Support of Summary Judgment

Exhibit 3

```
 1              UNITED STATES DISTRICT COURT
         FOR THE SOUTHERN DISTRICT OF GEORGIA
 2                   WAYCROSS DIVISION

 3    DR. MAHENDRA AMIN, M.D.

 4                  Plaintiff,    CASE NO.
         v.                       5:21-CV-00056-LGW-BWC
 5
      NBCUNIVERSAL MEDIA, LLC,
 6
                    Defendant.
 7


 8
             VIDEO-RECORDED DEPOSITION OF
 9                  ALEXANDER PRICE
             Davis Wright Tremaine, LLP
10          1251 Avenue of the Americas
                    21st Floor
11            New York, New York 10020

12                  06/15/2023
                 9:30 a.m. (EDT)
13

14

15

16

17

18

19

20

21

22

23

24    REPORTED BY:  MONIQUE CABRERA
      JOB NO. 454780
25
```

```
 1   But sharing them -- but me sharing them
 2   with someone, I didn't have that -- that
 3   kind of authority over her medical
 4   records.
 5       Q.   No.  Understood.
 6            But given that he was sharing
 7   them with another OB-GYN, don't you think
 8   he would have said yes if you had asked
 9   him if you could share them with Dr.
10   Crear-Perry?
11            MS. MCNAMARA:  Objection;
12       hypothetical.
13       A.   I have no idea.
14   BY MS. EVANS:
15       Q.   There's nothing that stopped you
16   from asking Andrew Free if you could share
17   the records directly, right?
18       A.   I believe I -- I don't know if
19   there's more to the Signal conversation
20   where I would have asked about that.  But
21   when you're dealing with medical records,
22   the best practice is generally to
23   anonymize them as best as possible.
24       Q.   Nothing stopped you from
25   blacking out the names as NBC did when
```

1   they produced records to us.  You could
2   have done that and shared them with
3   Dr. Crear-Perry, right?
4        A.    I would have -- I don't know if
5   there is information that I might have
6   missed if I did that, and I got -- I don't
7   know what time I got these records, but we
8   wanted to get the -- the information on it
9   in a -- in a timely fashion and also not
10  share records.  Because I have seen
11  records that have been redacted by the
12  government that were redacted incorrectly,
13  and news organization that received those
14  records were able to take off the
15  redactions.
16             I am not an expert at redacting
17  things, and so I don't want to -- I didn't
18  want to incorrectly do it in a way that
19  she could be deanonymized.
20       Q.    But again, you didn't ask Andrew
21  Free or Benjamin Osorio if you could just
22  share them?  You didn't ask the question.
23       A.    It doesn't appear in the -- in
24  the call.  I don't know if it's in the
25  Signal message or in my conversation with

```
 1    Ben Osorio.
 2        Q.    I will show you the rest the
 3    Signal conversation if you want me to.
 4        A.    That would be great.  Thank you.
 5        Q.    You have Exhibit 65, right?
 6        A.    Yes, I do.
 7        Q.    Just for the sake of completion,
 8    we are going to go on a little bit of a
 9    detour, but we'll get back the main
10    question.  I don't want to skip around.
11              MS. EVANS:  I'm going to hand
12        you what has been previously marked as
13        Exhibit 60.
14              (Whereupon, Exhibit 60,
15        Continuation of Price/Free Signal
16        messages, was identified.)
17        A.    Okay.
18    BY MS. EVANS:
19        Q.    This is the continuation of the
20    Signal conversation between you and Andrew
21    Free.
22              Do you recognize it as such?
23        A.    I do.
24        Q.    While you-all were on the call,
25    Andrew Free sent you the contact cards for
```

```
 1   Matherne and Ben Osorio that's reflected
 2   there at the top?
 3        A.   Yes.
 4        Q.   And then, after the call, you
 5   sent a message to Andrew Free at 6:10 that
 6   said what?
 7        A.   "Sorry.  Just to verify.  Was
 8   everything you told me on the record or
 9   for background?"
10        Q.   Is that normal that you asked
11   that question after an interview as
12   opposed before you get started?
13        A.   It sometimes happens before the
14   interview.  It sometimes happens after.
15        Q.   Isn't it customary practice that
16   unless an interviewee says before they
17   speak, This is off the record or this is
18   background, that it's on the record?
19        A.   It can happen before the
20   conversation or -- or after.
21        Q.   I understand you saying -- I
22   understand you saying what you just said
23   that it can happen.
24             I'm asking:  Isn't it sort of
25   the journalist rule that unless an
```

 1   interviewee tells you before they speak
 2   that something's off the record or on
 3   background, it's understood, the default
 4   is, it's on the record?
 5           MS. MCNAMARA:  Objection to
 6      form.
 7      A.   I mean, it's not a -- a hard and
 8   fast rule, I don't think.  And I thought
 9   it prudent to verify with him since he
10   is -- in his -- I'm sorry.
11           He refers to in Exhibit 67,
12   page 6, line 19, he refers to Benjamin
13   Osorio as the person who would go out
14   front on this.
15      Q.   He says, quoting from
16   Exhibit 67, line 20 -- page 6, line 20,
17   "And I think he" -- Ben Osorio -- "would
18   be the person who would go out front on
19   this since he's known these women and
20   their families for years."
21           That's what it says, right?
22      A.   Yes.
23      Q.   He didn't say he wouldn't --
24   that Andrew Free wouldn't be someone who
25   would go out front.  He just -- looks to

 1   me he's indicating that Ben would be
 2   better because he has known them longer,
 3   right?
 4       A.   He also, on page 26, lines --
 5   well, I guess starting on page 25, line 25
 6   and then going over to page 26.  He's,
 7   again, referring to Ben Osorio, saying
 8   that -- to talk to him, "because that's
 9   going to be your on-the-record, like,
10   interview," which is part of why I wanted
11   to confirm that this was on the record or
12   background that he was giving me.
13       Q.   But why did you need to ask?  It
14   sounds like you knew from these lines
15   that --
16       A.   I -- I inferred, but I didn't
17   know for certainty, so I wanted to verify.
18       Q.   And Andrew Free knew earlier in
19   the call that you were recording, right?
20       A.   Yes.
21       Q.   And he didn't say, This is on
22   background?
23       A.   I don't know.
24       Q.   It's on page 14, starting on
25   line 14.

```
 1      A.    Yes.  I told him I'm recording
 2   this for my notes.
 3      Q.    And he says at the bottom of
 4   line 25, "You said you were recording and
 5   I said that was fine."
 6      A.    Yeah.  He says -- on the bottom
 7   of page 14, he says "You said you were" --
 8   and then into 15 -- "you were recording.
 9   I said that was fine."
10            And I explained, "Oh, okay,
11   great.  Great.  Yeah.  I'm just recording
12   for my notes.  I don't necessarily type
13   the fastest, and I want to make sure I
14   don't miss anything on this."
15            So I -- we made it clear that I
16   was recording for -- for notetaking
17   purposes.
18      Q.    Why did Andrew Free not want to
19   be on the record?
20      A.    I don't know.
21      Q.    Did you ask him?
22      A.    I did hot.
23      Q.    Is it your preference to have
24   sources on the record or on background?
25      A.    It's always great to have
```

1   sources on the record.
2       Q.   If you had not sent this Signal
3   message reflected in Exhibit 60, do you
4   think you would have been authorized to
5   put Andrew Free on the record based on the
6   transcript reflected in Exhibit 67?
7       A.   I don't think I would have moved
8   forward without sending that verification
9   message.
10           (Reporter verification.)
11           THE WITNESS:  Sending.
12  BY MS. EVANS:
13      Q.   Is that your practice in talking
14  to sources, that you ask them again about
15  whether the -- or what you ask them after
16  the fact whether they're going to be on
17  the record or on background?
18      A.   Well, I wasn't -- I wasn't
19  asking; again, I was verifying.  And we
20  did establish in this interview that it
21  was for my notes and I do talk to people
22  for my notes, not necessarily for
23  reporting.
24      Q.   Do you take the notes so that
25  you have an accurate --

 1                MS. EVANS:  Or strike that.
 2     BY MS. EVANS:
 3          Q.    You do the recordings so that
 4     you can have an accurate record of what a
 5     source tells you, right?
 6          A.    Yes.
 7          Q.    Do you think it's more -- more
 8     frequent that journalists record
 9     interviews or that they don't?
10          A.    I don't know what other people's
11     practices are.
12          Q.    No idea?
13          A.    No.
14          Q.    How did it come to be your
15     practice that you recorded people?
16          A.    Because my -- my notetaking
17     ability is -- is kind of slow and it tends
18     to be very choppy, and I am just very
19     concerned I -- I might miss something.
20          Q.    I think you already have in
21     front of you Exhibit 68 and 69.
22          A.    Yes.
23                MS. EVANS:  I'm going to hand
24          you and your counsel what's been
25          marked as Exhibit 72.

1   discussing the call -- I mean, you-all
2   were discussing the interview during your
3   call.  You can flip through there and look
4   if you want to.
5       A.   Okay.  I just don't want to give
6   you incorrect information.  That's all.
7   Here we go.
8       Q.   You can look on page 3 of
9   Exhibit 74.  It may give you what -- the
10  comfort you need where you say on line 19,
11  "So we are -- we're working on how to
12  digitize her voice."
13      A.   Okay.  Yes.
14      Q.   "We're looking into potentially
15  just not even having a video feed of her,"
16  on lines 22 and 23?
17      A.   Yes, I see that.
18      Q.   And you believe that your call
19  with Ben Osorio took place before you
20  talked to "B"?
21      A.   That makes sense, yes.
22      Q.   Did you other telephone
23  conversations or Zooms or exchanges with
24  Ben Osorio prior the interview with "B"
25  that you recall on September 16th, 2020?

1      A.    I don't think so, no.
2      Q.    Do you know if Ben Osorio spoke
3   with anyone else at All In With Chris
4   Hayes prior to the recorded interview on
5   September 16th, 2020?
6      A.    I don't know.
7            MS. EVANS:  I'm going to hand
8      you and your counsel what I'm marking
9      as Exhibit 83.
10           (Whereupon, Exhibit 83,
11     9/16/2020 Shamis E-mail, was marked
12     for identification.)
13  BY MS. EVANS:
14     Q.    This an e-mail from Ms. Shamis
15  to you and several others, September 16th,
16  2020 at 1:37 p.m., subject line, "B,"
17  client of Ben Osorio.
18           Do you see that?
19     A.    I do.
20     Q.    She says, "Before jumping on
21  conference call, had a brief conversation
22  with attorney Ben Osorio regarding his
23  client "B."  She may want to use
24  alternative name.  Her appearance,
25  identity needs to be obscured."

```
 1            Do you see that?
 2      A.    I do.
 3      Q.    Can you read the next line in
 4   that e-mail?
 5      A.    "'B' was subjected -- was
 6   subject to a rushed and dubious
 7   gynecological procedure by the so-called
 8   uterus collector, Dr. Mahendra Amin."
 9            And then it gives his address
10   and telephone number.
11      Q.    Did that communicate to you that
12   you are going into this interview with "B"
13   with an open neutral mind about what
14   happened when she was treated by Dr. Amin?
15            MS. MCNAMARA:  Objection;
16      mischaracterization.
17      A.    I mean, this wasn't my state of
18   mind.  And I mean, he was referred to as
19   that in Dawn Wooten's complaint, so...
20   BY MS. EVANS:
21      Q.    She said, "'B' was subject to a
22   rushed and dubious gynecological
23   procedure."
24            Do you see that?
25      A.    Yes.
```

 1     Q.    Does that communicate to you
 2  that personnel for the All In With Chris
 3  Hayes show are going into the interview
 4  with "B" with an open mind?
 5           MS. MCNAMARA:  Objection;
 6     mischaracterization.
 7     A.    Well, I mean, Diane is a booker,
 8  not an editorial staff member.  And, I
 9  mean, I was -- yeah.  I -- I can't answer
10  for her -- for language there, but that
11  seem -- also seems to be what Ben Osorio
12  was communicating to her.  So, I mean, it
13  wasn't -- it, you know, it seems she's
14  just giving a read out of her
15  conversation, so I don't think it speaks
16  for our open mindedness.
17           (Reporter clarification.)
18           THE WITNESS:  Our.
19  BY MS. EVANS:
20     Q.    Were you aware that at some
21  point in 2021 it was decided that the
22  hysterectomy that "B" received, the
23  consensus was that it was appropriate and
24  found to be medically necessary?
25           MS. MCNAMARA:  Objection; lack

```
 1       of foundation.
 2       A.   I was not aware.
 3  BY MS. EVANS:
 4       Q.   You don't know anything about
 5  that?
 6       A.   No.
 7       Q.   Have you seen a tape of the full
 8  interview -- recorded interview with "B"
 9  that took place on September 16th, 2020?
10       A.   I have not, no.
11       Q.   You didn't see that in your work
12  to prepare for this deposition?
13       A.   No.
14       Q.   Were you part of discussions
15  with Ben Osorio to give him the capacity
16  to edit "B's" responses that were not
17  acceptable to him?
18       A.   No, I was not.
19       Q.   Were you aware that that
20  occurred?
21            MS. MCNAMARA:  Objection;
22       mischaracterization.
23       A.   No, I was not.
24  BY MS. EVANS:
25       Q.   Were you aware that that offer
```

```
 1   occurred?
 2      A.    No, I was not.
 3      Q.    Would that be appropriate in
 4   your mind according to guidance and
 5   Standards for NBCUniversal?
 6      A.    We would not make an agreement
 7   like that.
 8      Q.    An agreement like what?
 9      A.    Giving a lawyer editorial
10   control.
11      Q.    Or any source, right?
12      A.    Yes.
13      Q.    You wouldn't?
14      A.    Yes.  We would not, yes.
15            MS. EVANS:  Do you want to take
16   a break?  I am not sure how long we
17   have been going.
18            MS. MCNAMARA:  Okay.  Great.
19   It's about an hour.
20            MS. EVANS:  I am at a
21   transition.
22            MS. MCNAMARA:  Pardon me?
23            MS. EVANS:  I am at a
24   transition.
25            THE VIDEOGRAPHER:  We are going
```

 1       off the record.  The time is 5:14 p.m.
 2              (Whereupon, a brief recess was
 3       taken.)
 4              THE VIDEOGRAPHER:  We are back
 5       on the record.  The time is 5:30 p.m.
 6   BY MS. EVANS:
 7       Q.    Why did --
 8              MS. EVANS:  Strike that.  Excuse
 9       me.
10   BY MS. EVANS:
11       Q.    We were talking earlier about
12   being -- being interviewed on
13   September 16th, 2020, right?
14       A.    Yeah.
15       Q.    And then there was a desire to
16   do a second interview at some point.
17             Do you recall that?
18       A.    Yes.  I believe so.
19       Q.    Why was a second interview
20   desired?
21       A.    I believe it's because of
22   technical issues we were having with the
23   first one.
24       Q.    What happened?
25       A.    I -- I don't specifically

1        CERTIFICATE OF SHORTHAND REPORTER

2                   NOTARY PUBLIC

3           I, Monique Cabrera, the officer

4     before whom the foregoing deposition

5     was taken, do hereby certify that the

6     foregoing transcript is a true and

7     correct record of the testimony given;

8     that said testimony was taken by me

9     stenographically and thereafter

10    reduced to typewriting under my

11    direction; and that I am neither

12    counsel for, related to, nor employed

13    by any of the parties to this case and

14    have no interest, financial or

15    otherwise, in its outcome.

16          IN WITNESS WHEREOF, I have

17    hereunto set my hand this 15th day of

18    June, 2023.

19

20    _[signature: Monique Cabrera]_

21    _____

22    MONIQUE CABRERA
      Notary Public in and for the State of New
23    York
      County of Suffolk
24    My Commission No.  01CA6043156
      Expires:  06/12/2026
25