McNamara Reply Declaration

In Support of Summary Judgment

Exhibit 4

```
 1            IN THE UNITED STATES DISTRICT COURT
           FOR THE SOUTHERN DISTRICT OF GEORGIA
 2

 3

 4   DR. MAHENDRIA AMIN, M.D.,      )
                                    )
 5           Plaintiff,             )
                                    ) Civil Action No.:
 6   vs.                            ) 5:21-CV-00056-LGW-BWC
                                    )
 7   NBC UNIVERSAL MEDIA, LLC,      )
                                    )
 8           Defendant.             )

 9

10
                    VIDEOTAPED DEPOSITION OF
11                        SARAH OWINGS
         CONDUCTED AT THE OFFICE OF DAVID DREYER LAW
12                   270 PEACHTREE STREET
                          SUITE 1040
13                  ATLANTA, GEORGIA 30303

14

15
                        10:10 a.m. EST
16       Friday, the 25th day of August, 2023

17

18
             Eric Cavanaugh, CCR, GRL 2560
19

20

21

22

23

24

25
```

1    A.   I did, yes.
2    Q.   Do you know if Mr. Free had any independent
3    conversations with then Ms. Clinky, now Ms. Morgan?
4    A.   I don't know that he had any independent
5    conversations, no.
6    Q.   Have you ever talked with Mr. Free about that?
7    A.   About independent conversations with her?
8    Q.   Yes.
9    A.   I'm sorry.  Confused by the question.
10   Q.   Have you ever had any conversations -- strike
11   that.
12        Has Mr. Free ever mentioned to you that he had
13   conversations with Ms. Clinky, now Ms. Morgan
14   separate from you?
15        MS. LEVINE:  Objection to form.
16   A.   No, he's never mentioned that.
17   Q.   What did Ms. --
18   A.   I should say that I recall, because I don't
19   recall.
20   Q.   Sure.  What do you recall Ms. Morgan, prior --
21   priorly known as Ms. Clinky, what do you recall her
22   telling you about her client who saw Dr. Amin?
23   A.   She had a client that was sent to him.  I
24   don't remember what the diagnosis was.  I recall that
25   she was expressing some trepidation about it.

1        And then Tracy had seen a report.  She was
2   supposed to go and see him.  Tracy, I think said
3   don't -- you know, she's like keep your legs closed,
4   don't go see that doctor because this is not a good
5   situation.
6      Q.  If you could flip over to page 10 of Exhibit
7   67?
8      A.  Uh-huh.  (indicating in the affirmative).
9      Q.  On line 25, right at the bottom.  And then
10  there's Tracy Clinky.  Do you see that?
11     A.  Yeah.
12     Q.  And then there's Tracy Clinky who is -- and
13  carrying over to the next page -- another immigration
14  attorney.
15     A.  Uh-huh.  (indicating in the affirmative).
16     Q.  "And she had a client go there yesterday and
17  Tracy Clinky said that the client basically had some
18  bumps or maybe a rash.
19         And he wanted to do -- after the pap smear, he
20  wanted to do like basically his whole scheme
21  essentially which is to check for cysts and then say
22  you have ovarian cysts and do a hysterectomy".
23         Do you see that?
24     A.  Yeah.
25     Q.  Did Tracy Clinky share that information with

 1  you?
 2    A.  Tracy would have shared the information about
 3  the client having -- yeah, bumps or a rash or
 4  whatever it was.  I don't recall specifically.
 5       But she would have shared that with me, and it
 6  would have gone -- you know, one of the cases we were
 7  starting to document and put together the
 8  investigation.
 9    Q.  Do you recall Ms. Clinky saying anything to
10  you about her client having concerns that Dr. Amin
11  wanted to perform a hysterectomy on her?
12    A.  Everyone was scared that he wanted to perform
13  hysterectomies.  So, yes, because people didn't know
14  what he was performing.  That was part of the issue
15  here.
16    Q.  Prior to September 15th, 2020?
17    A.  Prior to September 15th, 2020, we weren't
18  talking about our client's medical procedures with
19  each other.  This was not something that had been
20  brought to our attention and the thing that we
21  couldn't trust and didn't know what to do about.
22    Q.  When did you have communication with
23  Ms. Clinky regarding her client?
24    A.  It would have been, you know, probably the
25  same day or whenever the call went out.  Yeah, as

1  soon as the report came out basically and we all
2  started to see stuff.
3     Q.  Did Ms. Clinky use the word hysterectomy to
4  you when she was discussing her client who had seen
5  Dr. Amin?
6     A.  I don't recall if she would have used the word
7  hysterectomy or not.
8     Q.  You mentioned other -- strike that.
9         You mentioned a little while ago that the
10 focus of your work as an immigration attorney has
11 been defending against removal?
12    A.  Correct.
13    Q.  Meaning keeping people from being deported?
14    A.  Correct.
15    Q.  Would you say that is always your goal when
16 you're working with a client who is in detention?
17    A.  Not always.  I couldn't say that that's one
18 hundred percent my goal.  But typically it's the
19 desired outcome for a client.
20        So sometimes people do want to be deported.
21 But, typically, that is the goal is to defend them in
22 the removal proceedings.
23    Q.  In the history of you being an immigration
24 attorney, how often would you say it's the case that
25 a client wants to be deported?

1    A.   Not that often, but it does happen.
2    Q.   Do you recall any of your clients that you
3    represented who spent time at Irwin County Detention
4    Center who wanted to be deported?
5    A.   I recall at least one client that I worked
6    with directly who didn't want to fight any more.
7    Q.   And who was that?
8    A.   ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
9    Q.   Could you spell that for us?
10   A.   ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ -- sorry -- ▇▇▇▇▇▇.
11   ▇▇▇▇▇▇▇▇▇▇▇▇▇▇
12   Q.   Ms. ▇▇▇▇ said she didn't want to fight any
13   more and wanted to be deported?
14   A.   Yes, that's correct.
15   Q.   And was she?
16   A.   She was.
17   Q.   And where is she now?
18   A.   I don't know.
19   Q.   Where was she deported to?
20   A.   Her country of origin, El Salvador.
21   Q.   Did Ms. ▇▇▇▇ -- strike that.
22        I think you testified earlier that Ms. ▇▇▇▇
23   was one of the women that spoke with the Department
24   of Justice?
25   A.   That's correct.

 1    Q.  Did it -- strike that.
 2        What are possible grounds for avoiding
 3    deportation?
 4    A.  Possible grounds for avoiding deportation?
 5    Q.  Uh-huh.  (indicating in the affirmative)?  Let
 6    me ask it a different way.
 7        With your goal usually being to help clients
 8    avoid deportation, how do you do that?
 9    A.  How do I do that?  Like -- sorry.  That's just
10    a really big question because there's lots of
11    different -- different avenues for relief.
12        So there's relief before the immigration
13    court.  There's also relief before ICE.  There's
14    sometimes judicial review that can occur.
15        There's affirmative applications that can be
16    filed with USCIS, various parts of the Department of
17    Homeland Security.  There's the creation of private
18    bills.
19        There's -- there's many different avenues for
20    people who can -- who can seek protection from
21    removal.
22    Q.  Was COVID ever a way or -- strike that.
23        Was COVID ever a reason that a client could
24    avoid deportation?
25    A.  Like physically having COVID?

```
 1   STATE OF GEORGIA

 2   COUNTY OF FULTON

 3

 4

 5                C E R T I F I C A T E

 6

 7

 8         A forgoing transcript of the proceedings

 9   was taken before me as the Certified Court Reporter

10   in and for the State of Georgia and reduced to

11   typewriting under my direction and supervision, and

12   I certify that it is the true and correct

13   transcript to the best of my ability of the

14   proceedings.

15

16

17              This 15th day of September, 2023.

18

19                     [signature: Eric Cavanaugh]

20              _____

21              Eric Cavanaugh
                Certified Court Reporter
22              No. 2560
                CCR, GRL
23

24

25
          EC/jm
```