McNamara Reply Declaration

In Support of Summary Judgment

Exhibit 6

**DR. MAHENDRA AMIN, M.D. vs NBCUNIVERSAL MEDIA, LLC**
**Julia Ainsley on 04/25/2023**

```
 1              UNITED STATES DISTRICT COURT

 2          FOR THE SOUTHERN DISTRICT OF GEORGIA

 3                  WAYCROSS DIVISION

 4

 5  DR. MAHENDRA AMIN, M.D.,     )

 6       Plaintiff,             )    Case No.

 7  V                           )    5:21-CV-00056-LGW-BWC

 8  NBCUNIVERSAL MEDIA, LLC,    )

 9  _____/

10

11              ZOOM VIDEOTAPED DEPOSITION OF

12                   JULIA AINSLEY

13          DATE:  Tuesday, April 25, 2023

14          TIME:   9:00 a.m. - 5:57 p.m.

15

16

17

18

19

20

21

22  REPORTED BY:  TAMIKA M. BURNETTE, RPR, CSR-2870

23

24

25
```

```
 1                         Tuesday, April 2, 2023

 2                         9:00 a.m.

 3

 4             *        *        *

 5             THE VIDEOGRAPHER:  Please stand by.  Good

 6   morning, Counselors.  This is the beginning of Media

 7   Number 1 in the deposition of Julia Ainsley in the

 8   matter of Dr. Mahendra Amin, MD, vs NBCUniversal Media,

 9   LLC.

10             Today's date is April 25, 2023, and the

11   time on the monitor is 10:31 a.m.  My name is Edwin

12   Harlequin and I'm the videographer.  The court reporter

13   is Tamika Burnette.  We are here with Huesby Global

14   Litigation.

15             Counsel, please introduce yourselves after

16   which the court reporter will swear in the witness.

17             MS. EVANS:  Stacey Evans on behalf of the

18   plaintiff.

19             MS. MCNAMARA:  Elizabeth McNamara on behalf

20   of NBCU and the witness.

21                    (Witness sworn.)

22                    JULIA EDWARDS AINSLEY,

23             The witness, after having been duly sworn

24             to tell the truth, was examined and

25             testified as follows:
```

```
 1                        EXAMINATION

 2       Q.  BY MS. EVANS:  Good morning, again.

 3       A.  Hi.  Good morning.

 4       Q.  I'm Stacey Evans, we've met.

 5       A.  Yeah.

 6       Q.  Got to chat?

 7       A.  Yeah.

 8       Q.  Could you please state your full name for the

 9  record?

10       A.  Sure.  Julia Edwards Ainsley.

11       Q.  And I'm going to -- I don't have exhibit

12  stickers, so I'm just going to write them in the bottom,

13  since we don't have a live court reporter.

14                (Plaintiff's Exhibit 1 marked for

15  identification.)

16       Q.  BY MS. EVANS:  This first exhibit is simply the

17  notice that brings us here today.

18       A.  Okay.

19       Q.  There's nothing really for you to do with it,

20  I'd just like to mark those.  And other than the time,

21  this is, again, the notice that just brings us here

22  today.

23                Are you currently employed by NBCUniversal,

24  MSNBC or some other entity?

25       A.  By NBC News, which is owned by NBCUniversal.
```

1      Q.  And how long has that been true?

2      A.  Since August of 2017, so coming up on six

3   years.

4      Q.  And you were working for NBC News in September

5   of 2020?

6      A.  Yes.

7      Q.  I'm going to hand you what I'm going to mark as

8   Plaintiff's Exhibit 2, with a copy to your counsel.

9      A.  Okay.

10          (Plaintiff's Exhibit 2 marked for

11   identification.)

12      Q.  BY MS. EVANS:  And it shows Exhibit A because

13   this is a version of this document that was attached to

14   a pleading filed in this case.

15          If you flip to the second page, do you

16   recognize this document?

17      A.  Yes, I do.

18      Q.  What is it?

19      A.  This is a complaint that's sent by the Project

20   South, and it's being sent to the Inspector General for

21   the Department of Homeland Security, CR -- what we would

22   call CRCL at DHS.  It's civil rights and civil

23   liberties, the Atlanta ICE field office, as well as the

24   warden of the Irwin County Detention Center, and it

25   details what we --

```
 1                    THE COURT REPORTER:  I'm sorry.  Excuse me.
 2   I'm sorry to interrupt, but my audio -- like, you-all
 3   are a little muffled and low, so If you could speak up,
 4   just a little bit, and make sure the Zoom mic is close.
 5   And if you could repeat that answer, if you would.
 6   Beginning with what is it, it's a complaint.
 7                    THE WITNESS:  It's a complaint to a number
 8   of people in the U.S. government and working as a
 9   warden, a person who is the warden of the Irwin County
10   Detention Center.  And it's a complaint on behalf of the
11   whistleblower.
12                    MS. EVANS:  Is that better sound-wise?
13                    THE COURT REPORTER:  It's the same, but I
14   will let you know if I have any questions.
15                    MS. EVANS:  Okay.
16                    THE COURT REPORTER:  I just don't want to
17   interrupt.
18                    THE WITNESS:  That's about as loud as I am
19   comfortably.
20                    MS. EVANS:  Can we move that closer?
21                    Do you want to go off the record for a
22   minute?
23                    THE VIDEOGRAPHER:  Sure.  The time is
24   10:34 a.m.  We are going off the record.
25                    (Off the record.)
```

1           THE VIDEOGRAPHER:  Please stand by.  The

2   time is 10:37 a.m.  We're back on the record.

3       **Q.  BY MS. EVANS:  Ms. Ainsley, when is the first**

4   **time that you saw what I've marked as Plaintiff's**

5   **Exhibit 2?**

6       A.  I don't recall the exact moment, but I think it

7   would have most likely been the morning of

8   September 15th.  But I know Jacob Soboroff and I were

9   talking about this story on the 14th, and it looks like

10  the date was the 14th, but I don't believe I reviewed it

11  until the 15th.

12      **Q.  You said that you and Mr. Soboroff were talking**

13  **about this story on the 14th.  When on the 14th do you**

14  **recall speaking with Mr. Soboroff about this story?**

15      A.  I believe that we discussed the possibility of

16  him having an interview with this whistleblower the next

17  morning, but that was -- was all I knew.  I had another

18  story that consumed a lot of my time on the 14th.

19           .  So this would have been kind of a back

20  burner thing for the next day.

21      **Q.  How was it that Mr. Soboroff came to tell you**

22  **that he may have an interview with the whistleblower?**

23      A.  I believe he was -- he must have been in touch

24  with these groups that were representing her, but I'm

25  not sure exactly what the arrangement was of how he got

1  that interview.  I just know that he was in the process

2  of working out the logistics of doing that interview.

3       Q.  Why was it that he would have told you?

4       A.  Because we work together, all the time, on all

5  these immigration things.  We wrote a ton of news on

6  family separations when the two of us had been a team

7  with this award-winning track record throughout our

8  media organization, reporting on immigration issues.

9            And so, of course, when Jacob would have an

10 interview like this coming up, I would be his first call

11 and I would do the same for him.

12      Q.  Do you know how he came to be in touch with the

13 groups?

14      A.  I don't.  But it wouldn't be unusual for groups

15 to reach out to Jacob because, you know, he's got such a

16 good track record interviewing people and handling

17 issues like this.

18      Q.  And do you know if they reached -- strike that.

19           Do you know if the groups reached out to

20 him or if he reached out to one of them?

21      A.  I don't know that.

22      Q.  Was there anyone else that was in this

23 discussion with you and Mr. Soboroff on the 14th?

24      A.  No.

25      Q.  Was there anybody besides Mr. Soboroff that you

 1  talked to about this story on the morning of the 15th?

 2       A.  So define morning, because I know Jake, when I

 3  would have started talking about it, and then when I

 4  finally had enough information, I'm sure, would have

 5  told my editors, you know --

 6       Q.  As far as --

 7       A.  -- staff.

 8       Q.  Fair enough.  At the time that you -- how did

 9  you come to see the letter, Plaintiff's Exhibit 2?

10       A.  I don't know exactly, but I would have to see.

11  I don't know if you have e-mails or communications about

12  this, but what I'm imagining what would typically happen

13  is we would get it as an attachment.

14            I would imagine that if Jacob was

15  interviewing this woman, and he knew about the

16  whistleblower complaint, that they would have sent him

17  the complaint for the interviews so he could prepare.

18            But I also think that the incept -- I don't

19  know this for sure, but I know this had already been

20  reported on, so there's a possibility, as well, that

21  this was just already public online.

22            So I'm not sure if this was e-mailed to me

23  or if it was just already posted online.

24       Q.  At some point on the morning of the 15th, did

25  you read the entirety of Plaintiff's Exhibit 2?

1      A.  Yes.  Whether that was morning or afternoon, I
2  know that I read this, the entirety of this, before
3  writing my article.
4      **Q.  Before writing the article?**
5      A.  Yes.
6      **Q.  Would it also be true that you would have read**
7  **the entirety of Plaintiff's Exhibit 2 prior to going on**
8  **Deadline:  White House?**
9      A.  Yes.
10     **Q.  If you look at Plaintiff's Exhibit 2, the**
11 **second page, up towards the top, there's a little bit of**
12 **a trailing sentence from page one, and then it says**
13 **"This complaint and Ms. Wooten's."  Do you see that?**
14     A.  Uh-huh.
15     **Q.  "This complaint and Ms. Wooten's accompanied**
16 **declaration, which is incorporated by reference," and**
17 **then it continues.  Do you see that?**
18     A.  Yes.
19     **Q.  Have you ever seen Ms. Wooten's declaration?**
20     A.  (Witness examining document.)
21          So that's separate from this complaint.
22     **Q.  According to Plaintiff's Exhibit 2, it's**
23 **something that was accompanying this letter, and I'm**
24 **wondering if you've ever seen it.**
25     A.  I cannot say for certain.  I know that I

1  reviewed all the documents that were publicly available

2  to me at the time.

3      Q.  I'll represent to you that I've never seen it.

4      A.  Okay.

5      Q.  And my understanding is that --

6      A.  Sorry, can I interject for a second?

7      Q.  Uh-huh.

8      A.  Often what will happen when someone sends a

9  complaint to the government, they may have additional

10 information that they're not sharing with the press.

11 I'm just going off of my reporting practices in the

12 past.

13          So I can still report on what they're

14 sharing with the government, but oftentimes they won't

15 share everything with the press that they share with the

16 government.  So that may be the case here.

17     Q.  At some point, someone at NBCUniversal or

18 MSNBC, reached out to Project South and asked for a copy

19 of that declaration.  Were you aware of that?

20     A.  I was not aware of that.

21     Q.  Have you -- have you heard anyone at

22 NBCUniversal -- I'm saying NBCUniversal, you say NBC

23 News?

24     A.  Yeah.

25     Q.  Are those the same things?

1      A.  Because NBCUniversal would include, like, theme

2   parks, and so NBC News is our -- yeah, that's where I

3   work.

4      **Q.  And when would you use MSNBC to discuss --**

5      A.  When I am -- in the context of shows.  So if

6   I'm going to appear on a show that's on the MSNBC

7   platform, the way I explain it -- if this is too much of

8   a tangent, but just so you understand it, you know.  I

9   work for NBC News, which incorporates all of this, but I

10  work for the investigative unit.  And so everything I

11  do, it's almost like I'm a freelancer within my own

12  organization.  So I can appear on NBC Nightly News,

13  Today's show, MSNBC.  We now have NBC News Now.  And

14  these are all platforms that use our reporting.

15     **Q.  If I use the phrase, "NBC News," that's going**

16  **to encompass MSNBC?**

17     A.  Yes.

18     **Q.  Okay.  Have you -- strike that.**

19         **Do you recall any discussions with anyone**

20  **at NBC News about Ms. Wooten's declaration that's**

21  **referenced in Plaintiff's Exhibit 2?**

22     A.  No.

23     **Q.  If you flip over to page -- on the bottom,**

24  **page 18, in the right-hand corner?**

25     A.  Yes.

1    Q.  It's page 19 of 28 at the top.

2    A.  Yes.

3    Q.  About middle-ways through the page it says,

4  Subsection D.  And it says "Detained immigrants and ICDC

5  nurse's report, high rates of hysterectomies done to

6  immigrant women."  Do you see that?

7    A.  I do.

8    Q.  If you look down at the bottom, in the

9  footnotes, footnote 93 and 95 reference Project South

10 interviews.  Do you see that?

11   A.  I do.

12   Q.  One in October of 2019 and one in the summer of

13 2020?

14   A.  Right.

15   Q.  Have you ever seen documentation of those

16 interviews?

17   A.  No, I have not.

18   Q.  Have you had any discussions with anyone at NBC

19 News about the interviews in the footnotes 93 and 95 of

20 Plaintiff's Exhibit 2?

21   A.  No.

22   Q.  You've read Plaintiff's Exhibit 2 in its

23 entirety at some point on September 15th, 2020; true?

24   A.  Yes.

25   Q.  You don't have any recollection of seeing the

 1  word "declaration" and thinking there's more to this, I

 2  need to ask for this?

 3                MS. MCNAMARA:  Objection.  Asked and

 4  answered.

 5                THE WITNESS:  Yeah, I did not -- sorry, can

 6  you repeat your question?

 7                Oh, wait, if it's asked and answered, then

 8  you don't -- then we're --

 9                MS. EVANS:  She's making objections for the

10  record.

11                THE WITNESS:  Okay.

12                MS. EVANS:  I've got you on cross.

13                MS. MCNAMARA:  Until -- unless I tell you

14  to not to answer the question --

15                THE WITNESS:  Okay, okay.

16                MS. MCNAMARA:  -- then you should answer

17  the question.

18                THE WITNESS:  Okay.

19     Q.  BY MS. EVANS:  At some point on September 15th,

20  2020, you read the entirety of Plaintiff's Exhibit 2;

21  true?

22     A.  Yes.

23     Q.  But you don't have any recollection of seeing

24  the word "declaration" and thinking that you should ask

25  to see that declaration?

1      A.  I do not have that recollection.  Again, very

2  common that there would be attachments that would go to

3  the government that would not be made public to the

4  media.

5      Q.  It's typical that they're -- strike that.

6          Taking your word for it that it's very

7  common that there may be attachments that would be

8  referenced that would go to the government, but would

9  not go to the media, is it also typical, though, that

10 the media would ask to see those additional accompanying

11 documents?

12     A.  Not necessarily.  And we were also interviewing

13 this person.  It's not -- yeah.  We were doing our own

14 research.  I -- I wouldn't necessarily ask for the

15 accompanying documents.  My first priority would be to

16 interview the whistleblower.

17     Q.  And after you -- strike that.

18          Did you seek to interview Ms. Wooten?

19     A.  No, because I knew Jacob was.

20     Q.  And he had that interview set as of when?

21     A.  I just knew that he was working on it the night

22 before and then he got it set up in the morning.  And

23 Jacob, at that point, one, still is more -- has more TV

24 experience, and so it's really normal that Jacob would

25 be the one to do that interview.

1      A.  No.  That would have been impossible if we

2  didn't know who the detainee was.

3      **Q.  Whatever the reason, the answer to my question**

4  **is no; true?**

5      A.  True.  I think the context here is important

6  and I'd like to get it for the record.

7              MS. MCNAMARA:  You can answer.

8      **Q.  Well, who else did you work with --**

9              MS. MCNAMARA:  Excuse me, the witness wants

10  to speak.

11              MS. EVANS:  It's not a -- it's not a

12  speech.  It's a I get to ask questions and she answers

13  them.

14              MS. MCNAMARA:  She wants to answer the

15  question to give context to her answer, and she's

16  entitled to fully explain her answer.  That's all she's

17  asking.

18      **Q.  BY MS. EVANS:  What is the context that you**

19  **wish to give, Ms. Ainsley?**

20      A.  The context I'd like to give is that we would

21  not be able to talk to this -- Project South has done

22  their research.  They're concealing the identity of

23  these migrants for a reason.  That happens all the time.

24              What's up to us to do is to find other

25  migrants or lawyers representing those migrants, who can

1  give us more context, and that's what we did.  And so I

2  just wanted to explain.  That's why we would not have

3  reached out to this detained migrant or ask Project

4  South to put us in touch with that detained migrant,

5  then put us in touch with the five different women.

6              Also, that happened between October and

7  December of 2019.  This is happening in September of

8  2020, and under the Zadvydas decision, migrants' kids

9  stay in ICE detention for more than six months, so they

10 wouldn't be there anyway; it would be impossible to find

11 those women.

12     **Q.  Did you ask anyone if the detainee that's**

13 **referenced as being interviewed in footnote 95 or any of**

14 **the women that she talked to had legal representation?**

15     A.  I'm sorry.  Can you repeat that question?

16     **Q.  Did you or anyone at NBC News ask Project South**

17 **if the detainee referenced as being interviewed in**

18 **footnote 95 or any of the women that she spoke to had**

19 **legal representation?**

20     A.  No.  For the same reasons I just stated.

21     **Q.  What is that reason?**

22     A.  That this detained migrant is most likely no

23 longer in this facility.  They would have been

24 impossible to reach.

25     **Q.  Did you ask?**

```
 1      A.  No.
 2      Q.  You're aware -- strike that.
 3              Did you ever speak personally with Ben
 4  Osorio?
 5      A.  Yes.
 6      Q.  You are aware that Mr. Osorio had a client that
 7  had been deported; true?
 8      A.  No.  I don't -- I cannot recall if his client
 9  -- what the immigration status of his client at that
10  moment was.  I don't recall.
11      Q.  You're aware that there are instances when a
12  detainee may be deported, but they are -- their
13  attorney, either current or in the past, is still known
14  and able to be reached; true?
15      A.  True.
16      Q.  Did you make any attempt -- you or anyone at
17  NBC News, to your knowledge, make any attempt to find
18  out whether there was either current or prior
19  representation, legally, for the woman that is
20  referenced as being interviewed in footnote 95 or any of
21  the women that she spoke to?
22      A.  No.
23      Q.  Why not?
24      A.  Because we had four other lawyers who were
25  representing women who had come through this facility.
```

1 We -- it is not up to us.  I mean, we -- we weren't

2 leaning on this document solely on its own, so we didn't

3 need to do that.  We were doing interview with Dawn

4 Wooten, and we always talked to four lawyers with

5 clients who had been detained in that facility.

6           That would have been a very -- that would

7 have been the path of most resistance, that would have

8 taken a very long time, and we had the information in

9 abundance and other resources.

10     **Q.  How did you find out about these other four**

11 **lawyers that you said, "we" spoke to?**

12     A.  I was connected to them through Andrew Free.

13     **Q.  And how did you come to be connected Andrew**

14 **Free?**

15     A.  Andrew Free has been a reliable source of mine

16 for years.

17     **Q.  Did you reach out to him on September 15th?**

18     A.  I did.  Because Andrew Free lives in Tennessee

19 or lived there at the time, I'm not sure where he lives

20 now.  He lives in Tennessee, and I know that he knows

21 detention issues throughout the southeast very well.

22 And so based on the region, I saw this, I thought I need

23 to give Andrew a call.

24     **Q.  When did you call Mr. Free?**

25     A.  Sometime I would imagine the morning of the

```
 1   15th.
 2        Q.   And did you reach him?
 3        A.   Yes.
 4        Q.   And you spoke with him personally?
 5        A.   Yes.
 6        Q.   Was anyone else on the phone when you spoke to
 7   him?
 8        A.   No.
 9        Q.   Did you record that phone call?
10        A.   No.
11        Q.   What did Mr. Free tell you?
12        A.   He told me that he had familiarity with this
13   issue, and that I should speak to three other lawyers
14   who also had familiarity with the issue.  And he also
15   named the doctor.
16        Q.   Did he tell you about any clients that he had
17   in the Irwin County Detention Center?
18        A.   I don't recall.
19        Q.   Who were the three lawyers that he told you you
20   should speak to?
21        A.   Ben Osorio; this woman, whose last name is
22   Mathren, and then there was another one, I believe their
23   last name was Owings.  You can correct me if I'm wrong
24   on that.  But yeah, I think that was it.
25        Q.   Did you personally speak with Mr. Osorio on
```

1  September 15th, 2020?

2      A.  I believe so.

3      Q.  **Why do you say believe so?**

4      A.  Because September 15th, 2020 was a really long

5  time ago.

6      Q.  **Well, this was a -- this was a big deal to you;**

7  **right?**

8      A.  For that day.  I've done over a hundred other

9  stories since then.

10     Q.  **Did you -- when did you find out you were going**

11 **to be deposed in this case?**

12     A.  It was either late 2022 or early 2023, I think.

13     Q.  **And did you attempt to refresh your**

14 **recollection in preparation for your testimony today?**

15     A.  Sure.  Yeah.

16     Q.  **Did you look back over any notes?**

17     A.  Yes.  I know I talked to Mr. Osorio at some

18 point.  I'm just trying to remember -- yes, I did talk

19 to him on -- I believe I talked to him on the 15th, that

20 would make sense.  But again, when you don't have a

21 record of a phone call, and I'm really accurate, I want

22 to tell you exactly what I remember, 100 percent, so if

23 I have any doubt, I'm going to tell you that.

24     Q.  **Did you record your phone call with Mr. Osorio?**

25     A.  No.  I never record my phone calls with people

 1  that I'm interviewing unless I ask for their permission.

 2      Q.  Did you -- and you didn't ask Mr. Osorio for

 3  his permission to record?

 4      A.  No.  That would not be at all in the keeping of

 5  my reporting practices.

 6      Q.  Your reporting practices not to record seem to

 7  be different than others at NBC News; would you agree

 8  with that?

 9      A.  I don't think so.

10      Q.  How do you ensure that you're accurately

11  reflecting what your sources tell you if you don't

12  record?

13      A.  I take notes, but only if they're going to be

14  an on-the-record quote, would I need to record --

15      Q.  And it's your testimony that Mr. Osorio did not

16  provide you on-the-record quotes for the story that you

17  wrote on September the 15th, 2020 about Irwin County

18  Detention Center?

19      A.  I don't remember.

20            THE VIDEOGRAPHER:  Sorry for the

21  interruption.  The court reporter is actually having

22  problems hearing.

23            MS. EVANS:  Okay.

24            THE VIDEOGRAPHER:  The time is 11:04 a.m.

25  We're going off the record.

```
 1                    (Off the record.)

 2                    THE VIDEOGRAPHER:  Please stand by.  The

 3    time is 11:15 a.m.  We're back on the record.

 4         Q.  BY MS. EVANS:  Ms. Ainsley, did you speak with

 5    Elizabeth Mathren?

 6         A.  Mathren, yes.  I'd have to look at -- yes, I

 7    did.

 8         Q.  On September 15th, 2020?

 9         A.  Yes.

10         Q.  And did you record that interview?

11         A.  No.

12         Q.  Did you take any notes of that interview?

13         A.  Yes, I believe I did.

14         Q.  Do you still have those notes?

15         A.  No.  What -- how I take notes is over e-mail,

16    and I e-mail myself the notes, and then when my e-mail

17    gets full, as it does, I have to delete.

18         Q.  Did you take notes -- strike that.

19                    You testified earlier that you did not

20    record your interview with Ben Osorio on September 15th;

21    true?

22         A.  Right.

23         Q.  Did you take notes from that interview?

24         A.  Yes.

25         Q.  In the same fashion that you just described?
```

```
1    A.   Yes, which is easier to --

2    Q.   You took notes to yourself?

3    A.   Yes.

4    Q.   I do that too.

5    A.   Yes.

6    Q.   I do that too.

7    A.   Yes.

8    Q.   I do that too.  And did you -- strike that.

9              Did you speak with Sarah Owings on

10   September 15th?

11   A.   No.  Jacob Soboroff did.  We split up the

12   calls.

13   Q.   And you did also speak with Andrew Free?

14   A.   Yes.

15   Q.   You did not record that interview?

16   A.   Correct.

17   Q.   Did you take notes?

18   A.   Yes, I did.

19   Q.   Also on e-mail?

20   A.   Yes.

21   Q.   Did you speak with any other attorneys of

22   immigrant women or detainees on September 15th, 2020?

23   A.   No.  And let me -- I have got to say something.

24   Okay.  So Andrew -- I talked to Andrew, he gave me those

25   three the names.  Jacob and I split it up.  I know I
```

 1  talked to Osorio, and I know that Jacob talked to Sarah

 2  Owings.  I am not 100 percent sure.  I know one of us

 3  talked to Ms. Mathren, I cannot tell you with certainly

 4  whether that was me or Jacob.

 5      Q.  **There was a written article that was published**

 6  **at some point by NBC News, true, on September 15th,**

 7  **2020?**

 8      A.  Yes.  And if you'll reference that, I'd love to

 9  have a copy in front of me.

10      Q.  **And you were the writer on that article; is**

11  **that right?**

12      A.  Yes.

13      Q.  **What does that mean to be the writer?**

14      A.  You write it up.  And that's just really

15  typical how Jacob and I work together.  I usually write

16  the articles.

17      Q.  **I'll hand you what I'm marking as Plaintiff's**

18  **Exhibit 3, with a copy to your counsel.**

19              (Plaintiff's Exhibit 3 marked for

20  identification.)

21      Q.  **BY MS. EVANS:  Do you recognize Plaintiff's**

22  **Exhibit 3?**

23      A.  Yes.

24      Q.  **And what is it?**

25      A.  It is the article that we published on

1  September 15th.

2      Q.  And this version -- strike that.

3              There's at least three versions of this

4  article; is that right?

5      A.  I know there are multiple versions, I'm not

6  sure how many.

7      Q.  This version, Plaintiff's Exhibit 3, was

8  published, according to the timestamp at the top, at

9  9:02 p.m. eastern time, on the 15th, 2020; is that

10  right?

11     A.  Yes, that's what I see in front of me.  And I

12  guess what I would say rather than versions, I would say

13  the updates.  We update with more information.

14     Q.  And sometimes -- strike that.

15              And sometimes take information away; true?

16     A.  Sure.

17     Q.  If you flip to the third page of Plaintiff's

18  Exhibit 3, you see a picture of Dawn Wooten --

19     A.  Uh-huh.

20     Q.  -- at the top?

21     A.  Yes.

22     Q.  And right under Ms. Wooten's picture is a quote

23  from Ms. Mathren.  Do you see that?

24     A.  Yes.

25     Q.  And your testimony is that you can't recall if

 1  it was you or Mr. Soboroff that spoke with Ms. Mathren?

 2      A.  Correct.

 3      Q.  Given that Ms. Mathren was quoted --

 4      A.  Correct.

 5      Q.  -- whether it was you or Mr. Soboroff that

 6  interviewed her, you would have expected that interview

 7  to be recorded; true?

 8              MS. MCNAMARA:  Objection.

 9              THE WITNESS:  Not necessarily.

10      Q.  BY MS. EVANS:  Why?

11      A.  I don't record every interview where I do a

12  direct quote.  I mean, I make sure it's correct, it

13  would be verbatim.  I would never publish anything where

14  I'm not getting it verbatim.  I cannot say with

15  certainty that I interviewed her or if I did interview

16  her, that it was recorded.

17      Q.  Do you recall testifying, right before the

18  break, that it is your practice to record interviews

19  when you are going to be quoting a source?

20      A.  Could you read back exactly what I said?

21      Q.  Well, I will ask the court reporter if she can

22  read it back.

23      A.  Okay.

24              THE COURT REPORTER:  Okay.  One moment.

25              MS. EVANS:  I think that's when she

```
 1  couldn't hear us, so it's not --

 2                 THE WITNESS:  Okay.

 3                 MS. EVANS:  -- on the real time.

 4                 THE WITNESS:  So would you like me to just

 5  answer it to the best of my knowledge?

 6                 MS. EVANS:  Well, no.  She's looking it

 7  up --

 8                 THE WITNESS:  Oh, okay.

 9                 MS. EVANS:  -- to read it back.  I was just

10  saying I would otherwise --

11                 MS. MCNAMARA:  Do you want to tell us where

12  that is?

13                 MS. EVANS:  Yeah, I was just trying to see

14  if I could find it.

15                 THE COURT REPORTER:  Do you know where it

16  was exactly?

17                 MS. EVANS:  It was right before the break,

18  Ms. Burnette.  I'm trying to find it myself.

19                 THE COURT REPORTER:  You had a question

20  where it says:  Did you take any notes of that

21  interview?

22                 Yes, I believe I did.

23                 Do you still have those notes?

24                 Is that what we're looking for or no?

25                 THE WITNESS:  That was after the break.
```

1              (Plaintiff's Exhibit 5 marked for

2    identification.)

3        Q.   BY MR. EVANS:  Do you see that?

4        A.   Yes.  She's describing the AP wire.

5        Q.   So tell me what that means, "she's describing

6    the AP wire"?

7        A.   Well, I was a wire reporter for years.  That

8    means the Associated Press would write up the story, and

9    this means that there's no one from our newsroom who has

10   changed -- actually, I don't know that for a fact.  I

11   don't -- I'm not on that side of this.

12              But what it would mean to me, as a reporter

13   looking at this, is that you would take what the

14   Associated Press puts out, and put it on your website

15   that we haven't done any additional reporting at this

16   point.  So that's why the bylines says Associated Press.

17       Q.   This document reflected in Plaintiff's

18   Exhibit 5, is this what's referred to as Daniella's

19   story?

20       A.   No.  Because it looks like she then did her own

21   update at 2:26.  So she must have added some more

22   information beyond this.  So what I'm updating, then,

23   that published around like 5:24, I think, was updating

24   Daniella's story, so not just the Associated Press.  But

25   Daniella used some of the Associated Press reporting in

1  her reporting.

2      Q.  At some point there was concern about whether

3  Daniella's story ran without permission of standards; is

4  that right?

5      A.  I don't recall.

6      Q.  When you -- strike that.

7          Did you meet with -- strike that.

8          What did you do to prepare for your

9  deposition today?

10     A.  I -- I spoke with my counsel and read the story

11  to create the story and, you know, turned over any

12  communications I may have had on this.

13     Q.  How many times did you have conversations with

14  counsel in preparation for your deposition?

15         THE WITNESS:  Is that privileged?

16         MS. MCNAMARA:  You can answer.

17     Q.  BY MS. EVANS:  Unless she tells you not to

18  answer, you're the witness, not the lawyer.

19     A.  So how many times --

20         MS. MCNAMARA:  You can answer the question

21  as to how many times; you can't discuss the substance.

22         THE WITNESS:  Okay.  Good to know.  Let's

23  see.  So we would have spoken by phone, right before my

24  maternity leave.  That was October 2021.  And then I

25  know we spoke twice, at least twice since I found out

 1  I'd be deposed, and then yesterday.  So that's at least

 2  four times.

 3      **Q.  BY MS. EVANS:  You spoke with Ms. McNamara in**

 4  **October of 2021?**

 5      A.  No.  I don't think that was Ms. McNamara at

 6  that point, but it was lawyers, you know, representing

 7  NBC.

 8      **Q.  In preparation for your deposition?**

 9      A.  No.  That was at the point where we just found

10  out there was discovery.  I was about to have a baby

11  like within days, and I didn't want to be spending my

12  maternity leave trying to find documents.  So I just

13  wanted to give them everything they needed so that I

14  could focus on the child.

15      **Q.  And then you met twice with lawyers since you**

16  **found out you were going to be deposed?**

17      A.  Spoke on the phone twice.

18      **Q.  Okay.**

19      A.  The only time I met in person was yesterday.

20      **Q.  Who did you meet with yesterday?**

21      A.  Not Adam, but it would have been Gale Gove and

22  Justine and Liz and Amanda Heikkila.

23      **Q.  And how long did y'all meet yesterday?**

24      A.  About five hours but, you know, we took breaks.

25      **Q.  And who was it that you spoke with on the phone**

1  the first time?

2      A.  I can't recall.

3      Q.  Was it more than one lawyer?

4      A.  I can't recall.

5      Q.  How long did you speak with that person?

6      A.  I absolutely can't recall that.

7      Q.  What about the second time?

8      A.  I think Amanda was the only person we talked to

9  the two times before the deposition, and those probably

10  would have been 30-minute calls, just what to expect,

11  trying to explain.

12              MS. MCNAMARA:  Sorry.

13      Q.  BY MS. EVANS:  Yes.  I don't want to know what

14  you talked about.

15      A.  Okay.  All right.  I'm just trying to say that

16  they weren't very long.

17      Q.  Sure.  When you met with counsel yesterday, did

18  y'all look at any documents?

19      A.  Yes.

20      Q.  What did you look at?

21      A.  I think everything in the discovery.  We looked

22  at e-mails.

23      Q.  Did you look at e-mails that reflected that at

24  some point, there was concern that Daniella's story had

25  been published without permission of standards?

1    A.  No.

2      Q.  You've never seen anything like that?

3    A.  Correct.  I have never seen an e-mail like

4  that.

5      Q.  I'm going to hand you and your counsel what

6  I've marked as Plaintiff's Exhibit 6.  If you can take a

7  moment to look at that.

8              (Plaintiff's Exhibit 6 marked for

9  identification.)

10     Q.  BY MS. EVANS:  My first question will be, do

11  you recognize the document?

12    A.  And I do.

13              MS. MCNAMARA:  And just for the record,

14  this is the document that's Bates-stamped NBCU2644

15  through 2651.

16     Q.  BY MS. EVANS:  Ms. Ainsley, do you recognize

17  Plaintiff's Exhibit 6 as an e-mail strain that goes --

18  it goes over some time.  But the last e-mail in the

19  string is an e-mail from you to a group of individuals?

20    A.  Correct.  Yes, I recognize this.

21     Q.  If you flip to the second page of the exhibit,

22  at the top of the page there's another e-mail from you

23  to a group on September 15th at 3:34 p.m. that states,

24  "Adding in Mark, his question remains:  What do we do

25  with Daniella's story and rather or not they ran the

 1  story without permission of standards?"  Do you see

 2  that?

 3       A.  I do.

 4       Q.  Does that refresh your recollection that at

 5  some point there was concern that Daniella's story had

 6  ran without the permission of standards?

 7       A.  Yes, that refreshes my memory.

 8       Q.  And what do you recall about that now that

 9  we've refreshed your recollection?

10       A.  So -- yes, I can explain to you.  Daniella is

11  part of our digital team.  I am part of the

12  investigative team, and the investigative team goes

13  through a very rigorous process, always having this, you

14  know, as you can see in our process right here.  I'm

15  answering all these questions, and Daniella, which was

16  based largely on, you know, reporting that was out there

17  by number of respected news organizations, including the

18  Associated Press, she pushed out her reporting, based on

19  that, and I think, basically, I'm griping here a little

20  bit to say hey, why is the bar higher for me than it is

21  for everybody else.  And Mark would have been also

22  making that on our behalf, because he's a good advocate

23  for us.

24       Q.  What is -- what is standards?

25       A.  What is standards?  They are a team of people

1  who -- they play devil's advocate.  They make sure that,

2  you know, I would go to them if a person I'm

3  interviewing needs to have their identity concealed.

4  They would be the ones who look at it and make sure it's

5  blurred enough.  They make sure the wording we're using

6  is up to NBC standards.

7                    They know what our standards are, and they

8  make sure that all of our work, whether it be a script

9  or something that goes online, meets our standards.

10      Q.  And you say it's a team of people.  Is there a

11  leader of standards?

12      A.  Yes, but that has changed over time.

13      Q.  At the time, was it Christopher Scholl?

14      A.  I think Chris was number two.  I would have to

15  go back and look.  I can't remember exactly when Marian

16  Porches left.  I'm sure people in this room could answer

17  this question for me.

18                    Marian Porches may have been head at the

19  time.  We can do a Google search and find out.

20      Q.  Who is head now?

21      A.  Oh, my God.  Is it Brian?  They can't tell me.

22  I think it's Brian.  But I still work with Chris a lot.

23  Chris is still on standards.  And if Chris is also head

24  of standards now, I apologize to Chris for not giving

25  him the promotion that he deserves in this testimony.

```
 1      Q.  Has he been head of standards at some point?
 2      A.  I don't recall.
 3      Q.  How big is standards?
 4      A.  I don't know.
 5      Q.  When you need to have -- strike that.
 6          Does everything that goes on television or
 7  in print have to be approved by standards?
 8          MS. MCNAMARA:  Objection to form.
 9          THE WITNESS:  It depends on its uniform.
10  Not everything.
11      Q.  BY MR. EVANS:  What does and what doesn't?
12      A.  This is probably one of the reasons why I'm
13  griping here.  What -- things that -- so first of all,
14  we would call it legal and standards because that's
15  where lawyers answers to standards.  We all say, does
16  this have to go to L&S.
17          Most of my reporting does go to legal and
18  standards, but I'm not -- I know my process, I don't
19  know the rest of the company.
20          Most of my reporting goes to legal and
21  standards because I do reporting that isn't just based
22  on the Associated Press.  Right.  So I've got my
23  sources.  I've got my documents.  I've got a lot of
24  really in depth reporting and that -- yeah.  Honestly,
25  it's a badge of honor that my reporting goes to legal
```

1 and standards because -- and that we have these

2 conversations because that means you're doing like --

3 oh, gosh, are you okay?  Yes.  So I don't know if

4 everything goes, but I know that my reporting does.

5        Q.  **All of your reporting does?**

6        A.  Probably not everything, no.  If I'm reporting

7 on a press conference.  See, I think I'm trying to

8 explain the difference.  There's commodity news.  If

9 Biden came up and gave a press conference, that would

10 need to go through legal and standards.  But I just want

11 you to understand that we don't send stories to legal

12 and standards because there's a flaw in them.  That is

13 not what that means.

14        Q.  **Do you send things to -- strike that.**

15            **You said L&S, legal and standards?**

16        A.  Yes.

17        Q.  **So are they the same thing?**

18        A.  No.  You have your lawyers and you have your

19 standards people, but you would just -- anyway.  That's

20 just how we usually say it, like, does this need to go

21 to L&S.

22        Q.  **Does most of your reporting go to both legal**

23 **and standards?**

24        A.  Yes, most of my reporting does.

25        Q.  **And how do you know when it needs to -- we'll**

 1  come back to standards in a minute.

 2              How do you know when it needs to go to

 3  legal?

 4       A.  My editor makes that decision.

 5       Q.  Remind me again who your editor is?

 6       A.  Mark Schone.  And at the time, my boss, who is

 7  even higher than Mark was Rich Greenberg, and he would

 8  also be a part of that decision.  Mark just -- I mean,

 9  Rich just left, but he would have been there at the

10  time.

11       Q.  Would you suggest or is that something that

12  they would --

13       A.  That's totally their call.

14       Q.  What about the decision to send something to

15  standards?

16       A.  It's totally their call.

17       Q.  As well?

18       A.  Yes.

19       Q.  And is it true that reporting that goes to

20  standards -- strike that.

21              I understand what you're saying about

22  commodity news.  It's a press conference.  There's

23  reporting.  It's done.

24       A.  Yes.

25       Q.  The reporting that you do that has to go to

 1  standards, is that when there are third-party sources

 2  involved that aren't directly on camera?

 3      A.  Define a third party; someone who's not

 4  directly on camera?

 5      Q.  Yes.  Any source that's not out in a public

 6  view, giving a speech, for example?

 7      A.  Oftentimes if someone is just named, they don't

 8  necessarily have to be on camera, but if we have all on

 9  the record sources, we will skip legal and standards.

10      Q.  So if you have sources that are not giving

11  public speeches and are not on the record, then it goes

12  to standards?

13              MS. MCNAMARA:  Objection.  Form.

14              THE WITNESS:  It's not -- it's not as clear

15  as that.  It's not -- I don't make that determination.

16  So I would ask you to -- someone else would be better to

17  answer that question than me.

18      Q.  BY MS. EVANS:  But you're aware that most of

19  your reporting goes to standards?

20      A.  Yes.

21      Q.  What is your understanding about why most of

22  your reporting goes to standards?

23      A.  Because most of my reporting is original.  And

24  by original, I mean not commodity news.

25      Q.  Who made the decision to send the print article

 1  that we were looking at, as reflected in Plaintiff's

 2  Exhibit 3, to standards?

 3      A.  I would imagine Mark Schone and Rich Greenberg.

 4      Q.  Collectively or one or the other?

 5      A.  Yes.  Collectively or one or the other.

 6      Q.  Do you know if Daniella's story -- strike that.

 7            Are we in agreement that Daniella's story

 8  is what's reflected in Plaintiff's Exhibit 4?

 9      A.  Yes.  It looks like it's got her byline on it,

10  and not mine.

11      Q.  But not Plaintiff's Exhibit 5?

12      A.  (Witness examining document.)

13            So your question is whether or not this is

14  Daniella's story.

15      Q.  Correct.  Plaintiff's Exhibit 5 that refers to

16  the Associated Press.

17      A.  No.  It looks like this is not Daniella's

18  story.  I don't know personally if Daniella had anything

19  to do with getting this published on our website.  That

20  would have been happening in a conversation I wasn't a

21  part of.

22      Q.  But Daniella's story is what's reflected in

23  Plaintiff's Exhibit 4, the 2:26 p.m. --

24      A.  Yes.  That is definitely her story.  It's got

25  her name on it.  But I can't say for sure if she had

1  anything to do with Exhibit 5.

2      **Q.  Do you know if Plaintiff's Exhibit 4 was**

3  **retroactively approved by standards?**

4      A.  I don't know.

5      **Q.  Do you know if it was ever approved by**

6  **standards at all?**

7      A.  I don't know.

8      **Q.  Do you know if standards reviewed it?**

9      A.  I don't know, because that -- this -- this

10  entire story is running without my involvement at all.

11      **Q.  When you get approval from standards, what --**

12  **strike that.**

13          **How is approval from standards**

14  **communicated?**

15      A.  E-mail, usually.

16      **Q.  And what does it say?**

17      A.  Oh, it's never like some sort of official

18  stamp.  It's just conversations back and forth.  They

19  usually answer questions -- or they ask questions, and

20  you answer questions, and then -- yes, then it can be

21  published.

22      **Q.  Well, how do they let you know that you can**

23  **publish it?**

24      A.  It varies.  It's not like we have some system

25  where the light turns green.  It wouldn't -- so I don't

1   even publish it myself.  Mark is the one who goes in and

2   publishes it.  And so Mark has made the determination --

3   if it's being published, Mark or Rich would have made

4   the determination that -- that we have resolved any of

5   the standards' concerns.

6        **Q.  How would it be possible for Daniella's story**

7   **to have been published without standards?**

8        A.  They must have made the determination that this

9   was commodity news.  It was being reported so widely, by

10  so many respected news organizations.  Nothing in here

11  is what I would consider original, so that's how they

12  made that determination.  Then I'm complaining that it's

13  unfair that I'm reporting on the exact same thing, yet I

14  have to go through a more rigorous process.

15       **Q.  There's not a situation where you, Julia**

16  **Ainsley, would push something up to the internet**

17  **yourself?**

18       A.  No.  I have no ability to do that.

19       **Q.  And Daniella wouldn't have the ability to do**

20  **that?**

21       A.  I don't know.  I've never even met Daniella.

22       **Q.  What is NCX?**

23       A.  News Connect.

24       **Q.  Tell me what is News Connect.**

25       A.  It is our system where you can share material

 1  with our whole news organization.  So MSNBC Show can use

 2  it.  We will mark it, you know, with reporting notes.

 3  You can tell people where to find footage of a video.

 4  It's just a way -- we're such a big news organization.

 5  It's a way that -- to communicate the news or lines of

 6  reporting that we're continuing to pursue.

 7      **Q.  Do things have to be approved before they can**

 8  **-- strike that.**

 9              **Do things have to be approved in some way**

10  **--  I'm not referring to standards necessarily with this**

11  **question.**

12              **Do things have to be approved in some way**

13  **to go on News Connect?**

14      A.  Not necessarily.  You can make a note to say

15  another news organization has reported something, and

16  you want to send out a note that says hey, we haven't

17  independently confirmed this yet ourselves, but we're

18  working on it.  You can tell people that over News

19  Connect.

20      **Q.  And anyone --**

21      A.  But you would indicate reporting that is

22  approved by standards, when you go on to News Connect,

23  so that they can know that that's been approved.

24      **Q.  And what would that indication look like?**

25      A.  You would just say it.

 1      Q.   This is approved by standards?

 2      A.   Sure.  Some people -- everybody uses a

 3   different form.  Some people would say reportable,

 4   approved by so and so.  They might use a name.

 5   Sometimes they might just say standards.  But you would

 6   just indicate that it's reportable.  But very often,

 7   people will forget and leave that off.

 8      Q.   What do you mean sometimes they would --

 9      A.   Some people will just put out -- they're

10   reporting, they're like copying and pasting their

11   article, they're copying and pasting and they'll forget

12   to say that it's approved.

13      Q.   Then how does one who's looking at News Connect

14   know what information in there is approved or reportable

15   versus what's just information sharing?

16      A.   It -- it should say approved.  If someone left

17   that off, they'd get a call, and they'd say is this

18   approved or not?

19      Q.   Get a call from?

20      A.   Probably the show that wanted to use it,

21   whoever wants to use it.  They'd say wow, that's good

22   information, can we use that?  Well, they didn't say if

23   we could, so let's call them up and ask.  This is so

24   hypothetical.  I'm just saying people sometimes forget,

25   but that's --

1    Q.   That's the way you do it?

2    A.   -- generally the way you would indicate it's

3  usable, as you would say it's been approved or it's

4  reportable.  If you say it's reportable.

5    Q.   So reportable means approved by standards as

6  well, because I've seen that?

7    A.   Yes.  Unless -- I mean, so there could be a

8  situation where it could be reportable, but it didn't

9  have to go through standards.  If my editor says that's

10  reportable and you don't need to go through standards,

11  then it's -- then it's reportable.  Rich Greenberg has

12  the authority to do that.

13    Q.   Okay.  And the entirety of the NBC News

14  organization has access to News Connect; true?

15    A.   I don't know for sure.  It would make sense

16  that they did, but I don't know for sure.

17    Q.   How do you put information into News Connect?

18  Logistically, how do you do it?

19    A.   You would go there -- it's funny.  It's

20  actually like so cumbersome.  We call it news concealed,

21  because it's so hard to find news on there.  So you go

22  into this website and you do like a plus button and you

23  can add on to a topic.  So like one of the topics I

24  follow is immigration.  So if there's ever any news on

25  immigration and someone adds to it, I get an e-mail that

1  says that.  I almost never even go on there, I just do

2  it if I need to post information.  The other thing I do

3  is I e-mail out.  We have this list serve of politics

4  deal that we call it, and that goes out to most people,

5  because News Connect is a pain.

6        **Q.  What do you think -- strike that.**

7              **What is the intent, as far as you**

8  **understand, of the News Connect platform?**

9        A.  To share information across our news

10  organization that can be used.

11       **Q.  And is it up to an individual that happens to**

12  **have gathered whatever news it is, whether to put it on**

13  **there or not?  And by "on there," I mean News Connect?**

14       A.  Okay.  Is it up to an individual to decide?

15  Well, they would have -- I think that question could

16  imply that someone could go and just publish.  The rules

17  are, you know, you're supposed to say whether or not

18  it's reportable or not reportable.

19             If you have something that's not

20  reportable, say, it's a single source, but you just want

21  to put that out there, you're putting it out there to

22  see if maybe somebody else can come get another source.

23       **Q.  Could add to the story?**

24       A.  Yes.  That's often when other news

25  organizations have already published something and we're

 1  trying to confirm it.  I personally don't put single

 2  source reporting in News Connect.  I would call up

 3  another reporter who would be able to help.  But that's

 4  my personal practices.  I don't know about the rest of

 5  my nesorganizations.

 6      Q.  When you refer to the legal of legal and

 7  standards --

 8      A.  Yes.

 9      Q.  -- the separate systems we talked about just a

10  moment ago --

11      A.  Yes.

12      Q.  -- is that the same thing as prepublication

13  review?

14      A.  So when I talk about legal, I'm talking about a

15  group of people, not a review.  That is one of their

16  functions.

17      Q.  One of the functions of legal is to do

18  prepublication reviews?

19      A.  Of some things, not all everything.

20      Q.  What is -- what are the other functions of

21  legal --

22      A.  Well --

23      Q.  -- as you understand it?

24      A.  This.

25      Q.  As far as the publication process of news, what

 1  is the -- what is the role of legal other than

 2  prepublication review?

 3       A.  That's -- in my experience, that's the only

 4  time I work with them.

 5       Q.  On September the 15th, we talked about the

 6  individual lawyers that you had talked to and/or that

 7  Mr. Soboroff had talked to.

 8            Did you -- do you recall that?

 9       A.  Yes.

10       Q.  Did you talk to anyone else outside of NBC News

11  about the story related to Irwin County Detention Center

12  on September 15th, 2020?

13       A.  No.  I do remember that I had to not -- I

14  remember like telling my husband I had to work on the

15  story and so I had to like -- I needed his help with

16  baby stuff, but that's like the extent of it.

17       Q.  Your husband's in the healthcare industry,

18  true?

19       A.  Yes.

20       Q.  Did you talk to him substantially at all about

21  any part of this situation at Irwin County Detention

22  Center?

23       A.  No.

24       Q.  Ever?

25       A.  He knows I'm here doing this deposition.

 1  That's the extent to which we've spoken about it.

 2       Q.  Did you speak to him about what sort of

 3  documents may exist or any special rules related to

 4  healthcare?

 5       A.  No.  We have not talked about that.

 6       Q.  Who did you -- strike that.

 7            Did you speak to any other news

 8  organizations on September 15, 2020 about Irwin County

 9  Detention Center?

10       A.  No, I did not.

11       Q.  Is that unusual for you to not talk to other

12  news organizations?

13       A.  That would be totally unusual to talk to

14  another news organization about that.  I mean, you see

15  what they publish.  We're certainly reading what

16  everybody has done, but that would be highly unusual to

17  call up a reporter and ask them about their process.

18       Q.  You wouldn't be speaking to your counterpart at

19  CNN, for example?

20       A.  No, no.  They would be like, what, why are you

21  calling me.

22       Q.  The same would be true for crime sources like

23  the New York Times?

24       A.  Yes, yes.  You see what they put out, but no

25  one is like opening up the hood and showing what they're

 1  within the period of time.  She explained why she

 2  thought she was credible.  It has been thoroughly

 3  explained and answered.  You just don't like the answer,

 4  so you're wasting time.

 5            You can answer it.  You can ask it again,

 6  but the witness has answered this question.

 7       Q.  BY MS. EVANS:  At the time you went on air, on

 8  Deadline:  White House on September 15th at 5:33 p.m.,

 9  you had evidence of two hysterectomies, true?

10       A.  True.

11       Q.  Did you have evidence of more?

12       A.  No.  But I had a whistleblower saying several,

13  and that's why I said, "She said several."  That's --

14       Q.  When you --

15       A.  -- why I attributed it to her.

16       Q.  You might want to go and talk to legal later

17  about tale-bearers and tale-makers.  It doesn't matter.

18       A.  What does that mean?

19            MS. MCNAMARA:  Objection.

20  Mischaracterization of the law.  Mischaracterization of

21  what she says.

22            MS. EVANS:  I'm sick of the legal, you

23  know, opinions coming from the witness chair.  I don't

24  have to sit here and listen to it.  She's wrong and

25  maybe y'all need to go and --

1            MS. MCNAMARA:  She is not giving a legal

2  opinion.

3            MS. EVANS:  Well, she's attempting to.

4            MS. MCNAMARA:  She's testifying as a

5  journalist and what she believed.  That's all you can

6  ask.

7            MS. EVANS:  Well, I'm going to get answers

8  to my questions.  I'm just trying to make that clear.

9  We're not going to just sit here and have a legal

10  lesson.

11            THE WITNESS:  It's not a legal lesson.

12      **Q.  BY MS. EVANS:  I'm going to ask the questions.**

13  **You spoke personally to Ben Osorio on September 15th?**

14      A.  Yes.

15      **Q.  Did you ask him how many clients he had at the**

16  **Irwin County Detention Center?**

17      A.  I know that he had the least one.  I don't

18  recall if I asked him how many and if he had more than

19  that.  I don't recall.

20      **Q.  How many clients, at Irwin County Detention**

21  **Center, did Elizabeth Mathren have?**

22      A.  I don't know.

23      **Q.  How many clients at Irwin County Detention**

24  **Center did Andrew Free have?**

25      A.  I don't know.  I just know that they all at

 1  least had one.

 2       Q.  Did Andrew Free have any clients at Irwin

 3  County Detention Center separate from the clients of Ben

 4  Osorio?

 5       A.  Not to my knowledge.

 6       Q.  How many clients at Irwin County Detention

 7  Center did Sarah Owings have?

 8       A.  I don't know.  And again, I believe that Jacob

 9  did that interview.

10       Q.  Did you -- and you didn't speak to any other

11  lawyers on September 15th?

12       A.  Correct.  And I want to say that at the time,

13  I'm sure I knew how many, collectively, these lawyers

14  represented, I don't know it now.

15       Q.  And you didn't share that on the air, if you

16  did know it, right?

17       A.  I don't -- I don't -- I don't believe I did.

18  I'm just trying to identify how many lawyers we spoke to

19  who have clients there.

20       Q.  Did you -- we'll put aside Jacob for a second.

21            Did you tell any of the lawyers that you

22  spoke with, whether that was Ben or Ben and Ms. Mathren,

23  did you tell them that you wouldn't name them on air?

24       A.  I don't recall making -- give me a second.  So

25  I don't believe that -- first of all, I don't recall the

 1   content of the conversation, but I don't believe I would
 2   have said that.  Because if I'm going to name someone in
 3   a digital article, then that would normally mean I could
 4   also name them on air.  I just wouldn't get tripped up
 5   over a name of someone who's not a public figure.  It's
 6   of no interest to our viewers who Ben Osorio is.  They
 7   don't know who that is, so that's why I wouldn't name
 8   them on air.
 9       Q.  And you didn't share the number of women that
10   these attorneys represented?
11               MS. MCNAMARA:  Objection.
12               THE WITNESS:  I would need to see the
13   transcript.
14       Q.  (By Ms. Evans)  We'll look at it.  Let's go
15   back to Exhibit 6.  So we had started at the back and
16   we're over on the page ending in Bates number 2650,
17   where you had been added to the e-mail chain, which was
18   a discussion --
19       A.  The very back, yes.
20       Q.  -- of Mr. Soboroff's interview.  We took a
21   second to look at the transcript for a minute.  It goes
22   through discussions of the bites for a little bit.  And
23   then if you flip over to the page that ends in 2648 --
24       A.  Yes.
25       Q.  -- the e-mail from Chris Scholl to Soboroff and

 1   several others --

 2       A.  Yes.

 3       Q.  -- including you.

 4       A.  Yes.

 5       Q.  Do you see that?

 6       A.  Uh-huh.

 7       Q.  And that is at 1:24 p.m.

 8       A.  Right.  Yes.

 9       Q.  Right?

10       A.  Yes.  Again, I think that's -- is that east

11   coast time?  Probably.

12       Q.  Yes, just judging from the prior e-mails.

13       A.  Yes.  Okay.

14       Q.  So Chris says, "As I've been mulling, my

15   concern is all we have is a public whistleblower

16   complaint, in which she provides no evidence to back up

17   her claims.  ICE makes essentially the same point, and

18   it appears a valid one.  She has no direct knowledge of

19   what she is claiming, is unable to name the doctor

20   involved, if I understood correctly, and we are unable

21   to verify any of it or determine whether there really is

22   a story here.

23               Essentially, it boils down to a single

24   source, with an agenda, telling us things we have no

25   basis to believe or prove.  At the least, we would have

 1  to note all of that in our reporting, but then it's

 2  worth asking, why are we reporting it in the first

 3  place.  I still think we need more of our own

 4  independent reporting before going with this?

 5          ICE's statement alone doesn't get us there,

 6  but I'm happy to chat further."  Did I read that

 7  correctly?

 8      A.  Yes.

 9      Q.  Is this what led you to actually call Andrew

10  Free?

11      A.  I don't know if I had a call in to him and he

12  called me back.  I can't remember exactly when I called

13  him.

14      Q.  Well, the e-mail -- the next e-mail in the

15  chain is from you.  It says 10:26 a.m., but I think

16  that's actually 2:36 p.m.?

17      A.  Yes.

18      Q.  Or 1:36?  My --

19          MS. MCNAMARA:  1:26.

20          THE WITNESS:  Yes, 1:26.  It says

21  two minutes after --

22      Q.  BY MS. EVANS:  1:26, yes.  My math, sometimes.

23          All right.  So at 1:26 p.m. Eastern Time,

24  you write back to the chain.  "Thank you, Chris.  For

25  what it's worth, I just had an off-the-record convo with

 1  ICE, and they said they are working on getting us data

 2  on the number of hysterectomies performed on this

 3  facility.  They believe the data will negate her

 4  claims."  Her, I assume, Wooten.  "But they haven't give

 5  me an ETA, just that they are working as fast as they

 6  can."

 7              Did read that correctly?

 8      A.  Yes, you did.

 9      Q.  So when had you spoken to ICE?

10      A.  I guess I -- it says I just had an

11  off-the-record.  So it sounds like I just got off the

12  phone with them at that point.

13      Q.  And they told you data on the number of

14  hysterectomies was going to be forthcoming?

15      A.  Yes.  Although I would say, in my experience

16  with them, it can take days.

17      Q.  You didn't say to Chris, "I've got a call in to

18  an immigration attorney.  I've got immigration attorneys

19  I can call," nothing of that sort, right?

20      A.  No.  I really wouldn't need to share that with

21  him.

22      Q.  But if you're trying to let him know that

23  there's more independent reporting coming, wouldn't you

24  have wanted to share that information with him to

25  alleviate his concerns?

 1      A.  Just reading ahead here, it looks like we do

 2   that.

 3              So at this point, it looks like, you know,

 4   I'm -- he's raising some concerns.  I'm saying we've got

 5   this from ICE, but then things change, because we're

 6   able to talk to Andrew and the lawyers and get more

 7   evidence that corroborates this characterization.

 8      Q.  **Why not wait for ICE to get back to you?**

 9      A.  Because it could take days, and the rest of the

10   news media is already reporting this.  So at this time,

11   CBS, the AP, all of these very well-respected media

12   organizations already have this, and we're being so

13   careful, even though they're all doing this.  We're

14   raising the bar.

15      Q.  **So you were concerned about getting scooped?**

16      A.  We had already been scooped on that piece.

17      Q.  **So then why rush?  Why not find --**

18      A.  Again, that's not a rush.  We raised the bar on

19   our reporting.  We went further than everybody else, by

20   calling these lawyers.  That's not a rush.

21      Q.  **When ICE tells you they believe they have data**

22   **that would negate her claim, don't you owe it to the**

23   **story and to Dr. Amin to find out?**

24      A.  That's why we called lawyers.  That's why we

25   personally went in and found the news that we put in

1   this article.

2        Q.  And you found two hysterectomies, right?

3        A.  Two hysterectomies in a span of four hours, and

4   nothing that conflicted with what Dawn Wooten was

5   saying.

6        Q.  And did you have any evidence at that time that

7   those hysterectomies were inappropriate or unnecessary?

8        A.  The lawyers were claiming that they may have

9   been.

10       Q.  May have been?  Based on their --

11       A.  Again, remember, I don't remember the exact

12  content of the conversations, but they said -- when I

13  brought this up, they said, "Oh, yes.  We know the

14  doctor she's talking about."  It was like the easiest

15  thing because it was like such common knowledge inside

16  the facility.

17       Q.  Is Mr. Osorio a doctor?

18       A.  He's a lawyer, representing a client, and it

19  was common knowledge to him based on his conversations

20  with his client.

21       Q.  Is he a doctor?

22       A.  No, he's not.

23       Q.  Is Mr. Free a doctor?

24       A.  No.

25       Q.  Is Ms. Mathren a doctor?

1      A.  No.

2      Q.  Is Ms. Owings a doctor?

3      A.  No.

4      Q.  Did you ask to speak to any medical

5  professional at all on September 15th, 2020?

6      A.  No, because I only wanted to speak to a medical

7  professional after we had -- well, I did ask to speak to

8  Dr. Amin.  So yes, I did ask to speak to a medical

9  professional, but they hung up.

10      Q.  That was your only effort of reaching out to a

11  doctor on September 15th, 2020?

12      A.  Correct.  Again, though, I'm going above and

13  beyond what all of the other news organizations are

14  doing, who are already running with this report.

15      Q.  I'm not sure that that's true, but we don't

16  have to figure that out today.  Did CNN ever run a story

17  about mass hysterectomies, large number of

18  hysterectomies?

19      A.  I'm not sure.  I'm more familiar with the AP

20  and CBS; they're really respected.

21      Q.  They didn't.

22      A.  Okay.  The New York Times sent a reporter down

23  there for a week, because they thought it was a really

24  big deal.

25      Q.  They wanted to find out more, didn't they?

 1     A.  They put resources behind it.  AP ran a story
 2  at 8:20 a.m. with that quote.
 3     **Q.  So on September 15th at 2:45, this is on the --**
 4  **still on the same exhibit, Exhibit 6, page ending in**
 5  **Bates number 2646.  You --**
 6     A.  I'm sorry?  Exhibit -- okay.
 7     **Q.  2646.  At the bottom, an e-mail from you to the**
 8  **same group.  "Here's where we are.  I'm leading with**
 9  **what we have that is new."  And this is after your**
10  **conversations and Jacob's conversations with the**
11  **lawyers; true?**
12     A.  Yes.  I'm also seeing something else here where
13  it says, did we ask to speak with the women directly and
14  I said, yes.
15           So I will go back and say I couldn't
16  remember the content of my conversations, it looks like,
17  from what I'm seeing here, yes, I did ask to speak to
18  the women directly.  So, yes.  This is what I have just
19  written up.  This is a draft.
20     **Q.  And what did they say when you asked if you**
21  **could speak to the women directly?  What did the lawyers**
22  **say?**
23     A.  I don't know.  I'm literally just going off of
24  this, that I must have asked to speak to them directly.
25  I don't know if they said they've been departed or

 1  they're still in immigration.  All I know, just from

 2  that piece of evidence in front of us, it looks like I

 3  did ask.

 4              MS. MCNAMARA:  Do we have a question

 5  pending?

 6              MS. EVANS:  No.  Not yet.

 7              MS. MCNAMARA:  Okay.

 8      **Q.  BY MS. EVANS:  On the first page of Exhibit 6,**

 9  **Bates Number 2644, the last e-mail on this exhibit**

10  **chain, you write another e-mail.  This is at 3:45 p.m.**

11  **"Chiming in here with more answers," in bold; do you see**

12  **that?**

13      A.  Yes.

14      **Q.  And then you ask, "Could we have approval to at**

15  **least do a News Connect note while the digital piece is**

16  **being worked out?"  Do you see that?**

17      A.  Yes.

18      **Q.  Why would you ask that?**

19      A.  So that we could go on air, that our shows

20  could use it.  That's something we do often.

21      **Q.  So that the shows could use it how?**

22      A.  So that they could report on the contents.

23  Basically, I'm wanting them to approve it from a legal

24  and standards perspective, and sometimes it just takes

25  longer to make something, you know, more polished,

1  easier to read piece online, and so oftentimes you can

2  get out of the meat of the story that's been approved,

3  in the News Connect note, before you're ready to publish

4  online.

5      Q.  **What would the News Connect note be that you're**

6  **asking to have approved here?**

7      A.  I mean this, minus the notes.

8      Q.  **This, meaning?**

9      A.  The text that I have written here in my --

10     Q.  **Which is your story, right?**

11     A.  Yes.

12     Q.  **Because you write your story, leading with**

13  **what's new, right?  That happens at 2:45, 2646.  Chris**

14  **pulls out some statements that he has questions about,**

15  **and then you are responding to them, and then at some**

16  **point, Jacob also add some information, right?**

17     A.  Uh-huh.

18     Q.  **So when you say, "Can we at least have approval**

19  **to put this in News Connect," you're talking about what**

20  **you wrote at 2:45, right?**

21     A.  I can't be sure.  I -- to do an NCX note.  So

22  actually, the note might mean different -- basically to

23  put out a note of what we know so far, while the digital

24  piece is being worked out.  I'm guessing that that isn't

25  the case, because at 5:53 Chris is asking me to put it

1  into News Connect.  So I guess we waited while we

2  continued to have these conversations, but that's

3  typical that I might ask this.  Because at this point,

4  all these other media organizations are -- our shows are

5  probably citing other media organizations, giving them

6  credit, because it looks like we don't have it.  And I

7  want this information, based on my interviews with the

8  lawyers, to get out there.

9      **Q.  Because you don't like that these other news**

10 **organizations are reporting on this and you are not?**

11     A.  But I had more information than they do.

12     **Q.  My question was --**

13     A.  It's not --

14     **Q.  The answer to my question is?**

15     A.  It's not that I don't want them to get the

16 credit.  In fact, Daniella already did something on what

17 they had, but I have information that I want to get out.

18 And also, yes, it wouldn't be a problem that -- yes, I

19 would want to get credit for reporting that I have that

20 is matching what somebody else says.

21     **Q.  Chris writes -- this is on 2645, the second**

22 **page of Exhibit 6.  Chris writes at 3:31 p.m., "I have a**

23 **hard commitment and am bringing Mary Lockhart in.  She**

24 **will take it from here."**

25                     **Who is Mary Lockhart?**

**DR. MAHENDRA AMIN, M.D. vs NBCUNIVERSAL MEDIA, LLC**
Julia Ainsley on 04/25/2023                                    Page 269

```
 1                  -      -          -

 2                 CERTIFICATE OF REPORTER

 3

 4           STATE OF GEORGIA)

 5                           )

 6           COUNTY OF DEKALB)

 7

 8           I, TAMIKA M. BURNETTE, hereby certify

 9  that the foregoing proceedings were taken before me at

10  the time and place therein designated; that a review of

11  the transcript was requested, and that the foregoing

12  pages numbered 1 through 268 are a true and correct

13  record of the aforesaid proceedings.

14           I further certify that I am not a relative,

15  employee, attorney or counsel of any of the parties, nor

16  am I a relative or employee of any of the parties'

17  attorneys or counsel connected with the action, nor am I

18  financially interested in the action.

19

20           DATED this 5th day of May, 2023

21           _____

22               TAMIKA M. BURNETTE

23           CERTIFIED COURT REPORTER, RPR, CSR-2870

24

25
```