UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
WAYCROSS DIVISION

DR. MAHENDRA AMIN, M.D.,     )
                                    )
       Plaintiff,          )
                                    )   Case No. 5:21-CV-00056-LGW-BWC
v.                           )
                                    )
NBCUNIVERSAL MEDIA, LLC,    )
                                    )
       Defendant.     )
_____

## PLAINTIFF'S SUPPLEMENT ON MOTIONS FOR SUMMARY JUDGMENT

Pursuant to the Court's permission, Dr. Amin files this supplemental brief discussing the existence of actual malice, the falsity of the Statements, Dr. Amin's ability to meet his burden on falsity regardless of the "gist" or the standard of review on falsity, and the lack of any fair report privilege:

**I.    There is an issue of genuine fact as to whether NBCU published the Statements with actual malice, particularly (a) when construing the evidence in the light most favorable to Dr. Amin as required when considering NBCU's Motion for Summary Judgment and (b) in light of abundant case law from the Supreme Court of the United States, the Eleventh Circuit, Georgia's appellate courts, and district courts within the Eleventh Circuit that matters of credibility as to actual malice are for the jury.**

Dr. Amin has cited mountains of evidence from which a jury may find actual malice by "decisionmakers" as to each broadcast. *See* Doc. 153 at 21-34.

**A.    Ms. Ainsley, Mr. Soboroff, and Standards are relevant decisionmakers for all broadcasts and acted with actual malice; Ms. Maddow and Mr. Hayes also have added culpability on actual malice.**

Not just anyone at NBCU having knowledge or reckless disregard for the falsity of the Statements matters for actual malice. But the information available to and subjective beliefs of decisions makers *does* matter.

First, Ms. Ainsley, Mr. Soboroff, and Standards are relevant for all the broadcasts.  In each broadcast, the on-air host claims their reporting is at least in part based on Ainsley and Soboroff's article and their individual reporting.  *E.g.*, Doc. 127 at 9, 29-31.  Further, NBCU admits that when MSNBC on-air hosts use NBC News reporting, they know that the reporting has gone through Standards.  *Id*. at 9.  So all shows necessarily relied on Standards as well.  Dr. Amin has produced evidence of actual malice as to Ms. Ainsley, Mr. Soboroff, and at least Christopher Scholl from Standards.  Second, Dr. Amin has produced evidence of actual malice as to each of the on-air hosts separately.

### B.  Evidence of Actual Malice

#### 1.  Contemporaneous expressions of subjective doubt

Because courts note that "it would be rare for a defendant to admit actual malice" the law provides that a plaintiff may establish actual malice through circumstantial evidence, in contemporaneous communications that publishers *did* make "admission[s] . . . that [they] knew [their] material was false or that [they] doubted its truth."  *Reid v. Viacom Int'l Inc.*, 2017 WL 11634618, at \*3 (N.D. Ga. Sept. 22, 2017) (quoting *Hunt v. Liberty Lobby*, 720 F.2d 631, 643 (11th Cir. 1983)).  Here there are many examples of communications among NBCU decisionmakers expressing contemporaneous disbelief or at least serious doubts about the reporting:

*Julia Ainsley and Jacob Soboroff*

- "Do we think they [lawyers] conspired at all"

- "heard mixed things about Wooten"

- "but only two hysterectomies"

- "I'm dying to know the truth"

■ "I don't want to just let this one lie and move on.  I have to know!"  Response: "Same"

Doc. 128-1 at 12-13.

If a journalist had no serious doubts about the truth of a statement, then she knows and would not have to say she is "dying to know" or "[has] to know."  And stating that you have heard "mixed things" about a source, or you wonder so much about whether your sources conspired to share their stories with you that you ask aloud during a conversation where you are both wondering about the truth, indicates you have doubts about the reporting.

NBCU argues this was just casual talk that always happens as part of reporting and should not be taken as expressions of doubt, but that is for a jury to decide.  All reasonable inferences from these statements should cut in favor of Dr. Amin, which means the statements could support a finding of actual malice because a jury could infer from those statements that Ms. Ainsley and Mr. Soboroff had subjective doubt about the story they had just blasted to the world.  The Court would have to credit all of NBCU's inferences on these statements, some of which are the opposite of the words on the page, to find no evidence from which a jury could find actual malice.

*Christopher Scholl of Standards*

Mr. Scholl expressed numerous "concerns" with the reporting which were never addressed, mostly notably that "essentially it boils down to a single source—with an agenda— telling us things we have no basis to believe are true."  Doc. 134-6 at 8.

Also despite extreme and contemporaneous evidence to the contrary, NBCU still pretends that the article was approved by Standards.  It never was.  Mr. Scholl stated on an audio taped conversation that the Statements were reportable "because we reported it" in a tone with linguistic emphasis from which a jury could conclude that the Statements should not have been

reported, but they were now deemed "reportable" only because NBCU had already reported them and so they must be considered as such internally.  Doc. 153-39.  And he admonished Mr. Schone after the story ran that it "is imperative that Standards see a final version of a story like this before it is posted," which would make no sense to do if it *had* been approved.  Doc. 153-1 ¶ 86; Doc. 153-24 at 2.  Additional evidence that the article was never approved includes:

- Ms. Ainsley sends an email stating that the article was approved by Standards.  No one from Standards ever sends an email saying the article is approved.  After-the-fact litigation testimony from Ms. Ainsley and her editor, Mark Schone, is that the "approval" was conveyed to either Ms. Ainsely on the phone or to Mr. Schone on the phone (who then relayed it to Ms. Ainsley).  The jury is entitled to consider whether they believe these statements, which are not credible given that if Mr. Scholl could give approval on the phone, he could respond to the numerous email threads that were active throughout this time period.  *See* Doc. 153-1 ¶¶ 86, 92, 102.  A jury could see from the email traffic that Mr. Scholl was not shy to send emails.  The jury is also entitled to consider that NBCU refuses to produce phone records that would show when these alleged calls took place that none of the witnesses can specifically recollect.  Doc. 188 at 9-11.  A jury should consider whether they believe Standards approved the article in light of this information, or whether they believe Mr. Scholl and Standards simply went into damage control mode after "what was done was done."

- Ms. Ainsley sends a text message to Mr. Soboroff that Mr. Schone is "mad at" Mr. Scholl.  Doc. 128-1 at 7.  This is after Mr. Schone sent Mr. Scholl an email stating, "I published this, which is based on the reporting you approved, after [redacted];" if Mr. Scholl had approved the article itself, then that formulation would make no sense.  Doc. 153-23 at 2.  The redacted portion refers to attorney-client privileged information, or it should not be redacted.  A reasonable jury could conclude that this indicates that Mr. Scholl told Mr. Schone he would not approve the article while Mr. Schone and Ms. Ainsley were in a time crunch to get the article approved so that Ms. Ainsley could go on air and discuss it (Ms. Ainsley was scheduled to go on air and did so on *Deadline*), and Mr. Scholl never approved it, but Mr. Schone went to legal to attempt to bypass Standards.  Doc. 153-23 at 2 (Mr. Scholl emailing that he published the article after [redacted]).  This conclusion is bolstered because emails (produced only after discovery closed and they could not be used in deposition cross examination) indicated that Standards had put a hold on the article all together, Doc. 165 at 5, and Ms. Ainsley stated a previous version of the article was published "without permission of standards." Doc. 153-24 at 4.

- In his deposition testimony, Mr. Scholl would not say the article was approved.  All he testified was that he was ultimately comfortable with the reporting.  Doc. 136-31 at 22:12-20.  The conflicting evidence with Ms. Ainsley and Mr. Schone's claims that

the article was approved, alone, creates a credibility issue which is for the factfinder.

*On Air Hosts*

First, Mr. Hayes admitted he did not believe the crux of the Statements: "the reason it went viral, right, is that it was, like, conjured the worst kind of like Third Reich, you know, sort of, you know, Jim Crow, Mississippi Hospital history" and "which is not the case here," and "you've got a secondhand, a very, very, you know, wildly provocative quote in a recorded whistleblower complaint by a woman with no factual, firsthand knowledge."  Doc. 153-1 ¶¶ 201, 267.  Next, Ms. Maddow described the story as one that was "jumping to conclusions" moments before deciding to publish the Statements in the premiere time slot of her show.  *Id*. ¶ 248. Finally, Ms. Wallace's producer indicated that Ms. Wallace was "into," apparently meaning interested, "but doesn't know what to make of it," indicating doubt as to the Statements.  *Id*. ¶ 165.  Further, the segment on Ms. Wallace's show was Ms. Ainsley pitching her article and nothing more.  *Id*.  Ms. Ainsley's actual malice is the key to evaluating that broadcast.

### 2.  Reporting information that is contrary to known information

Reporting information that is contrary to known information creates an inference of actual malice.  *Hunt*, 720 F.2d at 645.  NBCU seems to take pride that it did its own reporting and did not simply rely on Ms. Wooten.  *E.g.*, Doc. 127 at 7-9.  Yet its investigation revealed information contrary to the information it put on the air.  That is actual malice.

First, Ms. Ainsley and Mr. Soboroff spoke to Sarah Owings, an immigration attorney who had clients at ICDC and who was a leader in a 15,000+ immigration attorney organization who said she had been on the phone all day talking to her colleagues and they were ***not*** seeing evidence of mass hysterectomies.  Doc. 153-1 ¶ 62.  Despite this information, NBCU reported "mass" and "high numbers of" hysterectomies by the "uterus collector."  *Id*. ¶ 351.

Second, another of the immigration attorneys that NBCU spoke to, Benjamin Osorio, testified that he only had one client with records indicating she had a hysterectomy and that she had cancer, and that there were reasons to doubt her credibility in the form of her criminal history, but NBCU reported that he claimed he had two clients who both had hysterectomies. *Id*. ¶¶ 62, 205.  To this day, Mr. Osorio does not know if his second client had a hysterectomy but does know she was not treated by Dr. Amin.  *Id*.  A jury would be reasonable to credit Mr. Osorio's recollection of the phone call versus Ms. Ainsley's because of Ms. Ainsley's credibility issues, and because jurors would be reasonable to ask, "why would Mr. Osorio say something he never knew to be true?"  This is especially so given Mr. Osorio seems a cautious person: he told a producer for *All In*, "I mean, you know, I'm a little nervous.  I mean, obviously, this is how things start.  But I don't think we have a full, complete picture yet."  Doc. 132-11 at 10:15-19.

Next, even Ms. Wooten herself told NBCU that she did not know if the hysterectomies were forced, yet NBCU kept saying it and played portions of Ms. Wooten's interview while not airing her statements that tended to cast down on the Statements.  Doc. 153-1 ¶ 69.

Finally, NBCU kept reporting "high numbers" and "mass" hysterectomies by the "uterus collector" even after receiving a statement from ICE that it had records for only two hysterectomies performed on ICDC patients.  Doc. 122-1 ¶ 46; Doc. 153 at 27.  NBCU attempts to play a word game and claims ICE saying it only had records that two patients were "referred" for hysterectomies was something different than the number of women on whom hysterectomies had been "performed."  *Id*. at 31-32.  Indeed, both Mr. Hayes and Ms. Maddow demean ICE for using that word and credit only this made-up alternate interpretation that is contrary to internal discussions about ICE's statement and logic.  *Id*.; Doc. 122 at 19.  But the data came after Ms. Ainsley relayed that ICE said it would send data negating the claims, and an inference may be

made that it did so.  Doc. 153-19 at 2.

### 3.  Reporting information so inherently improbable

Reporting information that is so inherently improbable can also show actual malice. *Hunt*, 720 F.2d at 643 (quoting *St. Amant v. Thompson*, 390 U.S. 727 (1968)).[1]  Continuing with the ICE statement, even if a jury credits NBCU's claim that it believed "referred" was different than "performed," that understanding would undermine their entire theory of Dr. Amin's involvement.  NBCU claims repeatedly throughout its briefing and at the hearing that NBCU decisionmakers believed the allegations because Dr. Amin had already allegedly settled false claims allegations and was performing "mass" and "high numbers" of hysterectomies for the reimbursement money—and not because he was an evil Third Reich doctor on a sterilization campaign to collect uteruses.  *E.g.*, Doc. 153-1 ¶¶ 78-83, 215; Hearing Transcript at 43:6-14 (describing the settlement, which as discussed in the citations included Dr. Amin as one of nine co-defendant doctors who did not contribute to the settlement at all and admitted no liability and

---

[1] NBCU argued that Dr. Amin relies on *Hunt v. Liberty Lobby* "more than almost any other case in his papers."  Hearing Transcript at 45:20-25.  However, a look at the briefing demonstrates that Dr. Amin cites *Hunt*—binding Eleventh Circuit precedent—for its statements of law, such as this one, and not as presenting analogous circumstances of inherent improbability.  *See* Doc. 153 at 4, 21, 26, 31, 35.  However, Dr. Amin also submits that a doctor performing high numbers of unnecessary hysterectomies without authorization or consent *is* similarly inherently improbable such that it adds to the "sum total of the inferences of actual malice properly drawn from" the record.  *See Hunt*, 720 F.2d at 646.  This is particularly the case as to Mr. Hayes's purported theory of the case that Dr. Amin was seeking to bilk the government for money, which he purports is evidenced by a years-old complaint for which Dr. Amin admitted no liability, did not pay any penalty, and the settlement disposing of the complaint ***did not encompass any overbilling of procedures*** (it was alleged, but noticeably ***not*** part of the settlement), while simultaneously believing that more hysterectomies were performed than would be "referred" and paid.  Doc. 153 at 31-32; Doc. 153-1 ¶ 215.  Finally, as a district court applying *Hunt* ruled, *Hunt* was decided on a "sufficiency of the evidence" standard to support a jury verdict, and not on summary judgment "where the evidence must be viewed in a light most favorable to the plaintiff and drawing all logical inferences in plaintiff's favor."  *Reid v. Viacom Int'l Inc.*, 2017 WL 11634618, at *4 n.4 (N.D. Ga. Sept. 22, 2017).

which Mr. Scholl described contemporaneously as "really a different animal" from the

Statements, Doc. 153-1 ¶ 268, as "probably the most important piece of evidence" Ms. Ainsley

and Mr. Soboroff obtained on September 15.  If NBCU believed the allegations because they

believed Dr. Amin was out for money, and such evidence was "probably the most important

piece of evidence" Ms. Ainsley and Mr. Soboroff obtained on the day of September 15, then

once NBCU decisionmakers heard that ICE only had records that two hysterectomies were

referred, they had to know that means ICE could not have paid Dr. Amin for performing more

than two hysterectomies.  This means, that to then continue believing that Dr. Amin was

performing "mass" and "high numbers" of hysterectomies, NBCU necessarily had to believe that

Dr. Amin was doing it for sport or evil motive similar to a Third Reich doctor for the allegations

to remain plausible.  But NBCU decisionmakers say they never believed that was the case.

According to NBCU, they believed he was out for money and if he was not out for money, then

it is not credible to keep reporting he was a "uterus collector" performing "mass" and "high

numbers" of hysterectomies after they had information that ICE never could have authorized and

paid for more than two.

### 4.  Reasons to doubt the veracity of sources—and actual doubt of sources

When there are "obvious reasons to doubt the veracity of the informant or the accuracy of

his reports," the facts support an inference of actual malice.  Doc. 59 at 28 (quotation marks

omitted).  Here, not only were there reasons for NBCU to doubt the veracity of Ms. Wooten's

statements, but NBCU actually did doubt her.  For example, Mr. Scholl described Ms. Wooten as

having "an agenda" and "no evidence to back up her claims," Doc. 134-6 at 8; Mr. Hayes said

"you've got a secondhand, a very, very, you know, wildly provocative quote . . . by a woman

with no factual, firsthand knowledge," Doc. 132-15 at 12:6-9; and Mr. Soboroff told Ms. Ainsley

he had heard "mixed things" about Ms. Wooten, Doc. 128-1 at 12.  A reasonable inference from all these statements is that NBCU did not find Ms. Wooten reliable.

### 5.  Playing to a preconceived narrative or agenda

As the Court ruled at the pleadings stage, "Dr. Amin has alleged facts that plausibly raise the inference that NBCU was motivated to tie its reporting about Dr. Amin to its greater opposition of the Trump Administration," for purposes of alleging actual malice.  Doc. 59 at 47; *see also Palin v. N.Y. Times Co.*, 940 F.3d 804, 814 (2d Cir. 2019) (holding that political opposition *alone* does not constitute actual malice but can indicate "more than sheer political bias"); *Harris v. City of Seattle*, 152 F. App'x 565, 568 (9th Cir. 2005) ("Thus, evidence that a defendant conceived a story line in advance of an investigation and then consciously set out to make the evidence conform to the preconceived story is evidence of actual malice, and may often prove to be quite powerful evidence." (quotation marks omitted)).  Facts in discovery confirm that NBCU did this, for example, through *The Rachel Maddow Show* and in refusing to heed the caution from Mr. Free and Mr. Osorio that they were not ready to make the allegations of "forced sterilization" because "I don't think we have a full, complete picture yet," and Mr. Free sought to distance himself from the allegations mere days later.  Doc. 132-3 at 7:5-9:15, 19:3-8 (Mr. Free); Doc. 132-11 at 10:15-19 (Mr. Osorio); Doc. 153-1 ¶ 209.

First, after telling her staff that she thought there had been a "lot of jumping to conclusions around the complaint," not wanting to "assume it's true," and questioning whether she "should leave room in the show or not"—a mere eight minutes later and after no new information is shared—Ms. Maddow decided not only to include the story, but also to lead her show with it as part of the "next chapter" in the nefarious Trump Administration immigration apparatus with NBCU as the hero demanding accountability.  Doc. 153 at 21-34; Doc. 132-11 at

10:15-19, 11:18-12:8.  NBCU admits that this evidence constitutes a "flurry of arguments on

actual malice."  Exhibit 1, Hearing Transcript (Apr. 15, 2024), at 42:16-19.[2]  Further, Ms.

Maddow's decision to feed her preconceived narrative and story line is demonstrated by her

refusal to correct her use of photographs of ICE facilities and conditions during the Obama

Administration after her staff suggested a correction—and after having created this false

storyline—instructing her team "we should not be engaging with the Obama Administration's

ICE policies."  Doc. 153-1 ¶ 248.

     NBCU argued at the hearing, concerning this evidence of actual malice, "most of them

are misrepresentations of the record."  Hearing Transcript at 42:16-22.  But the two examples it

cited are not misrepresentations.  NBCU argued that Dr. Amin relies on a statement made by Ms.

Wallace at 10:30 as evidence of her state of mind several hours later during the broadcast at

---

[2] At the hearing, counsel for NBCU chided counsel for Dr. Amin for making "no effort to
distinguish" a case, *Bryant v. Cox*.  Hearing Transcript at 32:25-33:2.  Dr. Amin did not
distinguish that case in his response to NBCU's motion for summary judgment because NBCU
did not cite the case at all in its motion.  *See generally* Doc. 127.  It brought it up for the first
time in its reply brief.  Doc. 181 at 5.  Dr. Amin easily *can* distinguish that case: there, it was
undisputed that the media defendant *accurately reported that the investigators actually believed
Mr. Jewell planted a bomb* (even if they later changed their minds).  *Bryant v. Cox Enter., Inc.*,
311 Ga. App. 237-38 (2011).  In contrast, NBCU omitted from its reporting the contrary
information it had been receiving from sources about what they were seeing, what they believed,
and what they were willing to accuse in real time as discussed above; and it characterized the
unsigned letter as a "whistleblower complaint" when in fact the letter contained no affirmation
by counsel or Ms. Wooten, or even a signature, and was not officially submitted through the
proper channels of a whistleblower complaint.  Doc. 153 at 21-34.  The *Bryant* court also noted
that the media defendants reported evidence it had "tending to belie" the investigators' suspicion.
311 Ga. App. at 239.  In contrast, NBCU did *not* share with its viewers the fact that the
allegations were made only with the intent of spurring investigation, did *not* share with its
viewers that its sources had reported a lack of corroboration for the Statements, and did *not* share
with its viewers that ICE expected data to "negate" the claims of the letter and ultimately did so.
Doc. 153 at 30, 33.  In contrast, for example, Prism and the Intercept—the other two media
organizations which published Dr. Amin's name early on in association with accusations of mass
hysterectomies—shared "mixed things" they had found about Ms. Wooten as well as other
reasons to doubt the truth of the Statements, which NBCU communicated internally or received
from sources but did not report.  *Id.* at 30 n.14.

issue.  Hearing Transcript at 42:23-43:6.  There is no misrepresentation: NBCU simply argues that the Court should credit *its* interpretation that Ms. Wallace some time later changed her mind, without any documentation supporting that fact, and not credit Dr. Amin's argument that there is no such manifestation of her changing her mind.  That inference-drawing is not the province of the Court; it is for the jury.  *See Hammer v. Slater*, 20 F.3d 1137, 1143 (11th Cir. 1994) (The "issue of actual malice in conditional privilege cases is generally a jury issue, inappropriate for summary judgment.").

Second, and according to NBCU "most troubling," is Dr. Amin's "repeated use" of Mr. Free cautioning that one needed to see "some fucking documents" before asserting the allegations NBCU published.  Hearing Transcript at 43:24-44:2.  In his response to NBCU's motion for summary judgment, Dr. Amin cites Mr. Free's cautioning three times, each time indicating that Mr. Free was not yet comfortable making the allegations of mass forced hysterectomies that NBCU was publishing.  Doc. 153 at 2, 26, 34.  That is exactly what Mr. Free told Mr. Price: "In terms of the hysterectomies, I'm aware of it happening at some other facilities, but I don't have solid enough—like I want to look at—when I hear ***forced sterilization***, I want to see some fucking documents."  Doc. 132-3 at 19:3-8 (emphasis supplied).  "And it's— we're still trying to get to the bottom of it.  I've got an independent medical reviewer reviewing [BP's medical] records.  But, you know, and if we're comfortable with the data, ***then we'll make the allegation***.  But for right now, the allegation is that she [*only* B.P.] was given a hysterectomy without informed consent."  Doc. 132-3 at 7:5-9:15.  Mr. Free was making the accusation that his client had a hysterectomy without informed consent, but was not yet ready to make an allegation of forced sterilization or mass procedures.  And indeed, within days, Mr. Free was seeking to distance himself from the allegations.  Doc. 153-1 ¶ 209 (redacted).  Again, what NBCU calls a

"misrepresentation" is evidence creating an inference of actual malice, and on NBCU's motion for summary judgment all inferences are to be credited to Dr. Amin.

### C. NBCU's alleged reliance on other published reports is both incorrect and irrelevant

NBCU also briefly argued at the hearing that it relied only on previously published reports from reputable sources, a factor weighing against actual malice, and that "there is no dispute here that each of the three broadcasts at issue relied primarily on the NBC news article that was published beforehand," which itself "had incorporated as well the AP article."  Hearing Transcript at 42:6-15.[3]  This is not undisputed.  Indeed, NBCU argued elsewhere *at the summary judgment hearing* that it did not rely on previously published reports: "and the other thing that's important about *Hunt* is that The Court more than once underscores that they didn't do additional investigation, whereas here we clearly did do additional investigation."  Hearing Transcript at 46:15-18.  Further, NBCU has put on the docket in its motion for summary judgment plethoric evidence that programs conducted their own decision-making and reporting after the "NBC news article," which included subjective doubts post-dating those articles.  *E.g.*, Doc. 132-3; 132-11; 132-15.  Also, in an email, Ms. Ainsley reproached an early version of the article for not being

---

[3] Counsel for NBCU quoted *Berisha v. Lawson* as stating, "quote, the law is clear that individuals are entitled to rely on previously published reports from reputable sources, and that, standing alone, defeats actual malice."  Hearing Transcript at 42:6-10.  But in *Berisha*, the Eleventh Circuit noted the fact that the specific statements alleged to be defamatory had been published by "many independent sources," citing case law of "a multitude of previous reports upon which the publisher reasonably relied," *and* that several additional sources corroborated, rather than undermined or contradicted, the statements at issue.  973 F.3d 1304, 1313 (11th Cir. 2020).  Here, in contrast, NBCU expanded upon its own article, despite many reasons to doubt the accuracy of that article itself; despite expressing contemporaneous, subjective doubts as to what it was reporting; and despite learning information that rebutted its reporting.  To accept NBCU's view of the case and apply it here would be to excuse a publisher from repeating prior reporting when it learns information refuting the story—on top of having that rebutting information at the time of the original publication.  The law does not call that *a defeat of* actual malice; the law calls that ***actual malice***.

approved by Standards, and the evidence suggests that the "NBC news article" itself was never approved by Standards.  Doc. 153-1 ¶¶ 46, 86, 92, 100.

Further, NBCU witnesses themselves identified issues of credibility with those other articles, stating that NBCU should not rely on them.  *E.g.* Doc. 153 at 30, 30 n.14; Doc. 153-1 ¶¶ 36-37, 41.  And a look at the other articles demonstrates how distinct NBCU was in publishing Dr. Amin's name alongside the allegations of mass hysterectomies without sharing known reasons to doubt those allegations.  *Id*.

### D.  Credibility Issues Abound in this Case

NBCU argued that the issue of actual malice in this case is not one, like *Hammer*, where credibility is at issue and therefore the matter is for the jury: "These are not turning on solely credibility issues where it's a he said/she said situation."  Hearing Transcript at 37:1-19.[4]  There are numerous factual disputes on issues regarding actual malice where inferences may be drawn in multiple directions.  But also credibility *is* at issue, because NBCU's evidence of an absence of an issue of material fact as to actual malice is decisionmakers' declarations is that they did not doubt the allegations.  *See* Doc. 127 at 29-32; *e.g.*, Doc. 128 ¶¶ 29-30 (Ms. Ainsley); Doc. 129 ¶¶ 11, 13, 17-18 (Mr. Soboroff); Doc. 130 ¶¶ 19, 21, 25 (Ms. Wallace); Doc. 133 ¶¶ 6, 12-13, 18, 21, 30, 32 (Ms. Maddow); Doc. 134 ¶ 43 (Mr. Scholl).  These declarations, produced years later for use in this litigation, are contradicted by their makers' contemporaneous statements otherwise.  *See* Doc. 153 at 21-25 (collecting these same people's expressions of serious doubts about the Statements' truth in contemporaneous communications); *e.g.*, Doc. 132-15 at 10:1-7, 12:6-9 (Standards Call of September 16, 2020, at which Mr. Hayes stated, "the reason it went

---

[4] NBCU initially opposed the Court's characterization that actual malice is left to the jury if there is an issue of fact, but then appeared to concede it was arguing "there is simply no credibility-weighing to do in this regard" in this case.  Hearing Transcript at 36:25-37:10, 38:8-10.

viral, right, is that it was, like, conjured the worst kind of like Third Reich, you know, sort of, you know, Jim Crow, Mississippi Hospital history" and "which is not the case here," and "you've got a secondhand, a very, very, you know, wildly provocative quote in a recorded whistleblower complaint by a woman with no factual, firsthand knowledge."); Doc. 128-1 at 12-13 (a text thread, not produced to Dr. Amin until the night before Ms. Ainsley's deposition, Doc. 153 at 22 n. 10, between Ms. Ainsley and Mr. Soboroff, with Ms. Ainsley stating, "I'm dying to know the truth" and "Do we think they [our sources] conspired at all?" and Mr. Soboroff stating that Mr. Free has "heard mixed things about Wooten").  Indeed, there are many statements in the declarations that are contradicted by other evidence, creating an issue of credibility as to the other statements contained therein.  *See* Doc. 153-1 ¶¶ 46, 83, 163, 165, 168, 170, 173, 201, 212, 218, 255, 268, 281-82 (pointing out other purported statements of undisputed fact that are only supported by declarations and are contradicted by other evidence and/or do not support the contention for which they are cited).  Accordingly, Dr. Amin agrees with NBCU that there is, in many instances, not a "he said/she said situation"—because in such instances it is a "he said/*he said* situation," wherein a decisionmaker has stated one thing for purposes of supporting NBCU's motion but another at the time the Statements were defaming Dr. Amin.  At the heart of NBCU's evidence that it did not publish with actual malice "are issues of credibility: whether one believes [Dr. Amin]'s evidence or that of [NBCU].  We have repeatedly held that credibility is a factual issue that is uniquely the province of the jury."  *Hammer*, 20 F.3d at 1143.

### E.  Showing the Ability of a Jury to Find Actual Malice by Clear and Convincing Evidence is Not the Impossible Task NBCU Pretends

NBCU argued that "since *Hammer*, the Eleventh Circuit has over and over and over again affirmed grants of summary judgment on actual-malice grounds."  Hearing Transcript at 36:25-37:2.  But of course, numerous courts have also *denied* a defendant's motion for summary

judgment on actual malice, where the record demonstrated an issue of material fact as set forth in *Hammer*.  *See, e.g.*, *StopLoss Specialists, LLC v. VeriClaim, Inc.*, 340 F. Supp. 3d 1334, 1353-55 (N.D. Ga. 2018) ("While the record includes facts and testimony that may explain or refute the evidence of malice submitted by Plaintiffs, the Court's function in reviewing motions for summary judgment is not to resolve issues of fact presented by conflicting evidence since that role is solely within the province of the jury."); *Gray v. Koch Foods, Inc.*, 580 F. Supp. 3d 1087, 1135-36 (M.D. Ala. 2022) ("And to the extent Gray raises a conditional or qualified privilege argument, she has failed to show her entitlement to a judgment as a matter of law, when the facts are viewed in the light most favorable to McDickinson and Birchfield, because there is a question of fact as to whether Gray's communications were made in good faith and free of malice."); *Klayman v. Judicial Watch, Inc.*, 22 F. Supp. 3d 1240, 1252-53 (S.D. Fla. 2014) ("Viewing the evidence in the light most favorable to Klayman, Ruffley may have had knowledge of the falsity . . . .  Klayman has proffered evidence of actual malice, and it is for the trier of fact to decide whether Ruffley knew after researching the issue that Klayman was merely indicted for failing to pay child support.").

    NBCU asks this Court to read the "clear and convincing" standard as one where only one inference may be drawn on any piece of evidence.  But as the Supreme Court of the United States clarified, in the First Amendment context of *New York Times* the standard is "whether a reasonable factfinder ***could*** conclude, for example, that the plaintiff had shown actual malice with convincing clarity."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986) (emphasis supplied).  It is not "beyond a reasonable doubt" or "where only one inference may be drawn." *See id*.  "[W]here the *New York Times* 'clear and convincing' evidence requirement applies, the trial judge's summary judgment inquiry as to whether a genuine issue exists will be whether the

evidence presented is such that a jury applying that evidentiary standard *could* reasonably find for either the plaintiff or the defendant." *Id*. at 255.

The *Anderson* Court stated as to the Second Circuit opinion whose reasoning it was following: "Although the court thought that this higher standard would not produce different results in many cases, it could not say that it would never do so." *Id*. at 254 (discussing *U.S. v. Taylor*, 464 F.2d 240 (2d 1972)). As the *Anderson* Court stressed:

> Our holding that the clear-and-convincing standard of proof should be taken into account in ruling on summary judgment motions does not denigrate the role of the jury. It by no means authorizes trial on affidavits. Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . . The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor. Neither do we suggest that the trial courts should act other than with caution in granting summary judgment or that the trial court may not deny summary judgment in a case where there is reason to believe that the better course would be to proceed to a full trial.

*Id*. at 255 (citations omitted). The *Anderson* Court further noted that the clear and convincing standard did not alter the observation made in *Hutchinson v. Proxmire*, 443 U.S. 111, 120 n.9 (1979), that proof of actual malice "does not readily lend itself to summary disposition" because of the judicial reluctance "to grant special procedural protections to defendants in libel and defamation actions in addition to the constitutional protections embodied in the substantive laws." *Id*. at 255 n.7. The *Anderson* Court rejected the argument that "the defendant should seldom if ever be granted summary judgment where his state of mind is at issue and the jury might disbelieve him or his witnesses as to this issue," holding that "the plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Id*. at 256-57. Dr. Amin has done so, as to both actual malice and falsity (discussed below).

II.     **None of the broadcasts, each considered as a whole, alters the defamatory sting or "gist" of the Statements that Dr. Amin performed mass unnecessary, unauthorized, and unconsented-to hysterectomies.**

The Statements should be evaluated individually as to whether they are each false. "Gist" only comes into play because the law requires evaluating each statement in the context of its entire broadcast to determine if that context alters the "sting" or the "gist" of the Statements themselves. Mechanically, for example, the Court would take these steps, when evaluating the statement, "high numbers of female detainees, detained immigrants, at an ICE detention center in Georgia received questionable hysterectomies" made as part of the *Deadline* broadcast:  The factfinder would consider that the statement itself is false. That is, high numbers of women did not have questionable hysterectomies; a high number of women did not have any hysterectomy at all, and the two who did consented to hysterectomies that were medically necessary and authorized. Doc. 153 at 6-9.

Next, the Court would consider whether that singular statement viewed in the context of the entire broadcast "stings" differently than claiming that "high numbers" of women received questionable hysterectomies. NBCU claims that the broadcast as a whole "stings" as though Dr. Amin was performing mass generic unnecessary procedures. Dr. Amin argues that the broadcast as a whole continues to "sting" as though Dr. Amin was performing a high number of unnecessary hysterectomies.

NBCU brings up the term "gist" for purposes of its motion for summary judgment in the context of falsity. Doc. 137 at 18. Pursuant to the concept of "substantial truth," under Georgia law and federal law, "minor factual errors" do not constitute defamation falsity if such errors "do not go to the substance, the gist, the sting of a story." *Jaillett v. Ga. Television Co.*, 238 Ga. App. 885, 888 (1999) (quotation marks omitted); *see also Masson v. New Yorker Mag., Inc.*, 501

U.S. 496, 517 (1991) (quotation marks omitted).[5]  A statement is false for purposes of defamation if it "would have a different effect on the mind of the reader from that which the pleaded truth would have produced."  *Id.* (quotation marks omitted).  Accordingly, if the Statements accusing Dr. Amin of performing high numbers of unconsented to, unauthorized, unnecessary hysterectomies would have a different effect on the mind of the reader from the truth that he performed two hysterectomies both of which were consented to, authorized, and medically necessary, the Statements are false.

NBCU argued that "the delta is not sufficient" between "a high number of immigrants" receiving medically unnecessary hysterectomies and "one of the two hysterectomies" being improper.  Hearing Transcript at 29:18-30:4.[6]  But again, the undisputed evidence is that Dr. Amin performed *zero* hysterectomies without medical necessity, consent, or authorization: the procedures were authorized, necessary, and consented to.  *E.g.*, Doc. 176 at 20.  Certainly the sting of claiming Dr. Amin performed any unnecessary hysterectomies is different (very negative) than the sting of the truth, which is that Dr. Amin performed no unnecessary hysterectomies (not negative at all).  To credit NBCU's argument, the Court or jury has to first accept that Dr. Amin performed at least one unnecessary hysterectomy, and even then it would be reasonable for a jury to find that that even a claim of one unnecessary hysterectomy is vastly less harmful than "mass hysterectomies" and "uterus collector."

---

[5] *Masson* applied California law but noted that this rule is the same "in other jurisdictions," 501 U.S. at 516, and indeed Georgia law commonly quotes *Masson* for the same statements of law. *E.g.*, *Brewer v. Rogers*, 211 Ga. App. 343, at 347 (1993).

[6] At the hearing, counsel for NBCU appeared to concede that one of the two hysterectomies was not unnecessary.  *See* Hearing Transcript at 28:25-29:2 ("when first the evidence shows that one of those two hysterectomies was improper, was not the right procedure").  As Dr. Amin has set forth, there is no genuine issue of material fact that *both* hysterectomies were medically necessary, authorized, and consented to.

To the extent that the meaning of the Statements merits interpretation, that is a fact issue for the jury.  Interpreting text in a defamation case, "it is necessary to consider the entire article in order to arrive at its true meaning."  *Lucas v. Cranshaw*, 289 Ga. App. 510, 513 (2008) (quotation marks omitted).  The broadcast "must be read and construed in the sense in which the readers to whom it is addressed would ordinarily understand it."  *Id*. (quotation marks omitted).

> When thus read, if its meaning is so unambiguous as to reasonably bear but one interpretation, it is for the judge to say whether that signification is defamatory or not.  If, upon the other hand, it is capable of two meanings, one of which would be libelous and actionable and the other not, it is for the jury to say, under all the circumstances surrounding its publication, including extraneous facts admissible in evidence, which of the two meanings would be attributed to it by those to whom it is addressed or by whom it may be read.

*Id*. (quotation marks omitted).  A district court in Florida interpreted the identical rule of Florida law to be that whether a statement is substantially true is determined by the court if the statement is not ambiguous, but if it is in the "full context of its publication," the issue is for the jury.  *San Juan Prod., Inc. v. River Pools & Spas, Inc.*, 2023 WL 1994087, at *4 (M.D. Fla. Feb. 14, 2023).

Accordingly, the Court begins with the Statements, as they would be understood by the ordinary viewer and considering as a whole the broadcast in which each Statement appears.  If there is no issue of material fact and they are false, with any inaccuracy not the kind of "minor error" that does not alter the "gist" of the Statement and create a different effect on the mind of the viewer than the truth, then Dr. Amin should prevail on his motion for summary judgment.  Fed. R. Civ. P. 56(a).  Dr. Amin argues that the Statements on which he has moved for summary judgment are false as a matter of law and accordingly are not true, and that nothing in any of the broadcasts would alter the "gist" in the mind of the ordinary viewer.  *See* Doc. 122 at 2, 8-21; Doc. 176 at 14-17.  Dr. Amin argues that this applies to all of the Statements because NBCU

used the term "hysterectomy" around 50 times in the broadcasts and social media posts,

including flashed on the screen, so an ordinary viewer would interpret the term "procedure" to

refer to the "hysterectomies" elsewhere referred throughout the broadcasts; indeed, NBCU itself

called the story "the hysterectomy story" in numerous of the internal communications it offers in

support of its motion for summary judgment.  Doc. 176 at 2, 15-16; Doc. 130-3 at 2 ("We might

be interested in hysterectomies today"); Doc. 133-2 at 2 (Q: "Are you working on both the covid

and hysterectomy part of the ICE story?"  A: "Hysterectomy part"); Doc. 133-3 at 3

("HYSTERECTOMIES HAPPENING AT ICE FACILITY, WHISTLEBLOWER SAYS"); *id*.

at 4 ("Sounds like a lot of what they already reported on . . . he is focusing on hysterectomies");

Doc. 134-2 at 4 ("Uterus collector").  And Mr. Hayes testified that, as opposed to

hysterectomies, "[g]eneric procedures, I think, wouldn't capture the source of the

newsworthiness here."  Doc. 153-35 at 87:3-88:8.[7]  It certainly applies to Statements explicitly

referencing hysterectomies, which again are the vast majority of the Statements.  Doc. 176 at 17.

     In contrast, NBCU's argument that the "gist" of Statements about "hysterectomies" was

actually "non-hysterectomy procedures" such as excising lesions, birth control shots to control

---

[7] At the hearing, counsel for NBCU did not refute its own evidence of NBCU referring to the
Statements as the "hysterectomy" story.  NBCU merely provided additional testimony of Mr.
Hayes, and stated it is a "common theme, and I direct Your Honor to look at the record, not
representations of the record," apparently implying that the record does not match counsel for
Dr. Amin's representation thereof.  Hearing Transcript at 30:9-14.  But Dr. Amin had put that
additional testimony on the record already in its excerpts of Mr. Hayes's deposition at Doc. 153-
35, and nothing changes the fact that Mr. Hayes testified, when asked whether allegations of
generic procedures without allegations about hysterectomies would be newsworthy, they would
not be beyond the "baseline newsworthiness that had been elevated by past behaviors by the
same administration" such as "extremely ghastly allegations" of "intentional separation of
children" and, by implication, the allegations of forced hysterectomies.  Doc. 153-35 at 87:3-
88:25.  To the extent the testimony allows inferences otherwise, as NBCU urges, such inferences
are to be drawn in favor of Dr. Amin as non-movant on NBCU's motion.

bleeding, pelvic examinations, and tissue scraping to address pain,[8] is not convincing, because those procedures simply would not have the same effect on the mind of the ordinary viewer.  *Id*.

### III.   Dr. Amin can establish falsity of the Statements even as to what NBCU argues the "gist" is, and under the preponderance of the evidence standard or the clear and convincing evidence standard.

To the extent that the Court determines that an ordinary viewer would interpret a few of the Statements, such as those discussing "procedures," as referring to "non-hysterectomy procedures" such as excising lesions, birth control shots to control bleeding, pelvic examinations, and tissue scraping to address pain, NBCU has not shown as a matter of law that Dr. Amin cannot establish falsity.  Counsel for NBCU argued at the hearing that "the clear standard is that it is a clear-and-convincing-evidence standard."  Hearing Transcript at 26:5-6.  As an initial matter, that is not the case: clear Eleventh Circuit precedent which remains good law provides that "[n]either the Supreme Court nor [the Eleventh Circuit] have expressly decided whether the plaintiff must prove falsity by clear and convincing evidence or simply a preponderance."  *Levan v. Capital Cities/ABC, Inc.*, 190 F.3d 1230, 1239 n.26 (11th Cir. 1999) (citations omitted).  In *Levan*, the Eleventh Circuit observed that multiple other jurisdictions have found that a preponderance is sufficient.  *Id*.  Although NBCU has cited district court orders preceding or controverted by *Levan* and dicta in a holding from the Court of Appeals of Georgia in which the court did not determine falsity one way or the other, it has not identified anything that changes

---

[8] Counsel for NBCU's sweeping, unsupported statement at the hearing that the women detained at ICDC must have said "hysterectomies" when they meant "cystectomies" because "their English language is not for many of them their first language" and the terms "sound so much the same," and that "the evidence is really unrefuted for the large part . . . that those cystectomies were unnecessary," Hearing Transcript at 35:7-17, is inaccurate.  There is much evidence that all procedures, including ovarian cystectomies to relieve documented pain and bleeding, were necessary and the women were not confused but testified they never heard hysterectomies or "uterus collector" until *after* NBCU's broadcasts.  *E.g.*, Doc. 153-1 ¶ 302, 345, 349.

the observation of the Eleventh Circuit in *Levan* or that there is "nothing in *New York Times v. Sullivan* to support the novel theory that other elements of a defamation claim must be proved by clear and convincing evidence."  Doc. 176 at 18-19 (quotation marks omitted).[9]

But even under the clear and convincing standard, a genuine issue exists because Dr. Amin has set forth evidence such that a jury could reasonably find for him.  *See Anderson*, 477 U.S. at 255 ("Consequently, where the *New York Times* 'clear and convincing' evidence requirement applies, the trial judge's summary judgment inquiry as to whether a genuine issue exists will be whether the evidence presented is such that a jury applying that evidentiary standard could reasonably find for either the plaintiff or the defendant.").  *All* of the procedures that Dr. Amin performed—including the non-hysterectomy treatments—were authorized by ICE and consented to as evidenced by an informed consent form signed by the patient.  *See* Doc. 153 at 10-16.  ICE's independent approval and the patients' signed informed consent forms constitute evidence from which a jury could reasonably find that there were no unnecessary procedures. Indeed, NBCU received medical records for hundreds of women detained at ICDC and identified as witnesses patients who have been deposed in this action, and yet on summary judgment NBCU has identified *zero* non-hysterectomy procedures it contends are unnecessary.  *Id*. at 16.[10]

---

[9] In contrast, the Georgia statute on conditional privileges including the fair report privilege, Georgia courts, and federal courts applying Georgia law have been much more clear that conditional privileges including the fair report privilege "disappear[] in the face of actual malice."  Doc. 153 at 16-18 (quotation marks omitted).

[10] Counsel for NBCU stated at the hearing that "medical records" of a single patient "verify that the patient did not fully understand" and it "is verified" that she went into a procedure expecting one thing but receiving another.  Hearing Transcript at 40:15-21.  That assertion is extensively controverted by evidence, Doc. 153-1 ¶ 348, and in fact neither in its papers nor at the hearing has NBCU contended that even that patient's procedure was medically unnecessary or unconsented-to, contending only an absence of "fully understand[ing]."

Even if NBCU had presented evidence of the absence of an issue of material fact, however, Dr. Amin has set forth affirmative evidence as to falsity, including his own testimony and the medical records he produced to NBCU in this case, and a retained expert who has presented the opinion that no procedures he reviewed were unnecessary.  *Id*. at 12-13.  When the Court asked whether the signed informed consent forms at least provided evidence that procedures were authorized, counsel for NBCU responded only that there exists "evidence in this record that undermines that," Hearing Transcript at 39:23-40:2, but even under the clear and convincing standard a jury could certainly find that NBCU's Statements concerning non-hysterectomy procedures being unnecessary, unauthorized, and without consent were false.  That is particularly so when purported evidence from the Senate that NBCU cites otherwise is plainly inadmissible.  *See* Doc. 176 at 8-11.  Finally, that evidence is not helpful to NBCU, because it does not constitute evidence controverting Dr. Amin's evidence of medical necessity: the Senate expressly stated that "data in and of itself does not indicate that treatments were unnecessary," particularly in the absence of attendant "demographic information" and other "key variables of the female detainee population, including age and medical history," and NBCU's purported rebuttal experts do not identify any specific procedures that were medically unnecessary or done without consent or authorization.  *Id*. at 21-22 (citations omitted).

At the hearing, NBCU discussed the contents of *Cox Enter., Inc. v. Thrasher*, 264 Ga. 235, 235 (1994).[11]  As NBCU concedes, in that case on summary judgment, the Supreme Court of Georgia did *not* purport to apply the "clear and convincing" evidence standard as to falsity.

---

[11] Counsel for NBCU chided Dr. Amin's purported failure to address the case in his response brief, describing it as a case "the plaintiff doesn't really address and for good reason."  Hearing Transcript at 27:13-15.  But NBCU only cited the case a single time for a rule statement; not discussing the case's facts at all; there was nothing for Dr. Amin to address.  Doc. 127 at 18.

Hearing Transcript at 15-16.  The Supreme Court of Georgia affirmed the trial court's granting of summary judgment because, for one, it was not defamatory because no reasonable reader could have inferred from it that the plaintiff had engaged in promiscuous or adulterous sexual behavior.  *Thrasher*, 264 Ga. at 236.  In this case, in contrast, NBCU concedes that the Statements are defamatory per se.  *See* Doc. 155 at 25 n.18.  *Thrasher* also held that the plaintiff could not prove falsity of a statement accusing the plaintiff of having chlamydia as a matter of law "because the bacteria was not identified before it was treated," and the absence of any evidence identifying it existed rendered it impossible "to resolve conclusively whether the speech at issue [whether the plaintiff had chlamydia] was true or false."  264 Ga. at 236.  Dr. Amin has proffered evidence of falsity in the form of multiple fact witnesses' testimony, medical records including authorizations and signed informed consent forms, and expert opinion that the non-hysterectomy procedures Dr. Amin performed on women detained by ICE were not unnecessary, unconsented to, or unauthorized.  This case is like *Thrasher* **if** the plaintiff there had a test from which the jury could conclude—either by a preponderance of the evidence or with convincing clarity—that the plaintiff had not had chlamydia.

**IV.     The fair report privilege does not protect any of the statements.**

Also at the hearing, the Court asked counsel for Dr. Amin why the Statements are not protected by Georgia's fair report privilege.  Counsel for Dr. Amin identified, at the hearing and at briefing, why the letter was not a complaint or part of any "quasi-judicial" proceeding.  Hearing Transcript at 19:6-22:24; Doc. 153 at 18-19.  Also, NBCU does not even argue that the fair report privilege should protect all of the Statements and has not met its burden that this defense should apply at all.  *Id.* at 18.

In addition to those reasons, Dr. Amin notes additional reasons NBCU has not demonstrated that some Statements should be protected by the fair report privilege. NBCU's reporting was not a "fair and honest" report of the letter or of any purported proceeding. Doc. 153 at 19-20. Further, it is not clear what triggered any (non-quasi-judicial) investigation that occurred—whether it was the letter itself, which was not submitted to the DHS OIG, or the media frenzy kicked off by NBCU.[12] And to the extent any of these facts are disputed, Georgia law provides that the existence of the privilege is for the factfinder and not to be determined on summary judgment: "In general, questions of privilege are for the jury to decide." *Murray v. Cmty. Health Sys. Pro. Corp.*, 345 Ga. App. 279, 287 (2018) (citation omitted). "The questions of whether the Article is privileged as a fair report and whether the privilege, if applicable, is lost due to actual malice are generally questions of fact for the jury." *AirTran Airlines, Inc. v. Plain Dealer Pub. Co.*, 66 F. Supp. 2d 1355, 1365 (N.D. Ga. 1999) (citation to Georgia law omitted).

Finally, the fair report privilege is conditional, rather than absolute, and so it "disappears in the face of 'actual malice.'" *Morton v. Stewart*, 153 Ga. App. 636, 638 (1980). For the reasons discussed in Dr. Amin's response to NBCU's motion for summary judgment, NBCU's tentative assertion that the issue "appears unresolved," Doc. 127 at 25 n.13, is unconvincing. Doc. 153 at 17-18. Because the Court has ruled that the Georgia public interest privilege protects the Statements, Dr. Amin must demonstrate an issue of material fact as to actual malice, whether or not the fair report privilege covers the Statements. He submits that he has done so.

---

[12] Although counsel for NBCU appeared to contend that the OIG investigation for which it argues the letter was a complaint is ongoing and that "we still don't know," Hearing Transcript at 34:10-21, Ms. Wooten herself stated in a court filing that OIG provided her written notice that "the conditions for exhaustion of administrative remedies have been met," indicating the investigation is in fact over. Doc. 122-1 ¶ 45.

## CONCLUSION

Dr. Amin appreciates the opportunity to provide supplemental briefing.  Dr. Amin

requests the Court grant his motion (Doc. 122) and deny NBCU's motion (Doc. 127).

Respectfully submitted this 29th day of April 2024.

*/s/ Stacey G. Evans*
Stacey G. Evans                              Scott R. Grubman
Georgia Bar No. 298555                       Georgia Bar No. 317011
sevans@staceyevanslaw.com                    sgrubman@cglawfirm.com
Tiffany N. Watkins
Georgia Bar No. 228805                       CHILIVIS GRUBMAN
twatkins@staceyevanslaw.com                  DALBEY & WARNER LLP
J. Amble Johnson                             1834 Independence Square
Georgia Bar No. 229112                       Atlanta, GA 30338
ajohnson@staceyevanslaw.com                  (404) 233-4171 (phone)
STACEY EVANS LAW                             (404) 261-2842 (fax)
729 Piedmont Ave NE
Atlanta, GA 30308                            *Counsel for Plaintiff*
(404) 850-6750 (phone)
(404) 850-6748 (fax)

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing will be served upon all

attorneys in this matter by filing with the Court's CM/ECF system.

This 29th day of April 2024.

*/s/ Stacey G. Evans*
Stacey G. Evans