# Exhibit 1

1

```
             IN THE UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF GEORGIA
                      WAYCROSS DIVISION


DR. MAHENDRA AMIN, M.D.,            )
                                    )
              Plaintiff,            )
                                    )
          vs.                       )          CASE NO.
                                    )     5:21-CV-00056-LGW-BWC
NBCUniversal MEDIA, LLC,            )
                                    )
_____Defendant._____ )



                      MOTIONS HEARING
           BEFORE THE HONORABLE LISA GODBEY WOOD
                 April 15, 2024; 1:00 p.m.
                    Waycross, Georgia
```

APPEARANCES:

| For the Plaintiff: | STACEY GODFREY EVANS, Esq.<br>JOHN AMBLE JOHNSON, Esq.<br>Stacey Evans Law<br>729 Piedmont Avenue NE<br>Atlanta, Georgia  30327<br>(770) 779-9602<br>sevans@staceyevanslaw.com<br>ajohnson@staceyevanslaw.com |
|---|---|
| | SCOTT R. GRUBMAN, Esq.<br>Chilivis Grubman<br>1834 Independence Square<br>Atlanta, Georgia 30338<br>(404) 233-4171<br>sgrubman@cglawfirm.com |
| For the Defendant: | ELIZABETH A. McNAMARA, Esq.<br>AMANDA B. LEVINE, Esq.<br>Davis Wright Tremaine, LLP<br>1251 Avenue of the Americas<br>21st Floor<br>New York, New York  10020-1104<br>(212) 603-6437<br>lizmcnamara@dwt.com<br>amandalevine@dwt.com |

2

```
                              CYNTHIA L. COUNTS, Esq.
                              Fisher Broyles, LLP
                              945 East Paces Ferry Road, NE
                              Suite 2000
                              Atlanta, Georgia 30326
                              (404) 550-6233
                              cynthia.counts@fisherbroyles.com


Reported by:                  Debbie Gilbert, RPR, CCR
                              Official Court Reporter
                              801 Gloucester Street
                              Post Office Box 1894
                              Brunswick, GA 31521-1894
                              (912) 262-2608 or (912) 266-6006
                              debra_gilbert@gas.uscourts.gov



                   - - -
```

3

```
 1                    P R O C E E D I N G S

 2              (Call to order at 1:00 p.m.)

 3         THE COURT:  Good afternoon.  Ms. Sharp, call the next

 4    case.

 5         THE CLERK:  Case Number CV-5:21-56, Dr. Mahendra Amin,

 6    MD, versus NBCUniversal Media, LLC, Stacey Evans, John Johnson,

 7    Scott Grubman for the plaintiff, Elizabeth McNamara, Amanda

 8    Levine, Cynthia Counts for the defendant.

 9         THE COURT:  Ready for the plaintiff?

10         MS. EVANS:  Yes, Your Honor, thank you.

11         THE COURT:  And ready for the defendant?

12         MS. McNAMARA:  Yes, Your Honor.

13         THE COURT:  Let me state, before I turn to counsel for

14    argument, that we are employing a line to allow the parties to

15    call in and hear the arguments that are being made.

16         I need to stress to anyone who is participating in that

17    and listening online that it is for their convenience only to

18    hear what is said.

19         Any reproduction or rebroadcast of what is being said at

20    this hearing would subject that party, of course, to contempt of

21    court.  It is not something to record and not something to

22    rebroadcast.

23         With that understanding, let's turn to the motions that

24    are pending.  We have two dispositive motions.  The first was

25    filed by the plaintiff, a motion for partial summary judgment
```

1    that addresses some of the elements of the defamation claim and

2    some of the affirmative defenses that have been raised by NBC,

3    and then we have a complete motion for summary judgment that's

4    been filed by the defendant, NBC, so I'm going to go in order of

5    filing so we will begin with the plaintiff.

6          Ms. Evans, will it be you doing the argument?

7          MS. EVANS:  Yes, Your Honor.

8          THE COURT:  If you will come to the podium and begin,

9    and, of course, this is your opportunity to say anything that

10   you would like to say to augment the briefs that have been

11   filed.

12         Of course, I have had the opportunity to review those

13   briefs so I'm familiar with the contentions of the parties and

14   then I have a few questions for each side that I would like to

15   pose.  So with that, let me turn to you.

16         MS. EVANS:  Thank you, Your Honor.  Thank you for The

17   Court's time and attention today, and may it please The Court, I

18   am Stacey Evans and here with cocounsel it's our honor to

19   represent Dr. Amin.

20         As you mentioned, Dr. Amin has moved for partial summary

21   judgment on certain elements of his defamation claim.  Most of

22   those elements that we moved on NBCUniversal did not contest so

23   I'm not going to talk about "of and concerning publication,"

24   "defamatory" meaning.

25         This motion at this point is really about falsity, and

5

1   there is no genuine issue of material fact that the statements

2   at issue are false.  We've moved on 30 out of 32.

3        There are two statements that have to do with statements

4   that Dr. Amin was rough or had bruised, and which we

5   acknowledge.  Even though we don't think it's credible

6   testimony, there is testimony in the record that those things

7   occurred and, of course, Dr. Amin counters those, but that would

8   be for the jury.

9        We are moving on 30 of 32 statements that go to the

10  heart of this matter, the gist of the falsity of the statements,

11  which is that Dr. Amin performed mass hysterectomies that were

12  unnecessary, unauthorized and unconsented-to.

13       THE COURT:  Let me stop you there, when we're on the

14  gist, because each side has a different idea about whether we

15  use a microscope or a telescope to determine what the gist was.

16       You understandably are concentrating on the -- this one

17  procedure, hysterectomies, and saying, well, the gist of the

18  reports is that he did all those unauthorized hysterectomies and

19  it turns out, you say, there were only two ever done and you've

20  got informed consent for them.

21       They say that's not the gist of these reports.  The gist

22  of these reports is that he did atrocious care of people at the

23  facility and all kinds of improper gynecological fertility-type

24  treatments, and they say they have evidence to show that that is

25  true.

6

1        So let me ask it this way.  Who determines the gist?

2   How do we determine it?  How specific do I look and what are

3   your best cases to support how specific?  How do we know?  Are

4   you right on that or is she right on that?

5        MS. EVANS:  Certainly, Your Honor, we are right on that.

6   But to your question, the gist here is apparent.  There is no

7   genuine issue of material fact about what the gist is, and I

8   will talk about that more specifically, but if Your Honor

9   determines that it could go either way -- some audience viewers

10  may have viewed the gist of the statements as unauthorized

11  hysterectomies and others may have viewed it, as NBCUniversal

12  wants to paint it, as unauthorized generic procedures -- if you

13  think it could go either way, then the jury has got to decide

14  that.  That's not an issue of law.

15       THE COURT:  Your argument, at a minimum, you would say,

16  well, if we look broader, as NBC encourages, then they don't

17  win; they just go to the jury.

18       MS. EVANS:  Correct, Your Honor.  That's absolutely

19  right.  We also contend that, we feel very strongly that the

20  gist is that he was performing mass hysterectomies that were

21  unauthorized and unconsented-to and unnecessary.

22       But even if you were to accept or a jury were to

23  ultimately accept that the gist of these statements were

24  unnecessary generic procedures, that is still false, and we have

25  plenty of evidence to put into the record from which a jury

7

1    could find that to be true, but just stepping back on what is

2    the gist, it is just simply not credible for NBCUniversal in

3    particular to talk about the fact that the gist was anything

4    other than hysterectomies.

5         Of the 30 statements that are at issue in our motion,

6    all but three mention the word "hysterectomy" or

7    "hysterectomies" or "uterus collector."

8         THE COURT:  But is that your selective picking of what

9    you're complaining about?  Are the reports broader than what you

10   have pulled down to complain about?

11        MS. EVANS:  They are not, Your Honor, and each statement

12   has to be -- when we're trying to decide whether a statement is

13   true or false, we've got to look at that statement.

14        We look to the broader broadcast just to see if that

15   changes the gist or the meaning as the viewer would have seen

16   it, but because these broadcasts, even separate and apart from

17   any of the statements that we've put at issue, these broadcasts

18   are covered in a focus of hysterectomies.

19        Over 50 times "hysterectomy" is mentioned in these

20   broadcasts, and it's very important, Your Honor, to note this.

21   Internally, NBCUniversal referred to this as the hysterectomy

22   story.

23        They did not refer it as the generic procedures story

24   and, in fact, one of their on-air personalities, Chris Hayes,

25   when I asked him whether the use of the word -- whether if this

8

1   was just a story about procedures and what does that even mean,

2   would you have even written this, and his response, Your Honor,

3   was, quote, generic procedures I think wouldn't capture the

4   source of the newsworthiness here.

5        That's their words.  They call it the hysterectomy story

6   over and over and over, and the words throughout the broadcast

7   over and over are about hysterectomies, and that's just

8   absolutely false.

9        It is undisputed at this point that there were only two

10  hysterectomies performed.  It is undisputed that both of those

11  hysterectomies were authorized by ICE, and it's undisputed that

12  there are consent forms signed by the patients for both of those

13  hysterectomies.

14       Those are undisputed facts.  There is no genuine issue

15  of material fact that the hysterectomies were necessary.

16  Because both of the hysterectomies were authorized by ICE, that

17  alone means they went through a medical necessity review, which

18  I think there is enough.

19       THE COURT:  They've brought forward evidence that they

20  say undermines that whole review process.  How do you respond to

21  that?

22       MS. EVANS:  First of all, Your Honor, that report that

23  they are pointing to specifically excluded any medical necessity

24  review that took place for any procedure that was performed at

25  Irwin County Detention Center.

1    So that's one, but secondly, the report itself only took

2    issue with the review process.  They said, "We need to tighten

3    up the review process and maybe we need more MD's reviewing

4    these as opposed to NP's or other medical professionals," but

5    the report also went to great lengths to say, "Nothing in here

6    should be taken as any finding that any procedure that was

7    approved was not medically necessary."

8          They didn't go behind, in other words, any of the

9    reviews that did occur and say, "This one was wrong, this was

10   not medically necessary even though we originally said it did."

11   They just said, "We think that these review procedures should be

12   better," but again excluding anything that happened at Irwin

13   County Detention Center.

14         THE COURT:  Looking at the evidence that's been

15   developed during discovery, amass for me, what evidence can you

16   bring forth to show that several of these medical procedures

17   that were done were not unnecessary.

18         MS. EVANS:  Procedures other than hysterectomies?  Yes,

19   let me go through that, and if it's okay with Your Honor, I

20   realize I left my reading glasses back at counsel table.

21         THE COURT:  Yes, and I apologize to both sides in

22   advance.  I'm going to kind of be skipping around a little bit

23   with you, but as I say, I am familiar with the arguments, so

24   there's no need for you to sort of build that building for me.

25         MS. EVANS:  I appreciate that, Your Honor, and I would

1    actually rather answer your questions than talk to you about

2    things that you don't need to hear, but there is a large amount

3    of evidence that we have that there were no procedures performed

4    that were unnecessary.

5        I've talked about the fact that not only were both of

6    the hysterectomies reviewed for medical necessity before being

7    authorized by ICE, but every procedure that Dr. Amin performed

8    was also reviewed for medical necessity and authorized by ICE.

9        So there's one piece of evidence there that everything

10   was authorized, and they don't contest, Your Honor, that any of

11   the procedures that Dr. Amin performed were unauthorized, which

12   means by definition they went through this medical necessity

13   review.

14       Secondly, of course, we --

15       THE COURT:  They do, of course, point out the informed

16   consent part and they have brought forth evidence showing that

17   some of these women say "I really didn't understand any of

18   this."

19       MS. EVANS:  Yes, Your Honor, they do.  They don't,

20   however, just like with the hysterectomies, they do not contest

21   that for each procedure that was performed, there is a written

22   signed consent form that has language that says they were

23   counseled and they consented to the procedure.

24       Now what they say is not that those forms weren't signed

25   or that they don't exist.  They say that the women didn't

11

1   actually fully understand what was involved in the procedure.

2           I would submit, Your Honor, that is different than

3   consent.  I consent to a lot of medical procedures that I may

4   not fully understand.  It's why I go to the doctor in the first

5   place.

6           The other thing that they point to on one of the

7   hysterectomies is that one of the women said that she didn't

8   feel like she had a choice.

9           Well, in her deposition testimony, Your Honor, I believe

10  a jury could take what I took, which is that she didn't feel

11  like she has a choice because she was told she had cancer.

12  Because of her illness, she had to have this procedure.

13          She didn't want it.  It wasn't pleasant.  She might not

14  have fully understood it, but she did understand what Dr. Amin

15  showed her on the charts.  What was written in the consent form

16  is that she needed this or she may have serious consequences, so

17  they are not contending, Your Honor, that consent was not given.

18          They are contending that they didn't fully understand

19  perhaps or that they didn't feel like they had a choice.  These

20  are both things that are separate from consent, but also, Your

21  Honor, the witnesses on those issues are individuals who

22  are former -- women who were formerly detained.

23          That alone is not necessarily a reason for their

24  credibility to be questioned, but some of them do have criminal

25  histories, and to a person, for the ones that we were able to

12

1    depose, they all gave contradictory testimony during their

2    depositions.

3            So there are credibility issues with whether these women

4    actually didn't understand or didn't have an opportunity to have

5    questions answered, though most of them say no one stopped them

6    from asking questions, and in many instances, they talk about

7    how Dr. Amin put information up on a screen for them to look at

8    and they did have an opportunity to ask questions, so while they

9    want to make an issue of consent, Your Honor, on the procedures,

10   it's really not an issue of material fact on the issue of

11   consent.

12           If we had to prove that -- if they had put up on the

13   screen that Dr. Amin performed procedures on individuals who

14   didn't fully understand what was happening to them, maybe we

15   would have a fact issue on that, but we are talking about

16   consent and that's a different animal.

17           THE COURT:  Let me pull back further in that regard, and

18   NBC points out that many of their reports begin by saying that

19   these are allegations and not that "This is what happened; Dr.

20   Amin did these things," but that "These women, credible or not,

21   they are making these allegations."

22           How do you respond to that difference that they are

23   putting up?

24           MS. EVANS:  It's an age-old saying in defamation law

25   that a talebearer is as guilty as a talemaker, and so simply

1   because you throw the word "allegation" in front of something

2   doesn't absolve you from any responsibility.

3        That really goes more to the actual-malice issue, but

4   there is no -- we have a ton of evidence that there were no

5   unnecessary procedures.  In addition to the medical necessity

6   review, we have Dr. Amin's testimony, of course, that he did not

7   perform any procedure that was unnecessary.

8        We've offered expert testimony from Dr. Bills as well as

9   Dr. Hamilton to testify that they reviewed the procedures.  Dr.

10  Bills reviewed every procedure that occurred plus reviewed

11  medical records for women who at all were known to us to have

12  made a complaint against Dr. Amin, whether it was in a lawsuit

13  or a press statement, and not surprisingly, Dr. Bills found that

14  there wasn't anything that he found that wasn't medically

15  unnecessary, not surprising because anyone who was formerly

16  detained who had ever brought a claim against Dr. Amin in court,

17  all of those claims have been dismissed at this point.  There

18  are no pending lawsuits against Dr. Amin.  In addition, of

19  course, the Georgia --

20       THE COURT:  Dismissed on the merits?

21       MS. EVANS:  They were just dismissed on a motion to

22  dismiss, so they are no longer pending.  But I recognize, Your

23  Honor, they weren't, they didn't have a full factual finding.

24  They were thrown out before they even got to that.

25       The Georgia Composite Medical Boards, as you're aware

14

1  from the filings, had done an investigation of Dr. Amin without

2  taking action, and he is right now in Coffee County seeing

3  patients serving his community.  So we have --

4       THE COURT:  Of course, NBC has included in their

5  briefing what's happened with regard to the United States Senate

6  and the Senators that have looked at that, and how do you

7  address their argument that how could anything that these

8  reports might have brought forward, how can any sting that they

9  caused be any worse than the US Senators saying that Dr. Amin's

10  medical work was disgraceful.

11       MS. EVANS:  Well, two things, Your Honor.  First, any

12  impact of any other statement, whether it was from the Senate or

13  any other press statement or anything else that's happened as

14  fallout from their reporting -- we contend they started all

15  this -- but all that would only go, Your Honor, to the issue of

16  damages.

17       It doesn't go to whether they messed up and whether they

18  have liability in this action, but specifically with the Senate

19  report -- and I'm glad you brought that up -- we believe that

20  the Senate report is inadmissible for the truth of the matters

21  asserted therein for many reasons.

22       I know they have tried to raise this exception under

23  803(8) that this is a public record or report, and in candor,

24  Your Honor, as I was preparing for this argument -- well, let me

25  step back.

1          In our briefing, we sort of said, okay, maybe there

2     are -- maybe there are public reports that could fall under that

3     exception.  Maybe that Senate report could be that, but the

4     doctor statements within the Senate report, the doctors who

5     reported to, made statements to, most of them, as far as we

6     know, not under oath, didn't go through gatekeeping procedures,

7     those doctors' statements would not be admissible for the truth

8     of the matter asserted.

9          Certainly the most that you might have admissible from

10    the Senate report are their findings, but to my point, in candor

11    to Your Honor, preparing for this argument, I'm not sure that

12    any part of that Senate report actually falls under an 803(8)

13    exception because what NBCUniversal ultimately told us in their

14    reply brief is that they weren't actually trying to get in all

15    the doctor statements, though that did look like what they were

16    trying to do originally, and certainly we would object that all

17    of that is hearsay within hearsay, expert medical testimony that

18    members of the Senate were not authorized, not with knowledge to

19    consider or evaluate, no gatekeeping function like what we have

20    here.  That certainly is inadmissible for the truth of the

21    matter asserted.  I think the case law is clear on that.

22         So they backed up and said, no, we're just talking about

23    the factual findings.  I'm not sure that that is admissible

24    under 803(8) either because the only types of public records

25    that are admissible are ones that set out the office's

1    activities -- so this is what the Senate did today, I suppose --

2    a matter observed while under a legal duty to report -- I don't

3    believe that applies -- and what I think they are relying on is

4    Number 803(8)(A)(iii).  "In a civil case or against the

5    Government in a criminal case, factual findings from a legally

6    authorized investigation."

7         Well, that's not what that was.  That wasn't a civil

8    case.  I think what 803(8)(A)(iii) is referring to is like an

9    employment discrimination case, where you might have an EEOC

10   investigation and you look at the findings of fact from there.

11        I want to raise that in candor to The Court.  But

12   stepping back, even if you look at the factual findings, the

13   actual factual findings from the Senate report, it's not enough

14   to create a genuine issue of material fact on falsity because

15   here's what they say.

16        They give you raw numbers of the number of procedures

17   performed on women who were detained at ICDC but with no

18   context.  Okay, here's the number.  It's big but compared to

19   what?  I don't know.

20        And they also say specifically, the report explicitly

21   says, quote, the subcommittee recognizes that this data in and

22   of itself does not indicate that treatments were unnecessary, so

23   so what?

24        Now, the only thing, there is this findings of fact that

25   you will see in the Senate report -- like all good politicians,

1    they have a very vague statement here -- quote, female detainees

2    appear to have been subjected to excessive invasive and often

3    unnecessary gynecological procedures.

4         "Appear to have been," "often," no specifics, not "This

5    one was; this one wasn't," and again all of that is from these

6    doctors who submitted information to the committee, did not go

7    through any gatekeeping, and we know from discovery that one of

8    the doctors that shared information with the Senate or with

9    Congress was a gentleman named Dr. Ted Anderson.

10        We've moved -- this is someone that they have tried to

11   designate as a non-retained expert and we've moved to exclude

12   him for various reasons, but Dr. Ted Anderson is sort of an

13   example that we give of how unreliable these doctors' statements

14   to Congress actually were, because Dr. Ted Anderson, with a

15   group of other doctors, reviewed certain records that they had

16   for 19 women, and all he said from that was "From what I've

17   looked at, I don't see support for medical necessity," not that

18   there wasn't medical necessity.

19        And what we learned in discovery, Your Honor, and

20   hopefully conveyed in the briefs -- there's a lot of information

21   in there -- is that those records, I would say over 70 percent

22   of them if not more --

23        THE COURT:  The ones that he actually looked at?

24        MS. EVANS:  The ones he actually looked at were not Dr.

25   Amin's medical records from his office.  They were not hospital

18

1    records by and large.  They were records for the women while

2    they were in detention, so, for example, if you were in

3    detention at Irwin County Detention Center and you needed

4    Tylenol or you complained that you've got a headache or that you

5    sprained your ankle, it generates these kind of lengthy

6    documents, so most of what Dr. Anderson actually looked at were

7    just records from the detention center.

8          In fact, some of the stuff he looked at were immigration

9    court proceedings, transport records when people would have to

10   go to various places while they were in detention, whatever it

11   was, visitor logs, not medical records and, in fact, for two of

12   the 19 patients that Dr. Anderson reviewed records for, they

13   weren't even Dr. Amin's patients.

14         So it's so inherently unreliable just from that one

15   example of what we have that I don't think it would pass muster

16   to come in here, especially given the gatekeeping functions of

17   The Court, to allow any of that to come in, so what you're left

18   with, if anything -- and I go back to say I don't think any part

19   of the Senate report should be admissible but at best you've got

20   statements of raw numbers that are caveated by saying the

21   committee recognizes this doesn't mean that anything is

22   unnecessary and this vague statement that some people appear to

23   have been subjected to without any detail, so I don't think that

24   is enough when you consider the standards that we have to adhere

25   to in court but not in Congress about what a jury gets to hear.

1      It doesn't create a genuine issue of material fact, not

2 only on procedures, but certainly not on hysterectomies, and

3 recall -- I'm sure you will from the briefs -- that the Senate

4 reports actually found that there were only two hysterectomies

5 and they were medically necessary.

6      THE COURT:  Let me jump back around with you.  When I

7 ruled on the prior motion, the judgment on the pleadings, we

8 sort of set aside the Georgia's fair reporting privilege for

9 development of the record.  Go back with me to that.  Walk me

10 through why NBC's statements are not protected by Georgia's fair

11 report privilege.

12      MS. EVANS:  Absolutely, Your Honor.  And, Your Honor is

13 right, that when we were here last time, you were taking our

14 allegations as true, that the letter was not a complaint in that

15 it was not part of a judicial proceeding under 51-5-7 Subsection

16 5, which is fair and honest reports of proceedings of

17 legislative or judicial bodies.

18      Nothing revealed in discovery has changed that.  In

19 fact, it's clarified that we were right from the beginning that

20 that letter was not a complaint.

21      Now, there was a complaint.  There was a complaint, and

22 we put it in the record in response to NBCUniversal's statement

23 of material facts, Paragraph 6.  It's Docket 122-19, 20 and 21.

24      What that is, Your Honor, is a declaration signed under

25 oath by Dawn Wooten, a screenshot of the electronic transmission

1    of that declaration to the office of inspector general and a

2    letter from her attorneys from the Government Accountability

3    Project -- those were her attorneys; that's who appeared with

4    her on air, Government Accountability Project -- asking for

5    whistleblower status.  Those three documents are the

6    whistleblower complaint.

7            When you look at that on the docket that we've pointed

8    you to, 122-19, 20 and 21, not one word about hysterectomies.

9    You won't find that word.  You also will not find

10   "gynecological," "gynecology."  You will not find anything

11   related to medical care.

12           It was about COVID and her being fired because she

13   complained about the lack of COVID procedures.  That was the

14   whistleblower complaint.

15           The letter is just a letter.  The letter itself even is

16   not -- neither was the complaint, perhaps with regard to Dr.

17   Amin -- part of any judicial proceeding because ICE cannot

18   remove Dr. Amin from the practice of medicine.

19           They can't suspend his license.  They can't revoke his

20   privileges in that way, and it seems, you know, maybe it's

21   specific, but these privileges, these privileges are privileges.

22           They are written in statute.  They are specific, and it

23   has to be specific, so an allegation, like an allegation made in

24   a court proceeding, falls under Subsection 6 because if I make

25   an allegation in court, I've got to put in a complaint.  It's

1    got to be signed under oath or an attorney has got to be subject

2    to Rule 11.

3            That's part of the proceeding, but that's different than

4    a judicial proceeding.  Allegations made to a judicial

5    proceeding are not part of the proceeding and especially with

6    this letter, you know, and these things, you look at them closer

7    and you see things you didn't see before.

8            The letter is not signed by anyone.  Dawn Wooten is not

9    a signer on it.  There is not an individual lawyer's name on the

10   signature line.

11           If you look at it, you will see a list of four

12   organizations, Project South and three other non-profit

13   organizations.

14           What you will also not see is the Government

15   Accountability Project.  They did not put their name on that

16   letter.  Those are her lawyers.  They did not put it on there

17   and, in fact, in -- John Whitty was her main attorney from

18   Government Accountability Project, he said in his deposition he

19   never heard a word about hysterectomies until he read it on a

20   podcast, never heard it, her own lawyer, and one thing I failed

21   to mention, Your Honor, the actual whistleblower complaint, the

22   declaration under oath, the letter asking for whistleblower

23   status, the electronic screen shot showing submission to OIG,

24   that was submitted on September 8th.

25           The letter comes a week later.  So nothing related to

22

1    the letter is being investigated by a judicial body.  It is

2    simply not something that falls under that conditional privilege

3    of a fair report privilege because it wasn't a judicial

4    proceeding, and even if there was a judicial proceeding with

5    regard to Dr. Amin, that letter was not part of it.

6         I think about you can't -- you think about any letter

7    that someone may send to a legislator or an agency head.  That

8    cannot cloak media in this actual-malice privilege just because

9    some random person off the street made an allegation.

10        It's got to go through the proceeding, and there's not a

11   single case -- and I think I said this at the last hearing but

12   it bears repeating -- there is not a single case that I could

13   find where any use of the fair report privilege was given for a

14   judicial proceeding as opposed to a court proceeding without

15   that proceeding being over.

16        For example, you've seen several -- you mentioned

17   earlier, Your Honor, about the OIG coming out with the report

18   saying that they wanted to look back at their medical review

19   policies.  They made that report after the investigation.

20   That -- there would be fair report privilege on that, not

21   everything that was said out loud by someone about that along

22   the way because it's not part of the proceeding -- and here,

23   stepping back again -- it's tricky but there was nothing in the

24   actual complaint about hysterectomies or gynecological care.

25        THE COURT:  Some of the more memorable statements that

1   were made with regard to Dr. Amin include the uterus collector

2   report.  Did discovery bring any more information with regard to

3   that part of the statement that would allow either me or a jury

4   to distinguish whether that is a statement of fact or opinion,

5   hyperbole?

6        MS. EVANS:  Well, it remains a statement of fact as Your

7   Honor found before because it can't be understood as hyperbole

8   unless you separate it from the substantive allegation that he

9   was down in the basement performing all these hysterectomies,

10  but notably, Your Honor, during discovery, for every woman who

11  was formerly detained at Irwin County Detention Center that we

12  deposed -- I don't remember the exact number standing here

13  today, but seven, nine, something like that -- not a single --

14  and stepping back.

15       What was in the letter that's not the complaint, what's

16  in the letter is that everyone at the facility referred to him

17  as the uterus collector.  That's how they referred to this

18  doctor, uterus collector.

19       I asked every woman, we asked every woman that we

20  deposed who was formerly detained at Irwin County Detention

21  Center if they ever heard anyone use that phrase to describe Dr.

22  Amin.  Every single one of them said no with one exception, a

23  woman who testified that she heard people describe him like that

24  after they saw the news, not that that was ever anything that

25  was uttered in the facility.

1         And remember, again, we've got this statement from

2    Project South, which is the one who put out the letter, not the

3    Government Accountability Project, but Project South, we have a

4    statement from them in the press that they put allegations about

5    hysterectomies, uterus collector, they put that in the letter

6    because nobody was investigating it and they wanted somebody to,

7    which backs up the idea that it was never part of her complaint

8    on September 8th and also that they didn't know but they put it

9    in there and the press ran with it and it was never true.

10        THE COURT:  Is it your contention presently that the

11   statements led someone to believe that he was actually charged

12   with a crime?

13        MS. EVANS:  I wouldn't go that far, Your Honor, but when

14   you're talking about a doctor being accused of performing

15   unauthorized procedures and painting this picture of him in the

16   basement like some Nazi Germany/Jim Crowe-era doctor taking out

17   uteruses and putting them up on a trophy case, it's hard to

18   believe how that wouldn't turn into criminal conduct if you're

19   operating on women without consent, without authorization, but I

20   don't contend that they used the word "criminal" when they were

21   talking about these procedures.  That's not something -- but

22   they have certainly painted a horrific picture of him that goes

23   to the core of who any doctor is, but certainly Dr. Amin.

24        This is his whole identity.  His whole life has been

25   dedicated to serving underserved areas of Georgia and treating

1  women, and they've got him as this mad scientist in the

2  basement.  That's the picture that they took.  That's the gist

3  of the statements.

4       THE COURT:  Well, let me turn across the aisle then and

5  hear from your opponent.  Thank you, Ms. Evans.

6       MS. EVANS:  Thank you, Your Honor.

7       THE COURT:  And who will take the lead?  Is it you, Ms.

8  McNamara?

9       MS. McNAMARA:  Yes, Your Honor.  Thank you very much.

10      THE COURT:  If you will come to the podium and same

11 context for you, of course.  I have read all your briefs, and so

12 you don't need to recover it, but it is just your opportunity if

13 there's another way you want to state it or respond to what

14 you've heard this afternoon from Ms. Evans.

15      MS. McNAMARA:  Yes, and thank you very much, Your Honor,

16 and I appreciate the time it took to read all these briefs

17 because I know in preparation for this --

18      THE COURT:  Well, it's a fascinating case.

19      MS. McNAMARA:  Well, good.  I'm glad you enjoyed it for

20 that reason.

21      THE COURT:  And I know it means a lot to both sides.

22      MS. McNAMARA:  It does.  It most certainly does.  It

23 means -- is significant for my clients.  It's a significant

24 matter.

25      Let me turn to what I think you did not hear in the

1    argument from Ms. Evans today.  You heard repeatedly whether

2    there's a general issue of material fact, and Your Honor asked

3    appropriately at the very beginning, what, in order to go to a

4    jury, what do we need to decide here?  What is the question?

5         And on falsity, the clear standard is that it is a

6    clear-and-convincing-evidence standard, and as this Court held

7    just last year in *Boatright*, clear and convincing evidence is a

8    conclusive determination, i.e., that the thing to be proved is

9    highly probable or reasonably certain, so this does not go to a

10   jury because it might be more likely than not or it might be,

11   you know, there's a question of fact about an issue.  That does

12   not take us to the jury.

13        They have to prove that the gist of these statements,

14   which we're going to talk -- which I want to focus on and focus

15   The Court on what the gist is, you have to determine that a jury

16   could reasonably conclude with certainty that the statements

17   were false and that they were published with actual malice, and

18   we submit that on both grounds The Court cannot do so.

19        Now, the plaintiff has conceded, we submit, the clear

20   and convincing standard.  They did not oppose that on our motion

21   for summary judgment.  In reply, however, they did raise an

22   Eleventh Circuit footnote case in *Levan versus ABC,* but there

23   they were applying Florida law, Your Honor, not Georgia law, and

24   there have been two subsequent federal cases in Georgia that

25   reference the clear and convincing standard and found that

1   that's what applies in Georgia on falsity, and what you didn't

2   hear a lot from the plaintiff is case law, and I think it's

3   important for us to focus on some of the cases because I think

4   they drive the analysis here.

5          THE COURT:  They say that a lot of your cases are ones

6   that are from other circuits and other states.

7          MS. McNAMARA:  That's not true on these issues, Your

8   Honor.

9          THE COURT:  Are you able to stay close to the Eleventh

10  Circuit, within that circuit?

11         MS. McNAMARA:  I will stay close to the Eleventh Circuit

12  or I think on this point the Supreme Court of Georgia, which I

13  think is clearly operative, and that is the case of *Cox v.*

14  *Thrasher,* which, of course, the plaintiff doesn't really address

15  and for good reason, and there The Court did not use the phrase

16  "clear and convincing evidence," but it did find that the

17  plaintiff was unable to carry her burden of falsity because she

18  could not prove with certainty that the statement at issue was

19  false.

20         THE COURT:  Let me ask you then, let's look, for

21  example, at the statement about the number of hysterectomies.

22  It looks like she can prove with certainty that he only did two

23  hysterectomies.

24         So some of the statements said that there were multiple

25  unnecessary, unauthorized hysterectomies, and how is that true?

1      MS. McNAMARA:  Your Honor, what you -- first of all, I

2  want to reiterate, what is before Your Honor on this motion is

3  not us moving on substantial truth.

4      We are contending the plaintiff cannot carry his burden

5  of proving falsity by clear and convincing evidence.

6      THE COURT:  So what if she says "I can because here's

7  something; he only ever did two hysterectomies," and NBC

8  reported that he did a lot of unnecessary, unauthorized

9  hysterectomies when it looks like it's undisputed that he only

10  ever did two hysterectomies, so why isn't that evidence that a

11  jury could determine was clear and convincing that this was

12  false?

13      MS. McNAMARA:  Because if the jury was properly

14  instructed on gist, then what you look at is not the specific

15  words that are said.  You look at what is the impact on the

16  plaintiff's reputation and we submit here that the delta between

17  any harm caused --

18      THE COURT:  And I know that's Gorsuch's words.

19      MS. McNAMARA:  And it is indeed, Your Honor, and you

20  obviously, you know, looked at these paper carefully.

21      THE COURT:  I did look.

22      MS. McNAMARA:  And I really appreciate that, I can tell

23  you, but if you look at the delta between the harm done by

24  saying two hysterectomies or a high number of hysterectomies

25  versus two hysterectomies when first the evidence shows that one

1    of those two hysterectomies was improper, was not the right

2    procedure.

3            THE COURT:  There's some evidence that shows that.

4            MS. McNAMARA:  Yes.  There's some evidence, but we don't

5    have to show clear and convincing evidence.  We have to -- the

6    plaintiff has the burden of showing clear and convincing

7    evidence, so we have evidence in the record causing --

8    significant evidence from Dr. Carey, from Dr. Anderson, from the

9    Dr. Ogburn who wrote to the Georgia medical board that the

10   plaintiff produced saying that this was an outrageous kind of

11   hysterectomy, and you have the fact that's indisputable that Dr.

12   Amin performed more hysterectomies than the entire nation of --

13   in the entire nation of ICE facilities, only one hysterectomy

14   was performed, and Dr. Amin sought approvals for five

15   hysterectomies during that time and actually performed two, so

16   even there he's on excessive side.

17           THE COURT:  Two as opposed to one.

18           MS. McNAMARA:  Yes, that two, that one of those two was

19   seriously the wrong proper procedure, but here again, if you do

20   the delta between statements saying a high number of immigrants

21   received questionable hysterectomies versus the evidence as I've

22   indicated that one of the two hysterectomies was improper and

23   the findings of the Senate investigation, which I will get to,

24   Your Honor, to respond to her, that concluded that Dr. Amin

25   performed scores of unnecessary and invasive surgeries on

1    detained women at rates exponentially higher than any other

2    doctor treating detainees nationwide.

3         We submit that that delta is not sufficient and that

4    reasonable jurors would have reasonable concerns about Dr.

5    Amin's medical care on either side of that ledger, Your Honor,

6    and I note that the plaintiff only wants to focus on

7    hysterectomies because that's where the facts are best for them,

8    but it doesn't carry their burden, Your Honor, and --

9         THE COURT:  What about the witness that testified that

10   that was, this was thought of as the hysterectomy case; that's

11   where all the clicks were.  You know, that's the way that --

12        MS. McNAMARA:  The quote that -- okay, this is a common

13   theme, and I direct Your Honor to look at the record, not

14   representations of the record because my wonderful colleague,

15   Amanda, pulled up immediately what Chris Hayes said after that

16   quote, and this is what Chris Hayes said.

17        "The context here is that there's been a long set of

18   stories about immigrants and immigrant detainees between 2017

19   and 2020.  There was a newsworthiness to the treatment of

20   detainees, a baseline newsworthiness that has been elevated by

21   past behaviors by the same administration and fear that people

22   in immigrant detentions were not being afforded their full

23   rights."

24        There was no question --

25        THE COURT:  So a broader gist.

31

1        MS. McNAMARA:  Yes, there was no question, and that

2   broader focus, it's important to focus here, Your Honor, on two

3   points, and I think that they came in the plaintiff's argument

4   today.

5        One is how did the Government receive this?  This was a

6   complaint, Your Honor.  This was a complaint received by the

7   Government.  It was docketed with a complaint number, and it

8   was -- and it's under investigation by the office of

9   investigations.

10       I direct Your Honor's attention to Exhibit 3 -- the

11  Exhibit 6 to my declaration, which is the 9/12/22 memo of ICE

12  concerning the investigations, and in that document, Your

13  Honor -- this was produced by DHS -- it says, "CRCL received a

14  significant number of allegations concerning medical care at

15  ICDC, including allegations about unnecessary gynecological

16  procedures performed on detainees at ICDC without their informed

17  consent."

18       They drop a footnote.  They identify the complaint

19  number, and they say, "Regarding the whistleblower allegations

20  made by a former nurse at the facility regarding a gynecologist

21  who treated female detainees."

22       The record is clear.

23       THE COURT:  Let me ask you as far as case law goes

24  because, I mean, ultimately the purpose of oral argument is just

25  to try to get it right, my purpose, and what cases would inform

1   me again -- I will put it as I did earlier today -- do we use

2   more of a telescope or a microscope in trying to assess the gist

3   and is it always The Court's view, or when there's competing

4   evidence, is it ever the jury's role?

5         MS. McNAMARA:  Well, that's where the burden of proof

6   comes in and that's where *Thrasher* was.  There was competing

7   evidence.  The plaintiff put forth evidence in *Thrasher* that the

8   plaintiff had been treated for chlamydia.  That wasn't enough.

9   It didn't show truth or falsity, but The Court found because the

10  plaintiff could not establish with certainty that she did not

11  have chlamydia, she lost, and that's where The Court says

12  sometimes the First Amendment weighs in the favor that even

13  arguably false statements cannot get to a jury because of the

14  burden of proof.

15        That was the same true with, Your Honor, with *Bustos*

16  *versus A&E* with Justice Gorsuch, as you know, and there was a

17  clear distinction between what was being said and what wasn't

18  being said, as well as the *Nichols* case, which we cite out of

19  the Sixth Circuit where there was a clear distinction where it

20  was said that he was arrested in connection with the Oklahoma

21  bombing, but, in fact, he wasn't arrested.  It was something

22  entirely distinct but --

23        THE COURT:  What would be your best Eleventh Circuit or

24  Georgia Supreme Court case on that point?

25        MS. McNAMARA:  Well, Your Honor, I think it's an

1    appellate court case I would focus on first, which the plaintiff

2    makes no effort to distinguish, and that's *Bryant v. Cox*.  I

3    think it puts the kind of focus here on kind of what actually

4    was being said on these broadcasts, and there each of the three

5    shows -- there is no dispute that they were reporting on

6    breaking news concerning the whistleblower complaint that had

7    been filed the day before, and each show repeatedly made clear

8    that they were reporting on allegations.  They included all

9    denials.  They included evidence that undermined the credibility

10   of Dawn Wooten that allowed viewers to know that she might have

11   an ax to grind.

12        In short, they weren't reporting verifiable facts.  They

13   were reporting that allegations had been made and that's what

14   happened with *Bryant v. Cox* and I think with startling facts

15   that show how much the burden of falsity is.

16        There the *Atlanta Journal Constitution* reported that

17   unnamed investigators -- we didn't even know who they were --

18   unnamed investigators believed that Richard Jewell had planted

19   the bomb at the Olympic Park.  It was later proved unequivocally

20   that Mr. Jewell had no responsibility, but The Court dismissed

21   the action for lack of falsity in language that we would submit

22   is equally applicable here, Your Honor.

23        It found that a reasonable reader, here a viewer, would

24   have understood the information to be preliminary and published

25   during early stages of investigation, and like here, the

1    reporting included evidence tending to belie the suspicion.

2         Here, too, there is no reason to conclude that what was

3    being reported was anything other than the allegations, the

4    breaking news.  The evidence was they were told about denials.

5    They were told about questions to question Ms. Wooten, and they

6    were told unequivocally that this is going to be investigated.

7         That's how *The Rachel Maddow Show* ends.  It starts by

8    telling you, the first thing it tells you about the broadcast is

9    that this is a complaint filed by an advocacy organization.

10        She tells the viewers up front this is something filed

11   by an organization with an agenda.

12        In the course of the coverage, it includes nothing but

13   direct quotes or paraphrases of the whistleblower complaint, and

14   then it ends saying "So what's going to happen next," and Jacob

15   Soboroff, the reporter, indicates it's going to be referred to

16   the DOI; it's going to be investigated.

17        And that is, in fact, what happened, and we're still

18   sitting here today, and we don't know.  They haven't issued a

19   report regarding these investigation.  The criminal

20   investigation into Dr. Amin is still ongoing.  We still don't

21   have an answer on that so ...

22        THE COURT:  Looking back to old Supreme Court case, they

23   say repeating and reporting on some allegations that are so

24   inherently improbable that only a reckless person would put them

25   in circulation, how does NBC not fit that bill by reporting this

35

1   uterus collector allegation?

2        MS. McNAMARA:  Your Honor, well, first of all, that

3   was -- the uterus collector, I know Your Honor found on the

4   original motion it was a statement of fact, and I appreciate

5   that ruling, but I think it clearly, as the evidence has

6   unfolded, it was a hyperbolic statement, and I think aptly as we

7   put in the papers, one of the witnesses, one of the sources,

8   Andrew Free, said, "Look, all these women were being told that

9   they were having cystectomies," and they're not -- their English

10  language is not for many of them their first language, and they

11  hear cystectomy and they think what's the common word you know,

12  hysterectomy, and they sound so much the same, and we know that

13  he was routinely performing unnecessary cystectomies where you

14  are scraping an ovary and you could have serious impact on a

15  woman's fertility, and the evidence is really unrefuted for the

16  large part, except for Dr. Bills' conclusory statement, that

17  those cystectomies were unnecessary.

18        If I could turn to the Senate report, Your Honor, if I

19  may, where it concluded, not in just statements from random

20  doctors, this was, first of all, an investigation by the Senate

21  that occurred over 18 months.

22        It included 541,000 pages of records from DHS, ICE, ICD,

23  LaSalle and Irwin.  They interviewed 70 witnesses including from

24  ICE, LaSalle, detainees, and they sought to include Dr. Amin and

25  allow him to provide any evidence.

36

```
1        He declined citing his rights under the Fifth Amendment

2   which, of course, he's entitled to because of the pending

3   criminal charges against him or investigation.

4        And they -- the Senate, it was a bipartisan report and

5   the Senate -- and it included a retained expert that found that

6   Dr. Amin's care that was -- there were scores of unnecessary

7   procedures.

8        This complies with multiple decisions of admissible

9   evidence under the exception of 803(8).  That's Barry versus

10  Trustees out of the DC Circuit, which also includes a Senate

11  report.

12       The importance here is the length.  Is it trustworthy?

13  This is a 18-month investigation bipartisan.  The Republican

14  Senator issued a statement condemning the action and care given

15  by Dr. Amin as well as the Democrat, and the hearsay statements

16  that the plaintiff focuses on, she ignores the fact that the --

17  what we're citing here, the fact that female detainees were

18  subject to excessive invasive and often unnecessary

19  gynecological procedures is a finding of fact in the report.

20       There should be no dispute that it's admissible, and

21  standing alone, looking at the gist of the statements, Your

22  Honor, that should be sufficient to establish that the plaintiff

23  at this stage cannot establish clear and convincing evidence of

24  falsity.

25       THE COURT:  If we were to -- sort of jumping around --
```

1    if we were to get to the actual-malice side of things, that's

2    typically an issue left to the jury.  Why wouldn't it be in this

3    case?

4          MS. McNAMARA:  Well, Your Honor, I think what you're

5    relying on, I couldn't -- I hate to say you're wrong, but it's

6    not typical.  It's, in fact, I mean, the only case that the

7    plaintiff is citing on the fact that actual malice goes to a

8    jury is the *Hammer versus Slater* case of the Eleventh Circuit in

9    1994, where The Court found that, when the issues in dispute are

10   questions of credibility, it goes to the jury.

11         Now, first of all, the primary issues here, the primary

12   arguments the plaintiff is making about actual malice are not

13   issues of credibility.

14         The plaintiff is relying on e-mails that are in the

15   record, transcripts that are in the record.  The Court can

16   evaluate these documents, can evaluate the context of the

17   transcripts.

18         These are not turning on solely credibility issues where

19   it's a he said/she said situation, but more important, what the

20   plaintiff ignores is that since *Hammer*, I mean, first of all,

21   *Hammer* itself acknowledged in a footnote that actual malice

22   often is resolved on summary judgment, so *Hammer* itself

23   acknowledged that, distinguishing that the facts at issue there

24   raised particular credibility issues.

25         But since *Hammer*, the Eleventh Circuit has over and over

38

1   and over again affirmed grants of summary judgment on actual-

2   malice grounds.  We cite a number of cases but there's *Berisha*

3   *versus Lawson* in '22.  There's *Grayson* in '22.  There's the

4   *Lovingood versus Discovery* in 2020.  There's *Levan versus ABC* in

5   '19 and further cases in Footnote 9.

6          It is more the pattern of granting summary judgment on

7   actual malice than it is the pattern to deny it as a jury issue.

8          THE COURT:  And here you would contend there is simply

9   no credibility-weighing to do in this regard.

10          MS. McNAMARA:  There really isn't, Your Honor.  I think

11   that the evidence -- and I'm happy to go through the plaintiff's

12   evidence on actual malice -- and when you look at it in

13   virtually every case, what you're looking at are the plaintiff

14   is relying on text messages or an e-mail or a transcript of a

15   conversation so that we can look at those documents.  We can

16   look at them together.

17          Is the plaintiff taking the information out of context?

18   Is the plaintiff accurately characterizing these documents?  The

19   Court can make that independent assessment, and we would submit,

20   Your Honor, that the common thread running through the

21   plaintiff's evidence of actual malice is that the plaintiff is

22   taking information out of context and misrepresenting, sadly, in

23   certain cases what is being said, and when you actually go

24   through and look at each of these arguments, which I'm happy to

25   do, you will find that there is no evidence to support actual

1   malice, let alone clear and convincing evidence.

2          THE COURT:  Again, jumping around, do you claim that, is

3   authorization for medical procedure the same as informed

4   consent?

5          MS. McNAMARA:  Absolutely not, Your Honor, and I think

6   that that's the proof of this.  I mean, first of all, the

7   evidence, every expert that testified, including the plaintiff's

8   own expert, Dr. Bills, confirmed that simply the fact that you

9   signed an informed consent form does not mean that people

10  understood what was being said and understood what procedure was

11  being done.

12          It's a form, and it's a necessary form.  I'm not

13  belittling it, but it is merely a form and it does not equal to

14  informed consent, and that was the finding of this new report

15  that was just issued in the last few weeks, that there were

16  serious troubles with the authorization process of ICE

17  concerning medical procedures, and the plaintiff is correct that

18  that recent report did not address Dr. Amin's actions but why?

19          They didn't address it because they are still under

20  investigation by the office of investigation, and so they did

21  not -- they didn't intercede in that but they found that there

22  were serious problems under -- in ICE's authorization.

23          THE COURT:  Wouldn't Dr. Amin's presentation of signed

24  informed consent forms at least provide evidence that the

25  procedures were authorized?

40

1      MS. McNAMARA:  Well, Your Honor, I think there's a

2  wealth of evidence in this record that undermines that.  There

3  is Dr. Amin and his own assistant testifying that they were

4  signing these forms and said they were not even with the patient

5  when they were signed.  They were at their office.

6      THE COURT:  Isn't that just a jury dispute?

7      MS. McNAMARA:  I don't think that that is a jury dispute

8  if again the standard is clear and convincing.  If you've got

9  numerous witnesses testifying that "No, I didn't understand what

10  was being said," the evidence is crystal clear these forms were

11  all in English.  They were not read in -- although translators

12  were sometimes used, they were not read in full to the patients.

13  Many of these patients were not English speakers.

14      And they testified, including not only their testimony,

15  but contemporaneous documents verify and their medical records,

16  like P█████ B████s in the record, verify that the patient did

17  not fully understand.

18      They went into the procedure expecting to have a D and

19  C.  They came out of the procedure learning they had a

20  salpingectomy, an entirely different procedure.  That is

21  verified in the contemporaneous records.

22      When you have all of that together, I don't think that

23  the plaintiff has, even on the side of the ledger about whether

24  these were all authorized -- and keep in mind, Your Honor, The

25  Court doesn't have to conclude that all the procedures were

41

1  unnecessary and without adequate consent.

2      What was being said on the broadcast is that they were

3  unnecessary procedures being performed or done without adequate

4  consent, so there can be many times where either the procedure

5  was unnecessary but maybe the person understood or the procedure

6  was necessary and the person did not understand, and you still

7  would not have sufficient evidence there.

8      Do you want me to turn further to actual malice?

9      THE COURT:  Yes.

10     MS. McNAMARA:  Can I get some water?

11     THE COURT:  Yes, and it was my intent to give each side

12 about 35 minutes, so you've got about five more minutes, so if

13 you will keep that in mind, actual malice, and then any final

14 point that you want to make, and I will, of course, keep the

15 record open for a couple of weeks for you to follow up with any

16 brief that you want to.

17     You don't need to.  It's been very well briefed, but if

18 traveling home you think, "Oh, I wish I had said this, too," or

19 "I wish I had been able to reply in this respect," then you are

20 invited but not required to follow up in briefing.  Ms.

21 McNamara.

22     MS. McNAMARA:  On actual malice, is that 35 minutes

23 for the entire --

24     THE COURT:  You've only got five more minutes.

25     MS. McNAMARA:  Okay.  That's what I wanted to

1   understand.  That's not much so I will try to do what I can.

2          Let me first emphasize, I think that -- because it

3   hasn't been touched on yet -- that the Eleventh Circuit has over

4   and over rejected actual-malice arguments when, as here, the

5   defendant has relied on previously published articles.

6          This was most recently recognized in *Berisha* where the

7   Eleventh Circuit said, quote, the law is clear that individuals

8   are entitled to rely on previously published reports from

9   reputable sources, and that, standing alone, defeats actual

10  malice, and there is no dispute here that each of the three

11  broadcasts at issue relied primarily on the NBC news article

12  that was published beforehand, as well -- which had incorporated

13  as well the AP article and allegations in the AP article, which,

14  by the way, included uterus collector and other statements that

15  are at issue here.

16          So that alone, we would submit, defeats their argument,

17  but nonetheless, as I indicated, they have a flurry of arguments

18  on actual malice, none of which withstands scrutiny and all

19  of -- and most of them are misrepresentations of the record, and

20  because of the shortness of time, I will only focus on two

21  because I think I already talked about Maddow and how Maddow

22  went through.

23          So let me focus on first with *Deadline.*  The primary

24  evidence there, of course, the decisionmaker there on *Deadline*

25  is Nicolle Wallace, so it was what was in her mind except for

1    three statements made by Julia Ainsley where you might be able

2    to bring in her state of mind at the time, but there the

3    plaintiff relies on a comment made by Ms. Wallace at 10:30 in

4    the morning, and in the intervening seven hours, a significant

5    amount of work was done on this matter, and a significant amount

6    of evidence was obtained, and probably the most important piece

7    of evidence that was obtained -- and this goes to the inherent

8    improbability issue that Your Honor raised a little while ago --

9    is that they uncovered that in 2015 Dr. Amin had settled a

10   Medicare fraud action and that that -- and paid -- the payment

11   made in that settlement was over $500,000.00, and, importantly,

12   that Medicare fraud action included allegations of unnecessary

13   procedures being routinely done on patients at the hospital

14   where he was treating patients.

15         That gave everybody involved in this case, from the

16   original NBC article to Chris Hayes and others, a high degree of

17   confidence in the credibility of these allegations because these

18   allegations, too, turned on unnecessary procedures.

19         And so there was corroborating prior evidence, and then

20   turning to *All In* and the key fact there, I think this is a very

21   good example of kind of the plaintiff's use of the record

22   evidence and why we really implore The Court to look at the

23   actual exhibits and not simply the characterization.

24         Perhaps most troubling is Plaintiff's repeated use in

25   their record of Andrew Free, one of the source's observation

44

1  that you should see -- and excuse me -- some fucking documents

2  before asserting these allegations.

3      The plaintiff over and over invokes this phrase to argue

4  that Mr. Free told *All In* they should not report the

5  allegations, but when you review the actual transcript, which is

6  Exhibit 3 to the Price declaration, Mr. Free is asked, first on

7  Page Number 1824, Mr. Free is asked, "Have you seen this problem

8  with hysterectomies at other facilities, not ICDC," and then he

9  goes through an answer and he comes to saying, "Well, as far as

10  a directives goes, you know, you need fucking documents."

11      He's talking about the other facilities.  In the next

12  breath, the transcript reveals, he says, "But what I'm telling

13  you here, how I'm sourcing this is I am sourcing this with the

14  fact that I have either reviewed the documents or attorneys that

15  I'm working with have reviewed the documents," and so he is

16  unequivocally telling them that "You can go with this; you can

17  rely on this; we've looked at the documents," so as you can see,

18  I think that's a classic example of needing to look at the clear

19  evidence, so in closing, given -- I don't know where I am on my

20  five minutes, Your Honor -- but I want to emphasize kind of a

21  comparison of looking at the collective evidence on actual

22  malice and how you think about this and compare two cases out of

23  the Eleventh Circuit:  One case that the plaintiff relies on

24  over and over and over again in his papers and another case most

25  recently from the Eleventh Circuit.

1          The first case is the *Berisha* case, which I previously

2    mentioned, where the plaintiff was a son of a foreign prime

3    minister of Albania accused of being part of a Mafia ring of

4    corrupt arms dealers.

5          There the primary sources were admitted liars, who had

6    pled guilty to defrauding the federal government, but the

7    reporter there said nonetheless he found it to be credible what

8    they told about the plaintiff, and that was not sufficient to

9    establish actual malice because there, as here, also the

10   plaintiff was relying on previously published articles and

11   information, and the Eleventh Circuit said that should defeat

12   any claim of actual malice.

13         The plaintiff also argued that there was a preconceived

14   story line there, but that wasn't sufficient.  The plaintiff

15   also argued that the defendant had intentionally fabricated

16   certain details in the book, but that was not sufficient.

17         The Eleventh Circuit found, considering all this

18   evidence in its totality, was not sufficient to carry the burden

19   of clear and convincing evidence of actual malice, and you

20   contrast that with the case that the plaintiff relies on more

21   than almost any other case in his papers and that is *Hunt versus*

22   *Liberty Lobby*, where it's a 1983 case out of the Eleventh

23   Circuit, and as I say, it's doing a lot of work in the

24   plaintiff's arguments, but the plaintiff never describes the

25   facts of *Hunt*.

46

1          What was sufficient to get to a jury there on actual

2    malice?  And the facts there was that Hunt was a former CIA

3    agent and was accused of being the CIA's fall guy to cover up

4    the fact that the CIA had killed JFK.

5          Now we're talking an inherently improbable allegation,

6    in stark contrast to the allegations here, given the prior

7    medical settlement, but that wasn't only the fact.  The only

8    source for this allegation was one dubious source, and the

9    record established in the *Hunt* case that both the editor and the

10   owner of the publication testified that they were -- absolutely

11   questioned the source.

12         That's actual malice.  That's like the *Fox* case that

13   recently settled for close to a billion dollars where you had

14   testimony where people were expressing on the record serious

15   doubts about it, so that case got over, and the other thing

16   that's important about *Hunt* is that The Court more than once

17   underscores that they didn't do additional investigation,

18   whereas here we clearly did do additional investigation, and

19   they didn't do this even though it was not hot news.

20         So here as you can imagine, *Hunt* bears no possible

21   connection to *NBC News* breaking news and reliance on previously

22   published sources and independent investigation that further

23   corroborated the whistleblower complaint and allegations that

24   were entirely plausible given Dr. Amin's settlement of a similar

25   claim concerning unnecessary procedures.

1          In sum, Your Honor, we don't believe that there is any

2     evidence to support that each of the three shows -- and you have

3     to evaluate them separately as to the decisionmakers -- whether

4     each of these shows seriously doubted, let alone clear and

5     convincing evidence, to get over the bar, and so for all these

6     reasons, Your Honor, and for those in our papers, we submit that

7     our motion for summary judgment should be granted.

8          Thank you.

9          THE COURT:  Thank you, Ms. McNamara, and thank both

10    attorneys for very elucidating arguments.

11         Like I said, I will keep the record open for two weeks

12    if there's something that you think of that you wish you had

13    added or didn't have time to explain or reply to, you're invited

14    but not required to do so.

15         Ms. Evans.

16         MS. EVANS:  Thank you, Your Honor, and my apologies.

17    When you said we're going to start with the motions in the order

18    they were filed, I didn't understand that I was to also address

19    that motion when I was up there, so I appreciate -- I mean, I

20    would love to talk to you more if you want me to, but otherwise

21    I appreciate the opportunity for the two weeks to brief, but

22    there's certainly a lot about actual malice that I would love to

23    highlight because it's a separate motion.

24         THE COURT:  Anything that she has said, if there's

25    something that you would like to respond to, I will -- you're

1    invited to put that in a brief as well.

2         MS. EVANS:  But not come up and talk again?

3         THE COURT:  No.  I think we've been at it almost an hour

4    and a half and there's a point of diminishing returns even with

5    District Court dispositive arguments.

6         MS. EVANS:  Fair enough.

7         THE COURT:  So with that, we will adjourn for the day,

8    and I will wait to see if there's anything else you want to add,

9    and with that, we will be in recess.

10        (Proceeding concluded at 2:18 p.m.)

11                        CERTIFICATION

13        I certify that the foregoing is a true and correct

14   transcript of the stenographic record of the above-mentioned

15   matter.

19                                            04/16/2024

20   _____
     Debra Gilbert, Court Reporter          Date

48