UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
WAYCROSS DIVISION

| | |
|---|---|
| DR. MAHENDRA AMIN, M.D.,<br><br>  Plaintiff,<br><br>  v.<br><br>NBCUNIVERSAL MEDIA, LLC,<br><br>  Defendant. | Case No. 5:21-cv-00056-LGW-BWC<br><br>**SUPPLEMENTAL BRIEF IN FURTHER SUPPORT OF NBCU'S MOTION FOR SUMMARY JUDGMENT** |

In accordance with this Court's instructions during the April 15, 2024 hearing (the "Hearing"), Defendant NBCUniversal Media, LLC ("NBCU") respectfully submits this supplemental brief in further support of its Summary Judgment Motion ("Motion" or "Mot.") (Dkt. 127) and its Opposition to the Motion for Partial Summary Judgment (Dkt. 155) filed by Plaintiff Dr. Mahendra Amin ("Dr. Amin").[1] In this brief, NBCU further addresses certain issues raised by the Court and Dr. Amin's counsel during the Hearing.

### I.  Dr. Amin Fails to Meet His Burden of Establishing Material Falsity

- **During the Hearing,** *see* **Hearing Tr. at 5-6, the Court asked:**

    o **"Who determines the gist [of the challenged statements]?"**

As Eleventh Circuit precedent makes clear, the court determines the "gist" of a defamatory statement. *See, e.g.*, *Lovingood v. Discovery Commc'ns, Inc.*, 800 F. App'x 840, 848 (11th Cir. 2020) (on motion for summary judgment, noting, "before we may determine whether the 'defamatory falsehood relating to his official conduct . . . was made with actual malice,' we pause to identify what, exactly, is the defamatory falsehood.") (citation omitted); *Levan v. Capital*

---

[1] Unless otherwise noted, NBCU uses the same abbreviations and capitalizations as in its Motion.

*Cities/ABC, Inc.*, 190 F.3d 1230, 1240 (11th Cir. 1999) (court's "first job" is to "determine the gist or sting of the report"); *see also* NBCU Mot. at 18; NBCU Reply at 4.  This accords with the undisputed principle that it is the Court's role on summary judgment to determine whether the plaintiff is able to show by "clear and convincing" evidence that the challenged statements are materially false.  *See, e.g.*, *Wolf v. Ramsay*, 253 F. Supp. 2d 1323, 1353 (N.D. Ga. 2003) ("Plaintiff must prove falsity by clear and convincing evidence"); *Airtran Airlines, Inc. v. Plain Dealer Pub. Co.*, 314 F. Supp. 2d 1266, 1271, n.3 (N.D. Ga. 2002) ("Plaintiff's proof of falsity and actual malice" must be "clear and convincing"); *Cox Enterprises v. Thrasher*, 264 Ga. 235, 236 (1994) (when the "factfinding process will be unable to resolve *conclusively* whether the speech is true or false, the burden of proof is dispositive") (emphasis added).[2]

- o **"How do we determine [the gist]?"**

The "gist of any statement within a publication or broadcast is found only by reference to the entire context."  *Levan*, 190 F.3d at 1240.  The importance of context was highlighted in *Bryant v. Cox Enterprises Inc.*, 311 Ga. App. 230 (2011) ("[S]tatements cannot be considered in isolation to determine whether they are true or false").  As explained at the Hearing, the *Bryant* court found statements that "investigators believe" Richard Jewell planted the pipe bomb at the 1996 Olympic Games in Atlanta were not materially false since the context established that the challenged statements did not "amount[] to an accusation by the Media Defendants that Jewell

---

[2] Dr. Amin did not object to the "clear and convincing" falsity standard in his response to NBCU's summary judgment motion and therefore waived arguments to the contrary.  *ALM & Co. LLC v. Bank of Am., N.A.*, 2022 WL 18777444, at *2 (N.D. Ga. Aug. 29, 2022) (citing *Jones v. Bank of Am., N.A.*, 564 F. App'x 432, 434 (11th Cir. 2014)).  Dr. Amin first cites to *Levan* in his reply on his partial motion for summary judgment, but *Levan* applied Florida law, observing that neither the United States Supreme Court nor the Eleventh Circuit had created a unified standard for falsity.  *Levan*, 190 F.3d at 1239.  *Levan* (and Dr. Amin) also cites to *Rattray v. City of Nat'l City*, 51 F.3d 793, 801-02 (9th Cir. 1994), which applied a preponderance of the evidence standard.  But, even the Ninth Circuit has since joined several other Circuits and now applies the "clear and convincing" standard.  *See Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 861 F.3d 1081, 1110 (10th Cir. 2017); *Manzari v. Associated Newspapers Ltd.*, 830 F.3d 881, 889 (9th Cir. 2016); *Trivedi v. Slawecki*, 642 F. App'x 163, 166 (3d Cir. 2016); *Patrick v. Cleveland Scene Pub., LLC*, 360 F. App'x 592, 595 (6th Cir. 2009); *DiBella v. Hopkins*, 403 F.3d 102, 115 (2d Cir. 2005).

planted the bomb. Rather, a reasonable reader would have understood the information to be preliminary in nature." *Id.* at 238-39.

Here, Dr. Amin wrenches the challenged statements from (1) the broader context of the News Reports, which reported on "breaking news" a day after the Whistleblower Complaint was filed,[3] and (2) their immediate context, frequently cutting off the beginning or ending of the sentences in which the challenged statements appear. *See* McNamara Decl. Ex. 1, Statement No. 17 (omitting reference to "allegations" immediately before challenged statement); *e.g.*, *id.* Statement Nos. 1-2, 4, 7-8, 11-12, 17, 21-23, 24-25, 26-36, 39-41. When considering this context—coupled with each News Report including available denials and context about Wooten's potential motivations and limitations—it is clear that here, like in *Bryant*, NBCU was not reporting that Dr. Amin performed large numbers of improper hysterectomies on ICDC detainees, but that these allegations were made to the government in a Whistleblower Complaint (which is plainly accurate).

Independently, Dr. Amin cannot meet his burden of falsity concerning what he argues is the "sting" of the challenged statements. The Court must decide whether the challenged statements in context "would have a different effect on the mind of the reader from that which the pleaded truth would have produced." *Masson v. New Yorker Magazine*, 501 U.S. 496, 517 (1991). This requires "comparing the damage [the statements] ha[ve] done to the plaintiff's public reputation to the damage the truth would have caused." *Bustos v. A&E Television Networks*, 646 F.3d 762, 764 (10th Cir. 2011) (cited favorably in *Project Veritas v. Cable News Network, Inc.*, 591 F. Supp. 3d 1322, 1332-33 (N.D. Ga. 2022); *see also Stange v. Cox Enterprises*, 211 Ga. App. 731, 734

---

[3] Indeed, throughout the *Deadline* segment, including during the interviews with Ainsley and Wooten, a chyron appears on screen that reads "BREAKING NEWS." The *All In* and *TRMS* segments also emphasized the preliminary nature of the allegations and that they would be investigated by the government. *See* NBCU SOMF, ¶¶144, 180, 223, 241-244; Wallace Decl. Ex. 7.

3

(1994) ("[F]actual errors which do not go to the substance, the gist, the sting, of the story" are not actionable).

Throughout the Hearing, Dr. Amin's counsel misconstrued this test, stating that NBCU's audience would understand the challenged statements to be referring to hysterectomies and thus that would establish the "gist." *See* Hearing Tr. at 6, 7.  But even if viewers understood the News Reports to be primarily discussing hysterectomies, this is not what the Court looks to in order to determine the gist of the challenged statements.  Instead, in keeping with *Masson*, the Court must determine whether the evidence in the record—showing that Dr. Amin performed scores of unnecessary fertility-impacting gynecological procedures on ICDC detainees—would have a materially different effect on Dr. Amin's reputation from the allegations that he performed a number of hysterectomies on ICDC detainees that were unnecessary or unconsented-to.

It would not.  The difference between a doctor performing unnecessary or unconsented-to hysterectomies and performing unnecessary or unconsented-to D&Cs, laparoscopies and other surgeries that risk a woman's fertility is not sufficiently material to be actionable.  As the Court inquired "how can any sting that [NBCU] caused be any worse than the US Senators saying that Dr. Amin's medical work was disgraceful." *See* Hearing Tr. at 14.  It is not.

- o **"How specific do I look" (*i.e.* whether the statements should be viewed with a "microscope" or "telescope") and what are your best cases to support how specific?**

This question is best answered by *Haynes v. Alfred A. Knopf, Inc.*, 8 F.3d 1222 (7th Cir. 1993) (cited favorably by the Northern District of Georgia in *Project Veritas,* 591 F. Supp. 3d at 1332 & n.10, and by the Georgia Court of Appeals in *Collins v. Cox Enterprises*, 215 Ga. App. 679, 680 (1994)).  In *Haynes*, the court held that the alleged false statement (that plaintiff abandoned his children at night when he was supposed to be watching them) was no more

4

damaging than the true facts revealed during discovery (that the plaintiff had, at times, walked out on his wife and children and refused to financially support them). *Id.* at 1228-29. In so holding, the court noted that the "true damaging facts must be closely related to the false ones." *Id.* at 1228. That is precisely the case here. The damaging evidence revealed in discovery, which was also referenced in the News Reports, concerns Dr. Amin's medical treatment of ICDC detainees, not unrelated information about his character or medical practices. *See also Bustos*, 646 F.3d at 767-68 (finding that the "delta" between the challenged statement, that plaintiff was "member" of Aryan Brotherhood, and truth, that he passed drugs to various prison gangs, was not "significant" enough to establish material falsity).

- **Dr. Amin's counsel claimed that the Senate Report should not be admissible because it relied on the testimony of doctors, particularly Dr. Ted Anderson, who did not review detainees' full medical files.** *See* **Hearing Tr. at 14-18.**

Dr. Amin's argument is erroneous for three reasons. *First*, the Senate Report's findings are clearly admissible under Federal Rule of Evidence 803(8)(A)(iii). NBCU Reply at 3-4. During the Hearing, Dr. Amin's counsel suggested that this Rule has only limited application, Hearing Tr. at 16, but courts have historically applied this Rule more broadly than Dr. Amin's counsel suggests. *See Barry v. Trustees of International Association*, 467 F. Supp. 2d 91, 97, 101 (D.D.C. 2006) (admitting bipartisan Senate Committee report in ERISA action and noting Rules of Evidence "d[o] not single out Congressional reports or distinguish them from Executive agency reports.").

Here too, the Senate Report's factual findings are admissible as an exception to hearsay because they stem from a thorough bipartisan investigation authorized by law. *See* Hearing Tr. at 35-36; NBCU Reply at 4. Further, the statements of the doctors contained within the Report are admissible to show the basis of the findings. *See Fowler v. Blue Bell, Inc.*, 737 F.2d 1007, 1013-14 (11th Cir. 1984) (admitting affidavits relied upon in EEOC report for the purpose of "showing the basis" for EEOC's findings).

5

*Second*, while Dr. Amin focuses on Dr. Anderson, he was only one of many doctors cited in the Senate Report, all of whom reached the same conclusion concerning Dr. Amin performing a significant number of unnecessary invasive gynecological procedures on ICE detainees. Most notably, the Senate Subcommittee engaged Dr. Peter Cherouny, an independent OB-GYN, who reviewed 16,600 pages of medical records subpoenaed by the Subcommittee pertaining to 94 ICDC detainees treated by Dr. Amin, and concluded that Dr. Amin performed "inappropriate" gynecological procedures on ICDC detainees, including D&Cs, laparoscopies, and the removal of benign ovarian cysts. *See* McNamara Decl. Ex. 68 at NBCU002056-57.[4]

*Third*, Dr. Amin ignores that Dr. Anderson was deposed in this action and confirmed his testimony before the Senate, including his conclusion that Dr. Amin appeared to subject ICDC detainees to "excessive, invasive, and often unnecessary gynecological care" and that Dr. Amin "subjected women to aggressive and unethical gynecological care." *See* Dkt. 123-7 (Anderson Tr.) at 201:9-209:3. Dr. Anderson confirmed that reviewing additional pages of the detainees' medical records would not change his conclusions about Dr. Amin's care and, when presented with additional records, testified that these only reinforced his conclusion that Dr. Amin was performing unnecessary surgeries. *See, e.g.*, *id.* at 115:4-116:3, 141:15-22, 166:14-167:1.[5]

---

[4] During the Hearing, Dr. Amin's counsel noted that the Senate Report contained statistics about the number of procedures Dr. Amin performed but asked, "compared to what?" Hearing Tr. at 16. The Senate Report provides the necessary comparisons and they are damning: among other things, Dr. Amin "accounted for at least one out of three OB-GYN procedures and received nearly half of all payments from ICE for 10 OB-GYN services between 2017 and 2020 despite the fact the average daily female population at ICDC accounted for roughly 4% of the average daily female population in all ICE detention facilities," and Dr. Amin "ranked first among physicians performing D&C procedures on female detainees between 2017 and 2020—with 53 procedures during this time compared to three procedures for the second-ranked physician." McNamara Decl. Ex. 68 at NBCU002122-23.

[5] Two other representations Dr. Amin's counsel made about the factual record require comment. *First*, regarding ICE's recent report on its review process for approving medical procedures, Dr. Amin's counsel said that the report "went to great lengths to say, 'Nothing in here should be taken as any finding that any procedure that was approved was not medically necessary.'" Hearing Tr. at 8-9. But the report states that ICE "does not have assurance that all major surgeries conducted FY 2019 through FY 2021 were medically necessary," and that for two of six approved hysterectomies that were reviewed, "the detained non-citizens' IHSC medical files did not demonstrate that a hysterectomy was the most appropriate course of treatment or was medically necessary." *See* McNamara Opp. Decl. Ex. 1 at NBCU005296. *Second*, the claims dismissed against Dr. Amin in the pending *Oldaker* litigation were *not*

## II. Twenty-Two of the Challenged Statements Are Shielded By Georgia's Fair Report Privilege

- **The Whistleblower Complaint is a "complaint."** *See* **Hearing Tr. at 19-21.**

The record establishes that the Whistleblower Complaint was a "complaint" sent by Project South (on behalf of Dawn Wooten)[6] to the government, *see* McNamara Decl. Ex. 4, which opened Complaint No. 20-12-ICE-0987 "regarding the whistle-blower allegations." *See* McNamara Decl. Ex. 6 at DHS000035 n.2; *id.*, Ex. 104 at NBCU003860 (testimony of Inspector General Joseph Cuffari concerning ongoing investigation: "[i]n September 2020, we received a complaint concerning ICE detainees at the [ICDC] in Ocilla, Georgia" that included "allegations from ICE detainees and a licensed practical nurse previously employed by ICDC about inappropriate medical care"); McNamara Opp. Decl. Ex. 1 at NBCU005297 n.3 (DHS confirms that it did not review gynecological surgeries from ICDC "due to referrals to our Office of Investigations resulting from a whistleblower complaint."); NBCU Mot. at 24; NBCU Reply at 8, n.7.

The fact that Wooten *also* filed a retaliation complaint that did not reference hysterectomies does not change the indisputable fact that government agencies received the Whistleblower Complaint concerning unnecessary hysterectomies and other procedures at ICDC, considered it a whistleblower complaint, and commenced investigations that are still ongoing—the very foundation for the fair report privilege.

---

dismissed on the merits. *See* Hearing Tr. at 13. Rather, the Court declined to extend a *Bivens* remedy to Dr. Amin, finding that he is a private actor, and declined to exercise supplemental jurisdiction over the state law claims, finding that the court "makes no determination as to the merits" of those claims. *See Oldaker v. Giles*, 7:20-cv-00224-WLS (M.D. Ga.), Dkt. 363 at 37-40. The Court observed "that it cannot allow the seriousness of Plaintiffs' allegations against Defendant Dr. Amin, which are grave indeed, to distract it [from the Supreme Court's direction regarding *Bivens* claims.]" *Id.* at 39, n.25.

[6] Contrary to Dr. Amin's representation, *see* Hearing Tr. at 20-21, discovery has revealed Wooten was also represented by the Government Accountability Project for purposes of the Whistleblower Complaint.

- **Dr. Amin's counsel incorrectly argued that the fair report privilege cannot apply because the government has not concluded its investigation into Dr. Amin and does not have the capability to remove his license or otherwise discipline him.**

The fair report privilege applies to filed complaints with the government, not just concluded reports. In *Morton v. Stewart*, 153 Ga. App. 636, 639 (1980), for example, the fair report privilege applied to reports of letters submitted to the Georgia Composite State Board of Medical Examiners about the plaintiff's conduct. There was no suggestion that the privilege was only triggered by the conclusion of the subsequent investigation.

Further, the fair report privilege applies to "quasi-judicial proceedings" as well as "judicial proceedings," including "[a]dministrative proceedings by governmental agencies to discipline, remove from office, or revoke a license." *Morton*, 153 Ga. App. at 639. Here, the Whistleblower Complaint was sent to the Acting Director of the Atlanta ICE Field Office on September 14, 2020, among others. *See* McNamara Decl. Ex. 4. ICE is unquestionably a government agency, and it is undisputed that ICE began to investigate the Whistleblower Complaint's allegations into Dr. Amin by September 15, 2020. *See* Amin Response to NBCU SOMF ¶ 107. As the evidence now establishes, because ICE has control over the provision of medical services to detainees by outside medical providers, it had the ability to (and did) "discipline" Dr. Amin by removing his privilege to treat ICE detainees. *See* NBCU SOMF ¶¶ 110, 111.

Accordingly, the twenty-two challenged statements that directly quote from or closely paraphrase the allegations in the Whistleblower Complaint—including the allegations referring to Dr. Amin as a "uterus collector," that "everyone" Wooten talked to had a hysterectomy, and that five different women from October through December 2019 had a hysterectomy done—are privileged and non-actionable. *See* McNamara Decl. Ex. 1, Statement Nos. 1-2, 7-8, 11-12, 22-23, 25-36, 41.

### III. Dr. Amin Cannot Meet His Burden of Establishing Actual Malice

- **The Court asked whether actual malice can be decided on a motion for summary judgment.** *See* **Hearing Tr. At 36-37.**

"The question whether the evidence in the record in a defamation action is sufficient to support a finding of actual malice is a question of law." *Harte-Hanks Commcn's, Inc. v. Connaughton*, 491 U.S. 657, 685 (1989). When assessing a motion for summary judgment, a trial court must determine "whether the evidence in the record could support a reasonable jury finding either that the plaintiff has shown actual malice by clear and convincing evidence or that the plaintiff has not." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1984); *see also Harte-Hanks*, 491 U.S. at 686 (explaining that trial courts have a duty, arising from constitutional protections, to dismiss defamation claims that are "not supported by clear and convincing proof of actual malice"). In making this determination, the court *assumes* that the "gist" of the challenged statements is false and then asks whether the plaintiff can show by clear and convincing evidence that the defendant published this "gist" with "actual knowledge of its falsity" or "with a high degree of awareness of probable falsity." *Berisha v. Lawson,* 973 F.3d 1304, 1312 (11th Cir. 2020).

Here, Dr. Amin largely relies on *Hunt v. Liberty Lobby*, 720 F.2d 631 (11th Cir. 1983) and *Hammer v. Slater*, 20 F.3d 1137 (11th Cir. 1994) to suggest that actual malice is a question for the jury. But, as explained at the Hearing, contrasting *Hunt* with more recent Eleventh Circuit cases, such as *Berisha*, demonstrates that only concrete evidence showing actual, serious doubts at the time of publication is sufficient for the court to hold that a reasonable jury could find actual malice by clear and convincing evidence. *Compare Hunt*, 720 F.2d at 645-46 (factual question of actual malice when defendants admitted they "absolutely" doubted the veracity of the challenged allegations yet conducted no further investigation into them, even though story was not "hot" news), *with Berisha*, 973 F.3d at 1312-16 (affirming grant of summary judgment in favor of

defendants on actual malice grounds even though defendants' sources were admitted liars who had been convicted of fraud, plaintiff argued defendants had a preconceived story about plaintiff, and plaintiff claimed certain details in the book were fabricated).

Further, while *Hammer* indicated that actual malice may be a jury issue, it also noted that there were "many cases where courts have decided issues of privilege and malice as a matter of law" but distinguished the facts before it because the "heart of th[e] dispute" turned on issues of credibility. 20 F.3d at 1143. Indeed, in the thirty years since *Hammer*, the Eleventh Circuit, Georgia courts (and courts across the country) have frequently affirmed grants of summary judgment motions on actual malice grounds, particularly in cases against media organizations. *See, e.g.*, *Berisha*, 973 F.3d at 1312; *Lovingood*, 800 F. App'x at 851; *Klayman v. City Pages*, 650 F. App'x 744, 750-51 (11th Cir. 2016); *Ladner v. New World Commc'ns of Atlanta*, 343 Ga. App. 449 (2017); *Jones v. Albany Herald Pub. Co.*, 290 Ga. App. 126, 131-33 (2008); *Torrance v. Morris Pub. Grp.*, 289 Ga. App. 136, 138-41 (2007).[7]

Other than *Hunt* and *Hammer*, Dr. Amin cites in passing to only five other cases from Georgia or the Eleventh Circuit in support of his actual malice argument.[8] In two of those cases, *Ladner* and *Krass v. Obstacle Racing Media, LLC*, 667 F. Supp. 3d 1177 (N.D. Ga. 2023), the courts *granted* summary judgment for the defendants on actual malice grounds, finding that the

---

[7] In recent years, the Eleventh Circuit has likewise repeatedly affirmed grants of *motions to dismiss* on actual malice grounds. *See Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 706 (11th Cir. 2016); *Turner v. Wells*, 879 F.3d 1254, 1273-74 (11th Cir. 2018); *Coral Ridge Ministries Media, Inc. v. Amazon.com, Inc.*, 6 F.4th 1247, 1252-53 (11th Cir. 2021); *Jacoby v. Cable News Network, Inc.*, 2021 WL 5858569, at *4-6 (11th Cir. Dec. 10, 2021).

[8] The other cases that Dr. Amin cites are state court decisions from Washington and Pennsylvania and a decision from the Western District of Texas. As explained in NBCU's Reply, each of these cases—to the extent they even constitute persuasive authority given the wealth of Eleventh Circuit case law on actual malice—are far different from the facts here. *See* NBCU Reply at 14, 16. Dr. Amin also cites to *Palin v. New York Times Co.*, 940 F.3d 804 (2d Cir. 2019), a motion to dismiss decision that other courts have already called "sui generis." *McDougal v. Fox News Network, LLC*, 489 F. Supp. 3d 174, 186 (S.D.N.Y. 2020). Indeed, *Palin* involved an editor who was "responsible for the content of, reviewed, edited, and approved the publication of numerous articles" that directly contradicted the challenged allegations, *see Palin*, 940 F.3d at 813, something that did not occur here.

good faith investigations undertaken by the defendants—although not as wide-reaching as the plaintiffs may have desired—defeated a finding of actual malice. *Ladner*, 343 Ga. App. at 458-60; *Krass*, 663 F. Supp. 3d at 1210-14. The three other cases that Dr. Amin cites are easily distinguishable from the facts here:

- ***StopLoss Specialists, LLC v. VeriClaim, Inc.*, 340 F. Supp. 3d 1334 (N.D. Ga. 2018)**: This case stemmed from an email sent by an insurance claims adjustor, which stated that he witnessed a remediation company engaging in "fraud." Like *Hammer* and unlike here, this case turned *entirely* on credibility—*i.e.* whether the claims adjustor was motivated to fabricate events so that the remediation company would be replaced with another company he preferred.

- ***Reid v. Viacom Int'l Inc.*, 2016 WL 11746046 (N.D. Ga. Sept. 14, 2016):** Defendants aired a docudrama about a musical group that they represented was a "true story" and falsely depicted plaintiff, the group's manager, as engaging in ethically dubious actions. Discovery revealed that defendants cut a scene that undermined the accuracy of the challenged statements. Given this objective notice of contrary facts, the court held that a reasonable jury could find that defendants made knowingly false statements. Here, by contrast, NBCU did not purposefully exclude information that contradicted its publications.

    *Reid* should be considered in the context of *Lovingood,* later-decided by the Eleventh Circuit. *Lovingood* also involved a docudrama that referred to itself as a "true story." It included a scene falsely depicting the plaintiff, a manager at NASA, providing false testimony to a government committee. Unlike in *Reid*, the court found that there was no evidence defendants thought the scene was false, and the fact that defendants could have performed further investigation into the scene's veracity was insufficient to establish actual malice.

- ***Barber v. Perdue*, 194 Ga. App. 287 (1989)**: Defendant, a political aide, alleged that the plaintiff, a former commissioner, was paid a bribe. Because the defendant had reviewed a file from the Georgia Bureau of Investigation that established that his claims were false and because he admitted he was attempting to discredit the plaintiff to prevent him from running for office, the court found that a reasonable jury could find he acted with actual malice.

Here, the question of actual malice does not turn on the credibility of the individuals responsible for the challenged News Reports but, instead, can be decided by the Court based on the evidentiary record. And there is no evidence the individuals responsible for the News Reports had access to and purposefully ignored contradictory evidence. To the contrary, each of the News

11

Reports (which must be assessed individually) relied on the previously published NBC News Article. This Article itself incorporated information from a previously published *Associated Press* article, which reported on the allegations in the Whistleblower Complaint, including that Dr. Amin was referred to as the "uterus collector" and "everybody he sees has a hysterectomy." *See* NBCU SOMF ¶ 25. Reliance on these previously published sources alone defeats a claim of actual malice. *See Berisha*, 973 F.3d at 1313 ("The law is clear that individuals are entitled to rely on 'previously published reports' from 'reputable sources.'"). Further, in drafting the Article, NBC News conducted its own investigation into the Whistleblower Complaint's allegations, speaking with four lawyers who represented detainees who claimed to have been mistreated by Dr. Amin (including receiving potentially unnecessary hysterectomies) and learning that Dr. Amin previously settled a claim with the DOJ based on similar allegations of unnecessary procedures. Given this corroborative evidence, the individuals responsible for the News Reports, which relied in part on the Article, did not believe—and had no reason to believe—that they published anything false. *See* NBCU Reply at 11-12.

NBCU's Reply Brief explained in great detail why Dr. Amin's actual malice arguments, considered individually or collectively, are unavailing. *See* NBCU Reply at 13-25. Dr. Amin repeatedly takes facts out of context and ignores the full record. For example, he cites to communications between NBCU employees from hours before the challenged News Reports as evidence of actual malice, *see* Amin Opp. at 24, yet he ignores the events that occurred *after* these messages but before publication, including the corroborative investigation undertaken by NBC News, *see* NBCU Reply at 13, 18. The entire factual record belies Dr. Amin's interpretation of these messages. *See Ladner*, 343 Ga. App. at 460 (rejecting plaintiff's argument that defendant doubted truth of news reports based on statements in an email when viewing the email "in context"

led to opposite conclusion); *see also Dunn v. Airline Pilots Ass'n*, 193 F.3d 1185, 1200 (11th Cir. 1999) (Events "d[o] not occur in a vacuum but as part of a series of ongoing events."). Dr. Amin similarly extracts a phrase or sentence from a documented interview, *see* Amin Opp. at 26-27, when the full transcripts contradict his arguments, *see* NBCU Reply at 22-23. And he misrepresents the content and import of the statement ICE released on September 15, 2020, after the challenged *Deadline* News Report. Amin Opp. at 27. Not only did the challenged News Reports cite the ICE statement after it was available, but discovery also revealed that ICE's statement was false (Dr. Amin actually referred five women for hysterectomies, not just two), NBCU SOMF ¶ 322, and the reporters had reasons to doubt the accuracy of ICE's statement based on their prior experiences with ICE. *See, e.g.*, Ainsley Decl. ¶ 9; Scholl Decl. ¶¶ 12, 33; Price Decl. ¶ 30. In addition, as this Court already held with respect to the ICE statement "[w]hile the number of hysterectomies that occurred at ICDC could have been just those that were 'referred,' it does not exclude the possibility that other hysterectomies could have been performed on women who were not initially 'referred' for hysterectomies." Order at 34; *see also* NBCU Mot. At 33-34.

In other instances, Dr. Amin provides no evidentiary support for his actual malice arguments, relying solely on his own conclusory assertions. For example, while he claims that *TRMS* was motivated to increase its ratings by tying Dr. Amin to the Trump administration, *see* Amin Opp. At 30-31, he cites to no support for this assertion, perhaps because the evidence is to the contrary. Dr. Amin fails to mention that NBCU produced *extensive* data showing the ratings for the challenged News Report, which refute his speculation about increased ratings. *See also* Evans Opp. Decl. Ex. EE (Maddow Tr.) at 16:1-17:1.

Lastly, any "credibility" arguments that Dr. Amin makes are far from the "heart" of this dispute, as was the case in *Hammer* or *StopLoss*.[9] Dr. Amin argues that NBCU quoted attorney Benjamin Osorio as stating that Dr. Amin told two of his clients they had cancer and performed hysterectomies on them but, during his deposition, he testified that "only one of his clients had records indicating that she had a hysterectomy." Amin Opp. at 26, 33. Under Georgia law, even an actual conflict of testimony between a reporter and source is not enough to establish clear and convincing proof of actual malice. *See Savannah News-Press v. Whetsell*, 149 Ga. App. 233, 236-37 (1979). Regardless, Osorio's after-the-fact recollection is belied by the contemporaneous record, which reflects that he was, in fact, telling third parties that he had two clients who had hysterectomies from Dr. Amin. *See* McNamara Decl. Ex. 36 (Osorio email dated September 15, 2020 (the same day he was interviewed by Ainsley), "I have two clients that had hysterectomies while detained at Irwin."); *id.* Ex. 35 (*USA Today* article quoting Benjamin Osorio as having two clients who had hysterectomies after being told by Dr. Amin that they had cancer).[10]

Dr. Amin's other "credibility" arguments fare no better. For example, he claims that Ainsley's credibility is contested because she testified that she "basically closed up shop" in her reporting on the Whistleblower Complaint after *All In* began reporting on it, but days later she proposed a "new angle" to the story (which she ultimately did not pursue). Amin Opp. At 25.

---

[9] As NBCU noted in its Opposition, based on the list of statements contained in Dr. Amin's Statement of Material Facts, it appeared that Dr. Amin had abandoned claims stemming from Statement Nos. 2, 24, 39-41, and 52 in Exhibit 1 to the McNamara Declaration (which are found in Paragraphs 75(b), 78(m), 84(n)-(p), and 87 of the FAC). In his Reply, Dr. Amin disagreed with NBCU's position, claiming, "Dr. Amin's motion makes clear that he is bringing his motion as to all the Statements except those that have been previously dismissed by the Court . . . and those that concern alleged bruising." Amin Reply at 2, n.1. During the Hearing, Dr. Amin's counsel confirmed that there were 32 total challenged statements, which corresponds to the number of statements listed in Dr. Amin's Statement of Material Facts, which excludes Statement Nos. 2, 24, 39-41, and 52.

[10] *See also* Emily Shugerman, *ICE Hysterectomy Doctor Wasn't Even a Board-Certified OB-GYN*, THE DAILY BEAST, available at: https://www.thedailybeast.com/ice-hysterectomy-doctor-wasnt-even-a-board-certified-ob-gyn ("A second lawyer, Benjamin Osorio, told The Daily Beast that two of his clients received hysterectomies while detained at ICDC.").

14

Even if this could be deemed an "inconsistency" (and it is not), it is irrelevant to the actual malice question here because it concerns events *after* Ainsley's appearance on the challenged *Deadline News Report*. *See Tobinick v. Novella*, 848 F.3d 935, 946 (11th Cir. 2017). And while Dr. Amin claims that various sources, like Dawn Wooten, were not credible, it is not a defendant's "(perhaps impossible) duty to find only unimpeachable sources of evidence." *Berisha*, 973 F.3d at 1313.

- **The Court asked how the allegations in the Whistleblower Complaint, such as the description of Dr. Amin as a "uterus collector," were not "so inherently improbable that only a reckless person would put them in circulation." Hearing Tr. At 34.**

The record evidence establishes that the allegations in the Whistleblower Complaint were not "inherently improbable."

*First*, NBCU was far from the first or only media organization to report on the allegations, including the reference to Dr. Amin as a "uterus collector." The *Associated Press*, *Business Insider*, the *Daily Beast*, and others published these allegations before NBCU, including the "uterus collector" allegation in one article's headline. *See* NBCU SOMF ¶¶ 25, 28. The fact that so many reputable media organizations independently reported the same allegations from the Whistleblower Complaint supports that they were not inherently improbable. *See Berisha v. Lawson*, 378 F. Supp. 3d 1145, 1161-62 (S.D. Fla. 2018) (that other news organizations, including the *New York Times*, saw disputed comment as "news fit to print" belied finding of actual malice).

*Second*, as explained above, NBC News's investigation, which was relied upon by the challenged News Reports, bolstered the allegations in the Whistleblower Complaint. *See* NBCU Mot. at 28-29; NBCU Reply at 12.

*Third*, as Rachel Maddow and other witnesses testified, the allegations about Dr. Amin occurred in the wake of numerous other shocking but true allegations about the treatment of ICE

15

detainees, including family separations and tracking the menstrual cycles of female detainees to prevent them from obtaining abortions.  *See* NBCU Reply at 19.

*Fourth*, as this Court already found, the Whistleblower Complaint's allegations were "also 'probable' enough to prompt calls for investigation from members of Congress and to trigger federal agency investigations."  Order at 34.  For all these reasons, the allegations that NBCU reported on were not "inherently improbable."

In sum, the Court can—and should—find that Dr. Amin has not come forward with clear and convincing evidence of actual malice and grant NBCU's motion for summary judgment.

Respectfully submitted,

| | |
|---|---|
| *s/ Cynthia L. Counts* | *s/ Elizabeth A. McNamara* |
| Cynthia L. Counts | Elizabeth A. McNamara (*pro hac vice*) |
| Georgia Bar No. 190280 | Amanda B. Levine (*pro hac vice*) |
| FISHERBROYLES, LLP | Leena Charlton (*pro hac vice*) |
| 945 East Paces Ferry Rd. NE, Suite 2000 | DAVIS WRIGHT TREMAINE LLP |
| Atlanta, GA 30326 | 1251 Avenue of the Americas, 21st Floor |
| (404) 550-6233 | New York, NY 10020-1104 |
| cynthia.counts@fisherbroyles.com | Tel: (212) 489-8230 |
| | lizmcnamara@dwt.com |
| | amandalevine@dwt.com |
| | leenacharlton@dwt.com |

*Attorneys for Defendant*

\*   \*   \*

## CERTIFICATE OF SERVICE

The undersigned certifies that on the 29th day of April, 2024, a true and correct copy of the foregoing was served upon all counsel of record via the Court's electronic filing system.

*s/ Elizabeth A. McNamara*
Elizabeth A. McNamara (*pro hac vice*)