# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF GEORGIA
### WAYCROSS DIVISION

**Dr. Mahendra Amin, M.D.**,

    *Plaintiff,*

v.

**NBCUniversal Media, LLC.**,

    *Defendant.*

Civil Action No.
5:21-CV-00056-LGW-BWC

Northern District of Georgia
Civil Action No.
_____

## MOTION TO QUASH SUBPOENA FOR DEPOSITION OF AZADEH SHAHSHAHANI AND STAY THE DEPOSITION PENDING THE OUTCOME OF THE MOTION TO QUASH OR IN THE ALTERNATIVE, MOTION FOR A PROTECTIVE ORDER

COMES NOW Azadeh Shahshahani (hereinafter "Ms. Shahshahani" or "Movant"), a non-party in the above styled case, by and through undersigned counsel and pursuant to Federal Rule of Civil Procedure 45(d)(3), moves this Court to Quash the Deposition Subpoena of Azadeh Shahshahani and stay the deposition pending the outcome of the motion to quash, or in the alternative, moves for a protective order pursuant to Federal Rule of Civil Procedure 26(c). Plaintiff Dr. Amin alleges defamation against NBCUniversal Media, LLC and now seeks to depose active litigation counsel for Project South, Azadeh Shahshahani, in the pursuit of discovery in the above- styled case. As grounds for this motion, the undersigned states as

follows:

## I.    INTRODUCTION

Dr. Amin's attorney's audacious attempts to depose Azadeh Shahshahani under the guise of her having "knowledge of information related to Dr Amin's defamation claims" is nothing but a manipulative tactic designed to exploit opposing counsels' knowledge and undermine the sanctity of attorney-client and work-product privileges, that our adversarial system relies on in the search for truth and justice. (*See* Exhibit A, p. 2.) Ms. Shahshahani, the third-party Dr. Amin seeks to depose in the present case, is the legal and advocacy director of Project South, Inc. and she is active litigation counsel in a class action suit against Dr. Amin currently in the Middle District of Georgia. (*See* Exhibit B, Complaint, *Oldaker, et al. v. Giles, et al.*, No. 7:20-cv-224-WLS-MSH (M.D. Ga.).) Dr. Amin does not wish to depose just anyone who may have relevant information to his defamation claim, but Ms. Shahshahani is his *opposing* counsel in a pending case that commenced before the present case at bar and involves the same or substantially similar factual allegations that Dr. Amin is alleging is defamatory. Any questions regarding Ms. Shahshahani's involvement automatically delves into matters protected by attorney-client privilege, work-product doctrine**,** and threatens to compromise the litigation against Dr. Amin. Allowing a subpoena of this nature to proceed will set concerning precedent and

encourage similar conduct in the future.

Moreover, Stacey Evans, counsel for Dr. Amin, is abusing the subpoena power and engaging in unfair litigation tactics by attempting to issue subpoenas to multiple attorneys---including her own opposing counsel---Ms. Cynthia Counts—who is counsel for NBCUniversal in the above case as well as attempting to depose other counsel who like Ms. Shahshahani are fellow counsel for the detainees who have brought a current class action lawsuit against Dr. Amin for violation of civil rights.[1] By serving subpoenas in multiple jurisdictions, it is difficult for the respective Courts to see the scope and breadth of the abusive and almost unheard of discovery tactics that she is using by exploiting the subpoena power in an attempt to gain an unfair litigation advantage. Her bully tactics also have the chilling effect of intimidating witnesses who are also plaintiff litigants in the class action brought against her client, Dr. Amin.

As the Courts have held: "Deposing opposing counsel raises additional concerns as its "increasing practice... [is] a negative development in the area of litigation, and one that should be employed only in limited circumstances." *Shelton v. Am. Motors Corp.*, 805 F.2d 1323, 1327 (8th Cir. 1986). Permitting depositions

---

[1] https://projectsouth.org/wp-content/uploads/2020/12/Docket-54-Consolidated-Amended-Habeas-Petition.pdf

of opposing counsel "not only disrupts the adversarial system and lowers the standards of the profession, but it also adds to the already burdensome time and costs of litigation." *Id.* at 1327.

## II.  THIS COURT MUST GRANT THE MOTION TO QUASH PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 45(d)(3)(A)(iv) BECAUSE DR. AMIN'S COUNSEL'S REPEATED ATTEMPTS TO SUBPOENA OPPOSING COUNSEL IN THE UNDERLYING CASE TO APPEAR FOR THE DEPOSITION WOULD SUBJECT MS. SHAHSHAHANI TO UNDUE BURDEN, VIOLATES SACROSANCT PRIVILEGES, AND THE PROFESSIONAL RULES OF ETHICS

On timely motion, it is mandatory for this court to quash or modify a subpoena that subjects a person to undue burden, fails to allow reasonable time to comply, requires disclosure of privileged matter, and subjects a person to undue burden. Fed. R. Civ. P. 45(d)(3)(A). In this case, the attached Subpoena (Exhibit D) subjects Ms. Shahshahani to undue burden as it would automatically encroach on privileged matters in addition to the fact that it does not allow Ms. Shahshahani reasonable time to comply as the undersigned is not available during the month of September to sit for deposition, specifically her counsel is currently out of state on leave of Court.

Here, Dr Amin's counsel Stacey Evans continues in her attempts to abuse the discovery process by encroaching on sacrosanct attorney client privileges through her repeated attempts to depose opposing counsels who represent detainees in the underlying civil rights class action case brought against Dr. Amin. Her attempts to

do so exceed all bounds of decency and fairness to opposing counsel as required under the Professional Ethics Rule 3.4 where she has hired private investigators to stake out and stalk Ms. Shahshahani for weeks---interrogating her neighbors, trespassing onto her property, hiding in bushes on her property and jumping out at her--all traumatizing harassment against a prominent human rights attorney who is subject to ongoing death threats as a result of her human rights work on behalf of immigrants.[2]

The interrelatedness of the class action suit against Dr. Amin and Dr. Amin's suit against NBCU can be seen from examining the September 17, 2020 letter to Congress, along with the class action Complaint against Dr. Amin, and Dr. Amin's Complaint against NBCU. Project South's Legal and Advocacy department's involvement in Dr. Amin's defamation claim against NBCU stems from a whistle blower letter that Project South released to the Department of Homeland Security (DHS), the U.S. Immigrant and Customs Enforcement (ICE), and the Irwin County Detention Center (ICDC). (*See* Exhibit C, Letter to Congress from Government Accountability Project and Project South; s*ee also*, Amin Complaint ECF 1, ¶¶ 45-50). In this letter, Project South Inc. represents that Ms. Dawn Wooten, the LPN that came forward with the allegations of medical abuse without proper informed

---

[2] https://en.wikipedia.org/wiki/Azadeh_N._Shahshahani

consent, was Project South's client at the time. (*See* Exhibit C, p. 1 ¶ 1.) This same letter is addressed in the complaint against Dr. Amin in the class action suit and corroborates the experiences of Ms. Shahshahani's other clients throughout their detention at ICDC. (*See* Exhibit B, ¶¶ 55-57.) Thus, if the deposition of Ms. Shahshahani can offer any insight into the veracity of NBCU's statements in its broadcasts (*see* Amin Complaint, ECF 1, ¶¶ 76-80), Dr. Amin would essentially be asking her to divulge attorney client privileged communications she had with her clients, particularly those plaintiffs bringing the class action against Dr. Amin, and Ms. Dawn Wooten in preparation for litigation.

Furthermore, to the extent that Dr. Amin would like to question Ms. Shahshahani in matters involving her document production which shows that she had communications with journalists, these questions also are impossible for Ms. Shahshahani to compartmentalize into answers she may articulate without automatically divulging into both privileged attorney client communications along with her mental impressions and personal beliefs protected under the work product doctrine.

The United States Supreme Court in *Hickman v. Taylor,* recognized that a lawyer in preparing the client's case, assembles information, sifts through what the lawyer considers to be relevant facts, prepares "legal theories and plan[s] strategy,

without undue and needless interference" and this work, which has become known as counsel's "work product," is reflected "in interviews, statements, memoranda, correspondence, briefs, mental impressions, personal beliefs, and [in] countless other tangible and intangible ways" *Hickman v. Taylor,* 329 U.S. 495, 511 (1947) holding:

> Historically, a lawyer is an officer of the court and is bound to work for the advancement of justice while faithfully protecting the rightful interests of his clients. In performing his various duties, however, it is essential that a lawyer work with a certain degree of privacy, free from unnecessary intrusion by opposing parties and their counsel. Proper preparation of a client's case demands that he assemble information, sift what he considers to be the relevant from the irrelevant facts, prepare his legal theories and plan his strategy without undue and needless interference. That is the historical and the necessary way in which lawyers act within the framework of our system of jurisprudence to promote justice and to protect their clients' interests. This work is reflected, of course, in interviews, statements, memoranda, correspondence, briefs, mental impressions, personal beliefs, and countless other tangible and intangible ways—aptly though roughly termed by the Circuit Court of Appeals in this case (153 F.2d 212, 223) as the 'Work product of the lawyer.' Were such materials open to opposing counsel on mere demand, much of what is now put down in writing would remain unwritten. An attorney's thoughts, heretofore inviolate, would not be his own. Inefficiency, unfairness and sharp practices would inevitably develop in the giving of legal advice and in the preparation of cases for trial. The effect on the legal profession would be demoralizing. And the interests of the clients and the cause of justice would be poorly served. *Id* at 510-511.

Thus, the Supreme Court acknowledged the well-recognized policy against invading the privacy of an attorney's course of preparation. A very limited

exception—only "where relevant and non-privileged facts remain hidden in an attorney's file and where production of those facts is essential to the preparation of one's case, discovery may properly be had" and only upon showing of adequate justification. *Hickman*, 329 U.S. at 511. Otherwise, the work-product doctrine protects attorneys like Ms. Shahshahani's mental impressions, including thought processes, opinions, conclusions, and legal theories. *See id.* at 511, 67 S.Ct. at 393 (an attorney's thoughts are "inviolate"); *In re Murphy,* 560 F.2d 326, 336 (8th Cir.1977) (attorney's opinion work product enjoys nearly absolute immunity and can be discovered in very rare and extraordinary circumstances); Fed. R. Civ. P. 26(b)(3) (unlike ordinary work product, opinion work product cannot be discovered upon a showing of substantial need or undue hardship).

And the Supreme Court has held that "the general policy against invading the privacy of an attorney's course of preparation is so well recognized and so essential to an orderly working of our system of legal procedure that a burden rests on the one who would invade that privacy to establish adequate reasons to justify production through a subpoena or court order." *Hickman*, 329 U.S. at 512. In this case, Dr. Amin and his attorney cannot justify such an extreme invasion of such sacrosanct privileges of attorney client communications and work product doctrine.

Moreover, there are other, less burdensome, less time-consuming methods that

Dr. Amin may pursue to obtain this limited information. For example, Dr. Amin can depose the journalists identified in the documents themselves, he may choose to submit interrogatories to NBCU about these communications, but certainly, Dr. Amin's subpoena mandating Ms. Shahshahani, his opposing counsel in a current, underlying case involving the same set of facts, is a harassing, adversarial trial tactic that "does nothing for the administration of justice, but rather prolongs and increases costs of litigation, demeans the profession, and constitutes an abuse of the discovery process." *Shelton,* 805 F.2d at 1330. For the reasons stated below, Ms. Shahshahani respectfully requests that this Court grant this Motion to Quash Dr. Amin's Deposition Subpoena.

In the present case, Dr. Amin seeks to impose an undue burden on Ms. Shahshahani by mandating her appearance in a deposition because, any matter that she can testify to in relation to his defamation claim against NBCU poses the inherent risk of delving into matters protected by attorney-client and work-product privilege and threatens the sanctity of those privileges. Ms. Shahshahani is not only a non-party to the present suit, but she is also counsel opposing Dr. Amin in a separate suit, the relevancy of communications Ms. Shahshahani had with journalists as evidenced by her document production to Dr. Amin is minimal and does not have any bearing on the veracity of NBCU's allegedly defamatory statements against Dr.

Amin, and Dr. Amin may obtain the information he seeks by other, less burdensome methods by deposing the journalists identified in those documents themselves.

On timely motion, it is mandatory for this court to quash or modify a subpoena that subjects a person to undue burden. Fed. R. Civ. P. 45(d)(3)(A); *Jordan v. Commissioner, Mississippi Department of Corrections*, 947 F.3d 1322, 1337 (11th Cir. 2020). The undue burden analysis requires courts to balance the interests served by demanding compliance with the subpoena against the interests furthered by quashing it. *Id.* In completing this balancing analysis, factors that a court could consider include, (1) relevancy of the information sought, (2) burden that would be imposed by producing such information, and (3) status of the subpoena recipient as a non-party. *Id.*

In the present case, the burden that would be imposed by mandating Ms. Shahshahani's appearance in a deposition is great because as discussed above, she is active litigation counsel in a separate pending class action suit against Dr. Amin, and deposing her with regard to the present defamation suit poses the risk of delving into topics which would ordinarily be protected by work-product privilege or attorney-client privilege since the facts of the two cases are interrelated. (*Oldaker, et al. v. Giles, et al.*, No. 7:20-cv-224-WLS-MSH (M.D. Ga.).) Particularly because Dr. Amin alleges that the source of the defamatory statements come from Dawn Wooten,

a previous client of Ms. Shahshahani and witness in the pending class action suit against Dr. Amin, the risk of delving into topics protected by work-product privilege and attorney-client privilege is great. Given the interrelatedness of the two cases, it is hard to imagine what questions Dr. Amin might pose that would not involve either Ms. Shahshahani's communications with her clients protected by attorney-client privilege or as discussed earlier, her mental impressions developed in preparation for possible litigation.

Under the Georgia Rules of Professional Conduct, "any information gained in the professional relationship [with the client]., whatever its source" is treated as confidential, GA. R. Prof. Cond. 1.6, cmt. 5, and should be treated as "other protected material" under Rule (45)(d)(3)(iii). These privileges and protections are crucial to zealous representation and building trust in attorney-client relationships. Generally speaking, depositions of attorneys are discouraged because they could provide a backdoor method for attorneys to glean privileged information about an opponent's litigation strategy from the opposing attorneys' awareness of various documents. *In re subpoena Issued to Dennis Friedman*, 350 F.3d 65, 70 (2nd Cir. 2003) (citation omitted). This is analogous to forcing another party's trial counsel to testify as a witness, which courts discourage because of its disruptive effect on the adversary system. *Id*. Courts have stated that permitting the deposition of an

opposing counsel, "not only disrupts the adversarial system and lowers the standards of the profession but it also adds to the already burdensome time and costs of litigation." *Shelton v. American Motors Corp.*, 805 F.2d 1323, 1327 (8th Cir. 1986).

The practice of deposing an opposing counsel detracts from the quality of representation because counsel should be free to devote his or her time to preparing the client's case without fear of being interrogated by their opponent. *Id.* The fundamental principle of confidentiality is essential to "the trust that is the hallmark of the client-lawyer relationship." Model R. of Prof. Cond. 1.6(b)(6), cmt. 2; *see also* Ga. R. Prof. Cond. 1.6(a) ("A lawyer shall maintain in confidence all information gained in the professional relationship with a client."). The assurance of confidentiality encourages clients "to communicate fully and frankly with the lawyer even as to embarrassing or legally damaging subject matter." Model R. Prof. Cond. 1.6, cmt. 2; *see also* Ga. R. Prof. Cond. 1.6, cmt. 4. Confidentiality between a lawyer and her client "not only facilitates the full development of facts essential to proper representation of the client but also encourages people to seek early legal assistance." Ga. R. Prof. Cond. 1.6, cmt. 2. Clearly, if opposing counsel is allowed to be deposed in a case such as this, a client would be less inclined to openly and truthfully communicate with their attorney. *Shelton*, 805 F.2d at 1327 (stating that the "chilling effect" that such practice will have on the truthful communications from

the client to the attorney is obvious.)

The general policy against invading the privacy of an attorney's course of preparation is so well recognized and so essential to an orderly working of our legal procedure that a *burden rests on the one who would invade that privacy* to establish adequate reasons to justify the production through a subpoena or court order. *Hickman*, 329 U.S. 495. Non-party status is a factor courts may consider when analyzing whether a subpoena is unduly burdensome. *Pinehaven Plantation Properties, LLC v. Mountcastle Fam. LLC*, No. 1:12-CV-62 WLS, 2013 WL 6734117, at *2 (M.D. Ga. Dec. 19, 2013). In fact, it is a generally accepted rule that standards for non-party discovery require a stronger showing of relevance than for party discovery. *Id*. Thus, the burden is on Dr. Amin and his counsel to establish that Ms. Shahshahani's testimony would be relevant, non-duplicative, and not cause undue burden.

Stacey Evans, counsel for Dr. Amin asserts that the scope of the deposition would encompass the facts surrounding the documents that Project South produced earlier in this case, including communications Ms. Shahshahani made with non-client journalists. (*See* Exhibit A, p. 3.) However, to the extent that this information may be remotely relevant to Dr. Amin's defamation claim, it is not only duplicative since the communications have already been produced, but further information

regarding the communications is also readily obtainable from other sources, such as the journalists themselves, who are associated with the current defendant in Dr. Amins suit, not with Project South, a non-party to the suit. *See Bank of America N.S. v. Georgia Farm Bureau Mut. Ins. Co.*, 2014 WL 4851853 (M.D. Ga. Sept. 29, 2014) (Granting Motion to Quash Deposition Subpoena of current counsel because even though the requesting party would seek information that is ultimately non-privileged, the court determined that the information can be accessed from other sources.)

Much of Ms. Shahshahani's work with Project South, its clients, and communications with the public were in preparation for bringing the class action suit against Dr. Amin, thus any questioning with regards to the communication beyond what was actually said to the journalists has the tendency to reveal the mental impressions of Ms. Shahshahani. *See generally Hickman*, 329 U.S. 495 (characterizing the case as one in which the mental impressions of the attorney are at issue, without any showing of necessity or indication that denial of such production would unduly prejudice the preparation of the requesting party's case, or cause him harm or undue justice, where the plaintiffs requested interrogatory responses regarding statements of witnesses that were already publicly available.)

The factors that weigh against the enforcement of the deposition subpoena

include, Ms. Shahshahani's status as a non-party to the present case, her status as active litigation counsel in the underlying case pending against Dr. Amin where facts are interrelated and risk of delving into topics protected by attorney client privilege and work product privilege is great, the limited relevancy and importance of Ms. Shahshahani's testimony in the present defamation case, as well as Dr. Amin's ability to obtain the sought after relevant information from other sources which would not implicate the risk of divulging privileged information. *See Jordan*, 947 F.3d 1322 at 1337 (considering factors such as the relevancy of the information requested, the burden that would be imposed by producing it and the status of the subpoena recipient as a non-party weighing against the discover in the undue burden inquiry)*; see also Gamache v. Hogue*, 595 F.Supp.3d 1344, 1355-57 (M.D. Ga. 2022) (finding that factors that weigh against quashing include the subpoenaed attorney's status as non-litigation counsel; the testimony sought is not available from other sources; the testimony sought is relevant to the defendant's statute of limitations defense, and the testimony sought relates to matters that are non-privileged); and *In re Subpoena Issued to Dennis Friedman*, 350 F.3d 65, 72 (concluding that the judicial officer supervising the discovery should take into consideration all of the relevant facts and circumstances to determine whether the proposed deposition would entail an inappropriate burden or hardship such as the need to depose the lawyer, the lawyers

role in connection with the matter in which the discovery is sought and in relation to the pending litigation, the risk of encountering privilege and work product issues the extent of discovery already conducted, as well as the use of alternative discovery devices to be considered.)

While the Eleventh Circuit has not adopted a specific rule in establishing when the deposition of an attorney is appropriate, *Gamache*, 595 F.Supp.3d 1344, in applying the balancing test where the moving party's need for the information sought with the subpoenaed parties interests in its attorney-client relationship, it is clear that the information sought is minimally relevant to the pending case, can be obtained from other sources, and poses an undue burden on Ms. Shahshahani and her clients. Thus, this Court should enter an order granting this Motion to Quash the deposition subpoena of Ms. Shahshahani.

### III. ALTERNATIVELY, THIS COURT SHOULD ISSUE A PROTECTIVE ORDER TO LIMIT THE SCOPE OF THE SCOPE OF THE INFORMATION SOUGHT TO A LESS BURDENSOME MEANS OF DISCOVERY

Any person from whom discovery is sought may move for a protective order in the court where the action is pending, and upon showing of good cause, the court may issue an order to protect the person from undue burden or expense and may forbid the disclosure or discovery or prescribe a discovery method other than the one selected by the party seeking discovery. Fed. R. Civ. P. 26(c)(1). For the reasons

stated above, the deposition of Ms. Shahshahani is unduly burdensome because she is active litigation counsel in a class action suit pending against the plaintiff in the present case, the facts of the two cases are interrelated, and thus, the deposition presents a substantial risk of delving into topics protected by attorney client and work product privilege, furthermore the relevancy of the requested information would be minimal, and the information sought after would undeniably be obtainable from other sources.

In *Gaddy v. Texas Corporation*, after considering that the attorneys to be deposed are not active litigation counsel, as opposed to the present case, where the attorney to be deposed IS active litigation counsel in a case pending against the deposing party, the court concluded that the deposition should continue with the condition that the plaintiff only seek testimony about non-privileged matters separate and apart from the defendant's litigation strategy, and that the parties should coordinate the depositions to occur on days in which the court is available to hear by phone any claims of privilege. *Gaddy v. Texas Corporation*, 2015 WL 13545486 (N.D. Ga. Oct 10, 2015). The present case requires more protection than the protection afforded in *Gaddy* because not only is Ms. Shahshahani active litigation counsel in a case pending against Dr. Amin, but any non-privileged matters she may be able to testify to would also be available from other sources, and to the extent that

those other sources have already been examined, Ms. Shahshahani's testimony would be duplicative. Thus, this Court should issue a protective order and forbid the deposition of Mrs. Shahshahani, or alternatively order that the information sought be obtained from a less burdensome source. This way, Dr. Amin's discovery will be limited to only relevant, non-privileged information, it would be less time-consuming, and decreases the risk of the potential disclosure of information protected by attorney-client and work-product privileged.

## IV.   CONCLUSION

For the reasons stated above, the Movant respectfully requests that this Court grant this motion to quash the deposition subpoena for Azadeh Shahshahani, stay the deposition pending the outcome of the motion to quash, or alternatively issue a protective order.

Respectfully submitted this 19th day of September 2023,

**WILLIAMS OINONEN LLC**

/s/ JULIE OINONEN
Julie Oinonen (Ga. Bar No. 722018)
*Counsel for Non-Party Azadeh Shahshahani*

3344 Peachtree Road NE, Suite 800
Atlanta, GA 30326-4807
(404) 654-0288/ (404) 592-6225 FAX
julie@goodgeorgialawyer.com

## CERTIFICATE OF GOOD FAITH

Pursuant to Federal Rule of Civil Procedure 26 (c), the undersigned certifies that the movant has conferred in good faith with the party serving the subpoena in an effort to resolve the dispute without court action.

Respectfully submitted this 19th day of September 2023,

**WILLIAMS OINONEN LLC**

/s/ JULIE OINONEN
Julie Oinonen (Ga. Bar No. 722018)
*Counsel for Non-Party Azadeh Shahshahani*

3344 Peachtree Road NE, Suite 800
Atlanta, GA 30326-4807
(404) 654-0288/ (404) 592-6225 FAX
julie@goodgeorgialawyer.com

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF GEORGIA
### WAYCROSS DIVISION

**Dr. Mahendra Amin, M.D.**,

    *Plaintiff,*

v.

**NBCUniversal Media, LLC.**,

    *Defendant.*

Civil Action No.
5:21-CV-00056-LGW-BWC

Northern District of Georgia
Civil Action No.
_____

## CERTIFICATE OF SERVICE

This is to certify that I have this day electronically filed the MOTION TO QUASH SUBPOENA FOR DEPOSITION OF AZADEH SHAHSHAHANI AND STAY THE DEPOSITION PENDING THE OUTCOME OF THE MOTION TO QUASH OR IN THE ALTERNATIVE, MOTION FOR A PROTECTIVE ORDER with the Clerk of Court using the CM/ECF system and via email upon the Parties' counsel as follows:

    Scott Robert Grubman
    CHILIVIS GRUBMAN, LLP
    1834 Independence Square
    Atlanta, GA 30338
    sgrubman@cglawfirm.com

Stacey Godfrey Evans
Tiffany N. Watkins
John Amble Johnson
STACEY EVANS LAW
4200 Northside Parkway
Bldg One, Suite 200
Atlanta, GA 30327
sevans@staceyevanslaw.com
twatkins@staceyevanslaw.com
ajohnson@staceyevanslaw.com

Amanda B. Levine
Elizabeth A. McNamara
Leena Charlton
DAVIS WRIGHT TREMAINE LLP
1251 Avenue of the Americas
21st Floor
New York, NY 10020
amandalevine@dwt.com
lizmcnamara@dwt.com
leenacharlton@dwt.com

Cynthia L. Counts
FISHER BROYLES LLP
3340 Peachtree Road N.E.
Suite 1800
Atlanta, GA 30326
cynthia.counts@fisherbroyles.com

Robert Bates Lovett
FISHER BROYLES, LLP
2 East Bryan Street
Suite 436
Savannah, GA 31401
blovett@savannahga.gov

Eric Bierbauer
Taylor M. Carter
NBCUNIVERSAL MEDIA, LLC
30 Rockefeller Plaza
Room 620-557
New York, NY 10112
erik.bierbauer@nbcuni.com
taylor.carter@nbcuni.com

Respectfully submitted this 19th day of September 2023,

**WILLIAMS OINONEN LLC**

/s/ JULIE OINONEN
Julie Oinonen (Ga. Bar No. 722018)
*Counsel for Non-Party Azadeh Shahshahani*

3344 Peachtree Road NE, Suite 800
Atlanta, GA 30326-4807
(404) 654-0288/ (404) 592-6225 FAX
julie@goodgeorgialawyer.com

# Exhibit A

**From:** Stacey Evans <sevans@staceyevanslaw.com>
**Sent:** Tuesday, June 27, 2023 5:56 PM
**To:** Julie Oinonen <julie@goodgeorgialawyer.com>
**Cc:** Amble Johnson <ajohnson@staceyevanslaw.com>; Azadeh Shahshahani <azadeh@projectsouth.org>; Stacey Evans <sevans@staceyevanslaw.com>
**Subject:** RE: Amin v. NBCU: depositions of Azadeh Shahshahani and John Whitty

Julie,

Your continued and (now thinly veiled) threats continue to be noted. Your stance has no basis in law or fact and is countered by the productions made by Project South in this case.

We will move forward with serving a subpoena and will contact Mr. Whitty separately.

Thank you, Stacey

**From:** Julie Oinonen <julie@goodgeorgialawyer.com>
**Sent:** Tuesday, June 27, 2023 3:47 PM
**To:** Stacey Evans <sevans@staceyevanslaw.com>
**Cc:** Amble Johnson <ajohnson@staceyevanslaw.com>; Azadeh Shahshahani <azadeh@projectsouth.org>
**Subject:** Re: Amin v. NBCU: depositions of Azadeh Shahshahani and John Whitty

EXTERNAL SENDER. Only open links and attachments from known senders. DO NOT provide your username or password.

Hi Stacey,

We do not represent Mr. Whitty and our position has not changed as to the propriety of you deposing an attorney who is a litigation counsel in an active case pending against your client, a named defendant brought against him for civil rights abuses.
https://projectsouth.org/wp-content/uploads/2020/12/Docket-54-Consolidated-Amended-Habeas-Petition.pdf

We stand by our position that your attempts to do so are not supported by the law or our Professional Rules of Ethics. Quite frankly, we are perplexed by the tack that you are taking throughout this litigation in representing your client and speaking directly to you with respect, I for one do not understand why you have chosen to attach your name to this effort which seems to be a sure-fire way to burn down bridges of political good and your reputation as a "fierce advocate of progressive values" amongst progressive minded individuals and organizations throughout Georgia and nationwide.

You can zealously defend a client without blowing yourself up in the process. This is absolutely the wrong approach and I respectfully hope you will reconsider.

Sincerely,
Julie

Julie Oinonen
Williams Oinonen LLC
404-654-0288
www.goodgeorgialawyers.com (web)
www.goodgeorgialawyer.com (blog)

**From:** Stacey Evans <sevans@staceyevanslaw.com>
**Sent:** Tuesday, June 27, 2023 2:55 PM
**To:** Julie Oinonen <julie@goodgeorgialawyer.com>
**Cc:** Amble Johnson <ajohnson@staceyevanslaw.com>; Azadeh Shahshahani <azadeh@projectsouth.org>; Stacey Evans <sevans@staceyevanslaw.com>
**Subject:** RE: Amin v. NBCU: depositions of Azadeh Shahshahani and John Whitty

Julie,

It is not improper for us to take Ms. Shahshahani's deposition. None of the cases you cite are applicable. I hope you will work cooperatively to schedule the deposition of Ms. Shahshahani. Please let me know by the end of the day tomorrow. Otherwise, I will proceed with formal service of a subpoena. Please also let me hear from you with regard to Mr. Whitty.

*Shelton v. Am. Motors Corp.* involved the subpoena to take the deposition for an attorney in the litigation department of the opposing party within the case wherein the deposition was sought. 805 F.2d 1323, 1325 (8th Cir. 1986). It was not opposing counsel in a separate case. *See Gamache v. Hogue*, 595 F. Supp. 3d 1344, 1351 n. 1 (M.D. Ga. 2022) ("Courts have declined to apply *Shelton* when the proposed deponent is not trial or litigation counsel in the underlying case." (quotation marks omitted)). If Ms. Shahshahani were an in-house attorney at NBCUniversal, the situation might be analogous to *Shelton*, but that obviously is not the case.

Also, of course, *Shelton* is in the Eighth Circuit. *Gamache*, a case decided in a district court in the Middle District of Georgia, which you also cited, ruled instead:

> The Eleventh Circuit has not adopted a specific rule establishing when the deposition of an attorney is appropriate. In the absence of a specific rule, courts in the Middle District of Georgia focus their analyses on weighing and balancing the moving party's need for the information sought with the subpoenaed party's interests in its attorney-client relationship. Where an attorney is a fact witness, his or her deposition may be both necessary and appropriate. An attorney's deposition may be necessary and appropriate where the attorney is the person with the best information concerning non-privileged matters relevant to a lawsuit.
>
> In weighing Plaintiffs' need for complete discovery and Moore and Defendants' interest in their attorney-client relationship, the Court also takes into account that Moore is not litigation counsel, thus the considerations weighing against attorney depositions are mitigated.

*Gamache v. Hogue*, 595 F. Supp. 3d 1344, 1351 (M.D. Ga. 2022) (citations, quotation marks, and some punctuation omitted).

As to the burden-shifting, published Eleventh Circuit authority that post-dates the non-binding and inapposite *Shelton* holds unequivocally that the one who opposes discovery bears the "burden of establishing that a privilege or the work-product doctrine exempts these documents from discovery." *Republic of Ecuador v. Hinchee*, 741 F.3d 1185, 1189 (11th Cir. 2013) (citations omitted).

Further, Project South's own document production included communications between Ms. Shahshahani and non-clients, including journalists. Ms. Shahshahani's position as an attorney does not make these communications, which are not between attorney and client, privileged. Also from *Gamache*: "A communication made for a purpose other than to seek or give legal advice is not privileged, and the mere fact that a lawyer is used to make the non-legal communication does not make it privileged." *Id.* At 1352 (quotation marks omitted). We are not seeking communications between Ms. Shahshahani and her clients that are appropriately privileged as communications seeking or giving legal advice. And work product, which is not absolutely privileged but only enjoys a qualified privilege, protects information that is "prepared in anticipation of litigation or for trial." Fed. R. Civ. P. 26(b)(3). Again, Project South's own document production makes clear that Ms. Shahshahani has knowledge of information relevant to Dr. Amin's defamation claims against NBCUniversal that she did not acquire "in anticipation of litigation or for trial." We will not seek information that is protected pursuant to the attorney client privilege or work product, and to the extent counsel for Ms. Shahshahani believes deposition questions implicates such information, counsel can object and instruct her not to answer.

Thank you, Stacey

---

**From:** Julie Oinonen <julie@goodgeorgialawyer.com>
**Sent:** Tuesday, June 27, 2023 12:10 PM
**To:** Stacey Evans <sevans@staceyevanslaw.com>
**Cc:** Amble Johnson <ajohnson@staceyevanslaw.com>; Azadeh Shahshahani <azadeh@projectsouth.org>
**Subject:** Re: Amin v. NBCU: depositions of Azadeh Shahshahani and John Whitty

EXTERNAL SENDER. Only open links and attachments from known senders. DO NOT provide your username or password.

Stacey,

It would be highly improper to depose Azadeh who is currently active litigation counsel in an underlying, ongoing class action case brought against your client, the Defendant, Dr. Amin. And this would also set terrible precedent if suddenly parties/defendants who have active civil rights cases or other litigation brought against them were suddenly able to able depose opposing counsel, no doubt resulting in mad chaos that would ensue within our adversarial system. The problem with the questions that you intend to ask is that it not only encroaches on attorney client privileged communications but work product privilege in an active case brought against Dr. Amin, your client. I am also wondering how many other opposing counsel in the active civil rights case brought against him do you intend to depose?

As the Courts have held: "Deposing opposing counsel raises additional concerns as its "increasing practice ... [is] a negative development in the area of litigation, and one that should be employed only in limited circumstances." *Shelton v. Am. Motors Corp.*, 805 F.2d 1323, 1327 (8th Cir. 1986). Permitting depositions of opposing counsel "not only disrupts the adversarial system and lowers the standards of the profession, but it also adds to the already burdensome time and costs of litigation." *Id.* at 1327. The Eighth Circuit has set out a three-part test for determining when it is appropriate to depose opposing counsel that is followed by courts in the Ninth Circuit.[4] *Shelton*, 805 F.2d at 1327. Therefore, opposing counsel may be deposed if the party seeking the deposition establishes:

(1) no other means exist to obtain the information than to depose opposing counsel, [ ]; (2) the information sought is relevant and nonprivileged; and (3) the information is crucial to the preparation of the case.

*Id.* at 1327 (internal citation omitted). Generally, the burden of persuasion is on the party moving to quash the subpoena. *Luck v. Univ. of San Diego*, No. 13cv3088-JLS-BGS, 2014 WL 7111950, at *2 (S.D. Cal. Oct. 3, 2014). *Shelton*, however, shifts the burden to the party seeking the deposition. *Erhart*, 2017 WL 840648, at *3–*4 (citing *Shelton*, 805 F.2d at 1327). Accordingly, Defendants must demonstrate that Third Parties' deposition testimony is justified under *Shelton." In re Insogna*, No. 3:19-CV-1589-LAB-AHG, 2020 WL 85487, at *3 (S.D. Cal. Jan. 3, 2020) see also a recent Middle District of Georgia case "where the attorney was deposed where they were not trial or litigation counsel." Gamache v. Hogue, 595 F. Supp. 3d 1344, 1350 (M.D. Ga. 2022)."

Here Azadeh is active litigation counsel and your effort to depose her would be highly improper and we would contend a violation of the Rules.

In the event you seek to do so we will seek fees and sanctions.

Regards,
Julie Oinonen



Julie Oinonen
Williams Oinonen LLC
404-654-0288
www.goodgeorgialawyers.com (web)
www.goodgeorgialawyer.com (blog)

---

**From:** Stacey Evans <sevans@staceyevanslaw.com>
**Sent:** Tuesday, June 27, 2023 10:53 AM
**To:** Julie Oinonen <julie@goodgeorgialawyer.com>
**Cc:** Amble Johnson <ajohnson@staceyevanslaw.com>; Azadeh Shahshahani <azadeh@projectsouth.org>; Stacey Evans <sevans@staceyevanslaw.com>
**Subject:** RE: Amin v. NBCU: depositions of Azadeh Shahshahani and John Whitty

Julie,

Please don't threaten me.

I will be asking them about information relevant to the NBCU defamation case, which includes communications these attorneys had with NBCU and other media outlets and Congress (non-exclusive). I assume you (or someone else) would be present as counsel for these witnesses and can certainly lodge objections to protect any privilege.

If you will not work with me to mutually schedule these depositions, then I will serve subpoenas. Please let me know so I can act accordingly.

Thank you, Stacey

---

**From:** Julie Oinonen <julie@goodgeorgialawyer.com>
**Sent:** Tuesday, June 27, 2023 10:49 AM
**To:** Stacey Evans <sevans@staceyevanslaw.com>
**Cc:** Amble Johnson <ajohnson@staceyevanslaw.com>; Stacey Evans <sevans@staceyevanslaw.com>; Azadeh Shahshahani <azadeh@projectsouth.org>
**Subject:** Re: Amin v. NBCU: depositions of Azadeh Shahshahani and John Whitty

        EXTERNAL SENDER. Only open links and attachments from known senders. DO NOT provide your username or password.

Please let us know on what questions you intend to ask her.

They are attorneys and any questions you are asking them would be privileged involving the representation of clients. We would not agree to her deposition and will likely file a protective order.

Stacey, please know that if you try to depose her I suspect she and/or multiple other attorneys and other firms will try and depose you in other litigation so this may be a case of be careful what you wish for.

Regards,
Julie

Get Outlook for iOS

---

**From:** Stacey Evans <sevans@staceyevanslaw.com>
**Sent:** Tuesday, June 27, 2023 10:43 AM
**To:** Julie Oinonen <julie@goodgeorgialawyer.com>
**Cc:** Amble Johnson <ajohnson@staceyevanslaw.com>; Stacey Evans <sevans@staceyevanslaw.com>
**Subject:** Amin v. NBCU: depositions of Azadeh Shahshahani and John Whitty

Julie,

Good morning. I'm writing to see if we can mutually schedule dates for depositions of Azadeh Shahshahani and John Whitty. These depositions can be on the same day if convenient for them and counsel. If not, they can be separate dates. I'm not sure of the location preferences for either, so that could affect whether one day of depositions is possible. I would like to schedule these in September. Please send me available dates and I'll coordinate with NBCU's counsel.

Thank you, Stacey

---

Stacey Godfrey Evans
STACEY EVANS LAW
4200 Northside Pkwy NW
Bldg One; Suite 200
Atlanta, GA 30327
770-779-9602
[www.staceyevanslaw.com](www.staceyevanslaw.com)

☐ Reply   ☐ Forward

Exhibit B

David N. Dreyer
GA Bar No. 411322
**Dreyer Sterling, LLC**
437 Memorial Dr., SE, Ste. A-2
Atlanta, GA 30312
Tel: (404) 234-4447
david@dreyersterling.com

Elora Mukherjee (admitted *pro hac vice*)
NY Bar No. 4427233
**Morningside Heights Legal Services, Inc.**
435 West 116th Street, Room 831
New York, NY 10027
Tel: (203) 668-2639
emukherjee@law.columbia.edu

Sirine Shebaya (*pro hac vice* application forthcoming)
DC Bar No. 1019748
**National Immigration Project of the National Lawyers Guild (NIPNLG)**
2201 Wisconsin Ave NW, Suite 200
Washington, DC 20007
sirine@nipnlg.org

*Attorneys for Plaintiffs*
*(Additional counsel listed on signature page)*

# UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF GEORGIA

| | |
|---|---|
| YANIRA YESENIA OLDAKER, on behalf of herself and others similarly situated; TATYANA ALEKSEYEVNA SOLODKOVA, on behalf of herself and others similarly situated; LUZ ADRIANA WALKER, on behalf of herself and others similarly situated; LOURDES TERRAZAS SILAS, on behalf of herself and others similarly situated; JANE DOE #5; ; JANE DOE #8; JANE DOE #15; JANE DOE #22; JAROMY JAZMÍN FLORIANO NAVARRO, on behalf of herself and others similarly situated; MBETI VICTORIA NDONGA, on behalf of herself and others similarly situated; KEYNIN JACQUELIN REYES RAMIREZ, on behalf of herself and others similarly situated; and ANA GABRIELA ADAN CAJIGAL, on behalf of herself and others similarly situated, <br><br> *Petitioners-Plaintiffs*, | Case No.: 7:20-cv-00224-WLS-MSH <br><br> **CONSOLIDATED AMENDED PETITION FOR WRIT OF HABEAS CORPUS AND CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND FOR DAMAGES** |

v.

THOMAS P. GILES, in his individual
capacity and official capacity as Acting
Director of the Atlanta Field Office of U.S.
Immigration and Customs Enforcement;
TONY PHAM, in his official capacity as
Senior Official Performing the Duties of the
Director of U.S. Immigration and Customs
Enforcement; CHAD WOLF, in his official
capacity as Acting Secretary of Homeland
Security; WILLIAM BARR, in his official
capacity as Attorney General of the United
States; U.S. IMMIGRATION AND
CUSTOMS ENFORCEMENT; PATRICK
MUSANTE, in his individual capacity and
official capacity as Assistant Director of the
Atlanta Field Office of U.S. Immigration and
Customs Enforcement; CESAR CIPRIAN, in
his individual capacity and official capacity as
Supervisory Detention and Deportation
Officer at the ICE Atlanta Field Office; ANA
RIVERA, in her individual capacity and
official capacity as the Medical Director of
medical director of the ICE Health Service
Corps; UNNAMED ICE OFFICIALS ##1-X,
in their individual capacities and official
capacities as U.S. Immigration and Customs
Enforcement Health Service Corps
employees; IRWIN COUNTY DETENTION
CENTER; LASALLE SOUTHEAST, LLC;
HOSPITAL AUTHORITY OF IRWIN
COUNTY; DAVID PAULK, in his individual
capacity and official capacity as Warden of
Irwin County Detention Center;
MAHENDRA AMIN, in his individual
capacity and official capacity as physician at
the Irwin County Hospital; MARTEKA
GEORGE, in her individual capacity and
official capacity as Inmates' Services Director
at ICDC; MIA MINES, in her individual
capacity and official capacity as ICDC
officer; WILLIAM RABIOU, in his
individual capacity and official capacity as
ICDC officer; "FNU" HUGHES, in her
individual capacity and official capacity as

ICDC officer; "FNU" SMITH, in her
individual capacity and official capacity as
ICDC officer; "FNU" CONEY, in her
individual capacity and official capacity as
ICDC officer; "FNU" HANES, in his
individual capacity and official capacity as
ICDC officer; "FNU" FAISON, in her
individual capacity and official capacity as
ICDC officer; "FNU" BATTLE, in her
individual capacity and official capacity as
ICDC officer; "FNU" VAUGHN, in her
individual capacity and official capacity as
ICDC officer; "FNU" SCOTT, in her
individual capacity and official capacity as
ICDC officer; "FNU" SLACK, in her
individual capacity and official capacity as
ICDC officer; UNNAMED ICDC OFFICERS
##1-X, in their individual and official
capacities,

*Respondents-Defendants.*

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................... 1

PARTIES ............................................................................................................................. 2

I.     Detained Petitioners ............................................................................................. 2

II.    Deported or Released Petitioners ........................................................................ 4

III.   Federal Respondents ........................................................................................... 4

IV.   Irwin County Respondents .................................................................................. 6

JURISDICTION AND VENUE ......................................................................................... 9

FACTUAL ALLEGATIONS ............................................................................................. 9

I.     Widespread and Systematic Abuse by Respondent Amin ................................. 9

II.    The Whistleblower Complaint .......................................................................... 10

III.   Respondents' Knowledge and Disregard of Respondent Amin's Abuses ........ 11

IV.   A Broader Pattern of Medical Abuse or Neglect .............................................. 16

V.    Congressional Investigation into ICDC ............................................................ 19

VI.   Independent medical report on practices at ICDC ............................................ 20

VII.  Respondents' Conspiracy to Execute Removal Orders to Deter, Prevent, and Retaliate for Attempts to Participate in Lawsuits and Investigations .............. 20

VIII. Respondents disregard congressional intervention to halt retaliatory deportations .......... 22

IX.   Respondents Engaged in a Pattern of Retaliatory Actions Against Victims and Witnesses of Medical Abuse at ICDC .............................................................. 24

X.    Respondents Have Actively Endangered Petitioners' Health, Denied Petitioners Adequate Medical Care, and Retaliated Against Petitioners ............................. 27

       A.    Petitioner Yanira Yesenia Oldaker .............................................. 27

       B.    Petitioner Tatyana Alekseyevna Solodkova ............................... 35

       C.    Petitioner Luz Walker ................................................................. 38

       D.    Petitioner Jane Doe #5 ................................................................ 45

i

E.      Petitioner Jane Doe #6 ..................................................................49

F.      Petitioner Lourdes Terrazas Silas .........................................42

G.      Petitioner Jane Doe #8 ..................................................................53

H.      Petitioner Jane Doe #15 ................................................................56

I.       Petitioner Jane Doe #22 ................................................................61

J.      Petitioner Jaromy Floriano Navarro........................................63

K.      Petitioner Mbeti Ndonga ...........................................................67

L.      Petitioner Keynin Jackelin Reyes Ramirez...........................72

M.      Petitioner Ana Adan Cagjial ....................................................76

N.      Several Putative Class Members Who Have Suffered the Same Harms ..............81

XI.    The Federal Government's Inter-Governmental Agreement with Irwin County and ICE's Detention Standards................................................. 98

      A.      Inter-Governmental Agreement Between Federal Government and Irwin County................................................................98

      B.      PBNDS: Medical Care Standards ......................................100

CLASS ACTION ALLEGATIONS ........................................................ 102

CLAIMS FOR RELIEF ............................................................................ 107

FIRST CLAIM FOR RELIEF Habeas Authority to Order Release from Unlawful Detention.................................................................................. 107

SECOND CLAIM FOR RELIEF Violation of the First Amendment Against Federal Respondents (Retaliation)................................................. 108

THIRD CLAIM FOR RELIEF Violation of the First/Fourteenth Amendment (Retaliation under 42 U.S.C. § 1983) ............................................. 110

FOURTH CLAIM FOR RELIEF Violation of First Amendment (Alternative claim under Bivens) .......................................................................... 113

FIFTH CLAIM FOR RELIEF Violation of the Fifth Amendment (Punitive Conditions of Confinement and Deliberate Indifference against Federal Respondents)...................... 116

SIXTH CLAIM FOR RELIEF Violation of the Fourteenth Amendment (Punitive Conditions of Confinement and Deliberate Indifference pursuant to 42 U.S.C. § 1983) ............................................................................................................ 119

SEVENTH CLAIM FOR RELIEF Violation of the Fifth Amendment (Alternative First Amendment claim against ICDC Respondents under Bivens) ...................................... 122

EIGHTH CLAIM FOR RELIEF Violation of the Rehabilitation Act........................................ 126

NINTH CLAIM FOR RELIEF Violation of the Administrative Procedure Act and the Immigration and Nationality Act (Deportation of witnesses and individuals in the midst of legitimate efforts to protect their civil rights or civil liberties) ...................... 128

TENTH CLAIM FOR RELIEF Violation of the Administrative Procedure Act (Failure to follow PBNDS)............................................................................................................ 131

ELEVENTH CLAIM FOR RELIEF Violation of 42 U.S.C. § 1985(2) – Conspiring to Deter Testimony/Participation in Investigations and Court Proceedings ...................... 133

TWELFTH CLAIM FOR RELIEF Violation of the Right to Due Process Under the Fifth Amendment (Deportation of essential witnesses).......................................................... 137

THIRTEENTH CLAIM FOR RELIEF Release Pending Adjudication .................................... 138

FOURTEENTH CLAIM FOR RELIEF Breach of IGA Contract............................................. 139

FIFTEENTH CLAIM FOR RELIEF Negligent Hiring or Retention ........................................ 140

SIXTEENTH CLAIM FOR RELIEF Gross Negligence........................................................... 142

SEVENTEETH CLAIM FOR RELIEF Medical Battery........................................................... 144

EIGHTEENTH CLAIM FOR RELIEF Medical Malpractice .................................................... 145

NINETEENTH CLAIM FOR RELIEF Intentional Infliction of Emotional Distress ............... 147

TWENTIETH CLAIM FOR RELIEF Negligent Infliction of Emotional Distress................... 148

TWENTY-FIRST CLAIM FOR RELIEF Attorneys' Fees And Costs ..................................... 150

PRAYER FOR RELIEF ........................................................................................................... 150

## INTRODUCTION

1.      Petitioners-Plaintiffs ("Petitioners") are fourteen women who are or were detained by Respondents at the Irwin County Detention Center ("ICDC"). Each was subjected to, or ordered to be subjected to, non-consensual, medically unindicated, and/or invasive gynecological procedures by Mahendra Amin, with the knowledge or participation of other Respondents. In many instances, the medically unindicated gynecological procedures Respondent Amin performed on Petitioners amounted to sexual assault. These procedures were performed in the presence of unnamed ICDC officials ##1-X. Since at least 2018, women at ICDC have reported Respondent Amin's abusive behavior to ICDC guards, officers, and medical staff, and to ICE employees. Respondents also knew that from 2013 to 2015, Respondent Amin was investigated by the Department of Justice ("DOJ") for conducting medically unnecessary procedures. The abuses Petitioners experienced by and/or under the direction, control or authority of Respondent Amin are part of a broader pattern and practice of medical abuse and mistreatment at ICDC.

2.      After Petitioners spoke out, or attempted to speak out, about their abuse, Respondents retaliated against them in order to silence them. In an attempt to chill Petitioners' speech, Respondents engaged in a range of retaliatory actions. They placed or threatened to place Petitioners in medical units or solitary confinement; placed them on cell restriction; and transferred them to other units to separate protestors. They physically assaulted some women who spoke out, including while they were handcuffed. When women detained at ICDC went on hunger strike, Respondents rationed or threatened to ration their access to water, took money out of their commissary accounts, and limited or cut off their access to phones, tablets, video calls and email. They also delayed delivery of their prescribed medication and denied them access to the law library and to their own medical records. In addition to limiting phone access, Respondents systematically monitored outgoing phone calls, abruptly cutting the line when

Petitioners and other detainees mentioned hunger strikes or medical treatment or spoke with reporters. Respondents also destroyed letters documenting abusive medical treatment; refused to produce individuals at hearings related to Respondent Amin's abuses; refused to coordinate with consular officials; obstructed congressional committees' requests for information about medical treatment; and made false claims to congressional investigators.

3. Respondents have further retaliated against and attempted to silence Petitioners by deporting or attempting to deport them in retaliation for their speech or attempted speech about the abuses they have suffered at Respondents' hands.

4. Respondents' actions have violated Petitioners' First Amendment and Due Process rights and their rights under the Rehabilitation Act. Respondents have also failed to follow their own policies in violation of the Administrative Procedures Act and have committed multiple other violations of federal and Georgia state law.

5. Petitioners now seek relief from this Court, on behalf of themselves and others similarly situated, for the abuse they suffered by and/or under the direction, control or authority of Respondents. They further seek this Court's protection to enable them to freely pursue their claims against their abusers and to enable them to testify in ongoing investigations into Respondents' violations of their rights.

**PARTIES**

## I. Detained Petitioners

6. Petitioner Yanira Yesenia Oldaker is a 36-year-old woman who was brought to the United States from Mexico at the age of three. She is currently detained in the custody of U.S. Immigration and Customs Enforcement ("ICE") at ICDC.

7.      Petitioner Tatyana Alekseyevna Solodkova is a 48-year-old woman who arrived in the United States in 2016 after fleeing persecution in Russia. She is currently detained in ICE custody at ICDC.

8.      Petitioner Luz Adriana Walker is a 54-year-old woman originally from Columbia who has lived in the United States for more than 15 years. She is currently detained in ICE custody at ICDC.

9.      Petitioner Lourdes Terrazas Silas is a 41-year-old woman from Bolivia who has lived in the United States for more than twenty-one years. She is currently detained in ICE custody at ICDC.

10.      Petitioner Jane Doe #5 is a 28-year-old woman from Mexico who has lived in the United States since she was eleven years old. She is currently detained in ICE custody at ICDC.

11.      Petitioner Jane Doe #6 is a 33-year-old woman from Guatemala and a mother of six. She is currently detained in ICE custody at ICDC.

12.      Petitioner Jane Doe #8 is a 21-year-old woman from Mexico who was brought to the United States when she was eight years old. She is currently detained in ICE custody at ICDC.

13.      Petitioner Jane Doe #15 is a 38-year-old woman from Bolivia who is currently detained in ICE custody at ICDC.

14.      Petitioner Jane Doe #22 is a 39-year-old citizen of Senegal who came to the United States when she was eighteen years old. She is currently detained in ICE custody at ICDC.

## II.    Deported or Released Petitioners

15.    Petitioner Jaromy Jazmín Floriano Navarro is a 28-year-old woman from Mexico. She was detained in ICE custody at ICDC from October 18, 2019 until her sudden deportation on September 16, 2020.

16.    Petitioner Mbeti Victoria Ndonga is a 37-year-old woman who was brought to the United States from Kenya when she was two years old. She was detained in ICE custody at ICDC from April 2019 until December 16, 2020. She currently lives with her mother in Georgia.

17.    Petitioner Keynin Jackelin Reyes Ramirez is a 33-year-old woman who arrived in the United States fleeing persecution from Honduras. She was detained in ICE custody at ICDC for nearly eleven months and was released on December 11, 2020. Ms. Reyes Ramirez currently resides in Carrollton, Georgia.

18.    Petitioner Ana Gabriela Adan Cajigal is a 25-year-old woman who first came to the United States from Mexico when she was six months old. She was detained in ICE custody at ICDC from around late February 2020 until December 11, 2020. She currently resides in Smyrna, Georgia.

## III.    Federal Respondents

19.    Respondent Thomas P. Giles is named in his individual capacity and in his official capacity as the Director of the ICE Atlanta Field Office. The ICE Atlanta Field Office is responsible for, among other things, carrying out ICE's immigration detention operations at ICDC. Respondent Giles is responsible for administering the immigration laws and the execution of detention and removal determinations for individuals under the jurisdiction of the ICE Atlanta Field Office, which includes those detained at ICDC. As such, he is a legal custodian of Petitioners and others similarly situated.

20.     Respondent Tony Pham is named in his official capacity as Senior Official Performing the Duties of the Director of ICE. In this capacity, he is responsible for the enforcement of immigration laws and for ICE's policies, practices, and procedures. He has authority over the detention and removal of noncitizens throughout the United States. As such, he is a legal custodian of Petitioners and others similarly situated.

21.     Respondent Chad Wolf is named in his official capacity as Acting Secretary of DHS. In his official capacity, Respondent Wolf is responsible for administering the immigration laws pursuant to 8 U.S.C. § 1103(a) and is legally responsible for the detention and removal of immigrants. As such, he is a legal custodian of Petitioners and others similarly situated.

22.     Respondent William Barr is named in his official capacity as the Attorney General of the United States. In his official capacity, he is responsible for the administration of the immigration laws pursuant to 8 U.S.C. § 1103(g). As such, he is a legal custodian of Petitioners and others similarly situated.

23.     Respondent ICE is a federal law enforcement agency within the Department of Homeland Security ("DHS"). ICE is responsible for the criminal and civil enforcement of immigration laws, including the detention and removal of immigrants. Enforcement and Removal Operations, a division of ICE, manages and oversees the immigration detention system. As such, Respondent ICE is a legal custodian of Petitioners and others similarly situated.

24.     Respondent Patrick Musante is named his individual capacity and in his official capacity as Assistant Field Office Director of the ICE Atlanta Field Office. In this capacity, he is responsible for the administration of immigration laws and the execution of detention and removal determinations and is a custodian of Petitioners and others similarly situated.

25.     Respondent Cesar Ciprian is named in his individual capacity and in his official capacity as a Supervisory Detention and Deportation Officer at the ICE Atlanta Field Office.

26.     Respondent Ada Rivera is named in her individual capacity and in her official capacity as the medical director of the ICE Health Service Corps.

27.     Respondent Unnamed ICE Officials ##1-X are an unknown number of ICE Health Service Corps employees, who approve referrals of residents at ICDC to outside medical providers, including Respondent Amin, and are responsible for investigating complaints by detained individuals in ICE custody related to medical care. They are named in their individual capacities and in their official capacities.

## IV.     Irwin County Respondents

28.     Respondent Irwin County Detention Center ("ICDC") is a detention facility located in Ocilla, GA. Irwin County, GA has contracted with the federal government to detain individuals pursuant to federal immigration laws.

29.     Respondent LaSalle Southeast, LLC ("LaSalle") is a limited liability corporation that does business in this judicial district for the purpose of profit. Respondent LaSalle has contracted with Irwin County for the operation of ICDC. Respondent LaSalle was at all times material to this complaint acting under color of law.

30.     Respondent Hospital Authority of Irwin County ("Irwin County Hospital") is a general medical and surgical facility located in Ocilla, GA.

31.     Respondent David Paulk is named in his individual capacity and in his official capacity as the Warden of ICDC. Respondent Paulk is responsible for overseeing the administration and management of ICDC. In this capacity, he is or was the immediate custodian of Petitioners and others similarly situated. Respondent Paulk was at all times material to this petition acting under color of law.

32. Respondent Mahendra Amin is named in his individual capacity and in his official capacity as a physician affiliated with the Irwin County Hospital. Respondent Amin was authorized by unnamed ICE officials and/or unnamed ICDC officers to provide medical services to detained individuals in ICE custody at ICDC. Respondent Amin was at all times material to this petition acting under color of law.

33. Respondent Marteka George is named in her individual capacity and in her official capacity as the Inmates' Services Director at ICDC. Respondent George was at all times material to this petition acting under color of law.

34. Respondent Mia Mines is named in her individual capacity and in her official capacity as an officer at ICDC. Respondent Mines was at all times material to this petition acting under color of law.

35. Respondent William Rabiou is named in his individual capacity and in his official capacity as an officer at ICDC. Respondent Rabiou was at all times material to this petition acting under color of law.

36. Respondent "FNU" Hughes is named in her individual capacity and in her official capacity as a nurse at ICDC. Respondent Hughes was at all times material to this petition acting under color of law.

37. Respondent "FNU" Smith is named in her individual capacity and in her official capacity as an officer at ICDC. Respondent Smith was at all times material to this petition acting under color of law.

38. Respondent "FNU" Coney is named in her individual capacity and in her official capacity as an officer at ICDC. Respondent Coney was at all times material to this petition acting under color of law.

7

39. Respondent "FNU" Hanes is named in his individual capacity and in his official capacity as an officer at ICDC.[1] Respondent Hanes was at all times material to this petition acting under color of law.

40. Respondent "FNU" Faison is named in her individual capacity and in her official capacity as an officer at ICDC. Respondent Faison was at all times material to this petition acting under color of law.

41. Respondent "FNU" Battle is named in her individual capacity and in her official capacity as an officer at ICDC. Respondent Battle was at all times material to this petition acting under color of law.

42. Respondent "FNU" Vaughn is named in her individual capacity and in her official capacity as an officer at ICDC. Respondent Vaughn was at all times material to this petition acting under color of law.

43. Respondent "FNU" Scott is named in her individual capacity and in her official capacity as an officer at ICDC. Respondent Scott was at all times material to this petition acting under color of law.

44. Respondent "FNU" Slack is named in her individual capacity and in her official capacity as an officer at ICDC. Respondent Slack was at all times material to this petition acting under color of law.

45. Respondents Unnamed ICDC Officers ##1-X are an unknown number of officers at ICDC who perform functions including accompanying women detained at ICDC to their medical appointments, receiving and responding to verbal and written complaints, and responding to requests for medical care or assistance. They are named in their official capacities

---

[1] Possible alternative spellings could include "Haynes."

8

as officers at ICDC and in their individual capacities. Respondents Unnamed ICDC Officers ##1-X were at all times material to this petition acting under color of law.

## JURISDICTION AND VENUE

46.     This Court has subject matter jurisdiction over Claims One through Fourteen pursuant to 28 U.S.C. §§ 2241, 1331, 1651, 5 U.S.C. § 702, and Article I § 9, cl. 2 (the Suspension Clause) of the U.S. Constitution.

47.     This Court also has subject matter jurisdiction over Claims Fifteen through Twenty-One pursuant to 28 U.S.C. § 1367 because they form part of the same case or controversy giving rise to Claims One through Fourteen.

48.     This Court has the authority to grant declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201-2202 and 28 U.S.C. § 1651.

49.     Monetary damages are available pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388 (1971) as to Federal Respondents and, as to Irwin County Respondents, under 42 U.S.C. § 1983 and Georgia state law.

50.     Venue is proper in this district under 28 U.S.C. § 1391, because Petitioners Oldaker, Solodkova, Walker, Terrazas Silas, Jane Does ## 5, 6, 8, 15 and 22 are all currently detained at ICDC, located in this district. Venue is also proper in this district because a substantial part of the events or omissions giving rise to the claims occurred or are occurring in this district.

## FACTUAL ALLEGATIONS

**I.      Widespread and Systematic Abuse by Respondent Amin**

51.     Petitioners were victims of non-consensual, medically unindicated and/or invasive gynecological procedures, including unnecessary surgical procedures under general anesthesia, performed by and/or at the direction of Respondent Amin.

52.     As detailed below, in many instances, the medically unindicated gynecological procedures Respondent Amin performed on Petitioners amounted to sexual assault. These procedures were performed in the presence of unnamed ICDC officials ##1-X.

53.     Since at least 2018, Respondents have known about the medical abuse women detained at ICDC have suffered at the hands of Respondent Amin but have nonetheless continued a policy or custom of sending women to be mistreated and abused by Respondent Amin.

54.     The experiences Petitioners had at the hands of Respondent Amin form part of a disturbing pattern of inhumane medical abuse and mistreatment at ICDC.

## II.     The Whistleblower Complaint

55.     On September 14, 2020, a nurse from ICDC, Ms. Dawn Wooten, raised the first alarm about unnecessary medical procedures at ICDC.[2]

56.     Ms. Wooten described a general failure to obtain consent for medical procedures and a pattern of performing medically unindicated procedures.[3] She also described long delays between requests for medical attention and receipt of care, and responses to a broad range of requests for medical care with ibuprofen.

57.     This whistleblower complaint corroborates Petitioners' experiences throughout their detention at ICDC.

---

[2] Complaint by Project South, Georgia Detention Watch, Georgia Latino Alliance for Human Rights & South Georgia Immigrant Support Network to Joseph V. Cuffari, Cameron Quinn, Thomas P. Giles, & David Paulk, *Re: Lack of Medical Care, Unsafe Work Practices, and Absence of Adequate Protection Against COVID-19 for Detained Immigrants and Employees Alike at the ICDC County Detention Center* (Sept. 14, 2020), https://projectsouth.org/wp-content/uploads/2020/09/OIG-ICDC-Complaint-1.pdf.
[3] *Id.* at 20.

## III.     Respondents' Knowledge and Disregard of Respondent Amin's Abuses

58.     Since at least 2018, women treated by Respondent Amin and their counsel have reported his abusive behavior to certain Respondents and their agents, including unnamed ICE agents and ICDC officers, both verbally and in writing.

59.     Multiple women detained at ICDC, including several Petitioners, complained verbally or in writing about the painful, unnecessary, non-indicated, and/or non-consensual medical procedures Respondent Amin performed on them.

60.     Despite these complaints, Respondents have continued a policy or custom of regularly sending women detained at ICDC to be treated by Respondent Amin.

61.     Unnamed ICDC Officers ##1-X accompanied women detained at ICDC, including Petitioners, to their appointments with Respondent Amin. They remained in the room as he performed painful non-consensual procedures on them. They witnessed the women crying out in pain and asking Respondent Amin to stop, which he generally refused to do. They witnessed that Respondent Amin did not obtain consent for many of the procedures. They also witnessed that he frequently did not make any attempts or respond to requests to provide interpretation or to speak to each woman in a language she could understand.

62.     Federal and ICDC Respondents also knew that from 2013 to 2015, Respondent DOJ investigated Respondent Amin for similar behavior—performing unnecessary medical procedures in violation of the False Claims Act—as part of the lawsuit *United States v. Hospital Authority of Irwin County*, No. 7:13-cv-00097-HL (M.D. Ga.).[4]

---

[4]Press Release, Department of Justice, U.S. Attorney's Office, Middle District of Georgia, Hospital Authority of Irwin County Resolves False Claims Act Investigation for $520,000 (Apr. 29, 2015), https://www.justice.gov/usao-mdga/pr/hospital-authority-irwin-county-resolves-false-claims-act-investigation-520000.

63. In _United States v. Hospital Authority of Irwin County_, the DOJ alleged that "Dr. Amin has a standing order at ICH [Irwin County Hospital] which requires that certain tests always be run on pregnant patients, without any medical evaluation and regardless of her condition. For example, no matter what symptoms the patient may be exhibiting, ICH performs an OB ultrasound on every pregnant patient, without consulting [Dr. Amin] or obtaining his or any other doctor's medical opinion for that particular patient. . . . Dr. Amin's standing order for ultrasounds on his patients constitutes a pattern of medical services that he, ICH, and on-call doctors know or should know are not medically necessary."[5]

64. Despite this knowledge, Respondents continued to send women detained at ICDC to be treated by Respondent Amin.

65. On information and belief, Federal Respondents, including Respondents Giles and Musante, knew that Respondent Amin was subjecting detained individuals at ICDC to invasive and unnecessary gynecological procedures and surgeries without informed consent.

66. Respondent Giles, as the Field Office Director, and Respondent Musante, as the Assistant Field Office Director, are tasked with ensuring that all detention facilities in their areas of responsibility comply with applicable detention standards and policies.

67. On information and belief, Respondents Giles and Musante were aware of Respondent Amin's abuses at ICDC prior to the whistleblower complaint, and as early as 2018.

68. By failing to investigate these abuses or taking immediate action to prevent further harm, Respondents Giles and Musante disregarded the serious risk of harm that individuals detained at ICDC faced, as well as the actual harms to which some had been subjected.

---

[5]Complaint at 15, 17, _United States v. Hospital Authority of Irwin County_, No. 7:13-cv-00097 (M.D. Ga. July 8, 2013).

69.     Respondent Ciprian was aware of the invasive and unnecessary gynecological procedures and surgeries at ICDC. Putative class member Jane Doe #25 told Respondent Ciprian in 2018 about the inadequate medical care provided by Respondent Amin. However, Jane Doe #25 was nevertheless taken to Respondent Amin who subjected her to an invasive and unnecessary gynecological surgery.

70.     At the very least, Respondents Giles and Musante became aware of Respondent Amin's abuses on September 14, 2020, when Ms. Wooten submitted a whistleblower complaint to Respondent Giles describing his misconduct.

71.     Even after the whistleblower complaint was filed and widely publicized, Respondents continued to send women detained at ICDC to be treated by Respondent Amin. For example, Petitioner Jane Doe #22 was sent to Respondent Amin on or about September 22, 2020, one week after the allegations of abuse were public. Putative class member Rojas Fañas was also sent to Respondent Amin after the whistleblower complaint had been made public and the allegations of abuse were reported on by the media.

72.     Respondent Ciprian disregarded the serious risk of harm to the women subjected to Respondent Amin's abuses, including putative class member Jane Doe #25, who has now been told that there is a "90% chance" she cannot have another child as a result of Respondent Amin's procedure on her body without her informed consent. In fact, Jane Doe #25 wrote to Respondent Ciprian in 2018 describing the inadequate medical care provided by Respondent Amin and her fears of being treated by him. Jane Doe #25 was nonetheless subsequently taken to Respondent Amin for invasive and unnecessary gynecological surgery.

73.     Respondents Unnamed ICE Officials ##1-X are an unknown number of officials who work for the ICE Health Service Corps and/or ICE Enforcement and Removal Operations.

13

ICE Health Service Corps officers are responsible for approving referrals at ICDC to outside medical providers and are responsible for investigating complaints by detained individuals in ICE custody related to medical care. ICE Enforcement and Removal Operations officers are responsible for the placement of women in particular detention centers, are generally responsible for detained women's cases, and are regularly in touch with women whose cases they manage about issues relating to their detention and removal. Because of their direct involvement with medical care at ICDC, specifically approving outside referrals and responding to complaints, and/or with managing placement and cases of women detained at ICDC, Respondents Unnamed ICE Officials ##1-X were aware of Respondent Amin's abuses at ICDC.

74.     Respondents Unnamed ICE Officials ##1-X did not adequately investigate complaints by detained individuals in ICE custody at ICDC related to medical care. As a result, Respondents Unnamed ICE Officials ##1-X disregarded the serious risk of harm to individuals detained at ICDC, who were repeatedly sent to Respondent Amin after approval from Respondents Unnamed ICE Officials ##1-X.

75.     Respondent Ada Rivera is the Medical Director for ICE Health Service Corps, who oversees the operations of ICE Health Service Corps. On information and belief, Respondent Ada Rivera has known since at least 2018 about complaints against Respondent Amin. At the very latest, Respondent Rivera was made aware of Respondent Amin's abuses upon the public outcry over the whistleblower complaint.[6]  Nevertheless, ICE Health Service Corps continued to approve referrals for women at ICDC to see Respondent Amin for at least a

---

[6]*See* Elliot Spagat & Jeff Amy, *Democrats to investigate forced surgery claims in Georgia*, Washington Post (Sept. 15, 2020), https://www.washingtonpost.com/health/democrats-to-investigate-forced-surgery-claims-in-georgia/2020/09/15/6cf0cbb2-f7b3-11ea-85f7-5941188a98cd_story.html.

week after the filing of the whistleblower complaint. As a result, Respondent Rivera disregarded the serious risk of harm to individuals detained at ICDC.

76.     Respondents ICDC, LaSalle, their employees, agents, and/or contractors also knew that Respondent Amin was subjecting detained individuals at ICDC to invasive and unnecessary gynecological procedures and surgeries without informed consent.

77.     On information and belief, Respondents ICDC, LaSalle, and Paulk, as individuals and entities in charge of running the day-to-day operations of the facility, were aware of the invasive, nonconsensual, and medically unnecessary procedures and surgeries performed by Respondent Amin without informed consent.

78.     By failing to investigate these abuses or taking immediate action to prevent further harm, Respondents ICDC, LaSalle, and Paulk disregarded the serious risk of harm to individuals sent to Respondent Amin purportedly for gynecological procedures and surgeries.

79.     From July to November 2018, counsel for putative class member Jane Doe #35 repeatedly raised concerns about gynecological treatment at ICDC with Respondents ICDC, LaSalle, Paulk, and ICE and its agents. Counsel's efforts included multiple conversations with Respondent George explaining that Dr. Amin had mistreated Jane Doe #35. In late October 2018, Respondent George confirmed to counsel that she was "not surprised to hear this complaint against Dr. Amin." By this time, Respondent George had received "several previous verbal complaints about Dr. Amin."[7]

80.     On November 8, 2020, counsel for Jane Doe #35 personally met with Respondent Paulk to express concern about gynecological treatment at ICDC. The following day, counsel

---

[7]Caitlin Dickerson, Seth Freed Wessler & Miriam Jordan, *Immigrants Say They Were Pressured Into Unneeded Surgeries*, The New York Times (Sept. 29, 2020, https://www.nytimes.com/2020/09/29/us/ice-hysterectomies-surgeries-georgia.html.

wrote to Respondent Paulk documenting the "four months" of "advocacy with ICE and ICDC" to seek care of Jane Doe #35's debilitating pain resulting from gynecological complications. Counsel wrote that despite this debilitating pain, Jane Doe #35 "hesitated to seek medical attention because her last experience with Dr. Amin was so painful and traumatic that she did not want to be sent back to him."

81.     Respondents ICDC and LaSalle had a policy, practice, or custom of referring individuals to Respondent Amin despite their knowledge of his abuses.

82.     ICDC officers and medical staff, including Respondents Mines, Rabiou, Hughes, Smith, Doney, Hanes, Faison, Battle, Vaughn, Scott, Slack, and Unnamed ICDC Officers ##1-X, were aware of the abuses by Respondent Amin. By failing to report Respondent Amin's abuses or taking immediate action to prevent further harm, ICDC officers and medical staff disregarded the serious risk of harm to individuals sent to Respondent Amin for gynecological procedures and surgeries.

## IV.     A Broader Pattern of Medical Abuse or Neglect

83.     The medical abuses Petitioners suffered at the hands of Respondents form part of a broader pattern of medical abuse or neglect at ICDC, of which Respondents were fully aware.

84.     Immigrants detained at ICDC have, for years, reported lack of access to adequate medical care, including unanswered requests for treatment, failure to provide necessary medication or prenatal care, and long wait times of up to two weeks to see medical staff at the facility.[8]

---

[8]Project South & Penn State Law Center for Immigrants' Rights Clinic, Imprisoned Justice: Inside Two Georgia Immigrant Detention Centers 48-49 (May 2017), https://projectsouth.org/wp-content/uploads/2017/06/Imprisoned_Justice_Report-1.pdf (hereinafter "Imprisoned Justice"); *see also* ACLU-GA, *Prisoners of Profit* 89-90 (2012), https://www.acluga.org/sites/default/files/field_documents/prisoners_of_profit.pdf (documenting multiple "unreasonable delays in receiving medical care" at Irwin, including failure to provide necessary cancer treatment, x-rays, pain medication, treatment for diabetes and high blood pressure, among other medical neglect and mistreatment).

85.     Despite their knowledge of these well-known issues of medical neglect and
mistreatment at ICDC, and repeated requests by Petitioners and others detained at ICDC for
adequate care and reasonable accommodations, Respondents ICDC, LaSalle, and unnamed ICE
agents have denied adequate medical care to detained individuals at ICDC and have failed to
provide reasonable accommodations to individuals who suffer from recorded physical and
mental impairments that substantially limit their major life activities.

86.     In fact, instead of providing such care and accommodations to individuals in their
custody, Respondents ICDC, LaSalle, and unnamed ICE agents have retaliated against those who
seek medical care, including placement in solitary confinement in response to requests for
medical assistance.[9]

87.     Even when seen by providers, immigrants at ICDC have consistently reported
cursory exams that fail to respond to health concerns and lack of appropriate medication or
treatment, accompanied by an absence of adequate language interpretation.[10] Immigrants have
also routinely described lack of mental health screenings and fears of reporting mental health
concerns given the practice of inappropriately placing immigrants on suicide watch in solitary
confinement.[11]

---

[9]*Id. see also* ACLU-GA, *Prisoners of Profit* at 91 (noting that "[o]ver two-thirds of the  detainees  interviewed expressed  fear  and  concern  at  the  possibility  of  complaining"  due to retaliatory behavior from guards including being placed in solitary: "[I]f you complain, it only gets worse."). Reports have also documented the misuse and overuse of solitary confinement at ICDC in other contexts. Detention Watch Network, *A Toxic Relationship: Private Prisons and U.S. Immigration Detention* 5 (2016),
https://www.detentionwatchnetwork.org/sites/default/files/reports/A%20Toxic%20Relationship_DWN.pdf
(describing the placement of an 18-year-old girl in solitary after she reported suffering harassment on account of her sexual orientation and the placement of a new arrival at ICDC in segregation due to lack of space in housing units).
[10]Imprisoned Justice at 48. *See also* ACLU-GA, *Prisoners of Profit* at 90 (noting that "no staff member of the medical unit is able to provide interpretation for detainees who do not speak English well or at all" and as one interviewee described because "[t]here was no interpreter, . . . I had no idea why or what was happening. Even if you go because you're sick they ignore you.").
[11]*Id.* at 48-49. *See also* ACLU-GA, *Prisoners of Profit* at 90-91 ("Many detainees suffer from depression, anxiety, insomnia, and other emotional difficulties" and are "generally afraid to talk about their mental health" for fear of being placed in segregation instead of receiving treatment").

88.    DHS has itself documented serious violations of health and safety standards at ICDC, citing, for example, unsanitary conditions in medical unit cells that "needed to be mopped, walls wiped down, toilets cleaned, and trash and refuse removed."[12] In a compliance inspection report, DHS cited failures by medical staff at ICDC to complete required trainings, including in CPR and emergency first aid training.[13] Inspectors also documented failures by the medical staff to consistently review intake screening forms to assess priority for treatment and the lack of critical information related to mental health, medical history, and medications in health screenings.[14] Inspectors were unable to validate if an external state physician conducted peer reviews as requested and inspectors documented examination tables "torn beyond repair, making cleaning and decontamination impossible" as well as broken cabinets, drawers and doors "held together with tape."[15]

89.    In April 2020, women detained at ICDC released a video pleading for release from detention due to the harmful conditions at ICDC, including the unsanitary conditions and lack of protection against the COVID-19 pandemic.[16]

---

[12]U.S. Department of Homeland Security, Immigration and Customs Enforcement, Office of Professional Responsibility, Inspections and Detention Oversight Division, Compliance Inspection, Enforcement and Removal Operations, ERO Atlanta Field Office, Irwin County Detention Center, Ocilla, Georgia at 6 (Mar. 7-9, 2017), https://www.ice.gov/doclib/foia/odo-compliance-inspections/2017IrwinCountyGA.pdf at 6. *See also* ACLU-GA, *Prisoners of Profit* at 81, 85, 87, 94 (highlighting other hygiene concerns and concerns about sanitary conditions, food, access to medical care, delays in receiving medications, misuse and overuse of solitary confinement among other "serious and systematic problems with living conditions, medical attention, and treatment of detainees at Irwin"). For examples of lack of adequate or effective medical or dental care at other ICE detention facilities, *see generally* U.S. House of Representatives, Comm. on Homeland Sec., *ICE Detention Facilities: Failing to Meet Basic Standards of Care* 13-20 (Sept. 21, 2020) (describing ongoing abuses committed at facilities owned and operated by LaSalle Corrections, Inc., among others).

[13]*Id.* at 8-9.

[14]*Id.* at 9.

[15]U.S. Department of Homeland Security, Immigration and Customs Enforcement, Office of Professional Responsibility, Inspections and Detention Oversight Division, Compliance Inspection, Enforcement and Removal Operations, ERO Atlanta Field Office, Irwin County Detention Center, Ocilla, Georgia (Mar. 2020) at 15, https://www.ice.gov/doclib/foia/odo-compliance-inspections/irwinCoDetCntr_OcillaGA_Mar3-5_2020.pdf.

[16]UN Communication Addressing U.S. Violations of International Law at Immigration Detention Facilities in the U.S. State of Georgia and Calling for a Coordinated Site Visit and International Condemnation, Nov. 19, 2020,

90.     This inhumane treatment of women at ICDC includes destruction of immigrants' medical request forms, fabrication of medical records, accusations of exaggerating pain, taunting of non-English speaking immigrants, lack of interpretation, and performance of surgeries and gynecological procedures without informed consent and without explanation.[17]

## V.     Congressional Investigation into ICDC

91.     On September 15, 2020, the day after Ms. Wooten blew the whistle on abuses at ICDC, Senator Cory Booker called on the DHS Inspector General to immediately investigate the whistleblower complaint.[18]

92.     The New York Times, The Washington Post, and The LA Times all covered the whistleblower complaint and the subsequent congressional outcry.[19]

93.     Soon after the whistleblower report, multiple federal agencies opened investigations into allegations of medical abuses of women detained at ICDC. Those federal agencies include the DOJ, DHS Office of the Inspector General ("OIG"), and the Federal Bureau of Investigation ("FBI").

94.     On September 26, 2020, a congressional delegation visited ICDC to investigate the experiences of detained women.[20] The congressional delegation included Representatives

---

https://projectsouth.org/wp-content/uploads/2020/11/2020.11.19_UN-Communication-ICDC-Medical-Neglect-and-Abuse.pdf (citing https://www.youtube.com/watch?v=aQt6QbkWsLI&feature=youtu.be).

[17] Id.

[18] Letter from Senator Booker to Inspector General Cuffari (Sept. 15, 2020), https://www.booker.senate.gov/imo/media/doc/9.15.20%20Letter%20to%20DHS%20OIG%20re%20GA%20Whistleblower%20Complaint%20FINAL%20SIGNED%20(002).pdf.

[19] Caitlin Dickerson, Seth Freed Wessler, and Miriam Jordan, *Immigrants Say They Were Pressured Into Unneeded Surgeries*, New York Times (Sept. 29, 2020), https://www.nytimes.com/2020/09/29/us/ice-hysterectomies-surgeries-georgia.html; Elliot Spagat and Jeff Amy, *Democrats to investigate forced surgery claims in Georgia*, Washington Post (September 14, 2020), https://www.washingtonpost.com/health/nurse-questions-medical-care-at-immigration-jail-in-georgia/2020/09/14/1eed5708-f701-11ea-85f7-5941188a98cd_story.html.

[20] Congressional Hispanic Caucus Statement on Investigation of Irwin County Detention Center, https://chc.house.gov/media-center/press-releases/congressional-hispanic-caucus-statement-on-investigation-of-irwin-county.

Joaquin Castro, Nanette Barragan, Adriano Espaillat, Juan Vargas, Jimmy Gomez, Lou Correa, Raul Ruiz, Sheila Jackson Lee, Sylvia Garcia, Hank Johnson, and Pramila Jayapal.

## VI. Independent medical report on practices at ICDC

95.     In October, a team of independent medical professionals reviewed over 3,200 pages of medical records for 19 women detained at ICDC, including some of Petitioners' records, and provided their report to Congress.[21]

96.     The report by the medical team described an "alarming pattern" of medical abuse, including but not limited to description of widespread practices that corroborated the inhumane practices Petitioners describe and exposed them to multiple unnecessary gynecological procedures and surgeries without informed consent by Respondent Amin.[22]

## VII. Respondents' Conspiracy to Execute Removal Orders to Deter, Prevent, and Retaliate for Attempts to Participate in Lawsuits and Investigations

97.     Immediately after Ms. Wooten's whistleblower report was made public, Respondent ICE initiated retaliatory deportations against women detained at ICDC who spoke out about the medical abuse that they had suffered or witnessed.[23] Federal and ICDC

---

[21] Molly O'Toole, *19 women allege medical abuse in Georgia immigration detention, L.A. times*, Oct. 22, 2020, https://www.latimes.com/politics/story/2020-10-22/women-allege-medical-abuse-georgia-immigration-detention; Greg Walters, Carter Sherman, Neda Toloui-Semnani, *'A Disturbing Pattern': ICE Detainees Were Pressured to Have Gynecological Surgery, Doctors Say*, VICE (Oct. 24, 2020), https://www.vice.com/en/article/88a95x/ice-detainees-were-pressured-to-have-gynecological-surgery-doctors-say.

[22] Molly O'Toole, *19 women allege medical abuse in Georgia immigration detention*, L.A. Times (Oct. 22, 2020), https://www.latimes.com/politics/story/2020-10-22/women-allege-medical-abuse-georgia-immigration-detention; Greg Walters, Carter Sherman, Neda Toloui-Semnani, *'A Disturbing Pattern': ICE Detainees Were Pressured to Have Gynecological Surgery, Doctors Say*, VICE (Oct. 24, 2020) https://www.vice.com/en/article/88a95x/ice-detainees-were-pressured-to-have-gynecological-surgery-doctors-say.24, 2020. A week later, the Inter-American Commission on Human Rights expressed its concern over the non-consensual surgeries and sterilizations at ICDC, citing the whistleblower complaint and the medical report. Press Release, *IACHR Expresses Its Concern Over Reports of Sterilizations and Surgical Interventions Without Consent in Migrant Detention Centers in the United States* (Oct. 30, 2020). The IACHR emphasized the serious violations of reproductive and sexual rights at ICDC along with the overall negligent medical care, the lack of protective measures during the COVID-19 pandemic, the lack of interpretation and language barriers to accessing medical care, as well as discriminatory treatment and intimidation of immigrants at ICDC. *Id.*

[23] Gianna Toboni, *ICE Attempts to Deport Multiple Witnesses in Gynecologic Surgery Scandal*, VICE (Nov. 5, 2020), https://www.vice.com/en/article/jgqq7p/ice-attempts-to-deport-multiple-witnesses-in-gynecologic-surgery-scandal.

Respondents, including unnamed ICE agents and ICDC officers, have collectively engaged in a pattern of swiftly deporting victims and witnesses who have spoken to investigators, attempted to speak to investigators, filed federal lawsuits, attempted to file federal lawsuits, or have valuable information to share regarding medical abuses at ICDC.

98.     Petitioners Floriano Navarro and Jane Doe #31—both of whom were detained at ICDC and subjected to medical abuse during their detention—were deported within a day after they spoke out or confirmed that they had spoken out about medical abuses at ICDC. Federal investigators were unable to interview "at least eight women who were deported after receiving questionable medical diagnoses and treatment at Irwin."[24]

99.     On September 15, 2020, after the whistleblower report generated significant attention, officers at ICDC questioned detained women about the identity of the source of information in the whistleblower report. Among the women targeted by the guards for questioning was Petitioner Floriano Navarro. During her detention at ICDC, Respondent Amin had subjected her to non-consensual, invasive gynecological procedures and repeatedly pressured her into undergoing a hysterectomy, which she avoided on the day of the scheduled surgery only because she had tested positive for COVID-19.[25] On September 15, 2020, Unnamed ICDC Officer #1 specifically asked Ms. Floriano Navarro whether she had spoken up. Ms. Floriano Navarro responded, "Yes, it was me. . . . I told a lawyer that you guys were doing illegal surgeries here." Respondents deported Ms. Floriano Navarro the following day.

_____

[24] Neda Toloui-Semnani, *Women Say They Were Abused and Deported by ICE. Now They Fear Being Silenced.*, VICE (Dec. 11, 2020), https://www.vice.com/en/article/akd73b/women-say-they-were-abused-and-deported-by-ice-now-they-fear-being-silenced.
[25] *"They Wanted to Take My Womb Out": Survivor of Medical Abuse in ICE Jail Deported After Speaking Out*, Democracy Now! (Oct. 26, 2020),
https://www.democracynow.org/2020/10/26/ice_irwin_detention_center_invasive_surgeries.

100.     Moreover, Federal and ICDC Respondents attempted to deport Petitioners Oldaker, Ndonga, and Reyes Ramirez soon after they spoke out about the abuse they suffered or made known that they were willing to speak out. Petitioner Ndonga, for example, was informed by ICE that it had lifted a hold on her deportation within hours of her speaking with investigators from DOJ, DHS OIG, and FBI.

101.     Shortly before the delegation arrived at ICDC on September 26, 2020, Respondents ICDC, LaSalle, and their employees, agents, and/or contractors moved several survivors of Respondent Amin's abuse from the "Charlie" pod to the "Golf" pod. The Golf pod is in a trailer behind the main ICDC facility. The Congressional delegation did not speak with anyone in the "Golf" pod.

102.     Respondents and/or their employees and/or their contractors also actively suppressed and interfered with the ability of women in the "C" Pod cells to speak with the congressional delegation on September 26, 2020.  Minutes before the congressional delegation arrived, Respondents ICDC, LaSalle, their employees, agents and/or their contractors ordered the women not to speak to anyone in the congressional delegation and to stay in their beds.

## VIII.   Respondents disregard congressional intervention to halt retaliatory deportations

103.     On November 7, 2020, the U.S. House of Representatives Committee on the Judiciary submitted a letter to DHS expressing grave concern that ICE was moving forward with the removal of alleged victims and potential witnesses of forced medical procedures at ICDC, even as investigators attempted to collect testimony. The letter expressed concern that these deportations would interfere with these women's ability to provide testimony to the investigations and demanded that ICE "immediately pause the removal of women who come forward with allegations of misconduct until all investigations are completed."

104.    On November 12, 2020, the House Oversight Committee demanded that ICE "immediately cease efforts to deport any individuals who may be witnesses to or victims of the medical malpractice alleged at ICDC."

105.    On November 19, 2020, thirty U.S. Senators and seventy-five U.S. Representatives demanded that DHS and ICE "immediately stay the removal of witnesses in the investigations in the provision of medical care at the Irwin County Detention Center."

106.    On November 25, 2020, the House Committee on Homeland Security and the House Committee on Oversight and Reform issued a subpoena against Respondent LaSalle after its refusal to provide "even the most basic information about the treatment and care—provided at taxpayer expense—to women detained at ICDC." The Committees concluded that Respondent LaSalle "is actively obstructing the Committees' efforts to examine the troubling allegations raised by Ms. Wooten and others."

107.    Despite these repeated demands from congressional committees and members of Congress, Respondents have continued to schedule and implement deportations of victims of and witnesses to medical abuses at ICDC after the women made known that they have chosen to testify and participate in federal lawsuits and the federal investigations.[26]

108.    Respondents Giles and Musante are responsible for removing individuals within the Atlanta Field Office's jurisdiction, which includes individuals at ICDC. Respondents Giles and Musante authorized and facilitated the deportations of the women detained at ICDC who spoke out or made known they were willing to speak out about the medical abuse they had suffered or witnessed.

---

[26]Gianna Toboni, *ICE Attempts to Deport Multiple Witnesses in Gynecologic Surgery Scandal*, VICE (Nov. 5, 2020), https://www.vice.com/en/article/jgqq7p/ice-attempts-to-deport-multiple-witnesses-in-gynecologic-surgery-scandal.

109. Respondents ICDC, LaSalle, and their employees, agents and/or contractors, including Respondents Paulk, Hanes, and Unnamed ICDC Officers ##1-X, facilitated and carried out the deportations of the women detained at ICDC who spoke out about or made known they were willing to speak out about the medical abuse they had suffered or witnessed.

110. On information and belief, Respondents ICE, ICDC, and LaSalle and their employees and/or agents and/or contractors have coordinated and agreed to this pattern of swift deportations and attempted deportations of Petitioners and other victims and witnesses who speak out or attempt to speak out about the medical abuses at ICDC.

## IX. Respondents Engaged in a Pattern of Retaliatory Actions Against Victims and Witnesses of Medical Abuse at ICDC

111. Respondents have engaged in a broader pattern of retaliatory actions against Petitioners and other victims and witnesses of Respondent Amin's abuses who all have valuable information to share with federal investigators regarding medical abuses at ICDC. Respondents have implemented multiple policies and practices at ICDC that have chilled Petitioners' speech and denied them the ability to exercise their First Amendment rights.

112. These retaliatory actions against Petitioners and other victims and witnesses of medical abuse at ICDC include, but are not limited to, placing or threatening to place them in medical units or solitary confinement; placing them on cell restriction; transferring them to other units to separate protestors; physically assaulting them, including while handcuffed; threatening to deprive hunger strikers and protestors of property and commissary; threatening to shut off or ration water; withholding their food; delaying delivery of their prescribed medication; denying them access to the law library and to their own medical records; denying them internet access; limiting or denying them phone access; monitoring their phone calls and abruptly ending their calls when discussing hunger strikes, medical treatment, or when speaking with reporters;

24

destroying their letters documenting treatment; refusing to produce individuals at hearings related to Respondent Amin's abuses; refusing to coordinate with consular officials; obstructing congressional committees' requests for information about medical treatment; and making false claims to congressional investigators.

113.    Respondents and/or their employees and/or their contractors have retaliated against women for exercising their First Amendment right to protest the conditions of the facility.

114.    In March 2020, women in one unit began a hunger strike in protest of ICDC's failure to provide them with masks, cleaning products, and other necessities to limit the spread of COVID-19. In response, Respondents ICDC, LaSalle and their employees, agents, and/or contractors, including Respondent Battle, cut off participants' WiFi or device access, barring them from contacting their relatives and legal counsel.

115.    Respondent Battle told detained individuals that they could not engage in peaceful protest by having signs on the wall. Respondents and their employees also denied participants access to water and took away participants' commissary funds in retaliation for the strike.

116.    On at least one occasion, Respondents and/or their employees and/or their contractors have responded to a detained individual's exercise of her First Amendment right of free expression with physical violence.

117.    On April 12, 2020, Andrea Manrique Yaruro, a detained individual at ICDC, spoke in a video she and others filmed on ICDC's tablet. In the video, Ms. Manrique Yaruro spoke about the conditions in ICDC, and specifically about the spread of COVID-19 in the facility.

118.     Another woman said in the video, "We . . . fear that they'll retaliate against us for speaking out. [We are] afraid they'll put us in solitary confinement and cut off contact with our families because we spoke out. If you don't hear from us again . . . that's what happened." Guards subsequently punished four or five of the women in the video by placing them in solitary confinement. The guards told the women they were being locked down in solitary because they made the video.

119.     A family member of another detained individual sent the video to reporters, who uploaded it to the internet. One week later, ICDC guards assaulted Ms. Manrique Yaruro in retaliation for participating in the video, causing serious injuries that persist to this day.

120.     The guards assaulted Ms. Manrique Yaruro in front of many other women, and word of the attack spread throughout the facility. Crucial witnesses in the federal investigations are afraid to speak up about Respondent Amin because of their fear that ICDC will brutalize them in retaliation for their speech, just like they did with Ms. Manrique Yaruro.

121.     The culture of retaliation is pervasive within ICDC, and ICDC officers protect other officers who are engaged in unlawful activity. Respondent Faison, for example, refused to identify another officer who tackled a detained woman at ICDC.

122.     Individuals who have filed grievances against ICDC employees have been targeted for retaliation. Respondent Coney, for example, targeted Ms. Terrazas Silas after she filed a grievance against Respondent Coney. And unnamed ICDC Officer #2 saw Ms. Terrazas Silas writing a grievance about the night shift guards, took the statement from her, and ripped it up.

26

123. Respondents and/or their employees and/or their contractors have also told detained individuals that they will place them in solitary confinement for speaking out about any investigation into medical abuses or conditions at ICDC.

124. Respondents' suppression of the free speech rights of women detained at ICDC has only intensified in the wake of the whistleblower report and during congressional and federal investigations into medical abuses at ICDC.

## X. Respondents Have Actively Endangered Petitioners' Health, Denied Petitioners Adequate Medical Care, and Retaliated Against Petitioners

### A. Petitioner Yanira Yesenia Oldaker

125. Petitioner Yanira Yesenia Oldaker is a 36-year-old woman who came to the United States at age three from Mexico. She has an 11-year-old U.S. citizen daughter. She was the victim of and witness to medically unnecessary and non-consensual gynecological procedures at ICDC.

126. Ms. Oldaker has been diagnosed with severe and chronic Posttraumatic Stress Disorder and major depression. As a result, she has periods of being overwhelmed by her anxiety, anger, and sadness, accompanied by physical responses of dizziness, clamminess, and overall stress within her body. She also has trouble concentrating, remembering things, and suffers from insomnia.

127. Ms. Oldaker's mental health illnesses qualify as disabilities under the Rehabilitation Act.

128. ICDC has failed to provide adequate mental health treatment to Ms. Oldaker or otherwise accommodate her disabilities.

129. Ms. Oldaker was detained at ICDC on January 1, 2020 and two days later, requested medical assistance due to hot flashes, feeling tired and waking up in the middle of the

night. She had undergone a hysterectomy in 2014 due to endometriosis and had those symptoms on and off for six years, which she had treated with an estrogen patch before she was detained. As a result, she put in a request with the medical unit to ask for a prescription.

130. On January 13, 2020, Sebrina Taylor, who is described as a "Requesting Provider," entered a gynecological referral for Ms. Oldaker into the ICDC medical system.

131. Unnamed ICDC Officers sought approval from ICE Health Service Corps to refer Ms. Oldaker to Respondent Amin. Unnamed ICE Officials approved the request and referred Ms. Oldaker to Respondent Amin, whom she saw in February 2020. She explained to the nurse that she was having hot flashes and needed a new estrogen patch.

132. Instead of prescribing a patch, Respondent Amin asked her to undress for an ultrasound. Ms. Oldaker explained to Respondent Amin that she had undergone a hysterectomy, but he said that he did ultrasounds on all his patients. Respondent Amin then violently jammed a transvaginal ultrasound monitor inside her and, after removing it, pushed several fingers into her vagina, causing her excruciating pain. Ms. Oldaker squirmed and told him "no," but he kept going. A survivor of extreme sexual violence, Ms. Oldaker described it as feeling like she was "being raped again." At the end of the visit, he prescribed her Estrace pills.

133. A female ICDC officer accompanied Ms. Oldaker from ICDC and played on her phone during Respondent Amin's examination.

134. Respondent Amin's examination caused Ms. Oldaker so much pain that she had to take ibuprofen. She bled and had discharge for days afterwards. She felt pain upon urinating and when wiping herself.

135. Unnamed ICDC Officers sought approval from ICE Health Service Corps to refer Ms. Oldaker to Respondent Amin again. Unnamed ICE Officials approved the request, and Ms.

Oldaker saw Respondent Amin again on September 8, 2020 for a medication refill. She did not want to see him again but needed medication to manage her hot flashes and that was her only option.

136.    During that visit, she explained that she just wanted a refill of her prescription. But the nurse told her she had to have a pap smear. She did not understand why that was necessary given that she had had a full hysterectomy, but the nurse gave her no choice.

137.    The pap smear that Respondent Amin performed was exceedingly painful. He inserted a metal clamp in Ms. Oldaker's vagina. He scraped inside and when he pulled the metal clamp out, it hurt even more. She was in agonizing pain. When she wiped, she realized Respondent Amin had not used lubrication.

138.    The pain Ms. Oldaker experienced lasted for days afterwards. She had trouble sitting, was sore and could not wipe herself for several days. Respondent Amin's pap smear also exacerbated her PTSD. It took her back to the physical and sexual abuse she had suffered in the past. She still cannot stop thinking about the experience and does not understand why Respondent Amin treated her this way.

139.    On October 26, 2020, Ms. Oldaker submitted her sworn testimony about her experiences with Respondent Amin to the DOJ. This step clearly communicated Ms. Oldaker's willingness to cooperate with federal investigators and expose medical abuses at ICDC.

140.    On November 5, 2020, an attorney provided the DOJ, the DHS OIG, and the FBI with a list of seventeen women detained at ICDC and a summary of each woman's experiences of medical abuse and neglect while detained at ICDC. Ms. Oldaker's name and experiences with Respondent Amin were included in that communication.

141. On information and belief, as a result of this November 5, 2020 communication, Federal Respondents became aware that Ms. Oldaker was a victim of and witness to medical abuses at ICDC.

142. On the evening of November 7, 2020, in response to a phone call from an organizer who was checking on the safety and well-being of the women detained at ICDC, Ms. Oldaker realized that her commissary account had been "zeroed out." Ms. Oldaker, like others detained at ICDC, know that when a commissary account is emptied, ICE officers will deport that person swiftly, usually within 24 to 48 hours.

143. When Ms. Oldaker learned that her commissary had been zeroed out, she panicked. She could not bear the thought of being exiled from the only country she has ever known and the likelihood of never seeing her beloved daughter again. Ms. Oldaker did everything in her power to try to stop her deportation, and on November 8, 2020, Ms. Oldaker was able to find legal counsel to represent her.

144. On November 8, 2020, Ms. Oldaker's attorney and multiple congressional offices contacted Respondent ICE on Ms. Oldaker's behalf to ensure that ICE was aware that Ms. Oldaker was a victim and witness in ongoing federal investigations who wished to testify and had not yet been given an opportunity to testify. However, the Assistant Director of the Atlanta ICE Field Office, Respondent Patrick Musante, informed Ms. Oldaker's attorney on the evening of November 8, 2020 that Ms. Oldaker was scheduled to be deported the following morning on November 9, 2020.

145. On information and belief, Respondents planned to swiftly deport Ms. Oldaker because she had participated in, and wished to continue participating in, the federal investigations about medical abuse at ICDC.

146.    Following the filing of the instant lawsuit at approximately 6 a.m. on November 9, 2020, officers transporting Ms. Oldaker to the airport in Columbus, GA informed her that her deportation had been halted.

147.    The officers forced Ms. Oldaker to sign two documents. The officer informed Ms. Oldaker that these documents were necessary to effectuate her removal and told her that she would be removed "in three weeks to a month." Ms. Oldaker could not read the documents while she was handcuffed but signed them anyway because she felt that she had no choice. After Ms. Oldaker signed the documents, the officers transported her back to ICDC.

148.    Since November 9, 2020, Respondents have retaliated against Ms. Oldaker because of her willingness to speak out against medical abuses at ICDC.

149.    ICE, LaSalle, and ICDC employees, agents, and contractors have denied Ms. Oldaker the medication that she needs. Ms. Oldaker takes daily medication to control her severe and complex post-traumatic stress disorder (PTSD) and recurring nightmares, but ICDC staff refused to give Ms. Oldaker her medication for almost a full day and a half after she was returned to ICDC. ICDC staff told Ms. Oldaker that they could not give her the medication because she "was not supposed to be there." As a result, Ms. Oldaker suffered debilitating headaches and could not sleep. Because ICDC had depleted Ms. Oldaker's commissary funds before her attempted deportation, Ms. Oldaker could not purchase ibuprofen to treat her withdrawal headaches.

150.    ICDC staff also refused to return Ms. Oldaker's personal hygiene items and personal effects. For almost a day and a half after Ms. Oldaker's return, ICDC staff retained her toothbrush, deodorant, shampoo, clothes, undergarments, pens, and personal and legal papers.

Critically, ICDC staff retained the piece of paper with the phone number of Ms. Oldaker's counsel written on it, and Ms. Oldaker consequently struggled to contact her counsel.

151. Ms. Oldaker finally called her counsel on a monitored line on the evening of November 10 and informed her counsel that ICDC still retained most of her belongings and that she needed medications. Almost immediately after the conclusion of this phone call, ICDC returned Ms. Oldaker's belongings to her. Within about an hour, she was given her medications. This sequence of events strongly suggests that ICDC staff were listening to privileged and confidential attorney-client communications between Ms. Oldaker and her counsel.

152. For weeks since Ms. Oldaker's return, ICDC denied Ms. Oldaker access to her own phone account. Prior to Respondents' attempted deportation of Ms. Oldaker, she had a phone account. On information and belief, all the other people detained at ICDC who wanted phone accounts had their own phone accounts at the time. Ms. Oldaker repeatedly requested access to a phone account. Respondents' decision to deny Ms. Oldaker a phone account was an effort to silence her from speaking out about abuses at ICDC. Respondents' decision to deny Ms. Oldaker a phone account restricted her ability to communicate with her counsel, the media, members of Congress, and the public at a time when there was national and international concern about abuses at ICDC.

153. For weeks, despite making repeated requests to unnamed ICDC officers, including supervisory officers, Ms. Oldaker did not have a phone account. As a result, she had to rely on the phone accounts of other women detained at ICDC to make phone calls. While Ms. Oldaker had been using other women's phone accounts for calls, Respondents limited Ms. Oldaker's phone calls to five minutes in duration. Before Ms. Oldaker's attempted deportation, Ms. Oldaker was allowed to make 15-minute phone calls. Other women detained at ICDC are

likewise permitted to make 15-minute phone calls. Ms. Oldaker had been singled out for abbreviated five-minute phone calls. This pattern of abbreviated five-minute phone calls began when Ms. Oldaker attempted to speak about how she was nearly deported with Adolfo Flores, a reporter from the media outlet BuzzFeed, on November 9, 2020.

154.    When undersigned counsel express concerns about the denial expressed concerns about the denial of phone access for Ms. Oldaker, ICE falsely responded:

> She [Ms. Oldaker] has a phone account and it is active, it has never been "turned off," she has just six cents on her account, she can add money to it anytime she wants through commissary. She has not made any requests to add minutes.  Each detainee gets 500 free minutes per month, she used all hers this month. She last used the phone on 11/10/20. She can add funds to the account, set up unmonitored calls with the attorney through the process, have her family add funds, call collect, or wait until next month for 500 more minutes.

155.    In fact, Ms. Oldaker's phone account had been suspended or deleted, as confirmed by multiple employees of the Correct Solutions Group. Employees of the Correct Solutions Group explained that they "get the names directly from Irwin" to set up phone accounts, said their "suggestion is to try contacting the detention center," and explained that "[w]e don't put the names in." The U.S. Attorney's Office subsequently conceded that ICE "discovered" that her phone account had been suspended.

156.    Despite Respondents' retaliatory actions against Ms. Oldaker, she continues to speak with reporters and congressional staffers and plans to do so throughout the pendency of any investigations. Ms. Oldaker is desperate to share her story and ensure that Respondents, their employees, and contractors no longer abuse vulnerable immigrant women who are detained. Simultaneously, Ms. Oldaker gravely acknowledges that her willingness to speak out about medical abuses at ICDC increases the risk of retaliation to her.

157.    Since Ms. Oldaker has voiced her experiences publicly, two experts have offered her evaluations.  After reviewing Ms. Oldaker's medical records, Dr. Margaret Mueller, M.D., concluded: "There was no medical indication to perform a transvaginal ultrasound" because, following her total hysterectomy, "there are no reproductive organs to evaluate."  After conducting a mental health evaluation for Ms. Oldaker by videoconferencing, Dr. Jennifer McQuaid, PhD, concluded: "the events with Dr. Amin served to trigger and exacerbate Yanira's existing distress. They became associated with previous incidences in which Yanira felt both a lack of control and pain, that she did not anticipate, and from which she was unable to remove herself."

158.    If Ms. Oldaker is deported to Mexico, it will be impossible for her to meaningfully participate in the pending federal investigations and any other investigations that may be opened to expose medical abuses and retaliation against women at ICDC.

159.    If Ms. Oldaker is deported to Mexico, it will be impossible for her to meaningfully engage with U.S.-based media outlets that have expressed ongoing interest in covering her experience and the experiences of other women detained at ICDC.

160.    If Ms. Oldaker is deported to Mexico, she will not have anyone to receive her, a place to stay, access to reliable internet, access to counsel, access to medical professionals, or the support she needs to participate in ongoing investigations about invasive, unnecessary, non-consensual medical procedures at ICDC.

161.    Ms. Oldaker's imminent deportation fits into a pattern of swiftly deporting victims and witnesses of medical abuse at ICDC once they identify themselves as willing to exercise their First Amendment rights to testify.

**B.  Petitioner Tatyana Alekseyevna Solodkova**

162.    Petitioner Tatyana Alekseyevna Solodkova is a 48-year-old woman, who fled to the United States in 2016 from Russia. She has suffered from multiple serious health concerns while in detention, including heart and breathing issues from chronic bronchitis and asthma, along with kidney, liver, thyroid and breast problems. She was also the victim of non-consensual gynecological procedures and narrowly avoided unnecessary gynecological surgery performed by Respondent Amin.

163.    As a result of her medical issues, Ms. Solodkova has frequent chest pain, difficulty breathing, and pain in her liver and kidneys.

164.    Ms. Solodkova also suffers from major depressive disorder in addition to post-traumatic stress disorder. She is experiencing clinically significant levels of mood changes, mood reactivity and anxiety. As a result, she has difficulty sleeping, breathing, doing basic tasks, concentrating, and remembering her life prior to being detained. These symptoms have persisted and worsened since arriving at ICDC.

165.    Ms. Solodkova's medical and mental health conditions qualify as disabilities under the Rehabilitation Act.

166.    Ms. Solodkova has repeatedly asked for medical assistance for these health problems while in detention, but her requests for assistance have been repeatedly ignored, and the medical staff is frequently angry with her. ICDC has failed to provide adequate health care and treatment to Ms. Solodkova or otherwise accommodate her disabilities.

167.    The medical staff and providers who see Ms. Solodkova often do not use interpreters, so she does not understand what is wrong with her. She has a family history of cancer and is very fearful that she has cancer too.

35

168.     Ms. Solodkova was taken in handcuffs to see Respondent Amin three times over the course of August and September of 2020. No one told her where she was going or why she was going there. Each time, Unnamed ICDC Officers sought approval from ICE Health Service Corps to refer Ms. Solodkova to Respondent Amin. Unnamed ICE Officials then approved the request and referred Ms. Solodkova to Respondent Amin.

169.     Respondent Amin performed transvaginal ultrasound exams, a pelvic exam that was very painful, as well as a pap smear on Ms. Solodkova.

170.     Respondent Amin did not explain any of his actions to Ms. Solodkova and did not show her a picture from her ultrasounds. She did not understand why he was performing these exams and is still confused about her diagnosis. There was no interpreter at these appointments.

171.     Respondent Amin indicated that Ms. Solodkova needed to have surgery, but did not explain why. Based on Respondent Amin's hand gestures, Ms. Solodkova understood that she would be put under general anesthesia for the surgery. Ms. Solodkova shook her head to demonstrate her lack of consent to the operation.

172.     At ICDC, a nurse insisted that Ms. Solodkova sign a document, which she later learned was a form to refuse the surgery with Respondent Amin.

173.     Ms. Solodkova repeatedly requested her medical records in order to understand what was wrong with her, but it took multiple requests over months for her to receive them. With the help of an interpreter, Ms. Solodkova reviewed her medical records and discovered that her exam results were normal and that surgery was not needed. Ms. Solodkova also noticed that some exam results and records of appointment visits were missing from her medical record.

174.     To date, Ms. Solodkova has never received a diagnosis or treatment for her breathing, heart, kidney, liver, breast or thyroid-related symptoms.

175.    Despite her fears of reprisal by Respondents, their employees, and contractors, Ms. Solodkova has participated in advocacy efforts since the attempted deportation of a number of women who suffered similarly at the hands of Respondent Amin.

176.    An attorney provided federal investigators from DOJ, DHS OIG, and the FBI Ms. Solodkova's name and information about the medical abuses that she had suffered on November 5, 2020.

177.    Upon information and belief, as a result of this November 5, 2020 communication, Federal Respondents became aware that Ms. Solodkova was a victim of and witness to medical abuses at ICDC.

178.    An attorney included her name and A number in a follow up email that was sent on November 10, 2020 to nine different officials at DHS, DOJ, OIG, ICE and the FBI. The email again reiterated that Respondent Amin subjected Ms. Solodkova to non-consensual, invasive procedures and emphasized the "valuable information" she has "to share with the federal investigators about the non-consensual, invasive procedures."

179.    A follow-up email, dated November 24, from an attorney to the FBI, OIG and DOJ emphasized Ms. Solodkova's ongoing willingness to and interest in testifying before Congress.

180.    Ms. Solodkova is committed to ensuring that Respondents, their employees, and contractors no longer abuse vulnerable immigrant women who are detained. Simultaneously, she is cognizant that her willingness to speak out about medical abuses at ICDC increases the risk of retaliation to her.

181.    If deported to Russia, Ms. Solodkova recognizes that it would be impossible for her to meaningfully participate in the pending federal investigations and any other investigations that may be opened to expose medical abuses and retaliation against women at ICDC. Ms. Solodkova's imminent deportation fits into a pattern of swiftly deporting victims and witnesses of medical abuse at ICDC once they identify themselves as willing to exercise their First Amendment rights to testify.

### C.    Petitioner Luz Adriana Walker

182.    Petitioner Luz Adriana Walker is a 54-year-old woman originally from Colombia who has lived in the United States since 2000 and has been a lawful permanent resident for more than 15 years. She has been detained in ICE custody at ICDC since late 2018. While detained at ICDC, she was subjected to non-consensual, medically unindicated, or invasive gynecological procedures at the hands of Respondent Mahendra Amin.

183.    Mrs. Walker has experienced several medical and mental health issues since being detained. On November 18, 2020, Mrs. Walker underwent carpal tunnel surgery. She experienced a significant amount of pain, reduced strength, and had difficulty with basic tasks that require the use of her hands. Because she has not been provided physical therapy for her hands, she continues to experience pain and problems using her hands. She also suffers from emotional trauma and depression and has symptoms characteristic of insomnia.

184.    Mrs. Walker's medical conditions qualify as disabilities under the Rehabilitation Act.

185.    ICDC has failed to provide adequate treatment to Mrs. Walker or otherwise accommodate her disabilities.

186.     Following a January 18, 2020 physical exam by an ICDC provider, Mrs. Walker was referred Respondent Amin for an annual pap smear in February 2020. She had not complained of any gynecological issues.

187.     According to medical records, ICDC Nurse Practitioner Jessica Lyons requested a pap smear for Mrs. Walker. On January 21, 2020, ICDC employee Mattie Davis approved a referral to Respondent Amin, and the appointment took place on February 14, 2020.

188.     Mrs. Walker was taken into Respondent Amin's office through the back door in handcuffs and shackles. Once inside, she was told to undress and remove her underwear.

189.     When Respondent Amin came into the exam room, the first thing he said was, "When are you going to be deported?" The ICDC transport guard who was present in the room told Respondent Amin that his question to Mrs. Walker was not appropriate and not why she was there.

190.     Without explaining what he was doing or asking for Mrs. Walker's consent, Respondent Amin performed a transvaginal ultrasound on Mrs. Walker. She does not know why this invasive procedure was done. Respondent Amin was rough with inserting the ultrasound wand and did not use lubrication, which caused Mrs. Walker a lot of pain. For about three days afterwards, she had a constant vaginal burning sensation.

191.     Mrs. Walker has had multiple gynecological exams in her life and none involved a transvaginal ultrasound.

192.     Respondent Amin wanted to give Mrs. Walker a family planning shot but she told him she had not had her period in years. Respondent Amin also performed a pap smear on Mrs. Walker. She asked for the results but never received them. Respondent Amin also told Mrs. Walker he was referring her for a mammogram, but she did not receive one.

193.    Mrs. Walker remains very disturbed by her experience with Respondent Amin. His failure to obtain consent for the transvaginal ultrasound was particularly trauma-inducing in light of childhood experiences Mrs. Walker discussed at length with the mental health professionals who have submitted an expert report.

194.    While detained at ICDC, Mrs. Walker has known at least 10 women who have undergone gynecological surgery or other procedures by Respondent Amin, in some cases without consent to, or understanding of, the procedure performed. Mrs. Walker can attest to the fact that many of the women operated on by Respondent Amin, some of whom do not speak or understand English, were confused about what had been done to them, indicating that he did not obtain informed consent. Regarding the now-deported women, Mrs. Walker can attest to the fact that after their surgeries they experienced debilitating pain, often for a month or longer, which is also true for others who saw Respondent Amin and are still in the country.

195.    Mrs. Walker was witness to the lack of care shown to the women by ICDC employees, who did not clean their surgical wounds, leaving Mrs. Walker and other detainees to do this.  ICDC officers laughed at one of the women for asking for help when she was in pain, saying that she was "faking."  An ICDC employee made another woman who was being deported carry her own mattress out of the dorm, in the middle of the night, just days after her surgery when the woman could barely walk.

196.    Mrs. Walker cared for many of the women operated on by Respondent Amin, bringing them food and ibuprofen from the ICDC commissary, and helping them clean their incisions. She helped one woman get to the bathroom when she was having trouble standing and assisted her in going up and down the stairs to their second-floor housing unit.

197.    Mrs. Walker also tried to cheer and distract these women who, following their surgeries or other treatments by Respondent Amin, were often crying in pain during their lengthy recovery period, and/or were depressed, despondent, and sleeping excessively.

198.    On November 22, 2020, Mrs. Walker was identified to federal investigators as a witness concerning Respondent Amin's mistreatment of women at ICDC by Petitioner Yanira Yesenia Oldaker's attorneys.

199.    On November 25, 2020, and again on December 1, 2020, Ms. Oldaker's attorneys identified Mrs. Walker to the Assistant United States Attorneys representing ICE and ICDC as an ICDC detainee with a final removal order who warranted protection from deportation because she possesses information relevant to ongoing federal investigations of abuse at the detention center and planned to participate in this consolidated petition and complaint.

200.    Two days later, on December 3, 2020, Unnamed ICE official at ICDC fingerprinted Mrs. Walker and told her that her travel documents were being expedited by the Colombian consulate, indicating ICE was preparing to promptly deport her.

201.    As of December 17, 2020, Mrs. Walker was experiencing pain and inflammation and described a sensation of "something eating me from the inside." She was started on a course of antibiotics only after Respondents were aware that she was talking to her lawyers. She was given pain medication only after her lawyers contacted ICE to request medical attention for her likely infection.

202.    Respondents have also retaliated against Ms. Walker and other women who speak out about conditions inside the detention center. Around March 2020, Ms. Walker participated in a hunger strike with other women in her housing unit to protest the dangerous conditions inside ICDC. ICDC officials, among other retaliatory actions, withheld the women's food, threatened to

41

cut or ration their water, separated the women, and threatened them with "early deportation." Respondent George was among the ICDC officers who threatened the women with deportation as punishment for protesting, telling the women that ICDC was her facility and she was in charge. As a result of these threats, the women stopped the hunger strike. One of the women leading the strike was deported soon after the strike ended.

**D.     Lourdes Terrazas Silas**

203.    Ms. Terrazas Silas is a 41-year-old woman originally from Bolivia who has lived in the United States for more than twenty-one years. She has been detained in ICE custody at ICDC since March 2020. During this time, she was subjected to non-consensual, medically unindicated, or invasive gynecological procedures by Respondent Mahendra Amin.

204.    Ms. Terrazas Silas has ongoing chronic pelvic pain which was exacerbated by Dr. Amin's unnecessary and invasive procedures and treatment. Since her experiences with Dr. Amin, she has suffered from depression and is taking medications for her depression. Her medical conditions have substantially limited her ability to perform major life tasks. For example, she is unable to sleep at night because of the pain and sometimes, the pain is so severe that she is unable to get out of bed.

205.    Ms. Terrazas Silas' medical conditions qualify as disabilities under the Rehabilitation Act.

206.    Respondents have failed to provide adequate treatment to Ms. Terrazas Silas or otherwise accommodate her disabilities.

207.    Unnamed ICDC Officers sought approval from ICE Health Service Corps to refer Ms. Terrazas Silas to Respondent Amin on several occasions. Unnamed ICE Officials approved the request and referred Ms. Terrazas Silas to Respondent Amin.

208.     Ms. Terrazas Silas first saw Respondent Amin in around March of 2020. Respondent Amin conducted a painful gynecological examination. He then left the room without further comment and ordered his nurses to administer unknown injections. She was told by the nurses that the injections were to treat pain, but she experienced lingering side effects of fevers, nausea, vomiting, diarrhea, and cramps. An ICDC nurse informed Ms. Terrazas Silas one of the injections was actually a birth control shot. Ms. Terrazas Silas did not consent to any birth control injections.

209.     During her second appointment with Respondent Amin, Ms. Terrazas Silas refused a second birth control shot and confronted Respondent Amin about giving her the prior shot. He told her there was nothing more to say after he conducted a second painful gynecological examination.

210.     Ms. Terrazas Silas was brought to Respondent Amin a third time after she visited medical for an infection. Respondent Amin asked her why she was there and when she explained she had an infection, he said that had nothing to do with him, but proceeded to conduct yet another painful gynecological examination. During this appointment, Respondent Amin told Ms. Terrazas Silas he would have to remove her entire uterus because there was a tumor the size of a coconut. When she requested a second opinion, Respondent Amin negotiated with her, telling her the surgery is expensive and at least this way, ICE would pay for it. When she continued to refuse the surgery, Respondent Amin said, "If you were in your twenties or thirties I would understand why you don't want the surgery, but you're an old woman."

211.     Ms. Terrazas Silas spoke to an ICDC nurse on May 9, 2020, who noted "she wants 2nd opinion [illegible] Fibroid – [not] happy . . . how she was explained need for

hysterectomy." Ms. Terrazas Silas also spoke to an ICDC nurse on May 20, 2020, who noted

Respondent Amin recommended a hysterectomy and she wanted a second opinion.

212.    As word about the COVID-19 pandemic reached ICDC, Ms. Terrazas Silas

decided to join a hunger strike in protest of the facility's lack of cleaning supplies, masks, and

inadequate social distancing measures. The women removed their uniforms and made a video

that was posted online.

213.    In retaliation for their speech, Major Battle placed the women in lockdown, and

other Unnamed ICDC Officers cut off their Wi-Fi and confiscated the women's personal

supplies, including their food, drinks, and the tablets they used to contact individuals outside of

the facility. Respondent Slack silenced Ms. Terrazas Silas' speech when she threatened to either

transfer Ms. Terrazas Silas to a stricter lockdown in the E-4 pod or cut off her access to water if

Ms. Terrazas Silas did not resume eating.

214.    Given ICDC's failure to implement adequate safety measures to prevent the

spread of COVID-19, Ms. Terrazas Silas was exposed to the virus in July 2020. She was

transferred to the E-4 pod for isolation, where she was forced to spend 20 days in lockdown.

During this time, Respondents Coney and Smith insulted her and denied her access to toilet

paper, menstrual pads, water, and the phone.

215.    Despite notifying officers that she could not breathe well in the room because it

was humid and moldy, officers denied Ms. Terrazas Silas' request for air flow, referring to her

pejoratively as "infected." She "felt like a dog" putting her mouth near the bottom crack of the

door. Respondent Coney subsequently sprayed the same crack of the door with disinfectant. Ms.

Terrazas Silas wrote a grievance about Respondent Coney, but an Unnamed ICDC Officer ripped

the grievance up.

44

216.     Extreme medical neglect and mistreatment is so entrenched in the culture at ICDC at that Ms. Terrazas Silas no longer trusts the medication administered to her by ICDC medical personnel. She believes that they have given her the wrong medication and the wrong dosage of her prescription medicine, causing her to avoid swallowing pills given to her by the nurses. She has also been waiting months for treatment of a stomach ulcer diagnosed in 2016.

217.     After the investigation into Respondent Amin began, Ms. Terrazas Silas started having routine appointments with lawyers and other professionals. ICDC officers began to make Ms. Terrazas Silas feel uncomfortable, telling her things like "you are very popular lately, are you leaving soon?"

218.     Ms. Terrazas Silas has spoken out about the experiences with and abuse she has suffered at the hands of Dr. Amin. She wants to share her story and ensure that Respondents, their employees, and contractors no longer abuse vulnerable immigrant women who are detained. Simultaneously, Ms. Terrazas Silas gravely acknowledges that her willingness to speak out about medical abuses at ICDC increases the risk of retaliation to her.

219.     If Ms. Terrazas Silas is deported to Bolivia, it will be impossible for her to meaningfully participate in the pending federal investigations and any other investigations that may be opened to expose medical abuses and retaliation against women at ICDC.
If Ms. Terrazas Silas is deported to Bolivia, it will be impossible for her to meaningfully engage with U.S.-based media outlets that have expressed ongoing interest in covering her experience and the experiences of other women detained at ICDC.

### E.     Petitioner Jane Doe #5

220.     Petitioner Jane Doe #5 is a 28-year-old citizen of Mexico. She was raped in Mexico at the age of 6 and came to the United States with her family in 2003, when she was 11 years old. At the age of 23, she was raped in the United States. She was also subjected to

domestic violence in two relationships by the fathers of her children. She has three U.S. citizen children, ages three, six, and nine. She had one miscarriage, and in her most recent pregnancy she had to be on bed rest for five months and had to take shots to maintain the pregnancy.

221.     Jane Doe #5 has been detained at Irwin County since June 18, 2020. She asked for medical care for an umbilical hernia that was very painful. She was also having some vaginal bleeding. She was sent for a CT scan and ultrasound and then told that she would be sent to an outside OBGYN. She did not understand why an appointment was being made with an OBGYN when her main complaint was the hernia.

222.     Unnamed ICDC Officers sought approval from ICE Health Service Corps to refer Jane Doe #5 to Respondent Amin. Unnamed ICE Officials approved the request and referred Jane Doe #5 to Respondent Amin.

223.     She had her first visit with Respondent Amin on August 12, 2020. He gave her a vaginal ultrasound. The procedure was very rough and painful. She felt violated and it hurt for several days afterward. Respondent Amin also did a pap smear, which felt like sandpaper inside of her. He opened the speculum inside her very quickly without explaining what he was doing. While performing an internal exam with his hand, Dr. Ami pressed down on the area with the hernia, which was painful.

224.     After the exam, Respondent Amin told Jane Doe #5 that she had a cyst and advised that she get the Depo shot. He mentioned cancer, which scared her, because her father had died of cancer. Jane Doe #5 did not understand what the Depo shot was before she got it. She had a hard time understanding Respondent Amin and did not have much of an opportunity to ask questions, as she felt rushed.

225.     After the visit, when Jane Doe #5 had a chance to look at the papers, she saw that depression is a side effect of the Depo shot. Had Respondent Amin mentioned that, she would not have gotten the shot because she has struggled with severe depression and anxiety.

226.     Jane Doe #5 gained around twenty pounds in one month after taking the Depo shot and is now obese, with a BMI of 31. Her back aches from the weight gain and she has no energy. She currently feels depressed and anxious most of the time.

227.     In August 2020, when Jane Doe #5 met with Respondent Amin, he told her the cyst was abnormal and the best option was surgery. He did not give her much information.

228.     Jane Doe #5 found out from the nurses that she was going to have three surgical procedures by Respondent Amin on September 4, 2020. She did not know what the procedures were and did not understand the terms they were using. She did not see Respondent Amin before or after the surgeries.

229.     When she brought up questions about the surgeries, the staff at ICDC told that if she didn't do it now, ICE may not agree to take her later. She was afraid of cancer and felt pressured to do the surgeries right away.

230.     After the surgeries, she requested her medical records, which indicated that Respondent Amin had actually done six procedures. But she had only heard of three of them beforehand.

231.     Jane Doe #5 bled for two days after the surgeries and was in constant pain, but never had a follow-up appointment with Respondent Amin.

232.     After begging for a follow-up appointment, she was finally taken to see a different doctor on October 29, 2020. That doctor told her that Respondent Amin "cut or burned" part of

her uterus, but she does not know exactly what was done. This doctor also informed her that Respondent Amin's note says she has endometriosis.

233.    Jane Doe #5 feels worse than she did before the surgery. She has only received Tylenol, which is not enough to control her pain, and no other post-surgery care.

234.    She has several large scars on her abdomen. Her anxiety and depression have gotten worse, and she is also suffering from insomnia. She is unable to sleep on most nights. She was never treated for her hernia.

235.    A specialist who reviewed Jane Doe #5's medical records found that she may not be able to carry a child.

236.    Jane Doe #5 suffers from severe pain because of her medical conditions, including an umbilical hernia. This pain has been exacerbated by Respondent Amin's non-consensual, invasive and unnecessary gynecological procedures. She has difficulty using the bathroom as a result of the pain.

237.    Jane Doe #5's medical conditions qualify as disabilities under the Rehabilitation Act.

238.    ICDC has failed to provide adequate treatment to Jane Doe #5 or otherwise accommodate her disabilities.

239.    Jane Doe #5 experienced retaliation after speaking out about her experiences with Respondent Amin. It became harder for her to receive the medical assistance she needed: her pain was ignored, and her prescribed medication was delayed so she ran out of it. She has had to put in medical requests constantly to try to get the medical care that she needs. The guards have become ruder to her and she hears them talking about her. She has heard at least one guard say that they will "pay for this."

48

240. Jane Doe #5 also witnessed retaliation against other women who spoke out, including at least one woman who was deported and forced to carry her own bags right after having surgery. She also observed how quickly ICE tried to deport Yanira Oldaker. Jane Doe #5 fears further retaliation based on what has happened to other women.

241. When representatives from Congress visited ICDC, Jane Doe #5 wanted to talk to them but never had an opportunity to do so. She was not allowed outside that day and the representatives were never brought to her dorm.

242. On or about December 12, 2020, Jane Doe #5 requested mental health care and was told she did not have anxiety or depression. She was told that she was just suffering from stress and insomnia. However, an outside evaluation by a specialist indicates that Jane Doe #5 requires treatment for depression.

### F.    Petitioner Jane Doe #6

243. Petitioner Jane Doe #6 is a mother of six who has been living in the U.S. with a U visa since 2014. Jane Doe #6 has a pending Application for Adjustment of Status under the U visa and is waiting to hear from the U.S. Citizenship and Immigration Services whether her application for lawful permanent residence is approved. Jane Doe #6 has been detained at ICDC for twenty-two months. During this time, she was a victim and a witness to non-consensual gynecological procedures at ICDC as well as to abuse at the hands of Respondents ICDC and Amin, among others.

244. Jane Doe #6 has repeatedly asked for medical assistance for health problems while in detention, but her requests for assistance have been repeatedly ignored, and the medical staff has frequently expressed anger towards her.

245. In May 2019, Jane Doe #6 was taken to Respondent Amin for the first time–a month after complaining of ovary pain. Despite knowing that Jane Doe #6 speaks very little

English, she was seen without a translator being present. When Respondent Amin came into the room, he hardly acknowledged Jane Doe #6. Respondent Amin did not explain what he was going to do to Jane Doe #6 or ask for her consent; rather, he put an ultrasound inside of her, conducted an intravaginal ultrasound examination, and then put his fingers inside of Jane Doe #6's vagina. Ms. Lopez had never had an intravaginal ultrasound before or a doctor touch her in this way. She trusted Respondent Amin because he was a doctor. Respondent Amin's assistant and an ICDC guard were both in the room. Jane Doe #6 explained to Respondent Amin that she did not understand what he was saying, but he continued to speak only English to her. No one in the room explained what was happening to Jane Doe #6 or why Amin had invaded her body with equipment and his fingers.

246.    After the ultrasound, Respondent Amin promptly left the room. The nurse told Jane Doe #6 that Respondent Amin had found a cyst on her ovary and that she needed a "Depo shot" to remove the cyst. She was told that if the shot did not work, she would need surgery. Jane Doe #6 did not know what a Depo shot was, but took the injection because she thought she needed it to survive and wanted to live for her children. No one gave Jane Doe #6 information about the shot. The shot made Jane Doe #6 bleed for two weeks.

247.    Jane Doe #6 prayed she would not need surgery because she had seen other women go through surgery conducted by Respondent Amin. She noticed that, after the surgery, those women were in extreme pain, barely able to arise from bed. She also noticed that many women at ICDC would not get the medication that they had been told to take after their surgeries.

248.    In July 2019, Jane Doe #6 was taken to see Respondent Amin for a second time. He again conducted a vaginal ultrasound and put his hands inside of Jane Doe #6's vagina with

no explanation. And again, there was no translator in the room. Respondent Amin left the room promptly after his activities on Jane Doe #6's body and left it to a nurse to provide all information to Jane Doe #6. Jane Doe #6 was not shown the results of the ultrasound examination, while it was being conducted or afterwards. Instead, a nurse told Jane Doe #6 that the cyst was no longer there, but that there was now a "black shadow" on her uterus and that Respondent Amin had prescribed pills for her to take. Because Respondent Amin had already left the room, Jane Doe #6 could not ask what the black shadow was or what was happening.

249.    Jane Doe #6 also was prescribed medication for a urinary tract infection ("UTI") at the July 2019 visit to Amin's clinic. Yet, after she was returned to ICDC, Jane Doe #6 was given only three of the five-day course of medication for her UTI. This was not the first time the staff at ICDC refused to give Jane Doe #6 medication. She previously was refused medication for a UTI, when ICDC medical staff told her to drink more water instead of providing her medication.

250.    In November 2019, Jane Doe #6 was taken to see Respondent Amin for a third time because she was having irregular periods. Respondent Amin did not explain what he was going to do, but checked Jane Doe #6 with his hands again. There was no translator present. The ICDC officer who brought Jane Doe #6 to the appointment spoke Spanish, but refused to translate for Jane Doe #6.

251.    Then, in early 2020, Jane Doe #6 sought treatment for a pain in the area of her navel. She was taken to the hospital, given an X-ray, and told she needed surgery. Despite requests, she has never been shown the medical test results nor has the surgery been scheduled. She wants the suffering to stop but has not gotten any care notwithstanding her pleas for medical assistance.

252.    Jane Doe #6 has faced additional mistreatment at the hands of ICDC staff. For instance, in 2019, an ICDC officer told Jane Doe #6 to wear filthy underwear, soiled with large bloodstains. It was only after Jane Doe #6 begged the officer for clean underwear that he relented and gave her a cleaner pair to wear.

253.    In March 2020, Jane Doe #6 participated in the hunger strike in her unit, E2. The women were striking to protest the poor conditions at ICDC and because the staff had failed to inform the detainees about the pandemic. When the ICDC officers learned that one of the women had told her husband about the strike, they put the unit on lockdown. Jane Doe #6 watched an officer refuse to give water to a woman in her unit. Later that evening, the officers confiscated of the women's food in the commissary. Then, the tablets that the women used to make calls and emails stopped working. And later, the officers threatened to disconnect the water – including in the bathrooms – and put the women in solitary confinement if the strike continued. In response to these threats, they ended the hunger strike.

254.    After the hunger strike, women were stopped from going to the law library.  In addition, women who tried to share their experiences about the strike over the phone had their calls dropped in mid-sentence. Although Jane Doe #6 has been at the ICDC for almost two years, the only time that one of her telephone calls were dropped was after she referred to the hunger strike during her phone call.

255.    In July 2020, Jane Doe #6 was tested for COVID-19 and told that she had tested positive. Despite requesting to see the test results, she was never provided a document showing her test results. Purportedly in response to the test results, Jane Doe #6 was put into lockdown for nineteen days. Even in lockdown, the guards are supposed to let the women out for at least one hour each day to call their families and to take care of themselves, but the guards routinely

52

disregarded this process. On one of her days in lockdown, Jane Doe #6 was not let out at all, despite her pleas to the guards.

256.     Jane Doe #6 spoke with investigators from the DOJ in November 2020, telling them about her experiences. She is committed to ensuring that Respondents, their employees, and contractors no longer abuse vulnerable immigrant women who are detained. Simultaneously, she knows that her willingness to speak out about medical abuses at ICDC increases the risk that she will be retaliated against.

257.     If deported to Guatemala, Jane Doe #6 is certain that it would be impossible for her to meaningfully participate in the pending federal investigations or any other investigations that may be opened to expose medical abuses and retaliation against women at ICDC.

**G.     Petitioner Jane Doe #8**

258.     Petitioner Jane Doe #8 was born in Guadalajara, Mexico. She was brought to the United States in 2007, when she was eight years old. She is currently detained at ICDC, where she has been subjected to invasive, non-consensual gynecological procedures by and at the direction of Respondent Amin.

259.     When Jane Doe #8 was nine or ten years old, she was a victim of frequent sexual abuse from her stepfather. As a result of this trauma, she suffers from anxiety and depression. She also has a history of experiencing panic attacks that are triggered by being touched by men, even those with whom she had intimate relationships. Jane Doe #8 reported that touches from her high school boyfriend triggered panic attacks because it would remind her of the abuse she suffered as a child.

260.     While in custody, Jane Doe #8 requested medical attention after experiencing pain in her lower stomach region. Subsequently, in September 2020, Jane Doe #8 was taken to see Respondent Amin. Prior to her appointment, the guard took Jane Doe #8 to intake, where they

cuffed her hands and ankles and put a chain around her waist. Then, officers wearing hats that said LaSalle took her to the clinic, in handcuffs. At the clinic, they took her weight and blood pressure while she was handcuffed. She then was escorted by a guard into a room where a nurse directed her to undress in front of the guard despite Jane Doe #8's distress in doing so. She was forced to be completely naked in front of the guard before putting on a paper gown.

261.    The nurse told Jane Doe #8 that Respondent Amin would see her but did not tell her what was going to be done during the visit. When Respondent Amin came into the room, he did not acknowledge Jane Doe #8 with even a hello. Rather, he said "open up your legs." Jane Doe #8 was then forced to open her legs and expose herself to the guard sitting at eye level and directly facing her vagina. Respondent Amin did not explain what he was doing or why he was doing it.

262.    Respondent Amin performed a transvaginal ultrasound without alerting Jane Doe #8 that he would be doing so. Because of her history with sexual abuse, she instantly felt violated as he put the equipment inside of her without any explanation. After the exam, Respondent Amin told her that she had a cyst on her left ovary. Respondent Amin said that he was going to give her a "Depo shot" and that if the cyst did not dissolve in four weeks, she would be scheduled for surgery to remove the cyst.

263.    Respondent Amin promptly left the room. At no time did he explain what a Depo shot was or ask Jane Doe #8 whether she wanted to receive the shot. After he left, Jane Doe #8 was allowed to get dressed, but was immediately handcuffed again. The guard never left the room. The nurse then gave Jane Doe #8 the shot while she was handcuffed. Jane Doe #8 was then asked to sign paperwork that she did not understand. Neither the nurse nor Respondent Amin explained the contents of the paperwork to Jane Doe #8.

264.     Jane Doe #8 learned that the Depo shot was a form of birth control from another detainee, who had also been transported to the medical facility that day for a visit with Respondent Amin. That other detainee also reported that she had been told by Respondent Amin that she had a cyst on her left ovary that required a Depo shot. Jane Doe #8 was surprised and alarmed to learn that the Depo shot was birth control. Due to her fear of the side effects of birth control, she would have asked questions had she known they were injecting her with birth control medication.

265.     After her visit with Respondent Amin, Jane Doe #8 experienced intense anxiety. She did not know what would happen if the cyst did not dissolve or what the surgery entailed because neither Respondent Amin nor any other medical or other staff explained anything to her.

266.     Jane Doe #8 learned that at least five other women in her pod at ICDC had also been told, during their appointments with Respondent Amin, that they had cysts on one of their ovaries. She also learned that these women had surgeries performed by Respondent Amin.

267.     Since receiving the Depo shot, Jane Doe #8's menstrual cycle has been extremely irregular and longer lasting.

268.     In late October 2020, Jane Doe #8 visited the medical office at ICDC. She spoke with a staff member named Jessica. She informed her of the symptoms she had experienced since receiving the Depo shot. Jessica told Jane Doe #8 not to believe the reports that had circulated in the news about Respondent Amin, urging her to tell other detainees that the news reports about Respondent Amin were not true.

269.     At ICDC, detainees' phone calls are monitored and recorded. Jane Doe #8 tried to speak about her experience with Respondent Amin over the phone to her mother. When she tried speaking about what happened, the phone call would disconnect. Jane Doe #8 thought her

mother hung up, but her mother informed her that she had not. This happened repeatedly and only when Jane Doe #8 tried to speak with her mother about her experience with Respondent Amin.

270.    Jane Doe #8 has requested all of her medical records at ICDC. Yet, to date, she has only received medical records for the last month of her time at ICDC. These records did not include any of the records from her appointment with Respondent Amin. When Jane Doe #8 asked a guard for her complete medical records, she was told that her request may not be possible.

271.    Jane Doe #8 has not been able to receive an independent physical examination in detention. Because of the side effects she experienced from the Depo shot administered by Respondent Amin, she has requested an independent physical examination to understand what happened to her.

272.    Jane Doe #8 is committed to ensuring that Respondents, their employees, and contractors no longer abuse vulnerable immigrant women who are detained. Simultaneously, she knows that her willingness to speak out about medical abuses at ICDC increases the risk of retaliation to her.

273.    If deported to Mexico, Jane Doe #8 recognizes that it would be impossible for her to meaningfully participate in the pending federal investigations and any other investigations that may be opened to expose medical abuses and retaliation against women at ICDC.

**H.    Petitioner Jane Doe #15**

274.    Petitioner Jane Doe #15 is currently detained at ICDC. She has been detained there since February 2020. Due to embarrassment from the horrific abuse she suffered and due to fear of retaliation from the guards, Jane Doe #15 has asked to remain anonymous.

275.    Jane Doe #15 does not speak English. She is a native Spanish speaker.

276.     Jane Doe #15 has experienced and witnessed harassment, abuse, and violence –
including forced gynecological procedures – against herself and other detainees at ICDC. She is
terrified to speak up for fear of retaliation, which she also has witnessed while detained.

277.     Jane Doe #15 has witnessed several women receive time in solitary confinement
as punishment for speaking up when they are abused or harassed. She knows women who have
spent as long as 15 days in solitary confinement for "causing problems."

278.     In April 2020, four or five women were placed in solitary confinement after they
recorded a YouTube video showing their mistreatment and the unsanitary living conditions in
ICDC. Jane Doe #15 fears that she will be placed in solitary confinement if she ever speaks up
about her experiences.

279.     Jane Doe #15 also witnessed physical violence when she saw multiple guards
attack another detainee named Michelle. Jane Doe #15 saw the guards throw Michelle to the
ground and pin her down with their knees while they filmed the assault. Jane Doe #15 is terrified
that this type of assault could happen to her.

280.     These incidents, among others, have caused Jane Doe #15 to stay silent while she
suffered the same pattern of harassment and abuse from the staff at ICDC.

281.     Jane Doe #15 has also suffered unnecessary and traumatic medical procedures
performed on her by Respondent Amin. She underwent surgery performed by Respondent Amin
in June 2020.

282.     Jane Doe #15 first saw Respondent Amin in May 2020 after complaining of pain
in her pelvic area. Respondent Amin asked her no questions during this appointment. Jane Doe
#15 could not understand what he said while he hastily examined her because there was no

57

translator present. By the time a nurse arrived to translate, Respondent Amin had already left the room.

283.    The nurse informed her in Spanish that there was a cyst on her right ovary "the size of an egg," as well as fibroids in her uterus. Jane Doe #15 later learned that Respondent Amin told many women in Jane Doe #15's unit that they had cysts "the size of an egg."

284.    At the May 2020 appointment, the nurse gave Jane Doe #15 an injection, but neither Respondent Amin nor the nurse gave Jane Doe #15 any information about the injection or what medication she was being injected with. The nurse simply told her that the injection would make the cyst go away. Because Respondent Amin did not return after the nurse arrived, Jane Doe #15 could not ask him any questions about her diagnosis or the injection. Jane Doe #15 still does not know what substance was injected into her.

285.    The injection did not help Jane Doe #15. Instead, it caused her to bleed consistently for ten days before she was able to see Respondent Amin again.

286.    At the second appointment, Respondent Amin performed a vaginal ultrasound and explained, with the aid of the nurse, that her cyst and fibroids remained and she would need surgery. This terrified Jane Doe #15. She had witnessed several women return in terrible condition after surgeries performed by Respondent Amin. She saw them experience crippling pain. One woman bled for weeks. Jane Doe #15 also saw that many of Respondent Amin's former surgery patients thereafter got deported, and she feared the same would happen to her if she received surgery.

287.    Jane Doe #15 was frightened of the surgery, but the nurse told her that without it she would lose her uterus and never be able to have children. Jane Doe #15 was willing to risk

anything to preserve her chance to become a mother, so she went forward with the surgery despite being given no information about what it entailed or when it would be performed.

288.    A few days later, on June 25, 2020, a guard came to Jane Doe #15 around 11:00 p.m. and told her not to drink or eat anything after midnight. The guard did not explain the reason for this instruction. The next morning, on June 26, 2020, the guards woke her up without any explanation and transported her to the hospital in handcuffs. This was when Jane Doe #15 found out she was scheduled for surgery.

289.    At the hospital, Jane Doe #15 did not have the aid of a translator at any point before the surgery. She could not understand anything the medical staff said, and the guards completely ignored her. Out of desperation, she begged one of the guards to help her ask a question using Google Translate, an imperfect tool that can only translate short, simple phrases reliably. Even when Jane Doe #15 used this to ask the staff what the surgery entailed, they told her only that it would take two to three hours and that she would receive anesthesia.

290.    Immediately before the surgery began, a nurse handed Jane Doe #15 a piece of paper to sign. The document was entirely in English and Jane Doe #15 could not read any of it. She did not know what it said. She was already undressed and the surgical team was present and ready to begin surgery. Jane Doe #15 felt that she had no choice but to sign, despite not knowing what the surgery was for, what they would do to her body during the surgery, or what wounds or potential side effects she might suffer after the surgery. She signed the document without informed consent.

291.    Jane Doe #15 did not see Respondent Amin, or any medical doctor, at any point during her time in the hospital. She woke up bleeding from the surgery, continued to bleed as the guards brought her back to ICDC, and bled consistently for more than a week thereafter.

292. The staff at ICDC neglected to care for her in any way when she returned from surgery. Jane Doe #15 could not get out of bed on her own without assistance from the other women in her unit. She had to have food brought to her by other detainees when staff neglected to do so. Her fellow detainees had to help her walk to get her post-surgery medications because the nurses refused to deliver them to her.

293. While Jane Doe #15 recovered, two of her wounds became infected. When she asked the nurses for bandages and rubbing alcohol in order to disinfect them, they provided her with one bandage and nothing to clean the wounds. They gave her no other assistance.

294. Jane Doe #15 saw Respondent Amin one more time in August 2020, despite the fact that she made no request to do so. A nurse was present to translate. Jane Doe #15 immediately asked what surgery he performed on her, but Respondent Amin did not answer the question. Respondent Amin informed her that, despite the surgery, Jane Doe #15 still had fibroids in her uterus. With little regard for her distress, he informed her that she would never be able to have children. Jane Doe #15 requested that someone else examine her, but Respondent Amin simply shrugged and told her he would see her again in three months. Jane Doe #15 left the appointment completely devastated, embarrassed, and ashamed.

295. Jane Doe #15 remains in terrible pain to this day. However, she is afraid to tell ICDC staff out of fear she will experience more medical trauma. To this day, she does not know what surgery Respondent Amin performed on her.

296. Despite her horrific experience, Jane Doe #15 continues to fight for justice. She has recently spoken to investigators at the DOJ. Jane Doe #15 informed the investigators of all of the abuses she suffered at the hands of Respondent Amin.

297.    Deportation would deprive Jane Doe #15 of the opportunity to participate in an ongoing federal investigation and interfere with the DOJ's ability to further interview an active witness. Deportation would deprive her of the ability to participate in any judicial adjudication of her own claims.

### I.    Petitioner Jane Doe #22

298.    Petitioner Jane Doe #22 is a 39-year-old woman who came to the United States from Senegal over twenty years ago with a tourist visa and married a U.S. citizen who was very abusive. She has three U.S. citizen children. She had a serious leg injury in 2018 that causes her pain and swelling when she walks and has gained a significant amount of weight in detention, becoming obese. She also suffers from depression.

299.    Jane Doe #22's medical and mental health issues qualify as disabilities under the Rehabilitation Act.

300.    ICDC has failed to provide adequate treatment to Jane Doe #22 or otherwise accommodate her disabilities.

301.    Unnamed ICDC Officers sought approval from ICE Health Service Corps to refer Jane Doe #22 to Respondent Amin. Unnamed ICE Officials approved the request and referred Jane Doe #22 to Respondent Amin.

302.    Jane Doe #22 was taken to Respondent Amin in September 2020, after news stories about him had already become public. She was not told the name of the doctor she was being taken to see. When she arrived and saw that it was Respondent Amin, she was terrified of being butchered.

303.    Respondent Amin performed a vaginal ultrasound, internal exam with his hand, and Pap smear on Jane Doe #22. The vaginal ultrasound and internal exam were done without Jane Doe #22 informed consent. All three of the procedures were rough and painful.

304.    Respondent Amin told Jane Doe #22 that she had cysts and said he could put her on birth control for them, but she declined. He then prescribed her antibiotics. Jane Doe #22 did not understand why she was being given antibiotics. When she returned to ICDC, she was still bleeding from the procedures that Respondent Amin had performed. She felt violated by the experience.

305.    When Jane Doe #22 requested her medical records, they were delayed. She received them only after complaining about ICDC's failure to provide them to her. She states that ICDC staff prevent detained women from raising awareness about problems with medical care by not providing medical records in a timely way.

306.    Jane Doe #22 knows that ICDC retaliates against women by delaying or denying pain medication. One of the reasons she has stopped walking around the yard is because it has been so difficult for her to obtain ibuprofen for her leg.

307.    Jane Doe #22 corroborates that Jane Doe #21 was deported to Mexico just days after being subjected to surgery by Respondent Amin. She witnessed Jane Doe #21 being forced to carry her own bags while she was still in excruciating pain, and Petitioner Walker further reports that Jane Doe #21 was forced to carry her own mattress out.

308.    Jane Doe #22 further confirms that ICE tried to deport a woman named Alma Bella Bowman who spoke out about Respondent Amin but had to bring her back to ICDC and recently released her.

309.    Additionally, Jane Doe #22 confirms that ICE deported Petitioner Navarro after she spoke out about how women at ICDC are pressured to have surgeries.

310.    Jane Doe #22 has not yet participated in the federal investigation and would like to do so. She also recognizes that speaking out increases the risk of retaliation against her.

311.    If Jane Doe #22 is deported to Senegal, it will be impossible for her to meaningfully participate in the pending federal investigations and any other investigations that may be opened to expose medical abuses and retaliation against women at ICDC.

**J.    Petitioner Jaromy Jazmín Floriano Navarro**

312.    Petitioner Jaromy Jazmín Jasmin Floriano Navarro is a mother of two young daughters, both United States citizens, from Mexico. She was deported on September 16, 2020, without warning. She currently lives in Mexico, but her two daughters remain in the United States. Ms. Floriano Navarro is a survivor of sexual assault.

313.    Ms. Floriano Navarro was detained in ICDC from October 18, 2019, until her deportation.

314.    During her detention at ICDC, Ms. Floriano Navarro experienced and witnessed mistreatment, harassment, and abuse at the hands of ICDC staff. Guards withheld food from Ms. Floriano Navarro and others, including when the COVID-19 pandemic first began. One officer would not give them food unless the women would speak English first.

315.    Ms. Floriano Navarro experienced escalating sexual harassment and abuse from another detainee. Two women tried to protect her but could not meaningfully do so. Ms. Floriano Navarro was terrified of being sexually assaulted and had no choice but to report her abuser to ICDC staff. When Ms. Floriano Navarro tried to speak up, the guards sent Ms. Floriano Navarro to the medical room which is used for solitary confinement for about five days.  Ms. Floriano Navarro spent Christmas 2019 in solitary confinement alone, while the abuser was not punished and remained in the company of other women. The solitary confinement room was filthy, the lights always remained on, and guards only permitted her to shower once. Ms. Floriano Navarro describes it as being in a "hellhole." Ms. Floriano Navarro believes she was punished by Respondents for speaking up. Respondents never meaningfully investigated the sexual

63

aggression against Ms. Floriano Navarro. This experience convinced Ms. Navarro that she

should keep her mouth shut to avoid retaliation.

316.    Ms. Floriano Navarro also witnessed women placed in solitary confinement,

without access to water, when they went on a hunger strike to protest their mistreatment and the

conditions at ICDC. When the women returned to Ms. Floriano Navarro's housing unit, guards

pepper sprayed them and isolated them again. Many of those women were deported as a result of

the protest. This terrified Ms. Floriano Navarro and discouraged her from ever speaking out

about her experiences at ICDC.

317.    Ms. Floriano Navarro also suffered medical abuse from Respondent Amin during

her time in ICDC. After complaining of heavy menstrual cramps to a nurse in March 2020, the

nurse referred her to Respondent Amin. This was the first time Ms. Floriano Navarro saw

Respondent Amin. At the appointment, Respondent Amin performed a vaginal ultrasound on

Ms. Floriano Navarro with no warning or explanation. With no understanding of why this was

being conducted, Ms. Floriano Navarro felt violated.

318.    Respondent Amin then told Ms. Floriano Navarro that she needed to have

surgery. He said that she had a cyst that would grow. He did not explain what the cyst was, if it

was dangerous, or give her any details whatsoever.

319.    At this same appointment, Respondent Amin told her Ms. Floriano Navarro that

she needed to have a Depo shot to treat the cyst. He did not give her any choice.

320.    She bled for a month straight after receiving the Depo shot. This was unusual for

her, because, before her detention, when she had been treated with the Depo shot, she had not

suffered any side effects.

321.     After that first appointment, Ms. Floriano Navarro was brought back to see Respondent Amin regularly through July 2020.

322.     Given her history as a survivor of sexual assault, each visit made Ms. Floriano Navarro feel extremely uncomfortable and violated.  During her appointments, Respondent Amin rested one hand on her knee while he inspected her vaginal area, and inside her body, without ever explaining why he was doing so. He would switch between inserting his fingers and inserting an ultrasound wand inside her body. Respondent Amin also told her at every appointment that she needed surgery, but he never told her why or what kind of surgery was needed. He also never told her when the surgery would occur.

323.     Then, on July 31, 2020, Ms. Floriano Navarro was scheduled for surgery at the Irwin County Hospital. Another detainee, Jane Doe #21, was also scheduled for surgery that day. Ms. Floriano Navarro was told the surgery was to drain her cyst. When the ICDC guard, named Ms. Vaughn, asked Ms. Floriano Navarro what surgery she was having that day, she smirked as Ms. Floriano Navarro stated it was surgery to drain her cyst.

324.     At the hospital, a nurse prepped Ms. Floriano Navarro for the surgery, conducted a COVID-19 test, and made her sign a consent form without letting her read it.  After Ms. Floriano Navarro was fully prepared for surgery, Ms. Vaughn came in the room and told her that Respondent Amin was actually going to perform a hysterectomy, which would remove her womb. This was the first time any person had mentioned a hysterectomy to Ms. Floriano Navarro.

325.     Ms. Floriano Navarro would have been forced to have the hysterectomy, but for the fact that right before the surgery, the results of her COVID-19 test were returned, showing

that she had COVID-19 antibodies. Ms. Floriano Navarro was taken back to ICDC, and the hysterectomy surgery was not performed.

326.    None of the other women in Ms. Floriano Navarro's housing unit were told about Ms. Floriano Navarro's COVID-19 test results. Ms. Floriano Navarro attempted to inform them as soon as she returned, so they could take necessary precautions, but she was immediately taken to an isolation unit. The guards then lied to the other women and told them that Ms. Floriano Navarro was going home rather than telling them about the test results.

327.    ICDC staff continued to pressure Ms. Floriano Navarro to get the surgery despite her resistance. For instance, Officer Rabiou, a guard with no medical background, encouraged her to get the surgery before she was deported. ICE Officers William and Mia also encouraged her to get the surgery after she expressed her concerns and informed them of her experiences with Respondent Amin. Despite Ms. Floriano Navarro's repeated complaints about her treatment, none of the ICDC staff or ICE officers showed her any concern.

328.    Ms. Floriano Navarro saw Respondent Amin one more time before her deportation.  On September 15, 2020, the guards took her to see Respondent Amin without warning.  Respondent Amin berated her for not getting the surgery. Immediately after the appointment, guards brought Ms. Floriano Navarro to the intake area where she was informed that she would be deported. Ms. Floriano Navarro had never before seen any other woman called to the intake area to be told they would be deported. Ms. Floriano Navarro waited in the intake area for about an hour and a half.  While she waited, Respondent Smith confronted her about a whistleblower report on medical abuses at ICDC that had come out the day before, on September 14, 2020. Upon being questioned, Ms. Floriano Navarro admitted that she had told a lawyer about her own experiences, and Respondent Smith immediately told other staff nearby.

66

Respondent Smith berated Ms. Floriano Navarro and told her that she should leave for Mexico "fresh and clean," meaning after undergoing surgery. Ms. Floriano Navarro felt terrified and her heart was racing. When she returned to her pod, she was crying and extremely distressed, and other women tried to comfort her.

329.     Within 24 hours, Ms. Floriano Navarro was deported. Ms. Navarro believes that she was deported so that she could not speak out about her experiences and mistreatment at the hands of Respondent Amin and in retaliation for having told her lawyer about Respondent Amin's plan to perform a hysterectomy on her.

330.     Because of Ms. Floriano Navarro's deportation to Mexico, she has never been unable to participate in any federal investigation. She actively wants to speak out and assist the authorities to prevent what happened to her in detention from happening to others.

**K.     Petitioner Mbeti Victoria Ndonga**

331.     Petitioner Mbeti Victoria Ndonga is a 37-year-old woman who was brought to the United States when she was two years old. Ms. Ndonga has lived in the United States for thirty-five years and currently lives with her mother in Georgia.

332.     Ms. Ndonga was released from ICE custody on December 16, 2020, pursuant to the national injunction in *Fraihat v. ICE.* However, as Ms. Ndonga remains subject to a final order of removal, Ms. Ndonga is still at imminent risk of deportation and is still in custody for habeas purposes.

333.     Ms. Ndonga suffers from serious mental health disabilities, specifically schizoaffective disorder, a schizophrenia-spectrum disorder. She also has been diagnosed with post-traumatic stress disorder (PTSD). An immigration judge in Atlanta, Georgia adjudicated her mentally incompetent after ICE moved to hold a *Matter of M-A-M-* competency hearing in May 2019. ICE has been aware of Ms. Ndonga's mental disabilities since at least that time.

334.    Additionally, Ms. Ndonga suffers from hypertension, obesity, and chronic and severe gynecological problems. Specifically, Ms. Ndonga suffers from heavy, irregular bleeding and debilitating menstrual cramps. While in ICE custody, Ms. Ndonga repeatedly sought treatment for her gynecological issues, but never received appropriate treatment.

335.    Both Ms. Ndonga's physical issues and mental illness qualify as disabilities under the Rehabilitation Act.

336.    Ms. Ndonga was detained at ICDC in April 2019. Before her release, Ms. Ndonga was detained at ICDC for more than 616 days, including 267 days after receiving a final order of removal.

337.    Ms. Ndonga was subjected to non-consensual, invasive, and medically unindicated procedures at the hands of Respondent Amin.

338.    Throughout her detention at ICDC, Ms. Ndonga suffered from severe gynecological problems. Her menstrual cycle was highly irregular and caused her to bleed heavily for prolonged periods of time of up to twenty days in a single stretch. In addition to heavy bleeding, she suffered immensely from intense cramps that regularly left her bedridden for days. When Ms. Ndonga alerted ICDC staff to her debilitating symptoms in the summer of 2019, she expected to receive a Depo-Provera shot to manage her pain and bleeding. This medical treatment successfully helped to manage Ms. Ndonga's gynecological symptoms in the past.

339.    On July 31, 2019, Ms. Ndonga had an appointment with Respondent Amin. During the appointment, Ms. Ndonga requested a Depo-Provera shot, but Respondent Amin refused to give her that shot. He did not explain the refusal.

340.    Instead, Respondent Amin subjected Ms. Ndonga to a medically unindicated, non-consensual transvaginal ultrasound, despite Ms. Ndoga's inability to provide truly informed

68

consent given her known mental health disabilities. After the ultrasound, Respondent Amin told Ms. Ndonga that she needed additional medical procedures. Respondent Amin did not tell Ms. Ndonga what those procedures would be, why they were necessary, what less invasive options might be, or the benefits and risks of the procedures—in direct violation of his professional obligations.

341.    Ms. Ndonga saw Respondent Amin for a second time on August 16, 2019. Respondent Amin again subjected Ms. Ndonga to non-consensual and medically unnecessary procedures without obtaining Ms. Ndonga's informed consent. Alarmingly, Respondent Amin performed dilation and curettage, a laparoscopy, and an ovarian cystectomy without Ms. Ndonga's knowledge while Ms. Ndonga was under general anesthesia. After the surgery, Ms. Ndonga woke up with three wounds on her abdomen. She also developed a surgical site infection that lasted for months. In addition to the infection, the surgery worsened her cramps and bleeding, and left her with a pinching pain in her abdomen that has continued for the past 16 months.

342.    Ms. Ndonga did not learn what happened to her during the surgery until she retained counsel in October 2020, almost 15 months later. Throughout that time, Ms. Ndonga was overwhelmed with fear that she had been sterilized and would never be able to bear children.

343.    Additionally, given her personal history as a survivor of sexual trauma, Ms. Ndonga found the procedures forced on her by Respondent Amin to be emotionally traumatizing. As a result of her prior sexual abuse, Ms. Ndonga suffers from post-traumatic stress disorder (PTSD).  Respondent Amin's non-consensual, invasive, medically unindicated procedures further triggered and exacerbated Ms. Ndonga's PTSD.

344. Ms. Ndonga's horrific experiences motivated her to participate in the federal investigations into the pattern of unnecessary, non-consensual, invasive gynecological procedures performed on women detained at ICDC.

345. On October 27, 2020, Ms. Ndonga completed a one-hour interview with federal investigators from the DOJ, DHS OIG, and FBI. Ms. Ndonga told investigators that she had more information to share, but her fears of deportation and other retaliation made her afraid to do so.

346. A few hours later, on October 27, 2020, ICE informed Ms. Ndonga that it had lifted the hold on her deportation, and that she would be deported imminently. Ms. Ndonga filed two requests for release on October 27 and 28; ICE denied both almost immediately. On October 30, 2020, Respondent Musante informed Ms. Ndonga's counsel that ICE would deport Ms. Ndonga in early December and that her flight had already been scheduled.

347. ICE only scheduled Ms. Ndonga's removal after she spoke out against her abusive treatment at ICDC, after Ms. Ndonga informed investigators that she had more information to share and almost 19 months after she was first detained.

348. Ms. Ndonga's deportation fits into a pattern of retaliation she experienced following her efforts to speak out against the poor conditions at ICDC.

349. For example, Ms. Ndonga repeatedly tried to hang a sign on the wall of her cell shortly after she arrived at ICDC. Women generally hang materials on the walls of their cell without incident. Ms. Ndonga used her sign as a way to voice her frustration with her poor medical treatment and ongoing medical neglect. Specifically, Ms. Ndonga's sign read: "Death 2 Prejudiced Healthcare for Black Female Here in GA, USA. Pay, pay, pay. I live with pain every day."

350.     Despite Ms. Ndonga's right to display her sign, guards repeatedly told Ms. Ndonga to take her sign down. When Ms. Ndonga refused and reminded guards of her right to peacefully protests, guards removed the sign themselves. However, Ms. Ndonga reprinted her sign and hung it again. Guards continued to remove her new signs, but every time, Ms. Ndonga reprinted and re-hung her sign.

351.     Ms. Ndonga has even taken her activism outside the walls of ICDC. Since speaking with federal investigators, Ms. Ndonga has spoken with numerous reporters and has been featured with her full name and photograph in several articles about the pattern of gynecological abuse at ICDC. Ms. Ndonga is also eager to continue her participation in the ongoing federal investigations into gynecological abuse at ICDC. Ms. Ndonga is desperate to speak out against the abuse she suffered at the hands of Respondent Amin, even though she knows it heightens the risk that Respondents will retaliate against her.

352.     Two experts offered Ms. Ndonga evaluations.  Based on a review of medical records, Dr. Mueller concluded that Ms. Ndonga "underwent inappropriate, overly aggressive evaluation and care by Dr. Amin"; "the operation that Dr. Amin performed on Ms. Ndonga did not meaningfully contribute to the evaluation or management of her gynecologic condition"; and "[n]one of the care provided by Dr. Amin actually addressed Ms. Ndonga's underlying gynecologic complaints." After evaluating Ms. Ndonga by videoconferencing, Dr. Jasdeep Sandhu, M.D., found, "Ms. Ndonga has been personally subjected to physical and psychological harm at the hands of Dr. Amin and this has worsened her preexisting PTSD symptoms and jeopardized her progress made in treatment of her mental illness."  Dr. Sandhu further concluded, ""[D]ue to her severe mental illness of Schizoaffective Disorder and PTSD she is

more vulnerable to abuse of any kind especially when in a compromised position as in a doctor patient relationship and in detention."

353.    If Ms. Ndonga is deported to Kenya, it will be impossible for her to participate in the investigations and to speak to media outlets about the pattern of abuse. Ms. Ndonga does not have anyone to receive her or anywhere to stay in Kenya, and she will likely not have access to appropriate healthcare.

### L.    Petitioner Keynin Jackelin Reyes Ramirez

354.    Petitioner, Keynin Jackelin Reyes Ramirez, is a 33-year-old woman. Ms. Reyes Ramirez fled Honduras to the United States six years ago in order to escape an abusive ex-partner. Ms. Reyes Ramirez is the mother of three Honduran children approved for Special Immigrant Juvenile Status on the basis of their father's abuse, and two U.S. Citizen children. She is the wife of Cristian Alexander Hernandez, a United States citizen, and works hard to support her family as a house cleaner and roofer.

355.    Ms. Reyes Ramirez was detained at ICDC from January 30, 2020 until December 11, 2020. During this time, she was subjected to non-consensual, invasive, and medically unnecessary gynecological procedures at the hands of Respondent Amin.

356.    On March 9, 2020, Ms. Reyes Ramirez put in a request to receive a birth control injection, as she had historically received them prior to her detention. On June 16, 2020, Ms. Reyes Ramirez complained about an abnormal pH balance and requested to see an OBGYN for her yearly checkup. On June 17, 2020, Ms. Reyes Ramirez again requested medical attention due to vaginal pain. Three months after her initial request for gynecological care, she was finally referred to a provider on June 18, 2020.

357. On July 5, 2020, ICDC medical staff noted that Ms. Reyes Ramirez had a bump in the vaginal area that burned and also noted that Ms. Reyes Ramirez requested a birth control injection to regulate her menstruation.

358. Unnamed ICDC Officers sought approval from ICE Health Service Corps to refer Ms. Reyes Ramirez to Respondent Amin. Unnamed ICE Officials approved the request and referred Ms. Reyes Ramirez to Respondent Amin.

359. Early in the morning on July 9, 2020, Ms. Reyes Ramirez was taken in handcuffs to see Respondent Amin. She was not informed where she was going, and because four months had passed since her initial request to see a provider, she was confused as to where she was being taken.

360. At Respondent Amin's office, Ms. Reyes Ramirez was asked questions about how many children she had, and whether she had any prior C-sections. Ms. Reyes Ramirez signed a sheet of paper, but she was not told what she was signing. Without saying anything to Ms. Reyes Ramirez, Respondent Amin roughly forced her legs apart and inserted a tubular device. An interpreter was present but did not say anything about what Respondent Amin was doing or why he was doing it. Neither Respondent Amin nor the nurse in the room explained to her what was happening either. Respondent Amin then informed Ms. Reyes Ramirez that she had several cysts in her ovary, a diagnosis she had never received from former gynecologists despite attending regular check-ups.

361. Respondent Amin gave Ms. Reyes Ramirez an injection, but did not tell her what it was, only that it would remove cysts. He told Ms. Reyes Ramirez he would have results in two weeks but did not clarify what results he was referring to. When Ms. Reyes Ramirez inquired about the possibility of taking birth control pills rather than the injection, Respondent Amin

73

dismissed her question without explaining why other options were not available. Ms. Reyes Ramirez never received confirmation from Respondent Amin that the injection he gave her was the contraceptive she requested and if it was a contraceptive, when she would have to return for another injection.

362.    When Ms. Reyes Ramirez returned to the detention center after her appointment with Respondent Amin, she experienced significant pain and cramping, a pain she described as similar to childbirth. Ms. Reyes Ramirez was only able to access ibuprofen from the ICDC commissary to manage the intense pain she felt. Ms. Reyes Ramirez also noticed a strong smell from her vagina in the days following her appointment with Respondent Amin.

363.    Ms. Reyes Ramirez was also subjected to non-consensual tooth extractions while detained at ICDC.

364.    On September 22, 2020, Ms. Reyes Ramirez requested her medical records. She was provided an incomplete copy of her medical records and told by Deportation Officer Portillo that if she wanted these records because it was "about the doctor" she would need a lawyer in order to obtain the full record. On September 26, 2020, Ms. Reyes Ramirez spoke with congressional representatives who visited ICDC in response to the whistleblower complaint and media reports about abuses by Respondent Amin. Ms. Reyes Ramirez spoke with these representatives despite being told by officials at ICDC that she should "go to bed," "keep quiet" and should not speak with the representatives. Ms. Reyes Ramirez shared with visiting congressional representatives the details of what happened to her at the hands of Respondent Amin.

365. On November 5, 2020, Ms. Reyes Ramirez's name was provided to federal investigators identifying her as a victim of Respondent Amin and potential witness in the investigation.

366. On November 10, 2020, Ms. Reyes Ramirez noticed that her commissary account was "zeroed out," which typically indicates a detainee's deportation will occur within 24-48 hours. The same day, Ms. Reyes Ramirez's counsel notified Respondent Musante that Ms. Reyes Ramirez was represented, by email and telephone. Ms. Reyes Ramirez's counsel also indicated to Respondent Musante that Ms. Reyes Ramirez was a victim of Respondent Amin, intended to participate in an ongoing DOJ Investigation and that her deportation would violate ICE policy. These claims were reiterated in Ms. Reyes Ramirez's I-246 Stay Request, filed with ICE by email on November 11, 2020, in person on November 13, 2020, and granted on November 17, 2020.

367. Respondents' efforts to deport Ms. Reyes Ramirez immediately followed her name being released to the DOJ, but prior to her having the opportunity to interview with investigators regarding the investigation.

368. On November 16, 2020, Ms. Reyes Ramirez filed a federal habeas petition and motion for a Temporary Restraining Order in the Middle District of Georgia. On November 17, 2020, once again Ms. Reyes Ramirez's commissary account was zeroed out.

369. Ms. Reyes Ramirez's counsel again contacted Respondent Musante and informed him that Ms. Reyes Ramirez was a victim of Respondent Amin and that she intended to participate in the ongoing investigation regarding his abuse of women at ICDC. Counsel also informed Respondent Musante that on November 16, 2020, Ms. Reyes Ramirez had filed a

federal habeas petition and motion for a Temporary Restraining Order in the Middle District of Georgia.

370.     Ms. Reyes Ramirez's counsel also notified AUSAs Shannon Statkus and Jason Blanchard that Ms. Reyes Ramirez was at risk of imminent deportation. Later in the day on November 17, 2020, AUSA Statkus informed Ms. Reyes Ramirez's counsel that she spoke with Deputy Chief Counsel of ICE, Emily Reece, who agreed with Officer Musante not to remove Ms. Reyes Ramirez until the Temporary Restraining Order was resolved and that she would be removed from the flight to Honduras set to occur the following morning.

371.     Although Ms. Reyes Ramirez was not deported on November 18, 2020, the timing of Respondents' second attempt to swiftly remove Ms. Reyes Ramirez within a two-week period confirm that Respondents sought to deport Ms. Reyes Ramirez in retaliation for her willingness to participate in the ongoing federal investigations and to prevent her from testifying in those investigations. Further, Ms. Reyes Ramirez's access to the phone through her commissary account was not reinstated until Friday, November 20, 2020, which limited her ability to contact her legal team, the press and congressional representatives.

### M.     Petitioner Ana Gabriela Adan Cajigal

372.     Ana Gabriela Adan Cajigal, is a 25-year-old woman. Ms. Adan Cajigal came to the United States when she was six months old. She lived in the United States with DACA status, until 2015 when she took voluntary departure and moved to Mexico at 21-years old.

373.     While in the custody at ICDC, Ms. Adan Cajigal became a victim of and witness to medically unnecessary and non-consensual gynecological procedures performed on female detainees by Dr. Mahendra Amin.

374.     Adan Cajigal was detained at Irwin County Detention Center on or about late February 2020.

375.     On May 4, 2020, Ms. Adan Cajigal put in a request for medical assistance because of gynecological concerns.

376.     Unnamed ICDC Officers sought approval from ICE Health Service Corps to refer Ms. Adan Cajigal to Respondent Amin. Unnamed ICE Officials approved the request and referred Ms. Adan Cajigal to Respondent Amin.

377.     It was not until September 14, 2020 that Ms. Adan Cajigal was sent to the gynecologist, Respondent Amin. Respondent Amin administered a pap smear, then performed a vaginal ultrasound without lubrication and without asking for Ms. Adan Cajigal's consent. He did not explain to her what he was doing or ask for the reasons of her visit. He then inserted the monitor in a "rough" manner and told her that he found a small cyst "the size of a toenail" on her left ovary and that she needed birth control pills, even though she informed him that she had skin irritation and pain in her vaginal area. The visit only lasted five minutes and Respondent Amin never explained to her why she had a cyst or what a cyst was. She experienced lingering pain as a result of the procedures Respondent Amin performed on her.

378.     A few days later, she heard from the news and other detainees about the non-consensual gynecological procedures that Respondent Amin had performed on some of the women at ICDC. In order to help those women speak out about their experiences with Respondent Amin, Ms. Adan Cajigal volunteered to translate their medical records and interpret phone calls between them and news reporters. She became concerned that Respondent Amin had misdiagnosed her, and that she could have a condition other than "just a cyst" that might require immediate medical attention. Due to her concerns as well as her continuing symptoms, she requested medical attention and was taken to an OB/GYN clinic in Valdosta, GA on October 27,

2020. There, the doctor performed a complete evaluation and informed her that she did not have a cyst and ran some diagnostic tests.

379.    The doctor prescribed medication for Ms. Adan Cajigal that was not given to her by the ICDC personnel until more than a month later.

380.    Ms. Adan Cajigal also suffers from asthma which she had been diagnosed with as a child. Prior to her detention at ICDC, her asthma had been stable, and she had not needed to use her puffer for two years. However, her asthma began worsening considerably after her detention at ICDC due to the harsh chemicals in the cleaning products used at the facility. She filed several medical requests complaining of chest pain and difficulty breathing. In her requests, she notes that she gets tired quickly, feels like she is lacking air and will pass out, and that the chemicals used at ICDC were causing these symptoms to worsen. She tested negative for COVID-19 and was prescribed an inhaler. But because she is only able to use the inhaler a limited number of times a day, she continued to experience the symptoms detailed above.

381.    Ms. Adan Cajigal has experienced significant physical and emotional trauma and was diagnosed with posttraumatic stress disorder (PTSD) at the Irwin County Detention Center. She has been prescribed Prazosin, a drug used to reduce nightmares in patients with PTSD, and Escitalopram, a drug used to reduce anxiety and depression. While being held at the Irwin County Detention Center, Ms. Adan Cajigal has asked to receive mental health therapy on multiple occasions but has been unable to receive any.

382.    After speaking to FBI investigators, attorneys, and organizations involved in helping victims of Respondent Amin about their experiences, ICDC guards began harassing and threatening Ms. Adan Cajigal because she had knowledge of incidents involving guards beating some of the women at ICDC. She saw how one of the women began experiencing back problems

and trouble with walking and balance after an incident with the guards. She also witnessed the guards violently dragging one of the detained individuals out. This terrified Ms. Adan Cajigal.

383. On September 26, representatives from Congress visited the detention center and she informed them about the inhumane conditions and experiences that the detainees are facing. However, guards repeatedly attempted to obstruct other detained individuals' ability to speak to the representatives.

384. On October 26, 2020, Ms. Adan Cajigal's attorney submitted her signed declaration about her experiences with Respondent Amin to the Department of Justice. Her attorney communicated Ms. Adan Cajigal's desire to cooperate with the investigation and complete an interview about her experiences with Respondent Amin.

385. On November 2, 2020, attorney Tracie Klinke emailed Respondent Giles, Supervisory Detention and Deportation Officer (SDDO) Alejandro Hernandez, Deportation Officer (DO) Charlene Johnson, and Medical Officer of the Commonwealth (MOC) Hank Johnson, providing them with Ms. Adan Cajigal's record in support of her claim for custody re-determination pursuant to *Fraihat v. ICE*, Case No. 5:19-cv-01546-JGB-SHK (C.D. Cal. Oct. 7, 2020), ECF No. 240.

386. Ms. Adan Cajigal spoke to investigators from DOJ, FBI and OIG on November 10, 2020 via Zoom with her attorney present.

387. On November 17, 2020, two officers began intimidating Ms. Adan Cajigal, not allowing her to use her phone or communicate with anyone. Ms. Adan Cajigal's mother spoke to Univision 34, a TV channel, about the conditions at ICDC, and connected Ms. Adan Cajigal briefly to speak about her experiences. The officers then informed Ms. Adan Cajigal that she was "going to be deported tomorrow."

388.    On the evening of November 17, 2020, Ms. Adan Cajigal noticed that her commissary was "zeroed out," which typically indicates a pending deportation. On November 17, 2020, multiple congressional offices contacted ICE on Ms. Adan Cajigal behalf, to ensure ICE was aware that Ms. Adan Cajigal was a witness in ongoing investigations who wished to testify and had not yet been given an opportunity to testify.

389.    At approximately 4:50pm EST on November 17, 2020, Ms. Klinke was informed by Respondent Musante that Ms. Adan Cajigal was scheduled to be deported on November 18, 2020 at 5am.

390.    Respondent Musante informed Ms. Klinke that he was aware of her interactions with Respondent Amin and her communications with investigators. However, he said that no law enforcement agency had informed him that her presence was necessary for their investigation. He told Ms. Klinke that Ms. Adan Cajigal had a final order of removal and he had a process to follow. Ms. Klinke informed Respondent Musante that she may be filing a TRO. Respondent Musante responded by saying that if a federal lawsuit was filed and he received a copy of it before midnight that Ms. Adan Cajigal would not be removed the following day.

391.    Respondents' efforts to deport Ms. Adan Cajigal immediately followed her submission of a declaration to the Department of Justice. When ICE notified Ms. Klinke about the scheduled deportation, she and the attorneys and students at the University of Pittsburgh's Immigration Law Clinic immediately began working on filing a Habeas Corpus Petition and a Temporary Restraining Order in the US District Court for the Middle District of Georgia under Case Number 7:20-cv-00237. A Stay of Removal Request was also filed that day to stop the deportation. ICE granted the Stay of Removal Request at 3:45AM, only a little over an hour prior to the scheduled deportation time.

392.     Ms. Adan Cajigal was finally released from ICDC on December 11, 2020.

393.     If Ms. Adan Cajigal is deported to Mexico, she will be homeless and without access to reliable internet, nor the ability to participate in ongoing investigations about non-consensual medical procedures at Irwin County Detention Center.

### N.     Several Putative Class Members Who Have Suffered the Same Harms

394.     **Jane Doe #35** was born March 24, 1988 and now lives in Mexico. She was detained at ICDC from about June 4 or 5, 2018 until mid-January 2019.

395.     By the time she was transferred to ICDC, Jane Doe #35 was experiencing intense pain that had started after a miscarriage and curettage performed at another detention center months before. The pain had diminished but was still extreme and kept her awake. She tried to tell ICDC medical staff about the pain, but they did not speak Spanish and there were not interpreters.

396.     In July 2018, still experiencing severe pain, Jane Doe #35 was sent to Respondent Amin for a transvaginal ultrasound. She knew that other women were afraid of him because he had hurt them. However, she had had an ultrasound before and thought it would be fine.

397.     Respondent Amin stuck the instrument into Jane Doe #35 and moved it around roughly. It was so painful that she screamed the only English word she could think of: "PAIN!" Respondent Amin laughed. She was scared, because Respondent Amin did not appear to care at all.

398.     After the appointment, because of Respondent Amin's actions, Jane Doe #35 started to bleed and was in even more pain than she had been in before.

399.     Although she was afraid, Jane Doe #35 returned to Respondent Amin for the follow up appointment. Again, the ultrasound was rough and painful. Again, Respondent Amin

did not appear to care that she was in pain. Jane Doe #35 continued to experience pain (which began to radiate to her arms and legs), as well as swelling and fluid discharge, for months.

400.    No one ever explained why Jane Doe #35 was getting these ultrasounds. The medical staff did not speak to her in Spanish, so she had nobody to ask.

401.    Jane Doe #35 told the ICDC staff how horrible Respondent Amin was, using other detained women as interpreters. The ICDC staff told her that he was the only doctor and that they were not going to get another because she did not like him. Ms. Gonzalez Hidalgo explained that he was abusing them.

402.    From July 2018 to November 2018, Jane Doe #35's immigration lawyers also repeatedly complained to ICE and ICDC staff, including Respondents Paulk and George, about Respondent Amin and what happened to Jane Doe #35. Respondent George indicated to her attorney that they had heard other complaints about Respondent Amin.

403.    After she returned to Mexico, Jane Doe #35 went to a clinic to learn what was wrong. She was still in pain. The doctors at the clinic told her she had a serious infection and began medication to treat it. The doctors also told her that her ovaries would get inflamed easily and prescribed medicine that she was told she will have to take for the rest of her life.

404.    Jane Doe #35 suffered a great deal of trauma and became depressed while she was at ICDC. The trauma remains with her. Even today, Jane Doe #35 has difficulty sleeping. She wakes up sweating from recurring nightmares about ICDC.

405.    **Jane Doe #26** is a 28-year-old woman from Guyana, who was detained in ICE custody at ICDC. While at ICDC, Jane Doe #26 was a victim of horrific medical abuse and to medically unnecessary and non-consensual procedures at the hands of medical staff ICDC and Respondent Amin.

406.    When she arrived at ICDC, Jane Doe #26 told the medical staff that she had an IUD that needed to be removed. But despite numerous oral and written requests, she did not receive medical treatment for around nine months and had to live with constant discomfort and sharp pain from the IUD.

407.    When the medical staff at Irwin referred her to Respondent Amin, he examined her and told her that she had several cysts on her ovaries, including one that was the size of a golf ball that needed to be drained immediately. He indicated that it would be a simple outpatient procedure.

408.    Yet, on the day of what was supposed to be a simple outpatient procedure, Jane Doe #26 was shackled, put into a transport van and taken to Irwin County hospital. This was when she discovered she was not going to Respondent Amin's office, but was being taken to have surgery. She had not been told prior to this that surgery was necessary. When she arrived at the hospital, the nurse told her that she was having a dilation and curettage procedure, where the doctor would scrape the inside of her uterus with a metal instrument. This was when she learned what surgery she was having that day.

409.    Jane Doe #26 told the nurse she wanted time to think about the surgery and discuss it with her attorney and her family. The nurse told her that if she delayed the surgery, she would be putting her health at risk because the cyst could burst at any time and cause her severe pain and complications. The nurse also said there was no telling how long ICE would take to approve another surgery. Jane Doe #26 felt pressured into having the surgery. She did not know what would happen if she did not have the surgery. The nurse then gave her forms to sign. When Jane Doe #26 asked for copies, the nurse only gave her a copy of the hospital policy, not the actual form about the surgery.

410.     She was confused and concerned about the surgery, and wanted more information, but no one explained what was happening to her or why, despite her requests for documentation about the procedure she was undergoing. Jane Doe #26 luckily advised the nurse that she was allergic to penicillin despite no one asking. The nurse was relieved because she was about to give Jane Doe #26 something that had penicillin in it.

411.     When she woke up from general anesthesia, shackled to the bed, her stomach was bandaged. At ICDC, she was not given proper post-surgery care. She had to clean and tend to her wounds herself. When she removed her bandages, she saw that her navel had been removed. Instead of having a navel, her stomach was sunken in. She was crying and scared. She developed an infection and still was not given proper care at ICDC. A doctor had prescribed antibiotics, but ICDC staff would not give them to Jane Doe #26.

412.     The medical staff at Irwin retaliated against her for speaking up about needing medical care. When she kept speaking up, the medical staff tried to put her in the medical room, which is akin to solitary confinement, in order to silence her.

413.     Several doctors reviewed her medical records and from their reports, she learned that the dangerous and invasive surgery Respondent Amin performed was not medically necessary, that the cyst would have resolved itself.

414.     She has suffered great emotional hardship as a result of her treatment in detention and her time separated from her young children. Although she has been released, she is still fearful about what ICE will do to her for speaking out. But she is committed to speaking out about the inhumane treatment at ICDC and has spoken to Congress, because she knows that other women are still there, and she does not want them to suffer in the same way she did at the hands of Respondent Amin and the medical staff at ICDC.

415.   **Jane Doe #24** was detained at ICDC for over a year between 2018 and 2019, before she was deported to Nigeria. After around six months at ICDC, Jane Doe #24 noticed that her periods were getting much shorter in length and that the blood was almost black in color. When she requested medical care, the nurse at ICDC acted as if what she was experiencing was normal.

416.   When Jane Doe #24 was finally able to obtain an appointment with an outside OBGYN, it was with Respondent Amin. He gave her a vaginal ultrasound and told her she had a large cyst in her right ovary. He told her she could have surgery or be on birth control for thirty days to see if the cyst shrinks. She elected birth control. She was taken back to see him before the thirty days had passed, and he told her that birth control was not working.

417.   After performing several vaginal ultrasounds on Jane Doe #24, Respondent Amin told her that she had to do surgery. He said that it would involve three incisions and take just fifteen minutes. He told Jane Doe #24 that he would scrape out the cysts and she would be fine. Jane Doe #24 was worried about the surgery because she had not had children yet, but Respondent Amin told her it would be fine.

418.   Jane Doe #24 felt very scared because she was having terrible, painful cramping all the time and her periods were not normal. She felt pressured to agree to the surgery right away, without having a chance to think about it.

419.   She was taken for surgery, without any advanced notice. The first time she heard the term "D&C" was at the hospital, where a nurse mentioned it. Jane Doe #24 was confused because she didn't understand how a D&C would take care of her cysts. She had no idea what was happening.

420.     After the procedure, while she was still under the influence of anesthesia, she was forced up out of bed with no chance to recover from the surgery. As soon as she was up and dressed, she was immediately shackled again and wheeled out, even though she had just had surgery.

421.     Once she was back at ICDC, she was taken to the medical unit. She could not see anyone, and her food was handed to her through a slit in the door. When ICDC needed the space in the medical unit, they forced her to sign a form stating she was voluntarily deciding to leave medical to go back to the dorm. She did not want to sign the form because it was not her choice to leave, but she was pressured to sign it.

422.     In the dorm, she was not given proper medical supplies to clean her wounds from the incisions. She had to beg and fight for those medical supplies. Jane Doe #24 also did not receive adequate pain medication after her surgery.

423.     Prior to her deportation, Jane Doe #24 did not receive any medication to help prevent infection. When she arrived in Nigeria, she found out that she had a staph infection and a yeast infection.

424.     Jane Doe #24 has suffered from severe depression since her detention at ICDC. She attempted suicide after being deported to Nigeria. She also developed colitis after being deported to Nigeria and was very sick for several months. She explains that she became physically ill and lost her will to live because of how she was treated at ICDC. She continues to struggle with severe depression.

425.     It is difficult for her to participate in federal investigation of Respondent Amin since being deported.

86

426.     **Jenel Haug** is a 35-year-old citizen of Canada, who was detained at ICDC from approximately October 31, 2019 until March 11, 2020, when she was deported to Canada.

427.     Ms. Haug was pregnant when she arrived at ICDC. She had a positive home pregnancy test before being detained. Although she informed ICE and ICDC that she was pregnant and had a history of multiple miscarriages and difficult pregnancies, she was denied appropriate care. ICDC staff did not acknowledge that she was pregnant and failed to perform a blood test to check if she was pregnant.

428.     Four days after arriving at ICDC, she started spotting and a few days later she started bleeding. She informed medical staff at ICDC that she was having a miscarriage, but they continued to deny that she was ever pregnant. Ms. Haug bled for about two weeks due to the miscarriage and had terrible cramping. After her mother made numerous complaints, she was finally taken to see an OBGYN, Respondent Amin.

429.     Respondent Amin performed a vaginal ultrasound and internal exam with his hand, which were rough, painful, and forced. Ms. Haug describes it as "the most medical way of being raped you could possibly experience."

430.     Respondent Amin told Ms. Haug that she had cysts and endometriosis. Ms. Haug was confused by the diagnosis of endometriosis because she did not have the symptoms described in the information she received about the condition.

431.     Respondent Amin initially recommended a Depo shot, which Ms. Haug refused, so he prescribed regular birth control pills. ICDC delayed providing Ms. Haug with the prescribed birth control pills.

432.     Respondent Amin pressured Ms. Haug to get the Depo shot because he determined that the cysts were not shrinking. Ms. Haug felt she had no choice but to get the shot in order to avoid surgery.

433.     During one of the visits, Ms. Haug was bleeding and did not want to have internal procedures done, but Respondent Amin pushed her back on the table and performed them anyway.

434.     After two Depo shots, Respondent Amin told Ms. Haug that the cysts had not shrunk and that she needed surgery. He told her she would not have to pay if the surgery was done while she was detained. Although Ms. Haug told him she did not want to have surgery while detained, Respondent Amin told her the next appointment would be for surgery if the cysts did not shrink. Respondent Amin talked about both "D&C" and hysterectomy, saying it would likely be the latter because of the size of the cysts.

435.     Ms. Haug was terrified of having a hysterectomy and of not getting enough pain medication after surgery. She had observed other women at ICDC in excruciating pain after surgeries. She knew that pain medication is typically limited to ibuprofen or Tylenol and commonly delayed.

436.     Ms. Haug was sent back to Canada on March 11, 2020. She stayed in contact with some of the women at ICDC who informed her that she had been scheduled for surgery shortly after she left. Ms. Haug was examined by a doctor in Canada, who told her that he did not see any signs of cysts or endometriosis.

437.     Ms. Haug experienced several forms of retaliation for complaining about conditions at ICDC. She was placed in lockdown, supposedly as a form of "protective custody," which also resulted in her losing her cleaning job that paid $1/day. Worst of all, her daughter,

who was only around 4-months old when Ms. Haug was detained, was put up for adoption after ICDC staff refused to help her make calls to her case manager and children. Respondent George refused to assist her with these calls. Consequently, Child Protective Services decided that she had abandoned her child while detained.

438. When Ms. Haug requested her medical records from ICDC, she received only eight pages, which do not include all of the medical appointments.

439. She would like to talk to federal investigators about her experiences at ICDC. She recognizes that cooperating with a federal investigation will be much more difficult now that she has been deported.

440. **Alma Bella Bowman** was detained at ICDC until her release in December 2020. Less than a year before Ms. Bowman's arrival at ICDC, she had been diagnosed with rectocele by two different medical professionals on two separate occasions, both of whom informed her that her condition required surgery. Rectocele is a rectal prolapse into the vagina that can have serious consequences if left untreated.

441. Ms. Bowman's first appointment with Respondent Amin was in May 2018. When she told him about her two previous, recent rectocele diagnoses – one of which occurred only two months prior – he dismissed her completely, telling her that the rectocele was all in her imagination.

442. Despite other health professionals' recommendation for surgery, Respondent Amin provided Ms. Bowman with only a hormonal vaginal cream, which he said would strengthen her vaginal walls. Ms. Bowman used the cream, but her condition did not improve, and the prescription for the cream was never refilled.

443. Ms. Bowman had a second appointment with Respondent Amin a year later in May 2019, during which she told him that the hormonal cream did not help. Unlike her previous appointment, Respondent Amin this time acknowledged that she had rectocele, but refused to provide her with further treatment.

444. Ms. Bowman became angry with Respondent Amin and began arguing with him while she was still undressed on the examination table. He told her that if she wanted to have sex with her husband, she could "push it down," referring to the bulge that appears in the vaginal wall when an individual has rectocele. Respondent Amin told Ms. Bowman that she did not know what she was talking about and left the room. He then complained about Ms. Bowman to the head nurse at ICDC.

445. After this traumatic experience, Ms. Bowman decided that she would never see Respondent Amin again. She was so distraught by the way that Respondent Amin treated her that she had to see the psychiatrist at ICDC, Dr. Faulk.

446. Ms. Bowman requested her medical records from Respondent Amin's office, and was troubled to discover that they were incomplete. Specifically, she noticed that the medical history forms she completed during her second appointment had been replaced by forms she completed during her first appointment.

447. Ms. Bowman remains very disturbed by her experience with Respondent Amin. He ignored Ms. Bowman's cries for help, refused to provide her with medical treatment, and refuted her diagnosis that has been corroborated by four medical professionals to date—the two professionals she saw before her first appointment with Respondent Amin, and two more since.

448.    The two medical professionals Ms. Bowman saw after Respondent Amin both diagnosed her with stage 2-3 rectocele. Respondent Amin's refusal to provide treatment has led to her condition to become even worse.

449.    **Jane Doe #28** was detained at ICDC from March 4, 2020 until her release on December 7, 2020. Before she was detained, Jane Doe #28 was diagnosed with a tumor on her uterus. The doctor she saw told Jane Doe #28 that the tumor was not a threat to Jane Doe #28's health, and the doctor advised Jane Doe #28 that the tumor would disappear with menopause.

450.    While detained at ICDC, Jane Doe #28 noticed that she had a hard lump on her lower abdomen. She requested medical attention. Jane Doe #28 visited a medical facility and received a CT scan. When Jane Doe #28 returned to ICDC, a nurse informed her that the CT scan revealed that she had a tumor and would need to go to another appointment.

451.    Jane Doe #28 was sent to Respondent Amin. A female nurse brought Jane Doe #28 to an exam room and gestured for her to undress. An interpreter was not present in person or over the phone to explain to Jane Doe #28 what was about to happen. The nurse gestured for Jane Doe #28 to undress, and Jane Doe #28 obliged. The nurse left and Jane Doe #28 waited alone in the room, unsure of what was going to occur during this appointment.

452.    Respondent Amin began to examine Jane Doe #28 without an interpreter and without explaining who he was or what he was doing. Respondent Amin turned on a machine and inserted an instrument inside of Jane Doe #28's vagina. Jane Doe #28 was confused about what was happening and was in pain throughout the procedure Respondent Amin performed. After the painful procedure ended, finally Respondent Amin used a Mandarin interpreter over the phone. The interpreter told Jane Doe #28 that Respondent Amin discovered a tumor in her uterus and that she needed surgery to remove it.

453.     Jane Doe #28 was also provided a form which she could not understand because it was written in English. Jane Doe #28 did not understand what the form was for, but the interpreter told Jane Doe #28 that she needed to sign it, so that Respondent Amin could perform surgery. Still unclear of what exactly she was agreeing to, Jane Doe #28 signed the form. After meeting with Respondent Amin, Jane Doe #28 was fearful. Her previous gynecologist told her that the tumor was not dangerous. After meeting with Respondent Amin, Jane Doe #28 was scared that the tumor had turned into cancer. Because Respondent Amin did not explain to Jane Doe #28 why surgery was necessary, Jane Doe #28 felt that the tumor must be life-threatening for him to want to remove it.

454.     Thereafter, in June of 2020, around 5:00 am, Jane Doe #28 was taken from ICDC to a medical facility for surgery. No one explained to Jane Doe #28 where she was going or what the surgical procedure would entail. When she arrived at the medical facility, Jane Doe #28 saw Respondent Amin at the reception desk, but was not able to communicate with him because no interpreter was present. Jane Doe #28 was guided to a room where she was given anesthesia and underwent surgery by Respondent Amin. Jane Doe #28 was not informed by anyone what surgery was done or what symptoms she may experience in the future because of the surgery. Respondent Amin was not present when Jane Doe #28 woke up from surgery.

455.     When Jane Doe #28 returned to ICDC after the surgery, she was in pain for three days. She was not prescribed any medicine to deal with the pain besides a general anti-inflammatory medication. Jane Doe #28 noted that after her surgery, the hard lump in her abdomen was not gone. Additionally, Jane Doe #28 continued to have irregular menstrual periods over the next few months. Concerned about the hard lump in her abdomen and her

irregular periods, Jane Doe #28 requested medical attention again. Despite making a medical request in the middle of November 2020, Jane Doe #28 did not see a medical professional.

456.  **Jane Doe #25** was detained in ICE custody at ICDC before her sudden deportation to Mexico. After entering ICDC in early 2018, Jane Doe #25 began experiencing issues with her menstrual cycle. Her frequent requests for medical help went unanswered. In August of 2018, she contacted Respondent Ciprian, whose contact information was posted on a bulletin board in her dormitory. After speaking with Respondent Ciprian, Jane Doe #25 was transported to the hospital and she began to trust Respondent Ciprian for helping her.

457.  After her hospital visit, Jane Doe #25 had follow-up visits with Respondent Amin. She was concerned that Respondent Amin hardly examined her, had no knowledge of her prior treatment, and did not always have an interpreter for her. Because she did not have faith in Respondent Amin, she sought help from Respondent Ciprian.

458.  Jane Doe #25 decided to write Respondent Ciprian. In one of those letters from 2018, Jane Doe #25 wrote, "I am very afraid and I do not know what to do . . . I told the nurse everything that had happened to me but she could not do anything else because she was only a nurse. I am very afraid because the outside doctor is negligent and I do not trust him . . . I am afraid, very afraid."

459.  Despite the letter to Respondent Ciprian, Jane Doe #25 was taken for surgery with Respondent Amin on October 16, 2018.

460.  After her surgery, she woke up and saw three cuts on her abdomen. An ICDC staff member told Jane Doe #25 that Respondent Amin had removed her right ovary. Earlier, she had been told that there was a cyst on her left ovary. And Respondent Amin had never even

mentioned her ovary to her. She felt betrayed and upset that she was powerless to stop this man from touching her.

461.    On November 5, 2018, Jane Doe #25 returned to Respondent Amin's office with an ICDC guard who helped her ask Respondent Amin what he had done. He claimed that he removed the cysts from her ovaries and cleaned her uterus of endometriosis, and said that she did not have cancer and could still have children.

462.    On December 6, 2018, Jane Doe #25 refused to attend a follow up appointment with Respondent Amin.

463.    Upon return to Mexico, Jane Doe #25 has seen a gynecologist for follow up care. She learned that Respondent Amin removed more than half of her left ovary and that she only has a 10% chance of successfully carrying a future pregnancy. She and her husband had dreams of having and raising a child together.

464.    Jane Doe #25 also experienced retaliation by ICDC officials for engaging in free speech. After submitting a grievance against an ICDC officer, she was locked in her cell for one day. Her access to the outside world was limited for three or four days when a protest was taking place outside ICDC that officials did not want detainees to observe.

465.    Jane Doe #25 was deported one or two weeks after talking on the phone about the difficulty she was having in obtaining all of her medical records from ICDC officials. She believes officials were listening to her call because the line cut out while she explained the issue. She was not able to call her friends back.

466.    Jane Doe #25 believes she deserves justice for what she experienced and wants to be involved as a witness to investigations and lawsuits against Respondent. Unfortunately, she faces the barriers of reliable phone and internet access in Mexico.

94

467.    **Angela Rojas Fañas** was the victim of and witness to medically unnecessary and non-consensual gynecological procedures at ICDC. Shortly before traveling to the United States from the Dominican Republic, Ms. Rojas Fañas visited her gynecologist. At that time, she was told everything was normal.

468.    After Ms. Rojas Fañas, arrived in the United States, ICE confined her inside ICDC for four months. During that time, Respondents took her to Respondent Amin's office twice.

469.    The first visit was on August 26, 2020. Ms. Rojas Fañas had been feeling pain in her hip and back, so she submitted a request for medical care to ICDC staff. The staff told her she had kidney problems and had to see an outside provider.

470.    An officer from ICDC took Ms. Rojas Fañas to Respondent Amin's office. Respondent Amin entered the room, put on gloves, and proceeded to penetrate Ms. Rojas Fañas's vagina with his hands in a manner that was rough and made Ms. Rojas Fañas feel very uncomfortable. Ms. Rojas Fañas was humiliated. She felt like Respondent Amin treated her as less than fully human.

471.    Respondent Amin then spoke to Ms. Rojas Fañas in English, a language she does not understand. No interpreter was present. Respondent Amin called the nurse who spoke some Spanish back into the room. The nurse told Ms. Rojas Fañas that, according to Respondent Amin, she had fibroids in her uterus as large as avocadoes. The nurse said she needed surgery as soon as possible to remove the fibroids. She told Ms. Rojas Fañas to return for the surgery in a week, on September 1, 2020.

472.    Ms. Rojas Fañas was scared and confused. Ms. Rojas Fañas told the nurse she did not want the surgery. The nurse left the room. When she returned, she told Ms. Rojas Fañas that

95

Respondent Amin recommended an injection to reduce inflammation. The nurse said that without the injection, the pain she was feeling would become unbearable.

473.    Ms. Rojas Fañas received the injection. No one explained the risks or side effects. Ms. Rojas Fañas did not understand what the injection contained or what it would do to her body.

474.    For weeks after the injection, Ms. Rojas Fañas bled heavily and abnormally. She felt weak. And she felt sharp pain, especially in her hip area. During this time, she learned of several other women in her unit who were suffering after similar mistreatment. One woman in her unit was recovering from surgery without pain medicine. She had to use sanitary napkins to cover the incisions.

475.    Concerned and afraid about the ongoing bleeding she was experiencing, Ms. Rojas Fañas sought out ICDC medical staff several times but to no avail. As her condition persisted and her desperation grew, when Ms. Rojas Fañas visited ICDC medical staff a third time, she was told she would have to see an outside provider.

476.    On September 14, 2020, news reports of Respondent Amin's abuses broke. Two days later, Respondents told Ms. Rojas Fañas she was being taken to a doctor outside ICDC. Ms. Rojas Fañas feared Respondents would take her to Respondent Amin. She feared being left alone in a room with Respondent Amin. She feared that Respondent Amin would hurt her again.

477.    Respondents in fact did take her to Respondent Amin, who performed a pelvic ultrasound. The nurse told her she did not have fibroids anymore and did not need surgery. The nurse said the bleeding was normal.

478.    After these revelations, Ms. Rojas Fañas talked with several other women who had survived Respondent Amin's abuses, and explored speaking out more broadly. She saw two

outspoken women removed from her unit, and heard they were placed in solitary confinement. The officers changed the television channel from Spanish-language news to English-language stations. Ms. Rojas Fañas began noticing that the temperature in the unit was lowered to the point that it kept her from sleeping.

479. Ms. Rojas Fañas was deported to the Dominican Republic in late October 2020. In mid-November 2020, she visited a gynecologist who performed an ultrasound and ordered bloodwork. The gynecologist diagnosed Ms. Rojas Fañas with a kidney infection. The doctor said the infection was probably caused by the abnormal bleeding. The doctor said the abnormal bleeding could have been caused by a birth control injection. The doctor did not detect any large fibroids. Ms. Rojas Fañas is still awaiting the results of a biopsy.

480. **Jane Doe #32** is a 36-year-old woman, who was detained in ICE custody at ICDC before her deportation to Senegal. She has suffered extraordinary mental pain and trauma due to her treatment by Respondents.

481. Jane Doe #32's scar from her two C-sections burst while she was at ICDC. She was in tremendous pain, but the medical staff and guards at ICDC did not help her. Despite repeated requests for medical care for the scar, the medical staff at ICDC ignored her. When she spoke up and insisted that she was in pain, the medical staff threatened to put her in solitary confinement and accused her of lying.

482. When Respondents finally took her to a gynecologist, they handcuffed her. The doctor performed an exam, but never told her what was wrong or what he was doing. Although she does not know his name, he had an accent like hers. She asked for her records to find out what the diagnosis was, but the facility refused to give them to her, despite repeated requests.

483.    On information and belief, the doctor who performed the exam on Jane Doe #32 was Respondent Amin.

484.    Jane Doe #32 is prepared to testify to Congress and to speak with officials investigating these abuses at ICDC. She is committed to making her voice heard, to holding ICE and ICDC accountable for the pain and suffering they caused her and so many other women.

## XI.    The Federal Government's Inter-Governmental Agreement with Irwin County and ICE's Detention Standards

### A.    Inter-Governmental Agreement Between Federal Government and Irwin County

485.    In 2007, the United States Marshals Service entered into an Intergovernmental Agreement ("IGA") with Irwin County, Georgia allowing "three (3) Federal Government components, specifically, the United States Marshals Service (USMS) and the Federal Bureau of Prisons (BOP) of the Department of Justice (DOJ); and the United States Immigration and Customs Enforcement (ICE) of the Department of Homeland Security (DHS), to house federal detainees with the Local Government at the Irwin County Detention Center."[27]

486.    In exchange for payment on a per-detainee per-diem basis, Irwin County ensures the daily operation of the detention center.

487.    The IGA requires Irwin County to, among other things, "accept and provide for the secure custody, safekeeping, housing, subsistence and care of federal detainees in accordance with state and local laws, standards and procedures, or court orders applicable to the operations of the facility, consistent with federal law, policies and regulations."

488.    The IGA also requires that "where ICE detainees are housed, the ICE federal detainees are to be housed in accordance with ICE standards."

---

[27] *See* Intergovernmental Agreement No. 20-07-0058 (July 25, 2007), at 3, https://assets.documentcloud.org/documents/1672364/irwin-county-igsa-contract.pdf.

489. Irwin County is required under the IGA to obtain the express written consent of the federal government before contracting out the overall management and operation of the facility.

490. On information and belief, Irwin County obtained the requisite approval from the federal government and executed an agreement for the operation of the facility to a private for-profit company, Respondent LaSalle.

491. Because Respondent ICE contracts with Irwin County, which in turn contracts with Respondent LaSalle, for the operation of the detention facility, Respondents ICDC, LaSalle, and their employees, agents, and officers are state or local actors and subject to suit under 42 U.S.C. § 1983,[28] independent of whether they may also be considered federal actors because they are engaging in the core federal function of civil immigration detention.

492. Private physicians, such as Respondent Amin, who are authorized to provide medical services to detained individuals, act under color of state law when treating individuals who are detained and are subject to liability under § 1983.[29]

493. As the prison warden, Respondent Paulk can also be held liable under § 1983.[30]

494. Irwin County Respondents, including Irwin County Hospital, are also subject to suit pursuant to 42 U.S.C. § 1983 under a theory of municipal liability.[31] Municipal liability under § 1983 arises where the municipality has undertaken an official policy or custom which causes an unconstitutional deprivation of plaintiffs' rights. *Id*.

---

[28] *See Richardson v. McKnight*, 521 U.S. 399, 412-13 (1997).
[29] *West v. Atkins*, 487 U.S. 42 (1988).
[30] *Miller v. King*, 384 F.3d 1248 (11th Cir. 2004).
[31] See Monell v. Dep't of Soc. Servs. of City of N.Y., 436 U.S. 658, 694-95 (1978).

99

495.     The Performance-Based National Detention Standards ("PBNDS") apply to all ICE-dedicated civil detention facilities, including ICDC.

496.     The PBNDS set forth mandatory requirements for conditions inside detention facilities, including for medical care, to which a facility is bound.

497.     The PBNDS 2008[32] applies to ICDC pursuant to the IGA.

498.     Private contractors are also subject to, and required to follow, the PBNDS.

**B.     PBNDS: Medical Care Standards**

499.     Federal Respondents have failed to ensure that Irwin County Respondents follow the PBNDS mandates for providing medical care.

500.     The medical care standards require that every facility provide initial medical, mental health and dental screening, medically necessary and appropriate medical, dental and mental health care and pharmaceutical services, comprehensive, routine and preventative health care, as medically indicated, emergency care, specialty health care, timely responses to medical complaints, and hospitalization as needed within the local community. The PBNDS also provide specific instructions for how to meet these requirements.

501.     The PBNDS medical care standards specifically provide that "[h]ealth care needs will be met in a timely and efficient manner." Accordingly, "[e]very facility shall directly or contractually provide its detainee population [with] . . . [t]imely responses."

502.     More specifically, the PBNDS medical care standards provide that: "Each facility shall have a sick call procedure that allows detainees the unrestricted opportunity to freely request health care services . . . provided by a physician or other qualified medical staff in a clinical setting." "All detainees . . . shall have access to sick call." The sick-call procedures

---

[32] See https://www.ice.gov/doclib/dro/detention-standards/pdf/medical_care.pdf

"shall include . . . an established procedure in place to ensure that all sick call requests are received and triaged by appropriate medical personnel within 48 hours after the detainee submits the request. In an urgent situation, the housing unit officer shall notify medical personnel immediately."

503.    The PBNDS further specify that "[a] detainee who needs health care beyond facility resources will be transferred in a timely manner to an appropriate facility where care is available. A written list of referral sources, including emergency and routine care, will be maintained as necessary and updated at minimum annually."

504.    Under the PBNDS, "[d]etainees with chronic conditions will receive care and treatment for conditions where non-treatment would result in negative outcomes or permanent disability as determined by the clinical medical authority."

505.    The PBNDS requires that detention and medical care personnel are adequately trained and licensed; and has specific requirements for treatment and care of those with suspected or known mental health concerns.

506.    The PBNDS also include detailed procedures requiring informed consent for any medical treatment. They explicitly state that "[a]s a rule, medical treatment shall not be administered against a detainee's will." Further, "[i]nvoluntary treatment is a decision made only by medical staff under strict legal restrictions. Prior to any contemplated action involving involuntary medical treatment, DHS/ICE respective Chief Counsel will be consulted."

507.    Under the PBNDS, the facility is obligated to provide communication assistance to individuals who are limited in their English proficiency. The standards provide that: "Non-English speaking detainees and detainees who are deaf or hard of hearing will be provided interpretation or translation services or other assistance as needed for medical care activities."

508.    Finally, the PBNDS requires the designated administrative health authority, who is "authorized and responsible for making decisions about the deployment of health resources and the day-to-day operations of the health services program," to "implement a system of internal review and quality assurance" which includes "[s]ystematic investigation of complaints and grievances."

509.    Petitioners were subjected to non-consensual, medically unindicated, and invasive gynecological procedures while they were detained in ICE custody at ICDC. Petitioners did not receive the adequate, timely care necessary following those procedures as required by the PBNDS.

510.    Federal Respondents failed to ensure that Irwin County Respondents provided appropriate medical care as required by the PBNDS.

511.    Federal Respondents failed to ensure that ICDC administers medical treatment only with informed consent.

512.    Federal Respondents failed to ensure that ICDC provided language accessibility to non-English speakers, including Petitioner Solodkova and putative class members Xu, Rojas Fañas, and Jane Doe #25, while receiving medical care.

## CLASS ACTION ALLEGATIONS

513.    Petitioners bring the Second, Third, Fourth, Fifth, Sixth, Seventh, and Eleventh Claims for Relief, set forth below, pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of themselves and all other persons similarly situated.

514.    Petitioners Yanira Yesenia Oldaker, Tatyana Alekseyevna Solodkova, Luz Adriana Walker, and Lourdes Terrazas Silas seek to represent a class of individuals held in ICE custody at ICDC who were subjected to Respondent Amin's medical abuses, including a subclass for individuals who were retaliated against for speaking out against his abuses.

102

515.    The proposed "Main Class" is defined as:

All individuals who were subjected to non-consensual, medically unindicated, and/or invasive gynecological procedures while they were detained in U.S. Immigration and Customs Enforcement custody at the Irwin County Detention Center.

516.    The proposed "Retaliation Sub-Class" is defined as:

All individuals who, after speaking out about or protesting experiencing non-consensual, medically unindicated, and/or invasive gynecological procedures while they were detained in U.S. Immigration and Customs Enforcement Custody at the Irwin County Detention Center, were subject to retaliation by ICE and ICDC Respondents.

517.    The Main Class and Retaliation Sub-Class are so numerous that joinder of all members is impracticable. There are at least 60 individuals who are members of the Main Class.[33] Given the rampant, systematic retaliation against Petitioners and putative class members, many of the at least 60 individuals are also members of the Retaliation Sub-Class. Several members of the Main Class and Retaliation Sub-Class have been deported and are geographically dispersed, and several are subject to imminent deportation. Joinder of class members and sub-class members is impracticable due to their geographic diversity, the instability of their living situations, and limited understanding of English and the laws of the United States.

518.    There are questions of law and fact that are common to all members of the Main Class and Retaliation Sub-Class. The proposed Main Class members allege common harms, including denial of reasonable safety and adequate medical care; exposure to punitive conditions of confinement; and deliberate indifference to their serious medical needs. The Sub-Class members also allege common harms, including deterrence from participation in pending federal

---

[33]John Washington & José Olivares, *Number of Women Alleging Misconduct by ICE Gynecologist Nearly Triples*, The Intercept (Oct. 27, 2020), https://theintercept.com/2020/10/27/ice-irwin-women-hysterectomies-senate/.

proceedings, subjection to imminent removal as a result of speaking out about medical abuses, and retaliation spawned by speaking out about abuses and conditions or their attendance or testimony in federal court. Respondents' actions deterred them from bringing forward credible allegations of that abuse. All proposed Main Class members raise the same legal claims under the Due Process Clause of the Fifth and Fourteenth Amendments, and all proposed Sub-Class members raise the same legal claims under the First Amendment and 42 U.S.C. § 1985(2). The proposed class members' entitlement to these rights is based on a common core of facts. All proposed Main Class members were detained by ICE at ICDC when they were subjected to non-consensual, medically unindicated, or invasive gynecological procedures. Retaliation Sub-Class members were subjected to retaliation as a result of coming forward with their stories and experiences of medical abuse at ICDC. Their shared common facts will ensure that judicial findings regarding the legality of the challenged practices will be the same for all class members.

519. Petitioners' claims are typical of the claims of the proposed Main Class and Retaliation Sub-Class. Petitioners and proposed Main Class members raise common legal claims and are united in their interest and injury. Petitioners, like proposed Main Class members, are currently or were formerly detained at ICDC, where they were subjected to non-consensual, medically unindicated, or invasive gynecological procedures while in ICE custody at ICDC and were unlawfully deprived of their rights under the Due Process Clause of the U.S. Constitution. Petitioners, like proposed Retaliation Sub-Class members, also raised common legal claims and are united in their interest and injury as they all were also subjected to retaliation by ICE and ICDC Respondents as a result of speaking out about the medical abuses occurring at ICDC and were unlawfully deprived of their rights under the First Amendment and 42 U.S.C. § 1985(2). As a result, they are all victims of the same, unlawful course of conduct.

520. Petitioners Yanira Yesenia Oldaker, Tatyana Alekseyevna Solodkova, Luz Adriana Walker, and Lourdes Terrazas Silas are adequate class representatives. Petitioners seek relief on behalf of the proposed Main Class and Retaliation Sub-Class as a whole and have no interest antagonistic to other members of the Main Class or Retaliation Sub-Class. Petitioners' mutual goal is to declare Respondents' actions unlawful and to obtain damages that would cure the harm Respondents have caused. Petitioners seek a remedy for the same injuries as the proposed Main Class and Retaliation Sub-Class members, and all share an interest in having their rights vindicated. Thus, the interests of Petitioners and the proposed Main Class and Retaliation Sub-Class members are aligned.

521. Petitioners are represented by attorneys from the National Immigration Project of the National Lawyers Guild, Columbia Law School Immigrants' Rights Clinic, Dreyer Sterling, LLC, and other undersigned counsel. Counsel have a demonstrated commitment to protecting the rights and interests of noncitizens and, together, have considerable experience in handling complex and class action litigation in the immigration field. Counsel have represented numerous classes of immigrants and other victims of government misconduct in actions in which they successfully obtained class relief.

522. The aforementioned common questions of law and fact predominate over questions affecting only individual members. The issues in this action are subject to generalized proof and thus applicable to the proposed Main Class and Retaliation Sub-Class as a whole. Petitioners and proposed Main Class members were all subjected to the same or similar abusive procedures while in ICE custody at ICDC, and Retaliation Sub-Class members were further subjected to unlawful retaliation. While the suit may entail certain individual questions, a single common question overrides any remaining individual question for the Main Class: whether the

non-consensual, medically unindicated, and invasive gynecological procedures that Petitioners and proposed Main Class members were subjected to and the failure to provide them with adequate medical care violated their rights under the Due Process Clause of the Fifth and Fourteenth Amendments; and for the Retaliation Sub-Class: whether the subsequent actions by Respondents to deter and retaliate against them for attending or testifying in court or speaking out about the abuse they experienced at ICDC violated their rights under the First Amendment and 42 U.S.C. § 1985(2).

523.    For a fair and efficient adjudication of this controversy, a class action is superior to other available methods. Absent a class action, it is unlikely that potential claimants would be afforded relief due to the vulnerable nature of Petitioners and proposed class members. Petitioners and proposed class members are non-citizens who are currently or formerly detained at ICDC, are geographically dispersed, have limited understanding of the law, and some have limited English language skills. Proposed class members therefore face numerous barriers to bringing suits. Given the number of individuals who have been subjected to non-consensual, medically unindicated, or invasive gynecological procedures at ICDC and the number who have been retaliated against as a result of speaking out about the medical abuse at ICDC, aggregation of Petitioners' and proposed class members' claims would promote efficiency, enable faster processing of their claims and avoid duplication of litigation. Consolidation is preferable to individual actions in this case due to this judicial district's connection to the conduct giving rise to the claims. Petitioners are aware of no other pending litigation addressing the same damages claims arising from Respondents' unlawful conduct at issue in this case. Because Petitioners' common questions of fact and law predominate over individual questions, resolution of the

underlying issues in a class action would create less management issues than any of the alternatives.

**CLAIMS FOR RELIEF**[34]

**FIRST CLAIM FOR RELIEF**<br>**Habeas Authority to Order Release from Unlawful Detention**

On Behalf of Detained Petitioners

524.    Petitioners repeat and re-allege the allegations contained in the preceding paragraphs of this Petition as if fully set forth herein.

525.    The Court has broad, equitable authority under the habeas statute, 28 U.S.C. § 2241, 2243 and the common law, to dispose of Petitioners' cases as law and justice require, based on the unique facts and circumstances of their cases, in order to remedy Petitioners' harms resulting from Respondents' egregious and systematic retaliatory behavior.

526.    The Court should exercise this authority to grant Petitioners' habeas corpus petition and to fashion any and all additional relief, necessary to effectuate Petitioners' expeditious release from unlawful detention.

---

[34] As defined in the Parties section:
- "Detained Petitioners" refer to Petitioners Yanira Yesenia Oldaker, Tatyana Alekseyevna Solodkova, Luz Adriana Walker, Lourdes Terrazas Silas, Jane Doe #5, Jane Doe #6, Jane Doe #8, Jane Doe #15, Jane Doe #22;
- "Federal Respondents" refer to Respondents Thomas Giles, Tony Pham, Chad Wolf, William Barr, ICE, Patrick Musante, Cesar Ciprian, Ada Rivera, and Unnamed ICE officials ##1-X;
- "ICDC Respondents" refer to Respondents ICDC, LaSalle, David Paulk, Marteka George, Mia Mines, William Rabiou, FNU Hughes, FNU Smith, FNU Coney, FNU Hanes, FNU Faison, FNU Battle, FNU Vaughn, FNU Scott, FNU Slack, and Unnamed ICDC Officers ##1-X;
- "Irwin County Respondents" refer to all ICDC Respondents, Irwin County Hospital, and Mahendra Amin.

## SECOND CLAIM FOR RELIEF
### Violation of the First Amendment Against Federal Respondents (Retaliation)

For Declaratory and Injunctive Relief
On Behalf of Detained Petitioners Against Federal Respondents in Their Official Capacities

For Damages under *Bivens*
On Behalf of Petitioners and Retaliation Sub-Class Members Against Respondents Giles,
Musante, Ciprian, Rivera, and Unnamed ICE Officials ##1-X in Their Individual Capacities

527.    Petitioners repeat and re-allege the allegations contained in the preceding
paragraphs of this Petition as if fully set forth herein.

528.    Petitioners engaged in constitutionally protected speech and engaged in their
constitutionally protected right to petition the government for the redress of grievances related to
their medical abuse. When testifying to federal investigators and speaking to the press about their
medical abuse, Petitioners were engaging in First Amendment protected speech and petitioning.

529.    Further, Petitioners' speech about the medical abuse they suffered immediately
became a matter of prominent public concern.  Congress investigated their medical abuse, and
the press widely reported on it.  It is therefore entitled to the highest level of protection under the
First Amendment

530.    Petitioners also engaged in their constitutionally protected right to "petition the
government for a redress of grievances." *Stallworth v. Wilkins*, 802 F. App'x 435, 440 (11th Cir.
2020) (quoting *Boxer X v. Harris*, 437 F.3d 1107, 1112 (11th Cir. 2006)). The freedom to
petition protects detained individuals' rights to file a grievance and a complaint and participate
fully during the duration of a lawsuit. Here, it protects Petitioners' participation in the federal
investigations.

531.    Petitioners suffered adverse actions that would likely deter a person of ordinary
firmness from engaging in such speech. Specifically, Federal Respondents deported or attempted
to deport Petitioners. They also used force, solitary confinement and denial of privileges against

108

Petitioners. Outside of deportation or attempted deportation, the use of force, solitary confinement, and the denial of privileges also constitute adverse action under the First Amendment. Not only were these actions likely to deter speech, they actually did.

532.    There is a substantial causal connection between Petitioners' protected speech and Federal Respondents' adverse actions and threats. Petitioners' speech was a substantial or motivating factor for Respondents' retaliatory actions. For example, Respondent ICE deported or attempted to deport several Petitioners and putative class members almost immediately following federal investigators' receipt of their names as witnesses. Federal Respondents have also undertaken a broader pattern and practice of retaliatory deportations of other victims and witnesses. Federal Respondents are retaliating against Petitioners because they are, specifically, victims of and witnesses against the Federal Respondents and will state so accordingly.

533.    Federal Respondents' retaliatory actions caused and will continue to cause irreparable harm by chilling Petitioners exercise of their free speech rights.

534.    Federal Respondents' retaliatory actions and threats caused actual injury to Petitioners, including physical and/or psychological harm.

535.    Federal Respondents acted in clear violation of well-settled law, which reasonable persons would have been aware of, with regard to the standards for retaliation in violation of the First Amendment's right to free speech and right to petition.

536.    Petitioners and Retaliation Sub-Class Members seek, and are entitled to, damages against Federal Respondents Giles, Musante, Ciprian, Rivera, and Unnamed ICE Officials ##1-X in their individual capacities, pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971).

537.     Detained Petitioners seek, and are entitled to, declaratory and injunctive relief against Federal Respondents finding their actions in violation of the First Amendment and compelling all Federal Respondents to cease retaliating against Petitioners for their First Amendment protected conduct.

### THIRD CLAIM FOR RELIEF
### Violation of the First/Fourteenth Amendment (Retaliation under 42 U.S.C. § 1983)

For Declaratory and Injunctive Relief
On Behalf of Detained Petitioners Against ICDC Respondents in Their Official Capacities

For Damages
On Behalf of Petitioners and Retaliation Sub-Class Members Against ICDC Respondents in Their Official and Individual Capacities

538.     Petitioners repeat and re-allege the allegations contained in the preceding paragraphs of this Petition as if fully set forth herein.

539.     Because Respondent ICE contracts with Irwin County, which in turn contracts with Respondent LaSalle, for the operation of the detention facility, Respondents ICDC, LaSalle, and their employees, agents, and officers are state or local actors and subject to suit under 42 U.S.C. § 1983, independent of whether they may also be considered federal actors because they are engaging in the core federal function of civil immigration detention.

540.     Liability under § 1983 extends to private physicians, such as Respondent Amin, who are authorized to provide medical services to prisoners, as well the warden of a state or local detention facility or prison.

541.     ICDC deprived Petitioners of their federal rights under the First Amendment, which has been incorporated to states and localities by the Fourteenth Amendment's Due Process Clause.

542.     Petitioners engaged in constitutionally protected speech and engaged in their constitutionally protected right to petition the government for the redress of grievances.

110

543.    When testifying to federal investigators and speaking to the press, Petitioners were engaging in First Amendment protected speech and petitioning.

544.    Further, Petitioners' speech pertains to matters of prominent public concern. It is therefore entitled to the highest level of protection under the First Amendment.

545.    Petitioners also engaged in their constitutionally protected right to petition the government for a redress of grievances. Specifically, the freedom to petition protects detained individuals' rights to file a grievance complaint and participate fully during the duration of a lawsuit

546.    ICDC Respondents have taken egregious adverse actions against Petitioners and Retaliation Sub-Class members sufficient to trigger First Amendment protections.

547.    These actions include but are not limited to, placing or threatening to place them in medical units or solitary confinement; placing them on cell restriction; transferring them to other units to separate protestors; physically assaulting them, including while handcuffed; threatening to deprive hunger strikers and protestors of property and commissary; threatening to shut off or ration water; withholding their food; delaying delivery of their prescribed medication; denying them access to the law library; denying them internet access; limiting or denying them phone access; monitoring their phone calls and abruptly ending their calls when discussing hunger strikes, medical treatment, or when speaking with reporters; destroying their letters documenting treatment; refusing to produce individuals at hearings related to Respondent Amin's abuses; refusing to coordinate with consular officials; and making false claims to congressional investigators.

548.    There is a substantial causal connection between Petitioners' protected speech and Respondents' adverse actions and threats. ICDC, LaSalle, their employees, agents, and/or

111

contractors have undertaken a pattern and practice of retaliation against victims and witnesses of Respondent Amin's abuses. This pattern and practice demonstrates that ICDC Respondents are retaliating against Petitioners because they are, specifically, victims of and witnesses against the ICDC Respondents.

549. ICDC Respondents' retaliatory actions and threats caused actual injury to Petitioners, including physical and/or psychological harm.

550. ICDC Respondents' retaliatory actions caused and will continue to cause irreparable harm by chilling Petitioners' exercise of their free speech rights.

551. ICDC Respondents are also subject to suit pursuant to 42 U.S.C. § 1983 under a theory of municipal liability. Municipal liability under § 1983 arises where the municipality has undertaken an official policy or custom which causes an unconstitutional deprivation of the plaintiff's rights. *Id*.

552. ICDC had a policy or custom of retaliating against individuals who speak out about the deplorable conditions inside the facility, including medical abuse and neglect, and this policy or custom caused Petitioners' and proposed subclass members injury.

553. ICDC Respondents also failed to properly train their employees and staff regarding retaliation against individuals who report unlawful conditions and abuse.

554. ICDC Respondents are liable to Detained Petitioners for declaratory and injunctive relief resulting from their retaliation and violations of constitutional rights.

555. ICDC Respondents are liable to Petitioners and Retaliation Sub-Class members for all damages resulting from their retaliation and violations of constitutional rights.

556.    ICDC Respondents, in their individual capacities, were motivated by evil motive or intent and/or acted with callous or reckless indifference to the federally protected rights of Petitioners.

557.    Petitioners and Retaliation Sub-Class Members seek, and are entitled to, actual and punitive damages against ICDC Respondents in their official and individual capacities for violations of their First Amendment rights.

558.    Detained Petitioners seek, and are entitled to, declaratory and injunctive relief against ICDC Respondents in their official capacities, finding their actions in violation of the First Amendment and compelling all ICDC Respondents to cease retaliating against Petitioners for their First Amendment protected conduct.

## FOURTH CLAIM FOR RELIEF
### Violation of First Amendment (Alternative claim under *Bivens*)

For Declaratory and Injunctive Relief
On Behalf of Detained Petitioners Against ICDC Respondents in Their Official Capacities

For Damages under *Bivens*
On Behalf of Petitioners and Retaliation Sub-Class Members Against Respondents Paulk, Amin, George, Mines, Rabiou, Hughes, Smith, Coney, Hanes, Faison, Battle, Vaughn, Scott, Slack, and Unnamed ICDC Officers ##1-X in Their Individual Capacities

559.    Petitioners repeat and re-allege the allegations contained in the preceding paragraphs of this Petition as if fully set forth herein.

560.    This claim is brought in the alternative to Count Three. If the Court finds that the ICDC Respondents were operating solely under color of federal law, ICDC Respondents are liable for declaratory and injunctive relief under the First Amendment, and Respondents Paulk, Amin, Mines, Rabiou, Hughes, Smith, Coney, Hanes, Faison, Battle, Vaughn, and Unnamed ICDC Officers ##1-X are liable for damages under the First Amendment. *See Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971).

561.    Petitioners engaged in constitutionally protected speech and engaged in their constitutionally protected right to petition the government for the redress of grievances. When testifying to federal investigators and speaking to the press, Petitioners were engaging in First Amendment protected speech and petitioning.

562.    Further, Petitioners' speech pertains to matters of prominent public concern. It is therefore entitled to the highest level of protection under the First Amendment.

563.    Petitioners also engaged in their constitutionally protected right to petition the government for a redress of grievances. Specifically, the freedom to petition protects detained individuals' rights to file a grievance complaint and participate fully during the duration of a lawsuit. Here, it protects Petitioners' participation in the federal investigations.

564.    ICDC Respondents have taken egregious adverse actions against Petitioners and Retaliation Sub-Class members sufficient to trigger First Amendment protections. These actions include but are not limited to placing them in medical units or solitary confinement; placing them on cell restriction; transferring them to other units to separate protestors; physically assaulting them, including while handcuffed; threatening to deprive hunger strikers and protestors of property and commissary; threatening to shut off or ration water; withholding their food; delaying delivery of their prescribed medication; denying them access to the law library; denying them internet access; limiting or denying them phone access; monitoring their phone calls and abruptly ending their calls when discussing hunger strikes, medical treatment, or when speaking with reporters; destroying their letters documenting treatment; refusing to produce individuals at hearings related to Respondent Amin's abuses; refusing to coordinate with consular officials; and making false claims to congressional investigators.

114

565.    There is a substantial causal connection between Petitioners' protected speech and Respondents' adverse actions and threats. ICDC, LaSalle, their employees, agents, and/or contractors have undertaken a pattern and practice of retaliation against victims and witnesses of Respondent Amin's abuses. This pattern and practice demonstrates that ICDC Respondents are retaliating against Petitioners because they are, specifically, victims of and witnesses against the ICDC Respondents.

566.    ICDC Respondents' adverse actions and threats caused actual injury to Petitioners, including physical and/or psychological harm.

567.    ICDC Respondents' adverse actions caused and will continue to cause irreparable harm by chilling Petitioners' exercise of their free speech rights.

568.    ICDC Respondents are liable to Detained Petitioners for declaratory and injunctive relief resulting from their retaliation and violations of constitutional rights.

569.    Should this Court hold that ICDC Respondents were acting under color of federal authority, Petitioners and proposed sub-class members would have no available statutory cause of action which would provide a meaningful remedy. *See Carlson v. Green*, 446 U.S. 14, 23 (1980).

570.    Should this Court hold that ICDC Respondents were acting under color of federal authority, Petitioners and Retaliation Sub-Class Members seek, and would be entitled to, damages against individual ICDC Respondents Paulk, Amin, George, Mines, Rabiou, Hughes, Smith, Coney, Hanes, Faison, Battle, Vaughn, Scott, Slack, and Unnamed ICDC Officers ##1-X in their individual capacities, pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971).

115

571.    Should this Court hold that ICDC Respondents were acting under color of federal authority, Detained Petitioners also seek, and would be entitled to, declaratory and injunctive relief against ICDC Respondents in their official capacities.

### FIFTH CLAIM FOR RELIEF
### Violation of the Fifth Amendment (Punitive Conditions of Confinement and Deliberate Indifference against Federal Respondents)

For Declaratory and Injunctive Relief
On Behalf of Detained Petitioners Against Federal Respondents in Their Official Capacities

For Damages under *Bivens*
On Behalf of Petitioners and Main Class Members Against Respondents Giles, Musante, Ciprian, Rivera, and Unnamed ICE Officials #1-X in Their Individual Capacities

572.    Petitioners repeat and re-allege the allegations contained in the preceding paragraphs of this Petition as if fully set forth herein.

573.    The Due Process Clause guarantees persons in civil immigration detention the right to reasonable safety and to be free from punitive conditions of confinement. The government violates the right to substantive due process under the Fifth Amendment when it fails to satisfy its affirmative duty to provide conditions of confinement of reasonable health and safety to the people it holds in its custody, and therefore violates the Constitution when it fails to provide for their basic human needs—*e.g.*, food, clothing, shelter, medical care, and reasonable safety for those in custody. *See DeShaney v. Winnebago Cty. Dep't. of Soc. Servs.*, 489 U.S. 189, 199-200 (1989); *Helling v. McKinney*, 509 U.S. 25, 32 (1993).

574.    Individuals in civil detention are afforded "more constitutional protection, more considerate treatment, and conditions of confinement" than individuals with criminal convictions "whose conditions of confinement are designed to punish." *Youngberg v. Romeo*, 457 U.S. 307, 321-22 (1982); *see Marsh v. Fla. Dep't of Corr.*, 330 F. App'x 179, 182 (11th Cir. 2009).

116

575.    At a minimum, the Due Process Clause prohibits the government from being deliberately indifferent to a substantial risk of serious harm that would rise to the level of an Eighth Amendment violation. The government violates the right to substantive due process when, acting with deliberate indifference, it subjects those in civil detention to unreasonable risks to their health and safety. *See Hamm v. DeKalb Cty.*, 774 F.2d 1567, 1572-74 (11th Cir. 1985).

576.    Petitioners and Main Class members have been subjected to medical abuse, in many cases amounting to sexual assault, and have serious medical needs, including but not limited to those resulting from non-consensual, medically unindicated, or invasive gynecological procedures, while they are detained at ICDC.

577.    Federal Respondents, including Giles, Musante, Ciprian, Rivera, and Unnamed ICE Officials ##1-X, were aware of the risk of serious harm to Petitioners and Main Class members as a result of ICDC's abuse and medical neglect.

578.    Despite knowledge of the risk of serious harm to Petitioners and Main Class members, Federal Respondents have disregarded that risk by conduct that is more than negligence. Detained Petitioners continue to have their medical needs unaddressed, despite their need for urgent medical care. Federal Respondents have failed to ensure that ICDC provides Petitioners and Main Class members with adequate medical treatment for their medical needs. In so doing, Respondents have acted with deliberate indifference to serious and irreparable harm.

579.    Respondents' deliberate indifference and failure to ensure adequate medical care at ICDC have caused or contributed to the Petitioners' and Main Class members' ongoing injuries and harms, including physical and/or psychological harm.

580.    Respondents' actions in affirmatively subjecting Petitioners to medical abuse, in some cases amounting to sexual assault, at the hands of Respondent Amin, caused the Petitioners' and Main Class members' ongoing injuries and harms.

581.    Petitioners and Main Class members are currently or were formerly subjected to punitive conditions of confinement at ICDC which lack a reasonable relation to any legitimate government purpose. Federal Respondents subjected them to repeated medical abuse at the hands of Respondent Amin.

582.    Federal Respondents also failed to provide Petitioners and Main Class members with the minimum level of necessities while in ICE custody at ICDC, including safety and medical care, required under the Due Process Clause.

583.    By subjecting Detained Petitioners to ongoing medical abuse, in some instances rising to the level of sexual assault, and to medical neglect, Federal Respondents are maintaining detention conditions that amount to punishment and are failing to protect Detained Petitioners' health and safety in violation of Detained Petitioners' substantive due process rights.  They do so in clear violation of well-settled law, which reasonable persons would have been aware of.

584.    Federal Respondents Giles, Musante, Ciprian, Rivera, and Unnamed ICE Officials ##1-X, in their individual capacities, were motivated by evil motive or intent, and/or were callously or recklessly indifferent to Petitioners' federally protected rights.

585.    Petitioners and Main Class Members seek, and are entitled to, compensatory and punitive damages individual Federal Respondents Giles, Musante, Ciprian, Rivera, and Unnamed ICE Officials ##1-X for subjecting them to punitive conditions of confinement and acting with deliberate indifference to serious medical needs, pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971).

586.     Detained Petitioners also seek injunctive relief against Federal Respondents in their official capacities.

## SIXTH CLAIM FOR RELIEF
### Violation of the Fourteenth Amendment (Punitive Conditions of Confinement and Deliberate Indifference pursuant to 42 U.S.C. § 1983)

For Declaratory and Injunctive Relief
On Behalf of Detained Petitioners Against ICDC Respondents in Their Official Capacities

For Damages
On Behalf of Petitioners and Main Class Members Against ICDC Respondents in Their Official and Individual Capacities

587.     Petitioners repeat and re-allege the allegations contained in the preceding paragraphs of this Petition as if fully set forth herein.

588.     Because Respondent ICE contracts with Irwin County, which in turn contracts with Respondent LaSalle, for the operation of the detention facility, Respondents ICDC, LaSalle, and their employees, agents, and officers are state or local actors and subject to suit under 42 U.S.C. § 1983, independent of whether they may also be considered federal actors because they are engaging in the core federal function of civil immigration detention.

589.     Liability under § 1983 extends to private physicians, such as Respondent Amin, who are authorized to provide medical services to prisoners, as well the warden of a state or local detention facility or prison.

590.     The Due Process Clause persons in civil immigration detention the right to reasonable safety and to be free from punitive conditions of confinement. The government violates the right to substantive due process when it fails to satisfy its affirmative duty to provide conditions of confinement of reasonable health and safety to the people it holds in its custody, and therefore violates the Constitution when it fails to provide for their basic human needs—*e.g.*, food, clothing, shelter, medical care, and reasonable safety for those in custody.

119

591.     Individuals in civil detention are afforded "more constitutional protection, more considerate treatment, and conditions of confinement" than individuals with criminal convictions "whose conditions of confinement are designed to punish." *Youngberg v. Romeo*, 457 U.S. 307, 321-22 (1982).

592.     At a minimum, the Due Process Clause prohibits the government from being deliberately indifferent to a substantial risk of serious harm that would rise to the level of an Eighth Amendment violation. The government violates the right to substantive due process when, acting with deliberate indifference, it subjects those in civil detention to unreasonable risks to their health and safety.

593.     Petitioners and Main Class members have serious medical needs, including but not limited to those resulting from non-consensual, medically unindicated, or invasive gynecological procedures, while they are detained at ICDC.

594.     While detained at ICDC, Petitioners and proposed class members were subjected to non-consensual, medically unindicated, or invasive gynecological procedures at the hands of Respondent Amin. ICDC Respondents acting with deliberate indifference failed to provide Petitioners and proposed class members with conditions of reasonable health and safety during the time they were detained at ICDC.

595.     ICDC Respondents further acted with deliberate indifference to Petitioners' and Main Class members' serious medical needs. ICDC Respondents were aware of the serious risk of harm posed by medical abuse and neglect at ICDC, including non-consensual, medically unindicated, or invasive gynecological procedures.

596.     Despite knowledge of the risk of serious harm to Petitioners and Main Class members, ICDC Respondents have disregarded that risk by conduct that is more than negligence.

120

Detained Petitioners continue to have their medical needs neglected and ignored, despite their need for urgent medical care. ICDC Respondents have failed to provide Petitioners and Main Class members with adequate medical treatment for their medical needs. In so doing, ICDC Respondents have acted with deliberate indifference to serious and irreparable harm.

597.    ICDC Respondents' failure to provide adequate medical care has contributed to the Petitioners' and Main Class members' ongoing injuries and harms.

598.    The right to substantive due process is also violated when the government imposes punitive conditions of confinement to individuals in civil custody.

599.    Petitioners and Main Class members are currently or were formerly subjected to punitive conditions of confinement at ICDC which lack a reasonable relation to any legitimate government purpose. ICDC Respondents failed to provide Petitioners and Main Class members with the minimum level of necessities while in their custody, including safety and medical care, required under the Due Process Clause. By subjecting Detained Petitioners to ongoing medical neglect and abuse, ICDC Respondents are maintaining detention conditions that amount to punishment and are failing to protect Detained Petitioners' health and safety in violation of Detained Petitioners' substantive due process rights.

600.    By subjecting Petitioners and Main Class members to punitive conditions of confinement and acting with deliberate indifference to their serious medical needs, ICDC Respondents violated their rights to substantive due process.

601.    ICDC Respondents are also subject to suit pursuant to 42 U.S.C. § 1983 under municipal liability.

602.    ICDC had a policy or custom of retaliating against individuals who spoke out about medical abuses suffered at ICDC at the hands of Respondent Amin, and this policy or

custom caused Petitioners' and proposed subclass members injury. ICDC Respondents also failed to properly train their employees and staff regarding provision of adequate medical care.

603.    A plaintiff may also recover punitive damages "under § 1983 'when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves callous or reckless indifference to the federally protected rights of others.'" *Wright v. Sheppard*, 919 F.2d 665, 670 (11th Cir. 1990) (quoting *Smith v. Wade*, 461 U.S. 30, 56 (1983)). ICDC Respondents, in their individual capacities, have engaged in such conduct here, and Petitioners should be awarded punitive damages.

604.    Petitioners and Main Class members seek, and are entitled to, actual damages against ICDC Respondents in their official and individual capacities for all damages resulting from their violations of substantive due process rights.

605.    Petitioners and Main Class members seek, and are entitled to, punitive damages against ICDC Respondents in their official and individual capacities for violations of their substantive due process rights.

606.    Detained Petitioners also seek declaratory and injunctive relief against ICDC Respondents in their official capacities.

**SEVENTH CLAIM FOR RELIEF**
**Violation of the Fifth Amendment (Alternative First Amendment claim against ICDC Respondents under *Bivens*)**

For Declaratory and Injunctive Relief
On Behalf of Detained Petitioners Against ICDC Respondents in Their Official Capacities

For Damages under *Bivens*
On Behalf of Petitioners and Main Class Members Against Respondents Paulk, Amin, George, Mines, Rabiou, Hughes, Smith, Coney, Hanes, Faison, Battle, Vaughn, Scott, Slack, and Unnamed ICDC Officers ##1-X in Their Individual Capacities

607.    Petitioners repeat and re-allege the allegations contained in the preceding paragraphs of this Petition as if fully set forth herein.

122

608.    In the alternative, should this Court find that the ICDC Respondents were operating solely under color of federal law, ICDC Respondents are liable for declaratory and injunctive relief under the First Amendment, and Respondents Paulk, Amin, George, Mines, Rabiou, Hughes, Smith, Coney, Hanes, Faison, Battle, Vaughn, Scott, Slack, and Unnamed ICDC Officers ##1-X are liable for damages under the First Amendment.

609.    The Due Process Clause persons in civil immigration detention the right to reasonable safety and to be free from punitive conditions of confinement. The government violates the right to substantive due process when it fails to satisfy its affirmative duty to provide conditions of confinement of reasonable health and safety to the people it holds in its custody, and therefore violates the Constitution when it fails to provide for their basic human needs—*e.g.*, food, clothing, shelter, medical care, and reasonable safety for those in custody.

610.    Individuals in civil detention are afforded "more constitutional protection, more considerate treatment, and conditions of confinement" than individuals with criminal convictions "whose conditions of confinement are designed to punish." *Youngberg v. Romeo*, 457 U.S. 307, 321-22 (1982).

611.    At a minimum, the Due Process Clause prohibits the government from being deliberately indifferent to a substantial risk of serious harm that would rise to the level of an Eighth Amendment violation. The government violates the right to substantive due process when, acting with deliberate indifference, it subjects those in civil detention to unreasonable risks to their health and safety.

612.    Petitioners and Main Class members have serious medical needs, including those resulting from non-consensual, medically unindicated, or invasive gynecological procedures, while they are detained at ICDC.

123

613.    While detained at ICDC, Petitioners and proposed class members were subjected to non-consensual, medically unindicated, or invasive gynecological procedures at the hands of Respondent Amin. ICDC Respondents failed to provide Petitioners and proposed class members with conditions of reasonable health and safety during the time they were detained at ICDC.

614.    ICDC Respondents further acted with deliberate indifference to Petitioners' and Main Class members' serious medical needs. ICDC Respondents were aware of the serious risk of harm posed by medical abuse and neglect at ICDC, including non-consensual, medically unindicated, or invasive gynecological procedures.

615.    Despite knowledge of the risk of serious harm to Petitioners and Main Class members, ICDC Respondents have disregarded that risk by conduct that is more than negligence. Detained Petitioners continue to have their medical needs neglected and ignored, despite their need for urgent medical care. ICDC Respondents have failed to provide Petitioners and Main Class members with adequate medical treatment for their medical needs. In so doing, ICDC Respondents have acted with deliberate indifference to serious and irreparable harm.

616.    ICDC Respondents' failure to provide adequate medical care has contributed to the Petitioners' and Main Class members' ongoing injuries and harms.

617.    The right to substantive due process is also violated when the government imposes punitive conditions of confinement to individuals in civil custody.

618.    Petitioners and Main Class members are currently or were formerly subjected to punitive conditions of confinement at ICDC which lack a reasonable relation to any legitimate government purpose. ICDC Respondents failed to provide Petitioners and Main Class members with the minimum level of necessities while in their custody, including safety and medical care, required under the Due Process Clause. By subjecting Detained Petitioners to ongoing medical

neglect and abuse, ICDC Respondents are maintaining detention conditions that amount to punishment and are failing to protect Detained Petitioners' health and safety in violation of Detained Petitioners' substantive due process rights.

619.  By subjecting Petitioners and Main Class members to punitive conditions of confinement and acting with deliberate to their serious medical needs, ICDC Respondents violated their rights to substantive due process.

620.  ICDC Respondents are liable to Detained Petitioners for declaratory and injunctive relief resulting from their violations of constitutional rights.

621.  Because ICDC Respondents acted in clear violation of well-settled law, which reasonable persons would have been aware of, with regard to the standards for punitive conditions of confinement and with deliberate indifference to serious medical needs under the Fifth Amendment, the actions of individual ICDC Respondents Paulk, Amin, George, Mines, Rabiou, Hughes, Smith, Coney, Hanes, Faison, Battle, Vaughn, Scott, Slack, and Unnamed ICDC Officers ##1-X give rise to a cause of action for damages against them in their individual capacities on behalf of Petitioners and the Retaliation Sub-Class members, pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971).

622.  Should this Court hold that ICDC Respondents were acting under color of federal authority, Petitioners and proposed class members would have no available statutory cause of action which would provide a meaningful remedy.

623.  Should this Court hold that ICDC Respondents were acting under color of federal authority, Petitioners and Main Class Members seek, and would be entitled to, damages against Respondents Paulk, Amin, George, Mines, Rabiou, Hughes, Smith, Coney, Hanes, Faison, Battle, Vaughn, Scott, Slack, and Unnamed ICDC Officers ##1-X in their individual capacities

for damages under the First Amendment, pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971).

624. Should this Court hold that ICDC Respondents were acting under color of federal authority, Detained Petitioners seek, and would be entitled to, declaratory and injunctive relief against ICDC Respondents finding ICDC Respondents' actions in violation of the First Amendment and compelling all Federal Respondents to cease retaliating against Petitioners for their First Amendment protected conduct.

## EIGHTH CLAIM FOR RELIEF
### Violation of the Rehabilitation Act

<u>On Behalf of Detained Petitioners for Declaratory and Injunctive Relief
Against All Respondents in their Official Capacities</u>

625. Petitioners repeat and re-allege the allegations contained in the preceding paragraphs of this Petition as if fully set forth herein.

626. Section 504 of the Rehabilitation Act prohibits federal agencies and those receiving federal financial assistance from discriminating against individuals with disabilities. DHS regulations implementing the Rehabilitation Act mandate that "[n]o qualified individual with a disability in the United States, shall, by reason of his or her disability, be excluded from participation in, be denied benefits of, or otherwise be subjected to discrimination under any program or activity conducted by the Department." 6 C.F.R. § 15.30(a); *see also* 29 U.S.C. § 794(a); 28 C.F.R. § 39.130 (applying the Rehabilitation Act to the Department of Justice).

627. The regulations implementing Section 504 prohibits DHS from utilizing "criteria or methods of administration the purpose or effect of which would: (i) Subject qualified individuals with a disability to discrimination on the basis of disability; or (ii) Defeat or substantially impair accomplishment of the objectives of a program or activity with respect to individuals with a disability." 6 C.F.R. § 15.30(b)(4).

628. Section 504 of the Rehabilitation Act additionally compels executive agencies and those receiving federal financial assistance to provide reasonable accommodations for individuals with disabilities. *See* 29 U.S.C. § 794(d) (incorporating under the Rehabilitation Act the standards used to determine a violation of the American with Disabilities Act); 42 U.S.C. 12112(b)(5) (prohibiting the denial of reasonable accommodations to individuals with disabilities).

629. Under the Rehabilitation Act, a plaintiff may state a claim for intentional discrimination, disparate treatment or failure to make a reasonable accommodation. *See Schwarz v. City of Treasure Island*, 544 F.3d 1201, 1212 n.6 (11th Cir. 2008).

630. The Rehabilitation Act applies to the services, programs, and activities within ICDC where Respondent ICE detains Detained Petitioners, as Respondent ICDC receives substantial federal financial assistance.

631. Detained Petitioners' underlying medical conditions qualify as disabilities for the purposes of the Rehabilitation Act. 29 U.S.C. § 705(2)(B); 42 U.S.C. § 12102; 6 C.F.R. § 15.30. Detained Petitioners all have recorded physical and/or mental impairments, many of which are a direct result of the abuses that they have suffered at the hands of Respondent Amin, that substantially limit one or more major life activities. 29 U.S.C. § 705; 6 CFR § 15.3(d). The limitations on their life activities, such as caring for themselves, eating, sleeping, and speaking, are expected to be permanent or long-term. *See Gordon v. E.L. Hamm & Associates, Inc.*, 100 F.3d 907, 911 (11th Cir. 1996).

632. Respondents have excluded Detained Petitioners from participating in and/or denied them the benefits of the services, programs, and activities within ICDC by reason of their disabilities. Respondents' actions are discriminatory and have the purpose or effect of defeating

or substantially impairing the accomplishment of the objectives of the services, programs, and activities within ICDC with respect to Detained Petitioners.

633. Respondents' ongoing detention of Detained Petitioners, where they are unable to access the services, programs, and activities within ICDC, constitutes discrimination under the Rehabilitation Act.

634. Detained Petitioners are otherwise qualified to participate in the services, programs, and activities within ICDC.

635. The only available "reasonable accommodation" that would mitigate Detained Petitioners' disabilities is release from detention. Respondents have failed to implement this reasonable accommodation, which would not be unduly burdensome nor require a fundamental alteration in the services, programs, and activities of the detention center.

636. For these reasons, Respondents ongoing detention of Detained Petitioners violates the Rehabilitation Act.

637. Detained Petitioners seek, and are entitled to, injunctive and declaratory relief against all Respondents in their official capacities to remedy Respondents' ongoing violation of the Rehabilitation Act.

**NINTH CLAIM FOR RELIEF**
**Violation of the Administrative Procedure Act and the Immigration and Nationality Act**
**(Deportation of witnesses and individuals in the midst of legitimate efforts to protect their civil rights or civil liberties)**

On Behalf of Petitioners for Declaratory and Injunctive Relief
Against Federal Respondents in Their Official Capacities

638. Petitioners repeat and re-allege the allegations contained in the preceding paragraphs of this Petition as if fully set forth herein.

639.     The Administrative Procedure Act ("APA") provides that a "person suffering

legal wrong because of agency action, or adversely affected or aggrieved by agency action

within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702.

640.     Under *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954), and

related cases, an agency and agency officials are required to follow their own policies. *See*

*Morton v. Ruiz*, 415 U.S. 199, 235 (1974) ("Where the rights of individuals are affected, it is

incumbent upon agencies to follow their own procedures.")

641.     The Immigration and Nationality Act ("INA") and federal regulations prohibit the

departure of any noncitizen from the United States "if his departure would be prejudicial to the

interests of the United States." 8 C.F.R. §§ 215.2(a); see also 8 U.S.C. § 1185(a)(1) (providing

that "it shall be unlawful . . . for any alien to depart . . . from . . . the United States except under

such reasonable rules, regulations, and orders, and subject to such limitations and exceptions as

the President may prescribe"). That includes, *inter alia*, "Any [noncitizen] who is needed in the

United States in connection with any investigation or proceeding being, or soon to be, conducted

by any official executive, legislative, or judicial agency in the United States or by any

governmental committee, board, bureau, commission, or body in the United States, whether

national, state, or local." 8 C.F.R. § 215.3(h); *see also* Control of Aliens Departing from the

United States, 45 Fed. Reg. 65,515, 65,515-16 (Oct. 3, 1980) (promulgating into the immigration

regulations a copy of the State Department's pre-existing list in 22 C.F.R. Part 46).

642.     In addition, both statute and regulations contemplate the stay of removal and

release of individuals who are witnesses in ongoing civil and criminal prosecutions and

investigations, irrespective of whether they otherwise have authorization to be or remain in the

U.S. by virtue of immigration status. *See, e.g.*, 8 U.S.C. § 1231(c)(2)(a) (authorizing the issuance

129

of a stay and release on bond when "(i) immediate removal is not practicable or proper; or (ii) the alien is needed to testify in the prosecution of a person for a violation of a law of the United States or of any State"); 8 C.F.R. § 212.5(b)(4) (permitting parole from detention for "Aliens who will be witnesses in proceedings being, or to be, conducted by judicial, administrative, or legislative bodies in the United States").

643.    Respondent ICE has an established policy, ICE Policy Number 10076.1, which explicitly states, "it is . . . against ICE policy to remove individuals in the midst of a legitimate effort to protect their civil rights or civil liberties."

644.    Multiple federal agencies are known to be conducting investigations into medical abuse of women at ICDC, including the DOJ, DHS OIG, and FBI. Congressional committees have likewise expressed deep concern about treatment of women at ICDC, including the House Judiciary Committee by letter dated November 7, 2020 and the House Oversight Committee by letter dated November 12, 2020.

645.    ICE has already deported or attempted to deport and nearly deported several Petitioners shortly after their names and experiences at ICDC were shared with federal investigative agencies.

646.    On information and belief, neither the DOJ nor DHS OIG nor the FBI has made any efforts to protect Petitioners or follow the procedures outlined in the departure bar regulations.

647.    By failing to follow their own regulations, Federal Respondents have violated both the INA and the APA. Their actions are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), and "contrary to constitutional right, power, privilege, or immunity," 5 U.S.C. § 706(2)(B). A fundamental principle of

administrative law is that an "agency must follow its own rules." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 549 (2009); *see also Accardi*, 347 U.S. at 260. Federal Respondents' failure to follow the INA and their own regulations is unlawful agency action.

648.    Because Respondents violated the laws and procedures governing its enforcement actions and the rights afforded to individuals facing deportation in their efforts to silence Petitioners, Respondents' actions violate their constitutional, statutory, and regulatory rights.

649.    Petitioners seek, and are entitled to, declaratory and injunctive relief against Federal Respondents in their official capacities to remedy their violations of the APA and INA.

**TENTH CLAIM FOR RELIEF**
**Violation of the Administrative Procedure Act (Failure to follow PBNDS)**

On Behalf of Detained Petitioners for Declaratory and Injunctive Relief
Against Federal Respondents in Their Official Capacities

650.    Petitioners repeat and re-allege the allegations contained in the preceding paragraphs of this Petition as if fully set forth herein.

651.    The Administrative Procedure Act ("APA") provides that a "person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702.

652.    Under *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954), and related cases, an agency and agency officials are required to follow their own policies. *See Morton v. Ruiz*, 415 U.S. 199, 235 (1974) ("Where the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures.")

653.    The PBNDS apply at all ICE-dedicated civil detention facilities, including ICDC.

654.    The PBNDS set forth a set of mandatory requirements, including regarding medical care, to which a facility is bound. Failure to comply with the PBNDS can give rise to liability under the APA.

655.     ICDC, and any subcontractors, are bound by the 2008 PBNDS pursuant to the IGA.

656.     Federal Respondents have failed to ensure that ICDC Respondents follow the PBNDS mandates for providing medical care.

657.     Detained Petitioners were subjected to non-consensual, medically unindicated, or invasive gynecological procedures while they were detained in ICE custody at ICDC. Petitioners did not receive the adequate, timely care necessary following those procedures.

658.     Federal Respondents failed to ensure that ICDC Respondents provided appropriate medical care to Petitioners under the PBNDS.

659.     Federal Respondents failed to ensure that ICDC administers medical treatment only with informed consent.

660.     Federal Respondents failed to ensure that ICDC provided language accessibility to non-English speakers while receiving medical care.

661.     Petitioners are prejudiced by Federal Respondents' failure to follow the PBNDS and failure to ensure that the ICDC Respondents follow the PBNDS. Petitioners have suffered and will continue to suffer irreparable injury because of this failure to follow the PBNDS.

662.     A fundamental principle of administrative law is that an "agency must follow its own rules." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 549 (2009); *see also Accardi*, 347 U.S. at 260. The Federal Respondents' failure to follow the PBNDS and failure to ensure that the ICDC Respondents follow the PBNDS is unlawful agency action.

663.     Detained Petitioners seek, and are entitled to, declaratory and injunctive relief against Federal Respondents in their official capacities to remedy Federal Respondents' ongoing violations of the APA.

## ELEVENTH CLAIM FOR RELIEF
### Violation of 42 U.S.C. § 1985(2) – Conspiring to Deter Testimony/Participation in Investigations and Court Proceedings

For Declaratory and Injunctive Relief
On Behalf of Detained Petitioners Against All Respondents in Their Official Capacities

For Damages
On Behalf of Petitioners and Retaliation Sub-Class Members Against All Respondents in Their Official and Individual Capacities

664.     Petitioners repeat and re-allege the allegations contained in the preceding paragraphs of this Petition as if fully set forth herein.

665.     42 U.S.C. § 1985(2), which codifies portions of the Ku Klux Klan Act of 1871, provides a private right of action against persons who engage in a conspiracy to deter any party or witness from attending or testifying in a pending federal court proceeding. It also provides a provide right of action against persons who conspire to retaliate against witnesses or participants in federal court proceedings. Section 1985(2) was passed to protect the process of federal courts, and to allow them to proceed without improper outside influence, by preventing intrusions on the rights of parties and witnesses.

666.     To assert a deterrence claim under § 1985(2), a plaintiff must allege that (1) two or more people conspired (2) to deter a witness from testifying in a pending federal proceeding (3) which resulted in injury to the plaintiff.

667.     To assert a retaliation claim under § 1985(2), a plaintiff must allege (1) a conspiracy, (2) retaliation spawned by the attendance or testimony in federal court, (3) an act in furtherance of the conspiracy, and (4) injury to the plaintiff." *Aque v. Home Depot U.S.A., Inc.*, 629 F. Supp. 2d 1336, 1343 (N.D. Ga. 2009) (citation omitted)

668.     On information and belief and based on ample circumstantial evidence, Respondents and ICDC staff conspired and took action to deter and prevent petitioners from

133

participating in congressional and federal law enforcement investigation of medical abuse at ICDC.

669.    Shortly before a congressional delegation arrived at ICDC, Respondents and their employees and/or contractors transferred some survivors of medical abuse to the "Golf" pod, which is located behind the main ICDC facility and was not scheduled for inspection by the congressional delegation. Respondents and their employees and/or contractors ordered women not speak to Congressmembers and to stay in their beds during the inspection.

670.    On information and belief and based on ample circumstantial evidence, Respondents and their employees and/or contractors, including Unnamed ICE Agents, conspired to deter and prevent petitioners from testifying or participating in a pending federal proceeding by expediting the deportation of witnesses who attempted to participate in federal investigations into ICDC.

671.    On November 25, 2020, Petitioner Walker, through counsel, informed government attorneys that she had information relevant to federal investigations and judicial proceedings related to medical abuse at ICDC. Approximately one week later, an ICE agent at ICDC took Ms. Walker's fingerprints and informed her that issuance of her travel documents was being expedited, which meant she would soon be deported.

672.    On October 28, 2020, Petitioner Oldaker provided a declaration and list of victims to her lawyers. Her lawyers then shared these materials with federal investigators. Less than four days later, Ms. Oldaker's commissary was "zeroed-out" in preparation for her deportation. Ms. Oldaker was brought to the airport and would have been deported if not for the last-minute intervention of her attorneys and members of Congress.

673.    Ms. Oldaker's appeal to the Board of Immigration Appeals had been denied on October 7, 2020. Executing orders of removal so soon after the denial of a BIA appeal is extremely unusual.

674.    On October 27, 2020, Petitioner Ndonga spoke with federal investigators about medical abuse at ICDC. During the interview she told federal investigators that she was afraid of retaliation. Only hours after the interview with federal investigators ended, Respondent Hanes informed her that her removal hold had been lifted and she would soon be deported. At the time, Ms. Ndonga had been in immigration detention for over 19 months.

675.    On September 15, 2020, Petitioner Floriano Navarro admitted to ICDC staff and Unnamed ICE Agents that she had spoken with reporters about medical abuse at ICDC. She was deported within 24 hours of this admission.

676.    Prior to Petitioner Floriano Navarro's deportation, ICDC employees and Unnamed ICE Agents made statements suggesting that she was targeted for expedited deportation because she had helped expose misconduct at ICDC.

677.    The close proximity between participation in investigations of misconduct at ICDC and expedited deportation strongly suggests coordination between Respondents to deter and prevent participation in federal investigations and court proceedings.

678.    On information and belief and based on ample circumstantial evidence, these and other attempts to expedite the deportation of witnesses to medical abuse at ICDC were part of an ongoing conspiracy to deter and prevent participation and testimony in federal investigations and court proceedings.

679.    In addition to this overt conduct, Respondents and their employees and/or contractors have made explicit statements suggesting that they knew about and actively

135

participated in a conspiracy. This includes saying that Petitioners and other ICDC detainees would have to "pay" for speaking up about their mistreatment.

680.    Respondents and their employees and/or contractors also monitored Petitioners' phone calls. When Petitioners mentioned topics related to the federal investigation, including their abuse, mistreatment, of physical health, Respondents and their employees and/or contractors cut off the phone connection.

681.    By deterring and preventing participation in investigations and court proceedings, Respondents and their employees aimed to shield themselves from accountability.

682.    Victims and witnesses who are deported will be unable to effectively participate in federal investigation and court proceedings from abroad. Because of the actions or Respondents and their employees, those witnesses who were not deported are afraid to participate in federal investigations and court process because it may expose them to expedited deportation or other retaliation.

683.    Respondents' actions, including threats, intimidation, and deportation of witnesses, are sufficiently grave to constitute deterrence and retaliation under § 1985(2).

684.    On information and belief and based on ample circumstantial evidence, Respondents and their employees continue to conspire to deter witnesses to and victims of medical abuse at ICDC from testifying or participating in this federal action. If this Court does not intervene, petitioners and crucial fact witnesses are at risk of being deported or otherwise retaliated against before this action is resolved.

685.    Petitioners and the Retaliation Sub-Class seek, and are entitled to, damages against all Respondents in their official and individual capacities.

686.     Detained Petitioners also seek declaratory and injunctive relief against all

Respondents in their official capacities to remedy their ongoing or future violations of § 1985(2).

### TWELFTH CLAIM FOR RELIEF
**Violation of the Right to Due Process Under the Fifth Amendment (Deportation of essential witnesses)**

On Behalf of All Petitioners for Declaratory and Injunctive Relief
Against Federal Respondents in Their Official Capacities

687.     Petitioners repeat and re-allege the allegations contained in the preceding

paragraphs of this Petition as if fully set forth herein.

688.     The deportation of a material witness in a criminal proceeding may establish a

violation of the Due Process Clause of the Fifth Amendment. *See United States v. Valenzuela-*

*Bernal*, 458 U.S. 858, 872–73 (1982); *United States v. Schaefer*, 709 F.2d 1383, 1385 (11th Cir.

1983); *United States v. De La Cruz Suarez*, 601 F.3d 1202, 1212–13 (11th Cir. 2010).

689.     To show a Due Process violation, a criminal defendant must make a "plausible

showing" that the deported witness would have offered testimony that is material, favorable to

their defense, and "not merely cumulative to the testimony of available witnesses." *Valenzuela-*

*Bernal*, 458 U.S. at 872-73; *see also United States v. Schlei*, 122 F.3d 944, 983 (11th Cir. 1997).

It also requires showing that the government "acted in bad faith" in repatriating non-citizens.  *De*

*La Cruz Suarez*, 601 F.3d at 1213; *see also United States v. McCullough*, 166 F. App'x 469, 472

(11th Cir. 2006).

690.     These Due Process protections apply in the civil context where "circumstances

warrant certain procedural protections usually reserved for criminal proceedings." *United States*

*v. One 1982 Chevrolet Crew-Cab Truck VIN 1GCHK33M9C143129*, 810 F.2d 178, 183 (8th Cir.

1987).

691.     Petitioners have material testimony relating to the abuse and medical neglect they have suffered at ICDC. Petitioners have all been subjected to non-consensual, medically unindicated, and/or invasive gynecological procedures at the hands of Respondent Amin. Some of these procedures amount to sexual assault. Petitioners have expressed an interest and desire in sharing their material testimony in court proceedings and with federal investigators.

692.     Petitioners' testimony is not merely cumulative to the testimony of available witnesses. While Petitioners all experienced medical abuse and neglect at the hands of Respondent Amin, each of their testimonies highlights a broader pattern and practice of medical abuse and neglect at ICDC.

693.     Respondents have acted in bad faith by deporting several Petitioners within days, and in some cases within hours, of them coming forward and sharing their experiences at ICDC.

694.     By deporting or threatening to deport Petitioners in this case, Respondents have infringed on the rights of all Petitioners to a full and fair hearing on their claims.

695.     Petitioners seek declaratory and injunctive relief against Federal Respondents in their official capacities to remedy these violations their Fifth Amendment right to a full and fair hearing.

### THIRTEENTH CLAIM FOR RELIEF
### Release Pending Adjudication

<u>On Behalf of Detained Petitioners Against All Respondents in Their Official Capacities</u>

696.     Petitioners repeat and re-allege the allegations contained in the preceding paragraphs of this Petition as if fully set forth herein.

697.     This Court has the authority to grant bail to habeas petitioners. Bail is appropriate when petitioners are likely to succeed on their claims or in special circumstances. *See, e.g.*, *Mapp v. Reno*, 241 F.3d 221, 230 (2d Cir. 2001) (holding that federal courts have inherent authority to

138

set bail pending the adjudication of a habeas petition to "make the grant of bail necessary to make the habeas remedy effective").

## FOURTEENTH CLAIM FOR RELIEF
### Breach of IGA Contract

On Behalf of Petitioners Against All Respondents in Their Official and Individual Capacities

698.    Petitioners repeat and re-allege the allegations contained in the preceding paragraphs of this Petition as if fully set forth herein.

699.    Respondents are parties to the IGA contract, which requires Respondents to "accept and provide for the secure custody, safekeeping, housing, subsistence and care of federal detainees in accordance with state and local laws, standards and procedures, or court orders applicable to the operations of the facility, consistent with federal law, policies and regulations."

700.    The IGA also requires that "where ICE detainees are housed, the ICE federal detainees are to be housed in accordance with ICE standards."

701.    Pursuant to the IGA, the PBNDS 2008 applies to Respondents' custody and care for Petitioners.

702.    Respondents have breached the terms of the IGA, including by failing to abide by the terms of the PBNDS. For example, they have failed to provide appropriate medical care, to administer medical treatment only with informed consent, and to provided language accessibility to non-English speakers while receiving medical care.

703.    Petitioners are intended third-party beneficiaries of the IGA, including the IGA's provisions requiring Respondents to abide by the PBNDS.  Those provisions were made directly to benefit the care and treatment of ICE detainees like Petitioners. *See, e.g.*, *Melvin v. Cty. of Westchester*, No. 14-CV-2995 (KMK), 2016 WL 1254394, *22 (S.D.N.Y. Mar. 29, 2016); *Zikianda v. Cty. of Albany*, No. 1:12-CV-1194, 2015 WL 5510956, at *37 (N.D.N.Y. Sept. 15,

2015). Therefore, Petitioners have standing to enforce Respondents' breach of the terms of the IGA.

704.    Petitioners have been damaged in an amount to be proven at trial by Respondents' breach of the IGA. Petitioners have suffered and will continue to suffer irreparable injury and damages because of this breach of the IGA.

705.    Petitioners seek, and are entitled, to enforce the terms of the IGA contract.

706.    Petitioners also seek, and are entitled to, actual damages resulting from breach of the IGA contract.

**FIFTEENTH CLAIM FOR RELIEF**
**Negligent Hiring or Retention**

On Behalf of Petitioners for Damages
Against ICDC, LaSalle, and Irwin County Hospital

707.    Petitioners repeat and re-allege the allegations contained in the preceding paragraphs of this Petition as if fully set forth herein.

708.    In order to sustain a claim for negligent hiring or retention, a claimant must show that the employer knew or should have known of the employee's propensity to engage in the conduct that caused the plaintiff's injury. *Piney Grove Baptist Church v. Goss*, 255 Ga. App. 380, 565 S.E.2d 569 (2002).

709.    Respondent Amin is affiliated with and a member of the staff of Irwin County Hospital. In this capacity, he was authorized to provide medical services to detained individuals in ICE custody at ICDC, including Petitioners and class members.

710.    At all relevant times, Petitioners and putative class members were in the care, control, and custody of the Respondents ICDC, LaSalle, and Irwin County Hospital, who owed a duty to them to exercise reasonable and ordinary care.

140

711.    Respondent Amin performed non-consensual, medically unindicated, or invasive gynecological procedures on Petitioners and class members. As a result, Petitioners and class members were injured by Respondent Amin's conduct, including by enduring major surgeries that were unnecessary, suffering medical complications, and mental health issues.

712.    ICDC and LaSalle knew or should have known of Respondent Amin's propensity to engage in non-consensual, medically unindicated, or invasive gynecological procedures. Several women, including Petitioners and putative class members, lodged complaints to ICDC and LaSalle officers against Respondent Amin at least two years before he was confirmed to no longer provide services to women at ICDC.

713.    Irwin County Hospital knew or should have known of Respondent Amin's propensity to engage in non-consensual, medically unindicated, or invasive gynecological procedures. Petitioners' and putative class members' complaints to Irwin County hospital staff regarding Respondent Amin's conduct were investigated by the DOJ. *See United States v. Hospital Authority of Irwin County*, No. 7:13-cv-00097-HL (M.D. Ga.). In a 2013 lawsuit against Irwin County Hospital and Respondent Amin, the DOJ specifically alleged that Respondent Amin was engaged in "a pattern of medical services that he, ICH, and on-call doctors know or should know are not medically necessary."

714.    ICDC, LaSalle, and Irwin County Hospital knew that other medical professionals supported Respondent Amin in performing non-consensual, medically unindicated, or invasive gynecological procedures.

715.    ICDC, LaSalle, and Irwin County Hospital breached their duty to Petitioners and putative class members by hiring and retaining Respondent Amin. Since the DOJ lawsuit and Petitioners' and putative class members' numerous complaints, and even after the whistleblower

complaint went public on September 14, 2020 and was reported on by numerous media outlets, Respondent Amin continued to perform non-consensual, medically unindicated, or invasive gynecological procedures on women detained at ICDC.

716.    The actions by ICDC, LaSalle, and Irwin County Hospital were the direct and proximate cause of damages to Petitioners and putative class members. Respondents made conscious decisions to either act or fail to act causing Petitioners and putative class members to suffer grave physical pain, medical complications, and severe emotional distress and anguish.

717.    Petitioners and putative class members in no way contributed to their own injuries.

718.    ICDC, LaSalle, and Irwin County Hospital are liable to Petitioners and putative class members for all damages, in an amount to be proven at trial, resulting from their negligent hiring and retention of Respondent Amin.

719.    ICDC, LaSalle, and Irwin County Hospital have shown willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences, and ICDC, LaSalle, and Irwin County Hospital are liable to Respondents for punitive damages.

720.    Petitioners and Main Class Members seek, and are entitled to, actual and punitive damages against ICDC, LaSalle, and Irwin County Hospital for negligent hiring and retention of Respondent Amin.

## SIXTEENTH CLAIM FOR RELIEF
### Gross Negligence

On Behalf of Petitioners for Damages Against Irwin County Respondents

721.    Petitioners repeat and re-allege the allegations contained in the preceding paragraphs of this Petition as if fully set forth herein.

142

722.     Under O.C.G.A. § 51–1–4, gross negligence is the absence of "slight diligence," which is defined as "that degree of care which every man of common sense, however inattentive he may be, exercises under the same or similar circumstances." O.C.G.A. § 51–1–4.

723.     At all relevant times, Petitioners and putative class members were detained in the care, control, and custody of the ICDC Respondents, who owed a duty to them to exercise reasonable and ordinary care.

724.     ICDC Respondents breached their duty to Petitioners and putative class members by subjecting them to non-consensual, medically unindicated, or invasive gynecological procedures at the hands of Respondent Amin.

725.     ICDC Respondents committed these actions in the absence of slight diligence and with complete disregard for Petitioners' and putative class members' safety, health, and wellbeing.

726.     The actions by ICDC Respondents were the direct and proximate cause of the damages that Petitioners and putative class members suffered. ICDC Respondents made conscious decisions to either act or fail to act causing Petitioners and putative class members to suffer grave physical pain, medical complications, and severe emotional distress and anguish.

727.     Petitioners and putative class members in no way contributed to their own injuries.

728.     ICDC Respondents are liable to Petitioners and putative class members for the damages resulting from their gross negligence in an amount to be proven at trial.

729.     ICDC Respondents have shown willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious

indifference to consequences, and ICDC Respondents are liable to Respondents for punitive damages.

730.    Petitioners seek actual and punitive damages against ICDC Respondents for gross negligence.

**SEVENTEETH CLAIM FOR RELIEF**
**Medical Battery**

On Behalf of Petitioners for Damages Against Respondent Amin and Irwin County Hospital

731.    Petitioners repeat and re-allege the allegations contained in the preceding paragraphs of this Petition as if fully set forth herein.

732.    Under Georgia law, a plaintiff may recover for a medical battery by establishing either: (i) that there was a lack of consent to the procedure performed, *see Joiner v. Lee*, 197 Ga. App. 754, 756(1), 399 S.E.2d 516, 518 (1990); or (ii) that the treatment was at substantial variance with the consent granted, *see Morton v. Wellstar Health System, Inc.*, 288 Ga. App. 301, 302 (2007) (*citing Sood v. Smeigh*, 259 Ga. App. 490, 495(2), 578 S.E.2d 158, 162 (2003)).

733.    At all relevant times, Petitioners and putative class members were in the care of the Respondent Amin, who owed a duty to them to exercise reasonable and ordinary care.

734.    Respondent Amin performed gynecological procedures on Petitioners and putative class members without obtaining consent for those procedures or performed gynecological procedures on Petitioners and putative class members that were at substantial variance with the consent granted.

735.    Respondent Amin breached his duty to Petitioners and putative class members by subjecting them to non-consensual, medically unindicated, or invasive gynecological procedures.

736.    The actions by Respondent Amin were the direct and proximate cause of the harm that Petitioners and putative class members suffered. Respondent Amin made conscious

144

decisions to either act or fail to act causing Petitioners and putative class members to suffer grave physical pain, medical complications, and severe emotional distress and anguish.

737. Petitioners and putative class members in no way contributed to their own injuries.

738. Respondent Amin is liable to Petitioners and putative class members for all damages resulting from his medical battery.

739. Respondent Amin has shown willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences, and Respondent Amin is liable to Respondents for punitive damages.

740. Petitioners seek actual and punitive damages against Respondent Amin and Irwin County Hospital for medical battery.

## EIGHTEENTH CLAIM FOR RELIEF
### Medical Malpractice

On Behalf of Petitioners for Damages Against Respondent Amin and Irwin County Hospital

741. Petitioners repeat and re-allege the allegations contained in the preceding paragraphs of this Petition as if fully set forth herein.

742. At all relevant times, Petitioners and putative class members were in the care of the ICDC, LaSalle, Irwin County Hospital, and Respondent Amin, who owed a duty to them to exercise the requisite and/or acceptable degree of skill and care required under the facts and circumstances.

743. ICDC, LaSalle, Irwin County Hospital, and Respondent Amin performed gynecological procedures on Petitioners and putative class members without obtaining consent

for those procedures or performed gynecological procedures on Petitioners and putative class members that were at substantial variance with the consent granted.

744.    ICDC, LaSalle, Irwin County Hospital, and Respondent Amin also performed medically unindicated and invasive gynecological procedures.

745.    ICDC, LaSalle, Irwin County Hospital, and Respondent Amin breached their duty to Petitioners and putative class members by subjecting them to medically unindicated and invasive gynecological procedures.

746.    ICDC, LaSalle, Irwin County Hospital, and Respondent Amin were negligent and failed to comport with the requisite and/or acceptable degree of skill and care required under the facts and circumstances of the case.

747.    The actions by ICDC, LaSalle, Irwin County Hospital, and Respondent Amin were the direct and proximate cause of the harm that Petitioners and putative class members suffered, causing Petitioners and putative class members to suffer grave physical pain, medical complications, and severe emotional distress and anguish.

748.    Petitioners and putative class members in no way contributed to their own injuries.

749.    ICDC, LaSalle, Irwin County Hospital, and Respondent Amin is liable to Petitioners and putative class members for all damages resulting from the medical malpractice.

750.    ICDC, LaSalle, Irwin County Hospital, and Respondent Amin have shown willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences, and ICDC, LaSalle, Irwin County Hospital, and Respondent Amin are liable to Respondents for punitive damages.

146

751.     Petitioners seek actual and punitive damages against Respondent Amin and Irwin County Hospital for medical malpractice.

## NINETEENTH CLAIM FOR RELIEF
### Intentional Infliction of Emotional Distress

On Behalf of Petitioners for Damages Against Irwin County Respondents

752.     Petitioners repeat and re-allege the allegations contained in the preceding paragraphs of this Petition as if fully set forth herein.

753.     Under Georgia law, "[a] claim for intentional infliction of emotional distress has four elements: (1) intentional or reckless conduct (2) which is extreme and outrageous and (3) caused the emotional distress (4) which is severe." *Pyle v. City of Cedartown*, 240 Ga. App. 445, 447, 524 S.E.2d 7, 9 (1999).

754.     At all relevant times, Petitioners and putative class members were detained in the care, control, and custody of the Irwin County Respondents, who owed a duty to them to exercise reasonable and ordinary care.

755.     Irwin County Respondents breached their duty to Petitioners and putative class members by subjecting them to non-consensual, medically unindicated, or invasive gynecological procedures at the hands of Respondent Amin.

756.     Irwin County Respondents' conduct was intentional or reckless. Despite knowing that Respondent Amin was subjecting women to these procedures, Irwin County Respondents continued to refer Petitioners and putative class members to Respondent Amin.

757.     Irwin County Respondents' conduct was extreme and outrageous.

758.     Irwin County Respondents' conduct was the direct and proximate cause of the harm that Petitioners and putative class members suffered. Irwin County Respondents made

conscious decisions to either act or fail to act causing Petitioners and putative class members to suffer severe emotional distress and anguish.

759.    Petitioners and putative class members in no way contributed to their own injuries.

760.    Irwin County Respondents are liable to Petitioners and putative class members for all damages resulting from their intentional infliction of emotional distress in an amount to be proven at trial.

761.    Irwin County Respondents have shown willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences, and Irwin County Respondents are liable to Respondents for punitive damages.

762.    Petitioners members seek actual and punitive damages against Irwin County Respondents for intentional infliction of emotional distress.

## TWENTIETH CLAIM FOR RELIEF
### Negligent Infliction of Emotional Distress

<u>On Behalf of Petitioners for Damages Against Irwin County Respondents</u>

763.    Petitioners repeat and re-allege the allegations contained in the preceding paragraphs of this Petition as if fully set forth herein.

764.    Under Georgia law, "three elements are necessary to prevail on a claim for negligent infliction of emotional distress: (1) a physical impact to the plaintiff; (2) the physical impact causes physical injury to the plaintiff; and (3) the physical injury to the plaintiff causes the plaintiff's mental suffering or emotional distress." *Reid v. Waste Industries USA, Inc.*, 345 Ga. App. 236, 244, 812 S.E.2d 582, 590 (2018) (citation omitted).

765.     At all relevant times, Petitioners and putative class members were detained in the care, control, and custody of the Irwin County Respondents, who owed a duty to them to exercise reasonable and ordinary care.

766.     Irwin County Respondents breached their duty to Petitioners and putative class members by subjecting them to non-consensual, medically unindicated, or invasive gynecological procedures at the hands of Respondent Amin.

767.     Irwin County Respondents' conduct caused physical injury to Petitioners and putative class members, including medical complications and severe physical pain.

768.     Petitioners and putative class members suffered emotional distress as a result of being subjected to non-consensual, medically unindicated, or invasive gynecological procedures and their resulting physical injuries.

769.     Irwin County Respondents' conduct was the direct and proximate cause of the harm that Petitioners and putative class members suffered. Irwin County Respondents made conscious decisions to either act or fail to act causing Petitioners and putative class members to suffer emotional distress and anguish.

770.     Petitioners and putative class members in no way contributed to their own injuries.

771.     Irwin County Respondents are liable to Petitioners and putative class members for all damages resulting from their negligent infliction of emotional distress.

772.     Irwin County Respondents have shown willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences, and Irwin County Respondents are liable to Respondents for punitive damages.

149

773.     Petitioners seek actual and punitive damages against Irwin County Respondents

for negligent infliction of emotional distress.

### TWENTY-FIRST CLAIM FOR RELIEF
### Attorneys' Fees And Costs

<u>On Behalf of Petitioners for Damages Against Irwin County Respondents</u>

774.     Petitioners repeat and re-allege the allegations contained in the preceding

paragraphs of this Petition as if fully set forth herein.

775.     Petitioners are also entitled to their attorneys' fees and costs against all

Respondents that have committed intentional torts.

776.     Respondents' actions also constitute conscious indifference to the consequences

and have caused Petitioners unnecessary trouble and expense within the meaning of O.C.G.A. §

13-6-11.

777.     Petitioners are entitled to recover their attorneys' fees and costs associated

with this action in an amount to be proven at trial.

### FEDERAL TORT CLAIMS ACT CLAIMS

778.     Petitioners are currently in the process of complying with the administrative

claims process for the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671-2680, which

requires administrative exhaustion prior to suit being brought in federal court. Petitioners reserve

the right to bring those claims when the administrative process is complete.

### <u>PRAYER FOR RELIEF</u>

WHEREFORE, Petitioners pray that this Court grant the following relief:

A.     Issue a writ of habeas corpus and order Detained Petitioners' immediate release or

placement in community-based alternatives to detention such as conditional release, on the

ground that their continued detention violates the First Amendment, Due Process Clause and/or the Rehabilitation Act;

B.      In the alternative, issue a temporary restraining order or preliminary and permanent injunctive relief ordering Respondents to immediately release Detained Petitioners or place them in community-based alternatives to detention such as conditional release, on the ground that their continued detention violates the First Amendment, Due Process Clause and/or the Rehabilitation Act;

C.      Declare that Respondents' conduct described herein as applied to Petitioners violates the First, Fifth and Fourteenth Amendments to the United States Constitution, the Rehabilitation Act, the Administrative Procedure Act, and 42 U.S.C. § 1985(2), and is therefore unlawful;

D.      Issue an injunction prohibiting Respondents, their subordinates, agents, and all others acting in concert with them from:

      a.      subjecting Petitioners to the unconstitutional and unlawful practices described in this petition;

      b.      retaliating against Petitioners—whether currently or formerly detained—for having brought this suit;

      c.      retaliating against or otherwise deterring Petitioners from testifying in federal court proceedings or otherwise participating in any investigation or legal action related to their detention or abuse, including by expediting the deportation of witnesses and/or Petitioners;

      d.      removing witnesses needed in connection with an ongoing criminal investigation.

E.   Issue a writ of habeas corpus ad testificandum compelling the presence of witnesses, including Petitioners, at all hearings before this Court, including trial if necessary;

F.   Issue an injunction ordering Respondents to provide adequate medical and mental health care to Detained Petitioners pending their release;

G.   Issue an order certifying this case as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

H.   Appoint the undersigned as class counsel pursuant to Rule 23(g) of the Federal Rules of Civil Procedure;

I.   Award Petitioners compensatory and punitive damages;

J.   Award Petitioners' counsel reasonable attorneys' fees and litigation costs, including but not limited to fees, costs, and disbursements pursuant to 28 U.S.C. § 241242, U.S.C. § 1988(b), and O.C.G.A. 13-6-11; and

K.   Grant such other and further relief as the Court deems just and proper.

Respectfully submitted on this 21st day of December,

/s/ David N. Dreyer
David N. Dreyer
GA Bar No. 411322
Michael T. Sterling
GA Bar No. 745667
**Dreyer Sterling, LLC**
437 Memorial Dr., SE, Ste. A-2
Atlanta, GA 30312
Tel: (404) 234-4447
david@dreyersterling.com

Elora Mukherjee**
NY Bar No. 4427233
**Morningside Heights Legal Services, Inc.**
435 West 116th Street, Room 831
New York, NY 10027
Tel: (203) 668-2639
emukherjee@law.columbia.edu

Sirine Shebaya*
DC Bar No. 1019748
Matthew S. Vogel*+
LA Bar No. 35363
Amber Qureshi*++
Joseph Meyers*+++
CA Bar No. 325183
**National Immigration Project of the National Lawyers Guild (NIPNLG)**
2201 Wisconsin Ave NW, Suite 200
Washington, DC 20007
(202) 656-4788
sirine@nipnlg.org

Clare Norins
Georgia Bar No. 575364
cnorins@uga.edu
**First Amendment Clinic**
**University of Georgia School of Law**
Post Office Box 388
Athens, Georgia 30603
706-542-1419

Jason A. Cade
Georgia Bar No. 575364
Kristen E. Shepherd
Georgia Bar No. 789624
**Community Health Law Partnership**
**University of Georgia Law School**
P.O. Box 1761
Athens, Georgia 30603
706-227-5333
cadej@uga.edu
shepherdk@uga.edu

Sarah Sherman-Stokes
**Immigrants' Rights and Human**
**Trafficking Program**
**Boston University School of Law**
765 Commonwealth Avenue
Boston, MA 02215
617-358-6272

Sabrineh Ardalan*
Sameer Ahmed*
**Harvard Immigration and Refugee Clinical**
**Program**
6 Everett Street, WCC 3103
Cambridge, MA 02138
617-384-7504

Fatma Marouf*
Immigrant Rights Clinic
**Texas A&M School of Law**
307 W. 7th St. Suite LL50
Fort Worth, TX 76102
817-212-4123

Azadeh Shahshahani*
Priyanka Bhatt*
**Project South**
9 Gammon Ave SE
Atlanta, Georgia 30315
404-622-0602

*Attorneys for Petitioners-Plaintiffs*

*pro hac vice application forthcoming
**admitted pro hac vice
+Not admitted in DC; working remotely from and admitted in Louisiana only
++Admitted in Maryland; DC bar admission pending
+++Not admitted in DC; working remotely from and admitted in California only

## **CERTIFICATE OF SERVICE**

I certify that on December 21, 2020, I filed Petitioners-Plaintiffs' **CONSOLIDATED AMENDED PETITION FOR WRIT OF HABEAS CORPUS AND CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND FOR DAMAGES** with the Clerk of Court using the CM/ECF system, which will automatically send e-mail notification of such filing to counsel of record.

/s/ David N. Dreyer
David N. Dreyer
GA Bar No. 411322
**Dreyer Sterling, LLC**
437 Memorial Dr., SE, Ste. A-2
Atlanta, GA 30312
Tel: (404) 234-4447
david@dreyersterling.com

*Attorney for Petitioners-Plaintiffs*

# Exhibit C





Institute for the Elimination of Poverty & Genocide

1612 K Street NW, Suite 1100
Washington, DC, 20006
(202) 457-0034
whistleblower.org

9 Gammon Ave SE
Atlanta, GA 30315
projectsouth.org

September 17, 2020

The Honorable Bennie Thompson
Chairman
House Committee on Homeland Security
310 Cannon House Office Building
Washington, D.C. 20515

The Honorable Ron Johnson
Chairman
Senate Committee on Homeland Security
and Governmental Affairs
340 Dirksen Senate Office Building
Washington, D.C. 20510

The Honorable Mike Rogers
Ranking Member
House Committee on Homeland Security
310 Cannon House Office Building
Washington, D.C. 20515

The Honorable Gary Peters
Ranking Member
Senate Committee on Homeland Security
and Governmental Affairs
340 Dirksen Senate Office Building
Washington, D.C. 20510

The Honorable Lindsey Graham
Chairman
Senate Committee on the Judiciary
224 Dirksen Senate Office Building
Washington, D.C. 20510

The Honorable Dianne Feinstein
Ranking Member
Senate Committee on the Judiciary
224 Dirksen Senate Office Building
Washington, D.C. 20510

The Honorable Carolyn Maloney
Chairwoman
House Committee on Oversight and Reform
2157 Rayburn House Office Building
Washington, D.C. 20515

The Honorable James Comer
Ranking Member
House Committee on Oversight and Reform
2157 Rayburn House Office Building
Washington, D.C. 20515

The Honorable Jerrold Nadler
Chairman
House Committee on the Judiciary
2138 Rayburn House Office Building
Washington, D.C. 20515

The Honorable Jim Jordan
Ranking Member
House Committee on the Judiciary
2138 Rayburn House Office Building
Washington, D.C. 20515

**RE: Whistleblower's Disclosures on Medical Care in ICE Detention at Irwin County Detention Center: Private Contractors' Mismanagement is Endangering Immigrant, Worker and Public Health and Safety**

Dear Committee Chairpersons and Ranking Members:

Government Accountability Project and Project South[1] submit this letter seeking an investigation into the disturbing whistleblower disclosures contained herein of our client Ms. Dawn Wooten, LPN, concerning gross mismanagement of the spread of COVID-19 and other disturbing failures in the provision of medical care generally at the Irwin County Detention Center (ICDC) in Ocilla, Georgia, run by LaSalle Correctional (LaSalle), a private company contracted by the Immigrations and Customs Enforcement (ICE) to operate immigration detention facilities. This letter constitutes a protected disclosure pursuant to federal whistleblower law.

Ms. Wooten, as a provider of direct medical care to the detained immigrants at ICDC, possesses both direct and indirect evidence concerning medical neglect and other misconduct, including high numbers of hysterectomies and concerns regarding informed consent, the shredding of medical requests submitted by detained immigrants, the fabrication of medical records, and the denial of medical treatment.

Ms. Wooten has also directly witnessed misconduct and failures to provide medical care in the context of the COVID-19 pandemic. Ms. Wooten has disclosed LaSalle's disregard of public health guidelines set by both the Centers for Disease Control and Prevention (CDC) and ICE, including: the failure to isolate and quarantine in accordance with CDC guidance; LaSalle's refusal to test detained immigrants for COVID-19 who have been exposed to the virus and are symptomatic; refusal to comply with CDC requirements regarding Personal Protective Equipment (PPE), social isolation, and medical quarantining for COVID-19; continuously allowing transfers of detained immigrants, even those who have tested positive for COVID-19; and the months-long failure to abate unsanitary conditions. Ms. Wooten observed ICDC under-counting and under-reporting to State of Georgia public health officials regarding the number of staff and detained immigrants who were determined to have or be suspected of having COVID-19.

Ms. Wooten's disclosures of conditions at ICDC echo concerns outlined in Government Accountability Project's June 2020 letter to Congress on behalf of employees and former employees from the Richwood Correctional Center, another private prison operated by LaSalle

---

[1] Government Accountability Project is a global leader in whistleblower advocacy and protection. Our lawyers have represented whistleblower employees for over four decades, employees who, among other things, have exposed government and corporate illegality, waste, fraud, abuse, and serious dangers to public health and safety.

Project South was founded as the Institute to Eliminate Poverty & Genocide in 1986, and includes a legal and advocacy program that provides direct consultation, representation, and attorney training to support communities facing discrimination and legislative marginalization, particularly immigrants and migrants without documentation, refugees, Muslim communities, and young Black people.

in Monroe, Louisiana, about gross misconduct and failures to comply with CDC guidelines mandated by regulations governing ICE detention facilities, endangering immigrants, workers and the public.[2]

These disclosures validate warnings of other Department of Homeland Security (DHS) whistleblowers. As early as February 2020, Government Accountability Project clients Drs. Scott Allen and Josiah Rich, medical subject matter experts in detention health for the Department of Homeland Security's Office of Civil Rights and Civil Liberties, started raising the alarm that the the spread of COVID-19 in ICE detention would pose imminent harm to the health and safety of immigrants, workers and the public.[3]

It is well-documented that the provision of medical care in ICE detention is inconsistent and inadequate.[4] Conditions at ICDC similarly have been shown to fail to meet prescribed standards of care.[5]

Ms. Wooten's disclosures, validated below by reports from immigrant detainees provided to Project South, reveal the willful disregard of ICDC's responsibility to meet the medical needs of immigrants in detention, a condition that has only compounded harm during the COVID-19 pandemic. ICDC's abuses not only harmed immigrant detainees, but also endangered workers and the public at large.

**<u>Nurse Dawn Wooten is a Protected Whistleblower</u>**

Ms. Wooten has been a Licensed Practical Nurse since 2009, and she first began work at ICDC in 2010. In the time since, Ms. Wooten has also worked elsewhere, but has been rehired by ICDC three times, most recently in October 2019, when she was hired as a full-time LPN, working regular shifts and averaging 36-40 hours per week. Her performance record at ICDC was unblemished and, indeed, praised by her superiors until she began disclosing her concerns to LaSalle in March 2020.

---

[2] Letter from Government Accountability Project to Chairman Thompson (July 10, 2020). https://whistleblower.org/wp-content/uploads/2020/07/071020-letter-to-Congress-from-GovAcctProj-re-whistleblowers-ICE-Detention-COVID-FINAL-Submitted.pdf
[3] Scott A. Allen, MD, FACP and Josiah Rich, MD, MPH, Letter to Congress (March 19, 2020), available at https://whistleblower.org/wp-content/uploads/2020/03/Drs.-Allen-and-Rich-3.20.2020-Letter-to-Congress.pdf.
[4] Department of Homeland Security Office of Inspector General, Concerns about ICE Detainee Treatment and Care at Four Detention Facilities (June 3, 2019), https://www.oig.dhs.gov/sites/default/files/assets/2019-06/OIG-19-47-Jun19.pdf; Department of Homeland Security Office of Inspector General, Concerns about ICE Detainee Treatment and Care at Detention Facilities (December 11, 2017), https://www.oig.dhs.gov/sites/default/files/assets/2017-12/OIG-18-32-Dec17.pdf.
[5] Project South and PennState Law Center for Immigrants' Rights Clinic, "Imprisoned Justice: Inside Two Georgia Immigrant Detention Centers," (May 2017), https://projectsouth.org/wp-content/uploads/2017/06/Imprisoned_Justice_Report-1.pdf; DHS Office of Detention Oversight, "Compliance Inspection: Enforcement and Removal Operations, ERO Atlanta Field Office, Irwin County Detention Center" (March 7-9, 2017), https://www.ice.gov/doclib/foia/odo-compliance-inspections/2017IrwinCountyGA.pdf

Ms. Wooten has been disclosing to LaSalle management her concerns of the mismanagement of the ongoing response to the coronavirus pandemic since March 2020. Also, earlier this month, Ms. Wooten filed a disclosure and retaliation complaint with the DHS Office of Inspector General (OIG). She also made protected disclosures via a complaint submitted by Project South to the DHS OIG, the Office of Civil Rights and Civil Liberties, the ICE Atlanta Field Office, and the Warden of the Irwin County Detention Center seeking expedited investigation.[6]

Federal whistleblower laws, specifically 41 U.S.C. § 4712, protect employees of federal contractors, like LaSalle, who make disclosures of misconduct, gross mismanagement, abuses of authority, and substantial and specific dangers to public health and safety to all of these entities. As counsel for Ms. Wooten, we are now similarly asking Congress to thoroughly investigate the following disclosures which warrant immediate action to prevent ongoing and future harm to immigrant detainees and workers at ICDC.

## A. Disclosures Related to Gross Medical Negligence

### 1) Detained Immigrants Received High Numbers Of Hysterectomies With Dubious Consent

Several detained immigrants reported that many immigrant women have received hysterectomies while detained at ICDC by ICE without their fully informed consent. Upon our information and belief, one woman reported last year that ICDC routinely sends many women to see a particular gynecologist outside the facility and that some women find him untrustworthy. More recently, a detained immigrant told Project South that she talked to five different women detained at ICDC during just the last three months of 2019. When she talked to them about the surgeries they had received, the women "reacted confused when explaining why they had one done."

This detained immigrant said: "When I met all these women who had had surgeries, I thought this was like an experimental concentration camp … they're experimenting with our bodies."

Ms. Wooten similarly expressed concern regarding the high numbers and percentages of detained immigrant women at ICDC receiving hysterectomies. She stated that although some women have heavy menstruation or other severe issues that might would require a hysterectomy, "everybody's uterus cannot be that bad." Ms. Wooten explained:

> "Everybody he sees has a hysterectomy—just about everybody. He's even taken out the wrong ovary on a young lady [detained immigrant woman]. She was supposed to get her left ovary removed because it had a cyst on the left ovary; he took out the right one. She was upset. She had to go back to take out

---

[6] Complaint from Project South to DHS OIG, CRCL, ICE Atlanta Field Office, and ICDC RE: Lack of Medical Care, Unsafe Work Practices, and Absence of Adequate Protection Against COVID-19 for Detained Immigrants and Employees Alike at the Irwin County Detention Center (September 14, 2020), https://projectsouth.org/wp-content/uploads/2020/09/OIG-ICDC-Complaint-1.pdf

Letter to Congress from Government Accountability Project and Project South Re: Whistleblower Disclosures on Medical Care in ICE Detention/Irwin County Detention Center
September 17, 2020
Page 4 of 13

the left and she wound up with a total hysterectomy. She still wanted
children—so she has to go back home now and tell her husband that she can't
bear kids… she said she was not all the way out under anesthesia and heard
him [doctor] tell the nurse that he took the wrong ovary."

The rate at which the hysterectomies have occurred have been a red flag for Ms. Wooten and
other nurses at ICDC. As Ms. Wooten has explained: "Everybody he sees, he's taking all their
uteruses out or he's taken their tubes out."

Intertwined with the issue of the reported high rates of hysterectomies is **widespread lack of
proper, informed consent**. Regarding the hysterectomies, Ms. Wooten explained: "These
immigrant women, I don't think they really, totally, all the way understand this is what's going
to happen depending on who explains it to them." Ms. Wooten observed that the sick call nurse
tried to communicate with the detained immigrants in Spanish by simply googling translations or
by asking another detained immigrant to help interpret rather than using "the language line" as
medical staff are instructed to use.

Ms. Wooten recalled that detained women expressed to her that they didn't fully understand why
they had to get a hysterectomy. She said: "I've had several inmates tell me that they've been to
see the doctor and they've had hysterectomies and they don't know why they went or why
they're going." And if the immigrants do understand what they're getting done, "some of them a
lot of times won't even go, they say they'll wait to get back to their country to go to the doctor."

One detained immigrant reported to Project South that staff at ICDC and the doctor's office did
not properly explain to her what procedure she was going to have done. When she asked what
was being done to her body, she was given three completely different and conflicting responses
by three different individuals.

*First*, she was told by the doctor that she had an ovarian cyst and was going to have a small
twenty-minute procedure done drilling three small holes in her stomach to drain the cyst. *Second*,
the ICDC officer who was transporting her to the hospital told her that she was receiving a
hysterectomy to have her womb removed. *Third and finally*, when the hospital refused to operate
on her because her COVID-19 test came back positive for antibodies, she was transferred back to
ICDC where the ICDC nurse said that the procedure she was going to have done entailed dilating
her vagina and scraping tissue off. The nurse initially told the detained immigrant she was going
to get this procedure done because she had heavy bleeding, but then told her it was because she
had a thick womb. The woman quickly responded that she never had heavy bleeding in her life
and was never told by the doctor that she had a thick womb. Instead she stated that the doctor
had described an entirely different procedure that did not involve scraping her vagina. She stated:
"I tried to explain to her that something isn't right; that procedure isn't for me." The nurse
responded by getting angry and agitated and began yelling at her.

In addition to the disclosures made to Project South, lawyers representing detained victims
alleging similar wrongdoing have publicly discussed their clients' experiences following Ms.

Wooten's disclosures' publicization.[7]

## 2) LaSalle Improperly Withheld Medical Care From Detained Immigrants, Shredded Detainees' Medical Request Forms

Since October 2019, Ms. Wooten has disclosed to LaSalle management her concerns regarding the lack of medical care for detained immigrants at ICDC. She disclosed that the sick call nurses commonly shred medical request forms from detained immigrants who make requests to go to the medical unit. She also disclosed that the sick call nurse sometimes fabricated medical records such as vital signs without ever seeing the individual requesting medical help.

At ICDC, detained immigrants have two methods for making a sick call request. One is via a paper form, blue in color, which detainees fill out and then put in a box on the wall of their unit to be picked up by a nurse each night. The other is an electronic request, prepared and submitted by the detainees on the electronic "Telmate" tablets available in the units. Ms. Wooten has disclosed to OIG that LaSalle has encouraged detained immigrants to fill out handwritten request form because ICDC's medical staff supposedly will be able to more quickly review and act on such handwritten requests. However, when detained immigrants fill out the blue handwritten request forms, the nurse in charge of reviewing these documents will shred the forms without even looking at them. In fact, Ms. Wooten disclosed to the OIG that she has seen the sick call nurse shred an entire box worth of forms without looking at them.

Ms. Wooten has disclosed to OIG the case of a woman who had put in 12 sick call requests in the span of two weeks because she had an infection from an abdominal laparoscopy procedure and thus "green pus" was "oozing out of her belly button." Ms. Wooten believed that this woman's sick call requests had been shredded because the green puss oozing from the woman's navel so clearly would indicate an immediate course of treatment by antibiotics to any competent medical provider.

Ms. Wooten also disclosed to OIG LaSalle's practice of shredding paper "sick call" requests while preserving and fulfilling the simpler requests (such as requests for shampoo and toothpaste). If the immigrant filed a second sick call request indicating COVID-19 symptoms, LaSalle would decline that request, claiming that it was identical to a recently submitted, and supposedly completed request.

---

[7] Jose Olivares and John Washington, "'He Just Empties You All Out'" Whistleblower Reports High Number of Hysterectomies at ICE Detention Facility," The Intercept (September 15, 2020), https://theintercept.com/2020/09/15/hysterectomies-ice-irwin-whistleblower/; Jacob Soboroff, Julia Ainsley and Daniella Silva, "Lawyers allege abuse of migrant women by gynecologist for Georgia ICE detention center," NBC News Investigations (September 15, 2020), https://www.nbcnews.com/news/latino/nurse-questions-medical-care-operations-detainees-immigration-jail-georgia-n1240110.

### 3) LaSalle Fabricated Medical Records when Detained Immigrants Submitted an Electronic Medical Request Form

Ms. Wooten has disclosed to LaSalle management and OIG that when an immigrant submits an electronic sick call request, where shredding the requests is not an option, LaSalle would fabricate records of medical exams of immigrants. For example, upon a request for care that described symptoms of a runny nose and a fever, LaSalle would close the request by prescribing an over-the-counter cold medicine — without seeing, talking to, or examining the immigrant detainee. In addition, LaSalle would falsely annotate the immigrant's medical record as if the immigrant had been examined, to include bogus vital signs.

Ms. Wooten further disclosed that LaSalle gamed the sick call request system to further deny and delay medical care for the immigrants. LaSalle variously told the detained immigrants that a written request was more effective for obtaining needed treatment and that the electronic requests were the better method. When an immigrant inquired about delayed treatment following a written request, LaSalle would tell the immigrant that they should submit an electronic request. After an electronic request was ignored, LaSalle would tell the immigrant to file a paper request to ensure treatment. When Ms. Wooten disclosed internally that this practice was a serious threat to the immigrants' health and safety, her supervisors refused to take steps to address the problem.

## B. Disclosures Related to COVID-19

### 1) LaSalle Continued to Transfer Immigrants in and out of ICDC Against Both CDC Guidelines and the Advice of ICDC's Medical Director

Ms. Wooten disclosed to OIG that LaSalle continued to allow transfers of individuals in and out of ICDC, contrary to CDC guidelines for correctional and detention facilities,[8] guidelines which are made mandatory on detention facilities by ICE's own ICE's Performance-Based National Detention Standards (PBNDS).[9] Ms. Wooten disclosed that Dr. Howard McMahan**,** the Medical Director of ICDC, pleaded with ICDC Warden David Paulk in March 2020, when the facility had its first COVID-19 case, to stop all transfers of individuals in and out the facility, but the Warden would not heed the Medical Director. Ms. Wooten disclosed that LaSalle continues to allow transfers of individuals into the facility who have COVID-19 and that ICDC also continues to transfer COVID-19 positive immigrants and those awaiting COVID-19 test results out of the facility. Ms. Wooten disclosed to OIG specific incidents involving a COVID-19 positive immigrant deported to Mexico and a COVID-19 positive immigrant transferred ICE-funded detention facility Lumpkin, Georgia, the Stewart Detention Center, which is operated by the

---

[8] Centers for Disease Control and Prevention, "Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities" (Updated July 22, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html
[9] ICE detention facilities are bound to follow the Performance Based National Detention Standards (PBNDS), which state that "Centers for Disease Control and Prevention (CDC) guidelines for the prevention and control of infectious and communicable diseases shall be followed." Immigration and Customs Enforcement, PBNDS 2011, Medical Care, Section 4.3, available at https://www.ice.gov/doclib/detention-standards/2011/4-3.pdf

Corrections Corporation of America. Ms. Wooten disclosed that LaSalle had ignored her admonition that the immigrants were COVID-19 positive and should not be transferred or deported.

### 2) LaSalle Did not Properly Isolate, Quarantine, and Cohort Immigrants with Confirmed COVID-19 Cases or Symptoms, or Those in Close Contact

Ms. Wooten disclosed to OIG that LaSalle failed to follow CDC guidelines concerning isolation, quarantine, and cohorting. The CDC guidelines, mandated by ICE's Performance-Based National Detention Standards (PBNDS), require medical **isolation** when an immigrant develops symptoms of COVID-19, 14-day **quarantine** of anyone who is a close contact of a confirmed or suspected case of COVID-19, and any **cohorting** of confirmed cases with suspected cases or case contacts is strictly prohibited.

Ms. Wooten disclosed that LaSalle would cohort entire dorm units for a 14-day quarantine after a single individual in the unit was confirmed as having, or merely suspected of having COVID-19. In addition, new transferees would be introduced into a unit that was in the middle of a 14-day quarantine, without restarting the 14-day clock. This defeats the entire purpose of a quarantine. If the new arrival was in fact COVID-19 positive, then all her unit-mates would come out of quarantine less than 14 days after the introduction of the immigrant with COVID-19, placing the group, the general population, facility staff, and the general public at risk.

### 3) LaSalle Downplayed the Need for COVID-19 Testing and Did Not Use the COVID-19 Testing Machines at ICDC

Ms. Wooten disclosed that detained women in ICDC's Unit C complained about fevers and sore throats during the pandemic, however, LaSalle did not test them for COVID-19, downplaying the immigrants' symptoms. The ICDC's Health Services Administrator (HSA) stated that "all [the immigrants] want is attention. . . . Everybody wants to be tested for COVID." Ms. Wooten disclosed that even if a detained immigrant had COVID-19 symptoms like a fever, LaSalle would do nothing but put them on over-the-counter cold medications for seven days without testing them for COVID-19.

Ms. Wooten further disclosed to OIG that LaSalle not only downplayed the need to test immigrants for COVID-19, it also declined to utilize two rapid-testing COVID-19 machines that had cost ICE $14,000 each. Ms. Wooten disclosed that LaSalle had not trained any medical staff on the operation of the rapid-testing machines as of August 2020, and that as of July 2020, she had only seen the machines used twice, once for an immigrant and once for a LaSalle employee. The ICDC Director of Nursing kept the machines locked up, claiming that she did not want the employees testing each other.

### 4) LaSalle Concealed the Nature and Extent of COVID-19 at ICDC

In August, ICE reported that a total of 41 detained immigrants at ICDC tested positive for COVID.[10] However, Ms. Wooten disclosed to OIG that the actual number of those infected is much higher because LaSalle was not actively testing detained immigrants and had been under-reporting the number of positive cases to ICE and to Georgia public health officials.

### 5) ICDC Employees were Instructed to Work if They Had a Positive COVID-19 Test Result, Exhibit COVID-19 Symptoms, or Were Awaiting a COVID-19 Test Result

Ms. Wooten has disclosed to OIG serious concerns regarding LaSalle's COVID-19 employee policies. She disclosed that LaSalle employees were expected to come into work even if they had COVID-19 symptoms and were awaiting test results. ICDC's HSA instructed medical staff, such as Ms. Wooten, to come into work while they were waiting to be tested, waiting for their test results, and even if they tested positive, stating that "we can work symptomatic and work positive as long as we had a mask on."

Ms. Wooten also disclosed LaSalle's practice of "clearing" symptomatic employees for work, despite the admonition of the employee screening form that must be completed upon arrival for work. The document expressly states:

> If there are any 'yes' answers to any questions above and/or if the temperature is equal to or greater than 100.4 degrees Fahrenheit, medical staff will be notified and the individual will not be allowed access to the facility and will be advised to seek medical attention.

Ms. Wooten disclosed LaSalle's practice of requiring employees to work their shifts, despite having COVID-19 symptoms. On June 22, 2020, Ms. Wooten answered "yes" to having symptoms of COVID-19 as she reported for work, including muscle or body aches, headaches, and diarrhea. LaSalle still cleared her to work that day.

Ms. Wooten also disclosed to OIG that the thermometer at the ICDC's front desk, which is intended to measure and record the temperature of employees as they report to work, and as part of the screening form, intended to screen out COVID-19 symptomatic employees, was defectively operated, maintained, and calibrated. Ms. Wooten disclosed that the thermometer regularly reported obviously incorrect readings, such as 89.6 and 90.4 degrees Fahrenheit.

### 6) LaSalle Failed to Provide Employees Proper PPE or Facilitate Social-Distancing

Ms. Wooten disclosed that she repeatedly requested, to no avail, that LaSalle provide a replacement N-95 mask after her original mask had broken. Her supervisor told her that she had been issued one N-95, and LaSalle would not issue her another. Ms. Wooten is immuno-

compromised, due to sickle cell anemia, and has made LaSalle aware of her consequently increased risk for complications from COVID-19, but the response of ICDC's HSA was nothing more than saying "life goes on," implying that if Ms. Wooten were to get sick or die, LaSalle would simply replace her.

Ms. Wooten disclosed to OIG an occasion when higher-ranked and longer-tenured nurses brought a detained immigrant who presumably had COVID-19 into their shared office and removed the immigrant's mask without warning Ms. Wooten. While the higher-rank nurses had N-95 masks on, Ms. Wooten did not. She had to walk out of the room to protect herself, especially because of her immunocompromised condition. Ms. Wooten's office—four computers, shared by eight employees—made six-foot separation impossible, but LaSalle made no accommodations.

Ms. Wooten also disclosed to OIG that LaSalle did not provide proper sanitization material in the medical unit. When medical staff requested and finally received sprays and sanitizers in May or June 2020, the HSA took all of them and locked them in the HSA's office while leaving out only one bottle of the spray and sanitizer because the HAS said she did not want the medical staff just " pass[ing] them out." Ms. Wooten disclosed that this resulted in employees not being able to properly sanitize their workspace because they lacked the necessary resources.

### 7) ICDC Refused to Inform Employees and Detained Immigrants of who had COVID-19

Ms. Wooten disclosed to OIG that LaSalle management at ICDC did not tell officers which detained immigrant or employee had COVID-19. She tried to warn her fellow officers, so they could take proper precautions when they were about to come in contact with an immigrant with COVID-19, but LaSalle targeted her and reprimanded her, saying that was "not her job." Ms. Wooten disclosed that the officers were the most at risk of contracting the virus because of their extensive contact with the immigrants, such as transporting them and providing food to them, and should have had ample warning to take proper precautions.

Ms. Wooten disclosed to OIG an incident when she had interacted with several immigrants whom the HSA had assured Ms. Wooten had tested negative for COVID-19. Ms. Wooten later discovered that those immigrants were *awaiting* their test results and were later confirmed COVID-19 positive. This callous and negligent threat to Ms. Wooten's health is emblematic of LaSalle's general disregard for the risk of COVID-19 and the employees' and immigrants' health.

### C. Past Whistleblower Complaints Warned of and Exposed Risks from the Spread of COVID-19 From Systemic Problems and Gross Mismanagement in ICE Detention

Government Accountability Project's July 10, 2020 letter to the House Committee on Homeland Security's Subcommittee on Border Security, Facilitation & Operations summarized the concerns that DHS's subject matter medical experts on detention health, Drs. Scott Allen and Josiah "Jody" Rich, expressed to Congress on March 19, 2020 and again in testimony before the

Senate Judiciary Committee's June 2, 2020 hearing on "Examining Best Practices for Incarceration and Detention During COVID-19"[11]. Warning of a "tinderbox scenario" where rapid spread of the virus through a detention facility could rapidly overwhelm local hospital capacity and result in community spread of the virus, some of the risks they noted include:

1)  The congregate nature of immigrant detention makes compliance with detention standards related to medical care and CDC guidelines both critical and difficult. Social distancing, adequate Personal Protective Equipment (PPE), frequent handwashing, and sanitizing the frequently shared surfaces of dorms, door handles, and other common areas are uniquely challenging in detention settings, which is why some other non-detention facilities, like schools and nursing homes, have focused on closures and/or population reduction;

2)  The steady rotation of ICE and contractor staff in and out of detention facilities for work shifts, and the frequent transfers of immigrant detainees between facilities and for deportation through airports, dramatically exacerbates the public spread of COVID-19; and

3)  Failures to adequately test and report infections of both detainees and all ICE and ICE-contractor staff puts the health of workers, detained immigrants, and the public at greater risk.

The whistleblowers from LaSalle's Richwood facility provided first-hand accounts validating DHS experts' concerns. They told Congress that LaSalle is clearly not implementing anything close to "best practices" when it comes to COVID-19. Not only did they report that CDC guidelines were not being met because of the challenge of the congregate setting of detention and frequent transfers in and out of the facility by both staff and detainees, but that LaSalle management willfully ignored the ICE-mandated CDC standards for managing infectious disease in a detention facility and for maintaining minimum hygiene, cleanliness, and sanitation at Richwood. This breach has fueled the public health disaster that Drs. Allen and Rich warned Congress of this spring.

Coupled with the Richwood whistleblowers' disclosures, Ms. Wooten's disclosures reinforce their concerns of systemic wrongdoing and expand upon them to include evidence of LaSalle's willful abdication of its responsibility to provide medical care for detained immigrants and practices that negligently threaten the health of immigrants, employees, and the community.

As if the disclosures of medical neglect and misconduct, during a pandemic, were not concerning enough, Ms. Wooten's reports of a pattern of women undergoing hysterectomies without adequate informed consent, reinforced by testimony of reports by immigrants to Project South as

---

[11] U.S. Senate Judiciary Committee, "Examining Best Practices for Incarceration and Detention During COVID-19" (June 2, 2020), available at https://www.judiciary.senate.gov/imo/media/doc/Scott%20Allen%20Testimony.pdf

well as other immigration attorneys,[12] evidence potential violations of laws, rules and regulations, gross mismanagement, abuses of authority, and substantial and specific threats to public health and safety. This would constitute a form of unconscionable discrimination and human rights violations against women immigrants in U.S. detention, a profoundly vulnerable and marginalized population. [13] Even if these abuses are discrete, a system plagued by a pandemic and deficient in oversight would allow them to flourish. Every instance of wrongdoing disclosed by any detention whistleblower deserves a full and robust investigation. Ms. Wooten seeks an investigation into her disclosures so that the United States Government can find the facts, stop the misconduct, and apply corrective actions.

**Conclusion**

Our clients from LaSalle's Irwin County Detention Center and Richwood Correctional Center have disclosed that LaSalle has flouted the PBNDS-mandated CDC guidelines for managing infectious disease in detention facilities. LaSalle has not met the minimum requirements to adequately mitigate the serious public health risk of the coronavirus pandemic to the detained immigrants, LaSalle's employees, and the community, instead exacerbating the risk of harm through negligent and willful disregard of its duties of care. And evidence of multiple hysterectomies performed without consent constitutes a level of wrongdoing that, if further validated upon investigation, should warrant immediate corrective action.

In thanks to Ms. Wooten for her frequent internal challenges of LaSalle's misconduct, in July 2020, LaSalle demoted Ms. Wooten from a full-time position to an "on call" position. She no longer has a regular shift and her hours have been severely curtailed. Her OIG complaint includes details of her retaliation claim. The chilling effect of LaSalle's retaliation on other employees who may want to disclose these or similar breaches of the public trust is real. Acknowledging the courage required of whistleblowers may help to counteract that chilling effect. We ask Congress to demand that the OIG prioritize a full investigation into Ms. Wooten's complaint of retaliation to reinforce the essential role employees of conscience play in exposing wrongdoing, promoting accountability and preventing and mitigating health and safety dangers. Sending such requests to the DHS Inspector General, Hon. Joseph Cuffari, helps ensure OIG conducts a fulsome investigation into Ms. Wooten's disclosures and the retaliation she has suffered for speaking up.

---

[12] Jose Olivares and John Washington, "'He Just Empties You All Out'" Whistleblower Reports High Number of Hysterectomies at ICE Detention Facility," The Intercept (September 15, 2020), https://theintercept.com/2020/09/15/hysterectomies-ice-irwin-whistleblower/; Jacob Soboroff, Julia Ainsley and Daniella Silva, "Lawyers allege abuse of migrant women by gynecologist for Georgia ICE detention center," NBC News Investigations (September 15, 2020), https://www.nbcnews.com/news/latino/nurse-questions-medical-care-operations-detainees-immigration-jail-georgia-n1240110.
[13] Patel, P. Forced sterilization of women as discrimination. *Public Health Rev* 38, 15 (2017). https://doi.org/10.1186/s40985-017-0060-9

We appreciate the oversight the House Committee on Homeland Security's Subcommittee on Border Security, Facilitation & Operations and Senate Judiciary Committee has already conducted on this issue. But we also recognize that more oversight is necessary. We hope that Ms. Wooten's whistleblower disclosures drive additional and urgently needed efforts to address the gross abuses in ICE detention the pose ongoing and imminent dangers to immigrants in detention on an ongoing basis, as well as to workers and the public during the coronavirus pandemic.

For more information contact John Whitty at johnw@whistleblower.org and Priyanka Bhatt at priyanka@projectsouth.org, or by phone at (202) 457-0034.

Very truly yours,

Government Accountability Project
John Whitty, Staff Attorney

Project South
Priyanka Bhatt, Esq.

Exhibit D

AO 88A (Rev 12/20) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Southern District of Georgia

| | |
|---|---|
| DR. MAHENDRA AMIN, M.D. | ) |
| *Plaintiff* | ) |
| v | ) Civil Action No   5:21-CV-00056-LGW-BWC |
| NBCUNIVERSAL MEDIA, LLC | ) |
| | ) |
| *Defendant* | ) |

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To          Azadeh Shahshahani
1061 Mercer Street SE, Atlanta, GA 30316

*(Name of person to whom this subpoena is directed)*

☑ *Testimony*   YOU ARE COMMANDED to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action If you are an organization, you must promptly confer in good faith with the party serving this subpoena about the following matters, or those set forth in an attachment, and you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about these matters

| Place: Stacey Evans Law | Date and Time: |
|---|---|
| 4200 Northside Pkwy NW, Bldg One Ste 200 Atlanta, GA 30327 | 09/28/2023 10:00 am |

The deposition will be recorded by this method    audio, audiovisual, or stenographic means

☐ *Production:* You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material

The following provisions of Fed R Civ P 45 are attached – Rule 45(c), relating to the place of compliance, Rule 45(d), relating to your protection as a person subject to a subpoena, and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so

Date     08/23/2023

| *CLERK OF COURT* | |
|---|---|
| | OR |
| _____ | _____ |
| *Signature of Clerk or Deputy Clerk* | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*   DR. MAHENDRA AMIN, M.D.                                                                , who issues or requests this subpoena, are
STACEY GODFREY EVANS, STACEY EVANS LAW, 4200 NORTHSIDE PKWY, BLDG ONE; SUITE 200, ATLANTA, GEORGIA 30327, 770-779-9602

**Notice to the person who issues or requests this subpoena**

If this subpoena commands the production of documents, electronically stored information, or tangible things before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed Fed R Civ P 45(a)(4)



AO 88A (Rev. 12/20) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No.  5:21-CV-00056-LGW-BWC

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❐ I served the subpoena by delivering a copy to the named individual as follows _____

_____ on *(date)* _____ , or

❐ I returned the subpoena unexecuted because _____

_____

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____

My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00

I declare under penalty of perjury that this information is true.

Date _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.

AO 88A (Rev. 12/20) Subpoena to Testify at a Deposition in a Civil Action (Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1) For a Trial, Hearing, or Deposition.** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
(A) within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
(B) within the state where the person resides, is employed, or regularly transacts business in person, if the person
   (i) is a party or a party's officer; or
   (ii) is commanded to attend a trial and would not incur substantial expense.

**(2) For Other Discovery.** A subpoena may command:
(A) production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
(B) inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1) Avoiding Undue Burden or Expense; Sanctions.** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2) Command to Produce Materials or Permit Inspection.**
(A) *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
(B) *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
   (i) At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
   (ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3) Quashing or Modifying a Subpoena.**
(A) *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
   (i) fails to allow a reasonable time to comply;
   (ii) requires a person to comply beyond the geographical limits specified in Rule 45(c);
   (iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
   (iv) subjects a person to undue burden.
(B) *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

   (i) disclosing a trade secret or other confidential research, development, or commercial information; or
   (ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
(C) *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
   (i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
   (ii) ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1) Producing Documents or Electronically Stored Information.** These procedures apply to producing documents or electronically stored information:
(A) *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
(B) *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
(C) *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
(D) *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2) Claiming Privilege or Protection.**
(A) *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
   (i) expressly make the claim; and
   (ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
(B) *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

## CERTIFICATE OF SERVICE

I certify that on this day, I served the foregoing **SUBPOENA TO TESTIFY AT A**

**DEPOSITION IN A CIVIL ACTION TO AZADEH SHAHSHAHANI** via Process Server.

And I further certify that I served the foregoing via e-mail to the counsel for Defendant,

as follows:

Elizabeth A. McNamara – lizmcnamara@dwt.com
Amanda B. Levine – amandalevine@dwt.com
Leena Charlton – leenacharlton@dwt.com
Cynthia L. Counts – cynthia.counts@fisherbroyles.com

This 23rd day of August 2023.

/s/ **Stacey Godfrey Evans**
Stacey Godfrey Evans

JS44 (Rev. 10/2020 NDGA)                    CIVIL COVER SHEET
1:23-mi-0095 MLB/RDC 890 FRCP45b

The JS44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form is required for the use of the Clerk of Court for the purpose of initiating the civil docket record. (SEE INSTRUCTIONS ATTACHED)

## I. (a) PLAINTIFF(S)

Dr. Mahendra Amin, M.D.

## DEFENDANT(S)

NBCUniversal Media, LLC.

**(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF** Unknown
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT Unknown
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

## (c) ATTORNEYS (FIRM NAME, ADDRESS, TELEPHONE NUMBER, AND E-MAIL ADDRESS)

## ATTORNEYS (IF KNOWN)

## II. BASIS OF JURISDICTION
(PLACE AN "X" IN ONE BOX ONLY)

☐ 1 U.S. GOVERNMENT PLAINTIFF

☐ 2 U.S. GOVERNMENT DEFENDANT

☐ 3 FEDERAL QUESTION (U.S. GOVERNMENT NOT A PARTY)

☐ 4 DIVERSITY (INDICATE CITIZENSHIP OF PARTIES IN ITEM III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES
(PLACE AN "X" IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)
(FOR DIVERSITY CASES ONLY)

| | PLF | DEF | | PLF | DEF | |
|---|---|---|---|---|---|---|
| | ☐ 1 | ☐ 1 | CITIZEN OF THIS STATE | ☐ 4 | ☐ 4 | INCORPORATED OR PRINCIPAL PLACE OF BUSINESS IN THIS STATE |
| | ☐ 2 | ☐ 2 | CITIZEN OF ANOTHER STATE | ☐ 5 | ☐ 5 | INCORPORATED AND PRINCIPAL PLACE OF BUSINESS IN ANOTHER STATE |
| | ☐ 3 | ☐ 3 | CITIZEN OR SUBJECT OF A FOREIGN COUNTRY | ☐ 6 | ☐ 6 | FOREIGN NATION |

## IV. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)

☐ 1 ORIGINAL PROCEEDING

☐ 2 REMOVED FROM STATE COURT

☐ 3 REMANDED FROM APPELLATE COURT

☐ 4 REINSTATED OR REOPENED

☐ 5 TRANSFERRED FROM ANOTHER DISTRICT (Specify District)

☐ 6 MULTIDISTRICT LITIGATION - TRANSFER

☐ 7 APPEAL TO DISTRICT JUDGE FROM MAGISTRATE JUDGE JUDGMENT

☐ 8 MULTIDISTRICT LITIGATION - DIRECT FILE

## V. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE - DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)

Motion to Quash Subpoena of Non-Party Azadeh Shahshahani pursuant to Federal Rule of Civil Procedure 45(d)(3). This matter is pending in the U.S. District Court of the Southern District of Georgia. This Court is the compliance court for filing this Motion to Quash Subpoena of Non-Party.

### (IF COMPLEX, CHECK REASON BELOW)

☐ 1. Unusually large number of parties.

☐ 2. Unusually large number of claims or defenses.

☐ 3. Factual issues are exceptionally complex

☐ 4. Greater than normal volume of evidence.

☐ 5. Extended discovery period is needed.

☐ 6. Problems locating or preserving evidence

☐ 7. Pending parallel investigations or actions by government.

☐ 8. Multiple use of experts.

☐ 9. Need for discovery outside United States boundaries.

☐ 10. Existence of highly technical issues and proof.

**CONTINUED ON REVERSE**

FOR OFFICE USE ONLY

RECEIPT # _____   AMOUNT $_____   APPLYING IFP _____   MAG JUDGE (IFP) _____

JUDGE_____   MAG JUDGE _____ (Referral)   NATURE OF SUIT _____   CAUSE OF ACTION _____

## VI. NATURE OF SUIT (PLACE AN "X" IN ONE BOX ONLY)

**CONTRACT - "0" MONTHS DISCOVERY TRACK**
- ☐ 150 RECOVERY OF OVERPAYMENT & ENFORCEMENT OF JUDGMENT
- ☐ 152 RECOVERY OF DEFAULTED STUDENT LOANS (Excl. Veterans)
- ☐ 153 RECOVERY OF OVERPAYMENT OF VETERAN'S BENEFITS

**CONTRACT - "4" MONTHS DISCOVERY TRACK**
- ☐ 110 INSURANCE
- ☐ 120 MARINE
- ☐ 130 MILLER ACT
- ☐ 140 NEGOTIABLE INSTRUMENT
- ☐ 151 MEDICARE ACT
- ☐ 160 STOCKHOLDERS' SUITS
- ☐ 190 OTHER CONTRACT
- ☐ 195 CONTRACT PRODUCT LIABILITY
- ☐ 196 FRANCHISE

**REAL PROPERTY - "4" MONTHS DISCOVERY TRACK**
- ☐ 210 LAND CONDEMNATION
- ☐ 220 FORECLOSURE
- ☐ 230 RENT LEASE & EJECTMENT
- ☐ 240 TORTS TO LAND
- ☐ 245 TORT PRODUCT LIABILITY
- ☐ 290 ALL OTHER REAL PROPERTY

**TORTS - PERSONAL INJURY - "4" MONTHS DISCOVERY TRACK**
- ☐ 310 AIRPLANE
- ☐ 315 AIRPLANE PRODUCT LIABILITY
- ☐ 320 ASSAULT, LIBEL & SLANDER
- ☐ 330 FEDERAL EMPLOYERS' LIABILITY
- ☐ 340 MARINE
- ☐ 345 MARINE PRODUCT LIABILITY
- ☐ 350 MOTOR VEHICLE
- ☐ 355 MOTOR VEHICLE PRODUCT LIABILITY
- ☐ 360 OTHER PERSONAL INJURY
- ☐ 362 PERSONAL INJURY - MEDICAL MALPRACTICE
- ☐ 365 PERSONAL INJURY - PRODUCT LIABILITY
- ☐ 367 PERSONAL INJURY - HEALTH CARE/ PHARMACEUTICAL PRODUCT LIABILITY
- ☐ 368 ASBESTOS PERSONAL INJURY PRODUCT LIABILITY

**TORTS - PERSONAL PROPERTY - "4" MONTHS DISCOVERY TRACK**
- ☐ 370 OTHER FRAUD
- ☐ 371 TRUTH IN LENDING
- ☐ 380 OTHER PERSONAL PROPERTY DAMAGE
- ☐ 385 PROPERTY DAMAGE PRODUCT LIABILITY

**BANKRUPTCY - "0" MONTHS DISCOVERY TRACK**
- ☐ 422 APPEAL 28 USC 158
- ☐ 423 WITHDRAWAL 28 USC 157

**CIVIL RIGHTS - "4" MONTHS DISCOVERY TRACK**
- ☐ 440 OTHER CIVIL RIGHTS
- ☐ 441 VOTING
- ☐ 442 EMPLOYMENT
- ☐ 443 HOUSING/ ACCOMMODATIONS
- ☐ 445 AMERICANS with DISABILITIES - Employment
- ☐ 446 AMERICANS with DISABILITIES - Other
- ☐ 448 EDUCATION

**IMMIGRATION - "0" MONTHS DISCOVERY TRACK**
- ☐ 462 NATURALIZATION APPLICATION
- ☐ 465 OTHER IMMIGRATION ACTIONS

**PRISONER PETITIONS - "0" MONTHS DISCOVERY TRACK**
- ☐ 463 HABEAS CORPUS- Alien Detainee
- ☐ 510 MOTIONS TO VACATE SENTENCE
- ☐ 530 HABEAS CORPUS
- ☐ 535 HABEAS CORPUS DEATH PENALTY
- ☐ 540 MANDAMUS & OTHER
- ☐ 550 CIVIL RIGHTS - Filed Pro se
- ☐ 555 PRISON CONDITION(S) - Filed Pro se
- ☐ 560 CIVIL DETAINEE: CONDITIONS OF CONFINEMENT

**PRISONER PETITIONS - "4" MONTHS DISCOVERY TRACK**
- ☐ 550 CIVIL RIGHTS - Filed by Counsel
- ☐ 555 PRISON CONDITION(S) - Filed by Counsel

**FORFEITURE/PENALTY - "4" MONTHS DISCOVERY TRACK**
- ☐ 625 DRUG RELATED SEIZURE OF PROPERTY 21 USC 881
- ☐ 690 OTHER

**LABOR - "4" MONTHS DISCOVERY TRACK**
- ☐ 710 FAIR LABOR STANDARDS ACT
- ☐ 720 LABOR/MGMT. RELATIONS
- ☐ 740 RAILWAY LABOR ACT
- ☐ 751 FAMILY and MEDICAL LEAVE ACT
- ☐ 790 OTHER LABOR LITIGATION
- ☐ 791 EMPL. RET. INC. SECURITY ACT

**PROPERTY RIGHTS - "4" MONTHS DISCOVERY TRACK**
- ☐ 820 COPYRIGHTS
- ☐ 840 TRADEMARK
- ☐ 880 DEFEND TRADE SECRETS ACT OF 2016 (DTSA)

**PROPERTY RIGHTS - "8" MONTHS DISCOVERY TRACK**
- ☐ 830 PATENT
- ☐ 835 PATENT-ABBREVIATED NEW DRUG APPLICATIONS (ANDA) - a/k/a Hatch-Waxman cases

**SOCIAL SECURITY - "0" MONTHS DISCOVERY TRACK**
- ☐ 861 HIA (1395ff)
- ☐ 862 BLACK LUNG (923)
- ☐ 863 DIWC (405(g))
- ☐ 863 DIWW (405(g))
- ☐ 864 SSID TITLE XVI
- ☐ 865 RSI (405(g))

**FEDERAL TAX SUITS - "4" MONTHS DISCOVERY TRACK**
- ☐ 870 TAXES (U S  Plaintiff or Defendant)
- ☐ 871 IRS - THIRD PARTY 26 USC 7609

**OTHER STATUTES - "4" MONTHS DISCOVERY TRACK**
- ☐ 375 FALSE CLAIMS ACT
- ☐ 376 Qui Tam  31 USC 3729(a)
- ☐ 400 STATE REAPPORTIONMENT
- ☐ 430 BANKS AND BANKING
- ☐ 450 COMMERCE/ICC RATES/ETC
- ☐ 460 DEPORTATION
- ☐ 470 RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS
- ☐ 480 CONSUMER CREDIT
- ☐ 485 TELEPHONE CONSUMER PROTECTION ACT
- ☐ 490 CABLE/SATELLITE TV
- ☐ 890 OTHER STATUTORY ACTIONS
- ☐ 891 AGRICULTURAL ACTS
- ☐ 893 ENVIRONMENTAL MATTERS
- ☐ 895 FREEDOM OF INFORMATION ACT 899
- ☐ 899 ADMINISTRATIVE PROCEDURES ACT / REVIEW OR APPEAL OF AGENCY DECISION
- ☐ 950 CONSTITUTIONALITY OF STATE STATUTES

**OTHER STATUTES - "8" MONTHS DISCOVERY TRACK**
- ☐ 410 ANTITRUST
- ☐ 850 SECURITIES / COMMODITIES / EXCHANGE

**OTHER STATUTES - "0" MONTHS DISCOVERY TRACK**
- ☐ 896   ARBITRATION (Confirm / Vacate / Order / Modify)

**\* PLEASE NOTE DISCOVERY TRACK FOR EACH CASE TYPE. SEE LOCAL RULE 26.3**

## VII. REQUESTED IN COMPLAINT:
- ☐ CHECK IF CLASS ACTION UNDER F.R.Civ.P. 23     DEMAND $_____

JURY DEMAND ☐ YES  ☑ NO  (CHECK YES ONLY IF DEMANDED IN COMPLAINT)

## VIII. RELATED/REFILED CASE(S) IF ANY

JUDGE_____     DOCKET NO._____

CIVIL CASES ARE DEEMED RELATED IF THE PENDING CASE INVOLVES:  (CHECK APPROPRIATE BOX)
- ☐ 1.  PROPERTY INCLUDED IN AN EARLIER NUMBERED PENDING SUIT.
- ☐ 2.  SAME ISSUE OF FACT OR ARISES OUT OF THE SAME EVENT OR TRANSACTION INCLUDED IN AN EARLIER NUMBERED PENDING SUIT.
- ☐ 3.  VALIDITY OR INFRINGEMENT OF THE SAME PATENT, COPYRIGHT OR TRADEMARK INCLUDED IN AN EARLIER NUMBERED PENDING SUIT.
- ☐ 4.  APPEALS ARISING OUT OF THE SAME BANKRUPTCY CASE AND ANY CASE RELATED THERETO WHICH HAVE BEEN DECIDED BY THE SAME BANKRUPTCY JUDGE.
- ☐ 5.  REPETITIVE CASES FILED BY PRO SE LITIGANTS.
- ☐ 6.  COMPANION OR RELATED CASE TO CASE(S) BEING SIMULTANEOUSLY FILED (INCLUDE ABBREVIATED STYLE OF OTHER CASE(S)):

- ☐ 7.  EITHER SAME OR ALL OF THE PARTIES AND ISSUES IN THIS CASE WERE PREVIOUSLY INVOLVED IN CASE NO. _____ , WHICH WAS DISMISSED. This case ☐ IS   ☐ IS NOT (check one box) SUBSTANTIALLY THE SAME CASE.

_____     9/19/2023
SIGNATURE OF ATTORNEY OF RECORD     DATE