# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | | |
|---|---|---|
| **In re: Subpoena Issued to Azadeh Shahshahani,** | ) ) ) | |
| **DR. MAHENDRA AMIN,** | ) ) | **CIVIL ACTION FILE NO. 1:23-mi-00095-MLB-RDC** |
| **Plaintiff,** | ) ) | |
| **v.** | ) ) | |
| **NBCUNIVERSAL,** | ) ) | |
| **Defendant.** | ) ) ) | |

## PLAINTIFF'S RESPONSE TO NON-PARTY AZADEH SHAHSHAHANI'S MOTION TO QUASH AND RESPONSE TO BRIEF OF AMICI CURIAE

Azadeh Shahshahani moves to quash the non-party subpoena for deposition

that Dr. Amin served her in his defamation case against NBCUniversal.  She served

as a source for journalists regarding statements that NBCUniversal published and

communicated directly with journalists for NBCUniversal.  Ms. Shahshahani

nevertheless argues that all information she has, including her conversations with

reporters, is protected attorney-client communication or opinion attorney work

product.  Because the subpoena seeks Ms. Shahshahani's discoverable information as

a fact witness, does not require the disclosure of information protected by privileges

such as work product or attorney-client communications, does not impose any undue

1

burden on Ms. Shahshahani because it is reasonably calculated to lead to admissible evidence and does not burden her, and provides reasonable time to comply, the motion should be denied.

Ms. Shahshahani originally filed this motion in the United States District Court for the Southern District of Georgia, where Dr. Amin brought his lawsuit against NBCUniversal. Ms. Shahshahani's counsel wrote to that court: "I believe that this SDGA Court has the most familiarity with these issues and we submit to its jurisdiction willingly." Ex. 2, Email Thread with S.D. Ga. (Sept. 19, 2023). Dr. Amin agrees. Although Ms. Shahshahani has changed course without explaining why, Dr. Amin requests in the alternative this Court transfer the motion.

Ms. Shahshahani is an attorney, and her co-counsel in a *different* lawsuit has also filed a Motion for Leave to File Brief of Amici Curiae. Doc. 3. Counsel for amici curiae did not seek Dr. Amin's consent to file the motion. Ex. 1, Declaration of Stacey G. Evans (October 2, 2023), ¶ 17. Had it done so, it would have been able to note that Dr. Amin does not oppose the motion.[1] However, nothing in the brief of amici curiae, which fails to acknowledge or address at all Ms. Shahshahani's conversations with NBCUniversal journalists, changes the fact that the subpoena

---

[1] The motion and attached brief appear to violate N.D. Ga. Local Rule 7.1(D), which requires counsel to "certify that the brief has been prepared with one of the font and point selections approved by the Court in LR 5.1." There appears to be no such certification. *See* Doc. 3; Doc. 3-1.

2

appropriately deposes Ms. Shahshahani as a fact witness.

Dr. Amin further moves the Court to hear Ms. Shahshahani before ordering
that her counsel pay the reasonable costs Dr. Amin incurred in litigating this motion.

## **BACKGROUND**

In *Amin v. NBCUniversal Media, LLC*, Dr. Mahendra Amin alleges that
NBCUniversal defamed him. 5:21-CV-56, 2022 WL 16964770, at *1, 4-5 (S.D. Ga.
Nov. 16, 2022). Most of his allegations having survived NBCUniversal's motion for
judgment on the pleadings, *see generally id.*, Dr. Amin is now seeking factual
evidence to prove his allegations. Under Georgia law, Dr. Amin must prove that
NBCUniversal's allegedly defamatory statements that he performed mass
hysterectomies and unnecessary and unconsented-to medical procedures on women
detained by the United States Immigration and Customs Enforcement (ICE) at the
Irwin County Detention Center (ICDC) were false, and were published with "actual
malice"—knowledge of falsity or reckless disregard of the truth. *See id.* at *21.

Ms. Shahshahani is an attorney activist with Project South, which she has
described as an "organization based in the Black Radical Traditions of the US South"
with whom she has sought to "shut down" ICDC for "many years." Ex. 5, Michigan
Journal Article (Apr. 15, 2021), at 3, also available at https://mjrl.org/2021/04/14/on-
movement-lawyering-an-interview-with-azadeh-shahshahani/. To that end, Ms.
Shahshahani coauthored a letter addressed to several federal officials and distributed

3

to the media that mostly discussed COVID-19 and other conditions at ICDC, but included a short section on high rates of hysterectomies.  *Id*.; *see generally* Ex. 3, Project South Letter (Sept. 14, 2020).  NBCUniversal claims this section served as a basis of its reporting.  Ms. Shahshahani also spoke with NBCUniversal reporters, and her statement is quoted in a story that also served as a source for the defamatory statements on the broadcasts at issue.  Doc. 1-1 at 3-4; Ex. 7, NBC Article (Sept. 15, 2020).  In response to a third-party document subpoena in *NBCUniversal*, Project South produced many documents showing Ms. Shahshahani's media campaign work.  Indeed, NBCUniversal identified "representative(s) from Project South" in its initial disclosures as "individuals likely to have discoverable information."  Ex. 8, Defendant's Rule 26(a) Initial Disclosure Statement (Jan. 10, 2022), at 2, 4.

In an effort reasonably calculated to lead to admissible evidence in *NBCUniversal*, Dr. Amin subpoenaed Ms. Shahshahani to appear for a deposition in Atlanta, Georgia.  Doc. 1-4.  Counsel for Dr. Amin first invited Ms. Shashani to accept service, to avoid service expense and the need to send a process server to Ms. Shahshahani's home or office.  Now Ms. Shahshahani moves to quash the subpoena, arguing that the subpoena is "nothing but a manipulative tactic designed to exploit opposing counsels' [sic] knowledge and undermine the sanctity of attorney-client and work-product privileges."  Doc. 1 at 2.  Ms. Shahshahani is one of sixteen attorneys in a sprawling lawsuit, *Oldaker v. Giles*, Case No. 7:20-cv-00224-WLS-MSH (S.D.

Ga.), regarding ICDC, in which Dr. Amin is one of 25 named defendants.  Doc. 1-2 at 3-4, 159-60.  That case, filed after Ms. Shahshahani's sharing the letter and statements with the media, remains in the pleadings stage, as several motions to dismiss are pending.  Ex. 1, ¶ 7; Doc. 3-1 at 6.

Ms. Shahshahani originally moved to quash in the *NBCUniversal* court, in the Southern District of Georgia.  *NBCUniversal*, Third Party Motion to Quash the Deposition Subpoena of Azadeh Shahshahani (Sept. 19, 2023), ECF No. 99.  The *NBCUniversal* court had previously denied a motion to quash subpoena filed by a different third party, ruling that it does not have jurisdiction to hear a Rule 45 motion if it is not the "place of compliance" for the subpoena.  Accordingly, counsel for Dr. Amin alerted the *NBCUniversal* court via email that, "in light of the late stage of discovery, the Court's previous ruling, and the absence of information on the place of compliance in Ms. Shahshahani's motion, Dr. Amin brings it to the attention of the Court and all parties that it may find that it has no jurisdiction."  Ex. 2 at 2-3.  The same day, Ms. Shahshahani filed an amended motion to quash, which included the subpoena showing the place of compliance in Atlanta, in the Northern District of Georgia.  *Id*. at 1.  Counsel for Ms. Shahshahani stated to the court: "In an abundance of caution we will also file a motion to quash in NDGA as jurisdiction is unclear— however, I believe that this SDGA Court has the most familiarity with these issues and we submit to its jurisdiction willingly."  *Id*.

5

Two days later, the *NBCUniversal* court denied Ms. Shahshahani's motion,
indicating that indeed, "at this time, this Court lacks jurisdiction to hear the Motion to
Quash." *NBCUniversal*, Order on Motion to Quash (Sept. 21, 2023) at 2.  However,
that court also stated: "The Rule also provides a vehicle for transferring such motions
to the issuing court: When the court where compliance is required did not issue the
subpoena, it may transfer the motion under this rule to the issuing court fi the person
subject to the subpoena consents or if the court finds exceptional circumstances." *Id.*
(quotation marks omitted).  It added: "The parties may request and consent to
transfer, but the court of compliance—the District Court for the Northern District of
Georgia—will make the determination whether to transfer the motion." *Id*.

On September 22, counsel for Dr. Amin asked counsel for Ms. Shahshahani to
join on or consent to a motion to transfer, as outlined by the *NBCUniversal* court.
Ex. 6, Email Correspondence, at 11.  Counsel for Ms. Shahshahani refused to agree.
*Id*. at 9.  When counsel for Dr. Amin asked for an explanation as to the surprising
change of course, counsel for Ms. Shahshahani did not give any substantive response,
stating merely: "The SDGA denied jurisdiction and as such we will proceed
accordingly." *Id*. at 5.  She continued: "I have no interest in a back and forth with
you via email.  You may respond to our legal arguments through a response brief."
*Id*.  Therefore Ms. Shahshahani has not justified objecting to transfer to the very
court she originally filed her motion.

6

## LEGAL STANDARD

The Federal Rules of Civil Procedure provide for broad discovery, including "any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). "Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." *Adkins v. Christie*, 488 F.3d 1324, 1330 (11th Cir. 2007) (quotation marks omitted). Federal Rule of Civil Procedure 45 allows parties to obtain discovery from third parties that are not part of a lawsuit, and the "scope of information for a nonparty is the same as the scope of a discovery request made upon a party to the action under Rule 26." *Young v. Ray of Hope Couns. Servs., Inc.*, Case No. 1:20-cv-03684-LMM-RDC, 2022 WL 19934808, at *3 (N.D. Ga. Mar. 28, 2022) (citation omitted). "[I]nformation is relevant if it has a 'tendency to make a fact more or less probable' and 'the fact is of consequence in determining the action.'" *Id.* (quoting *Jordan v. Comm'r, Miss. Dep't of Corr.*, 947 F.3d 1322, 1329 (11th Cir. 2020)).

Narrow grounds allow or require a court in the district in which the subpoena requires compliance to quash a non-party subpoena, including when the non-party demonstrates that the subpoena "requires disclosure of privileged or other protected matter, if no exception or waiver applies," and when the subpoena "subjects a person to undue burden." Fed. R. Civ. P. 45(d)(3). "The burden falls on the party seeking to

quash the subpoena to demonstrate that it is subjected to an undue burden or that the sought information is otherwise protectable under Rule 45." *KKMB, LLC v. Khader*, Case No. 1:20-CV-3997-JPB-JSA, 2020 WL 13593895, at *2 (N.D. Ga. Oct. 9, 2020) (citations omitted).

A motion to quash a subpoena issued pursuant to Federal Rule of Civil Procedure 45 must be brought before "the court where compliance is required." Fed. R. Civ. P. 45(d)(3)(A). However, "[w]hen the court where compliance is required did not issue the subpoena, it may transfer a motion under this rule to the issuing court if the person subject to the subpoena consents or if the court finds exceptional circumstances." Fed. R. Civ. P. 45(f). In determining whether "exceptional circumstances" exist, courts "should look to a variety of factors to determine if the judge from the issuing court is in a better position to rule on the motion due to her familiarity with the full scope of the issues involved as well as any implications the resolution of the motion will have on the underlying litigation." *Hoog v. PetroQuest, LLC*, 338 F.R.D. 515, 517 (S.D. Fla. 2021) (quotation marks omitted).

## ARGUMENT

### I.    The Motion Should Be Denied.

Ms. Shahshahani's motion should be denied, because she has non-privileged, discoverable information to which Dr. Amin is entitled, and any burden on Ms. Shahshahani was caused by Ms. Shahshahani's delays and avoidance of service, not

8

Dr. Amin's subpoena.  Further, the subpoena provided ample time for response and

compliance.  For these same reasons, the Court should also deny Ms. Shahshahani's

request in the alternative for a protective order.

**A. The Subpoena Does Not Require Disclosure of Privilege or Other Protected Matter.**

Notwithstanding Ms. Shahshahani's contention that "[a]ny questions

regarding Ms. Shahshahani's involvement automatically delves into matters

protected by attorney-client privilege," Doc. 1 at 2, Ms. Shahshahani spoke to

journalists; there can be no argument that such communications enjoy attorney-

client privilege.[2]  Accordingly, the subpoena does not "require[] disclosure of

privilege or other protected matter, if no exception or waiver applies," pursuant to

---

[2] Ms. Shahshahani argues that counsel for Dr. Amin "is abusing the subpoena power and engaging in unfair litigation tactics by attempting to issue subpoenas to multiple attorneys—including her own opposing counsel—Ms. Cynthia Counts." Doc. 1 at 3.  Though unrelated to this motion, Ms. Counts was served a subpoena, after she agreed to accept service.  The subpoena was contemplated to narrowly inquire as to Ms. Counts's violation of the United States District Court for Southern Carolina Local Rules during a deposition where she questioned a third party witness, but counsel for Dr. Amin and Ms. Counts are conferring, and counsel for Dr. Amin hopes to avoid the need for a deposition.  Ex. 1, Declaration of Stacey G. Evans (Oct. 2, 2023), ¶ 11.  As for the other "multiple attorneys," they, like Ms. Shahshahani, are fact witnesses who spoke to journalists, and were not subpoenaed in their capacity as counsel.  Indeed, Ms. Shahshahani is the *only* such fact witness (who is also an attorney) who has contested the propriety of sitting for a deposition; the others agreed to be deposed without filing a motion to quash, and in fact those depositions have already occurred.  *Id*. ¶ 10.

Rule 45, and it should not be quashed.  Ms. Shahshahani has not met her burden of demonstrating otherwise.

Ms. Shahshahani's status as counsel for adverse parties in a *different* case does not change the fact that she has relevant, discoverable, non-privileged information as a fact witness in *NBCUniversal*, and a subpoena for deposition into those discoverable matters does not "require[] disclosure" of privileged information.  The cases Ms. Shahshahani cites, and indeed nearly all of amici curiae's brief as a whole, stand for the unremarkable proposition that opinion attorney work product and confidential attorney-client communications are not discoverable, or that heightened scrutiny is merited where a party seeks to depose counsel of the adverse party in the same case, such as in-house counsel for the adverse party or lawyers for the adverse party.  *See generally* Doc. 1; Doc. 3-1; *see Shelton v. Am. Motors Corp.*, 805 F.2d 1323, 1324 (8th Cir. 1986) (in-house counsel of the defendant); *Gamache v. Hogue*, 595 F. Supp. 3d 1344, 1348 (M.D. Ga. 2022) (managing partner of law firm who acted as legal counsel for several defendants).[3]  Ms. Shahshahani is not counsel for

---

[3] The exception is amici curiae's citation of *In re an Ord. Pursuant to 28 U.S.C. §1782 to Conduct Discovery for Use in a Foreign Proceeding*, No. 17-1466, 2017 WL 3708028 (D.D.C. Aug. 18, 2017).  Doc. 3-1 at 10-11.  The out-of-circuit district court case did not consider a Rule 45 motion to quash.  *In re an Ord.*, 2017 WL 3708028, at *1.  Further, the subpoenas at issue in that case directly sought information as to their role as counsel, not independently as a fact witness.  *Id.* *2. Finally, the status of the sought witnesses as counsel was only one factor the court weighed in determining whether to grant the petitioner's request for discovery,

NBCUniversal, and such information is not at issue in this subpoena.  Accordingly, the appropriate course is for Ms. Shahshahani to testify as to the information she has as a fact witness.  To the extent the answers to specific questions would require the disclosure of privileged information, her counsel should object to those specific questions on those grounds and Ms. Shahshahani may refuse to answer them.  But the subpoena should not be quashed.

Ms. Shahshahani argues, "[g]iven the interrelatedness of the two cases, it is hard to imagine what questions Dr. Amin might pose that would not involve either Ms. Shahshahani's communications with her clients protected by attorney-client privilege or as discussed earlier, her mental impressions developed in preparation for possible litigation."  Doc. 1 at 11.  But the exhibit she attaches to her motion, of emails between her counsel and counsel for Dr. Amin, shows examples of just such questions: "I will be asking [Ms. Shahshahani] about information relevant to the NBCU defamation case, which includes communications [she] had with NBCU and other media outlets and Congress (non-exclusive)."  Doc. 1-1 at 4.  Later in the same email thread, counsel for Dr. Amin stated: "Project South's own document production included communications between Ms. Shahshahani and non-clients, including journalists.  Ms. Shahshahani's position as an attorney does not make these

---

rather a non-party's motion to quash; the court also weighed the limited relevance of the information against the burden imposed.  *Id*. *5.

communications, which are not between attorney and client, privileged." *Id*. at 3.

Such communications are also not "mental impressions;" they are communications.

In an interview with a law school journal, Ms. Shahshahani herself admitted

that her actions as to ICDC, including bringing "national and international attention

to [ICDC]," were *not* limited to the role of litigator:

> In this scenario, if you saw litigation as the only tool, when
> the lawsuits in spring 2020 weren't successful, you would
> have just backed off and thought, "I did everything I could
> do, and that's the end of it." But being a part of a
> movement is realizing lawsuits are one strategy and
> saying, "Okay, let's see what other tools I can use" with
> the goal of freeing people and shutting this place down.
> You would think of all the strategies we have used over the
> years to bring attention to this place, to publish reports, to
> talk to directly impacted folks. And then finally filing the
> complaint that brought the world's attention to [ICDC] and
> *then* filing the class action lawsuit. Just keeping at it until
> this place is shut down.

Ex. 5 at 3 (emphasis in original). This simply does not square with Ms.

Shahshahani's assertion that a deposition "would automatically encroach on

privileged matters." Doc. 1 at 4. In the interview quoted here and in her statements

to the media, it does not appear that it was "impossible for Ms. Shahshahani to

compartmentalize into answers she may articulate without automatically divulging

into both attorney client communications along with her mental impressions and

personal beliefs protected under the work product doctrine." *Id*. at 6. To the extent

such communications ever did enjoy privileges, Ms. Shahshahani waived them by

willingly conveying them to journalists, and so it further cannot be said that "no exception or waiver applies."  Fed. R. Civ. P. 45(d)(3)(A)(iii).

Also, even if Ms. Shahshahani were opposing counsel in *NBCUniversal*, which she is not, "a protective order which prohibits a deposition is rarely given and nothing in the federal rules prohibits the deposition of opposing counsel." *Bank of Am., N.A. v. Ga. Farm Bureau Mut. Ins. Co.*, Case No. 3:12-CV-155 (CAR), 2014 WL 4851853, at *2 (M.D. Ga. Sept. 29, 2014) (quotation marks omitted).  As a district court within the Eleventh Circuit observed: "The Federal Rules of Civil Procedure do not prevent the deposition of another party's lawyer, so long as the deposition seeks relevant, non-privileged information." *Gamache*, 595 F. Supp. 3d at 1350 (quotation marks omitted).  Counsel for Dr. Amin has already provided counsel for Ms. Shahshahani repeated assurances that it is her testimony as a *fact witness in NBCUniversal* that is the reason for his seeking her deposition.  In email correspondence that Ms. Shahshahani herself attaches to her motion, counsel for Dr. Amin stated unequivocally: "We will not seek information that is protected pursuant to the attorney client privilege or work product, and to the extent counsel for Ms. Shahshahani believes deposition questions implicates [sic] such information, counsel can object and instruct her not to answer."  Doc. 1-1 at 3.  There is simply no concern of any "precedent" being set, as amici curiae argue.  Doc. 3-1 at 7.  Rather, more concerning is the idea that an attorney may seek court intervention to categorically

avoid testifying as a fact witness. *See generally* Doc. 3-1 (failing to address Ms. Shahshahani's conversations with journalists or authorship of the September 2020 letter *at all*); *see Gamache*, 595 F. Supp. 3d at 1350 ("A lawyer's profession is not a talisman of privilege, automatically granting attorneys immunity from discovery under the federal rules." (quotation marks omitted)).

Amici curiae further argue that they "may be forced to shield themselves from relevant facts, thereby resulting in less effective representation, in the *Oldaker* litigation due to a fear of being deposed in Amin's defamation matter." Doc. 3-1 at 8. This point, again, fails to acknowledge Ms. Shahshahani's position as a fact witness with obviously relevant non-privileged information. Subpoenas for depositions of other *Oldaker* counsel, who did not speak to NBCUniversal journalists around the time of the broadcasts at issue regarding issues relating to the defamatory statements, would not be reasonably calculated to lead to discoverable evidence, and accordingly those counsel have no justification for their "fear" of being deposed. Indeed, as a practical matter, discovery in *NBCUniversal* closes October 4, 2023; no more deposition subpoenas are possible given this timing. *NBCUniversal*, Second Amended Scheduling Order (June 12, 2023), ECF 80.[4]

---

[4] Discovery depositions of fact witnesses had been due to end July 31, 2023. *NBCUniversal*, Amended Scheduling Order (Nov. 28, 2022), ECF 61, at 1. However, the Court granted the parties' joint motion to amend the scheduling order for good cause, noting that amendment was necessary, in part, because "several

**B. The Subpoena Does Not Impose Undue Burden on Ms. Shahshahani.**

The subpoena seeks Ms. Shahshahani's highly relevant testimony regarding conversations with journalists underlining the statements at issue in *NBCUniversal* and her communications with NBCUniversal directly. It will require a few hours of testimony and imposes minimal inconvenience on Ms. Shahshahani. It does not impose undue burden.

"The undue burden analysis requires the court to balance the interests served by demanding compliance with the subpoena against the interests furthered by quashing it. Several factors have been identified as pertinent to the analysis, including the relevance of the information requested to the underlying litigation and the burden that would be imposed by producing it." *Jordan*, 947 F.3d at 1337 (quotation marks omitted).[5]

---

non-parties had moved to quash the parties' subpoenas." *NBCUniversal*, Second Amended Scheduling Order (June 12, 2023), ECF 80, at 1. These non-parties are *Oldaker* plaintiffs, who brought, including through amici curiae as counsel, motions to quash or amend or for protective order before multiple judicial districts, including the Northern District of Georgia heard by United States Magistrate Judge Justin S. Anand. *See, e.g.*, *Amin v. NBCUniversal*, Order, Case No. 1:23-cv-03042-AT (July 11, 2023), ECF 8. Neither Ms. Shahshahani nor amici curiae's briefs address the rulings on those motions, all of which ordered that the depositions proceed. *E.g.*, *id*. at 2.

[5] Amici curiae cites Fourth Circuit authority. *See* Doc. 3-1 at 13-14. Eleventh Circuit authority interpreting Rule 45, such as *Jordan v. Comm'r, Miss. Dep't of Corr.*, 947 F.3d 1322 (11th Cir. 2020), governs Ms. Shahshahani's motion.

Relevance for discovery "has been construed broadly to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case." *Akridge v. Alfa Mut. Ins. Co.*, 1 F.4th 1271, 1276 (11th Cir. 2021). As discussed above, Ms. Shahshahani communicated with NBCUniversal reporters and shared a letter regarding allegations of mass hysterectomies with media, and NBCUniversal used those communications and the letter to publish the statements that Dr. Amin alleges defamed him. She further communicated directly with NBCUniversal journalists. She plainly has information highly relevant to Dr. Amin's claims in *NBCUniversal*.

Ms. Shahshahani argues that the information she has could be acquired by other means. Doc. 1 at 8-9. But that is not so. She states that "Dr. Amin can depose the journalists identified in the documents themselves" and "may choose to submit interrogatories to NBCU about these communications." *Id*. at 9. Federal Rule of Civil Procedure 33(a)(1) limits a party to "no more than 25 written interrogatories, including all discrete subparts." Dr. Amin did serve an interrogatory on NBCUniversal requesting it identify all persons with "personal knowledge or discoverable information relating to any of Dr. Amin's allegations in the Complaint or your defenses in this litigation," and NBCUniversal identified "Representative(s) from Project South." Ex. 1, ¶ 15. Further, Dr. Amin *has* deposed journalists; one with whom Ms. Shahshahani spoke testified, "I don't recall" multiple times regarding

16

that conversation, and he answered, "No," when asked whether he knew Ms. Shahshahani, even though communications show that he does.  *Id.* ¶ 16.  Also, unlike Ms. Shahshahani or her clients, NBCUniversal journalists work for the party adverse to Dr. Amin in *NBCUniversal*, and he is accordingly entitled to probe the credibility of the journalists' testimony and contentions.  *See, e.g.*, Fed. R. Evid. 401 ("Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action.").  Dr. Amin has investigated the "less burdensome" sources Ms. Shahshahani identifies, and indeed that discovery led to his reasonable calculation that Ms. Shahshahani has discoverable evidence.

The subpoena does not impose more than minimal burden on Ms. Shahshahani.  It requires a single deposition, in Atlanta at the office of counsel for Dr. Amin.  As counsel for Dr. Amin has indicated, counsel is willing to work with counsel for Ms. Shahshahani to further maximize convenience and to that end has offered to schedule the deposition at a location, date, and time convenient for her.

Indeed, any inconveniences of which Ms. Shahshahani complains are the result of her own refusal to work with counsel for Dr. Amin—not of any burden imposed by the subpoena.  For example, Ms. Shahshahani objects to counsel for Dr. Amin's having conducted "traumatizing harassment against a prominent human rights attorney who is subject to ongoing death threats," apparently referencing

17

personal service of the subpoena. Doc. 1 at 5. Ms. Shahshahani's own exhibit again demonstrates the disingenuousness of her claim: her counsel did not agree to mutually schedule her deposition, after counsel for Dr. Amin noted: "If you will not work with me to mutually schedule these depositions, then I will serve subpoenas. Please let me know so I can act accordingly." Doc. 1-1 at 4.[6] Personal service would not have been necessary, had Ms. Shahshahani not refused to accept service through counsel, which, of course, would not have limited her ability to contest the subpoena.

It is true that the "status of the subpoena recipient as a non-party is also a factor that *can* weigh against disclosure in the undue burden inquiry." *Jordan*, 947 F.3d at 1337 (citation omitted) (emphasis supplied). Dr. Amin has and will continue to strive to minimize any burden imposed on Ms. Shahshahani in recognition of her status as a non-party. But Rule 45 provides a mechanism for deposing non-parties, so of course a subpoena is not invalid merely because it is addressed to a non-party. *See id.* at 1342 (noting the subpoena recipient's status as a non-party but stating as "[m]ore important[]" the relevance of the testimony and burdens imposed).

_____

[6] This followed an email from Ms. Shahshahani's counsel, in which she threatened Dr. Amin's counsel: "Stacey, please know that if you try to depose [Ms. Shahshahani] I suspect she and/or multiple other attorneys and other firms will try and depose you in other litigation so this may be a case of be careful what you wish for." Doc. 1-1 at 4. "[L]ower[ing] the standards of the profession [and] add[ing] to the already burdensome time and costs of litigation," indeed. Doc. 1 at 3-4 (quoting *Shelton v. Am. Motors Corp.*, 805 F.2d 1323, 1327 (8th Cir. 1986).

It is Dr. Amin who would be prejudiced by the inability to acquire deposition testimony from Ms. Shahshahani.  Dr. Amin is preparing for summary judgment and for trial, and Ms. Shahshahani can testify as to matters that Dr. Amin reasonably calculates could lead to admissible evidence in his case against NBCUniversal.

### C. The Subpoena Provides Reasonable Time to Respond.

Ms. Shashahani is correct that Federal Rule of Civil Procedure 45(d)(3) provides that a subpoena should be quashed if it "fails to allow reasonable time to comply," and "courts make the determination of reasonableness on a case-by-case basis." *Bailey v. Fair & Walker Unit Owners Ass'n, Inc.*, Case No. 1:23-cv-00098-ELR, 2023 WL 2119490, at *2 (N.D. Ga. Jan. 17, 2023) (quotation marks omitted)). But here there can be no doubt that the subpoena allowed reasonable time to comply. Counsel for Dr. Amin reached out to counsel for Ms. Shahshahani June 27, 2023, seeking to schedule her deposition in September at a location convenient for Ms. Shahshahani.  Doc. 1-1 at 4.

When counsel for Ms. Shahshahani made clear that she would not agree to schedule a deposition, counsel for Dr. Amin attempted to personally serve Ms. Shahshahani.  Ex. 1, ¶¶ 12-13.  Ms. Shahshahani dodged such service for weeks; a process server indicated that a co-worker of Ms. Shahshahani's said she was not in the office and Ms. Shahshahani did not call the phone number the server left, and multiple visits to Ms. Shahshahani's house were unanswered, despite her evidently

being at home. *Id*. ¶ 13. Finally, on September 5, a process server was able to serve Ms. Shahshahani at her garage. Ex. 4, Proof of Service (Sept. 6, 2023). The subpoena provided for the deposition to be held on September 28—23 days later. Doc. 1-4 at 2.[7]

Now, Ms. Shahshahani argues that the subpoena "does not allow Ms. Shahshahani reasonable time to comply as the undersigned is not available during the month of September to sit for deposition, specifically her counsel is currently out of state on leave of Court." Doc. 1 at 4. This is Ms. Shahshahani's counsel's scheduling issue, raised for the first time in her Motion; it is not grounds for quashing a subpoena issued from a federal court.

Further, counsel for Dr. Amin has made abundantly clear, time and again, that it has been willing to work with counsel for Ms. Shahshahani to schedule the deposition at a mutually satisfactory time, date, and location. Ms. Shahshahani's implications otherwise are insincere. Indeed, in an email thread that Ms. Shahshahani attaches to her motion, her counsel refuses to agree to mutually schedule a September deposition for Ms. Shahshahani, in *June*. Doc. 1-1 at 4. She cannot now claim that the subpoena, served on her 23 days before the deposition the

---

[7] Although counsel for Ms. Shahshahani never requested counsel for Dr. Amin to consent to a stay, counsel for Dr. Amin offered to and has agreed to stay the deposition pending this Court's ruling as a courtesy. Ex. 6 at 2.

subpoena noticed, provides insufficient notice. *See Bailey*, 2023 WL 2119490, at *2 (noting that district courts in the Southern District and Florida have determined that 14 days is reasonable time for a non-party to conform to a Rule 45 subpoena, while ruling that a single day was not a reasonable time). To date, counsel for Ms. Shahshahani has not entertained any scheduling discussion whatsoever, even on the contingency that she does not prevail in her efforts to avoid deposition. Ex. 6 at 1.

### D. No Protective Order is Warranted.

Finally, Ms. Shahshahani argues that she should be granted a protective order pursuant to Rule 26(c)(1). Doc. 1 at 16-18. She presents no new grounds for this request. Further, in the single case she cites, the court ordered that the deposition *should* proceed, upon the condition that "the plaintiff only seek testimony about non-privileged matters separate and apart from the defendant's litigation strategy." *Id*. at 17. As discussed above, Dr. Amin has repeatedly given Ms. Shahshahani that exact assurance. And "a protective order which prohibits a deposition is rarely given." *Bank of Am.*, 2014 WL 4851853, at *2 (quotation marks omitted).

## II. In the Alternative, the Court Should Transfer the Motion to the United States District Court for the Southern District of Georgia.

Before Ms. Shahshahani was against her motion being decided by the *NBCUniversal* court, she was for it. Ms. Shahshahani wrote to that court, on the same day she filed her motion in this Court: "In an abundance of caution we will also file a motion to quash in NDGA as jurisdiction is unclear—however, I believe that

this SDGA Court has the most familiarity with these issues and we submit to its jurisdiction willingly." Ex. 2 at 1. Accordingly, Ms. Shahshahani through counsel has already consented to the *NBCUniversal* court deciding the motion, and she has nowhere articulated any reason that court would be inconvenient to her. Ms. Shahshahani's counsel, indeed, filed the motion in that court.

However, Ms. Shahshahani's counsel has refused to join or consent to Dr. Amin's request to transfer. Ex. 6 at 9. Dr. Amin submits that, even if Ms. Shahshahani were able to articulate a good faith reason for her opposition to transfer to the court in which she sought relief just days earlier, which she has not, "exceptional circumstances" pursuant to Rule 45(f) merit transfer. In the Advisory Committee Notes to the 2013 Amendments to Rule 45, the Advisory Committee explained "exceptional circumstances":

> The prime concern should be avoiding burdens on local nonparties subject to subpoenas, and it should not be assumed that the issuing court is in a superior position to resolve subpoena-related motions. In some circumstances, however, transfer may be warranted in order to avoid disrupting the issuing court's management of the underlying litigation, as when that court has already ruled on issues presented by the motion or the same issues are likely to arise in discovery in many districts. Transfer is appropriate only if such interests outweigh the interests of the nonparty served with the subpoena in obtaining local resolution of the motion. Judges in compliance districts may find it helpful to consult with the judge in the issuing court presiding over the underlying case while addressing subpoena-related motions.

Fed. R. Civ. P. 45(f), advisory committee notes (2013 amendments).

Here, Ms. Shahshahani's actions have demonstrated that her interests in obtaining resolution in this Court are minimal. Her counsel filed the motion in the Southern District of Georgia first, demonstrating clear capacity to litigate there and even explicitly communicating her preference to argue before that court. Despite being invited to explain her sudden unwillingness to agree to that court deciding the motion, counsel for Ms. Shahshahani did not articulate any reason.

On the other hand, interests served by transfer are significant. Both the assigned Magistrate Judge and District Judge of the *NBCUniversal* court have decided multiple rulings, including on a dispositive motion and multiple discovery disputes between the parties and among the parties and non-parties. *See, e.g.*, *NBCUniversal*, Order Granting in Part and Denying in Part Motion for Judgment on the Pleadings (Nov. 16, 2022), ECF No. 59; *NBCUniversal*, Order Denying Motion to Quash Subpoena (Apr. 5, 2023), ECF No. 67; *NBCUniversal*, Order on Discovery Dispute (Aug. 21, 2023), ECF No. 90. That court is therefore in a "better position to rule on the motion due to [its] familiarity with the full scope of the issues involved as well as any implications the resolution of the motion will have on the underlying litigation." *Hoog*, 338 F.R.D. at 517 (quotation marks omitted). Further, that court is managing the underlying litigation. With discovery due to end October 4, such management would be disrupted by failure to timely deny or transfer the motion.

23

Accordingly, in the alternative to his request that the Court deny the Motion, Dr. Amin respectfully requests the Court transfer Ms. Shahshahani's motion to the United States District Court for the Southern District of Georgia.

### III.   Dr. Amin Should Be Awarded Costs Reasonably Incurred Responding to Ms. Shahshahani's Motion.

Ms. Shahshahani's motion creates needless motion practice, expands the litigation unnecessarily, and has caused Dr. Amin unnecessary time and expense. Ms. Shahshahani obviously has discoverable information: Ms. Shahshahani spoke to NBCUniversal journalists as a source for the broadcasts at issue in this case and was part of a concerted strategy to close ICDC, which included drawing attention through the media.  Indeed, she has explicitly stated in an interview that such efforts went beyond her capacity as a litigator.  Yet her counsel nevertheless argues that she does not have any information except for information protected by privileges.  In a similarly bald U-turn, counsel for Ms. Shahshahani argued that the United States District Court for the Southern District of Georgia should hear her motion before then, without any justification, refusing to join or consent to a motion to transfer, stating merely that she opposes the subpoena "to the fullest."  Ex. 6 at 9.

Such reversals are unreasonable and vexatious.  Accordingly, Dr. Amin requests permission to separately brief a motion for fees under 28 U.S.C. § 1927, which provides that "[a]ny attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings

24

in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct."

## **CONCLUSION**

For the reasons discussed above, Dr. Amin respectfully requests this Court deny Ms. Shahshahani's Motion to Quash (Doc. 1). In the alternative, he requests the Court transfer the motion to the United States District Court for the Southern District of Georgia. Further, Dr. Amin requests the Court require Dr. Amin's reasonable costs incurred in litigating the motion be paid.

Respectfully submitted this 2nd day of October 2023.

<table>
<tr>
<td>

**STACEY EVANS LAW**

*/s/ Stacey G. Evans*
Stacey G. Evans
Georgia Bar No. 298555
Tiffany Watkins
Georgia Bar No. 228805
John Amble Johnson
Georgia Bar No. 229112
4200 Northside Parkway NW
Building One, Ste 200
Atlanta, Georgia 30327
Telephone: 770-779-9602
Facsimile: 404-393-2828
sevans@staceyevanslaw.com
twatkins@staceyevanslaw.com
ajohnson@staceyevanslaw.com

</td>
<td>

**CHILIVIS GRUBMAN DALBEY & WARNER LLP**

Scott R. Grubman
Georgia Bar No. 317011
sgrubman@cglawfirm.com
1834 Independence Square
Atlanta, GA 30338
(404) 233-4171 (phone)
(404) 261-2842 (fax)

*Counsel for Plaintiff*

</td>
</tr>
</table>

25

## <u>LOCAL RULE 7.1(D) CERTIFICATE</u>

The undersigned counsel certifies that this Document has been prepared with one of the font and point selections approved by the Court in Local Rule 5.1.

This <u>2nd</u> day of October, 2023.

*/s/ Stacey G. Evans*
Stacey G. Evans
Georgia Bar No. 298555
sevans@staceyevanslaw.com

*Counsel for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I electronically filed the foregoing **PLAINTIFF'S REPSONSE TO NON-PARTY AZADEH SHAHSHAHANI'S MOTION TO QUASH AND RESPONSE TO BRIEF OF AMICI CURIAE** with the Clerk of Court using the CM/ECF system, which will automatically send e-mail notification of such filing to the attorneys of record.

This <u>2nd</u> day of October 2023.

<div style="margin-left:40%">

*/s/ Stacey G. Evans*
Stacey G. Evans
Georgia Bar No. 298555
sevans@staceyevanslaw.com

*Counsel for Plaintiff*

</div>

# Exhibit 1

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | |
|---|---|
| **In re: Subpoena Issued to Azadeh Shahshahani,** ) | |
| ) | |
| **DR. MAHENDRA AMIN,** ) | **CIVIL ACTION FILE** |
| ) | **NO. 1:23-mi-00095-** |
| **Plaintiff,** ) | **MLB-RDC** |
| ) | |
| **v.** ) | |
| ) | |
| **NBCUNIVERSAL,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |
| _____ ) | |

## <u>DECLARATION OF STACEY G. EVANS</u>

I, Stacey G. Evans, declare as follows:

1.  I am an attorney with the firm of Stacey Evans Law, counsel of record for
    Plaintiff Dr. Mahendra Amin in this matter and in *Amin v. NBCUniversal
    Media, LLC*, 5:21-CV-56, in the United States District Court for the
    Southern District of Georgia ("*NBCUniversal*").

2.  There is a protective order in *NBCUniversal* that allows parties or non-
    parties producing evidence, including deposition testimony, to designate
    such evidence "CONFIDENTIAL."

3.  I reasonably calculated that the subpoena for deposition to Azadeh
    Shahshahani would lead to admissible evidence in *NBCUniversal*.

1

4. This calculation was supported by documents I obtained through previous discovery in *NBCUniversal*.

5. Such documents demonstrate Ms. Shahshahani's involvement in efforts to attract media and Congressional attention and action to allegations that Dr. Amin performed unnecessary and unconsented-to gynecological procedures, including mass hysterectomies, on women detained by United States Immigration and Customs Enforcement (ICE) at the Irwin County Detention Center (ICDC), which is the subject of the defamatory statements at issue in *NBCUniversal*.

6. Such documents also demonstrate Ms. Shahshahani's having direct conversations with journalists relevant to Dr. Amin's claims of defamation against NBCUniversal.

7. Separate from Ms. Shahshahani's role as a fact witness, she is one of 16 plaintiff's counsel in *Oldaker v. Giles*, Case No. 7:20-cv-00224-WLS-MSH (S.D. Ga.), a lawsuit regarding ICDC in which Dr. Amin is one of 25 named defendants; the case, filed after the events for which Ms. Shahshahani has discoverable information relevant to *NBCUniversal*, is in the pleadings stage, with pending motions to dismiss, and it has not proceeded to discovery.

8. I did not subpoena Ms. Shahshahani because she is counsel in *Oldaker*.

2

9. At a deposition, I will not ask Ms. Shahshahani about communications protected by attorney-client privilege, opinion work product, or mental impressions she has developed in anticipation of litigation. If I inadvertently ask a question that calls for such information, I would invite and expect an appropriate objection and instruction not to answer.

10. Four other non-parties who are attorneys who similarly served as sources for journalists at issue in *NBCUniversal* have agreed to sit and indeed have sat for depositions. In those depositions, their counsel objected when they argued that the answer would divulge information protected by privileges such as opinion work product and attorney-client communications. Those attorneys did not seek to quash their subpoenas for deposition. Several accepted service of the subpoena through counsel, while others required personal service but then complied once personal service of the subpoena was effected.

11. In *NBCUniversal* at a deposition, I believe counsel for NBCUniversal violated the United States District Court for South Carolina Local Rules by communicating with a non-party witness about the witness's testimony during a lunch break in the deposition. I served a subpoena to counsel for NBCUniversal for the narrow purpose of deposing her about the violation to consider whether to ultimately file a motion or sanctions. However, we

are currently attempting to compromise, and it is my sincere hope that no deposition is necessary.  These efforts are ongoing and are unrelated to the subpoena to Ms. Shahshahani.

12. Ms. Shahshahani, through her counsel, refused to cooperate in the scheduling of a deposition, requiring that she be personally served.

13. I engaged a process server to effect personal service on Ms. Shahshahani, and she evaded such service for weeks; the process servers reported that someone at her office said she was not in and that Ms. Shahshahani never called the phone number the process server left, and that Ms. Shahshahani refused to come to the door of her residence several times despite appearing to be at home, for example.

14. In other subpoenas for documents and depositions made in this case, I have worked with the non-parties, modifying the subpoenas as requested by non-parties' counsel to minimize burden while ensuring Dr. Amin acquires the discovery to which he is entitled.  For example, I have agreed to conduct depositions at a location and time and date convenient to the non-parties and their counsel.

15. I have served Interrogatories on NBCUniversal in *NBCUniversal*, including a request to identify all persons with "personal knowledge or discoverable information relating to any of Dr. Amin's allegations in the

4

Complaint or your defenses in this litigation," and NBCUniversal identified in response, among other persons, "Representative(s) from Project South."

16. I have deposed several NBCUniversal journalists and employees in *NBCUniversal*, and one of the journalists with whom Ms. Shahshahani spoke testified, "I don't recall," multiple times regarding having a conversation about Ms. Shahshahani, and he answered, "No," when asked whether he knew Ms. Shahshahani, even though Project South produced documents indicating otherwise.

17. Counsel for amici curiae did not request my consent to file a brief.

18. Attached to this Response as Exhibit 2 is email correspondence between the parties in *NBCUniversal*, the *NBCUniversal* court, and counsel for Ms. Shahshahani.

19. Attached to this Response as Exhibit 3 is the September 14, 2020 Project South letter, coauthored by Ms. Shahshahani, that served as a source of statements that Dr. Amin alleges in *NBCUniversal* defamed him.

20. Attached to this Response as Exhibit 4 is the Proof of Service the process server provided us, attesting to having personally served Ms. Shahshahani.

21. Attached to this Response as Exhibit 5 is an online article published by the Michigan Journal of Race & Law, "On Movement Lawyering: An Interview with Azadeh Shahshahani," dated April 15, 2021 and available at

5

the following website: https://mjrl.org/2021/04/14/on-movement-lawyering-an-interview-with-azadeh-shahshahani/.

22. Attached to this Response as Exhibit 6 is email correspondence between counsel for Ms. Shahshahani and me, regarding Ms. Shahshahani's Motion.

23. Attached to this Response as Exhibit 7 is an article published by NBC that served as a source of statements that Dr. Amin alleges in *NBCUniversal* defamed him.

24. Attached to this Response as Exhibit 8 is NBCUniversal's Initial Disclosures provided pursuant to *NBCUniversal* on January 10, 2022.

25. Attached to this Response as Exhibit 9 is email correspondence between Ms. Shahshahani and an NBCUniversal journalist, in which Shahshahani and the journalist state that they spoke on the telephone.

I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct.

Executed and respectfully submitted this 2nd day of October, 2023.

*/s/ Stacey G. Evans*
Stacey G. Evans

6

# Exhibit 2

**From:** Julie Oinonen
**Sent:** Tuesday, September 19, 2023 10:59 PM
**To:** Stacey Evans; Kim_Mixon@gas.uscourts.gov
**Cc:** McNamara, Elizabeth; amandalevine@dwt.com; Shahnaz Uddin; Michele Dobbs; Charlton, Leena; Cynthia Counts; Scott R. Grubman; Amble Johnson; Azadeh Shahshahani; Michele Dobbs; Shahnaz Uddin
**Subject:** Re: Motion to Quash, Amin-NBCU, 5:21-cv-56

EXTERNAL SENDER. Only open links and attachments from known senders. DO NOT provide your username or password.

Dear Ms. Mixon,

I am attaching a courtesy copy of the amended motion to quash that includes the subpoena just filed in SDGA. In an abundance of caution we will also file a motion to quash in NDGA as jurisdiction is unclear--however, I believe that this SDGA Court has the most familiarity with these issues and we submit to its jurisdiction willingly. Foremost, it is essential that this Court be made aware of Dr Amin's counsel Stacey Evans who continues in her attempts to abuse the discovery process by encroaching on sacrosanct attorney client privileges through her repeated attempts to depose opposing counsels –those who represent detainees in the underlying civil rights class action case brought against Dr. Amin as well as her attempts to depose opposing counsel in the case at bar.

In sum, Stacey Evans, counsel for Dr. Amin, is abusing the subpoena power and engaging in unfair litigation tactics by attempting to issue subpoenas to multiple attorneys---including her own opposing counsel---Ms. Cynthia Counts—who is counsel for NBCUniversal in the above case as well as attempting to depose other counsel who like Ms. Shashahani are fellow counsel for the detainees who have brought a current class action lawsuit against Dr. Amin for violation of civil rights. By serving subpoenas in multiple jurisdictions popping up throughout the southeast, it is difficult for each of the respective Courts to see the scope and breadth of the abusive and almost unheard of discovery tactics that she is using by exploiting the subpoena power in an attempt to gain an unfair litigation advantage by deposing attorneys which encroaches on both attorney client privileged communications and work product doctrine. The attorneys for detainees also have concerns that these bully tactics also appear to have the chilling effect of intimidating witnesses who are also plaintiff litigants in the class action brought against her client, Dr. Amin.

Her attempts to do so exceed all bounds of decency and fairness to opposing counsel as required under the Professional Ethics Rule 3.4 where she has hired private investigators to stake out and stalk Ms. Shahshahani for weeks---interrogating her neighbors, trespassing onto her property, hiding in bushes on her property and jumping out at her--all traumatizing harassment against a prominent human rights attorney who is subject to ongoing death threats as a result of her human rights work.

We respectfully seek aid from this Court. I am currently in New York City on leave of absence throughout much of September, however, I will make myself available as needed via telephone or zoom. I can be reached at 404-759-1384. Thank you and,

Respectfully yours,

Julie Oinonen

Counsel for Azadeh Shashahani



Julie Oinonen
Williams Oinonen LLC
404-654-0288
www.goodgeorgialawyers.com (web)
www.goodgeorgialawyer.com (blog)

---

**From:** Stacey Evans <sevans@staceyevanslaw.com>
**Sent:** Tuesday, September 19, 2023 8:33 PM
**To:** Kim_Mixon@gas.uscourts.gov <Kim_Mixon@gas.uscourts.gov>
**Cc:** Julie Oinonen <julie@goodgeorgialawyer.com>; McNamara, Elizabeth <lizmcnamara@dwt.com>; amandalevine@dwt.com <AmandaLevine@dwt.com>; Charlton, Leena <LeenaCharlton@dwt.com>; Cynthia Counts <Cynthia.Counts@fisherbroyles.com>; Scott R. Grubman <SGrubman@cglawfirm.com>; Amble Johnson <ajohnson@staceyevanslaw.com>; Azadeh Shahshahani <azadeh@projectsouth.org>; Michele Dobbs <mdobbs@goodgeorgialawyer.com>; Shahnaz Uddin <suddin@goodgeorgialawyer.com>; Stacey Evans <sevans@staceyevanslaw.com>
**Subject:** RE: Motion to Quash, Amin-NBCU, 5:21-cv-56

Ms. Mixon,

If the Court wishes to hear from us on this matter, we are happy to discuss further (of course), but I feel compelled to respond very briefly to Ms. Oinonen's comments: We are attempting to depose Ms. Shashahani because she spoke to NBCU journalists as part of the broadcasts at issue in this case, and records show that she was otherwise involved in a concerted media strategy regarding ICDC and Dr. Amin. Just because she's also a lawyer in another case doesn't excuse her from providing testimony relevant to the defamation case, as at least 4 other attorneys who spoke to NBCU journalists have (and one will next week). Further, we gave Ms. Shashahani every opportunity to accept service and choose the deposition location, date, and time of her choosing prior to having her personally served, and she declined (though we certainly would always agree to reasonable logistical changes—location, date, time).

Thank you, Stacey

---

**From:** Julie Oinonen <julie@goodgeorgialawyer.com>
**Sent:** Tuesday, September 19, 2023 5:31 PM
**To:** Stacey Evans <sevans@staceyevanslaw.com>; Kim_Mixon@gas.uscourts.gov
**Cc:** McNamara, Elizabeth <lizmcnamara@dwt.com>; amandalevine@dwt.com; Charlton, Leena <LeenaCharlton@dwt.com>; Cynthia Counts <Cynthia.Counts@fisherbroyles.com>; Scott R. Grubman <SGrubman@cglawfirm.com>; Amble Johnson <ajohnson@staceyevanslaw.com>; Stacey Evans <sevans@staceyevanslaw.com>; Azadeh Shahshahani <azadeh@projectsouth.org>; Michele Dobbs

<mdobbs@goodgeorgialawyer.com>; Shahnaz Uddin <suddin@goodgeorgialawyer.com>
**Subject:** Re: Motion to Quash, Amin-NBCU, 5:21-cv-56

EXTERNAL SENDER. Only open links and attachments from known senders. DO NOT provide your username or password.

Dear Ms. Mixon,

Not only do we object to the subpoena and move to quash it as a highly objectionable and improper attempt to depose an opposing counsel in an active underlying case against Dr Amin a defendant in a class action civil rights case, we would further object to it being at Ms. Evans office, which violates most accepted practice amongst civil litigants.

I represent Ms. Shahshahani and furthermore am on a leave of absence in New York City at a trial lawyers conference and in New York most of this month of September, leave of absences I have filed with courts I am litigating in. We will await the Courts instructions as to jurisdiction.

Please include my paralegal Ms Dobbs on all correspondence via email thank you.
mdobbs@goodgeorgialawyer.com
Julie Oinonen

Get Outlook for iOS

---

**From:** Stacey Evans <sevans@staceyevanslaw.com>
**Sent:** Tuesday, September 19, 2023 2:29 PM
**To:** Kim_Mixon@gas.uscourts.gov <Kim_Mixon@gas.uscourts.gov>
**Cc:** Julie Oinonen <julie@goodgeorgialawyer.com>; McNamara, Elizabeth <lizmcnamara@dwt.com>; amandalevine@dwt.com <AmandaLevine@dwt.com>; Charlton, Leena <LeenaCharlton@dwt.com>; Cynthia Counts <Cynthia.Counts@fisherbroyles.com>; Scott R. Grubman <SGrubman@cglawfirm.com>; Amble Johnson <ajohnson@staceyevanslaw.com>; Stacey Evans <sevans@staceyevanslaw.com>
**Subject:** Motion to Quash, Amin-NBCU, 5:21-cv-56

Dear Ms. Mixon,

Good afternoon.  I write to bring two issues to the Court's attention regarding non-party Azadeh Shahshahani's Motion to Quash Subpoena.

First, the subpoena to Ms. Shahshahani was served on her in Atlanta, Georgia, and it requires compliance at my office in Atlanta.  This is not clear from the motion, which does not discuss the place of compliance or attach the subpoena it seeks to quash, which I have attached here.  Judge Cheesbro previously denied a motion to a non-party's motion to quash subpoena to produce documents, finding that it lacked jurisdiction to hear the dispute because Federal Rule of Civil Procedure 45 provides that a challenge to the subpoena is to be heard by a district court in the district where compliance with the subpoena is required, and courts in the United States District Court for the Southern District of Georgia follow "the rule that 'the place of compliance is the location the subpoena directs the documents to be sent.'"  Doc. 67 at 1-2 (quotation marks omitted).  Obviously, if the Court finds that it does have jurisdiction to hear Ms. Shahshahani's motion, Dr. Amin welcomes the Court's resolution and is confident that he will prevail.  However, in light of the late stage of discovery, the Court's previous

ruling, and the absence of information on the place of compliance in Ms. Shahshahani's motion, Dr. Amin brings it to the attention of the Court and all parties that it may find that it has no jurisdiction.

Second, if the Court does wish for Dr. Amin to respond to the motion, Dr. Amin is cognizant of the Court's order as to his obligations in navigating discovery disputes.  Doc. 2 at 5-6.  Accordingly, Dr. Amin asks whether the Court's requirement to use the Court's informal discovery dispute resolution process, including scheduling a telephonic conference with the Court, applies to the motion, and the parties and non-parties should schedule a telephonic conference with the Court, or if instead Dr. Amin should respond to the motion by filing a response on the docket.

Thank you.

_____

Stacey Godfrey Evans
STACEY EVANS LAW
4200 Northside Pkwy NW
Bldg One; Suite 200
Atlanta, GA 30327
770-779-9602
www.staceyevanslaw.com

Get Outlook for iOS

**From:** Stacey Evans <sevans@staceyevanslaw.com>
**Sent:** Tuesday, September 19, 2023 2:29 PM
**To:** Kim_Mixon@gas.uscourts.gov <Kim_Mixon@gas.uscourts.gov>
**Cc:** Julie Oinonen <julie@goodgeorgialawyer.com>; McNamara, Elizabeth <lizmcnamara@dwt.com>; amandalevine@dwt.com <AmandaLevine@dwt.com>; Charlton, Leena <LeenaCharlton@dwt.com>; Cynthia Counts <Cynthia.Counts@fisherbroyles.com>; Scott R. Grubman <SGrubman@cglawfirm.com>; Amble Johnson <ajohnson@staceyevanslaw.com>; Stacey Evans <sevans@staceyevanslaw.com>
**Subject:** Motion to Quash, Amin-NBCU, 5:21-cv-56

Dear Ms. Mixon,

Good afternoon.  I write to bring two issues to the Court's attention regarding non-party Azadeh Shahshahani's Motion to Quash Subpoena.

First, the subpoena to Ms. Shahshahani was served on her in Atlanta, Georgia, and it requires compliance at my office in Atlanta.  This is not clear from the motion, which does not discuss the place of compliance or attach the subpoena it seeks to quash, which I have attached here.  Judge Cheesbro previously denied a motion to a non-party's motion to quash subpoena to produce documents, finding that it lacked jurisdiction to hear the dispute because Federal Rule of Civil Procedure 45 provides that a challenge to the subpoena is to be heard by a district court in the district where compliance with the subpoena is required, and courts in the United States District Court for the Southern District of Georgia follow "the rule that 'the place of compliance is the location the subpoena directs the documents to be sent.'"  Doc. 67 at 1-2 (quotation marks omitted).  Obviously, if the Court finds that it does have jurisdiction to hear Ms. Shahshahani's motion, Dr. Amin welcomes the Court's resolution and is confident that he will prevail.  However, in light of the late stage of discovery, the Court's previous

ruling, and the absence of information on the place of compliance in Ms. Shahshahani's motion, Dr. Amin brings it to the attention of the Court and all parties that it may find that it has no jurisdiction.

Second, if the Court does wish for Dr. Amin to respond to the motion, Dr. Amin is cognizant of the Court's order as to his obligations in navigating discovery disputes.  Doc. 2 at 5-6.  Accordingly, Dr. Amin asks whether the Court's requirement to use the Court's informal discovery dispute resolution process, including scheduling a telephonic conference with the Court, applies to the motion, and the parties and non-parties should schedule a telephonic conference with the Court, or if instead Dr. Amin should respond to the motion by filing a response on the docket.

Thank you.

_____

Stacey Godfrey Evans
STACEY EVANS LAW
4200 Northside Pkwy NW
Bldg One; Suite 200
Atlanta, GA 30327
770-779-9602
www.staceyevanslaw.com

# Exhibit 3



Institute for the Elimination of Poverty & Genocide

September 14, 2020

**VIA ELECTRONIC MAIL**

Joseph V. Cuffari
Inspector General
Office of the Inspector General
Department of Homeland Security
Washington, DC 20528

Cameron Quinn
Officer for Civil Rights and Civil Liberties
Department of Homeland Security
 245 Murray Lane, SW
Washington, DC 20528

Thomas P. Giles
Acting Director of Atlanta ICE Field Office
U.S. Immigration and Customs Enforcement Atlanta Field Office
180 Ted Turner Dr. SW Suite 522
Atlanta, GA, 30303

David Paulk
Warden of the Irwin County Detention Center
132 Cotton Drive
Ocilla, GA, 31774

> **Re: Lack of Medical Care, Unsafe Work Practices, and Absence of Adequate Protection Against COVID-19 for Detained Immigrants and Employees Alike at the Irwin County Detention Center**

Dear Mr. Cuffari, Ms. Quinn, Mr. Giles and Mr. Paulk:

Project South, Georgia Detention Watch, Georgia Latino Alliance for Human Rights, and South Georgia Immigrant Support Network file this complaint on behalf of detained immigrants at the Irwin County Detention Center (ICDC) operated by the private prison company, LaSalle Corrections; and Ms. Dawn Wooten, a licensed practical nurse employed by ICDC, who is a protected whistleblower and is

NBCU001536



**Institute for the Elimination of Poverty & Genocide**

represented by the Government Accountability Project and Project South. This complaint and Ms. Wooten's accompanying Declaration (which is incorporated by reference) document recent accounts of jarring medical neglect at ICDC including refusal to test detained immigrants for COVID-19 who have been exposed to the virus and are symptomatic, shredding of medical requests submitted by detained immigrants, and fabricating medical records. In addition, this complaint raises red flags regarding the rate at which hysterectomies are performed on immigrant women under ICE custody at ICDC. This complaint also documents hazardous and reckless actions taken by ICDC management such as allowing employees to work while they are symptomatic awaiting COVID-19 test results and hiding information from employees and detained immigrants about who has tested positive for COVID-19. In addition, this complaint documents ICDC's disregard for public health guidelines set by the Centers for Disease Control and Prevention by maintaining unsanitary conditions and continuously allowing transfers of detained immigrants, even those who have tested positive for COVID-19, and punishing immigrants with solitary confinement when they speak out against these injustices.

These life-threatening concerns require immediate attention and correction before more employees and detained immigrants at ICDC become sick with COVID-19 or other illnesses due to lack of medical care and proper COVID-19 policies. This complaint comes about a few months after another ICE Immigration Detention Center, Richwood Correctional Center, also operated by LaSalle Corrections, was reported to be using similar tactics including requiring employees who may be COVID-19 positive to work, concealing who has tested positive for COVID-19, mixing COVID-19 exposed individuals with those who are not, and more.1 We therefore urge you to conduct a prompt and thorough investigation into these practices at ICDC as well as all other LaSalle operated facilities as these complaints suggest a more systemic problem.

### I)   Background and Legal Standards

For years, detained immigrants at ICDC have reported human rights abuses including lack of medical and mental health care, due process violations, unsanitary living conditions and more as reported in Project South's 2017 report titled "Imprisoned Justice."2

In particular, detained immigrants have reported not being able to see a medical professional for several weeks despite submitting multiple sick call requests, not receiving life dependent medication consistently, and not receiving proper medical care once they are able to see a medical professional.

---

1 https://whistleblower.org/press-release/for-immediate-release-whistleblowers-from-richwood-correctional-center-in-louisiana-report-unsafe-practices-that-promote-the-spread-of-COVID-19COVID-19-in-ice-detention/; https://whistleblower.org/wp-content/uploads/2020/07/071020-letter-to-Congress-from-GovAcctProj-re-whistleblowers-ICE-Detention-COVID-19-FINAL-Submitted.pdf.

2 https://projectsouth.org/wp-content/uploads/2017/06/Imprisoned_Justice_Report-1.pdf.

NBCU001537



### Institute for the Elimination of Poverty & Genocide

During an interview with Project South, one detained immigrant said she was not given her breast cancer medication for six weeks.[3] In addition, she requested medical care four times and waited more than two weeks and still did not see a single medical professional.[4] She went on to say: "The medical unit is not helpful at all, even if you are dying."[5] She explained: "For everything, including serious illnesses, they just hand out ibuprofen."[6] Another immigrant reiterated the same problems, saying that he did not receive his HIV medication for three weeks.[7] He made five requests to see a doctor, but still had not seen one in over four weeks. He noted many individuals at Irwin have the same problem. He stated: "That's the major problem here … the medication."[8]

Another detained immigrant explained how he was sick and in pain and submitted multiple sick call requests but did not receive timely or proper medical care. He said: "I am very sick. I have been complaining. I don't know if they are really waiting to see me dead because sometimes they already see me on the floor laying crying, and not once, not twice, several times. All those things, sometimes make you hopeless and you know sometimes I feel like dying than to continue…"[9]

Detained immigrants have in fact raised red flags regarding the unsanitary conditions at ICDC as a whole. "This place is not equipped for humans," said one detained immigrant at Irwin.[10] Another immigrant stated: "This is the dirtiest facility I have ever been in: everything is dirty; one shower for more than fifty people; one bathroom for all of us; I don't even know how to give more details because it is all nasty, really nasty; only God is taking care of us here."[11] Another immigrant told Project South: "It's been hell. It's dirty, its nasty, and there is mold."[12] She went onto say: "The food is so bad that people can't keep it down."[13] She explained that the food is often spoiled and often times cockroaches and ants from the unit come into the food.[14] Another immigrant stated: "The meals are disgusting. There

---

[3] Project South Interview at Irwin Detention Center, October 2019.

[4] *Id.*

[5] *Id.*

[6] *Id.*

[7] *Id.*

[8] *Id.*

[9] Call with Immigrant Detained at the Irwin County Detention Center, April 2020.

[10] Project South Interview at the Irwin County Detention Center, October 2019.

[11] Letter from Immigrant Detained at the Irwin County Detention Center, April 2020.

[12] Project South Interview at the Irwin County Detention Center, October 2019.

[13] *Id.*

[14] *Id.*

NBCU001538



**Institute for the Elimination of Poverty & Genocide**

are ants in the food."[15] A 2017 Department of Homeland Security Office of Professional Responsibility investigation also found that the medical exam rooms did not meet ICE detention standards. The report found: "In the medical examination rooms, floors and patient examination tables were dirty and dust was observed on horizontal surfaces. Waste containers were overfilled and in need of cleaning."[16]

These and the following accounts indicate that ICDC has violated ICE's Performance-Based National Detention Standards (PBNDS) and CDC COVID-19 guidelines for correctional facility operations, hygiene protocol, and prevention practices. The CDC Interim Guidance on Management of Coronavirus Disease in Correctional and Detention Facilities provides guiding principles for healthcare and non-healthcare administrators of detention facilities to reduce the transmission of COVID-19.[17] CDC hygiene guidelines direct detention centers to provide staff and detained persons with access to cloth face coverings, soap, running water and disposable paper towels, as well as alcohol-based hand-sanitizer.[18] The CDC also has very specific standards regarding Personal Protective Equipment ("PPE"), including "ensur[ing] that sufficient stocks of hygiene supplies, cleaning supplies, PPE, and medical supplies (consistent with the healthcare capabilities of the facility) are on hand and available, and have a plan in place to restock as needed if COVID-19 transmission occurs."[19] Staff and detained immigrants should also be trained to correctly wear and dispose of PPE.[20]

CDC guidance also urges detention centers to "suspend all transfers of incarcerated/detained persons to and from other jurisdictions and facilities…unless necessary for medical evaluation, medical isolation/quarantine, health care, extenuating security concerns, release, or to prevent overcrowding."[21] If a transfer is absolutely necessary, transferees should clear COVID-19 screening *before* the transfer and facilities should ensure that the receiving facility has the capacity to isolate transferred detained immigrants. Temperature checks should be performed immediately after detained immigrants arrive and before they join the general population in a facility.[22] The CDC also recommends that temperature checks be performed once a day for staff when they arrive, twice a day for quarantined detained immigrants, and once a day in housing units where COVID-19 has been identified.[23] If an individual

---

[15] Project South Interview at the Irwin County Detention Center, October 2019.

[16] https://www.ice.gov/doclib/foia/odo-compliance-inspections/2017IrwinCountyGA.pdf.

[17] https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html.

[18] *Id.*

[19] *Id.*

[20] *Id.*

[21] *Id.*

[22] *Id.*

[23] https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html.

NBCU001539



**Institute for the Elimination of Poverty & Genocide**

with COVID-19 has been identified in a facility, CDC instructions urge the implementation of regular screenings and temperature checks for fourteen days in housing units that have not yet identified infections.[24]

CDC management and quarantine guidelines recommend that individuals with confirmed or supposed cases of COVID-19 be immediately placed under medical isolation and individually quarantined. Facilities should keep the movement of these individuals outside the medical unit at an absolute minimum by serving meals in isolation, keeping them isolated from all group activities, and assigning isolated individuals a dedicated bathroom if possible. Where such individuals must leave medical isolation, facilities should ensure that clean masks are provided and changed at least daily. However, the CDC recommends that detention centers "coordinate closely with their state, local, tribal, and/or territorial health department…to ensure effective medical isolation and quarantine, necessary medical evaluation and care, and medical transfer if needed."[25]

The guidelines also state that individuals with confirmed COVID-19 should be individually quarantined and advocate against the "cohorting" method unless "there are no other available options."[26] If cohorting is absolutely necessary, the CDC instructs that all individuals be monitored closely, with special mindfulness of detained immigrants who are at increased risk for severe illness from COVID-19. New individuals may not be added to an existing quarantine cohort after the fourteen-day clock has started, and the fourteen-day clock should *restart* if an individual in the cohort tests positive for COVID-19.[27] Regarding management strategies for staff, the CDC clarifies that staff identified as "close contacts" of someone diagnosed with COVID-19 should be tested and self-quarantined for fourteen days.[28]

The CDC also provides recommended hygiene and sanitation practices to limit the introduction and spread of COVID-19 in detainment centers. Regardless of whether COVID-19 cases have been identified, the CDC instructs detainment facilities to implement intensified cleaning and disinfecting procedures to prevent the spread of COVID-19.[29] Recommended procedures include cleaning and disinfecting frequently touched objects, surfaces, and equipment several times per day. Guidelines also

[24] *Id.*

[25] *Id.*

[26] *Id.*

[27] *Id.*

[28] *Id.*

[29] *Id.*

NBCU001540



Institute for the Elimination of Poverty & Genocide

direct facilities to keep adequate supplies and to have plans for rapid restock to support intensified cleaning practices.[30]

ICDC has also violated multiple Performance-Based National Detention Standards (PBNDS) created by ICE outlining basic standards for treatment in ICE custody. PBNDS standard 4.3, which establishes detention standards for medical care, requires facilities to comply with plans implemented by federal, state, or local authorities addressing specific public health issues including communicable disease reporting requirements.[31] This includes CDC COVID-19 management guidelines. Designated medical staff must report all detained immigrants diagnosed with a communicable disease of public health significance to the IHSC Public Health, Safety, and Preparedness Unit.[32] Standard 4.3 also mandates that each facility have a medical procedure ensuring that all sick call requests are received and triaged within twenty-four hours after a detained immigrants submits the request.[33] It adds that housing unit officers should notify medical personnel immediately for urgent healthcare situations. Additionally, CDC COVID-19 guidelines direct facilities to ensure that detained individuals receive medical treatment at the first sign of COVID-19 symptoms and to implement the CDC's Prevention and Control Recommendations for Patients with Suspected or Confirmed Coronavirus Disease in Healthcare Settings as fully as possible within the correctional or detention context.[34]

To prevent the introduction and spread of communicable diseases, ICE PBNDS standards—even before the COVID-19 pandemic—require that all horizontal surfaces be disinfected and damp-dusted daily with an approved germicidal solution.[35] Furnitures, fixtures, and floors should also be cleaned on a daily basis, and windows and window curtains should be cleaned and laundered regularly. Floors should be mopped using a clean mop head and a hospital disinfectant-detergent solution.[36] Cubicle curtains should also be cleaned following treatment of an infectious patient.

Regarding food service, ICE's national detention standards institute cleaning, extermination, and storage requirements to prevent food contamination and pests. PBNDS standard 4.1 requires that food preparation areas be free of pest infestations, that all incoming food shipments be inspected for contamination and pest infestation, and that food be stored so that it is protected from insects, unclean

---

[30] https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html.

[31] 2011 Operations Manual ICE Performance-Based National Detention Standards at 261–62, https://www.ice.gov/doclib/detention-standards/2011/pbnds2011r2016.pdf.

[32] *Id.* at 263.

[33] *Id.* at 271.

[34] https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html.

[35] 2011 Operations Manual ICE Performance-Based National Detention Standards at 30.

[36] *Id.* at 30–31.

NBCU001541



Institute for the Elimination of Poverty & Genocide

surfaces, leakage, and other sources of contamination.[37] Sanitary guidelines must be observed during preparation and service, with hot foods maintained at a temperature of at least 140 degrees, and refrigerated foods maintained at a temperature of forty-one degrees or below.[38]

## II) Accounts from Detained Immigrants at ICDC and Ms. Wooten

### 1) Lack of Protection Against COVID-19 for Detained Immigrants

Unfortunately, the pattern of lack of medical care and unsanitary conditions at ICDC has only worsened in light of COVID-19. Detained immigrants have reported not being able to be socially distant, not having proper PPE, and being afraid of dying in the facility.[39] In April, after the pandemic hit, detained immigrants created a powerful video[40] where they plead to ICE and the public to release them in light of the horrid conditions. One woman said: "We're very afraid of being incarcerated here and dying here. We are daughters, we are mothers, we are wives, we need freedom. Please help us." Another woman stated: "We are exposed to the virus. They don't give us anything to cover ourselves so that we can protect ourselves." The women went on to talk about the lack of medical care and COVID-19 prevention procedures in place, including how "officers come and go without protective measures." As a result of this video going public, Irwin punished the immigrants by putting them on lockdown, limiting access to phones, taking away their ability to video chat with loved ones for several days, and subjecting them to solitary confinement. While weeks later, detained immigrants received a cloth or paper mask, they have yet to receive a new one to this day.

Immigrants detained at ICDC told Project South that they are afraid for their lives inside the facility. One immigrant told Project South: "I don't want to die here. Please release me, let me be with my family… A lot of people are afraid."[41] While the facility has signs about social distancing, immigrants reported that it is impossible to actually practice that inside the facility. One immigrant said: "There is no social distancing. We're in an open dorm room. Our beds are nothing but three feet apart. We don't understand how we're supposed to do that…our living space is so small; there's no way we could do that. Our toilets are about four feet apart with a little wall separating them…we breathe the

---

[37] 2011 Operations Manual ICE Performance-Based National Detention Standards at 236, 244, 248, https://www.ice.gov/doclib/detention-standards/2011/pbnds2011r2016.pdf.

[38] *Id.* at 233.

[39] https://www.typeinvestigations.org/investigation/2020/04/09/i-cant-do-anything-doctor-detained-by-ice-waits-for-coronavirus-outbreak-to-hit/.

[40] https://www.youtube.com/watch?v=aQt6QbkWsLI&feature=youtu.be.

[41] Project South Interview with Detained Immigrant, Summer 2020.

NBCU001542



Institute for the Elimination of Poverty & Genocide

same air, we sneeze, we cough next to each other."[42] Another immigrant said: "There is no way to protect [against COVID-19] at all here in the facility…There is no way to keep social distancing. There is no way at all because we are all together. We share everything together. There is no way at all we can feel protected here in the facility."[43] Immigrants also reported not being able to receive a new mask and having to wait several days in order to receive cleaning supplies to sanitize their pods. Some detained immigrants reported that they did not have soap to clean their cells, so instead had to use the soap they bought from commissary to sanitize their cells.[44] Other detained immigrants stated when they do receive cleaning materials and ask for a refill, every officer has the same answer: "We're short on staff, we can't get anybody to fill it up."

Multiple immigrants have reported on the issues of short-staffing at ICDC. One immigrant stated that some officers are afraid to go into certain pods due to the risk of being infected with of COVID-19.[45] Another immigrant reported that officers have had to pick up extra shifts and also work in the kitchen, which is done usually by detained immigrants, because many units are quarantining due to COVID-19.[46] Because of this, individuals reported that meals have been increasingly worse and have often been delayed.[47]

Immigrants also reported short-staffing in the medical unit, which has caused extra delays in receiving medical care. One immigrant recalled a weekend when a nurse did not show up for the daily pill call to give medication to the immigrants in her pod.[48] As a result of the skipped pill call, a diabetic immigrant who was insulin dependent became very ill and had to be taken for medical evaluation.[49]

[42] Project South Interview with Detained Immigrant, Summer 2020.

[43] *Id.*

[44] GLAHR Interview with Detained Immigrant, Summer 2020.

[45] Project South Interview with Detained Immigrant, Summer 2020.

[46] *Id.*

[47] *Id.*

[48] *Id.*

[49] *Id.*

NBCU001543



**Institute for the Elimination of Poverty & Genocide**

**2) ICDC Allows Transfers of Individuals in and out of the Facility**

*A) ICDC continues to transfer immigrants in and out of the facility against CDC guidelines and the advice of ICDC's medical director.*

In addition to the lack of social distancing and proper protection against COVID-19, the facility has continued to allow transfers of individuals in and out of the facility against CDC guidelines for correctional and detention facilities.[50] Dawn Wooten, who used to be a full-time employee at Irwin until July 2020, explained that Dr. Howard McMahan**,** the Medical Director of ICDC, pleaded with ICDC Warden David Paulk in March when the facility had its first COVID-19 case to stop all transfers of individuals in and out the facility, but the Warden did not listen. Ms. Wooten explained that Warden Paulk is allowing transfers of individuals into the facility who already have COVID-19. She also stated that ICDC is transferring immigrants out of the facility who either are COVID-19 positive or who have been tested but not yet received their results. On one occasion, Ms. Wooten stated that ICDC knowingly allowed the deportation of one immigrant who tested positive for COVID-19 to Mexico, and transferred another COVID-19 positive immigrant from ICDC to the Stewart Detention Center in Lumpkin, Georgia. Ms. Wooten explained: "If I say no, this person doesn't need to be transferred, they're positive, he [Warden Paulk] transfers them anyway."

An ICDC correctional officer also shared concerns regarding the transfers of individuals. One detained immigrant told Project South that an officer warned immigrants back when the pandemic first started by saying: "If we have lawyers, we need to complain to our lawyers because there are people who are coming from outside and they are bringing them straight to the facility…the officer told us in secret that we need to call our lawyers because this is our health, this is our lives."[51]

*B) ICDC does not properly quarantine new individuals arriving at the facility.*

Ms. Wooten also raised red flags regarding the procedures in place when new individuals arrive at the facility. She explained that when new individuals come into the facility, they should be housed in the medical unit where there are negative pressure rooms in order to contain the virus. However, ICDC houses new individuals in the general population units. In addition, she explained that ICDC does not properly implement the cohorting quarantine method as recommended by the CDC. The CDC defines cohorting as "the practice of isolating multiple individuals with laboratory-confirmed COVID-19 together or quarantining close contacts of an infected person together as a group due to a limited number

---

[50] https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html.

[51] Project South Interview with Detained Immigrant, Summer 2020.

NBCU001544



**Institute for the Elimination of Poverty & Genocide**

of individual cells."[52] However, the CDC warns that "cohorting individuals with suspected COVID-19 is not recommended due to high risk of transmission from infected to uninfected individuals."[53]

At ICDC, Ms. Wooten and detained immigrants reported that entire dorm units of individuals go into cohorting for fourteen days after one individual is suspected or confirmed to have COVID-19. Ms. Wooten explained that the cohorting system is further problematic because ICDC mixes new transfers with individuals who have been quarantining already. For example, she said if an entire unit is cohorting for fourteen days, ICDC will put a new individual in a room with an individual who had already been quarantining for a number of days. Ms. Wooten explained that because ICDC put a new individual in the room, the fourteen-day clock should have restarted, but ICDC does not restart the clock. Instead, it allows the newly transferred individual to continue on the same quarantine timeline as the rest of the unit. That means that if the new individual does have COVID-19, and only had to quarantine for the remaining days the unit was quarantining, the new individual could expose the rest of the unit to COVID-19 since the individual never completed fourteen days of quarantining.

Detained immigrants have long decried this policy of allowing new transfers into their pods. When immigrants advocate for themselves and refuse to share a room with a new transfer due to concerns about COVID-19, they are punished. One immigrant told Project South that men had been complaining and advocating to not let new transfers come into their pod, but when they do so, they are thrown in solitary confinement.[54] He explained that after weeks of complaining, the captain at ICDC promised the men that they would not transfer new men into their pod. However, that promise was immediately broken when an officer brought a new man into their pod. When the man was told he had to share his cell with the newly transferred immigrant who just arrived at ICDC, he told the officer that he didn't feel comfortable due to COVID-19 and that the captain promised them they would not have to anymore.[55] However, the officer responded: "I don't care what the captain said; I do what I want to do," and proceeded to force the immigrant to share his cell with the new transfer.[56] One detained immigrant reported that when men continue to advocate against having to share a cell with a newly transferred individual, the officers will often put the men in solitary confinement for up to two weeks for refusing their orders.[57]

---

[52] https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html.

[53] *Id.*

[54] Project South Interview with Detained Immigrant, Summer 2020.

[55] *Id.*

[56] *Id.*

[57] *Id.*

NBCU001545



**Institute for the Elimination of Poverty & Genocide**

Similarly, in the women's unit, one immigrant noted that ICDC was "trying to put them [new transfers] in quarantine away from us but yet you're putting us all together."[58] She explained that there is often internal confusion and miscommunication in intake forms and between the guards at ICDC so that officers don't know where to put new transfers. Another woman reiterated this sentiment, saying that officers "don't even know what they're doing" in regard to where they put new transfers.[59] She also noted: "This has been happening. New girls get here and they're put in a cell with a girl that's been here for about 24 or 48 hours." In one instance, she saw an officer put a new transfer with a person who had been there for a week. The officer told the woman that "this isn't her house, she's not paying bills, she doesn't have a say of who goes in the cell with her or not." The woman noted "It sounds like a horror story, but it's true."[60]

In other cases, new transfers who arrive in the women's unit are given rooms by themselves in the general unit. However, detained immigrants still share the same concerns because they are forced to share the same phones, tables, microwaves, etc. as everyone else and therefore could unknowingly spread the virus.[61]

### 3) Lack of COVID-19 Testing and Reporting

In August, ICE reported that a total of forty-one detained immigrants at ICDC tested positive for COVID-19.[62] However, Ms. Wooten stated that the actual number of those infected is much higher. She explained that this is because ICDC has not been actively testing detained immigrants and has not been "reporting all these cases that are positive" to ICE or the State Department.

*A) Detained women who were exposed to the virus and also had pre-existing conditions were refused COVID-19 testing for over a month.*

Men and women detained at ICDC also overwhelmingly reported not being tested for COVID-19 from March until August 18, where only those in ICE custody in the facility were given the option to be tested, but the same did not apply to those incarcerated at ICDC outside of ICE custody.[63] One woman in Unit C reported that 100 women slept in the unit where women "coughed, had fever and other discomforts, but officers did not listen to them when they reported their health problems," and that they

---

[58] Project South Interview with Detained Immigrant, Summer 2020.

[59] *Id.*

[60] *Id.*

[61] *Id.*

[62] https://www.ice.gov/coronavirus.

[63] Project South Interview with Detained Immigrant, Summer 2020.

NBCU001546



**Institute for the Elimination of Poverty & Genocide**

were never tested for COVID-19.[64] After demanding that the sick women be taken to the medical unit, she reported that the women were finally taken but were brought back within an hour and just given pain killers.[65]

Similarly, women in Unit G-2 complained to the medical unit and ICE for over a month between July and August to get tested for COVID-19 after three women in their unit tested positive, but were not given any response and were not tested until August 18.[66]

The women in Unit G-2 explained that two women were not feeling well and had typical symptoms of COVID-19 including: fatigue, headaches, body pain, loss of smell and taste.[67] The women in the unit asked the pill call nurse to get their temperature checked, but the nurse refused saying that they had to put in a sick call request.[68] One of the sick women put in sick call requests three times over the span of a week and half before being taken to medical. The other sick woman waited over two weeks while putting in four or five requests to see medical. After the fifth request, the women in the unit gave up on any prospect of getting tested for COVID-19 or receiving proper medical attention. One woman explained: "We lost hope after they weren't being looked at, so we all knew it was up to us to take of ourselves."[69]

When the two women eventually did go to medical, they had their temperatures checked and were simply brought back to the general unit without being tested for COVID-19. One detained immigrant noted that when she visited the medical unit for a different reason, the nurse complained to her saying she didn't understand "why the detainees need to get tested for COVID-19."[70]

When the two women were brought back to the unit, they continued to interact with the rest of the women in the unit, even though they very likely were COVID-19 positive but had not been tested by ICDC.[71] One of the two women became so sick that she could not move out of bed.[72] When the immigrants in her unit asked the officer if they could give the food tray to the sick woman in bed, the

---

[64] GLAHR Interview with Detained Immigrant, Summer 2020.

[65] Project South Interview with Detained Immigrant, Summer 2020.

[66] *Id.*

[67] *Id.*

[68] *Id.*

[69] *Id.*

[70] *Id.*

[71] *Id.*

[72] *Id.*

NBCU001547



**Institute for the Elimination of Poverty & Genocide**

officer refused and told them in a demeaning way that the woman still had to get up and get the tray herself.[73] It wasn't until both of these women became even more ill that they were transferred to Unit E-4, the quarantine unit, and were subsequently tested for COVID-19.  Shortly after, a third woman in the same unit also had a similar experience where she had typical COVID-19 symptoms such as headaches and loss of taste and smell, but she was told by a nurse that she just had allergies and was not tested for COVID-19.[74]

Despite this exposure to COVID-19 and the fact that several women had pre-existing conditions like diabetes and hypertension, ICDC refused to test the women for COVID-19 even when the women submitted multiple requests to get tested.[75] The women explained that they put in multiple requests to medical as well as requests to ICE for about a month.[76] At the request of the women in unit G-2, on August 4, Project South submitted a complaint to ICE and the Office of Civil Rights and Civil Liberties requesting that they test the women in G-2 due to this exposure.[77] On August 5, ICE Assistant Field Office Director Patrick Musante responded claiming that:

> ICDC is currently following the Interim Considerations for SARS-CoV-2 Testing in Correctional and Detention Facilities, which can be found at https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/testing.html. Any person housed in ICDC that is presenting symptoms, and feels sick, can fill out a sick-call request and then be seen by the ICDC medical staff for evaluation and treatment as appropriate.

When Project South followed up with immigrants in Unit G-2, they responded that they still had not been seen by medical or tested for COVID-19 despite ICE's response.[78]  Project South followed up with ICE asking "what the protocol is for the medical unit to administer a COVID-19 test to a detained immigrant at ICDC (i.e. are there symptoms or temperature they must have)? Can your office provide details about how many individuals have been tested in Unit G-2 in the last month…" ICE declined to answer those questions.

After Project South's follow up advocacy with an officer at the Office of Civil Rights and Civil Liberties, ICDC tested immigrants inside the facility on August 18.  However, ICDC did not test the

---

[73] Project South Interview with Detained Immigrant, Summer 2020.

[74] *Id.*

[75] *Id.*

[76] *Id.*

[77] https://projectsouth.org/wp-content/uploads/2020/08/8.04.2020-Denial-of-COVID-19-Testing-at-Irwin-Letter-to-ICE.pdf.

[78] Project South Interview with Detained Immigrant, Summer 2020.

NBCU001548



**Institute for the Elimination of Poverty & Genocide**

other incarcerated population. ICDC also continued to bring new transfers into the pods where individuals had already been tested for COVID-19 and were awaiting their results—thereby mixing individuals who were tested with individuals who were not tested in one pod.

*B) Detained men with COVID-19 symptoms were also refused COVID-19 testing despite multiple requests to be tested.*

Similar to the women, detained men had been advocating for months to get tested for COVID-19. One immigrant told Project South:

> Many of us have been sick in the unit or have some type of symptom…
> for a very long time we started complaining…We were complaining to the
> captain and fighting for a long time because we needed at least to be
> tested…There is no way at all for us to be safe here…the guidelines say
> social distancing, here we cannot keep the social distancing…we share
> everything together.[79]

He shared that the men in the unit had been advocating verbally to the nurses at ICDC and the captain to get tested for COVID-19 since the pandemic started. He explained they didn't do a written request since the facility often does not respond to written requests.

Certain men even went on hunger strikes in protest in order to be released or at the very least receive better protections against COVID-19 and be tested. One immigrant said: "People went on serious hunger strikes for it."[80] He shared that an immigrant from Burkina Faso went on hunger strike about a month ago for three weeks and reportedly lost a lot of weight.[81] Often times when individuals go on hunger strike, ICDC shuts off their water source. Ms. Wooten confirmed that it was common practice for ICDC to shut off the water for those on hunger strike. Ms. Wooten stated that because of this policy, one detained immigrant was "drinking out of the toilet. It's what he had left."

In this case, after the men went on hunger strike, nothing had changed; ICE and ICDC did not implement any further protections against COVID-19 or test the immigrants for COVID-19 as they requested. The immigrant told Project South: "After they went on hunger strike, there was no change. There was nothing at all—so people gave up."[82]

---

[79] Project South Interview with Detained Immigrant, Summer 2020.

[80] *Id*.

[81] *Id*.

[82] *Id*.

NBCU001549



**Institute for the Elimination of Poverty & Genocide**

C) *Medical Staff at ICDC downplay the need for COVID-19 testing and actively don't use COVID-19 testing machines at the facility.*

Ms. Wooten's account confirms the accounts of detained immigrants regarding their experiences with the medical unit at ICDC. Ms. Wooten shared that detained women in Unit C complained about having a fever and sore throat during the pandemic. However, the HSA did not test them for COVID-19, downplaying the immigrants' symptoms and stating that "all they want is attention…Everybody wants to be tested for COVID-19." Ms. Wooten stated that even if a detained immigrant had COVID-19 symptoms like a fever, the nurse would do nothing but put them on an over-the-counter cold medication for seven days without testing them for COVID-19.

In addition, Ms. Wooten explained that the medical unit not only downplayed the need to test immigrants for COVID-19, it also declined to utilize two rapid-testing COVID-19 machines that ICE had purchased for $14,000 each. Ms. Wooten reported that no medical staff had been trained to use them even in August and that she saw the machine being used only once since it arrived at the facility in June. Instead, the machines were locked away in the supervisor's office. The ICDC's Director of Nursing (DON) refused to put the machines out into use claiming that she did not want the employees testing each other.

**4) General Lack of Medical Care**

A) *ICDC nurse shreds medical request forms from detained immigrants.*

Ms. Wooten also expressed significant concern regarding the lack of medical care for detained immigrants at Irwin. According to Ms. Wooten, it was common practice for the sick call nurse to shred medical request forms from detained immigrants who were requesting to go to the medical unit. She also stated that the sick call nurse sometimes fabricated records such as vital signs without ever seeing the individual requesting medical help.

At ICDC, in order to make a sick call request, detained immigrants can fill out a blue form and put it in a box on the wall in their unit that is picked up by a nurse at night. Detained immigrants can also fill out an electronic request on the Telmate tablet in their unit. Ms. Wooten stated that Irwin staff have encouraged detained immigrants to fill out the handwritten request claiming that ICDC will get to the complaint quicker. However, when detained immigrants do fill out the blue handwritten request, the nurse in charge of reviewing these documents shreds the forms without even looking at them or will complete an easy request and shred a difficult request. Ms. Wooten stated that she has seen the sick call nurse shred an entire box worth of forms without looking at them.

NBCU001550



### Institute for the Elimination of Poverty & Genocide

Ms. Wooten recalls one time when a woman had put in twelve sick call requests in the span of two weeks because she had an infection from a laparoscopy procedure and was "oozing out of her belly button." Oftentimes detained immigrants fill out multiple requests to show the severity of the issue. When Ms. Wooten confronted the nurse who should have attended to this woman, the nurse claimed that she saw the woman the prior week. Ms. Wooten stated that she knew the requests must have been shredded because it was not possible for the nurse to have seen the woman the prior week. Ms. Wooten explained that if the nurse truly had seen the woman the prior week, the nurse would have seen that the woman was oozing green pus out of her belly button and required antibiotics immediately.

Ms. Wooten also explained that if someone puts in a request for shampoo and another request about having COVID-19 symptoms, the nurse would shred the request regarding COVID-19 symptoms and would only attend to the easier request by giving the detained immigrant shampoo. When the detained immigrant asks about the request regarding COVID-19, the nurse would lie and say that she never received it. Then, when the immigrant put in another complaint about COVID-19, the nurse would decline to see that person stating that she had seen them the other day. When Ms. Wooten would tell the nurse that the immigrant may still not be feeling well, the nurse would just say: "Oh I already saw him yesterday…they just want some attention."

Due to these type of practices by the ICDC medical staff, many detained immigrants have reported long wait times before being seen by a medical professional at ICDC, if they are seen at all. One detained immigrant reported that it takes anywhere from a few days to several weeks for medical to respond and "sometimes they don't call at all."[83] Another detained immigrant noted that women in her unit gave up after submitting several requests to see medical because no one responded to their requests.[84] One detained immigrant stated that he resorted to making verbal complaints to nurses and ICDC staff instead of written requests because "sometimes it goes in the request and they don't respond at all, so sometimes it's better to talk personally face to face."[85]

B) *ICDC nurse fabricates medical records when detained immigrants submit an electronic medical request form.*

When detained immigrants submit a medical request on the electronic/computer tablet, Ms. Wooten stated that the sick call nurse will not see the individual, but will fabricate vital signs indicating that the nurse saw the patient and will prescribe medicine. Ms. Wooten explained that if a detained immigrant submitted a request because he had a fever and runny nose, and wanted to be tested for

---

[83] Project South Interview with Detained Immigrant, Summer 2020.

[84] *Id*.

[85] Project South Interview with Detained Immigrant, Summer 2020.

NBCU001551



**Institute for the Elimination of Poverty & Genocide**

COVID-19, the nurse will put in vital signs for the individual and prescribe cold medication on the tablet for the individual without ever talking to them or seeing them. One detained immigrant told Project South that he put in a request to see medical through the tablet because he was in pain. However, instead of coming to see him or taking him to the medical unit, the nurse responded through the tablet disregarding his statement about pain, and instead stating that he needs to take his medication and that he had been refusing his medication.[86] However, the detained immigrant explained to Project South that when he asked the pill call nurse if he had any medication prescribed to him, the nurse said he did not.[87] Then, when he made a another request to see the medical unit on the tablet, the nurse continued to refuse to see him claiming he refused his medication. The detained immigrant stated that he waited all week for a response back or a call, but no one ever responded or saw him. "When I put in a request [on tablet] they don't call me, they just respond on it [the tablet]. They say no, you have to take your medication. Why they don't want to see me, I'm in pain. They don't even call, we put in a request, it takes two to three weeks, they just respond on the tablet," he explained.[88]

Ms. Wooten further explained that detained immigrants are being told different things constantly regarding whether they should submit a written or electronic request. When detained immigrants submit a written request, they are told the nurses did not receive them and to submit an electronic one instead. "They're wishy washy with them and they play that game with them until they're literally going to kill somebody out there...If they send it in paper, the girl shreds them….If they put them in the computer system, she answers them, falsifies the vital signs and never sees them," said Ms. Wooten. When Ms. Wooten tried to tell the Health Services Administrator (HSA) about these issues, the HSA refused to hold the nurse accountable, saying that one day, she'll get caught.

*C) Detained immigrants receive poor treatment by certain medical staff at ICDC.*

In addition to not responding to sick call requests, Ms. Wooten raises red flags regarding the way in which Latino detained immigrants are treated by the medical staff. "Hispanics are treated the worst in the facility. I mean literally. They can't speak English. Even though they [ICDC] have the language line there, if they're trying to get understanding of their health it's like take these pills and get the hell on…[Hispanics] hurt and suffer through it." Ms. Wooten says that when medical staff actually take the time to use the language line like she did, they'll find that these immigrants often have underlying conditions such as tumors, histories of cancer, diabetes, mental health issues, and more. Detained immigrants have also reported that several ICDC staff have disrespected them for not speaking English. In a letter, detained immigrants stated: "[W]e also wish to report the harsh treatment that we receive by

---

[86] *Id.*

[87] *Id.*

[88] *Id.*

NBCU001552



**Institute for the Elimination of Poverty & Genocide**

some guards, some yell at us, or have a bad work attitude…We also ask for respect for those that do not speak English because they make fun of them and there is no respect."

Multiple other immigrants have also noted that the medical staff don't believe them or yell at them when they report pain. One detained immigrant stated: "The last two days I didn't sleep, but I don't fill any medical requests anymore because if I go there, they're going to isolate me, they are maybe going to give me nothing, or they are going to blame me, to yell at me saying I'm trying to exaggerate; so whenever I'm in pain, I'm in my room, I sleep, I pray to God, and cry…that's the only way I'm trying to survive."[89] The immigrant also stated that when he goes to the medical unit, "sometimes they don't even let you talk. You are complaining with pain, but they saw you are OK."[90] Another detained immigrant noted that when a detained immigrant tells the nurse what they are feeling, she will argue about "what you have and what you feel." [91] This detained immigrant went on to say: "Nurse X needs some help in terms of how to treat us. She's very rude. She probably thinks she's better than us."[92]

### D) Detained immigrants and ICDC nurses report high rates of hysterectomies done to immigrant women.

Several immigrant women have reported to Project South their concerns about how many women have received a hysterectomy while detained at ICDC. One woman told Project South in 2019 that Irwin sends many women to see a particular gynecologist outside the facility but that some women did not trust him.[93] She also stated that "a lot of women here go through a hysterectomy" at ICDC.[94] More recently, a detained immigrant told Project South that she talked to five different women detained at ICDC between October and December 2019 who had a hysterectomy done.[95] When she talked to them about the surgery, the women "reacted confused when explaining why they had one done."[96] The woman told Project South that it was as though the women were "trying to tell themselves it's going to

---

[89] Project South Interview with Detained Immigrant, Summer 2020.

[90] *Id.*

[91] *Id.*

[92] *Id.*

[93] Project South Interview at the Irwin County Detention Center, October 2019.

[94] *Id.*

[95] Project South Interview with Detained Immigrant, Summer 2020.

[96] *Id.*

NBCU001553



**Institute for the Elimination of Poverty & Genocide**

be OK." She further said: "When I met all these women who had had surgeries, I thought this was like an experimental concentration camp. It was like they're experimenting with our bodies."[97]

Ms. Wooten also expressed concern regarding the high numbers of detained immigrant women at ICDC receiving hysterectomies. She stated that while some women have heavy menstruation or other severe issues that would require hysterectomy, "everybody's uterus cannot be that bad." Ms. Wooten explained:

> Everybody he sees has a hysterectomy—just about everybody. He's even taken out the wrong ovary on a young lady [detained immigrant woman]. She was supposed to get her left ovary removed because it had a cyst on the left ovary; he took out the right one. She was upset. She had to go back to take out the left and she wound up with a total hysterectomy. She still wanted children—so she has to go back home now and tell her husband that she can't bear kids… she said she was not all the way out under anesthesia and heard him [doctor] tell the nurse that he took the wrong ovary.

Ms. Wooten also stated that detained women expressed to her that they didn't fully understand why they had to get a hysterectomy. She said: "I've had several inmates tell me that they've been to see the doctor and they've had hysterectomies and they don't know why they went or why they're going." And if the immigrants do understand what they're getting done, "some of them a lot of times won't even go, they say they'll wait to get back to their country to go to the doctor."

The rate at which the hysterectomies have occurred have been a red flag for Ms. Wooten and other nurses at ICDC. Ms. Wooten explained:

> We've questioned among ourselves like goodness he's taking everybody's stuff out…That's his specialty, he's the uterus collector. I know that's ugly…is he collecting these things or something...Everybody he sees, he's taking all their uteruses out or he's taken their tubes out. What in the world.

Intertwined with the issue of the reported high rates of hysterectomies is the issue of proper informed consent. Regarding the hysterectomies, Ms. Wooten explained: "These immigrant women, I don't think they really, totally, all the way understand this is what's going to happen depending on who explains it to them." Ms. Wooten stated that the sick call nurse tries to communicate with the

[97] *Id.*

NBCU001554



detained immigrants and speak Spanish to detained immigrants by simply googling Spanish or by asking another detained immigrant to help interpret rather than using the language line as medical staff are supposed to.

One detained immigrant reported to Project South that staff at ICDC and the doctor's office did not properly explain to her what procedure she was going to have done.[98] She reported feeling scared and frustrated, saying it "felt like they were trying to mess with my body." When she asked what was being done to her body, she was given three different responses by three different individuals. She was originally told by the doctor that she had an ovarian cyst and was going to have a small twenty-minute procedure done drilling three small holes in her stomach to drain the cyst. The officer who was transporting her to the hospital told her that she was receiving a hysterectomy to have her womb removed. When the hospital refused to operate on her because her COVID-19 test came back positive for antibodies, she was transferred back to ICDC where the ICDC nurse said that the procedure she was going to have done entailed dilating her vagina and scraping tissue off. The nurse first told the detained immigrant she was going to get this procedure done because she had heavy bleeding, but then told her it was because she had a thick womb. The woman quickly responded that she never had heavy bleeding in her life and was never told by the doctor that she had a thick womb. Instead she stated that the doctor had described an entirely different procedure that did not involve scraping her vagina. She stated: "I tried to explain to her that something isn't right; that procedure isn't for me." The nurse responded by getting angry and agitated and began yelling at her. She told Project South that seeing the nurse's nervous and angry response confirmed "that something was not right."

*E) Detained immigrants are subjected to unsanitary conditions in the medical and quarantine units.*

Detained immigrants and Ms. Wooten commented on the unsanitary conditions of the medical unit and quarantine unit in Unit E-4. Ms. Wooten reported that the patient exam tables could be dirty depending on the nurse. While nurses are supposed to wipe down the patient exam table and pull paper between patients as well as clean the floors, that does not always happen. Ms. Wooten reports that the medical area can be cluttered and unorganized. In addition, Ms. Wooten expressed concern over the quarantine units, stating that "the dorms down there are very nasty." She explained that while an employee sprays bleach in the showers, "nobody is getting in there scrubbing the showers." Ms. Wooten also stated that she knew that the Lysol being used to disinfect units was "watered down" and was not "fully concentrated."

Detained immigrants echoed this sentiment. One detained immigrant stated that ICDC's medical unit is "the worst one…it's really, really dirty." He also stated the medical unit sometimes smells and

---

[98] Project South Interview with Detained Immigrant, Summer 2020.

NBCU001555



Institute for the Elimination of Poverty & Genocide

that "they don't clean." In a letter, another immigrant described the medical unit as being "dirty and with animals like ants and insects with only one bed, toilet and sink[.T]o be able to do her daily personal cleaning she had to wait for a guard to take her to the showers when they wanted and at whatever time they wanted."

In addition to the medical unit, others reported that the quarantine unit in Unit E-4 is also dirty. In a letter, detained women described the conditions at Unit E-4 as conveyed by a fellow detained woman:

> She was locked up in lockdown cells in E4 where the treatment was absolutely terrible. She was locked up with no right to commissary, no right to communicate with her family for many days, she had no right to use the microwave to prepare her food for two days. The rest of the time she was there, she was only allowed to go out for 15 minutes in the morning and 15 minutes in the afternoon, depending on the guard who was there because there were days where she was not permitted to leave at all. During the day, she asked the guards for water and was denied many times, during her isolation in the cell she never had cleaning products to keep the space clean, the shower water was extremely hot and this prevented her from correctly completing her personal cleaning. She only received personal hygiene products once (four small bar soaps, four tubes of toothpastes, four bottles of body wash, and two toothbrushes) that were not enough for the whole period of time that she was isolated. The treatment by the guards is humiliating and since she doesn't speak English they make fun of her. She came out after 22 days of psychological, physical, and emotional torture.

Another detained immigrant noted that while the quarantine unit looked clean from the outside, she realized that it was dirty. "The day room was disgustingly dirty. There were breadcrumbs on top of breadcrumbs…The tables were dirty, the walls…the handle for the microwave was dirty…everything was dirty," she reported. In addition, her individual cell was also not clean. She told Project South: "I had to clean the mat with shampoo because they didn't give me any chemicals. I had to clean the bunk metal with my shampoo as well." In one instance, she recalls that one woman in Unit E-4 asked for cleaning products in order to clean the unit herself but didn't get any all weekend. Instead, this woman used her socks as a mop and cleaned the floors for several days. The detained immigrant stated: "I couldn't believe what I was seeing…if it wasn't for my faith in God, I think I would have gone insane and just break down and probably gone as far as hurting myself. There are a lot of people here who end up in medical trying to kill themselves because of how crazy it is. If it wasn't for God, I probably would

NBCU001556



**Institute for the Elimination of Poverty & Genocide**

have ended up in the infirmary for suicide. It was just crazy. I can't believe this is the quarantine unit, the cohort unit; the floors are disgusting and nobody cares."

**5) Unsafe Working and Living Conditions**

*A) ICDC employees are instructed to work if they exhibit COVID-19 symptoms, are awaiting a COVID-19 test result, or have had a positive COVID-19 test result.*

Employees and detained immigrants have both raised serious concerns regarding ICDC's COVID-19 policies. According to Ms. Wooten, ICDC employees are expected to come into work even if they have COVID-19 symptoms and are awaiting test results. The HSA instructed medical staff to come into work while they were waiting to be tested, waiting for their test results, and even if they tested positive, stating that "we can work symptomatic and work positive as long as we had a mask on." Ms. Wooten explained that when employees arrive to work, they must fill out a screening document that asks them if they have any COVID-19 symptoms. The document expressly states:

> If there are any 'yes' answers to any questions above and/or if the temperature is equal to or greater than 100.4 degrees Fahrenheit, medical staff will be notified and the individual will not be allowed access to the facility and will be advised to seek medical attention.

However, Ms. Wooten stated that even when employees document that they do have symptoms, they are still made to work. For example, Ms. Wooten filled out the form on June 22, 2020 where she answered "yes" to having symptoms of COVID-19. On the screening document, Ms. Wooten checked off that she has muscle or body aches, headaches, and diarrhea; all three are symptomatic of COVID-19. Despite answering "yes," Ms. Wooten was still cleared to work that day. Ms. Wooten explained that several officers know of other officers who came into work symptomatic while waiting for their COVID-19 test results and later found out that they tested positive for COVID-19. Ms. Wooten recalls at least thirteen officers who tested positive for COVID-19.

In addition, the form asked for documentation of the employee's temperature. However, the thermometer at the front desk is "defective." Ms. Wooten stated that when she took her temperature on the thermometer, it sometimes read 89.6; other times it would read 90.4, so she knew it wasn't accurate. While she recorded the faulty temperatures on the form, Ms. Wooten noted that not all of the forms were placed in her medical file as they should have been. "They're not consistently in there — every day I work, it's supposed to be filed in my medical file," she explained.

*B) ICDC employees and detained immigrants report lack of proper PPE.*

NBCU001557



**Institute for the Elimination of Poverty & Genocide**

Employees and detained immigrants alike have only received one mask since the beginning of the pandemic. Detained immigrants have stated that they have not received a new mask since they first received one many months ago.[99] Similarly, Ms. Wooten recalls requesting an N-95 mask several times since her mask broke, but she never received a new one. When she requested it, the supervisor told her the records show she already had one and therefore did not give her a new one. Instead, Ms. Wooten had to purchase her own mask in order to protect herself. In addition, Ms. Wooten stated that only upper level supervisors have N-95 masks. When she gave a mask to a correctional officer, her supervisor became angry and told Ms. Wooten that "it was not our responsibility to give officers [a mask.]"

Ms. Wooten recalls one time when upper level nurses brought a detained immigrant who presumably had COVID-19 into the shared office and removed his mask without informing Ms. Wooten. While the upper level nurses had N-95 masks on, Ms. Wooten did not have one and therefore had to walk out of the room to protect herself as an individual who is immunocompromised with diagnosed sickle cell anemia. Though Ms. Wooten has told her supervisors several times that she is immunocompromised, they have not provided her with any extra protections or a new N-95 mask even after she requested to get one multiple times. Ms. Wooten explained: "If I get sick with what I have, I won't make it. I don't have anybody else to raise my children." Instead, Ms. Wooten stated that there was no sympathy at all for her situation. The HSA stated: "life goes on," implying that that if she were to get sick or die, she would simply be replaced.

Similar to detained immigrants, ICDC staff report not being able to follow social distancing protocol within the office. Ms. Wooten explained: "It was on the wall, social distancing, but it was not actually carried out…It's hard to social distance; there's eight of us in the room…there's four computers…there's no way that as small as it [the office] was, we could be six feet apart."

Ms. Wooten also reported not having proper sanitization material in the medical unit. She reported that when medical staff requested and finally received sprays and sanitizers in May or June, the HSA took all of them and locked them in her office while leaving out only one bottle of the spray and sanitizer because she did not want the medical staff just "pass[ing] them out." Ms. Wooten explained that this resulted in employees not being able to properly sanitize their workspace. She stated: "You find yourself limited to what you spray and what you don't spray…we didn't have the resources to properly sanitize."

*C) ICDC refuses to tell employees and detained immigrants who has COVID-19.*

Detained immigrants and employees have also complained about ICDC's secrecy and lies regarding COVID-19. Neither the employees nor the detained immigrants know who has tested positive

---

[99] Project South Interview with Detained Immigrant, Summer 2020.

NBCU001558



Institute for the Elimination of Poverty & Genocide

for COVID-19. For example, Ms. Wooten explained that management at ICDC does not tell officers which detained immigrant or employee has COVID-19. She stated that when she tried to warn officers who are about to be in contact with a detained individual with COVID-19 so that they use proper precautions, she was reprimanded by management and told that warning other staff about cases was not her job. However, Ms. Wooten explained that it is their moral responsibility to tell the officers since the officers are the ones who are interacting with detained immigrants, transporting them and providing food to them, and therefore they are most at risk of contracting the virus.

Similarly, detained immigrants are anxious because they are not being told the truth about who has COVID-19 in the facility.[100] One immigrant stated: "We like to be informed. Just being informed helps things out…If we have someone to inform us about something, tell us about something that is going on, everything will be smooth…but getting people to give you information is impossible."[101] Another detained immigrant stated that since the pandemic started, "we've never been told…the facility never even confirm any positive cases; but from the people outside [I know] twenty cases at Irwin. The truth that we hear from them [ICDC] is different than the reality we see…we see other units in quarantine which means something is wrong, but nobody ever come and tell us what is going on…we are powerless, we can't do anything."[102]

One immigrant also noted that it seemed as though officers also did not know which immigrant had COVID-19. She explained that she was transferred to Unit E-4, the quarantine unit, for having COVID-19 antibodies and was awaiting her results for the most recent COVID-19 test. While she was in Unit E, an officer tried to put a new individual in the cell with her. When she refused and told the officer she shouldn't put the new person in her cell because she tested positive for COVID-19 antibodies and was awaiting her results for COVID-19, the officer reacted in shock exclaiming "you're positive for COVID-19?" The immigrant noted that the officers did not even know that she and others had tested positive for COVID-19 or had COVID-19 antibodies.

Not only does ICDC not share information about who has COVID-19; detained immigrants and employees reported instances where ICDC purposefully failed to disclose the truth about individuals who tested positive for COVID-19. Ms. Wooten has stated that the HSA and other upper lever nurses have withheld information about detained individuals testing positive for COVID-19. Ms. Wooten explained that the sentiment at ICDC is that "what you don't know you don't have to know." Ms. Wooten recalls a time when she had interacted with several detained individuals and asked the HSA if they had tested positive for COVID-19. The HSA responded that they had tested negative for COVID-

---

[100] Project South Interview with Detained Immigrant, Summer 2020.

[101] *Id.*

[102] *Id.*

NBCU001559



**Institute for the Elimination of Poverty & Genocide**

19, but in reality, they were suspected of having COVID-19 and were awaiting their test results. Ms. Wooten later discovered that those individuals had in fact tested positive for COVID-19 even though she was assured by the HSA that they were negative.

Similarly, one detained immigrant noted that the men in his unit explicitly asked the captain in June or July how many COVID-19 cases there were in the facility and the captain responded that there were no positive cases in the facility.[103] To the contrary, in May, ICE reported that six detained immigrants had already tested positive for COVID-19.[104]

In May 2020, the previous HSA, Ms. Cole, died from COVID-19. Many detained immigrants and employees believe she was exposed to the virus at the facility. Ms. Wooten stated that Ms. Cole explicitly told her and another colleague that she contracted COVID-19 from ICDC explaining that she only went to work and home without going anywhere else.  However, when Ms. Cole died, the new HSA, told staff that Ms. Cole contracted COVID-19 from a family barbeque and attributed Ms. Cole getting COVID-19 and dying to Ms. Cole's old age and other underlying conditions.

Ms. Wooten explained that she believes ICDC is hiding information about COVID-19 in order to keep things quiet. She stated that everyone in the facility is scared at this point, so management does not want to tell officers and detained immigrants the truth because they are afraid of an uproar. Instead, the secrecy has created a "silent pandemic" where even if officers get COVID-19 from the facility, the officers won't be able to blame ICDC because no one knows how prevalent COVID-19 is inside ICDC due to not testing detained immigrants and not sharing who has the virus. Therefore, ICDC can put the blame on officers who test positive for COVID-19 by saying they contracted it from the grocery store or other places. Ms. Wooten explained that she believes that this strategy keeps "the publicity from coming to the facility."

*D) ICDC retaliates against employees for adhering to protocol and public health guidelines.*

When employees do speak out against violations occurring at ICDC, they are reprimanded. Ms. Wooten has witnessed other employees be reprimanded for doing "what's right," and she has been reprimanded and retaliated against, herself. She witnessed one captain be fired for refusing to let things slide and for following the CDC and PBNDS rules strictly. She gave the example of how this captain always placed detained immigrants strictly according to their ICE classification[105]; however, this was

---

[103] Project South Interview with Detained Immigrant, Summer 2020.

[104] https://www.ice.gov/coronavirus.

[105] ICE categorizes detained immigrants as "being low, medium or high custody" and "house[s] them accordingly." 2011 Operations Manual ICE Performance-Based National Detention Standards at 62-66, https://www.ice.gov/doclib/detention-standards/2011/pbnds2011r2016.pdf.

NBCU001560



not common practice at the facility. Ms. Wooten believes that the captain was fired because he challenged the norm and because Warden Paulk "didn't like anybody to tell him no. You are not to tell him no."

Ms. Wooten herself faced retaliatory reprimand and demotion in July when she was suddenly demoted from being a "full-time" nurse (with regularly scheduled shifts) to an "as-needed" nurse (without regularly scheduled shifts), all without a proper explanation or adequate justification. In June, Ms. Wooten displayed symptoms of COVID-19 including muscle ache, fatigue, and shortness of breath and took a COVID-19 test. Ms. Wooten's doctor instructed Ms. Wooten not to return to work while she was symptomatic. Ms. Wooten submitted her doctor's notes to her supervisor. Despite this, she was required to work June 23 and June 25. However, she let her supervisor know that she would be quarantining until her COVID-19 results came back on June 29. While Ms. Wooten was quarantining at her home, she received a call from ICDC's HR staff telling her she had to call in sick each day she quarantined. Ms. Wooten then spoke with her supervisor who assured her that ICDC was aware she was quarantining and that she would not have to call out sick for following the doctor's orders, so she did not call out sick. When Ms. Wooten returned to work after her COVID-19 test result came back negative, she was summoned to see Deputy Warden Albright. He formally reprimanded Ms. Wooten for not calling out sick on the days she quarantined. The formal reprimand included testimony from her supervisor who falsely stated that she instructed Ms. Wooten to call in sick every day she planned to be absent while awaiting test results. A formal memo from Warden Paulk stated that if employees get tested for COVID-19: "[E]mployees are required to call out each day of their absence *unless they have submitted a physician's note* with specific dates of absence." (Emphasis added).

As discussed above, Ms. Wooten had, in fact, submitted two doctor's notes on June 22nd that explicitly stated she was excused from working until she was asymptomatic and until her COVID-19 test results came back. Despite these doctor's notes, she was still reprimanded, in violation of ICDC's own memo. Ms. Wooten later noted that the doctor's notes she submitted to her supervisor were never formally added to her medical records.

When Ms. Wooten talked to Warden Paulk about the reprimand, he expressed anger at her and demoted her effective immediately to "PRN" indicating an as needed basis which significantly reduced the number of hours she worked at the facility. Ms. Wooten believes that she was disciplined not because she missed work, but because she has been asking hard questions about testing detained immigrants for COVID-19 and warning officers when detained immigrants they are in contact with have tested positive for COVID-19. Ms. Wooten explained that she was aware of another employee who also did not call out sick while out, but that employee was never reprimanded. Ms. Wooten explained:

NBCU001561



**Institute for the Elimination of Poverty & Genocide**

You put two and two together. I'm asking for these things and I'm speaking for these detainees. I'm a problem. I'm being seen and I'm not supposed to be seen or heard. It makes it look like you're not doing your job… It [ICDC] has driven away so many people who work there whenever they go to speak out and they go to do what's right.

### III) Conclusion

Due to the gravity of these violations and the continued negative impact on the health and safety of both detained immigrants and ICDC employees, we ask that you review this complaint in an expedited manner. Thank you in advance for your time and consideration. If you have any questions or require additional information, please contact Azadeh Shahshahani, Legal and Advocacy Director at Project South at azadeh@projectsouth.org or Priyanka Bhatt, Staff Attorney at Project South, at priyanka@projectsouth.org.


Sincerely,

Project South
Georgia Detention Watch
Georgia Latino Alliance for Human Rights
South Georgia Immigrant Support Network

NBCU001562

# Exhibit 4

AO 88A (Rev. 12/20) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No. 5:21-CV-00056-LGW-BWC

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* July 17th, 2023
on *(date)* _Azadeh Shahshahami_

☐ I served the subpoena by delivering a copy to the named individual as follows:
_Azadeh Shah Shahami @ her residence in her garage_
_____ on *(date)* 9/5/2023 ; or @ 5:22 PM

☐ I returned the subpoena unexecuted because: _____

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of
$ _____.

My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: 9/6/23

_____
*Server's signature*

Stacey Maddox
*Printed name and title*

P.O. Box 411 Norcross, GA 30091
*Server's address*

Additional information regarding attempted service, etc.:

# Exhibit 5

# Michigan Journal of Race & Law

# ON MOVEMENT LAWYERING: AN INTERVIEW WITH AZADEH SHAHSHAHANI

## ON MOVEMENT LAWYERING: AN INTERVIEW WITH AZADEH SHAHSHAHANI

BY MJR&L ON APRIL 14, 2021APRIL 15, 2021
**By Aashna Rao**
**Associate Editor, Vol. 26**

In the past several years, a model of legal advocacy known as movement lawyering has gained increased attention. In reality, movement lawyering is nothing new—those who do this kind of work aim to provide legal support by following the lead of directly impacted communities and organizers on the ground.

Azadeh Shahshahani,[1] Legal and Advocacy Director at Project South and former president of the National Lawyers Guild, describes herself as a movement lawyer. Project South[2] is an Atlanta-based organization founded in 1986 with the goal of creating spaces for movement building. Since then, the organization has operated well-established organizing and community education programs. In 2016, the organization started its Legal Program; as the director of this program, Azadeh provides legal support to Project South's organizing and community-based education work.

In the following interview, Azadeh describes what her work entails and how law students can get involved in movement lawyering.

**What is movement lawyering, and how should aspiring movement lawyers approach this work?**

**AZADEH:** I would describe movement lawyering as being accountable to the movement and taking direction from the movement and movement leaders. Organizers are the ones who set the agenda and determine the strategy.

As lawyers, your role is to provide support and insight about the legal ramifications and to bring a certain skill—your legal skills—to the table. But you need to always keep in mind that it is the movement and movement leaders that set the strategy. That's why it's so important for lawyers to have

a clear understanding about the scope of their role.

**In the context of your work with Project South, could you provide an example of how you use your legal skills to support the initiatives of organizers on the ground while following their lead?**

**AZADEH:** In the spring of 2017, there were ICE raids in the city of Clarkston, a very diverse area of Georgia with immigrants and refugees from many different parts of the world. Those raids targeted members of the Somali community. [Project South was] working in a coalition with the Georgia Latino Alliance for Human Rights (GLAHR)[3] and other grassroots organizations in pushing city councils and county commissioners around the state to adopt policies limiting collaboration with ICE. That seemed like a concrete step that city councils could adopt. As lawyers, we were able to draft the policy and supporting legal memo for that to happen. But it was the organizers who decided that was the right strategy and they came to us for legal support.

The city council in Clarkston said it was welcoming and friendly towards immigrants, but after being threatened by ICE, the council's attitude on adopting the resolution was wishy washy. The directly impacted community members in Clarkston were mostly the wives of the detained men who were picked up as a result of the raids. And the wives said, "Remember that you're accountable to us, not to ICE. Remember that elections are coming up." After two hours of impactful testimony from them at a hearing, the city council adopted the resolution unanimously.

There was no doubt in my mind that the reason that happened was because of community organizing. Our role as lawyers was to support that. If, as lawyers, we had approached the city council with our fancy legal papers and pointed out examples of other localities in the country that had adopted the resolution, that wouldn't have gotten us very far at all. It was the community organizing that made it happen.

**What is the biggest lesson you have learned working with directly impacted communities that you want people to keep in mind?**

**AZADEH:** We're in this for the long haul. Movement building takes time, it won't happen overnight—it's not about a legal victory in a case. It is about movement victory in order to effect sustainable change. You need to keep at it. Learn from the folks who came before us, who faced all types of state repression from COINTELPRO onwards and who persevered. We need to look to those victories.

For example, when I got to Georgia in 2007, one of the challenges I learned about was 287(g),[4] an intense form of collaboration between local police and ICE. I remember the head of GLAHR came to our office and said, "Our people are disappearing off the streets into the Cobb jail." Cobb was the first county in Georgia to implement 287(g). And the situation in the Cobb jail was awful.

For many years, from 2007 on, we worked in partnership with GLAHR to try to end 287(g)—we published many reports, organized, held several rallies, went to county commissioners to testify, organized campaigns year after year after year. But the same anti-immigrant sheriffs who ran on anti-immigrant platforms got elected and the county commissioner supported them. And 287(g) continued. Last November *finally*, thanks to the organizing work of GLAHR and directly impacted folks, they were able to get rid of two anti-immigrant sheriffs. It took thirteen years for this victory to happen but it finally did.

**How do you view the role of litigation in movement lawyering and grassroots organizing initiatives?**

**AZADEH:** Litigation is a tool; it's an important tool, but it's just one tool in the fight for social justice.

We have been calling for the Irwin County Detention Center to be shut down for a long time. We've used a variety of strategies—publishing reports, coordinating campaigns, writing letters to Congress, etcetera, for many years. There was litigation during COVID [in spring 2020] to try to get people freed. Unfortunately, in Georgia, it wasn't successful.

The complaint that we published in September brought national and international attention to the Irwin County Detention Center and members of Congress started coming down. The same members of Congress who, in the past, would not have even answered our letters were now actively calling for Irwin to be shut down, which was pretty astounding to see. Then, there was a class action lawsuit that was filed and we were co-counsel and finally, pursuant to that, people started getting released.

In this scenario, if you saw litigation as the only tool, when the lawsuits in spring 2020 weren't successful, you would have just backed off and thought, "I did everything I could do, and that's the end of it." But being a part of a movement is realizing lawsuits are one strategy and saying, "Okay, let's see what other tools I can use" with the goal of freeing people and shutting this place down. You would think of all the strategies we have used over the years to bring attention to this place, to publish reports, to talk to directly impacted folks. And then finally filing the complaint that brought the world's attention to Irwin and *then* filing the class action lawsuit. Just keeping at it until this place is shut down.

**Do you have any advice on the kinds of skills or experiences law students interested in movement lawyering should seek out? What can we be doing beyond the law school curriculum to meaningfully support directly impacted communities?**

AZADEH: I would highly recommend that students try to work with movement lawyering organizations so you actually see movement lawyers in action and learn the relevant skills they use every day in their jobs. Try to volunteer with grassroots organizations on the ground to see what kind of support you can provide to make yourself useful to any type of organizing that's happening.

One avenue would be getting more involved with the National Lawyers Guild as a movement lawyering organization to see how we support the organizing work on the ground through various means. Through the NLG, students can act as Legal Observers for protests and can support people who've been arrested for protesting police brutality. Hopefully, this will help you start looking at the experience and the legal skills you learn not as a theoretical experiment but as a set of skills you've gained to support social justice movements and directly impacted people.

**Finally, many law students who want to work with directly impacted communities don't necessarily come from those communities themselves. Do you have any advice as to how we can ensure we are approaching our work with these communities mindfully and with great care?**

AZADEH: I would recommend people familiarize themselves with the Black Radical Traditions of the US South. Project South, for example, is an organization based in the Black Radical Traditions of the US South. There are various principles involved: internationalism; looking to the legacy of the ancestors and the strength of the elders; realizing that there are no saviors coming from the outside; realizing we are the ones who are going to free ourselves. Folks should learn more about those principles as a way of grounding yourself and your legal work in support of social justice movements.

———

[1] https://projectsouth.org/about/staff/#azadeh (https://projectsouth.org/about/staff/#azadeh)

[2] https://projectsouth.org/ (https://projectsouth.org/)

[3] https://glahr.org/ (https://glahr.org/).

[4] https://www.americanimmigrationcouncil.org/research/287g-program-immigration (https://www.americanimmigrationcouncil.org/research/287g-program-immigration)

Posted In:   **FROM OUR EDITORS**

Tagged:   **ATLANTA**, **MOVEMENT LAWYERING**, **PROJECT SOUTH**

# Exhibit 6

**From:** Stacey Evans
**Sent:** Tuesday, September 26, 2023 9:41 PM
**To:** Julie Oinonen
**Cc:** Amble Johnson; Michele Dobbs; Stacey Evans
**Subject:** RE: 5:21-cv-00056-LGW-BWC Amin v. NBCUniversal Media, LLC

It is disappointing that you won't save a date in the future. As you know, schedules fill up and this prejudices my client in the event (which we expect) that we are able to move forward with the deposition. This lack of cooperation will be brought to the Court's attention.

**From:** Julie Oinonen <julie@goodgeorgialawyer.com>
**Sent:** Tuesday, September 26, 2023 9:40 PM
**To:** Stacey Evans <sevans@staceyevanslaw.com>
**Cc:** Amble Johnson <ajohnson@staceyevanslaw.com>; Michele Dobbs <mdobbs@goodgeorgialawyer.com>
**Subject:** Re: 5:21-cv-00056-LGW-BWC Amin v. NBCUniversal Media, LLC

EXTERNAL SENDER. Only open links and attachments from known senders. DO NOT provide your username or password.

Thanks, because you are consenting to stay pending outcome, I will abstain from filing any emergency petition for hearing on motion tomorrow.

*Regarding your request to save the date, I cannot agree to that. What I can consent to is that if you prevail on the motion, I can agree to work professionally and courteously with you alongside my paralegal who manages my calendar to come up with a date that works for both you, myself, and my client along with working out the logistics of location.



Julie Oinonen
Williams Oinonen LLC
404-654-0288
www.goodgeorgialawyers.com (web)
www.goodgeorgialawyer.com (blog)

**From:** Julie Oinonen <julie@goodgeorgialawyer.com>
**Sent:** Tuesday, September 26, 2023 9:38 PM
**To:** Stacey Evans <sevans@staceyevanslaw.com>
**Cc:** Amble Johnson <ajohnson@staceyevanslaw.com>; Michele Dobbs

<mdobbs@goodgeorgialawyer.com>
**Subject:** Re: 5:21-cv-00056-LGW-BWC Amin v. NBCUniversal Media, LLC

Thanks, because you are consenting to stay pending outcome, I will abstain from filing any emergency petition for hearing on motion tomorrow.

Regarding your request to save the date, I cannot agree to that. What I can consent to is that if you prevail on the motion, what I can agree to is to work professionally and courteously with you alongside my paralegal who manages my calendar which to come up with a date that works for both you, myself, and my client along with working out the logistics of location.



Julie Oinonen
Williams Oinonen LLC
404-654-0288
www.goodgeorgialawyers.com (web)
www.goodgeorgialawyer.com (blog)

---

**From:** Stacey Evans <sevans@staceyevanslaw.com>
**Sent:** Tuesday, September 26, 2023 9:33 PM
**To:** Julie Oinonen <julie@goodgeorgialawyer.com>
**Cc:** Amble Johnson <ajohnson@staceyevanslaw.com>; Michele Dobbs
<mdobbs@goodgeorgialawyer.com>; Stacey Evans <sevans@staceyevanslaw.com>
**Subject:** RE: 5:21-cv-00056-LGW-BWC Amin v. NBCUniversal Media, LLC

Julie,

As I said, I will consent to a stay pending the outcome of your motion.  Though I'm doing so as a courtesy and not because you are entitled to a stay based on anything you've said in the motion, alleged applicability of your leaves of absence in other cases, or your representatives about the witness's schedule.

As others have done with other motions to quash, will you agree to hold a date for the deposition if the Court does not quash the subpoena?  If so, please let me know available dates so we can all "save the date."  I understand such an agreement would not waive any arguments you are making in your motion.

Thank you, Stacey

**From:** Julie Oinonen <julie@goodgeorgialawyer.com>
**Sent:** Tuesday, September 26, 2023 9:07 PM
**To:** Stacey Evans <sevans@staceyevanslaw.com>
**Cc:** Amble Johnson <ajohnson@staceyevanslaw.com>; Michele Dobbs <mdobbs@goodgeorgialawyer.com>
**Subject:** Re: 5:21-cv-00056-LGW-BWC Amin v. NBCUniversal Media, LLC

EXTERNAL SENDER. Only open links and attachments from known senders. DO NOT provide your username or password.

Do you oppose staying pending the outcome? If not, we can certainly attempt to file a petition for emergency hearing tomorrow albeit I will be presenting at the state bar conference at a certain time I will be close to the NDGA courthouse.

Get Outlook for iOS

**From:** Julie Oinonen <julie@goodgeorgialawyer.com>
**Sent:** Tuesday, September 26, 2023 8:51 PM
**To:** Stacey Evans <sevans@staceyevanslaw.com>
**Cc:** Amble Johnson <ajohnson@staceyevanslaw.com>; Michele Dobbs <mdobbs@goodgeorgialawyer.com>
**Subject:** Re: 5:21-cv-00056-LGW-BWC Amin v. NBCUniversal Media, LLC

To be clear with you I also explained earlier that I am on leaves of absences (filed with the courts) those dates and travelling out of state for most of September absent one day I am back to present at a conference. Therefore it is impossible for me to attend. Additionally I believe my client is out of state for much of September as well.

Get Outlook for iOS

**From:** Julie Oinonen <julie@goodgeorgialawyer.com>
**Sent:** Tuesday, September 26, 2023 8:46:03 PM
**To:** Stacey Evans <sevans@staceyevanslaw.com>
**Cc:** Amble Johnson <ajohnson@staceyevanslaw.com>; Michele Dobbs <mdobbs@goodgeorgialawyer.com>
**Subject:** Re: 5:21-cv-00056-LGW-BWC Amin v. NBCUniversal Media, LLC

I am confirming in case it is not clear. We are not showing up as we have filed a motion.

Get Outlook for iOS

**From:** Stacey Evans <sevans@staceyevanslaw.com>
**Sent:** Tuesday, September 26, 2023 8:14:12 PM
**To:** Julie Oinonen <julie@goodgeorgialawyer.com>
**Cc:** Amble Johnson <ajohnson@staceyevanslaw.com>; Michele Dobbs

<[mdobbs@goodgeorgialawyer.com](mailto:mdobbs@goodgeorgialawyer.com)>
**Subject:** Re: 5:21-cv-00056-LGW-BWC Amin v. NBCUniversal Media, LLC

I am confirming so I don't waste time and money showing up. I wouldn't want to risk not appearing and your client showing up and then claiming that I wasn't prepared to move forward with the deposition.

As you know (or should know), filing a motion to stay does not automatically stay the deposition. If you had bothered to ask, I would have agreed to a stay pending the outcome of the motion.

Sent from my iPhone

> On Sep 26, 2023, at 8:10 PM, Julie Oinonen <[julie@goodgeorgialawyer.com](mailto:julie@goodgeorgialawyer.com)> wrote:

> EXTERNAL SENDER. Only open links and attachments from known senders. DO NOT provide your username or password.

> That is why we filed and served you with the motion to quash, motion for protective order and motion to stay proceedings.

> Get [Outlook for iOS](https://outlook.com)

> **From:** Stacey Evans <[sevans@staceyevanslaw.com](mailto:sevans@staceyevanslaw.com)>
> **Sent:** Tuesday, September 26, 2023 8:01:39 PM
> **To:** Julie Oinonen <[julie@goodgeorgialawyer.com](mailto:julie@goodgeorgialawyer.com)>; Amble Johnson <[ajohnson@staceyevanslaw.com](mailto:ajohnson@staceyevanslaw.com)>; Michele Dobbs <[mdobbs@goodgeorgialawyer.com](mailto:mdobbs@goodgeorgialawyer.com)>
> **Cc:** Stacey Evans <[sevans@staceyevanslaw.com](mailto:sevans@staceyevanslaw.com)>
> **Subject:** RE: 5:21-cv-00056-LGW-BWC Amin v. NBCUniversal Media, LLC

> Julie,

> Am I correct that Ms. Shashahani does not intend to appear on Thursday for her subpoenaed deposition? I want to confirm.

> Thank you, Stacey

> **From:** Julie Oinonen <[julie@goodgeorgialawyer.com](mailto:julie@goodgeorgialawyer.com)>
> **Sent:** Monday, September 25, 2023 10:42 AM
> **To:** Amble Johnson <[ajohnson@staceyevanslaw.com](mailto:ajohnson@staceyevanslaw.com)>; Michele Dobbs <[mdobbs@goodgeorgialawyer.com](mailto:mdobbs@goodgeorgialawyer.com)>
> **Cc:** Stacey Evans <[sevans@staceyevanslaw.com](mailto:sevans@staceyevanslaw.com)>
> **Subject:** Re: 5:21-cv-00056-LGW-BWC Amin v. NBCUniversal Media, LLC

EXTERNAL SENDER. Only open links and attachments from known senders. DO NOT provide your username or password.

We have already discussed this with you. No, we will not agree to have her deposed. Our position is that you are violating the professional rules of ethics and abusing the discovery process by hitching your wagon to this star. We have explained in clear our position within our brief.

The SDGA denied jurisdiction and as such we will proceed accordingly.

I have no interest in a back and forth with you via email. You may respond to our legal arguments through a response brief.

Get Outlook for iOS

**From:** Amble Johnson <ajohnson@staceyevanslaw.com>
**Sent:** Monday, September 25, 2023 10:01:13 AM
**To:** Michele Dobbs <mdobbs@goodgeorgialawyer.com>; Julie Oinonen <julie@goodgeorgialawyer.com>
**Cc:** Stacey Evans <sevans@staceyevanslaw.com>
**Subject:** RE: 5:21-cv-00056-LGW-BWC Amin v. NBCUniversal Media, LLC

Julie and Michele,

Thanks for sharing the filings and the case number.

I still do not understand Ms. Shahshahani's positions that (1) she now opposes transfer of the motion to S.D. Ga., after communicating to that court through counsel that she preferred it determine the motion; and (2) that the subpoena should be quashed as a whole, rather than Ms. Shahshahani sitting for the deposition then (properly) refusing to answer questions whose answers would require divulgence of information protected by opinion attorney work product made in anticipation of litigation or attorney client communications. We agree with Ms. Shahshani's statement to the S.D. Ga. Court that that court has the most familiarity with the case and accordingly should be the one to rule on it. And, as we've now stated several times, Ms. Shahshahani clearly has relevant information, apart from information protected by privilege. To give just one example, for the purpose of illustration, think about the question, "What questions did the journalist ask you?" That question does not "require[] disclosure of privileged or other protected matter," and accordingly the grounds to quash a subpoena are not met, but Ms. Shahshahani's response is obviously relevant to our defamation case against NBCUniversal.

Can we agree to a deposition, avoid motions practice, and work on details about scheduling and logistics most convenient for you and Ms. Shahshahani? Please let me know as soon as possible, and if not, then please let me know if you have any response to the two points above, Wednesday lunch time at the latest. Also, if it would be easier

to discuss over the phone, or you would like to ask questions or discuss anything else over the phone, please let me know.

Thanks!

Amble Johnson
STACEY EVANS LAW
4200 Northside Parkway NW
Building One; Suite 200
770-779-9602
ajohnson@staceyevanslaw.com

---

**From:** Michele Dobbs
**Sent:** Monday, September 25, 2023 8:35 AM
**To:** Julie Oinonen; Amble Johnson
**Cc:** Stacey Evans
**Subject:** RE: 5:21-cv-00056-LGW-BWC Amin v. NBCUniversal Media, LLC

EXTERNAL SENDER. Only open links and attachments from known senders. DO NOT provide your username or password.

Good morning. Please see the attached file stamped documents. The Northern District case number is 1:23-mi-00095-MLB-RDC.

Kind regards,

Michele Dobbs
Paralegal
Williams Oinonen LLC
404-654-0288
www.goodgeorgialawyers.com (web)
www.goodgeorgialawyer.com (blog)

---

**From:** Julie Oinonen <julie@goodgeorgialawyer.com>
**Sent:** Saturday, September 23, 2023 12:03 PM
**To:** Amble Johnson <ajohnson@staceyevanslaw.com>
**Cc:** Stacey Evans <sevans@staceyevanslaw.com>; Michele Dobbs
<mdobbs@goodgeorgialawyer.com>
**Subject:** Re: 5:21-cv-00056-LGW-BWC Amin v. NBCUniversal Media, LLC

Hi Amble,

As you know, out of the office/out of the state on leave but as soon as my paralegal returns back in the office on Monday as today is Saturday I will ask her to send over whatever NDGA receipt confirmation she's received.

To answer your question, we provided you with the Amended motion to quash that was filed with SDGA and the NDGA and informed you via our email that it was also being filed in the NDGA that same night.

Regards,
Julie

<image001.png>
Julie Oinonen
Williams Oinonen LLC
404-654-0288
www.goodgeorgialawyers.com (web)
www.goodgeorgialawyer.com (blog)


<image002.png>
**From:** Amble Johnson <ajohnson@staceyevanslaw.com>
**Sent:** Friday, September 22, 2023 12:55 PM
**To:** Julie Oinonen <julie@goodgeorgialawyer.com>
**Cc:** Stacey Evans <sevans@staceyevanslaw.com>; Michele Dobbs <mdobbs@goodgeorgialawyer.com>
**Subject:** RE: 5:21-cv-00056-LGW-BWC Amin v. NBCUniversal Media, LLC

Can you or Ms. Dobbs then please send me some info so that I can find the N.D. Ga. docket? And when will you be able to address my other questions?

Again, I am sorry to push while you are away, but this is a time-sensitive matter and you have set forth points of opposition where I expected agreement, so I respectfully insist on additional explanation.

Amble Johnson
STACEY EVANS LAW
4200 Northside Parkway NW
Building One; Suite 200
770-779-9602
ajohnson@staceyevanslaw.com

**From:** Julie Oinonen
**Sent:** Friday, September 22, 2023 12:45 PM
**To:** Amble Johnson
**Cc:** Stacey Evans; Michele Dobbs
**Subject:** Re: 5:21-cv-00056-LGW-BWC Amin v. NBCUniversal Media, LLC


EXTERNAL SENDER. Only open links and attachments from known senders. DO NOT provide your username or password.

I am out of the office on leave right now at the trial lawyers conference in NYC and then attending to personal matters. We did file with NDGA same night as filing SDGA. There is indeed a pending motion to quash.

Get Outlook for iOS
<image003.png>
**From:** Amble Johnson <ajohnson@staceyevanslaw.com>
**Sent:** Friday, September 22, 2023 12:17:28 PM
**To:** Julie Oinonen <julie@goodgeorgialawyer.com>
**Cc:** Stacey Evans <sevans@staceyevanslaw.com>; Michele Dobbs <mdobbs@goodgeorgialawyer.com>
**Subject:** RE: 5:21-cv-00056-LGW-BWC Amin v. NBCUniversal Media, LLC

Julie,

I am sorry to require your attention while you are out of the office, but there are several points for which I must seek clarification quickly. (If a phone call would be easier, please let me know.) I know that you included Ms. Shahshahani in your email, but I removed her in an abundance of caution, since she is represented by you as counsel.

As to the technical aspects of filing in N.D. Ga.: Can you please then let me know when it was filed? And are you saying that N.D. Ga. has not sent you any confirmation of your filing, in the three days since you told us it was filed? Of course, if there were not a pending Motion to Quash, then there would be no excuse for the deposition to not proceed, as scheduled and delivered via personal service.

As to your reversal on having the Southern District decide the matter: Can you please explain to me why? You wrote to the Court in SD Ga: "I believe that this SDGA Court has the most familiarity with these issues and we submit to its jurisdiction willingly. Foremost, it is essential that this Court be made aware of Dr Amin's counsel Stacey Evans who continues in her attempts to abuse the discovery process by encroaching on sacrosanct attorney client privileges through her repeated attempts to depose opposing counsels –those who represent detainees in the underlying civil rights class action case brought against Dr. Amin as well as her attempts to depose opposing counsel in the case at bar." I struggle to see what could have possibly changed in the few days since you stated that to the Court, and am surprised to not get your consent to draft a motion to transfer.

As to the deposition itself, I have read your brief, and that is why I thought you may be receptive to a deposition. The brief appears to argue against a deposition that is not happening. It does not address Ms. Shahshahani's clear relevance as a fact witness, which is completely separate from any litigation preparation or attorney-client communications she may have. Again, she can refuse to answer specific questions to the extent the questions would require the disclosure of privileged information. Otherwise, she obviously has information that is discoverable. Nothing in your brief, or in any of your communications with me, or anything else I have been able to see, justifies opposition to the deposition "to the fullest," and I find such a position

unreasonable, particularly in light of our correspondence and our previous collaboration on the case, such as discovery from Project South.

Lastly, in your email to the Court you stated that you objected to the deposition being held at our office. We can collaborate on a location more convenient for Ms. Shahshahani, if we can at least agree, without Court intervention, that her deposition can go forward.

Sincerely,

Amble Johnson
STACEY EVANS LAW
4200 Northside Parkway NW
Building One; Suite 200
770-779-9602
ajohnson@staceyevanslaw.com

---

**From:** Julie Oinonen
**Sent:** Friday, September 22, 2023 11:58 AM
**To:** Amble Johnson
**Cc:** Stacey Evans; Michele Dobbs; Azadeh Shahshahani
**Subject:** Re: 5:21-cv-00056-LGW-BWC Amin v. NBCUniversal Media, LLC

EXTERNAL SENDER. Only open links and attachments from known senders. DO NOT provide your username or password.

Hi Amble, I am in a Trial Lawyers Conference in NYC right now, I am not ignoring you. At this point, I will not join on or consent to a Motion to Transfer your Motion to Quash to the S.D. Ga. at this point in time.

Regarding your request for NDGA information, we have not received any case number yet and it will likely take a couple days to process.

Regarding your request re: deposing my client, I assume you read the brief. We oppose it to the fullest.

Regards,
Julie

<image004.png>
Julie Oinonen
Williams Oinonen LLC
404-654-0288
www.goodgeorgialawyers.com (web)

[www.goodgeorgialawyer.com](http://www.goodgeorgialawyer.com) (blog)


<image002.png>
**From:** Amble Johnson <[ajohnson@staceyevanslaw.com](mailto:ajohnson@staceyevanslaw.com)>
**Sent:** Friday, September 22, 2023 10:40 AM
**To:** Julie Oinonen <[julie@goodgeorgialawyer.com](mailto:julie@goodgeorgialawyer.com)>
**Cc:** Stacey Evans <[sevans@staceyevanslaw.com](mailto:sevans@staceyevanslaw.com)>; Michele Dobbs
<[mdobbs@goodgeorgialawyer.com](mailto:mdobbs@goodgeorgialawyer.com)>
**Subject:** RE: 5:21-cv-00056-LGW-BWC Amin v. NBCUniversal Media, LLC

You asked a question to which I responded quickly, so I'll expect the same, thanks!

Amble Johnson
STACEY EVANS LAW
4200 Northside Parkway NW
Building One; Suite 200
770-779-9602
[ajohnson@staceyevanslaw.com](mailto:ajohnson@staceyevanslaw.com)

<image002.png>
**From:** Amble Johnson <[ajohnson@staceyevanslaw.com](mailto:ajohnson@staceyevanslaw.com)>
**Sent:** Friday, September 22, 2023 10:29:32 AM
**To:** Julie Oinonen <[julie@goodgeorgialawyer.com](mailto:julie@goodgeorgialawyer.com)>
**Cc:** Stacey Evans <[sevans@staceyevanslaw.com](mailto:sevans@staceyevanslaw.com)>; Michele Dobbs
<[mdobbs@goodgeorgialawyer.com](mailto:mdobbs@goodgeorgialawyer.com)>
**Subject:** RE: 5:21-cv-00056-LGW-BWC Amin v. NBCUniversal Media, LLC

Andrew Free, Sarah Owings, and John Whitty.  Elizabeth Matherne's is next week.

Amble Johnson
STACEY EVANS LAW
4200 Northside Parkway NW
Building One; Suite 200
770-779-9602
[ajohnson@staceyevanslaw.com](mailto:ajohnson@staceyevanslaw.com)

**From:** Julie Oinonen
**Sent:** Friday, September 22, 2023 10:24 AM
**To:** Amble Johnson
**Cc:** Stacey Evans; Michele Dobbs
**Subject:** Re: 5:21-cv-00056-LGW-BWC Amin v. NBCUniversal Media, LLC


EXTERNAL SENDER. Only open links and attachments from known senders. DO NOT
provide your username or password.

Who are these please?  "We have sought and received depositions of several other attorneys in this matter, including attorneys with whom Ms. Shahshahani worked."

<image004.png>
Julie Oinonen
Williams Oinonen LLC
404-654-0288
www.goodgeorgialawyers.com (web)
www.goodgeorgialawyer.com (blog)


<image003.png>
**From:** Amble Johnson <ajohnson@staceyevanslaw.com>
**Sent:** Friday, September 22, 2023 10:20 AM
**To:** Julie Oinonen <julie@goodgeorgialawyer.com>
**Cc:** Stacey Evans <sevans@staceyevanslaw.com>; Michele Dobbs <mdobbs@goodgeorgialawyer.com>
**Subject:** RE: 5:21-cv-00056-LGW-BWC Amin v. NBCUniversal Media, LLC

Ms. Oinonen,

I have been unable to find the case on the docket of the N.D. Ga.  Can you or Ms. Dobbs please send me the case information you received from the Clerk's Office after you filed it?

Also, Judge Cheesbro's order appears to make clear his willingness to hear the motion, if it is transferred to his Court.  Of course, his Court is where you originally filed it.  Would you join on or consent to a Motion to Transfer your Motion to Quash to the S.D. Ga.?  I can draft and send you a draft for your approval, if so.

Separately, as I hope we have made clear already, we are not seeking information regarding Ms. Shahshahani's mental work product prepared in anticipation of litigation, or her communications that are protected by attorney client privilege.  We are seeking her testimony as a fact witness as to non-privileged information relevant to *NBCUniversal*.  For example, communications with journalists who appeared on the Broadcasts at issue in our case, with the subject of such communications being the subject published on the Broadcasts, are a subject that is clearly relevant to our case and is discoverable, and Ms. Shahshahani had such communications.  We have sought and received depositions of several other attorneys in this matter, including attorneys with whom Ms. Shahshahani worked.  Such depositions have been productive for our discovery and did not infringe on the work product or attorney client communications of the attorneys.  Do you continue to disagree, or can we agree to avoid further motions practice and find a mutually agreeable date for a deposition, at which Ms. Shahshahani can of course assert privileges in response to specific questions, rather than moving to quash the deposition as a whole?

Thanks!

Sincerely,

Amble Johnson
STACEY EVANS LAW
4200 Northside Parkway NW
Building One; Suite 200
770-779-9602
ajohnson@staceyevanslaw.com

---

**From:** Michele Dobbs
**Sent:** Tuesday, September 19, 2023 11:12 PM
**To:** sgrubman@cglawfirm.com; Stacey Evans; Tiffany Watkins; Amble Johnson; Levine, Amanda; McNamara, Elizabeth; leenacharlton@dwt.com; cynthia.counts@fisherbroyles.com; blovett@savannahga.gov; erik.bierbauer@nbcuni.com; taylor.carter@nbcuni.com
**Cc:** Julie Oinonen
**Subject:** 5:21-cv-00056-LGW-BWC Amin v. NBCUniversal Media, LLC

EXTERNAL SENDER. Only open links and attachments from known senders. DO NOT provide your username or password.

Counsel,

Attached is a courtesy copy of the Motion that was recently filed in the Northern District of Georgia.

Kind regards,

Michele Dobbs
Paralegal
Williams Oinonen LLC
404-654-0288
www.goodgeorgialawyers.com (web)
www.goodgeorgialawyer.com (blog)

# Exhibit 7

**09/15/2020 - 02:26 PM**
**Word count: 1003**

A nurse who raised alarms about conditions at a U.S. Immigration and Customs Enforcement detention center in Georgia, including that it refused to test detainees for the coronavirus and that some detainees received questionable hysterectomies, said Tuesday that she decided to become a whistleblower so that detainees are treated better at the facility.

"Whenever you institutionalize people, I was brought up by the American dream that you treat people the way you want to be treated and you handle individuals as individuals," Dawn Wooten said Tuesday at a news conference in Atlanta. "All I want is that people are treated and triaged medically correct and they're treated in medical timeliness."

Wooten worked full time as a licensed practical nurse at the Irwin County Detention Center in Ocilla, Georgia, until being demoted in July.

She said Tuesday that she and other employees were not given sufficient personal protective equipment during her time there. Wooten, a single mother of five, said she has sickle cell disease and has been told that if she contracted the coronavirus, "I probably would not live."

In a federal complaint filed Monday, a coalition of rights groups accused the detention center of committing "jarring medical neglect," including failing to protect its detainees from coronavirus, red flags concerning a high rate of hysterectomies performed on detainees and fabricating medical records.



**Court rules Trump can end temporary protected status for immigrant families**

The 27-page complaint, filed with the Department of Homeland Security's Office of Inspector General, is based in part on Wooten's allegations and on those from detainees at the facility.

ICE Spokeswoman Lindsay Williams said in a statement to NBC News on Tuesday the agency does not comment on matters presented to the Office of the Inspector General, but it takes all allegations seriously and defers to the inspector general regarding any potential investigation and results.

"That said, in general, anonymous, unproven allegations, made without any fact-checkable specifics, should be treated with the appropriate skepticism they deserve," Williams said.

The agency said it is committed to the safety and welfare of those in its custody and its facilities are subject to regular inspections. The Irwin County Detention Center has repeatedly been found to operate in compliance with ICE's performance standards, the agency said.

Comprehensive medical care is provided to all individuals in ICE custody and care decisions are made by medical personnel, not law enforcement, the agency said.

LaSalle Corrections, the private company that runs the detention center, did not immediately respond to a request for comment.

Wooten said in the complaint that she and other nurses were alarmed at the rate at which immigrant women at the facility were receiving hysterectomies, and called an unnamed gynecologist who worked outside the facility "the uterus collector."

"I've had several inmates tell me that they've been to see the doctor and they've had hysterectomies and they don't know why they went or why they're going," Wooten said, according to the complaint.

NBCU002297

"These immigrant women, I don't think they really, totally, all the way understand this is what's going to happen depending on who explains it to them," she said.

In one case, the doctor removed the wrong ovary from a detainee and she ended up having her other ovary removed and wound up with a total hysterectomy, Wooten said, according to the complaint.

"The new shocking revelations about the abuses against women's bodies must lead to the immediate closure of this horrid facility," Azadeh Shahshahani, legal and advocacy director at Project South, said in a statement. "ICE and the private prison corporation must be held accountable."

The facility houses immigrant detainees in the custody of Immigration and Customs Enforcement, which is a part of the Department of Homeland Security. It also houses inmates for Irwin County and the U.S. Marshals Service, according to The Associated Press.

The complaint cites both allegations from unnamed detained immigrants and Wooten.

Project South, Georgia Detention Watch, Georgia Latino Alliance for Human Rights and South Georgia Immigrant Support Network filed the complaint on behalf of detained immigrants at the center and Wooten.

Wooten was demoted in July from a full-time nurse to "as-needed" after missing work because she had coronavirus symptoms. She said she believes the demotion was in retaliation for raising coronavirus protocol concerns, according to the complaint.

She also said that there was not enough active testing of the immigrant detainees for the coronavirus and that the facility was not "reporting all these cases that are positive," meaning the number of cases at the facility was possibly much higher than that reported by ICE.

The complaint said that men and women at the detention center "overwhelmingly reported not being tested for Covid-19 from March until August 18," when those in the ICE facility were given the option to be tested.

A woman reported that 100 women slept in a unit where women "coughed, had fever and other discomforts, but officers did not listen to them when they reported their health problems," and that they were never tested for Covid-19, according to the complaint.

"After demanding that the sick women be taken to the medical unit, she reported that the women were finally taken but were brought back within an hour and just given pain killers," the complaint said.

Wooten also claimed that it was common practice for a sick call nurse to shred medical request forms from detainees requesting to go to the medical unit and fabricate records such as vital signs without seeing the patient seeking help, the complaint said.

ICE said in its statement that its epidemiologists have been continually tracking the outbreak, regularly updating its infection prevention and control protocols, and issuing guidance to staff for the management of potential exposure among detainees.

ICE said on its website that as of Sept. 13, there were 42 confirmed cases of Covid-19 among its detainees at Irwin County Detention Center, and 5,772 in all of its facilities, with six overall deaths.

***Follow NBC Latino on Facebook, Twitter and Instagram.***

NBCU002298

# Exhibit 8

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF GEORGIA**
**WAYCROSS DIVISION**

DR. MAHENDRA AMIN, M.D.,

        Plaintiff,

    v.

NBCUNIVERSAL MEDIA, LLC,

        Defendant.

Case No. 5:21-cv-00056-LGW-BWC

## DEFENDANT'S RULE 26(a) INITIAL DISCLOSURE STATEMENT

Defendant NBCUniversal Media, LLC ("NBCU" or "Defendant") by and through its undersigned attorneys, hereby submits its Initial Disclosures pursuant to Rule 26(a)(1) of the Federal Rules of Civil Procedure. Defendant reserves the right to supplement these disclosures.

By making these disclosures, Defendant does not represent that it is identifying every document, tangible thing, or witness possibly relevant to this lawsuit. Nor does Defendant waive its right to object, on the basis of any privilege, the work product doctrine, relevancy, undue burden, or any other valid objection, to the production of any document or tangible thing disclosed. Rather, Defendant's disclosures represent a good faith effort to identify information that it reasonably believes is discoverable and which may be used to support its claims or defenses as is required under Rule 26(a)(1).

Defendant's disclosures are made without waiving, in any way: (1) the right to object on the grounds of competency, privilege, relevancy, materiality, hearsay, or any other proper ground, to the use of such information, for any purpose, in whole or in part, in any subsequent proceeding in this action or any other actions; and (2) the right to object on any and all proper grounds, at any

time, to any other discovery request or proceeding involving or relating to the subject matter of these disclosures.   To the extent Defendant believes that some of the below categories of documents in its possession, custody, and/or control contain confidential commercial and/or trade secret information, such documents will be produced only pursuant to a protective order appropriately limiting the use, control, disclosure, and ultimate disposition of the data and information therein.

All of the following disclosures are made subject to the above objections and qualifications.

## I.
## IDENTITY OF INDIVIDUALS LIKELY
## TO HAVE DISCOVERABLE INFORMATION

The following persons are reasonably likely to have discoverable information that Defendant may use to support its claims and defenses in the above-captioned action.   Defendant has not provided contact information where it does not have such information and/or such information is already known or otherwise readily available to Plaintiff.   Defendant does not consent for Plaintiff to directly contact any of its current or former employees or independent contractors listed below.   Attempts to contact these individuals should be directed to the undersigned counsel.

| Witness Name | Subject(s) of Testimony | Contact Information |
|---|---|---|
| Dr. Mahendra Amin | Plaintiff's reputation; substantial truth of the allegedly defamatory publication; Plaintiff's alleged damages. | c/o Stacey Godfrey Evans STACEY EVANS LAW 4200 Northside Parkway NW Bldg One; Suite 200 Atlanta, GA 30327 (770) 779-9602<br><br>Scott R. Grubman CHILIVIS GRUBMAN DALBEY & WARNER LLP 1834 Independence Square Atlanta, GA 30338 (404) 233-4171 |

2

| | | |
|---|---|---|
| Employees at Dr. Amin's medical office | Plaintiff's reputation; substantial truth of the allegedly defamatory publication; Plaintiff's alleged damages. | Unknown |
| Nicolle Wallace | Preparation and telecast of the allegedly defamatory publications. | c/o Davis Wright Tremaine LLP 1251 Avenue of the Americas 21st Floor New York, New York 10020 (212) 489-8230 |
| Patrick Burkey | Preparation and telecast of the allegedly defamatory publications. | c/o Davis Wright Tremaine LLP 1251 Avenue of the Americas 21st Floor New York, New York 10020 (212) 489-8230 |
| Rachel Maddow | Preparation and telecast of the allegedly defamatory publications. | c/o Davis Wright Tremaine LLP 1251 Avenue of the Americas 21st Floor New York, New York 10020 (212) 489-8230 |
| Cory Gnazzo | Preparation and telecast of the allegedly defamatory publications. | c/o Davis Wright Tremaine LLP 1251 Avenue of the Americas 21st Floor New York, New York 10020 (212) 489-8230 |
| Chris Hayes | Preparation and telecast of the allegedly defamatory publications. | c/o Davis Wright Tremaine LLP 1251 Avenue of the Americas 21st Floor New York, New York 10020 (212) 489-8230 |
| Denis Horgan | Preparation and telecast of the allegedly defamatory publications. | c/o Davis Wright Tremaine LLP 1251 Avenue of the Americas 21st Floor New York, New York 10020 (212) 489-8230 |
| Jacob Soboroff | Preparation and telecast of the allegedly defamatory publications. | c/o Davis Wright Tremaine LLP 1251 Avenue of the Americas 21st Floor New York, New York 10020 (212) 489-8230 |
| Julia Ainsley | Preparation and telecast of the allegedly defamatory publications. | c/o Davis Wright Tremaine LLP 1251 Avenue of the Americas 21st Floor New York, New York 10020 (212) 489-8230 |

| Dawn Wooten | Plaintiff's reputation; substantial truth of the allegedly defamatory publications. | Unknown |
|---|---|---|
| Benjamin Osorio | Substantial truth of the allegedly defamatory publications. | Murray Osorio 4103 Chain Bridge Road, Suite 300 Fairfax, VA 22030 (703) 352-2399 |
| Pauline Binam | Substantial truth of the allegedly defamatory publications. | Unknown |
| Detainees from the Irwin County Detention Center who received medical care from Dr. Amin | Substantial truth of the allegedly defamatory publications. | Unknown |
| Plaintiffs in *Oldaker v. Giles* (Case No. 7:20-cv-00224-WLS) | Substantial truth of the allegedly defamatory publications. | c/o David N. Dreyer Dreyer Sterling, LLC 437 Memorial Dr., SE, Ste. A-2 Atlanta, GA 30312 (404) 234-4447 |
| Representative(s) from Project South | Substantial truth of the allegedly defamatory publications; government activity related to Plaintiff and the Irwin County Detention Center. | 9 Gammon Street SE Atlanta, GA 30315 (404) 622-0602 |
| Representative(s) from Immigration and Customs Enforcement | Plaintiff's reputation; substantial truth of the allegedly defamatory publications; government activity related to Plaintiff and the Irwin County Detention Center. | U.S. Immigration and Customs Enforcement Office of the Principal Legal Advisor 500 12th Street, SW, Mailstop 5900 Washington, DC 20536 |
| Marteka George | Plaintiff's reputation; substantial truth of the allegedly defamatory publications; government activity related to Plaintiff and the Irwin County Detention Center. | Unknown |
| David Paulk | Plaintiff's reputation; substantial truth of the allegedly defamatory publications; government activity related to Plaintiff and the Irwin County Detention Center. | Unknown |

| Representative(s) from the Irwin County Detention Center | Plaintiff's reputation; substantial truth of the allegedly defamatory publications; government activity related to Plaintiff and the Irwin County Detention Center. | 132 Cotton Drive<br>Ocilla, GA 31774<br>(229) 468-4121 |
|---|---|---|
| Representative(s) from LaSalle Corrections | Plaintiff's reputation; substantial truth of the allegedly defamatory publications; government activity related to Plaintiff and the Irwin County Detention Center. | 192 Bastille Lane, Suite 200<br>Ruston, Louisiana 71270<br>(318) 232-1500 |
| Representative(s) from the Department of Homeland Security | Substantial truth of the allegedly defamatory publications; government activity related to Plaintiff and the Irwin County Detention Center. | The Honorable Alejandro Mayorkas<br>Secretary of Homeland Security<br>Washington, DC 20528 |
| Representative(s) from the Federal Bureau of Investigation | Substantial truth of the allegedly defamatory publications; government activity related to Plaintiff and the Irwin County Detention Center. | 935 Pennsylvania Avenue NW<br>Washington, DC 20535 |
| Representative(s) from the Department of Justice | Substantial truth of the allegedly defamatory publications; government activity related to Plaintiff and the Irwin County Detention Center. | U.S. Department of Justice<br>950 Pennsylvania Avenue, NW<br>Washington, DC 20530-0001 |

## II.
## CATEGORIES AND LOCATION OF RELEVANT DOCUMENTS

The following categories of documents and tangible things are in the possession, custody, or control of Defendant, and may be used by Defendant to support its defenses in the above-captioned action:

1) Documents relating to the publication of the allegedly defamatory statements;

2) Video recordings, transcripts, and copies of the news reports containing the allegedly defamatory statements; and

3) Documents showing that Plaintiff suffered no damages as a direct result of the allegedly defamatory statements.

## III.
## COMPUTATION OF DAMAGES

Defendant makes no claim for damages and thus have no computation of damages.

## IV.
## RELEVANT INSURANCE POLICIES

NBCU currently does not have reason to believe that any insurance business may be liable to provide coverage for part or all of a possible judgment in this action. NBCU reserves the right to supplement the foregoing disclosure as additional information becomes known to it.

Dated: January 10, 2022

/s/ Elizabeth A. McNamara
Elizabeth A. McNamara
(admitted *pro hac vice*)
Amanda B. Levine
(admitted *pro hac vice*)
DAVIS WRIGHT TREMAINE LLP
1251 Avenue of the Americas, 21st Floor
New York, NY 10020-1104
Tel: (212) 489-8230
lizmcnamara@dwt.com
amandalevine@dwt.com

/s/ Cynthia L. Counts
Cynthia L. Counts
Georgia Bar No. 190280
FISHERBROYLES, LLP
945 East Paces Ferry Rd. NE, Suite 2000
Atlanta, GA 30326
(404) 550-6233
cynthia.counts@fisherbroyles.com

*Attorneys for Defendant*

6

## CERTIFICATE OF SERVICE

The undersigned certifies that on the 10th day of January, 2022, a true and correct copy of the foregoing document was served upon the following via email:

Stacey Godfrey Evans
sevans@staceyevanlaw.com

Tiffany N. Watkins
twatkins@staceyevanslaw.com

Scott R. Grubman
sgrubman@cglawfirm.com

and that a true and correct copy of the foregoing has been served upon the following via first class mail:

Stacey Godfrey Evans
STACEY EVANS LAW
4200 Northside Parkway NW
Bldg One; Suite 200
Atlanta, GA 30327

Tiffany N. Watkins
STACEY EVANS LAW
4200 Northside Parkway NW
Bldg One; Suite 200
Atlanta, GA 30327

Scott R. Grubman
CHILIVIS GRUBMAN DALBEY & WARNER LLP
1834 Independence Square
Atlanta, GA 30338

*Amanda B. Levine*
Amanda B. Levine
(admitted *pro hac vice*)
DAVIS WRIGHT TREMAINE LLP
1251 Avenue of the Americas, 21st Floor
New York, NY 10028
Telephone: (212) 489-8230
amandalevine@dwt.com

*Attorneys for Defendant*

# Exhibit 9

 Gmail

Azadeh Shahshahani <shahshahaniazadeh@gmail.com>

---

## Re: [EXTERNAL] Re: CRCL complaint
1 message

**Soboroff, Jacob (NBCUniversal)** <jacob.soboroff@nbcuni.com>                    Tue, Sep 15, 2020 at 9:45 AM
To: John Whitty <JohnW@whistleblower.org>
Cc: Azadeh Shahshahani <azadeh@projectsouth.org>, Dana Gold <DanaG@whistleblower.org>, Priyanka Bhatt
<priyanka@projectsouth.org>

747-256-1545

On Sep 15, 2020, at 6:43 AM, John Whitty <JohnW@whistleblower.org> wrote:

Can I call you? What number?

John Whitty

*Staff Attorney*

Government Accountability Project

1612 K St NW, Suite 1100

Washington, DC 20006

202.457.0034 x196

301.806.4009 (mobile/Signal/WhatsApp)

www.whistleblower.org

*Government Accountability Project is the nation's leading whistleblower protection and advocacy organization, and is a non-partisan, non-profit 501(c)(3) public-interest organization. Government Accountability Project has actively promoted government and corporate accountability since 1977.*

CONFIDENTIALITY NOTICE: This email including attachment(s) are for the sole use of the intended recipient(s) and may contain confidential and privileged information protected by law. Any unauthorized review, use, disclosure or distribution of this communication and related metadata is prohibited.

---

**From:** "Soboroff, Jacob (NBCUniversal)" <jacob.soboroff@nbcuni.com>
**Date:** Tuesday, September 15, 2020 at 9:40 AM
**To:** John Whitty <JohnW@whistleblower.org>
**Cc:** Azadeh Shahshahani <azadeh@projectsouth.org>, Dana Gold <DanaG@whistleblower.org>, Priyanka Bhatt <priyanka@projectsouth.org>
**Subject:** Re: [EXTERNAL] Re: CRCL complaint



EXHIBIT
56

On Sep 15, 2020, at 6:36 AM, John Whitty <JohnW@whistleblower.org> wrote:

Would you be available to talk with Dawn in the next hour? We're trying to see if she has availability…

> John Whitty
>
> *Staff Attorney*
>
> Government Accountability Project
>
> 1612 K St NW, Suite 1100
>
> Washington, DC 20006
>
> 202.457.0034 x196
>
> 301.806.4009 (mobile/Signal/WhatsApp)
>
> www.whistleblower.org

*Government Accountability Project is the nation's leading whistleblower protection and advocacy organization, and is a non-partisan, non-profit 501(c)(3) public-interest organization. Government Accountability Project has actively promoted government and corporate accountability since 1977.*

CONFIDENTIALITY NOTICE: This email including attachment(s) are for the sole use of the intended recipient(s) and may contain confidential and privileged information protected by law. Any unauthorized review, use, disclosure or distribution of this communication and related metadata is prohibited.

---

**From:** "Soboroff, Jacob (NBCUniversal)" <jacob.soboroff@nbcuni.com>
**Date:** Tuesday, September 15, 2020 at 9:30 AM
**To:** John Whitty <JohnW@whistleblower.org>
**Cc:** Azadeh Shahshahani <azadeh@projectsouth.org>, Dana Gold <DanaG@whistleblower.org>, Priyanka Bhatt <priyanka@projectsouth.org>
**Subject:** Re: [EXTERNAL] Re: CRCL complaint

Would 2pm ET or between 7 and 9pm ET work?

> On Sep 15, 2020, at 4:41 AM, John Whitty <JohnW@whistleblower.org> wrote:
>
> Hi Jacob,
>
> Thanks for your interest. Dana and I have a standing meeting to discuss immigration client matters at 3pm today – It might be better for us if we could meet with you at another time. I'm otherwise open in the pm.

-John

John Whitty

*Staff Attorney*

Government Accountability Project

1612 K St NW, Suite 1100

Washington, DC 20006

202.457.0034 x196

301.806.4009 (mobile/Signal/WhatsApp)

www.whistleblower.org

*Government Accountability Project is the nation's leading whistleblower protection and advocacy organization, and is a non-partisan, non-profit 501(c)(3) public-interest organization. Government Accountability Project has actively promoted government and corporate accountability since 1977.*

*CONFIDENTIALITY NOTICE: This email including attachment(s) are for the sole use of the intended recipient(s) and may contain confidential and privileged information protected by law. Any unauthorized review, use, disclosure or distribution of this communication and related metadata is prohibited.*

---

**From:** "Soboroff, Jacob (NBCUniversal)" <jacob.soboroff@nbcuni.com>
**Date:** Tuesday, September 15, 2020 at 7:26 AM
**To:** Azadeh Shahshahani <azadeh@projectsouth.org>
**Cc:** Dana Gold <DanaG@whistleblower.org>, John Whitty <JohnW@whistleblower.org>, Priyanka Bhatt <priyanka@projectsouth.org>
**Subject:** Re: [EXTERNAL] Re: CRCL complaint

Would 3PM ET work today?

On Sep 14, 2020, at 8:34 PM, Soboroff, Jacob (NBCUniversal) <jacob.soboroff@nbcuni.com> wrote:

Thank you, Azadeh, it was good speaking with you as well. Is there a time that works for you all?

<azadeh@projectsouth.org> wrote:

Good evening Jacob, was good speaking with you earlier.

Copying our co-counsel with the Government Accountability Project as well as my colleague Priyanka Bhatt.

We would like for you to speak to Ms. Wooten at a mutually convenient time.

Best,

Azadeh

On Mon, Sep 14, 2020 at 5:55 PM Soboroff, Jacob (NBCUniversal) <jacob.soboroff@nbcuni.com> wrote:

> Good afternoon, this is Jacob soboroff with NBC news. Do you have a minute to speak about the CRCL complaint?
>
> Thanks.
>
> I'm at 747-256-1545

--

Azadeh N. Shahshahani

Legal & Advocacy Director

Project South

azadeh@projectsouth.org

404.622.0602

9 Gammon Ave SE Atlanta, GA 30315

Project South 000041