# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | |
|---|---|
| **Dr. Mahendra Amin, M.D.**, | |
| *Plaintiff,* | Civil Action No. |
| | 1:23-cv-04492-MLB-RDC |
| v. | |
| **NBCUniversal Media, LLC.**, | |
| *Defendant.* | |

## NON-PARTY AZADEH SHAHSHAHANI'S REPLY TO PLAINTIFF'S RESPONSE TO MOTION TO QUASH

Dr. Amin, through counsel Stacey Evans, has engaged in an almost unheard-of campaign of rampant discovery misconduct through their abuse of the subpoena power. Amin has orchestrated a concerted effort to attack, harass, and vilify multiple human rights attorneys throughout the country who represented or are currently representing the immigrant women who allege human rights and medical abuses against him through a class action lawsuit. Dr. Amin and Ms. Evans repeatedly engage in sanctionable conduct by seeking privileged information. Because they have done so throughout different jurisdictions, they have managed to fly under the radar with impunity. Not one court was made aware of his concerted campaign of sanctionable misconduct prior to the filing of this Motion to Quash.

Concerning the allegations made against Dr. Amin, Chairman of the Permanent Subcommittee on Investigations Committee on Homeland Security and

Governmental Affairs, U.S. Senator Jon Ossoff, described the Senate's 18-month investigation and the findings as detailed in the 108-page report stating:

> "Our findings are deeply disturbing," Sen. Jon Ossoff (D-Ga.), chair of the Senate Homeland Security and Governmental Affairs Committee's permanent subcommittee on investigations, said at a hearing Tuesday. Denouncing what he called "a catastrophic failure by the federal government to respect basic human rights," Ossoff said Amin scheduled surgeries when less-invasive options were available, performed "unnecessary injections and treatments" and often proceeded without the patients' informed consent.[1]

Dr. Amin filed suit against NBC-U for its reports concerning the complaints brought against him in the class action lawsuit he is defending in the Middle District of Georgia where Azadeh Shahshahani is current, active litigation counsel for the plaintiffs. *Oldaker v. Giles*, Case No. 7:20-cv-00224-WLS-MSH (M.D. Ga.). The *Oldaker* complaint alleges that Dr. Amin performed invasive, nonconsensual, and medically unnecessary procedures and surgeries against immigrant women detained at the Irwin County Detention Center in Georgia. (*See* Exhibit 3, Qureshi Decl. ¶ 3, Ex. A (Oldaker Second Am. Compl.) ¶ 77.) Discovery is stayed in *Oldaker* in part

---

[1] https://www.washingtonpost.com/national-security/2022/11/15/ice-amin-women-medical-mistreatment/ (*See* Exhibit 1.) Also see: "According to expert medical analysis conducted for the Subcommittee, under Dr. Amin's care, female detainees appear to have undergone excessive, invasive, and often unnecessary gynecological procedures. Over the course of its review, the Subcommittee determined that Dr. Amin holds no board certifications, and in 2013 the Department of Justice ("DOJ") and the State of Georgia sued Dr. Amin, claiming he had committed Medicaid fraud by ordering unnecessary and excessive medical procedures.6 That lawsuit was settled in 2015, when Dr. Amin and his codefendants paid a $520,000 settlement to the federal government while admitting no wrongdoing." (*See* Exhibit 2, United States Senate Medical Mistreatment Of Women In Ice Detention Staff Report, p. 4.)

due to pending criminal investigations into the allegations of Amin's misconduct. (Exhibit 4, Orders, ECF 319 & 322, *Oldaker v. Giles*, Case No. 7:20-cv-00224-WLS-MSH (M.D. Ga. Aug. 11, 2023).) Now, Amin is abusing the subpoena power in his defamation suit in an effort to engage in an end-around to circumvent the *Oldaker* Court's stay of discovery and gain a litigation advantage in his defense by seeking to obtain information protected by confidential attorney-client privileged communications and the mental impressions, conclusions, opinions, or legal theories of the human rights attorneys who represent these immigrant women subjected to medical abuse.

Dr. Amin, through counsel, made his contempt for Ms. Shahshahani clear by having her stalked and harassed for months—and disdainfully disparages her description as an "attorney activist" citing her movement lawyering article where she describes her work for Project South, that is based in Black radical tradition[2] as if that is an insult rather than a rich history rooted in disrupting anti-colonialism and anti-slavery efforts originating from many greats.[3] Nevertheless, Amin's conduct in targeting human rights attorneys and progressive organizations throughout the country, having served subpoenas in D.C., New York, and throughout the South, are

---

[2]https://lsa.umich.edu/ncid/news-events/all-news/spark/series-essays/spark-series-black-radical-tradition.html
[3]https://naacp.org/find-resources/history-explained/civil-rights-leaders/thurgood-marshall#:~:text=Thurgood%20Marshall%20was%20a%20civil,the%20historic%201954%20Brown%20v; https://en.wikipedia.org/wiki/Derrick_Bell

a complete perversion of legitimate judicial discovery process. His quest to open Pandora's box by attempting to make it an acceptable norm to target opposing counsel would create a chilling effect for human rights attorneys nationwide if this practice became precedent. Attorneys who file suits to enforce civil rights will consistently become targets subject to deposition by their opposing counsel.

In an attempt to show that there is no danger of delving into topics protected by attorney client privilege or work-product privilege, Dr. Amin notes that other depositions of fact witnesses who are also attorneys have already occurred, and that Ms. Shahshahani is the only fact witness who is also an attorney that contests the propriety of the sitting for a deposition (ECF-8, p. 9 f.n.2), when the reality is that she is current, active opposing counsel in an underlying case and the other attorneys are not, they are former counsel but not active opposing counsel.

In sum, Dr. Amin and his counsel are not telling the truth regarding these depositions, making the following misrepresentations before this Court:

## 1. Amin Falsely Tells This Court He Is Not Seeking Privileged Communication and Information In His Deposition When This Is What His Attorney Stacey Evans Has Done Every Single Time She Deposed An Attorney:

It is unclear where Dr. Amin's counsel Stacey Evans[4] learned to consider this behavior acceptable or what playbook she is operating from, but this type of

---

[4] Certainly, no one is suggesting she learned it from another attorney, having trained under one of the most well-known defamation lawyers in Georgia. https://en.wikipedia.org/wiki/L._Lin_Wood

behavior—which includes terrorizing Ms. Shahshahani with stalking and harassment for months with strangers jumping out from her bushes and interrogating her neighbors; Ms. Evans screaming at the attorneys she deposes in an unhinged manner; and Ms. Evans repeatedly seeking privileged information from attorney deponents hundreds of times—is conduct worthy of sanctions that should not be solely directed towards Dr. Amin but also toward his attorneys at Stacey Evans Law.

### A. Stacey Evans Sought Privileged Information Ninety-Three Times In the Deposition of Attorney John Whitty And Engaged in Harassing Behavior Which Caused Undue Burden When She Would Not Agree To Stop Screaming At The Attorney Deponent or His Attorney:

Ms. Evans' display of unhinged behavior at the deposition of Attorney John Whitty is evidence that Dr. Amin's tactic of deposing opposing counsel is nothing more but a harassing, adversarial tactic intended to cause undue burden, and "does nothing for the administration of justice, but rather prolongs and increases the costs of litigation, demeans the profession and constitutes an abuse of the discovery process." *Shelton v. Am. Motors Corp.*, 805 F.2d 1323, 1327 (8th Cir. 1986). Not only did she scream at the deponent and counsel, but admitted she would keep shouting at them:

> MS. AYERS:· You need to let me – and you need to stop shouting.
> MS. EVANS:· You interrupted me.
> MS. AYERS:· You need to stop shouting at me first.
> MS. EVANS:· I'm not going to stop shouting at you if you keep interrupting me.
> ***MS. AYERS:· Are you going to keep shouting at me in a deposition?***
> ***MS. EVANS:· Yes.***

MS. AYERS:· We will walk right out.· Do not shout at me again.

MS. EVANS:· Do not interrupt me again.

MS. AYERS:· Do not shout at this witness.

MS. EVANS:· I'm not shouting at the witness.

MS. AYERS:· Do not call his systems bogus.· That's completely improper.

MS. EVANS:· Do not interrupt me.

MS. AYERS:· So return to treating our client with respect --

MS. EVANS:· I am treating him with respect.

MS. AYERS:· -- and we will stay.

MS. EVANS:· But you also have to treat me with respect.

MS. AYERS:· No, you're not.· You called him bogus, and you started screaming.

MS. EVANS:· I didn't call him bogus.

MS. AYERS:· You called him bogus.

MS. EVANS:· I called the objection bogus.

MS. AYERS:· Nor have I -- nor have I screamed at you.· So you're out of line.

MS. EVANS:· Oh, my God.

MS. AYERS:· Stop acting like that.

MS. EVANS:· Don't tell me what to do.

MS. AYERS:· And you don't scream at me. Don't scream at my client.

(Exhibit 5, Whitty Dep. 37:11-39:6, Sept. 8, 2023.)

Mr. Whitty is the current Deputy Director of Operations of the United States House of Representatives and is the *former counsel* for Nurse Whistleblower Dawn Wooten at the Government Accountability Project.[5] Most relevantly, throughout Mr. Whitty's deposition, Ms. Evans sought privileged information approximately **ninety-three different times**. (*See generally* Whitty Dep.) Ms. Evans asked one or more objectionable question on nearly every page of the deposition transcript,

---

[5]https://whistleblower.org/blog/if-there-is-not-a-change-there-is-not-going-to-be-a-change-dawn-wootens-impact-one-year-later/ (*See* Exhibit 6.)

causing the deponent the undue burden of having to bear with this tactless behavior and wasted his time having to sit for the deposition since the majority of the deposition did not seek relevant information but rather information protected by the attorney client and work product privileges. *Id.*

Ms. Evans has engaged in the same tactics throughout all of the attorney depositions she has conducted and would undoubtedly do the same were she to depose Ms. Shahshahani. As the Eleventh Circuit has quoted: "'Past behavior is the best predictor of future behavior,' and those yearly instances of injury…constitute a fair predictor of future harm. After all, 'what's past is prologue.' William Shakespeare, The Tempest, act 2, sc. 1 (1611)." *J W by & through Tammy Williams v. Birmingham Bd. of Educ.*, 904 F.3d 1248, 1275 (11th Cir. 2018) (citation omitted).

Ms. Shahshahani represented Nurse Whistleblower Wooten and is current active co-counsel for the immigrant detainees in the ongoing class action lawsuit against Dr. Amin. Amin suggests that because Ms. Shahshahani spoke to journalists, this means the questioning will not veer into privileged communications. Nevertheless, all of the attorneys deposed so far have also spoken to journalists and this has done nothing to stem the onslaught of objectionable privilege-seeking questions Amin attempted throughout each deposition. The subpoenas issued to Ms. Shahshahani and other civil rights attorneys are simply a guise by Amin to gain a litigation advantage and interfere with the attorneys' ability to effectively represent

their clients. Perhaps, it is even an attempt to disqualify these attorneys by having them testify as fact witnesses.

Most importantly, it is impossible to narrowly construe or limit the questions strictly to that of communications with journalists because it would be impossible for an attorney–or anyone for that matter–to compartmentalize such questions when the factual basis of the answers all stem from information gleaned through attorney communications with clients, attorney work product, litigation preparation, trial strategy, communication, and shared litigation strategies with other co-counsel.

The core goal of the work-product doctrine is to "preserve a zone of privacy in which a lawyer can prepare and develop legal theories and strategies 'with an eye toward litigation,' free from unnecessary intrusion by his adversaries." *United States v. Adlman*, 134 F.3d 1194, 1196 (2d Cir. 1998)(quoting *Hickman v. Taylor*, 329 U.S. 495, 510-11 (1947). The only plausible answers that can stem from Amin's questions pertaining to Ms. Shahshahani's communications with journalists would absolutely be protected by the privilege as they would tend to reveal her mental impressions with an 'eye toward litigation' and communications with her clients. *See Pemberton v. Republic Servs., Inc.*, 308 F.R.D. 195, 202 (E.D. Mo. 2015) (finding that materials created in an effort to foster a public environment which would directly impact the potential for litigation while attempting to provide information to the public were protected by the work product privilege and a was considered a legitimate activity

8

within the scope of proper litigation strategy.)

Dr. Amin is able to obtain information surrounding the communications with journalists through other means. Amin states that deposing Ms. Shahshahani would be relevant to probing the credibility of these journalists, (ECF-8, p. 17) however, deposing her for this purpose is unnecessary and duplicative because he is already in possession of all written communications and has the ability to depose the journalist witnesses. Just because the other means of obtaining the information he seeks may turn out to be fruitless, does not mean that Dr. Amin is entitled to pose an undue burden on his opposing counsel by subjecting her questioning that would be impossible for her to answer without divulging attorney communications with clients and other work product privilege, such as her litigation strategy with co-counsel.

Dr. Amin has not met his burden of establishing the relevancy of the information he wishes to inquire into. *See Hickman*, 329 U.S. 495 (stating, "the general policy against invading the privacy of an attorney's course of preparation is so well recognized and so essential to the orderly working of our legal procedure that a *burden rests on the one who would invade that privacy* to establish adequate reasons to justify the production." (Emphasis added)). Amin makes a broad assertion that the testimony he seeks is "obviously relevant" (ECF-8, pp. 14-15), however as emphasized above, it is simply impossible for Ms. Shahshahani to answer questions pertaining to these communications when all the facts surrounding such are based

on communications with clients, attorney work product, litigation preparation, trial strategy, and communications with other co-counsel.

**B. Stacey Evans Sought To Ask Privileged Information In The Deposition of Attorney Andrew Free:**

Amin's counsel Ms. Evans deposed Attorney Andrew Free who had represented detainee women subjected to medical abuse. During this deposition, she asked him questions pertaining to the current class action litigation (Exhibit 7, Free Dep. 276, Aug. 15, 2023), asked him what his detainee clients had told him which were attorney client privileged communications (*id.* at 92:14-19), and even asked him what his own counsel told him: "Mr. Free during your meetings with counsel did your counsel tell you…." *Id.* at 26:5-10.

**C. Stacey Evans Sought and Obtained Attorney Client Privileged Communications In The Depositions of Attorney Sarah Owings:**

During the deposition of Attorney Sarah Owings, who formerly represented detainees, Ms. Evans repeatedly questioned her about what she and her clients discussed with one another, i.e., attorney client privileged communications, such as "had you ever heard any complaints from Ms. Baton [the client] regarding medical services at Irwin County Detention Center?"(Exhibit 8, Owings Dep. 9:9-11, 10-11, Aug. 25, 2023.) Additionally, she routinely veered into work product privilege and communications with other attorneys about their confidential attorney client privileged communications. *Id.* at 15:1-16.

10

## 2. Amin Falsely States That No Attorney Has Filed A Motion To Quash Which is Misleading And Deceptive:

Amin's counsel misleads the Court by such a suggestion as Amin is well aware that multiple attorneys intend to file motions to quash and/or protective order. (*See* Exhibit 9, Notice of Motion to Quash Subpoena For Deposition of Elora Mukerjee and to Stay the Deposition Pending Outcome of the Motion to Quash, filed by the Attorneys with the National Immigration Project of the National Lawyers Guild representing Attorney Elora Mukerjee.) Moreover, in Amin's brief (ECF-8, p. 9 f.n.2), he states: "counsel for Dr. Amin and Ms. Counts are conferring" leaving out the Court's recommendation (in a non-transcribed teleconference) that the best solution would be for Ms. Evans to file a Motion to Quash the subpoena/ Motion for Protective Order regarding Ms. Evans' attempts to notice the deposition of her own opposing counsel, Ms. Counts, in the defamation case at bar before the Southern District of Georgia. (*See* Exhibit 10.) In fact, according to Ms. Counts (counsel for NBCU that Ms. Evans has also tried to subpoena for a deposition), not only did the Southern District state that this subpoena appeared to be disproportional to the needs of the case and the Court was disinclined to order "discovery on discovery," but recommended that the best solution was to have Ms. Counts file the motion to quash the subpoena in the defamation case. *Id*. Ms. Counts stated, the court "expressed concerns as to whether [it] would have jurisdiction over other subpoenas that have been issued on counsel [i.e., Ms. Shahshahani's] but that the Court did have power

to protect counsel in active litigation from a subpoena" in the case pending in the Southern District. *Id*.

**3. Amin Falsely Suggests That The Previous Depositions of Other Attorneys Are Similar Situations When They Are Not: None Of The Previous Attorneys Are Active Counsel In Litigation, Where Azadeh Shahshahani Is Current, Active Counsel In The Underlying Class Action Litigation:**

Amin falsely suggests that all the previous attorneys he has deposed are similar to Ms. Shahshahani, however that is inaccurate. Dr. Amin misrepresents the facts surrounding these depositions because these other attorneys were not actively involved in any underlying case pending against Dr. Amin. However, those depositions have shown the dangerous nature of attorney depositions. The sheer volume of questions asked that delved into protected information involving the attorneys' former clients is enough to deter any client from divulging necessary information to assist their attorney in the preparation and litigation of their case. *See Shelton v. Am. Motors Corp.*, 805 F.2d 1323, 1327 (8th Cir. 1986) (discussing the chilling effect that the practice of deposing an opposing counsel will have on truthful communications from the client.) The fact that Ms. Shahshahani is currently opposing counsel in a class action suit brought against Amin magnifies the chilling effect of the deposition of an opposing counsel and puts the attorney at risk of disqualification. The blatant disregard Ms. Evans has for attorney client privilege can only be magnified when her deponent is in active pursuit of litigation against her client. *See* Exhibit 7, Free Dep. 26:5-10 ("Mr. Free during your meetings with

counsel **did your counsel tell you**…." ); *see also* Exhibit 8, Owings Dep. 9:9-11 ("had you ever heard any complaints from Ms. Baton [the client] regarding medical services at Irwin County Detention Center?").

As proven in reviewing all the depositions that Amin's counsel has previously taken, the risk of impinging upon the attorney-client privilege and work product protection is not just substantial in this case, but ***certain***, judging from what Ms. Evans has shown in *every deposition of an attorney thus far where she has sought privileged communications*.

The Eleventh Circuit has not itself adopted a specific rule on this issue of deposing opposing counsel. However, the issue has been addressed by numerous district courts within the Circuit, including those in Georgia and especially the Northern District. In *Langdale Company v. National Union Fire Insurance Company*, 2013 WL 12067452 (N.D. Ga., Judge Jones, 6/20/2013), Judge Jones applied the *Shelton* test and disallowed the deposition of opposing counsel. So too in *Floyd v. SunTrust Banks, Inc.*, C.A. No. 1:10-CV-2620-RWS (N.D. Ga., Judge Story, 6/30/2011), Judge Story applied *Shelton* and therefore quashed the Notice of Deposition of opposing counsel. And in *Bivens v. Select Portfolio Servicing, Inc.*, 2015 WL 11256612 (N.D. Ga., Judge Evans, 11/19/2015), Judge Evans, also relying on *Shelton* and on Judge Story's decision in *Floyd*, granted a motion to quash and prohibited the deposition of the opposing party's litigation counsel.

In sum, many courts state that depositions of opposing counsel are, "generally disfavored and call for "special scrutiny" because 'experience teaches that countenancing unbridled depositions of attorneys constitute an invitation to delay, disruption of the case, harassment, and perhaps disqualification of the attorney.'" *Sky Harbor Atlanta Ne., LLC v. Affiliated FM Ins. Co.,* No. 1:17-CV-3910-JPB, 2020 WL 762381, at *3 (N.D. Ga. Jan. 14, 2020), *report and recommendation adopted*, No. 1:17-CV-03910-JPB, 2020 WL 759215 (N.D. Ga. Feb. 4, 2020).

### 4. Azadeh Shahshahani should be awarded attorney fees and costs:

Rule 45(d)(1) provides that, "[a] party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction— which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply." Fed. R. Civ. P. 45(d)(1). Dr. Amin and his counsel have not even attempted to ensure that the information surrounding the communications they seek would not impose an undue burden. Ms. Evans' naked assurance that, "we are not seeking communications between Ms. Shahshahani and her clients that are appropriately privileged as communications seeking or giving legal advice" (ECF1-1, p. 3) has shown to be untrustworthy. Rather, the history of past performance reveals an almost unheard-of campaign of rampant discovery

misconduct and abuse of the subpoena power targeting the multiple human rights attorneys throughout the country who represented or are currently representing the immigrant women who allege human rights and medical abuses against him.

The Court alone has the power to stop this.

## 5. For the purposes of judicial economy, Azadeh Shahshahani opposes the transfer of the Motion to Quash to the Southern District of Georgia.

While it is true that Ms. Shahshahani originally filed this motion in the Southern District, Dr. Amin's counsel brought it to the undersigned's attention that jurisdiction was improper (*see* Exhibit 11) and as such, the motion was subsequently filed in this Court. The Southern District has already declined jurisdiction, (Exhibit 12, Order Denying Motion to Quash) and transferring this issue back to that court would constitute a waste of time and resources since this Court is already in possession of the briefs and has scheduled a conference on the issue. To the extent that the Southern District may also require a hearing on the issue, the location and associated travel time would be an additional burden on Ms. Shahshahani. For these reasons, Ms. Shahshahani rejects transfer of the motion and requests that this Court grant the Motion to Quash Dr. Amin's non-party deposition subpoena.

Respectfully submitted this 17th day of October 2023,

**WILLIAMS OINONEN LLC**

/s/ JULIE OINONEN
Julie Oinonen (Ga. Bar No. 722018)
*Counsel for Movant Azadeh Shahshahani*

15

3344 Peachtree Road NE, Suite 800
Atlanta, GA 30326-4807
(404) 654-0288/ (404) 592-6225 FAX
julie@goodgeorgialawyer.com

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Northern District of Georgia Local Rule 7.1(D), I hereby certify that the foregoing has been prepared using Times New Roman 14-point font in compliance with Local Rule 5.1.

/s/ JULIE OINONEN
Julie Oinonen (Ga Bar No. 722018)

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have served a true and correct copy of the foregoing NON-PARTY AZADEH SHAHSHAHANI'S REPLY TO PLAINTIFF'S RESPONSE TO MOTION TO QUASH with the Clerk of Court using the CM/ECF system which will automatically send email notification of such filing to all counsel of record.

Respectfully submitted this 17th day of October 2023,

**WILLIAMS OINONEN LLC**

<u>/s/ JULIE OINONEN</u>
Julie Oinonen (Ga. Bar No. 722018)
*Counsel for Movant Azadeh Shahshahani*

3344 Peachtree Road NE, Suite 800
Atlanta, GA 30326-4807
(404) 654-0288/ (404) 592-6225 FAX
julie@goodgeorgialawyer.com

Exhibit 1

# Senate report details medical mistreatment of female immigration detainees

## Authorities failed to halt years-long pattern of 'aggressive and unethical' treatment, report says

By [Maria Sacchetti](#)
 and
[Nick Miroff](#)
November 15, 2022 at 8:42 p.m. EST



Dawn Wooten, left, a nurse at Irwin County Detention Center in Ocilla, Ga., speaks at a September 2020 news conference in Atlanta protesting conditions at the immigration jail. (Jeff Amy/AP)
Listen
6 min

Share
Comment30

Women held at a privately run immigration jail in Georgia were probably subjected to unnecessary gynecological procedures, and Immigration and Customs
Enforcement authorities did not halt a years-long pattern of what medical experts called "aggressive and unethical" treatment, according to a report published Tuesday by a bipartisan Senate panel.

**Sign up for Fact Checker, our weekly review of what's true, false or in-between in politics.**

The 108-page report, the result of an 18-month investigation, examined claims made by immigrant advocates and a whistleblower, Dawn Wooten, who worked as a nurse at the Irwin County Detention Center in rural Georgia.
The inquiry did not substantiate claims that women at the facility**,** operated by the for-profit company LaSalle Corrections, had been subjected to mass hysterectomies, as advocates initially claimed. But the investigation found that Georgia physician Mahendra Amin appeared to have performed "excessive, invasive, and often unnecessary gynecological procedures" on dozens of women detained for deportation proceedings between 2017 and 2020.
Neither ICE nor La Salle Corrections took action until 2020, after the whistleblower came forward, the report said.
"Our findings are deeply disturbing," Sen. Jon Ossoff (D-Ga.), chair of the Senate Homeland Security and Governmental Affairs Committee's permanent subcommittee on investigations, said at a hearing Tuesday.
*ICE to stop detaining immigrants at two county jails under federal investigation*
Denouncing what he called "a catastrophic failure by the federal government to respect basic human rights," Ossoff said Amin scheduled surgeries when less-invasive options were available, performed "unnecessary injections and treatments" and often proceeded without the patients' informed consent.
Sen. Ron Johnson (R-Wis.), the ranking Republican on the subcommittee, and other GOP lawmakers were not at the hearing, but Johnson's name was on the report, and Ossoff thanked him and his staff for their work on the investigation.
From 2017 to 2020, Amin was the provider for 6.5 percent of all off-site obstetric and gynecological visits for ICE detainees nationwide. Yet he performed 82 percent of all "dilation and curettage" surgeries, 93 percent of all contraceptive injections and 94 percent of all laparoscopic surgery to remove lesions.
"One doctor," Ossoff said.
He said the subcommittee asked to interview Amin, then subpoenaed him when he refused. Ossoff said Amin invoked his Fifth Amendment right not to testify.
Amin's lawyer, Scott Grubman, defended Amin in an email to The Washington Post. Amin has filed lawsuits against a media outlet and an author who publicized the allegations, saying the claims against him were false.
"Dr. Amin has been practicing for nearly 40 years, and has never performed a procedure that was not, in his professional judgment, necessary and appropriate," Grubman said in the email. "Curiously, the Congressional Committee seems to have reached certain conclusions regarding Dr. Amin's medical care without requesting a single medical record

from Dr. Amin's office, proving that the Committee was not at all interested in the truth, but simply scoring political points."

Grubman's email did not respond to questions about why Amin took the Fifth or how Democratic or Republican lawmakers would gain politically from the report.

The Senate panel consulted with medical experts such as Peter Cherouny, an OB/GYN who previously conducted medical reviews for the Department of Health and Human Services and other federal agencies. Cherouny reviewed more than 16,600 pages of medical records that covered approximately 94 women treated by Amin, according to the report.

In the report, Cherouny found Amin's use of certain procedures to be "too aggressive" and "woefully behind the times," noting that Amin was not a board-certified physician who would be required to remain up-to-date on the most current medical practices.

Share this articleShare

Cherouny said the care Amin provided was "pretty good medicine for the 1980s, but we're not there anymore," according to the report.

*U.S. border reopens for some migrants as judge strikes down Trump-era policy*

Former detainees held at the Irwin facility filed a class-action lawsuit in 2020 against the jail, ICE, Amin, the Irwin County Hospital and other parties, alleging that the detainees had undergone nonconsensual and unnecessary gynecological procedures.

Amin has not been charged criminally, though the report says he was "under criminal investigation by multiple federal agencies" as of early 2022. Department of Homeland Security Inspector General Joseph Cuffari, who also testified at the hearing, confirmed that multiple agencies are still investigating the matter, including his.

In emotional testimony, Karina Cisneros Preciado, a mother of two who lives in Florida, said she was taken to Amin for a postpartum checkup in 2020, while she was in immigrant detention for several months. She testified that she was arrested after calling the police to report that her partner abused her. Authorities dropped criminal charges against her, she said, then transferred her to ICE for civil deportation proceedings.

She had been brought to the United States at age 8 from Mexico and had a 4-month-old daughter at the time of her arrest.

During the appointment, she said, Amin barely acknowledged her, roughly examined her pelvis, diagnosed her with a cyst and administered an injection. "Then he asks the nurse, 'How many more?' And he just walks off," she told the Senate panel.

She said she signed a piece of paper but didn't understand it.

Ossoff assailed Stewart D. Smith, assistant director of ICE Health Service Corps, for not properly vetting Amin. The senator said Amin had previously been sued by the Justice Department and the state of Georgia for allegedly "performing excessive and unnecessary procedures," had been dropped by a major insurer for "excessive malpractice claims" and was not board-certified.

"Are you not shocked that this happened under your watch?" Ossoff asked Smith, who called the testimony "very troubling."

Smith said ICE learned from the whistleblower in September 2020 of allegations of "forced medical procedures" and conducted a review the next month. ICE did not find evidence of any such procedures, he said in his written testimony, but immediately stopped sending patients to Amin "out of an abundance of caution and due to the seriousness of the allegations."

In May 2021, Homeland Security Secretary Alejandro Mayorkas said he would stop housing detainees at the Irwin County facility.

"ICE is firmly committed to ensuring all those in its custody receive appropriate medical care and are treated with respect and dignity," Smith said in his written testimony.

Pamela Hearn, medical director for LaSalle Corrections, said the private company had a "limited role" in detaining immigrants and transferring them to nearby health-care providers selected by Smith's office. In her written testimony, she said ICE "was solely authorized and responsible for vetting and credentialing all off-site medical providers to offer medical services to detainees."

Ossoff told Smith that if the committee had been able to background-check Amin and quantify the disproportionate number of procedures he was performing, then ICE should have, too.

"The data was warning you, but you weren't looking at it," Ossoff said. "And a lot of people got hurt."

# Exhibit 2

United States Senate
*PERMANENT SUBCOMMITTEE ON INVESTIGATIONS*
*Committee on Homeland Security and Governmental Affairs*

*Jon Ossoff, Chairman*
*Ron Johnson, Ranking Member*

# MEDICAL MISTREATMENT OF WOMEN IN ICE DETENTION

## STAFF REPORT

## PERMANENT SUBCOMMITTEE ON INVESTIGATIONS

## UNITED STATES SENATE



**RELEASED IN CONJUNCTION WITH THE
PERMANENT SUBCOMMITTEE ON INVESTIGATIONS
NOVEMBER 15, 2022 HEARING**

**SENATOR JON OSSOFF**
**Chairman**

**SENATOR RON JOHNSON**
**Ranking Minority Member**

**PERMANENT SUBCOMMITTEE ON INVESTIGATIONS**

**DOUGLAS S. PASTERNAK**
Staff Director

**CAITLIN WARNER**
Chief Counsel

**MEERAN AHN & DANIEL M. EISENBERG**
Senior Counsels

**TAYLOR BURNETT**
Counsel

**DENNIS HEINRICH**
Detailee

**SAMANTHA ARREGUI, SHIZA ARSHAD, KARAZ AXAM, DANIELLE DAVIS, CORENZA JEAN, KRISTY HAMER, ISMAEL FAROOQUI, SAM KREVLIN, MALLORY LEOPOLD NEEDLE, ZOE LI, MARYANNE MAGNIER, MORGEN OLSON, KEVIN PARKER, MADELYN PHINNEY, NICHOLAS RAWLINSON, ANNIA ROCHESTER, AVERY SALINGER, NAILA SCOTT, ANDREW VAILLIENCOURT, & THOMAS WEAVER**
Law Clerks

**BRIAN DOWNEY**
Staff Director to the Minority

**SCOTT WITTMANN**
Deputy Staff Director to the Minority

**KYLE BROSNAN**
Chief Counsel to the Minority

**PATRICK HARTOBEY**
Senior Counsel to the Minority

**MAURA BRENNAN, CHRISTOPHER ECKHARDT JR., VICTORIA GARRASTACHO, SLOAN MCDONAGH, JAMES PRIEST, & DAVID SAMBERG**
Law Clerks to the Minority

**KATE KIELCESKI**
Subcommittee Clerk

# MEDICAL MISTREATMENT OF WOMEN IN ICE DETENTION

## TABLE OF CONTENTS

I.    EXECUTIVE SUMMARY .................................................................... 3

II.   BACKGROUND ................................................................................ 21
      A.    Key Players ........................................................................ 22
      i.    ICE and Relevant Subcomponents ..................................... 22

      ii.   ICDC and LaSalle ............................................................. 24

      iii.  Dr. Amin and ICH ............................................................ 26

      B.    Key Processes for Medical Treatment of ICDC Detainees ............... 30
      i.    ICDC Sick Call Process ..................................................... 30

      ii.   ICE Surgical Approval Process ........................................... 31

      iii.  ICDC Grievance Process .................................................... 33

      C.    Key Medical Procedures and Treatments ............................... 34

III.  FORMER DETAINEES AND EMPLOYEES AS WELL AS FEDERAL ENTITIES
      HAVE ALLEGED SUBSTANDARD CARE AT ICDC ................................ 35
      A.    Former Detainees Have Alleged Deficiencies Related to ICDC Healthcare .... 36
      B.    Former ICDC Employees Reported Disturbing Conditions to the
            Subcommittee ................................................................... 38
      C.    Internal DHS Entities Have Identified Numerous and Repeat Deficiencies at
            ICDC .............................................................................. 41
      D.    The DHS OIG Found That ICDC Generally Met ICE Detention Standards for
            Healthcare but Identified Areas for Improvement ................. 44
      i.    The DHS OIG Found That ICDC Medical Care Generally Met Standards but
            Improvements Are Necessary ............................................ 44

      ii.   The OIG Identified Seven Other Areas of Concern About ICDC Medical Care 45

IV.   ALLEGED SERIOUS MEDICAL MISCONDUCT BY DR. MAHENDRA AMIN . 47
      A.    Former ICDC Detainees Have Raised Concerns About Conditions at ICDC
            and Alleged That Dr. Amin Performed Nonconsensual, Unnecessary, or
            Excessive OB-GYN Procedures ........................................... 48
      i.    Karina Cisneros Preciado .................................................. 49

      ii.   Jaromy Floriano Navarro ................................................... 50

      iii.  Wendy Dowe .................................................................... 53

      iv.   Maribel Castaneda-Reyes .................................................. 57

      v.    Jane Doe #1 ..................................................................... 58

      vi.   Jane Doe #2 ..................................................................... 60

      B.    Former ICDC Employees Recounted Concerns Regarding Dr. Amin to the
            Subcommittee ................................................................... 62

      C.      **Several Medical Experts Identified "Disturbing Patterns" in Treatment by Dr. Amin** ........................................................................................................ 63

        i.  **OB-GYN Medical Experts Engaged by Immigration Advocacy Groups Found Alarming Surgical Patterns by Dr. Amin** .................................................. 64

        ii. **The Subcommittee's Medical Expert Identified Concerning Treatment Patterns by Dr. Amin** ........................................................................................ 65

      D.     **Response from Dr. Amin Concerning ICDC Allegations** ................................ 69

**V.    DR. AMIN WAS A CLEAR OUTLIER IN THE VOLUME OF CERTAIN OB-GYN PROCEDURES HE PERFORMED ON ICDC DETAINEES** ...................................... 70

      A.     **Despite Housing a Low Number of ICE Detainees, ICDC and Dr. Amin Accounted for a Large Percentage of OB-GYN Referrals, Visits, and Procedures Within the ICE System** .................................................................. 71

      B.     **Dr. Amin Accounted for At Least One in Three OB-GYN Procedures and Received Nearly Half of All ICE Payments for OB-GYN Procedures Between 2017 and 2020** .............................................................................................. 73

**VI.   ICE FAILED TO EFFECTIVELY OVERSEE OR INVESTIGATE DR. AMIN** ..... 77

      A.     **Current ICE Oversight Mechanisms to Review Detention Centers and Medical Care** ................................................................................................................ 77

      B.     **ICE Had Limited Capabilities to Vet Off-Site Medical Providers or Monitor Their Medical Practices** ................................................................................ 80

        i.  **ICE Did Not Have a Thorough Process in Place to Vet Dr. Amin Before He Began Treating ICDC Detainees** .................................................................. 80

        ii. **ICE Never Identified Any Treatment by Dr. Amin as Potentially Excessive or Unnecessary and Lacked a Utilization Review Process to Identify Trends in Off-Site Medical Treatment** ...................................................................... 83

        iii. **ICE Performed a Limited Investigation Following the Public Allegations Against Dr. Amin** ........................................................................................ 86

        iv. **ICE Personnel Failed to Conduct Site Visits to ICDC Between January 2018 and October 2020** ........................................................................................ 89

        v. **ICE Is Not Required to Monitor the Use of Language Translation Services by Off-Site Medical Providers** .......................................................................... 91

        vi. **ICE Is Not Required to Ensure Off-Site Medical Providers Obtain Informed Consent** ...................................................................................................... 91

        vii. **ICE Conducts Limited Oversight of Hospitals Providing Off-Site Services for Non-IHSC Detention Facilities** ............................................................ 93

**VII. ICDC HAD LIMITED OBLIGATIONS TO CONDUCT OVERSIGHT OF OFF-SITE CARE FOR DETAINEES** ........................................................................ 94

      A.     **LaSalle Had Minimal Contractual Obligations Concerning Off-Site Medical Care at ICDC** .............................................................................................. 94

      B.     **LaSalle Conducted a Limited Investigation of Abuse Allegations** .................... 99

**VIII.** **ICH DECLINED TO IDENTIFY EFFORTS TO INVESTIGATE DR. AMIN AND DID NOT IDENTIFY ANY CHANGES TO POLICIES AND PROCEDURES FOLLOWING THE 2020 ALLEGATIONS** ................................................................. 101

**IX.** **CONCLUSION** ................................................................................................................. 103

## GLOSSARY OF ACRONYMS

| Acronym | Definition |
| --- | --- |
| CIA | Corporate Integrity Agreement |
| CMD | Custody Management Division |
| CMS | Centers for Medicare & Medicaid Services |
| CPI | Center for Program Integrity |
| CRCL | Office for Civil Rights and Civil Liberties |
| D&C | Dilation and Curettage |
| DHS | Department of Homeland Security |
| DOJ | Department of Justice |
| DON | Director of Nursing |
| DSCO | Detention Standards and Compliance Officer |
| DSM | Detention Service Manager |
| eCAMS | Electronic Claims Adjudication Management System |
| ERO | Enforcement and Removal Operations |
| FMC | Field Medical Coordinator |
| FOIA | Freedom of Information Act |
| GAO | Government Accountability Office |
| HHS | Department of Health and Human Services |
| HPMU | Health Plan Management Unit |
| HSA | Health Services Administrator |
| ICDC | Irwin County Detention Center |
| ICE | Immigration and Customs Enforcement |
| ICH | Irwin County Hospital |
| IGSA | Intergovernmental Service Agreement |

| | |
|---|---|
| IHSC | ICE Health Service Corps |
| IHSC Facilities | Facilities in which IHSC directly provides healthcare services |
| LaSalle or LaSalle Corrections | LaSalle Southeast, LLC |
| LEEP | Loop Electrosurgical Excision Procedure |
| LOU | Letter of Understanding |
| LPN | Licensed Practical Nurse |
| MedPAR | Medical Payment Authorization Request |
| NCCHC | National Commission on Correctional Health Care |
| Non-IHSC Facilities | Facilities in which local governments or their contractors provide services without embedded federal staff |
| NPDB | National Practitioner Data Bank |
| OB-GYN | Obstetrician and Gynecologist/Obstetrics and Gynecology |
| ODO | Office of Detention Oversight |
| OIG | Office of Inspector General |
| OPR | Office of Professional Responsibility |
| PBNDS | Performance-Based National Detention Standards |
| PSI or Subcommittee | Permanent Subcommittee on Investigations |
| RCD | Regional Clinical Director |
| VAFSC | Veterans Affairs Financial Services Center |

# I.    EXECUTIVE SUMMARY

In May 2021, the Permanent Subcommittee on Investigations ("Subcommittee" or "PSI") initiated a bipartisan investigation into the alleged mistreatment of Immigration and Customs Enforcement ("ICE") detainees housed in the Irwin County Detention Center ("ICDC") in Ocilla, Georgia. Over the course of its 18-month-long investigation, the Subcommittee examined multiple allegations of medical abuse against detainees at ICDC, a private detention center owned and operated by LaSalle Southeast, LLC ("LaSalle" or "LaSalle Corrections"). The allegations stemmed from a September 2020 whistleblower complaint ("September 2020 complaint") filed by immigration advocacy groups and attorneys alleging that an off-site obstetrician and gynecologist ("OB-GYN"), Dr. Mahendra Amin, performed "high rates" of unauthorized hysterectomies on ICDC detainees.[1] The groups also alleged that ICDC had poor medical conditions and lax COVID-19 mitigation procedures.[2]

The Subcommittee's investigation identified serious issues relating to ICDC and specifically connected to Dr. Amin's care:

- Female detainees appear to have been subjected to excessive, invasive, and often unnecessary gynecological procedures.

- There appears to have been repeated failures to secure informed consent for off-site medical procedures performed on ICDC detainees.

- Medical care provided to detainees at ICDC was known by DHS to be deficient, but neither ICE nor LaSalle took effective corrective action.

- ICE did not conduct thorough oversight of off-site medical providers and procedures.

The Subcommittee did not substantiate the allegations of mass hysterectomies on ICDC detainees. Records indicate that Dr. Amin performed two hysterectomies on ICDC detainees between 2017 and 2019. Both procedures were deemed medically necessary by ICE.

Dr. Amin stopped treating ICE detainees after the September 2020 complaint became public. In December 2020, former ICDC detainees filed a class action lawsuit ("December 2020 lawsuit") against ICDC, ICE, Dr. Amin, Irwin County Hospital ("ICH"), and other federal and nonfederal parties alleging that the detainees had undergone nonconsensual and unnecessary gynecological procedures.[3] In addition, the lawsuit alleged a broader pattern of medical abuse

---

[1] Complaint by Project South, Georgia Detention Watch, Georgia Latino Alliance for Human Rights & South Georgia Immigrant Support Network to Joseph V. Cuffari, Cameron Quinn, Thomas P. Giles, & David Paulk, *Re: Lack of Medical Care, Unsafe Work Practices, and Absence of Adequate Protection Against COVID-19 for Detained Immigrants and Employees Alike at the ICDC County Detention Center* (Sept. 14, 2020) (projectsouth.org/wp-content/uploads/2020/09/OIG-ICDC-Complaint-1.pdf) [hereinafter *Project South Complaint*].
[2] *Id.*
[3] Consolidated Amended Petition for Writ of Habeas Corpus and Class Action Complaint for Declaratory and Injunctive Relief and for Damages (Dec. 21, 2020), *Oldaker v. Giles*, M.D. GA (No. 7:20-cv-00224-WLS-MSH).

and mistreatment of detainees at ICDC. The plaintiffs demanded $5 million in money damages and other relief. The litigation is ongoing.

As of early 2022, Dr. Amin was under criminal investigation by multiple federal agencies.[4] PSI staff attempted on multiple occasions to obtain voluntary testimony from Dr. Amin regarding his treatment of female ICE detainees at ICDC. Dr. Amin declined these requests. On February 7, 2022, the Subcommittee served Dr. Amin with a subpoena for deposition. Through his attorney, Dr. Amin submitted an affidavit stating that he declined to provide testimony pursuant to his Fifth Amendment privilege against self-incrimination. The Subcommittee accepted Dr. Amin's invocation of his rights and did not question him throughout the investigation.

In May 2021, the Department of Homeland Security ("DHS") directed ICE to discontinue its contract with ICDC. As of September 3, 2021, all immigrant detainees were removed from the ICDC facility and moved to other detention facilities. Effective October 7, 2021, ICE terminated the contract with LaSalle regarding its management of ICDC.[5] As of today, ICDC is still utilized to detain individuals under the custody of the U.S. Marshals Service. The federal government continues to contract with LaSalle to operate other detention facilities throughout the country.

The Subcommittee investigated the veracity of the allegations surrounding medical treatment at ICDC and sought to determine whether these treatments occurred against a backdrop of general medical neglect or abuse at the facility. The Subcommittee also sought to determine whether gaps in ICE policies permitted an off-site provider of medical care to perform unnecessary, nonconsensual, or excessive procedures on ICE detainees.

### A. Female Detainees Appear to Have Been Subjected to Excessive, Invasive, and Often Unnecessary Gynecological Procedures

According to expert medical analysis conducted for the Subcommittee, under Dr. Amin's care, female detainees appear to have undergone excessive, invasive, and often unnecessary gynecological procedures. Over the course of its review, the Subcommittee determined that Dr. Amin holds no board certifications, and in 2013 the Department of Justice ("DOJ") and the State of Georgia sued Dr. Amin, claiming he had committed Medicaid fraud by ordering unnecessary and excessive medical procedures.[6] That lawsuit was settled in 2015, when Dr. Amin and his codefendants paid a $520,000 settlement to the federal government while admitting no wrongdoing.[7]

---

[4] Letter from Counsel for Dr. Amin to the Senate Permanent Subcommittee on Investigations (Feb. 21, 2022). PSI is unaware of the current status of these investigations.

[5] U.S. Department of Homeland Security, Office of Inspector General, *Medical Processes and Communication Protocols Need Improvement at Irwin County Detention Center* (OIG-22-14) (Jan. 3, 2022) (https://www.oig.dhs.gov/sites/default/files/assets/2022-01/OIG-22-14-Jan22.pdf).

[6] Complaint (July 8, 2013), *United States v. Hospital Authority of Irwin County*, M.D. Ga. (No. 7:13-cv-00097-HL).

[7] The United States of America's Filing of Settlement Agreement (July 8, 2013), *United States v. Hospital Authority of Irwin County*, M.D. Ga. (No. 7:13-cv-00097-HL); U.S. Department of Justice, U.S. Attorney's Office Middle District of Georgia, *Hospital Authority of Irwin County Resolves False Claims Act Investigation for $520,000* (Apr.

The Subcommittee's review of Dr. Amin's treatment practices of ICE detainees after the settlement, from 2017 to 2020, identified a similar pattern of potentially excessive medical procedures. Dr. Amin was a clear outlier in both the number and types of procedures he performed compared to other OB-GYNs that treated ICE detainees. ICDC housed roughly 4% of female ICE detainees nationwide from 2017 to 2020. Dr. Amin accounted for roughly 6.5% of total OB-GYN *visits* among all ICE detainees in the same time period. However, he performed nearly one-third of <u>certain</u> OB-GYN *procedures* on ICE detainees across the country between 2017 and 2020 and more than 90% of some key procedures.

For example, from 2017 to 2020:[8]

- Dr. Amin performed 44 laparoscopies to excise lesions, or 94% of all such procedures conducted on all ICE detainees.[9]

- Dr. Amin administered 102 Depo-Provera injections, or 93% of all such injections provided by all OB-GYN specialists to ICE detainees.[10]

- Dr. Amin performed 163 limited pelvic exams, or 92% of limited pelvic exams conducted on all ICE detainees.

- Dr. Amin performed 53 dilation and curettage ("D&C") procedures, or 82% of all D&C procedures conducted by all OB-GYN specialists treating ICE detainees.[11]

---

29, 2015) (www.justice.gov/usao-mdga/pr/hospital-authority-irwin-county-resolves-false-claims-act-investigation-520000).

[8] The Subcommittee recognizes that this data in and of itself does not indicate that the treatments were unnecessary. ICE does not track the demographic information of its female population, and the agency could not provide the Subcommittee with information regarding key variables of the female detainee population, including age and medical history.

[9] A laparoscopy may be used to obtain a small tissue sample for testing or even remove organs like the appendix or gallbladder, and it is generally performed under anesthesia. Johns Hopkins Medicine, *Laparoscopy* (www.hopkinsmedicine.org/health/treatment-tests-and-therapies/laparoscopy) (accessed Nov. 13, 2022).

[10] Depo-Provera is an injection that contains the hormone progestin and is typically administered every three months to prevent pregnancy and manage issues related to the menstrual cycle. Mayo Clinic, *Depo-Provera (contraceptive injection)* (www.mayoclinic.org/tests-procedures/depo-provera/about/pac-20392204) (accessed Nov. 13, 2022).

[11] A D&C procedure removes tissue from inside the uterus. During this procedure, a provider will dilate the cervix and then use a surgical instrument called a curette (a sharp instrument or suction device) to remove uterine tissue. Mayo Clinic, *Dilation and Curettage (D&C)* (www.mayoclinic.org/tests-procedures/dilation-and-curettage/about/pac-20384910) (accessed Nov. 13, 2022).

**Figure 1: Number of OB-GYN Medical Procedures Performed on ICE Detainees and Percentage Nationwide of Dr. Amin's Procedures for FY 2017-2020**[12]

| Medical Procedure | Dr. Mahendra Amin | Second Highest-Ranking Physician[13] | Total Number of Procedures on ICE Detainees Nationwide |
|---|---|---|---|
| | | | |
| Limited Pelvic Exam | 163 (92%) | 4 | 179 |
| | | | |
| Depo-Provera Injection | 102 (93%) | 2 | 110 |
| | | | |
| D&C | 53 (82%) | 3 | 65 |
| | | | |
| Laparoscopy | 44 (94%) | 1 | 47 |
| | | | |
| Total Procedures | 362 (90%) | 10 | 401 (100%) |

Following the September 2020 complaint, the ICE Health Services Corps ("IHSC") stated it "conducted a comparative analysis of medical referrals and claims completed after receiving allegations about Dr. Amin."[14] IHSC also stated that it "conduct[ed] an analysis of referral and claims data at ICDC compared to other ICE detention facilities housing females and determined that the number of referrals and claims was not abnormal."[15] IHSC stated that it never identified any red flags regarding Dr. Amin's treatment of detainees before or after officials reviewed his procedures following the publication of the September 2020 complaint.[16]

---

[12] U.S. Immigration and Customs Enforcement, *Q&A Paper: IHSC Response to PSI Requests: Irwin County Detention Center* (Sept. 1, 2021) (response on file with the Subcommittee) [hereinafter *Sept. 1, 2021 ICE Q&A Paper*].

[13] The second highest-ranking physician for these procedures varied. This column represents the second highest-ranking physician providing these treatments to ICE detainees for each procedure.

[14] U.S. Immigration and Customs Enforcement, *Q&A Paper: Responses to Allegations of Inappropriate Care Provided by Dr. Amin for the Female Population of the Irwin County Detention Center (ICDC)* (June 23, 2021) (response on file with the Subcommittee) [hereinafter *June 23, 2021 ICE Q&A Paper*].

[15] *Id.* Information ICE used in this analysis is discussed in more detail in Section IV.

[16] U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (Sept. 29, 2021). ICE later stated to the Subcommittee that based on the comparative analysis, ICE noted a possible overutilization of the D&C and laparoscopic procedures, but that it would need an expert OB-GYN review of the medical records because its analysis was based solely on medical claims data. Email from U.S. Immigration and Customs Enforcement Staff to the Senate Permanent Subcommittee on Investigations (Nov. 11, 2022).

An IHSC Regional Clinical Director ("RCD") approved each procedure before it was authorized. In interviews with the Subcommittee, IHSC officials explained that the disparity in the number of Dr. Amin's procedures compared to other doctors treating ICE detainees alone did not raise alarm either when the RCD approved the surgeries, or when IHSC retrospectively reviewed Dr. Amin's medical care. However, IHSC could not explain or provide context explaining why Dr. Amin was such an outlier compared to other doctors treating ICE detainees.

To better understand the appropriateness of Dr. Amin's treatment and care of ICDC detainees, the Subcommittee engaged Dr. Peter Cherouny, an OB-GYN physician who previously conducted medical reviews for the Department of Health and Human Services ("HHS") Office of Inspector General ("OIG") in other contexts. To support this investigation, Dr. Cherouny conducted an independent review of more than 16,600 pages of medical records obtained by the Subcommittee, pertaining to approximately 94 ICDC women Dr. Amin treated.

Dr. Cherouny identified significant issues with the care Dr. Amin provided to ICDC detainees and found Dr. Amin's use of certain surgical procedures to be "too aggressive" and inappropriate.[17] Dr. Cherouny's key findings include:

- Dr. Cherouny found that Dr. Amin performed 40 D&C procedures with a laparoscopy on ICDC detainees. He found that Dr. Amin's use of these procedures were "too aggressive" and that the "vast majority [of cases where Dr. Amin performed a D&C] appear to be manageable with imaging and appropriate hormonal therapy."[18]

- Dr. Cherouny concluded that Dr. Amin's practices were "woefully behind the times" and his treatment of ICDC detainees "is not meeting current standards of care."[19] He added, "[d]ue to a lack of knowledge or capability, Dr. Amin persistently uses inpatient, surgical options as diagnostic tools for benign clinical conditions."[20] Such conditions are "more appropriately managed with imaging studies and outpatient clinical tools."[21] Dr. Cherouny told the Subcommittee that Dr. Amin "appears unaware of these current options or does not have them available in his office or hospital."[22] In one interview with the Subcommittee, Dr. Cherouny summarized Dr. Amin's care as "pretty good medicine for the 1980s, but we're not there anymore."[23]

- Dr. Cherouny found that "Dr. Amin seemed to use a boiler plate approach to care. He uses a D&C and laparoscopy for primary diagnostic reasons and seems to 'pile

---

[17] Dr. Peter Cherouny, Interview with Senate Permanent Subcommittee on Investigations (Jan. 26, 2022); Memorandum from Dr. Peter Cherouny to Senate Permanent Subcommittee on Investigations (Oct. 27, 2022).
[18] Memorandum from Dr. Peter Cherouny to Senate Permanent Subcommittee on Investigations (Oct. 27, 2022).
[19] *Id.*
[20] Letter from Dr. Peter Cherouny to Senate Permanent Subcommittee on Investigations (Oct. 27, 2022).
[21] *Id.*
[22] *Id.*
[23] Dr. Peter Cherouny, Interview with Senate Permanent Subcommittee on Investigations (Sept. 8, 2022).

on' the pathologic diagnoses postoperatively."[24]

- Dr. Cherouny flagged that because Dr. Amin is not board certified, Dr. Amin "likely does no or limited continuing education to stay current" on up-to-date medical practices in these areas. He explained further that there appeared to be board certified OB-GYN providers in the area of ICDC and that he was "concerned" with how and why Dr. Amin was selected to treat this population.[25]

- Dr. Cherouny found that Dr. Amin performed 36 transvaginal ultrasounds on patients in the records he reviewed. Those records indicate Dr. Amin generally had "[p]oor performance and documentation of transvaginal ultrasound evaluation."[26] Dr. Cherouny commented further that Dr. Amin is "clearly not skilled in ultrasound of the female pelvis" and that he "appears to frequently confuse normal findings for pathology and uses these as indications for surgery."[27] Dr. Cherouny explained to the Subcommittee that these practices did not appear to comply with the American Institute of Ultrasound in Medicine Guidelines.[28]

- Dr. Cherouny explained that Dr. Amin "does not appear to follow the current recommendations regarding Pap smear management through colposcopy and further treatment."[29]

- Dr. Cherouny also found that Dr. Amin did not give "adequate time to affect a clinical response" in most of the 40 cases he examined where Depo-Provera injections were administered for abnormal uterine bleeding.[30] He explained that the "adequate time" for a response to this medication was six months and that was not given to these patients.[31] Dr. Cherouny noted that Dr. Amin generally used 2-6 weeks of clinical response time before declaring that the Depo-Provera medication failed and proceeded to surgery.[32]

- Dr. Cherouny explained that 40 patient records—of the 94 examined—indicated the patients had benign ovarian cysts removed by Dr. Amin, despite the fact that benign ovarian cysts "generally resolve without surgical intervention."[33] He noted that in the records he reviewed, Dr. Amin "persistently finds and removes

---

[24] Memorandum from Dr. Peter Cherouny to Senate Permanent Subcommittee on Investigations (Oct. 27, 2022).
[25] *Id.*
[26] Letter from Dr. Peter Cherouny to Senate Permanent Subcommittee on Investigations (Oct. 27, 2022).
[27] Memorandum from Dr. Peter Cherouny to Senate Permanent Subcommittee on Investigations (Oct. 27, 2022).
[28] The American Institute of Ultrasound in Medicine is a multidisciplinary medical association of more than 10,000 physicians, sonographers, scientists, students, and other healthcare providers. *See* American Institute of Ultrasound in Medicine, Training Guidelines (https://www.aium.org/resources/ptGuidelines.aspx) (accessed Nov. 13, 2022).
[29] Letter from Dr. Peter Cherouny to Senate Permanent Subcommittee on Investigations (Oct. 27, 2022).
[30] Letter from Dr. Peter Cherouny to Senate Permanent Subcommittee on Investigations (Feb. 1, 2022).
[31] Letter from Dr. Peter Cherouny to Senate Permanent Subcommittee on Investigations (Oct. 27, 2022).
[32] *Id.*
[33] Letter from Dr. Peter Cherouny to Senate Permanent Subcommittee on Investigations (Feb. 1, 2022).

functional ovarian cysts" and that the "vast majority" of the cysts "did not require removal."[34]  He also noted that there are risks with this surgery like any other, including infection and bleeding, and other issues that "can result in pain and infertility, among other risks."[35]

- Dr. Cherouny explained that seven patients underwent a Loop Electrosurgical Excision Procedure ("LEEP"),[36] used to identify abnormalities on Pap smears,[37] and he found that the records he reviewed suggest Dr. Amin has "limited knowledge and/or skill in Pap smear management."[38]  He noted that the "point of the [LEEP] procedure is to get tissue for diagnostic purposes and in each case [Dr. Amin] failed this outcome."[39]  Dr. Cherouny attributed these failures to Dr. Amin's "technique" in performing the procedure.[40]

- Dr. Cherouny also found that "Dr. Amin frequently prescribes multiple treatments for a vaginal discharge complaint without an appropriate clinical evaluation."[41] The failure to conduct appropriate clinical evaluation in these circumstances "results in patients receiving multiple treatments for the same complaints without improvement."[42]

- Dr. Cherouny stated that "[i]t appears there was, likely, no oversight of the care provided to these patients.  The repetitive nature of some of the issues, like inadequate cervical tissue after a LEEP procedure, would seem to prompt a review in many hospitals."[43]

Additionally, the Subcommittee interviewed three physicians—Dr. Ted Anderson, Dr. Margaret Mueller, and Dr. Sarah Collins.[44]  These physicians were part of a medical team asked

---

[34] Letter from Dr. Peter Cherouny to Senate Permanent Subcommittee on Investigations (Oct. 27, 2022); Memorandum from Dr. Peter Cherouny to Senate Permanent Subcommittee on Investigations (Oct. 27, 2022).

[35] Letter from Dr. Peter Cherouny to Senate Permanent Subcommittee on Investigations (Feb. 1, 2022).

[36] A LEEP is a procedure in which a provider uses a heated, electric wire to remove cell s and tissues in the cervix and vagina.  John Hopkins Medicine, *Loop Electrosurgical Excision Procedure (LEEP)* (www.hopkinsmedicine.org/health/treatment-tests-and-therapies/loop-electrosurgical-excision-procedure-leep) (accessed Nov. 13, 2022).

[37] A Pap smear or Pap test is a procedure used to test for cervical cancer in women.  A Pap test requires a provider to insert an instrument called a speculum into the vagina to take a tissue sample from the cervix using a soft brush and scraping device known as a spatula.  Mayo Clinic, *Pap Smear* (www.mayoclinic.org/tests-procedures/pap-smear/about/pac-20394841) (accessed Nov. 13, 2022).

[38] Memorandum from Dr. Peter Cherouny to Senate Permanent Subcommittee on Investigations (Oct. 27, 2022).

[39] *Id*.

[40] *Id*.

[41] Letter from Dr. Peter Cherouny to Senate Permanent Subcommittee on Investigations (Oct. 27, 2022).

[42] *Id*.

[43] Memorandum from Dr. Peter Cherouny to Senate Permanent Subcommittee on Investigations (Oct. 27, 2022).

[44] Dr. Anderson is the Vice Chair for Clinical Operations and Director of the Division of Gynecology at Vanderbilt University Medical Center.  Vanderbilt University Medical Center, *Ted L. Anderson, MD, PhD* (https://www.vumc.org/obgyn/person/ted-l-anderson-md-phd) (accessed Nov. 13, 2022).  Dr. Collins is an Assistant Professor at the Northwestern University, Feinberg School of Medicine.  Northwestern Medicine, *Sarah A. Collins, MD* (https://www.nm.org/doctors/1942401948/sarah-a-collins-md) (accessed Nov. 13, 2022).  Dr. Mueller is also an

by attorneys and advocacy groups later involved with the December 2020 lawsuit to review the medical charts for 19 ICDC detainees Dr. Amin treated.[45] The plaintiffs in the December 2020 lawsuit filed the summary findings of the medical review team and declarations from these doctors summarizing the chart reviews of select individual plaintiffs in support of the litigation.[46]

These experts concluded that Dr. Amin subjected women to aggressive and unethical gynecological care.[47] They found that Dr. Amin quickly scheduled surgeries when non-surgical options were available, misinterpreted test results, performed unnecessary injections and treatments, and proceeded without informed consent.[48] Dr. Collins later reviewed a new set of over 500 pages of medical records associated with 36 ICDC detainees in coordination with attorneys involved in the lawsuit by former detainees.[49] Dr. Collins stated that in many cases, Dr. Amin appeared to have proceeded with unnecessary or excessive treatment regardless of patient conditions.[50]

Subcommittee staff interviewed six former ICDC detainee patients treated by Dr. Amin—Karina Cisneros Preciado, Jaromy Floriano Navarro, Wendy Dowe, Maribel Castaneda-Reyes, Jane Doe #1, and Jane Doe #2—who described negative experiences with Dr. Amin.[51] All of these women, except Jane Doe #2, are plaintiffs in the December 2020 lawsuit. These women described feeling confused, afraid, and violated after their treatment by Dr. Amin. Several reported that they still live with physical pain and uncertainty regarding the effect of his treatments on their fertility. These women also described instances in which Dr. Amin was rough and insensitive while performing procedures, continued despite their complaints regarding pain, and failed to disclose the potential side effects of certain procedures or even answer

---

Assistant Professor at the Northwestern University, Feinberg School of Medicine. Northwestern Medicine, *Margaret G. Mueller, MD* (https://www.nm.org/doctors/1346570405/margaret-g-mueller-md) (accessed Nov. 13, 2022).

[45] The review team consisted of nine board-certified OB-GYN physicians and two nursing experts. The team examined 3,200 pages of medical records for 19 women who alleged medical maltreatment while detained at ICDC. The records for these 19 detainees were included in the files of the 94 detainees that Dr. Cherouny reviewed. *Executive Summary of Findings by the Independent Medical Review Team Regarding Medical Abuse Allegations at the Irwin County Detention Center* (Oct. 21, 2020) (on file with the Subcommittee).

[46] Docket, *Oldaker v. Giles*, M.D. GA (No. 7:20-cv-00224-WLS-MSH).

[47] *Executive Summary of Findings by the Independent Medical Review Team Regarding Medical Abuse Allegations at the Irwin County Detention Center* (Oct. 21, 2020) (on file with the Subcommittee).

[48] *Id.* Informed consent requires that patients are well informed of the planned benefits, potential risks, and possible alternative options of medical treatments, procedures or surgeries that a healthcare provider intends to perform. Importantly, it also requires that the patient clearly understands the benefits and potential risks of the proposed treatment option and is afforded ample opportunity to ask questions and obtain medically sound responses. Based on witness testimony to the Subcommittee and a review of medical records by a number of physicians, it appears that informed consent was not provided to multiple ICDC detainees treated off-site by OB-GYN specialist Dr. Amin. Dr. Amin did not voluntarily sit for an interview with the Subcommittee. However, in civil litigation against Dr. Amin he has claimed he always obtains informed consent from his patients.

[49] Email from Counsel for the National Immigration Project of the National Lawyers Guild to the Senate Permanent Subcommittee on Investigations (Oct. 22, 2021).

[50] Dr. Sarah Collins, Interview with Senate Permanent Subcommittee on Investigations (Oct. 19, 2021).

[51] All of these women entered ICDC detention following arrests by local law enforcement in the interior of the United States. These women's records were included in the documents reviewed by the medical experts engaged by the Subcommittee. Two former ICDC detainees the Subcommittee interviewed asked to remain anonymous.

questions regarding his diagnosis or treatment plan. Several women stated that they did not provide their consent to the examinations or procedures Dr. Amin performed.

## B. <u>There Appears to Have Been Repeated Failures to Secure Informed Consent for Off-Site Medical Procedures Performed on ICDC Detainees</u>

Obtaining informed consent from any patient is a sacrosanct responsibility of practicing physicians. This is particularly true when treating a vulnerable population in a confined institution. The American Medical Association's Code of Medical Ethics describes the importance of informed consent:

> To enable patients to participate meaningfully in decisions about health care, physicians have a responsibility to provide information and help patients understand their medical condition and options for treatment. […] Informed consent to medical treatment is fundamental in both ethics and law. It helps patients make well-considered decisions about their care and treatment.[52]

Furthermore, the Code of Medical Ethics advises: "Document the informed consent conversation and the patient's (or surrogate's) decision in the medical record in some manner. When the patient/surrogate has provided specific written consent, the consent form should be included in the record."[53]

ICE Performance-Based National Detention Standards ("PBNDS") define informed consent as: "An agreement by a patient to a treatment, examination, or procedure after the patient receives the material facts about the nature, consequences, and risks of the proposed treatment, examination or procedure; the alternatives to it; and the prognosis if the proposed action is not undertaken."[54]

The Subcommittee found that ICE does not monitor informed consent procedures for off-site medical providers and does not have a responsibility to do so.[55] IHSC officials stated to the Subcommittee that it is the sole professional obligation of the off-site provider to obtain informed consent from patients. Furthermore, there is no requirement in ICE's process for the approval or review of off-site medical procedures that an ICE official verifies that a consent form

---

[52] American Medical Association, Code *of Medical Ethics: Consent, Communication & Decision Making*, (https://www.ama-assn.org/delivering-care/ethics/code-medical-ethics-consent-communication-decision-making) (accessed Nov. 13, 2022).

[53] American Medical Association, *Informed Consent: Code of Medical Ethics Opinion 2.1.1* (https://www.ama-assn.org/delivering-care/ethics/informed-consent) (accessed Nov. 13, 2022).

[54] U.S. Department of Homeland Security, U.S. Immigration and Customs Enforcement, *Performance-Based National Detention Standards 2011*, at 469-470 (Revised December 2016) (https://www.ice.gov/doclib/detention-standards/2011/pbnds2011r2016.pdf).

[55] U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (Sept. 29, 2021). According to ICE, the agency does not have a responsibility to monitor informed consent because providers are professionally and legally obligated to ensure informed consent. Email from U.S. Immigration and Customs Enforcement Staff to the Senate Permanent Subcommittee on Investigations (Nov. 11, 2022).

from a visit with an off-site provider is included in a detainee's medical file.  The Subcommittee also found that LaSalle, the ICDC contractor, did not have any contractual obligation with ICE to oversee the off-site care of detainees housed at its facility.

According to medical experts who reviewed the records of Dr. Amin's ICDC patients, there was a lack of informed consent in many instances.  For example, based on the records Dr. Cherouny reviewed, he stated that Dr. Amin did not provide sufficient information regarding surgical procedures with detainee patients.[56]  The medical records reviewed do not consistently document thorough patient-doctor discussions and do not establish that patients were fully informed of all of their treatment options, including the benefits and risks of surgical procedures and other treatments, or whether they were clearly given a choice to opt out of any treatment at all.

Former ICDC detainees interviewed by Subcommittee staff stated that Dr. Amin did not explain or answer questions regarding examinations, medication administration, or surgical procedures he performed on them.  For example, one former detainee treated by Dr. Amin, Ms. Castaneda-Reyes, stated that she was told she was having surgery to remove an ovarian cyst and that when she arrived for the surgery, an electronic tablet and a stylus were simply handed to her to sign with no explanation from the nurses, the anesthesiologist, or Dr. Amin about the surgery or its risks, and they did not ask if she had any questions.[57]  This would appear to violate best practices of the doctor-patient informed consent process.

The Subcommittee received incomplete records from ICH, the hospital where Dr. Amin performed the procedures on ICDC detainees, and no records from Dr. Amin.  Thus, the Subcommittee could not verify whether any consent forms for the anonymized patients the medical experts reviewed may have existed in files separately maintained by Dr. Amin or ICH.  The records from ICH included signed consent forms from some anonymized ICDC patients.  In some cases, the records indicate that a nurse discussed the surgical process with Dr. Amin's patients.  However, these files do not indicate that Dr. Amin himself engaged in a thorough discussion with all of his patients regarding the informed consent process as would be expected medical practice for a physician.  Furthermore, the records provided to the Subcommittee do not establish that the detainees Dr. Amin treated were fully informed of all of their treatment options.

### C.  Medical Care Provided to Detainees at ICDC Was Known by DHS to Be Deficient, but neither ICE nor LaSalle Took Effective Corrective Action

Following its review of records and interviews with former detainees, former employees, and DHS auditors, the Subcommittee found that ICDC detainees made frequent complaints about the quality and timeliness of medical care they received at the facility.[58]  Former ICDC nurses described deficiencies and delays in the treatment of detainees.  Moreover, DHS offices

---

[56] Memorandum from Dr. Peter Cherouny to Senate Permanent Subcommittee on Investigations (Oct. 27, 2022).

[57] Maribel Castaneda-Reyes, Interview with Senate Permanent Subcommittee on Investigations (Oct. 5, 2021).

[58] The Subcommittee did not seek to verify every complaint heard from witnesses or every allegation reviewed in written grievances.  However, the Subcommittee reviewed an estimated 760 grievances and nearly 650 of them were related to medical care.  In addition, the complaints by detainees mirrored observations that former ICDC nurses relayed to Subcommittee staff in interviews and that have previously been documented by DHS.

responsible for oversight of detention facilities identified numerous, repeated, and serious deficiencies with the ICDC medical unit as far back as 2012, but ICDC and ICE failed to take effective corrective action to address these issues.

ICDC medical staff dealt with a large number of medical complaints from detainees on a regular basis. These complaints ranged from cosmetic issues like dandruff and dry skin to more serious medical and mental health conditions.[59] When detainees were not satisfied with the services they received from the medical unit, they submitted grievances to be addressed by ICDC leadership. The Subcommittee reviewed more than 760 grievances filed by ICDC ICE detainees between 2018 and 2020. Of those grievances reviewed, the Subcommittee identified 659 medical grievances that contained allegations of delayed or deficient medical care. For example, one detainee stated that the facility failed to provide their diabetes medicine and as a result they started experiencing blurry vision due to elevated sugar levels.[60] In other instances, an individual with chronic seizures and those with other chronic ailments, such as asthma, high blood pressure, and anemia, stated they were forced to wait days and weeks for the ICDC medical staff to address their critical prescription needs. Records reviewed by the Subcommittee showed that medical unit staff generally responded to these grievances with 24 to 48 hours.[61]

One detainee interviewed by Subcommittee staff said he submitted multiple requests related to a toothache but never received a response.[62] He claimed his pain eventually stopped because the tooth fell out.[63] Another detainee, who fell and broke her foot while at ICDC, told Subcommittee staff she was not taken to see anyone to treat the injury for a full month.[64] Former detainees also described making multiple requests for access to their own medical laboratory or imaging results that went unaddressed.[65] The Subcommittee was not able to review the medical records for these detainees and could not verify their claims. Some detainees alleged that their medical complaints were either not addressed or they received delayed care.[66] The Subcommittee did not obtain records to corroborate the allegations made by these detainees. However, medical records reviewed by the Subcommittee showed that the ICDC medical unit frequently responded to medical requests within a few days and provided lab or imaging results when requested.[67]

---

[59] *See, e.g.,* LaSalle_167885-88, LaSalle_216450, LaSalle_216456 (sick calls for dandruff); LaSalle_232939-40, LaSalle_232942 (sick calls for dry skin and dry scalp); LaSalle_177638-41 (mental health sick call for depression); LaSalle_281516-19 (sick call for pain related to a hernia).

[60] Records indicate that ICDC staff responded three days later stating that staff would contact the detainee's previous detention center again to request records and obtain medication names and dosages. LaSalle_002652.

[61] Records indicate that ICDC medical staff generally responded to these grievances within one to two days after the grievance was filed. LaSalle_000187; LaSalle_002668; LaSalle_002598; LaSalle_002600.

[62] Senate Permanent Subcommittee on Investigations Staff Visit to Irwin County Detention Center (Aug. 17, 2021) (memorandum on file with the Subcommittee).

[63] *Id.*

[64] A.K., Interview with Senate Permanent Subcommittee on Investigations (June 23, 2021).

[65] Senate Permanent Subcommittee on Investigations Staff Visit to Irwin County Detention Center (Aug. 17, 2021) (memorandum on file with the Subcommittee).

[66] *Id.*

[67] For example, one detainee filed a sick call request on September 9, 2020 requesting test results and complaining of skin irritation and pain in her ovaries (LaSalle_177857-61). She was seen for all three requests at the medical unit on September 10, 2020 where she also requested her medical records at the same visit (LaSalle_177863-65). The detainee received her medical records on September 21, 2020 (LaSalle_177869). The detainee requested all of

13

Interviews with former ICDC staff provided additional insight on the issues with the ICDC medical unit.  A former nurse described the facility's medical unit as "filthy."[68]  Another former nurse described ICDC as "the least clean place of any place I have worked in."[69]

As far back as 2012, internal DHS audit and oversight entities identified deficiencies with the ICDC medical unit.[70]  For example, the DHS Office for Civil Rights and Civil Liberties ("CRCL") cited issues at ICDC with record maintenance and medication distribution, including an incident involving a cancer patient who was never allegedly provided medication.[71]

In addition, a 2017 ICE Office of Detention Oversight ("ODO") review of ICDC found that ICDC staff inconsistently reviewed detainees' medical intake forms and often left sections of those forms blank.[72]  The review also found a lack of documentation showing that medical staff had completed required staff training.[73]  Finally, ODO found syringes and needles in examination rooms that were "neither secured nor inventoried."[74]  Overall, the inspection examined 15 ICE detention standards and found 26 deficiencies in 10 standards, which included nine "medical care" deficiencies, a number of which were repeat deficiencies.[75]

In March 2020, five months prior to the public allegations against ICDC surfaced, another ODO inspection found that medical files at ICDC were stored improperly, on the floor and across desks, and examination tables in facility medical units were "torn beyond repair, making cleaning and decontamination impossible."[76]  The ODO review found that ICDC was only in compliance with five of 18 ICE detention standards they examined overall and documented 36 deficiencies, including three regarding "medical care."[77]

---

her ICDC medical records on December 7, 2020 (LaSalle_178320).  She signed an acknowledgment that she received her ICDC medical records on December 10, 2020 (LaSalle_178329).

[68] LPN #1, formerly of Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (June 30, 2021).

[69] LPN #2, formerly of Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (July 12, 2021).

[70] U.S. Department of Homeland Security, Office for Civil Rights and Civil Liberties, *Redacted Irwin Rec & Close Memorandum from FY13 Expert Report Memorandum* (Nov. 5, 2012) (notes from document review on file with the Subcommittee).

[71] U.S. Department of Homeland Security, Office for Civil Rights and Civil Liberties, *Redacted Irwin Rec & Close Memorandum Expert Report Memorandum* (Nov. 4, 2016) (notes from document review on file with the Subcommittee).

[72] U.S. Department of Homeland Security, U.S. Immigration and Customs Enforcement, Office of Professional Responsibility, Inspections and Detention Oversight Division, *Compliance Inspection for the Irwin County Detention Center Ocilla, Georgia* (Mar. 2017) (https://www.ice.gov/doclib/foia/odo-compliance-inspections/2017IrwinCountyGA.pdf).

[73] *Id.*

[74] *Id.*

[75] *Id.*

[76] U.S. Department of Homeland Security, U.S. Immigration and Customs Enforcement, Office of Professional Responsibility, Inspections and Detention Oversight Division, *Compliance Inspection for the Irwin County Detention Center Ocilla, Georgia* (Mar. 2020) (https://www.ice.gov/doclib/foia/odo-compliance-inspections/irwinCoDetCntr_OcillaGA_Mar3-5_2020.pdf).

[77] *Id.*

**D. ICE Did Not Conduct Thorough Oversight of Off-Site Medical Providers and Procedures**

Past DHS reviews have documented consistent, ongoing, and unresolved deficiencies in ICE's medical record keeping procedures, prescription medication distribution practices, and overall quality of medical care at various ICE detention facilities, including ICDC. In addition, through multiple interviews with senior IHSC officials and a review of ICE documents, the Subcommittee identified key gaps in ICE oversight of physicians providing medical care to ICE detainees at facilities outside of its detention centers.

Highlights of the Subcommittee's investigation on ICE oversight of off-site medical providers include:

- ICE was not aware of, and did not review key information regarding Dr. Amin's professional history prior to the agency's agreement to allow Dr. Amin to treat ICDC detainees in 2014. ICE authorized Dr. Amin to treat ICE detainees based solely on the fact that he had an active medical license, admitting privileges at ICH, and was not otherwise prohibited from treating ICE detainees.

- ICE did not have access to the National Practitioner Data Bank ("NPDB")—a confidential federal clearinghouse of healthcare provider information—and was unable to conduct a search for Dr. Amin in the database before he began treating ICDC detainees. Had ICE been able to conduct this search, it would have found multiple past medical malpractice claims against Dr. Amin, and the fact that a major U.S. insurance company dropped him as a covered physician in 2005 due to "excessive malpractice cases" and an "extensive malpractice history."[78] ICE was not aware of the medical malpractice suits filed against Dr. Amin until _after_ the September 2020 public allegations against him.

- ICE was unaware that DOJ and the State of Georgia had filed a 2013 lawsuit against Dr. Amin and other physicians at ICH until _after_ the September 2020 allegations. The lawsuit included five counts, including allegations that Dr. Amin and his codefendants had engaged in Medicaid fraud, violated the Federal Anti-Kickback Statute and Georgia Medicaid policies, and maintained "standing orders" to conduct unnecessary gynecological procedures.

- Dr. Amin began treating ICDC detainee patients in 2014, the year after DOJ filed its lawsuit against him. In 2015, Dr. Amin, other physicians, and the hospital entered into a settlement agreement with DOJ and the State of Georgia and agreed to pay $520,000 to resolve the allegations regarding Medicaid fraud.

- ICE did not have a process to automatically flag the disproportionately high number of medical procedures Dr. Amin or any given doctor performs compared to his or her peers. While ICE informed the Subcommittee that the disparity in

---

[78] Staff conducted an _in camera_ review at the U.S. Department of Health and Human Services of National Practitioner Data Bank information on Dr. Amin. (Dec. 9, 2021) (notes on file with the Subcommittee).

the number of Dr. Amin's procedures alone would not be disqualifying, additional scrutiny of Dr. Amin's practices may have prevented unnecessary procedures from occurring.[79]

Since the initial September 2020 public allegations against Dr. Amin and ICE, IHSC has initiated limited vetting procedures of off-site medical providers. IHSC officials also noted, however, that even these new procedures likely would not have disqualified Dr. Amin from treating ICE detainees. An IHSC official told Subcommittee staff that the agency would not have deemed the information on Dr. Amin in the NPDB as disqualifying based on the fact that he maintains a current, active medical license with the state of Georgia, and the state had never restricted his license or otherwise intervened at any point in his medical service. As a result, the IHSC official said IHSC "would not have had any issues" with allowing Dr. Amin to treat ICE patients.[80]

Following the public allegations against Dr. Amin in September 2020, ICE conducted a limited review of medical records, claims, and referrals for his patients. ICE did not, however, obtain complete files from ICDC or ICH and ultimately suspended its investigation pending completion of a DHS OIG investigation into the allegations of inappropriate off-site gynecological care at ICDC.[81] In multiple conversations with Subcommittee staff, IHSC officials were only able to speculate about the reasons why Dr. Amin performed so many more procedures than other physicians providing OB-GYN care to ICE detainees. Dr. Amin stopped treating ICE detainees in September 2020.

**The Subcommittee's Investigation**

During the Subcommittee's 18-month long investigation, the Subcommittee interviewed more than 70 witnesses and reviewed more than 541,000 pages of records, including records from DHS, ICE, ICDC, LaSalle, and ICH.

The Subcommittee evaluated litigation materials, reports, declarations, expert medical assessments, and documents provided by the Department of Veterans Affairs Financial Services Center ("VAFSC"), and conducted an *in camera* review of documents from HHS and the Departments of Treasury.

---

[79] U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (Sept. 29, 2021). ICE later stated to the Subcommittee that based on the comparative analysis, ICE noted a possible overutilization of the D&C and laparoscopic procedures, but that it would need an expert OB-GYN review of the medical records because its analysis was based solely on medical claims data. Email from U.S. Immigration and Customs Enforcement Staff to the Senate Permanent Subcommittee on Investigations (Nov. 11, 2022).

[80] U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (Sept. 29, 2021).

[81] The DHS OIG started its review in October 2020. However, this review did not evaluate off-site medical care of ICDC detainees. This review "sought to determine whether ICDC provided detainees adequate [on-site] medical care and adhered to COVID-19 protections. This inspection did not review the gynecological procedure approval process for detainees at ICDC, which has been referred to our Office of Investigations." The review of gynecological treatment is currently underway. U.S. Department of Homeland Security, Office of Inspector General, *Medical Processes and Communication Protocols Need Improvement at Irwin County Detention Center* (OIG-22-14) (Jan. 3, 2022) (https://www.oig.dhs.gov/sites/default/files/assets/2022-01/OIG-22-14-Jan22.pdf).

The Subcommittee secured briefings from attorneys, advocates, physicians, and other entities including: the U.S. Marshals Service, the Centers for Medicare & Medicaid Services ("CMS"), HHS OIG, DHS OIG, the Nakamoto Group, and the Georgia Composite Medical Board.

Additionally, the Subcommittee interviewed nearly 50 former ICDC detainees, 40 of which were interviewed during the Subcommittee's August 2021 staff visit to ICDC. Subcommittee staff also interviewed seven former ICDC employees, four current ICDC or LaSalle employees, two ICH executives, three ICH nurses, six current ICE officials, and one former ICE official.

## FINDINGS OF FACT AND RECOMMENDATIONS

### Findings of Fact

(1)    **Female detainees at ICDC appear to have been subjected to excessive, invasive, and often unnecessary gynecological procedures.**

(2)    **The Subcommittee did not substantiate the allegation that ICDC detainees underwent "high rates" of unauthorized hysterectomies.** Dr. Amin performed two hysterectomies on ICDC detainees between 2017 and 2019. According to ICE, patient records indicated that both procedures were medically necessary.

(3)    **Between 2017 and 2020 Dr. Amin performed a significantly higher volume of invasive procedures on ICE detainees compared to other OB-GYN physicians serving ICE detainees.** Dr. Amin ranked first among all physicians treating ICE detainees across the country during this period in terms of the number of D&C procedures, laparoscopies to excise lesions, and limited pelvic exams he performed, as well as the number of Depo-Provera injections he administered. In fact, of the 401 combined total number of these procedures performed on all ICE detainees by OB-GYN specialists across the nation, Dr. Amin performed 362 of these procedures—or 90% of them. In ten categories of OB-GYN procedures the Subcommittee reviewed, Dr. Amin was among the top five providers for eight of the ten procedures. For the specific OB-GYN procedures the Subcommittee examined, Dr. Amin performed nearly one-third of the total procedures performed on ICE detainees at **all** ICE detention facilities between 2017 and 2020. This was despite the fact that ICDC housed about 4% of the female detainee population.

(4)    **For the specific OB-GYN procedures the Subcommittee examined, Dr. Amin received around half of all payments from ICE for these procedures.** From 2017 to 2020, physicians performed 1,201 of these ten types of OB-GYN procedures on ICE detainees, costing ICE over $120,400. Dr. Amin performed 392 of the 1,201 procedures and received approximately $60,000 for these procedures.

17

(5)     **Dr. Amin had a history of medical malpractice suits filed against him**. Due to this history, a major U.S. insurance company dropped its contract with him nearly one decade before ICE began using his services at ICDC.

(6)     **ICE was not aware of publicly available information regarding medical malpractice suits and a DOJ and State of Georgia Medicaid fraud complaint against Dr. Amin before he began treating ICE detainees.**

(7)     **Prior to October 2019, ICE did not employ a thorough vetting process for physicians treating detainees at facilities outside detention centers.** ICE has since established a process to review board certifications, records of adverse actions, and a list of individuals and entities excluded from federal healthcare programs, but ICE never completed this process for Dr. Amin.

(8)     **ICE officials stated that its new vetting procedures would not necessarily have disqualified Dr. Amin from treating detainees.** Due to the fact that the state of Georgia had never restricted Dr. Amin's license or otherwise intervened at any point in his medical service, and the information in the NPDB were unsubstantiated allegations that had been settled, ICE would not necessarily have disqualified Dr. Amin from treating ICE detainees.

(9)     **ICE lacked a medical utilization review process to identify potential trends in off-site medical treatment.** Until recently, ICE did not maintain a system to detect trends in medical procedures by off-site physicians that might indicate medical waste, fraud, or abuse. ICE states it intends to change its procedures to standardize the medical request approval process and has begun to employ a web-based application for medical utilization review and management, beginning with a retrospective review of ICE medical claims.

(10)    **ICE performed an investigation of medical treatments provided to ICDC detainees following the public allegations against Dr. Amin, but did not obtain complete medical records for ICDC detainees.** During its investigation, ICE did not obtain complete medical records for ICDC detainees and ultimately did not conduct a more thorough review due to the pending DHS OIG investigation involving off-site gynecological procedures.

(11)    **ICE personnel failed to conduct site visits at ICDC between January 2018 and October 2020.** The Field Medical Coordinator assigned to ICDC did not visit ICDC between January 2018 and October 2020—the period of greatest activity for Dr. Amin in terms of office visit claims and procedures.

(12)    **ICE is not required to monitor the use of language translation services by off-site medical providers or ensure these providers obtain informed consent for off-site medical procedures.** Instead, ICE has relied on off-site providers to fulfill their professional obligations to ensure detainees understand and consent to the medical care they receive.

**(13)    ICE conducts limited oversight of hospitals providing off-site care to detainees.**  To date, ICE has also performed no reviews of hospitals treating detainees to review the appropriateness of the medical care they provide, although ICE told the Subcommittee that it intends to conduct these reviews in the future.

**(14)    ICE approved Dr. Amin's performance of OB-GYN procedures on a case-by-case basis and never identified any of Dr. Amin's treatments as potentially excessive or unnecessary.**

**(15)    ICE's contract with LaSalle did not require the company or ICDC to conduct oversight of off-site medical care for detainees.**  ICDC and LaSalle played no role in vetting off-site medical providers treating detainees, or ensuring that these providers obtained informed consent or used appropriate language translation services.  No ICDC or LaSalle employee the Subcommittee interviewed recalled a review of treatment by Dr. Amin—prior to the public allegations in September 2020 or since—that found signs of waste, fraud, or abuse.

## Recommendations

**(1)    ICE should expedite efforts to improve the vetting of off-site medical providers for detainees and should consider expanding criteria for excluding providers.**  ICE officials noted to the Subcommittee that even new vetting procedures ICE instituted in 2019 might not have excluded Dr. Amin—despite his previous malpractice settlements, the fact that a major insurance company severed its contract with him based on his history of malpractice cases, and his False Claims Act settlement with DOJ in 2015.

**(2)    ICE should expedite efforts to identify trends in off-site medical procedures for detainees for potential waste, fraud, or abuse and should conduct regular audits of physicians, hospitals, or other facilities providing off-site care.**  To provide context for its review efforts, ICE should also expand the range of information it collects from detention centers to include historic demographic population information and descriptions of on-site medical capabilities.

**(3)    ICE should institute policies and procedures to ensure off-site providers obtain informed consent in connection with their treatment of detainees.**  ICE currently expects that off-site medical providers will honor their professional obligations to ensure detainees understand and consent to medical procedures, but ICE has taken no responsibility for them doing so.

**(4)    ICE should ensure it reviews all detainee complaints regarding medical treatment independently of site visits from Field Medical Coordinators.**  ICE officials should have the ability to receive and review all detainee medical

complaints electronically and contemporaneously, regardless of whether staffing challenges prevent annual visits to detention facilities.

**(5)** **Federal immigration policy should support and allow for the swifter adjudication of immigration cases without undermining the procedural due process rights of immigrants.**

## II.    BACKGROUND

On September 14, 2020, several immigration advocacy organizations filed a whistleblower complaint to DHS OIG, DHS CRCL, the ICE Atlanta Field Office, and the ICDC Warden alleging, among other claims, that an off-site medical provider for the ICDC facility had performed mass hysterectomies on detainees at ICDC.[82]  This provider was later identified as Dr. Mahendra Amin, an OB-GYN specialist authorized to provide off-site medical services for ICDC detainees since 2014.[83]  Three months after the initial complaint was filed, former ICDC detainees filed a class action lawsuit against ICDC, ICE, Dr. Amin, and other federal and nonfederal parties alleging that the detainees had received nonconsensual and unnecessary gynecological procedures.[84]  The lawsuit also alleged a broader pattern of medical abuse and mistreatment of detainees at ICDC.[85]  The lawsuit is ongoing.[86]

The initial September 2020 whistleblower complaint alleged that Dr. Amin performed mass hysterectomies on ICDC detainees.[87]  However, the Subcommittee found this allegation to be false, and ICE determined that the two hysterectomies Dr. Amin performed on ICDC detainees appeared to be medically necessary.[88]  Additional allegations in the September 2020 whistleblower complaint focused on ICDC's mismanagement of its response to COVID-19 and other issues related to medical care at ICDC.[89]

Dr. Amin stopped treating ICDC detainees in September 2020, when the public allegations against him first emerged.[90]  In May 2021, DHS directed ICE to discontinue its contract with ICDC.[91]  ICE terminated the contract effective October 7, 2021.[92]  As of September 3, 2021, all ICE detainees were removed from ICDC.[93]

---

[82] The Subcommittee's investigation did not find that Dr. Amin performed a large number of hysterectomies. According to records obtained by the Subcommittee, he performed two hysterectomies on ICE detainees, one in 2017 and one in 2019.  However, the data the Subcommittee obtained reveals that Dr. Amin did perform a dramatically larger number of other medical procedures on female detainees when compared to other OB-GYN specialists treating ICE detainees.  Information on the hysterectomies Dr. Amin performed are discussed in more detail in Section IV below.  *See* Project South Complaint, *supra* note 1.

[83] Consolidated Amended Petition for Writ of Habeas Corpus and Class Action Complaint for Declaratory and Injunctive Relief and for Damages (Dec. 21, 2020), *Oldaker v. Giles*, M.D. GA (No. 7:20-cv-00224-WLS-MSH).

[84] *Id.; June 23, 2021 ICE Q&A Paper*, *supra* note 14.

[85] Consolidated Amended Petition for Writ of Habeas Corpus and Class Action Complaint for Declaratory and Injunctive Relief and for Damages (Dec. 21, 2020), *Oldaker v. Giles*, M.D. GA (No. 7:20-cv-00224-WLS-MSH).

[86] *Id.*

[87] Project South Complaint, *supra* note 1.

[88] *June 23, 2021 ICE Q&A Paper*, *supra* note 14.

[89] Project South Complaint, *supra* note 1.

[90] *June 23, 2021 ICE Q&A Paper*, *supra* note 14; Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations (Oct. 22, 2021) (Tranche 18, 11144).

[91] U.S. Department of Homeland Security, *ICE to Close Two Detention Centers* (May 20, 2021) (https://www.dhs.gov/news/2021/05/20/ice-close-two-detention-centers).

[92] U.S. Department of Homeland Security, Office of Inspector General, *Medical Processes and Communication Protocols Need Improvement at Irwin County Detention Center* (OIG-22-14) (Jan. 3, 2022) (https://www.oig.dhs.gov/sites/default/files/assets/2022-01/OIG-22-14-Jan22.pdf).

[93] *Id.*

The Subcommittee's investigation examined the provision of healthcare on and off-site for ICDC detainees and reviewed Dr. Amin's treatment of female ICDC detainees. This section provides background on the key entities, policies, and procedures that served as the subject matter of the Subcommittee's investigation.

### A.  Key Players

#### i.  ICE and Relevant Subcomponents

Fiscal year 2022 saw a record 2,378,944 apprehensions of migrants at the Southwest border.[94]  Federal law requires that migrants in certain immigration proceedings be detained throughout the adjudication of their cases.  ICE is the federal agency responsible for immigration enforcement, including detention of noncitizens who have violated U.S. immigration laws.[95]  For decades, the federal government has struggled to balance the requirements of federal immigration law with rates of border apprehensions, rising timelines of completion for immigration cases, limited resources, and the rights and interests of detainees.

For Fiscal Year 2022, ICE housed immigration detainees in 130 detention centers, processing centers, and other facilities, with an average length of stay of about 25.8 days and an average daily population of about 22,578 detainees.[96]  ICE executes its detention mission through two main entities:  IHSC, which oversees healthcare at ICE detention facilities and ICE Enforcement and Removal Operations ("ERO"), which manages all aspects of enforcement and detention process.

#### a.  IHSC

As part of its healthcare focused mission, IHSC directs patient care at ICE-run facilities and oversight of compliance with detention standards at facilities operated by non-federal entities.[97]  IHSC maintains a workforce of 915 employees, including 600 commissioned officers of the U.S. Public Health Service, 15 federal civil servants, and 300 contract health professionals.[98]  IHSC directly provides healthcare services in 21 facilities nationwide ("IHSC facilities").[99]  IHSC monitors compliance with healthcare-related detention standards at approximately 150 other facilities in which local governments or their contractors provide services without embedded federal staff ("non-IHSC facilities") through the Field Medical Coordinators ("FMC") program.[100]  When it housed ICE detainees, ICDC was a non-IHSC

---

[94] U.S. Customs and Border Protection, *Southwest Land Border Encounters* (Oct. 21, 2022) (https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters) (accessed Nov. 13, 2022).

[95] U.S. Immigration and Customs Enforcement, *Mission* (Aug. 17, 2022) (https://www.ice.gov/mission).

[96] U.S. Immigration and Customs Enforcement, *ICE Facilities Data FY22 YTD* (https://www.ice.gov/doclib/detention/FY22_detentionStats09292022.xlsx) (accessed Nov. 13, 2022).

[97] *June 23, 2021 ICE Q&A Paper*, *supra* note 14; Email from U.S. Immigration and Customs Enforcement Staff to the Senate Permanent Subcommittee on Investigations (Nov. 11, 2022).

[98] *June 23, 2021 ICE Q&A Paper*, *supra* note 14.

[99] U.S. Immigration and Customs Enforcement, *ICE Health Service Corps* (https://www.ice.gov/detain/ice-health-service-corps) (accessed Nov. 13, 2022).

[100] *Id.*; *June 23, 2021 ICE Q&A Paper*, *supra* note 14.

facility. If ICDC was unable to provide certain medical services with its on-site medical staff, it would transfer detainees off-site to receive medical services from providers in the community.

IHSC FMCs typically conduct at least one site visit per year at non-IHSC facilities to evaluate their adherence to detention standards and quality of care indicators.[101] IHSC employees known as RCDs are physicians with oversight responsibilities for all ICE-operated and non-ICE-operated facilities.[102]

### b. ICE ERO

ICE ERO "manages all aspects of the immigration enforcement process, including identification and arrest, domestic transportation, detention, bond management, and supervised release, including alternatives to detention."[103] The Custody Management Division ("CMD") within ERO provides oversight of ICE detention facilities through two sub-divisions: the Custody Programs Division develops policies related to programing within detention facilities and oversees segregation procedures and policies to protect detainees with special vulnerabilities, and the Detention Management Division provides oversight of detention facilities through Detention Service Managers ("DSMs") and Detention Standards and Compliance Officers ("DSCOs") who inspect and audit certain detention facilities.[104] In addition to inspections by the Detention Management Division, CMD also performs announced annual inspections of detention facilities.[105]

### c. Other Federal Entities and Contractors

In addition to IHSC and ICE ERO, federal immigration detention is overseen by:

- DHS OIG who conducts unannounced inspections of detention facilities for violations of ICE standards;

- ICE ODO who conducts biannual inspections of certain facilities;

---

[101] U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (June 23, 2021); *see also* Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations (Feb. 7, 2022) (Tranche 3, 01014-27). IHSC provides direct medical care at 21 facilities in the United States and, in FY 2021, "oversaw health care for over 169,000 detainees housed in 150 non-IHSC staffed facilities." U.S. Immigration and Customs Enforcement, *ICE Health Service Corps* (https://www.ice.gov/detain/ice-health-service-corps) (accessed Nov. 13, 2022).
[102] U.S. Immigration and Customs Enforcement Health Service Corps Official Regional Clinical Director, Interview with Senate Permanent Subcommittee on Investigations (Feb. 14, 2022).
[103] U.S. Immigration and Customs Enforcement, *Enforcement and Removal Operations* (http://www.ice.gov/about-ice/ero) (accessed Nov. 13, 2022).
[104] U.S. Immigration and Customs Enforcement, Enforcement and Removal Operations, Custody Management Division, Briefing with Senate Permanent Subcommittee on Investigations (June 17, 2021).
[105] *Id.*

- DHS CRCL who investigates allegations of civil rights and civil liberties violations at detention facilities and issues policy recommendations to ICE headquarters, field offices, and facilities; and

- The Nakamoto Group, which is contracted by ICE to conduct annual inspections of detention facilities.[106]

### ii. ICDC and LaSalle

ICDC is located in Ocilla, Georgia. In 2007, the U.S. Marshals Service entered into an Intergovernmental Service Agreement ("IGSA") with Irwin County, Georgia, which allowed the Marshals Service, Federal Bureau of Prisons, and ICE to house federal detainees at ICDC.[107] The most recent IGSA between the federal government and Irwin County became effective on June 15, 2020.[108] In this IGSA, ICE agreed to maintain a minimum population of at least 600 detainees at ICDC with a bed day rate of $83 per detainee for the first 600 detainees and $65 per detainee above the 600-person threshold.[109]

On December 12, 2013, Irwin County entered into an agreement with LaSalle, a private company that operates correctional facilities in Louisiana, Texas, Arizona, and Georgia.[110] Under the agreement, LaSalle provided certain operation, maintenance, and management services to ICDC, either directly through LaSalle employees or individuals who contract with LaSalle.[111]

The current Warden of ICDC is David Paulk.[112] Mr. Paulk oversees officials including the Deputy Warden, Chief Security Officer, Captain of Administrative Services, Captain of Security, Health Services Administrator ("HSA"), Director of Nursing ("DON"), Medical Director, and food service manager.[113] According to Mr. Paulk, the ICDC staff comprised between 210 and 220 individuals when the facility operated at full capacity, during which it had 944 beds available.[114] Between FY 2017 and FY 2020, the average length of stay at ICDC rose

---

[106] In addition to these oversight bodies, detention facilities are required to maintain National Commission on Correctional Health Care and American Correctional Association accreditation. *Id.*; U.S. Department of Homeland Security, Office of Inspector General, *ICE's Inspections and Monitoring of Detention Facilities Do Not Lead to Sustained Compliance or Systemic Improvements* (OIG-18-67) (June 26, 2018) (https://www.oig.dhs.gov/sites/default/files/assets/2018-06/OIG-18-67-Jun18.pdf); Email from U.S. Immigration and Customs Enforcement Staff to the Senate Permanent Subcommittee on Investigations (Nov. 17, 2021); Email from U.S. Immigration and Customs Enforcement Staff to the Senate Permanent Subcommittee on Investigations (Nov. 11, 2022).
[107] LaSalle_048633-89.
[108] LaSalle_048623.
[109] LaSalle_048636. Bed day is defined as "one person per day." *Id.*
[110] LaSalle Corrections, Our Locations (https://lasallecorrections.com/locations/) (accessed Nov. 13, 2022); LaSalle_009481-505.
[111] Counsel for LaSalle, Briefing with Senate Permanent Subcommittee on Investigations (May 19, 2021); LaSalle 009481-505.
[112] David Paulk, Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Sept. 16, 2021).
[113] *Id.*
[114] *Id.*

slightly from 36 days to 42 days, and the average daily population varied between a high of 850 detainees and a low of 642 detainees.[115]

Under its agreement with Irwin County, LaSalle provided limited, basic medical services to detainees at ICDC, including intake screening, physicals, laboratory testing, routine healthcare, and emergency services or referrals.[116]  According to LaSalle policy, the HSA at ICDC was responsible for ensuring detainees have access to care and supporting the delivery of healthcare services to detainees.[117]  The HSA was to be aided by the DON, registered nurses, licensed practical nurses ("LPNs"), a medical records clerk, a dentist, and a psychiatrist.[118]

According to LaSalle policy, all detainees were supposed to receive an initial medical, dental, and mental health screening within 12 hours of arrival at ICDC that consisted of intake review questions and observatory assessments.[119]  LaSalle policy also required that all female detainees had "access to appropriate and necessary medical and mental healthcare, gynecological and obstetrical treatment during their detainment," as well as access to pregnancy services and preventative screenings, such as breast examinations, mammograms, and sexually transmitted disease testing.[120]  If ICDC medical personnel determine that they lack the capabilities or capacity to treat a particular ailment on-site, they would refer the patient to an outside provider. ICE would review and make the determination on whether the detainee would see an outside provider.

LaSalle was responsible for providing "communication assistance" to detainees who were limited in their English proficiency during on-site medical appointments.[121]  ICDC medical unit staff were responsible for referring detainees in need of healthcare beyond facility resources or hospital services to an IHSC-approved facility, and "all surgeries and major treatments must be approved by the Warden of [sic] designee."[122]  However, according to LaSalle's agreement with ICE, "[t]he primary point of contact for obtaining pre-approval for non-emergent care as well as the post approval for emergent care will be the IHSC FMC assigned to [ICDC]."[123]  Medical providers with which LaSalle contracted also had to maintain "adequate records in accordance with HIPPA [sic] guidelines" for on-site care, and LaSalle had to provide transportation to off-site medical services for detainees.[124]

LaSalle also contracted with Dr. Howard McMahan for the provision of medical services as ICDC Medical Director, which involved overseeing the work of on-site medical employees and—while ICDC housed individuals for ICE—providing medical services as necessary to all

---

[115] U.S. Immigration and Customs Enforcement, *HSGAC/PSI Interviews with ICE Health Service Corps (IHSC) Personnel Get-backs* (Nov. 5, 2021) (response on file with the Subcommittee).
[116] LaSalle_027934-37.
[117] LaSalle_009506-09.
[118] *Id.*
[119] LaSalle_027993-97.
[120] LaSalle_028057-59.
[121] LaSalle_027938-43.
[122] LaSalle_009506-09.
[123] LaSalle_048633-89.
[124] LaSalle_009506-09.

detainees, including those with chronic illnesses.[125]  Dr. McMahan is physically on-site at ICDC between two and a half and six hours per week and reports to Dr. Pamela Hearn, the Medical Director for LaSalle.[126]

### iii.  Dr. Amin and ICH

When an ICDC detainee required off-site OB-GYN care, ICDC medical personnel previously would refer the detainee patients to Dr. Mahendra Amin.  Dr. Amin attended medical school at Government Medical College of South Gujarat University in Surat, India.  He completed his internship at the New Civil Hospital in Surat, India and his OB-GYN residency at the University of Medicine and Dentistry in Newark, New Jersey.[127]  Dr. Amin maintains an active medical license with the Georgia Composite Medical Board, which was issued on June 11, 1985.[128]  However, he holds no board certifications.[129]  Dr. Amin has practices in Douglas, Georgia, and Ocilla, Georgia, and he has admitting privileges at ICH and Coffee Regional Medical Center.[130]

According to public reports and documents reviewed by the Subcommittee, a company incorporated by Dr. Amin called "MGA Health Management, Inc." ("MGA") entered into a contractual relationship with ICH in 1996 to run daily operations for the hospital.[131]  A November 2010 Amended and Restated Management Services Agreement between MGA and ICH states that MGA had "the authority and responsibility to supervise and manage the day-to-

---

[125] Howard McMahan, Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Sept. 15, 2021).

[126] *Id*.

[127] Emily Shugerman & William Bredderman, *ICE Hysterectomy Doctor Wasn't Even a Board-Certified OB-GYN*, Daily Beast (Sept. 19, 2020) (www.thedailybeast.com/ice-hysterectomy-doctor-wasnt-even-a-board-certified-ob-gyn); Georgia Composite Medical Board, License Details for Mahendrakumar Govindbhai Amin (https://gcmb.mylicense.com/verification/) (search first name "Mahendra" and search last name "Amin") (accessed Nov. 13, 2022).

[128] Georgia Composite Medical Board, License Details for Mahendrakumar Govindbhai Amin (https://gcmb.mylicense.com/verification/) (search first name "Mahendra" and search last name "Amin") (accessed Nov. 13, 2022).  Georgia state law requires one year of postgraduate training after medical school to obtain a medical license, and board certification is a voluntary process.  *See* Rules and Regulations of the State of Georgia, Rule 360-2-.01 Requirements for Licensure (https://rules.sos.ga.gov/gac/360-2); Shugerman & Bredderman, *supra* note 127.

[129] The American Board of Obstetrics and Gynecology has stated that "its records show Amin is not certified by the organization," and the American Board of Medical Specialties—the primary organization for physician board certifications in the United States—stated that Dr. Amin was not certified by any of its 24 member boards. Shugerman & Bredderman, *supra* note 127.

[130] *Id.*; Georgia Composite Medical Board, License Details for Mahendrakumar Govindbhai Amin (https://gcmb.mylicense.com/verification/) (search first name "Mahendra" and search last name "Amin") (accessed Nov. 13, 2022); Alan Judd, *At ICE Detention Center, Red Flag Raised about Gynecologist*, Atlanta Journal-Constitution (Oct. 2, 2020) (www.ajc.com/news/at-ice-detention-center-red-flag-raised-about-gynecologist/SH7TJ35UJRAOXONQH7KALL7IVM/).

[131] *See* Production from Irwin County Hospital to the Senate Permanent Subcommittee on Investigations, *November 10th Amended and Restated Management Services Agreement between MGA Health Management and Irwin County Hospital Authority* (Aug. 5, 2021); Shugerman & Bredderman, *supra* note 127; Alan Judd, *At ICE Detention Center, Red Flag Raised about Gynecologist*, Atlanta Journal-Constitution (Oct. 2, 2020) (www.ajc.com/news/at-ice-detention-center-red-flag-raised-about-gynecologist/SH7TJ35UJRAOXONQH7KALL7IVM/).

day operation of the Facilities."[132]  Under the agreement, MGA was required to assist the hospital "in the recruitment of physicians to join the medical staffs of the Facilities," including by "screening candidates presented by any physician recruitment firms or possible candidate to locate or relocate their medical practice to the area served by the Hospital."[133]  MGA received an annual fee of $960,000 in exchange for its services.[134]  In addition to the amended agreement, in November 2010, MGA and ICH entered into a promissory note for $2,303,847.71.[135]  According to current ICH CEO Paige Wynn, the promissory note was a loan from Dr. Amin for renovations to the hospital.[136]

In December 2014, the November 2010 amended agreement was terminated, and Dr. Amin and ICH entered into a "Physician Services Agreement."[137]  The new agreement established Dr. Amin as the Chief Medical Officer of ICH and an independent contractor receiving an hourly fee.[138]  Under the agreement, the ICH Board of Trustees "retain[ed] control over all functions of the Hospital."[139]  As Chief Medical Officer, Dr. Amin was required to assist with the development of policies and procedures regarding regulatory compliance, conduct oversight over hospital credentialing, assist the CEO and other hospital staff with accreditation and licensure, assist the DON with evaluating staffing needs, prepare operating and capital budgets for the hospital, and assist the Chief Compliance Officer with implementation of a compliance plan.[140]

Dr. Amin's agreement with the hospital continued to be renewed from 2015 through 2020.[141]  He continues to serve as the Chief Medical Officer and was re-credentialed in 2021.[142]  According to Ms. Wynn, Dr. Amin is "by far the busiest" physician at the hospital, the main doctor at ICH, and the busiest physician in the community at large.[143]

---

[132] Production from Irwin County Hospital to the Senate Permanent Subcommittee on Investigations, *November 10th Amended and Restated Management Services Agreement between MGA Health Management and Irwin County Hospital Authority* (Aug. 5, 2021).
[133] *Id.*
[134] *Id.*
[135] ICH005144-49.
[136] Ms. Wynn told the Subcommittee that the hospital renovations were completed and the Promissory Note was fully paid by ICH in May 2021.  Paige Wynn, Irwin County Hospital, Interview with Senate Permanent Subcommittee on Investigations (Aug. 25, 2021).
[137] ICH005120-35.
[138] According to counsel for ICH, in 2014, all agreements between ICH and Dr. Amin were provided to the HHS OIG and subsequently reviewed by an Independent Review Organization HHS OIG approved.  ICH005120-35; Email from Counsel for Irwin County Hospital to the Senate Permanent Subcommittee on Investigations (Nov. 17, 2021).
[139] ICH005120-35.
[140] ICH005128-29.
[141] ICH005101; ICH005113; ICH005114-19; ICH005136-41; ICH005143.
[142] Paige Wynn, Irwin County Hospital, Interview with Senate Permanent Subcommittee on Investigations (Aug. 25, 2021).
[143] *Id.*  Counsel for ICH noted to the Subcommittee that the community is "small" and contains approximately 9,500 residents.  Email from Counsel for Irwin County Hospital to the Senate Permanent Subcommittee on Investigations (Nov. 17, 2021).

According to a 2016 survey from the American Medical Association, around 63% of OB-GYN specialists have been sued at least once, and around 44% of these specialists have been sued at least twice.[144]  The NPDB shows that Dr. Amin settled at least seven medical malpractice lawsuits between 1998 and 2007.[145]  The settlements involve allegations concerning a mother's death, a miscarriage, fetal brain damage, stillbirths, and a pelvic abscess/infection.[146]  (See Figure 2.)  The Subcommittee's review of the NPDB showed that a major private insurance company terminated its contract with Dr. Amin in 2005 due to "excessive malpractice cases" and an "extensive malpractice history."[147]

**Figure 2: Dr. Amin Malpractice Settlements in the NPDB**[148]

| Date | Settlement |
|---|---|
| March 16, 2007 | Settlement for improper performance: 29-year-old underwent a hysterectomy for pelvic pain and bleeding; allegedly resulted in right **ureterovaginal fistula.**[149] |
| April 30, 2004 | Settlement for delay in treatment of identified fetal distress: alleged delay in C-section led to post-surgical pulmonary embolism which resulted in **mother's death.** |
| February 21, 2002 | Settlement for delay in delivery (inductive or surgery): allegedly resulted in **stillbirth.** |
| November 30, 2001 | Settlement for obstetric not otherwise specified: alleged failure to evaluate 21-week gestation resulted in **miscarriage.** |
| November 15, 1999 | Settlement for improperly managed labor not otherwise specified: alleged failure to diagnose and treat group B streptococcus infection, which resulted in **fetal brain damage.** |
| September 7, 1999 | Settlement for failure to diagnose: alleged **pelvic abscess/infection.** |
| February 26, 1998 | Settlement for delay in delivery: alleged failure to monitor fetus resulted in **stillbirth.** |

Many of the contractual arrangements for services by Dr. Amin described above occurred after DOJ and the State of Georgia joined a complaint filed by two employees of ICH in July 2013 against ICH, Dr. Amin, and eight other ICH physicians, alleging violations of the False

---

[144] The survey did not provide numbers on the percentage of OB-GYN specialists sued seven times in less than one decade.  José R. Guardado, PhD, *Medical Liability Claims Frequency Among U.S. Physicians*, American Medical Association: Policy Research Perspectives (2017) (https://www.ama-assn.org/media/21976/download).

[145] *June 23, 2021 ICE Q&A Paper*, *supra* note 14; Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations (Sept. 27, 2021) (Tranche 10, 3037-42).

[146] *Id.*

[147] Staff conducted an *in camera* review at HHS of National Practitioner Data Bank information on Dr. Amin. (Dec. 9, 2021) (notes on file with the Subcommittee).

[148] *June 23, 2021 ICE Q&A Paper*, *supra* note 14; Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations (Sept. 27, 2021) (Tranche 10, 3037-42).

[149] A ureterovaginal fistula describes an unusual opening that develops between the vagina and the tubes that carry urine from the kidneys to the bladder, also known as ureters.  Mayo Clinic, *Vaginal Fistula* (https://www.mayoclinic.org/diseases-conditions/vaginal-fistulas/symptoms-causes/syc-20355762) (accessed Nov. 13, 2022).

Claims Act and the Georgia False Medical Claims Act.[150]  The complaint asserted that physicians at ICH billed Medicare and Medicaid for treatments and procedures performed by nurses and technicians instead of physicians.[151]  Nurses allegedly followed "standing orders"—scripted procedures—regardless of an individual patient's condition.[152]

These standing orders allegedly required that "certain tests always be run on pregnant patients, without any medical evaluation and regardless of her condition."[153]  For example, the 2013 DOJ complaint stated:

> [N]o matter what symptoms the patient may be exhibiting, ICH performs an OB ultrasound on every pregnant patient, without consulting [Dr. Amin] or obtaining his or any other doctor's medical opinion for that particular patient. . . . Dr. Amin's standing order for ultrasounds on his patients constitutes a pattern of medical services that he, ICH, and the on-call doctors know or should know are not medically necessary.[154]

The complaint further alleged that Dr. Amin and other physicians allegedly engaged in a kickback scheme and directed patients to ICH despite the availability of a closer hospital.[155]

In April 2015, the defendants reached a civil settlement and agreed to pay $520,000 to resolve the allegations without a determination of liability.[156]  In announcing the settlement, DOJ noted that it "marks the end of an investigation into alleged violations of the Federal Anti-Kickback Statute, the Federal Stark Law, and related Georgia Medicaid policies."[157]

In October 2015, ICH replaced MGA with a different management company—ER Hospital LLC; however, Dr. Amin remained on the medical staff at the hospital, as the Medical Director.[158]  Along with the civil settlement, ICH entered into a five-year Corporate Integrity

---

[150] The other named physician defendants included: Ashfaq Saiyed, M.D.; Romana Bairan, M.D.; Arturo Ruanto, M.D.; Concordio Ursal, M.D.; Drew Howard, M.D.; Steve Anderson, M.D.; Robert Reese M.D.; and Marshall Tanner, M.D.  Complaint (July 8, 2013), *United States v. Hospital Authority of Irwin County*, M.D. Ga. (No. 7:13-cv-00097-HL).
[151] *Id.*
[152] *Id.*
[153] *Id.*
[154] *Id.*
[155] *Id.*
[156] The United States of America's Filing of Settlement Agreement (July 8, 2013), *United States v. Hospital Authority of Irwin County*, M.D. Ga. (No. 7:13-cv-00097-HL); U.S. Department of Justice, U.S. Attorney's Office Middle District of Georgia, *Hospital Authority of Irwin County Resolves False Claims Act Investigation for $520,000* (Apr. 29, 2015) (www.justice.gov/usao-mdga/pr/hospital-authority-irwin-county-resolves-false-claims-act-investigation-520000).
[157] U.S. Department of Justice, U.S. Attorney's Office Middle District of Georgia, *Hospital Authority of Irwin County Resolves False Claims Act Investigation for $520,000* (Apr. 29, 2015) (www.justice.gov/usao-mdga/pr/hospital-authority-irwin-county-resolves-false-claims-act-investigation-520000).
[158] Irwin County Hospital, *2018 Annual Hospital Questionnaire* (Feb. 28, 2019) (www.irwincntyhospital.com/fileadmin/Files/Irwin/Transparency_Documents/HTR-Annual-Hospital-Questionnaire.pdf).

Agreement ("CIA") with the HHS OIG that became effective in January 2015.[159]  The CIA required ICH to establish and maintain a compliance program that included a compliance officer and committee, develop and implement a code of conduct setting forth its "commitment to full compliance with all Federal healthcare program requirements," develop and implement written policies and procedures related to the operations of the hospital's compliance program, and provide training to staff regarding the compliance program and code of conduct.[160]  Counsel for ICH told the Subcommittee that ICH followed all recommendations in the CIA, and both HHS OIG and an Independent Review Organization that HHS OIG approved and reviewed this implementation, as well as monitoring and reporting by ICH.[161]

As of early 2022, Dr. Amin was under active criminal investigation by multiple federal agencies.[162]  In addition, the DHS OIG is currently examining two other matters that relate to the issues PSI investigated.  First, the DHS OIG Office of Investigations is reviewing the gynecological procedure approval process for ICDC detainees who underwent treatment by Dr. Amin.[163]  Second, the DHS OIG is conducting an audit of all surgical procedure authorizations and approvals across all ICE detention centers.[164]

## B.  Key Processes for Medical Treatment of ICDC Detainees

### i.  ICDC Sick Call Process

According to LaSalle's medical care policy, "[i]t is the policy of LaSalle Corrections to ensure a sick call procedure that allows detainees the unrestricted opportunity to freely request medical, mental health and dental services that are provided by a physician or other qualified medical staff in a clinical setting."[165]  To request routine medical assistance, detainees filled out a Health Services Request Form located in each residential housing unit or in the ICDC medical unit and submitted these forms at designated "Sick Call" boxes.[166]  Alternatively, detainees could complete an electronic request form on tablet computers available in each dormitory.[167]  The timeframe for the medical unit to respond to a request was 24 to 48 hours, and appointments for

---

[159] Production from Irwin County Hospital to the Senate Permanent Subcommittee on Investigations, *Corporate Integrity Agreement between the Office of Inspector General of the U.S. Department of Health and Human Services and Hospital Authority of Irwin County* (Aug. 5, 2021).
[160] *Id.*
[161] Email from Counsel for Irwin County Hospital to the Senate Permanent Subcommittee on Investigations (Nov. 17, 2021).
[162] Letter from Counsel for Dr. Amin to the Senate Permanent Subcommittee on Investigations (Feb. 21, 2022).  PSI is unaware of the current status of these investigations.
[163] U.S. Department of Homeland Security, Office of Inspector General, *Medical Processes and Communication Protocols Need Improvement at Irwin County Detention Center* (OIG-22-14) (Jan. 3, 2022) (https://www.oig.dhs.gov/sites/default/files/assets/2022-01/OIG-22-14-Jan22.pdf).
[164] *Id.*
[165] LaSalle_011126.
[166] LaSalle_011127; LaSalle_014225-26; LaSalle_014246-47.
[167] Amber Hughes Strout, formerly of Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Sept. 22, 2021).  Nurse Hughes Strout worked as a sick call nurse at ICDC from 2016 to April 2021.

detainees were typically scheduled within one week of their request.[168]  The detainee would either see a nurse practitioner or physician assistant for basic needs or the facility's medical director Dr. McMahan for more involved medical questions.[169]  If the facility lacked the capabilities to treat ICE detainees in house, ICDC would refer them to IHSC-approved off-site providers.[170]

### ii.    ICE Surgical Approval Process

The IHSC RCD reviews requests for routine, nonemergency surgery for detainees by off-site providers.[171]  According to ICE, detainee patients are first evaluated in the facility medical unit by the facility clinician.[172]  (See Figure 3.)  If the facility clinician believes a detainee patient's medical condition warrants a referral to an off-site specialist, the facility submits a Medical Payment Authorization Request ("MedPAR").  The FMC reviews and approves the MedPAR for the initial consult.  If the off-site provider recommends surgery, the facility will submit a MedPAR for the surgery.  The FMC will review the surgery request and forward the request to the RCD for review.  The RCD will review the documentation accompanying the surgery request and use their clinical judgment to approve or deny the surgery via email.  The facility is required to submit the approved MedPAR with the referral authorization number to the off-site provider for reimbursement.[173]

---

[168] Howard McMahan, Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Sept. 15, 2021); Amber Hughes Strout, formerly of Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Sept. 22, 2021); Lakeysa Brown, formerly of Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Jan. 5, 2022).

[169] Howard McMahan, Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Sept. 15, 2021).

[170] Lakeysa Brown, formerly of Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Jan. 5, 2022).

[171] U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (June 23, 2021); U.S. Immigration and Customs Enforcement Health Service Corps Official Regional Clinical Director, Interview with Senate Permanent Subcommittee on Investigations (Feb. 14, 2022).

[172] Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations (Feb. 22, 2022) (Tranche 7, 01255); Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations, *Summary Report: Irwin County Detention Center-Employee Allegations & Media Response* (Sept. 27, 2021) (Tranche 10, 3037-42).

[173] *Id.*; Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations (Feb. 7, 2022) (Tranche 3, 00947, 00983).

**Figure 3: IHSC Surgery Approval Process**[174]



[174] Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations (Feb. 22, 2022) (Tranche 7, 01255); Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations, *Summary Report: Irwin County Detention Center-Employee Allegations & Media Response* (Sept. 27, 2021) (Tranche 10, 3037-42).

Along with the referral, RCDs may review laboratory and imaging reports and the off-site provider's examination notes.[175]  When additional information or documentation is needed to aid in the RCD's determination of the referral, RCDs will contact the FMCs who will then ask the off-site provider for that information.[176]  RCDs will make decisions regarding surgical requests based on the needs of the patient and clinical practice guidelines.[177]  IHSC officials noted to the Subcommittee that IHSC currently does not provide guidance to RCDs regarding referral requirements for approving referral requests.[178]  In rare cases, an off-site provider can appeal if an RCD rejects a request due to lack of medical necessity, and a surgical request can be escalated to IHSC leadership.[179]  RCDs are also responsible for identifying unusually frequent referrals to a certain provider or insufficient justifications for referrals.[180]

### iii.    ICDC Grievance Process

When ICDC detainees had issues related to their detention, including medical treatment, detainees were supposed to utilize LaSalle's grievance process.  According to LaSalle policy, ICDC is responsible for providing "a grievance system that protects the detainee's rights and ensures they are treated fairly by providing procedures for them to file both informal and formal grievances, which will receive timely responses relating to any aspect of their detention, including medical care."[181]  The policy defines a "grievance" as a "formal written complaint filed by a detainee related to any aspect of facility life or condition of detention that personally affects the detainee grievant."[182]  To file a grievance, ICDC detainees filled out a paper grievance form or the electronic form on tablet computers.[183]  ICDC's "grievance officer" then

---

[175] An IHSC official told the Subcommittee that IHSC does not require specific documents to be submitted to RCDs with each referral.  U.S. Immigration and Customs Enforcement Health Service Corps Official Regional Clinical Director, Interview with Senate Permanent Subcommittee on Investigations (Feb. 14, 2022).  The Subcommittee reviewed emails between the ICDC FMC and the ICDC RCD regarding surgical requests and found that provider visit notes, documentation of prescribed medication, imaging reports, and lab results were generally forwarded to the RCD along with the surgical request.  *See, e.g.,* Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations (Apr. 25, 2022) (Tranche 10, 01445-61); Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations (Apr. 25, 2022) (Tranche 11, 01792-1806); Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations (Apr. 25, 2022) (Tranche 13, 02645-56).

[176] U.S. Immigration and Customs Enforcement Health Service Corps Official Regional Clinical Director, Interview with Senate Permanent Subcommittee on Investigations (Feb. 14, 2022).

[177] U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (June 23, 2021).

[178] U.S. Immigration and Customs Enforcement Health Service Corps Official Regional Clinical Director, Interview with Senate Permanent Subcommittee on Investigations (Feb. 14, 2022).

[179] *Id.*; U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (June 23, 2021).

[180] U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (May 17, 2021).

[181] According to the policy, an informal grievance is an "oral or written complaint attempting to resolve an issue through an informal process.  The issue may be resolved by staff at any level without complete processing of a formal grievance."  LaSalle_011690.

[182] *Id.*

[183] David Paulk, Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Sept. 16, 2021); Frank Albright, Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Sept. 21, 2021); Shanise Bell, formerly of Irwin County Detention Center, Interview with Senate

processed and forwarded the grievances to the relevant department heads who would respond to the grievances.[184]  For example, all medical grievances were referred to the HSA.[185]  According to former HSA Lakeysa Brown, the medical unit responded to medical grievances within 72 hours.[186]  ICDC addressed non-medical grievances typically within 5 to 15 days.[187]  After a grievance was investigated and addressed, it was logged and stored by the facility.[188]

Specifically for medical grievances, the HSA investigated each grievance.[189]  According to former HSA Brown, the investigative process generally involved calling the detainee to the medical unit.[190]  For example, regarding a grievance related to medication, the detainee's chart would be reviewed to see if the medication was ordered and the detainee would be called to the medical unit for a "face-to-face encounter" to resolve the issue.[191]  If the issue was resolved, the resolution and date of the resolution was noted in a grievance log, and no further response was required.  If a detainee was not satisfied with the resolution, the detainee could pursue the formal grievance process or appeal to the grievance board, which was composed of the Warden, Deputy Warden, and one other facility official.[192]  Detainees were also able to submit grievances related to off-site providers through this grievance process, and the HSA would "explore" the complaint.[193]

## C. Key Medical Procedures and Treatments

The report will discuss the following medical procedures and treatments:

- Colposcopy:  A colposcopy used to examine the cervix, vagina, and vulva for signs of disease.  The procedure is recommended after an abnormal Pap test result.  During the

---

Permanent Subcommittee on Investigations (Oct. 13, 2021); Lakeysa Brown, formerly of Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Jan. 5, 2022).

[184] David Paulk, Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Sept. 16, 2021); Frank Albright, Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Sept. 21, 2021).

[185] David Paulk, Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Sept. 16, 2021).

[186] Lakeysa Brown, formerly of Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Jan. 5, 2022).

[187] David Paulk, Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Sept. 16, 2021).

[188] Id.; Frank Albright, Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Sept. 21, 2021); Shanise Bell, formerly of Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Oct. 13, 2021); Lakeysa Brown, formerly of Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Jan. 5, 2022).

[189] Lakeysa Brown, formerly of Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Jan. 5, 2022).

[190] Id.

[191] Id.

[192] Id.; David Paulk, Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Sept. 16, 2021).

[193] Pamela Hearn, LaSalle Corrections, Interview with Senate Permanent Subcommittee on Investigations (Nov. 9, 2021); Lakeysa Brown, formerly of Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Jan. 5, 2022).

procedure, a colposcopy—a magnifying instrument—is used to identify any suspicious cells. A small sample of tissue may be collected if suspicious cells are identified.[194]

- <u>Depo-Provera</u>: Depo-Provera is an injection that contains the hormone progestin and is typically administered every three months to prevent pregnancy and manage issues related to the menstrual cycle.[195]

- <u>Dilation & Curettage ("D&C")</u>: A D&C procedure removes tissue from inside the uterus. During this procedure, a provider will dilate the cervix and then use a surgical instrument called a curette (a sharp instrument or suction device) to remove uterine tissue.[196]

- <u>Laparoscopy</u>: A laparoscopy may be used to obtain a small tissue sample for testing or even remove organs like the appendix or gallbladder, and it is generally performed under anesthesia.[197]

- <u>Loop Electrosurgical Excision Procedure ("LEEP")</u>: A LEEP is a procedure in which a heated, electric wire is used to remove cells and tissues in the cervix and vagina.[198]

- <u>Pap smear</u>: A Pap smear or Pap test is a procedure used to test for cervical cancer. A Pap test requires a provider to insert an instrument called a speculum into the vagina to take a tissue sample from the cervix using a soft brush and scraping device known as a spatula.[199]

## III. FORMER DETAINEES AND EMPLOYEES AS WELL AS FEDERAL ENTITIES HAVE ALLEGED SUBSTANDARD CARE AT ICDC

ICDC detainees, former ICDC medical unit employees, and federal entities have alleged substandard medical care at ICDC. The Subcommittee reviewed more than 700 grievances submitted by ICDC detainees. The grievances reviewed by Subcommittee staff included complaints regarding delays in medical care and lack of quality medical care. During a visit by Subcommittee staff to ICDC in August 2021, multiple detainees raised concerns regarding long wait times for medical care and issues obtaining translation services and medical test results. The Subcommittee also conducted interviews with eight former ICDC detainees who expressed

---

[194] Mayo Clinic, *Colposcopy* (https://www.mayoclinic.org/tests-procedures/colposcopy/about/pac-20385036) (accessed Nov. 13, 2022).

[195] Mayo Clinic, *Depo-Provera (Contraceptive Injection)* (www.mayoclinic.org/tests-procedures/depo-provera/about/pac-20392204) (accessed Nov. 13, 2022).

[196] Mayo Clinic, *Dilation and Curettage (D&C)* (www.mayoclinic.org/tests-procedures/dilation-and-curettage/about/pac-20384910) (accessed Nov. 13, 2022).

[197] Johns Hopkins Medicine, *Laparoscopy* (www.hopkinsmedicine.org/health/treatment-tests-and-therapies/laparoscopy) (accessed Nov. 13, 2022).

[198] John Hopkins Medicine, *Loop Electrosurgical Excision Procedure (LEEP)* (www.hopkinsmedicine.org/health/treatment-tests-and-therapies/loop-electrosurgical-excision-procedure-leep) (accessed Nov. 13, 2022).

[199] Mayo Clinic, *Pap Smear* (www.mayoclinic.org/tests-procedures/pap-smear/about/pac-20394841) (accessed Nov. 13, 2022).

concerns regarding medical treatment at the facility and referrals to off-site providers. PSI could not verify all of these allegations.

The Subcommittee also heard concerns from three former ICDC nurses who collectively worked at the facility from 2016 to 2020. The three nurses shared concerns regarding unsanitary medical unit conditions, delays in medical care, record keeping issues, and inconsistent use of language translation services.

Internal DHS entities—ICE ODO and DHS CRCL—have identified numerous and repeat deficiencies at ICDC over the past few years. Since 2017, at least three ODO inspections of ICDC documented violations of safety and health standards, including medical standards, at ICDC. CRCL inspections of ICDC conducted within the past ten years found ICDC detainees failed to receive appropriate or timely medical care, identified poor medical unit conditions at ICDC, and found medical records were mishandled. In addition, a recent DHS OIG report on medical care provided by ICDC found that ICDC generally met ICE detention standards but identified areas for improvement. The OIG report did not review the gynecological procedure approval process or the surgical approval process for detainees at ICDC. It is currently engaged in a separate investigation reviewing those matters.

## A. Former Detainees Have Alleged Deficiencies Related to ICDC Healthcare

ICDC medical staff dealt with a large number of medical complaints from detainees on a regular basis. These complaints ranged from cosmetic issues like dandruff and dry skin to more serious medical and mental health conditions.[200]

When detainees were not satisfied with the services they received from the medical unit, they submitted grievances to be addressed by ICDC leadership. The Subcommittee reviewed more than 650 medical grievances. The grievances reviewed included complaints regarding delays in medical care and lack of quality medical care. Detainees detailed not receiving requested medical care for severe stomach pain, severe intestinal pain, blood in urine, and mouth pain and bleeding.[201] One detainee grievance described being in pain for two months and not receiving a requested tooth extraction.[202] In addition, there were allegations of not receiving prescribed medications and waiting weeks for required medical care. One detainee stated that

---

[200] *See, e.g.*, LaSalle_167885-88, LaSalle_216450, LaSalle_216456 (sick calls for dandruff); LaSalle_232939-40, LaSalle_232942 (sick calls for dry skin and dry scalp); LaSalle_177638-41 (mental health sick call for depression); LaSalle_281516-19 (sick call for pain related to a hernia).

[201] Records indicate that for the detainee asking for "urgent help" due to stomach pain, the detainee had submitted a medical request one week before and received no response. The detainee filed this grievance, and ICDC staff responded to the detainee's grievance within six days stating that the detainee had been placed "on the list to be evaluated by the sick call nurse." LaSalle_002597. Records indicate that the detainee who detailed intestinal pain was seen for the issue three days after submitting the grievance. LaSalle_002831. Records indicate that the detainee who complained of urinary pain was seen for the issue within four days of submitting the grievance. LaSalle_003150. Records indicate that the detainee who complained of experiencing "severe mouth pain including bleeding" felt that "medical isn't providing care." The Warden spoke with the medical unit for the detainee and an off-site appointment was scheduled. LaSalle_000349.

[202] Records indicate that within an hour of the grievance submission, ICDC staff responded, "[y]ou have an upcoming appointment with the dentist." LaSalle_002659.

the facility failed to provide their diabetes medicine and as a result they started experiencing blurry vision due to elevated sugar levels.[203]  Records obtained by the Subcommittee indicate that medical unit staff responded three days after the detainee's initial complaint.[204]  Other detainees with chronic conditions, such as seizures, asthma, high blood pressure, and anemia, alleged in grievances that they were forced to wait days and weeks for their prescriptions.[205]  Records reviewed by the Subcommittee, however, showed that medical unit staff generally responded to these grievances with 24 to 48 hours.[206]  Another detainee said that he had submitted requests for a toothache, but ICDC staff never responded, and the pain ultimately stopped because the tooth fell out.[207]  The Subcommittee could not verify the accuracy of this detainee's claims.

In an interview with Subcommittee staff, ICDC detainees also complained about slow or non-existent translation services at ICDC.  For example, one detainee stated that he had repeatedly asked to go to the medical unit, and once he did arrive, it took one and a half hours to reach a translator on the language line.[208]  The Subcommittee's document review revealed widespread and common use of translation services at ICDC.  Documents show ICDC medical unit staff completed a "communication assessment" at intake to determine whether the detainee spoke English and made such notes in their medical files.[209]  If a detainee did not speak English, the medical file included a note indicating which language the detainee spoke and a code for the interpretation services provided.[210]  Other records identify the use of translation services when assessing sick call requests.[211]  In addition, during a Subcommittee staff visit to ICDC in August

---

[203] LaSalle_002652.

[204] Records indicate that ICDC staff responded three days later stating that staff would contact the detainee's previous detention center again to request records and obtain medication names and dosages.  *Id.*

[205] Records indicate that a detainee who suffered from chronic seizures had not received their third dose of seizure medications for a few days.  The ICDC HSA responded two days later stating that the pill cart nurses had been instructed to administer the detainee's medication three times daily and stated, "I can assure you that this matter will not occur again."  LaSalle_000187.  Records indicate that a detainee with asthma complained of waiting more than one month for an inhaler.  An inhaler was ordered for the detainee one day after the grievance was filed.  LaSalle_002668.  Records indicate that a detainee with high blood pressure complained of not receiving medication for two days and that "every other day a nurse will not find my blood pressure [medications]."  The ICDC medical unit staff responded to the complaint and changed the status of the grievance from "open" to "closed" two days after the grievance was filed.  LaSalle_002598.  Records indicate a detainee with anemia had not received iron supplements for two weeks despite multiple requests.  ICDC medical unit responded to the detainee by stating they did not see the detainee's "multiple medical requests," and placed the detainee "on the [nurse practitioner] list" the day after the grievance was submitted.  LaSalle_002600.

[206] Records indicate that ICDC medical staff generally responded to these grievances within one to two days after the grievance was filed.  LaSalle_000187; LaSalle_002668; LaSalle_002598; LaSalle_002600.

[207] Senate Permanent Subcommittee on Investigations Staff Visit to Irwin County Detention Center (Aug. 17, 2021) (memorandum on file with the Subcommittee).

[208] *Id.*

[209] *See, e.g.*, LaSalle_199415; LaSalle_386054; LaSalle_396725 (indicating these detainees were English speakers).

[210] *See, e.g.*, LaSalle_248643; LaSalle_350105 (indicating that these detainees spoke Spanish and were provided a Spanish interpreter).  The codes appear to be different for each use of the interpreter.

[211] *See, e.g.*, LaSalle_315366 (identifying that an interpreter was used in a July 14, 2017 medical request to address complaints of abdominal pain and a need to refill pain medication); LaSalle_315368 (identifying that an interpreter was used in a July 5, 2017 medical request for medical records); LaSalle_315370 (indicating an interpreter was used in a January 7, 2017 medical request complaining of irregular bleeding).

2021, ICDC medical unit staff showed Subcommittee staff how they use translation services.[212] ICDC staff were able to quickly and easily obtain a translator for a language of their choosing over the phone.[213]

Several detainees also stated to Subcommittee staff that they never received test results after medical tests. For example, one detainee told staff that the medical unit took a blood and urine sample for his kidney issues; he had yet to receive results from these tests one month later.[214] Another detainee said he had experienced knee pain and received an off-site X-ray, but he never received the results.[215] He stated that he continued to experience pain in his knees, and submitted multiple medical requests, but he had not received a response.[216] Subcommittee staff did not review the medical records for these detainees. However, Subcommittee staff reviewed medical files for other detainees and found that they received their test results when requested.[217]

The Subcommittee conducted more extensive interviews with eight former ICDC detainees who expressed concerns regarding medical treatment at ICDC and referrals to off-site providers. Several detainees described instances where another detainee's medical records ended up in their own medical file.[218] One detainee said that at one point during her detainment at ICDC, she fell and fractured her left foot.[219] It then took approximately one month before ICDC staff transported her to an off-site provider.[220] During this appointment, she said that the provider stated to her that he was surprised ICDC did not bring her for treatment sooner.[221] The Subcommittee was unable to verify the specifics of each of these claims.

## B. Former ICDC Employees Reported Disturbing Conditions to the Subcommittee

In interviews with the Subcommittee, three former LPNs who worked at ICDC collectively from 2016 to 2020 shared their concerns regarding unsanitary medical unit conditions, delays in medical care, record keeping issues, and inconsistent use of language translation services at the facility. These three individuals asked to remain anonymous. In interviews with the Subcommittee, the LPNs did not provide specific details or any corroborating evidence to support any of the alleged misconduct. The Subcommittee's review of hundreds of

---

[212] Senate Permanent Subcommittee on Investigations Staff Visit to Irwin County Detention Center (Aug. 17, 2021) (memorandum on file with the Subcommittee).

[213] *Id.*

[214] *Id.*

[215] *Id.*

[216] *Id.*

[217] For example, one detainee filed a sick call request on September 9, 2020 requesting test results and complaining of skin irritation and pain in her ovaries (LaSalle_177857-61). She was seen for all three requests at the medical unit on September 10, 2020 where she also requested her medical records at the same visit (LaSalle_177863-65). The detainee received her medical records on September 21, 2020 (LaSalle_177869). The detainee requested all of her ICDC medical records on December 7, 2020 (LaSalle_178320). She signed an acknowledgment that she received her ICDC medical records on December 10, 2020 (LaSalle_178329).

[218] N.A., Interview with Senate Permanent Subcommittee on Investigations (June 23, 2021); A.K., Interview with Senate Permanent Subcommittee on Investigations (June 23, 2021).

[219] A.K., Interview with Senate Permanent Subcommittee on Investigations (June 23, 2021).

[220] *Id.*

[221] *Id.*

thousands of pages of records from LaSalle did not identify instances corroborating these allegations. The Subcommittee makes no determination on the veracity of any of the LPNs' allegations.

LPN #1 described the ICDC medical unit conditions as "filthy."[222] They stated that the floors and examination tables were always dirty and they had to wipe down surfaces when they arrived to work.[223] They noted that staff members were responsible for bringing their own cleaning supplies, even during the COVID-19 pandemic.[224] When asked how the sanitary conditions at ICDC compared to previous places of employment, LPN #2 described ICDC as "the least clean of any place I have worked in."[225] LPN #3 stated that the conditions at ICDC were "terrible" and the building needed a lot of work.[226] In addition, LPN #1 stated that prior to ICE audits of the medical unit, the ICDC medical staff "scrambled" to get the unit in order, and according to LPN #3, medical unit staff would "shuffle things around" before ICE officials visited the unit.[227]

LPN #1 also alleged to the Subcommittee that detainee requests for medical attention were not addressed in a timely manner, and detainees often had to submit multiple requests before being seen.[228] LPN #1 recalled one detainee who submitted 14 medical requests, but did not provide the name of the detainee to allow the Subcommittee to verify the accuracy of this claim.[229] LPN #1 also stated that in some cases, detainees were not even seen by ICDC medical staff, however she did not raise this issue with her supervisors and did not provide specific cases to support this claim.[230] According to records reviewed by the Subcommittee, detainees generally received care within a few days after submitting requests, and ICDC medical staff responded to most requests within days.[231]

---

[222] LPN #1, formerly of Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (June 30, 2021).

[223] Id.

[224] Id.

[225] LPN #2, formerly of Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (July 12, 2021).

[226] LPN #3, formerly of Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (July 19, 2021).

[227] LPN #1, formerly of Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (June 30, 2021); LPN #3, formerly of Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (July 19, 2021).

[228] LPN #1, formerly of Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (June 30, 2021).

[229] Id. The Subcommittee was unable to identify the individual referenced in this statement and thus could not verify this claim.

[230] Id.

[231] For example, one detainee filed a sick call request on September 9, 2020 requesting test results and complaining of skin irritation and pain in her ovaries (LaSalle_177857-61). She was seen for all three requests at the medical unit on September 10, 2020. (LaSalle_177863-65). This detainee was added to the sick call list within 24 hours of submitting a complaint for irregular bleeding on November 24, 2020 (LaSalle_178294) and for general pain on December 23, 2020 (LaSalle_178607) and was seen within two days for a December 28, 2020 sick call complaining of blood in her stool (LaSalle_178635; LaSalle_178642).

LPN #2 stated that ICDC medical staff, "when possible," tried to see detainees within 24 hours after submission of a medical request, but sometimes it was not possible when the medical unit was short-staffed.[232]  In addition, if the ICDC nurse responsible for triaging sick call requests was absent over the weekend, detainees had to wait until Monday to be seen.[233]

Regarding record keeping inside the medical unit, LPN #1 stated, without providing specifics, that they saw some medical requests "tucked away" and "underneath a box."[234]  LPN #1 told the Subcommittee that when they showed these requests to a fellow nurse, the nurse responded that it "happens all the time."[235]  LPN #3 told the Subcommittee, without providing specific examples, that if a detainee submitted multiple requests, some medical unit staff would say, "we have already seen them for that" and "get rid" of the sick call request.[236]

LPN #1 alleged that medical unit staff had fabricated vital signs.[237]  Specifically, LPN #1 alleged the shift nurses would fabricate vital signs for patients in medical isolation and make little changes to previous vitals taken.[238]  Instead of taking vital signs, LPN #1 alleged ICDC medical staff were "busy surfing the internet."[239]  LPN #1 provided no names of detainees or cases to support this allegation.  In interviews with the Subcommittee, ICDC Medical Director Dr. McMahan, former ICDC HSA Brown, and former ICDC DON Shanise Bell denied these events occurred.[240]  The Subcommittee identified no evidence of fabrication of vital signs or document destruction.

The former LPNs also told the Subcommittee about instances in which the medical unit did not use language translation services.  For example, LPN #1 told the Subcommittee that one time  when a detainee needed blood drawn, another  nurse did not bother to call a translation provider and instead made another detainee waiting to be seen by medical staff translate for the patient.[241]  The LPN did not tell the Subcommittee the name of the nurse or detainee to allow for verification.   LPN #3 told the Subcommittee that if medical unit staff had "piles of intake,"

---

[232] LPN #2, formerly of Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (July 12, 2021).

[233] *Id*.  LPN #3 also stated that detainees who would place a sick call request on Saturdays and Sundays would not be seen until Monday because sick call nurses would not work on the weekends.  LPN #3, formerly of Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (July 19, 2021).

[234] LPN #1, formerly of Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (June 30, 2021).

[235] *Id*.  LPN #1 also alleged that a "stack" of grievances against a certain nurse were destroyed and "nothing was done." *Id.*

[236] LPN #3, formerly of Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (July 19, 2021).

[237] LPN #1, formerly of Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (June 30, 2021).

[238] *Id*.

[239] *Id*.

[240] Howard McMahan, Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Sept. 15, 2021); Shanise Bell, formerly of Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Oct. 13, 2021); Lakeysa Brown, formerly of Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Jan. 5, 2022).

[241] LPN #1, formerly of Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (June 30, 2021).

translation services might not have been used.[242]  LPN #3 also noted that staff could not use translation services when internet or phone services were down at the facility.[243]  The Subcommittee's document review, however, indicated widespread use of translation services both at intake and during sick call requests.[244]

## C. Internal DHS Entities Have Identified Numerous and Repeat Deficiencies at ICDC

ICE ODO has completed at least three compliance inspections of ICDC dating back to 2017.  In these inspections, ODO documented violations of safety and health standards, including medical standards, at ICDC.  ODO identified several medical deficiencies as repeat deficiencies and "priority components" for mitigation.

In 2017, ODO found that intake screening forms were inconsistently reviewed and the mental health, medical history, and medication sections of intake forms were incomplete or left blank.[245]  ODO further noted that of the 35 medical records it reviewed, three detainees had not received health appraisals or dental screenings at all and two more detainees received their appraisals and screenings outside of the required 14-day timeframe.[246]  ODO identified both of the intake-related deficiencies as a "priority component and repeat deficiency."[247]  ODO also found a lack of documentation showing that ICDC medical staff had completed required training.[248]  In reviewing medical records, ODO discovered that the materials "were not organized in a uniform or orderly manner, and many documents were awaiting filing at the time of inspection."[249]  Finally, ODO found syringes and needles in examination rooms that were "neither secured nor inventoried."[250]  Overall, the inspection examined 15 ICE detention standards and found 26 deficiencies in 10 standards, which included nine "medical care" deficiencies, a number of which were repeat deficiencies.[251]

---

[242] LPN #3, formerly of Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (July 19, 2021).

[243] *Id.*

[244] *See, e.g.*, LaSalle_248643, LaSalle_350105 (indicating that these detainees spoke Spanish and were provided a Spanish interpreter at intake); *see also, e.g.*, LaSalle_315366 (identifying that an interpreter was used on a July 14, 2017 medical request to address complaints of abdominal pain and a need to refill pain medication); LaSalle_315368 (identifying that an interpreter was used on July 5, 2017 to receive a request for medical records); LaSalle_315370 (indicating an interpreter was used in a January 7, 2017 sick call request complaining of irregular bleeding).

[245] U.S. Department of Homeland Security, U.S. Immigration and Customs Enforcement, Office of Professional Responsibility, Inspections and Detention Oversight Division, *Compliance Inspection for the Irwin County Detention Center Ocilla, Georgia* (Mar. 2017) (www.ice.gov/doclib/foia/odo-compliance-inspections/2017IrwinCountyGA.pdf).

[246] *Id.*

[247] According to ODO, "priority components" are "considered critical to facility security and the legal and civil rights of detainees."  *Id.*

[248] *Id.*

[249] *Id.*

[250] *Id.*

[251] *Id.*

In March 2020, ODO found that patient examination tables in the ICDC medical units were "torn beyond repair, making cleaning and decontamination impossible."[252]  In the medical department, "medical records were stored on the floor and across the desks throughout the area."[253]  ODO noted that the medical storage issues were a "repeat deficiency."[254]  In addition, ODO found that staff were not conducting regular medication room inventories and could not validate if requested peer reviews were conducted by an outside physician.[255]  The ODO review found that ICDC was only in compliance with five of 18 ICE detention standards examined overall and documented 36 deficiencies, including three regarding "medical care."[256]

In December 2020, ODO reviewed medical records of 12 detainees relating to their initial physical examination and found that one out of the 12 medical files had not been "reviewed nor signed by the physician within 14-days of the detainee's arrival to assess the detainee's priority for treatment."[257]  According to counsel for LaSalle, ODO identified these issues from numerous medical encounters ICDC facilitated in December 2020 and conducted 20 voluntary interviews with ICE detainees and a remote examination as part of its investigation.[258]

Over the past ten years, DHS CRCL has also conducted two on-site investigations of ICDC and noted deficiencies with the facility's provision of medical care.  Two CRCL Expert Recommendation Memoranda from November 2012 and November 2016 indicate that CRCL

---

[252] U.S. Department of Homeland Security, U.S. Immigration and Customs Enforcement, Office of Professional Responsibility, Inspections and Detention Oversight Division, *Compliance Inspection for the Irwin County Detention Center Ocilla, Georgia* (Mar. 2020) (www.ice.gov/doclib/foia/odo-compliance-inspections/irwinCoDetCntr_OcillaGA_Mar3-5_2020.pdf).

[253] *Id.*

[254] *Id.*

[255] *Id.*  According to the 2008 Performance-Based National Detention Standards, health authorities at detention centers must coordinate an external review of licensed medical professionals at their facilities every two years.  *Id.*  In interviews with the Subcommittee, LaSalle medical personnel stated that physicians outside of the ICDC medical unit conducted peer reviews on an annual basis and included chart reviews of patients of ICDC providers.  Pamela Hearn, LaSalle Corrections, Interview with Senate Permanent Subcommittee on Investigations (Nov. 9, 2021); Lakeysa Brown, formerly of Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Jan. 5, 2022).

[256] U.S. Department of Homeland Security, U.S. Immigration and Customs Enforcement, Office of Professional Responsibility, Inspections and Detention Oversight Division, *Compliance Inspection for the Irwin County Detention Center Ocilla, Georgia* (Mar. 2020) (https://www.ice.gov/doclib/foia/odo-compliance-inspections/irwinCoDetCntr_OcillaGA_Mar3-5_2020.pdf).

[257] U.S. Department of Homeland Security, U.S. Immigration and Customs Enforcement, Office of Professional Responsibility, Inspections and Detention Oversight Division, *Compliance Inspection of the Irwin County Detention Center Ocilla, Georgia* (Dec. 2020) (www.ice.gov/doclib/foia/odo-compliance-inspections/irwinCoDetCntrOcillaGA_Dec14-17_2020.pdf).  According to counsel for LaSalle, ICDC challenged or explained the two deficiencies in the December 2020 ODO report.  Specifically, regarding the physician sign-off deficiency, counsel for LaSalle explained that a local policy allowed for a licensed nurse practitioner to sign off on initial health assessments; the one medical file missing a physician sign-off had a signature from a nurse practitioner.  Regarding the lack of consent forms for psychotropic medications, ICDC staff maintained these forms in its files and submitted them to ODO on March 24, 2021.  Counsel for LaSalle, Briefing with Senate Permanent Subcommittee on Investigations (May 19, 2021).

[258] Email from Counsel for LaSalle to the Senate Permanent Subcommittee on Investigations (Nov. 17, 2021).  ODO did not issue any corrective action as a result of this review.  Email from Counsel for LaSalle to the Senate Permanent Subcommittee on Investigations (Nov. 11, 2022).

conducted site visits to ICDC due to complaints it received regarding the facility.[259]  The November 2012 memorandum detailed findings from a medical expert concerning circumstances in which ICDC detainees failed to receive appropriate or timely medical care.[260]  The medical expert noted instances in which staff inappropriately handled medication, failed to process laboratory orders correctly, and elected to prescribe medication for serious conditions instead of alerting the medical director immediately—actions that could have resulted in serious injury to detainees.[261]  In one case, staff allegedly never ordered medication for a detainee who suffered from chronic seizures; in several other cases, detainees waited multiple days for medical attention for acute conditions.[262]  After reviewing 11 randomly-selected medical records, the expert concluded that five files showed unacceptable response times to sick call requests.[263]  Another review of eight complaints from detainees concluded that four detainees had received inappropriate medical care.[264]

A second CRCL memorandum from November 2016—while generally describing medical care at ICDC as "good"—identified issues with medication distribution, medical records maintenance, and nurse staffing.[265]  The medical expert for this review concluded that medication was not consistently available to detainees at ICDC and specifically identified an incident in which medication was allegedly prescribed—but never administered—to a detainee with a serious cancer condition.[266]  The expert also identified two intake healthcare appraisals out of a set of 13 randomly-selected files that failed to meet appropriate standards and noted that ICDC medical records were not easily navigable.[267]

---

[259] According to the November 2012 memorandum, CRCL received three complaints from December 2011 to April 2012 and a report by the American Civil Liberties Union of Georgia "regarding concerns related to conditions of detention at ICDC.  Following a review of these complaints, CRCL decided to conduct a site review of ICDC to review medical care and overall correctional policies."  Similarly, the November 2016 memorandum indicated that CRCL conducted a site visit to ICDC following "numerous allegations alleging civil rights and civil liberties violations of persons being detained at ICDC" since 2015.  The allegations related to medical and mental healthcare, use of force, food service, segregation, recreation, and the detainee grievance system.  U.S. Department of Homeland Security, Office for Civil Rights and Civil Liberties, *Redacted Irwin Rec & Close Memorandum from FY13 Expert Report Memorandum* (Nov. 5, 2012) (notes from document review on file with the Subcommittee); U.S. Department of Homeland Security, Office for Civil Rights and Civil Liberties, *Redacted Irwin Rec & Close Memorandum Expert Report Memorandum* (Nov. 4, 2016) (notes from document review on file with the Subcommittee).

[260] U.S. Department of Homeland Security, Office for Civil Rights and Civil Liberties, *Redacted Irwin Rec & Close Memorandum from FY13 Expert Report Memorandum* (Nov. 5, 2012) (notes from document review on file with the Subcommittee).

[261] *Id.*

[262] *Id.*

[263] *Id.*

[264] *Id.*

[265] U.S. Department of Homeland Security, Office for Civil Rights and Civil Liberties, *Redacted Irwin Rec & Close Memorandum Expert Report Memorandum* (Nov. 4, 2016) (notes from document review on file with the Subcommittee).

[266] *Id.*

[267] *Id.*

**D. The DHS OIG Found That ICDC Generally Met ICE Detention Standards for Healthcare but Identified Areas for Improvement**

Following receipt of the September 2020 whistleblower complaint, the DHS OIG opened an audit in October 2020 to evaluate whether "ICDC provided detainees adequate medical care and adhered to COVID-19 protections."[268] According to the audit report that was released in January 2022, the OIG determined that ICDC "generally met [ICE] detention standards, which specify that detainees have access to appropriate and necessary medical, dental, and mental health care."[269] However, the OIG noted that the evaluation of ICDC's medical processes revealed that the facility's chronic care, continuity of care, and medical policies and procedures were inadequate. Further, the OIG identified seven other areas of concern within the ICDC medical unit.[270]

The OIG noted that its inspection did not review the gynecological procedure approval process for detainees at ICDC. That investigation has been referred to the OIG's Office of Investigations due to the potential criminal nature of the investigation and remains ongoing.[271] In addition, the OIG has initiated a separate audit that will focus on how surgical procedures are authorized and approved for detainees across the ICE system.[272]

**i. The DHS OIG Found That ICDC Medical Care Generally Met Standards but Improvements Are Necessary**

For the audit, the OIG utilized a contract medical team from the National Commission on Correctional Health Care ("NCCHC") to review medical records of ICDC detainees.[273] The NCCHC medical team was comprised of one physician and two registered nurses. The team reviewed 200 detainee records, including records for detainees held at ICDC for 180 days or longer between the fiscal years 2017 and 2020.[274] These chart reviews occurred in conjunction with a virtual site visit that occurred in February 2021.[275]

---

[268] U.S. Department of Homeland Security, Office of Inspector General, *Medical Processes and Communication Protocols Need Improvement at Irwin County Detention Center* (OIG-22-14) (Jan. 3, 2022) (https://www.oig.dhs.gov/sites/default/files/assets/2022-01/OIG-22-14-Jan22.pdf).

[269] *Id.*

[270] Those seven areas of concern include: health assessments, medication administration, sick call, health records, program administration, emergency care, and women's health. *Id.*

[271] *Id.*

[272] *Id.*

[273] *Id.*

[274] The medical chart reviews included 195 randomly selected records for detainees at ICDC for 180 days or longer between FY 2017 and FY 2020, including 118 male detainee records and 77 female detainee records. The team reviewed an additional five records based on concerns detainees raised with OIG staff during interviews. The nursing staff reviewed 158 records, "focusing on completeness, timeliness, and proper actions," while the physician reviewed the charts of 37 detainees with chronic illnesses. *Id.*; U.S. Department of Homeland Security, Office of Inspector General, Briefing with Senate Permanent Subcommittee on Investigations (Feb. 1, 2022).

[275] *Id.*

The OIG "determined that ICDC adhered to the ICE 2011 PBNDS, which specify that detainees have access to appropriate and necessary medical, dental, and mental health care."[276] The OIG's contract medical team "assessed the adequacy of medical processes and policies and the appropriateness of any actions taken to address medical concerns."[277]  Of the 36 medical processes the NCCHC medical team evaluated, the team determined three—chronic care, continuity of care, and policies and procedures—were inadequate.[278]

The NCCHC medical team determined that the care ICDC provided for specific chronic conditions "such as hypertension, hyperlipidemia, diabetes, asthma, and menstrual disorders, appeared adequate, but that the chronic care program itself was inadequate."[279]  For this review, the NCCHC physician reviewed medical files for 37 ICDC detainees with chronic conditions.[280] The physician identified issues in chronic care management in 15 of the medical files.[281]  These issues included inconsistent guidelines for chronic care; lack of monitoring and documenting the current status of detainees with chronic conditions; and issues with the interpretation, documentation, and sharing of lab information with detainees.[282]

The NCCHC physician identified issues with ICDC's continuity of care process in 12 of the 37 detainee medical files reviewed.[283]  These issues included "multiple medical files missing care plans, records without planned chronic care visits, missing laboratory results, and improper medications."[284]  The team also identified inconsistent medical record keeping including unexplained orders, grievance responses, improper referrals, and timeliness concerns.[285]

### ii.    The OIG Identified Seven Other Areas of Concern About ICDC Medical Care

The OIG identified seven additional areas of concern in the ICDC medical unit: (1) health assessments, (2) medication administration, (3) sick call, (4) health records, (5) program administration, (6) emergency care, and (7) women's health.[286]  A number of the OIG's findings mirror similar allegations the Subcommittee reviewed during its investigation.

With respect to health assessments, the NCCHC medical team concluded that in general, "ICDC's compliance with standards [for medical intake screening] was adequate, but there is room for improvement."[287]  Of the 195 detainee intake records reviewed, the NCCHC team found that medical care at intake was "timely and complete," and that three records showed

---

[276] *Id.*
[277] *Id.*
[278] *Id.*
[279] *Id.*
[280] *Id.*
[281] *Id.*
[282] *Id.*
[283] *Id.*
[284] *Id.*
[285] *Id.*
[286] *Id.*
[287] *Id.*

"minor issues that were not reflections of an inefficient intake program."[288]  The OIG noted, however, that seven records indicated an initial health screening occurred after the required 14-day timeframe, and 15 records lacked health assessment documentation altogether.[289]

The medical contractors concluded that the ICDC medication management process was ultimately "adequate," but that there were "some issues in medication administration."[290]  The NCCHC medical team found that it was "almost impossible to provide an accurate assessment of medication administration practices based on the documentation provided in the health record."[291]  In order to determine the adequacy of the medication administration procedures at ICDC, the contract medical team needed documents, such as the original order and documentation of the first dose, that were not in the health records of the detainees they reviewed.[292]  The NCCHC medical team also found additional concerns with records management of chronic care patients that refused to take prescribed medications.[293]

The NCCHC medical team reviewed 195 health records with 236 sick call visits and determined that the care provided during 8 of the 236 visits could have been "more appropriate."[294]  The contract team identified additional issues with nursing protocols that allow the ICDC "nursing staff to provide over-the-counter medications without checking the current medications the detainee is prescribed."[295]  For example, the NCCHC medical team determined it was inappropriate that ICDC LPNs were allowed to prescribe ibuprofen to detainees while the detainee was already on another non-steroidal anti-inflammatory drug or were on orders to not be administered such medication.[296]

The NCCHC medical team also identified issues with health records management.  The OIG noted that during the review, the medical team was "unable to determine if a Health Insurance Portability and Accountability Act (HIPAA) program was in place and properly applied" at ICDC.[297]  The team requested evidence that ICDC staff had undergone HIPAA training, but ICDC did not provide any.[298]

With respect to program administration, the NCCHC medical team found that "ICDC's medical unit had not developed a continuous quality improvement program."[299]  Such a program would improve detainee healthcare by "identifying problems, implementing and monitoring corrective action, and studying the improvement program's effectiveness."[300]  The OIG

---

[288] *Id.*
[289] *Id.*
[290] *Id.*
[291] *Id.*
[292] *Id.*
[293] *Id.*
[294] *Id.*
[295] *Id.*
[296] *Id.*
[297] *Id.*
[298] *Id.*
[299] *Id.*
[300] *Id.*

explained that "ICDC did not provide documentation showing any organized approach to evaluate the delivery of health care services."[301]

The ICDC medical unit was "unable to provide emergency response drill documentation" to the NCCHC medical team.[302] With the missing documentation, it was "unclear whether drills were being conducted."[303] The OIG explained that the lack of emergency preparation could "hinder proper response to emergency situations at ICDC."[304]

Regarding women's health, the OIG's contract medical team concluded that, based on its medical records review, women's healthcare at ICDC was "appropriate."[305] The OIG noted, however, that "off-site specialty provider care information was not consistently returned to the ICDC medical unit."[306]

## IV.     ALLEGED SERIOUS MEDICAL MISCONDUCT BY DR. MAHENDRA AMIN

In the September 2020 complaint to DHS OIG, DHS CRCL, the ICE Atlanta Field Office, and the ICDC Warden, a whistleblower alleged that Dr. Amin had performed a high volume of hysterectomies on female detainees at ICDC.[307] This allegation was not substantiated by the Subcommittee. In December 2020, several detainees filed a lawsuit against Dr. Amin, ICDC, ICE, and other parties alleging that Dr. Amin had subjected them to nonconsensual and unnecessary gynecological procedures as part of a broader pattern of medical abuse at ICDC.[308] This litigation is ongoing. Other complaints making similar allegations followed, including complaints to the Georgia Composite Medical Board.[309]

Ultimately, the Subcommittee's investigation found that Dr. Amin performed just two hysterectomies, one in 2017 and one in 2019, which ICE deemed to be medically necessary. However, the Subcommittee did find that Dr. Amin performed an unusually high number of other gynecological procedures on ICDC detainees.

As described in Section I, the Subcommittee discovered that Dr. Amin had also been the subject of similar allegations just seven years earlier. A 2013 DOJ complaint against Dr. Amin and other parties alleged that he and other physicians at ICH had maintained "standing orders" that required nurses to perform certain medical treatments on pregnant women regardless of their

---

[301] *Id.*
[302] *Id.*
[303] *Id.*
[304] *Id.*
[305] *Id.*
[306] *Id.*
[307] Project South Complaint, *supra* note 1.
[308] Consolidated Amended Petition for Writ of Habeas Corpus and Class Action Complaint for Declaratory and Injunctive Relief and for Damages (Dec. 21, 2020), *Oldaker v. Giles*, M.D. GA (No. 7:20-cv-00224-WLS-MSH).
[309] Complaints for six ICDC detainee patients treated by Dr. Amin are on file with the Subcommittee.

condition and without an evaluation from a physician.[310]  Dr. Amin and the other defendants reached a civil settlement with DOJ in 2015 without a determination of liability.[311]

In 2014—the year before his settlement with DOJ—Dr. Amin began providing OB-GYN services to detainees at ICDC.[312]  The Subcommittee interviewed six of these detainees who described feeling confused, afraid, and violated after their encounters with Dr. Amin—and many of the women reported that they still live with pain and uncertainty regarding their fertility. Former nurses at ICDC also told the Subcommittee that they had observed confusion among detainee patients regarding the procedures they were scheduled to receive by Dr. Amin and why they were receiving them.  The nurses also informed the Subcommittee that they observed excessive numbers of OB-GYN treatments by Dr. Amin.[313]  Dr. Amin stopped treating female ICDC detainees after the whistleblower complaint was filed in September 2020.[314]

The Subcommittee also spoke with multiple experts in the OB-GYN field of medicine. These doctors reviewed medical records of former ICDC patients who were treated by Dr. Amin. Each expert raised significant concerns about the treatment Dr. Amin provided to ICDC detainees.

A. **Former ICDC Detainees Have Raised Concerns About Conditions at ICDC and Alleged That Dr. Amin Performed Nonconsensual, Unnecessary, or Excessive OB-GYN Procedures**

To assess the allegations in the complaints, the Subcommittee spoke directly with six of the women Dr. Amin treated:  Karina Cisneros Preciado, Jaromy Floriano Navarro, Wendy Dowe, Maribel Castaneda-Reyes, Jane Doe #1, and Jane Doe #2.  All of these women, except Jane Doe #2, appear as plaintiffs in the December 2020 lawsuit against the federal government and other parties.[315]  Based on interviews with the women and reviews of their medical records, it appears that Dr. Amin deployed a specific pattern in examining and treating these women. Records and testimony indicate that Dr. Amin performed a vaginal ultrasound on all six women, diagnosed five of the women with ovarian cysts, and subsequently prescribed Depo-Provera

---

[310] Complaint (July 8, 2013), *United States v. Hospital Authority of Irwin County*, M.D. Ga. (No. 7:13-cv-00097-HL).

[311] The United States of America's Filing of Settlement Agreement (July 8, 2013), *United States v. Hospital Authority of Irwin County*, M.D. Ga. (No. 7:13-cv-00097-HL); U.S. Department of Justice, U.S. Attorney's Office Middle District of Georgia, *Hospital Authority of Irwin County Resolves False Claims Act Investigation for $520,000* (Apr. 29, 2015) (www.justice.gov/usao-mdga/pr/hospital-authority-irwin-county-resolves-false-claims-act-investigation-520000).

[312] *June 23, 2021 ICE Q&A Paper, supra* note 14.

[313] LPN #2, formerly of Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (July 12, 2021); LPN #3, formerly of Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (July 19, 2021).

[314] *June 23, 2021 ICE Q&A Paper, supra* note 14; Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations (Aug. 10, 2021) (Tranche 16, 10869).  The same day, Dr. Amin sent a letter to a LaSalle employee stating that he had "decided to sever my ties with ICDC and will no longer be treating ICDC patients."  Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations (Oct. 22, 2021) (Tranche 18, 11144).

[315] *See* Consolidated Amended Petition for Writ of Habeas Corpus and Class Action Complaint for Declaratory and Injunctive Relief and for Damages (Dec. 21, 2020), *Oldaker v. Giles*, M.D. GA (No. 7:20-cv-00224-WLS-MSH).

injections for each woman with the cyst diagnosis. Dr. Amin also appears to have recommended surgical procedures to four of the women, including a cyst removal, D&C, and a LEEP. One patient avoided undergoing a procedure from Dr. Amin because she tested positive for COVID-19 antibodies on the day of her scheduled surgery.[316]

### i. Karina Cisneros Preciado

Ms. Cisneros Preciado—a 23-year-old mother and survivor of domestic abuse—was brought to the United States by her mother from Mexico in 2007 at the age of eight.[317] She was detained at ICDC from July 2020 to January 2021 following an arrest in Georgia for domestic violence against an abusive partner.[318] Shortly before her detainment at ICDC, she gave birth to her daughter, and she sought postpartum treatment while at ICDC.[319] Ms. Cisneros Preciado also experienced pain in her lower abdomen.[320] She was ultimately referred to Dr. Amin.

Ms. Cisneros Preciado recalled that at her first appointment on September 2, 2020, Dr. Amin did not acknowledge her when he came into the room.[321] She stated that instead of explaining the procedures he intended to perform, Dr. Amin simply told Ms. Cisneros Preciado to "open your legs."[322] She stated that the ICDC female guard who escorted her to the visit sat directly in front of her during this encounter, so she did not feel comfortable complying.[323] Once the guard moved and stood next to her, she complied, and Dr. Amin inserted a long white tube into her vagina.[324]

Ms. Cisneros Preciado explained that the ICDC nurse had told her that she would be getting a Pap smear at this visit; however, based on her previous treatments, Ms. Cisneros Preciado said that she knew this was a vaginal ultrasound and not a Pap smear.[325] Ms. Cisneros Preciado told Subcommittee staff that she became confused and extremely uncomfortable, but she did not feel that she had any choice about what occurred.[326]

---

[316] Jaromy Jazmin Floriano Navarro, Interview with Senate Permanent Subcommittee on Investigations (June 25, 2021).

[317] Karina Cisneros Preciado, Interview with Senate Permanent Subcommittee on Investigations (Oct. 6, 2021).

[318] Ms. Cisneros Preciado told Subcommittee staff that she was actually the victim in the altercation that led to her arrest. Her charges have subsequently been dismissed. *Id.*; Email from Counsel for Ms. Cisneros Preciado to the Senate Permanent Subcommittee on Investigations (Nov. 10, 2022).

[319] Karina Cisneros Preciado, Interview with Senate Permanent Subcommittee on Investigations (Oct. 6, 2021); LaSalle_177704 (August 11, 2020 medical request from Ms. Cisneros Preciado stating, "I would like to get [p]renatal[] [vitamins]. I had a baby a few months ago and I still need them.").

[320] LaSalle_177736 (August 17, 2020 sick call request from Ms. Cisneros Preciado stating, "I have pain in the lower part of my stomach. Like my ovaries."); *see also* LaSalle_177737-39.

[321] Karina Cisneros Preciado, Interview with Senate Permanent Subcommittee on Investigations (Oct. 6, 2021); LaSalle_178472-82.

[322] Karina Cisneros Preciado, Interview with Senate Permanent Subcommittee on Investigations (Oct. 6, 2021).

[323] *Id.*

[324] *Id.*

[325] *Id.*

[326] *Id.*

She said that Dr. Amin told her that she had an ovarian cyst and he planned to administer a Depo-Provera injection, but he never provided any other information about the injection.[327] According to Dr. Amin's notes from the visit, his treatment plan included prescribing a Depo-Provera injection and having Ms. Cisneros Preciado return for a follow-up visit in four weeks.[328]

Ms. Cisneros Preciado recalled shaking while dressing after this encounter ended.[329] After she dressed, the ICDC guard put handcuffs back on Ms. Cisneros Preciado, and Dr. Amin's nurse asked her to sign a form.[330] While Ms. Cisneros Preciado was handcuffed, a nurse administered the Depo-Provera injection.[331] Ms. Cisneros Preciado learned after the appointment that Depo-Provera was a form of contraception.[332] According to an ICDC medical unit provider's notes from September 26, 2020, Ms. Cisneros Preciado "got a Depo – states wasn't explained."[333]

Ms. Cisneros Preciado did not return to Dr. Amin for additional treatment because the allegations about him became public a few weeks later.[334] On October 5, 2020, Ms. Cisneros Preciado received a transvaginal ultrasound at ICH for "report [of an] ovarian cyst."[335] The imaging report states that the ultrasound showed "[t]he uterus is normal in its appearance" and found an "[u]nremarkable evaluation of the pelvis."[336]

Ms. Cisneros Preciado currently resides in Fort Lauderdale, Florida.

### ii. Jaromy Floriano Navarro

Ms. Floriano Navarro—a 29-year-old mother of three daughters—was brought to the United States from Mexico when she was about eight years old by a family member, and was detained at ICDC from October 2019 to September 2020 following an arrest for traffic

---

[327] *Id.*
[328] LaSalle_178463; LaSalle_178465-67.
[329] Karina Cisneros Preciado, Interview with Senate Permanent Subcommittee on Investigations (Oct. 6, 2021).
[330] *Id.*
[331] *Id.*
[332] *Id.*
[333] LaSalle_178401.
[334] Karina Cisneros Preciado, Interview with Senate Permanent Subcommittee on Investigations (Oct. 6, 2021). According to medical records reviewed by the Subcommittee, Ms. Cisneros Preciado experienced irregular bleeding after the Depo-Provera injection and was referred to another OB-GYN provider in December 2020. The new OB-GYN provider prescribed oral Provera and Sprintec. LaSalle_178294; LaSalle_178295-97; LaSalle_178323; LaSalle_178354-64.
[335] LaSalle_178414-23.
[336] LaSalle_178223.

violations.[337]  Ms. Floriano Navarro described ICDC to the Subcommittee as "living in Hell."[338]  She said that the facility was dark and dirty, and detainees were treated like they were "less than human."[339]  Ms. Floriano Navarro also stated that the drinking water in the facility was "nasty" and "always dirty."[340]  She explained that detainees would often drink water from a rusty faucet, and rust would fall into the water.[341]  Additionally, she stated that the conditions at ICDC terrified her because she believed she "could die in there and nobody is going to know how it happened."[342]

While at ICDC, Ms. Floriano Navarro complained of painful menstrual cramps for about five to six months before she was ultimately referred to Dr. Amin.[343]  Prior to her appointment with Dr. Amin she had heard him referred to as "Mr. Two-Fingers" because "he would always just stick his two fingers inside of you."[344]  When Ms. Floriano Navarro ultimately met with Dr. Amin for the first time on February 24, 2020, she thought he was "cold" and stated that he did not look her in the eyes or say hello but instead walked in and said "lay back, open your legs."[345]  During this appointment, Dr. Amin performed a vaginal ultrasound, determined Ms. Floriano Navarro had an ovarian cyst, and administered a Depo-Provera injection.[346]  Ms. Floriano Navarro stated that she was grateful that she understood English because otherwise she would not have known what was occurring.[347]  Ms. Floriano Navarro recalled that no one asked her if she would be comfortable removing her clothes for an examination and stated that "no one ever got my consent."[348]

Ms. Floriano Navarro recalled that Dr. Amin did not explain anything in later appointments and did not look her in the eyes.[349]  In a subsequent visit with Dr. Amin on May 26, 2020, Ms. Floriano Navarro was under the impression she was to receive her second Depo-

---

[337] Ms. Floriano Navarro was arrested for possession of marijuana in 2013.  Jaromy Jazmin Floriano Navarro, Interview with Senate Permanent Subcommittee on Investigations (June 25, 2021); Declaration of Jaromy Jazmin Floriano Navarro (Nov. 18, 2020) (on file with the Subcommittee); Email from Counsel for Ms. Floriano Navarro to the Senate Permanent Subcommittee on Investigations (Nov.10, 2021); Email from Counsel for Ms. Floriano Navarro to the Senate Permanent Subcommittee on Investigations (Apr. 26, 2022); Email from Counsel for Ms. Floriano Navarro to the Senate Permanent Subcommittee on Investigations (Nov. 12, 2022).
[338] Jaromy Jazmin Floriano Navarro, Interview with Senate Permanent Subcommittee on Investigations (June 25, 2021).
[339] Id.
[340] Id.
[341] Id.
[342] Id.
[343] Id.; see, e.g., LaSalle_334271 (January 15, 2020 sick call request from Ms. Floriano Navarro stating, "I'm experiencing severe back pain and cramps due to my period."); LaSalle_334412 (February 6, 2020 sick call request from Ms. Floriano Navarro complaining of "cramps").
[344] Jaromy Jazmin Floriano Navarro, Interview with Senate Permanent Subcommittee on Investigations (June 25, 2021).
[345] Id.; LaSalle_335998-336018.
[346] Jaromy Jazmin Floriano Navarro, Interview with Senate Permanent Subcommittee on Investigations (June 25, 2021); LaSalle_333620-21 (The impressions from the transvaginal ultrasound report included "[e]nlarged uterus. Thickened Endometrium.  Follicular cysts on both ovaries."); LaSalle_333625.
[347] Jaromy Jazmin Floriano Navarro, Interview with Senate Permanent Subcommittee on Investigations (June 25, 2021).
[348] Id.
[349] Id.

Provera injection; however, this did not occur, and Dr. Amin prescribed antibiotics after she presented with right side pain, white discharge, and pain with urination.[350]  According to ICDC nurse notes from a June 5, 2020 encounter, Ms. Floriano Navarro continued "having cramps in lower [abdomen] and [] was told by Dr. Amin that she needed to have cyst removed."[351]  On June 29, 2020, Dr. Amin administered the second Depo-Provera injection.[352]

At a July 22, 2020 appointment, Dr. Amin informed Ms. Floriano Navarro that she would be receiving surgery for her cyst.[353]  Ms. Floriano Navarro said that she did not understand why Dr. Amin decided on surgery rather than giving the Depo-Provera injections a chance to work.[354]  On July 31, 2020, the day of her scheduled surgery for what she believed to be a cyst removal, Ms. Floriano Navarro stated that an ICDC guard informed Ms. Floriano Navarro that she was scheduled to receive a hysterectomy.[355]  Ultimately, this surgery did not take place because Ms. Floriano Navarro tested positive for COVID-19 antibodies.[356]  When Ms. Floriano Navarro returned to ICDC, she inquired about the potential hysterectomy.[357]  Ms. Floriano Navarro stated that an ICDC nurse told her that the ICDC guard must have misheard the name of the treatment and that she was actually scheduled for a D&C procedure.[358]

Ms. Floriano Navarro's surgery was later rescheduled for August 14, 2020.[359]  Before her surgery date, Ms. Floriano Navarro asked the ICDC medical unit whether her upcoming surgery was for a cyst drain procedure, to "remove [her] womb," or to remove an ovary.[360]  According to ICDC nurse notes, Ms. Floriano Navarro presented to the ICDC medical unit the day before what she believed was her scheduled surgery date to remove a cyst and was "informed she is having a D&C scope which is a dilation of the uterus to look around and take samples as needed for testing."[361]  However, Ms. Floriano Navarro still refused the surgery due to her confusion regarding which surgical procedure she would be undergoing.[362]

Ms. Floriano Navarro recalled feeling pressured by the ICDC medical unit to receive the surgery.[363]  Additionally, she recalled one ICDC officer stating that she "might as well" have the

---

[350] LaSalle_333435-44; LaSalle_333446; LaSalle_333450.

[351] LaSalle_334989-91.

[352] LaSalle_333616; LaSalle_333625.

[353] LaSalle_333602-15.  According to Dr. Amin's request for a D&C and laparoscopy, Ms. Floriano Navarro "was seen back on Feb. 24, 2020 and was given Depo Provera injection.  She follow[ed]-up a couple of times and more hormones were tried without a response.  The plan is to schedule her for a D&C scope."  Dr. Amin requested the outpatient surgery for July 31, 2020.  LaSalle_333614.

[354] Jaromy Jazmin Floriano Navarro, Interview with Senate Permanent Subcommittee on Investigations (June 25, 2021).

[355] Id.; ICH004869-4900; LaSalle_333646-55.

[356] Id.; ICH004869-4900; LaSalle_333646-55.

[357] Jaromy Jazmin Floriano Navarro, Interview with Senate Permanent Subcommittee on Investigations (June 25, 2021).

[358] Id.

[359] LaSalle_333700-10.

[360] LaSalle_333712.

[361] LaSalle_335569-71.

[362] Jaromy Jazmin Floriano Navarro, Interview with Senate Permanent Subcommittee on Investigations (June 25, 2021).

[363] Id.

surgery because it was "already paid for," and that she could go back to her home country and "start fresh."[364]  In medical requests submitted on August 20, 2020, Ms. Floriano Navarro wrote, "I did speak with the ICE agents, I was a bit scared, I do remember the period I had for about 3 weeks" and asked if the D&C procedure could be rescheduled because she was "cramping more now."[365]  On September 14, 2020, Ms. Floriano Navarro was taken to see Dr. Amin once more, and he again diagnosed her with an ovarian cyst and questioned Ms. Floriano Navarro's decision to reject the surgery.[366]  Ms. Floriano Navarro was rescheduled for a D&C procedure on September 18, 2020.[367]  On September 16, 2020, Ms. Floriano Navarro was deported to Mexico, where she currently resides.[368]

### iii. Wendy Dowe

Ms. Dowe—a 51-year-old mother of four children—arrived in the United States in 1997 on a visitor visa and ultimately overstayed that visa.[369]  She was detained for one and a half years following an arrest for possession of marijuana and providing a false information to a law enforcement officer.[370]  Ms. Dowe described ICDC as a "nightmare" and stated that she "would not even put dogs in ICDC."[371]  She further stated that "I can't give you the words for it," and she "does not like to relive or remember" her time at ICDC.[372]

While at ICDC, Ms. Dowe requested an appointment with an OB-GYN specialist because she had experienced heavy and painful menstrual cycles.[373]  On December 21, 2018, Ms. Dowe had an initial appointment with Dr. Amin.[374]  As with the other women, Ms. Dowe said that Dr. Amin performed a vaginal ultrasound and told her that she had ovarian cysts.[375]  Ms. Dowe stated that she asked Dr. Amin to explain what he meant by "cyst," but he refused to answer her question.[376]  Instead, Ms. Dowe said that Dr. Amin told her that the explanation would be provided in writing and forwarded to ICDC nurses because he "was not authorized" to give Ms. Dowe that information.[377]  Ms. Dowe said that she did not "know what was going on."[378]

---

[364] *Id.*

[365] LaSalle_333723; LaSalle_333725; *see also* LaSalle_335656-58.

[366] LaSalle_333658-67; LaSalle_333747.

[367] LaSalle_333753-62.

[368] Jaromy Jazmin Floriano Navarro, Interview with Senate Permanent Subcommittee on Investigations (June 25, 2021).

[369] Email from Counsel for Ms. Dowe to the Senate Permanent Subcommittee on Investigations (Apr. 25, 2022).

[370] Wendy Dowe, Interview with Senate Permanent Subcommittee on Investigations (June 25, 2021); Email from Counsel for Ms. Dowe to the Senate Permanent Subcommittee on Investigations (Nov. 18, 2021).

[371] Wendy Dowe, Interview with Senate Permanent Subcommittee on Investigations (June 25, 2021).

[372] *Id.*

[373] *Id.*; *see* LaSalle_323784 (December 12, 2018 sick call request from Ms. Dowe stating, "I'm on my cycle now for two weeks and bleeding heavily and I'm week [sic] and dizzy."); LaSalle_323943 (December 20, 2018 sick call request from Ms. Dowe stating, "I have pain in my abdomen.").

[374] LaSalle_323830-42; LaSalle_323897-901.

[375] Wendy Dowe, Interview with Senate Permanent Subcommittee on Investigations (June 25, 2021); ICH000972-1058.

[376] Wendy Dowe, Interview with Senate Permanent Subcommittee on Investigations (June 25, 2021).

[377] *Id.*  A review of Ms. Dowe's medical records indicate a diagnosis of "multiple uterine fibroids and ovarian cyst," but did not describe what a cyst was.

[378] *Id.*

According to ICDC nurse notes after Ms. Dowe returned from her visit, Dr. Amin had provided "new written orders, [] order for labs, [] order for [a] transvaginal pelvic sonogram, and a follow-[up] appointment" for an "[abdominal] mass" diagnosis.[379]

On January 10, 2019, medical records indicate that Ms. Dowe received a transvaginal ultrasound at ICH as requested by Dr. Amin.[380] The ultrasound report's impressions included "multiple uterine leiomyomata" and "[n]ormal ovaries with cysts present bilaterally."[381] The next day, Ms. Dowe had a follow-up visit with Dr. Amin.[382] At this visit, Dr. Amin determined that Ms. Dowe needed a D&C scope based on his impressions that Ms. Dowe was suffering from chronic pelvic pain, metrorrhagia, menorrhagia, and dysmenorrhea.[383] Ms. Dowe told the Subcommittee that on the day of her surgery, the ICDC medical unit staff called her to the medical unit to be transported to an "outside appointment."[384] Ms. Dowe recalled that the medical unit staff did not tell her what doctor she was going to see, nor was it explained that she was to have surgery that day.[385] Ms. Dowe received surgery on January 29, 2019.[386] It was only when she arrived at the hospital that she learned she was scheduled for surgery.[387]

Ms. Dowe said she was shackled at her feet and waist and "physically was not able to argue" with the ICH nursing staff about the surgery.[388] She recalled "it was too much for me at the time."[389] Ms. Dowe also told the Subcommittee that she did not recall signing any consent forms prior to this surgery.[390] After the surgery, Ms. Dowe said she awoke in the ICDC medical unit with pain in her lower abdomen.[391] She said she felt the bandages on her abdomen, and she had to ask the nursing staff about what had occurred.[392] The ICDC nurses stated that they could not answer her questions because they had not received paperwork from Dr. Amin.[393]

---

[379] LaSalle_323885-86; *see also* LaSalle_323899-323900.

[380] LaSalle_324222-29; LaSalle_324286.

[381] LaSalle_324286.

[382] LaSalle_324213-14.

[383] *Id.*; LaSalle_324285. Menometrorrhagia is the medical term for excessive, prolonged and/or irregular bleeding unrelated to menstruation. Cleveland Clinic, *Abnormal Uterine Bleeding* (my.clevelandclinic.org/health/diseases/15428-uterine-bleeding-abnormal-uterine-bleeding) (accessed Nov. 13, 2022). Mennorhagia is the medical term for menstrual periods with abnormally heavy or prolonged bleeding. Mayo Clinic, *Menorrhagia (Heavy Menstrual Bleeding)* (https://www.mayoclinic.org/diseases-conditions/menorrhagia/symptoms-causes/syc-20352829) (accessed Nov. 13, 2022). Dysmenorrhea is the medical term for menstrual cramps. Mayo Clinic, *Menstrual Cramps* (www.mayoclinic.org/diseases-conditions/menstrual-cramps/symptoms-causes/syc-20374938) (accessed Nov. 13, 2022).

[384] Wendy Dowe, Interview with Senate Permanent Subcommittee on Investigations (June 25, 2021).

[385] *Id.*

[386] ICH000972-1058; LaSalle_324488-507; LaSalle_324913-14; LaSalle_325088-92.

[387] Wendy Dowe, Interview with Senate Permanent Subcommittee on Investigations (June 25, 2021).

[388] *Id.*

[389] *Id.*

[390] *Id.* The Subcommittee found a signed consent form for a D&C with laparoscopy in Ms. Dowe's medical records from ICH. ICH000991-92.

[391] Wendy Dowe, Interview with Senate Permanent Subcommittee on Investigations (June 25, 2021).

[392] *Id.*

[393] *Id.*

Ms. Dowe told Subcommittee staff that she learned a week later that she had undergone a cyst removal procedure.[394] Following the procedure, Ms. Dowe continued to have pain in her stomach and was referred to Dr. Amin for a follow-up visit.[395] On March, 19, 2019, Ms. Dowe went back to Dr. Amin. At this visit, like Ms. Floriano Navarro, Ms. Dowe received a Depo-Provera injection.[396] Ms. Dowe also recalled that Dr. Amin told her she needed another surgery—a hysterectomy.[397] Ms. Dowe stated that when she asked why, Dr. Amin said it was for a cancerous tumor in her ovary and stated it was the "size of a cantaloupe."[398] She explained that Dr. Amin asked her how many children she had, and after she answered, he stated, "Okay, you're good, you don't need no more [children]."[399] Dr. Amin requested the hysterectomy be scheduled April 11-13, 2019, and in his request for a hysterectomy summarized his care for Ms. Dowe as the following:

> The patient is a 47 year old female … [Patient] recently had surgery D&C scope on 01-29-19. Operative findings were leiomyoma of the uterus 16 week size, pelvic endometriosis. Pathology was benign. [Patient] came in for another [appointment] 03-19-19 chief complaints were vaginal pain and abdominal pain. [Patient] was still bleeding since February 2019. Depo Provera injection was given. The plan is to admit for a hysterectomy.[400]

On April 10, 2019, the day before her scheduled hysterectomy surgery, Ms. Dowe refused to undergo the procedure.[401] According to ICDC nurse notes, Ms. Dowe stated, "I'm not going to no appointment for a hysterectomy" and added "I will get it done when I get out of here" and signed a refusal of treatment form.[402] After Ms. Dowe declined the hysterectomy, she said she was subjected to pressure from ICDC staff.[403] Ms. Dowe stated that ICDC staff told her she was "crazy" for refusing medical treatment and attempted to force her to see a psychiatrist several times.[404]

According to a May 7, 2019 sick call request, Ms. Dowe continued to experience gynecological issues writing, "bleeding for the past three weeks now and it can't stop I [am] feeling very week [sic]."[405] On May 28, 2019, Ms. Dowe was referred back to Dr. Amin.[406] Dr.

---

[394] Id.

[395] See LaSalle_324737 (February 17, 2019 sick call request from Ms. Dowe stating, "I still have the swelling and the pain in my stomack [sic] and left side of my back is swollen and hurts alot [sic].").

[396] Wendy Dowe, Interview with Senate Permanent Subcommittee on Investigations (June 25, 2021); LaSalle_325086.

[397] Wendy Dowe, Interview with Senate Permanent Subcommittee on Investigations (June 25, 2021); LaSalle_325087.

[398] Wendy Dowe, Interview with Senate Permanent Subcommittee on Investigations (June 25, 2021).

[399] Id.

[400] LaSalle_325085.

[401] LaSalle_325361; LaSalle_325364.

[402] Id.

[403] Wendy Dowe, Interview with Senate Permanent Subcommittee on Investigations (June 25, 2021).

[404] Id.

[405] LaSalle_325749.

[406] LaSalle_325846-54; LaSalle_326062-63.

Amin's notes from this appointment stated that Ms. Dowe needed to have surgery—a hysterectomy—as "soon as possible" and noted that she had been approved for the procedure.[407] On June 7, 2019, Ms. Dowe again refused the hysterectomy.[408]

On August 8, 2019, Ms. Dowe submitted a sick call request asking for a "second opinion" because her ovary was "hurting" and she had been "bleeding over a month."[409] According to ICDC medical records, an order for a provider visit was put into the system stating that Ms. Dowe wanted "to discuss getting a second opinion with another OB/GYN on problems she is having."[410] By October 2019, Ms. Dowe still had not received a second opinion. ICDC medical unit notes for an encounter with Ms. Dowe on October 30, 2019 states, "Mrs. Dowe has been referred to mental health for stress. She does not want to have surgery [a hysterectomy] because she is afraid. She wants a second opinion for the surgery. Will try to find another OB/GYN for consulting."[411]

Based on documents reviewed by the Subcommittee, there is no record that Ms. Dowe received a second opinion. In fact, Ms. Dowe was referred back to Dr. Amin in February 2020 for "stomach and vaginal pain."[412] Dr. Amin's notes indicate that his impression for Ms. Dowe's pain was due to "fibroids" and noted to follow up yearly or as needed.[413] A few weeks after that appointment, Ms. Dowe submitted a sick call request stating that she was "still in terrible pain in my ovary."[414] She was seen in the medical unit the next day, and the nurse notes for the visit included instructions for a provider visit noting that Ms. Dowe "still wants second opinion."[415]

In March 2020, due to continuing pain in her lower abdomen which was "getting worse," Ms. Dowe was scheduled to see Dr. Amin again despite requesting a second opinion.[416] A March 4, 2020 outside provider referral order for Ms. Dowe stated, "Referral to Dr. Amin to discuss option of fibroid biopsy/Total Hysterectomy."[417] However, the order was canceled due to Ms. Dowe's scheduled release from the facility a few weeks later.[418] Ms. Dowe was ultimately deported to Jamaica in April 2020. Since leaving ICDC, Ms. Dowe says she has seen a doctor who confirmed that she does not have a cancerous tumor.[419]

---

[407] LaSalle_326062-63.
[408] LaSalle_326174-75; LaSalle_326178.
[409] LaSalle_319164.
[410] LaSalle_319161-62.
[411] LaSalle_320169.
[412] LaSalle_322136-37; LaSalle_322785.
[413] LaSalle_322785.
[414] LaSalle_322419.
[415] LaSalle_322421-23.
[416] LaSalle_322511.
[417] LaSalle_322528-29.
[418] *Id.*
[419] Wendy Dowe, Interview with Senate Permanent Subcommittee on Investigations (June 25, 2021).

### iv. Maribel Castaneda-Reyes

Ms. Castaneda-Reyes—a 30-year-old mother to three children—was brought to the United States from Mexico when she was ten years old by her parents.[420]  Ms. Castaneda-Reyes is a rape and domestic abuse survivor.[421]  Ms. Castaneda-Reyes was detained at ICDC from June to December 2020 following a May 2020 arrest for possession of a controlled substance.[422]  She recalled that she was "shocked" by the living conditions when she first arrived at ICDC.[423]  She said there were spider webs covering the surfaces at ICDC, and when she arrived, staff provided her with dirty, used underwear.[424]  Like others, she described the water as discolored and "not drinkable."[425]

While at ICDC, Ms. Castaneda-Reyes originally sought medical treatment for a hernia; however, she began "spotting" and the ICDC medical unit referred her to Dr. Amin. [426]  On August 12, 2020, Ms. Castaneda-Reyes had her first appointment with Dr. Amin.[427]  According to Dr. Amin's notes, Ms. Castaneda-Reyes presented with "irregular menstrual cycle" and had been bleeding for three weeks intermittently.[428]  Ms. Castaneda-Reyes told Subcommittee staff that at her first appointment with Dr. Amin, he told her to lift her legs and "rammed" a camera inside of her.[429]  According to medical records reviewed by the Subcommittee, Dr. Amin performed a pelvic ultrasound and his ultrasound report indicated a "right ovarian mass."[430]  Ms. Castaneda-Reyes recalled that Dr. Amin told her that she had a cyst and that the best course of action would be surgery or a Depo-Provera injection.[431]  Ms. Castaneda-Reyes informed Dr. Amin that she was already on birth control.  However, Dr. Amin administered a Depo-Provera injection anyway.[432]  Ms. Castaneda-Reyes inquired about her hernia, but Dr. Amin responded that he did not treat hernias.[433]  In the same appointment, Ms. Castaneda-Reyes received a Pap smear from Dr. Amin.[434]  She stated that this was the most painful Pap smear she had ever received and "the way he checks you is not how a regular doctor checks you."[435]

---

[420] Maribel Castaneda-Reyes, Interview with Senate Permanent Subcommittee on Investigations (Oct. 5, 2021); Declaration of Jane Doe #5 – Maribel Castaneda-Reyes (Dec. 16, 2020) (on file with the Subcommittee).
[421] Id.
[422] Id.; Email from Counsel for Ms. Castaneda-Reyes to the Senate Permanent Subcommittee on Investigations (Oct. 15, 2021)
[423] Maribel Castaneda-Reyes, Interview with Senate Permanent Subcommittee on Investigations (Oct. 5, 2021).
[424] Id.
[425] Id.
[426] Id.; LaSalle_281089; LaSalle_281102-04; LaSalle_281156; LaSalle_281182; LaSalle_281187-89; LaSalle_281244-45; Declaration of Jane Doe #5 – Maribel Castaneda-Reyes (Dec. 16, 2020) (on file with the Subcommittee).
[427] LaSalle_282410-20.
[428] LaSalle_282348-49.
[429] Maribel Castaneda-Reyes, Interview with Senate Permanent Subcommittee on Investigations (Oct. 5, 2021).
[430] LaSalle_282342.
[431] Maribel Castaneda-Reyes, Interview with Senate Permanent Subcommittee on Investigations (Oct. 5, 2021).
[432] Id.; LaSalle_282396-97; LaSalle_282401.
[433] Maribel Castaneda-Reyes, Interview with Senate Permanent Subcommittee on Investigations (Oct. 5, 2021).
[434] Declaration of Jane Doe #5 – Maribel Castaneda-Reyes (Dec. 16, 2020) (on file with the Subcommittee); LaSalle_282348-49.
[435] Maribel Castaneda-Reyes, Interview with Senate Permanent Subcommittee on Investigations (Oct. 5, 2021).

In a follow-up appointment on August 26, 2020, Dr. Amin told her that her ovarian cyst was abnormal and that surgery was the best course of action.[436] According to Dr. Amin's notes and request for surgery, Ms. Castaneda-Reyes was seen "on 08-12-20 for irregular periods for 3 weeks on [and] off. She was treated with depo provera [sic] injection, Pap smear [and] HPV was detected. The plan is to schedule for D&C, LEEP, scope."[437]

On September 4, 2020, Ms. Castaneda-Reyes arrived at ICH for surgery.[438] She recalled that the anesthesiologist made fun of her teeth, and that the nurses and the anesthesiologist did not explain the procedures, but simply handed her an electronic tablet with a document on it and a stylus to sign it—"everything was quick."[439] According to Ms. Castaneda-Reyes, she was not shown the document or given time to read it.[440] Following the surgery, Ms. Castaneda-Reyes only learned that Dr. Amin performed a D&C and a LEEP by reviewing her own medical records.[441]

Ms. Castaneda-Reyes currently resides in Gainesville, Georgia.[442] Since her release from ICDC, a physician told her that she would not be able to have any more children because her uterine lining is so thin.[443] She has also sought mental health counseling and is taking medications for her mental health to help cope with the trauma from her time at ICDC.[444] Additionally, Ms. Castaneda-Reyes says she experiences constant pain shooting down her leg that has left her unable to run, which she used to do for enjoyment, and unable to bend which forced her to leave her previous job.[445]

### v. Jane Doe #1

Jane Doe #1—38-year-old mother of a 13-year-old daughter—was brought to the United States from Mexico by her grandparents at the age of three and was detained at ICDC from January to December 2020 following an arrest in South Carolina for possession of a controlled

---

[436] LaSalle_282376-85; LaSalle_282341; *see also* Maribel Castaneda-Reyes, Interview with Senate Permanent Subcommittee on Investigations 5 (Oct. 5, 2021); Declaration of Jane Doe #5 – Maribel Castaneda-Reyes (Dec. 16, 2020) (on file with the Subcommittee).

[437] LaSalle_282340.

[438] ICH005031-99; LaSalle_282319-28; LaSalle_281403-04; LaSalle_281406-10.

[439] Maribel Castaneda-Reyes, Interview with Senate Permanent Subcommittee on Investigations (Oct. 5, 2021); Email from Counsel for Ms. Castaneda-Reyes to the Senate Permanent Subcommittee on Investigations (Nov. 10, 2022).

[440] Email from Counsel for Ms. Castaneda-Reyes to the Senate Permanent Subcommittee on Investigations (Nov. 10, 2022).

[441] Maribel Castaneda-Reyes, Interview with Senate Permanent Subcommittee on Investigations (Oct. 5, 2021).

[442] *Id.*

[443] Email from Counsel for Ms. Castaneda-Reyes to the Senate Permanent Subcommittee on Investigations (Nov. 10, 2022).

[444] Maribel Castaneda-Reyes, Interview with Senate Permanent Subcommittee on Investigations (Oct. 5, 2021); Email from Counsel for Ms. Castaneda-Reyes to the Senate Permanent Subcommittee on Investigations (Nov. 10, 2022).

[445] Maribel Castaneda-Reyes, Interview with Senate Permanent Subcommittee on Investigations (Oct. 5, 2021).

substance.[446]  Jane Doe #1 described the water at ICDC as not drinkable and having a yellowish tint.[447]  She also stated that ICDC staff were rude and would laugh at the detainees who did not speak English.[448]  While detained at ICDC, Jane Doe #1 stated that she generally felt like a "caged animal."[449]

On January 4, 2020, Jane Doe #1 requested an appointment with an OB-GYN provider to obtain a prescription for estrogen pills.[450]  She said that she had previously undergone a hysterectomy and wanted medication to regulate her hormone levels.[451]  On February 7, 2020, Jane Doe #1 had her first appointment with Dr. Amin.[452]  Even though Jane Doe #1 explained her medical history to the nurse at Dr. Amin's office, she was still told to undress, which she thought was odd.[453]

Jane Doe #1 stated that when Dr. Amin arrived, he told her that he would be performing a vaginal ultrasound, which he described as a standard procedure.[454]  Instead of gently inserting the instrument, Jane Doe #1 stated that Dr. Amin "just shoved it in there."[455]  When Jane Doe #1 told Dr. Amin she was in pain, Jane Doe #1 said he responded: "it's okay; almost done."[456]  He then performed a finger examination, which according to Jane Doe #1, felt like "he shoved his whole hand" inside of her.[457]  She further stated that it burned and she tried to hold still, but Dr. Amin just told her to stop moving.[458]  Dr. Amin ultimately prescribed the estrogen pills for her.[459]

In August 2020, Jane Doe #1 ran out of her estrogen pills and had another appointment with Dr. Amin on September 8, 2020.[460]  During this visit, Jane Doe #1 stated to the Subcommittee that a nurse working with Dr. Amin encouraged her to receive a Pap smear.[461]  As with the vaginal ultrasound, Jane Doe #1 stated that the Pap smear was rough, and she again told Dr. Amin that she was in pain, but he did not stop the examination.[462]  Jane Doe #1 recalled that she attempted to ask questions, but Dr. Amin told her she would be notified of any abnormal

---

[446] This former ICDC detainee asked to remain anonymous.  Jane Doe #1, Interview with Senate Permanent Subcommittee on Investigations (Oct. 12, 2021); Declaration of Jane Doe #1 (Dec. 18, 2020) (on file with the Subcommittee).

[447] Jane Doe #1, Interview with Senate Permanent Subcommittee on Investigations (Oct. 12, 2021).

[448] Id.

[449] Id.

[450] Id.; LaSalle_443112.

[451] Jane Doe #1, Interview with Senate Permanent Subcommittee on Investigations (Oct. 12, 2021); LaSalle_443114.

[452] Declaration of Jane Doe #1 (Dec. 18, 2020) (on file with the Subcommittee); LaSalle_443017-18; LaSalle_443067-74.

[453] Jane Doe #1, Interview with Senate Permanent Subcommittee on Investigations (Oct. 12, 2021).

[454] Id.; LaSalle_443019.

[455] Jane Doe #1, Interview with Senate Permanent Subcommittee on Investigations (Oct. 12, 2021).

[456] Id.

[457] Id.

[458] Id.

[459] Id.; LaSalle_442999.

[460] LaSalle_442629-30; LaSalle_442633; LaSalle_442636; LaSalle_443179-81.

[461] Jane Doe #1, Interview with Senate Permanent Subcommittee on Investigations (Oct. 12, 2021); LaSalle_443172.

[462] Jane Doe #1, Interview with Senate Permanent Subcommittee on Investigations (Oct. 12, 2021).

results and walked out of the room. [463] Jane Doe #1 stated that she never received the results of this test.[464] Dr. Amin wrote her a prescription for estrogen pills at this appointment.[465] Jane Doe #1 did not see Dr. Amin again.[466] During her interview with the Subcommittee, Jane Doe #1 stated that she is still afraid to see a doctor following her experience with Dr. Amin.[467]

Following her release from ICDC, Jane Doe #1 now resides in Jackson, South Carolina.[468] Jane Doe #1 was recently arrested again for possession of a controlled substance.[469]

### vi. Jane Doe #2

Jane Doe #2—a 32-year-old mother to a 14-year-old U.S. citizen daughter—was brought to the United States from Cameroon by her parents when she was two years old.[470] Jane Doe #2 was detained at ICDC from October 2017 to February 2020, following a 2017 encounter with the police, the charge from which was later dropped.[471] Jane Doe #2 informed the Subcommittee that she actively sought medical services available to detainees, as the services were free to her.[472]

During her time at ICDC, she experienced "severe" pain in between her menstrual cycles.[473] In March 2019, Jane Doe #2 complained of pelvic pain and abnormal menstrual cycle and was referred to Dr. Amin.[474] Similar to Ms. Navarro, Jane Doe #2 said that she was told by

---

[463] Id.

[464] Id.

[465] LaSalle_443170.

[466] Jane Doe #1, Interview with Senate Permanent Subcommittee on Investigations (Oct. 12, 2021).

[467] Id.

[468] Id.

[469] Email from Counsel for Jane Doe #1 to the Senate Permanent Subcommittee on Investigations (Nov. 10, 2022).

[470] This former ICDC detainee asked to remain anonymous. Email from Counsel for Jane Doe #2 to the Senate Permanent Subcommittee on Investigations (Nov. 15, 2021).

[471] Jane Doe #2, Interview with Senate Permanent Subcommittee on Investigations (Oct. 4, 2021); Email from Counsel for Jane Doe to the Senate Permanent Subcommittee on Investigations (Nov. 11, 2022). The dropped charge (shoplifting) arose from an incident in which she was sitting in the car outside of a gas station when her friends attempted to steal beer without her knowledge. Prior to this dropped charge, she was convicted of three non-violent misdemeanors from two incidents: shoplifting and possession of stolen goods when she was underage (2007) and misdemeanor larceny (2014). The 2014 conviction arose from her being present during a former boyfriend's criminal act. She did not participate in the criminal act herself. Although she was initially charged with conspiracy to commit robbery with a firearm or dangerous weapon, felony possession of cocaine, and felony possession of a controlled substance she was only convicted of misdemeanor larceny. Email from Counsel for Jane Doe #2 to the Senate Permanent Subcommittee on Investigations (Nov. 11, 2022).

[472] Jane Doe #2 mentioned that detainees were able to receive free glasses within 90 days and get their teeth whitened within six months so she "wanted to do stuff like that." Jane Doe #2, Interview with Senate Permanent Subcommittee on Investigations (Oct. 4, 2021).

[473] Id.; Email from Counsel for Jane Doe #2 to the Senate Permanent Subcommittee on Investigations (Nov. 10, 2022). See also LaSalle_244060 (December 21, 2017 medical request from Jane Doe #2 stating, "My menstruation cramps are causing me severe pain please help me."); LaSalle_245228 (October 29, 2018 medical request from Jane Doe #2 stating, "I am having very bad cramps, and I need something for the pain please.").

[474] LaSalle_245699; LaSalle_245701; LaSalle_245724; LaSalle_245744; LaSalle_245747-48.

other detainees that Dr. Amin was "rough," and she should not see him or allow him to treat her because he "messes people up."[475]

On April 3, 2019, Jane Doe #2 had her initial appointment with Dr. Amin.[476]  She stated that Dr. Amin told her that she had an ovarian cyst and prescribed Depo-Provera injections.[477]  Jane Doe #2 noted that Dr. Amin did not provide an explanation regarding the Depo-Provera injection, other than saying it would hopefully shrink the cyst, and did not explain the potential side effects.[478]  Jane Doe #2 received a Depo-Provera injection at this visit.[479]

According to medical records reviewed by the Subcommittee, Jane Doe #2 had follow-up visits with Dr. Amin on April 17, 2019 and May 2, 2019.[480]  At the May 2019 visit, Jane Doe #2 complained that she had not started her period.[481]  According to Dr. Amin's notes for the visit, Dr. Amin prescribed another Depo-Provera injection and a follow-up appointment in one month.[482]  On June 19, 2019, Jane Doe #2 returned to Dr. Amin and received a Depo-Provera injection.[483]  Dr. Amin also performed a pelvic ultrasound at the appointment and found an "enlarged uterus" and "follicular cysts on both ovaries."[484]

After the June 2019 appointment, Jane Doe #2 experienced vaginal bleeding and was referred back to Dr. Amin on August 2, 2019.[485]  According to Dr. Amin's visit notes, Jane Doe #2 had been bleeding "since [her] last visit [on] 6/19/19" and her menstrual cycle had been "spotting to heavy."[486]  Dr. Amin's plan included prescribing Provera and Tramadol and performing a D&C scope.[487]  Jane Doe #2 recalled that Dr. Amin told her that the Depo-Provera injections she received did not work and she would need a D&C.[488]  Jane Doe #2 stated that Dr. Amin did not explain this procedure, but because she believed that Dr. Amin worked for a "government organization," she did not feel the need to second-guess his opinion.[489]

According to Dr. Amin's request to perform a D&C and laparoscopy, Jane Doe #2 had been seen by his office since April 3, 2019 for lower pelvic pain, bleeding with cramps, and irregular periods and was "diagnosed with cysts on both ovaries and enlarged uterus."[490]  Jane Doe #2 received two Depo-Provera injections, Provera hormone tablets, and pain medication,

---

[475] Jane Doe #2, Interview with Senate Permanent Subcommittee on Investigations (Oct. 4, 2021).
[476] LaSalle_245759-68; LaSalle_245874-75.
[477] Jane Doe #2, Interview with Senate Permanent Subcommittee on Investigations (Oct. 4, 2021).
[478] Id.; Email from Counsel for Jane Doe #2 to the Senate Permanent Subcommittee on Investigations (Nov. 10, 2022).
[479] LaSalle_242761.
[480] LaSalle_245858-66; LaSalle_245976-78; LaSalle_246023-32; LaSalle_246109.
[481] LaSalle_246109.
[482] Id.
[483] LaSalle_246813-23; LaSalle_440128; LaSalle_440131.
[484] LaSalle_440132.
[485] LaSalle_247113-14; LaSalle_247297-98; Email from Counsel for Jane Doe #2 to the Senate Permanent Subcommittee on Investigations (Nov. 10, 2022).
[486] LaSalle_440130.
[487] Id.; LaSalle_440129.
[488] Jane Doe #2, Interview with Senate Permanent Subcommittee on Investigations (Oct. 4, 2021).
[489] Id.
[490] LaSalle_440125.

which all "failed."[491]  As a result, Dr. Amin scheduled Jane Doe #2 for a D&C and laparoscopy and indicated that "[s]he agrees and understands the procedure."[492]

On August 23, 2019, Dr. Amin performed a D&C and laparoscopy on Jane Doe #2.[493] Following her procedure, Jane Doe #2 stated that Dr. Amin informed her that he had performed a D&C and removed a portion of her fallopian tube.[494]  She said that Dr. Amin also told her that she would never be able to have children naturally again.[495]  Jane Doe #2 stated to Subcommittee staff that Dr. Amin never explained that the removal of a fallopian tube was a possible risk associated with a D&C.[496]

According to medical records reviewed by the Subcommittee, Jane Doe #2 received another Depo-Provera injection on September 9, 2019.[497]  A few months later in November 2019, Jane Doe #2 experienced "spotting" and was "not sure why" because she had a D&C and received a Depo-Provera injection.[498]  In January 2020, Jane Doe #2 submitted a medical request for a follow up with Dr. Amin regarding her D&C and an overdue Depo-Provera injection.[499] On February 6, 2020, Jane Doe #2 returned to Dr. Amin's office for a follow-up visit.  His staff administered another Depo-Provera injection at this visit and recommended a follow-up appointment in three months.[500]

Jane Doe #2 currently resides in Baltimore, Maryland.

## B.  Former ICDC Employees Recounted Concerns Regarding Dr. Amin to the Subcommittee

As mentioned above, Subcommittee staff spoke with three former LPNs who collectively worked at ICDC between 2016 and 2020.  LPN #1 told the Subcommittee that they recalled an instance in September 2020 in which a detainee returned from an outpatient procedure performed by Dr. Amin not fully understanding the type of procedure she received and questioning whether she would be able to have children.[501]  The LPN did not name this patient and the Subcommittee's document review was unable to verify this claim.

---

[491] *Id.*

[492] *Id.*

[493] LaSalle_240221; LaSalle_240259-60; LaSalle_440113-23; ICH002539-2617.

[494] Jane Doe #2, Interview with Senate Permanent Subcommittee on Investigations (Oct. 4, 2021).  According to an ICDC psychiatric progress note five days after the surgery, Jane Doe #2 was "'bothered' by the fact that she went into surgery expecting a D&C and ended up having a salpingectomy x 1."  LaSalle_240320.

[495] Jane Doe #2, Interview with Senate Permanent Subcommittee on Investigations (Oct. 4, 2021).

[496] *Id.*

[497] LaSalle_242760.

[498] LaSalle_241418.

[499] LaSalle_242247.

[500] LaSalle_242759-60; Email from Counsel for Jane Doe #2 to the Senate Permanent Subcommittee on Investigations (Nov. 10, 2022).

[501] LPN #1, formerly of Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (June 30, 2021).

LPN #1 also told the Subcommittee that in a previous role, they observed patients of Dr. Amin at ICH signing consent forms for surgical procedures while the patients were on the operating table.[502] That nurse stated that some of these patients "were about to drift off to sleep" from anesthesia and "were just coherent enough" to sign the forms; "that lets you know that the patients have no recollection of what they agreed to," they said.[503] The Subcommittee was unable to verify this claim. In addition, the Subcommittee interviewed two nurses that work at ICH and assist Dr. Amin in surgeries who told the Subcommittee that they were not aware of any instances where Dr. Amin or ICH staff received signatures on informed consent forms after the patient was administered anesthesia.[504]

LPN #2 stated to the Subcommittee that Dr. Amin performed "a lot" of D&C procedures.[505] That nurse stated that any detainee sent to Dr. Amin for the third time would receive a D&C, and that it was almost a "standard thing" that detainees would receive D&Cs when being treated by Dr. Amin.[506] LPN #3 was not aware of Dr. Amin performing unnecessary procedures prior to their departure from ICDC in 2018.[507] However, they said they were aware of complaints from patients outside ICDC regarding the quality of care Dr. Amin provided.[508]

## C. Several Medical Experts Identified "Disturbing Patterns" in Treatment by Dr. Amin

Subcommittee staff consulted with four medical experts regarding Dr. Amin's treatment of former ICDC detainees and reviewed documents prepared by these experts regarding their evaluation of the medical records of some of these detainees. Subcommittee staff first interviewed Dr. Ted Anderson, Dr. Sarah Collins, and Dr. Margaret Mueller, members of a team ("Team") asked by attorneys and advocacy groups later representing plaintiffs in the December 2020 lawsuit to review the medical files of some ICDC detainees who were treated by Dr. Amin.[509] This Team reviewed over 3,200 pages of partial medical records for 19 ICDC

---

[502] Id.

[503] Id.

[504] Ryan Lupo, Irwin County Hospital, Interview with Senate Permanent Subcommittee on Investigations (Oct. 20, 2021); Julie Harper, Irwin County Hospital, Interview with Senate Permanent Subcommittee on Investigations (Oct. 21, 2021).

[505] LPN #2, formerly of Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (July 12, 2021).

[506] Id.

[507] LPN #3, formerly of Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (July 19, 2021).

[508] Id.

[509] Dr. Anderson is the Vice Chair for Clinical Operations and Director of the Division of Gynecology at Vanderbilt University Medical Center. Vanderbilt University Medical Center, *Ted L. Anderson, MD, PhD* (https://www.vumc.org/obgyn/person/ted-l-anderson-md-phd) (accessed Nov. 13, 2022). Dr. Collins is an Assistant Professor at the Northwestern University, Feinberg School of Medicine. Northwestern Medicine, *Sarah A. Collins, MD* (https://www.nm.org/doctors/1942401948/sarah-a-collins-md) (accessed Nov. 13, 2022). Dr. Mueller is also an Assistant Professor at the Northwestern University, Feinberg School of Medicine. Northwestern Medicine, *Margaret G. Mueller, MD* (https://www.nm.org/doctors/1346570405/margaret-g-mueller-md) (accessed Nov. 13, 2022). The Team was comprised of nine board-certified OB-GYN physicians and two nursing experts. The members of the team are: Ted Anderson, MD; Haywood L. Brown, MD; Sarah Collins, MD; Caron Jo Gray, MD; Julia Geynisman-Tan, MD; Geri D. Hewitt, MD; Margaret Mueller, MD; Andrea Shields, MD; Geoffrey Schnider,

detainees.  The Subcommittee received complete medical records from ICDC and partial medical records from ICH (which included the 3,200 pages of partial medical records the Team reviewed).  The Subcommittee consulted its own medical expert, Dr. Peter Cherouny, an OB-GYN physician from Vermont.[510]  Dr. Cherouny reviewed over 16,600 pages of medical records pertaining to approximately 94 former detainees treated by Dr. Amin to provide the most comprehensive analysis of Dr. Amin's treatment.[511]  Based on all of the various medical records reviewed, all consulted experts determined that Dr. Amin did not follow current medical guidelines for patient care, and all experts determined that Dr. Amin followed a pattern of treatment for almost all patients he treated regardless of their specific diagnosis or condition.

### i.  OB-GYN Medical Experts Engaged by Immigration Advocacy Groups Found Alarming Surgical Patterns by Dr. Amin

In October 2020, the Team produced an executive summary of findings regarding allegations of medical abuse allegations at ICDC.[512]  Two members of the Team—Dr. Ted Anderson and Dr. Haywood Brown—testified in a closed meeting of the Senate Democratic Caucus on October 26, 2020.[513]

The plaintiffs filed Drs. Anderson and Brown's testimony in support of the litigation in November 2020 and referenced the Team's executive summary in an amended complaint filed in December 2020.[514]  The plaintiffs also submitted three declarations drafted by Dr. Mueller in support of their case: (1) a declaration summarizing her review of the records as a whole; (2) a

---

MD; Michelle Collins, PhD, CNM; and Suzanne McMurtry Baird, DNP, RN.  According to the executive summary, the records of 19 women were the "first records available and were limited by production from the facility, which appear[ed] to be incomplete."  *Executive Summary of Findings by the Independent Medical Review Team Regarding Medical Abuse Allegations at the Irwin County Detention Center* (Oct. 21, 2020) (on file with the Subcommittee).  As previously discussed, immigration advocacy groups and attorneys made allegations regarding Dr. Amin's treatment of ICDC detainees in a September 2020 whistleblower complaint.  The complaint asked for DHS OIG, DHS CRCL, IHSC, and ICDC to conduct an investigation into these allegations.  Following the filing of this complaint, an immigration attorney named Andrew Free was contacted by immigration attorneys for some of the women detained at ICDC.  Mr. Free offered his assistance and ultimately obtained the medical records of some of the former ICDC detainees who were treated by Dr. Amin.  Mr. Free determined that a review by medical experts, rather than a review conducted by immigration advocates, would be the most beneficial to the federal government's investigation into the allegations.  Mr. Free contacted a women's health attorney, Adam Snyder, to form this medical review team.  Members of the review team were not affiliated with immigration advocacy organizations nor were they compensated for their services.  Andrew Free, Briefing with Senate Permanent Subcommittee on Investigations (June 11, 2021); Adam Snyder, Briefing with Senate Permanent Subcommittee on Investigations (June 24, 2021).
[510] Dr. Cherouny is a Professor Emeritus at the University of Vermont, Larner College of Medicine.  Dr. Peter Cherouny Curriculum Vitae (on file with the Subcommittee).
[511] The 16,600 pages of medical records for 94 patients that Dr. Cherouny reviewed included the 3,200 pages for 19 patients reviewed by the Team.
[512] *Executive Summary of Findings by the Independent Medical Review Team Regarding Medical Abuse Allegations at the Irwin County Detention Center* (Oct. 21, 2020) (on file with the Subcommittee).
[513] *Testimony of Dr. Ted Anderson* (Oct. 26, 2020) (on file with the Subcommittee); *Testimony of Dr. Haywood Brown* (Oct. 26, 2020) (on file with the Subcommittee).
[514] Yesnia Aff. In Support re 2 Motion for Temp. Restraining Order (Nov. 19, 2020), *Oldaker v. Giles*, M.D. GA (No. 7:20-cv-00244-WLS-MSH); Consolidated Amended Petition for Writ of Habeas Corpus and Class Action Complaint for Declaratory and Injunctive Relief and for Damages (Dec. 21, 2020), *Oldaker v. Giles*, M.D. GA (No. 7:20-cv-00244-WLS-MSH).

declaration summarizing her review of the medical records of lead plaintiff, Yanira Oldaker; and (3) a declaration summarizing her review of the records of another plaintiff, Mbeti Ndonga.[515] Dr. Collins, another member of the Team, reviewed an additional set of over 500 pages of medical records of ICDC detainees. Immigration advocacy organizations obtained these additional records in Freedom of Information Act ("FOIA") litigation, and the records are connected to the December 2020 lawsuit.[516] Subcommittee staff interviewed Dr. Anderson, Dr. Mueller, and Dr. Collins about their findings and to gain a better understanding of the medical procedures performed by Dr. Amin.

Based on the records it reviewed, the Team found that a number of women were subjected to "patterns of aggressive and unethical care," including what they believed to be inappropriate invasive procedures and diagnostic tests, such as ultrasounds, LEEPs, and Pap tests.[517] Dr. Mueller and Dr. Collins also commented on the context in which Dr. Amin subjected these women to treatment. Specifically, Dr. Mueller highlighted to the Subcommittee that Dr. Amin's patients were members of a vulnerable group undergoing painful procedures from a doctor they did not choose.[518] Dr. Collins emphasized that physicians occupy a position of power relevant to their patients, and she felt that "power was abused" in the case of Dr. Amin.[519]

### ii. The Subcommittee's Medical Expert Identified Concerning Treatment Patterns by Dr. Amin

The Subcommittee provided over 16,600 of pages of medical records pertaining to approximately 94 ICDC female detainees to Dr. Peter Cherouny, a medical expert the HHS OIG relied upon to perform a medical record review for one of its previous studies.[520] Like Drs.

---

[515] *See* Declaration of Margaret Mueller, MD, FACS, FACOG for Yanira Oldaker (Nov. 18, 2020), *Oldaker v. Giles*, M.D. GA (No. 7:20-cv-00224-WLS-MSH); Declaration of Margaret Mueller, MD, FACS, FACOG for Jane Doe # 1 (Mbeti Ndonga) (Dec. 14, 2020), *Oldaker v. Giles*, M.D. GA (No. 7:20-cv-00224-WLS-MSH); Medical Care Provided to Women in Detention at Irwin County Detention Center: Declaration of Margaret Mueller, MD, FACS, FACOG (Dec. 20, 2020), *Oldaker v. Giles*, M.D. GA (No. 7:20-cv-00224-WLS-MSH).

[516] Dr. Sarah Collins, Interview with Senate Permanent Subcommittee on Investigations (Oct. 19, 2021). According to counsel representing former ICDC detainees in the *Oldaker* litigation and in a FOIA lawsuit against ICE, Dr. Collins reviewed 518 pages not included in the original 3,200 pages of records the Independent Medical Review Team received. Email from Counsel for the National Immigration Project of the National Lawyers Guild to the Senate Permanent Subcommittee on Investigations (Oct. 22, 2021).

[517] *Executive Summary of Findings by the Independent Medical Review Team Regarding Medical Abuse Allegations at the Irwin County Detention Center* (Oct. 21, 2020) (on file with the Subcommittee). Dr. Mueller explained that a LEEP is an excisional procedure in which the surgeon "excises or removes" a portion of a woman's cervix. In general, a LEEP is only used if pre-cancerous cells are detected. The short-term implications for a LEEP include extensive bleeding that could become extensive enough to require a hysterectomy. A LEEP can also result in long-term implications, including reproductive consequences. In addition, the removal of a significant portion of the cervix can often create cervical insufficiency, which can lead to the pre-term loss of pregnancies. Dr. Mueller explained that if there is no indication for a particular procedure and no identifiable benefit, performing this procedure is "only exposing a woman to a risk." Dr. Margaret Mueller, Interview with Senate Permanent Subcommittee on Investigations (July 27, 2021).

[518] Dr. Margaret Mueller, Interview with Senate Permanent Subcommittee on Investigations (July 27, 2021).

[519] Dr. Sarah Collins, Interview with Senate Permanent Subcommittee on Investigations (Oct. 19, 2021).

[520] *See* U.S. Department of Health and Human Services, Office of Inspector General, *Instances of IHS Labor and Delivery Care Not Following National Clinical Guidelines or Best Practices* (OEI-06-19-00190) (Dec. 2020)

Anderson, Mueller, and Collins, Dr. Cherouny determined that Dr. Amin followed a "boiler plate approach to care" for almost all patients he treated.[521] This "algorithm" Dr. Amin employed was generally used for a patient presenting with abnormal bleeding and/or pelvic pain.[522] Dr. Amin would first perform a transvaginal ultrasound, where he would often diagnose patients with ovarian cysts that required treatment. Dr. Amin would then prescribe Depo-Provera injections to treat the cysts. He would not allow the Depo-Provera to take effect, and would instead declare the treatment a failure and proceed to surgery. In one interview with the Subcommittee, Dr. Cherouny summarized Dr. Amin's care as "pretty good medicine for the 1980s, but we're not there anymore."[523] The sections below discuss what Dr. Cherouny saw in the medical records and Dr. Amin's treatment patterns.

### a. Dr. Amin's Flawed Use of Transvaginal Ultrasounds

Dr. Amin generally performed transvaginal ultrasounds in response to patients presenting with menstrual abnormalities, such as heavy bleeding and/or pelvic pain. The Subcommittee learned that a transvaginal ultrasound is not usually the first step in an evaluation for menstrual abnormalities.[524] Instead, the first step for a patient with abnormal bleeding would be to conduct a pregnancy test and compile a thorough patient history to determine how long the bleeding has occurred.[525]

Of the approximately 94 patient records he reviewed, Dr. Cherouny determined that Dr. Amin performed transvaginal ultrasounds on 36 of the women he treated.[526] Dr. Cherouny commented that generally, "the documentation of these ultrasounds was limited and appeared incomplete."[527] He added that the records he reviewed show that Dr. Amin generally had "[p]oor performance and documentation of transvaginal ultrasound evaluation."[528] Dr. Cherouny further explained that Dr. Amin is "clearly not skilled in ultrasound of the female pelvis" and that he "appears to frequently confuse normal findings for pathology and uses these indications for surgery."[529] Dr. Cherouny also stated that it was likely that Dr. Amin's ultrasound practices were not in compliance with the American Institute of Ultrasound in Medicine guidelines.[530]

---

(https://oig.hhs.gov/oei/reports/OEI-06-19-00190.pdf). Dr. Cherouny reviewed LaSalle medical records, ICH medical records, the files reviewed by the Team, and the additional set of over 500 pages of records Dr. Collins reviewed.

[521] Memorandum from Dr. Peter Cherouny to Senate Permanent Subcommittee on Investigations (Oct. 27, 2022).

[522] Dr. Sarah Collins, Interview with Senate Permanent Subcommittee on Investigations (Oct. 19, 2021).

[523] Dr. Peter Cherouny, Interview with Senate Permanent Subcommittee on Investigations (Sept. 8, 2022).

[524] Dr. Sarah Collins, Interview with Senate Permanent Subcommittee on Investigations (Oct. 19, 2021).

[525] Id.

[526] Letter from Dr. Peter Cherouny to the Senate Permanent Subcommittee on Investigations (Feb. 1, 2022).

[527] Id.

[528] Letter from Dr. Peter Cherouny to Senate Permanent Subcommittee on Investigations (Oct. 27, 2022).

[529] Memorandum from Dr. Peter Cherouny to Senate Permanent Subcommittee on Investigations (Oct. 27, 2022).

[530] Dr. Peter Cherouny, Interview with Senate Permanent Subcommittee on Investigations (Jan. 26, 2022).

### b. Dr. Amin's Misuse of Depo-Provera Injections

Dr. Cherouny found that Dr. Amin administered Depo-Provera injections, at least once, to 40 women in what appeared to be an attempt to manage abnormal uterine bleeding.[531] The Subcommittee learned that physicians generally "shy away" from using" these injections because side effects may complicate a diagnosis.[532]

Dr. Cherouny determined that in most of the cases he reviewed, Dr. Amin deviated from the standard of care and the Depo-Provera "was not given adequate time to affect a clinical response" in these women.[533] He explained that the "adequate time" for a response to Depo-Provera was six months. Dr. Cherouny noted that Dr. Amin generally used 2-6 weeks of clinical response time before declaring that the Depo-Provera medication failed and proceeded to surgery.[534] Dr. Cherouny added that Depo-Provera is not the preferred treatment for management of abnormal uterine bleeding because it causes unwanted side effects, including menstrual cycle irregularity.[535]

### c. Dr. Amin's Aggressive Surgical Approach

Dr. Cherouny identified that Dr. Amin performed a D&C with laparoscopy on 40 patients out of the approximately 94 patient files he reviewed.[536] The Subcommittee learned that a D&C is not a first step of action, and it is not indicated as necessary in the treatment for chronic pelvic pain.[537] Furthermore, a D&C is generally only indicated after an endometrial biopsy if the doctor did not obtain enough tissue after an endometrial biopsy, if a post-pregnancy patient is bleeding, or for acute management purposes if a woman comes into an emergency room bleeding.[538]

Dr. Cherouny found that Dr. Amin's use of these procedures were "too aggressive."[539] Dr. Cherouny stated to the Subcommittee that Dr. Amin often did not follow standard practice, which would have been to escalate from a transvaginal ultrasound to advanced imaging, like an MRI or a CT scan.[540] Instead, for the vast majority of patients, Dr. Amin proceeded directly from an ultrasound to a D&C and operative laparoscopy, using these procedures as diagnostic

---

[531] Letter from Dr. Peter Cherouny to the Senate Permanent Subcommittee on Investigations (Feb. 1, 2022).

[532] Dr. Margaret Mueller, Interview with Senate Permanent Subcommittee on Investigations (July 27, 2021).

[533] Letter from Dr. Peter Cherouny to the Senate Permanent Subcommittee on Investigations (Feb. 1, 2022).

[534] Letter from Dr. Peter Cherouny to Senate Permanent Subcommittee on Investigations (Oct. 27, 2022).

[535] Dr. Peter Cherouny, Interview with Senate Permanent Subcommittee on Investigations (Jan. 26, 2022). Dr. Cherouny stated that most patient records he reviewed were premenopausal or perimenopausal women. The initial treatment recommendation for women at this age includes oral progestin, like Provera, a levonorgestrel-containing IUD or combination birth control rather than Dr. Amin's use of Depo-Provera injections. *Id.*

[536] Memorandum from Dr. Peter Cherouny to Senate Permanent Subcommittee on Investigations (Oct. 27, 2022).

[537] Dr. Margaret Mueller, Interview with Senate Permanent Subcommittee on Investigations (July 27, 2021).

[538] *Id.*

[539] Dr. Peter Cherouny, Interview with Senate Permanent Subcommittee on Investigations (Jan. 26, 2022).

[540] *Id.*

tools.[541]  Dr. Cherouny added that the "vast majority [of cases where Dr. Amin performed a D&C] appear to be manageable with imaging and appropriate hormone therapy."[542]

Dr. Cherouny also found that during the previously mentioned surgeries, Dr. Amin removed or aspirated ovarian cysts in 40 women.[543]  The Subcommittee learned that the general standard of care for simple, or functional, ovarian cysts would have been to do nothing and repeat an ultrasound in six weeks.[544]  Dr. Cherouny stated that these cysts were "benign in every case," and the "majority were functional ovarian cysts in normally cycling ovaries" that would "generally resolve without surgical intervention."[545]  Out of the 40 patients who underwent cyst removals or aspirations, Dr. Cherouny only identified one patient whose pathology reports indicated the removal was reasonable.[546]

In addition, Dr. Cherouny identified seven patients who underwent a LEEP—a procedure used to further assess abnormalities identified by a Pap smear and colposcopy—and found that the records he reviewed suggest Dr. Amin has "limited knowledge and/or skill in Pap smear management."[547]  He explained that the "point of the [LEEP] procedure is to get tissue for diagnostic purposes and in each case [Dr. Amin] failed this outcome."[548]  Dr. Cherouny attributed these failures to Dr. Amin's "technique" in performing the procedure.[549]  For example, one patient who underwent a LEEP had a negative Pap smear and positive HPV test.  In this case, the appropriate management would have been a follow-up Pap smear and HPV test one year later, but Dr. Amin performed a LEEP.[550]  Dr. Cherouny stated this was "well outside of the guidelines."[551]  For two other patients who received a LEEP, Dr. Cherouny found that no abnormal tissue was detected and there was no indication of a colposcopy before the LEEP.[552]  Dr. Cherouny stated that Dr. Amin skipped "certainly a few" steps in the diagnostic process before performing a LEEP.[553]

### d.  Dr. Amin's Questionable Informed Consent Practices and Lack of Board Certification

Dr. Cherouny explained to the Subcommittee that informed consent requires the patient to have "adequate, accurate, and useful information."[554]  Based on the records he reviewed, Dr. Cherouny stated that Dr. Amin did not provide specific information regarding surgical

---

[541] *Id.*

[542] Memorandum from Dr. Peter Cherouny to Senate Permanent Subcommittee on Investigations (Oct. 27, 2022).

[543] Letter from Dr. Peter Cherouny to the Senate Permanent Subcommittee on Investigations (Feb. 1, 2022).

[544] Dr. Ted Anderson, Interview with Senate Permanent Subcommittee on Investigations (July 20, 2021).

[545] Letter from Dr. Peter Cherouny to the Senate Permanent Subcommittee on Investigations (Feb. 1, 2022).

[546] Dr. Peter Cherouny, Interview with Senate Permanent Subcommittee on Investigations (Jan. 26, 2022).

[547] Letter from Dr. Peter Cherouny to the Senate Permanent Subcommittee on Investigations (Feb. 1, 2022).

[548] Memorandum from Dr. Peter Cherouny to Senate Permanent Subcommittee on Investigations (Oct. 27, 2022).

[549] *Id.*

[550] Dr. Peter Cherouny, Interview with Senate Permanent Subcommittee on Investigations (Jan. 26, 2022); Letter from Dr. Peter Cherouny to the Senate Permanent Subcommittee on Investigations (Feb. 1, 2022).

[551] Dr. Peter Cherouny, Interview with Senate Permanent Subcommittee on Investigations (Jan. 26, 2022).

[552] *Id.*; Letter from Dr. Peter Cherouny to the Senate Permanent Subcommittee on Investigations (Feb. 1, 2022).

[553] Dr. Peter Cherouny, Interview with Senate Permanent Subcommittee on Investigations (Jan. 26, 2022).

[554] Dr. Peter Cherouny, Interview with Senate Permanent Subcommittee on Investigations (Apr. 13, 2022).

procedures with detainee patients and there was "no documentation of discussions regarding options for care."[555]

Dr. Cherouny flagged that Dr. Amin "does not appear to be board certified" and "likely does no or limited continuing education to stay current" on up-to-date medical practices in these areas.[556] He explained further that it appears there are board certified OB-GYN providers in the area of ICDC and that he was "concerned" with how and why Dr. Amin was selected to treat this population.[557] He noted that the American College of Obstetricians and Gynecologists requires annual continuing medical education, which helps OB-GYN physicians stay current in their training.[558] Dr. Cherouny stated that it was likely that Dr. Amin would have pursued different treatment methods had he been board certified.[559]

Dr. Cherouny also noted that "[i]t appears there was, likely, no oversight of the care provided to these patients. The repetitive nature of some of the issues, like inadequate cervical tissue after a LEEP procedure, would seem to prompt a review in many hospitals."[560]

### D. Response from Dr. Amin Concerning ICDC Allegations

Following the public allegations in the September 2020 whistleblower complaint and December 2020 lawsuit, Dr. Amin filed two defamation lawsuits against NBCUniversal Media, LLC and the author Don Winslow.[561] In these complaints, Dr. Amin stated that he performed only two hysterectomies on ICDC detainees.[562] According to the complaints, for both hysterectomies "the patients were informed and consented to the procedures."[563] In addition, Dr. Amin claimed that ICE "conducted an independent review of the treatment plans and approved the [hysterectomies]," which "confirms that the procedures were medically necessary."[564]

The complaints also stated that Dr. Amin "never performed" a procedure on an ICDC detainee without obtaining ICE approval and was supervised by at least one other person when he treated ICDC detainees, which "was a matter of protocol."[565] Dr. Amin further claimed that he "always obtains" informed consent, uses interpreters for non-English speaking patients, and "has never treated any patient roughly or inappropriately."[566] Both lawsuits are ongoing.

---

[555] *Id.*; Memorandum from Dr. Peter Cherouny to Senate Permanent Subcommittee on Investigations (Oct. 27, 2022).

[556] Memorandum from Dr. Peter Cherouny to Senate Permanent Subcommittee on Investigations (Oct. 27, 2022).

[557] *Id.*

[558] Dr. Peter Cherouny, Interview with Senate Permanent Subcommittee on Investigations (Jan. 26, 2022).

[559] *Id.*

[560] Memorandum from Dr. Peter Cherouny to Senate Permanent Subcommittee on Investigations (Oct. 27, 2022).

[561] *Amin v. NBCUniversal Media*, No. 5:21-cv-00056 (S.D. Ga. Sept. 9, 2021); *Amin v. Winslow*, No. 3:21-cv-01635 (S.D. Cal. Sept. 17, 2021).

[562] *Id.*

[563] *Id.*

[564] *Id.*

[565] *Id.*

[566] *Id.*

When allegations against Dr. Amin first emerged in September 2020 regarding his treatment of ICDC detainees, he sent a letter to a LaSalle employee, obtained by the Subcommittee that stated, in part:

> Recently, allegations have been made regarding my treatment of ICDC detainees. To be clear, I vigorously deny these allegations, and am confident that a full review will demonstrate that the care that I provided to all of my patients, including those housed at ICDC, was medically necessary and appropriate, and always done with the full informed consent of the patient.[567]

The Subcommittee tried on multiple occasions to obtain voluntary testimony from Dr. Amin regarding his treatment of female ICE detainees at ICDC. Dr. Amin declined the Subcommittee's requests for a voluntary interview. On February 7, 2022, the Subcommittee served Dr. Amin with a subpoena for deposition. Dr. Amin submitted an affidavit to the Subcommittee stating that he was innocent of the allegations and that he declined to provide testimony pursuant to his Fifth Amendment privilege against self-incrimination.[568] His attorney also mentioned the ongoing criminal investigation into Dr. Amin at the time in a cover letter accompanying the affidavit.[569] The Subcommittee is unaware of whether the criminal investigation is still ongoing.

## V.   DR. AMIN WAS A CLEAR OUTLIER IN THE VOLUME OF CERTAIN OB-GYN PROCEDURES HE PERFORMED ON ICDC DETAINEES

Despite housing a low percentage of the total population of female ICE detainees (4%), ICDC and Dr. Amin accounted for a substantial number of OB-GYN procedures overall (over one-third), a large total of invasive procedures performed on ICE detainees, and a sizeable proportion of all taxpayer money spent on OB-GYN procedures for ICE detainees. The Subcommittee's data analysis revealed that Dr. Amin was an outlier in the number of invasive procedures performed and how much money he billed the government for these procedures. While the Subcommittee could not account for every variable of the ICE female population (e.g. ICE does not track and does not know the health histories of the female populations across ICE detention centers) the data the Subcommittee received from ICE shows potentially alarming differences in the treatment patterns of ICDC detainees compared to female detainees housed at other ICE detention centers across the country.

---

[567] Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations (Oct. 22, 2021) (Tranche 18, 11144).

[568] Letter from Counsel for Dr. Amin to the Senate Permanent Subcommittee on Investigations (Feb. 21, 2022).

[569] *Id.* PSI contacted Dr. Amin's counsel during the Subcommittee's errata review process and did not receive a response. Email from the Senate Permanent Subcommittee on Investigations to Counsel for Dr. Amin (Nov. 10, 2022).

**A. Despite Housing a Low Number of ICE Detainees, ICDC and Dr. Amin Accounted for a Large Percentage of OB-GYN Referrals, Visits, and Procedures Within the ICE System**

ICE data provided to the Subcommittee shows that ICDC housed roughly 4% of female ICE detainees between 2017 and 2020.[570]  (See Figure 4.)  The Subcommittee also received data from ICE concerning the total number of OB-GYN referrals, visits, and procedures for all ICE facilities from 2017 to 2020.[571]  These statistics show that OB-GYN referrals from ICDC, as a percentage of total annual OB-GYN referrals across the ICE system, increased from 9% in 2018 to nearly 17% in 2020.[572]  Between 2017 and 2020, OB-GYN referrals for ICDC female detainees accounted for 14% of OB-GYN referrals for all ICE female detainees.[573]  (See Figure 5).

**Figure 4: FY 2017-2020 Female ADP Percentage at ICDC vs All ICE Facilities[574]**

| Fiscal Year | ICE Female Average Daily Population (ADP) | ICDC Female ADP | ICDC Female ADP as a Percentage of Total ICE Female ADP |
|---|---|---|---|
| 2017 | 5,716 | 196 | 3.43% |
| 2018 | 6,224 | 210 | 3.37% |
| 2019 | 7,552 | 269 | 3.56% |
| 2020 | 4,997 | 218 | 4.36% |

---

[570] U.S. Immigration and Customs Enforcement, *HSGAC/PSI Interviews with ICE Health Service Corps (IHSC) Personnel Get-backs* (Nov. 5, 2021) (response on file with the Subcommittee); Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations (Feb. 8, 2022) (Tranche 4, 1073-95).

[571] *June 23, 2021 ICE Q&A Paper*, *supra* note 14; *Sept. 1, 2021 ICE Q&A Paper*, *supra* note 12; Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations (Feb. 2, 2022).  As explained above, referrals for off-site care from a detention facility will include referrals for initial treatment after facility staff has evaluated a detainee, as well as later referrals for surgical procedures that the off-site provider has recommended.  Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations (Sept. 27, 2021) (Tranche 10, 3037-42); Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations (Feb. 22, 2022) (Tranche 7, 01255).

[572] *June 23, 2021 ICE Q&A Paper*, *supra* note 14; Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations (Feb. 2, 2022).

[573] *Id.*

[574] U.S. Immigration and Customs Enforcement, *HSGAC/PSI Interviews with ICE Health Service Corps (IHSC) Personnel Get-backs* (Nov. 5, 2021) (response on file with the Subcommittee); Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations (Feb. 8, 2022) (Tranche 4, 1073-95).  In an internal memorandum from October 2020, ICE noted that the female population of ICDC increased in 2019 "due to the closure of other detention facilities" in the Atlanta area of responsibility.  Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations (Sept. 27, 2021) (Tranche 10, 3037-42).

**Figure 5: 2017-2020 Total Number of ICE OB-GYN-Related Referrals and ICDC OB-GYN-Related Referrals**[575]

| Fiscal Year | Total ICE OB-GYN Referrals | ICDC OB-GYN Referrals | ICDC OB-GYN Referrals as a Percentage of Total ICE OB-GYN Referrals |
|---|---|---|---|
| **2017** | 783 | 126 | 16.09% |
| **2018** | 1,127 | 103 | 9.14% |
| **2019** | 1,652 | 240 | 14.53% |
| **2020** | 1,703 | 288 | 16.91% |
| **Totals** | **5,265** | **757** | **14.38%** |

From 2017 to 2020, ICE detainees had 2,567 OB-GYN specialist visits system wide.[576] ICE paid approximately $191,812 for these visits.[577]  (See Figure 6.)  Between 2017 and 2020, Dr. Amin performed the fourth-most visits (167) of OB-GYN providers treating ICE detainees, which accounted for roughly 6.5% of total OB-GYN visits for that time period and 7.3% of the total ICE paid for these visits.[578]  (See Figure 7.)

**Figure 6: Total Number of OB-GYN Specialist Visits by ICE Detainees for 2017-2020**[579]

| Fiscal Year | 2017 | 2018 | 2019 | 2020 | Total |
|---|---|---|---|---|---|
| **Total Count** | 281 | 643 | 829 | 814 | **2,567** |
| **ICE Payment Amount** | $17,177.38 | $47,792.88 | $66,421.87 | $60,419.95 | **$191,812.08** |

---

[575] *June 23, 2021 ICE Q&A Paper*, *supra* note 14; Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations (Feb. 2, 2022).  ICE noted that "[w]hile several other practitioners served ICDC over [the 2017 to 2020] time period, most OB-GYN patients were being seen by Dr. Amin."  *June 23, 2021 ICE Q&A Paper*, *supra* note 14.  In September 2021, ICE provided initial data regarding the number of OB-GYN referrals for ICE detainees.  Specifically, ICE provided the following totals for ICDC OB-GYN referrals: 209 (FY17), 178 (FY18), 526 (FY19), 648 (FY20), 1,561 (total FY17-20).  ICE explained that these totals were part of ICE's "initial data reporting" and its "referral analyst was still determining the best methods for data analysis."  In addition, the earlier data was a "combination of claims and referral data" and "[a]s a result multiple counts […] were included which significantly inflated the totals."  *June 23, 2021 ICE Q&A Paper*, *supra* note 14; Email from U.S. Immigration and Customs Enforcement Staff to the Senate Permanent Subcommittee on Investigations (Feb. 10, 2022).

[576] *Sept. 1, 2021 ICE Q&A Paper*, *supra* note 12.

[577] *Id.*

[578] *Id.*  According to ICE, this total refers only to billing by Dr. Amin for office visits.  As mentioned below, Dr. Amin submitted claims for treatment for 313 detainees in total between 2014 and 2020, which would have included billing for "care and services he would have provided in the Emergency Room and inpatient at the local hospitals."  U.S. Immigration and Customs Enforcement, *November 4, 2021 HSGAC/PSI Additional Follow-Up Questions* (Nov. 16, 2021) (response on file with the Subcommittee).

[579] *Sept. 1, 2021 ICE Q&A Paper*, *supra* note 12.

**Figure 7: Top Five Providers of OB-GYN Visits for ICE Detainees for 2017-2020**[580]

| Top Five Specialists/Providers | Total Visit Count | Billed Charges | ICE Payment Amount |
|---|---|---|---|
| Top Provider 1 | 231 | $55,360.00 | $25,405.00 |
| Top Provider 2 | 205 | $35,545.00 | $16,466.59 |
| Top Provider 3 | 173 | $39,755.00 | $9,216.88 |
| **Dr. Mahendra Amin** | **167** | **$22,050.00** | **$14,002.77** |
| Top Provider 5 | 155 | $32,050.00 | $10,576.38 |
| **Total** | **931** | **$184,760.00** | **$75,667.62** |

### B. Dr. Amin Accounted for At Least One in Three OB-GYN Procedures and Received Nearly Half of All ICE Payments for OB-GYN Procedures Between 2017 and 2020

In September 2021, ICE produced statistical information to the Subcommittee regarding certain OB-GYN procedures Dr. Amin performed for ICE detainees between 2017 and 2020, as well as data on the frequency and cost of these OB-GYN procedures across the ICE detention system.[581]  The Subcommittee determined that Dr. Amin accounted for at least one out of three OB-GYN procedures and received nearly half of all payments from ICE for 10 OB-GYN services between 2017 and 2020 despite the fact the average daily female population at ICDC accounted for roughly 4% of the average daily female population in all ICE detention facilities.[582]  Specifically, from 2017 to 2020, physicians performed 1,201 of these OB-GYN procedures on ICE detainees.[583]  The procedures cost ICE over $120,416.[584]  (See Figure 8.)

---

[580] *Id.*

[581] *Id.*  These procedures include: hysterectomies, tubal ligations, BX/curett of cervix with scope; conization of cervix; cryocautery of cervix; D&C; injection, medroxyprogesterone acetate, 100 mg; laparoscopy, excise lesions; laparoscopy, lysis; transvaginal US, obstetric; US exam, pelvic complete; and US exam, pelvic, limited.  According to ICE, no tubal ligations were performed by any OB-GYN provider on ICE detainees from 2017 to 2020.  *Id.*

[582] *See id.*; Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations (Feb. 8, 2022) (Tranche 4, 1073-95).  The 10 procedures are: BX/curett of cervix with scope; conization of cervix; cryocautery of cervix; dilation and curettage; injection, medroxyprogesterone acetate, 100 mg; laparoscopy, excise lesions; laparoscopy, lysis; transvaginal US, obstetric; US exam, pelvic complete; and US exam, pelvic, limited.  *Sept. 1, 2021 ICE Q&A Paper*, *supra* note 12.

[583] *Sept. 1, 2021 ICE Q&A Paper*, *supra* note 12.

[584] *Id.*

**Figure 8: Total Number of Ten OB-GYN Procedures Performed on ICE Detainees and Related Costs for 2017-2020**[585]

| Fiscal Year | 2017 | 2018 | 2019 | 2020 | Total |
|---|---|---|---|---|---|
| Total Count | 99 | 238 | 388 | 476 | **1,201** |
| Payment Amount | $5,673.96 | $15,738.35 | $46,024.38 | $52,979.45 | **$120,416.14** |

The Subcommittee found that Dr. Amin was a clear outlier among physicians providing specialist OB-GYN care to ICE detainees and performed significantly more invasive procedures than other OB-GYN providers treating ICE detainees between 2017 and 2020 despite having the fourth-most visits from ICE detainees over the same time period. According to the data, Dr. Amin ranked first among physicians performing D&C procedures on female detainees between 2017 and 2020—with 53 procedures during this time compared to three procedures for the second-ranked physician.[586] Similarly, Dr. Amin also ranked first for Depo-Provera injections, having administered 102 injections during the same time period (and the "Hospital Authority of Irwin County" administered another two), compared to two shots for the next-highest provider.[587] Dr. Amin also ranked first for laparoscopies and limited pelvic exams. Dr. Amin performed 44 laparoscopies to excise lesions, compared to only one procedure for the second-ranked provider, and 163 limited pelvic exams, compared to four exams for the second-ranked provider.[588]

Overall, in ten categories of OB-GYN procedures, Dr. Amin was among the top five providers for eight of those ten procedures—and for seven out of these eight procedures, Dr. Amin was among the top two providers.[589] Dr. Amin accounted for almost one-third—392—of 1,201 total procedures performed by OB-GYN providers on ICE detainees between 2017 and 2020.[590] He was paid approximately $60,000 for these services—nearly half of all payments ($120,400) from ICE for these services.[591] (See Figure 9.) In addition, the payout rate for Dr. Amin for these ten procedures was 31% compared to the payout rate of 27% for the 1,201 total number of procedures performed by all OB-GYN providers treating ICE detainees.[592]

---

[585] *Id.* As indicated above, the 10 procedures are: BX/curett of cervix with scope; conization of cervix; cryocautery of cervix; dilation and curettage; injection, medroxyprogesterone acetate, 100 mg; laparoscopy, excise lesions; laparoscopy, lysis; transvaginal US, obstetric; US exam, pelvic complete; and US exam, pelvic, limited. *Id.*

[586] *Id.*

[587] *Id.*

[588] *Id.*

[589] The figure does not include the two procedures in which Dr. Amin was not among the top five providers—"BX of cervix w/scope, LEEP" and "US exam, pelvic, complete." *Id.*

[590] Subcommittee staff calculated the 392 gynecological or obstetrical procedures based on the following information regarding certain procedures performed by Dr. Amin from 2017 to 2020: conization of cervix (4); D&C (53); cryocautery of cervix (7); injection, medroxyprogesterone acetate, 100 MG (102); laparoscopy, excise lesions (44); laparoscopy, lysis (6); transvaginal US, obstetric (13); and US exam, pelvic, limited (163). *Id.*

[591] *Id.* In addition to the $59,967.05 ICE paid for the eight procedures, ICE paid $1,160 for the two hysterectomies Dr. Amin performed from 2017 to 2020. *Id.*

[592] *Id.* According to ICE data, Dr. Amin billed $193,100 for these procedures and was paid $59,967. For the 1,201 total number of these procedures, OB-GYN providers billed $441,708 and were paid $120,416. *Id.*

**Figure 9: Top Five Providers for Eight OB-GYN Procedures for ICE Detainees for 2017-2020**[593]

| Top 5 Providers: Laparoscopy, Excise Lesions | | |
|---|---|---|
| # | Provider Name | Total Count (47) | Payment Amount ($28,862.04) |
| 1 | **Mahendra G Amin MD PC** | **44 (93.6%)** | **$27,960.34 (96.9%)** |
| 2 | Top Provider 2 | 1 | $113.27 |
| 3 | Top Provider 3 | 1 | $788.43 |
| 4 | Top Provider 4 | 1 | $0.00 |

| Top 5 Providers: Injection, Medroxyprogesterone Acetate | | |
|---|---|---|
| # | Provider Name | Total Count (110) | Payment Amount ($8,647.98) |
| 1 | **Mahendra G Amin MD PC** | **102 (92.7%)** | **$8,608.98 (99.5%)** |
| 2 | Top Provider 2 | 2 | $0.00 |
| 3 | Top Provider 3 | 2 | $0.00 |
| 4 | Top Provider 4 | 1 | $0.00 |
| 5 | Top Provider 5 | 1 | $0.00 |

| Top 5 Providers: US Exam, Pelvic, Limited | | |
|---|---|---|
| # | Provider Name | Total Count (179) | Payment Amount ($7,348.51) |
| 1 | **Mahendra G Amin MD PC** | **163 (91%)** | **$6,941.12 (94.5%)** |
| 2 | Top Provider 2 | 4 | $162.99 |
| 3 | Top Provider 3 | 2 | $0.00 |
| 4 | Top Provider 4 | 2 | $23.36 |
| 5 | Top Provider 5 | 2 | $50.09 |

| Top 5 Providers: Dilation and Curettage | | |
|---|---|---|
| # | Provider Name | Total Count (65) | Payment Amount ($12,511.14) |
| 1 | **Mahendra G Amin MD PC** | **53 (81.5%)** | **$10,736.45 (85.8%)** |
| 2 | Top Provider 2 | 3 | $440.83 |
| 3 | Top Provider 3 | 2 | $445.37 |
| 4 | Top Provider 4 | 2 | $239.02 |
| 5 | Top Provider 5 | 2 | $218.58 |

| Top 5 Providers: Laparoscopy, Lysis | | |
|---|---|---|
| # | Provider Name | Total Count (8) | Payment Amount ($3,356.75) |
| 1 | **Mahendra G Amin MD PC** | **6 (75%)** | **$2,677.10 (79.8%)** |
| 2 | Top Provider 2 | 2 | $679.65 |

[593] ICE stated that certain procedures did not have "Top 5" providers and only had a "Top 2" or "Top 3." *Id.* Additionally, as discussed above, of the approximately 94 patient records he reviewed, Dr. Cherouny determined that Dr. Amin performed transvaginal ultrasounds on 36 of the women he treated. However, the information provided by ICE indicated that Dr. Amin performed only 13 transvaginal ultrasounds. When asked to explain this discrepancy, ICE stated that it provided the Subcommittee with "medical claims data." According to ICE, if the ultrasounds were performed in Dr. Amin's office, he may not have billed for the ultrasounds separately by Current Procedural Terminology (CPT) code. In addition, if the ultrasounds were performed at a hospital, the hospital would have billed for the ultrasound and possibly bundled into other coding/billing and not billed as separate CPT codes. Email from U.S. Immigration and Customs Enforcement Staff to the Senate Permanent Subcommittee on Investigations (Apr. 27, 2022).

| Top 5 Providers: Cryocautery of Cervix | | |
|---|---|---|
| # | Provider Name | Total Count (13) | Payment Amount ($1,854.65) |
| 1 | **Mahendra G Amin MD PC** | **7 (53.8%)** | **$958.68 (51.7%)** |
| 2 | Top Provider 2 | 3 | $429.11 |
| 3 | Top Provider 3 | 2 | $316.99 |
| 4 | Top Provider 4 | 1 | $149.87 |
| **Top 5 Providers: Conization of Cervix** | | | |
| # | Provider Name | Total Count (15) | Payment Amount ($3,230.43) |
| 1 | Top Provider 1 | 6 | $1,237.32 |
| 2 | **Mahendra G Amin MD PC** | **4 (26.7%)** | **$1,000.29 (31%)** |
| 3 | Top Provider 3 | 1 | $277.63 |
| 4 | Top Provider 4 | 1 | $243.19 |
| 5 | Top Provider 5 | 1 | $238.39 |
| **Top 5 Providers: Transvaginal US, Obstetric** | | | |
| # | Provider Name | Total Count (209) | Payment Amount ($10,580.18) |
| 1 | Top Provider 1 | 33 | $2,968.76 |
| 2 | Top Provider 2 | 18 | $454.63 |
| 3 | Top Provider 3 | 16 | $457.65 |
| 4 | **Mahendra G Amin MD PC** | **13 (6.2%)** | **$1,084.09 (10.2%)** |
| 5 | Top Provider 5 | 11 | $820.33 |
| | | **Total Count of Procedures for Dr. Amin: 392** | **Total Payment Amount to Dr. Amin: $59,967.05** |

According to information from ICE, Dr. Amin submitted referrals for four hysterectomies, but he performed only two hysterectomies—one on June 14, 2017 and the other on August 9, 2019.[594]  ICE stated to the Subcommittee that "medical records show that both procedures were medically necessary."[595]  Regarding the other two hysterectomies, one detainee refused the procedure and the other detainee was released from ICE custody before the surgery.[596]  In total, ICE approved 14 hysterectomies between 2017 and 2020, and ICE was billed $31,843 in professional fees for these services and paid $8,731.[597]  For the two hysterectomies Dr. Amin performed, ICE paid Dr. Amin $1,160.[598]  No other provider treating ICE detainees performed more than one hysterectomy during this period.[599]

---

[594] *June 23, 2021 ICE Q&A Paper*, *supra* note 14.

[595] *Id.*

[596] *Id.*

[597] According to ICE, "[m]edical services are reimbursed at the lesser of billed charges or the Medicare allowable, therefore the initial charges to ICE will generally not be the same as the amount paid out to the provider."  *Sept. 1, 2021 ICE Q&A Paper*, *supra* note 12.

[598] *Id.*

[599] From 2017 to 2020, the number of hysterectomies approved by ICE annually included: 2017 (6), 2018 (2), 2019 (5), and 2020 (1).  *Id.*

# VI.    ICE FAILED TO EFFECTIVELY OVERSEE OR INVESTIGATE DR. AMIN

During the period in which Dr. Amin performed the services described in Section IV above, ICE, ICDC, and ICH all had responsibilities related to ensuring ICDC detainees received appropriate medical treatment.  As the sections below describe, ICE, in particular—and other DHS components and federal contractors—maintains a complex oversight system designed to monitor detainee healthcare and general conditions inside detention facilities.  ICE, however, engaged in limited efforts to vet Dr. Amin, monitor or review the treatment he provided, ensure he obtained informed consent or used language translation services, or investigate the public allegations against him.

## A.    Current ICE Oversight Mechanisms to Review Detention Centers and Medical Care

IHSC Field Medical Coordinators ("FMCs") typically conduct at least one site visit per year at non-IHSC facilities to evaluate their adherence to detention standards and quality of care indicators.[600]  FMCs will also conduct a general overview of the layout of facilities, identify any safety concerns related to medical care, assess the quality of health services, and follow up on previous findings from other DHS auditors or private contractors.[601]  In preparation for site visits, FMCs will review trends regarding complaints from detainees concerning medical care.[602]  FMCs will also review a sample of medical records at each facility and conduct further investigations if they detect any deviations.[603]  In addition, FMC site visits will include a review of a sample of sick call requests at each facility.[604]  FMCs will document the results of their site visits and include any recommendations and facility actions and share the site visit reports with the facility and appropriate ICE Field Office Director.[605]

To the extent that systemic issues arise with medical care at detention centers, IHSC will work with these entities to draft a corrective action plan, which will often link recommendations to specific detention standards.[606]  Local and regional FMCs will review facility responses to

---

[600] U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (June 23, 2021); *see also* Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations (Feb. 7, 2022) (Tranche 3, 01014-27).  IHSC provides direct medical care at 21 facilities in the United States and, in FY 2021, "oversaw health care for over 169,000 detainees housed in 150 non-IHSC staffed facilities."  U.S. Immigration and Customs Enforcement, ICE Health Service Corp Focused on Best Patient Outcomes (https://www.ice.gov/features/health-service-corps) (accessed Nov. 13, 2022).
[601] U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (June 23, 2021); Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations (Feb. 22, 2022) (Tranche 7, 01256).
[602] U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (June 23, 2021).
[603] *Id.*
[604] *Id.*
[605] Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations (Feb. 22, 2022) (Tranche 7, 01256).
[606] U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (June 23, 2021).

corrective action plans and close any addressed recommendations.[607]  As with ICE oversight generally, FMC efforts will often overlap with inspections and investigations from ODO, CRCL, the American Correctional Association, NCCHC, and the Nakamoto Group.[608]

IHSC employees known as Regional Clinical Directors ("RCDs") are physicians with oversight responsibilities for all IHSC-staffed and non-IHSC-staffed facilities.  RCDs report to IHSC's Deputy Medical Director.[609]  These employees supervise facility clinical directors and ensure facilities comply with IHSC medical policies.[610]  RCDs will also perform the duties of a clinical director for facilities without a clinical director and supervise clinical staff, lead quality control meetings, establish weekly facility plans, and meet with department heads and providers.[611]  As previously noted, RCDs are also responsible for identifying unusually frequent referrals to a certain provider or insufficient justifications for referrals.[612]

The Veterans Affairs Financial Services Center ("VAFSC") processes medical claims for reimbursement by ICE in response to claims from off-site healthcare providers, including the receipt of requests through the MedPAR system and the provision of lists of billed treatments or procedures to IHSC.[613]  IHSC staff will then review and verify these treatments and procedures before VAFSC issues reimbursements to providers.[614]  Starting in 2020, the Health Plan Management Unit ("HPMU") inside IHSC has overseen all medical claims, and IHSC has also acquired national care guidelines—effective June 2021—to support reviews of medical care for potential waste or fraud.[615]

The IHSC officials the Subcommittee interviewed explained that IHSC plays a role in monitoring and investigating complaints from individuals that receive medical care while in detention.  Detainees can raise concerns verbally with facility employees, through a written complaint, or by calling a hotline.[616]  At IHSC-staffed facilities, staff will investigate any complaints that are received; for non-IHSC facilities, the FMC will conduct an investigation.[617]

---

[607] *Id.*

[608] U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (May 17, 2021).

[609] U.S. Immigration and Customs Enforcement Health Service Corps Official Regional Clinical Director, Interview with Senate Permanent Subcommittee on Investigations (Feb. 14, 2022).

[610] *Id.*

[611] *Id.*

[612] *Id.*; U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (May 17, 2021).

[613] *Id.*  ICE noted to the Subcommittee that medical records are not uploaded to MedPAR because this functionality does not exist.  FMCs or RCDs may, however, request these requests and upload them to a detainee's referral in the IHSC electronic health record.  Email from U.S. Immigration and Customs Enforcement Staff to the Senate Permanent Subcommittee on Investigations (Nov. 17, 2021).

[614] U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (May 17, 2021).

[615] *Id.*; *June 23, 2021 ICE Q&A Paper*, *supra* note 14; Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations (Feb. 22, 2022) (Tranche 7, 01254).

[616] U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (May 17, 2021).

[617] *Id.*; Email from U.S. Immigration and Customs Enforcement Staff to the Senate Permanent Subcommittee on Investigations (Nov. 17, 2021).

The IHSC investigative unit will also investigate complaints submitted to the ICE Office of Professional Responsibility ("OPR").[618] For these OPR cases, IHSC staff will conduct interviews, review relevant medical records, and present findings to the IHSC Medical Director.[619] Upon finding that the investigation has substantiated a complaint, the Medical Director will forward the findings to the IHSC Health Care Compliance Division, which will establish a corrective action plan for the relevant facility and monitor compliance.[620]

Detainees receiving medical treatment from an off-site healthcare provider can raise concerns regarding their care in a follow-up visit with detention facility staff.[621] Detainees can also raise concerns through the same procedures applicable to complaints regarding on-site medical care, and IHSC will respond in the same way—with the addition of outreach to the off-site provider for discussions or interviews.[622] If IHSC receives a particularly egregious complaint—or frequent complaints—against an off-site provider, IHSC will attempt to identify a replacement provider in the community with similar expertise.[623] An IHSC official noted to the Subcommittee, however, that because detention facilities often operate "in the middle of nowhere," no comparable specialists may be available.[624] In addition, an October 2021 DHS OIG report similarly noted that "[r]emote locations and reluctance among some medical specialists to treat detainees reduce access to specialty care."[625] In this case, IHSC will recommend that ICE transfer the complaining detainee to another facility near another specialist who can provide the same treatment, if medically indicated.[626]

Finally, as explained in more detail in Section B below, IHSC has begun to engage in limited vetting efforts for physicians providing off-site care, including a review of board certifications, records of adverse actions, and the HHS OIG List of Excluded Individuals/Entities.[627]

---

[618] Email from U.S. Immigration and Customs Enforcement Staff to the Senate Permanent Subcommittee on Investigations (Nov. 17, 2021).

[619] U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (May 17, 2021).

[620] *Id.*

[621] *Id.*

[622] *Id.*

[623] *Id.*

[624] *Id.*

[625] U.S. Department of Homeland Security, Office of Inspector General, *Many Factors Hinder ICE's Ability to Maintain Adequate Staffing at Detention Facilities* (OIG-22-03) (Oct. 29, 2021) (https://www.oig.dhs.gov/reports/2022/many-factors-hinder-ices-ability-maintain-adequate-medical-staffing-detention-facilities/oig-22-03-oct21).

[626] U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (May 17, 2021).

[627] *Id.* HHS OIG possesses the authority to exclude individuals and entities from federally funded health care programs for various reasons, including for Medicare or Medicaid fraud. HHS OIG maintains a list of these individuals and entities and routinely updates this list on its website. U.S. Department of Health and Human Services, Office of Inspector General, *Exclusions Program* (oig.hhs.gov/exclusions/).

**B. ICE Had Limited Capabilities to Vet Off-Site Medical Providers or Monitor Their Medical Practices**

As part of its investigation into the role ICE could or should have played in preventing alleged medical abuses against ICDC detainees, the Subcommittee conducted three interviews with a group of senior IHSC officials, interviewed senior officials from the ICE Atlanta Field Office, interviewed the IHSC employee responsible for approving surgical procedures at ICDC, received narrative responses and statistics from the agency, and reviewed nearly 17,000 pages of medical records, complaints, and other internal ICE materials. The Subcommittee's review suggests that ICE lacked—and continues to lack—key tools to detect or deter any off-site provider performing unnecessary or excessive medical treatments for ICE detainees.

The only vetting ICE performed on Dr. Amin before he began treating ICDC detainees was to confirm that he was a licensed doctor and affiliated with an accredited hospital. ICE also failed to identify any treatment by Dr. Amin as potentially excessive or unnecessary and did not maintain a utilization review process to detect high numbers of medical procedures by off-site physicians that might indicate medical waste, fraud, or abuse.[628] ICE was also unaware of any detainee complaints against Dr. Amin before the public allegations emerged in September 2020.[629] IHSC officials explained to the Subcommittee that ICE policies do not require detention facilities to forward all medical grievances to ICE. Instead, FMCs will review grievances during their site visits to facilities.

The FMC assigned to ICDC, however, did not conduct a site visit between January 2018 and October 2020—a period in which Dr. Amin billed ICE for hundreds of procedures. Finally, ICE does not maintain policies and procedures to monitor the use of language translation services by off-site providers, ensure off-site providers obtain informed consent from detainees, or review the appropriateness of medical care at hospitals providing off-site services.

**i. ICE Did Not Have a Thorough Process in Place to Vet Dr. Amin Before He Began Treating ICDC Detainees**

In a statement to the Subcommittee, ICE explained that "[a]t the time Dr. Amin became a provider for detainees at ICDC in 2014, ICE did not have an independent vetting process for licensed medical providers in the community, though it has since begun implementing such a process."[630] IHSC officials told the Subcommittee that ICE authorized physicians to treat

---

[628] U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (Sept. 29, 2021).

[629] *June 23, 2021 ICE Q&A Paper, supra* note 14.

[630] *Id.* By comparison, the Centers for Medicare & Medicaid Services ("CMS") Center for Program Integrity ("CPI") screens providers for enrollment into the Medicare program, and states are required to screen providers for enrollment into their Medicaid programs. (States may utilize CMS's screening of providers in lieu of conducting state screenings for providers enrolling in both Medicare and Medicaid.) CMS utilizes contractors to conduct the screening of providers. Contractor screening procedures include checking the provider's licensure status, site visits, fingerprint checks, reviewing the HHS OIG Exclusion List, and reviewing other databases for felony convictions and other adverse actions. Providers may be disqualified from Medicare enrollment for not having a valid license, failing the site visit, having a felony conviction, being on the HHS OIG Exclusion List, or other grounds specified in regulation pertaining to program integrity or non-compliance. CMS also has established a Preclusion List, which is

detainees if the provider had a valid license and hospital credentials.[631]  As a result, IHSC did not maintain an independent vetting process for off-site medical providers or otherwise require a review of these providers before they treated detainees.[632]

IHSC officials stated to the Subcommittee, however, that in October 2019, it began a credentialing process that involves a review of a provider's board certification, records of adverse actions like license suspensions or revocations in the federal National Practitioner Data Bank ("NPDB"), and a check against the List of Excluded Individuals/Entities the HHS OIG maintains.[633]  In addition, IHSC started conducting NPDB queries "intermittently" on providers "when there were concerns raised regarding the provision of care."[634]  IHSC officials also explained that IHSC might also perform additional research to supplement information in the NPDB.[635]

IHSC officials further explained that in the event IHSC finds a past complaint or investigation, officials will investigate; if the concern was previously adjudicated and resolved in favor of the provider, and the provider is the only provider in a particular community, IHSC will proceed with the provider for a trial period.[636]  Officials also stated that IHSC will not use providers who have had their licenses suspended by a medical licensing board or have an extensive history of misconduct, fraud, or malpractice leading to an adverse outcome, such as death or loss of limb.[637]  They explained, however, that the reviews IHSC conducts do not

---

a list of providers who are precluded from receiving payment for Medicare Advantage items and services and prescribers where pharmacy claims for Medicare Part D drugs prescribed by them to Medicare beneficiaries are to be rejected or denied.  Medicare Advantage plans are required to deny payment for a healthcare item or service furnished by an individual or entity on the Preclusion List and Part D sponsors are required to reject a pharmacy claim (or deny a beneficiary request for reimbursement) for a Part D drug that is prescribed by an individual on the Preclusion List.  Providers on the HHS OIG Exclusion List will also appear on CMS's Preclusion List, but some providers on the CMS Preclusion List may not appear on the HHS OIG Exclusion List due to different criteria. Centers for Medicare & Medicaid Services, Briefing with Senate Permanent Subcommittee on Investigations (May 25, 2021); *see also* Centers for Medicare & Medicaid Services, *Preclusion List Frequently Asked Questions (FAQs)* (Dec. 16, 2020) (www.cms.gov/Medicare/Provider-Enrollment-and-Certification/MedicareProviderSupEnroll/Downloads/Preclusion_List_FAQs.pdf); Joe Stefansky, *CMS Preclusion v. OIG Exclusion*, Streamline Verify (Feb. 8, 2021) (www.streamlineverify.com/cms-preclusion-vs-oig-exclusion/).
[631] U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (Sept. 29, 2021).
[632] *June 23, 2021 ICE Q&A Paper*, *supra* note 14.  In addition, although IHSC enters into Letters of Understanding with hospitals providing medical care to detainees, it does not engage in vetting efforts for these facilities beyond verifying their accreditation.  *Id.*
[633] *June 23, 2021 ICE Q&A Paper*, *supra* note 14; U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (June 23, 2021); U.S. Immigration and Customs Enforcement, *HSGAC/PSI Interviews with ICE Health Service Corps (IHSC) Personnel Get-backs* (Nov. 5, 2021) (response on file with the Subcommittee); Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations (Feb. 22, 2022) (Tranche 7, 01258-60).
[634] Email from U.S. Immigration and Customs Enforcement Staff to the Senate Permanent Subcommittee on Investigations (Apr. 27, 2022).
[635] U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (June 23, 2021).
[636] U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (May 17, 2021).
[637] *Id.*; U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (June 23, 2021).

involve obtaining data on claims a provider may have submitted to Medicare and a review of this data for potentially unusual patterns.[638]

The new recruitment process IHSC has instituted is retrospective, meaning that IHSC has focused on off-site providers with no previous Letter of Understanding ("LOU") with IHSC or a prior credentialing review.[639]  IHSC has also established LOUs with certain new providers.[640]  As part of this process, IHSC has phased in a requirement that providers submit a "provider packet" to ICE that includes a LOU, recruitment letter, and forms needed for reimbursement.[641]

As of June 28, 2021, 5,044 off-site specialty providers treated detainees in ICE custody, and IHSC completed retrospective reviews for only 96 providers, reviews were in progress for 55 providers, and reviews were pending for 70 providers.[642]  According to IHSC, no providers had been disqualified under the new independent vetting system as of September 2021.[643]  IHSC has noted that it will increase the amount of LOUs processed each year as it expands its staffing.[644]

ICE had not completed the process described above for Dr. Amin at the time of the public allegations against him in September 2020.[645]  A December 30, 2020, email to a senior IHSC official noted that the LOU process was not started for Dr. Amin "due to the back log of 100+ recruitment requests pending for LOU's [sic] and 100+ in progress.  [...]  The credentialing process was not completed either."[646]

After learning of the September 2020 allegations, however, ICE searched for information concerning Dr. Amin in the HHS OIG List of Excluded Individuals/Entities and did not find any information indicating he had been excluded or debarred.[647]  ICE found that Dr. Amin held an active license from the Medical Board of Georgia and did not discover any public board actions

---

[638] U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (June 23, 2021).  ICE noted to the Subcommittee that the credentialing process includes a check of the HHS OIG List of Excluded Individuals/Entities, which is a "list of 'bad actors.'"  Email from U.S. Immigration and Customs Enforcement Staff to the Senate Permanent Subcommittee on Investigations (Nov. 11, 2022).

[639] U.S. Immigration and Customs Enforcement, *PSI Briefing Get Backs* (July 26, 2021).

[640] *Id*.  An LOU will explain that the provider will accept Medicare rates, provide IHSC with access to medical records, and perform an agreed set of services.  U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (June 23, 2021).

[641] *June 23, 2021 ICE Q&A Paper*, *supra* note 14; Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations (Feb. 7, 2022) (Tranche 3, 01072).

[642] U.S. Immigration and Customs Enforcement, *PSI Briefing Get Backs* (July 26, 2021) (response on file with the Subcommittee).

[643] U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (Sept. 29, 2021).

[644] U.S. Immigration and Customs Enforcement, *PSI Briefing Get Backs* (July 26, 2021) (response on file with the Subcommittee).

[645] *June 23, 2021 ICE Q&A Paper*, *supra* note 14.

[646] Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations (Sept. 17, 2021) (Tranche 7, 2010).

[647] *June 23, 2021 ICE Q&A Paper*, *supra* note 14; Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations (Sept. 27, 2021) (Tranche 10, 3041).

against him.[648]  ICE also found that Dr. Amin held privileges at Coffee Regional Hospital and ICH and was a board eligible OB-GYN.[649]  Finally, ICE noted that it reviewed documents related to prior medical malpractice settlements paid by Dr. Amin and his 2015 settlement with DOJ—but again, this occurred *after* the September 2020 allegations.[650]

According to IHSC, under the new independent vetting process, these adverse actions would be reviewed but would only be "red flags" if any allegations were substantiated.[651] Therefore, if the new vetting system had been applied to Dr. Amin, based on IHSC's assessment that the information in the NPDB were only allegations and not substantiated as the claims were "settled" without a determination of liability, and the fact that the state of Georgia had never restricted Dr. Amin's license or otherwise intervened at any point, ICE would not necessarily have disqualified him from treating ICE detainees.[652]

An IHSC official also explained to the Subcommittee that in no scenario would an off-site provider undergo a peer review.[653]  ICE later noted that community-based providers are not ICE employees or contractors and therefore not subject to ICE's peer-review requirements.[654]  An IHSC official told the Subcommittee that because peer reviews are standard practice in the medical community, IHSC made a "reasonable assumption" that ICH and its treatment oversight board reviewed Dr. Amin's treatment and charts.[655]

### ii.  ICE Never Identified Any Treatment by Dr. Amin as Potentially Excessive or Unnecessary and Lacked a Utilization Review Process to Identify Trends in Off-Site Medical Treatment

IHSC never identified any treatment by Dr. Amin as potentially excessive or unnecessary.  When asked about the fact that the volume of procedures Dr. Amin performed on ICDC detainees was substantially out of proportion to the number of OB-GYN procedures performed by any other OB-GYN treating ICE detainees, IHSC officials explained that the disparity alone was not reason for alarm and that the surgeries were approved on a case-by-case basis by IHSC.[656]

In addition, before September 2020, IHSC never sought to determine whether any of the OB-GYN procedures Dr. Amin performed were medically necessary beyond the initial approval

---

[648] *Id.*

[649] *Id.*  "Board eligible" refers to a physician who has completed the requirements necessary before undergoing a board examination, but who has not taken or passed the examination.  MedicineNet, *Medical Definition of Board Eligible* (www.medicinenet.com/board_eligible/definition.htm) (accessed Nov. 13, 2022).

[650] *June 23, 2021 ICE Q&A Paper*, *supra* note 14.

[651] U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (Sept. 29, 2021).

[652] *Id.*

[653] IHSC officials told the Subcommittee that it conducts peer reviews of its staff at IHSC facilities.  *Id.*

[654] Email from U.S. Immigration and Customs Enforcement Staff to the Senate Permanent Subcommittee on Investigations (Nov. 17, 2021).

[655] U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (Sept. 29, 2021).

[656] *Id.*

process.[657]  ICE further noted to the Subcommittee that because "Dr. Amin is a community provider who owns and operates his own private practice and he is not an ICE employee or contractor," no corrective actions in response to allegations concerning his treatment were available during the period in which he treated ICDC detainees.[658]

In interviews with the Subcommittee, IHSC officials explained that until recently, IHSC did not maintain a real-time or automated system to detect high numbers of medical procedures by off-site physicians that might be indicative of waste, fraud, or abuse.[659]  As ICE stated to the Subcommittee in November 2021, "IHSC does not have a utilization review process in place to identify overutilization of medical procedures."[660]  Although the VAFSC—the entity responsible for processing claims from off-site providers—has certain limited capabilities to detect suspicious activity, IHSC officials noted to the Subcommittee that these functions are "not impressive," and VAFSC does not automatically screen or report claims to ICE for waste, fraud, or abuse.[661]  Essentially, VAFSC currently focuses only on the existence of an authorization for a particular medical procedure.[662]

Because IHSC has not obtained satisfactory "deep dive" metrics on waste, fraud, and abuse from its current arrangement with VAFSC, it has recently worked to transition to an electronic claims management system—the Electronic Claims Adjudication Management System ("eCAMS")—from VAFSC to more efficiently adjudicate claims.[663]  IHSC officials estimated that IHSC could begin using eCAMS in fiscal year 2022.[664]

---

[657] *Id.*

[658] *June 23, 2021 ICE Q&A Paper, supra* note 14.

[659] U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (May 17, 2021); U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (June 23, 2021); U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (Sept. 29, 2021).  In contrast, the CMS Center for Program Integrity utilizes contractors to conduct various reviews at different points during the Medicare payment process.  According to CMS officials, CMS receives over 1.2 billion Medicare claims a year, and CMS reviews less than 1 million.  Medical Review Contractors conduct primarily prepayment reviews and prior authorizations and Recovery Audit Contractors conduct post-payment reviews.  All payment reviews are informed by data analytics.  CMS review contractors must adhere to statute, regulations, and the Medicare Program Integrity Manual, and CMS conducts oversight of its contractors to ensure they make accurate decisions.  Centers for Medicare & Medicaid Services, Briefing with Senate Permanent Subcommittee on Investigations (May 25, 2021).

[660] U.S. Immigration and Customs Enforcement, *HSGAC/PSI Interviews with ICE Health Service Corps (IHSC) Personnel Get-backs* (Nov. 5, 2021) (response on file with the Subcommittee).

[661] U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (May 17, 2021).

[662] U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (June 23, 2021).

[663] *Id.;* U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (May 17, 2021).

[664] U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Permanent Subcommittee on Investigations (June 23, 2021).

The current IHSC system is around 20 years old.[665]  This new claims processing system "will support fraud, waste, and abuse [] reviews related to medical claims."[666]  In June 2021, IHSC procured national care guidelines from Milliman Care Guidelines and has begun using a web-based application from this entity for utilization review of ICE medical claims, beginning with a retrospective review of these claims.[667]

According to IHSC, the Milliman Care Guidelines "will be used for [utilization review] in retrospective, concurrent, and prospective formats when used in its fullest potential."[668]  Although IHSC has not established the criteria and process for investigations regarding instances of suspected waste, fraud, or abuse flagged by the new system, the investigations will be conducted by "trained [Certified Professional Medical Auditors] based on established criteria, national care guidelines [Milliman Care Guidelines], as well as related CMS and Title 18 regulations."[669]

Although IHSC is unable to identify trends using VAFSC, IHSC officials explained to the Subcommittee that RCDs may report unusually frequent numbers of referrals to a certain provider.[670]  In an interview with the Subcommittee, an IHSC official with first-hand knowledge of RCD practices confirmed that reporting a high number of referrals was part of the RCD's responsibilities.[671]

However, in an interview with the RCD specifically responsible for approving surgical referrals for ICDC detainees, the RCD stated to the Subcommittee that they did not track the total number of referrals to off-site providers or referrals by types of surgical procedures and, in fact, did not "track referrals at all."[672]  Instead, to determine whether the number of referrals was unusual, the ICDC RCD would review factors such as the population at a facility.  The ICDC

---

[665] *Id.*

[666] *June 23, 2021 ICE Q&A Paper*, *supra* note 14.

[667] U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (June 23, 2021); Email from U.S. Immigration and Customs Enforcement Staff to the Senate Permanent Subcommittee on Investigations (Nov. 17, 2021); Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations (Feb. 22, 2022) (Tranche 7, 01254).

[668] Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations (Feb. 22, 2022) (Tranche 7, 01254).

[669] Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations (Feb. 22, 2022) (Tranche 7, 01256).

[670] U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (May 17, 2021).  ICE noted to the Subcommittee that even if an outlier was identified, it would require a review of medical records and consultation with an expert physician to make a determination of over-utilization and/or inappropriate medical services.  Email from U.S. Immigration and Customs Enforcement Staff to the Senate Permanent Subcommittee on Investigations (Nov. 17, 2021); U.S. Immigration and Customs Enforcement Health Service Corps Official Regional Clinical Director, Interview with Senate Permanent Subcommittee on Investigations (Feb. 14, 2022).

[671] U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (May 17, 2021).

[672] U.S. Immigration and Customs Enforcement Health Service Corps Official Regional Clinical Director, Interview with Senate Permanent Subcommittee on Investigations (Feb. 14, 2022).

RCD stated that they did not compare off-site providers in question to other off-site providers or facilities to determine a high number of referrals.[673]

The ICDC RCD stated that they did not flag any referrals for Dr. Amin.[674]  The ICDC RCD stated to the Subcommittee that they were not concerned with the disparities in procedures between Dr. Amin and the other off-site providers as discussed above because some facilities housed a larger female population than other facilities, and questioned "why should I be concerned."[675]  Furthermore, the RCD stated that RCDs in general are not required to provide regular reports relating to referrals to IHSC.[676]

IHSC stated that it intends to provide nationally-recognized steps for RCDs to follow before approving referrals for medical procedures.[677]  As mentioned above, IHSC does not currently provide guidance to RCDs regarding the referral approval process.[678]  For example, IHSC does not provide guidance to RCDs for determining the medical necessity of a D&C procedure, and the review process for a hysterectomy is the same for a hernia.[679]  The ICDC RCD stated to the Subcommittee that they considered the detainee's needs and factored in the psychological impact of undergoing surgery while detained.[680]  This RCD stated that they relied mainly on their medical training and expertise when evaluating referrals.

In an interview with the Subcommittee, however, the ICDC RCD stated they had no additional training specific to the OB-GYN specialty since residency rotations in the 1980s and 1990s.[681]  IHSC explained to the Subcommittee that while this review process "previously relied on clinical judgment of individual medical experts, the new system will combine clinical judgment with an approach that includes nationally recognized community standards of care based on evidence-based practice (EBP) and will also allow IHSC to collect more information and facilitate more efficient and effective reviews."[682]

### iii.    ICE Performed a Limited Investigation Following the Public Allegations Against Dr. Amin

Dr. Amin stopped seeing ICE detainees in September 2020, after the publication of the whistleblower allegations.[683]  IHSC conducted a limited review of medical records for his

---

[673] Id.

[674] Id.; see also Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations (Feb. 22, 2022) (Tranche 7, 01255).

[675] U.S. Immigration and Customs Enforcement Health Service Corps Official Regional Clinical Director, Interview with Senate Permanent Subcommittee on Investigations (Feb. 14, 2022).

[676] Id.

[677] U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (June 23, 2021).

[678] Id.

[679] U.S. Immigration and Customs Enforcement Health Service Corps Official Regional Clinical Director, Interview with Senate Permanent Subcommittee on Investigations (Feb. 14, 2022).

[680] Id.

[681] Id.

[682] June 23, 2021 ICE Q&A Paper, supra note 14.

[683] Id.

patients, but IHSC officials explained to the Subcommittee that they did not undertake a deeper dive because they were told by ICE ERO leadership to "stand down" and await the completion of the DHS OIG investigation.[684]  IHSC officials stated a more extensive evaluation would have required an "in-depth review of the record," which IHSC did not have due to incomplete records from ICDC.[685]  IHSC officials informed the Subcommittee that ICH refused to provide additional records to IHSC due to the ongoing DHS OIG investigation.[686]

ICE explained that IHSC conducted a "comparative analysis of medical referrals and claims completed after receiving allegations about Dr. Amin."[687]  IHSC did not compare services performed by Dr. Amin to services by other providers for ICDC detainees, "as Dr. Amin saw the majority of OB/GYN patients from 2014 to 2020 and such a comparison would not have been helpful."[688]  IHSC did "conduct an analysis of referral and claims data at ICDC compared to other ICE detention facilities housing females and determined that the number of referrals and claims was not abnormal."[689]

More than one year after the public allegations regarding Dr. Amin emerged, IHSC staff expressed uncertainty to the Subcommittee as to why significant disparities existed between the volume of OB-GYN procedures he performed and procedures by other off-site physicians treating detainees.[690]  IHSC staff, for example, speculated that ICDC might have had a higher percentage of female detainees than other facilities.[691]  Those explanations do not explain the fact that Dr. Amin performed more than 90% of particular OB-GYN procedures when compared to the entire ICE detention network across the United States, and yet the ICDC facility housed just 4% of the female population.

---

[684] U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (Sept. 29, 2021); Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations (Feb. 22, 2022) (Tranche 7, 01257).  ICE noted that it is standard practice across DHS components to cease investigations while DHS OIG moves forward with its investigation to mitigate the risk of interfering with the OIG investigation.  Email from U.S. Immigration and Customs Enforcement Staff to the Senate Permanent Subcommittee on Investigations (Nov. 17, 2021).  Similarly, the decision to "stand down" here was "done to preclude potential interference and/or duplication of effort with DHS OIG."  ICE stated that the DHS OIG's investigation "takes precedence over ICE investigations."  Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations (Feb. 22, 2022) (Tranche 7, 01257).

[685] U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (Sept. 29, 2021).  ICE also reported to the Subcommittee that DHS CRCL has opened numerous investigations into inappropriate medical care provided to female detainees at ICDC, including translation issues, general conditions, and alleged retaliation in response to grievances.  Email from U.S. Immigration and Customs Enforcement Staff to the Senate Permanent Subcommittee on Investigations (Nov. 17, 2021).

[686] U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (Sept. 29, 2021).

[687] *June 23, 2021 ICE Q&A Paper, supra* note 14.

[688] *Id.*

[689] *Id.*  Information ICE used in this analysis is discussed in more detail in Section IV above.

[690] U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (Sept. 29, 2021).

[691] *Id.*

IHSC officials also suggested that other factors affecting the number of OB-GYN claims for ICDC detainees could include whether ICDC referred all OB-GYN specialty care off-site, in contrast to policies and capabilities at other detention facilities that might perform routine gynecological exams and treatments on-site.[692]  ICE later noted to the Subcommittee, however, that *no* detention facilities would have the capacity to perform D&C procedures or laparoscopies on-site, "as those are [operating room] procedures that need to be performed in an ambulatory surgical center or hospital by [an] OB-GYN."[693]

Relatedly, IHSC officials mentioned anecdotal evidence that in-house ICDC medical staff might have been uncomfortable performing certain procedures like administering Depo-Provera injections, leading to a higher volume of shots administered by Dr. Amin.[694]  ICE later explained, however, that IHSC did not review whether facilities administered Depo-Provera shots or pelvic exams on-site and may not have been able to make this determination, given that non-IHSC-run detention centers would not have reported this care to IHSC.[695]  IHSC also identified other factors relevant to an analysis of OB-GYN claims, including age, pregnancy and birth history, previous pelvic and birth history, previous pelvic infections, and surgical history for female detainee populations.[696]

However, IHSC officials did not take the factors described above into account when analyzing the data it compiled for Dr. Amin's treatments because it would have involved "a huge undertaking," and IHSC had discontinued its efforts due to the DHS OIG investigation.[697]

As mentioned above, IHSC found that Dr. Amin only performed two hysterectomies,[698] and ICE stated to the Subcommittee that "medical records show that both procedures were medically necessary."[699]  According to IHSC officials, substantial intramural fibroids and cervical cancer were the medical indications for the two procedures.[700]  IHSC further determined that "Dr. Amin performed total hysterectomies on less than 1% of those detainees to whom he provided OB/GYN services," which it described as "not excessive" given hysterectomy rates among the U.S. female population.[701]

---

[692] *Id.*

[693] U.S. Immigration and Customs Enforcement, *HSGAC/PSI Interviews with ICE Health Service Corps (IHSC) Personnel Get-backs* (Nov. 5, 2021) (response on file with the Subcommittee).

[694] U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (Sept. 29, 2021).

[695] U.S. Immigration and Customs Enforcement, *HSGAC/PSI Interviews with ICE Health Service Corps (IHSC) Personnel Get-backs* (Nov. 5, 2021) (response on file with the Subcommittee).

[696] Email from U.S. Immigration and Customs Enforcement Staff to the Senate Permanent Subcommittee on Investigations (Nov. 17, 2021).

[697] U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (Sept. 29, 2021).

[698] Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations (Sept. 27, 2021) (Tranche 10, 3039).

[699] *June 23, 2021 ICE Q&A Paper*, *supra* note 14.

[700] U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (Sept. 29, 2021).

[701] *June 23, 2021 ICE Q&A Paper*, *supra* note 14.

After the conclusion of its limited review, IHSC produced an internal summary memorandum for DHS headquarters dated October 5, 2020, which included recommendations regarding prior authorization and concurrence utilization review—a review of medical services while the patient receives these services—as well as continuing the LOU process with off-site providers and related credentialing process.[702] IHSC further recommended working with ICDC and LaSalle staff to secure community OB-GYN services for ICDC detainees and suggested that the FMC assigned to ICDC conduct a site visit as soon as possible.[703] These recommendations have been implemented throughout all contract facilities with IHSC, including ICDC prior to September 2021 when the contract ended.

### iv. ICE Personnel Failed to Conduct Site Visits to ICDC Between January 2018 and October 2020

As noted above, ICE policies state that FMCs should conduct at least one site visit per year at non-IHSC facilities to ensure these facilities have complied with contractual detention standards.[704] However, an investigation that former DHS Acting Deputy Secretary Ken Cuccinelli began into ICDC allegations in the fall of 2020 found that the FMC responsible for ICDC had not visited the facility in several years.[705] Mr. Cuccinelli stated that he was alarmed by the prospect of involuntary hysterectomies and formed a three-person team to inspect the ICDC facility, review detainee medical records, and interview female detainees over the course of approximately one week in the fall of 2020.[706]

Mr. Cuccinelli told the Subcommittee finding that the FMC had not visited the facility in several years "was not a favorable discovery" and stated: "You would think the people responsible for medical care would get to the … facility."[707] After his team's initial review, in which they tentatively determined that involuntary hysterectomies were not occurring, Mr. Cuccinelli stated he was primarily concerned with the FMC's lack of visits to ICDC.[708]

The October 5, 2020, IHSC memorandum mentioned above confirmed this finding from the Cuccinelli investigative team. The memorandum explained that the last FMC site visit to

---

[702] According to ICE, the agency is in the process of implementing these recommendations. Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations (Sept. 27, 2021) (Tranche 10, 3037-42) (notes on file with the Subcommittee); U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (Sept. 29, 2021); Email from U.S. Immigration and Customs Enforcement Staff to the Senate Permanent Subcommittee on Investigations (Feb. 11, 2022).

[703] Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations (Sept. 27, 2021) (Tranche 10, 3037-42) (notes on file with the Subcommittee).

[704] U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (June 23, 2021); U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (Sept. 29, 2021).

[705] Ken Cuccinelli, Interview with Senate Permanent Subcommittee on Investigations (Sept. 20, 2021).

[706] Id.; see also Natalie Andrews and Michelle Hackman, *U.S. Opens Investigation into Claims of Forced Hysterectomies on Detained Migrants*, The Wall Street Journal (Sept. 16, 2020) (www.wsj.com/articles/lawmakers-seek-investigation-into-allegations-of-mass-hysterectomies-on-detained-migrants-11600291610).

[707] Ken Cuccinelli, Interview with Senate Permanent Subcommittee on Investigations (Sept. 20, 2021).

[708] Id.

ICDC was conducted on January 8, 2018, and no site visit occurred in 2019 "due to the government shut down at the beginning of the year and [temporary staffing] requirements for FMCs which made scheduling and completing the ICDC site visit difficult."[709] The memorandum further explained that the FMC "prioritized" site visits to facilities that had major findings and non-compliance with standards during the 2018 site visits.[710] An IHSC official told the Subcommittee that IHSC prioritizes facilities that have had serious medical concerns in the past, and "ICDC was not one of those facilities."[711] In addition, the FMC completed a site visit to Stewart Detention Facility in Lumpkin, Georgia, instead of ICDC in 2019 because "Stewart had recently transitioned to an IGSA."[712] A site visit was scheduled for ICDC in March 2020, but that visit did not occur due to the COVID-19 pandemic, and the FMC "prioritized ICDC for an onsite visit in October 2020."[713]

According to an IHSC official, the October 2020 ICDC site visit did, in fact, occur and no significant medical deficiencies were identified.[714] ICE also noted to the Subcommittee that ICDC received site visits from the Nakamoto Group in June 2018, June 2019, and September 2020, as well as an ODO visit in March 2020, and that ICE CMD had a DSCO assigned to ICDC.[715]

---

[709] Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations (Sept. 27, 2021) (Tranche 10, 3038). An IHSC official explained that IHSC clinical staff is required to support ITOS (IHSC Temporary Duty On-call Schedule) efforts for 30 days each year to address staffing shortages. Another IHSC official stated that IHSC staff is constantly pulled into activities such as COVID-19 testing for U.S. Customs and Border Protection, making site reviews difficult. This official told Subcommittee staff that ICE leadership is aware that other activities will "fall off" as a result. U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (Sept. 29, 2021). A recent DHS OIG report noted that "FMC resources are…limited; approximately 40 FMCs are responsible for oversight of 148 non-IHSC staffed ICE detention facilities." In response, ICE noted that it had analyzed FMC staffing levels and "concluded that it was necessary to add FMC positions. ICE officials stated that formal presentation of the evaluation and staffing recommendations is pending, but that some new positions were created." U.S. Department of Homeland Security, Office of Inspector General, *Many Factors Hinder ICE's Ability to Maintain Adequate Staffing at Detention Facilities* (OIG-22-03) (Oct. 29, 2021) (https://www.oig.dhs.gov/reports/2022/many-factors-hinder-ices-ability-maintain-adequate-medical-staffing-detention-facilities/oig-22-03-oct21).

[710] Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations (Sept. 27, 2021) (Tranche 10, 3038).

[711] U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (Sept. 29, 2021). This official also stated that complications due to ITOS responsibilities—a temporary duty on-call schedule for the IHSC clinical workforce—was a reasonable explanation for the absence of a site visit to ICDC in 2019. *Id.*

[712] Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations (Sept. 27, 2021) (Tranche 10, 3038).

[713] *Id.*

[714] U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (Sept. 29, 2021). The 2020 ICDC site visit report found the facility compliant with the standards and noted that "[t]here were no areas of concern noted during reviews of medical records, facility processes, procedures, and policy." Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations (Feb. 14, 2022) (Tranche 5, 01095).

[715] Email from U.S. Immigration and Customs Enforcement Staff to the Senate Permanent Subcommittee on Investigations (Nov. 17, 2021). ICDC received a "Meets Standard" rating from the Nakamoto Group for each inspection from 2018 to 2020 and met the ICE PBNDS. The Nakamoto Group did not identify significant medical deficiencies. Information on the March 2020 ODO site visit is discussed in more detail in Section II above.

### v. ICE Is Not Required to Monitor the Use of Language Translation Services by Off-Site Medical Providers

IHSC does not monitor the use of language translation services by non-IHSC facilities, such as ICDC, although it tracks the use of these services in IHSC-staffed facilities on a yearly basis and audits invoices to the translation vendor.[716]  Similarly, IHSC does not monitor use of language translation services by off-site providers even though it provides a phone number and code for a "language line translator" with a referral to an off-site specialist.[717]  IHSC officials stated to the Subcommittee that they believe each provider has a professional responsibility to provide language services to ensure their patients understand each proposed treatment—and neither IHSC nor the relevant detention facility plays a role in ensuring a provider meets this responsibility.[718]

Internal ICE emails appear to confirm that ICE does not monitor the use of language translation services by off-site medical providers.  In a September 17, 2020, email to ICE officials, a *New York Times* reporter asked whether ICE had records of Dr. Amin's use of translation or interpretation services for ICDC detainees.[719]  An ICE Atlanta Field Office official later sent an internal email stating that Dr. Amin "uses a language line service," but "we do not track his usage."[720]

### vi. ICE Is Not Required to Ensure Off-Site Medical Providers Obtain Informed Consent

ICE detention standards define informed consent as: "An agreement by a patient to a treatment, examination, or procedure after the patient receives the material facts about the nature,

---

Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations (June 8, 2021) (668-703); Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations (Jan. 31, 2022) (Tranche 2, 00295-893).

[716] U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (June 23, 2021); U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (Sept. 29, 2021).  According to IHSC officials, ICE ODO and DHS CRCL monitor the use of language services in non-IHSC facilities and will indicate any deficiencies related to these services in their reports.  U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (Sept. 29, 2021).

[717] U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (Sept. 29, 2021).  Documents reviewed by the Subcommittee showed that off-site referrals included a phone number and code for a translator.  *See, e.g.,* LaSalle_333444; LaSalle_333490; LaSalle_333516.

[718] U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (Sept. 29, 2021).

[719] Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations (Oct. 27, 2021) (Tranche 17, 11058).

[720] Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations (Oct. 27, 2021) (Tranche 17, 11057).

consequences, and risks of the proposed treatment, examination or procedure; the alternatives to it; and the prognosis if the proposed action is not undertaken."[721]

As with language translation services, ICE does not monitor off-site providers to ensure they obtain informed consent from detainees before providing medical services.[722]  Instead, IHSC officials explained to the Subcommittee that providers have a professional responsibility to obtain informed consent and include consent forms with medical records, and hospitals have an incentive to obtain consent to avoid risking their accreditation.[723]  As a result, neither IHSC officials—including RCDs—nor detention facilities like ICDC have a role in ensuring providers fulfill these responsibilities.[724]  In fact, the ICDC RCD had "no idea" what the process was for obtaining consent for a surgical procedure from a detainee.[725]

During its limited investigation into allegations concerning Dr. Amin, IHSC searched for consent forms related to certain detainee patients and found that forms were missing in some cases.[726]  According to IHSC, this was "not best practices,"[727] and IHSC officials reinforced to ICDC the importance of maintaining full records for all off-site medical procedures.[728]  Mr. Cuccinelli identified a major concern related to female ICDC detainees who indicated they did not understand or consent to treatments Dr. Amin performed.[729]  Mr. Cuccinelli also stated that "there was definitely a disconnect" in the patient-doctor relationship, and detainees were not in a position to understand the procedures that occurred, "which is in itself inadequate."[730]

Internal communications also appear to confirm that ICE relied on off-site providers to meet their professional obligation to obtain consent instead of verifying that detainees provided consent or auditing consent documents after treatments.  For example, in an email exchange from

---

[721] U.S. Department of Homeland Security, U.S. Immigration and Customs Enforcement, *Performance-Based National Detention Standards 2011*, at 469-470 (Revised December 2016) (https://www.ice.gov/doclib/detention-standards/2011/pbnds2011r2016.pdf).

[722] U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (Sept. 29, 2021).

[723] *Id.;* U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (June 23, 2021).  IHSC officials and medical staff at randomly selected facilities stated to the Government Accountability Office that "ICE expects community providers, as licensed medical professionals, to execute all aspects of informed consent when providing care to detained noncitizens," and that "it is the responsibility of the off-site community provider to obtain and document informed consent."  Government Accountability Office, *Immigration Detention: ICE Needs to Strengthen Oversight of Informed Consent for Medical Care*, 15 (GAO-23-105196) (Oct. 2022) (https://www.gao.gov/products/gao-23-105196).

[724] U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (June 23, 2021); U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (Sept. 29, 2021); U.S. Immigration and Customs Enforcement Health Service Corps Official Regional Clinical Director, Interview with Senate Permanent Subcommittee on Investigations (Feb. 14, 2022).

[725] U.S. Immigration and Customs Enforcement Health Service Corps Official Regional Clinical Director, Interview with Senate Permanent Subcommittee on Investigations (Feb. 14, 2022).

[726] U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (Sept. 29, 2021).

[727] *Id.*

[728] *Id.*

[729] Ken Cuccinelli, Interview with Senate Permanent Subcommittee on Investigations (Sept. 20, 2021).

[730] *Id.*

September 2020, an official from the Consulate General of Mexico stated that the medical file for Y.J.—a Mexican national who was subject to gynecological procedures by Dr. Amin while detained at ICDC—was missing consent forms and asked an ICE Atlanta Field Office official "how consent is obtained from detainees and if there are any forms they have to sign to submit themselves to invasive procedures."[731]  This ICE official replied by stating that "[c]onsent forms are obtained by the surgeon" and that "files are maintained at his office and at the hospital."[732]

Recently, the Government Accountability Office ("GAO") conducted a review of 48 medical files from six ICE detention facilities across the country.[733]  GAO determined that these facilities generally documented informed consent for care provided within the facility's medical unit.[734]  Like ICDC, however, GAO determined that most facilities reviewed did not include consent documentation in medical records for off-site medical care.[735]  GAO highlighted that ICE policies do not require detention facilities to obtain documentation of informed consent for off-site medical care.[736]  GAO recommended: (1) ICE should establish and communicate a policy requiring IHSC-staffed facilities to collect informed consent documentation for medical care from community providers; (2) ICE should require non-IHSC-staffed detention facilities to collect informed consent documentation for medical care from community providers; and (3) ICE should include a review of these policies in its oversight mechanisms once they are established.[737]

### vii.    ICE Conducts Limited Oversight of Hospitals Providing Off-Site Services for Non-IHSC Detention Facilities

ICE conducts limited oversight of hospitals providing off-site care to ICE detainees. IHSC, for example, did not maintain a written agreement or contract with ICH while ICDC housed detainees, and IHSC officials indicated that any agreement with the hospital would be at the "local level."[738]  Although ICE has begun entering into LOUs with hospitals, as mentioned above, it never concluded an LOU with ICH.[739]  However, according to ICE, an LOU is not a contract or agreement that directs hospitals on how to provide medical care and other services to

---

[731] Citizens for Responsibility and Ethics in Washington, National Immigration Project of the National Lawyers Guild, and Project South, *Deliberate Indifference: Records Show ICE's Systemic Failures at Georgia Detention Facility at the Center of Gynecological Abuse Investigations* (June 2021) (nipnlg.org/PDFs/2021_03June_ICE-ICDC-Report.pdf).

[732] *Id.*

[733] Government Accountability Office, *Immigration Detention: ICE Needs to Strengthen Oversight of Informed Consent for Medical Care* (GAO-23-105196) (Oct. 2022) (https://www.gao.gov/products/gao-23-105196).

[734] *Id.*

[735] *Id.*

[736] *Id.*

[737] *Id.*

[738] U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (Sept. 29, 2021).  As noted above, ICDC detainees received OB-GYN services at ICH due to Dr. Amin's affiliation with the hospital.

[739] U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (Sept. 29, 2021).

detainees.[740]  Before ICH began treating ICDC detainees, IHSC also did not conduct any reviews to determine whether the hospital had been the subject of previous allegations concerning medical waste, fraud, or abuse.[741]

IHSC officials said they intend to review inpatient hospital admissions using the Milliman Care Guidelines as part of IHSC's new utilization review process, but no reviews have been performed to date.[742]  IHSC also has not required hospitals to submit regular reports or other information concerning the treatment of detainees, with the exception of clinical updates regarding in-patient care, and it does not provide guidance or policies to hospitals regarding appropriate treatment.[743]

## VII. ICDC HAD LIMITED OBLIGATIONS TO CONDUCT OVERSIGHT OF OFF-SITE CARE FOR DETAINEES

LaSalle, the contractor who operated the ICDC facility, says it played a very limited role in vetting off-site physicians treating detainees from ICDC, reviewing the medical care they administered, or ensuring that detainees provided informed consent in connection with these procedures.  LaSalle and ICDC employees were also unaware of any review by ICDC staff prior to the September 2020 complaint that revealed abuse, waste, or fraud in connection with care Dr. Amin provided or any complaints or grievances from ICDC detainees concerning Dr. Amin.

Finally, LaSalle and ICDC conducted a limited review of medical records for ICDC detainees who had received gynecological surgical procedures from Dr. Amin following the public allegations against him.  LaSalle Medical Director Dr. Hearn could not make a conclusive determination regarding the appropriateness of the gynecological care Dr. Amin provided.  LaSalle representatives stated to the Subcommittee that no ICDC employee had authority or responsibility related to the quality or nature of care off-site physicians provided—only the duty to negotiate and maintain arrangements with these physicians.

### A. LaSalle Had Minimal Contractual Obligations Concerning Off-Site Medical Care at ICDC

In interviews with the Subcommittee, ICDC officials described limited efforts to vet Dr. Amin before he provided care to ICDC detainees or review the care he eventually provided.  For example, ICDC Warden Paulk, Deputy Warden Frank Albright, and Medical Director Dr.

---

[740] ICE noted to the Subcommittee that LOUs are only intended to describe the services the provider can offer and to ensure the provider agrees to accept Medicare reimbursement rates.  Email from U.S. Immigration and Customs Enforcement Staff to the Senate Permanent Subcommittee on Investigations (Nov. 17, 2021).

[741] U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (Sept. 29, 2021).

[742] Id.; Production from U.S. Immigration and Customs Enforcement to the Senate Permanent Subcommittee on Investigations (Feb. 22, 2022) (Tranche 7, 01254); Email from U.S. Immigration and Customs Enforcement Staff to the Senate Permanent Subcommittee on Investigations (Nov. 11, 2022).  *See also* Milliman Care Guidelines, *Industry-Leading Evidence-Based Care Guidelines* (https://www.mcg.com/care-guidelines/care-guidelines/) (accessed Nov. 13, 2022).

[743] U.S. Immigration and Customs Enforcement Health Service Corps, Briefing with Senate Permanent Subcommittee on Investigations (Sept. 29, 2021).

McMahan were unaware of the 2015 settlement between Dr. Amin and other parties and DOJ or the previous malpractice lawsuits against Dr. Amin.[744]  Dr. McMahan also stated that he was not aware of any efforts by ICDC to vet Dr. Amin before he began treating ICDC detainees.[745]

LaSalle representatives explained to the Subcommittee that the company plays no role in vetting off-site medical providers for detainees.[746]  Dr. Hearn, Medical Director for LaSalle, also confirmed that LaSalle employees play no role in vetting off-site providers.[747]  All current ICDC and LaSalle employees the Subcommittee interviewed indicated they became aware of recent allegations against Dr. Amin only through the public disclosures in September 2020.[748]

LaSalle explained to the Subcommittee that the IGSA between ICDC and ICE required only that ICDC "ensure…access to an offsite emergency medical provider at all times."[749] Moreover, according to LaSalle's contract with ICE, the only obligation of the HSA related to this issue was, in collaboration with ICE, to "negotiate[] and maintain[] agreements with nearby medical facilities or health care providers to provide required health care not available within the facility."[750]

Regarding oversight of medical care by Dr. Amin, Dr. McMahan explained that the HSA, in accordance with her general oversight concerning access to care, and the DON might have become aware of certain aspects of care by off-site providers and would consult with him, as the facility's Medical Director, on occasion.[751]  Dr. McMahan, however, could not recall any particular circumstances in which these officials referred a patient who had seen Dr. Amin to him for further oversight.[752]

---

[744] Howard McMahan, Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Sept. 15, 2021); David Paulk, Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Sept. 16, 2021); Frank Albright, Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Sept. 21, 2021).

[745] Howard McMahan, Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Sept. 15, 2021).

[746] Counsel for LaSalle, Briefing with Senate Permanent Subcommittee on Investigations (May 19, 2021).

[747] Pamela Hearn, LaSalle Corrections, Interview with Senate Permanent Subcommittee on Investigations (Nov. 9, 2021).

[748] Howard McMahan, Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Sept. 15, 2021); David Paulk, Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Sept. 16, 2021); Frank Albright, Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Sept. 21, 2021); Pamela Hearn, LaSalle Corrections, Interview with Senate Permanent Subcommittee on Investigations (Nov. 9, 2021).

[749] LaSalle_048633-89; Email from Counsel for LaSalle to the Senate Permanent Subcommittee on Investigations (Nov. 17, 2021).

[750] LaSalle_027934-37; Email from Counsel for LaSalle to the Senate Permanent Subcommittee on Investigations (Nov. 17, 2021).

[751] Howard McMahan, Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Sept. 15, 2021); LaSalle_027935.

[752] Howard McMahan, Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Sept. 15, 2021).

Former HSA Brown confirmed that she did not recall any instance in which she asked Dr. McMahan to review care Dr. Amin provided.[753]  She also stated that she was not aware which ICDC employees were able to monitor or review the treatment Dr. Amin provided to ICDC detainees.[754]  Additionally, Dr. Hearn stated to the Subcommittee that she was not aware of any efforts at the detention center level, in general, to oversee the care detainees receive from off-site providers.[755]  She did recall, however, instances in which she had reviewed the volume of referrals to off-site providers from detention centers for signs of waste, fraud, or abuse, pursuant to her authority to make decisions regarding "the deployment of health resources" to "support the delivery of health care services."[756]

In addition, former HSA Brown did not recall undertaking any analysis of medical treatment by Dr. Amin prior to the public allegations against Dr. Amin.[757]  Warden Paulk and Deputy Warden Albright were not aware of any review of Dr. Amin by ICDC staff, prior to September 2020, that revealed irregularities or indications of waste, fraud, and abuse in the treatment Dr. Amin provided to detainees.[758]  Dr. Hearn was similarly unaware of any review of this kind taking place before the public allegations against Dr. Amin.[759]  In addition, none of the ICDC employees the Subcommittee interviewed were aware of efforts to review trends related to detainees refusing to receive treatment from Dr. Amin.[760]  In an interview with the Subcommittee, former HSA Brown recalled one complaint from a detainee in November 2018 refusing to see Dr. Amin because she "felt uncomfortable" and requested a different provider.[761]

---

[753] Lakeysa Brown, formerly of Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Jan. 5, 2022).  According to LaSalle, former HSA Brown did not have "access to sufficient records to enable such a review."  Email from Counsel for LaSalle to the Senate Permanent Subcommittee on Investigations (Nov. 11, 2022).

[754] Lakeysa Brown, formerly of Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Jan. 5, 2022).

[755] Pamela Hearn, LaSalle Corrections, Interview with Senate Permanent Subcommittee on Investigations (Nov. 9, 2021).

[756] *Id.*; LaSalle_027935; Email from Counsel for LaSalle to the Senate Permanent Subcommittee on Investigations (Nov. 17, 2021).

[757] Lakeysa Brown, formerly of Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Jan. 5, 2022).  According to LaSalle, former HSA Brown did not have "access to records sufficient to undertake" any analysis of medical treatment by Dr. Amin.  Email from Counsel for LaSalle to the Senate Permanent Subcommittee on Investigations (Nov. 11, 2022).

[758] David Paulk, Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Sept. 16, 2021); Frank Albright, Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Sept. 21, 2021).

[759] Pamela Hearn, LaSalle Corrections, Interview with Senate Permanent Subcommittee on Investigations (Nov. 9, 2021).

[760] *Id.*; Howard McMahan, Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Sept. 15, 2021); David Paulk, Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Sept. 16, 2021); Frank Albright, Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Sept. 21, 2021); Amber Hughes Strout, formerly of Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Sept. 22, 2021); Lakeysa Brown, formerly of Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Jan. 5, 2022).

[761] Lakeysa Brown, formerly of Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Jan. 5, 2022).

Dr. McMahan also explained to the Subcommittee that he was unaware of any issues with Dr. Amin failing to obtain informed consent from detainee patients, and Warden Paulk was similarly unaware of any concerns that detainees may not have provided informed consent.[762] Former HSA Brown told the Subcommittee that off-site providers were responsible for obtaining informed consent from the detainee in the language understood by the detainee.[763] She did not recall ICDC medical unit staff having access to detainees' records from an off-site visit to review for a record of consent or having the ability to monitor off-site providers to ensure consent procedures were followed.[764]

Dr. Hearn explained to the Subcommittee that detention center staff play no role in ensuring off-site providers obtain informed consent from detainees.[765] Similarly, LaSalle representatives stated that responsibility for obtaining informed consent for off-site treatment lies with the relevant healthcare provider.[766] Relatedly, Dr. Hearn also stated that staff would play no role in verifying that detainees receive language translation services during off-site care.[767] Former HSA Brown confirmed that ICDC medical unit staff could not verify off-site providers' use of translation services and stated that it is the responsibility of the off-site provider to obtain consent and ensure that an interpreter is utilized.[768]

ICDC officials were also unaware of the existence of any complaints or grievances by ICDC detainees concerning Dr. Amin and no records of complaints or grievances concerning his care were discovered by ICDC, with the exception of the complaint former HSA Brown recalled discussed above and an email that Warden Paulk stated he received in November 2018 from the

---

[762] Howard McMahan, Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Sept. 15, 2021); David Paulk, Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Sept. 16, 2021).

[763] Lakeysa Brown, formerly of Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Jan. 5, 2022). This was in accordance with ICE 2011 PBNDS, Section 4.3 V.D ("Informed consent shall be obtained prior to providing treatment (absent medical emergencies)."). Email from Counsel for LaSalle to the Senate Permanent Subcommittee on Investigations (Nov. 11, 2022).

[764] Lakeysa Brown, formerly of Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Jan. 5, 2022).

[765] Pamela Hearn, LaSalle Corrections, Interview with Senate Permanent Subcommittee on Investigations (Nov. 9, 2021).

[766] Email from Counsel for LaSalle to the Senate Permanent Subcommittee on Investigations (Nov. 17, 2021); Email from Counsel for LaSalle to the Senate Permanent Subcommittee on Investigations (Nov. 11, 2022); see also 2011 PBNDS, Section 4.3 V.D ("Health care practitioners should explain any rules about mandatory reporting and other limits to confidentiality in their interactions with detainees. Informed consent shall be obtained prior to providing treatment (absent medical emergencies)." LaSalle's own Medical Request and Consent for Treatment Form, for procedures inside its detention facilities, grants LaSalle "authority to administer and perform routine examinations, treatments of minor illnesses and injuries, medications and diagnostic procedures which may be necessary to address my above medical complaint." LaSalle_014225-26.

[767] Pamela Hearn, LaSalle Corrections, Interview with Senate Permanent Subcommittee on Investigations (Nov. 9, 2021).

[768] Lakeysa Brown, formerly of Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Jan. 5, 2022). In documents reviewed by the Subcommittee, off-site referral packets from ICDC to the off-site provider included the IHSC MedPAR authorization and had information for a "language line translator." See, e.g., LaSalle _323835; LaSalle_324227; LaSalle_324493.

Southern Poverty Law Center.[769]  The email discussed an ICDC detainee who had suffered a miscarriage while in custody and was still suffering from "debilitating pain."[770]  According to the email, the detainee was seen by Dr. Amin at least twice, but her pain returned and worsened.[771]  The email further stated that the detainee's "experience with Dr. Amin was so painful and traumatic that she did not want to be sent back to him."[772]  According to subsequent emails, ICDC responded to this complaint by sending the detainee to a different off-site provider "unassociated with Dr. Amin."[773]

With the exception of the one complaint discussed above, former HSA Brown was unaware of any complaints from detainees or staff regarding Dr. Amin.[774]  Dr. McMahan also was unaware of any complaints from detainees or staff regarding Dr. Amin, and apart from an email containing a memorandum regarding Dr. Amin that Deputy Warden Albright viewed shortly after joining ICDC, Deputy Warden Albright learned of no complaints regarding Dr. Amin.[775]  Dr. Hearn was similarly unaware of any complaints against Dr. Amin.[776]

As explained in Section III above, however, all of the women the Subcommittee interviewed concerning their treatment by Dr. Amin recalled submitting grievances to ICDC, ICE, or both, expressing their concerns to ICDC staff, or requesting second opinions.  Ms. Dowe, for example, stated that she requested a second opinion after Dr. Amin recommended a hysterectomy following her cyst removal.[777]  However, Ms. Dowe recalled that an ICDC nurse informed her that ICE would not pay for a second opinion.[778]

Ms. Castaneda-Reyes recalled that she shared concerns about her interaction with Dr. Amin with a mental healthcare provider at ICDC, but this individual then downplayed these concerns.[779]  She also recalled that she shared her concerns with ICDC guards about infertility

---

[769] David Paulk, Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Sept. 16, 2021); LaSalle_2573-77; Email from Paralegal to Counsel for LaSalle to the Senate Permanent Subcommittee on Investigations Staff (Sept. 24, 2021); Email from Counsel for LaSalle to the Senate Permanent Subcommittee on Investigations (Nov. 11, 2022).

[770] LaSalle_2574.

[771] *Id.*

[772] *Id.*

[773] LaSalle_2573.

[774] Lakeysa Brown, formerly of Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Jan. 5, 2022).  No complaints from detainees or staff regarding Dr. Amin were later located by LaSalle.  Email from Counsel for LaSalle to the Senate Permanent Subcommittee on Investigations (Nov. 11, 2022).

[775] Howard McMahan, Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Sept. 15, 2021); Frank Albright, Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Sept. 21, 2021).  Deputy Warden Albright could not further recall the specific content of this email or memorandum in his interview with the Subcommittee.

[776] Pamela Hearn, LaSalle Corrections, Interview with Senate Permanent Subcommittee on Investigations (Nov. 9, 2021).

[777] Wendy Dowe, Interview with Senate Permanent Subcommittee on Investigations (June 25, 2021); *see also* LaSalle_319164; LaSalle_320169.

[778] Wendy Dowe, Interview with Senate Permanent Subcommittee on Investigations (June 25, 2021).

[779] Maribel Castaneda-Reyes, Interview with Senate Permanent Subcommittee on Investigations (Oct. 5, 2021).  This encounter was not reflected in Ms. Castaneda-Reyes' medical records.

following treatment by Dr. Amin, but one guard dismissed her concerns because Ms. Castaneda-Reyes already had three children.[780]

Jane Doe #2 also stated that she told multiple nurses at ICDC regarding her experiences with Dr. Amin. She recalled that "none of them were shocked," and they told her that she was not the first one Dr. Amin had "messed up."[781] Ms. Floriano Navarro remembered submitting grievances to obtain more information about the procedures Dr. Amin performed.[782] The Subcommittee was only able to substantiate Ms. Floriano Navarro's recollections.

## B. LaSalle Conducted a Limited Investigation of Abuse Allegations

Following the public allegations against Dr. Amin, Dr. Hearn conducted a review of medical records for ICDC detainees who had received gynecological surgical procedures since 2016.[783] Former HSA Brown told the Subcommittee that she, along with other medical unit staff, pulled the charts for all female detainees who were referred to Dr. Amin over the past few years.[784] Over three days, Dr. Hearn reviewed referrals from ICDC to Dr. Amin and verified that the referrals were appropriate and had been approved by IHSC.[785] Due to the limited and incomplete patient records ICDC had access to, she could not, however, make a conclusive determination regarding the appropriateness of the gynecological care detainees received.[786]

According to LaSalle representatives, the company "does not have access to hospital records other than those provided to detainees or sporadically provided to ICDC staff."[787] Dr. Hearn also reviewed ICDC grievance logs, and she informed the Subcommittee that she did not find any material raising concerns regarding off-site gynecological services.[788] She did not interview detainees—most of whom were no longer at ICDC—or speak to Dr. Amin—who was represented by legal counsel—during her review.[789] Former HSA Brown stated that she was interviewed by LaSalle headquarters.[790] She also stated that she was not presented with the findings of Dr. Hearn's review.[791]

---

[780] Id.
[781] Jane Doe #2, Interview with Senate Permanent Subcommittee on Investigations (Oct. 4, 2021). These encounters were not reflected in Jane Doe #2's medical records.
[782] Jaromy Jazmin Floriano Navarro, Interview with Senate Permanent Subcommittee on Investigations (June 25, 2021); LaSalle_333712; LaSalle_335569-71.
[783] Pamela Hearn, LaSalle Corrections, Interview with Senate Permanent Subcommittee on Investigations (Nov. 9, 2021).
[784] Lakeysa Brown, formerly of Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Jan. 5, 2022).
[785] Pamela Hearn, LaSalle Corrections, Interview with Senate Permanent Subcommittee on Investigations (Nov. 9, 2021).
[786] Id.; Email from Counsel for LaSalle to the Senate Permanent Subcommittee on Investigations (Nov. 17, 2021).
[787] Letter from Counsel for LaSalle to the Senate Permanent Subcommittee on Investigations (Nov. 17, 2021).
[788] Pamela Hearn, LaSalle Corrections, Interview with Senate Permanent Subcommittee on Investigations (Nov. 9, 2021).
[789] Id.; Email from Counsel for LaSalle to the Senate Permanent Subcommittee on Investigations (Nov. 11, 2022).
[790] Lakeysa Brown, formerly of Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Jan. 5, 2022).
[791] Id.

Dr. McMahan also reviewed the past five years of gynecological procedures performed on ICDC detainees, including procedures Dr. Amin performed.[792]  Specifically, he reviewed medical charts and the "number of procedures done and justifications for doing them."[793]  He stated that his analysis was a "broad review," and he found "very few surgical interventions in the realm of the allegations."[794]  For example, Dr. McMahan found only three hysterectomies had been performed over the last five years for ICDC detainees.[795]  Dr. McMahan stated that he focused on hysterectomies and laparoscopies, in contrast to the wider evaluation he understood LaSalle conducted.[796]  His review also did not include interviews of detainees—most of whom were no longer at ICDC—nor ICDC or ICH staff.[797]

Dr. McMahan recalled that the review process only took "one afternoon."[798]  He reviewed medical charts and the "number of procedures done and justifications for doing them."[799]  He told the Subcommittee that he was "concerned about the allegations," but found "nothing alarming at all" in the medical files and that his review of those files confirmed that there "was nothing out of line, nothing egregious."[800]  Although he had not received a formal briefing on the LaSalle investigation, he spoke with Dr. Hearn in the course of her review, and he understood from that conversation that his findings were similar to the results from her inquiry.[801]

In his interview with the Subcommittee, Warden Paulk was unaware of the specific scope of the LaSalle investigation or the medical review Dr. McMahan conducted, but stated that he was aware that Dr. Hearn and Dr. McMahan had reviewed certain medical files.[802]  He also explained that he had not received a briefing concerning any findings from the two investigations and had not seen any written product summarizing these findings.[803]  Warden Paulk was also unaware of any ICDC investigative efforts involving ICH or interviews with ICDC employees.[804]  Similarly, Deputy Warden Albright was unaware of any investigative efforts regarding Dr. Amin.[805]

Finally, prior to the removal of ICE detainees from the facility, all ICDC employees the Subcommittee interviewed were unaware of ICDC implementing any new policies or procedures

---

[792] Howard McMahan, Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Sept. 15, 2021).

[793] *Id.*

[794] *Id.*

[795] *Id.*

[796] *Id.*

[797] *Id.*

[798] *Id.*

[799] *Id*; Email from Counsel for LaSalle to the Senate Permanent Subcommittee on Investigations (Nov. 11, 2022).

[800] *Id.*

[801] Howard McMahan, Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Sept. 15, 2021).

[802] David Paulk, Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Sept. 16, 2021).

[803] *Id.*

[804] *Id.*

[805] Frank Albright, Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Sept. 21, 2021).

specifically in response to the allegations concerning Dr. Amin.[806]  In addition, Warden Paulk, Dr. McMahan, and former HSA Brown were unaware of any investigative efforts that identified particular ICDC employees as failing to exercise an appropriate standard of care in overseeing detainee treatment.[807]  Dr. Hearn was also unaware of LaSalle identifying any employees who had failed to exercise this standard of care.[808]

LaSalle representatives stated to the Subcommittee that no ICDC employee has authority or responsibility related to the quality or nature of care off-site physicians provide—only the duty to negotiate and maintain arrangements with these physicians.[809]  Specifically, LaSalle representatives stated that "LaSalle staff are not contracted or otherwise allowed to be present for medical procedures [like] hysterectomies."[810]

## VIII.  ICH DECLINED TO IDENTIFY EFFORTS TO INVESTIGATE DR. AMIN AND DID NOT IDENTIFY ANY CHANGES TO POLICIES AND PROCEDURES FOLLOWING THE 2020 ALLEGATIONS

Dr. Amin continues to serve as the Chief Medical Officer and exercises a broad leadership role at ICH.[811]  The current ICH executives the Subcommittee interviewed were not aware of the initial vetting process for Dr. Amin when he first joined the hospital staff but mentioned he was re-credentialed in 2021.[812]  The executives further explained that the current ICH re-credentialing process involves checking a physician's license, running a background check, checking for exclusion from Medicare and Medicaid programs, and reviewing any medical malpractice cases, which are relevant but not determinative for this process.[813]  While an

---

[806] *Id.*; Howard McMahan, Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Sept. 15, 2021); David Paulk, Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Sept. 16, 2021); Amber Hughes Strout, formerly of Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Sept. 22, 2021); Pamela Hearn, LaSalle Corrections, Interview with Senate Permanent Subcommittee on Investigations (Nov. 9, 2021); Lakeysa Brown, formerly of Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Jan. 5, 2022).

[807] Howard McMahan, Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Sept. 15, 2021); David Paulk, Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Sept. 16, 2021); Lakeysa Brown, formerly of Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Jan. 5, 2022); *see also* Amber Hughes Strout, formerly of Irwin County Detention Center, Interview with Senate Permanent Subcommittee on Investigations (Sept. 22, 2021).  According to LaSalle, no ICDC employees have authority or responsibility for medical care provided by off-site providers.  Email from Counsel for LaSalle to the Senate Permanent Subcommittee on Investigations (Nov. 11, 2022).

[808] Pamela Hearn, LaSalle Corrections, Interview with Senate Permanent Subcommittee on Investigations (Nov. 9, 2021).  According to LaSalle, "[n]o LaSalle employees are authorized or are allowed to review the quality of nature of care provided by off-site medical providers."  Email from Counsel for LaSalle to the Senate Permanent Subcommittee on Investigations (Nov. 11, 2022).

[809] Email from Counsel for LaSalle to the Senate Permanent Subcommittee on Investigations (Nov. 17, 2021); *see also* LaSalle_027934-37.

[810] Letter from Counsel for LaSalle to the Senate Permanent Subcommittee on Investigations (Nov. 17, 2021).

[811] Paige Wynn, Irwin County Hospital, Interview with Senate Permanent Subcommittee on Investigations (Aug. 25, 2021).

[812] *Id.*

[813] *Id.*

ICH representative noted that Dr. Amin had been accused of medical malpractice, the representative also noted he was "cleared by multiple jury trials."[814] ICH executives also explained to the Subcommittee that under the CIA with HHS OIG, an outside auditor reviewed all ICH agreements, including the agreement with Dr. Amin, as discussed above.[815]

ICH CEO Paige Wynn stated she had not received any complaints against Dr. Amin from patients or staff since she joined the hospital in 2015.[816] Ms. Wynn also stated that she was not aware of any instances in which ICH identified waste, fraud, and abuse related to Dr. Amin—and apart from the 2015 DOJ settlement, she was not aware of any such issues related to Dr. Amin.[817]

The Subcommittee reviewed at least one medical file from ICH in which a nurse noted that she had questioned a detainee patient of Dr. Amin about the type of surgery she was having. According to the notes, the patient "didnt [sic] know she was having surgery" and spoke "very little English."[818] Using a language translation service, the nurse confirmed that the patient "wasnt [sic] aware of having surgery" that day.[819] The notes also indicate that the patient "is refusing surgery at this time" and will "wait and have it done in her country."[820] The notes further state that the surgery was not performed and the patient left the hospital.[821] According to ICH representatives, there is no indication that Ms. Wynn had seen this note.[822]

Ms. Wynn, explained that she first learned about the allegations against Dr. Amin from public reporting in September 2020.[823] ICH officials declined to provide any information to the Subcommittee concerning any investigative actions the hospital took in response to the public allegations against Dr. Amin.[824] Ms. Wynn stated that ICH had not changed any policies or procedures in response to the allegations and does not have "any plans" to implement new policies.[825] ICH has also not implemented any new policies or procedures designed to monitor Dr. Amin, specifically, and ICH officials explained he was subject to the same rules as other medical staff.[826]

---

[814] *Id.* Counsel for ICH also stated to the Subcommittee that Dr. Amin has not had any disciplinary actions brought against him during his tenure at ICH. Email from Counsel for Irwin County Hospital to the Senate Permanent Subcommittee on Investigations (Nov. 17, 2021).

[815] Paige Wynn, Irwin County Hospital, Interview with Senate Permanent Subcommittee on Investigations (Aug. 25, 2021).

[816] *Id.*

[817] *Id.*

[818] ICH004737.

[819] *Id.* The medical file indicates the scheduled surgeries were a D&C, laparoscopy, and LEEP. ICH004734.

[820] ICH004737.

[821] *Id.*

[822] Email from Counsel for Irwin County Hospital to the Senate Permanent Subcommittee on Investigations (Nov. 17, 2021).

[823] Paige Wynn, Irwin County Hospital, Interview with Senate Permanent Subcommittee on Investigations (Aug. 25, 2021).

[824] *Id.*

[825] *Id.*

[826] *Id.*

## IX.  CONCLUSION

Anyone held in the custody of the U.S. government should receive proper medical care. The Subcommittee's investigation into ICDC found that was not always the case for the female ICE detainees at that facility.  Additionally, for years, deficiencies in detainee medical care that were identified by multiple DHS oversight components went unaddressed.

Gaps in policies and procedures concerning off-site medical services and a weak vetting process of off-site medical experts limited ICE's ability to obtain insight into the professional conduct of Dr. Amin.  ICDC accounted for a small percentage of the total female ICE detainee population, yet Dr. Amin performed more medical procedures on female detainees than all other ICE off-site medical providers providing OB-GYN care.  ICE failed to recognize or adequately explain the vast discrepancy of medical procedures that Dr. Amin performed on ICDC female detainees compared to other providers treating ICE detainees.  The agency has still not provided any clear explanation for this disparity.  Even now, senior ICE officials can only speculate about why Dr. Amin performed a significantly higher volume of certain OB-GYN procedures compared to his peer physicians.

Although ICE has promised reforms in response to many of these deficiencies, Congress should continue to exercise aggressive oversight over medical care at ICE facilities.  ICE and DHS should consider implementing the following recommendations:

1.  ICE should expedite efforts to improve the vetting of off-site medical providers for detainees and should consider expanding criteria for excluding providers.

2.  ICE should expedite efforts to identify trends in off-site medical procedures for detainees for potential waste, fraud, or abuse and should conduct regular audits of physicians, hospitals, or other facilities providing off-site care.

3.  ICE should institute policies and procedures to ensure off-site providers obtain informed consent in connection with their treatment of detainees.

4.  ICE should ensure it reviews all detainee complaints regarding medical treatment independently of site visits from Field Medical Coordinators.

5.  Federal immigration policy should support and allow for the swifter adjudication of immigration cases without undermining the procedural due process rights of immigrants.

# Exhibit 3

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **MAHENDRA AMIN**, | Southern District of Georgia |
| Plaintiff, | Civil Action No. 5:21-cv-00056-LGW-BWC |
| v. | |
| | Southern District of New York |
| **NBCUNIVERSAL MEDIA, LLC**, | Civil Action No. 1:23-mc-377 |
| Defendant. | |

**DECLARATION OF AMBER QURESHI, ESQ.**

I, Amber Qureshi, hereby declare pursuant to 28 U.S.C. § 1746 as follows:

1.       I am a Staff Attorney at the National Immigration Project of the National Lawyers Guild (NIPNLG). I am counsel for non-party movant Elora Mukherjee.

2.       I certify that the attached exhibits are true and correct copies of the following documents referred to in the Motion to Quash Subpoena for Deposition of Elora Mukherjee and to Stay the Deposition Pending Outcome of the Motion to Quash.

3.       A copy of the Second Amended Complaint in the *Oldaker v. Giles*, Case No. 7:20-cv-00224-WLS-MSH (M.D. Ga.) is attached as **Exhibit A**.

4.       A copy of the joint status report filed on May 24, 2023 in *In re Yanira Oldaker Subpoena*, 3:23-mc-00251-MGL (D.S.C.) is attached as **Exhibit B**.

5.       A copy of excerpts of the transcript of the deposition of Yanira Oldaker is attached as **Exhibit C**.

6.       A copy of the joint status report filed on August 4, 2023 in *In re Yanira Oldaker Subpoena*, 3:23-mc-00251-MGL (D.S.C.) is attached as **Exhibit D**.

7.       Between August 16, 2023 and August 28, 2023, I corresponded via email with Ms. Evans regarding her intent to depose Prof. Mukherjee. A copy of this email correspondence is attached as **Exhibit E**.

8.       Between September 22, 2023 and October 11, 2023, my co-counsel, Matthew Vogel, and counsel for Mahendra Amin, Ms. Stacey Evans, corresponded via email concerning

1

the subpoena directed at Prof. Mukherjee. A copy of this email correspondence is attached as **Exhibit F**.

I declare under penalty of perjury and under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

Executed this 12th day of October 2023 at Columbia, Maryland.

*/s/Amber Qureshi*_____
Amber Qureshi

# EXHIBIT A

David N. Dreyer
GA Bar No. 411322
**Dreyer Sterling, LLC**
437 Memorial Dr., SE, Ste. A-2
Atlanta, GA 30312
Tel: (404) 234-4447
david@dreyersterling.com

Elora Mukherjee (admitted *pro hac vice*)
NY Bar No. 4427233
Columbia Law School Immigrants' Rights Clinic
**Morningside Heights Legal Services, Inc.**
435 West 116th Street, Room 831
New York, NY 10027
Tel: (203) 668-2639
emukherjee@law.columbia.edu

Sirine Shebaya (admitted *pro hac vice*)
DC Bar No. 1019748
**National Immigration Project of the
National Lawyers Guild (NIPNLG)**
2201 Wisconsin Ave NW, Suite 200
Washington, DC 20007
Tel: (617) 227-9727
sirine@nipnlg.org

*Attorneys for Plaintiffs*
*(Additional counsel listed on signature page)*

# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA

| | |
|---|---|
| YANIRA YESENIA OLDAKER; TATIANA ALEKSEYEVNA SOLODKOVA; LUZ ADRIANA WALKER; JANE DOE #5; JANE DOE #6; LOURDES TERRAZAS SILAS; JANE DOE #8; JANE DOE #15; JANE DOE #22; JANE DOE #25; JAROMY JAZMÍN FLORIANO NAVARRO; MBETI VICTORIA NDONGA; KEYNIN JACQUELIN REYES RAMIREZ; PAULINE BINAM; and ANA GABRIELA ADAN CAJIGAL, on behalf of themselves and others similarly situated, <br><br> *Plaintiffs*, <br><br> v. <br><br> JARVIS MCMILLER, in his official capacity as Acting Director of the Atlanta Field Office of U.S. Immigration and Customs Enforcement; THOMAS P. GILES, in his individual capacity; TAE JOHNSON, in his | Case No.: 7:20-cv-00224-WLS-MSH <br><br> **CONSOLIDATED SECOND AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND FOR DAMAGES** |

official capacity as Director of U.S.
Immigration and Customs Enforcement;
ALEJANDRO MAYORKAS, in his official
capacity as Secretary of Homeland Security;
MERRICK GARLAND, in his official
capacity as Attorney General of the United
States; U.S. IMMIGRATION AND
CUSTOMS ENFORCEMENT; PATRICK
MUSANTE, in his individual capacity and
official capacity as Chief of Staff of the Atlanta
Field Office of U.S. Immigration and
Customs Enforcement; CESAR CIPRIAN, in
his individual capacity and official capacity
as Supervisory Detention and Deportation
Officer at the ICE Atlanta Field Office; ANA
RIVERA, in her individual capacity and
official capacity as the Medical Director of
medical director of the ICE Health Service
Corps; UNKNOWN ICE OFFICIALS ##1-X,
in their individual capacities and official
capacities as U.S. Immigration and Customs
Enforcement Health Service Corps
employees; UNKNOWN ICE OFFICIALS
##1-X, in their individual and official
capacities; IRWIN COUNTY DETENTION
CENTER; LASALLE SOUTHEAST, LLC;
HOSPITAL AUTHORITY OF IRWIN
COUNTY; DAVID PAULK, in his individual
capacity and official capacity as Warden of
Irwin County Detention Center;
MAHENDRA AMIN, in his individual
capacity and official capacity as physician at
the Irwin County Hospital; MARTEKA
GEORGE, in her individual capacity and
official capacity as Inmates' Services Director
at ICDC; MIA MINES, in her individual
capacity and official capacity as ICDC
officer; WILLAIM RABIOU, in his
individual capacity and official capacity as
ICDC officer; "FNU" HUGHES, in her
individual capacity and official capacity as
ICDC officer; "FNU" SMITH, in her
individual capacity and official capacity as
ICDC officer; "FNU" CONEY, in her
individual capacity and official capacity as
ICDC officer; "FNU" HANES, in his

individual capacity and official capacity as
ICDC officer; "FNU" FAISON, in her
individual capacity and official capacity as
ICDC officer; "FNU" BATTLE, in her
individual capacity and official capacity as
ICDC officer; "FNU" VAUGHN, in her
individual capacity and official capacity as
ICDC officer; "FNU" SCOTT, in her
individual capacity and official capacity as
ICDC officer; "FNU" SLACK, in her
individual capacity and official capacity as
ICDC officer; UNKNOWN ICDC
OFFICERS ##1-X, in their individual and
official capacities,

*Defendants*.

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................1

PARTIES ..............................................................................................................2

    I.     Plaintiffs .....................................................................................................2

    II.    Federal Defendants ...................................................................................5

    III.   Irwin County Detention Center Defendants .............................................7

    IV.   Irwin County Medical Defendants ...........................................................10

JURISDICTION AND VENUE ............................................................................10

EXHAUSTION .....................................................................................................11

FACTUAL ALLEGATIONS ...............................................................................12

    I.     Widespread and Systematic Abuse by Defendant Amin .......................12

    II.    The Whistleblower Complaint .................................................................13

    III.   Defendants' Knowledge and Disregard of Defendant Amin's Abuses ...............14

    IV.   A Broader Pattern of Medical Abuse or Neglect ....................................20

    V.    Congressional Investigation into ICDC ...................................................24

    VI.   Independent medical report on practices at ICDC ...................................25

    VII.  Defendants' Conspiracy to Execute Removal Orders to Deter, Prevent, and Retaliate for Attempts to Participate in Lawsuits and Investigations ...........25

    VIII. Defendants Disregard Congressional Intervention to Halt Retaliatory Deportations ..............................................................................................27

    IX.   Defendants Engaged in a Pattern of Retaliatory Actions Against Victims and Witnesses of Medical Abuse at ICDC ...........................................29

    X.    Defendants Have Actively Endangered Plaintiffs' Health, Denied Plaintiffs Adequate Medical Care, and Retaliated Against Plaintiffs ...................32

        A.    Plaintiff Yanira Yesenia Oldaker ...................................................32

        B.    Plaintiff Tatiana Alekseyevna Solodkova .....................................40

        C.    Plaintiff Luz Walker ......................................................................45

D.     Plaintiff Lourdes Terrazas Silas ..................................................49

E.     Plaintiff Jane Doe #5 ....................................................................52

F.     Plaintiff Jane Doe #6 ....................................................................56

G.     Plaintiff Jane Doe #8 ....................................................................60

H.     Plaintiff Jane Doe #15 ..................................................................64

I.     Plaintiff Jane Doe #22 ..................................................................68

J.     Plaintiff Jaromy Jazmín Floriano Navarro ...................................70

K.     Plaintiff Mbeti Victoria Ndonga ..................................................75

L.     Plaintiff Keynin Jackelin Reyes Ramirez .....................................80

M.     Plaintiff Ana Gabriela Adan Cajigal .............................................84

N.     Plaintiff Pauline Nadege Binam ...................................................89

O.     Plaintiff Jane Doe #25 ..................................................................97

XI.     Several Putative Class Members Have Suffered the Same Harms .....................103

XII.     The Federal Government's Inter-Governmental Agreement with Irwin County and ICE's Detention Standards ............................................................118

A.     Inter-Governmental Agreement Between Federal Government and Irwin County ....................................................................................118

B.     ICE's Performance-Based National Detention Standards and ICE's Oversight Role ...............................................................................121

CLASS ACTION ALLEGATIONS .....................................................................125

CLAIMS FOR RELIEF .......................................................................................131

FIRST CLAIM FOR RELIEF Violation of the First Amendment Against Federal Defendants (Retaliation) ...............................................................131

SECOND CLAIM FOR RELIEF Violation of the First/Fourteenth Amendment (Retaliation under 42 U.S.C. § 1983) .............................................134

THIRD CLAIM FOR RELIEF Violation of First Amendment (alternative claim under *Bivens*) .................................................................................137

FOURTH CLAIM FOR RELIEF Violation of the Fifth Amendment (Punitive Conditions of Confinement and Deliberate Indifference against Federal Defendants) ........................................................................140

FIFTH CLAIM FOR RELIEF Violation of the Fourteenth Amendment (Punitive Conditions of Confinement and Deliberate Indifference pursuant to 42 U.S.C. § 1983) ....................................................................143

SIXTH CLAIM FOR RELIEF Violation of the Fifth Amendment (Alternative First Amendment claim against ICDC Defendants under *Bivens*) .....................147

SEVENTH CLAIM FOR RELIEF Violation of the Administrative Procedure Act and the Immigration and Nationality Act (Deportation of witnesses and individuals in the midst of legitimate efforts to protect their civil rights or civil liberties) ........................................................................151

EIGHTH CLAIM FOR RELIEF Violation of the Administrative Procedure Act (Failure to follow PBNDS) ..................................................................154

NINTH CLAIM FOR RELIEF Violation of 42 U.S.C. § 1985(2) – Conspiring to Deter Testimony/Participation in Investigations and Court Proceedings ...........156

TENTH CLAIM FOR RELIEF Violation of the Right to Due Process Under the Fifth Amendment (Deportation of essential witnesses) ......................................160

ELEVENTH CLAIM FOR RELIEF Breach of IGA Contract .......................................162

TWELFTH CLAIM FOR RELIEF Negligent Hiring or Retention................................163

THIRTEENTH CLAIM FOR RELIEF Gross Negligence .............................................166

FOURTEENTH CLAIM FOR RELIEF Medical Battery ...............................................168

FIFTEENTH CLAIM FOR RELIEF Medical Malpractice.............................................170

SIXTEENTH CLAIM FOR RELIEF Intentional Infliction of Emotional Distress ........172

SEVENTEENTH CLAIM FOR RELIEF Negligent Infliction of Emotional Distress....................................................................................................174

EIGHTEENTH CLAIM FOR RELIEF Negligence, Gross Negligence, and Recklessness under the Federal Tort Claims Act and Georgia Law...................175

NINETEENTH CLAIM FOR RELIEF Negligence *per se* under the Federal Tort Claims Act and Georgia Law..............................................................178

TWENTIETH CLAIM FOR RELIEF Negligent Supervision under the Federal Tort Claims Act and Georgia Law......................................................179

TWENTY-FIRST CLAIM FOR RELIEF Intentional Infliction of Emotional
    Distress under the  Federal Tort Claims Act and Georgia Law .......................... 181

TWENTY-SECOND CLAIM FOR RELIEF Negligent Infliction of Emotional
    Distress under the Federal Tort Claims Act and  Georgia Law .......................... 183

TWENTY-THIRD CLAIM FOR RELIEF Attorneys' Fees And Costs ........................ 184

PRAYER FOR RELIEF ............................................................ 185

# INTRODUCTION

1. Plaintiffs are fifteen women who are or were detained by Defendants at the Irwin County Detention Center ("ICDC"). Each was subjected to, or ordered to be subjected to, non-consensual, medically unindicated, and/or invasive gynecological procedures by Mahendra Amin, with the knowledge or participation of other Defendants. In many instances, the medically unindicated gynecological procedures Defendant Amin performed on Plaintiffs amounted to sexual assault. These procedures were performed in the presence of unknown ICDC officials ##1-X. Since at least 2018, women at ICDC have reported Defendant Amin's abusive behavior to ICDC guards, officers, and medical staff, and to ICE employees. Defendants also knew that from 2013 to 2015, Defendant Amin was investigated by the Department of Justice ("DOJ") for conducting medically unnecessary procedures. The abuses Plaintiffs experienced by and/or under the direction, control or authority of Defendant Amin are part of a broader pattern and practice of medical abuse and mistreatment at ICDC.

2. After Plaintiffs spoke out, or attempted to speak out, about their abuse, Defendants retaliated against them in order to silence them. In an attempt to chill Plaintiffs' speech, Defendants engaged in a range of retaliatory actions. They placed or threatened to place Plaintiffs in medical units or solitary confinement; placed them on cell restriction; and transferred them to other units to separate protestors. They physically assaulted some women who spoke out, including while they were handcuffed. When women detained at ICDC went on hunger strike, Defendants rationed or threatened to ration their access to water, took money out of their commissary accounts, and limited or cut off their access to phones, tablets, video calls and email. In addition to limiting phone access, Defendants systematically monitored outgoing phone calls, abruptly cutting the line

when Plaintiffs and other detainees mentioned hunger strikes or medical treatment or spoke with reporters. Defendants also delayed delivery of Plaintiffs' prescribed medication and denied them access to the law library and to their own medical records. Defendants destroyed letters documenting abusive medical treatment; refused to produce individuals at hearings related to Defendant Amin's abuses; refused to coordinate with consular officials; obstructed congressional committees' requests for information about medical treatment; and made false claims to congressional investigators.

3. Defendants have further retaliated against and attempted to silence Plaintiffs by deporting or attempting to deport them in retaliation for their speech or attempted speech about the abuses they have suffered at Defendants' hands.

4. Defendants' actions have violated Plaintiffs' First Amendment and Due Process rights. Defendants have also failed to follow their own policies in violation of the Administrative Procedure Act and have committed multiple other violations of federal and Georgia state law.

5. Plaintiffs now seek relief from this Court, on behalf of themselves and others similarly situated, for the abuse they suffered by and/or under the direction, control, or authority of Defendants. They further seek this Court's protection to enable them to freely pursue their claims against their abusers and to enable them to testify in ongoing investigations into Defendants' violations of their rights.

## **PARTIES**

### I.    **Plaintiffs**

6. Plaintiff Yanira Yesenia Oldaker is a 37-year-old woman who was brought to the United States from Mexico at the age of three. She was detained in ICE custody at ICDC from

January 1, 2020 until December 30, 2020. She currently lives in Jackson, South Carolina.

7. Plaintiff Tatiana Alekseyevna Solodkova is a 49-year-old woman who arrived in the United States in 2016 after fleeing persecution in Russia and being trafficked to the U.S. She was detained in ICE custody at ICDC from February 14, 2020 until December 31, 2020. She currently lives in housing provided by Jubilee Partners, Inc. in Comer, Georgia.

8. Plaintiff Luz Adriana Walker is a 55-year-old woman, originally from Colombia, who has lived in the United States for more than 22 years. She was detained in ICE custody at ICDC from November 23, 2018 until December 23, 2020. She currently lives with her husband, a United States citizen, in High Point, North Carolina.

9. Plaintiff Lourdes Terrazas Silas is a 42-year-old woman from Bolivia who has lived in the United States for more than twenty-one years. She was detained in ICE custody at ICDC from March 6, 2020 until January 21, 2021. She currently lives in Triangle, Virginia.

10. Plaintiff Jane Doe #5 is a 29-year-old woman from Mexico who has lived in the United States since she was around eleven years old.

11. Plaintiff Jane Doe #6 is a 33-year-old woman from Guatemala and a mother of six. She was detained in ICE custody at ICDC from February 2019 until January 2021. She currently lives in Georgia.

12. Plaintiff Jane Doe #8 is a 22-year-old woman from Mexico who was brought to the United States when she was eight years old. She was detained in ICE custody at ICDC from July 2020 until January 2021. She currently lives in Fort Lauderdale, Florida.

13. Plaintiff Jane Doe #15 is a 38-year-old woman from Bolivia. She was detained in ICE custody at ICDC from February 2020 until January 2021. She currently lives in Arlington, Virginia.

14. Plaintiff Jane Doe #22 is a 40-year-old citizen of Senegal who came to the United States when she was eighteen years old. She was detained in ICE custody at ICDC from May 2020 until January 6, 2021. She currently lives in Stone Mountain, Georgia.

15. Plaintiff Jaromy Jazmín Floriano Navarro is a 29-year-old woman from Mexico. She was detained in ICE custody at ICDC from October 18, 2019 until her sudden deportation on September 16, 2020.

16. Plaintiff Mbeti Victoria Ndonga is a 38-year-old woman who was brought to the United States from Kenya when she was two years old. She was detained in ICE custody at ICDC from April 2019 until December 16, 2020. She currently lives in Georgia.

17. Plaintiff Keynin Jackelin Reyes Ramirez is a 33-year-old woman who arrived in the United States fleeing persecution from Honduras. She was detained in ICE custody at ICDC from January 30, 2020 until December 11, 2020. Ms. Reyes Ramirez currently resides in Carrollton, Georgia.

18. Plaintiff Ana Adan Cajigal is a 25-year-old woman who first came to the United States from Mexico when she was six months old. She was detained in ICE custody at ICDC from around late February 2020 until December 11, 2020. She currently resides in Smyrna, Georgia.

19. Plaintiff Pauline Nadege Binam is a 32-year-old woman who came with her parents to the United States from Douala, Cameroon at the age of two. She was detained in ICE

custody from October 13, 2017 to on or about September 19, 2020. She currently lives in Randallstown, Maryland.

20. Plaintiff Jane Doe #25 is a 40-year-old woman originally from Mexico. She was detained in ICE custody at ICDC from February 24, 2018 through February 4, 2019. She is currently in Chiapas, Mexico.

## II.    Federal Defendants

21. Defendant United States of America is subject to suit for personal injuries caused by the negligent or wrongful acts or omissions of its employees or agents acting within the scope of their employment or office under circumstances where Defendant United States of America, if a private person, would be liable. *See* 28 U.S.C. § 1346(b).

22. At all relevant times, Defendant United States of America acted through its agency, the Department of Homeland Security ("DHS"), and its subagency Immigration and Customs Enforcement ("ICE").

23. Defendant ICE is a federal law enforcement agency within DHS. ICE is responsible for the criminal and civil enforcement of immigration laws, including the detention and removal of immigrants. Enforcement and Removal Operations ("ERO"), a division of ICE, manages and oversees the immigration detention system. As such, Defendant ICE was a legal custodian of Plaintiffs and others similarly situated.

24. Defendant Jarvis McMiller is named in his official capacity as the Director of the ICE Atlanta Field Office. The ICE Atlanta Field Office is responsible for, among other things, carrying out ICE's immigration detention operations at ICDC. Defendant McMiller is responsible for administering the immigration laws and the execution of detention and removal determinations for individuals under the jurisdiction of the ICE Atlanta Field Office, which includes those detained at ICDC.

25. Defendant Thomas P. Giles is the former Director of the ICE Atlanta Field Office. The ICE Atlanta Field Office is responsible for, among other things, carrying out ICE's immigration detention operations at ICDC. Defendant Giles was responsible for administering the immigration laws and the execution of detention and removal determinations for individuals under the jurisdiction of the ICE Atlanta Field Office, which includes those detained at ICDC. As such, Defendant Giles was a legal custodian of Plaintiffs and others similarly situated. He is named in his individual capacity.

26. Defendant Tae Johnson is named in his official capacity as Director of ICE. In this capacity, he is responsible for the enforcement of immigration laws and for ICE's policies, practices, and procedures. He has authority over the detention and removal of noncitizens throughout the United States. As such, he was a legal custodian of Plaintiffs and others similarly situated.

27. Defendant Alejandro Mayorkas is named in his official capacity as Secretary of DHS. In his official capacity, Defendant Mayorkas is responsible for administering the immigration laws pursuant to 8 U.S.C. § 1103(a) and is legally responsible for the detention and removal of immigrants. As such, he was a legal custodian of Plaintiffs and others similarly situated.

28. Defendant Merrick Garland is named in his official capacity as the Attorney General of the United States. In his official capacity, he is responsible for the administration of the immigration laws pursuant to 8 U.S.C. § 1103(g). As such, he was a legal custodian of Plaintiffs and others similarly situated.

29. Defendant Patrick Musante is named his individual capacity and in his official capacity as Assistant Field Office Director and Chief of Staff of the ICE Atlanta Field Office. In

his official capacity, Defendant Musante is responsible for the administration of
immigration laws and the execution of detention and removal determinations and is a
custodian of Plaintiffs and others similarly situated.

30. Defendant Cesar Ciprian is named in his individual capacity and in his official capacity
as a Supervisory Detention and Deportation Officer at the ICE Atlanta Field Office.

31. Defendant Ada Rivera is named in her individual capacity and in her official capacity as
the medical director of the ICE Health Service Corps.

32. Defendants Unknown ICE Officials ##1-X are an unknown number of ICE employees,
including ICE Enforcement and Removal Operations ("ERO") employees and ICE
Health Service Corps employees, whose identities are unknown to Plaintiffs. ICE ERO
employees are responsible for managing and overseeing the immigration detention and
removal system. ICE Health Service Corps employees approve or approved referrals of
residents at ICDC to outside medical providers, including to Defendant Amin, and are
responsible for investigating complaints by detained individuals in ICE custody related
to medical care. They are named in their individual capacities and in their official
capacities.

## III.   Irwin County Detention Center Defendants

33. Defendant Irwin County Detention Center ("ICDC") is a detention facility located in
Ocilla, GA. Irwin County, GA contracted with the federal government to detain
individuals pursuant to federal immigration laws at ICDC. The Biden Administration
announced it was ending the contract with ICDC in May 2021 and did, in fact, end the
contract in October 2021.

34. Defendant LaSalle Southeast, LLC ("LaSalle") is a limited liability corporation that does
business in this judicial district for the purpose of profit. Defendant LaSalle has

contracted with Irwin County for the operation of ICDC. At all times material to this complaint, Defendant LaSalle was acting under color of law.

35. Defendant David Paulk is named in his individual capacity and in his official capacity as the Warden of ICDC. Defendant Paulk is responsible for overseeing the administration and management of ICDC. In this capacity, he is or was the immediate custodian of Plaintiffs and others similarly situated. Defendant Paulk was at all times material to this complaint acting under color of law.

36. Defendant Marteka George is named in her individual capacity and in her official capacity as the Inmates' Services Director at ICDC. Defendant George was at all times material to this complaint acting under color of law.

37. Defendant Mia Mines is named in her individual capacity and in her official capacity as an officer at ICDC. Defendant Mines was at all times material to this complaint acting under color of law.

38. Defendant William Rabiou is named in his individual capacity and in his official capacity as an officer at ICDC. Defendant Rabiou was at all times material to this complaint acting under color of law.

39. Defendant "FNU" Hughes is named in her individual capacity and in her official capacity as a nurse at ICDC. Defendant Hughes was at all times material to this complaint acting under color of law.

40. Defendant "FNU" Smith is named in her individual capacity and in her official capacity as an officer at ICDC. Defendant Smith was at all times material to this complaint acting under color of law.

41. Defendant "FNU" Coney is named in her individual capacity and in her official capacity as an officer at ICDC. Defendant Coney was at all times material to this complaint acting under color of law.

42. Defendant "FNU" Hanes is named in his individual capacity and in his official capacity as an officer at ICDC.[1] Defendant Hanes was at all times material to this complaint acting under color of law.

43. Defendant "FNU" Faison is named in her individual capacity and in her official capacity as an officer at ICDC. Defendant Faison was at all times material to this complaint acting under color of law.

44. Defendant "FNU" Battle is named in her individual capacity and in her official capacity as an officer at ICDC. Defendant Battle was at all times material to this complaint acting under color of law.

45. Defendant "FNU" Vaughn is named in her individual capacity and in her official capacity as an officer at ICDC. Defendant Vaughn was at all times material to this complaint acting under color of law.

46. Defendant "FNU" Scott is named in her individual capacity and in her official capacity as an officer at ICDC. Defendant Scott was at all times material to this complaint acting under color of law.

47. Defendant "FNU" Slack is named in her individual capacity and in her official capacity as an officer at ICDC. Defendant Slack was at all times material to this complaint acting under color of law.

---

[1] Possible alternative spellings could include "Haynes."

9

48. Defendants Unknown ICDC Officers ##1-X are an unknown number of officers at ICDC whose identities are unknown to Plaintiffs and who performed functions including accompanying women detained at ICDC to their medical appointments, receiving and responding to verbal and written complaints, and responding to requests for medical care or assistance. They are named in their official capacities as officers at ICDC and in their individual capacities. Defendants Unknown ICDC Officers ##1-X were at all times material to this complaint acting under color of law.

## IV.    Irwin County Medical Defendants

49. Defendant Hospital Authority of Irwin County ("Irwin County Hospital") is a general medical and surgical facility located in Ocilla, GA.

50. Defendant Mahendra Amin is named in his individual capacity and in his official capacity as a physician affiliated with the Irwin County Hospital. Defendant Amin was authorized by unknown ICE officials and/or unknown ICDC officers to provide medical services to detained individuals in ICE custody at ICDC. Defendant Amin was, at all times material to this complaint, acting under color of law.

## JURISDICTION AND VENUE

51. This Court has subject matter jurisdiction over Claims One through Eleven pursuant to 28 U.S.C. § 1331, 1651 and 5 U.S.C. § 702

52. This Court has subject matter jurisdiction over Claims Eleven through Seventeen and Claim Twenty-Three pursuant to 28 U.S.C. § 1367 because they form part of the same case or controversy giving rise to Claims One through Ten and Claim Twenty-Three.

53. This Court has subject matter jurisdiction over Claims Eighteen through Twenty-Two pursuant to the Federal Tort Claims Act (FTCA), 28 U.S.C. § 1346(b), in that these claims are against Defendant United States of America, for money damages for personal

injuries caused by the negligent or wrongful acts or omissions of United States employees acting in the scope of their office or employment, under circumstances where Defendant United States of America, if a private person, would be liable.

54. This Court has the authority to grant declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201-2202 and 28 U.S.C. § 1651.

55. Monetary damages are available pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388 (1971) as to Federal Defendants and, as to Irwin County Defendants, under 42 U.S.C. § 1983 and Georgia state law.

56. Venue is proper in this district under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred or are occurring in this district.

## **EXHAUSTION**

57. Plaintiffs Oldaker, Solodkova, Walker, Silas, Floriano Navarro, Ndonga, Ramirez, Cajigal, and Jane Does ## 5, 6, 8, 15 and 22 (collectively, "FTCA Plaintiffs") have administratively exhausted their administrative remedies for purposes of their claims under the Federal Tort Claims Act ("FTCA") against the United States of America for the actions of ICE employees and/or agents. *See* 28 U.S.C. §§ 2675, 1346.

58. On February 24, 2021, FTCA Plaintiffs submitted individual administrative tort claims to DHS and ICE in accordance with the FTCA, 28 U.S.C. § 2675(a). Their administrative claims allege that FTCA Plaintiffs were subject to non-consensual, medically unnecessary, and/or invasive gynecological procedures as a direct and proximate result of ICE's negligent, grossly negligent, and reckless acts, omissions, and conduct. Their administrative claims also allege medical negligence, negligence *per se*, negligent supervision, medical battery, and intentional infliction of emotional distress under Georgia tort law.

59. By letter dated February 2, 2022, FTCA Plaintiffs Floriano Navarro, Ndonga, Oldaker, Solodkova, Walker, Terrazas, Cajigal, Jane Doe #5, Jane Doe #6, Jane Doe #8, Jane Doe #15, Jane Doe #22, claims were finally denied in writing by ICE and such denials were sent to Plaintiffs.

60. FTCA Plaintiff Keynin Reyes Ramirez has not received written denials by ICE as of the filing of this amended complaint. Their claims are deemed denied, due to the agency's failure to make a final disposition within six months after the date of submission. *See* 28 U.S.C. 2675(a).

61. Plaintiffs' FTCA claims are timely under 28 U.S.C. § 2401(b) because the claims were submitted to the appropriate agency within two years of accrual and this action was filed within six months of an official and final denial of the claims.

## FACTUAL ALLEGATIONS

**I.** **Widespread and Systematic Abuse by Defendant Amin**

62. Plaintiffs were victims of non-consensual, medically unindicated and/or invasive gynecological procedures, including but not limited to unnecessary surgical procedures under general anesthesia, performed by and/or at the direction of Defendant Amin.

63. As detailed below, in many instances, the non-consensual and/or medically unindicated gynecological procedures Defendant Amin performed on Plaintiffs amounted to sexual assault. These procedures were performed in the presence of unknown ICDC officials ##1-X.

64. Since at least 2018, and likely as early as 2013, Defendants knew about the medical abuse women detained at ICDC have suffered at the hands of Defendant Amin. They nonetheless continued a policy or custom of sending women to be mistreated and abused by Defendant Amin until September 22, 2020.

65. The experiences Plaintiffs had at the hands of Defendant Amin form part of a disturbing pattern of inhumane medical abuse and mistreatment at ICDC.

## II. The Whistleblower Complaint

66. On September 14, 2020, a nurse from ICDC, Ms. Dawn Wooten, raised the first alarm about unnecessary medical procedures at ICDC.[2]

67. Ms. Wooten described a general failure to obtain consent for medical procedures and a pattern of performing medically unindicated procedures.[3] She also described long delays between requests for medical attention and receipt of care, and responses to a broad range of requests for medical care with ibuprofen.

68. This whistleblower complaint corroborates Plaintiffs' experiences throughout their detention at ICDC.

69. ICE continued to send patients from ICDC to Dr. Amin after the whistleblower complaint became public. It was not until on or about September 22, 2020, that ICE announced that Dr. Amin would no longer see ICDC patients. The date on which ICE actually stopped sending any patients to Dr. Amin is unknown but, upon information and belief, was after September 22, 2020, as Plaintiff Jane Doe #22 was sent to him on that date.

---

[2] Complaint by Project South, Georgia Detention Watch, Georgia Latino Alliance for Human Rights & South Georgia Immigrant Support Network to Joseph V. Cuffari, Cameron Quinn, Thomas P. Giles, & David Paulk, *Re: Lack of Medical Care, Unsafe Work Practices, and Absence of Adequate Protection Against COVID-19 for Detained Immigrants and Employees Alike at the ICDC County Detention Center* (Sept. 14, 2020), https://projectsouth.org/wp-content/uploads/2020/09/OIG-ICDC-Complaint-1.pdf.

[3] *Id.* at 20.

### III. Defendants' Knowledge and Disregard of Defendant Amin's Abuses

70. Since at least 2018, women treated by Defendant Amin and their counsel have reported Amin's abusive behavior to certain Defendants and their agents, including unknown ICE agents and ICDC officers, both verbally and in writing.

71. Multiple women detained at ICDC, including several Plaintiffs, complained verbally or in writing to unknown ICE agents and ICDC officers about the painful, unnecessary, non-indicated, and/or non-consensual medical procedures Defendant Amin performed on them.

72. Despite these complaints, Defendants continued a policy or custom of regularly sending women detained at ICDC to be treated by Defendant Amin.

73. Unknown ICE Officials ##1-X and/or ICDC Officials ##1-X accompanied women detained at ICDC, including Plaintiffs, to their appointments with Defendant Amin. They remained in the room as he performed painful non-consensual procedures on them. They witnessed the women crying out in pain and asking Defendant Amin to stop, which he generally refused to do. They witnessed that Defendant Amin did not obtain consent for many of the procedures he performed on women detained at ICDC. They observed that he did not inform Plaintiffs of less-invasive treatment alternatives to the procedures he performed. They also witnessed that he frequently did not make any attempts or respond to requests to provide interpretation or to speak to each woman in a language she could understand.

74. Federal and ICDC Defendants also knew that from 2013 to 2015, Defendant DOJ investigated Defendant Amin for similar behavior—performing unnecessary medical

procedures in violation of the False Claims Act—as part of the lawsuit *United States v. Hospital Authority of Irwin County*, No. 7:13-cv-00097-HL (M.D. Ga.).[4]

75. In *United States v. Hospital Authority of Irwin County*, the DOJ alleged that "Dr. Amin has a standing order at ICH [Irwin County Hospital] which requires that certain tests always be run on pregnant patients, without any medical evaluation and regardless of her condition. For example, no matter what symptoms the patient may be exhibiting, ICH performs an OB ultrasound on every pregnant patient, without consulting [Dr. Amin] or obtaining his or any other doctor's medical opinion for that particular patient. . . . Dr. Amin's standing order for ultrasounds on his patients constitutes a pattern of medical services that he, ICH, and on-call doctors know or should know are not medically necessary."[5]

76. Despite this knowledge, Defendants continued to send women detained at ICDC to be treated by Defendant Amin.

77. On information and belief, Federal Defendants, including Defendants Giles and Musante, knew that Defendant Amin was subjecting detained individuals at ICDC to invasive and unnecessary gynecological procedures and surgeries without informed consent.

78. Defendant ICE, Defendant Giles, as the Field Office Director, and Defendant Musante, as the Assistant Field Office Director and later Chief of Staff, are tasked with ensuring

---

[4] Press Release, Department of Justice, U.S. Attorney's Office, Middle District of Georgia, Hospital Authority of Irwin County Resolves False Claims Act Investigation for $520,000 (Apr. 29, 2015), https://www.justice.gov/usao-mdga/pr/hospital-authority-irwin-county-resolves-false-claims-act-investigation-520000.

[5] Complaint at 15, 17, *United States v. Hospital Authority of Irwin County*, No. 7:13-cv-00097 (M.D. Ga. July 8, 2013).

that all detention facilities in their areas of responsibility comply with applicable detention standards and policies.

79. On information and belief, Defendants Giles and Musante were aware of Defendant Amin's abuses at ICDC prior to the whistleblower complaint, and as early as 2018.

80. Defendants Giles and Musante disregarded the serious risk of harm that individuals detained at ICDC faced, as well as the actual harms to which some had been subjected.

81. Defendant Ciprian was aware of the invasive and unnecessary gynecological procedures and surgeries at ICDC. Putative class member Jane Doe #25 told Defendant Ciprian in 2018 about the inadequate medical care provided by Defendant Amin. However, Jane Doe #25 was nevertheless taken to Defendant Amin who subjected her to an invasive and unnecessary gynecological surgery.

82. At the very latest, Federal Defendants became aware of Defendant Amin's abuses on September 14, 2020, when Ms. Wooten submitted a whistleblower complaint to Defendant Giles describing his misconduct.

83. Even after the whistleblower complaint was filed and widely publicized, Defendants continued to send women detained at ICDC to be treated by Defendant Amin. For example, Plaintiff Jane Doe #22 was sent to Defendant Amin on or about September 22, 2020, a full week after the allegations of abuse were made public. Putative class member Rojas Fañas was also sent to Defendant Amin after the whistleblower complaint had been made public and the allegations of abuse were reported by the media.

84. Defendant Ciprian disregarded the serious risk of harm to the women subjected to Defendant Amin's abuses, including putative class member Jane Doe #25, who has now been told that she has a significantly reduced change of successfully carrying a future

pregnancy to term as a result of Defendant Amin's procedure on her body without her informed consent. In fact, Jane Doe #25 wrote to Defendant Ciprian in 2018 describing the inadequate medical care provided by Defendant Amin and her fears of being treated by him. Jane Doe #25 was nonetheless subsequently taken to Defendant Amin for invasive and unnecessary gynecological surgery.

85. Defendants Unknown ICE Officials ##1-X are an unknown number of officials who work for the ICE Health Service Corps and/or ICE Enforcement and Removal Operations. ICE Health Service Corps officers are responsible for approving referrals at ICDC to outside medical providers and are responsible for investigating complaints by detained individuals in ICE custody related to medical care. ICE Enforcement and Removal Operations officers are responsible for the placement of women in particular detention centers, are generally responsible for detained women's cases, and are regularly in touch with women whose cases they manage about issues relating to their detention and removal. Because of their direct involvement with medical care at ICDC, specifically approving outside referrals and responding to complaints, and/or with managing placement and cases of women detained at ICDC, Defendants Unknown ICE Officials ##1-X were aware of Defendant Amin's abuses at ICDC.

86. Defendants Unknown ICE Officials ##1-X did not adequately investigate complaints by detained individuals in ICE custody at ICDC related to medical care. As a result, Defendants Unknown ICE Officials ##1-X disregarded the serious risk of harm to individuals detained at ICDC, who were repeatedly sent to Defendant Amin after approval from Defendants Unknown ICE Officials ##1-X.

87. Defendant Ada Rivera is the Medical Director for ICE Health Service Corps, who oversees the operations of ICE Health Service Corps. On information and belief, Defendant Ada Rivera has known since at least 2018 about complaints against Defendant Amin. At the very latest, Defendant Rivera was made aware of Defendant Amin's abuses upon the public outcry over the whistleblower complaint.[6] Nevertheless, ICE Health Service Corps continued to approve referrals for women at ICDC to see Defendant Amin for at least a week after the filing of the whistleblower complaint. As a result, Defendant Rivera disregarded the serious risk of harm to individuals detained at ICDC.

88. Defendants ICDC, LaSalle, their employees, agents, and/or contractors also knew that Defendant Amin was subjecting detained individuals at ICDC to invasive and unnecessary gynecological procedures and surgeries without informed consent.

89. On information and belief, Defendants ICDC, LaSalle, and Paulk, as individuals and entities in charge of running the day-to-day operations of the facility, were aware of the non-consensual and/or medically unindicated invasive procedures and surgeries performed by Defendant Amin without informed consent.

90. By failing to investigate these abuses or taking immediate action to prevent further harm, Defendants ICDC, LaSalle, and Paulk disregarded the serious risk of harm to individuals sent to Defendant Amin purportedly for gynecological procedures and surgeries.

---

[6] *See* Elliot Spagat & Jeff Amy, *Democrats to investigate forced surgery claims in Georgia*, Wash. Post (Sept. 15, 2020), https://www.washingtonpost.com/health/democrats-to-investigate-forced-surgery-claims-in-georgia/2020/09/15/6cf0cbb2-f7b3-11ea-85f7-5941188a98cd_story.html.

91. From July to November 2018, counsel for putative class member Jane Doe #35 repeatedly raised concerns about gynecological treatment at ICDC with Defendants ICDC, LaSalle, Paulk, and ICE and its agents. Counsel's efforts included multiple conversations with Defendant George explaining that Dr. Amin had mistreated Jane Doe #35. In late October 2018, Defendant George confirmed to counsel that she was "not surprised to hear this complaint against Dr. Amin." By this time, Defendant George had received "several previous verbal complaints about Dr. Amin."[7]

92. On November 8, 2020, counsel for Jane Doe #35 personally met with Defendant Paulk to express concern about gynecological treatment at ICDC. The following day, counsel wrote to Defendant Paulk documenting the "four months" of "advocacy with ICE and ICDC" to seek care of Jane Doe #35's debilitating pain resulting from gynecological complications. Counsel wrote that despite this debilitating pain, Jane Doe #35 "hesitated to seek medical attention because her last experience with Dr. Amin was so painful and traumatic that she did not want to be sent back to him."

93. Defendants ICDC and LaSalle had a policy, practice, or custom of referring individuals to Defendant Amin despite their knowledge of his abuses.

94. ICDC officers and medical staff, including Defendants Mines, Rabiou, Hughes, Smith, Doney, Hanes, Faison, Battle, Vaughn, Scott, Slack, and Unknown ICDC Officers ##1-X, were aware of the abuses by Defendant Amin. By failing to report Defendant Amin's abuses or taking immediate action to prevent further harm, ICDC officers and medical

---

[7] Caitlin Dickerson, Seth Freed Wessler & Miriam Jordan, *Immigrants Say They Were Pressured Into Unneeded Surgeries,* N.Y.Times (Sept. 29, 2020), https://www.nytimes.com/2020/09/29/us/ice-hysterectomies-surgeries-georgia.html.

staff disregarded the serious risk of harm to individuals sent to Defendant Amin for gynecological procedures and surgeries.

## IV.     A Broader Pattern of Medical Abuse or Neglect

95.   The medical abuses Plaintiffs suffered at the hands of Defendants form part of a broader pattern of medical abuse or neglect at ICDC, of which Defendants were fully aware.

96.   Immigrants detained at ICDC reported lack of access to adequate medical care for years, including unanswered requests for treatment, failure to provide necessary medication or prenatal care, and long wait times of up to two weeks to see medical staff at the facility.[8]

97.   Despite their knowledge of these well-known issues of medical neglect and mistreatment at ICDC, and repeated requests by Plaintiffs and others detained at ICDC for adequate care and reasonable accommodations, Defendants ICDC, LaSalle, and Unknown ICE agents denied adequate medical care to detained individuals at ICDC and failed to provide reasonable accommodations to individuals who suffered from recorded physical and mental impairments that substantially limited their major life activities.

98.   In fact, instead of providing such care and accommodations to individuals in their custody, Defendants ICDC, LaSalle, and Unknown ICE agents retaliated against those who sought medical care, including placement in solitary confinement in response to requests for medical assistance.[9]

---

[8] Project South & Penn State Law Ctr. for Immigrants' Rts. Clinic, *Imprisoned Justice: Inside Two Georgia Immigrant Detention Centers* 48-49 (2017) [hereinafter *Imprisoned Justice*], https://projectsouth.org/wp-content/uploads/2017/06/Imprisoned_Justice_Report-1.pdf; *see also* ACLU-GA, *Prisoners of Profit* 89-90 (2012), *archived at* https://web.archive.org/web/20120530173158/https://acluga.org/Prisoners_of_Profit.pdf (documenting multiple "unreasonable delays in receiving medical care" at Irwin, including failure to provide necessary cancer treatment, x-rays, pain medication, treatment for diabetes and high blood pressure, among other medical neglect and mistreatment).

[9] *Imprisoned Justice*, *supra*, at 51; *see also* ACLU-GA, *supra*, at 91 (noting that "[o]ver two-thirds of the detainees interviewed expressed fear and concern at the possibility of complaining" due to retaliatory behavior from guards including being placed in solitary: "[I]f you complain, it only gets worse."). Reports have also documented the misuse and overuse of solitary confinement at ICDC in other contexts. Det. Watch Network, *A Toxic Relationship:*

99. Even when seen by providers, immigrants detained at ICDC consistently reported cursory exams that failed to respond to health concerns and lack of appropriate medication or treatment, accompanied by an absence of adequate language interpretation.[10] Immigrants detained at ICDC also routinely described lack of mental health screenings and fears of reporting mental health concerns given the practice of inappropriately placing immigrants on suicide watch in solitary confinement.[11]

100. DHS itself documented serious violations of health and safety standards at ICDC, citing, for example, unsanitary conditions in medical unit cells that "needed to be mopped, walls wiped down, toilets cleaned, and trash and refuse removed."[12] In a compliance inspection report, DHS cited failures by medical staff at ICDC to complete required trainings, including in CPR and emergency first aid training.[13] Inspectors also documented failures by the medical staff to consistently review intake screening forms to assess priority for treatment and the lack of critical information related to mental

---

*Private Prisons and U.S. Immigration Detention* 5 (2016), https://www.detentionwatchnetwork.org/sites/default/files/reports/A%20Toxic%20Relationship_DWN.pdf (describing the placement of an 18-year-old girl in solitary after she reported suffering harassment on account of her sexual orientation and the placement of a new arrival at ICDC in segregation due to lack of space in housing units).

[10] *Imprisoned Justice*, *supra*, at 48. *See also* ACLU-GA, *supra*, at 90 (noting that "no staff member of the medical unit is able to provide interpretation for detainees who do not speak English well or at all" and as one interviewee described because "[t]here was no interpreter . . . I had no idea why or what was happening. Even if you go because you're sick they ignore you.").

[11] *Imprisoned Justice*, *supra*, at 48-49. *See also* ACLU-GA, *supra*, at 90-91 ("Many detainees suffer from depression, anxiety, insomnia, and other emotional difficulties" and are "generally afraid to talk about their mental health" for fear of being placed in segregation instead of receiving treatment).

[12] U.S. Dep't of Homeland Sec., Immigr. & Customs Enf't, Office of Pro. Resp., Inspections & Det. Oversight Div., *Compliance Inspection for the Irwin County Detention Center* 6 (2017), https://www.ice.gov/doclib/foia/odo-compliance-inspections/2017IrwinCountyGA.pdf. *See also* ACLU-GA, *supra*, at 81, 85–87, 94 (highlighting other hygiene concerns and concerns about sanitary conditions, food, access to medical care, delays in receiving medications, misuse and overuse of solitary confinement among other "serious and systematic problems with living conditions, medical attention, and treatment of detainees at Irwin"). For examples of lack of adequate or effective medical or dental care at other ICE detention facilities, *see generally* U.S. House of Representatives, Comm. on Homeland Sec., *ICE Detention Facilities: Failing to Meet Basic Standards of Care* 13-20 (Sept. 21, 2020) (describing ongoing abuses committed at facilities owned and operated by LaSalle Corrections, Inc., among others).

[13] U.S. Dep't of Homeland Sec., Immigr. & Customs Enf't, Office of Pro. Resp., Inspections & Det. Oversight Div., *supra*, at 8–9.

health, medical history, and medications in health screenings.[14] Inspectors were unable to

validate if an external state physician conducted peer reviews as requested and

inspectors documented "examination tables . . . torn beyond repair, making cleaning and

decontamination impossible" as well as broken cabinets, drawers and doors "held

together with tape."[15]

101. In April 2020, women detained at ICDC released a video pleading for release from

detention due to the harmful conditions at ICDC, including the unsanitary conditions

and lack of protection against the COVID-19 pandemic.[16]

102. This inhumane treatment of women at ICDC included destruction of immigrants'

medical request forms, fabrication of medical records, accusations of exaggerating pain,

taunting of non-English speaking immigrants, lack of interpretation, and performance of

surgeries and gynecological procedures without informed consent and without

explanation.[17]

103. On January 3, 2022, the DHS Office of the Inspector General ("OIG"), issued a report of

an investigation following the whistleblower complaint filed by Ms. Wooten in

September 2020. The OIG report focused on medical care and COVID-19 and expressly

did not address the process for approval of gynecological procedures or retaliation

---

[14] *Id.* at 9.

[15] U.S. Dep't of Homeland Sec., Immigr. & Customs Enf't, Office of Pro. Resp., Inspections & Det. Oversight Div., *Compliance Inspection of the Irwin County Detention Center* 15 (2020), https://www.ice.gov/doclib/foia/odo-compliance-inspections/irwinCoDetCntr_OcillaGA_Mar3-5_2020.pdf.

[16] Letter from Sarah H. Paoletti, Director, Transnat'l Legal Clinic, & Azadeh Shahshahani, Legal & Advoc. Director, Project South, to Dubravka Simonovic, UN Special Rapporteur on Violence Against Women, & Elizabeth Broderick, UN Working Grp. On Discrimination Against Women & Girls, (Nov. 19, 2020) (citing Rachel Taber, *Women Detained at Irwin County ICE Processing Center Fight for Their Lives Against COVID-19*, YouTube (Apr. 13, 2020), https://www.youtube.com/watch?v=aQt6QbkWsLI&feature=youtu.be), https://projectsouth.org/wp-content/uploads/2020/11/2020.11.19_UN-Communication-ICDC-Medical-Neglect-and-Abuse.pdf.

[17] *Id.*

claims because they are subject to separate OIG investigations.[18] The report confirmed that ICDC's provision of medical care was lacking and its oversight and evaluation of the provision of medical care was inadequate.

104.    The report highlighted that ICDC did not have basic oversight mechanisms in place with respect to medical care. For example, OIG could not determine if ICDC had any Health Insurance Portability and Accountability Act (HIPAA) program in place and found no evidence that HIPAA training was provided to the medical team at the facility.[19] Additionally, the report found that ICDC had no documentation of any organized approach to evaluating the delivery of health care.[20] The report also found that ICDC did not implement or enforce adequate social distancing measures to protect against the spread of COVID-19.[21]

---

[18] Memorandum from Joseph V. Cuffari, Inspector Gen., to Tae D. Johnson, Acting Dir. of U.S. Immigr. & Customs Enf't 3 , *Medical Processes and Communication Protocols Needs Improvement at Irwin County Detention Center* (Jan. 3, 2022), https://www.oig.dhs.gov/sites/default/files/assets/2022-01/OIG-22-14-Jan22.pdf.
[19] *Id.* at 11.
[20] *Id.*
[21] *Id.* at 13.

## V.    Congressional Investigation into ICDC

105.  On September 15, 2020, the day after Ms. Wooten blew the whistle on abuses at ICDC, Senator Cory Booker called on the DHS Inspector General to immediately investigate the whistleblower complaint.[22]

106.  *The New York Times*, *The Washington Post*, *The Los Angeles Times*, and numerous other media outlets all covered the whistleblower complaint and the subsequent congressional outcry.[23]

107.  Soon after the whistleblower report, multiple federal agencies opened investigations into allegations of medical abuses of women detained at ICDC. Those federal agencies include the DOJ, DHS OIG, and the Federal Bureau of Investigation ("FBI").

108.  On September 26, 2020, a congressional delegation visited ICDC to investigate the experiences of detained women.[24] The congressional delegation included Representatives Joaquin Castro, Nanette Barragan, Adriano Espaillat, Juan Vargas, Jimmy Gomez, Lou Correa, Raul Ruiz, Sheila Jackson Lee, Sylvia Garcia, Hank Johnson, and Pramila Jayapal.[25]

---

[22] Letter from Sen. Cory A. Booker to Inspector Gen. Joseph V. Cuffari (Sept. 15, 2020), https://www.booker.senate.gov/imo/media/doc/9.15.20%20Letter%20to%20DHS%20OIG%20re%20GA%20Whistleblower%20Complaint%20FINAL%20SIGNED%20(002).pdf.

[23] Caitlin Dickerson, Seth Freed Wessler, & Miriam Jordan, *Immigrants Say They Were Pressured Into Unneeded Surgeries*, N.Y. Times (Sept. 29, 2020), https://www.nytimes.com/2020/09/29/us/ice-hysterectomies-surgeries-georgia.html; Elliot Spagat & Jeff Amy, *Democrats to Investigate Forced Surgery Claims in Georgia*, Wash. Post (September 14, 2020), https://www.washingtonpost.com/health/nurse-questions-medical-care-at-immigration-jail-in-georgia/2020/09/14/1eed5708-f701-11ea-85f7-5941188a98cd_story.html; Molly O'Toole, *19 Women Allege Medical Abuse in Georgia Immigration Detention*, L.A. Times (Oct. 22, 2020), https://www.latimes.com/politics/story/2020-10-22-women-allege-medical-abuse-georgia-immigration-detention.

[24] Press Release, Cong. Hisp. Caucus, Congressional Hispanic Caucus Statement on Investigation of Irwin County Detention Center (Sept. 26, 2020) https://chc.house.gov/media-center/press-releases/congressional-hispanic-caucus-statement-on-investigation-of-irwin-county.

[25] Press Release, Cong. Hisp. Caucus, Congressional Hispanic Caucus and House Judiciary Committee Lead Congressional Delegation to Investigate Reports of Abuse at the ICE Irwin County Detention Center (Sept. 24, 2020) https://chc.house.gov/media-center/press-releases/media-advisory-congressional-hispanic-caucus-and-house-judiciary.

## VI.   Independent medical report on practices at ICDC

109.   In October 2020, a team of independent medical professionals reviewed over 3,200

pages of medical records for 19 women detained at ICDC, including some of Plaintiffs'

records, and provided their report to Congress.[26]

110.   The report by the medical team described an "alarming pattern" of medical abuse,

including but not limited to description of widespread practices that corroborated the

inhumane practices Plaintiffs describe and exposed them to multiple unnecessary

gynecological procedures and surgeries without informed consent by Defendant Amin.[27]

## VII.   Defendants' Conspiracy to Execute Removal Orders to Deter, Prevent, and Retaliate for Attempts to Participate in Lawsuits and Investigations

111.   Immediately after Ms. Wooten's whistleblower report was made public, Defendant ICE

initiated retaliatory deportations against women detained at ICDC who spoke out about

the medical abuse that they had suffered or witnessed.[28] Federal and ICDC Defendants,

including unknown ICE agents and ICDC officers, collectively engaged in a pattern of

swiftly deporting victims and witnesses who had complained about their abuse to ICDC

and ICE, spoken or attempted to speak to investigators, filed or attempted to file federal

lawsuits, or had valuable information to share regarding medical abuses at ICDC.

---

[26] Molly O'Toole, *supra*; Greg Walters, Carter Sherman, & Neda Toloui-Semnani, *'A Disturbing Pattern': ICE Detainees Were Pressured to Have Gynecological Surgery, Doctors Say*, VICE (Oct. 24, 2020), https://www.vice.com/en/article/88a95x/ice-detainees-were-pressured-to-have-gynecological-surgery-doctors-say.

[27] O'Toole, *supra*; ; Walters et al., *supra*. A week later, the Inter-American Commission on Human Rights expressed its concern over the non-consensual surgeries and sterilizations at ICDC, citing the whistleblower complaint and the medical report. Press Release, Org. of Am. States, IACHR Expresses Its Concern Over Reports of Sterilizations and Surgical Interventions Without Consent in Migrant Detention Centers in the United States (Oct. 30, 2020), https://www.oas.org/en/iachr/media_center/PReleases/2020/262.asp. The IACHR emphasized the serious violations of reproductive and sexual rights at ICDC along with the overall negligent medical care, the lack of protective measures during the COVID-19 pandemic, the lack of interpretation and language barriers to accessing medical care, as well as discriminatory treatment and intimidation of immigrants at ICDC. *Id.*

[28] Gianna Toboni, Ana Sebescen, & Nicole Bozorgmir, *ICE Attempts to Deport Multiple Witnesses in Gynecologic Surgery Scandal*, VICE (Nov. 5, 2020), https://www.vice.com/en/article/jgqq7p/ice-attempts-to-deport-multiple-witnesses-in-gynecologic-surgery-scandal.

112. Plaintiffs Floriano Navarro and Jane Doe #31—both of whom were detained at ICDC and subjected to medical abuse during their detention—were deported within a day after they spoke out or confirmed that they had spoken out about medical abuses at ICDC. Federal investigators were unable to interview "at least eight women who were deported after receiving questionable medical diagnoses and treatment at Irwin."[29]

113. On September 15, 2020, after the whistleblower report generated significant public and media attention, officers at ICDC questioned detained women about the identity of the source of information in the whistleblower report. Plaintiff Floriano Navarro was among the women targeted by the guards for this questioning.. During her detention at ICDC, Defendant Amin had subjected her to non-consensual, invasive gynecological procedures and repeatedly pressured her into undergoing a hysterectomy, which she avoided on the day of the scheduled surgery only because she had tested positive for COVID-19.[30] On September 15, 2020, Unknown ICDC Officer #1 specifically asked Ms. Floriano Navarro whether she had spoken up. Ms. Floriano Navarro responded, "Yes, it was me. . . . I told a lawyer that you guys were doing illegal surgeries here."[31] Defendants deported Ms. Floriano Navarro the following day.

114. Moreover, Federal and ICDC Defendants attempted to deport Plaintiffs Oldaker, Ndonga, Reyes Ramirez, Binam, and Walker soon after they spoke out about the abuse they suffered, made known that they were willing to speak out, and/or were publically

---

[29] Neda Toloui-Semnani, Carter Sherman, & Emily Green, *Women Say They Were Abused and Deported by ICE. Now They Fear Being Silenced.*, VICE (Dec. 11, 2020), https://www.vice.com/en/article/akd73b/women-say-they-were-abused-and-deported-by-ice-now-they-fear-being-silenced.

[30] *"They Wanted to Take My Womb Out": Survivor of Medical Abuse in ICE Jail Deported After Speaking Out*, Democracy Now! (Oct. 26, 2020), https://www.democracynow.org/2020/10/26/ice_irwin_detention_center_invasive_surgeries.

[31] *Id.*

identified as a victim and witness of the abuse. Plaintiff Ndonga, for example, was informed by ICE that it had lifted a hold on her deportation within hours of her speaking with investigators from DOJ, DHS OIG, and FBI.

115. Shortly before the Congressional Delegation arrived at ICDC on September 26, 2020, Defendants ICDC, LaSalle, and their employees, agents, and/or contractors moved several survivors of Defendant Amin's abuse from the "Charlie" pod to the "Golf" pod. The "Golf" pod is in a trailer behind the main ICDC facility. The Congressional delegation did not speak with anyone in the "Golf" pod.

116. Defendants and/or their employees, agents, and/or contractors also actively suppressed and interfered with the ability of women in the "C" Pod cells to speak with the congressional delegation on September 26, 2020. Minutes before the congressional delegation arrived, Defendants ICDC, LaSalle, their employees, agents and/or their contractors ordered the women not to speak to anyone in the congressional delegation and to stay in their beds.

**VIII.  Defendants Disregard Congressional Intervention to Halt Retaliatory Deportations**

117. On November 7, 2020, the U.S. House of Representatives Committee on the Judiciary submitted a letter to DHS expressing grave concern that ICE was moving forward with the removal of alleged victims and potential witnesses of forced medical procedures at ICDC, even as investigators attempted to collect testimony. The letter expressed concern that these deportations would interfere with these women's ability to provide testimony to the investigations and demanded that ICE "immediately pause the removal of women who come forward with allegations of misconduct until all investigations are completed."

118. On November 12, 2020, the House Oversight Committee demanded that ICE "immediately cease efforts to deport any individuals who may be witnesses to or victims of the medical malpractice alleged at ICDC."[32]

119. On November 19, 2020, thirty U.S. Senators and seventy-five U.S. Representatives demanded that DHS and ICE "immediately stay the removal of witnesses in the investigations in the provision of medical care at the Irwin County Detention Center."[33]

120. On November 25, 2020, the House Committee on Homeland Security and the House Committee on Oversight and Reform issued a subpoena against Defendant LaSalle after its refusal to provide "even the most basic information about the treatment and care provided—at taxpayer expense—to women detained at ICDC." The Committees concluded that Defendant LaSalle "is actively obstructing the Committees' efforts to examine the troubling allegations raised by Ms. Wooten and others."[34]

121. Despite these repeated demands from congressional committees and members of Congress, Defendants continued to schedule and implement deportations of victims of and witnesses to medical abuses at ICDC after the women made known that they chose to testify and participate in federal lawsuits and the federal investigations.[35]

---

[32] Press Release, House Comm. on Oversight & Reform, Oversight and Homeland Security Committees Demand ICE Cease Deportations of Victims and Witnesses Alleging Medical Mistreatment at Detention Facilities (Nov. 12, 2020), https://oversight.house.gov/news/press-releases/oversight-and-homeland-security-committees-demand-ice-cease-deportations-of.

[33] Letter from Sen. Richard Blumenthal et al. to Tony H. Pham, Senior Official Performing the Duties of the Director, U.S. Dep't of Homeland Sec., Eric Dreiband, Assistant Attorney Gen., U.S. Dep't of Just., & Christopher Wray, Dir., Fed. Bureau of Investigation (Nov. 19, 2020), https://www.menendez.senate.gov/imo/media/doc/STOP%20Removal%20of%20potential%20witnesses%20at%20ICDC_%20Bi-Cameral%20Letter.pdf.

[34] Letter from Chairman Bennie G. Thompson, Comm. on Homeland Sec., & Chairwoman Carolyn B. Maloney, Comm. on Oversight & Reform to Rodney Cooper, Exec. Dir., LaSalle Corr. (Nov. 25, 2020), https://homeland.house.gov/imo/media/doc/LaSalle%20subpoena%20letter.pdf.

[35] Toboni et al., *supra* note 28.

122. Defendants Giles and Musante were responsible for removing individuals within the Atlanta Field Office's jurisdiction, which includes individuals at ICDC. Defendants Giles and Musante authorized and facilitated the deportations of the women detained at ICDC who spoke out or made known they were willing to speak out about the medical abuse they had suffered or witnessed.

123. Defendants ICE, ICDC, LaSalle, and their employees, agents and/or contractors, including Defendants Paulk, Hanes, and Unknown ICDC Officers ##1-X, facilitated and carried out the deportations of the women detained at ICDC who spoke out about or made known they were willing to speak out about the medical abuse they had suffered or witnessed.

124. On information and belief, Defendants ICE, ICDC, and LaSalle and their employees, agents, and/or contractors have coordinated and agreed to this pattern of swift deportations and attempted deportations of Plaintiffs and other victims and witnesses who speak out or attempt to speak out about the medical abuses at ICDC.

## IX. Defendants Engaged in a Pattern of Retaliatory Actions Against Victims and Witnesses of Medical Abuse at ICDC

125. Federal and ICDC Defendants have engaged in a broader pattern of retaliatory actions against Plaintiffs and other victims and witnesses of Defendant Amin's abuses who all have valuable information to share with federal investigators regarding medical abuses at ICDC. Defendants implemented multiple policies and practices at ICDC that chilled Plaintiffs' speech and denied them the ability to exercise their First Amendment rights.

126. These retaliatory actions against Plaintiffs and other victims and witnesses of medical abuse at ICDC include, but are not limited to, placing or threatening to place them in medical units or solitary confinement; placing them on cell restriction; transferring them

to other units to separate protestors; physically assaulting them, including while handcuffed; threatening to deprive hunger strikers and protestors of property and commissary; threatening to shut off or ration water; withholding their food; delaying delivery of their prescribed medication; denying them access to the law library and to their own medical records; denying them internet access; limiting or denying them phone access; monitoring their phone calls and abruptly ending their calls when discussing hunger strikes, medical treatment, or when speaking with reporters; destroying their letters documenting treatment; refusing to produce individuals at hearings related to Defendant Amin's abuses; refusing to coordinate with consular officials; obstructing congressional committees' requests for information about medical treatment; and making false claims to congressional investigators.

127. Defendants and/or their employees, agents, and/or contractors have retaliated against women for exercising their First Amendment right to protest the conditions of the facility.

128. In March 2020, women in one unit began a hunger strike in protest of ICDC's failure to provide them with masks, cleaning products, and other necessities to limit the spread of COVID-19. In response, Defendants ICDC, LaSalle and their employees, agents, and/or contractors, including Defendant Battle, cut off participants' WiFi or device access, barring them from contacting their relatives and legal counsel.

129. Defendant Battle told detained individuals that they could not engage in peaceful protest by having signs on the wall. Defendants and their employees, agents, and/or contractors also denied participants access to water and took away participants' commissary funds in retaliation for the strike.

130. On at least one occasion, Defendants and/or their employees, agents, and/or contractors responded to a detained individual's exercise of her First Amendment right of free expression with physical violence.

131. On April 12, 2020, Andrea Manrique Yaruro, a detained individual at ICDC, spoke in a video she and others filmed on ICDC's tablet. In the video, Ms. Manrique Yaruro spoke about the conditions in ICDC, and specifically about the spread of COVID-19 in the facility.

132. Another woman said in the video, "We . . . fear that they'll retaliate against us for speaking out. [We are] afraid they'll put us in solitary confinement and cut off contact with our families because we spoke out. If you don't hear from us again . . . that's what happened." Guards subsequently punished four or five of the women in the video by placing them in solitary confinement. The guards told the women they were being locked down in solitary because they made the video.

133. A family member of another detained individual sent the video to reporters, who uploaded it to the internet. One week later, ICDC staff and/or ICE officials physically assaulted Ms. Manrique Yaruro in retaliation for participating in the video, causing serious injuries that persist to this day.

134. The guards physically assaulted Ms. Manrique Yaruro in front of many other women, and word of the attack spread throughout the facility. Crucial witnesses in the federal investigations were afraid to speak up about Defendant Amin because of their fear that ICDC would brutalize them in retaliation for their speech, just like they did to Ms. Manrique Yaruro.

135. The culture of retaliation was pervasive within ICDC, where ICDC officers and/or ICE officials protected other officers who engaged in unlawful activity. Defendant Faison, for example, refused to identify another officer who tackled a detained woman at ICDC.

136. Individuals who filed grievances against ICDC employees were targeted for retaliation. Defendant Coney, for example, targeted Ms. Terrazas Silas after she filed a grievance against Defendant Coney. And Unknown ICDC Officer #2 saw Ms. Terrazas Silas writing a grievance about the night shift guards, took the statement from her, and then ripped it up.

137. Defendants and their employees, agents, and/or contractors also told detained individuals that they would place them in solitary confinement for speaking out about any investigation into medical abuses or conditions at ICDC.

138. Defendants' suppression of the free speech rights of women detained at ICDC only intensified in the wake of the whistleblower report and during congressional and federal investigations into medical abuses at ICDC.

## X.   Defendants Have Actively Endangered Plaintiffs' Health, Denied Plaintiffs Adequate Medical Care, and Retaliated Against Plaintiffs

### A.   Plaintiff Yanira Yesenia Oldaker

139. Plaintiff Yanira Yesenia Oldaker is a 37-year-old woman who came to the United States at age three from Mexico. She has a 12-year-old daughter who is a U.S. citizen. She was detained in ICE custody at ICDC from January 1, 2020 until December 30, 2020. She was the victim of and witness to medically unnecessary and non-consensual gynecological procedures at ICDC.

140. Ms. Oldaker has been diagnosed with severe and chronic post-traumatic stress disorder (PTSD) and major depression. As a result, she has periods of being overwhelmed by her

anxiety, anger, and sadness, accompanied by physical responses of dizziness, clamminess, and overall stress within her body. She also has trouble concentrating, remembering things, and suffers from insomnia.

141. ICDC has failed to provide adequate mental health treatment to Ms. Oldaker or otherwise accommodate her disabilities.

142. Ms. Oldaker was detained at ICDC on January 1, 2020 and two days later, requested medical assistance due to hot flashes, feeling tired and waking up in the middle of the night. She had undergone a hysterectomy in 2014 due to endometriosis and had those symptoms on and off for six years, which she had treated with an estrogen patch before she was detained. As a result, she put in a request with the medical unit to ask for a prescription.

143. On January 13, 2020, Sebrina Taylor, who is described as a "Requesting Provider," entered a gynecological referral for Ms. Oldaker into the ICDC medical system.

144. Unknown ICDC Officers sought approval from ICE Health Service Corps to refer Ms. Oldaker to Defendant Amin. Unknown ICE Officials approved the request and referred Ms. Oldaker to Defendant Amin, whom she saw in February 2020. She explained to the nurse that she was having hot flashes and needed a new estrogen patch.

145. Instead of prescribing a patch, Defendant Amin asked her to undress for an ultrasound. Ms. Oldaker explained to Defendant Amin that she had undergone a hysterectomy, but he said that he did ultrasounds on all of his patients. Defendant Amin then violently jammed a transvaginal ultrasound monitor inside her and, after removing it, pushed several fingers into her vagina, causing her excruciating pain. Ms. Oldaker squirmed and told him "no," but he kept going. A survivor of extreme sexual violence, Ms. Oldaker

described it as feeling like she was "being raped again." At the end of the visit, he prescribed her Estrace pills.

146. A female ICDC officer accompanied Ms. Oldaker from ICDC and played on her phone during Defendant Amin's examination.

147. Defendant Amin's examination caused Ms. Oldaker so much pain that she had to take ibuprofen. She experienced vaginal bleeding and had discharge for days afterwards. She felt pain upon urinating and when wiping herself.

148. Unknown ICDC Officers sought approval from ICE Health Service Corps to refer Ms. Oldaker to Defendant Amin again. Unknown ICE Officials approved the request, and Ms. Oldaker saw Defendant Amin again on September 8, 2020 for a medication refill. She did not want to see him again, but needed medication to manage her hot flashes and he was her only option.

149. During that visit, she explained that she just wanted a refill of her prescription. But the nurse told her she had to have a pap smear. She did not understand why that was necessary given that she had had a full hysterectomy, but the nurse gave her no choice.

150. The pap smear that Defendant Amin performed was exceedingly painful. He inserted a metal clamp in Ms. Oldaker's vagina. He scraped inside and when he pulled the metal clamp out, it hurt even more. She was in agonizing pain. When she wiped, she realized Defendant Amin had not used lubrication.

151. The pain Ms. Oldaker experienced lasted for days afterwards. She had trouble sitting, was sore, and could not wipe herself for several days. Defendant Amin's pap smear also exacerbated her PTSD. It took her back to the physical and sexual abuse she had

suffered in the past. She still cannot stop thinking about the experience and does not understand why Defendant Amin treated her this way.

152. On October 26, 2020, Ms. Oldaker submitted her sworn testimony about her experiences with Defendant Amin to the DOJ. This step clearly communicated Ms. Oldaker's willingness to cooperate with federal investigators and expose medical abuses at ICDC.

153. On November 5, 2020, an attorney provided the DOJ, the DHS OIG, and the FBI with a list of seventeen women detained at ICDC and a summary of each woman's experiences of medical abuse and neglect while detained at ICDC. Ms. Oldaker's name and experiences with Defendant Amin were included in that communication.

154. On information and belief, as a result of this November 5, 2020 communication, Federal Defendants became aware that Ms. Oldaker was a victim of and witness to medical abuses at ICDC.

155. On the evening of November 7, 2020, in response to a phone call from an organizer who was checking on the safety and well-being of the women detained at ICDC, Ms. Oldaker realized that her commissary account had been "zeroed out." Ms. Oldaker, like others detained at ICDC, knew that when a commissary account is emptied, ICE officials will deport that person swiftly, usually within 24 to 48 hours.

156. When Ms. Oldaker learned that her commissary had been zeroed out, she panicked. She could not bear the thought of being deported from the only country she has ever known and the likelihood of never seeing her beloved daughter again. Ms. Oldaker did everything in her power to try to stop her deportation, and on November 8, 2020, Ms. Oldaker was able to find legal counsel to represent her.

157. On November 8, 2020, Ms. Oldaker's attorney and multiple congressional offices contacted Defendant ICE on Ms. Oldaker's behalf to ensure that ICE was aware that Ms. Oldaker was a victim and witness in ongoing federal investigations who wished to testify and had not yet been given an opportunity to testify. However, Defendant Musante informed Ms. Oldaker's attorney on the evening of November 8, 2020, that Ms. Oldaker was scheduled to be deported the following morning on November 9, 2020.

158. On information and belief, Defendants planned and conspired to swiftly deport Ms. Oldaker because she had participated in, and wished to continue participating in, the federal investigations about medical abuse at ICDC.

159. During the early morning hours of November 9, 2020, officers transported Ms. Oldaker to the tarmac of the airport in Columbus, GA to effectuate her deportation.

160. Following the filing of the instant lawsuit at approximately 6 a.m. on November 9, 2020, the officers transporting Ms. Oldaker to the airport in Columbus, GA informed her that her deportation had been halted.

161. The transporting officers forced Ms. Oldaker to sign two documents. The officers informed Ms. Oldaker that these documents were necessary to effectuate her removal and told her that she would be removed "in three weeks to a month." Ms. Oldaker could not read the documents while she was handcuffed but signed them anyway because she felt that she had no choice. After Ms. Oldaker signed the documents, the officers transported her back to ICDC.

162. After November 9, 2020, Defendants retaliated against Ms. Oldaker because of her willingness to speak out against medical abuses at ICDC.

163. ICE, LaSalle, and ICDC and their employees, agents, and/or contractors denied Ms. Oldaker the medication that she needed. Ms. Oldaker takes daily medication to control her severe and complex PTSD and recurring nightmares, but ICDC staff refused to give Ms. Oldaker her medication for almost a full day and a half after she was returned to ICDC. ICDC staff told Ms. Oldaker that they could not give her the medication because she "was not supposed to be there." As a result, Ms. Oldaker suffered debilitating headaches and could not sleep. Because ICDC had depleted Ms. Oldaker's commissary funds before her attempted deportation, Ms. Oldaker could not purchase ibuprofen to treat her withdrawal headaches.

164. ICDC staff also refused to return Ms. Oldaker's personal hygiene items and personal effects. For almost a day and a half after Ms. Oldaker's return, ICDC staff retained her toothbrush, deodorant, shampoo, clothes, undergarments, pens, and personal and legal papers. Critically, ICDC staff retained the piece of paper with the phone number of Ms. Oldaker's counsel written on it, and Ms. Oldaker consequently struggled to contact her counsel.

165. Ms. Oldaker finally called her counsel on a monitored line on the evening of November 10 and informed her counsel that ICDC still retained most of her belongings and that she needed medications. Almost immediately after this phone call, ICDC returned Ms. Oldaker's belongings to her. Within about an hour, she was given her medications. This sequence of events strongly suggests that ICDC staff were listening to privileged and confidential attorney-client communications between Ms. Oldaker and her counsel.

166. For weeks after Ms. Oldaker's return to ICDC on November 9, 2020, ICDC denied Ms. Oldaker access to her detention center phone account. Prior to Defendants' attempted

deportation of Ms. Oldaker, she had a phone account. On information and belief, all the

other people detained at ICDC who wanted phone accounts had their own phone

accounts at the time. Ms. Oldaker repeatedly requested access to a phone account.

Defendants' decision to deny Ms. Oldaker a phone account was an effort to silence her

from speaking out about abuses at ICDC. Defendants' decision to deny Ms. Oldaker a

phone account restricted her ability to communicate with her counsel, the media,

members of Congress, and the public at a time when there was national and international

concern about abuses at ICDC.

167.  For weeks, despite making repeated requests to unknown ICDC officers and/or ICE

officials, including supervisory officers, Ms. Oldaker did not have a phone account. As a

result, she had to rely on the phone accounts of other women detained at ICDC to make

phone calls. While Ms. Oldaker had been using other women's phone accounts for calls,

Defendants limited Ms. Oldaker's phone calls to five minutes in duration. Before Ms.

Oldaker's attempted deportation, Ms. Oldaker was allowed to make 15-minute phone

calls. Other women detained at ICDC were likewise permitted to make 15-minute phone

calls. Ms. Oldaker had been singled out for abbreviated five-minute phone calls. This

pattern of abbreviated five-minute phone calls began when Ms. Oldaker attempted to

speak about how she was nearly deported with Adolfo Flores, a reporter from the media

outlet BuzzFeed, on November 9, 2020.

168.  When undersigned counsel expressed concerns about the denial of phone access for Ms.

Oldaker, ICE falsely responded:

> She [Ms. Oldaker] has a phone account and it is active, it has never been
> "turned off," she has just six cents on her account, she can add money to it
> anytime she wants through commissary. She has not made any requests to
> add minutes.  Each detainee gets 500 free minutes per month, she used all

hers this month. She last used the phone on 11/10/20. She can add funds to the account, set up unmonitored calls with the attorney through the process, have her family add funds, call collect, or wait until next month for 500 more minutes.

169. In fact, Ms. Oldaker's phone account had been suspended or deleted, as confirmed by multiple employees of the Correct Solutions Group. The Correct Solutions Group administers the phone accounts at ICDC. When contacted about Ms. Oldaker's phone account, employees of the Correct Solutions Group explained that they "get the names directly from Irwin" to set up phone accounts, said their "suggestion is to try contacting the detention center," and explained that "[w]e don't put the names in." The U.S. Attorney's Office subsequently conceded that ICE "discovered" that her phone account had been suspended.

170. Despite Defendants' retaliatory actions against Ms. Oldaker, she continues to speak with reporters and congressional staffers and plans to do so throughout the pendency of any investigations. Ms. Oldaker is desperate to share her story and ensure that Defendants, their employees, agents, and/or contractors no longer abuse vulnerable immigrant women who are detained. Simultaneously, Ms. Oldaker gravely acknowledges that her willingness to speak out about medical abuses at ICDC increases the risk of retaliation against her.

171. Since Ms. Oldaker has voiced her experiences publicly, two experts have offered her evaluations. After reviewing Ms. Oldaker's medical records, Dr. Margaret Mueller, M.D., concluded: "There was no medical indication to perform a transvaginal ultrasound" because, following her total hysterectomy, "there are no reproductive organs to evaluate."  After conducting a mental health evaluation for Ms. Oldaker by videoconferencing, Dr. Jennifer McQuaid, PhD, concluded: "the events with Dr. Amin

served to trigger and exacerbate Yanira's existing distress. They became associated with previous incidences in which Yanira felt both a lack of control and pain, that she did not anticipate, and from which she was unable to remove herself."

172. If Ms. Oldaker is deported to Mexico, it will be impossible for her to meaningfully participate in the pending federal investigations and any other investigations that may be opened to expose medical abuses and retaliation against women at ICDC.

173. If Ms. Oldaker is deported to Mexico, it will be impossible for her to meaningfully engage with U.S.-based media outlets that have expressed ongoing interest in covering her experience and the experiences of other women detained at ICDC.

174. If Ms. Oldaker is deported to Mexico, she will not have anyone to receive her, a place to stay, access to reliable internet, access to counsel, access to medical professionals, or the support she needs to participate in ongoing investigations about non-consensual, medically unindicated, and/or invasive medical procedures at ICDC.

175. Ms. Oldaker's imminent deportation fits into a pattern of swiftly deporting victims and witnesses of medical abuse at ICDC once they identify themselves as willing to exercise their First Amendment rights to testify.

**B. Plaintiff Tatiana Alekseyevna Solodkova**

176. Plaintiff Tatiana Alekseyevna Solodkova is a 49-year-old woman, who fled to the United States from Russia in 2016. She was detained in ICE custody at ICDC from February 14, 2020 through December 31, 2020. Ms. Soldokova suffered from multiple serious health concerns while in detention, including heart and breathing issues from chronic bronchitis and asthma, along with kidney, liver, thyroid, and breast problems. She was also the victim of non-consensual gynecological procedures and narrowly avoided unnecessary gynecological surgery performed by Defendant Amin.

177. As a result of her medical issues, Ms. Solodkova experienced frequent chest pain, difficulty breathing, and pain in her liver and kidneys while detained.

178. Ms. Solodkova also has suffered from major depressive disorder in addition to post-traumatic stress disorder. Because of her detention and actions by Dr. Amin and other Defendants, she has experienced clinically significant levels of mood changes, mood reactivity, and anxiety. She still experiences anxiety, mood changes, difficulty sleeping, breathing, concentrating, and remembering her life prior to being detained.

179. Ms. Solodkova repeatedly asked for medical assistance for these health problems while in detention, but her requests for assistance were repeatedly ignored, and medical staff was frequently angry with her.

180. ICDC failed to provide adequate health care and treatment to Ms. Solodkova or otherwise accommodate her disabilities.

181. The medical staff and providers who saw Ms. Solodkova often did not use interpreters, so she was unable to communicate her symptoms and medical history to them. The language barriers also meant that she often did not understand diagnoses or proposed treatment plans. She has a family history of cancer and was very fearful that she had cancer too.

182. While detained in ICDC, Ms. Solodkova lived in constant fear of contracting COVID-19 She was at heightened risk from COVID-19 due to her underlying medical conditions. Ms. Solodkova's comorbidities noted above made her particularly afraid of COVID-19, but she was unable to maintain appropriate levels of hygiene because Defendants failed to provide her with sufficient masks or hand sanitizer. Many guards did not wear masks or gloves, and Ms. Solodkova did not have access to regular COVID testing. She was

only tested once while she was in detention, despite her health problems, including her breathing and heart concerns.

183. Ms. Solodkova slept poorly, struggled to remember things, and felt hopelessness due to her inability to access adequate medical care.

184. Ms. Solodkova was taken in handcuffs to see Defendant Amin three times over the course of August and September of 2020. No one told her where she was going or why she was going there. Each time, Unknown ICDC Officers and/or ICE officials sought approval from ICE Health Service Corps to refer Ms. Solodkova to Defendant Amin. Unknown ICE Officials then approved the request and referred Ms. Solodkova to Defendant Amin.

185. Defendant Amin performed transvaginal ultrasound exams, a pelvic exam that was very painful, and a pap smear on Ms. Solodkova.

186. Defendant Amin did not explain his actions to Ms. Solodkova and did not show her ultrasound images. She did not understand why he performed these exams and is still confused about her diagnosis. There was no interpreter at these appointments.

187. Defendant Amin indicated that Ms. Solodkova needed to have surgery but did not explain why. Based on Defendant Amin's hand gestures, Ms. Solodkova understood that she would be put under general anesthesia for the surgery. Ms. Solodkova shook her head to demonstrate her lack of consent to the operation.

188. At ICDC, a nurse insisted that Ms. Solodkova sign a document, which she later learned was a form to refuse the surgery with Defendant Amin.

189. Ms. Solodkova repeatedly requested her medical records in order to understand what was wrong with her, but it took multiple requests over months for her to receive them.

190. When ICDC finally produced the medical records, they were incomplete and no Russian translation was provided.

191. While detained, Ms. Soldokova continued to be afraid that something was medically wrong with her and that she needed the surgery Dr. Amin recommended, until she spoke with another doctor and learned that surgery was not needed.

192. Ms. Solodkova never received a diagnosis or treatment for her breathing, heart, kidney, liver, breast, or thyroid-related symptoms while at ICDC.

193. Ms. Solodkova never received any mental health care while at ICDC, which further traumatized her and exacerbated her fears.

194. The medical abuse Ms. Solodkova experienced made her scared of getting medical care, including after she developed an infection that required medication from dental treatment by a man she reported had shaky hands and was extremely elderly, making her afraid to return to the dentist.

195. Despite her fears of reprisal by Defendants, their employees, agents and/or contractors, Ms. Solodkova has participated in advocacy efforts since the attempted deportation of a number of women who suffered similarly at the hands of Defendant Amin.

196. An attorney provided Ms. Solodkova's name to federal investigators from DOJ, DHS OIG, and the FBI, and provided information about the medical abuses that she had suffered on November 5, 2020.

197. Upon information and belief, as a result of this November 5, 2020 communication, Federal Defendants became aware that Ms. Solodkova was a victim of and witness to medical abuses at ICDC.

198. An attorney included her name and a number in a follow up email that was sent on November 10, 2020 to nine different officials at DHS, DOJ, OIG, ICE and the FBI. The email again reiterated that Defendant Amin subjected Ms. Solodkova to non-consensual, invasive procedures and emphasized the "valuable information" she has "to share with the federal investigators about the non-consensual, invasive procedures."

199. A follow-up email dated November 24, 2020 from an attorney to the FBI, OIG, and DOJ emphasized Ms. Solodkova's ongoing willingness to and interest in testifying before Congress.

200. While detained at ICDC, Ms. Solodkova participated in a hunger strike to protest conditions there.

201. When Ms. Solodkova and other women at ICDC spoke out about conditions there, ICDC officers and/or ICE officials repeatedly threatened to punish them by placing them in isolation or deporting them. Because of these threats, Ms. Solodkova was afraid to speak out.

202. Ms. Solodkova is committed to ensuring that Defendants, their employees, agents, and/or contractors no longer abuse vulnerable immigrant women who are detained. Simultaneously, she is cognizant that her willingness to speak out about medical abuses at ICDC increases the risk of retaliation against her.

203. If deported to Russia, Ms. Solodkova recognizes that it would be impossible for her to meaningfully participate in the pending federal investigations and any other investigations that may be opened to expose medical abuses and retaliation against women at ICDC.

### C. Plaintiff Luz Walker

204. Plaintiff Luz Adriana Walker is a 55-year-old woman originally from Colombia who has lived in the United States since 2000 and became a lawful permanent resident in 2005. She was detained in ICE custody at ICDC from November 23, 2018 through December 23, 2020. While detained at ICDC, she was subjected to non-consensual and medically unindicated invasive gynecological procedures at the hands of Defendant Amin.

205. Ms. Walker has experienced several medical and mental health issues since being detained. On November 18, 2020, Ms. Walker underwent carpal tunnel surgery. She experienced a significant amount of pain, reduced strength, and had difficulty with basic tasks that require the use of her hands. Because she was not provided physical therapy for her hands, she experienced prolonged pain and problems using her hands. Following her experiences at ICDC, she suffers from diagnosed emotional trauma and depression and has symptoms characteristic of insomnia.

206. ICDC failed to provide adequate treatment to Ms. Walker or otherwise accommodate her disabilities.

207. Following a January 18, 2020 physical exam by an ICDC provider, Ms. Walker was referred to Defendant Amin for an annual pap smear in February 2020. She had not complained of any gynecological issues.

208. According to medical records, ICDC Nurse Practitioner Jessica Lyons requested a pap smear for Ms. Walker. On January 21, 2020, ICDC employee Mattie Davis approved a referral to Defendant Amin, and the appointment took place on February 14, 2020.

209. Ms. Walker was taken into Defendant Amin's office through the back door in handcuffs and shackles. Once inside, she was told to undress and remove her underwear.

210. When Defendant Amin came into the exam room, the first thing he said was, "When are you going to be deported?" The ICDC transport guard who was present in the room told Defendant Amin that his question to Ms. Walker was not appropriate and not why she was there.

211. Without explaining what he was doing or asking for Ms. Walker's consent, Defendant Amin then performed a transvaginal ultrasound on Ms. Walker. She does not know why this invasive procedure was done. Defendant Amin was rough with inserting the ultrasound wand and did not use lubrication, which caused Ms. Walker a lot of pain. For about three days afterwards, she had a constant vaginal burning sensation.

212. Ms. Walker has had multiple gynecological exams in her lifetime, and none involved a transvaginal ultrasound.

213. Defendant Amin wanted to give Ms. Walker a family planning shot but she told him she had not had her period in years. Defendant Amin also performed a pap smear on Ms. Walker. She asked for the results but never received them. Defendant Amin also told Ms. Walker he was referring her for a mammogram, but she did not receive one.

214. Ms. Walker remains very disturbed by her experience with Defendant Amin. His failure to obtain consent for the transvaginal ultrasound was particularly trauma-inducing in light of childhood experiences. Ms. Walker discussed these at length with the mental health professionals who have submitted an expert report detailing their trauma-based diagnosis.

215. While detained at ICDC, Ms. Walker knew at least ten women who underwent gynecological surgery or other procedures by Defendant Amin, in some cases without consent to, or understanding of, the procedure performed. Ms. Walker can attest to the

fact that many of the women operated on by Defendant Amin, some of whom do not speak or understand English, were confused about what had been done to them, indicating that he did not obtain their informed consent. Regarding the now-deported women, Ms. Walker can attest to the fact that after their surgeries they experienced debilitating pain, often for a month or longer, which is also true for others who saw Defendant Amin and are still in the country.

216. Ms. Walker was witness to the lack of care shown to the women by ICDC employees, who did not clean their surgical wounds, leaving Ms. Walker and other detainees to do this. ICDC officers and/or ICE officials laughed at one of the women for asking for help when she was in pain, saying that she was "faking."  An ICDC employee made another woman who was being deported carry her own mattress out of the dorm, in the middle of the night, just days after her surgery when the woman could barely walk.

217. Ms. Walker cared for many of the women operated on by Defendant Amin, bringing them food and ibuprofen from the ICDC commissary, and helping them clean their incisions. She helped one woman get to the bathroom when she was having trouble standing and assisted her in going up and down the stairs to their second-floor housing unit.

218. Ms. Walker also tried to cheer and distract these women who, following their surgeries or other treatments by Defendant Amin, were often crying in pain during their lengthy recovery period, and/or were depressed, despondent, and sleeping excessively.

219. On November 22, 2020, Ms. Walker was identified to federal investigators as a witness concerning Defendant Amin's mistreatment of women at ICDC by Plaintiff Yanira Yesenia Oldaker's attorneys.

220. On November 25, 2020, and again on December 1, 2020, Ms. Oldaker's attorneys identified Ms. Walker to the Assistant United States Attorneys representing ICE and ICDC as an ICDC detainee with a final removal order who warranted protection from deportation because she possesses information relevant to ongoing federal investigations of abuse at the detention center and planned to participate in this consolidated complaint.

221. Two days later, on December 3, 2020, an Unknown ICE Official at ICDC fingerprinted Ms. Walker and told her that her travel documents were being expedited by the Colombian consulate, indicating ICE was preparing to promptly deport her.

222. On December 17, 2020, Ms. Walker was still experiencing pain and inflammation from her carpal tunnel procedure and described a sensation of "something eating me from the inside." She was started on a course of antibiotics only after Defendants were aware that she was talking to her lawyers. She was given pain medication only after her lawyers contacted ICE to request medical attention for her likely infection.

223. Defendants also retaliated against Ms. Walker and other women who spoke out about conditions inside the detention center. Around March 2020, Ms. Walker participated in a hunger strike with other women in her housing unit to protest the dangerous conditions inside ICDC. ICDC officials and/or ICE officials withheld the women's food, threatened to cut or ration their water, separated the women, and threatened them with "early deportation, among other retaliatory actions. Defendant George was among the ICDC officers and/or ICE officials who threatened the women with deportation as punishment for protesting, telling the women that ICDC was her facility, and she was in charge. As a

result of these threats, the women stopped the hunger strike. One of the women leading

the strike was deported soon after the strike ended.

**D.      Plaintiff Lourdes Terrazas Silas**

224. Lourdes Terrazas Silas is a 42-year-old woman originally from Bolivia who has lived in

the United States for more than twenty-one years. She was detained in ICE custody at

ICDC from March 6, 2020 to January 21, 2021. During this time, she was subjected to

non-consensual, medically unindicated, and invasive gynecological procedures by

Defendant Amin.

225. Ms. Terrazas Silas has ongoing chronic pelvic pain which was exacerbated by Dr.

Amin's unnecessary and invasive procedures and treatment. Since her experiences with

Dr. Amin, she has suffered from depression and is taking medications for her

depression. Her medical conditions have substantially limited her ability to perform

major life tasks. For example, she is unable to sleep at night because of the pain, and

sometimes the pain is so severe that she is unable to get out of bed.

226. Defendants failed to provide adequate treatment to Ms. Terrazas Silas or otherwise

accommodate her disabilities.

227. Unknown ICDC Officers sought approval from ICE Health Service Corps to refer Ms.

Terrazas Silas to Defendant Amin on several occasions. Unknown ICE Officials

approved the request and referred Ms. Terrazas Silas to Defendant Amin.

228. Ms. Terrazas Silas first saw Defendant Amin in around March of 2020. Defendant Amin

conducted a painful gynecological examination. He then left the room without further

comment and ordered his nurses to administer unknown injections. Ms. Terrazas Silas

was told by the nurses that the injections were to treat pain, but she experienced

lingering side effects of fevers, nausea, vomiting, diarrhea, and cramps. A nurse

informed Ms. Terrazas Silas one of the injections was actually a birth control shot. Ms. Terrazas Silas did not consent to any birth control injections.

229. During her second appointment with Defendant Amin, Ms. Terrazas Silas refused a second birth control shot and confronted Defendant Amin about giving her the prior shot. He told her there was nothing more to say after he conducted a second painful gynecological examination.

230. Ms. Terrazas Silas was brought to Defendant Amin a third time after she visited medical for an infection. Defendant Amin asked her why she was there and when she explained she had an infection, he said that had nothing to do with him, but still proceeded to conduct yet another painful gynecological examination. During this appointment, Defendant Amin told Ms. Terrazas Silas he would have to remove her entire uterus because there was a tumor the size of a coconut. When she requested a second opinion, Defendant Amin negotiated with her, telling her the surgery is expensive and, at least this way, ICE would pay for it. When she continued to refuse the surgery, Defendant Amin said, "If you were in your twenties or thirties I would understand why you don't want the surgery, but you're an old woman."

231. Ms. Terrazas Silas spoke to an ICDC officer on May 9, 2020, who noted "she wants 2nd opinion [illegible] Fibroid – [not] happy . . . how she was explained need for hysterectomy." Ms. Terrazas Silas also spoke to an Unknown ICE or ICDC official on May 20, 2020, who noted Defendant Amin recommended a hysterectomy and she wanted a second opinion.

232. As word about the COVID-19 pandemic reached ICDC, Ms. Terrazas Silas decided to join a hunger strike in protest of the facility's lack of cleaning supplies, masks, and

inadequate social distancing measures. The women removed their uniforms and made a video that was posted online.

233. In retaliation for their speech, Major Battle placed the women in lockdown, and other Unknown ICDC Officers and/or ICE Officials cut off their Wi-Fi and confiscated the women's personal supplies, including their food, drinks, and the tablets they used to contact individuals outside of the facility. Defendant Slack threatened to either transfer Ms. Terrazas Silas to a stricter lockdown in the E-4 pod or cut off her access to water if Ms. Terrazas Silas did not resume eating.

234. Given ICDC's failure to implement adequate safety measures to prevent the spread of COVID-19, Ms. Terrazas Silas was exposed to the virus in July 2020. She was transferred to the E-4 pod for isolation, where she was forced to spend 20 days in lockdown. During this time, Defendants Coney and Smith insulted her and denied her access to toilet paper, menstrual pads, water, and the phone.

235. Despite notifying officers that she could not breathe well in the room because it was humid and moldy, officers denied Ms. Terrazas Silas's request for air flow, referring to her pejoratively as "infected." She "felt like a dog" putting her mouth near the bottom crack of the door to try to breathe fresh air. Defendant Coney subsequently sprayed the same crack of the door with disinfectant. Ms. Terrazas Silas wrote a grievance about Defendant Coney, but an Unknown ICDC Officer ripped the grievance up.

236. Extreme medical neglect and mistreatment was so entrenched in the culture at ICDC that Ms. Terrazas Silas no longer trusted the medication administered to her by ICDC medical personnel. She believed that they had given her the wrong medication and also the wrong dosage of her prescription medicine, causing her to avoid swallowing pills

given to her by the nurses. She also waited months for treatment of a stomach ulcer diagnosed in 2016.

237. After the investigation into Defendant Amin began, Ms. Terrazas Silas started having routine appointments with lawyers and other professionals. ICDC officers and/or ICE officials began to make Ms. Terrazas Silas feel uncomfortable, telling her things like "you are very popular lately, are you leaving soon?"

238. Ms. Terrazas Silas has spoken out about the experiences with and abuse she has suffered at the hands of Dr. Amin. She wants to share her story and ensure that Defendants, their employees, agents, and/or contractors no longer abuse vulnerable immigrant women who are detained. Simultaneously, Ms. Terrazas Silas gravely acknowledges that her willingness to speak out about medical abuses at ICDC increases the risk of retaliation against her.

239. If Ms. Terrazas Silas is deported to Bolivia, it will be impossible for her to meaningfully participate in the pending federal investigations and any other investigations that may be opened to expose medical abuses and retaliation against women at ICDC.

240. If Ms. Terrazas Silas is deported to Bolivia, it will be impossible for her to meaningfully engage with U.S.-based media outlets that have expressed ongoing interest in covering her experience and the experiences of other women detained at ICDC.

**E.    Plaintiff Jane Doe #5**

241. Plaintiff Jane Doe #5 is a 29-year-old citizen of Mexico. She was raped in Mexico at the age of 6 and came to the United States with her family in 2003, when she was around 11 years old. At the age of 23, she was raped in the United States. She was also subjected to domestic violence in two relationships by the fathers of her children. She has three children who are U.S. citizens, ages four, seven, and eleven. She had one miscarriage

involving twins, and in her most recent pregnancy she had to be on bed rest for five months and had to take shots to maintain the pregnancy.

242. Jane Doe #5 was detained at ICDC from June 18, 2020, until December 24, 2020. She asked for medical care for an umbilical hernia that was very painful. She was also having some vaginal bleeding. She was sent for a CT scan and ultrasound and then told that she would be sent to an outside OB/GYN. She did not understand why an appointment was being made with an OB/GYN when her main complaint was the hernia.

243. Unknown ICDC Officers sought approval from ICE Health Service Corps to refer Jane Doe #5 to Defendant Amin. Unknown ICE Officials approved the request and referred Jane Doe #5 to Defendant Amin.

244. Jane Doe #5 had her first visit with Defendant Amin on August 12, 2020. He gave her a vaginal ultrasound. The procedure was very rough and painful. She felt violated and was in pain for several days afterward. Defendant Amin also did a pap smear, which felt like sandpaper inside of her. He opened the metal clamp inside her very quickly without explaining what he was doing. While performing an internal exam with his hand, Dr. Amin pressed down on the area with the hernia, which was painful.

245. After the exam, Defendant Amin told Jane Doe #5 that she had a cyst and advised that she get an injection of Depo-Provera, (a "Depo shot"), commonly prescribed as an injectable form of birth control. He mentioned cancer, which scared her, because her father had died of cancer. Jane Doe #5 did not understand what the Depo shot was before she got it. She had a hard time understanding Defendant Amin and did not have much of an opportunity to ask questions, as she felt rushed.

246. After the visit, when Jane Doe #5 had a chance to look at the papers, she saw that depression is a side effect of the Depo shot. She would not have agreed to the shot if Defendant Amin had mentioned that beforehand because she had previously struggled with severe depression and anxiety.

247. Jane Doe #5 gained around twenty pounds in one month after taking the Depo shot and is now obese, with a BMI of 31. Her back aches from the weight gain and she has no energy. She currently feels depressed and anxious most of the time.

248. In August 2020, when Jane Doe #5 met with Defendant Amin, he told her the cyst was abnormal and the best option was surgery. He did not give her any additional information.

249. Jane Doe #5 found out from some nurses at ICDC that she was going to have three surgical procedures performed by Defendant Amin on September 4, 2020. She did not know what the procedures were and did not understand the terms the nurses were using. She did not see Defendant Amin before or after the surgeries.

250. When she brought up questions about the surgeries, the staff at ICDC told that if she did not do it now, ICE may not agree to take her later. She was afraid of cancer and felt pressured to do the surgeries right away.

251. After the surgeries, she requested her medical records, which indicated that Defendant Amin had not performed three procedures but rather six procedures on her.

252. Jane Doe #5 bled for two days after the surgeries and was in constant pain, but never had a follow-up appointment with Defendant Amin.

253. After begging for a follow-up appointment, she was finally taken to see a different doctor on October 29, 2020. That doctor told her that Defendant Amin "cut or burned"

part of her uterus, but she does not know exactly what was done. This doctor also informed her that Defendant Amin's note says she has endometriosis.

254. Jane Doe #5 feels worse than she did before the surgery. She only received Tylenol, which is not enough to control her pain, and no other post-surgery care.

255. Jane Doe #5 has several large scars on her abdomen. Her anxiety and depression have worsened, and she is suffering from insomnia. She is unable to sleep on most nights. She was never treated for her hernia.

256. A specialist who reviewed Jane Doe #5's medical records found that she may not be able to carry a child.

257. Jane Doe #5 suffers from severe pain because of her medical conditions, including an umbilical hernia. This pain has been exacerbated by Defendant Amin's non-consensual, invasive, and unnecessary gynecological procedures. She has difficulty using the bathroom as a result of the pain.

258. ICDC failed to provide adequate treatment to Jane Doe #5 or otherwise accommodate her disabilities.

259. Jane Doe #5 experienced retaliation after speaking out about her experiences with Defendant Amin. It became harder for her to receive the medical assistance she needed: her pain was ignored, and her prescribed medication was delayed so she ran out of it. She had to put in medical requests constantly to try to get the medical care that she needs. The guards became increasingly rude to her and she heard them talking about her. She heard at least one guard say that women detained at ICDC who spoke out about the abuse would "pay for this."

260. Jane Doe #5 also witnessed retaliation against other women who spoke out, including at least one woman who was deported and forced to carry her own bags right after having surgery. She observed how quickly ICE tried to deport Yanira Yesenia Oldaker. Jane Doe #5 fears further retaliation based on what has happened to other women.

261. When representatives from Congress visited ICDC, Jane Doe #5 wished to speak with them but never had an opportunity to do so. She was not permitted outside that day and the representatives were never brought to her dorm.

262. On or about December 12, 2020, Jane Doe #5 requested mental health care and was told she did not have anxiety or depression. She was told that she was just suffering from stress and insomnia. However, an outside evaluation by a specialist indicates that Jane Doe #5 requires treatment for depression.

### F. Plaintiff Jane Doe #6

263. Plaintiff Jane Doe #6 is a mother of six who has been living in the U.S. with a U visa since 2014. She is pursuing immigration relief. Jane Doe #6 was detained in ICE custody at ICDC from February 2019 until January 2021. During this time, she was a victim and a witness to non-consensual and invasive gynecological procedures at ICDC, as well as to abuse at the hands of Defendant Amin and ICDC employees, agents, and/or contractors.

264. Jane Doe #6 repeatedly asked for medical assistance for health problems while in detention, but her requests for assistance were repeatedly ignored, and the medical staff frequently expressed anger towards her.

265. In May 2019, Jane Doe #6 was taken to Defendant Amin for the first time–a month after complaining of ovary pain. Despite knowing that Jane Doe #6 speaks very little English, she was seen without a translator being present. When Defendant Amin came into the

room, he hardly acknowledged Jane Doe #6. Defendant Amin did not explain what he was going to do to Jane Doe #6 or ask for her consent; rather, he put an ultrasound inside of her, conducted an intravaginal ultrasound examination, and then put his fingers inside of Jane Doe #6's vagina. Jane Doe #6 had never had an intravaginal ultrasound before or had a doctor touch her in this way. She initially trusted Defendant Amin because he was a doctor. Defendant Amin's assistant and an ICDC guard were both in the room. Jane Doe #6 explained to Defendant Amin that she did not understand what he was saying, but he continued to speak only English to her. No one in the room explained what was happening to Jane Doe #6 or why Amin had invaded her body with equipment and with his fingers.

266.  After the ultrasound, Defendant Amin promptly left the room. The nurse told Jane Doe #6 that Defendant Amin had found a cyst on her ovary and that she needed a Depo shot to remove the cyst. She was told that if the shot did not work, she would need surgery. Jane Doe #6 did not know what a Depo shot was, but took the injection because she thought she needed it to survive and wanted to live for her children. No one gave Jane Doe #6 information about the shot. The shot caused Jane Doe #6 vaginal bleeding for two weeks.

267.  Jane Doe #6 prayed she would not need surgery because she had seen other women go through surgeries conducted by Defendant Amin. She noticed that, after the surgery, those women were in extreme pain and barely able to rise from bed. She also noticed that many women at ICDC would not get the medication that they had been told to take after their surgeries.

268. In July 2019, Jane Doe #6 was taken to see Defendant Amin for a second time.  He again conducted a vaginal ultrasound and put his hands inside of Jane Doe #6's vagina with no explanation. And again, there was no translator in the room. Defendant Amin left the room promptly after and left it to a nurse to provide information to Jane Doe #6. Jane Doe #6 was not shown the results of the ultrasound examination while it was being conducted or afterwards.  Instead, a nurse told Jane Doe #6 that the cyst was no longer there, but that there was now a "black shadow" on her uterus and that Defendant Amin had prescribed pills for her to take. Because Defendant Amin had already left the room, Jane Doe #6 could not ask what the black shadow was or what prescription Defendant Amin had given her.

269. Jane Doe #6 also was prescribed medication for a urinary tract infection ("UTI") during the July 2019 visit to Amin's clinic. Yet, after she was returned to ICDC, Jane Doe #6 was given only three of the five-day course of medication for her UTI. This was not the first time the staff at ICDC refused to give Jane Doe #6 medication. She was previously refused medication for a prior UTI when ICDC medical staff told her to drink more water instead of providing her medication.

270. In November 2019, Jane Doe #6 was taken to see Defendant Amin for a third time because she was having irregular periods. Defendant Amin did not explain what he was going to do but conducted a vaginal ultrasound and put his fingers in her vagina. There was no translator present. The ICDC officer who brought Jane Doe #6 to the appointment spoke Spanish, but refused to translate for Jane Doe #6.

271. In early 2020, Jane Doe #6 sought treatment for pain near her navel. She was taken to the hospital, given an X-ray, and told she needed surgery. Despite requests, she has

never been shown the medical test results nor has the surgery been scheduled. She wants the suffering to stop but has not gotten any care despite her pleas for medical assistance.

272. Jane Doe #6 faced additional mistreatment at the hands of ICDC employees, agents, and/or contractors. For instance, in 2019, an Unknown ICDC Officer told Jane Doe #6 to wear filthy underwear, soiled with large bloodstains. It was only after Jane Doe #6 begged the officer for clean underwear that he relented and gave her a cleaner pair to wear.

273. In March 2020, Jane Doe #6 participated in the hunger strike in her unit, E2. The women were striking to protest the poor conditions at ICDC and because the staff had failed to inform the detainees about the pandemic. When Unknown ICDC Officers and/or Unknown ICE Officials learned that one of the women had told her husband about the strike, they put the unit on lockdown. Jane Doe #6 observed an officer refuse to give water to a woman in her unit. Later that evening, the officers confiscated all of the women's food in the commissary. Then, the tablets that the women used to make calls and emails stopped working. Later, the officers threatened to disconnect the water, including in the bathrooms, and to put the women in solitary confinement if the strike continued. In response to these threats, the women ended the hunger strike.

274. After the hunger strike, women were stopped from going to the law library. In addition, when women tried to share their experiences about the hunger strike over the phone, the phone call would disconnect, sometimes mid-sentence. Although Jane Doe #6 has been at the ICDC for almost two years, the only time that one of her phone calls were dropped was after she referred to the hunger strike during her call.

275. In July 2020, Jane Doe #6 was tested for COVID-19 and told that she had tested positive. She requested to see her test results, but they were never provided to her. Purportedly in response to the test results, Jane Doe #6 was put into lockdown for nineteen days. Even in lockdown, the guards are supposed to let the women out of lockdown for at least one hour each day, but the guards routinely disregarded this process. On one of her days in lockdown, Jane Doe #6 was not let out at all, despite her pleas to the guards.

276. In November 2020, Jane Doe #6 spoke with investigators from the DOJ about her experiences. She is committed to ensuring that Defendants, their employees, agents, and/or contractors no longer abuse vulnerable immigrant women who are detained. Simultaneously, she knows that her willingness to speak out about medical abuses at ICDC increases the risk of retaliation against her.

277. If deported to Guatemala, it would be impossible for Jane Doe #6 to meaningfully participate in the pending federal investigations or any other investigations that may be opened to expose medical abuses and retaliation against women at ICDC.

### G.    Plaintiff Jane Doe #8

278. Plaintiff Jane Doe #8 was born in Guadalajara, Mexico. She was brought to the United States in 2007, when she was eight years old. While detained at ICDC from July 2020 until January 2021, she was subjected to non-consensual, invasive gynecological procedures by and at the direction of Defendant Amin.

279. When Jane Doe #8 was nine or ten years old, she was a victim of frequent sexual abuse from her stepfather. As a result of this trauma, she suffers from anxiety and depression. She also has a history of experiencing panic attacks that are triggered by being touched by men, even those with whom she had intimate relationships. Jane Doe #8 reported that

touches from her high school boyfriend triggered panic attacks because it would remind her of the abuse she suffered as a child.

280. While in custody, Jane Doe #8 requested medical attention after experiencing pain in her lower abdomen. In September 2020, Jane Doe #8 was taken to see Defendant Amin. Prior to her appointment, the guard took Jane Doe #8 to intake, where they cuffed her hands and ankles and put a chain around her waist. Then, Unknown ICDC Officers and/or Unknown ICE Officials took her to the clinic in handcuffs. At the clinic, they took her weight and blood pressure while she was handcuffed. She then was escorted by an Unknown ICDC Officer or Unknown ICE Official into a room where a nurse directed her to undress in front of the guard, despite Jane Doe #8's distress in doing so. She was forced to be completely naked in front of the guard before putting on a paper gown.

281. The nurse told Jane Doe #8 that Defendant Amin would see her but did not tell her what was going to be done during the visit. When Defendant Amin came into the room, he did not acknowledge Jane Doe #8 with even a hello. Rather, he said "open up your legs." Jane Doe #8 was then forced to open her legs and expose herself to the guard sitting at eye level and directly facing her vagina. Defendant Amin did not explain what he was doing or why he was doing it.

282. Defendant Amin performed a transvaginal ultrasound without alerting Jane Doe #8 that he would be doing so. Because of her history with sexual abuse, she instantly felt violated as he put the equipment inside of her without any explanation. After the exam, Defendant Amin told her that she had a cyst on her left ovary. Defendant Amin said that he was going to give her a Depo shot and that if the cyst did not dissolve in four weeks, she would be scheduled for surgery to remove the cyst.

283. Defendant Amin promptly left the room. At no time did he explain what a Depo shot was or ask Jane Doe #8 whether she wanted to receive the shot. After he left, Jane Doe #8 was allowed to get dressed, but was immediately handcuffed again. The guard never left the room. The nurse then gave Jane Doe #8 the shot while she was handcuffed. Jane Doe #8 was then asked to sign paperwork that she did not understand. Neither the nurse nor Defendant Amin explained the contents of the paperwork to Jane Doe #8.

284. Jane Doe #8 learned that the Depo shot was a form of birth control from another woman, who had also been transported to the medical facility that day for a visit with Defendant Amin. That other woman also reported that she had been told by Defendant Amin that she had a cyst on her left ovary that required a Depo shot. Jane Doe #8 was surprised and alarmed to learn that the Depo shot was birth control. Due to her fear of the side effects of birth control, she would have asked questions had she known they were injecting her with birth control medication.

285. After her visit with Defendant Amin, Jane Doe #8 experienced intense anxiety. She did not know what would happen if the cyst did not dissolve or what the surgery entailed because neither Defendant Amin nor any other medical or other staff explained anything to her.

286. Jane Doe #8 learned that at least five other women in her pod at ICDC had also been told, during their appointments with Defendant Amin, that they had cysts on one of their ovaries. She also learned that these women had surgeries performed by Defendant Amin.

287. After receiving the Depo shot, Jane Doe #8's menstrual cycle became extremely irregular and longer lasting.

288. In late October 2020, Jane Doe #8 visited the medical office at ICDC. She spoke with a
gynecologist named Jessica. She informed the gynecologist of the symptoms she had
experienced since receiving the Depo shot. Jessica told Jane Doe #8 not to believe the
reports that had circulated in the news about Defendant Amin, urging her to tell other
women that the news reports about Defendant Amin were not true.

289. At ICDC, the women's phone calls were monitored and recorded. Jane Doe #8 tried to
speak about her experience with Defendant Amin over the phone to her mother. When
she tried speaking about what happened, the phone call would disconnect. Jane Doe #8
thought her mother hung up, but her mother later informed her that she had not. This
happened repeatedly and only when Jane Doe #8 tried to speak with her mother about
her experience with Defendant Amin.

290. Jane Doe #8 has requested all of her medical records at ICDC but has only received
medical records for the last month of her time at ICDC. These records did not include
any of the records from her appointment with Defendant Amin. When Jane Doe #8
asked a guard for her complete medical records, she was told that her request may not be
possible.

291. Jane Doe #8 has not been able to receive an independent physical examination. Because
of the side effects she experienced from the Depo shot administered by Defendant
Amin, she has requested an independent physical examination to understand what
happened to her.

292. Jane Doe #8 is committed to ensuring that Defendants, their employees, agents, and/or
contractors no longer abuse vulnerable immigrant women who are detained. Jane Doe
#8 has spoken with reporters and congressional staffers about the abuse she experienced

at ICDC. Simultaneously, she knows that her willingness to speak out about medical abuses at ICDC increases the risk of retaliation against her.

293. If deported to Mexico, it would be impossible for Jane Doe #8 to meaningfully participate in the pending federal investigations and any other investigations that may be opened to expose medical abuses and retaliation against women at ICDC.

**H.      Plaintiff Jane Doe #15**

294. Plaintiff Jane Doe #15 was detained in ICE custody at ICDC beginning in February 2020. During this time, she was a victim and a witness to non-consensual and invasive gynecological procedures at ICDC, as well as abuse, at the hands of Defendant Amin and ICDC employees, agents, and/or contractors.

295. Jane Doe #15 does not speak English. She is a native Spanish speaker.

296. Jane Doe #15 has also witnessed retaliation against women who speak out about these forced procedures at ICDC.

297. Jane Doe #15 has witnessed retaliation against women who speak out at ICDC. She witnessed several women receive time in solitary confinement as punishment for speaking up when they are abused or harassed. She knows women who spent as long as fifteen days in solitary confinement for "causing problems."

298. In April 2020, four or five women were placed in solitary confinement after they recorded a YouTube video showing their mistreatment and the unsanitary living conditions in ICDC. Jane Doe #15 feared that she would be placed in solitary confinement if she spoke up about her experiences.

299. Jane Doe #15 also witnessed physical violence when she saw multiple guards attack another detainee named Michelle. Jane Doe #15 saw the guards throw Michelle to the

ground and pin her down with their knees while they filmed the assault. Jane Doe #15 is terrified that this type of assault could happen to her.

300. These incidents, among others, caused Jane Doe #15 to stay silent while she suffered the same pattern of harassment and abuse from the staff at ICDC.

301. Jane Doe #15 has also suffered unnecessary and traumatic medical procedures performed on her by Defendant Amin. She underwent surgery performed by Defendant Amin in June 2020.

302. In May 2020, Jane Doe #15 began experiencing pain in her pelvic area. She was seen by Defendant Amin for this pain. During the appointment, he asked her no questions. Jane Doe #15 could not understand what he said while he conducted a vaginal ultrasound because there was no translator present. By the time a nurse arrived to translate, Defendant Amin had already left the room.

303. The nurse informed her in Spanish that there was a cyst on her right ovary "the size of an egg," as well as fibroids in her uterus. Jane Doe #15 later learned that Defendant Amin had told many women in Jane Doe #15's unit that they had cysts "the size of an egg."

304. At the May 2020 appointment, the nurse gave Jane Doe #15 an injection, but neither Defendant Amin nor the nurse gave Jane Doe #15 any information about the injection or what medication she was being injected with. The nurse simply told her that the injection would make the cyst go away. Because Defendant Amin did not return after the nurse arrived, Jane Doe #15 could not ask him any questions about her diagnosis or the injection. Jane Doe #15 still does not know what substance was injected into her.

305. The injection did not help Jane Doe #15. Instead, she experienced consistent vaginal bleeding for ten days before she was able to see Defendant Amin again.

306. At the second appointment, Defendant Amin performed a vaginal ultrasound and explained, with the aid of the nurse, that her cyst and fibroids remained and that she would need surgery. This terrified Jane Doe #15. She had witnessed several women return in terrible condition after surgeries performed by Defendant Amin. She saw them experience crippling pain. One woman bled for weeks. Jane Doe #15 also saw that many of Defendant Amin's former surgery patients were deported soon after their procedures, and she feared the same would happen to her if she received surgery.

307. Jane Doe #15 was frightened of the surgery, but the nurse told her that without it she would lose her uterus and never be able to have children. Jane Doe #15 was willing to risk anything to preserve her chance to become a mother, so she went forward with the surgery despite being given no information about what it entailed or when it would be performed.

308. A few days later, on June 25, 2020, an Unknown ICDC Officer or an Unknown ICE Official came to Jane Doe #15 around 11:00 p.m. and told her not to drink or eat anything after midnight. He did not explain the reason for this instruction. The next morning, on June 26, 2020, Unknown ICDC Officers and/or Unknown ICE Officials woke her up without any explanation and transported her to the hospital in handcuffs. This was when Jane Doe #15 found out she was scheduled for surgery.

309. At the hospital, Jane Doe #15 did not have the aid of a translator at any point before the surgery. She could not understand anything the medical staff said, and the guards completely ignored her. Out of desperation, she begged one of the guards to help her ask

a question using Google Translate, an imperfect tool that can only translate short, simple phrases reliably. Even when Jane Doe #15 used this to ask the staff what the surgery entailed, they only told her that it would take two to three hours and that she would receive anesthesia.

310. Immediately before the surgery began, a nurse handed Jane Doe #15 a piece of paper to sign. The document was entirely in English and Jane Doe #15 could not read any of it. She did not know what it said. She was already undressed and the surgical team was present and ready to begin surgery. Jane Doe #15 felt that she had no choice but to sign, despite not knowing what the surgery was for, what they would do to her body during the surgery, or what wounds or potential side effects she might suffer after the surgery.

311. Jane Doe #15 did not see Defendant Amin, or any medical doctor, at any point during her time in the hospital. She woke up bleeding from the surgery, continued to bleed as Unknown ICDC Officers and/or Unknown ICE Officials brought her back to ICDC, and bled consistently for more than a week thereafter.

312. Officers at ICDC neglected to care for her in any way when she returned from surgery. Jane Doe #15 could not get out of bed on her own without assistance from the other women in her unit. She had to have food brought to her by other women when officers neglected to do so. Her fellow detainees had to help her walk to get her post-surgery medications because the nurses refused to deliver them to her.

313. While Jane Doe #15 recovered, two of her wounds became infected. When she asked the nurses for bandages and rubbing alcohol in order to disinfect them, they provided her with one bandage and nothing to clean the wounds. They gave her no other assistance.

314. In August 2020, Jane Doe #15 was brought to see Defendant Amin by Unknown ICDC Officers and/or Unknown ICE Officials. She had made no request to see Defendant Amin. A nurse was present to translate. Jane Doe #15 immediately asked what surgery he performed on her, but Defendant Amin did not answer the question. Defendant Amin informed her that, despite the surgery, Jane Doe. #15 still had fibroids in her uterus. With little regard for her distress, he informed her that she would never be able to have children. Jane Doe #15 requested that someone else examine her, but Defendant Amin simply shrugged and told her he would see her again in three months. Jane Doe #15 left the appointment completely devastated, embarrassed, and ashamed.

315. Jane Doe #15 remains in extreme pain to this day. However, she was afraid to tell ICDC officers or ICE officials out of fear she will experience more medical trauma. To this day, she does not know what surgery Defendant Amin performed on her.

316. Jane Doe #15 is committed to ensuring that Defendants, their employees, agents, and/or contractors no longer abuse vulnerable immigrant women who are detained. Jane Doe #15 has spoken with reporters and congressional staffers about the abuse she experienced at ICDC. Simultaneously, she knows that her willingness to speak out about medical abuses at ICDC increases the risk of retaliation against her.

317. If deported to Mexico, it would be impossible for Jane Doe #15 to meaningfully participate in the pending federal investigations and any other investigations that may be opened to expose medical abuses and retaliation against women at ICDC.

I.      **Plaintiff Jane Doe #22**

318. Plaintiff Jane Doe #22 is a 40-year-old woman who came to the United States from Senegal over twenty years ago with a tourist visa. She married a U.S. citizen who was very abusive. She has three children who are U.S. citizens. She had a serious leg injury

68

in 2018 that causes her pain and swelling when she walks. She has gained a significant amount of weight in detention, becoming obese. She also suffers from depression.

319. Defendant Amin, Unknown ICDC Officers, Unknown ICE Officials, and their agents, contractors, and/or employees failed to provide adequate treatment to Jane Doe #22 or otherwise accommodate her disabilities.

320. Unknown ICDC Officers sought approval from ICE Health Service Corps to refer Jane Doe #22 to Defendant Amin. Unknown ICE Officials approved the request and referred Jane Doe #22 to Defendant Amin.

321. Jane Doe #22 was taken to Defendant Amin in September 2020, after news stories about him had already become public. She was not told the name of the doctor she was being taken to see. When she arrived and saw that it was Defendant Amin, she was terrified.

322. Defendant Amin performed a vaginal ultrasound, internal exam with his hand, and pap smear on Jane Doe #22. The vaginal ultrasound and internal exam were done without Jane Doe #22's informed consent. All three of the procedures were rough and painful.

323. Defendant Amin told Jane Doe #22 that she had cysts and said he could put her on birth control for them, but she declined. He then prescribed her antibiotics. Jane Doe #22 did not understand why she was being given antibiotics. When she returned to ICDC, she was still bleeding from the examination that Defendant Amin had performed. She felt violated by the experience.

324. When Jane Doe #22 requested her medical records, they were delayed. She received them only after complaining about ICDC's failure to provide them to her. She states that ICDC Officers and/or ICE Agents prevent detained women from raising awareness about problems with medical care by not providing medical records in a timely way.

325. Jane Doe #22 believes that ICDC retaliates against women by delaying or denying pain medication. One of the reasons she has stopped walking around the yard is because it has been so difficult for her to obtain ibuprofen for her leg.

326. Jane Doe #22 corroborated that Jane Doe #21 was deported to Mexico just days after being subjected to surgery by Defendant Amin. She witnessed Jane Doe #21 being forced to carry her own bags while she was still in excruciating pain, and Plaintiff Walker further reports that Jane Doe #21 was forced to carry her own mattress out of her housing unit immediately prior to her deportation.

327. Jane Doe #22 further confirms that ICE tried to deport a woman named Alma Bella Bowman who spoke out about Defendant Amin. ICE had to bring her back to ICDC, but she was recently released.

328. Additionally, Jane Doe #22 confirms that ICE deported Plaintiff Floriano Navarro after she spoke out about how women at ICDC are pressured to have surgeries.

329. If Jane Doe #22 is deported to Senegal, it will be impossible for her to meaningfully participate in the pending federal investigations and any other investigations that may be opened to expose medical abuses and retaliation against women at ICDC.

### J.     Plaintiff Jaromy Jazmín Floriano Navarro

330. Plaintiff Jaromy Jazmin Floriano Navarro is from Mexico and a mother of three young daughters, two of whom are United States citizens. She was deported on September 16, 2020, without warning. She currently lives in Mexico, but her two daughters remain in the United States. She has since given birth to her third daughter. Ms. Floriano Navarro is a survivor of sexual assault.

331. Ms. Floriano Navarro was detained in ICDC from October 18, 2019, until her deportation on September 16, 2020.

332. During her detention at ICDC, Ms. Floriano Navarro experienced and witnessed mistreatment, harassment, and abuse at the hands of Unknown ICDC Officers and/of Unknown ICE Officials. Officers withheld food from Ms. Floriano Navarro and others, including when the COVID-19 pandemic first began. One officer would not give them food unless the women would speak English first.

333. Ms. Floriano Navarro experienced escalating sexual harassment and abuse from another detainee. Two women tried to protect her but could not meaningfully do so. Ms. Floriano Navarro was terrified of being sexually assaulted and had no choice but to report her abuser to ICDC staff and/or ICE agents. When Ms. Floriano Navarro tried to speak up, the guards sent Ms. Floriano Navarro to the medical room (which is also used for solitary confinement) for about five days. Ms. Floriano Navarro spent Christmas 2019 in solitary confinement while the abuser was not punished and remained in the company of other women. The solitary confinement room was filthy, the lights always remained on, and officers only permitted her to shower once. Ms. Floriano Navarro describes it as being in a "hellhole." Ms. Floriano Navarro believes she was punished by Defendants for speaking up. Defendants never meaningfully investigated the sexual aggression against Ms. Floriano Navarro. This experience convinced Ms. Floriano Navarro that she should keep her mouth shut to avoid retaliation.

334. Ms. Floriano Navarro also witnessed women being placed in solitary confinement without access to water when they went on a hunger strike to protest their mistreatment and the conditions at ICDC. When the women returned to Ms. Floriano Navarro's housing unit, officers pepper sprayed them and isolated them again. Many of those

women were deported as a result of the protest. This terrified Ms. Floriano Navarro and discouraged her from speaking out about her experiences at ICDC.

335. Ms. Floriano Navarro also suffered medical abuse from Defendant Amin. After complaining of heavy menstrual cramps to a nurse in March 2020, the nurse referred her to Defendant Amin. This was the first time Ms. Floriano Navarro saw Defendant Amin. At the appointment, Defendant Amin performed a vaginal ultrasound on Ms. Floriano Navarro with no warning or explanation. With no understanding of why this was being conducted, Ms. Floriano Navarro felt violated.

336. Defendant Amin then told Ms. Floriano Navarro that she needed to have surgery. He said that she had a cyst that would grow. He did not explain what the cyst was, if it was dangerous, or give her any details whatsoever.

337. At this same appointment, Defendant Amin told Ms. Floriano Navarro that she needed to have a Depo shot to treat the cyst. He did not give her any choice.

338. She experienced vaginal bleeding for a month straight after receiving the Depo shot. This was unusual for her, because, before her detention, when she had been treated with the Depo shot, she had not suffered any side effects.

339. After that first appointment, Ms. Floriano Navarro was brought back to see Defendant Amin regularly through July 2020.

340. Given her history as a survivor of sexual assault, each visit made Ms. Floriano Navarro feel extremely uncomfortable and violated. During her appointments, Defendant Amin rested one hand on her knee while he inspected her vaginal area, and inside her body, without ever explaining why he was doing so. He would switch between inserting his fingers and inserting an ultrasound wand inside her body. Defendant Amin also told her

at every appointment that she needed surgery, but he did not tell her why or what kind of surgery was needed. He also did not tell her when the surgery would occur.

341.  Then, on July 31, 2020, Ms. Floriano Navarro was scheduled for surgery at the Irwin County Hospital. Another woman, Jane Doe #21, was also scheduled for surgery that day. Ms. Floriano Navarro was told the surgery was to drain her cyst. When an ICDC officer named Ms. Vaughn asked Ms. Floriano Navarro what surgery she was having that day, she smirked as Ms. Floriano Navarro stated it was surgery to drain her cyst.

342.  At the hospital, a nurse prepped Ms. Floriano Navarro for the surgery, conducted a COVID-19 test, and made her sign a consent form without letting her read it. After Ms. Floriano Navarro was fully prepared for surgery, Ms. Vaughn came in the room and told her that Defendant Amin was actually going to perform a hysterectomy, which would remove her womb. This was the first time any person had mentioned a hysterectomy to Ms. Floriano Navarro.

343.  Ms. Floriano Navarro would have been forced to have the hysterectomy, but for the fact that right before the surgery, the results of her COVID-19 test were returned, showing that she had COVID-19 antibodies. Ms. Floriano Navarro was taken back to ICDC, and the hysterectomy surgery was not performed.

344.  None of the other women in Ms. Floriano Navarro's housing unit were told about Ms. Floriano Navarro's COVID-19 test results. Ms. Floriano Navarro attempted to inform them as soon as she returned, so they could take necessary precautions, but she was immediately taken to an isolation unit. The officers then lied to the other women and told them that Ms. Floriano Navarro was going home rather than telling them about the test results.

345. Unknown ICDC Officers continued to pressure Ms. Floriano Navarro to get the surgery despite her resistance. For instance, Officer Rabiou, an officer with no medical background, encouraged her to get the surgery before she was deported. ICE Officials William and Mia also encouraged her to get the surgery after she expressed her concerns and informed them of her experiences with Defendant Amin. Despite Ms. Floriano Navarro's repeated complaints about her treatment, none of the ICDC officers or ICE officials showed her any concern.

346. Ms. Floriano Navarro saw Defendant Amin one more time before her deportation. On September 15, 2020, the guards took her to see Defendant Amin without warning. Defendant Amin berated her for not getting the surgery. Immediately after the appointment, guards brought Ms. Floriano Navarro to the intake area where she was informed that she would be deported. Ms. Floriano Navarro had never before seen any other woman called to the intake area to be told they would be deported. Ms. Floriano Navarro waited in the intake area for about an hour and a half. While she waited, Defendant Smith confronted her about a whistleblower report on medical abuses at ICDC that was released the day before, on September 14, 2020. Upon being questioned, Ms. Floriano Navarro admitted that she had told a lawyer about her own experiences, and Defendant Smith immediately told other officers nearby. Defendant Smith berated Ms. Floriano Navarro and told her that she should leave for Mexico "fresh and clean," meaning after undergoing surgery. Ms. Floriano Navarro felt terrified and her heart was racing. When she returned to her pod, she was crying and extremely distressed, and other women tried to comfort her.

347. Within 24 hours, Ms. Floriano Navarro was deported. Ms. Floriano Navarro believes that she was deported so that she could not speak out about her experiences and mistreatment at the hands of Defendant Amin and in retaliation for having told her lawyer about Defendant Amin's plan to perform a hysterectomy on her.

348. Because of Ms. Floriano Navarro's deportation to Mexico, she has never been able to participate in any federal investigation. She actively wants to speak out and assist the authorities in preventing what happened to her in detention from happening to others.

### K. Plaintiff Mbeti Victoria Ndonga

349. Plaintiff Mbeti Victoria Ndonga is a 38-year-old woman who was brought to the United States when she was two years old. Ms. Ndonga currently lives in Georgia.

350. Ms. Ndonga was detained in ICE custody at ICDC from April 2019 until December 16, 2020. She was detained at ICDC for more than 616 days, including 267 days after receiving a final order of removal. While detained at ICDC, Ms. Ndonga was subjected to non-consensual, invasive, and medically unindicated procedures at the hands of Defendant Amin.

351. Ms. Ndonga suffers from serious mental health disabilities, specifically schizoaffective disorder, a schizophrenia-spectrum disorder. She also has been diagnosed with post-traumatic stress disorder (PTSD). An immigration judge in Atlanta, Georgia adjudicated her mentally incompetent after ICE moved to hold a *Matter of M-A-M-* competency hearing in May 2019. ICE and its employees, contractors, and/or agents were or should have been aware of Ms. Ndonga's mental disabilities since at least that time.

352. Additionally, Ms. Ndonga suffers from hypertension, obesity, and chronic and severe gynecological issues. Specifically, Ms. Ndonga suffers from heavy, irregular bleeding

and debilitating menstrual cramps. While in ICE custody, Ms. Ndonga repeatedly sought treatment for her gynecological issues, but never received appropriate treatment.

353. Throughout her detention at ICDC, Ms. Ndonga suffered from severe gynecological problems. Her menstrual cycle was highly irregular and caused her to bleed heavily for prolonged periods of time of up to twenty days in a single stretch. In addition to heavy bleeding, she suffered immensely from intense cramps that regularly left her bedridden for days. When Ms. Ndonga alerted ICDC staff to her debilitating symptoms in the summer of 2019, she expected to receive a Depo shot to manage her pain and bleeding. This medical treatment successfully helped to manage Ms. Ndonga's gynecological symptoms in the past.

354. On July 31, 2019, Ms. Ndonga had an appointment with Defendant Amin. During the appointment, Ms. Ndonga requested a Depo shot, but Defendant Amin refused to give her that shot. He did not explain the refusal.

355. Instead, Defendant Amin subjected Ms. Ndonga to a medically unindicated, non-consensual transvaginal ultrasound, despite Ms. Ndoga's inability to provide truly informed consent given her known mental health disabilities. After the ultrasound, Defendant Amin told Ms. Ndonga that she needed additional medical procedures. Defendant Amin did not tell Ms. Ndonga what those procedures would be, why they were necessary, what less invasive options might be, or the benefits and risks of the procedures—in direct violation of his professional obligations.

356. Ms. Ndonga saw Defendant Amin for a second time on August 16, 2019. Defendant Amin again subjected Ms. Ndonga to non-consensual and medically unnecessary procedures without obtaining Ms. Ndonga's informed consent. Alarmingly, Defendant

Amin performed dilation and curettage, a laparoscopy, and an ovarian cystectomy without Ms. Ndonga's knowledge while Ms. Ndonga was under general anesthesia. After the surgery, Ms. Ndonga woke up with three wounds on her abdomen. She also developed a surgical site infection that lasted for months. In addition to the infection, the surgery worsened her cramps and bleeding, and left her with a pinching pain in her abdomen that has continued for the past 16 months.

357. Ms. Ndonga did not learn what happened to her during the surgery until she retained counsel in October 2020, almost 15 months later. Throughout that time, Ms. Ndonga was overwhelmed with fear that she had been sterilized and would never be able to bear children.

358. Additionally, given her personal history as a survivor of sexual trauma, Ms. Ndonga found the procedures forced on her by Defendant Amin to be emotionally traumatizing. As a result of her prior sexual abuse, Ms. Ndonga suffers from post-traumatic stress disorder (PTSD). Defendant Amin's non-consensual, invasive, medically unindicated procedures further triggered and exacerbated Ms. Ndonga's PTSD.

359. Ms. Ndonga's horrific experiences motivated her to participate in the federal investigations into the pattern of unnecessary, non-consensual, invasive gynecological procedures performed on women detained at ICDC.

360. On October 27, 2020, Ms. Ndonga completed a one-hour interview with federal investigators from the DOJ, DHS OIG, and FBI. Ms. Ndonga told investigators that she had more information to share, but her fears of deportation and other retaliation made her afraid to do so.

361. A few hours later, on October 27, 2020, ICE informed Ms. Ndonga that it had lifted the hold on her deportation, and that she would be deported imminently. Ms. Ndonga filed two requests for release on October 27 and 28; ICE denied both almost immediately. On October 30, 2020, Defendant Musante informed Ms. Ndonga's counsel that ICE would deport Ms. Ndonga in early December 2020 and that her flight had already been scheduled.

362. ICE only scheduled Ms. Ndonga's removal after she spoke out against her abusive treatment at ICDC, after Ms. Ndonga informed investigators that she had more information to share and almost 19 months after she was first detained.

363. Ms. Ndonga's deportation fits into a pattern of retaliation she experienced following her efforts to speak out against the poor conditions at ICDC.

364. For example, Ms. Ndonga repeatedly tried to hang a sign on the wall of her cell shortly after she arrived at ICDC. Women generally hang materials on the walls of their cell without incident. Ms. Ndonga used her sign as a way to voice her frustration with her poor medical treatment and ongoing medical neglect. Specifically, Ms. Ndonga's sign read: "Death 2 Prejudiced Healthcare for Black Female Here in GA, USA. Pay, pay, pay. I live with pain every day."

365. Despite Ms. Ndonga's right to display her sign, Unknown ICDC Officers and/or Unknown ICE Officials repeatedly told Ms. Ndonga to take her sign down. When Ms. Ndonga refused and reminded the officers of her right to peacefully protests, the officers removed the sign themselves. However, Ms. Ndonga reprinted her sign and hung it again. Officers continued to remove her new signs, but every time, Ms. Ndonga reprinted and re-hung her sign.

366. Ms. Ndonga has even taken her activism outside the walls of ICDC. Since speaking with federal investigators, Ms. Ndonga has spoken with numerous reporters and has been featured with her full name and photograph in several articles about the pattern of gynecological abuse at ICDC. Ms. Ndonga is also eager to continue her participation in the ongoing federal investigations into gynecological abuse at ICDC. Ms. Ndonga is desperate to speak out against the abuse she suffered at the hands of Defendant Amin, even though she knows it heightens the risk that Defendants will retaliate against her.

367. Two experts offered evaluations of Ms. Ndonga. Based on a review of medical records, Dr. Mueller concluded that Ms. Ndonga "underwent inappropriate, overly aggressive evaluation and care by [Defendant] Amin"; "the operation that [Defendant] Amin performed on Ms. Ndonga did not meaningfully contribute to the evaluation or management of her gynecologic condition"; and "[n]one of the care provided by [Defendant] Amin actually addressed Ms. Ndonga's underlying gynecologic complaints." After evaluating Ms. Ndonga by videoconferencing, Dr. Jasdeep Sandhu, M.D., found, "Ms. Ndonga has been personally subjected to physical and psychological harm at the hands of [Defendant] Amin and this has worsened her preexisting PTSD symptoms and jeopardized her progress made in treatment of her mental illness." Dr. Sandhu further concluded, ""[D]ue to her severe mental illness[es] of schizoaffective disorder and PTSD she is more vulnerable to abuse of any kind especially when in a compromised position as in a doctor patient relationship and in detention."

368. If Ms. Ndonga is deported to Kenya, it will be impossible for her to participate in the investigations and to speak to media outlets about the pattern of abuse. Ms. Ndonga does

not have anyone to receive her or anywhere to stay in Kenya, and she will likely not have access to appropriate healthcare.

**L.     Plaintiff Keynin Jackelin Reyes Ramirez**

369.   Plaintiff, Keynin Jackelin Reyes Ramirez, is a 33-year-old woman. Ms. Reyes Ramirez fled to the United States from Honduras more than six years ago in order to escape an abusive ex-partner. Ms. Reyes Ramirez is the mother of three Honduran children approved for Special Immigrant Juvenile Status on the basis of their father's abuse, and two children who are U.S. citizens. She is the wife of Cristian Alexander Hernandez, a United States citizen, and works hard to support her family as a house cleaner and roofer.

370.   Ms. Reyes Ramirez was detained at ICDC from January 30, 2020 until December 11, 2020. During this time, she was subjected to non-consensual, invasive, and medically unnecessary gynecological procedures at the hands of Defendant Amin.

371.   On March 9, 2020, Ms. Reyes Ramirez put in a request to receive a birth control injection, as she had historically received them prior to her detention. On June 16, 2020, Ms. Reyes Ramirez complained about an abnormal vaginal pH balance and requested to see an OB/GYN for her yearly checkup. On June 17, 2020, Ms. Reyes Ramirez again requested medical attention due to vaginal pain. Three months after her initial request for gynecological care, she was finally referred to a provider on June 18, 2020.

372.   On July 5, 2020, ICDC medical staff noted that Ms. Reyes Ramirez had a bump in the vaginal area that burned and also noted that Ms. Reyes Ramirez requested a birth control injection to regulate her menstruation.

373. Unknown ICDC Officers sought approval from ICE Health Service Corps to refer Ms. Reyes Ramirez to Defendant Amin. Unknown ICE Officials approved the request and referred Ms. Reyes Ramirez to Defendant Amin.

374. Early in the morning on July 9, 2020, Ms. Reyes Ramirez was taken in handcuffs to see Defendant Amin. She was not informed where she was going, and because four months had passed since her initial request to see a provider, she was confused as to where she was being taken.

375. At Defendant Amin's office, Ms. Reyes Ramirez was asked questions about how many children she had, and whether she had any prior C-sections. Ms. Reyes Ramirez signed a sheet of paper, but she was not told what she was signing. Without saying anything to Ms. Reyes Ramirez, Defendant Amin roughly forced her legs apart and inserted a tubular device. An interpreter was present but did not say anything about what Defendant Amin was doing or why he was doing it. Neither Defendant Amin nor the nurse in the room explained to her what was happening either. Defendant Amin then informed Ms. Reyes Ramirez that she had several cysts in her ovary, a diagnosis she had never received from former gynecologists despite attending regular check-ups.

376. Defendant Amin gave Ms. Reyes Ramirez an injection, but did not tell her what it was, only that it would remove cysts. He told Ms. Reyes Ramirez he would have results in two weeks but did not clarify what results he was referring to. When Ms. Reyes Ramirez inquired about the possibility of taking birth control pills rather than the injection, Defendant Amin dismissed her question without explaining why other options were not available. Ms. Reyes Ramirez never received confirmation from Defendant Amin that

the injection he gave her was the contraceptive she requested; and if it was a contraceptive, when she would have to return for another injection.

377. When Ms. Reyes Ramirez returned to the detention center after her appointment with Defendant Amin, she experienced significant pain and cramping, a pain she described as similar to childbirth. Ms. Reyes Ramirez was only able to access ibuprofen from the ICDC commissary to manage the intense pain she felt. Ms. Reyes Ramirez also noticed a strong smell from her vagina in the days following her appointment with Defendant Amin.

378. Ms. Reyes Ramirez was also subjected to non-consensual tooth extractions while detained at ICDC.

379. On September 22, 2020, Ms. Reyes Ramirez requested her medical records. She was provided an incomplete copy of her medical records and told by Deportation Officer Portillo that if she wanted these records because it was "about the doctor" she would need a lawyer in order to obtain the full record.

380. On September 26, 2020, Ms. Reyes Ramirez spoke with congressional representatives who visited ICDC in response to the whistleblower complaint and media reports about abuses by Defendant Amin. Ms. Reyes Ramirez spoke with these representatives despite being told by officials at ICDC that she should "go to bed," "keep quiet" and should not speak with the representatives. Ms. Reyes Ramirez shared with visiting congressional representatives the details of what happened to her at the hands of Defendant Amin.

381. On November 5, 2020, Ms. Reyes Ramirez's name was provided to federal investigators identifying her as a victim of Defendant Amin and potential witness in the investigation.

382. On November 10, 2020, Ms. Reyes Ramirez noticed that her commissary account was "zeroed out," which typically indicates that a deportation will occur within 24-48 hours. The same day, Ms. Reyes Ramirez's counsel notified Defendant Musante, by email and telephone, that Ms. Reyes Ramirez was represented. Ms. Reyes Ramirez's counsel also indicated to Defendant Musante that Ms. Reyes Ramirez was a victim of Defendant Amin, intended to participate in an ongoing DOJ investigation, and that her deportation would violate ICE policy. These claims were reiterated in Ms. Reyes Ramirez's I-246 Stay Request, filed with ICE by email on November 11, 2020, in person on November 13, 2020, and granted on November 17, 2020.

383. Defendants' efforts to deport Ms. Reyes Ramirez immediately followed her name being released to the DOJ, but prior to her having the opportunity to interview with investigators regarding the investigation.

384. On November 16, 2020, Ms. Reyes Ramirez filed a federal habeas petition and motion for a Temporary Restraining Order in the Middle District of Georgia.  On November 17, 2020, once again Ms. Reyes Ramirez's commissary account was "zeroed out."

385. Ms. Reyes Ramirez's counsel again contacted Defendant Musante and informed him that Ms. Reyes Ramirez was a victim of Defendant Amin and that she intended to participate in the ongoing investigation regarding his abuse of women at ICDC. Counsel also informed Defendant Musante that on November 16, 2020, Ms. Reyes Ramirez had filed a federal habeas petition and motion for a Temporary Restraining Order in the Middle District of Georgia.

386. Ms. Reyes Ramirez's counsel also notified AUSAs Shannon Statkus and Jason Blanchard that Ms. Reyes Ramirez was at risk of imminent deportation. Later in the day

on November 17, 2020, AUSA Statkus informed Ms. Reyes Ramirez's counsel that she

had spoken with Deputy Chief Counsel of ICE, Emily Reece, who agreed with Officer

Musante not to remove Ms. Reyes Ramirez until the Temporary Restraining Order was

resolved and that she would be removed from the flight to Honduras set to occur the

following morning.

387. Although Ms. Reyes Ramirez was not deported on November 18, 2020, the timing of

Defendants' second attempt to swiftly remove Ms. Reyes Ramirez within a two-week

period confirm that Defendants sought to deport Ms. Reyes Ramirez in retaliation for

her willingness to participate in the ongoing federal investigations and to prevent her

from testifying in those investigations. Further, Ms. Reyes Ramirez's access to the

phone through her commissary account was not reinstated until Friday, November 20,

2020, which limited her ability to contact her legal team, the press, and congressional

representatives.

**M.    Plaintiff Ana Gabriela Adan Cajigal**

388. Ana Adan Cajigal, is a 25-year-old woman. Ms. Adan Cajigal came to the United States

when she was six months old. She lived in the United States with DACA status until

2015 when she took voluntary departure and moved to Mexico at 21-years old.

389. Ms. Adan Cajigal was detained at ICDC from late February 2020 until December 11,

2020. While detained, Ms. Adan Cajigal became a victim of and witness to medically

unnecessary and non-consensual gynecological procedures performed on female

detainees by Defendant Amin.

390. On May 4, 2020, Ms. Adan Cajigal put in a request for medical assistance because of

gynecological concerns.

391. Unknown ICDC Officers sought approval from ICE Health Service Corps to refer Ms. Adan Cagijal to Defendant Amin. Unknown ICE Officials approved the request and referred Ms. Adan Cagijal to Defendant Amin.

392. It was not until September 14, 2020 that Ms. Adan Cagijal was sent to Defendant Amin. Defendant Amin administered a pap smear, then performed a vaginal ultrasound without lubrication and without asking for Ms. Adan Cagijal's consent. He did not explain to her what he was doing or ask for the reasons for her visit. He then inserted the monitor in a "rough" manner and told her that he found a small cyst "the size of a toenail" on her left ovary. He told her that she needed birth control pills, even though she informed him that she had skin irritation and pain in her vaginal area. The visit only lasted five minutes and Defendant Amin never explained to her why she may have a cyst or what a cyst was. She experienced lingering pain as a result of the examination Defendant Amin performed on her.

393. A few days later, she heard on the news, and from other women, about the non-consensual gynecological procedures that Defendant Amin had performed on some of the women at ICDC. In order to help those women speak out about their experiences with Defendant Amin, Ms. Adan Cagijal volunteered to translate their medical records and interpret phone calls between them and news reporters. She became concerned that Defendant Amin had misdiagnosed her, and that she could have a condition other than "just a cyst" that might require immediate medical attention. Due to her concerns as well as her continuing symptoms, she requested medical attention and was taken to an OB/GYN clinic in Valdosta, GA on October 27, 2020. There, the doctor performed a

complete evaluation and informed her that she did not have a cyst and ran some diagnostic tests.

394. The doctor prescribed medication for Ms. Adan Cajigal that was not given to her by the ICDC officers until more than a month later.

395. Ms. Adan Cagijal also suffers from asthma. She was diagnosed with asthma as a child. Prior to her detention at ICDC, her asthma had been stable, and she had not needed to use her inhaler for two years. However, her asthma began worsening considerably after her detention at ICDC due to the harsh chemicals in the cleaning products used at the facility. She filed several medical requests complaining of chest pain and difficulty breathing. In her requests, she noted that she gets tired quickly, feels like she is lacking air and will pass out, and that the chemicals used at ICDC were causing these symptoms to worsen. She tested negative for COVID-19 and was prescribed an inhaler. But because she is only able to use the inhaler a limited number of times a day, she continued to experience these symptoms.

396. Ms. Adan Cagijal has experienced significant physical and emotional trauma and was diagnosed with post-traumatic stress disorder (PTSD) at ICDC. She has been prescribed Prazosin, a drug used to reduce nightmares in patients with PTSD, and Escitalopram, a drug used to reduce anxiety and depression. While being held at ICDC, Ms. Adan Cagijal asked to receive mental health therapy on multiple occasions but was unable to receive any therapy.

397. After Ms. Adan Cagijal spoke to FBI investigators, attorneys, and organizations involved in helping victims of Defendant Amin, Unknown ICDC Officers and/or Unknown ICE Officials began harassing and threatening Ms. Adan Cagijal because she

had knowledge of incidents involving ICDC officers and/or ICE officials beating some of the women at ICDC. She saw how one of the women began experiencing back problems and trouble with walking and balance after an incident with the officers and/or officials. She also witnessed Unknown ICDC Officers and/or Unknown ICE Officials violently drag an individual out of ICDC. This experience terrified Ms. Adan Cagijal.

398.  On September 26, 2020, representatives from Congress visited the detention center and she informed them about the inhumane conditions and experiences that the detainees are facing. However, guards repeatedly attempted to obstruct other detained individuals' ability to speak to the representatives.

399.  On October 26, 2020, Ms. Adan Cagijal's attorney submitted her signed declaration about her experiences with Defendant Amin to the DOJ. Her attorney communicated Ms. Adan Cagijal's desire to cooperate with the investigation and complete an interview about her experiences with Defendant Amin.

400.  On November 2, 2020, attorney Tracie Klinke emailed Defendant Giles, Supervisory Detention and Deportation Officer (SDDO) Alejandro Hernandez, Deportation Officer (DO) Charlene Johnson, and Medical Officer of the Commonwealth (MOC) Hank Johnson, providing them with Ms. Adan Cagijal's record in support of her claim for custody re-determination pursuant to *Fraihat v. ICE*, Case No. 5:19-cv-01546-JGB-SHK, 2020 WL 6541994 (C.D. Cal. Oct. 7, 2020).

401.  Ms. Adan Cagijal spoke to investigators from DOJ, FBI and OIG on November 10, 2020 via Zoom with her attorney present.

402.  On November 17, 2020, two officers began intimidating Ms. Adan Cagijal by not allowing her to use her phone or communicate with anyone. Ms. Adan Cagijal's mother

spoke to Univision 34, a TV channel, about the conditions at ICDC, and connected Univision reporters with Ms. Adan Cagijal to briefly speak about her experiences. The officers then informed Ms. Adan Cagijal that she was "going to be deported tomorrow."

403. On the evening of November 17, 2020, Ms. Adan Cagijal noticed that her commissary was "zeroed out," which typically indicates that a deportation will occur in the next 24-48 hours. On November 17, 2020, multiple congressional offices contacted ICE on Ms. Adan Cagijal behalf to ensure ICE was aware that Ms. Adan Cagijal was a witness in ongoing investigations who wished to testify and had not yet been given an opportunity to testify.

404. At approximately 4:50pm EST on November 17, 2020, Ms. Klinke was informed by Defendant Musante that Ms. Adan Cagijal was scheduled to be deported on November 18, 2020 at 5am.

405. Defendant Musante informed Ms. Klinke that he was aware of her interactions with Defendant Amin and her communications with investigators. However, he said that no law enforcement agency had informed him that her presence was necessary for their investigation. He told Ms. Klinke that Ms. Adan Cagijal had a final order of removal and he had a process to follow. Ms. Klinke informed Defendant Musante that she may be filing a Temporary Restraining Order. Defendant Musante responded by saying that if a federal lawsuit was filed and he received a copy of it before midnight that Ms. Adan Cagijal would not be removed the following day.

406. Defendants' efforts to deport Ms. Adan Cagijal immediately followed her submission of a declaration to the Department of Justice. When ICE notified Ms. Klinke about the scheduled deportation, she immediately began working on filing a Habeas Corpus

Petition and a Temporary Restraining Order in the U.S. District Court for the Middle

District of Georgia under Case Number 7:20-cv-00237. A Stay of Removal Request was

also filed that day to stop the deportation. ICE granted the Stay of Removal Request at

3:45AM, only a little over an hour prior to the scheduled deportation time.

407. Ms. Adan Cagijal was finally released from ICDC on December 11, 2020.

408. If Ms. Adan Cagijal is deported to Mexico, she will be homeless and without access to

reliable internet. She will not have the ability to participate in ongoing investigations

about non-consensual medical procedures at ICDC.

**N.    Plaintiff Pauline Nadege Binam**

409. Plaintiff Pauline Nadege Binam is a 32-year-old woman originally from Cameroon. She

has lived in the United States since 1992. She has a 13-year-old daughter who is a U.S.

citizen. She was detained in ICE custody from October 13, 2017 until on or about

September 19, 2020.

410. While detained, she was subjected to non-consensual, invasive, and/or medically

unindicated invasive gynecological procedures by Defendant Amin.

411. Ms. Binam has been diagnosed with chronic post-traumatic stress disorder (PTSD),

generalized anxiety disorder, and bipolar disorder II.

412. ICDC failed to provide adequate treatment to Ms. Binam or otherwise accommodate her

disabilities.

413. Throughout 2017 and 2018, Ms. Binam experienced painful abdominal cramping.

414. She filed medical complaints about this at ICDC, but was not referred to a provider.

415. Ms. Binam did not insist on seeing a gynecologist because she had been warned about

Defendant Amin by other ICDC detainees and women and by ICDC officers. Ms. Binam

was told that Defendant Amin "messed [people] up" and heard he subjected women to unnecessary procedures that they did not agree to.

416. But in March 2019, Ms. Binam's abdominal pain became unbearable. She requested gynecological treatment and was referred to Defendant Amin for "menorrhalgia," which means difficult and painful menstruation.

417. Ms. Binam first saw Defendant Amin on April 3, 2019. He performed a pap smear. His records do not indicate that he performed an ultrasound.

418. At that appointment, Defendant Amin told Ms. Binam she had a cyst on her right ovary but did not explain to Ms. Binam if the cyst was causing her abdominal pain.

419. Defendant Amin told Ms. Binam that he would administer Depo Provera injections over the course of several months to shrink the cyst. He told her if this did not work, she would have to have the cyst removed surgically.

420. Defendant Amin did not advise Ms. Binam of any alternative treatments.

421. At this April 3rd appointment, Ms. Binam received one Depo Provera injection.

422. During two subsequent visits in April and May 2019, Defendant Amin performed pelvic-speculum exams on Ms. Binam.

423. Both times, his demeanor was very cold, and he did not tell Ms. Binam what, if anything, he concluded from these two exams.

424. On June 19, 2019, Ms. Binam went for another follow-up visit. Dr. Amin performed a transvaginal pelvic ultrasound.

425. He was physically rough when inserting the ultrasound wand.

426. According to Defendant Amin's medical records for Ms. Binam, the ultrasound report indicated Ms. Binam's fallopian tubes were normal but indicated follicular cysts on both ovaries, as well as an enlarged uterus.

427. Upon information and belief, a follicular cyst occurs when an ovarian follicle grows an egg but does not release it for ovulation.

428. Upon information and belief, follicular cysts are common in women of child-bearing age and often resolve on their own without surgical intervention.

429. Defendant Amin did not share this or similar information about follicular cysts with Ms. Binam.

430. Ms. Binam also received her second Depo Provera injection at this June 19th visit.

431. On August 2, 2019, Ms. Binam saw Defendant Amin again, and reported to him that she had been experiencing vaginal bleeding since their last appointment.

432. Defendant Amin performed a pelvic-speculum exam.

433. His records do not indicate that he performed an ultrasound during this visit.

434. Defendant Amin told Ms. Binam that her ovarian cysts had increased in size, and that surgical intervention ("D&C scope") was required.

435. Defendant Amin told Ms. Binam that this was a "simple procedure" where he would cut her cysts, drain them, and scrape them off.

436. Defendant Amin did not explain how the surgery would be performed (i.e., transvaginally or through abdominal incisions), the risks of the surgery, or discuss any alternative options.

437. On August 23, 2019, Ms. Binam was transported to Irwin County Hospital and placed under anesthesia.

438. Defendant Amin performed a laparoscopy that involved making three incisions in her lower abdomen and inserting a small camera.

439. Ms. Binam understood the purpose of the surgery was to remove ovarian cysts.

440. However, unbeknownst to Ms. Binam until after the surgery, Defendant Amin performed a partial salpingectomy, meaning removal, of her right fallopian tube.

441. When Ms. Binam awoke, Defendant Amin told her that during the surgery, he noticed a clog in her fallopian tube so he "cut it out."

442. Ms. Binam asked Defendant Amin to repeat himself, hoping she had misheard. He repeated that he had cut her fallopian tube out.

443. Ms. Binam asked Defendant Amin how her fallopian tubes related to surgery on her ovaries.

444. Defendant Amin told Ms. Binam that he had made a judgment call to remove the blockage.

445. Defendant Amin told Ms. Binam she would no longer be able to conceive without fertility assistance.

446. Ms. Binam started sobbing. She told Defendant Amin that she did not give him permission to remove her fallopian tube.

447. Defendant Amin failed to get Ms. Binam's informed consent to the salpingectomy.

448. Defendant Amin did not engage in mutual decision-making with Ms. Binam about the salpingectomy and her reproductive health.

449. Upon information and belief, the salpingectomy was not medically necessary.

450. Ms. Binam was transported back to ICDC. She was not given proper medical care for her surgical wounds. Other women had to help Ms. Binam change her bandages and bring her food in the dormitory because it was painful for her to walk.

451. On August 28, 2020, Ms. Binam told an ICDC mental health provider that she had gone into the surgery expecting a D&C and was 'bothered' that she had instead had her fallopian tube cut.

452. On September 9, 2019, Ms. Binam had a follow-up appointment at Dr. Amin's office.

453. Ms. Binam noticed that Defendant Amin was in the office and requested to speak with him.

454. She was instead seen by a different provider, a woman, who told her that Defendant Amin was not available.

455. This provider told Ms. Binam that according to her file, Defendant Amin had reattached her fallopian tube.

456. This left Ms. Binam even more confused and distressed since it did not seem to match what Defendant Amin had told her after her surgery.

457. The provider checked Ms. Binam's surgical wounds and had a nurse administer another Depo Provera injection.

458. Back at ICDC, Ms. Binam complained about her non-consensual surgery by Defendant Amin at every opportunity and also told her family and immigration lawyer about what Defendant Amin had done to her.

459. She wrote multiple grievances to ICE officials about her surgery but did not receive any response.

460. Ms. Binam requested the contact information for Defendant Amin's private practice from ICDC Nurse Cole, who told Ms. Binam that she would not give it to her because Defendant Amin was her friend of over 20 years.

461. Ms. Binam repeatedly requested her medical records but Unknown ICDC Officers and/or Unknown ICE Officials did not provide them.

462. Ms. Binam's mother and sister also attempted to request Ms. Binam's medical records, but were unsuccessful.

463. After Ms. Binam began complaining about her surgery and requesting her records, ICDC officers and ICE officials started to treat her worse than they previously had.

464. Her deportation officer refused to meet with her, even though he came to ICDC and was meeting with other women, and ICDC officers avoided her.

465. Ms. Binam's sister's phone number was blocked from making calls to the ICDC facility.

466. Her sister had to buy a disposable phone, with a different number, in order to speak with Ms. Binam.

467. Ms. Binam did not have her period for approximately 22 months after her surgery.

468. Upon information and belief, her ability to naturally conceive and carry a child has been compromised as a result of the nonconsensual surgery.

469. On February 24, 2020, with no explanation, Ms. Binam was transferred to the Montgomery Processing Center in Conroe, Texas.

470. For months after she arrived, ICE Deportation Officer Dwight Hunt regularly met with Ms. Binam, telling her she was being deported soon. He even stated at one point that the Cameroonian Government had issued the travel document for Ms. Binam to be

removed. He never provided Ms. Binam or her immigration attorney with an expected date of removal.

471. On September 14, 2020, the Whistleblower Complaint regarding medical abuse at ICDC was published.

472. Upon reading the Whistleblower Complaint, Ms. Binam's friend, Reverend Leeann Culbreath of the South Georgia Immigrant Support Network, recognized that Ms. Binam was also a likely victim of this abuse based on what Ms. Binam had told her.

473. Rev. Culbreath reached out to Ms. Binam by phone at the Montgomery Processing Center to request her permission to publicly share Ms. Binam's experience with Defendant Amin. Ms. Binam gave her permission.

474. On September 15, 2020, Reverend Culbreath, spoke about Ms. Binam's experience with Defendant Amin at a press conference in Atlanta, Georgia regarding the Whistleblower Complaint.

475. By letter dated September 15, 2020, over 100 members of Congress called for the Department of Homeland Security's Office of the Inspector General (DHS OIG) to open an investigation into the Whistleblower Complaint.

476. After Ms. Binam was publicly identified as a possible victim and witness to medical abuse, ICE then tried to accelerate her deportation by removing her from the Montgomery Processing Center. ICE put her on a plane to Chicago O'Hare International Airport, where ICE intended to board her on a commercial flight to Cameroon.

477. While Ms. Binam was in transit and/or waiting at O'Hare airport, ICE received communications from her immigration attorney and, on information and belief,

95

members of Congress, asking that her deportation be halted in light of Ms. Binam's status as a victim of Dr. Amin's medical abuse and a witness in an investigation by DHS OIG.

478. Upon information and belief, United States Representative Sheila Jackson Lee spoke with one or more ICE officials about Ms. Binam, who had now been publicly identified as a survivor of and witness to the medical abuse at ICDC, asking to stay her deportation.

479. Upon information and belief, ICE officials told Rep. Jackson Lee that Ms. Binam was being moved but would not be imminently deported.

480. ICE nonetheless continued to try to board Ms. Binam on the flight to Cameroon and thereby deport her.

481. This was despite continuing requests by Ms. Binam's immigration attorney and, upon information and belief, members of Congress, that ICE refrain from deporting her in light of what had happened to her while detained at ICDC.

482. Upon information and belief, and as reported by the *Los Angeles Times* and *The Intercept*, the commercial airline rejected the travel document that ICE produced for Ms. Binam as invalid.[36]

483. Ms. Binam was returned to the Montgomery Processing Center in Texas.

---

[36] Molly O'Toole & Andrea Castillo, 'Betrayed' Black asylum seekers say Trump administration is ramping up deportations by force and fraud, Los Angeles Times (Nov. 27, 2020), https://www.latimes.com/politics/story/2020-11-27/black-asylum-seekers-trump-officials-push-deportations (reporting on Binam's invalid travel documents); Joe Penny, Pauline Binam Says She Never Gave ICE Doctor Consent to Remove Her Fallopian Tube, The Intercept (Oct. 2, 2020), https://theintercept.com/2020/10/02/ice-irwin-amin-obgyn-cameroon-women/ (same).

484. News media *NPR*, *The New York Times*, and *Snopes* published articles naming Ms. Binam as a victim of Dr. Amin.[37] Several other media outlets also published articles shortly thereafter.

485. In response to continuing legal and congressional advocacy, ICE released Ms. Binam from custody on or about September 19, 2020.

486. She remains subject to ICE supervision and annual ICE check-ins.

487. Ms. Binam has given testimony about her treatment by Defendant Amin, and related retaliation to the DOJ, DHS OIG, FBI, and the United States Senate's Permanent Subcommittee on Investigations.

### O. Plaintiff Jane Doe #25

488. Jane Doe #25 is a 40-year-old woman originally from Mexico who lived in the United States from 2006 to 2019. She was detained in ICE custody at ICDC until her deportation to Mexico on February 4, 2019. While detained at ICDC, she was subjected to non-consensual and/or medically unindicated invasive gynecological procedures at the hands of Defendant Amin.

489. While detained at ICDC, Jane Doe # 25 experienced significant medical issues, including asthma and painful gynecological symptoms.

490. ICDC failed to provide adequate treatment to Jane Doe #25 or otherwise accommodate her disabilities.

---

[37] Joel Rose, *ICE Almost Deported Immigrant Woman Who Says She Got Unwanted Surgery While Detained*, NPR (Sept. 16, 2020), https://www.npr.org/2020/09/16/913698689/ice-almost-deported-immigrant-woman-who-says-she-got-unwanted-surgery-while-deta.; Caitlin Dickerson, *Inquiry Ordered Into Claims Immigrants Had Unwanted Gynecology Procedures*, N.Y. Times (Sept. 16, 2020), https://www.nytimes.com/2020/09/16/us/ICE-hysterectomies-whistleblower-georgia.html.

491.  On May 16, 2018, Jane Doe # 25 sought medical assistance after her period lasted for fifteen days. Over the course of the next several weeks, she submitted multiple requests to see a doctor related to the pain she was experiencing.

492.  On June 13, 2018, she had a transvaginal ultrasound performed on her at Dorminy Medical Center. Results of that ultrasound reflect that Jane Doe # 25's right ovary appeared normal, but that her left ovary had a cyst, measuring 2.7 cm. Defendant Amin subsequently prescribed Orthotricyclen, a form of birth control.

493.  On July 9, 2018, Jane Doe # 25 requested to see a doctor, noting that her pain would not stop. Nurse Amber Hughes denied this request because she had recently seen Defendant Amin.

494.  On or about August 8, 2018, Jane Doe # 25 had a follow up appointment with Defendant Amin, including a second transvaginal ultrasound.  The medical records reflect the ultrasound revealed a benign cyst on her right ovary, measuring 2.4 x 1.8 x 1.8 cm, while her left ovary was found to be normal in appearance.

495.  On August 13, 2018, she once again requested medical help, noting that "the pain [in] my abdomen doesn't go away." She met with Nurse Hughes that day and begged for help. Nurse Hughes told Jane Doe # 25 that "no stronger pain meds could be given" and that she "is just a nurse."

496.  Jane Doe # 25's pain continued to worsen so she contacted Defendant Ciprian, whose contact information was posted on a bulletin board in her dormitory and who speaks Spanish. After speaking with Defendant Ciprian on August 16, 2018, Jane Doe # 25 was transported to the emergency room at Irwin County Hospital. Because he helped her, Jane Doe # 25 began to trust Defendant Ciprian.

497. After her hospital visit, Jane Doe # 25 had follow-up visits with Defendant Amin. She was concerned that Defendant Amin hardly examined her during these visits, seemed to have no knowledge of her prior treatment, and did not always have an interpreter for her.  She also distrusted Defendant Amin based on the experiences other women who resided in her dormitory had with him.

498. Because she did not trust that Defendant Amin was providing competent treatment, Jane Doe # 25 reached out to Defendant Ciprian. In one of their conversations, Defendant Ciprian assured her he would do everything he could to get her a new doctor. Jane Doe # 25 also tried to talk to the warden, Defendant Paulk, but was never able to because he did not have an interpreter.

499. On August 31, 2018, Nurse Lyons issued an order for a third transvaginal ultrasound, noting an apparent diagnosis of Polycystic Ovary Syndrome.

500. Following a visit to Defendant Amin on October 2, 2018, Jane Doe # 25 was scheduled for "D & C" and "Laparoscope" procedures. She recalls Defendant Amin telling her that she did not have Polycystic Ovary Syndrome but that he would do a vaginal scraping.

501. Jane Doe # 25 wrote several letters to Defendant Ciprian. In one, written in early October 2018, Jane Doe # 25 wrote, "The doctor said I do not have polycystic ovarian syndrome, that my uterus is very swollen and in 5 days he would do a scraping."

502. She further stated in her letter, "I am very afraid and I do not know what to do. . . . I told the nurse everything that had happened to me but she could not do anything else because she was only a nurse. I am very afraid because the outside doctor is negligent and I do not trust him. . . . I am afraid, very afraid."

503. Despite notifying Defendant Ciprian of her concerns about Defendant Amin, Jane Doe # 25 was taken for surgery with Defendant Amin on October 16, 2018.

504. After her surgery, she woke up and saw three cuts on her abdomen. An ICDC staff member was present and told Jane Doe # 25 that Defendant Amin had removed her right ovary. Jane Doe #25 was confused and upset. She had been aware from previous medical visits that there was a benign cyst on her left ovary; no one had ever said anything to her about an issue with her right ovary.

505. Moreover, Defendant Amin himself had never even mentioned anything about operating on either of her ovaries. Jane Doe #25's understanding was that he was just going to do a uterine scraping. She felt betrayed and upset.

506. Operative notes indicate Defendant Amin performed a D&C, operative laparoscopy, lysis of adhesions, electrocoagulation of pelvic endometriosis, and a right ovarian cystectomy.

507. On October 25, 2018, Jane Doe # 25 saw Defendant Amin and had a third ultrasound. The results of this ultrasound indicated the presence of a right-sided ovarian follicular cyst, measuring 14 x 11 mm.

508. Jane Doe # 25 asked Defendant Amin exactly what he had done, through an ICDC guard acting as an interpreter. Defendant Amin asserted that he had removed the cysts from her ovaries and cleaned her endometriosis. He told her that she did not have cancer and could still have children.

509. On December 6, 2018, Jane Doe # 25 refused to attend a follow up appointment with Defendant Amin.

510. Between December 6, 2018, and February 4, 2019, which is on or about the date that Jane Doe # 25 was removed from ICDC and deported to Mexico, she frequently requested to be seen by a provider other than Defendant Amin. She made this request at least as late as January 24, 2019.

511. Despite Jane Doe # 25's request to see a different doctor, records reflect that ICDC official M. Davis once again submitted an "off-site to [Defendant] Amin" request on January 29, 2019, on Jane Doe #25's behalf. Jane Doe # 25 did not attend that appointment.

512. Throughout Jane Doe # 25's detention at ICDC, she requested her medical records over a dozen times. She specifically requested copies of her ultrasounds and treatments with Defendant Amin but the records she was given included "no reports of [her] menstrual issues."

513. Jane Doe #25 also told friends and family about her concerns over what Defendant Amin did to her and the difficulty she was having in obtaining the records from ICDC officials. She believes officials were listening to her calls, because in the two weeks before she was deported, the line cut out and the call was dropped while she was on a call with two of her friends discussing these issues. The phone system never allowed her to call these friends back.

514. Three days before she was deported, on February 1, 2019, Jane Doe # 25 filed a motion to reopen her removal proceedings. Her motion was successful and her removal order was reopened on May 15, 2019. The Executive Office of Immigration Review's system indicates that she is scheduled for a new hearing before an immigration judge on July 10, 2023.

515. Since returning to Mexico, Jane Doe #25 has seen multiple gynecologists for follow-up care. She has been told that Defendant Amin removed more than half of her left ovary and that she has a significantly reduced chance of successfully carrying a future pregnancy to term.

516. Upon information and belief, this surgical procedure was not medically necessary.

517. Jane Doe #25 and her husband had hopes and dreams of having and raising a child together, which now may be lost forever due the actions of Defendant Amin.

518. Jane Doe #25 also suffered from asthma while at ICDC. She was, at times, denied the medication she needed in order to treat her chronic condition. On one occasion, she had an asthma attack, and it took three hours for an ICDC nurse to aid her as she struggled to breathe. On several occasions, medical personnel injected something in Jane Doe #25's leg. She does not know what was injected and to this day, she experiences shooting and burning pains in her leg.

519. Jane Doe # 25 also experienced retaliation by ICDC officials for exercising her free speech rights. After submitting a grievance against an ICDC officer, she was locked in her cell for one day. Her access to the outside world was limited for three or four days when a protest was taking place outside ICDC that officials did not want her to observe.

520. Jane Doe # 25 believes she deserves justice for what she experienced and wants to be involved in the investigations and lawsuits against Defendants. Although she faces hardships and numerous practical obstacles due to her deportation to Mexico, she is determined to do everything she can to overcome them and pursue justice on behalf of herself and other women harmed by Defendant Amin.

## XI. Several Putative Class Members Have Suffered the Same Harms

521. **Jane Doe #35** is 33-years old and now lives in Mexico. She was detained at ICDC from about June 4 or 5, 2018 until mid-January 2019.

522. By the time she was transferred to ICDC, Jane Doe #35 was experiencing intense pain that had started after a miscarriage and curettage performed at another detention center months before. The pain had diminished but was still extreme and kept her awake. She tried to tell ICDC medical staff about the pain, but they did not speak Spanish and there were not interpreters.

523. In July 2018, still experiencing severe pain, Jane Doe #35 was sent to Defendant Amin for a transvaginal ultrasound. She knew that other women were afraid of him because he had hurt them. However, she had had an ultrasound before and thought it would be fine.

524. Defendant Amin stuck the instrument into Jane Doe #35 and moved it around roughly. It was so painful that she screamed the only English word she could think of: "PAIN!" Defendant Amin laughed. She was scared, because Defendant Amin did not appear to care at all.

525. After the appointment, Jane Doe #35 started experiencing vaginal bleeding because of Defendant Amin's and was in even more pain than she had been in before.

526. Although she was afraid, Jane Doe #35 returned to Defendant Amin for the follow up appointment. Again, the ultrasound was rough and painful. Again, Defendant Amin did not appear to care that she was in pain. Jane Doe #35 continued to experience radiating pain in her arms and legs, as well as swelling and fluid discharge, for months.

527. No one ever explained why Jane Doe #35 was getting these ultrasounds. The medical staff did not speak to her in Spanish, so she had no one to ask.

528. Jane Doe #35 told the ICDC staff how horrible Defendant Amin was, using other detained women as interpreters. The ICDC staff told her that he was the only doctor and that they were not going to get another because she did not like him. Jane Doe #35 explained that Defendant Amin was abusing them.

529. From July 2018 to November 2018, Jane Doe #35's immigration lawyers also repeatedly complained to ICE and ICDC staff, including Defendants Paulk and George, about Defendant Amin and what he did to Jane Doe #35. Defendant George indicated to her attorney that they had heard other complaints about Defendant Amin.

530. After she returned to Mexico, Jane Doe #35 went to a clinic to learn what was wrong. She was still in pain. The doctors at the clinic told her she had a serious infection and began medication to treat it. The doctors also told her that her ovaries would get inflamed easily and prescribed medicine that she was told she will have to take for the rest of her life.

531. Jane Doe #35 suffered a great deal of trauma and became depressed while she was at ICDC. The trauma remains with her. Even today, Jane Doe #35 has difficulty sleeping. She wakes up sweating from recurring nightmares about ICDC.

532. **Jane Doe #26** is a 28-year-old woman from Guyana, who was detained in ICE custody at ICDC. While at ICDC, Jane Doe #26 was a victim of horrific medical abuse and of medically unnecessary and non-consensual procedures at the hands of medical staff ICDC and Defendant Amin.

533. When she arrived at ICDC, Jane Doe #26 told the medical staff that she had an IUD that needed to be removed. But despite numerous oral and written requests, she did not

receive medical treatment for around nine months and had to live with constant discomfort and sharp pain from the IUD.

534.  When the medical staff at ICDC referred her to Defendant Amin, he examined her and told her that she had several cysts on her ovaries, including one that was the size of a golf ball that needed to be drained immediately. He indicated that it would be a simple outpatient procedure.

535.  Yet, on the day of what was supposed to be a simple outpatient procedure, Jane Doe #26 was shackled, put into a transport van and taken to Irwin County Hospital. This was when she discovered she was not going to Defendant Amin's office, but was being taken to have surgery. She had not been told prior to this that surgery was necessary. When she arrived at the hospital, the nurse told her that she was having a dilation and curettage procedure, where the doctor would scrape the inside of her uterus with a metal instrument. This was when she learned what surgery she was having that day.

536.  Jane Doe #26 told the nurse she wanted time to think about the surgery and discuss it with her attorney and her family. The nurse told her that if she delayed the surgery, she would be putting her health at risk because the cyst could burst at any time and cause her severe pain and complications. The nurse also said there was no telling how long ICE would take to approve another surgery. Jane Doe #26 felt pressured into having the surgery. She did not know what would happen if she did not have the surgery. The nurse then gave her forms to sign. When Jane Doe #26 asked for copies, the nurse only gave her a copy of the hospital policy, not the form about the actual surgery.

537.  Jane Doe #26 was confused and concerned about the surgery, and wanted more information, but no one explained what was happening to her or why, despite her

requests for documentation about the procedure she was undergoing. Jane Doe #26 advised the nurse that she was allergic to penicillin despite no one asking. The nurse was relieved because she was about to give Jane Doe #26 something that had penicillin in it.

538. When she woke up from general anesthesia, she was shackled to the bed and her stomach was bandaged. At ICDC, she was not given proper post-surgery care. She had to clean and tend to her wounds herself. When she removed her bandages, she saw that her navel had been removed. Instead of having a navel, her stomach was sunken in. She was crying and scared. She developed an infection and still was not given proper care at ICDC. A doctor had prescribed antibiotics, but ICDC staff would not give them to Jane Doe #26.

539. The medical staff at Irwin retaliated against her for speaking up about needing medical care. When she kept speaking up, the medical staff tried to put her in the medical room, which is akin to solitary confinement, in order to silence her.

540. Several doctors reviewed her medical records. From their reports she learned that the dangerous and invasive surgery Defendant Amin performed was not medically necessary because that the cyst would have resolved itself.

541. She has suffered great emotional hardship as a result of her treatment in detention and her time separated from her young children. Although she has been released, she is still fearful about what ICE officials will do to her for speaking out. But she is committed to speaking out about the inhumane treatment at ICDC and has spoken to Congress, the DOJ, the FBI, and the DHS OIG because she does not want anyone to suffer in the same way she did at the hands of Defendant Amin, ICDC officers, ICE officials.

542. **<u>Jane Doe #24</u>** was detained at ICDC for over a year between 2018 and 2019, before she was deported to Nigeria. After around six months at ICDC, Jane Doe #24 noticed that her periods were getting much shorter in length and that the blood was almost black in color. When she requested medical care, the nurse at ICDC acted as if what she was experiencing was normal.

543. When Jane Doe #24 was finally able to obtain an appointment with an outside OB/GYN, it was with Defendant Amin. He performed a transvaginal ultrasound and told her she had a large cyst in her right ovary. He told her she could have surgery or be on birth control for thirty days to see if the cyst shrinks. She elected birth control. She was taken back to see him before the thirty days had passed and he told her that birth control was not working.

544. After performing several transvaginal ultrasounds on Jane Doe #24, Defendant Amin told her that she had to do surgery. He said that it would involve three incisions and take just fifteen minutes. He told Jane Doe #24 that he would scrape out the cysts and she would be fine. Jane Doe #24 was worried about the surgery because she had not had children yet, but Defendant Amin told her it would be fine.

545. Jane Doe #24 felt very scared because she was having terrible, painful cramping all the time and her periods were not normal. She felt pressured to agree to the surgery right away without having a chance to think about it.

546. She was taken for surgery without any advanced notice. The first time she heard the term "D&C" was at the hospital, where a nurse mentioned it. Jane Doe #24 was confused because she didn't understand how a D&C would take care of her cysts.

547. After the procedure, while she was still experiencing the impact of anesthesia, she was forced up out of bed with no chance to recover from the surgery. As soon as she was up and dressed, she was immediately shackled again and wheeled out.

548. Once she was back at ICDC, she was taken to the medical unit. She could not see anyone and her food was handed to her through a slit in the door. When ICDC needed the space in the medical unit, they forced her to sign a form stating she was voluntarily deciding to leave medical to go back to the dorm. She did not want to sign the form because it was not her choice to leave, but she was pressured to sign it.

549. In the dorm, she was not given proper medical supplies to clean her wounds from the incisions. She had to beg and fight for those medical supplies. Jane Doe #24 also did not receive adequate pain medication after her surgery.

550. Prior to her deportation, Jane Doe #24 did not receive any medication to help prevent infection. When she arrived in Nigeria, she found out that she had a staph infection and a yeast infection.

551. Jane Doe #24 has suffered from severe depression since her detention at ICDC. She attempted suicide after being deported to Nigeria. She also developed colitis after being deported to Nigeria and was very sick for several months. She explains that she became physically ill and lost her will to live because of how she was treated at ICDC. She continues to struggle with severe depression.

552. It is difficult for her to participate in federal investigation of Defendant Amin since being deported.

553. **Jenel Haug** is a 37-year-old citizen of Canada, who was detained at ICDC from approximately October 31, 2019 until March 11, 2020, when she was deported to Canada.

554. Ms. Haug was pregnant when she arrived at ICDC. She had a positive home pregnancy test before being detained. Although she informed Unknown ICDC Officers and Unknown ICE Officials that she was pregnant and had a history of multiple miscarriages and difficult pregnancies, she was denied appropriate care. ICDC officers did not acknowledge that she was pregnant and failed to perform a blood test to check if she was pregnant.

555. Four days after arriving at ICDC, she started spotting and a few days later she started bleeding. She informed medical staff at ICDC that she was having a miscarriage, but they continued to deny that she was ever pregnant. Ms. Haug bled for about two weeks due to the miscarriage and had terrible cramping. After her mother made numerous complaints, she was finally taken to see an OB/GYN, Defendant Amin.

556. Defendant Amin performed a transvaginal ultrasound and internal exam with his hand, which were rough, painful, and forced. Ms. Haug describes it as "the most medical way of being raped you could possibly experience."

557. Defendant Amin told Ms. Haug that she had cysts and endometriosis. Ms. Haug was confused by the diagnosis of endometriosis because she did not have the symptoms described in the information she received about the condition.

558. Defendant Amin initially recommended a Depo shot. Ms. Haug refused the shot, so he prescribed regular birth control pills. ICDC delayed providing Ms. Haug with the prescribed birth control pills.

559. Defendant Amin pressured Ms. Haug to get the Depo shot because he determined that the cysts were not shrinking. Ms. Haug felt she had no choice but to get the shot in order to avoid surgery.

560. During one of the visits, Ms. Haug was bleeding and did not want to have internal procedures done, but Defendant Amin pushed her back on the table and performed them anyway.

561. After two Depo shots, Defendant Amin told Ms. Haug that the cysts had not shrunk and that she needed surgery. He told her she would not have to pay if the surgery was done while she was detained. Although Ms. Haug told him she did not want to have surgery, Defendant Amin told her the next appointment would be for surgery if the cysts did not shrink. Defendant Amin talked about both "D&C" and hysterectomy, saying it would likely be the latter because of the size of the cysts.

562. Ms. Haug was terrified of having a hysterectomy and of not getting enough pain medication after surgery. She had observed other women at ICDC in excruciating pain after surgeries. She knew that pain medication is typically limited to ibuprofen or Tylenol and is commonly delayed.

563. Ms. Haug was sent back to Canada on March 11, 2020. She stayed in contact with some of the women at ICDC who informed her that she had been scheduled for surgery shortly after she left. Ms. Haug was examined by a doctor in Canada, who told her that he did not see any signs of cysts or endometriosis.

564. Ms. Haug experienced several forms of retaliation for complaining about conditions at ICDC. She was placed in lockdown, supposedly as a form of "protective custody," which resulted in her losing her cleaning job that paid $1/day. Worst of all, her daughter,

who was only around 4-months old when Ms. Haug was detained, was put up for adoption after ICDC officers refused to help her make calls to her case manager and children. Defendant George specifically refused to assist her with these calls. Consequently, Child Protective Services decided that she had abandoned her child.

565. When Ms. Haug requested her medical records from ICDC, she received only eight pages. These pages do not include all of the medical appointments.

566. She would like to talk to federal investigators about her experiences at ICDC. She recognizes that cooperating with a federal investigation will be much more difficult now that she has been deported.

567. **Alma Bella Bowman** was detained at ICDC until her release in December 2020. Less than a year before Ms. Bowman's arrival at ICDC, she had been diagnosed with rectocele by two different medical professionals on two separate occasions, both of whom informed her that her condition required surgery. Rectocele is a rectal prolapse into the vagina that can have serious consequences if left untreated.

568. Ms. Bowman's first appointment with Defendant Amin was in May 2018. When she told him about her two previous rectocele diagnoses, one of which occurred only two months prior, he dismissed her completely, telling her that the rectocele was all in her imagination.

569. Despite other health professionals' recommendations for surgery, Defendant Amin provided Ms. Bowman with only a hormonal vaginal cream, which he said would strengthen her vaginal walls. Ms. Bowman used the cream, but her condition did not improve, and the prescription for the cream was never refilled.

570. Ms. Bowman had a second appointment with Defendant Amin a year later in May 2019. During this appointment, she told him that the hormonal cream did not help. Unlike her previous appointment, Defendant Amin this time acknowledged that she had rectocele, but refused to provide her with further treatment.

571. Ms. Bowman became angry with Defendant Amin and began arguing with him while she was still undressed on the examination table. He told her that if she wanted to have sex with her husband, she could "push it down," referring to the bulge that appears in the vaginal wall when an individual has rectocele. Defendant Amin told Ms. Bowman that she did not know what she was talking about and left the room. Defendant Amin then complained about Ms. Bowman to the head nurse at ICDC.

572. After this traumatic experience, Ms. Bowman decided that she would never see Defendant Amin again. She was so distraught by the way that Defendant Amin treated her that she had to see the psychiatrist at ICDC, Dr. Faulk.

573. Ms. Bowman requested her medical records from Defendant Amin's office and was troubled to discover that they were incomplete. Specifically, she noticed that the medical history forms she completed during her second appointment had been replaced by forms she completed during her first appointment.

574. Ms. Bowman remains very disturbed by her experience with Defendant Amin. He ignored Ms. Bowman's cries for help, refused to provide her with medical treatment, and refuted her diagnosis that has been corroborated by four medical professionals to date—the two professionals she saw before her first appointment with Defendant Amin, and two more since.

575. The two medical professionals Ms. Bowman saw after Defendant Amin both diagnosed
her with stage 2-3 rectocele. Defendant Amin's refusal to provide treatment has led to
her condition to become even worse.

576. **Jane Doe # 28** was detained at ICDC from March 4, 2020 until her release on December
7, 2020. Before she was detained, Jane Doe #28 was diagnosed with a tumor on her
uterus. The doctor she saw told Jane Doe #28 that the tumor was not a threat to Jane Doe
#28's health, and the doctor advised Jane Doe #28 that the tumor would disappear with
menopause.

577. While detained at ICDC, Jane Doe #28 noticed that she had a hard lump on her lower
abdomen. She requested medical attention. Jane Doe #28 visited a medical facility and
received a CT scan. When Jane Doe #28 returned to ICDC, a nurse informed her that the
CT scan revealed that she had a tumor and would need to go to another appointment.

578. Jane Doe #28 was sent to Defendant Amin. A female nurse brought Jane Doe #28 to an
exam room. An interpreter was not present in person or over the phone to explain to
Jane Doe #28 what was about to happen. The nurse gestured for Jane Doe #28 to
undress, and Jane Doe #28 obliged. The nurse left and Jane Doe #28 waited alone in the
room, unsure of what was going to occur during this appointment.

579. Defendant Amin began to examine Jane Doe #28 without an interpreter and without
explaining who he was or what he was doing. Defendant Amin turned on a machine and
inserted an instrument inside of Jane Doe #28's vagina. Jane Doe #28 was confused
about what was happening and was in pain throughout the procedure Defendant Amin
performed. Upon information and belief, Defendant Amin performed a transvaginal
ultrasound. After the painful procedure ended, Defendant Amin finally used a Mandarin

interpreter over the phone. The interpreter told Jane Doe #28 that Defendant Amin discovered a tumor in her uterus and that she needed surgery to remove it.

580. Jane Doe #28 was also provided a form which she could not understand because it was written in English. Jane Doe #28 did not understand what the form was for, but the interpreter told Jane Doe #28 that she needed to sign it so that Defendant Amin could perform surgery. Still unclear of what exactly she was agreeing to, Jane Doe #28 signed the form. After meeting with Defendant Amin, Jane Doe #28 was fearful. Her previous gynecologist told her that the tumor was not dangerous. After meeting with Defendant Amin, Jane Doe #28 was scared that the tumor had turned into cancer. Because Defendant Amin did not explain to Jane Doe #28 why surgery was necessary, Jane Doe #28 felt that the tumor must be life-threatening for him to want to remove it.

581. In June of 2020, around 5:00 am, Jane Doe #28 was taken from ICDC to a medical facility for surgery. No one explained to Jane Doe #28 where she was going or what the surgical procedure would entail. When she arrived at the medical facility, Jane Doe #28 saw Defendant Amin at the reception desk, but was unable to communicate with him because no interpreter was present. Jane Doe #28 was guided to a room where she was given anesthesia and underwent surgery by Defendant Amin. Jane Doe #28 was not informed by anyone what surgery was done or what symptoms she may experience in the future because of the surgery. Defendant Amin was not present when Jane Doe #28 woke up from surgery.

582. When Jane Doe #28 returned to ICDC after the surgery, she was in pain for three days. She was not prescribed any medicine to deal with the pain besides a general anti-inflammatory medication. Jane Doe #28 noted that after her surgery, the hard lump in

her abdomen was not gone. Additionally, Jane Doe #28 continued to have irregular menstrual periods over the next few months. Concerned about the hard lump in her abdomen and her irregular periods, Jane Doe #28 requested medical attention again. Despite making a medical request in the middle of November 2020, Jane Doe #28 did not see a medical professional.

583. **Angela Rojas Fañas** was the victim of and witness to medically unnecessary and non-consensual gynecological procedures at ICDC. Shortly before traveling to the United States from the Dominican Republic, Ms. Rojas Fañas visited her gynecologist. At that time, she was told everything was normal.

584. After Ms. Rojas Fañas, arrived in the United States, she was detained by ICE at ICDC for four months. During that time, Unknown ICDC Officers and/or Unknown ICE Officials took her to Defendant Amin's office twice.

585. The first visit was on August 26, 2020. Ms. Rojas Fañas had been feeling pain in her hip and back, so she submitted a request for medical care to ICDC staff. The staff told her she had kidney problems and had to see an outside provider.

586. An Unknown ICDC Officer took Ms. Rojas Fañas to Defendant Amin's office. Defendant Amin entered the room, put on gloves, and proceeded to penetrate Ms. Rojas Fañas's vagina with his hands in a manner that was rough and made Ms. Rojas Fañas feel very uncomfortable. Ms. Rojas Fañas was humiliated. She felt like Defendant Amin treated her as less than fully human.

587. Defendant Amin then spoke to Ms. Rojas Fañas in English, a language she does not understand. No interpreter was present. Defendant Amin called the nurse who spoke some Spanish back into the room. The nurse told Ms. Rojas Fañas that, according to

Defendant Amin, she had fibroids in her uterus as large as avocadoes. The nurse said she

needed surgery as soon as possible to remove the fibroids. She told Ms. Rojas Fañas to

return for the surgery in a week, on September 1, 2020.

588. Ms. Rojas Fañas was scared and confused. Ms. Rojas Fañas told the nurse she did not

want the surgery. The nurse left the room. When she returned, she told Ms. Rojas Fañas

that Defendant Amin recommended an injection to reduce inflammation. The nurse said

that without the injection, the pain she was feeling would become unbearable.

589. Ms. Rojas Fañas received the injection. No one explained the risks or side effects. Ms.

Rojas Fañas did not understand what the injection contained or what it would do to her

body.

590. For weeks after the injection, Ms. Rojas Fañas experienced heavy and abnormal vaginal

bleeding. She felt weak and she felt sharp pain, especially in her hip area. During this

time, she learned of several other women in her unit who were suffering after similar

mistreatment. One woman in her unit was recovering from surgery without pain

medicine. She had to use sanitary napkins to cover the incisions.

591. Concerned and afraid about the ongoing bleeding she was experiencing, Ms. Rojas

Fañas sought out ICDC medical staff several times but to no avail. As her condition

persisted and her desperation grew, when Ms. Rojas Fañas visited ICDC medical staff a

third time, she was told she would have to see an outside provider.

592. On September 14, 2020, news reports of Defendant Amin's abuses broke. Two days

later, Unknown ICDC Officers and/or Unknown ICE Officials told Ms. Rojas Fañas she

was being taken to a doctor outside ICDC. Ms. Rojas Fañas feared the officers and/or

officials would take her to Defendant Amin. She feared being left alone in a room with Defendant Amin. She feared that Defendant Amin would hurt her again.

593. Unknown ICDC Officers and/or Unknown ICE Officials did, in fact, take her to Defendant Amin, who performed a pelvic ultrasound. The nurse told her she did not have fibroids anymore and did not need surgery. The nurse said the bleeding was normal.

594. After these revelations, Ms. Rojas Fañas talked with several other women who had survived Defendant Amin's abuses and explored speaking out more broadly. She saw two outspoken women removed from her unit, and heard they were placed in solitary confinement. ICDC officers changed the television channel from Spanish-language news to English-language stations. Ms. Rojas Fañas began noticing that the temperature in the unit was lowered to the point that it kept her from sleeping.

595. Ms. Rojas Fañas was deported to the Dominican Republic in late October 2020. In mid-November 2020, she visited a gynecologist who performed an ultrasound and ordered bloodwork. The gynecologist diagnosed Ms. Rojas Fañas with a kidney infection. The doctor said the infection was probably caused by the abnormal bleeding. The doctor said the abnormal bleeding could have been caused by a birth control injection. The doctor did not detect any large fibroids. Ms. Rojas Fañas is still awaiting the results of a biopsy.

596. **Jane Doe #32** is a 36-year-old woman, who was detained in ICE custody at ICDC before her deportation to Senegal. She has suffered extraordinary mental pain and trauma due to her treatment by Defendant Amin, ICDC officers, and ICE officials.

597. Jane Doe #32's scar from her two C-sections burst while she was at ICDC. She was in tremendous pain, but the medical staff and ICDC officers refused to help her. Despite

repeated requests for medical care for the scar, the medical staff at ICDC ignored her. When she spoke up and insisted that she was in pain, the medical staff threatened to put her in solitary confinement and accused her of lying.

598. Unknown ICDC Officers and/or Unknown ICE Officials handcuffed Jane Doe #32 when they finally took her to a gynecologist. The doctor performed an exam, but never told her what was wrong or what he was doing. Although she does not know his name, he had an accent like hers. She asked for her records to find out what the diagnosis was, but the facility refused to give them to her, despite repeated requests.

599. On information and belief, the doctor who performed the exam on Jane Doe #32 was Defendant Amin.

600. Jane Doe #32 is prepared to testify before Congress and to speak with officials investigating these abuses at ICDC.IC She is committed to making her voice heard, to holding ICDC officers and ICE officials accountable for the pain and suffering they caused her and so many other women.

## XII.   The Federal Government's Inter-Governmental Agreement with Irwin County and ICE's Detention Standards

### A.      Inter-Governmental Agreement Between Federal Government and Irwin County

601. In 2007, the United States Marshals Service entered into an Intergovernmental Agreement ("IGA") with Irwin County, Georgia allowing "three (3) Federal Government components, specifically, the United States Marshals Service (USMS) and the Federal Bureau of Prisons (BOP) of the Department of Justice (DOJ); and the United States Immigration and Customs Enforcement (ICE) of the Department of Homeland

Security (DHS), to house federal detainees with the Local Government at the Irwin
County Detention Center."[38]

602. In exchange for payment on a per-detainee per-diem basis, Irwin County ensures the
daily operation of the detention center.

603. The IGA requires Irwin County to, among other things, "accept and provide for the
secure custody, safekeeping, housing, subsistence and care of federal detainees in
accordance with state and local laws, standards and procedures, or court orders
applicable to the operations of the facility, consistent with federal law, policies and
regulations."

604. The IGA also requires that "where ICE federal detainees are housed, the ICE federal
detainees are to be housed in accordance with ICE standards."

605. ICE maintains an active supervisory role over the medical care provided to detainees at
ICDC under the IGA. The IGA requires Irwin County to allow ICE to inspect the
facility for compliance with its National Detention Standards.

606. The IGA requires Irwin County to provide "all medical treatment provided to federal
detainees within the facility," but Irwin County must seek approval from ICE for all
requests for treatment to be provided outside the facility.

607. The ICE Health Service Corps (IHSC) approves and denies all non-emergency off-site
medical care requests for detained individuals, and tracks costs and amounts paid for
off-site care. The majority of such requests are adjudicated by IHSC Field Medical

---

[38] *See* U.S. Gov't Accountability Off., GAO-16-231, Immigration Detention: Additional Actions Needed to
Strengthen Management and Oversight of Detainee Medical Care 17–18 (2016), https://www.gao.gov/assets/gao-16-
231.pdf.

Coordinators. In cases involving surgical procedures, such requests are adjudicated by an IHSC Regional Clinical Director or Regional Dentist.[39]

608. The IGA also requires Irwin County to report all medical emergencies to ICE.

609. Irwin County is required under the IGA to obtain the express written consent of the federal government before contracting out the overall management and operation of the facility.

610. On information and belief, Irwin County obtained the requisite approval from the federal government and executed an agreement for the operation of the facility to a private for-profit company, Defendant LaSalle.

611. Defendant ICE contracts with Irwin County, which in turn contracts with Defendant LaSalle, for the operation of the detention facility. Thus, Defendants ICDC, LaSalle, and their employees, agents, contractors, and/or officers are state or local actors and subject to suit under 42 U.S.C. § 1983,[40] independent of whether they may also be considered federal actors because they are engaging in the core federal function of civil immigration detention.

612. Private physicians, such as Defendant Amin, are subject to liability under § 1983 because they are authorized to provide medical services to detained individuals, and therefore act under color of state law when treating individuals who are detained.[41]

613. As the prison warden, Defendant Paulk can also be held liable under § 1983.[42]

---

[39] *See* United States Government Accountability Office, Immigration Detention: Additional Actions Needed to Strengthen Management and Oversight of Detainee Medical Care (Feb. 2016), at 17-18, available at https://www.gao.gov/assets/gao-16-231.pdf.

[40] *See Richardson v. McKnight*, 521 U.S. 399, 412-13 (1997).

[41] *West v. Atkins*, 487 U.S. 42 (1988).

[42] *Miller v. King*, 384 F.3d 1248 (11th Cir. 2004).

614. Irwin County Defendants, including Irwin County Hospital, are also subject to suit

pursuant to 42 U.S.C. § 1983 under a theory of municipal liability.[43] Municipal liability

under § 1983 arises where the municipality has undertaken an official policy or custom

which causes an unconstitutional deprivation of plaintiffs' rights.[44]

### B.   ICE's Performance-Based National Detention Standards and ICE's Oversight Role

615. The Performance-Based National Detention Standards ("PBNDS") apply to all ICE-

dedicated civil detention facilities, including ICDC.

616. The PBNDS set forth mandatory requirements for conditions inside detention facilities,

including for medical care, to which a facility and ICE are bound.

617. The PBNDS 2008[45] applies to ICDC pursuant to the IGA.

618. Private contractors are also subject to, and required to follow, the PBNDS.

619. Federal Defendants have failed to ensure that Irwin County Defendants follow the

PBNDS mandates for providing medical care.

620. The medical care standards require that every facility provide initial medical, mental

health and dental screening, medically necessary and appropriate medical, dental and

mental health care and pharmaceutical services, comprehensive, routine and

preventative health care, as medically indicated, emergency care, specialty health care,

timely responses to medical complaints, and hospitalization as needed within the local

---

[43] *See Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 694-95 (1978).

[44] *Id.*

[45] *See* Immigr. & Customs Enf't, *ICE/DRO Detention Standard: Medical Care* (2008), https://www.ice.gov/doclib/dro/detention-standards/pdf/medical_care.pdf.

community.[46] The PBNDS also provide specific instructions for how to meet these requirements.

621. The PBNDS medical care standards specifically provide that "[h]ealth care needs will be met in a timely and efficient manner."[47] Accordingly, "[e]very facility shall directly or contractually provide its detainee population [with] . . . [t]imely responses."[48]

622. More specifically, the PBNDS medical care standards provide that: "Each facility shall have a sick call procedure that allows detainees the unrestricted opportunity to freely request health care services . . . provided by a physician or other qualified medical staff in a clinical setting." "All detainees . . . shall have access to sick call." The sick-call procedures "shall include . . . an established procedure in place to ensure that all sick call requests are received and triaged by appropriate medical personnel within 48 hours after the detainee submits the request. In an urgent situation, the housing unit officer shall notify medical personnel immediately."[49]

623. The PBNDS further specify that "[a] detainee who needs health care beyond facility resources will be transferred in a timely manner to an appropriate facility where care is available. A written list of referral sources, including emergency and routine care, will be maintained as necessary and updated at minimum annually."[50]

---

[46] *Id.* at 4.
[47] *Id.* at 1.
[48] *Id.* at 4.
[49] *Id.* at 16.
[50] *Id.* at 1.

624. Under the PBNDS, "[d]etainees with chronic conditions will receive care and treatment for conditions where non-treatment would result in negative outcomes or permanent disability as determined by the clinical medical authority."[51]

625. The PBNDS requires that detention and medical care personnel are adequately trained and licensed; and has specific requirements for treatment and care of those with suspected or known mental health concerns.

626. The PBNDS also include detailed procedures requiring informed consent for any medical treatment. They explicitly state that "[a]s a rule, medical treatment shall not be administered against a detainee's will." Further, "[i]nvoluntary treatment is a decision made only by medical staff under strict legal restrictions. Prior to any contemplated action involving involuntary medical treatment, DHS/ICE respective Chief Counsel will be consulted."[52]

627. Under the PBNDS, the facility is obligated to provide communication assistance to individuals who are limited in their English proficiency. The standards provide that: "Non-English speaking detainees and/or detainees who are deaf and/or hard of hearing will be provided interpretation or translation services or other assistance as needed for medical care activities."[53]

628. Finally, the PBNDS requires the designated administrative health authority, who is "authorized and responsible for making decisions about the deployment of health resources and the day-to-day operations of the health services program," to "implement

---

[51] *Id.* at 2.

[52] *Id.* at 19.

[53] *Id.* at 3.

a system of internal review and quality assurance" which includes "[s]ystematic

investigation of complaints and grievances."[54]

629. ICE is charged with overseeing ICDC's compliance with the PBNDS. ICE uses various

mechanisms to oversee medical care at facilities, including periodic inspections, site

visits by Field Medical Coordinators, audits by IHSC, monitoring by on-site ICE

Detention Service Managers.[55]

630. Detention Service Managers work with the Field Medical Coordinators at IGA facilities,

such as ICDC, to resolve medical-related issues.

631. ICE IHSC is also charged with receiving and investigating complaints from detained

individuals regarding medical care. IHSC is "ultimately responsible for addressing

medical-care-related complaints" made to ICE.[56]

632. Plaintiffs were subjected to non-consensual, medically unindicated, or invasive

gynecological procedures while they were detained in ICE custody at ICDC. Plaintiffs

did not receive adequate or timely care as required by the PBNDS.

633. Despite their knowledge of Defendant Amin's abuses, Federal Defendants continued to

approve off-site medical visits for detained individuals to Defendant Amin.

634. Federal Defendants failed to ensure that Irwin County Defendants provided appropriate

medical care as required by the PBNDS.

635. Federal Defendants failed to ensure that ICDC administered medical treatment only with

informed consent.

---

[54] *Id.* at 3, 22.

[55] *See* U.S. Gov't Accountability Off., Immigration Detention: Additional Actions Needed to Strengthen
Management and Oversight of Detainee Medical Care 21-24 (2016), https://www.gao.gov/assets/gao-16-231.pdf .

[56] *Id.* at 35.

636. Federal Defendants failed to ensure that ICDC provided language accessibility to non-English speakers, including Plaintiff Solodkova and putative class members Xu, Rojas Fañas, and Jane Doe #25, while receiving medical care.

## CLASS ACTION ALLEGATIONS

637. Plaintiffs bring the First, Second, Third, Fourth, Fifth, Sixth, Eighth, Ninth, Eleventh, Twelfth, Thirteenth, Fourteenth, Sixteenth, Seventeenth, and Twenty-Third Claims for Relief, set forth below, pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of themselves and all other persons similarly situated.

638. Plaintiffs Oldaker, Solodkova, Walker, Silas, Floriano Navarro, Ndonga, Ramirez, Cajigal, Binam, and Jane Does ## 5, 6, 8, 15, 22, and 25 seek to represent a class of individuals held in ICE custody at ICDC who were subjected to Defendant Amin's medical abuses, as well as (1) a sub-class of individuals who were subjected to gynecological procedures without prior disclosure of their nature, purpose, risks, or alternatives and (2) a subclass of individuals who were subjected to medically unindicated gynecological procedures.

639. Plaintiffs Oldaker, Solodkova, Walker, Silas, Floriano Navarro, Ndonga, Ramirez, Cajigal, Binam, and Jane Does ## 5, 6, 8, 15, and 22 seek to represent a class of individuals who were retaliated against for speaking out against Defendant Amin's abuses, making known they were willing to speak out, and/or being publicly identified as victims and witnesses of the abuses.

640. The proposed "Medical Abuse Class" is defined as:

> All individuals who were subjected to gynecological procedures by Dr. Mahendra Amin after July 13, 2013, while they were in U.S. Immigration and Customs Enforcement custody at the Irwin County Detention Center.

641. The proposed "Consent Sub-Class" is defined as:

> All individuals who were subjected to gynecological procedures by Dr. Mahendra Amin without prior disclosure of their nature, purpose, risks, or alternatives after July 13, 2013, and while they were in U.S. Immigration and Customs Enforcement custody at the Irwin County Detention Center.

642. The proposed "Unnecessary Procedures Sub-Class" is defined as:

> All individuals who were subjected to medically unindicated gynecological procedures by Dr. Mahendra Amin after July 13, 2013, and while they were in U.S. Immigration and Customs Enforcement custody at the Irwin County Detention Center.

643. The proposed "Retaliation Class" is defined as:

> All individuals who were subject to retaliation by Federal and/or ICDC Defendants after speaking out about, protesting, making known they were willing to speak out about, and/or being publicly identified as victims or witnesses of non-consensual and/or medically unindicated gynecological procedures performed by Dr. Mahendra Amin while they were detained in U.S. Immigration and Customs Enforcement custody at the Irwin County Detention Center.

644. The Medical Abuse Class, Consent Sub-Class, Unnecessary Procedures Sub-Class[57], and Retaliation Class are so numerous that joinder of all members is impracticable. There are at least 60 individuals who are members of the Medical Abuse Class, Consent Sub-Class, and Unnecessary Procedures Sub-Class.[58] Given the rampant, systematic retaliation against Plaintiffs and putative class members, many of the at least 60 individuals are also members of the Retaliation Class. Several members of the Medical

---

[57] The Medical Abuse Class, Consent Sub-Class, and Unnecessary Procedures Sub-Class will at times be referred to collectively as the "Medical Abuse Class and Sub-Classes."

[58] John Washington & José Olivares, *Number of Women Alleging Misconduct by ICE Gynecologist Nearly Triples*, The Intercept (Oct. 27, 2020), https://theintercept.com/2020/10/27/ice-irwin-women-hysterectomies-senate/.

126

Abuse Class and Sub-Classes and of the Retaliation Class have been deported and are geographically dispersed, and several are subject to imminent deportation. Joinder of class members is impracticable due to their geographic diversity, the instability of their living situations, and limited understanding of English and the laws of the United States.

645. There are questions of law and fact that are common to all members of the Medical Abuse Class, Consent Sub-Class, Unnecessary Procedures Sub-Class, and Retaliation Class. The proposed Medical Abuse Class members allege common harms, including denial of reasonable safety and adequate medical care; exposure to punitive conditions of confinement; and deliberate indifference to their serious medical needs. The proposed Consent Sub-Class members allege the common harm of being subjected to medical procedures without their informed consent. The proposed Unnecessary Procedures Sub-Class members allege the common harm of being subjected to medically unnecessary procedures, resulting in physical and mental pain and suffering.

646. The Retaliation Class members also allege common harms, including deterrence from participation in pending federal proceedings, subjection to imminent removal as a result of speaking out about medical abuses, and retaliation spawned by speaking out about abuses and conditions or their attendance or testimony in federal court. Defendants' actions deterred them from bringing forward credible allegations of that abuse. All proposed Medical Abuse Class, Consent Sub-Class, and Unnecessary Procedures Sub-Class members raise the same legal claims under the Due Process Clause of the Fifth and Fourteenth Amendments, and all proposed Retaliation Class members raise the same legal claims under the First Amendment and 42 U.S.C. § 1985(2). The proposed class members' entitlement to these rights is based on a common core of facts. All

proposed Medical Abuse Class, Consent Sub-Class, and Unnecessary Procedures Sub-Class members were detained by ICE at ICDC when they were subjected to non-consensual, medically unindicated, or invasive gynecological procedures. Retaliation Class members were subjected to retaliation as a result of coming forward with their stories and experiences of medical abuse at ICDC. Their shared common facts will ensure that judicial findings regarding the legality of the challenged practices will be the same for all class members.

647. Plaintiffs' claims are typical of the claims of the proposed Medical Abuse Class, Consent Sub-Class, Unnecessary Procedures Sub-Class, and Retaliation Class. Plaintiffs and proposed Medical Abuse Class and Subclass members raise common legal claims and are united in their interest and injury. Plaintiffs, like proposed Medical Abuse Class and Subclass members, are currently or were formerly detained at ICDC, where they were subjected to non-consensual, medically unindicated, or invasive gynecological procedures while in ICE custody at ICDC and were unlawfully deprived of their rights under the Due Process Clause of the U.S. Constitution. Plaintiffs, like proposed Retaliation Class members, also raised common legal claims and are united in their interest and injury as they all were also subjected to retaliation by ICE and ICDC Defendants as a result of speaking out about the medical abuses occurring at ICDC and were unlawfully deprived of their rights under the First Amendment and 42 U.S.C. § 1985(2). As a result, they are all victims of the same, unlawful course of conduct.

648. Plaintiffs Oldaker, Solodkova, Walker, Silas, Floriano Navarro, Ndonga, Ramirez, Cajigal, Binam, and Jane Does ## 5, 6, 8, 15, 22, and 25 are adequate class representatives. Plaintiffs seek relief on behalf of the proposed Medical Abuse Class,

Consent Sub-Class, Unnecessary Procedures Sub-Class, and Retaliation Class as a whole and have no interests antagonistic to other members of the Medical Abuse Class or Retaliation Class. Plaintiffs' mutual goal is to declare Defendants' actions unlawful and to obtain damages that would cure the harm Defendants have caused. Plaintiffs seek a remedy for the same injuries as the proposed Medical Abuse Class, Consent Sub-Class, Unnecessary Procedures Subclass, and Retaliation Class members, and all share an interest in having their rights vindicated. Thus, the interests of Plaintiffs and the proposed Medical Abuse Class, Consent Sub-Class, Unnecessary Procedures Subclass, and Retaliation Class members are aligned.

649. Plaintiffs are represented by attorneys from the National Immigration Project of the National Lawyers Guild, Columbia Law School Immigrants' Rights Clinic, Dreyer Sterling, LLC, and other undersigned counsel. Counsel have a demonstrated commitment to protecting the rights and interests of noncitizens and, together, have considerable experience in handling complex and class action litigation in the immigration field. Counsel have represented numerous classes of immigrants and other victims of government misconduct in actions in which they successfully obtained class relief.

650. The aforementioned common questions of law and fact predominate over questions affecting only individual members. The issues in this action are subject to generalized proof and thus applicable to the proposed Classes as a whole. Plaintiffs and proposed Medical Abuse Class and Sub-Class members were all subjected to the same or similar abusive procedures while in ICE custody at ICDC, and Retaliation Class members were further subjected to unlawful retaliation. While the suit may entail certain individual

questions, a single common question overrides any remaining individual question for each of the classes. For the Medical Abuse Class: whether the non-consensual and/or medically unindicated gynecological procedures that Plaintiffs and proposed Medical Abuse Class members were subjected to and the failure to provide them with adequate medical care violated their rights under the Due Process Clause of the Fifth and Fourteenth Amendments. For the Consent Sub-Class: whether Sub-Class Members were effectively informed alternatives to, or the nature, risks, or purpose of, medical treatments given them while detained at ICDC. For the Unnecessary Procedures Sub-Class: whether Sub-Class Members underwent unnecessary medical procedures resulting in harm. And, for the Retaliation Class: whether the subsequent actions by Defendants to deter and retaliate against them for attending or testifying in court or speaking out about the abuse they experienced at ICDC violated their rights under the First Amendment and 42 U.S.C. § 1985(2).

651. For a fair and efficient adjudication of this controversy, a class action is superior to other available methods. Absent a class action, it is unlikely that potential claimants would be afforded relief due to the vulnerable nature of Plaintiffs and proposed class members. Plaintiffs and proposed class members are noncitizens who were formerly detained at ICDC, are geographically dispersed, have limited understanding of the law, and some have limited English language skills. Proposed class members therefore face numerous barriers to bringing suits. Given the number of individuals who have been subjected to non-consensual, medically unindicated, and/or invasive gynecological procedures at ICDC and the number who have been retaliated against as a result of speaking out about the medical abuse at ICDC, aggregation of Plaintiffs' and proposed class members'

claims would promote efficiency, enable faster processing of their claims, and avoid

duplication of litigation. Consolidation is preferable to individual actions in this case due

to this judicial district's connection to the conduct giving rise to the claims. Because

Plaintiffs' common questions of fact and law predominate over individual questions,

resolution of the underlying issues in a class action would create fewer management

issues than any of the alternatives.

## CLAIMS FOR RELIEF[59]

### FIRST CLAIM FOR RELIEF
**Violation of the First Amendment Against Federal Defendants (Retaliation)**

For Declaratory and Injunctive Relief
On Behalf of Plaintiffs Against Federal Defendants in Their Official Capacities

For Damages under *Bivens*
On Behalf of Plaintiffs and Retaliation Class Members Against Defendants Giles, Musante,
Ciprian, Rivera, and Unknown ICE Officials ##1-X in Their Individual Capacities

652.  Plaintiffs repeat and re-allege the allegations contained in the preceding paragraphs of

this Petition as if fully set forth herein.

653.  Plaintiffs engaged in constitutionally protected speech and engaged in their

constitutionally protected right to petition the government for the redress of grievances

related to their medical abuse. When testifying to federal investigators and speaking to

---

[59]As defined in the Parties section:
- "FTCA Plaintiffs" refers to Plaintiffs Oldaker, Solodkova, Walker, Silas, Navarro, Ndonga, Ramirez, Cajigal, and Jane Does ## 5, 6, 8, 15 and 22;
- "Federal Defendants" refers to Defendants Jarvis McMiller, Thomas Giles, Tae Johnson, Alejandro Mayorkas, Merrick Garland, ICE, Patrick Musante, Cesar Ciprian, Ada Rivera, and Unknown ICE officials ##1-X;
- "ICDC Defendants" refers to Defendants ICDC, LaSalle, David Paulk, Marteka George, Mia Mines, William Rabiou, FNU Hughes, FNU Smith, FNU Coney, FNU Hanes, FNU Faison, FNU Battle, FNU Vaughn, FNU Scott, FNU Slack, and Unknown ICDC Officers ##1-X;
- "Irwin Medical Defendants" refers to Irwin County Hospital and Mahendra Amin;
- "Irwin County Defendants" refers to all ICDC Defendants, Irwin County Hospital, and Mahendra Amin.

the press about their medical abuse, Plaintiffs were engaging in First Amendment

protected speech and petitioning.

654. Further, Plaintiffs' speech about the medical abuse they suffered immediately became a

matter of prominent public concern. Congress investigated their medical abuse, and the

press widely reported on it.  It is therefore entitled to the highest level of protection

under the First Amendment.

655. Plaintiffs also engaged in their constitutionally protected right to "petition the

government for a redress of grievances." *Stallworth v. Wilkins*, 802 F. App'x 435, 440

(11th Cir. 2020) (quoting *Boxer X v. Harris*, 437 F.3d 1107, 1112 (11th Cir. 2006)). The

freedom to petition protects detained individuals' rights to file a grievance and a

complaint and to participate fully during the duration of a lawsuit. Here, it protects

Plaintiffs' participation in the federal investigations.

656. Plaintiffs suffered threats and adverse actions that would likely deter a person of

ordinary firmness from engaging in such speech. Specifically, Federal Defendants

deported or attempted to deport Plaintiffs. They also used, or threatened to use, force,

solitary confinement, and denial of privileges against Plaintiffs. Outside of deportation

or attempted deportation, the use of force, solitary confinement, and the denial of

privileges also constitute adverse action under the First Amendment. Not only were

these actions likely to deter speech, they actually did.

657. There is a substantial causal connection between Plaintiffs' protected speech and Federal

Defendants' adverse actions and threats. Plaintiffs' speech was a substantial or

motivating factor for Defendants' retaliatory actions. For example, Federal Defendants

deported or attempted to deport several Plaintiffs and putative class members almost

immediately following federal investigators' receipt of their names as witnesses. Federal Defendants have also undertaken a broader pattern and practice of retaliatory deportations of other victims and witnesses. Federal Defendants retaliated against Plaintiffs because they are, specifically, victims of and witnesses against the Federal Defendants and will state so accordingly.

658. Federal Defendants' retaliatory actions caused and will continue to cause irreparable harm by chilling Plaintiffs' exercise of their free speech rights.

659. Federal Defendants' retaliatory actions and threats caused actual injury to Plaintiffs, including physical and/or psychological harm.

660. Federal Defendants acted in clear violation of well-settled law, which reasonable persons would have been aware of, with regard to the standards for retaliation in violation of the First Amendment's right to free speech and right to petition.

661. Plaintiffs and Retaliation Class Members seek, and are entitled to, damages against Federal Defendants Giles, Musante, Ciprian, Rivera, and Unknown ICE Officials ##1-X in their individual capacities, pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971).

662. Plaintiffs seek, and are entitled to, declaratory and injunctive relief against Federal Defendants, finding their actions in violation of the First Amendment and compelling all Federal Defendants to cease retaliating against Plaintiffs for their First Amendment protected conduct.

**SECOND CLAIM FOR RELIEF**
**Violation of the First/Fourteenth Amendment (Retaliation under 42 U.S.C. § 1983)**

For Declaratory Relief
On Behalf of Plaintiffs Against ICDC Defendants in Their Official Capacities

For Damages
On Behalf of Plaintiffs and Retaliation Class Members Against ICDC Defendants in Their
Official and Individual Capacities

663. Plaintiffs repeat and re-allege the allegations contained in the preceding paragraphs of this Petition as if fully set forth herein.

664. Because Defendant ICE contracted with Irwin County, which in turn contracted with Defendant LaSalle, for the operation of the detention facility up until October 7, 2021, Defendants ICDC, LaSalle, and their employees, agents, and/or contractors were state or local actors and subject to suit under 42 U.S.C. § 1983, independent of whether they may also be considered federal actors because they had engaged in the core federal function of civil immigration detention.

665. Liability under § 1983 extends to private physicians, including Defendant Amin, who are authorized to provide medical services to prisoners, as well the warden of a state or local detention facility or prison.

666. ICDC deprived Plaintiffs of their federal rights under the First Amendment, which has been incorporated to states and localities by the Fourteenth Amendment's Due Process Clause.

667. Plaintiffs engaged in constitutionally protected speech and engaged in their constitutionally protected right to petition the government for the redress of grievances.

668. When testifying to federal investigators and speaking to the press, Plaintiffs were engaging in First Amendment protected speech and petitioning.

669. Further, Plaintiffs' speech pertains to matters of prominent public concern. It is therefore entitled to the highest level of protection under the First Amendment.

670. Plaintiffs also engaged in their constitutionally protected right to petition the government for a redress of grievances. Specifically, the freedom to petition protects detained individuals' rights to file a grievance complaint and participate fully during the duration of a lawsuit.

671. ICDC Defendants have taken egregious adverse actions against Plaintiffs and Retaliation Class Members sufficient to trigger First Amendment protections.

672. These actions include but are not limited to, placing or threatening to place them in medical units or solitary confinement; placing them on cell restriction; transferring them to other units to separate protestors; physically assaulting them, including while handcuffed; threatening to deprive hunger strikers and protestors of property and commissary; threatening to shut off or ration water; withholding their food; delaying delivery of their prescribed medication; denying them access to the law library; denying them internet access; limiting or denying them phone access; monitoring their phone calls and abruptly ending their calls when discussing hunger strikes, medical treatment, or when speaking with reporters; destroying their letters documenting treatment; refusing to produce individuals at hearings related to Defendant Amin's abuses; refusing to coordinate with consular officials; and making false claims to congressional investigators.

673. There is a substantial causal connection between Plaintiffs' protected speech and ICDC Defendants' adverse actions and threats. ICDC, LaSalle, their employees, agents, and/or contractors have undertaken a pattern and practice of retaliation against victims and

witnesses of Defendant Amin's abuses. This pattern and practice demonstrate that ICDC Defendants retaliated against Plaintiffs because they are, specifically, victims of and witnesses against the ICDC Defendants.

674. ICDC Defendants' retaliatory actions and threats caused actual injury to Plaintiffs, including physical and/or psychological harm.

675. ICDC Defendants' retaliatory actions caused irreparable harm by chilling Plaintiffs' exercise of their free speech rights.

676. ICDC Defendants are also subject to suit pursuant to 42 U.S.C. § 1983 under a theory of municipal liability. Municipal liability under § 1983 arises where the municipality has undertaken an official policy or custom which causes an unconstitutional deprivation of the plaintiff's rights.[60]

677. ICDC had a policy or custom of retaliating against individuals who speak out about the deplorable conditions inside the facility, including medical abuse and neglect, and this policy or custom caused Plaintiffs' and proposed subclass members injury.

678. ICDC Defendants also failed to properly train their employees and staff regarding retaliation against individuals who report unlawful conditions and abuse.

679. ICDC Defendants are liable to Plaintiffs for declaratory relief resulting from their retaliation and violations of constitutional rights.

680. ICDC Defendants are liable to Plaintiffs and Retaliation Class Members for all damages resulting from their retaliation and violations of constitutional rights.

---

[60] *See Monell*, *supra* note 43.

681. ICDC Defendants, in their individual capacities, were motivated by evil motive or intent and/or acted with callous or reckless indifference to the federally protected rights of Plaintiffs.

682. Plaintiffs and Retaliation Class Members seek, and are entitled to, actual and punitive damages against ICDC Defendants in their official and individual capacities for violations of their First Amendment rights.

683. Plaintiffs seek, and are entitled to, declaratory relief against ICDC Defendants in their official capacities, finding their actions in violation of the First Amendment.

**THIRD CLAIM FOR RELIEF**
**Violation of First Amendment (alternative claim under *Bivens*)**

For Declaratory Relief
On Behalf of Plaintiffs Against ICDC Defendants in Their Official Capacities

For Damages under *Bivens*
On Behalf of Plaintiffs and Retaliation Class Members Against Defendants Paulk, Amin, George, Mines, Rabiou, Hughes, Smith, Coney, Hanes, Faison, Battle, Vaughn, Scott, Slack, and Unknown ICDC Officers ##1-X in Their Individual Capacities

684. Plaintiffs repeat and re-allege the allegations contained in the preceding paragraphs of this Petition as if fully set forth herein.

685. This claim is brought in the alternative to Count Three. If the Court finds that the ICDC Defendants were operating solely under color of federal law, ICDC Defendants are liable for declaratory relief under the First Amendment, and Defendants Paulk, Amin, Mines, Rabiou, Hughes, Smith, Coney, Hanes, Faison, Battle, Vaughn, and Unknown ICDC Officers ##1-X are liable for damages under the First Amendment. *See Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971).

686. Plaintiffs engaged in constitutionally protected speech and engaged in their constitutionally protected right to petition the government for the redress of grievances.

When testifying or offering to testify to federal investigators and speaking to the press, Plaintiffs were engaging in First Amendment protected speech and petitioning.

687. Further, Plaintiffs' speech pertains to matters of prominent public concern. It is therefore entitled to the highest level of protection under the First Amendment.

688. Plaintiffs also engaged in their constitutionally protected right to petition the government for a redress of grievances. Specifically, the freedom to petition protects detained individuals' rights to file a grievance complaint and participate fully during the duration of a lawsuit. Here, it protects Plaintiffs' participation in the federal investigations.

689. ICDC Defendants have taken egregious adverse actions against Plaintiffs and Retaliation Class Members sufficient to trigger First Amendment protections. These actions include but are not limited to placing them in medical units or solitary confinement, or threatening to do so; placing them on cell restriction; transferring them to other units to separate protestors; physically assaulting them, including while handcuffed; threatening to deprive hunger strikers and protestors of property and commissary; threatening to shut off or ration water; withholding their food; delaying delivery of their prescribed medication; denying them access to the law library; denying them internet access; limiting or denying them phone access; monitoring their phone calls and abruptly ending their calls when discussing hunger strikes, medical treatment, or when speaking with reporters; destroying their letters documenting treatment; refusing to produce individuals at hearings related to Defendant Amin's abuses; refusing to coordinate with consular officials; and making false claims to congressional investigators.

690. There is a substantial causal connection between Plaintiffs' protected speech and Defendants' adverse actions and threats. ICDC, LaSalle and their employees, agents, and/or contractors have undertaken a pattern and practice of retaliation against victims and witnesses of Defendant Amin's abuses. This pattern and practice demonstrates that ICDC Defendants are retaliating against Plaintiffs because they are, specifically, victims of and witnesses against the ICDC Defendants.

691. ICDC Defendants' adverse actions and threats caused actual injury to Plaintiffs, including physical and/or psychological harm.

692. ICDC Defendants' adverse actions caused and will continue to cause irreparable harm by chilling Plaintiffs' exercise of their free speech rights.

693. ICDC Defendants are liable to Plaintiffs for declaratory relief resulting from their retaliation and violations of constitutional rights.

694. Should this Court hold that ICDC Defendants were acting under color of federal authority, Plaintiffs and proposed Class Members would have no available statutory cause of action which would provide a meaningful remedy. *See Carlson v. Green*, 446 U.S. 14, 23 (1980).

695. Should this Court hold that ICDC Defendants were acting under color of federal authority, Plaintiffs and Retaliation Class Members seek, and would be entitled to, damages against individual ICDC Defendants Paulk, Amin, George, Mines, Rabiou, Hughes, Smith, Coney, Hanes, Faison, Battle, Vaughn, Scott, Slack, and Unknown ICDC Officers ##1-X in their individual capacities, pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971).

696. Should this Court hold that ICDC Defendants were acting under color of federal authority, Plaintiffs also seek, and would be entitled to, declaratory relief against ICDC Defendants in their official capacities.

**FOURTH CLAIM FOR RELIEF**
**Violation of the Fifth Amendment (Punitive Conditions of Confinement and Deliberate Indifference against Federal Defendants)**

For Declaratory Relief
On Behalf of Plaintiffs Against Federal Defendants in Their Official Capacities

For Damages under *Bivens*
On Behalf of Plaintiffs, Medical Abuse Class Members, Consent Sub-Class Members, and Unnecessary Procedures Sub-Class Members Against Defendants Giles, Musante, Ciprian, Rivera, and Unknown ICE Officials #1-X in Their Individual Capacities

697. Plaintiffs repeat and re-allege the allegations contained in the preceding paragraphs of this Petition as if fully set forth herein.

698. The Due Process Clause guarantees persons in civil immigration detention the right to reasonable safety and to be free from punitive conditions of confinement. The government violates the right to substantive due process under the Fifth Amendment when it fails to satisfy its affirmative duty to provide conditions of confinement of reasonable health and safety to the people it holds in its custody, and therefore violates the Constitution when it fails to provide for their basic human needs—*e.g.*, food, clothing, shelter, medical care, and reasonable safety for those in custody. *See DeShaney v. Winnebago Cty. Dep't. of Soc. Servs.*, 489 U.S. 189, 199-200 (1989); *Helling v. McKinney*, 509 U.S. 25, 32 (1993).

699. Individuals in civil detention are afforded "more constitutional protection, more considerate treatment, and conditions of confinement" than individuals with criminal convictions "whose conditions of confinement are designed to punish." *Youngberg v.*

*Romeo*, 457 U.S. 307, 321-22 (1982); *see Marsh v. Fla. Dep't of Corr.*, 330 F. App'x 179, 182 (11th Cir. 2009).

700.  At a minimum, the Due Process Clause prohibits the government from being deliberately indifferent to a substantial risk of serious harm that would rise to the level of an Eighth Amendment violation. The government violates the right to substantive due process when, acting with deliberate indifference, it subjects those in civil detention to unreasonable risks to their health and safety. *See Hamm v. DeKalb Cty.*, 774 F.2d 1567, 1572-74 (11th Cir. 1985).

701.  Plaintiffs, Medical Abuse Class Members, Consent Sub-Class Members, and Unnecessary Procedures Sub-Class Members have been subjected to medical abuse, in many cases amounting to sexual assault, and have serious medical needs, including but not limited to those resulting from non-consensual, medically unindicated, and/or invasive gynecological procedures, while they were detained at ICDC.

702.  Federal Defendants, including Giles, Musante, Ciprian, Rivera, and Unknown ICE Officials ##1-X, were aware of the risk of serious harm to Plaintiffs, Medical Abuse Class members, Consent Sub-Class Members, and Unnecessary Procedures Sub-Class Members as a result of ICDC's abuse and medical neglect.

703.  Despite knowledge of the risk of serious harm to Plaintiffs and Class Members, Federal Defendants have disregarded that risk by engaging in conduct that amounts to more than negligence.

704.  Defendants' deliberate indifference and failure to ensure adequate medical care at ICDC have caused or contributed to the Plaintiffs' and Medical Abuse Class and Subclass Members' ongoing injuries and harms, including physical and/or psychological harm.

705. Defendants' actions in affirmatively subjecting Plaintiffs to medical abuse, in some cases amounting to sexual assault, at the hands of Defendant Amin, caused the Plaintiffs' and Medical Abuse Class and Subclass Members' ongoing injuries and harms.

706. Plaintiffs and Medical Abuse and Class and Sub-Class Members were formerly subjected to punitive conditions of confinement at ICDC which lack a reasonable relation to any legitimate government purpose. Federal Defendants subjected them to repeated medical abuse at the hands of Defendant Amin.

707. Federal Defendants also failed to provide Plaintiffs and Medical Abuse Class and Sub-Class Members with the minimum level of necessities while in ICE custody at ICDC, including safety and medical care, as required under the Due Process Clause.

708. Federal Defendants Giles, Musante, Ciprian, Rivera, and Unknown ICE Officials ##1-X, in their individual capacities, were motivated by evil motive or intent, and/or were callously or recklessly indifferent to Plaintiffs' federally protected rights.

709. Plaintiffs and Medical Abuse Class and Sub-Class Members seek, and are entitled to, compensatory and punitive damages against individual Federal Defendants Giles, Musante, Ciprian, Rivera, and Unknown ICE Officials ##1-X for subjecting them to punitive conditions of confinement and acting with deliberate indifference to serious medical needs, pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971).

## FIFTH CLAIM FOR RELIEF
### Violation of the Fourteenth Amendment (Punitive Conditions of Confinement and Deliberate Indifference pursuant to 42 U.S.C. § 1983)

For Declaratory Relief
On Behalf of Plaintiffs Against ICDC Defendants in Their Official Capacities

For Damages
On Behalf of Plaintiffs, Medical Abuse Class Members, Consent Sub-Class Members, and Unnecessary Procedures Sub-Class Members Against ICDC Defendants in Their Official and Individual Capacities

710. Plaintiffs repeat and re-allege the allegations contained in the preceding paragraphs of this Petition as if fully set forth herein.

711. Because Defendant ICE contracts with Irwin County, which in turn contracts with Defendant LaSalle, for the operation of the detention facility, Defendants ICDC, LaSalle, and their employees, agents, and officers are state or local actors and subject to suit under 42 U.S.C. § 1983, independent of whether they may also be considered federal actors because they are engaging in the core federal function of civil immigration detention.

712. Liability under § 1983 extends to private physicians, such as Defendant Amin, who are authorized to provide medical services to prisoners, as well as the warden of a state or local detention facility or prison.

713. The Due Process Clause provides persons in civil immigration detention the right to reasonable safety and to be free from punitive conditions of confinement. The government violates the right to substantive due process when it fails to satisfy its affirmative duty to provide conditions of confinement of reasonable health and safety to the people it holds in its custody, and therefore violates the Constitution when it fails to provide for their basic human needs—*e.g.*, food, clothing, shelter, medical care, and reasonable safety for those in custody.

714. Individuals in civil detention are afforded "more constitutional protection, more considerate treatment, and conditions of confinement" than individuals with criminal convictions "whose conditions of confinement are designed to punish." *Youngberg v. Romeo*, 457 U.S. 307, 321-22 (1982).

715. At a minimum, the Due Process Clause prohibits the government from being deliberately indifferent to a substantial risk of serious harm that would rise to the level of an Eighth Amendment violation. The government violates the right to substantive due process when, acting with deliberate indifference, it subjects those in civil detention to unreasonable risks to their health and safety.

716. Plaintiffs, Medical Abuse Class Members, Consent Sub-Class Members, and Unnecessary Procedures Sub-Class Members have serious medical needs, including but not limited to those resulting from non-consensual, medically unindicated, and/or invasive gynecological procedures, while they were detained at ICDC.

717. While detained at ICDC, Plaintiffs and proposed Class Members were subjected to non-consensual, medically unindicated, and/or invasive gynecological procedures at the hands of Defendant Amin. ICDC Defendants, acting with deliberate indifference, failed to provide Plaintiffs and proposed Class Members with conditions of reasonable health and safety during the time they were detained at ICDC.

718. ICDC Defendants further acted with deliberate indifference to Plaintiffs' and Medical Abuse Class and Sub-Class Members' serious medical needs. ICDC Defendants were aware of the serious risk of harm posed by medical abuse and neglect at ICDC, including non-consensual, medically unindicated, and/or invasive gynecological procedures.

719. Despite knowledge of the risk of serious harm to Plaintiffs and Medical Abuse Class and Sub-Class Members, ICDC Defendants disregarded that risk by conduct that is more than negligence. Plaintiffs had their medical needs neglected and ignored, despite their need for urgent medical care. ICDC Defendants failed to provide Plaintiffs and Medical Abuse Class and Sub-Class Members with adequate medical treatment for their medical needs. In so doing, ICDC Defendants acted with deliberate indifference to serious medical needs and caused irreparable harm.

720. ICDC Defendants' failure to provide adequate medical care has contributed to the Plaintiffs' and Medical Abuse Class and Sub-Class Members' ongoing injuries and harms.

721. The right to substantive due process is also violated when the government imposes punitive conditions of confinement to individuals in civil custody.

722. Plaintiffs and Medical Abuse Class and Sub-Class Members were formerly subjected to punitive conditions of confinement at ICDC which lack a reasonable relation to any legitimate government purpose. ICDC Defendants failed to provide Plaintiffs and Medical Abuse Class Members with the minimum level of necessities while in their custody, including safety and medical care, required under the Due Process Clause. By subjecting Plaintiffs to ongoing medical neglect and abuse, ICDC Defendants maintained detention conditions that amounted to punishment and failed to protect Plaintiffs' health and safety in violation of Plaintiffs' substantive due process rights.

723. By subjecting Plaintiffs and Medical Abuse Class and Sub-Class Members to punitive conditions of confinement and acting with deliberate indifference to their serious medical needs, ICDC Defendants violated their rights to substantive due process.

724. ICDC Defendants are also subject to suit pursuant to 42 U.S.C. § 1983 under municipal liability.

725. ICDC had a policy or custom of retaliating against individuals who spoke out about medical abuses suffered at ICDC at the hands of Defendant Amin, and this policy or custom caused Plaintiffs' and proposed Sub-class Members' injury. ICDC Defendants also failed to properly train their employees and staff regarding provision of adequate medical care.

726. A plaintiff may also recover punitive damages "under § 1983 'when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves callous or reckless indifference to the federally protected rights of others.'" *Wright v. Sheppard*, 919 F.2d 665, 670 (11th Cir. 1990) (quoting *Smith v. Wade*, 461 U.S. 30, 56 (1983)). ICDC Defendants, in their individual capacities, have engaged in such conduct here, and Plaintiffs should be awarded punitive damages.

727. Plaintiffs, Medical Abuse Class Members, Consent Sub-Class Members, and Unnecessary Procedures Sub-Class Members seek, and are entitled to, actual damages against ICDC Defendants in their official and individual capacities for all damages resulting from their violations of substantive due process rights.

728. Plaintiffs and Medical Abuse Class and Sub-Class Members seek, and are entitled to, punitive damages against ICDC Defendants in their official and individual capacities for violations of their substantive due process rights.

729. Plaintiffs also seek declaratory and injunctive relief against ICDC Defendants in their official capacities.

**SIXTH CLAIM FOR RELIEF**
**Violation of the Fifth Amendment (Alternative First Amendment claim against ICDC**
**Defendants under *Bivens*)**

For Declaratory Relief
On Behalf of Plaintiffs Against ICDC Defendants in Their Official Capacities

For Damages under *Bivens*
On Behalf of Plaintiffs, Medical Abuse Class Members, Consent Sub-Class Members, and
Unnecessary Procedures Sub-Class Members Against Defendants Paulk, Amin, George, Mines,
Rabiou, Hughes, Smith, Coney, Hanes, Faison, Battle, Vaughn, Scott, Slack, and Unknown
ICDC Officers ##1-X in Their Individual Capacities

730. Plaintiffs repeat and re-allege the allegations contained in the preceding paragraphs of

this Petition as if fully set forth herein.

731. In the alternative, should this Court find that the ICDC Defendants were operating solely

under color of federal law, ICDC Defendants are liable for declaratory and injunctive

relief under the First Amendment, and Defendants Paulk, Amin, George, Mines, Rabiou,

Hughes, Smith, Coney, Hanes, Faison, Battle, Vaughn, Scott, Slack, and Unknown

ICDC Officers ##1-X are liable for damages under the First Amendment.

732. The Due Process Clause provides persons in civil immigration detention the right to

reasonable safety and to be free from punitive conditions of confinement. The

government violates the right to substantive due process when it fails to satisfy its

affirmative duty to provide conditions of confinement of reasonable health and safety to

the people it holds in its custody, and therefore violates the Constitution when it fails to

provide for their basic human needs—*e.g.*, food, clothing, shelter, medical care, and

reasonable safety for those in custody.

733. Individuals in civil detention are afforded "more constitutional protection, more

considerate treatment, and conditions of confinement" than individuals with criminal

convictions "whose conditions of confinement are designed to punish." *Youngberg v. Romeo*, 457 U.S. 307, 321-22 (1982).

734. At a minimum, the Due Process Clause prohibits the government from being deliberately indifferent to a substantial risk of serious harm that would rise to the level of an Eighth Amendment violation. The government violates the right to substantive due process when, acting with deliberate indifference, it subjects those in civil detention to unreasonable risks to their health and safety.

735. Plaintiffs, Medical Abuse Class Members, Consent Sub-Class Members, and Unnecessary Procedures Sub-Class Members have serious medical needs, including those resulting from non-consensual, medically unindicated, and/or invasive gynecological procedures, while they were detained at ICDC.

736. While detained at ICDC, Plaintiffs and proposed Class Members were subjected to non-consensual, medically unindicated, and/or invasive gynecological procedures at the hands of Defendant Amin. ICDC Defendants failed to provide Plaintiffs and proposed Class Members with conditions of reasonable health and safety during the time they were detained at ICDC.

737. ICDC Defendants further acted with deliberate indifference to Plaintiffs' and Medical Abuse Class and Sub-Class Members' serious medical needs. ICDC Defendants were aware of the serious risk of harm posed by medical abuse and neglect at ICDC, including non-consensual, medically unindicated, and/or invasive gynecological procedures.

738. Despite knowledge of the risk of serious harm to Plaintiffs and Medical Abuse Class and Sub-Class Members, ICDC Defendants have disregarded that risk by conduct that is

more than negligence. Plaintiffs had their medical needs neglected and ignored, despite their need for urgent medical care. ICDC Defendants failed to provide Plaintiffs and Medical Abuse Class and Sub-Class Members with adequate medical treatment for their medical needs. In so doing, ICDC Defendants acted with deliberate indifference to serious and irreparable harm.

739. ICDC Defendants' failure to provide adequate medical care has contributed to the Plaintiffs' and Medical Abuse Class and Sub-Class Members' ongoing injuries and harms.

740. The right to substantive due process is also violated when the government imposes punitive conditions of confinement to individuals in civil custody.

741. Plaintiffs and Medical Abuse Class Members were formerly subjected to punitive conditions of confinement at ICDC which lack a reasonable relation to any legitimate government purpose. ICDC Defendants failed to provide Plaintiffs and Medical Abuse Class and Sub-Class Members with the minimum level of necessities while in their custody, including safety and medical care, required under the Due Process Clause. By subjecting Plaintiffs to ongoing medical neglect and abuse, ICDC Defendants maintained detention conditions that amounted to punishment and failed to protect Plaintiffs' health and safety in violation of Plaintiffs' substantive due process rights.

742. By subjecting Plaintiffs and Medical Abuse Class and Sub-Class Members to punitive conditions of confinement and acting with deliberate indifference to their serious medical needs, ICDC Defendants violated their rights to substantive due process.

743. ICDC Defendants are liable to Plaintiffs for declaratory relief resulting from their violations of constitutional rights.

744.  Because ICDC Defendants acted in clear violation of well-settled law, which reasonable persons would have been aware of, with regard to the standards for punitive conditions of confinement and with deliberate indifference to serious medical needs under the Fifth Amendment, the actions of individual ICDC Defendants Paulk, Amin, George, Mines, Rabiou, Hughes, Smith, Coney, Hanes, Faison, Battle, Vaughn, Scott, Slack, and Unknown ICDC Officers ##1-X give rise to a cause of action for damages against them in their individual capacities on behalf of Plaintiffs and the Retaliation Class members, pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971).

745.  Should this Court hold that ICDC Defendants were acting under color of federal authority, Plaintiffs and proposed Class Members would have no available statutory cause of action which would provide a meaningful remedy.

746.  Should this Court hold that ICDC Defendants were acting under color of federal authority, Plaintiffs and Medical Abuse Class and Sub-Class Members seek, and would be entitled to, damages against Defendants Paulk, Amin, George, Mines, Rabiou, Hughes, Smith, Coney, Hanes, Faison, Battle, Vaughn, Scott, Slack, and Unknown ICDC Officers ##1-X in their individual capacities for damages under the First Amendment, pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971).

747.  Should this Court hold that ICDC Defendants were acting under color of federal authority, Plaintiffs seek, and would be entitled to, declaratory relief against ICDC Defendants finding ICDC Defendants' actions in violation of the First Amendment.

## SEVENTH CLAIM FOR RELIEF
**Violation of the Administrative Procedure Act and the Immigration and Nationality Act
(Deportation of witnesses and individuals in the midst of legitimate efforts to protect their
civil rights or civil liberties)**

On Behalf of Plaintiffs for Declaratory and Injunctive Relief
Against Federal Defendants in Their Official Capacities

748. Plaintiffs repeat and re-allege the allegations contained in the preceding paragraphs of

this Petition as if fully set forth herein.

749. The Administrative Procedure Act ("APA") provides that a "person suffering legal

wrong because of agency action, or adversely affected or aggrieved by agency action

within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C.

§ 702.

750. Under *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954), and related

cases, an agency and agency officials are required to follow their own policies. *See*

*Morton v. Ruiz*, 415 U.S. 199, 235 (1974) ("Where the rights of individuals are affected,

it is incumbent upon agencies to follow their own procedures.")

751. The Immigration and Nationality Act ("INA") and federal regulations prohibit the

departure of any noncitizen from the United States "if his departure would be prejudicial

to the interests of the United States." 8 C.F.R. §§ 215.2(a); *see also* 8 U.S.C. §

1185(a)(1) (providing that "it shall be unlawful . . . for any [noncitizen] to depart . . .

from . . . the United States except under such reasonable rules, regulations, and orders,

and subject to such limitations and exceptions as the President may prescribe"). That

includes, *inter alia*, "Any [noncitizen] who is needed in the United States in connection

with any investigation or proceeding being, or soon to be, conducted by any official

executive, legislative, or judicial agency in the United States or by any governmental

committee, board, bureau, commission, or body in the United States, whether national,

state, or local." 8 C.F.R. § 215.3(h); *see also* Control of Aliens Departing from the United States, 45 Fed. Reg. 65,515, 65,515-16 (Oct. 3, 1980) (promulgating into the immigration regulations a copy of the State Department's pre-existing list in 22 C.F.R. Part 46).

752. In addition, both statutes and regulations contemplate the stay of removal and release of individuals who are witnesses in ongoing civil and criminal prosecutions and investigations, irrespective of whether they otherwise have authorization to be or remain in the U.S. by virtue of immigration status. *See, e.g.*, 8 U.S.C. § 1231(c)(2)(a) (authorizing the issuance of a stay and release on bond when "(i) immediate removal is not practicable or proper; or (ii) the [noncitizen] is needed to testify in the prosecution of a person for a violation of a law of the United States or of any State"); 8 C.F.R. § 212.5(b)(4) (permitting parole from detention for "[noncitizens] who will be witnesses in proceedings being, or to be, conducted by judicial, administrative, or legislative bodies in the United States").

753. Defendant ICE has an established policy, ICE Policy Number 10076.1, which explicitly states, "it is . . . against ICE policy to remove individuals in the midst of a legitimate effort to protect their civil rights or civil liberties."

754. Multiple federal agencies are known to be conducting investigations into medical abuse of women at ICDC, including the DOJ, DHS OIG, and FBI. Congressional committees have likewise expressed deep concern about treatment of women at ICDC, including the House Judiciary Committee by letter dated November 7, 2020, and the House Oversight Committee by letter dated November 12, 2020.

755. ICE has already deported or attempted to deport and nearly deported several Plaintiffs shortly after their names and experiences at ICDC were shared with federal investigative agencies.

756. On information and belief, neither the DOJ nor DHS OIG nor the FBI has made any efforts to protect Plaintiffs or follow the procedures outlined in the regulations.

757. By failing to follow their own regulations, Federal Defendants have violated both the INA and the APA. Their actions are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), and "contrary to constitutional right, power, privilege, or immunity," 5 U.S.C. § 706(2)(B). A fundamental principle of administrative law is that an "agency must follow its own rules." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 549 (2009); *see also Accardi*, 347 U.S. at 260. Federal Defendants' failure to follow the INA and their own regulations is unlawful agency action.

758. Because Federal Defendants violated the laws and procedures governing its enforcement actions and the rights afforded to individuals facing deportation in their efforts to silence Plaintiffs, Defendants' actions violate their constitutional, statutory, and regulatory rights.

759. Plaintiffs seek, and are entitled to, declaratory and injunctive relief against Federal Defendants in their official capacities to remedy their violations of the APA and INA.

## EIGHTH CLAIM FOR RELIEF
### Violation of the Administrative Procedure Act (Failure to follow PBNDS)

On Behalf of Plaintiffs, Medical Abuse Class, Consent Sub-Class, and Unnecessary Procedures Sub-Class for Declaratory Relief
Against Federal Defendants in Their Official Capacities

760. Plaintiffs repeat and re-allege the allegations contained in the preceding paragraphs of this Petition as if fully set forth herein.

761. The Administrative Procedure Act ("APA") provides that a "person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702.

762. Under *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954), and related cases, an agency and agency officials are required to follow their own policies.*See Morton v. Ruiz*, 415 U.S. 199, 235 (1974) ("Where the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures.")

763. The PBNDS apply at all ICE-dedicated civil detention facilities, including at ICDC.

764. The PBNDS set forth a set of mandatory requirements, including regarding medical care, to which a facility is bound. Failure to comply with the PBNDS can give rise to liability under the APA.

765. ICDC, LaSalle, and any subcontractors, are bound by the 2008 PBNDS pursuant to the IGA.

766. Federal Defendants have failed to ensure that ICDC Defendants followed the PBNDS mandates for providing medical care.

767. Plaintiffs were subjected to non-consensual, medically unindicated, and/or invasive gynecological procedures while they were detained in ICE custody at ICDC. Plaintiffs did not receive the adequate, timely care necessary following those procedures.

768. Federal Defendants failed to ensure that ICDC Defendants provided appropriate medical care to Plaintiffs under the PBNDS.

769. Federal Defendants failed to ensure that ICDC administered medical treatment only with informed consent.

770. Federal Defendants failed to ensure that ICDC provided language accessibility to non-English speakers while receiving medical care.

771. Plaintiffs are prejudiced by Federal Defendants' failure to follow the PBNDS and failure to ensure that the ICDC Defendants follow the PBNDS. Plaintiffs have suffered and will continue to suffer irreparable injury because of this failure to follow the PBNDS.

772. A fundamental principle of administrative law is that an "agency must follow its own rules." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 549 (2009); *see also Accardi*, 347 U.S. at 260. The Federal Defendants' failure to follow the PBNDS and failure to ensure that the ICDC Defendants follow the PBNDS is unlawful agency action.

773. Plaintiffs seek, and are entitled to, declaratory relief that Federal Defendants violated the APA.

## NINTH CLAIM FOR RELIEF
### Violation of 42 U.S.C. § 1985(2) – Conspiring to Deter Testimony/Participation in Investigations and Court Proceedings

For Declaratory and Injunctive Relief
On Behalf of Plaintiffs Against Federal Defendants and ICDC Defendants in Their Official Capacities

For Damages
On Behalf of Plaintiffs and Retaliation Class Members Against Federal Defendants and ICDC Defendants in Their Official and Individual Capacities

774. Plaintiffs repeat and re-allege the allegations contained in the preceding paragraphs of this Petition as if fully set forth herein.

775. 42 U.S.C. § 1985(2), which codifies portions of the Ku Klux Klan Act of 1871, provides a private right of action against persons who engage in a conspiracy to deter any party or witness from attending or testifying in a pending federal court proceeding. It also provides a private right of action against persons who conspire to retaliate against witnesses or participants in federal court proceedings. Section 1985(2) was passed to protect the process of federal courts, and to allow them to proceed without improper outside influence, by preventing intrusions on the rights of parties and witnesses.

776. To assert a deterrence claim under § 1985(2), a plaintiff must allege that (1) two or more people conspired (2) to deter a witness from testifying in a pending federal proceeding (3) which resulted in injury to the plaintiff.

777. To assert a retaliation claim under § 1985(2), a plaintiff must allege (1) a conspiracy, (2) retaliation spawned by the attendance or testimony in federal court, (3) an act in furtherance of the conspiracy, and (4) injury to the plaintiff." *Aque v. Home Depot U.S.A., Inc.*, 629 F. Supp. 2d 1336, 1343 (N.D. Ga. 2009) (citation omitted).

778. On information and belief and based on ample circumstantial evidence, Federal Defendants and ICDC staff conspired and took action to deter and prevent Plaintiffs

from participating in congressional and federal law enforcement investigations of medical abuse at ICDC.

779.  Shortly before a congressional delegation arrived at ICDC, Defendants and their employees, agents, and/or contractors transferred some survivors of medical abuse to the "Golf" pod, which is located behind the main ICDC facility and was not scheduled for inspection by the congressional delegation. Defendants and their employees, agents, and/or contractors ordered women not speak to Congress members and to stay in their beds during the inspection.

780.  On information and belief and based on ample circumstantial evidence, Defendants and their employees, agents, and/or contractors, including Unknown ICE Officials, conspired to deter and prevent Plaintiffs from testifying or participating in a pending federal proceeding by expediting the deportation of witnesses who attempted to participate in federal investigations into ICDC.

781.  On November 25, 2020, Plaintiff Walker, through counsel, informed government attorneys that she had information relevant to federal investigations and judicial proceedings related to medical abuse at ICDC. Approximately one week later, an ICE official at ICDC took Ms. Walker's fingerprints and informed her that issuance of her travel documents was being expedited, which meant she would soon be deported.

782.  On October 28, 2020, Plaintiff Oldaker provided a declaration and list of victims to her lawyers. Her lawyers then shared these materials with federal investigators. Less than four days later, Ms. Oldaker's commissary was "zeroed-out" in preparation for her deportation. Ms. Oldaker was brought to the airport and would have been deported if not for the last-minute intervention of her attorneys and members of Congress.

783. Ms. Oldaker's appeal to the Board of Immigration Appeals was denied on October 7, 2020. Executing orders of removal so soon after the denial of a BIA appeal is extremely unusual.

784. On October 27, 2020, Plaintiff Ndonga spoke with federal investigators about medical abuse at ICDC. During the interview she told federal investigators that she was afraid of retaliation. Only hours after the interview with federal investigators ended, Defendant Hanes informed her that her removal hold had been lifted and she would soon be deported. At the time, Ms. Ndonga had been in immigration detention for over 19 months.

785. On September 15, 2020, Plaintiff Floriano Navarro admitted to ICDC staff and Unknown ICE Agents that she had spoken with reporters about medical abuse at ICDC. She was deported within 24 hours of this admission.

786. Prior to Plaintiff Floriano Navarro's deportation, ICDC employees and Unknown ICE Officials made statements suggesting that she was targeted for expedited deportation because she had helped expose misconduct at ICDC.

787. The close proximity between participation in investigations of misconduct at ICDC and expedited deportation strongly suggests coordination between Defendants to deter and prevent participation in federal investigations and court proceedings.

788. On information and belief and based on ample circumstantial evidence, these and other attempts to expedite the deportation of witnesses of medical abuse at ICDC were part of an ongoing conspiracy to deter and prevent participation and testimony in federal investigations and court proceedings.

789. In addition to this overt conduct, Federal Defendants, ICDC Defendants, and their employees, agents, and/or contractors have made explicit statements suggesting that they knew about and actively participated in a conspiracy. This includes saying that Plaintiffs and other ICDC detainees would have to "pay" for speaking up about their mistreatment.

790. Federal and ICDC Defendants and their employees, agents, and/or contractors also monitored Plaintiffs' phone calls. When Plaintiffs mentioned topics related to the federal investigation, including their abuse, mistreatment, of physical health, Defendants and their employees, agents, and/or contractors cut off the phone connection.

791. By deterring and preventing participation in investigations and court proceedings, Federal and ICDC Defendants and their employees, agents, and/or contractors aimed to shield themselves from accountability.

792. Victims and witnesses who are deported will be unable to effectively participate in federal investigations and court proceedings from abroad. Because of the actions of Federal and ICDC Defendants and their employees, agents, and/or contractors, those witnesses who were not deported are afraid to participate in federal investigations and court proceedings because it may expose them to expedited deportation or other retaliation.

793. Defendants' actions, including threats, intimidation, and deportation of witnesses, are sufficiently grave to constitute deterrence and retaliation under § 1985(2).

794. On information and belief and based on ample circumstantial evidence, Federal and ICDC Defendants and their employees, agents, and/or contractors continue to conspire to deter witnesses to and victims of medical abuse at ICDC from testifying or

participating in this federal action. If this Court does not intervene, Plaintiffs and crucial

fact witnesses are at risk of being deported or otherwise retaliated against before this

action is resolved.

795. Plaintiffs and the Retaliation Class Members seek, and are entitled to, damages against

all Defendants in their official and individual capacities.

796. Plaintiffs also seek declaratory and injunctive relief against all Federal and ICDC

Defendants in their official capacities to remedy their ongoing or future violations of

§ 1985(2).

## TENTH CLAIM FOR RELIEF
### Violation of the Right to Due Process Under the Fifth Amendment (Deportation of essential witnesses)

On Behalf of Plaintiffs for Declaratory and Injunctive Relief
Against Federal Defendants in Their Official Capacities

797. Plaintiffs repeat and re-allege the allegations contained in the preceding paragraphs of

this Petition as if fully set forth herein.

798. The deportation of a material witness in a criminal proceeding may establish a violation

of the Due Process Clause of the Fifth Amendment. *See United States v. Valenzuela-*

*Bernal*, 458 U.S. 858, 872–73 (1982); *United States v. Schaefer*, 709 F.2d 1383, 1385

(11th Cir. 1983); *United States v. De La Cruz Suarez*, 601 F.3d 1202, 1212–13 (11th

Cir. 2010).

799. To show a Due Process violation, a criminal defendant must make a "plausible

showing" that the deported witness would have offered testimony that is material,

favorable to their defense, and "not merely cumulative to the testimony of available

witnesses." *Valenzuela-Bernal*, 458 U.S. at 872-73; *see also United States v. Schlei*, 122

F.3d 944, 983 (11th Cir. 1997). It also requires showing that the government "acted in

bad faith" in repatriating noncitizens. *De La Cruz Suarez*, 601 F.3d at 1213; *see also United States v. McCullough*, 166 F. App'x 469, 472 (11th Cir. 2006).

800. These Due Process protections apply in the civil context where "circumstances warrant certain procedural protections usually reserved for criminal proceedings." *United States v. One 1982 Chevrolet Crew-Cab Truck VIN 1GCHK33M9C143129*, 810 F.2d 178, 183 (8th Cir. 1987).

801. Plaintiffs have material testimony relating to the abuse and medical neglect they have suffered at ICDC. Plaintiffs have all been subjected to non-consensual, medically unindicated, and/or invasive gynecological procedures at the hands of Defendant Amin. Some of these procedures amount to sexual assault. Plaintiffs have expressed an interest and desire in sharing their material testimony in court proceedings and with federal investigators.

802. Plaintiffs' testimony is not merely cumulative to the testimony of available witnesses. While Plaintiffs all experienced medical abuse and neglect at the hands of Defendant Amin, each of their testimonies highlights a broader pattern and practice of medical abuse and neglect at ICDC.

803. Federal Defendants have acted in bad faith by deporting several Plaintiffs within days, and in some cases within hours, of them coming forward and sharing their experiences at ICDC.

804. By deporting or threatening to deport Plaintiffs in this case, Federal Defendants have infringed on the rights of all Plaintiffs to a full and fair hearing on their claims.

805.  Plaintiffs seek declaratory and injunctive relief against Federal Defendants in their

official capacities to remedy these violations their Fifth Amendment right to a full and

fair hearing.

### ELEVENTH CLAIM FOR RELIEF
### Breach of IGA Contract

On Behalf of Plaintiffs, Medical Abuse Class, Consent Sub-Class, and Unnecessary Procedures
Sub-Class Against Irwin County Detention Center and LaSalle

806.  Plaintiffs repeat and re-allege the allegations contained in the preceding paragraphs of

this Petition as if fully set forth herein.

807.  ICDC and LaSalle, through Irwin County, are parties to the IGA contract, which

requires Defendants to "accept and provide for the secure custody, safekeeping, housing,

subsistence and care of federal detainees in accordance with state and local laws,

standards and procedures, or court orders applicable to the operations of the facility,

consistent with federal law, policies and regulations."

808.  The IGA also requires that "where ICE detainees are housed, the ICE federal detainees

are to be housed in accordance with ICE standards."

809.  Pursuant to the IGA, the PBNDS 2008 applies to ICDC's custody and care for Plaintiffs.

810.  ICDC, LaSalle, and their employees, agents, and/or contractors, including all ICDC

Defendants, have breached the terms of the IGA, including by failing to abide by the

terms of the PBNDS. For example, they have failed to provide appropriate medical care,

to administer medical treatment only with informed consent, and to provide language

accessibility to non-English speakers while receiving medical care.

811.  Plaintiffs and putative members of the Medical Abuse Class, Consent Sub-Class, and

Unnecessary Procedures Sub-Class are intended third-party beneficiaries of the IGA,

including the IGA's provisions requiring Defendants to abide by the PBNDS.  Those

provisions were made directly to benefit the care and treatment of ICE detainees like Plaintiffs. *See, e.g.*, *Melvin v. Cty. of Westchester*, No. 14-CV-2995 (KMK), 2016 WL 1254394, *22 (S.D.N.Y. Mar. 29, 2016); *Zikianda v. Cty. of Albany*, No. 1:12-CV-1194, 2015 WL 5510956, at *37 (N.D.N.Y. Sept. 15, 2015). Therefore, Plaintiffs have standing to enforce Defendants' breach of the terms of the IGA.

812. Plaintiffs and putative class members have been damaged in an amount to be proven at trial by Defendants' breach of the IGA. Plaintiffs have suffered and will continue to suffer irreparable injury and damages because of this breach of the IGA.

813. Plaintiffs and putative class members seek, and are entitled, to enforce the terms of the IGA contract.

814. Plaintiffs and putative class members also seek, and are entitled, to actual damages resulting from breach of the IGA contract.

**TWELFTH CLAIM FOR RELIEF**
**Negligent Hiring or Retention**

On Behalf of Plaintiffs, Medical Abuse Class, Consent Sub-Class, and Unnecessary Procedures
Sub-Class for Damages
Against ICDC, LaSalle, and Irwin County Hospital

815. Plaintiffs repeat and re-allege the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

816. In order to sustain a claim for negligent hiring or retention, a claimant must show that the employer knew or should have known of the employee's propensity to engage in the conduct that caused the plaintiff's injury. *Piney Grove Baptist Church v. Goss*, 255 Ga. App. 380, 565 S.E.2d 569 (2002).

817. Defendant Amin is affiliated with and a member of the staff of Irwin County Hospital. In this capacity, he was authorized to provide medical services to detained individuals in ICE custody at ICDC, including Plaintiffs and Class Members.

818. At all relevant times, Plaintiffs and putative members of the Medical Abuse Class, Consent Sub-Class, and Unnecessary Procedures Sub-Class were in the care, control, and custody of the Defendants ICDC, LaSalle, and Irwin County Hospital, who owed a duty to them to exercise reasonable and ordinary care, including the duty to obtain informed consent from Plaintiffs for any and all medical and gynecological procedures prior to performing or allowing them to be performed on Plaintiffs.

819. Defendant Amin and agents and/or employees of Irwin County Hospital who performed or assisted Defendant Amin, performed non-consensual, medically unindicated, and/or invasive gynecological procedures on Plaintiffs and class members. As a result, Plaintiffs and class members were injured by Defendant Amin's conduct, including by enduring major surgeries that were unnecessary, suffering medical complications, and mental health issues.

820. ICDC and LaSalle knew or should have known of Defendant Amin's propensity to engage in non-consensual, medically unindicated, and/or invasive gynecological procedures. Several women, including Plaintiffs and putative class members, lodged complaints to ICDC and LaSalle officers against Defendant Amin at least two years before he was confirmed to no longer provide services to women at ICDC.

821. Irwin County Hospital knew or should have known of Defendant Amin's propensity to engage in non-consensual, medically unindicated, and/or invasive gynecological procedures. Complaints to Irwin County hospital staff regarding Defendant Amin's

conduct were investigated by the DOJ. *See United States v. Hospital Authority of Irwin County*, No. 7:13-cv-00097-HL (M.D. Ga.). In a 2013 lawsuit against Irwin County Hospital and Defendant Amin, the DOJ specifically alleged that Defendant Amin was engaged in "a pattern of medical services that he, ICH, and the on-call doctors know or should know are not medically necessary."

822.  ICDC, LaSalle, and Irwin County Hospital knew that other medical professionals supported Defendant Amin in performing non-consensual, medically unindicated, and/or invasive gynecological procedures.

823.  ICDC, LaSalle, and Irwin County Hospital breached their duty to Plaintiffs and putative class members by hiring and retaining Defendant Amin. Since the DOJ lawsuit and Plaintiffs' and putative class members' numerous complaints, and even after the whistleblower complaint went public on September 14, 2020, and was reported on by numerous media outlets, Defendant Amin continued to perform non-consensual, medically unindicated, and/or invasive gynecological procedures on women detained at ICDC.

824.  The actions by ICDC, LaSalle, and Irwin County Hospital were the direct and proximate cause of damages to Plaintiffs and putative class members. Defendants made conscious decisions to either act or fail to act, causing Plaintiffs and putative class members to suffer grave physical pain, medical complications, and severe emotional distress and anguish.

825.  Plaintiffs and putative class members in no way contributed to their own injuries.

826. ICDC, LaSalle, and Irwin County Hospital are liable to Plaintiffs and putative class members for all damages, in an amount to be proven at trial, resulting from their negligent hiring and retention of Defendant Amin.

827. ICDC, LaSalle, and Irwin County Hospital have shown willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences, and ICDC, LaSalle, and Irwin County Hospital are liable to Defendants for punitive damages.

828. Plaintiffs and putative members of the Medical Abuse Class, Consent Sub-Class, and Unnecessary Procedures Sub-Class seek, and are entitled to, actual and punitive damages against ICDC, LaSalle, and Irwin County Hospital for negligent hiring and retention of Defendant Amin.

## THIRTEENTH CLAIM FOR RELIEF
### Gross Negligence

On Behalf of Plaintiffs, Medical Abuse Class, Consent Sub-Class, and Unnecessary Procedures Sub-Class for Damages Against Irwin County Defendants

829. Plaintiffs repeat and re-allege the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

830. Under O.C.G.A. § 51–1–4, gross negligence is the absence of "slight diligence," which is defined as "that degree of care which every man of common sense, however inattentive he may be, exercises under the same or similar circumstances." O.C.G.A. § 51–1–4.

831. At all relevant times, Plaintiffs and putative members of the Medical Abuse Class were detained in the care, control, and custody of the Irwin County Defendants, who owed a duty to them to exercise reasonable and ordinary care.

832. Irwin County Defendants breached their duty to Plaintiffs and putative members of the Medical Abuse Class, Consent Sub-Class, and Unnecessary Procedures Sub-Class by subjecting them to non-consensual, medically unindicated, and/or invasive gynecological procedures at the hands of Defendant Amin.

833. Irwin County Defendants committed these actions in the absence of slight diligence and with complete disregard for Plaintiffs' and putative class members' safety, health, and wellbeing.

834. The actions of Irwin County Defendants were the direct and proximate cause of the damages that Plaintiffs and putative class members suffered. Irwin County Defendants made conscious decisions to either act or fail to act causing Plaintiffs and putative class members to suffer grave physical pain, medical complications, and severe emotional distress and anguish.

835. Plaintiffs and putative class members in no way contributed to their own injuries.

836. Irwin County Defendants are liable to Plaintiffs and putative class members for the damages resulting from their gross negligence in an amount to be proven at trial.

837. Irwin County Defendants have shown willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences, and Irwin County Defendants are liable to Plaintiffs and putative class members for punitive damages.

838. Plaintiffs and putative class members seek actual and punitive damages against Irwin County Defendants for gross negligence.

## FOURTEENTH CLAIM FOR RELIEF
### Medical Battery

On Behalf of Plaintiffs, Medical Abuse Class, Consent Sub-Class, and Unnecessary Procedures
Sub-Class for Damages Against Defendant Amin and Irwin County Hospital

839. Plaintiffs repeat and re-allege the allegations contained in the preceding paragraphs of

this Complaint as if fully set forth herein.

840. Under Georgia law, a plaintiff may recover for a medical battery by establishing either:

(i) that there was a lack of consent to the procedure performed, *see Joiner v. Lee*, 197

Ga. App. 754, 756, 399 S.E.2d 516, 518 (1990); or (ii) that the treatment was at

substantial variance with the consent granted, *see Morton v. Wellstar Health System,*

*Inc.*, 288 Ga. App. 301, 302 (2007) (*citing Sood v. Smeigh*, 259 Ga. App. 490, 495, 578

S.E.2d 158, 162 (2003)).

841. At all relevant times, Plaintiffs and putative members of the Medical Abuse Class,

Consent Sub-Class, and Unnecessary Procedures Sub-Class were in the care of Irwin

County Hospital and Defendant Amin, who owed a duty to them to exercise reasonable

and ordinary care, including the duty to obtain informed consent from Plaintiffs for any

and all medical and gynecological procedures prior to  performing or allowing them to

be performed on Plaintiffs.

842. Through principles of agency and respondeat superior, Defendant Amin, ICDC, and

Irwin County Hospital are liable for the acts and omissions of their agents and

employees who participated in performance of unnecessary gynecological procedures on

Petitioners, including but not limited to, transvaginal procedures such as ultrasounds,

Pap tests, and LEEP procedures and administration of drugs such as Depo Provera,

which were neither medically necessary nor indicated.

843. Defendant Amin, and/or employees of Irwin County Hospital assisting Defendant Amin, performed gynecological procedures on Plaintiffs and putative class members without obtaining consent for those procedures or performed gynecological procedures on Plaintiffs and putative class members that were at substantial variance with the consent granted.

844. Irwin County Hospital, Defendant Amin, and employees, agents and/or contractors of Irwin County Hospital, individually and collectively breached their duty to Plaintiffs and putative class members by subjecting them to non-consensual, medically unindicated, and/or invasive gynecological procedures.

845. The actions by Irwin County Hospital, Defendant Amin, and employees, agents, and/or contractors of Irwin County Hospital were the direct and proximate cause of the harm that Plaintiffs and putative class members suffered. Irwin County Hospital and Defendant Amin made conscious decisions to either act or fail to act causing Plaintiffs and putative class members to suffer grave physical pain, medical complications, and severe emotional distress and anguish.

846. Plaintiffs and putative class members in no way contributed to their own injuries.

847. Irwin County Hospital, Defendant Amin, and employees, agents and/or contractors of Irwin County Hospital are liable to Plaintiffs and putative class members for all damages resulting from his medical battery.

848. Irwin County Hospital, Defendant Amin, and agents and/or employees of Irwin County Hospital have shown willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences. They are liable to Defendants for punitive damages.

849. Plaintiffs seek actual and punitive damages against Irwin County Hospital, Defendant Amin, and agents and/or employees of Irwin County Hospital for medical battery.

### FIFTEENTH CLAIM FOR RELIEF
### Medical Malpractice

<u>On Behalf of Plaintiffs for Damages Against Defendant Amin, Irwin County Hospital, ICDC, and LaSalle</u>

850. Plaintiffs repeat and re-allege the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

851. At all relevant times, Plaintiffs were in the care of the ICDC, LaSalle, Irwin County Hospital, and Defendant Amin, who owed a duty to them to exercise a reasonable degree of care and skill in the medical management and performance of gynecological procedures.

852. The applicable standard of care for the medical management of Plaintiffs by Defendant Amin, ICDC, and Irwin County Hospital, required that they refrain from performing unnecessary gynecological procedures on Plaintiffs, including but not limited to, transvaginal procedures such as ultrasounds, Pap tests, and LEEP procedures and administering drugs such as Depo Provera which were neither medically necessary nor indicated.

853. Through principles of agency and respondeat superior, Defendant Amin, ICDC, and Irwin County Hospital are liable for the acts and omissions of their agents and employees who participated in the performance of unnecessary gynecological procedures on Plaintiffs, including but not limited to, transvaginal procedures such as ultrasounds, Pap tests, and LEEP procedures and administration of drugs such as Depo Provera, which were neither medically necessary nor indicated.

854. ICDC, LaSalle, Irwin County Hospital, Defendant Amin, and their employees, agents, and/or contractors performed gynecological procedures on Plaintiffs without obtaining consent for those procedures or performed gynecological procedures on Plaintiffs that were at substantial variance with the consent granted.

855. ICDC, LaSalle, Irwin County Hospital, Defendant Amin, and their employees, agents, and/or contractors also performed non-consensual, medically unindicated and/or invasive gynecological procedures.

856. ICDC, LaSalle, Irwin County Hospital, Defendant Amin, and their employees, agents, and/or contractors breached their duty to Plaintiffs by subjecting them to non-consensual, medically unindicated and/or invasive gynecological procedures.

857. ICDC, LaSalle, Irwin County Hospital, and Defendant Amin were negligent and failed to comport with a reasonable degree of care and skill in the medical management and performance of gynecological procedures on Plaintiffs.

858. The actions by ICDC, LaSalle, Irwin County Hospital, and Defendant Amin individually and collectively, by and through their employees, agents, and/or contractors, were the direct and proximate cause of the harm that Plaintiffs suffered, causing Plaintiffs to suffer grave physical pain, medical complications, and severe emotional distress and anguish.

859. Plaintiffs in no way contributed to their own injuries.

860. ICDC, LaSalle, Irwin County Hospital, and Defendant Amin are liable individually and collectively to Plaintiffs or all damages resulting from the medical malpractice.

861. ICDC, LaSalle, Irwin County Hospital, and Defendant Amin have shown willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which

would raise the presumption of conscious indifference to consequences, and ICDC, LaSalle, Irwin County Hospital, and Defendant Amin are liable to Plaintiffs for punitive damages.

862. Plaintiffs seek actual and punitive damages against ICDC, LaSalle, Irwin County Hospital, and Defendant Amin, individually and collectively, for medical malpractice.

### SIXTEENTH CLAIM FOR RELIEF
### Intentional Infliction of Emotional Distress

On Behalf of Plaintiffs, Medical Abuse Class, Consent Sub-Class, and Unnecessary Procedures Sub-Class for Damages Against Irwin County Defendants

863. Plaintiffs and putative members of the Medical Abuse Class, Consent Sub-Class, and Unnecessary Procedures Sub-Class repeat and re-allege the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

864. Under Georgia law, "[a] claim for intentional infliction of emotional distress has four elements: (1) intentional or reckless conduct (2) which is extreme and outrageous and (3) caused the emotional distress (4) which is severe." *Pyle v. City of Cedartown*, 240 Ga. App. 445, 447, 524 S.E.2d 7, 9 (1999).

865. At all relevant times, Plaintiffs and putative members of the Medical Abuse Class, Consent Sub-Class, and Unnecessary Procedures Sub-Class were detained in the care, control, and custody of the Irwin County Defendants, who owed a duty to them to exercise reasonable and ordinary care.

866. Irwin County Defendants breached their duty to Plaintiffs and putative class members by subjecting them to non-consensual, medically unindicated, and/or invasive gynecological procedures at the hands of Defendant Amin.

867. Irwin County Defendants' conduct was intentional or reckless. Despite knowing that Defendant Amin was subjecting women to these procedures, Irwin County Defendants continued to refer Plaintiffs and putative class members to Defendant Amin.

868. Irwin County Defendants' conduct was extreme and outrageous.

869. Irwin County Defendants' conduct was the direct and proximate cause of the harm that Plaintiffs and putative class members suffered. Irwin County Defendants made conscious decisions to either act or fail to act, causing Plaintiffs and putative class members to suffer severe emotional distress and anguish.

870. Plaintiffs and putative class members in no way contributed to their own injuries.

871. Irwin County Defendants are liable to Plaintiffs and putative class members for all damages resulting from their intentional infliction of emotional distress in an amount to be proven at trial.

872. Irwin County Defendants have shown willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences, and Irwin County Defendants are liable to Defendants for punitive damages.

873. Plaintiffs and putative members of the Medical Abuse Class, Consent Sub-Class, and Unnecessary Procedures Sub-Class seek actual and punitive damages against Irwin County Defendants for intentional infliction of emotional distress.

**SEVENTEENTH CLAIM FOR RELIEF**
**Negligent Infliction of Emotional Distress**

<u>On Behalf of Plaintiffs and Medical Abuse Class for Damages Against Irwin County Defendants</u>

874.   Plaintiffs and putative members of the Medical Abuse Class repeat and re-allege the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

875.   Under Georgia law, "three elements are necessary to prevail on a claim for negligent infliction of emotional distress: (1) a physical impact to the plaintiff; (2) the physical impact causes physical injury to the plaintiff; and (3) the physical injury to the plaintiff causes the plaintiff's mental suffering or emotional distress." *Reid v. Waste Industries USA, Inc.*, 345 Ga. App. 236, 244, 812 S.E.2d 582, 590 (2018) (citation omitted).

876.   At all relevant times, Plaintiffs and putative class members were detained in the care, control, and custody of the Irwin County Defendants, who owed a duty to them to exercise reasonable and ordinary care.

877.   Irwin County Defendants breached their duty to Plaintiffs and putative class members by subjecting them to non-consensual, medically unindicated, and/or invasive gynecological procedures at the hands of Defendant Amin.

878.   Irwin County Defendants' conduct caused physical injury to Plaintiffs and putative class members, including medical complications and severe physical pain.

879.   Plaintiffs and putative class members suffered emotional distress as a result of being subjected to non-consensual, medically unindicated, and/or invasive gynecological procedures and their resulting physical injuries.

880.   Irwin County Defendants' conduct was the direct and proximate cause of the harm that Plaintiffs and putative class members suffered. Irwin County Defendants made

conscious decisions to either act or fail to act, causing Plaintiffs and putative class members to suffer emotional distress and anguish.

881. Plaintiffs and putative class members in no way contributed to their own injuries.

882. Irwin County Defendants are liable to Plaintiffs and putative class members for all damages resulting from their negligent infliction of emotional distress.

883. Irwin County Defendants have shown willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences, and Irwin County Defendants are liable to Defendants for punitive damages.

884. Plaintiffs seek actual and punitive damages against Irwin County Defendants for negligent infliction of emotional distress.

### EIGHTEENTH CLAIM FOR RELIEF
**Negligence, Gross Negligence, and Recklessness under the Federal Tort Claims Act and Georgia Law**

On Behalf of FTCA Plaintiffs for Damages Against Defendant United States of America

885. FTCA Plaintiffs repeat and re-allege the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

886. At all relevant times, Federal Defendants were officers and/or agents employed by the United States of America operating under the scope of employment.

887. Under Georgia law, to establish negligence, the plaintiff must show: (1) a legal duty, (2) a breach of that duty, (3) a causal connection between the conduct and the resulting injury, and (4) damage to the plaintiff. *See, e.g.*, *Goldstein, Garber & Salama, LLC v. J.B.*, 300 Ga. 840, 841, 797 S.E.2d 87, 89 (2017) (citing *Johnson v. American Nat. Red Cross*, 276 Ga. 270, 272, 578 S.E.2d 106, 108 (2003)).

888. In Georgia, the "absence of [slight diligence] is termed gross negligence." O.C.G.A. §
51–1–4.

889. ICE had a duty to ensure conditions of confinement of reasonable health and safety to
the individuals detained at ICDC. ICE also had a duty to ensure that those detained at
ICDC received adequate medical care that adhered to standards of gynecological
medical care.

890. The acts and omissions alleged herein constitute a breach of that duty of care with
respect to the Plaintiffs by ICE employees and/or agents acting in the scope of their
employment.

891. ICE employees and/or agents were stationed at ICDC to ensure adherence to binding
directives in the Performance Based National Detention Standards, which apply to both
federal and private detention facilities.

892. ICE employees and/or agents authorized Defendant Amin to provide non-consensual
and medically unnecessary procedures on individuals in ICE custody at ICDC, including
the Plaintiffs.

893. ICE employees and/or agents knew or should have known and/or recklessly disregarded
ICDC's practice of medical abuse and mistreatment. At least thirteen women brought
verbal or written complaints about the unnecessary, non-indicated, and/or non-
consensual medical procedures Defendant Amin performed on them.

894. ICE employees and/or agents knew or should have known and/or recklessly disregarded
the fact that, from 2013 to 2015, the DOJ investigated and sued Defendant Amin for
similar behavior—performing unnecessary medical procedures in violation of the False

Claims Act—as part of the lawsuit *United States v. Hospital Authority of Irwin County*, No. 7:13-cv-00097-HL (M.D. Ga.).

895. ICE employees and/or agents were negligent or grossly negligent in the provision of medical care, and in the provision of safe and sanitary conditions at ICDC.

896. ICE employees and/or agents breached their duty by failing to ensure adequate and appropriate medical care, despite sufficient notice of ongoing, unconsented to, and unnecessary gynecological surgeries at ICDC, and by failing to address repeated reports of inadequate medical care.

897. Plaintiffs suffered significant emotional, physical, and psychological distress under the conditions caused by the negligence, gross negligence and/or recklessness of ICE employees and/or agents acting within the scope of their employment.

898. ICE employees' and/or agents' breach of their duty of care was a direct and proximate cause and a substantial factor in the Plaintiffs' injuries, pain, and suffering. At all relevant times ICE employees and/or agents had the authority to prevent the known incidents of medical abuse at ICDC and yet failed to act to prevent ongoing and future harm. As such, ICE employees' and/or agents' actions proximately and directly caused Plaintiffs' harm.

899. The actions or omissions of ICE employees and/or agents described herein constitute the tort of negligence and/or gross negligence under the laws of the State of Georgia.

900. Under the Federal Tort Claims Act, Defendant United States of America is liable for these actions or omissions.

901. Plaintiffs seek actual and compensatory damages against the United States of America for negligence and/or gross negligence.

## NINETEENTH CLAIM FOR RELIEF
### Negligence *per se* under the Federal Tort Claims Act and Georgia Law

On Behalf of FTCA Plaintiffs for Damages Against Defendant United States of America

902.  FTCA Plaintiffs repeat and re-allege the allegations contained in the preceding

paragraphs of this Complaint as if fully set forth herein.

903.  At all relevant times, Federal Defendants were officers and/or agents employed by the

United States of America operating under the scope of employment.

904.  Under Georgia law, a plaintiff may recover for negligence *per se* when: (1) the

defendant violates a statute, (2) the person harmed falls within the class of persons the

legislation was intended to protect, (3) the harm or injury actually suffered was the same

harm the statute was intended to guard against, and (4) there is a causal connection

between the violation and the damage inflicted. *Groover v. Johnston*, 277 Ga. App. 12,

13, 625 S.E.2d 406, 408 (2005).

905.  ICE employees and/or agents have a duty to ensure conditions of confinement of

reasonable health and safety to the individuals detained at ICDC. ICE employees and/or

agents also have a duty to ensure that those detained at ICDC received adequate medical

care adhering to standards of care.

906.  ICE's PBNDS provide binding directives for medical care in all facilities housing ICE

detainees.

907.  By providing uniform standards of care to all ICE detainees, the PBNDS aims to protect

detainees from medical abuse or neglect. Plaintiffs thus fall within the class of persons

the PBNDS aims to protect.

908.  Additionally, by prescribing base standards for medical care, the PBNDS seeks to

rectify harms or injuries to detained noncitizens resulting from medical negligence or

malpractice. Thus, the harm sustained by Plaintiffs—the physical, emotional, and psychological harm of being subjected to medical abuse—is the exact harm the PBNDS seeks to guard against.

909. ICE employees and/or agents breached their duty by failing to ensure adequate and appropriate medical care, despite sufficient notice of ongoing unconsented to and unnecessary gynecological surgeries at ICDC and by failing to address repeated reports of inadequate medical care.

910. ICE employees and/or agents knew or should have known and/or recklessly disregarded the fact that from 2013 to 2015, the DOJ investigated and sued Defendant Amin for similar behavior—performing unnecessary medical procedures in violation of the False Claims Act—as part of the lawsuit *United States v. Hospital Authority of Irwin County*, No. 7:13-cv-00097-HL (M.D. Ga.).

911. ICE employees' and/or agents' acts, omissions, and conduct is the direct and proximate result of Plaintiffs' harm.

912. Under the Federal Tort Claims Act, Defendant United States of America is liable for these actions or omissions.

913. FTCA Plaintiffs seek actual and compensatory damages against the United States of America for negligence, gross negligence, and recklessness.

### TWENTIETH CLAIM FOR RELIEF
### Negligent Supervision under the Federal Tort Claims Act and Georgia Law

On Behalf of FTCA Plaintiffs for Damages Against Defendant United States of America

914. FTCA Plaintiffs repeat and re-allege the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

915. At all relevant times, Federal Defendants were officers and/or agents employed by the United States of America operating under the scope of employment.

916. Under Georgia law, an employer may be found liable for negligent supervision of an employee if there is "sufficient evidence to establish that the employer reasonably knew or should have known of an employee's tendencies to engage in certain behavior relevant to the injuries allegedly incurred by the plaintiff." *Novare Group, Inc. v. Sarif*, 290 Ga. 186, 190-91, 718 S.E.2d 304, 309 (2011) (quoting *Leo v. Waffle House, Inc.*, 298 Ga. App. 838, 841, 681 S.E.2d 258, 262 (2009).

917. ICE has a duty to prevent its employees and/or agents from causing physical harm to a third party. ICE has a duty to supervise its employees, agents, and/or contractors and to oversee the treatment of persons in their custody.

918. ICE breached its duty by failing to ensure safe, sanitary, and humane conditions at ICDC, including by failing to carry out adequate management oversight of the provision of medical care at the ICDC.

919. ICE employees and/or agents displayed a tendency of engaging in medical oversight and abuse. At least thirteen women launched verbal or written complaints about the unnecessary, non-indicated, and/or non-consensual medical procedures Defendant Amin performed on them, yet ICE employees and/or agents continued to approve referrals to send Plaintiffs to Defendant Amin.

920. ICE reasonably knew or should have known of its employees', agents', and/or contractors' broad practice of medical oversight and abuse. Beyond the numerous complaints launched, ICE knew or reasonably should have known that from 2013 to 2015, the DOJ investigated and sued Defendant Amin for similar behavior—performing

unnecessary medical procedures in violation of the False Claims Act—as part of the lawsuit *United States v. Hospital Authority of Irwin County*, No. 7:13-cv-00097-HL (M.D. Ga.). For years, immigrants detained at ICDC reported the lack of access to adequate medical care, including unanswered requests for treatment, failure to provide necessary medication or prenatal care, and long wait times of up to two weeks to see medical staff at ICDC.

921. As a direct and proximate cause of ICE employees and/or agents' acts, omissions, and conduct, Plaintiffs were forced to endure non-consensual, invasive, and unnecessary gynecological procedures.

922. ICE employees' and/or agents' acts, omissions, and conduct caused FTCA Plaintiffs to suffer extreme physical, mental, and emotional pain and distress.

923. Under the Federal Tort Claims Act, Defendant United States of America is liable for these actions or omissions.

924. Plaintiffs seek actual and compensatory damages against the United States of America for negligent supervision.

### TWENTY-FIRST CLAIM FOR RELIEF
### Intentional Infliction of Emotional Distress under the
### Federal Tort Claims Act and Georgia Law

On Behalf of FTCA Plaintiffs for Damages Against Defendant United States

925. FTCA Plaintiffs repeat and re-allege the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

926. At all relevant times, Federal Defendants were officers and/or agents employed by the United States of America operating under the scope of employment.

927. Under Georgia law, "[a] claim for intentional infliction of emotional distress has four elements: (1) intentional or reckless conduct (2) which is extreme and outrageous and

(3) caused the emotional distress (4) which is severe." *Pyle v. City of Cedartown*, 240 Ga. App. 445, 447, 524 S.E.2d 7, 9 (1999).

928. ICE has a duty to prevent its employees, agents, and/or contractors from causing physical harm to a third party. ICE breached its duty by failing to ensure safe, sanitary, and humane conditions at ICDC, including by failing to carry out adequate management oversight of the provision of medical care at the detention facility.

929. ICE employees' and/or agents' conduct was intentional and/or reckless. Despite knowing that Defendant Amin was subjecting women to unnecessary and physically abusive procedures, ICE employees and/or agents continued to approve referrals to Defendant Amin.

930. ICE employees' and/or agents' conduct was extreme and outrageous. ICE employees' and/or agents' conduct to continue approvals to Defendant Amin despite knowing of Defendant Amin's and ICDC's pattern of medical abuse and mistreatment is beyond the bounds of acceptable societal standards.

931. As a direct and proximate cause of ICE employees' and/or agents' conduct, Plaintiffs suffered extreme physical, emotional, and psychological distress and anguish.

932. Under the Federal Tort Claims Act, Defendant United States of America is liable for these actions or omissions.

933. Plaintiffs seek actual and compensatory damages against the United States of America for intentional infliction of emotional distress.

### TWENTY-SECOND CLAIM FOR RELIEF
**Negligent Infliction of Emotional Distress under the Federal Tort Claims Act and Georgia Law**

On Behalf of FTCA Plaintiffs for Damages Against Defendant United States of America

934. FTCA Plaintiffs repeat and re-allege the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

935. At all relevant times, Federal Defendants were officers and/or agents employed by the United States of America operating under the scope of employment.

936. Under Georgia law, "three elements are necessary to prevail on a claim for negligent infliction of emotional distress: (1) a physical impact to the plaintiff; (2) the physical impact causes physical injury to the plaintiff; and (3) the physical injury to the plaintiff causes the plaintiff's mental suffering or emotional distress." *Reid v. Waste Industries USA, Inc.*, 345 Ga. App. 236, 244, 812 S.E.2d 582, 590 (2018) (citation omitted).

937. ICE has a duty to prevent its employees, agents, and/or contractors from causing physical harm to a third party. ICE breached its duty by failing to ensure safe, sanitary, and humane conditions at ICDC, including by failing to carry out adequate management oversight of the provision of medical care at the detention facility.

938. ICE employees and/or agents acted negligently and/or recklessly. ICE employees and/or agents knew or should have known about ICDC's practice of medical abuse and mistreatment. At least thirteen women launched verbal or written complaints about the unnecessary, non-indicated, and/or non-consensual medical procedures Defendant Amin performed on them.

939. ICE employees and/or agents knew or should have known and/or recklessly disregarded the fact that from 2013 to 2015, the DOJ investigated and sued Defendant Amin for similar behavior—performing unnecessary medical procedures in violation of the False

Claims Act—as part of the lawsuit *United States v. Hospital Authority of Irwin County*, No. 7:13-cv-00097-HL (M.D. Ga.).

940. ICE employees' and/or agents' actions, omissions, and conduct caused a physical injury to Plaintiffs, including medical complications and severe physical pain.

941. FTCA Plaintiffs suffered emotional distress as a result of being subjected to non-consensual, medically unindicated, and/or invasive gynecological procedures and their resulting physical injuries.

942. ICE employees' and/or agents' actions, omissions, and conduct were the direct and proximate cause of Plaintiffs' physical, emotional, and psychological pain and suffering.

943. Under the Federal Tort Claims Act, Defendant United States of America is liable for these actions or omissions.

944. Plaintiffs seek actual and compensatory damages against the United States of America for negligent infliction of emotional distress.

### TWENTY-THIRD CLAIM FOR RELIEF
### Attorneys' Fees And Costs

On Behalf of Plaintiffs, Medical Abuse Class Members, Consent Sub-Class Members, and Unnecessary Procedures Sub-Class Members for Damages Against Irwin County Defendants

945. Plaintiffs repeat and re-allege the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

946. Plaintiffs are entitled to their attorneys' fees and costs against all Defendants that have committed intentional torts.

947. Defendants' actions also constitute conscious indifference to the consequences and have caused Plaintiffs unnecessary trouble and expense within the meaning of O.C.G.A. § 13-6-11.

948. Plaintiffs are entitled to recover their attorneys' fees and costs associated with this action in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court grant the following relief:

A. Declare that Defendants' conduct described herein as applied to Plaintiffs violates the First, Fifth, and Fourteenth Amendments to the United States Constitution; the Administrative Procedure Act; and 42 U.S.C. § 1985(2); and is therefore unlawful;

B. Issue an injunction prohibiting Defendants, their subordinates, agents, employees, contractors, and all others acting in concert with them from:

   a. subjecting Plaintiffs to the unconstitutional and unlawful practices described in this Complaint;

   b. retaliating against Plaintiffs for having brought this suit;

   c. retaliating against or otherwise deterring Plaintiffs from testifying in federal court proceedings or otherwise participating in any investigation or legal action related to their detention or abuse, including by expediting the deportation of witnesses and/or Plaintiffs;

   d. removing witnesses needed in connection with an ongoing criminal investigation.

C. Issue an order certifying this case as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

D. Appoint the undersigned as class counsel pursuant to Rule 23(g) of the Federal Rules of Civil Procedure;

E. Award Plaintiffs compensatory and punitive damages;

F.  Award Plaintiffs' counsel reasonable attorneys' fees and litigation costs, including but not limited to fees, costs, and disbursements pursuant to 28 U.S.C. § 241242, U.S.C. § 1988(b), and O.C.G.A. 13-6-11; and

G.  Grant such other and further relief as the Court deems just and proper.

Respectfully submitted on this 22d day of February 2022,

/s/ David N. Dreyer
David N. Dreyer
GA Bar No. 411322
Michael T. Sterling
GA Bar No. 745667
**Dreyer Sterling, LLC**
437 Memorial Dr., SE, Ste. A-2
Atlanta, GA 30312
Tel: (404) 234-4447
david@dreyersterling.com
michael@dreyersterling.com

/s/ Elora Mukherjee (by consent)
Elora Mukherjee (admitted *pro hac vice*)
NY Bar No. 4427233
**Morningside Heights Legal Services, Inc.**
435 West 116th Street, Room 831
New York, NY 10027
Tel: (203) 668-2639
emukherjee@law.columbia.edu

/s/ Sarah Sherman-Stokes (by consent)
Sarah Sherman-Stokes
(admitted *pro hac vice*)
**Immigrants' Rights and Human
Trafficking Program
Boston University School of Law**
765 Commonwealth Avenue
Boston, MA 02215
(617) 358-6272
sstokes@bu.edu

/s/ Clare Norins (by consent)
Clare Norins
Georgia Bar No. 575364
cnorins@uga.edu
**First Amendment Clinic
University of Georgia School of Law**
Post Office Box 388
Athens, Georgia 30603
(706) 542-1419
cnorins@uga.edu

/s/ Sirine Shebaya (by consent)
Sirine Shebaya
DC Bar No. 1019748
Matthew S. Vogel+
LA Bar No. 35363
Amber Qureshi++
Joseph Meyers+++
CA Bar No. 325183
(all admitted *pro hac vice*)
Ann Garcia*
DC Bar. No. 252661
**National Immigration Project of the
National Lawyers Guild (NIPNLG)**
2201 Wisconsin Ave NW, Suite 200
Washington, DC 20007
(202) 656-4788
sirine@nipnlg.org
matt@nipnlg.org
amber@nipnlg.org
joseph@nipnlg.org

/s/ Sabrineh Ardalan (by consent)
Sabrineh Ardalan
Sameer Ahmed
(both admitted *pro hac vice*)
**Harvard Immigration and Refugee Clinical
Program**
6 Everett Street, WCC 3103
Cambridge, MA 02138
(617) 384-7504
sardalan@law.harvard.edu
sahmed@law.harvard.edu

s/ Fatma Marouf (by consent)
Fatma Marouf
Immigrant Rights Clinic
**Texas A&M School of Law**
307 W. 7th St. Suite LL50
Fort Worth, TX 76102
(817) 212-4123
fatma.marouf@law.tamu.edu

/s/ Jason A. Cade (by consent)
Jason A. Cade
Georgia Bar No. 628870
Kristen E. Shepherd
Georgia Bar No. 789624
**Community Health Law Partnership**
**University of Georgia Law School**
P.O. Box 1761
Athens, Georgia 30603
(706) 227-5333
cadej@uga.edu
shepherdk@uga.edu

/s/ Azadeh Shahshahani (by consent)
Azadeh Shahshahani
Priyanka Bhatt
**Project South**
9 Gammon Ave SE
Atlanta, Georgia 30315
(404) 622-0602
azadeh@projectsouth.org

+Not admitted in DC; working remotely from and admitted in Louisiana only
++Admitted in Maryland; DC bar admission pending
+++Not admitted in DC; working remotely from and admitted in California only
* *Pro hac vice* application forthcoming

## CERTIFICATE OF SERVICE

I certify that on December 1, 2022, I filed Petitioners-Plaintiffs' Consolidated Second Amended Class Action Complaint for Declaratory and Injunctive Relief and for Damages with the Clerk of Court using the CM/ECF system, which will automatically send e-mail notification of such filing to counsel of record.

/s/ Amber Qureshi
Amber Qureshi
DC Bar No. 90001046
(admitted *pro hac vice*)
**National Immigration Project of the National Lawyers Guild (NIPNLG)**
2201 Wisconsin Ave NW, Suite 200
Washington, DC 20007
(202) 470-2082
amber@nipnlg.org

# EXHIBIT B

Case 3:23-mc-00251-MGL Document 17-2 Filed 05/24/24 Page 333 of 422

3:23-mc-00251-MGL   Date Filed 05/24/23   Entry Number 17   Page 1 of 3
Case 1:23-mc-00377   Document 3-2   Filed 10/12/23   Page 2 of 4

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION**

| | |
|---|---|
| **IN RE YANIRA OLDAKER** ) | |
| **SUBPOENA**, issued in the case of ) | |
| ) | |
| DR. MAHENDRA AMIN, ) | CIVIL ACTION FILE |
| ) | NO. 3:23-MC-00251-MGL |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| NBCUNIVERSAL MEDIA, LLC, ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

## JOINT STATUS REPORT

After conferring, the parties jointly inform the Court that we have reached agreement on

the following terms for Ms. Oldaker's deposition:

1. Amin and NBCU will each provide intended topic areas of questioning one week in

   advance of Ms. Oldaker's deposition.  Reasonable follow-up on topics that arise during

   questioning is allowed.

2. Amin and NBCU will each provide exhibits expected to be used one week in

   advance.  Documents needed for reasonable follow-up on topics that arise during

   questioning is allowed.

3. Amin may have up to 2 hours and 15 minutes on the record to depose Ms. Oldaker.  If

   Amin believes additional time is necessary to depose Ms. Oldaker after 2 hours and 15

   minutes on the record, Amin may petition the District Court for South Carolina for

   additional deposition time.

4. NBCU may have up to 1 hour and 15 minutes on the record to depose Ms. Oldaker.  If

   NBCU believes additional time is necessary to depose Ms. Oldaker after 1 hour and 15

Case 3:23-cv-00560-JBA-BW Document 17-2 Filed 05/24/24 Page 335 of 422

3:23-mc-00251-MGL   Date Filed 05/24/23   Entry Number 17   Page 2 of 3
Case 1:23-mc-00377   Document 3-2   Filed 10/12/23   Page 3 of 4

minutes on the record, NBCU may petition the District Court for South Carolina for additional deposition time.

5. The deposition of Ms. Oldaker will be marked confidential pursuant to the Protective Order. If any party in the *Amin v. NBCU* litigation seeks to file it in the litigation (i.e., as an exhibit during summary judgment briefing), it would have to be filed under seal.

6. If any party wishes to use the transcript of Ms. Oldaker's deposition outside of the *Amin v. NBCU* case, that party shall petition the relevant court for permission to do so (i.e., for the Oldaker litigation, it would be at Judge Sands' discretion).

7. Ms. Oldaker agrees that she will not argue that having her deposition taken in the *Amin v. NBCU* litigation is a basis for claiming that a deposition of her should not be had of her in the *Oldaker* litigation.

8. Counsel will continue to work in good faith to schedule Ms. Oldaker's deposition.

9. Counsel are hopeful that they will be able to resolve the issues raised in Ms. Oldaker's motion to quash without a need for further court intervention.

The parties shall provide another Joint Status Report to the Court on or before July 7, 2023.

Case 3:23-mc-00251-MGL   Document 17-2   Filed 05/24/23   Page 3 of 3

3:23-mc-00251-MGL    Date Filed 05/24/23    Entry Number 17    Page 3 of 3
Case 1:23-mc-00377   Document 3-2    Filed 10/12/23   Page 4 of 4

Consented to this 24th day of May, 2023.


/s/ Tina Cundari
Tina Cundari (Fed. I.D. No. 9679)
tina.cundari@smithrobinsonlaw.com
Frederick Hanna (Fed. I.D. No. 13826)
fred.hanna@smithrobinsonlaw.com
Smith Robinson Holler Dubose
and Morgan, LLC
2530 Devine Street, 3rd Floor
Columbia, SC 29205


-AND-

Stacey G. Evans
*Pro Hac Vice Application Forthcoming*
John Amble Johnson
*Pro Hac Vice Application Forthcoming*
Stacey Evans Law
4200 Northside Parkway NW
Building One, Ste. 200
Atlanta, Georgia 30327

**Attorneys for Dr. Mahendra Amin**


Elizabeth A. McNamara
*Pro Hac Vice Application Forthcoming*
Amanda B. Levine
*Pro Hac Vice Application Forthcoming*
Davis Wright Tremaine LLP
1251 Avenue of the Americas, 21st Floor
New York, NY 10020

**Attorneys for NBCUniversal Media, LLC**

/s/ Brad Banias
Brad Banias (Fed. I.D. No. 11585)
brad@baniaslaw.com
Banias Law, LLC
5 Sutherland Avenue
Charleston, SC 29403


-AND-

Elora Mukherjee
*Pro Hac Vice Application Forthcoming*
Morningside Heights Legal Services,
Inc.
435 W. 116th Street
New York, NY 10027

**Attorneys for Yanira Oldaker**

3

# EXHIBIT C
# FILED UNDER SEAL

# EXHIBIT D

Case 3:23-mc-00251-MGL Document 23 Filed 10/12/24 Page 339 of 422

3:23-mc-00251-MGL    Date Filed 08/04/23    Entry Number 23    Page 1 of 2
Case 1:23-mc-00377   Document 3-4   Filed 10/12/23   Page 2 of 3

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA
## COLUMBIA DIVISION

| | | |
|---|---|---|
| **IN RE YANIRA OLDAKER** | ) | |
| **SUBPOENA**, issued in the case of | ) | |
| | ) | |
| DR. MAHENDRA AMIN, | ) | CIVIL ACTION FILE |
| | ) | NO. 3:23-MC-00251-MGL |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| NBCUNIVERSAL MEDIA, LLC, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## JOINT STATUS REPORT

Pursuant to the Court's order dated July 10, 2023, the parties file this Joint Status Report. The deposition of Ms. Oldaker took place on July 27, 2023. Accordingly, Ms. Oldaker's motion to quash, or in the alternative, stay the deposition (Docket #1) is now moot. However, counsel for Dr. Amin is considering moving for sanctions to address off-the-record conferences that occurred between Ms. Oldaker, her counsel, and counsel for NBCUniversal during the deposition. Counsel for Dr. Amin will promptly decide whether to file a motion for sanctions after receipt and review of the transcript of Ms. Oldaker's deposition. Counsel for Dr. Amin seeks the Court's guidance on whether any such motion should be filed in this matter or in a new miscellaneous matter to be filed with the Court. Counsel for Ms. Oldaker will oppose any motion seeking sanctions against them.

If the Court wishes to hear a potential motion for sanctions in the present case, Dr. Amin will provide a Status Report to the Court within seven (7) days of receipt of the Oldaker deposition transcript stating whether he will move for sanctions. If the Court does not wish to hear a potential motion for sanctions in this matter, the parties jointly request dismissal and closure of the case, with leave for Dr. Amin to file a motion for sanctions in another matter.

Case 5:23-cv-00558-BO-RN Document 17-205 Filed 05/22/24 Page 208 of 422
3:23-mc-00251-MGL    Date Filed 08/04/23    Entry Number 23    Page 2 of 2
Case 1:23-mc-00377  Document 3-4  Filed 10/12/23  Page 3 of 3

Consented to this 4th day of August, 2023.


_/s/ Tina Cundari_
Tina Cundari (Fed. I.D. No. 9679)
tina.cundari@smithrobinsonlaw.com
Frederick Hanna (Fed. I.D. No. 13826)
fred.hanna@smithrobinsonlaw.com
Smith Robinson Holler Dubose
and Morgan, LLC
2530 Devine Street, 3rd Floor
Columbia, SC 29205


-AND-

Stacey G. Evans
_Pro Hac Vice Application Forthcoming_
John Amble Johnson
_Pro Hac Vice Application Forthcoming_
Stacey Evans Law
4200 Northside Parkway NW
Building One, Ste. 200
Atlanta, Georgia 30327

**Attorneys for Dr. Mahendra Amin**


Elizabeth A. McNamara
_Pro Hac Vice Application Forthcoming_
Amanda B. Levine
_Pro Hac Vice Application Forthcoming_
Davis Wright Tremaine LLP
1251 Avenue of the Americas, 21st Floor
New York, NY 10020

**Attorneys for NBCUniversal Media, LLC**

_/s/ Brad Banias_
Brad Banias (Fed. I.D. No. 11585)
brad@baniaslaw.com
Banias Law, LLC
5 Sutherland Avenue
Charleston, SC 29403

-AND-


Elora Mukherjee
_Pro Hac Vice Application Forthcoming_
Morningside Heights Legal Services,
Inc.
435 W. 116th Street
New York, NY 10027

**Attorneys for Yanira Oldaker**

# EXHIBIT E



Amber Qureshi <amber@nipnlg.org>

---

## Fwd: Amin/NBCU: Ms. Oldaker deposition

**Stacey Evans** <sevans@staceyevanslaw.com>                          Mon, Aug 28, 2023 at 3:26 PM
To: Amber Qureshi <amber@nipnlg.org>
Cc: Elizabeth <lizmcnamara@dwt.com>, "amandalevine@dwt.com" <AmandaLevine@dwt.com>, Leena
<LeenaCharlton@dwt.com>, "Scott R. Grubman" <SGrubman@cglawfirm.com>, Amble Johnson
<ajohnson@staceyevanslaw.com>, Cynthia Counts <Cynthia.Counts@fisherbroyles.com>, Matthew Vogel
<matt@nipnlg.org>, Elora Mukherjee <emukherjee@law.columbia.edu>, Stacey Evans <sevans@staceyevanslaw.com>

Elora did *not* note the contents of the lunch meeting on the record.  The deposition is part of a process to hopefully avoid
needing to file a motion for sanctions, I've indicated it would be short, and that we could conduct it remotely.  Despite all
this, your position is clear and we will act accordingly.

---

**From:** Amber Qureshi <amber@nipnlg.org>
**Sent:** Monday, August 28, 2023 3:24 PM
**To:** Stacey Evans <sevans@staceyevanslaw.com>
**Cc:** Elizabeth <lizmcnamara@dwt.com>; Leena <LeenaCharlton@dwt.com>; Scott R.
Grubman <SGrubman@cglawfirm.com>; Amble Johnson <ajohnson@staceyevanslaw.com>; Cynthia Counts
<Cynthia.Counts@fisherbroyles.com>; Matthew Vogel <matt@nipnlg.org>; Elora Mukherjee
<emukherjee@law.columbia.edu>
**Subject:** Re: Amin/NBCU: Ms. Oldaker deposition

EXTERNAL SENDER. Only open links and attachments from known senders. DO NOT provide your username or
password.

Dear Stacey,

As I am sure you are aware, the rule further states that: "Any conferences that occur pursuant to, or in violation of, Local
Civ. Rule 30.04(E) (D.S.C.) shall be noted on the record by the counsel who participated in the conference. The purpose
and outcome of the conference shall be noted on the record." Local Civ. Rule 30.04(G) (D.S.C.).

You already had the opportunity to inquire about any off-the-record conversations Elora may have had with Ms. Oldaker.
Elora very clearly and thoroughly stated as much on the record. The Rule does not contemplate, and you have not cited a
single case where, the deposing attorney was allowed to depose counsel for the witness after the deposition. Thus, the
requirements of the Local Rule are met and a deposition is wholly inappropriate in these circumstances.

I mentioned at the end of my prior email that Elora will not accept service of a subpoena and neither will we accept
service on her behalf.

Regards,

Amber



**Amber** (um-ber) **Qureshi** | she/her/hers
Staff Attorney
National Immigration Project
Tel: (202) 470-2082
2201 Wisconsin Ave. NW, Suite 200
Washington, DC 20007
www.nipnlg.org | @nipnlg

Give today | View our upcoming trainings | Become a member

WARNING: The information contained herein is intended only for the use of the intended recipient(s) and may contain information that is confidential or legally privileged. Interception, copying, accessing, disclosure, distribution, or use of this message or any attachments by any person other than an intended recipient is prohibited. If you are not the intended recipient, please immediately advise the sender by replying by email that this message has been inadvertently transmitted to you and destroy all electronic and paper copies in your possession or control.

On Fri, Aug 25, 2023 at 5:29 PM Stacey Evans <sevans@staceyevanslaw.com> wrote:

Amber,

Thank you for your email.  I did, indeed, share the rule that Elora violated during Ms. Oldaker's deposition.  Again, it is DSC Local Rule 30.04(e), the text of which I'll share here:  "Counsel and witnesses shall not engage in private, 'off the record' conferences during depositions or during breaks or recesses regarding the substance of the testimony at the deposition, except for the purpose of deciding whether to assert a privilege or to make an objection or to move for a protective order."  Local Rule 30.04 includes subsection (j), which provides that "Violation of this rule shall be deemed to be a violation of a court order and shall subject the violator to sanctions under Fed. R. Civ. P. 37(b)(2)."

Ms. Oldaker testified to conversations regarding testimony with counsel.  *See, e.g.*, Oldaker Dep. at 93-94, 114-117.  Elora herself admitted to conversations regarding testimony with Ms. Oldaker.  *See, e.g.*, Oldaker Dep. at 118-120.

You did not specify whether Elora would or would not accept service of a subpoena for her deposition so I will ask now if she will or if you or Mr. Vogel will accept on her behalf.  Let me know by 5pm Monday.  If she or you (or Mr. Vogel) will not accept service, then I will proceed with formal service.

Thank you, Stacey

**From:** Amber Qureshi <amber@nipnlg.org>
**Sent:** Thursday, August 24, 2023 5:10 PM
**To:** Stacey Evans <sevans@staceyevanslaw.com>; Elizabeth <lizmcnamara@dwt.com>; amandalevine@dwt.com; Leena <LeenaCharlton@dwt.com>; Scott R. Grubman <SGrubman@cglawfirm.com>; Amble Johnson <ajohnson@staceyevanslaw.com>; Cynthia Counts <Cynthia.Counts@fisherbroyles.com>
**Cc:** Matthew Vogel <matt@nipnlg.org>; Elora Mukherjee <emukherjee@law.columbia.edu>
**Subject:** Re: Amin/NBCU: Ms. Oldaker deposition

EXTERNAL SENDER. Only open links and attachments from known senders. DO NOT provide your username or password.

Dear Stacey,

My colleague Matt Vogel (cc'd) and I represent Elora regarding this matter. Our view is that any sanctions motions and certainly any deposition of Elora or other counsel at Ms. Oldaker's deposition are inappropriate, unwarranted, and have no basis in law or fact. Further, you have cited no authority either supporting sanctions under these circumstances or requiring such depositions. Accordingly, neither we nor Elora consent to accepting service of a subpoena.

Thank you,

Amber



**Amber** (um-ber) **Qureshi** | she/her/hers
Staff Attorney
National Immigration Project
Tel: (202) 470-2082
2201 Wisconsin Ave. NW, Suite 200
Washington, DC 20007
www.nipnlg.org | @nipnlg

Give today | View our upcoming trainings | Become a member

WARNING: The information contained herein is intended only for the use of the intended recipient(s) and may contain information that is confidential or legally privileged. Interception, copying, accessing, disclosure, distribution, or use of this message or any attachments by any person other than an intended recipient is prohibited. If you are not the intended recipient, please immediately advise the sender by replying by email that this message has been inadvertently transmitted to you and destroy all electronic and paper copies in your possession or control.

---------- Forwarded message ---------
From: **Stacey Evans** <sevans@staceyevanslaw.com>
Date: Wed, Aug 23, 2023 at 12:14 PM
Subject: RE: Amin/NBCU: Ms. Oldaker deposition
To: Cynthia Counts <Cynthia.Counts@fisherbroyles.com>, Elora Mukherjee <EMukherjee@law.columbia.edu>
Cc: McNamara, Elizabeth <lizmcnamara@dwt.com>, amandalevine@dwt.com <AmandaLevine@dwt.com>, Charlton, Leena <LeenaCharlton@dwt.com>, Scott R. Grubman <SGrubman@cglawfirm.com>, Amble Johnson <ajohnson@staceyevanslaw.com>, Stacey Evans <sevans@staceyevanslaw.com>

Following up on this email.

Cynthia and Elora, Please let me know if you will work cooperative to schedule these depositions, or if you will at least accept service of subpoenas, by 5pm tomorrow.  Otherwise we will serve you with subpoenas for the depositions.

Liz, I also need an answer to the question I posed to you by 5pm tomorrow as well so I can consider what relief I may need to request from the Court.

Thank you, Stacey

---

**From:** Stacey Evans <sevans@staceyevanslaw.com>
**Sent:** Wednesday, August 16, 2023 10:19 AM
**To:** Cynthia Counts <Cynthia.Counts@fisherbroyles.com>; Elora Mukherjee <EMukherjee@law.columbia.edu>
**Cc:** McNamara, Elizabeth <lizmcnamara@dwt.com>; amandalevine@dwt.com; Charlton, Leena <LeenaCharlton@dwt.com>; Scott R. Grubman <SGrubman@cglawfirm.com>; Amble Johnson <ajohnson@staceyevanslaw.com>; Stacey Evans <sevans@staceyevanslaw.com>
**Subject:** Amin/NBCU: Ms. Oldaker deposition

**Cynthia and Elora**,

Good morning.  As you know, Plaintiff has concerns that there were multiple violations of the D.S.C. Local Rules during Ms. Oldaker's deposition.  Those concerns remain after receipt and review of the transcript of the deposition.  Specifically, we are concerned that counsel for Defendant and counsel for the witness violated Local Rule 30.04(e) during the lunch break and during at least three smaller breaks during the deposition.  Before we file a motion for sanctions, we want to exercise our right to explore the communications that occurred during those breaks with Ms. Counts and Ms. Mukherjee.  I believe this can be accomplished via short remote depositions.  I would like to work cooperative to arrange these depositions.

To that end, I ask that each of you let me know if you will accept service of a subpoena for your deposition and what dates/time you are available for same.  I don't expect either of these depositions to be longer than one hour.  I'm not committing to that time frame, but I'm sharing that expectation for scheduling purposes.

Further, **Liz**, I would appreciate you confirming that you will not seek to count these two depositions against our third party deposition counts in the NBCU case.  I am still not convinced we will use all remaining third depositions, but I don't want to get to that point and have you argue these two count against what remains.  Please confirm so that I can reach out to the Court for assistance if we disagree here.

Thank you, Stacey

_____

Stacey Godfrey Evans

STACEY EVANS LAW

4200 Northside Pkwy NW

Bldg One; Suite 200

Atlanta, GA 30327

770-779-9602

www.staceyevanslaw.com

# EXHIBIT F



**Amber Qureshi <amber@nipnlg.org>**

---

## Elora Mukherjee deposition

**Stacey Evans** <sevans@staceyevanslaw.com>　　　　　　　　Wed, Oct 11, 2023 at 9:34 AM
To: Matthew Vogel <matt@nipnlg.org>
Cc: "amber@nipnlg.org" <amber@nipnlg.org>, Elora Mukherjee <emukherjee@law.columbia.edu>, "McNamara, Elizabeth"
<lizmcnamara@dwt.com>, Amanda Levine <AmandaLevine@dwt.com>, Cynthia Counts
<Cynthia.Counts@fisherbroyles.com>, Amble Johnson <ajohnson@staceyevanslaw.com>, Stacey Evans
<sevans@staceyevanslaw.com>

Matt,


Thank you.  I understand you will do what you feel you need to do, but even your statement of Elora's "discussing" of the
lunch meeting on the record makes clear that she did not share the substance of the discussion between Cynthia and Ms.
Oldaker, which is the subject matter we are looking to discover.


Thank you, Stacey

---

**From:** Matthew Vogel <matt@nipnlg.org>
**Sent:** Wednesday, October 11, 2023 9:21 AM
**To:** Stacey Evans <sevans@staceyevanslaw.com>
**Cc:** amber@nipnlg.org; Elora Mukherjee <emukherjee@law.columbia.edu>; McNamara, Elizabeth
<lizmcnamara@dwt.com>; Amanda Levine <AmandaLevine@dwt.com>; Cynthia Counts
<Cynthia.Counts@fisherbroyles.com>; Amble Johnson <ajohnson@staceyevanslaw.com>
**Subject:** Re: Elora Mukherjee deposition


EXTERNAL SENDER. Only open links and attachments from known senders. DO NOT provide your username or
password.

Dear Stacey,


Thank you for your email. We do not see any meaningful way to narrow the questions that would address our
concerns, so we plan to move forward with a motion to quash.


Just to clarify, as we have said before, Elora did, in fact, discuss the lunch meeting on the record at the deposition - see
our September 22 email. As we said there, "Elora directly addressed the lunch meeting on the record, saying that they
discussed the number of preparatory sessions they had with Ms. Oldaker, Oldaker Depo. Tr. at 119:18-25, and noted
the contents of conversations with Ms. Oldaker during the breaks including lunch, id. at 118:9-120:11."


If there is anything further you would like to discuss, please let us know.


Thank you,

Matt

**Matthew Vogel** | *he/him*

Supervising Attorney

National Immigration Project (NIPNLG)

Tel: (504) 264-3613

2201 Wisconsin Ave. NW, Suite 200

Washington, DC 20007

www.nipnlg.org | @nipnlg

*Based in New Orleans; admitted in Louisiana only.*

Give today | View our upcoming trainings | Become a member

WARNING: The information contained herein is intended only for the use of the intended recipient(s) and may contain information that is confidential or legally privileged. Interception, copying, accessing, disclosure, distribution, or use of this message or any attachments by any person other than an intended recipient is prohibited. If you are not the intended recipient, please immediately advise the sender by replying by email that this message has been inadvertently transmitted to you and destroy all electronic and paper copies in your possession or control.

On Oct 5, 2023, at 2:12 PM, Stacey Evans <sevans@staceyevanslaw.com> wrote:

Matt,

Good afternoon.

I will reiterate my offer of the written declaration answering the questions I posed.  If you want to discuss narrowing those questions, I'm open to that, but otherwise, my offer stands.

While you stated that "Elora already put on the record what happened during any discussions that may have involved the substance of Ms. Oldaker's testimony, either affirmatively or under questioning from you," Elora must acknowledge that she did not provide any information about the lunch conversation.  Given Ms. Oldaker did testify that Cynthia previewed questions to her, but then suddenly claimed not to remember information asked to follow up on that question after Cynthia started objecting, it is clear there was substantive discussion of testimony during lunch.  That lunch discussion is the beginning and end of my inquiry and I ask you to reconsider the declaration.  Happy to discuss by phone.

Thank you, Stacey

---

**From:** Matthew Vogel <matt@nipnlg.org>
**Sent:** Monday, October 2, 2023 4:58 PM
**To:** Stacey Evans <sevans@staceyevanslaw.com>
**Cc:** amber@nipnlg.org; Elora Mukherjee <emukherjee@law.columbia.edu>; McNamara, Elizabeth <lizmcnamara@dwt.com>; Amanda Levine <AmandaLevine@dwt.com>; Cynthia Counts <Cynthia.Counts@fisherbroyles.com>; Amble Johnson <ajohnson@staceyevanslaw.com>
**Subject:** Re: Elora Mukherjee deposition

EXTERNAL SENDER. Only open links and attachments from known senders. DO NOT provide your username or password.

Dear Stacey,

Thank you for your email and for your offer to reschedule the deposition. Without conceding any of our arguments against the subpoena, and in an effort to facilitate further conferral and orderly briefing, should we ultimately seek to quash the subpoena, we accept your offer to reschedule Elora's deposition to November 1, 2023.

We look forward to your further response, especially any suggestions as to how we may resolve this matter without bringing it before the court.

Thanks,

Matt

<~WRD0001.jpg>     **Matthew Vogel** | *he/him*

Supervising Attorney

National Immigration Project (NIPNLG)

Tel: (504) 264-3613

2201 Wisconsin Ave. NW, Suite 200

Washington, DC 20007

www.nipnlg.org | @nipnlg

*Based in New Orleans; admitted in Louisiana only.*

Give today | View our upcoming trainings | Become a member

WARNING: The information contained herein is intended only for the use of the intended recipient(s) and may contain information that is confidential or legally privileged. Interception, copying, accessing, disclosure, distribution, or use of this message or any attachments by any person other than an intended recipient is prohibited. If you are not the intended recipient, please immediately

advise the sender by replying by email that this message has been inadvertently transmitted to you and destroy all electronic and paper copies in your possession or control.

On Oct 2, 2023, at 10:25 AM, Stacey Evans <sevans@staceyevanslaw.com> wrote:

Matthew,

Thank you.  I'll respond further, but for now I wanted to let you know that I'm fine to pick a date further out to allow time for further conferral/your anticipated motion.  What date would you like to use – would Nov. 1 work?

Thank you, Stacey

---

**From:** Matthew Vogel <matt@nipnlg.org>
**Sent:** Monday, October 2, 2023 10:03 AM
**To:** Stacey Evans <sevans@staceyevanslaw.com>
**Cc:** amber@nipnlg.org; Elora Mukherjee <emukherjee@law.columbia.edu>; McNamara, Elizabeth <lizmcnamara@dwt.com>; Amanda Levine <AmandaLevine@dwt.com>; Cynthia Counts <Cynthia.Counts@fisherbroyles.com>; Amble Johnson <ajohnson@staceyevanslaw.com>
**Subject:** Re: Elora Mukherjee deposition

EXTERNAL SENDER. Only open links and attachments from known senders. DO NOT provide your username or password.

Dear Stacey,

Thanks for your email. Just to recap, you had previously offered by email to accept a declaration from Elora that answered a list of eleven question which you provided. Then, on Tuesday, September 26, following another deposition in the case, you, me, and Cynthia Counts had a short conference regarding the deposition and possible sanctions motion. You reiterated your offer of a declaration and also offered to take a sworn oral statement, and to put whatever Elora and Cynthia decided to do under a protective order. You explained that you believe that Elora committed sanctionable conduct by violating the District of South Carolina local rules, but said that if your questions were answered satisfactorily, you would not seek sanctions against either Elora or Cynthia.  You reported your impression that, during Yanira Oldaker's deposition, when Cynthia started objecting to your questions, then Ms. Oldaker suddenly didn't remember anything, and, as you have already said and questioned Elora about, you believe Ms. Oldaker changed an answer because of something Elora said to her. You indicated that, if Elora does not submit a declaration or sworn statement and challenges the deposition with a motion to quash, then you would proceed with filing the sanctions motion.

I relayed all of this to my co-counsel and to Elora, and Elora has decided not to provide a declaration or sworn statement and to move forward with a motion to quash the deposition. Our position is, as we have said before, that, in an abundance of caution, Elora already put on the record what happened during any discussions that may have involved the substance of Ms. Oldaker's testimony, either affirmatively or under questioning from you.

Accordingly, we again ask that you withdraw the subpoena, for all of the reasons that we outlined in our last email on the subject (Sept. 22 email to Stacey Evans). If you do not, we will move forward with a motion to quash the deposition for those reasons. We will file the motion to quash as soon as possible, but because of the rapidly approaching date of the deposition, the only fifteen-day window between service of the subpoena and the deposition date, and because the negotiations around the deposition have been ongoing until now, we request that you postpone the deposition until after the motion to quash litigation has been resolved.

We would be happy to discuss this further if you have any questions.

Thank you,

Matt

<~WRD0001.jpg>   **Matthew Vogel** | *he/him*

Supervising Attorney

National Immigration Project (NIPNLG)

Tel: (504) 264-3613

2201 Wisconsin Ave. NW, Suite 200

Washington, DC 20007

www.nipnlg.org | @nipnlg

*Based in New Orleans; admitted in Louisiana only.*

Give today | View our upcoming trainings | Become a member

WARNING: The information contained herein is intended only for the use of the intended recipient(s) and may contain information that is confidential or legally privileged. Interception, copying, accessing, disclosure, distribution, or use of this message or any attachments by any person other than an intended recipient is prohibited. If you are not the intended recipient, please immediately advise the sender by replying by email that this message has been inadvertently transmitted to you and destroy all electronic and paper copies in your possession or control.

On Sep 30, 2023, at 6:02 PM, Stacey Evans <sevans@staceyevanslaw.com> wrote:

Matthew,

I wanted to follow up and see if Elora would like to provide the declaration in lieu of further fighting about the deposition.

Thank you, Stacey

---

**From:** Stacey Evans <sevans@staceyevanslaw.com>
**Sent:** Friday, September 22, 2023 10:32 PM
**To:** Matthew Vogel <matt@nipnlg.org>
**Cc:** amber@nipnlg.org; Elora Mukherjee <emukherjee@law.columbia.edu>; McNamara, Elizabeth <lizmcnamara@dwt.com>; Amanda Levine <AmandaLevine@dwt.com>; Cynthia Counts <Cynthia.Counts@fisherbroyles.com>; Amble Johnson <ajohnson@staceyevanslaw.com>; Stacey Evans <sevans@staceyevanslaw.com>
**Subject:** RE: Elora Mukherjee deposition

Matthew,

Thank you for your email.

I'll briefly address the points in your email:

- Service is proper under the Federal Rules and Ms. Mukherjee clearly has notice of the subpoena.
- I've already agreed to limit the deposition to the lunch conversation that Ms. Mukherjee, Ms. Oldaker, and Ms. Counts participated in on July 27, 2023.  There can be no concern of privilege over this conversation because a third party to the attorney-client relationship (Ms. Counts) was present.
- There is no undue burden because I've already agreed to limit the deposition to the lunch conversation and to take it by Zoom.

Nevertheless, I appreciate your offer of the declaration.  All I want to know is what occurred during the lunch conversation and I believe that can be accomplished with a declaration signed by Ms. Mukherjee answering the following questions.  If she will agree to do so, I will withdraw the subpoena.

Questions:

1. During lunch on July 27, 2023, did Ms. Counts or Ms. Mukherjee discuss any questions Ms. Counts was planning to ask Ms. Oldaker?
2. During lunch on July 27, 2023, did Ms. Counts or Ms. Mukherjee say that Ms. Counts would ask Ms. Oldaker about prior pap smears with other doctors?

3. During lunch on July 27, 2023, did Ms. Counts or Ms. Mukherjee say that Ms. Counts would ask Ms. Oldaker about prior transvaginal ultrasounds with other doctors?
4. During lunch on July 27, 2023, did Ms. Counts or Ms. Mukherjee say that Ms. Counts would ask Ms. Oldaker about literature or pamphlets available at other doctors' offices she had visited?
5. During lunch on July 27, 2023, did Ms. Counts or Ms. Mukherjee say that Ms. Counts would ask Ms. Oldaker whether other doctors had given her pamphlets during her visits?
6. During lunch on July 27, 2023, did Ms. Counts or Ms. Mukherjee show Ms. Oldaker any medical records?
7. During lunch on July 27, 2023, did Ms. Counts or Ms. Mukherjee say that Ms. Counts was going to ask Ms. Oldaker about a sonogram picture?
8. During lunch on July 27, 2023, did Ms. Counts or Ms. Mukherjee suggest that Ms. Oldaker should have, must have, or maybe did hear more information about women at ICDC having hysterectomies than Ms. Oldaker shared in response to Dr. Amin's counsel's questioning?
9. During lunch on July 27, 2023, did Ms. Counts or Ms. Mukherjee suggest to Ms. Oldaker what her answers to any questions should be, and if so, what?
10. During lunch on July 27, 2023, did Ms. Counts or Ms. Mukherjee state how they would answer any questions if they were Ms. Oldaker, and if so, what?
11. What was said during lunch on July 27, 2023 (inclusive of all present)?

Thank you, Stacey

---

**From:** Matthew Vogel <matt@nipnlg.org>
**Sent:** Friday, September 22, 2023 5:37 PM
**To:** Stacey Evans <sevans@staceyevanslaw.com>
**Cc:** amber@nipnlg.org; Elora Mukherjee <emukherjee@law.columbia.edu>; McNamara, Elizabeth <lizmcnamara@dwt.com>; Amanda Levine <AmandaLevine@dwt.com>; Cynthia Counts <Cynthia.Counts@fisherbroyles.com>
**Subject:** Elora Mukherjee deposition


EXTERNAL SENDER. Only open links and attachments from known senders. DO NOT provide your username or password.


Dear Stacey,


We understand that your process server recently served a subpoena for a deposition of Elora Mukherjee on October 4 on somebody at her clinic. We write to ask that you withdraw this subpoena and stop seeking to depose Elora or else we will have to seek protection from the court.


As we have previously stated, Elora has already provided on the record at the deposition both the purpose and the outcome of any off-the-record conversations she had with Ms. Oldaker which may have had to do with the substance of the testimony at that deposition. *See* Oldaker Depo. Tr. at 118:3-120:16, 122:5-123:8. You had previously stated that "Elora did not note the contents of the lunch meeting on the record." Email from Stacey Evans, Aug. 28, 2023 at 3:26:56. However, Elora directly addressed the lunch meeting on the record, saying that they discussed the number of preparatory sessions they had with Ms. Oldaker, Oldaker Depo. Tr. at 119:18-25, and noted the contents of conversations with Ms. Oldaker during the breaks including lunch, *id.* at 118:9-120:11. We simply do not see what else Elora could relevantly testify to.

Accordingly, we do not believe that this deposition is proper. First, we do not believe there has been proper service upon Elora, nor do we believe that the subpoena that was served complies with the requirements of Rule 45. Second, as we have stated, we do not believe that further testimony from Elora is relevant. Relatedly, it is important to remember that Ms. Oldaker is Elora's client, and Elora will not testify to any privileged, work product, or otherwise protected communications with her client.

Third, and perhaps most importantly, this deposition would constitute an undue burden on a non-party to the defamation litigation - and not just a non-party, but counsel for a non-party witness who is suing your client in a separate civil rights action. Not only is deposing counsel disfavored, Elora's teaching duties will have her traveling out of the country all week next week, leaving her little opportunity to prepare for a deposition that was scheduled so soon as to leave only just barely enough time even to challenge it in court. Further, you already had the opportunity to - and, in fact, did - question Ms. Oldaker during the deposition regarding any possible witness coaching, as would have been proper and as is contemplated under the District of South Carolina local rules. *See* Oldaker Depo. Tr. at 125:5-20. At no point did you interrupt the deposition to seek relief from the Court because of anything improper. In fact, not only did you question Ms. Oldaker regarding any possible witness coaching, you also questioned Elora at the deposition about whether she suggested that Ms. Oldaker change one of her answers, and Elora directly answered that she did not. *See, e.g.*, Oldaker Depo. Tr. at 120:12-16. Elora has placed on the record the purpose and outcome of any off-the-record conversations she may have had with her client during the deposition that related to the substance of the testimony at the deposition, and both she and Ms. Oldaker also answered questions from you regarding those conversations. You had the opportunity to question them and you did; further questioning at a deposition is unwarranted and improper.

Elora simply has nothing else to relate regarding her conversations with her client. If there is nevertheless information that you believe Elora could provide, perhaps she could provide a declaration.

Thank you,

Matt

 <image001.jpg>  **Matthew Vogel** | *he/him*

Supervising Attorney

National Immigration Project (NIPNLG)

Tel: (504) 264-3613

2201 Wisconsin Ave. NW, Suite 200

Washington, DC 20007

www.nipnlg.org | @nipnlg

*Based in New Orleans; admitted in Louisiana only.*

Give today | View our upcoming trainings | Become a member

WARNING: The information contained herein is intended only for the use of the intended recipient(s) and may contain information that is confidential or legally privileged. Interception, copying, accessing, disclosure, distribution, or use of this message or any attachments by any person other than an intended recipient is prohibited. If you are not the intended recipient, please immediately advise the sender by replying by email that this message has been inadvertently transmitted to you and destroy all electronic and paper copies in your possession or control.

# Exhibit 4

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
VALDOSTA DIVISION

YANIRA YESENIA OLDAKER, *et al.*,                 :
                                                  :
              Plaintiffs,                         :
                                                  :
       v.                                         :        CASE NO:  7:20-cv-224 (WLS)
                                                  :
THOMAS P. GILES, *et al.*,                        :
                                                  :
              Defendants.                         :
_____

## ORDER

By Order (Doc. 305) entered May 4, 2023, the Court continued the stay of discovery in this case due to ongoing criminal investigation concern the same alleged violations as those alleged by Plaintiffs in this action. The Order further required that on or before August 2, 2023, the Official Capacity Federal Defendants were to file a statement in the record updating the Court as to whether the criminal and internal investigations are still ongoing and, to the extent Counsel is able, provide an estimate of when the investigations will be concluded. (Doc. 305 at 2-3.) The Official Capacity Federal Defendants timely filed a Status Report, explaining that:

> As of July 28, 2023, United States Attorneys and other federal civil rights investigators continue to investigate the allegations in this lawsuit, to determine whether any criminal conduct, including criminal civil rights violations, occurred. Counsel for Federal Defendants have been informed that the criminal investigation remains ongoing. Because of the nature of such investigations, Counsel have been unable to obtain an estimate of when the investigation will end or when discovery in this case will no longer interfere with the investigation.

(Doc. 314 at 2.) The Official Capacity Federal Defendants request that the discovery stay remain in effect for an additional ninety (90) days through and including October 31, 2023, at which time, they will provide an additional status report to the Court. The Court ordered that any Parties who wish to object to the requested extension do so by August 10, 2023. (Doc. 316.) Responses were filed by the Plaintiffs (Doc. 317) and Defendants Walkiria Mines and Djibril "William" Rabiou (Doc. 318), who all stated that they do not oppose the requested stay.

Accordingly, for good shown this case and all pending deadlines are hereby **STAYED** until **Tuesday, October 31, 2023**, unless otherwise ordered by the Court. By the same date, the Official Capacity Federal Defendants **SHALL** file a Status Report and, if applicable, shall explain the appropriateness of an extension of the stay. Any responses to such status report shall be filed within seven (7) days of the date such Status Report is filed.

   **SO ORDERED**, this 11th day of August 2023.

**/s/ W. Louis Sands**
**W. LOUIS SANDS, SR. JUDGE**
**UNITED STATES DISTRICT COURT**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
### VALDOSTA DIVISION

| | | |
|---|---|---|
| **YANIRA YESENIA OLDAKER**, *et al.*, | : | |
| | : | |
| **Plaintiffs,** | : | |
| | : | |
| **v.** | : | **CASE NO: 7:20-cv-224 (WLS)** |
| | : | |
| **THOMAS P. GILES**, *et al.*, | : | |
| | : | |
| **Defendants.** | : | |
| _____ | : | |

## ORDER

This matter is before the Court, *sua sponte*, for purposes of correcting the Order (Doc. 319) entered August 11, 2023.  That Order was intended to stay only discovery in this case, but incorrectly stayed this case and all pending deadlines until October 31, 2023.

Therefore, the first full paragraph on page 2 of the Order is amended to read:

Accordingly, for good shown **discovery** of this case shall be, and hereby is, **STAYED** until **Tuesday, October 31, 2023**, unless otherwise ordered by the Court. By the same date, the Official Capacity Federal Defendants **SHALL** file a Status Report and, if applicable, shall explain the appropriateness of an extension of the discovery stay. Any responses to such status report shall be filed within seven (7) days of the date such Status Report is filed.

The remainder of the Court's Order (Doc. 319) shall remain unchanged.

**SO ORDERED**, this 17th day of August 2023.

/s/  W. Louis Sands
**W. LOUIS SANDS, SR. JUDGE**
**UNITED STATES DISTRICT COURT**

# Exhibit 5

DR. MAHENDRA AMIN, M.D. vs NBCUNIVERSAL MEDIA, LLC
John S. Whitty on 09/08/2023

1                UNITED STATES DISTRICT COURT

2            FOR THE SOUTHERN DISTRICT OF GEORGIA

3     --------------------------
      DR. MAHENDRA AMIN, M.D.,
4
              Plaintiff,
5
      v.                    Case No.
6     5:21-CV-00056-LGW-BWC

7
      NBCUNIVERSAL MEDIA, LLC,
8
              Defendant.
9     --------------------------

10

11

12            VIDEOTAPED DEPOSITION OF

13                 JOHN S. WHITTY

14             Baltimore, Maryland

15              September 8, 2023

16                 10:30 a.m.

17

18

19

20

21   Reported by:  Goldy Gold, RPR

22   Job No.  00008612

1                        Date:  September 8, 2023

2                        Time:  10:30 a.m.

3

4

5              VIDEOTAPED DEPOSITION OF JOHN S. WHITTY,

6      taken by Counsel for the Plaintiff, in the

7      above-titled matter, on September 8, 2023,

8      commencing at 10:30 a.m., and reported by Goldy

9      Gold, a Registered Professional Reporter and a

10     Notary Public within and for the State of

11     Maryland.

12

13

14

15

16

17

18

19

20

21

22

```
 1  A P P E A R A N C E S:

 2

 3  On Behalf of the Plaintiff/Dr. Mahendra Amin:

 4      STACEY EVANS LAW
        4200 Northside Parkway, Building 1, Suite 200
 5      Atlanta, Georgia 30327
        Telephone:  770.779.9602
 6      E-mail:  sevans@staceyevanslaw.com
        BY:  STACEY EVANS, ESQUIRE
 7

 8
    On Behalf of the Defendant/NBCUniversal Media:
 9
        DAVIS WRIGHT TREMAINE, LLP
10      1251 Avenue of the Americas, 21st Floor
        New York, New York 10020
11      Telephone:  212.489.8230
        E-mail:  taylor.carter@nbcuni.com
12      BY:  TAYLOR CARTER, ESQUIRE

13

14  On Behalf of the Witness, John S. Whitty:

15      LAW OFFICE OF S.C. AYERS
        P.O. Box 1061
16      Medford, Oregon 97501
        Telephone: 813.382.7865
17      Email:  Stephani@whistleblower.com
        BY:  STEPHANI AYERS, ESQUIRE
18

19  ALSO PRESENT:  (Appearing via Zoom)

20      Cynthia Counts, Erik Bierbauer, Amble Johnson,

21      Andrea Meza, Thad Guyer and Kim Johnson,

22      Videographer
```

```
 1   assertion "bogus."

 2          MS. EVANS:  Do not -- but do not

 3   interrupt me.

 4          MS. AYERS:  If you have a good faith --

 5          MS. EVANS:  Do not interrupt me.  I am

 6   able to make a record.

 7          MS. AYERS:  You are not allowed to shout

 8   at me.

 9          MS. EVANS:  She can't take us both down.

10   You need to let me finish my statement.

11          MS. AYERS:  You need to let me -- and

12   you need to stop shouting.

13          MS. EVANS:  You interrupted me.

14          MS. AYERS:  You need to stop shouting at

15   me first.

16          MS. EVANS:  I'm not going to stop

17   shouting at you if you keep interrupting me.

18          MS. AYERS:  Are you going to keep

19   shouting at me in a deposition?

20          MS. EVANS:  Yes.

21          MS. AYERS:  We will walk right out.  Do

22   not shout at me again.
```

1          MS. EVANS:  Do not interrupt me again.

2          MS. AYERS:  Do not shout at this

3    witness.

4          MS. EVANS:  I'm not shouting at the

5    witness.

6          MS. AYERS:  Do not call his systems

7    bogus.  That's completely improper.

8          MS. EVANS:  Do not interrupt me.

9          MS. AYERS:  So return to treating our

10   client with respect --

11         MS. EVANS:  I am treating him with

12   respect.

13         MS. AYERS:  -- and we will stay.

14         MS. EVANS:  But you also have to treat

15   me with respect.

16         MS. AYERS:  No, you're not.  You called

17   him bogus, and you started screaming.

18         MS. EVANS:  I didn't call him bogus.

19         MS. AYERS:  You called him bogus.

20         MS. EVANS:  I called the objection

21   bogus.

22         MS. AYERS:  Nor have I -- nor have I

1    screamed at you.  So you're out of line.

2         MS. EVANS:  Oh, my God.

3         MS. AYERS:  Stop acting like that.

4         MS. EVANS:  Don't tell me what to do.

5         MS. AYERS:  And you don't scream at me.

6    Don't scream at my client.

7         MS. EVANS:  All right.  I'm going back

8    to asking question.  You make objections.  This

9    is a federal court proceeding --

10        MS. AYERS:  I know what court that it's

11   linked to --

12        MS. EVANS:  You're allowed to make form

13   objections.  You're allowed to assert

14   privileges.  And that's it.

15        MS. AYERS:  And you're not allowed to

16   scream.

17        MS. EVANS:  I'm not screaming.

18        MS. AYERS:  You did scream.  You just

19   said you'd do it again if you wanted to.

20        MS. EVANS:  Well, I didn't scream.

21        MS. AYERS:  It's on the record.

22        MS. EVANS:  I raised my voice.  I

Exhibit 6

10/17/23, 2:11 PM    "If There is Not a Change, There is Not Going to be a Change": Dawn Wooten's Impact, One Year Later - Government Accountab…

Case 5:21-cv-00056-LGW-BWC   Document 95   Filed 05/27/22   Page 368 of 422

Support Us ⌄    Contact



ABOUT ⌄    ISSUES ⌄    WHAT WE DO ⌄    NEWS ⌄    RESOURCES        DONATE

Take Action    🔍

# "If There is Not a Change, There is Not Going to be a Change": Dawn Wooten's Impact, One Year Later

💬 Seek Assistance                    ‹ Previous    Next ›                Searc    🔍

"If There is Not a Change, There is Not Going to be a Change"

*Dawn Wooten's Impact, One Year Later*

At this time last year, over 270 thousand new cases of COVID-19 were recorded, Ruth Bader Ginsburg was the first woman to lay in state at the U.S. Capitol, and devastating wildfires out west injected climate change into the presidential campaign. Another major story was about to break in rural Georgia though, where nurse Dawn Wooten publicly blew the whistle on hazardous conditions found at Irwin County Detention Center (ICDC), a private prison which housed immigrants detained by Immigrations and Custom Enforcement (ICE).

Ms. Wooten alleged not only egregious failures to protect immigrants in detention and workers from COVID-19, but also numerous instances of immigrant women undergoing hysterectomies and other invasive gynecological procedures with dubious consent. This disclosure, which quickly

SIGN UP FOR THE LATEST WHISTLEBLOWER NEWS

En        Submit

CATEGORIES

Select Category ⌄

RECENT POSTS

> Dominica News Online: Investigation Reveals People with 'Dark Pasts' Obtained Dominica Passports

> OCCRP: Implausible Budget Numbers, Undisclosed




garnered viral media attention last fall, was a shocking glimpse into the kinds of abuses found within ICE detention facilities. While revealing atrocities at ICDC, the disclosure further corroborated other anonymous whistleblower disclosures of similar COVID-19 mismanagement at another detention center run by the same company, LaSalle Corrections.

Ms. Wooten's original disclosure described instances of mismanagement and blatant abuse including:

- Deliberately denying or delaying medical care for detained immigrants both before and during the coronavirus pandemic, including immigrants symptomatic for COVID-19;

- Failing to isolate detained immigrants who had confirmed or suspected cases of COVID-19;

- Failing to provide personal protective equipment (PPE) to medical and correctional staff who have close and prolonged contact with detained

Names Raise Red Flags about Dominica's Citizenship-By-Investment Program

> Guardian: Dominica may have sold thousands more 'golden passports' than it disclosed, analysis suggests

> Miami Herald: 'Golden passports': Sale of citizenship in Caribbean raises security concerns

immigrants with confirmed cases of COVID-19;

- Requiring symptomatic staff to continue to work in the facility and threatening staff with discipline if they refuse to work in dangerous conditions;
- Systematically undercounting and underreporting COVID-19 cases at ICDC; and
- Performing hysterectomies on numerous immigrant women with dubious consent.

Thanks to Ms. Wooten's choice to blow the whistle, a group of over 170 members of Congress demanded a thorough and immediate investigation into ICDC by the Department of Homeland Security's Office of Inspector General (DHS OIG). Fifty-seven survivors of unwanted medical procedures from ICDC also came forward to support Ms. Wooten's statement and to eventually file a class action lawsuit against the facility themselves, which helped lead to the removal of all detained immigrant women in ICDC in May. Finally, on May 20, 2021, following a long and tumultuous

> Breaking
> Belize News:
> From Afghan
> spymasters to
> Gaddafi's
> colonel: The
> faces behind
> Dominica's
> citizenship
> sales revealed

year of advocacy to remove all detained immigrants from ICDC, Department of Homeland Security (DHS) Secretary Mayorkas directed ICE to sever its contract with LaSalle at ICDC for immigrant detention, noting "we will not tolerate the mistreatment of individuals in civil immigration detention or substandard conditions of detention." By September 3, 2021, the last of the immigrants were finally removed from ICDC.

When asked in an interview with MSNBC's Jacob Soboroff last fall what words she would share to the detained immigrant women following her initial disclosure, Ms. Wooten said "All hope is not lost, there is a light at the end of the tunnel." And indeed, a year now after her disclosure, that light at the end of the tunnel is actualized because ICDC is no longer detaining immigrants.

Despite the ethical courage Dawn exhibited in stepping forward to bring about positive change for detained immigrants, Ms. Wooten recognized as "the

whistleblower," has unfortunately suffered retaliation for her truth-telling. LaSalle, which has still not terminated Ms. Wooten, has never called her for shifts despite posting regularly for available nursing positions over the past year. Ms. Wooten has still has not secured gainful employment due to local resentment of her whistleblowing, even though her profession is in high demand. As a single, Black mother of five children— all of whom recently contracted COVID-19—the experience of whistleblowing has created untold anxiety and strain on Dawn and her whole family. Ms. Wooten's experience highlights the critical need to ensure that when federal employees and contractors blow the whistle on serious abuses, they are protected, not punished.

Today, we honor Ms. Wooten: for the integrity it took to blow the whistle even when aware of the consequences of retaliation, and for the subsequent change she catalyzed. We also call for change in the way whistleblowers like Ms. Wooten are treated—they deserve protection, not

punishment, and to be valued rather
than vilified.

---

September 17th, 2021 | Blog, Dawn Wooten,
Federal Whistleblowers, ICE Detention,
Immigration, Public Health

---

## SHARE THIS POST

  

## NEWSROOM

> Dominica
  News Online:
  Investigation
  Reveals
  People with
  'Dark Pasts'
  Obtained
  Dominica
  Passports

> OCCRP:
  Implausible
  Budget
  Numbers,
  Undisclosed
  Names Raise

## RESOURCES

**Privacy
Policy**

**Financials**

**Resources &
Publications**

## SIGN UP FOR
THE LATEST
WHISTLEBLOWER
NEWS

**CLICK HERE
TO SIGN UP**

## CONTACT

**ADDRESS:**

1612 K St. NW,
Suite #1100
Washington DC,
20006

**TO REQUEST
ASSISTANCE:**

Fill out our Intake
Form

**GENERAL
INQUIRES:**

(202) 457-0034

info@whistleblower.org

**MEDIA
INQUIRES:**

Red Flags
about
Dominica's
Citizenship-
By-Investment
Program

> Guardian:
Dominica may
have sold
thousands
more 'golden
passports'
than it
disclosed,
analysis
suggests

> Miami Herald:
'Golden
passports':
Sale of
citizenship in
Caribbean
raises security
concerns

> Breaking
Belize News:
From Afghan
spymasters to

AndrewH@whistleblower.org

Gaddafi's
colonel: The
faces behind
Dominica's
citizenship
sales revealed

© Copyright 2023  |  DESIGN & DEVELOPMENT CAUSE INSPIRED

MEDIA  |  Government Accountability Project is a 501c3 Organization. EIN# 52-1343924





# Exhibit 7

```
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE SOUTHERN DISTRICT OF GEORGIA
 2

 3
     MAHENDRA AMIN, M.D.,        § CIVIL ACTION FILE NO.
 4                               § 5:21-CV-00056-LGW-BWC
                                 §
 5                               §
               Plaintiff,        §
 6                               §
         vs.                     §
 7                               §
                                 §
 8   NBCUNIVERSAL MEDIA, LLC,    §
 9                               §
                                 §
10                               §
               Defendant.        §
11   ~~~~~~~~~~~~~~~~~~~~~~~~

12             VIDEOTAPED DEPOSITION OF
                    ANDREW FREE
13

14

15                  9:44 a.m. EST
           Tuesday, the 15th day of August, 2023
16

17
                    Suite 1600
18             999 Peachtree Street, NE
                   Atlanta, Georgia
19

20

21
         Blanche J. Dugas, RMR, CRR, CCR No. B-2290
22

23

24

25
```

## MAHENDRA AMIN, M.D. vs NBCUNIVERSAL MEDIA, LLC
**Andrew Free on 08/15/2023**　　　　　　　　　　　　　**Pages 2..5**

**Page 2**

APPEARANCES OF COUNSEL

On Behalf of the Plaintiff:
　STACEY G. EVANS, Esquire
　Stacey Evans Law
　Building One, Suite 200
　4200 Northside Parkway, NW
　Atlanta, Georgia  30327
　(404) 275-4135
　sevans@staceyevanslaw.com

On Behalf of the Defendant:
　ELIZABETH A. MCNAMARA, Esquire
　Davis Wright Tremaine, LLP
　21st Floor
　1251 Avenue of the Americas
　New York, New York  10020-1104
　(212) 603-6437
　(212) 489-8340 (facsimile)
　lizmcnamara@dwt.com

On Behalf of the Non-Party Witness Andrew Free:
　CHARLES D. TOBIN, Esquire
　Ballard Spahr, LLP
　12th Floor
　1909 K Street, NW
　Washington DC  20006-1157
　(202) 661-2218
　(202) 661-2299 (facsimile)
　tobinc@ballardspahr.com

　KYLE A. CEUNINCK, Esquire
　Ballard Spahr, LLP
　Suite 1600
　999 Peachtree Street, NE
　Atlanta, Georgia  30309-4421
　(678) 420-9330
　(678) 420-9301 (facsimile)
　ceuninckk@ballardspahr.com

Also Present:
James Downie, videographer
Amble Johnson
Cynthia Counts, Esq.
Amanda Levine

**Page 3**

INDEX OF EXAMINATION

EXAMINATION　　　　　　　　　　　　PAGE
EXAMINATION　　　　　　　　　　　　5
BY MS. EVANS

　　　　　　- - -

INDEX TO EXHIBITS

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| 123 | Subpoena to testify at a deposition in a civil action | 6 |
| 124 | E-mail chain Bates-stamped FREE_0004494 | 79 |
| 125 | Form Bates-stamped FREE_0004625 through 4627 | 101 |
| 126 | E-mail chain, Bates-stamped FREE_0001121 through 1123 | 165 |
| 127 | E-mail chain, Bates-stamped FREE_0001132 and 1133 | 167 |
| 128 | E-mail chain regarding WSJ request, Bates-stamped FREE_0001254 through 1258 | 183 |
| 129 | E-mail chain, Bates-stamped FREE_0001662 | 197 |
| 130 | ICE's continued detention and removal of survivors impedes efforts to investigate, closed session briefing before the Democratic Caucus of the United States Senate, October 26, 2020, Bates-stamped FREE_0004810 through 4812 | 218 |

**Page 4**

| 131 | E-mail string, Bates-stamped FREE_0003911 and 3912 | 232 |
|---|---|---|
| 132 | E-mail string, Bates-stamped FREE_0004462 through 4465 | 234 |
| 133 | E-mail string, Bates-stamped FREE_0000874 through 878 | 234 |
| 134 | E-mail string, Bates-stamped FREE_0000268 through 271 | 237 |
| 135 | Privilege log | 253 |
| 136 | Privilege log | 256 |
| 137 | E-mail chain, Bates-stamped FREE_0000296 through 301 | 274 |
| 138 | E-mail string, Bates-stamped FREE_0000420 through 424 | 283 |

　　(Original Exhibits 123 through 138 have been attached to the original transcript.)

**Page 5**

Videotaped Deposition of Andrew Free
August 15, 2023

　　VIDEOGRAPHER:  This is the beginning of Media 1 in the deposition of Andrew Free in the matter of Mahendra Amin, M.D. versus NBCUniversal Media, LLC.  Today's date is August 15th, 2023.  The time is 9:45 a.m.

　　If the attorneys present would please introduce themselves for the record, after which the court reporter will swear in the witness.

　　MS. EVANS:  Stacey Evans on behalf of the plaintiff.

　　MS. MCNAMARA:  Elizabeth McNamara on behalf of NBCUniversal.

　　MR. TOBIN:  Charles Tobin on behalf of non-party witness Andrew Free.

　　MR. CEUNINCK:  Kyle Ceuninck on behalf of non-party witness Andrew Free.

　　ANDREW FREE,
having been first duly sworn, was examined and testified as follows:
EXAMINATION
BY MS. EVANS:
　Q.　Good morning, Mr. Free.

**MAHENDRA AMIN, M.D. vs NBCUNIVERSAL MEDIA, LLC**
Andrew Free on 08/15/2023                           Pages 26..29

Page 26

1   Ms. Ainsley, Mr. Soboroff or Mr. Hayes?
2       A.   I don't remember.
3       Q.   What about as between Ms. Ainsley and
4   Mr. Soboroff?
5       A.   I don't recall.
6       Q.   And what about as between Ms. Ainsley and
7   Mr. Soboroff on the one hand and Mr. Hayes on the
8   other?
9       A.   Don't recall.
10      Q.   With regard to Mr. Hayes, did he call you or
11  did you call him first with regard to Irwin County
12  Detention Center?
13      A.   I don't know.
14      Q.   And what about with Mr. Soboroff?
15      A.   Same answer.
16      Q.   You don't know?
17      A.   I don't recall.
18      Q.   And with Ms. Ainsley, do you not know or do
19  you not recall?  You used the different phrases, so
20  I'm just asking.
21      A.   Yeah.  I -- I don't have a clear
22  recollection of the timeline of any of these calls.  I
23  don't know if that saves you time.
24      Q.   I understand you keep a handwritten notebook
25  with regard to your work; is that right?

Page 27

1       A.   Yes.
2       Q.   And how long have you kept that notebook?
3       A.   It's multiple notebooks.  Once I fill one
4   up, I do another one.  I think I started 2017, maybe
5   earlier.
6       Q.   And what is your practice with regard to
7   making notes in these notebooks?
8            MR. TOBIN:  Object to the form.
9            THE WITNESS:  What do you mean?
10      Q.   (By Ms. Evans)  When do you decide to write
11  something down?
12      A.   I'm not sure if I understand.  What do you
13  mean, like...
14      Q.   Do you try to keep -- strike that.
15           Do you use the notebooks as sort of a
16  journal of activities?
17      A.   No.  It's more of sort of note-taking that's
18  meant to sort of preserve, like, a train of thought
19  within a context of work.  But I wouldn't call it,
20  like, a journal.  I -- I have a separate kind of
21  journal practice that I use personally, and I wouldn't
22  call it that.  It's essentially just having a place to
23  keep my notes that's not 18 different yellow pads.
24  That's why I switched to an actual book, because you
25  can put notes in a lot of different places.  I wanted

Page 28

1   it in one place.
2       Q.   And you keep a journal separate and apart
3   from the notebooks we're talking about here?
4       A.   Yeah.
5       Q.   Have you written in that journal regarding
6   Irwin County Detention Center?
7       A.   No.
8       Q.   Have you made notes in -- strike that.
9            The journal that I just asked you about, you
10  told me you didn't write about Irwin County Detention
11  Center; true?
12      A.   True.
13      Q.   I'm going to use the word "notebooks" --
14      A.   Okay.
15      Q.   -- to talk about the other part.  Under --
16  we're in agreement on that?
17      A.   Yeah, that's fine.
18           MR. TOBIN:  I'm just going to ask,
19       Andrew, make sure she's finished the
20       question before you give an answer.
21           THE WITNESS:  Sorry.
22      Q.   (By Ms. Evans)  It's hard.  It's such an
23  artificial way to talk to each other.
24           Did you write about Irwin County
25  Detention -- strike that.

Page 29

1            Did you make any notes regarding Irwin
2   County Detention Center in your notebooks?
3       A.   Yes.
4       Q.   And when did you start doing that?
5       A.   When I found out, so September 14th,
6   September 15th maybe.
7       Q.   Did you make notes regarding your
8   conversations with the media regarding Irwin County
9   Detention Center?
10      A.   I don't know.  Probably.
11      Q.   And you've turned all of those notebooks
12  over to your counsel?
13      A.   I have.
14      Q.   Was Ms. Owings at your house this morning?
15      A.   I wasn't at my house this morning.  I was
16  petsitting.
17      Q.   When was the last time you were at your
18  house?
19      A.   Last night.
20      Q.   Was Ms. -- was Ms. Owings at your house last
21  night?
22      A.   No.
23      Q.   When did you first learn of -- or strike
24  that.
25           At some point, you became aware of a letter

Page 90

1    Q.   That's fine.
2    A.   I do recall that she was a person that, when
3    folks asked during visits who -- who is it that might
4    need a medical intervention or who is it that might
5    need to be prioritized to speak with people, to speak
6    with investigators or things like that, Shelley was
7    consistently mentioned.
8    Q.   No. 7, I don't --
9    A.   Sorry.
10   Q.   Yes.  Do you know what her condition was
11   that had her on this list?
12   A.   Not as I sit here today, no.
13   Q.   And what about Ms. Batan?
14   A.   Marcia Mendoza Batan.  So that's Sarah --
15   that was Sarah Owings' client.  That was roughly why,
16   all things being equal, I got involved in the way that
17   I did, because Sarah had taken -- maybe at my
18   request -- I don't recall the time -- the actual
19   tick-tock of the thing, but Sarah had taken on this
20   case at the request of Immigrant Families Together,
21   which was a nonprofit that I did a lot of work with,
22   both on COVID advocacy and on family separation.
23   Immigrant Families Together was kind of formed around
24   family separation in 2018.
25       Marcia had been complaining of medical

Page 91

1    problems for the preceding several months before
2    September of 2020, and she had been told that she
3    needed surgery, gynecologic surgery or a gynecologic
4    procedure.  And she tried expressing to Sarah, I
5    didn't try to go to the gynecologist.  I needed
6    somebody for gastritis or a gastrointestinal problem.
7    She didn't know why she was sent -- when she asked for
8    problems with her stomach, why she was sent to
9    Dr. Amin, but that's where Irwin sent her.
10       Dr. Amin didn't ask her about her gastritis,
11   as far as I know.  He said, you know, I'm not that
12   kind of doctor.  And unlike basically every facility
13   in the country that I've ever dealt with where you
14   can't get an outside medical referral -- that's why a
15   lot of the folks that we work with had family members
16   die, beginning with Jean Jimenez at Stewart, is
17   because there was not an outside medical referral.
18       I know that both I and Sarah hold a lot of
19   guilt for not listening to Marcia over the summer.
20   And just assuming, well, if a doctor said you need a
21   surgery, then you probably need a surgery, you know.
22   Why would you -- why would you assume anything
23   different.  And it destroyed the, I think, trust for
24   not just us as advocates, but for a lot of other
25   immigration lawyers to have your client telling you

Page 92

1    there's this thing wrong, and then us saying, Eh,
2    we're talking about your immigration case.
3        She was suffering -- she was still suffering
4    the effects of this stomach issue while this was going
5    on, despite having been to Dr. Amin and told she
6    needed surgery.
7    Q.   The information that you have about
8    Ms. Batan --
9    A.   Uh-huh (affirmative).
10   Q.   -- was any of that told to you from
11   Ms. Batan or was it all through Ms. Owings?
12   A.   So I was in -- I'm not going to talk about
13   our conversations.  I would say that that's
14   privileged.  The information I just shared with you, I
15   think, was actually shared in a declaration with
16   the -- with the exception of, like, how Sarah felt
17   about it and the trust issues.  You know, but this
18   basic layout of the timeline, I think she actually
19   signed a declaration about that.
20   Q.   Have you ever spoken directly with
21   Ms. Batan?
22   A.   I have.  I mean, directly being on a video
23   link from -- you know, not in Irwin, but through --
24   through a screen.
25   Q.   Sure.  I just mean talking to her either on

Page 93

1    the phone, on the video --
2    A.   Yes.  Yes, I have.
3    Q.   Not necessarily limited to in person.
4    A.   Yeah, I have.
5    Q.   And did you prepare -- or strike that.
6        Did you work with Ms. Batan to prepare the
7    declaration that you referred to?
8    A.   Yes.
9    Q.   And was that as a result of her answering
10   questions that you had and then you typed it up and
11   she looked at it?
12   A.   So I want to be really clear.  I --
13       MR. TOBIN:  Only talk about the
14       process.
15       THE WITNESS:  Yeah.  Oh, yeah, I
16       worked with Ms. Owings to help her prepare
17       her client's declaration.  And really the
18       engagement or the -- the specific thing
19       that I worked on was, you know, you're
20       going to have an opportunity to speak with
21       federal investigators, and that was the
22       context in which I touched the declaration.
23       But Sarah was the primary person who
24       collected that information because she had
25       been representing her.

**MAHENDRA AMIN, M.D. vs NBCUNIVERSAL MEDIA, LLC**
Andrew Free on 08/15/2023                                      Pages 274..277

Page 274

1    providing them information as a source for
2    journalism?
3        MS. EVANS:  Sure.
4        THE WITNESS:  Yeah, so I think the
5    answer is maybe.
6        Q.   (By Ms. Evans)  Did they send out any
7    petitions with regard to Irwin County Detention
8    Center?
9        A.   I think they did.
10       (Plaintiff's Exhibit 137 was marked
11   for identification.)
12       Q.   (By Ms. Evans)  I'm going to hand you and
13   your counsel what I've marked as Exhibit 137.
14       MS. EVANS:  Just for fun apparently.
15   Thank you for checking, though,
16   because I had all my secret notes on it.
17       MR. TOBIN:  That's my concern.
18       THE WITNESS:  Okay.
19       Q.   (By Ms. Evans)  Have you had a chance to
20   look at Exhibit 137?
21       A.   I have.
22       Q.   If you could flip to the next-to-last
23   page -- or the -- I'm sorry.  Could you flip to the
24   page Bates-numbered 299.
25       A.   Yep.

Page 275

1        Q.   Do you see an e-mail from the associate
2    campaign director for Daily Kos?
3        A.   Ntebo?
4        Q.   Yes.
5        A.   Yes.
6        Q.   She says, "Hi" -- he or she?
7        A.   She.
8        Q.   She says, "Hi, Andrew and Lynn.  Here's the
9    updated petition link.  Please use the above URL
10   because I ended up updating the URL to match the
11   language change from 'forced hysterectomy' to 'forced
12   sterilization'."
13       Do you see that?
14       A.   I do.
15       Q.   Why was that change made in the petition
16   language?
17       A.   Because I asked for it to be made.
18       Q.   Why?
19       A.   To encompass the true scope of the harm that
20   we were encountering, particularly as to Pauline.
21       Q.   Particularly as to?
22       A.   Pauline Binam, who is referenced in the --
23   part of the e-mail.
24       Q.   And what is it about Pauline Binam that is
25   encompassed by sterilization but not hysterectomy?

Page 276

1        A.   She had a sterilizing -- potentially
2    sterilizing procedure that was not a hysterectomy, but
3    it was not done with informed consent.
4        Q.   Do you contend that that procedure was
5    performed by Dr. Amin?
6        A.   I don't know.
7        Q.   Are you involved in the -- the litigation
8    oftentimes referred to as the Oldaker litigation in
9    the Middle District of Georgia?
10       A.   No.
11       Q.   Have you ever been?
12       A.   That is the litigation that grew out of the
13   investigation we conducted.  So depending on how you
14   define "involved," I'll tell you what my involvement
15   was and you can decide for yourself.
16       We -- we had been supporting folks who were
17   on the brink of removal, kind of in a onesie, twosie
18   habeas posture and trying to avoid people being in the
19   brink -- on the brink of removal, "people" being Amin
20   patients and folks who had also been subjected to
21   medical abuse and neglect earlier.
22       I'm trying to figure out what I can say
23   without getting into attorney-client -- client
24   privileged communications or work product.
25       Q.   Well, I can ask you a couple of questions --

Page 277

1        A.   Yeah, if you want to.  I mean, I'll just
2    tell you I turned over the investigative -- the sort
3    of document transfer that I referred to when I was
4    speaking about the communications with Ms. Ahn.
5    That's what I was talking about.  That's who I gave
6    that stuff to.  Those are the lawyers for the women,
7    so that's my role is having been a person at the
8    beginning, but not someone who is carrying that
9    forward.
10       Q.   Did you ever represent Ms. Binam in that
11   litigation?
12       A.   Binam?
13       Q.   Binam.  I'm sorry.
14       A.   In the Oldaker litigation, I'm not counsel,
15   so the answer is no.
16       Q.   Did you facilitate in any way her
17   involvement in that litigation?
18       A.   Yes.
19       Q.   Was that done by introducing her to other
20   counsel?
21       A.   Yes.
22       Q.   Did you review her medical records prior to
23   introducing her to counsel that were involved in the
24   Oldaker litigation?
25       A.   I don't recall.  She was represented by Von

# Exhibit 8

**DR. MAHENDRIA AMIN vs NBC UNIVERSAL MEDIA**
**Sarah  Owings on 08/25/2023**

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF GEORGIA
 2

 3

 4   DR. MAHENDRIA AMIN, M.D.,      )
                                    )
 5             Plaintiff,           )
                                    ) Civil Action No.:
 6   vs.                            ) 5:21-CV-00056-LGW-BWC
                                    )
 7   NBC UNIVERSAL MEDIA, LLC,      )
                                    )
 8             Defendant.           )

 9

10

                 VIDEOTAPED DEPOSITION OF
11                     SARAH OWINGS
        CONDUCTED AT THE OFFICE OF DAVID DREYER LAW
12                 270 PEACHTREE STREET
                       SUITE 1040
13               ATLANTA, GEORGIA 30303

14

15
                     10:10 a.m. EST
16        Friday, the 25th day of August, 2023

17

18
             Eric Cavanaugh, CCR, GRL 2560
19

20

21

22

23

24

25
```

**DR. MAHENDRIA AMIN vs NBC UNIVERSAL MEDIA**
Sarah  Owings on 08/25/2023                                    Page 2

```
 1                  APPEARANCE OF COUNSEL

 2

 3    On Behalf of the Plaintiff:

 4         Stacey G. Evans, Esquire
           Amble Johnson, Esquire
 5         Stacey Evans Law
           Suite 200
 6         4200 Northside Parkway, NW
           Atlanta, Georgia 30327
 7         404.275.4135
           Sevans@staceyevanslaw.com
 8

 9
      On Behalf of the Defendant:
10
           Amanda Levine, Esquire
11         Cynthia L. Counts, Esquire
           FisherBroyles LLP
12         Suite B
           1384 Lanier Place
13         Atlanta, Georgia 30326
           cynthia.counts@fisherbroyles.com
14         404.550.6233

15
      On Behalf of Sarah Owings:
16
           David N. Dreyer, Esquire
17         Washington Dreyer & Associates, LLC
           Suite 104
18         270 Peachtree Street
           Atlanta, Georgia 30303
19         404.234.4447
           david@washingtondreyer.com
20

21     Also Present:

22         Michael Bond
           Videographer
23

24

25
```

1    Q.   What was her name?

2    A.   Marcia Michelle Mendoza Baton.

3    Q.   Can you say that one more time?

4    A.   Marcia Michelle Mendoza Baton.

5    Q.   Is Ms. Baton still in the United States?

6    A.   Yes, she is.  I believe she's still here.  I

7    no longer represent her though.

8    Q.   Did -- strike that.

9         Prior to September 14th, 2020, had you ever

10   heard any complaints from Ms. Baton regarding medical

11   services at Irwin County Detention Center?

12        MR. DREYER:  I mean, I'm just concerned about

13        attorney/client privilege.  But, otherwise, please

14        feel free to answer.

15   A.   She was concerned about the care that she was

16   receiving.  And I was working with her -- I'll go

17   ahead and answer this.  I was working with her.  She

18   provided me medical records.  We were trying to get

19   her released.

20        And she was saying to me that what the doctor

21   was trying to do was making her uncomfortable and she

22   didn't think that she needed to have what he was

23   saying she needed to have.

24   Q.   Are those medical records that you're

25   referring to in her discussion with you, was that

```
 1   regarding Dr. Amin?

 2     A.  It included Dr. Amin.

 3     Q.  But it also included other doctors?

 4     A.  It included all the care providers at the

 5   facility.  There were records from inside the

 6   facility as well as outside referral to him.

 7     Q.  Had she seen doctors other than Dr. Amin off

 8   the campus of Irwin County Detention Center?

 9     A.  I don't completely recall, but I do not

10   believe so.

11     Q.  In your efforts to get her medical records or

12   her sharing with you her concerns about her

13   treatment, was that all before September 14th, 2020?

14     A.  It was.

15     Q.  When did it start?

16     A.  She provided me records and indicated that he

17   was trying to schedule her for a diagnostic procedure

18   by telephone.  We spoke on the phone, and she was

19   really nervous about it.  She didn't think that she

20   needed to have that procedure.

21     Q.  When was that?

22     A.  I don't recall the exact date, but it would

23   have been sometime in August -- late July or August,

24   if I'm...

25     Q.  How did the concerns regarding her medical
```

```
 1   care come to your attention?
 2      A.  She told me verbally that she was concerned
 3   about this doctor.
 4      Q.  And that was on a phone call?
 5      A.  On a phone call.
 6      Q.  Have you ever been physically to Irwin County
 7   Detention Center?
 8      A.  I have.
 9      Q.  How many times?
10      A.  I don't -- I couldn't say how many -- a
11   handful of times.  Not during COVID.  This would have
12   been before that all happened.
13      Q.  Did you ever go to Irwin County Detention
14   Center in person after September of 2020?
15      A.  No.
16         MS. EVANS:  I should have done this earlier.
17      I'm just going to mark for the record Plaintiff's
18      Exhibit 139.  I've got a copy for you and your
19      counsel.
20         This is simply a copy of the subpoena that
21      brings us here today.  There's nothing really for
22      you to do with it.  I just like to mark it for my
23      own road map logistically.
24         (Plaintiff's Exhibit 139 marked for
25      identification)
```

```
 1    A.  Any specific recollections, no, I don't.
 2    Q.  Is it your testimony that Ms. Shirazi
 3  indicated to you that she had a client who had seen
 4  Dr. Amin?
 5    A.  She testified -- well, she told me that she
 6  had a client who had had a miscarriage in the
 7  facility.  I didn't ask her about Dr. Amin.  I think
 8  I asked her more generally about any -- any medical
 9  problems people had experienced.
10       And she said she had a client that had a
11  miscarriage that had really rattled her dealing with
12  getting care for that person.
13       I said, okay, well, if you think there were
14  problems with it, there's this -- we'd be happy to
15  review it and see about it in relation to this
16  investigation.
17    Q.  She never mentioned Dr. Amin to you, did she?
18    A.  She never mentioned Amin specifically.  But
19  she told me the time frame of it being -- I can't
20  remember exactly what she said.
21       But that was in 2020 and she said it had been
22  in the last couple of years, and then later backed
23  off on that.  But based on the time frame she
24  indicated, because he was the gynecological provider
25  that we knew of at the facility, it was something
```

Exhibit 9

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **MAHENDRA AMIN**, | Southern District of Georgia |
| Plaintiff, | Civil Action No. |
| | 5:21-cv-00056-LGW-BWC |
| v. | |
| | Southern District of New York |
| **NBCUNIVERSAL MEDIA, LLC**, | Civil Action No. 1:23-mc-377 |
| Defendant. | |

### NOTICE OF MOTION TO QUASH SUBPOENA FOR DEPOSITION
### OF ELORA MUKHERJEE AND TO STAY THE DEPOSITION
### PENDING OUTCOME OF THE MOTION TO QUASH

PLEASE TAKE NOTICE that upon the Declaration of Amber Qureshi, Esq., the

attached exhibits, the accompanying Memorandum of Law, and such evidence and argument

as the Court may allow, non-party movant Elora Mukherjee hereby moves this Court pursuant

to Federal Rule of Civil Procedure 45(d)(3) to quash the deposition subpoena served on her by

Mahendra Amin, to stay the deposition pending resolution of this matter, and to award her

attorney's fees and costs and such other and further relief as the Court deems just and proper.

New York, NY
October 12, 2023

Respectfully submitted,

*/s/ Victoria Neilson*
Victoria Neilson[†]
NY Bar No. 2689792
Amber Qureshi[*]
DC Bar No. 90001046
Matthew S. Vogel[‡]
Louisiana Bar No. 35363
NATIONAL IMMIGRATION PROJECT
OF THE NATIONAL LAWYERS GUILD
2201 Wisconsin Ave NW, Suite 200

Washington, DC 20007
(202) 742-4447
victoria@nipnlg.org
amber@nipnlg.org
matt@nipnlg.org

[*] *Pro hac vice* admission motion forthcoming
[†] Not admitted in D.C.; working remotely from and admitted in New York only
[‡] Not admitted in D.C.; working remotely from and admitted in Louisiana only

*Counsel for Elora Mukherjee*

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

**MAHENDRA AMIN**,

       Plaintiff,

v.

**NBCUNIVERSAL MEDIA, LLC**,

       Defendant.

Southern District of Georgia
Civil Action No.
5:21-cv-00056-LGW-BWC

Southern District of New York
Civil Action No. 1:23-mc-377

## MEMORANDUM OF LAW IN SUPPORT OF
## MOTION TO QUASH SUBPOENA FOR DEPOSITION
## OF ELORA MUKHERJEE AND TO STAY THE DEPOSITION
## PENDING OUTCOME OF THE MOTION TO QUASH

## INTRODUCTION

This action seeks to quash a subpoena issued by a lawyer seeking to depose opposing counsel under threat of sanctions. This litigation tactic is nothing short of intimidating, harassing, coercive, and threatening, and should be roundly rejected by this Court.

Several women were subjected to nonconsensual and/or medically unindicated gynecological procedures while they were held in immigration detention at Irwin County Detention Center in Ocilla, Georgia. Elora Mukherjee, a professor at Columbia Law School, has represented some of them for years. Some of those women filed a class action lawsuit against, *inter alia*, Mahendra Amin, the doctor who performed the procedures. After those women filed their lawsuit, Amin filed a defamation lawsuit against NBCUniversal, concerning media coverage of the allegations. As part of that lawsuit, Amin obtained non-party depositions under Rule 45 of a few of the women, including the named plaintiff in the class action lawsuit, Yanira Oldaker. Now, alleging *potential* misconduct during the lunch break in Ms. Oldaker's deposition, Amin's counsel, Stacey Evans, seeks to depose two of the three lawyers present at the lunch: Elora Mukherjee, one of the lawyers who represented Ms. Oldaker at the deposition, and Cynthia Counts, the lawyer who represented NBCUniversal at the deposition.

This deposition is a fishing expedition designed to intimidate, harass, and threaten Prof. Mukherjee into creating evidence for Ms. Evans to use against her. Ms. Evans has not actually sought sanctions for any conduct at the deposition and never sought judicial intervention during it. Prof. Mukherjee has already not only stated on the record at the deposition the non-privileged content and outcome of any conversations she had with her client during the deposition, but also answered questions *from Ms. Evans* about those conversations. This Court should not condone such vexatious, unprofessional, and unnecessary litigation tactics and should quash the subpoena.

1

## RELEVANT FACTUAL BACKGROUND

Elora Mukherjee ("Prof. Mukherjee") is the Jerome L. Greene Clinical Professor of Law at Columbia Law School in New York. Ex. 1, Declaration of Elora Mukherjee ("Mukherjee Decl.") ¶ 2. She is "[a] globally recognized advocate, practitioner, and voice for immigrants, asylum seekers, and unaccompanied migrant children." Columbia Law School, "Elora Mukherjee," https://www.law.columbia.edu/faculty/elora-mukherjee (last accessed Oct. 11, 2023).

Prof. Mukherjee is one of the lead litigation counsel for plaintiffs in a putative class action lawsuit pending in the Middle District of Georgia, *Oldaker v. Giles*, Case No. 7:20-cv-00224-WLS-MSH (M.D. Ga.) ("*Oldaker*"). The *Oldaker* complaint alleges that Mahendra Amin performed invasive, nonconsensual, and medically unnecessary procedures and surgeries against immigrant women detained at the Irwin County Detention Center in Georgia. *See* Ex. 3, Declaration of Amber Qureshi ("Qureshi Decl.") ¶ 3, Ex. A (Oldaker Second Amended Complaint). Amin is a defendant in the *Oldaker* action. *Id.* Discovery is stayed in *Oldaker* in part because of pending criminal investigations into the allegations of Amin's misconduct. Order, ECF Nos. 319 & 322, *Oldaker v. Giles*, Case No. 7:20-cv-00224-WLS-MSH (M.D. Ga. Aug. 11, 2023).

The subpoena at issue here arises under a different, but related, case. After the *Oldaker* lawsuit was filed, Amin filed a defamation action against NBCUniversal Media, LLC ("NBCU"), alleging that NBCU made defamatory statements about him regarding the events that are the subject of the *Oldaker* litigation in television broadcasts aired between September 15 and September 17, 2020. *See Amin v. NBCUniversal Media, LLC*, No. 5:21-CV-00056-LGW-BWC

(S.D. Ga.) ("*Amin v. NBCU*"). As part of that lawsuit, Amin has deposed as non-party witnesses several *Oldaker* plaintiffs – including lead plaintiff Yanira Yesenia Oldaker.

Ms. Oldaker was served with a subpoena under Federal Rule of Civil Procedure 45 for her non-party deposition in connection with the *Amin v. NBCU* matter on April 1, 2023. On April 13, 2023, Ms. Oldaker filed a Motion to Stay and to Quash the Deposition Subpoena or, In the Alternative, to Modify in the District of South Carolina, the district where the deposition was to take place. *See In re Yanira Oldaker Subpoena*, 3:23-mc-00251-MGL (D.S.C.). The court stayed the deposition of Ms. Oldaker pending conferral between the parties to resolve the matter without further court intervention. *Id*., ECF Nos. 4, 8, 15. The parties in the Oldaker subpoena litigation reached an agreement for Ms. Oldaker's deposition, which included several guardrails for Ms. Oldaker's deposition–including that "the deposition of Ms. Oldaker will be marked confidential pursuant to the Protective Order." Qureshi Decl. ¶ 4, Ex. B (May 24, 2023 Joint Status Report).

Ms. Oldaker's deposition took place in Columbia, South Carolina on July 27, 2023. Prof. Mukherjee and Fatma Marouf, Professor of Law and Director of the Immigrant Rights Clinic at Texas A&M University School of Law, represented Ms. Oldaker. Stacey Evans ("Ms. Evans") represented Amin and Cynthia Counts ("Ms. Counts") represented NBCU. Right before stopping the deposition for lunch, Ms. Evans stated that she had concluded her questioning of Ms. Oldaker and indicated that she may have other questions after counsel for NBCU was finished with her questioning. Qureshi Decl. ¶ 5, Ex. C (Oldaker Depo. Tr.) at 109:9-12.[1]

---

[1] Because the deposition transcript is marked confidential under the terms of the *Amin v. NBCU* protective order, undersigned counsel have concurrently moved to file the deposition transcript as an exhibit under seal.

After the lunch break, however, Ms. Evans noted that she did have questions for Ms.

Oldaker. *Id*. at 113:25-114:2. Ms. Evans proceeded to question Ms. Oldaker about her

conversations with Prof. Mukherjee, Fatma Marouf, and Ms. Counts during the breaks in the

deposition, including the lunch break. *Id*. at 114:4-117:5. Ms. Oldaker stated that her counsel and

Ms. Counts did not discuss or suggest what her answers to any questions should be. *Id*. at 116:3-

23. Ms. Evans then noted the content of the District of South Carolina Local Rule 30.04(E)-(G),

which states as follows:

> 30.04: Conduct During Depositions.
> (E) Counsel and witnesses shall not engage in private, "off the record"
> conferences during depositions or during breaks or recesses regarding the
> substance of the testimony at the deposition, except for the purpose of
> deciding whether to assert a privilege or to make an objection or to move
> for a protective order.
> (F) Any conferences that occur pursuant to, or in violation of, Local Civ.
> Rule 30.04(E) (D.S.C.) are proper subjects for inquiry by deposing counsel
> to ascertain whether there has been any witness coaching and, if so, to what
> extent and nature.
> (G) Any conferences that occur pursuant to, or in violation of, Local Civ.
> Rule 30.04(E) (D.S.C.) shall be noted on the record by the counsel who
> participated in the conference. The purpose and outcome of the conference
> shall be noted on the record.

District of South Carolina Local Rule 30.04; Qureshi Decl. ¶ 5, Ex. C (Oldaker Depo. Tr.) at

117:6-118:2. Ms. Evans asked Prof. Mukherjee to note on the record the content of any

conversations she had with Ms. Oldaker during the breaks. *Id*. at 118:3-8. Prof. Mukherjee

provided on the record at the deposition both the purpose and the outcome of any off-the-record

conversations she had with Ms. Oldaker which may have had to do with the substance of the

testimony at that deposition. *See id*. at 118:3-120:16, 122:5-123:8. Prof. Mukherjee directly

addressed the lunch meeting on the record, stating that they discussed the number of preparatory

sessions they had with Ms. Oldaker, *id*. at 119:18-25, and noted the contents of conversations

with Ms. Oldaker during the breaks including lunch, *id*. at 118:9-120:11.

Towards the end of a grueling deposition in which Ms. Oldaker was forced to recount horrific memories of her experiences with Amin and after Ms. Counts was finished with her examination, Ms. Evans again pressed Ms. Oldaker on what she discussed with Ms. Counts during the breaks. *Id.* at 220:1-228:3. After Ms. Evans was done, Ms. Counts then began questioning Ms. Oldaker to clarify again for the record that she was not coached by Ms. Counts or her counsel. *Id.* at 228:16-229:2. Ms. Evans interrupted the testimony calling Ms. Oldaker a liar, *id.* at 229:5-6, and then had an unnecessary argument with Ms. Counts in the middle of the third party deposition. *Id.* at 231:9-13. Ms. Evans also accosted Prof. Mukherjee, stating that she should not be teaching law students. *Id.* at 230:9-10. During this exchange, Ms. Oldaker repeatedly asked counsel if she may be excused. *Id.* at 231:9-13. At no point during the deposition did Ms. Evans stop the deposition or seek relief from the District of South Carolina – which, at the time, had a pending open matter regarding this deposition.

On August 4, 2023, counsel for Amin filed a Joint Status Report in the Oldaker subpoena matter in the District of South Carolina. In the Joint Status Report, counsel for Amin represented to the court that:

> Counsel for Dr. Amin is considering moving for sanctions to address off-the-record conferences that occurred between Ms. Oldaker, her counsel, and counsel for NBCUniversal during the deposition. Counsel for Dr. Amin will promptly decide whether to file a motion for sanctions after receipt and review of the transcript of Ms. Oldaker's deposition. Counsel for Dr. Amin seeks the Court's guidance on whether any such motion should be filed in this matter or in a new miscellaneous matter to be filed with the Court. Counsel for Ms. Oldaker will oppose any motion seeking sanctions against them.

> If the Court wishes to hear a potential motion for sanctions in the present case, Dr. Amin will provide a Status Report to the Court within seven (7) days of receipt of the Oldaker deposition transcript stating whether he will move for sanctions. If the Court does not wish to hear a potential motion for sanctions in this matter, the parties jointly request dismissal and closure of the case, with leave for Dr. Amin to file a motion for sanctions in another matter.

5

Qureshi Decl. ¶ 6, Ex. D (August 4, 2023 Joint Status Report). The same day the Joint Status

Report was filed, the District of South Carolina issued a text order stating that: "Pursuant to the

parties' status report, Petitioner Yanira Oldaker's motion to quash is DEEMED AS MOOT. The

Clerk's Office is directed to close this case. IT IS SO ORDERED." Order, ECF No. 24, *In re*

*Yanira Oldaker Subpoena*, 3:23-mc-00251-MGL (D.S.C., Aug. 4, 2023).

On August 16, Ms. Evans emailed Ms. Counts and Prof. Mukherjee noting that "Plaintiff

has concerns that there were multiple violations of the D.S.C. Local Rules during Ms. Oldaker's

deposition. . . Before we file a motion for sanctions, we want to exercise our right to explore the

communications that occurred during those breaks with Ms. Counts and Prof. Mukherjee. I

believe this can be accomplished via short remote depositions." Qureshi Decl. ¶ 7, Ex. E (August

Email Correspondence). Counsel for Prof. Mukherjee noted their objections to any deposition of

Prof. Mukherjee, stating that Ms. Evans "already had the opportunity to inquire about any off-

the-record conversations [Prof. Mukherjee] may have had with Ms. Oldaker. [Prof. Mukherjee]

very clearly and thoroughly stated as much on the record. The Rule does not contemplate, and

you have not cited a single case where, the deposing attorney was allowed to depose counsel for

the witness after the deposition. Thus, the requirements of the Local Rule are met and a

deposition is wholly inappropriate in these circumstances." *Id*. Counsel for Amin responded that

Prof. Mukherjee "did *not* note the contents of the lunch meeting on the record," even though

Prof. Mukherjee did in fact do so.

On September 19, 2023, a process server served a subpoena for a non-party deposition

under Rule 45 of Prof. Mukherjee in the *Amin v. NBCU* litigation on Ms. Brenda Eberhart, an

employee of Morningside Heights Legal Services, Inc., which is a non-profit law firm housed at

Columbia Law School and which contains Columbia Law School's clinics, including the

Immigrants' Rights Clinic, which Prof. Mukherjee directs. Ex. 2, Declaration of Brenda J. Eberhart ("Eberhart Decl.") ¶¶ 2-5, Ex. A (Subpoena); Mukherjee Decl. ¶¶ 2-7; Columbia Law School, "Clinics," https://www.law.columbia.edu/academics/experiential/clinics (last accessed Oct. 11, 2023); "Elora Mukherjee," https://www.law.columbia.edu/faculty/elora-mukherjee (last accessed Oct. 11, 2023). The subpoena was not served personally on Prof. Mukherjee, nor was it mailed to her, and it was not served with any check for attendance fees or mileage. Eberhart Decl. ¶¶ 3-6; Mukherjee Decl. ¶¶ 7-9. The subpoena directed that the place of the deposition was to be "via Zoom Meeting" (providing an internet link, meeting identification number, and passcode) and that it was to begin at 9:00 a.m. on October 4, 2023, only fifteen days later. It was signed and issued by Ms. Evans. Eberhart Decl. ¶ 8, Ex. A (Subpoena).

Thereafter, on September 22, 2023, undersigned counsel contacted Ms. Evans via email to request that Ms. Evans withdraw the subpoena and outlining the reasons why it should be withdrawn. Alternatively, counsel offered to submit a declaration from Prof. Mukherjee. Qureshi Decl. ¶ 8, Ex. F (September & October Email Correspondence). In response, later, on September 22, Ms. Evans allowed that a declaration would suffice, provided that it answered eleven questions she included in that email:

1. During lunch on July 27, 2023, did Ms. Counts or Ms. Mukherjee discuss any questions Ms. Counts was planning to ask Ms. Oldaker?
2. During lunch on July 27, 2023, did Ms. Counts or Ms. Mukherjee say that Ms. Counts would ask Ms. Oldaker about prior pap smears with other doctors?
3. During lunch on July 27, 2023, did Ms. Counts or Ms. Mukherjee say that Ms. Counts would ask Ms. Oldaker about prior transvaginal ultrasounds with other doctors?
4. During lunch on July 27, 2023, did Ms. Counts or Ms. Mukherjee say that Ms. Counts would ask Ms. Oldaker about literature or pamphlets available at other doctors' offices she had visited?
5. During lunch on July 27, 2023, did Ms. Counts or Ms. Mukherjee say that Ms. Counts would ask Ms. Oldaker whether other doctors had given her pamphlets during her visits?

7

6.   During lunch on July 27, 2023, did Ms. Counts or Ms. Mukherjee show
     Ms. Oldaker any medical records?

7.   During lunch on July 27, 2023, did Ms. Counts or Ms. Mukherjee say that
     Ms. Counts was going to ask Ms. Oldaker about a sonogram picture?

8.   During lunch on July 27, 2023, did Ms. Counts or Ms. Mukherjee suggest
     that Ms. Oldaker should have, must have, or maybe did hear more
     information about women at ICDC having hysterectomies than Ms.
     Oldaker shared in response to Dr. Amin's counsel's questioning?

9.   During lunch on July 27, 2023, did Ms. Counts or Ms. Mukherjee suggest
     to Ms. Oldaker what her answers to any questions should be, and if so,
     what?

10.  During lunch on July 27, 2023, did Ms. Counts or Ms. Mukherjee state
     how they would answer any questions if they were Ms. Oldaker, and if so,
     what?

11.  What was said during lunch on July 27, 2023 (inclusive of all present)?

*Id.*

On September 26, after a deposition in the *Amin v. NBCU* case of another non-party

witness who has also made serious allegations against Amin, Ms. Evans, Ms. Counts, and

undersigned counsel Mr. Vogel met briefly to discuss the deposition and declaration, and the

possible sanctions motion against Prof. Mukherjee. Ms. Evans reiterated her offer of a

declaration and also offered to take a sworn oral statement, and to put the testimony under a

protective order. Ms. Evans explained that she believes that Prof. Mukherjee committed

sanctionable conduct by violating the District of South Carolina local rules and that Ms. Oldaker

changed an answer because Prof. Mukherjee suggested that she should. But, Ms. Evans said that

if her questions were answered to her satisfaction, she would not seek sanctions against either

Prof. Mukherjee or Ms. Counts. Ms. Evans also indicated that, if Prof. Mukherjee did not submit

a declaration or sworn statement and proceeded to challenge the subpoena with a motion to

quash, then Ms. Evans would proceed with filing the sanctions motion. *Id.*

On October 1, 2023, on behalf of Prof. Mukherjee, undersigned counsel rejected the

declaration and sworn statement options and again asked Ms. Evans to withdraw the subpoena

for all the reasons outlined in their September 22 email to Ms. Evans, reiterating that "in an abundance of caution, [Prof. Mukherjee] already put on the record what happened during any discussions that may have involved the substance of Ms. Oldaker's testimony, either affirmatively or under questioning from [Ms. Evans]." Undersigned counsel informed Ms. Evans that if she did not withdraw the subpoena they would proceed to seek to quash it. Because of the rapidly approaching date of the deposition, undersigned counsel requested that Ms. Evans delay the deposition until after the motion to quash litigation was resolved. *Id.*

On October 2, 2023, Ms. Evans offered to postpone the deposition to November 1, 2023, in order "to allow for time for further conferral/your anticipated motion." *Id.* Undersigned counsel accepted that offer on October 2[2] and indicated a willingness to consider further possible ways to resolve the matter without coming before this Court. *Id.* Ms. Evans responded that her previous offer of a declaration stands, claimed once again that Prof. Mukherjee had not previously addressed any lunch meeting, and said she would consider narrowing the questions. *Id.* Undersigned counsel responded that they could see no way to meaningfully narrow the questions that would address their concerns, repeated their previous statement that Prof. Mukherjee had indeed already addressed her conversations at any lunch meeting on the record, *see supra*, at pp. 4-6, and advised that they would be filing a motion to quash. Qureshi Decl. ¶ 8, Ex. F (September & October Email Correspondence). Ms. Evans responded, indicating that she was interested in investigating any lunchtime discussion between Ms. Oldaker, and Ms. Counts, the lawyer for NBCUniversal at the deposition. *Id.* This motion followed.

---

[2] Ms. Evans has not reissued the subpoena, but because the parties agreed to postpone it until November 1, 2023, undersigned counsel is proceeding with that date as the operative date of the subpoenaed deposition.

## LEGAL STANDARD

"Rule 45 permits a party to command a non-party to produce documents and provide deposition testimony." *City of Almaty v. Sater*, No. 19 Civ. 2645 (AJN) (KHP), 2022 WL 769213, at *2 (S.D.N.Y. Feb. 24, 2022). Under the Rule, the court "must quash or modify a subpoena that . . . requires a person to comply beyond the geographical limits specified in Rule 45(c) . . . requires disclosure of privileged or other protected matter, if no exception or waiver applies . . . or subjects a person to undue burden." Fed. R. Civ. P. 45(d)(3). A court may also limit discovery "for good cause shown" and "make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense," including "forbidding the disclosure or discovery." Fed. R. Civ. P. 26(c)(1). "The burden of persuasion in a motion to quash a subpoena and for a protective order is borne by the movant." *Jones v. Hirschfeld*, 219 F.R.D. 71, 74–75 (S.D.N.Y. 2003) (citing *Dove v. Atl. Capital Corp.*, 963 F.2d 15, 19 (2d Cir. 1992)). Ultimately, the decision to quash a subpoena is entrusted to the sound discretion of the Court. *United States v. Sanders*, 211 F.3d 711, 720 (2d Cir. 2000).

While Rule 45 allows for the depositions of non-parties, "depositions of opposing counsel are disfavored." *United States v. Yonkers Bd. of Educ.*, 946 F.2d 180, 185 (2d Cir. 1991) (citing *Shelton v. American Motors Corp.,* 805 F.2d 1323, 1327 (8th Cir. 1986)). Within the Second Circuit, when determining whether to allow discovery from adversary counsel, courts generally apply the factors contained in the Second Circuit's opinion in *In re Friedman*, 350 F.3d 65 (2d Cir. 2003).[3] Those factors include: "the need to depose the lawyer, the lawyer's role in connection with the matter on which discovery is sought and in relation to the pending litigation,

---

[3] Although the Second Circuit's opinion is dicta, *see In re Friedman*, 350 F.3d at 72, n.4,"[c]ourts within this Circuit rely on the language of *Friedman* when ruling on the appropriateness of ordering a deposition of opposing counsel." *Nimkoff Rosenfeld & Schechter, LLP v. RKO Properties, Ltd.*, 07 Civ. 7983 (DAB)(HBP), 2016 WL 3042733, at *9 (S.D.N.Y. May 24, 2016) (collecting cases).

the risk of encountering privilege and work-product issues, and the extent of discovery already

conducted." *Id*. at 72. These factors allow the court to "strike a balance between the legitimate

need for information in discovery and the danger of allowing gamesmanship to sidetrack

litigation." *Lee v. Kucker & Bruh, LLP*, No. 12 CIV. 4662 BSJ JCF, 2013 WL 680929, at *2

(S.D.N.Y. Feb. 25, 2013). "If the discovery can be obtained from other sources thus eliminating

the need to obtain it from the lawyer herself, and if the discovery is of marginal relevance, the

case for permitting it is weakened." *Varbero v. Belesis*, No. 20-CV-2538 (LJL), 2020 WL

7043503, at *2 (S.D.N.Y. Dec. 1, 2020).

**ARGUMENT**

**I.      Subpoena Is Invalid Under Federal Rule of Civil Procedure 45.**

This Court must quash the subpoena because it fails to comply with Federal Rule of Civil

Procedure 45. First, the subpoena was not accompanied by "fees for 1 day's attendance" as

required by Fed. R. Civ. P. 45(b)(1). "'This requirement is strictly enforced,' and 'courts in this

[d]istrict as well as this [c]ircuit have deemed subpoenas invalid and granted motions to quash

where a party failed to tender a witness fee with service of the subpoena.'" *Angelo, Gordon &*

*Co., L.P. v. MTE Holdings*, LLC, No. 20 MISC. 23, 2020 WL 4700910, at *2 (S.D.N.Y. Aug.

13, 2020) (citing *KOS Bldg. Grp., LLC v. R.S. Granoff Architects, P.C.*, No. 19 Civ. 2918, 2020

WL 1989487, at *3 (S.D.N.Y. Apr. 24, 2020)." Because Amin failed to provide witness fees, the

subpoena should be quashed. Eberhart Decl. ¶ 6; Mukherjee Decl. ¶ 8.

Second, the subpoena lists the place of compliance as "via Zoom meeting" with a link to

a video conference. Under Rule 45(c), the subpoena must state a place of compliance. Under the

Rule, compliance with a deposition subpoena "may be required within 100 miles of where the

person subject to the subpoena resides, is employed, or regularly conducts business in person.

11

While a Rule 43(a) order authorizes testimony from a remote location, the witness can be commanded to testify only from a place described in Rule 45(c)(1)." *Rochester Drug Coop., Inc. v. Campanelli*, No. 23 MISC. 89 (KPF), 2023 WL 2945879, at *2 (S.D.N.Y. Apr. 14, 2023). Thus, requiring that the deposition place be "via Zoom Meeting," as was done here, is improper, as a videoconference is a means of deposition, not a place. Eberhart Decl. ¶ 8, Ex. A (Subpoena); *see Fed. Ins. Co. v. Tungsten Heavy Powder & Parts, Inc.*, No. 21CV1197-W-MDD, 2022 WL 2820667, at *7 (S.D. Cal. July 18, 2022) ("'ZOOM VIDEO CONFERENCE,' however, is not a place."); *CSS, Inc. v. Herrington*, 354 F. Supp. 3d 702, 710 (N.D. Tex. 2017) ("an email address does not qualify as a location or place where compliance is required under Rule 45"); *Russell v. Maman*, No. 18-CV-06691-RS (AGT), 2021 WL 3212646 (N.D. Cal. July 29, 2021) (denying a motion to compel compliance where the subpoena listed the place of compliance as "via Zoom"); *Frobe v. UPMC St. Margaret*, No. 2:20-CV-00957-CRE, 2021 WL 9628848, at *2 (W.D. Pa. July 13, 2021) ("'Zoom Videoconferencing' is not a 'place;' rather, it is a method of taking the deposition").

Third and finally, the subpoena was not personally served on Prof. Mukherjee. Courts within the Second Circuit have traditionally interpreted Rule 45(b)(1) as requiring personal service for non-party witnesses. *Agran v. City of New York*, 1997 WL 107452, at *1 (S.D.N.Y. 1997) (noting that "the weight of authority is that a subpoena . . . must be served personally" and "the Court is without authority to sanction an alternative form of service"); *see Conanicut Investment Co. v. Coopers & Lybrand*, 126 F.R.D. 461, 462 (E.D.N.Y. 1989) ("Nowhere in Rule 45 is the Court given discretion to permit alternate service in troublesome cases."); 9A Charles Alan Wright & Arthur R. Miller, Fed. Prac. & Proc. § 2454 (3d ed., Apr. 2023 update) ("The longstanding interpretation of Rule 45 has been that personal service of subpoenas is required. . .

12

. In recent years a growing number of cases have departed from the view that personal service is

required and alternatively have found service of a subpoena under Rule 45 proper absent

personal service."). Although district courts have recently allowed alternative forms of service

under Rule 45, "[c]ourts that follow the recent trend do not give serving parties carte blanche.

These courts typically require the serving party to seek leave to serve by alternative means and to

demonstrate a prior diligent attempt to personally serve." *Kenyon v. Simon & Schuster, Inc.*, No.

16 MISC. 327 (P1), 2016 WL 5930265, at *3 (S.D.N.Y. Oct. 11, 2016). Here, the process server

served the subpoena on Ms. Brenda Eberhart, the Associate Director of the Morningside Heights

Legal Services, Inc., the nonprofit clinical law firm where Prof. Mukherjee works. Eberhart

Decl. ¶ 2; Mukherjee Decl. ¶¶ 5-6. In addition to personal delivery to the person to be served,

New York law permits substitute service at "a person of suitable age and discretion at the actual

place of business, dwelling place or usual place of abode of the person to be served" as long as a

copy is also mailed to the defendant's residence or place of business. N.Y. C.P.L.R. 308(1)-(2).

Prof. Mukherjee was not served personally, and Amin has not sought leave to serve by

alternative means. Nor was Prof. Mukherjee mailed a copy of the subpoena as is required to

effectuate service under New York's law on substitute service. Mukherjee Decl. ¶ 9. Therefore,

this Court should quash the subpoena for failure to properly serve Prof. Mukherjee.

**II.     The Subpoena Should Be Quashed Under the *Friedman* Factors.**

Under the Second Circuit's opinion in *In re Friedman*, courts consider the following

factors when determining whether to allow the deposition of adversary counsel:[4] (1) "the need to

---

[4] Although Prof. Mukherjee is not "opposing counsel" against Amin in the defamation matter, she is his opposing counsel in the *Oldaker* action, undoubtedly making her Amin's adversary. In addition, because the truth and credibility of Ms. Oldaker's serious allegations against Amin are central to both *Oldaker* and *Amin v. NBCU*, Prof. Mukherjee, as Ms. Oldaker's counsel for the *Amin v. NBCU* non-party deposition, was also Amin's adversary directly for that deposition. That is sufficient for the Court to consider the *Friedman* factors in this context. *Doe v. Town of Greenwich*, No. 3:18CV01322(KAD), 2020 WL

13

depose the lawyer;" (2) "the lawyer's role in connection with the matter on which discovery is sought and in relation to the pending litigation;" (3) "the risk of encountering privilege and work-product issues;" and (4) "the extent of discovery already conducted." 350 F.3d 65, 72 (2d Cir. 2003). In this case, all of the *Friedman* factors favor quashing the subpoena. *See Gragg v. Int'l Mgmt. Grp.*, No. CIVA5:03CV0904NPMDEP, 2007 WL 1074894, at *10 (N.D.N.Y. Apr. 5, 2007) (finding that allowing a deposition of an attorney accused by plaintiff's counsel of withholding documents would "open the door to the sort of mischief that the courts in *Shelton* and *In re: Friedman* sought to avoid.").

First, there is no need whatsoever to depose Prof. Mukherjee, as she has already been questioned by Ms. Evans about her conduct at the deposition. Ms. Evans has stated that the central issue here is essentially whether Prof. Mukherjee and/or Ms. Counts engaged in witness coaching during breaks at Ms. Oldaker's deposition. With this deposition, what Ms. Evans wants is a second bite at the apple. Ms. Evans has already had the opportunity to - and, in fact, did - question Ms. Oldaker during the deposition regarding any possible witness coaching, as would have been proper and as is contemplated under the District of South Carolina local rules. *See* Qureshi Decl. ¶ 5, Ex. C (Oldaker Depo. Tr.) at 114:4-116:23, 125:5-20, 220:1-226:6, 226:17-227:25, 228:12-229:2125:5-20; *See Doe v. Town of Greenwich*, No. 3:18CV01322(KAD), 2020 WL 2374867, at *5 (D. Conn. Jan. 10, 2020) ("Where the information sought from the attorney can be provided by non-attorney witnesses, that weighs against permitting the deposition of an attorney."). At no point did Ms. Evans interrupt the deposition to seek relief from the court because of anything improper. In fact, not only did Ms. Evans question Ms. Oldaker regarding any possible witness coaching, Ms. Evans also questioned Prof. Mukherjee at the deposition

---

2374867, at *3 (D. Conn. Jan. 10, 2020) (applying the Second Circuit's *Friedman* factors where attorney sought to be deposed was not "opposing counsel" in the litigation but an "adversary.")

about whether she suggested that Ms. Oldaker change one of her answers, and Prof. Mukherjee

directly answered that she did not. *See*, *e.g.*, Qureshi Decl. ¶ 5, Ex. C (Oldaker Depo. Tr.) at

120:12-16. At the deposition, Prof. Mukherjee placed on the record the purpose and outcome of

any off-the-record conversations she may have had with her client Ms. Oldaker during the

deposition that related to the substance of the testimony at the deposition, and both Prof.

Mukherjee and Ms. Oldaker also answered questions from Ms. Evans regarding those

conversations. Ms. Evans had the opportunity to question them and did; further questioning at a

deposition is not only unwarranted and improper, it is unnecessary. *See Resqnet.Com, Inc. v.

Lansa, Inc.*, No. 01 CIV.3578(RWS), 2004 WL 1627170, at *5 (S.D.N.Y. July 21, 2004) ("As

[defendant] has not specified particular subjects not already covered by the prior discovery and

has not indicated why the information has not been or cannot be obtained through means other

than [plaintiff's counsel's] testimony, it has not established the need for [plaintiff's counsel's]

deposition....").

      To the extent that Ms. Evans is seeking testimony from Prof. Mukherjee only as to any

conversations Ms. Counts may have had with Ms. Oldaker during the lunch break, Prof.

Mukherjee's is equally unnecessary. Ms. Evans already questioned Ms. Oldaker at length at the

deposition about any conversations she may have had with Ms. Counts and Ms. Evans already

questioned Prof. Mukherjee about the lunch conversation as well. *See*, *e.g.*, Qureshi Decl. ¶ 5,

Ex. C (Oldaker Depo. Tr.) at 114:4-116:23, 120:12-16, 125:5-9, 220:1-226:6, 226:17-227:25,

228:12-229:2.

      With respect to the second factor, any testimony Prof. Mukherjee may offer on the

contents of her communication with her client during breaks in the deposition has no relation to

the claims or defenses in the pending *Amin v NBCU* defamation matter in the Southern District

of Georgia, and there is no other "pending litigation" to which it could relate. *See In re Chevron Corp.*, 749 F. Supp. 2d 141, 163 (S.D.N.Y.), *aff'd sub nom. Lago Agrio Plaintiffs v. Chevron Corp.*, 409 F. App'x 393 (2d Cir. 2010) (the second *Friedman* factor "goes at least in part to whether the lawyer is likely to have first-hand evidence that is important to the resolution of the lawsuit"). The subpoena served on Prof. Mukherjee was issued out of the Southern District of Georgia in connection with *Amin v. NBCU.* The only purpose counsel for Amin has indicated to depose Prof. Mukherjee is to determine whether to bring sanctions motions against Prof. Mukherjee and/or Ms. Counts in relation to Ms. Oldaker's deposition. It is undisputed that Ms. Evans does not seek Prof. Mukherjee's testimony in relation to the claims or defenses directly at issue in *Amin v. NBCU. See New York Indep. Contractors All., Inc. v. Highway, Rd. & St. Const. Laborers Loc. Union 1010 of Dist. Council of Pavers & Rd. Builders of Laborer's Int'l Union of N. Am.*, No. 07-CV-1830 ERK/VVP, 2008 WL 5068870, at \*6 (E.D.N.Y. Nov. 24, 2008) ("A subpoena seeking to depose opposing counsel should be quashed when the attorney's role is limited to legal representation."). Rather, if a deposition of Prof. Mukherjee is relevant to *any* proceedings at all (which Prof. Mukherjee does not concede it is), it would be to sanctions proceedings in the District of South Carolina where the Oldaker deposition was subpoenaed, and whose Local Rules Ms. Evans has claimed Prof. Mukherjee violated. Although she has repeatedly threatened a sanctions motion, Ms. Evans has not filed any such sanctions motion since the deposition took place almost three months ago. Moreover, counsel for Amin already requested that the District of South Carolina hear a motion for sanctions, which it declined to do. *See*, *supra*, at pp. 5-6.

Indeed, that there is no pending sanctions motion is highly illustrative of the fishing expedition nature of this subpoena. It is not the case that Ms. Evans sought sanctions and then

requested the deposition in order to further develop the evidence, for example. Rather, Ms. Evans has stated that she will only seek sanctions if she finds the information revealed at the deposition to be unsatisfactory. Qureshi Decl. ¶ 8, Ex. F (September & October Email Correspondence). The deposition thus becomes a highly threatening, coercive, and intimidating tool used to try to force Prof. Mukherjee to develop evidence against herself and/or Ms. Counts. It is all the more abusive because undertaking the deposition will not necessarily prevent sanctions proceedings; Ms. Evans has stated that she will seek sanctions if she does not find the deposition testimony to be to her satisfaction. *Id.* Further, Ms. Evans has also stated that she believes that the Oldaker deposition transcript plainly reveals that Prof. Mukherjee has violated the District of South Carolina local rules, therefore committing sanctionable conduct. *Id.* If that is the case, then the need for additional testimony from Prof. Mukherjee is absolutely unclear.

Third, the risk of impinging upon the attorney-client privilege and work product protection is substantial in this case. Prof. Mukherjee has already stated on the record during the deposition the content of any conversation she had with Ms. Oldaker during the breaks that may have been related to her testimony. Because Prof. Mukherjee is opposing litigation counsel in a civil rights case against Amin, a case which revolves, like the *Amin v. NBCU* case from which this deposition arose, the truth and credibility of, in part, Ms. Oldaker's serious allegations against Amin, the risk of privilege and/or work product protection issues coming up in any deposition of Prof. Mukherjee is substantial - even if the focus of the questioning is any conversation between Ms. Counts and Ms. Oldaker, as Ms. Oldaker is Prof. Mukherjee's client.[5]

---

[5] Regardless of how much any deposition questioning delves into attorney-client or work product protected communications, it is highly possible that the deposition questioning would concern confidential information within the meaning of N.Y. Rule of Professional Conduct 1.6. That Rule defines "confidential information" as "information gained during or relating to the representation of a client, whatever its source, that is (a) protected by the attorney-client privilege, (b) likely to be embarrassing or detrimental to the client if disclosed, or (c) information that the client has requested be kept confidential."

Even if Ms. Evans limits her questioning to nonprivileged information, that risk is "not negligible" and at best, this factor is neutral. *Resqnet.Com, Inc.*, 2004 WL 1627170, at \*6.

Finally, the fourth *Friedman* factor–the extent to which discovery has already been conducted–weighs in favor of Prof. Mukherjee. Discovery in the *Amin v. NBCU* litigation has been ongoing for nearly a year and the discovery period ends on November 17, 2023. Third Amended Scheduling Order, ECF No. 105, *Amin v. NBCUniversal Media, LLC*, No. 5:21-CV-00056-LGW-BWC (S.D. Ga. Oct. 2, 2023). To the extent that there needs to be discovery on this matter, a substantial amount has already been conducted regarding Prof. Mukherjee's interactions with her client. Ms. Evans has already questioned Prof. Mukherjee and the witness about their conversations during the lunch and all deposition breaks. Instead of evading the question or refusing to answer, Prof. Mukherjee directly answered and was forthcoming about what was discussed, and the same is true of Ms. Oldaker. *See*, *supra*, at pp. 4-6. Ms. Evans has not suggested otherwise, either at the deposition, or since. Moreover, in addition to answering Amin's counsel's questions, Prof. Mukherjee herself described the outcome and substance of the interactions for the record. *Id*. *If* a sanctions motion is filed, and *if* the court hearing that motion is in need of further testimony, it would be well within its power to order such testimony; at this juncture, no legitimate purpose would be served by obtaining duplicative information from Prof. Mukherjee from this deposition.

Therefore, this Court should quash the deposition subpoena.

---

N.Y. R. Prof. Cond. 1.6. In observing this Rule, Prof. Mukherjee may only disclose such "confidential information" under very specific, carefully circumscribed conditions, none of which are applicable here. *See id.*

III.     **Prof. Mukherjee Should Be Awarded Attorneys' Fees & Costs.**

Counsel for Amin has acted "vexatiously" and multiplied the proceedings, which

warrants sanctions under 28 U.S.C. § 1927. *See N. Am. Foreign Trading Corp. v. Zale Corp.*, 83

F.R.D. 293, 297 (S.D.N.Y. 1979) (awarding attorneys' fees, expenses, and costs under 28 U.S.C.

§ 1927 where counsel's actions resulted in "an unreasonable and vexatious expansion of the

costs."). During the deposition itself, counsel used intemperate language when addressing the

witness, Prof. Mukherjee, and counsel for NBCUniversal – including calling the witness a liar

and stating that Prof. Mukherjee should not be teaching law students. *See* Qureshi Decl. ¶ 5, Ex.

C (Oldaker Depo. Tr.) at 229:5-6, 230-9-10. Counsel for Amin already had ample opportunity to

question Ms. Oldaker about her conversation with Prof. Mukherjee during the deposition. *See*,

*supra*, at pp. 4-6. Out of an abundance of caution, pursuant to the District of South Carolina local

rule, Prof. Mukherjee already noted the purpose and outcome of her conversations with Ms.

Oldaker during the deposition breaks. *See, supra*, at pp. 4-6. After the District of South Carolina

already indicated that it does not wish to hear any motion for sanctions related to this deposition,

counsel for Amin now seeks a deposition of Prof. Mukherjee, his opposing counsel in the

*Oldaker* action, under threat of filing a motion for sanctions against her. Ms. Evans' conduct has

not only needlessly multiplied proceedings, but borders on harassment, coercion, and

intimidation of Prof. Mukherjee.

In addition, Rule 45(d)(1) provides that, "[a] party or attorney responsible for issuing and

serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a

person subject to the subpoena. The court for the district where compliance is required must

enforce this duty and impose an appropriate sanction—which may include lost earnings and

reasonable attorney's fees—on a party or attorney who fails to comply." This subpoena never

should have been issued or should have been withdrawn. Twice undersigned counsel asked that the subpoena be withdrawn and provided reasons. *See* Qureshi Decl. ¶ 8, Ex. F (September & October Email Correspondence). By requiring undersigned counsel to come before this Court to quash this subpoena, Ms. Evans has failed in her duty to "avoid imposing undue burden or expense" on Prof. Mukherjee. "Sanctions are properly imposed and attorney's fees are awarded where, as here, the party improperly issuing the subpoena refused to withdraw it, requiring the non-party to institute a motion to quash." *Night Hawk Ltd. v. Briarpatch Ltd., L.P.*, No. 03 CIV.1382 RWS, 2003 WL 23018833, at *9 (S.D.N.Y. Dec. 23, 2003). Accordingly, this Court "must enforce this duty and impose an appropriate sanction," which, in this case, is "reasonable attorney's fees."

**IV. This Court Should Stay Prof. Mukherjee's Deposition Pending Outcome Of This Motion.**

Prof. Mukherjee's deposition is currently scheduled for November 1, 2023. A stay of this date is warranted during the pendency of the instant Motion in order to allow for full briefing, any necessary argument, and time for the Court to make its determination as to this Motion.

**CONCLUSION**

For all of the reasons stated above, and for any others that may appear to the Court, Prof. Mukherjee respectfully requests that the Court stay her deposition pending its resolution of this Motion, quash the subpoena, and award her costs and attorney's fees and any further relief that the Court deems just and proper.

New York, NY
October 12, 2023

Respectfully submitted,

*/s/ Victoria Neilson*
Victoria Neilson[†]
NY Bar No. 2689792
Amber Qureshi[*]
DC Bar No. 90001046

20

Matthew S. Vogel‡
Louisiana Bar No. 35363
NATIONAL IMMIGRATION PROJECT
OF THE NATIONAL LAWYERS GUILD
2201 Wisconsin Ave NW, Suite 200
Washington, DC 20007
(202) 742-4447
victoria@nipnlg.org
amber@nipnlg.org
matt@nipnlg.org

* *Pro hac vice* admission motion forthcoming
† Not admitted in D.C.; working remotely from and
admitted in New York only
‡ Not admitted in D.C.; working remotely from and
admitted in Louisiana only

*Counsel for Elora Mukherjee*

## <u>CERTIFICATE OF SERVICE</u>

I, the undersigned, hereby certify that on this date, I uploaded the foregoing, along with all attachments thereto, to this Court's CM/ECF system, which will send a Notice of Electronic Filing (NEF) to all counsel of record who have entered an appearance through CM/ECF.

I further certify that I served by electronic mail copies of the foregoing on the following counsel of record in *Amin v. NBCUniversal Media, LLC*, Case No. 5:21-CV-00056-LGW-BWC (S.D. Ga.):

Stacey Godfrey Evans
sevans@staceyevanslaw.com
Tiffany N. Watkins
twatkins@staceyevanslaw.com
John Amble Johnson
ajohnson@staceyevanslaw.com
STACEY EVANS LAW
4200 Northside Parkway NW
Bldg One; Suite 200
Atlanta, GA 30327
Tel: (770) 779-9602

Scott R. Grubman
sgrubman@cglawfirm.com
CHILIVIS GRUBMAN
DALBEY & WARNER LLP
1834 Independence Square
Atlanta, GA 30338
Tel: (404) 233-4171

*Counsel for Mahendra Amin*

Elizabeth A. McNamara
lizmcnamara@dwt.com
Amanda B. Levine
amandalevine@dwt.com
DAVIS WRIGHT TREMAINE LLP
1251 Avenue of the Americas, 21st Floor
New York, NY 10020-1104
Tel: (212) 489-8230

Cynthia L. Counts
cynthia.counts@fisherbroyles.com
FISHERBROYLES, LLP
945 East Paces Ferry Rd. NE, Suite 2000
Atlanta, GA 30326
Tel: (404) 550-6233

Robert Bates Lovett
blovett@savannahga.gov
Fisher Broyles, LLP
2 East Bryan Street, Suite 436
Savannah, GA 31401
Tel: (912) 335-4467

*Counsel for NBCUniversal Media, LLC*

Dated: October 12, 2023

Respectfully submitted,

*/s/ Victoria Neilson*
Victoria Neilson
NY Bar No. 2689792

Exhibit 10

**From:** Stacey Evans <sevans@staceyevanslaw.com>
**Subject: Re: F RE: Elora Mukherjee deposition**
**Date:** October 2, 2023 at 5:35:15 PM CDT
**To:** Cynthia Counts <Cynthia.Counts@fisherbroyles.com>
**Cc:** Amble Johnson <ajohnson@staceyevanslaw.com>, Matthew Vogel <matt@nipnlg.org>, "McNamara, Elizabeth" <lizmcnamara@dwt.com>, Stacey Evans <sevans@staceyevanslaw.com>

I disagree with much of what you see below. I'm not responding further to this today as I'm tied up on other matters.

Cynthia, I have confirmed the alt date of Nov 1 to you at least 3 times now - understanding it is a placeholder as we confer further and you contemplate a motion. Can you please confirm that you have now heard me as to this date?

Sent from my iPhone

> On Oct 2, 2023, at 6:29 PM, Cynthia Counts <Cynthia.Counts@fisherbroyles.com> wrote:

EXTERNAL SENDER. Only open links and attachments from known senders. DO NOT provide your username or password.

To Recap from my end:

1. my subpoena has a return date for Oct. 4;
2. your subpoenas to opposing counsel was a matter of concern that Judge Cheesbro; indeed, Judge Cheesbro addressed those subpoenas at the very outset of our status call and he is disinclined generally to order "discovery on discovery" and that such subpoenas appeared to be disproportional to the needs of this case;
3. Judge Cheesbro recommended that the best solution would be to have me file a motion for protective order/motion to quash in the Southern District of Georgia in our defamation case;
4. The Court expressed concerns as to whether he would have jurisdiction over other subpoenas that have been issued on counsel, but as Judge Cheesbro pointed out, the Court does have the power to protect counsel in active litigation from a subpoena and that I have entered an appearance as counsel in the defamation case pending in the Southern District of Georgia -- the court that issued the subpoena.

Please let me know if you disagree with any of the above. Also, I agree with Matt that you should withdraw the subpoenas. I further agree that if you insist on seeking depositions of your opposing counsel there is no reason for you to insist on a deposition date before we file our motions and get a ruling from the court. Currently my subpoena return date is for October 4th; please sent me written confirmation that you are withdrawing that subpoena or that you have agreed to a revised return date by noon tomorrow. I appreciate it.

Also, please let me know if you are planning on issuing a new subpoena.

Cynthia

Exhibit 11

**From:** Stacey Evans <sevans@staceyevanslaw.com>
**Sent:** Tuesday, September 19, 2023 2:29 PM
**To:** Kim_Mixon@gas.uscourts.gov <Kim_Mixon@gas.uscourts.gov>
**Cc:** Julie Oinonen <julie@goodgeorgialawyer.com>; McNamara, Elizabeth <lizmcnamara@dwt.com>; amandalevine@dwt.com <AmandaLevine@dwt.com>; Charlton, Leena <LeenaCharlton@dwt.com>; Cynthia Counts <Cynthia.Counts@fisherbroyles.com>; Scott R. Grubman <SGrubman@cglawfirm.com>; Amble Johnson <ajohnson@staceyevanslaw.com>; Stacey Evans <sevans@staceyevanslaw.com>
**Subject:** Motion to Quash, Amin-NBCU, 5:21-cv-56

Dear Ms. Mixon,

Good afternoon.  I write to bring two issues to the Court's attention regarding non-party Azadeh Shahshahani's Motion to Quash Subpoena.

First, the subpoena to Ms. Shahshahani was served on her in Atlanta, Georgia, and it requires compliance at my office in Atlanta.  This is not clear from the motion, which does not discuss the place of compliance or attach the subpoena it seeks to quash, which I have attached here.  Judge Cheesbro previously denied a motion to a non-party's motion to quash subpoena to produce documents, finding that it lacked jurisdiction to hear the dispute because Federal Rule of Civil Procedure 45 provides that a challenge to the subpoena is to be heard by a district court in the district where compliance with the subpoena is required, and courts in the United States District Court for the Southern District of Georgia follow "the rule that 'the place of compliance is the location the subpoena directs the documents to be sent.'"  Doc. 67 at 1-2 (quotation marks omitted).  Obviously, if the Court finds that it does have jurisdiction to hear Ms. Shahshahani's motion, Dr. Amin welcomes the Court's resolution and is confident that he will prevail.  However, in light of the late stage of discovery, the Court's previous ruling, and the absence of information on the place of compliance in Ms. Shahshahani's motion, Dr. Amin brings it to the attention of the Court and all parties that it may find that it has no jurisdiction.

Second, if the Court does wish for Dr. Amin to respond to the motion, Dr. Amin is cognizant of the Court's order as to his obligations in navigating discovery disputes.  Doc. 2 at 5-6.  Accordingly, Dr. Amin asks whether the Court's requirement to use the Court's informal discovery dispute resolution process, including scheduling a telephonic conference with the Court, applies to the motion, and the parties and non-parties should schedule a telephonic conference with the Court, or if instead Dr. Amin should respond to the motion by filing a response on the docket.

Thank you.

_____
Stacey Godfrey Evans
STACEY EVANS LAW
4200 Northside Pkwy NW
Bldg One; Suite 200
Atlanta, GA 30327
770-779-9602
www.staceyevanslaw.com

Exhibit 12

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF GEORGIA
### WAYCROSS DIVISION

DR. MAHENDRA AMIN, M.D.,

        Plaintiff,

    v.

NBCUNIVERSAL MEDIA, LLC,

        Defendant.

CIVIL ACTION NO.: 5:21-cv-56

## **O R D E R**

Non-party Azadeh Shahshahani ("Ms. Shahshahani") filed a Motion to Quash Subpoena for Deposition, as amended. Docs. 99, 100. For the following reasons, I **DENY** the Motion, as amended.

A federal court has both the power and the obligation to inquire into its jurisdiction whenever there is a possibility jurisdiction does not exist. Fitzgerald v. Seaboard Sys. R.R., Inc., 760 F.2d 1249, 1251 (11th Cir. 1985). Federal Rule of Civil Procedure 45 governs subpoenas and challenges to subpoenas. Fed. R. Civ. P. 45. "A subpoena must be issued by the court where the underlying action is pending, but challenges to the subpoena are to be heard by the district court encompassing the place where compliance with the subpoena is required." Woods ex rel. United States v. SouthernCare, Inc., 303 F.R.D. 405, 406 (N.D. Ala. 2014) (citing Fed. R. Civ. P. 45(a)(2), (d)(3)(A)). For subpoenas seeking a deposition, the place of compliance must be "within 100 miles of where the person resides, is employed, or regularly transacts business in person." Fed. R. Civ. P. 45(c)(1)(A). Rule 45 provides the court where compliance is required with the power to adjudicate a motion to quash or modify the subpoena. Miller Constr. Equip.

Sales, Inc. v. Clark Equip. Co., No. 1:15-CV-7, 2016 WL 447717, at *4 (S.D. Ga. Feb. 4, 2016) (citing Fed. R. Civ. P. 45(d)(3)). The Rule also provides a vehicle for transferring such motions to the issuing court: "When the court where compliance is required did not issue the subpoena, it may transfer a motion under this rule to the issuing court if the person subject to the subpoena consents or if the court finds exceptional circumstances." Id. (citing Fed. R. Civ. P. 45(f)).

Here, the subpoena requires the deposition to be conducted in Atlanta, Georgia. Doc. 100-4 at 2. The district court encompassing the place of compliance would be the Northern District of Georgia. See 28 U.S.C. § 90. The parties may request and consent to transfer, but the court of compliance—the District Court for the Northern District of Georgia—will make the determination whether to transfer the motion. If the Northern District of Georgia transfers the motion, then this Court will address the merits of the Motion to Quash at that time. But, at this time, this Court lacks jurisdiction to hear the Motion to Quash. I **DENY** non-party Azadeh Shahshahani's Motion to Quash for lack of jurisdiction.

**SO ORDERED**, this 21st day of September, 2023.

_____
BENJAMIN W. CHEESBRO
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA