**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
WAYCROSS DIVISION**

DR. MAHENDRA AMIN, M.D.,

        Plaintiff,

    v.

NBCUNIVERSAL MEDIA, LLC,

        Defendant.

CIVIL ACTION NO.: 5:21-cv-56

**O R D E R**

Plaintiff filed a Motion to Exclude Expert Testimony of Erin Carey.  Doc. 124. Defendant filed a Response in opposition.  Doc. 160.  Plaintiff filed a Reply.  Doc. 178.  For the following reasons, the Court **GRANTS in part** and **DENIES in part** Plaintiff's Motion to Exclude Expert Testimony of Erin Carey.  Doc. 124.  Dr. Carey shall not be permitted to offer any opinion testimony on the issue of informed consent, but Dr. Carey shall be permitted to offer her other opinions, as set forth in her expert report.

**BACKGROUND**

In this suit, Plaintiff, Dr. Mahendra Amin, alleges Defendant aired a series of broadcast segments on MSNBC that contained multiple false and defamatory statements concerning Plaintiff's medical treatment of detainees at Irwin County Detention Center ("ICDC").  Doc. 1. The Court recently provided a detailed description of the factual allegations underlying this case in its Order on the parties' cross-motions for summary judgment.  Doc. 209.  The factual allegations will not be repeated here.

Relevant to this Order, Plaintiff retained two experts, Dr. Lauren Hamilton and Dr. Eldridge Bills, to review the medical records of Plaintiff's patients and to provide opinions regarding the medical necessity of certain procedures Plaintiff performed.  Doc. 124 at 3.  In his Report, Dr. Bills stated he reviewed a collection of medical records for 69 patients Plaintiff saw and treated.  Doc. 123-2.  Dr. Bills divided those 69 patients into three categories.[1]  First, Dr. Bills discussed two individual patients, identified by initials B.P. and K.C., upon whom Plaintiff performed hysterectomies.  Dr. Bills opined, generally, the hysterectomies were medically appropriate.  Id.  Second, Dr. Bills explained Plaintiff "medically managed" 14 of the 69 patients and those patients did not require any surgical intervention.  Third, Dr. Bills discussed 52 patients upon whom Plaintiff performed outpatient surgical procedures, identifying the number and types of procedures performed and the stated reasons for those procedures.  For this category, Dr. Bills did not discuss any specific patient or individual procedure but, instead, concluded each procedure was "medically indicated as documented by various modalities including the history and physical, preoperative ultrasound evaluation, intraoperative surgical images documentation, and final pathology."  Dr. Bills noted Plaintiff was serving a "high-risk patient population."  Id. at 17.  Ultimately, Dr. Bills stated, "[I]t appears that Dr Amin has been providing appropriate care to his high-risk indigent population and has not performed nay unnecessary medical procedures."  Id.  In this Report, Dr. Bills did not mention the concept of patient consent or consultation.

Plaintiff's other expert, Dr. Hamilton, provided two affidavits ostensibly serving as her reports.  Id. at 6–11.  In those affidavits, Dr. Hamilton describes her review of medical records for K.C. and B.P.  Dr. Hamilton opines in both instances the hysterectomies that were performed

---

[1]     Dr. Bills states he reviewed the medical records of 69 patients, but the patients in these three categories add up to only 68.

were medically necessary and Plaintiff appropriately performed medical treatment within the applicable standard of care for these patients.  Dr. Hamilton observed the medical records for K.C. and B.P. contained executed informed consent forms, but Dr. Hamilton did not offer any specific opinion about informed consent as to these two patients.  Dr. Hamilton did not offer opinions about other patients or Plaintiff's conduct more broadly.

Defendant did not disclose any expert witnesses by the deadline set in the operative Scheduling Order.  However, the parties agreed Defendant could identify "rebuttal experts" by September 19, 2023.  Defendant identified Dr. Carey as a rebuttal expert witness on September 19, 2023, and provided Dr. Carey's 13-page report on that same day.[2]  Doc. 124-3 at 2.

### A.    Dr. Carey's Report

Dr. Carey's report is divided into four sections: records reviewed; qualifications; opinions; and conclusions.  Id. at 5–17.  Dr. Carey explained she reviewed medical records for 70 of Dr. Amin's patients, including records from 69 patients Dr. Bills reviewed, and the initial expert reports from Dr. Hamilton and Dr. Bills.  Id. at 2.  The "Opinions" section of the Report is divided into four subsections: (a) "Medical chart selection"; (b) "Routinely interpreting normal physiology as pathology"; (c) "Patterns of aggressive surgical intervention"; and (d) "Medical management practices."  In the first section, "Medical chart selection," Dr. Carey merely states which patient records Dr. Bills and Dr. Carey reviewed.  This first section contains no opinions and requires no further discussion.  The remaining three opinion sections are summarized here.

***Routinely interpreting normal physiology as pathology.***  In this section, Dr. Carey opines Plaintiff had a "pattern" of interpreting normal physiological changes with pathology and

---

[2]    Defendant also identified Dr. Anderson on that same date and in the same letter.  Plaintiff has raised a separate challenge to Dr. Anderson's testimony.  Doc. 123.  That challenge is addressed by separate order.

Plaintiff used his interpretation to justify "surgically aggressive behavior." Id. at 6. Dr. Carey provides two examples. First, Dr. Carey contends, "Almost all of Dr. Amin's patients were pre-menopausal women with normal endometrium, even when described as 'thickened.'" Id. at 7. Dr. Carey's opinion on this point—to the extent there is an opinion—is difficult to discern. It appears Dr. Carey is implying Plaintiff incorrectly diagnosed his patients with endometrial thickness, which was then used to justify some surgical intervention, but the diagnosis was incorrect because Plaintiff failed to consider various patient-specific factors, though that opinion is not expressly stated. Second, Dr. Carey discusses adnexal masses generally (i.e., masses of the ovary, fallopian tube, or surrounding tissues), and observation, "[o]f all the adnexal masses Dr. Amin identified on ultrasound, almost all were simple cysts with benign characteristics; thin, smooth walls; no solid components or septations." Id. at 8. Dr. Carey does not rely on this observation to support an express opinion in this section, but the implication is Plaintiff incorrectly diagnosed patients with adnexal masses and then used that misdiagnosis to justify surgical or other invasive interventions. Again, this opinion is not expressly stated in this portion of the report.

   ***Patterns of aggressive surgical intervention.*** This section contains the bulk of Dr. Carey's opinions. Here, Dr. Carey discusses five types of surgical interventions.

   First, Dr. Carey discusses "Dilation and Curettage (D&C) vs. office endometrial biopsy." Most of this portion of the report discusses the nature of the two procedures, including general risks associated with the procedures and comparisons of when each procedure should be performed. In terms of an opinion relevant to this case, Dr. Carey states, "Dr. Amin routinely performed surgeries [i.e., D&C] instead of procedures [i.e., office endometrial biopsies] for the

same indication."[3]  Id. at 9.  Dr. Carey does not discuss any specific patient at this point in the report.

Second, Dr. Carey discusses endometriosis surgery.  Id. at 10.  In this section, Dr. Carey observes Plaintiff fulgurated suspicious areas of endometriosis for "many" patients who underwent diagnostic laparoscopy, but Plaintiff did not excise any cells or send any cells to pathology to confirm the presence of disease.  Dr. Carey states certain guidelines recommend initially treating endometriosis with medical therapy rather than laparoscopy.

Third, Dr. Carey discusses endocervical curettage ("ECC").[4]  Id.  Dr. Carey states ECCs are indicated or recommended only in certain circumstances (e.g., women with abnormal findings on pap, women with +HPV infection, etc.).  Dr. Carey states Plaintiff appears to collect an ECC on each patient at the time of a D&C.

Fourth, Dr. Carey discusses ovarian cystectomies.  Id.  Dr. Carey discusses cystectomies generally, including frequency of surgical intervention for ovarian cysts, risks associated with the cystectomies, and circumstances that may warrant surgical removal of an ovarian cyst.  Dr. Carey makes an observation that for the cystectomies performed by Plaintiff and reviewed by Dr. Carey, all were for cysts that were 7 centimeters or smaller.  Additionally, Dr. Carey states of the 54 patients who underwent laparoscopy, 36 had an ovarian cystectomy and almost all returned as

---

[3]      In this portion of her report, Dr. Carey describes the difference between her use of the terms "procedures" and "surgeries."  Dr. Carey explains a "procedure" is a "short interventional technique" and "all other invasive interventions (including superficial incisional or excisional procedures and placement of devices or implants that require repair)" are considered surgeries.

[4]      The National Cancer Institute defines ECC as: "A procedure done after an abnormal Pap test result in which a sample of tissue is scraped from the lining of the cervical canal (the inner part of the cervix that connects the uterus to the vagina) using a spoon-shaped instrument called a curette.  The tissue is then checked under a microscope for signs of disease."  See https://www.cancer.gov/publications/dictionaries/cancer-terms/def/endocervical-curettage (last visited July 11, 2024).

follicular cysts.  Regarding cystectomies, Dr. Carey expressly disputes Dr. Bills's opinion cystectomies may be more appropriate for Plaintiff's patients because the ICE detainees are transient and less likely to receive follow-up care.

Fifth, Dr. Carey discusses hysterectomies.  Id. at 11.  Dr. Carey states Plaintiff engaged in a "pattern of limited medical trials and aggressive surgical approach."  Dr. Carey discusses five individual patients who were scheduled to receive hysterectomies, though only two were completed (B.P. and K.C.).  For the three patients where the hysterectomy was scheduled but not completed, Dr. Carey opines one patient (R.F.S.) was a "candidate for uterine-sparing intervention."  Id.  For the other two patients (W.D. and C.M.) Dr. Carey offers no opinions about their need for hysterectomies, though Dr. Carey notes Plaintiff recommended the hysterectomies at the postoperative visit from the D&C scope, which Dr. Carey contends is too soon after the first procedure for an assessment of the need of a second surgical procedure.  It appears Dr. Carey also opines Plaintiff failed to offer appropriate trials of medical therapy before surgical interventions were recommended for these patients, though Dr. Carey is vague as to whom this opinion applies.

Dr. Carey offers more detailed opinions on the two hysterectomies that were completed, concerning patients B.P. and K.C.  Plaintiff performed a hysterectomy on B.P. on August 9, 2019.  Dr. Carey identifies "several concerning features" of Plaintiff's treatment of B.P.  Plaintiff performed a LEEP procedure on B.P., which returned as "Carcinoma in situ with positive margins."[5]  Id. at 12.  Dr. Carey opines these results required a "repeat excisional biopsy" to determine the correct course of treatment (i.e., surgery or radiation), and Plaintiff did not order

---

[5]     The National Cancer Institute defines a LEEP procedure as: "A technique that uses electric current passed through a thin wire loop to remove abnormal tissue." https://www.cancer.gov/publications/dictionaries/cancer-terms/def/leep (last visited July 11, 2024).

that biopsy.  Dr. Carey also opined B.P.'s medical circumstances (i.e., positive margins) warranted a "modified radical hysterectomy," not a "simple hysterectomy," like the one Plaintiff performed on B.P.  Id.  Dr. Carey opines Plaintiff performed B.P.'s hysterectomy less than four weeks after the LEEP procedure but Plaintiff should have waited six to eight weeks to allow for resolution of inflammation.

Plaintiff performed a total abdominal hysterectomy on K.C. on June 14, 2017.  Dr. Carey does not dispute K.C.'s circumstances required a hysterectomy.  However, Dr. Carey opines the surgical method (or "route") Plaintiff employed was improper.  Dr. Carey opines "K.C. was a candidate for a minimally invasive route of hysterectomy however there is no documentation on counseling for route of hysterectomy an no indication for an abdominal hysterectomy."  Id. at 13. Dr. Carey is vague about what specific minimally invasive route should have been performed (e.g., vaginal, laparoscopic, or robotic-assisted laparoscopic), instead indicating an abdominal hysterectomy was not the appropriate route.  Dr. Carey also points out Plaintiff prescribed K.C. oral estrogen therapy, which she contends contradicts Dr. Bills's opinion Plaintiff was not prescribing oral medical therapy because Plaintiff's patients were being held in ICE custody.

***Medical management practices.***[6]  In this section, Dr. Carey discusses seven different areas of Plaintiff's medical management of patients.  Id. at 15.  Throughout this section, Dr. Carey responds to and disagrees with Dr. Bills's opinion Plaintiff's treatment methods were driven by the unique nature of the patient cohort, namely it was more difficult or impossible to provide follow up care or ongoing treatment to ICE detainees due to limited access and the possibility of deportation.  In support of this argument, Dr. Carey states Plaintiff "routinely and excessively" used Depo-Provera, which requires quarterly monitoring and follow up visits.  Dr.

---

[6]     The parties appear to use the term "medical management" to mean treatment not involving surgical interventions.

Carey also opines if Plaintiff was genuinely concerned about long-term follow up, he would have prescribed long-acting reversible contraception (e.g., intrauterine devices) for contraception and abnormal uterine bleeding, but Plaintiff did not offer this care to a single patient who qualified. Id.

Dr. Carey also offers an opinion about Plaintiff's use of Provera in his course of treatment.  Dr. Carey states Plaintiff "routinely" prescribes a 10-day course of Provera as "trial of hormone therapy."  Id.  However, Dr. Carey opines a 10-day course is not long enough to serve as a trial and only a 3- to 6-month course would suffice.  Dr. Carey states "only a handful" of Plaintiff's patients were prescribed a 3- to 6-month course of Provera that would serve as a "trial of hormone therapy."  Id.

Dr. Carey mentions Plaintiff's use of "transvaginal ultrasound" and asserts Plaintiff "readily" uses the technique as a component of his initial assessment.  Id. at 16.  Dr. Carey then states transvaginal ultrasounds are appropriate in some limited circumstances.  While Dr. Carey does not expressly state Plaintiff's use of transvaginal ultrasounds is improper, her report implies Plaintiff used the technique too frequently.  Dr. Carey offers a similar opinion about Plaintiff's use of pelvic exams, noting the medical records demonstrated a "high number of repeated pelvic examinations" and stating such exams are "not required on a routine basis."  Id.

Next, Dr. Carey discusses Plaintiff's inconsistency with "management of cervical cancer screening and treatment of abnormal pap smears."  Id.  Dr. Carey notes Dr. Bills's view Plaintiff was providing lifesaving care related to cervical cancer treatment, but Dr. Carey opines the medical records she reviewed do not support that conclusion.  Dr. Carey opines the medical records do not indicate Plaintiff followed certain guidelines from the American Cancer Society for screening and early detection.  Dr. Carey then describes certain actions Plaintiff took

regarding three patients.  For one of those patients, B.P., Dr. Carey reiterates some of her criticisms of Plaintiff's treatment of that individual and concludes a proper course of treatment would have involved an additional biopsy and an alternative form of hysterectomy.  For the other two patients, Dr. Carey merely recounts their course of treatment without providing a clear opinion about the propriety of the treatment.

Dr. Carey then provides a description of "trauma-informed care" (TIC) as an approach to healthcare.  Dr. Carey states, "[I]t does not appear that Dr. Amin incorporated TIC as a core component of his patient experiences."  Id.  Dr. Carey does not elaborate further.

Dr. Carey then discusses 14 patients Dr. Bills identified as patients Plaintiff medically managed without performing surgery.  Dr. Carey disagrees with any suggestion by Dr. Bills Plaintiff adequately cared for these patients.  Instead, Dr. Carey opines the medical records for these patients shows "a pattern of repeated exams, procedures/ultrasounds and surgical recommendations before exploring medical management options."  Id. at 17.

Dr. Carey provides a "Conclusion" section at the end of her report.  In that section, Dr. Carey states:

> Dr. Amin consistently acted in a surgically aggressive manner, performing unnecessary surgeries and failing to provide patients alternative medical therapies. From the medical record review, fertility risks were not addressed and some of the unnecessary surgeries could have impacted future fertility.
>
> [I]t appears that Dr. Amin frequently offered a procedure known as 'D&C scope,' which, in several instances, may not have been medically necessary and exposed patients to avoidable harm.  Dr. Amin would also consistently remove follicular cysts that did not need to be removed.  Ovarian cystectomies have the unique risk of potential damage to future fertility.  Even in the medical records of the women who were deemed 'medically managed', several were offered the surgery only to decline or be deported/released before the surgery date.
>
> . . . .

> In my review of the medical records, it did not appear that Dr. Amin consistently
> followed the full process of informed consent, particularly in considering surgical
> interventions with patients.  Additionally, from my review of the medical records,
> Dr. Amin did appear to not consistently engaged patients in shared medical
> decision-making.

Id.

### B.    Plaintiff's Experts' Reply Reports

Both of Plaintiff's experts provided "Reply" reports in response to Dr. Carey's expert

report.  Doc. 123-4.  In his Reply, Dr. Bills concludes Dr. Carey's opinions are erroneous

because Dr. Carey did not fully account for the unique aspects of the patient cohort, namely ICE

detainees who could be deported on short notice.  Dr. Bills also opines the term "aggressive

surgical approach" (a term Dr. Carey used) does not necessarily suggest an improper medical

approach but is, instead, a common approach of many practitioners.  Dr. Bills then addresses

each subsection of the "Opinions" section in Dr. Carey's report, generally disagreeing with Dr.

Carey's individual opinions.  For example, Dr. Bills discusses Plaintiff's treatment of B.P., and

opines no additional biopsy was required (as Dr. Carey opined).  Notably, Dr. Bills takes issue

with Dr. Carey's opinions on TIC, stating he (Dr. Bills) was unfamiliar with the concept, TIC is

irrelevant to this case, and Dr. Carey's reliance on the TIC approach reflects "Dr. Carey's

research and academic status and her bias in trying to review this case."  Id. at 10.  Speaking

more generally, Dr. Bills opines in many instances Dr. Carey opined there were better or optimal

forms of care Plaintiff could have provided to his patients, but Dr. Carey frequently failed to

conclude Plaintiff provided any improper or unnecessary care.

Dr. Hamilton also provided a "Reply."  Id. at 4.  In her Reply, Dr. Hamilton disputed Dr.

Carey's opinion Plaintiff engaged in a pattern that involved the most aggressive approaches and

that resulted in unnecessary surgeries.  Dr. Hamilton also discusses informed consent and

generally concludes, "Only Dr. Amin or the OR staff can truly speak to whether the patient was consented in their primary language via an interpreter." Id. Thus, it appears Dr. Hamilton believes a patient should be informed about consent in their primary language, but medical records—including consent forms—cannot prove or disprove proper consent.

Dr. Hamilton then reiterates her opinions about Plaintiff's treatment of B.P. Dr. Hamilton opines the type of hysterectomy Plaintiff performed on B.P was acceptable under applicable guidelines. Dr. Hamilton also discusses her opinions about Plaintiff's care of K.C. Dr. Hamilton rejects the significance of Dr. Carey's opinion that a less invasive hysterectomy might have been warranted. Dr. Hamilton states, "[W]hat we are debating is not the route of hysterectomy chosen, but whether it was appropriate[,]" and "[I]t is clear this hysterectomy was also indicated and reasonable." Id. at 5.

**C.    Expert Depositions**

Based on the record before the Court, it appears the parties deposed three of the four expert witnesses. The parties provided the Court with transcripts from depositions of: Dr. Bills, Dr. Anderson, and Dr. Carey. See Anderson, doc. 123-7 at 207; Carey, doc. 124-9 at 345; Bills, doc. 139-8 at 69. The parties did not provide any transcript for Dr. Hamilton and it does not appear Dr. Hamilton was deposed.

**D.    The Court's Order on the Parties' Cross-Motions for Summary Judgment**

The parties filed cross-motions for summary judgment. Docs. 122, 127. The Honorable Lisa Godbey Wood granted in part and denied in part these motions, and, in doing so, addressed 39 specific statements contained in the relevant broadcasts. Doc. 209 at 30. Judge Wood determined "multiple NBC statements" "are verifiably false." Id. at 42. Specifically, Judge Wood granted a portion of Plaintiff's summary judgment motion, concluding based on the

undisputed material facts, the following Statements were false: Statements 5, 6, 14–16, 23, and 25–28.[7]  Id. at 49, 85, 88–89, 91, 92–93.  In reaching her conclusions, Judge Wood found, as a matter of undisputed fact: (1) there were no mass or high numbers of hysterectomies at ICDC; (2) Plaintiff performed only two hysterectomies on ICDC detainees; and (3) Plaintiff is not a "uterus collector."

Judge Wood also determined the following statements are capable of being proved false, leaving it up to a jury to determine their veracity: Statements 1, 2–4, 7, 8, 10, 12–13, 17–21, 24, 29, 31–33, and 37–39.  Id. at 49–50, 53, 84–85, 86, 87–88, 89–90, 91–92, 93–95, 96.  Judge Wood noted "the sting of the defamation" does not depend on the number of procedures performed but "whether Plaintiff performed unnecessary or unauthorized hysterectomies and gynecological procedures."  Id. at 52, 84, 86, 88, 89, 90, 96–97.  In addition, Judge Wood found a jury must determine the veracity of statements concerning Plaintiff's alleged improper treatment of patients or performing procedures without informed consent and authorization.  Id. at 53, 84–85, 86, 87–88, 89–90, 91–92, 93–95, 96.  Judge Wood denied the parties' cross-motions as to these Statements.  Id. at 53.

Judge Wood then determined five Statements—11, 22, 30, 35, and 36—are non-actionable as defamation because they cannot be proved false.  Id. at 53–55.  Judge Wood noted Statements 11, 22, and 30 are opinions based on subjective assessments.  Statements 35 and 36 are not actionable because these two statements "can be justified[]" as only detailing the fact an investigation was opened based on allegations concerning medical procedures being performed on immigrant women at ICDC without their consent.  Id. at 55–56.  Judge Wood granted

---

[7]     Although the Court determined the undisputed material facts show these Statements are false, other issues related to these Statements still must be resolved by the jury.  Specifically, for each of these Statements, Plaintiff must prove the statements were defamatory and Defendants acted with the requisite level of fault.

Defendant's motion and denied Plaintiff's motion as to these five statements.  <u>Id.</u> at 56–57, 87, 91, 94, 95–96.

## LEGAL STANDARD

Plaintiff's challenges can be divided into two categories.  First, Plaintiff argues Dr. Carey's opinions should be limited in scope to opinions that rebut Plaintiff's experts' opinions.  This challenge arises under Federal Rules of Civil Procedure 26 and 37.  Second, Plaintiff argues Dr. Carey is providing expert testimony and her opinions should be excluded because they are not reliable and are not helpful to the trier of fact.  These challenges arise under Federal Rule of Evidence 702 and <u>Daubert v. Merrell Dow Pharmaceutical, Inc.</u>, 509 U.S. 579 (1993).  The Court provides both legal standards here.

### I.     Rebuttal Witness Standard

A rebuttal expert witness's testimony is permitted under Rule 26 "if the evidence is intended solely to contradict or rebut evidence on the same subject matter identified by another party under Rule 26(a)(2)(B) or (C), within 30 days after the other party's disclosure."  Fed. R. Civ. P. 26(a)(2)(D)(ii); <u>see also</u> <u>In re Trasylol Prods. Liab. Litig.</u>, No. 09-01928, 2010 WL 4065436, at *2 (S.D. Fla. Aug. 6, 2010) (stating rebuttal testimony must "directly address an assertion raised by an opponent's expert").  A rebuttal witness cannot "advance new arguments or new evidence."  <u>Blake v. Securitas Sec. Servs.</u>, Inc., 292 F.R.D. 15, 17 (D.D.C. 2013).

Under Rule 37(c)(1), if a party fails to comply with the Rule 26 disclosure requirements, "the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."  Fed. R. Civ. P. 37(c)(1).  As a result, rebuttal witness testimony that exceeds the scope of the opposing party's expert should not be excluded, absent any substantial justification.  Fed. R. Civ. P. 37; <u>Home</u>

13

<u>Design Servs., Inc. v. Hibiscus Homes of Fla., Inc.</u>, No. 603CV1860ORL19, 2005 WL 2465020, at *5 (M.D. Fla. Oct. 6, 2005) ("Non-rebuttal, expert evidence which casts doubt on an opposing expert's report cannot be admitted under the thirty-day period for rebuttal evidence provided in Rule 26(a)(2).").

## II.     The <u>Daubert</u> Legal Standard

The United States Supreme Court's holding in <u>Daubert v. Merrell Dow Pharmaceutical, Inc.</u>, 509 U.S. 579 (1993), and the text of Rule 702 require trial judges to serve as gatekeepers in determining the admissibility of expert testimony; however, any decision regarding admissibility is not a position on the strength or weight of the testimony.  Fed. R. Evid. 702; <u>Kumho Tire Co. v. Carmichael</u>, 526 U.S. 137, 141 (1999).  In this Circuit, courts routinely look to three elements to determine if expert testimony is admissible under <u>Daubert</u> and Rule 702.  As the Eleventh Circuit Court of Appeals has stated, the elements for consideration are whether:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in <u>Daubert</u>; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

<u>United States v. Frazier</u>, 387 F.3d 1244, 1260 (11th Cir. 2004) (citations omitted).  "[A]lthough there is some overlap among the inquiries into an expert's qualifications, the reliability of his proffered opinion and the helpfulness of that opinion, these are distinct concepts that courts and litigants must take care not to conflate."  <u>Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.</u>, 326 F.3d 1333, 1341 (11th Cir. 2003).  The trial court has broad latitude in evaluating each of these three factors.

As to qualifications, an expert may be qualified "by knowledge, skill, training, or education."  <u>Hendrix ex rel. G.P. v. Evenflo Co., Inc.</u>, 609 F.3d 1183, 1193 (11th Cir. 2010).

The expert need not have experience precisely mirroring the case at bar in order to be qualified. Maiz v. Virani, 253 F.3d 641, 665 (11th Cir. 2001). However, where an expert does have experience directly applicable to an issue at bar, experience alone may provide a sufficient foundation for expert testimony. Frazier, 387 F.3d at 1261.

As to reliability, courts look, when possible, to: (1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community. Daubert, 509 U.S. at 593–94. However, these factors are not exhaustive, and "a federal court should consider any additional factors that may advance its Rule 702 analysis." Quiet Tech., 326 F.3d at 1341. At all times in this flexible inquiry, the court's focus must be "solely on principles and methodology, not on the conclusions that they generate." Seamon v. Remington Arms Co., LLC, 813 F.3d 983, 988 (11th Cir. 2016) (citation omitted).

Finally, as to the third element, expert testimony is likely to assist the trier of fact to the extent "it concerns matters beyond the understanding of the average lay person and logically advances a material aspect of the proponent's case." Kennedy v. Elec. Ins. Co., Case No. 4:18-cv-148, 2019 WL 2090776, at *5 (S.D. Ga. May 13, 2019) (citing Daubert v. Merrell Dow Pharmaceutical, Inc., 509 U.S. 579, 591 (1993)); Frazier, 387 F.3d at 1262–63. Rule 702 permits experts to make conclusions based on competing versions of the facts, but those conclusions must still assist the trier of fact by explaining something that is "beyond the understanding of the average lay person." Jackson v. Catanzariti, No. 6:12-CV-113, 2019 WL 2098991, at *10 (S.D. Ga. May 14, 2019) (citing United States v. Frazier, 387 F.3d 1244, 1262 (11th Cir. 2004)). Expert testimony generally will not help the trier of fact "when it offers nothing more than what

15

lawyers for the parties can argue in closing arguments." Id. (quoting Cook v. Sheriff of Monroe Cnty., 402 F.3d 1092, 1111 (11th Cir. 2005)).  Such testimony "is properly excluded when it is not needed to clarify facts and issues of common understanding which jurors are able to comprehend for themselves." Hibiscus Assocs. Ltd. v. Bd. of Trs. of Policemen & Firemen Ret. Sys., 50 F.3d 908, 917 (11th Cir. 1995) (citations omitted).

"The burden of laying the proper foundation for the admission of the expert testimony is on the party offering the expert, and the admissibility must be shown by a preponderance of the evidence." Allison v. McGhan Med. Corp., 184 F.3d 1300, 1306 (11th Cir. 1999); McCorvey v. Baxter Healthcare Corp., 298 F.3d 1253, 1257 (11th Cir. 2002).  However, "it is not the role of the district court to make ultimate conclusions as to the persuasiveness of proffered evidence." Quiet Tech., 326 F.3d at 1341.  Instead, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." Daubert, 509 U.S. at 596.

## DISCUSSION

In the instant Motion, Plaintiff argues Dr. Carey's rebuttal opinions exceed the scope of rebuttal expert testimony.  Plaintiff also argues Dr. Carey's opinions should be excluded because they are not based on reliable methodology and do not assist the trier of fact.  Defendant opposes Plaintiff's Motion.

## I.     Dr. Carey May Only Offer Expert Opinions That Rebut or Contradict Plaintiff's Experts' Opinions

Plaintiff argues Dr. Carey was only offered as a rebuttal witness, and, therefore, her opinions should be limited to rebuttal of opinions expressed by Dr. Amin's experts.[8]  Plaintiff

---

[8]     This argument does not arise under Federal Rule of Evidence 702 or Daubert.  Instead, Plaintiff's argument arises under Federal Rules of Civil Procedure 26 and 37.

states his experts' opinions are limited to the medical necessity of two hysterectomies and whether Plaintiff performed unnecessary medical procedures.  Doc. 124 at 13–14; Doc. 178 at 12.  Plaintiff argues many of Dr. Carey's opinions exceed the scope of the subject matter identified.

Defendant does not dispute Dr. Carey is a rebuttal witness or the scope of Dr. Carey's expert opinions should be limited to rebutting Plaintiff's experts.[9]  Instead, Defendant argues all of Dr. Carey's opinions rebut or contradict opinions Plaintiff's experts, Dr. Bills and Dr. Hamilton, offer.

In comparing the experts' opinions, it is important to note Dr. Bills expresses very broad opinions about Plaintiff's treatment of detainees.  Dr. Bills reviewed medical records for approximately 69 patients Plaintiff saw and treated.  Plaintiff performed hysterectomies on 2 of those patients (B.P. and K.C.), Plaintiff treated 14 patients without surgical interventions, and Plaintiff performed outpatient surgical procedures on 52 patients.  Dr. Bills generally concludes the two hysterectomies were appropriate, and he opines for the procedures performed on the 52 patients receiving outpatient surgical care, every single procedure was "medically indicated as documented by various modalities including the history and physical, preoperative ultrasound evaluation, intraoperative surgical images documentation, and final pathology."  Doc. 139-1 at 8.  Additionally, Dr. Bills offers a broad opinion about all of the medical care Plaintiff provided to these 69 patients, stating: "[I]t appears that Dr. Amin has been providing appropriate care to his high-risk indigent population and has not performed any unnecessary medical procedures."  Id.

---

[9]     To be sure, Defendant could not dispute this point.  Defendant expressly identified Dr. Carey as a rebuttal expert and only disclosed Dr. Carey as an expert after the deadline for Defendant to disclose its affirmative experts had passed.

In order to form her opinions, Dr. Carey reviewed the same patient records Dr. Bills reviewed.  In the section of her report titled "interpreting normal physiology as pathology," Dr. Carey explains—in her opinion—Plaintiff had a "pattern" of interpreting normal physiology with pathology, and Plaintiff justified surgeries based on this practice.  Dr. Carey discusses specific examples.  In the section titled "patterns of aggressive surgical intervention," Dr. Carey discusses five types of surgical interventions Plaintiff used, and she opines Plaintiff's use of those interventions was improper and unnecessary.  In the section titled "medical management practices," Dr. Carey discusses seven different areas of Plaintiff's medical management of patients.  In this section, Dr. Carey frequently responds to and disagrees with Dr. Bills's opinion Plaintiff's treatment methods were driven by the unique attributes of the patient cohort.

With one exception (addressed below), I conclude Dr. Carey's opinions, as expressed in her expert report, "contradict or rebut" Plaintiff's experts' opinions—especially the broad opinions expressed by Dr. Bills.  Notably, Dr. Carey and Dr. Bills generally reviewed the same patient records.  Dr. Bills opines broadly Plaintiff has been providing "appropriate care" to a "high-risk indigent population," and Plaintiff "has not performed any unnecessary medical procedures."  Dr. Carey offers numerous opinions in opposition to Dr. Bills's broad assessments. Dr. Carey opines on the propriety of specific surgeries and procedures, as well as Plaintiff's specific methods of medical management of patients.  Although Dr. Carey's opinions are more detailed than Dr. Bills, and discuss nuances Dr. Bills did not address, Dr. Carey's more detailed opinions all support her broader opinion that Plaintiff "consistently acted in a surgically aggressive manner, performing unnecessary surgeries and failing to provide patients alternative medical therapies."  Doc. 124-3.  Thus, the majority of Dr. Carey's opinions sufficiently rebut the opinions Dr. Bills and Dr. Hamilton express.

The one exception concerns Dr. Carey's opinions on informed consent.  At various points in her report, Dr. Carey discusses whether Plaintiff obtained informed consent from his patients and opines specifically "it did not appear that Dr. Amin consistently followed the full process of informed consent, particularly in considering surgical interventions with patients."  Id. Importantly, neither Dr. Bills nor Dr. Hamilton offered any opinion about informed consent.  Dr. Hamilton noted in her report the medical records for K.C. and B.P. contained executed informed consent forms, but Dr. Hamilton did not offer any specific opinion about informed consent as to these two patients.  Later, in her reply report, Dr. Hamilton expressly disclaims holding any opinion on whether Plaintiff obtained informed consent from his patients, observing it depends on information known only by individuals present at the consultations.  Dr. Bills also testified clearly he offers no opinion on the issue of informed consent.  See Doc. 139-7 at 26; Doc. 162 at 20 (Plaintiff explaining Dr. Bills was not asked to opine about informed consent).  Because neither of Plaintiff's experts have expressed any opinions on informed consent, Defendant's rebuttal expert, Dr. Carey, also may not express any opinion on informed consent.

In sum, most of Dr. Carey's opinions do not exceed the scope of the subject matter Plaintiff's experts identified.  The majority of Dr. Carey's opinions directly address assertions both Dr. Bills and Dr. Hamilton raise.[10]  However, Dr. Carey's opinions about informed consent exceed the scope of Plaintiff's experts' opinions, and, therefore, do not "rebut or contradict" Plaintiff's experts' opinions.  Dr. Carey shall, therefore, not be permitted to offer any opinion on informed consent.

---

[10]     To be sure, this determination—Dr. Carey's opinions are responsive to Plaintiff's experts' opinions—does not necessarily mean the opinions are all admissible or are not subject to challenge on other grounds.  This determination is limited only to the challenges arising under Rules 26 and 37.

## II.   Dr. Carey's Opinions Are Based on Reliable Methodology

Plaintiff argues Dr. Carey's opinions are not based on a reliable methodology.  In support, Plaintiff states Dr. Carey mischaracterizes procedures as "unnecessary" merely based on her view that the patients did not receive the best possible treatment.  Doc. 124 at 6.  Plaintiff states Dr. Carey does not opine on whether the identified patients received unnecessary hysterectomies; rather, she disagrees with the types of hysterectomies Plaintiff performed and the treatment Plaintiff provided prior to recommending the hysterectomies.  Id. at 6–7.

Defendant argues Plaintiff misrepresents Dr. Carey's opinions on the two hysterectomy patients.  Doc. 160 at 2–4.  Defendant states Dr. Carey explained in her report and her deposition patient B.P.'s hysterectomy was medically unnecessary.  Id.  Additionally, Defendant argues Plaintiff's characterization of Dr. Carey's opinion regarding patient K.C.'s treatment is an oversimplification because if Plaintiff had offered the appropriate course of medical therapy, K.C. might not have needed a hysterectomy.  Id. at 4.

I conclude Dr. Carey's opinions are based on a sufficiently reliable methodology. Plaintiff's challenges largely attack the conclusions Dr. Carey reached (e.g., whether any hysterectomy was appropriate for B.P. versus whether the type of hysterectomy Plaintiff performed was appropriate).  Despite invoking "reliability," Plaintiff's challenge does not attack the methodology Dr. Carey used to reach her conclusions.  Dr. Carey's methodology is sufficiently reliable.

Defendant correctly summarizes Dr. Carey's methodology: "[Dr. Carey] reviewed the very same medical records that Dr. Bills and Dr. Hamilton reviewed (which were selected by Dr. Amin's counsel), analyzed the procedures Dr. Amin performed as she would look at a patient in her clinic, and determined whether Dr. Amin's treatment accorded with guidelines from ACOG,

medical literature, and clinical recommendations." Doc. 160-1 at 9. Dr. Carey emphasized she has a master's degree in clinical research, which taught her to "critically review data" and she is a federally funded researcher for the National Institutes of Health. Id. Moreover, in her expert report, Dr. Carey discusses her education, training, and experience, and she expressly identifies guidelines and publications she relied on in forming her opinions.

Having reviewed her report and deposition testimony, it is clear Dr. Carey applied her training, knowledge, and experience to review patient medical records and to form opinions about the care and treatment described in those records. For experience-based testimony, like Dr. Carey's opinions, "the relevant reliability concerns may focus upon personal knowledge or experience." Kumho, 526 U.S. at 150; see also Am. Gen. Life Ins. Co. v. Schoenthal Family, LLC, 555 F.3d 1331, 1338 (11th Cir. 2009) ("A district court may decide that nonscientific expert testimony is reliable based 'upon personal knowledge or experience.'") (quoting Kumho, 526 U.S. at 150). In order for the opinion to be deemed reliable, Dr. Carey must "explain how her experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion and how that experience is reliably applied to the facts." Frazier, 387 F.3d at 1261 (citation omitted).

Dr. Carey sufficiently explains how she applied her knowledge, training, and experience to the medical records she reviewed and how that led her to reach the conclusions she reached. For her opinion on Plaintiff's treatment of ovarian cysts, Dr. Carey explains how simple or follicular cysts will spontaneously regress when examined with repeat ultrasounds and none of Plaintiff's patients who underwent surgery for ovarian cysts returned for serial ultrasound to evaluate for cyst resolution. Doc. 124-3 at 7–8. Additionally, in her deposition, Dr. Carey provided a thorough explanation of her analysis of individual patient records, such as when she

analyzed patient B.P.'s treatment.  For example, when discussing patient B.P.'s medical

treatment, Dr. Carey explained how Plaintiff did not have enough information at the time to offer

a hysterectomy and what information he would have needed to make that determination.

Doc. 124-9 at 118–20.  Dr. Carey also explained how the medical community allows three to six

months before determining if a medical treatment failed and Plaintiff did not allow enough time

to see if treatment worked before offering surgical interventions.  Id. at 203.  Overall, when

asked to explain her methodology, Dr. Carey testified she reviewed the patient files as if she was

seeing a patient in her clinic or teaching a medical student how to approach a patient.  Id. at 200.

Dr. Carey testified, "I did it the same way that I would do in my own clinical practice."  Id. at

201.  These explanations are sufficient to show how Dr. Carey applied her knowledge, training,

and experience to the medical records she reviewed and how that led her to reach her

conclusions.

Plaintiff asserts other arguments in support of his reliability challenge, but they are

unavailing.[11]  Most of Plaintiff's supporting arguments are simply a challenge to the importance

or correctness of Dr. Carey's opinions.  For example, Plaintiff argues Dr. Carey devotes much of

her report to identifying risks inherent to medical procedures, but Dr. Carey does not measure

whether the risks outweigh the benefits of the treatments Plaintiff performed.  In this argument,

Plaintiff does not challenge how Dr. Carey reached her opinions (i.e., Dr. Carey's methodology),

but, instead, argues Dr. Carey's opinion is unconvincing because there was no weighing of risk

and benefits.  This challenge goes to weight of Dr. Carey's opinion, not its admissibility.  Thus,

---

[11]     One of Plaintiff's arguments is Dr. Carey did not apply any methodology to reach her conclusions about informed consent.  Because I grant Plaintiff's request to exclude this portion of Dr. Carey's testimony on other grounds, I do not address Plaintiff's reliability challenge concerning Dr. Carey's informed consent opinions.

Plaintiff may challenge the opinion through rigorous cross-examination, but the challenge is not properly brought in a motion to exclude.

Similarly, Plaintiff argues Dr. Carey's opinion is unreliable because Dr. Carey does not identify in her expert report any individual patient whose surgical procedure was unnecessary. Plaintiff states this demonstrates Dr. Carey's methodology is not reliable because she cannot support her conclusion Dr. Amin performed a "pattern of unnecessary surgeries" without identifying specific surgeries.  Again, Plaintiff is challenging the overall correctness or validity of Dr. Carey's opinion, not the reliability of the methodology Dr. Carey used.[12]

In sum, contrary to the characterization in the briefing, Plaintiff's arguments are generally not attacks on the reliability of Dr. Carey's methodology.  Instead, Plaintiff attacks the importance and correctness of Dr. Carey's opinions.  Such challenges are more properly raised during cross examination, not a motion to exclude.  Defendants have sufficiently demonstrated Dr. Carey's opinions—aside from her opinions on informed consent—are based on a reliable methodology.

### III.   Dr. Carey's Opinions Assist the Trier of Fact

Plaintiff argues Dr. Carey's opinions do not assist the trier of fact.  Plaintiff argues Dr. Carey does not offer opinions on whether Dr. Amin performed unnecessary procedures but,

---

[12]     To clarify, I reject this argument because it is not a challenge to Dr. Carey's methodology, but I would also reject it because it is largely based on a mischaracterization of Dr. Carey's expert report. Although Dr. Carey's report could be clearer, a reasonable reading of the report shows Dr. Carey believes many of the D&C procedures Plaintiff performed were unnecessary, and Dr. Carey describes the criteria she would use to identify unnecessary D&Cs.  As far as a "pattern," Dr. Carey stated she observed a pattern in the medical records she reviewed.  Plaintiff is free to challenge that portion of Dr. Carey's opinion by pointing to the medical records she did not review.  Finally, in a supplement, Dr. Carey subsequently identified individual patients for whom she believes unnecessary procedures were performed.  Doc. 139-4.  Plaintiff criticizes the supplement report as improper, but he raises the challenge only for the first time in his reply brief, months after the supplement was provided.  Plaintiff's argument is superficial and does not demonstrate the supplement was improper or must be excluded.

rather, Dr. Carey only opines Dr. Amin took an aggressive approach to treating patients.

Doc. 124 at 11.  As it pertains to hysterectomies, Plaintiff argues Dr. Carey's opinion is a

different type of hysterectomy was preferable, not that a hysterectomy was unnecessary.

Regarding all gynecological procedures, Plaintiff argues Dr. Carey does not identify which

patients' surgical procedures were unnecessary and makes general conclusions about Dr. Amin's

"aggressive approach" to treatment.  Id. at 12.

Defendant argues Dr. Carey's opinions are directly relevant to the issues in this case and

assist the trier of fact.  Doc. 160 at 5.  Defendant argues each section of Dr. Carey's expert

opinion report responds to the expert opinions of Dr. Bills and Dr. Hamilton.  Defendant also

argues Dr. Carey did not need to discuss individual patients to rebut Dr. Bills's opinions because

Dr. Bills did not discuss the treatment of any specific non-hysterectomy patients and stated an

opinion on all outpatient surgical procedures annotated in the medical records he reviewed.  Id.

at 8.  Defendant states Dr. Carey explained in her deposition Dr. Amin performed the exact same

procedures on dozens of his patients regardless of their symptoms, leading Dr. Carey to the same

conclusions for the procedures discussed in her report.  Defendant states Dr. Carey also

supplemented her report identifying the specific patients who received unnecessary surgeries.  Id.

Expert testimony is likely to assist the trier of fact to the extent "it concerns matters

beyond the understanding of the average lay person and logically advances a material aspect of

the proponent's case."  Kennedy, 2019 WL 2090776, at *5.  Dr. Carey's expert opinions may

assist the trier of fact.  Throughout Dr. Carey's report, she provides examples of surgical

procedures and interventions Plaintiff performed without properly implementing other less

invasive medical interventions that would have made the surgical procedures unnecessary.

See Doc. 124-3 at 7–11.  Dr. Carey's opinion emphasizes evaluating a patient's entire course of

treatment and interventions to determine if a surgical procedure was medically necessary.  Dr.

Carey's deposition testimony, combined with her expert report, show she opines one of the

hysterectomies Plaintiff performed was medically unnecessary and the way Plaintiff assessed the

need for the second hysterectomy was inappropriate.  See Doc. 124-9 at 118 (Dr. Carey stating

the hysterectomy Plaintiff performed on B.P. was unnecessary); id. at 131 (Dr. Carey stating the

hysterectomy Plaintiff performed on K.C. was medically appropriate but the method Plaintiff

used to assess the need for the surgery and the procedures preceding the hysterectomy were

inappropriate).

Plaintiff argues Dr. Carey's broad conclusions about Dr. Amin's aggressive approach are

unhelpful because Dr. Carey fails to discuss specific unnecessary procedures for specific

patients.  This argument fails.  In her report, Dr. Carey identifies the number of patients who

underwent surgical interventions and provides details about additional patients.  Dr. Carey also

explains in her report when her analysis applied to all patients within that category and highlights

patients whose treatment differed from the rest, including a patient-by-patient analysis under the

"Hysterectomy" section of the report.  Doc. 124-3 at 8–14.  Even within the "Patterns of

aggressive surgical intervention" section, Dr. Carey states the majority of Dr. Amin's patients

were low-risk and, therefore, less invasive biopsies were medically indicated.  Id. at 8–11.  Dr.

Carey also identifies the different types of procedures and surgeries Dr. Amin performed and she

compares Plaintiff's approach to the ACOG guidelines.  Therefore, Dr. Carey's broader,

overarching opinions are sufficiently supported by discussions of individual categories of

procedures and patients such that the broad opinions remain sufficiently helpful to the jury.

Furthermore, Dr. Carey's expert report and deposition testimony demonstrate Dr. Carey intends

to offer opinions that may provide the jury with pertinent information going to the heart of the

alleged defamatory statements, namely the whether the medical procedures and surgeries Dr.

Amin performed on ICDC patients were necessary and appropriate.

## CONCLUSION

For the foregoing reasons, the Court **GRANTS in part** and **DENIES in part** Plaintiff's

Motion to Exclude Expert Testimony of Erin Carey.  Doc. 124.  Dr. Carey shall not be permitted

to offer any opinion testimony on the issue of informed consent, but Dr. Carey shall be permitted

to offer her other opinions, as set forth in her expert report.

**SO ORDERED**, this 11th day of July, 2024.

_____
BENJAMIN W. CHEESBRO
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA