# UNITED STATES DISTRICT COURT

# FOR THE SOUTHERN DISTRICT OF GEORGIA

# WAYCROSS DIVISION

DR. MAHENDRA AMIN, M.D.,

    Plaintiff,

 v.

NBCUNIVERSAL MEDIA, LLC,

    Defendant.

Case No. 5:21-cv-00056-LGW-BWC

**NBCU'S CONSOLIDATED MOTIONS *IN LIMINE***

   Pursuant to Rule 7.4 of the Local Rules of the United States District Court for the Southern District of Georgia and page 3 of the Scheduling Order entered by this Court on January 13, 2022, Defendant NBCUniversal Media, LLC ("NBCU") submits the below motions *in limine* and evidentiary objections.[1]  NBCU has attempted to resolve the issues raised herein with Plaintiff Dr. Mahendra Amin ("Dr. Amin") but has been unable to do so.  Dr. Amin opposes the relief sought by NBCU.

## FACTUAL BACKGROUND

   As this Court knows, this action stems from various news reports aired on MSNBC on the programs "Deadline: White House," hosted by Nicolle Wallace, "All In," hosted by Chris Hayes, and "The Rachel Maddow Show," hosted by Rachel Maddow.  Each reported on a September 14, 2020 whistleblower complaint, filed with the federal government, which alleged that a doctor treating women detained at the Irwin County Detention Center ("ICDC") was performing a "high number" of hysterectomies and other gynecological procedures that were unnecessary or done

---

[1] For the Court's ease of reference, NBCU has consolidated its twelve motions *in limine* into this single document

without the detainees' full informed consent (the "Whistleblower Complaint").  The doctor was identified by third-party news organizations as Dr. Amin prior to the MSNBC reporting at issue here.

Dr. Amin initially filed this lawsuit on September 9, 2021, and the First Amended Complaint (the "FAC") (Dkt. 49)—the operative complaint in this action—was filed on May 3, 2022.  The FAC challenged fifty-three statements made on "Deadline: White House," "All In," and "The Rachel Maddow Show" between September 15, 2020 and September 17, 2020, *see* FAC ¶¶ 74-88, and also alleged that "MSNBC and its reporters repeated their false and defamatory statements of and concerning Dr. Amin on Twitter on at least three occasions on September 16, 2020 and September 22, 2020," *id.* ¶ 89.  Following a motion for judgment on the pleadings and motion for summary judgment filed by NBCU and a motion for partial summary judgment filed by Dr. Amin, thirty-four challenged statements remain in this action (the "Statements").  Thirty-one of the statements were published in the September 15, 2020 episodes of "Deadline: White House," "All In," or "The Rachel Maddow Show" (each, a "News Report," collectively, the "News Reports").  Three of the statements were identified by Dr. Amin for the first time in his motion for partial summary judgment and were published on the "All In" social media accounts on September 17, 2020 and September 21, 2020 (the "Social Media Statements").

The parties' pre-trial conference is scheduled for December 19, 2024, and trial is scheduled to begin on April 22, 2025.  NBCU now submits the below motions *in limine* and evidentiary objections in advance of the parties' pre-trial conference.

## NBCU'S MOTIONS *IN LIMINE*

**1.  A motion requesting that the three challenged News Reports are played for the jury in their entireties at the start of trial.**

The Court should direct the jury to watch the three News Reports, from the September 15,

2020 episodes of "Deadline: White House," "All In," and "The Rachel Maddow Show," before opening statements begin. Dr. Amin does not object to the News Reports being shown, but disagrees as to when they should be shown.[2]

Allegedly defamatory "statements cannot be considered in isolation to determine whether they are true or false." *Bryant v. Cox Enters., Inc.*, 311 Ga. App. 230, 238 (Ga. App. Ct. 2011). Rather, they must be "construe[d] . . . in the context of the entire writing to assess the construction placed upon [them] by the average reader." *Id.* "The test to be applied in determining whether an allegedly defamatory statement constitutes an actionable statement of fact requires that the court examine the statement in its totality in the context in which it was uttered or published." *Bollea v. World Championship Wrestling, Inc.*, 371 Ga. App. 555, 558 (Ga. App. Ct. 2005) (quoting *Ollman v. Evans*, 750 F.2d 970, 1000 (D.C. Cir. 1984) (Bork, J., concurring)); *accord Pierce v. Warner Bros Ent., Inc.*, 237 F. Supp. 3d 1375 (M.D. Ga. 2017). For statements made on a television program like those at issue here, the factfinder must look to "[t]he telecast, the pictures and spoken narrative taken in their entire context." *Brewer v. Rogers*, 211 Ga. App. 343, 347 (Ga. App. Ct. 1993) (quoting *Pac. & S. Co. v. Montgomery*, 233 Ga. 175, 177 (1974)). For example, in *Horsley v. Rivera*, 292 F.3d 695, 702 (11th Cir. 2002), the Eleventh Circuit found that statements uttered by a television host "concerning emotionally-charged issues of significant public concern" were not defamatory when considered in light of "the circumstances in which the statement was expressed."

Because it is essential that allegedly defamatory statements be evaluated in the context in which they were made, courts and juries often review entire articles, *see, e.g.*, *Richmond Newspapers, Inc. v. Lipscomb*, 234 Va. 277, 297 (1987); *Braun v. Flynt*, 726 F.2d 245, 253 (5th

---

[2] Copies of each News Report were provided to the Court at Summary Judgment. *See* Wallace Decl. Ex. 7 (Dkt. 130-7); Hayes Decl. Ex. 1 (Dkt. 131-1); Maddow Decl. Ex. 6 (Dkt. 133-6).

Cir. 1984); *Mengel v. Reading Eagle Co.*, 241 Pa. 367, 373 (1913); watch lengthy segments of television shows, *see, e.g.*, *Mitre Sports Int'l Ltd. v. Home Box Office, Inc.*, No. 08-cv-9117 (S.D.N.Y. 2015), ECF No. 496, at 42-43; listen to audio recordings, *see Eramo v. Rolling Stone, LLC*, No. 3:15-cv-00023 (W.D. Va. 2016), ECF No. 291, at 5-6, 15-55 & ECF No. 293 at 5; or even read entire books, *see, e.g.*, *Hoffman-Pugh v. Ramsey*, 312 F.3d 1222, 1225-26 (11th Cir. 2002); *Chau v. Lewis*, 935 F. Supp. 2d 644, 661 (S.D.N.Y. 2013), *aff'd*, 771 F.3d 118 (2d Cir. 2014); *see also Masson v. New Yorker Magazine, Inc.*, 85 F.3d 1394, 1399-1400 (9th Cir. 1996) (suggesting that excerpts alone "might mislead or confuse the jury " and that "the jury would have to read the entire book to understand the author's message"); *Smith v. Cuban Am. Nat'l Found.*, 731 So. 2d 702, 705 (Fla. 3d DCA 1999) (trial court abused its discretion in not permitting defendant "to show the entire documentary to the jury").

Here, Dr. Amin complains about Statements from three different News Reports, including both Statements spoken by the hosts or interview subjects and Statements displayed on the screen. *See* FAC ¶¶ 75-76, 78-79, 84-85.  As alleged in the FAC, and argued on summary judgment, Dr. Amin takes most Statements out of the context of the sentences in which they appear—*e.g.*, excising that a challenged Statement is identified as an "allegation" in the Whistleblower Complaint—or presents them without the context of the contemporaneous graphics, commentary, or surrounding information that inform the meaning of the Statements.  Absent the full context, jurors would not understand, for example, that Dr. Amin's name or image is never identified in any way in the "All In" News Report or that his name is used in The Rachel Maddow Show only in repeating Dr. Amin's own counsel's statement. The jury will be unable to resolve the key issues in this case if the Statements are not understood in the context in which they were uttered or shown.  Jurors should therefore be afforded the opportunity to review the relevant segments of the three News Reports in

their entirety, *before* they hear opening statements or other characterizations of the Statements made by either party.

Requiring the jurors to watch the relevant segments of the three shows will not waste time or unduly delay proceedings. *See* Fed. R. Evid. 403. The "Deadline" News Report ran less than seven minutes; the "All In" News Report ran approximately nine-and-a-half minutes; and "The Rachel Maddow Show" News Report ran approximately 22.5 minutes, of which approximately seven minutes was an introductory discussion of Trump-era immigration policy generally and approximately 15 minutes focused on the whistleblower complaint's allegations about a gynecologist at an ICE detention center. In other words, the jurors could watch the relevant portions of the three News Reports in under 40 minutes. This will provide the necessary unadulterated context to assess and follow opening statements and the testimony that follows.

Analogous procedures have been employed successfully in other recent defamation trials. For example, in *Mitre Sports*, the Court played a 22-minute segment of the HBO series containing the challenged statements before opening statements, *see Mitre Sports*, No. 08-cv-09117 (S.D.N.Y. 2015), ECF No. 496, at 42-43, while in *Eramo*, the Court devoted approximately two hours to having a law clerk read aloud the full challenged article and to playing two audio clips, including a 16-minute excerpt of a Slate podcast, before opening statements began, *see Eramo*, No. 3:15-cv-00023 (W.D. Va. 2016), ECF No. 291, at 5-6, 15-55 & ECF No. 293 at 5; *see also Masson v. New Yorker Magazine, Inc.*, 832 F. Supp. 1350, 1354, 1357, 1369 (N.D. Cal. 1993) (jury was given the "lengthy" "entire article" to read), *aff'd*, 85 F.3d 1394 (9th Cir. 1996). As in these cases, the jury should be shown the three News Reports before it undertakes to consider the merits of the parties' contentions. That way, jurors will be able to assess the evidence they receive and the arguments they hear in the context of their own assessment of the News Reports, furthering

5

the goal of a jury verdict based on an objective and reasoned evaluation of the evidence.

### 2. A motion to instruct the jury on the definition of and standard for "actual malice" at the start of trial.

This Court should give the jury impartial instructions about the law it is expected to apply before opening arguments are delivered by counsel, particularly the legal definition of "actual malice." The law of defamation relies upon legal terms of art that at times are counterintuitive to their plain-English meaning. "[T]he phrase 'actual malice' is unfortunately confusing in that it has nothing to do with bad motive or ill will." *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 666 n.7 (1989). In *Tavoulareas v. Piro*, 817 F.2d 762 (D.C. Cir. 1987), then-Judge Ruth Bader Ginsburg observed that "[k]eeping the jury on track poses a formidable challenge for the judge in a libel case governed by the actual malice standard." *Id.* at 806 (Ginsburg, J., concurring). To avoid confusion, she advised courts to "explain, instruct, or clarify continuously, from the commencement of the trial through to the jury's deliberations," including by "instructing the jury, in plain English, at the opening of the case and at appropriate times during trial, as well as at the close of the case." *Id.* at 807*; see also Harte-Hanks Commc'ns*, 491 U.S. at 666 n.7 (explaining that trial judge can prevent juror confusion in defamation actions by offering instructions at appropriate junctures throughout trial); William W. Schwarzer, *Reforming Jury Trials*, 132 F.R.D. 575, 583 (1991) ("[N]ot giving preinstructions is like telling jurors to watch a baseball game and decide who won without telling them the rules until the end of the game."). Instructions delivered prior to opening statements will provide the jury with the legal primer necessary to deliver an informed and well-reasoned verdict.

For the same reasons, jurors should be provided with written copies of the preliminary instructions for reference and should be encouraged to consult them as they receive evidence. As Judge Ginsburg noted, "[t]he challenge for the trial judge" in explaining unfamiliar legal concepts

to a jury "demands attention throughout the proceedings.  It is not met by allowing the jurors to listen, without education, as the evidence unfolds and then submitting the case for their general verdict after dousing them with a kettleful of law during the charge that would make a third-year law-student blanch." *Tavoulareas*, 817 F.2d at 807 (citations and alterations omitted).  Clear pre-trial instructions that can be readily consulted throughout the proceedings will assist the jurors as they begin the serious task of interpreting the testimony and weighing the evidence offered at trial.

3. **A motion to exclude from trial the following witnesses listed on Dr. Amin's "may call" witness list: Margie Amin, Swati Amin, Jan Chauncey, Felicia Ellis, and Amna Shirazi.**

This Court should exclude testimony from potential witnesses Margie Amin, Swati Amin (Dr. Amin's wife and daughter, respectively), Jan Chauncey, Felicia Ellis, and Amna Shirazi on the grounds that they were not properly identified by Dr. Amin in accordance with the Federal Rules of Civil Procedure and that NBCU would be severely prejudiced if these individuals were allowed to testify during trial.

Pursuant to Federal Rule of Civil Procedure 26(a), each party to an action is required to disclose to the other parties "the name and, if known, the address and telephone number of each individual likely to have discoverable information—along with the subjects of that information—that the disclosing party may use to support its claims or defenses."  Under Federal Rule of Civil Procedure 37(c)(1), a party who fails to identify a witness under Rule 26 "is not allowed to use that . . . witness to supply evidence . . . at a trial, unless the failure was substantially justified or is harmless."  "The burden of establishing that a failure to disclose was substantially justified or harmless rests on the nondisclosing party."  *Mitchell v. Ford Motor Co.*, 318 F. App'x 821, 824 (11th Cir. 2009) (citation omitted).

Here, Dr. Amin served his Rule 26(a) initial disclosures on January 11, 2022 and supplemented those disclosures on May 16, 2023.  *See* **Exhibit 1**.  In neither of those disclosures

was Margie Amin, Swati Amin, Jan Chauncey, Felicia Ellis, or Amna Shirazi identified as an individual likely to have discoverable information.  Instead, these witnesses were identified for the *first time* when the parties exchanged proposed witness lists for purposes of drafting the consolidated proposed pre-trial order, after the close of discovery.  Specifically, on September 20, 2024, Dr. Amin identified Margie and Swati Amin, Chauncey, and Ellis for the first time and on September 29, 2024, Dr. Amin identified Shirazi.  Because these individuals were never properly identified as witnesses—and, indeed, were not identified as witnesses whatsoever until months before trial—under Rule 37, Dr. Amin is precluded from relying on them at trial since NBCU has not had an opportunity to depose them.  *See Moore v. Ingles Markets, Inc.*, 2015 WL 11670159, at *6 (N.D. Ga. May 18, 2015) (granting motion to exclude witnesses not included in plaintiff's initial disclosures and only identified in proposed pretrial order, noting that proposed witnesses were "Plaintiff's family members" and "[i]f Plaintiff intended to use them as witnesses, it was incumbent upon Plaintiff to identify them during discovery"); *Davis v. Green*, 2015 WL 3505665, at *2 (N.D. Ga. June 3, 2015) (excluding witnesses that were identified in proposed pretrial order after "the case had been pending for two and one half years" and "discovery had been closed for months"); *Nance v. Ricoh Elecs., Inc.*, 2008 WL 926662, at *3 (N.D. Ga. Apr. 4, 2008) (excluding witnesses that were not identified in initial disclosures on the ground that defendant would be prejudiced because "he did not take the opportunity, during the discovery period, to depose the witnesses"), *aff'd*, 381 F. App'x 919, 923 (11th Cir. 2010).

    In discussions between counsel, Dr. Amin has proffered two arguments as to why NBCU would not be prejudiced if these witnesses were permitted to testify at trial, neither of which has merit.

*First*, Dr. Amin claims that Swati Amin, Chauncey, and Ellis were each employees of his medical office, and his initial disclosures included the general category, "Individual employees of Dr. Amin's medical office." This argument is inapplicable to Margie Amin (Dr. Amin's wife) and Amna Shirazi (an immigration attorney). Nor does the argument have any merit as to Swati Amin, Chauncey, and Ellis, as courts across the country have recognized that naming a general category of individuals in a Rule 26 disclosure is insufficient to identify a specific individual within that category. *See Durham v. Navient Sols., LLC*, 2019 WL 13207594, at *3 (N.D. Ga. Sept. 19, 2019) (disclosure of "employees and/or representatives of [defendant]" deemed insufficient to put plaintiff on notice that specific employee of defendant would be submitting declaration); *Schweyen v. Univ. of Montana-Missoula*, 2023 WL 7157131, at *4 (D. Mont. Oct. 31, 2023) (plaintiff did not properly disclose witnesses even though his initial disclosures listed "student athletes on the women's basketball team during Plaintiff's tenure as head coach," as this included "approximately 30 players" and "[g]eneral references to categories of people . . . do not satisfy [Rule 26's] requirement"), *appeal docketed*, No. 23-3903 (9th Cir. Dec. 1, 2023). This general rule is particularly true in a case, like this one, where Dr. Amin's initial disclosures also *specifically identified* employees of his office, including Maria Nito and Alma Arceo, who he believed had discoverable information. If Dr. Amin listed by name certain employees of his office, NBCU would have no reason to believe that there were other, unidentified employees, who could similarly be appearing as witnesses at trial. Indeed, under Dr. Amin's theory, he could bring to trial *any* employee who worked in his office over the last four years—no matter their position—on the grounds that they were sufficiently identified by his broad disclosure. Permitting him to do so would clearly defy the purpose of Rules 26 and 37—*i.e.*, "put[ting] a party on notice of the evidence that it must understand and with which it may have to contend at trial," allowing it to

"develop a reasoned, cost-effective plan for discovery" and "to assess its case." *Davis*, 2015 WL 3505665, at *2.

Far from providing NBCU with actual notice concerning the intended use of any of these "employees," Dr. Amin took actions in discovery which indicated that he would *not* be relying on any of these people. Consider, in particular, Dr. Amin's belated attempt to add his daughter, Swati Amin to the list of trial witnesses. Throughout this action, Dr. Amin has repeatedly represented that Swati was his lawyer for purposes of this litigation, while never identifying her as an employee of his medical office.  Swati is referenced fifty-seven times on Dr. Amin's privilege log, *see* **Exhibit 2**, and, during Dr. Amin's deposition, counsel advised him not to discuss conversations with Swati "about legal strategy or conversations or advice" because she was "part of the counsel team," *see* **Exhibit 3** (Amin Tr. at 130:8-131:3)[3]  Now, however, Dr. Amin insists for the first time that Swati was not simply his lawyer but also a previously unidentified employee at his office (without providing her title or anything about what her job entails), in an improper attempt to shoehorn her into his vague prior disclosure.

Accordingly, Dr. Amin's inclusion of the general category of "individual employees of Dr. Amin's medical office" was insufficient to put NBCU on notice that Swati Amin, Chauncey, or Ellis would be witnesses in this trial.

*Second*, Dr. Amin claims that, as to Chauncey and Ellis, NBCU was aware of these witnesses because they were listed in a response to an interrogatory, served by NBCU, which requested that Dr. Amin "[i]dentify the person(s) who assisted [him] in the treatment of ICDC

---

[3] During discovery, NBCU attempted to obtain discovery from another of Dr. Amin's lawyers, Scott Grubman, concerning his non-privileged communications with news organizations about the Whistleblower Complaint's allegations.  Counsel for Dr. Amin accused counsel for NBCU of engaging in "abusive litigation practices" by attempting to depose a lawyer in this action and threatened to seek fees from the Court.  *See* **Exhibit 21**.  Given this response, NBCU certainly would not have been on notice that it could serve a subpoena to Swati Amin, who was similarly identified as Dr. Amin's counsel.

detainees, including but not limited to any nurses or medical assistants." *See* **Exhibit 4**. In response, Dr. Amin listed *twenty-three* individuals, including Chauncey and Ellis. As an initial matter, this argument is inapplicable to Shirazi, Margie Amin, and Swati Amin, none of whom was identified on this list (which further undermines Dr. Amin's attempts to belatedly include Swati Amin as an employee of his office). But even as to Chauncey and Ellis, courts have recognized that "listing names in discovery responses does not eliminate the need to supplement the Witness List." *L.A. v. Riverside Mil. Acad. Found., Inc.*, 2021 WL 8998914, at *6 (N.D. Ga. Sept. 30, 2021); *Station Enters. v. Ganz, Inc.*, 2009 WL 3059148, at *5 (E.D. Mich. Sept. 24, 2009) ("Defendants' argument suggests that by mentioning a name in a discovery response, a party is no longer obligated to include it on a witness list. Such a practice would effectively render the Court's scheduling order regarding the identification of witnesses superfluous and is contrary to the Federal Rules of Civil Procedure."); *Schweyen*, 2023 WL 7157131, at *4 (the fact that two individuals were "named in [] interrogatory answers as 'individuals with knowledge of relevant facts'" did not obviate need to amend initial disclosures to identify such individuals under Rule 37).

Indeed, NBCU served document requests to each of the employees identified in this interrogatory response; Chauncey did not produce a single document, and Ellis produced only a copy of her resume, which merely noted that she was a "part time" women's health nurse for Dr. Amin since February 2016. Accordingly, in neither case would NBCU be on notice that these individuals had additional discoverable information, nor would NBCU have any reason to believe these individuals should be deposed as compared to the twenty-one other employees identified on Dr. Amin's list. Thus, Dr. Amin's inclusion of Chauncey and Ellis in his interrogatory response did not obviate his need to identify them in his Initial Disclosures.

For these reasons, the Court should preclude Margie and Swati Amin, Chauncy, Ellis and Shirazi from testifying in this trial. Should the Court deny NBCU's motion as to any of them, NBCU respectfully requests that, in the interest of fundamental fairness and to prevent undue prejudice, it be provided an opportunity to depose that individual before trial.

### 4. A motion to reaffirm that Statements 9 and 34[4] have not been found false as a matter of law, and Dr. Amin must prove the falsity of these Statements at trial.

NBCU submits this motion *in limine* requesting that the Court reaffirm that Statements 9 and 34[5] have not been found false as a matter of law and, accordingly, Dr. Amin must prove that these statements are false at trial.

In their cross-motions for summary judgment, both parties in this action moved for summary judgment on the issue of falsity: Dr. Amin argued that certain of the challenged Statements were false as a matter of law, and NBCU argued that Dr. Amin could not meet his burden of proof on falsity as to each of the challenged Statements. In its Order, the Court held that five of the challenged Statements—Statements 11, 22, 30, 35, and 36—could not be proven false and dismissed them from this action. *See* Order at 56-57. At the same time, the Court held that ten of the challenged Statements—*i.e.*, Statements 5, 6, 14, 15, 16, 23, 25, 26, 27, and 28—were materially false and, as a result, Dr. Amin would not be required to establish falsity as to these Statements at trial. *See id.* at 48-49. This left twenty-four Statements where Dr. Amin must

---

[4] All references to Statements in these motions *in limine* refer to the numbering in Appendix I to the Court's Order on Summary Judgment. *See* Dkt. 209 ("Order") at 84-97.

[5] Statement 9 is "You have detained women—I had several detain[ed] women on numerous occasions that would come to me and say, Miss Wooten, I had [a] hysterectomy, why? I had no answers to why they had those procedures. And one lady walked up to me here this last time . . . and she said 'what is he? **Is he the uterus collector?**" Statement 34 is "And I think, you know, this—this statement that **they considered him the uterus collector** is graphic, it's hard to listen to, but that's what they're talking about, according to Ms. Wooten, inside this facility, and she's not the only one saying so." Dr. Amin challenges the bolded portions of these statements.

establish substantial falsity by clear and convincing evidence—Statements 1-4, 7-10, 12-13, 17-21, 24, 29, 31-34, and 37-39.

In so doing, the Court's Order specifically explained that, because Dr. Amin "did not move for summary judgment on Statements 9 and 34, he must prove their falsity at trial." *Id.* at 49 n.4. Nonetheless, in the chart annexed to the Order as Appendix II, the Court indicated that Dr. Amin's motion for partial summary judgment was "granted" as to falsity for Statements 9 and 34. *See id.* at 100, 106. This was clearly an error in the chart. As the Court correctly noted in the text of its Order—which controls—because Dr. Amin did not move on these Statements, his motion could not have been granted as to them.

During conferrals, Dr. Amin's counsel indicated that Dr. Amin would add to his list of proposed stipulations that Statements 9 and 34 are false as a matter of law under the "law of the case" since those two Statements both reference that one or more detainee referred to Dr. Amin as "the uterus collector," and other Statements referring to "uterus collector" were found false as a matter of law. But the law of the case doctrine merely provides that "when a court decides a rule of law, that decision should continue to govern the same issues in subsequent stages of the same case." *Mishra v. HCA Inc.*, 2010 WL 11537723, at *2 (S.D. Ga. Apr. 16, 2010) (citation and internal quotation marks omitted). Here, the Court expressly held that it could not find Statements 9 and 34 false as a matter of law. It is this finding—not the Court's finding as to other challenged Statements—that governs subsequent stages of the case. And, notably, a factual question still exists as to these Statements, which NBCU intends to show at trial. While Dr. Amin has argued that "the testimony of women who brought claims against Dr. Amin was that they . . . *never* heard anyone call Dr. Amin a 'uterus collector,'" *see* Dkt. 122 (Dr. Amin Mot. for S.J.) at 24, the record actually documents, as NBCU explained in its motion for summary judgment, that two detainees

testified they heard Dr. Amin called the "uterus collector" by others at ICDC *before* the challenged MSNBC News Reports, *See* Dkt. 137 (NBCU SOMF) ¶ 349.[6]  Since the "uterus collector" Statements, in context, reference the fact that Nurse Wooten or others heard Dr. Amin called this name or detainees questioned whether he was a "uterus collector," the record evidence supports this fact and it is a question for the jury.

Put simply, Dr. Amin chose not to move on Statements 9 and 34, the Court squarely ruled that he must show the falsity of these Statements at trial, and he cannot now correct his mistake through a proposed stipulation (to which NBCU does not agree).  For this reason, NBCU respectfully requests that the Court reaffirm its already clear holding that Dr. Amin is required to prove the falsity of Statements 9 and 34 at trial.

### 5.  A motion to exclude references to Dawn Wooten's September 8, 2020 whistleblower retaliation complaint.

NBCU submits this motion *in limine* under Federal Rules of Evidence 402 and 403 to exclude reference to a September 8, 2020 whistleblower retaliation complaint, filed on behalf of Dawn Wooten, on the grounds that this retaliation complaint is irrelevant to the issues in this case and, even if relevant, would confuse the jury and prejudice NBCU.

As NBCU explained in its motion for judgment on the pleadings and motion for summary judgment, Dawn Wooten is a nurse who worked at the Irwin County Detention Center ("ICDC") treating detained immigrants.  On September 14, 2020, a non-profit legal organization, Project South, on Nurse Wooten's behalf, filed the Whistleblower Complaint with various government agencies, including Immigration & Customs Enforcement ("ICE") and the Department of

---

[6] In its Order on the parties' summary judgment motions, the Court held "[t]he evidence shows that one detainee at the facility heard Plaintiff referred to as the 'uterus collector,' but that this began *after* news outlets covered the whistleblower letter."  *See* Order at 49.  This is contrary to the evidence in this case, which establishes that another detainee unequivocally testified that she heard numerous detainees refer to Dr. Amin as the "uterus collector" *before* any reporting on the Whistleblower Complaint, supporting the notion that he had a "reputation as the 'uterus collector' with detainees at the facility." *Id.* at 48.

Homeland Security's Office of Civil Rights and Civil Liberties ("CR-CL") and Office of the Inspector General ("OIG").  *See* **Exhibit 5**.  As evidence in this case has established—and Dr. Amin does not, and cannot, contest—the government immediately began investigating the claims in the Whistleblower Complaint, and these investigations continue to this day.

In addition to the Whistleblower Complaint, on September 8, 2020, the Government Accountability Project, another non-profit entity that jointly represented Nurse Wooten alongside Project South, filed a whistleblower retaliation complaint and accompanying declaration via OIG's Online Allegation Form.  *See* **Exhibit 6** (the "Retaliation Complaint").  The Retaliation Complaint alleged that ICDC was not following CDC guidelines for handling COVID-19 and that, when Nurse Wooten complained about this issue, she was demoted.  It did not discuss Dr. Amin's treatment of female detainees.  Throughout this action, Dr. Amin has repeatedly argued that the Retaliation Complaint is the only "real" whistleblower complaint and that the Whistleblower Complaint is only a "letter"—not a whistleblower complaint—because  it was not submitted through the Online Allegation Form (and, thus, in Dr. Amin's words, not "filed" with OIG).  As evidenced by Dr. Amin's summary judgment filings, Dr. Amin hopes that by delegitimizing the Whistleblower Complaint through reference to the Retaliation Complaint, he can cast doubt on NBCU's reporting.

Evidence and arguments about the Retaliation Complaint should be excluded from the trial in this action because they are irrelevant and will only confuse the jury.  Clearly, the Retaliation Complaint, which does not mention Dr. Amin's treatment of detainees, is not relevant to the truth or falsity of the challenged Statements.  And the Retaliation Complaint is equally unconnected to the issue of actual malice, which is based on the subjective state of mind of NBCU's reporters at the time of the challenged publications.  "Deadline: White House," "All In," and "The Rachel

Maddow Show" did not report on the Retaliation Complaint; they reported on the Whistleblower Complaint. And the record is clear that those responsible for the News Reports did not see or rely on the Retaliation Complaint. There is no evidence that any of NBCU's reporters had access to the Retaliation Complaint, and the statements provided by ICE, Dr. Amin, and LaSalle Southeast LLC (the private company that ran ICDC) each referenced the allegations concerning hysterectomies in the Whistleblower Complaint, not the Retaliation Complaint. As such, the Retaliation Complaint has no relevance to the issues before the Court at trial. *See Allen v. Peake*, 2009 WL 1362635, at *1 (W.D. Pa. May 14, 2009) (granting motion *in limine* to exclude reference to an earlier whistleblower claim filed by the plaintiff because the earlier whistleblower claim was "not relevant to this proceeding"). Put simply, the Retaliation Complaint has nothing to do with NBCU's reporting—or, for that matter, the groundswell of reporting about Dr. Amin from other news organizations in the Whistleblower Complaint's aftermath—and, thus, is irrelevant to this action.

Even if the Retaliation Complaint were somehow relevant, allowing Dr. Amin to introduce it and falsely argue that it is the only "real" complaint filed by Nurse Wooten would severely prejudice NBCU because this argument is contrary to established law and the evidence adduced during discovery. Allowing the Retaliation Complaint in evidence would create an irrelevant mini-trial concerning how, when, why, and where the respective Complaints were filed and the impact, if any, of the different filing methods.

*First*, it is simply incorrect that to be categorized as a protected "whistleblower complaint," a complaint must be submitted through the Online Allegation Form, as Dr. Amin tries to misleadingly argue. The Department of Homeland Security website defines a protected disclosure as one based on a "reasonable belief that wrongdoing has occurred" in specified areas, including

"a substantial and specific danger to public health or safety."  And the website recognizes that there are numerous ways to make a whistleblower disclosure, including "exercis[ing] an appeal, complaint, or grievance right granted by law, rule, or regulation," "cooperat[ing] with or disclos[ing] information to the Inspector General, the U.S. Office of Special Counsel, or any other component responsible for internal investigation or review;" or even "refus[ing] to obey an order that would require a violation of law, rule, or regulation."[7]   Accordingly, by sending the Whistleblower Complaint to OIG and CR-CL, Project South, on behalf of Dawn Wooten, undoubtedly filed a protected whistleblower complaint.  *See* **Exhibit 7** (Project South_000211-214) (email from Priyanka Bhatt at Project South transmitting the Whistleblower Complaint to the Office of Inspector General); **Exhibit 8** (Shahshahani Tr. at 64:2-7) (explaining that Project South "submitted" the Whistleblower Complaint "in September 2020 to the Office of Inspector General and the Office for Civil Rights and Civil Liberties").  Consistent with this reality, in its very first sentence, the Whistleblower Complaint unequivocally states "Project South, Georgia Detention Watch, Georgia Latino Alliance for Human Rights, and South Georgia Immigrant Support Network file this complaint on behalf of detained immigrants at the Irwin County Detention Center (ICDC) . . . and Ms. Dawn Wooten, a licensed practical nurse employed by ICDC, who is a protected whistleblower and is represented by the Government Accountability Project and Project South."  *See* **Exhibit 5** at 1-2.

    *Second*, documents produced in this litigation demonstrate that the government received the Whistleblower Complaint and docketed it as a "Complaint."  For example, a September 12, 2022 memorandum from CR-CL, states that "CRCL opened *Complaint* No. 20-12-ICE-0987 regarding the *whistle-blower allegations* made by a nurse at the facility regarding a gynecologist

---

[7] https://www.oig.dhs.gov/whistleblower-protection.

who treated female detainees.  This complaint was retained by the Office of Inspector General."

*See* **Exhibit 9** (DHS000034) (emphasis added).[8]  Similarly, on January 23, 2024, OIG issued a

report titled "ICE Major Surgeries Were Not Always Properly Reviewed and Approved for

Medical Necessity," which concluded that ICE did not always adequately document the medical

necessity of major surgeries on detainees, including hysterectomies.  Notably, OIG explained that

it was not including surgeries "associated with the Irwin County Detention Center" in its analysis

"due to referrals to our Office of Investigations resulting *from a whistleblower complaint*."  *See*

**Exhibit 10** (NBCU005294) (emphasis added).  Accordingly, Dr. Amin's assertion that only the

Retaliation Complaint was a "complaint" and that the Whistleblower Complaint was nothing more

than a random "letter" is contradicted by the very government agencies tasked with investigating

whistleblower complaints.[9]

Thus, because the Retaliation Complaint is irrelevant to this action and because Dr. Amin's

arguments about the Retaliation Complaint are contrary to the record in this case and prejudicial

to NBCU, evidence about the Retaliation Complaint should be excluded from trial.

### 6.    A motion to strike any claims stemming from the three "Social Media Statements."

Pursuant to Federal Rule of Evidence 403, NBCU submits this motion *in limine* to exclude

from this action claims stemming from the three "Social Media Statements" (Statements 37-39)

---

[8] Indeed, prior to this litigation, even Dr. Amin's own counsel referred to the Whistleblower Complaint as such, releasing a statement on the evening of September 15, 2020:  "We are aware of the whistleblower's allegations as they relate to Dr. Amin, and vehemently deny them."

[9] Dr. Amin also misleadingly argues that John Whitty, one of Nurse Wooten's attorneys, had not heard of allegations regarding hysterectomies until he saw the allegations on the Internet. *See* Dkt. 122 (Dr. Amin Mot. for S.J.) at 4;  Dkt. 122-1 (Dr. Amin SOMF) ¶ 44.  But Dr. Amin ignores that Mr. Whitty and the Government Accountability Project were not Nurse Wooten's only lawyers; as Mr. Whitty himself testified, she was jointly represented by Project South. *See* **Exhibit 22** (Whitty Tr. at 10:10-15) (explaining that the Government Accountability Project and Project South were "co-counsel in the matter of representing Nurse Wooten").  Thus, the fact that Mr. Whitty was uninvolved with Nurse Wooten's allegations about Dr. Amin does not suggest that the Whistleblower Complaint is not a formal, protected complaint.

on the ground that their inclusion significantly complicates the issues in this case and, even with detailed jury instruction, will only confuse the jury, prejudice NBCU, and waste this Court's time and resources.

As NBCU explained above and in its motion for summary judgment, the FAC—after recounting in detail the challenged statements that appeared in the September 15 episode of "Deadline: White House," the September 15 episode of "The Rachel Maddow Show," and the September 15, 16, and 17 episodes of "All In"—obliquely alleged that "MSNBC and its reporters repeated their false and defamatory statements of and concerning Dr. Amin on Twitter on at least three occasions on September 16, 2020 and September 22, 2020."  FAC ¶ 89.  Throughout discovery, Dr. Amin *never* produced or even identified the social media statements that supposedly "repeated" the defamatory statements.

Then, in his motion for partial summary judgment, Dr. Amin specified for the first time the "Twitter" posts that his FAC apparently referenced—(1) a tweet from the "All In with Chris Hayes" Twitter account dated September 17, 2020, which linked to an excerpt from the September 16 episode of "All In" and stated "Learn more about the three women claiming they have received unnecessary hysterectomies," *see* **Exhibit 11**; (2) a tweet from the "All In with Chris Hayes" Twitter account dated September 17, 2020, which similarly linked to an excerpt from the September 16, 2020 episode of "All In" and stated "Three women claim they received unnecessary hysterectomies at ICE facility," *see* **Exhibit 12**; and (3) a Facebook post (not a Twitter post) from the "All In with Chris Hayes" Facebook page dated September 21, 2020, which linked to Hayes' September 15, 2020 interview with whistleblower, Dawn Wooten, and stated "Nurse Dawn Wooten alleges mass hysterectomies performed at Georgia facility," *see* **Exhibit 13**.  Notably, Dr. Amin's summary judgment motion never identified who at MSNBC was responsible for drafting,

reviewing, or posting these Social Media Statements, nor did he elicit any testimony or other evidence on this topic during discovery.[10]

Including claims stemming from these three Social Media Statements in the trial will confuse the issues before the jury for at least two reasons.

*First*, including these claims will significantly and confusingly expand the scope of admissible evidence.  Under controlling precedent, the actual malice inquiry is concerned *exclusively* with an individual's subjective state of mind *at the time a challenged statement was published*.  *See Bose Corp. v. Consumer Union of U.S., Inc.*, 466 U.S. 485, 512 (1984); *Silvester v. Am. Broad Cos.*, 650 F. Supp. 766, 779 (S.D. Fla. 1986) ("The statement of an ABC employee that the legal department thought after the broadcast that it might contain libelous material does not, without more, prove that defendants had such thoughts at the time the segment was aired, which is the critical time for purposes of establishing actual malice."), *aff'd*, 839 F.2d 1491 (11th Cir. 1988).  As to the three News Reports, the relevant issue is the state of mind of the responsible individuals for each News Report on September 15, 2020.  The state of mind of the individual(s) responsible for the Social Media Statements—and there is no evidence in the record identifying who was responsible—will bring in additional events, news reporting and related evidence that transpired between September 16-21, 2020, none of which is relevant to the actual malice inquiry as to the three News Reports.

Injecting the September 17 and 21, 2020 Social Media Statements into this action would require the jury to understand that it can consider certain additional evidence from September 16-21, 2020 *only* when determining whether the three Social Media Statements were published with

---

[10] In its order on NBCU's motion for reconsideration, the Court suggested that the state of mind of NBCU's Standards Group could be relevant for determining whether the Social Media Statements were published with actual malice.  *See* Dkt. 222 at 8.  This is directly contrary to the testimony elicited during discovery, in which the deputy head of NBCU's Standards Group made clear that Standards does not review statements posted to social media.  *See* Dkt. 222-1.

actual malice, while ignoring this same evidence when determining whether the other thirty-one Statements from the three September 15, 2020 News Reports were published with actual malice. NBCU would undoubtedly be prejudiced if evidence that the jury would not otherwise be permitted to consider when assessing actual malice as to thirty-one challenged Statements from the News Reports is introduced merely because Dr. Amin vaguely pled that Statements were "repeated" on social media.

Further, the amount of evidence in this action that post-dates September 15, 2020 is significant. "All In" undertook additional reporting on September 16 and 17, 2020, including obtaining medical records from multiple detainees, speaking with an OB-GYN, and interviewing a detainee and her lawyer, all of which will need to be introduced and discussed by witnesses. Likewise, other news reporting and comments from the government occurred over this time period as reporting on concerns regarding Dr. Amin's treatment of ICDC patients continued across media platforms. Undoubtedly, this will significantly increase the length and complexity of the jury trial.

*Second*, as explained above, the two challenged "All In" Twitter posts link to and include a clip from the September 16, 2020 episode of "All In." But, the Court previously dismissed all claims stemming from this "All In" segment on NBCU's motion for judgment on the pleadings. The Court held that Dr. Amin did not—and could not—establish actual malice as to this segment, including because it reported ICE's response to the claims against Dr. Amin. *See* Dkt. 59 at 48-55.[11] By keeping the September 17 Social Media Statements in this action, the Court will need to re-introduce the September 16 "All In" news segment, instruct the jury that it was dismissed from this case, but also instruct the jury that the September 17 tweets referencing this segment

_____

[11] Notably, the excerpt from the September 16, 2020 episode of "All In" that is linked to in the two Social Media Statements includes the *same* portion of ICE's statement (as well as a denial from Dr. Amin's attorney). Logically, for the same reasons the September 16 News Report was dismissed, Social Media Statements linking to the same News Report should be precluded.

nonetheless remain in this action. Introducing a distinct, dismissed news report into this case likely will influence the jury's decision-making as to the September 15 News Reports. For example, if jurors do not like the way "All In's" reporting was presented on September 16, they may be inclined to improperly find liability for the September 15 News Report instead. This would significantly prejudice NBCU.

For these reasons, the claims stemming from the Social Media Statements should be excluded under Federal Rule of Evidence 403.

**7.  A motion to exclude hearsay damages evidence.**

Pursuant to Federal Rules of Evidence 403 and 802, NBCU submits this motion *in limine* to preclude Dr. Amin from relying on hearsay evidence to prove injury to his reputation and other damages at trial.

Hearsay is "a statement that the declarant does not make while testifying at the current trial or hearing . . . offer[ed] in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801(c). In the absence of a procedural rule or statute, hearsay is inadmissible unless it is defined as non-hearsay under Federal Rule of Evidence 801(d) or falls within a hearsay exception under Rules 803, 804, or 807. *See* Fed. R. Evid. 802.

In the FAC, Dr. Amin claimed that the NBCU News Reports "assassinated [his] character and damaged his reputation as a physician," FAC ¶ 10, and that his "personal reputation and his reputation as a physician have been permanently damaged," *id.* ¶ 226. He asserted that he was "regularly stalked and otherwise followed by people calling him names," *id.* ¶ 229, and was the "recipient of multiple vile and hateful telephone calls, in-person comments, social media comments, and mail that no person should have to endure," *id.* ¶ 230. Yet, during discovery, when Dr. Amin was obligated to provide factual evidence in support of these allegations, he and other witnesses relied largely on hearsay evidence reflecting non-specific statements made by

unidentified third-parties. No evidence produced tied any such events to the News Reports at issue. Such evidence should be categorically barred.

As just a few examples:

- Dr. Amin testified—without identifying any specific person—that "lots of people, patients, and everybody is, you know, they come to the office or call the office and see what is going on and why this is going on." **Exhibit 3** (Amin Tr. at 285:24-286:3).

- Dr. Amin claimed "they tried to break into my car, picture it, they threaten my employee, a couple of employee that leave because of all of this, that they can't take it. . . . It's like people, reporter, or I don't know, they come out – sometimes – what happened my office is full, there are only 20 chairs of patients, sometimes they have to wait outside because there is no place to sit down. And they'll go out and harass them and ask them about me, all of these questions and everything." Yet he admitted he didn't know who "they" in his own testimony was referring to. **Exhibit 3** (Amin Tr. at 258:12-260:16).

- Dr. Amin's billing coordinator, Rachel Courson, testified that she "think[s]" that "some people" believed the allegations about Dr. Amin. In support, she claimed: "I was over at Dr. Amin's office picking up some work, and while I was there, calls were coming in with threats to the girls. And I know that sounds like hearsay, but I was there and the girls were obviously scared and upset." She admitted that she was not on these calls, she did not know precisely what was said on the calls, and she did not know whether anyone on the calls specifically referenced the news, let alone MSNBC. **Exhibit 14** (Courson Tr. at 174:6-175:19).

- When asked whether she spoke to anyone about Dr. Amin's treatment of ICE detainees, Courson could not recall any specific conversations but claimed, "I know everybody in Douglas was talking about it." When asked how she knew this, she testified: "It was just – when you went places you could hear people where people would be talking about it. It's just Douglas it not a very big town, and people will sometimes ask you things if they know you might have some information." When questioned whether she was personally asked about the allegations about Dr. Amin, Courson testified—without identifying any individual with whom she spoke—"They would ask things like what's going on with Dr. Amin or is that true or what's he doing." **Exhibit 14** (Courson Tr. at 172:25-174:2).

- Dr. Amin's office manager, Maria Nito, testified that she overheard other employees of Dr. Amin's office answering threatening phone calls. For example, she testified that she once heard another employee, Josie Garcia, answer a phone call. Despite not being a participant to this call, Nito said that the person on the line cursed at Garcia and "they would just threaten to send someone to hurt or to do bad things to us." Garcia later ended her employment with Dr. Amin, and Nito speculated it was because "she would make comments along with other co-workers that they felt unsafe coming to work."

Dr. Amin did not have Garcia testify in this action. **Exhibit 15** (Nito Tr. at 139:5-140:3).

- Dwayne Peal, a nurse at Irwin County Hospital, testified that he saw people saying negative things against Dr. Amin "[i]n some threads" on Facebook but "nothing specific." When asked whether he knew who these people were to Dr. Amin, Peal admitted, "No, I didn't know who these people were. I don't know if they ever used his services." **Exhibit 16** (Peal Tr. at 167:16-23; 168:6-11).

- Dr. Ashfaq Saiyed, the doctor who Dr. Amin claims treated him for his purported emotional distress, testified, among other things that unidentified hospital staff members said that they saw Dr. Amin "crying," that he "heard" from hospital staff that there were demonstrations at ICDC (but that he did not personally see them or go to them), and that unidentified patients with "OB/GYN problem[s]" did not want to be referred to Dr. Amin. **Exhibit 17** (Saiyed Tr. at 37:22-38:11; 80:9-81:14)

The traditional justification for excluding hearsay—that it is inherently untrustworthy because it cannot be subjected to the traditional means of exposing inaccuracy, *see Chambers v. Mississippi*, 410 U.S. 284, 298 (1973)—is clearly applicable here. Indeed, in similar circumstances, courts across the country have consistently excluded evidence like NBCU seeks to exclude here. *See Sandidge v. Fed. Nat'l Mortg. Ass'n*, 2017 WL 2362016, at *9 (N.D. Tex. May 31, 2017) (excluding as hearsay testimony that an employee heard from "unidentified employees" unspecified "statements to the effect that" plaintiff engaged in misconduct), *aff'd*, 722 F. App'x 389 (5th Cir. 2018); *Clark v. Time Inc.*, 242 F. Supp. 3d 1194, 1204 (D. Kan. 2017) ("[T]he Affidavit describes conversations that Ms. Taylor says she had with a banker about plaintiff. And, plaintiff offers these statements to prove damage to his reputation. The statements thus are out-of-court written statement[s] . . . now offered to prove the truth of the matter asserted. . . . The court thus concludes that the statements are inadmissible hearsay and excludes them.") (internal citations and quotation marks omitted); *Jackson v. Quebecor World (USA), Inc.*, 2008 WL 4372368, at *3 (W.D. Okla. Sept. 23, 2008) ("Plaintiff's effort to identify who said what to whom,

which allegedly resulted in lost employment opportunities, damage to her reputation, and emotional distress is based wholly on speculation and hearsay evidence.").

Dr. Amin is free to call properly disclosed witnesses to testify as to their views of him and how those views may have been affected by the News Reports.  But he cannot introduce secondhand statements from unidentified individuals who purportedly thought less of him after viewing unknown content published by unidentified sources or statements about overhearing unidentified individuals making threats to Dr. Amin.  Accordingly, the Court should preclude Dr. Amin should from relying on vague hearsay testimony to prove his damages.

**8.    A motion to preclude Dr. Amin from presenting evidence of alleged harm to his family members, employees, or other third parties.**

Pursuant to Federal Rules of Evidence 402 and 403, NBCU submits this motion *in limine* to exclude evidence relating to emotional distress or other injury allegedly suffered by individuals other than Dr. Amin, such as his family and office staff.

Despite seeking $30 million in damages from NBCU, Dr. Amin cannot establish that he suffered damages due to the challenged News Reports (particularly as opposed to the extensive other reporting on the Whistleblower Complaint's allegations).  Indeed, he recognizes that many other news organizations reported the allegations before and after the News Reports, and he testified that he never watched the News Reports in full.  *See* **Exhibit 3** (Amin Tr. at 29:3-12; 109:20-110:1).  In an article published in *The Intercept* prior to any of the challenged News Reports, Dr. Amin admitted that "allegations of performing procedures without patients' consent were ruining his reputation and affecting his practice."  *See* **Exhibit 18** (NBCU001619).

To bolster his claim of damages, Dr. Amin has sought to introduce evidence of distress allegedly suffered by his family members and employees.  For example, during his deposition, Dr. Amin testified:

> I have to call my son, all of this, and I told him that if somebody calls you, because they are harassing my children calling, that if somebody calls, just tell them you don't know me, don't tell them you are my son. Because I don't want to put his life in danger. Same thing as my employee was threatened.

*See* **Exhibit 3** (Amin Tr. at 37:2-13); *id.* at 257:4-7 (alleging that reporters from unidentified publications were calling his son and daughters to "harass them"). Dr. Amin, however, did not testify that any of these unspecified individuals mentioned MSNBC when purportedly harassing his family members

His employees deposed in this action similarly testified as to their own emotional distress. For example, Dr. Amin's office manager, Maria Nito, stated that, in the wake of the allegations about Dr. Amin, she and other employees at Dr. Amin's office "started getting a lot of threats for the phone, nonstop" and that she, personally, "experienced the harassments." Nito admitted that the individuals who called Dr. Amin's office and purportedly harassed her did not mention MSNBC or the challenged News Reports. *See* **Exhibit 15** (Nito Tr. at 138:7-139:21).

NBCU anticipates that Dr. Amin will attempt to introduce these and similar statements at trial. But these statements are irrelevant and highly prejudicial to NBCU and should therefore be excluded.

Defamation is a tort that is personal to the party defamed. *McBeth v. United Press Int'l, Inc.*, 505 F.2d 959, 960 (5th Cir. 1974) (per curiam); *Miracle v. New Yorker Mag.*, 190 F. Supp. 2d 1192, 1199 (D. Haw. 2001); *Davis v. Costa-Gavras*, 619 F. Supp. 1372, 1376 (S.D.N.Y. 1985); *Gugliuzza v. K.C.M.C., Inc.*, 606 So. 2d 790, 791-92 (La. 1992); *Coulon v. Gaylord Broad.*, 433 So. 2d 429, 431 (La. Ct. App. 1983); *see also* Prosser & Keeton, *The Law of Torts* § 111 (1984 ed. & Supp. 1988). In other words, defamation exists as a cause of action only "to redress injury to *the plaintiff's reputation* by a statement that is defamatory and false." *Masson v. New Yorker Mag., Inc.*, 501 U.S. 496, 515 (1991) (emphasis added). Georgia, therefore, like every other state,

recognizes that a plaintiff cannot recover damages for derivative injuries that may have been sustained by others. *See In re Adams*, 478 B.R. 476, 488 (Bankr. N.D. Ga. 2012) (recognizing that the "critical element" of a defamation claim is "injury to reputation, which is a personal injury"); *cf. Bibbs v. Toyota Motor Corp.*, 304 Ga. 68, 73, 75 (2018) (wrongful death claim only covers "damages for injuries suffered by the decedent—as measured from her perspective—not damages for the separate-but-related loss sustained by the survivors themselves," because personal injury damages "cover the losses *suffered by the injured person*" (emphasis in original)).

Thus, a plaintiff cannot recover for injuries suffered by someone else, even if it arises out of defamation targeted at him. *Fowler v. Curtis Publ'g Co.*, 78 F. Supp. 303, 304 (D.D.C. 1948), ("A person who is injured by reason of the fact that someone else is libeled, has no right of recovery."), *aff'd*, 182 F.2d 377 (D.C. Cir. 1950); *Wehling v. Columbia Broad. Sys.*, 721 F.2d 506, 509 (5th Cir. 1983) (wife has no cause of action for husband's defamation); *Sethi v. WFMJ Television, Inc.*, 732 N.E.2d 451, 462-63 (Ohio Ct. App. 1999); *Gugliuzza*, 606 So. 2d at 791-92 (no cause of action for defamed decedent's relatives); *Geddes v. Princess Props. Int'l, Ltd.*, 451 N.Y.S.2d 150, 151 (App. Div. 1982) (spouse of defamed person has no cause of action for mental anguish and suffering). Dr. Amin is the only plaintiff in this action. Accordingly, he can only recover for injuries that he suffered personally, not those suffered by non-parties, including his wife, daughters, son, and employees. Thus, alleged distress to these other individuals are irrelevant to the issues in this case.

During conferrals, Dr. Amin's counsel suggested that Dr. Amin is entitled to introduce information about how NBCU's purported defamation affected his family members and employees because he was personally distressed by the effect the defamation had on these third parties. NBCU is aware of no case in the Eleventh Circuit or Georgia that has held as much, and the Court

should reject this attempt to skirt the requirement of personal damage. In any event, such testimony has very limited relevance because in no instance can alleged threats or distress be tied to the News Reports at issue (as opposed to other reporting), and it also has limited probative value as to Dr. Amin's own emotional state. Yet, this evidence would clearly prejudice NBCU. The third-party testimony likely will be highly emotional. Indeed, when testifying about threatening phone calls she claims to have received, Nito cried during her deposition. Even with clear instructions that it can only consider this evidence for its effect on Dr. Amin, there is a great risk of the jury being swayed by the emotional nature of the testimony to improperly award Dr. Amin damages out of sympathy for his family members or employees.

For these reasons, NBCU respectfully requests that the Court preclude Dr. Amin from offering evidence of distress and other injury to non-parties at the trial.

### 9. A motion to exclude lost profits/income damages evidence without specific calculation.

Pursuant to O.C.G.A. § 51-12-2(b) and Federal Rule of Evidence 403, NBCU submits this motion *in limine* to preclude Dr. Amin from recovering special damages in this action because he never provided a specific calculation for such damages.

As the Eleventh Circuit has made clear, special damages refer to "the loss of something having economic or pecuniary value." *Simon v. Shearson Lehman Bros.*, 895 F.2d 1304, 1311 (11th Cir. 1990) (quoting Restatement 2d Torts § 575 cmt. b). "Special damages are those which actually flow from a tortious act; they must be proved in order to be recovered." O.C.G.A. § 51-12-2(b). Accordingly, Georgia case law recognizes that special damages "must be pled and proven with particularity," and "[g]eneralized allegations of damages are insufficient to establish special damages." *Veatch v. Aurora Loan Servs., LLC*, 331 Ga. App. 597, 600 (2015) (citation omitted); *see also Robert E. Canty Bldg. Contractors, Inc. v. Garrett Mach. & Constr., Inc.*, 270 Ga. App.

871, 872 (Ga. App. Ct. 2004) (special damages must be "proven with sufficient specificity to enable the jury to reach a conclusion thereon without resort to speculation or guesswork").

To meet this particularity requirement, the plaintiff must offer "*specific figures* to show special damage." *Veatch*, 331 Ga. App. at 601-02 (emphasis added) (citing *Harmon v. Cunard*, 190 Ga. App. 19, 19 (1989)); *see also Bonner v. Am. Residential Leasing Co., LLC*, 2016 WL 11567791, at *5 (N.D. Ga. Jan. 27, 2016) (plaintiff must "show specific figures to support the claim of [special] damages") (quoting *Veatch*, 331 Ga. App. at 601), *report and recommendation adopted*, 2016 WL 11567835 (N.D. Ga. Feb. 17, 2016).

In the FAC, Dr. Amin claimed that, "[a]s a direct and proximate result of the false and defamatory statements about him in the broadcasts, [he] has suffered special damages." FAC ¶ 243. He went on to plead that he "lost patients at his medical practice as a direct and proximate result of the false and defamatory statements about him in the broadcasts" and he "lost his ability to provide medical services to the ICDC patients as a direct and proximate result of the false and defamatory statements about him in the broadcasts." *Id.* ¶¶ 244-45. Yet the FAC did not attempt to quantify these damages.

Because these vague and conclusory allegations did not put NBCU on notice of the amount of Dr. Amin's special damages, NBCU served interrogatories on March 18, 2022 asking Dr. Amin to "[i]dentify with specificity the complete nature of the damages [he is] claiming in this Action, the amount of damage and how [he] calculate[s] it, and all facts relating to or supporting the allegation of injury." *See* **Exhibit 4**. In response, Dr. Amin claimed that he was still "collecting information pertinent to this request" and would "[r]easonably supplement this response," and said he was seeking "presumed damages, compensatory damages, punitive damages, and litigation costs." *Id.* He further claimed that the compensatory damages arose from "harms to personal and

professional reputation; mental anguish . . . ; harassment and fear for safety; and lost opportunities to engage in social and community activities he previously enjoyed." *Id.* He did not mention special damages flowing from supposedly lost patients, and never updated his interrogatory responses to provide further information about any such lost patients or lost profits.

Dr. Amin's failure to quantify any lost profits or patients attributable to the NBCU News Reports is unsurprising, given that there is no evidence in this action tying any loss of patients or profits to the News Reports specifically. Dr. Amin has produced no records indicating that any patient left his practice as a result of the News Reports as opposed to the Whistleblower Complaint itself or any of the other reporting on the same subject. Indeed, during his deposition, when asked whether he had any reason to believe that any patients left his practice because of the News Reports versus all of the other reporting, Dr. Amin testified "I cannot tell that one" and explained that his office does not ask patients why they are leaving the practice. *See* **Exhibit 3** (Amin Tr. at 290:16-291:19). Nor can the fact that Dr. Amin stopped treating ICE patients be tied in any way to the News Reports. ICE's own records discussing the Whistleblower Complaint do not mention the News Reports and, instead, show that ICE was concerned about the lengthy history of malpractice claims against Dr. Amin. *See* **Exhibit 19** (ICE001910) (explaining that if ICE has known about Dr. Amin's malpractice history, it would "not have accepted utilizing this specialist"). And while Dr. Amin has generally cited to the fact that he no longer treats ICE detainees, he produced a letter—which does not reference the challenged News Reports—indicating that he chose to resign from this role. *See* **Exhibit 20** (Amin_0001160) (stating that Dr. Amin decided to sever his ties with ICDC and w[ould] no longer be treating ICDC patients" in the aftermath of "allegations [] made regarding [his] treatment of ICDC detainees"). Clearly, if Dr. Amin made the decision to

voluntarily stop treating ICDC patients, he cannot hold NBCU responsible for the loss of these patients.

Now, after failing to produce any evidence to support special damages, Dr. Amin alleges in the joint proposed pretrial order that he intends to seek special damages for "lost profits from lost patients and gratuitous entertainment and hospitality." Dkt. 223 at 11. Dr. Amin still does not identify how many patients he lost due to the challenged News Reports or the lost profits attributable to those patients, nor does he explain what he means by, for the first time, suggesting that he had special damages involving "gratuitous entertainment and hospitality."

Dr. Amin has had every opportunity to quantify his special damages yet has failed to do so. Allowing him to now seek these damages at trial would be highly prejudicial to NBCU, which did not have a sufficient opportunity during discovery to test the basis for these purported damages or gather evidence to establish that they were tied to something other than the challenged News Reports. Accordingly, the Court should preclude Dr. Amin from recovering these special damages.

**10. A motion to exclude references to NBCU's size or financial status.**

Pursuant to Federal Rules of Evidence 402 and 403, NBCU submits this motion *in limine* to preclude Dr. Amin from referring to NBCU's size or financial status unless and until any punitive damages phase commences in the trial in this action.

It is well-established under Georgia law that "[a] man's treatment before the bar of Justice should not vary with his financial condition." *Denton v. Con-Way S. Express, Inc.*, 261 Ga. 41, 42 (1992) (citation omitted), *overruled on other grounds*, *Grissom v. Gleason*, 262 Ga. 374 (1992). For this reason, "argument[s] referring to the wealth or poverty of a party . . . [are] universally condemned." *Cont'l Cas. Co. v. Wilson-Avery, Inc.*, 115 Ga. App. 793, 796 (1967). As applied to the present action, evidence about NBCU's size and financial status is both irrelevant to the merits of the case and has the real risk of swaying the jury to award damages solely based on a belief that

NBCU can afford to pay them, regardless of whether Dr. Amin has established each element of a defamation claim or proved a quantum of recoverable damages. This would be highly prejudicial to NBCU.

Dr. Amin has suggested that he should be permitted to introduce evidence about NBCU's size and financial status because it relates to the issue of actual malice. Under Dr. Amin's theory, a large and well-resourced company, like NBCU, should have known or been able to determine that the challenged statements were false. But this represents a fundamental misunderstanding of actual malice for two reasons. *First*, as this Court has recognized, actual malice focuses on the state of mind of the *specific individuals* responsible for the challenged statements; what other employees at a large company may have known is irrelevant. *See Amin v. NBCUniversal Media, LLC*, 2023 WL 8238975, at *4 & n.7 (S.D. Ga. Nov. 28, 2023) ("Plaintiff will need to demonstrate specific individuals—i.e., the individuals employed by Defendant who participated in publishing the Challenged News Reports—acted with actual malice. . . . '[C]ollective knowledge' is not sufficient."). *Second*, this would transform actual malice into a negligence standard at most, in essence asking the jury whether NBCU acted responsibly in publishing the challenged News Reports, and further suggesting that NBCU must follow a higher standard of care because of its size. Established case law clearly disallows Dr. Amin's theory. *See Dunn v. Air Line Pilots Ass'n*, 193 F.3d 1185, 1197 (11th Cir. 1999) ("The inquiry in a case involving actual malice is not whether the defendants acted negligently or imprudently in publishing the challenged statements."); *Baker v. Joseph*, 2013 WL 12094322, at *4 n.7 (S.D. Fla. May 30, 2013) ("[A]ctual malice is measured by Defendant's subjective knowledge, that is, . . . by whether Defendant actually knew that the allegedly defamatory statements were false. . . . [N]egligence, what Defendant should have known, is not the appropriate standard for . . . actual malice . . . ."). Accordingly, NBCU's size and financial

status are irrelevant to the question of whether the journalists responsible for the challenged News Reports acted with actual malice.

The only place where NBCU's size or financial status could conceivably have any relevance is to an assessment of the amount of punitive damages awarded, since punitive damages are not awarded "as compensation to a plaintiff" but "solely to punish, penalize, or deter a defendant." *See* O.C.G.A. § 51-12-5.1(c).[12]  Under O.C.G.A. § 51-12-5.1(d), however, the question of the amount of punitive damages cannot be answered until *after* a trial on the merits. Specifically, "the trier of fact shall first resolve from the evidence produced at trial whether an award of punitive damages shall be made.  This finding shall be made specially through an appropriate form of verdict."  Only if it is found that punitive damages are appropriate is the trial "recommenced in order to receive such evidence as is relevant to a decision regarding what amount of damages will be sufficient to deter, penalize, or punish the defendant in light of the circumstances of the case."[13]

Accordingly, courts in the Eleventh Circuit—and across the country—have repeatedly held that evidence about a defendant's size and financial status should not be introduced unless and until a trial recommences for purposes of determining the amount of punitive damages to be awarded.  *See Collin-Williams v. Contour Eastwyck, LLC*, 2023 WL 11909716, at *3 (N.D. Ga. May 3, 2023) (excluding evidence of defendant's "wealth, financial size, and status," because plaintiffs "may introduce this evidence only in the punitive damages phases of the trial"); *McSweeney v. Kahn*, 2008 WL 11333598, at *10 (N.D. Ga. June 26, 2008) ("[T]he Court will not

---

[12] NBCU maintains that any award of punitive damages in this action would be improper.

[13] As NBCU agreed in the proposed pre-trial order, the question of liability and compensatory damages should not be bifurcated.  *See* Dkt. 223, ¶ 22.  NBCU understands, however, that even in a non-bifurcated trial, the question of the amount of punitive damages to award requires a recommencement of the trial following the verdict.

permit the introduction of Defendant['s] net worth statements and other financial circumstances during the liability phase of trial."); *Boneta v. Am. Med. Sys., Inc.*, 2021 WL 6776245, at *5 (S.D. Fla. Oct. 6, 2021) (excluding evidence of defendant's "financial resources," because such evidence "is irrelevant and unduly prejudicial" and "will become relevant only if this case proceeds to the punitive damages phase"); *Horrillo v. Cook Inc.*, 2014 WL 8186705, at *4 & n.4 (S.D. Fla. June 6, 2014) ("Plaintiff may not introduce evidence of Defendant's comparative wealth, resources, or net worth during the first phase of the trial, but may do so during the [punitive damages] phase of the trial."); *Fluor Corp. v. Zurich Am. Ins. Co.*, 2021 WL 3021973, at *13 (E.D. Mo. July 16, 2021) ("[E]vidence of [defendant's] size, financial condition and net worth . . . should not be presented to the jury during the first phase of the trial on liability and compensatory damages."). The Court should take the same approach here.

### 11. Any punitive damages should be capped at the statutory maximum of $250,000.

NBCU submits this motion *in limine* pursuant to O.C.G.A. § 51-12-5.1(g) to cap any punitive damages award that Dr. Amin can recover to the statutory maximum of $250,000.

Under O.C.G.A. § 51-12-5.1(g), "[f]or any tort action . . . in which the trier or fact has determined that punitive damages are to be awarded, the amount which may be awarded in the case shall be limited to a maximum of $250,000.00." This $250,000 cap applies to each plaintiff in the action "regardless of the number of theories of recovery arising out of the same transaction, occurrence, or series of transactions or occurrences." *Surles v. Cornell Corr. of Cal., Inc.*, 290 Ga. App. 260, 270 (2008) (quoting *Bagley v. Shortt*, 261 Ga. 762, 763 (1991)); *see also Parker v. Scrap Metal Processors, Inc.*, 386 F.3d 993, 1019 n.34 (11th Cir. 2004) ("Georgia law caps punitive damages at $250,000.00 per plaintiff.").

A defamation plaintiff can *only* recover punitive damages in excess of this cap if he is able to prove that "the defendant acted, or failed to act, with the specific intent to cause harm."

O.C.G.A. § 51-12-5.1(f).  "'[S]pecific intent to cause harm' means that 'the actor desires to cause consequences of his act, or that he believes that the consequences are substantially certain to result from it.'"  *Cap. Inventory, Inc. v. Green*, 2024 WL 1383228, at *4 (N.D. Ga. Feb. 29, 2024) (quoting *J.B. Hunt Transp., Inc. v. Bentley*, 207 Ga. App. 250, 255 (1992)).  Importantly, "the mere knowledge and appreciation of a risk, short of a substantial certainty," does not constitute the requisite specific intent.  *J.B. Hunt Transp.*, 207 Ga. App. at 255.  Nor does "conscious indifference" constitute specific intent.  *Aldworth Co. v. England*, 286 Ga. App. 1, 5 (2007).

Here, Dr. Amin does not plead that the challenged News Reports were published with ill will or a specific intent to cause harm.  Instead, in his FAC, Dr. Amin alleges that he is entitled to punitive damages because NBCU acted with "constitutional actual malice."  FAC ¶ 249.  But actual malice has nothing to do with a specific intent to cause harm (as required to exceed Georgia's cap on punitive damages). Instead, "actual malice" means "knowledge that [a challenged statement] was false or [] reckless disregard of whether it was false or not."  *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 280 (1964).  Actual malice "is different from common law malice which reflects whether the statement itself is 'calculated to injure'" or made "with the specific intent to cause [plaintiff] harm."  *Simon*, 895 F.2d at 1320; *Masson*, 501 U.S. at 510 ("Actual malice under the *New York Times* standard should not be confused with the concept of malice as an evil intent or a motive arising from spite or ill will."); *Harte-Hanks Commc'ns*, 491 U.S. at 667 n.7 (1989) ("The phrase 'actual malice' . . . has nothing to do with bad motive or ill will.").  Thus, even if Dr. Amin can establish actual malice at trial—and he cannot—such a finding is entirely irrelevant to whether NBCU acted with the specific intent to harm him.

Further, Dr. Amin has not proffered any evidence during discovery to show that NBCU acted with the specific intent to cause harm or with any ill will toward him.  Rather, the

uncontroverted evidence shows just the opposite: the reporters responsible for the challenged News Reports had never even heard of Dr. Amin before the Whistleblower Complaint was filed with the government and they began reporting about its allegations. And NBCU reported the stories at issue because they were newsworthy—no different than the countless other news organizations across the political spectrum reporting on the same allegations about Dr. Amin. *See* Dkt. 153-1 ¶¶ 173, 218, 253. Indeed, any contention that NBCU sought to specifically harm Dr. Amin is in direct conflict with the indisputable fact that the challenged "All In" News Report does not even name Dr. Amin or use his image. Similarly, the challenged "The Rachel Maddow Show" News Report does not name or otherwise identify Dr. Amin, except when showing the statement provided by Dr. Amin's lawyer, which itself identifies him.

Because Dr. Amin has never alleged or produced any evidence that NBCU acted with a specific intent to cause him harm, and there is no evidence in this action to support such an argument, punitive damages in this case should be capped at the $250,000 maximum.[14]

### 12. A motion to preclude Dr. Amin from recovering attorneys' fees.

Pursuant to O.C.G.A. § 13-6-11, NBCU submits this motion *in limine* to preclude Dr. Amin from recovering the attorneys' fees he incurred for litigating the present action.

"Generally, an award of attorney fees is not available in Georgia unless authorized by statute or contract." *Horton v. Dennis*, 325 Ga. App. 212, 215 (Ga. App. Ct. 2013) (quoting *Moon v. Moon*, 277 Ga. 375, 379 (2003)). This rule is codified in O.C.G.A. § 13-6-11, which provides that the "expenses of litigation generally shall not be allowed as a part of the damages." The statute includes an exception that allows the recovery of attorneys' fees only in narrow circumstances,

---

[14] If the Court decides to not rule on this issue on this motion *in limine*, NBCU reserves its right to raise this issue at the close of evidence and/or at the charging conference.

"where the plaintiff has specially pleaded and has made prayer therefor and where the defendant has acted in bad faith, has been stubbornly litigious, or has caused the plaintiff unnecessary trouble and expense." O.C.G.A. § 13-6-11. In other words, the plaintiff must satisfy two requirements: *First*, he must "specially plead[]" and "pray[]" for attorneys' fees. *Second*, he must satisfy one of the requisite substantive elements, such as "bad faith."

Here, the Court need look no further than the first requirement, since Dr. Amin did not specifically plead and pray for attorneys' fees in his FAC in the manner contemplated by the statute. Rather, Dr. Amin generically demanded that "all costs of this action be assessed against NBCUniversal." Dkt. 49, Demand for Relief ¶ (d). This generic demand for costs—which does not reference O.C.G.A. § 13-6-11—is not a prayer for attorneys' fees and is not a special pleading setting forth any basis for fees. *See Ahmed v. Air France-KLM*, 165 F. Supp. 3d 1302, 1317 (N.D. Ga. 2016) ("Plaintiffs' pleadings for 'all costs deemed just and proper' do not suffice under the special pleading standards of O.C.G.A. § 13-6-11. . . . [The] Complaint fails to specially plead attorneys' fees, and fails to allege the factual basis for seeking those fees."); *Wilson v. HH Savannah, LLC*, 2022 WL 4473619, at *11 (S.D. Ga. Sept. 26, 2022) (denying fees where complaint "merely prays for 'judgment against Defendants for attorneys' fees and expenses of litigation'; it neither refers to Section 13-6-11 nor alleges facts that would support a recovery of fees under this provision"); *Hammock v. Wal-Mart Stores, Inc.*, 2012 WL 12832385, at *5 (N.D. Ga. July 26, 2012) ("In his Complaint, Plaintiff does not specifically reference section 13-6-11 or the criteria set forth therein, and thus he is not eligible to recover attorney's fees or the costs of litigation as a matter of law." (citation omitted)); *Dep't of Transp. v. Ga. Television Co.*, 244 Ga. App. 750, 752 (Ga. App. Ct. 2000) ("A general request for attorney fees, without reference to OCGA § 13-6-11 or the criteria set forth therein, is not the specific pleading contemplated by the

statute."); *Lines v. City of Bainbridge*, 273 Ga. App. 420, 422 (Ga. App. Ct. 2005) ("Appellants make no reference in their complaint to OCGA § 13-6-11 or the criteria set forth therein as a basis for their claim for attorney fees. Thus they have not adequately pled for such an award under the statute."); *Rowell v. Rowell*, 212 Ga. 584, 584 (1956) ("award of attorney's fees was clearly erroneous" where claimant did "not pray for the award of attorney's fees"). Accordingly, Dr. Amin cannot satisfy the first requirement of O.C.G.A. § 13-6-11 and for this reason alone, his new demand for legal fees should be precluded.

Looking to avoid this conclusion, during conferrals between counsel, Dr. Amin claimed that attorneys' fees were part of his request for damages because he was required to bring this lawsuit to restore his reputation. But, if the Court were to accept Dr. Amin's theory, it would render O.C.G.A. § 13-6-11—including its broad pronouncement that "expenses of litigation generally shall not be allowed as part of the damages"—completely meaningless in defamation actions. In essence, any time a plaintiff sought to recover damage to his reputation, which is the very nature of a defamation action, attorneys' fees would necessarily be included in the damages calculation. Clearly, such a result is not contemplated by Georgia law.

Further, even if Dr. Amin's FAC could be read to have properly pled attorneys' fees (and it cannot) there is no dispute that Dr. Amin cannot meet the second prong of O.C.G.A. § 13-6-11—that NBCU acted in "bad faith, has been stubbornly litigious, or has caused the plaintiff unnecessary trouble and expense." "Bad faith requires more than bad judgment or negligence. Rather, it imports a dishonest purpose or some moral obliquity and implies conscious doing of wrong and a breach of known duty through some motive of interest of ill will." *Powell Co. v. McGarey Grp.*, 508 F. Supp. 2d 1202, 1219-20 (N.D. Ga. 2007) (citation and internal quotation marks omitted). NBCU's publication of news segments about a public Whistleblower

Complaint—no different than countless other news organizations—unquestionably fails to rise to this high standard of "bad faith." And NBCU has not been "stubbornly litigious" or caused Dr. Amin "unnecessary trouble and expense." Nor has Dr. Amin produced any such evidence.

Therefore, due to his failure to meet the requirements of O.C.G.A. § 13-6-11, Dr. Amin cannot recover attorneys' fees.[15]

Dated: December 9, 2024

Respectfully submitted,

_s/ Benjamin H. Brewton_
Benjamin H. Brewton
Georgia Bar No. 002530
Jena C. Lombard
Georgia Bar No. 213734
BALCH & BINGHAM LLP
801 Broad Street, Suite 800
Augusta, GA 30901
Tel.: (706) 842-3700
bbrewton@balch.com
jlombard@balch.com

_s/ Elizabeth A. McNamara_
Elizabeth A. McNamara
(admitted _pro hac vice_)
Amanda B. Levine
(admitted _pro hac vice_)
Leena Charlton
(admitted _pro hac vice_)
DAVIS WRIGHT TREMAINE LLP
1251 Avenue of the Americas, 21st Floor
New York, NY 10020-1104
Tel.: (212) 489-8230
lizmcnamara@dwt.com
amandalevine@dwt.com
leenacharlton@dwt.com

_Attorneys for Defendant_
_NBCUniversal Media, LLC_

---

[15] If the Court decides to not rule on this issue on this motion _in limine_, NBCU reserves its right to raise this issue at the close of evidence and/or at the charging conference. NBCU also reserves its right to argue that Dr. Amin failed to show bad faith or any other substantive basis for an award of attorneys' fees.

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on the 9th day of December, 2024, a true and correct copy of the foregoing document was served upon all counsel of record via the Court's electronic filing system:

<u>*s/ Elizabeth A. McNamara*</u>
Elizabeth A. McNamara
(admitted *pro hac vice*)
DAVIS WRIGHT TREMAINE LLP
1251 Avenue of the Americas, 21st Floor
New York, NY 10020-1104
Tel.: (212) 489-8230
lizmcnamara@dwt.com

*Attorneys for Defendant*
*NBCUniversal Media, LLC*